IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Barbara E. Varner, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No.: 1:CV 01-0725 |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Ninth Judicial District, Cumberland | : | **JURY TRIAL DEMANDED** |
| County, and Cumberland County | : | |
| and S. Gareth Graham, Individually, | : | **JUDGE YVETTE KANE** |
| and Joseph Osenkarski, Individually, | : | |
| Defendants | : | |

## BRIEF IN SUPPORT OF

## MOTION FOR SUMMARY JUDGMENT

## FILED BY CUMBERLAND COUNTY

# TABLE OF CONTENTS

**Page**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     i

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     ii

I.     Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

II.     Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     13

    A.     Cumberland County is not Varner's employer for purposes of
           Title VII liability nor is it a joint employer with the court . . . . . . . .     13

    B.     <u>Graves v. Lowery</u> has been overruled sub silentio by the Supreme
           Court decisions in Faragher and Ellerth.. . . . . . . . . . . . . . . . . . . . .     23

III.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     30

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     31

## TABLE OF CITATIONS

| Citation | Page |
|---|---|
| Allen v. Amtrak, 90 F. Supp. 2d 603, 610 (E.D. Pa. 2000), aff'd 254 F.3d 1077 (3rd Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| Andrews, 892 F.2d at 1486 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 25 |
| Andrews v. Philadelphia, 895 f.2d 1469, 1486 (3rd Cir. 1990) . . . . . . . . . . . . . . | 28 |
| Beckert v. AFSCME, 425 A.2d 859 (Pa. Cmwlth. 1981). . . . . . . . . . . . . . . . . . . | 15 |
| Bonenberger v. Plymouth Township, 132 F.3d 20, 26 (3rd Cir. 1997) . . . . . . . . . . | 28 |
| Bouton v. BMW, 29 F.3d 103, 110 (3rd Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . | 27 |
| Bradley v. PLRB, supra . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 17 |
| Brown v. Taylor, 494 A.2d 29, 34 (Pa. Cmwlth. 1995) . . . . . . . . . . . . . . . . . . . . | 22 |
| Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . | 2, 23, 24, 25, 26, 27, 28, 29 |
| Callahan v. Pennsylvania, 207 F.3d 668, 669 (3rd Cir.2000) . . . . . . . . . . . . . . . . . . | 17 |
| Commonwealth v. PLRB, 681 A.2d 157, 160 (Pa. 1996). . . . . . . . . . . . . . . . . . . . . | 20 |
| County of Washington v. PLRB, 364 A.2d 519, 525 (Pa. Cmwlth. 1996). . . . . . . . . | 22 |
| Court of Common Pleas of Erie County v. PHRC, 682 A.2d 1246 (Pa. 1996) . . . . . | 16 |
| Dougherty v. Henderson, 155 F. Supp. 2d 269, 281 (E.D. Pa. 2001) . . . . . . . . . . . . | 26 |
| Dowling v. Home Depot, 2002 U.S. Dist. Lexis 25270 (E.D. Pa. 2003) . . . . . . . . . | 28 |
| Ellenbogen v. County of Allegheny, 388 A.2d 730 (Pa. 1978). . . . . . . . . . . . . . . . . | 17 |
| Eshelman v. Commissions of Berks County, 436 !.2d 710 (Pa. Cmwlth. 1981) . . . . | 21 |
| Faragher v. City of Boca Raton, 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . | 2, 23, 24, 25, 26, 27, 28, 29 |

First Judicial District of Pennsylvania v. PHRC, 727 A.2d 1110 (Pa. 1999) . . . . . . .     16, 17

Graves v. Lowery, 117 F.3d 723 (3rd Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     14, 18, 19, 20, 21, 23, 26, 28, 29

Harris v. L & L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997). . . . . . . . . . . . . . . .     28

Jakomas v. McFalls and the County of Allegheny, 229 F. Supp. 2d 412
   (W.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16, 17, 18,

Jeffries v. Delotte Touche Tohmatsu International, 893 F. Supp. 455,
   459 (E.D. Pa. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

Judge's v. County of Washington, 548 A.2d 1306 (Pa. Cmwlth. 1986) . . . . . . . . . .     22

Kay v. Independence Blue Cross, 2003 U.S. Dist. Lexis 8521 (E.D. Pa. 2003) . . . .     27, 28

Knabe v. Boury Corp., 114 F.3d 407, 412 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . .     25

Knabe v. Boury Corp., 114 F.3d 407, 414 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . .     25

Kunin v. Sears Robuck and Company, 175 F.3d 289, 295 (3rd Cir. 1999). . . . . . . . .     25, 27

Lehigh, supra, at 1327 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     20

Matter of Antolik, 501 A.2d 697 (Pa. Cmwlth. 1985) . . . . . . . . . . . . . . . . . . . . . . . .     20

Spain v. Gallegos, 26 F.3d 439, 447 (3rd Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . .     19

Sweet v. PLRB, supra. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     20

United States v. Orleans, 425 U.S. 807 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

Velacquez v. Valu-Plus, 2003 U.S. Dist. Lexis 7960 (E.D. Pa. 2003) . . . . . . . . . . .     25, 26,

Watson v. City of Philadelphia, 638 A.2d 489 (Pa. Cmwlth.1994) . . . . . . . . . . . . .     18

Weston, 251 F.3d at 427 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Barbara E. Varner, | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | **No.: 1:CV 01-0725** |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Ninth Judicial District, Cumberland | : | **JURY TRIAL DEMANDED** |
| County, and Cumberland County | : | |
| and S. Gareth Graham, Individually, | : | **JUDGE YVETTE KANE** |
| and Joseph Osenkarski, Individually, | : | |
| **Defendants** | : | |

**BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

I.    **STATEMENT OF THE FACTS**

Barbara Varner filed this action for:

    a.    Acts of unlawful discrimination by Cumberland County and the Ninth Judicial District, which is better known as the Court of Common Pleas of Cumberland County, based upon her sex, female, and that she has been treated differently than male individuals. Complaint, ¶39.

    b.    For sexual harassment which has been repeated, pervasive and severe enough to constitute a hostile work environment. Id.

    c.    For being the victim of retaliation for making complaints of discrimination.

Her complaint alleges that she is an employee of the County because the County pays her, she works under the County's personnel policies, has a County identification badge, and has been referred to the County's personnel office to make complaints of discrimination. Complaint, ¶ 10.

The Complaint alleges that she is an employee of the Court "to the extent that the Court has the statutory authority to hire, discharge and supervise her." Complaint, ¶ 11.

