IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA
DEC 19 2003
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

| | |
|---|---|
| BARBARA E. VARNER, | : |
| Plaintiff | : |
| | : No.: 1:CV 01-0725 |
| v. | : |
| | : |
| COMMONWEALTH OF PENNSYLVANIA, | : |
| NINTH JUDICIAL DISTRICT, | : JURY TRIAL DEMANDED |
| CUMBERLAND COUNTY, | : |
| | : |
| and | : |
| | : |
| CUMBERLAND COUNTY, | : |
| | : |
| and | : |
| | : |
| S. GARETH GRAHAM, Individually | : JUDGE YVETTE KANE |
| | : |
| and | : |
| | : |
| JOSEPH OSENKARSKI, Individually | : |
| Defendants | : |

### STATEMENT OF UNDISPUTED MATERIAL FACTS
### SUBMITTED BY DEFENDANT S. GARETH GRAHAM

Defendant S. Gareth Graham ("Graham") submits the following Statement of Undisputed Material Facts in connection with his Motion for Summary Judgment. Many of the facts set forth herein are, in fact, disputed by Graham. However, for the purpose of the present motion, Graham has set forth the version of facts most favorable to the Plaintiff so that the statement will be beneficial to the Court in adjudicating Graham's Summary Judgment Motion. Graham reserves the right at time of trial to dispute any or all of the Statement of Undisputed Material Facts.

985984v1

Set forth below is a summary of the material facts and testimony of several of the witnesses deposed in this matter.

**Plaintiff Barbara Varner**

1.  Plaintiff Barbara Varner ("Plaintiff") started working for the County in the Children and Youth Services department ("CYS") in 1989. (Complaint at ¶ 14).

2.  Plaintiff and Graham worked together on joint cases and Graham assisted Plaintiff with her work. (Pl. dep. at 7).

3.  Plaintiff and Graham got along and they had a "cordial" relationship through 1996. (Id. at 83, 125).

4.  Plaintiff testified that Graham's reputation in late 1994 and early 1995, before she joined the Probation Department, was that he was an emotional individual who would get angry quickly. She heard that both Defendant Joseph Osenkarski ("Osenkarski") and Graham played favorites and if an employee was not in good favor with them, the employee would be "punished." At that time, Plaintiff was in good favor with them. (Pl. dep.[1] at 90).

5.  Graham encouraged Plaintiff to apply for the position in the Probation Department and was supportive of her transfer. (Id. at 113).

6.  At the time Plaintiff began her employment in the Probation Department in February, 1995, she worked with Defendant Graham ("Graham") on a daily basis and was on good terms with Graham. (Id. at 9, 94). The good working relationship continued through at least August, 1996. (Id. at 106).

7.  For example, they both took a day trip to Atlantic City and voluntarily sat together on the bus ride from Harrisburg to Atlantic City. (Id. at 17).

---

[1] "Pl. dep." refers to pages from the deposition transcript of Plaintiff Barbara Varner, taken on January 27 and 28, 2003, a copy of which is submitted as Exhibit "A."

2

985984v1

8. Plaintiff did not complain about Graham's leadership or training to anybody during calendar year 1995. (Id. at 97).

9. During a mace training at the prison in 1995, Graham patted Plaintiff's behind in the presence of female probation officer Debra Green. (Id. at 140). Plaintiff said nothing but responded with an embarrassed laugh. (Id. at 140-142).

10. Plaintiff admits there were no other occasions where Graham touched her inappropriately. (Id. at 142).

11. Despite the alleged pat on her behind, Plaintiff admits that from February, 1995, until August, 1996, she had no particular problem with Graham. (Id. at 94, 98). Specifically, Graham did not lose his temper with Plaintiff or scream at her, although she admits that Graham lost his temper and screamed at other people. (Id. at 99).

12. After Probation Chief Ken Bolze retired in August, 1996, Graham began to tell Plaintiff that things that she had previously done right and were acceptable, were now wrong. (Id. at 100). By this, Plaintiff means that Graham was critical of some of the decisions or recommendations that she made with respect to particular juveniles. (Id. at 101).

