**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Barbara E. Varner,** | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **No.: 1:CV 01-0725** |
| | : | |
| **Commonwealth of Pennsylvania,** | : | |
| **Ninth Judicial District, Cumberland** | : | **JURY TRIAL DEMANDED** |
| **County, and Cumberland County** | : | |
| **and S. Gareth Graham, Individually,** | : | **JUDGE YVETTE KANE** |
| **and Joseph Osenkarski, Individually,** | : | **ELECTRONICALLY FILED** |
| **Defendants** | : | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS
SUBMITTED BY CUMBERLAND COUNTY**

Cumberland County submits the following Statement of Undisputed Material Facts in connection with its Motion for Summary Judgment. Many of the facts set forth herein are, in fact, disputed. Cumberland County has set forth the version of facts most favorable to the Plaintiff so that the statement will be beneficial to the Court in adjudicating the Summary Judgment Motion. Cumberland County reserves the right at time of trial to dispute any or all of the Statement of Undisputed Material Facts.

1.      Barbara Varner denies that she ever had a consensual sexual affair with Gary Graham. (Varner at 5).

2.      Varner agrees that a consensual sexual affair with Graham would have been morally wrong. (Id. at 6).

3.      Varner denies ever kissing Gary Graham. (Id. at 7).

4.      Varner denies ever engaging in oral or anal sex with Graham, holding hands with Graham or having any type of intimate physical relationship whatsoever with Graham. (Id. at 7-8).

5.      Varner in fact denies ever having any extra marital affairs at any time in her life. (Id. at 7).

6.      Varner began employment with the Juvenile Probation Department of the Cumberland County Court system on February 7, 1995. (Id. at 8).

7.      At the time she began her employment in probation she agreed she was on good terms with Gary Graham. (Id. at 9). She did not, however, consider him a personal colleague. (Id. at 10).

8.      Graham has only been inside Varner's home on one occasion. (Id. at 13). That occurred sometime during her first year of employment in the probation department. There was a business purpose, i.e., Graham was picking Varner up to accompany him on a commitment trip for a juvenile. (Id. at 13).

9.      Varner was previously married to Kenneth Spidle. (Id. at 14).

10.     Varner denied that Graham had ever seen her naked. (Id. at 14).

11.     Varner denied that she had a small scar at the base of her spine. (Id. at 14).

12.     In 1994 Varner took a bus trip to Atlantic City. She went by herself on a business day for the purpose of lying on the beach. Gary Graham was on that same bus. Carol Snokes, a secretary from her then office in Children & Youth Services, was also on the bus together with her fiancé, Wayne Shearer. (Id. at 15-16).

13.     Varner invited Snokes and Shearer to sit in front of her. At that point in time Graham moved up from the back of the bus and sat down next to her. Graham and Varner sat together from Harrisburg to Atlantic City. (Id. at 17).

14.     Varner and Graham returned to the Harrisburg area at the end of the day on another Rohrer Bus.

15.     Varner denies Graham's allegation that they traveled to Atlantic City together for the purpose of having sexual intercourse at the Bally Hotel and Casino.  (Id. at 18).

16.     Varner was hired by Cumberland County Children & Youth Services in 1989 as a caseworker trainee.  (Id. at 76).

17.     She first met Graham in early 1990.  (Id.)

18.     She met Graham because she and Graham shared several cases.  Varner would have the neglected children and Graham would typically be responsible for supervising the father.  At this point in time she acknowledges that Graham was helpful when she needed assistance with difficult or violent male individuals.  (Id. at 77).

19.     In 1991 through 1994 Varner's contact with Graham was limited to once a month, mostly on the phone and perhaps two or three occasions of personal contact.  (Id. at 78 - 80).

20.     In addition to the contacts with Graham noted above, between 1990 and 1994 Varner saw Graham perhaps once or twice a week in the Courthouse break room.  She does not remember whether she ate with Graham in the break room, is confident she did not see him on a regular basis in the break room during their work week, and is confident that she saw him outside of the workplace only on very, very rare occasions.  (Id. at 82).

21.     Varner described her relationship with Graham from 1990 to 1994 as a cordial working relationship.  She knew him as well as any other co-worker but no better.  (Id. at 83).  She specifically declined to describe her relationship with Graham as a close one.  (Id.).

22.     During the summer of 1994 Graham spoke to Varner and Lynn Dickerson about the probation department needing two females with social work field experience and inquired of them whether they were interested in working in probation.  (Id. at 87).

3

23.    Joe Osenkarski also told Varner about the availability of a position in the probation department and that it would be an appropriate position for a female with a social work background.  (Id. at 87).

24.    Varner testified that Graham's reputation in late 1994 and early 1995, before she joined probation, was that he was a hot head who would get angry quickly.  She knew that both Osenkarski and Graham played favorites and if you were not in good favor with them you would basically be punished.  She felt at that time that she appeared to be in good favor with them.  (Id. at 90).

25.    When Varner applied for employment at juvenile probation she understood that in all likelihood Graham would be the person responsible for training her.  (Id. at 92).

26.    When Varner joined the probation department she understood that President Judge Sheely was the person ultimately in charge.  She described probation officers as "officers of the Court".  (Id. at 92-93).

27.    She agreed that Sheely had the ultimate authority over probation officers and that the Chief of Probation, Ken Bolze, reported to Judge Sheely for "hiring, firing, those kind of things".  (Id. at 93).

28.    Varner had no problems with Graham when she first started working in probation in February, 1995.  She worked with him on a daily basis at that time.  (Id. at 94).

29.    Nonetheless, Varner described Graham as a "poor trainer".  She further described him as exhibiting "poor leadership".  As an example she said that Graham would take her out on the road to show her how to supervise and pretend to throw a card at someone's house and indicate that "there's a contact rather than actually doing the face to face with the kids".  (Id. at 95).

30.     Nonetheless, Varner did not complain about Graham's leadership or training to anybody during calendar year 1995.  (Id. at 97).

31.     Varner agreed that from February 1995 until August 1996 she had no particular problem with Graham.  (Id. at 94).  Specifically, she had no episodes of Graham losing his temper with her or screaming at her although she acknowledged that he exhibited that conduct towards other people.  (Id. at 99).

32.     Varner indicated that after Probation Chief Bolze retired in August, 1996 Graham began to tell her that things that she had previously done right and were acceptable were now wrong.  (Id. at 100).  By this she meant that Graham was critical of some of the decisions or recommendations that she made with respect to particular juveniles.  (Id. at 101).

33.     Varner complained that Graham would scream at her and use the word "fuck" at her because she would make commitment trips with co-worker, Debra Green, and would leave after 8:00 in the morning.  Graham screamed at her that all placement trips regarding juveniles should start at eight in the morning.  (Id. at 101).

34.     Varner complained that Graham told her and Debra Green that they had lied about a commitment trip they had been on and over stated their time by one hour.  (Id. at 101).

35.     Varner contended that male probation officers were not required to start commitment trips at 8:00 in the morning.  (Id. at 102).  As a consequence of Graham's contention that Varner and Green had over stated their time on a commitment trip, he docked each of them one hour of overtime.  (Id. at 103).

36.     Varner complained that she had prepared an extensive list of victims of a robbery. Graham picked up the paper with the victims names on it, wadded the paper up, and threw it at

her with the statement that this is no fucking good, it is not acceptable. (Id. at 104). This incident occurred in early 1997.

37.    Varner contends that Graham would move within a foot of her, put his finger in her face, and tell her that "you don't know what the fuck you are doing". She described this as "very scary". (Id. at 105).

38.    Varner agreed that the use of the word "fuck" does not shock her. (Id. at 105).

39.    Prior to August 1996 Varner reiterated that she had a decent working relationship with Graham.   However, she described the relationship on Graham's part as a flirtatious relationship. (Id. at 106).

40.    In 1998 Varner earned a masters degree at Shippensburg University in the Administration of Justice.   Her tuition for her masters degree was paid for entirely by the Juvenile Court Judges Commission. (Id. at 111).

41.    Varner ultimately agreed that Graham actually encouraged her to apply for the position in the probation department because he thought she would be a good probation worker with her caseworker background and undergraduate degree in criminal justice and he had previous knowledge of the kind of work performance she would deliver. (Id. at 113).

42.     Varner contends that at a professional conference in State College in October 1996 Graham knocked on her hotel room door.  She declined to answer.  Graham then called her room.  Varner answered the phone.  Graham said he wanted to stop in.  Varner said she was studying.  That ended the conversation.  Graham did not come back to Varner's door.  (Id. at 114-115).  Varner describes this as an instance of sexual harassment.

43.    Varner acknowledges that by October 1996 her relationship with Graham was not good. (Id. at 115).

44.    Varner testified that she was the subject of an act of discrimination.  Juvenile Probation had a female intern who was fired based on her enrollment in the ARD Program. Around this time, Probation had a male intern while in the middle of his internship it was learned that he had an ARD for a DUI offense and he was allowed to complete his internship.  Varner agrees that her knowledge of this alleged instance of discrimination is based on rumor in the workplace.  (Id. at 118).

45.    Other than the incident described in the previous paragraph Varner stated that her federal court complaint sets forth all the allegations that she contends violated her rights as an employee of the probation department.  (Id. at 120).

46.    Varner contends that on November 20, 1996, she gave Graham a social history of a female having suicidal tendencies related to her premenstrual problems.  Graham read the social history and made the statement that "do I have to get a peter meter in my office".  Graham used the words "Jesus Christ" prior to that.  (Id. at 120-121).

47.    Varner never heard Graham make a similar statement prior to November 26, 1996.  (Id. at 121).

48.    Subsequent to November 26, 1996, Varner never heard Graham use the term "peter meter" again.  (Id. at 122).

49.    Varner agreed the context of the conversation about the "peter meter" related to the female juvenile and was not made with respect to her personally.  (Id. at 123).

