1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
       . . . . . . . . . . . . . . . .
 3   BARBARA E. VARNER,            .  CIVIL ACTION
               Plaintiff          .
 4
         vs.                      .  NO: 1:CV 01-0725
 5
     COMMONWEALTH OF PENNSYLVANIA, .
 6   NINTH JUDICIAL DISTRICT,      .
     CUMBERLAND COUNTY;            .
 7   CUMBERLAND COUNTY; S. GARETH  .
     GRAHAM, individually; and     .
 8   JOSEPH OSENKARSKI,            .
     individually,                .
 9            Defendants          .
       . . . . . . . . . . . . . . . .
     .
10

11

12

13            Deposition of:  DAVID  W. DeLUCE

14            Taken by    :  Plaintiff

15            Date        :  October 24, 2003, 10:42
a.m.
16            Place       :  5001 Louise Drive
                             Mechanicsburg,
Pennsylvania 17
              Before      :  Ann M. Wetmore

18                           Reporter - Notary Public

19

20

21

22
```

23

24

25

2

```
 1   APPEARANCES:
 2        LAW OFFICES OF DEBRA K. WALLET
          By:  DEBRA K. WALLET, ESQ.
 3
               For - Plaintiff
 4
          ADMINISTRATIVE OFFICE OF
 5        PENNSYLVANIA COURTS
          SUPREME COURT OF PENNSYLVANIA
 6        By:  A. TAYLOR WILLIAMS, ESQ.

 7             For - Defendant Ninth Judicial District

 8        THOMAS, THOMAS & HAFER
          By:  JAMES K. THOMAS, II, ESQ.
 9             PAUL J. DELLASEGA, ESQ.

10             For - Defendant Cumberland County

11        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          By:  DAVID J. MacMAIN, ESQ.
12
               For - Defendant Gary Graham
13
          SWEENEY & SHEEHAN, P.C.
14        By:  PAUL LANCASTER ADAMS, ESQ.

15             For - Defendant Joseph Osenkarski

16   ALSO PRESENT:

17        PETER ZANGARDI, ST. PAUL INSURANCE CO.
          BARBARA VARNER
18        GARY GRAHAM
          JOSEPH OSENKARSKI

19

20

21

22

23

24
```

25

3

1                              INDEX
                              _____
                              WITNESS
                              _____
2
                                                Examination
                                                _____
                                                ___
3
     DAVID DeLUCE
4
          By Ms. Wallet                              4
5
          By Mr. MacMain                           109
6
          By Mr. Adams                             132
7
          By Ms. Williams                            -
8
          By Mr. Thomas                              -
9
          By Mr. Dellasega                           -
10
11                            EXHIBITS
                              _____

12   DeLuce Deposition
     Exhibit_Number
Page
          _____ _____
____
13
     1    Handritten notes authored by
4
14        David W. DeLuce and fax cover
          Sheet dated October 22, 2003
15
     2    Confidential Attorney Impressions
4
16        Memorandum to HAJ from DWD,
          dated April 30, 1997
17
     3    Confidential Attorney Impressions

```
 4
18          Memorandum to HAJ from DWD,
            dated June 4, 1997
19
     4      Letter to Daniel Hartnett from
11
20          Horace Johnson, dated June 26, 1997

21   5      Handwritten Memo to Dan from Joe O.
121
            dated April 30, 1997, with case

22          assignments

23

24

25
```

4 1

```
 2              It is hereby stipulated by and between

 3         counsel for the respective parties that
sealing,

 4         certification and filing are hereby waived;
and

 5         all objections except as to the form of the

 6         question are reserved to the time of trial.

 7              (DeLuce Deposition Exhibits #1, #2 and #3

 8         marked for identification)

 9              DAVID W. DeLUCE, called as a witness,
being

10         duly sworn, testified as follows:

11                        EXAMINATION

12    BY MS. WALLET:

13    Q.   Good morning, Mr. DeLuce, my name is Debra
Wallet.

14         I'm here representing Barbara Varner in an
action

15         that has been brought against the county, the

16         court and two individuals.  Before I begin my

17         questioning of you, I'd like to get some
matters

18         on the record if I may.

19              I've had the court reporter mark for me as

20         DeLuce Deposition Exhibit Number 1 a multiple-
```

page

21        document.  The first page is an October 22, 2003,

22        fax cover sheet memo/letter from Paul Dellasega to

23        counsel.  "Please find enclosed a copy of notes

24        offered by David W. DeLuce, Esquire, which Judge

25        Kane ordered be produced."  And attached to that

Exam./Wallet - DeLuce

5 1      document are I believe some -- it's hard to

2      tell -- 37 pages perhaps.  I can't tell because

3      some of this came over the fax twice so it may be

4      that I have some additional things two times.

5         Before we move off DeLuce Deposition Exhibit

6      Number 1, I'd like counsel for the County to

7      examine this document and tell me whether it

8      accurately reflects what you have in your file as

9      far as the notes for David DeLuce; and, second,

10      why it appears that there are some notes contained

11      in that package that were identified previously as

12      notes from Judge Hoffer.

13         MR. THOMAS:  Jim Thomas on behalf of the

14      County and I will respond.  And actually, Deb,

15      before I respond to your request in that regard,

16      let me indicate for the record that we are

17      producing Mr. DeLuce here today for

deposition

18       pursuant to Judge Kane's order on your motion to

19       compel production of documents and the deposition

20       of Dave DeLuce, which memorandum and order was

21       dated September 25, 2003.

22          While we've read that opinion and order and

23       have produced him, perhaps out of a sense of

24       excess caution, I'd like you to agree that we have

25       a continuing objection.  We continue to believe,

Exam./Wallet - DeLuce

6 1        with all due respect, that Judge Kane is
incorrect

2          in her ruling in this matter.  I'd like your

3          agreement that we have a continuing objection
to

4          any and all questions that are asked today on
the

5          basis that we oppose Mr. DeLuce and in general
but

6          not exclusively on the basis of attorney client

7          privilege and attorney work product.  Can we
have

8        that agreement?

9          MS. WALLET:  I will be happy to agree so
long

10         as you state specifically the nature of your

11         objections today.

12         MR. THOMAS:  Well, the nature of our

13         objections is that Mr. DeLuce in general I
would

14         rely on the briefing which was done, but in

15         general Mr. DeLuce was hired as an attorney,

16         worked as an attorney on behalf of the County
to

17         gather information and facts and made certain

18          recommendations and rendered legal opinions

19          included in those recommendations to the

County.

20              We believe that much of his communication

was

21          entitled to be protected because it was

22          communications to and on behalf of a client.

We

23          believe much of what you will make inquiry into

24          today was, in fact, attorney work product.

That's

25          the general nature of the objection.

Exam./Wallet - DeLuce

7 1          MS. WALLET:  So, you are raising today as a

2          continuing objection two bases, attorney client

3          privilege and attorney work product.

4          MR. THOMAS:  Yes.  And I assume we will have

5          the usual stipulations with respect to other

6          objections?

7          MS. WALLET:  And that being that everything

8          say for the objection as to the form of the

9          question will be preserved until later?

10          MR. THOMAS:  Correct.  Do we have such an

11          agreement?

12          MS. WALLET:  We certainly have an agreement

13          that all objections except as to the form of the

14          question will be preserved.  We have an agreement

15          that you continue to believe that all of the

16          testimony of Mr. DeLuce is subject to attorney

17          client privilege and attorney work product, that

18        and that alone.

19            MR. THOMAS:  And you agree that I don't have

20        to object to every question, that we will have a

21        standing objection to the questions and inquiry

22        today on that basis.  Fair?

23            MS. WALLET:  That's correct.

24            MR. THOMAS:  All right.  With respect to your

25        inquiry with respect to what has been marked as

Exam./Wallet - DeLuce

8 1       DeLuce Number 1, these do represent the notes

2         prepared by Mr. DeLuce as part of his

3         investigation.  They also include notes that
were

4         apparently prepared by Judge Hoffer and out of
a

5         sense of being complete we have produced both
for

6         you.  Certainly this witness can identify for
you

7         today those notes which are in his handwriting
and

8         those which are not.

9            MS. WALLET:  Do you believe that the
package

10        that we've marked as Deposition Exhibit Number
1

11        is a complete package of all of the notes that

12        exist, were in the care and custody of David

13        DeLuce prior to being turned over to your
office?

14           MR. THOMAS:  We do with the exception of

15        Judge Hoffer's notes.  I don't know that the
notes

16        of Judge Hoffer were in Mr. DeLuce's

possession.

17        In fact, I believe they were not.

18            MS. WALLET:  Okay.

19            MR. THOMAS:  Okay.

20            MS. WALLET:  Now we've marked as Deposition

21        Exhibit Number 2 what has been produced by your

22        office as being the investigative report of David

23        W. DeLuce.  I would like you to look at this

24        package and tell me whether you believe this to be

25        the report prepared by Mr. DeLuce and tell me

Exam./Wallet - DeLuce

 9 1       whether or not this is some draft or a version,

   2       what the nature of this report is.

   3             MR. THOMAS:  This is a report that
contains a

   4       date of April 30, 1997.  The document which has

   5       been referred to the Court as the DeLuce
report

   6       was an evolutionary document.  This
investigation

   7       took a substantial amount of time.  It
involved

   8       the interview of numerous witnesses,
significant

   9       legal research and compilation of the facts

  10       compares to the law, in addition to certain

  11       recommendations or impressions with respect to
Mr.

  12       DeLuce.

  13           The document evolved over time as I noted.

  14       This is a version which I would note while

  15       containing a date of April 30, a close review
will

  16       reflect it was obviously not prepared on April
30

  17       because it makes reference to certain events

that

18          occurred in May within the context of the

report.

19          This was the report that was in our possession

and

20          was subject of the motion practice before Judge

21          Kane and is the one that was produced.

22              As part of the preparation of Mr. DeLuce

for

23          this deposition yesterday, because of our

24          discussions -- and let me add was the report in

25          the possession of Mr. DeLuce and that's the

reason

Exam./Wallet - DeLuce

10 1    it was produced.  As part of deposition

 2      preparation yesterday, I perhaps out of a sense
of

 3      caution, there were certain things that I'm

 4      obviously not going to reveal here today that
led

 5      me to believe there may be another version,
later

 6      version of this evolving document.  As a
result, I

 7      called Taylor, counsel for the Court, asked her
to

 8      look at the copy of this report that was
contained

 9      in her files which would have been obtained
from

10      the Court.  I at that time determined that
there

11      was, in fact, a later report I believe dated
June

12      7.

13          MS. WILLIAMS:  4.

14          MR. THOMAS:  June 4.  That report was then

15      produced for you yesterday by Taylor prior to
the

16          commencement of this deposition.

17               MS. WALLET:  Mr. Thomas, is what has been

18          marked as Deposition Number 2 what was produced

to

19          Judge Kane as a result of your order that you

20          produced these documents in camera?

21               MR. THOMAS:  It was.

22               MS. WALLET:  And did you produce what has

23          been marked as Deposition Exhibit 1 to Judge

Kane

24          in camera?

25               MR. THOMAS:  It was.  Well, let me put a

Exam./Wallet - DeLuce

11 1       caveat on that.  I'm not certain at this moment

2       without comparing them page by page whether the

3       documents that were produced for Judge Kane

4       included or excluded the notes that are Judge

5       Hoffer's notes, that appear to be Judge

Hoffer's

6       notes.

7            MS. WALLET:  Did you produce for Judge

Kane

8       in camera other than Deposition 1 or Deposition

2?

9            MR. THOMAS:  We did produce for the judge

the

10       letter which has generally been referred to as

the

11       Johnson letter to the County also.

12            MS. WALLET:  Let the record show that I'll

13       hand to Mr. Thomas a letter dated June 26,

1997,

14       from Horace A. Johnson to Daniel J. Hartnett.

15       Would that be the letter to which you just

16       referred?

17            MR. THOMAS:  It appears to be.

18            MS. WALLET:  And did it include the

19       documents, four pages attached to this

letter?

20          MR. THOMAS:  Yes, I believe so.

21          MS. WALLET:  Let's mark that for

22        identification as Deposition Exhibit Number

4.

23         (DeLuce Deposition Exhibit #4 marked

for

24        identification)

25         MS. WALLET:  So, if I understand

correctly,

Exam./Wallet - DeLuce

12 1       Deposition Exhibits 1, 2 and 4 were produced to

2          Judge Kane for her examination in camera?

3               MR. THOMAS:  Give me the numbers again.

4               MS. WALLET:  1, 2 and 4.

5               MR. THOMAS:  Correct.

6               MS. WALLET:  To the best of your

knowledge,

7          was anything else produced for the judge?

8               MR. THOMAS:  No.

9               MS. WALLET:  And I understand your

10         clarification with regard to Deposition Exhibit

1,

11         you are not certain whether it included the

Hoffer

12         notes as well?

13              MR. THOMAS:  That's correct.

14              MS. WALLET:  Now let me hand you what

we've

15         marked as Deposition Exhibit 3.  This is the

one

16         that was received by me by fax late yesterday

17         afternoon.

18              MR. THOMAS:  This is the document I made

19         reference to we learned of its existence, it

was

20          not contained in Mr. DeLuce's file, we learned of

21          its existence late yesterday and it was produced

22          following the deposition preparation to all

23          counsel.

24              MS. WALLET:  To the best of your knowledge,

25          have you produced for me in response to the

Exam./Wallet - DeLuce

13 1     judge's order all of the investigative
documents

2        created or used by David DeLuce as part of his

3        investigation of the complaints made by Barbara

4        Varner?

5            MR. THOMAS:  We believe that we have
complied

6        with the court's order and produced those

7        documents which have been ordered produced.  In

8        fact, arguably we may have gone beyond the

9        requirements of the court order in terms of

10       documents produced.  To our knowledge, we
believe

11       that we've produced the DeLuce investigative

12       materials in accordance with the court's
ruling.

13           MS. WALLET:  Thank you, Mr. Thomas.

14           MR. THOMAS:  You're welcome.

15           MR. ADAMS:  Off the record.

16           (Discussion held off the record)

17           MR. ADAMS:  Mr. Adams on behalf of Mr.

18       Osenkarski.  I just want to put on the record
that

19       the agreement between plaintiff's counsel and

20       County counsel is that of those two parties in

21          terms of waiving the objections except for that
of

22          form, there's been some evidence through this

23          litigation that has included items that may

24          warrant objections beyond objections simply
just

25          for form, that of conclusions of law,

Exam./Wallet - DeLuce

14 1      mischaracterizations, and questions that may be

2      designed to have a witness speculate and, so,

3      therefore, Osenkarski has not waived objections

4      for such things.

5           MR. THOMAS:  Does that mean you intend to

6      assert those objections today, Paul, or are you

7      simply making certain that the record is clear

