```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . .
BARBARA E. VARNER,               .
        Plaintiff,               .   CIVIL ACTION
                                 .   NO. 1:CV 01-0725
        vs.                      .
                                 .
COMMONWEALTH OF PENNSYLVANIA,    .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,         .
CUMBERLAND COUNTY; CUMBERLAND    .
COUNTY; S. GARETH GRAHAM,        .
Individually, and JOSEPH         .
OSENKARSKI, individually,        .
        Defendants.              .
. . . . . . . . . . . . . . . . .
```

```
                        VOLUME 1
                 Pages 1 to ^ page

        Deposition of:  S. GARETH GRAHAM

        Taken by    :  Plaintiff

        Date        :  January 29, 2003, 9:27 a.m.

        Before      :  Emily Clark, RMR, Reporter-Notary

        Place       :  Administrative Offices of
                       Pennsylvania Courts
                       5035 Ritter Road, Suite 700
                       Mechanicsburg, Pennsylvania


APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
            For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
            For - Defendant Commonwealth of Pennsylvania
                  Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  JAMES K. THOMAS, II, ESQUIRE
             PAUL J. DELLASEGA, ESQUIRE
            For - Defendant Cumberland County
```

Emily R. Clark, RMR
717-233-1744, emily.clarkk@worldnet.att.net

APPEARANCES (continued):

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
BY:  DAVID J. MacMAIN, ESQUIRE
     For - Defendant S. Gareth Graham

SWEENEY & SHEEHAN, P.C.
BY:  JASON G. BATES, ESQUIRE
     For - Defendant Joseph L. Osenkarski

ALSO PRESENT:

MS. BARBARA E. VARNER

MR. JOSEPH OSENKARSKI

MS. MELANIE McDONOUGH

Emily R. Clark, RMR
717-233-1744, emily.clarkk@worldnet.att.net

I N D E X

WITNESS

S. Gareth Graham                                    Examination

    By Ms. Wallet                                        4

EXHIBITS

No.  Description                            Identified

1    1-page "Employee Certification"            121
     27 March '81

2    1-page "Receipt Acknowledgment"            121
     4/17/01

*   *   *   *   *

Emily R. Clark, RMR
717-233-1744, emily.clarkk@worldnet.att.net

S. Gareth Graham                                    4


 1                      STIPULATION

 2          It is hereby stipulated by and between the

 3   respective parties that signing, sealing, certification and

 4   filing are waived; and that all objections except as to the

 5   form of the question are reserved until the time of trial.

 6

 7          S. GARETH GRAHAM, called as a witness, being duly

 8   sworn, was examined and testified, as follows:

 9   BY MS. WALLET:

10      Q.      What is your name, sir?

11      A.      S. Gareth Graham.

12      Q.      By whom are you employed?

13      A.      The Court of Cumberland County, Ninth Judicial

14   District.

15      Q.      How long have you been so employed?

16      A.      27, 26, 27 years.  Started in September of '77,

17   but had a previous employment with the county from July 26th

18   of '96.

19      Q.      Sir, do you have any hearing problems?

20          A.      No, I don't.

21          Q.      Would there be any reason today why you could not

22  answer my questions completely and truthfully?

23          A.      No.

24          Q.      Are you on any medication that would interfere

25  with your ability to listen or to respond?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                              5


 1          A.      No.

 2          Q.      Can we agree, please, that if you for some reason

 3  have not heard my question or did you not understand my

 4  question, that you will ask me to repeat it?

 5          A.      Okay.

 6          Q.      If you answer my question, I will assume that you

 7  have both heard it and you understood it.  Is that agreeable?

 8          A.      That's correct.

 9          Q.      You have counsel here today.  Has that counsel

10  been paid for by you personally?

11          A.      No.

12          Q.      Has the county provided counsel to you in this

13  litigation?

14          A.      Yes.

15          Q.      Are you being paid by the court system for your

16  appearance here today?

17          A.      Yes.

18      Q.      You receive your full salary today?

19      A.      Yes.

20      Q.      Are you required to take any leave to attend

21   these depositions?

22      A.      I have not clarified that.  On the reporting

23   instrument that I report on, I put county meetings or county

24   depositions, so I did not get prior approval or clarification

25   to your question.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        6


1       Q.      Have you submitted a leave slip?

2       A.      No, ma'am.

3       Q.      Mr. Graham, when did you first learn that any

4   complaints had been made about you by Barbara Varner?

5       A.      I don't know the exact date.

6       Q.      Do you know what year?

7       A.      Probably 19 -- I think she began her complaining

8   in 1996, and she filed in 1997 with the EEOC in the early

9   part of the year.

10      Q.      Do you believe that you first learned about the

11   complaint of Ms. Varner when you were told that an EEOC

12   complaint had been filed?

13      A.      I was called down to the Human Relations office

14   on the 29th of April, I think it was '97, and I was

15   questioned by David Deluce and Dan Hartnett as to sexual

16    harassment allegations made by Mrs. Varner.

17         Q.    Is that your recollection of the first time that

18    anyone told you about complaints that had been made by

19    Ms. Varner?

20         A.    My recollection occurred prior to that, because

21    Ms. Varner was engaged in clandestine or office meetings

22    every morning with different members of the Probation staff,

23    and for about a year these rumors, she would meet early in

24    the morning with different members of the Probation

25    Department in closed-door sessions.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                              7


 1              And I was first informed because she -- Tom Boyer

 2    came to me and said, did you know she, Barb Varner, is filing

 3    a petition or complaint against you for sexual harassment.

 4    And he knew that from Fran Rose, and Fran Rose knew that from

 5    Lyle Herr, because this conversation had occurred in the

 6    Adult side of the Probation Department, and this had got past

 7    me.  So the first inkling of my recollection of anything that

 8    she was doing was given to me by Tom Boyer.

 9         Q.    And do you recall when that was, sir?

10         A.    Around December of '96.

11         Q.    What did Tom Boyer tell you at that time?

12         A.    I just told you that, ma'am.

13    Q.    Did he tell you anything else?

14    A.    No.

15    Q.    What did you say to him?

16    A.    And I said, well, that's her prerogative.

17    Q.    Prior to being called into the HR office in April

18    of '97, did anyone in your supervisory chain of command tell

19    you that Ms. Varner had made complaints about you?

20    A.    No.  I think Joe had a call from Human Relations

21    or David Deluce a few days before.  I was out on supervision

22    on the 29th of April, and he was, you know, trying to reach

23    me and find out, because they were downstairs assembled to

24    question me about the complaint.  So that's --

25    Q.    He, Joe Osenkarski, was trying to reach you on


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        8


1    the 29th of April?

2    A.    Right.

3    Q.    And did he reach you that day?

4    A.    I came into the office after doing a supervision

5    matter in the morning, and then came in and he said, they're

6    looking for you downstairs, you know, they're assembled and

7    questioning people regarding that.

8         And I think prior to that they had questioned

9    other members of the Probation Department.

10    Q.    How do you know that?

11          A.      Just from the office rumor mill.

12          Q.      Did someone tell you that they had been

13     questioned?

14          A.      No one specific.  Just that different people were

15     being called down on her behalf to validate concerns of her

16     sexual harassment issue.

17          Q.      So you met with Mr. Deluce you think sometime

18     after the 29th of April?

19          A.      No.  I think it was on that date, the 29th.  I'm

20     pretty -- you could get that from when they conducted their

21     first investigation.

22          Q.      And how long did you meet with him?

23          A.      Well, the first meeting was really short.  He

24     asked me a number of simple questions, and did you sexually

25     harass Mrs. Varner; no.  And a whole periphery of questions

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    9

1     regarding did you talk to her about things about your wife,

2     did you -- just questions of that nature of -- and have you

3     been sexually harassing her.  And I said no.  He asked me

4     just a few small questions at the beginning.

5              And then about a week later when he was still

6     conducting his investigation, I called down to Dan Hartnett

7     and asked him if I could have another appearance to talk

8     about this situation.  And on the second occasion I went

9    down, I had gone back and resurrected some of my notes of

10   contacts with Ms. Varner.  I provided to David Deluce or I

11   shared with David Deluce a list of contacts that I had with

12   Ms. Varner.

13          She was alleging that sexual harassment, she was

14   afraid of me, I was basically made out to be a monster.  And

15   she was in a position to -- and I said, well, if that's the

16   case, sir, here's all the trips that she went on.  And I

17   produced a document, not to them, I wouldn't give them a copy

18   of it, but that document said it was 24 separate trips.  I

19   identified all the trips that I was on with Ms. Varner, and I

20   identified all the mileage that I was on with Ms. Varner, and

21   I identified all the hours I had spent with Ms. Varner.

22          And my contention to David Deluce was the fact

23   that if this woman is terrified of me and afraid of me and

24   purporting and alleging that I'm sexually abusing her, she's

25   only traveled with me all these distances, all these times

1    and to all these events.  And I wouldn't think that she would

2    put herself in the close proximity of a vehicle with me for

3    20 hours on one particular occasion when we drove to New

4    Jersey, if she was being subjected to being sexually harassed

5    and worried about me personally and physically and

6    emotionally and whatever.

7    Q.    Let's go back to the first meeting.  You said it

8    was rather short.  Was there anyone else present in that

9    meeting besides you and Mr. Deluce?

10    A.    David Deluce, Dan Hartnett.

11        MR. THOMAS:  I'm sorry to interrupt.  Let me

12    place an objection on the record.  As you know, Deb, we do

13    contend that Mr. Deluce was counsel for the county and that

14    this investigation may be protected pursuant to the

15    attorney-client privilege or attorney work product

16    exclusions.  And I don't want to limit your deposition, but I

17    obviously anything that Mr. Deluce said we will object to and

18    instruct this witness not to answer it.  I'm prepared to

19    permit you to continue the examination.  I think you're

20    entitled to know that an investigation occurred.

21        I would like an ongoing objection to the

22    testimony and I would like your agreement that there will not

23    later be a waiver, an argument that we have waived any

24    privilege that we may have.

25        MS. WALLET:  I don't intend to raise an issue of

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    11

1    waiver.  I understand your position.

2        MR. THOMAS:  Okay.  Thanks.

3    BY MS. WALLET:

4    Q.    How long do you think that that first meeting

5   which you described as short with Mr. Deluce and

6   Mr. Hartnett, lasted?

7        A.    Most likely less than 10 minutes.

8        Q.    Did you give Mr. Deluce anything at that time?

9        A.    No, I did not.

10       Q.    You had a second meeting which you requested; is

11   that correct?

12       A.    That's correct.

13       Q.    And who was present at that meeting?

14       A.    Dan Hartnett and David Deluce.

15       Q.    Anyone else?

16       A.    No.  Myself.

17       Q.    And why did you request this meeting?

18       A.    To clarify some of the allegations that she had

19   made in her complaint, that they had read on the second

20   occasion they had expounded on the questions that they were

21   asking me.  And in response to that, I wanted to provide a

22   defense.

23             They asked me about a personal birthday card that

24   I had given her, and I responded and -- I'm sorry to

25   jeopardize Mr. Thomas's objection, but I responded and said I

                    S. Gareth Graham                         12


1   don't remember any card, would you show me the card.  And

2   they failed to show me the card.  I said I don't remember.

3          I said to them, my dad used to operate a little

4    cut-rate store, we sold greeting cards and everything.  And I

5    said, you know, the card manufacturer could probably validate

6    by turning the card over on the back side, the manufacturing

7    date of the card.  And I had asked Mr. Deluce and them to go

8    and validate when the card was printed from the printing

9    manufacturer.  And Ms. Wallet, I have done that.  I have gone

10   to the printing manufacturer of that card, and I think it's

11   Sussex, Maine, and that card was produced into publication in

12   1991.

13         And my contention was that they, she, Ms. Varner

14   has alleged that I gave her that card in '96, and I didn't.

15   I did not.  And that was a question they asked me and that's

16   the reply I gave them.  I did not give them the call.

17         Subsequently when I finally received this card,

18   this birthday card, just recently in some of this discovery

19   discussions, I then called the card manufacturer.  I have the

20   name of the lady, I have the company, I have the producer of

21   the card, and when it was placed into production.  My

22   contention was I didn't understand, you know, that I did not

23   give her the card in '96 as she alleged.  I had given her the

24   card in 19 -- probably '91 or '92 or '93.  I didn't remember

25   the card.  And that's the truth.

1                MR. MacMAIN:  Just listen to her question and

2      just --

3                THE WITNESS:  I just want to --

4                MR. MacMAIN:  Okay.

5      BY MS. WALLET:

6          Q.    So you requested this meeting primarily to tell

7      them about this greeting card, or for some other reason?

8          A.    I requested the meeting to try to defend some of

9      the allegations that Ms. Varner had produced.

10         Q.    Other than the card, what did you feel needed to

11     be clarified at that time?

12               MR. MacMAIN:  I think it's been answered.  He

13     said to clarify what the allegations were.

14               MS. WALLET:  And I asked him what did he wish to

15     clarify.

16               THE WITNESS:  I just wished to expound on some of

17     the questions they had asked me originally, and then they

18     asked me some additional questions after that.

19     BY MS. WALLET:

20         Q.    Well, you went to this meeting to tell them

21     specifically about the greeting card, correct?

22         A.    No.

23         Q.    What did you go to this meeting to tell them

24     specifically?

25         A.    To tell them that I had a defense to her

S. Gareth Graham                          14

1    allegations.

2        Q.      And your defense involved this greeting card?

3        A.      That was one of her allegations, so I just

4    responded to her allegations.

5        Q.      What other items did you feel that you needed

6    this meeting in order to clarify?

7        A.      Whatever the line of questioning they would have

8    given me:  Did I discriminate against her in the workplace;

9    no.  Things like that.  I did jot some of those down, you're

10   talking how many years ago, to try to -- I just can't recall

11   that from exact memory each question they asked.

12       Q.      Do you have notes from either one of these

13   meetings?

14       A.      No.

15       Q.      You said you jotted something down before you

16   went to see these people?

17       A.      No.  I basically summarized in my mind what

18   questions they had asked, and then I responded to them.

19       Q.      And you jotted that down?

20       A.      My response?  No, I didn't jot my response down.

21       Q.      What is it, sir, that you said that you jotted

22   them down?

23       A.      The sequence of questions they were asking me,

24   like, the three questions they had asked me, I tried to, you

25   know, write those down to try to remember what they asked me.

1      Q.      And what happened to those notes?

2      A.      I have no idea.

3      Q.      You don't presently have them?

4      A.      I don't have them.

5      Q.      And you don't have any other notes from either

6   one of these meetings?

7              MR. MacMAIN:  You mean notes taken during the

8   meeting?  Or notes I may have asked him to write down things

9   as part of the defense of this case?

10  BY MS. WALLET:

11     Q.      Other than what you have provided to your

12  counsel, do any notes of those meetings exist?

13     A.      No.

14     Q.      Did you give them anything at this second

15  meeting?

16     A.      Absolutely not.

17     Q.      Do you have in your possession now the

18  information regarding the production of this greeting card?

19     A.      No.

20     Q.      Did you take notes of what the manufacturer told

21  you?

22     A.      I think I have -- yeah, I think I did take a note

23  and I wrote it on the back of the card, because I called just

24  recently, maybe a month or two months ago.

25              MS. WALLET:   And you'll provide those to me, I

                    S. Gareth Graham                          16


 1   assume?

 2              MR. MacMAIN:  I may.  I mean, I think there might

 3   be issues of work product and so forth, but I'll certainly

 4   consider it and if I think it's appropriate, I'll produce it.

 5   If I don't, I'll let you know that as well.

 6              MS. WALLET:  You can consider this my formal

 7   request that those be produced.

 8              MR. MacMAIN:  I'd prefer if you sent me a letter.

 9   And I'll make a list so it's not missed.  If you want to send

10   me a letter with whatever items would you like.

11              MS. WALLET:  I believe it falls within the

12   interrogatory that I think you have a duty to supplement.

13   BY MS. WALLET:

14       Q.    Other than those two times that you just

15   described, Mr. Graham, did you meet with anyone who told you

16   that they were investigating the charges made by Ms. Varner?

17       A.    I had gone to the EEOC.  I had gone to the

18   Pennsylvania Human Relations Commission to try to get

19   included in discovery of that information once I found that

20   those things were, they're filed there, yes.  And I was

21   denied access there.

22       Q.    When did you contact the EEOC?

23        A.        Numerous times.

24        Q.        And who did you contact there?

25        A.        Sylvia Williams.  I had driven to Philadelphia


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          17


1    and went to the Bourse Building on the, I think it's the 15th

2    floor, and I talked to Ms. -- it was a supervisor there, I

3    think it was, her name's Joan Gamiter.  And I had asked to be

4    included in the EEOC's investigation.  And she had informed

5    me that since you and Ms. Varner had not named me as a

6    defendant I was not entitled to any information from the EEOC

7    at that juncture.

8        Q.        Did you at any subsequent time receive

9    information from the EEOC?

10       A.        The only information I received from the EEOC

11   was -- and I made requests, I think I did send a letter

12   through another counsel, I don't have the copy of that, I

13   wouldn't know where that's at, but I was seeking out counsel

14   to try to -- for defending this claim.  And I had been to a

15   multitude of different lawyers to assist me.  So I can't

16   recall exactly who made that request or who -- I think he

17   directed me to send the letter myself to the EEOC under

18   freedom of information discovery.

19       Q.        And who is he?

20       A.        Cowden, William Cowden, in Harrisburg.

21    Q.    In any event, did you receive --

22    A.    Strokoff and Cowden.  Are you familiar with that

23 firm?

24    Q.    I am.

25    A.    Okay.  So do I have that right?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          18


1            MR. MacMAIN:  She doesn't want to know what you

2 discussed with any counsel.

3            MS. WALLET:  Correct.

4            MR. MacMAIN:  Just did you make the request, and

5 you've answered it, so.

6            THE WITNESS:  Yes.  Okay.

7 BY MS. WALLET:

8    Q.    Did you go to the EEOC during work time?

9    A.    No, I did not.

10    Q.    Did you take leave?

11    A.    Yes.

12    Q.    When did you do that?

13    A.    I don't know.  I can't recall the date.

14    Q.    Do you remember what month?

15    A.    No.

16    Q.    Do you remember what year?

17    A.    I took a witness with me down there to meet Miss

18 Gamiter.

19      Q.      And who did you take with you?

20      A.      Charlie Mallios, a college roommate of mine.

21      Q.      And who is Mr. Mallios, other than your

22   college -- other than your college roommate, who is he?

23      A.      He's just a friend of mine and he was a college

24   roommate of mine.

25      Q.      Does he own some business?


                     Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                     S. Gareth Graham                          19


 1      A.      He owns the Deer Lodge restaurant.

 2      Q.      You've known him since college?

 3      A.      Yes.

 4      Q.      How often do you see him?

 5      A.      Weekly.

 6      Q.      Social friends?

 7      A.      Yes.  Our children go to school at the same high

 8   school.

 9      Q.      Any other relationship with Mr. Mallios?  Are you

10   in business with him in any fashion?

11      A.      No, I'm not.

12      Q.      No other relationship?

13      A.      None.

14      Q.      Why did you take Mr. Mallios with you to the

15   EEOC?

16      A.      Probably I was intimidated by the driving into

17    Philadelphia a little bit, and I wanted somebody, like proof

18    positive to show that they denied me access to the EEOC

19    investigation.

20         Q.    Why did you think when you went that they were

21    going to deny you access?

22         A.    I didn't know when I went.  I wouldn't have

23    driven down there if I knew they were going to deny me

24    access.  I asked to be included in their investigation.

25         Q.    Well, if you took Mr. Mallios with you in order


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          20


 1    to have a witness that they would deny you information --

 2         A.    No, I didn't say they would deny me information,

 3    Ms. Wallet.  I said I went down there to try to be

 4    interviewed firsthand so -- because they wouldn't answer my

 5    phone calls and they wouldn't include me.  They just said

 6    that you're not a named defendant and you have no rights to

 7    defend this claim.

 8              I don't know why you didn't, you know, sue myself

 9    and Mr. Osenkarski from the beginning and include us in that

10    investigation.  And that perplexes me as to why you wouldn't

11    include us at that juncture in the -- and maybe I don't

12    understand the law, but here I was being named as a

13    defendant.  I was feeling that my Constitutional rights to

14    discovery had been limited because I couldn't even discover

15    anything that she had said about me.  I couldn't see any

16    complaints that she had made about me.  And I think it's a

17    flawed federal process, and I'm not saying that as -- as in

18    layman terms, I don't know -- I didn't know the process, I

19    was ignorant to the process, and I tried to intelligently

20    deal with defending this accusation against me.  That's what

21    I was trying to do.  That was my intent.

22        Q.    So you took Mr. Mallios with you to be a witness

23    to what the EEOC did or didn't do?

24            MR. MacMAIN:  I think it's been asked and

25    answered.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    21


1            THE WITNESS:  I answered that a couple times.

2            MR. MacMAIN:  He said that he tried to get the

3    information through letters and phone calls, and when he

4    didn't, he drove down there.  So I think it's been asked and

5    answered.

6    BY MS. WALLET:

7        Q.    And you took him to help you to navigate the

8    Philadelphia traffic, correct?

9        A.    I took him to allow him to witness that they were

10   going to deny me or I thought they would deny me access.  I

11   thought maybe they would -- I didn't know where the parking

12   was, you know.  I had been down even to another Philadelphia

13    lawyer down there and he went down with me to that

14    Philadelphia lawyer named Alice Ballard.  I had been down to

15    her to try to get representation.  I didn't know where the

16    parking was.

17         He dropped me off on that juncture and went up to

18    the office to have the interview, and then he did some other

19    dealings that he had to do at Temple at the time or Temple

20    University.  And then he came back and picked me up after I

21    was done with that.  So he rode along the second time for the

22    same reason.

23      Q.    Did you take Mr. Mallios because you believed

24    Mr. Mallios had information relative to Ms. Varner's claim?

25      A.    Mr. Mallios didn't know anything about


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham          22


1    Ms. Varner's claim.

2      Q.    Did he know anything about your relationship

3    between Ms. Varner and yourself?

4      A.    No, he did not.

5      Q.    So Charlie Mallios doesn't know anything about

6    this case?

7      A.    That's correct.

8      Q.    Only what you've told him?

9      A.    That's correct.

10      Q.    Would you consider Mr. Mallios to be your best

11    friend?

12        A.    Yes, probably.

13        Q.    How long do you think he's been your best friend?

14        A.    Well, since I met him in college around 1974 or

15    '75.

16        Q.    And have you seen him weekly since then?

17        A.    No, not weekly.

18        Q.    You've seen him weekly only in the last several

19    years because of your children?

20        A.    Right.

21        Q.    Have you seen him weekly since, let's say, 1990?

22        A.    Yes.

23        Q.    Does he know your wife?

24        A.    Yes, he does.

25        Q.    Does he know your children?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                           23


1         A.    Yes.

2         Q.    Know the rest of your family?

3         A.    That's my immediate family.  My parents are both

4    deceased.  He did know my parents.

5         Q.    Okay.  You said you went to the PHRC.  Did you

6    just phone them, or did you go?

7         A.    I think I sent a letter to a Louise Oakley or she

8    sent me a letter from Louise Oakley, that she sent me a

9   response that there had been no claim filed with them.

10      Q.    Do you have any of those documents?

11      A.    I would have to find them.  I don't know where

12   they're at.  I might have them, I might not.  I had them at

13   one point.  I mean, I had the letter she sent back to me.

14      Q.    Now, I asked you did you meet with anyone who

15   indicated that they were investigating the allegations made

16   by Ms. Varner, and you told me, of course, of the two

17   meetings with Mr. Deluce, your efforts to obtain information

18   from the PHRC and the EEOC --

19      A.    That's correct.

20      Q.    Anyone else?

21      A.    I had met with Jim Thomas and Paul Dellasega on

22   July 26th, 19 -- I think '99.  I remember that because it was

23   my mother's birthday, so.

24      Q.    And did they ask you to come to meet with them,

25   or did you request that meeting?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    24

1       A.    I think they had asked to talk with me because

2   they were new counsel for the county.  And the meeting took

3   place in Dave Foster's office.

4       Q.    Why was that?

5       A.    Truthfully?  I wanted them to come to my

 6    attorneys.  I didn't want to go to their office to be

 7    interviewed.

 8        Q.    And you considered Mr. Foster to be your attorney

 9    at that time?

10        A.    I'm sure, you know, that because he had contacted

11    you, Ms. Wallet, so that's self explanatory.

12        Q.    Did you consider Mr. Foster to be your attorney

13    at that time?

