IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
        Plaintiff,             .    CIVIL ACTION
                               .    NO. 1:CV 01-0725
        vs.                    .
                               .
COMMONWEALTH OF PENNSYLVANIA,   .    (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
        Defendants.            .
. . . . . . . . . . . . . . . . .

VOLUME 2
Pages 184 to 334

Deposition of:  S. GARETH GRAHAM

Taken by      :  Plaintiff

Date          :  February 14, 2003, 9:11 a.m.

Before        :  Emily Clark, RMR, Reporter-Notary

Place         :  Administrative Offices of
                 Pennsylvania Courts
                 5001 Louise Drive
                 Mechanicsburg, Pennsylvania


APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
             For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
             For - Defendant Commonwealth of Pennsylvania
                   Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY: PAUL J. DELLASEGA, ESQUIRE
             For - Defendant Cumberland County

APPEARANCES (continued):

    MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
    BY:  DAVID J. MacMAIN, ESQUIRE
        For - Defendant S. Gareth Graham

    SWEENEY & SHEEHAN, P.C.
    BY:  JASON G. BATES, ESQUIRE
        For - Defendant Joseph L. Osenkarski

ALSO PRESENT:

    MS. BARBARA E. VARNER

    MR. JOSEPH OSENKARSKI

I N D E X

WITNESS

| S. Gareth Graham | Examination |
|---|---|
| By Ms. Wallet | 187 |
| By Ms. Williams | 332 |

GRAHAM EXHIBITS

| No. | Description | Identified |
|---|---|---|
| 3 | 1-page photocopy of birthday card | 201 |
| 4 | 1-page memo, 6/13/97, to Varner from Osenkarski | 278 |
| 5 | 1-page memo, 4/2/97, to Sheely and Graham from Varner, annotated | 288 |
| 6 | 1-page memo, 7/17/97, to Ward and Deluce from Sheely | 330 |

*   *   *   *   *

S. Gareth Graham                                187

1          S. GARETH GRAHAM, recalled as a witness, previously

2    being duly sworn, testified further, as follows:

3    BY MS. WALLET:

4          Q.     Good morning, Mr. Graham.

5          A.     Good morning.

6          Q.     May I remind you that are still under oath.  Do

7    you understand that that oath requires you to testify to the

8    truth today?

9          A.     Sure.

10          Q.     Is there any reason today why you could not

11    answer my questions completely and truthfully?

12          A.     No.

13          Q.     And if at any time you have not heard my

14    question, I will expect that you will ask me to repeat it,

15    and that if you answer a question, you have both heard it and

16    understood it.  Is that agreed?

17          A.     Understood.

18          Q.     You heard a lot of testimony at the last day of

19    depositions about the seniority issue.  Did you have an

20    opinion with regard to how seniority should be credited for

21    probation officers?

22        A.    I had no opinion.

23            Seniority was an issue in our office that was

24    debated for probably 11 years, the entire time Ken Bolze was

25    the chief of the Probation office.  There was numerous


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                S. Gareth Graham                      188


1    memorandums.  I think there's possibly a real thick file that

2    was attributed to different people making different

3    suggestions to Mr. Bolze over the years.  I think there was a

4    number of people that contributed trying to be in a position

5    to identify what seniority we should go with and how that

6    should be established.  And I'm positive that Dirk Madison

7    wrote a memorandum to Ken Bolze about the seniority issue.

8    I'm sure that Tom Boyer wrote a memo about the seniority

9    issue.  And it was just something that was never quite

10    resolved in the entire time that I was in Probation.

11            So as far as my opinion of it, it didn't really

12    matter, because Mr. Bolze controlled most of the seniority

13    and it was his decision on how he was going to apply

14    seniority in our office, and he did it unfairly and unjustly.

15        Q.    And why do you say that?

16        A.    Because he counted time for part-time service.

17    And nowhere in the county manual or nowhere in the county

18    history was anybody else being attributed part-time service.

19    So he -- and other men in the office such as Tom Boyer felt

20    that was discriminatory towards him especially, and that's

21    why everybody was invited into this issue and out of this

22    issue and around this issue for almost 11 years.

23        Q.    Now, you had prior county time outside the

24    Probation office, correct?

25        A.    Yes, ma'am.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          189


1         Q.    And under the Bolze policy which counted the

2    county time, you benefitted from that policy, correct?

3         A.    In what regard did I benefit?

4         Q.    Well, you were granted more seniority because

5    your time outside the Probation office was counted towards

6    seniority.

7         A.    No, ma'am.  I was granted county seniority

8    because the county seniority policy was continuous service,

9    years of continuous service.  That didn't, that wasn't

10    necessarily the case with Probation seniority.  Mr. Bolze

11    dated that I understand Probation seniority sometime from the

12    point where you came into the office for office, some

13    office-related matters.

14            So your questions I think the other day were

15    attributed to Mr. Osenkarski about how was this certain

16    policy, and that was the October factor that was used in

17   promotions, and that's just not true, because there was a man

18   promoted years ago named John Roller who sits in the Adult

19   chief that was promoted over a man named Bob Houser.  And my

20   recollection of that was the fact that I think maybe

21   Mr. Houser had more seniority than Mr. Roller.  So that

22   wasn't the only situation.

23          And then there was a situation I think on the

24   Adult side that transpired where Lyle Herr was, who sits as

25   the Adult supervisor, was promoted over a man by the name of

1   Charles McKenrick, who had more Probation seniority.  And

2   this is, this was a very hot potato as far as how they count

3   seniority, because Mr. McKenrick had been over in Perry

4   County working as a probation officer in Perry County for a

5   number of years, and he was disappointed that here we were

6   counting, according to Mr. Bolze, in some regards all county

7   probation.  That meant if you worked in Children and Youth,

8   that meant if you worked as a maintenance man, that meant if

9   you worked as a, in any capacity in any county position, you

10   would be in a position to have continuous county service.

11   And I think what we tried to do when we split the staffs is

12   to try to make a decision on how we were going to look at

13   different individuals in the Probation office so that we

14   would have an element of fairness.

15    Q.    Now, you said you had no opinion with regard to

16  this issue.  Is that correct?

17    A.    I wasn't involved in the mechanics of realigning

18  this seniority issue.  I was consumed in other office

19  affairs.

20    Q.    Did you ever express your opinion on the

21  seniority issue?

22    A.    It didn't matter if you expressed your issue.

23  With Mr. Bolze, he made up his mind on how he was going to

24  apply seniority, and sometimes it would be one way, and

25  sometimes it would be some other way.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          191


1    Q.    So your position was that Bolze was not

2  consistent on his policy?

3    A.    He was never consistent, you're absolutely right.

4  I don't see him being consistent in any of that, because, you

5  know, there was so much issues where McKenrick had gone to

6  him and said here you're going to count county seniority and

7  they might have worked in a completely different office with

8  different responsibilities.  We had that.  We had Lyle Herr

9  coming from the Sheriff's Department, we had Mike Piper

10  coming from the Sheriff's Department.  But here we had a man

11  that had probation experience in the same venue of what we,

12  how we operate in Probation, and he was just ignored because

13    he came from another county.  So it didn't make any sense to

14    be in a position to try to align Probation seniority without

15    looking at relative probation experience.  And that's exactly

16    what we tried to do.

17         Q.     Now, you had time in the Recorder of Deeds

18    office, correct?

19         A.     Yes, ma'am.

20         Q.     Did you have time in any other county offices

21    prior to assuming your probation work?

22         A.     No, ma'am.

23         Q.     But you got credit for your Recorder of Deeds

24    time, did you not?

25         A.     It's interesting, if you look at the documents

1    that supposedly are in this seniority issue, my seniority was

2    dating back from my date of hire in the Probation office,

3    which was sometime in 19 -- September 1977.

4         Q.     So you're saying your understanding is you got no

5    credit for your time in the Recorder of Deeds office?

6         A.     I got county seniority, ma'am.  I got county

7    seniority from the time that I started with the county in

8    July 26th of 1976.  And I worked a little over a year in the

9    Recorder of Deeds office, and then had applied to Probation,

10    took a pay cut, took a pay cut and went into the field of my

11    endeavors with my college and everything else.

12        Q.    And when you were promoted from a PO-I to a PO-II

13    in 1985, your time with the Recorder of Deeds was counted,

14    wasn't that correct?

15        A.    You would have to ask Mr. Bolze that question.

16        Q.    You don't know?

17        A.    I don't know in -- no, I don't know.

18        Q.    Are you aware of any other individuals in the

19    Juvenile Probation office that county time, counting it or

20    not counting it, applies to, other than Barbara Varner?

21        A.    I don't understand your question, ma'am.

22        Q.    Are you aware of anyone else in the Juvenile

23    Probation Department for whom there is a significance with

24    regard to counting prior non-Probation office time?

25            MR. MacMAIN:  Objection to form.  I'm not sure I

S. Gareth Graham                          193


1    understand your question.

2    BY MS. WALLET:

3        Q.    Well, do you agree, sir, the issue is do you

4    count only time beginning when you started in the Probation

5    office or do you count time when you began with the county

6    outside the Probation office?

7            MR. MacMAIN:  At what time?  What time period are

8    we talking?

 9   BY MS. WALLET:

10       Q.      The controversy over 11 years.  Wasn't that part

11   of the controversy?

12       A.      That was some of the controversy, right.

13       Q.      And some of the other controversy was part-time

14   versus full-time?

15       A.      Yes.  And credit for other out-of-county service

16   was another issue, whether Mr. McKenrick should be punished

17   for not being in a position of having any credit towards his

18   probation experience in Perry County.  So there was --

19       Q.      Okay.  Anything else?

20       A.      No.

21       Q.      Those were the three issues?

22       A.      That I'm aware of.

23       Q.      I'm asking you about only one of those issues,

24   that's the issue of whether or not you count prior time with

25   the county before you joined the Probation office.


                    Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                      194


 1       A.      You're asking me to define something that I don't

 2   know how Mr. Bolze applied this.  That's what you're asking

 3   me to define.  I don't know how he applied what he used as

 4   opposed to seniority or when he started or when he stopped.

 5   It was never clear, ma'am.  There was never that I understand

 6   a written policy.  I've seen the documents that you've

7    provided, but I never knew the issue to be resolved.

8        Q.    Okay.  Now, at some time after the split it was

9    resolved, correct?

10       A.    We made an attempt in Probation, Juvenile

11   Probation, to resolve it.  But the interesting paradox to

12   this is I don't even know where the seniority list, since

13   I've been relegated to the prison for the last five years, I

14   don't even know where I stand on the seniority list in the

15   Adult Probation office.  I don't think there's one of those

16   that exists, either, after five years of this controversy.

17   So there is no Adult, that I know of or am aware of where I

18   stand on my seniority in the Adult Probation office.

19       Q.    Let's talk about the period between the time of

20   the split and the time that you were demoted to the prison.

21   Okay?  Are we clear on the time frame?

22       A.    The time of the split up until where I'm working

23   now.

24       Q.    Correct.  Are you clear on what time I'm speaking

25   about?


                    Emily R. Clark, RMR
           717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        195


1        A.    Yes, ma'am.

2        Q.    All right.  During that period of time, there was

3    a change in the prior policy; no matter what Mr. Bolze's

4    policy was, it was changed.  Correct?

5             MR. MacMAIN:  If you can answer it.  If you're in

6    a position to know what the policy was, you can answer it.

7    If you don't, then you can't.

8             THE WITNESS:  There was a proposal made to try to

9    identify and rectify the seniority issue in the Probation

10   office at the time of the split by the Juvenile Probation

11   Department.  The Adult side did not clarify the issue, did

12   not approach the issue, and did not by default make a

13   position on seniority.

14            They have also been in a position to try to

15   identify where a seniority list lies, because they have an

16   obligation by receiving state and federal reimbursement,

17   there are certain regulations and one of the regulations is

18   that they have a posted seniority list.

19            MR. MacMAIN:  Gary.

20            THE WITNESS:  And the Adult side has no posted

21   seniority list to identify the seniority issue.

22   BY MS. WALLET:

23        Q.    Did you ever ask for one?

24        A.    No.

25        Q.    Talking about the time between the split and when

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              196

1    you left for the prison.  Did you play any role in that

2    proposal to change the existing seniority policy?

3       A.      Mr. Osenkarski delegated that issue of seniority

4    to Mr. Boyer.  And did I play any role in that?  Not until

5    the document was proposed, and I don't know when it was

6    adopted, because that's when this other controversy came up.

7       Q.      Did anybody ask you your opinion with regard to

8    the proposed change?

9       A.      My opinion was that we needed to clarify the

10   seniority issue once and for all and that we should probably

11   be in a position to identify relevant probation experience.

12      Q.      Did anyone come to you, sir, and ask you your

13   opinion on the seniority issue?

14      A.      I think Mr. Boyer asked my opinion.

15      Q.      And what did you respond?

16      A.      And I said that the seniority regarding the

17   Probation office should date from the time someone comes in

18   and starts full-time service in the Probation, in the

19   Cumberland County Probation office.  I wasn't interested in

20   giving total credit for out-of-county service because that

21   didn't seem to be fair for the people that chose to work in

22   Cumberland County and commit to the cause and, you know, and

23   commit to the organization.  So you couldn't be in a position

24   to give credit for, you know, out-of-county when even though

25   it was relevant experience.

1      Q.      Okay.  What was your position on full-time versus

2   part-time?

3      A.      I have very, very strong opinions against

4   part-time work, and that's due to a lot of the shenanigans

5   that have transpired in the county courthouse about who's on

6   part-time and who's not on part-time, who's working full-time

7   jobs and/or and actually being in the office.  I have very

8   strong opinions against part-time credit being given.

9      Q.      Okay.  And what shenanigans are you referring to,

10   sir?

11      A.      Just other issues where there's other employment

12   throughout the county where people have been given credit for

13   working full-time and maybe pursuing their law degree during

14   the day at the local law school at Dickinson.

15      Q.      Specifically what people?

16      A.      I don't know if I want to mention that today.

17      Q.      Why not?

18      A.      Well, I don't know if I would be in a position to

19   be sued if I would relate that information.

20      Q.      Which people?

21              MR. MacMAIN:  I'm going to object.  Does this

22   have any relevance to the issue, the probation seniority

23   issue?

24              MS. WALLET:  I don't know.

25              MR. MacMAIN:  I'll ask this.  Is there anybody in

Emily R. Clark, RMR

717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          198


 1   the Probation Department that would be responsive to the

 2   question?  Or is it other departments besides Probation?

 3            THE WITNESS:  It has nothing to do with the

 4   Probation Department.

 5   BY MS. WALLET:

 6       Q.    So these shenanigans that you identified are

 7   something outside the Probation office?

 8       A.    Absolutely.

 9       Q.    What offices are they in?

10       A.    Mostly out of the commissioners' office.

11       Q.    Did you prepare any writings with regard to the

12   seniority issue?

13       A.    Absolutely not.

14       Q.    Now, at the time of the split you were already a

15   senior probation officer II, correct?

16       A.    No.

17       Q.    At the time of the split you were only a PO-I?

18       A.    No.

19       Q.    What was your position at the time of the split?

20       A.    I was a PO-II.

21       Q.    But not senior PO-II?

22       A.    No.

23       Q.    When were you made senior PO-II?

24       A.    The confusing part of this, Ms. Wallet, is the

25   senior PO position is a position underneath the PO-II

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    199

1    position.

2        Q.    Okay.

3        A.    So I'll just try to clarify that for you.

4        Q.    So at the split you were a supervisor?

5        A.    No.  I was a PO-II.

6        Q.    But you acted as a supervisor?

7        A.    No.  I had a regular caseload, and the only time

8    I was in a supervisory capacity is when I was delegated to

9    be.  I had no administrative position, nor did David Meyers

10   have any administrative positions to handle under that

11   position.

12       Q.    Well, now I am confused, sir.  At the time of the

13   split did you have probation officers reporting to you?

14       A.    At the time of the split I became -- I'm sorry.

15   I became a supervisor.

16       Q.    Okay.  And you had probation officers reporting

17   to you, did you not?

18       A.    Yes.

19       Q.    And who were those individuals?

20       A.    Whoever was in the office at that time.

21       Q.    All of them?

22       A.    Yes.

23       Q.    Did you do their performance evaluations?

24        A.      You know, I don't think I did.  I contributed to

25    the performance evaluation but I think Mr. Osenkarski did the


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    200


1    performance evaluation, as I recall.  Because I was just

2    newly assigned and didn't have any experience with that.  So

3    I talked to him about case assignments, I talked to him about

4    other things that he asked me to contribute to in regard to

5    the performance of people, yes.  Did I actually do it?  I

6    think we co-did it, or we --

7        Q.      Were you paid more for your supervisory duties?

8        A.      Yes, ma'am.

9        Q.      And what supervisory duties did you perform that

10   warranted your being paid more?

11       A.      I was in charge of basically case management in

12   the Probation Department.

13       Q.      And what did that mean?

14       A.      That meant from the time cases were referred they

15   were sent to my office to distribute to the rest of the staff

16   on assignment.

17       Q.      And Mr. Osenkarski gave you that position,

18   correct?

19       A.      No.  Judge Sheely gave me that position.

20       Q.      Do you know whether Mr. Osenkarski made a

21   recommendation that you be placed in this position?

22      A.      I think he and Mr. Bolze and Mr. Roller presented

23   that as an option to the Court on how to divide the staffs

24   and who would be moving to the responsible positions.

25              MS. WALLET:  I'd like to show you what we'll mark


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        201


 1   as Deposition Exhibit 3.

 2              (Graham Deposition Exhibit No. 3 was marked.)

 3   BY MS. WALLET:

 4      Q.      Do you have what we've marked as Deposition 3?

 5      A.      Yes.

 6      Q.      Do you recognize that, sir?

 7      A.      Faintly.  I recognize my name on the bottom of

 8   it.

 9      Q.      Is that your signature on Deposition 3?

10      A.      It's my name.

11      Q.      Well, is it your signature?

12      A.      I think it is.

13      Q.      Why aren't you sure?

14      A.      I don't remember the card specifically.

15      Q.      Well, do you know whether you gave this card to

16   Barbara Varner?

17      A.      I would imagine I did.  I don't totally remember

18   the card.

19      Q.      Do you remember purchasing this card?

20      A.      Not really.

21      Q.      Well, do you remember your testimony that you

22  made some efforts to try to find when this card was

23  manufactured?

24      A.      Absolutely.

25      Q.      Why did you do that?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    202


1       A.      Because the county, when they called me in on

2   April 29th, questioned me about a card.  And I asked

3   Mr. Deluce, I said, well, I don't remember any card.  I said,

4   I don't think I gave her any card.  I said, I want to see a

5   copy of the card, I said, because I couldn't remember it.

6   And he never provided the card.

7               And just recently did I ever see the card.  I

8   mean, just within the past probably four months is the first

9   time the card was ever produced for me to visualize and

10  identify.

11      Q.      And when did you see this card in the last four

12  months?

13      A.      I don't know.  It was part of a --

14              MR. MacMAIN:  I'll represent it was part of

15  obviously the litigation process.

16  BY MS. WALLET:

17      Q.      Did your lawyer give you this card?

18      A.      Yes.

19      Q.      Now, having looked at this card within the last

20  four months and today, do you remember anything about this

21  card?

22      A.      I remember -- I remember that that's my signature

23  and I remember that I probably gave her that card at some

24  juncture.

25      Q.      Do you remember whether you gave it to her on her

S. Gareth Graham                                        203

1  actual birthday?

2      A.      Well, I know her birthday to be January 18th, so

3  I probably would have given it to her on her birthday.

4      Q.      Did you give it to her personally or did you mail

5  her the card?

6      A.      Personally.

7      Q.      Did she open it in your presence?

8      A.      I don't remember that.  Probably.  I wouldn't

9  have sent it to her.

10      Q.      Why did you give her this card?

11      A.      Because we were involved in a relationship since

12  1990 to 1996.

13      Q.      And do you believe you gave this to her sometime

14  close in 1990 or sometime closer to 1996?

15      A.      That's what I've recalled since I've seen the

16    card, and I recall that once I saw the card, that it, when

17    the county was questioning me whether I gave her a birthday

18    card in 1996, my answer was no, I didn't.  And that card was

19    not given to her in 1996.

20         Q.    Okay.  So we know it wasn't 1996.

21         A.    Do I know when it was?  It could have been

22    anywhere during the period of 1990 to probably in the

23    beginning of our relationship.

24         Q.    Okay.

25         A.    So I would say probably the first three or four


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              204


1    years of the affair.

