1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
    . . . . . . . . . . . . . . . .
 3  BARBARA E. VARNER,          .
         Plaintiff,        .   CIVIL ACTION
 4                          .   NO. 1:CV 01-0725
         vs.                .
 5                          .
    COMMONWEALTH OF PENNSYLVANIA, .  (JUDGE YVETTE KANE)
 6  NINTH JUDICIAL DISTRICT,      .
    CUMBERLAND COUNTY; CUMBERLAND .
 7  COUNTY; S. GARETH GRAHAM,      .
    Individually, and JOSEPH      .
 8  OSENKARSKI, individually,      .
         Defendants.        .
 9  . . . . . . . . . . . . . . . .


10


11  Deposition of:  DANIEL HARTNETT


12  Taken by        :  Plaintiff


13  Date            :  November 3 and 12, 2003


14  Before          :  Emily Clark, RMR, Reporter-Notary


15  Place           :  Administrative Office of
        Pennsylvania Courts
16                     5001 Louise Drive
                       Mechanicsburg, Pennsylvania
17


18
    APPEARANCES:
19
    DEBRA K. WALLET, ESQUIRE
20       For - Plaintiff

21  ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
22       For - Defendant Commonwealth of Pennsylvania
                 Ninth Judicial District, Cumberland
23  County

24  THOMAS, THOMAS & HAFER
    BY:  PAUL J. DELLASEGA, ESQUIRE
25       For - Defendant Cumberland County
```

2

APPEARANCES (continued):

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
BY:  DAVID J. MacMAIN, ESQUIRE
       For - Defendant S. Gareth Graham

SWEENEY & SHEEHAN, P.C.
BY:  PAUL LANCASTER ADAMS, ESQUIRE
        For - Defendant Joseph L. Osenkarski


ALSO PRESENT:

MS. BARBARA E. VARNER (ll/3/03 only)

MR. S. GARETH GRAHAM

MR. JOSEPH L. OSENKARSKI

3

I N D E X

WITNESS

| Daniel Hartnett | Examination |
|---|---|
| By Ms. Wallet | 5, 141 |
| By Mr. MacMain | 114 |
| By Ms. Williams | 133 |
| By Mr. Lancaster Adams | 139 |

EXHIBITS

| No. | Description | Identified |
|---|---|---|
| 1 | 5-page memo, 4/24/97, to Hartnett from Varner | 23 |
| 2 | 2-page memo, 1/23/97, to Elected Officials, Department Heads and Agency Directors from Hartnett | 38 |
| 3 | 1-page memo, 4/25/97, to Hartnett from Varner (also Varner No. 16) | 41 |
| 4 | 3-page memo, 7/11/97, to Ward from Sheely | 57 |
| 5 | 7 pages: 3-page letter, 6/26/97, to Hartnett from Johnson; attachments | 72 |
| 6 | 3 pages:  1-page handwritten note, 4/30/97, to Dan from Joe O.; attachments | 76 |
| 7 | 2-page memo, 6/30/97, to Sheely from Osenkarski | 78 |
| 8 | 1-page memo, 7/8/97, to Sheely from Hartnett | 80 |

4

EXHIBITS

| No. | Description | Identified |
|-----|-------------|------------|
| 9 | 1-page letter, 12/23/97, to Hartnett from Varner | 87 |
| 10 | 2 pages: 1-page memo, 2/11/98, to Hoffer from Hartnett; 1-page memo, 2/4/98, to Hartnett from Varner | 89 |
| 11 | 2-page memo, 3/31/98, to Osenkarski from Varner | 95 |
| 12 | 3-page "History of the Senior Probation Officer Position" | 97 |
| 13 | 1-page memo, 4/6/98, to Hoffer from Hartnett | 98 |
| 14 | 1-page handwritten letter, 6/1/98, to Osenkarski from Varner | 102 |
| 15 | 2-page list of probation officers | 104 |
| 16 | 2 pages, handwritten probation officer organizational chart | 119 |

* * * * *

```
 1                        STIPULATION

 2      It is hereby stipulated by and between the

 3   respective parties that sealing, certification and

 4   filing are waived; and that all objections except as to

 5   the form of the question are reserved until the time of

 6   trial.

 7

 8           DANIEL HARTNETT, called as a witness, being

 9   duly sworn, was examined and testified, as follows:

10   BY MS. WALLET:

11      Q.    Good afternoon, Mr. Hartnett.  My name is Debra

12   Wallet.  I'm here representing Barbara Varner in an

13   action that has been brought against the court, the

14   county, Joe Osenkarski, and against Gary Graham.  You

15   are appearing today pursuant to my subpoena.

16      A.    Yes.

17      Q.    Have you ever been deposed before, sir?

18      A.    Yes, I have.

19      Q.    All right.  So you're aware that this is the

20   time for the attorneys to have an opportunity to ask you

21   some questions relative to the case?

22      A.    Yes.

23      Q.    Is there any reason today why you could not

24   answer my questions completely and truthfully?

25      A.    No.
```

6

1   Q.   Are you under any medication that would impair

2   your ability to answer questions?

3   A.   No.

4   Q.   I think that we need to have an agreement.  If

5   I ask you a question, if you have not heard that

6   question, will you ask me to repeat it before you

7   attempt to answer it?

8   A.   Yes.

9   Q.   And if for some reason you don't understand one

10  of my questions, will you also ask me to rephrase it

11  before you attempt to answer?

12  A.   Yes.

13  Q.   By whom are you currently employed?

14  A.   I'm retired.

15  Q.   How long have you been retired?

16  A.   About five years.

17  Q.   Did you most previously work for the County of

18  Cumberland?

19  A.   Yes.

20  Q.   Do you recall what date you stopped working for

21  the county?

22  A.   It was early October of '98.

23  Q.   How long had you worked for the county?

24  A.   About 12 years.

25  Q.   Do you remember your date of hire?

1     A.     No, I don't.

2     Q.     Approximately what year?

3     A.     It was early '86.

4     Q.     How did you come to be hired by the county?

5     A.     Someone, a friend told me that they were

6  looking or going to be looking for a new personnel

7  director.

8     Q.     Where did you work at the time that you applied

9  for the job with the county?

10     A.     I wasn't working.  I had been laid off from

11  another position.

12     Q.     Tell us briefly what your background is as far

13  as work.

14     A.     Going back how far?

15     Q.     I'm not sure we have to go back to college,

16  but --

17     A.     Well, okay.  I had worked for a union for a

18  number of years, from I think about 1970 till 1985.  And

19  then as I said, I was laid off sometime in late '85,

20  and -- I think it was '85, and then started with the

21  county in '86.

22     Q.     What union was it?

23     A.     AFSCME.

24     Q.     What was your position with AFSCME?

25     A.     Well, I had various positions.  I was an

1  organizer, a union representative, an assistant to the

2  executive director.  I was a council director.

3     Q.    And what was your position just before late

4  '85?

5     A.    Basically doing some research.

6     Q.    Did you report to the executive director at

7  that time?

8     A.    Yes.

9     Q.    Did you have a period of unemployment before

10  you became employed by the county?

11     A.    No.

12     Q.    So --

13     A.    I had gone to graduate school, I mean, right

14  before I started with the union.

15     Q.    I meant were you unemployed between when you

16  were laid off from AFSME and when you took the job with

17  the county?

18     A.    Yes.  Yes, I was unemployed.

19     Q.    What position did you hold with the county

20  between early '86 and October of '98?

21     A.    I was the personnel director.

22     Q.    Describe your duties and responsibilities.

23     A.    Geez.  Kind of did everything in personnel.

24  They -- all the benefits were under personnel, whether,

25  you know, from the Blue Cross or medical or dental

1   division, the life insurance, the long-term disability,

2   short-term disability policies, property insurance

3   policies, liability policies.

4           The kind of the day-to-day paperwork involved

5   in the hirings were, you know, occasionally discharges,

6   promotions.  We had had negotiations with the union.  We

7   had grievances, arbitration cases, cases along this line

8   that we're here for.

9           Some training, educational training for staff.

10   Q.    Did you have a staff?

11   A.    Yes.

12   Q.    Would you describe your staff?  Beginning in

13   '86 and ending with October of '98.

14   A.    Okay.  In '86 when I first started there, there

15   were, I think there were just two people, basically, you

16   know, clerical people, one of who somewhat, you know,

17   oversaw all the medical benefits, and the other who was,

18   that did, you know, a lot of the clerical work for me,

19   my own work, as well as handling all the paperwork that

20   was involved in the hiring as people and the transfers

21   of people and promotions of people.

22           Subsequent to that, later on in the latter -- I

23   had two people for quite some time.  And then probably

24   towards the last couple of years or so that I was there

25   we ended up hiring basically another clerical person and

1    kind of a risk management person and basically a person

2    who was the assistant to me, assistant personnel

3    director.

4        Q.    And who was that?

5        A.    His name was -- I'm trying to think of his last

6    name.  His first name was Dan.  I hire people named Dan.

7    No.  I don't remember his last name, to be honest with

8    you.  He's no longer there.

9        Q.    Was it Dan Monken?

10       A.    Yes, that's correct.

11       Q.    And do you remember when Mr. Monken first

12   became employed?

13       A.    Probably -- not exactly, no.  Probably maybe

14   just four, five, six months before I left.

15       Q.    Did he become your successor?

16       A.    Yes.

17       Q.    When he was hired, was it intended that he

18   would be your successor?

19       A.    It was my intention, yes.

20       Q.    You were always in the position of personnel

21   director from early '86 through and including October

22   '98 when you retired?

23       A.    That's correct.

24       Q.    What did you do, sir, to prepare for your

25   deposition today?

1     A.     I talked to Paul here the other day, and he

2   sent me some paperwork that I, as I understand that you

3   have, I reviewed that, the DeLuce report and a letter

4   from Hank Johnson.

5     Q.     And when you say you met with Paul, that would

6   be Paul Dellasega?

7     A.     I talked to him a few days ago, yes.

8     Q.     Prior to your speaking with him in preparation

9   for this proceeding, had you spoken with Mr. Dellasega

10  previously?

11    A.     Yes.

12    Q.     On what occasions had you spoken with him?

13    A.     Just once.  I guess it was in early April of

14  this year I had gotten a call from Paul or -- or I don't

15  know whether I got a call or I got a subpoena.  Anyway,

16  we just really kind of didn't follow through with the

17  subpoena.  But he and I went and got together and had

18  coffee and discussed the situation.

19    Q.     Did you review documents at that time?

20    A.     No.

21    Q.     When you left the county in October of '98, did

22  you take any documents with you that related to this

23  lawsuit?

24    A.     No.

25    Q.     How about anything that related to the

1   Complaint that Ms. Varner had made, whether or not it

2   related to a lawsuit?

3       A.      No

4       Q.      Do you have anything in your possession

5   currently that relates to this matter?

6       A.      No.

7       Q.      Did you have a file at the county relating to

8   Barbara Varner?

9       A.      Yes.

10      Q.      Describe for me what your file looked like.

11      A.      It was, you know, just have been in a filing

12  folder like this, you know, similar to this, with some,

13  you know, notes and dates and of, you know, the various

14  allegations, I guess, that she came forth with.

15      Q.      How was it labeled?

16      A.      Probably just labeled Barb Varner.

17      Q.      Did you have a separate file for Gary Graham?

18      A.      No, I don't believe so.

19      Q.      How about Joe Osenkarski?

20      A.      I don't believe so.

21      Q.      Do you know what happened to your file labeled

22  Barbara Varner?

23      A.      To my knowledge it's still in a filing cabinet

24  in the county.

25      Q.      Do you consider Mr. Dellasega to be your

1   attorney?

2       A.      That's my understanding, yes.

3       Q.      Why do you believe so?

4       A.      I guess because he said that, you know, he said

5   counsel for the county.

6       Q.      After you retired in October of '98 but before

7   you first spoke with Mr. Dellasega in April of this

8   year, did you speak with anyone about the allegations

9   made by Ms. Varner?

10      A.      No.

11      Q.      Was there a prior personnel director when you

12  took your job in '86?

13      A.      Yes.

14      Q.      What if any activities did you engage in to

15  issue any personnel directives or personnel manuals?

16      A.      Would you repeat that?

17      Q.      Sure.  Let me break it into two.

18              When you came in 1986 were there any personnel

19  handbooks?

20      A.      Yes.

21      Q.      Did you do anything to change the language in

22  the handbook?

23      A.      Yes.

24      Q.      What, if anything, did you do?

25      A.      We issued, I don't know exactly when, but

1    sometime, obviously sometime subsequent to when I came

2    there we had, were -- kind of revised, updated the

3    personnel manual and issued another one.  And then I

4    think it was just that, I think it was just that one

5    time.

6         And then not too long before I was leaving,

7    before I left, we were in the process of rewriting that

8    one.  And it actually, it came out I think, you know,

9    just very, very soon, within a matter of weeks or a

10   month or so that after I had left.

11   Q.   Okay.  Do you know whether the personnel

12   handbook contained a sexual harassment policy?

13   A.   Yes, it did.

14   Q.   Do you believe it had a sexual harassment

15   policy since early '86?

16   A.   I can't recall whether there was one in there

17   when I first got there, I don't remember that.  I don't

18   remember whether there was or there wasn't.

19   Q.   When you did your first update on the personnel

20   handbook, did it contain a sexual harassment policy?

21   A.   Yes, it did.

22   Q.   Have you had any specialized training in sexual

23   harassment or sex discrimination?

24   A.   Formal training?

25   Q.   Yes, sir.

```
1      A.    I don't think I've had formal training.  I had

2   probably some exposure to it in graduate school.  I had

3   some exposure to it, you know, in the union position,

4   you know, cases like that had come up.

5      Q.    Describe your educational background.

6      A.    I have a bachelor's degree in psych,

7   psychology, and have a master's degree in industrial

8   relations.

9      Q.    When did you receive your master's degree?

10     A.    In I think, I think it was 1970.

11     Q.    Any other education?

12     A.    No.

13     Q.    Now, do you know, sir, whether there was a

14   separate handbook for employees of the Probation

15   Department?

16     A.    Not to my knowledge, there wasn't, no.

17     Q.    Do you know whether Probation employees

18   received the handbook that you described that you worked

19   on as the county personnel director?

20     A.    Yes.  Everybody in the county should have had

21   one, yes.

22     Q.    Were the employees of the Probation Office

23   subject to the county handbook?

