```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
        Plaintiff,             .   CIVIL ACTION
                               .   NO. 1:CV 01-0725
      vs.                      .
                               .
COMMONWEALTH OF PENNSYLVANIA,  .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,       .
CUMBERLAND COUNTY; CUMBERLAND  .
COUNTY; S. GARETH GRAHAM,      .
individually, and JOSEPH       .
OSENKARSKI, individually,      .
        Defendants.            .
. . . . . . . . . . . . . . . . .
```

                            VOLUME 1
                        Pages 1 to 228

        Deposition of:  BARBARA E. VARNER

        Taken by    :  Defendant Cumberland County

        Date        :  January 27, 2003, 9:35 a.m.

        Before      :  Emily Clark, RMR, Reporter-Notary

        Place       :  Administrative Offices of
                       Pennsylvania Courts
                       5035 Ritter Road, Suite 700
                       Mechanicsburg, Pennsylvania


APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
             For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
             For - Defendant Commonwealth of Pennsylvania
                   Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  JAMES K. THOMAS, II, ESQUIRE
             PAUL J. DELLASEGA, ESQUIRE
             For - Defendant Cumberland County

2

```
 1   APPEARANCES (continued):

 2       MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
         BY:  DAVID J. MacMAIN, ESQUIRE
 3           For - Defendant S. Gareth Graham

 4       SWEENEY & SHEEHAN, P.C.
         BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5           For - Defendant Joseph L. Osenkarski

 6

 7   ALSO PRESENT:

 8       MR. LEE VARNER

 9       MR. S. GARETH GRAHAM

10       MR. JOSEPH L. OSENKARSKI

11       MS. MELANIE McDONOUGH

12       MR. PETER ZANGARDI

13       MS. PAT LANE

14

15

16

17

18

19

20

21

22

23

24
```

25

3

1                           I N D E X

2                             WITNESS

3  Barbara E. Varner                        Examination

4     By Mr. Thomas                              4

5

6                            EXHIBITS
7
   Varner Deposition
8  Exhibit Number                                Page

9  1   4-page memo, 4/25/97, to Hartnett from         191
       Varner, annotated
10
   2   1-page memo, 6/13/97, to Varner from Osenkarski   192
11
   3   4 pages: 1-page memo, 7/17/97, to Ward and     194
12     Deluce from Sheely; 3-page memo, 7/11/97, to
       Ward and Deluce from Sheely
13
   4   1-page handwritten note, 7/21/97, "Dear        196
14     Jo Ann"

15 5   10-page EEOC Complaint                         197

16                        *   *   *   *   *
17

18

19

20

21

22

23

24

25

Barbara Varner                                    4

1                        STIPULATION

2              It is hereby stipulated by and between the

3         respective parties that signing, sealing, certification

4         and filing are waived; and that all objections except

as

5         to the form of the question are reserved until the time

6         of trial.

7

8              BARBARA E. VARNER, called as a witness, being duly

9         sworn, was examined and testified, as follows:

10   BY MR. THOMAS:

11   Q    Will you state your full name for the record, please?

12   A.   Barbara Eileen Varner.

13   Q    And where do you presently reside, Barbara?

14   A.   I live at 5 Maple Drive in Etters, Pennsylvania.

15   Q    You understand you're here today for us to take your

16        sworn testimony in a case which you've instituted

17        against the Cumberland County Court, Cumberland County

18        and certain individuals?  You understand that?

19   A.   Yes, I do.

20    Q    Is there any reason today that you could not understand

21         and answer questions completely?

22    A.   No.

23    Q    Are you on any type of medication that would affect your

24         ability to comprehend the questions that are asked today

25         and answer fully and completely?

Barbara Varner                                    5

1     A.   No.

2     Q    If you answer a question today, I'm going to assume that

3          you've both heard and understood the question.  Is that

4          fair?

5     A.   Yes.

6     Q    How about a date of birth on you, Barb?

7     A.   1/18/49.

8     Q    You and I have met in the past; is that correct?

9     A.   That's correct.

10    Q    And we met and discussed some of the allegations that

11         are part of this litigation, correct?

12    A.   Correct.

13    Q    At that time you agreed with me that if you had had a

14         voluntary affair with Mr. Graham, that there would be no

15         base for this lawsuit.  Do you recall that conversation?

16    A.    But that's not exactly true.  If this affair interfered

17          with any kind of work behavior or -- either positive or

18          negative, then it would absolutely be a case.  It's

19          still a violation of Title 7.

20    Q.    Well, let me ask you the question directly.  Did you

21          have a consensual sexual affair with Mr. Graham?

22    A.    I did not.

23    Q.    If you had such an affair with Mr. Graham, would there

24          be any validity to your claim here?

25    A.    If it had not interfered with my work environment, my

Barbara Varner                                6

1          job, then I would say no.

2    Q.    Meaning that even if you had an affair with Mr. Graham,

3          it would be a valid cause of action?

4    A.    In any situation, work environment, if at any time a

5          relationship between two people interferes with that
job

6          or the environment of the employment, it is a problem.

7    Q.    Did you previously degree in our last meeting that if

8          such an affair existed, that there would be no validity

9          to this litigation?

10    A.    I don't think I completely answered that, because if it

11          interferes with your work environment in any way, shape

12          or form, then it is a problem.

13    Q    I'm not sure I understand your answer exactly.  You say

14         that there was no such affair, correct?

15    A.   That's correct.

16    Q    And if I recall our previous conversation correctly,
you

17         agreed unequivocally that if such an affair had
existed,

18         then there would be no merit in this litigation.  Are

19         you changing your mind in that regard?

20    A.   If it did not interfere in the work environment at all,

21         I don't think it's a problem.  Morally it is wrong, but

22         I don't think if it did not interfere with the work

23         environment, cause a hostile environment, positive or

24         negative for myself, then there would not be an issue.

25    Q    Well, how would the affair, a consensual affair not

                    Barbara Varner                    7

1          interfere in your interpersonal relationships in the

2          work environment?

3     A.   I think there are people that can probably keep things

4          separate.  Perhaps they're not in the same department,

5          perhaps they're not in a supervisory or employee

6          position.  I don't know that.

7     Q    Have you ever had occasion to have an extramarital

8          affair of any kind?

9     A.   No, I didn't.

10   Q    And this is your second marriage; is that correct?

11   A.   Yes, it is.

12   Q    Did you have any extramarital affairs in your first

13        marriage?

14   A.   I did not.

15   Q    Have you ever had occasion to kiss Mr. Graham?

16   A.   I did not.

17   Q    Have you ever had any type of intimate physical

18        relationship with Mr. Graham of any type?

19   A.   No.

20   Q    You've had no intercourse with him?

21   A.   No.

22   Q    No oral sex with him?

23   A.   Absolutely not.

24   Q    And no anal sex with him?

25   A.   Absolutely not.


Barbara Varner                              8


1   Q    Have you ever held hands with Mr. Graham?

2   A.   I have not.

3   Q    Has Mr. Graham ever been inside your residence at Maple

4        Drive?

5   A.   Yes, he has.

6   Q    Can you tell me when?

7   A.   I had started working for Juvenile Probation.  There

was

8       a time that he picked me up to go to York, I believe to

9       pick up a kid from detention.  I was getting ready.  My

10      husband was in the house, he was in the shower.

11      Mr. Graham came with the county car to pick me up.

Came

            12      in, asked to use the telephone, had a cup of coffee, I

13      believe.  And we left from there to pick up the kid to

14      transport him to court.

15    Q   And this was Maple Drive?

16    A.  Yes, it was.

17    Q   I want to explore that in a little detail.

18    A.  Okay.

19    Q   Do you remember when that was?

20    A.  It had to be in 1995 to '96.

21    Q   Refresh my recollection as to when you started with

22      Juvenile Probation.

23    A.  February 7th, 1995.

24    Q   Is that how you placed the date, because it was within

a

            25      year of when you commenced?

                            Barbara Varner            9

1    A.  Yes.

2    Q   And he was picking you up and you were going to

3      transport a juvenile?

4    A.  We were to pick up a juvenile at York Detention Center.

5          I live halfway between Harrisburg and York, so it was

6          convenient for him to pick me up.

7              We took the kid to court, returned him to the

8          detention center.

9     Q    Where exactly is your residence at Maple Drive?  Give me

10         directions on how you get there.

11    A.   South 83, off the Yocumtown exit.  And it's

12         approximately a mile and a half from the exit.

13    Q    On this particular occasion Mr. Graham came to the house

14         to pick you up, correct?

15    A.   That's correct.

16    Q    And did you invite him in?

17    A.   He knocked on the door and he asked if he could use the

18         phone to make a personal phone call.

19    Q    What was the nature of your relationship with Mr. Graham

20         at this time in '95 or '96?

21    A.   He was a supervisor.  He was assigned, not officially,

22         but he was to train me.

23    Q    Were you on good terms?

24    A.   Yes.

25    Q    Did you consider him a personal friend?

Barbara Varner                                    10

```
 1   A.   Not a personal friend.  A colleague.

 2   Q    So he comes to the door, knocks on the door.  Do you

 3        respond to the door, answer the door?

 4   A.   Yes, certainly.

 5   Q    You knew he was coming to pick you up?

 6   A.   Yes, I did.

 7   Q    Were you prepared to leave the house?  Did you have your

 8        coat on?

 9   A.   Yes.  Well, yes.  Yes, I did.

10   Q    What did he say to you?

11   A.   He said could I use the phone.

12   Q    So he entered through what I guess was some type of

13        foyer?

14   A.   No.  It would be the garage door.  Most of the time we

15        come in through the garage door, come in the garage.

16   Q    Was this the first time he was ever at your house?

17   A.   Yes.

18   Q    And he came to the garage door to summon you?

19   A.   Right, that's correct.

20   Q    He didn't come to the front door of the house?

21   A.   No.

22   Q    What type of house is this?

23   A.   We have a bi-level.

24   Q    Bi-level?

25   A.   Um-hum.
```

| | | |
|---|---|---|
| 1 | Q | So he comes, he raps on the door, you answer the door, |
| 2 | | he asks to come in.  When he steps inside the house from |
| 3 | | the garage, what part of the house does he enter? |
| 4 | A. | We have a large dining room, living room, kitchen all |
| 5 | | one, pretty much one area. |
| 6 | Q | Would this be the second floor of the house -- |
| 7 | A. | Yes. |
| 8 | Q | -- if it's a bi-level? |
| 9 | A. | Yes, it is. |
| 10 | Q | So you would step up two or three steps to enter that |
| 11 | | level? |
| 12 | A. | You come up from the garage and you're right in level, |
| 13 | | you're on level with the dining room. |
| 14 | Q | Okay.  So he entered from the garage into this sort of |
| 15 | | combination living room/dining room? |
| 16 | A. | Right, um-hum. |
| 17 | Q | Where was your phone located? |
| 18 | A. | In the kitchen, right within maybe 15 feet of the door. |
| 19 | Q | So he entered through the garage door, went to the |
| 20 | | kitchen? |
| 21 | A. | Correct. |
| 22 | Q | Used the phone? |
| 23 | A. | Right. |
| 24 | Q | Was he in any other part of the house? |
| 25 | A. | I went in to talk to my husband and he said -- he was |

Barbara Varner                          12

1           asking me, this is a nice place, very large.  And I

2           said, well, help yourself, look around.  I believe he

3           went down to the basement, I can't say for sure.  When

I

4           came out, I was ready to go.

5      Q    He was on the phone.  Did you leave the kitchen area

6           when he was on the phone?

7      A.   Yes, I did.  Yes, I did.

8      Q    And you went where?

9      A.   Back the hallway to my bedroom, my husband and my

10          bedroom, in the back.

11     Q    To what, say good-bye to him?

12     A.   Yes, that I was leaving.

13     Q    What conversation did you have with your husband?

14     A.   That I was leaving, basically I was leaving and I would

15          see him that evening.

16     Q    Was that the extent of it?

17     A.   Pretty much, yes.

18     Q    You then turned around, left the bedroom area and came

19          back to the kitchen?

20     A.   That's correct.

21     Q    Where was Mr. Graham when you came back?

22     A.   He was standing, I don't know, living room.  Like I

23          said, it was a combination living room/bedroom area --

I

24          mean living room/dining room area.

25    Q     How long were you gone from the kitchen?


                        Barbara Varner                          13


 1    A.    Oh, it was not very long.  Several minutes.

 2    Q     When you came back he was still in the same general

 3          area?

 4    A.    Yes.

 5    Q     Any conversation with him about any other portion of
the
 6          house?

 7    A.    No.

 8    Q     Did he enter the master bedroom?

 9    A.    No.

10    Q     Did he ever tell you that he had been downstairs?

11    A.    No.

12    Q     Were there any other occasions when he was in the

13          basement of your residence at Maple Drive?

14    A.    No.

15    Q     Was this the only occasion on which you're aware that
he
16          was ever physically inside your house?

17    A.    Yes.

18    Q     And as far as you're aware, that visit was limited to

19          the combination kitchen/dining room/entry area?

20    A.    Yes.

21   Q    Have you ever lived anywhere else other than Maple

22         Drive.

23   A.   Yes, I have.

24   Q    Where else?

25   A.   I lived on Weatherburn Drive in New Cumberland.


Barbara Varner           14


1   Q    Who did you live there with?

2   A.   My husband Lee.  My son lived there briefly.  And my

3         daughter also had a room.  She was in college and she

4         would come home.

5   Q    She was in college at West Chester?

6   A.   Yes.

7   Q    When was that, Mrs. Varner?

8   A.   1990.

9   Q    For just one year?

10   A.   Approximately a year and a half we lived there.

11   Q    How about the residence before that?

12   A.   I lived at Apple Drive in Mechanicsburg.

13   Q    Was that with your first husband?

14   A.   Yes, it is.  Was.

15   Q    For the record, what was his name?

16   A.   Kenneth Spidle, S-P-I-D-L-E, Jr.

17   Q    Has Mr. Graham ever seen you naked?

18   A.   No.

```
19    Q    Do you have a small scar at the base of your spine?

20    A.   No.

21    Q    Have you ever had any back surgery?

22    A.   No.

23    Q    Have you ever told anybody that you have a double
nipple

24         on your right breast?

25    A.   No.
```

Barbara Varner                                    15

```
 1    Q    Do you, in fact, have a double nipple on your right

 2         breast?

 3    A.   No, I do not.

 4    Q    Do you have any type of cartilage condition on your

 5         right breast?

 6    A.   No.

 7    Q    On either breast?

 8    A.   No.

 9    Q    Have you ever used the term mature adult relationship?

10    A.   No.

11    Q    Never used that term with anyone?

12    A.   Not that I can recall.

13    Q    In 1994 did you take a bus trip to Atlantic City?

14    A.   Yes, I did.

15    Q    Who went with you?
```

16    A.    I went by myself.

17    Q.    Was Mr. Graham on that trip?

18    A.    He was on the bus.

19    Q.    Where were you going?

20    A.    I was going to Atlantic City.

21    Q.    For what purpose?

22    A.    To lay on the beach.

23    Q.    You were going alone?

24    A.    Yes, I was.

25    Q.    Who knew that you were going to Atlantic City alone?


                    Barbara Varner                    16


1    A.    My husband, my daughter, my mother.  Possibly everybody

2          within -- many people in the office.  I had just

3          graduated from undergrad and I would make comments as

4          you would hear from the Super Bowl, so what are you

5          going to do.  People would say, I'm going to Disney

6          World.  My comment would be I'm going to Atlantic City.

7    Q.    To lie on the beach alone?

8    A.    Absolutely.

9    Q.    How was it that Mr. Graham ended up on the bus?

10   A.    I have no idea.

11   Q.    Did you meet or see anybody else from your employment

12         while you were on the bus?

13   A.    Yes.  Carol Snokes, a secretary from our office, and I

14          believe it was her fiance was on.

15    Q     Wayne Shearer?

16    A.    Yes.  And I invited them to sit in front of me.

17    Q     Where did Mr. Graham sit?

18    A.    He was sitting in the back, I believe at the very back

19          row.

20    Q     Did you have any conversation with Mr. Graham during

the

21          trip?

22    A.    Yes.  As more people got on at the last stop in

23          Harrisburg is where Carol Snokes and her boyfriend got

24          on.  It was after that time Mr. Graham moved up and

25          gave, must have given somebody else his seat, and sat


                         Barbara Varner                    17


1           down beside me.

2     Q     What conversation did you have with Mr. Graham?

3     A.    General business.  He said he was going to visit his

4           sister.  Apparently his wife and children were going to

5           go with him that day.

6     Q     He told you he was going to visit his sister?

7     A.    That's correct.

8     Q     What explanation, if any, did you give Carol Snokes and

9           Wayne Shearer as to why you were on the bus or where

you

10          were going?

```
11   A.   I told Carol I was going down to lay on the beach, that
12        I passed my undergrad and that was my goal.
13   Q.   So if I understand correctly, as the trip progressed
14        after leaving Harrisburg, you and Mr. Graham were
15        sitting together?
16   A.   Yes.
17   Q.   Is that correct?
18   A.   That's correct.
19   Q.   And Carol Snoke and Wayne Shearer were sitting in the
20        seat in front of you?
21   A.   That's correct.
22   Q.   After you got to Atlantic City tell me what you did.
23   A.   I walked through one of the casinos and went out to the
24        beach.
25   Q.   Do you remember which casino?
```

Barbara Varner                                    18

```
1    A.   No, I don't.
2    Q.   Was it Bally's, by chance?
3    A.   Wherever the bus dropped us off.  I'm not sure.
4    Q.   And that was a Rohrer bus?
5    A.   Yes.
6    Q.   Tell me how you spent the day.
7    A.   I was on the beach.
8    Q.   All day?
```

```
 9   A.   Yes.  Stopped to get something to drink, went up to one

10        of the little concessions, and then I went back down.

11        Used the restroom and then I went back to the beach.

12   Q    Do you remember what the date of that trip was?

13   A.   No, I don't know exactly.  I finished my classes June.

14        I'm not sure of the date.

15   Q    Were you in the Bally Hotel casino at all that day?

16   A.   The trip gave you so much, so many tokens to spend, so

17        used those before going back on the bus.

18   Q    Was that in Bally's?

19   A.   I'm not sure which one it was.

20   Q    Have you ever eaten at Coakley's?

21   A.   Yes.

22   Q    Is that a regular place where you dine?

23   A.   My husband and I used to go there quite frequently.

24   Q    Have you ever been there with Mr. Graham?

25   A.   Yes, I have.
```

I

Barbara Varner                                    19

```
 1   Q    On how many occasions?

 2   A.   Several.  He had a person in there he was supervising

 3        who worked I believe in the kitchen, and he would stop

 4        to do a supervision check on him.

 5   Q    And why would you and Mr. Graham be together?

 6   A.   Because he was training me.
```

```
 7   Q    Can you give me an estimate of how many times you were

 8        in Coakley's with Mr. Graham?

 9   A.   Several.

10   Q    During what time frame?

11   A.   Are you asking during the day, or?

12   Q    Either.

13   A.   It was always during the day.  It was always lunchtime,

14        time frame 1995 to '97, '96, somewhere around there.

15   Q    Where would your car be that you were with Mr. Graham?

16   A.   Quite often at the courthouse, we would leave from the

17        courthouse, in my parking lot.

18   Q    So you would leave together?

19   A.   Yes.

20   Q    Were there ever occasions when you met Mr. Graham in
```

New

```
21        Cumberland?

22   A.   If there was supervision in that area, yes.  We would

23        supervise several kids, several kids he was
```

transferring

```
24        to me, that I was down in that area, anyway, since we

25        would meet.  And then he would take me over to meet the
```

Barbara Varner                    20

```
 1        juveniles or in order to supervise them.

 2   Q    Meaning the individual he was supervising at Coakley's?
```

        3    A.    No.  There was other juveniles in New Cumberland area
as

        4          well.

        5    Q.    On those occasions, where would you leave your car when

        6          the two of you met?

        7    A.    Usually behind Coakley's, in the parking lot.

        8    Q.    Did you ever meet at a grocery store in New Cumberland?

        9    A.    No.

       10    Q.    Do you remember the name of the individual that he was

       11          supervising at Coakley's?

       12    A.    No, I don't.  It was an adult.

       13    Q.    It was an adult he was supervising?

       14    A.    Yes.

       15    Q.    Why would he have been supervising an adult in 1995?

       16    A.    At that time we were combined.  We were adult and

       17          juvenile combined.  So Mr. Graham did both adult and

       18          juveniles.  I was specifically juvenile.

       19    Q.    And after the split occurred in 1996, did you still go

       20          to Coakley's with Mr. Graham?

       21    A.    No, I didn't.  No.

       22    Q.    So you were never in Coakley's after 1996 when the
split

       23          occurred between adult and juvenile?  Never there with

       24          Mr. Graham?

       25    A.    I don't believe so.


                              Barbara Varner                        21

```
1    Q    Have you ever eaten at the Deer Lodge?

2    A.   Yes.

3    Q    Have you ever been there with Mr. Graham?

4    A.   Yes.

5    Q    On what occasion?

6    A.   Following a trip, he wanted to get dinner out there.

7         And his friend owned the Deer Lodge, so that's why he

8         wanted to go there.

9    Q    Were you there on only one occasion?

10   A.   Yes.

11   Q    Do you remember the owner's name?

12   A.   Nick Mallios.

13   Q    Did you know anybody else in the establishment?

14   A.   No.

15   Q    Meaning employees.

16   A.   No.

17   Q    Do you remember the name of the cook at the Deer Lodge

18        restaurant?

19   A.   No, I don't.

20   Q    If I mention the name William Byrd, would that mean

21        anything to you?

22   A.   No, it doesn't.

23   Q    That would not refresh your recollection in terms of
who
24        the employees at the Deer Lodge may have been?

25   A.   No.
```

Barbara Varner                                  22

```
1   Q    Tell me about the dinner at the Deer Lodge with

2        Mr. Graham.  What time did you arrive?

3   A.   It was after a trip.  I remember it was dark.

4   Q    What time of year?

5   A.   I don't remember.

6   Q    What year?

7   A.   It would have been '95 or '96.  I don't know.

8   Q    Was it just you and Mr. Graham?

9   A.   Yes, it was.

10  Q    You don't remember what time you arrived?

11  A.   No, I don't.

12  Q    Do you remember what time you left?

13  A.   After eating the meal.  An hour, whatever.

14  Q    Do you remember seeing or talking to anybody at the
```
Deer
```
15       Lodge on that particular occasion?

16  A.   The owner, probably, but I can't be sure.  I don't

17       remember.

18  Q    Other than Mr. Mallios you don't remember speaking with

19       anybody else at the restaurant?

20  A.   No.

21  Q    Were the two of you traveling together?

22  A.   For work, yes.

23  Q    So you were in his vehicle?

24  A.   At times.

25  Q    I'm now still speaking about the Deer Lodge dinner.
```

Barbara Varner                          23

1   A.   Oh.  I don't remember if it was his vehicle or a county

2        vehicle.  I don't recall.

3   Q    But it was not your vehicle?

4   A.   No, it wasn't.

5   Q    So the two of you stopped after a trip to have dinner at

6        the Deer Lodge.  Was there any particular reason for you

7        attending dinner with him that evening?

8   A.   We still had not gotten an hour on the clock for dinner,

9        and we still, you know, Mr. Graham liked to get in all

10       the meals that he could, and so that's where we stopped.

11  Q    I don't understand that.  You say you didn't get an hour

12       on the clock?  What does that mean?

13  A.   That means when you're on a trip so long and you are

14       allowed to have dinner, lunch and dinner.  It was taking

15       the dinnertime, taking the hour for dinner.

16  Q    Where had this trip been?

17  A.   I don't know where we had gone.  We traveled several

18       times, many times, transporting juveniles.

19  Q    Do you remember what the route of travel was to get to

20       the Deer Lodge?

21   A.   The main road from off, I assume 81, it's called the

22        Holly Pike.  I'm not sure what the route number is.

23   Q    So you would have gotten off Route 81 at the Holly Pike

24        there on the south end of Carlisle?

25   A.   Yes.  I guess it's the Hanover exit.  And then taken a


                          Barbara Varner                    24


 1        left and gone out the Holly Pike.

 2   Q    The Mt. Holly Pike?

 3   A.   Correct.

 4   Q    And at the time you got off Route 81 at the Holly Pike

 5        you would have been within a half a mile of the

 6        Cumberland County courthouse?

 7   A.   Probably.

 8   Q    Is that where your vehicle was parked?

 9   A.   My car was probably -- if it was a county car, it would

10        have been over at the garage, which is over near the

11        prison.  That's where we leave our county cars when

12        we're going on trips.  We go over, leave our cars there

13        and then --

14   Q    Out on Route 74?

15   A.   What's 74?  I'm not sure what the route is.  It's near

16        the prison.

17   Q    Are you talking about the prison downtown or the prison

18        out of town?

19    A.    The prison out of town.

20    Q     Okay.  Is there any reason why you didn't have

21          Mr. Graham drop you at your car so that you could go

22          home this particular evening instead of going to dinner

23          with him at the Deer Lodge?

24    A.    We still had an hour that we could have dinner.  We

were

25          allowed an hour time for dinner.


                         Barbara Varner                        25


1     Q     So at this point in '95 or '96, whenever it was, you

2           opted to go to dinner with Mr. Graham at the Deer

Lodge,

3           right?

4     A.    Yes, that's correct.

5     Q     Your workday was essentially done?

6     A.    No.  We still had an hour for dinner.

7     Q     But there was no work to be done at dinner; that was

8           really sort of a perc, I gather, of your employment?

9     A.    Not really.  We had been on the road a long time.  We

10          had might have stopped for lunch.  Usually we drove

11          quite a few hours without stopping.  So, no, it was an

12          earned dinner, because I still had to travel home.

13    Q     And at that time you were living where, Maple Drive?

14    A.    I would have been at -- yes.  Yes.

15    Q     After dinner was over, what did you do?

16    A.    We went back to my car and I drove home.

17    Q    So Mr. Graham drove you to the prison and you went home

18         from there?

19    A.    Right.

20    Q    Did you go directly from the Deer Lodge to the location

21         where your vehicle was parked?

22    A.    Yes.

23    Q    Were there any other occasions when you were at the

Deer

24         Lodge other than this one dinner that we've talked

25         about?

Barbara Varner                    26

1    A.    My husband and I have been there before.

2    Q    How many times?

3    A.    Three or four.  Prior to that I had been there before I

4         was working for the county, I would say at least 10

5         times prior to that.

6    Q    Did you know Mr. Mallios personally?

7    A.    Only to say hello.

8    Q    You didn't have a personal friendship with him?

9    A.    No, I didn't.

10    Q    Had you ever been to his house, his private residence?

11    A.    Mr. Mallios?

12    Q    Yes.

13    A.    No, I didn't.  I never was.

14    Q     Never on any occasion?

15    A.    No.

16    Q     And specifically, not with Mr. Graham?

17    A.    No.

18    Q     Did you have a practice of going to the Silver Springs

19          flea market?

20    A.    Yes.

21    Q     When did you start that practice?

22    A.    Oh, 19 -- probably '80.

23          MR. ADAMS:  I'm sorry, I can't hear.

24          THE WITNESS:  1980.  Probably 1980.

25          MR. ADAMS:  Thank you.


                    Barbara Varner                        27


1     BY MR. THOMAS:

2     Q     How frequently did you go during the time 1995 to '96?

3     A.    Probably I would say every couple of weeks on Sundays

4           with my daughter or my son.

5     Q     Did you ever go alone?

6     A.    I would go over alone and then I would meet my son and

7           pick up my grandson.

8     Q     How about during the early 1990s, was the frequency of

9           your attendance any different, '91, '92, '93?

10    A.    No.  About the same.

11   Q   On the occasions when you went to Silver Springs flea

12       market, you say at least on occasion you went alone,

13       correct?

14   A.  Generally to meet my -- well, usually meet my son.

They

15       lived in Mechanicsburg.

16   Q   How old was your son at that time?

17   A.  He would have been late twenties.

18   Q   What time would you leave to go to the flea market on

19       Sunday morning as a practice or pattern?

20   A.  Usually I would try to leave by 7:30, around there.

21   Q   What did you do at the flea market?

22   A.  Like I said, I usually met my son.  They're into

jewelry

23       collecting.  I might get apples, produce, candles,

24       things like that.

25   Q   What time did you meet your son?

Barbara Varner          28

1   A.  Usually within -- he would call when he was leaving and

2       I would leave, and I would usually meet them, there's

3       one stand they always went to, probably within a half

4       hour of arriving there.  I had a good idea what area

5       they were in.

6   Q   So you would usually meet him between 8:00 and 8:30; is

7       that fair?

8   A.   Somewhere around there.  If I went with my daughter it

9        was usually a little later because it took her a while

10       to get up and going.

11  Q    Were there ever occasions when you went to the Silver

12       Springs flea market and did not meet one of your

13       children?

14  A.   I can't recall of any time not meeting, being or

meeting

15       one of them.

16  Q    So you have no recollection of ever having been there

on

17       an occasion where you did not meet either your son or

18       your daughter?

19  A.   I can't think -- no.

20  Q    And normally you would meet your son between 8:00 and

21       8:30 and your daughter maybe a little later, 8:30 to

22       9:00?

23  A.   She would go with me.

24  Q    She was living with you at the time?

25  A.   Well, she would be home for the weekends.  She was in

Barbara Varner                          29

1        college.

2   Q    So if I understand the procedure correctly, you would

3        meet your son there, but take your daughter with you?

4   A.   Yes.  There were occasions when she wasn't home.  I

5       would go over and just meet them and pick up -- the

baby

6       was born in July of '95, so from then on I would go and

7       pick up the baby, take him home.

8    Q   Did you ever meet Mr. Graham at the Silver Springs flea

9        market?

10   A.  I had occasion to see him there.

11   Q   How often?

12   A.  Several times.  I remember coming across -- he knew my

13       son.  He had met my son.

14   Q   How did he know your son?

15   A.  He had met him when my son would come in to visit the

16       office.

17   Q   Did he ever provide any assistance of any type for your

18       son?

19   A.  What form of assistance are you talking about?

20   Q   Any type of assistance.  Did you ever have anything to

21       do with your son's employment?

