IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                      .
        Plaintiff,              .       CIVIL ACTION
                                .       NO. 1:CV 01-0725
        vs.                     .
                                .
COMMONWEALTH OF PENNSYLVANIA,   .       (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
        Defendants.             .
. . . . . . . . . . . . . . . . . .

VOLUME 2
Pages 229 to 424


Deposition of:  BARBARA E. VARNER

Taken by      :  Defendant Cumberland County

Date          :  January 28, 2003, 9:27 a.m.

Before        :  Emily Clark, RMR, Reporter-Notary

Place         :  Administrative Offices of
                 Pennsylvania Courts
                 5035 Ritter Road, Suite 700
                 Mechanicsburg, Pennsylvania


APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
            For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
            For - Defendant Commonwealth of Pennsylvania
                  Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  JAMES K. THOMAS, II, ESQUIRE
             PAUL J. DELLASEGA, ESQUIRE
             For - Defendant Cumberland County

```
 1   APPEARANCES (continued):

 2       MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
         BY:  DAVID J. MacMAIN, ESQUIRE
 3            For - Defendant S. Gareth Graham

 4       SWEENEY & SHEEHAN, P.C.
         BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5            For - Defendant Joseph L. Osenkarski

 6

 7   ALSO PRESENT:

 8       MR. S. GARETH GRAHAM

 9       MR. JOSEPH L. OSENKARSKI

10       MS. MELANIE McDONOUGH

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

25

231

1                        I N D E X

2                        WITNESS

3  Barbara E. Varner                        Examination

4      By Mr. Thomas                            417

5      By Ms. Williams                          256

6      By Mr. MacMain                           331

7      By Mr. Adams                        232, 420

8

9                        EXHIBITS

10  Varner Deposition
    Exhibit Number                              Page
11

11      6  1-page memo, 3/27/02, to Hoffer from Varner       261
12
12      7  28 pages, handwritten notes                       263
13
13      8  1-page handwritten note, 12/3/96 "Joe"            286
14
14      9  3-page memo, 7/11/97, to Ward and Deluce from     288
15         Sheely
15
16     10  1-page "Fax Transmission Sheet" 1/12/00, to       293
           Wallet from Varner
17
17     11  1-page handwritten notes, "terroristic threats"   296
18
18     12  1-page memo, 7/12/00, to Guido from Varner        312
19
19     13  37-page "National CASA Association Request for     313
20         Proposals, New Program Development"
20
21     14  2 pages, handwritten notes, 12/16/96, "Trip       373
           to Lourdesmont"
22

15  4-page Probation Department report, 4/8/97         375

23

16  1-page memo, 4/25/97, to Hartnett from Varner      413

24

                            *   *   *   *   *

25

                    Barbara Varner                        232

1            BARBARA E. VARNER, recalled as a witness,

2            previously sworn, testified further, as follows:

3   BY MR. ADAMS:

4   Q     Good morning, Ms. Varner.

5   A.    Good morning.

6   Q     My name is Paul Lancaster Adams and I represent Joe

7         Osenkarski in this case.  I can tell you that I'm going

8         to be very short, especially, in comparison to

9         yesterday's examination of you.  That's probably why
I'm

10        going first.

11           I do want you to please keep in mind the

12        instructions given to you yesterday by Jim Thomas.  Do

13        you remember those instructions in terms of how the

14        deposition is conducted from yesterday morning?

15  A.    Yes, I do.

16  Q     Okay.  One thing I do want to add, that as explained to

17        me this morning, that as part of the instructions
today,

18        and I ask that you also consider them as yesterday,
that

19          if I ask you a question, you understand I'm going to

20          assume that you understood my question and that you're

21          answering correctly.  Is that okay?

22     A.   (Witness nodded head affirmatively.)

23     Q    At least to the best of your knowledge?

24     A.   (Witness nodded head affirmatively.)

25     Q    Also, you have to say something verbal so she can get
it


                          Barbara Varner                    233


1           typed down.

2      A.   Yes.  I'm sorry.

3      Q    There were some questions asked by Jim Thomas yesterday

4           that I'm going to remind you of today just to have you

5           either elaborate on them or explain more fully.  Is
that

6           okay?

7      A.   That's right.  That's fine.

8      Q    I'd like to start off with some of those questions.

9           Yesterday you testified that for the first year and a

10          half with the probationary department, the Probation

11          Department, excuse me, Joe Osenkarski was very

12          complimentary of your work.  Do you remember saying

13          that?

14     A.   He didn't appear to find any problems with my work.

15     Q    Okay.  And can you explain what you mean by

16          complimentary of your work?

17    A.    My first evaluation I received from Joe I had worked

18          with the grant for Family Preservation, he had told me

19          during my first evaluation he was pleased with how that

20          program was going.  It was a one-year grant at that

21          time, and he was pleased with my work.

22               If I turned in a file to Joe, I really had no

23          problems with that.  Joe was fair.  When I first

started

24          Probation I was very pleased with Joe.  His criticism

25          was not even -- he really was not a critical type

Barbara Varner                          234

1           person.  He would make adjustments, corrections, in a

2           very appropriate way.  No, I had no problems with Joe

3           when I would turn cases over to him, just to approve,

4           that kind of thing.

5     Q     Okay.  Did that understanding of Joe's complimentary,

6           complimenting of your work, last your entire stay with

7           the Probation Department, including up to current

8           status?

9     A.    My evaluations from Joe have always been okay, they've

10          been fine.  Joe as the chief, he's not the one doing my

11          major evaluations now, he's part of it.  But my

12          evaluations, the last one I had was done by Hank

13          Thielemann and Tom Boyer, and then Joe signed as well,

14          as chief.

15     Q    When did Mr. Osenkarski stop doing your evaluations?

16     A.   Mr. Osenkarski has always been part of my evaluations

17          because he is the chief, so he still has to sign off on

18          them.  And I'm sure he's told, you know, informed of

19          what my evaluation is.  So he's still involved.

20     Q    Okay.  I want to take you back a little bit a ways

21          before you joined the probationary department.  Is that

22          okay?

23     A.   Okay.

24     Q    I keep saying probationary.  Probation Department.

25          When you found out about the job vacancy there,
and

Barbara Varner                    235

1          you testified yesterday that prior to working there you

2          actually sought out Mr. Osenkarski and you wanted to

3          discuss your interest in the job vacancy with

4          Mr. Osenkarski.  Do you remember that time period?

5     A.   I remember discussing with him about the position, yes.

6     Q    Okay.  Why did you choose to go Mr. Osenkarski about

7          your job interest?

8          MS. WALLET:  I'm sorry, I missed that.  Was it why

9          or when?

10         MR. ADAMS:  Why.

11          THE WITNESS:  Because Mr. Osenkarski was head of

12          the juvenile division in Probation.  We were combined

13          but still he was part of that division.  The Family

14          Preservation program would be under the juvenile

15          program.

16   BY MR. ADAMS:

17   Q    Okay.  Your understanding at that time was still that

18        Judge Sheely was in charge of Probation, of the

19        Probationary Department; is that correct?

20   A.   I don't even -- I'm not sure if I was even aware of the

21        whole hierarchy at that time.  I knew it would be

22        Probation.  Who exactly they answer to, probably, but I

23        can't say for sure that I knew that, that specifically.

24   Q    When you talked to Mr. Osenkarski were you comfortable?

25   A.   Yes, I was.


                        Barbara Varner                    236


1    Q    Okay.  Was he helpful?

2    A.   Yes, he was.

3    Q    Okay.  Was he informative?

4    A.   Yes, he was.

5    Q    Okay.  Do you believe that he had any influence at all

6         in your receiving the job ultimately with the Probation

7         Department?

8    A.   I believe he did, because he was one of the three

9          gentlemen who interviewed me for my interview, my

10         original interview with them.

11   Q    Okay.  In that line, can you explain that process when

12         you, in fact, did interview for the Probation

13         Department?

14   A.   I sat down with Mr. Osenkarski, John Roller, who was

15         with the adult section, and Ken Bolze who was the
chief,

16         and they interviewed me just about how I felt about --
I

17         remember one time they asked about dealing with violent

18         offenders, how I felt about that, sort of my philosophy

19         in coming to the program, what I saw with Family

20         Preservation, and my, of course, my background, what my

21         schooling was in.  I had to provide a resume.

22   Q    Okay.  And that's all the interview process that you

23         went through at the time?

24   A.   That I went through?  Yes.  Yes.

25   Q    Okay.  Did Mr. Osenkarski by chance recommend you for


                          Barbara Varner                    237


1          your current position of senior probation officer?

2    A.   It would have had to be him.  He was the chief.

3    Q    Okay.  Could anyone else have made that decision for
you

4          or on behalf of you?

5    A.   Joe would have the ultimate say in recommending that.

```
 6    Q    Okay.  Did Gary Graham by chance, I guess, was Gary

 7         still involved with your supervision around this time?

 8    A.   No, he was not.

 9    Q    This was after that?

10    A.   Right, it was after that.

11    Q    Okay, thank you.

12              By chance, did Mr. Osenkarski also have any

13         influence in recommending a job for your son?  I think

14         at the Stafford Detention Center, is that the place?

15    A.   Schaffner Detention Center.

16    Q    Schaffner?  Okay.  Did Mr. Osenkarski help in that or

17         assist in that in any way?

18    A.   Not that I'm aware of.

19    Q    Did he discuss with you the opportunity for your son to

20         be employed with that particular detention center?

21    A.   I don't believe Mr. Osenkarski mentioned it.  I know
his

22         daughter had, when she had started working there, I
know

23         she had gotten a job later at the same place, but I

24         can't remember whether he discussed it prior to or
after

25         my son getting the job, I don't remember that.
```

                              Barbara Varner                    238

```
 1    Q    You testified yesterday that you had heard that, this
is
```

2        prior to being an employee with the Probation

3        Department, that Gary Graham and Mr. Osenkarski would

4        punish people when they were crossed.  Do you recall

5        that?

6  A.    That's right.  Yes.

7  Q     After suspecting this or hearing this, you still felt

8        comfortable talking to Mr. Osenkarski about the job

9        vacancy?

10  A.    To me, it -- perhaps it was more rumor.  Personally,

11        Mr. Osenkarski had always been polite to me.  I had no

12        problem with that.

13           I liked the philosophy when I spoke to him about

14        the hands-off supervision, that you were allowed to

15        manage your case and do your own thing.  And like I

said

16        yesterday, it wasn't micromanaged like I was in

Children

17        and Youth.  And it was my field.

18  Q     Sure.  And that was an attractive feature for you in

19        this particular job?

20  A.    Absolutely.

21  Q     Okay.  Would you agree that there are different

22        managerial styles in running an office --

23  A.    Certainly.

24  Q     -- generally speaking?  And in the case with

25        Mr. Osenkarski, he had a hands-off approach to

Barbara Varner                               239

 1          managerial style?

 2    A.    I think Mr. Osenkarski was more delegating it to other

 3          people.  Mr. Osenkarski has been -- it was apparent to

 4          most people that he was not in the office hardly at
all.

 5          If I really would have had a complaint, it was very

 6          difficult to catch up to Mr. Osenkarski.  And that's

 7          still a pattern now, that just not available.  More an

 8          omission, allowing somebody else to do the work for
him.

 9    Q     Are you aware of what Mr. Osenkarski is doing when he's

10          out of the office?

11    A.    No, I'm not aware of that.

12    Q     Could he be doing Department like jobs, do you think,

13          that may require him to be at meetings or seeking
grants

14          or things of the like that are not innate with the

15          office operations as you see it?

16    A.    Possibility.  But I know I've heard that the
secretaries

17          when they want to reach him, like, the middle of the
day

18          they'll call his house, that he's home in the middle of

19          the day, those kind of things.  That's an ongoing
issue.

20    Q     Are you aware that Mr. Osenkarski works from home at

21          times?

22    A.    That's not something I would know about.

23    Q     On October 21st, 2002, a few months ago, you actually

24      had a conversation with Mr. Osenkarski in the hall.  Do

25      you remember that?


Barbara Varner                          240


1    A.   Yes, I do.

2    Q    And that was at the courthouse annex?

3    A.   Yes, it was.

4    Q    And by chance that's across from the Sheriff's Office;

5         is that correct?

6    A.   Yes, in that area.

7    Q    And you actually stopped him in the hall; is that

8         correct?

9    A.   Yes, I did.

10   Q    Okay.  And is it true that you said to him that you

11        realize you shouldn't be talking to him but you wanted

12        to speak with him briefly?

13   A.   Um-hum.  Yes, I did.

14   Q    And in fact, you did?

15   A.   Yes, I did.

16   Q    And is it true that you expressed to him at the time

17        that you didn't want to leave your job?

18   A.   Yes.

19   Q    Okay.  And that you really thought that most of the

20        actions centered around this case related to Gary

Graham

21        and not him?

22    A.    What I said to him is I just wished this whole thing
was

23          over.  I can see, I mean, I see Joe when I see him in

24          office, like I said, it's neutral right now, it's one
of

25          those things I want it over.  I've wanted this over
from

Barbara Varner                          241

1     the very beginning.  I just wanted everything to stop.

2     It just continues, just on and on.  And I just said, I

3     just want you to know I'd rather this was over, I wish

4     it was over, and I don't think the issue is so much --

5     it's -- it's just an issue that things have got to be

6     finalized.  I just want to continue my job.  I want to

7     do the job that I was hired to do and just left to do
it

8     but I didn't feel like I should have to leave my job.

9     Q    Okay.  Did you say to Mr. Osenkarski at that time that

10         you didn't believe that any of this, meaning
surrounding

11         this case, was any of his doing?

12    A.   No, I did not say that.

13    Q    What do you believe?  Do you believe that Mr.
Osenkarski

14         is a part of this suit by you?

15    A.   Absolutely.  I think by omission, by allowing Mr.
Graham

16          to have full reign, giving him the power and just

17          backing away, when he saw and he would hear Mr. Graham

18          yelling and screaming at me.  But he would just back

19          away and say my hands are washed of it, he's in charge.

20          That's not the way.  You can't let this kind of thing

21          happen.

22              There was another incident with Mr. Osenkarski in

23          March of 2002 where we had a bomb threat in our

24          building.  It was a bomb threat, I was left in my -- I

25          was the only one left in the office.  My office is next

Barbara Varner                    242

1          to Mr. Osenkarski's.  I had signed in on the sign-in

2          board which is directly outside of his office.  Within,

3          I believe within an hour after I had signed in, and

4          normally my door is shut because I have an air purifier

5          on, and I happened to be dictating that day but I can

6          still hear voices outside.

7              I was left in my office for it was close to two

8          hours.  No one told me there was a bomb threat.  No one

9          knocked on my door.  Everybody else was cleared out.

10          People would walk right past my door and no one took it

11          upon themselves to tell me.

12              I walked out of the building -- first I walked out

13          of my office and I realized that I was the only one

left

14     in the building.  I started down the hall to the

15     Sheriff's Department.  No one else was there.  I got

out

16     to the street and I saw the sheriffs and I said, what's

17     going on?  They said, there's a bomb scare, what are

you

18     doing?  I said, no one told me that there's a bomb

19     scare.

20         No one told me and I just -- obviously, and I've

21     told people before, if it was your child that was left

22     in a school and they weren't notified, how would you

23     feel?  I was left in that building for almost two

hours.

24     No one -- do I think that Mr. Osenkarski intentionally

25     said leave her there?  I don't know.  I can't help but

Barbara Varner                    243

1      believe as retaliation, perhaps, because I was the only

2      one in that whole building, that whole courthouse that

3      was left.

4          I went out to the street and I found some people

5      from the Probation office, and I explained to them.

Joe

6      was there.  Tom was -- no.  Joe was there, Hank was

7      there, a couple of secretaries, Kathy, I believe was

8      there.  And I went out, and Mr. Turo, the Public

9        Defender, and I said, I was left in there, I was left

in

10       that building, I was by myself.  No one told me.

11            Mr. Osenkarski, his concern was -- he walked over

12       to Kathy Zeigler and he was concerned -- he had a

13       training or a conference he had to go to.  He was

14       concerned that to make sure that the search dogs they

15       take through the building knew about our ammo down in

16       the basement.  Not like, I was just -- I had been doing

17       so well with the counseling, doing so well, and

18       absolutely -- so do I think it was intentional?  I

can't

19       imagine why they would let me there.  And he's in

charge

20       of that department.  It was his responsibility to make

21       sure all his employees were out.

22   Q    Are you okay?

23   A.   Yes.

24            This year at another time -- no, year 1998,

25       Mr. Osenkarski came to me and he told me that Judge


                         Barbara Varner                    244


1        Hoffer said I was not allowed to be in another

Probation

2        office, which is down the east -- we have a main office

3        in the main courthouse, and down -- I need to take a

4        break just for a second.

5              (Recess taken from 9:37 until 9:41 a.m.)

6    BY MR. ADAMS:

7    Q     We talked about quite a few things at once and I'm

8          going to break them down one at a time, if that's okay?

9    A.    That's fine.

10   Q     How long have you known Mr. Osenkarski?

11   A.    Several -- well, I met him when I started with Children

12         and Youth just in passing.  Talking to him, probably

I'd

13         say '93, '94, something like that, some conversations.

14   Q     Explain to me, and forgive me for not being totally

15         familiar, please explain to me where Children and Youth

16         is located in comparison to the Probation Department in

17         the building.

18   A.    Right now they're located down the street in another

19         building called the Human Services Building.  Prior to

20         that they were located on the third floor, same floor

21         that Probation was on.  We were in what's called the

22         east wing, it was an annex connected by a hallway.  And

23         all the same floor with a common lunch room area.

24   Q     Okay.

25   A.    Shared by lots of, all the, you know, the whole

                    Barbara Varner                        245

1          courthouse.

2    Q     Okay.  And could you be in, hypothetically could you be

3        in the Children and Youth Services Department and hear

4        things going on in the Probation Department down the

5        hall?

6  A.    No, we couldn't.

7  Q     Okay.  If things or activities are going on in the

8        hallway between that department and the other

9        department, is there some overplay or interaction

10       between the two departments?

11  A.   Probably only in the lunch room area, because for them,

12       the courthouse, most people would exit out of the

13       courthouse, and we had our own exit out the east wing.

14  Q    Okay.  You said you had your own exit out the east
wing?

15  A.   Right.  There's a back exit out the east wing.

16  Q    Okay.  Is that just an exit that everyone by chance
uses

17       because it's the closest door?

18  A.   Yeah.  It's just part of that exit from that building.

19  Q    Okay.  When you were with Children and Youth Services

20       was that the door that you would use to come in and out

21       naturally?

22  A.   Yes.  When I was with Children and Youth, yes.

23  Q    In case of an emergency would that also be the door you

24       would go out of?

25  A.   Yes.  The stairways, yes.

1    Q    How did you know that?

2    A.    Probably there are exit signs, I would assume, and

3          stairways.  I know the elevator's right beside the

4          stairway.  Of course, it says don't use the elevator.

5          But there's an exit out.

6    Q    Okay.  No one told you that that's the exit you use for

7          emergencies when you were in Children and Youth

8          Services, right?

9    A.    There probably -- we probably had fire drills, yeah,

and

10         they would say which way to exit.

11   Q    Who would say that to you?

12   A.    That would be, then it was the personnel -- the county

13         would run fire drills.  I assume it came through the

14         Sheriff's Department or the fire companies, I don't

15         know.  But we would have fire drills.

16   Q    Okay.  So you think the county's responsibility,

17         emergency process in fire drills, you think that goes

18         back to the county's responsibility; is that correct?

19   A.    To ensure safety, sure, of the workers.  Absolutely.

20   Q    When you were with Children and Youth Services is that

21         when the Sheriff's Department would come and help with

22         the evacuation in case of an emergency, things like

23         that?

24   A.    I don't recall.  I just remember our director saying,

25         and in an evacuation we more sort of followed each

other

Barbara Varner                    247


1        knowing how to get out, it was that type of thing.  I

2        don't remember any actual training or anything.

3   Q    Or any protocol?

4   A    No.  Just, you know, us being told and signs saying you

5        exit this way.

6   Q    So the key with you when you were with Children and

7        Youth Services in terms of exiting for an emergency or

8        even a fire drill was you follow everyone else; is that

9        correct?

10  A    In general, yes.

11  Q    Would that be the same with the Probation Department,

12       that basically in an emergency or something happens,

13       everyone follows everyone else out of the building?

14  A    I think just common knowledge you use the stairways as

15       in any building, you would not take the elevator, use

16       the stairway closest to you, and that would be common

17       knowledge, I would think, anywhere.

18  Q    You follow everyone else to exit?

19  A    Basically, yes.

20  Q    Okay.  At some point when you were with the Probation

21       Department you were given an office that was, it was a

22       closed-door office; is that correct?

23  A    Yes.

24  Q    Okay.  And that office didn't have any window, did it?

25    A.    Yes, it does.  It has a window out to the secretarial

Barbara Varner                        248

1          area.  It's not to the outside, but there's a sliding

2          glass window that right outside there the secretaries

3          sit.

4    Q    And while you're sitting down can you see the

5          secretarial staff as you just described?

6    A.    Generally I would -- we had, like, little mini blinds.

7          I would keep them turned so that the secretaries

8          couldn't see the clients that I had in there.  But I

9          could see enough I could see the clock.  But I really

10          didn't want my clients or them to see, you know, what

11          was going on in the office with clients.

12    Q    Okay.  And you had this office, this closed-door office

13          at the time of the incident which you felt you were

left

14          in the building; is that correct?

15    A.    Yes, I did.

16    Q    Okay.  So when there's a fire drill that actually

17          happened on that day that you just described, you

18          couldn't see people going back and forth; is that true?

19    A.    No, I did not.  I was dictating.  But everybody in the

20          office was aware that my door was shut.

21    Q    How do you know that?

22    A.    Because it was just common.  They knew I had the air

23          purifier in there.  It was just a common thing.  My door

24          was shut most of the time.

25     Q    Is that why you had that office to yourself, because of


                    Barbara Varner                          249


1           the air purifier?

2      A.   No, I had gotten that office seniority-wise.  It was one

3           of those things, that's the thing as you move up in the

4           seniority, if there's an office by yourself, that's sort

5           of something you sort of achieve to.  And I was senior

6           and able to take that.  When we really -- it was when we

7           split our departments.

8                Like I said, Mr. Osenkarski was aware I was in the

9           building.  So were the other, the secretaries and stuff

10          were aware that I was there.  And I had signed in on the

11          board which is directly outside of his door.  At a very

12          glance you can see who was in and who was out.

13     Q    Okay, okay.  When Gary Graham was a supervisor in the

14          Probation Department he used to yell at other folks as

15          well; is that correct?

16     A.   Not as much as he did me.  Not nearly as much.

17     Q    How much would he yell at others?

18  A.    I don't -- it really wasn't, not so much.  He would get

19        loud with them.  Never that much derogatory to them,

20        like your F-ing ability or actually making direct

21        comments to them about them.  It was more in anger

22        talking about other things, F this, F that, or about

23        other people, about the chief, about everybody.

24  Q    So he would say F that hypothetically about anything or

25        everyone?

Barbara Varner                    250

1  A.    You heard him use that quite a bit, yes.

2  Q    And Mr. Osenkarski was familiar with Mr. Graham's

3        language; is that correct?

4  A.    Oh, yes.

5  Q    Okay.  But isn't that sort of the climate of the

6        department, persons are sort of free for all speaking

7        all types of ways?

8  A.    You don't -- no.  You don't hear that constantly in the

9        offices at all.  That was not a constant thing.  I

can't

10        really think of anybody else who would be that -- he

was

11        always just an angry, angry man, after we split and he

12        basically got power, got the authority that he could do

13        what he wanted.

14            He would be angry before that, about his wife,

```
15            about situations, about bosses, about anything.  But it
16            was directed at me is what caused the problems for me,
17            when it was actually at me, the language, the anger,
18            that kind of, and the threats.
19   Q        Okay.  When you say split, you mean that you and Gary
20            stopped seeing each other?
21   A.       No, no, no.  When the Department split, the juvenile
     and
22            adult, after the Department split.
23   Q        Okay, thanks.
24   A.       And he sort of was left to be in power.  Mr. Osenkarski
25            started delegating it to him.
```

Barbara Varner                          251

```
 1   Q        But you were aware that Mr. Osenkarski's style
 2            nevertheless was a hands-off approach to management?
 3   A.       I didn't know it was that extreme, that he would let
 4            Gary do whatever he wanted to do.
 5                When I started there, Ken Bolze was still chief.
 6            Ken Bolze kept basically a lid on Mr. Graham and on
 7            Mr. Osenkarski, that, you know, they had to go through
 8            him before -- they had to answer to Mr. Bolze.
 9   Q        In terms of emptying out the building, clearing the
10            building of personnel when there's an emergency or a
11            fire drill, what do you think the responsibility is of
12            the Sheriff's Department in that situation for the
```

13        building?

14    A.    My understanding is they come around and they assure

15          that every office has been cleared out.  They look to

16          the directors of the department, whoever -- they always

17          look to whoever is senior officer in there, whether

it's

18          chief or whoever is there, to assure that their office

19          is cleared.

20              And I believe they checked when they get out and

21          it's the chief or whoever is in charge, to meet with.

22          I'm not sure whether -- it's another department, they

23          have to meet with them and assure that their department

24          is clear, that everybody was out.  And then I know the

25          sheriffs will go around afterwards with their dogs and,


                    Barbara Varner                    252


1         you know, checking for bombs.

2              But ultimately it is the department head, whoever

3         is the department head at that time when it happens, to

4         make sure the office is cleared.

5    Q    Okay.  And how do you know that?

6    A.   We had one prior to that, and we were evacuated.  And

at

7         that time they were going around getting all the

8         department heads together as soon as everybody was

9         cleared, saying, is all your people out, have you gone

10          down the roster, who was there, gone down the roster
and

11          made sure they were out.  And I assume that's the same

12          procedure they would follow.

13    Q     The Sheriff's Department goes to the department head in

14          most cases?

15    A.    I believe it's Personnel, well, Human Resources that

16          goes around and says -- the departments make a list of

17          who was in that building -- did you make sure they were

18          out, assuring that they were all left the building.

19    Q     Okay.  So during the drill, fire drill or emergency,

20          you're saying that --

21    A.    During the bomb scare yes.

22    Q     Bomb scare, I'm sorry, in this instance --

23    A.    Right.

24    Q     HR was the person, someone from HR would go to the

25          department heads and to determine if everyone was

Barbara Varner                         253

1           accounted for?

2     A.    Yeah.  I believe was the Clerk of Courts.  No, chief

3           clerk, chief with personnel.  Those were the two people

4           that were in charge of in that the department had to

5           contact them to make sure everybody was out of the

6           building.  So it was sort of that chain of command.

