**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BARBARA E. VARNER, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| | : | NO. 1:CV 01-0725 |
| v. | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | JURY TRIAL DEMANDED |
| NINTH JUDICIAL DISTRICT, CUMBERLAND | : | |
| COUNTY; S. GARETH GRAHAM, individually; | : | JUDGE YVETTE KANE |
| and JOSEPH OSENKARSKI, individually, | : | |

**REVISED[1] STATEMENT OF FACTS TO WHICH COURT DEFENDANT CONTENDS
THERE IS NO MATERIAL ISSUE TO BE TRIED, SUBMITTED BY
COMMONWEALTH OF PENNSYLVANIA, NINTH JUDICIAL DISTRICT,
<u>CUMBERLAND COUNTY COURT OF COMMON PLEAS</u>**

Court Defendant submits the following Statement of Facts to which Court Defendant

tends there is no material issue to be tried, in connection with its Motion for Summary Judgment.

Many of the facts set forth herein are, in fact, disputed.  Comprehensive Discovery was taken,

including depositions of Plaintiff, the individual defendants, President Judge Hoffer, former

President Judge Sheely, Judge Guido, Investigator David DeLuce and several employees of the

Probation Department. Court Defendant has set forth the version of facts most favorable to the

Plaintiff so that the statement will be beneficial to the Court in adjudicating the Summary

Judgment Motion.  Court Defendant reserves the right at time of trial to dispute any or all of the

facts contained herein.

1.      Plaintiff Barbara Varner denies that she had a consensual sexual affair with Gary

Graham.  (<u>Varner Deposition</u> at 5).

---

[1]      The instant revised statement corrects defects (incorrectly numbered paragraphs), and
clarifies sources set forth in the original Statement of Facts.

2.      Varner began employment with the Juvenile Probation Department of the Cumberland County Court system on February 7, 1995.  (Id. at 8).

3.      At the time Varner began her employment in probation she agreed she was on good terms with Defendant Gary Graham.  (Id. at 9).

4.      Graham has only been inside Varner's home on one occasion.  (Id. at 13).  That occurred sometime during her first year of employment in the probation department.  There was a business purpose, i.e., Graham was picking Varner up to accompany him on a commitment trip for a juvenile.  (Id. at 13).

5.      Varner first met Graham in 1990 (Id. At 76).  She described her relationship with Graham from 1990 to 1994 as a cordial working relationship.  She knew him as well as any other co-worker but no better.  (Id. at 83).  She specifically declined to describe her relationship with Graham as a close one.  (Id.).

6.      Varner testified that Graham's reputation in late 1994 and early 1995, before she joined probation, was that he was a hot head who would get angry quickly.  She knew that both Osenkarski and Graham played favorites and if you were not in good favor with them you would basically be punished.  She felt at that time that she appeared to be in good favor with them.  (Id. at 90).

7.      When Varner joined the Probation Department she understood that President Judge Sheely was the person ultimately in charge.  She described probation officers as "officers of the Court".  (Id. at 92-93).

8.      Varner agreed that Judge Sheely had the ultimate authority over probation officers and that the Chief of Probation, Ken Bolze, reported to Judge Sheely for "hiring, firing, those kind of things".  (Id. at 93).

9.     Varner had no problems with Graham when she first started working in probation in February, 1995.  She worked with him on a daily basis at that time.  (Id. at 94).

10.     Varner agreed that from February 1995 until August 1996 she had no particular problem with Graham.  (Id. at 94).  Specifically, she had no episodes of Graham losing his temper with her or screaming at her although she acknowledged that he exhibited that conduct towards other people.  (Id. at 99).

11.     Varner indicated that after Probation Chief Bolze retired in August, 1996 Graham began to tell her that things that she had previously done right and were acceptable were now wrong.  (Id. at 100).  By this she meant that Graham was critical of some of the decisions or recommendations that she made with respect to particular juveniles.  (Id. at 101).

12.     Varner complained that Graham would scream at her and use the word "fuck" at her because she would make commitment trips with co-worker, Debra Green, and would leave after 8:00 in the morning.  Graham screamed at her that all placement trips regarding juveniles should start at eight in the morning.  (Id. at 101).

13.     Varner complained that Graham told her and Debra Green that they had lied about a commitment trip they had been on and over stated their time by one hour.  (Id. at 101).

14.     Varner contended that male probation officers were not required to start commitment trips at 8:00 in the morning.  (Id. at 102).  As a consequence of Graham's contention that Varner and Green had over stated their time on a commitment trip, he docked each of them one hour of overtime.  (Id. at 103).

15.     Varner complained that she had prepared an extensive list of victims of a robbery. Graham picked up the paper with the victims names on it, wadded the paper up, and threw it at

her with the statement that this is no fucking good, it is not acceptable.  This incident occurred in early 1997. (Id. at 104).

16.     Varner contends that Graham would move within a foot of her, put his finger in her face, and tell her that "you don't know what the fuck you are doing".  She described this as "very scary".  (Id. at 105).

17.     Varner agreed that the use of the word "fuck" does not shock her.  (Id. at 105).

18.     Prior to August 1996 Varner reiterated that she had a decent working relationship with Graham.  However, she described the relationship on Graham's part as a flirtatious relationship.  (Id. at 106).

19.     Plaintiff received her college degree in 1994. (Id. 16).

20.     In 1998 Varner earned a masters degree at Shippensburg University in the Administration of Justice.  Her tuition for her masters degree was paid for entirely by the Juvenile Court Judges Commission.  (Id. at 111).

21.      Varner contends that at a professional conference in State College in October 1996, Graham knocked on her hotel room door.  She declined to answer.  Graham then called her room.  Varner answered the phone.  Graham said he wanted to stop in.  Varner said she was studying.  That ended the conversation.  Graham did not come back to Varner's door.  (Id. at 114-115).  Varner describes this as an instance of sexual harassment.

22.     Varner acknowledges that by October 1996 her relationship with Graham was not good.  (Id. at 115).

23.     Juvenile Probation had a female intern who was fired based on her enrollment in the ARD Program.  Around this time, Probation had a male intern while in the middle of his internship it was learned that he had an ARD for a DUI offense and he was allowed to complete

his internship.  Varner agrees that her knowledge of this alleged instance of discrimination is based on rumor in the workplace.  (Id. at 118).

24.    Varner contends that on November 20, 1996, she gave Graham a social history of a female having suicidal tendencies related to her premenstrual problems.  Graham read the social history and made the statement: "do I have to get a peter meter in my office".  Graham used the words "Jesus Christ" prior to that.  (Id. at 120-121).

25.    Varner never heard Graham make a similar statement prior to November 26, 1996.  (Id. at 121).

26.    Subsequent to November 26, 1996, Varner never heard Graham use the term "peter meter" again.  (Id. at 122).

27.    Varner agreed the context of the conversation about the "peter meter" related to the female juvenile and was not made with respect to her personally.  (Id. at 123).

28.    In January 1996 Varner testified she received a birthday card from Graham which offended her.  The card offended her because it implied there existed some kind of a relationship between her and Graham.  The card had an inscription that said something about "remembering good times" or "I'm thinking back over the good times we had before".  Varner felt this was an inappropriate act.  (Id. at 124-125).

29.    Prior to January 1996 Graham had never screamed at Varner or been critical of her.  She described their relationship then as "comfortable co-workers".  (Id. at 125).

30.    Varner described Graham in January 1996 as somebody designated to train her but not her former supervisor.  (Id. at 126).

31.    Varner did not complain about the birthday card but, rather, put it away and "just forgot about it".  (Id. at 126).

