IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                    .
        Plaintiff,                    .   CIVIL ACTION
                                      .   NO. 1:CV 01-0725
        vs.                           .
                                      .
COMMONWEALTH OF PENNSYLVANIA,         .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,              .
CUMBERLAND COUNTY; CUMBERLAND         .
COUNTY; S. GARETH GRAHAM,             .
individually, and JOSEPH              .
OSENKARSKI, individually,             .
        Defendants.                   .
. . . . . . . . . . . . . . . . . . .

VOLUME 1
Pages 1 to 228

Deposition of:  BARBARA E. VARNER

Taken by     :  Defendant Cumberland County

Date         :  January 27, 2003, 9:35 a.m.

Before       :  Emily Clark, RMR, Reporter-Notary

Place        :  Administrative Offices of
                Pennsylvania Courts
                5035 Ritter Road, Suite 700
                Mechanicsburg, Pennsylvania


APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
             For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
             For - Defendant Commonwealth of Pennsylvania
                   Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  JAMES K. THOMAS, II, ESQUIRE
             PAUL J. DELLASEGA, ESQUIRE
             For - Defendant Cumberland County

2

```
 1   APPEARANCES (continued):

 2       MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
         BY:  DAVID J. MacMAIN, ESQUIRE
 3           For - Defendant S. Gareth Graham

 4       SWEENEY & SHEEHAN, P.C.
         BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5           For - Defendant Joseph L. Osenkarski

 6

 7   ALSO PRESENT:

 8       MR. LEE VARNER

 9       MR. S. GARETH GRAHAM

10       MR. JOSEPH L. OSENKARSKI

11       MS. MELANIE McDONOUGH

12       MR. PETER ZANGARDI

13       MS. PAT LANE

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2                     WITNESS

 3   Barbara E. Varner                         Examination

 4       By Mr. Thomas                              4

 5

 6
                       EXHIBITS
 7
     Varner Deposition
 8   Exhibit Number                               Page

 9   1   4-page memo, 4/25/97, to Hartnett from    191
         Varner, annotated
10
     2   1-page memo, 6/13/97, to Varner from Osenkarski   192
11
     3   4 pages: 1-page memo, 7/17/97, to Ward and   194
12       Deluce from Sheely; 3-page memo, 7/11/97, to
         Ward and Deluce from Sheely
13
     4   1-page handwritten note, 7/21/97, "Dear     196
14       Jo Ann"

15   5   10-page EEOC Complaint                     197

16
                   *   *   *   *   *
17

18

19

20

21

22

23

24

25
```

Barbara Varner                                    4


1                         STIPULATION

2               It is hereby stipulated by and between the

3          respective parties that signing, sealing, certification

4          and filing are waived; and that all objections except as

5          to the form of the question are reserved until the time

6          of trial.

7

8               BARBARA E. VARNER, called as a witness, being duly

9          sworn, was examined and testified, as follows:

10    BY MR. THOMAS:

11    Q     Will you state your full name for the record, please?

12    A.    Barbara Eileen Varner.

13    Q     And where do you presently reside, Barbara?

14    A.    I live at 5 Maple Drive in Etters, Pennsylvania.

15    Q     You understand you're here today for us to take your

16          sworn testimony in a case which you've instituted

17          against the Cumberland County Court, Cumberland County

18          and certain individuals?  You understand that?

19    A.    Yes, I do.

20    Q     Is there any reason today that you could not understand

21          and answer questions completely?

22    A.    No.

23    Q     Are you on any type of medication that would affect your

24          ability to comprehend the questions that are asked today

25          and answer fully and completely?

Barbara Varner                              5

```
 1   A.   No.
 2   Q    If you answer a question today, I'm going to assume that
 3        you've both heard and understood the question.  Is that
 4        fair?
 5   A.   Yes.
 6   Q    How about a date of birth on you, Barb?
 7   A.   1/18/49.
 8   Q    You and I have met in the past; is that correct?
 9   A.   That's correct.
10   Q    And we met and discussed some of the allegations that
11        are part of this litigation, correct?
12   A.   Correct.
13   Q    At that time you agreed with me that if you had had a
14        voluntary affair with Mr. Graham, that there would be no
15        base for this lawsuit.  Do you recall that conversation?
16   A.   But that's not exactly true.  If this affair interfered
17        with any kind of work behavior or -- either positive or
18        negative, then it would absolutely be a case.  It's
19        still a violation of Title 7.
20   Q    Well, let me ask you the question directly.  Did you
21        have a consensual sexual affair with Mr. Graham?
22   A.   I did not.
23   Q    If you had such an affair with Mr. Graham, would there
24        be any validity to your claim here?
25   A.   If it had not interfered with my work environment, my
```

Barbara Varner                                6

1           job, then I would say no.

2    Q     Meaning that even if you had an affair with Mr. Graham,

3          it would be a valid cause of action?

4    A.    In any situation, work environment, if at any time a

5          relationship between two people interferes with that job

6          or the environment of the employment, it is a problem.

7    Q     Did you previously degree in our last meeting that if

8          such an affair existed, that there would be no validity

9          to this litigation?

10   A.    I don't think I completely answered that, because if it

11         interferes with your work environment in any way, shape

12         or form, then it is a problem.

13   Q     I'm not sure I understand your answer exactly.  You say

14         that there was no such affair, correct?

15   A.    That's correct.

16   Q     And if I recall our previous conversation correctly, you

17         agreed unequivocally that if such an affair had existed,

18         then there would be no merit in this litigation.  Are

19         you changing your mind in that regard?

20   A.    If it did not interfere in the work environment at all,

21         I don't think it's a problem.  Morally it is wrong, but

22         I don't think if it did not interfere with the work

23         environment, cause a hostile environment, positive or

24         negative for myself, then there would not be an issue.

25   Q     Well, how would the affair, a consensual affair not

Barbara Varner                          7

```
 1          interfere in your interpersonal relationships in the
 2          work environment?
 3    A.    I think there are people that can probably keep things
 4          separate.  Perhaps they're not in the same department,
 5          perhaps they're not in a supervisory or employee
 6          position.  I don't know that.
 7    Q     Have you ever had occasion to have an extramarital
 8          affair of any kind?
 9    A.    No, I didn't.
10    Q     And this is your second marriage; is that correct?
11    A.    Yes, it is.
12    Q     Did you have any extramarital affairs in your first
13          marriage?
14    A.    I did not.
15    Q     Have you ever had occasion to kiss Mr. Graham?
16    A.    I did not.
17    Q     Have you ever had any type of intimate physical
18          relationship with Mr. Graham of any type?
19    A.    No.
20    Q     You've had no intercourse with him?
21    A.    No.
22    Q     No oral sex with him?
23    A.    Absolutely not.
24    Q     And no anal sex with him?
25    A.    Absolutely not.
```

Barbara Varner                          8

1    Q    Have you ever held hands with Mr. Graham?

2    A.   I have not.

3    Q    Has Mr. Graham ever been inside your residence at Maple

4         Drive?

5    A.   Yes, he has.

6    Q    Can you tell me when?

7    A.   I had started working for Juvenile Probation.  There was

8         a time that he picked me up to go to York, I believe to

9         pick up a kid from detention.  I was getting ready.  My

10        husband was in the house, he was in the shower.

11        Mr. Graham came with the county car to pick me up.  Came

12        in, asked to use the telephone, had a cup of coffee, I

13        believe.  And we left from there to pick up the kid to

14        transport him to court.

15   Q    And this was Maple Drive?

16   A.   Yes, it was.

17   Q    I want to explore that in a little detail.

18   A.   Okay.

19   Q    Do you remember when that was?

20   A.   It had to be in 1995 to '96.

21   Q    Refresh my recollection as to when you started with

22        Juvenile Probation.

23   A.   February 7th, 1995.

24   Q    Is that how you placed the date, because it was within a

25        year of when you commenced?

Barbara Varner                                    9

1   A.   Yes.

2   Q    And he was picking you up and you were going to

3        transport a juvenile?

4   A.   We were to pick up a juvenile at York Detention Center.

5        I live halfway between Harrisburg and York, so it was

6        convenient for him to pick me up.

7            We took the kid to court, returned him to the

8        detention center.

9   Q    Where exactly is your residence at Maple Drive?  Give me

10       directions on how you get there.

11  A.   South 83, off the Yocumtown exit.  And it's

12       approximately a mile and a half from the exit.

13  Q    On this particular occasion Mr. Graham came to the house

14       to pick you up, correct?

15  A.   That's correct.

16  Q    And did you invite him in?

17  A.   He knocked on the door and he asked if he could use the

18       phone to make a personal phone call.

19  Q    What was the nature of your relationship with Mr. Graham

20       at this time in '95 or '96?

21  A.   He was a supervisor.  He was assigned, not officially,

22       but he was to train me.

23  Q    Were you on good terms?

24  A.   Yes.

25  Q    Did you consider him a personal friend?

Barbara Varner                              10

1   A.   Not a personal friend.  A colleague.

2   Q    So he comes to the door, knocks on the door.  Do you

3        respond to the door, answer the door?

4   A.   Yes, certainly.

5   Q    You knew he was coming to pick you up?

6   A.   Yes, I did.

7   Q    Were you prepared to leave the house?  Did you have your

8        coat on?

9   A.   Yes.  Well, yes.  Yes, I did.

10  Q    What did he say to you?

11  A.   He said could I use the phone.

12  Q    So he entered through what I guess was some type of

13       foyer?

14  A.   No.  It would be the garage door.  Most of the time we

15       come in through the garage door, come in the garage.

16  Q    Was this the first time he was ever at your house?

17  A.   Yes.

18  Q    And he came to the garage door to summon you?

19  A.   Right, that's correct.

20  Q    He didn't come to the front door of the house?

21  A.   No.

22  Q    What type of house is this?

23  A.   We have a bi-level.

24  Q    Bi-level?

25  A.   Um-hum.

Barbara Varner                          11

```
 1   Q    So he comes, he raps on the door, you answer the door,
 2        he asks to come in.  When he steps inside the house from
 3        the garage, what part of the house does he enter?
 4   A.   We have a large dining room, living room, kitchen all
 5        one, pretty much one area.
 6   Q    Would this be the second floor of the house --
 7   A.   Yes.
 8   Q    -- if it's a bi-level?
 9   A.   Yes, it is.
10   Q    So you would step up two or three steps to enter that
11        level?
12   A.   You come up from the garage and you're right in level,
13        you're on level with the dining room.
14   Q    Okay.  So he entered from the garage into this sort of
15        combination living room/dining room?
16   A.   Right, um-hum.
17   Q    Where was your phone located?
18   A.   In the kitchen, right within maybe 15 feet of the door.
19   Q    So he entered through the garage door, went to the
20        kitchen?
21   A.   Correct.
22   Q    Used the phone?
23   A.   Right.
24   Q    Was he in any other part of the house?
25   A.   I went in to talk to my husband and he said -- he was
```

Barbara Varner                              12

```
1          asking me, this is a nice place, very large.  And I
2          said, well, help yourself, look around.  I believe he
3          went down to the basement, I can't say for sure.  When I
4          came out, I was ready to go.
5     Q    He was on the phone.  Did you leave the kitchen area
6          when he was on the phone?
7     A.   Yes, I did.  Yes, I did.
8     Q    And you went where?
9     A.   Back the hallway to my bedroom, my husband and my
10         bedroom, in the back.
11    Q    To what, say good-bye to him?
12    A.   Yes, that I was leaving.
13    Q    What conversation did you have with your husband?
14    A.   That I was leaving, basically I was leaving and I would
15         see him that evening.
16    Q    Was that the extent of it?
17    A.   Pretty much, yes.
18    Q    You then turned around, left the bedroom area and came
19         back to the kitchen?
20    A.   That's correct.
21    Q    Where was Mr. Graham when you came back?
22    A.   He was standing, I don't know, living room.  Like I
23         said, it was a combination living room/bedroom area -- I
24         mean living room/dining room area.
25    Q    How long were you gone from the kitchen?
```

Barbara Varner                              13

1   A.   Oh, it was not very long.  Several minutes.

2   Q    When you came back he was still in the same general

3        area?

4   A.   Yes.

5   Q    Any conversation with him about any other portion of the

6        house?

7   A.   No.

8   Q    Did he enter the master bedroom?

9   A.   No.

10  Q    Did he ever tell you that he had been downstairs?

11  A.   No.

12  Q    Were there any other occasions when he was in the

13       basement of your residence at Maple Drive?

14  A.   No.

15  Q    Was this the only occasion on which you're aware that he

16       was ever physically inside your house?

17  A.   Yes.

18  Q    And as far as you're aware, that visit was limited to

19       the combination kitchen/dining room/entry area?

