Barbara Varner                          101

```
 1   Q    Referring to the petition now?
 2   A.   Petitions, court petitions, yes.  Making decisions on
 3        cases he didn't agree with.  And prior to that, that had
 4        been normal procedure.  It was just a constant thing, no
 5        matter what it was, I was in the wrong.
 6   Q    I need you to be specific for me now in terms of what
 7        they were.  You've described the petitions, he didn't
 8        like your wording.  He was critical of some of the
 9        decisions or recommendations you made with respect to
10        particular juveniles.
11   A.   Right.
12   Q    What else was he unhappy about?
13   A.   He was unhappy that I would take trips with Ms. Green
14        and we would leave after eight o'clock in the morning.
15        And he screamed and he screamed and F word at me, that
16        all placement trips, placement meaning placing juveniles
17        start at eight o'clock in the morning.
18             He told me that Debra Green and I had lied about a
19        trip we had been on.  It was a trip where we traveled up
20        north, we ran into an icy area, had to detour, were an
21        hour longer than he thought we should have been.
22        Screamed and yelled, took an hour overtime from both of
23        us.  He said he would check the odometer.  He said we
24        were lying to him, where we were.  There was not too
25        many places to go.
```

Barbara Varner                          102

1              He came in, he would take a piece of paper out of a

2         file -- I had done an extensive list of victims of a

3         crime spree that juveniles had committed --

4    Q    Sorry to interrupt you, but before we leave the trip,

5         this criticism of you and Ms. Green and the trip up

6         northeast, did that occur on more than just that one

7         occasion?

8    A.   Not yelling about the trip, no.  But informing us that

9         we should have known the -- screaming that all

10        commitment trips start at eight o'clock in the morning,

11        which was not a pattern anybody else had to follow.  We

12        would observe males coming and going at will anytime

13        they chose to go.

14   Q    Well, what about the other female probation officers,

15        when did they come and go?

16   A.   There was only one other juvenile probation officer and

17        that was Debra Green on the juvenile side.

18   Q    And this conversation or this episode that you're

19        talking about was on the one occasion when you two took

20        that trip to the northeast?

21   A.   Yes, it is.

22   Q    And he informed you that you were to come and go at

23        eight o'clock on placement trips, period?

24   A.   Yes.

25   Q    And screamed at you?

Barbara Varner                          103

1   A.   And screamed at me, yes.

2   Q    And used a loud tone of voice?

3   A.   He screamed at me on the phone and in the office at both

4        Debra and myself, screamed and used the F word at us,

5        and just constant.  And probably used every swear word

6        you could find.

7   Q    How long did he do this?  You said he did it on the

8        phone, he did it when he saw you in person in the

9        office?

10  A.   Yes.  On the cell phone, yes.

11  Q    And those two episodes, was that the extent of the

12       reprimand for that eight o'clock departure?

13  A.   He took an hour of overtime from us.  He said we had

14       lied about where we were.

15  Q    And other than that, did he continue any other conduct

16       toward you after that with respect to placement trips?

17  A.   With respect to that particular trip?  I heard about it

18       over and over again, reminding me that, you know, we had

19       done that.

20  Q    And I interrupted you, I'm sorry.

21  A.   That's okay.

22  Q    Other episodes?

23  A.   There was an occasion --

24  Q    You were talking about a paper that you prepared?

25  A.   Right.  I had an extensive list of victims of a robbery,

Barbara Varner                              104

```
 1              and it was an extensive list, how I had made all the
 2              contacts, extensive calling contacting.  For some reason
 3              it was -- he was not happy with that.  He brought the
 4              file into -- well, I guess the file was on my desk.  He
 5              came in and he picked up the paper that had the victims'
 6              names on.  Debra Green was in my office with me.  He
 7              threw the paper at me, hit me with a wadded paper, just
 8              saying this is no F-ing good, is not acceptable.  Tried
 9              to ask him what was wrong with it.  He just wouldn't
10              hear it.  He started moving pictures across my desk,
11              putting his finger in my face in a very, very
12              threatening manner, and just screaming.
13    Q         When was this?
14    A.        That would be early '97.
15    Q         Do you know the month?
16    A.        I can't recall at this time.
17    Q         And what was his objection to the piece of paper which
18              you had prepared with the victims' names on it?
19    A.        I have no idea.  He was just screaming it was not right.
20              I don't know how else I could have done it any
21              differently.  Names, address, how I contacted them,
22              whether I made contact or not.  It was extensive.
23    Q         Did you report that behavior to anybody at that time in
24              early '97?
25    A.        No.  The whole office heard that.  No.  Mr. Osenkarski
```

Barbara Varner                                105

1           was not in the office too often.

2       Q   When you say that you felt threatened by his conduct

3           that day, threatened in what way?

4       A.  He moved closely to me, within a foot of me.  His finger

5           was in my face.  He was saying you don't know what the F

6           you're doing.  And using the word, the F word at me.

7           Just very scary.

8       Q   Have you ever used the F word?

9       A.  Me?

10      Q   Yes.

11      A.  Only in describing perhaps what a kid has said to me.

12      Q   That's not something you use in your language?

13      A.  No, I don't.

14      Q   Certainly in working in the Probation Department that

15          word doesn't come as a shock to you, though, does it?

16      A.  No, it doesn't shock me.  It's offended once at me.  I

17          can hear it, but not at me, directed at me.

18      Q   Can I assume that in some of the episodes you had with

19          your first husband that he may have used inappropriate

20          language in his arguments with you?

21      A.  I can't recall him ever using the F word at me.

22      Q   Did he use other adjectives or adverbs that you found

23          troubling at the time?

24      A.  I'm sure he did.

25      Q   Is there any other, and we'll go through your Complaint

Barbara Varner                                    106

1           here in a minute, but are there any other specific
2           incidents in terms of difficulties with training or
3           leadership that you want to bring to my attention at
4           this time?
5      A.   There may be others but I can't, at this time I can't
6           think of any, but I'm sure there's others.
7      Q.   So in general, I gather, that you had at least a decent
8           working relationship with Mr. Graham up until
9           Mr. Bolze's retirement, correct?
10     A.   Yes.
11     Q.   But you would again describe it as no more than a
12          working relationship?
13     A.   That's correct.
14     Q.   There was no chemistry between the two of you?
15     A.   No.
16     Q.   You wouldn't describe it as a flirtatious relationship?
17     A.   On Mr. Graham's part, yes.
18     Q.   How about on your part?
19     A.   No.
20     Q.   You never had any interest in him?
21     A.   No.
22     Q.   Didn't consider him to be a close personal friend?
23     A.   No.
24     Q.   It was strictly a business relationship?
25     A.   Comfortable business, yes.  I was comfortable with him,

Barbara Varner                          107

1          but not on a friendly basis.

2     Q    Prior to your move to the Probation Department were you

3          aware that Kerry Houser had filed a sexual harassment

4          claim?

5     A.   Yes, I had heard about it.

6     Q    What had you heard?

7     A.   I had heard that she had filed a sexual harassment case

8          in the Probation Department.

9     Q    What did you know about it?  Or what were you told?

10         More appropriately.

11    A.   Just that there was problems after she had filed it.

12    Q    That claim was filed against Mr. Osenkarski?

13    A.   I believe so.

14    Q    And you knew that before you joined the Department?

15    A.   It was a rumor I had heard.

16    Q    Did you ever talk to Kerry Houser about it before you

17         accepted the job in the Probation Department?

18    A.   No, I didn't.

19    Q    Did you talk to her about it after you were --

20    A.   Yes.

21    Q    Did that give you any reason for concern?

22    A.   Yes, it did, but I was in favor at that time rather than

23         on the punishment side.

24    Q    How would you describe the culture of the Probation

25         Department when you got there in February of 1995?

Barbara Varner                    108

1   A.   Everybody really got along very well with each other,

2        the adult and juvenile, because there was so much

3        blending.  I liked the people.  I always have liked the

4        people that worked in Probation.  Very accommodating.

5   Q    It's pretty tough subject matter, isn't it?  I mean,

6        you're dealing with people who are on probation who are

7        in trouble with the criminal justice system?

8   A.   Certainly.

9   Q    It's certainly not a highly professional office like a

10       law office or something like that in terms of subject

11       matter; is that fair?

12  A.   I think they're very professional.

13  Q    Professional in the way they do their work?

14  A.   Absolutely.

15  Q    But the subject matter tends to be pretty tough stuff,

16       doesn't it, some of it?

17  A.   Certainly.  Certainly.

18  Q    As you've described earlier, you were dealing with

19       children who were either malnourished, correct?

20  A.   That's correct.

21  Q    Or who were involved in some sort of sexual

22       molestation --

23  A.   Correct.

24  Q    -- in some manner?

25  A.   Right.

Barbara Varner                              109

1   Q    So the subject matter is pretty tough?

2   A.   Certainly.

3   Q    What were your long-term goals when you took the job

4        with Probation in February of 1995?

5   A.   Long-term goals?  I was happy with the position, because

6        I had earned my undergrad, it was in criminal justice, I

7        liked working with the juveniles.  At that time it was

8        just to work there, be a good employee.

9   Q    So you had no long-range aspirations?

10  A.   Not at that point, no.

11  Q    Did you develop those later?

12  A.   Yes, I did.

13  Q    Tell me when.

14  A.   I applied for the master's program through the Juvenile

15       Court Judges Commission.  I completed the master's

16       program.  It was in 1988.

17  Q    Let me interrupt you for a minute, because that's one

18       thing we haven't done is finished your education.

19  A.   Okay.

20  Q    You told me that you went to cosmetology school, right?

21  A.   That's correct.

22  Q    And that was directly after Mechanicsburg High?

23  A.   Correct.

24  Q    At some time later I know that you went back to HACC?

25  A.   Yes.  That was in '86 I went back the HACC.  I went to

Barbara Varner                                    110


1          HACC the first time.

2     Q    And that was part-time?

3     A.   Yes.

4     Q    And your major there was social?

5     A.   Social, well, social sciences they called it.

6     Q    Did you obtain a degree from HACC?

7     A.   Yes, an associate degree.

8     Q    And when was that?

9     A.   1990.

10    Q    When was your next education after that?

11    A.   I went directly from there to Penn State Middletown.  My

12         major was criminal justice.

13    Q    You started there in 1990?

14    A.   Yes.  Was criminology, I'm sorry.  Criminology.

15    Q    Did you graduate from Penn State Middletown?

16    A.   Yes, 1994.

17    Q    You went there part-time?

18    A.   Yes.

19    Q    How was the tuition paid there?  Who paid the tuition?

20    A.   Tuition was paid, the county paid a small portion.  I

21         believe at that time they allowed, I'm just estimating,

22         I think it's $800 a year.  And the rest was paid by

23         myself.  And it had to qualify as a necessary course

24         with my.

25    Q    Job?

Barbara Varner                                111

1   A.   With my job, yes.

2   Q.   Did that qualify?

3   A.   Some did.  Some didn't.

4   Q.   Education after that?

5   A.   JCJC program, I earned my master's degree in

6        administration of justice.

7   Q.   What's JC?

8   A.   Juvenile Court Judges Commission.

9   Q.   Okay.  When did you earn your master's degree?

10  A.   That was in '98.

11  Q.   Did you receive tuition reimbursement for that study?

12  A.   No.

13  Q.   Was it paid for by the Commission?

14  A.   Court Administrators, yes.

15  Q.   So you had no out-of-pocket tuition for that --

16  A.   Just books.

17  Q.   -- further education?

18  A.   Yes.  I enrolled at Penn State Middletown in 2000 in a

19       Ph.D. program in adult education.  I took two classes.

20  Q.   Where do you stand with respect to your master's degree,

21       or I'm sorry, with respect to your Ph.D.?

22  A.   I stopped going to Penn State in spring of 2001.  It

23       just wasn't a good fit for me as far as the program.  I

24       made application to IUP in the administration leadership

25       Ph.D. program.

Barbara Varner                              112

1    Q    Where do you stand on that application?

2    A.   I'm waiting to see if I'm accepted for the fall class.

3    Q    How was the tuition at Penn State Middletown paid for?

4    A.   Like I said, Penn State Middletown was, like I said, the

5         county paid I believe, I'm just estimating, I believe

6         it's $800 a year is what they would pay if it was

7         qualified, if they felt it qualified with my employment.

8    Q    And did it qualify?

9    A.   Like I said, several did.

10   Q    At Penn State Middletown?

11   A.   Right.

12   Q    And what about the IUP program, same?

13   A.   I have not attended there yet.

14   Q    But do you expect that that will also be compensated

15        for, a partial reimbursement by the county?

16   A.   If it qualifies, if the courses qualify.  There's an

17        application you have to make through Personnel for that.

18        Human Resources, rather.

19   Q    What influence, if any, did Gary Graham have on your

20        decision the move to the Probation Department?

21             MS. WALLET:  Objection.  I think that was asked and

22        answered.

23   BY MR. THOMAS:

24   Q    Favor me with another answer, will you please?

25   A.   The influence?

Barbara Varner                    113

1   Q    Um-hum.

2   A.   I don't think he had much influence at all on me going

3        there.  Letting me know that the position was open, yes.

4        But as far as my getting the position, no.

5   Q    Did he encourage you to apply?

6   A.   He thought Lynn and I would be good people because of

7        having the caseworker back -- well, myself, caseworker

8        background and the criminal justice degree.  And he had

9        worked with me as a caseworker so he knew what kind of

10       work I would do.

