Barbara Varner                                    201

```
 1          And then it returned to Mr. Miller maybe six months ago,

 2          or, he was -- he was assigned me as a person to

 3          supervise.

 4     Q    Did you have any complaints with respect to your

 5          treatment by Mr. Thielemann while he was supervising

 6          you?

 7     A.   I think at the very beginning he was -- I think he was

 8          maybe angry about the whole thing.  I felt some, you

 9          know, resistance towards me.  But he appears to be

10          mellowing, I can use the word mellowing.  He still

11          supervises me for placement cases if I have children in

12          placement.  And Tom Boyer also supervises to the point

13          of daily logs, close-out cases.  But Mr. Miller is my

14          primary supervisor.

15     Q    Now?

16     A.   Yes.

17     Q    Did you have occasion to ever complain about

18          Mr. Thielemann in terms of any discrimination or

19          harassment toward you?

20     A.   No, I didn't.

21     Q    So other than feeling some resistance as you described

22          it, you've had a good working relationship with

23          Mr. Thielemann?

24     A.   Yes.  He had done some of the stacking-on of

25          assignments, the numbers were up.  He was party to that.
```

Barbara Varner                              202

```
 1          But like I said, he seems to be improving.  He seems to

 2          be doing well in the position he's in now.

 3    Q     So you've got no present complaints with respect to

 4          Mr. Thielemann?

 5    A.    No, I do not.

 6    Q     Although he's not your current supervisor?

 7    A.    Only for placement children.

 8    Q     And Mr. Miller is?

 9    A.    He's my primary supervisor.

10    Q     And you have no problem with Mr. Miller?

11    A.    No, I have none.

12    Q     And in fact, you've worked well with him?

13    A.    Yes, I have.

14    Q     And feel safe working for him?

15    A.    Yes, I do.

16    Q     Without concerns about retaliation?

17    A.    None at all.

18    Q     Mr. Osenkarski you described earlier as having

19          relinquished a fair amount of control with respect to

20          the Department and, in fact, when you were hired by him,

21          were impressed with the fact that he was not a micro

22          manager.

23    A.    Yes, that's correct.

24    Q     Since Mr. Graham has been removed have you had any

25          problems with Mr. Osenkarski?
```

Barbara Varner                              203

```
 1    A.    Only what I've heard people tell me, but directly, no.

 2    Q     Does he participate in your direct day-to-day

 3          supervision?

 4    A.    Only if some supervisors are not present.

 5    Q     And in terms of your dealings with him, you've had no

 6          problems?

 7    A.    Not personal, no.

 8    Q     Nothing that rose to the level that you felt necessary

 9          to complain to anybody about?

10    A.    I have heard, people told me that -- people have told me

11          that Joe would love to have me leave.  During the CASA

12          job possibility I was told that he was informing people

13          not to interfere in any way in having me out of there.

14          But he has said nothing directly to me.

15    Q     And who did you hear that from?

16    A.    If I recollect, I believe it was Mr. Drachbar, Dennis

17          Drachbar.

18              I was also told by the same man that Mr. Boyer

19          hates me and would do anything to get rid of me.

20    Q     Does Mr. Boyer have any direct supervision

21          responsibility with respect to you?

22    A.    Yes, he does.  He is one step above Mr. Miller.  He

23          would be next in line to the chief.  And he does do our

24          close-out case, like I said, close-out, and our time

25          sheets.
```

Barbara Varner                              204

1    Q    Have you had any problems with him?

2    A.   There are times when if I get on, if Mr. Miller or --

3         I'm sorry, Mr. Boyer is on an elevator, he will step off

4         and not ride with me.  That's happened on several

5         occasions.

6    Q    Has he ever said anything inappropriate to you since

7         Mr. Graham left the courthouse?

8    A.   No, he's not.

9    Q    Has he ever interfered in your employment relations in

10        any way since then?  Other than not to ride in the

11        elevator with you.

12   A.   No.

13   Q    Do you have concerns about your safety at the workplace

14        at this time?

15   A.   I think there's always an ongoing concern for myself

16        when I leave to go out into the parking lot, if I'm

17        alone.  And as I said before, the sheriff has told me

18        that just to be aware of when I'm going and where I'm

19        going and basically to watch my back.

20   Q    Have you ever received any threats of any kind?

21   A.   From -- not threat.  I've been harassed by Mrs. Graham

22        and have been physically pushed by Mrs. Graham on one

23        occasion.  Shoulder hit.

