```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
        Plaintiff,             .   CIVIL ACTION
                               .   NO. 1:CV 01-0725
        vs.                    .
                               .
COMMONWEALTH OF PENNSYLVANIA,   .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
        Defendants.            .
. . . . . . . . . . . . . . . . .
```

```
                    VOLUME 2
                Pages 229 to 424
```

```
        Deposition of:  BARBARA E. VARNER

        Taken by     :  Defendant Cumberland County

        Date         :  January 28, 2003, 9:27 a.m.

        Before       :  Emily Clark, RMR, Reporter-Notary

        Place        :  Administrative Offices of
                        Pennsylvania Courts
                        5035 Ritter Road, Suite 700
                        Mechanicsburg, Pennsylvania
```

```
APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
             For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
             For - Defendant Commonwealth of Pennsylvania
                   Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  JAMES K. THOMAS, II, ESQUIRE
             PAUL J. DELLASEGA, ESQUIRE
             For - Defendant Cumberland County
```

230

```
1    APPEARANCES (continued):

2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
         BY:  DAVID J. MacMAIN, ESQUIRE
3              For - Defendant S. Gareth Graham

4        SWEENEY & SHEEHAN, P.C.
         BY:  PAUL LANCASTER ADAMS, ESQUIRE
5              For - Defendant Joseph L. Osenkarski

6

7    ALSO PRESENT:

8        MR. S. GARETH GRAHAM

9        MR. JOSEPH L. OSENKARSKI

10       MS. MELANIE McDONOUGH

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

231

```
 1                        I N D E X

 2                          WITNESS

 3   Barbara E. Varner                       Examination

 4       By Mr. Thomas                          417

 5       By Ms. Williams                        256

 6       By Mr. MacMain                         331

 7       By Mr. Adams                        232, 420

 8


 9                         EXHIBITS

10   Varner Deposition
     Exhibit Number                              Page
11
     6    1-page memo, 3/27/02, to Hoffer from Varner      261
12
     7    28 pages, handwritten notes                      263
13
     8    1-page handwritten note, 12/3/96 "Joe"           286
14
     9    3-page memo, 7/11/97, to Ward and Deluce from    288
15        Sheely

16   10   1-page "Fax Transmission Sheet" 1/12/00, to      293
          Wallet from Varner
17
     11   1-page handwritten notes, "terroristic threats"  296
18
     12   1-page memo, 7/12/00, to Guido from Varner       312
19
     13   37-page "National CASA Association Request for   313
20        Proposals, New Program Development"

21   14   2 pages, handwritten notes, 12/16/96, "Trip      373
          to Lourdesmont"
22
     15   4-page Probation Department report, 4/8/97       375
23
     16   1-page memo, 4/25/97, to Hartnett from Varner    413
24
                       *   *   *   *   *
25
```

Barbara Varner                          232

1          BARBARA E. VARNER, recalled as a witness,

2          previously sworn, testified further, as follows:

3     BY MR. ADAMS:

4     Q    Good morning, Ms. Varner.

5     A.   Good morning.

6     Q    My name is Paul Lancaster Adams and I represent Joe

7          Osenkarski in this case.  I can tell you that I'm going

8          to be very short, especially, in comparison to

9          yesterday's examination of you.  That's probably why I'm

10         going first.

11              I do want you to please keep in mind the

12         instructions given to you yesterday by Jim Thomas.  Do

13         you remember those instructions in terms of how the

14         deposition is conducted from yesterday morning?

15    A.   Yes, I do.

16    Q    Okay.  One thing I do want to add, that as explained to

17         me this morning, that as part of the instructions today,

18         and I ask that you also consider them as yesterday, that

19         if I ask you a question, you understand I'm going to

20         assume that you understood my question and that you're

21         answering correctly.  Is that okay?

22    A.   (Witness nodded head affirmatively.)

23    Q    At least to the best of your knowledge?

24    A.   (Witness nodded head affirmatively.)

25    Q    Also, you have to say something verbal so she can get it

1       typed down.

2   A.  Yes.  I'm sorry.

3   Q   There were some questions asked by Jim Thomas yesterday

4       that I'm going to remind you of today just to have you

5       either elaborate on them or explain more fully.  Is that

6       okay?

7   A.  That's right.  That's fine.

8   Q   I'd like to start off with some of those questions.

9       Yesterday you testified that for the first year and a

10      half with the probationary department, the Probation

11      Department, excuse me, Joe Osenkarski was very

12      complimentary of your work.  Do you remember saying

13      that?

14  A.  He didn't appear to find any problems with my work.

15  Q   Okay.  And can you explain what you mean by

16      complimentary of your work?

17  A.  My first evaluation I received from Joe I had worked

18      with the grant for Family Preservation, he had told me

19      during my first evaluation he was pleased with how that

20      program was going.  It was a one-year grant at that

21      time, and he was pleased with my work.

22          If I turned in a file to Joe, I really had no

23      problems with that.  Joe was fair.  When I first started

24      Probation I was very pleased with Joe.  His criticism

25      was not even -- he really was not a critical type

person. He would make adjustments, corrections, in a very appropriate way. No, I had no problems with Joe when I would turn cases over to him, just to approve, that kind of thing.

Q Okay. Did that understanding of Joe's complimentary, complimenting of your work, last your entire stay with the Probation Department, including up to current status?

A. My evaluations from Joe have always been okay, they've been fine. Joe as the chief, he's not the one doing my major evaluations now, he's part of it. But my evaluations, the last one I had was done by Hank Thielemann and Tom Boyer, and then Joe signed as well, as chief.

Q When did Mr. Osenkarski stop doing your evaluations?

A. Mr. Osenkarski has always been part of my evaluations because he is the chief, so he still has to sign off on them. And I'm sure he's told, you know, informed of what my evaluation is. So he's still involved.

Q Okay. I want to take you back a little bit a ways before you joined the probationary department. Is that okay?

A. Okay.

Q I keep saying probationary. Probation Department.

When you found out about the job vacancy there, and

1        you testified yesterday that prior to working there you

2        actually sought out Mr. Osenkarski and you wanted to

3        discuss your interest in the job vacancy with

4        Mr. Osenkarski.  Do you remember that time period?

5    A.  I remember discussing with him about the position, yes.

6    Q   Okay.  Why did you choose to go Mr. Osenkarski about

7        your job interest?

8            MS. WALLET:  I'm sorry, I missed that.  Was it why

9        or when?

10           MR. ADAMS:  Why.

11           THE WITNESS:  Because Mr. Osenkarski was head of

12       the juvenile division in Probation.  We were combined

13       but still he was part of that division.  The Family

14       Preservation program would be under the juvenile

15       program.

16   BY MR. ADAMS:

17   Q   Okay.  Your understanding at that time was still that

18       Judge Sheely was in charge of Probation, of the

19       Probationary Department; is that correct?

20   A.  I don't even -- I'm not sure if I was even aware of the

21       whole hierarchy at that time.  I knew it would be

22       Probation.  Who exactly they answer to, probably, but I

23       can't say for sure that I knew that, that specifically.

24   Q   When you talked to Mr. Osenkarski were you comfortable?

25   A.  Yes, I was.

Barbara Varner                                    236

1    Q    Okay.  Was he helpful?

2    A.   Yes, he was.

3    Q    Okay.  Was he informative?

4    A.   Yes, he was.

5    Q    Okay.  Do you believe that he had any influence at all

6         in your receiving the job ultimately with the Probation

7         Department?

8    A.   I believe he did, because he was one of the three

9         gentlemen who interviewed me for my interview, my

10        original interview with them.

11   Q    Okay.  In that line, can you explain that process when

12        you, in fact, did interview for the Probation

13        Department?

14   A.   I sat down with Mr. Osenkarski, John Roller, who was

15        with the adult section, and Ken Bolze who was the chief,

16        and they interviewed me just about how I felt about -- I

17        remember one time they asked about dealing with violent

18        offenders, how I felt about that, sort of my philosophy

19        in coming to the program, what I saw with Family

20        Preservation, and my, of course, my background, what my

21        schooling was in.  I had to provide a resume.

22   Q    Okay.  And that's all the interview process that you

23        went through at the time?

24   A.   That I went through?  Yes.  Yes.

25   Q    Okay.  Did Mr. Osenkarski by chance recommend you for

Barbara Varner                                    237

1          your current position of senior probation officer?

2    A.    It would have had to be him.  He was the chief.

3    Q     Okay.  Could anyone else have made that decision for you

4          or on behalf of you?

5    A.    Joe would have the ultimate say in recommending that.

6    Q     Okay.  Did Gary Graham by chance, I guess, was Gary

7          still involved with your supervision around this time?

8    A.    No, he was not.

9    Q     This was after that?

10   A.    Right, it was after that.

11   Q     Okay, thank you.

12              By chance, did Mr. Osenkarski also have any

13         influence in recommending a job for your son?  I think

14         at the Stafford Detention Center, is that the place?

15   A.    Schaffner Detention Center.

16   Q     Schaffner?  Okay.  Did Mr. Osenkarski help in that or

17         assist in that in any way?

18   A.    Not that I'm aware of.

19   Q     Did he discuss with you the opportunity for your son to

20         be employed with that particular detention center?

21   A.    I don't believe Mr. Osenkarski mentioned it.  I know his

22         daughter had, when she had started working there, I know

23         she had gotten a job later at the same place, but I

24         can't remember whether he discussed it prior to or after

25         my son getting the job, I don't remember that.

Barbara Varner                              238

1   Q   You testified yesterday that you had heard that, this is

2       prior to being an employee with the Probation

3       Department, that Gary Graham and Mr. Osenkarski would

4       punish people when they were crossed.  Do you recall

5       that?

6   A.  That's right.  Yes.

7   Q   After suspecting this or hearing this, you still felt

8       comfortable talking to Mr. Osenkarski about the job

9       vacancy?

10  A.  To me, it -- perhaps it was more rumor.  Personally,

11      Mr. Osenkarski had always been polite to me.  I had no

12      problem with that.

13          I liked the philosophy when I spoke to him about

14      the hands-off supervision, that you were allowed to

15      manage your case and do your own thing.  And like I said

16      yesterday, it wasn't micromanaged like I was in Children

17      and Youth.  And it was my field.

18  Q   Sure.  And that was an attractive feature for you in

19      this particular job?

20  A.  Absolutely.

21  Q   Okay.  Would you agree that there are different

22      managerial styles in running an office --

23  A.  Certainly.

24  Q   -- generally speaking?  And in the case with

25      Mr. Osenkarski, he had a hands-off approach to

Barbara Varner                              239

1          managerial style?

2   A.     I think Mr. Osenkarski was more delegating it to other

3          people.  Mr. Osenkarski has been -- it was apparent to

4          most people that he was not in the office hardly at all.

5          If I really would have had a complaint, it was very

6          difficult to catch up to Mr. Osenkarski.  And that's

7          still a pattern now, that just not available.  More an

8          omission, allowing somebody else to do the work for him.

9   Q      Are you aware of what Mr. Osenkarski is doing when he's

10         out of the office?

11  A.     No, I'm not aware of that.

12  Q      Could he be doing Department like jobs, do you think,

13         that may require him to be at meetings or seeking grants

14         or things of the like that are not innate with the

15         office operations as you see it?

16  A.     Possibility.  But I know I've heard that the secretaries

17         when they want to reach him, like, the middle of the day

18         they'll call his house, that he's home in the middle of

19         the day, those kind of things.  That's an ongoing issue.

20  Q      Are you aware that Mr. Osenkarski works from home at

21         times?

22  A.     That's not something I would know about.

23  Q      On October 21st, 2002, a few months ago, you actually

24         had a conversation with Mr. Osenkarski in the hall.  Do

25         you remember that?

Barbara Varner                              240

1   A.   Yes, I do.

2   Q    And that was at the courthouse annex?

3   A.   Yes, it was.

4   Q    And by chance that's across from the Sheriff's Office;

5        is that correct?

6   A.   Yes, in that area.

7   Q    And you actually stopped him in the hall; is that

8        correct?

9   A.   Yes, I did.

10  Q    Okay.  And is it true that you said to him that you

11       realize you shouldn't be talking to him but you wanted

12       to speak with him briefly?

13  A.   Um-hum.  Yes, I did.

14  Q    And in fact, you did?

15  A.   Yes, I did.

16  Q    And is it true that you expressed to him at the time

17       that you didn't want to leave your job?

18  A.   Yes.

19  Q    Okay.  And that you really thought that most of the

20       actions centered around this case related to Gary Graham

21       and not him?

22  A.   What I said to him is I just wished this whole thing was

23       over.  I can see, I mean, I see Joe when I see him in

24       office, like I said, it's neutral right now, it's one of

25       those things I want it over.  I've wanted this over from

1           the very beginning.  I just wanted everything to stop.

2           It just continues, just on and on.  And I just said, I

3           just want you to know I'd rather this was over, I wish

4           it was over, and I don't think the issue is so much --

5           it's -- it's just an issue that things have got to be

6           finalized.  I just want to continue my job.  I want to

7           do the job that I was hired to do and just left to do it

8           but I didn't feel like I should have to leave my job.

9    Q      Okay.  Did you say to Mr. Osenkarski at that time that

10          you didn't believe that any of this, meaning surrounding

11          this case, was any of his doing?

12   A.     No, I did not say that.

13   Q      What do you believe?  Do you believe that Mr. Osenkarski

14          is a part of this suit by you?

15   A.     Absolutely.  I think by omission, by allowing Mr. Graham

16          to have full reign, giving him the power and just

17          backing away, when he saw and he would hear Mr. Graham

18          yelling and screaming at me.  But he would just back

19          away and say my hands are washed of it, he's in charge.

20          That's not the way.  You can't let this kind of thing

21          happen.

22               There was another incident with Mr. Osenkarski in

23          March of 2002 where we had a bomb threat in our

24          building.  It was a bomb threat, I was left in my -- I

25          was the only one left in the office.  My office is next

Barbara Varner                          242

1          to Mr. Osenkarski's.  I had signed in on the sign-in

2          board which is directly outside of his office.  Within,

3          I believe within an hour after I had signed in, and

4          normally my door is shut because I have an air purifier

5          on, and I happened to be dictating that day but I can

6          still hear voices outside.

7               I was left in my office for it was close to two

8          hours.  No one told me there was a bomb threat.  No one

9          knocked on my door.  Everybody else was cleared out.

10         People would walk right past my door and no one took it

11         upon themselves to tell me.

12              I walked out of the building -- first I walked out

13         of my office and I realized that I was the only one left

14         in the building.  I started down the hall to the

15         Sheriff's Department.  No one else was there.  I got out

16         to the street and I saw the sheriffs and I said, what's

17         going on?  They said, there's a bomb scare, what are you

18         doing?  I said, no one told me that there's a bomb

19         scare.

20              No one told me and I just -- obviously, and I've

21         told people before, if it was your child that was left

22         in a school and they weren't notified, how would you

23         feel?  I was left in that building for almost two hours.

24         No one -- do I think that Mr. Osenkarski intentionally

25         said leave her there?  I don't know.  I can't help but

1          believe as retaliation, perhaps, because I was the only

2          one in that whole building, that whole courthouse that

3          was left.

4               I went out to the street and I found some people

5          from the Probation office, and I explained to them.  Joe

6          was there.  Tom was -- no.  Joe was there, Hank was

7          there, a couple of secretaries, Kathy, I believe was

8          there.  And I went out, and Mr. Turo, the Public

9          Defender, and I said, I was left in there, I was left in

10         that building, I was by myself.  No one told me.

11              Mr. Osenkarski, his concern was -- he walked over

12         to Kathy Zeigler and he was concerned -- he had a

13         training or a conference he had to go to.  He was

14         concerned that to make sure that the search dogs they

15         take through the building knew about our ammo down in

16         the basement.  Not like, I was just -- I had been doing

17         so well with the counseling, doing so well, and

18         absolutely -- so do I think it was intentional?  I can't

19         imagine why they would let me there.  And he's in charge

20         of that department.  It was his responsibility to make

21         sure all his employees were out.

22    Q    Are you okay?

23    A.    Yes.

24              This year at another time -- no, year 1998,

25         Mr. Osenkarski came to me and he told me that Judge

Barbara Varner                          244

