```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                  .
        Plaintiff,                  .   CIVIL ACTION
                                    .   NO. 1:CV 01-0725
        vs.                         .
                                    .
COMMONWEALTH OF PENNSYLVANIA,       .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,            .
CUMBERLAND COUNTY; CUMBERLAND       .
COUNTY; S. GARETH GRAHAM,           .
Individually, and JOSEPH            .
OSENKARSKI, individually,           .
        Defendants.                 .
. . . . . . . . . . . . . . . . . .
```

```
        Deposition of:  HON. EDWARD E. GUIDO

        Taken by    :  Defendant

        Date        :  April 8, 2003, 12:04 p.m.

        Before      :  Emily Clark, RMR, Reporter-Notary

        Place       :  Cumberland County Courthouse
                       Courthouse Square
                       Carlisle, Pennsylvania
```

APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
            For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
            For - Defendant Commonwealth of Pennsylvania
                  Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  PAUL J. DELLASEGA, ESQUIRE
            For - Defendant Cumberland County

2

```
 1   APPEARANCES (continued):

 2       MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
         BY:  DAVID J. MacMAIN, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4       SWEENEY & SHEEHAN, P.C.
         BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
     ALSO PRESENT:
 7
         MS. BARBARA E. VARNER
 8
         MR. S. GARETH GRAHAM
 9
         MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                      I N D E X

 2                      WITNESS

 3   Hon. Edward E. Guido                    Examination

 4       By Ms. Wallet                          4, 56

 5       By Mr. Dellasega                        53

 6       By Ms. Williams                         55

 7

 8                  GUIDO EXHIBITS

 9   No.  Description                         Identified

10   1    1-page memo, 2/8/00, to Patterson from      18
          Osenkarski
11
     2    30 pages: 1-page memo, 3/13/00, to Guido     20
12        from Patterson; 29-page grant application

13   3    2-page memo, 6/15/00, to Ward from Guido     35

14   4    1-page memo, 7/12/00, to Guido from Varner   39

15   5    2-page memo, 7/18/00, to Guido from Ward     47

16                  *   *   *   *   *

17

18

19

20

21

22

23

24

25
```

1                    STIPULATION

2          It is hereby stipulated by and between the

3   respective parties that sealing, certification and filing are

4   waived; and that all objections except as to the form of the

5   question are reserved until the time of trial.

6

7          HON. EDWARD E. GUIDO, called as a witness, being

8   duly sworn, testified as follows:

9   BY MS. WALLET:

10      Q.      Afternoon, Judge.

11      A.      Good afternoon.

12      Q.      My name is Debra Wallet.  I'm here representing

13  Barbara Varner in the action that has been brought against

14  the county, the court, Mr. Osenkarski and Mr. Graham.  This

15  is the time that has been set for me to have an opportunity

16  to ask you some questions relative to this lawsuit.

17      A.      Sure.

18      Q.      Judge, have you ever been deposed before?

19      A.      I can't say that I have.

20      Q.      Well, there are some ground rules in these

21  depositions, and if I might go over those.

22          First of all, is there any reason today why you

23  could not answer questions completely and truthfully?

24      A.      None.

25      Q.      If I ask you a question and you answer it, I will

1    assume that you've heard that question and have understood

2    the question before you attempt to answer it.  Is that

3    agreeable to you?

4        A.    Yes.

5        Q.    Would you tell us, please, when you became a

6    judge?

7        A.    January 1998.

8        Q.    Would that be the first Monday in January?

9        A.    It would.

10       Q.    And prior to that, were you in the private

11   practice of law?

12       A.    Yes.

13       Q.    Tell us, sir, when you first became aware of the

14   Court-Appointed Special Advocate Association.

15       A.    While I was running for judge in 1977, a fellow

16   at a fund-raiser of mine asked if I would look into starting

17   one.  I had never heard about it before then.  He got my ear

18   and filled it for about half an hour, and I promised him that

19   if I were elected, that I would look into it.

20       Q.    Did you do this?

21       A.    Yeah.  When I was elected one of my first -- I

22   was told right after the election that I would be the

23   dependency judge, and so I began looking into it immediately,

24   as soon as I took office.

25       Q.    What does it mean to be the dependency judge?

1          A.      It means that I handle all of the cases involving

2     allegations of dependency in the county, where Children and

3     Youth petition to have a child declared dependent, meaning

4     without -- there are nine subsections of the law, but without

5     parental care and supervision, being abused, being

6     uncontrollable, et cetera.

7          Q.      Did you volunteer for that assignment, or was it

8     given to you?

9          A.      I did not.

10         Q.      And was it the president judge at the time who

11    gave that you assignment?

12         A.      It was.

13         Q.      And that would have been President Judge Hoffer?

14         A.      Correct.

15         Q.      Do you have any other specialized assignments,

16    sir?

17         A.      I've got to think.  No, I don't think we do.  I

18    do the dependency.  Judge Hoffer does the delinquency.  I

19    think Judges Hess and Oler share the discovery.  Other than

20    that, we all share everything equally.

21         Q.      All right.  When did you first learn that there

22    might be grant money available for CASA programs?

23         A.      That there might be grant money available?

24         Q.      Yes.

25         A.      I'd have to say that was sometime in, don't hold

1    me on dates, I think sometime in '99.  And the grant money

2    that I was looking at at that time, frankly, I didn't realize

3    national CASA gave grants.

4           I was looking for a way to -- I was on the victim

5    witness board and PCCD was giving away money all over the

6    place.  They had all kind of increases in funds.  If you

7    recall, the economy was good back then and taxes were high.

8    And PCCD had extra money to give away, and they were giving

9    away, a lot of money for the juvenile justice, juvenile

10   probation officers.  And initially I was hoping to maybe try

11   to scootch the definition of dependency under delinquency to

12   try to get some grants there.

13       Q.    I have to ask you for the record, what does PCCD

14   stand for?

15       A.    Pennsylvania Commission on Crime and Delinquency.

16       Q.    And that's a state program?

17       A.    Yes.  I think it was state.

18       Q.    What efforts did you make with PCCD to get some

19   money?

20       A.    Well, I looked hard at the definitions and I

21   realized that I wasn't going to be able to get the dependency

22   into the delinquency.  So if my memory serves correctly, I

23   approached Joe Osenkarski, the Juvenile Probation officer,

24   and I had -- originally was looking at this CASA program as a

25   part-time position.  I suggested to Joe that perhaps we could

1    get him a Juvenile probation officer and I could split it

2    with him and make half sort -- because a probation officer

3    working for the courts, I could supervise half of that

4    probation officer.  And if I'm not mistaken, when I looked at

5    the grant, it had to be for a new probation officer.  So we

6    talked about getting and using one of his existing probation

7    officers.  The new probation officer would do new stuff for

8    Juvenile, one of the existing probation officers would split

9    time between their duties as a delinquency probation officer

10   and the CASA coordinator.

11        Q.    Was there any discussion at that time about who

12   would pay for this split position?

13        A.    Yeah.  It would be the Probation Office.  In

14   other words, he would get a new full-time probation officer

15   and only have to give up half time of one of his existing

16   probation officers.  It would all come out of the same

17   budget.

18        Q.    And then half time that person would report to

19   you for this --

20        A.    Correct.

21        Q.    -- new program?

22        A.    Correct.  And I think it was pursuant to that

23   agreement that Mrs. Varner was later identified as the

24   possibility there.

25        Q.    Okay.  Do you recall how she was identified?

Judge Guido                                        9

1       A.     I don't remember, to tell you the truth.  I don't

2   remember if Joe told me, if Barb came to me or how that was

3   done.

4       Q.     Perhaps I should have asked you before we began,

5   but did you have in your office some sort of a file or folder

6   that had information related to the CASA program?

7       A.     Yeah, I did.

8       Q.     And did you provide that to your counsel?

9       A.     I think I did.

10              MS. WILLIAMS:  Yes.  We produced what Judge Guido

11  provided.

12              THE WITNESS:  When I say that, Carl Connellan, my

13  clerk, kept all of that stuff, and I told him to give her

14  everything that was in there.

15              MS. WILLIAMS:  And he did.

16              MS. WALLET:  All right.

17  BY MS. WALLET:

18      Q.     Do you know whether you had any handwritten notes

19  or any telephone messages or anything related to this

20  program?