If the Court permits this case to go to trial, the case will focus on a simpler, more fundamental issue: Whether Varner and her alleged harasser, Gary Graham, betrayed each other and their spouses by entering into a years' long adulterous relationship that included adulterous sex shortly after Varner's own honeymoon and whether the break-up of this relationship by Graham has prompted this Complaint by a vengeful and rejected female adulterer.

The evidence to support the existence of the adulterous relationship is persuasive but is disputed.

However, the undisputed evidence shows that the County, is entitled to summary judgment as a matter of law because it did not employ Varner and because it met all of the requirements imposed on employers and putative "joint employers" by the Supreme Court's seminal decisions in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1988) and <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998).

At one time Varner was an employee of Cumberland County. She was hired by Children and Youth Services in 1989 as a case worker trainee. SMF 16[1]

Varner first met Gary Graham of the Cumberland County Probation Department in early 1990. SMF 17. The two shared several cases together. Graham was helpful to her when she needed assistance with difficult or violent male individuals. SMF 18.

Varner described her relationship with Graham from 1990 to 1994 as a cordial working relationship. SMF 21.

In the summer of 1994, Graham told Varner the Probation Department needed two females with social work field experience and asked her whether she was interested

---

[1] "SMF" refers to Cumberland County's Statement of Undisputed Material Facts.

in working in the Probation Department. SMF 22. Co-Defendant, Joe Osenkarski, also urged Varner to apply for that position in the Probation Department. SMF 23. Varner did apply and understood that in all likelihood, Defendant Graham would be responsible for training her. SMF 25.

When she joined the Probation Department, she understood that the President Judge of the Cumberland County Court of Common Pleas was the person ultimately in charge. She described herself and her co-probation officers as "officers of the court." SMF 26. Varner agrees that the President Judge has the ultimate authority over probation officers and that the Chief of Probation reported to the President Judge for "hiring, firing, those kinds of things." SMF 27.

Varner became an official probation officer in February 1995.

Graham's deposition describes sexual encounters with Varner beginning on Valentine's Day 1992 and further describes intimate details regarding Varner's body and personal life that would be known only to someone physically intimate with her. Varner, who denies the affair, nonetheless admits she had no problem with Graham when she first began in Probation. SMF 28. Specifically, she had no episodes of Graham losing his temper with her or screaming at her although she acknowledged that he exhibited that sort of conduct towards other people. SMF 31. Her problems with Graham began after Graham testified he ended the adultery in October 1996.

Varner contends that at a professional conference in State College in October 1996, Graham knocked on her hotel door and she declined to answer. Graham then called her room. She answered the phone. Graham wanted to come in but Varner said she was studying. Although Graham did not come to Varner's door, Varner describes

this as an act of sexual harassment. SMF 42. Graham on the other hand describes this as the last occasion when they had sexual intercourse as part of their long term adultery and that upon his refusal to spend more time with her, she left the conference in annoyance.

After this Graham began to scream at her and use the word "fuck" in her presence. Graham told her and another female co-worker that they had lied about the hours they had put in on a commitment trip and had overstated their time by one hour. Graham would put his finger near her face and tell her that "you don't know what the fuck you are doing." SMF 37. However, the word "fuck" is a word that does not shock Varner by her own admission. SMF 38.

Although Varner agrees she knew that the President Judge had the ultimate authority over Probation Officers and that she was "an officer of the court", Varner was cognizant that a County policy existed that prohibited sexual harassment or discrimination. This policy contained a published complaint procedure. SMF 54. There is no evidence in the record that the Probation Office or the Court had any published policy regarding sexual harassment.

After more instances where Graham allegedly screamed at her and made some sexually oriented comments in front of her, and after certain instances over a period of years where she heard that Osenkarski had made off-color remarks, Varner finally, on April 25, 1997, filed a written memorandum of complaint pursuant to the County's sexual harassment and discrimination policy – the only policy with which she was familiar. SMF 94. Varner agrees that her complaint resulted in an investigation by the County and that as a consequence of her complaint, on June 13, 1997, Osenkarski

removed Graham from any authority over responsibility concerning her employment. SMF 95.

In fact, Varner agrees that as part of the investigation process that followed her complaint, she was interviewed and permitted to describe in detail the facts and circumstances of her employment that she felt violated her rights. SMF 96. Varner also knows that on July 11, 1997, then President Judge Harold Sheeley, issued a three day suspension to Gary Graham as a consequence of the investigation initiated by her complaint. SMF 97.

Varner was unhappy that Graham had only received a three day suspension from the Court and therefore filed a formal charge of discrimination with the EEOC on July 21, 1997. SMF 101.

Varner wrote an EEOC official a letter which stated, in part:

> I am a <u>Court worker</u> and have had to go directly to you after (Human Relations) denied being able to help. SMF 98. (Emphasis supplied).

Varner agrees that some months subsequent to her EEOC Complaint, and after she had lodged further hostile work environment complaints, the new President Judge, George Hoffer, transferred Graham from a position in the Courthouse to a position in the County Prison which eliminated all contact between the former adulterers. (Although Varner continues to deny the adultery). SMF 102.

Her later complaints stem from longstanding problems she experienced since her affair with Graham relating to Graham's wife, Barbara Graham, also a Court employee. Mrs. Graham works in the Courthouse as a court reporter for Judge Hess. SMF 106. Varner contends that in 1999, Mrs. Graham approached her in the parking lot. Mrs. Graham called her a liar, said she had an affair with her husband, and said that everyone

in the Courthouse knew Varner was a liar. Varner called the Carlisle Police and had Mrs. Graham charged with harassment. Mrs. Graham was subsequently acquitted of that charge by a district justice. SMF 106.

Varner complains that on a previous occasion, Mrs. Graham jeered at her with narrowed eyes and clenched teeth. SMF 107. On another occasion, Mrs. Graham committed the offense of staring at her. SMF 108. While if Mrs. Graham believed Varner was her husband's adulterous partner, this conduct is reasonable, Varner labels it sexual harassment.

In 1998, during a period of Courthouse remodeling, Mrs. Graham worked in the third floor annex of the Courthouse. A portion of the Probation Department also worked in the third floor annex during this time. Varner testified that Osenkarski relayed to her that Judge Hoffer said Varner was not allowed into that area of the Courthouse because Mrs. Graham was present and was bothered when Varner walked in there. Two days later, Varner contends that Judge Hoffer personally told her she was not allowed to go into that area of the Courthouse at all because "Mrs. Graham was going to have a breakdown if I didn't stay out of there." Varner told Judge Hoffer that the area of the Courthouse was a public office and that she had business there and it was not fair to restrict her from that area. Varner contends that Judge Hoffer nonetheless continued to restrict her access to a public area. SMF 117-118.