13. Plaintiff complained that Graham would scream at her, and used the word "fuck" at her because she made a commitment trip with co-worker, Debra Green, for which they left after 8:00 a.m.. Graham screamed at her that all placement trips regarding juveniles should start at eight in the morning. (Id. at 101).

14. Graham accused Plaintiff and Debra Green of lying about the commitment trip they made and that they over-stated their work time by one hour. (Id. at 101). As a consequence of Graham's contention that Plaintiff and Green had over-stated their time on a commitment trip, he docked each of them one hour of overtime. (Id. at 103).

3

15. Plaintiff alleges that male probation officers were not required to start commitment trips at 8:00 in the morning. (Id. at 102).

16. In early 1997, Graham allegedly picked up a paper containing a list of robbery victims prepared by Plaintiff, wadded the paper up, and threw it at her with the statement that, "this is no f-ing good, is not acceptable." (Id. at 104).

17. On one occasion, Graham allegedly moved within a foot of Plaintiff, put his finger in her face, and told her that, "you don't know what the fuck you're doing." She described this incident as "very scary." (Id. at 105).

18. Plaintiff admits that use of the word "fuck" does not shock Plaintiff. (Id. at 105).

19. At a professional conference in State College in October, 1996, Graham knocked on Plaintiff's hotel room door. She declined to answer. Graham then called her room and said he wanted to stop in. Plaintiff said she was studying. The conversation ended and Graham did not return to Plaintiff's door. (Id. at 113-115).

20. By October, 1996, Plaintiff's relationship with Graham was not good. (Id. at 115).

21. On November 20, 1996, Plaintiff gave Graham a social history of a female having suicidal tendencies and Plaintiff related the cause as being her premenstrual problems. Graham read the social history, used the phrase, "Jesus Christ," and made the statement, "Do I have to get a peter meter in my office[?]" (Id. at 120-121).

22. Plaintiff never heard Graham make a similar statement prior or subsequent to November 26, 1996. (Id. at 121, 122).

23. Plaintiff admits that the reference to a "peter meter" related to the female juvenile and was not directed to Plaintiff. (Id. at 123).

985984v1

24. In January, 1996, Plaintiff received a birthday card from Graham which offended her because the card contained an inscription that said something along the lines of "remembering good times" or "I'm thinking back over the good times we had before." (Id. at 124-125). Plaintiff did not complain about the birthday card but, rather, put it away and "just forgot about it." (Id. at 126).

25. Plaintiff testified that Graham told her stories about sexual problems he was having with his wife on commitment trips that they took together and in the office. (Id. at 128).

26. These stories were shared on approximately eight occasions. (Id. at 130). Plaintiff said:

> First he started to allude to problems, that he wasn't getting anything from her, that he was angry at her. He would talk about smashing her figurine collection in anger as a punishment for her. And he would make statements that he'll do anything he can to get even with her. (Id. at 129).

27. Plaintiff admits that Graham's criticisms of his wife were not directed toward Plaintiff. (Id. at 135).

28. Plaintiff testified that on one occasion, Graham told her that he woke up in the middle of the night and his bed was shaking. He pulled his wife's hands out of her underwear and her hands and fingers were wet. "He said he would keep a calendar of how often they had sex and he would show that to her." (Id. at 136).

29. Plaintiff testified that in response to this incident, she told Graham he needed counseling. In response Graham accelerated his car to around 95 miles per hour in a construction zone on I-81. (Id. at 136). Plaintiff did not report this incident to anybody in authority at the time. (Id. at 138).

985984v1

30. In May, 1996, Graham appeared at Plaintiff's home without an invitation. Graham first called her and said he was coming. When he arrived at her home, Plaintiff pretended that she was not there. Graham did not enter her home and left the premises. (Id. at 142-144). Plaintiff did not complain about this incident at the time and admits that she does not know why Graham was there. (Id. at 144).

31. Graham first became Plaintiff's supervisor on January 1, 1997, when the Probation Department split. (Graham dep.[2] at 53-54, 64; Osenkarski dep.[3] at 135).