50.    In January 1996 Varner testified she received a birthday card from Graham which offended her.  The card offended her because it implied there existed some kind of a relationship between her and Graham.  The card had an inscription that said something about "remembering

7

good times" or "I'm thinking back over the good times we had before".  Varner felt this was an inappropriate act.  (Id. at 124-125).

51.    Prior to January 1996 Graham had never screamed at Varner or been critical of her.  She described their relationship then as "comfortable co-workers".  (Id. at 125).

52.    Varner described Graham in January 1996 as somebody designated to train her but not her former supervisor.  (Id. at 126).

53.    Varner did not complain about the birthday card but, rather, put it away and "just forgot about it".  (Id. at 126).

54.    Varner was aware at the time that a County policy existed that prohibited sexual harassment or discrimination.  This policy was contained in a personnel manual which included a published complaint procedure.  (Id. at 127).  Varner acknowledged that she did not utilize that complaint procedure when she received the birthday card in January 1996.  (Id. at 127).

55.    Varner testified that Graham would tell her stories about sexual problems he was having with his wife on commitment trips that they took together and in the office.

56.    This occurred on maybe eight commitment trips.  Varner said:

> "First he started to explain the problems, that he wasn't getting anything from her, that he was angry at her.  He would talk about smashing her figurine collection in anger as a punishment for her.  And he would make statements that he'll do anything he can to get even with her."  (Id. at 129).

57.    Varner described Graham as the "gossip of the office" and that when you were around him you heard about "everything everybody else was doing".  (Id. at 133).

58.    Varner agreed that Graham's criticisms of his wife were not directed at her personally.  (Id. at 135).

59.     Varner's response to these conversations was to tell Graham that he should seek counseling.  (Id. at 135).

60.     Varner testified that Graham told her that he would wake up in the middle of the night and his bed would be shaking.  He would pull his wife's hands out of her underwear and her hands, fingers would be wet.  "He said he would keep a calendar of how often they had sex and he would show that to her".  (Id. at 136).

61.     Varner testified that after this incident she again told Graham he needed counseling.  In response Graham accelerated his car to around 95 miles per hour in a construction zone on I-81.  (Id. at 136).

62.     Varner did not report this incident to anybody in authority at the time.  (Id. at 138).

63.     Varner complained that during a mace training at the prison in 1995, Graham patted her behind in the presence of female probation officer Debra Green.  (Id. at 140).  There was no conversation between the two at this point in time.  Varner's response was an embarrassed laugh.  (Id. at 140-142).

64.     Varner can recall no other occasions where Graham touched her inappropriately.  (Id. at 142).

65.     Varner recalls that in May 1996 Graham appeared at her home without an invitation.  Graham first called her and said he was coming.  When he arrived at her home Varner pretended that she wasn't there.  Graham did not enter her home and left the premises.  (Id. at 142-144).

66.     Varner made no complaint about this incident at the time.  (Id. at 144).

67.    Varner acknowledged that even during her employment with Children and Youth there was a joke circulated that Graham liked her and had a romantic interest in her.  (Id. at 146).

68.    Varner testified that on one incident Graham told her that he was angry at his wife.  His mother-in-law had made a special birthday cake for Mrs. Graham.  Graham told Varner that he punished her and "he destroyed the cake in front of the little girls".  (Id. at 149).  Varner said the context of this conversation was that Graham was upset with his wife, had had a disagreement with her, and smashed something as a part of the punishment of his wife.  (Id. at 150).

69.    Varner testified that the incidents involving smashing the figurine and the birthday cake related to her by Graham were not offensive to her.  (Id. at 151).  Varner agreed these stories were not directed towards her.  (Id. at 152).

70.    In 1993 a female probation officer named Kery Houser filed a complaint of sexual harassment against Joe Osenkarski.  Varner testified that Graham told her not to talk to Kery Houser because "she's an angry woman, she divorced, she's an angry woman, all divorced woman are angry".  (Id. at 153).  Varner did not obey Graham's instructions to avoid Houser.  (Id. at 154).

71.    Varner testified that in August 1996 she had a conversation with Graham to the following effect:

> "Mr. Graham was explaining what he called the balanced approach where its necessary for you to satisfy the victim, the community, as well as the juvenile to make sure that they are rehabilitated.  Mr. Graham told me that I had to satisfy the victim, the community, and he looked at me and he pointed at himself, that those are the things that I have to satisfy.  And the smile on his face letting me know what he meant."

Varner interpreted Graham's expression as a statement that she had to satisfy him sexually. The basis for this conclusion was the way Graham smiled. (Id. at 156).

72.    Varner agrees that Graham never openly solicited her for sex, never asked to have intercourse with her, never suggested going to a hotel room to have sex, and indeed never asked for any type or form of sex from her. (Id. at 157).

73.    Sometime in 1997 female probation officers were being measured for bullet proof vests. Graham told the females that he knew what cup size they wore because the bullet proof vests were measured by cup size. Varner testified that Graham thought it was hilarious that he knew everybody's cup size. Graham told Varner that she was not as big as one of the other girls in the department. (Id. at 158).

74.    Varner agreed that Graham never discussed or mentioned to her anything about any other part of her body and there was no other occasion where he said anything about her breasts. (Id. at 159).

75.    Varner testified that on one occasion Graham referred to a young girl in the District Attorney's office by commenting "I wonder how dark her bush is". (Id. at 159).

76.    Varner recalls on one occasion in 1997 telling Graham that she didn't want to hear him use the word "fuck". Graham allegedly said that she should go back to doing her social work if she couldn't take it. (Id. at 163).

77.    Varner said that Graham, in front of another witness but not in front of her, made ranting comments that Varner had "no fucking sense, no fucking training and no fucking ability". (Id. at 163). Varner was, herself, not in the office at the time these comments were allegedly made. (Id. at 164).

78.     Varner's explanation for why Graham screamed at her and was unhappy with her "he just was unhappy with the way I handled the cases, I presume, the pattern I had done a hundred times before". (Id. at 167). Varner agreed the basis for Graham screaming at her had to do with his assessment of her performance. (Id. at 168).

79.     Varner acknowledged that she has heard Graham scream at other people. She acknowledged he has raised his voice "to quite a few people". (Id. at 173). She acknowledged that she saw him scream at Gary Shuey, male, the Director of Children & Youth Services. (Id.)

80.     Varner acknowledged that Graham uses the word "fuck" in regular conversations on an occasional basis. (Id. at 175).

81.     Varner complained that her superior, Joe Osenkarski, Chief of Juvenile Probation, was involved in a conversation that she overheard. In this conversation Osenkarski commenting about a female intern's breasts said that "she had a nice set of jahoobees". (Id. at 176). Osenkarski never made any inappropriate comments to her personally. (Id.).

82.     Varner also complained that some time in September 2000 Osenkarski, outside her presence, discussed his girlfriend's genital area at work. Specifically, Osenkarski was alleged to have said that when he was canning hot peppers his fingers would get hot and he had learned his lesson about inserting them in his girlfriend because it burned her. (Id. at 176).

83.     Varner alleged that on September 12, 2000, Osenkarski informed two new female probation officers that they would have to dance on the table at their first staff meeting. Varner did not hear this comment herself. (Id. at 177).

84.     On another occasion, again outside Varner's presence, Osenkarski was alleged to have commented to a new female probation officer that hysterectomies ruined women. Varner

took offense at this even though she was not present because she was possibly the only woman in the office who had had a hysterectomy. (Id. at 177-178).

85.     Varner also found offensive the fact that Osenkarski told another woman in the probation office that she reminded him of his ex-wife. Although this comment was not made in Varner's presence nor about her, she considers it an aspect of sexual harassment. (Id. at 178).

86.     Varner is not actually aware that any female ever danced on a table at any probation meeting. (Id. at 179).

87.     Of all the allegations Varner lodged against Osenkarski the only one she was actually present for – and which she simply overheard – was Osenkarski's comments about a young girls breasts being "jahoobees". (Id. at 179).

88.     Varner recalls that in 1996 Osenkarski had a Bic lighter shaped like a penis which he flicked at a female presenter. (Id. at 179-180). This was done in the context of a sexual offenders program and Varner assumed was done for the purpose of amusing people. (Id.)

89.     Varner contends that, without objective verification, she has been given less desirable assignments and more assignments then other probation officers. For example she was given cases where boys would need urine tests which she said was impossible to do because she could not observe what the boys were doing at the time they were giving the sample. (Id. at 181). She felt she was given cases involving large aggressive males. (Id.) She agreed that at this time period the probation clientele was probably seventy-five percent male, however. (Id. at 182).

90.     Varner agreed that Osenkarski has never retaliated against her in any fashion whatsoever. (Id. at 196).

91.     Varner contends that seniority within the probation department was determined by County service (including time outside of probation) prior to 1996 when adult and juvenile probation split into two different departments. Sometime after the split juvenile probation changed its policy so that time within the department rather than time within the County was the sole criteria for determining seniority. As a consequence of this switch, Varner contends the only persons affected were her and William Brandt and that whereas she had been senior to Brandt she was now below Brandt on the seniority roister. (Id. at 187-188).

92.     In point of fact, both she and Brandt received promotions on the same day, May 7, 1998, when they were each promoted to senior probation officer. Brandt had been scheduled for earlier promotion. When Varner complained, Brandt's promotion was put on hold, and they were each promoted the same day. (Id. at 189).

93.     Notwithstanding that Varner has not lost any benefit of employment as a consequence of what she perceives as this seniority dispute, Varner contends that all promotions within the department are made by seniority, Brandt is still ahead of her on the seniority list and ultimately one day Brandt will be promoted ahead of her because of this injustice done to her. (Id. at 188).

94.     On April 25, 1997, Varner filed a written memorandum of complaint pursuant to the harassment and discrimination policy that she was aware of as part of her employment. (Id. at 191). Varner understands that following her complaint the investigation was commenced by individuals on behalf of the County and Court. (Id. at 192, line 10).