8      that you're not waiving them?

9           MR. ADAMS:  The second, the latter.

10           MR. THOMAS:  Okay.

11           MR. MacMAIN:  I'll join in that objection I

12      suppose.

13           MS. WILLIAMS:  And I will join Paul's

14      objections as well.

15           MS. WALLET:  I'm still missing Deposition 2.

16           MR. THOMAS:  (Handing)

17           MS. WALLET:  Thank you, Mr. Thomas.

18           MR. THOMAS:  You're welcome.

19  BY MS. WALLET:

20  Q.   Mr. DeLuce, finally this is the opportunity for me

21          to ask you some questions regarding this
lawsuit.

22          I will do my best inasmuch as this room is

23          somewhat large to keep my voice up.  May we
please

24          have an agreement that if you would attempt to

25          answer one of my questions you have at least
heard

Exam./Wallet - DeLuce

15 1                that question?

2    A.    Yes.

3    Q.    And may we also have an agreement that if you

4          attempt to answer my question you have
understood

5          that question, and if you do not understand it,

6          you will ask for a clarification before you

7          attempt to answer it?

8    A.    Yes.

9    Q.    Is there any reason, sir, physical or otherwise

10         why you could not answer all of my questions

11         truthfully today?

12   A.    No reason.

13   Q.    Where are you employed presently, sir?

14   A.    I'm employed by the law firm of Johnson, Duffie

15         Stewart and Weidner.

16   Q.    And you are an attorney at law?

17   A.    I am an attorney at law.

18   Q.    How long have you been at your current law
firm?

19   A.    18 years.

20   Q.    Did you have prior employment after law school?

21   A.    For one year I was a judicial law clerk at the

22         York County Court of Common Pleas for Judge

23         Buckingham.

24  Q.    When did you graduate from law school?

25  A.    In 1984.

Exam./Wallet - DeLuce

16 1    Q.       Where did you get your law degree?

2    A.    Widener University in Delaware.

3    Q.    Did you have employment prior to law school but

4          after undergraduate school?

5    A.    Yes.  I worked for two years for a company called

6          Grove Manufacturing in Shady Grove, Pennsylvania.

7    Q.    What did you do for them?

8    A.    I was a district manager in the field.

9    Q.    What's the nature of their manufacturing

10         operation?

11   A.    They manufacture and sell hydraulic cranes.

12   Q.    Where did you get your bachelor's degree?

13   A.    Pennsylvania State University, University Park,

14         1979.

15   Q.    In what field?

16   A.    School of business, concentration in finance.

17   Q.    Do you have any other advanced degrees other than

18         a law degree?

19   A.    No, I do not.

20   Q.    Did you have any other postgraduate training other

21      than what you've described?

22  A.  No, I do not.  You mean graduate from college?

23  Q.  Correct.

24  A.  No, I do not.

25  Q.  In your job with Grove Manufacturing, did you

have

Exam./Wallet - DeLuce

17 1              any responsibilities for EEO compliance?

2   A.   No, I did not.

3   Q.   Describe briefly what your district manager job

4        was.

5   A.   Primarily manage a district with distributors. It

6        was sales and service coordination.  It was field.

7        I was located in the western United States.  I had

8        no employees under me.

9   Q.   Describe the nature of your law practice for the

10       past 18 years.

11  A.   General practice of law.  Initially probably more

12       family law, criminal, civil litigation.  It has

13       evolved into health law, small business, labor and

14       real estate.

15  Q.   How long have you been doing work for the County

16       of Cumberland?

17            MR. THOMAS:  You mean him specifically or

the

18        law firm?

19            MS. WALLET:  Him specifically.

20    A.   I don't know for sure.  My partner, Hank
Johnson,

21        was the county solicitor I believe through
1998.

22        At times during his term as solicitor I was
used

23        as special counsel on certain matters.  He
became

24        a solicitor I believe in 1986, so it would have

25        been during that time.

Exam./Wallet - DeLuce

18 1     BY MS. WALLET:

2   Q.   What kind of work did you do for the county

3        between 1986 and 1998?

4   A.   I recall working on contract matters.  I recall

5        working on labor matters.

6   Q.   Can you be more specific in the labor matter?

7   A.   Personnel issues.  I was consulted frequently by

8        the personnel director at the time.  It might have

9        dealt with family medical leave, it might have

10       dealt with Fair Labor Standards Act, it might have

11       dealt with other employment related issues.

12  Q.   Which personnel directors have you worked directly

13       with?

14  A.   Dan Hartnett, Dan Monkin.

15  Q.   Anyone else?

16  A.   No, no one else to my knowledge or my

17       recollection.

18  Q.   I thought you were struggling to remember another

19       name.

20  A.   No, I'm not.  I don't remember any other names.

21   Q.     Mr. DeLuce, tell me how you first became aware

22          that Barbara Varner had filed a complaint or a

23          charge involving Gary Graham.

24             MR. THOMAS:  Objection to the form.  You may

25          answer.

Exam./Wallet - DeLuce

19 1    A.        I was notified I believe by my partner, Hank

2            Johnson, that some type of complaint had been

3            filed or had been made and that I was to

4            communicate with Mr. Hartnett and assist him and

5            advise him in whatever way.

6    BY MS. WALLET:

7    Q.    Was this a verbal communication with Mr. Johnson

8            or did you receive something in writing?

9    A.    It was verbal.

10   Q.    Do you recall when this was, sir?

11   A.    I suspect based on reviewing the report that it

12            was in April of 1997, but I can't recall anything

13            more specific than that.

14   Q.    Now, at that point in time your firm was the

15            solicitor for the County of Cumberland?

16   A.    Hank Johnson, Horace H. Johnson was the county

17            solicitor.  We were hired at times as special

18            counsel on various matters as were other law

19        firms.

20   Q.   Do you know, sir, why the relationship between
Mr.

21        Johnson as solicitor and the County of
Cumberland

22        ended?

23   A.   He resigned.

24   Q.   To the best of your knowledge, sir, has your
firm

25        had any responsibilities with regard to the
County

                        Exam./Wallet - DeLuce

20 1              of Cumberland since Mr. Johnson

resigned in 1998?

 2   A.   I believe there may have been a couple files
that

 3        had been opened during Mr. Johnson's tenure by
our

 4        firm that we continued until they were
completed.

 5        What they were, I have no recollection.

 6   Q.   Did you engage in any professional relationship

 7        with the county after 1998?

 8   A.   If there were any open files that I was
handling,

 9        yes.  I have no present recollection of what
they

10        are.

11   Q.   Did you continue to be engaged as labor counsel

12        after 1998?

13   A.   No, unless there was a file already opened and
I

14        was already working on it prior to that time.

15   Q.   Sir, have you had any special training in sex

16        discrimination cases?

17             MR. THOMAS:  Objection to the form.  You
may

18          answer if you understand.  I'm not sure what you

19          mean by special training.

20    A.    I have spent or did spend and continue to spend

21          time going to seminars and training sessions on

22          the legal topic.  Continuing legal education is

23          probably the best way to sum it up on a regular

24          basis.

25    BY MS. WALLET:

Exam./Wallet - DeLuce

21 1     Q.          And did that occur both before and
after 1997?

2     A.     Yes.

3     Q.     Can you tell me what training you received
before

4          1997?

5     A.     On the job by working on cases that came into
our

6          firm with another attorney of our firm as well
as

7          attending seminars.  I cannot be anymore
specific

8          because I have no recollection.

9     Q.     So, Mr. Johnson came to you and asked you to be
in

10          contact with someone at the county?

11     A.     That's my recollection.

12     Q.     What did he tell you about the nature of the

13          complaint at that time?

14     A.     I don't recall him giving me any specifics.  I

15          recall him telling me to contact Mr. Hartnett
to

16          get information.

17     Q.     Did anyone else in your firm at that time do
any

18          of the labor or employment work for the county?

19    A.    Not that I can recall.

20    Q.    So, if it was a labor problem it got referred

to

21          you?

22    A.    Yes, if the county wanted us to do it.

23    Q.    Did Mr. Johnson do some of that work himself?

24    A.    I don't know.

25    Q.    Is there anyone else in the firm who did work

for

Exam./Wallet - DeLuce

22 1           the County of Cumberland other than you and Mr.

2           Johnson?

3   A.    Yes.

4   Q.    Who was that?

5   A.    I am not certain exactly who.  I know that Roy

6           Weidner did.  I know that James Johnson did.

7           There may have been others, I can't recall, it's

8           been six or seven years ago.

9   Q.    Did Mr. Johnson tell you why he picked you for

10          this particular assignment?

11  A.    No.

12  Q.    Did you ask?

13  A.    No.

14  Q.    What did you do as a response to Mr. Johnson's

15          assignment?

16  A.    My recollection is that I contacted Mr. Hartnett

17          and asked him what he knew.

18  Q.    What did he tell you?

19  A.    I have no present recollection of what he told me

20          other than to say that an employee in the

21          probation department had complained about some

22        form of sexual harassment.

23   Q.    What did Mr. Hartnett ask you to do?

24   A.    He wanted a recommendation as to what the
county

25        should do.

Exam./Wallet - DeLuce

23 1     Q.          Did you speak with him on the phone
or in person?

2     A.     I'm sure initially I spoke to him on the phone
and

3           I also know that I discussed the situation with

4           Mr. Johnson because of the unique nature of the

5           probation department.

6     Q.     And what do you mean by that, sir?

7     A.     Well, they both pointed out to me, as I recall,

8           that the probation department is under the
control

9           of the president judge and not the county.

10          Therefore, the first issue was what would be
our

11          role.

12    Q.     Who first raised that issue?

13    A.     I believe it was Hank Johnson, that's my

14          recollection.

15    Q.     Now, if I might ask you, sir, to take a look at

16          what we have marked as DeLuce Deposition Number
1.

17          Can you identify for us which of that package

18          constitutes notes in your handwriting?

19    A.     It looks like mine start on Page 5 of 37 at the

20          top of the fax and continue -- well, it looks

like

21          it's 5 of 37 through to 37 of 37, and then
behind

22          that it looks like 24 more pages and that does

23          appear to be my handwriting.

24    Q.    Did you keep any notes, sir, of any of your

25          telephone conversations with Dan Hartnett or
any

Exam./Wallet - DeLuce

24 1                  other individuals at the county?

2   A.   No.

3   Q.   Did you take notes but they are no longer

4        available or you just didn't take any notes?

5   A.   I did not take any notes of our phone

6        conversations to my recollection.

7   Q.   Describe for me what your file for this matter

8        looked like.

9   A.   Legal research was a large part of it, my notes of

10       meetings with witnesses that were interviewed by

11       Mr. Hartnett and myself, I'm sure there were some

12       correspondence.  The file also contains documents

13       from the EEOC, Thomas, Thomas & Hafer and the

14       federal lawsuit.

15  Q.   Do I understand, sir, you no longer have that in

16       your possession?

17  A.   A complete copy of my file was provided to

18       counsel.  I still have my file.

19  Q.   Do you have the originals or does counsel have the

20        originals?

21    A.    I have the originals.

22    Q.    Did you bring those with you today?

23    A.    No, I did not.

24    Q.    When you say counsel, could you be specific?

We

25        have a lot of lawyers here.

Exam./Wallet - DeLuce

25 1    A.          Counsel for the County who is here
with me today,

2           Thomas, Thomas & Hafer.

3    Q.   And that would Mr. Thomas and Mr. Dellasega?

4    A.   Mr. Thomas and Mr. Dellasega.

5    Q.   What was your understanding of the role of
Thomas,

6           Thomas & Hafer in this matter?

7               MR. THOMAS:  Well, obviously we've been

8           retained to defend a federal lawsuit and I do
not

9           want you to make inquiry of this witness of

10          conversations he's had with us.  I think that
goes

11          well beyond the court's order.

12   BY MS. WALLET:

13   Q.   Did Thomas, Thomas & Hafer have some role prior
to

14          being retained to defend the county in this

15          lawsuit?

16   A.   My recollection is they were not brought in
until

17          the EEOC complaint stage, but I cannot give you

18          any date certain.  That's not something that I
can

19        recall.

20              MR. THOMAS:  Nor would I permit him to

21        testify to that.

22   BY MS. WALLET:

23   Q.   Did you enter your appearance, yours personally,

24        in any administrative or court?

25   A.   My recollection is that I did file an answer on

Exam./Wallet - DeLuce

26 1                    behalf of the county with the EEOC.

2    Q.    To the best of your recollection, sir, did you do

3          anything else to formally represent the county?

4    A.    What do you mean by formally?

5    Q.    In an administrative agency or the court.

6          MR. THOMAS:  You mean other than everything

7          he did in terms of the investigation and including

8          filing the answer to the EEOC complaint?

9          MS. WALLET:  Yes.

10   A.    Not that I can recall.

11   BY MS. WALLET:

12   Q.    Did you engage in any settlement negotiations with

13         anyone regarding this case?

14   A.    Yes.

15   Q.    With whom?

16   A.    I recall attending a meeting where you were

17         present, your client was present, Mr. Thomas and

18         Mr. Dellasega were present at Thomas, Thomas &

19         Hafer.  The date I have no present recollection.

20   Q.    And what was your role in that meeting?

21   A.    I was there on behalf of the County of

Cumberland.

22   Q.    Were you their counsel at that time?

23   A.    I was one of their counsel at that time.

24   Q.    Did you enter into any engagement letter with

the

25         county with regard to your role in the

Exam./Wallet - DeLuce

27 1              investigation of Ms. Varner's
complaints?

2    A.    No.

3    Q.    Was there any memorialization of what your role

4          was to be in this matter?

5    A.    No.

6    Q.    Were you paid by the hour for your work?

7    A.    Yes.

8    Q.    To whom did you transmit your invoices?

9    A.    I can't recall for sure.

10   Q.    Was this matter invoiced separate from the

11         invoices that may have been submitted by Mr.

12         Johnson as solicitor for the county?

13   A.    Yes.

14   Q.    Do you know who paid your invoices?

15   A.    Do I know who paid it?  I believe the county
paid

16         the invoices, but I have no firsthand knowledge
of

17         that.  They have been satisfied, I know that.

18   Q.    How much were you paid for your role in dealing

19         with the Varner complaint?

20   A.    I don't know.

21   Q.    Do you have an estimate?

22   A.    No.

23   Q.   More than $10,000?

24   A.   No.

25   Q.   Not more?

Exam./Wallet - DeLuce

28 1    A.        No.  That's an estimate that it was
not.

2  Q.    Do you know what period of time you submitted

3        invoices for this matter?

4  A.    I would suspect in 1997 and I believe there
were

5        some subsequent ones after '97.

6  Q.    Do you believe after 1998?

7  A.    Yes.

8  Q.    And what do you recall doing in that period
after

9        1998?

10  A.    I assisted Mr. Dellasega and Mr. Thomas in
their

11        roles.

12  Q.    Have you had any experience in doing

13        investigations of sex discrimination?

14  A.    When you say experience, would you please
explain

15        that?

16  Q.    Prior to your being engaged to follow up on a

17        complaint filed by Ms. Varner, had you
previously

18        conducted any investigations into matters of
sex