14        A.    No.  He was providing me with some legal advice.

15            MR. MacMAIN:  Her question very simply is:

16    Mr. Foster was your attorney, you had retained him.

17            THE WITNESS:  I had paid him funds, right.

18    BY MS. WALLET:

19        Q.    And did you retain him to represent you with

20    regard to the complaints made by Ms. Varner?

21        A.    No.  He advised me his specialty was not civil

22    litigation.

23        Q.    So you had him as your attorney in other matters

24    but you spoke to him about these matters as well?

25        A.    No.  I never had him retained as an attorney.  He


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net


                    S. Gareth Graham                    25


 1    was a man that worked in the court system, I knew for maybe

 2    20 years.  I respected his judgment.  He knew, he advised me

 3    that he knew you, you were -- you and him were together in

 4     the Dickinson Law class along with Paul Dellasega.  And he

 5     advised me that he would like the chance to talk with you,

 6     you know, about these allegations.

 7                 MR. MacMAIN:  Anything you discussed with

 8     Mr. Foster is privileged.  She doesn't want to know what you

 9     discussed.  Listen carefully to what she's asking you.

10                 THE WITNESS:  Okay.

11                 MR. MacMAIN:  Okay?

12     BY MS. WALLET:

13         Q.     Who decided that this meeting should be in

14     Mr. Foster's office?

15         A.     I did.

16         Q.     Now, at that time you were represented by

17     Mr. Foster, not by Mr. Thomas and Mr. Dellasega?

18                 MR. THOMAS:  Objection to the form.

19                 MR. MacMAIN:  Do you understand her question?

20                 THE WITNESS:  At that time was I represented by

21     Dave Foster and not Thomas and -- yes.  And I wasn't

22     represented by Thomas and them at that time.

23     BY MS. WALLET:

24         Q.     Was there a time when you were represented by

25     them?


                         Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                         S. Gareth Graham                        26


 1         A.     Yes.

2      Q.      Do you remember when that was?

3      A.      Well, that's a matter of I think court record.  I

4   don't know the exact dates of when they came into the case.

5              They were -- they had indicated that they were

6   going to include me as counsel.  I met with Paul at the

7   courthouse with Christine Miller, or Christine Miller.  I

8   think that was in September.  I don't know the year, I don't

9   want to quote a year and misquote it.  But that was on a

10  Friday.  They had entered an entrance of appearance for me in

11  addition to an entry of appearance for Mr. Osenkarski.

12             And then on Monday -- I met with them, like,

13  Friday, and then and maybe a short time later they had

14  indicated that they were going to secure private counsel for

15  Joe and I individually.

16     Q.      Okay.  Did you meet with anyone else who told you

17  that they were investigating the complaints made by

18  Ms. Varner?

19             MR. MacMAIN:  You're not including counsel that's

20  represented him?

21             MS. WALLET:  Correct.

22             MR. MacMAIN:  What she wants to know very simply

23  was did anybody else investigate as opposed to defend

24  allegations or an attorney that you may have retained to

25  defend allegations, anyone else that was an investigator as

1    opposed to an attorney?

2            THE WITNESS:  No.

3    BY MS. WALLET:

4        Q.    Did Mr. Osenkarski at any time give you

5    directions regarding your relationship with Ms. Varner?

6        A.    I don't understand the question.

7        Q.    Did Mr. Osenkarski at any time tell you to do

8    something or not do something that related to Ms. Varner's

9    allegations?

10       A.    The only correspondence I received from

11   Mr. Osenkarski was to have Sam Miller review her work.  And I

12   was -- since this allegation had been made I was prohibited

13   from reviewing her social histories which she submitted for

14   approval.  He gave me a letter to that effect.

15       Q.    Other than that, did Mr. Osenkarski tell you to

16   do or not do anything with regard to Ms. Varner?

17           MR. MacMAIN:  With respect to the allegations?

18           MS. WALLET:  Correct.

19           MR. MacMAIN:  After the allegations were made by

20   Ms. Varner of sexual harassment, at that point were you given

21   any instruction?

22           THE WITNESS:  His instructions were to -- he --

23   his interest was to separate the parties.  And that was

24   contingent upon what should happen in any mediation or

25   mitigation that was offered through the EEOC, they tell you

S. Gareth Graham                                    28


 1   to separate the parties.  And he was telling me to separate

 2   myself from her activities.

 3   BY MS. WALLET:

 4        Q.     And how did he tell you to do that?  In writing,

 5   or --

 6        A.     Verbally.

 7        Q.      -- orally?

 8        A.     Orally.

 9        Q.     And what did he tell you to do that would cause

10   you to be separated from her?

11        A.     What did he tell me to do?

12        Q.     Yes.

13        A.     He just instructed me not to have contact with

14   her.

15        Q.     When do you believe that was?  Was it before or

16   after you met with Mr. Deluce?

17        A.     Oh, it wasn't before I met with Mr. Deluce.  I

18   didn't know anything about this until I met with Mr. Deluce.

19        Q.     Did you receive any written instructions that you

20   were no longer to supervise Ms. Varner?

21        A.     That letter was a written instruction not to

22   review her cases and Sam Miller would be appointed as a

23   reviewing officer for her activities in the office.

24        Q.     Do you know whether Ms. Varner received a copy of

25   that?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                29

1       A.      I think she did, and I think Mr. Miller informed

2    her of that also.

3       Q.      And when do you believe the change from you to

4    Mr. Miller occurred?

5       A.      That's in the memo and that could be produced.  I

6    don't know the date, but there's a memo to that effect.  Joe

7    probably would have that.

8       Q.      Is it accurate to say that you listened to two

9    days of questions of Ms. Varner as a part of these

10   depositions?

11      A.      That's accurate.

12      Q.      You were here during those two days?

13      A.      Yes, I was.

14      Q.      Except for any time that you might have gone to

15   the men's room briefly, you heard everything that she said

16   under oath?

17      A.      Yes, I did.

18      Q.      And you would agree that she was asked a number

19   of things about her personal sexual habits?

20      A.      Yes.

21      Q.      You heard all of those?

22      A.      Sure.

23      Q.      Now, you said that you were hired by the county

24    in 1977, specifically September.  Would you please run me

25    through your --

S. Gareth Graham                          30


1      A.      I was hired by the county in July 26th of 1976.

2      Q.      I'm sorry.

3      A.      And that I was hired as the deputy Recorder of

4    Deeds for Cumberland County.  A man had retired and there was

5    a position that came available.  And I had just graduated

6    from college in 1975, and I took a position in 19 -- I worked

7    a year as a carpenter, and then in 19 -- July 26, 1976, I

8    started with the Recorder of Deeds office.  And I was deputy

9    Recorder of Deeds for the County of Cumberland under Al

10   Kugler.

11     Q.      Was that a political position?

12     A.      It was a row office position.  Do you consider

13   that political?

14     Q.      I'm sorry, sir.  I ask the questions and you

15   answer them today.

16     A.      Okay.  I don't know.  It's a row office position.

17     Q.      Did you obtain your position as deputy Recorder

18   of Deeds through political or Civil Service means?

19     A.      I think the county commissioners -- there was

20   a --the county commissioners were looking for someone to fill

21   a short-term position, and I think my dad knew of that and he

22    said, do you want to try to get your foot in the door with

23    the county so you can eventually get into a county employment

24    position.

25            It was kind of a practice back then that Judge

S. Gareth Graham                              31


1    Shughart wanted people to be involved with the county in a

2    position and a lot of times they would send -- if probation

3    officers would apply and they weren't considered the first

4    time around, they would go maybe to a prison position.  They

5    would hire that person for a prison position or another

6    county position.  So that's the gist of how I got in there.

7        Q.    So your dad thought this would be a good way for

8    you to get your foot in the door?

9        A.    That's correct.

10       Q.    What was your father's name?

11       A.    C, period, Freemont, F-R-E-E-M-O-N-T, Graham.

12       Q.    And where was his business that you described as

13   a little cut-rate store?

14       A.    The corner of South High Street and Big Spring

15   Avenue in Newville, Pennsylvania.

16       Q.    How long did he have that business?

17       A.    From the time he got out of the war in the '40s

18   up till the early -- '91 or '92.

19       Q.    And did the business close at that time?

20     A.     No.  No, he became ill with cancer, and we

21 continued the store about a year and a half after that.

22     Q.     So the family continued the business and then it

23 was sold?

24     A.     My dad had a gentleman by the name of, a young

25 kid name Kenny Newell, N-E-W-E-L-L, and he kind of ran the


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    32


1 store after my dad died, for until my mother and I could sell

2 it.

3     Q.     Did your dad know Judge Shughart?

4     A.     Sure.

5     Q.     How did he know him?

6     A.     My dad was a committee person from, for the Town

7 of Newville.

8     Q.     For what political party?

9     A.     Republican.

10     Q.     Is that the political party that you are

11 affiliated with?

12     A.     Yes, ma'am.

13     Q.     Have you always been so affiliated with that

14 party?

15     A.     Yes.

16     Q.     Have you ever been a committee person?

17     A.     No.

18    Q.    Have you ever had any other party office?

19    A.    No.

20    Q.    You're simply a registered voter?

21    A.    I'm a registered voter.  I was, I was on, like,

22    the water and sewer committee of Newville.  I was on the

23    planning commission of Newville.  I did my -- I secured all

24    the right-of-ways for the sewer laterals when they put the

25    sewer in Newville.  I mean, those.  I'm a member of the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    33

1    library board of Newville.  You know, I'm affiliated with

2    Graham Medical Center.  The library board had built the

3    center trying to get doctors into Newville years ago.  So

4    those are the affiliations I have.

5    Q.    Is the Graham Medical Center in any way

6    affiliated with your family?

7    A.    It's not a direct descendent but it is affiliated

8    with the Grahams.  I am distantly related but it wouldn't be

9    considered being related.

10    What happened, the library board --

11    MR. MacMAIN:  She doesn't need to know the

12    history.  She asked you if you were affiliated.  All you have

13    to do is say yes.  Okay?

14    BY MS. WALLET:

15    Q.    So how did you get this job as deputy Recorder of

16    Deeds?

17        A.      All Kugler called me in and interviewed me.

18        Q.      And he was the recorder?

19        A.      He was the recorder.  He preceded Pat Vance,

20    which you might be familiar with.

21        Q.      And how long did you work as the deputy Recorder

22    of Deeds?

23        A.      July 26, '76, until September of '77.  A little

24    over a year.

25        Q.      And what happened then?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    34


1         A.      I applied to Probation and was hired in, I don't

2     know the date in '77, but --

3         Q.      Could it have been July 26th?

4         A.      No.  It wasn't a year later.  It was over a year.

5     It was September of '77.

6                 What happened is --

7                 MR. MacMAIN:  Gary, you don't need to tell her

8     the story.  She just want dates.

9     BY MS. WALLET:

10        Q.      Do you have any reason for why your personnel

11    file might indicate that you were hired in September -- I'm

12    sorry, in July?

13        A.      My personnel file?

14      Q.      Yes, sir.

15      A.      Says -- because that's when I began county

16  employment.

17      Q.      Okay.  So you think the September -- sorry --

18  July 26, '77 date is when you started with the Recorder of

19  Deeds?

20      A.      July 26, '76, is when I started with the Recorder

21  of Deeds office, and I worked there until September of '77.

22  A little over a year.

23      Q.      Okay.  How did you obtain your job in the

24  Probation office?  How did you know there was a job there?

25      A.      I guess through a secretary, you know, somebody


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                35


1  that I would have known, a Mary Rooney or somebody like that,

2  said that there's openings upstairs.

3      Q.      Did you interview for the job?

4      A.      Yes, I did.

5      Q.      Who did you interview with?

6      A.      Irving Groninger.

7      Q.      Who was he?

8      A.      He was the chief PO at the time.

9      Q.      Anybody else?

10      A.      Ken Bolze.

11      Q.      Anybody else?

12        A.        And my eventual final interview was with Judge

13   Shughart.

14        Q.        And who hired you at that time?

15        A.        Judge Shughart.

16        Q.        Did anyone give you letters of recommendation to

17   obtain a job in the Probation office?

18        A.        No.

19        Q.        At least not at your request?

20        A.        Not at my request.  I don't know what you mean by

21   that, I'm sorry.

22        Q.        I suppose it's possible somebody might have

23   recommended you that you wouldn't know about, so the question

24   is:  Did you ask for someone to give you --

25        A.        No.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          36


1        Q.        -- letters of recommendation?

2        A.        No.

3        Q.        And the position that you first held was

4   probation officer trainee?

5        A.        I don't know what it was called.  Probation

6   Officer-I.

7                  I took a salary cut to go up upstairs.  I was

8   making more money in the Recorder of Deeds office.  I think I

9   was making 11,000, and I went up there for 9,600.

10          Q.      Did you serve some sort of probationary period?

11          A.      I don't think.  I was just hired and I had to do

12     the job.

13          Q.      Were you a PO-I at one time?

14          A.      Yes, I was.

15          Q.      How long did you remain a PO-I before becoming a

16     PO-II?

17          A.      I don't know the correct date of when I became a

18     PO-II.  That could be found in the records, too.

19          Q.      Do you think May 26th of '85 would be correct?

20          A.      That's probably correct.

21          Q.      And how did you become a PO-II, whatever the date

22     was, in or about May of '85?

23          A.      I was interviewed along with a David Meyers.  And

24     my work performance allowed me to become a, you know, a

25     PO-II.


                          Emily R. Clark, RMR
                 717-233-1744, emily.clark@worldnet.att.net

                          S. Gareth Graham                    37


 1          Q.      Did you compete with others for the PO-II spot?

 2          A.      I don't think --

 3                  MR. MacMAIN:  Other than the person he just

 4     mentioned?

 5                  THE WITNESS:  Other than, yeah, David Meyers.  I

 6     was informed that -- I just don't recall the sequence of

 7     that.

8    BY MS. WALLET:

9        Q.    And Judge Sheely appointed you to the PO-II spot?

10       A.    I would have had to have been recommended by --

11   if Mr. Groninger was still there, I would have had to have

12   been recommended by Mr. Groninger and Mr. Bolze.

13       Q.    Do you know whether Judge Sheely appointed you to

14   the PO-II position?

15       A.    I think he approved their recommendation.

16       Q.    Did seniority play any role in that decision?

17       A.    I'm sure a part of a role, and adequate job

18   performance.

19       Q.    Who did you report to after you became a PO-II?

20       A.    Mr. Osenkarski and Ken Bolze.

21       Q.    What was Mr. Osenkarski's position in or about

22   1985?

23       A.    I think he had been the supervisor, and I don't

24   know when he was promoted to the supervisor, but he was a

25   line person when I first went in in '77, and I think shortly


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                          38


1    thereafter he was appointed as a supervisor.

2        Q.    At some point did you report directly to

3    Mr. Osenkarski?

4        A.    At the retirement of Ken Bolze, yes.

5        Q.    So when you were first a PO-II your immediate

6      supervisor was Mr. Bolze?

7          A.     Yes.  I would say he would be my immediate

8      supervisor, or Mr. Osenkarski.

9               We split, or we had areas of expertise, and

10     Mr. Meyers was given the area of the adult section and I was

11     given the area of the juvenile section.  So a lot of my

12     reporting duties would then probably have been to Joe first

13     and then Bolze second.  But Bolze was the chief, so everybody

14     reported to him because we had a unified department at that

15     point.

16         Q.     Okay.

17             MR. THOMAS:  Excuse me for a minute, Deb.  We

18     didn't clarify when we started the deposition that these were

19     the usual stipulations?  That we're preserving --

20             MR. MacMAIN:  Yes, I think that was understood.

21     But I think you're right, we should put it on the record.

22             MR. THOMAS:  I think it was, too, but I just

23     wanted to make sure.  Otherwise --

24             MR. MacMAIN:  All objections except as to form

25     are reserved.


                        Emily R. Clark, RMR
                 717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                          39


1              MR. THOMAS:  Signature?

2              MS. WALLET:  I have no problem with that.

3              MR. MacMAIN:  We'll also have the objection you

4    had made about the investigation report.

5    BY MS. WALLET:

6        Q.    In or about 1985 who did your performance

7    evaluations?

8        A.    Ken Bolze and Joe Osenkarski.

9        Q.    I guess my question --

10       A.    And John Roller.  I think John Roller was

11   included.  The three of them did the performance evaluations

12   on everybody.

13       Q.    Had you known Mr. Osenkarski prior to your

14   employment in the Probation office?

15       A.    Never.

16       Q.    You met him only when you came into the office?

17       A.    Yes, ma'am.

18       Q.    How would you describe your relationship,

19   personal and/or professional, with Mr. Osenkarski?

20       A.    Excellent.

21       Q.    You knew him initially because of your

22   employment?

23       A.    That's what I testified to.

24       Q.    Okay.  Did you eventually become social friends?

25             MR. MacMAIN:  You mean socialize outside of the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    40

1    work functions and work seminars and so forth?

 2          MS. WALLET:  Correct.

 3          THE WITNESS:  Social friend probably began near

 4    the time of his divorce.

 5    BY MS. WALLET:

 6      Q.     Do you remember when that was?

 7      A.     No.

 8      Q.     Why was his divorce significant?

 9      A.     He was, Joe was extremely distraught over his

10    marriage breakup.  And he had two 15-year-old girls, or one

11    was 15, one was 13, or something at the time.

12      Q.     And did he seek out your companionship?

13      A.     Probably.

14      Q.     Do you have any idea, was this mid '80s, mid

15    '90s?

16      A.     He can validate when that was.  I don't know.

17      Q.     When did you begin to see Mr. Osenkarski in a

18    social fashion outside of work?

19          MR. MacMAIN:  I thought he just answered that,

20    which was after his divorce.