2         Q.    Okay.  Did you ever give her any other cards for

3    her birthday?

4         A.    I don't think so.

5         Q.    Why not?

6         A.    Why not?

7         Q.    Why not?

8         A.    Probably I was too cheap.

9         Q.    Did you give her any Valentine?

10         A.    No.  But I kind of recall our first relationship

11    was on Valentine's Day, first time we had intercourse.

12         Q.    Did you give her any gifts other than cards?

13         A.    I had bought some small gifts.  Do I have any

14    receipts?  No.  I mean, I think I got her a couple bracelets

15    from Boscov's.

16        Q.      How many bracelets?

17        A.      I don't know.  I wouldn't know.

18        Q.      Were these on the occasion of some event?

19        A.      Just different type of interactions that we had

20    over the years.  You know, when it would become more positive

21    and more intimate, maybe something like that was done other

22    than going out to eat with her.

23        Q.      Okay.  Other than these more than one bracelet do

24    you remember any other gifts you gave her?

25        A.      No.


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                      205


1         Q.      Did you give her any other gifts?

2         A.      I just answered that.

3         Q.      Well, I guess it's a different question.  Did you

4    give her any gifts, you think but you can't remember what,

5    or --

6         A.      No, I didn't say that.

7         Q.      Okay.  Let me ask the question.  Did you give her

8    any other gifts besides the bracelets that you just

9    mentioned?

10            MR. MacMAIN:  That he can recall.

11            THE WITNESS:  I said I couldn't recall anything

12    else.

13    BY MS. WALLET:

14        Q.        Did you mark any of your anniversaries of

15    beginning your relationship with her?

16        A.        No.

17        Q.        Did you ever tell her that you loved her?

18        A.        No.

19        Q.        Did you love her?

20        A.        No.

21        Q.        Did you ever give her any notes that were of a

22    personal nature?

23        A.        Don't know.  I don't remember any but I won't

24    say, I won't deny I wrote her a note here and there.  In what

25    regard?  Kind of note?  I mean, it might have been do you


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          206


1    want to meet somewhere, or you want to -- I mean, I don't

2    know what type of note you're talking about.

3        Q.        Any kind of note.

4        A.        Any intimate note, I don't remember ever giving

5    her any intimacy note in any regard.

6        Q.        Okay.  But you might have given her some piece of

7    paper that indicated where and when to meet?

8        A.        Something to that nature.  I'm not admitting

9      that.  I'm saying something like that could have happened, I

10     could have scribbled a note to her.  We met clandestinely,

11     you know, at a lot of different locations.  So could I have

12     scribbled a note and gave it to her?  I might have.  I don't

13     remember, though.

14          Q.     Do you remember what you wrote on the envelope

15     for this particular card marked Deposition 3?

16          A.     No, ma'am.

17          Q.     What did you call her?

18          A.     Barb.

19          Q.     Did you have any other pet names for her?

20          A.     No, ma'am.

21          Q.     Nothing like sweetheart, honey, any of those?

22          A.     No.

23          Q.     Now, there was Barb 1 and Barb 2.  Which was your

24     wife and which was Ms. Varner?

25          A.     That was a rumor that was circulated in the

1      office.  I had nothing to do with any of that, and you'll

2      have to ask the people that authored the Barb 1 and Barb 2

3      who was who.

4          Q.     And who would that be?

5          A.     I don't know.  I just told you that.

6          Q.     I see.  So you never heard anybody say Barb 1,

 7    Barb 2?

 8              MR. MacMAIN:  That's not what he said.

 9              THE WITNESS:  That's not what I said.

10   BY MS. WALLET:

11        Q.    Did you hear anyone use the term Barb 1, Barb 2?

12        A.    I heard it used in the office.  I don't know

13   specifically who to attribute it to.

14        Q.    Well, who do you remember using this term?

15        A.    Maybe some of the secretaries.  Maybe Tom Boyer.

16   Maybe Darby Christlieb.  I don't know.  Maybe Denny Drachbar.

17   Maybe Sam Miller.

18        Q.    Well, it could be maybe anybody in the office,

19   correct?  I'm asking you, what do you remember about

20   individuals who used this term Barb 1 Barb 2?

21        A.    And I testified earlier that I didn't remember

22   who was attributed to the remarks.

23        Q.    Well, did you ever get a telephone message from

24   someone that said Barb and you had difficulty deciding

25   whether it was your wife or Barbara Varner?


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    208


 1        A.    No.  We had a type of a clandestine relationship

 2   with the phone business where when Mrs. Varner would contact

 3   me or Barb would contact me, she would let it ring three

 4   rings.  If I didn't pick up in three rings, we knew that the

5   message then would go out to the front secretary so she would

6   always hang up the phone.

7             So due to the multitude of hang-ups when the

8   secretaries received the call coming through on my phone,

9   they became suspicious of our relationship because we had a

10  personal friendship and throughout the -- we had a personal

11  relationship that people wanted to gossip about.

12      Q.    I don't understand, sir.  What was suspicious

13  about Ms. Varner calling you on your office phone?

14      A.    The multitude of times that she would call and

15  the multitude of times that the receptionist, Ronna Boyles

16  or -- would pick up the phone and there would be nobody on

17  the other end.

18      Q.    And Ronna Boyles assumed that was Barbara Varner?

19      A.    I think so.  And so did Denny Drachbar.

20      Q.    And how would they know that that would be

21  Barbara Varner allowing it to ring three times and then

22  hanging up?

23      A.    Not just the phone call.  They would know just

24  due to the interaction between Barb and I on individual

25  cases.  I testified the other day that we had -- we shared


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        209


1   companion cases quite frequently, and we would go out and

2   supervise, or she would implore me to go with her to a

3    dangerous situation.

4        Q.    In fact, you insisted that she come with you on

5    those trips, did you not?

6        A.    That was both ways.  No, that went both ways.  In

7    regard to the Fahnestocks, you know, she wanted me to come

8    along because the defendant I was working with had been

9    involved in a gun incident with his father, and that's why he

10   was under parole, because of the pulling the gun and

11   displaying the gun, a rifle.  That happened to be a very

12   secluded location back in the woods behind the PPG plant out

13   in Mount Holly.  So it was -- it wouldn't have been a

14   comfortable setting for any woman to drive back this long

15   lane in back of the PPG plant in the mountains to go visit

16   her kids that she had on the dependency concerns with that

17   family.

18       Q.    Okay.  Ms. Varner was assigned to supervise a

19   part of that family, you were assigned to supervise another

20   part of that family?

21       A.    Yes.

22       Q.    So it certainly wouldn't be unusual that the two

23   of you would go to this location at the same time, correct?

24       A.    I don't recall being at the location other than

25   the time she requested me to go along with her out there.

1     Q.     Okay.  But the request that you go with her would

2     not be unusual, inasmuch as you had work-related reasons to

3     be there and so did she?

4          MR. MacMAIN:  Objection.  I think he just

5     answered it that sometimes it would be requested, sometimes

6     it wouldn't.

7          MS. WALLET:  Well, my question was is it an

8     unusual request.  I don't think he answered that.

9          THE WITNESS:  I don't know what unusual or usual

10    is.  I don't understand what you mean by usual or unusual.

11    It wasn't unusual to supervise the same family that we were

12    involved in.  But there was unusual times where she would

13    make extra requests for me to go along where I didn't have

14    anyplace to go along

15    BY MS. WALLET:

16    Q.     Okay.  And were there times when you made

17    requests that she go along when she ordinarily would not have

18    had any reason to go?

19    A.     Absolutely, sure.  She went on commitment trips

20    with me where she had no relevance to the actual case, but

21    she was a volunteer that would ride along with me to

22    different institutions.

23    Q.     And your testimony is that it was totally her

24    idea, not your idea?

25          MR. MacMAIN:  Objection.

S. Gareth Graham                          211

1          THE WITNESS:  That's not my testimony.

2          MR. MacMAIN:  Objection.  What he said is

3   sometimes it was her idea and sometimes it was his idea.

4   BY MS. WALLET:

5      Q.      Okay.  You would agree there were times when you

6   as her supervisor assigned her to come on commitment trips

7   with you?

8      A.      No.  No, ma'am.

9      Q.      No assignment?

10     A.      No assignments.

11     Q.      I see.

12     A.      Commitment trips were a volunteer basis for the

13  most part.  Most times when it was your own kid that you were

14  dealing with that was committed, those were the people

15  responsible.  But there was a lot of people in the office did

16  not like to go on these commitment trips because they

17  required extended hours, extensive travel.  And we,

18  Mr. Osenkarski had a flexible schedule to that.  He said if

19  you can find somebody else that wants to go along or will go

20  along, you may take them, you know, those two people may go

21  on the trips.

22     Q.      Was there any requirement that more than one

23  probation officer go on these commitment trips?

24     A.      There was always a requirement two probation

25  officers went on those trips.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          212

1      Q.      And why was that, sir?

2      A.      Just for liability concerns and safety concerns.

3      Q.      Specifically what safety concerns?

4      A.      Oh, my.  Plenty.  Fights.  Arguments.

5    Contraband.  I can testify most of the morning as to the

6    safety concerns.  We had kids fighting in the courthouse.  We

7    had kids throwing the defendant's tables in the judge's

8    chambers.  We had kids fighting in the hall.  We had kids

9    fighting in our offices.

10            It was a traumatic time for a kid to be sent away

11   by judicial order to an institution for the next 12 months of

12   his life, and they weren't willing to go sometimes.

13     Q.      So the safety concern was it was thought that it

14   was better to have two adults along with one juvenile in case

15   there were problems?

16     A.      Yes, ma'am.

17     Q.      Were there any rules about having a probation

18   officer of the same sex go on these commitment trips?

19     A.      I don't recall any rules of any gender

20   differentiation between who you would take or who wouldn't

21   take.  I mean, Ms. Varner was included the same as was Nicole

22   Galbraith, or Nicole Horick at the time.  She went with me on

23   trips.  There was different people.  And I usually went on a

24   lot of trips because I enjoyed that part of the job and it

25    gave me the opportunity to meet with the administrators at

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                213

1    the placement facilities.

2        Q.       In fact, you volunteered for as many of those

3    trips as you could, correct?

4        A.       No.  I would volunteer when somebody else would

5    not want to go.

6        Q.       Now, was it ordinary that the person who had

7    previously supervised a particular juvenile take that

8    juvenile on the commitment trip?

9        A.       I testified earlier that usually the

10   responsibility remained with the person that was assigned the

11   juvenile, and if that juvenile got placed, that would be the

12   PO that was responsible to make arrangements for the

13   transportation of that juvenile to the institution he was

14   placed at.

15       Q.       And that probation officer would either take the

16   juvenile him or herself, or get somebody else to do it?

17       A.       He would decide on taking the person and then

18   recruiting another person to accompany him.

19       Q.       And it became known, did it not, that you were

20   one of the individuals who liked to take these trips?

21       A.       Known to who?

22       Q.       The other probation officers.

23          MR. MacMAIN:  I'll object as to what other people

24     thought or believed or knew.

25          THE WITNESS:  I don't know how to answer that.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    214


 1     BY MS. WALLET:

 2          Q.     Well, if a probation officer needed to recruit

 3     someone to accompany him or her, there were certain people in

 4     the office who didn't like to do it, and there were other

 5     people who did, correct?

 6          A.     Yes.

 7          Q.     Okay.  Give me the list of the people who didn't

 8     like to do it.

 9          A.     I don't know.  You're asking me to recount things

10     that were back 10 and 15 years ago and who wanted to go on a

11     certain commitment trip.  That's ludicrous.

12          Q.     You don't remember?

13          A.     I don't remember.

14          Q.     You do remember you liked to go?

15          A.     Yes.

16          Q.     And you think you kept that completely to

17     yourself, you didn't tell anybody else that you liked to go?

18          A.     Oh, come on.

19          MR. MacMAIN:  Objection.  That's argumentative.

20     He's already testified he likes to go.  He also testified he

21    can't tell you who, what other people thought.  I think

22    that's been asked and answered, and I think we can move on.

23    BY MS. WALLET:

24        Q.    If I looked at the statistics, sir, of how many

25    commitment trips the individual probation officers took,


                        Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                         215


 1    would you be on the list of having among the highest of the

 2    trips?

 3        A.    Yes.

 4        Q.    Now, did Ms. Varner like to go on these

 5    commitment trips?

 6        A.    She evidently did, because she was with me for

 7    almost 24 trips between '95 and the time she made her

 8    Complaint.

 9        Q.    Did she ever complain to you that she did not

10    want to go on these commitment trips?

11        A.    Not at all.

12        Q.    Did you ever say to her:  If you don't like to do

13    this kind of work, you can go back to your work in Children

14    and Youth?

15        A.    That's not true at all.

16        Q.    You never said that?

17        A.    Never said that at all.  That's a complete

18    fabricated lie if that's what her testimony is.

19      Q.      Did you ever say that in reference to any other

20  work besides commitment trips?

21      A.      No.

22      Q.      Did you ever say anything to her that suggested

23  that you thought social work was somehow lesser work than

24  probation officer work?

25      A.      That's another fabricated lie, if that's the


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    216


1  testimony.  No, I never said that.

2      Q.      Did you think that?

3      A.      No.

4      Q.      How many siblings in your family?

5      A.      Two children.

6      Q.      And was the other child a boy or a girl?

7      A.      Both children were girls.

8              MR. MacMAIN:  She's asking about his family,

9  whether he has siblings.

10             THE WITNESS:  Oh, I'm sorry.

11             MR. MacMAIN:  That's fine.  It wasn't clear.

12             THE WITNESS:  Okay.  You want to know in my

13  immediate family.  I have one sister.

14  BY MS. WALLET:

15     Q.      And what was your relationship to your sister?

16     A.      A brother.

17       Q.      Well, I'll grant you that.  How would you

18  describe your relationship with your sister?

19              MR. MacMAIN:  That's a better question.

20              THE WITNESS:  Very positive.

21  BY MS. WALLET:

22       Q.      Is she an older or younger sibling?

23       A.      She's an older.

24       Q.      How much holder?

25       A.      Almost two years.  Within a few months of two


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                         217


1   years older.

2        Q.      Does she work outside the home?

3        A.      Yes.

4        Q.      What does she do?

5        A.      She's a school nurse in the Ocean City, New

6   Jersey, school system.

7        Q.      Is she a registered nurse?

8        A.      Yes, ma'am.

9        Q.      Where did she go to school?

10       A.      Temple University.

11       Q.      Is she married?

12       A.      Yes.

13       Q.      Does she have children?

14       A.      Two children.

15      Q.      Boys or girls?

16      A.      One boy and one girl.

17      Q.      Hold are they?

18      A.      Sarah just turned 21, and Mark is 18, or he'll be

19   18 on April 11th.  So he's 17, soon to be 18.

20      Q.      Were your parents married more than one time?

21      A.      One time.

22      Q.      For life?

23      A.      Yes, ma'am.

24      Q.      And I know that your father is deceased.  Is your

25   mother still alive?


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                          218


1       A.      No, she's deceased.

2       Q.      And did your father die before your mother?

3       A.      He died in I think 1991.  August 22nd.

4       Q.      And when did she die?

5       A.      January 4th of '98.

6       Q.      Did you ever tell your mother about your

7    relationship with Ms. Varner?

8       A.      No, ma'am.

9       Q.      Why not?

10      A.      No specific reason.  I was probably embarrassed.

11      Q.      I believe I asked you this before.  You did not

12    tell your father, either, correct?

13        A.    No.  No.

14        Q.    He was really deceased before you began this

15    relationship?

16        A.    He was dying of cancer about the time I met

17    Mrs. Varner.  And that was one of the things I confided with

18    her about, how upset I was, you know, for him dying of

19    cancer.

20        Q.    How would you describe your relationship with

21    your mother?

22        A.    Wonderful.

23        Q.    Were you close to her?

24        A.    Sure.

25        Q.    Was she close to you?


                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        219


1        A.    Yes.

2        Q.    What was your childhood like?

3        A.    Wonderful.

4        Q.    What was wonderful about it?

5        A.    Just very satisfying, very fulfilling.  Very

6    loving, very nurturing.

7        Q.    How would you describe --

8        A.    A lot of commotion.  My parents had a store,

9    Ms. Wallet, and a lot of my excitability and a lot of my

10    personality is probably developed over that drugstore,

11    because what my dad did was run a little convenience store,

12    and he was in that store from seven o'clock in the morning

13    till ten o'clock at night.  So what that meant is our family

14    interactions were limited.  As far as having a sit-down meal,

15    it was unheard of.  And my recollection of what my mom used

16    to say, get the hell down to the store and let him come home

17    to eat.  That's how we had meals.

18          So some of my personality probably is formulated

19    by the rearing process of having a store being open 365 days

20    a year, my dad being in that store from seven o'clock in the

21    morning sometimes till 10 ten o'clock at night, and my

22    personality as well as my sister's probably are adaptive to

23    that type of setting.  And that's why I talk fast, I reason

24    fast, and because we had no time to settle, you know,

25    differences in the family or differences in things that would


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    220


1    come up.  We just, our life revolved around that store.

2        Q.      Did your parents have a good sexual relationship?

3                MR. MacMAIN:  Objection.  If you know.

4                THE WITNESS:  I don't know.  They consummated two

5    children so I'm sure they had something that was positive.

6    BY MS. WALLET:

7        Q.      To the best of your knowledge, did either of them

8    have any affairs?

9        A.    Not at all, that I know of.

10       Q.    Do you believe that you would know if that were

11   the case?

12       A.    Absolutely.  My family was in a public arena.  I

13   mean, we operated a store in a small town.  Everybody knew

14   everything about everybody.  I'm sure I would have heard

15   that.

16       Q.    Did you ever say to anyone in the workplace:  In

17   Newville men own their women?

18       A.    That's not true.

19       Q.    You never said that?

20       A.    No.  I think that was attributed to Kerry Houser

21   claiming I said that when Joe was going through his first

22   business with her.  Kerry says a lot of things, Ms. Wallet.

23       Q.    You believe her to be untruthful?

24       A.    Yes.

25       Q.    Could you give me some examples of why you


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        221


1    believe her to be untruthful?

2        A.    Just different defendants I even work with in the

3    Adult section feel that she's less -- she's disingenuous with

4    her cases.

5        Q.    Well, I'm not asking about anyone else.  I'm

6    asking you, what has caused you to conclude that she is

7    untruthful?

8        A.    Because I think she was part of the rumor mill

9    that established two probation officers in our office being

10    arrested by the Attorney General's Office over 10 years ago,

11    and/or and then -- or not arrested, I'm sorry, investigated

12    by the Attorney General's Office.  And subsequent

13    investigation proved that they were innocent and there was

14    never any charges pending.

15            But there was a vicious rumor mill regarding a

16    Mike Dunsmore and a Paul Meuron, and that rumor got

17    circulated in our office, and I believe Kerry to pass that

18    rumor on, maybe to Judge Bayley.  That's what I had heard.  I

19    don't have any person and I have no firsthand knowledge of

20    that.  But Kerry was one of the ones that was circulating

21    trying to have these men arrested, you know, for something

22    that they really didn't do.

23        Q.    So you believe that Kerry Houser made some

24    allegations against Mike Dunsmore and Paul Meuron?

25        A.    She was part of the office parade that were



                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    222


1    making accusations against those two men 10 years ago, or

2    longer than that.  It's 15 years ago now, I think.

3        Q.    And how do you know that, sir?

4        A.      There was newspaper articles and -- how do I know

5    about what?

6        Q.      How do you know that she was the one that made

7    the allegations?

8        A.      I think it was told to me that she was the one

9    that went up to Judge Bayley and was complaining to Judge

10   Bayley about the commotion about these two men with this DUI

11   school.

12       Q.      Okay.  And were either Mr. Dunsmore or Mr. Meuron

13   terminated?

14       A.      No.  They both had sought other employment and

15   left.

16       Q.      And your understanding --

17       A.      They were vindicated by the Attorney General's

18   Office.  They were never charged.

19       Q.      And what did you believe the allegations of

20   Ms. Houser were against these two men?

21       A.      What I believe is that I was told she was one of

22   the persons that went up to Judge Bayley to try to have this

23   matter investigated.

24       Q.      And what was this matter, sir?

25       A.      This matter of these men supposedly forging names

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                       223

1    on some DUI rosters.

2      Q.     It had something to do with individuals being

3  paid based on the number of individuals in the DUI school?