24     A.    It's kind of a tough question.  It may not

25   sound like it, but it is.  The court system in county
```

1   government whether -- any county government, have a

2   great deal of autonomy from, separate and apart from the

3   county commissioners, you know.  But by and large it's

4   my opinion that, you know, the court system to a great

5   extent followed the provisions of the personnel manual.

6        Q.    Did the employees of the Probation Office

7   receive a county ID badge?

8        A.    To my understanding, yes.  Yes.  I think

9   everyone in the county did, I think.

10       Q.    Were they subject to the pay scale and benefits

11   that were used for other county employees?

12       A.    Well, yes.  They were somewhere in that pay

13   matrix, yes.

14       Q.    So Probationary employees were assigned a pay

15   range?

16       A.    Probation employees, you mean --

17       Q.    Yes.  I didn't mean probationary as opposed to

18   not permanent.  Did employees in the Probation

19   Department, were they assigned a county pay range and

20   step?

21       A.    Yes.

22       Q.    Did they receive the same benefits as other

23   county employees?

24       A.    Yes.

25       Q.    Was their performance evaluated on the same

1    forms?

2        A.    To my knowledge, yes.

3        Q.    When a new employee was hired into the

4    Probation Office, who did the orientation of that

5    employee?

6        A.    I was there for really some time before, we

7    meaning kind of the Personnel Department, started a

8    formal orientation program for new employees.  Given

9    that, I don't know, you know, what orientation they had

10   when they were hired.

11       Q.    You said that you started some sort of a formal

12   orientation process?

13       A.    Yes.  And I don't know when exactly that was

14   started but, yeah, we would hold it sporadically because

15   we, you know, sometimes there might be a goodly number

16   of people hired across the county and we would have one,

17   you know, now and then.  You know, have one maybe soon

18   afterwards depending on the number of people that were

19   hired.  Or there might be, you know, a considerable gap

20   in time between when one was held and the next was held

21   just because, you know, we weren't holding these, you

22   know for on an individual basis, we were holding them as

23   group meetings.

24       Q.    Okay.  After these group meetings started, were

25   employees of the Probation Department included or

1   excluded from those orientation sessions?

2       A.    We invited everybody to come to those meetings,

3   all the new employees.

4       Q.    They were included?

5       A.    Everybody was invited.  I can't guarantee

6   everybody came to them, but yes.

7       Q.    At those orientation sessions, these group

8   meetings, what subjects did you cover?

9       A.    Well, pretty much the, you know, the key, the

10  salient factors of the personnel policy manual, you

11  know, the benefits and all that type of thing.

12      Q.    Did you give out a copy of the manual?

13      A.    They probably would have already received one

14  by the time they were at that meeting.

15      Q.    How would that be done?

16      A.    When somebody was hired, eventually or at some

17  point in time they had to have come into the Personnel

18  Department to fill out various paperwork, and they would

19  have been given that at that juncture.

20      Q.    Did they sign something saying that they had

21  been given it?

22      A.    Yes.  Or at least they should have been, yes.

23      Q.    Was that true the whole time that you were the

24  personnel director, or is that something that you

25  introduced?

1    A.    I don't recall.  I don't know that.

2    Q.    Walk me through the hiring of someone into the

3    Probation Office.  How would you find out that someone

4    had been hired?

5    A.    We would usually just -- there was a, what was

6    called a salary board meeting of, held by the

7    commissioners, it was every two weeks.  And every

8    department, you know, kind of had to notify the

9    Personnel Department of any new hires so that that could

10    appear on the agenda of the salary board.

11    Q.    Okay.  And then the salary board would vote

12    approving the hiring of this person?

13    A.    Yes.

14    Q.    Would that be true of employees in the

15    Probation Office?

16    A.    Yes.

17    Q.    Did the salary board also approve promotions?

18    A.    Yes.

19    Q.    Would that be true of promotions within the

20    Probation Office?

21    A.    Yes.

22    Q.    So you would find out that someone was selected

23    for hire.  The salary board would approve the hiring.

24    Then what happens?

25    A.    Well, sometimes prior to that, sometimes

1   subsequent to that, you know, they would be reporting to

2   our, my office and, you know, given all the necessary

3   paperwork that had to be filled out.  You know, the

4   applications and, you know, W2s and all -- well, maybe

5   W2s came from the controller's office.  But all the

6   necessary paperwork that had to be done to, you know,

7   meet, you know, I-9's I think they're called, all the

8   necessary paperwork that would be given in my office.

9   And then, you know, sit down and fill it out or bring it

10  back.

11      Q.    Who would send out the letter saying:  You are

12  hired?

13      A.    Normally that was by the department itself, the

14  hiring department, whoever that was.

15      Q.    So with regard to employees within the

16  Probation Office, who would send out the hiring letter?

17      A.    You're asking me who would send out that

18  letter?

19      Q.    Yes, sir.

20      A.    I can't answer, I don't know whether it came

21  from the person in charge of Probation or the president

22  judge, I don't know that.

23      Q.    In any event, these employees, new employees of

24  the Probation Office, would then come to your office and

25  receive paperwork and sign other forms?

1      A.     Yes.

2      Q.     And then they would be invited to participate

3 in this group orientation session?

4      A.     Once they were developed, yes.

5      Q.     When did you first learn that Barbara Varner

6 had made a complaint regarding her employment?

7      A.     You mean the date?

8      Q.     Yup.

9      A.     I couldn't tell you.  I have no idea.  She came

10 into the office and told me about it one day.

11      Q.     Okay.  Tell me what you remember about that

12 meeting.

13      A.     I don't remember specifics at all.  I remember

14 Barb coming to the office and, you know, and made some,

15 you know, allegations in regard to Gary Graham.

16      Q.     Do you know whether she made an appointment

17 with you?

18      A.     No, I don't.  She may have.  She may have just

19 come in.  She may have called and came in five minutes

20 later, I don't -- no, I don't recall.

21      Q.     Was it just you and she?

22      A.     I believe it was, yes.

23      Q.     Tell me what you remember her telling you at

24 that time.

25      A.     I just said that she came in and made some

1   allegations.  Specifically, I don't remember exactly

2   what they were.

3       Q.    Do you recall that she made allegations of

4   sexual harassment?

5       A.    Yes.

6       Q.    Did she make any allegations against others,

7   other than Gary Graham?

8       A.    At that time I don't know whether she did or

9   she didn't, or if we were just limited to him, I'm not

10  sure.

11      Q.    What did you do?

12      A.    I think what transpired at that point was that

13  they were some -- I mean, you know, when you're the

14  personnel director and this is one of the hats you wear,

15  you know, you take these allegations seriously, you

16  know, no matter what they are.  If they kind of fall

17  under the Human Relations Commission, whether it's, you

18  know, sexual harassment or it's discrimination of some

19  kind, you know, you take these things seriously, because

20  they can have some significant impact.

21          And I, you know, thought that, you know, that

22  this just may.  And I think what I did soon thereafter

23  was probably call up either Hank Johnson, who was the,

24  you know, chief counsel for the county, and/or Dave

25  DeLuce, who worked for Hank.

1     Q.     Well, did you tell Barbara Varner to do

2  anything as a result of this meeting that you had?

3     A.     Either I did or Dave did.  And I think we asked

4  her -- I don't know whether it was exactly at that

5  meeting or soon thereafter, I think we asked her to

6  write up, put in writing, you know, essentially what she

7  said verbally.

8     Q.     Do you know whether she did that?

9     A.     I believe she did, yes.

10     Q.     Prior to today, did you review her writing?

11     A.     No.  You mean in preparation for today?  No.

12          MS. WALLET:  Let's mark as Hartnett Deposition

13  1 a multiple-page memorandum.

14          (Hartnett Deposition Exhibit No. 1 was marked.)

15  BY MS. WALLET:

16     Q.     I've handed you what I've marked as Hartnett

17  Exhibit No. 1.  Would you take just a minute to look at

18  that, Mr. Hartnett, and tell me if you recall seeing it

19  prior to today?

20     A.     To be honest, no, I don't recall seeing this.

21  I'm assuming I did, but I don't recall that.

22     Q.     Do you remember that at your direction

23  Ms. Varner did prepare some writing regarding her

24  allegations?

25     A.     I think I said I think it's either I or Dave

1    DeLuce asked her to put this in writing.

2        Q.    When do you believe Mr. DeLuce became involved

3    in this process?

4        A.    I think fairly early on.  As I said there

5    earlier, I think I talked to him or Hank Johnson soon

6    after Barb came to see me.

7        Q.    You don't remember which one?

8        A.    No.  No, I don't.

9        Q.    Why did you call either Mr. Johnson or

10   Mr. DeLuce?

11       A.    Well, because Hank Johnson was the county

12   solicitor.

13       Q.    What did you want to know from either

14   Mr. Johnson or Mr. DeLuce?

15       A.    I think I basically was trying to repeat what

16   Barb had said to me.  I'm assuming, and you know, just

17   said that, you know, perhaps they ought to be involved

18   in this thing, too, right from the beginning.

19       Q.    Now, Mr. Hartnett, in or about April of 1997

20   when you're talking to Barbara Varner about this matter,

21   did you ever tell her that she was coming to you as the

22   wrong person?

23       A.    No.

24       Q.    Did you ever tell her that she should go

25   directly to Judge Sheely as opposed to deal with you?

1    A.    I don't think I did, no.

2    Q.    Do you believe that you received the document

3    marked Hartnett 1?

4    A.    I would assume I did, yes.  I don't recall

5    receiving it, but I guess I did.

6    Q.    Other than talk to either Mr. Johnson or

7    Mr. DeLuce, what did you do in response to this

8    memorandum?

9    A.    Well, I think what this triggered not only that

10    call to, you know, Hank Johnson or Dave DeLuce, but that

11    that began, you know, the investigation where Dave

12    and/or I, I think -- I think I was in most of the

13    meetings with Dave, I'm not positive, began the

14    investigation and talked to Barb and talked to a number

15    of co-workers and talked to Gary Graham and Joe

16    Osenkarski.

17    Q.    Why did you think an investigation might be

18    warranted?

19    A.    Because of the allegations.  I mean, somebody

20    came to me with those, those allegations or other ones

21    that I mentioned earlier, you know, just a

22    discrimination case or any of those types of cases that

23    fall under we'll say the Human Relations Commission or

24    EEOC type cases, you know, they're -- they have great

25    potential.  And so I mean, it's my, it was part of my

1    job to do this, you know, to properly, you know,

2    represent the county.

3        Q.    When you say they have great potential, what do

4    you mean by that?

5        A.    They have a significant impact on the employer.

6        Q.    And by that you mean the county?

7        A.    The county, the courts and whoever else, you

8    know, might be involved in it, yes.

9        Q.    Who decided that Mr. DeLuce would conduct an

10   investigation?

11       A.    I'm guessing this.  I'm assuming it was

12   probably Hank Johnson.

13       Q.    Did you ask Mr. Johnson to engage an

14   investigator?

15       A.    I think I did.  I don't know if in so many

16   words, but yes.

17       Q.    You believe it was your idea, not Mr. Johnson's

18   idea?

19       A.    I was telling Hank about the problem.  Hank

20   didn't know the problem until I told him.  You know, it

21   could have been his idea but, you know, he had to be

22   informed.

23       Q.    Who was your direct supervisor?

24       A.    Either the chief clerk or the county

25   commissioners.

1    Q.    Why are you uncertain?

2    A.    Just that I would report to, you know, on

3  various things any one of the four.

4    Q.    Okay.  When you say four, you mean the three

5  county commissioners and the chief clerk?

6    A.    Yes.

7    Q.    Was the chief clerk John Ward at that time?

8    A.    I'm not sure.  It might have been.  Whether he

9  was there yet when this first started, I don't know

10  exactly when John started there.

11    Q.    Do you remember having any discussions with the

12  chief clerk about Ms. Varner's allegations?

13    A.    I'm sure somewhere along the line I did.

14    Q.    You don't remember exactly when?

15    A.    Oh, no, I don't.  No.  Probably very soon, you

16  know, after she came forward with the allegations.

17    Q.    Do you think it was before you spoke with Hank

18  Johnson?

19    A.    I don't know.

20    Q.    Do you recall speaking to the three county

21  commissioners about these allegations?

22    A.    I don't recall a specific meeting with them.

23  Yes, I'm sure I did.

24    Q.    Do you believe that you spoke to them before

25  you spoke to Mr. Johnson?

1    A.    I don't know that.

2    Q.    Ultimately you had a meeting with the county

3    commissioners about this matter, correct?

4    A.    I'm sure.

5    Q.    Do you remember whether that was after

6    Mr. DeLuce had conducted his investigation?

7    A.    Probably during, sometime during, or even

8    before, because, you know, the investigation, you know,

9    lasted a while, and I surely talked to them prior to the

10   conclusion of that investigation.

11   Q.    Do you recall how long the investigation

12   lasted?

13   A.    No, I don't.  From the paperwork, you know, I

14   saw here just in the last couple days, it obviously, you

15   know, went on for some time.  No, I don't know how long

16   exactly.

17   Q.    A couple of months?

18   A.    I don't know.

19   Q.    In any event, it was decided that Mr. DeLuce

20   would conduct an investigation?

21   A.    Yes.

22   Q.    Did you give Mr. DeLuce any instructions as to

23   how he was to do this investigation?

24   A.    No.  He knows what to do.

25   Q.    How does he know that?

1      A.     Because he was involved I think with some other

2   cases along the same line.  Or let me put it this way,

3   maybe some other discrimination cases, something that

4   falls under, you know, the aegis of the human resources

5   commission.  The Human Relations Commission, excuse me.

6      Q.     When you say involved with other cases, you

7   mean with the county?

8      A.     Yes.  And he -- yes.  Yes.

9      Q.     Since you came to work in 1986 had you had any

10   prior sexual harassment cases?

11      A.     Yes.

12      Q.     Did it involve the Probation Department?

13      A.     No.

14      Q.     What was the nature of the allegation in these

15   other cases?

16      A.     Well, one was, one dealt with, it was, you

17   know, kind of a hiring discrimination, you know.  We

18   hired one person and the other -- and another person

19   felt that they should have been hired instead.  We had a

20   couple of those.

21            There was another case in another department

22   that where the woman was alleging, I don't know whether

23   it was sexual harassment.  More so sexual

24   discrimination.

25            And other case that started before I got there

1   that ended, it was resolved after I was there, though,

2   where the woman was kind of -- it was kind of sexual, I

3   guess a sexual harassment case.

4       Q.    Any others?

5       A.    Not that come to my mind right now.

6       Q.    What happened to the case in which the woman

7   alleging sexual discrimination in another department

8   made a claim?

9       A.    It kind of happened that there was another

10  department looking for an employee, and her background,

11  her education and everything pretty well, quite well fit

12  the vacancy, and she was I think promoted.  And I think

13  it resulted in a promotion.  But it was almost just kind

14  of happenstance, but a transfer to another department.

15      Q.    And that resolved the matter?

16      A.    Yes.

17      Q.    Do you recall what department this was?

18      A.    She came from?

19      Q.    Yes.

20      A.    I think it was a little department that dealt

21  with agriculture.

22      Q.    Agriculture?

23      A.    Yes.  I don't know exactly the name of that

24  department.  It had about, like, five people in it.  And

25  then she transferred from there to another department.

1   Q.    And the situation that you identified as sexual

2   harassment began before you came, resolved after you

3   came, what department did that involve?

4   A.    She had worked at the prison.

5   Q.    And what was the result of that?

6   A.    It -- she ended up that she -- it was agreed to

7   by everybody concerned that she transferred to another

8   department.

9   Q.    Somewhere other than the prison?

10  A.    Yes.

11  Q.    Do you remember where she transferred to?

12  A.    She transferred, to my recollection is it was

13  Domestic Relations.

14  Q.    Are the Domestic Relations employees subject to

15  court supervision?

16  A.    Yes.

17  Q.    And that transfer was done with the agreement

18  of the court?

19  A.    Yes.  Yeah, they -- well, they had to, yes.

20  Q.    They had to?

21  A.    Well, I mean, I don't mean legally had to, but

22  yeah, they had to agree with it in order for it to be

23  facilitated, yes.

24  Q.    In that situation did you or someone in your

25  office go to the judge and ask that he accept this

1  employee?

2      A.    I think in that case -- to my recollection and

3  it's not -- and I -- I probably dealt with the

4  department head.  I probably dealt with just the

5  department head.

6      Q.    That would be the head of the Domestic

7  Relations Department?

8      A.    Yes.  Yes.

9      Q.    To the best of your knowledge, had an EEOC or a

10  PHRC Complaint been filed in any of these three

11  situations you identified?

12     A.    The one that was at the prison, there clearly

13  was, yes.

14     Q.    Which?

15     A.    Well, I remember there was a hearing held by

16  the Pennsylvania Human Relations Commission at the

17  prison.  But you know, whenever -- you probably know

18  better than I, you know, usually when someone goes to

19  the Human Relations Commission, the Human Relations

20  Commission is also telling them to, you know, file

21  concurrently with the EEOC.  So we whether she did that

22  or not, I don't recall.

23     Q.    From the time you took the job as personnel

24  director to the time that you left, approximately how

25  many PHRC or EEOC charges were filed against the county?