22   A.  Well, my son is employed at Schaffner Detention Center.

23   Q   Schaffner?

24   A.  Yes.

25   Q   Mr. Graham have anything to do with that employment?


                        Barbara Varner                          30


1    A.  No, he did not.

2    Q   Was he instrumental in any way in helping your son

```
 3           secure that employment?
 4    A.     He had spoken to one person over there, the director.
 5           And when I had spoke to the director myself, he said he
 6           had my son's application on the top of the pile and was
 7           considering him.
 8    Q      When did Mr. Graham talk to the director about your
son?
 9    A.     I don't know.  He just told me he had.
10    Q      Who told you that?
11    A.     Mr. Graham.
12    Q      Did he do that at your request?
13    A.     No.
14    Q      Do you know why he did that?
15    A.     I think Mr. Graham was overly willing to do those kinds
16           of things for anybody.
17    Q      So you don't see anything unusual about his
18           recommendation for your son to the Schaffner Detention
19           Center?
20    A.     No.
21    Q      And you think it's something that he would have done
for
22           any of the employees at the Juvenile Probation
23           Department?
24    A.     Mr. Graham liked people to be in debt to him so that
25           they would owe him.  He was very proud of saying that I
```

```
 1            helped so and so get jobs, wherever, so that they would

 2            be in debt to him.

 3     Q      Can you give me an example of someone else who

 4            Mr. Graham assisted in terms of obtaining employment

 5            either for themselves or for one of their family

 6            members?

 7     A.     I think Mr. Graham believes he helped Debra Green get

 8            her job in Probation.

 9     Q      Anybody else?

10     A.     He would brag that he had gotten Denny Drachbar's son a

11            job at a bank, I believe.  Others.  That's all I can

12            recall.

13     Q      And the only contact between your son and Mr. Graham
was
14            that he had met him in the office when he stopped to
see
15            you?

16     A.     Yes.  And at the flea market there was times, when my

17            son was with me.

18     Q      How many times had Mr. Graham met your son at the flea

19            market?

20     A.     I don't recall.

21     Q      Was it more than one or two?

22     A.     I'd say two is fair.

23     Q      Is a fair estimate?

24     A.     Yes.

25     Q      So he had seen your son approximately two times at the
```

Barbara Varner                          32

```
 1           Silver Springs flea market.  And how many times had he

 2           met him when he came in to visit you at the county

 3           office in Carlisle?

 4      A.   My son was not there that often.  I'd say two would be

 5           fair as well.

 6      Q    So the total number of encounters between Mr. Graham and

 7           your son, as far as you're aware, were approximately

 8           four times?

 9      A.   Yes.

10      Q    And those were simply an introduction at the courthouse

11           when he was there to visit with you --

12      A.   Correct.

13      Q    -- or a chance meeting at the Silver Springs flea

14           market?

15      A.   That's correct.

16      Q    What would you estimate was the longest period of time

17           that Mr. Graham had spent with your son?

18      A.   I have no idea.

19      Q    More than five minutes?

20      A.   I wouldn't think so.  I would say no.

21      Q    Did you ever leave the Silver Springs flea market with

22           Mr. Graham?

23      A.   No, I did not.

24      Q    Did you ever see any other individuals that you knew at
```

25          the Silver Springs flea market while you were in the

Barbara Varner                           33

1          presence of Mr. Graham?

2     A.   Not that I recall.  No.

3     Q    On these occasions when you were at the Silver Springs

4          flea market and happened to see Mr. Graham, you don't

5          recall anybody else, particularly from work, being

6          present or seeing you or having any conversation with

7          you?

8     A.   It would be in passing, we would stop and talk a little

9          while, and then he would go on his way and I would go

on

10         my way.  I cannot recall any other employees.

11    Q    How about other acquaintances of your or his, do you

12         recall anybody seeing the two of you together at the

13         Silver Springs flea market?

14    A.   Talking?

15    Q    Yes.

16    A.   Not that I can recall.

17    Q    How long would you stay at the Silver Springs flea

18         market?

19    A.   At the most would be an hour.

20    Q    So you would normally leave there between 9:00 and

9:30?

21    A.   Approximately, yes.

22    Q    Where would you go from there?

23    A.   If I had the child with me, the baby with me, I would

24         generally go home.

25    Q    The grandchild?

Barbara Varner                                    34

1     A.   The grandchild.  With my daughter, we would go other

2          places shopping or stop at a store, out for breakfast.

3     Q    If I remember correctly, you indicated earlier that you

4          don't recall any episodes where you were there alone at

5          the Silver Springs flea market?

6     A.   The only time -- possibly to just stop in and pick up

7          some apples.  I remember I would pull in and try to get

8          a parking spot and I would run in to get the apples,

9          something like that, seasonal things, and then leave.

10    Q    Do you subscribe to any magazines?

11    A.   Yes, I do.

12    Q    Tell me what magazines you subscribe to.

13    A.   Martha Stewart and Oprah.

14    Q    Have you ever had a subscription to Redbook?

15    A.   No, I have not.

16    Q    Have you ever had an occasion to read any Redbook

17         magazines?

18    A.   Probably on occasions in a doctor's office.

ever

19    Q    Did a Redbook article dealing with anal intercourse

20         come to your attention?

21    A.   No.

22    Q    Did you ever discuss such an article with anyone?

23    A.   No, I did not.

24    Q    Your name in the prior marriage was Spidle, I think you

25         told us.  Is that correct?


                    Barbara Varner                    35


1    A.   That's correct.

2    Q    Did you have credit cards under the name of Barbara

3         Spidle?

4    A.   They were not under my name.  Well, yes, I did.  Yes, I

5         did.  After I was divorced, I did.

6    Q    Can you tell me what those credit cards were?

7    A.   Either MasterCard or Visa, I don't know which ones.

8    Q    Do you maintain the same accounts today, the same

cards?

9    A.   No, I don't.

10    Q    When did you last have a MasterCard or Visa under the

11         name Barbara Spidle?  Or if you changed your name after

12         you got married.  What I'm looking for is the same

13         account.

14    A.   They -- well, the name changed after '93.

15    Q    When you got married?

16    A.    Right.  Accounts, I'm not sure when I changed banks.  I

17          believe I changed banks on several occasions.  It was

18          more the bank being bought out by another bank.

19    Q     Do you remember which banks issued the charge cards to

20          you under the name Barbara Spidle?

21    A.    It was the First Federal for a while till I got

22          divorced.

23    Q     That was pre-divorce?

24    A.    Yes.  After that, I don't -- I can't remember the name

25          of the banks.  I know it was bought out by another

bank.

Barbara Varner                          36

1    Q     Was it a local bank?

2    A.    Um-hum.  Yes.  I know CCNB.  I don't think it was -- I

3          don't recall which bank.  Then I went with First

4          Federal.

5    Q     Did you ever have an account or charge card with CCNB?

6    A.    I don't believe it was CCNB.  I just don't recall what

7          bank it was.

8    Q     How about Commonwealth National, the old Commonwealth

9          National Bank?

10   A.    No, I don't believe I was ever with them.

11   Q     How about National Central?

12   A.    No.  First Federal.

13   Q     First Federal Savings and Loan?

14    A.    Yes.  But that became something else, too, and I can't

15          remember.

16    Q     Harris Savings?

17    A.    I just can't remember what account, what bank it was in

18          between.

19    Q     Do you still have any of your bank statements from the

20          1993-'94 era?

21    A.    No, I don't.

22    Q     When did you destroy those?

23    A.    Probably whenever I changed banks.

24    Q     Do you have credit cards today?

25    A.    Yes, I do.


                          Barbara Varner                    37


1     Q     Who are they with?

2     A.    Members First.

3                MR. MacMAIN:  I'm sorry, what was that?

4                THE WITNESS:  Members First.

5     BY MR. THOMAS:

6     Q     How long have you been with Members First?

7     A.    I'm not exactly sure.  At least, at least six years, I

8           believe.

9     Q     What type of credit cards do you have with them?

10    A.    I have a Visa.

11    Q     Just a Visa?

12    A.    It's a Visa/MAC, yes.

13    Q    Have you ever had occasion to stay at the Fairfield Inn

14         in New Cumberland?

15    A.    No.

16    Q    Have you ever had occasion to pay for a room at the

17         Fairfield Inn in New Cumberland with a credit card?

18    A.    No.

19    Q    Have you ever rented a room anywhere in New Cumberland

20         since 1990?

21    A.    Yes.

22    Q    Where was that?

23    A.    It was after our wedding reception, and it's changed

24         names so often.  I think it's Holiday.  I believe it was

25         a Holiday at that time.


Barbara Varner                                    38


1    Q    Holiday Inn?

2    A.    I believe that's what it was.

3    Q    Tell me where it was located.

4    A.    Off Limekiln Road.  Take a right beyond Bob Evans and

5         it's at the very end of the road.

6    Q    Used to be a Sheraton?

7    A.    Yes.  It's changed names quite often, yes.  That was in

8         1993.

9    Q    How did you pay for that room?

10   A.   My husband paid for that, credit card.

11   Q    What was the reason for renting that room?

12   A.   It was our wedding.  After our wedding reception we

13        stayed there that evening.

14   Q    Does the song "Groovy Kind of Love" carry any

15        significance to you?

16   A.   No.

17   Q    Do you know what that song is?

18   A.   I remember the song from the, I don't know, '70s, '60s.

19   Q    The song has no significance to you?

20   A.   No, it doesn't.

21   Q    And you never told anybody that it had any significance

22        to you?

23   A.   No.

24   Q    Your date of birth I think you told us was January --

25   A.   18th.


                    Barbara Varner                          39


1    Q    -- 18, 1949?

2    A.   That's correct.

3    Q    Correct?

4    A.   That's right.

5    Q    Where were you born?

6    A.   I was born in Harrisburg.

7    Q    You're a lifelong Harrisburg area resident?

8    A.    Lived in Mechanicsburg most of my life.

9    Q    I noticed you graduated from Mechanicsburg High School.

10   A.    Yes, I did.

11   Q    Tell me about your mother and father.

12   A.    My parents presently live in Camp Hill.

13   Q    Still both alive?

14   A.    Yes, they are.

15   Q    How about occupations?

16   A.    My father was a diesel mechanic for approximately 30

17         years at L.B. Smith until he went into the ministry in

18         his fifties.  Now he's a retired minister for the First

19         Church of God.

20   Q    And your mother?

21   A.    My mother graduated from John Harris High School.

22   Q    What year, do you know?

23   A.    Oh, guessing 1938.  Close to it.

24   Q    What's her present age?

25   A.    She is 81.  My father's 84.


Barbara Varner                              40


1    Q    Was she employed outside the home?

2    A.    Yes.  She had a -- she went to Central Penn secretarial

3         school and worked several years and off and on as a

4         secretary as I was growing up different times.

5    Q    Do you recall who for and what area?

6    A.    She worked, I believe she worked in Harrisburg for an

7         auto dealer for a while when she first got out of high

8         school.  And she worked with the Navy Depot for a
while.

9         After that, she mostly baby-sat for children in our

10        home.

11   Q    First marriage for both of them?

12   A.    Yes.

13   Q    How about brothers and sisters?

14   A.    I have a brother who is 60.

15   Q    His occupation?

16   A.    He's a computer specialist, retired Army.  Has his own

17        business at this time.

18   Q    Is he married?

19   A.    Yes, he is.

20   Q    How many times?

21   A.    It's his second marriage.

22   Q    What is his name?

23   A.    Stanley Dennis Derr, D-E-R-R.

24   Q    Was that your maiden name?

25   A.    Yes.

Barbara Varner                               41

1    Q    Where does Stanley reside?

2    A.    He lives in Alexandria, Virginia.

```
 3   Q    Do you know the address?

 4   A.   No, I don't.

 5   Q    You said it was his second marriage?

 6   A.   Yes.

 7   Q    What was the problem with the first marriage?

 8   A.   I don't know the exact problem, but just didn't seem

 9        like they were going the same direction.

10   Q    How long did the first marriage last?

11   A.   I'd say 13 years.  That's approximate.

12   Q    Other brothers or sisters?

13   A.   I have an older sister who is 57.

14   Q    Her name?

15   A.   Kathryn Swope, S-W-O-P-E.

16   Q    Where does she reside?

17   A.   She lives in Dillsburg.

18   Q    Is she married?

19   A.   Yes.

20   Q    How many times?

21   A.   Only one.

22   Q    And her husband's name?

23   A.   Glenn.

24   Q    Where do they live in Dillsburg?

25   A.   I believe it's Route 74.  I believe that's the main
```

| | | |
|---|---|---|
| 1 | | road, towards York. |
| 2 | Q | Towards York? |
| 3 | A. | Between Dillsburg and York. |
| 4 | Q | Do you recall the address there? |
| 5 | A. | No. |
| 6 | Q | Children to that marriage? |
| 7 | A. | They have two children. |
| 8 | Q | A moment ago you mentioned that you sort of grew up in |
| 9 | | Mechanicsburg, I guess. |
| 10 | A. | That's correct. |
| 11 | Q | You went attended Mechanicsburg High School? |
| 12 | A. | That's correct. |
| 13 | Q | How about the elementary and middle schools, were those |
| 14 | | Mechanicsburg, also? |
| 15 | A. | Yes. |
| 16 | Q | What was your principal major or field of study in high |
| 17 | | school? |
| 18 | A. | Academic, college prep. |
| 19 | Q | Was there ever any physical abuse in the household when |
| 20 | | you were growing up between your parents? |
| 21 | A. | No, there wasn't. |
| 22 | Q | How about emotional? |
| 23 | A. | No. |
| 24 | Q | How would you describe your childhood to us? |
| 25 | A. | It was a very normal childhood. |

Barbara Varner                                          43

```
 1    Q    Any problems at all?

 2    A.   No.

 3    Q    Did you ever have any type of counseling?

 4    A.   No.

 5    Q    Were you ever placed in any type of specialized

 6         education?

 7    A.   No.

 8    Q    You were college prep throughout your high school
```
years?
```
 9    A.   Yes, I was.

10    Q    Did you date during high school?

11    A.   Yes.

12    Q    How would you describe your dating experiences?

13    A.   Positive, good.

14    Q    Did you date a lot?

15    A.   No.

16    Q    Were you a member of any sports teams in high school?

17    A.   Yes, I was.

18    Q    Which ones?

19    A.   I played hockey.

20    Q    Field hockey?

21    A.   Um-hum.

22    Q    Any honors or awards in field hockey?

23    A.   Yes.

24    Q    Tell me about them.

25    A.   I was a state champion in 1965.
```

Barbara Varner                                    44

1    Q     The Mechanicsburg team was?

2    A.    Yes.

3    Q     And you were on the team?

4    A.    Yes.

5    Q     What position did you play?

6    A.    I played full back and half back.

7    Q     Any other activities in high school?

8    A.    I was sorority.

9    Q     What was the sorority?

10   A.    Senior VANX.

11   Q     Senior?

12   A.    VANX.

13   Q     V-A-N-X?

14   A.    X, um-hum.

15   Q     Social sorority?

16   A.    Yes.  I was a Rainbow girl.  That's part of a Masonic

17         program, the Children of Eastern Star, that kind of --

18         Rainbow girls.

19   Q     You graduated from high school in June of 1966?

20   A.    That's correct.

21   Q     What were your plans at the time of graduation?

22   A.    I had hoped to go on to college eventually, but I also

23         planned to get married.  And my parents' feeling was

not

24          to get married till I had least a technical training, so

25          I entered cosmetology school.


Barbara Varner                                    45


1    Q    Where was that?

2    A.   The Harrisburg Empire Beauty School.

3    Q    Were you a virgin when you graduated from high school?

4    A.   No, I wasn't.

5    Q    When did you lose your virginity?

6    A.   My senior year.  I was engaged to be married to my first

7         husband.

8    Q    Was he a student, also?

9    A.   No, not Mechanicsburg.  He had graduated from Cumberland

10        Valley High School.

11   Q    What year?

12   A.   '65.

13   Q    And his first name was?

14   A.   Kenneth.

15   Q    Spidle?

16   A.   Um-hum.

17   Q    When did you get engaged?

18   A.   It was Easter of my senior year, April sometime.

19   Q    How did your parents feel about that?

20   A.   I don't think they were thrilled, but it was pretty

21          normal at that time for girls to be engaged in senior

22          year.  And they liked him, so.

23     Q    And you lost your virginity to him?

24     A.   Yes.

25     Q    How frequently were you having sex at the end of your

Barbara Varner                                    46

1           senior year in high school?

2      A.   Not very often.  I'd say once or twice a month.

3      Q    What were your marriage plans at the end of high

school?

4      A.   Marriage plans were to -- my husband at that time was

at

5           HACC, and he was drafted to the Army.  So we had

planned

6           to get married when he got out of the service.  And he

7           got orders he was going to be shipped over to Vietnam,

8           so we decided to get married when he came back from

9           basic training in December of '66.

10     Q    And is that when you got married, December of '66?

11     A.   Yes.  Yes.

12     Q    You were pregnant at the time?

13     A.   No.

14     Q    When was your first child born?

15     A.   The first child was born November 7th, 1967.

16     Q    So you were not pregnant when you were married?

17    A.    No.

18    Q     And became pregnant in February or thereabouts, '67?

19    A.    Around that, yes.  Around that, yes.

20    Q     And you were what, 18-years-old at the time?

21    A.    Yes, I was.

22    Q     You were in cosmetology school?

23    A.    Yes.

24    Q     How long is that course of study?

25    A.    It's hours.  You have to have 1250 hours.  Generally,
it

                    Barbara Varner                          47

1           takes about eight months.

2     Q     How long did it take you?

3     A.    I took a break.  I decided to go -- my husband was

4           stationed in Oklahoma, so I decided to go out with him

5           after we were married.  I went out with him end of

6           December '66.  And then finished up cosmetology school

7           when we came back in '98.  I'm sorry.  '68.

8     Q     That's better.

9     A.    Yes.  '68.

10    Q     Did he ever go to Vietnam?

11    A.    No, he did not.

12    Q     And he was stationed in Oklahoma?

13    A.    Yes.

14    Q     How long was he in the military?

15    A.    Two years.

16    Q     And you were with him in Oklahoma?

17    A.    Yes.

18    Q     Were you employed at all during the two years you were

19          in Oklahoma?

20    A.    No, I wasn't.

21    Q     And I gather your son was born, was he born in
Oklahoma?

22    A.    Yes.  Yes.

23    Q     After you returned here can you tell me approximately

24          when that was?

25    A.    October '68.


                              Barbara Varner                          48


1     Q     What did you do when you returned?

2     A.    We had a child then.  We got an apartment.  First we

3           moved in with my parents for about a month.  Then we

4           found an apartment in Shiremanstown.  My husband found

5           work at UPS.  And stayed home and took care of the
child

6           and finished up my beauty school.

7     Q     When did you graduate from Empire?

8     A.    '69.  Probably, I'm thinking January, February, '69.

9     Q     Did you get a job after that?

10    A.    Briefly, for maybe two months.  At that time you did
not

11          make any money doing that, so it was -- didn't seem

12          worth it to have a baby-sitter.

13     Q    Do you recall where you worked for those two months?

14     A.   Vi Miller, Simpson Street in Mechanicsburg.

15     Q    Any problems with that employment other than lack of

16          adequate compensation?

17     A.   No.  No.

18     Q    Did your husband remain employed at UPS throughout your

19          marriage?

20     A.   Yes, he did.

21     Q    Is he still employed there, as far as you know?

22     A.   Yes.  Yes.

23     Q    Both of your children were fathered by Mr. Spidle?

24     A.   Yes.

25     Q    When did you start to have problems in that marriage?


                    Barbara Varner                        49


1      A.   The biggest problems were both of our children were in

2           college.

3      Q    What were the nature of the problems?

4      A.   We just didn't have the same goals, and we realized, I

5           think we both realized that most of our life was built

6           around the children.

7      Q    I assume the conception of Richard, who is the oldest,

8           isn't he?

```
9    A.    Yes.

10   Q.    The conception of Richard was consensual on your part?

11   A.    Yes.

12   Q.    Was there any infidelity in that marriage by either you

13         or Mr. Spidle?

14   A.    No.

15   Q.    So the reason for the divorce would be what?

16   A.    We were -- just drifted apart.  We had different goals

17         for our lives and it just wasn't working.

18   Q.    Was there any physical abuse in the marriage?

19   A.    Not a consistent abuse.  There was times that he would

20         let his anger get out of control.

21   Q.    Did he ever hit you?

22   A.    He shoved me.

23   Q.    When was that?

24   A.    '80s.  Early '80s.

25   Q.    Do you remember the reason?
```

Barbara Varner                                          50

```
1    A.    He was just angry.  I don't know exactly what

2          precipitated -- he was just angry.

3    Q.    Did he do that on more than one occasion?

4    A.    He had hurt me when we were first married.

5    Q.    What year was that?

6    A.    That was in '96.  And again, out of frustration.  He
```
was

```
 7          angry.

 8    Q     You said '96.

 9    A.    I'm sorry.  '66.

10    Q     Did you require medical attention?

11    A.    No, I didn't.

12    Q     How did he hurt you?

13    A.    He took my hand and took it down over back of a chair,

14          just in anger.

15    Q     Do you remember what the episode was?

16    A.    Yes.  I had decided to -- I had wanted to stay back.
We
17          found out his -- he was not getting orders to go to

18          Vietnam, and I had decided I was going to stay back and

19          finish up my cosmetology school.  And he said I was not

20          going to do that.  He was frustrated, he was angry.
And
21          it just, it happened.

22    Q     So you wanted to stay in Mechanicsburg, he wanted you
to
23          go to Oklahoma?

24    A.    Back with him, yes.

25    Q     Other than those two episodes, were there other
episodes
```

                        Barbara Varner                        51

```
 1          of physical abuse?

 2    A.    No.  Just a lot of intimidation, a lot of yelling and
```

3          screaming, those type things.

4    Q    Over what?

5    A.   It could be anything.  If I would decide to go away at

6          night, maybe to, a lot of times it was even to church,

7          he just wanted me home, having a meal ready for him.
He
8          was very much basic things like that.

9    Q    Those would degenerate into a screaming match?

10   A.   Not a screaming match.  More he wouldn't talk to me for

11        several weeks at a time.  So we just sort of lived

12        parallel lives, staying together for our children.

13   Q    Can you give me a time frame for this conduct?

14   A.   It was more during when the children were in maybe

15        senior high, junior high, that time.  Probably early

16        '80s.

17             MS. WALLET:  Can we stop just a moment?

18             (Recess taken from 10:44 until 10:57 a.m.)

19   BY MR. THOMAS:

20   Q    Barb, before the break we were talking about the

21        difficulties with your first marriage and we explored a

22        little bit the physical abuse elements involved there.

23        It sounds like the physical abuse started in the very

24        early phases of the marriage.  Is that correct?

25   A.   The one time, yes.

marriage

1    Q    Did the physical abuse continue throughout your

2         to Mr. Spidle?

3    A.   No.

4    Q    Was there a hiatus from the early episodes in the '60s

5         until the 1980s when things started to deteriorate?

6    A.   We were just busy raising our children.  So as far as a

7         lot of problems then, it was just maintaining.

8    Q    Before I forget, can I have your Social Security

number?

9    A.   ████████████

mean

10   Q    When you say it was busy with the kids, what do you

11        mean by that?

12   A.   My husband worked a lot of hours.  He was gone, he was

13        an over-the-road driver for UPS.  I was taking care of

14        the children.  So we just were doing our own things

15        parallel.

16   Q    But there were some episodes of physical abuse?

17   A.   Just the one other time where he pushed me.

18   Q    So there were only two, total?

19   A.   Right.  Yes.  A lot of anger, but that's about it for

20        the physical.

was

21   Q    So there were two episodes of physical abuse.  There

22        was a fair amount of screaming and yelling?

23   A.   Fair amount, I would say, that occurred just several

24        times a year.  It was not an ongoing weekly thing.  It

25        was just, it was more he wouldn't talk to me, more of a

Barbara Varner                                        53

1          silent treatment.

2     Q    Was there any physical violence directed toward the

3          children?

4     A.   No.  Just verbal.

5     Q    What do you mean by that?

6     A.   Just again, frustration, just yelling.  If they --

7          rather than just correcting them, he had a way of just

8          yelling at them to correct them.

9     Q    Who were the children closer to, you or him?

10    A.   To me.

11    Q    Were there any other problems in the first marriage?

12    A.   No.

13    Q    What was the state of your marriage to Mr. Spidle in

14         1989 when you started working for the county?

15    A.   We were divorced.

16    Q    When did you separate?

17    A.   We separated, I filed for divorce spring of '89, and he

18         moved out in the summer of '89, early summer.

19    Q    Were you separated for any period of time before he

20         moved out?

21    A.   No, we were both living in the same house.

22    Q    And that was Apple Drive?

23    A.   Yes.

24    Q    Let me see if I get that sequence correct.  1980s you're

25         having marital problems with him.  As you described it,

Barbara Varner                          54

1         you had grown apart, and at some point I guess you had a

2         conversation with him about divorce.

3    A.   Yes.

4    Q    Where were the children at that point?

5    A.   My son was in college.  They were both in college.

6    Q    Both at West Chester?

7    A.   Yes.

8    Q    Tell me about the conversation with Mr. Spidle where you

9         discussed divorce.

10   A.   It was a decision I made in April.  I remember telling

11        him what my plans -- that it just wasn't working.  I had

12        asked him to go to counseling; he basically refused.

13        And it was one of those times trying to work with him to

14        see what we could do, and he just refused to go to

15        counseling.  And then I progressed, met with an attorney

16        and proceeded towards filing.

17   Q    Did you ever tell him that if he didn't go to counseling

18        you were going to file for divorce?

```
19   A.   No.

20   Q    So you were having this deterioration in the

21        relationship, I guess, for lack of a better term.

22   A.   Right.

23   Q    You said to him, I think we should go to counseling.
He
24        said no, correct?

25   A.   Correct.
```

Barbara Varner                                    55

```
1    Q    You then went and hired a lawyer.

2    A.   There was a time we tried to go away on vacation

3         together.  We attempted that.  It just didn't work.  It

4         just basically the feelings weren't there anymore.

5    Q    What do you mean when you say it didn't work?

6    A.   It was just a very uncomfortable time.  It just was not

7         working.

8    Q    Where was the vacation?

9    A.   We went to Rehoboth Beach.  I think that's Delaware.

10   Q    When was that?

11   A.   It would have been in the spring, early spring of '89,

12        April.

13   Q    Was it after that trip that you consulted with a
lawyer?
14   A.   Yes.

15   Q    Who was the lawyer?
```

16    A.    John Purcell in Harrisburg.

17    Q.    How did you know Mr. Purcell?

18    A.    My brother had known him and he recommended him.

19    Q.    Does your brother have a drinking problem?

20    A.    No.

21    Q.    Has he had any problems with the law?

22    A.    No.

23    Q.    Do you know how he knew Mr. Purcell?

24    A.    I think he used him for his divorce lawyer.

25    Q.    Didn't you tell me where your brother's living now?


                    Barbara Varner                    56


1     A.    Alexandria, Virginia.

2     Q.    That's right.  You couldn't remember the address,
right?

3     A.    Right.

4     Q.    Is he employed in Alexandria?

5     A.    He's self employed.

6     Q.    What's he do?

7     A.    Him and his sister-in-law are developing security

8           equipment.  He's a computer specialist.

9     Q.    Do they have a company name?

10    A.    Not that I know of.  I don't believe -- if they do, I

11          don't know what it is.

12    Q.    You say his sister-in-law?

13    A.    Yes.

14    Q    Who is that?

15    A.    I don't know her name.

16    Q    What is her relationship to him?

17    A.    Sister-in-law.

18    Q    But how related?

19    A.    Through -- it's his wife's sister.

20    Q    What's his wife's name?

21    A.    Mary Rose.

22    Q    Was Rose her maiden name?

23    A.    No.  I don't know what her maiden name was.

24    Q    Do you know her husband's name?

25    A.    Mary Rose's husband's name?

Barbara Varner          57

1    Q    Yes.

2    A.    That's my brother.

3    Q    That's convenient, wasn't it.  So you consulted with

4         Mr. Purcell, and I assume he filed a Complaint in

5         Divorce?

6    A.    Yes.

7    Q    Did he file that in Cumberland County?

8    A.    Yes.

9    Q    Who represented Mr. Spidle?

10    A.    It's in Lemoyne, at the bridge in Lemoyne across from

```
11          Hardee's, that group that's there.  It was part -- was

12          it Irving, Irwin or something?  I can't think of the --

13    Q     Johnson Duffie?

14    A.    Yes.  It was one of their associates.  I don't know the

15          gentleman's name.

16    Q     Was the divorce contested?

17    A.    No.

18    Q     What were the basic terms of the property settlement?

19    A.    My husband bought me out.  He gave me, you know, a

20          percentage, and I left the home.

21    Q     I thought you testified earlier that he had moved out.

22    A.    He moved out briefly, and then moved back in again.

23    Q     When you moved out of the home on Apple Drive, where
did
24          you live?

25    A.    Our divorce was final in December, actually 31st of
```

                              Barbara Varner                    58

```
1           1989.  So I remained in the home.

2     Q     Until when?

3     A.    Till October of '89.

4     Q     Where did you move then?

5     A.    I moved in with my present husband.

6     Q     At what address?

7     A.    Sussex Avenue.  And that would be, I believe it's

8           actually a Harrisburg address.
```

9    Q    At any point during the 1980s did you live anyplace

10        other than at Sussex Avenue or Apple Drive?

11   A.   No.

12   Q    When was the Complaint in Divorce actually filed?  Was

13        it April?

14   A.   I don't know.  I know it was filed around this time.
It
15        was early spring.  I'm saying April would be a good

16        guess.

17   Q    And your husband continued to reside in the house with

18        you until sometime in the summer?

19   A.   He moved out, I believe it was June to July.

20   Q    Of '89?

21   A.   Um-hum.

22   Q    And where did he move to?

23   A.   He moved with his parents.

24   Q    Where do they live?

25   A.   On Trindle -- well, they did live on Trindle Road in

Barbara Varner                          59

1        Mechanicsburg for several weeks.

2    Q    And he lived with them until when?

3    A.   He moved back in the end of July.

4    Q    Back into Apple Drive?

5    A.   Yes.

6    Q    What was the reason for that?

7    A.   Under the advice of his attorney.

8    Q    So the two of you lived under the same roof then while

9         the divorce proceedings were continuing?

10   A.   Yes.

11   Q    And the two of you lived there together until when?

12   A.   It was October is when I moved in with Mr. Varner, my

13        husband.