```
 7   Q   The bomb scare that you are referring to today, on that
 8       particular occasion isn't it true that you were
 9       physically already outside the building by the time HR
10       actually requested that Osenkarski report to them about
11       who was in and who was out?
12   A.  I would have no idea about that.  I know during the
13       initial bomb scare that they were on top of that very
14       quickly, wanting to know and saying you make a list as
15       soon as you got out.  I heard them tell our
```
secretaries,
```
16       telling our secretaries, who was there, make a list,
17       let's make sure they were all out of building.  And so
18       they seemed to be on top of it in our first bomb scare.
19   Q   Okay.  Are you aware that Mr. Osenkarski after the
20       incident and with the bomb scare, actually went to the
21       HR department and advised them that there needed to be
22       more established protocols so that this would not
```
happen
```
23       to you again?
24   A.  It was my knowledge that Chris Miller, who was Human
25       Resources director at that time, called Mr. Osenkarski
```

                    Barbara Varner                    254

```
 1       down and that she had spoke to the chief clerk.  They
 2       had all gone up to talk to Judge Hoffer about this.
 3       That's what Chris had told me.  And as a result of
```
that,

```
 4          Mr. Osenkarski was told to come down and work on

 5          something, see what they could do to correct it.  That

 6          was my knowledge.

 7     Q    Okay.  How do you have that knowledge?

 8     A.   From Ms. Miller.  She was the Human Resources director

 9          at that time.

10     Q    Yesterday you testified about your educational

11          accomplishments, and I'd like to congratulate you on

12          those.

13              Did Mr. Osenkarski assist you in any way in terms

14          of pointing you in the direction for financial aid or

15          anything of that sort to progress your educational

16          goals?

17     A.   Mr. Osenkarski informed me of a grant program that
would
18          be available for my daughter.  At that time I had,
there
19          was three of us in college, my son, my daughter and

20          myself.  And the policy was you had to have three
people
21          in college to take advantage of that.  He gave me

22          information about that grant program.  I was able to

23          take advantage of it for one year.  It was only one
year
24          crossover with my children.  So that helped with one

25          year.  Yes.
```

```
1    Q    Is that it in terms of helping you or pointing you in

2         the right direction for your for assistance?

3    A.   Yes.  Yes.

4    Q    You also testified yesterday that Mr. Osenkarski knew
of
5         your hysterectomy?

6    A.   Yes.

7    Q    How do you know he's familiar with that procedure?

8    A.   When I had the procedure, I had -- my doctor wrote a

9         note saying that I would be out for such amount of
time,
10        and in there is -- it was a medical excuse, basically.

11        But I also explained to Sam Miller, who is my direct

12        supervisor, because I was going to be off for a week I

13        felt, you know, that's a long time.  I think it's over

14        three days you have to have a doctor's excuse.  And I

15        explained to Mr. Miller I was going to have the

16        procedure.  And Mr. Osenkarski is his, you know,

17        supervisor, so I'm sure that came up.  But there was a

18        medical excuse from my doctor the reason why I would be

19        out.

20   Q    Okay.  But you're not sure that Mr. Osenkarski actually

21        saw that medical excuse, are you?

22   A.   It was given to him.

23   Q    By you?

24   A.   Yes.

25   Q    Okay.  What date was that?
```

Barbara Varner                                    256

1   A.   October of '97.  I know it was around Thanksgiving --

2        not Thanksgiving, I'm sorry.  There was a holiday in

3        there.  Somewhere in the middle of October.  I believe

4        it was a holiday.

5   Q.   Are you aware that Mr. Osenkarski's ex-wife had a

6        hysterectomy?

7   A.   No, I did not know that.

8   Q.   Are you aware that Mr. Osenkarski has shared that

9        information with at least one person in the office?

10  A.   No, I'm not aware of that.

11           I personally found it offensive even talking about

12       hysterectomies and women with a new young employee.
And

13       she mentioned it to me because she was uncomfortable.

14  Q.   Who was that?

15  A.   Gail Schuhart, a new probation officer.

16  Q.   Gail Schuhart is the person that told you what?

17  A.   That Mr. Osenkarski said to her that hysterectomies
ruin

18       women.

19  Q.   So he never said to you, Mr. Osenkarski, directly about

20       that?

21  A.   No, he did not.

22           MR. ADAMS:  That's all I have.  Thank you.

23  BY MS. WILLIAMS:

```
24   Q    Ms. Varner, I'm Taylor Williams and I represent the
25        Commonwealth of Pennsylvania for the Ninth Judicial
```

Barbara Varner                          257

```
 1        District for the Common Pleas of Cumberland County.
 2             I would remind you that you are still under oath.
 3        Do you understand that?
 4   A.   Yes, I do.
 5   Q    And the same ground rules that were discussed yesterday
 6        by Mr. Thomas and this morning by Mr. Lancaster Adams
 7        also apply to our conversation.  That is, if you answer
 8        a question, I will assume that you have understood it
 9        and heard it, and if I need to clarify a question or
10        repeat it, please feel free to ask me to do so.
11   A.   Okay.
12   Q    Have you ever given a deposition before?
13   A.   No, I have not.
14   Q    Have you ever brought another lawsuit?
15   A.   No, I have not.
16   Q    You were discussing the bomb scare a few minutes ago.
17        Was there actually a bomb that day?
18   A.   No.  No, there was not.
19   Q    No bomb was found?
20   A.   Not that I know of.
21   Q    Did you have any conversation or notify Judge Hoffer,
```

22          President Judge Hoffer of any of the events involving

23          the bomb scare?

24    A.    Chris Miller, the Human Resources director, she told me

25          that her and Mr. Ward -- no, I'm sorry, it's not John

Barbara Varner                                              258

1           Ward.  It was chief clerk, John Connelly had spoken to

2           Judge Hoffer about that.

3     Q     Did you speak with Judge Hoffer about it?

4     A.    No, I did not.

5     Q     Do you know the result of their conversation?

6     A.    No.  Only what Chris would tell me, and what had

7           happened -- I need to back up a few years to explain

the

8           rest of your question.

9               In 1998 Judge Hoffer had told Mr. Osenkarski that

I

10          was not allowed to go down to the third floor annex,

11          which was when we split adult and juvenile.  Part of

our

12          department, the juvenile department and part of the

13          adult department moved down to the old Children and

14          Youth office which was at the east wing.  So there was

15          half adult and half juvenile.

16              In that time frame, Mrs. Graham, who is a court

17          stenographer, had moved down to several of those

offices

18    because they were renovating her, their office area.

19    Joe Osenkarski told me that Judge Hoffer said I was not

20    allowed to go in that department because Mrs. Graham
was

21    bothered when I walked in there and that I was not to
go

22    in there.  And I said to Mr. Osenkarski, it's a public

23    office, it's part of our department, there are
probation

24    officers down there I need to interact with and have

25    work with, and I didn't see that was right, and I asked

Barbara Varner                              259

1     him to have Judge Hoffer put that in writing.

2           Judge Hoffer had his secretary call me up, and I

3     was up in his office within a day or two.  And Judge

4     Hoffer told me I was not allowed to go down into that

5     office at all, I was to stay out, that Mrs. Graham was

6     going to have a breakdown if I didn't stay out of
there.

7     And I explained to him that it's a public office, I
have

8     business in there.  And he left me know, he said, do
you

9     understand what I'm saying?  You are not to go in this

10    that office.  And again, I said, it's a public office,
I

11    don't think that's fair.  Needless to say, Judge Hoffer

12    left me know I was not to go there.

13          So from 1998 till 2002 I was not allowed in a

14          public office in a courthouse.  Embarrassing, very

15          difficult to deal with.

16          But after this bomb scare I had requested that I

be

17          moved from my office where I was at in the courthouse

18          down to one of the offices in the east wing where there

19          were other people where I could feel safe.  I know my

20          friends were down there and I knew that probably they,

I

21          was sure they would alert me if there was another bomb

22          scare.  I just didn't feel comfortable up there,

23          thinking that if this would happen again and there

24          really was a bomb.  That was a concern.

25     Q    Judge Hoffer have an objection to your moving down


                    Barbara Varner                         260


1           there?

2      A.   I had to put it in writing.  I had to put a request in

3           writing that I wanted to move down there.  Hank

4           Thielemann -- I put it in writing.  I was sitting in

the

5           court -- in fact, I wrote it in a Human Resources

office

6           on one of those secretary's computers.  Chris Miller

had

7           asked me to put it in writing that I said I wanted to

8       move down there because I was afraid that I would be

9       left behind again.  I felt more comfortable down there

10      and I was requesting for me to move.

11      Hank Thielemann carried it up to Judge Hoffer.  He

share

12      said I had to put it in writing who I was going to

13      an office with, how long I planned to stay there.  And

14      at that time I was sitting in Chris Miller's office and

15      I said, this is absolutely ridiculous, nobody else when

16      they move offices have to get permission from the judge

17      to do this.  So, finally --

18  Q   Who else has moved an office?

19  A.  At that time, well, I had moved before.  I moved from

20      one office over to that single office when we split

21      departments.  There was so much movement.  There have

22      been hired new school-based probation officers who have

23      moved into different parts of the Department.

24  Q   Do you know what was required to make those moves?

25  A.  I think it was just Joe Osenkarski's okay.  He was the

Barbara Varner                          261

1       chief.

2   Q   Do you know that?

3   A.  As far as I'm ever -- no, I don't know that for sure

4       that they did not discuss it.  But Judge Hoffer when I

5       did, he did allow me to move down there, he came down

6  personally and met with the -- he called the girl who

7  was going to be my office mate, Gail Schuhart, and

asked

8  if it was okay.  He contacted one of the gentlemen who

9  was going to have to move his office out of the one

10  offices, asked him if it was okay.  It was a procedure

11  that had never, as far as I know had never been, had

12  never occurred before.

13 Q In what respect was he asking Gail was it okay?

14 A. Would she be okay sharing an office with me, that kind

15  of thing.

16 Q I'm going to show you a document that I'll ask the

court

17  reporter to mark as Plaintiff's Exhibit 6.

18   (Varner Deposition Exhibit No. 6 was marked.)

19 BY MS. WILLIAMS:

20 Q Is Plaintiff's Exhibit 6 the memo that you just told

21  me about that you typed to Judge Hoffer asking for a

22  change in your office space?

23 A. Yes, it is.

24 Q Now, there's handwriting on there.  Is that your

25  handwriting?

Barbara Varner     262

1 A. Yes, it is.

2 Q Now, the note that you put on there, you have three

3   exclamation points.  Why did you put those exclamation

4   points there?

5 A. For him to ask me how long I'll be there, who I'm going

6   to be sharing, what desk -- what I'm going to be, what

7   exactly desk I'm going to be using?  I wasn't allowed

in

8   that area, how would I know?

9    As far as how long, I don't know how long this is

10   going to be where I would feel comfortable anywhere at

11   that point.

12 Q But that was not because of your gender, was it?

13 A. About as far as moving and stuff?  I don't believe so,

14   but I don't know.  I don't think anybody else has had

to

15   do this kind of thing to move their office.

16 Q But you don't know for sure?

17 A. No, I do not know for sure.

18 Q Okay.  You had provided to me through your counsel a

19   series of handwritten notes.

20 A. Yes.

21 Q I'm going to ask you, did you supply all the

handwritten

22   notes that you've made about this case, to your

counsel?

23 A. I believe I have, yes.

24 Q Do you recall the date of the last handwritten note you

25   had submitted --

Barbara Varner                                    263

1    A.    No, I don't recall the date.

2    Q      -- to counsel?

3    A.    No, I don't recall.

4    Q    Do you continue to keep handwritten notes about the

5          case?

6    A.    Yes.

7    Q    And do you continue to provide them to your counsel?

8    A.    Things like this, yes.

9    Q    When was the last time you gave your counsel a

10         handwritten note?

11   A.    This perhaps was the last handwritten note, I believe.

12   Q    And what's the date of that?

13   A.    Looks like March 27, 2002.

14   Q    So you've submitted no further handwritten or notes or

15         diary submissions since that time?

16   A.    I would have correspondence with my attorney, but not -

17         more on dates and times and what's going on with the

18         case.  But I just -- at this point I cannot recall any

19         other handwritten notes since then.

20   Q    You can assure me that any handwritten notes you do

21         have, will be supplied to your counsel?

22   A.    Certainly.

23              MR. MacMAIN:  Off the record.

24              (Recess taken from 10:10 until 10:21 a.m.)

25              (Varner Deposition Exhibit No. 7 was marked.)

Barbara Varner                                    264

1    BY MS. WILLIAMS:

2    Q      Ms. Varner, I've given you a document which I've asked

3           the court reporter to mark as Plaintiff's Exhibit 7.

4           Can you identify that package of documents for us?

5    A.     It's just my personal notes that I took.

6    Q      Are those the notes that you told Jim Thomas yesterday

7           were written on a pad, a notepad?

8    A.     Just various pads, yes.

9    Q      You remember discussing them with Jim yesterday?

10   A.     Yes.  That we had provided, yes, the notes, personal

11          notes, yes.

12   Q      And these are those notes?

13   A.     Yes, they are.

14   Q      When were those notes made?

15   A.     They were ongoing.  '96, '98, '97.

16   Q      Were they made as --

17   A.     '99.

18   Q      -- various actions occurred?

19   A.     Yes.

20   Q      Or did you go back and fill in some information?

21   A.     Most of the time it was as they occurred so I wouldn't,

22          you know, forget things.

23   Q      Is some of the information filled in later?

24   A.     The only thing I believe filling in later was actually

25        the trips.


                    Barbara Varner                    265


1    Q    When you say the trips?

2    A.   I'm sorry.  It's back towards the back, there's a list

3         of trips that I could remember that I had taken with

4         Mr. Graham.

5    Q    What is the date?

6    A.   '96.

7    Q    But the rest of the notes you say were written

8         contemporaneously with the actions taken?

9    A.   Yes, that's true.

10   Q    I'd like to direct your attention to a page of the

11        notes, and I'll reference it by telling you that in the

12        upper left-hand corner there's a number 7 printed.

13   A.   Okay.

14   Q    And at the bottom of that page number 7 you have an

15        entry dated 7/11.  Do you see it?

16   A.   Yes.

17   Q    Do you remember what year that note was written?

18   A.   It would have been '97.

19   Q    And you say in that note you saw Judge Sheely?

20   A.   Um-hum.

21   Q    Would you tell me under what circumstances you saw the

22        judge?

23   A.   I had gone up to the judge's chambers to take a file
up.

24        We had court within the next day or so.  I had gone up

25        to take a file up, and when I walked into the office,


                    Barbara Varner                    266


1         his regular secretary was not there but he had one of

2         his law clerks, she was typing, in the process of
typing

3         a letter.  And what I found out that it was the order
he

4         was making or what he planned to do as a result of my

5         complaint, what his resolution would be.  When I walked

6         into the office the judge said, come over here.  And he

7         said, I just want you to know I've made a decision, and

8         then he said, why don't you come into my office with
me.

9             So I walked into the judge's chambers with him,
and

10        he proceeded to tell me that Mr. Graham and his wife
and

11        Attorney Dave Foster had come to him, I believe it was

12        the day before, I believe, that they had, Mr. Graham
had

13        confessed to this alleged affair to Judge Sheely.
Judge

14        Sheely told me that he felt so sorry for them, that I

15        had ruined their family.

16            And I explained to Judge Sheely that it was all an

17          orchestrated thing, because up to that point as far as
I

18          know, this alleged affair had never come up during the
19          whole investigation into anybody else.  And I said to
20          Judge Sheely, if you were a man would you confess in
21          front of public, would you confess in front of a judge,
22          in front of an attorney, or wouldn't you be more
23          discreet and tell your wife at home and then handle it?
24              I feel it was a ploy, because I knew Barb Graham
25          had worked with Judge Sheely.  He had basically a
tender


                    Barbara Varner                    267


1          spot for Barb Graham.  And I said to the judge, it did
2          not happen.  And he said, well, I'm telling you, it was
3          just horrible, they were both crying.  And just, you
4          could tell he had been -- it had been emotional for
5          Judge Sheely.
6     Q    Is this the first time you had talked with Judge Sheely
7          about your complaints?
8     A.   Yes, it is.
9     Q    You never asked for an opportunity to speak with him
10         prior to this?
11    A.   No.  And I was surprised he did not ask for my attorney
12         and myself to meet with him prior to making this

13     decision.  It was just made on an emotional time when -

14     and he just decided he was going to make this decision.

15          And he said to me, at that time he said that he

16     knows that they, well, meaning Joe and Gary, have been

17     asshole buddies for years.  He said, I know they get

18     into a lot of stuff, they've been asshole buddies.  And

19     he said, I'm not going to do anything else, you --

20     meaning me -- you have damaged this family enough.  And

21     I said, I did not damage this family, the man who is

22     causing this is Mr. Graham, and I said, I just wanted

23     the harassment, I just wanted it to stop.  And --

24  Q  Could you and your attorney, and/or your attorney, have

25     requested a meeting with Judge Hoffer?


                    Barbara Varner                    268


1  A.  He was writing the order at that time.

2  Q   I'm sorry, I meant Judge Sheely.  Strike that.

3  A.  He was in the process of writing the order.  He said,

4      I've made my decision.

5  Q   Prior to that, could you have made an appointment with

6      Judge Sheely and spoken to him?

7  A.  We didn't know where it was at.  Dave Deluce had told

my

8      attorney that we would be very happy with the

9      recommendation that they had made as a result of the

10          their investigation, and we assumed we would be hearing

11          from them.  This was a sudden thing as far as I was

12          concerned.  But I was just surprised that the judge did

13          not give us the courtesy of meeting with us and letting

14          us have our say.

15     Q   But did you ask for such a meeting?

16     A.  I believe I did mention it to him.

17     Q   When?

18     A.  At that, when I was in his office talking to him.

19     Q   And what did he say to you?

20     A.  He said, he had told -- he said, I have made my

21          decision.  He was just so emotionally taken up by what

22          he had witnessed in his office.

23     Q   Is it your understanding that Barbara Graham was there

24          when Judge Sheely talked with Gary about the affair?

25     A.  That's when the confession was supposed to have

Barbara Varner                          269

1          happened.  At least that's what Judge Sheely told me.

2          He said, they came up before me and they confessed,

they

3          were both crying, and said it was horrible.  And he

kept

4          saying, look what you have done to their family.  And I

5          said, Judge Sheely, I, I did not do anything to the

6          family, I did not have the affair, it was all a

7        performance for you.

8  Q    Do you know for sure that Gary had not told his wife

9        about the alleged affair in private before meeting with

10      Judge Sheely?

11  A.   I have no idea.  All I know is I think it was using the

12       emotional time and bringing Barb in there.  Why would

13       you want to embarrass her again in front of the judge

14       and in front of your attorney if not to use it as an

15       emotional ploy.

16  Q    I need you to clear something up for me.  I have two

17       documents, both of which have been verified by you.

18       I'll show you the verification.  This is titled

19       Plaintiff's Response to Defendant Joseph Osenkarski's

20       Interrogatories, and this is a verification.  Is that

21       your signature?

22  A.   Yes, it is.

23  Q    And I also have there was responses to Defendant

District's  24       Commonwealth of Pennsylvania's Ninth Judicial

25       Interrogatories, and that also contains a verification

Barbara Varner          270

1       which I'll show you.  Is that your verification?

2  A.   Yes, it is.

3  Q    Do you remember answering interrogatories for both the

4       court defendant and Mr. Osenkarski, the defendant?

```
 5   A.   Yes, I did.

 6   Q    Both of these documents address the statement that you

 7        referred to a minute ago regarding asshole buddies.  In

 8        the response to the court defendant's interrogatory

 9        number 9 you say this:  Judge Sheely admitted that he

10        and Mr. Graham are asshole buddies and political
friends

11        for years.

12             And then in the Answers to Interrogatories that
you

13        gave Mr. Osenkarski, and that's your response to number

14        1, you say:  Judge Sheely admitted to being political

15        friends with Mr. G's father and told me that he knew

16        Mr. G and Mr. O were asshole buddies for years.

17             Will you tell me which is the correct version of

18        the asshole buddies, pardon that phrase, sorry?

19   A.   I had told Judge Sheely about Mr. Graham talking,
saying

20        F this and F that to me, and also mentioned to him that

21        he was not aware what all was going on in the

22        department, just letting him know.

23             And I explained to him that there were times that

24        Mr. Osenkarski and Mr. Graham would go to Lebanon to

25        pick up boxes of shoes, saying that they were meant for
```

```
 1              the detention center and I know personally that they

 2              were giving them to their relatives, to their sister,

 3              daughters, that they were using them.  And at that time

 4              is when Judge Sheely said, Joe and Gary, I know they've

 5              been asshole buddies for years.  And then he continued

 6              to say that he has known Mr. Graham's father for years,

 7              he was a political -- he helped get him elected and
he's

 8              known him for years, he would go to political parties
at

 9              picnics and stuff prior to elections.

10     Q        Did that lead you to believe that Judge Sheely had some

11              political motive for finding for Gary?

12     A.       I believe so.  Absolutely.

13     Q        Just so the record is straight, the buddy statement

14              referred to Mr. Graham --

15     A.       And Mr. Osenkarski.

16     Q        -- and Mr. Osenkarski?

17     A.       That's correct.

18     Q        And not Judge Sheely and Mr. Graham?

19     A.       No.  No.

20     Q        Now, returning to your handwritten note, if you would,

21              turning the page to the page marked 8 in the left-hand

22              corner, upper left-hand corner?

23     A.       Yes.

24     Q        On page 8 you state:  Gary was gloating after.  Do you

25              see where I'm referencing?  It's at the end of the
first
```

Barbara Varner                                    272

```
 1        paragraph.

 2   A.   You're on page 8?

 3   Q    Um-hum.

 4   A.   Okay.  Gloating after.  Yes.

 5   Q    How was Gary gloating?

 6   A.   Let me just read.

 7           He was -- just the attitude.  He was just -- I

 8        would have eye contact with him, he would just, like,

 9        smirking at me, just happy, just apparent to me that he

10        had won, that kind of thing.

11   Q    Did he say something to you that indicated gloating?

12   A.   No.  That was just my opinion of what I was seeing.

13   Q    Further on down the page you say:  Gary wrote a letter.

14        It's the second paragraph from the bottom.

15   A.   Yes.

16   Q    Gary wrote letter little while ago to remind him of

17        political support.

18   A.   Yes.

19   Q    Am I reading that correctly?

20   A.   Yes.  I was told that Mr. Graham had written a letter
```
to
```
21        Judge Sheely prior to this alleged confession reminding
```
```
22        Judge Sheely of the political support him and his
```
family
```
23        had given to him in his election time.

24   Q    Who told you about that letter?
```

25   A.   Somebody in the office -- I'm trying to think how I --

I

Barbara Varner                          273

1         don't recall how I came to that information.

2    Q    Do you have a copy of such a letter?

3    A.   No, I don't.

4    Q    Did the judge ask at some point why you didn't come to

5         him with your complaint?

6    A.   Yes, he did.

7    Q    What exactly did he say to you?

8    A.   Judge Sheely on 12/29/97, it's in the packet, Judge

9         Sheely asked me why did I give letters to Personnel

10        about Gary and Barb, lawyer told me to -- let me see.

11        Told me to, sorry about the whole thing, nothing

12        happened.  He can't -- I know he couldn't -- I said I

13        will probably always have the stares and those kind of

14        things but he can't do anything about it.

15   Q    He said -- is this, you're looking at a note?

16   A.   Yes.

17   Q    And it's undated.

18   A.   It's -- at the very bottom it has a date on it, 12/29.

19   Q    Oh, 12/92, you're right, it does.

20   A.   Judge Sheely, why do I give letters to Personnel about

21        Gary and Barb and the lawyer.  Told --

22   Q    Just so the record is clear, it's in the packet of

23        notes --

24    A.    Yes, it is.

25    Q    -- that we've been discussing and we've marked it



                          Barbara Varner                    274



1         Plaintiff's Exhibit No. 7.

2     A.    There's another note in here, too.

3           MR. ADAMS:  Four pages past page 10, on the fourth

4           page after 10.

5           THE WITNESS:  I know there's a conversation Judge

6           Sheely had with me outside of the elevators on my

floor,

7           third floor, one day, not too long after this, that he

8           said that I was going to just have to put up with it

9     BY MS. WILLIAMS:

10    Q    This is the second time, a second time that you talked

11          to Judge Sheely about the matter?

12    A.    Yes.  Yes, I know it's in my notes.

13    Q    Well, your note on 12/29/97, if I'm reading it

14          correctly, says:  I'm nice lady.  Did Judge Sheely --

15    A.    He said I'm a nice lady who will probably always have

to

16          put up with the stares, he can't do anything about it.

17          He said, sorry about the whole thing, and I said,

18          nothing happened.

19    Q    Is this the complete conversation that you had with

```
20            Judge Sheely?

21      A.    As far as -- yes.  They were just brief --

22      Q     Did you make any response?

23      A.    Again, as I told him before, there's not a whole lot.
I
24            said to him, underlined it was like nothing happened.

25            And he just said, I'm a nice lady, you'll have to put
up
```

Barbara Varner                                    275

```
1             with the stares and he can't do anything about it.

2                   But there was another time and I believe it's in

3             here, where he said I would just have to put up with
it.

4       Q     How well do you know Judge Sheely?

5       A.    I've known Judge Sheely not personally but I've known

6             him since 19 -- probably '73, '72.

7       Q     How did you know the judge at that time?

8       A.    Judge Sheely lived beside me when I lived in

9             Shiremanstown.  My ex-husband and I lived in an

10            apartment briefly for maybe a year.  I met his wife.  I

11            would see him but I did not know him.

12                  And then when I came to the courthouse, I knew of

13            him just because I lived in Cumberland County, I knew

14            Judge Sheely.

15      Q     And you lived right nextdoor to the judge?
```

16    A.    In an apartment.  We were in a single house, we were in

17          the back apartment, and his home was beside us.

18    Q     Did your ex-husband know Judge Sheely?

19    A.    Just I think we might have met him one time, but that's

20          it, just in passing.  I saw his wife on occasion.

21    Q     Does your ex-husband still live next to Judge Sheely?

22    A.    No.  Well, there was a period he did, when we lived on

23          Apple Drive.  When I left, after I left my home, Judge

24          Sheely and his wife did move into the home beside my

25          ex-husband and his present wife.  But now he's not

Barbara Varner                          276

1           there.

2     Q     When did your ex-husband remarry?

3     A.    He remarried in 1990.

4     Q     Did he remarry someone that you now?

5     A.    I did not know her, no.

6     Q     Is it someone your present husband knows?

7     A.    Yes, his ex-wife.

8     Q     We've now discussed two conversations you had with

Judge

9           Sheely on this matter.  Are there any other

10          conversations that you had with Judge Sheely, who was

11          president judge at the time?

12    A.    Not that I can recall at this time.

13    Q    What did you tell him when he asked you why you had
gone

14         to the county instead of to him?

15    A.   That was -- after the investigation, when I went down
to

16         Dan Hartnett, because I had gone through the procedure.

17         I asked Mr. Graham to stop, to leave me alone.  I told

18         Mr. Osenkarski about it.  Nothing was done.  I went
down

19         to Dan Hartnett and I told him about it.  And he never

20         stopped me and said, you shouldn't be here, you should

21         go to the courts.  I was following what I presumed was

22         the hierarchy, you know, in the handbook, that if one

23         failed, you go to the next and to the next.  And to me,

24         the Personnel Department was the place to go when you

25         have personnel problems.  I also knew the EAP program


                    Barbara Varner                          277


1          was through there.  But not once did Dan Hartnett say,

2          this is not in our -- you should not be here, you
should

3          go directly to the judge.

4              So I proceeded with that.  And they pulled in Dave

5          Deluce immediately to do the investigation, and I know

6          he would have contact with the judge.  So I assumed I

7          had -- I was under the assumption I was doing the right

8          thing.