32.    Varner was aware at the time that a County policy existed that prohibited sexual harassment or discrimination.  This policy was contained in a personnel manual which included a published complaint procedure.  (Id. at 127).

33.    Varner acknowledged that she did not utilize that complaint procedure when she received the birthday card in January 1996.  (Id. at 127).

34.    Varner testified that Graham would tell her stories about sexual problems he was having with his wife on commitment trips that they took together and in the office.

35.    This occurred on maybe eight commitment trips.  Varner said:

> "First he started to explain the problems, that he wasn't getting anything from her, that he was angry at her.  He would talk about smashing her figurine collection in anger as a punishment for her.  And he would make statements that he'll do anything he can to get even with her."  (Id. at 129).

36.    Varner agreed that Graham's criticisms of his wife were not directed at her personally.  (Id. at 135).

37.    Varner's response to these conversations was to tell Graham that he should seek counseling.  (Id. at 135).

38.    Varner testified that only one time was Graham "really explicit:" That one time he told her that he would wake up in the middle of the night and his bed would be shaking.  He would pull his wife's hands out of her underwear and her hands, fingers would be wet.  "He said he would keep a calendar of how often they had sex and he would show that to her".  (Id. at 136).

39.    Varner testified that after this incident she again told Graham he needed counseling.  In response Graham accelerated his car to around 95 miles per hour in a construction zone on I-81.  (Id. at 136).

40.    Varner did not report this incident to anybody in authority at the time.  (Id. at 138).

41.    Varner complained that during a mace training at the prison in 1995, Graham patted her behind in the presence of female probation officer Debra Green.  (Id. at 140).  There was no conversation between the two at this point in time.  Varner's response was an embarrassed laugh.  (Id. at 140-142).  Varner can recall no other occasions where Graham touched her inappropriately.  (Id. at 142).

42.    Varner recalls that in May 1996 Graham appeared at her home without an invitation.  Graham first called her and said he was coming.  When he arrived at her home Varner pretended that she wasn't there.  Graham did not enter her home and left the premises. (Id. at 142-144).  Varner made no complaint about this incident at the time.  (Id. at 144).

43.    Varner testified that on one incident Graham told her that he was angry at his wife.  His mother-in-law had made a special birthday cake for Mrs. Graham.  Graham told Varner that he punished her and "he destroyed the cake in front of the little girls".  (Id. at 149).  Varner said the context of this conversation was that Graham was upset with his wife, had had a disagreement with her, and smashed something as a part of the punishment of his wife.  (Id. at 150).

44.    Varner testified that the incidents involving smashing the figurine and the birthday cake related to her by Graham were not offensive to her.  (Id. at 151).  Varner agreed these stories were not directed towards her.  (Id. at 152).

45.    In 1993 a female probation officer named Kerry Houser filed a complaint of sexual harassment against Osenkarski.  Varner testified that Graham told her not to talk to Kerry Houser because "she's an angry woman, she divorced, she's an angry woman, all divorced

woman are angry". (Id. at 153). Varner did not obey Graham's instructions to avoid Houser.

(Id. at 154).

46.    Varner testified that in August 1996 she had a conversation with Graham to the

following effect:

> "Mr. Graham was explaining what he called the balanced
> approach where its necessary for you to satisfy the victim, the
> community, as well as the juvenile to make sure that they are
> rehabilitated. Mr. Graham told me that I had to satisfy the victim,
> the community, and he looked at me and he pointed at himself, that
> those are the things that I have to satisfy. And the smile on his
> face letting me know what he meant."

Varner interpreted Graham's expression as a statement that she had to satisfy him sexually. The

basis for this conclusion was the way Graham smiled. (Id. at 156).

47.    Varner agrees that Graham never openly solicited her for sex, never asked to have

intercourse with her, never suggested going to a hotel room to have sex, and indeed never asked

for any type or form of sex from her. (Id. at 157).

48.    Sometime in 1997, female probation officers were being measured for bullet

proof vests. Graham told the females that he knew what cup size they wore because the bullet

proof vests were measured by cup size. Varner testified that Graham thought it was hilarious

that he knew everybody's cup size. Graham told Varner that she was not as big as one of the

other girls in the department. (Id. at 158).

49.    Varner agreed that Graham never discussed or mentioned to her anything about

any other part of her body and there was no other occasion where he said anything about her

breasts. (Id. at 159).

50.    Varner testified that on one occasion Graham referred to a young girl in the

District Attorney's office by commenting "I wonder how dark her bush is." (Id. at 159).

51.     Varner recalls on one occasion in 1997 telling Graham that she didn't want to hear him use the word "fuck". Graham allegedly said that she should go back to doing her social work if she couldn't take it. (Id. at 163).

52.     Varner said that Graham, in front of another witness but not in front of her, made ranting comments that Varner had "no fucking sense, no fucking training and no fucking ability". (Id. at 163). Varner was, herself, not in the office at the time these comments were allegedly made. (Id. at 164).

53.     Varner's explanation for why Graham screamed at her and was unhappy with her was that "he just was unhappy with the way I handled the cases, I presume, the pattern I had done a hundred times before". (Id. at 167). Varner agreed the basis for Graham screaming at her had to do with his assessment of her performance. (Id. at 168).

54.     Varner acknowledged that she has heard Graham scream at other people. She acknowledged he has raised his voice "to quite a few people". (Id. at 173). She acknowledged that she saw him scream at Gary Shuey, male, the Director of Children & Youth Services. (Id.)

55.     Varner acknowledged that Graham uses the word "fuck" in regular conversations on an occasional basis. (Id. at 175).

56.     Varner complained that she overheard her superior, Joe Osenkarski, Chief of Juvenile Probation, commenting about a female intern's breasts, that "she had a nice set of jahoobees". (Id. at 176).

57.     Osenkarski never made any inappropriate comments to her personally. (Id.).

58.     Varner also complained that some time in September 2000, Osenkarski, outside her presence, discussed his girlfriend's genital area at work. Specifically, Osenkarski was

alleged to have said that when he was canning hot peppers his fingers would get hot and he had learned his lesson about inserting them in his girlfriend because it burned her.  (Id. at 176).

59.    Varner alleged that on September 12, 2000, Osenkarski informed two new female probation officers that they would have to dance on the table at their first staff meeting.  Varner did not hear this comment herself.  (Id. at 177).

60.    On another occasion, again outside Varner's presence, Osenkarski was alleged to have commented to a new female probation officer that hysterectomies ruined women.  Varner took offense at this even though she was not present because she was possibly the only woman in the office who had had a hysterectomy.  (Id. at 177-178).

61.    Varner also found offensive the fact that Osenkarski told another woman in the probation office that she reminded him of his ex-wife.  Although this comment was not made in Varner's presence nor about her, she considers it an aspect of sexual harassment.  (Id. at 178).

62.    Varner is not actually aware that any female ever danced on a table at any probation meeting.  (Id. at 179).

63.    Of all the allegations Varner lodged against Osenkarski the only one she was actually present for – and which she simply overheard – was Osenkarski's comments about a young girls breasts being "jahoobees".  (Id. at 179). Co-workers "informed" Plaintiff of the remaining comments that she asserts were offensive to her.  (Id. 179:12-17)

64.    Varner recalls that in 1996 Osenkarski had a Bic lighter shaped like a penis which he flicked at a female presenter.  (Id. at 179-180).  This was done in the context of a sexual offenders program and Varner assumed was done for the purpose of amusing people.  (Id.)