20  A.   Yes.

21  Q    Have you ever lived anywhere else other than Maple

22       Drive.

23  A.   Yes, I have.

24  Q    Where else?

25  A.   I lived on Weatherburn Drive in New Cumberland.

Barbara Varner                                      14

```
 1    Q    Who did you live there with?

 2    A.   My husband Lee.  My son lived there briefly.  And my

 3         daughter also had a room.  She was in college and she

 4         would come home.

 5    Q    She was in college at West Chester?

 6    A.   Yes.

 7    Q    When was that, Mrs. Varner?

 8    A.   1990.

 9    Q    For just one year?

10    A.   Approximately a year and a half we lived there.

11    Q    How about the residence before that?

12    A.   I lived at Apple Drive in Mechanicsburg.

13    Q    Was that with your first husband?

14    A.   Yes, it is.  Was.

15    Q    For the record, what was his name?

16    A.   Kenneth Spidle, S-P-I-D-L-E, Jr.

17    Q    Has Mr. Graham ever seen you naked?

18    A.   No.

19    Q    Do you have a small scar at the base of your spine?

20    A.   No.

21    Q    Have you ever had any back surgery?

22    A.   No.

23    Q    Have you ever told anybody that you have a double nipple

24         on your right breast?

25    A.   No.
```

Barbara Varner                                    15

```
 1   Q     Do you, in fact, have a double nipple on your right
 2         breast?
 3   A.    No, I do not.
 4   Q     Do you have any type of cartilage condition on your
 5         right breast?
 6   A.    No.
 7   Q     On either breast?
 8   A.    No.
 9   Q     Have you ever used the term mature adult relationship?
10   A.    No.
11   Q     Never used that term with anyone?
12   A.    Not that I can recall.
13   Q     In 1994 did you take a bus trip to Atlantic City?
14   A.    Yes, I did.
15   Q     Who went with you?
16   A.    I went by myself.
17   Q     Was Mr. Graham on that trip?
18   A.    He was on the bus.
19   Q     Where were you going?
20   A.    I was going to Atlantic City.
21   Q     For what purpose?
22   A.    To lay on the beach.
23   Q     You were going alone?
24   A.    Yes, I was.
25   Q     Who knew that you were going to Atlantic City alone?
```

Barbara Varner                    16

1   A.   My husband, my daughter, my mother.  Possibly everybody
2        within -- many people in the office.  I had just
3        graduated from undergrad and I would make comments as
4        you would hear from the Super Bowl, so what are you
5        going to do.  People would say, I'm going to Disney
6        World.  My comment would be I'm going to Atlantic City.
7   Q    To lie on the beach alone?
8   A.   Absolutely.
9   Q    How was it that Mr. Graham ended up on the bus?
10  A.   I have no idea.
11  Q    Did you meet or see anybody else from your employment
12       while you were on the bus?
13  A.   Yes.  Carol Snokes, a secretary from our office, and I
14       believe it was her fiance was on.
15  Q    Wayne Shearer?
16  A.   Yes.  And I invited them to sit in front of me.
17  Q    Where did Mr. Graham sit?
18  A.   He was sitting in the back, I believe at the very back
19       row.
20  Q    Did you have any conversation with Mr. Graham during the
21       trip?
22  A.   Yes.  As more people got on at the last stop in
23       Harrisburg is where Carol Snokes and her boyfriend got
24       on.  It was after that time Mr. Graham moved up and
25       gave, must have given somebody else his seat, and sat

Barbara Varner                               17

1           down beside me.

2    Q      What conversation did you have with Mr. Graham?

3    A.     General business.  He said he was going to visit his

4           sister.  Apparently his wife and children were going to

5           go with him that day.

6    Q      He told you he was going to visit his sister?

7    A.     That's correct.

8    Q      What explanation, if any, did you give Carol Snokes and

9           Wayne Shearer as to why you were on the bus or where you

10          were going?

11   A.     I told Carol I was going down to lay on the beach, that

12          I passed my undergrad and that was my goal.

13   Q      So if I understand correctly, as the trip progressed

14          after leaving Harrisburg, you and Mr. Graham were

15          sitting together?

16   A.     Yes.

17   Q      Is that correct?

18   A.     That's correct.

19   Q      And Carol Snoke and Wayne Shearer were sitting in the

20          seat in front of you?

21   A.     That's correct.

22   Q      After you got to Atlantic City tell me what you did.

23   A.     I walked through one of the casinos and went out to the

24          beach.

25   Q      Do you remember which casino?

Barbara Varner                              18

```
1    A.    No, I don't.

2    Q     Was it Bally's, by chance?

3    A.    Wherever the bus dropped us off.  I'm not sure.

4    Q     And that was a Rohrer bus?

5    A.    Yes.

6    Q     Tell me how you spent the day.

7    A.    I was on the beach.

8    Q     All day?

9    A.    Yes.  Stopped to get something to drink, went up to one

10         of the little concessions, and then I went back down.

11         Used the restroom and then I went back to the beach.

12   Q     Do you remember what the date of that trip was?

13   A.    No, I don't know exactly.  I finished my classes June.

14         I'm not sure of the date.

15   Q     Were you in the Bally Hotel casino at all that day?

16   A.    The trip gave you so much, so many tokens to spend, so I

17         used those before going back on the bus.

18   Q     Was that in Bally's?

19   A.    I'm not sure which one it was.

20   Q     Have you ever eaten at Coakley's?

21   A.    Yes.

22   Q     Is that a regular place where you dine?

23   A.    My husband and I used to go there quite frequently.

24   Q     Have you ever been there with Mr. Graham?

25   A.    Yes, I have.
```

Barbara Varner                    19

1    Q     On how many occasions?

2    A.    Several.  He had a person in there he was supervising

3          who worked I believe in the kitchen, and he would stop

4          to do a supervision check on him.

5    Q     And why would you and Mr. Graham be together?

6    A.    Because he was training me.

7    Q     Can you give me an estimate of how many times you were

8          in Coakley's with Mr. Graham?

9    A.    Several.

10   Q     During what time frame?

11   A.    Are you asking during the day, or?

12   Q     Either.

13   A.    It was always during the day.  It was always lunchtime,

14         time frame 1995 to '97, '96, somewhere around there.

15   Q     Where would your car be that you were with Mr. Graham?

16   A.    Quite often at the courthouse, we would leave from the

17         courthouse, in my parking lot.

18   Q     So you would leave together?

19   A.    Yes.

20   Q     Were there ever occasions when you met Mr. Graham in New

21         Cumberland?

22   A.    If there was supervision in that area, yes.  We would

23         supervise several kids, several kids he was transferring

24         to me, that I was down in that area, anyway, since we

25         would meet.  And then he would take me over to meet the

Barbara Varner                    20

1           juveniles or in order to supervise them.

2     Q     Meaning the individual he was supervising at Coakley's?

3     A.    No.  There was other juveniles in New Cumberland area as

4           well.

5     Q     On those occasions, where would you leave your car when

6           the two of you met?

7     A.    Usually behind Coakley's, in the parking lot.

8     Q     Did you ever meet at a grocery store in New Cumberland?

9     A.    No.

10    Q     Do you remember the name of the individual that he was

11          supervising at Coakley's?

12    A.    No, I don't.  It was an adult.

13    Q     It was an adult he was supervising?

14    A.    Yes.

15    Q     Why would he have been supervising an adult in 1995?

16    A.    At that time we were combined.  We were adult and

17          juvenile combined.  So Mr. Graham did both adult and

18          juveniles.  I was specifically juvenile.

19    Q     And after the split occurred in 1996, did you still go

20          to Coakley's with Mr. Graham?

21    A.    No, I didn't.  No.

22    Q     So you were never in Coakley's after 1996 when the split

23          occurred between adult and juvenile?  Never there with

24          Mr. Graham?

25    A.    I don't believe so.

Barbara Varner                           21

1    Q    Have you ever eaten at the Deer Lodge?

2    A.   Yes.

3    Q    Have you ever been there with Mr. Graham?

4    A.   Yes.

5    Q    On what occasion?

6    A.   Following a trip, he wanted to get dinner out there.

7         And his friend owned the Deer Lodge, so that's why he

8         wanted to go there.

9    Q    Were you there on only one occasion?

10   A.   Yes.

11   Q    Do you remember the owner's name?

12   A.   Nick Mallios.

13   Q    Did you know anybody else in the establishment?

14   A.   No.

15   Q    Meaning employees.

16   A.   No.

17   Q    Do you remember the name of the cook at the Deer Lodge

18        restaurant?

19   A.   No, I don't.

20   Q    If I mention the name William Byrd, would that mean

21        anything to you?

22   A.   No, it doesn't.

23   Q    That would not refresh your recollection in terms of who

24        the employees at the Deer Lodge may have been?

25   A.   No.

Barbara Varner                          22

```
 1   Q    Tell me about the dinner at the Deer Lodge with
 2        Mr. Graham.  What time did you arrive?
 3   A.   It was after a trip.  I remember it was dark.
 4   Q    What time of year?
 5   A.   I don't remember.
 6   Q    What year?
 7   A.   It would have been '95 or '96.  I don't know.
 8   Q    Was it just you and Mr. Graham?
 9   A.   Yes, it was.
10   Q    You don't remember what time you arrived?
11   A.   No, I don't.
12   Q    Do you remember what time you left?
13   A.   After eating the meal.  An hour, whatever.
14   Q    Do you remember seeing or talking to anybody at the Deer
15        Lodge on that particular occasion?
16   A.   The owner, probably, but I can't be sure.  I don't
17        remember.
18   Q    Other than Mr. Mallios you don't remember speaking with
19        anybody else at the restaurant?
20   A.   No.
21   Q    Were the two of you traveling together?
22   A.   For work, yes.
23   Q    So you were in his vehicle?
24   A.   At times.
25   Q    I'm now still speaking about the Deer Lodge dinner.
```

Barbara Varner                          23

1    A.   Oh.  I don't remember if it was his vehicle or a county

2         vehicle.  I don't recall.

3    Q    But it was not your vehicle?

4    A.   No, it wasn't.

5    Q    So the two of you stopped after a trip to have dinner at

6         the Deer Lodge.  Was there any particular reason for you

7         attending dinner with him that evening?

8    A.   We still had not gotten an hour on the clock for dinner,

9         and we still, you know, Mr. Graham liked to get in all

10        the meals that he could, and so that's where we stopped.

11   Q    I don't understand that.  You say you didn't get an hour

12        on the clock?  What does that mean?

13   A.   That means when you're on a trip so long and you are

14        allowed to have dinner, lunch and dinner.  It was taking

15        the dinnertime, taking the hour for dinner.

16   Q    Where had this trip been?

17   A.   I don't know where we had gone.  We traveled several

18        times, many times, transporting juveniles.

19   Q    Do you remember what the route of travel was to get to

20        the Deer Lodge?

21   A.   The main road from off, I assume 81, it's called the

22        Holly Pike.  I'm not sure what the route number is.

23   Q    So you would have gotten off Route 81 at the Holly Pike

24        there on the south end of Carlisle?

25   A.   Yes.  I guess it's the Hanover exit.  And then taken a

Barbara Varner                    24

```
 1           left and gone out the Holly Pike.

 2    Q      The Mt. Holly Pike?

 3    A.     Correct.

 4    Q      And at the time you got off Route 81 at the Holly Pike

 5           you would have been within a half a mile of the

 6           Cumberland County courthouse?

 7    A.     Probably.

 8    Q      Is that where your vehicle was parked?

 9    A.     My car was probably -- if it was a county car, it would

10           have been over at the garage, which is over near the

11           prison.  That's where we leave our county cars when

12           we're going on trips.  We go over, leave our cars there

13           and then --

14    Q      Out on Route 74?

15    A.     What's 74?  I'm not sure what the route is.  It's near

16           the prison.

17    Q      Are you talking about the prison downtown or the prison

18           out of town?

19    A.     The prison out of town.

20    Q      Okay.  Is there any reason why you didn't have

21           Mr. Graham drop you at your car so that you could go

22           home this particular evening instead of going to dinner

23           with him at the Deer Lodge?

24    A.     We still had an hour that we could have dinner.  We were

25           allowed an hour time for dinner.
```

Barbara Varner                              25

1   Q    So at this point in '95 or '96, whenever it was, you

2        opted to go to dinner with Mr. Graham at the Deer Lodge,

3        right?

4   A.   Yes, that's correct.

5   Q    Your workday was essentially done?

6   A.   No.  We still had an hour for dinner.

7   Q    But there was no work to be done at dinner; that was

8        really sort of a perc, I gather, of your employment?

9   A.   Not really.  We had been on the road a long time.  We

10       had might have stopped for lunch.  Usually we drove

11       quite a few hours without stopping.  So, no, it was an

12       earned dinner, because I still had to travel home.

13  Q    And at that time you were living where, Maple Drive?

14  A.   I would have been at -- yes.  Yes.

15  Q    After dinner was over, what did you do?

16  A.   We went back to my car and I drove home.

17  Q    So Mr. Graham drove you to the prison and you went home

18       from there?

19  A.   Right.

20  Q    Did you go directly from the Deer Lodge to the location

21       where your vehicle was parked?

22  A.   Yes.

23  Q    Were there any other occasions when you were at the Deer

24       Lodge other than this one dinner that we've talked

25       about?

Barbara Varner                    26


1    A.    My husband and I have been there before.

2    Q    How many times?

3    A.    Three or four.  Prior to that I had been there before I

4          was working for the county, I would say at least 10

5          times prior to that.