11  Q    In October of 1996 there was a conference at Penn State

12       that you attended; is that correct?

13  A.   Yes.

14  Q    Can you tell me what the nature of that conference was?

15  A.   A DUI association.

16  Q    Why were you there?

17  A.   I was being certified as a, I believe that was a CRN,

18       CRN instructor.

19          MR. MacMAIN:  I'm sorry, I didn't hear that.

20          THE WITNESS:  Court Reporting Network instructor.

21  BY MR. THOMAS:

22  Q    Were there other members of the Probation Department

23       there also?

24  A.   Yes.

25  Q    Was Mr. Graham there?

Barbara Varner                                114

1    A.    Yes.

2    Q     Were there any problems while you were at that

3          conference?

4    A.    Yes.  He tried to get entrance to my hotel room.

5                MR. ADAMS:  I'm sorry?

6                THE WITNESS:  He tried to get entrance to my hotel

7          room.

8    BY MR. THOMAS:

9    Q     When was that?

10   A.    It was in the evening.

11   Q     The conference was what days of the week?

12   A.    I had gone up Sunday evening because my -- the class I

13         needed to be qualified was first thing Monday morning.

14         I don't believe the conference actually started till

15         Tuesday.  So I had arrived on Sunday evening.  And I

16         believe it went till Thursday.

17   Q     When did Mr. Graham try to gain access to your room?

18   A.    It would have been the Tuesday evening after the

19         conference had started.

20   Q     What happened?

21   A.    He continued to knock on my door.  I chose not to answer

22         it.  And then he called my room.

23   Q     Did you have a conversation with him?

24   A.    I answered the phone and found out who it was, and he

25         said he wanted to stop in.  And I said I was studying.

Barbara Varner                              115

1    Q    And what did he do?

2    A.   I don't know what he did at that time.

3    Q    That was the end of the conversation?

4    A.   Yes.

5    Q    And he didn't come back to your door?

6    A.   Not that I can recall, no.

7    Q    Did you at any point call his room during that

8         conference?

9    A.   No, I did not.

10   Q    Did you call his room during the early morning hours of

11        any of the days that you were there?

12   A.   No.

13   Q    Would you have had any reason to call his room?

14   A.   The only time I would ever call anybody's room is

15        because I was a runner and I would run first thing in

16        the morning, would be to let them know where I was so at

17        least somebody knew where I was.

18   Q    When you say you ran first thing in the morning, what

19        was first thing in the morning?

20   A.   Daybreak.  Six o'clock, six-thirty.

21   Q    You do not remember calling his room?

22   A.   No, I don't.

23   Q    And I assume by October of 1996 that the relationship

24        between the two of you was not good?

25   A.   That's correct.

Barbara Varner                              116

 1    Q     So if you were going to call somebody, he wouldn't have

 2          been your first choice?

 3    A.    Right.  No.

 4    Q     Did you leave the conference early?

 5    A.    Yes, I did.

 6    Q     Why?

 7    A.    When I went up the week before, Mr. Graham had said that

 8          he would be riding with other people, I think Dennis

 9          Drachbar and maybe Sam Miller, that he wanted me to give

10          him a ride home.  I was just really uncomfortable.

11          (Interruption.  Discussion held off the record.)

12    BY MR. THOMAS:

13    Q     Was there more to that answer?

14    A.    Which is unusual, because usually he would drive, I

15          think to get the mileage.  So it was just a red light, I

16          just don't want any -- didn't want him asking for a

17          ride.

18    Q     Was there ever a period of time when you heard anybody

19          in the Probation Department discussing Barb 1 versus

20          Barb 2?

21    A.    Not in those words, no.

22    Q     Did you ever hear any reference to Barb 1 or Barb 2?

23    A.    Not Barb 1 and Barb 2, no.

24    Q     What have you heard?

25    A.    Several of the gentlemen in our department have said, I

Barbara Varner                              117

1          think Graham is getting his Barbs mixed up, that when he
2          comes to work angry it's not me he's probably angry at,
3          it's probably his wife and he's taking it out on me.
4      Q   You never heard any reference to this as it related to
5          phone calls that were received in the Department?
6      A.  No.
7              MR. THOMAS:  Let's take a couple of minutes.
8              (Recess taken from 12:38 until 1:54 p.m.)
9   BY MR. THOMAS:
10     Q   Barb, I've had your counsel place in front of you a
11         copy of the Complaint that's been filed in this matter,
12         and I want to talk to you about the Complaint and some
13         of the allegations that are in there and get some of the
14         details from you, just by way of background so you know
15         where we're going.  Okay?
16     A.  (Witness nodded head affirmatively.)
17     Q   This Complaint you have reviewed, obviously, correct?
18     A.  Yes.
19     Q   And to the best of your ability, did you set forth all
20         of the activities by anybody on behalf of the county
21         that you consider to be a violation of your rights?
22     A.  Yes, all that I considered at the time.
23     Q   Are there any that have come to your attention since
24         that you would like to make me aware of now?
25     A.  There has recently been an incident, and I would say it

Barbara Varner                                    118

1          would be discrimination.

2     Q    What was that activity?

3     A.   Just against myself, is that what you're asking?

4     Q    Yes, in any way.

5     A.   That I was offended by?

6     Q    Yes.

7     A.   Okay.  Recently we had a female intern who was doing her

8          internship, and it was found at the very beginning of it

9          that she had had -- was in the ARD program.  She was

10         left go, she was fired.  Prior to that last, it would

11         have been the winter of 2002, we had a male intern who

12         in the middle of his internship they found out he had

13         had an ARD, a DUI, I believe, himself, and he was

14         allowed to complete his internship.  And I didn't

15         understand why one was left go and the other one wasn't.

16    Q    Are you familiar with all the facts associated with the

17         activities of those two interns?

18    A.   No.  All I know is that I heard that's what, that

19         happened to her.

20    Q    So you heard that as a rumor in the workplace; is that

21         fair?

22    A.   Yes, um-hum.

23    Q    You were not involved in the supervisory chain?

24    A.   No.

25    Q    And weren't consulted with respect to the reasons?

Barbara Varner                                    119

1    A.    No, I was not.

2    Q     Is it fair to say that you have not been apprised of any

3          of the other details by anybody in management as to why

4          there may have been different treatment of those two

5          interns?

6    A.    The only thing I heard, again, was through secondhand

7          information, and that was from Darby Christlieb, where

8          Mr. Boyer, who was one of our supervisors, made the

9          statement if he would have been on vacation and Joe

10         would have been making decisions, the girl would have

11         stayed.  Mr. Osenkarski would have, you know, been in

12         charge, that the girl would have stayed.  That Mr. Boyer

13         had the final say in that.

14   Q     And it was Boyer who made the decision with respect to

15         the female intern?  Is that what you've heard?

16   A.    That was my perception.

17   Q     And who made the decision with respect to the male

18         intern?

19   A.    I don't know.  I don't know that information.

20         Mr. Osenkarski was our chief.

21   Q     Do you know whether the court anybody on the court,

22         President Judge Hoffer, may have been involved in the

23         decision?

24   A.    I don't know.

25   Q     Okay.

Barbara Varner                          120

1    A.    I don't know that.

2    Q     So is it fair to say that you're not familiar with the

3          decision-making process or who was actually involved in

4          the two episodes?

5    A.    No, I'm not.

6    Q     Okay.  Other than that, does the Complaint at least by

7          your attempt set forth all the allegations that you

8          contend violated your rights as an employee for the

9          Probation Department?

10   A.    Yes.

11   Q     What I would like to do is take you through some of

12         those and ask you certain questions about them.  Let's

13         start at paragraph 16, if we could.  In paragraph 16 you

14         allege that Mr. Graham sexually harassed you from

15         November 20, 1996, until March of '98, correct?

16   A.    That's correct.

17   Q     What's the reason behind the dates that you've alleged

18         there?  For instance, what's the significance of

19         November 20, 1996?

20   A.    That's the day that Mr. Graham when I gave him a social

21         history of a female having suicidal tendencies related

22         to her premenstrual problems as documented by a

23         physician and it took it into his office to give him the

24         case, he made the statement do I have to get a peter

25         meter in my office.  And using the words Jesus Chris

Barbara Varner                                121

1           prior to that.

2    Q      Did you make a contemporaneous note of that comment by

3           him at the time?

4    A.     Yes.

5    Q      And where did you keep that note?

6    A.     I had a running little notepad that -- I'm a scribbler

7           so I would just make a note.

8    Q      Is that why you're able to identify that date

9           specifically as November 20, 1996?

10   A.     Yes.

11   Q      Where are those notes now?

12   A.     They were provided.  They were a packet of notes I

13          believe that was in my little scratch notes.

14   Q      You're indicating it was provided as part of discovery

15          in this matter?

16   A.     Yes, I believe it was.

17   Q      Do you still have possession of the originals, you or

18          your lawyer?

19   A.     They would be -- I have the originals.

20   Q      Had you ever heard a comment like that by Mr. Graham

21          prior to November 20, 1996?

22   A.     Specifically like that?  No.

23   Q      Had you ever heard at any time in your life reference to

24          a peter meter?

25   A.     No.

Barbara Varner                              122

1  Q    What is a peter meter?

2  A.   I'm just -- my idea of it would be something to measure

3       a males penis, or regulate, whatever.

4  Q    What was the context of that conversation?

5  A.   I had taken a case in to have approval of it, a file on

6       this young girl.  And I was trying to explain to him,

7       you know, the diagnosis and what, about the girl, and

8       that was the reaction I got from him.

9  Q    Did he have to approve every case that you handled?

10 A.   Yes.

11 Q    You had been with the Department at that point for a

12      year and what, nine months?

13 A.   Something like that, yes.

14 Q    And during the preceding 21 months he had made no

15      similar comment to you?

16 A.   Not like that, no.

17 Q    After November 20, 1996, did you ever hear him use the

18      term peter meter again?

19 A.   No.

20 Q    What was your response to him when he mentioned the

21      peter meter?

22 A.   I was very embarrassed.  It was in front of his office

23      mate, Hank Thielemann.  I was very embarrassed, really

24      shocked.

25           We deal with a lot of young females and this was a

Barbara Varner                              123

1       diagnosed problem this girl had.  It interfered with her

2       life, probably helped -- it was a facilitating issue for

3       her to commit the crime, because it was, I believe it

4       was an assault, and that she would have these problems

5       monthly and it was legitimate concern, and I was

6       offended that he minimized her condition.

7    Q  What was the basis for your concern that he minimized

8       the problem?

9    A. That, you know, a woman can have this problem and it can

10      cause her problems, and it's a psychological problem and

11      it's been medically diagnosed and it was not just her

12      telling me this, she had medical proof of it.

13   Q  The context of the conversation with him about the peter

14      meter was in reference to the juvenile that you were in

15      charge of?

16   A. Yes.

17   Q  It was no reference with respect to you personally?

18   A. No, but I was offended by it.

19   Q  I understand.  And what I'm trying to understand is the

20      basis for your offense.  Your offense, I gather, was

21      that he made light of her medical problem?

22   A. Yes.

23   Q  Is that right?

24   A. And minimized.  Yes, absolutely minimized it.

25   Q  And that was November 20 of 1996.  Was that the first

Barbara Varner                                  124

```
1              time that you were offended by his behavior in any
2              sexual context?
3    A.   No.
4    Q    What was the first time?
5    A.   He had given me a birthday card.
6    Q    And when was that?  January '96?
7    A.   Yes, around that time.
8    Q    And what about the birthday card offended you?
9    A.   It was inappropriate.
10   Q    Why?
11   A.   Because it indicated that there had been a past or some
12             kind of relationship with us.
13   Q    Are you talking about some inscription on the card?
14   A.   Yes.  Yes.
15   Q    What do you remember the inscription said?
16   A.   Something remembering good times or something, or
17             looking forward to more, whatever.  It was just
18             inappropriate.  From --
19   Q    Was it the inscription on the card that was handwritten?
20   A.   No.  It was printed.
21   Q    It was printed, so it was part of the formal card?
22   A.   Right.
23   Q    And what did it say, happy birthday?
24   A.   Yes.  As I'm thinking back over the good times we had
25             before, and he signed it.  It was just inappropriate for
```

Barbara Varner                              125

```
 1          a supervisor male to be giving to -- I was a married
 2          woman.  It was inappropriate.
 3     Q    What did you do when you received the card?
 4     A.   He had put it in the side of my briefcase and I didn't
 5          really find it till a day or so later when I was taking
 6          things out of my briefcase, and I found it.
 7     Q    And after you opened it and read it, what did you do?
 8     A.   I put it away.  I put it in -- I have stuff where I just
 9          throw papers, old time sheets.  I just threw it in
10          there.
11     Q    And that was January 1996, correct?
12     A.   Yes, um-hum.
13     Q    Did you say anything to him about the card?
14     A.   No.  I was uncomfortable and I didn't know how to
15          approach it.  Again, I knew Mr. Graham, his anger, I
16          didn't want to even start anything.  I thought, well,
17          just best to let it go at that point.
18     Q    Up to this point, January of 1996, had he had occasion
19          to be critical of you?  Had there been any screaming
20          episodes up to this point?
21     A.   Not directed at me, no.
22     Q    How would you describe your relationship with him at
23          work in January of 1996?
24     A.   Comfortable co-workers.  He was my supervisor.  Not
25          supervisor but assigned to train me.
```

Barbara Varner                                    126

1   Q    He was not a formal supervisor for you at that time, was

2        he?

3   A.   He was appointed by Mr. Osenkarski as my supervising

4        trainer.