24   Q    When was that?

25   A.   In 1999 is when she harassed me in the parking lot of

Barbara Varner                    205

1           where I park.

2    Q      What occurred?

3    A.     She had caught up to me when I was going to my car.  Her

4           car is parked on the front side as you're entering the

5           parking lot, she's one of the first cars as you reach.

6           My car is around and down probably 15 cars away from

7           her.  She approached me and started saying that I'm a

8           liar, that I had an affair with her husband and that

9           everybody knows I'm a liar, and she wants my husband to

10          find out that I'm a liar.

11              I said, just leave it alone.  I told her, leave it

12          alone.  I continued to my car.  I tried to get in my --

13          between my car, she stood there in between the two cars

14          and wouldn't let me get into my car, again saying that

15          I'm a liar.  And I said, just leave it alone, and I got

16          in my car and started make phone call.  And I called up

17          to the Sheriff's Department, and they came down and

18          escorted me into the courthouse.  And I filed a

19          complaint of harassment against her with Carlisle

20          police.

21   Q      And she was charged?

22   A.     Yes, she was.

23   Q      And there was a trial?

24   A.     Yes.  It was a hearing before District Justice Correal.

25   Q      And was she convicted?

Barbara Varner                          206

1   A.   What was said was all the elements of the crime

2        obviously were there, but following an annoying -- and

3        what the district justice said was that probably this

4        whole issue probably will be handled in a different

5        court.  She was warned not to do it again or it would be

6        a different result.  So she was not formally charged.

7   Q    Has there been any additional episode?

8   A.   No, there has not.

9   Q    In the last three or four years since that occurred have

10       you had any additional problems with Mrs. Graham?

11  A.   Yes.  And I think that's noted in here.  She -- there

12       was times that she would -- well, November 3rd -- are

13       you talking the time frame?  Or any time frame?

14  Q    Any time.

15  A.   Okay.  November 3rd of '97 I was walking out of the

16       courthouse and she physically threatened me.

17  Q    In what manner?

18  A.   She exited her car and walked toward me.  She stopped in

19       the street with her hands -- her eyes were narrowed, her

20       fists -- she had clenched teeth and just remained there

21       until I was directly in front of her.  She did that

22       on --

23  Q    Did she say anything to you?

24  A.   No, she did not.

25  Q    Did she make any movement to move to strike you in any

Barbara Varner                          207

1       fashion?

2    A.  No.

3           On December 4th, '97, I was waiting outside the

4        courtroom on the fourth floor.  She again walked towards

5        me with her narrowed eyes and clenched teeth, just very

6        angry look.

7    Q   Any others?

8    A.  Yes.  On March 3rd, '98, as I was walking from the

9        parking lot to the courthouse I came around the corner,

10       was confronted by Mr. and Mrs. Graham.  When I attempted

11       to walk around them, Mrs. Graham forcibly bumped into

12       me.

13          May 22nd of '98, I was -- after I had parked my

14       car, Mrs. Graham walked within two feet of me behind me

15       staying that position for the entire walk to the

16       building, just right on top.

17   Q   Did she say anything to you?

18   A.  No, she did not.

19   Q   Did she make any move to strike you in any fashion?

20   A.  No, she didn't.  It was very intimidating, though.

21   Q   And you two both work in the same building, do you not?

22   A.  Yes, we do.

23   Q   Both park in the same parking lot?

24   A.  Yes.  I moved my parking spot.  I used to park directly

25       behind her.  I moved it so I was not near her, just to

Barbara Varner                          208

1          avoid any further problems.

2     Q    Have you received your scheduled step increases terms of

3          salary?

4     A.   I have -- I had a copy several years ago but I don't at

5          this point.

6     Q    Are you aware of any pay increases that you have not

7          received?

8     A.   No.

9     Q    And you're till employed at the same job?

10    A.   Yes, I am.

11    Q    And you are now a probation officer, senior probation

12         officer?

13    A.   That's correct.

14    Q    Is there another step above that?

15    A.   Only other step would be to PO-II, supervisor, and

16         chief.

17    Q    And who presently holds those jobs?

18    A.   PO-II position is Mr. Dennis Drachbar.  We have three

19         supervisors.  Mr. Miller, Sam Miller.