```
 1              Hoffer said I was not allowed to be in another Probation

 2              office, which is down the east -- we have a main office

 3              in the main courthouse, and down -- I need to take a

 4              break just for a second.

 5                   (Recess taken from 9:37 until 9:41 a.m.)

 6    BY MR. ADAMS:

 7    Q    We talked about quite a few things at once and I'm

 8         going to break them down one at a time, if that's okay?

 9    A.   That's fine.

10    Q    How long have you known Mr. Osenkarski?

11    A.   Several -- well, I met him when I started with Children

12         and Youth just in passing.  Talking to him, probably I'd

13         say '93, '94, something like that, some conversations.

14    Q    Explain to me, and forgive me for not being totally

15         familiar, please explain to me where Children and Youth

16         is located in comparison to the Probation Department in

17         the building.

18    A.   Right now they're located down the street in another

19         building called the Human Services Building.  Prior to

20         that they were located on the third floor, same floor

21         that Probation was on.  We were in what's called the

22         east wing, it was an annex connected by a hallway.  And

23         all the same floor with a common lunch room area.

24    Q    Okay.

25    A.   Shared by lots of, all the, you know, the whole
```

Barbara Varner                          245

1           courthouse.

2     Q     Okay.  And could you be in, hypothetically could you be

3           in the Children and Youth Services Department and hear

4           things going on in the Probation Department down the

5           hall?

6     A.    No, we couldn't.

7     Q     Okay.  If things or activities are going on in the

8           hallway between that department and the other

9           department, is there some overplay or interaction

10          between the two departments?

11    A.    Probably only in the lunch room area, because for them,

12          the courthouse, most people would exit out of the

13          courthouse, and we had our own exit out the east wing.

14    Q     Okay.  You said you had your own exit out the east wing?

15    A.    Right.  There's a back exit out the east wing.

16    Q     Okay.  Is that just an exit that everyone by chance uses

17          because it's the closest door?

18    A.    Yeah.  It's just part of that exit from that building.

19    Q     Okay.  When you were with Children and Youth Services

20          was that the door that you would use to come in and out

21          naturally?

22    A.    Yes.  When I was with Children and Youth, yes.

23    Q     In case of an emergency would that also be the door you

24          would go out of?

25    A.    Yes.  The stairways, yes.

Barbara Varner                    246

1    Q    How did you know that?

2    A.   Probably there are exit signs, I would assume, and

3         stairways.  I know the elevator's right beside the

4         stairway.  Of course, it says don't use the elevator.

5         But there's an exit out.

6    Q    Okay.  No one told you that that's the exit you use for

7         emergencies when you were in Children and Youth

8         Services, right?

9    A.   There probably -- we probably had fire drills, yeah, and

10        they would say which way to exit.

11   Q    Who would say that to you?

12   A.   That would be, then it was the personnel -- the county

13        would run fire drills.  I assume it came through the

14        Sheriff's Department or the fire companies, I don't

15        know.  But we would have fire drills.

16   Q    Okay.  So you think the county's responsibility,

17        emergency process in fire drills, you think that goes

18        back to the county's responsibility; is that correct?

19   A.   To ensure safety, sure, of the workers.  Absolutely.

20   Q    When you were with Children and Youth Services is that

21        when the Sheriff's Department would come and help with

22        the evacuation in case of an emergency, things like

23        that?

24   A.   I don't recall.  I just remember our director saying,

25        and in an evacuation we more sort of followed each other

Barbara Varner                              247

1        knowing how to get out, it was that type of thing.  I

2        don't remember any actual training or anything.

3    Q   Or any protocol?

4    A.  No.  Just, you know, us being told and signs saying you

5        exit this way.

6    Q   So the key with you when you were with Children and

7        Youth Services in terms of exiting for an emergency or

8        even a fire drill was you follow everyone else; is that

9        correct?

10   A.  In general, yes.

11   Q   Would that be the same with the Probation Department,

12       that basically in an emergency or something happens,

13       everyone follows everyone else out of the building?

14   A.  I think just common knowledge you use the stairways as

15       in any building, you would not take the elevator, use

16       the stairway closest to you, and that would be common

17       knowledge, I would think, anywhere.

18   Q   You follow everyone else to exit?

19   A.  Basically, yes.

20   Q   Okay.  At some point when you were with the Probation

21       Department you were given an office that was, it was a

22       closed-door office; is that correct?

23   A.  Yes.

24   Q   Okay.  And that office didn't have any window, did it?

25   A.  Yes, it does.  It has a window out to the secretarial

Barbara Varner                               248

```
 1         area.  It's not to the outside, but there's a sliding

 2         glass window that right outside there the secretaries

 3         sit.

 4    Q    And while you're sitting down can you see the

 5         secretarial staff as you just described?

 6    A.   Generally I would -- we had, like, little mini blinds.

 7         I would keep them turned so that the secretaries

 8         couldn't see the clients that I had in there.  But I

 9         could see enough I could see the clock.  But I really

10         didn't want my clients or them to see, you know, what

11         was going on in the office with clients.

12    Q    Okay.  And you had this office, this closed-door office

13         at the time of the incident which you felt you were left

14         in the building; is that correct?

15    A.   Yes, I did.

16    Q    Okay.  So when there's a fire drill that actually

17         happened on that day that you just described, you

18         couldn't see people going back and forth; is that true?

19    A.   No, I did not.  I was dictating.  But everybody in the

20         office was aware that my door was shut.

21    Q    How do you know that?

22    A.   Because it was just common.  They knew I had the air

23         purifier in there.  It was just a common thing.  My door

24         was shut most of the time.

25    Q    Is that why you had that office to yourself, because of
```

Barbara Varner                    249

1          the air purifier?

2     A.   No, I had gotten that office seniority-wise.  It was one

3          of those things, that's the thing as you move up in the

4          seniority, if there's an office by yourself, that's sort

5          of something you sort of achieve to.  And I was senior

6          and able to take that.  When we really -- it was when we

7          split our departments.

8          Like I said, Mr. Osenkarski was aware I was in the

9          building.  So were the other, the secretaries and stuff

10         were aware that I was there.  And I had signed in on the

11         board which is directly outside of his door.  At a very

12         glance you can see who was in and who was out.

13    Q    Okay, okay.  When Gary Graham was a supervisor in the

14         Probation Department he used to yell at other folks as

15         well; is that correct?

16    A.   Not as much as he did me.  Not nearly as much.

17    Q    How much would he yell at others?

18    A.   I don't -- it really wasn't, not so much.  He would get

19         loud with them.  Never that much derogatory to them,

20         like your F-ing ability or actually making direct

21         comments to them about them.  It was more in anger

22         talking about other things, F this, F that, or about

23         other people, about the chief, about everybody.

24    Q    So he would say F that hypothetically about anything or

25         everyone?

Barbara Varner                    250

1    A.    You heard him use that quite a bit, yes.

2    Q     And Mr. Osenkarski was familiar with Mr. Graham's

3          language; is that correct?

4    A.    Oh, yes.

5    Q     Okay.  But isn't that sort of the climate of the

6          department, persons are sort of free for all speaking

7          all types of ways?

8    A.    You don't -- no.  You don't hear that constantly in the

9          offices at all.  That was not a constant thing.  I can't

10         really think of anybody else who would be that -- he was

11         always just an angry, angry man, after we split and he

12         basically got power, got the authority that he could do

13         what he wanted.

14             He would be angry before that, about his wife,

15         about situations, about bosses, about anything.  But it

16         was directed at me is what caused the problems for me,

17         when it was actually at me, the language, the anger,

18         that kind of, and the threats.

19   Q     Okay.  When you say split, you mean that you and Gary

20         stopped seeing each other?

21   A.    No, no, no.  When the Department split, the juvenile and

22         adult, after the Department split.

23   Q     Okay, thanks.

24   A.    And he sort of was left to be in power.  Mr. Osenkarski

25         started delegating it to him.

Barbara Varner                          251

1    Q    But you were aware that Mr. Osenkarski's style

2         nevertheless was a hands-off approach to management?

3    A.   I didn't know it was that extreme, that he would let

4         Gary do whatever he wanted to do.

5              When I started there, Ken Bolze was still chief.

6         Ken Bolze kept basically a lid on Mr. Graham and on

7         Mr. Osenkarski, that, you know, they had to go through

8         him before -- they had to answer to Mr. Bolze.

9    Q    In terms of emptying out the building, clearing the

10        building of personnel when there's an emergency or a

11        fire drill, what do you think the responsibility is of

12        the Sheriff's Department in that situation for the

13        building?

14   A.   My understanding is they come around and they assure

15        that every office has been cleared out.  They look to

16        the directors of the department, whoever -- they always

17        look to whoever is senior officer in there, whether it's

18        chief or whoever is there, to assure that their office

19        is cleared.

20             And I believe they checked when they get out and

21        it's the chief or whoever is in charge, to meet with.

22        I'm not sure whether -- it's another department, they

23        have to meet with them and assure that their department

24        is clear, that everybody was out.  And then I know the

25        sheriffs will go around afterwards with their dogs and,

Barbara Varner                              252

```
 1          you know, checking for bombs.
 2              But ultimately it is the department head, whoever
 3          is the department head at that time when it happens, to
 4          make sure the office is cleared.
 5    Q    Okay.  And how do you know that?
 6    A.   We had one prior to that, and we were evacuated.  And at
 7          that time they were going around getting all the
 8          department heads together as soon as everybody was
 9          cleared, saying, is all your people out, have you gone
10          down the roster, who was there, gone down the roster and
11          made sure they were out.  And I assume that's the same
12          procedure they would follow.
13    Q    The Sheriff's Department goes to the department head in
14          most cases?
15    A.   I believe it's Personnel, well, Human Resources that
16          goes around and says -- the departments make a list of
17          who was in that building -- did you make sure they were
18          out, assuring that they were all left the building.
19    Q    Okay.  So during the drill, fire drill or emergency,
20          you're saying that --
21    A.   During the bomb scare yes.
22    Q    Bomb scare, I'm sorry, in this instance --
23    A.   Right.
24    Q    HR was the person, someone from HR would go to the
25          department heads and to determine if everyone was
```

```
 1          accounted for?
 2     A.   Yeah.  I believe was the Clerk of Courts.  No, chief
 3          clerk, chief with personnel.  Those were the two people
 4          that were in charge of in that the department had to
 5          contact them to make sure everybody was out of the
 6          building.  So it was sort of that chain of command.
 7     Q    The bomb scare that you are referring to today, on that
 8          particular occasion isn't it true that you were
 9          physically already outside the building by the time HR
10          actually requested that Osenkarski report to them about
11          who was in and who was out?
12     A.   I would have no idea about that.  I know during the
13          initial bomb scare that they were on top of that very
14          quickly, wanting to know and saying you make a list as
15          soon as you got out.  I heard them tell our secretaries,
16          telling our secretaries, who was there, make a list,
17          let's make sure they were all out of building.  And so
18          they seemed to be on top of it in our first bomb scare.
19     Q    Okay.  Are you aware that Mr. Osenkarski after the
20          incident and with the bomb scare, actually went to the
21          HR department and advised them that there needed to be
22          more established protocols so that this would not happen
23          to you again?
24     A.   It was my knowledge that Chris Miller, who was Human
25          Resources director at that time, called Mr. Osenkarski
```

Barbara Varner                      254

1    down and that she had spoke to the chief clerk.  They

2    had all gone up to talk to Judge Hoffer about this.

3    That's what Chris had told me.  And as a result of that,

4    Mr. Osenkarski was told to come down and work on

5    something, see what they could do to correct it.  That

6    was my knowledge.

7  Q    Okay.  How do you have that knowledge?

8  A.   From Ms. Miller.  She was the Human Resources director

9    at that time.

10  Q    Yesterday you testified about your educational

11    accomplishments, and I'd like to congratulate you on

12    those.

13        Did Mr. Osenkarski assist you in any way in terms

14    of pointing you in the direction for financial aid or

15    anything of that sort to progress your educational

16    goals?

17  A.   Mr. Osenkarski informed me of a grant program that would

18    be available for my daughter.  At that time I had, there

19    was three of us in college, my son, my daughter and

20    myself.  And the policy was you had to have three people

21    in college to take advantage of that.  He gave me

22    information about that grant program.  I was able to

23    take advantage of it for one year.  It was only one year

24    crossover with my children.  So that helped with one

25    year.  Yes.

Barbara Varner                              255