21      A.     No, I don't recall seeing them.  I had some

22  e-mails, once we get started, some e-mails between, always

23  between somebody and Carl; one between Barb and Carl and

24  Laura Patterson was the grant director, once we determined we

25  were going to go on the CASA grant avenue.

1      Q.      Do you recall whether Ms. Varner had been

2    identified prior to your decision to solicit the monies from

3    CASA, or after?

4      A.      I'm sure it was prior.  And as I recall, Barb was

5    identified, and we started working together with the idea

6    that it was going to be a part-time position through trying

7    to get a PCCD grant.  Okay?  That's the answer to that

8    question.

9      Q.      And when you say "we started working together,"

10   you and Ms. Varner, or you and Ms. Varner and others?

11     A.      Meaning Ms. Varner and others.  We started

12   working on a -- and I'm not sure on when this came in,

13   whether we started working on the advisory committee before

14   we identified that we were going to try to go the CASA route

15   or we were still working under PCCD at that point.

16     Q.      Describe the advisory committee.

17     A.      Oh.  We were looking for community leaders to

18   show interest, because I wanted to be able to sell this to

19   the commissioners.  And we were -- let me back up a step.

20             I wanted to be able to sell it to the

21   commissioners because I -- the CASA model differs from county

22   to county.  In many counties it's supported by private

23   donations.  I didn't want to be chasing down money forever.

24   I thought this program was important enough and worthwhile

25   enough that the government should be funding it.

1            So we were trying to get interest in the

2    community, community leaders, Children and Youth, some

3    attorneys, some professors, and to get a steering committee

4    together to sort of try to put pressure on the commissioners

5    to support the CASA program.

6        Q.    Who selected the people on this advisory

7    committee?

8        A.    We got some suggestions from Wanda Knoll on the

9    type of people to contact.  The man that had approached me at

10   the fund-raiser told me about CASA, had done some groundwork

11   before and it really didn't go very far.  So I got some names

12   from him.  And just brainstorming with Children and Youth

13   Services.

14           And I think Barbara and I talked about some

15   people.  In fact, she made some contacts, as I recall, to

16   help set up the meeting.

17       Q.    Who was Wanda Knoll?

18       A.    Wanda Knoll was the executive director of the

19   CASA program in York County.  She was my initial contact.

20   And she did a fabulous job in helping me get it off the

21   ground here.  Told me what buttons to push and who to contact

22   and things like that.

23       Q.    So York already had a program in place?

24       A.    Yes.  York's was one of the first programs in

25   Pennsylvania.

1       Q.      Now, did this advisory committee actually meet?

2       A.      We had at least one meeting, maybe two.  I may

3    have had a meeting early on at the Carlisle Country Club.

4    Might have been even before Barb was involved, but I can't

5    swear to that.  But sometime in the spring of 2000 I know we

6    had a meeting.  We were pretty much well on the way, because

7    I had met with the policy board of the county and had gotten

8    favorable feedback.

9       Q.      Now, if you wanted to do this, did you have to

10   obtain approval from someone to begin this grant application

11   process?

12      A.      I don't think so.

13      Q.      Did you talk with --

14      A.      But I'm not sure.  Actually, Laura Patterson

15   is -- she carried the ball on all of that.  I just knew that

16   I wanted the program.  I knew I needed the commissioners on

17   board because the grant money was only going to pay for a

18   portion of the program.  And of course, I needed the

19   commissioners on board if we were going to go through PCCD,

20   also, which was the original route we were going to go.

21      Q.      Did you talk with Judge Hoffer about this idea?

22      A.      I talked with Judge Hoffer when I first took the

23   bench, and I said I thought this would be a good idea.  He

24   said:  You're the dependency judge, if you want it and it's

25   not going to be any more work for me, go for it, keep me out

1    of the loop, do what you have to do.

2        Q.    Now, who was Laura Patterson?

3        A.    She's the money lady in Cumberland County.  She

4    gets all the grants, makes all the grant applications.  Does

5    a wonderful job.

6        Q.    Do you know if she has a title?

7        A.    I call her the money lady.  Does she have an

8    official title?  She probably does.

9        Q.    Okay.  Could it be something like director of

10   grants administration and intermediate punishment programs?

11       A.    Could be.  I have no idea.

12       Q.    You don't know, okay.  Do you recall, was

13   Ms. Patterson involved from the very beginning in preparing

14   this application once you identified that CASA might have

15   some money available?

16       A.    Yes.  Yes, she was.  In fact, she was involved in

17   some of the policy team meetings even before that, because

18   she was going to help us look for places to get the money.

19   May even have been Laura that said why don't we apply to

20   CASA, I'm not sure.  It wasn't me that said, hey, let's apply

21   to CASA.  Somebody told me money was available there.

22       Q.    All right.  Now, you recall that Ms. Varner was

23   present in at least one of the advisory committee meetings?

24       A.    Um-hum.

25       Q.    Is that correct?

1      A.      Sure.

2      Q.      She might have been involved in others?

3      A.      I'm not sure there was another one.  I think

4  there might have been another one that was very early on,

5  even before Barbara had been identified.  And this would have

6  been a meeting with Children and Youth supervisors, some of

7  the attorneys.  Because one of the hurdles we had to overcome

8  was Children and Youth being afraid that CASA may be stepping

9  on their toes, and had to sort of let them know that this was

10  to compliment their work, not to replace their work.  And

11  Wanda Knoll was instrumental in helping allay their fears in

12  that regard.  And Judge Blackwell, also, came up from York

13  County, who was the dependency judge down there, to help

14  explain that.

15          So there may have been a meeting at the Carlisle

16  Country Club, I was a member there at the time, before

17  Barbara was even involved in the very early stages of this.

18  And some of those same people ended up on the advisory board.

19      Q.      All right.  Did you give the assignment to Laura

20  Patterson to prepare the grant application?  Would you have

21  been in a position to give her the assignment?

22      A.      Boy, I'm not sure how that bureaucracy works,

23  whether that was me that did that or -- I mean, I said:  Get

24  me money wherever you can.  Whether that was my assignment to

25  her or whether she had to get permission from somebody else

1    ahead of time, I just don't know.

2        Q.    Okay.  In the early stages of this grant

3    application development, was there discussion --

4        A.    When you're talking about grant application, are

5    you talking about the CASA grant?  Or any money or anything?

6    Because the CASA grant itself as I recall went real fast.  I

7    mean, it's like we identified there might be some CASA money,

8    there was a deadline, it was like bang bang bang, we've got

9    to get it done.  So just when you're talking about that,

10   either say CASA grant or something else so I know what you're

11   talking about.

12       Q.    Okay.  Well, let me ask you specifically, did you

13   ever request money formally from PCCD?  Or did you make the

14   determination that this program wasn't really eligible for

15   that?

16       A.    The latter.  I don't think we ever really

17   requested money from PCCD.

18       Q.    Okay.  And then the emphasis shifted to CASA

19   where there might be money available?

20       A.    I think after the PCCD, I think there was a

21   period of time where it was just, like, where might money be

22   available.  And Laura said:  Well, I'll do what I can to try

23   to find something out there, it's such a worthwhile program

24   there's got to be money out there somewhere.

25              So when the emphasis shifted to CASA, I'm not

1    sure.  I know that when they said money might be available at

2    CASA, it was like, bang bang, we've got to get moving.

3         Q.    There was a deadline upcoming?

4         A.    Yeah.

5         Q.    And you had to get the paperwork in?

6         A.    It was very close.  Yeah, it's not like we were

7    working on that for months and months and months, even though

8    we were trying to get the program together for about two

9    years at that time.

10        Q.    Okay.  Now, did there come a time when you

11   identified Barbara Varner as your selection to direct this

12   program?

13        A.    Oh, sure.  That would have been well before the

14   CASA was looked at as a source of funding.  As a matter of

15   fact, I think CASA wasn't even looked at as a source of

16   funding until the change came from Barbara being part-time to

17   full-time as a possibility, and I think we made that change.

18        Q.    Okay.  Did you discuss with Ms. Varner

19   specifically whether or not she would be interested in being

20   full-time CASA director?

21        A.    Yeah.  And as I recall the way that happened, it

22   was supposed to be a part-time situation, and I got a call

23   from Judge Hoffer to come to his chambers.  I went over to

24   his chambers, and there was an attorney from the AOPC there.