Varner contends that Judge Hoffer's order restricting her from being near Mrs. Graham's work site – even though Mrs. Graham genuinely believed that Varner had been sleeping with her husband for years – violates Title VII.

This was ultimately brought to the attention of Dan Hartnett, the County's Director of Personnel. Varner told him if she needed things from the office Barbara Graham was stationed in, someone was to get them for her. Varner found this unreasonable. Upon Varner's complaint to him, Hartnett approached Judge Hoffer. Hartnett specifically told Hoffer that this restriction placed on Varner was not correct. Hartnett felt it was his job to let the Judge know Varner's feelings and to advise the Judge that this situation, i.e., restrictions on Varner's access to parts of the Courthouse, should stop. SMF 309. Nonetheless, according to Varner, she still remains restricted from that area of the Courthouse by Judge Hoffer's order even today.

If there is a trial the evidence will show that Mrs. Graham is the true victim of this sordid mess. Varner continues to obsess with her and labels her as "in cahoots" with her husband to falsely protray to the Court the existence of an "ugly" adulterous relationship. Varner described her July 11, 1997 conversation with Judge Sheely before Sheely made any decisions about Graham's future. Varner described the conversation as follows:

> So I walked into the Judge's chambers with him and he proceeded to tell me that Mr. Graham and his wife and Attorney Dave Foster had come to him, I believe it was the day before, I believe, that they had, Mr. Graham confess to this alleged affair (with Varner) to Judge Sheely. Judge Sheely told me that he felt sorry for them, that I had ruined their family.

> And I explained to Judge Sheely that it was all an orchestrated thing, because up to that point, as far as I know, this alleged affair had never come up during the whole investigation into anybody else. And I said to Judge Sheely, if you were a man, would you confess in front of public, would you confess in front of a Judge, in front of an attorney, or wouldn't you be more discreet and tell your wife at home and then handle it.

> I felt it was a ploy, because I knew Barb Graham had

> worked with Judge Sheely. He had basically a tender
> spot for Barb Graham. And I said to the Judge, it
> did not happen. And he said, well I am telling you,
> it was just horrible, they were both crying. And just,
> you can tell he had been, it had been emotional for
> Judge Sheely. SMF 119.

After Sheely's retirement, Varner met with new President Judge Hoffer in January 1998. Hoffer asked Varner what she would like to see done. Varner stated: "I don't think the two men (Graham and Osenkarski) should ever supervise females again. Ideally, I would like to have them fired. He said he would look into it." SMF 120. Two months later, Judge Hoffer removed Graham from the Courthouse and banished him to the county prison at a loss in salary. At the prison he has no contact with Varner.

It is undisputed that the County thoroughly investigated Varner's claims of sexual harassment and discrimination. Dan Hartnett was the County's Personnel Director until early October 1998. Hartnett has considerable experience and training in sexual harassment issues through both graduate school training and his earlier position as a senior union leader for AFSCME. SMF 296.

Hartnett recalls that upon learning of Varner's complaint, he contacted either the County Solicitor, Hank Johnson, or his partner, Dave Deluce. He was told to ask Varner to put her allegations in writing. SMF 298.

Hartnett asked the County Solicitor to engage someone to investigate Varner's complaints. Attorney Deluce was selected.

Hartnett's protocol regarding the investigation was to direct the interview of all people involved. By the "all people involved", Hartnett means people identified by Varner as having knowledge of the sexual harassment. Additionally, Hartnett directed the interview of anybody mentioned by Defendants Graham and Osenkarski as

individuals who could substantiate their contrary version of the facts. Hartnett sat in on all of the interviews. SMF 300.

At the time, Hartnett found Varner credible. He did not find either Graham or Osenkarski credible. Hartnett thought Graham should be fired because the investigation had substantiated Varner's allegations. He did not believe Osenkarski should be fired but thought he should be asked to retire after a brief suspension or reprimand. SMF 304.

Hartnett recalled a meeting with Judge Sheely in July 1997. The Judge told him Graham would be transferred to Adult Probation. Hartnett recalls that in this meeting, he asked if he could relay this information to Varner. Hartnett thought this would probably satisfy Varner. He told Judge Sheely that because the problem had been going on for a while he wanted to talk to Varner and tell her it would be resolved. Sheely told him to go ahead and speak with Varner. Hartnett relayed to Varner the information that Graham was being transferred out of Juvenile Probation. Varner expressed satisfaction to him and Hartnett assumed that would conclude the case. SMF 305-306.

Judge Sheely ultimately moderated the punish after Graham confessed to the adulterous relationship with Varner.

Of considerable importance to the County's investigation, it is clear that Graham never acknowledged to Hartnett or Deluce that he had engaged in an adulterous affair with Varner. In fact, Hartnett did not learn about the adultery until April 2003, five years after his retirement. SMF 307.

Deluce, who participated in the investigation, is trained in the law of sexual harassment. Deluce recalls meeting with Varner, obtaining her verbal statement and asking her to put her charges in writing which she did. Varner provided names of the

9

people who should be interviewd.  Deluce and Hartnett met with all of those people and
with Osenkarski and Graham.  There were times when they met with an individual twice
as more facts came out and they wanted to re-verify various allegations.  Deluce
described this as an ongoing process that started in April 1997 and continued into June
1997 when Deluce's role in the investigation terminated.  SMF 312-313.

Deluce, like Hartnett, noted that Graham specifically denied that he had a sexual
relationship with Varner.  As part of his interviews, Graham told Deluce that Graham
disagreed with what some witnesses were saying and that those witnesses were lying.
Graham told him he had documents that would prove he (Graham) was right but Graham
would not give those documents to Deluce although Deluce asked for copies.  SMF 317.

Deluce testified that he first learned of Graham's confession of adultery after his
role in the investigation of a sexual harassment case had terminated.  He testified that had
he been aware of that during his investigation, he would have researched legal cases
involving adulterous relationships between employees and would have expanded the
scope of his investigation.  SMF 318.