32. On one occasion, Graham told Plaintiff that he was angry at his wife. Graham told Plaintiff that he "punished" his wife by "destroy[ing his wife's birthday] cake in front of [his] little girls." (Varner dep. at 149). Plaintiff said the context of this conversation was that Graham was upset with his wife, had had a disagreement with her, and smashed something as a part of the punishment of his wife. (Id. at 150).

33. Plaintiff admits that the incidents involving smashing Graham's wife's figurine collection and birthday cake were not directed toward her and were not offensive to Plaintiff. (Id. at 151, 152).

34. Plaintiff testified that Graham told her not to talk to Probation Officer Kerry Houser, who filed a sexual harassment complaint against Osenkarski in 1993, because "she's an angry woman, she's divorced, she's an angry woman, all divorced women are angry." (Id. at 153). Plaintiff did not obey Graham's instructions to avoid Houser. (Id. at 154).

35. Plaintiff produced no evidence that Graham retaliated against her or otherwise punished her for talking to Houser.

---

[2] "Graham dep." refers to pages from the deposition transcript of Gary Graham, taken on January 29 and February 14, a copy of which is submitted as Exhibit "B."
[3] "Osenkarski dep." refers to pages from the deposition transcript of Joe Osenkarski, taken on January 27 and February 11, a copy of which is submitted as Exhibit "C."

6

985984v1

36. Plaintiff testified that in August, 1996, she had a conversation with Graham in which Graham discussed a balanced approach to work that involved satisfying the victim, the juvenile and the community. Graham pointed at himself and smiled. Plaintiff interpreted Graham's expression as a statement that she had to satisfy him sexually. The entire basis for this conclusion was the way Graham smiled. (Id. at 156).

37. Plaintiff admits that Graham never asked for or demanded any type or form of sex from her. (Id. at 157).

38. In 1997, female probation officers were being measured for bulletproof vests. Graham told the females that he knew what cup size they wore because the bulletproof vests were measured by cup size. Graham thought it was "hilarious" that he knew everybody's cup size. Graham told Plaintiff that she was not as big as one of the other girls in the department. (Id. at 158).

39. Plaintiff admits that Graham never discussed or mentioned to her anything about any other part of her body and there was no other occasion where he said anything about her breasts. (Id. at 159).

40. On one occasion, Graham referred to a young girl in the District Attorney's office by commenting "I wonder how...dark her bush is." (Id. at 159).

41. On one occasion in 1997, Plaintiff told Graham that she did not want to hear him use the word "fuck." Graham allegedly said that she should go back to doing her social work if she could not take it. (Id. at 163).

42. Plaintiff heard from a third party that Graham commented that Plaintiff had "no f-ing sense, no f-ing training and no f-ing ability." (Id. at 163). Plaintiff was not in the office at

the time these comments allegedly were made. (Id. at 164). Plaintiff would have found the statement offensive even if no foul language had been used. (Id. at 163-64).

43.     Plaintiff admits that Graham used the word "fuck" in regular conversations on an occasional basis. (Id. at 175).

44.     Plaintiff admits that Graham screamed at her because he was unhappy based upon his assessment of her performance. (Id. at 167-68).

45.     Plaintiff admits that she has heard Graham scream at other people and raise his voice "to quite a few people." (Id. at 173). She also admits that she saw him scream at a male employee. (Id.)

46.     Plaintiff alleges that Graham screamed at quite a number of people in the courthouse, including Assistant Sheriff Andy Anderson, District Justice Paula Correal, Director of Children & Youth Services Gary Shuey, and Sarah Costicki (identified as a "victim witness person"). (Id. at 405 - 406).

47.     Graham was removed from his job in Juvenile Probation in March, 1998, and transferred to a position in the Adult Probation Department, located at the Cumberland County Prison. This was done by order of President Judge Hoffer based upon Hoffer's statement to Graham that Judge Hoffer had lost confidence in him. (Graham dep. at 162).