95.     Varner agrees that as a consequence of her complaint on June 13, 1997, Joe Osenkarski removed Gary Graham from any authority or responsibility concerning her employment. (Id. at 193).

96.     Varner agrees that as part of the investigation that resulted from her complaint she was interviewed and able to describe in detail the facts and circumstances of her employment that she felt violated her rights.  (Id. at 193).

97.     Varner is further aware that on July 11, 1997, President Judge Sheely issued a three day suspension to Gary Graham.  (Id. at 194).  Varner was aware that this three day suspension was a consequence of the investigation initiated by her complaint.  (Id. at 195, lines 1 – 7).

98.     On July 21, 1997, Varner wrote a woman named Joanne who she understood to be with the EEOC.  The letter stated, in part, "I am a Court worker and have had to go directly to you after Human [Relations] denied being able to help".  (Id. at 196, line 17 – 24).

99.     Notwithstanding this admission Varner testified that she works for both the County and the Court.  She follows the guidelines of the County handbook.  She is paid by the County.  She, however, can only be hired or fired by the Court, specifically, the President Judge. (Id. at 197).

100.     Varner thought that the three day suspension imposed on Graham by Judge Sheely was an inadequate penalty.  (Id. at 197).

101.     Varner filed a charge of discrimination with the EEOC on July 21, 1997.  (Id. at 199).

102.     Varner acknowledges subsequent to her EEOC complaint the new President Judge Hoffer transferred Graham from a position in the courthouse to a position in the County prison. This move eliminated day to day contact between Varner and Graham.  (Id. at 200).

103.     Varner is currently supervised by Sam Miller.  She has no complaints regarding Mr. Miller.  (Id. at 200).

104.    Varner has also been supervised by Hank Thielmann.  She has never complained about Mr. Thielmann's supervision in terms of discrimination or harassment.

105.    Since Gary Graham was transferred from the courthouse in March 1998 Varner has had no direct problems with Joseph Osenkarski and whatever complaints she has about him she has heard by hearsay.  (Id. at 202 - 203).

106.    Gary Graham's wife, Barbara Graham, works in the courthouse as a court reporter for Judge Hess.  Varner contends that in 1999 Mrs. Graham approached her in the parking lot, called her a liar, said she had an affair with her husband, and said that everyone in the courthouse knows Varner is a liar.  She said Mrs. Graham prevented her entrance to the car.  She called the Carlisle Police and had Mrs. Graham charged with harassment.  Mrs. Graham was acquitted of that charge by a district justice but according to Varner the district justice warned Mrs. Graham not to do it again or there would be a different result.  (Id. at 203 – 206).

107.    Varner complains that on November 3, 1997, Mrs. Graham jeered at her with narrowed eyes and clenched teeth.  However, she did not say anything to Varner nor did she make a movement to strike or hit Varner in any fashion.  (Id. at 206 – 207).

108.    Varner complains again that on December 4, 1997, Mrs. Graham stared at her. (Id. at 207).

109.    In the year 2000, around March, Varner applied for a position as Director of a Court Appointed Special Advocate Program [the Casa Program].  She contends that Judge Guido, who was in charge of that program, had chosen her as the designee to be the Casa Director.  She was offered the job for $29,000 per annum which was almost $11,000 less than what she was making as a probation officer.  (Id. at 211).

110.    Varner was extended a settlement offer whereby she would receive the Casa position program directorship at her current $40,000 salary if she withdrew this litigation. (Id. at 212).

111.    Varner turned down both the settlement offer and the offered position as director at $29,000 per year. (Id. at 212).

112.    The person ultimately hired as Director of the Casa Program was paid $29,000 a year.

113.    In her answers to interrogatories Varner identified as "court employees" her fellow probation officers. (Id. at 224).

114.    Varner agrees that Osenkarski was instrumental in having her hired and was complementary of her work.   (Id. at 233).   Varner agrees that Osenkarski approved her promotion to senior probation officer. (Id. at 237).

115.    Varner agrees that, personally, Osenkarski has always been polite to her. (Id. at 238).

116.    In March 2002 there was a bomb threat in the courthouse.  Varner's office is next to Osenkarski's.  Normally Varner keeps her door shut because she has an air purifier in her office.  No one told Varner there was a bomb threat and she was left in the empty building for two hours before she realized there was a bomb scare.  Varner does not go so far as to say Osenkarski intentionally left her there but does go so far as to say she believes her being left alone in her office during a bomb scare was retaliation for her protected activity.  (Id. at 242 - 243).

117.    In 1998 during a period of courthouse remodeling, Mrs. Graham, court reporter, worked in the third floor annex.  A portion of the probation department also worked in the third

floor annex during this remodeling time.  Osenkarski told Varner that Judge Hoffer said that Varner was not allowed into that area of the courthouse because Mrs. Graham was present and was bothered when she walked in there.  (Id. at 258).

118.    Two days later Varner contends that Judge Hoffer personally told her she was not allowed to go into that area of the courthouse at all because "Mrs. Graham was going to have a breakdown if I didn't stay out of there".  Varner told the Judge that that area of the courthouse was a public office and she had business there and it was not fair to restrict her from that area. Judge Hoffer nonetheless continued the restriction.  (Id. at 259).

119.    Approximately July 11, 1997, Varner met with Judge Sheely.  This was before Sheely disciplined Graham.  Varner described the conversation as follows:

> "So I walked into the Judge's chambers with him, and he proceeded to tell me that Mr. Graham and his wife and Attorney Dave Foster had come to him, I believe it was the day before, I believe, that they had, Mr. Graham had confessed to this alleged affair [with Varner] to Judge Sheely.  Judge Sheely told me that he felt sorry for them, that I had ruined their family.

> And I explained to Judge Sheely that it was all an orchestrated thing, because up to that point as far as I know, this alleged affair had never come up during the whole investigation into anybody else.  And I said to Judge Sheely, if you were a man would you confess in front of public, would you confess in front of a judge, in front of an attorney, or wouldn't you be more discrete and tell your wife at home and then handle it?

> I felt it was a ploy, because I knew Barb Graham had worked with Judge Sheely.  He had basically a tender spot for Barb Graham.  And I said to the Judge, it did not happen.  And he said, well, I am telling you, it was just horrible, they were both crying. And just, you could tell he had been – it had been emotional for Judge Sheely."  (Id. at 266 – 267).

120.    Judge Hoffer became President Judge in January 1998.  Shortly after becoming President Judge he met with Varner about her allegations.  He asked Varner what she would like

to see done.  Varner stated:  "I don't think the two men [Graham and Osenkarski] should ever supervise females again.  Ideally I would like to have them fired.  He said he would look into it".  (Id. at 301).

121.    Two months later Judge Hoffer removed Graham from the courthouse.  (Id. at 302).

122.    Varner advised the EEOC that Graham screamed at quite a number of people in the courthouse including Assistant Sheriff Andy Anderson, District Justice Paula Correal, Director of Children & Youth Services Gary Shuey, and Sarah Costicki (identified as a "victim witness person").  (Id. at 405 - 406).

123.    Joseph Osenkarski, Director of Juvenile Probation, described the type of language used in the Juvenile Probation Department:

> "We work, I am talking about juvenile and adult probation, in a very, very unnatural atmosphere, thirty-six to forty hours a week, over the years this environment hasn't changed.  What appears to be natural in a regular office situation is not natural in juvenile probation.  Anybody is capable of anything, because we work with a criminal element, a delinquent element, a sick element.  They are in there because they are troubled people and they are not normal.  And it is not unnatural to have conversations that are off-color, sometimes vulgar, sometimes humorous to keep your sanity, but they do touch on other than pleasantries.  And so I am going to say that at some times or frequently, or it can be frequently but not frequently all the time, its just a colored separate kind of people we deal with and I describe it as unnatural.
>
> There have been verbal – there has been verbal violence, there has been physical violence over the years that I have been in that office."  Osenkarski at 18.

124.    Osenkarski learned at some point in time while Judge Sheely was still the President Judge that a recommendation had been made that Osenkarski and Graham should be terminated.  Osenkarski learned this from Judge Sheely's secretary, Sandy Davis.  This

recommendation was made by an employee of the County to Judge Sheely due to Varner's complaint.  (Id. at 101 – 103).

125.    Osenkarski recalls that Gary Graham and Barbara Varner were very close friends. (Id. at 110).

126.    Osenkarski, the Chief of Juvenile Probation, was asked to explain the role of seniority in his department.  He stated seniority is one factor which is used to allow employees time off, vacation time, and scheduling on call work weekends.  With regard to promotions he stated that promotions are based more on performance reviews then seniority.  Seniority plays only a small role in promotions.  (Id. at 133 – 134).

127.    Osenkarski acknowledged seniority previously had been based on County wide service.  He described unhappiness with that policy.  He stated that shortly before probation split into adult and juvenile departments on January 1, 1997, he consulted other probation officers with regard to whether the seniority policy should be changed.  He was advised by a senior probation officer that the issue had been discussed with all juvenile probation officers who were satisfied that seniority within juvenile probation be based only on service within the probation department.  (Id. at 137 – 139).

128.    Osenkarski stated that Varner did not oppose this change in the seniority system when it was announced.  (Id. at 142).  More specifically, she was satisfied with the change.  (Id.).

129.    Sometime in July 1997 Judge Sheely called Osenkarski into his office and told him about Graham's affair with Varner.  Judge Sheely did not discipline Osenkarski other than to tell him that he should pay more attention to matters in the office which Osenkarski understood to be a mild reprimand.  (Id. at 160 – 162).

130.    Prior to this case Osenkarski never received any complaints about Gary Graham sexually harassing anyone.  (Id. at 194).

131.    Osenkarski described Graham as having a loud voice and being very excitable. He stated that was the personality Graham presented to everyone in the office.  (Id. at 195).