```
19        discrimination?

20   A.   Not that I can recall.

21   Q.   Same question with regard to matters of sexual

22        harassment?

23   A.   I have advised clients what their legal duties
and

24        obligations are and assisted them carrying them

25        out.
```

Exam./Wallet - DeLuce

29 1     Q.          Was this your first investigation into allegations

2          of sexual harassment?

3     A.     As I recall, this is the first one where I

4           participated in the questioning of witnesses.

5     Q.     Do you consider yourself to have expertise in the

6           area of sex discrimination or sexual harassment?

7     A.     What do you mean by expertise?

8     Q.     Do you believe that by virtue of your training or

9           experience you have a particular knowledge in this

10          area?

11     A.     I believe that by my training and experience I

12          have knowledge of the law in this area and can

13          advise my clients accordingly and assist them in

14          carrying out their duties.

15     Q.     Did you consider yourself to be an expert at the

16          time that you engaged in your investigation of Ms.

17          Varner's allegations?

18   A.   Again, I'm not sure what you mean by an expert. I

19        considered myself an attorney who practiced in the

20        area of labor law and had knowledge of the law in

21        this area.

22   Q.   Okay, so Mr. Johnson tells you to call the county

23        and you call Dan Hartnett.  Tell me to the best of

24        your recollection what Mr. Hartnett told you

25        during that first conversation regarding these

Exam./Wallet - DeLuce

30 1          matters.

 2   A.    I cannot recall specifics of the conversation. I

 3         know that we had a conversation and I'm sure that

 4         Barbara Varner's name came up and that she was an

 5         employee in probation, the basics I'm sure came

 6         up, but I have no present recollection of that

 7         conversation.

 8   Q.    Do you believe that first conversation was on the

 9         telephone?

10   A.    Yes.

11   Q.    Did you later meet with Mr. Hartnett?

12   A.    Yes.

13   Q.    Do you recall whether the meeting was shortly

14         after the telephone conversation?

15   A.    I believe that it was, but in the interim I also

16         know that we did some legal research on the

17         county's role with a probation employee and the

18         court's role.

19   Q.    Ultimately you did meet with Mr. Hartnett I take

20      it?

21   A.   Yes, yes.

22   Q.   Was it just you and Hartnett?

23   A.   Yes.

24   Q.   Describe for me what happened during that first

25      meeting.

Exam./Wallet - DeLuce

31 1    A.        I can't remember.  I have no present

recollection.

2               It's been six and a half years ago.  I'm

certain

3               we met and my recollection is that we sometime

4               thereafter, whether it was the same meeting or

at

5               another time, had Barbara Varner meet with us

in

6               the conference room in the personnel

department

7               and had her tell us her complaints that she

had

8               apparently initially told to Mr. Hartnett.

9    Q.    Did you exchange any documents with Mr.

Hartnett

10              prior to your meeting with Ms. Varner?

11    A.    I can't recall.

12    Q.    Do you believe that you may have had a copy of

the

13              written complaint prior to your meeting with

Ms.

14              Varner?

15    A.    I can't recall.  I believe that we asked Ms.

16              Varner to prepare a written complaint.  I don't

17        know whether that was at the first meeting
or

18        whether Mr. Hartnett asked her to do so for
our

19        first meeting.  I have no recollection.  I
do

20        recall that we asked her to put her allegations
in

21        writing.

22  Q.    Describe for me what you believed your mission
was

23        in this matter.

24            MR. THOMAS:  Objection to the form.  You
may

25        answer.

Exam./Wallet - DeLuce

32 1     A.          Was to assist Mr. Hartnett on behalf
of the county

2          and conduct an investigation and report
findings

3          to the county solicitor.

4     BY MS. WALLET:

5     Q.     That being Mr. Johnson?

6     A.     Yes.

7     Q.     Were you given any instructions as to how to

8          conduct this investigation?

9     A.     By whom?

10    Q.     By anyone.

11    A.     Not me personally.

12    Q.     Did your firm or any other members of your
firm

13          get some instructions?

14    A.     It's my understanding that someone spoke to
the

15          president judge and he authorized that the
matter

16          be investigated by the county on his behalf,
but I

17          did not participate in those discussions.

18    Q.     And would that have been President Judge
Sheely?

19  A.    Yes.

20  Q.    And how did you learn of that information?

21  A.    Either from Mr. Hartnett or Mr. Johnson, I cannot

22        recall.

23  Q.    And you believed prior to your beginning this

24        investigation that the president judge in

25        Cumberland County knew that you were going to do

Exam./Wallet - DeLuce

33 1          this investigation?

2  A.   I believe that he knew that because I had a

3         concern that if the employees and the
supervisors

4         didn't cooperate, what authority did we have to

5         make them cooperate.

6  Q.   Were you given any assurance that these
employees

7         would be required to cooperate with you?

8  A.   I was not.

9  Q.   Did you understand that someone from your firm
was

10        given such assurance?

11 A.   I can't recall whether that assurance was given
to

12        Mr. Johnson or somebody else at the county, but
I

13        believe Mr. Hartnett told me that somehow that

14        communication came down the chain but I was
not

15        part of it.

16 Q.   Did you at any time meet directly with
President

17        Judge Sheely?

18 A.   One time that I can recall.

19  Q.  Do you recall when that was?

20  A.  I believe that was in early June while we were

21      still meeting with witnesses.

22  Q.  That would be June of '97?

23  A.  Yes.

24  Q.  Do you believe you met with Judge Sheely before

25      you had interviewed all of the individuals that

Exam./Wallet - DeLuce

34  1          you intended to talk with?

2  A.    We met with Judge Sheely after I had spoken to

3          quite a few witnesses and gave him some

4          preliminary indications of what we were hearing

5          and then we went back and called on a few
more

6          people to meet with us again to gather
further

7          information.

8  Q.    When you say we, who was present at that
meeting?

9  A.    My recollection is that all meetings with

10         witnesses Dan Hartnett was with me.  He
arranged

11         them, he coordinated them, and he participated
in

12         those with me.

13  Q.    Actually my question wasn't very clear, but I

14         meant the meeting with Judge Sheely who was
there?

15  A.    I know that I was there, I know that Dan
Hartnett

16         was there, I know that Hank Johnson was there.

17         There may have been others, but I have no
present

18        recollection.

19   Q.    Did you request this meeting?

20   A.    I don't recall who requested the meeting.

21   Q.    Do you think Judge Sheely requested it?

22   A.    I don't recall.  I don't recall.

23   Q.    What did you understand the purpose of the
meeting

24        to be?

25   A.    To update him on what the employees were
telling

Exam./Wallet - DeLuce

35 1              us and to get some guidance on where
to go from

2         there.

3    Q.    What guidance did you receive at that time?

4    A.    Go back and talk to a couple witnesses,
including

5         the two employees that were accused, and get
some

6         further information from them.  And also talk
to

7         them and ask them to come up with a plan to

8         address the situation.

9    Q.    And when you say the two individuals who
were

10        accused, are we speaking of Gary Graham and
Joe

11        Osenkarski?

12   A.    Yes.

13   Q.    Anybody else?

14   A.    No.

15   Q.    Did you talk to anybody other than Gary Graham
or

16        Joe Osenkarksi as part of your investigation
after

17        you met with Judge Sheely?

18   A.   I believe that we did, but I cannot tell you who,

19        and I note that on my notes of meetings I did not

20        always put the dates of the meetings.

21   Q.   In this meeting with Judge Sheely, did you

22        understand that you were expected to report back

23        to Judge Sheely after you had done these things?

24   A.   I understood that someone was to report back to

25        Judge Sheely.  I don't recall who it was, but it

                    Exam./Wallet - DeLuce

36 1              did not end up being me.

  2   Q.   Do you know why it wasn't you?

  3   A.   I think because Mr. Hartnett and I met with the

  4        county commissioners, Mr. Ward, Mr. Johnson, and

  5        told them what we were hearing from the witnesses,

  6        and I believe it was them who indicated either

  7        they or Mr. Ward would talk to the president

  8        judge.

  9   Q.   Mr. DeLuce, could you run down for me the

 10        significant events that occurred as part of your

 11        investigation, in other words, could you just tell

 12        me who you met with and what the series of events

 13        were?

 14            MR. THOMAS:  Objection to the form.  I don't

 15        think that's a fair question because it requires

 16        him to make a qualitative evaluation of what the

 17        significant events were.

18   BY MS. WALLET:

19   Q.    Strike the word significant.  Could you tell us

20         what events occurred from the time that you had

21         your first we'll say meeting with Mr. Hartnett?

22              MR. THOMAS:  To the extent that you can

23         recall.

24   A.    My recollection is that we met with Mrs. Varner,

25         got her verbal statement, asked her to put it in

Exam./Wallet - DeLuce

37 1      writing.  She did.  And she also indicated to us

2         people that we should talk to regarding the

3         matter.  So, we began the process of talking to

4         other employees as well as to Mr. Osenkarski and

5         Mr. Graham and there were many meetings a couple

6         times with certain individuals as more facts came

7         out that we wanted to verify or reverify or get

8         versions of what may have transpired.  It was an

9         ongoing process that lasted for obviously

10        sometime, I believe it started in April, and we

11        were still continuing to meet with people into

12        June of 1997.

13    BY MS. WALLET:

14    Q.   So, you met with Varner, you interviewed some

15         people, you went back to the meeting with Judge

16         Sheely, met with some additional potential

17          witnesses, then what?

18              MR. THOMAS:  Well, he's already indicated to

19          you earlier that he also conducted some legal

20          research, reviewed legal precedents.  That's my

21          problem with the question.  I do not want this

22          question or the answer to be considered to be a

23          complete analysis of his investigation.  You have

24          his very lengthy report which details in some

25          detail the interviews, the things that he

Exam./Wallet - DeLuce

38 1            conducted.  So, I object to the question because I

2            think it's misleading.

3   A.    Throughout the process I would take my notes and

4            dictate a summary and that's how this report that

5            you have before you was evolved.  And I think that

6            is why there are different dates and different

7            versions because I would add to it as I learned

8            more information.  My impressions would change, my

9            thoughts would change and it was an ongoing in my

10           view work product that was my own impressions, but

11           I included in that research that I had in my

12           office from my research on these topics or as I

13           thought I needed and I used that to help formulate

14           legal opinions based on the facts after Mr.

15           Hartnett and I would discuss them after talking

16           with witnesses.

17   BY MS. WALLET:

18    Q.    So, again, you met with some additional people,

19          then someone met again with Judge Sheely, but not

20          you?

21    A.    Not me.

22    Q.    When in this time frame did you meet with the

23          Cumberland County commissioners?

24    A.    I believe I met with them sometime in mid June and

25          gave them verbally -- Mr. Hartnett and I both did

Exam./Wallet - DeLuce

39 1            and gave our impressions after what we were told

2            by the many witnesses.  I also gave them a

3            synopsis of what my opinion of the law is and

4            discussed their role as the county versus the

5            court's.  That was also an issue.

6    Q.    And who was present at that meeting?

7    A.    The county commissioners, John Ward, Horace

8            Johnson, Dan Hartnett, myself.

9    Q.    Could you identify the commissioners for me?

10   A.    Earl Keller, Nancy Besch, Marcia Myers.

11   Q.    Was anyone else present at that meeting to the

12           best of your recollection?

13   A.    No.

14   Q.    Were you given any additional assignments as a

15           result of that meeting with the Cumberland County

16           commissioners?

17   A.    No.

18   Q.    Did you make any recommendations to the Cumberland

19           County commissioners at that time?

20   A.    I believe Mr. Johnson made some recommendations

21           but not myself.  I believe I was there to provide

22        them with the legal issues and what the
witnesses
23        were telling myself and Mr. Hartnett.
24    Q.   Did you give them anything in writing at that
25        time?

Exam./Wallet - DeLuce

40 1    A.      No.

2    Q.    Did you ever give the county commissioners

3         anything in writing?

4    A.    No.

5    Q.    Did you ever give Dan Hartnett anything in

6         writing?

7    A.    If I did -- I may have, I can't recall.  It may

8         have been cases, it may have been summary of the

9         law, but I did not give him my memorandum that's

10        the subject of the court's motion.

11    Q.    After you met with the Cumberland County

12        commissioners, did you interview any other

13        individual?

14    A.    I have no recollection that I did anything further

15        other than maybe conferring with Mr. Hartnett,

16        but, no, I did not interview anybody else.

17    Q.    Did you consider your investigation to be complete

18        at least by mid June of 1997?

19    A.    I'm not sure if I would use the term complete.  I

20        think my role at that time was terminated or no

21        longer -- I was no longer to continue the

22        investigation.

23   Q.   How did you come to the conclusion that your role

24        was terminated?

25   A.   My recollection was Mr. Ward indicated that he

Exam./Wallet - DeLuce

41 1          would go talk to the president judge to discuss

2          the matter.

3    Q.    And that being President Judge Sheely?

4    A.    Yes.

5    Q.    Did you participate in any other meetings

6          regarding this investigation except for the

7          meeting you described earlier at Thomas, Thomas &

8          Hafer after you met with the Cumberland County

9          commissioners?

10          MR. THOMAS:  Objection to the form.  You may

11          answer.

12   A.    I'm sure that I did in preparing responses to the

13          EEOC, but I have no present recollection.  My

14          role -- or I was still involved as special counsel

15          for the county on this matter.  What exactly I did

16          I have no present recollection.

17   BY MS. WALLET:

18   Q.    What did you do in order to prepare the response

19          to the EEOC?

20    A.    I can't recall specifically.

21    Q.    Do you know who verified the answer to the

EEOC?

22    A.    Not offhand, no, I do not.

23    Q.    Do you know whether it was verified?

24    A.    Not offhand.  I don't have the document in

front

25          of me.

Exam./Wallet - DeLuce

42 1    Q.    Could you describe the process?  Did you draft the

2          answers and then did someone look at--

3              MR. THOMAS:  Let me have a moment with the

4          witness if I may.

5    A.    Yeah.

6              MS. WALLET:  Let the record reflect that Mr.

7          Thomas and Mr. Dellasega have now left the room

8          with Mr. DeLuce.

9              (Recess taken)

10    BY MS. WALLET:

11    Q.    Now, I believe when we broke I had just asked you

12          to describe the process whereby the EEOC response

13          was filed by you.

14    A.    My recollection is that I drafted the response and

15          I'm sure that I had input from Mr. Hartnett and

16          Mr. Ward.  But my response, as I recall, was that

17          you sued the wrong party, that we had no control

18          over the probation department and the employees

in

19          question; therefore, the Administrative Office
of

20          Pennsylvania Courts should have been the

21          defendant.  So, my recollection is that it was

22          basically a legal argument.

23    Q.    While we were off the record, did you have the

24          opportunity to review any documents that
refreshed

25          your recollection?

Exam./Wallet - DeLuce

43 1    A.   No, and I knew -- I recalled that -- no, I didn't

2        look at any documents to refresh my memory.

3    Q.   All right.  We were still in the events that you

4        participated in as part of your assignment from

5        the county to investigate this complaint from Ms.

6        Varner.

7            MR. THOMAS:  Objection to the form.  Go

8        ahead.

9            MS. WALLET:  I didn't get to the question

10        yet.

11            MR. THOMAS:  That's why I'm objecting, it

12        wasn't a question.

13    BY MS. WALLET:

14    Q.   My question is after you filed the EEOC response,

15        whatever that response might have been, did you

16        participate in any other meetings?

17    A.   I believe that I did, but I cannot give you

18        specifics.  I know that I had discussions and

19          meetings with Jim Thomas, Paul Dellasega, a

20          representative from the county and/or Mr. Ward,

21          but I cannot give you specifics in any way, shape

22          or form.

23    Q.    How would you describe the level of compliance of

24          the individuals that you spoke with as part of

25          this investigation?

Exam./Wallet - DeLuce

44 1                    MR. THOMAS:  Objection to the
form.  You may

2          answer it if you understand.

3   A.   Some were very forthcoming, some were not.

4   BY MS. WALLET:

5   Q.   Did you believe you had sufficient cooperation
by

6          the individuals that you interviewed to allow
you

7          to come to some conclusions regarding these

8          complaints?

9              MR. THOMAS:  Objection to form.  You may

10         answer.

11  A.   I felt that I had cooperation from plenty of

12         witnesses.  Some that didn't cooperate I tried
to

13         determine why.  And in my view sometimes the
lack

14         of cooperation or being forthright with me or

15         providing us with everything affected
credibility

16         issues.

17  BY MS. WALLET:

18  Q.   Had you known or worked with -- let's ask it

19         separately.  Had you known any of the

individuals

20        that you spoke with as part of your

investigation

21        prior to undertaking the investigation?

22   A.   The two individuals that were accused I did not

23        know.  In the probation department there may

have

24        been one or two that years ago when I did

criminal

25        work were involved with a defendant that I may

Exam./Wallet - DeLuce

45 1          have represented.  I recognized a couple names and

2          a couple persons, but they were not personal

3          friends and they were tangential business

4          acquaintances by virtue of them being a probation

5          officer for someone who I may have been

6          representing.

7   Q.    And other than that description you just gave me

8          of a professional acquaintance, did you have any

9          professional responsibilities to represent any of

10          these individuals that you interviewed?

11   A.    I do not recall ever representing any of the

12          persons that I interviewed as their attorney.

13   Q.    Did you conduct all of these interviews in

14          basically the same way or did the way in which you

15          conducted the interview differ depending on who

16          was being interviewed?

17   A.    I'm not sure I understand the question.

18   Q.    Did you have some sort of a predetermined script

19          or a method of operation?

20    A.    Yes.  We took the complaints that were provided to

21          us by Mrs. Varner and the person she said who

22          either witnessed it or part of it, part of the

23          incident, and we would question them on their

24          role, what they saw or heard.  And then if they

25          told us of persons who may have seen or heard

Exam./Wallet - DeLuce

46 1                    something or witnessed something, we would call

2          them in and direct their attention to those issues

3          to get their version of what transpired.

4   Q.    Did you give any of these individuals with whom

5          you spoke any documents?

6   A.    I have no recollection of doing that.

7   Q.    Do you have any recollection of showing them any

8          documents?

9   A.    I have no recollection.  I may have or I may not,

10         I don't recall.

11  Q.    I ask you to look, please, at Deposition Exhibit

12         Number 1.  It's the package of your notes.  I

13         believe I asked you this question before, but as

14         an abundance of caution I will ask you again. Do

15         you believe that there were any notes of

16         interviews that are not contained in this package?

17              MR. THOMAS:  Objection, asked and

answered.

18   A.    My belief is that these are all of those

19         documents.  The only concern I have is John
Roller

20         and I just want to make sure my notes -- oh, it

21         is, John Roller's notes are in here also.

22   Q.    Would that be at the document marked 20 of 24?

23   A.    Yes.  Yes.

24   Q.    And continuing through to 21 of 24?

25   A.    20 and 21.  To be honest with you, I cannot

Exam./Wallet - DeLuce

47 1          decipher what I was doing with 22. Obviously 23

2          is self-explanatory.  I don't have 24 of 24 here.

3   Q.   Take a look at 24.  We'll add it to the package.

4   A.   That looks -- that is the same, that's 23 of 24 in

5          my packet.

6   Q.   I'm sorry, I stand corrected.

7   A.   I have no 24 of 24 in front of me.

8          MS. WALLET:  Jim, do you know whether we have

9          24?

10          MR. THOMAS:  I do not.  The last page of

11          notes that I have is the document that you have as

12          marked 23 of 24.

13          MS. WILLIAMS:  I have 24 of 24 being the fax

14          sheet, the concluding fax sheet from Thomas,

15          Thomas & Hafer.

16          MS. WALLET:  Thank you.

17   A.   Thanks.

18   BY MS. WALLET:

19   Q.    Do you believe, sir, that you conducted any

20          interviews of anyone for which you did not have

21          notes?

22   A.    Not to my recollection.

23   Q.    Sir, let's exclude the first several pages of this

24          document which I believe we've already determined

25          are not in your handwriting, and if you could just

Exam./Wallet - DeLuce

48 1            tell me which of those documents using the numbers

2            at the top are not your notes?

3   A.   2 of 37, 3 of 37, 4 of 37 are not my notes.

4   Q.   Let's start with 5 of 37 and could you identify

5            for me what these are, whose interview notes they

6            were?

7   A.   This is my handwriting of a meeting that I had

8            with Mike Varner.  The date I am not certain.

9   Q.   6 of 37?

10   A.   My handwritten notes of a meeting I had with Darby

11            Christlieb in my handwritten notes.  7 is a

12            continuation of that.

13   Q.   Do we know what date you interviewed Darby

14            Christlieb?

15   A.   No.

16   Q.   Do you know, sir, whether there is any

17            significance to the order in which these notes are

18            contained in this package?

19   A.   I don't think there is any significance.  I did

20            not make this order.

21   Q.   Did your original file have any ordered note?

```
22   A.    No.