21          THE WITNESS:  After his divorce, mostly.

22    BY MS. WALLET:

23      Q.     Okay.  But you're not sure when that was?

24      A.     He can tell you when that was.

25          MR. MacMAIN:  She's just asking if you know.

```
 1              THE WITNESS:  Okay.  I don't know.
 2   BY MS. WALLET:
 3       Q.    Do you think it was before you became a PO-II?
 4       A.    Yes.
 5       Q.    Now, Mr. Bolze retired in August of '96.  Do you
 6   believe that to be correct?
 7       A.    Yes.
 8       Q.    And Mr. Osenkarski took Mr. Bolze's job?
 9       A.    Not necessarily, no.
10       Q.    Okay.  How would you describe the change at that
11   time?
12       A.    Well, that was an interesting situation, because
13   I had -- in June of '96 Mr. Bolze was interested in splitting
14   the Adult staff.  I think Mr. Osenkarski was the next in line
15   as per seniority and job performance and to get the next nod
16   to be chief of a combined department that had been in
17   existence for 40 years.  And --

18       Q.    To the best of your knowledge, had seniority
19   always been the way in which this was done?
20       A.    One factor.  It wasn't the only -- seniority was
21   not the only reason to promote someone.  Bob Houser had more
22   seniority over John Roller, and John Roller was appointed to
23   the first PO-II position.  So seniority did not always play a
24   part, if you're making that contention.
25       Q.    Do you know anyone else who was promoted not
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        42

1   based on seniority?

2       A.      Well, Lyle Herr.

3               MR. MacMAIN:  Hold on a second.  I'm just going

4   to object to the form, because I think what he said was

5   seniority was a part of it, it wasn't the only.  I think the

6   way your question was phrased implied that seniority was the

7   only --

8               THE WITNESS:  She's asking me additional people,

9   too.

10              MR. MacMAIN:  Right.

11              THE WITNESS:  And additional people was Lyle

12  Herr, because Mr. McKenrick, Charles McKenrick had more

13  seniority than Lyle Herr and he was promoted into the Adult

14  supervisor position.

15  BY MS. WALLET:

16      Q.      Okay.  Anyone else that you can think of?

17      A.      No.

18      Q.      And that would include anyone promoted up till

19  today?

20      A.      That's correct.

21      Q.      Seniority was generally used for promotions?

22              MR. MacMAIN:  I'm going to object.

23              THE WITNESS:  No.  It was one factor, I said.  It

24  was one consideration in knowing how long you had worked for

25  the county and did you have adequate work performance.

S. Gareth Graham                                        43

1    BY MS. WALLET:

2         Q.    Okay.  Now, you were telling me about what

3    happened after Mr. Bolze left.

4         A.    Okay, yeah.  What's your question?

5         Q.    Well, my question is did Mr. Osenkarski take

6    Mr. Bolze's job, and I believe you said, well, that's an

7    interesting question and you were about to tell me why you

8    thought that that was interesting.

9         A.    Okay.  When Mr. Bolze was considering a

10   retirement, he considered it about a year before he, this

11   August '96 date that you're talking about.  He and John

12   Roller and Dave Meyers had had private conversations with

13   Judge Sheely about the splitting of these departments.  And

14   my contention or my interpretation was we were being left out

15   of the loop in the juvenile end of Probation.

16        Q.    Who was we?

17        A.    Joe, me, the guys primarily doing the juvenile

18   work, Hank Thielemann, Sam Miller, Denny Drachbar, whoever

19   else had been there for 10 and 15 years of employment.

20              And Mr. Miller and Mr. Drachbar would -- had come

21   to me and said, we're going to get screwed here, you know,

22   Bolze doesn't like Joe for whatever reason and we're not

23   being represented, can't you advocate for us.

24          So I wrote a memorandum to Judge Sheely in June

25   of '96 about the split of these departments and asked him to

1    be very careful if he had determined if a split was actually

2    going to happen.

3          Q.     And what happened as a result of your memorandum?

4          A.     As a result of that, Judge Sheely allowed the

5    Juvenile men -- I said, call the men upstairs and talk to

6    them about their concerns.  And he did.  He called Sam Miller

7    up, he called Hank up, he called me up.  And he had listened

8    to the other side, because up until that point Ken Bolze left

9    Joe, left me and left the entire Juvenile department out of

10   the discussions of splitting these departments.

11          And then after that, this -- and then when Judge

12   Sheely had determined that was what he wanted to happen, then

13   there was this aligning of the staff of who was going to go

14   to what side.  And we did interviews in the office of who

15   would be available and the different positions that would be

16   available.  And we called John Roller, David Meyers, Joe and

17   I called everyone into the office and asked them what side of

18   the office they would like to choose, if they had a choice.

19          Q.     Why did you do that?

20          MR. MacMAIN:  I think he said he and other

21   people.

22    BY MS. WALLET:

23        Q.      Well, why did you participate in that?

24        A.      Because I was being -- I was a PO-II, and a PO-II

25    upon delegation was asked to do administrative work upon


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        45


1    being delegated.

2        Q.      And who delegated that to you?

3        A.      John Roller and Joe Osenkarski asked us to be

4    included, David Meyers and I.

5        Q.      You said this group got together, the people who

6    did juvenile work, Mr. Thielemann and Mr. Drachbar and

7    Mr. Miller, I believe.  Did you all decide that you were

8    going to try to do something collectively to stop this

9    movement?

10        A.      Yes.

11        Q.      And who decided that you would be the one that

12    would write this memorandum?

13        A.      They asked me to write it.

14        Q.      Why do you think they asked you to write it?

15        A.      Because I had the extensive experience in

16    juvenile work.  When I was first hired, you know, we had a

17    blended case load, we did adult and juvenile work.  But

18    different people in the different positions had different

19    percentages of cases assigned to them.  Some would be 90

20    percent adult and 10 percent juvenile.

21         When I took over upon the retirement of Glenn

22    Love -- that's who I replaced, you had asked me that earlier,

23    you know, why, how did I find out about the position.  But

24    Glenn Love is the guy that retired in '77 and that's the

25    position I took.  He had primarily all juvenile position.  So

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    46

1    I handled that caseload and I assumed that type of blended

2    assignment base.

3         Q.    Now, do you think they picked you to write this

4    memo because you knew Judge Sheely pretty well?

5         A.    On, no.  They picked me to write it about to

6    express the concerns, and they helped me contribute to the

7    letter.  You know, I met with them and said, you know -- and

8    I didn't want to work it straight that it was my only my

9    concern.  I wanted to allow the guys, and that's what Judge

10   Sheely did, he allowed the guys to go upstairs and talk to

11   him about it, because we had significant concerns.

12        Ms. Wallet, we had 650 referrals --

13        MR. MacMAIN:  Listen to her question.  She asked

14   if you were chosen because you knew Judge Sheely, and you

15   answered no, and she wants --

16        THE WITNESS:  I wasn't chosen because I knew

17   Judge Sheely.

18    BY MS. WALLET:

19        Q.      Did you feel comfortable in going directly to

20    Judge Sheely with your concerns?

21        A.      I didn't feel comfortable, no.

22        Q.      Why not?

23        A.      Well, because I put in the memorandum that Ken

24    was focused on his retirement and hadn't addressed the

25    concerns.  So I didn't know where I stood on, you know, the


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              47


1    pecking order of was I responsible to do this or not.

2        Q.      Did you know Judge Sheely outside of the

3    supervisory relationship that he had over you?

4        A.      Did I know him?  No.

5        Q.      Did you ever campaign for him?

6        A.      No.

7        Q.      Did your family campaign for him?

8        A.      My dad did.

9        Q.      Anybody else in your family?

10        A.      I think my mother was a committee man, too, or

11    committee woman.

12        Q.      But you didn't campaign for him?

13        A.      No.

14        Q.      Did you contribute to his campaign?

15        A.      No.

16    Q.    Do you know whether your parents did?

17    A.    I don't think they did.

18    Q.    Now, you said that Mr. Bolze did not like Joe.

19  You meant Joe Osenkarski?

20    A.    Yes.

21    Q.    Why did you say that Mr. Bolze did not like Joe

22  Osenkarski?

23    A.    Ken was a very officious, offensive in-your-face

24  type of person, similar I guess to what Ms. Varner has

25  described me.  And Joe is completely different than that.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    48


 1    Q.    Joe likes to avoid controversy?

 2          MR. MacMAIN:  Objection.

 3          THE WITNESS:  No, Joe doesn't avoid controversy.

 4  He has a blended style where he's not confrontational or

 5  argumentative.

 6  BY MS. WALLET:

 7    Q.    So if I were to ask what Mr. Bolze's reputation

 8  was within the cadre of probation officers --

 9    A.    I hope you do.

10    Q.     -- the general consensus would be that he was

11  vicious and offensive?

12          MR. MacMAIN:  Objection.  That's not what he

13  said.

14          MS. WALLET:  I'm asking him.

15          MR. MacMAIN:  I think you're trying to categorize

16    something and repackage it.

17          MS. WALLET:  I'm asking him.

18    BY MS. WALLET:

19      Q.      What do you think Mr. Bolze's general reputation

20    was among the cadre of probation officers?

21      A.      He was not liked.

22      Q.      And why was he not liked?

23      A.      Multitude of reasons.  He scrutinized people's

24    reports.  He never applied to the Courts for any relief for

25    the Probation Department.  He never instituted any grants.


                      Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                      S. Gareth Graham                        49


1    He was focused on his individual concerns.

2      Q.      Were there people within the Department who liked

3    Mr. Bolze?

4      A.      Yes.

5      Q.      Who?

6      A.      Probably Mike Varner.  John Roller.

7      Q.      What do you think the reputation of

8    Mr. Osenkarski is among the probation officers?

9      A.      I think he was well respected towards most of the

10    Probation Department.

11      Q.      Some people not like him?

12      A.      Sure.

13      Q.      Who?

14      A.      Kerry Houser.

15      Q.      Anybody else?

16      A.      Nick Barrolet.  Debra Green.  That's all I know.

17      Q.      Would you say that there were kind of two camps

18   within the probation officers, the Osenkarski camp and the

19   not-Osenkarski camp?

20              MR. MacMAIN:  I'll object.  What time frame are

21   you talking about?

22   BY MS. WALLET:

23      Q.      Let's talk about mid '80s to the present.

24      A.      Can you repeat that?  I'm sorry.

25      Q.      Within the Probation office do you think there


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    50


1    was a pro-Osenkarski camp and an anti-Osenkarski camp?

2              MR. MacMAIN:  What do you mean by --

3              THE WITNESS:  I would rather answer it on a

4    percentage basis.  I would rather say that those people,

5    those three or four individuals represented a small

6    percentage of the people that disliked Joe, and the majority

7    of the people liked Joe.

8    BY MS. WALLET:

9       Q.      Okay.  Anybody else in the dislike camp?

10          MR. MacMAIN:  Other than the names he's already

11  given you in the prior question?

12          MS. WALLET:  Yes.

13          THE WITNESS:  No.

14  BY MS. WALLET:

15      Q.    Barbara Varner ever indicate to you that she

16  didn't like Joe?

17      A.    No.  She indicated she liked Joe.  She thought he

18  was the best boss she ever had.

19      Q.    We started out by me asking you why did you say

20  that Bolze did not like Joe Osenkarski, and I'm not sure we

21  ever got that answer.

22          MR. MacMAIN:  Your question is why.

23  BY MS. WALLET:

24      Q.    Why did you say in your earlier testimony Bolze

25  did not like Osenkarski?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    51


1       A.    I think Ken was jealous of Joe.

2       Q.    Do you think that was justified?

3           MR. MacMAIN:  Objection.  Are you asking him to

4   speculate what was in Mr. Bolze's mind?

5           MS. WALLET:  No.  I'm asking would there be

6   reasons why Ken would be jealous of Mr. Osenkarski.

7           MR. MacMAIN:  I'm going to object to the extent

 8    you're asking him to get into Mr. Bolze's head.  I don't

 9    think that's a fair question.  I don't think it's something

10    he can possibly answer.

11         MS. WALLET:  All right.  I'll withdraw that

12    question.

13    BY MS. WALLET:

14    Q.    Is there any other reason why you think Bolze

15    didn't like Osenkarski besides being jealous?

16    A.    I think Joe had an intelligent aptitude that Ken

17    didn't have.

18    Q.    Anything else?

19    A.    No.

20    Q.    Okay.  So you were a PO-II until you were

21    transferred, correct?

22    A.    Yes.  A PO-I for a number of years, I guess,

23    from -- you gave me a date of 1985?  Right?  I was promoted

24    to PO-II?  Okay.  So from '77 to '85 I was a regular line

25    staff, and then from '85 I was a PO-II.


                    Emily R. Clark, RMR
           717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        52


 1         But PO-IIs primarily did direct service work,

 2    too.  We only assumed supervisory experience or any -- upon

 3    delegation.  And that wasn't included as an administrative

 4    position.  Ms. Varner's contention is that I trained her and

5      this and that, and that's just -- that wasn't the case.

6           Q.     Okay.  So you were a PO-II until approximately

7      March of 1998; is that correct?

8           A.     Yes.

9           Q.     And what happened in March of 1998?

10          A.     I was promoted with Dave Meyers to the

11     supervisor, and Joe -- promoted to supervisor position.

12                 But when we split the department.  The county

13     chief clerk, John Ward interrupted the split.  And he had

14     published in I think a newspaper article that -- and made a

15     statement that he wanted these guys to be seen as

16     supervisors.  He was going to downsize the position.

17          Q.     And when you say these guys, who do you mean?

18          A.     Joe and John.  Joe and John.  He wasn't going to

19     be in a position to promote them as chiefs, if he was going

20     to retain them as supervisors.

21          Q.     What did Mr. Ward have to do with this?

22          A.     I don't know.  He just -- he has a part in I

23     guess the salary board approving the -- he's the chief clerk,

24     he's advice to the commissioners.  And he plays a part in the

25     salary board making a decision on who gets promoted, and

1      there was a big flap.

2                 MR. MacMAIN:  Gary, all she asked was what Ward's

 3   role.

 4   BY MS. WALLET:

 5        Q.      And Mr. Ward is an employee of the County of

 6   Cumberland?

 7        A.      He was the chief clerk.

 8        Q.      Is that a yes?

 9        A.      Yes.

10        Q.      Is he still the chief clerk?

11        A.      No.

12        Q.      Who is the chief clerk now?

13        A.      John Connelly.

14        Q.      Do you know when Mr. Ward left and Mr. Connelly

15   took over?

16        A.      I think recently this year, April of this year.

17        Q.      2002?

18        A.      Yes.

19        Q.      We're now in 2003, but you mean 2002?

20        A.      2003, I'm sorry.

21        Q.      2000 --

22        A.      No.  He left -- I'm sorry.  2002.

23        Q.      So you were telling me what happened after the

24   split.  When did the split occur?

25        A.      Whenever we received the promotions and Judge

1    Sheely put a letter to that effect out to the commissioners

2    on how he was going to realign the two staffs.

3        Q.    Did you have to compete for a promotion at that

4    time?

5        A.    Are you asking was it advertised or was it --

6        Q.    Whatever you know about how you got the job.

7        A.    I think Ken went upstairs and highlighted the

8    expletives to our employment and our performance.  And when

9    Judge Sheely made this memorandum, he said Gary Graham

10   graduated from York College in 1975, he holds a bachelor of

11   science degree in this, he has been a PO-II in good standing

12   for so many years.  And he was -- and Judge Sheely and Ken

13   and Joe and John basically made the decision.

14            MR. MacMAIN:  Can I just ask one question?  You

15   used the term expletives, expletives meaning curse words?

16   Did you mean experiences?

17            THE WITNESS:  Experiences, I'm sorry.

18            MR. MacMAIN:  I thought that's what you meant.

19   BY MS. WALLET:

20       Q.    Okay.  So after this split, what position did you

21   have?

22       A.    After the split I was the Juvenile supervisor.

23       Q.    And how many individuals did you supervise?

24       A.    There was a total staff complement of 12 POs.

25       Q.    My question was:  How many did you supervise?

S. Gareth Graham                                                55

1    Did you supervise all 12?

2         A.      Yes, ma'am.

3         Q.      And in your supervisory role, what duties did you

4    have?

5         A.      To review the daily time sheets that were

6    submitted.

7         Q.      That's what was used to pay overtime, for

8    example?

9         A.      Yes.  That was, um-hum.

10        Q.      Okay.

11        A.      I also did case review, close-out review.  I

12   helped prepare the new budget that we had no experience on.

13               I had been a previous member of the Woodside

14   Detention Center, the detention facility that we used in

15   Harrisburg, and then became Woodside, and it was -- I was on

16   there for 11 years.  And I was there during the construction

17   of the Schaffner Youth Center, which it is today.  And I was

18   the Court board representative.  They had a you, know

19   advisory, board it was called.

20        Q.      And who you appointed you to that?

21        A.      Judge Sheely.  And I filled Joe's position.  Joe

22   had been on it for a number of years.  Its inception,

23   Woodside was somewhere around 1977, when they built Woodside.

24   Joe was on it shortly thereafter.  And then when he assumed,

25   when he assumed, when I think I became a PO-II somewhere

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                56

1    around '85, that would make about 11 years I was on it, till

2    '96.  So then I took that position.

3        Q.    Okay.  So you were listing for me your

4    supervisory duties.

5        A.    Okay.

6        Q.    To whom did the budget information go?

7        A.    To the county commissioners, eventually.  I think

8    to the chief clerk to review.

9        Q.    Do you agree that it's the county that determines

10   the budget for the Juvenile Probation Department?

11            MR. MacMAIN:  If you know.

12            THE WITNESS:  No, I'm not exactly sure.  I know

13   there's state grant money given in the Adult section and the

14   Juvenile section.  There's different contributions from the

15   state that appropriate money for the operation of the

16   Juvenile Probation office and the Adult Probation office.

17   And I think the budget gets submitted with those figures and

18   then the county makes a decision as to what items are

19   approved or disapproved.

20   BY MS. WALLET:

21       Q.    As a supervisor, did you make case assignments?

22       A.    Yes, I did.

23       Q.    You determined which of your officers got which

24   cases?

25        A.      Yes.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    57


1        Q.      Was that true for the entire time until you were

2    moved to the prison?

3        A.      Up until the time where Sam Miller was appointed

4    as her supervisor, contact person or supervisory person.

5        Q.      Okay.  I think you assumed I was asking you about

6    giving assignments to Ms. Varner.  I was asking you, did you

7    have responsibility as a supervisor to give case assignments

8    to those under your supervision --

9        A.      Yes, I did.

10       Q.       -- up until the time you were moved to the

11   prison?

12       A.      Yes, ma'am.

13       Q.      Okay.  After you were moved to the prison, did

14   you continue to have responsibility to make case assignments?

15       A.      None.

16       Q.      Okay.  Did you do anything else as the

17   supervisor?

18       A.      Well, I met with the county personnel, met with,

19   like the Children and Youth director.  I, we had discussions

20   on -- we had discussions on contracts at the Schaffner Youth

21   Center.  The county had contracted for so many beds and in

22   1977 till up until this point when the Schaffner Center was

23    used we only had two beds for any delinquent children to put

24    in.

25              MR. MacMAIN:  She doesn't need to know the


                        Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                  S. Gareth Graham                          58


1    history.  Just what were your responsibilities as the

2    supervisor.

3              THE WITNESS:  So I negotiated a -- I helped

4    negotiate the last contract with the Schaffner Youth Center

5    as part of my --

6    BY MS. WALLET:

7         Q.    Okay.  Let me be specific, sir.  Did you sign

8    leave slips for employees?

9         A.    Yes.  Approved vacations.

10        Q.    Did you determine when vacations would be

11   permitted for those individuals under your supervision?

12        A.    Yes.

13        Q.    Did you recommend or otherwise influence times

14   when individuals went to conferences?

15        A.    Did I influence them?  They put a request in and

16   then I would approve it.

17        Q.    So you approved requests to go for training or go

18   to conferences?

19        A.    Correct.

20        Q.    Okay.  Did you do performance evaluations?

21          A.      Yes, I did.

22          Q.      Were you in a position to recommend disciplinary

23     action?

24          A.      Yes, I was.

25          Q.      Did you do anything else like that as a



                         Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                         S. Gareth Graham                          59


 1     supervisor?

 2                  MR. MacMAIN:  Like what?

 3     BY MS. WALLET:

 4          Q.      Like that list of things that I've just given

 5     you.

 6          A.      Anything else?

 7                  MR. MacMAIN:  In other words, she wants to know

 8     essentially the different things you did as a supervisor.

 9                  THE WITNESS:  Yes.

10                  MR. MacMAIN:  Is there anything --

11                  MS. WALLET:  Correct.

12                  MR. MacMAIN:  Is there anything additional?

13                  THE WITNESS:  Not that I can recall.

14     BY MS. WALLET:

15          Q.      Okay.  Did you have any control over assignments

16     of weapons?

17          A.      No.

18          Q.      Who did that?

19      A.      Mr. Osenkarski.

20      Q.      Were there weapons assigned to probation

21  officers?

22      A.      I don't know.  I mean, there were weapons

23  purchased by the Probation Department.  I didn't handle any

24  of that.  Mr. Osenkarski handled that.

25      Q.      Okay.  Did you receive a weapon as part of your


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        60


1  duties as a probation officer?

2       A.      No, I did not, and never have.

3       Q.      Do you have a personal weapon, sir?

4       A.      In what regard?  A gun?

5       Q.      Do you own a gun?

6       A.      Yes.

7       Q.      How many guns do you own?

8       A.      Three or four.  A couple rifles, a couple

9  shotguns.

10      Q.      Okay.  You own anything that I would consider a

11  handgun, that someone would consider a handgun?

12      A.      Sure.

13      Q.      How many of those do you have?

14      A.      Four, three or four.

15      Q.      Did you ever use any of them as part of your

16  duties and responsibilities as a probation officer?

17    A.    I never carried a weapon on the job whatsoever.

18    Q.    Did you ever have one in your car?

19    A.    No.

20    Q.    There were no occasions when you had a weapon in

21    your vehicle when you were doing probation officer work?

22    A.    No.  The only time I would have had a weapon in

23    my vehicle would have been going maybe to a training that was

24    arranged by Joe and the Carlisle Police to go out and have a

25    qualification shoot.  That's the only time a weapon would be


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          61


1    in my car.  I never had a gun in my car during supervisions.

2    Q.    So if Ms. Varner says she saw a gun in your glove

3    compartment, that's a lie?

4    A.    Absolutely.

5    Q.    And if someone else said they saw a weapon in

6    your glove compartment, that's a lie as well?

7    A.    Absolutely.

8    Q.    Now, were you required to have weapons training

9    as a probation officer?

10    A.    It was an elective.  People that wanted to have,

11    wanted it, were able to participate in it as part of their

12    training, if they chose.

13    Q.    Did you elect to do that?

14      A.      I did for a couple years.

15      Q.      Are you certified in weapons of any kind?

16      A.      Not at all.

17      Q.      Is there a certification program that you could

18  be eligible for?

19      A.      Absolutely, yes.

20      Q.      But you've chosen not to do that?

21      A.      I've chosen not to do that.

22      Q.      Is there any requirement that you show any

23  proficiency in the use of a weapon in your position as a

24  probation officer?

25      A.      No.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        62


1       Q.      Is there any requirement that you show

2   proficiency in the use of a weapon for any of the duties

3   related to your employment as a probation officer?

4       A.      No.

5       Q.      Are you licensed to carry a handgun?

6               MR. MacMAIN:  Licensed unrelated to work --

7               THE WITNESS:  Licensed related to work?

8               MR. MacMAIN:  -- I think your question is.

9   BY MS. WALLET:

10      Q.      My question is:  Are you licensed to carry a

11  handgun?

12        A.      Now?  No.

13        Q.      At any time since 1990?

14        A.      I think I had a license to carry a handgun from

15    the Sheriff's Department.

16        Q.      What kind of license was it?

17        A.      Typical five-year protection permit or whatever

18    they used to call it, I don't know.

19        Q.      And when do you think you had such a permit?

20        A.      I had it for five years, so I don't know when it

21    was renewed.  You could get those records from the Sheriff's

22    Department.

23        Q.      So you're not sure when you had a permit?

24        A.      Probably the last five years, the previous five

25    years, and probably the previous 10 years.  I think I renewed


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    63


1    it once.

2        Q.      But you don't have it now?

3        A.      No.

4        Q.      And why don't you have it now?

5        A.      I didn't reapply.

6        Q.      And do you remember when it was that you would

7    have come up for reapplication?

8        A.      Last year sometime.

9        Q.      Was there a reason why you didn't reapply?

10        A.      I have no interest in carrying a handgun.

11        Q.      Why do you own three or four of them?

12        A.      I'm a hunter.  I'm a -- that's why I own them.

13        Q.      You're just a gun guy?

14        A.      Well, I'm a hunter.

15        Q.      Okay.

16                MR. MacMAIN:  Are we going to go on to a

17    different area?  A short break?

18                MS. WALLET:  Yes, that's fine.  Let's take a

19    short break.

20                (Recess taken from 10:49 until 10:59 a.m.)

21    BY MS. WALLET:

22        Q.      Mr. Graham, when did you first meet Barbara

23    Varner?

24        A.      1990.

25        Q.      On what occasion did you meet her?


                     Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                     S. Gareth Graham                        64


 1        A.      Bob Holtzberger, a Cumberland County Children and

 2    Youth worker, brought her around to introduce her to the

 3    Probation staff after she was hired in Children and Youth

 4    Services.

 5        Q.      And when did you first have some supervisory