4      A.     It had to do with -- what I understand of that

5  mess was that Mr. Meuron ran the DUI program and the ARD

6  program along with Mike Varner, and Mr. Meuron and

7  Mr. Dunsmore taught together.  And during their teaching they

8  evidently had excused a member of one of their classes to go

9  up, move on out to Colorado, and one of the other members

10  evidently signed the man in, thinking he was there and forgot

11  his signature.  So this was concocted to mean that this was a

12  criminal offense, a forgery, when it was more of a

13  bookkeeping issue.  And I think the Attorney General came in,

14  interviewed all the members of our staff in the DUI at that

15  point and then concluded there was not enough evidence to

16  prosecute these men.  And --

17           MR. MacMAIN:  Just answer what she's asking you.

18  BY MS. WALLET:

19      Q.     And did they leave shortly thereafter?

20      A.     One left early, and then -- one left because he

21  went on to a treatment center, and another one left maybe a

22  year later.

23      Q.     Which one left first?

24      A.     I think Meuron left first.  He was hired by Matt

25  Talbott House.

1     Q.     And then Dunsmore left later?

2     A.     Right.

3     Q.     What was your professional relationship to these

4    two men?

5     A.     Just as co-workers.

6     Q.     Why do you believe that Ms. Houser made these

7    allegations?

8            MR. MacMAIN:  Objection.  If you have any

9    personal knowledge or belief, you can answer that.  I don't

10    want you to guess.

11           THE WITNESS:  I don't know.

12    BY MS. WALLET:

13    Q.     Did you believe those allegations to be

14    untruthful?

15    A.     What allegations?

16    Q.     The allegations against Meuron and Dunsmore.

17    A.     Made by whom?

18    Q.     Made by Ms. Houser.

19    A.     I don't know what Ms. Houser exactly said other

20    than she wanted the matter investigated.

21    Q.     If you remember, sir, I asked you why did you

22    believe that Kerry Houser was untruthful, and I understood

23    your response to be she was involved in this mess with

24    Dunsmore and Meuron, that was one of your reasons why you

25    thought she was untruthful.  Did I misunderstand?

     1        A.      No, not at all.

     2        Q.      And what was it that you believed she had done

     3   that was untruthful with regard to this incident?

     4        A.      I don't think it was in her place to be assessing

     5   blame to individuals that were innocent of a charge, or

     6   innocent, and I think she along with other members of the

     7   office assessed blame to these men before anything was ever

     8   proven.

     9        Q.      Was it not in her place to bring some evidence of

    10   impropriety to the judge?

    11        A.      You would have to ask her that.

    12        Q.      Well, you said you didn't think it was in her

    13   place.  Why not?

    14        A.      I didn't think it was in her place to pass a

    15   rumor without any evidence to substantiate the rumor.  And

    16   that went as well to anybody else that passed the rumor about

    17   that.

    18        Q.      Was she allied with other people making this

    19   allegation?

    20        A.      She might have been.  Not that -- I don't know if

    21   she was aligned with them.  She was just one of the ones

    22   along with the others that had contributed to this commotion.

    23        Q.      And who else contributed to the commotion?

    24        A.      Probably Hank Thielemann and Tom Boyer.

    25        Q.      Anyone else?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    226

1    A.    You would have to ask Mr. Bolze.  He handled that

2   investigation initially.

3    Q.    I'm asking, sir, who else you know was involved

4   in this incident?

5          MR. MacMAIN:  If you know of anyone else that you

6   believe.

7          THE WITNESS:  No.  No.

8   BY MS. WALLET:

9    Q.    So Kerry Houser, Hank Thielemann and Tom Boyer

10  were the only ones you knew --

11   A.    And Ken Bolze.

12   Q.    Who you knew were involved in this?

13   A.    Who I knew, right.

14   Q.    Okay.  Now, what other incidents are you aware of

15  that has caused you to conclude that Ms. Houser is

16  untruthful?

17   A.    Well, it might not be a total matter of

18  untruthfulness, but I had had some problems with Mr. Meuron

19  when he ran the DUI school, and one particular problem was he

20  had --

21          MR. MacMAIN:  Gary, listen.  She asked you if you

22  can point to any examples, and if you can't, if it's just

23  your sense that you don't think that Kerry Houser is

24    completely truthful, okay?  So let's just stick with Kerry

25    Houser, and if you can, give examples.  If it's just your

S. Gareth Graham                                   227


1    sense that you don't believe she's credible or truthful, then

2    that's fine as well.  That's all she wants to know.

3             THE WITNESS:  And that's what I'm getting to.  I

4    just take a lot longer to get it out.

5             What happened was Meuron had purchased some books

6    like Don't Help and Under the Influence, and they were a type

7    of paperback books that were attributed to the DUI situation.

8    And they were like what we consider the Bibles on looking at

9    alcohol and alcoholism.  So he had purchased these books, and

10   he purchased maybe 11 of them.  And Mr. Bolze asked me -- you

11   know, I said, I didn't get a book.

12            And on those books -- I went around to different

13   people that Mr. Meuron had distributed the books to and

14   said -- I was frustrated because he didn't give me the

15   manual, or he didn't give me the book to read, and I was

16   complaining about Mr. Meuron.  And one of the persons I

17   complained to was Kerry Houser.  And I -- and she said, well,

18   in her quote and in her language, she said, don't you

19   understand, Gary, Mr. Bolze lives vicariously through Paul

20   Meuron's penis.  That was her quote to me.  So that's the

21   nature of Ms. Houser's comments.  And that was one of the

22    reasons I never liked Ms. Houser or professionally got along

23    with her.

24        Q.    So you didn't like her language?

25        A.    I didn't like her language.  And in that


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        228


1    particular situation that's how she viewed how the

2    relationship between Mr. Bolze and Mr. Meuron, that Ken lives

3    vicariously through Paul's penis, attributing that to Paul

4    Meuron, who was a single man that had different escapades and

5    evidently he shared those with Mr. Bolze.  So in Kerry's

6    glossary review of those two people was summarized in that

7    comment.

8        Q.    And why did that incident lead you to conclude

9    that Kerry Houser was untruthful?

10        A.    That incident made me not trust Kerry Houser

11    because I thought it was very inflammatory.  I thought it was

12    very gender specific, I thought it was, you know, it's very

13    frightful.

14        Q.    What was frightful about it?

15            MR. MacMAIN:  He just answered that.  He

16    explained to you.

17    BY MS. WALLET:

18        Q.    Do you have any other incidents that led you to

19    conclude that Kerry Houser was an untruthful person?

20    A.    Not during the Juvenile Probation office.  From,

21    I've had different people and there's different people

22    written letters to the Adult staff and the supervisors

23    attributing her to not being truthful.  But that can happen

24    to any probation officer, so I'm not just saying that happens

25    to her specifically.  Clients that you deal with always


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    229


 1    complain about you.

 2    Q.    Do you know any other incidents, you personally,

 3    know of any other incidents that caused you to conclude that

 4    Houser was untruthful?

 5    A.    Well, there was an incident where Barbara Varner

 6    shared with me is that Kerry was -- Barb Varner shared with

 7    me that Kerry was I guess cited by the Carlisle Police

 8    Department for a criminal trespass charge for going into her

 9    husband's lawyer's office when she was going through a

10    divorce.  And supposedly, according to Ms. Varner who was

11    repeating this to me, there was a notice going to be sent to

12    our office.  And I did see a certified mail laying on Ken

13    Bolze's desk regarding that she had had a notice of trespass

14    because she was going to Chuck Vohs's professional office,

15    who she was married to and had a baby to, and going there and

16    in short words, raising hell during the middle of the day to

17    the point where the lawyers, Mr. Vohs and his partner, had

18    her cited with criminal trespass and was served a criminal

19    trespass notice.  So that's the other only other incident

20    that I know of that came through Mrs. Varner because

21    Mrs. Varner told me that.

22         Q.    And what about that incident involved

23    untruthfulness?

24         A.    It's not an issue of untruthfulness, it's an

25    issue of whether I trusted her.  And I didn't trust her

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    230

1    because of the vicious things that she had done and said.

2         Q.    Did she say anything vicious about you?

3         A.    You would have to ask the other people.

4         Q.    I'm asking you, sir.  Do you know of anything

5    that she said that was vicious toward you?

6              MR. MacMAIN:  If you know.

7              THE WITNESS:  I don't know.  I don't remember.

8    BY MS. WALLET:

9         Q.    Did she say anything vicious toward anyone else

10    in the Probation office?

11              MR. MacMAIN:  Again, Gary, that you know of.

12              THE WITNESS:  No, that I know of.

13    BY MS. WALLET:

14         Q.    Now, you mentioned that you thought other people

15    believed her to be untruthful.  Correct?

16        A.      No, I don't remember saying that.

17        Q.      Well, you said other people wrote letters about

18   her untruthfulness.  Did I mishear that?

19        A.      Yeah.

20        Q.      Okay.  Well, were there others who thought she

21   was, she, Kerry Houser, was untruthful?

22        A.      I don't know.

23        Q.      Well, did other people tell you:  I don't trust

24   her, she doesn't tell the truth?

25              MR. MacMAIN:  Other people besides these letters


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    231


1    he spoke about?

2              MS. WALLET:  Yes.

3              THE WITNESS:  No.  I don't know of any other

4    incidents that I can recall.  I just don't remember.  The two

5    incidents that I cited were the glaring examples of what I

6    remember.  I mean, there could have been other incidents.

7    BY MS. WALLET:

8         Q.      Were there people in the Juvenile Probation

9    office who didn't like Kerry Houser?

10        A.      There again, I don't have any specific knowledge

11   of who liked her and who didn't like her.

12        Q.      Did you like her?

13        A.      Not particularly, ma'am.

14          Q.      Why not?

15                  MR. MacMAIN:  It's been asked and answered.  He's

16      already given you reasons and said why.  You want him to

17      answer again?

18                  MS. WALLET:  Well, I asked him about

19      untruthfulness.  That's different from whether you like

20      somebody.

21                  MR. MacMAIN:  You also asked about like and he

22      gave you examples.  He said she was vicious and he gave some

23      examples of those things.

24      BY MS. WALLET:

25          Q.      Any other reasons why you didn't like her?



                        Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        232


1           A.      I remember before she was even hired we had a

2       Christmas party one time, and at the counter, she stood at

3       the counter and told Judge Sheely dirty jokes.  And Denny

4       Drachbar, you know, brought that to me, too.

5           Q.      When you say brought that to you --

6           A.      Well, he heard her out there talking and telling

7       the jokes.

8           Q.      Did you hear her tell the jokes?

9           A.      I heard her telling the jokes, sure.

10          Q.      And then you and Drachbar talked about it later?

11          A.      Yeah, probably, um-hum.

12      Q.      And what was Drachbar's reaction?

13      A.      I don't know.  I think he said something about

14  maybe Judge Sheely will end up hiring her because he, you

15  know, she's out there personalizing things to him.

16      Q.      Why would Drachbar be of that opinion?

17      A.      Well, I think she had applied at our office.

18      Q.      Drachbar thought that Judge Sheely would be

19  impressed by the fact that she was telling dirty jokes?

20      A.      You'll have to ask him.  I don't -- that's...

21      Q.      Do your daughters know of your affair?

22      A.      Yes, they do.

23      Q.      Are either of your daughters married?

24      A.      No, ma'am.

25      Q.      Are they sexually active?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    233


1       A.      Not that I'm aware of.

2       Q.      Do you believe you would be aware of it?

3       A.      I think so, um-hum.

4       Q.      How would you describe your relationship to your

5   daughters?

6       A.      Excellent.

7       Q.      How did you tell your daughters about this

8   affair?

9       A.      Just by confessing.

10      Q.      Well, did you tell them one at a time or both

11  together?

12      A.      I told them individually.

13      Q.      Which one did you tell first?

14      A.      I think Andrea, the oldest one, and then Julie.

15      Q.      All right.  When did you do this in relation to

16  telling your wife?  Was it shortly thereafter, a couple weeks

17  after, months after?

18      A.      No.  It was quite a significant amount of time

19  after.  Maybe two years after.  Maybe longer.

20      Q.      And what prompted you to tell your daughters

21  about this?

22      A.      I think they had seen that my wife and my, our

23  relationship had deteriorated after these allegations in this

24  lawsuit, and I just felt somewhere along the line they needed

25  to know.  I wanted to protect them, because they were pretty


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                234


1  young teenagers, you know, at the time.  So I -- that's what

2  prompted me, just a cleansing.

3      Q.      And what did you tell Andrea about this affair?

4      A.      I just said that I had been involved in an

5  extramarital affair and that I was sorry.

6      Q.      Did you tell her with whom?

7      A.      I think Barb Varner -- I don't think she knew who

8    that was.

9    Q.    Did you mention Barb Varner by name?

10    A.    I think so.  Or a lady at work.  And I think she

11    knows it was Barb Varner.

12    Q.    Did your daughters ever meet Ms. Varner?

13    A.    On one occasion my oldest daughter met her.  She

14    come into the courthouse and we met, Barb and I had met in

15    the coffee room.  And Andrea was a swimmer at the time and

16    Barb had, Barb Varner had talked about her being a water

17    safety instructor.  And actually, Barb Varner I think gave my

18    daughter some, I don't know, I think it was comic books at

19    the time or something, that pertained to swimming.  My

20    daughter's been a swimmer and was a water safety instructor

21    and was a lifeguard.

22    Q.    And did you tell Andrea that this was the woman

23    that she had met and gave her the comic books?

24    A.    I don't think she remembers, though.

25    Q.    Did you tell Andrea that it went on for a number

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                         235

1    of years?

2    A.    Yes, ma'am.

3    Q.    What was her reaction?

4    A.    She's disappointed.

5    Q.    What did she say that caused you to believe she

6    was disappointed?

7        A.    She said, how could you do that to us.

8        Q.    And what did you respond?

9        A.    I responded that it was a very selfish thing to

10   do.

11       Q.    And now, you spoke to your daughter Julie on a

12   separate occasion, correct?

13       A.    Yeah.

14       Q.    Shortly after Andrea?

15       A.    No.  I don't know the time frame, no.  It

16   wouldn't have been shortly -- I think Andrea knew it for a

17   longer period.  And I think her mother had told them both,

18   that it was -- and I had told them my part of it.

19       Q.    Did their mother tell them before you told them?

20       A.    She might have, yes.

21       Q.    Why do you believe that?

22       A.    Well, I think -- I had asked my wife to try to

23   conceal this from the kids and not interrupt them, and she

24   said, well, it's going to have to come out sometime.  So I

25   think she mentioned it to them at one juncture.  And then



                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                         236


1    them individually, you know, came to me and asked probing

2    questions to the point where I talked to them about it.

3             I think Julie, I remember I was coming back from

4    the York fair and said something in the car and --

5        Q.    Just you and she?

6        A.    Yeah.

7        Q.    And you brought up the subject?

8        A.    She brought up the subject.

9        Q.    What did she say to you?

10       A.    Did you have a affair with this woman, why would

11   you do that.

12       Q.    And then you were --

13       A.    Can I get a drink?

14             MS. WALLET:  Sure.

15             MR. DELLASEGA:  I wouldn't mind five minutes.

16             (Recess taken from 10:26 until 10:35 a.m.)

17   BY MS. WALLET:

18       Q.    When we took the break I believe you were telling

19   me she brought up the subject when you and she were coming

20   home from York?

21       A.    Yes, coming home from the York fair.

22       Q.    What did she say to you?

23       A.    Just said, Dad, you know, how could you have done

24   that to Mom and us.

25       Q.    And how did you respond to Julie?


                    Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        237


1        A.    I told her the same thing, it was a very selfish

2    thing to do, and her mother and I's relationship had

3    deteriorated over the years, and I stepped outside the

4    marriage.

5         Q.    Now, you married your wife on what day?

6         A.    August 14th of '82.

7         Q.    And did you marry in a traditional religious

8    service?

9         A.    Yes, ma'am.

10        Q.    And did you take what I would consider to be

11   traditional religious vows?

12        A.    Yes.

13        Q.    Did you believe that this relationship with

14   Ms. Varner was a breaking of those vows?

15        A.    Yes, it was.

16        Q.    I believe I asked you this question, but indulge

17   me, it's been a while since I talked to you.  Did you break

18   your vows with regard to any other individual during the

19   course of your marriage?

20        A.    No, ma'am.

21        Q.    Now, you said that your marriage had deteriorated

22   and you thought that your daughters were aware of that.

23   Correct?

24        A.    Maybe deteriorated wasn't a good word.  It was --

25   maybe I could use the word just a matter of consumption.  We

1    were just at -- we were just consumed with everything in the

2    marriage, trying to earn a living, trying to both occupy two

3    separate jobs, trying to raise two children.

4          Q.    From 1982 until when you initiated this affair

5    with Ms. Varner, would you consider your marriage to have

6    been a happy one?

7          A.    Yes, ma'am.

8          Q.    Did you complain to anyone in the Probation

9    office about the condition of your marriage?

10         A.    In what time frame?

11         Q.    Between 1982 and approximately 1990 when I

12   believe you've said you began this relationship.

13         A.    No.  No.

14         Q.    Did you ever talk about your wife's sexual

15   preferences in the office during that time period?

16         A.    No, ma'am.

17         Q.    Did you ever talk about you and your wife's

18   sexual relationship with others in the office?

19         A.    In what regard?

20         Q.    Her sexual appetites, your sexual appetites?

21         A.    No, to those questions.

22         Q.    How about preferences?

23         A.    No.

24         Q.    Did you complain about her love making, in the

25   office?

Emily R. Clark, RMR

S. Gareth Graham                                         239

1        A.      I would probably say that we weren't active

2    enough, however.

3        Q.      You wanted sex more often than she did?

4        A.      Yes, ma'am.

5        Q.      And you would have said that in the office?

6        A.      I might have, sure.

7        Q.      Was there some one individual in the office with

8    whom you were particularly close and you confided these

9    things?

10       A.      Not really.  Just shared on a general basis, just

11   shared conversation between guys, mostly.  Not girls or gals

12   that were in the -- or the women that were in the office.

13       Q.      Did you have one person that you considered to be

14   your best friend in the office?

15       A.      I didn't have a real best friend.  I could have a

16   best co-worker, I would say.  Denny Drachbar and I did a lot

17   of things together, as well as Joe and I did a number of

18   things together.  And Tom Boyer and I used to have a good

19   relationship.  So there was some that I had better

20   relationships than others.

21       Q.      Okay.  Now, I'm talking about the period between

22   1982 and 1990.  Did you go out drinking with individuals in

23   the office?

24       A.      I can't recall.  I could have.

25       Q.      Did you go out drinking with Mr. Osenkarski?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    240

1        A.      No.  Not specifically, no.

2        Q.      Well, did you go out in groups where

3    Mr. Osenkarski was there and you were there?

4        A.      Probably.  I think when Kerry first joined the

5    staff she lived above the hardware store across from the

6    courthouse and she hosted a couple parties over there.  And I

7    think when Deb Graeff retired, I think Kerry hosted a party

8    there.  But specifically to go out with somebody to drink,

9    I'm not really a -- I wouldn't consider myself a drinker.

10       Q.      Do you keep alcohol in your home?

11       A.      No, ma'am.

12       Q.      Why is that?

13       A.      I don't use it.  My wife doesn't use it.

14       Q.      Is your wife opposed to it?

15       A.      We just don't use it.  She's not opposed to it.

16       Q.      Does she drink socially?

17       A.      No.

18       Q.      Would you say you are a social drinker?

19       A.      No.  I wouldn't describe myself as a social

20   director, either.

21       Q.      But you're not opposed to the intake of alcohol?

22       A.      No.

23       Q.      Now, these gatherings that involved probation

24   officers, did you take your wife to those gatherings?

25      A.      I don't really recall, no, taking my wife to


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    241


 1  Kerry's place.

 2      Q.      Do you believe that your wife was present with

 3  you when you were socializing with any of the groups of

 4  probation officers?

 5      A.      I think she was on occasion, sure.

 6      Q.      Did you ever lie to your wife about where you

 7  were going when you were going to go out with other probation

 8  officers?

 9      A.      No.

10      Q.      Did you ever tell other probation officers that

11  you had lied to your wife about where you were?

12      A.      You'll have to give me specifics.  I don't know,

13  that's a generalized -- I don't even know what you're getting

14  at.

15      Q.      You don't remember?

16              MR. MacMAIN:  Objection.  He said he didn't

17  understand your question.

18              THE WITNESS:  I don't understand.

19              MR. MacMAIN:  He can't answer your question, he

20  doesn't understand it.