1     A.     Probably six or seven.

2     Q.     Does that include Ms. Varner's?

3     A.     Yes.

4     Q.     Do you know whether any of those cases went to

5     litigation?

6     A.     No, none of them did.

7     Q.     Were some of them simply dropped?

8     A.     Yes, I think one or two was.  Some were

9     resolved.  Yes.  Or thrown out, you know, by Human

10    Relations Commission.

11    Q.     Some of them were settled?

12    A.     Yes.

13    Q.     Do you recall how many were settled?

14    A.     The two that come to mind -- what do you mean

15    when you say settled?  Let me ask you that.  Formally or

16    informally or --

17    Q.     Either.

18    A.     Oh.  Well --

19           MR. DELLASEGA:  That's a compound question and

20    I object to the form.

21    BY MS. WALLET:

22    Q.     Well, let's say how many were formally settled?

23    A.     The one with the woman that worked at the

24    prison was formally settled.

25           Well, that's your question, right?

1    Q.    Yes.  How many were informally settled?

2    A.    Oh.  Well, the rest of them minus one.  Minus

3    two.

4    Q.    And what were the situations with the two?

5    A.    Well, the one, this case.

6          The other, there was one, when I left there,

7    there was one case pending in front of the Human

8    Relations Commission that I don't think -- could be

9    settled by now, I have no knowledge.  It was a hiring

10   kind of discrimination charge.

11   Q.    In any of these cases that you've identified,

12   did the county engage someone to do an investigation?

13   A.    Yes, because the times that -- except for the

14   woman from the prison, I don't recall that, but the

15   other times when I would go to, you know, Pennsylvania

16   Human Relations Commission, it was an attorney with me.

17   So they would have been involved with that, yes.

18   Q.    Okay.  Actually, my question is:  Did the

19   county engage someone to do an actual investigation in

20   any of those other cases?

21   A.    I think, yeah, they were involved in it.  And

22   it was, you know, somebody was either -- it was, you

23   know, maybe Dave DeLuce or somebody else from Dave's or

24   from, yeah, Hank Johnson's office.

25   Q.    Were these other cases investigated in the same

1    way as Ms. Varner's allegations?

2         A.    Some of them weren't because perhaps they

3    weren't as, well, let me say as complex.

4         Q.    It's complex to answer the question?  Or --

5         A.    No, no, no.  No.

6         Q.    Or some of them were not as complex?

7         A.    Yes.  The case.

8         Q.    So an investigation could be done by talking to

9    two people and that was the end of it?

10        A.    Could be, yes.

11        Q.    Was there any prior investigation, prior to the

12   Varner investigation, that took several months of

13   interviews?

14        A.    No.  None that I recall, no.

15        Q.    Describe for me how you and Mr. DeLuce

16   determined to do this particular investigation.

17        A.    Well, you know, the allegations were such that,

18   you know, that it, there could have been, I mean, some,

19   you know, the allegations were such and I think right

20   from the beginning, and you can correct me if I'm wrong,

21   that I think that Barb Varner wanted one or both of

22   these people named to be, you know, discharged.  You

23   know, many times you get a remedy from the complainant

24   that is somewhat, you know, less severe than that as

25   possible solution to the situation.  To my recollection

1    that's what she wanted.

2        Q.    My question, sir, was:  How did you and

3    Mr. DeLuce decide to do this investigation?

4            MR. MacMAIN:  Objection.  I'm not sure I

5    understood your question.  You mean why did they decide

6    that the two of them would investigate it?  Or why did

7    they decide to investigate it?  Or what method or

8    procedure to investigate it.

9    BY MS. WALLET:

10       Q.    What method did you use to investigate these

11   charges of sexual harassment?

12       A.    We interviewed all these, all the people

13   involved.

14       Q.    Okay.  How did you decide who to interview?

15       A.    I think we -- when Dave was involved I, you

16   know, which was, you know, pretty early on, that I

17   think, you know, the three of us sat down, I believe, or

18   Dave at least and Barb got together and, you know, asked

19   a number of questions.  And she was, you know, saying

20   this and that; well, did anybody else see this, did

21   anybody else hear this, you know, who else does she know

22   that could, you know, confirm some of the allegations.

23   And you know, just went there with that.

24           You know, she's saying, well, you know, this

25   person, you know, could say this, or that person could

1    say that.  And then those folks were interviewed.  And

2    then, you know, the people that she was accusing were

3    interviewed and, you know, they mentioned some folks

4    that, you know, could perhaps, you know, buttress their

5    positions, and those people were interviewed.

6        Q.    Okay.  Did you believe that you had interviewed

7    everyone who had any potential information about these

8    allegations?

9        A.    Yeah, I think so.

10        Q.    And the list came about, the list of

11    interviewees came about jointly between you and

12    Mr. DeLuce and perhaps Ms. Varner?

13        A.    It came about in a way like I just said it came

14    about.  I mean, she had mentioned some other folks that

15    corroborate something or perhaps could corroborate

16    something and that's who we interviewed.  And if they

17    then would, you know, somebody she mentioned, I mean,

18    may have mentioned somebody else, we would interview

19    them.  And kind of did the same thing from the other

20    side of the table, that whenever, you know, Joe and Gary

21    were interviewed and if they mentioned anybody that

22    perhaps could, you know, substantiate what they said,

23    they too were interviewed.

24        Q.    Did you sit in on each of the interviews?

25        A.    If I didn't sit in on all of them I sat in on,

1   you know, like damn near all of them.

2       Q.    Did you take notes of these interviews?

3       A.    No.  Dave more so did than I.

4       Q.    Did you take any notes of any of the

5   interviews?

6       A.    I don't think so.

7       Q.    Now, when you received this April 25 --

8             MR. DELLASEGA:  Could we have a five-minute

9   bathroom break?

10            MS. WALLET:  Sure.

11            (Recess taken from 2:02 until 2:11 p.m.)

12  BY MS. WALLET:

13      Q.    Do you know whether you took any notes of the

14  meeting that you had initially with Barbara Varner?

15      A.    I'm assuming that I did.

16      Q.    Do you know what happened to those notes?

17      A.    They should have been in that file that I had.

18      Q.    Did the county have a workplace violence policy

19  at the time that Ms. Varner made her complaints in April

20  of '97?

21      A.    I don't believe so, no.  I don't believe so.

22  Maybe a better answer would be that I don't recall.

23            MS. WALLET:  Okay.  Let's mark as Hartnett 2 a

24  multiple-page document.

25            (Hartnett Deposition Exhibit No. 2 was marked.)

1   BY MS. WALLET:

2       Q.    Have you had a moment to look at that document,

3   sir?

4       A.    Yes.

5       Q.    And you're the Dan Hartnett on the from line?

6       A.    Yes.

7       Q.    Do you recall what prompted you to issue this

8   policy in or about January of 1997?

9       A.    No, I don't.

10      Q.    Do you believe that the county had a workplace

11  violence policy prior to your issuing this one in

12  January of '97?

13      A.    I don't believe so.

14      Q.    You think this was a new one?

15      A.    I believe so, yes.

16      Q.    To whom would this document, Hartnett 2, have

17  been sent?

18      A.    I would -- well, it's saying, you know, the

19  elected officials, departments and agency directors.

20  And then they're asking to up at the top, you know, it's

21  saying please post it on the, you know, the departmental

22  bulletin board or boards, and/or circulate it to the

23  employees.

24      Q.    Do you know whether or not this Hartnett 2 went

25  to the Probation Office?

1     A.     It certainly should have.  I mean, that's what

2     we're trying to -- we're trying to, you know, in the

3     elected officials, department heads or agency directors

4     we're saying we're trying to cover all the departments

5     of the county there.

6     Q.     Including the employees under the judge's

7     jurisdiction?

8     A.     Yes.  He's an elected official.

9     Q.     Do you know, sir, whether any of the judges

10    during the period of time that you were the personnel

11    director issued any supplemental personnel policies

12    applicable only to employees under the judges?

13    A.     No, I don't know whether they did or not.

14    Q.     Do you agree, sir, that Ms. Varner was making

15    some allegations in Hartnett 1 that included potential

16    physical harm?

17    A.     Well, when I looked over it briefly before I

18    think it says, well, it's saying that in the last

19    paragraph of the first page.

20    Q.     What if any action did you take in response to

21    her allegations of potential physical harm?

22    A.     I don't recall.

23    Q.     Did you make any effort to separate her from

24    the individual about whom she complained?

25    A.     No.  Not to my knowledge, no.

1    Q.    Did you make any efforts to restrict the

2    individuals about whom she complained from having access

3    to Ms. Varner?

4    A.    No.

5    Q.    Did you at some point ask Ms. Varner what her

6    proposed solution would be?

7    A.    Yes, I'm sure I did.

8    Q.    Do you recall whether she responded?

9    A.    I think I said earlier that I think when the

10    first time she came to my office with the Complaint,

11    with the allegations, that she asked that they both be

12    discharged.

13    Q.    Did she have any other suggestions?

14    A.    As a lesser solution, is that what you mean?

15    Q.    Any other suggestions for solutions.

16    A.    I don't -- not to my recollection.

17    Q.    Let me hand you what has previously been marked

18    as Varner Deposition Exhibit No. 16.  Let's go off the

19    record just for a minute.

20        MS. WALLET:  We'll mark a one-page document as

21    Hartnett Exhibit 3.  For the record, this was already

22    marked as Varner Deposition Exhibit 16.

23        (Hartnett Deposition Exhibit No. 3 was marked.)

24    BY MS. WALLET:

25    Q.    Mr. Hartnett, do you believe that you received

1   this memo dated April 25, 1997, in or around that date?

2       A.    I have no reason not to believe that.

3       Q.    Do you recall whether you received the, what I

4   assume to be a, what I would call a sticky note on the

5   upper right-hand corner?

6       A.    I'm sorry?

7       Q.    The handwritten note in the upper right-

8   corner?

9       A.    What about it?

10      Q.    Do you remember receiving that?

11      A.    No.  I may have, but no, I don't recall it, no.

12      Q.    Do you have any recollection of Ms. Varner

13  bringing to your attention that there might be guns

14  available to Joe Osenkarski and Gary Graham?

15      A.    Only because of the report that's being

16  referred to as the DeLuce report mentioning that, you

17  know, some Probation officers had the authority to have

18  guns and some didn't.

19      Q.    Did you confirm whether or not there were guns

20  available in the Probation Office?

21      A.    No.

22      Q.    Did you do anything in response to receiving

23  Hartnett 3?

24      A.    I'm assuming that I, you know, my course of

25  action was probably what, you know, happened when Barb

1   made other statements to me, that, you know, I'd just

2   get ahold of Dave and it would be part of the, you know,

3   file, part of the records, part of the investigation.

4       Q.    Pass it along to Mr. DeLuce?

5       A.    Yes.

6       Q.    Do you believe that's what you did do with

7   Hartnett 3?

8       A.    I'm assuming so.

9       Q.    Do you recall whether your interviews along

10  with Mr. DeLuce took several weeks, several days?

11      A.    It was certainly more than days, yes.  Probably

12  several weeks.

13      Q.    Mr. DeLuce did not work full-time for the

14  county, correct?

15      A.    That's correct.

16      Q.    Did you engage in any aspects of this

17  investigation without Mr. DeLuce?

18      A.    I don't believe so except, you know, the first

19  time that Barb came to see me.

20      Q.    What's the size the county complement, let's

21  talk about April of '97, how many employees are we

22  talking about?  Approximately.

23      A.    Oh, at that time --

24            MR. DELLASEGA:  This question refers to county

25  and court employees?

1          MS. WALLET:  Well, let's just say county

2     exclusively first.

3          THE WITNESS:  I'm trying to think who all was

4     under the courts as opposed to being under the

5     commissioners.  I know there was Probation, there's

6     Domestic Relations, the DA.  I don't know who else, but

7     if there was, say, at that time, you know, 1,100 or so

8     county employees, full-time, part-time, which was

9     probably, you know, relatively close, I don't know,

10    probably, there might have been, just a stab in the dark

11    but, you know, maybe 150, a couple hundred of the

12    people, if I'm recalling all the departments that are

13    under the courts vis-a-vis the county commissioners,

14    there are probably a couple hundred or so that were

15    under the court system.

16    BY MS. WALLET:

17         Q.    Okay.  So total complement under 1,500?

18         A.    Oh, when I'm saying 1,100 or so I'm saying that

19    totally, that's everybody.  And then I'm saying maybe a

20    couple of hundred of those 1,100 are --

21         Q.    I see.

22         A.    -- are under the courts.

23         Q.    Okay.  Now, when do you recall first speaking

24    to any of the judges about Ms. Varner's complaints?

25         A.    I have no idea.  I have no idea.

1    Q.    Well, you met with Mr. DeLuce --

2    A.    Yes.

3    Q.    -- and Judge Sheely at one point, correct?

4    A.    Yes.

5    Q.    Do you remember meeting with any of the judges

6    prior to that time?

7    A.    No.  I'm sure I had meetings with or

8    discussions with Dave before I met with any of the -- or

9    the judges, or the president judge it would have been.

10    Q.    Okay.  Did you speak with Judge Sheely and tell

11    him that an investigation was ongoing?

12    A.    At some time, I mean, obviously he was informed

13    of that.  I don't know whether I specifically told him

14    or Dave told him.  I don't recall that specifically.

15    Q.    Was he informed after the investigation was

16    done or pretty much well done, or before it started?

17    A.    I don't know that.  I would imagine it was, you

18    know, earlier rather than later.  I mean, he had the

19    right to know these things.

20    Q.    Did Judge Sheely give you any instructions as

21    to how this investigation should be done?

22    A.    I don't recall that, you know.  He may have.

23    Not with me.  He may have with Dave, I don't know.

24    Q.    Tell me what you remember about the meeting

25    with Judge Sheely, Dave or DeLuce, yourself, regarding

1   this investigation.

2           MR. DELLASEGA:  You're assuming there was just

3   one meeting?

4   BY MS. WALLET:

5       Q.    The first one that you remember.

6       A.    I don't remember the meeting.  I mean, at some

7   point it took place.  I know that I met with Judge

8   Sheely at one point.  I don't know.  When -- I don't

9   know when that was, let alone -- I don't remember, you

10  know, specifically a meeting with Dave DeLuce, myself,

11  and the president judge.

12      Q.    You don't remember having the meeting?  Or you

13  don't remember what happened at the meeting?

14      A.    Either one.

15      Q.    Well, you engaged in some interviews with

16  people and at some point was there an investigative

17  report prepared?

18      A.    Yes.

19      Q.    Did you receive that report?

20      A.    Yes.  Yes.

21      Q.    Did you receive a report directly from Dave

22  DeLuce?  Or did you receive a report from Hank Johnson?

23      A.    In some of the paperwork that I looked at in

24  the last day or so there was a, you know, a report

25  directly to me from Hank Johnson.  At some time, though,

1    time frame wise I'm not sure but, you know, I had seen

2    the report that's being referred to as the DeLuce

3    report, too.

4       Q.    Did Mr. DeLuce share that with you at the

5    conclusion of the investigation, or at some time during

6    the middle of the investigation?

7       A.    I don't know.  Just whenever he -- soon after

8    he did it I'm sure he shared it with me.

9       Q.    What did you understand Mr. DeLuce's

10   conclusions to be?

11           MR. LANCASTER ADAMS:  I'm going to object.  You

12   may answer.

13           MR. DELLASEGA:  Just to clarify the record here

14   in any event, since the witness is referring to the

15   DeLuce report, there are actually two DeLuce reports,

16   two different dates as we recall from his deposition.

17   The document he has reviewed that was given to him by me

18   is the earlier DeLuce report.

19   BY MS. WALLET:

20      Q.    Did you understand my question, sir?  My

21   question, sir, was:  DeLuce does an investigation.  What

22   did you understand his recommendations to be?

23      A.    I don't know that he is making a recommendation

24   at the end of that report that I saw.  You know, Hank

25   did.  Hank after reading that report as I could gather,

1    Hank was making recommendations.

2        Q.    Well, did you talk with DeLuce about whether he

3    found credible any of the allegations of Ms. Varner?

4        A.    He does state that in the report, as my

5    recollection just reading it in the last day or so.  He

6    felt that somewhere there he said that, you know, he

7    felt that she was credible, yes, or words to that

8    effect.

9        Q.    You sat in on these interviews, too, correct?

10       A.    Most of, not all, yes.

11       Q.    What conclusion did you come to with regard to

12   Ms. Varner's credibility?

13       A.    Pretty much the same thing Dave's saying.

14       Q.    And what was that?

15       A.    That he felt that, you know, by and large her

16   statements had -- were credible.  You know, what kind

17   of, like, third-party confirmations that were gotten,

18   seemed to augment her allegations.

19       Q.    Did you believe Ms. Varner?

20       A.    In the final --

21            MR. DELLASEGA:  Your question is at the end of

22   the DeLuce report?  Or today?

23            MS. WALLET:  At the end of the DeLuce report.

24            THE WITNESS:  I felt that she had the

25   credibility, I just said that, that I felt that, I

1   pretty much agreed with what Davis's saying in his

2   report.

3   BY MS. WALLET:

4       Q.    Do you believe that Gary Graham was a credible

5   witness?

6              MR. DELLASEGA:  Again, as --

7              MR. MacMAIN:  Objection.

8              MR. DELLASEGA:  Again, as of the end of the

9   report?

10             MS. WALLET:  Correct.

11             MR. MacMAIN:  Objection.  You may answer.

12             THE WITNESS:  Well, I can't -- I mean, if she's

13  credible, he can't be.  I mean, you know, it seemed to

14  be that the, you know, any preponderance of people