14   Q    When did you start dating Mr. Varner?

15   A.   We met at HACC during a class the end of July of '89.

16   Q    What was the class?

17   A.   Some type of history class.

18   Q    Do you remember any more about it?

19   A.   History of the Western World, I'm guessing at.

20        Something like that.

21   Q    Who was the professor?

22   A.   Josh -- I cannot remember his last name.  He was an

23        interim.  Not interim, yeah, just an interim professor

24        for the summer.

25   Q    When did you enroll in HACC?

Barbara Varner                                              60

1    A.   1986.

2    Q    What was your major?

3    A.   My major was social work.

```
 4   Q     And you were working toward a degree?

 5   A.    I was just going to school.  I was hoping to get an

 6         associate degree.

 7   Q     Why was Mr. Varner in the class?

 8   A.    He was finishing up.  He was a student at Shippensburg

 9         University and he was working at AMP in the Harrisburg

10         area.  And I believe he just had several electives he

11         had to finish up.  And I believe a co-worker of his
```
told
```
12         him you could do that at HACC.  And so I guess he found

13         the history class was interesting to him and he had

14         enrolled there.  I believe it was just two classes he

15         took to earn his graduate.

16   Q     Do you remember what the other course was?

17   A.    American, something American history.  It's more of a

18         civics class, that type thing.

19   Q     Do you remember anything else about the history class

20         where the two of you met?

21   A.    No, I don't.

22   Q     You can't tell me the name of the professor?

23   A.    Josh was his first name.  I just do not recall his last

24         name.

25   Q     Can't tell me the course number?
```

Barbara Varner                                        61

```
 1   A.    No.  No.
```

```
      2   Q    Do you remember what level course it was?

      3   A.   I was in just a second year at HACC, so I'm guessing

      4        it's probably 200, 300 level, something like that.

      5   Q    Tell me how you two met and how the relationship

      6        progressed.

      7   A.   We met in class.  We were older, non-traditional

      8        students, and after speaking with each other we met
each
      9        other over at the Forum, we were there for a field
trip,
     10        and we began talking, realized we had children the same

     11        age.  And then we would see each other in class another

     12        time, and just an interest developed.

     13   Q    And you began dating?

     14   A.   Yes.

     15   Q    When did you two start having sexual relations?

     16   A.   In October, when I moved in.

     17   Q    October of 1989?

     18   A.   Yes.

     19   Q    No sexual relations before then?

     20   A.   No.

     21   Q    And your divorce was final on December the 31st,

     22        correct?

     23   A.   Right, um-hum.

     24   Q    The last day of the year?

     25   A.   Right.
```

Barbara Varner                              62

```
 1   Q    In terms of property settlement, you told me that your
 2        husband, first husband, Mr. Spidle, purchased your
 3        interest in the home on Apple Drive?
 4   A.   That's correct.
 5   Q    What other terms were there to the property settlement?
 6   A.   I got my vehicle.  And my children were given -- we had
 7        a car for them, they were given that.  And they were
 8        both at West Chester so it was convenient for them.
 9             He -- let's see.  The percentage is what I got, a
10        percentage of the equity in everything we had.
11   Q    And what was the percentage?
12   A.   65 percent.
13   Q    Do you remember what the dollar number was that you
were
14        paid from him buying out your interest in the home?
15   A.   It was also his retirement as well.  He kept his
16        retirement.  It was close to a hundred thousand.
17   Q    And you say he kept his retirement account?
18   A.   Yes.
19   Q    And you got what?  65 percent of everything else?
20   A.   Um-hum.
21   Q    What about the children, was there a custody order?
22   A.   No.  They were both, they were 18.
23   Q    Tell me about your sexual relationship with Mr. Varner.
24   A.   In what aspect?
25   Q    I'm going to have to ask you some uncomfortable
```

Barbara Varner                              63

```
 1          questions, and I apologize for that --
 2    A.    Okay.
 3    Q     -- in advance.  Frequency of your sexual relationship
 4          with him?
 5    A.    At least probably five times a month.  One time a week.
 6              MR. ADAMS:  I'm sorry, I can't hear, ma'am.
 7              THE WITNESS:  At least one time a week.
 8    BY MR. THOMAS:
 9    Q     Any sexual preferences in terms of positions?
10    A.    No.
11    Q     Any oral sex?
12    A.    Yes.
13    Q     Was that something that was different than your first
14          marriage?
15    A.    Yes.
16    Q     Were you both and a giver and a receiver of oral sex in
17          the marriage with Mr. Varner?
18    A.    Yes.
19    Q     In the first marriage was there any oral sex at all?
20    A.    No.
21    Q     On either part?
22    A.    No.
23    Q     How would you describe your satisfaction level with the
24          sex in the relationship with Mr. Varner?
```

25    A.    Very well.


                          Barbara Varner                    64


1    Q    Does he have any sexual performance problems?

2    A.    No, he doesn't.

3    Q    Do you?

4    A.    No.

5    Q    Are you orgasmic in this relationship?

6    A.    Yes.

7    Q    Were you in your first marriage?

8    A.    No.

9    Q    Have you been with any man other than Mr. Spidle or

10        Mr. Varner?

11        MS. WALLET:  I assume that question was have you

12        been with any man in a sexual way?

13        MR. THOMAS:  Yes.

14   BY MR. THOMAS:

15   Q    Do you have a position that you prefer?

16   A.    No.

17   Q    Do you drink alcoholic beverages?

18   A.    On occasion.

19   Q    Would you describe yourself as a social drinker?

20   A.    Social drinker to me would be once during a social

21        event, once or twice a week.  That's how I define, yes.

22   Q    Once or twice a week?

23    A.    Yes.

24    Q     When type of alcoholic beverages do you drink?

25    A.    Wine.


                    Barbara Varner                          65


1     Q     Any hard liquors?

2     A.    Gin, on occasion.

3     Q     How about Mr. Varner, does he consume alcoholic

4           beverages?

5     A.    Yes.

6     Q     What's his drink of choice?

7     A.    I'd say beer.

8     Q     How would you describe his drinking habits?

9     A.    Again, I would say maybe two or three beers a week.

10          Usually if we're out, go out for dinner.

11    Q     Have you ever described him as a heavy drinker --

12    A.    No.

13    Q     -- to anyone?

14    A.    No.

15    Q     Does he have a brother?

16    A.    Yes, he does.

17    Q     Does his brother have a drinking problem?

18    A.    I'm not a drug and alcohol evaluator in that aspect.

19    Q     Well, you've been certainly lived in society long

enough

20          to know when people have alcohol problems, haven't you?

21    A.    Yes.  Whenever I've seen him intoxicated at certain

22          times, parties, at his home.

23    Q     So you've seen him intoxicated on a number of
occasions?

24    A.    I would say several.

25    Q     In your opinion does he have a drinking problem?


Barbara Varner                              66


1     A.    I don't know what he does on a daily basis.  At those

2           times he has drank pretty heavy.

3     Q     Have you ever told anybody that Mr. Varner's brother
has

4           a drinking problem?

5     A.    It's well known that Mr. Varner's brother had several

6           DUIs in Cumberland County.

7     Q     Has he been through the DUI schools in Cumberland

8           County?

9     A.    Yes, he has.

10    Q     How many DUIs has he had?

11    A.    I believe he's had two.

12    Q     Has he spent any time in jail --

13    A.    Yes.

14    Q     -- as a result of the DUI?

15    A.    Yes.

16    Q     Any other jail time for anything?

17    A.    Not that I know of.

18    Q    Does anybody else in Mr. Varner's family have any DUIs?

19    A.    Not that I know of.

20    Q    Does anybody else in his family have a drinking problem?

21    A.    No.

22    Q    Have you ever told anybody that Mr. Varner's brother has

23         an alcohol problem?

24    A.    No.

25    Q    Did you ever discuss Mr. Varner's brother with


Barbara Varner                              67


1         Mr. Graham?

2    A.    Mr. Graham discussed my brother-in-law with me.  He knew

3         he had a DUI and had been in class.

4    Q    What was the substance of that conversation?

5    A.    Just how is he related.  You know, the name came up.

6    Q    When did that conversation occur?

7    A.    Right after I started working in Juvenile Probation.

8         I'd say '95, '96.

9    Q    Do you know when Mr. Varner's brother had his second

10         DUI?

11    A.    No, I don't.

12    Q    Do you know when he had the first DUI?

13    A.    No, I don't.

14    Q    Do you know what the brother's employment is?

15    A.    He's retired.

16    Q    From where?

17    A.    Masland in Carlisle.

18    Q    Masland Carpet?

19    A.    Yes.

20    Q    Do you know what his job was there?

21    A.    No, I don't.

22    Q    Is he married?

23    A.    Yes.

24    Q    Where does he live?

25    A.    Pine Road outside -- it's a Carlisle address.

Barbara Varner                                    68

1    Q    Pine Road or Pinetown Road?

2    A.    Pine Road.

3    Q    Carlisle?

4    A.    Um-hum.

5    Q    Is your husband a member of a country club?

6    A.    Yes, he is.

7    Q    Which country club?

8    A.    Carlisle.

9    Q    How long has he been a member there?

10    A.    Approximately five years.

11    Q    What activities does he participate in at Carlisle

```
12          Country Club?

13    A.    Golfing.

14    Q     How frequently does he play golf?

15    A.    Not very frequently right now.

16    Q     Do you mean because it's winter?

17    A.    Yes.  But he has also cut back on his frequency.

18    Q     Why is that?

19    A.    Physical problems.

20    Q     Which are what?

21    A.    He has essential hand tremors.

22    Q     Before he developed the physical problems, how often
was
23          he playing golf at Carlisle Country Club?

24    A.    He's always had the problems, it's just they're getting

25          worse as he gets older.  He would play one or two days,
```

Barbara Varner                                69

```
1           one or two mornings a week.

2     Q     Weekends?

3     A.    Yes.

4     Q     Did he play Sunday mornings regularly?

5     A.    Yes, he did.

6     Q     Did he have a regular foursome that he played in?

7     A.    Yes.

8     Q     Do you know the members of the foursome?
```

```
 9   A.    No.  I think it would change.

10   Q     In 1994 through 1996 can you estimate for us during the

11         spring, summer and fall months, how often he would play

12         golf?

13   A.    I'd say twice a week.

14   Q     Principally on the weekend?

15   A.    Yes.

16   Q     Do you happen to know what his handicap is?

17         MS. WALLET:  I'm going to object that question.  I

18         can't see how that could possibly have any relevance to

19         anything.  And I'd like to say, Mr. Thomas, that we
```

have

```
20         produced Mrs. Varner here for one day of deposition.

21         However you want to use that day is fine with me, but

22         beware that one day is one day.

23         MR. THOMAS:  We're well aware what the rules are

24         and we'll attempt to abide by them, and if it's

25         insufficient time, we will petition the Court.
```

Barbara Varner                              70

```
 1         MS. WALLET:  You want her to answer the question

 2         about her husband's handicap?

 3         MR. THOMAS:  If she knows the answer.

 4         THE WITNESS:  I don't know.

 5   BY MR. THOMAS:

 6   Q     Your husband was employed at AMP?
```

```
 7    A.    Yes.

 8    Q     Is he still employed?

 9    A.    No, he's not.

10    Q     When did he last work for AMP or Tyco?

11    A.    I believe in '98, I believe.  That's a guess.

12    Q     Is he retired now?

13    A.    Yes, he is.

14    Q     What was his job with AMP or Tyco while he was
employed?

15    A.    He was a product manager.

16    Q     Did that involve traveling?

17    A.    Occasionally.

18    Q     Can you estimate for me how often he traveled?

19    A.    Maybe four, five times a year.  Some years, not at all.

20    Q     In the period 1992 through 1996 can you estimate what

21          his travel schedule was?

22    A.    I don't know.

23    Q     When you say he traveled four to five times a year,
what

24          time frame are you referring to?

25    A.    Could you rephrase that?
```

                        Barbara Varner                         71

```
 1    Q     You've testified a few minutes ago that you estimated

 2          that he would travel four to five times a year with his

 3          job with AMP or Tyco.  What time frame were you
```

```
 4            referring to?  What years?

 5   A.      I don't recall.

 6   Q.      Did you ever watch X-rated movies with Mr. Varner?

 7   A.      Once or twice I can remember, yes.

 8   Q.      Is that something he enjoys?

 9   A.      Yes.

10   Q.      How do you feel about it?

11   A.      It's fine with me.

12   Q.      Did you ever discuss that activity with anyone?

13   A.      No.

14   Q.      Did you ever discuss it with Mr. Graham?

15   A.      No.

16   Q.      Have you ever told anybody that Mr. Varner was

17           insensitive to your sexual needs?

18   A.      Absolutely not.

19   Q.      Did you ever have that conversation with Mr. Graham?

20   A.      Absolutely not.

21   Q.      When did you and Mr. Varner get married?

22   A.      November 27th, 1993.

23   Q.      Did you take a honeymoon after the marriage?

24   A.      Not immediately after.

25   Q.      How long after?
```

Barbara Varner                                      72

```
 1   A.      Probably a week to 10 days later.
```

```
 2   Q    Where did you go?

 3   A.   We went on a cruise to the Mexican Riviera.

 4   Q    Did you discuss your honeymoon with anybody?

 5   A.   I'm sure I did.

 6   Q    Did you discuss it with Mr. Varner?

 7   A.   With Mr. Varner?

 8   Q    I'm sorry.  With Mr. Graham?

 9   A.   I discussed it in the common lounge area that was
          shared

10        by a lot of departments.  I can't specifically remember

11        talking to Mr. Graham about it.

12   Q    Do you recall what you said about the honeymoon in this

13        lounge conversation that you had?

14   A.   Just what the plans were, where we were going.

15   Q    Nothing about the details?

16   A.   Not till afterwards.

17   Q    How about afterwards?

18   A.   Certainly, discussed it with my friends, in the break

19        room, had pictures, that kind of thing.

20   Q    Do you have a history of broken toes?

21   A.   No.

22   Q    Does Mr. Varner have a history of broken toes?

23   A.   No.

24   Q    Have you had your teeth recapped?

25   A.   No.
```

1    Q    Has Mr. Varner had his recapped?

2    A.    No.

3    Q    What's the ancestral background in your family?

4    A.    Ancestral?  Caucasian.

5    Q    Do you have any native American in your blood lines?

6    A.    Allegedly.

7    Q    Do you know which tribe?

8    A.    I don't know.

9    Q    Did you ever discuss your Native American blood lines

10          with anyone?

11    A.    Yes.  I would speak about that with several people.  My

12          son was trying to track down the ancestral connection

at

13          one time.

14    Q    Did you discuss that with Mr. Graham?

15    A.    Not that I can recall.

16    Q    I'm going to take you back.  Let's talk about your

17          employment history a little bit.  We've already touched

18          on that to some extent, in terms of your brief work

19          history during your first marriage.

20              You were a hair dresser for a short period of

time,

21          correct?

22    A.    Right.

23    Q    When was the next time that you were gainfully

employed?

24    A.    I worked from my home for quite few years doing

friends'

25          and relatives' hair.  And there was a period that I

Barbara Varner                                    74

1       worked as a hairdresser for a funeral parlor and that

2       was, say, '83, '84, around this time.  I'm just

3       guessing.  And then I obtained work at Holiday Hair.

4       That again was part-time.

5    Q   You say that was part-time?

6    A.  Yes.  That also was very short-lived.

7           Then in 1980 I -- I started working part-time for

8       the Capital Area Intermediate Unit.

9    Q   In 1980?

10   A.  Yes, around '80.

11   Q   What were you doing for them?

12   A.  I was a swimming instructor.

13   Q   Was that part-time?

14   A.  Yes, until 1985, when I came full-time as a teaching

15       assistant for the Intermediate Unit.  And I continued

16       working the school year, full-time school year until

17       1989 when I went to the county.

18   Q   And that was a full-time job at Capital Area

19       Intermediate Unit?

20   A.  Yes, it was.

21   Q   What was your rate of pay there?  Approximately.

22   A.  Yes.  I'm guessing maybe 9,000 a year.

23   Q   As part of the Capital Area Intermediate Unit did you

24          have an employee handbook or manual?

25     A.   Yes.


                      Barbara Varner                    75


1      Q    And as early as 1985, since that's when you went

2           full-time, you were aware that sexual harassment or

3           discrimination was prohibited in that workplace?

4      A.   I can't remember reading about it, but I would assume.

5      Q    Do you recall reading the employee handbook at the

6           Capital Area Intermediate Unit at any time?

7      A.   As needed, sure.

8      Q    Did you have occasion to file any claims or complaints

9           against any of the personnel of the Capital Area

10          Intermediate Unit?

11     A.   Claims?

12     Q    Complaints about any of your co-workers or supervisors.

13     A.   No.

14     Q    Did you follow any grievance procedures while employed

15          at the Capital Area Intermediate Unit about anything?

16     A.   No.

17     Q    What did you do as a teaching assistant?

18     A.   I was in the classroom for the first three years, I was

19          in a visually impaired classroom.  So I taught Braille.

20          We did a lot of orientation and mobility skills.  They

21          were multiple handicapped, they were mentally retarded.

22          Some were physically handicapped.  The overriding

23          problem was their vision, though, so we focused on the

24          visual problems.  It was aiding the teacher, helping

25          assist the teacher.


Barbara Varner                                    76


1    Q    What was your reason for leaving the Capital Area

2         Intermediate Unit?

3    A    I took a Civil Service exam and applied for a

caseworker

4         position.  And then I was interviewed by Children and

5         Youth and decided to go there.  It was more money.  It

6         was also in line with my degree aspirations.

7    Q    How did you learn that the job was available?

8    A    Civil Service.  I scored high on the Civil Service

test,

9         was put on a caseworker list, and Children and Youth

was

10        I guess the one that came up and they notified me about

11        an interview.

12   Q    Do you remember who you spoke to initially at the

13        county?

14   A    My interview was with Darlene Orr.

15   Q    And obviously you were hired for Children and Youth,

16        right?

17   A    Yes, that's correct.

18    Q    And initially hired as a caseworker trainee?

19    A.    Right.

20    Q    At a rate of pay of about $15,000 a year?

21    A.    That's correct.

22    Q    When did you first meet Mr. Graham?

23    A.    Probably the beginning of 1990 somewhere, the first

24          couple months of 1990.

25    Q    How did you meet him?


Barbara Varner                                77


1    A.    One of my fellow case workers was taking me around the

2          different departments, introducing me to different

3          staff.

4    Q    Did you two have occasion to work together?

5    A.    Yes.

6    Q    Tell me when and on what.

7    A.    We shared several cases.  I would have the children as

8          dependent children, mostly neglect children, and

9          Mr. Graham was supervising the father in these homes.

10    Q    What was your opinion of Mr. Graham in 1991, 1992?

11    A.    If I would ask for his assistance with the one
gentleman

12          who had a very violent temper, he would call him in and

13          talk to him.  The gentleman would not let me in to see

14          his children a lot of times, and I had to see the

down

15          children.  So he would call him in.  Or he would go

16          to see the gentleman, which is a block down the street,

17          and try to get him in line, and let him know that I had

18          to see the children.  So it was more of an assistant to

19          me as a probation officer and me as a caseworker.

20    Q    What was your opinion of him personally?

21    A.   Personally, I don't think I had a real opinion of him.

22          It's just that he was helpful when I needed the help

23          with certain clients.

how

24    Q    During the first three years you were at the county,

25          often did you deal with Mr. Graham on cases?


                      Barbara Varner                          78


1     A.   We had shared two sexual offender cases; he had the

2          offender and I had the children.  And the other one was

3          a severe neglect case.

4     Q    So how often?

5     A.   As needed if there was a problem.

you

6     Q    Can you give me an estimate of how many times a year

7          were dealing with Mr. Graham asking for assistance?

8          MS. WALLET:  I'll object to the form of that

want

9          question.  That's sort of a two-part question.  You

10         to break that down?

```
11                MR. THOMAS:  Sure.
12      BY MR. THOMAS:
13      Q     What I'm trying to learn, Barbara, is the amount of
14            contact that you had with Mr. Graham, and we can do it
15            any way you choose.  What I'm looking for is how often
16            during a given year, let's take 1991, how many times in
17            1991 did you have occasion to deal with Mr. Graham,
18            either asking assistance or working on a case with him?
19      A.    That would be the period where I had the high-risk
20            child, well, three children.  I would --
21      Q     The sex offender cases?
22      A.    No.  This would be the neglect, severe neglect case.
23            And I would say probably contact, maybe once a month.
24            It could be phone conversation, asking for his
25            assistance.  To actually physically get involved, that
```

Barbara Varner                                    79

```
1             might have been two or three times in a year.
2                  I would see him in the break room, we would
discuss
3             the case, how are things going, that kind of thing.
4       Q     How about 1992, how much contact did you have with
5             Mr. Graham during 1992?
6       A.    I would say probably approximately the same, because I
7             know we had two or three cases where, again, the men,
8             the father was volatile, and I was to supervise the
```

9        children.

10  Q    And so once a month you would have phone contact with

11        him, and maybe two or three times during the year you

12        would actually have to have him physically intervene and

13        you would see him on those occasions?

14  A.   When he actually intervened?

15  Q    Yes.

16  A.   There was a time when the gentleman would not even let

17        me in the house to see the children.  I called him and I

18        asked for his assistance to meet me down there.  It was

19        a high-neglect family, real concerned about the youngest

20        one not being able to thrive.  So I had to see his

21        children.  So I did ask for his assistance to meet me

22        there and do what he had to do with the father.

23  Q    How about 1993?

24  A.   '93?  Again, cases that we shared, sexual offender kept

25        coming back into the home.  He was under Mr. Graham's

Barbara Varner                80

1        jurisdiction.  Asked him for assistance to go, either

2        meet me at the house, because of the fear of what he

3        would, the father would do to me.

4  Q    Was the amount of contact that you had with Mr. Graham

```
      5              about the same?  Telephone once a month?

      6   A.    Probably, yes.  I would guess.

      7   Q     And maybe a couple, two to three face-to-face
occasions?

      8   A.    Yes.

      9   Q     How about 1994?

     10   A.    If there was a case we shared, it would be the similar.

     11              It would be similar to that.

     12   Q     So again, once a month?

     13   A.    Um-hum.

     14   Q     And two or three face-to-face visits?

     15   A.    Right.  That's a guesstimate.

     16   Q     Understood.  And of course, in February of '95 you

     17              transferred to Probation and then you worked closely

     18              with him after that?

     19   A.    That's correct.

     20   Q     During this period of that we're talking about, and I

     21              want to restrict my questions at the moment between
1990

     22              and 1994, did you have any other contact or dealings

     23              with Mr. Graham other than what we've described?

     24   A.    Not that were not work related.  Like I said, in the

     25              break room, there was times I would see him in there.
```

Barbara Varner                                      81

```
      1              General conversation.
```

2   Q    When you say you saw him in the break room on occasion,

3        can you quantify for me how often in the period 1990

4        through 1994 you saw him in the break room?

5   A.   Perhaps maybe once or a couple times a week.  All of
our

6        lunches and everything were kept in there.

7   Q    And is that when you saw him, over lunch?

8   A.   No.  I'm just saying that's where we stored our lunch.

9        It would be just going over.

10  Q    When did you see him in the break room?

11  A.   There's no really set time.  It was just occasionally.

12       A lot of people would eat lunch in the break room as

13       well.

14  Q    Did you ever eat lunch in the break room?

15  A.   Once in a while, yes.

16  Q    Did you ever eat with Mr. Graham in the lunch room?

17  A.   No.

18          MS. WALLET:  I assume that question is seated at

19       the same table?

20          MR. THOMAS:  In the room.

21          THE WITNESS:  Oh.  That's possible.  I don't

22       remember.

23  BY MR. THOMAS:

24  Q    If I understand your testimony correctly, it is that

25       and, again, I get the impression that this was a pretty

Barbara Varner                                82

1         infrequent occurrence?

2    A.    Um-hum.

3    Q    That you did not -- you have to say yes for the record.

4    A.    Yes.

5    Q    You didn't see him on a regular basis in the break room

6         during the work week?

7    A.    No.

8    Q    And you didn't see him outside the workplace except on

9         very, very rare occasions; is that fair?

10   A.    That's fair.  That's true.

11   Q    And the occasions which you saw him in the break room

12       were just coincidence?  Just happened to both be there

13       at the same time?

14   A.    Yes.

15   Q    The best you're able to tell me is you would estimate

16       that during the period 1990 through 1994 at a couple of

17       times a week?  Is that accurate?

18   A.    That's accurate.

19   Q    Did you ever call Mr. Graham and ask him to meet you in

20       the break room?

21   A.    No.

22   Q    Did you ever call him and ask to meet anywhere?

23   A.    Down at the one client's house, yes, I did.

24   Q    And on how many occasions was that?  Once?

25   A.    Maybe twice.

Barbara Varner                                    83

1    Q    So other than those two occasions when you called and

2         asked him to meet down at the client's house, you did

3         not call Mr. Graham and ask him to meet you anywhere?

4    A.   No.

5    Q    And the occasions on which you and he ended up in the

6         break room were merely coincidence and happened maybe a

7         couple of times a week?

8    A.   That's correct.

9    Q    How would you describe your relationship with Mr.
Graham

10        in the period 1990 through 1994?

11   A.   Working relationship.

12   Q    Friendly?

13   A.   Cordial.

14   Q    How well did you feel that you knew Mr. Graham during

15        that period?

16   A.   As well as I would know any other co-worker.

17   Q    And no better?

18   A.   No.  No.

19   Q    Meaning you didn't feel you knew him any better than
any

20        of your other co-workers?

21   A.   No.

22   Q    You won't describe your relationship as a close one

23        during that period?  Meaning 1990 through 1994.

24   A.   No.

25    Q    And I guess would you describe it as sort of a

Barbara Varner                              84

1         professional co-worker type arrangement?

2    A.   That's correct.

3    Q    Were you aware of any rumors with respect to you having

4         an intimate relationship or an affair with Mr. Graham

5         during that period?

6    A.   No.

7    Q    You don't recall anybody asking you whether or not you

8         were having an affair with Mr. Graham?

9    A.   No.

10   Q    There was no discussion with you by anybody suggesting

11        that you were too close to him?

12   A.   No.

13   Q    How did it happen that you transferred to the Probation

14        Department in February of 1995?

15   A.   I had applied for a position the year before, when I
was

16        still doing my undergrad work, with the Chief Bolze.
At

17        that time he told me I needed to have an undergrad

18        degree.

19            And then a friend of mine, Lynn Dickerson, was

20        doing her internship in Juvenile Probation, working on
a

21        grant that was called Family Preservation.  She had

```
22          spoken to me about how I had worked with a local mental

23          health program, establishing their Family Preservation

24          program.  In Children and Youth I was an in-home

25          protective service worker, which meant most of my
```

Barbara Varner                                      85

```
 1          emphasis was on family involvement and keeping the

 2          children in the home.  So Lynn and I spoke about this,

 3          that she was working on this grant and that she was the

 4          same age, she was a criminal justice major with me at

 5          school.  And --

 6      Q   I thought you were a social science major?

 7      A.  That was my associate degree.  My undergrad was in

 8          criminal justice.

 9      Q   Okay.

10      A.  And she had spoke to me about this position, how it

11          would be a nice blend of my criminal justice degree
```

plus

```
12          my Family Preservation experience, and recommended that

13          I should apply for the position.

14      Q   When was that conversation?

15      A.  I think her internship was the summer of '94.

16      Q   Were there any other factors that influenced your

17          decision to apply for a transfer to the Probation

18          Department?
```

19    A.    I had met with Mr. Osenkarski and we had discussed the

20          position.  He was aware that my degree was in criminal

21          justice and he knew what my background was with

Children

22          and Youth as protective services.

23              I also liked the idea that it was not a

24          micromanaged department, that you were more independent

25          and that Mr. Osenkarski trusted you to be able to

manage

Barbara Varner                        86

1          your own time and do your own thing, which was

different

2          than it was with Children and Youth.

3              But mostly is my field was criminal justice and I

4          really wanted to be able to get into it, and this was a

5          good opportunity.

6    Q     Did your relationship with Mr. Graham play any role in

7          your decision to ask for a transfer to the Probation

8          Department?

9    A.    I would say no.  In fact, Mr. Graham left me know not

to

10         let Mr. Bolze know that I was interested because they

11         did not have a good relationship.  So that was

12         downplayed, the fact I even knew Mr. Graham that well.

13   Q     So you downplayed your --

14   A.    I didn't mention, you know, I was not coming in saying

15          I'm here because Mr. Graham recommended me.  It was

16          of that.

17     Q    And you say you downplayed your relationship with

18          Mr. Graham.  Downplayed it to whom?

19     A.   Not downplayed it.  I -- not to mention to Mr. Bolze

20          that Mr. Graham was -- or Mr. Osenkarski wanted me to

21          come over into that position.

22     Q    Did Mr. Graham, in fact, want you to come over to the

23          Probation Department?

24     A.   He had spoken to me and Lynn Dickerson about the

25          position, that they needed two probably two females,


                        Barbara Varner                    87


1           probably in the case worker or social work field and,

2           you know, criminal justice, that they thought it was a

3           more of a woman type position because it was social

4           work, and whether I was interested or not.

5      Q    And when did that conversation occur, Barb?

6      A.   That would probably be while Lynn was there doing her

7           internship.

8      Q    1994?  During the summer of 1994 --

9      A.   Right.

10     Q     -- Mr. Graham and Mr. Osenkarski both advised you that

11          these positions were going to come --

12     A.   Yes.

13  Q    -- in the Probation Department, correct?

14  A.   Yes, that's correct.

15  Q    And that they thought it would be an appropriate

16       position for a female?

17  A.   Yes.

18  Q    Did they tell you why they thought it would be an

19       appropriate position for a female?

20  A.   I think because it was social-worky aspect, it's more

21       social work because you're dealing with families, a lot

22       of intensive -- part of the Family Preservation was

23       teaching parents parenting programs, that kind of
thing,

24       intensively in the home.

25  Q    And there were female probation officers at that time?


Barbara Varner                              88


1   A.   There was, I believe there was three at that time.

2   Q    And in searching for this job they were actively out

3        soliciting you as an interested female in that
position,

4        correct?

5   A.   I think it was more I approached them.  I talked to

6        Mr. Osenkarski about it.  Mr. Graham -- I knew they
were

7        writing the grant.  He had brought Lynn Dickerson down

8        to meet me.  And like I said, I already knew Lynn from

9        going to class with her at HACC.