```
 9   Q   Do you know when Judge Sheely found out about the
10       complaint?
11   A.  I have no idea.
12   Q   You knew you were a court employee?
13   A.  I knew I was both.  I knew I was an officer of the
14       court, but I also had a personnel book that belonged to
15       the county.  And they wrote my checks.  My time, my --
16       all my benefits come through the county, through the
17       Personnel office.  So most of my dealings as an
```
employee
```
18       was with the Personnel Department as far as any
19       day-to-day.
20           The judge was there for court, that's basically
```
the
```
21       contact we had.  He did not come down to the office and
22       interact that much or meet with us.  So most of my
23       contact was through the Personnel Department.
24   Q   But you knew that -- did you know that Judge Sheely was
25       the direct supervisor of Mr. Osenkarski?
```

                    Barbara Varner                      278

```
 1   A.  I knew he was -- right, absolutely.  I knew the
 2       hierarchy, yes.
 3   Q   Thanks.  You may recall yesterday when we were
 4       discussing your EEOC complaint, we marked that actually
 5       as an exhibit as P-5.  I'll just give it to you to
```

6          refresh your recollection.  You've just told me that
you

7          knew that you were a court employee, and yet the only

8          respondent that you named was Cumberland County.

9              Why did you only name the county as the respondent

10         in your complaint to the agency?

11    A.   At that point I assumed that the courts were part of
the

12         county.  We worked for Cumberland County as the big

13         umbrella.  The courts were part of a department.  It's

14         broken down in the personnel list as the courts, that's

15         a department.  Each department is listed.  To me,

16         Cumberland County is the big umbrella.  The county is

17         the big umbrella and like I said, the court is just one

18         part of that whole arena.

19    Q    Did it surprise you to find out that that's not so,
that

20         the court is actually a state entity?

21    A.   Yes.  I was not really aware of that at that time.  I

22         knew I was an officer of the court and I had certain

23         rights different than other employees, but I just

24         thought it was under one big umbrella, Cumberland

25         County.

Barbara Varner                                            279

1     Q    Now, you've given me two conversations that you had
with

2        Judge Sheely.  Are there any other conversations about

3        this matter that you had with Judge Sheely when he was

4        president judge?

5    A.  Not that I can recall at this time.  Well, when I went

6        up -- there would be three total, because when I went

up

7        on the 11th and he told me what his plan was, and I met

8        with him in his chambers.  And then the two times that

I

9        met, saw him in passing, the one where he told me that

10       I'm going to have to put up with it.

11   Q    That was at the elevator?

12   A.  Yes.  And the other one was -- I'm not sure where the

13       other one happened.  It was in passing again, that he

14       told me I was a nice lady.

15   Q    Oh.  That wasn't the same instance, then?

16   A.  No, it wasn't.  There was two.  There was two other.

17       There would be two plus the one in his office.

18   Q    Where did the one where he told you you were a nice

lady

19       take place?

20   A.  I'm guessing maybe up in his chambers, just in passing.

21       He would just stop and ask, you know, things.  It was

22       not any formalized, just in passing, like an

23       afterthought for him.

24   Q    What did you say to him in that instance?

25   A.  He would just make the comment and go on.  It was not -

-

Barbara Varner                                    280

1          I really never thought I want stand and argue with the

2          judge.  He would just go on.

3     Q    I'd like to direct your attention to P-7.  There's a

4          note dated 8/22, apparently '97, somewhere right about

5          in the middle of the stack.

6     A.   8/22.  Is there a page number?

7               MR. ADAMS:  Taylor, what date, again?

8               MS. WILLIAMS:  8/22.

9               THE WITNESS:  Yes.

10    BY MS. WILLIAMS:

11    Q    It says:  Gary told Nicole Sheely's pissed.  Going to

12         find out who talked.  See if change their stories when

13         they get on the stand.

14              Who is Nicole?

15    A.   To begin with, Mark Galbraith, he was a -- he's a
former

16         probation officer.  Nicole is now his wife.  At that

17         time her name was Nicole, Horwick, H-O-R-I-C-K.  She
was

18         an adult probation officer.

19    Q    And what exactly did you understand the subject of that

20         conversation to be?

21    A.   What it was is according to Mark, Gary had sought out

22         Nicole or saw her somewhere and said that Sheely was

23         pissed and going to find out who had talked regarding
my

24         case, and see if they would change their stories when

25          they got on the stand, and no one from adult side would

Barbara Varner                      281

1          be spared, that obviously punishment was going to be

2          doled out, it would be my interpretation of that.  And

3          that's how they interpreted it as well.

4    Q     I don't understand the who talked.  Was there gossip?

5          Is that what the talk is referenced there?

6    A.    My understanding is talked -- people were being called

the

7          down to the Personnel Department at that time during

8          investigation to tell their, what they had observed in

9          the office.  Those kind of things.  And it was anybody

10         who had gone down and spoke out about what was going

on.

11         And if they were going to testify in court, that they

12         would, I guess under the threat of would they change

13         their mind when they got on the stand.

14   Q     I guess I don't see the threat that you're talking

15         about.  What there constitutes a threat?  What words

16         constitute a threat?

17   A.    Well, if the judge is pissed and he's going to see if

18         they changed their story, finding out that the judge

19         feels that way might be intimidation for people to say,

20         hey, you know, I don't want to say anything, I'm not

21         going to talk about this because Judge Sheely is not

22          going to be happy if I really, you know, testify, if I

23          testify.

24    Q     But could it mean that he's unhappy that there is a

25          problem in the department?  Could it mean something as


                    Barbara Varner                    282


1           innocuous as that?

2     A.    No, because the reference is when they get on the
stand,

3           meaning they have to testify in court.

4     Q     If you'll turn the page you'll see another note dated

5           11/19?

6     A.    Before or after?

7               MR. ADAMS:  It will say 10/27 at the top.

8               MS. WILLIAMS:  Yes, thank you.

9               THE WITNESS:  Yes, I see that.

10    BY MS. WILLIAMS:

11    Q     On 11/19 you say:  Was informed by fellow professional

12          that Barb Graham was to have told one of the judges
that

13          I confessed to her to having an affair with her
husband.

14              Tell me the circumstances of that and everything

15          you know about that.

16    A.    This was '97.  Right now I cannot recall who that would

17          have been.  I'd have to think about that.  At this
point

18          I'm not sure who that was.

19    Q    When you think of it, will you let your lawyer know

20          and --

21    A.    I certainly will.

22    Q    -- and we'll ask her to let us know as well.

23    A.    Sure.

24    Q    Moving on through P-7, which is the notes, there's a

25          note written 5/26.  I think we talked a little bit
about

Barbara Varner                                    283

1           that situation earlier.  It's right toward the back,

2           maybe six pages in.

3     A.    5/26 did you say?

4     Q     Yes, 5/26.

5     A.    At the very top?  It's right here at the top?

6     Q     Yes.

7     A.    Okay, I have that.

8     Q     I think we're on the same page.  You say:  Joe said I'm

9           to conduct business in my office, not down hall.

10              Do you recall that conversation?

11    A.    Yes, I do.

12    Q     What exactly did Joe -- and I assume that's Joe

13          Osenkarski -- say to you?

14    A.    He said that the judge had instructed him to tell me

I

15       that I was not to go down to the other office, the one

16       had mentioned I was not allowed to go to.  I was not

17       allowed to go down there to conduct any business in the

18       office down the hall, judge's orders, that Barb Graham

19       was distraught.  And I requested that I wanted it in

20       writing from Mr. Osenkarski.

21  Q    And did you get it in writing from Mr. Osenkarski?

22  A.   Yes.  I got a letter from Mr. Osenkarski, but I still

23       wanted the judge to tell me.

24  Q    So what did you do?

25  A.   I got a call from the judge, like I said, within a day,

Barbara Varner           284

1       within a day or two, where he called me up to his

2       chambers.  And he said that I was not to go down to

that

3       office for any reason, that any business I had could be

4       handled down at my end.  And I explained to him it's a

5       public office, I didn't understand how he could keep me

6       out of a public office.  And he said -- he got very

loud

7       and he said, do you understand what I'm saying?  You

8       stay out of there, she's -- Barb Graham's going to have

9       a nervous breakdown.

10  Q    Had you complained that Barbara Graham was bothering

11       you?

12   A.   At that point, yes.  There was an incidence of that

13         before, yes.

14   Q   Did the judge say he was concerned about your safety?

15   A.   No.  He was concerned about Barb having a nervous

16         breakdown.

17   Q   Did he say that he wanted to keep you separate so that

18         no further incidents would happen?

19   A.   No, he did not.

20   Q   Did he ask you to voluntarily keep away from

21         Mrs. Graham?

22   A.   No.  He instructed me to stay out of there.  He never

23         said:  Stay away from Mrs. Graham.  He said when I go

24         into there that I upset her, that she's distraught.

25   Q   You say you called up by Sandy.

Barbara Varner                    285

1   A.   Yes.

2   Q   Who is Sandy?

3   A.   Judge Hoffer's secretary.

4   Q   When the judge told you this, what did you say besides

5         that it's a public office?  Did you say anything else?

6   A.   It continues on this page.  When the judge called me
up,

7         he told me to stay out.  He said, she's about to have a

8         breakdown, meaning Mrs. Graham.  It says you can
conduct

9   your business in your office.  If you can't, I'll have

10   to move everybody you have business with down there.

11   And says if you're going to have a lawsuit, do it.

This

12   is Judge Hoffer.

13 Q Now, further down there you say:  Do you know how

14   embarrassing humiliating for me?  Did you say that or

is

15   this your reflective note as you're writing the note?

16 A. No.  I said this to him.

17 Q What did he say to you?

18 A. He just kept emphasizing I need the stay out of there.

19    I further down, is this, any of this woman's

fault,

20   he asked me about Mrs. Graham.  And I said, no, it is

21   not my fault, either.  I'm the victim.  The man who

22   caused all this is still working here.

23    I have to see him, she pushed into me.  What

24   about -- and then he said about me to stay away from

25   her.  And I said, what about the bathroom on the fourth

Barbara Varner     286

1   floor of the court?  How about the parking lot?  There

2   are places that I feel threatened by her.  And he said,

3   do I make myself clear, you stay away from her.  And --

4 Q You seem to be reading the note.

5 A. Yes.

6 Q Does this note indicate the entire conversation you

7   claim you had with Judge Hoffer?

8 A. As I recalled it, yes.

9 Q Would you add anything to that, anything that you said

10   or anything that he might have said?

11 A. No.  I just went on and --

12 Q Were there any witnesses to this conversation?

13 A. No.  No.

14 Q Where was Sandy?

15 A. Sandy -- I really don't -- she's usually out in her

16   office.  But the door, the judge's door was closed when

17   he was speaking to me.  First he offered me a

cigarette,

18   and then he started in on with this.

19 Q Did you take the cigarette?

20 A. No.  It's a no-smoking building, and I don't smoke, so.

21   MS. WILLIAMS:  Let's mark this one as P-8.

22   (Varner Deposition Exhibit No. 8 was marked.)

23 BY MS. WILLIAMS:

24 Q I direct your attention to P-8.  I have this

25   separately.  It didn't appear to be in the packet that

Barbara Varner     287

1   was provided.

2   Is this in your handwriting, Ms. Varner?

3   A.   Yes, it is.

4   Q    It says:  Joe, I will not be affected by seniority
list.

5        He will take care of me.

6            Would you explain what this note means?

7   A.   Joe I'm referring to is Joe Osenkarski.  And this is

8        when they had been talking about the seniority list and

9        those type of things, and I was complaining about how

10       they planned to change it and move me down on the list.

11       And Joe had told me that not to worry, that I wouldn't

12       be affected by the seniority list, that he'll be making

13       a specialist position for me, a Family Preservation

14       specialist position.   And he said it would be -- would

15       have no effect on promotion at all, only on the

16       emergency duty time where you sign up to serve
emergency

17       duty on a weekend basis.  And that goes by seniority,

18       goes down the list.  But that's what Joe had told me

19       that day.  It was more if I just relax about the

20       seniority list I will take care of you.

21  Q    And did he do that?

22  A.   No.

23  Q    In what respect did he not?

24  A.   There was no specialist position ever developed beyond

25       the one year of grant money for the Family
Preservation.

1    Q    Do you know why?

2    A    I believe they did not apply for the Family
Preservation

3         because the number of referrals on juveniles was coming

4         in, and with Family Preservation was that very low

5         number to supervise and they needed more line people

6         rather than a smaller specialist area.

7    Q    Sounds like the circumstances changed?

8    A    Yes.

9    Q    Did you see a copy of the report that Judge Sheely
wrote

10        on your complaints to the county?

11   A    The Order that he wrote?  Or what?

12            MS. WILLIAMS:  We'll mark it.  P-9.

13            (Varner Deposition Exhibit No. 9 was marked.)

14   BY MS. WILLIAMS:

15   Q    Do you recognize that document?

16   A    Yes, I do.

17   Q    Do you dispute any of the findings that Judge Sheely

18        made, other than what we've already discussed?  If

19        you've already told me about it, you need only
reference

20        it.

21            MS. WALLET:  I'll object to the form of the

22        question only to the concept of findings.  Would you

23        like to identify what you mean by findings?

24   BY MS. WILLIAMS:

25   Q    Well, let me ask it this way.  Is this the Order that

Barbara Varner                                      289

1           you discussed in our previous conversation about Judge

2           Sheely?

3    A.     It is.  But I can also note, I read this after quite

4           some time.  My attorney had requested a copy of this.

5           The only time I even saw a little bit of it was when I

6           went up to the judge's chambers and his law clerk was

7           typing this and he explained it to me.

8    Q      Why do you call it an Order?

9    A.     Well, the judge signed it.  It's not an Order but it
was

10          his decision.

11   Q      You had a conversation about this with the law clerk?

12   A.     No, no, no.  She was typing what Judge Sheely was

13          dictating.

14   Q      So you never talked to the law clerk about it?

15   A.     No.  No.  She was just typing it.  And that's when he

16          took me into his chambers and told me what he had

17          planned to do.  But we had requested a copy of this for

18          quite some time.  I know my attorney was very irate
that

19          we had not received a copy for quite some time.

20   Q      I noticed that she's cc'd on the bottom of it and she

21          did eventually receive copy, did she not?

22   A.     Yes, eventually she did.

```
23   Q    Would you take a minute to read over it and tell me if
24        there is anything that you have not discussed with me
25        already that you dispute in Judge Sheely's finding.
```

                              Barbara Varner                    290

```
1         MS. WALLET:  Again, I'll object.  The problem is
2         Judge Sheely will say someone told me something.  Do we
3         object to the fact that someone told him something?
4         Maybe not.  But we might object to the substance of
```
what
```
5         was said.  That's why I would ask you to be specific
6         about what you mean by a finding.
7    MS. WILLIAMS:
8    Q    Perhaps we can just say is there anything other than
9         what we've discussed that Judge Sheely states in this
10        memo dated July 11th, 1997, that you dispute or
11        disagree?
12   A.   I disagree with how he handled this.
13   Q    Yes?
14   A.   Okay.
15   Q    We've discussed that.  Is there anything that we
```
haven't
```
16        talked about that you would specifically dispute at
```
this
```
17        point?
18   A.   I'd have to discuss with my attorney to find out, you
19        know, actually go over it.
```

20    Q    Factually.  We understand that legal conclusions are

21         left to your attorney, but it's facts I'm trying to

22         understand from you.

23    A.   I would take exception to that we were best friends.

24    Q    Do you know why Judge Sheely would have gotten the

25         impression that you were best of friends?


                         Barbara Varner                    291


1    A.   I guess because you have a cooperative, you know,

2         working relationship.  Best friends, friends would not

3         be a term I would use.

4    Q    Is there anything else?

5    A.   I call exception to the fact that he never had the

6         opportunity to meet with the two parties in the

chambers

7         and try to resolve the matter.  He met with Mr. Graham,

8         his attorney, and he met with them I know at least on

9         two occasions.  And we had never had the opportunity to

10        meet, my attorney and myself, prior to his making this

11        decision.

12    Q    We discussed that you never asked for that opportunity;

13        is that correct?

14    A.   Well, at that point this happened, as far as I'm

15        concerned this happened very suddenly, that he made

that

16        decision, just after hearing the confession, this

17        alleged confession, that he would act as far as I'm

18        concerned on an emotional basis rather than a factual

19        basis and not meet with all parties prior to this.

Gary's

20   Q    Does it make you angry that Judge Sheely believed

21        story rather than your story?

22   A.   Judge Sheely never actually heard my story from me at

never

23        all.  It was always secondhand information.  I was

gone

24        given an audience with him to talk about it.  I had

25        through the county, through Dave Deluce, with my

Barbara Varner                            292

1         understanding that Dave Deluce had contact with the

2         judge on an ongoing basis.

3    Q    Had you told your story to Dave Deluce?

4    A.   Yes.

5    Q    Do you know whether Judge Sheely saw that story as

6         presented to him through Dave Deluce?

7    A.   I have no idea.  Even the recommendation we have never

8         been given a copy.

9    Q    Is there anything else that you would dispute?

10        Factually.

11   A.   Not at this time.  I leave it open.

12   Q    If at any point during the course of the discovery you

13          do find something that you disagree with factually in

14          that document, will you advise your attorney and ask
her

15          to let me know that?

16     A.   Absolutely.

17     Q    At some point did you bring charges against Barbara

18          Graham?

19     A.   Yes, I did.

20     Q    I think we discussed that a little bit yesterday.

21     A.   Yes.

22     Q    As part of the discovery process you provided me with a

23          facsimile transmission from you at the Cumberland
County

24          Juvenile Probation Department to Debra Wallet, your

25          lawyer.  Do you recall that document I'm speaking of?


                    Barbara Varner                    293


1               MS. WALLET:  Perhaps you could show her.

2               THE WITNESS:  If I could see it.

3               MS. WILLIAMS:  We can mark it so the record is

4          clear.

5               (Varner Deposition Exhibit No. 10 was marked.)

6     BY MS. WILLIAMS:

7     Q    Is that your handwriting, Mrs. Varner?

8     A.   Yes, it is.

9     Q    And in that fax you state:  Debra, B. Graham admitted
to

10          the charges.  Is that correct?

11    A.    Yes.

12    Q     Exactly what did Barbara Graham say to admit to the

13          charges?

14    A.    The charge of harassment, she admitted to following me

15          or continuing with me to an area where she was not

16          parked, that she continued to my car, beside me,

17          continually talking after I had asked her not to say --

18          I just asked her to drop it.  She continued along,
which

19          is a continued behavior of harassment, that she had

20          admitted to doing that.  She did follow me to my car,

21          that she did continue to talk to me, that she had made

22          the statement that I had this alleged affair with her

23          husband, and that she was angry at me.  That is the

24          elements of harassment.

25    Q     But the judge found there was no harassment, didn't
she?

Barbara Varner                        294

1     A.    DJ Correal felt that Barb Graham had, quote, crossed
the

2           line, but she dropped the charges with a warning that

3           she put be put on notice that any further charges would

4           be handled differently.

5     Q     Right.  I see that's written there.

6   A.   Yes.  Right.

7   Q    Do you know whether there's a transcript of that

8        hearing?

9   A.   Yes, there is a transcript I'm sure.

10  Q    Have you ever seen it?

11  A.   No, I have not.

12  Q    Do you remember the district justice in that case

13       telling you that she expected more out of you as well
as

14       out of Barbara Graham, as well as from Barbara Graham?

15  A.   No, she -- not that I recall her saying that, no.

16  Q    If it's in the transcript, would that be true?

17  A.   I would assume it would be.

18  Q    Do you recall the district justice saying that I have

19       these kinds of cases on a regular basis, and believe
me,

20       harassment usually is much more severe than this?

21  A.   I don't recall her saying that.  She could have.

22  Q    But the result was that she was found not guilty of the

23       harassment charges; is that correct?

24  A.   What it was, Ms. Graham stated that we had a case --

25       that's, you know, obviously this case -- was
proceeding,

Barbara Varner                              295

1        and Judge Correal said, it sounds like this is going to

2        be handled in another court, whatever, and that she

3   warned her.

4 Q But this is a civil case that you've brought.

5 A. Yes.  But I think she saw that the problem that

6   Ms. Graham was bringing up, this alleged affair is going

7   to be at least discussed or handled, the whole issue

8   that probably precipitated this, her anger with me would

9   be handled somewhere else.

10 Q Does that satisfy you?  I mean, obviously criminal

11   penalties are different from civil ones.

12 A. My intent was not to have Mrs. Graham have criminal

13   charges.  My intent was to put her on warning, because

14   this had not been the first time.  It had been an

15   ongoing problem, where her crossing the line or

16   following me or just intimidating.  I just wanted her to

17   get the idea that you just cannot continue this.  I had

18   the right to go to my parking spot.  I already moved my

19   parking spot away from her.  That I had the right to be

20   free and feel safe when I'm going to my car.  And free

21   from harassment.  Just doing that.

22 Q Did you ever bring any criminal charges against Gary

23   Graham?

24 A. No, I did not.

25 Q I'm going to show you a document again provided by your

```
 1          counsel through the discovery process.

 2              (Varner Deposition Exhibit No. 11 was marked.)

 3  BY MS. WILLIAMS:

 4  Q    Is this a document you recognize, Ms. Varner?

 5  A.   Yes, it is.

 6  Q    It's a handwritten document.  Is that your handwriting?

 7  A.   No, it is not.

 8  Q    Okay.  Whose handwriting is it?

 9  A.   This is Debra Green, a probation officer.

10  Q    Okay.  And under what circumstances did Debra Green

11       write this?

12  A.   Debra Green was aware of most of the things that were

13       happening.  Obviously, she worked closely with me.  And

14       she had gone down a list of charges that she felt

15       absolutely would be justified in this case.

16  Q    Justified in what?

17  A.   Against Mr. Graham.

18  Q    All of these are possible charges against --

19  A.   Mr. Graham.

20  Q    -- Mr. Graham?

21  A.   Um-hum.

22  Q    What did you do with this information, if anything?

23  A.   I had contacted the District Attorney at one time early

24       on and I asked him about pressing charges.  It was a

25       phone conversation, and that would have been Skip
```

Ebert.

Barbara Varner                              297

```
 1            He never got back to me.  And --
 2    Q     Why did you not continue to press the charge?
 3    A.    The Sheriff's Department was aware of this.  CID was
 4          aware of this.  They were aware that they could bring
 5          the charges.  CID could bring the charges themselves.
 6    Q     You had already talked with them?
 7    A.    Probably at this time, yes, I had spoke to the sheriff
 8          as well as CID was involved.
 9    Q     And that's a contact that you initiated?
10    A.    Yes, it is.
11    Q     CID never brought any charges against Gary, did they?
12    A.    Not that I'm aware of.  They were in agreement that he
13          should be removed from the job, he, you know, that he
14          was an angry man, and they had made comments about
```
time.
```
15          Those kind of comments.  But --
16    Q     Do you know if Debra Green ever went to CID or the
17          sheriff or the police related to these, this list of
18          potential charges?
19    A.    We had also been called down to the Personnel
20          Department.  There was a time they -- I'm not sure
21          exactly what they were doing.  They were doing an
22          investigation is what they told us.  They were just
23          trying to look at different things, and they had called
24          several of us down on an individual basis and said,
```

25          could you tell us what problems are going on in your

Barbara Varner                          298

1           department.  And at that time we expressed a lot of the

2           concerns; the concerns about Mr. Osenkarski and Gary

3           getting the shoes from this factory under the alleged

4           giving them to a detention center, then personally

using

5           them.  We had concerns -- we told them all this stuff.

6               I told them about being stalked, and I felt was

7           stalking, coming to my home, being touched, the

indecent

8           assault, theft by unlawful taking.  Mr. Osenkarski had

9           been known almost notorious in our department as one

who

10          removes items from the supply cabinet.

11     Q    Mr. Osenkarski?

12     A    Yes, for personal use.  That's -- when I first started

13          at Probation I heard that.

14     Q    Have you ever seen him do such a thing?

15     A    No.  But it was just one of those things they told me

16          that's why they had to lock to supply cabinet.

17          Mr. Graham had informed me of that, too.  He would talk

18          about Mr. Osenkarski taking things out of the supply

19          cabinet for personal use.

20               These are things we expressed to them down there,

21      and they told us they would handle them, they could do

22      things.  But nothing ever came of it.

23  Q   I asked in my Answers to Interrogatories, which you
will

24      recall, I asked in my interrogatories which you
answered

25      and you will recall I showed you a copy and we
discussed

Barbara Varner                              299

1       your verification of it.  But I asked you if anybody
had

2       made any admissions regarding the case, and your

3       response was that the memorandum of July 11th, 1997,

4       which we've marked as P-9, contains many admissions

5       about the investigation of my complaints.

6           Can you tell me specifically what you consider to

7       be an admission?

8   A.  Could I see the --

9   Q   Yes, I'm sorry.  It's the memo.

10  A.  This one?

11  Q   Yes, July 11.

12  A.  And again, could you restate the question again?

13  Q   Yes.  You told me that that memorandum contains many

14      admissions about the investigation of my complaint and

15      the fact that Judge Sheely would not implement the

16      recommendations.

17          What specific admissions do you consider Judge

18     Sheely to have made there?

19  A.  Could I see the interrogatory?

20  Q   Sure.

21          (Handed to witness.)

22  A.  Mr. Graham using the F word and using loud and abusive

23     language.

24  Q   That's an admission by Judge Sheely?  I'm asking --

25  A.  Right.



Barbara Varner                                    300



 1  Q   -- do you consider that an admission?  Okay.

 2  A.  Admission that he failed to meet with the two parties.

 3          Admission he never spoke to me about the

 4     allegations.

 5  Q   He never spoke to you directly before this

conversation?

 6  A.  No.

 7  Q   Okay.

 8  A.  He did not.

 9  Q   Is that the extent of the admissions by Judge Sheely in

10     that memo?

11  A.  I think those would be the most important things for

us,

12     that he never met with us to resolve the matter and

13     obviously never met with me and my attorney, never gave

14          us the opportunity to do that.

15     Q    Okay.  And we discussed that earlier and we discussed

16          that you hadn't requested a, specifically requested a

17          meeting.

18     A.   Yes.

19     Q    I'm actually going to ask you to hold on to this

because

20          I have one more question on it.

21     A.   That's fine.

22     Q    Following down the page, you responded:  Judge Hoffer

23          told me that he did not know why Judge Sheely had not

24          taken care of this problem.  And you say that's an

25          admission.

Barbara Varner                          301

1           Tell me about that conversation, about that

2          conversation with Judge Hoffer.  Under what

3          circumstances did he say that?

4     A.   After Judge Hoffer took office, he had called me up to

5          his chambers and he had said -- he referred to Judge

6          Sheely as Harold.  He said he knew about the case and

he

7          said he did not know why Harold had not taken care of

8          this problem before he left.

9     Q    And what did you say to that?

10    A.   And I explained to him that -- I explained a little bit

11     of the whole case, that I felt more should be done,
that

12     I didn't think it was enough action taken, that I was

13     still, you know, being exposed to Mr. Graham, I was

14     still being harassed and retaliated.

15   Q    What did Judge Hoffer say?

16   A.   He had asked me what I had wanted, what I would like to

17     see done.  And I don't think the two men should ever

18     supervise females again.  Ideally I would like to have

19     them fired.  And he said he would look into it.  And

20     that's basically it.

21   Q    Do you remember the date of that conversation?

22   A.   No, I don't.  It was -- it wasn't too long after he
took

23     office.

24   Q    Who initiated that meeting?

25   A.   Judge Hoffer did.


Barbara Varner          302


1   Q    And shortly after, was it shortly after that that Gary

2     Graham was sent to another facility at the prison?

3   A.   I'm not sure about the time frame.  I know Mr. Graham

4     left our office in May and -- I'm sorry, in March.

5   Q    And when would this conversation have taken place, do

6     you recall, when Judge Hoffer first came on as PJ?

7   A.   I don't recall the exact date at this time.  I believe

8        it would have been the end of the year, end of -- it

9        would have been in -- I believe he retired at the end

of

10       the year.

11    Q   Judge Sheely?

12    A.  Yes.  And then it was after that.  So possibly at the

13        beginning of the year is when Judge Hoffer called me up

14        and just spoke to me briefly about that.  And then

March

15        is when Mr. Graham was moved.

16    Q   Were there any witnesses to that conversation?

17    A.  No, there wasn't.

18    Q   Why did you not write a note about that conversation?

19    A.  I don't know, I'm not sure, because I might have it on

20        maybe a calendar that I had met with the judge, but.

21    Q   Would you check to see if you have a calendar that has

22        any information on that --

23    A.  Yes, I will.

24    Q   -- conversation.

25    A.  Right.


                              Barbara Varner                    303


1     Q   Thanks.

2     A.  It would have been right after, it wasn't too long

after

3         he took office, though.

4             MS. WALLET:  Can could I ask for a five-minute

5          break, please?

6                  MS. WILLIAMS:  Oh, yes, let's.  I'm getting near

7          the end, you'll be pleased to know that.

8                  (Recess taken from 11:26 until 11:35 a.m.)

9     BY MS. WILLIAMS:

10    Q    Ms. Varner, are you aware that Mr. Osenkarski was sent

11         to sexual harassment training?

12    A.   I heard that he was.

13    Q    Are you aware that he submitted a corrective action
plan

14         to Judge Sheely regarding your complaints?

15    A.   No, I'm not aware of that.

16    Q    Let's talk a little bit about the CASA program.  Were

17         you involved in the development of that program?

18    A.   Not from the onset, no.  I think that started before

19         Judge Guido even got on the bench.

20    Q    Okay.  Tell me when you did get involved.

21    A.   I first heard about it when Mr. Osenkarski spoke to

22         several probation officers, I don't know who else was

23         there, but he said that Judge Guido was looking for an

24         officer of the court but also someone who knew maybe

25         some social work, was familiar with dependency court
and

                         Barbara Varner                    304

1          delinquency court, that they would be working directly

```
       2        with Children and Youth and was wanting to know if any

       3        of us were I interested in it.