65.    Varner contends that, without objective verification, she has been given less desirable assignments and more assignments then other probation officers.  For example she was

given cases where boys would need urine tests which she said was impossible to do because she could not observe what the boys were doing at the time they were giving the sample. (Id. at 181). She felt she was given cases involving large aggressive males. (Id.) She agreed that at this time period the probation clientele was probably seventy-five percent male, however. (Id. at 182).

66.    Plaintiff admits that after she filed her formal complaint in April, 1997, all harassment by Osenkarski ceased. Varner agreed that Osenkarski has never retaliated against her in any fashion whatsoever. (Id. at 196).

67.    Varner contends that seniority within the probation department was determined by County service (including time outside of probation) prior to 1996 when adult and juvenile probation split into two different departments. Sometime after the split, Juvenile Probation changed its policy so that time within the department rather than time within the County was the sole criteria for determining seniority. As a consequence of this policy change, Varner contends the only persons affected were herself and William Brandt and that whereas she had been senior to Brandt she was now just below Brandt on the seniority roster. (Id. at 187-188).

68.    Both she and Brandt received promotions on the same day, May 7, 1998, when they were each promoted to senior probation officer. Brandt had been scheduled for earlier promotion. When Varner complained, Brandt's promotion was put on hold, and they were each promoted the same day. (Id. at 189).

69.    Notwithstanding that Varner has not lost any benefit of employment as a consequence of what she perceives as this seniority dispute, Varner contends that all promotions within the department are made by seniority, Brandt is still ahead of her on the seniority list and

ultimately one day Brandt will be promoted ahead of her because of this injustice done to her. (Id. at 188).

70.    On April 25, 1997, Varner filed a written memorandum of complaint pursuant to the harassment and discrimination policy that she was aware of as part of her employment. (Id. at 191). Varner understands that following her complaint the investigation was commenced by individuals on behalf of the County and Court. (Id. at 192, line 10).

71.    Varner agrees that as a consequence of her complaint, on June 13, 1997, Joe Osenkarski removed Gary Graham from any authority or responsibility concerning her employment. (Id. at 193).

72.    Varner agrees that as part of the investigation that resulted from her complaint, she was interviewed and able to describe in detail the facts and circumstances of her employment that she felt violated her rights. (Id. at 193).

73.    Varner is further aware that on July 11, 1997, President Judge Sheely issued a three-day suspension to Gary Graham. (Id. at 194). Varner was aware that this three-day suspension was a consequence of the investigation initiated by her complaint. (Id. at 195, lines 1 – 7).

74.    Varner thought that the three-day suspension imposed on Graham by Judge Sheely was an inadequate penalty. (Id. at 197).

75.    Varner acknowledges that subsequent to her EEOC complaint, the new President Judge, Judge Hoffer, transferred Graham from a position in the courthouse to a position in the County prison. This move eliminated day-to-day contact between Varner and Graham. (Id. at 200).

76.    Varner is currently supervised by Sam Miller.  She has no complaints regarding Mr. Miller.  (Id. at 200).

77.    Varner has also been supervised by Hank Thielmann.  She has never complained about Mr. Thielmann's supervision in terms of discrimination or harassment. (Id.)

78.    Plaintiff feels safe in her current position and does not have any concern about retaliation.  (Id. 202).

79.    Since Gary Graham was transferred from the courthouse in March 1998 Varner has had no direct problems with Joseph Osenkarski and whatever complaints she has about him she has heard by hearsay.  (Id. at 202 - 203).

80.    Graham's wife, Barbara Graham, works in the courthouse as a court reporter for Judge Hess.  Varner contends that in 1999 Mrs. Graham approached her in the parking lot, called her a liar, said she had an affair with her husband, and said that everyone in the courthouse knows Varner is a liar.  She said Mrs. Graham prevented her entrance to the car.  She called the Carlisle Police and had Mrs. Graham charged with harassment.  Mrs. Graham was acquitted of that charge by a district justice. (Id. 203-206 and Com. v. Barbara E. Graham, Transcript of Proceedings before District Justice Paula P. Correal, Jan. 10, 2000).

81.    Varner complains that on November 3, 1997, Mrs. Graham jeered at her with narrowed eyes and clenched teeth.  However, she did not say anything to Varner nor did she make a movement to strike or hit Varner in any fashion.  (Id. at 206 – 207).

82.    Varner complains again that on December 4, 1997, Mrs. Graham stared at her. (Id. at 207).

83.    In the year 2000, around March, Varner applied for a position as Director of a Court Appointed Special Advocate Program [the CASA Program].  She contends that Judge

Guido, who was in charge of that program, had chosen her as the designee to be the CASA Director. She was offered the job for approximately $29,000 per annum which was almost $11,000 less than what she was making as a probation officer. (Id. at 211).

84.    Varner was extended a settlement offer whereby she would receive the CASA position program directorship at her current $40,000 salary if she withdrew this litigation. (Id. at 212).

85.    Varner turned down both the settlement offer and the offered position as director at $29,000 per year. (Id. at 212).

86.    The person ultimately hired as Director of the CASA Program was paid the lower salary of $29, 689 a year, which was the salary established by the salary board and offered to Plaintiff after she turned down the CASA position. (Guido deposition pp. 49-51).

87.    Varner agrees that Osenkarski was instrumental in having her hired and was complementary of her work. (Varner Dep. at 233). Varner agrees that Osenkarski approved her promotion to senior probation officer. (Id. at 237).

88.    Varner agrees that, personally, Osenkarski has always been polite to her. (Id. at 238).

89.    On March 21, 2002 there was a bomb threat in the courthouse. Varner's office is next to Osenkarski's. Normally Varner keeps her door shut because she has an air purifier in her office. No one told Varner there was a bomb threat and she was left in the empty building for two hours before she realized there was a bomb scare. Varner does not go so far as to say Osenkarski intentionally left her there but does go so far as to say she believes her being left alone in her office during a bomb scare was retaliation for her protected activity. (Id. at 242 - 243).

90.     Christine Miller from the County HR dept. advised Plaintiff by memo dated April 5, 2002, the results of her investigation into the bomb scare, concluding that no malicious intent existed, and putting into place revised evacuation procedures and confirming that a glass window had been cut in Plaintiff's office door to prevent anything similar from happening again. (Hoffer Deposition  Exhibit 12).

91.     In 1998 during a period of courthouse remodeling, Mrs. Graham, as a court reporter, worked in the third floor annex.  A portion of the probation department also worked in the third floor annex during this remodeling time.  Osenkarski told Varner that Judge Hoffer said that Varner was not allowed into that area of the courthouse because Mrs. Graham was present and was bothered when she walked in there.  (Varner deposition. at 258).

92.     Varner contends that, two days later, Judge Hoffer personally told her she was not allowed to go into that area of the courthouse at all because "Mrs. Graham was going to have a breakdown if I didn't stay out of there".  Varner told the Judge that that area of the courthouse was a public office and she had business there and it was not fair to restrict her from that area.  Judge Hoffer nonetheless continued the restriction.  (Id. at 259).

93.     Approximately July 11, 1997, Varner met with Judge Sheely.  This was before Judge Sheely disciplined Graham.  Varner described the conversation as follows:

> "So I walked into the Judge's chambers with him, and he proceeded to tell me that Mr. Graham and his wife and Attorney Dave Foster had come to him, I believe it was the day before, I believe, that they had, Mr. Graham had confessed to this alleged affair [with Varner] to Judge Sheely.  Judge Sheely told me that he felt sorry for them, that I had ruined their family.
>
> And I explained to Judge Sheely that it was all an orchestrated thing, because up to that point as far as I know, this alleged affair had never come up during the whole investigation into anybody else.  And I said to Judge Sheely, if you were a man would you confess in front of public, would you confess in front of

a judge, in front of an attorney, or wouldn't you be more discrete and tell your wife at home and then handle it?