6    Q    Did you know Mr. Mallios personally?

7    A.    Only to say hello.

8    Q    You didn't have a personal friendship with him?

9    A.    No, I didn't.

10   Q    Had you ever been to his house, his private residence?

11   A.    Mr. Mallios?

12   Q    Yes.

13   A.    No, I didn't.  I never was.

14   Q    Never on any occasion?

15   A.    No.

16   Q    And specifically, not with Mr. Graham?

17   A.    No.

18   Q    Did you have a practice of going to the Silver Springs

19         flea market?

20   A.    Yes.

21   Q    When did you start that practice?

22   A.    Oh, 19 -- probably '80.

23         MR. ADAMS:  I'm sorry, I can't hear.

24         THE WITNESS:  1980.  Probably 1980.

25         MR. ADAMS:  Thank you.

Barbara Varner                               27

1    BY MR. THOMAS:

2    Q    How frequently did you go during the time 1995 to '96?

3    A.   Probably I would say every couple of weeks on Sundays

4         with my daughter or my son.

5    Q    Did you ever go alone?

6    A.   I would go over alone and then I would meet my son and

7         pick up my grandson.

8    Q    How about during the early 1990s, was the frequency of

9         your attendance any different, '91, '92, '93?

10   A.   No.  About the same.

11   Q    On the occasions when you went to Silver Springs flea

12        market, you say at least on occasion you went alone,

13        correct?

14   A.   Generally to meet my -- well, usually meet my son.  They

15        lived in Mechanicsburg.

16   Q    How old was your son at that time?

17   A.   He would have been late twenties.

18   Q    What time would you leave to go to the flea market on

19        Sunday morning as a practice or pattern?

20   A.   Usually I would try to leave by 7:30, around there.

21   Q    What did you do at the flea market?

22   A.   Like I said, I usually met my son.  They're into jewelry

23        collecting.  I might get apples, produce, candles,

24        things like that.

25   Q    What time did you meet your son?

Barbara Varner                                28

 1   A.   Usually within -- he would call when he was leaving and

 2        I would leave, and I would usually meet them, there's

 3        one stand they always went to, probably within a half

 4        hour of arriving there.  I had a good idea what area

 5        they were in.

 6   Q    So you would usually meet him between 8:00 and 8:30; is

 7        that fair?

 8   A.   Somewhere around there.  If I went with my daughter it

 9        was usually a little later because it took her a while

10        to get up and going.

11   Q    Were there ever occasions when you went to the Silver

12        Springs flea market and did not meet one of your

13        children?

14   A.   I can't recall of any time not meeting, being or meeting

15        one of them.

16   Q    So you have no recollection of ever having been there on

17        an occasion where you did not meet either your son or

18        your daughter?

19   A.   I can't think -- no.

20   Q    And normally you would meet your son between 8:00 and

21        8:30 and your daughter maybe a little later, 8:30 to

22        9:00?

23   A.   She would go with me.

24   Q    She was living with you at the time?

25   A.   Well, she would be home for the weekends.  She was in

1          college.

2    Q    So if I understand the procedure correctly, you would

3          meet your son there, but take your daughter with you?

4    A.   Yes.  There were occasions when she wasn't home.  I

5          would go over and just meet them and pick up -- the baby

6          was born in July of '95, so from then on I would go and

7          pick up the baby, take him home.

8    Q    Did you ever meet Mr. Graham at the Silver Springs flea

9          market?

10   A.   I had occasion to see him there.

11   Q    How often?

12   A.   Several times.  I remember coming across -- he knew my

13         son.  He had met my son.

14   Q    How did he know your son?

15   A.   He had met him when my son would come in to visit the

16         office.

17   Q    Did he ever provide any assistance of any type for your

18         son?

19   A.   What form of assistance are you talking about?

20   Q    Any type of assistance.  Did you ever have anything to

21         do with your son's employment?

22   A.   Well, my son is employed at Schaffner Detention Center.

23   Q    Schaffner?

24   A.   Yes.

25   Q    Mr. Graham have anything to do with that employment?

Barbara Varner                                30

```
 1   A.   No, he did not.

 2   Q    Was he instrumental in any way in helping your son

 3        secure that employment?

 4   A.   He had spoken to one person over there, the director.

 5        And when I had spoke to the director myself, he said he

 6        had my son's application on the top of the pile and was

 7        considering him.

 8   Q    When did Mr. Graham talk to the director about your son?

 9   A.   I don't know.  He just told me he had.

10   Q    Who told you that?

11   A.   Mr. Graham.

12   Q    Did he do that at your request?

13   A.   No.

14   Q    Do you know why he did that?

15   A.   I think Mr. Graham was overly willing to do those kinds

16        of things for anybody.

17   Q    So you don't see anything unusual about his

18        recommendation for your son to the Schaffner Detention

19        Center?

20   A.   No.

21   Q    And you think it's something that he would have done for

22        any of the employees at the Juvenile Probation

23        Department?

24   A.   Mr. Graham liked people to be in debt to him so that

25        they would owe him.  He was very proud of saying that I
```

Barbara Varner                                31

1          helped so and so get jobs, wherever, so that they would
2          be in debt to him.
3     Q    Can you give me an example of someone else who
4          Mr. Graham assisted in terms of obtaining employment
5          either for themselves or for one of their family
6          members?
7     A.   I think Mr. Graham believes he helped Debra Green get
8          her job in Probation.
9     Q    Anybody else?
10    A.   He would brag that he had gotten Denny Drachbar's son a
11         job at a bank, I believe.  Others.  That's all I can
12         recall.
13    Q    And the only contact between your son and Mr. Graham was
14         that he had met him in the office when he stopped to see
15         you?
16    A.   Yes.  And at the flea market there was times, when my
17         son was with me.
18    Q    How many times had Mr. Graham met your son at the flea
19         market?
20    A.   I don't recall.
21    Q    Was it more than one or two?
22    A.   I'd say two is fair.
23    Q    Is a fair estimate?
24    A.   Yes.
25    Q    So he had seen your son approximately two times at the

Barbara Varner                                32

```
 1          Silver Springs flea market.  And how many times had he

 2          met him when he came in to visit you at the county

 3          office in Carlisle?

 4     A.   My son was not there that often.  I'd say two would be

 5          fair as well.

 6     Q    So the total number of encounters between Mr. Graham and

 7          your son, as far as you're aware, were approximately

 8          four times?

 9     A.   Yes.

10     Q    And those were simply an introduction at the courthouse

11          when he was there to visit with you --

12     A.   Correct.

13     Q    -- or a chance meeting at the Silver Springs flea

14          market?

15     A.   That's correct.

16     Q    What would you estimate was the longest period of time

17          that Mr. Graham had spent with your son?

18     A.   I have no idea.

19     Q    More than five minutes?

20     A.   I wouldn't think so.  I would say no.

21     Q    Did you ever leave the Silver Springs flea market with

22          Mr. Graham?

23     A.   No, I did not.

24     Q    Did you ever see any other individuals that you knew at

25          the Silver Springs flea market while you were in the
```

Barbara Varner                                    33

1           presence of Mr. Graham?

2    A.     Not that I recall.  No.

3    Q      On these occasions when you were at the Silver Springs

4           flea market and happened to see Mr. Graham, you don't

5           recall anybody else, particularly from work, being

6           present or seeing you or having any conversation with

7           you?

8    A.     It would be in passing, we would stop and talk a little

9           while, and then he would go on his way and I would go on

10          my way.  I cannot recall any other employees.

11   Q      How about other acquaintances of your or his, do you

12          recall anybody seeing the two of you together at the

13          Silver Springs flea market?

14   A.     Talking?

15   Q      Yes.

16   A.     Not that I can recall.

17   Q      How long would you stay at the Silver Springs flea

18          market?

19   A.     At the most would be an hour.

20   Q      So you would normally leave there between 9:00 and 9:30?

21   A.     Approximately, yes.

22   Q      Where would you go from there?

23   A.     If I had the child with me, the baby with me, I would

24          generally go home.

25   Q      The grandchild?

Barbara Varner                          34

1    A.    The grandchild.  With my daughter, we would go other
2          places shopping or stop at a store, out for breakfast.
3    Q     If I remember correctly, you indicated earlier that you
4          don't recall any episodes where you were there alone at
5          the Silver Springs flea market?
6    A.    The only time -- possibly to just stop in and pick up
7          some apples.  I remember I would pull in and try to get
8          a parking spot and I would run in to get the apples,
9          something like that, seasonal things, and then leave.
10   Q     Do you subscribe to any magazines?
11   A.    Yes, I do.
12   Q     Tell me what magazines you subscribe to.
13   A.    Martha Stewart and Oprah.
14   Q     Have you ever had a subscription to Redbook?
15   A.    No, I have not.
16   Q     Have you ever had an occasion to read any Redbook
17         magazines?
18   A.    Probably on occasions in a doctor's office.
19   Q     Did a Redbook article dealing with anal intercourse ever
20         come to your attention?
21   A.    No.
22   Q     Did you ever discuss such an article with anyone?
23   A.    No, I did not.
24   Q     Your name in the prior marriage was Spidle, I think you
25         told us.  Is that correct?

Barbara Varner                                    35

1    A.    That's correct.

2    Q.    Did you have credit cards under the name of Barbara

3          Spidle?

4    A.    They were not under my name.  Well, yes, I did.  Yes, I

5          did.  After I was divorced, I did.

6    Q.    Can you tell me what those credit cards were?

7    A.    Either MasterCard or Visa, I don't know which ones.

8    Q.    Do you maintain the same accounts today, the same cards?

9    A.    No, I don't.

10   Q.    When did you last have a MasterCard or Visa under the

11         name Barbara Spidle?  Or if you changed your name after

12         you got married.  What I'm looking for is the same

13         account.

14   A.    They -- well, the name changed after '93.

15   Q.    When you got married?

16   A.    Right.  Accounts, I'm not sure when I changed banks.  I

17         believe I changed banks on several occasions.  It was

18         more the bank being bought out by another bank.

19   Q.    Do you remember which banks issued the charge cards to

20         you under the name Barbara Spidle?

21   A.    It was the First Federal for a while till I got

22         divorced.

23   Q.    That was pre-divorce?

24   A.    Yes.  After that, I don't -- I can't remember the name

25         of the banks.  I know it was bought out by another bank.

Barbara Varner                                    36

1    Q    Was it a local bank?

2    A.   Um-hum.  Yes.  I know CCNB.  I don't think it was -- I

3         don't recall which bank.  Then I went with First

4         Federal.

5    Q    Did you ever have an account or charge card with CCNB?

6    A.   I don't believe it was CCNB.  I just don't recall what

7         bank it was.

8    Q    How about Commonwealth National, the old Commonwealth

9         National Bank?

10   A.   No, I don't believe I was ever with them.

11   Q    How about National Central?

12   A.   No.  First Federal.

13   Q    First Federal Savings and Loan?

14   A.   Yes.  But that became something else, too, and I can't

15        remember.

16   Q    Harris Savings?

17   A.   I just can't remember what account, what bank it was in

18        between.

19   Q    Do you still have any of your bank statements from the

20        1993-'94 era?

21   A.   No, I don't.

22   Q    When did you destroy those?

23   A.   Probably whenever I changed banks.

24   Q    Do you have credit cards today?

25   A.   Yes, I do.

Barbara Varner                              37

1    Q     Who are they with?

2    A.    Members First.

3          MR. MacMAIN:  I'm sorry, what was that?

4          THE WITNESS:  Members First.

5    BY MR. THOMAS:

6    Q     How long have you been with Members First?

7    A.    I'm not exactly sure.  At least, at least six years, I

8          believe.

9    Q     What type of credit cards do you have with them?

10   A.    I have a Visa.

11   Q     Just a Visa?

12   A.    It's a Visa/MAC, yes.

13   Q     Have you ever had occasion to stay at the Fairfield Inn

14         in New Cumberland?

15   A.    No.

16   Q     Have you ever had occasion to pay for a room at the

17         Fairfield Inn in New Cumberland with a credit card?

18   A.    No.

19   Q     Have you ever rented a room anywhere in New Cumberland

20         since 1990?

21   A.    Yes.

22   Q     Where was that?

23   A.    It was after our wedding reception, and it's changed

24         names so often.  I think it's Holiday.  I believe it was

25         a Holiday at that time.