5   Q    Trainer?

6   A.   Yeah.

7   Q    Did he have the right to hire or fire you?

8   A.   He had the right to make suggestions, but no.

9   Q    Did he have the right to change your job duties?

10  A.   Yes, I think he could have.  Yes.

11  Q    Did he have anything to say about how much you got paid?

12  A.   No.

13  Q    So you received this card in January of '96, you thought

14       it was inappropriate.  You made no complaint to him,

15       correct?

16  A.   I didn't mention it.

17  Q    Did you mention it to anybody else?

18  A.   No.  As a matter of fact, like I said, I put it away and

19       just forgot about it.

20  Q    You were aware in January of 1996 that the county had a

21       sexual harassment policy, weren't you?

22  A.   I don't -- I'm sure I was aware that they had it.  I

23       can't say that I actually sat down and read it, but I

24       was aware there was one in place.

25  Q    You were aware that there was a policy --

Barbara Varner                          127

1    A.    Yes.

2    Q     -- in the county that prohibited sexual harassment or

3          discrimination, correct?

4    A.    That's correct.

5    Q     And you were aware that in the personnel manual there

6          was a complaint procedure that had been published?

7    A.    Yes.

8    Q     You did not utilize that complaint procedure when you

9          received the birthday card in January of '96, correct?

10   A.    That's correct.

11   Q     And in fact, mentioned the birthday card, which you

12         found offensive, to no one?

13   A.    That's correct.

14   Q     Were there any other events between January of '96 and

15         November 20, '96, that you believe violated your rights?

16   A.    What was the dates again?

17   Q     The birthday, I'm expanding now from the birthday card

18         in January of '96 to the date published in your

19         paragraph 16, November 20 of '96.

20   A.    November 20?  I'm sorry, would you repeat the dates

21         again?

22   Q     I'm looking at your paragraph 16 --

23   A.    Okay.

24   Q     -- where you allege that you were sexually harassed by

25         Graham from November 20, '96, to March of '98.

Barbara Varner                              128

```
 1   A.   Okay.

 2   Q    I asked you whether there was anything before November

 3        of '96, and you've identified this birthday card in

 4        January.  My question now for you is:  Was there

 5        anything between the time of the birthday card and this

 6        date that you've alleged in your Complaint, November 20,

 7        of '96 that you believe violated your rights?

 8   A.   That is -- okay.  You mean from January through -- yes,

 9        from January to November?

10   Q    Correct?

11   A.   Is what you're asking.

12   Q    I am.

13   A.   Mr. Graham would tell me stories about the sexual

14        problems he was having with his wife.

15   Q    When did those occur?

16   A.   That was quite a few of the trips that we took, he would

17        talk about it, allude to it.

18   Q    Can you tell me when those, what the dates of those

19        trips were?

20   A.   '96 through '97.

21   Q    Were they before November 20?  Were any of them before

22        November 20 of 1996?

23   A.   It's possible, because he was always talking about

24        problems he was having with his wife.  A lot of times it

25        would be in the open office, he would talk about
```

Barbara Varner                          129

1          problems with her, he would come in complaining about

2          her.

3     Q    Let's stick to the trips for a moment.

4     A.   Okay.

5     Q    How often in 1995 and 1996 were you taking trips with

6          Mr. Graham?

7     A.   Oh, I would say just an approximate would be maybe once

8          a month, sometimes more.

9     Q    So during that slightly less-than-two-year period you

10         would estimate that perhaps there were 24 trips?

11    A.   Probably a little less than that, but around that, yes.

12    Q    On how many of these trips did he talk to you about his

13         sexual problems with his wife?

14    A.   I'd say he would start talking about -- first he started

15         to allude to problems, that he wasn't getting anything

16         from her, that he was angry at her.  He would talk about

17         smashing her figurine collection in anger as a

18         punishment for her.  And he would make statements that

19         he'll do anything he can to get even with her.

20    Q    Can you give me an estimate of how many times out of

21         this 24 trips that he may have talked to you about

22         sexual problems with his wife?

23    A.   Sometimes he would just gripe about it.  And then --

24    Q    Was it every trip?

25    A.   No.  I would not say it's every trip, no.  No.

Barbara Varner                              130

1    Q    Half the trips?

2    A.   Maybe a third of the trips.  Most of the time at the

3         very beginning he wouldn't get too explicit, it was more

4         displays of his anger, how he was punishing her.

5    Q    Where did these trips -- I guess I need to know the

6         basis on which these trips occurred.

7    A.   It was juvenile placement.  We had a juvenile in the car

8         with us and we would be transporting them to placement

9         or generally some -- to or from placement to court,

10        whatever.

11   Q    What were the range of the trips?

12   A.   Distance?

13   Q    Yes.

14   A.   There was -- the furthest one was above Pittsburgh,

15        Grove City, George Junior Republic.  And then some

16        toward Philly.  Really, some were in New Jersey.

17   Q    And George Junior is probably a four-hour drive?

18   A.   Oh, I would say at least, yes.

19   Q    So the two of you were in the car together for eight

20        hours?

21   A.   Yes, at least.

22   Q    And the one around Philly would be --

23   A.   There was one to New Jersey as well.

24   Q    Which is a couple hours down?

25   A.   We went north first, north to Clarks Summit, and picked

Barbara Varner                                    131

```
 1              up a juvenile and took her to New Jersey for an

 2              evaluation for her to enter a college.  And then

 3              returned her to the same place.

 4     Q        How long a trip was that, round trip?

 5     A.       Oh, I'm just guessing, 13, 14 hours.

 6     Q        How did it happen that you and he traveled together on

 7              those two trips that we're talking about specifically

 8              now, George Junior and the one to Philadelphia?

 9     A.       George Junior I didn't have -- never had a juvenile

10              under my supervision at George Junior.  Mr. Graham would

11              instruct me that I needed to go on the trips with him.

12              We would be taking kids that I had no contact with, no

13              need for me to have contact.  They were males.  George

14              Junior was only a male placement.  Ideally it should

15              have been two males because if the juvenile had to go to

16              the restroom or whatever.  But I was instructed I had to

17              go on the trips with him.

18     Q        And who instructed you?

19     A.       Mr. Graham.

20     Q        Was that true with respect to all 24 of the trips?

21     A.       No.  There were several that were my children, my girls,

22              that I had to do supervision.

23     Q        How many of them were yours?

24     A.       I can only think of four females.

25     Q        Where were those trips to?
```

Barbara Varner                                    132

1   A.   One was up to Clarks Summit.  One was in the
2        Philadelphia area.  One was out to around Pittsburgh
3        area.  And the other one, like I said, was the one
4        from -- even the one from to New Jersey wasn't my
5        juvenile, she wasn't under my supervision.
6   Q    All those trips that you've described, all three or four
7        of those are all trips that would be at least four hours
8        round trip, would they not?
9   A.   Yes.  Yes.
10  Q    Are there any other trips that you can think of?  We've
11       talked about the one to George Junior, we've talked
12       about the round robin to Clarks Summit and then to New
13       Jersey and back, we talked about another one to Clarks
14       Summit, Philadelphia.
15  A.   There was one to Maryland.  We met halfway, to a -- with
16       a detention center personnel and dropped a girl off.
17  Q    How long a trip was that?
18  A.   To the Maryland line.  Maybe two hours, four hours round
19       trip.
20  Q    Okay.  Others that you recall?
21  A.   I can't recall any more at this time.
22  Q    Okay.
23  A.   But the majority of the cases, the trips were not my
24       kids.
25  Q    And you've described four that were your kids, correct?

Barbara Varner                                    133

1   A.   Yes.

2   Q    What did you do in the car during these trips?  I gather

3        one of you was driving while the other was riding as

4        passenger?

5   A.   Mr. Graham always drove.

6   Q    What did you do?

7   A.   The juvenile was in the back, so usually conversation

8        with them.

9   Q    What were the subject matters with the juveniles?

10  A.   School, what they plan to do, explaining to them about

11       the placement.

12  Q    Any of it that you considered to be rehabilitation type

13       discussions?

14  A.   Certainly.  Sure.  About their families.

15  Q    And after you dropped the juvenile wherever they were

16       going, what did you do on the way back?

17  A.   We stopped to get something to eat and then drove back.

18  Q    What was the nature of the conversation?

19  A.   Usually hearing what Mr. Graham was doing.  He liked to

20       tell you everything that he was doing.  He was a lot of

21       the -- he was considered basically the gossip of the

22       office, so you heard, of course, about everything

23       everybody else was doing.

24  Q    Did you participate in the conversations?

25  A.   With Gary you just listened.  With Mr. Graham you just

Barbara Varner                                    134

1           listened.

2     Q     And some of the conversations centered around things

3           that were happening in the office?

4     A.    Yes.

5     Q     Some of it centered around educational matters or

6           training?

7     A.    No.

8     Q     Not at all?

9     A.    Probably not, no.

10    Q     And some of the conversation had to deal with his

11          complaints with his wife, I gather.  Yes?

12    A.    Complaints about anybody else in the office.  Just

13          complaints.

14    Q     When he started to complain to you about problems with

15          his wife, what was your participation, if any?

16    A.    When it was not explicit you just sort of listened and

17          just say, you know, maybe you ought to go to counseling.

18          When he got really explicit, and I mean, in detail, I

19          said you know, you two need to go to counseling.  You

20          could see it was getting worse, you need to go to

21          counseling.

22    Q     And you've described two subcategories there, one where

23          he wasn't very explicit, and one where he was.

24    A.    Yes.

25    Q     What was the subject matter that was not very explicit?

Barbara Varner                           135

```
 1   A.   Just complaining that she won't do what he wants her to

 2        do.  She -- he would complain because she was reading,

 3        oh, the books, I'm trying to think, the love story

 4        books, the magazine, little, the little paperback books.

 5        He hated her -- Harlequin, Harlequin romances.  He hated

 6        her reading those.  It appeared that he was jealous that

 7        she would read those.

 8             He would complain because he would see his wife

 9        talking to the court administrator.  If he saw her

10        talking to an attorney, he would go on and on and on and

11        on about I guess just a jealousy.  But he was just angry

12        at her, angry at his wife.

13   Q    These conversations weren't directed at you?

14   A.   No, those weren't.

15   Q    And your response to that was to suggest to him that

16        they needed to seek counseling?

17   A.   When he was talking that way, you just sort of listened

18        to him.  He was just sort of blowing off.

19             When he started talking explicitly about sexual,

20        her sexual behavior and how she was denying him sex, I

21        just said, Gary, you know, you need counseling, you and

22        your wife need to go to counseling.

23   Q    What was the explicit behavior that he talked to you

24        about?

25   A.   He would tell me that he would wake up in the middle of
```

Barbara Varner                         136

1            the night and the bed would be shaking, and he would

2            pull her hand out of her underwear and her hands,

3            fingers would be wet.  He said he would keep a calendar

4            of how often they had sex and he would show that to her.

5     Q      How often did that conversation occur?

6     A.     That explicit, that was really one time he was that

7            extremely explicit.

8     Q      When was that?

9     A.     It was in -- I'm not sure of the date.  One of the

10           trips, '96, '97.  More I believe '97 area.

11    Q      What was your response to him while he was going through

12           this explanation?

13    A.     I said, Gary, Mr. Graham, well, you need to get

14           counseling.  I really don't want to hear this, you need

15           to get counseling.  And his response was that he was

16           furious.  He said, I don't need counseling, there's

17           nothing wrong with me.  And we accelerated to around 95

18           miles per hour on a construction zone on 81.

19    Q      Did you call him Gary in those days or did you call him

20           Mr. Graham?

21    A.     I called him Gary.

22    Q      Was there ever any period of time where you called him

23           Mr. Graham?

24    A.     I don't believe so.

25    Q      Why was he confiding in you with respect to his concerns

Barbara Varner                                137

1        or difficulties with his wife?

2   A.   I have no idea.  I think I was a captive audience in the

3        car.

4   Q    Did these conversations offend you?

5   A.   Absolutely.

6   Q    Why?

7   A.   I don't need to hear details of his sexual behavior or

8        his problems with his wife.  I offered names of

9        counselors, family counselors, whatever.  He just didn't

10       want to hear it.

11  Q    Did you ever ask him not to describe his problems with

12       his wife to you?

13  A.   Yes, I did.

14  Q    When?

15  A.   It was the same day.

16  Q    On the day where?

17  A.   He was very explicit.  I said, I don't need the hear

18       this, I don't want to hear this, it's a problem between

19       you and your wife, you need counseling.

20  Q    Other than that one episode, were there any other

21       occasions where you said to him stop it, I don't want to

22       hear it?

23  A.   Whenever he would use the F word at me.

24  Q    I want to restrict that question really just to the

25       discussions that he had with you in the car about his

Barbara Varner                          138

```
1              wife.  Was there ever more than one occasion when you
2              told him stop, I don't want to hear it?
3    A.        I would recommend counseling.  Anytime he talked about
4              problems with his wife, I would suggest counsel for him.
5    Q         And on one occasion, the occasion where he was explicit
6              about her night problems, you said to him, stop, I don't
7              want to hear it?
8    A.        Right.
9    Q         Right?
10   A.        Right.
11   Q         Did you report that episode to anybody else at work?
12   A.        I told somebody else but I did not report it.
13   Q         Who did you tell?
14   A.        I discussed it with Debra Green.
15   Q         Is Deb Green your best friend at work?
16   A.        She's my co-worker, yes.
17   Q         You did not report to anybody in a position of
18             authority?
19   A.        Again, knowing to start talking about this, the
20             punishment element, I knew that if I started to say
21             anything it might cause really big problems for me.
22   Q         But whatever the reason, you did not report it?
23   A.        No, I didn't.  Not at the time.  I did later, yes.
24   Q         Sure, and we'll get to that.
25                  Did you at any point raise a concern with
```

Barbara Varner                    139

1        management about going on these placement trips with

2        Mr. Graham?

3    A.   I talked to Mr. Graham about it.  I said, I really

4        didn't want to go on these trips.  You know, I had other

5        work to do.  This is a whole day out of the office and I

6        was at that time, well, one Family Preservation, which

7        required intensive supervision, and he said if I didn't

8        like it I could go back to doing my former work as

9        social work.