20    Q    Who is your supervisor, right?

21    A.   Yes.  Hank Thielemann, and Thomas Boyer.

22    Q    How long have those four individuals been with

23         Probation?

24    A.   I don't know, but I would say at least 15, 18 years.

25         I'm not sure.

Barbara Varner                              209

1    Q    Long timers?

2    A.   Yes.  Yes, they are.  And then Osenkarski would be

3         chief.

4    Q    You haven't been demoted in any fashion?

5    A.   No.

6    Q    Your benefits haven't been changed?

7    A.   No.

8    Q    I understand there was a period of time when you worked

9         from home; is that correct?

10   A.   Yes, there was.

11   Q    What was that about?

12   A.   I found I had an allergic reaction to something in the

13        courthouse.  My physical symptoms were I had burns on my

14        hands and my face.  They subsided when I left the

15        building.

16   Q    Were there any other Probation employees that were

17        permitted to work from home?

18   A.   We have an on-call officer who works all the full-time

19        from home.  He's on call in the evenings.

20   Q    But other than the on-call probation officer, are there

21        any other employees of Probation that have ever been

22        permitted to work from home?

23   A.   I believe there has been.  People who -- there was a

24        woman, I'm not sure -- I can't say if she was able to

25        work or not, but I know she was out on medical leave for

Barbara Varner                            210

1         some time.

2              That was something that was recommended by my

3         doctor.  I felt I would rather work than go on any kind

4         of medical leave.  I prefer -- because a lot of my work

5         can be done from home.  And it worked out fine except

6         for court appearances.

7    Q    How long was that?

8    A    Several months until I could be returned to work.

9    Q    And was there some sort of air-filtration system

10        installed in your office?

11   A    Yes.  I was given an air-purifying system for my office.

12   Q    And has that solved your allergic problems?

13   A    It seems to, yes.

14   Q    So since then, you've been relocated back in the

15        building with air filtration in a private office, so to

16        speak?

17   A    I'm sharing an office at this time, but yes.

18   Q    Initially was it a private office?

19   A    Yes, it was.

20   Q    What requests have you made that have not been

21        satisfied?

22   A    I want to be assured that there's no retaliation against

23        me for filing this claim.

24   Q    Has there been any retaliation to date?

25   A    Yes, there has been.

Barbara Varner                          211

1   Q   In what manner?

2   A.  In the CASA position.  I had applied for a position, a

3       court-appointed special advocate program.  It was a new

4       program under the direction of Judge Guido.  I had

5       applied for that, been -- well, the judge had said in a

6       meeting in 2000, March 1st, 2000, that he had chosen me

7       as the designee to be the CASA director.

8           We proceeded with -- they made the grant

9       application using my salary as the salary for the

10      position.  Up to the very last minute, really, the 11th

11      hour, I was in the process of getting things transferred

12      over from Juvenile Probation to them, and my attorney

13      was informed that I could not have the position unless I

14      was willing to withdraw my Complaint.

15  Q   Were you offered a settlement in this case based upon

16      taking the CASA position and maintaining your current

17      salary?

18  A.  I didn't think my Complaint had anything to do with the

19      CASA position.  I was offered the position at a lower

20      salary, which was, I believe it was $29,000, which was

21      almost 11,000 less than what I'm making, to withdraw the

22      suit.

23  Q   You were, in fact, offered the CASA job but at a lower

24      salary, as I understand your testimony?

25  A.  Yes, I was.

Barbara Varner                          212

```
 1   Q    Okay.  And you were offered the CASA position at your
 2        current salary in conjunction with a settlement of this
 3        litigation; is that also accurate?
 4   A.   For withdrawing my suit, yes.  Not settlement.
 5        Withdrawing my suit.
 6   Q    We can argue about whether there's a difference or not.
 7   A.   Yes.
 8   Q    In any event, you chose not to take the position under
 9        either condition, correct?
10   A.   Yes.
11   Q    Other than the CASA job, have you been retaliated
12        against in any other fashion?
13   A.   I think retaliation, knowing that I'm in fear, knowing
14        that Mr. Graham has let people know that he will punish
15        anybody, as well as Mr. Osenkarski will punish anybody
16        who crossed them.  Just having that awareness.
17   Q    Have you been punished?
18   A.   Not at this point.
19   Q    Let me talk to you about your damages for a few minutes.
20   A.   Okay.
21   Q    Who is your current family doctor?
22   A.   Dr. Theresa Burick, B-U-R-I-C-K.
23   Q    Where is she located?
24   A.   She's located on Poplar Church Road in Camp Hill.
25   Q    How long has she been your family doctor?
```

Barbara Varner                                    213

1   A.   I'm guessing six years, six, seven years.  I believe

2        '96.