```
 1    Q    Is that it in terms of helping you or pointing you in
 2         the right direction for your for assistance?
 3    A.   Yes.  Yes.
 4    Q    You also testified yesterday that Mr. Osenkarski knew of
 5         your hysterectomy?
 6    A.   Yes.
 7    Q    How do you know he's familiar with that procedure?
 8    A.   When I had the procedure, I had -- my doctor wrote a
 9         note saying that I would be out for such amount of time,
10         and in there is -- it was a medical excuse, basically.
11         But I also explained to Sam Miller, who is my direct
12         supervisor, because I was going to be off for a week I
13         felt, you know, that's a long time.  I think it's over
14         three days you have to have a doctor's excuse.  And I
15         explained to Mr. Miller I was going to have the
16         procedure.  And Mr. Osenkarski is his, you know,
17         supervisor, so I'm sure that came up.  But there was a
18         medical excuse from my doctor the reason why I would be
19         out.
20    Q    Okay.  But you're not sure that Mr. Osenkarski actually
21         saw that medical excuse, are you?
22    A.   It was given to him.
23    Q    By you?
24    A.   Yes.
25    Q    Okay.  What date was that?
```

Barbara Varner                    256

```
 1   A.    October of '97.  I know it was around Thanksgiving --
 2         not Thanksgiving, I'm sorry.  There was a holiday in
 3         there.  Somewhere in the middle of October.  I believe
 4         it was a holiday.
 5   Q     Are you aware that Mr. Osenkarski's ex-wife had a
 6         hysterectomy?
 7   A.    No, I did not know that.
 8   Q     Are you aware that Mr. Osenkarski has shared that
 9         information with at least one person in the office?
10   A.    No, I'm not aware of that.
11             I personally found it offensive even talking about
12         hysterectomies and women with a new young employee.  And
13         she mentioned it to me because she was uncomfortable.
14   Q     Who was that?
15   A.    Gail Schuhart, a new probation officer.
16   Q     Gail Schuhart is the person that told you what?
17   A.    That Mr. Osenkarski said to her that hysterectomies ruin
18         women.
19   Q     So he never said to you, Mr. Osenkarski, directly about
20         that?
21   A.    No, he did not.
22             MR. ADAMS:  That's all I have.  Thank you.
23   BY MS. WILLIAMS:
24   Q     Ms. Varner, I'm Taylor Williams and I represent the
25         Commonwealth of Pennsylvania for the Ninth Judicial
```

Barbara Varner                              257

1            District for the Common Pleas of Cumberland County.

2                  I would remind you that you are still under oath.

3            Do you understand that?

4   A.    Yes, I do.

5   Q    And the same ground rules that were discussed yesterday

6         by Mr. Thomas and this morning by Mr. Lancaster Adams

7         also apply to our conversation.  That is, if you answer

8         a question, I will assume that you have understood it

9         and heard it, and if I need to clarify a question or

10        repeat it, please feel free to ask me to do so.

11  A.    Okay.

12  Q    Have you ever given a deposition before?

13  A.    No, I have not.

14  Q    Have you ever brought another lawsuit?

15  A.    No, I have not.

16  Q    You were discussing the bomb scare a few minutes ago.

17        Was there actually a bomb that day?

18  A.    No.  No, there was not.

19  Q    No bomb was found?

20  A.    Not that I know of.

21  Q    Did you have any conversation or notify Judge Hoffer,

22        President Judge Hoffer of any of the events involving

23        the bomb scare?

24  A.    Chris Miller, the Human Resources director, she told me

25        that her and Mr. Ward -- no, I'm sorry, it's not John

```
 1          Ward.  It was chief clerk, John Connelly had spoken to

 2          Judge Hoffer about that.

 3    Q     Did you speak with Judge Hoffer about it?

 4    A.    No, I did not.

 5    Q     Do you know the result of their conversation?

 6    A.    No.  Only what Chris would tell me, and what had

 7          happened -- I need to back up a few years to explain the

 8          rest of your question.

 9              In 1998 Judge Hoffer had told Mr. Osenkarski that I

10          was not allowed to go down to the third floor annex,

11          which was when we split adult and juvenile.  Part of our

12          department, the juvenile department and part of the

13          adult department moved down to the old Children and

14          Youth office which was at the east wing.  So there was

15          half adult and half juvenile.

16              In that time frame, Mrs. Graham, who is a court

17          stenographer, had moved down to several of those offices

18          because they were renovating her, their office area.

19          Joe Osenkarski told me that Judge Hoffer said I was not

20          allowed to go in that department because Mrs. Graham was

21          bothered when I walked in there and that I was not to go

22          in there.  And I said to Mr. Osenkarski, it's a public

23          office, it's part of our department, there are probation

24          officers down there I need to interact with and have

25          work with, and I didn't see that was right, and I asked
```

1          him to have Judge Hoffer put that in writing.

2                  Judge Hoffer had his secretary call me up, and I

3          was up in his office within a day or two.  And Judge

4          Hoffer told me I was not allowed to go down into that

5          office at all, I was to stay out, that Mrs. Graham was

6          going to have a breakdown if I didn't stay out of there.

7          And I explained to him that it's a public office, I have

8          business in there.  And he left me know, he said, do you

9          understand what I'm saying?  You are not to go in this

10         that office.  And again, I said, it's a public office, I

11         don't think that's fair.  Needless to say, Judge Hoffer

12         left me know I was not to go there.

13                 So from 1998 till 2002 I was not allowed in a

14         public office in a courthouse.  Embarrassing, very

15         difficult to deal with.

16                 But after this bomb scare I had requested that I be

17         moved from my office where I was at in the courthouse

18         down to one of the offices in the east wing where there

19         were other people where I could feel safe.  I know my

20         friends were down there and I knew that probably they, I

21         was sure they would alert me if there was another bomb

22         scare.  I just didn't feel comfortable up there,

23         thinking that if this would happen again and there

24         really was a bomb.  That was a concern.

25    Q    Judge Hoffer have an objection to your moving down

1           there?

2      A.   I had to put it in writing.  I had to put a request in

3           writing that I wanted to move down there.  Hank

4           Thielemann -- I put it in writing.  I was sitting in the

5           court -- in fact, I wrote it in a Human Resources office

6           on one of those secretary's computers.  Chris Miller had

7           asked me to put it in writing that I said I wanted to

8           move down there because I was afraid that I would be

9           left behind again.  I felt more comfortable down there

10          and I was requesting for me to move.

11               Hank Thielemann carried it up to Judge Hoffer.  He

12          said I had to put it in writing who I was going to share

13          an office with, how long I planned to stay there.  And

14          at that time I was sitting in Chris Miller's office and

15          I said, this is absolutely ridiculous, nobody else when

16          they move offices have to get permission from the judge

17          to do this.  So, finally --

18     Q    Who else has moved an office?

19     A.   At that time, well, I had moved before.  I moved from

20          one office over to that single office when we split

21          departments.  There was so much movement.  There have

22          been hired new school-based probation officers who have

23          moved into different parts of the Department.

24     Q    Do you know what was required to make those moves?

25     A.   I think it was just Joe Osenkarski's okay.  He was the

Barbara Varner                    261

1          chief.

2     Q    Do you know that?

3     A.   As far as I'm ever -- no, I don't know that for sure

4          that they did not discuss it.  But Judge Hoffer when I

5          did, he did allow me to move down there, he came down

6          personally and met with the -- he called the girl who

7          was going to be my office mate, Gail Schuhart, and asked

8          if it was okay.  He contacted one of the gentlemen who

9          was going to have to move his office out of the one

10         offices, asked him if it was okay.  It was a procedure

11         that had never, as far as I know had never been, had

12         never occurred before.

13    Q    In what respect was he asking Gail was it okay?

14    A.   Would she be okay sharing an office with me, that kind

15         of thing.

16    Q    I'm going to show you a document that I'll ask the court

17         reporter to mark as Plaintiff's Exhibit 6.

18         (Varner Deposition Exhibit No. 6 was marked.)

19    BY MS. WILLIAMS:

20    Q    Is Plaintiff's Exhibit 6 the memo that you just told

21         me about that you typed to Judge Hoffer asking for a

22         change in your office space?

23    A.   Yes, it is.

24    Q    Now, there's handwriting on there.  Is that your

25         handwriting?

Barbara Varner                          262

1   A.   Yes, it is.

2   Q    Now, the note that you put on there, you have three

3        exclamation points.  Why did you put those exclamation

4        points there?

5   A.   For him to ask me how long I'll be there, who I'm going

6        to be sharing, what desk -- what I'm going to be, what

7        exactly desk I'm going to be using?  I wasn't allowed in

8        that area, how would I know?

9            As far as how long, I don't know how long this is

10       going to be where I would feel comfortable anywhere at

11       that point.

12  Q    But that was not because of your gender, was it?

13  A.   About as far as moving and stuff?  I don't believe so,

14       but I don't know.  I don't think anybody else has had to

15       do this kind of thing to move their office.

16  Q    But you don't know for sure?

17  A.   No, I do not know for sure.

18  Q    Okay.  You had provided to me through your counsel a

19       series of handwritten notes.

20  A.   Yes.

21  Q    I'm going to ask you, did you supply all the handwritten

22       notes that you've made about this case, to your counsel?

23  A.   I believe I have, yes.

24  Q    Do you recall the date of the last handwritten note you

25       had submitted --

Barbara Varner                     263

1    A.    No, I don't recall the date.

2    Q      -- to counsel?

3    A.    No, I don't recall.

4    Q     Do you continue to keep handwritten notes about the

5          case?

6    A.    Yes.

7    Q     And do you continue to provide them to your counsel?

8    A.    Things like this, yes.

9    Q     When was the last time you gave your counsel a

10         handwritten note?

11   A.    This perhaps was the last handwritten note, I believe.

12   Q     And what's the date of that?

13   A.    Looks like March 27, 2002.

14   Q     So you've submitted no further handwritten or notes or

15         diary submissions since that time?

16   A.    I would have correspondence with my attorney, but not --

17         more on dates and times and what's going on with the

18         case.  But I just -- at this point I cannot recall any

19         other handwritten notes since then.

20   Q     You can assure me that any handwritten notes you do

21         have, will be supplied to your counsel?

22   A.    Certainly.

23              MR. MacMAIN:  Off the record.

24              (Recess taken from 10:10 until 10:21 a.m.)

25              (Varner Deposition Exhibit No. 7 was marked.)

Barbara Varner                    264

```
 1   BY MS. WILLIAMS:

 2   Q    Ms. Varner, I've given you a document which I've asked

 3        the court reporter to mark as Plaintiff's Exhibit 7.

 4        Can you identify that package of documents for us?

 5   A.   It's just my personal notes that I took.

 6   Q    Are those the notes that you told Jim Thomas yesterday

 7        were written on a pad, a notepad?

 8   A.   Just various pads, yes.

 9   Q    You remember discussing them with Jim yesterday?

10   A.   Yes.  That we had provided, yes, the notes, personal

11        notes, yes.

12   Q    And these are those notes?

13   A.   Yes, they are.

14   Q    When were those notes made?

15   A.   They were ongoing.  '96, '98, '97.

16   Q    Were they made as --

17   A.   '99.

18   Q    -- various actions occurred?

19   A.   Yes.

20   Q    Or did you go back and fill in some information?

21   A.   Most of the time it was as they occurred so I wouldn't,

22        you know, forget things.

23   Q    Is some of the information filled in later?

24   A.   The only thing I believe filling in later was actually

25        the trips.
```

Barbara Varner                          265

 1   Q    When you say the trips?

 2   A.   I'm sorry.  It's back towards the back, there's a list

 3        of trips that I could remember that I had taken with

 4        Mr. Graham.

 5   Q    What is the date?

 6   A.   '96.

 7   Q    But the rest of the notes you say were written

 8        contemporaneously with the actions taken?

 9   A.   Yes, that's true.

10   Q    I'd like to direct your attention to a page of the

11        notes, and I'll reference it by telling you that in the

12        upper left-hand corner there's a number 7 printed.

13   A.   Okay.

14   Q    And at the bottom of that page number 7 you have an

15        entry dated 7/11.  Do you see it?

16   A.   Yes.

17   Q    Do you remember what year that note was written?

18   A.   It would have been '97.

19   Q    And you say in that note you saw Judge Sheely?

20   A.   Um-hum.

21   Q    Would you tell me under what circumstances you saw the

22        judge?

23   A.   I had gone up to the judge's chambers to take a file up.

24        We had court within the next day or so.  I had gone up

25        to take a file up, and when I walked into the office,

1          his regular secretary was not there but he had one of

2          his law clerks, she was typing, in the process of typing

3          a letter.  And what I found out that it was the order he

4          was making or what he planned to do as a result of my

5          complaint, what his resolution would be.  When I walked

6          into the office the judge said, come over here.  And he

7          said, I just want you to know I've made a decision, and

8          then he said, why don't you come into my office with me.

9              So I walked into the judge's chambers with him, and

10         he proceeded to tell me that Mr. Graham and his wife and

11         Attorney Dave Foster had come to him, I believe it was

12         the day before, I believe, that they had, Mr. Graham had

13         confessed to this alleged affair to Judge Sheely.  Judge

14         Sheely told me that he felt so sorry for them, that I

15         had ruined their family.

16             And I explained to Judge Sheely that it was all an

17         orchestrated thing, because up to that point as far as I

18         know, this alleged affair had never come up during the

19         whole investigation into anybody else.  And I said to

20         Judge Sheely, if you were a man would you confess in

21         front of public, would you confess in front of a judge,

22         in front of an attorney, or wouldn't you be more

23         discreet and tell your wife at home and then handle it?

24             I feel it was a ploy, because I knew Barb Graham

25         had worked with Judge Sheely.  He had basically a tender

Barbara Varner                         267

1         spot for Barb Graham.  And I said to the judge, it did

2         not happen.  And he said, well, I'm telling you, it was

3         just horrible, they were both crying.  And just, you

4         could tell he had been -- it had been emotional for

5         Judge Sheely.

6    Q    Is this the first time you had talked with Judge Sheely

7         about your complaints?

8    A.   Yes, it is.

9    Q    You never asked for an opportunity to speak with him

10        prior to this?

11   A.   No.  And I was surprised he did not ask for my attorney

12        and myself to meet with him prior to making this

13        decision.  It was just made on an emotional time when --

14        and he just decided he was going to make this decision.

15             And he said to me, at that time he said that he

16        knows that they, well, meaning Joe and Gary, have been

17        asshole buddies for years.  He said, I know they get

18        into a lot of stuff, they've been asshole buddies.  And

19        he said, I'm not going to do anything else, you --

20        meaning me -- you have damaged this family enough.  And

21        I said, I did not damage this family, the man who is

22        causing this is Mr. Graham, and I said, I just wanted

23        the harassment, I just wanted it to stop.  And --

24   Q    Could you and your attorney, and/or your attorney, have

25        requested a meeting with Judge Hoffer?

Barbara Varner                        268

1   A.   He was writing the order at that time.

2   Q    I'm sorry, I meant Judge Sheely.  Strike that.

3   A.   He was in the process of writing the order.  He said,

4        I've made my decision.

5   Q    Prior to that, could you have made an appointment with

6        Judge Sheely and spoken to him?

7   A.   We didn't know where it was at.  Dave Deluce had told my

8        attorney that we would be very happy with the

9        recommendation that they had made as a result of the

10       their investigation, and we assumed we would be hearing

11       from them.  This was a sudden thing as far as I was

12       concerned.  But I was just surprised that the judge did

13       not give us the courtesy of meeting with us and letting

14       us have our say.

15  Q    But did you ask for such a meeting?

16  A.   I believe I did mention it to him.

17  Q    When?

18  A.   At that, when I was in his office talking to him.

19  Q    And what did he say to you?

20  A.   He said, he had told -- he said, I have made my

21       decision.  He was just so emotionally taken up by what

22       he had witnessed in his office.

23  Q    Is it your understanding that Barbara Graham was there

24       when Judge Sheely talked with Gary about the affair?

25  A.   That's when the confession was supposed to have

Barbara Varner                    269