25   I don't know his name, don't know who he was, and he asked

Judge Guido                                        17

1    about the CASA program.  And he mentioned about this

2    litigation that was pending, or this Complaint that was

3    pending, and asked how I was getting along with Mrs. Varner.

4    I said I was getting along fine with Mrs. Varner.  And could

5    I work with her?  I said, sure, I thought I could work with

6    her.  And would I be interested in having a full-time CASA

7    volunteer?  And I said, well, I'm not sure I need a full-time

8    CASA volunteer but we'll work into that, yeah, I would,

9    what's up.

10            He said, well, they were thinking of making an

11   offer to resolve the litigation by having her be a full-time

12   CASA volunteer, moving her out of Probation, because the idea

13   was for her to stay in probation, and as I understood, she

14   led me to believe there was ongoing problems still going

15   there and this might get me my program, which I was most

16   interested in, and get her out of the Probation Department.

17            So I said, sure, I'm really interested.  And she

18   said that Mr. Jim Thomas would be calling me.  And that

19   happened, and it went from there.

20       Q.    Okay.  Do you know whether this meeting in Judge

21   Hoffer's chambers with the person from the AOPC was before or

22   after the CASA grant was submitted?

23       A.    Oh, well before.  Well before.

24       Q.    Do you have any recollection of when that meeting

25   occurred?

1       A.      I've got a vague recollection that I came from

2   some meeting with Children and Youth or something like that,

3   I was sitting in my office.  And that's just not relevant to

4   why Judge Hoffer called me over.  But I went over.  But I

5   don't have any idea, was it winter, summer, spring, fall, I

6   just don't know.  I just know that from that point on we were

7   talking about a full-time position.

8       Q.      Okay.  Do you recall a memorandum requesting

9   information about Barbara Varner's salary?

10      A.      Do I recall one?  No.  I did see one, yes.

11      Q.      Okay.

12      A.      Okay?  One was in the file.  That's correct.

13              MS. WALLET:  All right.  Let's mark that as

14  Deposition Exhibit 1.

15              (Guido Deposition Exhibit No. 1 was marked.)

16              MS. WALLET:  The judge has been handed what we've

17  marked as Deposition Exhibit 1, with the understanding that

18  this obviously was Barbara Varner's copy of this memo.

19  BY MS. WALLET:

20      Q.      Having looked at this piece of paper, does this

21  refresh your recollection about any of the discussions

22  concerning the CASA grant director salary?

23      A.      Well, when I looked at it going through my file,

24  it didn't refresh my recollection.

25              I distinctly recalled the discussions with

1    Barbara.  And when we talked about having her go full-time, I

2    said:  The only fly in that ointment would be that your

3    salary is much higher than the position would call for, that

4    I think commissioners would want to fund.  And that it was

5    sort of a win-win situation; I wanted a CASA program, she

6    wanted out of Probation.  If they could get the litigation

7    resolved, she would move out of Probation, I'd get my

8    program, she would be doing something that she wanted to do,

9    and presumably, her and I could work together well.

10       Q.    Do you remember specific discussions with her

11   that linked the litigation that was pending to the CASA

12   program?

13       A.    I remember specifically having a discussion with

14   her about that.  Do I remember exactly what day it was, where

15   it was?  No.  It was in my office.  But I, you know, that was

16   a clear understanding between us, that we were moving

17   forward, she was my choice, but there was always that

18   question of whether we could resolve the litigation to her

19   satisfaction or the commissioners' satisfaction, and, you

20   know, that was the problem.

21       Q.    And you say that was always the understanding,

22   even from the beginning of the discussions about CASA?

23       A.    From the beginning of the discussions when it was

24   going to go full-time, okay?  I had always made clear to her

25   and anybody else, including Judge Hoffer and the lawyer over

Judge Guido                                  20

1    there, I didn't want to know the details of -- and Jim

2    Thomas, I didn't want to know the details of what the

3    litigation was about.  Didn't concern me.  I was only

4    concerned with getting a CASA program up and running.  I

5    wanted it funded.  I didn't think it was, that that position

6    was worth 40-plus thousand dollars, but if they were willing

7    to pay that to settle their suit, I was happy to have it.

8        Q.    Okay.  Now, at some point you got a memo from

9    Laura Patterson with a final CASA submission attached,

10   correct?

11       A.    Yeah.

12             MS. WALLET:  We'll mark that as Deposition 2.

13             (Deposition Exhibit No. 2 was marked.)

14   BY MS. WALLET:

15       Q.    Judge, I'm going to represent to you that this is

16   the document that was produced by your counsel.  It's not my

17   intent to ask a lot of questions about it, but would you

18   please flip through this document and tell me, do you have

19   any reason to believe that this is not the final submission

20   to CASA with respect to the grant program?

21       A.    I do not have any reason to believe that it's

22   not.

23       Q.    Did you have to sign off on this application?

24       A.    I don't recall if I did or not.

25       Q.    In any event, you did submit a letter of March 8,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Judge Guido                                    21

1   2000?

2       A.    Is that in the application?

3       Q.    Yes, it is.  It's Bates number O3O.

4       A.    Okay.  I do recall that letter.

5       Q.    Is there any question, sir, but that you were

6   very supportive of this application, you hoped it would be

7   funded, and you intended to have a program up and running in

8   Cumberland County?

9       A.    Absolutely.

10      Q.    Now, there is a document in here that lists the

11  attendees at an introductory meeting on March 1, 2000.  It's

12  Bates number O35.

13      A.    Um-hum.

14      Q.    And I believe that continues on O36.

15      A.    Okay.

16      Q.    Is that the meeting that you referenced earlier

17  that occurred at the Carlisle Country Club?

18      A.    Correct.

19      Q.    And these individuals who are listed, are they

20  the individuals that you identified previously as the

21  advisory committee?

22      A.    Yes.  Many of them are either employees of

23  Children and Youth or attorneys that worked in the Children

24  and Youth cases; in fact, the vast majority of them are that.

25  And there's a couple of I see citizens, Ms. Carol Case, and

Judge Guido                                     22

1    obviously Laura Patterson's there, and some other interested

2    citizens.  But again, the vast majority are attorneys who do

3    Children and Youth work or who are employees of Children and

4    Youth.

5        Q.    Do you think that there is a document somewhere

6    that lists separately the individuals who were a part of the

7    advisory committee?

8        A.    Our current CASA director may have that, because

9    we have an advisory committee and she keeps them posted with

10   newsletters and things like that.  So I'm sure she would be

11   able to provide this to you.

12       Q.    Now that you've looked at Bates number O35 and

13   the date of March 1, 2000, are you able to say whether this

14   was the first meeting of this group, or whether or not there

15   was an earlier one?

16       A.    I'm sure there was an earlier meeting with Wanda

17   Knoll and a lot of the members of Children and Youth and the

18   attorneys.  And I think one of the reasons I remember that is

19   that I may have gotten reimbursed for this one.  I know I

20   didn't get reimbursed for the first one, and so there would

21   have been an earlier one.  It may have been a year earlier or

22   eight months earlier, in the very early stages of this.

23       Q.    Do you recall that Ms. Varner was in attendance

24   at this March 1, 2000 meeting?

25       A.    Oh, absolutely, at that point.  In fact, if I'm

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

1    not mistaken, we went from this meeting to a meeting of the

2    Children and Youth Advisory Council, and Barbara came with me

3    to that.  I think it was same night; it may not have been.

4    But at that point in time she was the one I had identified.

5    We were working towards her being the director, again,

6    subject to getting the funding at her salary level.

7        Q.     Now, the submission indicates a salary for the

8    director; is that correct?

9        A.     Yes.  I reviewed it prior to the deposition.  I

10   did see her salary on there, that's correct.

11       Q.     And if I could direct you to Bates number O25?

12       A.     Okay.

13       Q.     The salary listed under personnel for program

14   director salary, and I believe there's three columns there,

15   the first year, second year; is that accurate?

16       A.     Um-hum.

17       Q.     Is that the salary that Ms. Varner was paid

18   immediately prior to the submission of this CASA --

19       A.     I think the first year is what she was making.  I

20   think the second year would have been her projected increases

21   in the Probation Office, yes.

22       Q.     And do you believe that that was the information

23   that was gleaned from Mr. Osenkarski to Ms. Patterson that's

24   referenced in Deposition No. 1?