Deluce kept a private report which he had not intended to turn over to the County.
The Court granted Varner's Motion to Compel production of this document, which the
County claimed was privileged attorney work product.  That report changed as his
interviews progressed.  Two copies of the report dated 4/30/97 and 6/4/97 are part of the
record in this case.  SMF 321-322.  In the April report, Deluce identifies what in his
opinion is actionable conduct by Osenkarski and Graham and recommends that at a
minimum they be suspended and that termination be considered since, absent

termination, "I don't expect the activity to cease and retaliatory conduct may continue." SMF 321.

By the end of his investigation, Deluce comments primarily on the poor management that exists in the Juvenile Probation Department and his focus on sexual harassment, based on additional interviews, is markedly reduced.  SMF 322.

The County Solicitor removed this report from Deluce's file without Deluce's knowledge and gave it to the Court.  In his accompanying letter, Solicitor Hank Johnson on 6/26/97 made the following recommendation on behalf of the County:

> At a minimum, Osenkarski should retire and Graham should
> be removed from any supervisory position.  Such action
> will mitigate the County's damages.  Unless the recommended
> action is taken, the County's knowledge of the allegation
> and the facts surrounding same will probably expose the
> County to liability for damages and punitive damage claims.
> Since the alleged conduct of Osenkarski and Graham is in
> violation of County policy, any liability imposed on them,
> including punitive damages, will probably not be covered
> by County insurance.  Clearly, punitive damages
> imposed upon them would not be covered nor would
> the County be responsible to pay same.  The probabilities
> are that both Osenkarski and Graham would have to
> get their own attorneys.
>
> We believe it is imperative that the recommended action
> be taken.
>
> Because it is the Court that hires, fires and manages the
> Probation Department, it is incumbent upon the
> County to provide the Court with a copy of this letter,
> a copy of the confidential attorney impressions
> memorandum, and a copy of the summary that I
> started to prepare.  By doing this, we have provided
> the Court with all of the information and recommendations.
> Given the fact that no action has been taken by the
> Court to date, a failure of the County to provide
> said information to the Court could be deemed a

negligent action by the County.

SMF 323.

John Ward was the Chief Clerk of Cumberland County during the Varner investigation. The Chief Clerk of a County is the County's highest ranking non-elected official and essentially operates as the chief executive for the County reporting only to the County Commissioners. SMF 277. Ward stated that the County did not exercise any authority over the Probation Department. Other than providing funding for the Department, Ward, whenever he received a complaint about any aspect of the operation of the Probation Department, would simply forward that complaint to the President Judge who would dispose of the complaint in any way that he wanted. SMF 278.

Ward believes the County investigated the Varner sexual harassment charges because historically the County's Human Relations Department dealt with issues concerning Courthouse personnel and those matters would only go to the President Judge when they could not be resolved by the Human Relations Department. SMF 279.

Ward's recollection is that Deluce provided to him initially an oral report that essentially said Osenkarski and Graham were both guilty of sexual harassment and that Graham was completely running the Probation Department. Deluce recommended that both Graham and Osenkarski should be fired. SMF 282. Hartnett and Ward concurred in Deluce's recommendation because they were concerned actual sexual harassment had occurred and they were equally concerned with Deluce's conclusion that the Juvenile Probation Department was being managed in an extremely poor manner. SMF 283.

Ward recalls a meeting with Judge Sheely where the County recommended that both Graham and Osenkarski should be fired and that Sheely should not be given a copy

of Deluce's investigation report. Sheely insisted upon receiving a copy. At the end of

the meeting, however, Ward was confident Sheely was going to discharge Graham and

Osenkarski. SMF 287.

Ward believes that Judge Sheely rescinded this discipline because Graham

confessed to Sheely his long term adulterous relationship with Varner. To Ward it was

very clear that it was the acknowledgement of the affair to Judge Sheely by Graham that

softened the Judge's previously expressed intent to discharge both Graham and

Osenkarski. SMF 288, 290.

Later, when Judge Hoffer became President Judge, Ward again renewed the

County's recommendation to him. Judge Hoffer, however, did not discharge Graham.

Because the County was completely without any power to intervene in the supervision

and discipline of Court employees, Ward had no alternative but to accept the decision of

President Judges Sheely and Hoffer. If the County had any decision-making authority in

this regard while Ward was Chief Clerk, both Graham and Osenkarski would have been

terminated. While Graham's subsequent revelations about his sexual escapades with

Varner left Ward uncertain as to Varner's veracity, the management issues described to

Deluce by other probation officers during his inquiries left Ward no doubt that from the

managerial standpoint alone, the department would be better off without Osenkarski and

Graham. SMF 294.

## II.    ARGUMENT

### A.    CUMBERLAND COUNTY IS NOT VARNER'S EMPLOYER FOR PURPOSES OF TITLE VII LIABILITY; NOR IS IT A JOINT EMPLOYER WITH THE COURT.

The Third Circuit set forth a test for determining whether two entities could be considered "joint employers" under Title VII in the 1997 case of <u>Graves v. Lowery</u>, 117 F.3d 723 (3rd Cir. 1997). At first blush, <u>Graves</u> appears similar to this case. However, careful examination of <u>Graves</u> and subsequent decisions within the Circuit demonstrates that here no joint employer relationship exists and the County therefore should be dismissed from this case for a matter of law.

In <u>Graves</u>, the Court was presented with a Title VII case brought by seven former clerks against their Judge, the Supreme Court of Pennsylvania and Dauphin County. The Court was asked to determine, under the unique circumstance as it existed in Pennsylvania, whether a County who paid the salaries of the clerks could be considered their employer when under the unified judicial system they were formally considered to be employees of the Court. <u>Id</u>. at 724. The Court ultimately determined that the clerks were not precluded from bringing suit against Dauphin County as their joint employer.

In so finding, the Court stated that for purposes of Title VII, the proper inquiry for determining employment status looks to the nature of a relationship regardless of whether or not the party could technically be described as an employer. <u>Id</u>. at 728. This means that the level of control that an organization has over a particular employee with respect to access and denial of employment becomes a key factor in determining whether or not the organization is an employer. <u>Id</u>. at 728.

The initial point that should be made with respect to <u>Graves</u> is that the Third Circuit's analysis does not unequivocally state that a county is always a joint employer for purposes of Title VII and therefore is always liable for any alleged employment discrimination committed by the court. Rather, the Court merely noted that there were

14

facts which, if proven, made the employment relationship ambiguous enough for that question to go to the jury. Id. at 729.