48.     Plaintiff contends that, without objective verification, she has been given less desirable assignments and more assignments then other probation officers. For example she was given cases where boys would need urine tests which she said was impossible to do because she could not observe what the boys were doing at the time they were giving the sample. (Pl. dep. at 181). She felt she was given cases involving large aggressive males. (Id.) She agreed that at

this time period the probation clientele was probably seventy-five percent male, however. (Id. at 182).

49. A chart created in 1997 showing the caseload distribution reveals that at least one male employee was assigned more cases than Plaintiff. (A copy of the chart is submitted as Exhibit "G").

50. On April 25, 1997, Plaintiff filed a written memorandum of complaint pursuant to the harassment and discrimination policy that she was aware of as part of her employment. (Pl. dep. at 191). Plaintiff admits that following her complaint, an investigation was commenced by individuals on behalf of the County and Court. (Id. at 192).

51. Plaintiff agrees that as a consequence of her complaint on June 13, 1997, Osenkarski removed Graham from any authority or responsibility concerning her employment. (Id. at 193).

52. Plaintiff admits that on July 11, 1997, President Judge Sheely issued a three day suspension to Graham. (Id. at 194). Plaintiff was aware that this three day suspension was a consequence of the investigation initiated by her complaint. (Id. at 195).

53. Plaintiff believes that the three day suspension imposed on Graham by Judge Sheely was an inadequate penalty. (Id. at 197). She also believes that Graham and Judge Sheely are part of a larger "conspiracy" to protect Graham. (Id. at 409-410, 412-413, 420-421). She believes this conspiracy also includes the Honorable George E. Hoffer. (Id.)

54. Plaintiff filed a charge of discrimination with the EEOC on July 21, 1997. (Id. at 199).

55. Plaintiff admits that subsequent to her EEOC complaint, President Judge Hoffer transferred Graham from a position in the courthouse to a position in the County prison. This

move eliminated day to day contact between Graham and employees in the Probation Office, including Plaintiff. (Id. at 200).

56.     Prior to this case, Osenkarski, Director of Juvenile Probation never received any complaints about Graham sexually harassing anyone. (Osenkarski dep. at 194).

57.     Osenkarski described Graham as having a loud voice and being very excitable. He stated that was the personality Graham presented to everyone in the office. (Id. at 195).

**Kerry Houser: Co-Employee**

58.     Probation Officer Kerry Houser, who worked with Graham and Plaintiff prior to the Department split, testified that Graham did not like her and consequently did not talk to her. She identified a number of other people Graham did not like and therefore would not talk to, including male employees Tom Boyer, Paul Meuron, Mike Dunsmore, Greg Miller and Lyle Herr. (Houser dep.[4] at 19). She described this behavior as Graham administering a form of "punishment." (Id. at 20).

59.     It was Houser's observation that Plaintiff and Graham were friends when Plaintiff worked at CYS and that they became "better friends" once Plaintiff started in the Probation Department. (Id. at 63).

60.     Houser never heard Graham yell at Plaintiff. (Id. at 28).

61.     Houser observed Graham yell at people other than Plaintiff. Graham is indiscriminant in (1) yelling at both men and women; (2) being rude to both men and women he dislikes; and (3) attempting or threatening to punish people he does not like. (Id. at 64).

62.     Graham treated both men and women equally poorly but Graham was not as overtly mean to women as he was to men. (Id. at 64).

---

[4] "Houser dep." refers to pages from the deposition of Kerry Houser, taken on March 3, 2003, a copy of which is submitted as Exhibit "K."

10

985984v1

63. Graham's use of foul language in the office was typical of "many others in the office." (Id. at 67).

64. When Houser shared an office with Plaintiff prior to the split of the Probation Department into Adult and Juvenile sections, she believed that Graham went out of his way to be nice to Plaintiff. (Id. at 29).

65. During the two year period that Houser and Plaintiff shared an office, Houser believed that Plaintiff "could really do no wrong as far as [Graham] was concerned." (Id. at 56, 57).

66. Houser has never seen Graham act towards Plaintiff in any way that was demeaning or unkind to Plaintiff. (Id. at 29, 30).