132.    Osenkarski recalls that while profanity is sometimes used in the office it is used by female as well as male probation officers.  Female as well as male probation officers have told off-colored jokes in the office.  (Id. at 200).

133.    Gary Graham was first questioned by David DeLuce, Esquire, and Dan Hartnett, the County's Human Resources Director, on April 29, 1997, regarding sexual harassment allegations made by Varner.  (Graham at 6).

134.    Graham met again with DeLuce and Hartnett one week later and provided additional information regarding Varner's allegations.  (Id. at 11).

135.    After probation split into adult and juvenile departments on January 1, 1997, Graham was promoted from Probation Officer II to the position of Juvenile Supervisor.  (Id. at 54).

136.    Graham testified he first met Barbara Varner in 1990.  (Id. at 63).

137.    Graham testified he first became Varner's supervisor on January 1, 1997.  (Id. at 64).

138.    Graham testified that in 1990 he began a personal relationship with Varner that included kissing but did not lead to sexual relations until 1992.  (Id. at 69 – 72).

139.    Graham testified he first had sex with Varner on Valentine's Day, 1992.  Varner denies this allegation.  (Id. at 74).

140.    Graham testified that his sexual affair with Varner continued through 1996. The first person he ever disclosed the affair to was Judge Sheely on either July 9 or 10, 1997. (Id. at 87).

141.    Graham testified that he terminated the sexual aspect of their relationship at a DUI Conference in State College, Pennsylvania in October 1996. (Id. at 107).

142.    Graham considered himself to be a Court rather than County employee because the President Judge of the Court "hired and disciplined and reviewed our work, and we did 99.9% of our activities as Court related matters. (Id. at 262).

143.    Graham was removed from his job in Juvenile Probation in March 1998 and transferred to a position in adult probation located at the Cumberland County Prison. This was done by order of President Judge Hoffer based upon Hoffer's statement to Graham that he had lost confidence in him. (Id. at 280 – 281).

144.    Kery Houser is currently an adult probation officer. Prior to the split of the department into adult and juvenile divisions she worked directly with Graham and Varner. She described herself and Varner as being "decent friends". Houser at 11.

145.    Houser testified that Graham didn't like her and consequently did not talk to her. She identified a number of other people Graham did not like and therefore would not talk to including Tom Boyer, Paul Meuron, Mike Dunsmore, Greg Miller and Lyle Herr. (Id. at 19). She described this as Graham administering a form of punishment. (Id. at 20).

146.    Houser, herself, never heard Graham yell at Varner. (Id. at 28).

147.    Houser testified that when she shared an office with Varner prior to the split of the probation department into adult and juvenile sections Graham went out of his way to be nice to Varner. (Id. at 29).

148.    Houser has never seen Graham act towards Varner in any way that was demeaning to Varner.  (Id. at 29).

149.    Houser has never seen Graham act unkind towards Varner.  (Id. at 30).

150.    Prior to the probation department's split, Varner never complained to Houser about Graham's behavior.  Complaints came only after the split.  (Id. at 30).

151.    Varner and Houser shared an office for two years prior to the split.  (Id. at 36).

152.    During the two year period Houser and Varner shared an office, Houser's observations about the Varner and Graham relationship was that "Barb could really do no wrong as far as Gary was concerned".  (Id. at 57).

153.    Houser described the change in tenor of the Varner/Graham relationship as being a pretty abrupt change.  (Id. at 57).

154.    Houser has had two or three seminars of sexual harassment training.  Based on what she has learned about sexual harassment it was her testimony that she never ever observed Graham sexually harass Varner.  (Id. at 58).  In fact she never observed him sexually harass anyone.  (Id.).

155.    It was Houser's observation that there were actually very few people in the office Graham would talk to in a pleasant manner.  She could describe only three after consideration: Dennis Drachbar, Sam Miller and Varner.  (Id. at 61).

156.    Houser observed at work that Graham had liked Varner while she worked at Cumberland County Children and Youth Services.  She observed that Graham would go out with her while she was at CYS on a lot of cases and that the two of them would talk more about cases than other probation officers and caseworkers would.  (Id. at 62).

157.    It was Houser's observation that Varner and Graham were friends when she was at CYS and that they became "better friends" once Varner started in probation.  (Id. at 63).

158.    While Houser has not observed Graham yell at Varner, she has observed him yell at other people.  She said that he is indiscriminant in yelling at both men and women.  He is indiscriminant in being rude to both men and women he dislikes.  He is indiscriminant in attempting or threatening to punish people he doesn't like.  (Id. at 64).

159.    Houser felt that Graham treats both men and women equally poorly.  Houser qualified this statement that with women he is not as overtly mean as he is to men.  (Id. at 64).

160.    While Houser and Varner shared an office, she never heard Varner complain about having to go anywhere with Graham although they took frequent trips together.  (Id. at 66 – 67).

161.    Houser has heard Graham use foul language in the office but concedes that that is not a rare event in the probation office and that Graham was simply typical of many others with respect to his swearing.  (Id. at 67).

162.    Ronna Boyles was secretary for both Graham and Varner prior to the probation office splitting in two.  Boyles described the relationship between Varner and Graham before the split as "very good" and "better than average".  Boyles at 10.

163.    Prior to Varner actually being hired within probation she heard Graham state that Varner was "really conscientious, a good worker and it would be good having her on the staff".  She characterized it as Graham "glowed about her abilities".  (Id. at 12).

164.    Boyles testified it was not usual for Graham to raise his voice within the office and that he was "an excitable man".  (Id. at 14).

165.    Boyles testified that Graham raised his voice indiscriminately between men and women, not favoring either gender.  (Id. at 15).

166.    Boyles characterized Varner as a "favorite" of Graham's and further testified that that status began to change at about the time of the probation department split.  (Id. at 15 – 16).  She described the change in status as "sudden".  (Id. at 17).

167.    Boyles has heard Graham use foul language but also testified that his use of foul language was in general conversation and was not atypical within the probation office.  (Id. at 18).

168.    Boyles said he cursed indiscriminately among both men and women.  (Id. at 19).

169.    Boyles testified that Graham nit-picked Varner's reports but that he nit-picked with other people as well and that was simply his style.  (Id. at 26).

170.    Bill Brandt became a  probation officer in 1990.  Brandt described the working relationship between Varner and Graham as "very friendly".  To his recollection that very friendly relationship lasted for a year or more and Varner and Graham "certainly spent a lot of time together".  Brandt at 27.

171.    Brandt described the relationship as "a very friendly working relationship" and that "they got along extremely well together".  (Id. at 27).

172.    Brandt does not recall the date but does recall there was a day when the relationship between Varner and Graham appeared to abruptly change.  (Id. at 28).  Thereafter Graham distanced himself from Varner.  (Id. at 29).

173.    Brandt, who stayed in the juvenile section after the probation department split into two, recalled that on the day the Varner/Graham relationship changed he heard yelling between the two.  At no point thereafter did he observe Graham to yell at Varner.  (Id. at 30 – 31).

174.    Brandt testified that within the probation office the use of bad language is common.  He identified himself as someone who uses bad language.  (Id. at 35 – 36).  He stated that the use of bad language involved both men and women and that "it's a product of the horrible environment that we work with".  (Id. at 36).

175.    Brandt testified that prior to the probation department splitting there was a vaguely understood concept that seniority within probation was based on years of service with the County both in and outside the probation department.  (Id. at 37).  There was no written document confirming this understanding.  (Id. at 37).

176.    Following the split the juvenile department came up with their own seniority policy as did the adult department.  (Id. at 38).

177.    Following the probation department splitting into two sections there was adnauseam conversation about what the seniority policy should be.  The debate centered around whether seniority should begin as of the date of hire within the Cumberland County Probation Department.  (Id. at 38 – 29).  Brandt understands that this change was in fact implemented. (Id.).

178.    Brandt was scheduled to be promoted to senior probation officer.  He understood that his promotion was delayed because of questions raised by Varner regarding seniority. Ultimately he and Varner were promoted to senior probation officer on the same day.  (Id. at 40 – 41).

179.    Brandt understands that as a consequence of the change in the seniority system he is now senior to Varner.  Brandt testified that that position as senior to Varner provides no benefit of any type to him.  (Id. at 41).

180.    Brandt testified that sexual banter within the probation office is common among both men and women.  (Id. at 46).

181.    President Judge Harold Sheely first learned that Barbara Varner had made allegations of sexual harassment by Graham in June or early July of 1997.  Sheely at 7.

182.    Judge Sheely learned this information from David DeLuce, Esquire whom he described as "one of the County solicitors".  (Id.)

183.    Judge Sheely testified that he saw the probation officers on a regular basis.  His only dealings with other County employees was to see them when he walked through the County but he testified that "I really had no direct relationship with them".  (Id. at 10).

184.    Judge Sheely testified he has the ability to hire and fire any of the probation officers and the ability to discipline any of them.  (Id. at 10).

185.    Judge Sheely does not report to anyone in the County.  To some extent he is under the supervision of the Administrative Office of Pennsylvania Courts.  (Id. at 12).

186.    Judge Sheely categorized the probation employees as "sort of hybrid-employees", he had the sole right to hire, fire and discipline them but "for other matters they were treated like County employees".  (Id. at 12).

187.    Judge Sheely is confident that he discussed the information given to him by DeLuce with Osenkarski.  He does not recall any of the specifics of that conversation.  (Id. at 14).

188.    Judge Sheely is, however, certain that Osenkarski told him that Graham had used some swear words in conversation with Varner and for that reason he suspended Graham for three days, i.e., for the use of improper language.  (Id. at 16).

27

189.    Judge Sheely was specific that he did not suspend Graham for any reason other than the use of improper language. (Id. at 18).

190.    Judge Sheely did not discuss his decision to suspend Graham with any person in the Cumberland County Human Resources Department. (Id. at 19).