23   Q.    So even if we saw your original file, we
wouldn't

24         be able to tell who you did first, who you did

25         second, who you did third?
```

Exam./Wallet - DeLuce

49 1    A.   No.  All I can recall is we met with Mrs. Varner

2        first.  After that, I can't say for certain,

3        because some of these people we met with more than

4        once.

5    Q.  Could you continue with the package, please?

6    A.  Sam Miller, 8 of 37, Pages 1 and 2 -- or actually,

7        8 and 9; Deborah Reitzel, Pages 10 and 11; Greg

8        Miller, Pages 12 and 13; Mark Galbreath, Pages 14,

9        15 and 16; Nick Baralett, Pages 17, 18; Jennifer

10       Crum, and you can see I have a date there 4/22/97,

11       I believe that to be the date I met with Jennifer,

12       Pages 19 and 20.

13   Q.  Page 20 has a lot of bleed through.  I take it

14       that your notes are only the top three lines?

15   A.  Yes.

16   Q.  And that any of this other document related to the

17       reverse side of the sheet when it was copied?

18   A.     Probably.

19          MR. THOMAS:  Objection to the form.  The

20          representation, again, Deb, is what, the first

21          three lines?

22          MS. WALLET:  Yes.

23          MR. THOMAS:  Oh, all right.  I'm sorry,
for

24          the second page?

25          MS. WALLET:  Correct.

Exam./Wallet - DeLuce

50 1    A.         Want me to continue?

2    BY MS. WALLET:

3    Q.    Please.

4    A.    Page 21 is Gary Graham, Page 22 is Gary

Graham,

5         Page 23 is Gary Graham, Page 24 is Gary

Graham.

6    Q.    Do we know when you conducted that

interview?

7    A.    No, I do not.  Page 25 is Joseph Osenkarski

and

8         that was conducted on 4/29/97.  Page 26 is

also

9         Joseph Osenkarski.  Page 27 is Kerry Howser, 28

is

10        Kerry Howser, 29 is Kerry Howser, 30 is Kerry

11        Howser.  31 is Deborah Green, 32 is Deborah

Green,

12        33 is Deborah Green, 34 is Deborah Green, 35 is

13        Deborah Green, 36 is Deborah Green.  Page 37

is

14        Barbara Varner and we met with her on May

6th,

15        1997.

16    Q.    Again, the we is you and Mr. Hartnett?

17   A.   Yes.  Page 1 of 24--

18   Q.   Is more of Ms. Varner?

19   A.   I do not believe.  Yes, I believe that Page 1 of

20        24 -- I'm not certain what 1 of 24 is.  I can't

21        tell.  There's obviously 2 of 24, which is a

22        continuation of that.  It may be all three for

23        Barbara Varner, I don't know.

24   Q.   If you could go back to 1 of 24, I call your

25        attention to the note "when she was at C&Y," which

Exam./Wallet - DeLuce

51 1              I assume means Children and Youth, "he would" does

2          that refresh your recollection?

3   A.    You're on 1 of 24?

4   Q.    Correct.

5   A.    That is probably the second page of the Barbara

6          Varner interview that occurred on 5/6/97.

7   Q.    Now we're up to 2 of 24?

8   A.    2 of 24 is also a continuation of Barbara Varner

9          and 3 of 24 is the last page of that Barbara

10         Varner interview.

11  Q.    All right.

12  A.    The next one, 4 of 24, is Barbara Varner.

13  Q.    Do you believe that these notes were taken before

14         or after the earlier notes?

15  A.    These look to have been taken before the earlier

16         notes.  I don't know what date they were taken.

17         But 4 of 24, 5 of 24, 6 of 24, 7 of 24, 8 of 24, 9

18         of 24, 10 of 24, 11 of 24, appear to all be the

19         same interview.

20  Q.    And that being the interview with Barbara

Varner?

21    A.    Yes.  Page 12 of 24 appears to be the second time,

22          it says BV-2, I assume that's the second time that

23          I met with Mrs. Varner and that would have been on

24          4/22/97.  Page 13 of 24 is the second page of that

25          interview.  14 of 24 I cannot identify what that

Exam./Wallet - DeLuce

52 1            is from, whether that is a continuation of the

2            previous two pages or it is something independent

3            of that, because I have at the top 2/4 telephone

4            call.  I can't identify that page.

5    Q.    It is in your handwriting?

6    A.    It is my handwriting.

7    Q.    So, you are not sure whether it's notes of a

8          telephone call with Barbara Varner or with someone

9          else?

10   A.    I can't identify that.  I don't know who I had

11         that conversation with.

12   Q.    Do you believe it might have been a conversation

13         with Debra Wallet?

14   A.    Very possible.

15   Q.    What about 15 of 24?

16   A.    These are my own personal notes, but not of any

17         witness.

18   Q.    Do you recall--

19   A.    Frankly, let me go off the record.

20              (Discussion held off the record between

Mr.

21          DeLuce and Mr. Thomas)

22    A.    15 of 24 is clearly my handwriting and I do not

23          believe it is of any specific witness.  The

24          language at the bottom may have been from a

25          conversation that we had with Mr. Osenkarski

and

Exam./Wallet - DeLuce

53 1              this may have been his plan as to
what to do that

2          we asked him to come up with.

3              16 of 24, obviously it's my handwriting

4          addressing Barb.  I put her name at the top,
Barb

5          Varner.  It looks like it might be her work

6          schedule when she will be available to talk to
us,

7          but I am not certain.

8   BY MS. WALLET:

9   Q.   Do you have any recollection of the "let me in"

10       quote?

11  A.   I don't have any present recollection.  I
believe

12       though there is a reference to that in my
report.

13       And I can tell you that my report what I would

14       typically do is when I would be back at my
office

15       I would dictate a summary of my notes as to
what

16       the witnesses said while things were fresh in
my

17       mind because my notes are so cryptic it's very

18          hard sometimes for me to recreate them six or

19          seven years later.

20   Q.     And were the summary of your notes contained in

21          what has been marked as DeLuce Deposition Exhibit

22          2?

23   A.     Yes.  You can see at the top Confidential Attorney

24          Impressions.  Those were my impressions.  Do you

25          want me to continue?

Exam./Wallet - DeLuce

54  1     Q.        Please.

 2    A.    16 and 17 I recognize as my handwriting and this

 3          must be information I suspect that Barb gave us,

 4          I'm not sure.  I believe 18 is a summary of

 5          salaries of various employees.  19 is my

 6          handwriting.  I have no present recollection of

 7          what that is.

 8    Q.    Do you know who Christy Steinbacher is?

 9    A.    No idea.  20 I believe is John Roller.  21 is John

10          Roller.  22 is my own cryptic notes.

11    Q.    Do you know what they relate to?

12    A.    I would be speculating at this point.  I can't

13          recall presently.

14          MR. THOMAS:  Don't speculate.

15    BY MS. WALLET:

16    Q.    Can you at least tell me on 22 of 24 is that SM,

17          GM with an underline on the left-hand side?

18    A.    The left hand at the top is an SM, below that is

19          an HT, below that is DC, below that is a GG, to

20          the right it's JO, BV and obviously at the top

I

21        have Mike Varner.

22    Q.    Can you identify any of those initials?

23    A.    SM is Sam Miller, HT is Hank Thielemann, DC is

24        Darby Christlieb, GG is Gary Graham, BV I
believe

25        is Barbara Varner, JO is Joseph Osenkarski.

                         Exam./Wallet - DeLuce

55 1    Q.          I have to ask just one question under JO, do you

    2        know what a-s-p-a-r-g-u-s refers to?

    3    A.    That was an incident that is referred to in my

    4          report.

    5    Q.    Is it a spelling of--

    6    A.    Asparagus.

    7    Q.    Thank you.

    8    A.    Page 23 of 24 looks like is my handwriting. I

    9          don't know the source of that information, but

    10         that's my handwriting.

    11   Q.    Were those pages that were identified as notes of

    12         interviews, were there any writings on those notes

    13         that did not belong to you?

    14   A.    I did not see any when I reviewed those pages at

    15         this time.

    16   Q.    And except for the documents marked 1 through 4 of

    17         37, the rest of this package is your handwriting?

18  A.    Yes.

19  Q.    Do you believe that these notes, at least with

20        respect to notes of interviews, accurately reflect

21        what was told to you by the person being

22        interviewed?

23            MR. THOMAS:  Objection to the form.

24  A.    I think it's my cryptic notes of what people were

25        telling me and I certainly believe that I was

Exam./Wallet - DeLuce

56 1          accurate in what I wrote down.  I think I was not

2          complete in all areas.

3    Q.    Now, as I understand the process, you would take

4          these notes, go back to your office and dictate

5          something?

6    A.    Yes.

7    Q.    Did you do the dictation on the same day or the

8          next day after you did the interviews?

9    A.    I tried to do it as soon thereafter as possible

10          while the information was fresh in my mind.

11          Whether it happened the same day, the next day, I

12          can't tell you.

13    Q.    Are there any other dictated versions of your

14          interviews other than that contained in Deposition

15          Exhibit Number 2 or Deposition Exhibit Number 3?

16    A.    Not to my knowledge.

17    Q.    So that if you interviewed someone and you took

18          notes contained in Deposition Number 1, there

19          would be a typed version contained either

in

20          Deposition Number 2 or Number 3?

21    A.    I cannot say for certain there is a typed
version

22          of every interview.  Attempts were made to have
it

23          that way, but whether that actually turned out,
I

24          can't tell you.

25    Q.    Let's look at Deposition Number 2.  Do you

Exam./Wallet - DeLuce

57 1              recognize that document, sir?

 2    A.    This document is dated April 30, 1997.  Yes, I

 3          recognize it.  It's a memorandum that says from

 4          me, DWD, to HAJ, Horace A. Johnson, of my

office.

 5    Q.    Do you believe you prepared that document in

this

 6          version, this version being the one that's

marked

 7          Deposition 2, on or about April 30, 1997?

 8    A.    No.

 9    Q.    Describe for me when you believe that you

prepared

10          Deposition 2.

11    A.    Deposition 2 was a work in process that after

12          interviews I would add to it primarily the

facts

13          section.  Therefore, I suspect what happened is

no

14          changes were made to the original date on Page

1

15          even though changes were made to the body of

the

16          document.  And I don't see it offhand, but I do

17          recall when I looked at this, yes, Page 10

there's

18          a reference that I met with Varner on May 6th,

19          1997, so it was obviously after it.  That's why

20          this document was a work in process that would

21          change from interview to interview and the date on

22          the front cover is not the date of the last

23          addition or change.

24    Q.    Do you believe Deposition Number 2 to be your last

25          version of what you've described as this work in

Exam./Wallet - DeLuce

58 1          progress?

2   A.    No.

3   Q.    Would you just look for a moment at Deposition

4         Exhibit 3 and tell me whether you believe that's

5         the last version of the work in progress?

6   A.    To the best of my knowledge today, I believe this

7         is the last version of this memorandum.

8   Q.    Let me ask you, sir, with respect to Deposition

9         Number 2, does it accurately reflect in the

10        section marked Facts the information that was

11        relayed to you by the individuals noted in

12        Deposition Number 2?

13            MR. ADAMS:  Facts or background?

14            MS. WALLET:  Facts.

15            MR. THOMAS:  Objection to the form.  You may

16        answer.

17  A.    Yes.

18  BY MS. WALLET:

19  Q.    Do you believe that there's anything contained in

20        the Facts section of Deposition Number 2 that is

21          inaccurate?

22   A.    Well, let me say this.  I think it's an accurate

23          depiction by me of what the witnesses told me at

24          that time.  Whether the statement or allegation is

25          true, they may not be true.  It's based on what

Exam./Wallet - DeLuce

59 1        the witness told me at the time.

2   Q.   Is there anything contained in Deposition 2 in

3       Roman Numeral III entitled Facts on Page 6 through

4       and including 24 that you believe does not

5       accurately depict what was told to you by the

6       individuals indicated?

7       MR. THOMAS:  Objection to the question.  I

8       think it's exactly the same question that was

9       responded to and he's testified that he believes

10      that portion of the report accurately reflects

11      what he was told without any comment on whether or

12      not the facts as such are actually correct.

13  A.   I agree.

14  BY MS. WALLET:

15  Q.   Some time has passed since April 30, 1997.  In the

16      period of time since April 1997 have you become

17      aware of any inaccuracies in your report marked

18      Deposition 2?

19      MR. THOMAS:  Objection to the form.  You may

20      answer.

21    A.    I was advised by Mr. Hartnett I believe in July of

22          1997 that Mr. Graham indicated that he and Mrs.

23          Varner had a relationship and that he indicated

24          this to Judge Sheely.  He and Mrs. Varner both

25          denied that they had a relationship when I spoke

Exam./Wallet - DeLuce

60 1              to them.

2   BY MS. WALLET:

3   Q.   Did Graham at any time ever tell you directly that

4        he had had a sexual relationship with Barbara

5        Varner?

6   A.   He told me that only one time -- strike that. No,

7        he told me they did not have a sexual

8        relationship.

9   Q.   And that would be with respect to any of the times

10       that you interviewed Mr. Graham directly?

11  A.   Yes.  I don't know that I asked him every time.

12  Q.   Now, with respect to Deposition Exhibit Number 3,

13       they have the same basic divisions, a Background

14       section and Section III again is Facts.  With

15       respect to Deposition Exhibit 3 between Pages 6

16       and 25 up to the part marked Attorney Impressions,

17       do you believe that the facts contained here

18       accurately reflect what was told to you by the

19        individuals noted?

20   A.   Yes.

21   Q.   Since the writing of this version, this being

22        Deposition 3, have you come to any realization

23        that any of these facts are incorrect?

24   A.   Again, as I stated with Deposition 2, I later

25        learned that Mr. Graham indicated that there was a

Exam./Wallet - DeLuce

61 1          relationship between him and Mrs. Varner and

2          obviously that is not reflected in my report. I

3          reflected that there was not one as I recall.

4    Q.    Would you describe for me what occurred between

5          Deposition Number 2 and Deposition Number 3?

6    A.    My recollection is that I became less concerned

7          that we had a sexual harassment issue and more

8          concern if we had anything it was an employment

9          supervisory issue.

10   Q.    And why did you come to that conclusion?

11   A.    Based upon the treatment or management style

12         towards the employees in the department.

13   Q.    Whose management style?

14   A.    I would say it's Mr. Osenkarski and Mr. Graham who

15         were the accused here.

16   Q.    Do you know whether you conveyed to Judge Sheely

17         any recommendations as indicated in Deposition

18         Number 2?

19   A.    My recollection is that I felt that some type

of

20          suspension based on what I was hearing to date,

21          sensitivity training, training on what is

sexual

22          harassment, and some transfer of supervisory

23          responsibilities should be seriously

considered,

24          as well as the role of the overall supervisor

in

25          juvenile probation based on what he told me and

Exam./Wallet - DeLuce

62 1                what the others told me, his nonactive role in the

   2        day-to-day management I felt that since the

   3        president judge is busy trying cases and hearing

   4        cases and cannot be there to watch what goes on in

   5        that department, that he should have someone there

   6        who does.

   7   Q.   And did you convey that directly to Judge Sheely?

   8   A.   I conveyed those issues and concerns along with

   9        Mr. Hartnett to Judge Sheely in the one meeting

  10        that I can recall having with him.

  11   Q.   And what if any response did you receive from

  12        Judge Sheely to those recommendations?

  13   A.   Go go back and talk to Gary and Joe and ask them

  14        to come up with a plan and let's see what they

  15        come up with and indicate that you have some

  16        concerns with some of the things that you have

  17        heard to date from other employees.  And we did

  18        meet with them again and tell them that.

  19   Q.   And this meeting was with Mr. Graham and Mr.

20          Osenkarski at the same time?

21    A.    My recollection is that it was separate.  And my

22          recollection is that it was separate and I think

23          we put more of the burden on Mr. Osenkarski who

24          was the overall supervisor.

25    Q.    So, there was a meeting or more than one meeting

Exam./Wallet - DeLuce

63 1         between you, Gary Graham, Dan Hartnett after you

2         met with Judge Sheely?

3    A.    I can't recall specifically.  My belief is it was

4         one meeting with Mr. Graham and two meetings with

5         Mr. Osenkarski, one when we gave him the directive

6         to come back with something, and two when he came

7         back to meet with us to give us some indications.

8    Q.    Describe for me the meeting with you, Dan Hartnett

9         and Gary Graham.

10   A.    Which meeting?

11   Q.    Immediately after your meeting with Judge Sheely

12         in which he instructed you to go to Graham and ask

13         for his suggestions.

14             MR. THOMAS:  Objection to the form.  You may

15         answer.

16   A.    My recollection is -- I don't have any specific

17         recollection of specific discussions.  I think the

18         meetings would start out calm and escalate through

19         the discussions with Mr. Graham.

20   BY MS. WALLET:

21   Q.    Do you know where this meeting took place?

22   A.    In the personnel conference room next to Mr.

23         Hartnett's office at the county courthouse.

24   Q.    Just the three of you?

25   A.    Just the three of us.

Exam./Wallet - DeLuce

64 1    Q.          Tell us what you recall about that

meeting.

2              MR. THOMAS:  Asked and answered.

3    A.    That's all I can recall.

4    BY MS. WALLET:

5    Q.    Well, who started the meeting?

6    A.    I'm sure that I did and Mr. Hartnett had a role

in

7          it and we asked, we indicated I'm sure that

there

8          were concerns that we had what we heard from

the

9          witnesses and we wanted him and we were going

to

10         ask Mr. Osenkarski to come up with some

11         recommendations as to how to address them in

order

12         to protect them and their employer.

13   Q.    Do you have at least a month when you think

that

14         this meeting occurred?

15   A.    It happened after we met with Judge Sheely.  My

16         recollection is we met with Judge Sheely

sometime

17         in early June, but I'm not certain of dates.

18  Q.    Do you know whether you met with Gary Graham

19        before you met with Joe Osenkarski?

20  A.    I don't know that.

21  Q.    Do you remember anything about the order in which

22        these meetings occurred?

23  A.    No.

24  Q.    Okay, I'm still on the meeting with Gary Graham.

25            MR. THOMAS:  There's no question I don't

Exam./Wallet - DeLuce

65 1            think.  Ask a question, please.

2    BY MS. WALLET:

3    Q.    What else do you remember occurring at that

4          meeting?

5    A.    Gary disagreed with what some of the witnesses had

6          told us, said they were lying and it was

7          untruthful.

8    Q.    Did you tell Mr. Graham who said what?

9    A.    I can't recall.

10   Q.    Do you believe you did?

11   A.    I think that if I recalled incidents he would have

12         an idea of who I was talking about, but I can't

13         recall specifics.  I felt my role was to alert him

14         to the allegations against him and get his version

15         of what is being claimed.

16   Q.    Do you recall any other response that Mr. Graham

17         made?

18   A.    I remember him having some documents that he

19         indicated would prove he was right and they were

20          wrong.  And he let me see them from a distance and

21          he said I don't think I'm going to give them to

22          you and he pulled them back.

23    Q.    Do you know what kind of documents they were?

24    A.    No, I did not.  No, they weren't prepared by me

25          and I do not know.

Exam./Wallet - DeLuce

66 1    Q.        Do you know whether they were handwritten or

2         typed?

3    A.    I can't recall.

4    Q.    Did you ask to have copies of them?

5    A.    Yes.

6    Q.    What response did you get?

7    A.    Whatever I said in my report.  I can't -- whatever

8         I said there.

9    Q.    You said that it started calm and then it

10        escalated.  What do you mean by that?

11    A.    Gary was upset and disagreed with what the

12        witnesses said and felt they were not being

13        truthful.

14    Q.    Did he raise his voice?

15    A.    He got excited would be how I would phrase it.

16    Q.    Did he raise his voice?

17    A.    Oh, sure.

18    Q.    Did he swear?

19    A.    I do not recall that, no.

20    Q.    Did he have any suggestions for what ought to be

21        done here?

22    A.    Not that I can recall.

23   Q.    Well, did he tell you what he thought you
should

24         do?

25   A.    I think Gary felt that there was no harassment
or

Exam./Wallet - DeLuce

67 1                any problems here and it was,
therefore, nothing

2        needed to be done.

3   Q.   How did the meeting end?

4   A.   I don't recall except that it, you know, we

5        reached -- it ended.  I don't know of anything
in

6        particular that I can recall at six and a half

7        years ago.

8   Q.   Tell me about the first meeting that you had
with

9        Joe Osenkarski, Dan Hartnett and yourself after

10       you had spoken to Judge Sheely?

11  A.   I think it would have been much the same, that
we

12       indicated that we have heard some statements
from

13       some witnesses that raise concerns to us that

14       could cause some liability to the employer and

15       that some action needed to be taken to address
the

16       situation for all parties involved.  And we
asked

17       him to come up with a plan.

18  Q.   What was Mr. Osenkarski's response?

19   A.   He said he had some ideas, he would work on them

20        and get back to us.

21   Q.   What prompted you to have a second meeting with

22        him?

23   A.   He was to present those ideas to us.

24   Q.   Back at the first meeting what else did you tell

25        Mr. Osenkarski that you recall about the

Exam./Wallet - DeLuce

68 1             allegations?

2  A.   I believe -- I have no present recollection except

3       to say I would have done the same as I did with

4       Gary, that is, review the allegations with him. I

5       can't recall him having any specific response

6       except that he was not aware of them.

7  Q.   He was not aware of what?

8  A.   I think you're better off to look at my report

9       where I summarize what Mr. Osenkarski said to us

10      regarding the incidents that we reviewed with him.

11  Q.   And you are looking at which version?

12  A.   Why don't we go to version Deposition Exhibit 3?

13  Q.   That being the June 4, '97 version?

14  A.   Yes.

15  Q.   And you are referring us to what page?

16  A.   I don't know.  I'm looking for it.

17        MR. THOMAS:  While you're looking for that,

18      off the record for a minute.

19        (Discussion held off the record)

20    A.    The question was?

21    BY MS. WALLET:

22    Q.    When we got a little off the record discussion you

23         were looking for the page that would indicate your

24         notes of this meeting.

25    A.    I'm not sure that Page 22 reflects specifically my

Exam./Wallet - DeLuce

69 1          notes of the meeting.  Page 22 reflects a summary

2          of what Mr. Osenkarski told us in our interviews,

3          which was just a denial of everything in a summary

4          word or words.

5   Q.    Mr. Osenkarski told you that he had never seen

6          Graham lose his temper?

7   A.    Whatever I have in here is an accurate depiction

8          of what I was told and what Mr. Hartnett was told.

9   Q.    I'd ask you to read that paragraph please and then

10          I'll ask you a couple of questions about it.

11              MR. ADAMS:  The entire paragraph on Page 22?

12              MS. WALLET:  Yes.

13   A.    Yes, your question?

14   BY MS. WALLET:

15   Q.    Did Mr. Osenkarski tell you that he had never seen

16          Graham lose his temper?

17              MR. THOMAS:  He's already told you that

18          whatever Mr. Osenkarski told him is reflected.

19          What are you asking him to do?

20              MS. WALLET:  I'm asking him to confirm
that

21          Mr. Osenkarski told him that Graham never lost
his

22          temper.

23              MR. THOMAS:  Do you have any independent

24          recollection today of what Mr. Osenkarski told
you

25          during your interviews six and a half years
ago?

Exam./Wallet - DeLuce

70 1    A.   No.

 2          MR. THOMAS:  Other than what's written?

 3   A.   Other than what's written here on my notes, no.

 4   BY MS. WALLET:

 5   Q.   Well, let me ask it this way.  You wrote on
Page

 6          22, quote:  "He claims he has never seen Graham

 7          lose his temper, never use the "f" word,
although

 8          upon further questioning admitted that at times

 9          Gary gets very excitable."  Is that an accurate

10          statement of what Mr. Osenkarski told you?

11          MR. THOMAS:  We'll agree that you've read
it

12          correctly.

13          MS. WALLET:  That's a different question.

14          MR. THOMAS:  The question has been asked
and

15          answered.

16   BY MS. WALLET:

17   Q.   Does that accurately reflect what Mr.
Osenkarski

18          told you?

19          MR. THOMAS:  Objection to form.  You can

20          answer it.

21   A.    Yes.

22   BY MS. WALLET:

23   Q.    Do you have any written confirmation, typed

24         confirmation, of what occurred when you met
with

25         Mr. Osenkarski the second time?

Exam./Wallet - DeLuce

71 1     A.          If it's not in this report, the
answer is no.

2    Q.    And this report meaning Deposition?

3    A.    2 or 3.

4    Q.    Well, did Mr. Osenkarski ever give you any

5          suggestions as to what he thought should be
done

6          here?

7    A.    Yes.

8    Q.    Did you receive them in writing or otherwise?

9    A.    I know we received them verbally.  Whether they