 6    relationship over Ms. Varner?

 7        A.      When I was promoted to supervisor.

8        Q.      Did you play any role in the hiring of Ms. Varner

9     in the Probation office?

10       A.      I talked to Joe that I had worked companion cases

11    with Mrs. Varner and I thought that she handled them well.

12    And I conveyed that to Joe and Ken Bolze when we were looking

13    for applicants for the -- we had a Family Preservation grant

14    and we had three positions available.

15       Q.      Did you recommend her for one of those positions?

16       A.      No.

17       Q.      Now, prior to her coming to the Probation staff,

18    how much association did you have with Ms. Varner?

19       A.      Extensive.

20       Q.      Would you describe what would cause you to be

21    associated with her?

22       A.      In a work environment or a personal environment?

23       Q.      Either.  Let's start with work.

24       A.      I worked companion cases with her.  Am I allowed

25    to say the names or are we going to -- is the record still


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    65


1     sealed in that regard?

2        Q.      I don't think it's necessary that we know the

3     names.

4        A.      Okay.

5        Q.      When you say companion cases, what do you mean?

6     A.     She had the dependency needs of the family and I

7    happened to have either the adult criminal charges or the

8    delinquency end of the case.

9     Q.     Okay.  And would that cause you to go on trips of

10   any sort prior to her coming to the Probation office?

11    A.     Prior to her coming to the Probation office?  No.

12   Well, yes, I'm sorry.  I want to correct myself on it.  Yes.

13   Because she would ask my assistance to go to places that she

14   felt threatened, and she would call me and I would make

15   arrangements to do that with her.

16    Q.     Did you work with any other individual in the

17   Children and Youth staff with regard to companion cases?

18    A.     Lots of staff, yeah.

19    Q.     Okay.  Female staff?

20    A.     Yes.

21    Q.     Any male staff in Children and Youth that you

22   worked with?

23    A.     Bob Holtzberger I worked with.  Arley Phillips, I

24   had worked with.  I don't know how many men they had there.

25    Q.     Now, you said that you had an association with

1    her personally.

2     A.     Yes.

3    Q.    When did you first have what you would consider

4    to be a personal relationship with her?

5    A.    Around 1990.

6    Q.    What happened in 1990?

7    A.    Well, we had shared companion cases.  We had a

8    case where we had gone to this dependent family and I had put

9    a -- the crib had no slat in it, so -- or the side slats in

10   the crib, one was missing, and I figured that the child could

11   choke.  Ms. Varner testified that they were extremely I think

12   retarded, the girl, the female side of that.  And so what I

13   did is I went home and made a slat and took it back and put

14   it in on another occasion with her.

15         She admired that.  And at that juncture we then

16   began a personal relationship.

17   Q.    Describe for me that personal relationship.

18   A.    She would call my office.  She would make

19   arrangements with her schedule and my schedule to meet in the

20   coffee room.  We talked about our mutual admiration for one

21   another.

22         The first occasion that I met with her and we

23   became intimate was when we drove to Ft. Hunter.  That would

24   have been '90, '91, '92.  She parked her car at the Zembo

25   Shrine parking lot.  She crawled in with my car, crawled into

1     my car.  We drove up to Ft. Hunter, parked along the river.

2     We discussed our mutual admiration and feelings for one

3     another.  We spent about an hour there talking.  She had

4     introduced to me that she had been just through a divorce.  I

5     think she had stated she was living with this other man, Lee

6     Varner, and she was confused as to, you know, why she had

7     feelings for me.

8          Q.     Now, is there any work reason for her to meet you

9     at Ft. Hunter?

10         A.     None.

11         Q.     And who initiated this contact, you or Ms.

12    Varner?

13         A.     I think she did.

14         Q.     And how did she do that?

15         A.     Calling me, said, do you want to spend lunch

16    together.

17         Q.     Was this on your lunch hour?

18         A.     No.

19         Q.     So she said, do you want to spend lunch with me,

20    but you went to Ft. Hunter not on the lunch hour?

21         A.     That's correct.

22         Q.     Did you spend lunch with her after she invited

23    you to do that?

24         A.     No.  We went up and we talked about our

25    admiration for one another.  And she was telling me the

S. Gareth Graham                                    68

1    complications that that presented, because she had been I

2    guess with this Mr. Varner, newly with this Mr. Varner for

3    maybe a year, year and a half, and said that she had feelings

4    for me.

5        Q.      Had you said that you had feelings for her before

6    she said this to you?

7        A.      We both mutually talked about our admiration for

8    one another.

9        Q.      When you say admiration, what do you mean?

10       A.      Interest.  Sexual interest.

11       Q.      What did she say that led you to believe that she

12   had a sexual interest in you?

13       A.      What did she say?  She said that she had feelings

14   for me.  And she thought, like on this occasion, that that

15   was such a nice thing to do for this family, and she's never

16   been around that type of kindness.

17               And we didn't engage one another physically at

18   Ft. Hunter, but when we went back to her car --

19       Q.      What time of day was this?

20       A.      It was lunch, over the lunch hour.  So it would

21   have been 12:00, 1:30, something like that.

22       Q.      Was this a workday?

23       A.      I don't remember.

24       Q.      Were you in your personal car?

25       A.      I was, and she was.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    69


1     Q.     And you spent how long at Ft. Hunter?

2     A.     An hour and a half.  An hour.

3     Q.     So you were gone from work at least two hours?

4     A.     Probably.

5     Q.     Do you think you took leave for this time?

6     A.     Sure.

7     Q.     Some kind of vacation leave?

8     A.     I don't remember -- I don't remember if it was

9     exactly a workday or it wasn't a workday.  I told you that

10    before.  I don't know.  I don't remember that.  But it could

11    have been a workday.  We would have taken our lunch hour to

12    have this conversation, if it happened to be a workday.

13    Q.     Who decided that you were going to meet at the

14    Zembo parking lot?

15    A.     She did.  Or she asked me where -- no.  I decided

16    to park her car there.  But she asked me where she could meet

17    me, and I said there's the Zembo parking lot there.  And then

18    she said, well, let's drive up to Ft. Hunter.

19    Q.     So initially you were going to meet at the Zembo

20    parking lot and you were going to go to lunch?

21    A.     I think, yes.

22    Q.     Where were you going to go to lunch?

23    A.     I don't know.  We were just going to find lunch

24    together.

25       Q.      Okay.  Now, how far is it from the Zembo parking


                          Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        70


 1   lot to Ft. Hunter?

 2       A.      Four or five miles.

 3       Q.      Who decided to go to Ft. Hunter, you or she?

 4       A.      I had testified it was her decision to go to

 5   Ft. Hunter where we could get a place to talk with one

 6   another about her --

 7       Q.      So you went, you drove?

 8       A.      I drove.

 9       Q.      She's in the car?

10       A.      She climbed in my car.

11       Q.      No one else is there?

12       A.      No one.

13       Q.      Anyone see you at Ft. Hunter?

14       A.      No.

15       Q.      Did you spend the entire time in your vehicle?

16       A.      Yes.

17       Q.      You didn't get out and walk around?

18       A.      No.

19       Q.      Okay.  And you said that you were intimate with

20   her on this occasion?

21       A.      She -- I was not intimate with her on that

22   occasion until I had dropped her off at her car, and she

23    leaned over and kissed me.

24        Q.    Okay.  Did you discuss having a sexual

25    relationship at that time?

S. Gareth Graham                            71


 1        A.    That was the first time she kissed me.  I don't

 2    know what that meant.  I mean, no, we didn't discuss, you

 3    know, where we were going with this.

 4        Q.    Did you object to the kiss?

 5        A.    No.  I was flattered by it.

 6        Q.    Okay.  And was that the end of --

 7        A.    That was it.

 8        Q.    -- that incident?

 9        A.    Um-hum.

10        Q.    Did you ever eat lunch?

11        A.    No.

12        Q.    When was the next time that you had what you

13    considered to be a personal meeting with Ms. Varner?

14        A.    It probably started at least twice a month after

15    that.  We would get together in the coffee room at work and

16    then we would talk about spending some time together and we

17    would determine where that time would be, and then we would

18    go to meet each other.  And that occurred from 1990 to around

19    '92.

20        Q.    And how often do you believe you saw Ms. Varner

21   for reasons other than work between 1990 and 1992?

22        A.     Probably once or twice a month.  Maybe every two

23   weeks, as a guesstimate.  I'm not exactly accurate.  I would

24   meet with her.  She would call me at the Probation office

25   from the Children and Youth Department she was in, and I

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                72

1    would call her.

2         Q.     Okay.  So approximately 20 to 50 times between

3    '90 and '92?

4         A.     Yes.

5         Q.     Were these during work hours or after work hours?

6         A.     Both.

7         Q.     Okay.  Tell me how many times you think you met

8    during work hours.

9         A.     I would say the same type of estimation, maybe

10   once or twice a month.

11        Q.     And would you initiate this or would she initiate

12   it?

13        A.     It occurred both ways.

14        Q.     Was it primarily during the lunch hour or regular

15   working hours?

16        A.     It was, I would say it was primarily over lunch

17   breaks, if you want a definition of how to do that.  I mean,

18   and then she would call me regarding any cases that she had,

19    like, in the Newville area or any cases I would have in the

20    Newville area, we might go up there, you know, supervising

21    independently and then hook up up there somewhere in

22    Newville, somewhere in New Cumberland.

23           After the relationship progressed -- I'll let you

24    ask the questions, I'm sorry.

25           Q.    Good idea, Mr. Graham.  Between '98 and '92 you


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        73


 1    had no supervisory relationship over Ms. Varner; is that

 2    correct?

 3           A.    No.  She was an employee at Children and Youth

 4    and I was an employee of the Probation Department.

 5           Q.    The only reason that you would have to meet from

 6    a work standpoint would be these companion cases that you

 7    mentioned to me?

 8           A.    Yes, ma'am.

 9           Q.    And it's your testimony that she initiated this

10    personal relationship?

11           A.    No.  It was a mutual admiration of one another.

12           Q.    I see.  But she made the first call to say:  Meet

13    me at lunch?

14           A.    No.  I didn't -- I don't know who made the first

15    call to say meet me at lunch.  I said I don't know who made

16    the first call in 1990, I'm sorry.

17      Q.      Were you sexually attracted to her at that time?

18      A.      Yes, I was.

19      Q.      You were married at that time?

20      A.      Yes, I was.

21      Q.      How long had you been married?

22      A.      20 years.

23      Q.      When were you married?

24      A.      August 14th of '82.

25      Q.      You're presently married?


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                          74


1       A.      Yes.

2       Q.      Still living with your wife?

3       A.      Yes.

4       Q.      Two children?

5       A.      Two girls.

6       Q.      Any other marriages?

7       A.      No.

8       Q.      Have you been unfaithful to your wife with anyone

9       other than Ms. Varner?

10      A.      No, ma'am.

11      Q.      Have you had any sexual relationship with any

12      other woman during your marriage?

13      A.      No.

14      Q.      So Ms. Varner was the only one?

15      A.      Yes, ma'am.

16      Q.      And you're not sure whether she initiated it or

17   you initiated it?

18              MR. MacMAIN:  It's been asked and answered

19   several times, I believe.  You want him to answer it again?

20              MS. WALLET:  Sure.

21              THE WITNESS:  Who initiated the initial meeting?

22   I don't know.

23   BY MS. WALLET:

24      Q.      When did you first have sex with Barbara Varner?

25      A.      Valentine's Day of '92.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          75


1       Q.      Obviously, you remember that pretty well.  What

2    happened on that day?

3       A.      We met in New Cumberland.  She parked her car at

4    the Giant parking lot.  I think we met for lunch at Coakley's

5    restaurant on Bridge Street in New Cumberland.  We had lunch.

6    We went down to a remote area of Goldsboro, which is along

7    the railroad tracks right beside the river in view of the --

8    and we engaged in sex in my vehicle.

9       Q.      Sexual intercourse?

10      A.      Sexual intercourse.

11      Q.      Describe for me what you did on that occasion.

12      A.      What I did?  I pulled my car in a remote area

13  along the railroad tracks.

14      Q.      What vehicle did you have?

15      A.      A Jeep Grand Wagoneer at the time.  And we began

16  by petting one another and got into the foreplay, and we

17  consummated the act of intercourse in my vehicle.

18      Q.      In the front seat or the back seat?

19      A.      In the front seat.

20      Q.      Was it a bench seat or split seats?

21      A.      Back then it was a, I think it was a bench seat.

22  Wait.  I'm not sure.  No, it was split seats.

23      Q.      Were you naked?

24      A.      From my waist down, I was.

25      Q.      Was she naked?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          76


1       A.      No.  From her waist down, she was.  She had wore

2   a dress.  And she climbed over onto me.

3       Q.      She initiated the sexual encounter?

4       A.      No.  Both of us did.

5       Q.      How long did this encounter last?

6       A.      Probably less than five minutes.

7       Q.      Was it during the day or after work?

8       A.      During the day.

9       Q.      Do you know what time of day?

10      A.      Afternoon, probably after lunch, probably 1:30.

11      Q.      Were you on the clock?

12      A.      I can't recall.  I don't think we were.

13      Q.      You think you took leave?

14      A.      We were allowed a lunch break and we were I think

15  engaging in our activity -- I think I took leave, yes, ma'am.

16      Q.      So you met her somewhere between 20 and 50 times

17  in the early '90s before you actually had sex with her on

18  Valentine's day in 1992?

19      A.      I met her in '90 and the first conception of

20  sexual intercourse was in about two years later.  Prior to

21  that on these meetings we would engage in kissing and

22  fondling one another in my vehicle, sometimes in her vehicle.

23      Q.      To the best of your knowledge, did anyone see

24  this activity?

25      A.      No.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          77


1      Q.      To the best of your recollection, did most of

2  these take place during the day or after work?

3      A.      Basically in the, like, afternoon hours.

4      Q.      So at four, five o'clock?

5      A.      Yes.

6      Q.      And you believe you took leave for this time?

7      A.      Yes.

8      Q.    So your leave for that period of time would show

9    a number of leave slips for the afternoon hours?

10     A.    Not for the afternoon hours.  For lunch hours.

11   For the lunch hours.

12     Q.    You don't have to take leave for lunch, do you?

13     A.    We count our time by increments of seven and a

14   half hours a day, you know.  And then we have a compensatory

15   time that you have the opportunity to take leave at your

16   discretion.

17           MR. MacMAIN:  I think what she's asking you, did

18   you fill out a leave slip or was there anything, was there

19   any paperwork documenting --

20           THE WITNESS:  No.

21   BY MS. WALLET:

22     Q.    What were your regular hours of work in the early

23   '90s?

24     A.    8:00 to 4:30.

25     Q.    Did you have any requirement to sign in or out?


                    Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        78


1      A.    There was a sign-in tablet, um-hum.

2      Q.    And how did you submit your hours to be paid

3    during that period of time?

4      A.    Just through daily report of activity and through

5    a -- later it became, there was a, I don't know what you call

6   the document, a time sheet.  They call it a time sheet.  I

7   guess that's the proper.

8       Q.      So these times that you met Ms. Varner in the

9   afternoon, would you indicate that there were periods of time

10  in the afternoon where you were not working?

11      A.      Yes.

12      Q.      And then would you make it up at the end of the

13  day, or how did this work?

14      A.      Made it up at the end of the week.  You had to

15  have your, you know, your time in by the end of the week.

16  You were allowed back then, you know, unlimited amounts of

17  compensatory time, because we had -- we tried to hold down

18  the overtime.  So the job required a lot of extra amounts of

19  time when you develop these cases.

20      Q.      To the best of your recollection, sir, did you

21  charge the county for any of the time that you spent in your

22  personal relationship with Ms. Varner?

23      A.      Never.

24      Q.      Did she, to the best of your knowledge?

25      A.      I don't know what she did.


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        79


1       Q.      After Ft. Hunter, do you remember what your next

2   contact was with Ms. Varner?

3       A.      Well, we just had -- after Ft. Hunter, well, no,

4    I don't remember the exact next -- no, not specifically.

5        Q.    You don't remember whether it was lunch, whether

6    it was a meeting?

7        A.    It was always lunch, and then it was usually

8    taking off in the afternoons.

9        Q.    When did you first have sex with Ms. Varner after

10   work?

11       A.    I'm not sure.  That would have to depend on --

12   I'm not sure.  I don't know.

13       Q.    Well, do you recall any time that you had sex

14   with her after normal working hours?

15       A.    The only times were when her husband was away

16   from the home and she would call and invite me to her home.

17       Q.    And how many times did she call you and invite

18   you to her home?

19       A.    Usually every time her husband went away.

20       Q.    Are we talking about once a month, twice a month?

21       A.    She testified yesterday he took what, four or

22   five trips a year.

23       Q.    So every time he went, she would call you and you

24   would meet for sex?

25       A.    She would call me and invite me to her home

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        80

1    saying -- and she would give me her husband's travel

2    schedule.

3            She would also take him to the airport and drive

4    him to the airport so he had an accountability of where his

5    car was at and no access to come back to the home.

6        Q.    And she told you this?

7        A.    Yes, she did.  She did this.

8        Q.    Where did Mr. Varner take trips to?

9        A.    He was employed at AMP at the time, and I think

10    he went out to San Diego.  He took some trips with her, but

11    he also took the majority, I guess, of the trips on his own.

12    That's what she was telling me.

13        Q.    Where did you remember that she told you that he

14    was on trips, what locations?  San Diego?

15        A.    Different.  San Diego.  Cincinnati, Ohio.

16    Different places.

17        Q.    Any others that you remember?

18        A.    I didn't pertain -- I don't remember exactly

19    where he went, no.

20        Q.    Did you use birth control during this sexual

21    encounter?

22        A.    The very first encounter back in February 14th of

23    that Valentine's Day, I used a condom.  After that, she had

24    purchased as I understand some vaginal gel.

25        Q.    So when you went to meet her on Valentine's Day

1   in '92 you had a condom with you?

2        A.    Yes, I did.

3        Q.    Did you have a condom with you because you

4   believed you were going to have sex with her on that

5   occasion?

6        A.    Yes.

7        Q.    Do you use birth control with your wife?

8        A.    You mean is she on the pill?

9        Q.    I'm asking you, do you use birth control when you

10  have sex with your wife?

11       A.    In what form?  I mean, I don't understand.

12       Q.    What part of that question don't you understand,

13  Mr. Graham?

14       A.    Do I use birth control with my wife?  My wife was

15  on birth control pills.

16       Q.    Anything else?

17            MR. MacMAIN:  Anything else what?  Any other

18  birth control beside pills?

19            MS. WALLET:  Correct.

20  BY MS. WALLET:

21       Q.    Any other birth control beside pills?

22       A.    She's not currently on birth control pills.  I

23  mean, it's a multi-level question.

24       Q.    Well, let me ask you this.  Were you having sex

25  with your wife at the same time as you were having sex with

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          82

1    Ms. Varner?

2        A.    Yes, I was.

3        Q.    And during those occasions, same time period,

4    were you using birth control when you had sex with your wife?

5        A.    Yes.

6        Q.    And it was her on the pill?

7        A.    Yes.

8        Q.    No others?

9        A.    No others.

10       Q.    So when you bought condoms, you bought them

11   specifically to have sex with Ms. Varner?

12       A.    I only used the condom one time with Ms. Varner.

13   After that, she went and purchased some vaginal birth control

14   preventative gel.

15       Q.    Were you concerned about conceiving a child

16   during this period?

17       A.    Absolutely.

18       Q.    And what steps did you take to make sure that you

19   did not conceive a child with Ms. Varner?

20       A.    I would always ejaculate outside of her.

21       Q.    I'm sorry, Mr. Graham, I have to ask you these

22   questions, but how did you do that?

23       A.    I would exit her at the time I was ready to

24   ejaculate.

25        Q.        And did you believe that might be an effective


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    83


1    birth control method?

2        A.        Yes, I did.

3        Q.        Sir, would you consider yourself to be sexually

4    experienced?

5                  MR. MacMAIN:  Can you define what you mean by

6    sexually experienced?

7    BY MS. WALLET:

8        Q.        Did you have sex before you married your wife?

9        A.        Yes, ma'am.

10       Q.        With how many people did you have sex prior to

11   your marriage?

12       A.        I don't know.

13       Q.        Well, five, more than five, more than 10?

14       A.        Probably five.

15       Q.        And when, at what date did you lose your

16   virginity?

17       A.        11th grade.  I graduated in '71, so that would

18   have been 1970.  1970.

19       Q.        And was this an older or a younger woman?

20       A.        She was a year younger than me.  She was my high

21   school sweetheart.

22       Q.        And did you have sex with her on more than one

23    occasion?

24        A.      Yes.

25        Q.      Did that continue through school?

1        A.      Yes.

2        Q.      Did you have other sexual encounters while you

3    were in high school?

4        A.      No.

5        Q.      Let's talk about your educational background, I

6    think we missed that.

7        A.      Okay.

8        Q.      Graduated from what high school?

9        A.      Big Spring High School, 1971.

10        Q.      Go immediately to college?

11        A.      I went to HACC for two years between '72 and '73.

12        Q.      Okay.

13        A.      Went to York College from '73 and graduated from

14    in '75.  Attended Shippensburg University I think back in the

15    early '80s for human -- just for a couple classes towards my

16    master's degree, but I never finished.

17        Q.      You hold a bachelor's degree?

18        A.      Yes.

19        Q.      What's that degree in?

20        A.      Criminal justice.

21     Q.     And that's from York College?

22     A.     Yes.

23     Q.     Do you hold any other advanced degrees?

24     A.     No.

25     Q.     You do not hold a master's; you took some classes


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                85


1     toward it?

2     A.     I took two summer classes, one in statistics and

3     one in theories of personality.  And I had no -- and I just

4     didn't develop an interest.  I think I got married right

5     after that, that was in '81, and I started building a house.

6     And I lost interest in it.

7     Q.     Now, these four, five people or more that you had

8     sex with before you got married, were they in primarily

9     college?

10     A.     Yes.

11     Q.     Other than your high school sweetheart?

12     A.     Well, I kept my high school sweetheart through

13     three years of college, too, so.  You're asking me, so.  I

14     don't know.

15     Q.     Were you shocked when Ms. Varner suggested to you

16     that you have a sexual relationship?

17             MR. THOMAS:  Objection to the form.

18                    THE WITNESS:  Was I shocked?  She had described

19   our relationship as a mature adult relationship.

20   BY MS. WALLET:

21        Q.      In what context did that come up?

22        A.      In the context of the infidelity that we were

23   committing.

24        Q.      Was she married at the time?

25        A.      She wasn't married to Lee Varner at the time.


                         Emily R. Clark, RMR
                 717-233-1744, emily.clark@worldnet.att.net

                         S. Gareth Graham                        86


 1   She was living with him at a Weatherburn address in New

 2   Cumberland, a townhouse.

 3        Q.      Okay.  So she had already initiated the

 4   relationship with Mr. Varner at the time that you began to

 5   have sex with her?

 6        A.      She had been -- from what she had told me, she

 7   had been through a divorce, met Mr. Varner at HACC while she

 8   was going to school there.  Yesterday was the first time I

 9   ever heard this her during her testimony, that she resided

10   with Mr. Varner in Harrisburg on this Sussex Street or

11   whatever she said.  I wasn't aware of that.  And -- but I was

12   aware that he lived with her in her townhouse apartment.  And

13   I think she, what she told me is she bought that house, that

14   townhouse, with the money she got from her divorce

15   settlement.  And he was living with her at the time at that

16    Weatherburn address.

17    Q.    Did you ever brag to people at work that you

18    wanted to do sexual things to Barbara Varner?

19    A.    In what respect?

20    Q.    Well, what part of that don't you understand?

21    Did you ever tell somebody at work you wanted to do something

22    sexual with Barbara Varner?

23    A.    Yes.

24    Q.    Who did you tell?

25    A.    Probably Mark Galbraith.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                87


1    Q.    Did you tell Mr. Osenkarski that you were

2    interested in having sex with her?

3    A.    No.

4    Q.    Did you tell Mr. Osenkarski that you were,

5    indeed, having sex with her?

6    A.    Never.

7    Q.    Did you tell anybody at work that you were having

8    sex with Ms. Varner?

9    A.    No.

10    Q.    I'm assuming now until you made this revelation

11    in July of '97 to Judge Sheely, correct?

12            MR. THOMAS:  Objection to the form.

13            MS. WALLET:  Sorry?

14          MR. THOMAS:  Objection to the form.  He can

15   answer.

16          THE WITNESS:  Not -- I didn't tell anyone about

17   our relationship.

18   BY MS. WALLET:

19       Q.    Let me withdraw that.  Let's make it clear.

20       A.    Okay.

21       Q.    Who was the first person at work that you told

22   that you were having a sexual relationship with Ms. Varner?

23       A.    Judge Sheely.

24       Q.    And you did that on the 9th or 10th of July of

25   1997?


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        88


1        A.    Yes.

2        Q.    Now, did you ever tell Mr. Deluce or anyone else

3    who was investigating the allegations that Ms. Varner had