21  BY MS. WALLET:

22      Q.      Did you ever tell any other probation officer

23    that you had lied to your wife about where you were?

24        A.    Not that I recall.

25        Q.    Did you ever observe Mr. Osenkarski in an


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    242


1    intoxicated state?

2        A.    Does intoxicated state imply that he was out of

3    control or in control?

4        Q.    Either one.

5        A.    Probably -- I've seen Joe many times when he's

6    been drinking and maybe somebody would call him intoxicated.

7    Was he out of control?  No.

8        Q.    Were there any times when the individuals present

9    would not permit him to drive?

10        A.    I don't -- no, I don't have any idea what you're

11    talking about there.

12        Q.    Were there times when you observed Mr. Osenkarski

13    in a state in which you would not want him to be behind the

14    wheel?

15        A.    No.

16        Q.    Did you ever take him home because you thought he

17    was intoxicated?

18        A.    No.

19        Q.    Are you aware of other times when individuals

20    took him home because they thought he was intoxicated?

21          MR. MacMAIN:  Objection to form of the question.

22          THE WITNESS:  I don't know what other people did

23   with Mr. Osenkarski.

24   BY MS. WALLET:

25     Q.    Did you ever observe Mr. Osenkarski to drink


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                          243


 1   alcoholic beverages during the workday?

 2     A.    I never observed him drinking during the workday.

 3     Q.    Including lunch time?

 4     A.    Including lunch time.

 5     Q.    Are you currently engaged in a dispute with your

 6   sister regarding your parents' estate?

 7          MR. MacMAIN:  Objection.  What --

 8          THE WITNESS:  No.  I can just answer that.

 9   BY MS. WALLET:

10     Q.    Is there a dispute regarding the distribution of

11   your parents' estate?

12     A.    Not at all, ma'am.  In fact, that was finalized

13   and you can look it up in the courthouse.

14     Q.    And when was that finalized?

15     A.    Well, after my mom's death in 1998.  Steve Tiley

16   was her attorney and he was -- and you can check with that.

17     Q.    Did you make any claims against the estate for

18    expenses that you believed were incurred during your mother's

19    lifetime?

20         MR. MacMAIN:  Let me just object.  Hold on.  I

21    don't see how there's any conceivable relevance to any

22    disputes in his mother's estate or could lead to relevant

23    evidence.  If you want to make an offer of proof as to how in

24    the world this could have any conceivable relevance to the

25    issues in the case, I'm happy to reconsider.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          244


1     MS. WALLET:  Well, as I understand it, the expert

2    that's been retained by the county defendant is going to

3    review the deposition transcript as part of his expert

4    report.  The relationship of Mr. Graham to other women is

5    certainly very relevant to the issue of whether or not he has

6    the predisposition to be a sexually harassing individual, and

7    his relationship to other women includes his family.

8         MR. MacMAIN:  I don't see how a dispute over an

9    estate, which he's already said there wasn't, could have any

10   relevance to that issue.

11        But I mean, I would just also note that we went

12   five-and-a-half hours the other day and we're getting -- I'm

13   going to allow you some liberty, as you did with us with more

14   than the seven hours, but not a whole lot beyond that.  And

15   I'd like to get to the issues that are directly related to

16    the issues in this case that you may want to explore rather

17    than I think on awful tangential issues, if even tangential

18    at all.

19            MS. WALLET:  I understand.

20    BY MS. WALLET:

21       Q.    Did you understand my question?

22       A.    You'll have to repeat it, I'm sorry.

23       Q.    Did you make any claims against the estate

24    regarding expenses that you incurred during your mother's

25    lifetime?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                         245


 1       A.    No, ma'am.

 2       Q.    Did you assert a claim for a less-than-even

 3    distribution of your mother's estate?

 4       A.    No, ma'am.

 5       Q.    So there were no disputes whatever regarding the

 6    settlement of your mother's estate?

 7       A.    None whatsoever.

 8       Q.    At least no disputes with your sister?

 9       A.    It's the only other remaining person.

10       Q.    Now, you said that your relationship with your

11    wife had deteriorated.  Is that one of the reasons why you

12    sought out a extramarital affair?

13       A.    That could have been one the factors.  I did

14    clarify that deteriorated isn't the best word.

15        Q.    Well, how would you --

16        A.    Strained.  I would say it was strained.

17        Q.    Did you ever use the term:  I will punish my

18    wife?

19        A.    No, ma'am.

20        Q.    Did you ever use words to that effect?

21        A.    No.

22        Q.    Did you ever use that term in relationship to

23    women who worked with you in the Probation office?

24        A.    No, ma'am.

25        Q.    Since the revelation of this affair, would you


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        246


1    describe your marriage as a happy one?

2        A.    Since this relevation, what do you mean by

3    relevation?  Coming to light?

4        Q.    Since you told your wife about the affair how

5    would you describe your marriage?

6        A.    Good.

7        Q.    Immediately good, or take a while?

8        A.    My wife's a very forgiving individual, but it

9    took quite some time.

10        Q.    Did she ever make any statements to you about

11    Barbara Varner?

12      A.      In what context?

13      Q.      Well, did she ever say:  I dislike Barbara

14  Varner?

15      A.      Sure.

16      Q.      What did she say?

17      A.      Well, she was resentful towards her as well as

18  me.

19      Q.      What did she say about Barbara Varner?

20      A.      I think she said how selfish Ms. Varner was.  I

21  think she made a comment about, you know, her children were

22  raised and her children were out of her home, and our

23  children were still within our home, and my wife saw that as

24  a very selfish issue with Ms. Varner.

25      Q.      Did your wife call Barbara Varner a bitch?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        247


1       A.      No, ma'am.

2       Q.      Did she use any other terms?

3       A.      Other than liar, I don't think anything else.

4       Q.      Did your wife express to you a hatred toward

5   Barbara Varner?

6       A.      No, I don't think my wife would hate her.  I

7   think my wife was disappointed in myself and her.  I wouldn't

8   say she hated her, no.  She never displayed any hatred toward

9   Barb Varner.

10      Q.      Now, you're aware, are you not, that Ms. Varner

11   made some complaints about your wife's conduct, correct?

12      A.      Yes, I am, ma'am.

13      Q.      And were you present on any of the occasions when

14   Ms. Varner and your wife were in the same vicinity?

15      A.      The only occasion I recall is the one day in

16   March, I think right before I was terminated, this happened

17   on a -- we had, my wife and I had gone home to eat.  And we

18   met Ms. Varner at a blind corner walking out of the

19   courthouse, and Ms. Varner walked directly into the path of

20   my wife and they bumped shoulders.

21      Q.      What was said at the time?

22      A.      I think just excuse me.

23      Q.      Who said that?

24      A.      I think both of them said it to each other.  This

25   is a -- I don't know how to explain it but it's a completely

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        248

1   blind corner, and Ms. Varner was coming out of the parking

2   lot and we were coming down the street on a narrow sidewalk,

3   and we were walking right beside this building.  And it was

4   like, I guess, I think it was, I guess I interpreted it as

5   a -- I saw her coming just at the last minute and stopped,

6   and my wife never saw her coming and they neither one would

7   fail to yield the right of way to each other.  So they

8     brushed shoulders.

9          Q.     And the only thing that was said was excuse me?

10         A.     Yeah.

11         Q.     Your wife didn't say anything else to Ms. Varner?

12         A.     No.

13         Q.     Ms. Varner didn't say anything else to your wife?

14         A.     No.  Or I don't recall.  I don't recall any other

15    conversation.

16         Q.     Now, your wife and Ms. Varner parked in the same

17    parking lot, correct?

18         A.     Yes, ma'am.

19         Q.     And were you aware that Ms. Varner moved her

20    parking space from closer to your wife's space to farther

21    away?

22         A.     No.

23         Q.     You never knew that?

24         A.     I knew it after -- I knew after this came out,

25    you know.  But my wife never told me about it, no.


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                      249


1          Q.     Were you present at the district justice hearing?

2          A.     No, ma'am.

3          Q.     What did your wife tell you about that district

4     justice hearing?

5        A.      She didn't tell me anything other than she was

6    vindicated from the charges that Ms. Varner brought.

7        Q.      Is your wife a quiet or a loud person?

8        A.      Quiet.

9        Q.      Does she talk a lot about personal things?

10       A.      Give me an example.

11       Q.      Well, does she speak with girlfriends about her

12   personal relationship with you?

13       A.      No.  My wife's a very private person.

14       Q.      Does she have a best friend?

15       A.      Probably.

16       Q.      You don't know?

17       A.      I don't know what you mean by best friend.

18       Q.      Does she have a person in whom she confides her

19   private things?

20       A.      Probably not.

21       Q.      Does she confide in you?

22       A.      Yes.

23       Q.      Was there a time when that was not so?

24       A.      Not that I can recall.

25       Q.      Is it accurate to say that your wife was angry

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                250

1    with you that you had an extramarital affair?

2        A.      Probably disappointed.

3      Q.      Not angry?

4      A.      What do you mean by angry, then?

5      Q.      Did she shout at you?

6      A.      No.

7      Q.      Did she give you the cold shoulder for a while?

8      A.      Yes.

9      Q.      Did she deny you sexual relations for a while?

10     A.      No.

11     Q.      Did you go to marital counseling?

12     A.      Yes.

13     Q.      When?

14     A.      I don't recall.

15     Q.      Well, shortly after you told her of the affair,

16  or before?

17     A.      After.

18     Q.      Shortly after, or several years after?

19     A.      Probably within -- it was June.  Probably within

20  a couple, maybe five months, six months.

21     Q.      And how long did you go to counseling?

22     A.      Maybe one or two years.

23     Q.      How often?

24     A.      Infrequently.  We used the EAP services of the

25  county, or what's the acronym, I'm not sure.

 1     Q.     The EAP program?

 2     A.     The Employee Assistance Program, EAP, yeah.

 3     Q.     Did you go to the same counselor, that is, you

 4  and she went to the same counselor?

 5     A.     Initially, no.  And then I ended up going to the

 6  counselor she used.  There was -- or the counselor she was

 7  seeing.

 8     Q.     So initially she went to one person.  Did you go

 9  to someone else?

10     A.     Yes.

11     Q.     And then you stopped going to your person and you

12  went to hers?

13     A.     Correct.

14     Q.     Was that a recommendation, that you use the same

15  counselor?

16     A.     No.  It just seemed to be more productive.

17     Q.     Are you in counseling now?

18     A.     No.

19     Q.     Other than marital counseling, have you engaged

20  in any personal counseling?

21     A.     No, ma'am.

22     Q.     So other than the individuals that you saw during

23  this one- to two-year period, you've not seen anyone else for

24  counseling of yourself?

25     A.     That's correct.

S. Gareth Graham                                              252

1      Q.      Mr. Osenkarski testified that he told you that he

2    had been told by the judge's secretary that you might be

3    fired.  Do you remember that testimony?

4      A.      I don't recall that testimony, no.

5      Q.      Did Mr. Osenkarski tell you that the judge's

6    secretary had told him that the both of you may be fired?

7      A.      No.  I don't think Joe said anything to me about

8    that.  I think -- I wouldn't say a definitive no, but I think

9    the entire office knew what Ms. Varner's pursuits were.

10     Q.      And how did they know that?

11     A.      I have no idea.  I think she -- well, for six

12   months she ran around and had secret clandestine meetings

13   with a select group of disgruntled employees.  I mean, every

14   morning she would meet with Barry Hair, prior to at 7:30 in

15   the morning she would meet with Mark Galbraith, she would

16   meet with Nicole Galbraith, Kerry Houser.  It was a regular

17   routine for her to go around and tell these different people,

18   you know, what she was involved with against Joe and I.  And

19   so I mean, that's just the nature of how it happened.

20             My mother was dying from September of '97 till

21   January of '98.  When she was dying, she was diagnosed as a

22   terminal patient with aortic aneurysms and I was consumed

23   with taking care of my mother.  And this woman, Barbara

24   Varner, just went around every morning with a heyday trying

25   to tell exactly any story she could tell about Joe and I and

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    253

1    trying to get us fired and trying to get us demoted.

2         Q.     You weren't very happy about that, were you?

3         A.     I didn't know anything about it because -- I

4    didn't have a happy or sad face about it.

5         Q.     You didn't know anything about it because you

6    weren't in the Juvenile Probation office at the time?

7         A.     Oh, yeah, I was in Juvenile Probation at the

8    time.

9         Q.     Well, did you observe this conduct or didn't you?

10        A.     I watched her do this, right.

11        Q.     So when you say I didn't know anything about

12   it --

13        A.     I don't know what the --

14        Q.     You watched it happen?

15        A.     I watched her go have these office meetings with

16   these individuals, sure.

17        Q.     And what did you say about that?

18        A.     I didn't say a thing about it.

19        Q.     You didn't go to Joe Osenkarski and say:  What's

20   she wasting time doing this for?

21        A.     I probably did say that.

22        Q.     What else did you tell him?

23        A.     Tell who?

24        Q.     Mr. Osenkarski.

25        A.     Nothing.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                254

1       Q.      Well, did you complain at any time about Barbara

2    Varner and the way in which she acted toward you?

3       A.      I don't recall any specific complaints.

4       Q.      Did you ever make any written complaints about

5    Barbara Varner?

6       A.      No, ma'am.

7       Q.      Did you make any oral complaints that you

8    remember right now to Mr. Osenkarski about Barbara Varner?

9       A.      No.

10      Q.      What did you think of Ms. Varner's professional

11   capability?

12      A.      She was adequate.  Adequate.

13      Q.      Limit it to the period of time that you

14   supervised her.

15      A.      Okay.  Adequate.

16      Q.      How would you rank her among the probation

17   officers that you supervised?

18      A.      In what regard of ranking?

19      Q.      Let's talk about total conduct in the workplace.

20      A.      She was appropriate as far as her conduct in the

21   workplace.

22      Q.      What about quantity of work?

```
23      A.      Probably marginal --

24      Q.      How about quality?

25      A.      -- to average.  Marginal to average.  She didn't
```

                        Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                              255


```
 1   excel, so.

 2              What was your other question, I'm sorry?

 3      Q.      Quality of work.

 4      A.      Satisfactory.  Sometimes commendable.

 5      Q.      Relationship with others?

 6      A.      Good.  Commendable.

 7      Q.      Knowledge of her professional work?

 8      A.      She was inexperienced when I -- she was

 9   inexperienced, so her knowledge was lacking as to how to

10   prepare reports.

11      Q.      Did you make any complaints about Ms. Varner's

12   work performance to anyone during the period of time that you

13   supervised her?

14              MR. MacMAIN:  Including Ms. Varner?  Or are you

15   talking about --

16              MS. WALLET:  Correct.

17              MR. MacMAIN:  Or are you talking about people

18   above them?

19              THE WITNESS:  I complained to her.

20   BY MS. WALLET:
```

21      Q.      What complaints did you make to her?

22      A.      Just different things that she was omitting on

23  her reports.

24      Q.      Specifically what was she omitting?

25      A.      Petition numbers.  She was dropping charges.  She


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                  256


1   didn't carry the charge from the police report onto the

2   juvenile petitions.  She didn't identify victims and where

3   the restitution went.  She didn't differentiate between adult

4   co-defendants and juvenile accomplices, because we would get

5   juveniles charged with certain crimes and we would be

6   processing them much sooner than the adult counterpart, and

7   she would never differentiate between who was involved and

8   what their status was.  She -- there was a multitude of

9   different memorandums I gave to her.

10      Q.      And after you brought these to her attention, did

11  she change the way in which she did reports?

12      A.      Sometimes she resented my corrections.  And as

13  Joe testified to yesterday, we were consumed with other

14  things, I mean, other areas of trying -- pursuits when we

15  split these staffs.  So I finally got so frustrated after

16  giving her the memos two and three different times, I'd say,

17  please get your work reviewed by one of the senior POs before

18  you give it to me.

19       Q.       And who did you expect would review her work

20   before it came to you?

21       A.       Either Sam Miller or Denny Drachbar or Darby

22   Christlieb, any of the senior POs that could help her with

23   correcting the deficiencies in her work.

24       Q.       Did you complain to Sam Miller about Ms. Varner's

25   work?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    257


1       A.       He complained to me about her work.  And he

2   complained to me about always helping her, and he thought it

3   was unfair that I was always assisting her and in writing her

4   petitions, assisting her in writing her reports.  He and

5   Drachbar.  They were very experienced men, been on staff for

6   a long time, handled, you know, a lot of intensive work.  And

7   he thought -- they were giving me a hard time all the time

8   for helping her with her work.

9                Fran Rose would give me a hard time how -- she

10   was a secretary, kept coming to me where Ms. Varner would be

11   omitting things that the judge wanted on the reports.

12       Q.       Okay.  Now, you said that Miller and Drachbar

13   complained to you?

14       A.       For helping her.

15       Q.       Because they had to help Ms. Varner?  Didn't I

16   understand that correctly?

17    A.    No.  They complained to me for overly helping

18  Ms. Varner all the time, in saying, you know, you don't offer

19  that service to anyone else in here, how come she's the only

20  one that gets, you know, all the time, and why are you always

21  doing her petitions, she's never going to learn how to do

22  them while you keep doing them for her.

23    Q.    I understood you to say that you got tired of it

24  after a while and you told her to take her work to one of the

25  other senior POs?

1    A.    On a couple occasions I gave her the same

2  correction memorandum two and three different times.

3    Q.    Okay.  And one of those individuals would be

4  Mr. Miller.  Is it your testimony that Mr. Miller complained

5  to you because he didn't want to review Ms. Varner's work?

6    A.    No.  No.  He was obligated, you know, to review

7  her work since I had asked him to help her with her

8  deficiencies in her reports.

9    Q.    Now, did Mr. Drachbar complain to you about

10  having to review Ms. Varner's work?

11    A.    No.

12    Q.    But Fran Rose, the secretary, did?

13    A.    Fran Rose came to me repeatedly in things that

14  she would miss on her reports.  And Judge Sheely would call

15    down and say, you know, I've been through this before,

16    there's no petition numbers on this juvenile petition.

17        Q.    Was Ms. Varner the only individual about whom

18    there were these complaints?

19        A.    No, ma'am.

20        Q.    Was it a common complaint?

21        A.    Well, there was a -- in that one time period

22    there was probably a couple memos a month, you know, or a

23    couple, you know, just one right after the other probably

24    leading into this April 29th meeting down when she made her

25    complaints with the county.  I had probably gave her a memo

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          259

1    every month that preceded that from November or December.

2    I'm not sure.  You're asking me to go back six, seven years

3    on memos on specific cases that I haven't had any access to.

4        Q.    Do you have any of those memos in your personal

5    possession?

6        A.    Sure.

7              MS. WALLET:  Are you going to supplement your

8    interrogatories?

9              MR. MacMAIN:  Yes.  I can give them to you.  I

10    figured these questions would be asked so I made --

11             MS. WALLET:  Do I take this to be the complete

12    supplementation of the production request?

13          MR. MacMAIN:  Not complete.  This is one packet

14   of information in regard to your question.  You want to mark

15   this or do you want to ask about it?

16          MS. WALLET:  No.  We'll have to take that up at

17   another time, I'm afraid.

18   BY MS. WALLET:

19      Q.     You said earlier, prior to your being terminated.

20   Was that just a slip of the tongue?  Mr. Graham?

21      A.     A slip of the tongue?  I was terminated from the

22   Juvenile Probation office.

23      Q.     Why do you believe that you were terminated as

24   opposed to simply transferred?

25      A.     Because I went out of one department and into a


                    Emily R. Clark, RMR
           717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                      260


1    completely different department.

2       Q.     And that was not your choice?

3       A.     No, ma'am.

4       Q.     That was Judge Hoffer's choice?

5       A.     Well, that's interesting, too.  I don't know

6    whose choice it was because I don't know who employs me.

7       Q.     When you say you don't know who employs you, what

8    do you mean by that?

9       A.     Be it the county did the investigation, and the

10   Court, you know, provided me direction on where I was headed.

11      Q.      Okay.  Well, did you doubt that Judge Hoffer had

12  the ability to transfer you?

13      A.      I've never agreed with the action he took against

14  me, Ms. Wallet.

15      Q.      My question would be:  Whether or not you agreed,

16  did you have any reason to believe he did not have the

17  authority to take some action against you?

18              MR. MacMAIN:  Do you understand the question?

19              Do you mind if I attempt to rephrase it?

20              MS. WALLET:  Sure.

21              MR. MacMAIN:  What she wants to know is, it was

22  not your decision to be transferred to your current position,

23  but now I guess her question is do you know who had the

24  authority to make the decision?  And if you don't, you don't.