15  confirming Barb's statements, they were more on her side

16  than they were on his.  I mean, she -- the statements,

17  what statements were made, what allegations were made

18  that could be augmented by someone else, you know,

19  tended to lend her credibility.

20  BY MS. WALLET:

21      Q.    Did you believe that Joe Osenkarski was

22  credible?

23             MR. LANCASTER ADAMS:  Objection.  You may

24  answer.

25             THE WITNESS:  I guess the answer has to be the

1   same thing.  You know, they both can't be credible.

2   BY MS. WALLET:

3        Q.    Both Ms. Varner and Mr. Osenkarski?

4        A.    Yeah.

5        Q.    And with regard to the allegations against

6   Mr. Osenkarski, who did you find more credible?

7              MR. LANCASTER ADAMS:  Same objection.

8              THE WITNESS:  Barb, I guess.

9   BY MS. WALLET:

10       Q.    Did anybody at any time say:  Dan Hartnett as

11  personnel director, what do you recommend we do here?

12       A.    I don't recall that, no.

13       Q.    Did Judge Sheely ask you that?

14       A.    No, I don't think he ever did.

15       Q.    Did Dave DeLuce ever ask you that?

16       A.    Dave and I had to discuss this.  I don't

17  remember him specifically asking that, but we certainly

18  had to discuss that.

19       Q.    Well, did you and Mr. DeLuce differ on

20  anything?

21              MR. DELLASEGA:  Object to the form, but you may

22  answer.

23              THE WITNESS:  Yes.  Well, I thought that Hank's

24  conclusion of the resolution in regard to Joe Osenkarski

25  was too severe.

1  BY MS. WALLET:

2    Q.    And for the record, what did you understand

3  Hank's conclusion with regard to Joe Osenkarski to be?

4    A.    Well, it's in the report that I read in the

5  last day, and it was that Mr. Osenkarski retire.

6    Q.    And why did you think that would be too severe?

7    A.    I just think he was, had kind of -- was just

8  involved on kind of a peripheral way here, not nearly as

9  directly.

10   Q.    Did you believe that there was any reason to

11 take disciplinary action against Mr. Osenkarski?

12   A.    No matter what the disciplinary action is?

13   Q.    No matter what.

14   A.    Ask me the question again.

15   Q.    Did you believe that there was any reason to

16 take disciplinary action against Joe Osenkarski?

17         MR. LANCASTER ADAMS:  I'm going to object as

18 this witness would not be qualified to make that

19 determination, it would have been the president judge.

20 BY MS. WALLET:

21   Q.    You may answer.

22   A.    If so, very little disciplinary action, of

23 minor disciplinary action.

24   Q.    Such as?

25   A.    A brief suspension, a reprimand, something

1   along that line.

2       Q.    And what would be the reason for that

3   discipline?

4       A.    I guess from some of the comments that were

5   written up in either Hank's report or Dave DeLuce's

6   report in that, you know, the statements that were

7   allegedly that he had made on various things on, you

8   know, just kind of, statements that shouldn't be made by

9   the, you know, professional management person.

10      Q.    Specifically what statements?

11      A.    Well, I don't know.  I'd have to look at that

12  report again.  But some of the, you know, kind of foul

13  language stuff that seemed to be prevalent.

14      Q.    Did you have evidence that Mr. Osenkarski

15  operated as the supervisor of this department?

16      A.    I'm sorry?  Ask that again?

17      Q.    Did you have evidence that he operated as the

18  supervisor of this department?

19      A.    Well, yeah.  He was the supervisor of the

20  department.

21      Q.    I believe the DeLuce report talked in terms of

22  Mr. Osenkarski perhaps abrogating some of his

23  responsibilities as supervisor.  Is that your

24  understanding of the report?

25      A.    That's part of it said in the report, yes.

1    Q.    And did you agree with that?

2    A.    Well, the -- I mean, a number of people said

3    that.  I don't -- I'm not familiar with, you know, the

4    day -- I wasn't familiar with the day-to-day operations

5    there.  A number of people said that, and supposedly

6    some people that worked there said that he had said

7    that.  Now, I don't recall hearing that at any of the

8    interviews, but it's in that report.

9    Q.    So you thought he should get some kind of light

10   disciplinary action for the use of foul language?

11   A.    That fairly well captures it, yes.

12   Q.    Any other reason?

13   A.    No.

14   Q.    Originally I had asked you whether you had

15   differed with Mr. DeLuce in any respect, and you said

16   yes, you differed with regard to the disciplinary action

17   of Joe Osenkarski.

18        Did you differ with Mr. DeLuce in any other

19   respect?

20   A.    Not that I recall.  Not that I recall, no.

21   Q.    Did you agree that some disciplinary action

22   should be imposed upon Mr. Graham?

23   A.    Yes.

24   Q.    What did you think the disciplinary action

25   should be with regard to Mr. Graham?

1     A.     In the report to me from Hank Johnson, he

2   recommended that Gary Graham be separated, and I would

3   have had no problem with that.

4     Q.     You thought that Graham should be fired?

5     A.     Yes.

6     Q.     Why?

7     A.     Because of the allegations that were kind of

8   somewhat of Barb Varner's that could be substantiated by

9   some other folks.

10     Q.     And if he were fired, what reasons would you

11   list in the firing letter?

12          MR. MacMAIN:  Objection.

13          THE WITNESS:  I wouldn't be doing that.

14   BY MS. WALLET:

15     Q.     If a county employee had engaged in the same

16   conduct that was concluded by Mr. DeLuce, would you have

17   recommended that he be fired?

18          MR. DELLASEGA:  Object to the form.  You can

19   answer.

20          MR. MacMAIN:  Same objection.

21          THE WITNESS:  I'm sorry, say that again?

22   BY MS. WALLET:

23     Q.     If this were a county employee, someone under

24   the Human Resource director's supervision, would you

25   have recommended firing?

1      A.     That would be done by -- that would be under

2   the commissioners as opposed to under me?

3      Q.     Yes.

4      A.     Would I have recommended firing?

5      Q.     Yes.

6      A.     Yes.

7      Q.     And if you were in a position to implement that

8   firing, what reasons would you give for the firing?

9             MR. DELLASEGA:  Object to the form.  You may

10  answer.

11            THE WITNESS:  In a letter to the employee?

12  BY MS. WALLET:

13     Q.     Yes, sir.

14     A.     I wouldn't mention that.  I would just say he's

15  fired.

16     Q.     What reasons would you give to your supervisors

17  to justify the firing?

18            MR. DELLASEGA:  Object to the form.  You may

19  answer.

20            THE WITNESS:  I would just -- you can't

21  reiterate all the allegations and then those they're --

22  can be substantiated.

23  BY MS. WALLET:

24     Q.     Well, did you believe that he had engaged in

25  foul language?

1    A.    Yes.

2    Q.    Did you believe that he had engaged in hostile

3    environment kind of conduct?

4    A.    Yes.

5    Q.    Did you believe that he had made statements

6    that would suggest some retaliation against individuals

7    who opposed him?

8    A.    Yes.

9    Q.    Did you believe he had a tendency to be a

10   violent individual?

11   A.    From what was said by various people that were

12   interviewed, yes.

13   Q.    Any other reason that you would think he ought

14   to deserve some disciplinary action?

15         MR. DELLASEGA:  Object to the form.

16         THE WITNESS:  No, it all involves this.

17   BY MS. WALLET:

18   Q.    The things I mentioned?

19   A.    Yes.

20   Q.    Now, you had this meeting with Dave DeLuce and

21   Judge Sheely and yourself.  Do you remember anything

22   about that meeting?

23         MR. DELLASEGA:  I'm going to object to the form

24   because I don't recall him testifying he had such a

25   meeting.

57

1      THE WITNESS:  No, I didn't say I had a meeting.

2   It may very well have happened, but I don't recall.  And

3   I don't recall when, if did it happen, I don't really

4   recall the three of us getting together.  I'm not saying

5   we didn't, but I don't recall that.

6      MS. WALLET:  Let me mark Deposition 4.

7      (Hartnett Deposition Exhibit No. 4 was marked.)

8   BY MS. WALLET:

9   Q.   Have you had a chance to look at the document

10  I've marked as Deposition Exhibit 4?

11  A.   Yes.

12  Q.   Do you believe that you received a copy of this

13  document as indicated in or about July of 1997?

14  A.   Yes.

15  Q.   Do you agree, sir, with Judge Sheely when he

16  says:  I had planned to transfer Mr. Graham to Adult

17  Probation and previously told Dan Hartnett of this

18  decision?

19  A.   I do now, after reading this, yes.

20  Q.   Do you recall when you talked to Judge Sheely

21  about transferring Mr. Graham?

22  A.   It would have -- it would have been just prior

23  to -- I'm sure just prior to this date.  I mean, by

24  within a week, I would assume.

25  Q.   Did Judge Sheely initiate this conversation, or

1  did you?

2      A.    I don't recall.

3      Q.    What do you recall about that conversation in

4  which Mr. Graham was supposedly to be transferred?

5      A.    I remember talking -- I remember this letter,

6  because after meeting with the judge I had said to the

7  judge, I says -- well, I don't know whether he asked me

8  to talk to Barb or I says, you know, do you care if I

9  talk to Barb.  Because even though obviously this is --

10 I had forgotten what he had said as to the proposed

11 solution to this situation, but -- and I read here now

12 that he's saying, you know, I'll just transfer him to

13 the other side of Probation.

14          I thought that whatever he said would have been

15 a satisfactory resolution to the whole situation, and I

16 was pleased with that, okay?  Because it's been going on

17 for some time now.  And then I don't know whether he

18 asked me or I said to him, do you care if I talk to Barb

19 about this.  Because I said it had been going on for a

20 while, I wanted to get it resolved.  And he said no, or

21 go ahead and talk to her, or something to that effect.

22          And as I recall it, I went back to my office,

23 called Barb, asked her to come to my office.  And told

24 her this.  And --

25     Q.    Told her what?  I'm sorry, sir.

1    A.    I'm -- well, whatever the judge had said to me

2    that seemed to resolve it.  Now he's saying in this

3    letter it was a transfer to the other side of Probation,

4    and I have no reason to disbelieve that, so.  But I

5    didn't recall, you know, what he had said is the

6    proposed solution.  But assuming it was this exactly

7    what he's saying, I then went to my office, called up

8    Barb as per, you know, agreement between the judge and

9    I, called her in.  And I basically thought that this

10    thing was resolved at that juncture.

11    Q.    Okay.  Now, did the judge give you any reason

12    for why he had decided to transfer Graham to Adult

13    Probation?

14    A.    Just to resolve the issues.

15    Q.    Did Judge Sheely have the DeLuce report or a

16    version of the DeLuce report at the time he talked to

17    you about transferring Graham?

18    A.    I don't know.  I'm assuming so.  I don't know.

19    I don't know the dates.

20    Q.    And do you know why you were having this

21    conversation with Judge Sheely?  Did he call you?

22    A.    Oh.  I'm assuming so.

23    Q.    Okay.  Was this on the phone or in person?

24    A.    No, I think we met person-to-person.

25    Q.    And do you think there were others there at the

1  time?

2      A.    No, I don't believe so.

3      Q.    Just you and he?

4      A.    Yes.

5      Q.    Do you remember anything else about that

6  conversation?

7      A.    Nothing other than what I just said, no.

8      Q.    Did you go through the report?  Did he look

9  through the paper and --

10     A.    Oh, I don't think -- while I was there, he

11  didn't.

12     Q.    Well, did he ask you what your recommendation

13  was?

14     A.    I don't recall him asking me that, no.

15     Q.    So he called you in, he said:  I have this

16  report, I've decided to transfer Graham?

17     A.    No, I don't believe he said he has the report

18  or not.  But he obviously said that he was -- apparently

19  based on this memo that he apparently said he was going

20  to transfer Graham.

21     Q.    And when you learned that, you then relayed

22  that to Ms. Varner?

23     A.    Yes.  I asked him if I could, and he said yes.

24  I says, okay, I'll do it.

25     Q.    Okay.  What was her reaction?

1    A.    I think she was pleased with the whole thing,

2    you know, and it seemed to, you know, like I said, at

3    that point I just assumed that this thing was a wrap

4    here, a deal, it's done, it's over.

5    Q.    And what did she say to you that caused you to

6    conclude that she was pleased?

7    A.    I don't remember.  I mean, she just -- as I

8    recall it she just seemed to, you know, pleased, too,

9    that, you know, that it's over, you know, and she can

10   live with this solution.

11   Q.    At the time that you met with Ms. Varner was

12   there any contemplated disciplinary action against

13   Mr. Osenkarski?

14   A.    Not that I know of.

15   Q.    Did you discuss some action against Osenkarski?

16   A.    With the judge at this meeting?

17   Q.    Yes.

18   A.    No.  I don't recall that, no.  I don't think we

19   did.

20   Q.    So the first meeting that you have with the

21   judge at which he announces some conclusion to this

22   investigation, the recommendation was transfer Graham to

23   Adult Probation?

24   A.    Apparently.

25   Q.    Did this transfer involve a transfer in office

1   location?

2   A.    Physically, you mean?

3   Q.    Yes.

4   A.    I don't know, because at the time I don't --

5   the Probation was a growing department, I mean, just in

6   the number of employees, okay?  And they were pretty

7   well jammed into this one particular, you know, area on

8   the one floor of the courthouse.  And subsequent to that

9   they, I think they moved them or gave them more office

10  space.

11        And so I don't know, you know, just when that

12  was in relation to when, you know, he was -- whether the

13  two departments were separated physically or not at that

14  time.  I mean, if they were, then it involved a physical

15  move for him.  If they were still one, you know, it

16  probably didn't involve a physical move.

17  Q.    Did you have any opinion as to whether or not

18  Varner and Graham could continue to work together?

19  A.    Did I have an opinion on that?

20  Q.    Yes, sir.

21  A.    Under these circumstances, I would assume that

22  they -- well, if this had been implemented, then I mean,

23  by and large they wouldn't be working together.

24  Q.    And you believed that was because Adult

25  Probation was sufficiently separate from Juvenile

1    Probation that they didn't have interaction?

2       A.    Well, there might have been some, but it would

3    have been minimal, or certainly minimal compared to, you

4    know, both being in, you know, on the same side of

5    Probation, yeah.  It would have been much, much greatly

6    reduced.

7       Q.    I'm sorry, was that the end of the sentence?

8       A.    Yes, that was the end.  Period, yes.  Yes.

9       Q.    Now, you don't have a recollection of where

10   Juvenile Probation was in relation to Adult Probation in

11   or about July of 1997?

12      A.    No.

13      Q.    Is that what you're saying?

14      A.    Yeah.  They were physically together at one

15   time and all in one in great big room, and then

16   subsequent to -- subsequently, I don't know when, they

17   were physically, some were physically moved.

18      Q.    Okay.  Now, obviously you learned at some point

19   that the plan to transfer Mr. Graham was off?

20      A.    Yes.

21      Q.    How did you learn that?

22      A.    I think it was -- well, I was going to say I

23   think in his memo, but I guess that I had to know that

24   before this memo because perhaps -- no, I don't know.  I

25   mean, the short answer is I don't know.  I'm assuming

1   that Barb came back to me and said that, you know, what

2   I just told her was off.  Because I knew prior to this

3   memo that the judge had changed his mind and I told Paul

4   that -- you know, I was kind of relieved to get this

5   memo because, you know, here I had gone out and based on

6   what the judge had said just verbally and told Barb, you

7   know, this is the solution.  And I'm pleased with it,

8   you know.  And then I think, I'm assuming that she came

9   to me and said all of a sudden, boom, it's gone, the

10   solution's gone.

11         And I was concerned because here I am, you

12   know, the personnel director, and there he is the

13   president judge and, you know, he's going to have some

14   more credibility than I. And but then he followed up

15   with his memo saying that, you know, we had agreed and

16   he had to change his mind, and he changed his mind.

17   Q.    Okay.  Did you meet with Judge Sheely again

18   after the discussion about transferring Graham but

19   before this July 11, 1997 memo marked Deposition 4?

20   A.    I don't believe so.

21   Q.    Did you speak to him on the phone?

22   A.    I don't recall.  I have no idea.

23   Q.    So you think the first you heard it was off was

24   from Barb Varner?

25   A.    I'm assuming it was from her.

1    Q.    And did you confirm that then with Judge

2    Sheely?

3    A.    The only time that I can recall that it was

4    confirmed is when he sent this, when he sent this memo

5    out.

6    Q.    Okay.  So weren't you just a little bit curious

7    that --

8    A.    You're damn right I was.

9    Q.    -- that you thought you understood what the

10   deal was?

11   A.    Yes.  Yes.  Yes.

12   Q.    So you hear it's off, but you don't do anything

13   to find out whether that's true?

14   A.    Well, I -- assuming, assuming it was Barb came

15   down and told me that, then I maybe she said she had

16   heard it from the judge himself.  I had no reason to

17   deny -- to not believe what, you know, she said to me.

18   So it was done.  You know, I mean, I didn't rule the

19   judge.  I mean, he makes up his mind, you know, I don't

20   overrule him.

21   Q.    I understand.  Well, did Judge Sheely ever come

22   to you and say:  I have some new information that I'm

23   considering?

24   A.    I don't recall that.  I just know that I got

25   this memo.

1    Q.    During your meetings with Gary Graham did Gary

2    Graham ever say to you:  I had an affair with Barbara

3    Varner?

4    A.    No, he didn't.

5    Q.    Did he ever say anything to you that even

6    hinted that he had had a personal sexual relationship

7    with Barbara Varner?

8         MR. MacMAIN:  Objection.  Can you define

9    hinted?

10   BY MS. WALLET:

11   Q.    Did he say anything to you that made you think,

12   hmm, I wonder if there was a sexual relationship between

13   the two of them?

14   A.    No.

15   Q.    Did anybody as part of these interviews that

16   you were present in, say anything to you about a sexual

17   relationship between Barbara Varner and Gary Graham?

18   A.    No.

19   Q.    Today do you have any evidence that there was a

20   sexual relationship between Gary Graham and Barbara

21   Varner?

22   A.    Let me ask a question.

23        MR. DELLASEGA:  You want to speak with me

24   outside?

25        THE WITNESS:  Yes.