10   Q   And this conversation that you've described occurred

11      with each of them?  Or the two of them at the same
time?

12   A.  Possibly both.  Probably with both of them at one time

13      and on separate occasions.  He would come down and ask

14      me when I was with Children and Youth, which is right

15      down the hall, he would come down and ask for some

16      paperwork of what we used, like maybe the family
service of

17      plan that we used with Children and Youth, those kind

18      things, tools, that could be translated into the Family

19      Preservation program.

20   Q   When you say he came down the hall, can you identify he

21      for me?

22   A.  Mr. Graham.

23   Q   How often did he come down the hall to see you and make

24      requests of any type?

25   A.  I would say that was only maybe two times.  It was

Barbara Varner              89

1      mostly for paperwork.

2         And I know Lynn came down as well, trying to get

3      paperwork from me regarding the Family Preservation

4      program that I had been involved in.

5   Q   So as a result of those conversations, you made formal

6       application for the job?

7   A.  Yes.

8   Q   Did you complete a formal written application?

9   A.  No.

10  Q   Who did you advise that you were interested in the job?

11  A.  Ken Bolze.  Chief Ken Bolze.

12  Q   Tell me how you got hired.

13  A.  I was interviewed by Chief Bolze, John Roller, who was

14      an adult supervisor, and Mr. Osenkarski.  And I believe

15      that, by the three gentlemen.

16  Q   I gather from the testimony you've given already that

17      Children and Youth and Probation had occasion to work

18      together?

19  A.  Absolutely.

20  Q   And where were they physically located within the

21      courthouse?  Were they close together?

22  A.  Yes.  We were all on the third floor.  The only thing

23      that separated us was a door.  We were in what's called

24      the east wing and they were on the main courthouse.  So

25      it was a matter of just around the corner and down the

Barbara Varner                              90

1       hall.

2   Q   So there was a fair amount of interaction and close

3          proximity in terms of physical location, between the
two

4          departments?

5    A.    Yes.

6    Q     Is that fair?

7    A.    It was a common lunch room as well.

8    Q     What was your understanding of the reputation of

9          Mr. Graham when you were interviewed for this position

10         in late 1994 or early 1995?

11   A.    Reputation?  I had heard he was a hot head, that he

12         really would get angry quickly.  And I was, knew that

13         Mr. Osenkarski and Mr. Graham, either you were in good

14         favor with them or you were basically being punished.

15         And at that point I appeared to be in good favor.

16   Q     Why do you say that?

17   A.    Because I did -- it seems like they wanted me to come
to

18         that position.  They were very positive about that.

19   Q     And you wanted to go to the position, also?

20   A.    Yes, I did.

21   Q     And as I understand it, it was because it was within

22         your area of study, which was criminal justice?

23   A.    That's correct.

24   Q     And also, there was a $9,000 pay raise or something
like

25         that involved, right?

```
 1   A.   Yes.
 2   Q    Were there any other reasons why you wanted to transfer
 3        to the probation?
 4   A.   As I said, I think it was a whole attitude,
 5        Mr. Osenkarski, that it was not a micromanaged.  In
 6        Children and Youth there was so much meetings, meetings
 7        after meetings.  It was not so much time out actual in
 8        it field as much time as you should be out in the
```
field,
```
 9        where with Probation Mr. Osenkarski left me know that
```
he
```
10        doesn't micromanage, he depends on his workers to do
11        their job.  And to me, that was very interesting
```
because
```
12        Children and Youth when you first start out you were
13        training, so.
14   Q    Did you have any impression from those interviews who
15        you would actually be working with when you were
16        transferred to Probation?  If you were accepted for the
17        job.
18   A.   Mr. Bolze, of course, was chief.  And Mr. Osenkarski
19        was, headed up the juvenile division of the Department
20        at those interviews, the only three people there.
21   Q    Was there any discussion about who you would be working
22        for or working with?
23   A.   I knew the position would be under Juvenile Probation.
24        It was the grant under the juvenile system.
25   Q    And did you know where Mr. Graham was concentrating at
```

Barbara Varner                                    92

1           that time?

2    A.     Yes.  He was in Juvenile Probation.

3    Q      Did you have an understanding that if hired, it was

4           likely that he would be the person responsible for

5           training you?

6    A.     Yes.

7    Q      Did you have any reservations about that?

8    A.     No, because I knew Mr. Osenkarski was still his boss.

9           And Chief Bolze, I had a lot of respect for him and I

10          knew he was still overseeing the whole group.

11   Q      Based on the reputation that Mr. Graham was a hot head

12          and you were either in favor or out of favor, did that

13          cause you any hesitancy or concerns in terms of

14          accepting the job?

15   A.     Maybe a little hesitancy, but like I said, I knew Chief

16          Bolze basically kept them in line.

17   Q      When was the job formally offered to you and by whom?

18   A.     It was offered to me by Chief Bolze, and exactly when,

I

19          don't know.  Sometime in January.

20   Q      And you then told Children and Youth you would be

21          leaving and moving over to Probation, correct?

22   A.     That's correct.

23   Q      Who did you understand was ultimately in charge of the

```
24          Probation Department?

25   A.     Chief Bolze.  Well, Judge Sheely.  Judge Sheely at that
```

Barbara Varner                                  93

```
 1          time.

 2   Q      And why Judge Sheely?

 3   A.     Because we were officers of the court and he was the

 4          president judge.

 5   Q      And it was your understanding that Judge Sheely then
```
had
```
 6          ultimate authority over the probation officers in that

 7          department?

 8   A.     Yes.

 9   Q      And Ken Bolze was the chief of the department and he

10          reported to Judge Sheely?

11   A.     For, yes, hiring, firing, those kind of things.

12   Q      So you took the job, you started there on February 6,

13          1995, correct?

14   A.     I believe it was February 7th, 1995.

15   Q      And your salary there would have been $24,868 when you

16          started; does that sound right?

17   A.     That sounds correct.

18   Q      Describe for me, if you would, what the hierarchy was
```
in
```
19          terms of management when you got there on February 7th,

20          1995.
```

```
21   A.   Chief Bolze was the chief.  Mr. Osenkarski was a

22        supervisor and mostly in juvenile work.  I believe he

23        did split, too, adult and juvenile.  And John Roller
```
was
```
24        more adult than juvenile.

25   Q    Where did Mr. Graham fall in the pecking order?
```

Barbara Varner                              94

```
1    A.   Mr. Graham would have been emphasis on juvenile under

2         both John Roller and Chief Bolze, but predominantly

3         working for Mr. Osenkarski.

4    Q    Where were you assigned when you first started in

5         February?

6    A.   I was assigned to the Family Preservation unit.

7    Q    And who did you report to?

8    A.   Mr. Graham was my trainer.  He's the one that was

9         supposed to be training me how to be a probation

10        officer.  Mr. Osenkarski was the supervisor.  And

11        ultimately it would be Ken Bolze.

12   Q    So the chain of command from you was to Graham,

13        Osenkarski, and Bolze?

14   A.   That's correct.

15   Q    Did you have any problems with Mr. Graham when you
```
first
```
16        started to work there in February of 1995?

17   A.   No.
```

18    Q    Did you work with him on a daily basis?

19    A.    Pretty fairly, yes.  Pretty much.

20    Q    Did you share an office?

21    A.    Yes.  Not with -- with who?

22    Q    And with whom did you share it?

23    A.    I did share an office.  I was with Buck McKenrick and

24          Mike Piper.

25    Q    What did your training consist of?

Barbara Varner                              95

1    A.    Writing petitions, the paperwork, the court work.
Doing

2          a case from the beginning to end, from intake to

3          deposition -- disposition, I'm sorry, to disposition.

4          Supervising the juveniles, wherever they are.

5          Placement.  Paperwork.  Basically all the paperwork

6          that's needed to do the job.  Time sheets.  Mileage

7          sheets.

8    Q    How would you describe your relationship with Mr.
Graham

9          as your trainer?

10    A.    I would describe him as a poor trainer.

11    Q    In what way?

12    A.    Just getting by with a minimal, just basically whatever

13          you can get away with.

14    Q    Give me some examples.

15    A.    Supervision, if he would take me out to show me how to

16          supervise, he would pretend to throw a card at

17          somebody's house and say there's a contact, rather than

18          actually doing the face-to-face with the kids.  Just

19          basically poor leadership.

20    Q     And you say poor leadership, what do you mean by that?

21    A.    If you're supposed to learn by example, that was a poor

22          example.  That you needed to, in my job as a caseworker

23          at any time I have worked it's important that you see

24          your clients, you do the face-to-face, you take time to

25          know the families.  That didn't seem to be relevant to

Barbara Varner                                    96

1           him.  His interest seemed to be in making it, his job

2           convenient for him.

3              That would -- if he's on the way to somewhere he

4           might make a stop someplace on his of personal
interest.

5           Like I said, he would pretend to throw cards at the

6           houses and say that would be a contact.  That's poor

7           leadership.

8     Q     Any other examples of what you would describe as poor

9           leadership or poor training?

10    A.    Inconsistent in how he wanted paperwork done,
petitions,

11          court paperwork.

12    Q    Did you have occasion to discuss what you've described

13         as poor leadership or poor training with either of the

14         other direct reports above you?  And by that I mean
with

15         either Mr. Osenkarski or Mr. Bolze.

16    A.   During that time I also was aware that either you're in

17         favor or you're punished, and I really did not want to

18         fall into the punishment mode.  So to question things
at

19         that point, just sort of left them ride.  And that I

20         learned from other people in our department it was easy

21         to go from one officer to another for training to get

22         information.  And I found a lot of other resources.  I

23         could learn to do petitions and, you know, social

24         histories from them.

25    Q    So I guess the answer is you never complained about


Barbara Varner                                           97


1          Mr. Graham's leadership or training to anybody?

2     A.   At the very beginning, no.  In '95, no.

3     Q    When did you first complain about any problems with

4          Mr. Graham's leadership or training?

5     A.   Whenever I went to Mr. Osenkarski, there was a day that

6          I had taken cases in to Mr. Graham in '96 -- '96, '97.

7          I had taken cases in to him.  And I had done everything

8          that was supposed to be done, gotten everything

```
 9          together.  And he started screaming at me and said who

10          the F, meaning, do I think I am, making decisions on

11          these cases.

12              When I worked, turned cases in to Mr. Osenkarski,
I
13          never had a problem with going ahead and making a

14          decision on what I would recommend for disposition on

15          the juvenile.  Suddenly, I had done everything wrong,

16          according to him.  He screamed at me, threw me out of

17          his office.  And I went to Mr. Osenkarski and I said,

18          you have to get the guy under control.  And he said,

19          he's in charge, I put my so many years in with the

20          county and he's in charge.

21     Q    When was this?

22     A    It was in '97.

23     Q    So from February 1995 when you started until sometime
in
24          1997, you never complained about Mr. Graham's
leadership
25          or training?
```

Barbara Varner                                              98

```
 1     A    Not to him.  To other people.  Other people agreed with

 2          me, other staff members, co-workers.

 3     Q    But you never went up the chain of command to

 4          Mr. Osenkarski prior to 1997?

 5     A    Like I said, I sought out other help as far as
```

```
6              petitions.  He was not -- he was not screaming at me or
7              those kind of things, which happened later on.  But I
8              was aware that he was inconsistent.
9      Q       We'll come back to that in a minute.  But what do you
10             attribute the change of behavior to?
11     A.      Whenever Chief Bolze retired and we split adult and
12             juvenile and there was not that person who could
13             basically keep the lid on Mr. Graham, which would have
14             been Chief Bolze.  It was now only Mr. Osenkarski.
15     Q       Up until the time of Bolze's retirement, you and
16             Mr. Graham had a good relationship?
17     A.      Working relationship.
18     Q       And would you describe it as no better than a working
19             relationship?
20     A.      I would say no better than that, no.
21     Q       When did Bolze retire?
22     A.      August of '96.
23     Q       So from February 1995 until August of 1996 you had no
24             particular problem with Mr. Graham?
25     A.      Not with any nasty or yelling at me, no.
```

Barbara Varner                          99

```
1      Q       No screaming?
2      A.      No, not at that point.
3      Q       No sexual harassment?
```

4    A.    Yes, there was incidents of that, but not of the

5          violence or fear that I had experienced later on.

6    Q    We'll talk about the sexual harassment in a minute.
But

7          the episode of deterioration in the relationship, at

8          least the screaming or fear as you've described it,

9          didn't materialize until after August of 1996?

10    A.    Until after Chief Bolze had retired.

11    Q    At that point you had been working with him for a year

12          and a half, or approximately that long, correct?

13    A.    That's correct.

14    Q    And had had no episodes of him losing his temper with

15          you or screaming at you?

16    A.    Not at me.  With other people, but not at me.

17    Q    Had he been complimentary of your work for that year
and

18          a half?

19    A.    Chief Osenkarski at times was, but Graham, no.

20    Q    Who was responsible for doing reviews on you?

21    A.    Mr. Osenkarski and Mr. Graham signed as well.

22    Q    Did you receive unfavorable reviews during the 18
months

23          from February '95 until August of '96?

24    A.    Initially Ken Bolze, when he was there he was also

25          involved in evaluations, and they were fine.  I had no

1          problems with my evaluations.

2     Q    At any time?

3     A.   No.

4     Q    Was there any particular event or happening that

5          occurred as best you understand it in August of '96
that

6          caused Mr. Graham to suddenly start screaming at you?

7     A.   I think he had free reign.  Mr. Osenkarski took a back

8          seat and turned everything over to Mr. Graham.

9     Q    But there was no specific event?  Other than the

10         retirement of Chief Bolze.

11    A.   It was a slow progression.  Slow progression that you

12         could see the power and the authority he was just

13         gaining, gaining the power, and you could feel that.
He

14         was angry most of the time.

15    Q    What was he angry about?

16    A.   It could be basically anything that I did.

17    Q    And when did that start?

18    A.   That would be after Chief Bolze retired.

19    Q    After August of '96?

20    A.   Yes.  Things that I had done right one time, that were

21         acceptable, now were wrong.

22    Q    Give me some examples of those things.

23    A.   Could be the way you do petitions.  He just -- suddenly

24         the wording wasn't right.  No matter what I did, it was

25         wrong.  He didn't want me --

Barbara Varner                           101

1    Q    Referring to the petition now?

2    A.   Petitions, court petitions, yes.  Making decisions on

3         cases he didn't agree with.  And prior to that, that
had

4         been normal procedure.  It was just a constant thing,
no

5         matter what it was, I was in the wrong.

6    Q    I need you to be specific for me now in terms of what

7         they were.  You've described the petitions, he didn't

8         like your wording.  He was critical of some of the

9         decisions or recommendations you made with respect to

10        particular juveniles.

11   A.   Right.

12   Q    What else was he unhappy about?

13   A.   He was unhappy that I would take trips with Ms. Green

14        and we would leave after eight o'clock in the morning.

15        And he screamed and he screamed and F word at me, that

16        all placement trips, placement meaning placing
juveniles

17        start at eight o'clock in the morning.

18            He told me that Debra Green and I had lied about a

19        trip we had been on.  It was a trip where we traveled
up

20        north, we ran into an icy area, had to detour, were an

21        hour longer than he thought we should have been.

22        Screamed and yelled, took an hour overtime from both of

23        us.  He said he would check the odometer.  He said we

24     were lying to him, where we were.  There was not too

25     many places to go.

Barbara Varner                          102

 1          He came in, he would take a piece of paper out of

a

 2     file -- I had done an extensive list of victims of a

 3     crime spree that juveniles had committed --

 4  Q  Sorry to interrupt you, but before we leave the trip,

 5     this criticism of you and Ms. Green and the trip up

 6     northeast, did that occur on more than just that one

 7     occasion?

 8  A. Not yelling about the trip, no.  But informing us that

 9     we should have known the -- screaming that all

10     commitment trips start at eight o'clock in the morning,

11     which was not a pattern anybody else had to follow.  We

12     would observe males coming and going at will anytime

13     they chose to go.

14  Q  Well, what about the other female probation officers,

15     when did they come and go?

16  A. There was only one other juvenile probation officer and

17     that was Debra Green on the juvenile side.

18  Q  And this conversation or this episode that you're

19     talking about was on the one occasion when you two took

20     that trip to the northeast?

21   A.   Yes, it is.

22   Q    And he informed you that you were to come and go at

23        eight o'clock on placement trips, period?

24   A.   Yes.

25   Q    And screamed at you?

Barbara Varner                                    103

1    A.   And screamed at me, yes.

2    Q    And used a loud tone of voice?

3    A.   He screamed at me on the phone and in the office at

both

4         Debra and myself, screamed and used the F word at us,

5         and just constant.  And probably used every swear word

6         you could find.

7    Q    How long did he do this?  You said he did it on the

8         phone, he did it when he saw you in person in the

9         office?

10   A.   Yes.  On the cell phone, yes.

11   Q    And those two episodes, was that the extent of the

12        reprimand for that eight o'clock departure?

13   A.   He took an hour of overtime from us.  He said we had

14        lied about where we were.

15   Q    And other than that, did he continue any other conduct

16        toward you after that with respect to placement trips?

17   A.   With respect to that particular trip?  I heard about it

18    over and over again, reminding me that, you know, we had

19    done that.

20  Q    And I interrupted you, I'm sorry.

21  A.   That's okay.

22  Q    Other episodes?

23  A.   There was an occasion --

24  Q    You were talking about a paper that you prepared?

25  A.   Right.  I had an extensive list of victims of a robbery,

Barbara Varner                                                104

1    and it was an extensive list, how I had made all the

2    contacts, extensive calling contacting.  For some reason

3    it was -- he was not happy with that.  He brought the

4    file into -- well, I guess the file was on my desk.  He

5    came in and he picked up the paper that had the victims'

6    names on.  Debra Green was in my office with me.  He

7    threw the paper at me, hit me with a wadded paper, just

8    saying this is no F-ing good, is not acceptable.  Tried

9    to ask him what was wrong with it.  He just wouldn't

10   hear it.  He started moving pictures across my desk,

11   putting his finger in my face in a very, very

12   threatening manner, and just screaming.

13  Q    When was this?

```
14   A.   That would be early '97.

15   Q    Do you know the month?

16   A.   I can't recall at this time.

17   Q    And what was his objection to the piece of paper which

18        you had prepared with the victims' names on it?

19   A.   I have no idea.  He was just screaming it was not
right.

20        I don't know how else I could have done it any

21        differently.  Names, address, how I contacted them,

22        whether I made contact or not.  It was extensive.

23   Q    Did you report that behavior to anybody at that time in

24        early '97?

25   A.   No.  The whole office heard that.  No.  Mr. Osenkarski
```

Barbara Varner                                        105

```
1         was not in the office too often.

2    Q    When you say that you felt threatened by his conduct

3         that day, threatened in what way?

4    A.   He moved closely to me, within a foot of me.  His
finger

5         was in my face.  He was saying you don't know what the
F

6         you're doing.  And using the word, the F word at me.

7         Just very scary.

8    Q    Have you ever used the F word?

9    A.   Me?

10   Q    Yes.
```

11    A.    Only in describing perhaps what a kid has said to me.

12    Q    That's not something you use in your language?

13    A.    No, I don't.

14    Q    Certainly in working in the Probation Department that

15          word doesn't come as a shock to you, though, does it?

16    A.    No, it doesn't shock me.  It's offended once at me.  I

17          can hear it, but not at me, directed at me.

18    Q    Can I assume that in some of the episodes you had with

19          your first husband that he may have used inappropriate

20          language in his arguments with you?

21    A.    I can't recall him ever using the F word at me.

22    Q    Did he use other adjectives or adverbs that you found

23          troubling at the time?

24    A.    I'm sure he did.

25    Q    Is there any other, and we'll go through your Complaint

Barbara Varner                         106

1          here in a minute, but are there any other specific

2          incidents in terms of difficulties with training or

3          leadership that you want to bring to my attention at

4          this time?

5     A.    There may be others but I can't, at this time I can't

6          think of any, but I'm sure there's others.

7     Q    So in general, I gather, that you had at least a decent

8          working relationship with Mr. Graham up until

9          Mr. Bolze's retirement, correct?

10   A.    Yes.

11   Q     But you would again describe it as no more than a

12         working relationship?

13   A.    That's correct.

14   Q     There was no chemistry between the two of you?

15   A.    No.

16   Q     You wouldn't describe it as a flirtatious relationship?

17   A.    On Mr. Graham's part, yes.

18   Q     How about on your part?

19   A.    No.

20   Q     You never had any interest in him?

21   A.    No.

22   Q     Didn't consider him to be a close personal friend?

23   A.    No.

24   Q     It was strictly a business relationship?

25   A.    Comfortable business, yes.  I was comfortable with him,

Barbara Varner                                   107

1          but not on a friendly basis.

2    Q     Prior to your move to the Probation Department were you

3          aware that Kerry Houser had filed a sexual harassment

4          claim?

5    A.    Yes, I had heard about it.

6    Q     What had you heard?

7    A.    I had heard that she had filed a sexual harassment case

8          in the Probation Department.

9    Q    What did you know about it?  Or what were you told?

10         More appropriately.

11   A.    Just that there was problems after she had filed it.

12   Q    That claim was filed against Mr. Osenkarski?

13   A.    I believe so.

14   Q    And you knew that before you joined the Department?

15   A.    It was a rumor I had heard.

16   Q    Did you ever talk to Kerry Houser about it before you

17         accepted the job in the Probation Department?

18   A.    No, I didn't.

19   Q    Did you talk to her about it after you were --

20   A.    Yes.

21   Q    Did that give you any reason for concern?

22   A.    Yes, it did, but I was in favor at that time rather

than

23         on the punishment side.

24   Q    How would you describe the culture of the Probation

25         Department when you got there in February of 1995?

Barbara Varner                                    108

1    A.    Everybody really got along very well with each other,

2          the adult and juvenile, because there was so much

3          blending.  I liked the people.  I always have liked the

4        people that worked in Probation.  Very accommodating.

5   Q    It's pretty tough subject matter, isn't it?  I mean,

6        you're dealing with people who are on probation who are

7        in trouble with the criminal justice system?

8   A.   Certainly.

9   Q    It's certainly not a highly professional office like a

10      law office or something like that in terms of subject

11      matter; is that fair?

12  A.   I think they're very professional.

13  Q    Professional in the way they do their work?

14  A.   Absolutely.

15  Q    But the subject matter tends to be pretty tough stuff,

16      doesn't it, some of it?

17  A.   Certainly.  Certainly.

18  Q    As you've described earlier, you were dealing with

19      children who were either malnourished, correct?

20  A.   That's correct.

21  Q    Or who were involved in some sort of sexual

22      molestation --

23  A.   Correct.

24  Q    -- in some manner?

25  A.   Right.

Barbara Varner          109

1   Q    So the subject matter is pretty tough?

```
 2   A.   Certainly.

 3   Q    What were your long-term goals when you took the job

 4        with Probation in February of 1995?

 5   A.   Long-term goals?  I was happy with the position,
          because

 6        I had earned my undergrad, it was in criminal justice,
          I

 7        liked working with the juveniles.  At that time it was

 8        just to work there, be a good employee.

 9   Q    So you had no long-range aspirations?

10   A.   Not at that point, no.

11   Q    Did you develop those later?

12   A.   Yes, I did.

13   Q    Tell me when.

14   A.   I applied for the master's program through the Juvenile

15        Court Judges Commission.  I completed the master's

16        program.  It was in 1988.

17   Q    Let me interrupt you for a minute, because that's one

18        thing we haven't done is finished your education.

19   A.   Okay.

20   Q    You told me that you went to cosmetology school, right?

21   A.   That's correct.

22   Q    And that was directly after Mechanicsburg High?

23   A.   Correct.

24   Q    At some time later I know that you went back to HACC?

25   A.   Yes.  That was in '86 I went back the HACC.  I went to
```

1        HACC the first time.

2    Q    And that was part-time?

3    A.   Yes.

4    Q    And your major there was social?

5    A.   Social, well, social sciences they called it.

6    Q    Did you obtain a degree from HACC?

7    A.   Yes, an associate degree.

8    Q    And when was that?

9    A.   1990.

10   Q    When was your next education after that?

11   A.   I went directly from there to Penn State Middletown.

My

12        major was criminal justice.

13   Q    You started there in 1990?

14   A.   Yes.  Was criminology, I'm sorry.  Criminology.

15   Q    Did you graduate from Penn State Middletown?

16   A.   Yes, 1994.

17   Q    You went there part-time?

18   A.   Yes.

19   Q    How was the tuition paid there?  Who paid the tuition?

20   A.   Tuition was paid, the county paid a small portion.  I

21        believe at that time they allowed, I'm just estimating,

22        I think it's $800 a year.  And the rest was paid by

23        myself.  And it had to qualify as a necessary course

24        with my.

25   Q    Job?

Barbara Varner                                    111

1    A.    With my job, yes.

2    Q     Did that qualify?

3    A.    Some did.  Some didn't.

4    Q     Education after that?

5    A.    JCJC program, I earned my master's degree in

6          administration of justice.

7    Q     What's JC?

8    A.    Juvenile Court Judges Commission.

9    Q     Okay.  When did you earn your master's degree?

10   A.    That was in '98.

11   Q     Did you receive tuition reimbursement for that study?

12   A.    No.

13   Q     Was it paid for by the Commission?

14   A.    Court Administrators, yes.

15   Q     So you had no out-of-pocket tuition for that --

16   A.    Just books.

17   Q     -- further education?

18   A.    Yes.  I enrolled at Penn State Middletown in 2000 in a

19         Ph.D. program in adult education.  I took two classes.

20   Q     Where do you stand with respect to your master's
degree,

21         or I'm sorry, with respect to your Ph.D.?

22   A.    I stopped going to Penn State in spring of 2001.  It

23         just wasn't a good fit for me as far as the program.  I

24          made application to IUP in the administration
leadership

25          Ph.D. program.


Barbara Varner                                          112


1    Q    Where do you stand on that application?

2    A.   I'm waiting to see if I'm accepted for the fall class.

3    Q    How was the tuition at Penn State Middletown paid for?

4    A.   Like I said, Penn State Middletown was, like I said,
the

5         county paid I believe, I'm just estimating, I believe

6         it's $800 a year is what they would pay if it was

7         qualified, if they felt it qualified with my
employment.

8    Q    And did it qualify?

9    A.   Like I said, several did.

10   Q    At Penn State Middletown?

11   A.   Right.

12   Q    And what about the IUP program, same?

13   A.   I have not attended there yet.

14   Q    But do you expect that that will also be compensated

15        for, a partial reimbursement by the county?

16   A.   If it qualifies, if the courses qualify.  There's an

17        application you have to make through Personnel for
that.

18        Human Resources, rather.

19   Q    What influence, if any, did Gary Graham have on your

```
20          decision the move to the Probation Department?

21              MS. WALLET:  Objection.  I think that was asked
and

22          answered.

23  BY MR. THOMAS:

24  Q    Favor me with another answer, will you please?

25  A.   The influence?
```

                              Barbara Varner                    113

```
 1  Q    Um-hum.

 2  A.   I don't think he had much influence at all on me going

 3       there.  Letting me know that the position was open,
yes.

 4       But as far as my getting the position, no.

 5  Q    Did he encourage you to apply?

 6  A.   He thought Lynn and I would be good people because of

 7       having the caseworker back -- well, myself, caseworker

 8       background and the criminal justice degree.  And he had

 9       worked with me as a caseworker so he knew what kind of

10       work I would do.

11  Q    In October of 1996 there was a conference at Penn State

12       that you attended; is that correct?

13  A.   Yes.

14  Q    Can you tell me what the nature of that conference was?

15  A.   A DUI association.

16  Q    Why were you there?
```

17    A.    I was being certified as a, I believe that was a CRN,

18          CRN instructor.

19                MR. MacMAIN:  I'm sorry, I didn't hear that.

20                THE WITNESS:  Court Reporting Network instructor.

21    BY MR. THOMAS:

22    Q     Were there other members of the Probation Department

23          there also?

24    A.    Yes.

25    Q     Was Mr. Graham there?

Barbara Varner                    114

1     A.    Yes.

2     Q     Were there any problems while you were at that

3           conference?

4     A.    Yes.  He tried to get entrance to my hotel room.

5                 MR. ADAMS:  I'm sorry?

6                 THE WITNESS:  He tried to get entrance to my hotel

7           room.

8     BY MR. THOMAS:

9     Q     When was that?

10    A.    It was in the evening.

11    Q     The conference was what days of the week?

12    A.    I had gone up Sunday evening because my -- the class I

13          needed to be qualified was first thing Monday morning.

14          I don't believe the conference actually started till

```
15          Tuesday.  So I had arrived on Sunday evening.  And I

16          believe it went till Thursday.

17     Q    When did Mr. Graham try to gain access to your room?

18     A.   It would have been the Tuesday evening after the

19          conference had started.

20     Q    What happened?

21     A.   He continued to knock on my door.  I chose not to answer

22          it.  And then he called my room.

23     Q    Did you have a conversation with him?

24     A.   I answered the phone and found out who it was, and he

25          said he wanted to stop in.  And I said I was studying.
```

                    Barbara Varner                    115

```
1      Q    And what did he do?

2      A.   I don't know what he did at that time.

3      Q    That was the end of the conversation?

4      A.   Yes.

5      Q    And he didn't come back to your door?

6      A.   Not that I can recall, no.

7      Q    Did you at any point call his room during that

8           conference?

9      A.   No, I did not.

10     Q    Did you call his room during the early morning hours of

11          any of the days that you were there?

12     A.   No.
```

13    Q    Would you have had any reason to call his room?

14    A.    The only time I would ever call anybody's room is

15          because I was a runner and I would run first thing in

16          the morning, would be to let them know where I was so

at

17          least somebody knew where I was.

18    Q    When you say you ran first thing in the morning, what

19          was first thing in the morning?

20    A.    Daybreak.  Six o'clock, six-thirty.

21    Q    You do not remember calling his room?

22    A.    No, I don't.

23    Q    And I assume by October of 1996 that the relationship

24          between the two of you was not good?

25    A.    That's correct.


                    Barbara Varner                    116


1    Q    So if you were going to call somebody, he wouldn't have

2          been your first choice?