       4   Q    When you say Judge Guido was looking for, was this for
a
       5        specific position or was it part of a committee, or
what
       6        exactly was it that?

       7   A.   For director of the CASA program.  So that's when I

       8        initially heard about Mr. Osenkarski mentioned it.  And

       9        when I started to think about it I thought, well, that

      10        would be a good blend for me because I had prior with

      11        Children and Youth, and also an officer of the court.
I
      12        knew our court system and I knew dependency and

      13        delinquency so it seemed like a good fit.  I thought
I'm
      14        just going to look into it.

      15            So I met with Judge Guido and he explained it the

      16        me.  His tipstaff, Carl, gave me a lot of paperwork,

      17        people who had written letters of interest, paperwork
he
      18        had gotten from the York, I believe it was the York

      19        program who was a model program for CASA.  Just letting

      20        me know what it was all about.  And he said that they

      21        were in the process of writing a grant, and Laura

      22        Patterson is grant writer for the county, was the one

      23        who was in the process of writing the grant.

      24   Q    At some point were you appointed to a committee?

      25   A.   A committee?
```

Barbara Varner                                          305

1    Q    Involving CASA.

2    A.   We were just a group of us, really.  It was myself,

3         Carl, and the judge, were looking at people we could

4         invite to have a meeting, to try to get some community

5         interest in the program.

6             So we had scheduled a meeting at the Carlisle

7         Country Club, I believe it was March 1st of 2000.  I'm

8         not sure about the date but I believe that's when it

9         was.  And I had invited some attorneys, some

10        professionals I knew that I had been working with and

11        they had done the same, and we compiled a list of

people

12        to attend this meeting.

13   Q    Why were people invited to a meeting?

14   A.   Just to try to get some community interest, inform them

15        of what CASA was all about.  We brought in the director

16        from York who had been running the program so she could

17        inform the people about you need community support for

18        this program.

19   Q    And when you say we, you mean Judge Guido?

20   A.   Carl.

21   Q    You and Carl, what's Carl's last name?

22   A.   Connelly, C-O-N-N-E-L-L-Y, I believe.

23   Q    Would it be Connellan?

24   A.   Connellan, there you go.  I'm sorry.

25    Q    So what transpired at the meeting that you had?

Barbara Varner                                306

1    A.    At the meeting, Judge Guido ran the meeting, and he had

2          introduced me as the potential CASA director.

3    Q    This is the first meeting?

4    A.    Yes, as far as -- yes, as a community meeting.

5    Q    Are there minutes of that meeting, do you know?

6    A.    I'm sure there were.  I believe it would have been
Laura

7          Patterson's secretary, I believe she was there taking

8          notes.

9    Q    And Judge Guido introduced you as the potential

10         director?

11   A.    As who he had selected to be the director, yes.

12   Q    What exactly did he say?

13   A.    He had introduced me and he said that we were hoping to

14         get a program started in Cumberland County, and that I

15         had been chosen as the potential director for it, if
the

16         program would get going.

17   Q    He said you had actually been chosen?

18   A.    He had chosen me, yes.

19   Q    What process did you go through to be selected as

20         director by Judge Guido?

21   A.    I think the first thing was just showing an interest.

22          Then I met with him and explained my background.  I

23          believe I gave him a copy of my resume.  He was

24          surprised he did not know I had a master's degree in

25          administration of justice, which was an aid.


                    Barbara Varner                          307


1           And I heard about the program.  It just sounded

2           like something that I would like to at least pursue.

3           And I asked him at our first meeting if it would be
okay

4           for me to go and visit some sites of other locations.
I

5           went to Pittsburgh, to York, and had a lot of

6           correspondence, email with other programs, getting

7           information just exactly what CASA was all about.  And

8           Mr. Osenkarski allowed me the time to go do several

9           visits.

10     Q    Did you talk with Judge Guido about the complaints that

11          you had raised and this lawsuit?

12     A.   No.  I never discussed that with Judge Guido.

13     Q    How many meetings of this committee were there, do you

14          recall?

15     A.   I know there was that one.  They were trying to get a

16          steering committee, people that would be committed to

17          being on the board.  That's what they were looking for,

18          interest and also a board that you would -- you have to

19          have a board to support the program.

20    Q     Do you serve on this board now?

21    A.    I'm still part of it.  I still get the newsletters and

22          stuff.

23    Q     Do you attend meetings now?

24    A.    No.  I've chosen not to.

25    Q     Do you recall any talk at these meetings that we've
just


Barbara Varner                                      308


program  1     discussed or in any other context about what the

2          director's salary would be worth?

my       3    A.    When they started developing the grant they just took

4          salary.  Laura Patterson asked me for my salary, and

5          that's what they put on as in our grant.

6    Q     Do you know why she did that?

7    A.    I always assumed because I was the one they were

8          choosing to head up the program.

9    Q     Did you ever have a conversation with Laura about why

10          that figure was used?

be       11   A.    It was my salary, because it was planned that I would

12          the director.

13    Q     Did you have a conversation with Laura about your

14          salary --

15    A.    Yes, I did.

16    Q    -- and why it would be used?  What exactly did Laura say

17         to you?

18    A.    She had been at the meeting, also, that meeting at the

19          country club.  And she had heard -- as far as I think

20          both her and I were concerned, we were going ahead and I

21          would be the director.  And she was using my information

22          to fill in on the grant.

23    Q    Do you recall any discussion of the director's job being

24          a part-time job rather than a full-time job?

25    A.    No.  No, I did not want part-time employment.

Barbara Varner                                        309

1    Q    But did you ever hear any conversation about whether it

2          could be approved as a full-time position?

3    A.    From the very beginning it was going to be a full-time

4          position.

5    Q    How do you know that?

6    A.    All of them, as far as my knowledge, all of them were

7          full-time positions.  I don't know, I personally did not

8          know anybody was doing it on a part-time basis in any

9          county.

10    Q    Were there meetings perhaps between the commissioners

11          and Judge Guido or between other parties that you might

12          not be privy to, where the salary or the part-time

13          full-time issue might be discussed?

14    A.    Well, certainly.  I have no knowledge of that.

15    Q     Did you ever hear that the commissioners might be

16          willing to support a full-time CASA director position

at

17          your salary if it would resolve your lawsuit?

18    A.    I never heard that until the very end.

19    Q     Tell me about the very end.

20    A.    It was, we were in a meeting with the court

21          administrator, I guess assistant court administrator.

22    Q     Could you give me the name?

23    A.    She's blonde.  I cannot think of her name.

24    Q     Is it Taryn Dixon?

25    A.    Yes, Taryn Dixon.  She was there.  Tom Boyer was there.


                    Barbara Varner                    310


1          Joe Osenkarski was there.  Judge Guido was there.  I

2          believe Carl was there.  And I'm not sure if anybody

3          else was there.  And we were basically finalizing,

4          because I had asked that if the position did not work

5          out, that I would be able to come back to Probation.  I

6          had asked certain conditions.  I had also asked that if

7          Probation would get a raise, that I would get a raise.

8        Those were -- trying to negotiate the final points.

9    Q   Right.  Were these communicated by you or through your

10       attorney, do you know?

11   A.  I'm sure we spoke about that.

12   Q   When you say we, who do you --

13   A.  My attorney and myself, we spoke about that.  Because I

14       wanted assured that I had a job if they did not apply

15       for a grant again.  And it was -- my attorney had gotten

16       a call informing us, I believe it was from Mr. Thomas or

17       Dellasega, I'm not sure which one, saying that I could

18       not have the position unless I withdraw my case, my

19       Complaint.  That was the first time we heard that there

20       had been anything, one had anything to do with anything,

21       with the other one, any relevance to it.

22   Q   And do you remember the date of all this discussion?

23   A.  I do not know the date when they contacted her, no.

24   Q   Do you have any note about it in your packet?  I

25       don't --

Barbara Varner                          311

1    A.  That probably would have been something just between my

2        attorney and myself, my personal notes from her.

3    Q   The meeting with Taryn, T-A-R-Y-N, Dixon and Judge

4        Guido, that you had told us about --

5    A.    Probably would be on a calendar.

6    Q    Will you check to see if there are any notes that you

7          have related to that meeting?

8    A.    Certainly.

9    Q    So were you ever aware that Judge Guido felt that the

10         CASA director position was not worth the salary that
you

11         were being paid at that time?

12   A.    No.

13   Q    That was never discussed in any of the meetings you

14         attended?

15   A.    Judge Guido was aware of my salary when I applied.

16   Q    Was there ever any discussion in your presence of what

17         the commissioners felt that salary would be worth?

18   A.    No.

19   Q    Did Judge Guido ever tell you that he didn't think

20         funding at your probation officer's salary would be

21         approved --

22   A.    No.

23   Q    -- by the commissioners?

24   A.    No, he did not.  He said it was a program he wanted to

25         get started, and I think he felt he had enough leverage

Barbara Varner                          312

1          that it would go through.

2   Q     You sent a memo to Judge Guido, and we can mark this as

3         P-12.

4             (Varner Deposition Exhibit No. 12 was marked.)

5   BY MS. WILLIAMS:

6   Q     This is a memo dated July 12th, 2000, and it indicates

7         that it's from you.  Do you recall typing up this memo?

8   A.    Yes, I do.

9   Q     Okay.  And in this memo you say:  I personally

10        presented -- it's in the second paragraph -- I

11        personally presented the grant at the commissioners

12        meeting on June 16th where the terms and conditions were

13        agreed to and signed by the commissioners.

14            What do you mean by presented?  What happened there

15        at that meeting?

16  A.    They had a commissioners meeting, it was an open forum,

17        and Laura Patterson, the grant writer, had gone with me.

18        And there was a place to sign as a director, agreement,

19        for the CASA program for them, the commissioners, to

20        approve the grant.  And it was presented.  They already

21        had known about it.  They had a copy of it.  And it was

22        brought up before the board about the interest.

23            And I believe it was Nancy Besch, one of the

24        commissioners, had stated how -- anyways, one of the

25        commissioners had said how they were for this, they

1           thought it would be a good community program and that

2           they had signed it.  They signed the grant and I signed

3           as a director.

4     Q     Are there minutes of that meeting, do you know?

5     A.    I'm sure there are.

6     Q     Do you have a copy of them?

7     A.    No, I do not.  It was Laura and myself that went to the

8           meeting.

9     Q     Was Judge Guido present?

10    A.    No.  He was not at the commissioners meeting.

11    Q     Did you ever talk to Judge Hoffer about the CASA

12          program?

13    A.    I don't recall ever speaking to him about it.

14              MS. WILLIAMS:  Off the record a second.

15              (Discussion held off the record.)

16              MS. WILLIAMS:  Let's mark that 13.

17              (Varner Deposition Exhibit No. 13 was marked.)

18    BY MS. WILLIAMS:

19    Q     Let me ask you if you can identify that document,

20          Ms. Varner?

21    A.    Yes.  It's the grant proposal for CASA.

22    Q     And to your knowledge, is that the grant proposal that

23          was actually submitted?

24    A.    To my knowledge, it is, yes.

25    Q     Now, you indicated a minute ago that you had to sign

Barbara Varner                          314

1          this document as the --

2     A.   That's correct.

3     Q     -- proposed executive director?

4     A.   Program director.

5     Q    Program director?

6     A.   Um-hum.

7     Q    Can you point out where your signature appears?

8     A.   It's page 6, the very last page.

9     Q    Did you say that you signed this in the meeting with the

10         commissioners?

11    A.   Yes.

12    Q    And what conversation or pronouncements were made around

13         your signing of this document, do you recall?

14    A.   Nancy Besch signed it.  I was given -- I remember Laura

15         was with me, because I said to Laura, it said

16         administrator board president, and Laura said just cross

17         that out and write program director above that, because

18         she was familiar with how the grant language would be

19         written.

20    Q    I'm confused about why a proposed director would be

21         required to sign for a proposed program that is not yet

22         in existence.  Do you know why that would be true?

23    A.   I think by getting the commissioner's name on there,

24          they were saying they were on, they all agreed to this,

25          that they would follow through, that perhaps if the

Barbara Varner                    315

1          grant didn't go through, that they would still be

2          willing to, you know, underwrite it.  I do not know.

3          All I know is this is how it proceeded.

4     Q    But at this point the program was not actually in

5          existence, if I understand correctly; is that right?

6     A.   That's correct.  But Laura had -- she saw no reason why

7          it would not go.  She had met, she had met all the

8          criteria for it.  She's a pretty good judge of whether,

9          you know, things go.

10              And I think CASA, the national CASA had said that,

11          you know, they were willing -- they were trying to

12          develop all new programs and the money was available.

13    Q    Now, was this before or after you were informed that
the

14          CASA director's position was being offered to you as a

15          settlement of your suit?

16    A.   This was prior, because in the note that I sent wrote
to

17          Judge Guido, the date on my signature here is June
13th.

18          The letter I, memo I wrote the Judge Guido was July

19          12th.  And it says as of July 12th I had not heard any

```
20          more about -- I'm sharing some concerns.  It says I met
21          on June 16th.  I was making preparations to transfer
out
22          of my department, until at the 11th hour when an issue
23          came up regarding my salary.  So this was prior to my
24          learning this.
25              MS. WALLET:  I'm sorry, you'll have to clarify,
```

Barbara Varner                                        316

```
1          which was first?
2              THE WITNESS:  Okay.  The CASA, when I signed the
3          CASA grant was prior to me being informed that I could
4          not have it unless I withdraw my charges.  And that's
5          why I had wrote this letter to Judge Guido, because at
6          that time our quarterly reports for the CASA program
7          just in getting the grant was coming up, and I wanted
to
8          get it implemented.
9     BY MS. WILLIAMS:
10    Q    What response, if any, did you receive to your memo of
11          July 12th?  Which we've marked as P-12.
12    A.   I did not get a response.  Judge Guido did -- Judge
13          Guido contacted my attorney and requested if there's
any
14          way we can work this out, get the case settled, what
15          could we do to make sure I would get the position.
16    Q    Did you actually have any conversation with Judge Guido
```

17        about it after you wrote the memo?

18  A.    He also talked -- called me up and asked me if I could

19        do anything about coming up with a resolution that

20        somehow I could have this position, and can I resolve

21        the Complaint, is there anything we can do.  And I

22        explained to Judge Guido at that time, I said, I don't

23        see that there's any connection.  It was not a

24        connection made to me at the very beginning, they were

25        just coming looking for a director and I just --

                  Barbara Varner           317

1  Q     What did Judge Guido say to that?

2  A.    He said he wanted me in the position, he would like me

3        to have the position, and he wanted me to find out if

4        there's anything we could do to work it out and to talk

5        to my attorney.

6  Q     And did you do that?

7  A.    Yes, I did.

8  Q     Were you eventually offered the job?

9  A.    Yes, at a lower salary, at around 29,000.

10  Q    Prior to this, although you had signed the CASA grant

11        form, was there a formal job offer made?

12  A.   Judge Guido had said he wanted me for the position.

13  Q    Right.  But the formal job offer came with the lower

14        salary.  Am I understanding that right?

15    A.    No.  Before this, whenever we worked with Laura

16          Patterson, I was under the belief that I had the

17          position at my salary.

18    Q     But had you signed any documents, any -- I don't know

19          what documents the county would require, but had you

20          signed anything indicating that you were in a new

21          position officially with the county or the court?

22    A.    The only thing I signed was the CASA, the CASA
paperwork

23          as you've noted, with my salary listed as the starting

24          salary for this position.

25    Q     Is that the extent of the conversation you ever had
with


                    Barbara Varner                          318


1          Judge Guido on the CASA position?

2                MS. WALLET:  You're referring to the several

3          communications she's testified to?

4                MS. WILLIAMS:  She's testified to the one where

5          Judge Guido apparently telephoned you or talked with

6          you.

7                MS. WALLET:  I guess I'll object to the question.

8          Could you ask the question again?

9     BY MS. WILLIAMS:

10    Q     I'm interested in what happened after you found out

11          that there was a tie to resolving the case, that the

```
12          position was tied to resolving the case.  Tell me about

13          every conversation you had with Judge Guido after you

14          discovered that the position was offered only if the

15          case was resolved.

16    A.    Like I said, he had called me up and asked if there was

17          any way we could resolve this, and he was aware that

18          obviously that this was becoming an issue.  He was

19          informed of the case, and the Complaint.  And he just

20          asked me if there was any way I could work it out, work

21          it out with my attorney to come to some kind of

22          resolution for the case.

23    Q     Right.  Were there any other conversations you had with

24          him?

25    A.    I can't -- I don't exactly remember.  I don't recall at
```

Barbara Varner                                          319

```
1           this point.

2     Q     How did you turn down the CASA directorship?  Did you
do

3           that orally or in writing?

4     A.    I told Judge Hoffer -- no, I'm sorry -- Judge Guido
that

5           I would not take it at the lower salary and I didn't

6           think there should be any connection between the two.

7     Q     Was this in the conversation you just told me about?
Or
```

8          did you have a subsequent conversation?

9     A.   I believe there was a subsequent, because I remember
him

10         telling me that he was going to start interviewing.
And

11         he had like a list of -- is there any way you could
work

12         it out and at that salary, I would have to accept that

13         salary, and I said I would not.

14    Q    My understanding of that job is that it's finding and

15         training volunteers.  Is that an accurate description
of

16         the job?

17    A.   That's correct, yes.

18    Q    Would that job have been a promotion for you?

19    A.   No, it wouldn't have been.  It would have been lateral.

20    Q    In fact, it would have taken you out of the mainstream

21         of probation work?

22    A.   Yes, it would have.

23    Q    Was someone hired at that lower salary after you turned

24         the job down, do you know?

25    A.   Yes, there was.

Barbara Varner                                320

1     Q    Do you know if there have been any complaints about the

2          person who is program director now?

3     A.   I have heard complaints from some Children and Youth

```
  4              workers at the very beginning.  The reason was that the

  5              new director, Anita Brewster, had no idea what

  6              dependency meant.  She had never worked the court

  7              system.  And they were just frustrated because you have

  8              to go in and be able to read a file, they had the right

  9              to read actual case files.  You've got to be able to

 10              read the file, understand what the court orders mean.

 11              She wasn't familiar with our court system, which as

 12              everybody knows is different than anybody else's.  They

 13              were very frustrated with her lack of knowledge.

 14     Q     Who are those people?  Can you give me names?

 15     A.    Yes.  It would be Becky, her name would have been Becky

 16              Over at that time.  She was a caseworker.  Her name is

 17              Byers now.

 18     Q     Do you know if the administration is pleased with

 19              Ms. Brewster's work?

 20     A.    As far as I know, they are.

 21     Q     And are you aware of the salary that she receives?

 22     A.    I'm assuming she started at the entrance level salary

 23              that they offered me, but I do not know.

 24     Q     Do you have any other facts other than those you've
told

 25              me today that indicate your entitlement, the
entitlement
```

Barbara Varner                                    321

1          you claim you have to the CASA position?

2     A.   I think I was the most qualified person they could have

3          found in the fact that I had worked dependency, court

4          system, for over five years.  I was familiar with all

5          the caseworkers, which you need to be able to work very

6          closely with them.  I knew how to do reports.  I was an

7          officer of the court so I knew the delinquency system.

8          And there would be times that CASA was supposed to be

9          used for delinquent kids, too.  So I was aware of both

10         systems, I knew the courthouse system.  I knew the

11         judges.  I was familiar with everything that went on in

12         both arenas.  I also had a master's degree in

13         administration of justice.

14    Q.   Did you need a master's degree for that position?

15    A.   No, you did not.  It was just an aid for me.  I think
it

16         made me even more qualified for the position.

17    Q.   Could you have been over-qualified for the position?

18    A.   Perhaps.  It just would give me relief from the

19         Probation Department at that time.

20    Q.   I'm interested in whether you have a theory, and this
is

21         going back, to why Gary Graham says he has had an
affair

22         with you, if you say you didn't have an affair.  Do you

23         have any insight or any theory on that?

24    A.   Yes, I do.  I think if he did not, was not able to hide

25         behind that, he would have no reason to treat me the
way

Barbara Varner                                          322

1    he did.

2        I think he -- it's a way for him to punish his

3    wife.  I can imagine that Mr. Graham would perhaps say

4    to her, "you wouldn't give me sex but I can get it

5    elsewhere."  I could see him using that.

6        But I think going before Judge Sheely and just

7    saying I did yell at her, I did curse at her, I just

8    felt like it, yes, I demanded sex, Judge Sheely would

9    have -- I think he would have taken more drastic

10   measures.  Taking his wife up there, confessing the way

11   he did in front of his wife, both in tears, absolutely

12   getting the heart strings of Judge Sheely.  And

13   Mrs. Graham had worked for him for a long time.  He had

14   watched them have children, bring the young children in

15   to see him.  And he was close with the family as well

in

16   the political arena.  So he knew this family very well.

17   I think that was a whole game plan.  I honestly believe

18   she was in on the whole plan, because I think Gary

19   losing his job --

20   Q   When you say she, you mean --

21   A.  Mrs. Graham, was aware of how it was going to be

22       orchestrated.  I really believe that, because I know

23       they had met with Mr. Foster for hours that morning

24       before going up to meet with Judge Sheely.  But I

25          honestly --


                        Barbara Varner                      323


 1    Q    You know that Gary and his wife --
 2    A.   And Mrs. Graham had met with Dave Foster in his office
 3         for several hours the day of this confession.
 4    Q    And Dave Foster is their?
 5    A.   Was their attorney.
 6    Q    Was their attorney?
 7    A.   His attorney.
 8    Q    How do you know that they met with Dave Foster for
 9         hours?
10    A.   Well, they were back in their office and my office is
11         right around the corner.  But that's my -- I just can't
12         imagine what else.  And also, puts this whole case on
13         another level, a different thing.  It's a he said/she
14         said thing, which it is not.  It is all about power and
15         how I was treated in the environment, how I was
harassed
16         and discriminated and retaliated against, when all I
17         wanted to do from the very beginning in March of '97
was
18         to have the harassment stop.  That's all I asked.
19    Q    When you spoke to Judge Sheely, and we've talked at
20         length about that conversation, the first time you
spoke
21         to Judge Sheely about your complaints, was he

22          sympathetic to you at all?  Did he say anything that you

23          construed to be sympathetic to you?

24    A.    None whatsoever.  None whatsoever.  He said that I had

25          caused problems in the family.  He kept going on and on,


                    Barbara Varner                         324


1           you just don't know how upset they were, they both

2           cried.  Well orchestrated.

3     Q     Did he say to you that he hoped that your family life

4           wouldn't be affected by it?

5     A.    Yes, he did.

6     Q     Tell me what exactly he said, to your recollection.

7     A.    He said, I hope this won't affect your family life.  And

8           I said to him, why should it affect my family life?  I

9           didn't do anything.  I'm the victim here.

10    Q     Did you construe that to be sympathetic to you, to say

11          he hoped -- when he said he hoped it wouldn't affect

12          your family?

13    A.    Perhaps it could have been interpreted that way.

14    Q     You said it was well orchestrated.  Are you contending

15          that Judge Sheely was somehow in on a conspiracy with

16          the Grahams?

17    A.    I'd say there's a very good possibility that -- I don't

18          think he knew it was going to happen that way, but I
19          think after getting this -- like I said before, I
20          believe there was a letter sent up to him prior to, the
21          day before, reminding him of the loyalty of the Graham
22          family with Judge Sheely in his elections.
23              I think Mr. Osenkarski had met with Judge Sheely
to
24          discuss the case, how it could be resolved.  I think
25          maybe they discussed how, what they could do.

Barbara Varner                    325

1    Q    Do you have any dates of meetings or any specifics of
2         such meetings?
3    A.   No, I do not.
4    Q    So you're speculating that this might have happened?
5    A.   I am speculating, yes.
6    Q    Now, Judge Sheely retired shortly after this --
7    A.   Yes.
8    Q    -- as we discussed earlier?
9    A.   Right.
10   Q    At that point, the point of retirement, did he have any
11        more use for political cronies?
12   A.   I think Judge Sheely probably always liked to be in the
13        political arena.  I think it was more of a he owed them
14        because of the prior support, he felt he owed -- and I

15        believe it was more sympathetic towards Barb Graham,
and

16        I believe that's why she was taken up for this

17        confession.  I believe that's probably the most

18        important reason she was there, because Judge Sheely
did

19        have a soft spot for her.

20  Q   Just so I'm clear, are you saying that this wasn't on

21        Judge Sheely's part a determination of credibility, but

22        that it was a conspiracy where he conspired with the

23        Grahams to find that this was an affair?

24  A.  I think he struggled with the political connections.  I

25        think he really struggled with not so much what was


Barbara Varner          326


1        right, what was legal.  It was more of I don't want to

2        hurt this family, meaning the Grahams, anymore, that

3        they've suffered enough, and it was directed at me.

4  Q   But do you believe that Judge Sheely devised this story

5        of an affair?

6  A.  No, I don't believe he devised it.  I believe the

7        Grahams did.

8  Q   So your position is Judge Sheely was willing to believe

9        their story?

10  A.  I think he wanted to believe their story.

11  Q   I'm almost finished.  I just want to look over a few