I felt it was a ploy, because I knew Barb Graham had worked with Judge Sheely. He had basically a tender spot for Barb Graham. And I said to the Judge, it did not happen. And he said, well, I am telling you, it was just horrible, they were both crying. And just, you could tell he had been – it had been emotional for Judge Sheely." (Id. at 266 – 267).

94.     Judge Hoffer became President Judge in January 1998. Shortly after becoming President Judge he met with Varner about her allegations. He asked Varner what she would like to see done. Varner stated: "I don't think the two men [Graham and Osenkarski] should ever supervise females again. Ideally I would like to have them fired. He said he would look into it". (Id. at 301).

95.     Two months later, Judge Hoffer removed Graham from the courthouse. (Id. at 302).

96.     Varner advised the EEOC that Graham screamed at quite people in the courthouse including Assistant Sheriff Andy Anderson, District Justice Paula Correal, Director of Children & Youth Services Gary Shuey, and Sarah Costicki (identified as a "victim witness person"). (Id. at 405 - 406).

97.     Joseph Osenkarski, Director of Juvenile Probation, described the type of language used in the Juvenile Probation Department:

"We work, I am talking about juvenile and adult probation, in a very, very unnatural atmosphere, thirty-six to forty hours a week, over the years this environment hasn't changed. What appears to be natural in a regular office situation is not natural in juvenile probation. Anybody is capable of anything, because we work with a criminal element, a delinquent element, a sick element. They are in there because they are troubled people and they are not normal. And it is not unnatural to have conversations that are off-color, sometimes vulgar, sometimes humorous to keep your sanity, but they do touch on other than pleasantries. And so I

16

am going to say that at some times or frequently, or it can be
frequently but not frequently all the time, its just a colored separate
kind of people we deal with and I describe it as unnatural.

There have been verbal – there has been verbal violence,
there has been physical violence over the years that I have been in
that office." (Osenkarski deposition at 18).

98.     Osenkarski recalls that Gary Graham and Barbara Varner were very close friends.

(Id. at 110).

99.     Osenkarski, the Chief of Juvenile Probation, was asked to explain the role of

seniority in his department.  He stated seniority is one factor which is used to allow employees

time off, vacation time, and scheduling on call work weekends.  With regard to promotions he

stated that promotions are based more on performance reviews then seniority.  Seniority plays

only a small role in promotions.  (Id. at 133 – 134).

100.     Osenkarski acknowledged seniority previously included County wide service.  He

described unhappiness with that policy.  He stated that shortly before probation split into adult

and juvenile departments on January 1, 1997, he consulted other probation officers with regard to

whether the seniority policy should be changed.  He was advised by a senior probation officer

that the issue had been discussed with all juvenile probation officers who were satisfied that

seniority within juvenile probation be based only on service within the probation department.

(Id. at 137 – 139).

101.     Graham testified that his sexual affair with Varner continued through 1996.  The

first person he ever disclosed the affair to was Judge Sheely on either July 9 or 10, 1997.

(Graham Deposition at 87).

102.     Graham testified that he terminated the sexual aspect of their relationship at a

DUI Conference in State College, Pennsylvania in October 1996.  (Id. at 107).

17

103.    Graham was removed from his job in Juvenile Probation in March 1998 and transferred to a position in Adult Probation located at the Cumberland County Prison. This was done by order of President Judge Hoffer based upon Hoffer's statement to Graham that he had lost confidence in him. His pay was cut. (Id. at 280 – 281).

104.    Varner and Houser shared an office for two years prior to the split. (Kerry Houser Deposition at 36). During the two-year period Houser and Varner shared an office, Houser's observations about the Varner and Graham relationship was that "Barb could really do no wrong as far as Gary was concerned". (Id. at 57).

105.    Houser described the change in tenor of the Varner/Graham relationship as being a pretty abrupt change. (Id. at 57).

106.    Houser has had two or three seminars of sexual harassment training. Based on what she has learned about sexual harassment it was her testimony that she never ever observed Graham sexually harass Varner. (Id. at 58). In fact she never observed him sexually harass anyone. (Id.).

107.    Houser observed at work that Graham had liked Varner while she worked at Cumberland County Children and Youth Services. She observed that Graham would go out with her while she was at CYS on a lot of cases and that the two of them would talk more about cases than other probation officers and caseworkers would. (Id. at 62).

108.    It was Houser's observation that Varner and Graham were friends before Varner came to Probation and that they became "better friends" once Varner started in probation. (Id. at 63).

109.    While Houser has not observed Graham yell at Varner, she has observed him yell at other people. She said that he is indiscriminant in yelling at both men and women. He is

indiscriminant in being rude to both men and women he dislikes.  He is indiscriminant in attempting or threatening to punish people he doesn't like.  (Id. at 64).

110.    Houser has heard Graham use foul language in the office but concedes that that is not a rare event in the probation office and that Graham was simply typical of many others with respect to his swearing.  (Id. at 67).

111.    Ronna Boyles was secretary for both Graham and Varner prior to the probation office splitting in two. (Boyles deposition, p. 7.)

112.    Boyles described the relationship between Varner and Graham before the split as "very good" and "better than average."  (Id., p. 10).

113.    Prior to Varner actually being hired within probation, Boyles heard Graham state that Varner was "really conscientious, a good worker and it would be good having her on the staff".  She characterized it as Graham "glowed about her abilities."  (Id. at 12).

114.    Boyles testified it was not usual for Graham to raise his voice within the office and that he was "an excitable man."  (Id. at 14).

115.    Boyles testified that Graham raised his voice indiscriminately between men and women, not favoring either gender.  (Id. at 15).

116.    Boyles characterized Varner as a "favorite" of Graham's and further testified that that status began to change at about the time of the probation department split.  (Id. at 15 – 16).  She described the change in status as "sudden".  (Id. at 17).

117.    Boyles has heard Graham use foul language but also testified that his use of foul language was in general conversation and was not atypical within the probation office.  (Id. at 18).

118.    Boyles said Graham cursed indiscriminately among both men and women.  (Id. at 19).

119.    Boyles testified that Graham nit-picked Varner's reports but that he nit-picked with other people as well and that was simply his style.  (Id. at 26).

120.    Bill Brandt became a probation officer in 1990.  Brandt described the working relationship between Varner and Graham as "very friendly".  To his recollection, their very friendly relationship lasted for a year or more and Varner and Graham "certainly spent a lot of time together".  (Brandt dep. at 27).

121.    Brandt described the relationship as "a very friendly working relationship" and that "they got along extremely well together."  (Id. at 27).

122.    Brandt does not recall the date but does recall there was a day when the relationship between Varner and Graham appeared to abruptly change.  (Id. at 28).  Thereafter Graham distanced himself from Varner.  (Id. at 29).

123.    Brandt, who stayed in the juvenile section after the probation department split into two, recalled that on the day the Varner/Graham relationship changed, he heard yelling between the two.  At no point thereafter did he observe Graham yell at Varner.  (Id. at 30 – 31).

124.    Brandt testified that within the probation office the use of bad language is common.  He identified himself as someone who uses bad language.  (Id. at 35 – 36).  He stated that bad language was used by both men and women and that "it's a product of the horrible environment that we work with".  (Id. at 36).