Barbara Varner                              38

```
 1   Q    Holiday Inn?

 2   A.   I believe that's what it was.

 3   Q    Tell me where it was located.

 4   A.   Off Limekiln Road.  Take a right beyond Bob Evans and

 5        it's at the very end of the road.

 6   Q    Used to be a Sheraton?

 7   A.   Yes.  It's changed names quite often, yes.  That was in

 8        1993.

 9   Q    How did you pay for that room?

10   A.   My husband paid for that, credit card.

11   Q    What was the reason for renting that room?

12   A.   It was our wedding.  After our wedding reception we

13        stayed there that evening.

14   Q    Does the song "Groovy Kind of Love" carry any

15        significance to you?

16   A.   No.

17   Q    Do you know what that song is?

18   A.   I remember the song from the, I don't know, '70s, '60s.

19   Q    The song has no significance to you?

20   A.   No, it doesn't.

21   Q    And you never told anybody that it had any significance

22        to you?

23   A.   No.

24   Q    Your date of birth I think you told us was January --

25   A.   18th.
```

Barbara Varner                                    39

1    Q    -- 18, 1949?

2    A.   That's correct.

3    Q    Correct?

4    A.   That's right.

5    Q    Where were you born?

6    A.   I was born in Harrisburg.

7    Q    You're a lifelong Harrisburg area resident?

8    A.   Lived in Mechanicsburg most of my life.

9    Q    I noticed you graduated from Mechanicsburg High School.

10   A.   Yes, I did.

11   Q    Tell me about your mother and father.

12   A.   My parents presently live in Camp Hill.

13   Q    Still both alive?

14   A.   Yes, they are.

15   Q    How about occupations?

16   A.   My father was a diesel mechanic for approximately 30

17        years at L.B. Smith until he went into the ministry in

18        his fifties.  Now he's a retired minister for the First

19        Church of God.

20   Q    And your mother?

21   A.   My mother graduated from John Harris High School.

22   Q    What year, do you know?

23   A.   Oh, guessing 1938.  Close to it.

24   Q    What's her present age?

25   A.   She is 81.  My father's 84.

Barbara Varner                                40

1    Q    Was she employed outside the home?

2    A.   Yes.  She had a -- she went to Central Penn secretarial

3         school and worked several years and off and on as a

4         secretary as I was growing up different times.

5    Q    Do you recall who for and what area?

6    A.   She worked, I believe she worked in Harrisburg for an

7         auto dealer for a while when she first got out of high

8         school.  And she worked with the Navy Depot for a while.

9         After that, she mostly baby-sat for children in our

10        home.

11   Q    First marriage for both of them?

12   A.   Yes.

13   Q    How about brothers and sisters?

14   A.   I have a brother who is 60.

15   Q    His occupation?

16   A.   He's a computer specialist, retired Army.  Has his own

17        business at this time.

18   Q    Is he married?

19   A.   Yes, he is.

20   Q    How many times?

21   A.   It's his second marriage.

22   Q    What is his name?

23   A.   Stanley Dennis Derr, D-E-R-R.

24   Q    Was that your maiden name?

25   A.   Yes.

Barbara Varner                        41

1    Q    Where does Stanley reside?

2    A.   He lives in Alexandria, Virginia.

3    Q    Do you know the address?

4    A.   No, I don't.

5    Q    You said it was his second marriage?

6    A.   Yes.

7    Q    What was the problem with the first marriage?

8    A.   I don't know the exact problem, but just didn't seem

9         like they were going the same direction.

10   Q    How long did the first marriage last?

11   A.   I'd say 13 years.  That's approximate.

12   Q    Other brothers or sisters?

13   A.   I have an older sister who is 57.

14   Q    Her name?

15   A.   Kathryn Swope, S-W-O-P-E.

16   Q    Where does she reside?

17   A.   She lives in Dillsburg.

18   Q    Is she married?

19   A.   Yes.

20   Q    How many times?

21   A.   Only one.

22   Q    And her husband's name?

23   A.   Glenn.

24   Q    Where do they live in Dillsburg?

25   A.   I believe it's Route 74.  I believe that's the main

Barbara Varner                          42

1           road, towards York.

2     Q     Towards York?

3     A.    Between Dillsburg and York.

4     Q     Do you recall the address there?

5     A.    No.

6     Q     Children to that marriage?

7     A.    They have two children.

8     Q     A moment ago you mentioned that you sort of grew up in

9           Mechanicsburg, I guess.

10    A.    That's correct.

11    Q     You went attended Mechanicsburg High School?

12    A.    That's correct.

13    Q     How about the elementary and middle schools, were those

14          Mechanicsburg, also?

15    A.    Yes.

16    Q     What was your principal major or field of study in high

17          school?

18    A.    Academic, college prep.

19    Q     Was there ever any physical abuse in the household when

20          you were growing up between your parents?

21    A.    No, there wasn't.

22    Q     How about emotional?

23    A.    No.

24    Q     How would you describe your childhood to us?

25    A.    It was a very normal childhood.

Barbara Varner                          43

1    Q    Any problems at all?

2    A.   No.

3    Q    Did you ever have any type of counseling?

4    A.   No.

5    Q    Were you ever placed in any type of specialized

6         education?

7    A.   No.

8    Q    You were college prep throughout your high school years?

9    A.   Yes, I was.

10   Q    Did you date during high school?

11   A.   Yes.

12   Q    How would you describe your dating experiences?

13   A.   Positive, good.

14   Q    Did you date a lot?

15   A.   No.

16   Q    Were you a member of any sports teams in high school?

17   A.   Yes, I was.

18   Q    Which ones?

19   A.   I played hockey.

20   Q    Field hockey?

21   A.   Um-hum.

22   Q    Any honors or awards in field hockey?

23   A.   Yes.

24   Q    Tell me about them.

25   A.   I was a state champion in 1965.

Barbara Varner                              44

1    Q    The Mechanicsburg team was?

2    A.   Yes.

3    Q    And you were on the team?

4    A.   Yes.

5    Q    What position did you play?

6    A.   I played full back and half back.

7    Q    Any other activities in high school?

8    A.   I was sorority.

9    Q    What was the sorority?

10   A.   Senior VANX.

11   Q    Senior?

12   A.   VANX.

13   Q    V-A-N-X?

14   A.   X, um-hum.

15   Q    Social sorority?

16   A.   Yes.  I was a Rainbow girl.  That's part of a Masonic

17        program, the Children of Eastern Star, that kind of --

18        Rainbow girls.

19   Q    You graduated from high school in June of 1966?

20   A.   That's correct.

21   Q    What were your plans at the time of graduation?

22   A.   I had hoped to go on to college eventually, but I also

23        planned to get married.  And my parents' feeling was not

24        to get married till I had least a technical training, so

25        I entered cosmetology school.

Barbara Varner                              45

1    Q     Where was that?

2    A.    The Harrisburg Empire Beauty School.

3    Q     Were you a virgin when you graduated from high school?

4    A.    No, I wasn't.

5    Q     When did you lose your virginity?

6    A.    My senior year.  I was engaged to be married to my first

7          husband.

8    Q     Was he a student, also?

9    A.    No, not Mechanicsburg.  He had graduated from Cumberland

10         Valley High School.

11   Q     What year?

12   A.    '65.

13   Q     And his first name was?

14   A.    Kenneth.

15   Q     Spidle?

16   A.    Um-hum.

17   Q     When did you get engaged?

18   A.    It was Easter of my senior year, April sometime.

19   Q     How did your parents feel about that?

20   A.    I don't think they were thrilled, but it was pretty

21         normal at that time for girls to be engaged in senior

22         year.  And they liked him, so.

23   Q     And you lost your virginity to him?

24   A.    Yes.

25   Q     How frequently were you having sex at the end of your

Barbara Varner                              46

1           senior year in high school?

2    A.     Not very often.  I'd say once or twice a month.

3    Q      What were your marriage plans at the end of high school?

4    A.     Marriage plans were to -- my husband at that time was at

5           HACC, and he was drafted to the Army.  So we had planned

6           to get married when he got out of the service.  And he

7           got orders he was going to be shipped over to Vietnam,

8           so we decided to get married when he came back from

9           basic training in December of '66.

10   Q      And is that when you got married, December of '66?

11   A.     Yes.  Yes.

12   Q      You were pregnant at the time?

13   A.     No.

14   Q      When was your first child born?

15   A.     The first child was born November 7th, 1967.

16   Q      So you were not pregnant when you were married?

17   A.     No.

18   Q      And became pregnant in February or thereabouts, '67?

19   A.     Around that, yes.  Around that, yes.

20   Q      And you were what, 18-years-old at the time?

21   A.     Yes, I was.

22   Q      You were in cosmetology school?

23   A.     Yes.

24   Q      How long is that course of study?

25   A.     It's hours.  You have to have 1250 hours.  Generally, it

```
 1            takes about eight months.

 2    Q       How long did it take you?

 3    A.      I took a break.  I decided to go -- my husband was

 4            stationed in Oklahoma, so I decided to go out with him

 5            after we were married.  I went out with him end of

 6            December '66.  And then finished up cosmetology school

 7            when we came back in '98.  I'm sorry.  '68.

 8    Q       That's better.

 9    A.      Yes.  '68.

10    Q       Did he ever go to Vietnam?

11    A.      No, he did not.

12    Q       And he was stationed in Oklahoma?

13    A.      Yes.

14    Q       How long was he in the military?

15    A.      Two years.

16    Q       And you were with him in Oklahoma?

17    A.      Yes.

18    Q       Were you employed at all during the two years you were

19            in Oklahoma?

20    A.      No, I wasn't.

21    Q       And I gather your son was born, was he born in Oklahoma?

22    A.      Yes.  Yes.

23    Q       After you returned here can you tell me approximately

24            when that was?

25    A.      October '68.
```

Barbara Varner                                    48

1   Q     What did you do when you returned?

2   A.    We had a child then.  We got an apartment.  First we

3         moved in with my parents for about a month.  Then we

4         found an apartment in Shiremanstown.  My husband found

5         work at UPS.  And stayed home and took care of the child

6         and finished up my beauty school.

7   Q     When did you graduate from Empire?

8   A.    '69.  Probably, I'm thinking January, February, '69.

9   Q     Did you get a job after that?

10  A.    Briefly, for maybe two months.  At that time you did not

11        make any money doing that, so it was -- didn't seem

12        worth it to have a baby-sitter.

13  Q     Do you recall where you worked for those two months?

14  A.    Vi Miller, Simpson Street in Mechanicsburg.

15  Q     Any problems with that employment other than lack of

16        adequate compensation?

17  A.    No.  No.

18  Q     Did your husband remain employed at UPS throughout your

19        marriage?

20  A.    Yes, he did.

21  Q     Is he still employed there, as far as you know?

22  A.    Yes.  Yes.

23  Q     Both of your children were fathered by Mr. Spidle?

24  A.    Yes.

25  Q     When did you start to have problems in that marriage?

Barbara Varner                          49


 1   A.   The biggest problems were both of our children were in

 2        college.

 3   Q    What were the nature of the problems?

 4   A.   We just didn't have the same goals, and we realized, I

 5        think we both realized that most of our life was built

 6        around the children.

 7   Q    I assume the conception of Richard, who is the oldest,

 8        isn't he?

 9   A.   Yes.

10   Q    The conception of Richard was consensual on your part?

11   A.   Yes.

12   Q    Was there any infidelity in that marriage by either you

13        or Mr. Spidle?

14   A.   No.

15   Q    So the reason for the divorce would be what?

16   A.   We were -- just drifted apart.  We had different goals

17        for our lives and it just wasn't working.

18   Q    Was there any physical abuse in the marriage?

19   A.   Not a consistent abuse.  There was times that he would

20        let his anger get out of control.

21   Q    Did he ever hit you?

22   A.   He shoved me.

23   Q    When was that?

24   A.   '80s.  Early '80s.

25   Q    Do you remember the reason?

Barbara Varner                          50

1   A.   He was just angry.  I don't know exactly what
2        precipitated -- he was just angry.
3   Q    Did he do that on more than one occasion?
4   A.   He had hurt me when we were first married.
5   Q    What year was that?
6   A.   That was in '96.  And again, out of frustration.  He was
7        angry.
8   Q    You said '96.
9   A.   I'm sorry.  '66.
10  Q    Did you require medical attention?
11  A.   No, I didn't.
12  Q    How did he hurt you?
13  A.   He took my hand and took it down over back of a chair,
14       just in anger.
15  Q    Do you remember what the episode was?
16  A.   Yes.  I had decided to -- I had wanted to stay back.  We
17       found out his -- he was not getting orders to go to
18       Vietnam, and I had decided I was going to stay back and
19       finish up my cosmetology school.  And he said I was not
20       going to do that.  He was frustrated, he was angry.  And
21       it just, it happened.
22  Q    So you wanted to stay in Mechanicsburg, he wanted you to
23       go to Oklahoma?
24  A.   Back with him, yes.
25  Q    Other than those two episodes, were there other episodes

Barbara Varner                              51

1          of physical abuse?

2   A.    No.  Just a lot of intimidation, a lot of yelling and

3          screaming, those type things.

4   Q     Over what?

5   A.    It could be anything.  If I would decide to go away at

6          night, maybe to, a lot of times it was even to church,

7          he just wanted me home, having a meal ready for him.  He

8          was very much basic things like that.

9   Q     Those would degenerate into a screaming match?

10  A.    Not a screaming match.  More he wouldn't talk to me for

11         several weeks at a time.  So we just sort of lived

12         parallel lives, staying together for our children.

13  Q     Can you give me a time frame for this conduct?

14  A.    It was more during when the children were in maybe

15         senior high, junior high, that time.  Probably early

16         '80s.

17          MS. WALLET:  Can we stop just a moment?

18          (Recess taken from 10:44 until 10:57 a.m.)

19  BY MR. THOMAS:

20  Q     Barb, before the break we were talking about the

21         difficulties with your first marriage and we explored a

22         little bit the physical abuse elements involved there.