10   Q    But I guess the answer to that is the only person you

11       told was Mr. Graham?

12   A.   (Witness nodded head affirmatively.)

13   Q    You didn't tell Mr. Osenkarski?

14   A.   No, I did not.

15   Q    You didn't tell Mr. Bolze while he was still there?

16   A.   Mr. Bolze was not there at that time.

17   Q    He was gone?

18   A.   He was gone.

19   Q    You didn't tell anybody in HR, Human Relations?

20   A.   At the time, no.

21   Q    And didn't tell Judge Hoffer or Judge Sheely?

22   A.   There really was minimal contact with them.

23   Q    Did you have some contact with the president judge

24       during your employment with the county?

25   A.   With Judge Sheely?

Barbara Varner                                    140

1    Q    Um-hum.

2    A.   Yes, of course.

3    Q    What was the nature of that contact?

4    A.   Could be taking cases up.  He heard my cases.

5    Q    He knew who you were?

6    A.   Absolutely.  He hired me.

7    Q    In paragraph 16 in the subparts you start to detail some

8         of the allegations which you've talked about in general,

9         and I'd like to go over a few of those, if we could.

10   A.   Okay.

11   Q    We might as well start with A.  We've already talked

12        about A, and that was the girl who had the premenstrual

13        problems, correct?

14   A.   Correct.

15   Q    And the peter meter.  Is there anything else you want to

16        add with respect to that allegation?

17   A.   No.

18   Q    B is the inappropriate birthday card.  We've talked

19        about that, right?

20   A.   Yes.

21   Q    B also includes inappropriate touching.

22   A.   Yes.

23   Q    What do you mean by that allegation in paragraph B?

24   A.   During a Mace, a Mace training at the prison, it was in

25        '95, Mr. Graham patted my behind in front of Debra

Barbara Varner                                    141

1           Green.

2    Q      When in 1995?

3    A.     I'm not sure of the date.

4    Q      Spring, summer?

5    A.     Probably -- I'm just guessing, speculating spring.

6    Q      What were the circumstances where he patted you?

7    A.     We were walking down the hall to a training area.  It's

8           a large gymnasium at the prison.

9    Q      You were walking with him or beside him?

10   A.     No.  I was with Debra Green.  I think I was walking past

11          him.

12   Q      Were you all going the same direction?

13   A.     Yes.

14   Q      Was there any conversation between the two of you before

15          he patted you?

16   A.     No.

17   Q      Describe to me what happened.

18   A.     As I was walking past, it's not very clear to me what

19          happened, but Debra Green witnessed it, and he patted my

20          behind.  And I just took off into the training room.

21   Q      Were there any words exchanged between you and he when

22          that happened?

23   A.     No.  I just went into the class and we started the

24          training session.

25   Q      Were you running when you went into the training room?

Barbara Varner                                    142

1   A.   Moving quickly.

2   Q    Were you laughing?

3   A.   I was embarrassed.

4   Q    Were you laughing?

5   A.   Embarrassed laugh.

6   Q    Was anything else said after that?

7   A.   No.

8   Q    So you went through the training session?

9   A.   Right.

10  Q    Were there any other occasions where he touched you

11       inappropriately other than this one pat in the spring of

12       '95?

13  A.   No.

14  Q    So the inappropriate touching was limited to one event,

15       correct?

16  A.   Yes.

17  Q    B also includes appearing uninvited at your home.

18  A.   Yes.

19  Q    Which home are we talking about?

20  A.   On Maple Drive in Etters.

21  Q    When was that?

22  A.   May of '96.

23  Q    What time of day?

24  A.   It was early evening, just dusk.

25  Q    Tell me what occurred.

Barbara Varner                          143

```
 1   A.    I was at my home.  Like I said, we have a bi-level
 2         house.  I had the doors, the back door open, and I was
 3         up in the living room area.  And I got a call on my
 4         phone and it was from Mr. Graham.  He said he's come
 5         down to see me.  And I said, you know, well, my
 6         husband's not home, I really didn't -- he said, I know
 7         he's not home, and then he hung up.  And the next thing
 8         within maybe --
 9   Q     He didn't say good-bye?
10   A.    No.  No.
11   Q     Okay.
12   A.    I hung up.  The next thing I know, he was -- our house
13         is on a dead-end road that runs beside our home.  And
14         the next thing I know he was outside at our back yard
15         yelling my name.  And I didn't go, I didn't go out.  I
16         knew who it was.  I had pretended like I wasn't home.
17   Q     Did anybody see him there?
18   A.    No, not that I know of.
19   Q     Have your neighbors ever told you that they saw him
20         there?
21   A.    No.  We live -- the back of our house are over
22         apartments, like an apartment complex beside the back of
23         our house.
24   Q     Did he ever gain access to your home that evening?
25   A.    No, he did not.
```

Barbara Varner                                    144

1    Q    Did he eventually leave?

2    A.   Yes.

3    Q    And he left without being inside the house?

4    A.   Yes.

5    Q    Do you know why he was there?

6    A.   I can't speak for him, but I assume he came down to see

7         me when he knew my husband was not home.

8    Q    And this was May of 1996?

9    A.   Yes.

10   Q    Was that the only occasion on which he appeared

11        uninvited at your home?

12   A.   Yes, it is.

13   Q    Did you report that episode to anybody at Probation?

14   A.   No, I didn't.

15   Q    Did you ever ask him why he showed up on that evening in

16        May of 96?

17   A.   Again, it was I would rather not even approach it.  I

18        didn't want to get into anything, because if I would say

19        anything to make a big deal out of it I'm afraid there

20        would be punishment.

21   Q    So you never raised it with him, correct?

22   A.   No.

23   Q    Never raised it with any superior?

24   A.   No.

25   Q    And never filed any written complaint in accord with the

Barbara Varner                              145

1         complaint procedures in the employee manual, correct?

2    A.   No, I did not.

3    Q    You'll have to say no.

4    A.   No.  I'm sorry.

5    Q    Paragraph C deals with the hotel room at Penn State, and

6         we've already talked about that, haven't we?

7    A.   Yes.

8    Q    Is there anything in our earlier discussions that you

9         know that you didn't reveal to me about that episode?

10   A.   Not that I can think of at this time.

11   Q    Did you ever report that episode to management?

12   A.   Not at the time.  I assumed I could handle it.

13   Q    In paragraph D you say that when Graham -- or when you

14        showed a lack of interest in his sexual overtures, that

15        his attitude toward you changed.

16             Tell me what it is about his overtures that led you

17        to believe that there was a sexual interest in you.

18   A.   I think coming to my home, obviously, knowing when my

19        husband wasn't home.  Trying to get entrance to my hotel

20        room at Penn State.  I think it was pretty well known

21        that Mr. Graham had -- was -- I guess had an interest in

22        me.  It was pretty apparent to most people.

23   Q    Did you do anything to encourage that interest?

24   A.   No, I did not.

25   Q    When did his attitude toward you change?

Barbara Varner                                   146

```
 1   A.   Most of it changed whenever he had -- whenever Mr. Bolze

 2        retired and you could see that Mr. Graham was becoming

 3        much more authoritative, and angry.

 4   Q    Had he expressed an interest, sexual interest in you as

 5        you described it, right from the outset of your

 6        employment with Probation?

 7   A.   It was something -- it was, like, it was apparent -- in

 8        hindsight it was apparent to everybody that he had an

 9        interest in me.

10   Q    And did that predate your employment with Probation?

11   A.   Yes, it did.

12   Q    Went all the way back to your employment with Children

13        and Youth?

14   A.   It was a joke that Mr. Graham liked me, which I thought

15        was ridiculous.  He's a grown man, married, as I was.

16   Q    Why was it a joke?

17   A.   Because we were both married and it was such a childish

18        behavior.

19   Q    And who was it a joke among?

20   A.   Caseworkers.

21   Q    Your fellow employees?

22   A.   Yes.

23   Q    Did they say something to you?

24   A.   They would say, you know, Graham is interested in you,

25        and they would laugh.  They were young girls, early
```

Barbara Varner                              147

1        twenties.

2    Q   Who said that?

3    A.  A girl named Kelly Miller.  Well, it was Kelly Zeager at

4        the time.  She was dating one of the Probation officers.

5    Q   She was working in the Department and dating one of the

6        probation officers?

7    A.  She was in my department.  She was a caseworker and she

8        was dating one of the probation officers.

9    Q   So she was in Children and Youth at that time?

10   A.  Yes, she was.  Yes, she is.  And I had asked her not to

11       repeat that at all, because Mr. Graham's cousin worked

12       in Children and Youth, didn't want rumors starting.

13   Q   Did rumors get started?

14   A.  No.

15   Q   You're not aware of any rumors that the two of you were

16       having an affair?

17   A.  No.  It was only his interest in me.

18   Q   Well, irrespective of whose interest it was, were you

19       aware that there were rumors in the courthouse that you

20       and he were having an affair?

21   A.  I never heard of any rumors.

22   Q   Looking back on it, in view of the relationship that you

23       two had, can you understand why people might have

24       reached the conclusion that you were having an affair?

25   A.  No, I don't.

Barbara Varner                           148

1    Q    Because in your mind, the relationship was always an

2         arm's length professional relationship?

3    A.   I traveled with Mr. Graham.  It was necessary for my

4         job.

5    Q    The allegations contained in E are the description of

6         the sexual problems he was having with his wife, as

7         you've already testified, correct?

8    A.   Yes.

9    Q    Do you want to add anything to that?

10   A.   Not at this time.

11   Q    Are there any facts that you have in regard to this that

12        you haven't previously disclosed to me or that I haven't

13        asked you?

14   A.   Not -- not to be noted at this time.

15   Q    F refers to a smashing of a wife's figurines.  Do you

16        recall that?

17   A.   Yes.

18   Q    When did that occur?

19   A.   Again, it was on trip and it was prior to his detailing

20        his, the problems with his wife.  He had bragged that he

21        smashed her figurine collection against the fireplace to

22        punish her.

23            The birthday cake incident to me was just horrible.

24        His -- he had young girls, and I understand his

25        mother-in-law had made this special birthday cake for

Barbara Varner                              149

1           his wife.  Mr. Graham was angry at his wife, I don't

2           know exactly what it was for, but he told me he said he

3           punished her and he destroyed the cake in front of the

4           little girls.

5    Q     Well, on the trip where he discussed the figurines, do

6           you remember where you were coming from or going to?

7    A.    No, I don't.

8    Q     Do you remember anything about the date of that

9           particular trip?

10   A.    It was just prior to the trip where he explained in

11          detail about the sexual behavior.

12   Q     Well, you told me earlier that you kept a notepad with

13          respect to these episodes.  Was there a specific note

14          with respect to the discussions involving figurines?

15   A.    No.  No, I don't believe there was a note about that.

16          It was just something I recalled that he had -- well,

17          that sort of stays in your mind when you hear about

18          somebody smashing things like that.  As far as dates,

19          I'm not sure.  I know it was on trip.

20   Q     What was the context of the conversation where he

21          brought that up?

22   A.    Again, anger at her.  He was punishing her.  He was

23          angry because -- I don't even know why he was angry.  He

24          was always angry at his wife.

25   Q     Because of his personal problems with her?

Barbara Varner                              150

1   A.   Yes, personal problems with her.

2   Q    So the sort of the context of the conversation was that

3        he was upset with her, that they had some disagreement

4        over something, and --

5   A.   Right.

6   Q    -- he smashed the figurine as part of this?

7   A.   As part of his punishment.

8   Q    Punishment, okay.  And the birthday cake episode, did

9        that occur on the same trip?

10  A.   No, I don't believe.  I believe he talked about that on

11       a different time.  I'm not sure.  I remember they were

12       on trips when I would hear about these things.

13  Q    Did you ever complain about your relationship with

14       Mr. Varner as part of these trips?

15  A.   No, absolutely not.

16  Q    Did you ever return conversations about any problems in

17       your life when he was describing the problems in his?

18  A.   My husband Lee and I really have not had any problems to

19       complain about.

20  Q    Have you had any problems of any type in your life?

21  A.   Of course.

22  Q    Did you share with Mr. Graham any of those conversations

23       while traveling with him?

24  A.   Problems?  Maybe stories about maybe some teen-age

25       problems when my kids were growing up, just as an aid to

Barbara Varner                                    151

1         him.  More parenting, parenting techniques that I would

2         use with my children.

3    Q    What other subjects did you share with him during the

4         travels?

5    A.   Subjects.

6    Q    What did you talk about?

7    A.   I know.  Like I said, most of the time you would listen

8         to Mr. Graham.  He would be on the phone a lot.  It was

9         just generally listening to his stories.

10   Q    And the only thing you can remember sharing with him was

11        some conversation about parenting techniques involving

12        your children?