3   Q    So back to 1996?

4   A.   I believe so.

5   Q    Who was your family doctor before that?

6   A.   I really didn't have a family -- Dr. Sullivan, who I

7        rarely saw.

8   Q    Where was Dr. Sullivan?

9   A.   He was located in Mechanicsburg.

10  Q    Is he still in practice?

11  A.   I believe he is.  John Sullivan.

12  Q    How long were you with Dr. Sullivan?

13  A.   Maybe two years.  He had broke off from another group.

14  Q    What was that group?

15  A.   Mazzitti Sullivan.  Mazzitti and Sullivan.  Cincotta,

16       Mazzitti and Sullivan.

17  Q    Who did you see in that group?

18  A.   Whoever was available.

19  Q    And that's where you got your internal medicine, family

20       physician type stuff?

21  A.   Yes.

22  Q    How long were you with that group?

23  A.   We were there from, my family was there, I'm guessing

24       probably '72 till -- and Dr. Sullivan, carrying him

25       over, probably till '96.

Barbara Varner                          214

```
 1    Q    '96?

 2    A.   '96, yes.

 3    Q    Anybody before then?

 4    A.   Dr. Stahl and Zimmerman in Mechanicsburg, when I was in

 5         high school.  Childbirth for one.

 6    Q    Have you ever been hospitalized other than for your

 7         childbirths?

 8    A.   Yes.

 9    Q    When?

10    A.   In October of '97, I had a hysterectomy, partial

11         hysterectomy.

12    Q    Any other reasons for hospitalization?

13    A.   No, not hospitalization.

14    Q    Which hospital were you in for the hysterectomy?

15    A.   Harrisburg.  No, wait.  Polyclinic.  I believe it was

16         Harrisburg.

17    Q    It had to be either Harrisburg or Polyclinic, right?

18    A.   I believe it was Harrisburg.  I know.  I believe it was

19         Harrisburg.

20    Q    So other than the hysterectomy and the childbirth, you

21         have no hospitalizations?

22    A.   No.  Not hospitalizations, no.

23    Q    Surgical procedures?

24    A.   Yes.  I've had foot surgery.

25    Q    When was that?
```

Barbara Varner                                    215

1    A.    I had one I guess it was two years ago.

2    Q    What was that for?

3    A.    It was a hammer toe.

4    Q    That would have been around 2000?

5    A.    I'm guessing, yes.

6    Q    Who did that surgery for you?

7    A.    Dr. Zlotoff, Z-L-O-T-O-F-F.

8    Q    Other procedures?

9    A.    Had the same thing done a year before that.  It didn't

10         work out.  I think it was two years before that.

11   Q    Same foot?

12   A.    Same foot, same toe.

13   Q    Other procedures?

14   A.    Surgical?  Dental, a lot of dental surgery.

15   Q    Who are your dentists for dental surgery?

16   A.    Dr. Dinello.

17          Foot surgery in, I'd say mid '80s, I had other foot

18         surgery.

19   Q    What was that for?

20   A.    Bunions.

21   Q    And the dental is Dr. Dinello.  Anybody else on the

22         dental side?

23   A.    Dr. Wagner is my dentist.

24   Q    How long has he been your dentist?

25   A.    10 years.

Barbara Varner                                216

1    Q    Do you contend that you've sustained any lost wages as a
2         result of this subject matter of your Complaint here?
3    A.   Lost wages?  Well, all the time I'm taking here is
4         personal time.  So as far as lost wages, lost time.  But
5         wages, no.
6    Q    Anything other than what's been associated with this
7         deposition?
8    A.   As far as my wages?
9    Q    Yes.
10   A.   No.
11   Q    And you've essentially lost no pay increases that you're
12        aware of?
13   A.   No.
14   Q    We already reviewed that, right?
15   A.   Right.
16   Q    Your pay hasn't been reduced, right?
17   A.   No.
18   Q    You've never been demoted?
19   A.   No.
20   Q    I notice in reviewing your Answers to Interrogatories
21        you contend that you have post-traumatic stress
22        disorder.
23   A.   That's correct.
24   Q    Who diagnosed for that you?
25   A.   Lee Morand, M-O-R-A-N-D.