```
 1            happened.  At least that's what Judge Sheely told me.
 2            He said, they came up before me and they confessed, they
 3            were both crying, and said it was horrible.  And he kept
 4            saying, look what you have done to their family.  And I
 5            said, Judge Sheely, I, I did not do anything to the
 6            family, I did not have the affair, it was all a
 7            performance for you.
 8       Q    Do you know for sure that Gary had not told his wife
 9            about the alleged affair in private before meeting with
10            Judge Sheely?
11       A.   I have no idea.  All I know is I think it was using the
12            emotional time and bringing Barb in there.  Why would
13            you want to embarrass her again in front of the judge
14            and in front of your attorney if not to use it as an
15            emotional ploy.
16       Q    I need you to clear something up for me.  I have two
17            documents, both of which have been verified by you.
18            I'll show you the verification.  This is titled
19            Plaintiff's Response to Defendant Joseph Osenkarski's
20            Interrogatories, and this is a verification.  Is that
21            your signature?
22       A.   Yes, it is.
23       Q    And I also have there was responses to Defendant
24            Commonwealth of Pennsylvania's Ninth Judicial District's
25            Interrogatories, and that also contains a verification
```

1       which I'll show you.  Is that your verification?

2   A.  Yes, it is.

3   Q   Do you remember answering interrogatories for both the

4       court defendant and Mr. Osenkarski, the defendant?

5   A.  Yes, I did.

6   Q   Both of these documents address the statement that you

7       referred to a minute ago regarding asshole buddies.  In

8       the response to the court defendant's interrogatory

9       number 9 you say this:  Judge Sheely admitted that he

10      and Mr. Graham are asshole buddies and political friends

11      for years.

12          And then in the Answers to Interrogatories that you

13      gave Mr. Osenkarski, and that's your response to number

14      1, you say:  Judge Sheely admitted to being political

15      friends with Mr. G's father and told me that he knew

16      Mr. G and Mr. O were asshole buddies for years.

17          Will you tell me which is the correct version of

18      the asshole buddies, pardon that phrase, sorry?

19  A.  I had told Judge Sheely about Mr. Graham talking, saying

20      F this and F that to me, and also mentioned to him that

21      he was not aware what all was going on in the

22      department, just letting him know.

23          And I explained to him that there were times that

24      Mr. Osenkarski and Mr. Graham would go to Lebanon to

25      pick up boxes of shoes, saying that they were meant for

```
 1            the detention center and I know personally that they

 2            were giving them to their relatives, to their sister,

 3            daughters, that they were using them.  And at that time

 4            is when Judge Sheely said, Joe and Gary, I know they've

 5            been asshole buddies for years.  And then he continued

 6            to say that he has known Mr. Graham's father for years,

 7            he was a political -- he helped get him elected and he's

 8            known him for years, he would go to political parties at

 9            picnics and stuff prior to elections.

10    Q    Did that lead you to believe that Judge Sheely had some

11         political motive for finding for Gary?

12    A    I believe so.  Absolutely.

13    Q    Just so the record is straight, the buddy statement

14         referred to Mr. Graham --

15    A    And Mr. Osenkarski.

16    Q    -- and Mr. Osenkarski?

17    A    That's correct.

18    Q    And not Judge Sheely and Mr. Graham?

19    A    No.  No.

20    Q    Now, returning to your handwritten note, if you would,

21         turning the page to the page marked 8 in the left-hand

22         corner, upper left-hand corner?

23    A    Yes.

24    Q    On page 8 you state:  Gary was gloating after.  Do you

25         see where I'm referencing?  It's at the end of the first
```

Barbara Varner                        272

1           paragraph.

2    A.     You're on page 8?

3    Q      Um-hum.

4    A.     Okay.  Gloating after.  Yes.

5    Q      How was Gary gloating?

6    A.     Let me just read.

7               He was -- just the attitude.  He was just -- I

8           would have eye contact with him, he would just, like,

9           smirking at me, just happy, just apparent to me that he

10          had won, that kind of thing.

11   Q      Did he say something to you that indicated gloating?

12   A.     No.  That was just my opinion of what I was seeing.

13   Q      Further on down the page you say:  Gary wrote a letter.

14          It's the second paragraph from the bottom.

15   A.     Yes.

16   Q      Gary wrote letter little while ago to remind him of

17          political support.

18   A.     Yes.

19   Q      Am I reading that correctly?

20   A.     Yes.  I was told that Mr. Graham had written a letter to

21          Judge Sheely prior to this alleged confession reminding

22          Judge Sheely of the political support him and his family

23          had given to him in his election time.

24   Q      Who told you about that letter?

25   A.     Somebody in the office -- I'm trying to think how I -- I

Barbara Varner                          273

1           don't recall how I came to that information.

2      Q    Do you have a copy of such a letter?

3      A.   No, I don't.

4      Q    Did the judge ask at some point why you didn't come to

5           him with your complaint?

6      A.   Yes, he did.

7      Q    What exactly did he say to you?

8      A.   Judge Sheely on 12/29/97, it's in the packet, Judge

9           Sheely asked me why did I give letters to Personnel

10          about Gary and Barb, lawyer told me to -- let me see.

11          Told me to, sorry about the whole thing, nothing

12          happened.  He can't -- I know he couldn't -- I said I

13          will probably always have the stares and those kind of

14          things but he can't do anything about it.

15     Q    He said -- is this, you're looking at a note?

16     A.   Yes.

17     Q    And it's undated.

18     A.   It's -- at the very bottom it has a date on it, 12/29.

19     Q    Oh, 12/92, you're right, it does.

20     A.   Judge Sheely, why do I give letters to Personnel about

21          Gary and Barb and the lawyer.  Told --

22     Q    Just so the record is clear, it's in the packet of

23          notes --

24     A.   Yes, it is.

25     Q    -- that we've been discussing and we've marked it

Barbara Varner                    274

1           Plaintiff's Exhibit No. 7.

2    A.    There's another note in here, too.

3           MR. ADAMS:  Four pages past page 10, on the fourth

4           page after 10.

5           THE WITNESS:  I know there's a conversation Judge

6           Sheely had with me outside of the elevators on my floor,

7           third floor, one day, not too long after this, that he

8           said that I was going to just have to put up with it

9    BY MS. WILLIAMS:

10   Q     This is the second time, a second time that you talked

11         to Judge Sheely about the matter?

12   A.    Yes.  Yes, I know it's in my notes.

13   Q     Well, your note on 12/29/97, if I'm reading it

14         correctly, says:  I'm nice lady.  Did Judge Sheely --

15   A.    He said I'm a nice lady who will probably always have to

16         put up with the stares, he can't do anything about it.

17         He said, sorry about the whole thing, and I said,

18         nothing happened.

19   Q     Is this the complete conversation that you had with

20         Judge Sheely?

21   A.    As far as -- yes.  They were just brief --

22   Q     Did you make any response?

23   A.    Again, as I told him before, there's not a whole lot.  I

24         said to him, underlined it was like nothing happened.

25         And he just said, I'm a nice lady, you'll have to put up

Barbara Varner                                    275

1              with the stares and he can't do anything about it.

2                   But there was another time and I believe it's in

3              here, where he said I would just have to put up with it.

4        Q     How well do you know Judge Sheely?

5        A.    I've known Judge Sheely not personally but I've known

6              him since 19 -- probably '73, '72.

7        Q     How did you know the judge at that time?

8        A.    Judge Sheely lived beside me when I lived in

9              Shiremanstown.  My ex-husband and I lived in an

10             apartment briefly for maybe a year.  I met his wife.  I

11             would see him but I did not know him.

12                  And then when I came to the courthouse, I knew of

13             him just because I lived in Cumberland County, I knew

14             Judge Sheely.

15       Q     And you lived right nextdoor to the judge?

16       A.    In an apartment.  We were in a single house, we were in

17             the back apartment, and his home was beside us.

18       Q     Did your ex-husband know Judge Sheely?

19       A.    Just I think we might have met him one time, but that's

20             it, just in passing.  I saw his wife on occasion.

21       Q     Does your ex-husband still live next to Judge Sheely?

22       A.    No.  Well, there was a period he did, when we lived on

23             Apple Drive.  When I left, after I left my home, Judge

24             Sheely and his wife did move into the home beside my

25             ex-husband and his present wife.  But now he's not

Barbara Varner                          276

1            there.

2    Q     When did your ex-husband remarry?

3    A.    He remarried in 1990.

4    Q     Did he remarry someone that you now?

5    A.    I did not know her, no.

6    Q     Is it someone your present husband knows?

7    A.    Yes, his ex-wife.

8    Q     We've now discussed two conversations you had with Judge

9          Sheely on this matter.  Are there any other

10          conversations that you had with Judge Sheely, who was

11          president judge at the time?

12   A.    Not that I can recall at this time.

13   Q     What did you tell him when he asked you why you had gone

14          to the county instead of to him?

15   A.    That was -- after the investigation, when I went down to

16          Dan Hartnett, because I had gone through the procedure.

17          I asked Mr. Graham to stop, to leave me alone.  I told

18          Mr. Osenkarski about it.  Nothing was done.  I went down

19          to Dan Hartnett and I told him about it.  And he never

20          stopped me and said, you shouldn't be here, you should

21          go to the courts.  I was following what I presumed was

22          the hierarchy, you know, in the handbook, that if one

23          failed, you go to the next and to the next.  And to me,

24          the Personnel Department was the place to go when you

25          have personnel problems.  I also knew the EAP program

1       was through there.  But not once did Dan Hartnett say,

2       this is not in our -- you should not be here, you should

3       go directly to the judge.

4           So I proceeded with that.  And they pulled in Dave

5       Deluce immediately to do the investigation, and I know

6       he would have contact with the judge.  So I assumed I

7       had -- I was under the assumption I was doing the right

8       thing.

9  Q    Do you know when Judge Sheely found out about the

10      complaint?

11  A.   I have no idea.

12  Q    You knew you were a court employee?

13  A.   I knew I was both.  I knew I was an officer of the

14      court, but I also had a personnel book that belonged to

15      the county.  And they wrote my checks.  My time, my --

16      all my benefits come through the county, through the

17      Personnel office.  So most of my dealings as an employee

18      was with the Personnel Department as far as any

19      day-to-day.

20          The judge was there for court, that's basically the

21      contact we had.  He did not come down to the office and

22      interact that much or meet with us.  So most of my

23      contact was through the Personnel Department.

24  Q    But you knew that -- did you know that Judge Sheely was

25      the direct supervisor of Mr. Osenkarski?

Barbara Varner                        278

1    A.    I knew he was -- right, absolutely.  I knew the

2          hierarchy, yes.

3    Q     Thanks.  You may recall yesterday when we were

4          discussing your EEOC complaint, we marked that actually

5          as an exhibit as P-5.  I'll just give it to you to

6          refresh your recollection.  You've just told me that you

7          knew that you were a court employee, and yet the only

8          respondent that you named was Cumberland County.

9                Why did you only name the county as the respondent

10         in your complaint to the agency?

11   A.    At that point I assumed that the courts were part of the

12         county.  We worked for Cumberland County as the big

13         umbrella.  The courts were part of a department.  It's

14         broken down in the personnel list as the courts, that's

15         a department.  Each department is listed.  To me,

16         Cumberland County is the big umbrella.  The county is

17         the big umbrella and like I said, the court is just one

18         part of that whole arena.

19   Q     Did it surprise you to find out that that's not so, that

20         the court is actually a state entity?

21   A.    Yes.  I was not really aware of that at that time.  I

22         knew I was an officer of the court and I had certain

23         rights different than other employees, but I just

24         thought it was under one big umbrella, Cumberland

25         County.

Barbara Varner                          279

1   Q    Now, you've given me two conversations that you had with
2        Judge Sheely.  Are there any other conversations about
3        this matter that you had with Judge Sheely when he was
4        president judge?
5   A.   Not that I can recall at this time.  Well, when I went
6        up -- there would be three total, because when I went up
7        on the 11th and he told me what his plan was, and I met
8        with him in his chambers.  And then the two times that I
9        met, saw him in passing, the one where he told me that
10       I'm going to have to put up with it.
11  Q    That was at the elevator?
12  A.   Yes.  And the other one was -- I'm not sure where the
13       other one happened.  It was in passing again, that he
14       told me I was a nice lady.
15  Q    Oh.  That wasn't the same instance, then?
16  A.   No, it wasn't.  There was two.  There was two other.
17       There would be two plus the one in his office.
18  Q    Where did the one where he told you you were a nice lady
19       take place?
20  A.   I'm guessing maybe up in his chambers, just in passing.
21       He would just stop and ask, you know, things.  It was
22       not any formalized, just in passing, like an
23       afterthought for him.
24  Q    What did you say to him in that instance?
25  A.   He would just make the comment and go on.  It was not --

1       I really never thought I want stand and argue with the

2       judge.  He would just go on.

3   Q   I'd like to direct your attention to P-7.  There's a

4       note dated 8/22, apparently '97, somewhere right about

5       in the middle of the stack.

6   A.  8/22.  Is there a page number?

7           MR. ADAMS:  Taylor, what date, again?

8           MS. WILLIAMS:  8/22.

9           THE WITNESS:  Yes.

10  BY MS. WILLIAMS:

11  Q   It says:  Gary told Nicole Sheely's pissed.  Going to

12      find out who talked.  See if change their stories when

13      they get on the stand.

14          Who is Nicole?

15  A.  To begin with, Mark Galbraith, he was a -- he's a former

16      probation officer.  Nicole is now his wife.  At that

17      time her name was Nicole, Horwick, H-O-R-I-C-K.  She was

18      an adult probation officer.

19  Q   And what exactly did you understand the subject of that

20      conversation to be?

21  A.  What it was is according to Mark, Gary had sought out

22      Nicole or saw her somewhere and said that Sheely was

23      pissed and going to find out who had talked regarding my

24      case, and see if they would change their stories when

25      they got on the stand, and no one from adult side would

1       be spared, that obviously punishment was going to be

2       doled out, it would be my interpretation of that.  And

3       that's how they interpreted it as well.

4   Q   I don't understand the who talked.  Was there gossip?

5       Is that what the talk is referenced there?

6   A.  My understanding is talked -- people were being called

7       down to the Personnel Department at that time during the

8       investigation to tell their, what they had observed in

9       the office.  Those kind of things.  And it was anybody

10      who had gone down and spoke out about what was going on.

11      And if they were going to testify in court, that they

12      would, I guess under the threat of would they change

13      their mind when they got on the stand.

14  Q   I guess I don't see the threat that you're talking

15      about.  What there constitutes a threat?  What words

16      constitute a threat?

17  A.  Well, if the judge is pissed and he's going to see if

18      they changed their story, finding out that the judge

19      feels that way might be intimidation for people to say,

20      hey, you know, I don't want to say anything, I'm not

21      going to talk about this because Judge Sheely is not

22      going to be happy if I really, you know, testify, if I

23      testify.

24  Q   But could it mean that he's unhappy that there is a

25      problem in the department?  Could it mean something as

Barbara Varner                                    282