25       A.     I presume it was.  I know she -- I recall seeing

Judge Guido                                    24

1    an e-mail from her at some time saying that's a little high,

2    and we were all aware of that, that -- but if the

3    commissioners were willing to pay it based upon getting this

4    all resolved, we were willing to take it.

5        Q.      When this submission was sent, and I presume it

6    was sent in or about March 13, when Ms. Patterson indicates

7    that the Federal Express went last Friday, did you have

8    discussions with Ms. Varner at that time that involved the

9    litigation that was pending?

10       A.      I never discussed the litigation because I didn't

11   want to know about it.  All the discussions were, was that

12   all of this was subjected to her being able to make the

13   lateral move based upon the Complaint's being resolved, and

14   that was clear.  That was clear in my mind, it was clear in

15   her mind, at least I thought it was clear in her mind,

16   because we discussed it.

17              And as we got closer to the time, the grant was

18   approved, and we had some meetings about trying to get things

19   resolved and trying to protect her when she moved over,

20   things like you wouldn't do normally, saying that if the

21   program goes south she can move back in, be able to do this,

22   that and the other thing.

23              So it was very clear that we wanted her there and

24   that she could come there at this salary, but the

25   commissioners weren't going to pay that salary unless it was

1    part of an overall resolution.

2        Q.      And you say that you believed that was clear to

3    Ms. Varner?

4        A.      Yes.

5        Q.      Okay.  Now, on March 13, the date of this memo,

6    on the top of Deposition 2 it indicates that the

7    commissioners were meeting at two o'clock that same day.

8            Do you recall whether you were in attendance at

9    that meeting?

10       A.      I never went to any commissioners' meeting per

11   se, any public commissioners' meeting.  I was at policy team

12   meetings but, so no, the answer would be no.

13       Q.      All right.  Before I get too far afield, back on

14   the March 1, 2002, meeting at the country club?

15       A.      What page is that?

16       Q.      O35.  Did you address the group at that time?

17       A.      Sure.

18       Q.      And what was your intent in addressing this

19   collection of attorneys and other people at that time?

20       A.      Fire them up.  Fill them with spit and vinegar.

21   Get their support.

22       Q.      All right.  And do you know whether Ms. Varner

23   was introduced at that meeting?

24       A.      Sure.

25       Q.      And how did you introduce her?

Judge Guido                                    26

1       A.      As the lady I hoped would be running the program.

2       Q.      Did you learn subsequent to March 13, 2000, that

3    the commissioners had signed this proposal?

4       A.      I must have.  I mean, I knew the proposal was in.

5    I knew the proposal was into the hands of CASA and that at

6    some point we got the grant and the commissioners were on

7    board with this.

8       Q.      Okay.  Maybe I could ask you in more general

9    terms, could you run me through what the process was for

10   this?  You got interested, you --

11      A.      I got interested, I got the okay from Judge

12   Hoffer.  I had to sell Children and Youth on the idea in

13   order to do that.

14              After I got interested, I called Wanda Knoll.

15   She come up.  I bought her lunch, we talked.  She said that

16   she would like to meet with Children and Youth to help me to

17   convince them.

18              So I brought her up a second time.  Talked with

19   Gary Shuey.

20              Brought her up a third time to meet with all the

21   supervisors from Children and Youth, and Judge Blackwell came

22   up there.  By that meeting, we had Children and Youth in our

23   camp.  This is maybe six months that I'm on the bench.

24              Then we had to submit it to the policy board.

25   So --

Judge Guido                                27

1        Q.      Who is the policy board?

2        A.      I don't have a clue.  I was at meeting at

3    Children and Youth, a whole bunch of people from different

4    departments at Cumberland County.  You know, you might get

5    more from maybe Joe, I know Joe Osenkarski being there.

6    Dennis Marion was there.  Just a handful of other people.

7        Q.      Is this an entity of the county?

8        A.      I think it is.  I think it is.  And I was clear

9    from the beginning that I wanted to go the route of public

10   funding, and that's why I was trying to selling that to them.

11   So we got the policy board on board.

12           And this whole time it was only a part-time

13   position, because I remember being at a luncheon with some

14   members of the policy board, I had included Skip Ebert, and

15   this was early on when I was trying to sell it and explained

16   that these were volunteers that come in.  And he said:  Well,

17   how many volunteers do you expect to get?  And I fudged, I

18   thought maybe we could get five the first year, five or six.

19   And I said high because the volunteers have to go through

20   eight weeks' worth of training, a rigorous application

21   process and do a job that just breaks their heart.  And Skip,

22   who was the DA, said:  You know how tough it is to get

23   volunteers to do much less than that?  So he was a little

24   less than enthusiastic.

25           So, the job of the CASA volunteer would have been

Judge Guido                                          28

1    basically to supervise a handful of volunteers.  That's why I

2    thought it would be a part-time position.

3              (Court Reporter interruption.  Discussion held

4    off the record.)

5    BY MS. WALLET:

6        Q.    I had initially asked you to run me through what

7    the process was, and I think you were somewhere in the middle

8    of that process.  Now we've gotten the policy board

9    supposedly on board.  What happens next?

10       A.    They were on board, and then we started looking

11   for funding and things like that.  And that's where I sort of

12   picked up trying to come up with ideas.  I saw the PCCD

13   grant.  That led to the conversation with Joe Osenkarski,

14   which was, you know, we'll get you a new probation officer,

15   we'll split one of your existing probation officers.  Then at

16   some point in time Barbara was identified to me to work for a

17   while under the prospect of it being paid for hoping for a

18   PCCD grant or something like that.

19             There was even some sort of deal with Joe that

20   even if we didn't get the PCCD grant, if I would recommend to

21   the commissioners that he needed another probation officer,

22   he would go along with me sharing one of his to get this

23   program developed.

24             And there was discussion in there with Children

25   and Youth.  They were going to -- even they were -- they came

Judge Guido                                29

1  so much on board they were talking about funding it through

2  them and having the employee through them.  I viewed that as

3  a conflict and didn't want to have it that way.  So I wanted

4  it under the auspices of the Court, and the Probation Office

5  was under that auspice.

6         Then after this settlement idea came on it

7  became, okay, we'll get her out of Probation, put this job

8  under the court administrator and move her into another

9  building.

10   Q.    And whose idea was that?

11   A.    I'm sure that came from the county or the

12  attorney for Judge Hoffer.  They said full-time, get it

13  settled, can you work with Barbara.  The answer to all that

14  was yes, and there we went.

15   Q.    I guess I'm confused.  Where in this process do

16  the commissioners come in?  The grant apparently was

17  submitted.

18   A.    Well, the commissioners have to come in because

19  they've got to pay the salaries.  The grant doesn't go for

20  salaries.  The commissioners have to commit to something.

21  And I don't know how they do their internal bookkeeping.  The

22  grant money offsets some other stuff.

23   Q.    Okay.  Do you know whether the commissioners had

24  put their blessing on this grant application before it was

25  submitted to CASA?

Judge Guido                                    30

1       A.      I have no idea.

2       Q.      And that part of this process would have been

3   left to Ms. Patterson to work out?

4       A.      Yes.

5       Q.      Did you have any hesitation in submitting your

6   grant application showing a full-time program director salary

7   at the level of $40,000?

8               MR. ADAMS:  Objection.  I think he already

9   answered that question.  I think he said that he thought that

10  it would -- that the salary was high for the particular

11  position.

12              MS. WALLET:  Well, I think that's a different

13  question than --

14              THE WITNESS:  Did I have any hesitation?

15  BY MS. WALLET:

16      Q.      Yes.

17      A.      I thought the salary was too high.  I understood

18  that we were going to fund a full-time director.  That's all

19  the grant people really wanted to know, that we were going to

20  be doing that.

21              I got a memo from Laura saying, boy, this

22  salary's out of whack, CASA tells me that the average

23  nationwide is around 30,000 or 33,000 or something like that.

24  So I didn't have a problem with any of that, it was what it

25  was, and that's what we were doing.  If we got the deal

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

1    worked out, it would be that; if we didn't, it would be

2    something else.

3        Q.      You think you had a written document from Laura

4    that referenced the salary being, as you say, out of whack?

5        A.      I recall seeing an e-mail to that effect.  And I

6    recall seeing that recently because I was reviewing my file.

7                MS. WALLET:  Okay. Off the record.

8                (Discussion held off the record.)