The facts the Court emphasized were that (a) the County hired the clerks, (b) they were County employees, (c) they were covered by the County's personnel policies, (d) they made their initial complaints to the County, which investigated them, and (e) they were subject to termination by the County. (Emphasis added). Id. at 724-725. Of particular note, in that case, the District Justice for whom the employees worked fired them. The County actually refused to acknowledge the District Justice's termination decision, and instead transferred the employees to other positions that were clearly within the County.

Given this rather remarkable set of circumstances, the conclusion that a joint employer relationship could exist is not unreasonable. However, it would be unreasonable to make that decision in this case, where termination powers were not vested on the County. Accordingly, Graves is distinguishable.

There have been numerous cases within this Circuit that discuss the anomalous relationship between the Court system and County government, particularly as to whether Court employees can assert claims against their County for various alleged wrongdoings.

The power of the judiciary to make employment decisions about its own employees – to hire, to fire and to supervise – flows directly from the doctrine of separation of powers embodied in Article V, Section I of the Pennsylvania Constitution. Beckert v. AFSCME, 425 A.2d 859 (Pa.Cmwlth. 1981). It is the bedrock of judicial independence and the touchstone of Pennsylvania jurisprudence whenever the Court's independence is at issue. Id.

The Pennsylvania Supreme Court relied on this principle in a pair of recent decisions that rejected the jurisdiction of the Pennsylvania Human Relations Commission over employment discrimination claims filed by court employees.  In First Judicial District of Pennsylvania v. PHRC, 727 A.2d 1110 (Pa. 1999), the court concluded that directing a court to act or not to act on a personnel matter is interference with the operation of the courts prohibited by the separation of powers doctrine; in Court of Common Pleas of Erie County v. PHRC, 682 A.2d 1246 (Pa. 1996), the court reasoned that "in order to carry out the duties delegated to the judiciary by the constitution, the courts must retain the authority to select the people who are needed to serve in judicial proceedings and to assist judges in performing their judicial duties."

Therefore, in a new case involving the recently notorious Judge McFalls of Allegheny County, Jakomas v. McFalls and the County of Allegheny, 229 F.Supp. 2d 412 (W.D. Pa. 2002), the Court held that a common pleas judge could not be sued for violating the Whistle Blower Law since there would be no means of enforcing the relief granted by that law, because the Judge has the exclusive right to hire or discharge his employees.  Interference with the Judge's prerogative would contradict the multiple Pennsylvania cases which have consistently emphasized that a judge and only a judge can hire, supervise or discharge court employees.  Id. at 424.

Judge McFalls' staff members sued not only the Judge but Allegheny County as well for the Judge's misconduct.  Allegheny County argued that it could not be a party to the Whistle Blower suit because it had no policy creating authority over the Judge's decision to fire his staff.

In a companion action pursuant to 42 USC § 1983 the discharged staff members argued that the Judge was acting as a policy maker for Allegheny County when he discharged them. This position was found to be totally without merit. As the Court noted under Pennsylvania law, Pennsylvania trial courts are part of the unified judicial system of the Commonwealth of Pennsylvania and are under the direct supervision of the State Supreme Court. In Pennsylvania, Judges retain the right to hire, discharge and supervise court personnel. Bradley v. PLRB, supra; Ellenbogen v. County of Allegheny, 388 A.2d 730 (Pa. 1978); Callahan v. Pennsylvania, 207 F.3d 668, 669 (3rd Cir. 2000); First Judicial District of Pennsylvania v. PHRC, 727 A.2d 1110 (Pa. 1999) (holding that "the Supreme Court has the sole power and the responsibility to supervise "the practice, procedure and the conduct of all courts").

Accordingly, under Pennsylvania law it is clear that the Supreme Court and not the County has the sole authority over the conduct of the common pleas courts and its personnel. Therefore, a common pleas judge cannot be acting as a policy maker for a county when he hires, discharges or disciplines his own employees. Jakomas, supra, at 429. The Section 1983 claim was thus dismissed.

The Whistle Blower Law claim was disposed of under a similar rationale. Judge McFalls' staff members could not sue the County under that law because the County was not their employer and the Judge was not the County's agent. "Under Pennsylvania law, the County had no authority to hire, supervise or discharge the Plaintiffs in this case, who were each members of Judge McFalls' personal staff. [Citations omitted]. Judge McFalls, alone, had that power and he was not acting as a policy maker or agent for

Allegheny County when he exercised it and discharged his staff.  The Court held that the Plaintiffs failed to state a claim under the whistle blower law.  Id. at 431.

In Jakomas, Plaintiffs attempted to defeat Allegheny County's Motion by ignoring the impressive array of authority cited by the Court and relying instead on the single case of Graves v. Lowery, supra.

The District Court had little difficulty dismissing this argument with a touch of contempt.  The Court made no attempt to address the logic of the Graves decision.  Since Graves was a Third Circuit Decision, the District Court could not pronounce it erroneous but it could pronounce it "simply irrelevant" which is exactly what it did.  Id. at 429.[2]

Other than Graves, supra, there does not appear to be any other decision within this Circuit holding that, under the unique situation presented with Pennsylvania common pleas courts and the counties in which they reside, the court and county are "joint employers."  Indeed, the logic of Graves has resulted in no substantially similar holdings and the recent decision in Jakomas held that it is "simply irrelevant".  To say that Graves is relevant only because it is a Title VII is disingenuous at best.  Jakomas was, inter alia, a Whistle Blower suit.  Pennsylvania courts employ in  Whistle Blower suits the same burden shifting analysis and provide fundamentally the same remedies as found in Title VII jurisprudence.  See Watson v. City of Philadelphia, 638 A.2d 489 (Pa. Cmwlth. 1994).  Graves is a case decided on bad facts which should be limited to the unique situation present in there and which are clearly not presented in this case or anywhere

---

[2] Of interest, the lawyer representing Judge McFalls in Jakomas was Taylor Williams, Esquire, who ably represents the Court of Common Pleas of Cumberland County in the case at bar.  There is no indication in the Jakomas decision that the Court there opposed Allegheny County's Motions to Dismiss or in any way
supported a "joint employer" theory.

18

else. Specifically, the County in <u>Graves</u> exercised authority over the hiring and firing decisions regarding the employees, while in this case the Court disregarded the Counties' recommendations and refused to terminate Graham or Osenkarski.