67. Prior to the Probation Department's split in 1997, Plaintiff never complained to Houser about Graham's behavior or about having to travel with Graham. She complained only after the split. (Id. at 30, 66-67).

68. Houser has had two or three seminars of sexual harassment training. Based on what she learned about sexual harassment, she never ever observed Graham sexually harass Plaintiff or anyone else. (Id. at 57, 58).

69. There were very few people in the office to whom Graham would talk in a pleasant manner. Houser could identify only three: Dennis Drachbar, Sam Miller and Plaintiff. (Id. at 61).

### Ronna Boyles: Co-Employee

70.  Ronna Boyles worked as a secretary for both Graham and Plaintiff prior to the Probation Office splitting into two departments. Boyles described the relationship between Plaintiff and Graham before the split as "very good" and "better than average." (Boyles dep.[5] at 10.)

71.  Prior to Plaintiff being hired within the Probation Office, Boyles heard Graham state that Plaintiff was "really conscientious, a good worker and it would be good having her on the staff." Boyles testified that Graham "glowed about [Plaintiff's] abilities". (Id. at 12).

72.  Boyles testified it was not unusual for Graham to raise his voice within the office and that he was "an excitable man." (Id. at 14).

73.  Boyles testified that Graham raised his voice indiscriminately between men and women and did not favor either gender. (Id. at 15).

74.  Boyles characterized Plaintiff as a "favorite" of Graham's and testified that that status changed "sudden[ly]" at about the time of the Probation Department split. (Id. at 15 – 16, 17).

75.  Graham has used foul language in general conversation with men and women, and foul language was common within the Probation Office. (Id. at 18, 19).

76.  Graham nit-picked Plaintiff's reports, but he nit-picked with other people as well, and that was his "style." (Id. at 26).

### William Brandt – Co-Employee

77.  William Brandt became a probation officer in 1990. Brandt described the working relationship between Plaintiff and Graham as "very friendly." That "very friendly"

---

[5] "Boyles dep." refers to pages from the deposition of Ronna Boyles, taken on March 3, 2003, a copy of which is submitted as Exhibit "F."

relationship lasted for a year or more, and Plaintiff and Graham "certainly spent a lot of time together," and "got along extremely well together." (Brandt dep.[6] at 27).

78.  Brandt, who stayed in the Juvenile section after the Probation Department split into two, recalled that on the day the relationship between Plaintiff and Graham changed, he heard yelling between them. At no other point in time did he observe Graham to yell at Plaintiff. (Id. at 30 – 31).

79.  Within the Probation Office, the use of bad language, including by Brandt, is common. (Id. at 35 – 36). The use of bad language involves both men and women and "it's a product of the horrible environment that we work with." (Id. at 36).[7]

### (Former) President Judge of Cumberland County Harold Sheely

80.  President Judge Harold Sheely first learned that Plaintiff had made allegations of sexual harassment by Graham in June or early July of 1997. (Sheely[8] dep. at 7).

81.  Judge Sheely recalled that Graham had been "really anxious" to have Plaintiff hired and that Graham and Plaintiff had always had a good relationship. (Id. at 26).

82.  Judge Sheely suspended Graham for three days for the use of improper language and no other reason. (Id. at 16, 18).

### President Judge of Cumberland County George E. Hoffer

83.  Judge George E. Hoffer, who became President Judge of the Cumberland County Court of Common Pleas on January 1, 1998, testified that he demoted Graham because he

---

[6] "Brandt dep." refers to pages from the deposition of Williams A. Brandt, a copy of which is submitted as Exhibit "M."
[7] Brandt was referring to the nature of probation work in which clients have been convicted with a range of criminal behavior, and have various social problems and emotional problems.
[8] "Sheely dep." refers to pages from the deposition of Judge Harold Sheely, taken on February 25, 2003, a copy of which is submitted as Exhibit "D."

13

985984v1

believed Graham had an affair with Plaintiff, because of Graham's management deficiencies and because he lost confidence in Graham's ability to be a supervisor. (Hoffer dep.[9] at 68).