191.    Judge Sheely testified that as a consequence of Varner's allegations he directed that Varner no longer be supervised by Graham and that another probation officer, Sam Miller, assume her supervision. This was his own idea. (Id. at 20).

192.    Judge Sheely testified that to his knowledge the animosity between Varner and Graham was something new and that "they had always gotten along well in the past". (Id. at 20).

193.    In July 1997, either shortly before or after his July 11 memorandum suspending Graham, Judge Sheely met with Mr. and Mrs. Graham. At that time Graham told him that he and Mrs. Varner had been carrying on a sexual relationship for some time. Mrs. Graham was present when her husband made this confession. Graham had asked Judge Sheely for the opportunity to meet with him. (Id. at 22).

194.    In this conversation Graham explained that the termination of his sexual affair with Varner was the reason why a conflict between he and Varner had developed. (Id. at 23).

195.    Judge Sheely testified he believed Graham's confession that he had had a sexual relationship with Varner because he could not conceive that a man would bring his wife into the President Judge and admit to having a sexual relationship with a co-employee in front of the wife unless what he was saying was true. (Id. at 25).

196.    Judge Sheely recalled that Graham had been "really anxious" to have Varner hired and that they had always had a good relationship. He could not believe that all of a sudden they were at each other in an adversarial way unless there was some reason for it. That

reinforced his belief that what Graham told him about the sexual relationship was true. (Id. at 26).

197.    Judge Sheely testified that before he learned of the sexual affair between Graham and Varner he had considered in addition to a three day suspension transferring Graham from juvenile to adult probation to get him away from Varner. (Id. at 33). When he learned of the affair he decided that if both parties were engaging in adultery he was not going to penalize the man solely for this type of conduct. (Id. at 34).

198.    Judge Sheely testified he did not consider terminating Graham because if Graham and Varner were having a sexual affair it would be unfair to give him the capital punishment of termination when Varner got no penalty at all. (Id. at 34 – 35).

199.    Judge Sheely testified that he was very disappointed that Varner did not come to him with her problems rather than "running over to the Personnel Director for the County". He said Varner never asked him for a meeting. (Id. at 36 – 37).

200.    Judge Sheely testified that he did not have a specific sexual harassment policy in place for the Court because he felt Court employees would be subject to the County's sexual harassment policy. (Id. at 38).

201.    Judge Sheely's impression was that the sexual harassment policy required the alleged victim to go to her immediate supervisor and if that did not work the alleged victim, if a Court employee, should go to him. (Id. at 39).

202.    Judge Sheely believes that Varner failed to follow the sexual harassment policy by not coming to see him. (Id. at 43).

203.    Judge Sheely did not consider himself to be a County employee. (Id. at 47).

204.   It was Judge Sheely's recollection that seniority in the probation department was based on time in the probation department only.  (Id. at 63).

205.   Judge Sheely is confident that he was aware Varner had made allegations of sexual harassment before he decided what to do with Graham.  He testified that he felt the sexual harassment claim was mollified by virtue of the fact that Varner and Graham had engaged in a consensual sexual affair.  (Id. at 72).

206.   Judge Sheely explained:

> "Well, I felt that if this relationship between Mr. Graham and Mrs. Varner had been going on over these years, that for me to take all of this corrective action against Mr. Graham and not do anything with her, that would not be proper.  She was involved, I thought, the same as he was.  And at the time I had planned to transfer Mr. Graham I didn't know about this relationship, and that changed my mind".  (Id. at 73).

207.   Judge Sheely testified that, in his opinion, the affair described by Graham with Varner did occur.  (Id. at 108).

208.   Judge Sheely testified that Daniel Hartnett, the County's Director of Human Resources, did not have the power to suspend, terminate or otherwise discipline Graham.  (Id. at 113).

209.   Judge Hoffer became President Judge of the Cumberland County Court of Common Pleas on January 1, 1998.  Hoffer at 6.  At that time Hoffer knew that Varner had filed a Complaint with the EEOC.  He subsequently examined a report prepared by Attorney David DeLuce.  (Id. at 7).

210.   After reviewing the DeLuce report he interviewed various probation officers.  (Id. at 8).  Those officers included Nick Barrolet, Bill Brandt, Debra Green, Jenny Crum, and Fran Rose.  (Id. at 15).

211.    Following his interview of these officers he met with the entire staff of the probation department and indicated that if they did not act more professionally he would micromanage the office.  (Id. at 18).

212.    Judge Hoffer believes that the probation officers were required to comply with the policies stated in the County Employee Handbook.  He is also of the opinion that as the President Judge he had the authority to issue either different employment policies or contradictory employee policies.  (Id. at 21).

213.    As a consequence of his review of the DeLuce report and his interviews with the various probation officers he demoted Graham to a position outside the courthouse at the County jail.  The reason for the demotion was that Judge Hoffer stated he had lost confidence in Graham.  (Id. at 23).  He explained that on one hand he had the allegations of the Graham/Varner affair but, more important to him, was the fact that he had lost his confidence in Graham's ability to lead.  (Id. at 23).

214.    Judge Hoffer testified that he is generally unaware of any seniority policies within the probation department.  Furthermore, he feels seniority is generally unimportant:  "Seniority has never been high on my books".  Hoffer has no recollection of making any changes to any seniority policies within probation.  (Id. at 32).

215.    Judge Hoffer believes that the County Human Resources Director may have recommended to him that Graham be fired but does not have a specific recollection of that.  (Id. at 34).

216.    In 1998, during renovations within the courthouse, the Court stenographers, including Graham's wife, were temporarily transferred in a space then occupied by juvenile probation.  Varner had an office elsewhere in the courthouse.  Judge Hoffer told Osenkarski to

ask Varner to please stay away from the work site where Barbara Graham was located.  (Id. at 39).

217.    The next day Judge Hoffer received a note from Varner demanding that he set forth this request in writing.  (Id. at 40).

218.    Judge Hoffer had Varner come to his office the next day.  Hoffer prepared notes of that meeting which indicate that in the meeting he explained to Varner that he wanted to eliminate as much contact between Varner and Barbara Graham as possible.  He told Varner that he would move Barbara Graham if it was possible but it did not appear to be possible.  He thus asked Varner to voluntarily stay out of Barbara Graham's office and to have probation officers she needs to talk to come to her own office.  Varner wanted to know why.  Ultimately Varner agreed with Judge Hoffer that regardless of anything else "Barbara Graham is an innocent victim".  (Id. at 43).

219.    Judge Hoffer's notes show that he explained to Barbara Varner that he was not ordering her where or where not to go.  He wanted Varner to volunteer to stay away from Barbara Graham's work station to ease tensions.  (Id. at 44).

220.    His notes further stated:  "My position of Barbara Varner:  I am not ordering her to do anything but if she still insists, I will move any officer Barbara Varner has to see out of that office, [where Barbara Graham was] until Barbara Graham is relocated".  (Id. at 44).

221.    Judge Hoffer testified that Varner did not agree to comply with his request. Hoffer said that he "absolutely" did not give her an order to stay away from the office area where Barbara Graham was located.  (Id. at 46).

222.    Judge Hoffer further indicated that he told Barbara Graham to stay away from Varner "period". (Id. at 46). This had occurred at or about the same time as his conversation with Varner. (Id. at 47).

223.    Judge Hoffer has notes that show he met with Varner on March 4, 1998. Varner advised that her new supervision by Sam Miller was "going okay", "but Graham's hand is pervasive through the office through little things". Judge Hoffer thereafter demoted Graham about ten days following this meeting with Varner. (Id. at 52). However the demotion was not solely the result of his interview with Varner. (Id.).

224.    Judge Hoffer testified that if a dispute were to exist between the County and himself as to terms and conditions of employment of probation officers there would ultimately be no dispute: "I do the hiring and firing, ma'am. I am in charge of the probation office". (Id. at 63).

225.    Judge Hoffer testified he believes it is incorrect under any circumstances for a supervisor to have any kind of sexual affair with a person he is supervising. That was one of the reasons why he demoted Graham in addition to Graham's management deficiencies. (Id. at 68). The other part, of course, was that he had lost his confidence in Graham's ability to be a supervisor. (Id.).

226.    In Cumberland County there exists a Salary Board. There are five members on the Board. The three County Commissioners and the County Controller are always members. The fifth member would be the row officer or department head whose budget is being effected or, in the case of the Court, the President Judge. (Id. at 72).

227.    Judge Hoffer testified that the Salary Board always has three Commissioners who would constitute a majority vote. Therefore, the Commissioners would always be able to control

salaries set for Court employees. Nonetheless, other than the creation of Court jobs and the salary set for those jobs, Judge Hoffer testified that he controlled each and every other term and condition of employment for the Court employees. (Id. at 72).

228.    Judge Hoffer testified that if he had two probation officers, one slightly senior to the other, and the junior probation officer is the better qualified employee, then the junior qualified employee will absolutely be considered for promotion over the more senior employee. (Id. at 74).

229.    Dennis Drachbar is a Probation Officer II. He has been employed in the Cumberland County Probation Department since 1984. Drachbar has never seen Graham sexually harass any individual within the probation department including, specifically, Varner. Drachbar at 8. He has never observed Graham to yell at Varner, curse at Varner, or say anything sexually demeaning to Varner. (Id.).

230.    From Drachbar's observations Graham treated Varner with respect. (Id. at 9).

231.    Drachbar has never heard Osenkarski sexually harass anyone, treat any women rudely, speak demeaningly of any women within the office, or discuss intimate details of his own personal sexual life within the office. (Id. at 11).

232.    Sam Miller became a probation officer with Cumberland County in 1983.

233.    From his own personal observation Miller believes that Graham and Varner were friends and that that status changed to being a strained relationship. Miller at 9.

234.    Miller stated that within the probation office yelling at each other was not uncommon and specifically he and Graham yelled at each other on a number of occasions. (Id. at 10).

235.    After Miller recalled the Varner/Graham relationship becoming strained he still did not observe any instances of Graham treating Varner worse than he treated any other employee in the office.  (Id. at 11).