10         were in writing, I have no recollection of
that.

11   Q.    And what were Mr. Osenkarski's suggestions?

12   A.    I can't remember specifically what they were.
I

13         don't have a present recollection of what
they

14         were.

15   Q.    Do you remember anything?

16   A.    I know that--

17              MR. ADAMS:  Object to form.

18   A.    I know that there were -- I believe there
were

19         some type of training or seminar or some type

of

20          educational program on what is sexual

harassment.

21          Beyond that I have no present recollection.

22    BY MS. WALLET:

23    Q.    Did he recommend any transfers?

24    A.    Not that I can recall.  Not that I can recall

25          other -- not that I can recall.

Exam./Wallet - DeLuce

72 1   Q.       Did he recommend any suspensions?

2  A.   No.

3  Q.   Did he recommend any action be taken against Gary

4      Graham?

5  A.   No, except -- and I can't remember the time

6      frame -- whether by then we had indicated that

7      another senior PO should be reviewing her work and

8      recommended that Gary not have direct supervisory

9      control over her.  When that went into effect,

10      what he did in carrying it out, I can't remember,

11      but I do believe that at some point that that

12      occurred.  I don't know when.  You have to

13      understand we didn't have authority.  We could

14      only make recommendations.

15  Q.   Did you take any of the recommendations from Mr.

16      Osenkarski back to Judge Sheely?

17  A.   I did not.

18  Q.   Do you know if anyone else did?

19  A.   I do not know if Mr. Hartnett or anyone else did.

20  Q.    You did not meet again with Judge Sheely after you

21        spoke with Osenkarski and Graham to receive their

22        recommendations?

23  A.    I have no memory of any subsequent meeting with

24        Judge Sheely.

25  Q.    Do you know whether Judge Sheely received a copy

Exam./Wallet - DeLuce

73 1                     of what has been marked as
Deposition Number 3?

 2              MR. THOMAS:  Objection to form.  Misstates

 3         the testimony.

 4    A.   I did not give him a copy of that Deposition

 5         Number 3.  If he received it, it came from

 6         somebody else.

 7    BY MS. WALLET:

 8    Q.   Did you give Deposition Number 3 to anyone
other

 9         than Horace A. Johnson?

10    A.   I never gave Deposition Number 3 to Horace A.

11         Johnson.

12    Q.   After you did Deposition Number 3, what did you
do

13         with it?

14    A.   Stuck it in the file.

15    Q.   Did you give it to Dan Hartnett?

16    A.   No.

17    Q.   Did Dan Hartnett ever receive anything that
could

18         be considered a written report from you of your

19         investigation?

20    A.   Not directly from me.

21    Q.   Do you believe that Mr. Johnson gave a written

22          report to Mr. Hartnett?

23   A.    I have come to learn that there was a letter from

24          Mr. Johnson to Mr. Hartnett -- strike that. Can I

25          see that letter?  I'd just like to see that first

Exam./Wallet - DeLuce

74 1            before I make any comments.

2   Q.    Let the record reflect that I'm handing what's

3         been marked as Deposition Number 4.

4   A.    I have come to learn that a letter was sent by Mr.

5         Johnson to Mr. Hartnett on June 26th, 1997.

6   Q.    And how did you come to that knowledge?

7   A.    I was told by Mr. Johnson at some subsequent point

8         that he retrieved the report from my file and

9         delivered it to the county.  Who he delivered it

10        to, I was not certain.  I saw this letter of June

11        26th, 1997, just recently.

12  Q.    Do you know what copies were attached or enclosed

13        with the June 26th, 1997, letter marked Deposition

14        4?

15  A.    No, I do not.

16  Q.    So, today you are not sure what went to Dan

17        Hartnett except for this letter dated June 26th,

18        1997?

19          MR. THOMAS:  Objection to the form.  He's not

20      even sure -- you can't put him in a position to

21      tell you what went to Hartnett.  All he can say is

22      he has seen the letter that was addressed to him.

23      He would have no way of knowing whether Hartnett

24      got it or not.

25  A.  I'm sorry, your question is?

Exam./Wallet - DeLuce

75 1      BY MS. WALLET:

2    Q.    Do you know whether anything other than Deposition

3          Number 4 went to Dan Hartnett?

4    A.    I don't know what went to Dan Hartnett other

5          than -- I don't even know that Deposition Number 4

6          went to Daniel Hartnett.  I presume it does

7          because I see a letter addressed to him with the

8          date with attachments, but I don't know that that

9          went to him.  I have no recollection of a

10         discussion with Mr. Hartnett that he received this

11         letter.

12   Q.    Did you have any discussions with Mr. Johnson

13         after June 26th, 1997, relative to this letter?

14   A.    Yes -- no, relative to the letter, no.

15   Q.    Did you have any discussions with Mr. Johnson

16         relative to this investigation after June 26th,

17         1997?

18  A.  I'm sure that I did.

19  Q.  Do you recall the substance of any of those

20      discussions?

21  A.  I believe they are confidential between two

22      attorneys in the same law firm.

23  Q.  When did you learn that any action had been
taken

24      against Gary Graham or Joseph Osenkarski?

25  A.  I got a telephone call from Mr. Hartnett
somewhere

Exam./Wallet - DeLuce

76 1             on or near the 4th of July because I
was off and

2          he called me at home to tell me what he had
heard

3          transpired.

4    Q.    So, Hartnett calls you at home and what does he

5          tell you?

6    A.    He said that there was a meeting with Judge
Sheely

7          and Mr. Graham and that his wife was present
and

8          that Mr. Graham indicated that he had had an

9          affair or relationship with Barbara Varner and

10         they discussed that with Judge Sheely and then
he

11         told me what Judge Sheely did as far as any

12         disciplinary action regarding that.

13   Q.    And what did Hartnett tell you that Sheely
did?

14   A.    My recollection is there was a couple days'

15         suspension and I can't remember the rest of
it,

16         that's over six years ago, but I know that
there

17         was a suspension.  Beyond that I don't recall.

18   Q.    Do you know who was suspended?

19   A.    I believe that Mr. Graham was suspended.

20   Q.    Do you know whether Mr. Osenkarski was
suspended?

21   A.    I do not recall that he was, but I'm not
certain.

22   Q.    Do you know whether any disciplinary action
was

23         taken against Mr. Osenkarski?

24   A.    I do not know what Judge Sheely may have done.

25   Q.    Did you have any discussions with Mr. Hartnett

Exam./Wallet - DeLuce

77 1            after the July 4th conversation?

2   A.   Sure.

3   Q.   Relative to this matter?

4   A.   Well, certainly we discussed the revelation by Mr.

5        Graham and what impact that may have had upon our

6        investigation.

7   Q.   What do you recall about that discussion?

8   A.   Well, I think it's a fact that I think would have

9        been relevant for us to be aware of in what we

10       did.  And if you notice the cases that I cited in

11       my memorandum, they did not, as I recall, deal

12       with a situation where the parties had some type

13       of relationship.  It was simply claims of sexual

14       harassment as I recall.  I certainly would have

15       looked at the situation differently.

16  Q.   In what way?

17  A.   Well, you're asking me to speculate.  I think I

18      would have liked to have asked some more
questions
19      of the parties regarding the matter to get a
20      better understanding of what transpired, look
at
21      the relevant case law and come up with further
22      recommendations is the way I would have handled
23      it.
24   Q.  But you were not asked to do that?
25   A.  No.

Exam./Wallet - DeLuce

78 1    Q.         Were you asked to do anything after June 26th,

   2         1997?

   3    A.    Continue representing the county on any legal

   4          matters involving this situation which included --

   5          I have no present recollection of when we were

   6          served with the EEOC documents, but I know that I

   7          was involved in that.

   8    Q.    You were not asked to do anything else with

   9          respect to investigating Barbara Varner's

   10         complaint after June 26th, 1997?

   11   A.    No, in my view the employer made their

   12         determination.  The judge decided what was to be

   13         done.

   14   Q.    Did you believe that your investigation was

   15         concluded by June 26th, 1997?

   16             MR. THOMAS:  June what?

   17             MS. WALLET:  26th.

   18   A.    I believe that it was based on the facts that were

   19         given to us to date.

   20   BY MS. WALLET:

21    Q.    To date meaning today or June 26th of '97?

22    A.    June 26th of 1997.

23    Q.    In any event, nobody asked you to do anything

24          after June 26th, 1997?

25    A.    No.

Exam./Wallet - DeLuce

79 1                         MS. WALLET:  Okay, let's take a

break now.

2                  (Lunch recess taken)

3    BY MS. WALLET:

4    Q.    Mr. DeLuce, you are certainly still under oath.

5          You understand that?

6    A.    I understand that.

7    Q.    Would you tell me, please, what recommendation

you

8          made to Judge Sheely as a result of your

9          investigation?

10   A.    I made no recommendation to Judge Sheely.  I

11         indicated to him that I had some concerns with

12         what I saw -- or what I heard from the

witnesses,

13         not only from there was some concern about

14         potential sexual harassment, but also

management

15         issues, and I felt that some action needed to

be

16         taken and movement of personnel also needed to

be

17         done in order to terminate this matter from a

18         legal standpoint and also from the employees'

19         perspective.

20   Q.    And when you say from the employees'
perspective,

21         who are you referring to?

22   A.    Well, I think my report reflects that there was

23         some issues by many members of the department
with

24         management of the department and there were

25         concerns and I thought from a personnel
standpoint

Exam./Wallet - DeLuce

80 1              that somebody needed to address those issues as

2              well.

3   Q.    And did you make any specific recommendations

4         about what should be done?

5   A.    To Judge Sheely, no, I did not.

6   Q.    Was there anything else that you recommended to

7         Judge Sheely that you haven't just told me?

8   A.    No.

9         MS. WILLIAMS:  I'm going to object to the

10        form of that question.  I think his testimony was

11        that he made no recommendations.  So, I would

12        object to your characterization as a

13        recommendation.

14  BY MS. WALLET:

15  Q.    Did you make any recommendations at all as a

16        result of your investigation to Judge Hoffer?

17  A.    No.

18  Q.    Did you make any recommendations at all to anyone

19        with the County of Cumberland?

20  A.    I did indicate to the county commissioners and Mr.

21        Ward that they should urge the judge to take

some

22        action based upon what we had heard from the

23        witnesses and my concerns would be to both the

24        court and what my concerns would be to my

client,

25        the county, and I think they are stated in my

Exam./Wallet - DeLuce

81 1                      Deposition Exhibit Number 2.

2   Q.    So, what is contained in Deposition Exhibit
Number

3         2 on Page 24 and 25 is your summary of what you

4         told the county commissioners?

5              MR. THOMAS:  I have an objection to the
form

6         in terms of date.  I think my recollection is
that

7         the meeting with the commissioners was after
the

8         later report.

9   A.    It was after the later report and my
recollection

10        is that there should be some action taken, but
of

11        course the county could not do it.  They were

12        going to go talk to Judge Sheely, but I felt
there

13        should at least be a suspension, sensitivity

14        training, maybe a management change and
monitoring

15        of the situation because of the concerns that
Mr.

16        Hartnett and I had after talking to the

witnesses.

17          But we didn't give anything specific.  We gave

18          them a range of what can be done and then they

19          were going to take that in some manner and go

see

20          Judge Sheely.

21     BY MS. WALLET:

22     Q.    They meaning?

23     A.    The commissioners and Mr. Ward.

24     Q.    Do you know whether that occurred?

25     A.    I was not personally present.

Exam./Wallet - DeLuce

82 1     Q.          Do you have any information to believe that that

2          occurred?

3    A.   I believe that there was a meeting.  Who attended

4          and what was said, I do not know.

5    Q.   Now, you said your recommendation of action

6          included suspension.  Suspension of whom?

7    A.   The supervisors involved with this situation.

8    Q.   Specifically?

9    A.   Mr. Osenkarski and Mr. Graham.

10   Q.   And did you make a recommendation even though it

11          be a range for what those suspensions should be?

12   A.   I gave no range.

13   Q.   Did you recommend specifically what kind of

14          management change you would recommend?

15   A.   I felt that based on what the witnesses had told

16          me Joe was not running the day-to-day operations

17          of the department and they needed somebody in

18          there to oversee and do that and keep an eye on

19          the situation.  And I suggested that they

consider

20        talking to Mr. Osenkarski about retiring since he

21        was vested in his retirement plan -- but you have

22        to understand the county could not do that, that

23        would have been up to the judge -- and then have

24        somebody else maybe supervise the department and

25        Mr. Graham.

Exam./Wallet - DeLuce

83 1    Q.         Someone could supervise Mr. Graham?

2    A.    Yes.

3    Q.    Did you recommend any change in physical
location

4         for either Mr. Osenkarski or Mr. Graham?

5    A.    Specifically, no, because I've never seen the

6         department myself.

7    Q.    Did you recommend that Graham be separated from

8         Varner?

9    A.    Yes.

10    Q.    What was the nature of your recommendation?

11    A.    Well, I felt that it was a situation that would

12         continue and in order to stop that for both

13         parties involved and to remove the allegation
of

14         sexual harassment that there should be some

15         separation of the parties in the workplace from

16         supervisory control.

17    Q.    Why did you think the situation would continue?

18    A.    As I said, the judge who has ultimate
supervision

19         is busy, he's trying cases, he's in a different

20         floor.  This is not something that he is able
to

21         stay close to from what I could tell and it was

22        clear from the witnesses and even Mr. Osenkarski

23        that he was not into handling the day-to-day

24        activities.

25   Q.   What monitoring did you have in mind?

Exam./Wallet - DeLuce

84  1    A.    I had none in mind that I could specify to
you.

   2  Q.    I believe that was one of your list of

   3        recommendations?

   4  A.    Yeah, but it's not -- I think that's for the
judge

   5        to decide that, not me.

   6  Q.    Did you make any recommendation with regard to
the

   7        what I'll call seniority issue, do you
understand

   8        what I mean by the seniority issue?

   9  A.    I have no present recollection of making a

  10        recommendation regarding the seniority
issue.

  11  Q.    Did you believe that the county could issue
any

  12        regulations or policies with regard to how

  13        seniority was treated?

  14            MR. ADAMS:  Objection.  How would this

  15        witness be qualified to answer that question?

  16            MS. WALLET:  He represents the county, so
he

  17        says.

  18            MR. ADAMS:  Are you asking him to

interpret a

19      policy by the county?

20          MS. WALLET:  Is that an objection?

21          MR. ADAMS:  Objection based on the fact that

22      he's not qualified to respond based on the

23      policies.

24  BY MS. WALLET:

25  Q.   You may answer the question.

Exam./Wallet - DeLuce

85 1    A.    Should I answer the question?

 2           MR. THOMAS:  Yeah.

 3    A.    My understanding was that these type of policies

 4           were developed by the judge and not the county

 5           and, in fact, I was told that employees who were

 6           dissatisfied with the policy went to see the judge

 7           to give their viewpoint.  This was not in my view

 8           within the county's domain.

 9    BY MS. WALLET:

10    Q.    Did you believe the county had any ability to

11           remedy any of this situation?

12           MR. THOMAS:  Objection to the form.

13           MR. ADAMS:  What situation?

14           MS. WALLET:  Complaints brought by Ms.

15           Varner.

16    A.    No.

17    BY MS. WALLET:

18    Q.    No, you believe that they had no ability to

19           remedy?

20    A.    That's correct.

21    Q.    Who did you believe had the ability to remedy?

22   A.   If any changes were to be made or a remedy was

23        needed, it would be up to the president judge who

24        controlled that department, not the county.

25   Q.   Why did you bother to make recommendations if you

Exam./Wallet - DeLuce

86 1          didn't think that the county had any ability to

2          implement them?

3    A.    Who are you referring that those recommendations

4          were made to?

5    Q.    Well, let's start with Deposition 2.

6    A.    First of all, you have to understand that

7          Deposition 2 was a work in process.  It evolved

8          into Deposition 3, just so you understand that.

9          I'm sorry, repeat your question, please.

10   Q.    Why did you bother to make recommendations if you

11         didn't think the county had any ability to

12         implement them?

13   A.    Because the county certainly had the ability to

14         recommend those to the president judge and they

15         wanted something from their legal counsel as to

16         what the options were.

17   Q.    Did you consider that you were an investigator for

18      the court?

19  A.  I considered myself as an attorney for the

county

20      who was conducting an investigation.

21  Q.  For whom?

22  A.  The investigation in my view was at the request

of

23      the president judge and with his authority.  It

24      was done though by the county personnel office

and

25      myself.

Exam./Wallet - DeLuce

87 1    Q.        Did you consider yourself to be the president

2         judge's lawyer?

3    A.    No.

4    Q.    Why did you believe that you were investigating at

5         the request of the president judge?

6    A.    Because I knew very early on that the county had

7         no authority to make personnel changes in the

8         probation department.

9    Q.    Did the president judge give you any direction

10        with regard to conducting an investigation into

11        the allegations made by Barbara Varner?

12   A.    Not that I can recall except for the one meeting

13        we had, which I've already explained my

14        recollection of what transpired.

15   Q.    To the best of your knowledge, did the court pay

16        for any of your investigative activity?

17   A.    I didn't see the checks when payments were made,

18        but to the best of my knowledge it was paid by the

19      county.

20   Q.   Now, this memo marked Deposition 2 was actually

21      from you to your would you call him your superior,

22      Horace Johnson?

23   A.   I would call him my partner at the time.

24   Q.   Did Mr. Johnson direct you to write this memo to

25      him as opposed to someone else?

Exam./Wallet - DeLuce

88  1    A.          I can't recall what he may have directed at that

    2               time.  I obviously -- the way I drafted it, it was

    3               addressed to him, but I never physically gave it

    4               to him.

    5    Q.          How did he get it?

    6    A.          I presume he took it out of the file.

    7    Q.          And you don't know when that happened?

    8    A.          I suspect it was -- I believe it was during the

    9               last week of June of 1997.

   10    Q.          Why didn't you write a report directed to Dan

   11               Hartnett?

   12    A.          Because these were my own impressions and my own

   13               thoughts as an attorney after talking to witnesses

   14               and doing my own research.  I did not prepare this

   15               with the intention of giving it to my client.  I

   16               would have done it differently.

   17    Q.          Did you consider yourself to be an independent

   18               investigator?

19    A.    What do you mean by independent?

20          MR. THOMAS:  Objection to form.

21    BY MS. WALLET:

22    Q.    Independent to the parties involved.

23    A.    No, I felt myself as counsel for the county.

24    Q.    What caused you to change what was Roman

Numeral

25          Number IV, Recommendation, in the April 30, '97

Exam./Wallet - DeLuce

89 1            memo to Attorney Impressions in the
June 4 '97

2        memo marked Deposition 3?

3   A.   As the process continued and the interviews

4        continued, I became less and less concerned
with

5        the sexual harassment and more concerned with
a

6        management personnel issue in the department
and

7        that is why I recall making changes to my

8        recommendations.

9   Q.   Did you believe that the change from

10       recommendation to attorney impressions would

11       somehow protect this document from future

12       disclosure?

13  A.   I typically put that on my file memorandums
that I

14       want to keep for my future reference and
because

15       they are for me.  If they are intended for the

16       client, I would do it differently.

17  Q.   So, you really never intended to conduct an

18       investigation, prepare a report and submit that

19       report to someone?

20              MR. THOMAS:  Objection to the form.

21    A.    If my client had asked me for a written report, I

22          would discuss that with them, and if they wanted

23          that, I certainly would give them a written

24          report.

25    BY MS. WALLET:

Exam./Wallet - DeLuce

90 1    Q.        And they never asked you for that?

2    A.    I have no recollection of Mr. Hartnett asking me

3        for a written report.

4    Q.    When you say if my client had asked me for a

5        written report, you are speaking to someone in

6        authority with the County of Cumberland?

7    A.    Well, Mr. Hartnett would have been sufficient for

8        me or the chief clerk or the commissioners.

9    Q.    And not one of those three entities ever asked you

10        for a report?

11    A.    I have no recollection of any of them asking me

12        for a written report.

13    Q.    Would you look, please, at Deposition Exhibit 3,

14        the first page?  You write at the bottom of the

15        first full paragraph:  "The written complaint from

16        Barbara Varner as well as her proposed solution to

17        the problem were submitted in writing at my

18        request."  Were those the written complaints that

19          were referenced in the prior sentence?

20    A.    Yes.

21    Q.    So, you had in your possession the complaint that

22          Barbara Varner had written to Dan Hartnett dated

23          April 28, 1997?

24    A.    Yes.

25    Q.    Did you have anything else in writing from her?

Exam./Wallet - DeLuce

91 1    A.    I don't know.  I can't recall.

2    Q.    Did you believe that you had a satisfactory

3          description of Ms. Varner's complaint prior to

4          your engaging in the interview of witnesses?

5               MR. MacMAIN:  Objection.  Do you mean based

6          on the writing or you said the first thing he said

7          was interview her or--

8               MS. WALLET:  Based on the writing.

9    A.    I'm not sure what you mean by satisfactory. She

10         provided us verbally and then in writing her

11         allegations and then we embarked upon talking to

12         her and witnesses that she either told us or that

13         we thought had relevant knowledge of these

14         incidents to try and determine the facts.

15   BY MS. WALLET:

16   Q.    My question was did you believe that you

17         sufficiently understood what Barbara Varner was

18         complaining about in order to engage in some

19         investigation of those complaints?

20              MR. THOMAS:  Objection to form.  You may

21          answer.

22    A.    Yes.

23    BY MS. WALLET:

24    Q.    What was your understanding of what Barbara
Varner

25          was complaining about?

Exam./Wallet - DeLuce

92 1    A.        That she was working in a hostile environment, it

2        was made hostile by her immediate supervisor, Mr.

3        Graham, and that he treated her differently than

4        others.

5    Q.    And did she indicate that she believed she was

6        treated differently because of her gender?

7    A.    I don't have the written complaint in front of me

8        so I don't know what's in there.  If you're asking

9        me to comment about whether that's in there or

10        not, I don't know.  I certainly recall verbally

11        that her concern was that she was treated

12        differently because of her gender.  I don't know

13        whether it's in the written complaint.

14    Q.    Did she have any complaints about Joseph

15        Osenkarski and his treatment of her because of her

16        gender?

17    A.    Without looking at her complaint and my notes,

I

18          can't recall that independently.  But certainly

19          her complaint was against him as well as Mr.

20          Graham, that I do recall.

21    Q.    Did she complain to you about Joseph
Osenkarski's

22          failure to stop what she considered to be the

23          harassment by Gary Graham?

24    A.    Yes.

25    Q.    Did you understand her complaint to be that she

Exam./Wallet - DeLuce

93 1            was treated differently with regard
to seniority

2            because of her gender?

3    A.    Did I understand that was her complaint that she

4            felt she was treated differently because of her

5            gender and seniority?

6    Q.    Yeah.

7    A.    I think that was her complaint.  That doesn't mean

8            that I necessarily agreed with that.

9    Q.    I understand.  I'm just asking you what you

10            understood to be the complaint that you were

11            investigating.  Did you understand Ms. Varner's

12            complaint to be that she had been treated

13            differently after she had complained about Mr.

14            Graham's treatment of her?

15    A.    She expressed to us a concern for retaliation,

16            yes.

17    Q.    Did you understand her complaint to be that she

18            was treated differently because of her age?

19    A.    I do not recall any age basis to her claims.  I

20            qualify that and all of this line of questions

21            with the fact I don't have the written complaint