4    made against you, that you had a sexual relationship with her

5    prior to your telling Judge Sheely?

6        A.    That question didn't come up.

7        Q.    So because nobody said, are you having sex with

8    Barbara Varner, you didn't think that it was important to

9    tell them?

10          MR. MacMAIN:  Objection to the form.

11   BY MS. WALLET:

12        Q.        You have to answer the question, sir.

13        A.        Repeat it again?  I'm sorry.

14                  MR. MacMAIN:  Her question was, I think it's

15      already been asked and answered, is:  Did you tell anybody at

16      work that you were having sex with Barbara Varner before you

17      told Judge Sheely?

18                  MS. WALLET:  No, that wasn't my question.

19      BY MS. WALLET:

20        Q.        My question was -- your answer was you didn't

21      tell anyone because it didn't come up.

22        A.        No.

23        Q.        My question was:  Did you expect someone to ask

24      you:  Are you having sex with Barbara Varner?

25        A.        You asked me about David Deluce.  You didn't ask


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        89


1      me about anyone else at work.  Your general -- I mean, that's

2      a generalized statement you made.  You asked me about David

3      Deluce, Ms. Wallet.

4        Q.        My question --

5        A.        I said David Deluce did not bring that subject up

6      when he interviewed me.

7        Q.        And you didn't bring it up, either?

8        A.        Absolutely.

9        Q.        Because you didn't think it was important at that

10    time?

11        A.        Not because I didn't see it was important, I

12    saw --

13                MR. THOMAS:  Objection.

14                THE WITNESS:  I saw that they had called down a

15    series of people that didn't like me and started this

16    interviewing process.  And I could see that I had no friend

17    in the room when he started his interview of me in regard to

18    this situation.

19                And then when I provided him with a list of all

20    the trips and things and somewhat of a defense to some of the

21    questions he asked, he went back to her, David Deluce went

22    back to her and then I saw that the county was sharing the

23    information I confidentially gave them and then preparing a

24    defense against me.

25                So I didn't share anything with him.  Wouldn't


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        90


1    give him a copy of anything.  I wouldn't give Mr. Thomas or

2    anybody a copy of anything, you know, even when this matter

3    came up.  I wasn't going to share my personal life with those

4    people that were out head-hunting for my head.

5    BY MS. WALLET:

6        Q.        Okay.  So you did tell somebody at work that you

7    wanted to have sex with Ms. Varner, correct?

8       A.      That was a -- yes.  And that was mostly because

9    it was a disguise, because they had seen that her and I had

10   so much contact together.  We had, you know, we would be seen

11   in the coffee room.  The rumor mill at the office was that we

12   were having some type of an affair, so would I would try to

13   diffuse that or deflect that by saying that I was interested

14   in having, when I was already involved with her.  But I would

15   go around and say that I was interested in having some type

16   of affair, trying to divert that rumor and act like I hadn't

17   been having an affair with her.

18       Q.      So you were telling people at work, at least one

19   person, I'd really like to have sex with Barbara Varner,

20   when, in fact, you were having sex with Barbara Varner but

21   you were saying this to disguise that fact?

22       A.      Absolutely.  That's accurate.

23       Q.      I see.  Who else at work did you tell that you

24   were interested in having sex with Barbara Varner?

25       A.      I can't recall.



                     Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                     S. Gareth Graham                        91


1       Q.      Do you believe there was no one else except for

2    the name you mentioned?

3       A.      Do I believe there was no one else?  I might have

4    said something, you know, in passing, giving her compliments

5    and saying, you know, I'd like to be involved with her.

6       Q.      Did you say anything specific about what you

7    wanted to do to her in a sexual way?

8       A.      No.

9       Q.      You just said:  I want to have sex with her?

10      A.      I think I said she was an attractive woman and I

11   was interested in her.

12      Q.      And you didn't tell Mr. Deluce anything about

13   that interest or your statements --

14      A.      Why would I tell him when he didn't ask me the

15   question?

16              MR. MacMAIN:  Gary, listen to her question.  She

17   had asked you before if you told Mr. Deluce.  You said no.

18   And she's asking you again if you told Mr. Deluce.

19              MS. WALLET:  No, I'm asking a different question

20   but you interrupted me, sir.

21              THE WITNESS:  I'm sorry.

22   BY MS. WALLET:

23      Q.      Did you tell Mr. Deluce that you had, indeed,

24   indicated to someone at work that you might be interested in

25   having sex with Ms. Varner?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        92


1       A.      No.  That didn't even come up.

2       Q.      So he didn't ask you that?

3       A.      That's what I said earlier.

4      Q.      So you didn't bring anything up?

5      A.      I didn't bring a thing up.

6      Q.      The only thing you did was answer his specific

7    questions?

8      A.      Right.

9      Q.      And he asked you did you sexually harass

10   Ms. Varner, correct?

11     A.      Yes.

12     Q.      And did he ask you whether you had had any

13   contact with Ms. Varner?

14     A.      No.

15     Q.      Did he ask you if you touched her?

16     A.      No.

17     Q.      The only question he asked was did you sexually

18   harass her, and you said no?

19     A.      That's right.

20             There was two meetings with Deluce.  The first

21   meeting he only asked a minimal amount of questions.  Did

22   you, you know, discriminate against her with seniority, did

23   you deny her access to the DUI school, did you -- I mean, I

24   can think of some of these as we go through but I can't

25   remember back to that specific date all specific questions.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    93


1    Did you deny her access to gun training, did you sexually,

2    you know, harass her.  No.  No.  No, no, no.  That's all I

3    answered.

4        Q.    And then the second meeting which you

5    initiated --

6        A.    I went down --

7        Q.     -- you could tell him whatever you wanted,

8    correct?

9        A.    That's correct.

10       Q.    But you didn't tell him then, either?

11       A.    No, I didn't.  Because I had --

12       Q.    I'm sorry?

13       A.     I hadn't told my wife, I hadn't told anybody, so,

14   at the juncture that he was interviewing me.  That was April

15   29th of I think '97.

16       Q.    So in April of '97 you hadn't told anyone that

17   you were having sex with Ms. Varner?

18       A.    No one.

19       Q.    Did you tell your friend Charlie Mallios?

20       A.    No one.

21       Q.    Did you ever tell your friend Charlie Mallios?

22       A.    No, not till after this thing came out.

23       Q.    Okay.  Did he know it when he went with you to

24   the EEOC?

25       A.    No.

1       Q.      How much later did you wait to tell Mr. Mallios?

2       A.      I don't remember that.

3       Q.      Well, do you remember whether, in fact, you told

4    him?

5       A.      Yes, I told him.

6       Q.      And do you remember whether you initiated the

7    conversation in which you said:  I need to tell you

8    something?

9       A.      Yes, I did.

10      Q.      What did you tell him?

11      A.      I told him that I had an affair with her.

12      Q.      Did you tell him anything else?

13      A.      No.

14      Q.      Did you tell him specifically you had sex with

15   her?

16      A.      Sure.

17      Q.      Have you seen Ms. Varner naked?

18      A.      Yes.

19      Q.      Totally naked?

20      A.      Yes.

21      Q.      On what occasions?

22      A.      Different occasions.  I mean, she rented a room,

23   oh, man, at the Fairfield Inn.

24      Q.      When was that, sir?

25      A.      I'm not --

1          MR. MacMAIN:  If you don't know the date --

2          THE WITNESS:  Somewhere in May of '93.  Maybe the

3     23rd or 26th of May, I'm not sure.  Something like that.

4     26th of May.  She rented a room.

5     BY MS. WALLET:

6          Q.    She rented the room?

7          A.    Yeah.  We had got together, wanted to have more

8     time together other than activities that were in our car or

9     in her home or at my house.

10         Q.    So prior to the Fairfield Inn, you had had sex

11    with her in the car, in her house, and --

12         A.    In my home.

13         Q.    -- at other locations?

14         A.    In my home, um-hum, three times.  Twice in the

15    house and once in the garage.

16         Q.    When you say house and garage, are you talking

17    about her home or your home?

18         A.    My home.  My home, two times in the house, one in

19    the back room, one in the living room, and one in the garage.

20         Q.    Okay.

21         A.    And at her home.

22         Q.    Let's go back to the Fairfield Inn and then we'll

23    move to the others.

24         A.    Okay.

25         Q.    So tell me what happened on the occasion that you

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    96

1    had sex with Ms. Varner at the Fairfield Inn.

2        A.      She rented a room with her credit card under her

3    previous married name, Barb Spidle.  She paid for the room

4    with her credit card.  And we went down to, I think it was

5    room 106.  It was on the end of the Fairfield Inn.  And I met

6    her after work around three o'clock.  I took off early.  I

7    went to the West Shore Diner, purchased some club sandwiches,

8    brought a bottle of Amaretto.  We went into the room, we had

9    oral and vaginal sex till about from 3:00 till I think 6:30

10   that night.  I had to teach DUI school at Trinity, so I left.

11            She signed the registration card there at the

12   Fairfield Inn.  And I tried to retain, you know, I tried to

13   receive that card, and that company is -- it was Sage

14   Industries and it was associated with the Marriott at the

15   time.  And I went down later to that Fairfield Inn and tried

16   to get a copy of her receipt and a copy of the registration

17   form she signed.  And I talked --

18       Q.      And when did you do that, sir?

19       A.      That was a couple years when she -- that was

20   after she started this sexual harassment complaint.

21       Q.      So after 1997?

22       A.      Yes.  So that might have been four years later.

23   But I talked to a Daniel Hoy and a Dan Matiattose and then I

24    called an attorney for Sage Industry, Dan Queen out in

25    Colorado Springs, to try to get the receipt.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                97


1        Q.      Were you successful in getting the receipt?

2        A.      I haven't been permitted to access that because

3    it was charged on her credit card.

4        Q.      Does that mean no, you weren't successful?

5        A.      No, that doesn't mean that.  That means it can

6    still be accessible if I show cause.  But I wasn't named in

7    any lawsuit at that time because you and Mrs. Varner had

8    proceeded through the EEOC proceedings which I was prohibited

9    to try to get discovery from.

10       Q.      My question, sir, is:  Do you have in your

11   possession now any document related to a registration card or

12   any credit card information related to the Fairfield Inn

13   sexual encounter?

14       A.      I answered that.  I do not.  But that's not to

15   say that they haven't retained tape it.

16               MR. MacMAIN:  She isn't interested -- she just

17   wants to know if you had anything now.

18               THE WITNESS:  No.

19               MR. MacMAIN:  The answer was no.

20   BY MS. WALLET:

21       Q.      All right.  So you spent the afternoon at the

22    Fairfield Inn between approximately three o'clock and six

23    o'clock?

24        A.    Right.

25        Q.    Okay.  And what were Ms. Varner's sexual

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    98

1    preferences?

2        A.    To have intercourse, oral and vaginal

3    intercourse.

4        Q.    What was her preference?

5        A.    Both.

6        Q.    What was your preference?

7        A.    Both.

8        Q.    Did you ever have anal intercourse with her?

9        A.    On one occasion.

10        Q.    When was that, sir?

11        A.    I don't know the date.  It was after a DUI

12    school.  She would meet me.  And previous to that she had

13    shown me a Redbook article on anal sex as we were delivering

14    a juvenile up to State College.

15        Q.    Do you still have that article?

16        A.    No.  She showed me the article.

17        Q.    What did she say?

18        A.    She was interested in having anal sex.

19      Q.      How long was it after she showed you the article

20   that you did it?

21      A.      I don't know.

22      Q.      Months, weeks?

23      A.      I don't know.

24      Q.      Days?

25      A.      I have no idea.  I don't know the date that we

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        99

1    had it.  I know the place that we had it.  I know it was

2    after a DUI school.  It was along the road to the state

3    correctional institution, because we would meet at where she

4    used to work at the Cedar Run, yeah, Cedar Run School.  She

5    used to work there.  So when I would meet her after the DUI,

6    she would say that she would meet me at the Cedar Run Capital

7    Area Intermediate School.

8               So we met there after a DUI school and engaged in

9    anal sex along a road, right -- there's a lime quarry right

10   there, and there's a single tree right along the gates of the

11   state correctional institution, and that's exactly where it

12   happened.

13      Q.      So you just pulled right in there and had anal

14   sex?

15      A.      I met her earlier in the evening at the parking

16   lot of Capital -- or Cedar Run, and Cedar Run was right

17    beside there.  So we drove to the area, got involved in a

18    sexual encounter and then had anal sex.

19         Q.    Was it during daylight hours?

20         A.    Nighttime.

21         Q.    Middle of the night?

22         A.    It would have probably been around 9:00, 9:30 --

23    between 9:30 and 10:00.

24         Q.    And how long did that last?

25         A.    Not long.


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        100


1          Q.    A couple minutes?

2          A.    10 minutes.

3          Q.    Were you fearful of being discovered doing this

4     along the side of the road?

5          A.    Sure.  You know, we would take a remote location

6     each time.  I mean, we took those type of precautions because

7     I was aware and she was aware that you can be arrested in

8     your car for having sex.  So usually we would drive to

9     out-of-county destinations so in case we would ever get

10    interrupted we wouldn't be cited with a disorderly conduct

11    citation by a police department and that wouldn't go through

12    the Cumberland County, you know, court authorities.

13         Q.    So you thought if you got cited in another county

14    that that wouldn't get back to Cumberland County?

15        A.    Sure.  Yeah.

16        Q.    I don't understand.  Why would you do it out of

17    county?

18        A.    We would drive to out-of-county locations and

19    engage in sex during this time that we were driving around

20    together and meeting one another.

21        Q.    Is New Cumberland in Cumberland County?

22        A.    No, that's -- we would go to Goldsboro.  We would

23    park -- she would park her car.  She drove a Cabriolet and it

24    was quite a significant car because it was an aqua blue car

25    and it had a white roof on.  She was always fearful for her


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          101


1    husband to see her car somewhere, so what she would do is

2    park it at the Giant so she would have an alibi in case he

3    saw her car and tried to find her.

4        Q.    Did she tell you this?

5        A.    Sure.  She told me that, and she said if he ever

6    comes in the grocery story I'll tell him I was in the

7    bathroom.

8              And lot of times she took groceries home to cover

9    the fact that she had parked in the parking lot and had gone

10   with me for an hour and a half.  So she intentionally bought

11   groceries to take home to provide an alibi of around these

12    encounters.

13        Q.    Did you have anal intercourse with her on more

14    than occasion?

15        A.    One occasion, ma'am.

16        Q.    Just one?

17        A.    Just one.

18        Q.    You didn't like it?

19        A.    I did it at her, basically at her request,

20    because she was somewhat angry with me that I would never

21    ejaculate in her.  So she saw this as a way that I could

22    ejaculate in her butt as opposed to in her vagina.

23        Q.    She told you that?

24        A.    Yes, she did.

25        Q.    Did she like it?


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        102


1        A.    I don't know.  I mean, she was happy that I

2    fulfilled a consummation of ejaculation inside her.  That was

3    what she was wanting and that's what I did.

4        Q.    Why didn't you do it again?

5        A.    I don't know.  We just never got into that again.

6        Q.    And this occurred, this anal intercourse, one

7    occasion, near the correctional facility?

8        A.    Right on the road directly beside the state

9    correctional institution.  There's a single tree and then

10    there's a high bank, and it was in a secluded area where

11    nobody in the yard of the state correctional institution

12    could see you.

13         We would always park in a location where there

14    was a long area in front of us and a long area in back of us

15    and no -- you know, we would find a road, we would find roads

16    that had a seclusion atmosphere or environment.  And then

17    that way -- most of the time she would wear a dress.

18         She would call me up on the phone at work and she

19    would say:  I have no panties on today, I'm wearing a teddy

20    today.  And usually the days that we were going to and

21    pre-planned to have sex, she wore a dress, and then she would

22    crawl over onto my lap and we would have sex in my car.  And

23    it was a -- it's not the most flattering way to have sex but

24    we were involved with each other in those terms.

25         Q.    Your car or her car for the anal intercourse?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          103

1    A.    My car.

2    Q.    Did it generally occur in your car rather than

3    hers?

4    A.    Yes, ma'am.

5    Q.    Did you have the same car throughout this sexual

6    relationship?

7    A.    I had different cars.  I had, like, an old Jeep,

8    I don't know the year.  It was a Grand Wagoneer.  And I had a

9    Toyota car that I still drive today because I bought that in

10   1990.  So a lot of it was in my Toyota and some of it was in

11   my Jeep.

12        Q.    What cover did you use with your wife?

13        A.    What cover?

14        Q.    Yeah.

15             MR. MacMAIN:  Do you understand what she means by

16   cover?

17             THE WITNESS:  Yeah.  What in regard to, the trip,

18   like, the Atlantic City or something?  The time we went down

19   to Atlantic City?

20   BY MS. WALLET:

21        Q.    Did you tell your wife you were working at these

22   times?

23        A.    I don't think I told my wife anything.

24        Q.    I see.  You just wouldn't show up after work on

25   this occasion and --


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                    104


1         A.    Ma'am, these incidents only lasted about -- our

2    infatuation with each other would consummate the act of sex

3    and we were done within an hour most times.  It wasn't a real

4    flattering sexual type of loving relationship.  It was more

5    of an infatuation and excitement drove the moment.

6    Q.    I see.  Did you love her?

7    A.    Did I love who?

8    Q.    Ms. Varner.

9    A.    No.

10   Q.    Did you ever tell her that you loved her?

11   A.    No.

12   Q.    Did she ever tell you that she loved you?

13   A.    No.

14   Q.    It was purely for sex?

15   A.    Yes, ma'am.

16   Q.    And she used the words mature adult relationship?

17   A.    Yes.

18   Q.    And she said:  We're simply having this mature

19   adult relationship and it's not really an infidelity?

20   A.    No.  She said that she was dissatisfied with her

21   husband's performance at home, she was dissatisfied with him

22   going golfing, she was dissatisfied with him paying a country

23   club tuition, she was dissatisfied with him in his sexual

24   performance and watching X-rated movies.

25   Q.    What else did she tell you about her relationship


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    105


1    with her husband?

2    A.    That's pretty much the list.  She didn't like his

3    smoking.  She didn't like his flirting at work.  She gave me

4   the name of Blaine Budman, a guy that worked at PPG, and her

5   husband and Blaine's wife had been engaged in some, I don't

6   know, type of horseplay.  I don't think it was anything

7   sexual, but -- and she was jealous of that and told me that,

8   like, she was wanting to retaliate for those type of things,

9   how he acted.

10          She was basically resentful of his position and

11   his traveling because, you know, I mean, I guess she thought

12   she was controlled.  She had related on her first husband

13   that he was controlling.  She had come to me, she had come to

14   Joe, she had said when she was hired first in Probation that

15   she was an abused woman.  Her husband was a truck driver for

16   UPS, this Mr. Spidle, he was abusive to her, according to

17   her.  And she resented some of the things, you know, he did.

18      Q.    Okay.  Now, we're back to you didn't have to tell

19   your wife anything because it wasn't unusual for you to be

20   not at home?

21          MR. MacMAIN:  Objection.  That's not what he

22   said.  He said there was an hour period of time.

23          MR. THOMAS:  At some point, Deb, I need a break,

24   but I don't want to interrupt your line of questioning.

25          MS. WALLET:  Okay.  We'll break within a half


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    106


1   hour.  Is that acceptable?  Is that all right for you,

2    Ms. Williams?

3         (Discussion held off the record. Recess taken

4    from 12:03 until 12:11 p.m.)

5    BY MS. WALLET:

6    Q.    We were discussing whether you needed to tell

7    your wife that you were somewhere else in order to avoid

8    periods of time when you were not at home, and you said no,

9    you did not need to do that?

10    A.    I didn't discuss with my wife, you know, period

11    of time, because usually it occurred between noon at work and

12    ended before 5:00, so my wife didn't have any knowledge of

13    this whatsoever.

14    Q.    Did you have occasion to tell your wife that you

15    were somewhere other than with Ms. Varner?

16    A.    The time I went to Atlantic City on that bus trip

17    with her, I told my wife that I was going down to my sister's

18    and just taking the day off to go down there.

19    Q.    Did you tell your wife on any other occasions

20    that you were somewhere else when, in fact, you were with

21    Ms. Varner?

22    A.    No.

23    Q.    Now, at some time this sexual relationship ended,

24    correct?

25    A.    Yes.

1        Q.      When did it end?

2        A.      In State College, somewhere in October during a

3    DUI conference that she testified to yesterday.  I don't know

4    the exact date.

5        Q.      Do you know what year it was?

6        A.      Not exactly.  Maybe '96.  '97.  '97.  I'm not

7    sure.

8        Q.      And how did the sexual relationship end?

9        A.      We were on a -- we were on a commitment trip to

10   George Junior Republic.  I'm not sure of the guy's name; I

11   think it was Chauncey Shields.  We had taken a juvenile out.

12          And after I got promoted to supervisor I told

13   Mrs. Varner that this couldn't keep -- this couldn't work,

14   this couldn't keep going on.  And I watched her then

15   associate with people in the office, and there was a lot of

16   disgruntled employees because we had recently split the

17   department --

18          MR. MacMAIN:  Her question was when did it end?

19   When was it ended?

20          THE WITNESS:  That DUI conference was the last

21   sexual experience I had with her in State College at the

22   Nittany Lion Inn.  She had called my room five o'clock in the

23   morning.  I was rooming with Hank Thielemann.  He can

24   validate that she made the call.  I didn't meet her as she

25   testified yesterday in the evening.  She called me at five

1    o'clock in the morning.  Hank said to me, what's she calling

2    for.  And I said, she wants to go walking.  She wants to go,

3    you know, on a morning walk.

4            I went down to her room.  She invited me in, and

5    we had sex there.  That was the end of it.

6            During the DUI conference there was a number of

7    people, Sam Miller, Denny Drachbar, Hank, I don't know who

8    else.  Barb.  Barb had gone up early on Monday.  She

9    testified yesterday that she had a -- didn't -- the reason

10   she went up early was she had failed the CRN evaluation for

11   the Pennsylvania Drunk Driving program.  Yesterday she

12   testified that that didn't happen, but it did.  She had

13   failed the test originally for the CRN evaluator test.  So

14   she went up to retake the test the Monday before the

15   conference started on Tuesday.  And she wanted me to go up

16   early with her, and I refused, and I said, I cannot make

17   alibis to cover our activities and these guys will be

18   suspicious.

19           So I would not go up with her Monday, and she was

20   pissed at that.  So she went up, took her test.  I met with

21   her Tuesday morning.  I think that was the Tuesday morning

22   she called.  Hank will validate that she called my room or

23   our room I was sharing with Hank.  And I left and went down,

24   engaged in sex with her, and then went walking with her, to

25   cover our early-morning activities.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    109

1           She became angry at me at this conference because

2     I didn't use this conference as exclusive time with her.  She

3     felt that this was an opportunity for the two of us to have

4     extra time together that we wouldn't normally have.  And I

5     had gone out with different guys and I said, well, I'm not

6     going to just go with you out to dinner, I'm going to go with

7     the rest of the people, and she was angry at that.

8           She did leave the conference early.

9     Q.      And is it your testimony that she left early

10    because she was angry with you?

11    A.      She left early because she was angry that I

12    wouldn't spend exclusive time with her up there as opposed to

13    going out to eat with Denny Drachbar, Sam and the rest of the

14    people.

15    Q.      How many people were at this conference?

16          MR. MacMAIN:  Total?  Or from the county?

17          MS. WALLET:  Total.

18    BY MS. WALLET:

19    Q.      Hundreds?

20    A.      No.

21    Q.      Dozens?

22    A.      Wait a minute.  Wait a minute.  It's an annual --

23    I would say hundreds.  Maybe a hundred, 130.  That's a

24    guesstimate.

25         Q.    And your recollection is this conference was what

1    kind of conference?

2         A.    It was a DUI annual conference.  The Driving

3    Under the Influence Association every year has a yearly

4    conference, and at that conference you attend training

5    sessions to get and to keep your certification to teach as an

6    instructor for the DUI schools, and as a CRN evaluator to

7    administer a Court Reporting Network instrument to anybody

8    that gets arrested for drunk driving.

9         Q.    How many individuals from Cumberland County

10   attended this conference?

11        A.    What I remember is Denny Drachbar, Sam Miller,

12   Hank Thielemann, Barb, and myself.  I can't remember.  Or I

13   mean, there could have been, you know, a couple others.  We

14   have a number of DUI instructors in our office.  A lot of

15   them elect not to go to the annual conference.  But that's

16   the people I know of that were there.

17        Q.    You think Barb Varner was the only woman from the

18   Probation office at that time?

19        A.    At that conference --

20              MR. MacMAIN:  I'll object.  That's not what he

21   said.  He said there may have been other people, he couldn't

22    recall.

23    BY MS. WALLET:

24        Q.    Do you remember any other women besides

25    Ms. Varner?

S. Gareth Graham                                    111


1        A.    No, because she had a room to herself, and if