25  If you do, you do.  What she's asking is what you know.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    261


1               THE WITNESS:  I don't know if he had the

2   authority to do what he did.

3   BY MS. WALLET:

4       Q.      Why is it that you don't know?

5       A.      I think it's the same issue that's been debated

6   for years, whether Probation staff is a court-related

7   function or a county-related function.

8       Q.      What do you think?

9      A.    Oh, I think it's a court-related function.

10     Q.    So if it's court related why didn't Judge Hoffer

11  have the ability to transfer you?

12           MR. MacMAIN:  Let me object.  I think you're

13  asking him really a legal conclusion on what he believes the

14  law to be.  I don't think he can answer that.  He's told you

15  what he thinks.  I think going further why he -- his opinion

16  on a legal issue I think would be inappropriate.

17           MS. WALLET:  Well, I don't think I'm asking him a

18  legal issue.  I'm asking him why he believes that Judge

19  Hoffer might not have the ability to transfer him.  That's a

20  fact, that's not a legal conclusion.

21           MR. MacMAIN:  If you know, Gary.

22           THE WITNESS:  I don't know.

23  BY MS. WALLET:

24     Q.    Did you think that the county, i.e., the county

25  personnel officer, would have the ability to transfer you?


                  Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                  S. Gareth Graham                    262


1            MR. MacMAIN:  Same objection, but answer it if

2   you know.

3            THE WITNESS:  I don't know.  I don't know.

4   BY MS. WALLET:

5      Q.    Well, what did you think would happen as a result

6   of an investigation of some complaint against you?

7        A.      What did I think would happen?

8        Q.      Well, let me be more precise.  What did you think

9   the procedure should have been?  Someone makes a complaint

10  about you.  What did you think the procedure should have

11  been?

12       A.      I think the complaint should have been made to

13  Judge Sheely initially and not to the county Human Relations

14  division.

15       Q.      And why do you believe that?

16       A.      Because I considered him as the employer.

17       Q.      Okay.

18       A.      I mean, he's the man that hired and disciplined

19  and reviewed our work, and we did 99.9 percent of our

20  activities as court-related matters.

21       Q.      Okay.  And who would have investigated that

22  complaint?

23       A.      Probably the judge, if it would have gone to him,

24  but it didn't.

25       Q.      So you thought the judge should have done all of

1   this?

2        A.      Absolutely.  You know, not Judge Hoffer.

3        Q.      Now, if Judge Sheely had the ability to do it,

4    why wouldn't Judge Hoffer?

5        A.    Because the incident of complaints preceded any

6    involvement of Judge Hoffer.  Judge Hoffer was only on the

7    bench in January of '98.  The complaints that Ms. Varner was

8    making had preceded all those.  So his authority -- like

9    Mr. MacMain said, I'm not trying to offer some legal

10   explanations, but I don't know where his authority extended

11   into the activities I had been alleged to have done prior to

12   him sitting in the administrative judge's position on the

13   bench.  And he was, you know, he was put there in January of

14   '98.  And I was -- he made a decision against me in March

15   9th, I think or March 7th, March 9th of '98, less than 40

16   days thereafter.  Because I was off two weeks for my mother's

17   death and for my wife's grandmother's death.  So there was a

18   juncture of about 40 days of employment that I was under

19   Judge Hoffer's jurisdictional bounds.

20       Q.    And you didn't think that was long enough for him

21   to reach any conclusion about your performance?

22       A.    I didn't say that.  No.

23       Q.    What's the significance of the 40 days, sir?

24       A.    That's the threshold of time that I considered

25   myself under Judge Hoffer's purview of employment.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                S. Gareth Graham                        264


1        Q.    And you didn't think that was long enough?

2          A.     No.  That's just factually how long he was on the

3    bench as president judge as an administrator of the Probation

4    Department, during that juncture from January 1st till I was

5    demoted and sent to the prison.

6          Q.     Well, did you think he had long enough to judge

7    your work performance?

8                 MR. MacMAIN:  Objection.  It's been asked and

9    answered.

10                THE WITNESS:  It's his prerogative.

11   BY MS. WALLET:

12         Q.     Would you agree, sir, that your performance

13   evaluations have always been at least satisfactory, if not

14   commendable?

15         A.     I would think they were satisfactory and

16   commendable, yes.

17         Q.     Do you recall, sir, that the one area that you

18   tended to be rated lower in was interpersonal relations and

19   Affirmative Action?

20         A.     You would have to show me those, because I don't

21   recall that.

22         Q.     Did anyone ever come to you and explain to you

23   why you were rated lower in that area than in the other

24   areas?

25                MR. MacMAIN:  Object.  He said he couldn't --

1                THE WITNESS:  I don't know what you're saying.

2                MR. MacMAIN:  Hold on, Gary.

3                I object.  He said he doesn't know that he was

4       rated lower in those areas, so to ask him other questions

5       you're assuming something he doesn't know whether it's true

6       or not.

7       BY MS. WALLET:

8            Q.    Did anyone ever speak to you, sir, about your

9       conduct in the area of interpersonal relations or Affirmative

10      Action?

11           A.    No, ma'am.

12           Q.    And that would be true of Mr. Osenkarski?

13           A.    Mr. Osenkarski.

14           Q.    Mr. Bolze?

15           A.    Yes, ma'am.

16           Q.    And who currently does your performance

17      evaluations, sir?

18           A.    Lyle Herr and I guess John Roller, I guess the

19      two of them.  And Mike Varner has done them in the past.

20      I've been given three different supervisors, so it started

21      with Herr, it went to Varner, now it's back to Herr again,

22      so.

23           Q.    And your testimony, sir, is none of those

24      individuals has ever spoken to you about the area of

25      interpersonal relations, slash, Affirmative Action?

S. Gareth Graham                                    266

1      A.      No, ma'am.

2      Q.      Before you met with Judge Sheely did you know

3   that you might possibly be terminated from your employment?

4      A.      No, ma'am.

5      Q.      Did you think that that was at least a

6   possibility in the range of potential disciplinary action?

7      A.      You're asking me what I thought on --

8      Q.      Yes.

9      A.      In regard to what?  Whether I would be

10   terminated?  Is that what you're saying?

11      Q.      I asked you, did you think that there was a

12   possibility that you might be terminated before you met with

13   Judge Sheely in or about July of 1997?

14      A.      I don't know a thing about anything that was

15   going on, and I didn't interrupt anything that was going on

16   and I knew nothing about what was going on other than what

17   the county had called me down on the 29th of April.  So any

18   subsequent investigation, any subsequent report, any

19   subsequent actions, I knew nothing about and heard nothing

20   about, period.

21      Q.      Did you have any discussions with the judge's

22   secretary about the possibility of your being terminated?

23      A.      No.

24      Q.      If the judge's secretary, and I'm speaking of

25   Sandy, now, did she ever engage you in a conversation about

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    267

1    your employment in the Probation office?

2         A.    No, ma'am.

3         Q.    When you went to see Judge Sheely the first time,

4    I believe you told me you had two conversations with him,

5    correct?

6         A.    Yeah.  I think I have that straight now.  I

7    wasn't very clear the last time, so.

8         Q.    Okay.  Well, tell me what you remember now about

9    how many times you met with him and when.

10        A.    I only met with him -- I testified earlier that

11   Hank Thielemann came downstairs and I think he had summoned

12   different people upstairs over the course of the events to

13   find out what was going on, or what he knew, what they knew

14   about what was going on.  I'm not sure of that.  That's just

15   another rumor that passed around.

16        Q.    I'm not asking you, sir, for rumors.  I'm asking

17   you to tell me how many times did you meet with Judge Sheely

18   regarding --

19        A.    I think twice.

20        Q.       -- Ms. Varner's complaints?

21        A.    Twice.  I went up on my own after Hank said, I

22   think he's going to transfer you, Gary.  I said, what do you

23   mean he's going to transfer me.  And he said, you better go

24    up there and just talk to him.

25              And so I went up and I asked if I could have time

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    268

1    to talk to him.  And I went in and I basically at that

2    juncture said, Judge Sheely, this is not about sexual

3    harassment in our office, it's about me having a consensual

4    affair with Barb Varner.

5         Q.    Just the two of you?

6         A.    Yeah.

7         Q.    Okay.

8         A.    Then I think I got together with Dave Foster the

9    next day at, like, 11 o'clock or something, or 11:30, right

10   before lunch, I think we both went in.

11        Q.    Okay.  And who was there that time?

12        A.    Just I think Dave Foster and myself and Judge

13   Sheely.

14        Q.    Do you remember anything more about what happened

15   at that 11 o'clock meeting the next day?

16              MR. MacMAIN:  You mean more than what he

17   testified the first day of his deposition?

18              MS. WALLET:  Earlier, yes.

19              MR. MacMAIN:  Anything else you want to add to

20   what you have already told us before?

21          THE WITNESS:  Not really, no.

22          MR. MacMAIN:  That's it, then.

23   BY MS. WALLET:

24     Q.    And did you review something between the time

25   that we took your first day of deposition and today that


                    Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    269


 1   caused you to remember these things?

 2     A.    I just kind of recall, I was trying to separate

 3   that out and I was trying to -- and I had talked to my wife

 4   about it, and I said, you know, I was down there giving

 5   disjointed information the other day and probably driving the

 6   court reporter nuts because I couldn't remember the exactness

 7   of if I would have been in first or if I would have been in

 8   with David Foster.  And then I said, I said -- and she didn't

 9   know because she didn't know when I went in.  And I said, I'm

10   almost positive I went in myself when Hank came down and said

11   something to me, I went directly upstairs.

12          And then the next day I met with Judge Sheely

13   and, you know, with Dave Foster at noon.

14     Q.    Okay.  And you answered that your wife was not

15   present for either of these meetings, correct?

16     A.    No, in ma'am.  Not -- no.

17     Q.    And did you ask your wife recently whether she

18   recalled something different?

19      A.      I think I reviewed that with her the other day

20   after our testimony.  And she said, I wasn't in there with

21   you, she said.

22      Q.      Did your wife tell you anything else that

23   refreshed your recollection --

24      A.      No.

25      Q.      -- of these events?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    270


 1      A.      No, ma'am.

 2      Q.      Is her recollection generally better than yours?

 3      A.      I would think it might be, because I was pretty

 4   traumatized when I went in there and that's probably why I

 5   can't remember.

 6      Q.      And she wasn't --

 7      A.      She wasn't there.

 8      Q.      She wasn't traumatized?

 9      A.      Sure.

10      Q.      Who is Jody Nelson?

11      A.      I have no idea.

12      Q.      Did you ever visit the homes of any of the

13   probation officers who worked with you other than Ms. Varner?

14      A.      I think I had been to Kerry Houser's apartment

15   for a party.  I think I had been to Deb Graeff's house at one

16   point.

17     Q.     For what reason?

18     A.     For, might have been a party when she was

19   retiring.  That's all I can remember.

20     Q.     Ever pick up any of the other probation officers

21   at their homes to go on some work-related trip?

22     A.     I don't recall, no.  Mary Jo Keffer 25 years ago,

23   I remember going to her house in Camp Hill.

24     Q.     And who was she?

25     A.     She was a probation officer.  But that, I can


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    271


1    just remember picking her up at her house.  She wanted to be

2    picked up at her house.

3      Q.     Anybody else?

4      A.     Not that I can remember, recall.  I just can't

5    recall.

6      Q.     Did you ever visit any probation officer

7    uninvited at his or her home?

8      A.     No, ma'am.

9      Q.     Did you know Lynn Dickerson?

10     A.     Yes.

11     Q.     Ever visit her home?

12     A.     Yes, I did.

13     Q.     On what occasion?

14     A.     Under what circumstances or what occasion?  I

15    don't understand what you mean.

16         Q.     Well, what do you remember about visiting Lynn

17    Dickerson at her home?

18         A.     Lynn Dickinson -- I have to go into a periphery

19    here of a story to tell you why I was at her home.

20         Q.     Fine.  I have plenty of time, Mr. Graham.

21         A.     Okay.  What happened is Lynn Dickinson was one of

22    the probation officers that was hired along with Barb Varner

23    and Mark Galbraith when we hired the Family Preservation

24    grant in probation.  She was hired under that, those, that

25    grant proposal.  Mr. Osenkarski and Lynn Dickinson worked

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    272

1    regularly on that grant reporting.  Lynn basically took her

2    summer internship and worked on that proposal.  And it just

3    so happened that Ms. Varner and Lynn Dickinson were in school

4    together at Penn State and I guess they were friends or

5    acquaintances.

6              And what happened is when Lynn Dickinson, after

7    she was hired she decided not to take the position in

8    Probation and go on further to pursue her master's degree.

9    And I received a call at my home by Lynn Dickinson's husband

10   who is an attorney with the Governor's office, and he was

11   distraught because Lynn Dickinson had received a call from

12   Kerry Houser at her personal residence.  And he was angry

13    because Kerry evidently said that in glossary or in

14    conclusatory form, nobody in Probation likes Lynn and she's

15    really not welcome.  And this man was devastated and he said,

16    can you share any light what did Lynn do wrong.  And I said,

17    she did nothing wrong.

18              And I went down and I talked to him and I talked

19    to Lynn about that situation, and that's the only time I was

20    at her home.

21        Q.    Were you invited to the home on that occasion?

22        A.    Her husband called me and said, can we discuss

23    this.

24        Q.    Did he invite you to his home on that occasion?

25        A.    I think so is what I recall.  I don't remember,

S. Gareth Graham                           273


1    like, being inside.  I think I even talked to him on the

2    street or at the front door.  I don't remember ever being

3    inside the home.  I just remembered it was located near

4    Rolling Green cemetery.

5        Q.    Do you remember visiting the Dickinson home on

6    any other occasions?

7        A.    No.  No, none, that I recall.

8        Q.    Only one time?

9        A.    Only the time when he was extremely upset about

10    Lynn getting this phone call from Kerry and saying that

11    nobody wanted her in the Probation office.

12        Q.    Did you hear that directly from Lynn or just from

13    Lynn's husband?

14        A.    From her husband.

15        Q.    Why do you think her husband called you?

16            MR. MacMAIN:  Objection.  If you know why her

17    husband called you.  If you don't, then say you don't.

18            THE WITNESS:  I have no idea why he called me

19    other than --

20            MR. MacMAIN:  If you don't know --

21            THE WITNESS:  I don't know.  I won't summarize.

22    BY MS. WALLET:

23        Q.    Had he known you previously?  Is really the

24    question.

25        A.    No, ma'am.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    274


1        Q.    You never met him before?

2        A.    No, ma'am.

3        Q.    Since you've been at the prison, sir, did you

4    brag about having sexual relations with anyone?

5        A.    No, ma'am.

6        Q.    Did you brag about someone that you had sexual

7    relations with and the father-in-law came to complain?

8        A.    You'll have to be more specific.  I have no idea

 9   what you're talking about.

10        Q.      You have no recollection of that?

11        A.      What, a father-in-law -- I don't have any idea

12   what you're talking about or what your question is.

13        Q.      Did you ever date someone whose father-in-law

14   works at the prison?

15        A.      I don't know who you're referring to.

16        Q.      Did you meet with Mr. Foster in your offices in

17   the Probation Department?

18        A.      I think Mr. Foster came into my office the day we

19   were going to go up to see Judge Sheely.

20        Q.      And did you meet with him there?

21        A.      Sure.

22        Q.      Do you recall how long that meeting was?

23        A.      Probably a couple minutes.  Less than five

24   minutes.

25        Q.      Had you met with Mr. Foster on any other occasion


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        275


 1   prior to your going to meet with Judge Sheely at which

 2   Mr. Foster -- let me try that again.

 3        A.      I'm following you so far.

 4        Q.      Did you meet with Mr. Foster at any time except

 5   for the meeting in your office before you went to see Judge

 6   Sheely and Mr. Foster accompanied you?

```
 7      A.      No, ma'am.

 8      Q.      Did anyone in the Probation office ever tell you

 9  not to raise your voice to Barbara Varner?

10      A.      No, ma'am.

11      Q.      No one?

12      A.      No one.

13      Q.      Did Mr. Osenkarski share his corrective action

14  memo with you?  I'm going to show you --

15      A.      You'll have to remind me.

16      Q.      -- what has been marked previously as Osenkarski

17  Deposition Exhibit 2.

18      A.      I don't recall, ma'am.  I don't remember it.

19      Q.      Did he tell you in or about June of '97 that he

20  was preparing some sort of a corrective action plan?

21      A.      No.  He basically told me that he was researching

22  the, you know, the correction course or the proper course to

23  take for sexual harassment complaints.  That's what I

24  remember him telling me about.

25      Q.      You don't remember him talking to you at all
```

```
 1  about what he was doing in response to Ms. Varner's

 2  complaints?

 3      A.      No.  That's basically what he felt, how he, what

 4  he wanted -- no.  I don't know.  He didn't tell me anything
```

5    of what he was including or investigating in regard to a

6    corrective action plan.

7        Q.    Did he ever suggest to you that you should attend

8    some kind of sexual harassment training?

9        A.    No, ma'am.

10       Q.    Did he ever tell you that he thought you should

11   attend some management training?

12       A.    Sure.

13       Q.    When was that?

14       A.    I think Tom Boyer and I both went to management

15   seminars, you know.  I don't know when, but I recall going to

16   one or two that were put on for management.

17       Q.    And was it after June of '97?

18       A.    It was after I was promoted to supervisor, I can

19   tell you that.  I don't know when it occurred after that.

20       Q.    So you're not sure whether it was before or after

21   June of '97?

22       A.    I think it was after, well, whenever I was

23   promoted.

24            MR. MacMAIN:  She's asking you very specifically,

25   Gary, after these complaints were made.  Do you know if your


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    277


1    management training was after those complaints were made?  Or

2    before, or alternatively if you don't know, you don't know.

3          THE WITNESS:  No.  It preceded that, the

4   complaints.

5   BY MS. WALLET:

6      Q.     And were you aware of any kind of creation of a

7   committee that was to handle complaints of any issues within

8   the Probation office?

9      A.     I recall Joe talking about that.

10     Q.     What do you recall about that?

11     A.     Just that we want to be able to resolve the

12  differences in the amount of animosity that was generated by

13  the split of these staffs, and he felt it was counter

14  productive and unhealthy.  And he said, you know, where Bolze

15  never left anybody in on the administrative side to make

16  corrections, he was not going to do that.  He was going to

17  try to resolve differences between people, you know, in a

18  least restrictive setting or least, something like that.

19  That's what I remember.

20     Q.     Do you know whether such a committee was ever

21  created?

22     A.     I think he went around and asked people if they

23  would be willing to sit on a panel or whether they thought

24  that was a good idea, to try to lower the office commotion.

25     Q.     Did he ask you?

1       A.      No, I don't really think he asked me.

2       Q.      How do you know he asked others?

3       A.      Because I think he went around and I knew about

4    him going around.  Specifically asking me individually about

5    it?  I don't recall him doing that.

6       Q.      Do you know who he asked about whether or not

7    this committee was a good idea?

8       A.      I would imagine he --

9               MR. MacMAIN:  She's not asking for guesses.  Do

10   you know of any specific people that you have firsthand

11   knowledge of who he asked to be on the committee?  And if you

12   don't, you can say that.

13              THE WITNESS:  No, I don't have specific

14   knowledge.  He polled the offices, his words.

15   BY MS. WALLET:

16      Q.      So you know this because of what Mr. Osenkarski

17   told you, not because of what you observed?

18      A.      I just don't remember.

19      Q.      Have you ever gotten into trouble because of your

20   anger management?

21      A.      No, ma'am.

22              MS. WALLET:  Let's mark as Deposition 4 a

23   one-page document.

24              (Graham Deposition Exhibit No. 4 was marked.)

25   BY MS. WALLET:

1       Q.      Do you have that front of you, sir?

2       A.      Sure.

3       Q.      Tell me if you're the S. Gareth Graham listed on

4    this memorandum?

5       A.      Sure.

6       Q.      Do you believe you got a copy of this memo in or

7    about June of 1997?

8       A.      Sure.

9       Q.      And did someone hand you this memo?  How did you

10   receive it?

11      A.      I think Joe gave it to me.

12      Q.      Did you talk with him about this memo at the time

13   that he gave it to you?