```
 1              (Witness conferred with counsel privately.)

 2              MS. WALLET:  Let the record reflect that after

 3    a short discussion between Mr. Hartnett and

 4    Mr. Dellasega, the two of them have returned.

 5    BY MS. WALLET:

 6         Q.    Do you remember my question, sir?

 7         A.    Please ask it again.

 8         Q.    Do you have any evidence of there being a

 9    sexual relationship between Gary Graham and Barbara

10    Varner?

11              MR. DELLASEGA:  That actually wasn't the

12    question.  The question was does he have any evidence

13    today.  Is your question that?  Or did he have any

14    evidence in '97?

15              MS. WALLET:  Right.  My question was today.

16              THE WITNESS:  Yes, I do, today.

17    BY MS. WALLET:

18         Q.    What evidence do you have?

19         A.    Well, I just have what Dave told me.

20         Q.    Dave?  Dave DeLuce?

21         A.    Oh, no, no.  I'm sorry.

22              MR. MacMAIN:  He said they have, they've, I

23    think.

24              THE WITNESS:  Here.

25              MR. DELLASEGA:  Paul.  Paul, I'm sorry.
```

1          MR. LANCASTER ADAMS:  Dellasega.

2     BY MS. WALLET:

3          Q.   So Paul told you that there is some evidence of

4     a sexual relationship between Gary Graham and Barbara

5     Varner?

6          A.   Yes.

7          Q.   Do you have any personal knowledge of any such

8     relationship?

9          A.   No.

10         Q.   Are you aware of any observations by anyone of

11    the two of them having a personal relationship?

12         A.   No.

13         Q.   What is the nature of the evidence of sexual

14    relationship that you now have as a result of your

15    discussion with Mr. Dellasega?

16         A.   Well, he had said to me that, and --

17         Q.   And who is he?

18         A.   Paul, I'm sorry.  He had, when we met, and I

19    believe it was established we met back in April of this

20    year, that Gary Graham -- and the reason that the judge

21    had issued this memo that was the last Exhibit 4 or

22    whatever I think it was, that the reason the judge had

23    changed his mind was because, you know, Gary Graham had

24    gone to the president judge, you know, obviously quite

25    soon after our meeting, Sheely's meeting and mine, and

1    admitted that there was some kind of sexual relationship

2    going on between the two.  And to the best of my

3    recollection I -- the first time I heard that was when

4    Dave told me that.  Or when Paul told me that.  I'm

5    sorry.

6        Q.    So you did not know about this alleged sexual

7    relationship until April of 2003?

8        A.    To the best of my knowledge, yes, that's true,

9    that I didn't hear that for the rest of the time I was

10   at the county.

11       Q.    Up until today, has Gary Graham told you

12   personally that he had a sexual relationship with

13   Barbara Varner?

14       A.    No.

15       Q.    Did Judge Sheely, after learning this

16   information about the sexual relationship, come back to

17   you and say:  Dan Hartnett, did you find any evidence of

18   this sexual relationship?

19       A.    No.

20       Q.    Did Dave DeLuce ever come back to you and say:

21   As a result of this revelation from Mr. Graham, Dan

22   Hartnett, do you have any evidence of such a sexual

23   relationship?

24       A.    No.  Because like I said, to my, the best of my

25   recollection, you know, the first time I heard this was

1   when Paul told me that.  And of course, the last time I

2   saw Dave was, you know, years ago.

3      Q.   Well, when you got this memo and it said:  I

4   have recently received information that if true would

5   nullify in my judgment any sexual harassment claim

6   involved in this relationship, didn't you ask what the

7   heck information did the judge have?

8      A.   No, I didn't, for a couple reasons.  First of

9   all, I don't -- I don't necessarily question the judge.

10  He has the authority to do what he did.

11          And secondly, the next, very next sentence

12  says:  I do not wish to publicly reveal the details of

13  what I've been told at this time.  So I didn't think

14  that he was going to be telling me, anyway.

15     Q.   Well, did you go back to either Dave DeLuce and

16  Hank Johnson and say:  What the heck is the revelation

17  that made the judge change his mind?

18     A.   I probably did.  I don't remember that, but if

19  I did, I don't recall ever hearing that the rest of the

20  time that I was with the county.

21     Q.   Did you have your or a meeting with the

22  commissioners before or after July 11, 1997?

23     A.   Oh, I probably had meetings both before and

24  after.

25     Q.   About this subject.

1      A.     About?

2      Q.     About the subject of Barbara Varner's

3   allegations.

4      A.     Yes.

5      Q.     Let's start again.  I assume you met regularly

6   with the commissioners, correct?

7      A.     Yes.

8      Q.     On matters of personnel and --

9      A.     Oh, yeah.  Yeah, on matters of personnel or

10  with the chief clerk, yes.

11     Q.     My question to you is:  Did you meet with the

12  commissioners about Barbara Varner's allegations before

13  the July 11, 1997, memo marked Deposition 4?

14     A.     Oh, I'm sure I did.

15     Q.     And what do you remember telling the

16  commissioners about Barbara Varner's complaint?

17     A.     I don't remember specifically, but I'm telling

18  them basically the same thing I'm saying here, that

19  she's made these allegations, you know, we've done the

20  investigation, or we were partway through the

21  investigation, whatever time frame that I was talking to

22  the commissioners, and you know, we pretty much

23  ultimately came to the conclusion that, you know, that

24  her allegations were substantiated as best they could

25  be.

1     Q.     And what if any instructions did you get from

2     the commissioners regarding these charges?

3     A.     I don't recall.

4     Q.     Well, were they troubled by this situation?

5     A.     I would assume so, but I don't recall.

6     Q.     Did they tell you to meet with the judge?

7     A.     I don't know.

8     Q.     You don't remember anything that the

9     commissioners told you?

10     A.     Specifically question you asked me, no, I don't

11     recall what they said.

12     Q.     You don't remember whether you reported to the

13     commissioners about the DeLuce report?

14     A.     I'm sure they received a copy of the report.  I

15     assume they received a copy of the report.

16          MS. WALLET:  Let's mark as Deposition 5 the

17     June 26, 1997, letter to you.

18          (Hartnett Deposition Exhibit No. 5 was marked.)

19     BY MS. WALLET:

20     Q.     Do you have in front of you what we've marked

21     as Deposition Exhibit 5?

22     A.     Yes.

23     Q.     Do you believe that you received this letter

24     from Horace A. Johnson in or about June 26, 1997, in the

25     form in which it is marked here today?

1    A.    I would assume so, yes.

2    Q.    Do you remember this letter?

3    A.    I wouldn't.  I reviewed this letter in the last

4    day or so.

5    Q.    And you believe that it consisted of a couple

6    of pages of letter and then some attachments?

7    A.    Yes.

8    Q.    What if anything did you do with the June 26th,

9    1997, letter marked Deposition 5?

10   A.    I'm assuming that the commissioners and the

11   president judge received a copy of this.

12   Q.    Okay.  Did you give it to the commissioners?

13   A.    I would assume so, but I don't specifically

14   recall doing that.  But I'm sure I did.  I mean, it's

15   part of my job to do that, yes.

16   Q.    Okay.  Well, when you gave it to the

17   commissioners and it contains recommendations about what

18   should be done with these employees, did you discuss

19   those recommendations with the commissioners?

20   A.    I don't recall.

21   Q.    Well, do you believe that you discussed the

22   June 26, 1997, letter with the commissioners before you

23   got the July 11, '97, letter from Judge Sheely?

24   A.    I would certainly believe so.

25   Q.    Did you at any time tell the commissioners that

1   you agreed with the recommendation that Osenkarski

2   should retire and Graham should be removed?

3       A.    I'm sorry, ask that again, Deb?

4       Q.    Did you tell the commissioners that you agreed

5   with the recommendation of Mr. Johnson that Osenkarski

6   should retire and Graham should be removed?

7       A.    I don't -- I don't know.  The short answer is I

8   don't know.

9             I clarify that by saying kind of what I said

10  earlier, that I don't -- I didn't agree with the

11  recommendation in regard to Mr. Osenkarski, and if I

12  said anything about that to them, the commissioners,

13  based on Hank's letter, I probably would have said that.

14      Q.    Well, did the commissioners ask you:  What's

15  going to happen now?

16      A.    I doubt that.

17      Q.    Well, the solicitor is saying there might be

18  some potential liability to the county.  Correct?

19      A.    Yes.  Yes, he is.

20      Q.    And that information is being relayed to the

21  commissioners, who have responsibility to pay whatever

22  liability might arise, correct?

23      A.    They could.

24      Q.    And nobody said:  Well, Dan Hartnett, what

25  should we do now?

1      A.     I don't recall that, no.

2      Q.     All right.  After the July 11, '97, memo did

3  you go back to the commissioners and say --

4      A.     The what memo?  I'm sorry?

5      Q.     The July 11, '97, memo from Judge Sheely.

6      A.     Okay.

7      Q.     Did you go back to the commissioners and say:

8  Well, nothing's happening to Osenkarski, and Graham's

9  going to get a three-day suspension?

10     A.     This memo was written to the chief clerk, and I

11 report either to the chief clerk or the commissioners.

12 And so they would have received this letter.  So I

13 didn't, I don't know, have to go to the commissioners

14 and say, you know, they're only getting this and they're

15 only getting that.  They would know that via this memo.

16     Q.     If Mr. Ward gave it to them?

17     A.     Yes.  Yes.

18     Q.     Do you know whether Mr. Ward gave it to the

19 commissioners?

20     A.     No.  I have no way of knowing that.  I'm

21 assuming he did.  I'm sure did he.

22     Q.     Did you give it to the commissioners?

23     A.     I don't believe.  I don't recall.

24     Q.     Do you remember having any discussion with the

25 commissioners after the July 11, 1997, memo about this

1    issue?

2    A.    I couldn't -- I'm assuming I did.  I couldn't

3    say specifically that I did or when, no.

4    Q.    Did you have any discussions with anyone about

5    the numbers of cases that were assigned to Barbara

6    Varner?

7    A.    Not to my recollection.  I read that in the, I

8    guess one of the, one of those two exhibits or either in

9    that DeLuce report or this one, and I don't recall

10   specifically talking to anybody about that.

11   Q.    Well, did you know at the time, I'm talking

12   about back in April of '97, that Barbara Varner had

13   alleged that she had gotten the most number of cases?

14   A.    I know that -- I don't know when I knew it.  I

15   know it now from the DeLuce report.  I don't know when I

16   knew that, when I learned that, if I learned it before

17   that or not.  I don't recall.

18   Q.    Do you remember receiving any evidence from

19   anyone about the case assignments?

20   A.    No, I don't.

21         (Hartnett Deposition Exhibit No. 6 was marked.)

22   BY MS. WALLET:

23   Q.    Sir, do you remember seeing Deposition 6 prior

24   to today?

25   A.    No, I don't.

1      Q.    Do you have any reason to believe that you did

2    not receive Deposition 6 in or about April 30, 1997?

3      A.    No, I don't.

4      Q.    Do you remember anything about the issue of

5    case assignments as it relates to the Varner

6    allegations?

7      A.    No.  No, other than what I read in the last day

8    or so.

9      Q.    What do you know about Joseph Osenkarski

10   writing a corrective action plan?

11     A.    I don't know what you're talking about.

12           MR. DELLASEGA:  Good answer.

13   BY MS. WALLET:

14     Q.    Did you have any responsibility with regard to

15   some kind of corrective action plan to be submitted by

16   Joe Osenkarski?

17     A.    That doesn't mean anything to me.  I don't

18   remember anything about talking about that.

19     Q.    If I might refer you to Deposition 4, that's

20   the memo from Judge Sheely.  The last page, Judge Sheely

21   says:  I direct his supervisor, Mr. Osenkarski, to pay

22   better attention to matters taking place in the office.

23           Did you have any responsibility for ensuring

24   that Mr. Osenkarski did something?

25     A.    No.

1     Q.     Do you know why Mr. Osenkarski would send a

2     corrective action plan to you?

3     A.     Again, maybe because he was told to, or he

4     wanted to.  I don't know.

5     Q.     Did you have any discussions with Joe

6     Osenkarski about some corrective action plan?

7     A.     Not that I recall, no.

8          MS. WALLET:  Let me mark as Deposition Exhibit

9     7 a two-page memo which is the same as Osenkarski

10    Deposition Exhibit 2.

11          (Hartnett Deposition Exhibit No. 7 was marked.)

12    BY MS. WALLET:

13    Q.     Having read what we've marked as Hartnett

14    Deposition Exhibit 7, does this refresh your

15    recollection about this corrective action plan?

16    A.     No, it really doesn't.

17    Q.     Did you have any discussions with

18    Mr. Osenkarski about this document?

19    A.     I don't remember the -- I don't remember the

20    document, let alone remembering discussions with

21    Mr. Osenkarski regarding the memo.

22    Q.     Well, the first page of this document is dated

23    June 30, 1997.  The second page is dated July 3, 1997.

24    Do you have any explanation for the difference in dates?

25    A.     No.  I didn't even notice that.

1    Q.    The memo references Mr. Osenkarski's upcoming

2    vacation July 7 through July 11.  Do you have any reason

3    to believe that Mr. Osenkarski did not write this

4    document before he left on vacation on July 7?

5    A.    Say that, ask me that again?

6    Q.    Do you have any reason to believe that

7    Mr. Osenkarski did not write this document before July

8    7, 1997?

9    A.    I don't know.  You're losing me here somewhere,

10    Deb.

11    Q.    Okay.  Well, you don't remember this document,

12    correct?

13    A.    That's correct.

14    Q.    Okay.  But you don't have any reason to tell me

15    today that you didn't get this document; if it says cc

16    Dan Hartnett --

17    A.    That's correct, too.

18    Q.    -- you're assuming that you got it?

19    A.    I'm assuming so.

20    Q.    Okay.  And you don't have any recollection as

21    to when you received this?

22    A.    No.

23    Q.    Did your office have any kind of a

24    date-stamping routine for when you received things?

25    A.    Not -- probably not, not in general

1    correspondence.  We did with employment applications,

2    that type of thing.  But not to my recollection any

3    in-house memos.

4        Q.    So if we were to find your file and it

5    contained a document like Hartnett Deposition 7, we

6    wouldn't be able the know when you received it, either?

7        A.    Not -- probably not.  You know, it could be

8    dated but I don't think so.

9            MS. WALLET:  I show you what we'll mark as

10    Deposition Exhibit 8.

11            (Hartnett Deposition Exhibit No. 8 was marked.)

12    BY MS. WALLET:

13        Q.    Is that your signature, sir, on Deposition

14    Exhibit 8?

15        A.    Yes.

16        Q.    And do you have any recollection of this July

17    8, 1997 memorandum that you sent to Judge Sheely about

18    the discipline of Joe Osenkarski?

19        A.    No, I don't.

20        Q.    What do you remember about the meeting that you

21    reference in this memo on July 2nd, 1997?

22        A.    I don't remember the meeting at all.

23        Q.    Well, do you remember whether you called the

24    meeting, the judge called the meeting, who called the

25    meeting?

1     A.     No, I don't.

2     Q.     Do you remember having a July 2nd, 1997

3   meeting?

4     A.     No, I don't.

5     Q.     Whether it was on July 2nd or some other date

6   in June or July, do you remember a meeting at which you,

7   Dave DeLuce, John Ward attended?

8     A.     No, I don't.

9     Q.     You're writing this to Judge Sheely and you're

10  saying:  We are in agreement.  Who's the we?

11    A.     I'm assuming it's the county.

12    Q.     Who specifically for the county?

13    A.     The commissioners, I would assume.

14    Q.     And then it says:  With your position, and it's

15  addressed to Judge Sheely, correct?

16    A.     Yes.

17    Q.     Is it your recollection that Judge Sheely

18  recommended the suspension of Mr. Osenkarski?

19    A.     That's what I gather from this, but I don't

20  remember that.

21    Q.     You have no recollection of someone

22  recommending suspension of Mr. Osenkarski?

23    A.     No, I don't.

24    Q.     Do you know why you wrote this memo?

25    A.     Apparently -- I'm not trying to be flippant,

1    but apparently as a result of the July 2 meeting.

2        Q.    Perhaps to document what happened at the July 2

3    meeting?

4        A.    Perhaps.  That sounds like a good idea, yeah.

5        Q.    Do you have any recollection of any discussion

6    regarding Mr. Osenkarski attending an employee

7    assistance program?

8        A.    No, I don't.

9        Q.    Do you have any recollection of sensitivity

10   training sessions?

11       A.    That is the AP program that's referred to, and

12   no, I don't.

13       Q.    So you believe the EAP is the program, is the

14   same as sensitivity training sessions?

15       A.    Oh, I'm sorry.  I misread that, I guess.

16             No, I would think that they're two different

17   things.

18       Q.    Well, do you agree with me that you seem to be

19   saying somebody thought Osenkarski should do two things,

20   attend some supervisory skills training and attend

21   sensitivity training sessions?

22       A.    Yes, I would assume that.

23       Q.    Do you have any recollection as to who thought

24   that would be a good idea?

25       A.    No, I don't.  It seemed to come from the other

1    side.  I mean, you know, we're in agreement with your

2    position.

3        Q.    Meaning the judge's?

4        A.    Yeah.  And maybe -- I don't mean to put words

5    into his mouth, but that's what I would gather from

6    this.  It could be wrong, it could have come from me.

7        Q.    After reading this Deposition 8, do you believe

8    that the judge as of July 2nd had come to the conclusion

9    that Osenkarski should be suspended, attend a

10   supervisory skills session, and attend a sensitivity

11   training session?

12       A.    That would seem to agree with that, yes.

13       Q.    You don't recall whether you agreed with that

14   recommendation or not?

15       A.    I would -- based on what this letter's saying I

16   would assume I did.

17       Q.    Do you know whether Graham was ever suspended

18   for three days?

19       A.    I do now.  I do now.  I don't know that I knew

20   that before.

21       Q.    Before what?

22       A.    Before the last couple of days.

23       Q.    You know that because somebody told you in the

24   last couple of days that Graham was suspended for three

25   days?

1       A.      Yeah.  I think that's so, yes.

2       Q.      Okay.  And who would that someone be that told

3   you that?

4       A.      That would be Paul here.

5       Q.      Paul Dellasega?

6       A.      Yes.

7       Q.      Do you have any recollection --

8       A.      Jim?  Or Jim?

9               MR. DELLASEGA:  Or Jim.

10              THE WITNESS:  Or Jim.

11  BY MS. WALLET:

12      Q.      So it might have been Mr. Dellasega or it might

13  have been Mr. Thomas, but it was one or the other of

14  them?

15      A.      That's correct, yes.

16      Q.      Do you have any recollection of the suspension

17  of Mr. Graham?

18      A.      I thought that's what you just asked me.

19      Q.      Did you have any recollection of implementing

20  the suspension of Mr. Graham?

21              MR. DELLASEGA:  Personally implementing it?

22              MS. WALLET:  Correct.

23              THE WITNESS:  Oh, I didn't do that.  No.

24  BY MS. WALLET:

25      Q.      Okay.  Who would have?

1    A.    It would have to come from the -- assuming it

2    happened, it would have to come from the president

3    judge.

4    Q.    Well, let's go through that.  If an employee of

5    the Probation Department is going to be suspended by the

6    president judge, how does that person's check result in

7    three days' fewer pay?

8    A.    The controller's office would have to be

9    notified of that.

10    Q.    Would that be done directly by the president

11    judge to the comptroller?

12    A.    It could be.

13    Q.    Could it be by way of your office?

14    A.    It could.  It could, yes.

15    Q.    You just don't have any recollection of how it

16    happened in Mr. Graham's case?

17    A.    I don't -- like I said, I don't even know that

18    it did happen until recently.  That's the -- to the best

19    of my knowledge I did not know that when I was there.

20    Q.    So now we have a memo from Judge Sheely saying

21    we're going to suspend Graham for three days instead of

22    transferring him, and you didn't make any effort to see