3    A.    Right.  No.

4    Q    Did you leave the conference early?

5    A.    Yes, I did.

6    Q    Why?

7    A.    When I went up the week before, Mr. Graham had said

that

8          he would be riding with other people, I think Dennis

```
           9          Drachbar and maybe Sam Miller, that he wanted me to
give
          10          him a ride home.  I was just really uncomfortable.

          11             (Interruption.  Discussion held off the record.)

          12   BY MR. THOMAS:

          13   Q    Was there more to that answer?

          14   A.   Which is unusual, because usually he would drive, I

          15          think to get the mileage.  So it was just a red light,
I
          16          just don't want any -- didn't want him asking for a

          17          ride.

          18   Q    Was there ever a period of time when you heard anybody

          19          in the Probation Department discussing Barb 1 versus

          20          Barb 2?

          21   A.   Not in those words, no.

          22   Q    Did you ever hear any reference to Barb 1 or Barb 2?

          23   A.   Not Barb 1 and Barb 2, no.

          24   Q    What have you heard?

          25   A.   Several of the gentlemen in our department have said, I
```

                    Barbara Varner                          117

```
           1          think Graham is getting his Barbs mixed up, that when
he
           2          comes to work angry it's not me he's probably angry at,

           3          it's probably his wife and he's taking it out on me.

           4   Q    You never heard any reference to this as it related to

           5          phone calls that were received in the Department?
```

6   A.   No.

7            MR. THOMAS:  Let's take a couple of minutes.

8            (Recess taken from 12:38 until 1:54 p.m.)

9   BY MR. THOMAS:

10  Q    Barb, I've had your counsel place in front of you a

11       copy of the Complaint that's been filed in this matter,

12       and I want to talk to you about the Complaint and some

13       of the allegations that are in there and get some of

the

14       details from you, just by way of background so you know

15       where we're going.  Okay?

16  A.   (Witness nodded head affirmatively.)

17  Q    This Complaint you have reviewed, obviously, correct?

18  A.   Yes.

19  Q    And to the best of your ability, did you set forth all

20       of the activities by anybody on behalf of the county

21       that you consider to be a violation of your rights?

22  A.   Yes, all that I considered at the time.

23  Q    Are there any that have come to your attention since

24       that you would like to make me aware of now?

25  A.   There has recently been an incident, and I would say it

Barbara Varner                          118

1        would be discrimination.

2   Q    What was that activity?

3   A.   Just against myself, is that what you're asking?

4   Q   Yes, in any way.

5   A.   That I was offended by?

6   Q   Yes.

7   A.   Okay.  Recently we had a female intern who was doing her

8       internship, and it was found at the very beginning of it

9       that she had had -- was in the ARD program.  She was

10      left go, she was fired.  Prior to that last, it would

11      have been the winter of 2002, we had a male intern who

12      in the middle of his internship they found out he had

13      had an ARD, a DUI, I believe, himself, and he was

14      allowed to complete his internship.  And I didn't

15      understand why one was left go and the other one wasn't.

16   Q   Are you familiar with all the facts associated with the

17      activities of those two interns?

18   A.   No.  All I know is that I heard that's what, that

19      happened to her.

20   Q   So you heard that as a rumor in the workplace; is that

21      fair?

22   A.   Yes, um-hum.

23   Q   You were not involved in the supervisory chain?

24   A.   No.

25   Q   And weren't consulted with respect to the reasons?

```
 1   A.   No, I was not.

 2   Q    Is it fair to say that you have not been apprised of
any
 3        of the other details by anybody in management as to why

 4        there may have been different treatment of those two

 5        interns?

 6   A.   The only thing I heard, again, was through secondhand

 7        information, and that was from Darby Christlieb, where

 8        Mr. Boyer, who was one of our supervisors, made the

 9        statement if he would have been on vacation and Joe

10        would have been making decisions, the girl would have

11        stayed.  Mr. Osenkarski would have, you know, been in

12        charge, that the girl would have stayed.  That Mr.
Boyer
13        had the final say in that.

14   Q    And it was Boyer who made the decision with respect to

15        the female intern?  Is that what you've heard?

16   A.   That was my perception.

17   Q    And who made the decision with respect to the male

18        intern?

19   A.   I don't know.  I don't know that information.

20        Mr. Osenkarski was our chief.

21   Q    Do you know whether the court anybody on the court,

22        President Judge Hoffer, may have been involved in the

23        decision?

24   A.   I don't know.

25   Q    Okay.
```

1    A.    I don't know that.

2    Q    So is it fair to say that you're not familiar with the

3          decision-making process or who was actually involved in

4          the two episodes?

5    A.    No, I'm not.

6    Q    Okay.  Other than that, does the Complaint at least by

7          your attempt set forth all the allegations that you

8          contend violated your rights as an employee for the

9          Probation Department?

10   A.    Yes.

11   Q    What I would like to do is take you through some of

12         those and ask you certain questions about them.  Let's

13         start at paragraph 16, if we could.  In paragraph 16

you

14         allege that Mr. Graham sexually harassed you from

15         November 20, 1996, until March of '98, correct?

16   A.    That's correct.

17   Q    What's the reason behind the dates that you've alleged

18         there?  For instance, what's the significance of

19         November 20, 1996?

20   A.    That's the day that Mr. Graham when I gave him a social

21         history of a female having suicidal tendencies related

22         to her premenstrual problems as documented by a

23         physician and it took it into his office to give him

the

24          case, he made the statement do I have to get a peter

25          meter in my office.  And using the words Jesus Chris

Barbara Varner                              121

1           prior to that.

2      Q    Did you make a contemporaneous note of that comment by

3           him at the time?

4      A.   Yes.

5      Q    And where did you keep that note?

6      A.   I had a running little notepad that -- I'm a scribbler

7           so I would just make a note.

8      Q    Is that why you're able to identify that date

9           specifically as November 20, 1996?

10     A.   Yes.

11     Q    Where are those notes now?

12     A.   They were provided.  They were a packet of notes I

13          believe that was in my little scratch notes.

14     Q    You're indicating it was provided as part of discovery

15          in this matter?

16     A.   Yes, I believe it was.

17     Q    Do you still have possession of the originals, you or

18          your lawyer?

19     A.   They would be -- I have the originals.

20     Q    Had you ever heard a comment like that by Mr. Graham

21          prior to November 20, 1996?

```
22   A.   Specifically like that?  No.
23   Q.   Had you ever heard at any time in your life reference
to
24        a peter meter?
25   A.   No.
```

Barbara Varner                              122

```
 1   Q.   What is a peter meter?
 2   A.   I'm just -- my idea of it would be something to measure
 3        a males penis, or regulate, whatever.
 4   Q.   What was the context of that conversation?
 5   A.   I had taken a case in to have approval of it, a file on
 6        this young girl.  And I was trying to explain to him,
 7        you know, the diagnosis and what, about the girl, and
 8        that was the reaction I got from him.
 9   Q.   Did he have to approve every case that you handled?
10   A.   Yes.
11   Q.   You had been with the Department at that point for a
12        year and what, nine months?
13   A.   Something like that, yes.
14   Q.   And during the preceding 21 months he had made no
15        similar comment to you?
16   A.   Not like that, no.
17   Q.   After November 20, 1996, did you ever hear him use the
18        term peter meter again?
19   A.   No.
```

```
20   Q   What was your response to him when he mentioned the

21       peter meter?

22   A.  I was very embarrassed.  It was in front of his office

23       mate, Hank Thielemann.  I was very embarrassed, really

24       shocked.

25           We deal with a lot of young females and this was a
```

Barbara Varner                                              123

```
 1       diagnosed problem this girl had.  It interfered with
her
 2       life, probably helped -- it was a facilitating issue
for
 3       her to commit the crime, because it was, I believe it

 4       was an assault, and that she would have these problems

 5       monthly and it was legitimate concern, and I was

 6       offended that he minimized her condition.

 7   Q   What was the basis for your concern that he minimized

 8       the problem?

 9   A.  That, you know, a woman can have this problem and it
can
10       cause her problems, and it's a psychological problem
and
11       it's been medically diagnosed and it was not just her

12       telling me this, she had medical proof of it.

13   Q   The context of the conversation with him about the
peter
14       meter was in reference to the juvenile that you were in
```

15          charge of?

16    A.    Yes.

17    Q.    It was no reference with respect to you personally?

18    A.    No, but I was offended by it.

19    Q.    I understand.  And what I'm trying to understand is the

20          basis for your offense.  Your offense, I gather, was

21          that he made light of her medical problem?

22    A.    Yes.

23    Q.    Is that right?

24    A.    And minimized.  Yes, absolutely minimized it.

25    Q.    And that was November 20 of 1996.  Was that the first


                    Barbara Varner                    124


1           time that you were offended by his behavior in any

2           sexual context?

3     A.    No.

4     Q.    What was the first time?

5     A.    He had given me a birthday card.

6     Q.    And when was that?  January '96?

7     A.    Yes, around that time.

8     Q.    And what about the birthday card offended you?

9     A.    It was inappropriate.

10    Q.    Why?

11    A.    Because it indicated that there had been a past or some

12          kind of relationship with us.

13    Q    Are you talking about some inscription on the card?

14    A.    Yes.  Yes.

15    Q    What do you remember the inscription said?

16    A.    Something remembering good times or something, or

17          looking forward to more, whatever.  It was just

18          inappropriate.  From --

19    Q    Was it the inscription on the card that was handwritten?

20    A.    No.  It was printed.

21    Q    It was printed, so it was part of the formal card?

22    A.    Right.

23    Q    And what did it say, happy birthday?

24    A.    Yes.  As I'm thinking back over the good times we had

25          before, and he signed it.  It was just inappropriate for


Barbara Varner                                      125


1          a supervisor male to be giving to -- I was a married

2          woman.  It was inappropriate.

3    Q    What did you do when you received the card?

4    A.    He had put it in the side of my briefcase and I didn't

5          really find it till a day or so later when I was taking

6          things out of my briefcase, and I found it.

7    Q    And after you opened it and read it, what did you do?

8    A.    I put it away.  I put it in -- I have stuff where I just

9          throw papers, old time sheets.  I just threw it in

10          there.

11    Q     And that was January 1996, correct?

12    A.    Yes, um-hum.

13    Q     Did you say anything to him about the card?

14    A.    No.  I was uncomfortable and I didn't know how to

15          approach it.  Again, I knew Mr. Graham, his anger, I

16          didn't want to even start anything.  I thought, well,

17          just best to let it go at that point.

18    Q     Up to this point, January of 1996, had he had occasion

19          to be critical of you?  Had there been any screaming

20          episodes up to this point?

21    A.    Not directed at me, no.

22    Q     How would you describe your relationship with him at

23          work in January of 1996?

24    A.    Comfortable co-workers.  He was my supervisor.  Not

25          supervisor but assigned to train me.


                    Barbara Varner                    126


1     Q     He was not a formal supervisor for you at that time,
was

2           he?

3     A.    He was appointed by Mr. Osenkarski as my supervising

4           trainer.

5     Q     Trainer?

6     A.    Yeah.

    7    Q    Did he have the right to hire or fire you?

    8    A.    He had the right to make suggestions, but no.

    9    Q    Did he have the right to change your job duties?

    10    A.    Yes, I think he could have.  Yes.

    11    Q    Did he have anything to say about how much you got
paid?

    12    A.    No.

    13    Q    So you received this card in January of '96, you
thought

    14         it was inappropriate.  You made no complaint to him,

    15         correct?

    16    A.    I didn't mention it.

    17    Q    Did you mention it to anybody else?

    18    A.    No.  As a matter of fact, like I said, I put it away
and

    19         just forgot about it.

    20    Q    You were aware in January of 1996 that the county had a

    21         sexual harassment policy, weren't you?

    22    A.    I don't -- I'm sure I was aware that they had it.  I

    23         can't say that I actually sat down and read it, but I

    24         was aware there was one in place.

    25    Q    You were aware that there was a policy --


                        Barbara Varner                    127


    1    A.    Yes.

    2    Q     -- in the county that prohibited sexual harassment or

    3         discrimination, correct?

4    A.    That's correct.

5    Q    And you were aware that in the personnel manual there

6          was a complaint procedure that had been published?

7    A.    Yes.

8    Q    You did not utilize that complaint procedure when you

9          received the birthday card in January of '96, correct?

10   A.    That's correct.

11   Q    And in fact, mentioned the birthday card, which you

12         found offensive, to no one?

13   A.    That's correct.

14   Q    Were there any other events between January of '96 and

15         November 20, '96, that you believe violated your
rights?

16   A.    What was the dates again?

17   Q    The birthday, I'm expanding now from the birthday card

18         in January of '96 to the date published in your

19         paragraph 16, November 20 of '96.

20   A.    November 20?  I'm sorry, would you repeat the dates

21         again?

22   Q    I'm looking at your paragraph 16 --

23   A.    Okay.

24   Q    -- where you allege that you were sexually harassed by

25         Graham from November 20, '96, to March of '98.

```
 1   A.   Okay.

 2   Q    I asked you whether there was anything before November

 3        of '96, and you've identified this birthday card in

 4        January.  My question now for you is:  Was there

 5        anything between the time of the birthday card and this

 6        date that you've alleged in your Complaint, November
```
20,
```
 7        of '96 that you believe violated your rights?

 8   A.   That is -- okay.  You mean from January through -- yes,

 9        from January to November?

10   Q    Correct?

11   A.   Is what you're asking.

12   Q    I am.

13   A.   Mr. Graham would tell me stories about the sexual

14        problems he was having with his wife.

15   Q    When did those occur?

16   A.   That was quite a few of the trips that we took, he
```
would
```
17        talk about it, allude to it.

18   Q    Can you tell me when those, what the dates of those

19        trips were?

20   A.   '96 through '97.

21   Q    Were they before November 20?  Were any of them before

22        November 20 of 1996?

23   A.   It's possible, because he was always talking about

24        problems he was having with his wife.  A lot of times
```
it
```
25        would be in the open office, he would talk about
```

Barbara Varner                                129

1         problems with her, he would come in complaining about

2         her.

3    Q    Let's stick to the trips for a moment.

4    A.   Okay.

5    Q    How often in 1995 and 1996 were you taking trips with

6         Mr. Graham?

7    A.   Oh, I would say just an approximate would be maybe once

8         a month, sometimes more.

9    Q    So during that slightly less-than-two-year period you

10        would estimate that perhaps there were 24 trips?

11   A.   Probably a little less than that, but around that, yes.

12   Q    On how many of these trips did he talk to you about his

13        sexual problems with his wife?

14   A.   I'd say he would start talking about -- first he

started

15        to allude to problems, that he wasn't getting anything

16        from her, that he was angry at her.  He would talk

about

17        smashing her figurine collection in anger as a

18        punishment for her.  And he would make statements that

19        he'll do anything he can to get even with her.

20   Q    Can you give me an estimate of how many times out of

21        this 24 trips that he may have talked to you about

22        sexual problems with his wife?

23   A.   Sometimes he would just gripe about it.  And then --

24   Q    Was it every trip?

25    A.    No.  I would not say it's every trip, no.  No.


Barbara Varner                      130


1    Q    Half the trips?

2    A.    Maybe a third of the trips.  Most of the time at the

3          very beginning he wouldn't get too explicit, it was

more

4          displays of his anger, how he was punishing her.

5    Q    Where did these trips -- I guess I need to know the

6          basis on which these trips occurred.

7    A.    It was juvenile placement.  We had a juvenile in the

car

8          with us and we would be transporting them to placement

9          or generally some -- to or from placement to court,

10          whatever.

11    Q    What were the range of the trips?

12    A.    Distance?

13    Q    Yes.

14    A.    There was -- the furthest one was above Pittsburgh,

15          Grove City, George Junior Republic.  And then some

16          toward Philly.  Really, some were in New Jersey.

17    Q    And George Junior is probably a four-hour drive?

18    A.    Oh, I would say at least, yes.

19    Q    So the two of you were in the car together for eight

20          hours?

21    A.    Yes, at least.

22    Q    And the one around Philly would be --

23    A.    There was one to New Jersey as well.

24    Q    Which is a couple hours down?

25    A.    We went north first, north to Clarks Summit, and picked

Barbara Varner                          131

1         up a juvenile and took her to New Jersey for an

2         evaluation for her to enter a college.  And then

3         returned her to the same place.

4    Q    How long a trip was that, round trip?

5    A.    Oh, I'm just guessing, 13, 14 hours.

6    Q    How did it happen that you and he traveled together on

7         those two trips that we're talking about specifically

8         now, George Junior and the one to Philadelphia?

9    A.    George Junior I didn't have -- never had a juvenile

10        under my supervision at George Junior.  Mr. Graham

would

11        instruct me that I needed to go on the trips with him.

12        We would be taking kids that I had no contact with, no

13        need for me to have contact.  They were males.  George

14        Junior was only a male placement.  Ideally it should

15        have been two males because if the juvenile had to go

to

16        the restroom or whatever.  But I was instructed I had

to

17        go on the trips with him.

18    Q    And who instructed you?

19    A.    Mr. Graham.

20    Q    Was that true with respect to all 24 of the trips?

21    A.    No.  There were several that were my children, my
girls,

22         that I had to do supervision.

23    Q    How many of them were yours?

24    A.    I can only think of four females.

25    Q    Where were those trips to?

Barbara Varner                                    132

1    A.    One was up to Clarks Summit.  One was in the

2         Philadelphia area.  One was out to around Pittsburgh

3         area.  And the other one, like I said, was the one

4         from -- even the one from to New Jersey wasn't my

5         juvenile, she wasn't under my supervision.

6    Q    All those trips that you've described, all three or
four

7         of those are all trips that would be at least four
hours

8         round trip, would they not?

9    A.    Yes.  Yes.

10    Q    Are there any other trips that you can think of?  We've

11         talked about the one to George Junior, we've talked

12         about the round robin to Clarks Summit and then to New

13         Jersey and back, we talked about another one to Clarks

14         Summit, Philadelphia.

15    A.    There was one to Maryland.  We met halfway, to a --
with

16          a detention center personnel and dropped a girl off.

17    Q    How long a trip was that?

18    A.    To the Maryland line.  Maybe two hours, four hours
round

19          trip.

20    Q    Okay.  Others that you recall?

21    A.    I can't recall any more at this time.

22    Q    Okay.

23    A.    But the majority of the cases, the trips were not my

24          kids.

25    Q    And you've described four that were your kids, correct?


                          Barbara Varner                    133


1    A.    Yes.

2    Q    What did you do in the car during these trips?  I
gather

3          one of you was driving while the other was riding as

4          passenger?

5    A.    Mr. Graham always drove.

6    Q    What did you do?

7    A.    The juvenile was in the back, so usually conversation

8          with them.

9    Q    What were the subject matters with the juveniles?

10    A.    School, what they plan to do, explaining to them about

11          the placement.

12    Q    Any of it that you considered to be rehabilitation type

13         discussions?

14    A.   Certainly.  Sure.  About their families.

15    Q    And after you dropped the juvenile wherever they were

16         going, what did you do on the way back?

17    A.   We stopped to get something to eat and then drove back.

18    Q    What was the nature of the conversation?

19    A.   Usually hearing what Mr. Graham was doing.  He liked to

20         tell you everything that he was doing.  He was a lot of

21         the -- he was considered basically the gossip of the

22         office, so you heard, of course, about everything

23         everybody else was doing.

24    Q    Did you participate in the conversations?

25    A.   With Gary you just listened.  With Mr. Graham you just


Barbara Varner                                    134


1         listened.

2    Q    And some of the conversations centered around things

3         that were happening in the office?

4    A.   Yes.

5    Q    Some of it centered around educational matters or

6         training?

7    A.   No.

8    Q    Not at all?

9    A.   Probably not, no.

```
10   Q    And some of the conversation had to deal with his

11        complaints with his wife, I gather.  Yes?

12   A.   Complaints about anybody else in the office.  Just

13        complaints.

14   Q    When he started to complain to you about problems with

15        his wife, what was your participation, if any?

16   A.   When it was not explicit you just sort of listened and

17        just say, you know, maybe you ought to go to
counseling.

18        When he got really explicit, and I mean, in detail, I

19        said you know, you two need to go to counseling.  You

20        could see it was getting worse, you need to go to

21        counseling.

22   Q    And you've described two subcategories there, one where

23        he wasn't very explicit, and one where he was.

24   A.   Yes.

25   Q    What was the subject matter that was not very explicit?
```

Barbara Varner                          135

```
1    A.   Just complaining that she won't do what he wants her to

2         do.  She -- he would complain because she was reading,

3         oh, the books, I'm trying to think, the love story

4         books, the magazine, little, the little paperback
books.

5         He hated her -- Harlequin, Harlequin romances.  He
hated
```

6          her reading those.  It appeared that he was jealous
that

7          she would read those.

8              He would complain because he would see his wife

9          talking to the court administrator.  If he saw her

10          talking to an attorney, he would go on and on and on
and

11          on about I guess just a jealousy.  But he was just
angry

12          at her, angry at his wife.

13    Q    These conversations weren't directed at you?

14    A.   No, those weren't.

15    Q    And your response to that was to suggest to him that

16          they needed to seek counseling?

17    A.   When he was talking that way, you just sort of listened

18          to him.  He was just sort of blowing off.

19              When he started talking explicitly about sexual,

20          her sexual behavior and how she was denying him sex, I

21          just said, Gary, you know, you need counseling, you and

22          your wife need to go to counseling.

23    Q    What was the explicit behavior that he talked to you

24          about?

25    A.   He would tell me that he would wake up in the middle of



                    Barbara Varner                        136


1          the night and the bed would be shaking, and he would

2          pull her hand out of her underwear and her hands,

3        fingers would be wet.  He said he would keep a calendar

4        of how often they had sex and he would show that to her.

5   Q    How often did that conversation occur?

6   A.   That explicit, that was really one time he was that

7       extremely explicit.

8   Q    When was that?

9   A.   It was in -- I'm not sure of the date.  One of the

10      trips, '96, '97.  More I believe '97 area.

11  Q    What was your response to him while he was going through

12      this explanation?

13  A.   I said, Gary, Mr. Graham, well, you need to get

14      counseling.  I really don't want to hear this, you need

15      to get counseling.  And his response was that he was

16      furious.  He said, I don't need counseling, there's

17      nothing wrong with me.  And we accelerated to around 95

18      miles per hour on a construction zone on 81.

19  Q    Did you call him Gary in those days or did you call him

20      Mr. Graham?

21  A.   I called him Gary.

22  Q    Was there ever any period of time where you called him

23      Mr. Graham?

24  A.   I don't believe so.

25  Q    Why was he confiding in you with respect to his concerns

```
1          or difficulties with his wife?

2    A.    I have no idea.  I think I was a captive audience in
the
3          car.

4    Q     Did these conversations offend you?

5    A.    Absolutely.

6    Q     Why?

7    A.    I don't need to hear details of his sexual behavior or

8          his problems with his wife.  I offered names of

9          counselors, family counselors, whatever.  He just
didn't
10         want to hear it.

11   Q     Did you ever ask him not to describe his problems with

12         his wife to you?

13   A.    Yes, I did.

14   Q     When?

15   A.    It was the same day.

16   Q     On the day where?

17   A.    He was very explicit.  I said, I don't need the hear

18         this, I don't want to hear this, it's a problem between

19         you and your wife, you need counseling.

20   Q     Other than that one episode, were there any other

21         occasions where you said to him stop it, I don't want
to
22         hear it?

23   A.    Whenever he would use the F word at me.

24   Q     I want to restrict that question really just to the

25         discussions that he had with you in the car about his
```

Barbara Varner                          138

1        wife.  Was there ever more than one occasion when you

2        told him stop, I don't want to hear it?

3    A.  I would recommend counseling.  Anytime he talked about

4        problems with his wife, I would suggest counsel for
him.

5    Q.  And on one occasion, the occasion where he was explicit

6        about her night problems, you said to him, stop, I
don't

7        want to hear it?

8    A.  Right.

9    Q.  Right?

10   A.  Right.

11   Q.  Did you report that episode to anybody else at work?

12   A.  I told somebody else but I did not report it.

13   Q.  Who did you tell?

14   A.  I discussed it with Debra Green.

15   Q.  Is Deb Green your best friend at work?

16   A.  She's my co-worker, yes.

17   Q.  You did not report to anybody in a position of

18       authority?

19   A.  Again, knowing to start talking about this, the

20       punishment element, I knew that if I started to say

21       anything it might cause really big problems for me.

22   Q.  But whatever the reason, you did not report it?

23   A.   No, I didn't.  Not at the time.  I did later, yes.

24   Q    Sure, and we'll get to that.

25        Did you at any point raise a concern with


Barbara Varner                              139


1         management about going on these placement trips with

2         Mr. Graham?

3    A.   I talked to Mr. Graham about it.  I said, I really

4         didn't want to go on these trips.  You know, I had

other

5         work to do.  This is a whole day out of the office and

I

6         was at that time, well, one Family Preservation, which

7         required intensive supervision, and he said if I didn't

8         like it I could go back to doing my former work as

9         social work.

10   Q    But I guess the answer to that is the only person you

11        told was Mr. Graham?

12   A.   (Witness nodded head affirmatively.)

13   Q    You didn't tell Mr. Osenkarski?

14   A.   No, I did not.

15   Q    You didn't tell Mr. Bolze while he was still there?

16   A.   Mr. Bolze was not there at that time.

17   Q    He was gone?

18   A.   He was gone.

19   Q    You didn't tell anybody in HR, Human Relations?

```
20    A.    At the time, no.

21    Q    And didn't tell Judge Hoffer or Judge Sheely?

22    A.    There really was minimal contact with them.

23    Q    Did you have some contact with the president judge

24          during your employment with the county?

25    A.    With Judge Sheely?
```

                          Barbara Varner                    140

```
1     Q    Um-hum.

2     A.    Yes, of course.

3     Q    What was the nature of that contact?

4     A.    Could be taking cases up.  He heard my cases.

5     Q    He knew who you were?

6     A.    Absolutely.  He hired me.

7     Q    In paragraph 16 in the subparts you start to detail
some

8          of the allegations which you've talked about in
general,

9          and I'd like to go over a few of those, if we could.

10    A.    Okay.

11    Q    We might as well start with A.  We've already talked

12          about A, and that was the girl who had the premenstrual

13          problems, correct?

14    A.    Correct.

15    Q    And the peter meter.  Is there anything else you want
to

16          add with respect to that allegation?
```

17   A.   No.

18   Q    B is the inappropriate birthday card.  We've talked

19        about that, right?

20   A.   Yes.

21   Q    B also includes inappropriate touching.

22   A.   Yes.

23   Q    What do you mean by that allegation in paragraph B?

24   A.   During a Mace, a Mace training at the prison, it was in

25        '95, Mr. Graham patted my behind in front of Debra

Barbara Varner           141

1        Green.

2   Q    When in 1995?

3   A.   I'm not sure of the date.

4   Q    Spring, summer?

5   A.   Probably -- I'm just guessing, speculating spring.

6   Q    What were the circumstances where he patted you?

7   A.   We were walking down the hall to a training area.  It's

8        a large gymnasium at the prison.

9   Q    You were walking with him or beside him?

10   A.   No.  I was with Debra Green.  I think I was walking past

11        him.

12   Q    Were you all going the same direction?

13   A.   Yes.

14    Q    Was there any conversation between the two of you before

15         he patted you?

16    A.   No.

17    Q    Describe to me what happened.

18    A.   As I was walking past, it's not very clear to me what

19         happened, but Debra Green witnessed it, and he patted my

20         behind.  And I just took off into the training room.

21    Q    Were there any words exchanged between you and he when

22         that happened?

23    A.   No.  I just went into the class and we started the

24         training session.

25    Q    Were you running when you went into the training room?

                              Barbara Varner                    142

1    A.   Moving quickly.

2    Q    Were you laughing?

3    A.   I was embarrassed.

4    Q    Were you laughing?

5    A.   Embarrassed laugh.

6    Q    Was anything else said after that?

7    A.   No.

8    Q    So you went through the training session?

9    A.   Right.

10    Q    Were there any other occasions where he touched you

11          inappropriately other than this one pat in the spring
of

12          '95?

13    A.    No.

14    Q     So the inappropriate touching was limited to one event,

15          correct?

16    A.    Yes.

17    Q     B also includes appearing uninvited at your home.

18    A.    Yes.

19    Q     Which home are we talking about?

20    A.    On Maple Drive in Etters.

21    Q     When was that?

22    A.    May of '96.

23    Q     What time of day?

24    A.    It was early evening, just dusk.

25    Q     Tell me what occurred.


                        Barbara Varner                      143


1     A.    I was at my home.  Like I said, we have a bi-level

2           house.  I had the doors, the back door open, and I was

3           up in the living room area.  And I got a call on my

4           phone and it was from Mr. Graham.  He said he's come

5           down to see me.  And I said, you know, well, my

6           husband's not home, I really didn't -- he said, I know

7           he's not home, and then he hung up.  And the next thing

8           within maybe --

9    Q    He didn't say good-bye?

10   A.   No.  No.

11   Q    Okay.

12   A.   I hung up.  The next thing I know, he was -- our house

13        is on a dead-end road that runs beside our home.  And

14        the next thing I know he was outside at our back yard

15        yelling my name.  And I didn't go, I didn't go out.  I

16        knew who it was.  I had pretended like I wasn't home.

17   Q    Did anybody see him there?

18   A.   No, not that I know of.

19   Q    Have your neighbors ever told you that they saw him

20        there?

21   A.   No.  We live -- the back of our house are over

22        apartments, like an apartment complex beside the back

of

23        our house.

24   Q    Did he ever gain access to your home that evening?

25   A.   No, he did not.

Barbara Varner                               144

1    Q    Did he eventually leave?

2    A.   Yes.

3    Q    And he left without being inside the house?

4    A.   Yes.

5    Q    Do you know why he was there?

6    A.    I can't speak for him, but I assume he came down to see

7          me when he knew my husband was not home.

8    Q    And this was May of 1996?

9    A.    Yes.

10   Q    Was that the only occasion on which he appeared

11         uninvited at your home?

12   A.    Yes, it is.

13   Q    Did you report that episode to anybody at Probation?

14   A.    No, I didn't.

15   Q    Did you ever ask him why he showed up on that evening in

16         May of 96?

17   A.    Again, it was I would rather not even approach it.  I

18         didn't want to get into anything, because if I would say

19         anything to make a big deal out of it I'm afraid there

20         would be punishment.