```
12        last notes.
13             Yesterday when Jim Thomas was discussing the
14        occasions that Gary Graham might have had to come to
15        your home, you said that Gary knocked on your garage
16        door.  Did I understand that correctly?
17   A.   Yes.
18   Q    To pick you up.
19   A.   Yes.
20   Q    How did Gary know to come to the garage door and not
the
21        front door?
22   A.   When you come to my house -- we leave the garage door
23        open and it's difficult -- not difficult but it's out
of
24        the way to go to the front door.  The likely way to
25        enter would be the garage door.
```

Barbara Varner                              327

```
1    Q    Somebody coming for the first time would know that, in
2         your opinion?
3    A.   Yes.  Yes, generally they do.
4    Q    Have you ever been the victim of date rape?
5    A.   No, I have not.
6    Q    When you divorced your first husband, did you allege
any
7         fault ground?  Do you know what I mean by that?
8    A.   If you could clarify that.
```

9   Q    In Pennsylvania now you can have a no-fault divorce

10         where basically the parties agree that the marriage is

11         broken, or you can have a divorce where you say you did

12         something wrong, you're at fault.

13             Which kind of divorce did you have?

14   A.   We had a no-fault.

15   Q    Did you date anyone except Lee Varner between your

16         marriage, the break-up of your first marriage and your

17         marriage to Lee Varner?

18   A.   No, I didn't.

19   Q    Are you older or younger than Gary Graham, if you know?

20   A.   I believe I'm several years older.

21   Q    Did you find it flattering to have a younger man

22         interested in you?

23   A.   It really didn't make one difference one way or the

24         other.

25   Q    At some point did you become certified to be a DUI


                          Barbara Varner                      328


1          instructor?

2   A.   Yes, I did.

3   Q    Does that involve an exam?

4   A.   Yes.

5   Q    Did you pass the exam?

6   A.   Yes, I did.

7  Q  Did you pass it on the first try?

8  A.  The DUI?  Yes, I did.

9  Q  Do you have any reason to believe that if you had asked

10     for a meeting with Judge Sheely, that he would have

11     denied you that meeting?

12  A.  Probably not.  Unfortunately, he had already made his

13     decision before we could meet with him.

14  Q  But there was quite a time, there was a time frame

15     between the initiation of your Complaint and the time

16     that Judge Sheely, as you say, made the decision?

17  A.  Right.

18  Q  In that time frame could you have asked to speak with

19     Judge Sheely?

20  A.  I'm sure we could have.  But we were under the

21     understanding, meaning we, my attorney and myself, that

22     Dave Deluce was in constant contact with Judge Sheely.

23  Q  But you could have gone directly to Judge Sheely?

24  A.  Yes, we could have.

25  Q  You talked yesterday about the Central Investigation

Barbara Varner                              329

1      Department and harassment charges that you discussed

2      with them.

3  A.  Right.

4  Q  Did you initiate that conversation with the CID?

```
        5    A.    No.  What happened, I had spoke with the sheriff.  He

        6          had called me in and he had told me -- in fact, it was

        7          the day right around the time Mr. Graham was being
moved

        8          to the new position.  He had told me that they had
taken

        9          Mr. Graham's gun from him and that he would be searched

       10          anytime he came into the prison.  And he had asked the

       11          CID director to come down and meet with us at the same

       12          time.  So it was Tom Kline, the sheriff, who had

       13          initiated the initial call.

       14    Q     But you initiated the call to the sheriff; am I

       15          understanding that correctly?

       16    A.    I think we probably passed in the hall and he said, do

       17          you have a minute, I want to talk to you.

       18    Q     And what did he say at that point?

       19    A.    That's when he said I need for you to know that they --

       20          Mr. Graham was going to be moved out of the building
and

       21          that there was concerns about retaliation of his anger,

       22          and that --

       23    Q     Who expressed those concerns?

       24    A.    The sheriff.  The sheriff, Tom Kline.

       25    Q     On his own?
```

Barbara Varner                                    330

```
 1   A.   And the CID.  Yes.  They were both aware of the prior

 2        anger issues with Mr. Graham.

 3   Q    Were there any witnesses to that meeting?

 4   A.   The CID director was there, yes.

 5   Q    Both the CID director and the sheriff?

 6   A.   Yes.

 7        MS. WILLIAMS:  That's all I have for you,

 8        Ms. Varner, and I appreciate your attention.

 9        MR. MacMAIN:  I probably have an hour or two
hours.

10        I don't know if you want to take a lunch break and come

11        back, if you want to just continue on, I really don't

12        care.

13        MR. ADAMS:  With that in mind, I don't know how

14        long you need to examine Mr. Osenkarski, but I will not

15        be here tomorrow, and the person that's replacing me

16        cannot be present to defend his deposition.  So I don't

17        know how much time you have with all that's been taken

18        this morning.

19        MS. WALLET:  Did you know that yesterday?

20        MR. ADAMS:  Yes, I did.  I didn't think we would
be

21        here this long, honestly.

22        MS. WILLIAMS:  Sorry.  There were issues
particular

23        to the judges that I thought I was entitled to know.

24        MR. MacMAIN:  I'm agreeable if you want to do

25        Mr. Osenkarski this afternoon.  I can do the portion
```

Barbara Varner                          331

1       that remains that I have with Ms. Varner tomorrow, if

2       that's agreeable.

3            MR. ADAMS:  Or we can simply bring Mr. Osenkarski

4       back.  He's not -- beside the fact that this is

5       prolonging the opportunity for him, I mean, I do not

6       object to for any reason to think that we can't set

7       another time.

8            (Discussion held off the record.)

9            MS. WILLIAMS:  What do you think, Deb?

10           MS. WALLET:  I'm not happy.  I said I would
produce

11       my client for a long half day, and I consider this to
be

12       a long half day.  And I think it's unconscionable that

13       you didn't tell me yesterday that there was going to be

14       this problem.  I'm not happy about that.

15           MR. ADAMS:  I apologize.

16           MR. THOMAS:  Off the record.

17           (Recess taken from 12:16 until 1:16 p.m.)

18  BY MR. MacMAIN:

19  Q    We're going to start up after the lunch break.

20           Ms. Varner, my name is David MacMain.  I represent

21       Gary Graham.  We met yesterday.  I think we met at one

22       prior occasion.

23           Same instructions that all the other attorneys
have

24          given you.  If I ask you a question you don't understand

25          or I use a term, say so and I'll try to rephrase it.

Barbara Varner                                   332

1           But I will tell you we're going to cover a number of

2           different areas, some of which have already been covered

3           I may have some specific questions about, some things

4           that haven't been covered.  I'll try to give you signals

5           when we're moving into a different area.

6               First of all, is there anything that you testified

7           to yesterday in thinking about overnight that you would

8           like to recollect or add to?

9    A.     Not at this point.

10   Q      Same question as to anything talked about today or any

11          questions you were asked, is there anything you would

12          like to correct after the lunch break?

13   A.     Not at this point.

14   Q      Have you ever been involved in any other lawsuits of any

15          nature, either as a plaintiff, someone who brought the

16          suit, or as a defendant, someone who has been sued?

17   A.     Workmen's Comp years ago when I worked for the

18          Intermediate Unit.  It was not really a suit, it was

19          just an insurance claim.

20    Q    Can you tell me, it was a Worker's Comp claim?

21    A.    Yes, it was.

22    Q    Can you tell me about that?

23    A.    I was injured while I was working for the intermediate

24          unit.  Herniated two discs in my lower back.

25    Q    Did you have a procedure on your herniated disc?


Barbara Varner                                          333


1    A.    No.  No.  It was -- there was nothing done to my back.

2    Q    Who did you see for diagnosis and treatment?

3    A.    Dr. Richard Baltz, B-A-L-T-Z.

4    Q    Where is Dr. Baltz located?

5    A.    He's in Camp Hill.

6    Q    And Dr. Baltz is a medical doctor as opposed to a

7          chiropractor?

8    A.    He's an orthopedic doctor.

9    Q    Did you have any type of procedure or surgery done?

10    A.    No, I didn't.

11    Q    Can you tell me the time frame?

12    A.    Oh, mid '80s.

13    Q    And how was it you herniated discs in your back?

14    A.    There was a young child in the classroom that I worked

15          in who has cerebral palsy.  It was necessary as part of

16          the therapeutic program that we walk him every day.  He

17          was very spastic, and as he would fall he would quickly

18          go down, and I would be required to pick him up and

19          catch him.  And it just one day it just didn't work

20          anymore, and I hurt, had pain in my back.

21    Q    Other than Dr. Baltz, did you seek any other medical

22          treatment for that back injury?

23    A.    No.  He was my primary physician.  There was some --
no,

24          I did not.  No.  No.

25    Q    There was no one else you sought treatment from?


                    Barbara Varner                    334


1    A.    Not for that, no.

2    Q    Did you seek treatment for some other back injury at

3          some point?

4    A.    I had been in a car accident when I was working for

5          Juvenile Probation, probably, I'm guessing '97.  I was

6          rear-ended.

7    Q    And where did that occur?

8    A.    That occurred on the split from -- the 581 split
heading

9          towards Route 15 where it merges out.

10    Q    Maybe the easier way is was that investigated by a

11          police department?  Was there an accident report?

12    A.    Yes, there was.  And yes, there was a facts report.

13    Q    Do you know what police department that would have
been?

14    A.    It would have been -- you know, I really don't remember

15          the police being involved.  I remember both of us

16          exiting off the on-ramp and exchanging insurance cards.

17          I don't remember a police investigation, no.

18    Q     When I had mentioned accident report, you thought there

19          may have been one.  Was there some type of report filled

20          out by either you or the other driver?

21    A.    We did for the insurance, for insurance companies, yes.

22    Q     And this was in a county vehicle?

23    A.    No.  It was my own personal vehicle.

24    Q     Did you file any type of claim either with your

25          insurance company, with the other driver?

Barbara Varner                                               335

1     A.    Yes.

2     Q     And who was your insurance carrier?

3     A.    It would have been All State.

4     Q     And do you know who the insurance carrier was for the

5          other driver?

6     A.    No.  I don't -- I'm not sure.

7     Q     Do you have paperwork at home that would reflect the

8          claim that was submitted?

9     A.    Probably not.

10    Q     You were rear-ended?

11    A.    Yes.

12    Q    And what type -- were you injured?

13    A.    Yes.  I just suffered some -- I had some lower back

14          pains.

15    Q    Did you seek treatment for that?

16    A.    Yes.

17    Q    And where did you get treatment?

18    A.    Dr. Do.  Just D-O, Dr. Do.

19    Q    Where is Dr. Do located?

20    A.    He was part of -- he was at the Rehab Center in

21          Mechanicsburg.

22    Q    What type of doctor is Dr. Do, an orthopedic?

23    A.    Yes.

24    Q    How long did you get treatment from Dr. Do?

25    A.    Several months.


                        Barbara Varner                    336


1    Q    Did you miss time from work?

2    A.    No, only for -- I went to physical therapy but I don't

3          believe I missed any time from work.  I don't believe.

4    Q    This was in '97?  Can you tell me --

5    A.    I believe it was '97.

6    Q    Can you tell me what month or what time of year?

7    A.    No, I'm not -- I'm not sure.

8    Q    Did you report the accident to the folks at the county?

9    A.    Yes.

```
10    Q    Any other doctors besides Dr. Do you sought treatment

11         for your back?

12    A.   No.  And whenever I finished with Dr. Baltz, the
initial

13         injury, he had no restrictions or anything for me.  It

14         was just -- it was just exercise and, you know, that

15         kind of thing.

16    Q    Did you see a chiropractor at all for either of the two

17         times?

18    A.   No, I did not.

19    Q    You said you had physical therapy.  Where did you get

20         physical therapy?

21    A.   At the Rehab Center off of Route 15.  I'm not sure of

22         the name of the -- it was a rehab center.

23    Q    Is it the same center that Dr. Do is affiliated with?

24    A.   No, it was -- well, he referred me there but it's not

25         the same building.
```

Barbara Varner                    337

```
1    Q    And relating to the '97, you believe '97 accident, did

2         you get any type of procedure done?

3    A.   No.

4    Q    Any other times when you have sought treatment for your

5         back other than the two you've told me about?

6    A.   No.

7    Q    And neither one of these resulted in a lawsuit?
```

8    A.    No.

9    Q    You were shown a document earlier which we marked as

10        Varner 7 which is series of notes you kept regarding

11        events that occurred here.

12            Did you keep a calendar during the period of '90

13        through the present?  What I mean by that is a yearly

14        Daytimer or notebook where you kept your appointments

15        and visits and so forth?

16    A.    What dates are you talking about?

17    Q    From the years '90 to the present.  Do you keep a

yearly

18        calendar?

19    A.    I would keep one but I usually just got rid of them at

20        the end of the year.  When I left Children and Youth I

21        got rid of all my calendars.

22    Q    Do you have any calendars, say, currently, saved

23        currently?

24    A.    Probably 2000.  1999, 2000.

25    Q    And for prior years you think you threw out --

Barbara Varner                          338

1    A.    Yes.

2    Q    Okay.  Did you keep a hard calendar or did you keep it

3        on the computer?

4    A.    No.  I had several different calendars, just hard copy.

5    Q    Nothing on a computer?

6    A.    No.  I never used a computer for calendars.

7    Q    Did you keep any type of diary at any point from '90 to

8         the present?

9    A.    No.  I don't keep diaries.

10   Q    Do you know and work with, I think you had mentioned a

11        Hank Thielemann?

12   A.    Yes.

13   Q    Do you have a good relationship, working relationship

14        with Mr. Thielemann?

15   A.    We have a working relationship.

16   Q    Do you find Mr. Thielemann to be fair?

17   A.    He is becoming fair, I believe.

18   Q    Do you find Mr. Thielemann to be a truthful person?

19   A.    Most of the time.

20   Q    When you say most of the time, can you explain that,

21        what you mean by most of the time?

22   A.    I can remember a time where Mr. Graham was training me

23        to do my job, and we picked up Mr. Thielemann at his

24        house.  And we spent the entire day on the clock
looking

25        for paper and paint for Mr. Thielemann's new house.




Barbara Varner                                    339



1         Both of them demonstrated how we do supervision by

2        pretending to throw cards at a house, that that would be

3        considered a contact.  That continued for the whole day,

4        where we went around looking for wallpaper and paint for

5        Mr. Thielemann's house.  So truthful, I would say that

6        would not be truthful, because he was on the clock.

7  Q   Any other incidents you can think of where

8        Mr. Thielemann you believe was untruthful?

9  A.  Not at this time, I can't come up with a certain, any

10       other certain things, no.

11  Q   Yesterday you were asked about one occasion that

12       Mr. Graham came to your house uninvited.  Do you recall

13       that?

14  A.  Yes.

15  Q   And you said that he came in through your garage door.

16       So I understand, you have to open up the big door that

17       the car would be parked in to get to your garage door?

18  A.  The uninvited time he did not enter through the garage.

19         That's when he came to pick me up on a trip. And

20       when he came in that way, when he was picking me up for

21       a trip, the door was always open.  We always kept the

22       garage door open first thing in the morning.

23  Q   First thing in the morning you put the garage door up?

24  A.  Yes.  We have a dog, yes, and we would open it up.  I'm

25       usually up at 4:30 and we open the door and let her out.

Barbara Varner                                    340

1   Q    Do you keep a car in the garage?

2   A.   We keep two cars in the garage.

3   Q    And the door's located somewhere inside the garage?

4   A.   Right you come in and there's a set of steps right

5        inside the door.

6   Q    Had Mr. Graham ever been out to your house prior to

7        that?

8   A.   Not into my house, no.

9   Q    When he came out on this occasion, you said there was a

10       phone conversation, he said he was coming to pick you

11       up?

12  A.   No.  Which time are you talking about?  There was a

time

13       he came to pick me up for a trip that he came in the

14       garage.  Now, there's another time he came out to my

15       house uninvited that he came to the back of the house.

16  Q    I'm talking about the invited one.

17  A.   The invited one.

18  Q    You said you had a trip to York to pick up a juvenile,

I

19       think you estimated '95 or '96?

20  A.   Yes.

21  Q    When he came out on this, I'm talking about on that

22       occasion.

23  A.   Okay.

24  Q    Had you had a conversation on the phone with him before

25       he came out?

Barbara Varner                                    341

1    A.    No, we did not.

2    Q    But you knew he was coming?

3    A.    Yes.

4    Q    Did you tell him to come in through the garage door?

5    A.    I don't believe so.

6    Q    Where is your front door located?  Is it on the front

of

7         the house?

8    A.    Yes, but it's down a walkway and among bushes and it's

9         not that convenient to get to.

10   Q    Is it off of -- is there a walkway from the driveway

11        that would lead you to the front door?

12   A.    Yes.

13   Q    That occasion we're talking about, do you remember the

14        name of the person, the client, if you will, that you

15        were going to visit with Mr. Graham?

16   A.    That we were going to pick up?  I don't know.  I have

no

17        idea who it was.  It wasn't one of my clients.  And

it's

18        confidential to begin with, so I have --

19   Q    I'm sorry?

20   A.    It would be confidential to release a juvenile's name

to

21        begin with.  So I mean, I'm not -- even if I would

22          remember I don't feel comfortable saying it, anyways.

23    Q     But you're telling me you don't remember the name?

24    A.    I don't remember because it was not one of my clients.

25    Q     And you said there was another time where he came
around

Barbara Varner                                              342

1           back of your house uninvited?

2     A.    That's correct.

3     Q     Were there any other occasions at all that Mr. Graham

4           was ever at your house uninvited?

5     A.    Not that I know of.  He could have been at my house but

6           I didn't know of it.

7     Q     Were there any times that he was at your house when you

8           had invited him to come there?

9     A.    Only when we stopped for the trip, when he came to pick

10          me up.

11    Q     The one we spoke about already?

12    A.    Yes.

13    Q     Did you invite Mr. Graham to come to your house while

14          your husband was away on business?

15    A.    No, I did not.

16    Q     You said your husband traveled four to five times a

17          year?

18    A.    That's correct.

19    Q    And were these trips where he would fly somewhere?

20    A.    Sometimes he would drive.  Generally he would fly, yes.

21    Q    And how would he get to the airport?

22    A.    He would drive.

23    Q    You wouldn't drive him to the airport and drop him off?

24    A.    Generally, no, because a lot of his flights will leave

25          early, early in the morning.  And we never knew exactly


Barbara Varner                                                343


1          what time he would get back, and sometimes he would

2          catch other flights to get back.

3    Q    Were there occasions where you drove him to the airport

4          and picked him up when he was back from his flight?

5    A.    Once -- I can only think of perhaps one or two times

6          that I ever did that.

7    Q    We talked yesterday about a trip that you and Mr.

Graham

8          just coincidentally ended up on the same bus going to

9          Atlantic City?

10    A.    That's correct.

11    Q    Okay.  Were you going for the day or were you staying

12          overnight?

13    A.    No, I was going for the day.

14    Q    And was your husband away that day that you were going

15          on this Atlantic City trip?

16    A.    No, he wasn't.

17    Q    Had you purchased a ticket ahead of time?

18    A.    I purchased the ticket maybe a day or two ahead of

time.

19    Q    Did you tell anybody that you were going besides your

20          family members?

21    A.    Probably everybody in the lunch room.  As I explained

22          yesterday, it was one -- I had just finished my

23          undergrad degree.  I was so happy with that

24          accomplishment that I was joking around, like people

say

25          after the Super Bowl, where are you going, I'm going to


                    Barbara Varner                          344


1          Disney World.  I would say, I graduated, I'm going to

2          the beach.

3    Q    Do you remember, was it a workday that you went to

4          Atlantic City?

5    A.    Yes, it was.

6    Q    Do you remember what day of the week it was?

7    A.    I'm not sure.  It was between Tuesday to Thursday

8          because there was a special offer go.  I think you got

9          the bus ticket plus I believe it was $15 worth of

tokens

10          to spend.  There was a special running.

11    Q    Do you remember where you purchased the ticket?

12    A.    I purchased it at a kiosk, one of the kiosks out at

the,

13          I believe it was called the MJ Mall at that time, in

14          Carlisle.

15     Q    Do you remember the name of the bus company?

16     A.   It was Rohrer Bus.

17     Q    I think you had said the year was 1994?

18     A.   I don't believe -- yes, '94 is when I graduated.  Yes.

19     Q    And do you remember what month it was in 1994?

20     A.   I just finished classes in June.  I'd say it was either

21          June or July.  Probably, I'm guessing June.  June or

22          July.

23     Q    You said that on the bus ride you and Mr. Graham

24          coincidentally both ended up on the same bus, and then

25          two other people from work got on at a stop?


                    Barbara Varner                    345


1      A.   That's correct.  When I got on, Mr. Graham had probably

2           gotten on, I believe the bus started out in Carlisle,

3           then went to the West Shore and then ended up in

4           Harrisburg.  I believe, I'm assuming Mr. Graham got on

5           in Carlisle, because he was not waiting in line when I

6           was at the Bon-Ton store.  It picked up at the Bon-Ton

7           parking lot in Camp Hill and then proceeded on to

8           Harrisburg East Mall.

9      Q    Had you spoken to Mr. Graham before about the bus trip?

10          You talked about it in the lunch room.  Did you talk to

11          Mr. Graham specifically about going?

12    A.    No.  But he could have easily heard it, though.

13    Q     When you were in the lunch room did you notice him there

14          when you talked about this trip?

15    A.    I don't recall.

16    Q     Had you planned to go to Atlantic City with Mr. Graham?

17    A.    I did not.

18    Q     Just sheer coincidence that you both ended up on the bus

19          together?

20    A.    He had told me that him and his wife go down quite a

21          bit, so I do not know why he was on that bus.  I don't

22          have an answer.

23    Q     You said during the trip you and he ended up sitting

24          together at some point.  Did you have social

25          conversation on the way down?


                    Barbara Varner                    346


1     A.    I had a Walkman headset, so I had that on.  So as far as

2           conversation, some, general.  He had the newspaper, I

3           was -- was reading the newspaper.

4     Q     When you got off the bus in Atlantic City did you both

5           get off at the same stop?

6     A.    There was only two stops.  Yes.  There was one at the

```
 7          very end of the boardwalk, I believe, and then the next

 8          one was, like, in the main section where I wanted to
go,

 9          where the beach was, yes.

10    Q     And Mr. Graham got off at that stop and you got off at

11          that stop?

12    A.    Yes.

13    Q     Did the other two people get off at that stop?

14    A.    They got off at the first stop.

15    Q     Did you spend any time that day at Atlantic City with

16          Mr. Graham?

17    A.    I did not.  I got off.  He went -- I know he stopped to

18          make a phone call, I believe to call, I assume to call

19          his sister.  He said that's where he was going.  And I

20          proceeded, like, through the hotel and went out to the

21          beach.

22    Q     Did you rent a room while you were there?

23    A.    I did not.

24    Q     Were you on the beach the whole day?

25    A.    Yes, I was.  I stopped to get something to drink and go
```

Barbara Varner                                    347

```
 1          to the restroom, but yes, I was.

 2    Q     When did you head back?

 3    A.    I believe the -- I believe the bus picked us up around

 4          5:00, I'm guessing, around 5:00 to return.
```

```
 5   Q    Did both you and Mr. Graham get on the bus at five

 6        o'clock that afternoon?

 7   A.   He was on the bus.  Yes, they were all waiting to get

 8        on.

 9   Q    How about the other two, was it Carol Snook and Wayne

10        Shearer I think were the two people you mentioned?

11   A.   We picked them up as we were leaving.  They were at the

12        other stop.

13   Q    They both got on for the five o'clock return trip?

14   A.   Yes.

15   Q    Did you all sit together again?

16   A.   Yes.  Pretty much once you get on, I think most of the

17        senior citizens, I think you would be in trouble if you

18        took their seats.  They have pretty well assigned
```
seats.
```
19   Q    Have you taken any other day trips to Atlantic City
```
like
```
20        that?

21   A.   No, I have not.

22   Q    It was the one and only time?

23   A.   Yes.

24   Q    Have you ever taken a trip to Atlantic City with your

25        husband?
```

Barbara Varner                               348

```
 1   A.   We would to go Ocean City.  My husband was supposed to
```

2       go with me that day.  In fact, he was supposed to go,

3       and he chose not to go.  My daughter was supposed to go

4       and she couldn't make it, she was in school.  And my

5       husband didn't like the bus because his -- when he

rides

6       in a bus his knees are almost up to his nose.  He's

7       uncomfortable in buses.

8    Q  Had you already bought tickets for your husband and

your

9       daughter ahead of time?

10   A  No, I had not.

11   Q  You just bought a ticket for yourself?

12   A  Yes, I did.  My husband encouraged me to.  I rarely

went

13      anyplace on my own and I said I'd like to go, and he

14      said, well, just go and do it on your own.  I said,

15      well, I wasn't real comfortable.  He said, just go

ahead

16      and do it.  Just encouraged me to do some things on my

17      own.

18   Q  At what point was your husband going to go, then?  You

19      said your husband and daughter were going to go and it

20      just ended up --

21   A  I asked them to go.  My daughter couldn't go

22      convenience-wise, she was doing something else.  And my

23      husband said, it's a long ride, I prefer not to go,

24      because he's uncomfortable in the seats.

25   Q  You were asked yesterday about the times you had been

in

Barbara Varner                                349

```
 1        Silver Springs flea market?

 2   A.   Yes.

 3   Q    You said there were occasions you did see Mr. Graham

 4        there at the flea market?

 5   A.   Yes, there was.

 6   Q    Did you ever walk around the flea market with him?

 7   A.   No.  We would stop and have conversation, hi, how are

 8        you doing, what did you buy, what -- you know, that
```
kind
```
 9        of thing, and just passing.

10   Q    You wouldn't walk around the flea market with him?

11   A.   I don't -- no, I don't believe I ever did.

12   Q    You had said that your granddaughter, sometimes you

13        would pick up your granddaughter and take her to the

14        flea market?