125.    Brandt testified that prior to the probation department splitting there was a vaguely understood concept that seniority within probation was based on years of service with

the County both in and outside the probation department.  (Id. at 37).  There was no written document confirming this understanding.  (Id. at 37).

126.    Following the split, the Juvenile Probation Department came up with their own seniority policy as did the Adult Probation Department.  (Id. at 38).

127.    Following the probation department splitting into two sections, there was "adnauseam" conversation about what the seniority policy should be.  The debate centered around whether seniority should begin as of the date of hire within the Cumberland County Probation Department.  (Id. at 38 – 29).  Brandt understands that this change was in fact implemented.  (Id.).

128.    Brandt was scheduled to be promoted to senior probation officer.  He understood that his promotion was delayed because of questions raised by Varner regarding seniority.  Ultimately he and Varner were promoted to senior probation officer on the same day.  (Id. at 40 – 41).

129.    Brandt understands that as a consequence of the change in the seniority system he is now senior to Varner.  Brandt testified that his position as senior to Varner provides no benefit of any type to him.  (Id. at 41).

130.    Brandt testified that sexual banter within the probation office is common among both men and women.  (Id. at 46).

131.    President Judge Harold Sheely first learned that Barbara Varner had made allegations of sexual harassment by Graham in June or early July of 1997.  (Sheely deposition at 7).

132.    Judge Sheely learned this information from David DeLuce, Esquire whom he described as "one of the County solicitors." (Id.)

133    Plaintiff's Complaints were investigated through David DeLuce, a partner of the County Solicitor, at the County Solicitor's request. (DeLuce Deposition and DeLuce Deposition Exhibit 3).

134.    Deluce interviewed Plaintiff, the alleged harassers and all of the persons that Ms. Varner named as witness. (Id.)

135.    Judge Sheely thereafter learned of Plaintiff's complaint during the investigation through the County, and allowed the investigation to continue, insisting on seeing the Report produced. (Sheely Deposition. p.7, l. 4-6).

136.    During the course of DeLuce's investigation, two documents were prepared by Mr.DeLuce.  The initial document, a draft prepared as the investigation while the investigation was on-going, evidenced Mr. DeLuce's early inclination to find that sexual harassment had occurred. That document was never in possession of the Court Defendant Thereafter, as his investigation continued, Mr. DeLuce found that problems surfacing were related more to poor management within the juvenile probation office. (DeLuce Deposition, p. 89).  The second and final document can be described as milder in its conclusions than the earlier report.  This second and final Report is the only one ever seen by Court Defendant and President Judges Sheely and Hoffer.  The second DeLuce report, and the only report known to Court Defendant, made no recommendations that specific action be taken as to either Graham or Osenkarski. Court Defendant produced this document in discovery. (Id., pp. 1-9).

137.    Judge Sheely testified that he saw the probation officers on a regular basis. (Sheely Deposition at 10).

138.    Judge Sheely suspended Graham for the use of improper language.  (Id. at 18).

139.    Judge Sheely did not discuss his decision to suspend Graham with any person in the Cumberland County Human Resources Department.  (Id. at 19).

140.    Judge Sheely testified that as a consequence of Varner's allegations, he directed that Varner no longer be supervised by Graham and that another probation officer, Sam Miller, assume her supervision.  This was his own idea.  (Id. at 20).

141.    Judge Sheely testified that to his knowledge the animosity between Varner and Graham was something new and that "they had always gotten along well in the past".  (Id. at 20).

142.    In July 1997, either shortly before or after his July 11 memorandum suspending Graham, Judge Sheely met with Mr. and Mrs. Graham.  At that time Graham told him that he and Mrs. Varner had been carrying on a sexual relationship for some time.  Mrs. Graham was present when her husband made this confession.  Graham had asked Judge Sheely for the opportunity to meet with him.  (Id. at 22).

143.    In this conversation, Graham explained that the termination of his sexual affair with Varner was the reason why a conflict between he and Varner had developed.  (Id. at 23).

144.    Judge Sheely testified to the reason he believed Graham's assertions were credible.

> For a man to bring his wife in to the president judge and admit to having a sexual relationship with one of his co-employees [during the time most of the alleged affair took place, Plaintiff and Graham were co-workers, not supervisor and supervisee] in front of his wife, that--I don't think men would do that unless what they're saying was true.  (Sheely Dep. p. 25, 26.)

145.    Judge Sheely further testified to his belief that Graham was finally telling the true story, because the Judge knew that Graham and Plaintiff "had always had a good relationship."

> In fact, it was Mr. Graham that I remember was really anxious to have [Plaintiff] hired, and they had always had a good relationship, and I couldn't believe that all of a sudden they were at each other

or he was at her or making comments or something in the office
unless there would be some reason for it. (Id.)

146.    Judge Sheely testified that before he learned of the sexual affair between Graham and Varner he had considered in addition to a three day suspension, transferring Graham from Juvenile to Adult Probation to get him away from Varner.  (Id. at 33).  When he learned of the affair, he decided that if both parties were engaging in adultery he was not going to penalize the man solely for this type of conduct.  (Id. at 34).

147.    Judge Sheely testified he did not consider terminating Graham because if Graham and Varner were having a sexual affair, it would be unfair to give him the capital punishment of termination when Varner got no penalty at all.  (Id. at 34 – 35).

148.    Judge Sheely explained:

> "Well, I felt that if this relationship between Mr. Graham and Mrs. Varner had been going on over these years, that for me to take all of this corrective action against Mr. Graham and not do anything with her, that would not be proper.  She was involved, I thought, the same as he was.  And at the time I had planned to transfer Mr. Graham I didn't know about this relationship, and that changed my mind".  (Id. at 73).

149.    Judge Sheely testified that he was disappointed that Varner did not come to him with her problems rather than "running over to the Personnel Director for the County".  Varner never asked him for a meeting.  (Id. at 36 – 37).

150.    Judge Sheely testified that he did not adopt a separate harassment policy for the for the Court because he thought the County policy was well thought out.  He believed Court employees would be subject to the County's sexual harassment policy.  (Id. at 38).

151.    Judge Sheely's impression was that the sexual harassment policy required the alleged victim to go to her immediate supervisor and if that did not work, the alleged victim, if a Court employee, should go to him.  (Id. at 39).

152.    Judge Sheely testified that, in his opinion, the affair described by Graham with Varner did occur.  (Id. at 108).

153.    Judge Hoffer became President Judge of the Cumberland County Court of Common Pleas on January 1, 1998.  (Hoffer Deposition at 6.)  At that time, Judge Hoffer knew that Varner had filed a Complaint with the EEOC.  He subsequently examined the second report prepared by Attorney David DeLuce.  (Id. at 7).

154.    After reviewing the DeLuce report, Judge Hoffer interviewed various probation officers.  (Id. at 8).  Those officers included Nick Barrolet, Bill Brandt, Debra Green, Jenny Crum, and Fran Rose.  (Id. at 15).

155.    Following his interview of these officers, Judge Hoffer met with the entire staff of the probation department and indicated that if they did not act more professionally he would micro-manage the office.  (Id. at 18).

156.    Judge Hoffer required probation officers to comply with the policies stated in the County Employee Handbook.  He is also of the opinion that, as the President Judge, he had the authority to issue either different employment policies or contradictory employee policies.  (Id. at 21).

157.    As a consequence of his review of the DeLuce report and his interviews with the various probation officers, Judge Hoffer demoted Graham to a position outside the courthouse at the County jail.  The reason for the demotion was that Judge Hoffer stated he had lost confidence in Graham.  (Id. at 23).  He explained that on one hand he had the allegations of the

Graham/Varner affair but, also the fact that he had lost his confidence in Graham's ability to lead. (Id. at 23).