23         It sounds like the physical abuse started in the very

24         early phases of the marriage.  Is that correct?

25  A.    The one time, yes.

Barbara Varner                          52


 1   Q    Did the physical abuse continue throughout your marriage

 2        to Mr. Spidle?

 3   A.   No.

 4   Q    Was there a hiatus from the early episodes in the '60s

 5        until the 1980s when things started to deteriorate?

 6   A.   We were just busy raising our children.  So as far as a

 7        lot of problems then, it was just maintaining.

 8   Q    Before I forget, can I have your Social Security number?

 9   A.   ██████████

10   Q    When you say it was busy with the kids, what do you mean

11        by that?

12   A.   My husband worked a lot of hours.  He was gone, he was

13        an over-the-road driver for UPS.  I was taking care of

14        the children.  So we just were doing our own things

15        parallel.

16   Q    But there were some episodes of physical abuse?

17   A.   Just the one other time where he pushed me.

18   Q    So there were only two, total?

19   A.   Right.  Yes.  A lot of anger, but that's about it for

20        the physical.

21   Q    So there were two episodes of physical abuse.  There was

22        a fair amount of screaming and yelling?

23   A.   Fair amount, I would say, that occurred just several

24        times a year.  It was not an ongoing weekly thing.  It

25        was just, it was more he wouldn't talk to me, more of a

Barbara Varner                          53

1         silent treatment.

2    Q    Was there any physical violence directed toward the

3         children?

4    A.   No.  Just verbal.

5    Q    What do you mean by that?

6    A.   Just again, frustration, just yelling.  If they --

7         rather than just correcting them, he had a way of just

8         yelling at them to correct them.

9    Q    Who were the children closer to, you or him?

10   A.   To me.

11   Q    Were there any other problems in the first marriage?

12   A.   No.

13   Q    What was the state of your marriage to Mr. Spidle in

14        1989 when you started working for the county?

15   A.   We were divorced.

16   Q    When did you separate?

17   A.   We separated, I filed for divorce spring of '89, and he

18        moved out in the summer of '89, early summer.

19   Q    Were you separated for any period of time before he

20        moved out?

21   A.   No, we were both living in the same house.

22   Q    And that was Apple Drive?

23   A.   Yes.

24   Q    Let me see if I get that sequence correct.  1980s you're

25        having marital problems with him.  As you described it,

Barbara Varner                     54

```
 1          you had grown apart, and at some point I guess you had a
 2          conversation with him about divorce.
 3     A.   Yes.
 4     Q    Where were the children at that point?
 5     A.   My son was in college.  They were both in college.
 6     Q    Both at West Chester?
 7     A.   Yes.
 8     Q    Tell me about the conversation with Mr. Spidle where you
 9          discussed divorce.
10     A.   It was a decision I made in April.  I remember telling
11          him what my plans -- that it just wasn't working.  I had
12          asked him to go to counseling; he basically refused.
13          And it was one of those times trying to work with him to
14          see what we could do, and he just refused to go to
15          counseling.  And then I progressed, met with an attorney
16          and proceeded towards filing.
17     Q    Did you ever tell him that if he didn't go to counseling
18          you were going to file for divorce?
19     A.   No.
20     Q    So you were having this deterioration in the
21          relationship, I guess, for lack of a better term.
22     A.   Right.
23     Q    You said to him, I think we should go to counseling.  He
24          said no, correct?
25     A.   Correct.
```

Barbara Varner                    55

1    Q    You then went and hired a lawyer.

2    A.   There was a time we tried to go away on vacation

3         together.  We attempted that.  It just didn't work.  It

4         just basically the feelings weren't there anymore.

5    Q    What do you mean when you say it didn't work?

6    A.   It was just a very uncomfortable time.  It just was not

7         working.

8    Q    Where was the vacation?

9    A.   We went to Rehoboth Beach.  I think that's Delaware.

10   Q    When was that?

11   A.   It would have been in the spring, early spring of '89,

12        April.

13   Q    Was it after that trip that you consulted with a lawyer?

14   A.   Yes.

15   Q    Who was the lawyer?

16   A.   John Purcell in Harrisburg.

17   Q    How did you know Mr. Purcell?

18   A.   My brother had known him and he recommended him.

19   Q    Does your brother have a drinking problem?

20   A.   No.

21   Q    Has he had any problems with the law?

22   A.   No.

23   Q    Do you know how he knew Mr. Purcell?

24   A.   I think he used him for his divorce lawyer.

25   Q    Didn't you tell me where your brother's living now?

Barbara Varner                                56

```
 1   A.   Alexandria, Virginia.

 2   Q    That's right.  You couldn't remember the address, right?

 3   A.   Right.

 4   Q    Is he employed in Alexandria?

 5   A.   He's self employed.

 6   Q    What's he do?

 7   A.   Him and his sister-in-law are developing security

 8        equipment.  He's a computer specialist.

 9   Q    Do they have a company name?

10   A.   Not that I know of.  I don't believe -- if they do, I

11        don't know what it is.

12   Q    You say his sister-in-law?

13   A.   Yes.

14   Q    Who is that?

15   A.   I don't know her name.

16   Q    What is her relationship to him?

17   A.   Sister-in-law.

18   Q    But how related?

19   A.   Through -- it's his wife's sister.

20   Q    What's his wife's name?

21   A.   Mary Rose.

22   Q    Was Rose her maiden name?

23   A.   No.  I don't know what her maiden name was.

24   Q    Do you know her husband's name?

25   A.   Mary Rose's husband's name?
```

Barbara Varner                            57

1   Q    Yes.

2   A.   That's my brother.

3   Q    That's convenient, wasn't it.  So you consulted with

4        Mr. Purcell, and I assume he filed a Complaint in

5        Divorce?

6   A.   Yes.

7   Q    Did he file that in Cumberland County?

8   A.   Yes.

9   Q    Who represented Mr. Spidle?

10  A.   It's in Lemoyne, at the bridge in Lemoyne across from

11       Hardee's, that group that's there.  It was part -- was

12       it Irving, Irwin or something?  I can't think of the --

13  Q    Johnson Duffie?

14  A.   Yes.  It was one of their associates.  I don't know the

15       gentleman's name.

16  Q    Was the divorce contested?

17  A.   No.

18  Q    What were the basic terms of the property settlement?

19  A.   My husband bought me out.  He gave me, you know, a

20       percentage, and I left the home.

21  Q    I thought you testified earlier that he had moved out.

22  A.   He moved out briefly, and then moved back in again.

23  Q    When you moved out of the home on Apple Drive, where did

24       you live?

25  A.   Our divorce was final in December, actually 31st of

Barbara Varner                          58

1         1989.  So I remained in the home.

2    Q    Until when?

3    A.   Till October of '89.

4    Q    Where did you move then?

5    A.   I moved in with my present husband.

6    Q    At what address?

7    A.   Sussex Avenue.  And that would be, I believe it's

8         actually a Harrisburg address.

9    Q    At any point during the 1980s did you live anyplace

10        other than at Sussex Avenue or Apple Drive?

11   A.   No.

12   Q    When was the Complaint in Divorce actually filed?  Was

13        it April?

14   A.   I don't know.  I know it was filed around this time.  It

15        was early spring.  I'm saying April would be a good

16        guess.

17   Q    And your husband continued to reside in the house with

18        you until sometime in the summer?

19   A.   He moved out, I believe it was June to July.

20   Q    Of '89?

21   A.   Um-hum.

22   Q    And where did he move to?

23   A.   He moved with his parents.

24   Q    Where do they live?

25   A.   On Trindle -- well, they did live on Trindle Road in

Barbara Varner                    59


1           Mechanicsburg for several weeks.

2      Q    And he lived with them until when?

3      A.   He moved back in the end of July.

4      Q    Back into Apple Drive?

5      A.   Yes.

6      Q    What was the reason for that?

7      A.   Under the advice of his attorney.

8      Q    So the two of you lived under the same roof then while

9           the divorce proceedings were continuing?

10     A.   Yes.

11     Q    And the two of you lived there together until when?

12     A.   It was October is when I moved in with Mr. Varner, my

13          husband.

14     Q    When did you start dating Mr. Varner?

15     A.   We met at HACC during a class the end of July of '89.

16     Q    What was the class?

17     A.   Some type of history class.

18     Q    Do you remember any more about it?

19     A.   History of the Western World, I'm guessing at.

20          Something like that.

21     Q    Who was the professor?

22     A.   Josh -- I cannot remember his last name.  He was an

23          interim.  Not interim, yeah, just an interim professor

24          for the summer.

25     Q    When did you enroll in HACC?

```
 1    A.    1986.

 2    Q     What was your major?

 3    A.    My major was social work.

 4    Q     And you were working toward a degree?

 5    A.    I was just going to school.  I was hoping to get an

 6          associate degree.

 7    Q     Why was Mr. Varner in the class?

 8    A.    He was finishing up.  He was a student at Shippensburg

 9          University and he was working at AMP in the Harrisburg

10          area.  And I believe he just had several electives he

11          had to finish up.  And I believe a co-worker of his told

12          him you could do that at HACC.  And so I guess he found

13          the history class was interesting to him and he had

14          enrolled there.  I believe it was just two classes he

15          took to earn his graduate.

16    Q     Do you remember what the other course was?

17    A.    American, something American history.  It's more of a

18          civics class, that type thing.

19    Q     Do you remember anything else about the history class

20          where the two of you met?

21    A.    No, I don't.

22    Q     You can't tell me the name of the professor?

23    A.    Josh was his first name.  I just do not recall his last

24          name.

25    Q     Can't tell me the course number?
```

Barbara Varner                                    61

1   A.   No.  No.

2   Q    Do you remember what level course it was?

3   A.   I was in just a second year at HACC, so I'm guessing

4        it's probably 200, 300 level, something like that.

5   Q    Tell me how you two met and how the relationship

6        progressed.

7   A.   We met in class.  We were older, non-traditional

8        students, and after speaking with each other we met each

9        other over at the Forum, we were there for a field trip,

10       and we began talking, realized we had children the same

11       age.  And then we would see each other in class another

12       time, and just an interest developed.

13  Q    And you began dating?

14  A.   Yes.

15  Q    When did you two start having sexual relations?

16  A.   In October, when I moved in.

17  Q    October of 1989?

18  A.   Yes.

19  Q    No sexual relations before then?

20  A.   No.

21  Q    And your divorce was final on December the 31st,

22       correct?

23  A.   Right, um-hum.

24  Q    The last day of the year?

25  A.   Right.

Barbara Varner                        62

1   Q     In terms of property settlement, you told me that your
2         husband, first husband, Mr. Spidle, purchased your
3         interest in the home on Apple Drive?
4   A.    That's correct.
5   Q     What other terms were there to the property settlement?
6   A.    I got my vehicle.  And my children were given -- we had
7         a car for them, they were given that.  And they were
8         both at West Chester so it was convenient for them.
9             He -- let's see.  The percentage is what I got, a
10        percentage of the equity in everything we had.
11  Q     And what was the percentage?
12  A.    65 percent.
13  Q     Do you remember what the dollar number was that you were
14        paid from him buying out your interest in the home?
15  A.    It was also his retirement as well.  He kept his
16        retirement.  It was close to a hundred thousand.
17  Q     And you say he kept his retirement account?
18  A.    Yes.
19  Q     And you got what?  65 percent of everything else?
20  A.    Um-hum.
21  Q     What about the children, was there a custody order?
22  A.    No.  They were both, they were 18.
23  Q     Tell me about your sexual relationship with Mr. Varner.
24  A.    In what aspect?
25  Q     I'm going to have to ask you some uncomfortable

Barbara Varner                                    63

```
 1          questions, and I apologize for that --
 2   A.     Okay.
 3   Q      -- in advance.  Frequency of your sexual relationship
 4          with him?
 5   A.     At least probably five times a month.  One time a week.
 6              MR. ADAMS:  I'm sorry, I can't hear, ma'am.
 7              THE WITNESS:  At least one time a week.
 8   BY MR. THOMAS:
 9   Q      Any sexual preferences in terms of positions?
10   A.     No.
11   Q      Any oral sex?
12   A.     Yes.
13   Q      Was that something that was different than your first
14          marriage?
15   A.     Yes.
16   Q      Were you both and a giver and a receiver of oral sex in
17          the marriage with Mr. Varner?
18   A.     Yes.
19   Q      In the first marriage was there any oral sex at all?
20   A.     No.
21   Q      On either part?
22   A.     No.
23   Q      How would you describe your satisfaction level with the
24          sex in the relationship with Mr. Varner?
25   A.     Very well.
```

Barbara Varner                          64

1   Q      Does he have any sexual performance problems?

2   A.     No, he doesn't.

3   Q      Do you?

4   A.     No.

5   Q      Are you orgasmic in this relationship?

6   A.     Yes.

7   Q      Were you in your first marriage?

8   A.     No.

9   Q      Have you been with any man other than Mr. Spidle or

10         Mr. Varner?

11             MS. WALLET:  I assume that question was have you

12         been with any man in a sexual way?