13   A.   Yes, about my children in general.

14   Q    Did you report the difficulties or the conversation

15        involving the figurine or the birthday cake to anybody

16        in management at the time those discussions occurred?

17   A.   That, I mean, it wasn't offensive to me.  I felt bad for

18        his wife and his children, but it did not offend me.

19   Q    Neither of those conversations?

20   A.   No.  All, mostly what that did to me was remind me of

21        how he can dole out punishment and how he was willing to

22        do that to people that he loved, that he would use that

23        punishment mode.  It put me on guard, made me aware of

24        what he could do.

25   Q    But the conversations in and of themselves you recognize

Barbara Varner                              152

1          weren't directed to you?

2     A.   They were not directed at me, just --

3     Q    And you recognize -- and I'm sorry to interrupt you --

4     A.   That's all right.

5     Q    And they didn't particularly offend you but you felt

6          badly for his wife and for his children?

7     A.   And put me on notice of what Mr. Graham, how angry he

8          can get and what he's possibly, you know, what he's

9          possible to do.

10    Q    And neither of those conversations had anything to do

11         with his purported sexual interest in you?

12    A.   No.

13    Q    In G you make reference to an instruction that you

14         apparently received from him not to talk to another

15         female probation officer who had complained of sexual

16         harassment.

17    A.   That's correct.

18    Q    Who was that?

19    A.   Kerry Houser.

20    Q    And you knew about her prior complaint of sexual

21         harassment before you took the job in Probation,

22         correct?

23    A.   Yes, I had heard about it.

24    Q    Do you recall when he gave you that instruction?

25    A.   Not too long after I started in the Department.

Barbara Varner                                153

 1   Q     It was sometime after February of '95?

 2   A.    Yes.

 3   Q     Had you talked to Kerry Houser before that, before you

 4         got the instruction?

 5   A.    Yes.

 6   Q     Had you talked to her about her sexual harassment claim?

 7   A.    At that point we had not really discussed it, no.  I

 8         just heard about it when I was with Children and Youth.

 9   Q     What did you hear about it while you were in Children

10         and Youth?

11   A.    Just that she had filed a suit against the Department,

12         Juvenile Department.

13   Q     Did you hear what the outcome was?

14   A.    No, I didn't.

15   Q     Do you know whether there was any financial aspect to

16         the resolution of it?

17   A.    I don't know that.

18   Q     Did you ever find out?

19   A.    No, I didn't.

20   Q     What did Mr. Graham instruct you with respect to Kelly

21         Houser?

22   A.    Kerry Houser.  He told me not to talk to her.

23   Q     Did he tell you why?

24   A.    He said, she's an angry woman, she's divorced, she's an

25         angry woman, all divorced women are angry.

Barbara Varner                                          154

1    Q    You were a divorced woman at the time, were you not?

2    A.   Yes, I was.

3    Q    Did he tell you that you were an angry woman?

4    A.   No.

5    Q    And in fact, he had expressed or at least as far as you

6         were concerned, exhibited a sexual interest in you,

7         correct?

8    A.   Yes.

9    Q    Did you follow his instructions not to talk to her?

10   A.   No.

11   Q    Did you make a notation of when that conversation

12        occurred?

13   A.   I believe I did.

14   Q    What date did it occur on?

15   A.   I don't know the date at this time.

16   Q    Did you have any conversation with him about whether

17        that conversation was appropriate or inappropriate?

18   A.   I don't think we had a discussion on it.  It was just he

19        told me not to talk to her because of a prior suit that

20        they had and that she was angry.

21   Q    Did you respond to him in any fashion when he told you

22        that?

23   A.   I don't remember.  I don't believe.

24   Q    Did you report that statement by him to anybody in

25        management?

Barbara Varner                                    155

```
 1   A.   Mr. Osenkarski was part of that suit.  He would be the
 2        next in line to complain to, and I chose not to.  Again,
 3        punishment issue.
 4   Q    Could you have taken your complaint to Judge Sheely?
 5   A.   In hindsight, he probably wouldn't have done anything.
 6   Q    Could you have taken the complaint to him?
 7   A.   I could have.
 8   Q    There was nothing that prevented you from doing that,
 9        was there?
10   A.   No.  No.
11   Q    In fact, you never complained to Judge Sheely about the
12        treatment you received from Mr. Graham, did you?
13   A.   No, not until after.
14   Q    Not until after you filed the --
15   A.   Right.
16   Q    -- EEOC Complaint?
17   A.   Right.
18   Q    But you did understand that Judge Sheely was the head of
19        the Probation Department, didn't you?
20   A.   Certainly.
21   Q    In paragraph H you make reference to a conversation that
22        you had with Mr. Graham involving seniority and the need
23        to satisfy all parties involved.
24   A.   Yes.
25   Q    Do you recall that conversation?
```

Barbara Varner                              156

1   A.   I certainly do.

2   Q    When did it occur?

3   A.   It was -- I can tell you where.  It was after August of

4        '96, it was in my office.  Mr. Graham was explaining

5        what he called a balanced approach where it's necessary

6        for you to satisfy the victim, the community and as well

7        as the juvenile to make sure that they're rehabilitated.

8        Mr. Graham told me that I have to satisfy the victim,

9        the community, and he looked at me and he pointed at

10       himself, that those are the things that I have to

11       satisfy.  And the smile on his face letting me know what

12       he meant.

13  Q    Did he make any oral reference to a sexual component to

14       that satisfaction?

15  A.   His expression saying that I had to satisfy him

16       certainly meant sexual to me.

17  Q    Did you challenge him in that regard?  Did you ask him

18       what he meant specifically?

19  A.   I said, I don't want to hear it, and that was it.  He

20       left my office.  I didn't want to hear it.  And he left

21       my office.

22  Q    What was it that led you to believe that the innuendo

23       there was toward some sort of sexual favor?

24  A.   It was his smile, the way he smiled at me.  It wasn't

25       like a friendly smile, it was a provocative smile I

Barbara Varner                                      157

```
 1          guess you would say.  It was just a flirtatious smile.
 2     Q    Did he ever openly solicit you for sex?
 3     A.   No.
 4     Q    He never asked you to have intercourse with him?
 5     A.   No.
 6     Q    He never said, hey, let's get a hotel room and go have
 7          sex?
 8     A.   No.
 9     Q    He never asked you for any form of sex?
10     A.   No.
11     Q    What he did on this occasion was reviewed the balanced
12          approach, as you described it, and then smiled at you
13          and pointed at himself, correct?
14     A.   That I need, I needed, he said, in our department we
15          have to satisfy the victim, the community, and to make
16          sure the juvenile's rehabilitated.  He said, you have to
17          satisfy the victim, the community and (indicating), and
18          smiled at me, a very sexual provocative.
19     Q    And that was the way you interpreted it?
20     A.   Yes, it is.
21     Q    Was there anybody else present when he did that?
22     A.   No.
23     Q    So it was just you and him?
24     A.   Yes.
25     Q    In I you make reference to Graham calling attention to
```

Barbara Varner                              158

```
 1          your gender and making inappropriate comments about
 2          females.  What do you mean by that?
 3     A.   It goes to the sentence that he made a comment to me
 4          about how dark he believes a young female's, quote, bush
 5          is.
 6     Q    Did he ever make any comments about your body?
 7     A.   He would just compliment me on just -- anytime I would
 8          see him he would say how nice I was dressed, you look
 9          nice in your white pants, those kind of comments.
10     Q    Did he ever say anything about your breasts?
11     A.   No.  Well, there was a time where we were measuring for
12          bulletproof vests, and he thought it was so amusing to
13          let us know, the females know that he knew what cup size
14          we wore, because they're measured in cup size.  He
15          thought that was hilarious that he knew everybody's cup
16          size.  And he told me that I was not as big as one of
17          the other girls in the department.
18     Q    When was that?
19     A.   Probably, I'm just speculating, '97.
20     Q    Do you recall when in '97?
21     A.   No.
22     Q    Was anybody else present when that conversation
23          occurred?
24     A.   Other girls heard him talk about that, that he knew the
25          cup size.  He was back there when they were measuring.
```

Barbara Varner                                159

1   Q   Who were the other girls?

2   A.  Nicole Galbraith.  She wasn't married at the time.

3       Debra Green.  Kerry Houser was also a female.  I believe

4       that was all females at the time.

5   Q   Was there any solicitation associated with that, or was

6       it just a reference to your cup size?

7   A.  Just letting me know that he thought --

8   Q   That he knew your cup size?

9   A.  Yes.  It was humorous for him.

10  Q   Did he ever discuss or mention to you anything about any

11      other part of your body?

12  A.  No.

13  Q   Were there any other occasions when he mentioned

14      anything about your cup size or breasts?

15  A.  No.

16  Q   The comment that's contained in paragraph I with respect

17      to a young girl's bush, tell me how that occurred.

18  A.  I was in my office, which is right off the main area of

19      the office.  And there was a girl who worked in the

20      District Attorney's Office, a young girl, young new

21      girl, and I think he knew her from the Newville area.

22      And he just came in just so happy with himself, he said,

23      I wonder how -- I believe how dark her bush is.

24  Q   Did you make any note with respect to that?

25  A.  Yes, I did.

Barbara Varner                              160

1   Q   Did you date that note?

2   A.  Yes.

3   Q   What date was that?

4   A.  I don't have those dates with me.

5   Q   Did you protest to him when he made that comment?

6   A.  I was embarrassed and I said, you shouldn't talk about

7       that, you shouldn't talk like that.

8   Q   Was there anybody else present when he made that

9       comment?

10  A.  I don't -- no, I don't believe so.

11  Q   At any time, Barbara, during these various episodes

12      you've indicated at one time or another that you

13      protested to him, correct?

14  A.  That's correct.

15  Q   Did you at any point during any of those episode ever

16      say to him, please stop it or I'm going to have to go up

17      the chain of command and report your behavior?

18  A.  Yes.  And he said, go ahead and I'll have you

19      reprimanded, I'll take you up to the judge and have you

20      reprimanded.

21  Q   When did that occur?

22  A.  It would have been in '97.  Probably --

23  Q   When in '97?

24  A.  I would say probably beginning of '97.

25  Q   And what was the episode?

Barbara Varner                          161


1   A.   I would tell him I'm tired of hearing him use the F word

2        at me, I'm tired of him screaming at me.  And that's

3        when he threatened to take me up to the judge and have

4        me reprimanded.

5   Q.   All right.  Let's take that in steps.

6   A.   Okay.

7   Q.   And what I want to deal with is him screaming at you and

8        using the F word with respect to you separately.

9   A.   Right, okay.

10  Q.   With respect to the other episodes that we've been

11       talking about now for last hour or so, was there ever a

12       time when you said to him with respect to one of those,

13       where you said to him, enough?  Was there ever a time

14       when you said to him, if you don't stop talking about

15       those things I'm going to go up the chain of command and

16       take you upstairs?

17  A.   If I would say that and mentioned like, you know, you've

18       got to stop talking to me like this, he would say, go

19       ahead and take it to Joe, Joe won't do anything,

20       Mr. Osenkarski, he won't do anything.

21  Q.   My question to you is:  Did you ever do that?  Did you

22       ever say to him, I'm going to take you upstairs?

23  A.   I said I was going to talk to Joe.

24  Q.   About these things that we've been talking about?

25  A.   Yes.  I was tired of hearing about it, yes.

Barbara Varner                    162


1    Q    When did that conversation occur with Joe, or with

2         Mr. Graham?

3    A.   I would say probably late '96 I'm guessing.

4    Q    Did you ever report Mr. Graham's behavior to

5         Mr. Osenkarski?

6    A.   The one time when he threw me out of his office, and

7         that was about a file, that he just was calling me F-ing

8         this and F-ing that.

9    Q    We're going to get to that.  Okay?

10   A.   Okay.

11   Q    All right?  But other than that?

12   A.   No, I didn't.

13   Q    Okay.  So you never actually reported Mr. Graham's

14        offensive language to Mr. Osenkarski?

15   A.   No.  I was in fear of reprisal.  I was afraid of

16        reprisal from him and from Mr. O, Mr. Osenkarski.

17   Q    Now, you say that Mr. Graham on occasion used the F word

18        with respect to you.

19   A.   Yes.

20   Q    And actually in paragraph 17, actually it looks like

21        it's in J and also in 17 D.  Take a look at those.

22             MS. WALLET:  You're referring to 16 J?

23             MR. THOMAS:  Yes.

24             THE WITNESS:  Yes.

25   BY MR. THOMAS:

Barbara Varner                          163

1    Q    And those are two episodes where he either used the F

2         word or --

3    A.   Yes.

4    Q    -- or you challenged him with respect to its use,

5         specifically dealing with you, correct?

6    A.   That's correct.

7    Q    When did those two conversations occur?

8    A.   One in J, I heard that several times.  I would say

9         whenever he would start ranting with the F word in my

10        office, he did that, and that would have been in early

11        '97 that I told him I didn't want to hear that word

12        anymore.  And I know at a time before that he had said,

13        he would say, go back to doing your social work if you

14        can't take it.

15             The one in D, that was said Debra Green is the one

16        that heard him saying that.  It was a -- the office was

17        open for business.  He was going back and forth between

18        two offices just ranting and raving about no F-ing

19        sense, no F-ing training, no F-ing ability.  To my

20        understanding it continued on for approximately 10

21        minutes.

22   Q    Would those comments have offended you had he left the

23        word fuck out?

24   A.   No.  I'm sorry, yes, they would have offended me.

25   Q    If he had said no sense and no training and no ability,

Barbara Varner                              164

1           it still would have offended you?