Barbara Varner                          217

1    Q    When was that?

2    A.   Three years ago.  Three, four years ago.

3    Q    What kind of practitioner is Lee Morand?

4    A.   She's a psychologist.

5    Q    Do you still see Lee Morand?

6    A.   Yes, I do.

7    Q    When was the last time you saw Lee Morand?

8    A.   Last Friday.  I see her weekly.

9    Q    Do you still see her once a week?

10   A.   Yes, I do.

11   Q    When did you first see her?

12   A.   Just, I believe I started with her '99.  Around that

13        time.  I had seen other ones prior to that.

14   Q    Who was the first psychologist that you saw following

15        these series of episodes?

16   A.   Laurie Walker.

17   Q    Where was she located?

18   A.   She was with the Employee Assistance Program and she was

19        located at Mazzitti and Sullivan's on Trindle Road.  No,

20        wait.  Yeah, Mazzitti and Sullivan, Trindle Road.

21   Q    How often did you see her?

22   A.   I went for, I think there's three times with the

23        Employees Assistance Program.  Then she left there and

24        went to Guidance Associates, and I saw her on a weekly

25        basis.

Barbara Varner                              218

1    Q    For how long?

2    A.   Until she moved to Arizona, I believe it was.  I can't

3         remember the time frame, months.

4    Q    Who did you see after that?

5    A.   She recommended Elaine McKenna.  I think it's

6         M-C-K-E-N-N-A, again, with Guidance Associates in Camp

7         Hill.

8    Q    Were your records transferred to Elaine McKenna?

9    A.   Yes.

10   Q    How long did you see Elaine McKenna?

11   A.   I saw her for several months.

12   Q    What was your reason for changing from Elaine McKenna to

13        Laurie Walker?

14   A.   Went from Laurie to Elaine because Laurie left the area.

15        She moved to leave out west, I believe it was Arizona.

16        Colorado.  Colorado, I believe it was, I'm sorry.

17   Q    I'm sorry.  I got the names confused there.  You left

18        McKenna and went to Lee Morand, right?

19   A.   There was a time in between I thought I could manage on

20        my own, and Dr. Burick noticed that things were not

21        going well for me and she recommended Lee Morand to me.

22   Q    How long did you go without seeing anybody?

23   A.   I'm not sure of the time frame.

24   Q    And does Lee Morand now have all of your records with

25        respect to all three counselors that you've seen?

Barbara Varner                          219

1   A.   She should.  I can't say, but she should.

2   Q    Any medications prescribed?

3   A.   Yes.

4   Q    What?

5   A.   Dr. Leite, he's a gastroenterologist.  I'm taking

6        Prevacid for irritable bowel.

7             I take Celexa.

8   Q    I'm sorry, the doctor's name again?

9   A.   Dr. Louis Leite, L-E-I-T-E.  Gastroenterologist.

10  Q    When were you first diagnosed with irritable bowel

11       syndrome?

12  A.   I went to him in around 1996, '97 area.

13  Q    Any procedures or treatment other than the Prevacid?

14  A.   With him?  With Dr. Leite?

15  Q    For irritable bowel.

16  A.   No.  No.

17  Q    So it's just medication?

18  A.   Yes.  And moderate, you know, just relaxation

19       techniques.  Of course, he told me to leave the

20       stressful environment.  He related it to the work

21       environment.

22  Q    You've chosen not to do that?

23  A.   It's not that easy to do that.

24  Q    What other doctors or treatment?

25  A.   Theresa Burick, she has prescribed Celexa for me.

Barbara Varner                              220

1    Q    What's that for?

2    A.   That's for, well, it's post-traumatic stress symptoms.

3         The mood, the crying, the just panic attacks at times,

4         some depression.

5    Q    Are you still taking that?

6    A.   Yes, I am.

7    Q    How long have you been taking that?

8    A.   I've been taking -- we've tried other medications pretty

9         much the same, just trying to find something that works

10        for me, and that seemed to be the best.  So I've been

11        taking that type of medication for five, about six

12        years.

13   Q    What other medications or treatment?

14   A.   I'm on Premarin, which is a hormonal.

15   Q    Is that as a result of the hysterectomy?

16   A.   Yes.

17   Q    You don't contend that's related to this episode?

18   A.   No, I do not.  And Allegra for allergies, that's it.

19   Q    Any other medications?

20   A.   I'm on high blood pressure medication now.  That started

21        about within the last year that started.  And I'm not

22        sure of the name of that.