```
 1          innocuous as that?
 2   A.     No, because the reference is when they get on the stand,
 3          meaning they have to testify in court.
 4   Q      If you'll turn the page you'll see another note dated
 5          11/19?
 6   A.     Before or after?
 7              MR. ADAMS:  It will say 10/27 at the top.
 8              MS. WILLIAMS:  Yes, thank you.
 9              THE WITNESS:  Yes, I see that.
10   BY MS. WILLIAMS:
11   Q      On 11/19 you say:  Was informed by fellow professional
12          that Barb Graham was to have told one of the judges that
13          I confessed to her to having an affair with her husband.
14              Tell me the circumstances of that and everything
15          you know about that.
16   A.     This was '97.  Right now I cannot recall who that would
17          have been.  I'd have to think about that.  At this point
18          I'm not sure who that was.
19   Q      When you think of it, will you let your lawyer know
20          and --
21   A.     I certainly will.
22   Q      -- and we'll ask her to let us know as well.
23   A.     Sure.
24   Q      Moving on through P-7, which is the notes, there's a
25          note written 5/26.  I think we talked a little bit about
```

Barbara Varner                                    283

```
 1         that situation earlier.  It's right toward the back,
 2         maybe six pages in.
 3   A.    5/26 did you say?
 4   Q     Yes, 5/26.
 5   A.    At the very top?  It's right here at the top?
 6   Q     Yes.
 7   A.    Okay, I have that.
 8   Q     I think we're on the same page.  You say:  Joe said I'm
 9         to conduct business in my office, not down hall.
10             Do you recall that conversation?
11   A.    Yes, I do.
12   Q     What exactly did Joe -- and I assume that's Joe
13         Osenkarski -- say to you?
14   A.    He said that the judge had instructed him to tell me
15         that I was not to go down to the other office, the one I
16         had mentioned I was not allowed to go to.  I was not
17         allowed to go down there to conduct any business in the
18         office down the hall, judge's orders, that Barb Graham
19         was distraught.  And I requested that I wanted it in
20         writing from Mr. Osenkarski.
21   Q     And did you get it in writing from Mr. Osenkarski?
22   A.    Yes.  I got a letter from Mr. Osenkarski, but I still
23         wanted the judge to tell me.
24   Q     So what did you do?
25   A.    I got a call from the judge, like I said, within a day,
```

```
 1              within a day or two, where he called me up to his

 2              chambers.  And he said that I was not to go down to that

 3              office for any reason, that any business I had could be

 4              handled down at my end.  And I explained to him it's a

 5              public office, I didn't understand how he could keep me

 6              out of a public office.  And he said -- he got very loud

 7              and he said, do you understand what I'm saying?  You

 8              stay out of there, she's -- Barb Graham's going to have

 9              a nervous breakdown.

10    Q    Had you complained that Barbara Graham was bothering

11         you?

12    A.   At that point, yes.  There was an incidence of that

13         before, yes.

14    Q    Did the judge say he was concerned about your safety?

15    A.   No.  He was concerned about Barb having a nervous

16         breakdown.

17    Q    Did he say that he wanted to keep you separate so that

18         no further incidents would happen?

19    A.   No, he did not.

20    Q    Did he ask you to voluntarily keep away from

21         Mrs. Graham?

22    A.   No.  He instructed me to stay out of there.  He never

23         said:  Stay away from Mrs. Graham.  He said when I go

24         into there that I upset her, that she's distraught.

25    Q    You say you called up by Sandy.
```

```
 1    A.    Yes.

 2    Q     Who is Sandy?

 3    A.    Judge Hoffer's secretary.

 4    Q     When the judge told you this, what did you say besides

 5          that it's a public office?  Did you say anything else?

 6    A.    It continues on this page.  When the judge called me up,

 7          he told me to stay out.  He said, she's about to have a

 8          breakdown, meaning Mrs. Graham.  It says you can conduct

 9          your business in your office.  If you can't, I'll have

10          to move everybody you have business with down there.

11          And says if you're going to have a lawsuit, do it.  This

12          is Judge Hoffer.

13    Q     Now, further down there you say:  Do you know how

14          embarrassing humiliating for me?  Did you say that or is

15          this your reflective note as you're writing the note?

16    A.    No.  I said this to him.

17    Q     What did he say to you?

18    A.    He just kept emphasizing I need the stay out of there.

19                I further down, is this, any of this woman's fault,

20          he asked me about Mrs. Graham.  And I said, no, it is

21          not my fault, either.  I'm the victim.  The man who

22          caused all this is still working here.