9    BY MS. WALLET:

10       Q.      You knew, did you not, in or around the time of

11   this grant submission that if any of the probation officers

12   were to be the director of this program, they all made more

13   than $20,000, correct?

14       A.      Well, at the time we submitted the grant

15   program -- the simple answer to that is yes.  I'm trying

16   to -- but you have to understand the way I identified a

17   probation officer.  I didn't need a probation officer to do

18   this.  The probation officer was identified as part of a deal

19   to get some PCCD money to get a part-time employee and that's

20   how Barbara was identified.  And then so she's on board, I'm

21   happy with her, I presume she's happy with the program, we're

22   going to go part-time.

23               And then this proposal comes up, can you use a

24   full-time, do you want a full-time if we can get it for you

25   as part of resolving the litigation.  Sure, I want this

1    program to grow.

2        Q.    Okay.  It was always a part of this proposal that

3    the grant money would be part of the program costs, and

4    hopefully the county would come up with the rest of the

5    program costs?  Correct?

6        A.    Yes.

7        Q.    And do you know whether it spelled out precisely

8    how much you were asking CASA to fund at the time that you

9    submitted this application?

10        A.    I thought there was, like, a set amount that they

11    funded, X-amount per year for two years, for start-up, and I

12    couldn't tell you what that is.

13        Q.    So you thought it was some sort of a flat grant

14    that they gave $20,000 or some figure to anyone who applied

15    for their assistance?

16        A.    I knew it was competitive, and I'm not sure I

17    thought about it much at all.  I didn't think, to the extent

18    I thought about it, that what we were going to spend on the

19    program meant anything.

20            The important part of the grant application was,

21    one, that you had a judge that was behind the program, and

22    two, that you had a need for the program.  Those were the two

23    most important parts.  And that they wanted to see -- if

24    they're going to give you 29,000, if that's the figure, I

25    don't know why 29,000 sticks in my head as the grant, but if

1    they're going to give you money, they want to see that you're

2    going to implement a program and you've got a chance at being

3    successful.

4        Q.    Well, I can't say that I understand this totally,

5    but if you would look at Bates number O24, can you confirm

6    for me that the request was for $38,184?

7              MR. ADAMS:  That indicates for two years, on the

8    document.

9              MS. WALLET:  I'm sorry, I missed what you said.

10             MR. ADAMS:  I didn't mean to interject, but it

11   counts for two years, you should mention on the figure, on

12   O25.

13             THE WITNESS:  I'm looking at the -- O25, I'm

14   sorry.  I was looking at O24.

15   BY MS. WALLET:

16       Q.    Actually, O24 was the one that I was calling your

17   attention to.

18       A.    It sure looks to be that way.  I have no idea

19   what the grant was.  I don't know where I got 29,000.

20       Q.    Do you believe that the CASA people approved less

21   than what was requested?

22       A.    I have no idea.

23       Q.    Do you know how much they approved?

24       A.    Do not.  Somebody told me at one time, but I

25   didn't really care what it costs.  I thought the

1   commissioners should pay for it, vas finito, and the grant

2   was to get our foot in the door to show that it could be

3   successful, and it has been, and --

4        Q.    I hate to beat a dead horse, but you believed it

5   didn't matter how much you asked for; you thought CASA just

6   gave up to a certain maximum to everyone?

7        A.    That's my understanding.  That's my

8   understanding.

9        Q.    It wasn't a situation in your mind where you

10  asked for a lot more than you really wanted in the hope that

11  they would fund a percentage of what you requested?

12       A.    I would have no idea.  Laura Patterson can fill

13  you in on that.

14       Q.    All right.  So you believed that by the time this

15  was submitted in March, you had already had your conversation

16  with the attorney from AOPC?

17       A.    Yes.  Yes.

18       Q.    And you believed that as a result of that

19  conversation with the AOPC attorney, you then met with

20  Ms. Varner?

21       A.    Yes.

22       Q.    And your purpose of meeting with Ms. Varner was

23  to relay to her what the AOPC attorney had indicated?

24       A.    I don't know if that's the only purpose.  The

25  purpose was, okay, this is going to be full-time, that the

1    commissioners were going to go along with full-time, that I

2    don't know if they're going to go along with your salary in

3    this position, and the purpose is to try to resolve this

4    litigation.  Their purpose is to try to resolve this

5    litigation.  My purpose always was to get the CASA program up

6    and going.

7        Q.    And how did she respond to that?  She, Barbara

8    Varner.

9        A.    I don't exactly recall.  I presume that she

10    responded favorably, because we continued to pursue it as her

11    being the CASA director.

12        Q.    Okay.  Did she at that time raise any objections

13    to this somehow being tied to her pending litigation?

14        A.    She may have.  She may have wanted to try to get

15    into the details of the litigation.  I remember I didn't want

16    to know from anybody about anything on the litigation.  And I

17    recall that it made sense that they weren't going to pay more

18    than the job was worth, which they didn't have to do, while

19    she had a suit going, and we had that discussion at some

20    point, I recall that discussion.  When that was, I don't

21    know, whether that was at that very first meeting or some

22    subsequent time while this was all going on.

23            MS. WALLET:  Okay.  Let me show you what I'll

24    mark for identification as Deposition Exhibit 3.

25            (Deposition Exhibit No. 3 was marked.)

1          MS. WALLET:  I've handed the witness what we've

2    marked as Deposition Exhibit 3, that being a two-page letter

3    from the judge to John Ward, chief clerk.

4    BY MS. WALLET:

5       Q.      The letter references a June 15, 2000, meeting.

6    I assume that your letter accurately reflects the attendees

7    at that meeting?

8       A.      Probably.  I recall the meeting.  I don't

9    recall -- do I mention that Carl Connellan was there?  I'm

10   sure he was, if he's not mentioned in there.

11      Q.      And he is your court clerk?

12      A.      Yes.

13      Q.      Did anyone take minutes of this meeting, to the

14   best of your knowledge?

15      A.      No, other than the fact that I wrote this letter

16   right afterwards.

17      Q.      Was there any representative of the county,

18   either the commissioners' office or the county Human

19   Resources Department, at that June 15 meeting?

20      A.      Not that I recall.  Okay.

21      Q.      Okay.

22      A.      I don't remember if --

23      Q.      I mean, it does --

24      A.      -- if John Ward was there or not.

25      Q.      In fairness, sir, it does say Taryn Dixon and

1   Laura Patterson were there.

2        A.      Yeah, I see that.  You asked me if there was

3   anybody else other than mentioned in the letter.  Carl

4   Connellan.  Whether there was somebody from Human Resources,

5   I don't know.  Whether John Ward was there, I don't recall

6   that, either.

7        Q.      Okay.  Would you describe for me what you recall

8   about what happened at that meeting?  First of all, how did

9   this meeting come about?  Did you call it?

10       A.      I don't remember.  I know we were trying to get

11  the funding for her position resolved.  And because it was

12  tied into the litigation, I think she had some concerns that,

13  hey, this grant's only for two years, what if this is some

14  clever ruse by the county to get me to settle the litigation

15  and then pull the plug out from under the program and I'm out

16  of a job in two years from now.  And that gave me some

17  concerns concern, too, because I didn't want my program to be

18  the victim of some litigation.  So I wanted to make sure that

19  the county wasn't just setting somebody up to resolve some

20  litigation.

21              So I figured that if they were in further ahead

22  of the game when they pulled the plug on my program, if they

23  didn't, we'd come up with these proposals to make sure that

24  if the plug got pulled at the end of the two years, she was

25  protected.  The county didn't save a nickel, so they had no

1   financial reason to pull the plug on my program and it would

2   only be pulled if it wasn't working.

3        Q.      Okay.  How did this meeting end?  Did everyone

4   leave thinking that there was an agreement here subject to --

5        A.      I don't know that anybody could agree to

6   anything.  This is -- I think I needed Joe's agreement

7   because he was losing a probation officer, and I wanted to

8   make sure he was getting one back, so from that standpoint,

9   he was satisfied with that proposal.  But I don't recall that

10  anybody was there that could bind the commissioners.  That's

11  why the letter went to John Ward.  Unless John Ward was

12  there, and I don't recall that.  I don't think he would have

13  been.

14           But throughout all this, I mean, this was getting

15  down to crunch time and so we sort of needed -- what was

16  underlying all of this was to get the suit settled so we

17  could move forward with this, but -- and part of the problem

18  with getting the suit settled was as I articulated before, we

19  wanted to have some protections in there that she wasn't

20  going to be just out of a job in two years and me out of a

21  program.