A more intensive review of <u>Graves</u> explains why this logic is persuasive. The County can be held liable under 42 U.S.C. § 2000(e) only where Varner can prove that the County employed her. Without proof of an employer/employee relationship, there is no basis for finding the existence of a respondeat superior relationship, which is a necessary element under Title VII. <u>See</u>, e.g., <u>Spain v. Gallegos</u>, 26 F.3d 439, 447 (3rd Cir. 1994). In determining whether or not the County is an employer sufficient to impose liability, the Court will generally analyze the circumstances of the relationship under agency law. <u>Jeffries v. Delotte Touche Tohmatsu International</u>, 893 F.Supp. 455, 459 (E.D. Pa. 1995). An analysis under agency law will take into account the totality of the circumstances, although the greatest weight will be placed on the right of the "hiring party" to control the manner and means of the work of the employee. <u>Id</u>. Other factors to be considered include the right to assign additional duties, the discretion over hours, whether the work is the regular business of the hiring party, the means of employment, and the skill required in the employment. <u>Id</u>. <u>However, where the primary interaction between the alleged employer/employee is in the exchange of payment for work performed, an agency relationship does not exist on the basis of this fact alone.</u> <u>United States v. Orleans</u>, 425 U.S. 807 (1976). (Emphasis supplied).

The case at bar does present a unique situation, limited to Pennsylvania, where it is clear that Varner and Defendants Graham and Osenkarski are clearly employees of the judicial system, yet are paid by the County in which the Court/employer sits. Under

Pennsylvania law, with respect to employees of the judicial system specifically, the power to appoint personnel necessary to the functioning of the judiciary is inherent in the judicial power. See, e.g., Sweet v. PLRB, supra. "Since the court has the inherent right to hire, discharge and supervise, an employer/employee relationship exists by definition between the Judges and their appointees."

Probation officials, such as the Plaintiff and Defendant in this case, fall within the category of judicial personnel. The legislature has defined probation officers as personnel of the unified judicial system and "of the Commonwealth, and they are appointed by the Judges of the Court of Common Pleas in each judicial district. See Matter of Antolik, 501 A.2d 697 (Pa. Cmwlth. 1985); Pa.C.S. §102. The Pennsylvania Supreme Court holds that probation officers are "court employees." Commonwealth v. PLRB, 681 A.2d 157, 160 (Pa. 1996).

The Court has held that the fact that the counties pay the salaries of judicial employees does not change the Court's employer status. See Lehigh, supra, at 1327. However, despite the fact that general agency law will not find an employment relationship solely on the basis of the fact that an entity pays the salary of the alleged employee, Graves v. Lowery still addressed, under bizarre facts, the joint employer issue for purposes of Title VII litigation.

In Graves, the Court was asked to determine, under the unique circumstance presented, whether a County paid the salaries of judicial clerks could be considered their employer when under the unified judicial system they were formally considered to be employees of the Commonwealth. Id. at 724. In ruling for the Plaintiffs, the Court stated that the proper inquiry for determining employment status looks to the nature of a

relationship regardless of whether or not the party could be technically described as an employer. Id. at 728. Cumberland County completely agrees with this statement of the law. Cumberland County agrees with the Graves' court that this means that the level of control that an organization has over a particular employee with respect to access and denial of employment is the key factor in determining whether or not an organization is an employer. Id. at 728.

The key fact in Graves was that the district justice fired his employees and the County, for inexplicable reasons, but obviously evidencing a desire to control these employees, rescinded their terminations and transferred them to other positions within the County.

Obviously, this is not the factual case presented now. Unlike Graves, no permission is required from the County before the Judge may hire or fire a person in Varner's position. Although Varner responded to the County's sexual harassment policy in the absence of one from the Court, it is clear that the investigation and report resulting from her complaints can only be characterized as a recommendation as to how to rectify the situation. In fact, what makes this case unique is that the County's recommendation was so resoundingly rejected by not one but two different judges. Had the County's recommendation been accepted, this action would never have been brought. Because the County's recommendations were overruled by the Judges, this litigation involving the County has dragged on for several years.

By law, the authority to hire and fire that is vested in the judge and not the county has obvious and critical implications. In Eshelman v. Commissions of Berks County, 436 A.2d 710 (Pa.Cmwlth. 1981), the Court struck down an arbitration award as it applied to

court personnel because it "would operate to take from the judges' decisions which go to the essence of the judges' constitutional power over the hiring, supervisions and discharge of court-appointed employees." Id. at 713.

In Brown v. Taylor, 494 A.2d 29, 34 (Pa.Cmwlth. 1995). The Court ruled that a county could not occur any obligation in connection with the unlawful discharge of a judicial employee notwithstanding the adoption of an employee's code by the county because this would operate to take away the right inherent in the judiciary to control hiring, supervision and discharge of its own employees.

Finally, in County of Washington v. PLRB, 364 A.2d 519, 525 (Pa.Cmwlth. 1996), the Court held that a County's status as a payor of employees at the judiciary could not affect the judiciary's independent "control over important conditions of the employer/employee relationship ... including the right to select the employee, the power to discharge them and the right to direct both their work to be done and the manner in which work shall be done."

The Commonwealth Court has also stated that "County policy cannot impinge upon the inherent supervisory authority of the judiciary." Judge's v. County of Washington, 548 A.2d 1306 (Pa.Cmwlth. 1986).

Under the circumstances of this case, there is no disputed material fact that the Court only has the right to hire, supervise, discipline and fire the employees involved in this case. There is no material dispute that the County was without power to supervise or discharge any judicial employees, including Graham and Osenkarski. As a matter of law, the County could not have disciplined or discharged Graham despite any allegedly improper actions. Indeed, carried to its logical extreme, the County cannot discharge a

court employee even if that employee were observed sexually assaulting another court employee.

Indeed, the fact that here the County did more than it was required to do should not invoke the principle that no good deed goes unpunished. It was simply outside the County's authority to force the Judges to act on its findings and recommendations and this fact, above all, vitiates against any joint employer finding.

**B.     GRAVES v. LOWERY HAS BEEN OVERRULED SUB SILENTIO BY THE SUPREME COURT DECISIONS IN FARAGHER AND ELLERTH.**

Graves v. Lowery was decided one year prior to the Supreme Court's leading decisions for cases involving claims of sexual harassment. In Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held that employers could be automatically liable under the doctrine of respondeat superior for employees who suffer a "tangible employment action." The court also held that where the alleged harasser was a supervisor, but no tangible employment action was involved, the employer would be entitled to raise an affirmative defense to the claim which requires it to show (1) that it exercised reasonable care to prevent and correct promptly any harassment, and (2) that the employee unreasonably failed to take advantage of opportunities provided by the employer to prevent or correct the alleged sexual harassment.