### Dennis Drachbar – Co-Employee

84. Dennis Drachbar is a Probation Officer II. He has been employed in the Cumberland County Probation Department since 1984. (Drachbar dep.[10] at 4-5.) He has never observed Graham to yell at Plaintiff, curse at Plaintiff, or say anything sexually demeaning to Plaintiff. (Id. at 8).

85. From Drachbar's observations, Graham treated Plaintiff with respect. (Id. at 9).

### Sam Miller – Co-Employee

86. Sam Miller became a probation officer with Cumberland County in 1983. (Miller dep.[11] at 4).

87. Miller observed that Graham and Plaintiff were friends and that that status changed to being a strained relationship just prior to Plaintiff filing her lawsuit. (Id. at 9).

88. Within the probation office, it was not uncommon for employees to yell at one another. Miller and Graham yelled at each other on a number of occasions. (Id. at 10).

89. After Miller recalled the Plaintiff/Graham relationship becoming strained, Miller did not observe any instances of Graham treating Plaintiff worse than he treated any other employee in the office. (Id. at 11).

90. During arguments, Miller probably swore at Graham more than Graham swore at him. (Id. at 23).

---

[9] "Hoffer dep." refers to pages from the deposition of Judge George Hoffer, taken on April 4, 2003, a copy of which is submitted as Exhibit "O."
[10] "Drachbar dep." refers to pages from the deposition of Dennis Drachbar taken on April 28, 2003, a copy of which is submitted as Exhibit "P."
[11] "Miller dep." refers to pages from the deposition of Samuel Miller, taken on April 28, 2003, a copy of which is submitted as Exhibit "L."

14

985984v1

91.     Miller became Plaintiff's supervisor on June 17, 1997. Graham was still in the office at that time. Miller testified that Graham never attempted to induce Miller to retaliate against Plaintiff or treat her any differently than any other employee. (Id. at 24 - 25).

92.     Miller did not observe that the newly strained relationship between Plaintiff and Graham resulted in Graham behaving more abusively toward Plaintiff than toward other employees whom he also supervised. (Id. at 33 – 34).

93.     Miller cannot recall any specific rule that commitment trips were to start at eight in the morning. He does recall discussions in which a probation officer was told that if she did not leave for a commitment trip by very early afternoon, the office needed a good reason for doing so since later trips increased the County's overtime costs. (Id. at 74).

### Darby Christlieb – Co-Employee

94.     Darby Christlieb has been a probation officer since 1989. (Christlieb dep.[12] at 4). Christlieb observed that, prior to the Probation Department split, Graham and Plaintiff were friends. During that time, he never observed Graham to yell, curse or say anything sexually demeaning to Plaintiff. To the contrary, Graham treated Plaintiff better than he treated other employees and treated her as one of his favorites. (Id. at 6 – 7).

95.     Prior to the department split, Christlieb never heard Plaintiff complain about having to take commitment trips with Graham. To the contrary, she appeared to accept Graham as a mentor and to enjoy his company. (Id. at 8).

96.     Christlieb heard Graham yell at most of the people in the Probation office. There was no distinction between Graham's yelling at male or female employees. Graham was a "equal opportunity yeller." (Id. at 15).

---

[12] "Christlieb dep." Refers to pages from the deposition of Darby Christlieb, taken on April 28, a copy of which is submitted as Exhibit "E."

985984v1

97.  Christlieb heard foul language used by both male and female probation officers, although more from the male officers. (Id. at 16).

98.  Graham has yelled at Christlieb at least a dozen times. (Id. at 17).

99.  Other than one occasion on which Graham's level of yelling at Plaintiff appeared to be more vicious than his yelling at Christlieb, Christlieb has never seen Graham treat Plaintiff inappropriately. (Id. at 17).

100.  Graham had "favorites" and people he did not like. Graham was uniformly rude and belligerent toward all people, male and female, that he did not like. (Id. at 18).

Respectfully submitted,

Date: 12/19/03

By: *David J. MacMain/kkb*
David J. MacMain, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19103
(215) 772-7413

Attorney for Defendant,
S. Gareth Graham