236.    Miller has never heard Graham ask for any type of sexual favor or say anything to Varner that contained sexual overtones.  (Id. at 15).

237.    Miller has not heard Osenkarski speak demeaningly about any women or treat any women in the office inappropriately.  (Id. at 17 – 18).

238.    Miller recalls that when Ken Bolze was in charge of the combined probation department (before the split into juvenile and adult divisions) Bolze had vaguely defined seniority rules which included all County service for seniority purposes and not just service within the probation department.  Miller stated there was a group of probation officers that were opposed to those seniority rules and that after Bolze departed and the probation department split, a new policy, primarily authored by Tom Boyer, was implemented with only time in probation counting for seniority.  Miller recalls discussing this with Varner who was critical of the new policy.  (Id. at 19 – 20).

239.    Miller acknowledged that with regard to swearing at each other during arguments, he probably swore at Graham more than Graham swore at him.  (Id. at 23).

240.    Miller became Varner's supervisor on June 17, 1997.  Graham was still in the office at that time.  Miller testified that:

> "I'll give him [Graham] credit.  He never came to me at the time I supervised Barb Varner, and we were pretty comfortable with each other.  I wouldn't say we were best friends, like, we didn't grow up together, but we were friendly.  But he never came to me and said, you better be tough on her, or you better do this or you better do that….Gary never came to me and said, please do this, or check on this, or blah, blah, blah, blah, blah.  That didn't happen."  (Id. at 24 – 25).

241.    Miller has never heard Graham say anything that would lead him be believe that Varner's physical safety was in jeopardy nor as he heard any such comment from any third person. (Id. at 30 – 31).

242.    Miller denied that from his observation the newly strained relationship between Varner and Graham resulted in Graham behaving more abusively to Varner than other employees who he also supervised.  He agreed Varner felt that way but did not personally observe anything that would confirm Varner's perception.  (Id. at 33 – 34).

243.    After Miller was assigned to supervise Varner in lieu of Graham, Dan Hartnett, the County's HR Director, met with him and instructed him how important it was that he act professionally and exhibit no retaliatory behavior or vindictiveness towards Varner.  (Id. at 42).

244.    At the time of his deposition Miller had not spoken to Graham for approximately six years.  (Id. at 49).

245.    With regard to the issue of commitment trips, Miller cannot recall any specific rule that commitment trips were to start at eight in the morning.  He does, however, recall discussions where a probation officer was told that if he did not leave for his commitment trip until noon or one you needed to have a good reason for doing that since later trips increased the County's overtime costs.  (Id. at 74).

246.    Darby Christlieb has been a probation officer since 1989.  He had the opportunity to observe Varner and Graham interact prior to the split of the probation department into adult and juvenile sections.  According to Christlieb Graham and Varner appeared to be friends.  He never observed Graham to yell at Varner, curse at Varner or say anything sexually demeaning to Varner.  In fact, he stated that Graham probably treated Varner better than he treated other people.  Specifically, he treated her as one of his favorites.  (Christelieb at 6 – 7).

247.    Again, prior to the split Christlieb never heard Varner complain about having to take so many trips with Graham.  She appeared to except Graham as a mentor and to enjoy his company.  (Id. at 8).

248.    Christlieb observed a change in the Varner/Graham relationship which he described as "very abrupt".  (Id. at 9).  That change would have taken place sometime in 1997. (Id.).

249.    Christlieb has been instructed in sexual harassment training twice since 1998.  Within the framework of the knowledge he has acquired he has never observed either Graham or Osenkarski to sexually harass anyone.  (Id. at 13).

250.    Christlieb's understanding of seniority in the probation office is based on date of hire within the probation office.  His understanding is that has continuously been the rule since 1989.  (Id. at 14).

251.    Christlieb has heard Graham yell not only at Varner but at most of the people in the probation office.  Christlieb said there is no distinction between Graham's yelling at men as compared with women.  He agreed Graham was a "equal opportunity yeller".  (Id. at 15).

252.    Christlieb has heard foul language used by both male and female probation officers although more among the male officers.  (Id. at 16).

253.    Christlieb stated that Graham has yelled at him at least a dozen times.  (Id. at 17).

254.    Christlieb stated that on one occasion Graham's level of yelling with Varner appeared to be more vicious than any of his yelling had been with Christlieb.  However, other than that occasion Christlieb has never seen Graham treat Varner inappropriately.  (Id. at 17).

255.    Christlieb described Graham as someone who had favorites and who had people he didn't like.  Christlieb stated that Graham was uniformly rude to all those people he did not

like and acted in a belligerent manner towards all of them.  The group of people he did not like included both men and women.  (Id. at 18).

256.    Christlieb testified that it was a mystery to himself and others as to why the friendly relationship between Varner and Graham terminated so abruptly.  (Id. at 77).

257.    Judge Edward Guido is the dependency judge for the Court of Common Pleas of Cumberland County.  He handles all cases involving allegations of dependency.  He first learned that there might be grant money available for the Court Appointed Special Advocate Association ("CASA") sometime in 1999.  He became a judge in January, 1998.  (Guido at 1 – 7).

258.    The grant money available was through the Pennsylvania Commission on Crime and Delinquency.  (Id. at 7).

259.    Judge Guido originally thought that the position as Director of the CASA Program, if the Program were funded, would be a part-time position.  He suggested to Osenkarski that a juvenile probation officer could fill this position on a half-time basis and remain half-time with the probation department.  (Id. at 7 – 8).

260.    In Guido's discussion with Osenkarski Guido explained that if his concept were approved juvenile probation would acquire a new probation officer and have to give up half-time ne of their existing probation officers who would become the half-time CASA Director.  (Id. at 8).

261.    Ultimately, the Court received a grant from the National CASA Program to help fund the Program in Cumberland County.  Before the existence of this grant was known to the Court, Judge Guido had contemplated getting grant money from the PCCD.  (Id. at 14 – 16).

262.    Judge Guido said that he identified Varner as his selection to direct the CASA Program well before the National CASA Organization was looked at as a source of funding.  (Id. at 16).

263.    Judge Guido identified Varner as the possible Director when his concept of the position remained as a part-time job.  He then received a phone call from Judge Hoffer and met with Hoffer and an attorney, Howard Holmes, from the AOPC.  Holmes briefly discussed with Judge Guido the present case and stated that the AOPC was thinking of making an offer to resolve the litigation by having Varner be a full-time CASA Director and moving her out of Probation.  Judge Guido was happy to have a full-time Director rather than a part-time Director and expressed his interest in having Varner full-time.  Holmes then told him that he would receive a further call from the County's counsel in this litigation.  (Id. at 17).

264.    Judge Guido recalls discussing with Varner the part-time versus full-time issue. He does not recall the date.  He testified:

> And when we talked about having her go full-time, I said "the only fly in that ointment would be that your salary is much higher than the position would call for, that I think Commissioners would want to fund and that it was sort of a win, win situation; I wanted a CASA Program, she wanted out of Probation.  If they could get the litigation resolved, she would move out of Probation, I'd get my program, she would be doing something that she wanted to do, and presumably, her and I could work together well".  (Id. at 19).

265.    Judge Guido further remembered talking with Varner about a link between her litigation and the CASA Program Directorship:

> I remember specifically having a discussion with her about that.  Do I remember exactly what day it was, where it was?  No. It was in my office.  But I, you know, that was a clear understanding between us that we were moving forward, she was my choice, but there was always that question of whether we could

resolve the litigation to her satisfaction or the Commissioners' satisfaction and, you know, that was the problem.  (Id. at 19).

266.    Judge Guido further explained that the linkage between the litigation and the CASA Program became absolutely clear when the concept of the directorship being a full-time position first arose:

> From the beginning of the discussions when it was going to go full time okay?  I had always made clear to her and anybody else, including Judge Hoffer and the lawyer over there, I didn't want to know the details of – and Jim Thomas, I didn't want to know the details of what the litigation was about.  Didn't concern me.  I was only concerned with getting the CASA Program up and running.  I wanted it funded.  I didn't think it was, that that position was worth forty plus thousand dollars, but if they were willing to pay that to settle their suit, I was happy to have it.  (Id. at 19 – 20).

267.    Judge Guido recalls a March 1, 2000, meeting.  (Id. at 22).  Judge Guido recalls introducing Varner at the meeting "as the lady I hoped would be running the program".  (Id. at 26).

268.    Judge Guido further recalls seeing the grant application for the CASA Program. That document contained proposed salaries for the CASA Director for the first three years of the project.  Those salaries tracked what Varner would have made had she remained in the probation department.  (Id. at 23).

269.    Judge Guido stated that he did not discuss this case with Varner but he did discuss the implication of this case with Varner as far as her receiving the Program Directorship, full-time, at her old salary which he felt was an inflated figure for the duties required as the CASA Director:

> I never discussed the litigation because I didn't want to know about it.  All the discussions were, was that all of this was subject to her being able to make the lateral move based upon the complaint's being resolved, and that was clear, that was clear in

my mind, it was clear in her mind, at least I thought it was clear in her mind, because we discussed it.

And as we got closer to the time, the grant was approved, and we had some meetings about trying to get things resolved and trying to protect her once she moved over, things like you wouldn't do normally, saying that if the program goes south she can move back in [to probation], be able to do this, that, and the other thing.

So it was very clear that we wanted her there and that she could come there at this salary [her probation salary], but the Commissioners weren't going to pay that salary unless it was part of an overall resolution. (Id.)

270.    Judge Guido clearly felt that $40,000 was an excessive amount to pay a full-time

Program Director for CASA:

I thought the salary was too high. I understood that we were going to fund a full-time director. That's all the grant people really wanted to know, that we were going to be doing that.