```
22        in front of me.

23   Q.   If it was in the written complaint, you believe

24        that you had a duty to investigate?

25   A.   Yes.
```

Exam./Wallet - DeLuce

94  1      Q.   Were there any complaints in this written

2           complaint form dated April 28, 1997, that you

3           believed you did not have a duty to

investigate?

4   A.   Can I see the complaint?

5   Q.   Maybe.

6            MR. THOMAS:  Note my objection to the

form.

7            MS. WALLET:  Your objection being to your

8           witness asking for something?

9            MR. THOMAS:  No, to the form of your prior

10          question.

11  BY MS. WALLET:

12  Q.   I'd like to show you what has previously been

13          marked in this matter as Varner Deposition

Number

14          1.

15  A.   The document you handed to me is dated April

25,

16          1997.  I don't know why my memorandum refers to

17          April 28th, 1997.  I presume it's the same

18          document, but I do not know that for certain.

I

19          see in her complaint she says she feels she

has

```
20        been discriminated or harassed in relation to
her
21        age, sex and marital status.  I'm sorry, your
22        question is?
23   Q.   I don't remember exactly what my question was,
but
24        let me ask a different question.  Now that
you've
25        had a chance to review Varner Deposition Number
1,
```

Exam./Wallet - DeLuce

95 1          do you believe that to be the writing that you had

2          in your possession at the time you engaged in the

3          investigation of Ms. Varner's complaints?

4    A.    It looks like the document that I had previously

5          seen.

6    Q.    Is it the document that you referenced in

7          Paragraph 1 of Deposition Number 3?

8    A.    Again, I believe it is, but there are different

9          dates.

10          MR. THOMAS:  They deviate by a day.

11    A.    Actually April 28th is what my memo says and this

12          is dated April 25th.

13          MR. THOMAS:  I'm sorry, three days.

14    A.    I don't know whether it is the -- I don't know

15          what I'm referring to, whether it's the date it

16          was given to me or the actual date of the memo.

17    BY MS. WALLET:

18    Q.    Mr. DeLuce, if we had your original file would it

19       have attached to Deposition Number 3 or some

20       version of Deposition Number 3 documents that
you

21       had to work with at the start of your

22       investigation?

23   A.   I believe a memorandum from Barbara Varner
would

24       be in the file.  Whether it's attached to this

25       document, I don't know.  I can tell you I do
not

Exam./Wallet - DeLuce

96 1          have in my file Deposition Exhibit Number 3.  I

   2          only have in my file Deposition Exhibit Number 2.

   3  Q.    Could I have Varner 1 back, please?

   4  A.    Sure.

   5  Q.    Now let me ask you, sir, did you come to any

   6         conclusions regarding whether or not there was a

   7         hostile environment for Barbara Varner when you

   8         conducted your investigation?

   9            MR. ADAMS:  Objection, calls for a legal

  10         conclusion I would think and it's inappropriate

  11         for this witness.

  12            MR. THOMAS:  Objection to the form.  You may

  13         answer.

  14  A.    I felt that at times there was a hostile

  15         environment, especially as perceived by the

  16         employee.

  17  BY MS. WALLET:

  18  Q.    And when you say the employee, you mean Barbara

19        Varner?

20   A.   Barbara Varner.

21   Q.   Did you find any evidence that other individuals

22        in the office believed that Barbara Varner was

23        subjected to a hostile environment?

24           MR. ADAMS:  Same objection.

25           MR. THOMAS:  Same objection.  Any employees?

Exam./Wallet - DeLuce

97 1                    MS. WALLET:  Any employees.

   2    A.    I think what's reflected in my report, who and

   3          what they said to me, you can make your own

   4          conclusions from what they said.

   5    BY MS. WALLET:

   6    Q.    Did any employees confirm the allegations of

   7          Barbara Varner regarding hostile environment?

   8    A.    Yes.

   9    Q.    Which employees?

  10    A.    You want me to go through the report and specify

  11          them?  I think my report speaks for itself.  I

  12          have no present recollection and, in fact, would

  13          not recognize most of those people if they walked

  14          in this room today.

  15    Q.    Did you reach any conclusions as to whether or not

  16          Joseph Osenkarski engaged in treatment of Ms.

  17          Varner differently because of her gender?

  18          MR. ADAMS:  Same objection.

  19          MR. THOMAS:  For his conclusion?

  20          MS. WALLET:  Yeah.

21  A.    I can't recall.  I think what you're asking me is

22         did I conclude whether Mr. Osenkarski treated her

23         differently or engaged in sexual harassment

24         because she was a woman?

25  BY MS. WALLET:

                    Exam./Wallet - DeLuce

98 1    Q.          Well, I asked you treated
differently.

   2    A.    I think my report speaks for itself.  My
   3          recollection now is only what I see in here and
   4          I'm going to stick by what I said in my report
   5          because that was contemporaneous with the
   6          investigation.

   7    Q.    So that any of the facts that you would testify
to
   8          now have been, shall we say, impaired by the
   9          passage of time?

  10    A.    Yes.

  11    Q.    So, you believe the best evidence of what you
  12          concluded at the time is contained in
Deposition 2
  13          and 3?

  14    A.    Yes.

  15          MR. THOMAS:  With the caveat that he's
  16          already told you earlier in his testimony
today
  17          that had he known about a consensual affair,
his
  18          research, investigation, conclusions may have
been
  19          different.

20   BY MS. WALLET:

21   Q.    At the time did you believe that there may be

22         retaliation against Barbara Varner because of her

23         complaints?

24             MR. THOMAS:  Present tense, past tense,

25         future tense?

Exam./Wallet - DeLuce

99 1    BY MS. WALLET.

2    Q.    At the time meaning at the time that you wrote

3          Deposition 2 and 3.

4    A.    My recollection is that my report indicates I had

5          some concerns about retaliation.

6    Q.    Why did you believe there might be some

7          retaliation against Barbara Varner?

8    A.    Because of the information given to me by other

9          employees that's indicated in my report.

10   Q.    The information that people told you Gary Graham

11         was prone to punish people?

12             MR. THOMAS:  Objection to the form.  You may

13         answer.

14   A.    I can't recall if that's the exact words, but I

15         believe there is some language in there that I

16         quoted from witnesses regarding that topic.

17   BY MS. WALLET:

18   Q.    Did you find those witnesses to be credible?

19             MR. THOMAS:  Which witnesses?

20   A.    Yeah.  I guess the witnesses dealing with the

21         concern of retaliation?

22   BY MS. WALLET:

23  Q.   Correct.

24  A.   I did at the time.

25  Q.   Mr. DeLuce, in your experience did you find it

Exam./Wallet - DeLuce

100 1          unusual that the court would ask you to go back to

2          Gary Graham and Joseph Osenkarski and ask them

3          what ought to be done in response to Ms. Varner's

4          complaint?

5    A.    When you say did I find it unusual, if you're

6          asking me is how would I have handled it, that's a

7          different question.  I think that decision of how

8          to handle it was up to the president judge, not

9          me.  I mean you're asking me to speculate why he

10          did that and that's what I would be doing. All I

11          can say is he was the supervisor and I think he

12          wanted to hear what their suggestions were on how

13          to resolve it.

14    Q.    Had you ever done a sexual discrimination or

15          sexual harassment investigation prior to this

16          time?

17                MR. THOMAS:  Asked and answered.
Don't

18        answer it.

19   BY MS. WALLET:

20   Q.    Have you done any since?

21   A.    I have assisted clients and my recollection is

22         that I did join in with a client's personnel

23         director on obtaining information.

24   Q.    Did you ever share any portions of Deposition

25         Exhibit 2 with Barbara Varner?

Exam./Wallet - DeLuce

101 1    A.        I have no recollection of sharing. When you say

2        portions of it, do you mean the physical report or

3        the content?

4    Q.    The physical report.

5    A.    I have no recollection of sharing this report with

6        Barbara Varner.

7    Q.    Do you have any recollection of sharing any

8        portions of the physical report of Deposition 3

9        with Barbara Varner?

10    A.    I have no recollection of doing that.

11    Q.    Did you share any of the portions of these reports

12        with Gary Graham?

13    A.    Again, do you mean the content or the physical

14        document?

15    Q.    Physical document.

16    A.    I have no recollection of showing him any of this,

17        either memorandum.

18    Q.    Did you share any of the document or portions of

19        the document Deposition 2 or Deposition 3 with

20          Joseph Osenkarski?

21    A.    The physical document I have no recollection of

22          doing that.

23    Q.    However, you did share with both of them the

24          findings, or at least some of the findings and

25          facts contained in those reports at the direction

Exam./Wallet - DeLuce

102 1                of Judge Sheely?

2              MR. THOMAS:  Objection to the form.

3    A.    We shared with both Mr. Osenkarski and Mr. Graham

4          statements and allegations, allegations made by

5          Barbara Varner and statements made by certain

6          witnesses as to what happened or what they saw to

7          get his version and confront him with the

8          allegations.

9    BY MS. WALLET:

10   Q.    And you did that at the direction of Judge Sheely?

11   A.    The answer is in my view, yes, as part of the

12         investigation.

13   Q.    Did you share any of the facts or information

14         contained in your report -- let's say reports, I'm

15         referring now to Deposition 2 and Deposition 3,

16         with Barbara Varner after you met with Judge

17         Sheely?

18   A.    I can't recall.

19   Q.    Did Judge Sheely tell you to go back to Barbara

20         Varner and ask her what her suggestions were?

21   A.    I don't recall him doing that.

22  Q.   Did you ever have any discussions with counsel for

23       Gary Graham in or about the April to June 1997

24       time frame?

25  A.   I recall being contacted by Attorney David

Foster.

Exam./Wallet - DeLuce

103 1            I recall that he indicated he was representing

2        Gary Graham.  I cannot recall the substance of the

3        conversations.

4   Q.   How did he know to call you?

5   A.   I suspect Mr. Graham, but I -- I didn't -- I mean

6        I didn't contact him.

7   Q.   Do you remember what Mr. Foster wanted you to do?

8   A.   I don't recall the substance of our conversations.

9   Q.   You had no notes of those -- I'm sorry, I didn't

10       mean to say those.

11  A.   My recollection is I have no notes of it and I

12       don't know if there was one or a couple or how

13       many, but I do know that he contacted me.

14  Q.   Do you know whether Mr. Foster told you any facts

15       relating to the relationship between Ms. Varner

16       and Mr. Graham?

17  A.   I have no recollection of him discussing facts

18          with me.

19    Q.    Did Mr. Foster at any time tell you that Gary

20          Graham had had a sexual relationship with Barbara

21          Varner?

22    A.    I don't recall him ever saying that to me.  I

23          think that's something I probably would have

24          remembered.

25    Q.    Did you have any conversations with Debra Wallet

Exam./Wallet - DeLuce

104 1              regarding your investigation into the complaints

2              of Ms. Varner?

3    A.    I can't recall.  I may have.  I can't recall.  I

4          know that we spoke at a certain point in time, but

5          I cannot tell you when that was.

6    Q.    Do you remember any of the substance of the

7          conversation with Debra Wallet?

8    A.    Are you talking April to June of 1997?

9    Q.    Or any other time.

10   A.    I know that we had discussions regarding how to

11         resolve or settle the issue or the -- I suspect it

12         was after the EEOC complaint was filed because I

13         know that I believe that we had those discussions.

14         Exact terms, time, I can't recall.

15   Q.    Did you initiate those calls or did Debra Wallet?

16   A.    I can't recall.

17   Q.    During your interviews with the individuals listed

18          in Deposition 2 and 3, did you give any assurances

19          to those individuals that what they told you would

20          be kept confidential?

21    A.    I can't recall specifically.  I do know that some

22          of the witnesses had concerns that what they were

23          telling us would get back to their supervisors.

24          And Mr. Hartnett and I were conscious of that

25          issue, but what assurances I gave I cannot recall.

Exam./Wallet - DeLuce

105 1    Q.        Do you believe that you told anybody that they

2        could feel free to talk to you because the

3        information they gave you would not be revealed?

4    A.    You are asking me do I believe I said that and you

5        are asking me to speculate what I may have said

6        six and a half years ago and I cannot recall what

7        I said.

8    Q.    Did you have any kind of a script that you used

9        when you began each of the interviews?

10        MR. THOMAS:  Objection, asked and answered.

11        Don't answer it.

12    BY MS. WALLET:

13    Q.    Did you have any mental list of what you would

14        tell each of the individuals that you interviewed?

15    A.    Should I answer it?

16        MR. THOMAS:  Sure.

17    A.    I'm sure that we did have some type of thought

18        processes as to what we were going to ask the

19        witnesses when they came to that conference

room.

20    BY MS. WALLET:

21    Q.    What did you tell these witnesses that you were

22          there to do?

23    A.    I can't specifically recall what I said to
them.

24          The witnesses that Barb asked us to interview
and

25          said they would be willing to talk to us, I'm
sure

Exam./Wallet - DeLuce

106 1              they knew what was going on.  The other witnesses

2          that we wanted to talk to, I think by the time we

3          got to them word had spread through the department

4          and they had a good idea of what the heck was

5          going on.  I can't recall specifically what we

6          told them.

7    Q.    Did you tell these witnesses that you were

8          investigating allegations by Barbara Varner

9          against individuals in the department?

10   A.    I can't recall exactly what I said to them.  I

11         can't recall exactly what I said to them.

12   Q.    Did you give any of the individuals that you

13         interviewed any assurance that there would be no

14         retaliation against them as a result of their

15         talking with you?

16   A.    Didn't you already ask me that?  I think I recall

17         that being a concern, especially with some of the

18         witnesses who came to see us.  And what I

would

19        have explained to them was that if there was
any,

20        they needed to report it, because that should
not

21        be going on.  What exactly I said to them I
cannot

22        recall, but I can tell you that's the way I
would

23        have answered their concerns.

24   Q.   Did you tell them who they should report it to?

25   A.   I believe -- no, I don't recall that we did

Exam./Wallet - DeLuce

107 1                     specifically, but we may have.  I
can't remember

2          whether we told them to report it to Mr.
Hartnett

3          or to the judge, but we would have told them to

4          report it.

5   Q.     Was there a sexual harassment policy in place
in

6          or about April through June of 1997?

7   A.     I don't have it in front of me, but my

8          recollection is that there was.

9   Q.     Do you know whether that policy was issued by
the

10         County or by the County of Cumberland?

11             MR. THOMAS:  Objection to the form.  You
may

12         answer.

13  A.     I don't know who issued it.  I don't know who

14         issued it.  My recollection is that it was part
of

15         the -- I'm not sure.  I'm speculating.

16  BY MS. WALLET:

17  Q.     Did you have a copy of a written policy at the

18         time that you began your investigation?

19  A.     My recollection is that I asked for it and

20          something was provided to me.

21    Q.    Do you know whether or not that policy was

22          contained in your file?

23    A.    I have to tell you that I don't recall seeing it

24          in there, but it may be in there.

25               MS. WALLET:  Mr. Thomas, I'm going to ask you

Exam./Wallet - DeLuce

108 1    to make available to me the entire investigative

2    file.

3    MR. THOMAS:  We will certainly obtain his

4    original and review it and take your request under

5    advisement.

6    MS. WALLET:  I take it that means there's no

7    assurance I'm going to get to look at it?

8    MR. THOMAS:  That's what that means.  I will

9    review it to see whether or not you've been

10    provided with the things that we believe are not

11    protected.  If there are things that I believe are

12    protected, we will provide you with a privilege

13    log.

14    MS. WALLET:  With a privilege?

15    MR. THOMAS:  Privilege log.

16    MS. WALLET:  Log, thank you.  And could I ask

17    that you do that within a week?

18    MR. THOMAS:  Sure.

19            MS. WALLET:  Thank you, Mr. DeLuce.
That's

20        all of the questions I have for you today.

21            MR. THOMAS:  I would ask that you fax me a

22        letter today or Monday reminding me to do that
so

23        that it gets done.

24                    EXAMINATION

25    BY MR. MacMAIN:

Exam./MacMain - DeLuce

109 1    Q.        Mr. DeLuce, my name is David
MacMain.  I represent

2        Mr. Graham and I had some things that I want to

3        ask you about that you have been asked about in

4        follow-up and some additional areas.  Now, you
had

5        said earlier that you interviewed some
witnesses

6        that had been suggested to you by Ms. Varner.

7        Correct?

8    A.    Correct.

9    Q.    Did you ask Mr. Graham when you interviewed him

10        for witnesses that he might suggest you
interview?

11    A.    Yes, I asked him to give me anything he could
to

12        help me in addressing this, especially if he
said

13        the allegations were untrue or false.

14    Q.    And do you recall what witnesses, the names of
any

15        of the witnesses that he provided to you to

16        interview?

17    A.    Certainly they are in the report.  Whether I
said

18          in here Gary or Joe told me to interview X, I

19          don't think I did that.  He gave me names.  I

20          cannot presently recall who they were.

21  Q.   Now, you did not interview everybody in the

22          probation department.  Correct?

23  A.   I don't know that.  I don't think that we did, but

24          I don't know that for a fact.

25  Q.   Anybody that you would have interviewed would be

Exam./MacMain - DeLuce

110 1           contained in your notes which was
DeLuce 1.

2       Correct?

3    A.    Correct.

4    Q.    So, if someone had been interviewed, their name

5          would be reflected in the interview notes

6          somewhere in Number 1?

7    A.    That is my recollection.

8    Q.    Now, you said you never physically had been in
the

9          office, the probation office?

10   A.    During the time that this was going on the
answer

11         is no.  I had been in the probation office
prior

12         to that when I did some criminal work.  Where

13         their offices are located I have no -- I
didn't

14         have any knowledge.  I mean I knew they were
on

15         the second floor, but that's all I knew.

16   Q.    You said these interviews were conducted with
both

17         yourself and Mr. Hartnett.  Was there any
breakout

18      of who asked the questions, for example, did you

19      ask the majority of the questions, did Mr.

20      Hartnett, was it--

21  A.    We both asked the questions and I would have

22      viewed it as a team approach.  He asked a lot of

23      questions.  He was experienced in his field and he

24      asked a lot of questions and I mean he was part of

25      the process.  We both did.

Exam./MacMain - DeLuce

111 1    Q.         Do you know if Mr. Hartnett took any notes?  We

2         have your notes here.

3    A.    You'll have to ask him.  I don't have his notes.

4    Q.    I'm looking at DeLuce 2.

5    A.    Okay.

6    Q.    I want to go through some of the documents and ask

7         you select questions about some things.  Second

8         paragraph about four lines down it says Graham and

9         Varner shared an office?

10    A.    Um-hum.

11    Q.    Do you know whether or not they ever shared an

12         office?  Where did you get that information from I

13         guess would be a better question?

14    A.    That came I think from Barbara Varner.  I don't

15         know whether that also came from Gary Graham.  But

16         this looks familiar to me to be part of my first

17         interview with Barb Varner.

18    Q.    And was it your understanding that they

actually

19        shared a I don't want to say an office, I mean a

20        specific office where people sit, as opposed to

21        the more general probation office generally?

22  A.    All I know is what I have here is they shared an

23        office.  What type of office or what that meant,

24        I'm not sure.

25  Q.    Did she tell you how long they had shared an

Exam./MacMain - DeLuce

112 1              office?