2    there would have been another woman, she would have been

3    sharing that conference room with another woman.  And she

4    went up early, so I don't know if maybe that was the reason,

5    I mean, that she got her single room.  I'm not sure about

6    that.  But that could be her contention.

7        Q.    Okay.  And you had sex with her on which day of

8    the conference?

9        A.    I think it was a Tuesday.

10       Q.    And did she leave immediately thereafter?

11       A.    It might have been -- I'm sorry.  It might

12   have -- I'm trying to think.  It might have -- because we

13   went up a day later.  If she went up on Monday, we would have

14   gone up on Tuesday.  It might have been Wednesday of that.  I

15   would say Wednesday is my estimation of when she called the

16   room.  But Hank was there and he said, who the hell's that

17   calling in the middle of the night, or in the middle of the

18   morning.

19       Q.    Did you identify her as Barb Varner?

20          MR. MacMAIN:  You mean when the call came in and

21    Hank said who was that?

22          THE WITNESS:  Yes.

23    BY MS. WALLET:

24     Q.    So you told Hank that Barb Varner was on the

25    phone?


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    112


 1     A.    Yes.  He asked me who the hell was that.

 2     Q.    You didn't just say Barb?

 3     A.    No.

 4     Q.    It's your belief that you said Barb Varner?

 5     A.    I said Barb Varner, because I left and went to

 6    her room, had sex and then went walking with her to disguise

 7    that.

 8     Q.    But you didn't tell Mr. Thielemann that you had

 9    gone to her room to have sex?

10     A.    I told him I was going to her room to meet her.

11     Q.    What else did you tell him as a result of that

12    telephone conversation?

13     A.    Nothing.  I just left.

14     Q.    Okay.  So the phone rings at five o'clock in the

15    morning?

16     A.    Right.

17     Q.    Do you answer it or does he answer it?

18    A.    5:30.  I think I answered it.

19    Q.    Okay.  Tell me what happened in this

20  conversation.  Hello.  Give me the rest of it.  Are we going

21  to get together at this conference, she says?

22    A.    Um-hum.

23    Q.    Okay.  What do you say?

24    A.    And I said yes.  And she said, well, you want to

25  come down to the room.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    113


 1    Q.    And you said?

 2    A.    And I said yes.  And she said, we can disguise

 3  this that we went walking, tell Hank that we went walking.

 4    Q.    And you said?

 5    A.    Okay.

 6    Q.    Good-bye?

 7    A.    Hang up.

 8    Q.    During this conversation did you say anything

 9  like, something, Barbara?  Did you use her name?

10    A.    Yes.  Hank asked me who was on the phone, and I

11  said Barbara Varner, she wants to go walking.

12    Q.    Well, that's not my question.  My question is:

13  During this conversation did you say something followed by

14  the words Barb or Barbara?

15          MR. MacMAIN:  What she wants to know is what

16     words Hank would have heard you say on the phone call.

17          MS. WALLET:  Precisely.

18          MR. MacMAIN:  Right.  Do you understand?  Hank's

19     hearing your end of the conversation.  She wants to know

20     other than what you've said, yes, yes and okay, was there

21     anything else you said?

22          THE WITNESS:  I don't know what Hank would have

23     heard about my conversation because he was just waking up and

24     he was saying to me, who the hell's on the phone, and I said

25     that's Barb Varner and she wants to go walking.  So that's


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          114


1      the extent of it.

2      BY MS. WALLET:

3          Q.     Okay.  Now, is it your testimony, sir, that

4      Ms. Varner left the conference early because you told her

5      that you were ending the sexual relationship?

6          A.     No.  I just didn't pay any attention to her

7      individually up there.  And she wanted to go out and have

8      dinner and have a time to ourselves, and I said that can't

9      happen because all these guys are here and they're going to

10     ask where I went to eat and, you know.

11         Q.     This was a three-day conference?

12         A.     Usually they're three-day conferences, right.

13         Q.     And you went Monday?

14        A.      No.  She went Monday.  I went up Tuesday morning,

15    and I think Wednesday morning was the call she made to me.

16        Q.      And you think the conference was Tuesday,

17    Wednesday, Thursday?

18        A.      Yes.

19        Q.      Okay.  And you were there and she was there on

20    Tuesday.  She wanted to have dinner with you Tuesday?

21        A.      I think we -- I don't recall.

22        Q.      Did she want to have dinner with you Wednesday?

23        A.      After the -- yeah, that evening, after we had --

24    I had met her in the morning.

25        Q.      And you thought that she wanted to have dinner


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                      115


1    with you Thursday?

2        A.      Yes.  Or Thursday --

3        Q.      So those were the three dinners that you thought

4    she wanted to have with you, and she was mad because you

5    wouldn't?

6        A.      Not three dinners.  She didn't specify, you know,

7    which.  She just wanted to have some time together up there

8    by ourselves.  I'm not going to say there was three meals.

9        Q.      How did you travel to this conference?

10        A.      That's interesting.  I don't know, either -- I

11    think Hank drove.

12      Q.      Personal car or county car?

13      A.      Personal car, his car.

14      Q.      You don't think you drove?

15      A.      No.

16              MS. WALLET:  We'll take a lunch break.

17              (Recess taken from 12:28 until 1:02 p.m.)

18  BY MS. WALLET:

19      Q.      We're back after the break.  You understand

20  you're still under oath, Mr. Graham?

21      A.      Yes.

22      Q.      I may be a bit distracted here, so if I repeat

23  something, I ask you to forgive me.

24              We're still at the Penn State conference.

25      A.      Okay.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    116


1       Q.      Did you tell her at the Penn State conference

2   that you were ending this relationship?  Or did you identify

3   this time only as the last time you had sex with her?

4       A.      I identified that as the last time I was having

5   sex with her.

6       Q.      So at some later time you broke off the

7   relationship?

8       A.      Yes.  We had taken one trip together out, after

9   that October date, I think it was a December trip out to

10    George Junior Republic.

11        Q.    Did you have sex on that trip?

12        A.    No.

13        Q.    Okay.

14        A.    It was a commitment trip.

15        Q.    And it was during that trip that you broke off

16    this relationship?

17        A.    Yes.

18        Q.    And how did you do that?

19        A.    I advised Mrs. Varner that this couldn't keep

20    working.  Since I had been promoted to her boss, we couldn't

21    keep this affair together, it wasn't going to work.

22            What I experienced at work is when I would

23    correct her, some of her deficient reports, she would get

24    angry at me.  She had submitted time sheets asking for

25    basically extra favors out of me that she never asked out of

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          117

1    Joe, and that was when she was attending the master's degree

2    program at Shippensburg University.  She wanted me to approve

3    training hours to go to a free master's degree program that

4    she was participating in.  And I said, you didn't submit your

5    request to Joe for payment of those hours, and she took

6    offense to that.  That was one of the things.

7            And basically, quite honestly, I just got

8    consumed with the amount of work I had dumped in my lap as a

9    supervisor, and our relationship deteriorated.  I watched her

10   align with all the disgruntled employees in our office and I

11   just lost interest in her, and I think she lost interest in

12   me.

13        Q.    Would you say that this ending was mutual?

14        A.    Neither one of us had any other episodes to

15   resurrect anger that we had towards each other, so I would

16   say it was mutual.

17        Q.    So you were angry at her at the time?

18        A.    No.

19        Q.    She was angry at you?

20        A.    Yes.

21        Q.    And what did she do to express her anger?

22        A.    She was just angry that I had totally ignored her

23   and not made an effort to resurrect the kind of relationship

24   we had previously.

25        Q.    My question was:  What did she do to express her


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                         118


1    anger?  Did she tell you that she was angry?  Did she do

2    something?

3         A.    She went to other co-workers and complained about

4    my supervision level.  She complained about me as a

5    supervisor.  She complained about assignments being unfair.

6    She complained to Judge Sheely about the seniority list being

7    unfair.  And just a multitude of different complaints.  And

8    there was no attraction at that point where I found that she

9    aligned with all these angry people in our office.

10              And I'm not saying that everyone was angry every

11   day, but the workload was phenomenal.  When we split those

12   departments there was 650 referrals, and I'm not going to go

13   on a tirade.  There was 12 people in each department.  Just

14   in less than three years later they have 20 people in the

15   Adult section and 21 people in the Juvenile section.  I don't

16   know what percentage increase between 12 and 21 people are.

17   I was replaced with three supervisors.  So I'm not telling

18   you that I didn't -- I was overwhelmed, Ms. Wallet.

19              Joe came to the job, he was angry of what Ken

20   Bolze had done.  He was angry also that --

21       Q.    He, Mr. Osenkarski?

22       A.    Mr. Osenkarski, and he was angry and the rest of

23   the staff were angry about what John Ward had done, trying to

24   take the chief's positions out of a 40-year operation by a

25   partisan political process and try to be a numbers cruncher


                         Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        119


1    and be in a position to not promote those men to the job that

2    they were deserving.

3        Q.    Now, you're saying that she was angry at you for

4   ending this affair and that's why she did these things?  Or

5   something else?

6              MR. MacMAIN:  Objection.  I'm not sure that

7   that's what he said.

8              MS. WALLET:  That's why I've asked him.

9              THE WITNESS:  I'm sorry.

10  BY MS. WALLET:

11      Q.     Are you saying that she was angry at you for

12  ending this affair and that's why she did those other things?

13      A.     Yes.  I think it was a way of retaliating against

14  me for ignoring her.

15      Q.     Now, you never made any claim that you were the

16  victim of some retaliation here, have you?

17      A.     I've been -- I was angry at Judge Hoffer and the

18  action he took against me.  Did I make a claim?  I don't

19  think I have a claim as an at-will employee.  I don't even

20  know who I'm really employed by.  I don't think you know who

21  is my true employer, and I don't think the Federal Court

22  knows who my true employer is.  I mean, that distinction I

23  think gave you trouble when you first applied to, for her

24  comments towards what forum to hear this case.  It's really

25  unfortunate that, you know, you work in a correctional -- you

                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        120

1   work for judges and -- I won't go on to that.

2     Q.     Why are you confused about where you're employed

3  or who employs you?

4     A.     Well, when I needed representation, I had an

5  attorney seek out who could represent me, and I was told by

6  the -- I got a letter from the AOPC that I was not a -- from

7  Zygmont Pines that I was not a court employee.

8     Q.     Okay.

9     A.     And I think Mr. Thomas and Mr. Dellasega's last

10  brief indicated that I'm not really a county employee, or

11  it's their contention that I might not be a county employee.

12  So that the paradox is between, you know, who belongs to

13  what.

14     Q.     Did you think that you were subject to the county

15  personnel policies?

16     A.     Absolutely.

17     Q.     Why did you believe that?

18     A.     That was the personnel manual that the county

19  distributed to all the county personnel.

20     Q.     To the best of your knowledge, while you've been

21  employed in the Probation office, let's limit it to the

22  Probation office, did you believe that the county personnel

23  policy manual had a no-harassment policy?

24     A.     Yes, it did.  I mean, I think it was covered in

25  general terms under, you know, harassment policy, and it was

1   a procedure clearly outlined in that policy, in that manual

2   that allowed people to have relief from that, from those

3   situations.

4        Q.     And do you agree that periodically you were given

5   a county personnel policy and you were asked to sign

6   indicating that you had received it and acknowledged that you

7   were subject to it?

8        A.     How far back do you want to go?  I have an '84

9   one.  I have maybe an '88 one.  I have every one that they

10  ever produced.

11             MS. WALLET:  Let's mark this as Graham

12  Deposition 1.  We'll mark both of them 1 and 2.

13             (Graham Deposition Exhibits 1 and 2 were marked.)

14  BY MS. WALLET:

15       Q.     I've handed you what we've had marked as

16  Deposition Exhibits 1 and 2.  Do you recognize your

17  signatures on those documents?

18       A.     Yes, ma'am.

19       Q.     Let me ask you about Deposition No. 1.  You

20  signed your name as Stewart G. Graham.

21       A.     Correct.

22       Q.     Is that your name?

23       A.     That's my full name.

24       Q.     You told the county in 1981 that you were

25  changing your name or you wanted to change your name to S.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                122


1    Gareth Graham.  Is that correct?

2         A.     That's correct.

3         Q.     Why did you do that, sir?

4         A.     Because everybody knows me as Gary and nobody

5    knows me as Stewart.

6         Q.     So your formal name is Stewart G. Graham?

7         A.     Stewart Gareth Graham, yes.

8         Q.     In any event, Deposition No. 1 has something

9    stricken out.  Do you know who did that?

10        A.     No.

11        Q.     Do you believe that it was stricken before you

12   were asked to sign this?

13        A.     That's 22 years ago.  I don't know.  I don't --

14               MR. MacMAIN:  If you don't know, you don't know.

15               THE WITNESS:  I don't know.

16   BY MS. WALLET:

17        Q.     Deposition No. 2 references a county sexual

18   harassment policy dated 3/9/01.  I assume your signature

19   indicates that you received that policy?

20        A.     Yes.

21        Q.     And you agreed at that time to be bound by it,

22   correct?

23        A.     Yes.

24        Q.     Do you know, sir, why a sexual harassment policy

25   was issued on March the 9th of '01?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                123

1       A.      No, I would be -- I guess that came from the

2   Human Resources section.

3       Q.      Do you believe it had anything to do with the

4   case filed by Ms. Varner?

5       A.      I don't know what it had to do with.

6       Q.      Have you received any sexual harassment training

7   while you've been employed?

8       A.      Yes.

9       Q.      When was that?

10      A.      In the recent years, '96 or '97.  '97.  And then

11  I think every subsequent year thereafter we've had sexual

12  harassment training.

13      Q.      Were you aware that there was a requirement that

14  the Probation officers attend training in sexual harassment

15  as a result of the complaints filed by Ms. Varner?

16      A.      I don't know that to be true, no.

17      Q.      Were you ever told that you were being required

18  to attend sexual harassment training because of something

19  Ms. Varner did?

20      A.      I was told that it was a requirement to attend

21  sexual harassment training because it was an adopted county

22  policy, and nothing to the -- any further, nothing having to

23  do with Mrs. Varner.

24        Q.    Did you attend sexual harassment training at the

25    same time as Ms. Varner?


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        124


 1        A.    On what Joe referred yesterday to the corrective

 2    action plan, and as part of that plan he was, I guess Joe was

 3    charged with setting up an exclusive sexual harassment

 4    training for the Probation staff.  And I guess, I think Joe

 5    had arranged that through Mazzitti and Sullivan like he

 6    testified to yesterday, and I attended that.

 7        Q.    So when you just told me that you didn't think

 8    you had to attend sexual harassment training because of

 9    anything related to the Varner complaints, did you forget

10    this time?

11             MR. MacMAIN:  Objection to the form.  He didn't

12    say that.

13             THE WITNESS:  I didn't say that, no.

14    BY MS. WALLET:

15        Q.    Let me ask it more clearly.  Was there ever a

16    time when you were required to attend sexual harassment

17    training because of complaints that Ms. Varner had filed?

18        A.    No.

19        Q.    So you didn't think your having to attend this

20    particular sexual harassment training had anything to do with

21    Ms. Varner's complaints?

22      A.      No.

23      Q.      What kind of corrective action plan was it?

24      A.      I would let Joe speak to that because I didn't

25   have anything to do with it.


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    125


1       Q.      Have you seen this corrective action plan?

2       A.      No.

3       Q.      How did you know there was a corrective action

4    plan?

5       A.      That's what Joe testified to yesterday.

6       Q.      And you didn't know about it before yesterday?

7       A.      I think he was charged by Judge Sheely, or I

8    don't know who it was from.  No.  I don't.  I don't know.  I

9    don't know.  I just know that I never saw a plan of

10   corrective action from Joe's desk.  I just heard him talk

11   about a corrective action plan.

12      Q.      Mr. Graham, were you angry that you had to attend

13   the sexual harassment seminar at which Ms. Varner was also in

14   attendance?

15      A.      No.

16      Q.      Did you display any anger at that sexual

17   harassment training?

18      A.      I think she alleged in her Complaint that I read

19   that I glared and stared at her, I positioned myself to look

20   at her, and I didn't do any of those things.

21        Q.     You didn't glare at her?

22        A.     No.

23        Q.     You didn't seat yourself directly across from

24   her?

25        A.     No.  I was in the room before she came in.  She I

                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        126

 1   think sat with Debra Green is what I remember how that came

 2   about.

 3        Q.     And you did nothing at that harassment training

 4   to indicate some displeasure with Ms. Varner?

 5        A.     Nothing at all.

 6        Q.     Mr. Graham, you indicated that you had had sex in

 7   Mrs. Varner's home.

 8        A.     Correct.

 9        Q.     Was that in one location or more than one

10   location?

11        A.     Multiple locations.

12        Q.     Tell me where you had sex with Mrs. Varner in her

13   home.

14        A.     In her master bedroom.

15        Q.     Actually, that's not what I meant.

16        A.     Okay.  On the bed or?

17          Q.      I meant the address.

18                  MR. MacMAIN:  The address of the home.

19     BY MS. WALLET:

20          Q.      What addresses?

21          A.      Her York address.

22          Q.      And what was the address of that location?

23          A.      Is it Etters?  I don't know the number.  I mean,

24     it's an Etters address.  I don't even remember the street.  I

25     know it's back the end of the, like, a cul-de-sac, or a



                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        127


1      one-way road.  You can only go in one way and out one way.

2           Q.      Okay.  How many times did you have sex at that

3      location?

4           A.      Probably eight or nine.  Probably less than 10.

5      I'm not exact -- I don't know exactly if that's the right

6      amount.  Frequently.

7                   She had called me one time she was having a gas

8      fireplace, gas fireplace, what do you call that when they

9      convert your fireplace in the basement to gas.  You know,

10     they ran a gas line into her fireplace in the basement of the

11     home.  And she was off so that -- she had to be off work that

12     day so that they could install this gas fireplace insert.  I

13     mean, whether it was just the gas line coming in or the --

14     and she called me that day and said, do you want to come

15    down, they've come here early, I have the rest of the day

16    free and Lee's out of town, or he's out on business.

17            So I went, I had sex with her that day in her

18    basement.  She has berber carpet in her basement we covered

19    up with a red wool, like, an Indian blanket.

20            I can narrate, you know, the description of the

21    room.  We had sex on the floor and on the couch there.  Her

22    husband had a Brooklyn Dodgers, I think it was a baseball

23    uniform hanging up on the wall.  I think she had two

24    different cameras downstairs.  She had pictures of her kids.

25    She told me to not go near the doors because her neighbors


                        Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                     S. Gareth Graham                        128


1    nextdoor, they were -- he was a well driller and that I

2    shouldn't go near the window for fear that the neighbors

3    would see.

4        Q.    And this was at the Etters address in York?

5        A.    Yes.

6        Q.    Eight or nine times you had sex there?

7        A.    Yes, ma'am.

8        Q.    Okay.

9        A.    And you said where else, and I --

10            MR. MacMAIN:  She'll ask you.  Just listen to her

11    questions.  She said Etters right now.

12    BY MS. WALLET:

13      Q.      What other address?

14      A.      That I had sex with her?

15      Q.      Yes.

16      A.      At my home.

17      Q.      No.  What other address that was the home of

18  Ms. Varner.

19      A.      I had met with her at the Weatherburn Drive

20  address in outside of New Cumberland, Beacon Hill

21  development.  What I remember, she had a townhouse, it was on

22  the end she bought.

23              Actually, she sold that townhouse to a former

24  Cumberland County Commissioner's daughter, Rose Mary Peifer,

25  I think, Howard's daughter.  And she was in a position that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          129

1   she didn't know how to do her taxes that year, so she asked

2   my advice.  And her, I think her tax, income tax form, her

3   and her husband's income tax form was done by my accounting,

4   at Howard accounting in Newville.  And I think that's

5   probably a matter of record, too.  I'm not positive.

6       Q.      How many times did you have sex in the

7   Weatherburn address?

8       A.      I never had sex in the Weatherburn house, but I'm

9   familiar with the layout of the house.  We would embrace

10  inside the front door.  We would sit on her couch and pet and

11    fondle each other.

12         Q.    But no sex there?

13         A.    No sex there, ma'am.

14         Q.    So the only location where Ms. Varner had her

15    home where you had sex was the Etters address somewhere

16    outside of York?

17         A.    The Etters address, and --

18              MR. MacMAIN:  She was just asking about her

19    addresses.

20              THE WITNESS:  Her address, yes.  Okay, I'm sorry.

21    BY MS. WALLET:

22         Q.    No other locations that Ms. Varner had as her

23    home where you had sex?

24         A.    No.

25         Q.    Now, let's go back to sex at the Etters address.


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    130


1     Is that how you want to refer to it?

2          A.    That's fine.

3          Q.    Okay.  More than five occasions, you're not sure?

4          A.    I'd say almost 10 or maybe more.  I would have to

5     look at her husband's travel schedule.

6               MR. MacMAIN:  Gary, just listen to her question.

7     She wanted you to give an estimate.  You gave an estimate.

8               THE WITNESS:  Okay.

 9    BY MS. WALLET:

10        Q.    Were these always times when Mr. Varner was

11    traveling?

12        A.    Not always.

13        Q.    What dates would you have had sex with her in her

14    home when Mr. Varner was not away?

15        A.    I wouldn't know when he was away or not away,

16    only on what she would tell me.  So I don't have any validity

17    to validate when he was actually there or when he was away or

18    he wasn't away.  I only could go on what she would tell me,

19    so I didn't know, Ms. Wallet.

20        Q.    Okay.  Well, were there times when you had sex in

21    the Etters address where she told you her husband was not

22    away?

23        A.    Well, that, I think that gas fireplace insert was

24    one of the times that he wasn't away, but she was there at

25    the house alone by herself.  And since the installation had

S. Gareth Graham                              131

 1    occurred I think earlier than she anticipated, it gave her a

 2    free afternoon, you know, because he was on business

 3    somewhere.

 4        Q.    Did she call you at work?

 5        A.    Sure.

 6        Q.    Would she call you on your regular desk phone or

7   on your cell phone?

8       A.     I don't know if we had cell phones back then.

9       Q.     So the phone would ring on your desk?

10      A.     Yes.

11      Q.     Was there a receptionist of some sort?

12      A.     Well, that -- yes.  What would happen is after

13  she -- it would ring directly, and after three rings it would

14  go out to the front desk.

15      Q.     Okay.  So if you picked it up on the first three

16  rings, you got it and you avoided the receptionist?

17      A.     That's correct.  And that was kind of a plan that

18  we had originated between the two of us, to make sure that we

19  answered.

20      Q.     Okay.  Now, you wanted to tell me where within

21  this home you had sex.  On the floor, on the couch in the

22  basement.  Where else?

23      A.     In her bedroom, master bedroom on her bed.

24  Directly across from the bedroom there's a room that she used

25  to call her sewing room.  That was, I think that was the


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    132


1   first, that was -- the first time I had sex with her there

2   that's where we had sex, in the sewing room.

3       Q.     Was there a bed in the sewing room?

4       A.     I think so.  Yeah.

5       Q.      Anywhere else?

6       A.      Mostly in the basement of the house, because I

7    would park behind her residence.  There was a -- adjacent to

8    her property there was a rental unit, and I would usually

9    park my car over near the rental unit, walk in and she would

10   plan to meet me at the back sliding glass door.

11      Q.      Okay.

12      A.      And I could walk in the back without having my

13   car disclosed.

14      Q.      Describe the master bedroom in the Etters

15   residence.

16      A.      She has a split-level house.  When you go up the

17   front steps you turn to the right, the first room you come to

18   is the bathroom.  The second room you come to on the

19   left-hand side is the master bedroom.

20      Q.      One bed, two beds?

21      A.      I think one bed.  Maybe a king size or queen

22   size, I'm not sure.  The bed against the inside wall facing

23   outside.

24      Q.      What color is it?

25      A.      I don't know.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    133


1       Q.      Any other furniture in that room?

2      A.      I don't recall.  I think there was a TV in that

3  room.

4      Q.      Do you recall anything else about the master

5  bedroom?

6      A.      No.

7      Q.      Any other locations in that house where you had

8  sex with Ms. Varner?

9      A.      No.  Mostly in the basement.  I think one

10  occasion in the sewing room, and one occasion in the master

11  bedroom.  That's it.

12      Q.      Now, you had sex in your home, correct?

13      A.      Yes, ma'am.

14      Q.      And what address was your home where you had sex

15  with Ms. Varner?

16      A.      2037 Ritner Highway, Carlisle, PA.

17      Q.      Who resided in that home with you at the time?

18      A.      My wife and children.

19      Q.      Two children?

20      A.      Two girls, right.

21      Q.      How many occasions did you have sex with

22  Ms. Varner at the 2037 Ritner Highway address?

23      A.      You asked me that earlier.  I said three times:

24  Once in the garage, once in living room, and once in the,

25  what I call Florida room.