14      A.      I think so, yes.

15      Q.      What do you recall about that conversation?

16      A.      He basically had said that when a sexual

17   harassment complaint has been lodged it's a suggestion that

18   the parties are separated so that there isn't anymore hostile

19   work environment or there's no more, what's the right word,

20   there's just no more interaction between the parties.

21      Q.      And did he use the term hostile work environment?

22      A.      Probably.

23      Q.      What did you say to him?

24      A.      And I said, well, that's your decision to make.

25      Q.      Were you happy about this decision, or unhappy?

 1    A.    I didn't agree with it.

 2    Q.    Did you tell him that?

 3    A.    Sure.

 4    Q.    What did you tell him?

 5    A.    I told him I didn't agree with it.

 6    Q.    What did he say?

 7    A.    That's the way it's going to be.

 8    Q.    Did you follow this memo?

 9    A.    Absolutely.

10    Q.    Do you know who was placed as supervisor, other

11 than Mr. Miller, over Ms. Varner?

12    A.    Just Denny Drachbar.  I mean, he was to fill in

13 if Sam wasn't available.

14    Q.    Do you know whether anyone else actually

15 supervised Ms. Varner after this memo in June of '97?

16    A.    No, I don't.  I don't know who else would have

17 supervised her.

18    Q.    Were you told at any time, sir, after June 13 of

19 1997 that you were not to associate with Ms. Varner?

20    A.    I don't understand your question on association.

21    Q.    Were you told to stay away from her?

22    A.    No.

23    Q.    You continued to work in the same office after

24 June 13 of 1997 until you were transferred to the prison, and

25    I believe that was effective --


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              281


1    A.    March '98.

2    Q.    -- March of '98.

3    A.    Yes, ma'am.

4    Q.    Where was your office in relation to Ms. Varner's

5    office between June of '97 and March of '98?

6    A.    My office was back the hall from hers.  She had a

7    cubicle, enclosed office out where the secretaries were, and

8    my office was in the back, in the back of the office.

9    Q.    Did you have to go past her cubicle to exit the

10   office?

11   A.    Yes, I did.  I had to go out into the secretarial

12   area.  I don't know whether you're claiming that's directly

13   past her -- it's a small quarters so it's probably within 10

14   feet of her office, yes, ma'am.

15   Q.    There was only one exit from the office at that

16   time, correct?

17   A.    That's correct.

18   Q.    And that exit was essentially past Ms. Varner's

19   cubicle?

20   A.    It was out into the secretarial area of the

21   office, and her office was back in the far corner of the

22   secretarial area of the office.

23     Q.    Did you have occasion to work on the same cases

24    after June 13, '97, until you were transferred to the prison

25    in March of '98?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham          282

1    A.    I just don't recall.  I might have had other

2    cases with her.

3    Q.    You don't remember?

4    A.    I don't remember.

5    Q.    Now, after you were transferred to the prison you

6    participated in some kind of a sexual harassment seminar,

7    correct?

8    A.    Yes, ma'am.

9    Q.    And it was after you were transferred to the

10    prison?

11    A.    It was before and after.

12    Q.    Do you recall a sexual harassment seminar after

13    you were transferred to the prison?

14    A.    Sure.

15    Q.    And was Ms. Varner also in attendance at that

16    seminar?

17    A.    Not that I recall.  I just don't know.  I don't

18    think so.

19    Q.    Do you believe that all of the probation

20    officers, adult and juvenile, were required to attend this

21    seminar?

22    A.    It was a county -- the one at the prison was a

23    county Human Resources seminar.

24    Q.    My question, sir, was:  Were all of the probation

25    officers required to attend this Human Relations seminar?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          283


1            MR. MacMAIN:  Is your question at the same time,

2    or just at some point they all had to take it?

3            MS. WALLET:  At the same time.

4            MR. MacMAIN:  Do you understand?

5            THE WITNESS:  No.  I'm confused.

6            MR. MacMAIN:  She wants to know if the training

7    that you recall taking at the prison, whether the entire

8    department was there at the same time.  If you know.

9            THE WITNESS:  I've had, like, two or three

10    different or yearly sexual harassment trainings that have

11    been offered at the prison, and it's my recollection that I

12    don't think there was any probation officers in attendance at

13    any of those.

14            MR. MacMAIN:  It perhaps would be easier, I don't

15    know if you want to focus, I believe that's one of the

16    assertions in the Complaint.  Is that the one you're

17    referring to?

18            THE WITNESS:  Well, that one happened at the

19    courthouse, though, the one she's referring to in her

20    Complaint.  That was the one that was set up by I guess the

21    judge and the Human Relations Commission and/or -- and Joe

22    and the rest of the people that used Mazzitti and Sullivan

23    to.

24    BY MS. WALLET:

25        Q.    Okay.  Do you know when that was, sir?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    284


1        A.    You'll have to give me the date.  I don't know.

2    Or judge, you know, can recall, maybe he can recall when that

3    was.

4        Q.    How about October 17 of '97?

5        A.    Yes.

6        Q.    Okay.

7        A.    But that wasn't at the prison.

8        Q.    I had originally asked you about seminars after

9    you were transferred to the prison.  But this was before you

10   were transferred, correct?

11       A.    Yes, ma'am.  Yes, ma'am.

12       Q.    So you have a recollection of the October 17,

13   '97, Mazzitti and Sullivan training?

14       A.    Yes, ma'am.

15       Q.    Okay.  And who was present at that training?

16       A.    A representative from Mazzitti and Sullivan, and

17    all the probation officers.

18        Q.      Were there other county employees at that

19    seminar?

20        A.      There might have been.  I just don't recall.

21    There might have been other people.

22        Q.      Was Ms. Varner present at the October 17, '97,

23    seminar?

24        A.      Yes, ma'am.

25        Q.      Where did you sit in relation to her?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    285


1         A.      I don't recall.

2         Q.      You don't recall that you sat across from her?

3         A.      I recall being in the room and had my -- and

4    talking to the trainer for some reason.  I don't know if I

5    had known him from a previous employment he was involved

6    with, or but I was conversing with him.  And then Ms. Varner

7    and the rest of the probation officers came in the room.

8                 As far as knowing where I sat, I had probably

9    already established my seat with my tablet where I sat that

10   day, so.  Where it was in relation to her, I couldn't tell

11   you.

12        Q.      You believe you sat down first?

13        A.      I was in the room first and sat -- and had my

14   material in the room first, yes.

15    Q.    And you believe that you selected your place --

16    A.    Absolutely.

17    Q.    -- at a chair first?

18    A.    Sure.

19    Q.    But you weren't in your chair at the time?

20    A.    I just said I was, I think I was talking to the

21    facilitator, because it was some connection I knew with this,

22    that I had known this guy or thought I knew this guy.

23    Q.    Did you glare at Ms. Varner during this seminar?

24    A.    No, ma'am.

25    Q.    If someone said you did, that would be a lie?


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    286


1    A.    Absolutely.

2    Q.    Now, you had another seminar after you were

3    transferred to the prison?

4    A.    I've had probably yearly seminars that the county

5    has provided on sexual harassment, and I've been in

6    attendance to all those.  So however many years I've been

7    down there they've had them, a yearly seminar on this.

8    Q.    What you say down there, what do you mean?

9    A.    At the prison.

10    Q.    And were you there with other prison employees?

11    A.    Yes, ma'am.

12    Q.    So this was a seminar for prison employees held

13    at the prison and you were a part of it?

14         A.     It was -- right.  It was a seminar held

15    countywide by a Human Relations facilitator that set up

16    sexual harassment training for everybody in the entire

17    county.  It made sense for me to attend the prison seminar as

18    opposed to run up to the courthouse to go to the Probation

19    seminar when they were being held.

20         Q.     Were you prohibited in any way from being at the

21    courthouse after you were transferred to the prison?  Do you

22    understand my question?

23         A.     Yeah.  That's kind of a multi-leveled, too,

24    response to that.

25         Q.     Well, let me be more specific.  Did you ever get




                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        287


1    a memo that said:  Now that you've been transferred to the

2    prison you are not to enter the courthouse as part of your

3    duties?

4         A.     No, I didn't.

5         Q.     Did any of your supervisors, including Judge

6    Hoffer, tell you that you were prohibited from coming into

7    the courthouse?

8         A.     No, ma'am.

9         Q.     Were you at any time after you were transferred

10    to the prison told that you should not associate or come near

11   Ms. Varner?

12        A.     No, ma'am.

13        Q.     Did you believe that you had any restrictions

14   with regard to your interaction with Ms. Varner?

15        A.     Only my self-imposed restrictions of not wanting

16   to have any interaction with her, and not having any -- I

17   didn't want to have any direct or indirect association with

18   her.

19        Q.     And that wasn't because of what somebody told

20   you, but you just thought that would be prudent to do?

21        A.     That's correct, ma'am.

22        Q.     Did you park next to her car at the prison last

23   week?

24        A.     I think I did.

25        Q.     There were lots of parking spaces at the prison?


                        Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        288


1        A.     I didn't recognize that to be her car until I

2   went in the prison and she was out there.

3               MS. WILLIAMS:  A short break?

4               MR. MacMAIN:  Why don't we take five minutes.

5               (Recess taken from 12:01 until 12:10 p.m.)

6               (Graham Deposition Exhibit No. 5 was marked.)

7   BY MS. WALLET:

8       Q.      Mr. Graham, do you have what we've marked as

9   Deposition Exhibit 5?

10      A.      Yes.

11      Q.      What do you recall about this document?

12      A.      It was a recommendation sheet submitted on Mark

13  Roderigo and --

14      Q.      Actually, I think wasn't our agreement that we

15  were going to black that out?  And I neglected to do that.

16              Was this a juvenile?

17      A.      Yes, it was.

18              MS. WALLET:  Okay.  I would ask that we just say

19  Mark R., and I'll mark sure that the rest of the name is

20  blocked.

21              MR. MacMAIN:  Agreed.

22              THE WITNESS:  Okay.  A recommendation memo that

23  Barb submitted along with a report.  She had submitted this I

24  think on one or two previous occasions.  I think she

25  submitted it prior to April 7th, 1997, and I had reviewed it



                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                      289


1   and found some things that she needed to add into her report.

2   I itemized those, and this was the second or third go-around

3   over the same material that she submitted.

4   BY MS. WALLET:

5       Q.      Okay.  Now, how do I know that this is a second

6    or third go-around?  Is there any way of telling that from

7    this document?

8              MR. MacMAIN:  From this single sheet of paper?

9              MS. WALLET:  Yes.  I'm still talking about

10   Deposition Exhibit 5.

11             MR. MacMAIN:  Sure.

12             THE WITNESS:  Well, I responded back to her on

13   the 18th of April with -- and I had also given her a memo to

14   you on April 7th that I referred to.

15   BY MS. WALLET:

16       Q.    You don't mean to me.  To Ms. Varner?

17       A.    To Ms. Varner.

18       Q.    Okay.  My question, sir, is:  Can I tell by

19   looking at this document that this is something submitted

20   other than on April 2nd, 1997?

21             MR. MacMAIN:  Let me just interject for

22   clarification.  He says "see me about these cases," he's

23   referring to other documents, and I think the documents I

24   gave to you earlier today are going to have the other

25   documents he's referring to.  So that would make things


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                       290


1    easier instead of this guessing game.  What he's referring to

2    is other documents I believe you can question him about.

3    BY MS. WALLET:

4    Q.    Did you understand my question, though?

5    A.    I think so.

6    Q.    And are you able to answer my question?

7    A.    What does this memo refer to?

8    Q.    My question is:  How can I tell by looking at

9    this document that it was something submitted other than on

10   April 2, 1997?

11   A.    I imagine that this report was prepared on April

12   2nd.  Can I validate that that's when it was sent to me or

13   given to me?  No, I can't.

14   Q.    You said you thought this was the second or third

15   go-around.  That's what I'm really asking you about.

16   A.    Okay.

17   Q.    How can I tell from this document that it was

18   some revision?

19   A.    Well, based on my response to her on the 18th of

20   April, the handwritten note at the bottom, it says, "see me

21   about these cases," and, "you did not include what I asked

22   for in my memo to you on April 7th, 1997."

23         So evidently I gave her a memo after she

24   submitted this somewhere between the 2nd of April and the 7th

25   of April, and I had given her some corrections to put on the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                291

1    report, and she resubmitted it again on the 18th of April is

2    when I made these comments.

3        Q.    Okay.  So you believe that this document was the

4    version that was submitted to you by Ms. Varner sometime

5    after April 2nd, after April 7, but before April 18?

6        A.    Yes, ma'am.

7        Q.    But you would agree the document itself doesn't

8    indicate that?

9        A.    You know, I'd have to pull -- I've had no

10   opportunity for discovery to pull those cases and to find

11   out, you know, what's actually in those cases and if they

12   contain the originalities of what were in them from the

13   beginning.  So these are notes that, you know, I had when I

14   packed everything up from the courthouse to go out of the

15   courthouse.

16       Q.    Okay.  So the pack of documents that I received

17   from your counsel today, they were documents that you had

18   with you when you left the Probation offices in the

19   courthouse in or about March of '98?

20       A.    Yes, ma'am.

21       Q.    And what caused you to take these documents at

22   that time?

23       A.    I had some documents on different people that

24   were in the office of court corrections that I had gone

25   through with them, and I had kept these documents because we

1    were -- we had hired some new probation officers and they

2    were inexperienced and basically they had errors in their

3    reports and omissions in their reports.  And I had kept

4    documents on different individuals that I made corrections

5    on.

6        Q.    So you had some sort of a folder that said

7    Barbara Varner and you had documents in that related to her?

8        A.    No.  I had a work-related folder just on

9    different just work-related memorandums.

10       Q.    Okay.  But in that folder you had things related

11   to probation officers other than Ms. Varner?

12       A.    Absolutely, um-hum.

13       Q.    And then at some point in time you went through

14   that folder and picked out the things that your counsel gave

15   me today?

16       A.    Well, when you produced this memo the other day,

17   you know, that you made reference to.

18       Q.    Now, do you recall answering some requests for

19   documents that I served upon you sometime in or around July

20   or September of 2002?

21       A.    I don't know what you're referring to.

22       Q.    Okay.  Well, let me just hand you what purports

23   to be S. Gareth Graham's Responses to Plaintiff's First Set

24   of Interrogatories.  I believe they were served on me by fax

25   November 18 of 2002.  Take a look at that.


Emily R. Clark, RMR

717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                  293

1      A.      Okay.

2      Q.      Have you had a chance to look at those responses?

3      A.      Sure.

4      Q.      Did you assist your counsel in preparing those

5    responses?

6              MR. MacMAIN:  Well, I'll represent I certainly

7    worked with Mr. Graham when we prepared responses based on

8    information provided and based on information that was set

9    forth in the Complaint.

10   BY MS. WALLET:

11     Q.      And I asked you to identify anything that you

12   might have in your possession relating to Barbara Varner or

13   her claims of sexual harassment and sex discrimination.  Do

14   you recall that question?

15     A.      Not really.

16     Q.      Well, did you have these documents that have been

17   provided to me today at the time that you answered this

18   request in or about November of '02?

19     A.      I knew I had them somewhere if I -- I knew I had

20   most of my material from my exit packed in boxes down in the

21   garage in my house, and I didn't go down there to discover

22   anything as far as -- until this became an issue here.

23     Q.      Okay.  You think you had them at that time; you

24   just hadn't gone through them?  Is that your testimony?

25             MR. MacMAIN:  Well, let me -- hold on a second.

S. Gareth Graham                                    294

1    Let me represent, the question that was asked was any

2    documents regarding sexual harassment.  At the time these

3    were answered -- and the Complaint set forth specific

4    instances that she's claiming harassment took place.  These

5    documents go to a different issue altogether, and that

6    specifically has to do with allegations she raised in her

7    deposition as to that he was unfair in terms of his

8    evaluation, screamed at her and so forth.

9              So I think if your implication is he didn't

10   provide documents that were responsive to a question, they're

11   not responsive to that document request, and we will

12   supplement it based on assertions that she has made at her

13   deposition now that we have a more clear picture of exactly

14   what it is she's claiming Mr. Graham did or did not do.

15             MS. WALLET:  Okay.  I'm not casting any

16   aspersions on anyone, Mr. MacMain, but the question was:

17   Identify all documents in your possession relating in any way

18   to Barbara Varner or to her claims of sexual harassment and

19   sex discrimination.

20             MR. MacMAIN:  Correct.  And the allegation of

21   sexual harassment is what is set forth in the Complaint.

22   These documents go to a different issue.

23             MS. WALLET:  I'm simply asking your client did he

24   have these documents in his possession at the time that he

25    answered this discovery request in November.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    295


1          THE WITNESS:  No.  I didn't -- I hadn't retrieved

2    them.  I didn't know if I even had them.

3    BY MS. WALLET:

4          Q.    Okay.  And you say they were in your garage?

5          A.    Sure.

6          Q.    You didn't think something in your garage was in

7    your possession?

8          A.    I didn't know what was in the boxes of materials

9    that I had -- I exited the courthouse in one day.  Judge

10   Hoffer called me up on March 9th and said, you need to go

11   downstairs, pack your bags, take the rest of the day off, and

12   leave.  That evening or that afternoon I packed everything in

13   boxes, actually computer boxes, and I threw everything in a

14   computer box and left the office.

15         Q.    Did you have one box or more than one box?

16         A.    I don't recall how many boxes I had.  Numerous

17   boxes.  Personal items and --

18         Q.    Can you estimate for me how many documents you

19   might have taken when you left the courthouse that would be

20   similar to the ones that have been provided to me today?

21         A.    I can't estimate anything like that.  I don't

22    know.

23        Q.      Well, you've looked through the boxes now,

24    correct?

25        A.      Sure.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        296


1        Q.      All right.  And my question, sir, is:  How much

2    material do you have relating to specific cases in your

3    possession?  One box?  Two boxes?  One folder?  A half inch?

4        A.      I don't know.  I don't know how many -- I

5    wouldn't be able to quantify what I have.

6        Q.      Okay.  After we had the deposition of Ms. Varner

7    did she raise certain issues and you said to yourself, oh, I

8    might have some of that stuff at home?  Correct?

9        A.      Sure.

10        Q.      Okay.  And then you went home and you looked

11    through what you had, and you came up with this package,

12    correct?

13        A.      Correct.

14        Q.      Okay.  I'm asking you, sir, how much material did

15    you have to go through in order to find this package?

16        A.      Maybe one folder.

17        Q.      One folder.  Is it half an inch thick, an inch

18    thick, three inches thick?

19        A.      Probably less than a quarter of an inch thick.

20      Q.    Okay.  Are you satisfied, sir, that you have gone

21   through all of your documents and that you have pulled out

22   all of the documents that relate in any way to Barbara

23   Varner?

24          MR. MacMAIN:  I'll object to that, because I

25   still need to review documents with him and provide


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    297


1   supplementations if need be.  So I'm not going to let him

2   answer whether he's gone through everything or he hasn't.

3          MS. WALLET:  Okay.  Are you going to let him

4   answer that he's gone through it but he's given some of it to

5   you?

6          MR. MacMAIN:  If you can answer that.  Have you

7   gone through all of -- well, no, because I need to consult

8   with him and determine what documents may be responsive and

9   which documents may not, which documents he has which may be

10   letters from counsel, either myself or prior counsel.  So

11   we'll certainly supplement our discovery responses for

12   documents that are related to documents that have been asked

13   for or are relevant in the litigation, as I expect you would

14   as well.

15          MS. WALLET:  Sure.

16   BY MS. WALLET:

17      Q.    Other than this folder that you indicated, do you

18    have any other documents in your house, in your garage, in

19    some storage area, someplace that you have access to that

20    relate to Barbara Varner?

21        A.    No, ma'am.

22        Q.    This handwriting on the document marked

23    Deposition 5, is all of that your handwriting?

24        A.    Yes.

25        Q.    The initials up at the top, BEV, I assume those


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    298


1    are Ms. Varner's initials?

2        A.    Yes, ma'am.

3        Q.    Everything else that's not typed belongs to you?

4        A.    Yes, ma'am.

5        Q.    Sir, have you talked to anyone other than your

6    wife since the deposition, the first day of your deposition,

7    regarding the matters surrounding Ms. Varner's Complaint?

8    We'll exclude counsel at this point.

9        A.    No.

10        Q.    Did you talk to Mr. Osenkarski?

11        A.    No.

12        Q.    Have you talked to any of the individuals who

13    have been identified as potential witnesses in this case?

14        A.    No.

15        Q.    Mr. Graham, did you ever threaten John Ward?

16      A.      No, ma'am.

17      Q.      Did you ever say that Mr. Ward would get his for

18  his activities relating to this Complaint?