23    that, indeed, he was suspended for three days?

24        MR. MacMAIN:  Objection.  Are you referring to

25    Hartnett 8?  That goes to Osenkarski, not Graham.

1          MS. WALLET:  No.  I'm referring to the July 11,

2     '97, memo from Judge Sheely marked Deposition 4 which

3     references a three-day suspension for Gary Graham.

4          THE WITNESS:  Okay.  Well, I said earlier that

5     I'm sure I -- I know I got this memo, okay.  I didn't

6     remember it saying the three-day suspension.  I just --

7     and even though I read it earlier, I didn't remember it

8     saying that.  So but I guess I was informed of that,

9     yes.  I didn't know that, no.  I didn't remember that.

10    BY MS. WALLET:

11    Q.    So the process would be somehow the comptroller

12    is informed so that three days' pay can be removed from

13    that person's paycheck?

14    A.    Yes.

15    Q.    And you don't know whether that happened in

16    this case or not?

17    A.    No, I don't know that.  I'm assuming so, but

18    no, I don't know that.

19    Q.    Did you have any other discussions with Judge

20    Sheely after July 11, 1997, about Barbara Varner or Gary

21    Graham?

22    A.    I don't know.

23    Q.    Well, can you recall a discussion, you just

24    don't know when it was?

25    A.    No.  No, neither.  I mean, I don't -- I may

1   have had other meetings with them.  I may not have.  If

2   I did, I obviously don't know the date.

3          MS. WALLET:  All right.  Let's mark as

4   Deposition Exhibit 9 a one-page letter.

5          (Hartnett Deposition Exhibit No. 9 was marked.)

6   BY MS. WALLET:

7   Q.    Do you have any reason to believe that you did

8   not receive this letter in or around December 23rd,

9   1997?

10  A.    No, I don't.

11  Q.    Did you have any discussions with Ms. Varner

12  about the complaints addressed in the December 23rd

13  letter?

14  A.    I think we discussed this in addition to, you

15  know, receiving the letter.

16  Q.    What do you remember Barbara Varner telling you

17  about the incidents referenced in the December 23rd

18  letter?

19  A.    Probably essentially the same thing she said

20  here in the memo.  Or perhaps I asked her to send me the

21  memo, I'm not certain.

22  Q.    Do you have any reason to doubt this letter

23  that says:  I want to reiterate what I told you three

24  weeks ago?

25  A.    Ask me that again?

1     Q.    Do you have any reason to believe that you

2     didn't have a conversation two weeks prior to this memo?

3     A.    Oh.  I may have.  I mean, the letter seems to

4     be, the first sentence seems to be saying exactly that.

5     Q.    Do you think she had met with you or talked to

6     you about this --

7     A.    I would assume so.

8     Q.    -- in early December, 1997?

9     A.    I would assume so.

10    Q.    Do you remember whether you told her to put it

11    in writing?

12    A.    No, I don't remember that.

13    Q.    Did you at any time tell her:  Don't come to

14    me, go to the judge?

15    A.    I don't think I said that.

16    Q.    What if anything did you do after you got the

17    December 23, 1997, letter?

18    A.    Probably shared it with Dave DeLuce.

19    Q.    Why would you do that?

20    A.    Probably so he could discuss it with the judge.

21    Q.    Do you know whether Dave DeLuce did indeed

22    discuss it with the judge?

23    A.    No, I don't know that.

24    Q.    Now, in December of '97 Ms. Varner is saying to

25    you:  I want to see this harassment stopped.  Did you

1   take any action after December 23rd, 1997, to address

2   her complaint of harassment?

3       A.    Like I said, I assume I passed this on to Dave

4   DeLuce to talk to the judge.  And I -- and you know,

5   that would be the only avenue that I could take to

6   correct the situation, is having the judge correct the

7   situation.

8       Q.    Ms. Varner wrote you again in February of 1998.

9   Do you recall that?

10      A.    No, I don't.

11            MS. WALLET:  Mark this as Deposition 10.

12            (Hartnett Deposition Exhibit 10 was marked.)

13            MR. DELLASEGA:  Mr. Hartnett requests the

14   opportunity for another break.

15            MS. WALLET:  Granted.

16            (Discussion held off the record.)

17            (Whereupon, the deposition recessed at

18   3:52 p.m. and resumed November 12, 2003, at 9:43 a.m.)

19

20            DANIEL HARTNETT resumed the witness chair.

21   BY MS. WALLET:

22      Q.    Good morning, Mr. Hartnett.

23      A.    Good morning.

24      Q.    How are you today?

25      A.    I'm wonderful.

1     Q.    Good.  Is there any reason today why you could

2   not answer my questions truthfully and completely?

3     A.    No.

4     Q.    You understand you're still under oath?

5     A.    Okay.

6     Q.    I believe when we left off you had been given a

7   copy of what we had marked as Deposition Exhibit No. 10,

8   and I really don't remember, sir, whether I asked you

9   whether that was your signature on the paper?

10    A.    Yes.

11    Q.    Do you believe that the attachment, the second

12  page of Deposition Exhibit 10, was the attachment you

13  reference in this memorandum?

14    A.    Just give me a moment, please.

15    Q.    Sure.

16          (Pause.)

17    A.    Okay.

18    Q.    I believe I asked you whether the document

19  that's attached as page 2 was the document you

20  transmitted to Judge Hoffer?

21    A.    I'm assuming so.

22    Q.    Do you have any recollection of receiving this

23  memorandum from Barbara Varner?

24    A.    No, I don't.

25    Q.    Other than transmitting this memorandum from

1  Barbara Varner to Judge Hoffer, did you do anything else

2  in response to her complaint?

3     A.    I don't know.  I don't recall doing anything.

4  I don't recall.

5     Q.    Did you do any investigation of her allegations

6  regarding Barbara Graham?

7     A.    No, I don't believe so.

8     Q.    Do you know whether you gave this information

9  to Mr. DeLuce?

10    A.    I'm saying here that I did.

11    Q.    Did you participate in any investigation that

12  Mr. DeLuce did regarding the allegations against Barbara

13  Graham?

14    A.    I don't recall, no.  I don't recall.

15    Q.    Do you have any recollection of meeting with

16  any individuals regarding these charges?

17    A.    I have no recollection of that, no.

18    Q.    What, if anything, did Judge Hoffer direct you

19  to do as a result of this memorandum marked Deposition

20  10?

21    A.    I don't know that -- I don't know what he said.

22  I don't remember what he said or if he said anything to

23  me.

24    Q.    Did you believe that Judge Hoffer would

25  investigate this allegation?

92

1     A.     I have no idea.

2     Q.     Do you have any knowledge that Judge Hoffer did

3  investigate?

4     A.     No, I have no knowledge.

5     Q.     Were you aware, sir, of sometime in 1997, 1998,

6  that there was a controversy concerning counting prior

7  county time for seniority purposes within the Probation

8  Department?

9     A.     Yes.

10     Q.     What do you remember about that controversy?

11     A.     Some of the information that we went over

12  either here or me in preparation for this meeting, that

13  mentioned it.  Otherwise I probably wouldn't have

14  recalled it.  But I -- it was something to the effect

15  that, you know, whether the time in the -- it was kind

16  of, you know, a departmental thing vis-a-vis countywide

17  seniority.  That was the nub of the issue, you know,

18  whether, you know, it should be just departmental time

19  only for purposes of -- for seniority purposes, or

20  should it be time throughout the county structure.

21     Q.     Do you know any other departments that

22  considered county time not to count?

23     A.     The simple answer is I -- the simple is I don't

24  know.  By and large we didn't have -- we didn't have

25  seniority units by and large because there were -- it

1    was virtually no unionization of the county.

2         You know, one of the main reasons an employer

3    has of seniority units is, you know, for layoff

4    purposes.  It certainly can be also for promotional

5    purposes.  But there were, I think there were 12 layoffs

6    in the county that happened a couple of years or so

7    before I started there.  I think all but a couple of

8    those people had been brought back.  So the seniority

9    structure was somewhat irrelevant and by and large, you

10   know, there were no seniority units established anywhere

11   in the county.

12   Q.    Now, it became an issue in Probation because

13   traditionally promotions had been done based on

14   seniority, correct?

15   A.    I don't know that that's correct, no.

16   Q.    What did you know about the history of the

17   issue regarding seniority?

18   A.    In that department?

19   Q.    Yes, sir.

20         MR. DELLASEGA:  The department Adult Pro or

21   Juvenile Pro, or combined departments?

22         MS. WALLET:  I just asked about Probation in

23   general.

24         MR. DELLASEGA:  That would be the combined

25   department.

1         THE WITNESS:  No.  Detail, I didn't know what

2    the -- what exactly they used, whether it was seniority,

3    whether it was countywide seniority, whether it was

4    departmental seniority.  Whether it was performance

5    evaluations or a combination of all those, I really

6    didn't know.

7    BY MS. WALLET:

8    Q.    Were you aware that Barbara Varner had made

9    allegations that the seniority system had been changed?

10        MR. LANCASTER ADAMS:  Can you specify, again,

11   please?  Are you talking Probation Department in

12   general?

13        MS. WALLET:  Either.  Either Juvenile or Adult.

14        THE WITNESS:  Maybe her allegation was that it

15   had been changed.  I'm not sure whether it was, she was

16   alleging it was changed or whether she was simply

17   alleging that it should include all county time as

18   opposed to simply departmental time in Probation.

19   BY MS. WALLET:

20   Q.    Were you aware that she had made an allegation

21   that concerned the seniority issue?

22   A.    Yes.

23   Q.    What if anything did you do to investigate her

24   charges regarding seniority?

25        MR. LANCASTER ADAMS:  Objection to form.  You

1    may answer.

2           THE WITNESS:  I don't recall doing anything.  I

3    may have talked to some people and asked them, you know,

4    what, you know, traditionally what has been going on,

5    but I couldn't say that for a fact.

6    BY MS. WALLET:

7       Q.    Did you give Mr. DeLuce anything regarding the

8    seniority issue?

9       A.    Give him something?

10      Q.    Yes.

11      A.    Not to my recollection, no, other than -- well,

12   no.  I don't recall that.

13          MS. WALLET:  Let's mark Deposition 11.

14          (Hartnett Deposition Exhibit 11 was marked.)

15   BY MS. WALLET:

16      Q.    Tell me when you're ready to talk about the

17   document I've marked as Deposition 11.

18      A.    Okay. (Pause.)  Okay.

19      Q.    Mr. Hartnett, do you have any reason to believe

20   that you did not receive a copy of this memorandum,

21   March 31, 1998, in or about that time?

22      A.    No.

23      Q.    Do you remember seeing this before?

24      A.    No.

25      Q.    What did you do after you received this

1    memorandum?

2         MR. LANCASTER ADAMS:  Objection.  He doesn't

3    recall receiving it.  Now you're asking it a different

4    way.

5         MS. WALLET:  Whether he receives it is

6    different from what he might have done after he received

7    it.

8         MR. LANCASTER ADAMS:  But if he testified that

9    he didn't recall receiving it, how can you ask a

10   question based on the fact that he did receive it in

11   March of 1998?  You can ask him based on what he

12   reviewed this morning.  That might be more appropriate.

13   BY MS. WALLET:

14   Q.    Did you understand my question, sir?

15   A.    Yes.

16   Q.    What did you do after March 31, 1998, regarding

17   this issue?

18   A.    I don't know what I did.

19   Q.    Do you know whether you had any discussions

20   with Judge Hoffer about the issues raised in this

21   memorandum?

22   A.    I may have but I don't know.  I don't recall.

23   Q.    Do you know whether Judge Hoffer asked you for

24   any information regarding the seniority issue?

25   A.    No.  I don't know whether he did or not, no.

1       Q.     Do you have any recollection at all of this

2    particular promotion that was at issue?

3       A.     No.

4              MS. WALLET:  Let's mark as Deposition Exhibit

5    12 a multiple-page document.

6              (Hartnett Deposition Exhibit 12 was marked.)

7              MR. DELLASEGA:  Do you recall whether this

8    document has been marked in another deposition?

9              MS. WALLET:  It has not, as far as I know.

10             MR. DELLASEGA:  I didn't recall it, either.  I

11    just thought maybe it was.

12             THE WITNESS:  Okay.

13    BY MS. WALLET:

14       Q.     Have you had a minute to look at we marked as

15    Deposition 12?

16       A.     Yes.

17       Q.     Do you know who wrote Deposition 12?

18       A.     No, I don't.  I was wondering the same thing.

19             (Interruption.  Recess taken from 10:04 until

20    10:26 a.m.)

21    BY MS. WALLET:

22       Q.     Deposition 12 had been given to me as part of

23    the DeLuce file.  Does that refresh your recollection as

24    to where this document may have come from?

25       A.     No, it doesn't.

1      Q.     Do you believe you might have written it?

2      A.     No, I don't think so.

3      Q.     Do you think someone on your staff might have

4    done so?

5      A.     No.

6      Q.     Do you have any guess as to where this document

7    came from?

8      A.     No, I don't.

9      Q.     Now, did there come a time, Mr. Hartnett, when

10    the county personnel board was considering, or the

11    county salary board, I guess I should be specific, was

12    considering some promotions in the Juvenile Probation

13    Department?

14      A.     Yes.

15      Q.     What role, if any, would you or your office

16    play in those promotions?

17      A.     It could have varied.  It could have simply

18    been processing the paperwork.  It could have been from

19    that to involvement in the discussions.  But I don't

20    recall that.

21      Q.     Okay.  Well, let me show you a memorandum that

22    we'll mark as Deposition Exhibit 13.

23            (Hartnett Deposition Exhibit 13 was marked.)

24    BY MS. WALLET:

25      Q.     Did you sign the document marked Deposition 13?

1    A.    Yes, that's my signature.

2    Q.    This references an upcoming salary board

3    meeting, I guess it identifies it as being of today.  So

4    may I assume that that meeting was April 6, 1998?

5    A.    Yes, I assume so.

6    Q.    Do you recall what proposed actions were slated

7    that you decided should be held up?

8    A.    Well, apparently the last sentence of the first

9    paragraph cites why, who.

10   Q.    So Bill Brandt was to be promoted to senior PO?

11   A.    Apparently.

12   Q.    And there was a hiring?

13   A.    Apparently.

14   Q.    Do you know whether the hiring was also held in

15   abeyance?

16   A.    From the memo, I would assume so.

17   Q.    Why would the hiring of someone be held up?

18         MR. DELLASEGA:  In this particular

19   circumstance?

20         MS. WALLET:  Yes.

21         MR. DELLASEGA:  Not generally?

22         MS. WALLET:  No.

23         THE WITNESS:  I would assume that, you know,

24   if -- this is an educated guess but, you know, if Bill

25   Brandt wasn't promoted at that particular point, then

1    there wouldn't have been an opening for somebody,

2    apparently somebody new coming off the street.  I would

3    assume that this Timothy DeAngelo was, you know, a new

4    hire.  That's my guess.

5    BY MS. WALLET:

6        Q.    Okay.  So your assumption is that unless Brandt

7    was promoted, DeAngelo didn't have a spot to move into?

8        A.    That's my assumption, yes.

9        Q.    What happened after you sent this memo?

10       A.    I have no idea.

11       Q.    Well, do you know whether Bill Brandt was

12   promoted to senior PO?

13       A.    No, I don't recall.

14       Q.    Do you remember having any discussions about

15   the promotion of Bill Brandt?

16       A.    No.

17       Q.    Do you remember anything else about this memo?

18       A.    No, I don't.

19       Q.    You say these actions may very well give more

20   credence to her allegations, meaning Varner's

21   allegations, correct?

22       A.    Um-hum, yes.

23       Q.    Do you have any explanation for that statement?

24       A.    Well, only what appears in the memo.  I

25   would -- that's what I would assume.  You know, she was

1   claiming that -- I'm assuming this, she's assuming --

2   I'm assuming that she's saying, you know, that she

3   should have this shot at the senior PO position, and

4   that the issue was, you know, still kind of up in the

5   air.  So you know, let's, you know, let us I guess

6   reconsider what we're doing here prior to, you know,

7   taking the action.

8      Q.   Do you know whether the 3/31/98 memo that's

9   referenced in Deposition 13 is, in fact, Deposition 11?

10      A.   No.  I don't know whether it is or it isn't.

11      Q.   Do you know whether you had the meeting that's

12   referenced in the last paragraph here, meeting with

13   Ward, DeLuce, Osenkarski and yourself?

14      A.   No, I don't know.

15      Q.   You have no recollection of what happened with

16   this issue?

17      A.   No.

18      Q.   I asked you what you had done, sir, to prepare

19   for the prior day's deposition.  What did you do to

20   prepare for today?

21      A.   Nothing.

22      Q.   Did you review any documents?

23      A.   No.

24      Q.   Have any more discussions with your counsel?

25      A.   We talked for about a moment outside.

1    Q.    Let me show you what we'll mark as Deposition

2   Exhibit 14.

3           (Hartnett Deposition Exhibit 14 was marked.)

4   BY MS. WALLET:

5    Q.    Have you had a minute to look at what's been

6   marked as Deposition Exhibit 14?

7    A.    Yes.

8    Q.    Do you have any reason to believe that you did

9   not receive a copy of this document in or around June of

10  1998?

11   A.    No.

12   Q.    Do you have any recollection of Ms. Varner's

13  complaints concerning where she was permitted to conduct

14  her Probation Office business?

15   A.    Yes.  Yes.

16   Q.    What do you recall about her complaints

17  regarding this matter?

18   A.    I don't -- I honestly don't remember this

19  particular memo, but I do remember her raising this

20  issue with me.

21   Q.    Do you know whether she raised it in person?

22   A.    I believe she did.

23   Q.    What do you remember about that?

24   A.    What's basically captured here, that, you know,

25  she was told not to go into the other part, like, of the

1    Probation Office; that if she needed things from that

2    office, someone was to get them for her.

3        Q.    She told you that?

4        A.    That's my recollection, yes.

5        Q.    Did you make any effort to try to investigate

6    that complaint?

7        A.    Yes.

8        Q.    What did you do?

9        A.    I'm almost positive I went up and talked to the

10   judge about it.

11       Q.    And this would have been Judge Hoffer?

12       A.    Yes.

13       Q.    What did Judge Hoffer tell you?

14       A.    I don't recall exactly.  I don't -- let me put

15   it this way.  It didn't correct the situation as far as

16   I was concerned.  I mean, to the best of my recollection

17   it didn't change.

18       Q.    Did Judge Hoffer confirm that there had been

19   restrictions placed on Ms. Varner about where she could

20   go within the courthouse?

21       A.    Either, he either -- well, he obviously didn't

22   deny that this was so.

23       Q.    Did he give you any explanation for why this

24   prohibition had been imposed on Ms. Varner?

25       A.    If he did, I really don't recall it.  I'm

1   assuming it's the reason that's captured in this memo.

2       Q.    Why did you go to Judge Hoffer to talk about

3   this issue?

4       A.    It's just kind of in, back to the other memo,

5   in the sense that, you know, here was the, you know, the

6   person making the allegations and, you know,

7   restrictions were being put on her.  I didn't feel it

8   was correct.  You know, in my opinion it was my job to

9   apprise them of the situation, and if they -- and advise

10  them that I think it should be corrected.  He obviously

11  apparently chose not to correct it?

12      Q.    And you believed that was Judge Hoffer's

13  decision?

14      A.    Ultimately it had to be.

15      Q.    Did you make any response to Ms. Varner

16  regarding Deposition 14?

17      A.    I may have but I don't recall specifically.

18  I'm sure she, you know, she learned of it through me or

19  from someone that it wasn't changing, is my

20  recollection.

21          MS. WALLET:  Let's mark as Deposition 15 a

22  multiple-page document.

23          (Hartnett Deposition Exhibit 15 was marked.)

24  BY MS. WALLET:

25      Q.    Have you seen this document before,

1   Mr. Hartnett?

2      A.    I don't recall.

3      Q.    It does reference a date of December 1, 1999.

4   That would have been after you left the county?

5      A.    Oh.  It does say that.  Yes.  Well after I left

6   the county.

7      Q.    Do you know whether you had a similar list of

8   probation officers that you worked from in determining

9   who would be interviewed by Mr. DeLuce and yourself as

10  part of Ms. Varner's investigation?