21   Q    So you never raised it with him, correct?

22   A.    No.

23   Q    Never raised it with any superior?

24   A.    No.

25   Q    And never filed any written complaint in accord with the


Barbara Varner                              145


1          complaint procedures in the employee manual, correct?

2    A.    No, I did not.

```
         3   Q    You'll have to say no.

         4   A.   No.  I'm sorry.

         5   Q    Paragraph C deals with the hotel room at Penn State,
and
         6        we've already talked about that, haven't we?

         7   A.   Yes.

         8   Q    Is there anything in our earlier discussions that you

         9        know that you didn't reveal to me about that episode?

        10   A.   Not that I can think of at this time.

        11   Q    Did you ever report that episode to management?

        12   A.   Not at the time.  I assumed I could handle it.

        13   Q    In paragraph D you say that when Graham -- or when you

        14        showed a lack of interest in his sexual overtures, that

        15        his attitude toward you changed.

        16           Tell me what it is about his overtures that led
you
        17        to believe that there was a sexual interest in you.

        18   A.   I think coming to my home, obviously, knowing when my

        19        husband wasn't home.  Trying to get entrance to my
hotel
        20        room at Penn State.  I think it was pretty well known

        21        that Mr. Graham had -- was -- I guess had an interest
in
        22        me.  It was pretty apparent to most people.

        23   Q    Did you do anything to encourage that interest?

        24   A.   No, I did not.

        25   Q    When did his attitude toward you change?
```

Barbara Varner                          146

Bolze

1    A.    Most of it changed whenever he had -- whenever Mr.

2          retired and you could see that Mr. Graham was becoming

3          much more authoritative, and angry.

4    Q.    Had he expressed an interest, sexual interest in you as

5          you described it, right from the outset of your

6          employment with Probation?

7    A.    It was something -- it was, like, it was apparent -- in

8          hindsight it was apparent to everybody that he had an

9          interest in me.

10   Q.    And did that predate your employment with Probation?

11   A.    Yes, it did.

12   Q.    Went all the way back to your employment with Children

13         and Youth?

14   A.    It was a joke that Mr. Graham liked me, which I thought

15         was ridiculous.  He's a grown man, married, as I was.

16   Q.    Why was it a joke?

17   A.    Because we were both married and it was such a childish

18         behavior.

19   Q.    And who was it a joke among?

20   A.    Caseworkers.

21   Q.    Your fellow employees?

22   A.    Yes.

23   Q.    Did they say something to you?

24   A.    They would say, you know, Graham is interested in you,

25         and they would laugh.  They were young girls, early

Barbara Varner                                      147

 1          twenties.

 2     Q    Who said that?

 3     A    A girl named Kelly Miller.  Well, it was Kelly Zeager
at

 4          the time.  She was dating one of the Probation
officers.

 5     Q    She was working in the Department and dating one of the

 6          probation officers?

 7     A    She was in my department.  She was a caseworker and she

 8          was dating one of the probation officers.

 9     Q    So she was in Children and Youth at that time?

10     A    Yes, she was.  Yes, she is.  And I had asked her not to

11          repeat that at all, because Mr. Graham's cousin worked

12          in Children and Youth, didn't want rumors starting.

13     Q    Did rumors get started?

14     A    No.

15     Q    You're not aware of any rumors that the two of you were

16          having an affair?

17     A    No.  It was only his interest in me.

18     Q    Well, irrespective of whose interest it was, were you

19          aware that there were rumors in the courthouse that you

20          and he were having an affair?

21     A    I never heard of any rumors.

22     Q    Looking back on it, in view of the relationship that
you

```
23        two had, can you understand why people might have

24        reached the conclusion that you were having an affair?

25    A.   No, I don't.
```

Barbara Varner                                           148

```
 1    Q    Because in your mind, the relationship was always an

 2         arm's length professional relationship?

 3    A.   I traveled with Mr. Graham.  It was necessary for my

 4         job.

 5    Q    The allegations contained in E are the description of

 6         the sexual problems he was having with his wife, as

 7         you've already testified, correct?

 8    A.   Yes.

 9    Q    Do you want to add anything to that?

10    A.   Not at this time.

11    Q    Are there any facts that you have in regard to this

that

12         you haven't previously disclosed to me or that I

haven't

13         asked you?

14    A.   Not -- not to be noted at this time.

15    Q    F refers to a smashing of a wife's figurines.  Do you

16         recall that?

17    A.   Yes.

18    Q    When did that occur?

19    A.   Again, it was on trip and it was prior to his detailing
```

20      his, the problems with his wife.  He had bragged that he

21      smashed her figurine collection against the fireplace to

22      punish her.

23          The birthday cake incident to me was just horrible.

24      His -- he had young girls, and I understand his

25      mother-in-law had made this special birthday cake for

Barbara Varner                          149

1       his wife.  Mr. Graham was angry at his wife, I don't

2       know exactly what it was for, but he told me he said he

3       punished her and he destroyed the cake in front of the

4       little girls.

5   Q   Well, on the trip where he discussed the figurines, do

6       you remember where you were coming from or going to?

7   A.  No, I don't.

8   Q   Do you remember anything about the date of that

9       particular trip?

10  A.  It was just prior to the trip where he explained in

11      detail about the sexual behavior.

12  Q   Well, you told me earlier that you kept a notepad with

13      respect to these episodes.  Was there a specific note

14      with respect to the discussions involving figurines?

15  A.  No.  No, I don't believe there was a note about that.

16      It was just something I recalled that he had -- well,

17          that sort of stays in your mind when you hear about

18          somebody smashing things like that.  As far as dates,

19          I'm not sure.  I know it was on trip.

20     Q    What was the context of the conversation where he

21          brought that up?

22     A.   Again, anger at her.  He was punishing her.  He was

23          angry because -- I don't even know why he was angry.

He

24          was always angry at his wife.

25     Q    Because of his personal problems with her?


                    Barbara Varner                    150


1      A.   Yes, personal problems with her.

2      Q    So the sort of the context of the conversation was that

3           he was upset with her, that they had some disagreement

4           over something, and --

5      A.   Right.

6      Q    -- he smashed the figurine as part of this?

7      A.   As part of his punishment.

8      Q    Punishment, okay.  And the birthday cake episode, did

9           that occur on the same trip?

10     A.   No, I don't believe.  I believe he talked about that on

11          a different time.  I'm not sure.  I remember they were

12          on trips when I would hear about these things.

13     Q    Did you ever complain about your relationship with

14          Mr. Varner as part of these trips?

15     A.   No, absolutely not.

16     Q    Did you ever return conversations about any problems in

17          your life when he was describing the problems in his?

18     A.   My husband Lee and I really have not had any problems
to

19          complain about.

20     Q    Have you had any problems of any type in your life?

21     A.   Of course.

22     Q    Did you share with Mr. Graham any of those
conversations

23          while traveling with him?

24     A.   Problems?  Maybe stories about maybe some teen-age

25          problems when my kids were growing up, just as an aid
to

                    Barbara Varner                    151

1           him.  More parenting, parenting techniques that I would

2           use with my children.

3      Q    What other subjects did you share with him during the

4           travels?

5      A.   Subjects.

6      Q    What did you talk about?

7      A.   I know.  Like I said, most of the time you would listen

8           to Mr. Graham.  He would be on the phone a lot.  It was

9           just generally listening to his stories.

10   Q   And the only thing you can remember sharing with him
was

11        some conversation about parenting techniques involving

12        your children?

13   A.   Yes, about my children in general.

14   Q   Did you report the difficulties or the conversation

15        involving the figurine or the birthday cake to anybody

16        in management at the time those discussions occurred?

17   A.   That, I mean, it wasn't offensive to me.  I felt bad
for

18        his wife and his children, but it did not offend me.

19   Q   Neither of those conversations?

20   A.   No.  All, mostly what that did to me was remind me of

21        how he can dole out punishment and how he was willing
to

22        do that to people that he loved, that he would use that

23        punishment mode.  It put me on guard, made me aware of

24        what he could do.

25   Q   But the conversations in and of themselves you
recognize

Barbara Varner                                    152

1        weren't directed to you?

2   A.   They were not directed at me, just --

3   Q   And you recognize -- and I'm sorry to interrupt you --

4   A.   That's all right.

5   Q   And they didn't particularly offend you but you felt

6        badly for his wife and for his children?

7    A.  And put me on notice of what Mr. Graham, how angry he

8        can get and what he's possibly, you know, what he's

9        possible to do.

10   Q.  And neither of those conversations had anything to do

11       with his purported sexual interest in you?

12   A.  No.

13   Q.  In G you make reference to an instruction that you

14       apparently received from him not to talk to another

15       female probation officer who had complained of sexual

16       harassment.

17   A.  That's correct.

18   Q.  Who was that?

19   A.  Kerry Houser.

20   Q.  And you knew about her prior complaint of sexual

21       harassment before you took the job in Probation,

22       correct?

23   A.  Yes, I had heard about it.

24   Q.  Do you recall when he gave you that instruction?

25   A.  Not too long after I started in the Department.


                    Barbara Varner                    153


1    Q.  It was sometime after February of '95?

2    A.  Yes.

3    Q.  Had you talked to Kerry Houser before that, before you

```
       4          got the instruction?

       5    A.    Yes.

       6    Q.    Had you talked to her about her sexual harassment
claim?

       7    A.    At that point we had not really discussed it, no.  I

       8          just heard about it when I was with Children and Youth.

       9    Q.    What did you hear about it while you were in Children

      10          and Youth?

      11    A.    Just that she had filed a suit against the Department,

      12          Juvenile Department.

      13    Q.    Did you hear what the outcome was?

      14    A.    No, I didn't.

      15    Q.    Do you know whether there was any financial aspect to

      16          the resolution of it?

      17    A.    I don't know that.

      18    Q.    Did you ever find out?

      19    A.    No, I didn't.

      20    Q.    What did Mr. Graham instruct you with respect to Kelly

      21          Houser?

      22    A.    Kerry Houser.  He told me not to talk to her.

      23    Q.    Did he tell you why?

      24    A.    He said, she's an angry woman, she's divorced, she's an

      25          angry woman, all divorced women are angry.
```

Barbara Varner                                            154

```
       1    Q.    You were a divorced woman at the time, were you not?
```

2   A.   Yes, I was.

3   Q   Did he tell you that you were an angry woman?

4   A.   No.

5   Q   And in fact, he had expressed or at least as far as you

6       were concerned, exhibited a sexual interest in you,

7       correct?

8   A.   Yes.

9   Q   Did you follow his instructions not to talk to her?

10   A.   No.

11   Q   Did you make a notation of when that conversation

12       occurred?

13   A.   I believe I did.

14   Q   What date did it occur on?

15   A.   I don't know the date at this time.

16   Q   Did you have any conversation with him about whether

17       that conversation was appropriate or inappropriate?

18   A.   I don't think we had a discussion on it.  It was just he

19       told me not to talk to her because of a prior suit that

20       they had and that she was angry.

21   Q   Did you respond to him in any fashion when he told you

22       that?

23   A.   I don't remember.  I don't believe.

24   Q   Did you report that statement by him to anybody in

25       management?

```
 1   A.   Mr. Osenkarski was part of that suit.  He would be the

 2        next in line to complain to, and I chose not to.
Again,

 3        punishment issue.

 4   Q    Could you have taken your complaint to Judge Sheely?

 5   A.   In hindsight, he probably wouldn't have done anything.

 6   Q    Could you have taken the complaint to him?

 7   A.   I could have.

 8   Q    There was nothing that prevented you from doing that,

 9        was there?

10   A.   No.  No.

11   Q    In fact, you never complained to Judge Sheely about the

12        treatment you received from Mr. Graham, did you?

13   A.   No, not until after.

14   Q    Not until after you filed the --

15   A.   Right.

16   Q    -- EEOC Complaint?

17   A.   Right.

18   Q    But you did understand that Judge Sheely was the head
of

19        the Probation Department, didn't you?

20   A.   Certainly.

21   Q    In paragraph H you make reference to a conversation
that

22        you had with Mr. Graham involving seniority and the
need

23        to satisfy all parties involved.

24   A.   Yes.

25   Q    Do you recall that conversation?
```

Barbara Varner                          156

```
 1   A.   I certainly do.

 2   Q    When did it occur?

 3   A.   It was -- I can tell you where.  It was after August of

 4        '96, it was in my office.  Mr. Graham was explaining

 5        what he called a balanced approach where it's necessary

 6        for you to satisfy the victim, the community and as
well
 7        as the juvenile to make sure that they're
rehabilitated.

 8        Mr. Graham told me that I have to satisfy the victim,

 9        the community, and he looked at me and he pointed at

10        himself, that those are the things that I have to

11        satisfy.  And the smile on his face letting me know
what
12        he meant.

13   Q    Did he make any oral reference to a sexual component to

14        that satisfaction?

15   A.   His expression saying that I had to satisfy him

16        certainly meant sexual to me.

17   Q    Did you challenge him in that regard?  Did you ask him

18        what he meant specifically?

19   A.   I said, I don't want to hear it, and that was it.  He

20        left my office.  I didn't want to hear it.  And he left

21        my office.
```

```
22   Q    What was it that led you to believe that the innuendo
23        there was toward some sort of sexual favor?
24   A.   It was his smile, the way he smiled at me.  It wasn't
25        like a friendly smile, it was a provocative smile I
```

Barbara Varner                                    157

```
 1        guess you would say.  It was just a flirtatious smile.
 2   Q    Did he ever openly solicit you for sex?
 3   A.   No.
 4   Q    He never asked you to have intercourse with him?
 5   A.   No.
 6   Q    He never said, hey, let's get a hotel room and go have
 7        sex?
 8   A.   No.
 9   Q    He never asked you for any form of sex?
10   A.   No.
11   Q    What he did on this occasion was reviewed the balanced
12        approach, as you described it, and then smiled at you
13        and pointed at himself, correct?
14   A.   That I need, I needed, he said, in our department we
15        have to satisfy the victim, the community, and to make
16        sure the juvenile's rehabilitated.  He said, you have
```
to
```
17        satisfy the victim, the community and (indicating), and
18        smiled at me, a very sexual provocative.
19   Q    And that was the way you interpreted it?
```

20    A.    Yes, it is.

21    Q    Was there anybody else present when he did that?

22    A.    No.

23    Q    So it was just you and him?

24    A.    Yes.

25    Q    In I you make reference to Graham calling attention to


Barbara Varner                                    158


1          your gender and making inappropriate comments about

2          females.  What do you mean by that?

3    A.    It goes to the sentence that he made a comment to me

4          about how dark he believes a young female's, quote,

bush

5          is.

6    Q    Did he ever make any comments about your body?

7    A.    He would just compliment me on just -- anytime I would

8          see him he would say how nice I was dressed, you look

9          nice in your white pants, those kind of comments.

10    Q    Did he ever say anything about your breasts?

11    A.    No.  Well, there was a time where we were measuring for

12          bulletproof vests, and he thought it was so amusing to

13          let us know, the females know that he knew what cup

size

14          we wore, because they're measured in cup size.  He

15          thought that was hilarious that he knew everybody's cup

16          size.  And he told me that I was not as big as one of

```
17          the other girls in the department.

18    Q     When was that?

19    A.    Probably, I'm just speculating, '97.

20    Q     Do you recall when in '97?

21    A.    No.

22    Q     Was anybody else present when that conversation

23          occurred?

24    A.    Other girls heard him talk about that, that he knew the

25          cup size.  He was back there when they were measuring.
```

Barbara Varner                                              159

```
1     Q     Who were the other girls?

2     A.    Nicole Galbraith.  She wasn't married at the time.

3           Debra Green.  Kerry Houser was also a female.  I
believe

4           that was all females at the time.

5     Q     Was there any solicitation associated with that, or was

6           it just a reference to your cup size?

7     A.    Just letting me know that he thought --

8     Q     That he knew your cup size?

9     A.    Yes.  It was humorous for him.

10    Q     Did he ever discuss or mention to you anything about
any

11          other part of your body?

12    A.    No.

13    Q     Were there any other occasions when he mentioned
```

14          anything about your cup size or breasts?

15   A.     No.

16   Q      The comment that's contained in paragraph I with
respect

17          to a young girl's bush, tell me how that occurred.

18   A.     I was in my office, which is right off the main area of

19          the office.  And there was a girl who worked in the

20          District Attorney's Office, a young girl, young new

21          girl, and I think he knew her from the Newville area.

22          And he just came in just so happy with himself, he
said,

23          I wonder how -- I believe how dark her bush is.

24   Q      Did you make any note with respect to that?

25   A.     Yes, I did.


                          Barbara Varner                         160


1    Q      Did you date that note?

2    A.     Yes.

3    Q      What date was that?

4    A.     I don't have those dates with me.

5    Q      Did you protest to him when he made that comment?

6    A.     I was embarrassed and I said, you shouldn't talk about

7           that, you shouldn't talk like that.

8    Q      Was there anybody else present when he made that

9           comment?

10   A.     I don't -- no, I don't believe so.

```
11   Q    At any time, Barbara, during these various episodes

12        you've indicated at one time or another that you

13        protested to him, correct?

14   A.   That's correct.

15   Q    Did you at any point during any of those episode ever

16        say to him, please stop it or I'm going to have to go
up
17        the chain of command and report your behavior?

18   A.   Yes.  And he said, go ahead and I'll have you

19        reprimanded, I'll take you up to the judge and have you

20        reprimanded.

21   Q    When did that occur?

22   A.   It would have been in '97.  Probably --

23   Q    When in '97?

24   A.   I would say probably beginning of '97.

25   Q    And what was the episode?
```

Barbara Varner                              161

```
1    A.   I would tell him I'm tired of hearing him use the F
word
2         at me, I'm tired of him screaming at me.  And that's

3         when he threatened to take me up to the judge and have

4         me reprimanded.

5    Q    All right.  Let's take that in steps.

6    A.   Okay.
```

    7   Q    And what I want to deal with is him screaming at you
and

    8         using the F word with respect to you separately.

    9   A.   Right, okay.

   10   Q    With respect to the other episodes that we've been

   11        talking about now for last hour or so, was there ever a

   12        time when you said to him with respect to one of those,

   13        where you said to him, enough?  Was there ever a time

   14        when you said to him, if you don't stop talking about

   15        those things I'm going to go up the chain of command
and

   16        take you upstairs?

   17   A.   If I would say that and mentioned like, you know,
you've

   18        got to stop talking to me like this, he would say, go

   19        ahead and take it to Joe, Joe won't do anything,

   20        Mr. Osenkarski, he won't do anything.

   21   Q    My question to you is:  Did you ever do that?  Did you

   22        ever say to him, I'm going to take you upstairs?

   23   A.   I said I was going to talk to Joe.

   24   Q    About these things that we've been talking about?

   25   A.   Yes.  I was tired of hearing about it, yes.


Barbara Varner                    162


    1   Q    When did that conversation occur with Joe, or with

    2         Mr. Graham?

    3   A.   I would say probably late '96 I'm guessing.

```
     4   Q     Did you ever report Mr. Graham's behavior to

     5         Mr. Osenkarski?

     6   A.    The one time when he threw me out of his office, and
ing
     7         that was about a file, that he just was calling me F-

     8         this and F-ing that.

     9   Q     We're going to get to that.  Okay?

    10   A.    Okay.

    11   Q     All right?  But other than that?

    12   A.    No, I didn't.

    13   Q     Okay.  So you never actually reported Mr. Graham's

    14         offensive language to Mr. Osenkarski?

    15   A.    No.  I was in fear of reprisal.  I was afraid of

    16         reprisal from him and from Mr. O, Mr. Osenkarski.

    17   Q     Now, you say that Mr. Graham on occasion used the F
word
    18         with respect to you.

    19   A.    Yes.

    20   Q     And actually in paragraph 17, actually it looks like

    21         it's in J and also in 17 D.  Take a look at those.

    22               MS. WALLET:  You're referring to 16 J?

    23               MR. THOMAS:  Yes.

    24               THE WITNESS:  Yes.

    25   BY MR. THOMAS:
```

```
 1   Q    And those are two episodes where he either used the F
 2        word or --
 3   A.   Yes.
 4   Q    -- or you challenged him with respect to its use,
 5        specifically dealing with you, correct?
 6   A.   That's correct.
 7   Q    When did those two conversations occur?
 8   A.   One in J, I heard that several times.  I would say
 9        whenever he would start ranting with the F word in my
10        office, he did that, and that would have been in early
11        '97 that I told him I didn't want to hear that word
12        anymore.  And I know at a time before that he had said,
13        he would say, go back to doing your social work if you
14        can't take it.
15             The one in D, that was said Debra Green is the one
16        that heard him saying that.  It was a -- the office was
17        open for business.  He was going back and forth between
18        two offices just ranting and raving about no F-ing
19        sense, no F-ing training, no F-ing ability.  To my
20        understanding it continued on for approximately 10
21        minutes.
22   Q    Would those comments have offended you had he left the
23        word fuck out?
24   A.   No.  I'm sorry, yes, they would have offended me.
25   Q    If he had said no sense and no training and no ability,
```

Barbara Varner                                  164

```
 1          it still would have offended you?

 2   A.     Absolutely.

 3   Q      Does the expletive add anything to the sense of outrage

 4          that you felt with him screaming at you that you had no

 5          sense, no training, and no ability?

 6   A.     Of course it did.

 7   Q      In what way?

 8   A.     I find the F word offensive.  It just makes it more

 9          derogatory towards me.

10   Q      After the tirade, as you described it outlined in 17 D,

11          what did you do?

12   A.     Like I said, that was said in front of Ms. Green.  I
```
was
```
13          on my way to the office and she called and told me what

14          he had said.  She was afraid for my safety.  She said,

15          he is in a tirade, go anywhere but don't come into the

16          office, he is just on a tirade.

17   Q      Were you not there when he said that?

18   A.     No, I was not.  It was in front of Miss Green and he
```
was
```
19          saying it between I believe it was Mr. Thielemann and I

20          believe Mr. Miller.

21   Q      So you weren't even physically present when the
```
outburst
```
22          occurred that's alleged in 17 D?

23   A.     No, I was not.

24   Q      You were not in the office?

25   A.     No, I was not.  I was on my way to the office and Miss
```

Barbara Varner                                    165

 1        Green called and told me what Mr. Graham had said.

 2    Q   All right.  So it wasn't as if he was confronting you
in

 3        person and saying those things; he was doing it in

 4        response to something that set him off in the office?

 5    A.  He had told me before he felt I had no F-ing ability.

 6        He told me that in the office.

 7    Q   Did you report that to anybody?

 8    A.  Yes.  That was whenever, probably almost at the point

 9        where I went down to Human Resources.  Well, it was

10        called the, yeah, Human Resources.

11    Q   And that was in April of 1997?

12    A.  Yes.

13    Q   And was it that outburst or something like it that

14        caused you to go to Human Resources?

15    A.  I think it was just a combination of everything.  It
was

16        getting worse.  No matter what I did, it was wrong.

17        Anything I did in the past, if I did it now it was

18        wrong.

19            Comments were made to me by other probation

20        officers saying, well -- if I would say, how are you

21        doing this, show me how you do this, and they said
don't

22          come to me because we can do it one way but he won't

23          allow you to do it that way.

24               And one of the co -- another probation officer had

25          copied the harassment discrimination policy from the

Barbara Varner                              166

1           county handbook, almost like as a reminder, like I was

2           so caught up in this that he reminded me, he said, you

3           need to go see somebody.  He was observing what was

4           going on.

5      Q    And who was that?

6      A.   That was Darby Christlieb.

7      Q    Do you remember when that was?

8      A.   It was right before I went down and spoke to

9           Mr. Hartnett.

10     Q    But you knew that that policy existed, correct?

11     A.   Yes, I did.  But I think I was so caught up in wondering

12          what I was doing wrong that I wasn't even thinking

13          beyond that.  I, you know, to complain to

14          Mr. Osenkarski, I knew it wouldn't do me that much good

15          because he was not in the office that much.  He really

16          had relinquished his power to Mr. Graham.

17     Q    And I gather you never pursued that route, you never

18          complained to Mr. Osenkarski?

19     A.   Yes, I did.  One day I did complain to Mr. Osenkarski.

20    Q    When was that?

21    A.    That was --

22    Q    About this same time, about April of '97?

23    A.    It would have been a couple, yeah, a couple months,
yes.

24    Q    Well, a couple of months or a few days?

25    A.    It was not a few days.  It was probably prior to that.


                              Barbara Varner                        167


1          It was -- I can't come up with the date right now.

2    Q    You filed your complaint with Dan Hartnett on April 25,

3          1997.

4    A.    That's correct.

5    Q    When would it have been in reference to that?

6    A.    I would say probably guessing, February, March.

7    Q    And you actually met with Mrs. Osenkarski?

8    A.    Yes, I did.

9    Q    In February or March of 1997?

10    A.    Right.

11    Q    Where did you meet with him?

12    A.    In his office.

13    Q    What did you say to him?

14    A.    Mr. Graham had just got done screaming and throwing me

15          out of his office because he didn't like how I had

16          handled several cases.  And I went into Mr. Osenkarski

17          and I said, you've got to stop, you've got to get this

18          man under control.

19     Q    Why was he unhappy with you in February or March of

'97?

20          Meaning Mr. Graham.

21     A.   I have no idea.

22     Q    Why was he screaming at you?

23     A.   He just was unhappy with the way I handled the cases, I

24          presume, the pattern I had done a hundreds of times

25          before.  No, a hundred times, 50 times before.


                         Barbara Varner                    168


1      Q    So the basis for him screaming at you had to do with

his

2           assessment of your performance?

3      A.   Yes.

4      Q    And he was unhappy with your performance, he told you -

-

5           screamed at you and told you to get out of his office?

6      A.   Threw me out of his office.

7      Q    Did he give you any instructions in terms of how he

8           wanted you to do it differently?

9      A.   No.

10     Q    So just threw you out of the office over a performance

11          issue.  You then went to Mr. Osenkarski in February

12          March, and said, you've got to get this guy under

13          control?

14    A.    Right.

15    Q    What details did you give Mr. Osenkarski in February

16          March of 1997 about Graham's behavior?

17    A.    He had been back in the office to begin with when I had

18          started discussing this case with Mr. Graham.  And I

had

19          looked to Mr. Osenkarski, I said, is this not the way

we

20          always proceed, the same thing we've always done?  And

21          he said, yes, but Mr. Graham's in charge.  He verified

22          that that, indeed, was the way, you know, when we

turned

23          cases in to Mr. Osenkarski that he was fine with it,

but

24          Mr. Graham was in charge.

25    Q    So if I understand correctly, there was an issue about


Barbara Varner                                    169


1          the manner in which you were doing some paperwork, I

2          guess?

3    A.    Right.

4    Q    Graham started to challenge you, Osenkarski was

present.

5          You said to Osenkarski, isn't this the way we always do

6          it?

7    A.    Um-hum.

8    Q    And Osenkarski said, yeah, but Graham's in charge?

```
 9   A.   And he exited and went to his office.

10   Q    Graham then proceeded to scream at you?

11   A.   Right, and threw me out of the office.

12   Q    Over the manner in which you were doing certain

13        paperwork?

14   A.   Right.

15   Q    Threw you out of the office and you went to Osenkarski?

16   A.   Osenkarski's office.

17   Q    And said, you've got to get this guy under control?

18   A.   Absolutely.

19   Q    Was there any solicitation of sex involved?

20   A.   No.

21   Q    What was it about the conversation or comments by

22        Mr. Graham that you found to be demeaning?  If you did.

23   A.   Telling me that I wasn't doing -- like I said, things

24        that I had done before were okay, now all of a sudden

25        they were not okay.  The yelling at me, not even
```

Barbara Varner                            170

```
 1        explaining anything.

 2   Q    Had you done similar or identical paperwork in the same

 3        fashion previously?

 4   A.   Yes.

 5   Q    Without complaint from him?

 6   A.   Yes.
```

7    Q    Did you ever get an explanation from him as to why it

8         was okay before but it wasn't okay now?

9    A.   No, I didn't.

10   Q    Other than Mr. Osenkarski, did you report that episode

11        to anybody else?

12   A.   To Mr. Hartnett.

13   Q    Is that when you went to Mr. Hartnett?

14   A.   It was about that time, yes.

15   Q    Do you remember the date on the first occasion in which

16        you complained to Mr. Hartnett?

17   A.   No, I don't.  It was probably the beginning of --

18   Q    April?

19   A.   April, yes.

20   Q    Of 1997?

21   A.   Um-hum.

22   Q    In 17 B, you mentioned this during your earlier

23        testimony today, you make reference to wadding up
paper.

24        Do you recall exactly when that occurred?

25   A.   Again, it was '97 -- I believe it was '97.


                         Barbara Varner                    171


1    Q    Was that something else that you noted in your personal

2         notes?

3    A.   Yes.

4    Q    And is there a date contained in those notes, to the

```
 5          best of your recollection?

 6   A.     Yes.  Yes, there is.

 7   Q      What was the subject matter of the discussion that

 8          morning?  If it was morning.

 9   A.     It was morning.  I was in my office.  Debra Green was

10          also sitting in my office with me.  Mr. Graham came in.

11          I believe I had the file in my desk.  Again, it was the

12          composite of the victims I had listed extensively for

13          the crime.  He was for some reason not happy with how I

14          had done that.  He came in, wadded the paper up, and

15          this is, I don't know what he called it but he was not

16          happy with it.  He wadded the paper up and threw it at

17          me.

18              He pointed his finger in my face and started

19          saying, you have no -- don't know what you're doing,

20          just on and on, you have no fucking idea what's going
on
21          here.  He was pushing my pictures on my desk towards
me,
22          moving them around and getting right in my face.

23              My office, I only had the one entrance and he was

24          blocking the entrance and he had his hand in my face,

25          his finger in my face shaking at me.
```

Barbara Varner                                      172

```
 1   Q      Was Debra Green there for the entire event?
```

2   A.   Yes, she was.  And he was loud when he did this.  And

3        it's an open office.

4   Q   It was loud?

5   A.   He was very loud and it was an open office.  My door

6        wasn't shut.  He was letting me know.

7   Q   And he was letting you know that is he --

8   A.   He was very angry.

9   Q   And very angry, again, about your performance on some

10      given task?

11   A.   Right.

12   Q   He used the word fuck?

13   A.   Yes, he did.

14   Q   How long did that episode last?

15   A.   Felt like an eternity.  Probably he went on and on for

16      several minutes.  I'd say at least three, four minutes,

17      he went on and on.