15   A.   Well, my grandson.  My daughter would go with me.

16   Q    Sorry.  Your grandson and your daughter?

17   A.   My daughter would go with me.  My grandson, I would
```
meet
```
18        my son and his wife at the flea market and bring my

19        grandson home with me.

20   Q    How often would you have your grandson with you at the

21        flea market?

22   A.   I would pick them up almost every Sunday.  My son and

23        daughter-in-law are really into antiqueing, do a lot of

24        swapping and that kind of thing, so I would try to get
```

25          the baby every, not every Sunday but most Sundays, if
it


Barbara Varner                    350


1          wasn't cold out.  Other than that, I would usually pick

2          him up or keep him overnight on Saturdays.

3     Q    You said you had met your son at the flea market on

4          occasion?

5     A.   Yes.

6     Q    And you referred to that there was a stand that you met

7          him at?

8     A.   Well, I have an idea where they were going to be, what

9          their focus, because I know a couple stands they like
to

10         stop at.

11    Q    Was there one particular stand that you would meet your

12         son?

13    A.   Yes.

14    Q    What stand was that?

15    A.   Well, the stand was in -- it's a, it was a jewelry

16         stand, and it would move around.  They would have to go

17         in and reserve a spot, so they -- but generally it was

18         in the center of the flea market.  I don't know the

19         name.  It's Bill and Mel are the owners, and I think it

20         was mostly jewelry and some maybe Civil War memorabilia

21         and cards.  I believe baseball cards as well.

22    Q    You were asked yesterday about whether or not your son

23         knew Gary Graham?

24    A.    Yes.

25    Q    And you had mentioned that Gary was willing to help

your

Barbara Varner                          351

1         son in terms of getting a job at the Schaffner Center?

2    A.    He spoke to a person at the Schaffner Detention Center,

3         I can't remember if it was the supervisor, just saying

4         that my son was interested in a job.  But when I went

5         over to the detention center the director already had

my

6         son's name.  It was on a pile of people he was going to

7         interview, anyway.

8    Q    You said your son's application was at the top of the

9         pile?

10    A.    It was on the pile, yes.  He was able to put his hands

11         on it right away.

12    Q    Did your son have to take a test to get a job there?

13    A.    I don't know that.  I'm not sure.

14    Q    Do you know whether your son failed the test twice

15         before getting the position?

16    A.    I didn't know if there even was a test.

17    Q    Do you know whether or not your son had ever gotten

18         together with Mr. Graham and brewed beer together?

19    A.    Not that I know of.

20    Q    Your son never told you that?

21    A.    No.

22    Q    You were asked yesterday about a song by Phil Collins

23          called "Groovy Kind of Love"?

24    A.    Yes.

25    Q    Are you familiar with the song?

Barbara Varner                                         352

1    A.    I've heard it before, yes.

2    Q    Does that song have any significance at all to you?

3    A.    No, it doesn't.

4    Q    It wasn't a song that between you and Mr. Graham was

5          your song?

6    A.    Absolutely not.

7    Q    Did you ever write a note to Mr. Graham about that

song?

8    A.    No, I did not.

9    Q    Did you ever tell anybody that that was yours and

10          Mr. Graham's song?

11    A.    No.

12    Q    You stated that after separating from your first

husband

13          you moved in with your current husband?

14    A.    Not till October of '89.

15    Q    Was there a period of time you lived somewhere else

16      besides the residence you shared with your first

17      husband?

18   A.   No.

19   Q    Did you at any time live with a Kay Wilcox, the Wilcox

20      family?

21   A.   I don't know a Kay Wilcox.

22   Q    Do you know a Wilcox family?

23   A.   No, I don't.

24   Q    Did you ever live with Kerry Houser?

25   A.   No.

Barbara Varner                                          353

1    Q    At no point ever lived with Kerry Houser?

2    A.   Never.

3    Q    Did you ever live with a Diane Rupp?

4    A.   No.

5    Q    Are you familiar with a location called Ft. Hunter?

6    A.   Yes.

7    Q    Have you ever been to Ft. Hunter?

8    A.   Yes.

9    Q    Were you ever at Ft. Hunter with Mr. Graham?

10   A.   No.

11   Q    Can you tell me the occasions you've been at Ft.

Hunter?

12   A.   My husband and I have gone up there several times.

I've

```
13          been up there with my family, my children.  We take my

14          daughter, my son, daughter-in-law, we took my grandson

15          up there one time.

16    Q     Are you familiar with a location near Ft. Hunter called

17          the Zembo Temple?

18    A.    Yes.

19    Q     Have you ever been to the Zembo Temple with Mr. Graham?

20    A.    No.

21    Q     Have you ever used the term mature adult relationship?

22    A.    No, I have not, that I can recall.

23    Q     You said that you can recall.  Do you recall ever using

24          that term?

25    A.    No.
```

Barbara Varner                                                    354

```
1     Q     Are you certain?

2     A.    I'm sure, I mean, I might have heard it before but I've

3           never used it, that I can recall.

4     Q     Do you have an understanding of what that term means?

5     A.    I would assume it means two mature adults in a

6           relationship.

7     Q     Did you ever have any type of relationship with an

8           Ashley Steffy?

9     A.    No.

10    Q     Do you know who Ashley Steffy is?
```

11    A.    Yes, I do.

12    Q    Tell me who he is.

13    A.    He was the principal at Northern Middle School when I

14          was working for the Intermediate Unit.

15    Q    And can you tell me the nature of any relationship you

16          may have had with Mr. Steffy?

17    A.    He was a co-worker, a very nice co-worker.  We got

along

18          quite well.

19    Q    Do you remember where the Giant is in New Cumberland?

20    A.    Do I know?

21    Q    Do you know where that's located?

22    A.    Yes.  Yes, I do.

23    Q    Did you ever meet Mr. Graham at the Giant in New

24          Cumberland?

25    A.    No, I did not.

Barbara Varner                                    355

1    Q    Can you tell me what -- did you ever drive a Volkswagon

2          Cabriolet?

3    A.    Yes.

4    Q    Was Mr. Graham ever in that vehicle with you?

5    A.    Yes.  We probably transported somebody in that vehicle

6          at one time or another.

7    Q    You talked yesterday about trips that you and Mr.

Graham

8        had taken to go on business.  When you would take
trips,

9        which vehicle would you take?  Which vehicles would you

10       take?

11    A.  We would use either the county vehicle or Mr. Graham's

12       vehicle.

13    Q.  Can you describe Mr. Graham's vehicle for me?

14    A.  He's had several.  A green 4x4.  Well, whatever.

15    Q.  A pickup truck or an SUV?

16    A.  SUV.

17    Q.  How many times do you think you were in that vehicle?

18    A.  For the trips, there would probably be half the time in

19       that vehicle and half the time in the county vehicle.

20    Q.  How many would be half the time, how many trips,

21       approximately?

22    A.  I think I estimated in the one report around 20, 20-
some

23       trips.  So maybe 10, and 10 in the county car.

24    Q.  Were there ever any trips you took with Mr. Graham that

25       was not a business trip?


                    Barbara Varner                    356


1     A.  No.

2     Q.  Did you ever stop with Mr. Graham in his vehicle up in

3        Roxbury near the Pennsylvania Turnpike?

4     A.  I'm not familiar with that area.  I don't know where

5           that is.

6   Q   The same question.  Did you ever stop with Mr. Graham
up

7           in Goldsboro near some railroad tracks?

8   A.   It would be no.  I don't know where these places are,

9           but no.

10   Q   I think you were asked this yesterday but let me just

11           make sure.  Has Mr. Graham ever seen you naked?

12   A.   No, he has not.

13   Q   Did you ever tell anybody that you had any type of scar

14           on your lower back?

15   A.   Yes.  And it's not my lower back, it's on the left-hand

16           side upper hip area.  And that came up when we were

17           talking about doing invest -- not investigation, but

18           social history interviews.  And I remember, I believe
it

19           was Deb -- I'm not sure it was Debra Green, but we were

20           talking about how you do the investigation, talking

21           about how the new -- at the booking centers they'll
take

22           pictures of tattoos and scars.  And I remember having a

23           discussion, they were saying -- on our intake interview

24           it says do you have any scars or tattoos.  And I

25           remember saying, I don't think I have any scars or

1          tattoos, and they said everybody has a birth mark.

2              And I said, I started to explain -- I know there

3          was several people -- that I had been on a wheel -- not

4          a wheelbarrow, an empty barrel when I was a young kid.

5          And my brother was rolling me back and forth, and I
hit,

6          like, a little picket fence.  And it was, just left a

7          little scar on my upper left back around my waist area.

8      Q   Do you remember being asked yesterday whether or not
you

9          had any scars on your lower back area?

10     A.  You said the end of my tailbone, and I do not.

11     Q   Do you remember being asked the question yesterday?

12     A.  Yes, I do.

13     Q   Do you remember what your answer was?

14     A.  I said I had no scars on the bottom of my tailbone.

15     Q   At any point did you ever kiss Mr. Graham?

16     A.  I did not.

17     Q   Did you ever meet Mr. Graham in the evenings after he

18         had taught at DUI school?

19     A.  I did not.

20     Q   Were you ever a member of the Carlisle YMCA?

21     A.  Yes.

22     Q   When were you a member?

23     A.  From 1989 till just recently.

24     Q   Do you remember whether Mr. Graham was a member of the

25         Carlisle YMCA?

1    A.    I don't know that.

2    Q     Had you ever seen him there?

3    A.    No.

4    Q     Did you ever meet him there at the Carlisle YMCA,
either

5          in the parking lot or in the building?

6    A.    There were times he would drive past when I was coming

7          out of my classes, on Saturday morning.  Just, he was

8          going shopping or whatever, and just stopped to say hi.

9    Q     And what was the time period?

10   A.    My class was from I believe 8:30 to 10:00.  And it

11         almost became a pattern, that for some reason he

12         happened to be in the area.  It got to the point where
I

13         stopped going to those classes.  It just felt

14         uncomfortable for me for him to be going past.  It was

15         not a coincidence.

16   Q     And what year or years was this?

17   A.    I don't remember.  I know I was in Juvenile Probation

18         but I don't know the time frame.  It was before my

19         grandson was born, so it would have been early '95.

20   Q     How many times would you estimate that you met

21         Mr. Graham there in the parking lot after your class on

22         Saturday?

23   A.    I did not meet him.  He was driving past as I was

24         leaving.  It was, like, just driving past and would

25         yell, hi, how are you.  And just several times, just to

Barbara Varner                                    359

```
 1        the point where I was uncomfortable him having that
 2        acknowledge -- hindsight I would almost say he was
 3        stalking, that he knew my pattern.  And so I parked on
 4        the other side of the building for a while, and then I
 5        stopped going completely.
 6    Q   How many times did this occur?
 7    A   I would say maybe three or four times.
 8    Q   Did you tell anybody about it?
 9    A   No, I don't believe so.
10    Q   Did you tell your husband?
11    A   Yes, I think I did mention it to him.
12    Q   What did you tell him?
13    A   I told him I was uncomfortable, something, you know,
14        this guy is passing me whenever I'm there, he seems to
15        be obvious that maybe he knows the time and that kind
```
of
```
16        thing.
17    Q   Did your husband encourage you to tell anybody at work
18        about it?
19    A   No.
20    Q   Did you think it might be a good idea to say something
21        to somebody at work?
22    A   It raised a red flag for me, and I thought I could
```

23    handle it just by not going or just moving the location

24    of my vehicle.

25  Q   Did you report it to any police agencies?


Barbara Varner                                    360


1   A.   No, I didn't.

2   Q    Did you make a note in any type of diary or notepad

like

3        you did in Varner 7?

4   A.   No, I didn't.

5   Q    How long would you talk to Mr. Graham there in the

6        parking lot?

7   A.   He would just wave and say hi.  He was going past on

the

8        road and I was in the parking lot.

9   Q    He didn't stop and talk to you?

10  A.   He just waved and said hi.

11  Q    And you waved back?

12  A.   Right.

13  Q    That was the extent of it?

14  A.   That was the extent of it.

15  Q    He didn't stop and have a conversation with you?

16  A.   No, he did not.

17  Q    Were you afraid of Mr. Graham?

18  A.   I knew how angry he could get and I had been warned

19       about punishment.  So I would say a healthy fear, just

20        be cautious.  Yes.

21    Q   And at some later point you actually went to work in
his

22        department?

23    A.  Yes, I did.  But it was Mr. Bolze's department and Joe

24        Osenkarski was the chief.

25    Q   I'm going to take you to the conference at Penn State


                              Barbara Varner                    361


1         that we talked about.  Do you recall what hotel you

2         stayed in?

3    A.   The Nittany Lion Inn.

4    Q    And is that where other people from the county stayed,

5         at the same conference?

6    A.   Yes.  Yes, they did.

7    Q    You had said that Mr. Graham had knocked on your door

8         and had tried to get in your room at some point,
thought

9         it was Monday evening?

10   A.   I believe -- I'm not sure.  I believe, I'm not sure if
I

11        said Monday or Tuesday.  I think it was Tuesday
evening,

12        I believe.

13   Q    Did you tell anybody about that?

14   A.   No.

15   Q    Did that cause you some concern?

16    A.    Absolutely.

17    Q.    You didn't tell anybody about it?

18    A.    Again, there if you raise the issues, I know there
would

19          be punishment.  I know he would be angry.

20    Q.    The answer is you didn't tell anybody about it?

21    A.    I didn't tell anybody, no.

22    Q.    You had said that you liked to run in the morning?

23    A.    Yes.

24    Q.    And that, I don't know, did you say at five o'clock in

25          the morning is when you usually --


Barbara Varner                                              362


1    A.    Around 6:00, daybreak.

2    Q.    Okay.  And you said you think you may have called

3          somebody to tell them about you were going to go out
for

4          a run?

5    A.    I said if I would have called, it would have been for

6          that purpose.

7    Q.    Were you in the habit of calling people and telling

8          them, I'm going out for a run, if I'm not back, that's

9          where I'll be?

10    A.    I know it's a good idea to do it.  Sometimes I
wouldn't,

11          and I know it's not a good habit.  But I don't remember

12          doing it, but if -- I don't remember calling anybody,

```
13          no, I don't.
14    Q     When you go to conferences did you typically call
people
15          in the morning at 5:00 or 6:00 to tell them you were
16          going out for a run?
17    A.    Usually I was in -- the conferences I went to, I only
18          went to several conferences away from this area and I
19          think I only ran at maybe two of those because of the
20          location.  Most of them were on the outskirts of -- not
21          outskirts, but were not as convenient as the one at the
22          Nittany Lion Inn.  They were at another place, I
believe
23          it was Comfort Inn.
24    Q     Did you call anybody?
25    A.    No.  No.
```

                              Barbara Varner                    363

```
1     Q     Was there ever a time when you called anybody at 5:00
or
2           6:00 in the morning while you were at a conference to
3           tell them you were going to go out running?
4     A.    Not that I can recall at this time, no.  No.
5     Q     So no, you didn't call?  Or no, you're not sure?
6     A.    I don't recall doing that.
7     Q     During that conference did you ever call Mr. Graham's
8           room at 5:00 in the morning?
```

```
 9   A.   No, I did not.

10   Q    Were you sharing a room with anybody at that
          conference?

11   A.   No.

12   Q    Do you know if Mr. Graham was sharing a room with

13        anybody?

14   A.   I don't know.  No, I don't remember.

15   Q    Do you know if he was sharing a room with Hank

16        Thielemann?

17   A.   I don't know.

18   Q    Are you aware that Mr. Graham's father had a store?

19   A.   I heard he did, yes.

20   Q    Had you ever been to that store?

21   A.   I stopped in one time, I believe.  I had a client that

22        lived across the street and I believe I stopped in one

23        time.

24   Q    Do you remember who the client was?

25   A.   Her first name was Wanda.  She had three children,
          Sammy
```

Barbara Varner                                              364

```
 1        and -- Wanda, I can remember Wanda.  She had three

 2        children.  One had cerebral palsy and there was two

 3        older children.  They lived above the district
          justice's

 4        office or in that area.

 5   Q    Why did you stop by Mr. Graham's father's store?
```

```
 6    A.    I wanted to get a soft drink.

 7              MR. THOMAS:  I'm sorry?

 8              THE WITNESS:  To get a soft drink.

 9    BY MR. MacMAIN:

10    Q    Was Mr. Graham there when you stopped?

11    A.    No, he wasn't.

12    Q    Were you ever at Mr. Graham's, the father, store while

13         Mr. Graham, the son, was there?

14    A.    No.  I was only in the store one time.

15    Q    You were asked some questions yesterday about your

16         husband's brother who had some DUI problems.

17    A.    Yes.

18    Q    What's his first name?

19    A.    Glenn.

20    Q    Was Mr. Graham involved at all with that matter, that

21         you know of?

22    A.    He could have been.  I'm not -- I was not involved in

23         the DUI school at that time.  I know my brother-in-law

24         was in at least two different DUI classes, and I don't

25         know which one he would have been in.  Mr. Graham
```

taught

Barbara Varner                              365

```
 1         one -- I don't know if he taught one but he was one of

 2         the instructors in the area.
```

3   Q   So the answer is you don't know whether Mr. Graham had

4       any involvement with your brother-in-law's --

5   A.  I don't know that.  I do not know.

6   Q   You were asked yesterday about, I guess it was your

7       first involvement with Mr. Graham.  You talked about it

8       was a severe neglect case, that Mr. Graham had assisted

9       you and was helpful.  Do you remember that?

10  A.  Yes.  Yes.

11  Q   Do you know the name of the case, the client that you

12      were working with?

13  A.  Dennis and Norma.

14  Q   You don't remember the last name?

15  A.  It's confidential.  Juvenile records.

16          MR. MacMAIN:  Do we have any kind of

17      confidentiality agreement with some of the records in

18      this case?

19          MS. WALLET:  Not that I'm aware of.

20          THE WITNESS:  Joe would be able to tell us.

21          MR. ADAMS:  Can we go off the record a second?

22          (Discussion held off the record.)

23          MS. WALLET:  Before you ask another question, my

24      client is perfectly willing to reveal the last name, so

25      long as someone in the supervisory chain of command

1    gives her permission to violate what she understands to

2    be confidentiality.

3    MR. MacMAIN:  I guess we could agree to seal this

4    portion of the record if it's an issue.  Or

5    alternatively, if there's a juvenile you were assigned

6    to, an adult that Mr. Graham was assigned to, would the

7    adult name be confidential?

8    MR. GRAHAM:  No.

9    THE WITNESS:  Joe's okay with that?

10    MR. ADAMS:  I don't want my client to acquiesce to

11    anything that might get him into any problem area just

12    because of this proceeding.

13    I actually agree with the idea maybe of sealing it

14    somehow, you know, and let the judiciary make that

15    decision so I can protect him.

16    MR. THOMAS:  Have we established whether the

17    individual we're talking about is an adult or a

18    juvenile?

19    MR. ADAMS:  They're adults now.  He said basically

20    they're probably defaults now because this is a little

21    bit of time ago.

22    MR. THOMAS:  Were they juveniles at the time?

23    THE WITNESS:  Yeah.

24    MR. GRAHAM:  No.  One was an adult and one was a

25    juvenile.

```
 1              MR. MacMAIN:  Let's agree to seal that portion of
 2         the record when we use names of anyone who would be a
 3         client either of Juvenile or Adult.
 4              MS. WALLET:  I'm not going to allow my client to
 5         give that name unless someone in her supervisory chain
 6         says she is permitted to do so and there will be no
 7         disciplinary action as a result of it.  If someone's
 8         willing to do that, we'll be more than happy to provide
 9         it.
10   BY MR. MacMAIN:
11   Q    Let's do it this way.  Who was the adult?  Dennis or
12        Norma?
13   A.   Again, it's a family name and that gives us the
14        children's name.
15   Q    Was Dennis the adult or the juvenile?
16   A.   Dennis is the adult.
17   Q    And Norma would be the juvenile?
18   A.   It's his wife.
19   Q    Was there a juvenile involved?
20   A.   Three children.
21   Q    Can you tell me their first names?
22   A.   Amanda, Dennis.  Oh, my.  I cannot think of the other
23        boy's name.  It's another little boy.  Dennis, Amanda.
24        I can't think of the other -- there's another boy.
25   Q    During the management of that case that you and
```

Barbara Varner                                    368

1        Mr. Graham would share, was there more than one visit
to

2        the home?

3    A.   There was probably several visits to the home.

4    Q    During one of the visits did Mr. Graham make a slat for

5        a crib?

6    A.   Yes.

7    Q    Did you comment to him that that was a nice thing to
do?

8    A.   What was happening is the little boy kept falling out
of

9        the crib, and the parents would not do anything about

10        it.  And he made a, like, a step up for the little boy.

11            The family, the mother's almost severely mentally

12        retarded and the father was very limited.  So I think

13        the concept of being able to build this was totally

14        abstract to them.  So it was very helpful for the
child.

15    Q    Did you comment to Mr. Graham that that was a nice
thing

16        to do?

17    A.   Yes, I did.

18    Q    You said when you started with the Department that

19        Mr. Graham was your trainer?

20    A.   He was appointed as a person to train me, yes.

21    Q    Was anyone else appointed to train you?

22    A.   No.

23   Q    Mr. Graham was your only trainer, then, during that

24        period of time?

25   A.   Yes.


                              Barbara Varner                    369


1    Q    Now, would you describe Mr. Graham as being loud

2         normally?

3    A.   Not -- not on a normal, like, not a loud-loud.  Just

his

4         voice carries, but it's not loud, no.

5    Q    You said his voice carries?

6    A.   Um-hum.

7    Q    He has a loud voice; would that be fair?

8    A.   Yes, fine.

9    Q    Well, I don't want you to agree with me just to agree

10        with me.

11   A.   But there are some loud voices and there are some loud

12        voices.  I would say maybe you could understand what he

13        was saying but he was not boisterous.

14   Q    But he talks loudly, correct?

15   A.   I would say it's an average voice.

16   Q    He has an average voice for --

17   A.   Level.  Level voice.

18   Q    But you don't think he's loud, his voice carries?

19   A.   He certainly gets loud, but not normally, no.

20   Q    You had commented yesterday Mr. Graham was a poor

21          trainer?

22   A.     Yes.

23   Q      And that he threw, I think you said he threw cards at a

24          house and said that that was considered a visit?

25   A.     Um-hum.


                    Barbara Varner                          370


1    Q      Yes?

2    A.     That's correct.

3    Q      Okay.  Can you tell me when that happened?  Did it

4           happen on more than one occasion?

5    A.     Yes, it did.

6    Q      Can you tell me how many times you observed that?

7    A.     Oh, I'd say at least 10 times.

8    Q      You had mentioned one of the times Mr. Thielemann was

9           with you?

10   A.     Yes.

11   Q      During these other occasions, who else was with you, if

12          anyone?

13   A.     This was just Mr. Graham and myself.

14   Q      Can you tell me where this happened?

15   A.     New Cumberland area several times.  Mechanicsburg area.

16          Carlisle area.  In those areas.

17   Q      That's three?

18   A.     But it could have happened several different locations

19          in this area.  That was the area that -- we cover

20          Cumberland County, so it was a big area.

21    Q    I'm just looking for specifics.

22    A.   Okay.

23    Q    Can you tell me the name of any of the clients by first

24          name, either on any of those --

25    A.   They were not my clients so I'm probably not real

                     Barbara Varner                        371

1           familiar with the names.  None of them were mine so I

2           don't know the names.

3    Q     Were they cases you were working on as a trainee under

4           Mr. Graham?

5    A.    No.  They were his cases.

6    Q     Did you ride together then on his cases?

7    A.    Yes.  He was training me.

8    Q     Were they, these trips that you or these visits that
you

9           and Mr. Graham were in the same vehicle, were these in

10          addition to the 20 --

11   A.    Yes.

12   Q     -- visits that you had made when you were in different

13          departments?

14   A.    Yes.  Those are transporting casings, where you

15          transport juveniles.  This was just general
supervision.

16   Q    Is the 20 that you told me that you estimated before,

17        they were transports to --

18   A.   Right.

19   Q    And these additional times, how many times do you think

20        you were in the car with Mr. Graham?

21   A.   Maybe two or three times a month.

22   Q    For how long of a period?

23   A.   Several hours.

24        MS. WALLET:  I'm sorry, are we talking about the

25        time frame when he was the trainer for Mrs. Varner?


Barbara Varner                                            372


1         MR. MacMAIN:  Right.

2         MS. WALLET:  Limited to that period?

3         MR. MacMAIN:  Right.  Which are in addition to the

4         20 transport trips that we discussed already.

5         MS. WALLET:  I understand.

6    BY MR. MacMAIN:

7    Q    How long of a period?  You said two to three times a

8         month for several hours you were in the car together?

9    A.   Maybe two, three hours, yes.  To go out to the house
and
10        come back.  Several houses at a time.

11   Q    And how long of a period did these trips take place?

12        What I mean by that, was it six months this happened

13          over, two months, a year?

14    A.    From '95 when I started till probably middle of '96.

15    Q     We went through yesterday afternoon in your Complaint

16          the specific examples that you would give in which you

17          think Mr. Graham acted inappropriately.

18    A.    Yes.

19    Q     And the examples that we went through in the Complaint,

20          they all occurred, were they separate and apart from

21          these '95 to '96 visits in the car?

22    A.    Some of them occurred during that time.

23    Q     During the other periods of time you were in the car

24          with Mr. Graham in '95 to '96 were there any other

25          occasions other than the ones you told us about

Barbara Varner                                373

1           yesterday in which he acted inappropriately?

2     A.    Not that I can recall at this time

3     Q     Yesterday you talked about one particular trip that you

4           had taken with Deb Green, and that Mr. Graham had been

5           upset with you about an expense report?

6     A.    Yes.

7     Q     Was it a expense report that you had filled out and

8           handed in?

9     A.    Yes.

10          MR. MacMAIN:  Let's mark this as 14.

11                    (Varner Deposition Exhibit No. 14 was marked.)

12    BY MR. MacMAIN:

13    Q    Do you recognize this document?

14    A.   Yes, I do.

15    Q    Is this the expense report you had turned in for the

16         trip you were talking about?

17    A.   This is not an expense report.  This is just a
composite

18         of that I gave to Mr. Graham to explain what we had
done

19         on the trip after he had questioned us.

20            The expense sheet would be an official county

21         expense sheet that I would have turned in, or time

22         sheet.

23    Q    Okay.  This is your handwriting?

24    A.   Yes, it is.

25    Q    Four lines from the bottom 2:30 to 5:30 travel,


Barbara Varner                          374


1          parenthesis, longer due to fog, slash, accident.

2     A.   That's correct.

3     Q    Was that the reason why the trip took longer?

4     A.   Yes, it is.

5     Q    Do you recall testifying yesterday that the reason
there

6          was a problem was the road was icy?

7     A.   It was -- that's what caused the accident.  It was

8        foggy, it was like a fog that hung on the car and it was

9        turning icy on the windshield.  It was foggy and icy and

10       there was an accident.

11   Q   Whose car was icy and foggy?

12   A.  It was a county car.

13   Q   You had the accident?

14   A.  No.  No, no.  There was an accident.  That's why we had

15       to detour off of main expressway, because there had been

16       an accident.

17   Q   And your car was foggy, the county car was foggy?

18   A.  Icy, foggy, yes.  I had already explained this to him

19       verbally, and then I put it in writing.

20   Q   On the second page it says:  Stopped five minutes to

21       pick up dinner.

22   A.  Right.

23   Q   Okay?  Does that indicate that on the way home, then,

24       you and Deb Green picked up dinner and took it home?

25   A.  I picked up my own dinner and took it home, yes.


Barbara Varner                                    375


1    Q   You didn't stop and have dinner then with Deb Green?

2    A.  No, I did not.

3    Q   You had said that there was occasions that on the way

4          home from trips you and Mr. Graham would stop and eat

5          dinner at the end of the day?

6    A.    That's correct.

7    Q     On this occasion you didn't have dinner with Ms. Green,

8          you just picked it up and took it home?

9    A.    That's correct.

10   Q     On any of the trips with Mr. Graham did you ever just

11         pick up dinner and take it home with you?  Or did you

12         always sit down and eat?

13   A.    No, there were times I would pick up and take home.

14   Q     Is there a reason why you didn't have dinner with

15         Ms. Green?

16   A.    I think because of the weather at that time.  This

17         happened, like I said, we were up there, it was icy and

18         foggy to begin with, we both wanted to get home.

19   Q     You said Mr. Graham had taken away one hour of

overtime?

20   A.    From both of us, yes.

21   Q     You talked yesterday about an incident in which

22         Mr. Graham questioned you about a report, about not

23         having it filled out properly.  Do you recall that?

24   A.    Yes.

25         (Varner Deposition Exhibit No. 15 was marked.)

Barbara Varner                                    376

1          MS. WALLET:  So we're clear, we're talking about

2        four pages?

3            MR. MacMAIN:  Right, a four-page document and we

4        marked this as Varner 15.

5    BY MR. MacMAIN:

6    Q    Do you recognize this document?

7    A.    Yes.  But I take exception.  You have the juvenile's

8        name, address, birthdate, all information about a

9        juvenile to be confidential, and there's in fact five

10       different juveniles mentioned here.  Is Mr. Osenkarski

11       with us?  This is information being shared,

confidential

12       information.

13           MR. THOMAS:  I think for the purpose of these

14       depositions we probably should agree that the record

15       will be sealed and the deposition transcripts will not

16       be disseminated to anybody except parties interested in

17       this case directly, and that each of those individuals

18       shall be instructed that this information is

19       confidential and that confidentiality should be

20       maintained.

21           THE WITNESS:  Okay.

22           MS. WALLET:  Are we talking about the whole

23       transcript being sealed?

24           MR. THOMAS:  I am.

25           MS. WALLET:  I won't agree to that.

1              MR. THOMAS:  Well, all right.  Then any portion

2         where a juvenile's name appears, will you agree to

that?

3              MR. ADAMS:  Only last name, I think.  The first

4         names are fine.

5              MR. THOMAS:  Sure.

6              MR. ADAMS:  Just where a last name appears

7         somewhere in the record of a juvenile.

8              MR. THOMAS:  Right.

9              MR. MacMAIN:  I'm agreeing to that.  Is that

10        agreeable to plaintiff?  That's agreeable for

11        Mr. Thomas, it's agreeable --

12             MS. WALLET:  My proposal is whoever introduces a

13        document has responsibility for obliterating the last

14        name and that no part of the last name be included as

15        part of the transcript of this deposition.  Doesn't

that

16        solve the problem?

17             MR. MacMAIN:  Okay.  So what we've marked as

Varner

18        15, before it's submitted with the transcript we'll

19        redact the last name of any juvenile referenced on

here.

20             MR. THOMAS:  That way the transcript itself does

21        not have to be a sealed document or otherwise have

22        confidentiality maintained with respect to it, and I

23        think that will solve the problem.

24   BY MR. MacMAIN:

25   Q     Do you recognize that document?

Barbara Varner                                378

```
 1   A.   I recognize the name.