158.    Judge Hoffer testified that he is generally unaware of any seniority policies within the Probation Department. Furthermore, he feels seniority is generally unimportant: "Seniority has never been high on my books." Judge Hoffer has no recollection of making any changes to any seniority policies within probation. (Id. at 32).

159.    Plaintiff testified that Judge Sheely asked her on 12/29/1997 "why did she go to [County] personnel" about Gary and his wife Barbara (Graham) staring at her [following Gary Graham's confession to Judge Sheely about the affair he says took place]. Plaintiff further testified that Judge Sheely told her she is "a nice lady who will probably always have to put up with the stares. He can't do anything about it." (Varner Deposition p. 278).

160.    On March 5, 1998, Plaintiff complained of a bumping incident and harassment by Barbara Graham. (Id., p. 207) At approximately the same time, Barbara Graham complained to Judge Hoffer that Varner was harassing her and that Judge Hoffer was unfairly taking Plaintiff's side. ( Hoffer Deposition. 36, 71).

161.    In 1998, during renovations within the courthouse, the Court stenographers, including Graham's wife, Barbara Graham, were temporarily transferred in a space then occupied by juvenile probation. Varner had an office elsewhere in the courthouse. Judge Hoffer told Osenkarski to ask Varner to please stay away from the work site where Barbara Graham was located. (Id. at 39).

162.    Judge Hoffer had Varner come to his office the next day (March 6, 1998). Judge Hoffer prepared notes of that meeting which indicate that in the meeting he explained to Varner that he wanted to eliminate as much contact between Varner and Barbara Graham as possible.

He told Varner that he would move Barbara Graham if it was possible but it did not appear to be possible.  He thus asked Varner to voluntarily stay out of Barbara Graham's office and to have probation officers she needs to talk to come to her own office.  Varner wanted to know why. Judge Hoffer's notes, indicated that ultimately Varner agreed with Judge Hoffer that regardless of anything else "Barbara Graham is an innocent victim".  (Id. at 43).

163.    Judge Hoffer's notes show that he explained to Barbara Varner that he was not ordering her where or where not to go.  He wanted Varner to volunteer to stay away from Barbara Graham's work station to ease tensions.  (Id. at 44).

164.    His notes further stated:  "My position of Barbara Varner:  I am not ordering her to do anything but if she still insists, I will move any officer Barbara Varner has to see out of that office, [where Barbara Graham was] until Barbara Graham is relocated".  (Id. at 44).

165.    Judge Hoffer testified that Varner did not agree to comply with his request. Hoffer said that he did not give her an order to stay away from the office area where Barbara Graham was located.  (Id. at 46).

166.    Judge Hoffer further indicated that he told Barbara Graham to stay away from Varner "period".  (Id. at 46).  This had occurred at or about the same time as his conversation with Varner.  (Id. at 47).

167.    Judge Hoffer has notes that show he met with Varner on March 4, 1998.  Varner advised that her new supervision by Sam Miller was "going okay", "but Graham's hand is pervasive through the office through little things".  Judge Hoffer thereafter demoted Graham about ten days following this meeting with Varner.  (Id. at 52).  However the demotion was not solely the result of his interview with Varner.  (Id.).

168.    Judge Hoffer testified he believes it is incorrect under any circumstances for a supervisor to have any kind of sexual affair with a person he is supervising.  That was one of the reasons why he demoted Graham in addition to Graham's management deficiencies.  (Id. at 68).  The other part was that he had lost his confidence in Graham's ability to be a supervisor.  (Id.).

169.    Judge Hoffer testified that if he had two probation officers, one slightly senior to the other, and the junior probation officer is the better qualified employee, then the junior, more qualified, employee will absolutely be considered for promotion over the more senior employee.  (Id. at 74).

170.    Dennis Drachbar is a Probation Officer II.  He has been employed in the Cumberland County Probation Department since 1984.  Drachbar has never seen Graham sexually harass any individual within the probation department including, specifically, Varner.  (Drachbar Deposition at 8.)  He has never observed Graham to yell at Varner, curse at Varner, or say anything sexually demeaning to Varner.  (Id.).

171.    Sam Miller became a probation officer with Cumberland County in 1983.  From his own personal observation, Miller believes that Graham and Varner were friends and that that status changed to being a strained relationship.  (Miller Deposition at 9.)

172.    After Miller recalled the Varner/Graham relationship becoming strained, he still did not observe any instances of Graham treating Varner worse than he treated any other employee in the office.  (Id. at 11.)

173.    Miller has never heard Graham ask for any type of sexual favor or say anything to Varner that contained sexual overtones.  (Id. at 15.)

174.    Miller has not heard Osenkarski speak demeaningly about any women or treat any women in the office inappropriately.  (Id. at 17 – 18.)

175.    Miller recalls that when Ken Bolze was in charge of the combined probation department (before the split into juvenile and adult divisions) Bolze had vaguely defined seniority rules which included all County service for seniority purposes and not just service within the probation department.  Miller stated there was a group of probation officers that were opposed to those seniority rules and that after Bolze departed and the Probation Department split, a new policy, primarily authored by Tom Boyer, was implemented with only time in probation counting for seniority.  Miller recalls discussing this with Varner who was critical of the new policy.  (Id. at 19 – 20).

176.    The seniority policy change was the result of a feeling among the probation officers as far back as 1985--well before Plaintiff's employment--that the policy was not fair.  The policy was studied and advocated by Probation Officer Tom Boyer.  (Memo dated February 28, 2000, and attachments, attached as Exhibit 12 to Osenkarski deposition.)

177.    Miller became Varner's supervisor on June 17, 1997.  Graham was still in the office at that time.  Miller testified that:

> "I'll give him [Graham] credit.  He never came to me at the time I supervised Barb Varner, and we were pretty comfortable with each other.  I wouldn't say we were best friends, like, we didn't grow up together, but we were friendly.  But he never came to me and said, you better be tough on her, or you better do this or you better do that….Gary never came to me and said, please do this, or check on this, or blah, blah, blah, blah, blah.  That didn't happen."  (Miller Deposition at 24 – 25).

178.    After Miller was assigned to supervise Varner in lieu of Graham, Dan Hartnett, the County's HR Director, met with him and instructed him how important it was that he act professionally and exhibit no retaliatory behavior or vindictiveness towards Varner.  (Id. at 42).

179.    At the time of his deposition Miller had not spoken to Graham for approximately six years.  (Id. at 49).

180.    Darby Christlieb has been a probation officer since 1989.  He had the opportunity to observe Varner and Graham interact prior to the split of the probation department into adult and juvenile sections.  According to Christlieb, Graham and Varner appeared to be friends.  He never observed Graham to yell at Varner, curse at Varner or say anything sexually demeaning to Varner.  In fact, he stated that Graham probably treated Varner better than he treated other people.  Specifically, he treated her as one of his favorites.  (Christlieb Deposition at 6 – 7).

181.    Again, prior to the split, Christlieb never heard Varner complain about having to take so many trips with Graham.  She appeared to accept Graham as a mentor and to enjoy his company.  (Id. at 8).

182.    Christlieb observed a change in the Varner/Graham relationship which he described as "very abrupt".  (Id. at 9).  That change would have taken place sometime in 1997. (Id.).

183.    Christlieb has been instructed in sexual harassment training twice since 1998. Within the framework of the knowledge he has acquired he has never observed either Graham or Osenkarski to sexually harass anyone.  (Id. at 13).