13             MR. THOMAS:  Yes.

14  BY MR. THOMAS:

15  Q      Do you have a position that you prefer?

16  A.     No.

17  Q      Do you drink alcoholic beverages?

18  A.     On occasion.

19  Q      Would you describe yourself as a social drinker?

20  A.     Social drinker to me would be once during a social

21         event, once or twice a week.  That's how I define, yes.

22  Q      Once or twice a week?

23  A.     Yes.

24  Q      When type of alcoholic beverages do you drink?

25  A.     Wine.

Barbara Varner                          65

1    Q    Any hard liquors?

2    A.   Gin, on occasion.

3    Q    How about Mr. Varner, does he consume alcoholic

4         beverages?

5    A.   Yes.

6    Q    What's his drink of choice?

7    A.   I'd say beer.

8    Q    How would you describe his drinking habits?

9    A.   Again, I would say maybe two or three beers a week.

10        Usually if we're out, go out for dinner.

11   Q    Have you ever described him as a heavy drinker --

12   A.   No.

13   Q    -- to anyone?

14   A.   No.

15   Q    Does he have a brother?

16   A.   Yes, he does.

17   Q    Does his brother have a drinking problem?

18   A.   I'm not a drug and alcohol evaluator in that aspect.

19   Q    Well, you've been certainly lived in society long enough

20        to know when people have alcohol problems, haven't you?

21   A.   Yes.  Whenever I've seen him intoxicated at certain

22        times, parties, at his home.

23   Q    So you've seen him intoxicated on a number of occasions?

24   A.   I would say several.

25   Q    In your opinion does he have a drinking problem?

Barbara Varner                    66

1   A.   I don't know what he does on a daily basis.  At those
2        times he has drank pretty heavy.
3   Q    Have you ever told anybody that Mr. Varner's brother has
4        a drinking problem?
5   A.   It's well known that Mr. Varner's brother had several
6        DUIs in Cumberland County.
7   Q    Has he been through the DUI schools in Cumberland
8        County?
9   A.   Yes, he has.
10  Q    How many DUIs has he had?
11  A.   I believe he's had two.
12  Q    Has he spent any time in jail --
13  A.   Yes.
14  Q    -- as a result of the DUI?
15  A.   Yes.
16  Q    Any other jail time for anything?
17  A.   Not that I know of.
18  Q    Does anybody else in Mr. Varner's family have any DUIs?
19  A.   Not that I know of.
20  Q    Does anybody else in his family have a drinking problem?
21  A.   No.
22  Q    Have you ever told anybody that Mr. Varner's brother has
23       an alcohol problem?
24  A.   No.
25  Q    Did you ever discuss Mr. Varner's brother with

Barbara Varner                           67

1           Mr. Graham?

2      A.   Mr. Graham discussed my brother-in-law with me.  He knew

3           he had a DUI and had been in class.

4      Q.   What was the substance of that conversation?

5      A.   Just how is he related.  You know, the name came up.

6      Q.   When did that conversation occur?

7      A.   Right after I started working in Juvenile Probation.

8           I'd say '95, '96.

9      Q.   Do you know when Mr. Varner's brother had his second

10          DUI?

11     A.   No, I don't.

12     Q.   Do you know when he had the first DUI?

13     A.   No, I don't.

14     Q.   Do you know what the brother's employment is?

15     A.   He's retired.

16     Q.   From where?

17     A.   Masland in Carlisle.

18     Q.   Masland Carpet?

19     A.   Yes.

20     Q.   Do you know what his job was there?

21     A.   No, I don't.

22     Q.   Is he married?

23     A.   Yes.

24     Q.   Where does he live?

25     A.   Pine Road outside -- it's a Carlisle address.

Barbara Varner                            68

1    Q     Pine Road or Pinetown Road?

2    A.    Pine Road.

3    Q     Carlisle?

4    A.    Um-hum.

5    Q     Is your husband a member of a country club?

6    A.    Yes, he is.

7    Q     Which country club?

8    A.    Carlisle.

9    Q     How long has he been a member there?

10   A.    Approximately five years.

11   Q     What activities does he participate in at Carlisle

12         Country Club?

13   A.    Golfing.

14   Q     How frequently does he play golf?

15   A.    Not very frequently right now.

16   Q     Do you mean because it's winter?

17   A.    Yes.  But he has also cut back on his frequency.

18   Q     Why is that?

19   A.    Physical problems.

20   Q     Which are what?

21   A.    He has essential hand tremors.

22   Q     Before he developed the physical problems, how often was

23         he playing golf at Carlisle Country Club?

24   A.    He's always had the problems, it's just they're getting

25         worse as he gets older.  He would play one or two days,

Barbara Varner                          69

1         one or two mornings a week.

2    Q    Weekends?

3    A.   Yes.

4    Q    Did he play Sunday mornings regularly?

5    A.   Yes, he did.

6    Q    Did he have a regular foursome that he played in?

7    A.   Yes.

8    Q    Do you know the members of the foursome?

9    A.   No.  I think it would change.

10   Q    In 1994 through 1996 can you estimate for us during the

11        spring, summer and fall months, how often he would play

12        golf?

13   A.   I'd say twice a week.

14   Q    Principally on the weekend?

15   A.   Yes.

16   Q    Do you happen to know what his handicap is?

17        MS. WALLET:  I'm going to object that question.  I

18        can't see how that could possibly have any relevance to

19        anything.  And I'd like to say, Mr. Thomas, that we have

20        produced Mrs. Varner here for one day of deposition.

21        However you want to use that day is fine with me, but

22        beware that one day is one day.

23        MR. THOMAS:  We're well aware what the rules are

24        and we'll attempt to abide by them, and if it's

25        insufficient time, we will petition the Court.

Barbara Varner                          70


1              MS. WALLET:  You want her to answer the question

2         about her husband's handicap?

3              MR. THOMAS:  If she knows the answer.

4              THE WITNESS:  I don't know.

5    BY MR. THOMAS:

6    Q    Your husband was employed at AMP?

7    A.   Yes.

8    Q    Is he still employed?

9    A.   No, he's not.

10   Q    When did he last work for AMP or Tyco?

11   A.   I believe in '98, I believe.  That's a guess.

12   Q    Is he retired now?

13   A.   Yes, he is.

14   Q    What was his job with AMP or Tyco while he was employed?

15   A.   He was a product manager.

16   Q    Did that involve traveling?

17   A.   Occasionally.

18   Q    Can you estimate for me how often he traveled?

19   A.   Maybe four, five times a year.  Some years, not at all.

20   Q    In the period 1992 through 1996 can you estimate what

21        his travel schedule was?

22   A.   I don't know.

23   Q    When you say he traveled four to five times a year, what

24        time frame are you referring to?

25   A.   Could you rephrase that?

Barbara Varner                    71

1   Q    You've testified a few minutes ago that you estimated

2        that he would travel four to five times a year with his

3        job with AMP or Tyco.  What time frame were you

4        referring to?  What years?

5   A.   I don't recall.

6   Q    Did you ever watch X-rated movies with Mr. Varner?

7   A.   Once or twice I can remember, yes.

8   Q    Is that something he enjoys?

9   A.   Yes.

10  Q    How do you feel about it?

11  A.   It's fine with me.

12  Q    Did you ever discuss that activity with anyone?

13  A.   No.

14  Q    Did you ever discuss it with Mr. Graham?

15  A.   No.

16  Q    Have you ever told anybody that Mr. Varner was

17       insensitive to your sexual needs?

18  A.   Absolutely not.

19  Q    Did you ever have that conversation with Mr. Graham?

20  A.   Absolutely not.

21  Q    When did you and Mr. Varner get married?

22  A.   November 27th, 1993.

23  Q    Did you take a honeymoon after the marriage?

24  A.   Not immediately after.

25  Q    How long after?

Barbara Varner                          72

1    A.    Probably a week to 10 days later.

2    Q    Where did you go?

3    A.    We went on a cruise to the Mexican Riviera.

4    Q    Did you discuss your honeymoon with anybody?

5    A.    I'm sure I did.

6    Q    Did you discuss it with Mr. Varner?

7    A.    With Mr. Varner?

8    Q    I'm sorry.  With Mr. Graham?

9    A.    I discussed it in the common lounge area that was shared

10         by a lot of departments.  I can't specifically remember

11         talking to Mr. Graham about it.

12    Q    Do you recall what you said about the honeymoon in this

13         lounge conversation that you had?

14    A.    Just what the plans were, where we were going.

15    Q    Nothing about the details?

16    A.    Not till afterwards.

17    Q    How about afterwards?

18    A.    Certainly, discussed it with my friends, in the break

19         room, had pictures, that kind of thing.

20    Q    Do you have a history of broken toes?

21    A.    No.

22    Q    Does Mr. Varner have a history of broken toes?

23    A.    No.

24    Q    Have you had your teeth recapped?

25    A.    No.

Barbara Varner                          73

1  Q    Has Mr. Varner had his recapped?

2  A.   No.

3  Q    What's the ancestral background in your family?

4  A.   Ancestral?  Caucasian.

5  Q    Do you have any native American in your blood lines?

6  A.   Allegedly.

7  Q    Do you know which tribe?

8  A.   I don't know.

9  Q    Did you ever discuss your Native American blood lines

10      with anyone?

11 A.   Yes.  I would speak about that with several people.  My

12      son was trying to track down the ancestral connection at

13      one time.

14 Q    Did you discuss that with Mr. Graham?

15 A.   Not that I can recall.

16 Q    I'm going to take you back.  Let's talk about your

17      employment history a little bit.  We've already touched

18      on that to some extent, in terms of your brief work

19      history during your first marriage.

20          You were a hair dresser for a short period of time,

21      correct?

22 A.   Right.

23 Q    When was the next time that you were gainfully employed?

24 A.   I worked from my home for quite few years doing friends'

25      and relatives' hair.  And there was a period that I

Barbara Varner                                    74

```
1          worked as a hairdresser for a funeral parlor and that

2          was, say, '83, '84, around this time.  I'm just

3          guessing.  And then I obtained work at Holiday Hair.

4          That again was part-time.

5    Q     You say that was part-time?

6    A.    Yes.  That also was very short-lived.

7              Then in 1980 I -- I started working part-time for

8          the Capital Area Intermediate Unit.

9    Q     In 1980?

10   A.    Yes, around '80.

11   Q     What were you doing for them?

12   A.    I was a swimming instructor.

13   Q     Was that part-time?

14   A.    Yes, until 1985, when I came full-time as a teaching

15         assistant for the Intermediate Unit.  And I continued

16         working the school year, full-time school year until

17         1989 when I went to the county.

18   Q     And that was a full-time job at Capital Area

19         Intermediate Unit?

20   A.    Yes, it was.

21   Q     What was your rate of pay there?  Approximately.

22   A.    Yes.  I'm guessing maybe 9,000 a year.

23   Q     As part of the Capital Area Intermediate Unit did you

24         have an employee handbook or manual?

25   A.    Yes.
```

Barbara Varner                    75

1    Q    And as early as 1985, since that's when you went
2         full-time, you were aware that sexual harassment or
3         discrimination was prohibited in that workplace?
4    A.   I can't remember reading about it, but I would assume.
5    Q    Do you recall reading the employee handbook at the
6         Capital Area Intermediate Unit at any time?
7    A.   As needed, sure.
8    Q    Did you have occasion to file any claims or complaints
9         against any of the personnel of the Capital Area
10        Intermediate Unit?
11   A.   Claims?
12   Q    Complaints about any of your co-workers or supervisors.
13   A.   No.
14   Q    Did you follow any grievance procedures while employed
15        at the Capital Area Intermediate Unit about anything?
16   A.   No.
17   Q    What did you do as a teaching assistant?
18   A.   I was in the classroom for the first three years, I was
19        in a visually impaired classroom.  So I taught Braille.
20        We did a lot of orientation and mobility skills.  They
21        were multiple handicapped, they were mentally retarded.
22        Some were physically handicapped.  The overriding
23        problem was their vision, though, so we focused on the
24        visual problems.  It was aiding the teacher, helping
25        assist the teacher.

Barbara Varner                          76

```
 1   Q    What was your reason for leaving the Capital Area

 2        Intermediate Unit?

 3   A.   I took a Civil Service exam and applied for a caseworker

 4        position.  And then I was interviewed by Children and

 5        Youth and decided to go there.  It was more money.  It

 6        was also in line with my degree aspirations.

 7   Q    How did you learn that the job was available?

 8   A.   Civil Service.  I scored high on the Civil Service test,

 9        was put on a caseworker list, and Children and Youth was

10        I guess the one that came up and they notified me about

11        an interview.

12   Q    Do you remember who you spoke to initially at the

13        county?

14   A.   My interview was with Darlene Orr.

15   Q    And obviously you were hired for Children and Youth,

16        right?

17   A.   Yes, that's correct.

18   Q    And initially hired as a caseworker trainee?

19   A.   Right.

20   Q    At a rate of pay of about $15,000 a year?

21   A.   That's correct.

22   Q    When did you first meet Mr. Graham?

23   A.   Probably the beginning of 1990 somewhere, the first

24        couple months of 1990.

25   Q    How did you meet him?
```

1    A.    One of my fellow case workers was taking me around the

2          different departments, introducing me to different

3          staff.