2    A.     Absolutely.

3    Q      Does the expletive add anything to the sense of outrage

4           that you felt with him screaming at you that you had no

5           sense, no training, and no ability?

6    A.     Of course it did.

7    Q      In what way?

8    A.     I find the F word offensive.  It just makes it more

9           derogatory towards me.

10   Q      After the tirade, as you described it outlined in 17 D,

11          what did you do?

12   A.     Like I said, that was said in front of Ms. Green.  I was

13          on my way to the office and she called and told me what

14          he had said.  She was afraid for my safety.  She said,

15          he is in a tirade, go anywhere but don't come into the

16          office, he is just on a tirade.

17   Q      Were you not there when he said that?

18   A.     No, I was not.  It was in front of Miss Green and he was

19          saying it between I believe it was Mr. Thielemann and I

20          believe Mr. Miller.

21   Q      So you weren't even physically present when the outburst

22          occurred that's alleged in 17 D?

23   A.     No, I was not.

24   Q      You were not in the office?

25   A.     No, I was not.  I was on my way to the office and Miss

Barbara Varner                         165

1          Green called and told me what Mr. Graham had said.

2     Q    All right.  So it wasn't as if he was confronting you in

3          person and saying those things; he was doing it in

4          response to something that set him off in the office?

5     A.   He had told me before he felt I had no F-ing ability.

6          He told me that in the office.

7     Q    Did you report that to anybody?

8     A.   Yes.  That was whenever, probably almost at the point

9          where I went down to Human Resources.  Well, it was

10         called the, yeah, Human Resources.

11    Q    And that was in April of 1997?

12    A.   Yes.

13    Q    And was it that outburst or something like it that

14         caused you to go to Human Resources?

15    A.   I think it was just a combination of everything.  It was

16         getting worse.  No matter what I did, it was wrong.

17         Anything I did in the past, if I did it now it was

18         wrong.

19              Comments were made to me by other probation

20         officers saying, well -- if I would say, how are you

21         doing this, show me how you do this, and they said don't

22         come to me because we can do it one way but he won't

23         allow you to do it that way.

24              And one of the co -- another probation officer had

25         copied the harassment discrimination policy from the

Barbara Varner                              166

1          county handbook, almost like as a reminder, like I was

2          so caught up in this that he reminded me, he said, you

3          need to go see somebody.  He was observing what was

4          going on.

5     Q    And who was that?

6     A.   That was Darby Christlieb.

7     Q    Do you remember when that was?

8     A.   It was right before I went down and spoke to

9          Mr. Hartnett.

10    Q    But you knew that that policy existed, correct?

11    A.   Yes, I did.  But I think I was so caught up in wondering

12         what I was doing wrong that I wasn't even thinking

13         beyond that.  I, you know, to complain to

14         Mr. Osenkarski, I knew it wouldn't do me that much good

15         because he was not in the office that much.  He really

16         had relinquished his power to Mr. Graham.

17    Q    And I gather you never pursued that route, you never

18         complained to Mr. Osenkarski?

19    A.   Yes, I did.  One day I did complain to Mr. Osenkarski.

20    Q    When was that?

21    A.   That was --

22    Q    About this same time, about April of '97?

23    A.   It would have been a couple, yeah, a couple months, yes.

24    Q    Well, a couple of months or a few days?

25    A.   It was not a few days.  It was probably prior to that.

Barbara Varner                              167

```
 1          It was -- I can't come up with the date right now.

 2     Q    You filed your complaint with Dan Hartnett on April 25,

 3          1997.

 4     A.   That's correct.

 5     Q    When would it have been in reference to that?

 6     A.   I would say probably guessing, February, March.

 7     Q    And you actually met with Mrs. Osenkarski?

 8     A.   Yes, I did.

 9     Q    In February or March of 1997?

10     A.   Right.

11     Q    Where did you meet with him?

12     A.   In his office.

13     Q    What did you say to him?

14     A.   Mr. Graham had just got done screaming and throwing me

15          out of his office because he didn't like how I had

16          handled several cases.  And I went into Mr. Osenkarski

17          and I said, you've got to stop, you've got to get this

18          man under control.

19     Q    Why was he unhappy with you in February or March of '97?

20          Meaning Mr. Graham.

21     A.   I have no idea.

22     Q    Why was he screaming at you?

23     A.   He just was unhappy with the way I handled the cases, I

24          presume, the pattern I had done a hundreds of times

25          before.  No, a hundred times, 50 times before.
```

Barbara Varner                               168

1   Q    So the basis for him screaming at you had to do with his

2        assessment of your performance?

3   A.   Yes.

4   Q    And he was unhappy with your performance, he told you --

5        screamed at you and told you to get out of his office?

6   A.   Threw me out of his office.

7   Q    Did he give you any instructions in terms of how he

8        wanted you to do it differently?

9   A.   No.

10  Q    So just threw you out of the office over a performance

11       issue.  You then went to Mr. Osenkarski in February

12       March, and said, you've got to get this guy under

13       control?

14  A.   Right.

15  Q    What details did you give Mr. Osenkarski in February

16       March of 1997 about Graham's behavior?

17  A.   He had been back in the office to begin with when I had

18       started discussing this case with Mr. Graham.  And I had

19       looked to Mr. Osenkarski, I said, is this not the way we

20       always proceed, the same thing we've always done?  And

21       he said, yes, but Mr. Graham's in charge.  He verified

22       that that, indeed, was the way, you know, when we turned

23       cases in to Mr. Osenkarski that he was fine with it, but

24       Mr. Graham was in charge.

25  Q    So if I understand correctly, there was an issue about

Barbara Varner                              169

```
 1         the manner in which you were doing some paperwork, I
 2         guess?
 3    A.   Right.
 4    Q    Graham started to challenge you, Osenkarski was present.
 5         You said to Osenkarski, isn't this the way we always do
 6         it?
 7    A.   Um-hum.
 8    Q    And Osenkarski said, yeah, but Graham's in charge?
 9    A.   And he exited and went to his office.
10    Q    Graham then proceeded to scream at you?
11    A.   Right, and threw me out of the office.
12    Q    Over the manner in which you were doing certain
13         paperwork?
14    A.   Right.
15    Q    Threw you out of the office and you went to Osenkarski?
16    A.   Osenkarski's office.
17    Q    And said, you've got to get this guy under control?
18    A.   Absolutely.
19    Q    Was there any solicitation of sex involved?
20    A.   No.
21    Q    What was it about the conversation or comments by
22         Mr. Graham that you found to be demeaning?  If you did.
23    A.   Telling me that I wasn't doing -- like I said, things
24         that I had done before were okay, now all of a sudden
25         they were not okay.  The yelling at me, not even
```

Barbara Varner                                    170

1         explaining anything.

2    Q    Had you done similar or identical paperwork in the same

3         fashion previously?

4    A.   Yes.

5    Q    Without complaint from him?

6    A.   Yes.

7    Q    Did you ever get an explanation from him as to why it

8         was okay before but it wasn't okay now?

9    A.   No, I didn't.

10   Q    Other than Mr. Osenkarski, did you report that episode

11        to anybody else?

12   A.   To Mr. Hartnett.

13   Q    Is that when you went to Mr. Hartnett?

14   A.   It was about that time, yes.

15   Q    Do you remember the date on the first occasion in which

16        you complained to Mr. Hartnett?

17   A.   No, I don't.  It was probably the beginning of --

18   Q    April?

19   A.   April, yes.

20   Q    Of 1997?

21   A.   Um-hum.

22   Q    In 17 B, you mentioned this during your earlier

23        testimony today, you make reference to wadding up paper.

24        Do you recall exactly when that occurred?

25   A.   Again, it was '97 -- I believe it was '97.

Barbara Varner                                    171

1    Q    Was that something else that you noted in your personal

2         notes?

3    A.   Yes.

4    Q    And is there a date contained in those notes, to the

5         best of your recollection?

6    A.   Yes.  Yes, there is.

7    Q    What was the subject matter of the discussion that

8         morning?  If it was morning.

9    A.   It was morning.  I was in my office.  Debra Green was

10        also sitting in my office with me.  Mr. Graham came in.

11        I believe I had the file in my desk.  Again, it was the

12        composite of the victims I had listed extensively for

13        the crime.  He was for some reason not happy with how I

14        had done that.  He came in, wadded the paper up, and

15        this is, I don't know what he called it but he was not

16        happy with it.  He wadded the paper up and threw it at

17        me.

18             He pointed his finger in my face and started

19        saying, you have no -- don't know what you're doing,

20        just on and on, you have no fucking idea what's going on

21        here.  He was pushing my pictures on my desk towards me,

22        moving them around and getting right in my face.

23             My office, I only had the one entrance and he was

24        blocking the entrance and he had his hand in my face,

25        his finger in my face shaking at me.

Barbara Varner                           172

```
 1    Q    Was Debra Green there for the entire event?

 2    A.   Yes, she was.  And he was loud when he did this.  And

 3         it's an open office.

 4    Q    It was loud?

 5    A.   He was very loud and it was an open office.  My door

 6         wasn't shut.  He was letting me know.

 7    Q    And he was letting you know that is he --

 8    A.   He was very angry.

 9    Q    And very angry, again, about your performance on some

10         given task?

11    A.   Right.

12    Q    He used the word fuck?

13    A.   Yes, he did.

14    Q    How long did that episode last?

15    A.   Felt like an eternity.  Probably he went on and on for

16         several minutes.  I'd say at least three, four minutes,

17         he went on and on.

18    Q    How close did he get to you?

19    A.   His finger was right in my face.  He came around to my

20         desk, his finger was right in my face.

21    Q    He was pointing at you?

22    A.   Yes, he was.

23    Q    And saying what?  You have no idea what you're doing?

24    A.   Yes.  F-ing this, and yes, he would scream when he would

25         talk.
```

Barbara Varner                          173

1    Q    Other than Deb Green did anybody else witness that
2         episode?
3    A.   I'm sure other people heard it.  The secretary's desk is
4         right outside of my door.  But Debra was right in there
5         when it happened.
6    Q    Did you ever hear Mr. Graham scream at anybody else?
7    A.   Yes, I've heard him scream at other people.
8    Q    Who?
9    A.   The director of Children and Youth.
10   Q    Who's that?
11   A.   Gary Shuey.  There was a meeting in the one of the back
12        rooms.
13   Q    Do you know what that was about?
14   A.   I don't know.  I have no idea.  We just heard the voices
15        and him screaming.
16   Q    Who else has he screamed at?
17   A.   He had raised his voice to quite a few people.  As far
18        as screaming, that kind of thing, I never heard him do
19        that at anybody but me.
20   Q    So the only person that you've heard him, the only two
21        people you've heard him ever scream at are you and
22        Mr. Shuey?
23   A.   That I can recall, yes.
24   Q    But you have heard him raise his voice with others?
25   A.   Yes.

Barbara Varner                                    174

1    Q    Can you tell me who those people are?  Let me ask it to
2         you a different way.
3              Is there anybody who you haven't heard him raise
4         his voice with?
5    A.   Many people.
6    Q    Who?
7    A.   Sam Miller.  Hank Thielemann.  Dennis Drachbar.  The
8         secretaries, I can't recall him doing that.
9    Q    How long have Miller, Thielemann and Drachbar been with
10        the Probation Department?
11   A.   I'd say probably over 20 years now.
12   Q    Was his elevated tone of voice something that he used
13        with newer employees?
14   A.   No, not that I believe.  No.
15   Q    So who else did you hear him raise his voice with?
16   A.   Those are the only three -- I heard him, he would go in
17        to Chief Bolze, he would get loud with him.  And with
18        Mr. Osenkarski, he would get very loud with
19        Mr. Osenkarski.  Not to the point of screaming, but he
20        basically told Mr. Osenkarski what he would do or what
21        he wouldn't do.
22   Q    Dictating to Osenkarski?
23   A.   Absolutely.  Absolutely.
24   Q    And he did that in a very loud and forceful manner?
25   A.   Yes.  I saw him do that several times.

Barbara Varner                                    175

1   Q    Did you ever hear him use the fuck word with Osenkarski
2        or Bolze?
3   A.   No.
4   Q    How about anybody else?
5   A.   Yes, he would.  Just in conversation, describing things,
6        not in an angry manner.
7   Q    So he used the fuck word as part of his regular
8        vocabulary?
9   A.   I wouldn't say regular, but you heard it occasionally.
10  Q    How about any other swear words, was there anything else
11       that was part of the vocabulary?
12  A.   Not that I can recall.
13  Q    So the principal word that you heard or at least
14       remembered was fuck?
15  A.   Seemed to be.
16  Q    Is there anything else in 17 A through E that we haven't
17       talked about?
18  A.   I don't believe.
19  Q    In paragraph 19 you allege that Mr. Osenkarski also is
20       guilty of harassment, correct?
21  A.   That's correct.
22  Q    Let's look at those allegations, if we could.  In 19 A
23       you say he called attention to your gender and made
24       inappropriate comments about other females.
25       Specifically, what did he say?