23   Q    Who's treating you for that?

24   A.   Dr. Burick.

25   Q    I see in some of the documents you contend that you had

Barbara Varner                                221

1          a stomach ulcer.  Has that in fact, been confirmed?

2     A.   Yes, it has about.

3     Q    By whom?

4     A.   Dr. Leite.  And we pursued whether it is bacterial

5          related.  He said, no, he felt in his opinion it was

6          stress related.

7     Q    Are you medicated in any fashion for that?

8     A.   The Prevacid helps.  Modification of diet.  Relaxation

9          things.  The Prevacid seems to help a lot.

10    Q    When was the last time you consulted with any physician

11         with respect to the ulcer problem?

12    A.   I have another appointment with Dr. Leite, I believe

13         it's in March.  I usually see him once a year for

14         medication checks to see how I'm doing.

15    Q    And how about for the panic attacks?

16    A.   Panic attacks, that's with Dr. Burick.  That's sort of

17         an ongoing thing we talk about.  I see her every three

18         months unless I see a need to see her more often.

19    Q    Have you had occasion to see her more than once in three

20         months in the last year?  Did you understand that

21         question?

22    A.   Yes.

23              MS. WALLET:  Good, because I don't.

24              THE WITNESS:  Have I seen her?  Why don't you

25         repeat that.

Barbara Varner                                    222

1    BY MR. THOMAS:

2    Q    You testified you see her once every three months --

3    A.   Yes.

4    Q    -- unless you need more.

5    A.   Right.

6    Q    My question is:  Have you seen her more frequently than

7         once every three months in the last year?

8    A.   I can't recall that I have.

9    Q    And you say you are seeking counseling, and that's once

10        a week?

11   A.   Yes.

12   Q    What type of counseling are you receiving?

13   A.   She's doing more a lot of, I don't know exactly what she

14        practices, what you would name it, but it's more

15        relaxation techniques, looking beyond the situation that

16        I'm in, that rather than getting totally wrapped up in

17        what's going on in the workplace, to look beyond and

18        look for another -- future, looking at goals for myself.

19   Q    I see in your Answers to Interrogatories you were asked

20        a question about who you communicated with regarding the

21        issue, and two of the people that you identified or two

22        of the organizations were ACLU and NOW.

23   A.   Right.

24   Q    What were the nature of those communications?

25   A.   Just contact with them, looking for support, somewhat,

Barbara Varner                                223

```
 1          some help.  I'm on my own here.  I have one attorney.

 2          Soliciting some help from a woman's organization,

 3          somebody else who had been involved with this, that

 4          could give me some, whether it's resources to look to or

 5          help with this.

 6    Q     Did you receive any documentation from either the ACLU

 7          or NOW?

 8    A.    It's more of an emailing, letting me know that they

 9          would give me resources for, if I needed attorneys, that

10          there really wasn't a whole lot of help they could give

11          me since I already had an attorney.

12    Q     Did you ever receive any resources of any kind from

13          them, publications, for instance?

14    A.    They gave me resources to check out for assistance.

15          Most of them were if you already have an attorney, that

16          I was proceeding the right way.  And there are support

17          groups here and there with NOW.

18    Q     Have you ever participated in any of those support

19          groups?

20    A.    They're not local.

21    Q     Let me show you your Answers to the Commonwealth's

22          Interrogatories, and I don't have an extra copy for you.

23               (Discussion held off the record.)

24    BY MR. THOMAS:

25    Q     Counsel provided these as your Answers to
```

Barbara Varner                          224

1           Interrogatories, and let's see, I guess you didn't

2           verify them.  There is a verification.  Do you recognize

3           that as your signature?

4     A.    Yes, it is.

5     Q     And the interrogatories at number 4 asked you to

6           identify people with knowledge regarding the claim, and

7           you've listed a number of people, including your lawyer,

8           your counselors, therapists and a number of the people

9           employed in the Probation Department.

10    A.    Right.

11    Q     Are you familiar with that?

12    A.    Yes, I am.

13    Q     Then in interrogatory number 6 you were asked who you've

14          had communications with, and you say:  I have talked

15          with everyone on the list provided in number 4 above.

16          Some of these were or are employees of the court

17          defendant.  I certainly don't remember the exact dates.