23                I have to see him, she pushed into me.  What

24          about -- and then he said about me to stay away from

25          her.  And I said, what about the bathroom on the fourth
```

Barbara Varner                    286

1              floor of the court?  How about the parking lot?  There

2              are places that I feel threatened by her.  And he said,

3              do I make myself clear, you stay away from her.  And --

4    Q    You seem to be reading the note.

5    A.   Yes.

6    Q    Does this note indicate the entire conversation you

7              claim you had with Judge Hoffer?

8    A.   As I recalled it, yes.

9    Q    Would you add anything to that, anything that you said

10             or anything that he might have said?

11   A.   No.  I just went on and --

12   Q    Were there any witnesses to this conversation?

13   A.   No.  No.

14   Q    Where was Sandy?

15   A.   Sandy -- I really don't -- she's usually out in her

16             office.  But the door, the judge's door was closed when

17             he was speaking to me.  First he offered me a cigarette,

18             and then he started in on with this.

19   Q    Did you take the cigarette?

20   A.   No.  It's a no-smoking building, and I don't smoke, so.

21             MS. WILLIAMS:  Let's mark this one as P-8.

22             (Varner Deposition Exhibit No. 8 was marked.)

23   BY MS. WILLIAMS:

24   Q    I direct your attention to P-8.  I have this

25             separately.  It didn't appear to be in the packet that

Barbara Varner                        287

1        was provided.

2              Is this in your handwriting, Ms. Varner?

3    A.   Yes, it is.

4    Q    It says:  Joe, I will not be affected by seniority list.

5         He will take care of me.

6              Would you explain what this note means?

7    A.   Joe I'm referring to is Joe Osenkarski.  And this is

8         when they had been talking about the seniority list and

9         those type of things, and I was complaining about how

10        they planned to change it and move me down on the list.

11        And Joe had told me that not to worry, that I wouldn't

12        be affected by the seniority list, that he'll be making

13        a specialist position for me, a Family Preservation

14        specialist position.  And he said it would be -- would

15        have no effect on promotion at all, only on the

16        emergency duty time where you sign up to serve emergency

17        duty on a weekend basis.  And that goes by seniority,

18        goes down the list.  But that's what Joe had told me

19        that day.  It was more if I just relax about the

20        seniority list I will take care of you.

21   Q    And did he do that?

22   A.   No.

23   Q    In what respect did he not?

24   A.   There was no specialist position ever developed beyond

25        the one year of grant money for the Family Preservation.

Barbara Varner                    288

1   Q     Do you know why?

2   A.    I believe they did not apply for the Family Preservation

3         because the number of referrals on juveniles was coming

4         in, and with Family Preservation was that very low

5         number to supervise and they needed more line people

6         rather than a smaller specialist area.

7   Q     Sounds like the circumstances changed?

8   A.    Yes.

9   Q     Did you see a copy of the report that Judge Sheely wrote

10        on your complaints to the county?

11  A.    The Order that he wrote?  Or what?

12             MS. WILLIAMS:  We'll mark it.  P-9.

13             (Varner Deposition Exhibit No. 9 was marked.)

14  BY MS. WILLIAMS:

15  Q     Do you recognize that document?

16  A.    Yes, I do.

17  Q     Do you dispute any of the findings that Judge Sheely

18        made, other than what we've already discussed?  If

19        you've already told me about it, you need only reference

20        it.

21             MS. WALLET:  I'll object to the form of the

22        question only to the concept of findings.  Would you

23        like to identify what you mean by findings?

24  BY MS. WILLIAMS:

25  Q     Well, let me ask it this way.  Is this the Order that

Barbara Varner                                    289

1          you discussed in our previous conversation about Judge

2          Sheely?

3     A.   It is.  But I can also note, I read this after quite

4          some time.  My attorney had requested a copy of this.

5          The only time I even saw a little bit of it was when I

6          went up to the judge's chambers and his law clerk was

7          typing this and he explained it to me.

8     Q    Why do you call it an Order?

9     A.   Well, the judge signed it.  It's not an Order but it was

10         his decision.

11    Q    You had a conversation about this with the law clerk?

12    A.   No, no, no.  She was typing what Judge Sheely was

13         dictating.

14    Q    So you never talked to the law clerk about it?

15    A.   No.  No.  She was just typing it.  And that's when he

16         took me into his chambers and told me what he had

17         planned to do.  But we had requested a copy of this for

18         quite some time.  I know my attorney was very irate that

19         we had not received a copy for quite some time.

20    Q    I noticed that she's cc'd on the bottom of it and she

21         did eventually receive copy, did she not?

22    A.   Yes, eventually she did.

23    Q    Would you take a minute to read over it and tell me if

24         there is anything that you have not discussed with me

25         already that you dispute in Judge Sheely's finding.

Barbara Varner                              290

1           MS. WALLET:  Again, I'll object.  The problem is
2           Judge Sheely will say someone told me something.  Do we
3           object to the fact that someone told him something?
4           Maybe not.  But we might object to the substance of what
5           was said.  That's why I would ask you to be specific
6           about what you mean by a finding.
7   MS. WILLIAMS:
8   Q    Perhaps we can just say is there anything other than
9        what we've discussed that Judge Sheely states in this
10       memo dated July 11th, 1997, that you dispute or
11       disagree?
12  A.   I disagree with how he handled this.
13  Q    Yes?
14  A.   Okay.
15  Q    We've discussed that.  Is there anything that we haven't
16       talked about that you would specifically dispute at this
17       point?
18  A.   I'd have to discuss with my attorney to find out, you
19       know, actually go over it.
20  Q    Factually.  We understand that legal conclusions are
21       left to your attorney, but it's facts I'm trying to
22       understand from you.
23  A.   I would take exception to that we were best friends.
24  Q    Do you know why Judge Sheely would have gotten the
25       impression that you were best of friends?

1   A.   I guess because you have a cooperative, you know,

2        working relationship.  Best friends, friends would not

3        be a term I would use.

4   Q    Is there anything else?

5   A.   I call exception to the fact that he never had the

6        opportunity to meet with the two parties in the chambers

7        and try to resolve the matter.  He met with Mr. Graham,

8        his attorney, and he met with them I know at least on

9        two occasions.  And we had never had the opportunity to

10       meet, my attorney and myself, prior to his making this

11       decision.

12  Q    We discussed that you never asked for that opportunity;

13       is that correct?

14  A.   Well, at that point this happened, as far as I'm

15       concerned this happened very suddenly, that he made that

16       decision, just after hearing the confession, this

17       alleged confession, that he would act as far as I'm

18       concerned on an emotional basis rather than a factual

19       basis and not meet with all parties prior to this.

20  Q    Does it make you angry that Judge Sheely believed Gary's

21       story rather than your story?

22  A.   Judge Sheely never actually heard my story from me at

23       all.  It was always secondhand information.  I was never

24       given an audience with him to talk about it.  I had gone

25       through the county, through Dave Deluce, with my

Barbara Varner                         292

1          understanding that Dave Deluce had contact with the

2          judge on an ongoing basis.

3    Q     Had you told your story to Dave Deluce?

4    A.    Yes.

5    Q     Do you know whether Judge Sheely saw that story as

6          presented to him through Dave Deluce?

7    A.    I have no idea.  Even the recommendation we have never

8          been given a copy.

9    Q     Is there anything else that you would dispute?

10         Factually.

11   A.    Not at this time.  I leave it open.

12   Q     If at any point during the course of the discovery you

13         do find something that you disagree with factually in

14         that document, will you advise your attorney and ask her

15         to let me know that?

16   A.    Absolutely.

17   Q     At some point did you bring charges against Barbara

18         Graham?

19   A.    Yes, I did.

20   Q     I think we discussed that a little bit yesterday.

21   A.    Yes.

22   Q     As part of the discovery process you provided me with a

23         facsimile transmission from you at the Cumberland County

24         Juvenile Probation Department to Debra Wallet, your

25         lawyer.  Do you recall that document I'm speaking of?

Barbara Varner                          293

1            MS. WALLET:  Perhaps you could show her.

2            THE WITNESS:  If I could see it.

3            MS. WILLIAMS:  We can mark it so the record is

4        clear.

5            (Varner Deposition Exhibit No. 10 was marked.)

6    BY MS. WILLIAMS:

7    Q    Is that your handwriting, Mrs. Varner?

8    A.   Yes, it is.

9    Q    And in that fax you state:  Debra, B. Graham admitted to

10       the charges.  Is that correct?

11   A.   Yes.

12   Q    Exactly what did Barbara Graham say to admit to the

13       charges?

14   A.   The charge of harassment, she admitted to following me

15       or continuing with me to an area where she was not

16       parked, that she continued to my car, beside me,

17       continually talking after I had asked her not to say --

18       I just asked her to drop it.  She continued along, which

19       is a continued behavior of harassment, that she had

20       admitted to doing that.  She did follow me to my car,

21       that she did continue to talk to me, that she had made

22       the statement that I had this alleged affair with her

23       husband, and that she was angry at me.  That is the

24       elements of harassment.

25   Q    But the judge found there was no harassment, didn't she?

Barbara Varner                    294

1    A.    DJ Correal felt that Barb Graham had, quote, crossed the

2          line, but she dropped the charges with a warning that

3          she put be put on notice that any further charges would

4          be handled differently.

5    Q    Right.  I see that's written there.

6    A.    Yes.  Right.

7    Q    Do you know whether there's a transcript of that

8          hearing?

9    A.    Yes, there is a transcript I'm sure.

10   Q    Have you ever seen it?

11   A.    No, I have not.

12   Q    Do you remember the district justice in that case

13         telling you that she expected more out of you as well as

14         out of Barbara Graham, as well as from Barbara Graham?

15   A.    No, she -- not that I recall her saying that, no.

16   Q    If it's in the transcript, would that be true?

17   A.    I would assume it would be.

18   Q    Do you recall the district justice saying that I have

19         these kinds of cases on a regular basis, and believe me,

20         harassment usually is much more severe than this?

21   A.    I don't recall her saying that.  She could have.

22   Q    But the result was that she was found not guilty of the

23         harassment charges; is that correct?

24   A.    What it was, Ms. Graham stated that we had a case --

25         that's, you know, obviously this case -- was proceeding,

Barbara Varner                          295

1           and Judge Correal said, it sounds like this is going to

2           be handled in another court, whatever, and that she

3           warned her.

4    Q      But this is a civil case that you've brought.

5    A.     Yes.  But I think she saw that the problem that

6           Ms. Graham was bringing up, this alleged affair is going

7           to be at least discussed or handled, the whole issue

8           that probably precipitated this, her anger with me would

9           be handled somewhere else.

10   Q      Does that satisfy you?  I mean, obviously criminal

11          penalties are different from civil ones.

12   A.     My intent was not to have Mrs. Graham have criminal

13          charges.  My intent was to put her on warning, because

14          this had not been the first time.  It had been an

15          ongoing problem, where her crossing the line or

16          following me or just intimidating.  I just wanted her to

17          get the idea that you just cannot continue this.  I had

18          the right to go to my parking spot.  I already moved my

19          parking spot away from her.  That I had the right to be

20          free and feel safe when I'm going to my car.  And free

21          from harassment.  Just doing that.

22   Q      Did you ever bring any criminal charges against Gary

23          Graham?

24   A.     No, I did not.

25   Q      I'm going to show you a document again provided by your

1          counsel through the discovery process.

2               (Varner Deposition Exhibit No. 11 was marked.)

3    BY MS. WILLIAMS:

4    Q     Is this a document you recognize, Ms. Varner?

5    A.    Yes, it is.

6    Q     It's a handwritten document.  Is that your handwriting?

7    A.    No, it is not.

8    Q     Okay.  Whose handwriting is it?

9    A.    This is Debra Green, a probation officer.

10   Q     Okay.  And under what circumstances did Debra Green

11         write this?

12   A.    Debra Green was aware of most of the things that were

13         happening.  Obviously, she worked closely with me.  And

14         she had gone down a list of charges that she felt

15         absolutely would be justified in this case.

16   Q     Justified in what?

17   A.    Against Mr. Graham.

18   Q     All of these are possible charges against --

19   A.    Mr. Graham.

20   Q     -- Mr. Graham?

21   A.    Um-hum.

22   Q     What did you do with this information, if anything?

23   A.    I had contacted the District Attorney at one time early

24         on and I asked him about pressing charges.  It was a

25         phone conversation, and that would have been Skip Ebert.

Barbara Varner                    297

1              He never got back to me.  And --

2      Q      Why did you not continue to press the charge?

3      A.     The Sheriff's Department was aware of this.  CID was

4              aware of this.  They were aware that they could bring

5              the charges.  CID could bring the charges themselves.

6      Q      You had already talked with them?

7      A.     Probably at this time, yes, I had spoke to the sheriff

8              as well as CID was involved.

9      Q      And that's a contact that you initiated?

10     A.     Yes, it is.

11     Q      CID never brought any charges against Gary, did they?

12     A.     Not that I'm aware of.  They were in agreement that he

13             should be removed from the job, he, you know, that he

14             was an angry man, and they had made comments about time.

15             Those kind of comments.  But --

16     Q      Do you know if Debra Green ever went to CID or the

17             sheriff or the police related to these, this list of

18             potential charges?

19     A.     We had also been called down to the Personnel

20             Department.  There was a time they -- I'm not sure

21             exactly what they were doing.  They were doing an

22             investigation is what they told us.  They were just

23             trying to look at different things, and they had called

24             several of us down on an individual basis and said,

25             could you tell us what problems are going on in your

Barbara Varner                    298

1          department.  And at that time we expressed a lot of the

2          concerns; the concerns about Mr. Osenkarski and Gary

3          getting the shoes from this factory under the alleged

4          giving them to a detention center, then personally using

5          them.  We had concerns -- we told them all this stuff.

6               I told them about being stalked, and I felt was

7          stalking, coming to my home, being touched, the indecent

8          assault, theft by unlawful taking.  Mr. Osenkarski had

9          been known almost notorious in our department as one who

10         removes items from the supply cabinet.

11    Q    Mr. Osenkarski?

12    A.   Yes, for personal use.  That's -- when I first started

13         at Probation I heard that.

14    Q    Have you ever seen him do such a thing?

15    A.   No.  But it was just one of those things they told me

16         that's why they had to lock to supply cabinet.

17         Mr. Graham had informed me of that, too.  He would talk

18         about Mr. Osenkarski taking things out of the supply

19         cabinet for personal use.

20              These are things we expressed to them down there,

21         and they told us they would handle them, they could do

22         things.  But nothing ever came of it.

23    Q    I asked in my Answers to Interrogatories, which you will

24         recall, I asked in my interrogatories which you answered

25         and you will recall I showed you a copy and we discussed

Barbara Varner                            299

1          your verification of it.  But I asked you if anybody had

2          made any admissions regarding the case, and your

3          response was that the memorandum of July 11th, 1997,

4          which we've marked as P-9, contains many admissions

5          about the investigation of my complaints.

6              Can you tell me specifically what you consider to

7          be an admission?

8     A.   Could I see the --

9     Q.   Yes, I'm sorry.  It's the memo.

10    A.   This one?

11    Q.   Yes, July 11.

12    A.   And again, could you restate the question again?

13    Q.   Yes.  You told me that that memorandum contains many

14         admissions about the investigation of my complaint and

15         the fact that Judge Sheely would not implement the

16         recommendations.

17             What specific admissions do you consider Judge

18         Sheely to have made there?

19    A.   Could I see the interrogatory?

20    Q.   Sure.

21             (Handed to witness.)

22    A.   Mr. Graham using the F word and using loud and abusive

23         language.

24    Q.   That's an admission by Judge Sheely?  I'm asking --

25    A.   Right.

Barbara Varner                         300

1   Q    -- do you consider that an admission?  Okay.

2   A.   Admission that he failed to meet with the two parties.

3        Admission he never spoke to me about the

4        allegations.

5   Q    He never spoke to you directly before this conversation?

6   A.   No.

7   Q    Okay.

8   A.   He did not.

9   Q    Is that the extent of the admissions by Judge Sheely in

10       that memo?

11  A.   I think those would be the most important things for us,

12       that he never met with us to resolve the matter and

13       obviously never met with me and my attorney, never gave

14       us the opportunity to do that.

15  Q    Okay.  And we discussed that earlier and we discussed

16       that you hadn't requested a, specifically requested a

17       meeting.

18  A.   Yes.

19  Q    I'm actually going to ask you to hold on to this because

20       I have one more question on it.

21  A.   That's fine.

22  Q    Following down the page, you responded:  Judge Hoffer

23       told me that he did not know why Judge Sheely had not

24       taken care of this problem.  And you say that's an

25       admission.

Barbara Varner                          301

1           Tell me about that conversation, about that

2       conversation with Judge Hoffer.  Under what

3       circumstances did he say that?

4    A.  After Judge Hoffer took office, he had called me up to

5       his chambers and he had said -- he referred to Judge

6       Sheely as Harold.  He said he knew about the case and he

7       said he did not know why Harold had not taken care of

8       this problem before he left.

9    Q   And what did you say to that?

10   A.  And I explained to him that -- I explained a little bit

11      of the whole case, that I felt more should be done, that

12      I didn't think it was enough action taken, that I was

13      still, you know, being exposed to Mr. Graham, I was

14      still being harassed and retaliated.

15   Q   What did Judge Hoffer say?

16   A.  He had asked me what I had wanted, what I would like to

17      see done.  And I don't think the two men should ever

18      supervise females again.  Ideally I would like to have

19      them fired.  And he said he would look into it.  And

20      that's basically it.

21   Q   Do you remember the date of that conversation?

22   A.  No, I don't.  It was -- it wasn't too long after he took

23      office.

24   Q   Who initiated that meeting?

25   A.  Judge Hoffer did.

Barbara Varner                                    302

1   Q    And shortly after, was it shortly after that that Gary

2        Graham was sent to another facility at the prison?

3   A.   I'm not sure about the time frame.  I know Mr. Graham

4        left our office in May and -- I'm sorry, in March.

5   Q    And when would this conversation have taken place, do

6        you recall, when Judge Hoffer first came on as PJ?

7   A.   I don't recall the exact date at this time.  I believe

8        it would have been the end of the year, end of -- it

9        would have been in -- I believe he retired at the end of

10       the year.

11  Q    Judge Sheely?

12  A.   Yes.  And then it was after that.  So possibly at the

13       beginning of the year is when Judge Hoffer called me up

14       and just spoke to me briefly about that.  And then March

15       is when Mr. Graham was moved.

16  Q    Were there any witnesses to that conversation?

17  A.   No, there wasn't.

18  Q    Why did you not write a note about that conversation?

19  A.   I don't know, I'm not sure, because I might have it on

20       maybe a calendar that I had met with the judge, but.

21  Q    Would you check to see if you have a calendar that has

22       any information on that --

23  A.   Yes, I will.

24  Q    -- conversation.

25  A.   Right.

```
 1   Q    Thanks.
 2   A.   It would have been right after, it wasn't too long after
 3        he took office, though.
 4            MS. WALLET:  Can could I ask for a five-minute
 5        break, please?
 6            MS. WILLIAMS:  Oh, yes, let's.  I'm getting near
 7        the end, you'll be pleased to know that.
 8            (Recess taken from 11:26 until 11:35 a.m.)
 9   BY MS. WILLIAMS:
10   Q    Ms. Varner, are you aware that Mr. Osenkarski was sent
11        to sexual harassment training?
12   A.   I heard that he was.
13   Q    Are you aware that he submitted a corrective action plan
14        to Judge Sheely regarding your complaints?
15   A.   No, I'm not aware of that.
16   Q    Let's talk a little bit about the CASA program.  Were
17        you involved in the development of that program?
18   A.   Not from the onset, no.  I think that started before
19        Judge Guido even got on the bench.
20   Q    Okay.  Tell me when you did get involved.
21   A.   I first heard about it when Mr. Osenkarski spoke to
22        several probation officers, I don't know who else was
23        there, but he said that Judge Guido was looking for an
24        officer of the court but also someone who knew maybe
25        some social work, was familiar with dependency court and
```

Barbara Varner                                    304

1                delinquency court, that they would be working directly

2                with Children and Youth and was wanting to know if any

3                of us were I interested in it.

4      Q    When you say Judge Guido was looking for, was this for a

5           specific position or was it part of a committee, or what

6           exactly was it that?

7      A.   For director of the CASA program.  So that's when I

8           initially heard about Mr. Osenkarski mentioned it.  And

9           when I started to think about it I thought, well, that

10          would be a good blend for me because I had prior with

11          Children and Youth, and also an officer of the court.  I

12          knew our court system and I knew dependency and

13          delinquency so it seemed like a good fit.  I thought I'm

14          just going to look into it.

15              So I met with Judge Guido and he explained it the

16          me.  His tipstaff, Carl, gave me a lot of paperwork,

17          people who had written letters of interest, paperwork he

18          had gotten from the York, I believe it was the York

19          program who was a model program for CASA.  Just letting

20          me know what it was all about.  And he said that they

21          were in the process of writing a grant, and Laura

22          Patterson is grant writer for the county, was the one

23          who was in the process of writing the grant.

24     Q    At some point were you appointed to a committee?

25     A.   A committee?