22       Q.      Why was Tom Boyer at this meeting?

23       A.      Probably as Joe's assistant.

24       Q.      Do you recall, sir, did you set the list of

25  people and have your clerk call them in?

Judge Guido                                    39

1      A.      Knowing how I operate, the answer would be no.

2   It was kind of like:  Carl, we've got to get this resolved,

3   figure out who we need to do it and let's get it done.

4      Q.      Okay.  And so you think Carl may have decided who

5   had to be at this meeting?

6      A.      And probably would have run it by me, what do you

7   think about this, that and the other thing.

8      Q.      Okay.  This letter doesn't say anything, does it,

9   about Ms. Varner agreeing to drop her lawsuit?

10     A.      Well, it doesn't in so many words.  But if you

11  look in the last paragraph, I should also mention it was made

12  clear to all those in attendance that the final approval of

13  this proposal was within the discretion of the commissioners

14  and Judge Hoffer.  And those are the two people that were

15  parties to the lawsuit that was pending.

16     Q.      Okay.

17     A.      And I was not a party.  I don't want to be

18  involved with any of it, I just wanted a program.

19     Q.      Okay.  Do you recall any discussion at the June

20  15 meeting that in order to make this deal work, Ms. Varner

21  would have to drop her lawsuit?

22     A.      I don't specifically recall any discussion at

23  that meeting with regard to that.

24     Q.      Now, Ms. Varner wrote you a memo just before this

25  meeting, correct?  About the CASA program?

1      A.      I don't recall that.

2              MS. WALLET:  Well, let's mark as Deposition 4 a

3      one-page memo.

4              (Guido Deposition Exhibit No. 4 was marked.)

5              THE WITNESS:  This memo I recall.  This is July

6      12.  This is a month after the meeting.  That was shortly

7      after my meeting with her where she told me that the suit

8      wasn't going to get settled.

9      BY MS. WALLET:

10     Q.      Okay.

11     A.      Okay?

12     Q.      Do you recall what happened in the interim

13     between June 15 and this memo July 12?

14     A.      All the details, no.  I just recall that the suit

15     wasn't settled and that the commissioners weren't going to

16     come up with the funding as long as -- with the, with paying

17     her her salary unless the litigation was resolved.

18     Q.      Did you have any discussions with anyone about

19     the terms and conditions, for lack of another word, of the

20     June 15 meeting, prior to your receiving the July 12 memo?

21     A.      I don't recall.  Well, I was working under the

22     assumption that if the suit was settled, that everything else

23     in the July 15 -- the June 15 memo was okay.  Everything else

24     was acceptable to everybody else, other than her salary, and

25     that that was conditioned upon the suit being settled.

1          And the whole memo of June 15, I mean, was all

2     part and parcel of the suit.  I mean, I wouldn't have had a

3     need to have my CASA employee be moved out of the courthouse

4     into the Human Relations office.  That was all part of the

5     complaints to resolve all of this.  So that was all part and

6     parcel of this.  It was understood by Barbara and I that her

7     suit had to be settled for her to get her funding or her pay,

8     her pay at that level.

9          Q.    She writes you on July 12 in some frustration,

10    correct?

11         A.    Well, that's what she says.

12         Q.    Judge, do you have any disagreement with the

13    facts that Ms. Varner has set forth in her memo of July 12th

14    which we've marked as Deposition 4?

15         A.    I presume that the grant was awarded in June.  I

16    don't know that for a fact.  I have no reason not to believe

17    that.

18             I don't know if she personally presented the

19    grant at the commissioners' meeting on June 16.

20             I presume she was making preparations to transfer

21    out of her department into the CASA position.

22             Certainly, the salary was part of the grant, but

23    it was always understood that it was conditioned upon this

24    being settled.  Otherwise, I would have to look for somebody

25    commensurate with, to pay commensurate with what the position

Judge Guido                                          42

1    would be worth.

2         Q.      How do you know that the commissioners believed

3    that something had to be settled?

4         A.      I presume that Mr. Thomas represented the

5    commissioners, and you know, it was clear, the position -- in

6    fact, they funded the position at about $29,000.  I thought

7    the position was worth about $25,000.  I may have even said

8    that to Barbara on an occasion or two.

9              Let me see what else.

10        Q.      Okay.

11        A.      I presume she was frustrated.

12             If the only issue is my salary she feels it

13   should have about addressed prior to the submission of the

14   grant with my salary included.  Honestly, I think it was.

15   Between her and I, I think it was all, you know, that I

16   thought that, I know from the beginning I always thought that

17   was too high for that position.  I'm sure we discussed that.

18   But if they were prepared to pay it, I was prepared to go

19   along with it.

20             And as far as other things she needed to get

21   done, she would know that better than me.  Quarterly reports,

22   things like that.

23        Q.      Is there anything else that you would disagree

24   with as far as the facts as presented in the July 12th memo?

25        A.      Give me specifics, if you would.  I hate to -- I

1    mean, if you want to take it one at a time, certainly she was

2    working with me, she made a lot of phone calls.  She was

3    identified as the person I would like to have direct the

4    program.  I presume she was honored.  Felt more committed.

5    Her name was provided to volunteers.

6             Yeah.  It seems to be in order.

7         Q.    Okay.  Did you personally have any discussion

8    with any of the three county commissioners regarding this

9    situation?

10        A.    No.  Well, what situation?  The suit?  The

11   funding?

12        Q.    Either.

13        A.    No.  I did discuss with Ms. Besch and maybe

14   Mr. Keller at a luncheon one time early on in the proceedings

15   about the need for a CASA program, what a great program it

16   is.

17        Q.    How about Mr. Rovegno?

18        A.    When did he become commissioner?

19        Q.    Don't know, sir.

20        A.    I don't recall discussing with him.

21              Whether Mrs. Meyers was part of any of this or

22   not, I don't know.

23        Q.    Did you have any discussions with John Ward about

24   the CASA program or about your letter of June 15th?

25        A.    It's a compound question.  I'm sure I discussed

1    the CASA program with John Ward at some point in time.  I

2    don't recall any specific discussions regarding my letter of

3    June 15.

4         Q.    Do you recall whether Mr. Ward responded in some

5    fashion to your June 15 letter?

6         A.    I recall seeing a letter from John Ward.

7               To your last question, let me back you up,

8    because one of my concerns was, and I think I recall a

9    conversation with John Ward sometime before June, whether we

10   were going to go to full-time CASA, and it was part of

11   resolving this suit.  I didn't want to get caught in the

12   middle of this litigation, and I didn't want to be left

13   holding the stick if the suit didn't get settled.

14              And said, I recall saying that I know the

15   salary's high but I want to make sure I get some CASA program

16   director if you guys don't get your suit settled.  And he

17   gave me assurances that the commissioners were on board for

18   the program, and if the suit didn't get settled I would still

19   get a CASA director.

20        Q.    Okay.  And you're not sure when that conversation

21   occurred?

22        A.    I'm not -- it certainly was before June 15th,

23   because through this time I was doing everything I could,

24   short of getting involved in the negotiations, which I wasn't

25   going to do.  I mean, I was encouraging Barbara to try to

1    settle it.  And we had a conversation, I'm not sure exactly

2    if it was before the July 12 letter or right after it, when

3    it was clear they told me to advertise for the position, and

4    might have been at the time I offered her the job, but I

5    could only offer it to her at the lower amount.

6              And I said, you know:  Is there no possibility of

7    settling the suit?  And she says:  No, I just can't accept

8    what they're offering.  And I said:  Well, that's your

9    personal decision, I'm sorry for that, but that's your

10   personal decision.

11        Q.    Do you recall --

12        A.    And I didn't want to know details of what they

13   were offering her or anything.

14        Q.    Okay.  Do you recall calling me as an attorney

15   for Ms. Varner?

16        A.    I think I did.  I think I did.

17        Q.    Why did you call me?

18        A.    Just to see, is there any possibility this suit's

19   going to get settled and if there was anything I could do to

20   help in that regard.  I don't remember when that was, though.

21   I think it was probably in this time frame here.  I'm talking

22   June-July time frame of 2000.

23        Q.    Did you consider Mr. Thomas to represent you in

24   some way?