Cases subsequent to Faragher and Ellerth have often focused on that prong of the two affirmative defenses which requires the employer to show that it exercised reasonable care to prevent and correct promptly any harassment.

Faragher and Ellerth are expressly meant by the Supreme Court to correct and unify the conflicting views expressed throughout the various courts of appeals regarding the standards to be employed in sexual harassment cases. Thus, "the disagreement reflected in the careful opinions of the judges of the Court of Appeals reflects the fact that Congress has left it to the Courts to determine controlling agency law principles in a new and difficult area of federal law. We granted certiorari to assist in defining the relevant standards of employment liability." Ellerth at 751. See also Faragher at 784:

> Since our decision in Meritor, Courts of Appeal have struggled to derive manageable standards to govern employer liability for hostile environment harassment perpetrated by supervisory employees. While following our admonition to find guidance in the common law of agency as embodied in the Restatement, the Courts of Appeal have adopted different approaches [citations omitted]. We granted certiorari to address the divergence.

In so doing, the Supreme Court attempted to develop in Faragher and Ellerth, new, clear, and novel rules to provide a uniform system of analysis to be applied nationwide in sexual harassment cases.

The novelty and breadth of the holdings in Faragher and Ellerth therefore require a re-examination of all earlier cases to discern whether they are consistent with or contradict the new sexual harassment jurisprudence articulated by the Supreme Court.

This re-examination is particularly well founded with respect to Graves v. Lowery which as noted, supra, suggested a court and county may, but are not required to be, Title VII joint employers. However, in every other circumstance where the joint employer argument has been raised it has been determined that no joint employer relationship would exist and that the Graves v. Lowery holding, expressly limited Title VII cases, is "simply irrelevant."

24

Cumberland County now argues that by virtue of Faragher and Ellerth, Graves v. Lowery is irrelevant in Title VII litigation as well. Graves v. Lowery did not and could not contemplate the affirmative defense the Supreme Court would create in its new sexual harassment jurisprudence. Subsequent decisions in this Circuit have elaborated on those affirmative defenses and demonstrate circumstances under which the employer will not be held responsible for sexual harassment even though offensive conduct may have occurred.

Perhaps the most persuasive of those cases is Velacquez v. Valu-Plus, 2003 U.S. Dist. Lexis 7960 (E.D. Pa. 2003). In Velacquez, the plaintiff complained about repeated incidents of sexual harassment. She told her manager and the harasser was terminated. Even so, the Plaintiff expressed concerns but continued to work in the same store. The manager offered a transfer which was declined. The employee later stopped coming to work claiming a constructive discharge. Summary judgment was granted for the employer on the following basis:

> The Third Circuit has held that when a plaintiff alleges co-worker harassment, the employer is not liable unless it "knew or should have known of the harassment and failed to take prompt remedial action." Andrews, 892 F.2d at 1486. The remedy provided by an employer is "adequate" if it is "reasonably calculated to prevent further harassment." Knabe v. Boury Corp. 114 F.3d 407, 412 (3rd Cir. 1997). Furthermore, "when an employer's response stops [the] harassment, there can be no Title VII liability." Kunin v. Sears Robuck and Company, 175 F.3d 289, 295 (3rd Cir. 1999).
>
> In this case, Valu-Plus terminated Paris within days of learning about his behavior. There are few employer actions that can be considered more prompt or more calculated to prevent further harassment than immediate discharge of the alleged harasser and, indeed, remedial action short of termination has often been considered sufficient. See Knabe, 114 F.3d at 414 (finding that

25

> taking punitive action against the harassing employee
> is not necessary to insulate the employer from
> liability for a hostile work environment); <u>see</u> also
> <u>Dougherty v. Henderson</u>, 155 F. Supp. 2d 269, 281
> (E.D. Pa. 2001).

In <u>Velacquez</u>, the employer complied with the affirmative defenses established by <u>Faragher</u> and <u>Ellerth.</u>  In unmistakably clear language, the court said that discharging the harasser is not only an adequate but ideal remedy to prevent further sexual harassment. Thus, it meets the duties established by <u>Faragher</u> and <u>Ellerth.</u>

In this case, Cumberland County or individuals acting on behalf of Cumberland County, all repeatedly urged either the discharge or suspension of Gary Graham.  All urged the discharge or some lesser punishment for Joe Osenkarski.  None of these recommendations were acted on because the County is utterly and completely without any right of control over the President Judge's employees, as noted in the many cases cited, supra.

<u>Graves v. Lowery</u>, supra, holding that a county and court can be jointly liable as joint employers makes no sense in light of <u>Faragher</u> and <u>Ellerth,</u> since it would be extremely unjust for an employer or a putative employer such as Cumberland County to completely honor the rules established by the Supreme Court and yet still be found liable. A fair reading of <u>Faragher</u> and <u>Ellerth</u>, therefore, suggests that <u>Graves v. Lowery</u> no longer constitutes good law or is distinguishable and that the dichotomy between the court and county, firmly established by the many other cases cited, supra, exists as well in Title VII litigation.  The suggestion that <u>Graves v. Lowery</u> is "simply irrelevant" has indeed come to fruition as a result of the Supreme Court's new sexual harassment jurisprudence.

This point is reaffirmed again in other cases within this Circuit. In a recent case,

Kay v. Independence Blue Cross, 2003 U.S. Dist. Lexis 8521 (E.D. Pa. 2003) involving a

gay employee alleging a hostile work environment, the District Court held for the

employer:

> An employer is not always liable for a hostile work environment.
> Kunin, 175 F.3d at 293. In cases in which co-workers, as
> opposed to supervisors, are the harassers, "a plaintiff must
> demonstrate that the employer failed to provide a reasonable
> avenue for complaint or, if the employer was aware of the
> alleged harassment, that it failed to take appropriate
> remedial action." Weston, 251 F.3d at 427 (citations
> omitted). "Essentially, the inquiry is whether the
> employer itself was negligent in failing to put a stop
> to an employee's harassing behavior." Allen v.
> Amtrak, 90 F. Supp. 2d 603, 610 (E.D. Pa. 2000),
> aff'd 254 F.3d 1077 (3rd Cir. 2001). This standard
> "envisions prompt remedial action when the hostile
> environment is discovered." Bouton v. BMW, 29 F.3d
> 103, 110 (3rd Cir. 1994). "An effective grievance
> procedure – one that is known to the victim and that
> timely stops the harassment – shields the employer from
> Title VII liability for hostile environment." Bouton,
> 29 F.3d at 110.