I got a memo from Laura [Patterson, the grant writer] saying, boy, this salary is out of wack, CASA tells me that the average nationwide is around $30,000 or $33,000 or something like that. So I didn't have a problem with any of that, it was what it was and that's what we were doing. If we got the deal worked out, it would be that; if we didn't, it would be something else. (Id. at 30).

271.    Judge Guido reiterated that he met with Varner after talking with the AOPC's

lawyer. His purpose wasn't limited to discussing with her the AOPC's settlement program:

I don't know if that's the only purpose, the purpose was, okay, this is going to be full-time, that the Commissioners were going to go along with full-time, but I don't know if they are going to go along with your salary in this position, and the purpose is to try to resolve this litigation. Their purpose is to try to resolve this litigation. (Id. at 35).

272.    Judge Guido said Varner wanted to discuss the details of the litigation:

She may have wanted to try to get into the details of the litigation. I remember I didn't want to know from anybody about anything on the litigation. And I recall that it made sense that they

weren't going to pay more than the job was worth, which they didn't have to do while she had a suit going, and we had that discussion at some point, I recall that discussion. (Id. at 35).

273.    According to Judge Guido, Varner participated in the discussions regarding the litigation and the possible directorship at an elevated salary:

> I know we were trying to get the funding for her position resolved. And because it was tied into the litigation, I think she had some concerns that, hey, this grant's only for two years, what if this is some clear ruse by the County to get me to settle the litigation and pull the plug out from under the program and I am out of a job in two years from now. And that gave me some concerns, too, because I didn't want my program to be the victim of some litigation. So I wanted to make sure that the County wasn't just setting somebody up to resolve some litigation.
>
> So I figured that if they were in further ahead of the game when the pulled the plug on my program, if they didn't we would come up with these proposals to make sure that if the plug got pulled at the end of the two years, she was protected. The County didn't save a nickel, so they had no financial reason to pull the plug on my program and it would be only pulled if it wasn't working. (Id. at 37 – 38).

274.    Judge Guido reiterated time and again in his deposition that both he and Varner clearly understood that the payment of the elevated salary was conditioned upon the litigation being settled:

> Certainly, the salary was part of the grant, but it was always understood that it was conditioned upon this being settled. Otherwise, I would have to look for somebody commensurate with, to pay commensurate with what the position would be worth.

275.    Judge Guido knew that the County had funded the directorship at $29,000 if there was not this litigation. Judge Guido himself thought that was too high. He thought the full-time position was worth about $25,000 per year and shared that thinking with Varner. (Id. at 42).

276.    When Varner could not agree to resolve the litigation Judge Guido offered her the CASA Directorship but at the $29,000 figure approved by the County and which he felt was

42

more than the position was worth.  Upon making the offer Varner told him she was not able to accept the $29,000 figure and Guido told her that that was her personal decision to make.  (Id. at 45).

277.    John Ward was the Interim Chief Clerk for Cumberland County between July 1995 and January 1996.  Ward became Chief Clerk in January 1996.  The Chief Clerk is the highest ranking non-elected official in Cumberland County and reports directly to the County Commissioners.  Cumberland County department heads report directly to the Chief Clerk.  (See Affidavit of John Ward).

278.    By law, Cumberland County was required to, in deed, provide the funding for the Cumberland County Court of Common Pleas' Probation Department.  Other than providing funding for the Probation Department, Cumberland County exercised no authority over the Probation Department.  Whenever as Chief Clerk, Ward received a complaint about any aspect of the operation of the Probation Department, he would simply forward that complaint to the President Judge of the Court of Common Pleas who would dispose of the complaint in any way he wanted.  (See Affidavit of John Ward).

279.    Ward became aware of the fact that Varner brought complaints regarding sexual harassment against Gary Graham and Joseph Osenkarski to the attention of the County rather than to the President Judge.  Ward believes this occurred because historically Cumberland County's HR Department dealt with issues rising within the Courthouse concerning personnel matters and those matters would only go to the President Judge when they could not be resolved by HR.  (See Affidavit of John Ward).

280.    Ward does not recall the exact day he learned about Varner's sexual harassment complaint.  He does recall that Dan Hartnett, the County's then HR Director, brought the

complaint to his attention within minutes after receiving the complaint. Ward and Hartnett discussed the complaint and agreed to seek the assistance of David DeLuce. DeLuce is an attorney for the firm where Horace Johnson is a partner. At the time the Varner complaint was made known to Ward, Horace Johnson was the County Solicitor. (See Affidavit of John Ward).

281.    Ward recalls that DeLuce was engaged as an outside independent investigator because Varner worked for the Court system.

282.    Ward recalls that DeLuce orally presented to him a report, following his investigation, that said essentially that Osenkarski and Graham were both guilty of sexual harassment and that Graham was completely running the Probation Department. The report did not mention anything at all about a sexual relationship between Varner and Graham. DeLuce recommended that both Graham and Osenkarski should be fired. (See Affidavit of John Ward).

283.    Hartnett and Ward ultimately concurred in DeLuce's recommendation. There were two reasons for their decision. First, Ward and Hartnett were concerned about DeLuce's conclusion that actual sexual harassment had occurred. Second, Ward and Hartnett were just as concerned with DeLuce's conclusion that the Juvenile Probation Department was being managed in an extremely poor manner. The evidence brought to our attention by DeLuce showed that Osenkarski was aware of the problems DeLuce identified with Graham's management or mismanagement of the department and did nothing to rectify any of these problems. (See Affidavit of John Ward).

284.    On a date presently unknown to Ward, he did meet with County Solicitor Horace Johnson. Solicitor Johnson and Ward went to President Judge Sheely and discussed with him the conclusions that had been derived from DeLuce's inquiries. Judge Sheely made known to them

at that time that he was already aware that DeLuce had been making inquires into the Varner complaint. (See Affidavit of John Ward).

285.    Ward recalls a second meeting with Judge Sheely but does not recall the date. Both DeLuce and Hartnett were present at that meeting and recommended that both Graham and Osenkarski should be fired.

286.    Judge Sheely, however, insisted upon receiving a copy of the report that DeLuce had prepared and was therefore given a copy. (See Affidavit of John Ward).

288.    Before Judge Sheely took any action, Ward believes that Gary Graham confessed to Judge Sheely his long term consensual sexual affair with Varner. Judge Sheely told Ward personally that Graham had confessed to the consensual affair. Judge Sheely indicated that he had therefore decided to simply give Graham a three day suspension rather than fire him. Osenkarski was not, to Ward's recollection, mentioned. Ward does know and recall that Osenkarski ultimately received no discipline. (See Affidavit of John Ward).

289.    Ward recalls that Judge Sheely had first said that Graham would receive a five day suspension and Osenkarski a three day suspension and that it was only later that the figures were reduced. (See Affidavit of John Ward).

290.    To Ward, it was very clear in meeting Judge Sheely and discussing the problem with him that it was the acknowledgement of the affair to Judge Sheely by Graham that softened the Judge's decisions on discipline. (See Affidavit of John Ward).

291.    At some point shortly after Sheely retired Hartnett advised Ward that he had received yet another complaint from Varner about sexual harassment. Ward, today, does not recall the exact nature of the complaint but does recall that Hartnett and he gave the complaint to Judge Hoffer. Judge Sheely having retired, Hoffer was now the President Judge of Cumberland

County.  Judge Hoffer indicated that he did not have much familiarity with the Varner situation and was going to discuss the situation with Judge Sheely.  Hoffer also had the opportunity to read the report that had been prepared by DeLuce.

294.    Because the County was completely without any power to intervene in the supervision and discipline of court employees, Ward had no alternative but to accept the decision of President Judges Sheely and Hoffer.  Had the County had any decision making authority in this regard while Ward was Chief Clerk, both Graham and Osenkarski would have been terminated.  While Graham's subsequent revelations about his sexual escapades with Varner left Ward uncertain as to Varner's veracity, the management issues described to DeLuce by the other probation officers during his inquiries left to Ward no doubt that from the managerial standpoint alone the department would be better off without Osenkarski and Graham.  (See Affidavit of John Ward).

295.    Daniel Hartnett was Cumberland County's Personnel Director from the time Varner was hired until his retirement in early October 1998.  (Hartnett at 5).

296.    Hartnett is familiar with the County's Personnel Handbook which contains a sexual harassment policy.  Hartnett personally has exposure to sexual harassment issues through graduate school training and his earlier position as a senior union leader for AFSCME.  (Id. at 12).

297.    In his capacity as Personnel Director, Hartnett is aware that the probation employees would have received a copy of the County's Personnel Handbook.  (Id. at 12).

298.    Hartnett does not recall when he first learned of Varner's complaint about sexual harassment.  (Id. at 17).  He does recall that upon learning of the Complaint he called up either

Hank Johnson, the County Solicitor, or David DeLuce, Esquire, Johnson's partner.  (Id. at 19).
Either Hartnett or DeLuce told Varner to put her allegations in writing.  (Id. at 19).

299.    Hartnett asked County Solicitor Johnson to engage someone to investigate
Varner's complaints of sexual harassment.  (Id. at 22).  The person selected was Johnson's
partner, David DeLuce, Esquire.

300.    Hartnett's protocol on the investigation was to direct that the interview of all
people involved.  By the phrase "all people involved" Hartnett means people identified by
Varner as having knowledge of the sexual harassment in Varner's interview with David DeLuce.
(Id. at 30-31).    Additionally, Hartnett directed the interview of anybody mentioned by
Defendants Graham and Osenkarski as individuals who could substantiate their contrary version
of the facts.  (Id. at 31).  Hartnett sat in on almost all of the interviews conducted by DeLuce.
(Id. at 32).

301.    Hartnett was told by Varner that her proposed solution was that Osenkarski and
Graham be discharged.  (Id. at 34).

302.    Hartnett found Varner credible and said that in his meetings with DeLuce,
DeLuce also found her credible.  Neither found Graham or Osenkarski credible.  (Id. at 40-42).