2   A.   If it's reflected in my notes, then she did.

3   Q.   Did you have any understanding of prior to the
two

4        of them working together in probation whether
they

5        worked together while she was located and
working

6        for a different county office, Children and
Youth

7        Services?

8   A.   Well, I think what it reflects here and in my

9        notes that they had some contact in their jobs
by

10       virtue of her being at Children and Youth and
him

11       being in juvenile probation and they worked

12       together on certain cases.  I recall that's how

13       they had their connection prior to her moving
to

14       the probation department.

15  Q.   And it was your understanding that her hiring
in

16       the probation department was actually at the

17       recommendation of Mr. Graham?  I'll cut right

to

18          the chase.  I'm looking at DeLuce 2, second

19          paragraph, it says she was hired as juvenile

20          probation officer upon the recommendation of

Mr.

21          Graham.

22    A.    Yes, I thought that was the case, but I wanted

to

23          find it somewhere.

24    Q.    Sure.  And was it your understanding that for a

25          number of years prior to her hire in the

probation

Exam./MacMain - DeLuce

113 1              department they actually worked together and took

2              trips together in their respective roles with the

3              different departments?

4    A.   I recall seeing that in my notes.

5    Q.   Do you know whether or not Ms. Varner had ever

6              lodged any complaints against Mr. Graham during

7              that time period?

8    A.   To my knowledge, I have no recollection of her

9              lodging any such complaints prior to this one.

10   Q.   Did you as part of your investigation look at Mr.

11             Graham's personnel file to see if anybody had ever

12             made any type of complaints against him during his

13             tenure with the county?

14   A.   My recollection is Mr. Hartnett did that.

15   Q.   And would it be fair to say that if there had been

16             any prior similar complaints against Mr. Graham

17          that that would be reflected somewhere in your

18          notes or in your report?

19    A.    If that was told to me, it likely would be in this

20          report.

21    Q.    And would it be fair to say the reason it would be

22          in the report is if there had been prior

23          complaints that would be of some significance in

24          your mind as the investigator?

25    A.    In my mind I would want to know about it and I

Exam./MacMain - DeLuce

114 1         would want to know what the outcome was.

 2    Q.    And were you aware of whether or not Ms. Varner

 3          had ever made any complaints against any employees

 4          prior to this complaint in 1997?

 5    A.    I was not aware of her making any complaint of

 6          sexual harassment or discrimination while a county

 7          employee.

 8    Q.    Now, you were asked by Ms. Wallet whether or not

 9          it was your belief that some employees' opinion

10          was that there was a hostile environment within

11          the office and I think you said some employees

12          believed that there may be.  Correct?

13    A.    Correct.  I think that's reflected in my report.

14    Q.    Were there also employees that felt that there was

15          not a hostile environment?

16    A.    Correct, and I think that is reflected in my

17        report.

18    Q.    People had different personal opinions as to the

19          environment of the office?

20    A.    Yes.

21    Q.    You were asked by Ms. Wallet whether or not there

22          was some people you interviewed that expressed

23          some concern about retaliation.  Do you know

24          whether, in fact, there's been any retaliation

25          against any employees in the six years since this

Exam./MacMain - DeLuce

115 1               investigation took place?

2   A.    I am not aware that there has been.  It's not been

3         reported to me.

4   Q.    DeLuce 2, if you would put that in front of you, I

5         just want to ask you about a few references.

6   A.    Yes.

7   Q.    Turning to Page 12, again, looking at the first

8         full paragraph, last sentence:  "Barb stated many

9         times to me that she has no romantic interest in

10        Mr. Graham."

11  A.    Yes.

12  Q.    Do you recall how many times she told you that

13        during the interviews?

14  A.    No, I'm not -- I mean many times.  All I can say

15        is many times.  I know that I asked the question

16        of both of them and I'm reasonably certain that

17        Mr. Hartnett did as well.  And my recollection

18        based on what's in the report is both

denied

19          anything.

20    Q.    But this statement many times she denied a

21          romantic interest, do you have any estimate of
how

22          many times she denied any type of a romantic

23          interest?

24    A.    I cannot give you a count.

25    Q.    Did you find it unusual that it would be
repeated

Exam./MacMain - DeLuce

116 1              many times to you that she has no interest?

2    A.    I don't know about unusual.  I do recall that card

3          that she claimed that he gave to her and my

4          recollection is that Mr. Graham denied giving it

5          to her.  I can't quantify many times.

6    Q.    Page 13 of the report, looking at the next to last

7          full paragraph, the last line.  Let's go to my

8          question before about the concern about

9          retaliation, you have written:  "Barb has not

10         relayed any facts where retaliation has occurred

11         since Brandt met with me."  Why did you put this

12         line in, what was the significance of this?

13   A.    Because I think it follows with the lead-in of

14         that paragraph about the reaction of Mr. Brandt

15         after he returned from meeting with myself and Mr.

16         Hartnett and this is what Barb told us.  And

that

17        gets into a whole other story about a previous

18        incident that he was the key witness where
someone

19        else lodged a complaint of sexual harassment,
and

20        I think if you look at my notes what Mr. Brandt

21        said his work conditions were for the previous

22        four years and he did not want any part of
this.

23   Q.   Does that statement also relay there's been no

24        retaliation against Barb since the
investigation

25        began?

Exam./MacMain - DeLuce

117 1    A.        You are asking me whether I'm saying Barb is

2          stating that there's been no retaliation against

3          her or no retaliation against Brandt?

4    Q.    Right.

5    A.    Both?

6    Q.    Both.  You've already answered as to Mr. Brandt.

7          There was no retaliation as to Mr. Brandt based on

8          his interview.

9    A.    I didn't clearly word that, but I think I am only

10         referring to Mr. Brandt.  I'm not referring to

11         Barb.

12   Q.    The next paragraph refers to an interview with a

13         Jennifer Crum, a secretary?

14   A.    Um-hum.

15   Q.    Did you interview any other secretaries in the

16         office who may have observed or not observed the

17         environment in the office at the time?

18   A.    My recollection is we interviewed another

person

19          who was not a probation officer, but my

20          recollection is she was from witness assistance
or

21          something like that.  I think it's reflected in

22          the report.  I think I tried to designate the

23          employment of the person who we interviewed.

24    Q.    Would that be Deborah Reitzel?

25    A.    What page is that on?

Exam./MacMain - DeLuce

118 1    Q.          If you turn to DeLuce 1, which are your notes,

2          Page 10 of 37.

3    A.    Yes.

4    Q.    And Deborah Reitzel relayed to you at the bottom

5          she never felt uneasy or uncomfortable with Gary

6          Graham.  It's the very last line, I'm sorry.

7    A.    That's my handwriting.

8    Q.    So, according to Ms. Reitzel, there was no hostile

9          environment that she observed in the office?

10   A.    I think what she is saying is towards her.

11   Q.    Did you ask her whether or not there was any

12         hostile environment towards Ms. Varner?

13   A.    I believe we asked her about the incident several

14         weeks ago at the probation office.

15   Q.    The reason I ask, there's nothing reflected in

16         here that Ms. Reitzel said there was any type of

17         hostile environment towards either her or Ms.

18         Varner.  I assume if she did, it would be in your

19      notes?

20   A.   I think she said that she didn't feel uneasy and I

21       think she says earlier Barbara Varner was not in

22       the group at the counter at the time.

23          MR. THOMAS:  Can we take a break for a

24       minute?

25          MR. MacMAIN:  Sure.

                    Exam./MacMain - DeLuce

119 1                    (Recess taken)

  2    BY MR. MacMAIN:

  3    Q.    Mr. DeLuce, in your report in DeLuce 2, and
flip

  4          that over to Page 6, in there you list a number
of

  5          people that were interviewed and the last line

  6          there's a Hank Thielemann who you note was

  7          interviewed?

  8    A.    Yes.

  9    Q.    I didn't see any reference to him in your

 10          interview notes, nor did I see his name
mentioned

 11          in your report.  Do you recall as you sit here

 12          whether or not he, in fact, was
interviewed?

 13    A.    Mr. Thielemann was interviewed.  I know
Mr.

 14          Thielemann because I believe when I did
criminal

 15          work he was a probation officer of a client
of

 16          mine.  And I thought I saw reference to Mr.

 17          Thielemann.  Yeah, here he is.  On Page 21
there's

18          reference to Mr. Thielemann and I thought I saw

19          file notes with reference to an HT, which would

20          have been Hank Thielemann.  He was one of I think

21          the two probation officers that I knew.  So, I

22          know Hank and I know I spoke to him.

23    Q.    You believe that's reflected in your notes which

24          is DeLuce 1?

25    A.    Well, I'm looking in there now to see if I can

Exam./MacMain - DeLuce

120 1          find it.  I'm certain I spoke to him.  I'm not

2          seeing notes, but--

3   Q.    The only reason I ask you is Page 33 of 37 his

4          initials are in the left-hand margin and it looks

5          like it's part of an interview with Deborah Green

6          on Page 33 of 37.

7   A.    Yeah, I see down about three quarters of the way

8          down?

9   Q.    Right.

10  A.    Well, it says other guys.  I assume it's Sam

11         Miller, Denny Drachbar and Hank Thielemann not

12         busy is what she's claiming.  There was an

13         allegation here that Barbara Varner got a higher

14         case load than anybody else.

15  Q.    And that was one of the examples given to you by

16         some witnesses as evidence that she was treated

17         unfairly?

18  A.    Yes.

19  Q.    And further that was claimed to be evidenced by

20          some of the witnesses that the group of more

21          senior employees in the department got a
lighter

22          case load?

23   A.     Yes.

24   Q.     Did you do any investigation to see if, in
fact,

25          that was true?

Exam./MacMain - DeLuce

121 1    A.    Yes.

2    Q.    And was it, in fact, true?

3    A.    My recollection is I stated something I thought in

4         the report because I saw that.  The answer was the

5         highest cases were with Barbara Varner and I

6         forget after that.  We got a list.  We made Mr.

7         Graham and Mr. Osenkarski produce a list and we

8         went down the list.  And I know that we discussed

9         that throughout this process and I thought I

10        reviewed something on that.

11   Q.    Yeah, if you turn to Page 17 of your report.

12             MS. WALLET:  Which one?

13             MR. MacMAIN:  Of DeLuce 2.

14   A.    There we go.  Yes, there's a reference in the

15        first full paragraph.

16   Q.    Okay.

17   A.    I knew we got statistics.

18             MR. MacMAIN:  Let's mark this as DeLuce 5 I

19        guess we're up to.

20             (DeLuce Deposition Exhibit #5 marked for

21          identification)

22     BY MR. MacMAIN:

23     Q.    On Page 17 of DeLuce 2, the draft or earlier

24           version of your report, it refers to a memo,

25           statistics provided April 29th, '97, from

Exam./MacMain - DeLuce

122 1            Osenkarski.  If you turn to the first page, this

2            appears to be a cover memo from Joe Osenkarski,

3            April 30th.  Attached is a list of cases, dated

4            April 29th, 1997.  Do you see that?

5     A.    Um-hum.

6     Q.    Is this the memo that was provided to you?

7     A.    I don't know.  I don't know.  This is addressed to

8            Dan, I assume that's Dan Hartnett, April 30th.  I

9            don't know if this is what was given to us or not.

10            I can't answer that.

11    Q.    If you turn to the second page that has the case

12            list on it, you recite in your report that Barb

13            has the most cases with 45?

14    A.    Um-hum.

15    Q.    If you look at the last column and add in the

16            number total and pending, that adds up to 44 which

17            is almost exactly the number that's cited?

18              MR. THOMAS:  Objection.  The number is 45

I

19        think.

20   A.    31 and 14 is 45.

21   BY MR. MacMAIN:

22   Q.    And then the next number that's given is

Drachbar

23        with 43?

24   A.    Um-hum.

25   Q.    If you add up the last two columns next to his

Exam./MacMain - DeLuce

123 1                     name, 35 and 8, that equals 43?

  2   A.   Okay.  I see what you're doing.

  3   Q.   Does this refresh your recollection as to whether

  4        or not this was the chart you were given and you

  5        referenced in your report?

  6   A.   Obviously the numbers seem to match what's in my

  7        report.  And I know I saw some type of a report

  8        like this.  Whether this is the same exact one, I

  9        don't know for sure.

 10   Q.   And at least according to this report, Mr.

 11        Drachbar has only one less case than Ms. Varner,

 12        correct, he has 43, Ms. Varner has 44?

 13   A.   He has 43, Ms. Varner has 45.

 14   Q.   Okay, 45, I'm sorry.

 15   A.   Yes.

 16   Q.   And Hank Thielemann has 40 cases?

 17   A.   Yes.

 18   Q.   And Ms. Green who complained that Ms. Varner and

19      she and other people were disfavored actually got

20      more cases, she only has 31 cases.  Correct?

21   A.    Um-hum.

22   Q.    Would this document refute or undercut Ms. Green's

23      contention that the one element to prove that

24      there was discrimination was that the case loads

25      were higher for her and other people and the older

Exam./MacMain - DeLuce

124 1                  males had lower case loads?

2   A.   I think you need to ask her that.  I see Mr.

3        Osenkarski's memo and he said when assignments

4        were made it is not simply a numbers game.
Other

5        factors such as complexity of cases and current

6        individual PO's daily activities are taken
into

7        consideration.  So, I don't know if it
refutes

8        what she said.  I do know that shear numbers
alone

9        are not the only answer.

10  Q.   But Ms. Green in the paragraph you recite she

11       believes that Barb and Nick Baralett have
the

12       highest case loads because Gary wants to
make a

13       point with them, that would not be reflected
in

14       this document, would it, that they did not
have

15       the highest -- well, Ms. Varner had the
highest

16       case load by a case or two?

17   A.     She had the highest case load, that was

clear.

18          She felt whatever it says there.  Obviously

the

19          numbers panned it out differently and I

reflected

20          that accurately in the report.

21   Q.     Did that have any effect on your credibility of

22          placing what Ms. Green had told you?

23   A.     Well, it didn't have a significant impact, no,

24          because the concern I had was that Barbara

Varner

25          had the most cases and some of the other things

Exam./MacMain - DeLuce

125 1              that Deb Green relayed my -- well, whatever my

2        report says Deb Green said says.  I don't want to

3        restate that because it's six and a half years.

4   Q.   Sure.

5   A.   I mean there's no question what I wrote in my

6        notes is what she said to me.  You are saying,

7        hey, the numbers don't pan out.  I'll let you ask

8        her that.

9   Q.   If you turn to Page 20 and, again, we're on DeLuce

10       2, this reflects an interview with a Kerry Howser.

11       She clearly does not like Osenkarski and Graham.

12       I want to go through a couple of the examples Ms.

13       Howser gave to support her belief that there was

14       mistreatment or differential treatment.  She first

15       tells you that DUI instructors got $20,000 extra.

16          Is that correct?

17    A.    That's what I put in the report.

18    Q.    But then the actual amounts are actually one

19          quarter or one half of that.  Correct?

20    A.    That's what we asked, what do they make, and I

21          wanted to correctly reflect that.

22    Q.    Based on looking at the numbers, did that have an

23          impact on your assessment of Ms. Howser's

24          credibility?

25    A.    No, because I don't think they, the individual

Exam./MacMain - DeLuce

126 1            employees knew how much was made by
the DUI

2        instructors.  I think they thought it was a lot

3        more money than it actually was.  The bigger

4        concern was that a lot of these employees
didn't

5        get a crack at this additional income.  And
that

6        was the issue is how were people selected to
get

7        this opportunity.  And I don't think I came to
any

8        significant conclusions, but I tried to bear
out

9        the facts to address the situation.

10   Q.   And the facts were that Ms. Howser's perception

11        was incorrect?

12   A.   I think her perception of the amount was

13        incorrect.  Her concern as to why certain
people

14        got it and why certain people didn't was an
issue

15        that needed further investigation.

16   Q.   Was that something that you investigated?

17   A.   I asked questions about it.

18    Q.    And did you do any further investigation beyond

19          asking questions?

20    A.    No.

21    Q.    In other words, did you look at documents?

22    A.    No.  Well, somebody looked at documents because

23          they got us the actual amounts they made.  I

24          believe Mr. Hartnett looked into that.

25    Q.    And the actual amounts were one quarter or one

Exam./MacMain - DeLuce

127 1              half of what Ms. Howser believed
them to be?

2            MS. WALLET:  I'll raise an objection. Asked

3        and answered.

4    BY MR. MacMAIN:

5    Q.    Is that correct, the numbers reflect one quarter

6        or one half of what Ms. Howser's perception was?

7    A.    Based on the math, yes.

8    Q.    Turning to Page 21, looking at the last paragraph,

9        and Ms. Howser likewise cites as an example of

10        unfair treatment that Mr. Thielemann's case load

11        is very low.  I'm looking at the third line from

12        the bottom.  Do you see where I am?

13    A.    Um-hum.

14    Q.    If we turn back to DeLuce 5, which is the case

15        load assignment, Mr. Thielemann, in fact, has one

16        of the highest case loads.  If my math is correct,

17        he has 40 cases?

18   A.   I think I explained that these notes are these --

19        this report contains my summary of what the

20        witnesses told me.

21   Q.   Sure.

22   A.   It's not -- I didn't make findings of fact that a

23        court would do.

24   Q.   Sure.  All I'm simply asking is what you were told

25        by a witness when you looked at the numbers, in

Exam./MacMain - DeLuce

128 1                fact, were inaccurate, the witness's either

   2        perception was inaccurate -- I mean you can't

   3        comment on their state of mind, but what the

   4        numbers bear out and what they told you are two

   5        different things.  Correct?

   6  A.    Yeah, in certain cases.

   7            MR. MacMAIN:  Does anyone else have any other

   8        questions?  I think I have a few select questions

   9        from your notes, but I don't want you to have to

  10        sit here for three minutes.

  11            (Discussion held off the record)

  12  BY MR. MacMAIN:

  13  Q.    Mr. DeLuce, let me ask you this.  One of the other

  14        things that you were told and I think is reflected

  15        in your notes and in your report is that the

  16        department had split a short time before all of

  17        this occurred.  Correct?

  18  A.    Yes.

  19  Q.    And was it your understanding that there was

some

20          unhappiness generally because of the split?

21   A.    I think whatever my report says, my
recollection

22          is that some were probably happy and some were

23          probably unhappy, but I think I explained
that

24          some people did not want to work for
certain

25          people and went to great lengths to get away
from

Exam./MacMain - DeLuce

129 1            them.

2  Q.    DeLuce 1, which are your notes, looking on Page 14

3        of the 37, and this is notes from your interview

4        with Mark Galbreath?

5  A.    Yes.

6  Q.    Five lines down you note that "worked closely with

7        Barb Varner."  That reflects I assume that Mr.

8        Galbreath worked closely with Barb Varner?

9  A.    If that's what I wrote, I must have gotten that

10       indication.

11 Q.    Did Mr. Galbreath indicate that Ms. Varner ever

12       complained to him about Mr. Graham's conduct?

13 A.    You are asking me if Mark Galbreath told me that

14       Barb Varner ever complained to Mark Galbreath

15       about Gary Graham's conduct?

16 Q.    Correct.

17 A.    And I will answer that by saying if I state it in

18       this summary, my answer is yes.  If it's not in

19       there, my answer is no.

20 Q.    Fair enough.