```
 1      Q.    I didn't ask you, but when you told us about the
 2  sex at Ms. Varner's house, are we talking about three
 3  separate occasions, or sex in three places on one occasion?
 4           MR. THOMAS:  Objection to form.
 5           MR. MacMAIN:  Objection.  I don't understand --
 6  hold on.  I don't understand the question, so.
 7  BY MS. WALLET:
 8      Q.    Okay, I'll be happy to clarify it.  You told me
 9  that you had sex eight or nine times in the Etters address.
10      A.    I know.  Right.
11      Q.    Would you have sex one time on each of those
12  visits?  Or are we talking about you had sex eight or nine
13  times but might have only been in one visit?
14      A.    No.  It was all separate visits.
15      Q.    Separate visits.
16      A.    One time in the master bedroom, one time in the
17  sewing room, and all the rest were downstairs in the
18  basement.
19      Q.    Okay.
20      A.    We did it, we engaged in sex on the floor and on
21  her sectional couch down there.
22      Q.    Now, I'm back to sex at 2037 Ritner in Carlisle.
23      A.    Okay.
24      Q.    Three separate occasions?
25      A.    Yes.
```

Emily R. Clark, RMR

717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    135

1    Q.    During the day or after work?

2    A.    During the day, over the lunch hour.

3    Q.    Where did you park when you went to your house?

4    A.    Usually put the car in the garage.  That's how we

5    had sex in the garage.  We just parked, I parked my car in

6    the garage so my wife wouldn't see that there was a car at

7    the residence for any reason.  I have a separate detached

8    garage that we pulled into, and had sex in the car.

9    Q.    Okay.

10   A.    And then the other occasions I think I went in

11   and let the garage door come down and put my vehicle inside.

12   Q.    Did your wife work for the county at this period

13   of time?

14   A.    Yes, ma'am.

15   Q.    Did she work full-time?

16   A.    Yes.

17   Q.    Did she ever go home for lunch?

18   A.    Yes.

19   Q.    Were you fearful of being discovered having sex

20   with someone not your wife by your wife?

21   A.    Yes, I was.

22   Q.    But you did it, anyway?

23   A.    Yes, I did.

24   Q.    Did you select this location as the place to have

25   sex?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          136


1     A.     Yes.  I would have made that decision based on

2     variables of where I thought my wife was at, maybe.

3     Q.     How old were your children at that time?

4     A.     Well, I'll let you figure out the math, but my

5     daughter, my oldest daughter was born in '84 and my youngest

6     daughter was born in '88.  So it was early '90s.  No.  It was

7     not till '92 I had the first sex, so it was after that.  '93,

8     '94, '95.  Something like that.  Whatever my children's ages

9     were.

10    Q.     So this sexual relationship spanned at least two

11    years, if not more?

12    A.     It spanned -- the sexual relationship went from

13    that February, Valentine's Day back in '92 the whole way

14    until the Nittany Lion Inn in 1996.

15    Q.     Does Ms. Varner have any distinguishing marks

16    that are not visible when she's wearing clothes?

17    A.     She has a scar at the base of her back, about her

18    waistline.

19    Q.     Describe the scar.

20    A.     A one-inch scar, no particular -- might have a

21    slight curve in it.

22    Q.     Do you know why she got that scar?

23    A.     She testified yesterday that she got that scar as

24    a result of an injury that she had received as a child, I

25    think.  The day before, she testified that she didn't have a

S. Gareth Graham                                    137


1    scar anywhere about her body.

2              What she told me was -- I asked her, you know,

3    did she have -- I asked her if she had back surgery, and I

4    was under the understanding that she might have had back

5    surgery because I don't know, I think she told me that.  But

6    evidently she didn't have back surgery, so.  And that's why I

7    remember the mark, because, you know, I questioned, I said,

8    do you have a disc problem or something.  It's at her lower

9    back on -- near the top of her butt.  Not as far down as the

10   tailbone or anything, it's up further near her waistline or

11   something.

12        Q.    Any other distinguishing marks?

13        A.    Well, she told me she had dental surgery to

14   correct, like, her teeth, she had all her teeth capped, but

15   she testified that she didn't have her teeth capped.  So I

16   don't know without getting her dental records if what she

17   told me was the truth or what she's telling during this

18   deposition is to be the truth.  I don't know.  I mean, I

19   guess only her dentist would know if she had her teeth

20   redone.  But she told me that.

21             I think she told me things like she had broken a

22    few toes or something at one time.  And I don't know what

23    that was a result of.

24         Q.    Any other distinguishing marks?

25         A.    Not that I can recall.


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        138


1         Q.    Is there any other intimate detail about

2    Ms. Varner that only someone who had a sexual relationship

3    with her would know about her?

4               MR. MacMAIN:  Objection as to form.  You want to

5    narrow that?  You mean personal information that was

6    revealed?  It's pretty --

7               MS. WALLET:  It doesn't matter.  Either.

8               MR. MacMAIN:  I'll continue to object to the

9    form, but if you can answer that.

10              THE WITNESS:  I mean, she was very orgasmic.  I

11   don't know if that's a specific incident or not.

12              Anything else that I would know?  Things that she

13   testified to yesterday that she wasn't into oral sex with her

14   first husband at all and had only been introduced to oral sex

15   with her new husband, Lee.

16              She described -- not -- I mean, this gets off the

17   point, to her first husband where she said he used to dig at

18   his crotch until he wore his jeans out.  I mean, you can ask

19   Mr. Spidle about that.  She said he reeked of fuel oil all

20    the time I guess from being a truck driver.

21          Things like her daughter had hooked up with a

22    black gentleman, Cindy had hooked up with a black gentleman

23    down in North Carolina, and she was concerned about her

24    ending up with a black man.  I don't know if she's a racist

25    or not, but she was concerned about that.


                    Emily R. Clark, RMR
          717-233-1744, emily.clark@worldnet.att.net

          S. Gareth Graham                              139


1          And how her daughter got introduced to the black

2     man is because Lee's daughter Sherry was also hooked up with

3     some black man and having a relationship.  And I remember

4     explicitly, you know, she had sought out my advice on what

5     she could do to end this relationship between her daughter

6     Cindy and this Kevin was his name.

7          And actually, I think she even employed her first

8     husband to take Cindy back to North Carolina for some reason

9     so that he could talk to her about not ending up with this

10    guy named Kevin.  And he had been up I think at Ms. Varner's

11    house for a Thanksgiving dinner or something, and she showed

12    up with this black guy.

13          So, those kind of, that I mean, that's not a

14    physical thing but those are some of the intimacies hat she

15    had shared with me.  I mean --

16    Q.    Is there anything physical that you would know or

17    only someone who had sex with her would know?

18          MR. MacMAIN:  Same objection.

19          Is there anything else that you can recall about

20   her physically other than what you've testified to?

21          THE WITNESS:  That she has olive skin.  I mean,

22   and -- she worked out quite a bit at the gym and she had

23   solid calves.  She was proud of the strength of her legs for

24   some reason.  I mean, she was always bragging about, you

25   know, going to the Y and when she would run into Kerry Houser


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              140


1    or something like that, and the police chief up there in

2    Carlisle, and she was always telling me about how he would

3    try to hit on her.  Margeson.  Margeson is his name.

4          She also told me, too, at the --

5          MR. MacMAIN:  She asked you physical.  Is there

6    anything else physical?

7          THE WITNESS:  Not other than her teeth, her toes,

8    scar on her back.

9          She always -- she said to me about her self

10   professed, like, double nipple.  And that was some kind of a

11   cartilage.  It wasn't an exterior type of thing but an

12   interior type of thing, you know, it was involved with her

13   breast, I mean --

14   BY MS. WALLET:

15          Q.    Did you observe that?

16        A.     There's nothing to observe.  I mean, it's what

17    she told -- basically what she told me.  It doesn't protrude

18    or anything else, it's just something that she claimed was

19    unique to her.

20        Q.     So she doesn't have a double nipple?

21             MR. MacMAIN:  If you can answer the question.

22    The question, I think the original question was --

23             THE WITNESS:  No.  I mean, she has some type of

24    cartilage under her nipple that's enlarged is what she told

25    me.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                         141


 1    BY MS. WALLET:

 2        Q.     Well, did you observe that, sir?  Is my question.

 3        A.     I don't recall that.  I don't remember it.  I

 4    mean --

 5        Q.     Did you ever kiss her breast?

 6        A.     Yes, ma'am.

 7        Q.     More than once?

 8        A.     Sure.

 9        Q.     In a position to observe her nipple?

10        A.     Sure.

11        Q.     And you didn't observe anything?

12             MR. MacMAIN:  Objection.  He said it wasn't

13    observable, it was under the skin so there was nothing to

14    observe.

15           THE WITNESS:  Yes.

16    BY MS. WALLET:

17       Q.      Could you feel it?

18       A.      I think she was -- she had pointed it out to me.

19    I don't really remember feeling it, no.

20       Q.      Is there anything, sir, that wasn't discussed

21    over the last two days that you know about Barbara Varner of

22    an intimate nature that you haven't already told us about?

23       A.      Well, she said that when her first husband kicked

24    her out because he always accused her of peddling her ass

25    around Mechanicsburg, she had gone to live with somebody that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    142

1    owns Wilcox Forging.  Now, I don't know, I think Mr. MacMain

2    asked the question do you know a Kay Wilcox, but maybe it

3    wasn't, maybe it was a different name.  Some Kay lady that

4    she had lived with and her husband had taken her in because

5    she told me she was living on the street and out of her car.

6    And this former friend of hers, okay, and this, I think they

7    were involved with Wilcox Forging, a forging company in

8    Mechanicsburg, that she had -- she was taken in when her

9    first husband kicked her out.  And then she said they really,

10    they helped her, you know, get through her first episode of

11    separation.

12     Q.    Mr. Graham, were you aware of any gynecological

13    problems that Ms. Varner had during the period of time that

14    you were having sex with her?

15     A.    I think she had a bladder problem.  I think she

16    would have a, like, a leaky bladder, because on occasion when

17    we would have sex, you know, she would be embarrassed because

18    she would, you know, when she would -- she would sometimes,

19    you know, just I guess pee, you know.  I don't know how else

20    to describe it.

21     Q.    Would she bring a change of clothes with her?

22     A.    No, not usually.

23     Q.    On those occasions where you had sex in the car

24    during lunch time, did she return to work?

25     A.    Not usually, no.  Neither one of us did.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham               143


1     Q.    So you would have sex at lunch time and then you

2    would both go home?

3     A.    Sometimes.

4     Q.    Ever return to work after sex?

5     A.    Not often.

6     Q.    More than five times?

7     A.    I can't give an estimation on that when we

8    returned home after sex and when we didn't.

9     Q.    Any other gynecological problems that you were

10   aware of?

11      A.    I think she told -- yeah.  I think she told me

12   she had a, like, a D&C procedure done before.  She had a

13   procedure done to put salt in her varicose veins.  That's

14   something that just came back to memory since you're talking

15   about that.  She had been treated for salt solution in some

16   of her -- spider veins, she didn't have varicose veins.

17   Spider veins.

18          She had a D&C.  And we had had sex before that

19   and she wanted me to ejaculate in her because, like, it was

20   an opportunistic time to consummate the entire act of

21   ejaculation inside her due to this D&C that she was going to

22   have performed the next day or something like that.  So she

23   said that would be a way to avert having her get pregnant.

24      Q.    She indicated that she wanted to get pregnant to

25   you?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    144


1      A.    No.  I just never trusted her the whole way.

2   That's why I didn't ejaculate in her.

3      Q.    Well, what was the reference to pregnancy?

4      A.    The pregnancy would occur if I would ejaculate in

5   her.  That was the reference.  And the D&C would be -- I

6   don't know what's the procedure, but it's a scraping of the

7   uterine wall, and evidently that would kill any sperm that

8    would happen to be in there or something.  I'm not a doctor,

9    I don't know.

10      Q.    So she wanted to have sex with you immediately

11   after the D&C procedure or immediately before?

12      A.    I think before.

13      Q.    And she told you why?  That was a question.  What

14   reason did she give you as to why?

15      A.    That would be a way to consummate the act fully

16   of ejaculating in her and not worry about getting her

17   pregnant, because she was worried about getting pregnant and

18   I was worried about her getting pregnant.  I had a vasectomy

19   after my relationship ended with Ms. Varner but I didn't have

20   it before.

21      Q.    When did you have a vasectomy, sir?

22      A.    I knew you were going to ask.  I don't know.

23   Just -- it was after, within the last four years.

24      Q.    Well, was it before or after you were transferred

25   to the prison?


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    145


1       A.    It was after I transferred, after I lost my job

2    in Probation.

3       Q.    You think it was within the last four years?

4       A.    Yes, ma'am.

5       Q.    Any other gynecological information that you have

6    about Ms. Varner?

7        A.    No.  No.

8        Q.    Did anyone witness any of these sexual liaisons?

9        A.    No.

10       Q.    Did anyone come upon the two of you after you had

11   had a sexual liaison?

12       A.    No.

13       Q.    No one ever discovered this?

14       A.    Somebody -- I mean, on occasion there were people

15   that had come up, where we were in the act in the car and

16   they had come up without us noticing them.  But no one had

17   ever interrupted us or stopped us or seen us.  I mean, it

18   just scared the daylights out of us.

19       Q.    And where did that occur?  What location?

20       A.    Down at the Goldsboro location, near the railroad

21   tracks.

22       Q.    Was that a frequent site of your sexual

23   encounters?

24       A.    Yes, it was, ma'am.

25       Q.    How many times did you have sex in or near

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        146

1    Goldsboro?

2        A.    Frequently.  I mean --

3        Q.    More than five?

4       A.      Two or three times a month.  It would depend -- I

5   mean, it would depend.  I mean, if it was a -- I mean, I

6   remember when it rained she would call me, you know, and

7   usually in the middle of the week we had sex.  I mean, there

8   was a lot of Wednesdays.

9       Q.      What was it about Wednesdays?

10      A.      There wasn't Juvenile court on Thursday, there

11  wasn't Adult court on Tuesday, things like that.  I mean,

12  there was -- it's kind of, like, a middle-of-week day.

13      Q.      A couple times of month in Goldsboro, a few of

14  those times somebody would come upon you?

15      A.      No.  Only one time a guy got behind us and he

16  beeped the horn.  That was it.

17              I remember one occasion I was up in Roxbury and I

18  think another Probation officer named Mike Dunsmore had seen

19  us in the car, and he came back and confronted me about it.

20      Q.      What had he seen?  Just the two of you in the

21  car?

22      A.      Just the two of us.  But he didn't have an

23  identity of who the other -- who Barb was.  And he said, that

24  was Barb Varner in with you, what were you doing up in

25  Roxbury.

1       Q.      And what did you say?

2        A.      I said we were supervising.

3        Q.      Is that true?

4                MR. MacMAIN:  Is what true, that he was

5     supervising?

6                MS. WALLET:  Yes.

7                MR. MacMAIN:  Or did Mike Dunmore --

8                MS. WALLET:  No.  That you were supervising.

9                THE WITNESS:  Yes.  We had a case and it was an

10    adult case so it's not protected under confidentiality.  It

11    was a guy named Steve Wilson, and she had his wife or his

12    girlfriend, some Naylor girl.  I'll just say Naylor, Kathy

13    Naylor.  And again, she was, like, slow --

14                MR. MacMAIN:  She didn't ask you about the case.

15    Just --

16                THE WITNESS:  Okay, okay.  And we had seen that

17    case and then gone on up to Roxbury over the lunch hour.

18    BY MS. WALLET:

19        Q.      And you had sex in the car?

20        A.      No.  We fondled and kissed each other up there on

21    the other side of the mountain at Roxbury.

22        Q.      When did you tell your wife of this liaison with

23    Ms. Varner?

24        A.      The day after I talked to Judge Sheely.

25        Q.      So you went to Judge Sheely, told him that you

1   had had a sexual relationship with Barb Varner and didn't

2   tell your wife till the next day?

3       A.      No.  Hank Thielemann had come down to my office

4   and said, Gary, this county has been upstairs, David Deluce

5   has been up there, Horace Johnson was up there, Ward was up

6   there and Hartnett was up there and they were all basically

7   gunning to have my job over this sexual harassment

8   investigation that they had done.  Hank said that Judge

9   Sheely's going to end up -- he's going to transfer you, Gary.

10  He said, you're going to the prison.

11      Q.      How did he know that?

12      A.      I don't know.  I think -- I don't really know.  I

13  think -- and he said, you better get upstairs, you know.  He

14  said, you know, it's time for you to -- I mean, he just said

15  something in that regard.  I don't know his exact words.  But

16  I said, I'm going to take care of this, and I went upstairs.

17      Q.      So the reason you went to Judge Sheely was at the

18  suggestion of Hank Thielemann?

19      A.      No.  He just -- he said that you're going to be

20  losing your job, that's what the rumor is, and you better,

21  you know, you better go upstairs or you better talk to Judge

22  Sheely.

23      Q.      And you thought that was a good idea?

24      A.      Yes.

25      Q.      Okay.  So, what did you do?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           149

1        A.      I went up to see Judge Sheely.  I went --

2        Q.      Did you call him, ask for time?

3        A.      No.  I went up to see him.  Asked the secretary,

4    I guess Sandy, if I could speak with the judge.

5        Q.      What happened?

6        A.      And I said, you know, Judge Sheely, there's

7    concerns that you're going to transfer me or put me over in

8    Adult Probation, and I said, I'm here to tell you that I did

9    not sexually harass Barbara Varner, I'm here to tell you that

10   I had an extramarital affair with this woman.  And I broke

11   down.  My wife was not there.  There was nobody there but me.

12       Q.      What did you tell Judge Sheely about this affair

13   at that time?

14       A.      I told him I had an extramarital affair with this

15   lady and the county was not responsible for her claims of

16   sexual harassment.  It was I was involved with her on a

17   consensual relationship, infidel relationship.

18       Q.      When do you mean the county was not responsible?

19       A.      There was no basis to her claims.

20       Q.      What did Judge Sheely say?

21       A.      He said, have you told your wife?  And I said no.

22   And I said, but I'm going to.  So the next day I think I went

23   in with Dave Foster.

24               MR. MacMAIN:  She just asked you about the

25   conversation with Judge Sheely.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    150

1            THE WITNESS:  Okay.  And then I went home and

2    told my wife.

3    BY MS. WALLET:

4        Q.     What did Judge Sheely say to you that ended that

5    conversation?

6        A.     He said, I'm glad you came to me.

7        Q.     Do you need a break?

8        A.     No.  I'll just be all right.  He said, I'm glad

9    you came to me, I'm going to put this matter to rest.  He

10   said, I'm going to call her up, meaning Barb Varner, and I'm

11   going to put you out on the street for your bad language.

12       Q.     Was there anyone else present at that meeting?

13       A.     I don't think so.  I am a little confused whether

14   Dave Foster walked in with me.  I'm confused whether he was

15   there or not at the time.  I'm not sure.

16       Q.     Well, do you remember Mr. Foster being there with

17   you with Judge Sheely on more than one occasion?

18       A.     I think on one occasion, and not the second

19   occasion, or, you know, on the second occasion, not the first

20   occasion.  But I'm not -- I don't know that to be in stone.

21   I don't know.  I can't remember exactly.

22       Q.     So you see Judge Sheely, you tell him you had

23   this relationship with Ms. Varner.  He suggests you tell your

24    wife.  Did he suggest that you tell your wife?

25        A.    No.




                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    151


 1        Q.    He asked you if you had told your wife?

 2        A.    Correct.

 3        Q.    And you said you were going to?

 4        A.    Correct.

 5        Q.    Okay.  The conversation ends, he's going to put

 6    this to rest.  Anything else --

 7        A.    He said he's going to take care of this.

 8        Q.    Is there anything else about that meeting that

 9    you remember?

10        A.    No.  I didn't even know -- I didn't even know he

11    had called her up, I mean, till later.  He just later, you

12    know, I mean, down the road I guess he made some -- that

13    document that he performed, you know, I mean, he come up with

14    that.

15            MR. MacMAIN:  Gary, she just asked you about your

16    conversation.

17            THE WITNESS:  That was it.

18            MR. MacMAIN:  Hold on.  She's not asking what

19    other people may have said or other people may have done.

20    Simply your conversation with Judge Sheely the first time.

21            MS. WALLET:  Right.

22          THE WITNESS:  That was it.

23  BY MS. WALLET:

24      Q.      Is there anything else about that conversation,

25  either what you said or what he said, that you remember now?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    152


1       A.      That's it.

2       Q.      All right.  So you go home, tell your wife.

3       A.      Right.

4       Q.      What do you tell your wife?

5       A.      That I was involved in a -- she asked me on the

6   way home, she said, now -- no.  The next day I told my wife,

7   because I went home that night and didn't tell her.  And the

8   next day at noon I told her.

9       Q.      Okay.  Why did you pick the next day at noon to

10  tell your wife?

11      A.      I think I talked to David Foster and he said,

12  Gary, he said, that's a long relationship -- well, you know,

13  don't tell details.  I mean, that's all he said, just don't

14  tell her details, it will hurt her.

15      Q.      Did you talk to Foster immediately after you met

16  with Judge Sheely --

17      A.      I think so.

18      Q.      -- or the next day?

19      A.      I think so, right after I talked to Judge Sheely.

20    And I don't know whether it was in person or on the phone.

21        Q.    Do you know what time of day your meeting the

22    first time with Judge Sheely was?

23        A.    Probably middle of the day.  I don't know.  I

24    can't remember.

25        Q.    Before or after lunch?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              153


1        A.    Before lunch.

2        Q.    Did you go back to work?

3        A.    I don't know.  I can't tell you.

4        Q.    You don't remember?

5        A.    I don't remember.

6        Q.    Did you and your wife customarily drive back and

7    forth to the courthouse together?

8        A.    No.  We drove separately.

9        Q.    Always?

10        A.    99 percent of the times we drove separately.

11        Q.    Why was that?

12        A.    Well, because she had different duties than I

13    did, and I had supervision duties.  I would go out and

14    supervise, so she wouldn't have a car, and if she wanted to

15    go home for lunch she would not have a vehicle.

16        Q.    Okay.  So you went home that night, didn't tell

17    your wife anything.

18    A.    Correct.

19    Q.    Did she know at that time that there was some

20    possibility that you would be disciplined as a result of the

21    complaints made by Ms. Varner?

22    A.    She didn't know a thing.  I think the next day

23    since I had told Judge Sheely I was going home to tell her

24    and I hadn't told her, you know, he ran into her somewhere, I

25    don't know, you know, being the elevator or in the office,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                  154

1    but he had said, you know, did Gary talk to you, or

2    something, I think.  You'll have to ask him what he said.

3    But he -- I think he said, did Gary talk to you, and he said,

4    do you think Gary had an affair.

5            And that next day we got in the car to go home

6    for lunch, and I didn't even get out of the parking lot when

7    she looked at me and said, did you have an affair with this

8    woman, is that why you're in this mess.  And I said, yes, I

9    did.  And then we went home.  I remember sitting on the patio

10    and confessing.

11    Q.    Okay.  What prompted you to be going home for

12    lunch with your wife on this day?

13    A.    I don't know.  I had gone home for lunch on

14    occasion with her.  I might have exaggerated my 99 percent,

15    but most often we drove separately, and even though we drove

16    separately we still went home to lunch together.

17        Q.    So is it your testimony that it was actually

18    Judge Sheely who told your wife?

19        A.    No.  I told my wife.  He didn't say anything to

20    her.  He said, could he have had an affair with this woman to

21    make her file these complaints.  So he was seeing if I told

22    her the night before.  That was his way of expressing

23    himself.

24        Q.    And that was the first notice she had about any

25    affair, when Judge Sheely asked her about it?



                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    155


 1        A.    He made a generalized comment, as I remember, and

 2    said that do you think Gary could have been having an affair

 3    with this woman or have you considered that, Barb.

 4              She got in the car, we went home, and before we

 5    got out of the parking lot, bang, that was it.

 6        Q.    What did she say to you?

 7              MR. MacMAIN:  You mean in the car other than what

 8    he's just told you?

 9    BY MS. WALLET:

10        Q.    Yes, in the car.

11        A.    How could you.

12        Q.    And what did you say to her?

13        A.    I said I was sorry.

14      Q.      Did she ask you for details of this relationship?

15      A.      I think I told her what Dave Foster said to me,

16  not to discuss details, it would just hurt her further.

17      Q.      Have you at any time since told her the details?

18      A.      Yes, she knows most of the details.  She doesn't

19  know the anal sex part of the details.

20      Q.      Is that because you told her?

21      A.      Yes.

22      Q.      Did she get any information about this

23  relationship from anyone else, to the best of your knowledge?

24      A.      No one.

25      Q.      Now, did you meet with Mr. Foster at the


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    156


1  workplace the day after you told Judge Sheely of this affair?

2      A.      I'm not clear on those details.  I mean, I might

3  have called Dave Foster and said, you know --

4              MR. MacMAIN:  Gary, hold on a second.  Mr. Foster

5  is an attorney.  Whatever he and you discussed would be

6  privileged, so she's not asking you what Mr. Foster said or

7  you said.  All she asked is whether or not you met with him.

8              THE WITNESS:  I met with him, I'm pretty sure.  I

9  mean, I know I met with him, but I don't know the sequence.

10  BY MS. WALLET:

11      Q.      You heard the testimony yesterday or the day

12    before where Ms. Varner said that you met with Mr. Foster and

13    your wife behind closed doors for a period of time?

14         A.    That's totally incorrect.  Well, met behind

15    closed doors or met with Judge Sheely?  I mean, there was --

16    where are you referencing behind closed doors?

17         Q.    My question is:  Did you meet with Mr. Foster at

18    the workplace before you went to see Judge Sheely the second

19    time?

20         A.    Yes.

21         Q.    You called him and asked to meet with him,

22    correct?

23         A.    As I remember, right.

24         Q.    Now, did you intend when you called him that you

25    were going to take him with you to see Judge Sheely?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          157


1          MR. THOMAS:  Him?  I'm sorry?  Take him?  Meaning

2    Mr. Foster?

3          MS. WALLET:  Correct.

4          MR. THOMAS:  Okay.

5          THE WITNESS:  I think he volunteered to be -- to

6    go up with me.  I don't think I took him by design, I think

7    he just said, do you want me to go up with you.

8    BY MS. WALLET:

9         Q.    Okay.  And who was present at this second meeting

10   with Judge Sheely?

11        A.      Just myself and Dave Foster and Judge Sheely.

12        Q.      Your wife was not there?

13        A.      That's incorrect.  She was not there.

14        Q.      And what was the purpose of this second meeting

15   with Judge Sheely?

16        A.      I'm trying to make sure I have the sequence

17   correct, Ms. Wallet.  I'm not -- I want to amend the record

18   to reflect I'm not sure what day David Foster went up with

19   me.  Either it was the first day or the second day.  He might

20   have gone in with me to Judge Sheely the first day when I

21   confessed the affair, instead of the second day.  But I don't

22   remember my wife being in on that meeting at all on the first

23   occasion I saw Judge Sheely.

24        Q.      Okay.  Were you with your wife at any meeting

25   with Judge Sheely?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    158


1         A.      No, not that I remember.  I went in with Dave

2    Foster.  I don't think I went in with Barb the next day.  I

3    don't think my wife Barb was included in that meeting.  She

4    could have been, I'm not sure.  That was a traumatic time.  I

5    can't recall that.

6         Q.      My question was:  What was the purpose of this