19      A.      No, ma'am.

20      Q.      Do you harbor any ill will toward Mr. Ward as a

21  result of his actions concerning this Complaint?

22      A.      Do I like him?  No, I don't like him.  Do I

23  harbor any ill will?  No.

24      Q.      Why don't you like him?

25      A.      A multitude of reasons.  I think he was a -- he


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           299


1   interrupted the Probation office that was basically

2   unencumbered by partisan political process until he became

3   the chief clerk.

4           I didn't like what he did to our detention

5   center, where he tried to accuse Joe and I of negotiating

6   contracts without fiscal concerns.  He talked clandestinely

7   that I can relate that behind our backs to the chief clerk in

8   Dauphin County over the Woodside and the Schaffner Youth

9   Centers.

10          He denied us compensation for after-hours duties,

11  where he would pay Children and Youth $30,000 at the time to

12  have a night call person, and then finally corrected that and

13  I guess Joe has a night call person to handle after-hours

14    emergency calls.

15          He accompanied Gary Shuey into our office and was

16    angry that we were -- that dependency kids could not be kept

17    in the new Schaffner Youth Center that was being built.  And

18    that was a decision Dauphin County had made to prohibit

19    dependency referrals being included into the detention

20    center.

21          There was an issue where he was advocating on

22    behalf of the 911 center because the probation officers

23    supposedly weren't answering their phones after emergency

24    call duty.  And I think he had written a memorandum that

25    chastised the probation officers' wives and husbands for

                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                         300

1     nobody answering the phone after emergency-duty calls.

2           He tried to demote a secretary of ours, Kathy

3     Zeigler, when we split the Juvenile Probation Departments.

4     And what I understand, it was the first time in the history

5     of the county where he tried to demote somebody moving

6     towards a, moving into a lateral position.

7           That's some of the things that I can recall.

8     That's probably not all of them.

9       Q.    Do you disklike him for any of the actions that

10    were taken with regard to Ms. Varner's complaints?

11        A.      I don't really know what he did in regard to

12    Ms. Varner's Complaint .

13        Q.      Have you expressed your displeasure about

14    Mr. Ward's actions to Mr. Ward?

15        A.      No.

16        Q.      Have you expressed your displeasure about

17    Mr. Ward's actions to anyone in the Probation Department?

18        A.      I don't think Mr. Ward is a fan of anyone in the

19    Probation office.  Did I -- in generality terms, probably,

20    yes.  I mean, from denial of grants to denial of, you know,

21    all those -- parking spaces.  I advocated to try to get

22    parking spaces to transport secured juveniles, and he

23    wouldn't give us any of those or advocate on our behalf to

24    get a secure parking arrangement to be able to take juveniles

25    in and out of the court setting.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                S. Gareth Graham                    301


1        Q.      My question, sir, was:  Did you express your

2    displeasure about Mr. Ward to anyone in the Probation office?

3        A.      I probably said some things that I was displeased

4    about, just -- and the list is what I've just told you about.

5        Q.      But you didn't say:  He'll get his?

6        A.      No.

7        Q.      Mr. Graham, did you ever brag about having sex

8    with a woman who was wearing only a trench coat?

9      A.      I think I did, yes.  Not brag.

10      Q.      What did you say?

11      A.      I had had a relationship with a woman prior to my

12  marriage, that I was visited by a lady that wore a trench

13  coat and she had nothing underneath it.

14      Q.      And did you make this statement during work

15  hours?

16      A.      I might have.

17      Q.      Was it during times when other probation officers

18  were present?

19      A.      Sure.

20      Q.      Were there female probation officers present at

21  that time?

22      A.      No, ma'am.

23      Q.      None?

24      A.      Not that I recall.

25      Q.      And what prompted you to bring up your prior

1  sexual relation at work?

2      A.      I think what prompted that was the amount of

3  phone calls that Ms. Varner made to me in regard to trying to

4  meet with me, and when the secretaries went to pick up the

5  phone they were suspicious that I had been involved with

6    somebody else or someone else, or somebody, so that's what

7    kind of prompted that.

8         Q.    So you led them to believe that it was this woman

9    who was only wearing the trench coat that was making these

10   calls?

11        A.    No.  I didn't lead them to believe anything.

12   They can believe what they want to believe, you know.  I

13   didn't say anything about that.

14        Q.    I don't understand your answer, sir.  I asked you

15   what prompted you to bring up this subject of having sex with

16   someone only wearing a trench coat, and you said it had

17   something to do with the calls you were receiving from

18   Ms. Varner.  I don't understand your answer.

19        A.    Well, they were suspicious of me having an

20   interaction with another woman.

21        Q.    Who was suspicious?

22        A.    Oh, my.  Denny Drachbar, Sam Miller, Ronna

23   Boyles.  Who else?  I don't know.  Fran Rose.  I don't know

24   who else.

25        Q.    What did they say or do that led you to conclude



                  Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                  S. Gareth Graham                        303


1    that they were suspicious of your relationship with

2    Ms. Varner?

3         A.    Ronna was always saying, why are you getting all

4      these phone calls and I'm getting hang-ups?

5          Q.      And what did you say?

6          A.      Nothing.

7          Q.      And what did Mr. Drachbar say or do that led you

8      to believe he was suspicious about your relationship with

9      Ms. Varner?

10         A.      I don't know.  I don't remember.  That's too far

11     long ago.

12         Q.      What did Mr. Miller say or do which led you to

13     believe that he was suspicious about your relationship with

14     Ms. Varner?

15              MR. MacMAIN:  If you know.

16              THE WITNESS:  I don't know.

17     BY MS. WALLET:

18         Q.      What did Rose say or do that led you to believe

19     that she was suspicious of your relationship with Ms. Varner?

20         A.      Just the complaints of Ronna receiving the calls

21     and nobody ever on the other end when they went to pick up.

22         Q.      Well, I asked you this before, but why did you

23     think someone thought that that was Barb Varner?

24         A.      Because Barb Varner and I shared companion cases.

25     We shared a personal relationship that was probably viewed by


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        304


1      in the office that was closer than most.  The fact that she,

2   you know, she was always confiding in me, you know, with some

3   of her personal situations.  And the fact that she was using

4   me to sometimes write her reports and help her write her

5   reports.  And all that interaction together was a position

6   that they thought I was showing her favoritism and

7   unfairness, or favoritism and it was unfair to them, that I,

8   they -- special audiences with her all the time as opposed

9   to, you know, giving them a correction.  I would just tell

10  them about it or, you know, write them a note.

11      Q.    Do you have a single fact that would link

12  Ms. Varner to your hang-up calls?

13      A.    I don't think so, no.

14      Q.    So Ms. Boyles comes to you and says something to

15  the effect of:  Why are we getting all these hang-up calls?

16      A.    Sure.  Ronna narrated a lot of things to me, you

17  know, about -- she was from the hometown I came from, and she

18  was going through a divorce at the time of this business that

19  was going on in the office.  And --

20          MR. MacMAIN:  She just wants to know do you have

21  anything, any direct evidence that the hang-up calls were

22  from Ms. Varner as opposed to someone else.

23          THE WITNESS:  No, I don't.  No.

24  BY MS. WALLET:

25      Q.    So Ms. Boyles comes you and says:  We've been

1    having all these hang-up calls.  Who brought up the subject

2    of Barbara Varner in reference to these hang-up calls?

3        A.    She did.

4        Q.    And why did she say she thought it might be

5    Barbara Varner?

6        A.    Because she thought that we were meeting in the

7    coffee room.  And people would see us meeting in the coffee

8    room.  We were having close interaction with one another.

9    And she knew that, I think, that I had advocated for

10    Ms. Varner's son, to get him a job at the Schaffner Youth

11    Center after he had failed to pass the first or second

12    interview that he was on.

13            So you know, those are the things that she, you

14    know, saw me extending myself to her benefit and figured

15    there might be something going on.  And that was pretty much

16    like the office rumor mill that there might be something

17    going on between the two of us.

18        Q.    And then this caused you to bring up the subject

19    of the woman wearing only the trench coat?

20        A.    That was around -- right.  That was around the

21    subject of -- Ronna said to me, well, you know, something

22    about, you know, something about who was that in reference,

23    or she said, I think Ronna said to me, I'll bet you were

24    pretty wild in your day, you know, in Newville.  And I think

25    I had talked to Boyles about living above my dad's store as a

Emily R. Clark, RMR

717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                          306

1   single man and talked to her about different things in that

2   regard.  And she, Ronna was after finding out if I knew any

3   information about who her husband --

4            MR. MacMAIN:  Gary, she just --

5            THE WITNESS:  -- was running around with up in

6   Newville.

7            MR. MacMAIN:  Gary, she asked about the trench

8   coat, and if you don't have any more answer than what you've

9   given, then that's fine.

10           THE WITNESS:  Did I give you the answer yet?

11  BY MS. WALLET:

12     Q.    Well, my question, sir, was:  What about these

13  circumstances could possibly have prompted you to blurt out

14  that you once had sex with a woman wearing only a trench

15  coat?

16     A.    And my response to that is Ronna had shared

17  information and been in request of information about her

18  husband who she was going through a divorce, and during those

19  conversations she would relate that I'll bet you were pretty

20  wild.

21           And there was a connection between Ronna and my

22  dad's store because the first owners that tried to buy my

23  dad's store was Robert and somebody Barrick, Cheryl Barrick.

24  I know their last name is Barrick, I don't remember her name.

25  Well, this Cheryl Barrick and Ronna's husband ended up

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    307

1    together and in a marital infidelity.  And Ronna was

2    questioning me as to if I knew anything.  And actually, she

3    was asking me daily, you know, what was going on, did you

4    hear anything about this Barrick girl and my husband.  And I

5    had -- the boy that was running our store at the time,

6    because my dad had just been deceased, he one day said to me,

7    he said, I think Ronna Boyles' husband Ken moved in with this

8    Barrick woman down the street across from the fire company.

9            So those are the kind of conversations that we

10   had that were of intimate interactions.  And I think during

11   those conversations with Ronna I got to talk to her about

12   I'll bet -- her making the introductory statement of saying,

13   I'll bet you were pretty wild in your day, and I said sure, I

14   was wild, you know, and I did things, so.

15       Q.     And this was an example of how wild you were?

16       A.     Well, if that's wild, Ms. Wallet.  I don't know

17   if that's wild or what that is.  I don't know if that -- I

18   don't know, what does that mean.

19       Q.     Did you give her any other examples of how wild

20   you were at that time?

21       A.     I don't remember anything else.

22       Q.     Now, there were others that overheard this

23   conversation, correct?

24        A.       I have no idea who overheard the conversation.

25    No, I don't know.


                         Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net

                         S. Gareth Graham                      308


 1        Q.       Did you consider this to be appropriate

 2    discussion for the work setting?

 3        A.       In the private confines of my office and

 4    responding to a desperate type of lady that was facing

 5    divorce and inquiring about information that she was asking

 6    me about, sure.  It was a matter of, you know, maybe of, I

 7    don't know, kind of pitying Ronna over the situation she

 8    found herself.  And I said everybody finds themselves in

 9    different situations that they regret somewhere in their

10    life.  Does that answer your question?

11        Q.       Let me hand you a copy of the Complaint.  Perhaps

12    this will make things a bit easier.

13               Would you turn to page 3 of the Complaint filed

14    by Ms. Varner in this action?

15        A.       Okay.

16        Q.       Specifically, paragraph 16.  I'm going to ask you

17    about these paragraphs, sir, and I'll try to be specific in

18    my questions and if you could try to be specific in your

19    answers perhaps we might finish a little more quickly.

20               Ms. Varner has alleged that you made comments

21    about a female juvenile relating to premenstrual problems:

22    Jesus Christ, do I need to get a peter meter in my office.

23              Did you make that statement?

24    A.    Not in front of Ms. Varner.

25    Q.    Did you make it in front of someone else?


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          309


1     A.    Hank Thielemann.  I don't remember saying Jesus

2     Christ.

3     Q.    But you asked about the peter meter?

4     A.    I made a comment to Hank after she turned the

5     case in of simple assault on a juvenile, I think it might

6     have been even a transfer case from Harrisburg, that this

7     girl's premenstrual cycle was the causation factors of the

8     girl's delinquency.  And I looked at Hank and said, you know,

9     if we're going to look at premenstrual cycle being the

10    determinant of delinquency, then we're going to have to get a

11    peter meter for any sex crimes that we end up having.

12              And what I was referring to, Ms. Wallet is, a

13    peter meter is not the appropriate term but there is a

14    mechanism called an phylesmograph which is the proper term of

15    an instrument that's used to measure sexual arousal on sexual

16    offenders.  So that's what my inclination was at the time I

17    made the off-the-cuff remark.

18    Q.    So your reference to a peter meter was to this

19    particular instrument?

20        A.    It was lack of a better word of understanding

21    exactly what a phylesmograph was properly called, yes.

22    Because I knew there was an instrument they measure sexual

23    arousal on sexual cases.  And they also have, you know,

24    different modalities like showing videos and other things

25    that coincide with understanding how to measure sexual

S. Gareth Graham                              310

1    stimulation in different cases.

2        Q.    Did you think it inappropriate of Ms. Varner to

3    reference something that was in this juvenile's medical

4    history?

5        A.    You know, I'd have to see the report, and I've

6    never seen -- I can't recall the issues.  You're asking me to

7    recite from memory something that's happened six and seven

8    years ago, and I can't recite those, that, those

9    circumstances.  I just don't remember.

10              I remember that she didn't have medical concerns

11    or suicidal concerns that I was aware of.  I don't remember

12    reading that in her report on the review.  I remember her

13    highlighting the premenstrual problems, that that was the

14    causation factor, not the suicidal tendencies that she now

15    reports in her Complaint.  I don't remember that.  Could it

16    have been in there?  It might have been.  Could I have missed

17   it?  Absolutely.  I don't recall it being there.  I recall it

18   just being a premenstrual problem that was highlighted in one

19   of her paragraphs.  And I looked at Hank and said -- and she

20   wasn't even in the room.  So that's an error, too.  She

21   wasn't in the room when I made the comment.

22        Q.    Were there others in the room then that overheard

23   the comment?

24        A.    Only Henry Thielemann and myself.  Hank

25   Thielemann and myself.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    311


 1        Q.    And where did this conversation take place?

 2        A.    In my office.

 3        Q.    Do you know whether Mr. Thielemann repeated this?

 4        A.    No.  What happened was she came back into the

 5   office, she came back into the office and Hank was smiling at

 6   her, and she said, well, what are you guys smiling about?

 7   And I said, Barb -- I made a comment about the juvenile

 8   social history that you submitted and Henry found humor in

 9   that.

10        Q.    And was the comment repeated?

11        A.    She asked for it to be repeated.  She -- I said,

12   I don't want to repeat the comment because you will be citing

13   me for harassing and you will find it distasteful.  And she

14   said, I'm fine with it, will you tell me what you said.  And

15    I told her.  And then she authored me with this Complaint.

16        Q.    Now, why did you think at that time to say:  I

17    don't want to repeat this because this might be sexual

18    harassment?

19        A.    Because of what Joe had been through years before

20    on the Complaint with Kerry Houser.

21        Q.    Had you received any sexual harassment training

22    before you made the statement about the peter meter?

23        A.    I made it to another male individual in a private

24    setting, and I didn't see that as a matter of sexual

25    harassment.  It might have been distasteful, it might have

S. Gareth Graham                         312


1    been out of order.  It probably was out of order for me to

2    make the comment about it.  But was it sexual harassment?

3    No.  Did it pertain to Ms. Varner specifically?  No.

4        Q.    Did you consider it to be demeaning?

5        A.    No.

6        Q.    Did you consider it to be demeaning to the female

7    juvenile about which this statement was made?

8        A.    Oh, no.

9        Q.    And that was because the female juvenile would

10    never know about this?

11        A.    The female juvenile, it was something that

12    Ms. Varner was reporting that the female juvenile had

13    experienced.  I don't even know if the female juvenile, you

14    know, was talking about a premenstrual cycle.  Maybe

15    Ms. Varner is the author of that premenstrual cycle comment.

16    You would have to talk to that juvenile, I guess.

17         Q.    Now, B is the personal birthday card.  You don't

18    deny sending that card?

19         A.    I don't, ma'am.  I didn't send it.  I would have

20    given it to her.

21         Q.    Okay.  Do you deny any inappropriate touching?

22               MR. MacMAIN:  Let me object.  Do you mean -- we

23    went through this the other day, that it's his position this

24    was a consensual sexual affair.  You're asking anything

25    beyond that?


                         Emily R. Clark, RMR
               717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                        313


 1               MS. WALLET:  Correct.

 2               THE WITNESS:  No, ma'am.

 3    BY MS. WALLET:

 4         Q.    Well, the question was:  Do you deny any

 5    inappropriate touching?

 6               MR. MacMAIN:  Well, I'm just clarifying what you

 7    mean by inappropriate touching.  Certainly -- Gary, let me

 8    finish, please.

 9               And if he believes, it's his position that it was

10    a consensual affair, I don't think under your definition it

11     would be inappropriate.

12              MS. WALLET:  Right.  And I asked the question

13     again because I don't think he understands the question.

14              THE WITNESS:  You're right.  I'm sorry, I don't.

15     BY MS. WALLET:

16         Q.     Did you engage in any inappropriate touching

17     other than related to your consensual affair?

18         A.     No, ma'am.

19         Q.     You didn't go past her desk and touch her?

20         A.     No, I didn't.

21         Q.     Did you touch her at all in the workplace?

22         A.     No.

23         Q.     Did you ever appear uninvited at her home?

24         A.     Absolutely not.

25         Q.     Did you go into her back yard and shout for her?


                        Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        314


1          A.     No, ma'am.

2          Q.     Never?

3          A.     Never.  I testified the other day that I would

4      meet her through her back entrance of her house.  That's

5      where -- when she would call me down to her house and we

6      would meet at her house I would go in the back door, the back

7      sliding glass doors where she would stand and wait for me to

8    park in an adjacent parking lot in a, it was an apartment

9    building adjacent from her house.  So I would park in there,

10   walk in the back, and then she would let me in the back so

11   that her neighbors Gilbert and Crystal wouldn't see me, the

12   neighbors nextdoor.  They were well -- he was in the well

13   drilling business.  He was home quite a bit, so.

14        Q.    Where did Gilbert and Crystal live?

15        A.    Right across the street from Barb Varner.

16        Q.    Across from the front door?

17        A.    Right.

18        Q.    You're sure about that?

19        A.    Only what she told me.

20        Q.    Okay.  You're looking at C on page 4?

21        A.    Yes, ma'am.

22        Q.    Do you deny that allegation?

23        A.    Absolutely.  I had been to her room, though, on

24   her invite at five o'clock in the morning under the auspices

25   of going walking in the morning.  But I had not been at her


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          315


1    room on any other times and had not requested to be in her

2    room at any other juncture up there at State College.

3         Q.    Did you call her room repeatedly?

4         A.    No, ma'am.

5      Q.    Did you take any action, sir, that Ms. Varner

6    might consider to be hostile or abusive?

7            MR. MacMAIN:  Objection as to the form.  How

8    would he know what she would consider hostile or abusive?

9            MS. WALLET:  Well, I know when I say something to

10   a pet, that that pet is taking it as hostile or abusive.  I

11   don't have to be in the pet's mind.

12           MR. MacMAIN:  I'm not going to allow him to

13   answer what was in her mind.  Unless you want to rephrase the

14   question, I'm not going to let him answer that.

15   BY MS. WALLET:

16      Q.    Did you ever shout at Ms. Varner in the

17   workplace?

18      A.    No, ma'am.

19      Q.    Never?

20      A.    Never.

21      Q.    Did you ever raise your voice to her in the

22   workplace?

23      A.    I might have raised my voice on being

24   disappointed in having to revisit the same issue three and

25   four times.


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                         316


1       Q.    Did you ever swear at her?

2       A.    Not at her.  No, ma'am.

 3    Q.    Did you swear in her presence in the workplace?

 4    A.    I reverted to saying the F word on occasions.

 5    Q.    But you say that wasn't directed at her?

 6    A.    Not directed at her.

 7    Q.    She was present but it wasn't directed at her?

 8    A.    What do you mean by present?  She was in the

 9  office when I might have been angry about something and that

10  might not even have pertained to her and I used the F word.

11    Q.    Is it your testimony that she never once told you

12  not to use the F word in speech with her?