11     A.    I'm sorry, ask me again?  What did you say?

12     Q.    That was a very complicated question.  Let me

13  ask a simpler one.

14         This apparently is a list, this meaning

15  Deposition 15, is a list of the probation officers who

16  worked between January '98 and December '99.  I'm

17  assuming that this was created sometime after you were

18  gone from the county.  Is that reasonable to assume?

19     A.    It would have to be, yes.

20     Q.    Okay.  But my question is:  Did you have a list

21  similar to this that you worked from in deciding who to

22  be interviewed regarding Ms. Varner's allegations?

23     A.    Well, my office, of course, had a list of

24  everybody in the county.

25     Q.    Did you give any kind of a list to Mr. DeLuce

1  so that he would know the cast of characters for the

2  Probation Office?

3      A.    I don't recall doing that, but he could have

4  had access to it, yes.

5      Q.    Did you have home addresses and telephone

6  numbers available in your office for the individuals who

7  worked in Juvenile Probation?

8      A.    I would assume so.  We may or may not have had

9  phone numbers, but we should have had in some form or

10  another the address, names and addresses of all the

11  people, yes.

12      Q.    Okay.  Were those names and addresses kept

13  separately because these were individuals who reported

14  to the judges?

15      A.    The only place that I would have the names and

16  addresses would be in a personnel file.

17      Q.    Was there a master list of some sort of all of

18  the individuals who worked for the county?

19      A.    Yes.

20      Q.    And did that master list also include the

21  employees in Juvenile Probation?

22      A.    Yes.

23      Q.    Sir, did you play any role in defending the

24  charges that were filed by Ms. Varner in the

25  Pennsylvania Human Relations Commission?

1    A.    Ask me that again, please.

2    Q.    Did you play any role in the charges that were

3    filed by Ms. Varner at the PHRC?  Pennsylvania Human

4    Relations Commission.

5    A.    I don't remember going there in regard to her

6    case.  You know, we used to have meetings there on

7    charges that fall under their jurisdiction.  I don't

8    remember doing that in her case.

9    Q.    Do you remember working on any written Answer

10   to any Complaints at the PHRC?

11   A.    No, I don't recall that.

12   Q.    Same question for the EEOC.

13   A.    No.  I don't recall that, either.  I could

14   have, but I don't recall.

15   Q.    Did anyone call you to review the Complaint

16   that had been filed in federal court by Ms. Varner?

17   A.    No.

18   Q.    Now, back in April of 1997 when you first got

19   this written complaint from Ms. Varner, did you know any

20   of the individuals in the Probation Office at that time?

21   A.    Yes, some.

22   Q.    Who did you know at that time?

23   A.    I have -- you want me to list them?

24   Q.    Yes.

25   A.    Oh, I have no idea.  You know, normally I would

1  probably have been working with, you know, the

2  department head or assistant to the department head.

3      Q.    Okay.  Did you have dealings with

4  Mr. Osenkarski?

5      A.    I'm sure I had at one time or another on

6  various things, yes.

7      Q.    Had you had any dealings with Mr. Graham at

8  that time?

9      A.    I don't believe so.

10     Q.    Had you had any dealings with Ms. Varner?

11     A.    No, I don't believe so.  I met her, I know

12  that, you know, when she worked at Children and Youth.

13     Q.    Did you play any role in investigating the

14  charge that was brought by Kerry Houser against

15  Mr. Osenkarski?

16     A.    I'm aware of the charges but I don't know that

17  I had any role or not.  I remember from some of the

18  information that I reviewed that she had an issue, and

19  whether I was involved or not, I don't recall.

20     Q.    Did you give any information to Mr. DeLuce

21  about the charges that had previously been brought

22  against Mr. Osenkarski when he began to investigate

23  Ms. Varner's complaint?

24     A.    Did I give him anything?

25     Q.    Yes, sir.

1     A.    Not to my recollection.

2     Q.    Did you tell him about it?

3     A.    I don't recall.

4     Q.    Did Mr. DeLuce ask you had there been any prior

5  allegations against Mr. Osenkarski?

6     A.    I don't remember.

7     Q.    Did Mr. DeLuce ask you whether there were any

8  prior allegations against Gary Graham?

9     A.    I don't recall him asking me that.

10    Q.    Do you know, sir, whether there was any

11 indication of the charge or the resolution of the charge

12 against Mr. Osenkarski in Mr. Osenkarski's personnel

13 file?

14    A.    In regard to?

15    Q.    The charge by Ms. Kerry Houser.

16    A.    Do I know if anything was in his personnel

17 file?

18    Q.    Yes, sir.

19    A.    No, I don't know.

20    Q.    Do you know whether you reviewed the personnel

21 file of Mr. Osenkarski prior to Mr. DeLuce beginning his

22 investigation?

23    A.    No, I don't.

24    Q.    Do you know whether you looked at Mr. Graham's

25 personnel file in preparation for Mr. DeLuce beginning

1    his investigation?

2        A.    No, I don't.

3        Q.    Did you have any discussions with Sheriff Kline

4    regarding Ms. Varner's allegations of potential

5    violence?

6        A.    No, I don't.

7        Q.    Did you send any memos to Sheriff Kline about

8    any of her allegations?

9        A.    I don't recall.

10       Q.    Did you take any action pursuant to your

11   workplace violence policy with regard to Ms. Varner's

12   allegations?

13       A.    Not that I recall.

14       Q.    In your role as HR director were you given any

15   assignment to speak to Mr. Graham regarding his behavior

16   in the workplace?

17       A.    I don't believe so.

18       Q.    Were you given any responsibility as HR

19   director to speak to Mr. Osenkarski about his behavior

20   in the workplace?

21       A.    Not to my recollection, no.

22       Q.    How about to Mrs. Graham?

23       A.    No.

24       Q.    Do you remember having a meeting with Deb Green

25   in or about August of 1997?

1    A.    No.

2    Q.    This would have been after the memorandum from

3    Judge Sheely about what to do with Varner and Graham.

4    A.    No.  It may have taken place, but no, I don't

5    recall it, no.

6    Q.    How was Dan Monken made aware of the

7    investigation into the Varner allegations?

8         MR. MacMAIN:  Objection.  Which allegations?

9    There's a series of them.  You mean the Graham

10   allegations, the seniority?

11        MS. WALLET:  Any of them.

12        THE WITNESS:  You asked me what?  Would you

13   repeat that, please?

14   BY MS. WALLET:

15   Q.    Yes.  You handed over your responsibilities to

16   a fellow named Dan Monken, correct?

17   A.    Correct, right.

18   Q.    I believe you told us earlier in your

19   deposition that Mr. Monken worked with you while you

20   were the HR director.

21   A.    Yes.

22   Q.    Okay.  What, if anything, did you tell

23   Mr. Monken about any of the allegations that Ms. Varner

24   had made?

25   A.    I don't remember.

1    Q.    Did you turn over your Varner file that you

2    identified for us earlier in your deposition, to

3    Mr. Monken?

4    A.    Well, it would have been in the office but, you

5    know -- you mean physically handed it to him?

6    Q.    Yes.

7    A.    I don't believe.  No, I don't know that.

8    Q.    Do you recall any discussions that you had with

9    Mr. Monken regarding Ms. Varner's allegations?

10   A.    I don't recall any.

11   Q.    Do you know whether Mr. Monken was aware of

12   Ms. Varner's allegations?

13   A.    Let me put -- I tried to fill, you know,

14   Mr. Monken in on, you know, everything that was current,

15   everything that was, you know, before the, before the

16   you know, the department.  You know, I'm assuming that I

17   filled him in on that as well as, you know, 500 other

18   things.

19   Q.    In the course of your discussions with the

20   individuals in the Probation Office as part of the

21   DeLuce investigation -- do you understand what I mean

22   when I say the DeLuce investigation?

23   A.    Yes.

24   Q.    Did you receive any information about

25   Mr. Osenkarski and the time that he spent in the office

1   as opposed to out of the office?

2       A.    No, I don't.

3       Q.    Did you come to any conclusions regarding

4   whether or not Mr. Osenkarski was running his department

5   in or about the time of Ms. Varner's allegations?

6       A.    Do I recall whether he was running his office?

7       Q.    Yes.

8       A.    He was running the office, yes.

9       Q.    Did you become aware of any complaints of the

10  subordinates in his office about how Mr. Osenkarski was

11  running the office?

12      A.    During the course of this investigation?

13          MR. DELLASEGA:  Just a second.  This particular

14  question as a time frame during the investigation?

15          MS. WALLET:  Yes.

16          MR. DELLASEGA:  And only then?

17          MS. WALLET:  Yes.

18          THE WITNESS:  Based on, you know, what I've

19  read, yes.  Yes.

20  BY MS. WALLET:

21      Q.    And what did you learn about how Mr. Osenkarski

22  ran the Juvenile Probation Office?

23      A.    I think I said at the last time we met that it

24  apparently left some things to be desired.

25      Q.    Can you be more specific?

1    A.    I don't know.  It just wasn't necessarily the

2    most, I don't know, in the most professional manner.

3    Q.    Did you hear any allegations that he may have

4    been using county supplies or property for his own use?

5    A.    No.

6    Q.    Were you aware of any allegations that he may

7    have kept items that were donated to the county for his

8    own use?

9    A.    No.

10    Q.    Do you remember any discussions about shoes?

11          MR. LANCASTER ADAMS:  Objection.

12          THE WITNESS:  No.

13          MS. WALLET:  I believe that's all the questions

14    I have.  Thank you, Mr. Hartnett.

15    BY MR. MacMAIN:

16    Q.    Mr. Hartnett, my name is David MacMain.  I

17    represent Gary Graham.  I wanted to follow up on some of

18    the questions you've been asked over the past two days

19    of your deposition.

20          Now, prior to being employed with the county

21    you were actually I guess a union organizer?

22    A.    At one time, yes.

23    Q.    And you did that for a number of years?

24    A.    Yes.

25    Q.    Would it be fair to say that your experience

1    was that of representing employees versus management?

2    A.    Yes.

3    Q.    Okay.  Would it be fair to say that based on

4    those years of doing that type of works, that if you

5    would get any bias, it would be in favor of employees

6    versus management?

7    A.    Ask me that again?

8    Q.    Yes, sure.  I would expect that having been a

9    union organizer for 15 years, that if you brought any

10   bias to reviewing employee-management issues, that the

11   bias would be in favor of employees versus management.

12   Would that be fair?

13   A.    I don't think so.

14   Q.    During the time that you were employed I guess

15   as a union organizer, have you been the subject of any

16   complaints of harassment by anyone?

17   A.    No.

18   Q.    During your prior employment before coming to

19   the county, had you had any type of experience regarding

20   conducting investigations?

21   A.    Prior to coming to the county?

22   Q.    Prior to coming to the county, correct.

23        MR. DELLASEGA:  You mean sexual harassment

24   investigation?

25        MR. MacMAIN:  Let's make it broad first.

1  BY MR. MacMAIN:

2  Q.    Have you had any kind of investigative training

3  prior to being employed with the county?

4  A.    Yes.  I mean, I did a lot of investigating, you

5  know, of grievances, arbitration cases, that type of

6  thing, yes.

7  Q.    When you said you investigated grievances and

8  arbitrations, was that as the advocate?  In other words,

9  you were advocating the employer or union's position as

10  opposed to being an objective investigator?

11  A.    Well, I felt that I was objective, but yes, I

12  was representing the employee or the union member.

13  Q.    Let me just be clear with my question, and I

14  probably wasn't.

15        Did you have any experience where you were an

16  objective investigator?  In other words, you hear both

17  sides and you come up with a decision as to which side

18  you think is correct?

19  A.    In a formal setting, I would say no.  In kind

20  of an informal setting, I would say yes.  I would -- to

21  try to explain that, I mean, I used to handle, you know,

22  grievances as a step before they would go to arbitration

23  or in preparation for arbitration or handle the

24  arbitration cases themselves, and as I would investigate

25  the grievances that were coming to the, like, the step

1    before the arbitration case, if I felt that they, that

2    you know, that they had no merit, they wouldn't to go

3    arbitration.

4        Q.    Can you give me a percentage of how many of

5    those grievances you felt had no merit and therefore did

6    not pursue the grievance against management by the

7    employee?

8        A.    Oh, dozens and dozens.

9        Q.    Any formal training regarding investigations?

10    You said you had hands-on, but any formal training?

11        A.    No, other than I guess just the education I

12    had.  We would have, when I worked for the union and

13    really, also, when I worked for the county, we would

14    have, you know, seminars on, well, on issues, you know,

15    labor law issues, employment law issues, those types of

16    training, that type of training.

17        Q.    Prior to this investigation were there any

18    other investigations regarding sexual harassment that

19    you were responsible for?

20        A.    Yes.  I -- yes.

21        Q.    Can you tell me how many you had been

22    responsible for prior to this?

23        A.    The only ones that I can really recall were

24    what I had mentioned earlier the other day, that, you

25    know, that occurred at the county.

1     Q.    Regarding Barbara Varner and Gary Graham, prior

2  to undertaking the complaint by Ms. Varner of sexual

3  harassment, had you -- you said you had some experience

4  or worked with or knew of Barbara Varner?

5     A.    Yes.

6     Q.    Okay.  Had she ever registered any complaints

7  to you prior to the formal complaint she filed regarding

8  Mr. Graham?

9     A.    No.

10     Q.    Okay.  Would you on occasion see Ms. Varner in

11  the coffee room prior to her formal complaint?

12     A.    I don't know.

13     Q.    Would you ever see Ms. Varner and Mr. Graham

14  together in the break or coffee room prior to this

15  formal complaint?

16     A.    Not that I recall.

17     Q.    Prior to the formal complaint had you ever

18  received any complaints regarding sexual harassment

19  against Mr. Graham?

20     A.    No.

21     Q.    And I think you had said that during the course

22  of this investigation you didn't look at Mr. Graham's

23  personnel file to see if anybody had ever made a

24  complaint against him for any reason?

25     A.    I don't think that's what was asked, but there

1    was none that I know of.

2        Q.    Among the employees in the Probation Department

3    there were a number of females, correct?

4        A.    Yes.

5        Q.    To your knowledge, no one ever made any

6    complaints against Mr. Graham prior to Ms. Varner's

7    complaint?

8        A.    That's correct.

9        Q.    Now, you were asked today whether or not you

10    received any type of -- whether you had any type of list

11    of all the employees within the department prior to

12    undertaking the investigation, and I think you said you

13    weren't sure whether you had such a list and/or provided

14    it to Mr. DeLuce, correct?

15        A.    Well, no.  I said we had a list of all the

16    employees in that department, the whole county.  And I

17    think I said that, you know, Mr. DeLuce could have had

18    access to that.

19            MR. MacMAIN:  Okay.  Let me, and we'll have to

20    make copies of this, these the documents, Paul, that I

21    guess we got yesterday.  We'll call this Hartnett 16.

22            (Hartnett Deposition Exhibit 16 was marked.)

23            (Recess taken from 11:07:07 until 11:13 a.m.)

24    BY MR. MacMAIN:

25        Q.    Mr. Hartnett, I just put in front of you what

1    we've marked as Hartnett 16.  This appears to be a chart

2    that Mr. DeLuce made up of the various employees, kind

3    of a flow chart.  Have you seen this document before?

4        A.    That's my writing.

5        Q.    This is your writing?

6        A.    Yes.

7        Q.    Okay.  So this would be the list of all the

8    employees in both Juvenile and Adult Probation

9    Department at the time you undertook your investigation?

10       A.    I'm assuming so, yes.

11       Q.    Okay.  Now, let me ask you I guess a question

12   we had asked Mr. DeLuce.  Mr. DeLuce kept notes of the

13   various interviews.

14       A.    Yeah.

15       Q.    Did you keep any notes of the interviews?  Or

16   Mr. DeLuce was the scrivener?

17       A.    I think he did, yes.

18       Q.    Okay.  And Mr. DeLuce had said if there were no

19   notes of the interview, that means the person wasn't

20   interviewed.  In other words, he's documented the notes

21   of who was interviewed.  If a person's name didn't

22   appear, it means they weren't interviewed.

23       A.    Okay.

24       Q.    I'm only asking, you didn't keep separate

25   notes?  Or you would agree with his --

1    A.    I would agree with his statement, yes.

2    Q.    Now, and I'm not going to show you the list or

3    the memo, but do you know why only one -- if you turn to

4    the first page there is a list of the clerical, the

5    secretaries, Jennifer Crum, Fran Rose, Robin Wiser,

6    there's also a Kathy Zeigler, that's four women named?

7    A.    Yes.

8    Q.    And I'll represent to you it appears that only

9    one of the four, Jennifer Crum, was interviewed.  Can

10   you tell me why the other three women were not

11   interviewed?

12   A.    No, I can't, other than, really, than to say

13   that, I mean, it was my recollection that anybody that

14   kind of like, you know, Barb or Gary, that anybody that

15   they would say that could kind of augment something they

16   said, would be interviewed.

17   Q.    Okay.  And your understanding of the complaints

18   from Ms. Varner were that Mr. Graham was harassing her

19   and was loud and it was known within the office of his

20   conduct?

21   A.    Yes.

22   Q.    Okay.  And the list of people interviewed were

23   people that she said would support her version of

24   events?

25   A.    I guess, whoever, yeah, she mentioned, that

1  could augment something, or that Gary mentioned that

2  could augment something, yes.

3      Q.    And this environment that she claimed was

4  prevalent within the office as a result of Mr. Graham's

5  conduct and I guess Mr. Osenkarski not policing him,

6  would it be important as an investigator to interview

7  some of the other people that were in the area that may

8  have or not heard some of the allegations that

9  Ms. Varner made?

10     A.    I guess it could be, yes.

11     Q.    Okay.  And do you know where Fran Rose and

12  Robin Wiser and Kathy Zeigler sat in relation to

13  Mr. Graham and/or Ms. Varner?

14     A.    No, I don't.

15     Q.    Tom Boyer, who is one of the supervisors along

16  with Mr. Osenkarski and Mr. Graham, he was not

17  interviewed, either.  Do you know why he was not

18  interviewed?

19     A.    No.  No.

20         MS. WALLET:  Is he done?

21         THE WITNESS:  Yeah, but -- yeah.  No, if you

22  would have asked me whether Tom Boyer would have been

23  interviewed I would have probably said yes, and you said

24  he wasn't and I believe you.

25  BY MR. MacMAIN:

1    Q.    I'll represent to you that Mr. Boyer's name

2    does not appear in the memo and I do not see any notes

3    from an interview with him.

4    A.    Okay.

5    Q.    So assuming that to be true --

6    A.    Okay.

7    Q.    -- you don't know why Mr. Boyer wasn't

8    interviewed?

9    A.    No.

10    Q.    On the Adult side there's a, if you turn to the

11    second page there's a supervisor by the name of Betsy

12    Baker.

13    A.    Yes.

14    Q.    She was not interviewed, either.  Do you know

15    why?

16    A.    Probably -- I assume from what I said earlier

17    that nobody mentioned her as somebody who, you know, saw

18    something, witnessed something, overheard something that

19    was relevant.

20    Q.    Now, you had mentioned on the first day that

21    some of the allegations that Ms. Varner had made, that

22    there were third-party confirmation of some of her

23    allegations, correct?

24    A.    Yes.

25    Q.    Were there also third parties that refuted her

1    or contradicted her allegations, that things she said

2    were said, in fact, people testified in the interviews

3    did not happen the way she claimed?

4        A.    I think -- I can only answer this kind of

5    really from the DeLuce report that I read prior to the

6    first meeting, and I think there were some things in

7    there that, if I'm recalling that memo properly, that I

8    think there was some things in there that indicated

9    that.

10       Q.    So some people confirmed Ms. Varner's

11   allegations and some people refuted Ms. Varner's

12   allegations?

13       A.    I would have to reread that memo to be sure

14   myself.  I don't think that everything she said was

15   confirmed in that memo is my recollection of the memo,