18   Q   How close did he get to you?

19   A.   His finger was right in my face.  He came around to my

20      desk, his finger was right in my face.

21   Q   He was pointing at you?

22   A.   Yes, he was.

23   Q   And saying what?  You have no idea what you're doing?

24   A.   Yes.  F-ing this, and yes, he would scream when he
would

25      talk.

1    Q    Other than Deb Green did anybody else witness that

2         episode?

3    A    I'm sure other people heard it.  The secretary's desk

is

4         right outside of my door.  But Debra was right in there

5         when it happened.

6    Q    Did you ever hear Mr. Graham scream at anybody else?

7    A    Yes, I've heard him scream at other people.

8    Q    Who?

9    A    The director of Children and Youth.

10   Q    Who's that?

11   A    Gary Shuey.  There was a meeting in the one of the back

12        rooms.

13   Q    Do you know what that was about?

14   A    I don't know.  I have no idea.  We just heard the

voices

15        and him screaming.

16   Q    Who else has he screamed at?

17   A    He had raised his voice to quite a few people.  As far

18        as screaming, that kind of thing, I never heard him do

19        that at anybody but me.

20   Q    So the only person that you've heard him, the only two

21        people you've heard him ever scream at are you and

22        Mr. Shuey?

23   A    That I can recall, yes.

24   Q    But you have heard him raise his voice with others?

25   A    Yes.

Barbara Varner                                    174

```
 1    Q    Can you tell me who those people are?  Let me ask it to
 2         you a different way.
 3              Is there anybody who you haven't heard him raise
 4         his voice with?
 5    A.   Many people.
 6    Q    Who?
 7    A.   Sam Miller.  Hank Thielemann.  Dennis Drachbar.  The
 8         secretaries, I can't recall him doing that.
 9    Q    How long have Miller, Thielemann and Drachbar been with
10         the Probation Department?
11    A.   I'd say probably over 20 years now.
12    Q    Was his elevated tone of voice something that he used
13         with newer employees?
14    A.   No, not that I believe.  No.
15    Q    So who else did you hear him raise his voice with?
16    A.   Those are the only three -- I heard him, he would go in
17         to Chief Bolze, he would get loud with him.  And with
18         Mr. Osenkarski, he would get very loud with
19         Mr. Osenkarski.  Not to the point of screaming, but he
20         basically told Mr. Osenkarski what he would do or what
21         he wouldn't do.
22    Q    Dictating to Osenkarski?
23    A.   Absolutely.  Absolutely.
24    Q    And he did that in a very loud and forceful manner?
```

25    A.    Yes.  I saw him do that several times.


Barbara Varner                              175


1    Q    Did you ever hear him use the fuck word with Osenkarski

2         or Bolze?

3    A.    No.

4    Q    How about anybody else?

5    A.    Yes, he would.  Just in conversation, describing things,

6         not in an angry manner.

7    Q    So he used the fuck word as part of his regular

8         vocabulary?

9    A.    I wouldn't say regular, but you heard it occasionally.

10    Q    How about any other swear words, was there anything else

11         that was part of the vocabulary?

12    A.    Not that I can recall.

13    Q    So the principal word that you heard or at least

14         remembered was fuck?

15    A.    Seemed to be.

16    Q    Is there anything else in 17 A through E that we haven't

17         talked about?

18    A.    I don't believe.

19    Q    In paragraph 19 you allege that Mr. Osenkarski also is

20         guilty of harassment, correct?

21   A.   That's correct.

22   Q    Let's look at those allegations, if we could.  In 19 A

23        you say he called attention to your gender and made

24        inappropriate comments about other females.

25        Specifically, what did he say?

Barbara Varner             176

1   A.   He made the comment when I was standing at the door of

2        our office talking to another probation officer, Mike

3        Varner, he walked past -- Mr. Varner and I had no

4        relation -- were engaged in a conversation, and he just

5        walked past and he said about a female intern's

breasts,

6        that she had a nice said of jehoobees, and then

7        continued to walk out the door.

8   Q    Did he ever make any inappropriate comments with

respect

9        to you personally?

10   A.   No.

11   Q    Other than this one episode where he made a comment

12        about the young girl's breasts, were there any other

13        episodes where Mr. Osenkarski said something that you

14        thought was inappropriate?

15   A.   Yes.  There was a time that Mr. Osenkarski was

16        discussing his girlfriend's genital area, Debra Green

17        was a witness to this, that he spoke about when he was

18        canning hot peppers that their fingers would get hot,

19        and he had learned his lesson about inserting them in

20        her because it burned her.  And this comment was made,

21        Ms. Green heard this and there was other secretaries

22        there.

23    Q   When did that occur?

24    A.  I'd say '98.  I'm speculating on this date.  '99.

25    Q   Was that something else that you also noted on your

Barbara Varner                          177

1         notepad?

2     A.  Yes.  Correction.  It looks in here it says in
September

3         of 2000 when he made that comment.

4     Q   That was September of 2000?

5     A.  Yes, according to my reporting.

6     Q   So the inappropriate comments made by Chief Osenkarski

7         from the time you joined the Probation Department in

8         February of '95 until September of 2000, a period of

9         five years, you can identify two, correct?

10    A.  No, there are others.

11    Q   Okay.

12    A.  On September 12th, 2000, Mr. Osenkarski informed two
new

13        female probation officers they would have to dance on

14        the table at their first staff meeting.  Ms. Green
heard

15          this comment.  It was a staff meeting that was about to

16          begin.

17     Q    So we're now up to three; is that correct?

18     A.   There was also Mr. Osenkarski commented to a new female

19          probation officer that hysterectomies ruin women.  To
my

20          knowledge, I was possibly the only one in the office

21          that had that.

22     Q    Did he know that you had had a hysterectomy?

23     A.   Yes, he did.

24     Q    Did you interpret that comment as being directed to you

25          personally?


                    Barbara Varner                    178


1      A.   Yes, I did.

2      Q    Was he looking at you when he said it?

3      A.   No.  I was not present when he said that.

4      Q    You were not present?

5      A.   No, I was not.  I was --

6      Q    How did you learn of the comment?

7      A.   The girl herself told me, Gail Schuhart, a probation

8          officer.  Mr. Osenkarski would tell Ms. Schuhart that

9          she reminded him of his ex-wife.

10     Q    Was that somehow inappropriate?

11     A.   She was uncomfortable.

12   Q   Ms. Schuhart was?

13   A.   Yes.

14   Q   The comment about dance on the table?

15   A.   Yes.

16   Q   What is it about that comment that you find offensive?

17   A.   It's demeaning.  I don't believe he ever told men, guys

18       that they had to dance on the table at the first staff

19       meeting.  You usually don't see guys dancing on tables.

20       That's probably presumed by most people it's

21       provocative.

22   Q   Was that said in jest?

23   A.   I was not there.  Debra Green was there when it

happened

24       as well as other probation officers.

25   Q   So you were not present to hear that comment, either?

Barbara Varner                              179

1   A.   No, I was not.

2   Q   Were you aware of any of the new female probation

3       officers that actually had to dance on tables?

4   A.   No.

5   Q   Are you aware of any female that ever danced on a table

6       at any probation meeting?

7   A.   Not that I know of, no.

8   Q   So of the allegations contained in your paragraph 19,

9       you were present for the comment about the intern's

10          breasts, correct?

11    A.    Correct.

12    Q     Were you present for any of the other comments?

13    A.    No.  I was just informed about those.

14    Q     Okay.  So in your presence, the only comment that was

15          made by Mr. Osenkarski amounted to the comment about
the

16          young girl's breasts, right?

17    A.    Yes.

18              There was one other incident where I was at a

19          training with Mr. Osenkarski and Mr. Graham in Penn

20          State, and it was on sexual, juvenile sexual offenders
I

21          believe is how it was defined.  And Mr. Osenkarski had

22          on him a Bic lighter, Bic type lighter, and when he

23          flicked it, it was a penis.  And he flicked it at the

24          female presenter several times.

25    Q     When was that?


                    Barbara Varner                          180


1     A.    It was '96.

2     Q     Do you know when in 1996?

3     A.    No, I don't.

4     Q     And who attended the Penn State conference?

5     A.    Juvenile Probation officers.

6     Q     Did he ever flick the Bic at you?

7    A.    Yes, he did.  He did that wherever he was.

8    Q    Was there any comment or solicitations associated with

9         it?

10   A.    No.  Not towards me, no.

11   Q    What was his purpose in doing so?

12   A.    Just amusing people, I guess, because it was a sexual

13        offenders program and this woman was presenting on

14        sexual offenders.

15   Q    In paragraph 20 you allege that you've been given less

16        desirable assignments.

17   A.    Yes.

18   Q    Tell me what you mean by that.

19   A.    In the past.  I have been, there were times where

20        assignments were not given out to males to supervise

21        females because of concerns of maybe inappropriate

22        allegations being made.  That was never the issue with

23        me.  I was given cases where the boys would need urine

24        tests, they might not even be in school.  Schools do

not

25        want to do urines for us.  It just puts me in the same

Barbara Varner                              181

1         position.  But I was required to do the urine testing,

2         drug users, who needed that constant urine testing.  It

3         was almost impossible for me to get a good urine

because

```
 4          I can't observe what they're doing.

 5             I was given cases of large males, large aggressive

 6          males -- obviously, I'm not a very large person -- that

 7          I was to supervise them in their home by themselves,

 8          assaultive.  It was just -- size-wise it was an

 9          inappropriate assignment.

10    Q     Did you protest that assignment to anybody?

11    A.    I talked to at the time it was Mr. Thielemann who had

12          assigned that case, concerns about that, that I can't

13          urine test.  And physical-ness.  And --

14    Q     Are we talking about one case involving urine tests of

15          males?

16    A.    No, there were several.  I would get, you know,

17          routinely cases males that needed a urine screening,

18          where I would see males not getting assigned to females

19          who needed the same thing.

20    Q     How many cases involving this urine-sampling problem got

21          assigned to you?

22    A.    Really, now, all males need to be urined and I have, you

23          know, cases with males.

24    Q     Do you have any idea of the relative caseload of male to

25          female in the Probation Department?
```

```
 1    A.   The girls are getting more and more.  Males, I would

 2         just speculate probably 75 percent male, 25 percent

 3         female.  It could be more than that for females now.

 4    Q    And how about in the time frame 1995 to 1996?

 5    A.   I would say it probably would be about the same then.
I
 6         think it's getting more now, more females.

 7    Q    What else, other than the urine testing or the size of

 8         the particular male probation people, are you referring

 9         to when you say you got less desirable assignments?

10    A.   The numbers.  My assignment numbers were extremely high

11         compared to others for while.  That is not -- now it's

12         not happening.

13    Q    You had a high caseload?

14    A.   Yes, I did, compared --

15    Q    When was that?

16    A.   That would be in '96, '97.

17    Q    What was your caseload?

18    A.   I don't know the numbers right now, but just looking in

19         comparison, mine was a lot higher.

20    Q    What do you mean by a lot higher?

21    A.   Perhaps six, seven more than other ones.

22    Q    What was your average caseload in the '96-'97 period?

23    A.   I'm guessing, speculating 25, 30, 35, somewhere around

24         there.

25    Q    In 20 B you say that other probation officers
```

Barbara Varner                                183

1       continually reminded that you were in physical danger
of
2       retaliation by Graham?

3   A.  Yes.

4   Q   Who were the probation officers that told you that?

5   A.  Sam Miller.  Dennis Drachbar.  Darby Christlieb.  Debra

6       Green.  Kerry Houser.  I've been told to always be

7       careful where I go because of Mr. Graham by the sheriff

8       and by the CID Department.

9   Q   What's CID?

10  A.  Central Investigation Department of the DA's office.

11      They had advised me to call my local police and inform

12      them of Mr. Osenkarski's type of car and Mr. Graham's

13      type of car.  They also asked me to get a phone

14      monitoring -- number monitor on my phone.

15  Q   Did you did that?

16  A.  Yes, I did.  My own cost.

17  Q   Did you ever receive any crank calls?

18  A.  We receive lots of crank calls.  My husband could
verify
19      that.  Probably for a while it was one to two a day,

20      hang-up calls.  We could not trace the number, it would

21      be unavailable or anonymous.  Usually unavailable.

22  Q   Do you have any reason to believe that any of those

23      calls were made by Mr. Graham or Mr. Osenkarski?

24  A.  Yes, I do.

25    Q     On what basis?

                              Barbara Varner                         184

 1    A.    Just knowledge of the potential, what they could do.

 2          And the police, like I said, the CID are the ones that

 3          informed me that that would be a good idea for me to

do.

 4    Q     When did Mr. Miller tell you that you should be

 5          concerned about physical danger?

 6    A.    Specifically, he told me on, it was it 1999.  He said

 7          that he was aware and he was concerned about how angry

 8          he had heard Mr. Graham was, and that I needed to watch

 9          myself.

10    Q     Did he indicate that he had received any firsthand

11          information from Mr. Graham that he was threatening

you?

12    A.    I don't think they would ever tell me specifically that

13          they would.  They were just sort of alerting me just to

14          be careful.

15    Q     How about Mr. Drachbar?

16    A.    Mr. Drachbar, again, he was concerned -- most of them

17          expressed concern to me or they'll just say, watch your

18          back, be careful, you know.  Or else they'll say

19          Graham's around or those kind of things, to let me

know.

20    Q     Has Mr. Graham ever physically threatened you?

21    A.    He has threatened that he'll punish me.  He will punish

22    anybody who crosses him.  And knowing his history with

23    his wife, I absolutely believed him.

24  Q    When did he threaten to punish you?

25  A.    That was an ongoing thing after he was starting to get

Barbara Varner                           185

1    angry.  And we were always told ahead of time even

2    before that, just letting us know what they had done to

3    people before, Mr. Osenkarski, Mr. Graham, that they

4    punished people.  They liked to say that.

5  Q    Was this '96-'97?

6  A.    Even before -- well, after I -- once I started there,

7    these are comments I heard.

8  Q    From February '95 on?

9  A.    Right, about the punishment phase.

10  Q    Mr. Graham no longer has any supervisory

11    responsibilities over you; is that correct?

12  A.    No, he did not.

13  Q    And hasn't had since the summer of '97?  Let's approach

14    it this way.

15  A.    Right.

16  Q    Sometime after you filed your Complaint --

17  A.    Right.

18  Q     -- you received a letter, did you not, removing all

19          supervisory responsibilities with respect to Mr.

Graham?

20    A.    Yes, I did.  It would have been spring of '97, I think.

21          Late spring, probably.

22    Q     And we'll get to that at some point.

23    A.    Okay.

24    Q     And Mr. Osenkarski, of course, has remained in the

25          Department throughout, correct?


                        Barbara Varner                    186


1     A.    Yes, he has.

2     Q     Has he retaliated against you in any fashion

whatsoever?

3     A.    Not directly, no.

4           MR. THOMAS:  Let's take a couple of minutes, okay?

5           (Recess taken from 3:31 until 3:44 p.m.)

6     BY MR. THOMAS:

7     Q     Barb, before we took the break you were talking a

8           minute ago about the comments or concerns involving

9           Mr. Osenkarski, and remember, we reviewed those and you

10          were only personally present for one of those, as I

11          recall.  Do you recall that conversation?  It's

12          paragraph 19 of your Complaint.

13          One of the things I forgot to ask you there was,

14          you indicated that other probation officers informed

you

15          of the comments that he had made.

16    A.    Yes.

17    Q    Who were those probation officers?

18    A.    As regard to E would have been Debra Green.  D would be

19          Debra Green observed it.  The two females would have

20          been Gail Schuhart and Jill Grim-Rhoads, that's

21          hyphenated.

22          MR. MacMAIN:  Would you repeat that last name?

23          THE WITNESS:  Grim-Rhoads, G-R-I-M-E, hyphen,

24    R-H-O-A-D-S, I believe.

25          C would have been Gail Schuhart.  I think I
already


Barbara Varner                          187


1          said that.

2                And that would --

3    BY MR. THOMAS:

4    Q    Let's go back to paragraph 20, now, I believe is where

5          we were.  In D you make reference to seniority
problems.

6          There was a dispute at one point, was there not, over

7          whether probation officers got credit for all county

8          time or only time in the Probation Department; is that

9          correct?

10   A.    After we split, after we became juvenile and adult.

11         Prior to that, they had already established a policy.

12   Q    And that dispute arose, and as I understand it, you

13          correct me if I'm wrong, I gather that seniority
problem

14          has been solved to your satisfaction?

15     A.   No.  I'm still below on the seniority list.  I'm still

16          below the gentleman who I had been above when I was

17          hired.

18     Q    Based on total time?

19     A.   Yes.

20     Q    And who is that gentleman?

21     A.   That's William Brandt.

22     Q    And the dispute centers around whether or not a

23          probation officer, in terms of seniority, gets credit

24          for all time while employed in any branch of county

25          government, or whether the only time that applies is
the

                    Barbara Varner                          188

1           Probation Department, correct?

2      A.   That's correct.

3      Q    And you say that still has not been solved to your

4           satisfaction?

5      A.   No.  I'm still below him.  I had -- when I first
started

6           with Probation I was above him, and then he was moved

7           down when we split.  Well, not when we split, whenever

8           the -- yes, when the seniority list was changed.

```
 9   Q   And what aspects of your employment does that seniority

10       list affect?

11   A.  It could be an on-call.  We have to go by seniority
when
12       you put down for on-call.  Any kind of promotion has

13       always been historically longevity.  And I think it's -
-
14       I don't know of any other times that promotions were
not
15       based on longevity and, well, seniority list.  And so

16       that would affect me when that occurs.

17   Q   Have you ever been passed over for a promotion?

18   A.  When the senior -- a senior probation officer position.

19       And I said, wait a minute, that I had more seniority

20       than Bill Brandt.

21   Q   Are you now a senior probation officer?

22   A.  Yes, I am.

23   Q   When were you made a senior probation officer?

24   A.  I don't know the exact date.  '98, I believe.

25   Q   How about May 7, 1998?
```

Barbara Varner                                          189

```
 1   A.  Okay.

 2   Q   When did you think you were eligible to become a senior

 3       probation officer before that?

 4   A.  They had promoted -- they had -- Mr. Osenkarski had

 5       posted that Mr. Brandt would be a senior probation
```

| 6 | | officer, and I'm not sure when that had happened, but |

it

| 7 | | was in the prior probably six-month period. |
| 8 | Q | Do you know as a matter of fact or is it merely your |
| 9 | | suspicion that you weren't promoted to a senior |
| 10 | | probation officer at the same time as Mr. Brandt?  That |
| 11 | | was a very awkward question.  Do you understand it? |
| 12 | A. | No, I don't.  Would you rephrase that? |
| 13 | Q | What I want to know is why you believe that Mr. Brandt |
| 14 | | was made a senior probation officer before you were. |
| 15 | A. | They changed the seniority list, one thing, and put him |
| 16 | | above me.  So again, the seniority. |
| 17 | | And also, Mr. Graham had told me that I didn't |

need

| 18 | | it as much as Mr. Brandt did, that I had a rich |

husband,

| 19 | | and that Mr. Brandt -- I'm sorry, and Mr. Brandt would |
| 20 | | have a family, eventually get married and have a family |
| 21 | | and he would need it more than I would. |
| 22 | Q | Do you know as a matter of fact that Mr. Brandt was |

made

| 23 | | a senior probation officer before you were? |
| 24 | A. | He was, until I complained. |
| 25 | Q | And then what happened? |

Barbara Varner                              190

| 1 | A. | Then I guess there was discussion about that, |

2         Mr. Osenkarski and -- I don't know who all.  All I know

3         is discussion was held and that seniority move was put

4         on hold.

5   Q    What was the end result?

6   A.   We were both promoted.  He still remained senior to me,

7         though.

8   Q    So you were both made senior probation officers at the

9         same time?

10   A.   Yes.

11   Q    What other effect has it had on your employment, if
any?

12   A.   At this point, nothing.  It's just potential, as I
said.

13         If there's promotions, looking at the seniority list,
he

14         is above me.

15   Q    Is he the only one that's affected?

16   A.   Yes, he is.

17   Q    In paragraph 21 of your Complaint you indicated that
you

18         complained about harassment, sexual harassment by
Graham

19         and Osenkarski to Mr. Hartnett on April the 8th, 1997.

20         You see that allegation in paragraph 21?

21   A.   Yes, I do.

22   Q    Is that, in fact, the first time that you filed a
formal

23         complaint?

24   A.   That's the first time I went down and spoke to

25         Mr. Hartnett about that, yes.

Barbara Varner                                191

```
 1   Q     And was that pursuant to the policies and procedures
 2         that you were aware of regarding harassment and
 3         discrimination?
 4   A.    Yes, it was.
 5   Q     Did you follow that meeting up with a written
 6         memorandum?
 7   A.    Yes, I did, on April 25th.
 8         (Varner Deposition Exhibit No. 1 was marked.)
 9   BY MR. THOMAS:
10   Q     I've placed in front of you what we've marked as your
11         Deposition Exhibit No. 1.  Do you recognize that
12         document?
13   A.    Yes, I do.
14   Q     And is that, in fact, the April 25, memorandum that you
15         filed with respect to your claims here?
16   A.    Yes, it is.
17   Q     And was that filed pursuant to the harassment and
18         discrimination policy that you were aware of as part of
19         your employment?
20   A.    Yes, it is.
21   Q     Did you attempt to detail in that document all the
22         various events, some of which we've discussed here
23         today?
24   A.    Yes, I did.
```

25    Q    And at the time, that was your recitation in terms of

Barbara Varner                          192

1         the behavior that you thought violated your rights,

2         correct?

3    A.   That's correct.

4    Q    Are you aware that following your submission of that

5         document that an investigation was commenced?

6    A.   Yes, it was.

7    Q    And it was commenced by or on behalf of individuals in

8         the county; is that fair?

9    A.   To my knowledge, yes.

10   Q    County and the court?

11   A.   Yes.

12        (Varner Deposition Exhibit No. 2 was marked.)

13   BY MR. THOMAS:

14   Q    I've placed in front of you a document which we've

15        marked as your Deposition Exhibit No. 2.  Do you

16        recognize that document?

17   A.   Yes.

18   Q    Do you recognize and can you identify that as a

document

19        authored by Joe Osenkarski?

20   A.   His initials are on that, yes.

21   Q    And you received a copy of this document at about the

22        time it was published on June 13, 1997?

23    A.    Yes.

24    Q     And was this one of the actions taken as a result of

25          your complaint?

                              Barbara Varner                          193

1     A.    I believe so.

2     Q     You filed your complaint on April 25th, 1997, and on

3           June 13 Mr. Osenkarski removed Mr. Graham from any

4           authority or responsibility concerning your employment;

5           is that fair?

6     A.    That's correct.

7     Q     Were you interviewed as part of the investigation?

8     A.    Yes, I was.

9     Q     And did you talk to the investigator?

10    A.    Yes, I did.

11    Q     Described in detail the facts and circumstances of your

12          employment that troubled you?

13    A.    Yes, I did.

14    Q     And that you felt violated your rights?

15    A.    Yes.

16    Q     Were you subsequently advised that some corrective

17          action was going to be taken?

18    A.    We were told that we would be very happy with the

result

19          of the investigation.

20    Q    Who told you that?

21    A.    Mr. Deluce gave my attorney, Deb Wallet, that

22          information.  We were never told what the results were

23          or the recommendation.

24          (Varner Deposition Exhibit No. 3 was marked.)

25    BY MR. THOMAS:


Barbara Varner                              194


1     Q    I've placed in front of you a document which we've

2          marked as your Deposition Exhibit No. 13, and it shows
a
3          copy to --

4               MS. WALLET:  13?

5     BY MR. THOMAS:

6     Q    I'm sorry, No. 3, that shows a copy to your attorney,

7          Debra Wallet.  Do you see that?

8     A.    Yes, I do.

9     Q    Have you seen this document in the past?

10    A.    Yes.

11    Q    And do you recall having received or reviewed a copy of

12         this document in the summer of 1997?

13    A.    Yes.

14    Q    And the document, there's really two parts.  It
consists
15         of two letters, a letter of July 11 authored by Judge

16         Sheely, and a letter authored by him on July 17,

17          correct?

18    A.    I never saw the first page, but the second page I'm

19          aware, the July 11th one.

20    Q     And you're aware that on July 11 Judge Sheely imposed a

21          punishment against Mr. Graham, correct?

22    A.    Yes, three-day suspension.

23    Q     And the letter of July 17 amends the dates of the

24          suspension to July 25, 28 and 29, correct?

25    A.    Yes.

                    Barbara Varner                    195

1     Q     So you are aware that as a result of your complaint

2           initiated on April 25, by July 17,  I guess more

3           appropriately by July 11, Judge Sheely, after an

4           investigation, gave Mr. Graham a three-day suspension,

5           correct?

6     A.    Yes.

7     Q     Did you agree with that --

8                MS. WALLET:  Let me just object to that.  Aware

9           when?  Aware in July or aware now?

10               MR. THOMAS:  Aware in July.

11    BY MR. THOMAS:

12    Q     Were you aware in July of 1997 that Judge Sheely had

13          given Mr. Graham a three-day suspension?

14    A.    According to his Order.

15    Q    Yes.

16    A.    Yes, I see that.

17    Q    When did you first file a complaint with the EEOC

18        office, if you recall?

19    A.    I first filed with Human Relations and they informed me

20        that I needed to file with the EEOC in that it was the

21        courts were involved.

22            (Varner Deposition Exhibit No. 4 was marked.)

23    BY MR. THOMAS:

24    Q    I've placed in front of you, Barb, a handwritten

25        letter dated July 21, 1997.  It's marked as your

Barbara Varner                              196

1            Deposition Exhibit No. 4.  Do you recognize that

2            document?

3    A.    It's my writing, I can't -- Joanne, yes.  She was with

4            EEOC, Joanne.

5    Q    You say that is your handwriting?

6    A.    Yes.

7    Q    And Joanne was with EEOC, correct?

8    A.    I believe so.

9    Q    And this is a note that you wrote to her?

10    A.    Yes.

11    Q    Would you read it for the record, please?  It's only

two

12            sentences long.

13   A.   I appreciate -- Dear Joanne, dated 7/21/97.  I

14        appreciate any help you can give me to expedite this

15        procedure.  As I explained to you, I am a court worker

16        and have had to go directly to you after Human
Resources

17        denied being able to help.

18   Q    Who are you referring to when you say Human Resources?

19   A    Probably perhaps maybe Human Relations rather than
Human

20        Resources.

21   Q    You're talking about a state agency there?

22   A    Yes.  Yes, I believe.

23   Q    And you've identified yourself there as a court worker,

24        correct?

25   A    Um-hum.


Barbara Varner                              197


1   Q    And was that because you understood that you were, in

2        fact, working for the court?

3   A    I work for both county and court.  I was an officer of

4        the court in the Juvenile Probation Department, but I'm

5        also a county employee.  I follow the guidelines of the

6        county book, procedural book.  I'm paid by the county.

7   Q    Who had the right to hire or fire you?

8   A    That would be Judge Sheely.  The Court.

9   Q    Did anybody else have the right to hire or fire a

10          probation officer?

11    A.    No.  I would say no.

12    Q     It had to be done by the president judge?

13    A.    I'm sure -- yes, final thing, yes.  Final say.

14    Q     You asked for, in a number of documents later you asked

15          for a number of things to be done, correct?

16    A.    Um-hum.  Yes.

17          (Varner Deposition Exhibit No. 5 was marked.)

18    BY MR. THOMAS:

19    Q     At the time Mr. Graham was suspended by Judge Sheely,

20          did you have any objection to that action that was

taken

21          by him, by Judge Sheely?

22    A.    I didn't think it was nearly enough.

23    Q     You thought it was an inadequate penalty?

24    A.    Absolutely.

25    Q     Why do you believe that?


                              Barbara Varner                    198


1     A.    Because it was a recurring derogatory threatening me.

I

2           don't think that justified only three days.  I was

3           suffering problems at that point because of this, fear

4           of my own safety.  I didn't think it was enough.

5     Q     So your objection to the penalty imposed was that it

was

```
  6            an inadequate penalty?
  7    A.      He still would have access to me.  He would still be in
  8            our office.  He would still be an employee of the
  9            county.  Still be able to come across, be around the
 10            area.
 11    Q       At that point he had been removed from any supervisory
 12            responsibility over you, correct?
 13    A.      That's correct.
 14    Q       And he had been given a reprimand and a three-day
 15            suspension?
 16    A.      Right.
 17    Q       And what you wanted at that point was you wanted him
 18            fired from the county?
 19    A.      I -- what I had asked, that I did not think he should
 20            supervise any other females, and I wanted to not have
 21            any contact with him whatsoever.
 22    Q       You personally?
 23    A.      Yes.
 24    Q       I've placed in front of you what we've marked as your
 25            Deposition Exhibit No. 5.  Can you identify that for
us,
```

                            Barbara Varner                    199


```
  1            please?
  2    A.      Yes.
  3    Q       What is it?
```

4    A.    This was my initial complaint to the EEOC.

5    Q    Do you know when it was filed?

6    A.    I dated it 7/21/97.  The date it was filed, let's see

7          the date on here.  That's when I sent it.

8    Q    That's when you sent it to EEOC?

9    A.    Right.

10   Q    Does this appear in your handwriting?

11   A.    Yes, it is.

12   Q    And the beginning on page 3 of the document and for

13         several pages thereafter you detail the events that

14         you're complaining about, correct?

15   A.    Yes.

16   Q    When you filed that action or claim in July of 1997,

17         what is it that you wanted done?

18   A.    I wanted the harassment and the discrimination to stop.

19         I wanted to be, have a safe environment that I could go

20         to work and not worry about my supervisors, well,

21         Mr. Graham, or Mr. Osenkarski, retaliating against me.

22         I wanted what Title 7 said that I'm allowed to have, a

23         harassment-free environment, safe environment to work

24         in.  I wanted to be treated equally.  I wanted my

25         seniority addressed.

Barbara Varner                                200

1    Q    As of now, Mr. Graham has been physically removed from

2          the courthouse, correct?

3    A.    His office, he's located at the prison.  I believe he

4          does come to the courthouse sometimes.  I'm not sure

5          when.

6    Q     But Judge Hoffer actually invoked a physical transfer

7          which moved him out of the courthouse, correct?

8    A.    That's correct.

9    Q     So he is no longer in the same work premises that you're

10         in on a day-to-day basis, correct?