 2   Q    If you turn to the third page, it should actually say

 3        page 2 at the top.

 4   A.   Right.

 5   Q    It has a reference in the last paragraph about contact

 6        made with 20 listed victims, and then there's some
```

text.

```
 7        Does that refresh your recollection as to whether this

 8        was the document that you spoke about yesterday that

 9        Mr. Graham was upset with you over?

10   A.   No, this is not the document.  This is only part of the

11        social history.  This is a working social history.  As

12        we got in information, we would add it into this.  But

13        that is not the list.

14            There was an entirely separate list of all the

15        people that I had contact and the type of contact I had

16        made with them, and whether they had responded.

17            This is just a general information about the case.

18   Q    You don't think this is a complete copy of the report?

19   A.   No, it's not.  This is the working -- this is a working

20        form.  Because all -- I'm sorry, go ahead.

21   Q    When you saying a working form, you're telling me this

22        is a draft?
```

23    A.    On the front, that front page would be a working draft,

24          because we had not gotten any of the -- had not gone to

25          court yet.  The date of, you know, a lot of the

Barbara Varner                                              379

1          information has not even been provided yet.

2    Q.    What about the pages, the second, third and fourth page,

3          are they drafts as well?

4    A.    Yes, they would be working drafts.  There's no fourth

5          page.  Second and third.

6    Q.    There's four pages total?

7    A.    Yes.  Well, the front is your face sheet.  The other

8          ones are working, working sheets.  As the information

9          was gathered, then you could add into it.

10   Q.    So all four pages are drafts is what you're telling me?

11   A.    Yes.

12   Q.    Did you ever complete this report, put it in final?

13   A.    Yes, I did.

14   Q.    Would that be maintained in the original case file?

15   A.    Yes, it should be.

16   Q.    Was this document turned in to Mr. Graham?

17         MS. WALLET:  I'm sorry, I missed the question.

18   BY MR. MacMAIN:

19   Q.    Was this document turned in to Mr. Graham?

20         MS. WALLET:  This meaning Deposition Exhibit 15?

21          MR. MacMAIN:  Right.

22          MS. WALLET:  Or the one you just mentioned, the

23     final one?

24          MR. MacMAIN:  I'm sorry.

25     BY MR. MacMAIN:


Barbara Varner                          380


1     Q     The document that's in front of us, was this turned in

2           to Mr. Graham?

3     A     The front sheet would not have been turned in like

that,

4           but the next three pages, plus the list of the victims.

5           It's not complete.  It's not complete.

6     Q     Who would have prepared this report?  Would that have

7           been you?

8     A     It would have been me, yes.

9     Q     If you turn to the fourth page, bottom left-hand corner

10          are some initials?

11    A     Yes.

12          MS. WALLET:  That being the page marked number 3,

13     though?

14          MR. MacMAIN:  Right.  The fourth page of the

15     document.

16          THE WITNESS:  Right.

17    BY MR. MacMAIN:

18    Q    VEV, that would be you?

19    A.    Yes.

20    Q    Who was JAC?

21    A.    Jen Crum.  She was a secretary.

22    Q    Who typed up the actual document?

23    A.    She would have been typing it.  Then she kept it in her

24          registry and we would add things as the information came

25          in.


                    Barbara Varner                    381


1    Q    So Jen would have typed this up for you?

2    A.    Yes.

3    Q    Would you have given her a dictation tape?  Or how would

4          this information have --

5    A.    It's a dictation, and then she would transcribe it.  And

6          then as we got new information or changed it, she could

7          modify it.

8    Q    Was a copy of this draft kept in the original file?

9    A.    Probably not.

10    Q    Was it discarded when it was completed?  Why would this

11          draft not have been kept?

12    A.    We always shred this kind of thing.  Once the original

13          is compiled, we usually make a copy of it, the whole

14          thing, for our case books.  But these are always

15      shredded.  The information with the children's names is

16      always shredded.

17  Q   Where would it be shredded?

18  A.  At the office.

19  Q   You have a shredding machine at the office?

20  A.  Yes, we do.  Yes, we do.

21  Q   And you would have had one in '97?

22  A.  I don't know.  I know we disposed of them.  I'm not
sure

23      what happened to them but I think we might have had a

24      shredding machine, I don't recall.

25  Q   If there wasn't a shredding machine, how could it have


                    Barbara Varner                          382


1       been shredded?

2   A.  Well, I'm saying they -- the whole idea is whenever you

3       have these things you've got to get rid of the fact
that

4       it's the juvenile.  You've got to get rid of it so

5       people can't go through the trash and find out

6       information like this.

7           I don't know whether they took it down to central,

8       you know, shredding machine, or what.  I know we have

9       one in our office now and they had one at Children and

10      Youth, but I just don't remember this time frame
whether

```
11          we actually had one there or not.  But I know it was

12          taken care of so these were not found in the trash
```
cans.
```
13    Q     Is this the document that you were referring to before

14          that Mr. Graham wadded up and threw at you?

15    A.    This one?

16    Q     Yes.

17    A.    No, it is not.

18    Q     Was it a document similar to this?

19    A.    It was part of this.  It was a list of victims and the

20          contacts I had had with them.

21    Q     You said that he actually wadded up this piece of paper

22          and threw it in your face?

23    A.    Yes, he did.

24    Q     And you're sure he threw it in your face?

25    A.    Yes, I am.
```

Barbara Varner                                        383

```
1    Q     Do you still have Varner 7 in front of you?  Varner 7

2          was the running diary that you had kept.

3    A.    Yes.

4    Q     Turn to the page that's marked 5 at the top.

5    A.    (Witness complied.)

6    Q     Are you with me?

7    A.    Yes.

8          MS. WALLET:  I'm not.
```

```
 9                    (Discussion held off the record.)

10   BY MR. MacMAIN:

11   Q    Looking at paragraph, about a third of the way down it

12        says discussed cases, some direction?

13   A.   Right.

14   Q    I can't read your handwriting.  Another list has to?

15   A.   Be in separate, has to be in separately.  I already had

16        one list and he was asking for another list.

17   Q    And then reading on further:  Crumpled victim list,

18        threw it on the desk.  You see that?

19   A.   Yes.

20   Q    Did he throw it in your face or did he throw it on the

21        desk?

22   A.   I was sitting at the desk and he threw it at me and it

23        landed on the desk.  But he threw it at me.

24   Q    Did it hit you in the face first?

25   A.   No, it didn't hit me, but he threw it at me.
```

Barbara Varner                                           384

```
 1   Q    Did you testify yesterday that he hit you in the face

 2        with the paper?

 3   A.   He threw it at my face.

 4   Q    Did you write that in your statement at the time, that

 5        he threw it at your face?  Or did you put on there he

 6        threw it on the desk?
```

```
 7   A.   It says here:  Threw it on the desk.  It was at the

 8        direction of my face.  I was sitting at the desk and he

 9        was standing.

10   Q    But you would agree with me it says nothing in here
```
when
```
11        you took your notes that he threw it at your face?

12   A.   I was sitting at my desk, he was standing above me and

13        he threw it at me.  It came right at me.  And he didn't

14        throw it down, he threw it towards my face direction.

15   Q    But you would agree on your notes that you took at the

16        time this occurred you mentioned nothing about being

17        thrown at your face?

18   A.   It says threw it on the desk.  It doesn't say where it

19        went before it hit my desk.  He didn't throw it down at

20        my desk, he threw it at me.

21   Q    You had said yesterday that someone in the office

22        commented to you about you think that Gary was getting

23        his Barbs mixed up.  Do you remember stating that?

24   A.   Yes.

25   Q    Who said that?
```

Barbara Varner                                           385

```
 1   A.   Mr. Christlieb.  Darby Christlieb.

 2   Q    Did anybody else say that to you?

 3   A.   Not that I can recall.
```

4    Q    You were asked yesterday about an incident in which you

5         claim Mr. Graham made a comment about a peter meter.

6    A.   Yes.

7    Q    And you also said that someone had, the female at issue

8         had a medical diagnosis, correct?

9    A.   Yes.

10   Q    Was there a doc's note or anything, medical proof of

11        that?

12   A.   Yes.  Within her file she had seen a psychologist and

13        also medical doctor, and I believe there was -- I know

14        there's a report from the doctor and I'm not sure if I

15        had a -- I don't believe I actually got anything from

16        the therapist.  But the doctor had diagnosed her and I

17        did have reports on that.

18   Q    Did you provide reports as part of the case file?

19   A.   Yes.  I requested medical records.

20   Q    The comment that Mr. Graham had made, did you actually

21        hear it or did somebody tell you he said that?

22   A.   No, he said it directly to me.

23   Q    Do you recall Mr. Graham speaking in his office with

24        someone else about this issue?

25   A.   No.



                    Barbara Varner                        386



1    Q    He said it to you directly?

2    A.    He said it directly to me.  Mr. Thielemann was in his

3          office but he said it directly to me.

4    Q     You were asked about a birthday card that Mr. Graham had

5          given you, and I think you said it was January of '96?

6    A.    Yes.

7    Q     How do you know?  How can you date it?  How do you know

8          the year?

9    A.    That was my -- well, I remember that's the year it

10         happened.

11   Q     How is it that '96, is there some something that

12         triggers that year in your mind?

13   A.    I was not working in Juvenile Probation in January of

14         '95.  It had to be '96, because in '97 there was a lot

15         of problems.  That's when all these things were

16         happening.  So that's the only year that's left.

17   Q     So you're certain it was January of '96?

18   A.    Yes, I am.

19   Q     Okay.  When you received that card, did you say anything

20         to Mr. Graham?

21   A.    I did not.

22   Q     And you didn't tell anybody else in the office about it?

23   A.    Like I said yesterday, he put it inside of my briefcase,

24         I took it home.  As I redd out my briefcase several, I'm

25         not even sure it was weeks, not even weeks, days ago,

Barbara Varner                    387

1        after that, I just filed it away with a lot of other

2        miscellaneous papers to clean out my briefcase.

3    Q   You said you had gone on 20, approximately 20 trips
with

4        Mr. Graham prior to coming into the Department?

5    A.  Prior to coming?

6    Q   Prior to coming into the Department you had, I forget

7        the term you used, called these trips, visits?

8    A.  I was part of Juvenile Probation when those trips

9        happened.

10   Q   Did you take any of these trips with him -- and you

11       talked about Debra Green -- anyone else that you took

12       these type of trips with?

13   A.  Yes.  I went with Hank Thielemann, Nick Barolet.  I
went

14       supervising -- no, that's not when I was in Probation.

15       Kerry Houser.  I cannot think of any other at this
time.

16   Q   Any of those people that you mentioned, can you
estimate

17       how many trips you took with each?

18   A.  Debra Green, maybe two or three.  Kerry, one that I

19       recall.  Hank, one that I recall.  And Nick, I believe

20       two.

21   Q   You talked about yesterday about an incident in which

22       you were in the car with Mr. Graham and he told you

23       about his wife's problems and you had suggested that

24          they ought to see a counselor?

25    A.    Right.


                      Barbara Varner                          388


1    Q.    Did you give names of counselors?

2    A.    Yes, I did make suggestions of places they could go for

3          counseling.

4    Q.    How were you aware of these places?

5    A.    Because I was always considered the resource person in

6          Children and Youth and in Probation, hooking families

up

7          with counseling services.  That was part of my job.

8    Q.    Had you seen any of these marital counselors yourself?

9    A.    No, I had not.

10   Q.    Have you ever seen a marriage counselor?

11   A.    No, I have not.

12   Q.    You said Mr. Graham was driving 90 miles an hour?

13   A.    About 95 miles an hour.

14   Q.    How long was he driving at that speed?

15   A.    It seemed like an eternity.  I'd say at least five

16         minutes, through construction.

17   Q.    This was on I-81?

18   A.    Yes.

19   Q.    And was the entire five minutes through a construction

20         zone, or only a portion?

21   A.    Most of it's through construction.

```
22   Q    How do you know?  Did you actually look at his

23        speedometer?

24   A.   Yes, I did.

25   Q    And did Mr. Graham get a ticket, pulled over?
```

Barbara Varner                                          389

```
 1   A.   No, he did not.

 2   Q    During any of the other times that you drove with

 3        Mr. Graham, had he ever driven at that rate of speed

 4        before?

 5   A.   Not quite that high, but he would go very -- he would

 6        travel maybe 80 miles an hour.  And a lot of concerns

 7        you had, Gary was on the phone, a lot of his -- while
he
 8        was driving a lot of times.  And another concern, he
had
 9        a juvenile usually in the back with us.

10   Q    On a cell phone?

11   A.   Um-hum.

12   Q    Did you report this to anybody?

13   A.   Mr. Drachbar, another officer in our department, was

14        well aware of that, because he said he drives way too

15        fast.  But who was I going to say anything to?

16        Mr. Osenkarski, I think he had already let me know that

17        Mr. Graham was in charge.

18   Q    My question was:  Did you report this to anybody?
```

19  A.  No, I didn't.

20  Q.  Did Mr. Graham ever get a ticket while you were driving

21      with him?

22  A.  No, he didn't.

23  Q.  Did he ever get pulled over?

24  A.  Not that I recall.

25  Q.  I assume the vehicle you were driving in didn't look

Barbara Varner                                    390

1       like a police car?

2  A.  Yes.  Our county car does look like a police car.

3  Q.  What kind of car was it?

4  A.  I believe they're Ford Fairlanes.  The larger Fords.

5  Q.  How about when he was driving in his Jeep, his Jeep

6      doesn't look like a police car, does it?

7  A.  No.  No.

8  Q.  We talked I think both yesterday and today about

charges

9       that you had filed against Mrs. Graham, correct?

10  A.  Yes.

11  Q.  You also attempted or at least spoke to someone from

the

12      District Attorney's Office about charges against

13      Mr. Graham as well?

14  A.  Yes, I did.

15  Q.  Is Varner 11, which was the list --

16  A.  Yes.

17  Q.  This is a list that Debra Green drafted up?

18  A.  Yes, it is.

19  Q.  Does Debra Green have a law degree?

20  A.  No.  But we do, every time we get a referral it's

21      regarding charges, so we're well aware of what the

22      elements that are needed to meet the requirements for

23      these charges.

24  Q.  In your job do you charge, criminally charge people?

25  A.  No.  We process the charges.  We do the petitions.  We

                    Barbara Varner                    391

1       take the charge and put it on the petition in the

2       language of the crime book.

3   Q.  Did you assist Ms. Green with preparing this list?

4   A.  No, I did not.

5   Q.  Did you ask her to prepare this list for you?

6   A.  No, I did not.

7   Q.  And did you take this list to anybody from the District

8       Attorney's Office?

9   A.  No.  But I know we shared this, we shared not this

exact

10      list but her concerns with the controller's office when

11      we were called down during the investigation they were

12      doing.

13    Q    Who specifically from the District Attorney's Office did

14         you speak with?

15    A.   I left a message for Skip Ebert, the District Attorney.

16    Q    Did Mr. Ebert call you back?

17    A.   No, he did not.

18    Q    Did you call his office or stop by to follow up?

19    A.   No, I didn't.

20    Q    Did you speak to anybody else from the District

21         Attorney's Office?

22    A.   Not about these specific charges, no.

23    Q    About anything?

24    A.   The CID, yes.  They're part of the District Attorney's

25         Office.

Barbara Varner                                        392

1     Q    Who did you speak with in CID?

2     A.   I've spoken to two of the directors.  Mike Brennan was

3          the last director, and now it is Les Freeling, and I

4          spoke with both of them.

5     Q    Were you aware that you could file criminal charges

6          privately?

7     A.   Yes, I was.

8     Q    And you did not file criminal charges privately against

9          Mr. Graham?

10    A.   This is a procedure, the direction -- I was hoping the

11          county would be able to stop it so I didn't have to go

12          that direction.  I had asked assistance from the county

13          to help stop this.

14    Q     And no one, the charges were, in fact, not filed by
you?

15    A.    No.  I was hoping it could be stopped internally.

16    Q     And you didn't file charges on your own, even though
you

17          knew you could?

18    A.    Yes, that's correct.

19    Q     Have you ever applied for or sought a Protection From

20          Abuse Order as to either Mr. Graham or Mrs. Graham?

21    A.    I talked to the Sheriff's Department about that.
Again,

22          I have two different jurisdictions.  I live in York

23          County, and this happened in Cumberland County.

24    Q     Who did you speak with in the Sheriff's office?

25    A.    I had spoke to them about the potential of protection


Barbara Varner                          393


1           from abuse, that would have been the sheriff.  He had

2           real concerns for my safety as well.

3     Q     Who was the sheriff that you spoke with?

4     A.    Tom Kline.

5     Q     Did Mr. Kline have any personal knowledge, or was it

6           just what you had told him?

```
          7   A.   No.  He had prior knowledge of Mr. Graham and his anger

          8        and his outbursts.  He was aware of that in the county.

          9   Q    Did he tell you how he was aware?  Did he have any

         10        personal knowledge or was it just something that
someone
         11        had told him?

         12   A.   He didn't tell me how he knew.

         13   Q    And going back to my original question:  Did you seek a

         14        Protection From Abuse Order from either Mr. Graham or

         15        Mrs. Graham?

         16   A.   I did not.

         17   Q    Okay.  In the line of work that you're in, you're aware

         18        that there are Protection From Abuse petitions that can

         19        be filed?

         20   A.   Yes.  I know they're very complicated.  And again, from

         21        my -- am I to pay an attorney for all of this again?

         22   Q    Are you aware that you can do this on your own without

         23        an attorney?

         24   A.   No, I really was not aware of that.

         25   Q    You had no idea after all the years you've been in this
```

Barbara Varner                                        394

```
          1        criminal justice system you couldn't file a Protection

          2        From Abuse on your own?

          3   A.   I never went through that process.  No.

          4   Q    Did you deal with any of your cases over the years in
```

5    which there were PFAs as part of the file or part of
the
6    procedure that you dealt with?

7  A.  Certainly.  But I just was never in that part of the
8    procedure, in that process.  I would send them to --
I'd
9    always send it to Legal Services.  That's where I would
10    refer my clients to.

11  Q  You said it was a complicated procedure.  You do have a
12    master's degree and you're working on a --

13  A.  Right, Ph.D.

14  Q  -- Ph.D.  You thought it would be too complicated for
15    you to be able to fill out?

16  A.  Not too complicated.  I just didn't want to get  -- I
17    was hoping, like I said, that we could handle this
18    internally, I did not have to go through the process of
19    bringing criminal charges against.  I had my faith in
20    the county that they would do what had to be done.  And
21    we were informed that we would be pleased with their
22    investigation.

23  Q  Did you ever ask anybody from the county to fill out a
24    PFA for you?

25  A.  No, I did not.


Barbara Varner                          395


1  Q  The preparation of a PFA, and I don't want you to tell

2          me what you may have discussed with legal counsel, but

3          did that issue ever come up?

4              MS. WALLET:  Objection.  How can she possibly

5          answer that question unless it would call for an answer

6          related to a discussion with an attorney?  I object and

7          I instruct her not to answer.

8     BY MR. MacMAIN:

9     Q    You had legal counsel since early '97, correct?

10         Relating to these episodes?

11    A.   In '97, yes, I contacted counsel.

12    Q    And that would be your current attorney?

13    A.   Yes, it is.

14    Q    Have you ever consulted any other attorneys besides

15         Attorney Wallet?

16    A.   As far as the case?  No.

17    Q    Can you tell me when you first retained Attorney

wallet?

18    A.   I don't have Tony Wallet, I have Debra Wallet.

19    Q    I said Attorney Wallet, I'm sorry.

20    A.   I thought you said Tony Wallet.

21             MS. WALLET:  It's that New York accent.

22             THE WITNESS:  I don't remember the exact date.  I

23         know it was spring of '97.

24    BY MR. MacMAIN:

25    Q    At any point prior to making your complaint with the

1        county, did you ever speak to Mrs. Graham?

2   A.   There was an occasion she came into the office.  I

3        remember speaking with her maybe once or twice.

4   Q   Would this be small talk?

5   A.   Yes.  Yes.

6   Q   Did you ever consider speaking to her about -- speaking

7        to her directly about getting counseling?

8   A.   No.  I didn't know her that well, and I didn't have the

9        occasion to see her.

10   Q   Did you ever speak to her about her husband?

11   A.   No, I did not.

12   Q   You talked yesterday about an incident involving being

13        measured for a bulletproof vest and Mr. Graham made a

14        comment?

15   A.   Yes.

16   Q   Can you tell me when that was?

17   A.   '96.  '95 to '97.  '95 to '96.  In that time frame.  I

18        don't remember exactly when it was.  I know they were

19        talking about, you know, gun training and all that and

20        that's the reason we were looking at getting

bulletproof

21        vests.

22   Q   Do you actually wear a bulletproof vest, or did you?

23   A.   I have, as needed.

24   Q   Do you remember when you were first issued a

bulletproof

25        vest?

Barbara Varner                                397


1   A.    I don't remember the date, no.

2   Q     Can you tell me the year?

3   A.    I'm guessing '96.

4              MS. WALLET:  Can I have a five-minute break,

5         please?

6              MR. MacMAIN:  Sure.

7              (Recess taken from 2:39 until 2:50 p.m.)

8   BY MR. MacMAIN:

9   Q     You had said yesterday you've seen three mental health

10        professionals since all this occurred?

11  A.    Yes.

12  Q     Dr. Morand, Laurie Walker, and Elaine McKenna?

13  A.    Alaine McKenna, yes.

14  Q     Who was the first?

15  A.    Laurie Walker.

16  Q     Was the first person you saw?

17  A.    Yes, she was.

18  Q     How did you come to see Laurie Walker?

19  A.    Went through the EAP program at work.

20  Q     Do you recall when you first saw Laurie Walker?

21  A.    I don't recall the date.  Spring of '97.

22  Q     As a result of the alleged incidents in this case, have

23        you sought any type of marital counseling?

24  A.    I have not.

25   Q    Have you had any marital problems as a result of these

Barbara Varner                                    398

1         incidents?

2    A.   No.  It's affected me personally, but not between my

3         husband and I, no.

4    Q    Either during your first marriage or at any time up to

5         the events in this incident, had you ever sought marital

6         counseling?

7    A.   I have not, no.

8    Q    Other than the counseling you got, you've received since

9         these incidents, alleged incidents occurred, have you

10        ever previously sought any type of mental health

11        counseling, either psychologist, psychiatrist, through

12        your church or synagogue?

13   A.   No.  I never needed anything till this happened.

14   Q    Have you ever at any point had any type of drug or

15        alcohol counseling?

16   A.   No, I've not.

17   Q    Have you ever been arrested?

18   A.   No.

19   Q    Very briefly, you spoke this morning about a bomb

20        threat --

21   A.   Yes.

22    Q    -- in 2002.  Did anyone in the office come and tell you

23         that -- you had pointed to Mr. Osenkarski.  Did anyone

24         else come --

25    A.   No.  But the ultimate responsibility is with the


Barbara Varner                                399


1          department head.

2     Q    Do you have people in the office that you consider your

3          friends?

4     A.   Yes.

5     Q    And none of them came and told you about this bomb

6          threat?

7     A.   Most of them were either out of the office or down at

8          the other east wing area.

9     Q    During the two hours, what were you doing for the two

10         hours?

11    A.   Dictating.

12    Q    Two hours straight of dictating?

13    A.   Oh, yes.

14    Q    Who would you give the dictation tapes to?

15    A.   One of the secretaries.

16    Q    Any one particular secretary you were assigned to?

17    A.   No.  I'm not assigned to any of them.  We have two

18         secretaries that do dictating typing for us.

19    Q    One of your complaints with Mr. Graham is the use of
the

20          F word?

21    A.    Yes.

22    Q    Would you agree with me that many of your clients also

23          use foul language?

24    A.    Not around me, they don't.

25    Q    Your clients don't use profanity at all around you?


Barbara Varner                            400


1    A.    My juveniles do not.

2    Q    Do you hear other clients in the office using
profanity?

3    A.    Some will get out of hand, but that's not a usual

4          conversation word that you use.  I mean, it's one of

5          those things, I know people may laugh that I say they

6          don't, but that's one of the things I do not let my
kids

7          swear at me, the juveniles I supervise, swear at me.

8          And you don't hear conversation between probation

9          officers and juveniles using swear words.

10    Q    The juveniles don't, other juveniles don't use swear

11          words?

12    A.    Well, certainly they use swear words, but for my, when

13          I'm in their homes or when I'm supervising them I do
not

14          allow that.

15   Q   You said earlier today that Mr. Graham wrote a letter
to

16       Judge Sheely about political support.  Have you ever

17       seen any document like that?

18   A.  No, I've not.

19   Q   Where did you hear this from?

20   A.  Somebody -- I'm trying to think.  Somebody in the
office

21       told me about that.  I can't say for sure who.  All I

22       know is I was informed that he had given a letter to

23       Judge Sheely reminding him of that, but I'm not sure

24       who.

25   Q   Do you know if you heard it from more than one person?


                      Barbara Varner                      401


1    A.  I don't recall that.  I believe just one person.

2    Q   Did they say they saw this document or letter?

3    A.  I don't remember if they said they saw it or not.  All
I

4        know is they said they knew it had been given to Judge

5        Sheely the day before.

6    Q   If you would pull up Varner 7, which is the notes that

7        you kept.

8    A.  Okay.

9    Q   Did someone tell you to keep notes?

10   A.  My therapist recommended that I do.

11   Q   So you started keeping it after you had gone to a

12          therapist?

13     A.   No, I started before that.  It was just one of those

14          things that -- it was more when things started to turn

15          ugly, when Mr. Graham started to be nasty to me.  I
just

16          felt it was necessary for me to document it because

17          knowing the punishment mode that was in the office, I

18          figured I better start writing down things or say I

19          could just feel the tide turning, so to speak.

20     Q.   When did you start keeping this list?

21     A.   Looks like the first entry was in November of '96.

22     Q.   Would you agree with me there's things in here that

23          refer to dates prior to November of '96?

24     A.   I would have to review it.  If there was, that's when
it

25          was documented.


                    Barbara Varner                    402


1      Q.   Did someone tell you it might be a good idea to keep a

2           list?

3      A.   After I met with my therapist she advised that I do.

4      Q.   But you had already started keeping the list before you

5           met with your therapist.

6      A.   Yes, but she suggested I continue on.  And my attorney

7           also recommended I do this, just for documentation
sake.