184.    Christlieb has heard Graham yell not only at Varner, but at most of the people in the probation office.  Christlieb said there is no distinction between Graham's yelling at men as compared with women.  He agreed Graham was a "equal opportunity yeller."  (Id. at 17).

185.    Christlieb described Graham as someone who had favorites and who had people he didn't like.  Christlieb stated that Graham was uniformly rude to all those people he did not like and acted in a belligerent manner towards all of them.  The group of people he did not like included both men and women.  (Id. at 18).

186.    Christlieb stated that on one occasion Graham's level of yelling with Varner appeared to be more vicious than any of his yelling had been with Christlieb.  However, other than that occasion, Christlieb has never seen Graham treat Varner inappropriately.  (Id. at 17).

187.    Christlieb testified that it was a mystery to himself and others as to why the friendly relationship between Varner and Graham terminated so abruptly.  (Id. at 77).

188.    Judge Edward Guido is the dependency judge for the Court of Common Pleas of Cumberland County.  He handles all cases involving allegations of dependency.  He first learned that there might be grant money available for the Court Appointed Special Advocate Association ("CASA") sometime in 1999.  He became a judge in January, 1998.  (Guido Deposition at 1 – 7).

189.    The grant money available was through the Pennsylvania Commission on Crime and Delinquency.  (Id. at 7).

190.    Judge Guido originally thought that the position as Director of the CASA Program, if the Program were funded, would be a part-time position.  He suggested to Osenkarski that a juvenile probation officer could fill this position on a half-time basis and remain half-time with the probation department.  (Id. at 7 – 8).

191.    In Guido's discussion with Osenkarski Guido explained that if his concept were approved, Juvenile Probation would acquire a new probation officer and have to give up half-time, one of their existing probation officers who would become the half-time CASA Director.  (Id. at 8).

192.    Ultimately, the Court received a grant from the National CASA Program to help fund the Program in Cumberland County.  Before the existence of this grant was known to the Court, Judge Guido had contemplated getting grant money from the PCCD.  (Id. at 14 – 16).

193.    Judge Guido said that he identified Varner as his selection to direct the CASA

Program well before the National CASA Organization was looked at as a source of funding.  (Id.

at 16).

194.    Judge Guido identified Varner as the possible Director when his concept of the

position remained as a part-time job.  He then received a phone call from Judge Hoffer and met

with Hoffer and an attorney, Howard Holmes, from the AOPC.  Holmes briefly discussed with

Judge Guido the present case and stated that the AOPC was thinking of making an offer to

resolve the litigation by having Varner be a full-time CASA Director and moving her out of

Probation.  Judge Guido was happy to have a full-time Director rather than a part-time Director

and expressed his interest in having Varner full-time.  Holmes then told him that he would

receive a further call from the County's counsel in this litigation.  (Id. at 17).

195.    Judge Guido recalls discussing with Varner the part-time versus full-time issue.

He does not recall the date.  He testified:

> And when we talked about having her go full-time, I said
> "the only fly in that ointment would be that your salary is much
> higher than the position would call for, that I think Commissioners
> would want to fund and that it was sort of a win, win situation; I
> wanted a CASA Program, she wanted out of Probation.  If they
> could get the litigation resolved, she would move out of Probation,
> I'd get my program, she would be doing something that she wanted
> to do, and presumably, her and I could work together well".  (Id. at
> 19).

196.    Judge Guido further remembered talking with Varner about a link between her

litigation and the CASA Program Directorship:

> I remember specifically having a discussion with her about
> that.  Do I remember exactly what day it was, where it was?  No.  It
> was in my office.  But I, you know, that was a clear understanding
> between us that we were moving forward, she was my choice, but
> there was always that question of whether we could resolve the

litigation to her satisfaction or the Commissioners' satisfaction and,
you know, that was the problem.  (Id. at 19).

197.    Judge Guido further explained that the linkage between the litigation and the

CASA Program became absolutely clear when the concept of the directorship being a full-time

position first arose:

> From the beginning of the discussions when it was going to
> go full time okay?  I had always made clear to her and anybody
> else, including Judge Hoffer and the lawyer over there, I didn't
> want to know the details of – and Jim Thomas, I didn't want to
> know the details of what the litigation was about.  Didn't concern
> me.  I was only concerned with getting the CASA Program up and
> running.  I wanted it funded.  I didn't think it was, that that
> position was worth forty plus thousand dollars, but if they were
> willing to pay that to settle their suit, I was happy to have it.  (Id. at
> 19 – 20).

198.    Judge Guido recalls a March 1, 2000, meeting.  (Id. at 22).  Judge Guido recalls

introducing Varner at the meeting "as the lady I hoped would be running the program".  (Id. at

26).

199.    Judge Guido further recalls seeing the grant application for the CASA Program.

That document contained proposed salaries for the CASA Director for the first three years of the

project.  Those salaries tracked what Varner would have made had she remained in the probation

department, [part-time] as he initially anticipated.  (Id. at 23).

200.    Judge Guido stated that he did not discuss her federal lawsuit with Varner but he

did discuss the implication of this case with Varner as far as her receiving the Program

Directorship, full-time, at her old salary  which he felt was an inflated figure for the duties

required as the CASA Director:

> I never discussed the litigation because I didn't want to
> know about it.  All the discussions were, was that all of this was
> subject to her being able to make the lateral move based upon the
> complaint's being resolved, and that was clear, that was clear in

my mind, it was clear in her mind, at least I thought it was clear in her mind, because we discussed it.

And as we got closer to the time, the grant was approved, and we had some meetings about trying to get things resolved and trying to protect her once she moved over, things like you wouldn't do normally, saying that if the program goes south she can move back in [to probation], be able to do this, that, and the other thing.

So it was very clear that we wanted her there and that she could come there at this salary [her probation salary], but the Commissioners weren't going to pay that salary unless it was part of an overall resolution. (Id.)

201.    Judge Guido clearly felt that $40,000 was an excessive amount to pay a full-time

Program Director for CASA:

I thought the salary was too high. I understood that we were going to fund a full-time director. That's all the grant people really wanted to know, that we were going to be doing that.

I got a memo from Laura [Patterson, the grant writer] saying, boy, this salary is out of wack, CASA tells me that the average nationwide is around $30,000 or $33,000 or something like that. So I didn't have a problem with any of that, it was what it was and that's what we were doing. If we got the deal worked out, it would be that; if we didn't, it would be something else. (Id. at 30).

202.    Judge Guido reiterated that he met with Varner after talking with the AOPC's

lawyer. His purpose wasn't limited to discussing with her a possible settlement:

I don't know if that's the only purpose, the purpose was, okay, this is going to be full-time, that the Commissioners were going to go along with full-time, but I don't know if they are going to go along with your salary in this position, and the purpose is to try to resolve this litigation. Their purpose is to try to resolve this litigation. (Id. at 35).

203.    Judge Guido said Varner wanted to discuss the details of the litigation:

She may have wanted to try to get into the details of the litigation. I remember I didn't want to know from anybody about anything on the litigation. And I recall that it made sense that they

> weren't going to pay more than the job was worth, which they
> didn't have to do while she had a suit going, and we had that
> discussion at some point, I recall that discussion. (Id. at 35).