4    Q    Did you two have occasion to work together?

5    A.    Yes.

6    Q    Tell me when and on what.

7    A.    We shared several cases.  I would have the children as

8          dependent children, mostly neglect children, and

9          Mr. Graham was supervising the father in these homes.

10   Q    What was your opinion of Mr. Graham in 1991, 1992?

11   A.    If I would ask for his assistance with the one gentleman

12         who had a very violent temper, he would call him in and

13         talk to him.  The gentleman would not let me in to see

14         his children a lot of times, and I had to see the

15         children.  So he would call him in.  Or he would go down

16         to see the gentleman, which is a block down the street,

17         and try to get him in line, and let him know that I had

18         to see the children.  So it was more of an assistant to

19         me as a probation officer and me as a caseworker.

20   Q    What was your opinion of him personally?

21   A.    Personally, I don't think I had a real opinion of him.

22         It's just that he was helpful when I needed the help

23         with certain clients.

24   Q    During the first three years you were at the county, how

25         often did you deal with Mr. Graham on cases?

Barbara Varner                          78

1    A.    We had shared two sexual offender cases; he had the

2          offender and I had the children.  And the other one was

3          a severe neglect case.

4    Q     So how often?

5    A.    As needed if there was a problem.

6    Q     Can you give me an estimate of how many times a year you

7          were dealing with Mr. Graham asking for assistance?

8              MS. WALLET:  I'll object to the form of that

9          question.  That's sort of a two-part question.  You want

10         to break that down?

11             MR. THOMAS:  Sure.

12   BY MR. THOMAS:

13   Q     What I'm trying to learn, Barbara, is the amount of

14         contact that you had with Mr. Graham, and we can do it

15         any way you choose.  What I'm looking for is how often

16         during a given year, let's take 1991, how many times in

17         1991 did you have occasion to deal with Mr. Graham,

18         either asking assistance or working on a case with him?

19   A.    That would be the period where I had the high-risk

20         child, well, three children.  I would --

21   Q     The sex offender cases?

22   A.    No.  This would be the neglect, severe neglect case.

23         And I would say probably contact, maybe once a month.

24         It could be phone conversation, asking for his

25         assistance.  To actually physically get involved, that

Barbara Varner                                79

```
 1          might have been two or three times in a year.
 2               I would see him in the break room, we would discuss
 3          the case, how are things going, that kind of thing.
 4     Q    How about 1992, how much contact did you have with
 5          Mr. Graham during 1992?
 6     A    I would say probably approximately the same, because I
 7          know we had two or three cases where, again, the men,
 8          the father was volatile, and I was to supervise the
 9          children.
10     Q    And so once a month you would have phone contact with
11          him, and maybe two or three times during the year you
12          would actually have to have him physically intervene and
13          you would see him on those occasions?
14     A    When he actually intervened?
15     Q    Yes.
16     A    There was a time when the gentleman would not even let
17          me in the house to see the children.  I called him and I
18          asked for his assistance to meet me down there.  It was
19          a high-neglect family, real concerned about the youngest
20          one not being able to thrive.  So I had to see his
21          children.  So I did ask for his assistance to meet me
22          there and do what he had to do with the father.
23     Q    How about 1993?
24     A    '93?  Again, cases that we shared, sexual offender kept
25          coming back into the home.  He was under Mr. Graham's
```

Barbara Varner                          80


```
 1           jurisdiction.  Asked him for assistance to go, either
 2           meet me at the house, because of the fear of what he
 3           would, the father would do to me.
 4      Q    Was the amount of contact that you had with Mr. Graham
 5           about the same?  Telephone once a month?
 6      A.   Probably, yes.  I would guess.
 7      Q    And maybe a couple, two to three face-to-face occasions?
 8      A.   Yes.
 9      Q    How about 1994?
10      A.   If there was a case we shared, it would be the similar.
11           It would be similar to that.
12      Q    So again, once a month?
13      A.   Um-hum.
14      Q    And two or three face-to-face visits?
15      A.   Right.  That's a guesstimate.
16      Q    Understood.  And of course, in February of '95 you
17           transferred to Probation and then you worked closely
18           with him after that?
19      A.   That's correct.
20      Q    During this period of that we're talking about, and I
21           want to restrict my questions at the moment between 1990
22           and 1994, did you have any other contact or dealings
23           with Mr. Graham other than what we've described?
24      A.   Not that were not work related.  Like I said, in the
25           break room, there was times I would see him in there.
```

Barbara Varner                              81

1           General conversation.

2      Q    When you say you saw him in the break room on occasion,

3           can you quantify for me how often in the period 1990

4           through 1994 you saw him in the break room?

5      A.   Perhaps maybe once or a couple times a week.  All of our

6           lunches and everything were kept in there.

7      Q    And is that when you saw him, over lunch?

8      A.   No.  I'm just saying that's where we stored our lunch.

9           It would be just going over.

10     Q    When did you see him in the break room?

11     A.   There's no really set time.  It was just occasionally.

12          A lot of people would eat lunch in the break room as

13          well.

14     Q    Did you ever eat lunch in the break room?

15     A.   Once in a while, yes.

16     Q    Did you ever eat with Mr. Graham in the lunch room?

17     A.   No.

18              MS. WALLET:  I assume that question is seated at

19          the same table?

20              MR. THOMAS:  In the room.

21              THE WITNESS:  Oh.  That's possible.  I don't

22          remember.

23     BY MR. THOMAS:

24     Q    If I understand your testimony correctly, it is that

25          and, again, I get the impression that this was a pretty

Barbara Varner                                    82

1           infrequent occurrence?

2    A.     Um-hum.

3    Q      That you did not -- you have to say yes for the record.

4    A.     Yes.

5    Q      You didn't see him on a regular basis in the break room

6           during the work week?

7    A.     No.

8    Q      And you didn't see him outside the workplace except on

9           very, very rare occasions; is that fair?

10   A.     That's fair.  That's true.

11   Q      And the occasions which you saw him in the break room

12          were just coincidence?  Just happened to both be there

13          at the same time?

14   A.     Yes.

15   Q      The best you're able to tell me is you would estimate

16          that during the period 1990 through 1994 at a couple of

17          times a week?  Is that accurate?

18   A.     That's accurate.

19   Q      Did you ever call Mr. Graham and ask him to meet you in

20          the break room?

21   A.     No.

22   Q      Did you ever call him and ask to meet anywhere?

23   A.     Down at the one client's house, yes, I did.

24   Q      And on how many occasions was that?  Once?

25   A.     Maybe twice.

Barbara Varner                          83

1    Q    So other than those two occasions when you called and

2         asked him to meet down at the client's house, you did

3         not call Mr. Graham and ask him to meet you anywhere?

4    A.   No.

5    Q    And the occasions on which you and he ended up in the

6         break room were merely coincidence and happened maybe a

7         couple of times a week?

8    A.   That's correct.

9    Q    How would you describe your relationship with Mr. Graham

10        in the period 1990 through 1994?

11   A.   Working relationship.

12   Q    Friendly?

13   A.   Cordial.

14   Q    How well did you feel that you knew Mr. Graham during

15        that period?

16   A.   As well as I would know any other co-worker.

17   Q    And no better?

18   A.   No.  No.

19   Q    Meaning you didn't feel you knew him any better than any

20        of your other co-workers?

21   A.   No.

22   Q    You won't describe your relationship as a close one

23        during that period?  Meaning 1990 through 1994.

24   A.   No.

25   Q    And I guess would you describe it as sort of a

1          professional co-worker type arrangement?

2    A.    That's correct.

3    Q     Were you aware of any rumors with respect to you having

4          an intimate relationship or an affair with Mr. Graham

5          during that period?

6    A.    No.

7    Q     You don't recall anybody asking you whether or not you

8          were having an affair with Mr. Graham?

9    A.    No.

10   Q     There was no discussion with you by anybody suggesting

11         that you were too close to him?

12   A.    No.

13   Q     How did it happen that you transferred to the Probation

14         Department in February of 1995?

15   A.    I had applied for a position the year before, when I was

16         still doing my undergrad work, with the Chief Bolze.  At

17         that time he told me I needed to have an undergrad

18         degree.

19              And then a friend of mine, Lynn Dickerson, was

20         doing her internship in Juvenile Probation, working on a

21         grant that was called Family Preservation.  She had

22         spoken to me about how I had worked with a local mental

23         health program, establishing their Family Preservation

24         program.  In Children and Youth I was an in-home

25         protective service worker, which meant most of my

1           emphasis was on family involvement and keeping the

2           children in the home.  So Lynn and I spoke about this,

3           that she was working on this grant and that she was the

4           same age, she was a criminal justice major with me at

5           school.  And --

6    Q      I thought you were a social science major?

7    A.     That was my associate degree.  My undergrad was in

8           criminal justice.

9    Q      Okay.

10   A.     And she had spoke to me about this position, how it

11          would be a nice blend of my criminal justice degree plus

12          my Family Preservation experience, and recommended that

13          I should apply for the position.

14   Q      When was that conversation?

15   A.     I think her internship was the summer of '94.

16   Q      Were there any other factors that influenced your

17          decision to apply for a transfer to the Probation

18          Department?

19   A.     I had met with Mr. Osenkarski and we had discussed the

20          position.  He was aware that my degree was in criminal

21          justice and he knew what my background was with Children

22          and Youth as protective services.

23              I also liked the idea that it was not a

24          micromanaged department, that you were more independent

25          and that Mr. Osenkarski trusted you to be able to manage

Barbara Varner                              86

```
 1            your own time and do your own thing, which was different
 2            than it was with Children and Youth.
 3                 But mostly is my field was criminal justice and I
 4            really wanted to be able to get into it, and this was a
 5            good opportunity.
 6    Q      Did your relationship with Mr. Graham play any role in
 7            your decision to ask for a transfer to the Probation
 8            Department?
 9    A.     I would say no.  In fact, Mr. Graham left me know not to
10            let Mr. Bolze know that I was interested because they
11            did not have a good relationship.  So that was
12            downplayed, the fact I even knew Mr. Graham that well.
13    Q      So you downplayed your --
14    A.     I didn't mention, you know, I was not coming in saying
15            I'm here because Mr. Graham recommended me.  It was none
16            of that.
17    Q      And you say you downplayed your relationship with
18            Mr. Graham.  Downplayed it to whom?
19    A.     Not downplayed it.  I -- not to mention to Mr. Bolze
20            that Mr. Graham was -- or Mr. Osenkarski wanted me to
21            come over into that position.
22    Q      Did Mr. Graham, in fact, want you to come over to the
23            Probation Department?
24    A.     He had spoken to me and Lynn Dickerson about the
25            position, that they needed two probably two females,
```

Barbara Varner                          87

```
 1           probably in the case worker or social work field and,

 2           you know, criminal justice, that they thought it was a

 3           more of a woman type position because it was social

 4           work, and whether I was interested or not.

 5    Q      And when did that conversation occur, Barb?

 6    A.     That would probably be while Lynn was there doing her

 7           internship.

 8    Q      1994?  During the summer of 1994 --

 9    A.     Right.

10    Q       -- Mr. Graham and Mr. Osenkarski both advised you that

11           these positions were going to come --

12    A.     Yes.

13    Q      -- in the Probation Department, correct?

14    A.     Yes, that's correct.

15    Q      And that they thought it would be an appropriate

16           position for a female?

17    A.     Yes.

18    Q      Did they tell you why they thought it would be an

19           appropriate position for a female?

20    A.     I think because it was social-worky aspect, it's more

21           social work because you're dealing with families, a lot

22           of intensive -- part of the Family Preservation was

23           teaching parents parenting programs, that kind of thing,

24           intensively in the home.

25    Q      And there were female probation officers at that time?
```

Barbara Varner                          88

1   A.   There was, I believe there was three at that time.

2   Q    And in searching for this job they were actively out

3        soliciting you as an interested female in that position,

4        correct?

5   A.   I think it was more I approached them.  I talked to

6        Mr. Osenkarski about it.  Mr. Graham -- I knew they were

7        writing the grant.  He had brought Lynn Dickerson down

8        to meet me.  And like I said, I already knew Lynn from

9        going to class with her at HACC.

10  Q    And this conversation that you've described occurred

11       with each of them?  Or the two of them at the same time?

12  A.   Possibly both.  Probably with both of them at one time

13       and on separate occasions.  He would come down and ask

14       me when I was with Children and Youth, which is right

15       down the hall, he would come down and ask for some

16       paperwork of what we used, like maybe the family service

17       plan that we used with Children and Youth, those kind of

18       things, tools, that could be translated into the Family

19       Preservation program.

20  Q    When you say he came down the hall, can you identify he

21       for me?

22  A.   Mr. Graham.

23  Q    How often did he come down the hall to see you and make

24       requests of any type?

25  A.   I would say that was only maybe two times.  It was

Barbara Varner                        89

1        mostly for paperwork.

2            And I know Lynn came down as well, trying to get

3        paperwork from me regarding the Family Preservation

4        program that I had been involved in.

5    Q   So as a result of those conversations, you made formal

6        application for the job?