Barbara Varner                        176

```
 1   A.   He made the comment when I was standing at the door of
 2        our office talking to another probation officer, Mike
 3        Varner, he walked past -- Mr. Varner and I had no
 4        relation -- were engaged in a conversation, and he just
 5        walked past and he said about a female intern's breasts,
 6        that she had a nice said of jehoobees, and then
 7        continued to walk out the door.
 8   Q    Did he ever make any inappropriate comments with respect
 9        to you personally?
10   A.   No.
11   Q    Other than this one episode where he made a comment
12        about the young girl's breasts, were there any other
13        episodes where Mr. Osenkarski said something that you
14        thought was inappropriate?
15   A.   Yes.  There was a time that Mr. Osenkarski was
16        discussing his girlfriend's genital area, Debra Green
17        was a witness to this, that he spoke about when he was
18        canning hot peppers that their fingers would get hot,
19        and he had learned his lesson about inserting them in
20        her because it burned her.  And this comment was made,
21        Ms. Green heard this and there was other secretaries
22        there.
23   Q    When did that occur?
24   A.   I'd say '98.  I'm speculating on this date.  '99.
25   Q    Was that something else that you also noted on your
```

Barbara Varner                                177

1          notepad?

2    A.    Yes.  Correction.  It looks in here it says in September

3          of 2000 when he made that comment.

4    Q     That was September of 2000?

5    A.    Yes, according to my reporting.

6    Q     So the inappropriate comments made by Chief Osenkarski

7          from the time you joined the Probation Department in

8          February of '95 until September of 2000, a period of

9          five years, you can identify two, correct?

10   A.    No, there are others.

11   Q     Okay.

12   A.    On September 12th, 2000, Mr. Osenkarski informed two new

13         female probation officers they would have to dance on

14         the table at their first staff meeting.  Ms. Green heard

15         this comment.  It was a staff meeting that was about to

16         begin.

17   Q     So we're now up to three; is that correct?

18   A.    There was also Mr. Osenkarski commented to a new female

19         probation officer that hysterectomies ruin women.  To my

20         knowledge, I was possibly the only one in the office

21         that had that.

22   Q     Did he know that you had had a hysterectomy?

23   A.    Yes, he did.

24   Q     Did you interpret that comment as being directed to you

25         personally?

Barbara Varner                                    178

1    A.    Yes, I did.

2    Q     Was he looking at you when he said it?

3    A.    No.  I was not present when he said that.

4    Q     You were not present?

5    A.    No, I was not.  I was --

6    Q     How did you learn of the comment?

7    A.    The girl herself told me, Gail Schuhart, a probation

8          officer.  Mr. Osenkarski would tell Ms. Schuhart that

9          she reminded him of his ex-wife.

10   Q     Was that somehow inappropriate?

11   A.    She was uncomfortable.

12   Q     Ms. Schuhart was?

13   A.    Yes.

14   Q     The comment about dance on the table?

15   A.    Yes.

16   Q     What is it about that comment that you find offensive?

17   A.    It's demeaning.  I don't believe he ever told men, guys

18         that they had to dance on the table at the first staff

19         meeting.  You usually don't see guys dancing on tables.

20         That's probably presumed by most people it's

21         provocative.

22   Q     Was that said in jest?

23   A.    I was not there.  Debra Green was there when it happened

24         as well as other probation officers.

25   Q     So you were not present to hear that comment, either?

Barbara Varner                                179

1   A.    No, I was not.

2   Q     Were you aware of any of the new female probation

3         officers that actually had to dance on tables?

4   A.    No.

5   Q     Are you aware of any female that ever danced on a table

6         at any probation meeting?

7   A.    Not that I know of, no.

8   Q     So of the allegations contained in your paragraph 19,

9         you were present for the comment about the intern's

10        breasts, correct?

11  A.    Correct.

12  Q     Were you present for any of the other comments?

13  A.    No.  I was just informed about those.

14  Q     Okay.  So in your presence, the only comment that was

15        made by Mr. Osenkarski amounted to the comment about the

16        young girl's breasts, right?

17  A.    Yes.

18        There was one other incident where I was at a

19        training with Mr. Osenkarski and Mr. Graham in Penn

20        State, and it was on sexual, juvenile sexual offenders I

21        believe is how it was defined.  And Mr. Osenkarski had

22        on him a Bic lighter, Bic type lighter, and when he

23        flicked it, it was a penis.  And he flicked it at the

24        female presenter several times.

25  Q     When was that?

Barbara Varner                          180

1  A.   It was '96.

2  Q    Do you know when in 1996?

3  A.   No, I don't.

4  Q    And who attended the Penn State conference?

5  A.   Juvenile Probation officers.

6  Q    Did he ever flick the Bic at you?

7  A.   Yes, he did.  He did that wherever he was.

8  Q    Was there any comment or solicitations associated with

9       it?

10 A.   No.  Not towards me, no.

11 Q    What was his purpose in doing so?

12 A.   Just amusing people, I guess, because it was a sexual

13      offenders program and this woman was presenting on

14      sexual offenders.

15 Q    In paragraph 20 you allege that you've been given less

16      desirable assignments.

17 A.   Yes.

18 Q    Tell me what you mean by that.

19 A.   In the past.  I have been, there were times where

20      assignments were not given out to males to supervise

21      females because of concerns of maybe inappropriate

22      allegations being made.  That was never the issue with

23      me.  I was given cases where the boys would need urine

24      tests, they might not even be in school.  Schools do not

25      want to do urines for us.  It just puts me in the same

Barbara Varner                          181

```
 1        position.  But I was required to do the urine testing,
 2        drug users, who needed that constant urine testing.  It
 3        was almost impossible for me to get a good urine because
 4        I can't observe what they're doing.
 5             I was given cases of large males, large aggressive
 6        males -- obviously, I'm not a very large person -- that
 7        I was to supervise them in their home by themselves,
 8        assaultive.  It was just -- size-wise it was an
 9        inappropriate assignment.
10   Q    Did you protest that assignment to anybody?
11   A.   I talked to at the time it was Mr. Thielemann who had
12        assigned that case, concerns about that, that I can't
13        urine test.  And physical-ness.  And --
14   Q    Are we talking about one case involving urine tests of
15        males?
16   A.   No, there were several.  I would get, you know,
17        routinely cases males that needed a urine screening,
18        where I would see males not getting assigned to females
19        who needed the same thing.
20   Q    How many cases involving this urine-sampling problem got
21        assigned to you?
22   A.   Really, now, all males need to be urined and I have, you
23        know, cases with males.
24   Q    Do you have any idea of the relative caseload of male to
25        female in the Probation Department?
```

Barbara Varner                          182

1   A.   The girls are getting more and more.  Males, I would

2        just speculate probably 75 percent male, 25 percent

3        female.  It could be more than that for females now.

4   Q    And how about in the time frame 1995 to 1996?

5   A.   I would say it probably would be about the same then.  I

6        think it's getting more now, more females.

7   Q    What else, other than the urine testing or the size of

8        the particular male probation people, are you referring

9        to when you say you got less desirable assignments?

10  A.   The numbers.  My assignment numbers were extremely high

11       compared to others for while.  That is not -- now it's

12       not happening.

13  Q    You had a high caseload?

14  A.   Yes, I did, compared --

15  Q    When was that?

16  A.   That would be in '96, '97.

17  Q    What was your caseload?

18  A.   I don't know the numbers right now, but just looking in

19       comparison, mine was a lot higher.

20  Q    What do you mean by a lot higher?

21  A.   Perhaps six, seven more than other ones.

22  Q    What was your average caseload in the '96-'97 period?

23  A.   I'm guessing, speculating 25, 30, 35, somewhere around

24       there.

25  Q    In 20 B you say that other probation officers

Barbara Varner                               183

1          continually reminded that you were in physical danger of

2          retaliation by Graham?

3     A.   Yes.

4     Q    Who were the probation officers that told you that?

5     A.   Sam Miller.  Dennis Drachbar.  Darby Christlieb.  Debra

6          Green.  Kerry Houser.  I've been told to always be

7          careful where I go because of Mr. Graham by the sheriff

8          and by the CID Department.

9     Q    What's CID?

10    A.   Central Investigation Department of the DA's office.

11         They had advised me to call my local police and inform

12         them of Mr. Osenkarski's type of car and Mr. Graham's

13         type of car.  They also asked me to get a phone

14         monitoring -- number monitor on my phone.

15    Q    Did you did that?

16    A.   Yes, I did.  My own cost.

17    Q    Did you ever receive any crank calls?

18    A.   We receive lots of crank calls.  My husband could verify

19         that.  Probably for a while it was one to two a day,

20         hang-up calls.  We could not trace the number, it would

21         be unavailable or anonymous.  Usually unavailable.

22    Q    Do you have any reason to believe that any of those

23         calls were made by Mr. Graham or Mr. Osenkarski?

24    A.   Yes, I do.

25    Q    On what basis?

Barbara Varner                          184

```
 1   A.   Just knowledge of the potential, what they could do.
 2        And the police, like I said, the CID are the ones that
 3        informed me that that would be a good idea for me to do.
 4   Q    When did Mr. Miller tell you that you should be
 5        concerned about physical danger?
 6   A.   Specifically, he told me on, it was it 1999.  He said
 7        that he was aware and he was concerned about how angry
 8        he had heard Mr. Graham was, and that I needed to watch
 9        myself.
10   Q    Did he indicate that he had received any firsthand
11        information from Mr. Graham that he was threatening you?
12   A.   I don't think they would ever tell me specifically that
13        they would.  They were just sort of alerting me just to
14        be careful.
15   Q    How about Mr. Drachbar?
16   A.   Mr. Drachbar, again, he was concerned -- most of them
17        expressed concern to me or they'll just say, watch your
18        back, be careful, you know.  Or else they'll say
19        Graham's around or those kind of things, to let me know.
20   Q    Has Mr. Graham ever physically threatened you?
21   A.   He has threatened that he'll punish me.  He will punish
22        anybody who crosses him.  And knowing his history with
23        his wife, I absolutely believed him.
24   Q    When did he threaten to punish you?
25   A.   That was an ongoing thing after he was starting to get
```

Barbara Varner                                        185


1          angry.  And we were always told ahead of time even

2          before that, just letting us know what they had done to

3          people before, Mr. Osenkarski, Mr. Graham, that they

4          punished people.  They liked to say that.

5     Q    Was this '96-'97?

6     A.   Even before -- well, after I -- once I started there,

7          these are comments I heard.

8     Q    From February '95 on?

9     A.   Right, about the punishment phase.

10    Q    Mr. Graham no longer has any supervisory

11         responsibilities over you; is that correct?

12    A.   No, he did not.

13    Q    And hasn't had since the summer of '97?  Let's approach

14         it this way.

15    A.   Right.

16    Q    Sometime after you filed your Complaint --

17    A.   Right.

18    Q     -- you received a letter, did you not, removing all

19         supervisory responsibilities with respect to Mr. Graham?

20    A.   Yes, I did.  It would have been spring of '97, I think.

21         Late spring, probably.

22    Q    And we'll get to that at some point.

23    A.   Okay.

24    Q    And Mr. Osenkarski, of course, has remained in the

25         Department throughout, correct?

Barbara Varner                          186

1   A.    Yes, he has.

2   Q     Has he retaliated against you in any fashion whatsoever?

3   A.    Not directly, no.

4         MR. THOMAS:  Let's take a couple of minutes, okay?

5         (Recess taken from 3:31 until 3:44 p.m.)

6   BY MR. THOMAS:

7   Q     Barb, before we took the break you were talking a

8         minute ago about the comments or concerns involving

9         Mr. Osenkarski, and remember, we reviewed those and you

10        were only personally present for one of those, as I

11        recall.  Do you recall that conversation?  It's

12        paragraph 19 of your Complaint.

13        One of the things I forgot to ask you there was,

14        you indicated that other probation officers informed you

15        of the comments that he had made.

16  A.    Yes.

17  Q     Who were those probation officers?

18  A.    As regard to E would have been Debra Green.  D would be

19        Debra Green observed it.  The two females would have

20        been Gail Schuhart and Jill Grim-Rhoads, that's

21        hyphenated.

22        MR. MacMAIN:  Would you repeat that last name?

23        THE WITNESS:  Grim-Rhoads, G-R-I-M-E, hyphen,

24        R-H-O-A-D-S, I believe.

25        C would have been Gail Schuhart.  I think I already

Barbara Varner                                187

 1        said that.

 2            And that would --

 3    BY MR. THOMAS:

 4    Q    Let's go back to paragraph 20, now, I believe is where

 5         we were.  In D you make reference to seniority problems.

 6         There was a dispute at one point, was there not, over

 7         whether probation officers got credit for all county

 8         time or only time in the Probation Department; is that

 9         correct?

10    A.   After we split, after we became juvenile and adult.

11         Prior to that, they had already established a policy.

12    Q    And that dispute arose, and as I understand it, you

13         correct me if I'm wrong, I gather that seniority problem

14         has been solved to your satisfaction?

15    A.   No.  I'm still below on the seniority list.  I'm still

16         below the gentleman who I had been above when I was

17         hired.

18    Q    Based on total time?

19    A.   Yes.

20    Q    And who is that gentleman?

21    A.   That's William Brandt.

22    Q    And the dispute centers around whether or not a

23         probation officer, in terms of seniority, gets credit

24         for all time while employed in any branch of county

25         government, or whether the only time that applies is the

Barbara Varner                              188

1          Probation Department, correct?

2     A.    That's correct.

3     Q     And you say that still has not been solved to your

4           satisfaction?

5     A.    No.  I'm still below him.  I had -- when I first started

6           with Probation I was above him, and then he was moved

7           down when we split.  Well, not when we split, whenever

8           the -- yes, when the seniority list was changed.

9     Q     And what aspects of your employment does that seniority

10          list affect?