18              My question to you is:  Who do you identify on

19          Answer to Interrogatory number 4 as court employees?

20    A.    That would be any of the probation officers.

21    Q     From Deb Green all the way down through the secretaries,

22          Fran Rose being the last one?

23    A.    Yes.

24    Q     And those are the people that you intended --

25    A.    Well, it's Rebecca Overs who is in -- well, it's Byers

```
 1           now.  She was Children and Youth.
 2    Q      Okay.  And the rest of them are all employees of the
 3           Probation Department --
 4    A.     Yes.
 5    Q      -- in one fashion or another?
 6    A.     Yes, they have been.
 7    Q      And people that you identified as court employees,
 8           correct?
 9    A.     Yes.
10               MR. THOMAS:  Okay.  That's all I have for now, so
11           that I don't usurp the rest of the time for everybody.
12               MS. WALLET:  Note for the record it's now 4:32.
13               MR. THOMAS:  Yes?  We have many hours to go.
14               MS. WALLET:  I see.  On the record, could I have
15           some explanation of how long you expect to continue to
16           depose my client?
17               MR. ADAMS:  With respect to what, Debra?
18               MS. WALLET:  To continue to depose my client.
19               MS. WILLIAMS:  Well, I mean, we have four
20           defendants and we each have individual interests, so I
21           think we all have to have some opportunity to question.
22           I think that Mr. Thomas has laid a fine groundwork, but
23           there are some things that I need to go especially into.
24               If you want us to come back tomorrow and, you know,
25           if Ms. Varner is tired and you want us to continue
```

Barbara Varner                          226

1      tomorrow, we can certainly be able to do that.

2          MR. MacMAIN:  I would concur.  Some of the areas

3      that I intended to cover has already been covered by

4      Mr. Thomas, but there's obviously some areas unique to

5      Mr. Graham.  I wouldn't expect to have a really lengthy

6      amount of time, but again, I'm willing, if your client's

7      tired or if she feels she's gone too long, to continue

8      tomorrow.  It's really agreeable.

9          How do you feel, Paul?

10         MR. ADAMS:  I'm looking at the time.  Again, I

11     think Mr. Thomas has done an excellent job in covering a

12     lot of the aspects in terms of the parties and on our

13     side of the case.  I don't think we're going to -- my

14     examination is not going to be too long.  I'm wondering

15     if we take a minute three break so I can talk to my

16     client, I might be able to finish up in 30 minutes, my

17     portion.

18         MS. WILLIAMS:  I would think I would need a couple

19     of hours, although I will tell you that Mr. Thomas

20     delved into some areas that I was planning to go into.

21     I suppose if I had the evening I would go through my

22     questions and strike the things he's already covered.

23     Otherwise, I might not be as well --

24         MR. THOMAS:  How long do you think you'll be?

25     What's the line-up for tomorrow?

Barbara Varner                    227

```
1          MS. WALLET:  Well, we were to do Mr. Osenkarski at
2     9:30, followed by what I thought would be Mr. Graham
3     sometime in the early afternoon.
4          Let me talk with my client about what her
5     preference is.
6          I certainly don't want to be unreasonable.  I'll
7     allow her to stand for some additional questions, but
8     what I don't think I want her to do is another full day
9     like we just did today.
10         MR. MacMAIN:  It may be after Taylor's done it
11    narrows mine even more.
12         MS. WALLET:  Let's go off the record now.
13         (Discussion held off the record.)
14         MR. THOMAS:  We've agreed that we will resume with
15    Mrs. Varner tomorrow to conclude her deposition,
16    followed by Mr. Osenkarski and Mr. Graham, and that
17    we'll reschedule Mr. Varner for another session which
18    we've already got reserved and approved by the Court.
19    Correct?
20         MS. WALLET:  Correct.  And that I further said that
21    it's my intent to produce my client for four or five
22    hours tomorrow but not for a whole day.
23         MR. THOMAS:  Understood.  That's a fair response.
24         (Whereupon, the deposition was continued at
25    4:45 p.m.)
```

228

COMMONWEALTH OF PENNSYLVANIA      )
                                  )   SS.
COUNTY OF DAUPHIN                 )


    I, Emily R. Clark, Reporter and Notary Public in
and for the Commonwealth of Pennsylvania and County of
Dauphin, do hereby certify that the foregoing testimony
was taken before me at the time and place hereinbefore
set forth, and that it is the testimony of:


            BARBARA E. VARNER


    I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

    I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

    Dated at Harrisburg, Pennsylvania, this 5th day of
February, 2003.



                        _____
                        Emily R. Clark
                        Reporter - Notary Public



(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)