```
 1   Q    Involving CASA.
 2   A.   We were just a group of us, really.  It was myself,
 3        Carl, and the judge, were looking at people we could
 4        invite to have a meeting, to try to get some community
 5        interest in the program.
 6             So we had scheduled a meeting at the Carlisle
 7        Country Club, I believe it was March 1st of 2000.  I'm
 8        not sure about the date but I believe that's when it
 9        was.  And I had invited some attorneys, some
10        professionals I knew that I had been working with and
11        they had done the same, and we compiled a list of people
12        to attend this meeting.
13   Q    Why were people invited to a meeting?
14   A.   Just to try to get some community interest, inform them
15        of what CASA was all about.  We brought in the director
16        from York who had been running the program so she could
17        inform the people about you need community support for
18        this program.
19   Q    And when you say we, you mean Judge Guido?
20   A.   Carl.
21   Q    You and Carl, what's Carl's last name?
22   A.   Connelly, C-O-N-N-E-L-L-Y, I believe.
23   Q    Would it be Connellan?
24   A.   Connellan, there you go.  I'm sorry.
25   Q    So what transpired at the meeting that you had?
```

Barbara Varner                    306

```
 1   A.   At the meeting, Judge Guido ran the meeting, and he had
 2        introduced me as the potential CASA director.
 3   Q    This is the first meeting?
 4   A.   Yes, as far as -- yes, as a community meeting.
 5   Q    Are there minutes of that meeting, do you know?
 6   A.   I'm sure there were.  I believe it would have been Laura
 7        Patterson's secretary, I believe she was there taking
 8        notes.
 9   Q    And Judge Guido introduced you as the potential
10        director?
11   A.   As who he had selected to be the director, yes.
12   Q    What exactly did he say?
13   A.   He had introduced me and he said that we were hoping to
14        get a program started in Cumberland County, and that I
15        had been chosen as the potential director for it, if the
16        program would get going.
17   Q    He said you had actually been chosen?
18   A.   He had chosen me, yes.
19   Q    What process did you go through to be selected as
20        director by Judge Guido?
21   A.   I think the first thing was just showing an interest.
22        Then I met with him and explained my background.  I
23        believe I gave him a copy of my resume.  He was
24        surprised he did not know I had a master's degree in
25        administration of justice, which was an aid.
```

1          And I heard about the program.  It just sounded

2      like something that I would like to at least pursue.

3      And I asked him at our first meeting if it would be okay

4      for me to go and visit some sites of other locations.  I

5      went to Pittsburgh, to York, and had a lot of

6      correspondence, email with other programs, getting

7      information just exactly what CASA was all about.  And

8      Mr. Osenkarski allowed me the time to go do several

9      visits.

10  Q   Did you talk with Judge Guido about the complaints that

11      you had raised and this lawsuit?

12  A.  No.  I never discussed that with Judge Guido.

13  Q   How many meetings of this committee were there, do you

14      recall?

15  A.  I know there was that one.  They were trying to get a

16      steering committee, people that would be committed to

17      being on the board.  That's what they were looking for,

18      interest and also a board that you would -- you have to

19      have a board to support the program.

20  Q   Do you serve on this board now?

21  A.  I'm still part of it.  I still get the newsletters and

22      stuff.

23  Q   Do you attend meetings now?

24  A.  No.  I've chosen not to.

25  Q   Do you recall any talk at these meetings that we've just

Barbara Varner                          308

1           discussed or in any other context about what the program
2           director's salary would be worth?
3    A.     When they started developing the grant they just took my
4           salary.  Laura Patterson asked me for my salary, and
5           that's what they put on as in our grant.
6    Q      Do you know why she did that?
7    A.     I always assumed because I was the one they were
8           choosing to head up the program.
9    Q      Did you ever have a conversation with Laura about why
10          that figure was used?
11   A.     It was my salary, because it was planned that I would be
12          the director.
13   Q      Did you have a conversation with Laura about your
14          salary --
15   A.     Yes, I did.
16   Q      -- and why it would be used?  What exactly did Laura say
17          to you?
18   A.     She had been at the meeting, also, that meeting at the
19          country club.  And she had heard -- as far as I think
20          both her and I were concerned, we were going ahead and I
21          would be the director.  And she was using my information
22          to fill in on the grant.
23   Q      Do you recall any discussion of the director's job being
24          a part-time job rather than a full-time job?
25   A.     No.  No, I did not want part-time employment.

Barbara Varner                                    309

```
 1   Q    But did you ever hear any conversation about whether it
 2        could be approved as a full-time position?
 3   A.   From the very beginning it was going to be a full-time
 4        position.
 5   Q    How do you know that?
 6   A.   All of them, as far as my knowledge, all of them were
 7        full-time positions.  I don't know, I personally did not
 8        know anybody was doing it on a part-time basis in any
 9        county.
10   Q    Were there meetings perhaps between the commissioners
11        and Judge Guido or between other parties that you might
12        not be privy to, where the salary or the part-time
13        full-time issue might be discussed?
14   A.   Well, certainly.  I have no knowledge of that.
15   Q    Did you ever hear that the commissioners might be
16        willing to support a full-time CASA director position at
17        your salary if it would resolve your lawsuit?
18   A.   I never heard that until the very end.
19   Q    Tell me about the very end.
20   A.   It was, we were in a meeting with the court
21        administrator, I guess assistant court administrator.
22   Q    Could you give me the name?
23   A.   She's blonde.  I cannot think of her name.
24   Q    Is it Taryn Dixon?
25   A.   Yes, Taryn Dixon.  She was there.  Tom Boyer was there.
```

Barbara Varner                    310

1           Joe Osenkarski was there.  Judge Guido was there.  I
2           believe Carl was there.  And I'm not sure if anybody
3           else was there.  And we were basically finalizing,
4           because I had asked that if the position did not work
5           out, that I would be able to come back to Probation.  I
6           had asked certain conditions.  I had also asked that if
7           Probation would get a raise, that I would get a raise.
8           Those were -- trying to negotiate the final points.
9      Q    Right.  Were these communicated by you or through your
10          attorney, do you know?
11     A.   I'm sure we spoke about that.
12     Q    When you say we, who do you --
13     A.   My attorney and myself, we spoke about that.  Because I
14          wanted assured that I had a job if they did not apply
15          for a grant again.  And it was -- my attorney had gotten
16          a call informing us, I believe it was from Mr. Thomas or
17          Dellasega, I'm not sure which one, saying that I could
18          not have the position unless I withdraw my case, my
19          Complaint.  That was the first time we heard that there
20          had been anything, one had anything to do with anything,
21          with the other one, any relevance to it.
22     Q    And do you remember the date of all this discussion?
23     A.   I do not know the date when they contacted her, no.
24     Q    Do you have any note about it in your packet?  I
25          don't --

```
 1   A.   That probably would have been something just between my

 2        attorney and myself, my personal notes from her.

 3   Q    The meeting with Taryn, T-A-R-Y-N, Dixon and Judge

 4        Guido, that you had told us about --

 5   A.   Probably would be on a calendar.

 6   Q    Will you check to see if there are any notes that you

 7        have related to that meeting?

 8   A.   Certainly.

 9   Q    So were you ever aware that Judge Guido felt that the

10        CASA director position was not worth the salary that you

11        were being paid at that time?

12   A.   No.

13   Q    That was never discussed in any of the meetings you

14        attended?

15   A.   Judge Guido was aware of my salary when I applied.

16   Q    Was there ever any discussion in your presence of what

17        the commissioners felt that salary would be worth?

18   A.   No.

19   Q    Did Judge Guido ever tell you that he didn't think

20        funding at your probation officer's salary would be

21        approved --

22   A.   No.

23   Q    -- by the commissioners?

24   A.   No, he did not.  He said it was a program he wanted to

25        get started, and I think he felt he had enough leverage
```

Barbara Varner                                312

1           that it would go through.

2    Q    You sent a memo to Judge Guido, and we can mark this as

3           P-12.

4                (Varner Deposition Exhibit No. 12 was marked.)

5    BY MS. WILLIAMS:

6    Q    This is a memo dated July 12th, 2000, and it indicates

7           that it's from you.  Do you recall typing up this memo?

8    A.   Yes, I do.

9    Q    Okay.  And in this memo you say:  I personally

10          presented -- it's in the second paragraph -- I

11          personally presented the grant at the commissioners

12          meeting on June 16th where the terms and conditions were

13          agreed to and signed by the commissioners.

14                What do you mean by presented?  What happened there

15          at that meeting?

16   A.   They had a commissioners meeting, it was an open forum,

17          and Laura Patterson, the grant writer, had gone with me.

18          And there was a place to sign as a director, agreement,

19          for the CASA program for them, the commissioners, to

20          approve the grant.  And it was presented.  They already

21          had known about it.  They had a copy of it.  And it was

22          brought up before the board about the interest.

23                And I believe it was Nancy Besch, one of the

24          commissioners, had stated how -- anyways, one of the

25          commissioners had said how they were for this, they

Barbara Varner                    313

 1          thought it would be a good community program and that

 2          they had signed it.  They signed the grant and I signed

 3          as a director.

 4      Q   Are there minutes of that meeting, do you know?

 5      A.  I'm sure there are.

 6      Q   Do you have a copy of them?

 7      A.  No, I do not.  It was Laura and myself that went to the

 8          meeting.

 9      Q   Was Judge Guido present?

10      A.  No.  He was not at the commissioners meeting.

11      Q   Did you ever talk to Judge Hoffer about the CASA

12          program?

13      A.  I don't recall ever speaking to him about it.

14              MS. WILLIAMS:  Off the record a second.

15              (Discussion held off the record.)

16              MS. WILLIAMS:  Let's mark that 13.

17              (Varner Deposition Exhibit No. 13 was marked.)

18      BY MS. WILLIAMS:

19      Q   Let me ask you if you can identify that document,

20          Ms. Varner?

21      A.  Yes.  It's the grant proposal for CASA.

22      Q   And to your knowledge, is that the grant proposal that

23          was actually submitted?

24      A.  To my knowledge, it is, yes.

25      Q   Now, you indicated a minute ago that you had to sign

Barbara Varner                          314

```
1              this document as the --
2    A.   That's correct.
3    Q     -- proposed executive director?
4    A.   Program director.
5    Q    Program director?
6    A.   Um-hum.
7    Q    Can you point out where your signature appears?
8    A.   It's page 6, the very last page.
9    Q    Did you say that you signed this in the meeting with the
10            commissioners?
11   A.   Yes.
12   Q    And what conversation or pronouncements were made around
13            your signing of this document, do you recall?
14   A.   Nancy Besch signed it.  I was given -- I remember Laura
15            was with me, because I said to Laura, it said
16            administrator board president, and Laura said just cross
17            that out and write program director above that, because
18            she was familiar with how the grant language would be
19            written.
20   Q    I'm confused about why a proposed director would be
21            required to sign for a proposed program that is not yet
22            in existence.  Do you know why that would be true?
23   A.   I think by getting the commissioner's name on there,
24            they were saying they were on, they all agreed to this,
25            that they would follow through, that perhaps if the
```

1       grant didn't go through, that they would still be

2       willing to, you know, underwrite it.  I do not know.

3       All I know is this is how it proceeded.

4   Q   But at this point the program was not actually in

5       existence, if I understand correctly; is that right?

6   A.  That's correct.  But Laura had -- she saw no reason why

7       it would not go.  She had met, she had met all the

8       criteria for it.  She's a pretty good judge of whether,

9       you know, things go.

10      And I think CASA, the national CASA had said that,

11      you know, they were willing -- they were trying to

12      develop all new programs and the money was available.

13  Q   Now, was this before or after you were informed that the

14      CASA director's position was being offered to you as a

15      settlement of your suit?

16  A.  This was prior, because in the note that I sent wrote to

17      Judge Guido, the date on my signature here is June 13th.

18      The letter I, memo I wrote the Judge Guido was July

19      12th.  And it says as of July 12th I had not heard any

20      more about -- I'm sharing some concerns.  It says I met

21      on June 16th.  I was making preparations to transfer out

22      of my department, until at the 11th hour when an issue

23      came up regarding my salary.  So this was prior to my

24      learning this.

25      MS. WALLET:  I'm sorry, you'll have to clarify,

Barbara Varner                          316

 1          which was first?

 2              THE WITNESS:  Okay.  The CASA, when I signed the

 3          CASA grant was prior to me being informed that I could

 4          not have it unless I withdraw my charges.  And that's

 5          why I had wrote this letter to Judge Guido, because at

 6          that time our quarterly reports for the CASA program

 7          just in getting the grant was coming up, and I wanted to

 8          get it implemented.

 9  BY MS. WILLIAMS:

10  Q     What response, if any, did you receive to your memo of

11        July 12th?  Which we've marked as P-12.

12  A.    I did not get a response.  Judge Guido did -- Judge

13        Guido contacted my attorney and requested if there's any

14        way we can work this out, get the case settled, what

15        could we do to make sure I would get the position.

16  Q     Did you actually have any conversation with Judge Guido

17        about it after you wrote the memo?

18  A.    He also talked -- called me up and asked me if I could

19        do anything about coming up with a resolution that

20        somehow I could have this position, and can I resolve

21        the Complaint, is there anything we can do.  And I

22        explained to Judge Guido at that time, I said, I don't

23        see that there's any connection.  It was not a

24        connection made to me at the very beginning, they were

25        just coming looking for a director and I just --

Barbara Varner                        317

1    Q    What did Judge Guido say to that?

2    A.   He said he wanted me in the position, he would like me

3         to have the position, and he wanted me to find out if

4         there's anything we could do to work it out and to talk

5         to my attorney.

6    Q    And did you do that?

7    A.   Yes, I did.

8    Q    Were you eventually offered the job?

9    A.   Yes, at a lower salary, at around 29,000.

10   Q    Prior to this, although you had signed the CASA grant

11        form, was there a formal job offer made?

12   A.   Judge Guido had said he wanted me for the position.

13   Q    Right.  But the formal job offer came with the lower

14        salary.  Am I understanding that right?

15   A.   No.  Before this, whenever we worked with Laura

16        Patterson, I was under the belief that I had the

17        position at my salary.

18   Q    But had you signed any documents, any -- I don't know

19        what documents the county would require, but had you

20        signed anything indicating that you were in a new

21        position officially with the county or the court?

22   A.   The only thing I signed was the CASA, the CASA paperwork

23        as you've noted, with my salary listed as the starting

24        salary for this position.

25   Q    Is that the extent of the conversation you ever had with

Barbara Varner                          318

1          Judge Guido on the CASA position?

2               MS. WALLET:  You're referring to the several

3          communications she's testified to?

4               MS. WILLIAMS:  She's testified to the one where

5          Judge Guido apparently telephoned you or talked with

6          you.

7               MS. WALLET:  I guess I'll object to the question.

8          Could you ask the question again?

9     BY MS. WILLIAMS:

10    Q    I'm interested in what happened after you found out

11         that there was a tie to resolving the case, that the

12         position was tied to resolving the case.  Tell me about

13         every conversation you had with Judge Guido after you

14         discovered that the position was offered only if the

15         case was resolved.

16    A.   Like I said, he had called me up and asked if there was

17         any way we could resolve this, and he was aware that

18         obviously that this was becoming an issue.  He was

19         informed of the case, and the Complaint.  And he just

20         asked me if there was any way I could work it out, work

21         it out with my attorney to come to some kind of

22         resolution for the case.

23    Q    Right.  Were there any other conversations you had with

24         him?

25    A.   I can't -- I don't exactly remember.  I don't recall at

Barbara Varner                                    319