25        A.    I didn't consider that I was a party to any of

1    this.  I didn't consider anybody was representing me.  I was

2    just some guy trying to get a program started and happened to

3    have identified somebody that was involved in litigation that

4    was making more money than the job was worth.

5         Q.    And you thought the job was worth about $25,000?

6         A.    I think that was the ballpark that I was looking

7    at, because I remember being pleasantly surprised when I was

8    interviewing and had somewhere around 28 or 29 thousand to

9    offer.  I forget the exact figure.

10        Q.    Did you identify any comparable positions or

11   similar positions within the county that caused you to

12   believe that 25,000 might be the appropriate range?

13        A.    I don't know how I got that.  I just figured that

14   it wasn't -- you know, we were looking at half a dozen

15   volunteers, tops, is what I thought.  I just didn't see that

16   there was that much work going to be involved at first.  It

17   turned out I was wrong.  I'm not very good at that stuff.

18        Q.    Okay.  And you thought it could easily be done on

19   a part-time basis?

20        A.    I thought so.  I thought I needed somebody, and I

21   may have had this discussion with Joe, that I needed

22   somebody -- I know I had the discussion with Barbara, that I

23   needed somebody full-time for about six months, but after,

24   that I thought, you know, full-time to get the program up and

25   running to identify some volunteers, do the advertising,

1   speak at different programs, different communities meetings,

2   but after that I thought part-time would be sufficient.  As

3   it turns out, that's not what occurred, but that's the

4   premise I was working under at the time.

5       Q.     It was eventually filled as a full-time position?

6       A.     Yes.  Yes, that was part of the agreement I had

7   in that unspecified date with John, that if we were going to

8   go full-time, I didn't want to get stuck holding the bag

9   later on if the suit didn't get resolved.

10      Q.     You recall no conversations with Mr. Ward between

11  June 15 and his letter back to you July 18 of 2000?

12      A.     I do not.

13             MS. WALLET:  Let's mark that as Deposition

14  Exhibit 5.

15             (Guido Deposition Exhibit No. 5 was marked.)

16             THE WITNESS:  You know where I may have come up

17  with the 25 salary?  And I'm not sure, but entry level

18  probation officer.  I may have checked with Joe on that, and

19  I may not have.  I just don't recall.

20  BY MS. WALLET:

21      Q.     You believe 25,000 is about the entry level

22  salary?

23      A.     No.  I'm saying -- you asked how I come up with

24  that.  There may have been a discussion with Joe Osenkarski

25  about what the PCCD grant would be or what it's going to, you

1   know, what that person's coming in at, and that may be where

2   I was coming from.

3           Again, you're asking me to recall and pick, you

4   know, specifics.  Some of the major things I do recall, like

5   when I said I don't recall the conversation with John Ward

6   doesn't mean there wasn't one between June 15 and June 18.  I

7   just don't recall any.

8       Q.    Do you remember seeing the July 18, 2000, letter

9   marked Deposition 5 before now?

10      A.    I'm sure I saw it when he sent it to me.

11      Q.    What, if anything, did you do in response to the

12  July, 18th, 2000 letter?

13      A.    Is this the one where he told me to advertise the

14  position?  Because I think that's what I did.  I think I

15  advertised the position, got a whole bunch of resumes, and

16  interviewed.

17      Q.    Okay.  Do you agree that apparently Mr. Ward

18  wasn't sure at this point, July 18, whether or not Ms. Varner

19  would accept the position at the 29,689 per year?  I refer

20  you to page 2.

21      A.    If that's what he says in this letter.  I don't

22  have any independent recollection of a conversation with him.

23      Q.    Well, if you could look at the second full

24  paragraph on page 2, as long as you continue.

25      A.    Okay.  He certainly said that.  Next question?

1      Q.      Do you think that you went to Ms. Varner after

2   the July 18 letter and told her of these terms and

3   conditions?

4      A.      I don't recall if I went to her after the July 18

5   letter.  I recall her specifically telling me that she can't

6   afford to take the job at what it was being offered at, so I

7   presumed she knew that it was 29,689.

8           So did I show her the letter?  I don't know.  But

9   I do recall that conversation that she couldn't afford to

10  take the job at what it was being offered at.  And --

11     Q.      Do you remember whether you told her that it was

12  going to be 29,689?

13     A.      I don't remember if I told her that or not.

14     Q.      In any event, she eventually told you that if

15  that's what it was paying, she wasn't interested, correct?

16     A.      It may have been part of the same conversation

17  that we had where I was asking is there any way to settle the

18  suit, and she said, I can't take what they're offering, and I

19  said, well, the job is yours.  And it may have been a

20  different conversation, the job is yours at what they're

21  offering, and she said I can't afford the cut in pay, so.

22     Q.      Okay.  What did you do to describe the position

23  as far as posting this and putting it on the website?  Did

24  you play any role in that?

25     A.      Huh-uh.  No.  I would have given the okay to go

Judge Guido                                            50

1    ahead and post it or advertise it, and the county does

2    whatever they do.

3         Q.     Do you know who did that?

4         A.     No.

5         Q.     Do you know how many applicants you had for the

6    position?

7         A.     A bunch.  I know we winnowed through them, we

8    being Mr. Connellan and I, and interviewed a handful.

9         Q.     Do you know the person that's being referenced in

10   the middle of this page?  I'm looking now at Deposition 5,

11   page 2.  It says:  Additionally, we would ask the Probation

12   Department to contact the individual outside the county who

13   has prior experience in a CASA program?  Do you know who that

14   person is?

15        A.     Do I now know who that is?  No, I don't.  Did

16   I -- I'm not sure I didn't interview that person as part of

17   the job search, but I'm not sure that I did, either.

18        Q.     Do you have a list somewhere of the people that

19   you've interviewed?

20        A.     I don't know.  Mr. Connellan might know.  I mean,

21   that's not something I would have kept.

22               I specifically recall a couple of the interviews,

23   a couple of very nice ladies, a nice man that was one of the

24   finalists, and then the lady we eventually hired.

25        Q.     Okay.  Did the woman from York County, Wanda

                    Emily R. Clark, RMR
            717-233-1744, emily.clark@worldnet.att.net

1    Knoll, interview for this job?

2        A.    Oh, no.

3        Q.    Do you know how much she was paid in her

4    position?

5        A.    I don't, but it would be surprising to me if she

6    was making anymore than the mid forties, and she had been

7    there for quite a while and had dozens and dozens of

8    volunteers that she was overseeing, and a staff.  And we were

9    talking about much less than that.

10       Q.    Okay.  Did you select the individual who

11    ultimately took the CASA program director position?

12       A.    Yes.

13       Q.    Who was that person?

14       A.    Anita Brewster.

15       Q.    Could you tell me what Ms. Brewster's background

16    was?

17       A.    In detail, no.  She had come from Germany.  She

18    had put together -- she had been an American citizen

19    stationed in Germany.  She had some administrative experience

20    in putting together some program over there.  So that's what

21    impressed us to do the interview.

22            And in the interview, it was between her and a

23    fellow who had some more administrative experience than Anita

24    did and some more social services background than Anita did,

25    and it was a very close call.  It was, boy, I wouldn't -- a

1   paper-thin difference.  And I just sort of went with my gut

2   and felt that Anita was somebody that I could work with and

3   she was good with people.  And I haven't made many good

4   decisions in my life, but that was one of them.

5        Q.    Do you recall the name of the male applicant?

6        A.    Do not.  I can picture him but I don't remember

7   his name.

8        Q.    Do you know whether Anita Brewster was hired at

9   $29,689 per year?

10       A.    I presume that she was, but I didn't get into

11  those details.

12       Q.    Who would have done that?

13       A.    Somebody in Human Resources.  Probably Rick

14  Pierce or Taryn, because the position was eventually hired

15  under the court administrator.

16       Q.    Okay.  Do you know when Ms. Brewster assumed her

17  duties?

18       A.    September or October of 2000.  And again, I'm --

19  please don't hold me to the dates.

20       Q.    Now, the grant program had already begun,

21  correct?

22       A.    I don't know.

23       Q.    Didn't it run from July 1?

24       A.    On the fiscal year?  Probably.

25       Q.    Yes.

1        A.       Probably.

2        Q.       And who did the duties between July 1 and when

3    Ms. Brewster assumed her position?

4        A.       There were no duties.  We needed to hire a

5    program director, and I'm not sure if that wasn't to be

6    expected through the grant.