Kay, supra, at 8523-24. In its decision, the Kay court acknowledged that Faragher and

Ellerth were controlling law. Id. at 8524.

Here Cumberland County has met the burden placed upon it by Faragher and

Ellerth. The DeLuce report, solicitor Johnson's letter to the Commissioners, and the

recommendations of Dan Hartnett, HR Director, all evidence the existence of a

reasonable avenue for a complaint procedure.[3] The putative employer was aware of the

alleged harassment, and the putative employer attempted prompt remedial action to

correct the hostile work environment. Because that prompt remedial action was rejected

---

[3] Which Varner does not deny and in fact utilized.

by the real employer it would again be grossly unfair to hold Cumberland County liable

for the conduct of the Court.  Kay is another illustration of how Graves has been sub

silentio overruled by the new Supreme Court jurisprudence in Faragher and Ellerth.

Yet another recent case within the Circuit, Dowling v. Home Depot, 2002 U.S.

Dist. Lexis 25270 (E.D. Pa. 2003) reaffirms this analysis.  In Dowling, a hostile work

environment case, the issue was whether the Plaintiff could establish a viable theory of

respondeat superior liability as required by Ellerth, supra.

The following quote from the Court illustrates the problem:

> Here, Home Depot argues that plaintiff cannot establish
> the fifth factor, the existence of respondeat superior
> liability.  In this regard, Home Depot correctly points out
> that Mr. Kihengo was not Ms. Dowling's supervisor.
> Although this fact renders plaintiff's case more difficult
> to prove, it does not resolve the matter.  That is, in a case
> where the alleged harasser is the plaintiff's co-worker,
> an employer's liability exists where the defendant
> knew or should have known of the harassment and failed to
> take prompt remedial action.  Andrews v. Philadelphia, 895 F.
> 2d 1469, 1486 (3rd Cir. 1990)(citations omitted); cf.
> Burlington Industries v. Ellerth, 524 U.S. 742,
> 759 (1999).  Prompt remedial action has been defined
> as conduct "reasonably calculated to prevent further
> harassment."  Bonenberger v. Plymouth Township,
> 132 F.3d 20, 26 (3rd Cir. 1997) (citations omitted).
> Additionally, the Third Circuit has emphasized that "an
> employer, in order to avoid liability
> for the discriminatory conduct of an employee …
> [must take] corrective action reasonably likely to
> prevent the offending conduct from recurring."
> Knabe v. Boury Corp., 114 F.3d 407, 414 (3rd
> Cir. 1997) (citations omitted); see also Harris v.
> L&L Wings, Inc., 132 F.3d 978, 984 (4th Cir.
> 1997) (good faith investigation of alleged
> harassment may satisfy the "prompt and adequate"
> response standard).  Dowling, super, at 25728.

Again, this case shows that Cumberland County has done what <u>Ellerth</u> requires. It has taken prompt remedial action "reasonably calculated to prevent further harassment." The <u>Deluce</u> report is a "good faith investigation of alleged harassment" which satisfies the prompt and adequate response standard.

The County's conduct must be distinguished from the Court's. As the Third Circuit notes, liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action. Here the County knew, the County promised to take prompt remedial action, and the County was prevented from doing so by the firm hand of the Court, which had the complete right of control to do as it pleased with its own employees.

If <u>Faragher</u> and <u>Ellerth</u> are to mean anything, they must mean that employers, uniformly across the nation, may avoid Title VII liability by taking the prompt remedial action contemplated by the affirmative defense created in this new sexual harassment jurisprudence. Accordingly, it is again clear that <u>Faragher</u> and <u>Ellerth</u> overrule or distinguish <u>Graves v. Lowery</u> to the degree that <u>Graves</u> no longer can be considered binding precedent within this circuit as applied to the court vs. county dichotomy. The Western District's prediction that it is "simply irrelevant" is seen to have come to fruition.

The County acknowledges that an argument that its response was significant to meet its obligations under <u>Faragher</u> and <u>Ellerth</u> may well be based on a false premise, to wit, that no long term adulterous relationship existed between Varner and Graham. The County witnesses acknowledged that had they known of that lengthy adulterous deceit, they would have investigated the case differently. However, for summary judgment

29

purposes, that point is moot. The County's investigation produced the recommendations and relief Varner wanted, and that is what matters to the Plaintiff and this Court. Those recommendations were not implemented solely because of the Court's complete utter and dominating control over its own personnel, a degree of control not only recognized but virtually hallowed by virtue of the doctrine of separation of powers set forth in the Pennsylvania Constitution.

**III.    CONCLUSION**

Because the County is not, as a matter of law or fact, Plaintiff's joint employer and equally because Graves v Lowery has been implicitly overruled by Faragher and Ellerth, the County is entitled to summary judgment and the dismissal of all claims against it.

Respectfully submitted,

**THOMAS, THOMAS & HAFER, LLP**

**s/James K. Thomas, II**

By:_____
James K. Thomas, II, Esquire
Atty. ID #:  15613
Paul J. Dellasega, Esquire
Atty. ID #:  23146
305 North Front Street
Sixth Floor, P.O. Box 999
Harrisburg, PA  17108
(717) 255-7602

Attorney for Defendant Cumberland County

DATE:  December 19, 2003
270309.1

30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Barbara E. Varner, | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | No.: 1:CV 01-0725 |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Ninth Judicial District, Cumberland | : | **JURY TRIAL DEMANDED** |
| County, and Cumberland County | : | |
| and S. Gareth Graham, Individually, | : | **JUDGE YVETTE KANE** |
| and Joseph Osenkarski, Individually, | : | |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

I hereby certify that I sent a true and correct copy of the foregoing document to

the following counsel of record, by placing a copy of same in the United States, first class

mail, postage prepaid, addressed as follows:

Debra K. Wallet, Esquire
24 North 32nd Street
Camp Hill, PA 17011

A. Taylor Williams, Esquire
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102

David J. MacMain, Esquire
Montgomery, McCracken,
 Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109

Paul J. Adams, Esquire
Sweeney & Sheehan, P.C.
1515 Market Street, 15th Floor
Philadelphia, PA 19102

**THOMAS, THOMAS & HAFER, LLP**

**s/James K. Thomas, II**

By:

_____
James K. Thomas, II, Esquire

Dated:  December 19, 2003