303.    Hartnett thought Graham should be fired because he felt that the investigation had
substantiated Varner's allegations.  (Id. at 45-46).

304.    Hartnett did not agree with the County Solicitor's recommendation that
Osenkarski be fired.  Hartnett felt that Osenkarski should be asked to retire after perhaps a brief
suspension or reprimand.  (Id. at 43).

305.    Hartnett recalls a meeting with Judge Sheely in July 1997.  Judge Sheely told him
he planned to transfer Graham to Adult Probation.  Hartnett recalls that in this meeting he asked

if he could relay this information to Varner.  Hartnett personally thought this would have been a satisfactory solution to the whole problem.  He told Judge Sheely that because the problem had been going on for a while he wanted to talk to Varner and tell her it was being resolved.  Judge Sheely told him to go ahead and speak with Varner.  (Id. at 49).

306.    Hartnett relayed to Varner the information that Graham was being transferred out of Juvenile Probation.  (Id. at 50).  Varner expressed satisfaction to him and Hartnett assumed that would conclude the case.  (Id. at 51).

307.    In his meetings with Graham, Graham never acknowledged to Hartnett that he had engaged in an adulterous affair with Varner.  (Id. at 56).  In fact, Hartnett did not learn about the adultery until long after his retirement in April 2003.  (Id. at 58).

308.    Hartnett testified that the seniority issues were not important within the County because they were not unionized and they did not have a history of layoffs – the things for which seniority is important.  "So the seniority structure was somewhat irrelevant and by enlarge, you know, there were no seniority units established anywhere in the County."  (Id. at 79).

309.    Hartnett recalls that Varner was instructed not to go into one part of the Probation Office where Gary Graham's wife, Barbara Graham, was temporarily stationed.  He recalls that Varner was told that if she needed things from that office, someone was to get them for her. Varner told this to Hartnett.  Hartnett talked to President Judge Hoffer about it.  He told Hoffer he did not feel this was correct.  He felt it was his job to let the Judge know about this situation and to advise the Judge that this situation, i.e., restrictions on Varner, should be corrected.  (Id. at 87-88).

310.    Hartnett absolutely concurs with Judge Hoffer that it is the Court and not the County who determines in the Probation Department who would be laid off or promoted. (Id. at 115).

311.    David DeLuce, Esquire, has legal training in the law of sexual harassment. (DeLuce at 20-21).

312.    DeLuce recalls that he and Hartnett met with Varner, got her verbal statement and asked her to put her charges in writing, which she did. Varner indicated to them people they should talk to. DeLuce and Hartnett talked to those people and to Osenkarski and Graham. There were times when they met with an individual twice as more facts came out and they wanted to re-verify various allegations. DeLuce described this as an ongoing process that started in April 1997 and continued into June 1997. (Id. at 36-37).

313.    DeLuce's role in the investigation terminated in mid June 1997. (Id. at 40).

314.    DeLuce described the protocol in the investigation as the interview of Varner, the interviews of people identified as witnesses by Varner and the interviews of other persons identified by Varner's witnesses as having relevant information. (Id. at 45-46).

315.    Defendant Graham specifically stated to DeLuce that he had not had a sexual relationship with Varner. (Id. at 60).

316.    DeLuce testified that as a consequence of the many interviews he had with probation department personnel "I became less concerned that we had a sexual harassment issue here and more concerned if we had anything it was an employment/supervisory issue." (Id. at 61).

317.    As part of his interviews Defendant Graham told DeLuce that Graham disagreed with what some witnesses said and that those witnesses were lying. Graham told him he had

documents that would prove he [Graham] was right but Graham would not give those documents to DeLuce although DeLuce asked for copies. (Id. at 63-66).

318.    DeLuce first learned about Graham's confession that he had had an adulterous relationship with Varner somewhere around July 4, 1997 – after his participation in the investigation of the sexual harassment case had already terminated. (Id. at 77-78). Had he still been part of the investigation he would have researched legal cases involving adulterous relationships between employees and would have expanded the scope of his investigation. (Id. at 77-78).

319.    DeLuce did urge the County Commissioners and the County Chief Clerk, John Ward, that they should urge the President Judge to take some action on Varner's Complaint. (Id. at 80).

320.    The written report prepared by DeLuce was not prepared with the intention of giving it to the County or the Court. That document evolved as he made changes in it as he interviewed additional witnesses. As more witnesses were interviewed he became less and less concerned with sexual harassment and more concerned with the issue of poor management in the Probation Department. (Id. at 89).

321.    The DeLuce report dated 4/30/97, DeLuce Deposition Exhibit 2, states the following recommendation:

> "My impression is that we have both a hostile environment and an employment problem. It is clear from all employees in the department that there exists certain favorites (the group of six). This is supported by the fact that those six were taken to Reno and are the core group which provides the DUI training which gives each of them additional income. Whether that is justified depends to whom you speak. Others have asked to be included in that DUI training and were told no, stay out of it, and also don't discuss the Reno trip. There also appears to be a great disparity in the daily work environment and the satisfaction of employees between juvenile

probation and adult probation. Almost all employees commented about the problems that have been allowed to permeate both departments for years as a result of a former director who recently retired. It is also clear that many employees did not want to work with Osenkarski and Graham, and cited the same reasons that were described by the Complainant.

In all examples cited by the Complainant of unwanted activity where a third party witnessed the incident or comment, the Complainant's version was verified by the third party. Osenkarski simply denied everything whereas Graham denied some or placed his own twist…on the incident. If significant action is not taken, the behavior will certainly continue and in fact I would suspect significant retaliatory action which has been historical in this department. At a minimum, a suspension, sensitivity training, and very close monitoring should occur. Whether this will eliminate the work place conditions is doubtful. While termination is severe, unless there is a transfer of the supervisors, or a new supervisor over all of them, I don't expect the activity to cease and retaliatory conduct may continue.

Also, new nondiscriminatory policies need to be implemented to offer all probation officers Act 235 training, reimbursement for continuing education expenses, and opportunity for participation in DUI training.

From the County's prospective, if only minimal action is taken, can we defend a claim of sexual harassment for a hostile environment? That is very difficult to answer. There is certainly ample evidence of a hostile environment that we cannot refute. It will depend how these persons are portrayed to and perceived by a jury if it ever gets to that point. Frankly, I believe Graham is excitable and will not be the best of witnesses. He losses his temper quickly as he did with me and has an attitude that he is always right and blames others for the problems. Moreover, any litigation would probably involve the deposition and probable trial testimony of much of the department reaching all the way to the President Judge. Even if we prevail, we make only the working environment more tenuous then already exists."

322. The report dated 6/4/97, Deposition Exhibit 3, contains the following recommendation:

"My impression is that we have both a hostile environment and an employment problem. It is clear that there exists certain

51

favorites (the group of six) in the department.  This is supported by the fact that those six were taken to Reno and are the core group that provides the DUI training which gives each of them additional income.  Whether this is justified depends to whom you speak.  Others have asked to be included in that DUI training and they were told no, stay out of it and also don't discuss the Reno trip.  There also appears to be a great disparity in the daily work environment and satisfaction of employees between juvenile probation and adult probation.  Almost all employees commented about the problems that have been allowed to permeate both departments for years as a result of a former director who recently retired.  It is also clear that many employees did not want to work for Osenkarski and Graham, and cited the same reasons that were described by the Complainant."

323.    Hank Johnson's letter to Hartnett of 6/26/97 contains the following recommendation:

> At a minimum, Osenkarski should retire and Graham should be removed from any supervisory position.    Such action will mitigate the County's damages.  Unless the recommended action is taken, the County's knowledge of the allegations and the facts surrounding same will probably expose the County to liability for damages and punitive damage claims.  Since the alleged conduct of Osenkarski and Graham is in violation of County policy, any liability imposed on them, including punitive damages, will probably not be covered by County insurance.  Clearly punitive damages imposed upon them would not be covered nor would the County be responsible to pay same.  The probabilities are that both Osenkarski and Graham would have to get their own attorneys.
>
> We believe it is imperative that the recommended action be taken.
>
> Because it is the Court that hires, fires and manages the probation department, it is incumbent upon the County to provide the Court with a copy of this letter, a copy of the confidential attorney impressions memorandum, and a copy of the summary that I started to prepare.  By doing this we have provided the Court with all of the information and recommendations.  Given the fact that no action has been taken by the Court to date, failure of the County to provide said information to the Court could be deemed as a negligent action by the County."
>
> Respectfully submitted,

52

**THOMAS, THOMAS & HAFER, LLP**

**s/James K. Thomas, II**

By:_____

James K. Thomas, II, Esquire
Atty. ID No.:  15613
Paul J. Dellasega, Esquire
Atty. ID No.:  23146
305 North Front Street
Sixth Floor, P.O. Box 999
Harrisburg, PA  17108-0999
(717) 255-7602
Attorney for Defendant,
Cumberland County

DATE:  December 29, 2003

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Barbara E. Varner, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No.: 1:CV 01-0725 |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Ninth Judicial District, Cumberland | : | JURY TRIAL DEMANDED |
| County, and Cumberland County | : | |
| and S. Gareth Graham, Individually, | : | JUDGE YVETTE KANE |
| and Joseph Osenkarski, Individually, | : | |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I hereby certify that I sent a true and correct copy of the foregoing document to the following counsel of record, by placing a copy of same in the United States, first class mail, postage prepaid, addressed as follows:

Debra K. Wallet, Esquire
24 North 32nd Street
Camp Hill, PA 17011

A. Taylor Williams, Esquire
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102

David J. MacMain, Esquire
Montgomery, McCracken,
 Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109

Paul J. Adams, Esquire
Sweeney & Sheehan, P.C.
1515 Market Street, 15th Floor
Philadelphia, PA 19102

**THOMAS, THOMAS & HAFER, LLP**

By:    **s/James K. Thomas, II**
_____
James K. Thomas, II, Esquire

Dated: December 29, 2003