```
21   A.   I can't remember what Mark Galbreath told me
six
22        and a half years ago.
23   Q.   I'll represent to you there's no indication in
24        your notes that he stated that Ms. Varner
25        complained to him at any point about Mr.
Graham.
```

Exam./MacMain - DeLuce

130 1                    So, what you're telling me, if it's not in there,

2          he didn't tell you that.

3              If you turn to Page 30 of the same document,

4          30 of 37, and looking at the very top of the page

5          there's two names written, Fran Rose and Winnie

6          Stern?

7     A.    Um-hum.

8     Q.    These were names provided to you by the person you

9          were interviewing, would that be fair?

10    A.    I don't know.  I presume Kerry Howser gave me

11         these names because this seems to be part of the

12         Kerry Howser interview.

13    Q.    And did you ever interview Fran Rose or Winnie

14         Stern?

15    A.    I have no recollection of interviewing those two

16         individuals.

17    Q.    Did you ever interview Tom Boyer?

18    A.    My recollection is that we did.  Because, again, I

19      know Tom because I believe Tom handled DUIs and,

20      therefore, I had some DUI cases.  But are you

21      telling me I have no notes in here from Tom Boyer?

22  Q.  I did not see any.

23  A.  Well, I -- I'm not going to speculate.  You're

24      asking me did we ever interview Tom Boyer?  I

25      can't recall specifically.

Exam./MacMain - DeLuce

131 1    Q.         I don't want to ask a question that's already been

2          asked, but if you would have interviewed Mr.

3          Boyer, there would be notes reflected in this

4          package of materials.  Would that be fair?

5    A.   Fair statement is there should be.  Okay?  I

6          turned the entire -- I believe if I interviewed

7          him and took notes, they exist.  And maybe because

8          I knew Tom I thought that I had.  I can't explain

9          the difference.

10   Q.   If you turn to Page 21 of 24, same document you

11         have in front of you.

12   A.   Okay.

13   Q.   This is Page 2 of your interview with John Roller?

14   A.   Yes.

15   Q.   Very last line says GG - "Attila the Hun",

16         different managerial style, can get the work done.

17         This came from Mr. Roller obviously.  Do you

18         recall anymore specifically what he told you?

19   A.   He told me that Mr. Graham's nickname in

the

20          courthouse was the Attila the Hun, but he
has a

21          different managerial style and he can get
work

22          done.  He said though, as I recall, it was not
his

23          style.

24    Q.    What was not his style?

25    A.    Mr. Graham's style.

Exam./MacMain - DeLuce

132 1    Q.        Was the not the same as Mr. Roller's
style?

2    A.    Yes.

3    Q.    The reference about can get the work done would

4         indicate that Mr. Graham was able to
effectively

5         complete jobs and get the work done?

6    A.    I think that was Mr. Roller's opinion.

7    Q.    Just in a different style than what Mr. Roller

8         would do?

9    A.    I think you need to ask him that, but that -- I

10        think you need to ask him that.

11            MR. MacMAIN:  That's all of the questions
I

12        have.  Thank you.

13                        EXAMINATION

14    BY MR. ADAMS:

15    Q.    Mr. DeLuce, you testified at some point today
that

16        when you were interviewing witnesses for your

17        report that you took complaints from Ms.
Varner

18        and you used them as input to ask questions
to

19        witnesses.  Do you recall that?

20   A.   Yes.

21   Q.   Can you give me an example of that by

chance?

22   A.   I think if you look at my notes of my meeting

with

23        Barbara Varner, which is contained in this

24        packet--

25   Q.   Are you referring to your handwritten notes?

Exam./Adams - DeLuce

133 1    A.        Yes.

2    Q.    The one set of them?

3    A.    Yes.

4    Q.    Let me raise the question, did you ask the

5         witnesses that Ms. Varner provided to you what

6         they observed or did you ask them specifics based

7         on what Ms. Varner told you?

8    A.    I think it was twofold.  I think we asked them

9         specifically about specific incidents that Ms.

10        Varner told us and then we would ask them some

11        general terms about what they observed regarding

12        the attitude, behavior in the office environment

13        towards other employees, whether they be males or

14        females.

15   Q.    In terms of the sexual harassment that Ms. Varner

16        was alleging, did you ask witnesses that she

17        provided specific questions in that area, for

18        example, did you see Ms. Varner subjected to

blank

19        in the sexual harassment area?

20   A.   I can't recall exact questions that were asked. I

21        tried to reflect in my notes the answers that were

22        given.

23   Q.   Not to belabor this any longer, can you look at

24        Page 9 on Deposition I guess it's Number 2?

25             MR. THOMAS:  The typewritten report.

Exam./Adams - DeLuce

134 1                        MR. ADAMS:  Right.

 2    BY MR. ADAMS:

 3    Q.    This is an example.  I don't want to go through

 4          all of this, but I just want to ask you one
for

 5          example.  The last paragraph -- well, the
first

 6          real paragraph, the paragraph at the bottom
starts

 7          with Varner.  It says:  "Varner states that
Graham

 8          frequently screams at her while she is at her
desk

 9          and in her office, or uses foul language

10          describing her working abilities in the general

11          office area."

12             If you go down a couple of lines, he also

13          indicates that the ranting and raving and
putting

14          her down was confirmed by Deborah Green, and
I'm

15          not reading the complete sentence, but would
that

16          be an example of when you talked to Deborah
Green

```
17        that you asked Deborah Green did she see Mr.

18        Graham do these things, blah, blah, blah, based
on

19        what Varner described?

20   A.   Yes, that's what we would do.  And the ranting
and

21        raving comments were I'm certain relayed to me
by

22        Barbara Varner and then we asked witnesses if
they

23        witnessed that and what they saw towards her
and

24        others.  I'm reasonably certain that was the

25        context of the type of questioning.
```

Exam./Adams - DeLuce

135 1    Q.        Okay, thank you, sir.  Did you ever discover facts

2        by talking to any of the witnesses that Ms. Varner

3        complained to Joe Osenkarski regarding the sexual

4        harassment by Gary Graham?

5    A.    Did I ever discover facts that Ms. Varner

6        complained to Joe Osenkarski regarding the actions

7        by Gary Graham?

8    Q.    Or the sexual harassment allegations by Gary

9        Graham.

10    A.    I think there is some reference in here.  I don't

11        want to speculate, but I thought there was some

12        reference in here that Mrs. Varner indicated that

13        she said something to Joe about it and got

14        nowhere, but -- well, I don't want to speculate.

15        If I say it in here, she told me; if I didn't say

16        it in here, she didn't tell me.

17    Q.    Okay.

18   A.      I hate to go beyond the four corners of this

19           document since it's six and a half years ago.

20   Q.      I'll submit to you that I haven't seen it, but you

21           have no evidence to the contrary, do you, off the

22           top of your head?

23              MR. THOMAS:  Let me make an observation for

24           the record.  I'm not sure that the answer was

25           responsive to the question.  I thought your

Exam./Adams - DeLuce

136 1         question was did anybody else confirm that Varner

2         complained to Osenkarski and I think the witness

3         responded by noting that Varner complained to

4         Osenkarski.

5    A.    I misinterpreted the question.  I think the answer

6         is no to your question.

7    BY MR. ADAMS:

8    Q.    That no other person--

9    A.    --confirmed that they heard Barbara Varner

10        complain about Gary Graham to Joe Osenkarski.

11   Q.    Is that the same in terms of anyone coming forth

12        and claiming that Ms. Varner complained to Mr.

13        Osenkarski about different treatment for women

14        versus men in the office?

15   A.    I'm sorry, you're asking me if anyone else

16        complained about different treatment towards women

17        in the office?

18   Q.    Or confirmed Ms. Varner's allegations that Mr.

19          Osenkarski was notified of such or complained to

20          Mr. Osenkarski about such things?

21   A.    No one told me that anyone else complained to Mr.

22          Osenkarski about the treatment of women in the

23          office.

24   Q.    Did anyone tell you that Ms. Varner complained to

25          Mr. Osenkarski about the seniority system and how

Exam./Adams - DeLuce

137 1              it affected her in the office?

 2   A.    I can't recall that.  I know that Ms. Varner

 3         complained about it.  Whether someone else did, I

 4         can't recall.

 5   Q.    If you could turn to Page 22, the first paragraph

 6         there which if you go from the bottom of the

 7         paragraph up, if you look in the left-hand column

 8         side the sentence that starts with Osenkarski, do

 9         you see that?

10   A.    Yes.

11   Q.    It reads Osenkarski can only remember Barb coming

12         to him once to discuss a case and that was when

13         her and Gary disagreed, and you have in

14         parentheses, the Trinity basketball player, I

15         guess in regard to a case involving a trendy

16         basketball player.  Is that correct?

17   A.    That's correct.

18   Q.    Did Gary Graham confirm this example of Ms.

Varner

19        going to Mr. Osenkarski and complain only of this

20        particular case versus something else?

21            MS. WALLET:   Objection.   That's clearly a

22        compound question.

23    A.   I'm sorry, what are you asking?

24    BY MR. ADAMS:

25    Q.   Let me rephrase the question.   Did you discover

Exam./Adams - DeLuce

138 1          any evidence to the contrary that Ms. Varner went

2          to Mr. Osenkarski to complain about anything else

3          with regard to Gary Graham other than this

4          particular case involving the trendy basketball

5          player?

6    A.    I can't recall.  If I have it in my notes or it's

7          in this report, she did.

8    Q.    Okay.

9    A.    If I don't, I can't recall any other additional

10         complaints.

11   Q.    Did you, in fact, take into consideration that you

12         didn't have any evidence other than what Ms.

13         Varner shared with you that any notice or

14         complaints were given to Mr. Osenkarski with

15         regarding her treatment in your recommendation

16         that you finally gave to the commissioners and Mr.

17         Hartnett?

18   A.    Could you repeat the question?

19             (Question from Page 138, Lines 11 through 17,

```
20          read by the Reporter)

21   A.     I'm sorry, I don't understand the question.

22   BY MR. ADAMS:

23   Q.     I think you testified that you gave some

24          recommendations about Gary Graham and Mr.

25          Osenkarski to the commissioners, and I can't
```

Exam./Adams - DeLuce

139 1                    remember who else was involved, but certainly

2          commissioners heard your recommendations as to

3          what you thought should be done with regards to

4          the office of juvenile probation.  Is that

5          correct?

6               MR. THOMAS:  Objection to form.  I think it

7          mischaracterizes his earlier testimony, but you

8          may answer it.

9    A.    I had a meeting with the commissioners, John Ward,

10         Dan Hartnett, Horace Johnson, where I verbally as

11         well as Mr. Hartnett gave information regarding

12         our investigation and then I gave the

13         commissioners options that could be considered and

14         some thoughts and recommendations in my mind that

15         I thought would help resolve the complaint and

16         improve the department and the employment

issues,

17          management issues that were going on.

18   BY MR. ADAMS:

19   Q.    Did you take into consideration when you made that

20          recommendation that other than what Ms. Varner

21          shared with you there was no other evidence that

22          indicated that she complained to Mr. Osenkarski

23          about her seniority issue, sexual harassment or

24          anything else?

25   A.    My recollection is that she complained to Mr.

Exam./Adams - DeLuce

140 1           Osenkarski about a couple of issues. My

2           recollection is she was dissatisfied with the

3           response or lack of response or the fact that a

4           decision had to be made by the president judge and

5           none were forthcoming.

6    Q.    Can you turn to Page 6 of Deposition 2, under

7           facts there, that paragraph, I don't know, maybe

8           four lines down it reads:  "I also spoke with

9           senior probation officer, Kerry Howser, who in

10          1993 filed a complaint of sexual harassment based

11          on a comment made about her by Mr. Osenkarski."

12          You also indicate that it says:  "He was

13          reprimanded informally and required to apologize

14          to her and engage in some type of sensitivity

15          training."  Did you write that?

16   A.    I wrote that.

17   Q.    Did you also in your investigation learn that that

18          particular allegation of sexual harassment was

```
19          unfounded?
20    A.    I don't recall that.  I got to believe -- well,
21          strike that.  Leave it at that.  I don't recall
22          that.
23    Q.    Can you turn over to Page 7?  That first real
24          paragraph there discusses the seniority system
and
25          Ms. Varner's complaint about it, would you
agree?
```

Exam./Adams - DeLuce

141 1          Please take your time to look at the
paragraph so

2          I can ask you a question or two.

3    A.    This is the seniority list.

4    Q.    Okay.

5    A.    Yes.

6    Q.    And I think you testified that Ms. Varner

7          complained that she felt that the seniority in
the

8          system was unfair.  Is that correct?

9    A.    I think she felt it was discriminatory.

10   Q.    Did you share with you that prior to the

11         implementation of the seniority policy that she

12         thought changing it from applying full county
time

13         to priority time of probation officers being
more

14         paramount, she actually thought that was fair

15         before it actually was applied.  Did she share

16         that with you?

17   A.    I don't recall.  I'm sorry, did she share what

18         with me?  That she felt that her time in
Children

19         and Youth should be included in determining

20         seniority?

21    Q.    No.  Did she share with you that prior to the

22          seniority list being implemented which led to her

23          losing ground by one notch that she thought that

24          the change was a fair one for everyone, did she

25          share that with you?

Exam./Adams - DeLuce

142 1    A.    I have no recollection of that.

2    Q.    What is your opinion of the environment in the

3          juvenile probation department when you were

4          investigating this, did you have an opinion of
it

5          at all as a whole?

6               MR. THOMAS:  Objection to the form.

7               MR. ADAMS:  That's okay.

8               MR. THOMAS:  Well--

9               MR. ADAMS:  I'll rephrase it.

10               MR. THOMAS:  Okay.

11    BY MR. ADAMS:

12    Q.    Mr. DeLuce, did you ever receive any
information

13          that led you to believe that the environment in

14          the juvenile probation department was one of
light

15          humor, jokes in the office?

16    A.    I did not get that feeling from some of the

17          employees and yet from other employees I think
it

18          was a comfortable environment.  For
some

19          I felt it was an uncomfortable environment.

20    Q.    Would the information received on both sides,

21        would that include from women and men the same

22        opinions?

23   A.   I think initially I felt from what the
witnesses

24        said that the women felt they were treated

25        differently.  As we went through talking to
more

                    Exam./Adams - DeLuce

143 1          people, they confirmed that they felt some of the

  2            women were treated differently but some of the men

  3            were too.  I think that's why my recommendations

  4            were changing somewhat from a harassment issue to

  5            include an issue regarding management.

  6    Q.      Would those thoughts that you gravitated to

  7            include the language that was shared in the office

  8            among employees, men and women?

  9            MS. WALLET:  Objection to the form of the

 10            question.

 11    A.      I think it was clear that some of the employees

 12            were uncomfortable with the language and some of

 13            them probably were not.

 14    BY MR. ADAMS:

 15    Q.      Would that include women and men?  Strike that, if

 16            I can strike it.

 17    A.      Certainly some of the women--

 18            MR. THOMAS:  There's no question.

19   A.   Okay.

20   BY MR. ADAMS:

21   Q.   One last set of questions, Mr. DeLuce.  You

22        testified that you were with the
understanding

23        that it was the president judge who made
the

24        ultimate decision with regard to Mr. Graham and

25        Mr. Osenkarski.  Is that correct?

Exam./Adams - DeLuce

144 1     A.          That's correct.

2     Q.     And you were aware that the president judge

3            actually received a copy of your report, that

4            being the confidential attorney impressions

5            report?

6     A.     I am not personally aware that he received it.
I

7            don't know for sure what the president judge

8            received.  I have seen in Judge Kane's I think

9            opinion reference to the fact that it was

10           disclosed to the president judge.  I didn't

11           deliver it to him.  I didn't sit down with the

12           report and discuss it with him.

13    Q.     But you are aware that the president judge
decided

14           not to terminate Mr. Osenkarski's employment as
a

15           result of Ms. Varner's complaints--

16    A.     Oh, yes.

17    Q.     --and the investigation.  Is that correct?

18    A.     I'm aware that he decided not to take --
my

19           recollection is he decided not to take
any

20           employment action against Mr. Osenkarski.  I'm

not

21          aware of any being taken.  If there is, I
didn't

22          see it.

23               MR. ADAMS:  That's my last two questions.

24          Thank you.

25     A.   We're done?

                        Exam./Adams - DeLuce

145 1              MS. WILLIAMS:  I have no questions for you,

    2         Mr. DeLuce.

    3              (The deposition concluded at 3:55 p.m.)

    4

    5

    6

    7

    8

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

25

146

1

COMMONWEALTH OF PENNSYLVANIA   )

2                                )
ss.

COUNTY OF CUMBERLAND            )

3

4          I, Ann M. Wetmore, Reporter and Notary
Public

in and for the Commonwealth of Pennsylvania and
5          County of Cumberland, do hereby certify that
the

foregoing deposition was taken before me at the
6          time and place hereinbefore set forth, and that
it

is the testimony of:

7

8                    DAVID W. DeLUCE

9

I further certify that said witness was by
me 10      duly sworn to testify the whole and complete
truth

in said cause; that the testimony then given
was 11     reported by me stenographically, and
subsequently

transcribed under my direction and supervision;
12         and that the foregoing is a full, true and
correct

transcript of my original shorthand notes.

13

14         I further certify that I am not counsel
for

or related to any of the parties to the
foregoing 15   cause, or employed by them or their
attorneys, and

am not interested in the subject matter or
outcome 16 thereof.

17

Dated at Mechanicsburg, Pennsylvania, this
18         27th day of October, 2003.

19

20

_____                    Ann M. Wetmore
21                                          Reporter - Notary
Public

22
          (The foregoing certification of this transcript
23        does not apply to any reproduction of the same
by
          any means unless under the direct control
and/or 24 supervision of the certifying reporter.)

25