7    second meeting with Judge Sheely?

8          A.       I don't know.  I mean, I don't know what -- I

9     don't even -- maybe there wasn't even a second meeting, maybe

10    I'm running them together.  I just don't -- I don't know.

11    I'm confused on that topic, Ms. Wallet, I don't know.

12    Because I thought I originally told my wife, and then I

13    checked with her last night and she said, no, you didn't tell

14    me the first day that I think you and David went in there,

15    you told me the next day, because Judge Sheely come up to me

16    and said do you think he could have been having an affair.

17    And then she said, I questioned you in the car on the ride

18    home.  And she said, I remember her saying it was Lainey's

19    birthday.  I mean, what a time to remember.  That's her

20    cousin.

21          As far as the second day, maybe I'm running the

22    two days together.  Maybe there was only one contact with

23    Judge Sheely.  I was thinking I went in myself and then Dave

24    Foster later, but -- and I'm not trying to confuse the

25    record, I'm just -- poor Emily.  I don't -- maybe there was


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        159


1     only one meeting with Judge Sheely and then -- I don't know

2     if I had the second meeting.  I just do not recall.  I'm

3     confused.

4          Q.       Well, do you remember Judge Sheely telling you

5     anything other than:  I'm going to put you on the street for

6    your bad language?

7        A.        No, he didn't say a thing.  He didn't say what

8    type of disposition he was going to make.  He said, I'm going

9    to take care of this matter, and that was it.

10       Q.        Did he ask you anything about the specific

11   allegations by Ms. Varner of sexual harassment?

12       A.        Not after I told him I had a consensual affair

13   with her, no, not that I recall.

14       Q.        So after you said you had a consensual affair,

15   your recollection is Judge Sheely said:  I'm going to take

16   care of this matter?

17       A.        Yes, ma'am.  And he didn't say anything further.

18       Q.        How did you learn that you did get three days on

19   the street?

20       A.        He put it in a document and sent it down to, I

21   guess Joe.

22       Q.        And the original days that you were going to be

23   suspended were changed, correct?

24       A.        Yes.

25       Q.        Why were they changed?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                      160


1        A.        I don't know.  I don't know.  I don't have any

2    idea.

3        Q.        You don't remember why there was a change in the

4    days of your suspension?

5                MR. MacMAIN:  He just said he doesn't.

6                THE WITNESS:  I don't.  I don't remember why.

7    BY MS. WALLET:

8        Q.    Had you previously received any disciplinary

9    action while you worked for the county?

10       A.    No.

11       Q.    How about for the courts?

12       A.    No.

13       Q.    So this three-day suspension was the first

14   disciplinary action you had ever suffered?

15       A.    Yes, ma'am.

16       Q.    Did you believe that you had been disciplined in

17   any other way as a result of the allegations of Ms. Varner

18   other than the three-day suspension?

19       A.    Did I?  I'm sorry, you'll have to repeat that.

20                MS. WALLET:  Let's take a short break.  Let's

21   talk about what our plan is for today.

22                (Recess taken from 2:21 until 2:24 p.m.)

23   BY MS. WALLET:

24       Q.    After you met with Judge Sheely and he said he

25   would take care of it, did you think that this matter was


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net
                    S. Gareth Graham                        161

1    over?

2        A.    No.

3        Q.    What did you think would happen after that?

4        A.    I didn't know what was going to happen.

5        Q.    When was the first time after you had the meeting

6    with Judge Sheely that someone spoke to you about

7    Ms. Varner's complaints?

8        A.    The first time that somebody spoke to me about

9    Ms. Varner's complaint after talking with Judge Sheely, I

10   don't know.  I don't know if anybody spoke to me about it.

11       Q.    Do you know whether someone spoke to you before

12   you learned that you had been named as a defendant in the

13   federal court suit?

14       A.    I think the formal notice that I received was

15   from your office asking me to acknowledge your federal

16   lawsuit, and I didn't ever send you an acknowledgment of your

17   notice because I didn't want to --

18       Q.    Okay.  So you think between the time you met with

19   Judge Sheely and when you received the federal Complaint, no

20   one spoke to you about Ms. Varner's allegations?

21       A.    No.

22       Q.    No, you don't think so?  Or no, no one did?

23       A.    No, no one spoke to me about anything further.

24       Q.    Were you angry at being sent to the prison?

25       A.    No.  Furious.

1      Q.      And what, if anything, did you do to express your

2    anger and furiousness?

3      A.      There was nothing I could do.

4      Q.      Did you complain to anyone in the supervisory

5    chain?

6      A.      No.  It was a decision by Judge Hoffer.

7      Q.      Did you express displeasure to Judge Hoffer at

8    his action?

9      A.      The day that he -- it was a Monday.  It was

10   more -- he called me into his office said that I'm

11   transferring you to the Adult Probation office.  I was there

12   less than three minutes.  I implored him to let me speak and

13   to the events that have happened over the last couple years,

14   and I asked him not to put me in Adult Probation and put me

15   down in -- he said, you're going down, you're going to be

16   transferred to the Adult Probation office, go clean out your

17   desk, take the rest of the day off and report to John Roller

18   the next day.

19          I said, would you please let me explain the

20   circumstances around the last year and a half, and he said

21   no.  And he said -- I said, can you give me a reason why I'm

22   being transferred, and he said, I've lost confidence in you.

23          Prior to that week --

24          MR. MacMAIN:  Gary, just answer her question.  If

25   she wants more, she'll ask you for more.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    163

1    BY MS. WALLET:

2        Q.      Do you remember anything else about what you said

3    or what Judge Hoffer said at that time?

4        A.      I just remember -- I didn't make any comments but

5    I remember feeling that he treated me like a dog, where I had

6    to sit in front of him and I couldn't speak and I couldn't

7    give an explanation as to my frustration in defending these

8    accusations.

9        Q.      Did he tell you at that time that your transfer

10   to Adult Probation had anything to do with the allegations

11   that were made by Ms. Varner?

12       A.      No.

13       Q.      Did you believe that they were related to the

14   allegations that Ms. Varner made?

15       A.      Did I believe?  Sure, I believed that.

16       Q.      Why did you believe that?

17       A.      I didn't know what other reason he would transfer

18   me.

19       Q.      Did you tell anybody that day that you had been

20   transferred?

21       A.      I think so.

22       Q.      Who did you tell?

23       A.      I walked in the Probation office.  Denny Drachbar

24   caught me at the first counter and was giving me a raft of

25   baloney over being upstairs talking to Hoffer about, you

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    164

1   know, why are we having staff meetings now again.  And I just

2   said, well, you won't have to worry about that, you won't

3   have to be bugging me about it because I've been sent to the

4   prison or, yeah, sent to the prison.

5        Q.    Did you tell anybody else?

6        A.    I think I told Joe.

7        Q.    What did you tell Joe?

8        A.    I think Tom Boyer was in his office.  I said,

9   I've just been terminated and I've been terminated from my

10  position and I'm to report to John Roller tomorrow morning.

11       Q.    Did you use the F word?

12       A.    I don't think so.

13       Q.    Anybody else at that little gathering use the F

14  word?

15            MR. MacMAIN:  Objection as to form, that little

16  gathering.

17  BY MS. WALLET:

18       Q.    Just my reference to Joe and Tom Boyer.

19       A.    Joe and Boyer being in Joe's office.

20       Q.    Yes.

21       A.    No, I didn't use the F word.

22       Q.    My question was:  Did anyone else use the F word?

23       A.    No.  No, they didn't.  They were as shocked as I

24    was.

25        Q.      Were you angry at that time?


                    Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    165


 1        A.      I was numb at that time.

 2        Q.      Did you tell anybody at that time or shortly

 3    thereafter that there would be punishment for those who sided

 4    with Ms. Varner?

 5        A.      No.  That's not true.

 6        Q.      You never said that?

 7        A.      I never said that.

 8        Q.      Never said something like:  I'll get even?

 9        A.      I said, this isn't right.  I said, I worked 22

10    years advancing good will in this office, to be dismissed in

11    three minutes with not even being able to utter a word, yes,

12    I was angry.

13              I had just gone through my mother's death on

14    January 4th, and less than 40 days later he was taking my job

15    away.  So I was pretty emotionally numb to this.

16        Q.      Have you threatened anyone who may be a witness

17    in this case?

18        A.      Not at all.

19        Q.      Did you call any other individual within the

20    Probation Department disloyal to you?

21        A.      No.

22      Q.      Have you talked to any potential witnesses in

23   this case about this case?

24      A.      No one will talk to me, ma'am.

25      Q.      You haven't talked to Hank Thielemann?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    166

1       A.      No.

2       Q.      You haven't talked to Hank Thielemann about the

3    Penn State conference?

4       A.      No.

5       Q.      Have you talked to Tom Boyer?

6       A.      No.

7       Q.      Have you had Mr. Osenkarski talk to these people

8    on your behalf?

9       A.      No.

10      Q.      Have you asked anybody that you think might be a

11   witness in this case what they are going to say about the

12   circumstances of the case?

13      A.      No.

14      Q.      You haven't talked to anybody at the Probation

15   office about this case?

16      A.      I said I was falsely accused.

17      Q.      Who did you tell that to?

18      A.      Probably a number of people.  John Roller.  Lyle

19   Herr.  Mike Varner.  Heime Rivera.  Charles McKenrick.

20     Q.     Is there a difference in the weapons policy

21   between Juvenile Probation and Adult Probation?

22     A.     Yes, there is.

23     Q.     What is the difference?

24     A.     I think Adult officers are allowed to carry a

25   firearm if they complete firearm training that the state


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        167


1   provides.

2     Q.     Do you have any interest in doing that?

3     A.     Not at all.

4     Q.     Did anyone tell you that you would not be

5   permitted to carry a firearm as part of your duties and

6   responsibilities in Adult Probation?

7     A.     No, not at all.  In fact, Mike Varner had given

8   me an application saying that if I had any interest, you

9   know, I could sign up for being equipped with a weapon and

10   training.

11     Q.     Let's talk about the Atlantic City trip.

12     A.     Okay.

13     Q.     Was this trip, in your opinion, planned with

14   Ms. Varner in advance of the day of the trip?

15     A.     Yes, it was.

16     Q.     Tell me how it was planned.

17        A.        We had talked about having, like, a day that we

18    could escape when her husband was away.  She testified that

19    he wasn't -- he was home when she went on that trip.  He

20    wasn't, he was away, is what she told me, so -- and I suspect

21    that you can get his travel record to find that he was away

22    on this date.

23                What do you want know about it?  I bought the

24    tickets at the Personal Tees booth in the MJ Mall.

25        Q.        Did you buy one or two tickets?


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        168


1        A.        Two tickets.

2        Q.        Charge them or pay cash?

3        A.        Cash.

4        Q.        Did you buy a ticket specifically for Barbara

5    Varner?

6        A.        Yes, I did.

7        Q.        What was the plan?

8        A.        The plan was to go down, my -- under the guise of

9    me going to see my sister, and her going because her husband

10    was out of town for that day.

11        Q.        Why did you get on at separate stops?

12        A.        Because there was a Carlisle stop, a Camp Hill

13    stop, and a Harrisburg stop.  We both drove down.  I drove to

14    Camp Hill so that my car would not be, you know, in Carlisle.

15    And I -- we both got on at the Bon-Ton beside the Capital

16    City Mall, the parking lot behind Burger King.  I don't know

17    what the address is there, but that was the bus pickup.  And

18    we both --

19        Q.    So your testimony is you got on at the same stop?

20        A.    Absolutely.

21        Q.    And you got on at the Bon-Ton stop?

22        A.    Yes, I did.  We both parked our cars there.

23        Q.    And when you got onto the bus, did you

24    immediately sit together?

25        A.    Yes, we did.


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                           169


1        Q.    Where did you sit on the bus?

2        A.    Back of the bus.

3        Q.    Very back?

4        A.    I think we moved back there.  But we sat in near

5    the back, within three seats of the back of the bus.  Yes.

6        Q.    Anybody on the bus that you knew?

7        A.    Not at the time we got on it, but when the bus

8    stopped in Harrisburg, Barb jumped up and said, oh, my God,

9    there's Carol Shearer, or Carol Snoke.  And it was a

10    secretary that she had worked with at Children and Youth.

11    And her husband-to-be, Wayne Shearer.

12      Q.      Okay.  Did she move her seat?

13      A.      She jumped up and we separated seats and we

14   pretended that we were just on the bus separately.

15      Q.      And then eventually did you sit together?

16      A.      Yeah.  We sat together going down.  I think the

17   bus was full, so I think -- and then we sat together going

18   down and we sat together coming home.

19      Q.      Did you know anybody else on the bus?

20      A.      No, ma'am.

21              MR. MacMAIN:  You mean other than the people he's

22   mentioned?

23              MS. WALLET:  The people that were identified.

24   Anyone else meant somebody in addition.

25   BY MS. WALLET:


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    170


1       Q.      Okay.  What did you do when you got to Atlantic

2    City?

3       A.      Went to -- we didn't get off at different stops.

4    I think she testified yesterday we got off at different

5    stops.  I don't even remember the bus having a different

6    stop.

7               She is correct with the, I think we got $15 in

8    coin to spend.  And Ms. Varner's testimony is correct that I

9    called my sister.

10          I then purchased a room with cash funds at the

11  Bally's resort, and it's now the Hilton.  They've changed

12  names from when I registered for the room.  We went to --

13      Q.    Did you register in your own name?

14      A.    You know, it's interesting.  I don't know.  I

15  might have used Stewart.  I might have used Stewart Graham,

16  or just a single initial.  I paid cash, though.

17          And we went to a room on the fifth floor

18  overlooking the air conditioners.  We engaged in oral and

19  vaginal sex there for the afternoon.  We got a shower

20  together, a bath together.  We went down and ate at the

21  buffet restaurant.  I don't think we set foot on the beach

22  that whole day.  So that directly conflicts with what she

23  testified to.

24      Q.    Okay.  Did you do anything else that day that you

25  remember?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              171


1       A.    No.  We just went, spent the day in the room.  I

2   remember talking about, I don't know how this happened, but

3   we -- she was talking about her dad, I think, and my dad, and

4   we got to talking about, like, war stories, or World War II

5   or something.  I mean, we got to talking about something like

6   that, of all things, when we were intimate together and

7   spending time, we were talking about that.

8           MR. THOMAS:  Someone's ringing.

9           (Discussion held off the record.)

10  BY MS. WALLET:

11      Q.    I don't remember whether we were in mid question

12  or mid answer.

13          MR. MacMAIN:  You had answered.

14          MR. THOMAS:  We were mid answer.

15          THE WITNESS:  So we had spent the afternoon -- we

16  got there at 11 o'clock and we left there around five

17  o'clock.  We had sex in the room after I registered.  And

18  then we went down to the buffet and ate.

19  BY MS. WALLET:

20      Q.    Okay.  Why didn't you just drive to Atlantic

21  City?

22      A.    Probably because I would have to give my wife an

23  explanation why I was going there.

24      Q.    What explanation did you give your wife for going

25  on the bus?


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          172


1       A.    I said I was just going to go down for the day.

2       Q.    When you paid cash for this room, do you remember

3  how much it cost?

4       A.    50-some dollars.  It was a -- yes, it was a

5  midweek type of deal, I think.

6          Q.     How did you explain these cash expenditures to

7    your wife?

8          A.     I didn't.

9          Q.     Did you do anything else in Atlantic City

10   together?

11               MR. MacMAIN:  Other than what you've already told

12   her.

13               THE WITNESS:  Nothing.

14   BY MS. WALLET:

15         Q.     How many times have you had dinner with

16   Ms. Varner at the Deer Lodge?

17         A.     On a couple occasions, maybe two.

18         Q.     Alone?

19         A.     Three.  Yes.

20         Q.     Just the two of you?

21         A.     Yes.

22         Q.     And do you remember any work-related reason for

23   why you may have stopped at the Deer Lodge?

24         A.     Well, we wanted to get a good place to eat at the

25   end of an institutional trip, so we would come back the whole


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        173


1    way to Carlisle to eat at a good place.

2          Q.     And who suggested the Deer Lodge?

3          A.     Well, she had been there with her husband, she

4    had, you know, on a weekend.  And then I think they had just

5    opened a new deck.  And she and her husband were up, and we,

6    me and my wife were out there.  My wife and I were out there

7    one night.  And we made introductions.

8        Q.    Do you agree that you went to the Deer Lodge on a

9    day that you had been on a business trip?

10       A.    I think so, yeah.

11       Q.    Both times?

12       A.    Probably.

13       Q.    Did you consider these dates?

14       A.    Oh, no.  No.  That was -- it was a county policy

15   that allowed if you were outside the area after the dinner

16   hour you were allowed to put reimbursement in for a meal,

17   which generally meant around five o'clock or something, if

18   you were outside of town and weren't home after a business

19   trip.

20       Q.    So if you came home from a business trip and you

21   went right to your car and went home, you didn't get a meal

22   allowance, correct?

23       A.    They gave you a meal allowance if -- yes, because

24   you could take a meal home with you.  If you chose at that,

25   at the end of that trip not to go somewhere, you could do



                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        174


1    what Ms. Varner did and Ms. Green did, went to a restaurant,

2    buy a meal, take it home and end your day earlier than you

3    would just eat, you know, the last hour on the county

4    overtime.

5        Q.    Could you get paid for the hour of your meal if

6    you took a meal at the end of your trip?

7        A.    Yes, you do.

8        Q.    That was the whole reason to do it, right?  The

9    county paid the meal and you got an extra hour of wage?

10       A.    You'd have to ask Joe or Ken Bolze on that, on

11   reimbursement.  I don't know if they took away from your

12   overtime or just paid your regular pay at that time.  I

13   don't -- they might have only paid you regular pay for that

14   hour instead of overtime pay.  I'm not sure.

15       Q.    Well, was there an advantage to eating and

16   getting a receipt for food at the end of a business trip at

17   the end of the business day?

18       A.    Sure.

19       Q.    What was the advantage?

20       A.    The advantage is to get reimbursed for the meal

21   you ate.

22       Q.    Anything else?

23       A.    And probably add that to the amount of total time

24   that you spent delivering the juvenile.

25       Q.    Okay.  How many times did you meet Barbara Varner

1    for what you considered to be a date at the Silver Springs

2    flea market?

3        A.    Multiple Sunday mornings.  And as far as number,

4    probably during the whole summer season, you know, seasons,

5    you know, she said --

6        Q.    Every Sunday?

7        A.    A good bit of Sundays.  Not every Sunday.

8    Every -- three Sundays out of a month, maybe.  Sometimes two

9    Sundays out of a month.

10       Q.    Okay.  Always on Sunday?

11       A.    Yes.  Sunday morning.

12       Q.    And what did you tell your wife about where you

13   went on Sunday morning?

14       A.    I still go to the flea market on Sunday mornings,

15   and I still do that.  So I just told her I was going to the

16   flea market.

17       Q.    Did she ever ask to come with you?

18       A.    She -- no.  She doesn't care to do that.

19       Q.    Did you go to the flea market before you began to

20   meet Ms. Varner?

21       A.    Yes.

22       Q.    So this was a rather regular routine for you; you

23   liked to go to the Silver Springs flea market and you've done

24   that for many years?

25       A.    I've done it for a number of years.  Probably

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                176


 1   what, I was -- most of my motivation at that juncture was to

 2   go and meet with her, because that provided a facility and a

 3   time frame that we could meet.

 4        Q.    Did you have sex during or after any of those

 5   flea market meetings?

 6        A.    Yes, we did.

 7        Q.    Where would you have sex?

 8        A.    Up on the top of, I think it was on McClure's

 9   Gap, but it was out in back of on 944 on back of Visaggio's

10   there's a road that goes up over the top of the mountain.  I

11   can't think of what gap it's called.  There's a number of

12   different gaps there.  We'd drive my vehicle up to the top of

13   the mountain and have sex in my car.

14        Q.    So she would come in her vehicle, you would come

15   in your vehicle.

16        A.    Right.

17        Q.    Then what happened?

18        A.    Then we would leave, go have sex at the top of

19   the mountain.

20        Q.    And then return to the flea market?

21        A.    Yes, ma'am.

22        Q.    How long did all of this take?

23        A.    Well, we would usually be there around 7:00 and

24   we were usually home by 10:30, 11 o'clock.

25              She told me her husband, she was repulsed at her

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    177


 1   husband golfing every Sunday morning, and that was I guess

 2   her way of retaliating.

 3        Q.    Did she ever meet any of her children --

 4        A.    Sure.  I met her children there.

 5        Q.    How many times did you meet her children?

 6        A.    A couple times.

 7        Q.    More than five?

 8        A.    I advocated for her son to get hired at Schaffner

 9   Youth Center.

10        Q.    That's not responsive to my question.

11        A.    Okay.  More than five.

12        Q.    Did you meet more than five?

13        A.    Probably less than five.

14        Q.    And were they occasions when you met both her son

15   and her daughter on the same day?  Or you met different

16   children on different days?

17        A.    Different children on different days.  I think

18   her daughter was in college.  She was only there, you know,

19   just if she was visiting on a weekend.  She would mostly go

20   alone.

21        Q.    Were there times when Ms. Varner would have the

22   grandchild?

23          A.      I don't think ever, that I remember.  I think the

24    grandchild was picked up after our activities had ceased and

25    she picked him up on the way home.


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        178


 1          Q.      When you say after your activities had ceased,

 2    meaning after 11 o'clock or 11:30?

 3          A.      Yes, ma'am.

 4          Q.      Not after in months of time?

 5          A.      No.  After we had concluded having our sex at the

 6    top of the mountain.

 7          Q.      Anybody see you at the Silver Springs flea market

 8    with her?

 9          A.      Yes.  Becky Over.  I don't know what her married

10    name is.  She provided that yesterday.

11                  Her son saw us there.  Jeanie, her son's wife,

12    saw us there.

13                  Her son I think purchased some baseball gloves

14    for me.  I was hunting some extra baseball gloves and he

15    ended up, I think he got baseball gloves for me.

16          Q.      Did Ms. Over observe any activity between the two

17    of you that would suggest a romantic relationship?

18          A.      No.

19          Q.      Anybody that you know see you at the Silver

20    Springs flea market engaging in any conduct which would be

21    considered, which someone might consider to be a romantic

22    conduct?

23        A.    No.

24            MR. MacMAIN:  Objection as to what someone might

25    believe that they saw.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    179


 1    BY MS. WALLET:

 2        Q.    Something like holding hands or kissing?

 3        A.    No, none of that.

 4        Q.    Is it your testimony, sir, you were very discreet

 5    about not allowing anyone to see the two of you together?

 6        A.    I don't think we were -- no, we didn't make any

 7    extra steps during those flea market days to, I mean, during

 8    the flea market activities to be real discreet.  We didn't

 9    walk around totally together, because once we saw each other

10    and once we hooked up, then we took off and went up to the

11    top of the mountain.

12        Q.    Are you aware of any witnesses, sir, on any of

13    these occasions when you were with Ms. Varner who observed

14    conduct that would be suggestive of a romantic relationship?

15            MR. MacMAIN:  Same objection as before.  Be

16    specific.  I'm not sure what someone's --

17    BY MS. WALLET:

18        Q.    Such as kissing, holding hands, arm in arm?

19      A.      I think we were pretty discreet in most of our --

20  in concealing our infidelity.  That's how I can answer that.

21  I don't...

22      Q.      Is it your testimony that you had sex with

23  Ms. Varner at your father's store?

24      A.      No.  I was -- I'll let you ask.

25      Q.      Ms. Varner was asked about whether or not she was


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          180


1   in your father's store.  Do you know why she was asked that

2   question?

3               MR. MacMAIN:  Objection --

4               THE WITNESS:  Yes.

5               MR. MacMAIN:  -- but you can ask him whether or

6   not she was ever at his father's store.

7               THE WITNESS:  She was at my father's store.  I

8   had been repairing an apartment above my dad's store and

9   during the early interludes that we would meet, she came up

10  there.  That was early, early in the relationship, between

11  '90 and '92, it was early, because my dad was still living

12  there.  He died in '91, so.  And she had come up to the

13  apartment while I was working on it, in the evening, and we

14  kissed and fondled one another upstairs in the apartment.

15  BY MS. WALLET:

16      Q.      And this apartment is directly upstairs from the

17    store?

18        A.    Well, my dad had a store -- we owned the entire

19    corner building.  And there was a store and then what was to

20    be a video shop beside it, and the apartment was directly

21    above it.  So, it was four units there, two storerooms

22    downstairs and two apartments upstairs.

23        Q.    Could you access the apartment from the store?

24        A.    No.

25        Q.    Were you concerned that your father would see you

S. Gareth Graham                                        181

1    there with another woman?

2        A.    Somebody did see us there.  The boy that ran our

3    store was name of Kenny Newell, N-E-W-E-L-L.  And Ms. Varner

4    and I were up there an extensive period of time, being it

5    possibly an hour and a half, and she was there under the

6    guise that she was looking for an apartment maybe for her

7    daughter.  And she was coming -- and her position was that if

8    somebody asked, you know.  And when we went down the back

9    steps, not the front steps but the back steps, Kenny Newell

10    was just locking the stock room and he looked up and saw us

11    coming down.

12        Q.    What did you tell Mr. Newell?

13        A.    I didn't say a thing to him.  I later said to him

14    that that was a woman looking for an apartment for her

15    daughter.

16        Q.    Okay.  Again, I ask you, you weren't concerned

17    about your father seeing you with another woman there?

18        A.    My father wasn't there at the time.

19        Q.    Is that the only occasion when Ms. Varner was in

20    the apartment above your father's store?

21        A.    Yes, ma'am.

22            MR. MacMAIN:  Debra, I would note it's just about

23    three o'clock.  I don't know if you're done this area or if

24    this is a good break point.

25            MS. WALLET:  It's fine.  We'll break so long as


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    182


1    you'll produce Mr. Graham on another occasion and allow me to

2    finish.

3            MR. MacMAIN:  Sure.  Absolutely.

4            (Whereupon, the deposition was continued sine die

5    at 3:01 p.m.)

6                        *   *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

183

1  COMMONWEALTH OF PENNSYLVANIA  )

2                                )

3  COUNTY OF DAUPHIN             )

4       I, Emily R. Clark, a Court Reporter-Notary Public

5  authorized to administer oaths and take depositions in the

6  trial of causes, and having an office in Harrisburg,

7  Pennsylvania, do hereby certify that the foregoing is the

8  testimony of S. GARETH GRAHAM taken by Plaintiff at the

9  Administrative Offices of Pennsylvania Courts, 5035 Ritter

10  Road, Mechanicsburg, Pennsylvania.

11        I further certify that before the taking of said

12   deposition the witness was duly sworn; that the questions and

13   answers were taken down in stenotype by the said

14   Reporter-Notary, approved and agreed to, and afterwards

15   reduced to computer printout under the direction of said

16   Reporter.

17            I further certify that the proceedings and

18   evidence are contained fully and accurately in the notes

19   taken by me on the within deposition, and that this copy is a

20   correct transcript of the same.

21            In testimony whereof, I have hereunto subscribed

22   my hand this 21st day of February, 2003.

23

24                    _____

25                    Notary Public



                    Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net