13    A.    That's my testimony, that's correct.

14    Q.    She never objected to any of the language that

15  you used in front of her?

16    A.    No, ma'am.

17    Q.    Looking at page 4, subsection E.

18    A.    Okay.

19    Q.    Did you tell Ms. Varner any stories about your

20  sexual problems with your wife?

21    A.    Other than I was disappointed in the amount of

22  sex that my wife and I were having, yes, I told her that.

23    Q.    Did you talk about your wife's masturbation

24  habits?

25    A.    No, ma'am.

1      Q.      Did you tell her that you kept a calendar of the

2  times when she would refuse to have sex with you?

3      A.      No, ma'am.  I did say that I probably not had sex

4  in maybe only two times a month, I would share that with her.

5  No calendars.

6      Q.      Did you threaten to get even with your wife

7  because she wouldn't have sex with you?

8      A.      No, ma'am.

9      Q.      Did Ms. Varner ever suggest to you that you go to

10 counseling?

11     A.      Not at all.

12     Q.      Did you scream at her as part of these

13 discussions about you and your wife's sexual habits?

14     A.      No.

15     Q.      And do you deny driving at a high rate of speed?

16     A.      That's questionable as far as -- I'm not a

17 conformist to the speed limit like most people aren't

18 probably even in this room, so -- but do I drive at a high

19 rate of speed?  I've never been given a ticket, Ms. Wallet,

20 in my personal car or the county car in the extensive amount

21 of trips that I took for speeding, and never been pulled over

22 for that, ma'am.  So that's not true.

23     Q.      Did you speed up the car in order to frighten

24 her?

25     A.      Not at all.  That's completely false.

S. Gareth Graham                              318

1       Q.      Did your wife have a figurine collection?

2       A.      Yes, she does.

3       Q.      Did you tell Ms. Varner that you had smashed some

4   of it?

5       A.      I think I told Denny Drachbar one time that I had

6   smashed a figurine.

7       Q.      And what prompted you to tell Mr. Drachbar that

8   fact?

9       A.      Our kitten had -- or our cat had had a litter of

10  kittens and there was one particular kitten that I liked, it

11  was striped, and my wife, I asked her to save it, because her

12  grandmother wanted some cats and her nieces and nephews

13  wanted a couple cats.  And she gave the cat away that I liked

14  the most, and I was angry about it.  And I don't know, I

15  guess we were talking about it in the living room, and I just

16  got consumed with my anger and I remember knocking the head

17  off of a figurine.  I guess I picked this figurine up and I

18  just snapped it on the fireplace or something.  But I was

19  angry over a kitten that she had given away, not I guess

20  what's in this Complaint.

21      Q.      Did you ever tell Ms. Varner that you smashed

22  some of the figurine collection in response to her sexual

23  denials?

24      A.      Not at all.  That's a fabricated lie.

25      Q.      What prompted you to tell Mr. Drachbar that you

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    319

1   had done this?

2       A.      I don't know.  I just -- I think I had, he was --

3   I don't know.  I don't know what prompted me.  I just said I

4   got consumed by my anger the other evening.

5       Q.      Ever destroy a birthday cake in front of your

6   daughters?

7       A.      Not in front of my daughters, but I think I

8   was -- I think that's the situation where I was angry at my

9   wife because Denny Drachbar and Sam Miller repeatedly had

10  come down to my office and was basically what males would

11  call ribbing, teasing me or whatever, about this particular

12  law clerk named Tom Placey being in my wife's office and

13  having extended periods of discussions with her.  And that

14  made me angry.  And I think we got into an argument about why

15  he's having these extra, what I called it was bird-dogging,

16  he was up there following my wife, having extra amounts of

17  conversations, which totally that I interpreted much further

18  than it actually was meant.  And I was jealous of that,

19  Ms. Wallet.

20      Q.      So you thought Tom Placey was interested in your

21  wife sexually?

22      A.      Yes, ma'am.

23      Q.      And you were getting some ribbing about this from

24  your co-workers?

25        A.    Yes, ma'am.

S. Gareth Graham                                    320


1        Q.    Because they had observed him hanging around your

2   wife?

3        A.    Yes, ma'am.

4        Q.    And what did you do in response to this?

5        A.    I think we got into an argument and that's --

6        Q.    We who?

7        A.    My wife and I.  And that's one of the nights I

8   must have smashed a piece of birthday cake.  But it was not

9   in front of my daughters.  That's not true.

10        Q.    What did you do with this birthday cake?

11        A.    I said I might have smashed it, or she might have

12   went to serve me cake and I said I don't want it, I want to

13   get back to the argument that we were in about him being

14   upstairs with her extended periods of time.

15        Q.    And whose birthday cake was this?

16        A.    I don't remember.

17        Q.    Well, was it your birthday?

18        A.    I don't recall.  It wasn't my birthday, I don't

19   think.

20        Q.    Was it her birthday?

21        A.    It might have been.  Might have been her

22    birthday.

23        Q.    And why did you tell somebody about this incident

24    between you and your wife and the birthday cake?

25        A.    I told Ms. Varner this.  And why did I tell her?


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                321


1    Because I guess I was asking for or looking to her for

2    sympathy, you know, since that would maybe enhance our

3    relationship or our involvement with each other.

4        Q.    So you thought it would improve your chances of

5    having sex with Ms. Varner if you made it clear you were

6    fighting with your wife?

7        A.    It was having sex with Ms. Varner.  It didn't --

8    I don't follow your question.  That wasn't accurately stated,

9    or I don't understand what you're trying to allege.

10        Q.    My question is:  What would have prompted you to

11    say to someone:  You know, last night my wife served me

12    birthday cake and I smashed it in front of her?

13            MR. MacMAIN:  He just answered your question.

14            MS. WALLET:  Well, I didn't get the answer.

15            THE WITNESS:  The answer was I thought it would

16    enhance the involvement I would have with Ms. Varner if she

17    knew I was mad at my wife.  We were trying to justify our

18    illegitimate selfish behaviors, and we were always looking

19    for excuses to do that.  It wasn't right but that's what

20    people do, I guess, that get involved with affairs.

21    BY MS. WALLET:

22       Q.    Did you think that Ms. Varner when she heard this

23    might are fearful of you?

24       A.    No.  I thought it would enhance, I might even --

25    I thought she would interpret that as an enhancement towards


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                            322


1    having our relationship be more cemented or more fruitful.

2       Q.    Did you tell other probation officers,

3    specifically female probation officers, that they were off

4    limits to Ms. Varner because they had made complaints?

5       A.    No, ma'am.

6       Q.    Did you warn Ms. Varner about Kerry Houser?

7       A.    No, ma'am.

8       Q.    Never said anything to Ms. Varner that was

9    negative about Kerry Houser?

10      A.    I said I didn't like her.

11      Q.    What did you tell Ms. Varner about Kerry Houser?

12      A.    What did I tell Ms. Varner?  Probably the same

13   stories I've testified earlier to, the fact that she had made

14   that revelation when I had an argument with Paul.  She was

15   angry.  She had made a call to Lynn Dickinson and her husband

16   out of the blue called me at my house.  And actually

17   interrupted the woman's hiring.  The woman was so what I

18    understand, and she can testify to this, she was so

19    traumatized she left and went to pursue her master's degree.

20         MR. MacMAIN:  Gary, let me just interrupt.  Is it

21    the same stuff we've already talked about before is what you

22    told Ms. Varner?

23         THE WITNESS:  Yes.

24         MR. MacMAIN:  We don't need to go through it all

25    over again.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           323


1         THE WITNESS:  Okay.

2         MS. WALLET:  I agree.

3    BY MS. WALLET:

4    Q.    Did you tell Ms. Varner to stay away from Kerry

5    Houser?

6    A.    No, I did not, ma'am.

7    Q.    Did you tell Ms. Varner that she shouldn't talk

8    to Kerry Houser?

9    A.    No, I did not.

10   Q.    Did you make the statement about how dark you

11   thought a young female's bush was?

12   A.    No, ma'am, I did not make that statement.

13   Q.    At no time?

14   A.    At no time.

15   Q.    Did you ever move closer to Ms. Varner in an

16    aggressive manner?

17        A.    No, ma'am.

18        Q.    Did you ever point your finger in her face?

19        A.    No.

20        Q.    Did you ever point at her?

21        A.    No.

22        Q.    Did you ever throw something wadded up at her?

23        A.    I looked at that Complaint and I do recall, it

24    might have been one of these sheets that she submitted after

25    the second or third time, and I rolled it up and I said, I


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    324


1    think it was in regard to that victim sheet, she kept -- this

2    was a case of it was a trinity, there was a four or five

3    different individuals that were involved with this, and --

4            MS. WALLET:  Let the record show that he's

5    referring now to Deposition Exhibit 5.

6            MR. MacMAIN:  Gary, she didn't ask you about the

7    whole background.

8            THE WITNESS:  What I'm saying is I balled the

9    paper up and threw it in the waste can and said, you know,

10    you didn't do what I asked you to do.  You didn't put what I

11    asked you to put in these things.  So I balled the paper up

12    and threw it in her trash can.  And she's made the allegation

13    that I threw it at her, and I not do that, ma'am.

14    BY MS. WALLET:

15        Q.    And you did that real quietly, didn't raise your

16    voice?

17        A.    I didn't say I didn't raise my voice.

18        Q.    You did raise your voice?

19        A.    Sure.

20        Q.    What did you say to her?

21        A.    I just said, this isn't what I asked you, and I

22    asked -- and I've been through this three or four different

23    times with you.  And I balled it up and threw it in the waste

24    can.  And she's made the interpretation now that I threw it

25    at her, which I did not do.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    325


1        And did I raise my voice?  Yes.  Did I swear?  I

2    don't remember swearing.  I just remember I was frustrated

3    about seeing the same report three and four different times

4    submitted.

5        Q.    Did you ever say anything to Ms. Varner that

6    would suggest that you and Mr. Osenkarski would punish people

7    in the office?

8        A.    No, not at all.

9        Q.    Did you ever say anything that would indicate

10    that people owed you for favors that you had given them?

11        A.    No, ma'am.

12     Q.     Did you ever tell Ms. Varner you thought she owed

13  you?

14     A.     No, not at all.  I did a number of different

15  things for a number of different people in that office over

16  the years, and that's just, that's the nature of what I was

17  like, not the nature of what you've reported in this

18  particular document and Complaint.

19     Q.     Did you ever make the statement that all divorced

20  females are angry at men?

21     A.     No, ma'am.

22     Q.     Did you ever make the statement that women would

23  do a lot better if they spent more time on their knees?

24     A.     Not at all.  Never said anything like that.

25     Q.     Never said that?


                        Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                        S. Gareth Graham                        326


1     A.     Never.

2     Q.     Did you ever brag that you could have Nicole

3  Galbraith Horick in a sexual fashion any time you wanted?

4     A.     That's not true, ma'am.  No.  I had an excellent

5  relationship with Nicole Galbraith, or Horick.

6     Q.     Did you have any sexual interest in her?

7     A.     None whatsoever, ma'am.

8     Q.     Did you ever do or say anything that someone

9  might interpret as a sexual interest in her?

10        A.        No, ma'am.

11        Q.        Do you believe that your affair with Ms. Varner

12    interfered in any way with the work that you were paid to do?

13        A.        No, ma'am, not at all.

14        Q.        I think I asked you this before.  All of the time

15    that you spent during the workday in this affair, sexual

16    relations, were not on the clock?

17        A.        Were not on duty.

18        Q.        Even the ones that occurred during the middle of

19    the day?

20        A.        We would take the afternoon off.

21        Q.        I believe you told me there were sometimes when

22    you would sneak away for your liaison and go back to work,

23    correct?

24        A.        That might have been in the early development

25    where we wouldn't do anything, we would just sneak away and


                    Emily R. Clark, RMR
              717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          327


 1    be with one another and talk about our disappointments in our

 2    partners' performances or sexually or something like that,

 3    but we wouldn't really do anything.

 4        Q.        Did you ever take Ms. Varner in the car with you

 5    when you visited a juvenile offender's mother in

 6    Shippensburg, make her spend time in the car?

 7        A.        There again, you would have to give me a

8    reference point of who you're referring to or --

9      Q.    Someone who worked at a dry cleaner's?

10     A.    Yes.

11     Q.    Do you know which individual I'm talking about

12   now?

13     A.    Not specifically.

14     Q.    This was someone who worked at a dry cleaner's,

15   lived in Shippensburg?

16     A.    Yes.

17     Q.    And what professional responsibility did you have

18   with regard to this woman or her family?

19     A.    I think I handled her kid.

20     Q.    And when you say handled, meaning it was a

21   juvenile that you were assigned to supervise?

22     A.    Yes, ma'am.  Yes, ma'am.

23     Q.    And did you visit the home?

24     A.    Whose home, the lady's home?

25     Q.    Yes.


                    Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                    328


1      A.    Yes, ma'am.

2      Q.    On more than one occasion?

3      A.    Probably a few occasions, yes.

4      Q.    And was Ms. Varner with you on any of those

5    occasions?

6        A.      She might have been.

7        Q.      You don't remember?

8        A.      I don't recall.  She could have been, sure.

9    Because we handled cases, I mean, Steve Wilson, I mean, I

10   remember, and that's an adult, so, and some other cases in

11   Shippensburg that, you know, she could have been along with

12   me and then we made a circle and stopped at other peoples'

13   homes.

14       Q.      Did you ever tell her to stay in the car while

15   you went to visit this woman?

16       A.      No, ma'am.  I mostly saw the woman I guess at the

17   dry cleaner's or her house.  I mean, that's what remember --

18   or the dry cleaning facility there in Shippensburg.

19       Q.      Were you sexually attracted to this woman?

20       A.      No, ma'am.

21       Q.      Did you ever make any statements that would

22   indicate that you were sexually attracted to her?

23       A.      No, ma'am.

24       Q.      Mr. Graham, you were suspended for three days?

25       A.      Yes, ma'am.


                         Emily R. Clark, RMR
                  717-233-1744, emily.clark@worldnet.att.net

                         S. Gareth Graham                         329


1        Q.      As a result of the allegations that Ms. Varner

2    made, correct?

3        A.      No, ma'am.

4      Q.      Didn't have anything to do with the allegations

5   that Ms. Varner made?

6      A.      It had to do with swearing in the office.

7      Q.      And how do you know that?

8      A.      I think that's what Judge Sheely made in a

9   memorandum, that memorandum that he wrote or something.

10     Q.      It was your belief that that didn't have anything

11  to do with Ms. Varner?

12             MR. MacMAIN:  Objection.  That's not what he

13  said.  I think your question was anything to do with sexual

14  harassment, and he said no, his understanding was poor

15  language.

16  BY MS. WALLET:

17     Q.      I thought my question was:  Was it related to the

18  complaints made by Ms. Varner.

19             Did it have anything to do with the complaints

20  that Ms. Varner made?

21     A.      You would have to ask him.

22     Q.      In any event, you were told that you were going

23  to be suspended for three days.

24     A.      Right.

25     Q.      And then a different three days were picked,


                    Emily R. Clark, RMR
             717-233-1744, emily.clark@worldnet.att.net

                    S. Gareth Graham                          330


1   correct?

2       A.      Yes.

3       Q.      What do you remember about those circumstances?

4       A.      Not a thing.  I've tried to remember that, and I

5   don't know what the circumstances are, why they were changed.

6   I thought maybe they were a holiday.  Did I ask him?  No.

7       Q.      Do you know whether this was Judge Sheely's idea

8   to change these dates?

9       A.      You would have to ask him.  I don't know.  I

10  don't remember why the dates were changed.  That's beyond me.

11              MS. WALLET:  Okay.  We'll still mark this

12  document.  I think we're up to 6.

13              (Graham Deposition Exhibit No. 6 was marked.).

14  BY MS. WALLET:

15      Q.      Do you have Deposition 6 in front of you?

16      A.      Um-hum, yes.

17      Q.      I don't see your name on this document, but did

18  you get a copy of this document either through your counsel

19  or in some other fashion?

20              MR. MacMAIN:  Through your counsel, you mean in

21  this litigation?  Or do you mean Mr. Foster back when all

22  this was happening?

23              MS. WALLET:  From Mr. Foster back when all of

24  this was happening.  Strike all of that.  We'll start again.

25  BY MS. WALLET:


                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net
                    S. Gareth Graham                        331

1     Q.      Did somebody give you what has been marked as

2   Deposition Exhibit 6?

3     A.      Not that I recall, no.

4     Q.      You don't think you received it in or about July

5   17, 1997?

6     A.      I don't remember this corrected dates of

7   suspension.  I don't remember it at all.

8     Q.      Okay.  Do you believe you got some other memo

9   telling you that the dates for your suspension had been

10  changed?

11    A.      No, ma'am.

12    Q.      Do you know who set the original dates when you

13  were to be suspended?

14    A.      No.  I mean, I imagine it was Judge Sheely.

15    Q.      And you don't remember anything else about why

16  you were given the suspension or the date that you were to

17  serve the suspension?

18    A.      Why I was given the suspension is because I used

19  foul language in the office.  And what was the other part of

20  the question?  Did I --

21    Q.      Why it was changed, why the dates were changed.

22    A.      I don't know.  I don't know why, no.

23    Q.      Did you disagree with this suspension?

24    A.      I was guilty of using foul language in the

25  office.  I didn't disagree with it at all.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                      332


1        Q.      And what language did you consider to be foul

2    that you admit you used?

3        A.      Using the F word.

4        Q.      Did Judge Sheely ask you whether or not you had

5    used the F word?

6        A.      Yes.

7        Q.      And how did you respond?

8        A.      Yes.

9                MS. WALLET:  Okay.  I think I'm finished with my

10   questioning at this time, and simply reserve the right to

11   recall Mr. Graham after I've reviewed these documents.  I'm

12   not saying that I'm going to, but I'd like to have the

13   opportunity to ask him a few more questions if I feel that's

14   necessary.

15               MR. MacMAIN:  Sure.  And the same, I think it's

16   the same reservation we had regarding Ms. Varner since we had

17   not gotten Answers to written discovery as well.  It's

18   something counsel can amicably work out if it comes up in

19   either case.

20               MS. WALLET:  Okay.  That's all the questions I

21   have for today.

22               MS. WILLIAMS:  I have just one quick

23   clarification.

24   BY MS. WILLIAMS:

25       Q.      Mr. Graham, I think you know who I am by now.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                333

1    I'm Taylor Williams representing the Court.

2              Can you clarify for me who initiated the affair

3    that you had with Barbara Varner?

4         A.    What I would justify initiation is when she

5    leaned over in the parking lot of the Zembo Shrine in

6    Harrisburg and kissed me, on the way out.  That's what I

7    would say is an initiation.

8              Did we probably flirt with one another before

9    that?  We probably both flirted, both each way.

10        Q.    Did you actively pursue Mrs. Varner?

11        A.    No, ma'am.

12        Q.    So Ms. Wallet's characterizations in her

13   deposition questions that you sought this affair or initiated

14   that affair, would you say that those were correct or

15   incorrect characterizations?

16        A.    They're incorrect.

17              MS. WILLIAMS:  Thank you.  That's all I have.

18              MR. BATES:  I have no questions.

19              MS. WALLET:  I think we're finished for today.

20              (Whereupon, the deposition was concluded at

21   1:27 p.m.)

22                          *   *   *   *   *

23

24

25

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

334

1  COMMONWEALTH OF PENNSYLVANIA  )
                                 )
2  COUNTY OF DAUPHIN             )

3      I, Emily R. Clark, a Court Reporter-Notary Public

4  authorized to administer oaths and take depositions in the

5  trial of causes, and having an office in Harrisburg,

6  Pennsylvania, do hereby certify that the foregoing is the

7  testimony of S. GARETH GRAHAM taken by Plaintiff at the

8  Administrative Offices of Pennsylvania Courts, 5001 Louise

9  Drive, Mechanicsburg, Pennsylvania.

10     I further certify that before the taking of said

11  deposition the witness was duly sworn; that the questions and

12  answers were taken down in stenotype by the said

13  Reporter-Notary, approved and agreed to, and afterwards

14  reduced to computer printout under the direction of said

15  Reporter.

16         I further certify that the proceedings and

17  evidence are contained fully and accurately in the notes

18  taken by me on the within deposition, and that this copy is a

19  correct transcript of the same.

20         In testimony whereof, I have hereunto subscribed

21   my hand this 27th day of February, 2003.

22

23

                              _____
24                                Notary Public

25



                         Emily R. Clark, RMR
                717-233-1744, emily.clark@worldnet.att.net