16   not my recollection of what happened way back then.

17       Q.    Just generally, you interviewed a number of

18   people and some people said Gary Graham is loud and

19   difficult, and some people did not agree with that

20   assessment, correct?

21       A.    I think that's the gist -- I think that's part

22   of Dave's report.

23       Q.    Now, prior to undertaking the investigation

24   were you aware that there was some unhappiness within

25   the office about workload, the workload being increased

1  because of the split?

2      A.    What reminds of that is a memo that is an

3  exhibit here, whatever number, just this morning where

4  it's talking about I think Dave Miller.  Was that the

5  name?  Dave --

6      Q.    Sure.  And in fact --

7            MR. GRAHAM:  Myers.

8            THE WITNESS:  Myers, yeah.

9  BY MR. MacMAIN:

10     Q.    Let me refer you to Hartnett 12, if that's the

11 memo you're referring to.  12 is the one that has the

12 heading at the top History of the Senior Probation

13 Office Position?

14     A.    Okay.

15     Q.    Is this what you're referring to?  In the third

16 full paragraph the author talks about the office was

17 grossly understaffed?

18     A.    Yes.

19     Q.    And that in the fourth paragraph the author

20 talks about the Probation Department received no new

21 additional professional staff; is that correct?

22     A.    Is what correct?

23     Q.    Does this refresh your recollection --

24     A.    Oh, yes.

25     Q.    -- that during the time period these

1   allegations were made there was a lot of unhappiness

2   within the office because of case loading?

3       A.    Let me try and explain something just because

4   since this is factual.  Whenever this Dave Myers -- he

5   and I met on a number of occasions.  It was kind of, I

6   mean, it was known by, you know, everybody that we were

7   meeting.  We were almost like two people negotiating

8   something.  And I don't know just the time frame of this

9   but, you know, they were -- the president judge knew it,

10  the commissioners knew it, everybody knew it.

11          And we were -- they were not happy with the pay

12  scales that they were at, they being, you know, at least

13  the professional employees of the Probation Department.

14  Dave and I met a number of times in regard to that.

15          And ultimately something was, you know, banged

16  out that, you know, they got pay raises, et cetera, et

17  cetera.  At that time that they went on, there was

18  really no problem ostensibly with the staffing of the

19  department.  That was never raised, that was never an

20  issue at that point in time.  And don't ask me what

21  exactly the time frame was on that.

22          But then subsequent to the pay raises being put

23  into effect it was more so at that juncture later that

24  the issue of the number of people in the department

25  became an issue.

1    Q.    Okay.  I think you had said the first day in

2    your deposition that this was a growing department and

3    people were jammed into small office quarters?

4    A.    Yes.

5    Q.    And would that be during the time period prior

6    to Ms. Varner's complaints that we're talking about?

7    A.    Oh, I don't know exactly the timing of that

8    vis-a-vis that, but it was, you know, it was in the

9    general time frame.  Whether it was before or after I'm

10   not sure, or at the same time.

11   Q.    To put it in context, would it be the time

12   period after the Department was split into Juvenile and

13   Adult?

14   A.    Both -- I don't recall when that was.  You

15   know, it was, I mean, it was fairly crowded, you know,

16   when they were all in -- they were all in one room, I

17   mean, basically, in part of the third floor, whatever it

18   was.

19   Q.    So that the various employees of the Department

20   would be in close quarters, they would hear things if

21   something happened?

22   A.    They were in close quarters.

23   Q.    So that if something was said or there was some

24   type of misconduct, you would expect that a number of

25   employees would have heard them, correct?

1    A.    It's possible.  I mean, it's also, I mean,

2  there's some closed doors, there could be closed doors

3  there, too.

4    Q.    You said you didn't look at Mr. Graham's

5  personnel file.  Did you ever look at Ms. Varner's

6  personnel file prior to conducting the investigation or

7  during the investigation?

8    A.    I really don't recall doing that.  The

9  personnel office, and I wanted to answer, kind of say

10  this earlier in response to one of Deb's questions, too,

11  the personnel office of the county had a personnel file

12  on, I think I said this before, had a personnel file on

13  everybody that worked for the county.  At the same time,

14  some of the departments under the court system had their

15  own personnel files.

16        And you know, some years before this before I

17  was even there, there was a greater, a great separation

18  in, you know, under what was under the judge and what

19  was under the county commissioners.  And there was kind

20  of some things let's say, you know, very close to the

21  vest under the court system.

22        And so you know, so there were probably -- you

23  know, I always felt that, you know, my personnel files

24  were the official personnel files of the county.

25  However, you know, I don't know that the courts viewed

1    at this time same way and that they had personnel files

2    on people that I'm sure I didn't have.

3        Q.    At the time you undertook your investigation,

4    you were aware that Mr. Graham had been employed with

5    the county or the court for some number of years,

6    correct?

7        A.    Yes.

8        Q.    And were you aware that Mr. Graham and

9    Ms. Varner had actually worked together in the same

10   department for some number of years prior to her

11   complaint?

12       A.    I'm certain I would have learned that, yes.

13       Q.    And did you also understand that they had

14   worked together on mutual cases while Ms. Varner was in

15   Children and Youth and Mr. Graham was in Probation?

16       A.    I didn't know that but I, you know, I came to

17   learn that, yes.

18       Q.    And to your knowledge, she had never made any

19   complaints against Mr. Graham during all this time

20   period for his conduct?

21       A.    That's correct.

22       Q.    Now, you were asked about I believe it was

23   Hartnett 2, or Hartnett 10, I'm sorry, about alleged

24   problems between Mrs. Varner and Mrs. Graham.  Is that

25   correct?  I believe you were shown an exhibit today

1    along those same lines?

2    A.    Between who, I'm sorry?

3    Q.    It was Mrs. Varner and Mrs. Graham.

4    A.    Oh, yes.  Yes.

5    Q.    That Mrs. Varner had made allegations against

6    Mrs. Graham about what she claimed to be harassment

7    or --

8    A.    Yes.

9    Q.    Are you aware that Ms. Varner, in fact, had

10   criminal charges filed against Mrs. Graham?

11   A.    No, I'm not.

12   Q.    So you're not aware of the resolution of those

13   charges, either, then?

14   A.    No.

15   Q.    All right.  During the course of your

16   investigation, and I think you were even asked

17   subsequent, whether or not there was any allegations of

18   violence or retaliation that Ms. Varner had made that

19   Mr. Graham would retaliate or there was violence that

20   may come to her as a result of her complaint.  Do you

21   recall those allegations being made?

22   A.    Yes.

23   Q.    During the time that you were with the county

24   following your investigation was there ever any violence

25   against Ms. Varner by anyone?

1     A.     No, not that I know of.

2     Q.     I want to refer you to Hartnett 3.  This was a

3  document that you were shown during the first portion of

4  your deposition.  There's a note in the upper right-hand

5  corner appears from Ms. Varner about guns.

6     A.     Yes.

7     Q.     During the course of your investigation or at

8  any point following your investigation was there ever

9  any evidence or allegation that guns were ever used or

10  threatened to be used or shown to Ms. Varner?

11     A.     No.

12     Q.     In the very last sentence she refers to a

13  resolution that's fair to myself and my co-workers.  Did

14  she ever identify who her co-workers were?

15     A.     No.  Not that I know of, no.

16     Q.     Did anyone else during the course of your

17  investigation or following your investigation ever file

18  any type of complaint against Mr. Graham other than

19  Ms. Varner?

20     A.     No.

21     Q.     If you'd turn to Hartnett 6.  Mr. Hartnett,

22  this is a note with a chart of cases assigned?

23     A.     Yes.

24     Q.     Have you seen this document before?

25     A.     Only the last time we were here.

1    Q.    Okay.  So on the second and third pages where

2    it has a list of cases assigned to probation officers,

3    you had not seen that prior to today, or prior to I

4    guess the first day of your deposition?

5    A.    I don't believe so, no.

6    Q.    Do you recall whether one of the specific

7    examples that one of the witnesses, particularly

8    Ms. Green, had given you of evidence of unfair treatment

9    of females, including Ms. Varner, was that caseloads

10   assigned were higher than they were to male probation

11   officers?

12   A.    From who?

13   Q.    From Deb Green.

14   A.    I'm sorry, would you ask me that again?

15   Q.    Sure.  One of the things, one of the examples

16   that you were given by Ms. Green as to evidence of

17   unfair treatment was that female probation officers had

18   higher caseloads than some of the males.  Do you recall

19   that being one of the allegations being made?

20   A.    I believe -- I believe so.

21   Q.    And did you do any type of investigation into

22   that allegation to see if, in fact, Ms. Green's

23   allegations were true?

24   A.    I don't recall.

25        MR. MacMAIN:  I believe that's all the

1  questions I have.

2        MR. DELLASEGA:  Don't go.  There are still

3  others who get their shot at you.

4  BY MS. WILLIAMS:

5     Q.   Mr. Hartnett, my name is Taylor Williams.  I

6  represent the Ninth Judicial District, Court of Common

7  Pleas of Cumberland County.

8        You testified last time we met about the salary

9  board.  Do you recall your testimony related to the

10  salary board?

11    A.   I remember talking a little bit about it, yes.

12    Q.   You testified that the salary board approved

13  promotions.  Are you aware that the duties of the salary

14  board are set down by law?

15    A.   Yes.

16    Q.   And are you aware that the salary board's

17  function is an administrative one solely to set salary?

18    A.   No, I think -- no.  To my knowledge it creates

19  positions and sets the salary for those positions.

20    Q.   As far as the court is concerned, however, it

21  has no duty to create a position, does it?

22        MR. DELLASEGA:  Could you repeat the question?

23  I don't know that I grasped it.

24        MS. WILLIAMS:  Maybe I'll change it as I repeat

25  it.

1   BY MS. WILLIAMS:

2       Q.    Are you aware that the salary board's role is

3   purely a financial role?

4       A.    I mean, my recollection -- my recollection --

5       Q.    As to court programs.  In other words, the

6   salary board has no right under the law to create a

7   court program, but only to address financial

8   administrative issues related to court programs?  In

9   other words, they cannot, the salary board cannot say

10  we're going to create a program for the court; that has

11  to be initiated only by the court.  Isn't that correct?

12      A.    I don't think they can create a program for the

13  court.  It's my recollection of the salary board is that

14  they, you know, they create and -- create positions and

15  set the salary scale for that position, or those

16  positions.

17      Q.    But they create those positions only as the law

18  allows them to create them; is that correct?

19      A.    Well, I don't know that they're creating

20  illegal positions.  I don't know whether I follow what

21  you're saying there.  Like I said, I mean, my

22  recollection is that they create positions and set the

23  salary for that position.

24      Q.    Let's turn it around this way, then.

25      A.    Okay.

1    Q.    Are you aware that by law only the Court has

2    the right to hire, fire, supervise and promote court

3    employees?

4    A.    Yes.

5    Q.    And although the courts are funded through the

6    county --

7    A.    Yes.

8    Q.    -- the supervision, hiring, promoting of

9    employees, remains the function of the Court?

10    A.    Yes.

11    Q.    Regardless of what the salary board does?

12    A.    Yes.  Yes.

13    Q.    So it would be the Court and not the county

14    that would determine who was laid off or promoted,

15    wouldn't it?

16    A.    Yes.  Yes.  But action has to be taken to

17    implement that, though, too.

18    Q.    That's right, to implement the funding through

19    the salary board?

20    A.    Yeah, or to process the paperwork for the

21    promotions and the hiring, yes.

22    Q.    Thank you.  I'd like to direct your attention

23    to the exhibit we've marked H-14.  This is the document

24    which you've identified from Barbara Varner which you

25    received a copy?

1     A.    Yes.

2     Q.    Where Ms. Varner indicates that she was upset

3  because she was directed to stay away from the area of

4  the courthouse where Barbara Graham's office was; is

5  that correct?

6     A.    Yes.

7     Q.    The document is addressed to Mr. Osenkarski; is

8  that correct?

9     A.    Yes.

10     Q.    Did you ever talk with Mr. Osenkarski about

11  these allegations?

12     A.    I don't recall talking to Mr. Osenkarski.

13     Q.    Did you ever talk to Barbara Graham about these

14  allegations?

15     A.    Yes.

16     Q.    What did Barbara Graham say to you?

17     A.    Basically what's here, that --

18     Q.    Do you understand the difference between

19  Barbara Varner and Barbara Graham?

20     A.    Oh, I'm sorry.  I'm sorry.  Ask me that again.

21     Q.    Did you ever talk with Barbara Graham about the

22  allegations that Barbara Varner made here?

23     A.    No.

24     Q.    Do you know if Barbara Graham ever talked to

25  Judge Hoffer?

1    A.    About this?

2    Q.    Yes.  Barbara Graham.

3    A.    Yeah.  No, I don't know that.

4    Q.    So you really only heard Barbara Varner's side

5   of this story; isn't that correct?

6    A.    Yes.

7    Q.    As she relates it here?  And you don't --

8    A.    Yes.

9    Q.    And you don't know whether what she states here

10  was told to Barbara Varner by Joseph Osenkarski is true;

11  is that correct?

12    A.    Ask me that again, please.

13    Q.    She states here to Joe Osenkarski, she says

14  Joe, you informed me.  Correct?

15    A.    Yes.

16    Q.    But you don't know whether she is correctly

17  reporting --

18    A.    She, Barbara Varner.

19    Q.    She, Barbara Varner, is reporting correctly

20  what Joe Osenkarski said to her, that this is what she

21  claims?

22    A.    Yes, okay.  Yes.  Although I believe I, and I

23  believe I stated earlier that I talked to the judge

24  about this, but --

25    Q.    Yes.  But you didn't talk to Joe --

1      A.     I don't think I did.

2      Q.     -- whether this is what Joseph Osenkarski

3   reported to Barbara Varner?

4      A.     Well, I wasn't -- I'm not trying to be flippant

5   here with you but, you know, no, I don't know what, you

6   know, Joe said to her.  All I know is that, you know,

7   when I -- I'm pretty sure my recollection of, you know,

8   me talking to the judge about this, and the judge not,

9   you know, not saying anything contrary to this.

10     Q.     Do you know if Judge Hoffer talked with Barbara

11  Graham?

12     A.     I don't recall.

13     Q.     Judge Hoffer testified that he had asked

14  Ms. Varner to voluntarily to stay away from Ms. Graham.

15  Do you have any information that would contradict that?

16  In other words, Judge Hoffer said this was a voluntary

17  request for --

18     A.     Oh.  I never heard that before.

19     Q.     But do you have any information that would

20  contradict Judge Hoffer's statement?

21     A.     Well, I guess my recollection is I believe I

22  talked to the judge about this, and I don't remember

23  him -- I don't remember him saying to me that, you know,

24  this was a voluntary thing.

25     Q.     But it could have been; you don't have any

1   information that would contradict that?

2       A.    I couldn't prove that, no.

3       Q.    You're aware that Ms. Varner had made

4   allegations that Mrs. Graham was glaring at her?

5       A.    Yes.

6       Q.    And that Ms Varner's complaints asked for

7   protection from Ms. Graham?

8       A.    I don't know if protection is the correct word

9   but, yes, she expressed concern about this.

10      Q.    So Judge Hoffer was in a position of having to

11  separate these women for Ms. Varner's protection?  Isn't

12  that correct?

13      A.    Ask me that again, please?

14      Q.    Judge Hoffer was in a position of having to

15  separate these women in order to protect Ms. Varner;

16  isn't that correct?

17      A.    I don't know what his motivation was.

18            MS. WILLIAMS:  I think that's all I have at the

19  moment.  Thank you.

20  BY MR. LANCASTER ADAMS:

21      Q.    Mr. Hartnett, I'm Paul Lancaster Adams.  I

22  represent Joe Osenkarski.

23            You were asked questions by plaintiff's counsel

24  regarding Kerry Houser.  Do you recall those questions?

25      A.    Yes.

1    Q.    And Ms. Houser had a complaint against

2  Mr. Osenkarski for sexual harassment at some point; is

3  that correct?

4    A.    Yes, that's my understanding.

5    Q.    And your understanding is there was also an

6  investigation surrounding that complaint by Ms. Houser;

7  is that correct?

8    A.    Based on one of these exhibits or something,

9  yes, that's my understanding.

10    Q.    Is it also your understanding that based on the

11  investigation that it was determined that there was no

12  sexual harassment by Mr. Osenkarski against Ms. Houser?

13        MS. WALLET:  I'll object to the form of the

14  question.  I don't believe that that question is based

15  on facts that are in or that could potentially be in

16  evidence here.

17        MR. LANCASTER ADAMS:  I'll withdraw the

18  question.

19  BY MR. LANCASTER ADAMS:

20    Q.    Is it true that the investigation determined

21  that the complaints by Ms. Houser were unfounded?

22        MS. WALLET:  Same objection.

23        MR. LANCASTER ADAMS:  I believe there's a

24  document that actually that's put into evidence that

25  says unfounded, that she on the record says that.

1        THE WITNESS:  If that was in one of these

2   exhibits, I just don't recall it.

3   BY MR. LANCASTER ADAMS:

4        Q.    Do you have any information to the contrary?

5        A.    No.

6             MR. LANCASTER ADAMS:  Okay.  No further

7   questions.

8   BY MS. WALLET:

9        Q.    Mr. Hartnett, is there any reason why would you

10  not be available to appear at trial in this matter in

11  April?

12       A.    The fact I don't want to be there, does that

13  make any difference?

14            MR. DELLASEGA:  Just tell her you'll say no to

15  all her questions.

16            THE WITNESS:  That I -- do I have any reason to

17  believe I wouldn't be available?

18  BY MS. WALLET:

19       Q.    Yes.

20       A.    Unfortunately I don't, no.

21       Q.    Are you planning any extended vacations for the

22  spring of next year?

23            MR. DELLASEGA:  That trip to Australia you told

24  me about.

25            THE WITNESS:  I'm going to, yeah.  No.

1  BY MS. WALLET:

2      Q.    Sir, are you aware of any restrictions that

3  were ever placed on Barbara Graham as to where she might

4  go in the courthouse?

5      A.    I'm not aware of any.

6           MS. WALLET:  That's all the questions I have.

7           MR. DELLASEGA:  David, I think it's your turn.

8           MR. MacMAIN:  No, I don't have any more

9  questions.

10          MR. DELLASEGA:  Taylor?

11          MS. WILLIAMS:  Thank you, Mr. Hartnett.  I have

12  no more questions for you.

13          (Whereupon, the deposition was concluded at

14  11:48 a.m.)

15                        *   *   *   *   *

16

17

18

19

20

21

22

23

24

25

```
1    COMMONWEALTH OF PENNSYLVANIA    )
                                     )
2    COUNTY OF DAUPHIN               )

3         I, Emily R. Clark, a Court Reporter-Notary Public

4    authorized to administer oaths and take depositions in

5    the trial of causes, and having an office in Harrisburg,

6    Pennsylvania, do hereby certify that the foregoing is

7    the testimony of DANIEL HARTNETT taken by Plaintiff at

8    the Administrative Offices of Pennsylvania Courts, 5001

9    Louise Drive, Mechanicsburg, Pennsylvania.

10        I further certify that before the taking of said

11   deposition the witness was duly sworn; that the

12   questions and answers were taken down in stenotype by

13   the said Reporter-Notary, approved and agreed to, and

14   afterwards reduced to computer printout under the

15   direction of said Reporter.

16            I further certify that the proceedings and

17   evidence are contained fully and accurately in the notes

18   taken by me on the within deposition, and that this copy

19   is a correct transcript of the same.

20            In testimony whereof, I have hereunto

21   subscribed my hand this 14th day of November, 2003.

22

23

24            _____
                           Notary Public
25
```