11   A.    Correct.  That is correct.

12   Q     He no longer has any supervisory responsibility over

13         you, correct?

14   A.    No, he does not.

15   Q     Who's currently supervising you?

16   A.    Sam Miller.

17   Q     Do you have any complaints or concerns with respect to

18         Mr. Miller?

19   A.    No, I do not.

20   Q     And how long has he supervised you?

21   A.    He was assigned as my supervisor back at this, when that

22         was.

23   Q     July of '97?

24   A.    Yes.  And then, I'm not sure about the time frame, but

25         then Mr. Thielemann became my supervisor for a period.

Barbara Varner                                    201


        1              And then it returned to Mr. Miller maybe six months
ago,

        2              or, he was -- he was assigned me as a person to

        3              supervise.

        4      Q       Did you have any complaints with respect to your

        5              treatment by Mr. Thielemann while he was supervising

        6              you?

        7      A.      I think at the very beginning he was -- I think he was

        8              maybe angry about the whole thing.  I felt some, you

        9              know, resistance towards me.  But he appears to be

       10              mellowing, I can use the word mellowing.  He still

       11              supervises me for placement cases if I have children in

       12              placement.  And Tom Boyer also supervises to the point

       13              of daily logs, close-out cases.  But Mr. Miller is my

       14              primary supervisor.

       15      Q       Now?

       16      A.      Yes.

       17      Q       Did you have occasion to ever complain about

       18              Mr. Thielemann in terms of any discrimination or

       19              harassment toward you?

       20      A.      No, I didn't.

       21      Q       So other than feeling some resistance as you described

       22              it, you've had a good working relationship with

       23              Mr. Thielemann?

       24      A.      Yes.  He had done some of the stacking-on of

       25              assignments, the numbers were up.  He was party to
that.

Barbara Varner                          202

```
1          But like I said, he seems to be improving.  He seems to
2          be doing well in the position he's in now.
3     Q    So you've got no present complaints with respect to
4          Mr. Thielemann?
5     A.   No, I do not.
6     Q    Although he's not your current supervisor?
7     A.   Only for placement children.
8     Q    And Mr. Miller is?
9     A.   He's my primary supervisor.
10    Q    And you have no problem with Mr. Miller?
11    A.   No, I have none.
12    Q    And in fact, you've worked well with him?
13    A.   Yes, I have.
14    Q    And feel safe working for him?
15    A.   Yes, I do.
16    Q    Without concerns about retaliation?
17    A.   None at all.
18    Q    Mr. Osenkarski you described earlier as having
19         relinquished a fair amount of control with respect to
20         the Department and, in fact, when you were hired by
him,
21         were impressed with the fact that he was not a micro
22         manager.
23    A.   Yes, that's correct.
```

24    Q    Since Mr. Graham has been removed have you had any

25          problems with Mr. Osenkarski?



                              Barbara Varner                      203


1     A.   Only what I've heard people tell me, but directly, no.

2     Q    Does he participate in your direct day-to-day

3          supervision?

4     A.   Only if some supervisors are not present.

5     Q    And in terms of your dealings with him, you've had no

6          problems?

7     A.   Not personal, no.

8     Q    Nothing that rose to the level that you felt necessary

9          to complain to anybody about?

10    A.   I have heard, people told me that -- people have told

me

11         that Joe would love to have me leave.  During the CASA

12         job possibility I was told that he was informing people

13         not to interfere in any way in having me out of there.

14         But he has said nothing directly to me.

15    Q    And who did you hear that from?

16    A.   If I recollect, I believe it was Mr. Drachbar, Dennis

17         Drachbar.

18            I was also told by the same man that Mr. Boyer

19         hates me and would do anything to get rid of me.

20    Q    Does Mr. Boyer have any direct supervision

21      responsibility with respect to you?

22  A.  Yes, he does.  He is one step above Mr. Miller.  He

23      would be next in line to the chief.  And he does do our

24      close-out case, like I said, close-out, and our time

25      sheets.


                    Barbara Varner                    204


1   Q   Have you had any problems with him?

2   A.  There are times when if I get on, if Mr. Miller or --

3       I'm sorry, Mr. Boyer is on an elevator, he will step

off

4       and not ride with me.  That's happened on several

5       occasions.

6   Q   Has he ever said anything inappropriate to you since

7       Mr. Graham left the courthouse?

8   A.  No, he's not.

9   Q   Has he ever interfered in your employment relations in

10      any way since then?  Other than not to ride in the

11      elevator with you.

12  A.  No.

13  Q   Do you have concerns about your safety at the workplace

14      at this time?

15  A.  I think there's always an ongoing concern for myself

16      when I leave to go out into the parking lot, if I'm

17      alone.  And as I said before, the sheriff has told me

18      that just to be aware of when I'm going and where I'm

19          going and basically to watch my back.

20    Q    Have you ever received any threats of any kind?

21    A.   From -- not threat.  I've been harassed by Mrs. Graham

22          and have been physically pushed by Mrs. Graham on one

23          occasion.  Shoulder hit.

24    Q    When was that?

25    A.   In 1999 is when she harassed me in the parking lot of


                    Barbara Varner                    205


1           where I park.

2     Q    What occurred?

3     A.   She had caught up to me when I was going to my car.

Her

4           car is parked on the front side as you're entering the

5           parking lot, she's one of the first cars as you reach.

6           My car is around and down probably 15 cars away from

7           her.  She approached me and started saying that I'm a

8           liar, that I had an affair with her husband and that

9           everybody knows I'm a liar, and she wants my husband to

10          find out that I'm a liar.

11              I said, just leave it alone.  I told her, leave it

12          alone.  I continued to my car.  I tried to get in my --

13          between my car, she stood there in between the two cars

14          and wouldn't let me get into my car, again saying that

15          I'm a liar.  And I said, just leave it alone, and I got

16          in my car and started make phone call.  And I called up

17          to the Sheriff's Department, and they came down and

18          escorted me into the courthouse.  And I filed a

19          complaint of harassment against her with Carlisle

20          police.

21     Q    And she was charged?

22     A.   Yes, she was.

23     Q    And there was a trial?

24     A.   Yes.  It was a hearing before District Justice Correal.

25     Q    And was she convicted?


Barbara Varner                                    206


1      A.   What was said was all the elements of the crime

2           obviously were there, but following an annoying -- and

3           what the district justice said was that probably this

4           whole issue probably will be handled in a different

5           court.  She was warned not to do it again or it would

be

6           a different result.  So she was not formally charged.

7      Q    Has there been any additional episode?

8      A.   No, there has not.

9      Q    In the last three or four years since that occurred

have

10          you had any additional problems with Mrs. Graham?

11     A.   Yes.  And I think that's noted in here.  She -- there

12          was times that she would -- well, November 3rd -- are

13          you talking the time frame?  Or any time frame?

14    Q     Any time.

15    A     Okay.  November 3rd of '97 I was walking out of the

16          courthouse and she physically threatened me.

17    Q     In what manner?

18    A     She exited her car and walked toward me.  She stopped
in
19          the street with her hands -- her eyes were narrowed,
her
20          fists -- she had clenched teeth and just remained there

21          until I was directly in front of her.  She did that

22          on --

23    Q     Did she say anything to you?

24    A     No, she did not.

25    Q     Did she make any movement to move to strike you in any

Barbara Varner                                          207

1           fashion?

2     A     No.

3                 On December 4th, '97, I was waiting outside the

4           courtroom on the fourth floor.  She again walked
towards
5           me with her narrowed eyes and clenched teeth, just very

6           angry look.

7     Q     Any others?

8     A     Yes.  On March 3rd, '98, as I was walking from the

9           parking lot to the courthouse I came around the corner,

10          was confronted by Mr. and Mrs. Graham.  When I
attempted

11          to walk around them, Mrs. Graham forcibly bumped into

12          me.

13               May 22nd of '98, I was -- after I had parked my

14          car, Mrs. Graham walked within two feet of me behind me

15          staying that position for the entire walk to the

16          building, just right on top.

17     Q    Did she say anything to you?

18     A.   No, she did not.

19     Q    Did she make any move to strike you in any fashion?

20     A.   No, she didn't.  It was very intimidating, though.

21     Q    And you two both work in the same building, do you not?

22     A.   Yes, we do.

23     Q    Both park in the same parking lot?

24     A.   Yes.  I moved my parking spot.  I used to park directly

25          behind her.  I moved it so I was not near her, just to

Barbara Varner                          208

1          avoid any further problems.

2     Q    Have you received your scheduled step increases terms
of

3          salary?

4     A.   I have -- I had a copy several years ago but I don't at

5          this point.

6     Q    Are you aware of any pay increases that you have not

7         received?

8    A.   No.

9    Q    And you're till employed at the same job?

10   A.   Yes, I am.

11   Q    And you are now a probation officer, senior probation

12        officer?

13   A.   That's correct.

14   Q    Is there another step above that?

15   A.   Only other step would be to PO-II, supervisor, and

16        chief.

17   Q    And who presently holds those jobs?

18   A.   PO-II position is Mr. Dennis Drachbar.  We have three

19        supervisors.  Mr. Miller, Sam Miller.

20   Q    Who is your supervisor, right?

21   A.   Yes.  Hank Thielemann, and Thomas Boyer.

22   Q    How long have those four individuals been with

23        Probation?

24   A.   I don't know, but I would say at least 15, 18 years.

25        I'm not sure.


                         Barbara Varner                      209


1    Q    Long timers?

2    A.   Yes.  Yes, they are.  And then Osenkarski would be

3         chief.

4    Q    You haven't been demoted in any fashion?

5    A.    No.

6    Q    Your benefits haven't been changed?

7    A.    No.

8    Q    I understand there was a period of time when you worked

9         from home; is that correct?

10   A.    Yes, there was.

11   Q    What was that about?

12   A.    I found I had an allergic reaction to something in the

13        courthouse.  My physical symptoms were I had burns on
my

14        hands and my face.  They subsided when I left the

15        building.

16   Q    Were there any other Probation employees that were

17        permitted to work from home?

18   A.    We have an on-call officer who works all the full-time

19        from home.  He's on call in the evenings.

20   Q    But other than the on-call probation officer, are there

21        any other employees of Probation that have ever been

22        permitted to work from home?

23   A.    I believe there has been.  People who -- there was a

24        woman, I'm not sure -- I can't say if she was able to

25        work or not, but I know she was out on medical leave
for

Barbara Varner                                210

1    some time.

2          That was something that was recommended by my

3          doctor.  I felt I would rather work than go on any kind

4          of medical leave.  I prefer -- because a lot of my work

5          can be done from home.  And it worked out fine except

6          for court appearances.

7    Q    How long was that?

8    A.   Several months until I could be returned to work.

9    Q    And was there some sort of air-filtration system

10         installed in your office?

11   A.   Yes.  I was given an air-purifying system for my
office.

12   Q    And has that solved your allergic problems?

13   A.   It seems to, yes.

14   Q    So since then, you've been relocated back in the

15         building with air filtration in a private office, so to

16         speak?

17   A.   I'm sharing an office at this time, but yes.

18   Q    Initially was it a private office?

19   A.   Yes, it was.

20   Q    What requests have you made that have not been

21         satisfied?

22   A.   I want to be assured that there's no retaliation
against

23         me for filing this claim.

24   Q    Has there been any retaliation to date?

25   A.   Yes, there has been.

Barbara Varner                                    211

1   Q    In what manner?

2   A.   In the CASA position.  I had applied for a position, a

3        court-appointed special advocate program.  It was a new

4        program under the direction of Judge Guido.  I had

5        applied for that, been -- well, the judge had said in a

6        meeting in 2000, March 1st, 2000, that he had chosen me

7        as the designee to be the CASA director.

8            We proceeded with -- they made the grant

9        application using my salary as the salary for the

10       position.  Up to the very last minute, really, the 11th

11       hour, I was in the process of getting things
transferred

12       over from Juvenile Probation to them, and my attorney

13       was informed that I could not have the position unless
I

14       was willing to withdraw my Complaint.

15  Q    Were you offered a settlement in this case based upon

16       taking the CASA position and maintaining your current

17       salary?

18  A.   I didn't think my Complaint had anything to do with the

19       CASA position.  I was offered the position at a lower

20       salary, which was, I believe it was $29,000, which was

21       almost 11,000 less than what I'm making, to withdraw
the

22       suit.

23  Q    You were, in fact, offered the CASA job but at a lower

24       salary, as I understand your testimony?

25  A.   Yes, I was.

Barbara Varner                                    212

1    Q    Okay.  And you were offered the CASA position at your

2         current salary in conjunction with a settlement of this

3         litigation; is that also accurate?

4    A.   For withdrawing my suit, yes.  Not settlement.

5         Withdrawing my suit.

6    Q    We can argue about whether there's a difference or not.

7    A.   Yes.

8    Q    In any event, you chose not to take the position under

9         either condition, correct?

10   A.   Yes.

11   Q    Other than the CASA job, have you been retaliated

12        against in any other fashion?

13   A.   I think retaliation, knowing that I'm in fear, knowing

14        that Mr. Graham has let people know that he will punish

15        anybody, as well as Mr. Osenkarski will punish anybody

16        who crossed them.  Just having that awareness.

17   Q    Have you been punished?

18   A.   Not at this point.

19   Q    Let me talk to you about your damages for a few

minutes.

20   A.   Okay.

21   Q    Who is your current family doctor?

22   A.   Dr. Theresa Burick, B-U-R-I-C-K.

23    Q    Where is she located?

24    A.    She's located on Poplar Church Road in Camp Hill.

25    Q    How long has she been your family doctor?


                    Barbara Varner                    213


1    A.    I'm guessing six years, six, seven years.  I believe

2          '96.

3    Q    So back to 1996?

4    A.    I believe so.

5    Q    Who was your family doctor before that?

6    A.    I really didn't have a family -- Dr. Sullivan, who I

7          rarely saw.

8    Q    Where was Dr. Sullivan?

9    A.    He was located in Mechanicsburg.

10    Q    Is he still in practice?

11    A.    I believe he is.  John Sullivan.

12    Q    How long were you with Dr. Sullivan?

13    A.    Maybe two years.  He had broke off from another group.

14    Q    What was that group?

15    A.    Mazzitti Sullivan.  Mazzitti and Sullivan.  Cincotta,

16          Mazzitti and Sullivan.

17    Q    Who did you see in that group?

18    A.    Whoever was available.

19    Q    And that's where you got your internal medicine, family

20          physician type stuff?

21  A.  Yes.

22  Q   How long were you with that group?

23  A.  We were there from, my family was there, I'm guessing

24      probably '72 till -- and Dr. Sullivan, carrying him

25      over, probably till '96.


Barbara Varner                                          214


1   Q   '96?

2   A.  '96, yes.

3   Q   Anybody before then?

4   A.  Dr. Stahl and Zimmerman in Mechanicsburg, when I was in

5       high school.  Childbirth for one.

6   Q   Have you ever been hospitalized other than for your

7       childbirths?

8   A.  Yes.

9   Q   When?

10  A.  In October of '97, I had a hysterectomy, partial

11      hysterectomy.

12  Q   Any other reasons for hospitalization?

13  A.  No, not hospitalization.

14  Q   Which hospital were you in for the hysterectomy?

15  A.  Harrisburg.  No, wait.  Polyclinic.  I believe it was

16      Harrisburg.

17  Q   It had to be either Harrisburg or Polyclinic, right?

18  A.  I believe it was Harrisburg.  I know.  I believe it was

19          Harrisburg.

20    Q    So other than the hysterectomy and the childbirth, you

21          have no hospitalizations?

22    A.   No.  Not hospitalizations, no.

23    Q    Surgical procedures?

24    A.   Yes.  I've had foot surgery.

25    Q    When was that?


                    Barbara Varner                          215


1     A.   I had one I guess it was two years ago.

2     Q    What was that for?

3     A.   It was a hammer toe.

4     Q    That would have been around 2000?

5     A.   I'm guessing, yes.

6     Q    Who did that surgery for you?

7     A.   Dr. Zlotoff, Z-L-O-T-O-F-F.

8     Q    Other procedures?

9     A.   Had the same thing done a year before that.  It didn't

10          work out.  I think it was two years before that.

11    Q    Same foot?

12    A.   Same foot, same toe.

13    Q    Other procedures?

14    A.   Surgical?  Dental, a lot of dental surgery.

15    Q    Who are your dentists for dental surgery?

16    A.   Dr. Dinello.

17          Foot surgery in, I'd say mid '80s, I had other foot

18          surgery.

19    Q     What was that for?

20    A.    Bunions.

21    Q     And the dental is Dr. Dinello.  Anybody else on the

22          dental side?

23    A.    Dr. Wagner is my dentist.

24    Q     How long has he been your dentist?

25    A.    10 years.



                              Barbara Varner                    216


1     Q     Do you contend that you've sustained any lost wages as a

2           result of this subject matter of your Complaint here?

3     A.    Lost wages?  Well, all the time I'm taking here is

4           personal time.  So as far as lost wages, lost time. But

5           wages, no.

6     Q     Anything other than what's been associated with this

7           deposition?

8     A.    As far as my wages?

9     Q     Yes.

10    A.    No.

11    Q     And you've essentially lost no pay increases that you're

12          aware of?

```
13    A.    No.

14    Q     We already reviewed that, right?

15    A.    Right.

16    Q     Your pay hasn't been reduced, right?

17    A.    No.

18    Q     You've never been demoted?

19    A.    No.

20    Q     I notice in reviewing your Answers to Interrogatories

21          you contend that you have post-traumatic stress

22          disorder.

23    A.    That's correct.

24    Q     Who diagnosed for that you?

25    A.    Lee Morand, M-O-R-A-N-D.
```

                    Barbara Varner                       217

```
1     Q     When was that?

2     A.    Three years ago.  Three, four years ago.

3     Q     What kind of practitioner is Lee Morand?

4     A.    She's a psychologist.

5     Q     Do you still see Lee Morand?

6     A.    Yes, I do.

7     Q     When was the last time you saw Lee Morand?

8     A.    Last Friday.  I see her weekly.

9     Q     Do you still see her once a week?

10    A.    Yes, I do.
```

11    Q    When did you first see her?

12    A.    Just, I believe I started with her '99.  Around that

13          time.  I had seen other ones prior to that.

14    Q    Who was the first psychologist that you saw following

15          these series of episodes?

16    A.    Laurie Walker.

17    Q    Where was she located?

18    A.    She was with the Employee Assistance Program and she

was

19          located at Mazzitti and Sullivan's on Trindle Road.

No,

20          wait.  Yeah, Mazzitti and Sullivan, Trindle Road.

21    Q    How often did you see her?

22    A.    I went for, I think there's three times with the

23          Employees Assistance Program.  Then she left there and

24          went to Guidance Associates, and I saw her on a weekly

25          basis.


Barbara Varner                                            218


1    Q    For how long?

2    A.    Until she moved to Arizona, I believe it was.  I can't

3          remember the time frame, months.

4    Q    Who did you see after that?

5    A.    She recommended Elaine McKenna.  I think it's

6          M-C-K-E-N-N-A, again, with Guidance Associates in Camp

7          Hill.

8  Q    Were your records transferred to Elaine McKenna?

9  A.   Yes.

10  Q   How long did you see Elaine McKenna?

11  A.   I saw her for several months.

12  Q   What was your reason for changing from Elaine McKenna to

13      Laurie Walker?

14  A.   Went from Laurie to Elaine because Laurie left the area.

15      She moved to leave out west, I believe it was Arizona.

16      Colorado.  Colorado, I believe it was, I'm sorry.

17  Q   I'm sorry.  I got the names confused there.  You left

18      McKenna and went to Lee Morand, right?

19  A.   There was a time in between I thought I could manage on

20      my own, and Dr. Burick noticed that things were not

21      going well for me and she recommended Lee Morand to me.

22  Q   How long did you go without seeing anybody?

23  A.   I'm not sure of the time frame.

24  Q   And does Lee Morand now have all of your records with

25      respect to all three counselors that you've seen?


Barbara Varner                                 219


1  A.   She should.  I can't say, but she should.

2  Q   Any medications prescribed?

3  A.   Yes.

4  Q   What?

```
 5   A.   Dr. Leite, he's a gastroenterologist.  I'm taking

 6        Prevacid for irritable bowel.

 7            I take Celexa.

 8   Q.   I'm sorry, the doctor's name again?

 9   A.   Dr. Louis Leite, L-E-I-T-E.  Gastroenterologist.

10   Q.   When were you first diagnosed with irritable bowel

11        syndrome?

12   A.   I went to him in around 1996, '97 area.

13   Q.   Any procedures or treatment other than the Prevacid?

14   A.   With him?  With Dr. Leite?

15   Q.   For irritable bowel.

16   A.   No.  No.

17   Q.   So it's just medication?

18   A.   Yes.  And moderate, you know, just relaxation

19        techniques.  Of course, he told me to leave the

20        stressful environment.  He related it to the work

21        environment.

22   Q.   You've chosen not to do that?

23   A.   It's not that easy to do that.

24   Q.   What other doctors or treatment?

25   A.   Theresa Burick, she has prescribed Celexa for me.
```

Barbara Varner                              220

```
 1   Q.   What's that for?

 2   A.   That's for, well, it's post-traumatic stress symptoms.
```

3          The mood, the crying, the just panic attacks at times,

4          some depression.

5     Q    Are you still taking that?

6     A.   Yes, I am.

7     Q    How long have you been taking that?

8     A.   I've been taking -- we've tried other medications

pretty

9          much the same, just trying to find something that works

10          for me, and that seemed to be the best.  So I've been

11          taking that type of medication for five, about six

12          years.

13     Q    What other medications or treatment?

14     A.   I'm on Premarin, which is a hormonal.

15     Q    Is that as a result of the hysterectomy?

16     A.   Yes.

17     Q    You don't contend that's related to this episode?

18     A.   No, I do not.  And Allegra for allergies, that's it.

19     Q    Any other medications?

20     A.   I'm on high blood pressure medication now.  That

started

21          about within the last year that started.  And I'm not

22          sure of the name of that.

23     Q    Who's treating you for that?

24     A.   Dr. Burick.

25     Q    I see in some of the documents you contend that you had

Barbara Varner                                         221

1          a stomach ulcer.  Has that in fact, been confirmed?

2     A.   Yes, it has about.

3     Q    By whom?

4     A.   Dr. Leite.  And we pursued whether it is bacterial

5          related.  He said, no, he felt in his opinion it was

6          stress related.

7     Q    Are you medicated in any fashion for that?

8     A.   The Prevacid helps.  Modification of diet.  Relaxation

9          things.  The Prevacid seems to help a lot.

10    Q    When was the last time you consulted with any physician

11         with respect to the ulcer problem?

12    A.   I have another appointment with Dr. Leite, I believe

13         it's in March.  I usually see him once a year for

14         medication checks to see how I'm doing.

15    Q    And how about for the panic attacks?

16    A.   Panic attacks, that's with Dr. Burick.  That's sort of

17         an ongoing thing we talk about.  I see her every three

18         months unless I see a need to see her more often.

19    Q    Have you had occasion to see her more than once in

three

20         months in the last year?  Did you understand that

21         question?

22    A.   Yes.

23              MS. WALLET:  Good, because I don't.

24              THE WITNESS:  Have I seen her?  Why don't you

25         repeat that.

Barbara Varner                                    222

1    BY MR. THOMAS:

2    Q    You testified you see her once every three months --

3    A.   Yes.

4    Q    -- unless you need more.

5    A.   Right.

6    Q    My question is:  Have you seen her more frequently than

7         once every three months in the last year?

8    A.   I can't recall that I have.

9    Q    And you say you are seeking counseling, and that's once

10        a week?

11   A.   Yes.

12   Q    What type of counseling are you receiving?

13   A.   She's doing more a lot of, I don't know exactly what she

14        practices, what you would name it, but it's more

15        relaxation techniques, looking beyond the situation that

16        I'm in, that rather than getting totally wrapped up in

17        what's going on in the workplace, to look beyond and

18        look for another -- future, looking at goals for myself.

19   Q    I see in your Answers to Interrogatories you were asked

20        a question about who you communicated with regarding the

21        issue, and two of the people that you identified or two

22        of the organizations were ACLU and NOW.

23   A.   Right.

24    Q    What were the nature of those communications?

25    A.    Just contact with them, looking for support, somewhat,

Barbara Varner                    223

1         some help.  I'm on my own here.  I have one attorney.

2         Soliciting some help from a woman's organization,

3         somebody else who had been involved with this, that

4         could give me some, whether it's resources to look to
or

5         help with this.

6    Q    Did you receive any documentation from either the ACLU

7         or NOW?

8    A.    It's more of an emailing, letting me know that they

9         would give me resources for, if I needed attorneys,
that

10        there really wasn't a whole lot of help they could give

11        me since I already had an attorney.

12   Q    Did you ever receive any resources of any kind from

13        them, publications, for instance?

14   A.    They gave me resources to check out for assistance.

15        Most of them were if you already have an attorney, that

16        I was proceeding the right way.  And there are support

17        groups here and there with NOW.

18   Q    Have you ever participated in any of those support

19        groups?

20   A.    They're not local.

21    Q    Let me show you your Answers to the Commonwealth's

22          Interrogatories, and I don't have an extra copy for

you.

23          (Discussion held off the record.)

24    BY MR. THOMAS:

25    Q    Counsel provided these as your Answers to

Barbara Varner                          224

1          Interrogatories, and let's see, I guess you didn't

2          verify them.  There is a verification.  Do you

recognize

3          that as your signature?

4    A.    Yes, it is.

5    Q    And the interrogatories at number 4 asked you to

6          identify people with knowledge regarding the claim, and

7          you've listed a number of people, including your

lawyer,

8          your counselors, therapists and a number of the people

9          employed in the Probation Department.

10   A.    Right.

11   Q    Are you familiar with that?

12   A.    Yes, I am.

13   Q    Then in interrogatory number 6 you were asked who

you've

14          had communications with, and you say:  I have talked

15          with everyone on the list provided in number 4 above.

16          Some of these were or are employees of the court

17          defendant.  I certainly don't remember the exact dates.

18              My question to you is:  Who do you identify on

19          Answer to Interrogatory number 4 as court employees?

20     A.   That would be any of the probation officers.

21     Q    From Deb Green all the way down through the

secretaries,

22          Fran Rose being the last one?

23     A.   Yes.

24     Q    And those are the people that you intended --

25     A.   Well, it's Rebecca Overs who is in -- well, it's Byers

Barbara Varner                          225

1           now.  She was Children and Youth.

2      Q    Okay.  And the rest of them are all employees of the

3           Probation Department --

4      A.   Yes.

5      Q    -- in one fashion or another?

6      A.   Yes, they have been.

7      Q    And people that you identified as court employees,

8           correct?

9      A.   Yes.

10              MR. THOMAS:  Okay.  That's all I have for now, so

11          that I don't usurp the rest of the time for everybody.

12              MS. WALLET:  Note for the record it's now 4:32.

13              MR. THOMAS:  Yes?  We have many hours to go.

14              MS. WALLET:  I see.  On the record, could I have

15      some explanation of how long you expect to continue to

16      depose my client?

17          MR. ADAMS:  With respect to what, Debra?

18          MS. WALLET:  To continue to depose my client.

19          MS. WILLIAMS:  Well, I mean, we have four

20      defendants and we each have individual interests, so I

21      think we all have to have some opportunity to question.

22      I think that Mr. Thomas has laid a fine groundwork, but

23      there are some things that I need to go especially

into.

24          If you want us to come back tomorrow and, you

know,

25      if Ms. Varner is tired and you want us to continue


                    Barbara Varner                    226


1       tomorrow, we can certainly be able to do that.

2           MR. MacMAIN:  I would concur.  Some of the areas

3       that I intended to cover has already been covered by

4       Mr. Thomas, but there's obviously some areas unique to

5       Mr. Graham.  I wouldn't expect to have a really lengthy

6       amount of time, but again, I'm willing, if your

client's

7       tired or if she feels she's gone too long, to continue

8       tomorrow.  It's really agreeable.

9           How do you feel, Paul?

10          MR. ADAMS:  I'm looking at the time.  Again, I

a

11          think Mr. Thomas has done an excellent job in covering

12          lot of the aspects in terms of the parties and on our

13          side of the case.  I don't think we're going to -- my

14          examination is not going to be too long.  I'm wondering

15          if we take a minute three break so I can talk to my

16          client, I might be able to finish up in 30 minutes, my

17          portion.

18              MS. WILLIAMS:  I would think I would need a couple

19          of hours, although I will tell you that Mr. Thomas

20          delved into some areas that I was planning to go into.

21          I suppose if I had the evening I would go through my

22          questions and strike the things he's already covered.

23          Otherwise, I might not be as well --

24              MR. THOMAS:  How long do you think you'll be?

25          What's the line-up for tomorrow?


                        Barbara Varner                    227


1              MS. WALLET:  Well, we were to do Mr. Osenkarski at

2          9:30, followed by what I thought would be Mr. Graham

3          sometime in the early afternoon.

4              Let me talk with my client about what her

5          preference is.

6              I certainly don't want to be unreasonable.  I'll

7          allow her to stand for some additional questions, but

8          what I don't think I want her to do is another full day

9        like we just did today.

10           MR. MacMAIN:  It may be after Taylor's done it

11       narrows mine even more.

12           MS. WALLET:  Let's go off the record now.

13           (Discussion held off the record.)

14           MR. THOMAS:  We've agreed that we will resume with

15       Mrs. Varner tomorrow to conclude her deposition,

16       followed by Mr. Osenkarski and Mr. Graham, and that

17       we'll reschedule Mr. Varner for another session which

18       we've already got reserved and approved by the Court.

19       Correct?

20           MS. WALLET:  Correct.  And that I further said
that

21       it's my intent to produce my client for four or five

22       hours tomorrow but not for a whole day.

23           MR. THOMAS:  Understood.  That's a fair response.

24           (Whereupon, the deposition was continued at

25       4:45 p.m.)

228

COMMONWEALTH OF PENNSYLVANIA     )
                                 )  SS.
COUNTY OF DAUPHIN                )


     I, Emily R. Clark, Reporter and Notary Public in
and for the Commonwealth of Pennsylvania and County of
Dauphin, do hereby certify that the foregoing testimony
was taken before me at the time and place hereinbefore
set forth, and that it is the testimony of:

BARBARA E. VARNER

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Harrisburg, Pennsylvania, this 5th day of February, 2003.

_____
Emily R. Clark
Reporter - Notary Public

(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)