```
 8    Q    So you kept the list but you didn't tell anybody until

 9         the spring of '97, correct?

10    A.   Right.  Just my therapist, that's correct.

11    Q    But prior to the spring of '97 you had not told anybody

12         at the county or the courts about these various things

13         that you were keeping a diary on?

14    A.   No.  No, I did not.

15              MS. WALLET:  I have to object to the form of the

16         question.  Was your question did you tell anyone at the

17         county about the documents?  Or did you tell anybody at

18         the county about the things recorded in the document?

19              MR. MacMAIN:  I thought the question was clear but

20         I'll ask it again.

21    BY MR. MacMAIN:

22    Q    Did you tell anybody at the county or the courts about

23         the things that you had written about, not the
document,

24         but the various things you kept your running list on

25         prior to the spring of '97?
```

                                    Barbara Varner                    403

```
 1    A.   Well, some of the things, like things that occurred
with

 2         other people, like with Debra Green, she was aware of

 3         the document, the things that had happened in here.

 4    Q    If you turn to about halfway through, the pages that
```

```
  5          have dates and just little notations next to them?
  6     A.   Right, right.
  7     Q    The first page will have, looks like a 30 with a slash
  8          and a 6 at the top?
  9     A.   Right.
 10     Q    And then the list of dates appears to go on for four
 11          pages?
 12     A.   Yes.
 13     Q    Can you tell me where these dates came from?
 14     A.   These were from daily logs.  My daily logs of, you
know,
 15          daily activities.  I was trying to compile a list of
 16          trips I had taken with Mr. Graham, or any trips I had
 17          taken.
 18     Q    Where did these dates come from?  Did these come from a
 19          calendar that you kept?
 20     A.   No.  From my daily logs, daily we turn in every two
 21          weeks.
 22     Q    And you believe that these are all the trips that you
 23          had taken with Mr. Graham?
 24     A.   Some are not with Graham.  They're just lists of --
 25          there are a few that are not, but most of them were
with
```

Barbara Varner                          404

```
  1          Mr. Graham.
```

2 Q Why did you write all these down?  What was the reason

3   why you did this list?

4 A. It was in compiling all the paperwork for this.

5 Q Why specifically would you keep a list of all the trips

6   that you had taken primarily with Mr. Graham?

7 A. In preparation, after I started filing this and we

8   started realizing how many, just looking at the

9   documentation, trying to compile a list of how many

10   trips I had taken with him.

11 Q Were these dates that someone at the county suggested

12   you write down or check into?

13 A. No.  I believe the conversation was with my attorney

14   about this.

15 Q If you turn a few pages back, five pages from the end

of

16   the document?

17 A. Five pages from the back?

18 Q From the back.  At the top it will say called

19   Ms. Something, I can't read the name, it says 8/4.

20 A. Called Ms. Gamiter.

21 Q Right.

22 A. Yes.

23 Q Who is Ms. Gamiter?

24 A. She was from the EEOC.

25 Q Is this a narration of a conversation you had with Miss

```
 1          Gamiter?

 2     A.   No.  I was just noting the day I called her.

 3     Q    Looking at the entry for 5/29 --

 4     A.   Okay.

 5     Q    Called to Dave, it says, parenthesis.  Who's Dave?

 6     A.   Dave Deluce.

 7     Q    And then after that it says, need to tell him, and

 8          there's a series of names?

 9     A.   Yes.

10     Q    Okay.  The first name is Andy --

11     A.   Anderson.

12     Q    Who is Andy Anderson?

13     A.   He's assistant sheriff.

14     Q    Assistant chair what?

15     A.   Cumberland County.

16     Q    Why did you --

17          MS. WALLET:  I'm sorry, I think she said sheriff.

18          MR. MacMAIN:  I thought you said chair.

19          MS. WALLET:  I can translate between Philadelphia

20          and Harrisburg.

21   BY MR. MacMAIN:

22     Q    What did you need to tell Mr. Deluce about Andy --

23     A.   Anderson.

24     Q    -- Anderson?

25     A.   These were names that were, people were telling me of
```

1          people that Mr. Graham had had arguments with or gotten

2          in arguments with over the last years.

3     Q    Andy I assume is a guy?

4     A.   Yes, he is.

5     Q    The next name is DJ Paula Correal?

6     A.   Yes.

7     Q    And that also was someone who you understood that

8          Mr. Graham had had an argument with?

9     A.   Yes.

10    Q    Where do these names come from?  Who gave these names
to

11         you?

12    A.   They were just names that were given to me by people in

13         the office.  Well, Gary Shuey, I had heard him yelling

14         at him.  Wendy Hoverter herself had told me, she was
one

15         of the supervisors at Children and Youth, she had told

16         me about an argument, that was before, you know, years

17         ago.

18              And Sarah Costicki, I'm not sure who -- I think
she

19         might have been a victim witness person, I believe.

20         This information was given to me -- I believe Sarah was

21         from Kerry Houser.

22              And Paula Correal, I don't remember who but

23         somebody in the office.  It was just a list of names

24         that he had screamed at or had an argument that he was

25          angry at them.


                         Barbara Varner                        407


1    Q    They weren't people that Mr. Graham had allegedly
2         sexually harassed, just that he had words with?
3    A.   Yelled and screamed at them, that's all I knew.
4    Q    And DJ Paula Correal, she's the district justice that
5         found Mrs. Graham not guilty of harassment?
6    A.   She's the district justice who heard the hearing, who
7         heard the --
8    Q    And she found Mrs. Graham not guilty of harassment?
9    A.   She, as I said before, she told Mrs. Graham to not
10        repeat the behavior and that she felt it would be
11        handled in another court.
12   Q    I'm not going to quibble with you over what was said,
13        but Mrs. Graham was not convicted of the charges that
14        were brought?
15   A.   She was not convicted, that's correct.
16   Q    Have you ever spoken to DJ Paula Correal about him?
17   A.   No, I've not.
18   Q    How about Andy Anderson?
19   A.   I have not.
20   Q    How about Wendy Hoverter?
21   A.   Yes.
22   Q    Ever spoken to her about Mr. Graham?

```
23    A.    Yes.

24    Q     And does she have a claim that Mr. Graham had ever

25          sexually harassed her?
```

Barbara Varner                                        408

```
 1    A.    No.  Just screamed.

 2    Q     How about, same question with regard to Gary Shuey,
have

 3          you ever spoken to him about Mr. Graham?

 4    A.    No.  I overheard him screaming at Mr. Shuey.

 5    Q     How about Sarah Costicki?

 6    A.    I don't -- I've only heard the name.  I do not know
her.

 7    Q     You talked this morning about Mr. Osenkarski getting

 8          shoes donated and then using them for personal use?

 9    A.    That's correct.

10    Q     You did also get a pair of shoes from Mr. Osenkarski

11          from the same group of free shoes?

12    A.    I did not.

13    Q     You didn't take any for your son or your daughter, your

14          grandson?

15    A.    I did not, no.

16    Q     Was it your understanding that these shoes were, in

17          fact, donated in large part to charitable organizations

18          and so forth?
```

19    A.    They were supposed to be given to detention centers, but

20          Mr. Graham had told me not to ever say anything to

21          anybody, especially Mr. Osenkarski, that nobody was to

22          know that they were doing this.  So it was obviously --

23          if it was just for that purpose there was no reason for

24          the secrecy.  But that was kept very -- I was to keep

25          that very confidential.

Barbara Varner                                    409

1    Q.    How did you even know about it?

2    A.    He had taken pairs -- he told me he was picking them up.

3          They would go down and pick up several boxes with a

4          trailer of his.  And on one of the trips, when I spoke

5          about going up to Clarks Summit to pick up a girl and

6          taking her to New Jersey, he had several pairs of shoes

7          in the car for his sister and for his niece and he gave

8          them to them.

9    Q.    When you're talking about he, is that Mr. Graham or

10         Mr. Osenkarski?

11   A.    Mr. Graham.

12   Q.    And you at no point ever took any shoes for yourself --

13   A.    I did not take --

14   Q.    -- or your family members?

15   A.    No.  I did not.

was

16    Q    You were asked some questions this morning about who

17         involved in this conspiracy, who you believe was

18         involved in this conspiracy, and you mentioned Mr. and

19         Mrs. Graham and you had also said you believe Judge

20         Sheely was involved in this conspiracy.  Do you recall

21         answering that question?

questioned

22    A.   I remember having a discussion on that, being

23         about that.

there

24    Q    Do you believe that Judge Sheely wanted to believe

25         had been an affair?

Barbara Varner                     410

1    A.   I think Judge Sheely wanted to resolve the thing and I

2         believe he was very sympathetic to Mrs. Graham because

3         of her crying.

there

4    Q    Was it your belief that Judge Sheely doesn't think

5         was an affair, this whole thing was a hatched plan?

6    A.   I don't think Judge Sheely really knows what happened,

7         and I don't think he was willing to look into it more

8         than what he did, from that one time, the alleged

9         confession.

understand

10    Q   You made reference to a long meeting that you

11        took place between Mr. Graham, his wife and David

```
12          Foster?

13    A.    That's correct.

14    Q     Do you believe Mr. Foster is in on this conspiracy?

15    A.    I don't know that.

16    Q     And it's your belief that Mr. Graham made up this whole

17          story about the affair?

18    A.    Yes, it is my belief.

19    Q     And you believe he would reveal or make up this story

20          about an affair and jeopardize his marriage?

21    A.    He always told me that there's no fear of divorce

22          because his wife's Catholic and she'll never leave him.

23    Q     You believe that Mr. Graham would make up this story at

24          the expense of hurting his children?

25    A.    What I heard about Mr. Graham about smashing the
```

Barbara Varner                                        411

```
1           birthday cake and such, I don't think his agenda was

2           what was best for his children.  His agenda appeared to

3           be what was best for him.

4     Q     Did you ever speak to your husband about this
accusation

5           of having an affair with Mr. Graham?

6     A.    Yes, I did.

7     Q     When did you discuss it with your husband?

8     A.    When the allegations were first made, when this whole
```

```
 9              thing, with Judge Sheely, the day after I spoke, or the
10              day of my speaking with Judge Sheely.
11    Q    And I assume you told your husband there wasn't an
12         affair?
13    A.   It never came up.  He knows I did not have an affair.
14    Q    Did you have a discussion with him about it?
15    A.   He didn't ask me if I did or not.  He knows I did not.
16    Q    He didn't question you at all?
17    A.   No.  I told him I did not, and he believed me.
18    Q    Just a couple questions.  In your Complaint you talked
19         about yesterday, and I'll just read the portions I'm
20         specifically interested in, paragraph 54, you made the
21         allegation that individuals Graham and Osenkarski have
22         aided and abetted violations of the PHRA by directly
23         discriminating against Varner and by conspiring with
    the
24         county and the Court to engage in acts which violate
    the
25         PHRA.
```

Barbara Varner                                    412

```
 1              Can you tell me what specifically Mr. Graham did
 to
 2         conspire with Mr. Osenkarski and/or the courts and/or
 3         the county?
 4    A.   I believe there's discussion between him and
 5         Mr. Osenkarski about the case, about what they just --
```

6      discussion on the case.  I think there was discussion

7      with Judge Sheely about the case, without us being

8      involved.

9   Q  Do you believe that Mr. Graham and Mr. Osenkarski spoke

10     to Judge Sheely together, the two of them?

11  A  I believe Mr. Graham did and I believe Mr. Osenkarski

12     did as well, yes.

13  Q  Do you believe that -- tell me specifically what you

14     believe Mr. Osenkarski's role in this conspiracy is.

15  A  I believe there was a discussion with Judge Sheely and

16     even with Judge Hoffer about this whole case.  I think

17     there's an ongoing rapport between all of them about

18     this case.

19  Q  Can you point to any specific dates or months you think

20     these conversations have taken place?

21  A  I would not be privileged to the dates and times.  I

22     just feel it was an ongoing discussion.

23  Q  You believe the conspiracy is continuing to today?

24  A  I think it is.  I think that there's -- not, maybe not

25     with Mr. Graham and Judge Hoffer, but with

Barbara Varner                              413

1      Mr. Osenkarski and Judge Hoffer, yes.

2   Q  I show you a document I don't think we've marked

before.

3          This will be Varner 16.  We'll have to make copies.

4               (Varner Deposition Exhibit No. 16 was marked.)

5     BY MR. MacMAIN:

6     Q    I just want to ask you about one reference.  We're

7          looking at Varner 16, a memo from Dan Hartnett to you

8          April 25, 1997.  There appears to be a Post-It note on

9          the upper right-hand corner.  Dan, slash, Dave to let

10         you know Joe and Gary both have guns locked in our

11         office with ammo locked in a closet, Barb Varner.

12              Did you write that?

13    A.   Yes, I did.

14    Q    Do you believe that Mr. Graham and Mr. Osenkarski had a

15         locked gun?

16    A.   Yes, they did.

17    Q    And have you actually seen these guns?

18    A.   Yes, I did.

19    Q    Did anybody else see these guns?

20    A.   Yes.  Everybody in the office knew they were there.

21    Q    And you've actually seen those guns locked in the gun

22         cabinet?

23    A.   Yes, I have.

24    Q    When did you see them?

25    A.   Just as soon as we started getting guns, we would see

                              Barbara Varner                    414

1          them.  We would go through the process of breaking down

2          the guns.  There was also people involved in gun

3          training.  I saw them as recently as just several
months

4          ago.

5    Q     Would you agree with me that other people in the

6          Department use guns as part of their job?

7    A.    We're not allowed to carry guns.

8    Q     Do you know Mr. Graham to carry a gun?

9    A.    Yes, he did carry a gun.

10   Q     When did you see him carry a gun?

11   A.    He had a gun in his private vehicle.

12   Q     When?

13   A.    When we were transporting.

14   Q     Each of the times you transported?

15   A.    No.  I just remember seeing him have one.

16   Q     Can you recall any of the dates on either the
particular

17         trips either by name, by location, by client?

18   A.    No.  I was just aware that he did have one.

19   Q     Did you ever see the gun?

20   A.    In his glove compartment, yes.

21   Q     Did you open the glove compartment?  Did he open it?

22         How did you know it was in there?

23   A.    I believe he opened it and he showed the gun to me.

24   Q     Can you tell me what the gun looked like?

25   A.    I don't know guns.  It was an automatic, the semi --

Barbara Varner                                    415

1          smaller semiautomatics.

2     Q    Can you tell me what color it was?

3     A.   Black, black and gray, I don't know.

4     Q    Did you see it on more than one occasion?

5     A.   No.

6     Q    Since these incidents occurred, have you had any type
of

7          flashbacks or nightmares about Mr. Graham?

8     A.   I have had those, yes.

9     Q    Like when?

10    A.   It was '97, '98, in that time, when I first started

11         therapy.  And more recently.  A lot of the flashbacks

12         stuff now have occurred because of the bomb scare.

13    Q    Any of the flashbacks prior to the bomb scare, what

14         specifically were you flashing back to?

15    A.   What I recall, a lot would be going back in his office

16         and the screaming at me.  There were times I would

17         remember the speed of the car we were in.  A lot of

18         times my concern would be the children in the car.  I

19         remember having a kid in the car and him driving so

20         quickly.  But I can remember the fear I had, especially

21         at a man screaming at me going that fast.  I would

22         remember that.

23             It was more like a repeated getting screamed at,

24         going back and opening the handle of that door, turning

25         the door and not knowing what was waiting for me, the

Barbara Varner                                        416

1          screaming or what was going to happen.  Just bits and

2          pieces of that.

3     Q.   Was this in a car or in an office that you were --

4     A.   You mean when I would have the --

5     Q.   The flashbacks, were you in a car or were you in the

6          office?

7     A.   At times it was in the car and at times it was in the

8          office.  More in the office than in the car.

9     Q.   How often would you have these nightmares?

10    A.   It's not a -- I can't pinpoint.  It was just all of a

11         sudden it would for something would click, when I was

12         going back to the office or something, that would just

13         click it in.

14    Q.   Did you ever receive any kind of medication for any

15         sleep disabilities?

16    A.   No.

17    Q.   Do you have any difficulty getting in cars?

18    A.   No.

19    Q.   Or fear of driving in car?

20    A.   No.  No.

21    Q.   Currently do you have any difficulty sleeping?

22    A.   Off and on, I do.  Either I'll sleep a lot or I won't

23         sleep at all.

24   Q    Can you tell me why you have difficulty sleeping?

25   A.   I wake up and I can't get back to sleep.  More anxiety

Barbara Varner                    417

1         type behaviors.  Nervous stomach.

2              MR. MacMAIN:  That's all the questions I have.

3         Thanks.

4    BY MR. THOMAS:

5    Q    Barb, just a couple.  On the page in what has been

6         marked as P-7, your notes?

7    A.   Yes.

8    Q    The last entry on that, I think it's the seventh page

9         from the end, there's a date June 2nd.  Are you with

me?

10   A.   Yes.

11   Q    Can you read that entry for me?  It's not legible on my

12        copy.

13   A.   It says:  Call from Dave -- I'm referring to Dave

14        Deluce -- told all the new information from last week

15        and other names.  And those would be the names of

16        Correal, Costicki, those ones we reviewed about

17        Mr. Graham yelling at them.

18   Q    Those are listed in the entry or two above that?

19   A.   Yes.  And it says that Dave Deluce says he knows Sarah

20        and that Gary is scared.  Referring to Sara Costicki.

21   Q    And Gary referring to Gary Graham?

22    A.    Yes.

23          MR. THOMAS:  I would simply note for the record

24          that these notes which are contained in Plaintiff's

25          Exhibit 7 and 8 were not previously supplied to us.


                    Barbara Varner                    418


1           Some of them are not legible here today.  I've not had

2           an opportunity to review them in detail, and some of

3           them I can't read.  I will ask Deb for the opportunity

4           to review the originals, and depending on what I find

in

5           them, if there's something there that has not been

6           adequately covered in the deposition, I would reserve

7           the right to request to recall Mrs. Varner to question

8           her about anything here, since the documents were not

9           earlier produced and should have been.

10          With that, I have nothing further.

11          MS. WALLET:  For the record, I'd like to note that

12          they were produced in July with a specific note that

13          they were being sent to the requesting counsel and that

14          they would be made available at any mutually convenient

15          time or a set would be produced.

16          MR. THOMAS:  If fairness, they should have been

17          provided to each counsel and served on them.  I don't

18          know whether -- I don't want to get in a fight over it.

19          I don't know whether that's adequate or not.  The fact

20          of the matter is, they weren't produced before today,

21          and I saw them for the first time this morning.  And it

22          may be that there's nothing there.  She's obviously

been

23          examined intensively, and I know that some of these

24          notes were probably used in conjunction with the

25          Complaint, so I'm not sure there will be any surprises.


                    Barbara Varner                    419


1                   Let me ask her one question about that.

2      BY MR. THOMAS:

3      Q    Barb, these notes that you've testified about

4           extensively today I assume were made contemporaneous

5           with the dates that are contained in the notes; is that

6           correct?

7      A.   That's correct.

8      Q    So for instance, on the first page I see a note of

9           December 16th, and as I understand that note, then,

10          would have been transcribed by you on that date, the

11          date of December 16th, correct?

12     A.   That's correct.

13     Q    So they were made contemporaneous with whatever date

14          appears on the particular page, and there are 28 pages

15          of notes here or something like that, right?

16     A.   The only one that would be an exception would be the

17          trips that I went back through to try to compile that

18          off my daily logs.

19    Q     And to the extent that there may be any conflict
between

20          your recollection as you've described it over the last

21          two days, and these notes, I assume that you would
agree

22          the notes would be more accurate than your recollection

23          today some years after the events?  Is that fair?

24    A.    I would think so.

25              MR. THOMAS:  That's all I have.


                    Barbara Varner                        420


1               MR. ADAMS:  I have a few more questions.  It won't

2          take long.

3    BY MR. ADAMS:

4    Q     Ms. Varner, do you have any correspondence, notes,

5          memos or any document or piece of evidence at all

6          supporting your claim that Mr. Osenkarski's conspired

7          against you in violation of PHRC?

8    A.    I don't have paperwork.  I've just heard that he's had

9          conversations with Judge Hoffer.

10    Q     Who did you hear that from?

11    A.    At this time I can't recall names.  It's just been

12          information, word of mouth in the office.

13    Q     Okay.  So would you agree at this time you can't

14        identify any witness person at all to support your
claim

15        that can testify and support your claim that

16        Mr. Osenkarski has conspired against you in violation
of

17        PHRC?  Is that correct?

18            MS. WALLET:  I'm sorry, did you say witness?

19            MR. ADAMS:  Witness or person who can testify in

20        support of her claims of a violation by Mr. Osenkarski.

21            THE WITNESS:  I think the fact that I was kept out

22        of that office for four years, and that was a
discussion

23        between Mr. Osenkarski and Judge Hoffer, I think

24        whatever that discussion was, Mr. Osenkarski I'm sure

25        and Judge Hoffer was aware that it was a public office.


                        Barbara Varner                    421


1        I'm sure there was discussion, and to me, that was a

2        retaliation.

3   BY MR. ADAMS:

4   Q    But did you hear that discussion?  Did you hear any

5        remnants of that discussion yourself?

6   A.   From Mr. Osenkarski, yes.

7   Q    You heard from Mr. Osenkarski that he was going to

8        conspire against you?

9   A.   Well, no.  That he had met with Judge Hoffer and that
he

10          had been given this direction to keep me out of there.

11          To me, even those two talking about it is something
that

12          is illegal to keep me out of a public office.

13    Q    But you don't know, yourself, from anything you heard,

14          that Mr. Osenkarski conspired against you in violation

15          of the PHRC; is that correct?  Yes or No.

16    A    I'm just trying to think.

17              I did not personally witness that.

18    Q    And you can't identify any person at all who witnessed

19          or heard any type of conversation by Mr. Osenkarski or

20          Judge Hoffer that would be in violation of the PHRC

21          based on conspiracy?

22    A    I think those two would be the ones to be able to

23          testify because it would have been private information,

24          private conversations.

25    Q    Would you agree that's strictly related to
conversations

Barbara Varner                          422

1          between Judge Hoffer and Mr. Osenkarski, so only one of

2          the two of them or both of them can testify to that?

3    A    That's correct.

4    Q    Okay.  And do you have any correspondence, note, memo,

5          documentation or any shred of evidence at all
supporting

```
      6          your claim that Mr. Osenkarski purposely left you in
the
      7          building during the bomb threat that you spoke of?

      8     A.   There was no effort to get me out and he knew I was

      9          there.

     10     Q    Well, I'm sorry.  The question is:  Do you have any

     11          documentation, any note, correspondence, any memo,

     12          anything that you can turn to as a piece of evidence to

     13          say this supports your claim?

     14     A.   That he actually said I'm going to leave her behind?

     15          No.

     16     Q    Okay.

     17     A.   I don't have that, but I believe there was well -- he

     18          was well informed, he knew I was there.  He had all

     19          reason to believe I was there.

     20     Q    Okay.  Can you identify any person at all that can

     21          testify to support your claim that Mr. Osenkarski

     22          purposely left you in the building during the bomb
scare
     23          you spoke of?

     24     A.   I would not have any witnesses except my own testimony

     25          that I was left behind and he knew I was there.
```

Barbara Varner                          423

```
      1          Mr. ADAMS:  Okay.  No further questions.

      2          MS. WILLIAMS:  I have nothing further.
```

```
 3              MR. THOMAS:  Nothing further.

 4              MS. WALLET:  I have no questions for this witness.

 5              (Whereupon, the deposition was concluded at

 6         3:26 p.m.)

 7                            *   *   *   *   *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COMMONWEALTH OF PENNSYLVANIA          )
                                      )  SS.
COUNTY OF DAUPHIN                      )


    I, Emily R. Clark, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Dauphin, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:


                BARBARA E. VARNER


    I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

    I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

    Dated at Harrisburg, Pennsylvania, this 4th day of February, 2003.


_____
Emily R. Clark
Reporter - Notary Public


(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)