204.    According to Judge Guido, Varner participated in the discussions regarding the

litigation and the possible directorship at an elevated salary:

> I know we were trying to get the funding for her position
> resolved. And because it was tied into the litigation, I think she
> had some concerns that, hey, this grant's only for two years, what
> if this is some clear ruse by the County to get me to settle the
> litigation and pull the plug out from under the program and I am
> out of a job in two years from now. And that gave me some
> concerns, too, because I didn't want my program to be the victim
> of some litigation. So I wanted to make sure that the County
> wasn't just setting somebody up to resolve some litigation.
>
> So I figured that if they were in further ahead of the game
> when the pulled the plug on my program, if they didn't we would
> come up with these proposals to make sure that if the plug got
> pulled at the end of the two years, she was protected. The County
> didn't save a nickel, so they had no financial reason to pull the
> plug on my program and it would be only pulled if it wasn't
> working. (Id. at 37 – 38).

205.    Judge Guido reiterated time and again in his deposition that both he and Varner

clearly understood that the payment of the elevated salary was conditioned upon the litigation

being settled:

> Certainly, the salary was part of the grant, but it was always
> understood that it was conditioned upon this being settled.
> Otherwise, I would have to look for somebody commensurate
> with, to pay commensurate with what the position would be worth.

206.    Judge Guido knew that the County had funded the directorship at $29,000 if there

was not this litigation. Judge Guido himself thought that was too high. He thought the full-time

position was worth about $25,000 per year and shared that thinking with Varner. (Id. at 42).

207.    When Varner could not agree to resolve the litigation Judge Guido offered her the

CASA Directorship but at the $29,000 figure approved by the County and which he felt was

more than the position was worth.  Varner told him she was not able to accept the $29,000 figure and Guido told her that that was her personal decision to make.  (Id. at 45).

208.    The applicable County Personnel policy provided in relevant pertinent part, as follows:  Employees may file complaints under the following procedures without fear of reprisal or retaliation.

> (1) Step One - Any employee with a complaint shall discuss the matter with his immediate supervisor, who shall attempt to settle the matter to the mutual satisfaction of the County and employee within two (2) working days of its presentation.

> (2) Step Two - If the employee is not satisfied with the disposition of his complaint after discussion with his immediate supervisor, he may submit a written appeal to his department head within three a supervisor fails to respond within five (5) days or if the employee is not satisfied with the disposition of his complaint after discussion with his immediate supervisor, he may submit a written appeal to his department head within five (5) working days after receiving a decision at Step One.  The department head, within five working days after receiving the appeal, shall meet with the employee in an attempt to resolve the complaint.  The department head shall give the employee a written decision within five (5) working days after the meeting. (Sexual Harassment Policy dated 1990, in effect at the time of Plaintiff's Complaint.)

209.    On April 25, 1997, Plaintiff complained in writing to County Personnel Director Hartnett that she had been harassed by Mr. Graham and by Mr. Osenkarski, and that the harassment activities "have escalated since …the summer of 1996, and that "the most aggressive harassment has occurred within the last 180 days." (Varner Deposition Exhibit 1.)

210.    DeLuce recalls that he and Hartnett met with Varner, got her verbal statement and asked her to put her charges in writing, which she did.  Varner indicated to them people they should talk to.  DeLuce and Hartnett talked to those people and to Osenkarski and Graham. They met with Graham and others twice as more facts came out and they wanted to re-verify

various allegations.  DeLuce described this as an ongoing process that started in April 1997 and

continued into June 1997.  (DeLuce Deposition at 36-37).

211.    DeLuce's role in the investigation terminated in mid June 1997.  (Id. at 40).

212.    DeLuce described the protocol in the investigation as the interview of Varner, the

interviews of people identified as witnesses by Varner and the interviews of other persons

identified by Varner's witnesses as having relevant information.  (Id. at 45-46).

213.    Defendant Graham told DeLuce that he had not had a sexual relationship with

Varner.  (Id. at 60).

214.    DeLuce testified that, as a consequence of the many interviews he had with

probation department personnel, "I became less concerned that we had a sexual harassment issue

here and more concerned if we had anything it was an employment/supervisory issue."  (Id. at

61).

215.    The written report prepared by DeLuce evolved as he made changes in it as he

interviewed additional witnesses.  As more witnesses were interviewed he became less and less

concerned with sexual harassment and more concerned with the issue of poor management in the

Probation Department.  (Id. at 89).

216.    The only DeLuce report seen by Court Defendant, dated 6/4/97, DeLuce

Deposition Exhibit 3, contains the following conclusion:

> "My impression is that we have both a hostile environment
> and an employment problem.  It is clear that there exists certain
> favorites (the group of six) in the department.  This is supported by
> the fact that those six were taken to Reno and are the core group that
> provides the DUI training which gives each of them additional
> income.  Whether this is justified depends to whom you speak.
> Others have asked to be included in that DUI training and they were
> told no, stay out of it and also don't discuss the Reno trip.  There
> also appears to be a great disparity in the daily work environment
> and satisfaction of employees between juvenile probation and adult

probation.  Almost all employees commented about the problems
that have been allowed to permeate both departments for years as a
result of a former director who recently retired.  It is also clear that
many employees did not want to work for Osenkarski and Graham,
and cited the same reasons that were described by the
Complainant."

217.    On June 30, 1997, Osenkarski submitted a corrective action plan to Judge Sheely

recommending sexual harassment training.  (Osenkarski Deposition Exhibit 2).

218.    Plaintiff's EEOC charge against the Court Defendant was initially received by the

EEOC on 1/07/1999 and transmitted to Defendant Court on 2/26/99.  (EEOC Docket).


Respectfully submitted,


**s/A. Taylor Williams**
A. TAYLOR WILLIAMS, ESQUIRE
Attorney I.D. No. PA33149
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
legaldepartment@pacourts.us
(215) 560-6300, Fax: (215) 560-5486
***Attorney For Court Defendant***
***Cmwlth. of Pennsylvania, Ninth Judicial District,***
***Cumberland County Court Of Common Pleas***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BARBARA E. VARNER, | : | |
| *Plaintiff* | : | CIVIL ACTION |
| v. | : | NO. 1:CV 01-0725 |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, | : | JURY TRIAL DEMANDED |
| NINTH JUDICIAL DISTRICT, CUMBERLAND | : | |
| COUNTY; S. GARETH GRAHAM, individually; | : | JUDGE YVETTE KANE |
| and JOSEPH OSENKARSKI, individually, | : | |

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on December 31, 2003, she personally

caused to be served upon the following a true and correct copy of the foregoing *Revised*

*Statement of Facts to Which Court Defendant Contends There is no Material Issue to be Tried*,

submitted by Commonwealth of Pennsylvania, Ninth Judicial District, Cumberland County

Court of Common Pleas and Exhibits thereto, by electronic service to:

Debra K. Wallet, Esq.
24 North 32nd Street
Camp Hill, PA 17011
*Counsel for Plaintiff*
walletdeb@aol.com

Paul J. Dellasega
Thomas, Thomas & Hafer, LLP
305 N. Front St., P.O. Box 999
Harrisburg, PA 17108
pdellasega@tthlaw.com

David J. Macmain, Esquire
L. Kristen Blanchard, Esquire
Montgomery, McCracken
123 South Broad Street
Philadelphia, PA 19109
kblanchard@mmwr.com

Paul Lancaster Adams, Esquire
Sweeney & Sheehan, P.C.
1515 Market Street, 15th Floor
Philadelphia, PA 19102
paul.adams@sweeneyfirm.com

s/A. Taylor Williams
A. TAYLOR WILLIAMS, ESQUIRE
Attorney I.D. No. PA33149
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
legaldepartment@pacourts.us
(215) 560-6300, Fax: (215) 560-5486