7    A.  Yes.

8    Q   Did you complete a formal written application?

9    A.  No.

10   Q   Who did you advise that you were interested in the job?

11   A.  Ken Bolze.  Chief Ken Bolze.

12   Q   Tell me how you got hired.

13   A.  I was interviewed by Chief Bolze, John Roller, who was

14       an adult supervisor, and Mr. Osenkarski.  And I believe

15       that, by the three gentlemen.

16   Q   I gather from the testimony you've given already that

17       Children and Youth and Probation had occasion to work

18       together?

19   A.  Absolutely.

20   Q   And where were they physically located within the

21       courthouse?  Were they close together?

22   A.  Yes.  We were all on the third floor.  The only thing

23       that separated us was a door.  We were in what's called

24       the east wing and they were on the main courthouse.  So

25       it was a matter of just around the corner and down the

Barbara Varner                               90

```
 1          hall.

 2    Q     So there was a fair amount of interaction and close

 3          proximity in terms of physical location, between the two

 4          departments?

 5    A.    Yes.

 6    Q     Is that fair?

 7    A.    It was a common lunch room as well.

 8    Q     What was your understanding of the reputation of

 9          Mr. Graham when you were interviewed for this position

10          in late 1994 or early 1995?

11    A.    Reputation?  I had heard he was a hot head, that he

12          really would get angry quickly.  And I was, knew that

13          Mr. Osenkarski and Mr. Graham, either you were in good

14          favor with them or you were basically being punished.

15          And at that point I appeared to be in good favor.

16    Q     Why do you say that?

17    A.    Because I did -- it seems like they wanted me to come to

18          that position.  They were very positive about that.

19    Q     And you wanted to go to the position, also?

20    A.    Yes, I did.

21    Q     And as I understand it, it was because it was within

22          your area of study, which was criminal justice?

23    A.    That's correct.

24    Q     And also, there was a $9,000 pay raise or something like

25          that involved, right?
```

Barbara Varner                          91

```
 1    A.    Yes.

 2    Q     Were there any other reasons why you wanted to transfer

 3          to the probation?

 4    A.    As I said, I think it was a whole attitude,

 5          Mr. Osenkarski, that it was not a micromanaged.  In

 6          Children and Youth there was so much meetings, meetings

 7          after meetings.  It was not so much time out actual in

 8          it field as much time as you should be out in the field,

 9          where with Probation Mr. Osenkarski left me know that he

10          doesn't micromanage, he depends on his workers to do

11          their job.  And to me, that was very interesting because

12          Children and Youth when you first start out you were

13          training, so.

14    Q     Did you have any impression from those interviews who

15          you would actually be working with when you were

16          transferred to Probation?  If you were accepted for the

17          job.

18    A.    Mr. Bolze, of course, was chief.  And Mr. Osenkarski

19          was, headed up the juvenile division of the Department

20          at those interviews, the only three people there.

21    Q     Was there any discussion about who you would be working

22          for or working with?

23    A.    I knew the position would be under Juvenile Probation.

24          It was the grant under the juvenile system.

25    Q     And did you know where Mr. Graham was concentrating at
```

Barbara Varner                                    92

1           that time?

2    A.     Yes.  He was in Juvenile Probation.

3    Q.     Did you have an understanding that if hired, it was

4           likely that he would be the person responsible for

5           training you?

6    A.     Yes.

7    Q.     Did you have any reservations about that?

8    A.     No, because I knew Mr. Osenkarski was still his boss.

9           And Chief Bolze, I had a lot of respect for him and I

10          knew he was still overseeing the whole group.

11   Q.     Based on the reputation that Mr. Graham was a hot head

12          and you were either in favor or out of favor, did that

13          cause you any hesitancy or concerns in terms of

14          accepting the job?

15   A.     Maybe a little hesitancy, but like I said, I knew Chief

16          Bolze basically kept them in line.

17   Q.     When was the job formally offered to you and by whom?

18   A.     It was offered to me by Chief Bolze, and exactly when, I

19          don't know.  Sometime in January.

20   Q.     And you then told Children and Youth you would be

21          leaving and moving over to Probation, correct?

22   A.     That's correct.

23   Q.     Who did you understand was ultimately in charge of the

24          Probation Department?

25   A.     Chief Bolze.  Well, Judge Sheely.  Judge Sheely at that

Barbara Varner                                    93

1          time.

2     Q    And why Judge Sheely?

3     A.   Because we were officers of the court and he was the

4          president judge.

5     Q    And it was your understanding that Judge Sheely then had

6          ultimate authority over the probation officers in that

7          department?

8     A.   Yes.

9     Q    And Ken Bolze was the chief of the department and he

10         reported to Judge Sheely?

11    A.   For, yes, hiring, firing, those kind of things.

12    Q    So you took the job, you started there on February 6,

13         1995, correct?

14    A.   I believe it was February 7th, 1995.

15    Q    And your salary there would have been $24,868 when you

16         started; does that sound right?

17    A.   That sounds correct.

18    Q    Describe for me, if you would, what the hierarchy was in

19         terms of management when you got there on February 7th,

20         1995.

21    A.   Chief Bolze was the chief.  Mr. Osenkarski was a

22         supervisor and mostly in juvenile work.  I believe he

23         did split, too, adult and juvenile.  And John Roller was

24         more adult than juvenile.

25    Q    Where did Mr. Graham fall in the pecking order?

1    A.    Mr. Graham would have been emphasis on juvenile under

2          both John Roller and Chief Bolze, but predominantly

3          working for Mr. Osenkarski.

4    Q    Where were you assigned when you first started in

5          February?

6    A.    I was assigned to the Family Preservation unit.

7    Q    And who did you report to?

8    A.    Mr. Graham was my trainer.  He's the one that was

9          supposed to be training me how to be a probation

10         officer.  Mr. Osenkarski was the supervisor.  And

11         ultimately it would be Ken Bolze.

12   Q    So the chain of command from you was to Graham,

13         Osenkarski, and Bolze?

14   A.    That's correct.

15   Q    Did you have any problems with Mr. Graham when you first

16         started to work there in February of 1995?

17   A.    No.

18   Q    Did you work with him on a daily basis?

19   A.    Pretty fairly, yes.  Pretty much.

20   Q    Did you share an office?

21   A.    Yes.  Not with -- with who?

22   Q    And with whom did you share it?

23   A.    I did share an office.  I was with Buck McKenrick and

24         Mike Piper.

25   Q    What did your training consist of?

Barbara Varner                              95

1   A.   Writing petitions, the paperwork, the court work.  Doing
2        a case from the beginning to end, from intake to
3        deposition -- disposition, I'm sorry, to disposition.
4        Supervising the juveniles, wherever they are.
5        Placement.  Paperwork.  Basically all the paperwork
6        that's needed to do the job.  Time sheets.  Mileage
7        sheets.
8   Q    How would you describe your relationship with Mr. Graham
9        as your trainer?
10  A.   I would describe him as a poor trainer.
11  Q    In what way?
12  A.   Just getting by with a minimal, just basically whatever
13       you can get away with.
14  Q    Give me some examples.
15  A.   Supervision, if he would take me out to show me how to
16       supervise, he would pretend to throw a card at
17       somebody's house and say there's a contact, rather than
18       actually doing the face-to-face with the kids.  Just
19       basically poor leadership.
20  Q    And you say poor leadership, what do you mean by that?
21  A.   If you're supposed to learn by example, that was a poor
22       example.  That you needed to, in my job as a caseworker
23       at any time I have worked it's important that you see
24       your clients, you do the face-to-face, you take time to
25       know the families.  That didn't seem to be relevant to

Barbara Varner                                96

1       him.  His interest seemed to be in making it, his job

2       convenient for him.

3           That would -- if he's on the way to somewhere he

4       might make a stop someplace on his of personal interest.

5       Like I said, he would pretend to throw cards at the

6       houses and say that would be a contact.  That's poor

7       leadership.

8    Q  Any other examples of what you would describe as poor

9       leadership or poor training?

10   A.  Inconsistent in how he wanted paperwork done, petitions,

11      court paperwork.

12   Q  Did you have occasion to discuss what you've described

13      as poor leadership or poor training with either of the

14      other direct reports above you?  And by that I mean with

15      either Mr. Osenkarski or Mr. Bolze.

16   A.  During that time I also was aware that either you're in

17      favor or you're punished, and I really did not want to

18      fall into the punishment mode.  So to question things at

19      that point, just sort of left them ride.  And that I

20      learned from other people in our department it was easy

21      to go from one officer to another for training to get

22      information.  And I found a lot of other resources.  I

23      could learn to do petitions and, you know, social

24      histories from them.

25   Q  So I guess the answer is you never complained about

1          Mr. Graham's leadership or training to anybody?

2   A.     At the very beginning, no.  In '95, no.

3   Q      When did you first complain about any problems with

4          Mr. Graham's leadership or training?

5   A.     Whenever I went to Mr. Osenkarski, there was a day that

6          I had taken cases in to Mr. Graham in '96 -- '96, '97.

7          I had taken cases in to him.  And I had done everything

8          that was supposed to be done, gotten everything

9          together.  And he started screaming at me and said who

10         the F, meaning, do I think I am, making decisions on

11         these cases.

12             When I worked, turned cases in to Mr. Osenkarski, I

13         never had a problem with going ahead and making a

14         decision on what I would recommend for disposition on

15         the juvenile.  Suddenly, I had done everything wrong,

16         according to him.  He screamed at me, threw me out of

17         his office.  And I went to Mr. Osenkarski and I said,

18         you have to get the guy under control.  And he said,

19         he's in charge, I put my so many years in with the

20         county and he's in charge.

21  Q      When was this?

22  A.     It was in '97.

23  Q      So from February 1995 when you started until sometime in

24         1997, you never complained about Mr. Graham's leadership

25         or training?

Barbara Varner                    98

1  A.  Not to him.  To other people.  Other people agreed with

2      me, other staff members, co-workers.

3  Q.  But you never went up the chain of command to

4      Mr. Osenkarski prior to 1997?

5  A.  Like I said, I sought out other help as far as

6      petitions.  He was not -- he was not screaming at me or

7      those kind of things, which happened later on.  But I

8      was aware that he was inconsistent.

9  Q.  We'll come back to that in a minute.  But what do you

10     attribute the change of behavior to?

11 A.  Whenever Chief Bolze retired and we split adult and

12     juvenile and there was not that person who could

13     basically keep the lid on Mr. Graham, which would have

14     been Chief Bolze.  It was now only Mr. Osenkarski.

15 Q.  Up until the time of Bolze's retirement, you and

16     Mr. Graham had a good relationship?

17 A.  Working relationship.

18 Q.  And would you describe it as no better than a working

19     relationship?

20 A.  I would say no better than that, no.

21 Q.  When did Bolze retire?

22 A.  August of '96.

23 Q.  So from February 1995 until August of 1996 you had no

24     particular problem with Mr. Graham?

25 A.  Not with any nasty or yelling at me, no.

Barbara Varner                              99

1   Q     No screaming?

2   A.    No, not at that point.

3   Q     No sexual harassment?

4   A.    Yes, there was incidents of that, but not of the

5         violence or fear that I had experienced later on.

6   Q     We'll talk about the sexual harassment in a minute.  But

7         the episode of deterioration in the relationship, at

8         least the screaming or fear as you've described it,

9         didn't materialize until after August of 1996?

10  A.    Until after Chief Bolze had retired.

11  Q     At that point you had been working with him for a year

12        and a half, or approximately that long, correct?

13  A.    That's correct.

14  Q     And had had no episodes of him losing his temper with

15        you or screaming at you?

16  A.    Not at me.  With other people, but not at me.

17  Q     Had he been complimentary of your work for that year and

18        a half?

19  A.    Chief Osenkarski at times was, but Graham, no.

20  Q     Who was responsible for doing reviews on you?

21  A.    Mr. Osenkarski and Mr. Graham signed as well.

22  Q     Did you receive unfavorable reviews during the 18 months

23        from February '95 until August of '96?

24  A.    Initially Ken Bolze, when he was there he was also

25        involved in evaluations, and they were fine.  I had no

1           problems with my evaluations.

2    Q     At any time?

3    A.    No.

4    Q     Was there any particular event or happening that

5          occurred as best you understand it in August of '96 that

6          caused Mr. Graham to suddenly start screaming at you?

7    A.    I think he had free reign.  Mr. Osenkarski took a back

8          seat and turned everything over to Mr. Graham.

9    Q     But there was no specific event?  Other than the

10         retirement of Chief Bolze.

11   A.    It was a slow progression.  Slow progression that you

12         could see the power and the authority he was just

13         gaining, gaining the power, and you could feel that.  He

14         was angry most of the time.

15   Q     What was he angry about?

16   A.    It could be basically anything that I did.

17   Q     And when did that start?

18   A.    That would be after Chief Bolze retired.

19   Q     After August of '96?

20   A.    Yes.  Things that I had done right one time, that were

21         acceptable, now were wrong.

22   Q     Give me some examples of those things.

23   A.    Could be the way you do petitions.  He just -- suddenly

24         the wording wasn't right.  No matter what I did, it was

25         wrong.  He didn't want me --