11    A.    It could be an on-call.  We have to go by seniority when

12          you put down for on-call.  Any kind of promotion has

13          always been historically longevity.  And I think it's --

14          I don't know of any other times that promotions were not

15          based on longevity and, well, seniority list.  And so

16          that would affect me when that occurs.

17    Q     Have you ever been passed over for a promotion?

18    A.    When the senior -- a senior probation officer position.

19          And I said, wait a minute, that I had more seniority

20          than Bill Brandt.

21    Q     Are you now a senior probation officer?

22    A.    Yes, I am.

23    Q     When were you made a senior probation officer?

24    A.    I don't know the exact date.  '98, I believe.

25    Q     How about May 7, 1998?

Barbara Varner                          189

1  A.  Okay.

2  Q   When did you think you were eligible to become a senior

3      probation officer before that?

4  A.  They had promoted -- they had -- Mr. Osenkarski had

5      posted that Mr. Brandt would be a senior probation

6      officer, and I'm not sure when that had happened, but it

7      was in the prior probably six-month period.

8  Q   Do you know as a matter of fact or is it merely your

9      suspicion that you weren't promoted to a senior

10     probation officer at the same time as Mr. Brandt?  That

11     was a very awkward question.  Do you understand it?

12 A.  No, I don't.  Would you rephrase that?

13 Q   What I want to know is why you believe that Mr. Brandt

14     was made a senior probation officer before you were.

15 A.  They changed the seniority list, one thing, and put him

16     above me.  So again, the seniority.

17          And also, Mr. Graham had told me that I didn't need

18     it as much as Mr. Brandt did, that I had a rich husband,

19     and that Mr. Brandt -- I'm sorry, and Mr. Brandt would

20     have a family, eventually get married and have a family

21     and he would need it more than I would.

22 Q   Do you know as a matter of fact that Mr. Brandt was made

23     a senior probation officer before you were?

24 A.  He was, until I complained.

25 Q   And then what happened?

Barbara Varner                          190

1    A.    Then I guess there was discussion about that,

2          Mr. Osenkarski and -- I don't know who all.  All I know

3          is discussion was held and that seniority move was put

4          on hold.

5    Q    What was the end result?

6    A.    We were both promoted.  He still remained senior to me,

7          though.

8    Q    So you were both made senior probation officers at the

9          same time?

10   A.    Yes.

11   Q    What other effect has it had on your employment, if any?

12   A.    At this point, nothing.  It's just potential, as I said.

13         If there's promotions, looking at the seniority list, he

14         is above me.

15   Q    Is he the only one that's affected?

16   A.    Yes, he is.

17   Q    In paragraph 21 of your Complaint you indicated that you

18         complained about harassment, sexual harassment by Graham

19         and Osenkarski to Mr. Hartnett on April the 8th, 1997.

20         You see that allegation in paragraph 21?

21   A.    Yes, I do.

22   Q    Is that, in fact, the first time that you filed a formal

23         complaint?

24   A.    That's the first time I went down and spoke to

25         Mr. Hartnett about that, yes.

Barbara Varner                          191

1    Q     And was that pursuant to the policies and procedures

2          that you were aware of regarding harassment and

3          discrimination?

4    A.    Yes, it was.

5    Q     Did you follow that meeting up with a written

6          memorandum?

7    A.    Yes, I did, on April 25th.

8              (Varner Deposition Exhibit No. 1 was marked.)

9    BY MR. THOMAS:

10   Q     I've placed in front of you what we've marked as your

11         Deposition Exhibit No. 1.  Do you recognize that

12         document?

13   A.    Yes, I do.

14   Q     And is that, in fact, the April 25, memorandum that you

15         filed with respect to your claims here?

16   A.    Yes, it is.

17   Q     And was that filed pursuant to the harassment and

18         discrimination policy that you were aware of as part of

19         your employment?

20   A.    Yes, it is.

21   Q     Did you attempt to detail in that document all the

22         various events, some of which we've discussed here

23         today?

24   A.    Yes, I did.

25   Q     And at the time, that was your recitation in terms of

Barbara Varner                              192

1          the behavior that you thought violated your rights,

2          correct?

3    A.    That's correct.

4    Q     Are you aware that following your submission of that

5          document that an investigation was commenced?

6    A.    Yes, it was.

7    Q     And it was commenced by or on behalf of individuals in

8          the county; is that fair?

9    A.    To my knowledge, yes.

10   Q     County and the court?

11   A.    Yes.

12             (Varner Deposition Exhibit No. 2 was marked.)

13   BY MR. THOMAS:

14   Q     I've placed in front of you a document which we've

15         marked as your Deposition Exhibit No. 2.  Do you

16         recognize that document?

17   A.    Yes.

18   Q     Do you recognize and can you identify that as a document

19         authored by Joe Osenkarski?

20   A.    His initials are on that, yes.

21   Q     And you received a copy of this document at about the

22         time it was published on June 13, 1997?

23   A.    Yes.

24   Q     And was this one of the actions taken as a result of

25         your complaint?

Barbara Varner                              193

1    A.    I believe so.

2    Q     You filed your complaint on April 25th, 1997, and on

3          June 13 Mr. Osenkarski removed Mr. Graham from any

4          authority or responsibility concerning your employment;

5          is that fair?

6    A.    That's correct.

7    Q     Were you interviewed as part of the investigation?

8    A.    Yes, I was.

9    Q     And did you talk to the investigator?

10   A.    Yes, I did.

11   Q     Described in detail the facts and circumstances of your

12         employment that troubled you?

13   A.    Yes, I did.

14   Q     And that you felt violated your rights?

15   A.    Yes.

16   Q     Were you subsequently advised that some corrective

17         action was going to be taken?

18   A.    We were told that we would be very happy with the result

19         of the investigation.

20   Q     Who told you that?

21   A.    Mr. Deluce gave my attorney, Deb Wallet, that

22         information.  We were never told what the results were

23         or the recommendation.

24              (Varner Deposition Exhibit No. 3 was marked.)

25   BY MR. THOMAS:

Barbara Varner                                    194


1    Q    I've placed in front of you a document which we've

2         marked as your Deposition Exhibit No. 13, and it shows a

3         copy to --

4              MS. WALLET:  13?

5    BY MR. THOMAS:

6    Q    I'm sorry, No. 3, that shows a copy to your attorney,

7         Debra Wallet.  Do you see that?

8    A.   Yes, I do.

9    Q    Have you seen this document in the past?

10   A.   Yes.

11   Q    And do you recall having received or reviewed a copy of

12        this document in the summer of 1997?

13   A.   Yes.

14   Q    And the document, there's really two parts.  It consists

15        of two letters, a letter of July 11 authored by Judge

16        Sheely, and a letter authored by him on July 17,

17        correct?

18   A.   I never saw the first page, but the second page I'm

19        aware, the July 11th one.

20   Q    And you're aware that on July 11 Judge Sheely imposed a

21        punishment against Mr. Graham, correct?

22   A.   Yes, three-day suspension.

23   Q    And the letter of July 17 amends the dates of the

24        suspension to July 25, 28 and 29, correct?

25   A.   Yes.

Barbara Varner                          195

```
1   Q    So you are aware that as a result of your complaint
2        initiated on April 25, by July 17,  I guess more
3        appropriately by July 11, Judge Sheely, after an
4        investigation, gave Mr. Graham a three-day suspension,
5        correct?
6   A.   Yes.
7   Q    Did you agree with that --
8           MS. WALLET:  Let me just object to that.  Aware
9        when?  Aware in July or aware now?
10          MR. THOMAS:  Aware in July.
11  BY MR. THOMAS:
12  Q    Were you aware in July of 1997 that Judge Sheely had
13       given Mr. Graham a three-day suspension?
14  A.   According to his Order.
15  Q    Yes.
16  A.   Yes, I see that.
17  Q    When did you first file a complaint with the EEOC
18       office, if you recall?
19  A.   I first filed with Human Relations and they informed me
20       that I needed to file with the EEOC in that it was the
21       courts were involved.
22          (Varner Deposition Exhibit No. 4 was marked.)
23  BY MR. THOMAS:
24  Q    I've placed in front of you, Barb, a handwritten
25       letter dated July 21, 1997.  It's marked as your
```

Barbara Varner                         196

```
 1            Deposition Exhibit No. 4.  Do you recognize that
 2            document?
 3       A.   It's my writing, I can't -- Joanne, yes.  She was with
 4            EEOC, Joanne.
 5       Q    You say that is your handwriting?
 6       A.   Yes.
 7       Q    And Joanne was with EEOC, correct?
 8       A.   I believe so.
 9       Q    And this is a note that you wrote to her?
10       A.   Yes.
11       Q    Would you read it for the record, please?  It's only two
12            sentences long.
13       A.   I appreciate -- Dear Joanne, dated 7/21/97.  I
14            appreciate any help you can give me to expedite this
15            procedure.  As I explained to you, I am a court worker
16            and have had to go directly to you after Human Resources
17            denied being able to help.
18       Q    Who are you referring to when you say Human Resources?
19       A.   Probably perhaps maybe Human Relations rather than Human
20            Resources.
21       Q    You're talking about a state agency there?
22       A.   Yes.  Yes, I believe.
23       Q    And you've identified yourself there as a court worker,
24            correct?
25       A.   Um-hum.
```

Barbara Varner                          197

1    Q    And was that because you understood that you were, in

2         fact, working for the court?

3    A.   I work for both county and court.  I was an officer of

4         the court in the Juvenile Probation Department, but I'm

5         also a county employee.  I follow the guidelines of the

6         county book, procedural book.  I'm paid by the county.

7    Q    Who had the right to hire or fire you?

8    A.   That would be Judge Sheely.  The Court.

9    Q    Did anybody else have the right to hire or fire a

10        probation officer?

11   A.   No.  I would say no.

12   Q    It had to be done by the president judge?

13   A.   I'm sure -- yes, final thing, yes.  Final say.

14   Q    You asked for, in a number of documents later you asked

15        for a number of things to be done, correct?

16   A.   Um-hum.  Yes.

17            (Varner Deposition Exhibit No. 5 was marked.)

18   BY MR. THOMAS:

19   Q    At the time Mr. Graham was suspended by Judge Sheely,

20        did you have any objection to that action that was taken

21        by him, by Judge Sheely?

22   A.   I didn't think it was nearly enough.

23   Q    You thought it was an inadequate penalty?

24   A.   Absolutely.

25   Q    Why do you believe that?

Barbara Varner                          198

1    A.    Because it was a recurring derogatory threatening me.  I
2          don't think that justified only three days.  I was
3          suffering problems at that point because of this, fear
4          of my own safety.  I didn't think it was enough.
5    Q     So your objection to the penalty imposed was that it was
6          an inadequate penalty?
7    A.    He still would have access to me.  He would still be in
8          our office.  He would still be an employee of the
9          county.  Still be able to come across, be around the
10         area.
11   Q     At that point he had been removed from any supervisory
12         responsibility over you, correct?
13   A.    That's correct.
14   Q     And he had been given a reprimand and a three-day
15         suspension?
16   A.    Right.
17   Q     And what you wanted at that point was you wanted him
18         fired from the county?
19   A.    I -- what I had asked, that I did not think he should
20         supervise any other females, and I wanted to not have
21         any contact with him whatsoever.
22   Q     You personally?
23   A.    Yes.
24   Q     I've placed in front of you what we've marked as your
25         Deposition Exhibit No. 5.  Can you identify that for us,

Barbara Varner                              199

1        please?

2    A.   Yes.

3    Q    What is it?

4    A.   This was my initial complaint to the EEOC.

5    Q    Do you know when it was filed?

6    A.   I dated it 7/21/97.  The date it was filed, let's see

7         the date on here.  That's when I sent it.

8    Q    That's when you sent it to EEOC?

9    A.   Right.

10   Q    Does this appear in your handwriting?

11   A.   Yes, it is.

12   Q    And the beginning on page 3 of the document and for

13        several pages thereafter you detail the events that

14        you're complaining about, correct?

15   A.   Yes.

16   Q    When you filed that action or claim in July of 1997,

17        what is it that you wanted done?

18   A.   I wanted the harassment and the discrimination to stop.

19        I wanted to be, have a safe environment that I could go

20        to work and not worry about my supervisors, well,

21        Mr. Graham, or Mr. Osenkarski, retaliating against me.

22        I wanted what Title 7 said that I'm allowed to have, a

23        harassment-free environment, safe environment to work

24        in.  I wanted to be treated equally.  I wanted my

25        seniority addressed.

Barbara Varner                                    200

```
1   Q    As of now, Mr. Graham has been physically removed from
2        the courthouse, correct?
3   A.   His office, he's located at the prison.  I believe he
4        does come to the courthouse sometimes.  I'm not sure
5        when.
6   Q    But Judge Hoffer actually invoked a physical transfer
7        which moved him out of the courthouse, correct?
8   A.   That's correct.
9   Q    So he is no longer in the same work premises that you're
10       in on a day-to-day basis, correct?
11  A.   Correct.  That is correct.
12  Q    He no longer has any supervisory responsibility over
13       you, correct?
14  A.   No, he does not.
15  Q    Who's currently supervising you?
16  A.   Sam Miller.
17  Q    Do you have any complaints or concerns with respect to
18       Mr. Miller?
19  A.   No, I do not.
20  Q    And how long has he supervised you?
21  A.   He was assigned as my supervisor back at this, when that
22       was.
23  Q    July of '97?
24  A.   Yes.  And then, I'm not sure about the time frame, but
25       then Mr. Thielemann became my supervisor for a period.
```