```
 1         this point.
 2    Q    How did you turn down the CASA directorship?  Did you do
 3         that orally or in writing?
 4    A.   I told Judge Hoffer -- no, I'm sorry -- Judge Guido that
 5         I would not take it at the lower salary and I didn't
 6         think there should be any connection between the two.
 7    Q    Was this in the conversation you just told me about?  Or
 8         did you have a subsequent conversation?
 9    A.   I believe there was a subsequent, because I remember him
10         telling me that he was going to start interviewing.  And
11         he had like a list of -- is there any way you could work
12         it out and at that salary, I would have to accept that
13         salary, and I said I would not.
14    Q    My understanding of that job is that it's finding and
15         training volunteers.  Is that an accurate description of
16         the job?
17    A.   That's correct, yes.
18    Q    Would that job have been a promotion for you?
19    A.   No, it wouldn't have been.  It would have been lateral.
20    Q    In fact, it would have taken you out of the mainstream
21         of probation work?
22    A.   Yes, it would have.
23    Q    Was someone hired at that lower salary after you turned
24         the job down, do you know?
25    A.   Yes, there was.
```

1    Q    Do you know if there have been any complaints about the

2         person who is program director now?

3    A.   I have heard complaints from some Children and Youth

4         workers at the very beginning.  The reason was that the

5         new director, Anita Brewster, had no idea what

6         dependency meant.  She had never worked the court

7         system.  And they were just frustrated because you have

8         to go in and be able to read a file, they had the right

9         to read actual case files.  You've got to be able to

10        read the file, understand what the court orders mean.

11        She wasn't familiar with our court system, which as

12        everybody knows is different than anybody else's.  They

13        were very frustrated with her lack of knowledge.

14   Q    Who are those people?  Can you give me names?

15   A.   Yes.  It would be Becky, her name would have been Becky

16        Over at that time.  She was a caseworker.  Her name is

17        Byers now.

18   Q    Do you know if the administration is pleased with

19        Ms. Brewster's work?

20   A.   As far as I know, they are.

21   Q    And are you aware of the salary that she receives?

22   A.   I'm assuming she started at the entrance level salary

23        that they offered me, but I do not know.

24   Q    Do you have any other facts other than those you've told

25        me today that indicate your entitlement, the entitlement

Barbara Varner                           321

1           you claim you have to the CASA position?

2     A.    I think I was the most qualified person they could have

3           found in the fact that I had worked dependency, court

4           system, for over five years.  I was familiar with all

5           the caseworkers, which you need to be able to work very

6           closely with them.  I knew how to do reports.  I was an

7           officer of the court so I knew the delinquency system.

8           And there would be times that CASA was supposed to be

9           used for delinquent kids, too.  So I was aware of both

10          systems, I knew the courthouse system.  I knew the

11          judges.  I was familiar with everything that went on in

12          both arenas.  I also had a master's degree in

13          administration of justice.

14    Q     Did you need a master's degree for that position?

15    A.    No, you did not.  It was just an aid for me.  I think it

16          made me even more qualified for the position.

17    Q     Could you have been over-qualified for the position?

18    A.    Perhaps.  It just would give me relief from the

19          Probation Department at that time.

20    Q     I'm interested in whether you have a theory, and this is

21          going back, to why Gary Graham says he has had an affair

22          with you, if you say you didn't have an affair.  Do you

23          have any insight or any theory on that?

24    A.    Yes, I do.  I think if he did not, was not able to hide

25          behind that, he would have no reason to treat me the way

Barbara Varner                           322

1          he did.

2               I think he -- it's a way for him to punish his

3          wife.  I can imagine that Mr. Graham would perhaps say

4          to her, "you wouldn't give me sex but I can get it

5          elsewhere."  I could see him using that.

6               But I think going before Judge Sheely and just

7          saying I did yell at her, I did curse at her, I just

8          felt like it, yes, I demanded sex, Judge Sheely would

9          have -- I think he would have taken more drastic

10          measures.  Taking his wife up there, confessing the way

11          he did in front of his wife, both in tears, absolutely

12          getting the heart strings of Judge Sheely.  And

13          Mrs. Graham had worked for him for a long time.  He had

14          watched them have children, bring the young children in

15          to see him.  And he was close with the family as well in

16          the political arena.  So he knew this family very well.

17          I think that was a whole game plan.  I honestly believe

18          she was in on the whole plan, because I think Gary

19          losing his job --

20     Q    When you say she, you mean --

21     A.    Mrs. Graham, was aware of how it was going to be

22          orchestrated.  I really believe that, because I know

23          they had met with Mr. Foster for hours that morning

24          before going up to meet with Judge Sheely.  But I

25          honestly --

Barbara Varner                          323

1    Q    You know that Gary and his wife --

2    A.   And Mrs. Graham had met with Dave Foster in his office

3         for several hours the day of this confession.

4    Q    And Dave Foster is their?

5    A.   Was their attorney.

6    Q    Was their attorney?

7    A.   His attorney.

8    Q    How do you know that they met with Dave Foster for

9         hours?

10   A.   Well, they were back in their office and my office is

11        right around the corner.  But that's my -- I just can't

12        imagine what else.  And also, puts this whole case on

13        another level, a different thing.  It's a he said/she

14        said thing, which it is not.  It is all about power and

15        how I was treated in the environment, how I was harassed

16        and discriminated and retaliated against, when all I

17        wanted to do from the very beginning in March of '97 was

18        to have the harassment stop.  That's all I asked.

19   Q    When you spoke to Judge Sheely, and we've talked at

20        length about that conversation, the first time you spoke

21        to Judge Sheely about your complaints, was he

22        sympathetic to you at all?  Did he say anything that you

23        construed to be sympathetic to you?

24   A.   None whatsoever.  None whatsoever.  He said that I had

25        caused problems in the family.  He kept going on and on,

Barbara Varner                              324

1           you just don't know how upset they were, they both

2           cried.  Well orchestrated.

3      Q    Did he say to you that he hoped that your family life

4           wouldn't be affected by it?

5      A.   Yes, he did.

6      Q    Tell me what exactly he said, to your recollection.

7      A.   He said, I hope this won't affect your family life.  And

8           I said to him, why should it affect my family life?  I

9           didn't do anything.  I'm the victim here.

10     Q    Did you construe that to be sympathetic to you, to say

11          he hoped -- when he said he hoped it wouldn't affect

12          your family?

13     A.   Perhaps it could have been interpreted that way.

14     Q    You said it was well orchestrated.  Are you contending

15          that Judge Sheely was somehow in on a conspiracy with

16          the Grahams?

17     A.   I'd say there's a very good possibility that -- I don't

18          think he knew it was going to happen that way, but I

19          think after getting this -- like I said before, I

20          believe there was a letter sent up to him prior to, the

21          day before, reminding him of the loyalty of the Graham

22          family with Judge Sheely in his elections.

23               I think Mr. Osenkarski had met with Judge Sheely to

24          discuss the case, how it could be resolved.  I think

25          maybe they discussed how, what they could do.

```
 1   Q    Do you have any dates of meetings or any specifics of
 2        such meetings?
 3   A.   No, I do not.
 4   Q    So you're speculating that this might have happened?
 5   A.   I am speculating, yes.
 6   Q    Now, Judge Sheely retired shortly after this --
 7   A.   Yes.
 8   Q    -- as we discussed earlier?
 9   A.   Right.
10   Q    At that point, the point of retirement, did he have any
11        more use for political cronies?
12   A.   I think Judge Sheely probably always liked to be in the
13        political arena.  I think it was more of a he owed them
14        because of the prior support, he felt he owed -- and I
15        believe it was more sympathetic towards Barb Graham, and
16        I believe that's why she was taken up for this
17        confession.  I believe that's probably the most
18        important reason she was there, because Judge Sheely did
19        have a soft spot for her.
20   Q    Just so I'm clear, are you saying that this wasn't on
21        Judge Sheely's part a determination of credibility, but
22        that it was a conspiracy where he conspired with the
23        Grahams to find that this was an affair?
24   A.   I think he struggled with the political connections.  I
25        think he really struggled with not so much what was
```

Barbara Varner                                    326

1         right, what was legal.  It was more of I don't want to

2         hurt this family, meaning the Grahams, anymore, that

3         they've suffered enough, and it was directed at me.

4    Q    But do you believe that Judge Sheely devised this story

5         of an affair?

6    A.   No, I don't believe he devised it.  I believe the

7         Grahams did.

8    Q    So your position is Judge Sheely was willing to believe

9         their story?

10   A.   I think he wanted to believe their story.

11   Q    I'm almost finished.  I just want to look over a few

12        last notes.

13             Yesterday when Jim Thomas was discussing the

14        occasions that Gary Graham might have had to come to

15        your home, you said that Gary knocked on your garage

16        door.  Did I understand that correctly?

17   A.   Yes.

18   Q    To pick you up.

19   A.   Yes.

20   Q    How did Gary know to come to the garage door and not the

21        front door?

22   A.   When you come to my house -- we leave the garage door

23        open and it's difficult -- not difficult but it's out of

24        the way to go to the front door.  The likely way to

25        enter would be the garage door.

1   Q   Somebody coming for the first time would know that, in

2        your opinion?

3   A.   Yes.  Yes, generally they do.

4   Q   Have you ever been the victim of date rape?

5   A.   No, I have not.

6   Q   When you divorced your first husband, did you allege any

7        fault ground?  Do you know what I mean by that?

8   A.   If you could clarify that.

9   Q   In Pennsylvania now you can have a no-fault divorce

10       where basically the parties agree that the marriage is

11       broken, or you can have a divorce where you say you did

12       something wrong, you're at fault.

13          Which kind of divorce did you have?

14   A.   We had a no-fault.

15   Q   Did you date anyone except Lee Varner between your

16       marriage, the break-up of your first marriage and your

17       marriage to Lee Varner?

18   A.   No, I didn't.

19   Q   Are you older or younger than Gary Graham, if you know?

20   A.   I believe I'm several years older.

21   Q   Did you find it flattering to have a younger man

22       interested in you?

23   A.   It really didn't make one difference one way or the

24       other.

25   Q   At some point did you become certified to be a DUI

Barbara Varner                                  328

1          instructor?

2     A.   Yes, I did.

3     Q    Does that involve an exam?

4     A.   Yes.

5     Q    Did you pass the exam?

6     A.   Yes, I did.

7     Q    Did you pass it on the first try?

8     A.   The DUI?  Yes, I did.

9     Q    Do you have any reason to believe that if you had asked

10         for a meeting with Judge Sheely, that he would have

11         denied you that meeting?

12    A.   Probably not.  Unfortunately, he had already made his

13         decision before we could meet with him.

14    Q    But there was quite a time, there was a time frame

15         between the initiation of your Complaint and the time

16         that Judge Sheely, as you say, made the decision?

17    A.   Right.

18    Q    In that time frame could you have asked to speak with

19         Judge Sheely?

20    A.   I'm sure we could have.  But we were under the

21         understanding, meaning we, my attorney and myself, that

22         Dave Deluce was in constant contact with Judge Sheely.

23    Q    But you could have gone directly to Judge Sheely?

24    A.   Yes, we could have.

25    Q    You talked yesterday about the Central Investigation

1          Department and harassment charges that you discussed

2          with them.

3    A.    Right.

4    Q     Did you initiate that conversation with the CID?

5    A.    No.  What happened, I had spoke with the sheriff.  He

6          had called me in and he had told me -- in fact, it was

7          the day right around the time Mr. Graham was being moved

8          to the new position.  He had told me that they had taken

9          Mr. Graham's gun from him and that he would be searched

10         anytime he came into the prison.  And he had asked the

11         CID director to come down and meet with us at the same

12         time.  So it was Tom Kline, the sheriff, who had

13         initiated the initial call.

14   Q     But you initiated the call to the sheriff; am I

15         understanding that correctly?

16   A.    I think we probably passed in the hall and he said, do

17         you have a minute, I want to talk to you.

18   Q     And what did he say at that point?

19   A.    That's when he said I need for you to know that they --

20         Mr. Graham was going to be moved out of the building and

21         that there was concerns about retaliation of his anger,

22         and that --

23   Q     Who expressed those concerns?

24   A.    The sheriff.  The sheriff, Tom Kline.

25   Q     On his own?