7        Q.       I'm sorry, I didn't understand that.

8        A.       I'm not sure that they expected us to have a CASA

9    program up and running.  This was to develop a CASA program.

10   So while the funding started for the program, I'm not sure

11   they expected us to -- we had to hire a director, we had to

12   advertise for volunteers, we had to train volunteers.  I

13   don't think I swore my first class in until the spring of

14   2001.

15       Q.       Do you know whether you had any reporting

16   requirement to report to the CASA people as to the progress

17   that you were making with their dollars?

18       A.       I don't know.  I would be surprised if we don't,

19   if we didn't, but that would be handled by the court

20   administrator or the program director.  So she would have

21   that information for you, I'm sure.

22       Q.       Up until the time that Ms. Varner turned down the

23   job at the salary offered, was Ms. Varner your selection for

24   this job?

25       A.       Yes.

1           MS. WALLET:  Thank you, Judge.  I appreciate your

2     time.

3     BY MR. DELLASEGA:

4           Q.     As I understand, Judge, there are two ways you

5     can fund CASA:  Through government funding or through private

6     funding?

7           A.     Um-hum.  Yes.  I'm sorry.

8           Q.     And it was your election as to whether you wanted

9     to seek for Cumberland County the position to be funded

10    through the government as opposed to attempting to fund it

11    through private sources?

12          A.     That's correct.

13          Q.     All right.  And had you wished, you could have

14    pursued private funding as opposed to what you chose, which

15    was to pursue county funding; is that correct, also?

16          A.     I certainly could have chosen to do that.  I had

17    no intention of ever doing that, but I --

18          Q.     Understood.

19          A.     I could have chosen to do that.

20          Q.     Had you elected the private funding and received

21    sufficient private funding, you would have been able to have

22    the CASA program without any involvement by the county; is

23    that correct, also?

24          A.     Yeah, I guess.

25          Q.     Okay.  And in that event, you would not have

1    needed the county's approval to create the slot of CASA

2    director; is that correct?

3        A.    If they wouldn't be an employee of the county, I

4    guess not.  I mean, you're asking me questions I don't really

5    know the answer to.  I'd have to look at the --

6        Q.    I was asking in the hopes that you did know the

7    answer.

8        A.    No, I don't know the answer, because I never

9    wanted to pursue it from a private funding standpoint.

10       Q.    In either instance, whether it's government

11   funded or private funded, you have the right or share that

12   right with Judge Hoffer, to discharge the CASA director --

13       A.    Well --

14       Q.    -- for poor performance; would that be correct?

15       A.    Not if it was private funded.  I mean, if it was

16   privately funded, I presume there would be a board of

17   directors of the nonprofit corporation, and I don't know how

18   that would work.  Certainly -- and, if it had been publicly

19   funded under some branch of government that I have no control

20   over, I wouldn't be able to dismiss the CASA volunteer

21   coordinator.

22           But I was looking at the model of, one, making it

23   funded by the commissioners, and two, having me have

24   authority over who that person would be, therefore, someone

25   that's working under the court's auspices, whether it be in

Judge Guido                                                56

1    Probation or the court administrator's office.

2         Q.      Okay.  Under the model that you selected, you do

3    have authority over the CASA director?

4         A.      Correct.

5         Q.      Which would include the power to hire and fire,

6    discipline and otherwise regulate --

7         A.      Right.

8         Q.      -- her performance in office?

9         A.      Correct.

10               MR. DELLASEGA:  That's all.

11               MR. MacMAIN:  I have no questions.

12               MR. ADAMS:  I have no questions.

13   BY MS. WILLIAMS:

14        Q.      Judge, I have just one small point to clarify.

15   I'd like to refer you to Deposition Exhibit 4, which counsel

16   had asked you about, and she wanted to know your agreement

17   and disagreement.

18               I note that that exhibit says:  I was making

19   preparations to transfer out of my department to the new CASA

20   position until at the 11th hour when an issue came up

21   regarding my salary.

22        A.      Okay.

23        Q.      Do you agree with Ms. Varner's characterization

24   of the salary issue coming up at the 11th hour?

25        A.      I certainly do not, and I missed that.  I don't

Judge Guido                                          57

1    agree with that.  It was clear all along that that salary had

2    to be approved by the commissioners, because it was a high

3    salary.

4              MS. WILLIAMS:  Okay.  Thank you.

5    BY MS. WALLET:

6        Q.    You said that Ms. Brewster is physically located

7    under the court administrator?  Did I understand that

8    correctly?

9        A.    I don't know about physically.  Her office is in

10   the Human Services building, but the chain of command is she

11   works for the court administrator.

12       Q.    Okay.  Does the court administrator evaluate her

13   performance?

14       A.    I don't remember if they gave that to me or not.

15   I hate to do those evaluations of anybody, so I'm not sure if

16   Taryn does those or if I did that.

17       Q.    Do you recall whether you have evaluated

18   Ms. Brewster?

19       A.    I don't recall if I have or not.  I get

20   evaluations and they sit there for months until somebody

21   screams about them.  May have gotten Anita -- hers would have

22   been easy to do because I would have just filled out all

23   excellents.  So I may have evaluated her, or our court

24   administrator may have done that.

25       Q.    Okay.  You believe you have the power to fire

1    her?

2        A.      Within the rules and the framework of what the

3    county allows me to do, that's correct.  She's a county

4    employee but working under the auspices of the court

5    administrator.

6        Q.      Does the county have the ability to fire her?

7        A.      I have no idea.

8        Q.      Does the court administrator --

9        A.      Does the -- the county would really have to pick

10   a fight with me if they tried to fire her without my

11   authority, unless they cut the funding.

12       Q.      You anticipated my question.  Does the county

13   have the ability to cut the funding?

14       A.      Absolutely, they do.

15       Q.      Is this position funded for the next fiscal year?

16       A.      It is.  It's been a rousing success.  We went

17   through that with the commissioners not too long ago.  As a

18   matter of fact, there may have been a request for an

19   expansion grant, also.  I don't know if that was approved or

20   not.  But even in these tight budgetary times the

21   commissioners agree that it's a worthwhile program.

22       Q.      Did you submit another grant application to the

23   CASA people?

24       A.      I think so.

25       Q.      Did you play any role in that?

Judge Guido                                    59

1        A.      Other than signing something Laura prepared,

2   probably not.  Or giving her some input on why we needed it.

3   Because we've gotten a lot more volunteers than we ever

4   anticipated, and we've got a lot more need than we

5   anticipated, too, it's worked so well.

6        Q.      Is Ms. Brewster subject to the personnel rules of

7   the county?

8        A.      Yeah.  I think the only people in the courthouse

9   that are not are me and the court administrator and the other

10  judges.  I think everybody else are county employees, despite

11  what the Supreme Court has said.

12              MS. WALLET:  That's all I have.

13              MR. DELLASEGA:  None.

14              MR. MacMAIN:  Thank you.

15              MS. WILLIAMS:  Thank you, Judge.

16              MR. ADAMS:  Thank you, your Honor.

17              MS. WALLET:  Thank you very much, Judge.

18              (Whereupon, the deposition was concluded at
        2:36 p.m.)
19

20

21

22

23

24

25

```
 1   COMMONWEALTH OF PENNSYLVANIA  )
                                   )
 2   COUNTY OF DAUPHIN             )

 3            I, Emily R. Clark, a Court Reporter-Notary Public

 4   authorized to administer oaths and take depositions in the

 5   trial of causes, and having an office in Harrisburg,

 6   Pennsylvania, do hereby certify that the foregoing is the

 7   testimony of  HON. EDWARD E. GUIDO taken by Plaintiff at the

 8   Cumberland County Courthouse, One, Courthouse Square,

 9   Carlisle, Pennsylvania.

10            I further certify that before the taking of said

11   deposition the witness was duly sworn; that the questions and

12   answers were taken down in stenotype by the said

13   Reporter-Notary, approved and agreed to, and afterwards

14   reduced to computer printout under the direction of said

15   Reporter.

16            I further certify that the proceedings and

17   evidence are contained fully and accurately in the notes

18   taken by me on the within deposition, and that this copy is a

19   correct transcript of the same.

20            In testimony whereof, I have hereunto subscribed

21   my hand this 24th day of April, 2003.

22

23

24                        _____
                          Notary Public

25
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net