```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                   .
        Plaintiff,                   .   CIVIL ACTION
                                     .   NO. 1:CV 01-0725
        vs.                          .
                                     .
COMMONWEALTH OF PENNSYLVANIA,        .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,             .
CUMBERLAND COUNTY; CUMBERLAND        .
COUNTY; S. GARETH GRAHAM,            .
Individually, and JOSEPH             .
OSENKARSKI, individually,            .
        Defendants.                  .
. . . . . . . . . . . . . . . . . .
```

```
                         VOLUME 1
                      Pages 1 to 70


        Deposition of:  JOSEPH L. OSENKARSKI


        Taken by      :  Plaintiff


        Date          :  January 27, 2003, 3:27 p.m.


        Before        :  Emily Clark, RMR, Reporter-Notary


        Place         :  Administrative Offices of
                         Pennsylvania Courts
                         5035 Ritter Road, Suite 700
                         Mechanicsburg, Pennsylvania
```

```
APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
              For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
              For - Defendant Commonwealth of Pennsylvania
                  Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  JAMES K. THOMAS, II, ESQUIRE
              PAUL J. DELLASEGA, ESQUIRE
              For - Defendant Cumberland County
```

Emily R. Clark, RMR
717-233-1744, emily.clarkk@worldnet.att.net

                                                                    2

    1    APPEARANCES (continued):

    2         MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
              BY:  DAVID J. MacMAIN, ESQUIRE
    3              For - Defendant S. Gareth Graham

    4         SWEENEY & SHEEHAN, P.C.
              BY:  PAUL LANCASTER ADAMS, ESQUIRE
    5              For - Defendant Joseph L. Osenkarski

    6
         ALSO PRESENT:
    7
              MS. BARBARA E. VARNER
    8
              MR. S. GARETH GRAHAM
    9
              MS. MELANIE McDONOUGH
   10
              MS. PAT LANE
   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25

3

```
 1                            I N D E X

 2                             WITNESS

 3   Joseph L. Osenkarski                        Examination

 4      By Ms. Wallet                               5

 5

 6

 7
                             EXHIBITS
 8
     (None marked)
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Joseph Osenkarski                                    4

1                    STIPULATION

2              It is hereby stipulated by and between the

3    respective parties that signing, sealing, certification and

4    filing are waived; and that all objections except as to the

5    form of the question are reserved until the time of trial.

6

7              JOSEPH L. OSENKARSKI, called as a witness, being

8    duly sworn, and testified as follows:

9    BY MS. WALLET:

10        Q.    What is your name, sir?

11        A.    Joseph L. Osenkarski.

12        Q.    By whom are you employed?

13        A.    Cumberland County Juvenile Probation.

14        Q.    How long have you been so employed?

15        A.    Today is the anniversary of the first day of my

16   39th year.  I started January 28th, 1965.

17        Q.    Mr. Osenkarski, we have met before.  My name is

18   Debra Wallet.

19        A.    Yes, we met before.

20        Q.    You know that I am here representing Barbara

21   Varner in the action that she has brought against the county

22   and the court and you and Mr. Graham.

23        A.    Yes.

24        Q.    I'm going to ask you a number of questions

25   regarding this case.  Is there any reason why you could not

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                          5


1    answer my questions completely and truthfully today?

2         A.    No.

3         Q.    Are you under any medications that might impact

4    on your ability to either hear or to understand my questions?

5         A.    I'm under blood pressure medication, but it

6    should not, has not affected me in the past.

7         Q.    Do you have a hearing problem, sir?

8         A.    I have a slight hearing problem that I never was

9    treated for, but I received while on basic training at Ft.

10   Knox, Kentucky, in the spring of 1967.  But it does not

11   affect my work.  I do not wear any aids.

12        Q.    If at any time, sir, you do not hear a question

13   that I ask of you or that any of the counsel asks of you, may

14   we agree that you will ask us to repeat it --

15        A.    Yes.

16        Q.    -- before you attempt to answer it?

17        A.    Yes, I will.

18        Q.    If at any time, sir, you do not understand a

19   question that I have asked of you, will you please ask me to

20   rephrase it before you attempt to answer?

21        A.    Yes, I will.

22        Q.    And if at any time you feel you need to consult

23   with your attorney or you need a break, you will tell me

24   that?

25        A.    Yes, I will.

1      Q.      Mr. Osenkarski, when did Barbara Varner first

2    complain to you about the conduct of Mr. Graham?

3      A.      Barbara Varner came to me in early 1997, I'm

4    going to guess February, March.  She came to me on one

5    occasion and complained that -- they were unspecified

6    complaints, about Gary's difference with her about I believe

7    some specific cases.  I'm going to give you a detailed answer

8    because I've thought about this, having heard this the last

9    day and a half.

10      Q.      And when you say the last day and a half, you're

11    speaking of the deposition of Ms. Varner that we have just

12    conducted?

13      A.      Yes.  Yes.  When she came to me, of course, I

14    immediately listened to her.  And I believe I had heard a

15    part of the loud conversation but did not understand that,

16    you know, the content of the conversation.

17             As a new manager, again, just being officially

18    appointed several months before that as chief, my new

19    management philosophy which I was developing told me that it

20    was always best to settle a complaint at the lowest level,

21    damage control, so.  Because I told Mr. Graham I would never

22    interfere with case management, because interfering with case

23    management I felt was wrong, because it was done to me as a

24    supervisor for many years.  Specifically, Mr. Bolze at times

25    interfered with me.

1          I then told her that I would like her to go back

2     to Mr. Graham.  And again, after watching and observing a

3     number of years of a totally close relationship between both

4     Mr. Graham and Ms. Varner, I felt that they're two

5     intelligent people, and both having college degrees, having

6     worked together, again, for several years, I felt that they

7     would be able to solve it, and I told her that.  And I felt

8     that she should go back and try to resolve it, and if she

9     couldn't, to come back to me, and both of them come back to

10    me and then I would be forced to resolve it my way.

11         The conversation was not lengthy, again, because

12    I didn't want to go into -- in detail about the interference

13    part I spoke about earlier.  Then that was the extent of the

14    conversation.  Barbara Varner did not come back to me.

15         And I want to make a comment about that I'm

16    referring to the 18, statement 18 of the Complaint, there's a

17    reference --

18         MR. ADAMS:  Wait till a question is asked.

19         THE WITNESS:  Okay, I'll stop.

20    BY MS. WALLET:

21    Q.    On this occasion in early February or March of

22    1997, what did Ms. Varner say to you at that time?

23    A.    To the best of my knowledge, that she had been

24    having some problems with Gary about some specific cases.

25         And immediately, you know, my red light lit up

Joseph Osenkarski                                        8

1    and I then stopped her and told her that I would feel that

2    the first level of trying to manage this case of defusing

3    would be to have her go back and again try to resolve it with

4    Mr. Graham.

5        Q.    Before you tell me what you said to her, I'd like

6    to hear what she said to you.

7              MR. MacMAIN:  Mr. Osenkarski, keep your voice up

8    just a little bit.  I'm having trouble hearing you down here.

9              THE WITNESS:  All right.  She said that, Barbara

10   said that they had just got done arguing about a case or a

11   couple of specific cases.  And without allowing her to go

12   into detail because it was a case management matter, in my

13   opinion, I stopped her and told her that we would want to try

14   to have this thing resolved between two adults who were very

15   good friends for a long, long time that I had seen many

16   years, and worked together, gone out together, had managed

17   cases together, had trained, Gary had trained her.  And I

18   felt that they were intelligent people and could resolve the

19   issue.

20   BY MS. WALLET:

21       Q.    Okay.  So she said something and then you stopped

22   her?

23       A.    Well, I -- yes, I did.

24       Q.    Do you remember what she said to you?

25       A.    I do not recall.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    9


1      Q.      Did she say something like:  Did you hear that

2    loud voice?

3      A.      I made reference to her saying something to that

4    effect.  I said, I had heard Gary, he was loud.

5      Q.      Was Ms. Varner speaking in a loud voice?

6      A.      No.  Ms. Varner does not have a loud speaking

7    voice.  She has a rather, I would -- if you want to describe

8    speaking voices, Gary is very loud and is at this end of the

9    scale, and Barbara Varner is at the extreme opposite end.

10   But I understood her.

11     Q.      So you were in your office.  Was the door closed?

12     A.      I don't believe the door was closed.

13             MR. THOMAS:  When?

14             MS. WALLET:  At the time of this conversation.

15             THE WITNESS:  At the time of the incident?

16   BY MS. WALLET:

17     Q.      At the time of this conversation.

18     A.      Oh, my door I believe was open.

19     Q.      So you had heard some discussion, you were able

20   to recognize Mr. Graham's loud voice; is that correct?

21             MR. ADAMS:  I'm going to object.  That's already

22   asked and answered, at least this series of what happened.

23   Ms. Varner came to the door or office.  I just don't want you

24   to mischaracterize what's already been testified to.

25             But you may answer.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      10

1              THE WITNESS:  I recognized Mr. Graham's loud

2    voice.

3    BY MS. WALLET:

4         Q.    And this conversation between Mr. Graham and

5    Ms. Varner, was it taking place somewhere outside your office

6    in an open area?

7         A.    I don't know precisely where, but I assumed it

8    was in Mr. Graham's office, where he normally conducted case

9    management issues with all of the probation officers.

10        Q.    And at that time was Mr. Graham's office adjacent

11   to yours?

12        A.    Mr. Graham's office was never adjacent to mine.

13   It was down a hallway and around a corner.

14        Q.    Do you have an assessment as to how far his

15   office was from your office at the time of this conversation?

16        A.    You want my guesstimate of how many feet?

17        Q.    Yes, sir.

18        A.    20.

19        Q.    Did you hear anything that Mr. Graham said prior

20   to Ms. Varner entering your office?

21        A.    No.

22        Q.    So you just heard the voice you identified as

23   his, but were not able to hear the words?

24        A.    I could not discern the words.

25        Q.    Did she say to you at any time during this

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    11


1    conversation:  Mr. Graham uses the F word?

2         A.    I don't recall.

3         Q.    Was she upset when she came to you?

4         A.    She appeared to be distraught.

5         Q.    She clearly came to your office at that time to

6    make a complaint; is that correct?

7              MR. ADAMS:  Objection to form.  Do you know that?

8              THE WITNESS:  She was making in my estimation an

9    unspecified verbal complaint, to which I began to listen.

10   And then upon learning that it was a case management issue,

11   about discussion, disagreement discussions about cases, I did

12   stop it, because I felt that to go any further -- we should

13   go back and try to diffuse the matter at the lowest level

14   possible.

15   BY MS. WALLET:

16        Q.    Did she at that time say something to the effect

17   of:  You have to do something about Gary Graham?

18              MR. ADAMS:  Objection.  He's already answered

19   what she said to him, which as I understand was about cases,

20   and sent her back to Gary Graham to take care of the cases.

21              THE WITNESS:  In so many words, yes.

22   BY MS. WALLET:

23        Q.    In so many words she said to you:  You have to do

24   something about Gary Graham?

25        A.    I don't know if it was those words.  I don't

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          12


  1    recall the exact wording is the safest answer I can give.

  2        Q.      Did she come to your office and tell you about

  3    anything at that time other than her complaint concerning

  4    Gary Graham?

  5        A.      No.

  6        Q.      You sent her away?

  7                MR. ADAMS:  Objection.

  8                MS. WALLET:  What's objectionable about that?

  9                MR. ADAMS:  That's not what he testified to.

 10                MS. WALLET:  I'm asking.

 11                MR. ADAMS:  Sending away sounds very offensive.

 12    It's not appropriate.

 13                THE WITNESS:  I did not dismiss her from my

 14    office.

 15    BY MS. WALLET:

 16        Q.      Did you welcome her to sit down --

 17        A.      She sat down.

 18        Q.      -- in your office?  Did she sit down?

 19        A.      Yes.

 20        Q.      And did you invite her to leave your office?

 21        A.      I listened to her conversation, which was, again,

 22    an undifferentiated verbal complaint about Gary and the

 23    differences they were having about cases, case management.

 24                And again, because I felt that both were very

 25    good friends and co-workers and professional friends, that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    13


1    they could resolve it in my opinion because of their lengthy

2    and I'm saying several-year lengthy professional friendship

3    is the best word.

4         Q.     Did she use the word harassment during that

5    conversation?

6         A.     I do not recall.

7         Q.     Is it possible she used that word?

8         A.     I do not recall.

9         Q.     Do you recall anything else that she said to you

10   at that time?

11        A.     No.

12        Q.     Do you recall anything else that you said to her

13   at that time?

14        A.     I summarized what I said to you earlier about

15   having her attempting to back and to go Gary and to try to

16   resolve it so that the thing would be fixed at the lowest

17   level so that we didn't have to escalate what appeared to be

18   a minor problem, to me at the time.

19        Q.     Why did you conclude it was a minor problem?

20        A.     Well, it was a case-specific situation.  I'm

21   having flashbacks about it in trying to think about one of

22   the cases, but I believe one of the kids was sports oriented

23   and there may have been an issue about whether or not the kid

24   should be considered for placement.  That's the most I can

25   recall about that part of the conversation.

Joseph Osenkarski                                    14


1        Q.      And was that based on what Ms. Varner told you in

2   your office, or based on what you had overheard outside the

3   office?

4        A.      Well, I didn't overhear much, but when Ms. Varner

5   came in the office, that's the conclusion I drew.

6        Q.      How long would you say this conversation lasted?

7        A.      My conversation with Ms. Varner and me?

8        Q.      Yes, sir.

9        A.      Or her and Gary?

10       Q.      No.  The conversation that you had with Ms.

11  Varner.

12       A.      I'm going to guesstimate five minutes.

13       Q.      Can you remember anything else that was said

14  during that five-minute conversation?

15       A.      Well, maybe it's not appropriate to comment, but

16  I want to make a comment, I don't know if I should wait until

17  I --

18              MR. ADAMS:  Just answer the question.

19              THE WITNESS:  Do I remember anything else about

20  the conversation?

21  BY MS. WALLET:

22       Q.      Do you remember anything else that was said

23  either by you or by Ms. Varner during that conversation?

24       A.      No.

25       Q.      In your mind, this was not a significant

1   conversation?

2          MR. ADAMS:  Objection.  Significant?  What do you

3   mean by significant?

4   BY MS. WALLET:

5      Q.     You didn't think it was very important in your

6   role as a supervisor?

7      A.     Any conversation with me in my office under my

8   management, you know, anything is significant.  But the line

9   I'm drawing was the fact that, again, as a new supervisor, as

10  a new manager, I felt that to try to de-escalate this thing

11  at the lowest level was the most significant thing to do,

12  because I felt there was a possibility of it being resolved.

13     Q.     Did you direct Ms. Varner to report back to you

14  whether or not the problem was resolved?

15     A.     I asked Ms. Varner -- I told Ms. Varner, I didn't

16  ask her, I told her that if it couldn't be resolved, that I

17  would want both of them back to me and then we would have to

18  resolve it at my level.

19     Q.     After Ms. Varner left on that day, did you speak

20  to Gary Graham about Ms. Varner's conversation with you?

21     A.     I made a comment to Mr. Graham, I believe, and

22  this is vague, from my recollection, again, this is seven,

23  six years ago, that Ms. Varner had come in to me and had made

24  a complaint and I would prefer that Gary resolve it with

25  Ms. Varner.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          16

1      Q.      Did you suggest to him how he should resolve

2    this?

3      A.      No, I did not.  I assume he understood to have

4    further conversation with her and to work on ways to resolve

5    a case management issue because he had the resolve to do

6    that, that was Mr. Graham's new duty.  We had one supervisor

7    and it was a supervisor's responsibility, and he was that

8    person.

9      Q.      At that time or any other time, did you tell

10   Barbara Varner that you had put in your F-ing 35 years and

11   that now Mr. Graham was in charge?

12     A.      No, I did not say that, because I didn't have 35

13   years in until three years later.  And I know precisely when

14   that was, and that was January 2000.  This was early '97.

15     Q.      How many years did you have in in 1997?

16     A.      32.

17     Q.      If you have 39 now, how many years did you have

18   in 1996?

19     A.      31, as of January 28th, 1996.

20     Q.      Did you at any time use the F word in Ms.

21   Varner's presence?

22     A.      I don't recall, no.

23     Q.      Is that a word that you customarily use in your

24   vocabulary?

25     A.      I have used that word, not with great frequency.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    17

1      Q.      Have you used it directed at any individual,

2   including Ms. Varner?

3      A.      No.

4      Q.      So you never used the F word directed at someone

5   else?

6      A.      Like my, in my work with my co-workers are you

7   asking?

8      Q.      Or your supervisees.

9      A.      No.  I've got an extreme opposite temperament or

10  style, and I treat people and have treated people with

11  dignity, including and especially Barbara Varner from day

12  one, which was many years before she became an employee in

13  the Probation office, the Juvenile Probation Department, or

14  the combined office, I'm sorry.

15     Q.      How would you describe the use of the F word in

16  the Juvenile Probation office?  Was it used frequently, not

17  frequently?

18             MR. ADAMS:  By whom?

19  BY MS. WALLET:

20     Q.      By anyone.

21     A.      Let me generally answer that.  Can I answer that

22  in the context of both Adult and Juvenile?  Or doesn't it --

23  because we were together for more years than we were split.

24     Q.      You may answer it however you wish, sir.

25     A.      Okay.  Let me think about this a minute.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    18


1            We work, I'm talking about Juvenile and Adult

2      Probation, in a very, very unnatural atmosphere, 40 hours a

3      week or 36 to 40 hours a week.  Over the years this

4      environment hasn't changed.  What appears to be natural in a

5      regular office situation is not natural in Juvenile

6      Probation.  Anybody is capable of anything, because we work

7      with a criminal element, a delinquent element, a sick

8      element.  They're in there because they're troubled people

9      and they're not normal.  And it's not unnatural to have

10     conversations that are off-color, sometimes vulgar, sometimes

11     humorous to keep your sanity, but they do touch on other than

12     pleasantries.  And so I'm going to say that it's sometimes or

13     frequently, or it can be frequently but not frequently all

14     the time, it's just a colored separate kind of people we deal

15     with, and I describe it as unnatural.

16            There have been verbal -- there's been verbal

17     violence, there's been physical violence over the years that

18     I've been in that office.  There's been physical violence

19     upstairs in the courtrooms.  Shortly -- well, several years

20     before I got there, a judge was shot, a defendant was killed.

21     Not -- the defendant was arrested and later died in prison.

22     But it's a violent, it can be a violent place, but it can be

23     sometimes normal.

24            MR. ADAMS:  Try to just answer the question.

25     BY MS. WALLET:

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    19


    1        Q.    You cannot always control the conduct of the

    2    clients that come into your office; would you agree?

    3              MR. ADAMS:  Objection.

    4              MS. WALLET:  What's the objection?

    5              MR. ADAMS:  Control the clients that come into

    6    his office would seem to lead to the direction that he's not

    7    doing his job.  I think it's not an appropriate question.

    8              But you can answer.

    9              THE WITNESS:  Our job is to control

   10    uncontrollable people, and we have to try.  Sometimes it's

   11    difficult.

   12    BY MS. WALLET:

   13        Q.    So you may not be able to control the clients,

   14    but you can control your employees, can you not?

   15        A.    Yes.  That's part of our duty.

   16        Q.    As a supervisor, you had both a duty and a

   17    responsibility to control the employees under your

   18    supervision?

   19        A.    The answer is yes.

   20        Q.    Do you believe you did that with regard to Gary

   21    Graham?

   22        A.    I had control of my people.

   23        Q.    Do you believe you did that with regard to Gary

   24    Graham?

   25              MR. ADAMS:  I'm going to object.

1          MS. WALLET:  What's the objection?

2          MR. ADAMS:  Control Gary Graham to?  I'm sorry,

3    the question, can you repeat the question?  Can you repeat

4    the question, please.

5              (Record read.)

6          THE WITNESS:  Yes.

7    BY MS. WALLET:

8      Q.    Do you believe you were capable of controlling

9    Gary Graham as one of your supervised employees?

10     A.    Yes.  Let me give you a but.  Gary Graham is a

11   good, was and is a still a good employee.  He is at times

12   louder than most.  Maybe excitable is a better word.

13   Excitable is a better word.  And his voices elevate with his

14   excitability.  That's my answer.

15     Q.    Did anyone other than Barbara Graham ever

16   complain to you about the conduct of Gary Graham?

17         MR. MacMAIN:  Objection to form.  Are you asking

18   about sexual harassment conduct, or just conduct generally?

19         MS. WALLET:  The word is complaint, any

20   complaint.

21         THE WITNESS:  No formal complaints.  People did

22   say that Gary was loud, louder than most.

23   BY MS. WALLET:

24     Q.    Did you ever at any time tell Mr. Graham that

25   perhaps in a workplace a less-loud tone of voice might be

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                21

1    appropriate?

2         A.      I believe I've told Gary to tone his voice down.

3         Q.      Did any women come to you besides Barbara Varner

4    and complain to you about Gary Graham?

5                 MR. ADAMS:  Objection.  Complain about what?

6    Because the testimony is about cases that were complained

7    about, so what are you talking about specifically?

8                 MS. WALLET:  Complain about anything.

9                 THE WITNESS:  No one ever made any formal

10   complaints about Gary Graham.

11   BY MS. WALLET:

12        Q.      And when you say formal complaint, do you mean

13   some kind of complaint in writing?

14        A.      Complaint in writing, or verbal do something

15   about it.

16        Q.      No other woman ever came to you and made any

17   verbal complaint about Gary Graham?

18        A.      No.

19        Q.      Did any women come to you and complain to you

20   about your treatment of them?

21        A.      Women complaining to me about my treating them --

22        Q.      Correct.

23        A.      -- correctly?  No.

24        Q.      Did Kerry Houser make a complaint to you about

25   her treatment by you?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      22


    1        A.      Kerry Houser in about 1993 gave a one-page

    2    written letter of complaint to me with a copy to Mr. Bolze,

    3    the chief at the time.  Mr. Bolze immediately investigated it

    4    as department head, and gave me a verbal -- a written copy,

    5    handwritten copy, of the results of his investigation, which

    6    determined the complaint was unfounded.

    7        Q.      Based on this one-page written letter, what did

    8    Kerry Houser complain about?

    9        A.      Kerry Houser made a statement that I was

   10    discriminatory with a verbal statement.

   11        Q.      And what was?

   12        A.      Toward her.  Toward her.

   13        Q.      I'm sorry, what was that verbal statement, sir?

   14        A.      I don't know till today because nothing was -- it

   15    was determined that no substantial verbal complaint was made,

   16    which is why Mr. Bolze dismissed it.

   17        Q.      My question, sir, was:  Based on the one-page

   18    written letter that Ms. Houser wrote, what did she complain

   19    about?

   20             MR. ADAMS:  Objection, asked and answered.

   21    BY MS. WALLET:

   22        Q.      Do you know?

   23        A.      No.

   24        Q.      Do you remember the term cunt club?

   25        A.      Do I remember it?

Joseph Osenkarski                                      23


1       Q.      Yes.

2       A.      I've heard that word.  I didn't -- I don't recall

3    making it.

4       Q.      Did Ms. Houser allege that you had made that

5    statement directed at women in the office?

6       A.      She made that statement, but Mr. Bolze did not

7    determine, was unable to substantiate it, which is why he

8    dismissed the action.

9       Q.      Do you agree, sir, that Ms. Houser complained

10   about the language in the office?

11      A.      I don't recall.  I'd have to go back through the

12   documents, which is -- which I'd have to dig up.  I don't

13   have access to right here and now.

14      Q.      Did you ever make the statement in public about

15   the cunt club?

16      A.      I don't recall.

17      Q.      You said she complained about discrimination.

18   Can you remember anything about the nature of her complaint

19   of discrimination?

20      A.      No.

21      Q.      Well, do you remember, sir?

22      A.      It was allegedly my language, but again, nothing

23   was substantiated.

24      Q.      Do you recall whether she complained about the

25   use of the F word?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                        24

1      A.     No.

2      Q.     No, you don't recall?  Or no, she did not

3  complain?

4      A.     I don't recall.  And Ms. Houser herself used

5  off-color language, which I did hear.

6      Q.     Is there anything else about this complaint that

7  was made by Ms. Houser in the one-page letter that you

8  remember?

9      A.     No, except that it was unsubstantiated.

10      Q.     Did you get any letter to you saying that this

11  was unsubstantiated?

12      A.     Yes.

13      Q.     Do you have a copy of that letter?

14             MR. ADAMS:  If you don't, if it's unsubstantiated

15  I don't want anybody to have this.

16             THE WITNESS:  But not -- this is a document of

17  Mr. Bolze stating it is my finding that the utterances --

18             MR. ADAMS:  Let me see it.  Excuse me.

19             MS. WALLET:  We'll take a minute, Mr. Adams.

20  BY MS. WALLET:

21      Q.     But my question was:  Do you have a copy of the

22  written document saying that Ms. Houser's complaint was

23  unsubstantiated?  That's a yes or a no, sir.  Do you have a

24  document?

25      A.     No evidence to support --

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    25


 1              MR. ADAMS:  Then you'll have to answer and say

 2     yes.

 3              THE WITNESS:  Yes.  Yes, I have a document.

 4              MR. THOMAS:  You want to take a minute?  I

 5     thought you said we were going to take a minute.

 6              MR. ADAMS:  I was just looking at what he pulled

 7     out.

 8              MR. THOMAS:  Okay.

 9     BY MS. WALLET:

10         Q.    You have just shown your counsel a document.  Is

11     that the document to which you are referring when you say

12     that you received something that the complaint was

13     unsubstantiated?

14         A.    Yes.

15              MR. ADAMS:  With that in mind, can I take a

16     minute off the record so I can confer with him about this

17     document?

18              MS. WALLET:  Sure.

19              MR. THOMAS:  Why don't we take a restroom break

20     for a minute.

21         (Recess taken from 4:04 until 4:12 p.m.)

22              MS. WALLET:  I believe we were off the record for

23     your counsel to review the document.  Has counsel completed

24     his review?

25              MR. ADAMS:  Yes.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    26


 1   BY MS. WALLET:

 2      Q.     Did you receive any disciplinary action as a

 3   result of the complaint that was made by Kerry Houser?

 4      A.     Mr. Bolze suggested I make an apology in the

 5   choice -- for the choice of words that I used, not in her

 6   presence or in the presence of any other females, but in the

 7   presence of a subordinate male worker.  And without even

 8   asking what the poor choice of words were, I elected to make

 9   a generic apology to Kerry.

10      Q.     What did you apologize to Kerry for?

11      A.     For poor judgment that I used in the choice of

12   words.  And the words were used to, and again, I did not ask

13   what those words were, but made a generic apology just to end

14   the matter.

15      Q.     And at no time you never knew what words

16   Ms. Houser found to be offensive?

17      A.     No.

18      Q.     Did Mr. Bolze or anyone else come to you and say:

19   These are the allegations, what do you have to say about

20   them?

21      A.     I'm not guilty, conduct an investigation.

22      Q.     My question, sir, is:  Did someone come to you

23   and say:  We have these allegations, what's your response to

24   those allegations?

25      A.     I'm not guilty.

 1      Q.    The question, sir, is:  Did someone come to you

 2   and ask you about these allegations?

 3            MR. ADAMS:  Objection.  It's been asked and

 4   answered twice now.

 5   BY MS. WALLET:

 6      Q.    Did someone come to you and ask you about the

 7   allegations?

 8      A.    Mr. Bolze initiated a conversation with me, which

 9   I don't remember anymore.  Again, this is nine years ago.

10   And then he finished his investigation.

11      Q.    And when Mr. Bolze came to you, what did he say

12   to you about this?

13      A.    You're not guilty of harassment, or I find no

14   evidence to support a finding of harassment and/or

15   discrimination.  And I said thank you very much.

16      Q.    So he never asked you what your version was; he

17   just came to you and announced that his conclusion was that

18   it was unfounded?

19      A.    Yes.

20      Q.    And Mr. Bolze said:  I want you to make an

21   apology to someone?

22      A.    He asked me to make an apology to Kerry, to end

23   the matter.

24      Q.    And you never knew what you were being directed

25   to make a apology for?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      28

1       A.      Not specifically.

2       Q.      Did Mr. Bolze or someone else suggest that you

3    take some training in sexual harassment?

4       A.      No.  The -- in consideration for the apology,

5    which she accepted, the matter was ended and we signed off

6    his document.

7       Q.      After that incident, did you voluntarily choose

8    to go to training in sexual harassment?

9       A.      I volunteered to go for sexual harassment

10   training.  And suggested to the county in my corrective

11   action plan that I wrote in 1997 that everyone in the county

12   attend appropriate sexual harassment training.  And that the

13   judge at the time, who was Judge Sheely, agreed with me and

14   told me to set up a department-wide sexual harassment

15   training, which I did, with   Mazzitti and Sullivan, which

16   was a counseling service and still is a counseling service

17   that the county contracts with.  And then followed through

18   with attending, myself and my entire department attending as

19   well as the Adult department.

20      Q.      So in 1997 you recommended that there be sexual

21   harassment training for your employees and yourself?

22      A.      Yes.  And because the county was lacking in

23   providing this service prior to that time, I suggested a

24   countywide formal sexual harassment training so that

25   occurrences, reoccurrences would end.

1      Q.      And prior to October 27, 1997, you had never

2   previously attended any training in sexual harassment?

3      A.      I don't recall any specific entire sessions of

4   attending sexual harassment training.  But since 1997 our

5   entire department I think went to three sessions, '97, '99

6   and 2002.

7      Q.      As a supervisor, sir, do you know what sexual

8   harassment is?

9      A.      Yes.

10     Q.      Tell me what it is.

11             MR. ADAMS:  In your opinion.

12             THE WITNESS:  In my opinion?  It's providing any

13  unwanted verbal, physical, utterances or behaviors that would

14  amount to any form of touching that's unwanted.

15  Additionally, sexual harassment as I learned, you know, must

16  be repetitive and pervasive and must create an intolerable

17  work environment.

18  BY MS. WALLET:

19     Q.      Anything else?

20     A.      That's it in a nutshell.

21     Q.      And did you come by this information as a result

22  of the sexual harassment training you received in October of

23  '97?

24     A.      Yes, and '99 and 2002, as well as self study.

25             Again, immediately after this action was first

Joseph Osenkarski                                      30

1    filed in '97, I took it upon myself to go to a friend who was

2    a person who worked in that capacity on the federal level,

3    and took instruction from her so that I could write a

4    corrective action plan and try to digest what I could for the

5    good of the department.

6        Q.     So by 1997 you thought you had a pretty good

7    handle on what constituted sexual harassment?

8        A.     That's when I first went to the federal person as

9    well as made recommendations to set up the training.  And

10   then set it up.

11       Q.     Prior to October of 1997 did you have any

12   knowledge of sexual harassment?

13       A.     Just what I read in the newspapers about what was

14   happening.  It was a new topic, so to speak.

15       Q.     Were you aware of any policies about sexual

16   harassment that were applicable to you?

17       A.     Not specifically.

18       Q.     Were you aware of any policies that you thought

19   were applicable to you prior to October of 1997?

20              MR. ADAMS:  Objection.  What do you mean by you?

21   Can you explain what you mean by you?  Is it Osenkarski the

22   manager?  What do you mean by you?  Can you explain that,

23   please?

24   BY MS. WALLET:

25       Q.     You as an employee of the Juvenile Probation

Joseph Osenkarski                                    31

1    office.

2         A.      Well, I knew as my responsibility as a manager

3    that if any complaints were made, it was one of my

4    responsibilities to follow through and try to prevent the

5    occurrence, the reoccurrence.

6         Q.      Were you subject to any of the policies that were

7    applicable to county employees?

8         A.      Everyone, manager or line person, is subject to

9    following policy.

10        Q.      You were an employee of the county as well as an

11   employee of the court system?

12        A.      I am an at-will employee of the court system as

13   has been explained to me by the Juvenile Court Judges

14   Commission.  However, the county pays our salary, which comes

15   from federal, state and local tax monies.

16        Q.      Do you get a badge issued to you by the county?

17        A.      It's issued ultimately by the court.

18        Q.      Do you get copies of employee handbooks issued by

19   the county?

20        A.      Yes.

21        Q.      Did you consider yourself to be subject to those

22   county policies and procedures?

23        A.      Yes.

24        Q.      Do you know, sir, whether the county policies and

25   procedures have had any reference to sexual harassment since

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                           32


1    1990?

2        A.      In my estimation the county was lacking in

3    specific procedures, which is why I recommended in my

4    corrective action plan to institute formal training and

5    formal, more formal procedures.

6        Q.      Were you aware prior to, let's say, 1996, what

7    procedure would be used by an employee if she or he felt a

8    victim of sexual harassment?

9        A.      The person who felt they were a victim should go

10   to their supervisor and report the incident.

11       Q.      And what if that didn't work?

12       A.      Then the employee -- now the policy is since the

13   training we received was to go to the next level of

14   supervision, and ultimately to Human Resources, which is a

15   current policy since the last sexual harassment training I

16   believe in either '98 or 2002, I'm not sure.  I'd have to

17   look at paperwork.

18       Q.      So you think this policy you just recited for me

19   is new as of 1997?

20       A.      Yeah.  Yes.

21       Q.      And prior to that, what did you think the policy

22   was?

23       A.      Just generally speaking, as a manager or

24   supervisor, common sense would say you accept the complaint

25   and try to resolve the problem.

     1            MR. THOMAS:  I'm not sure whether the answer was

     2    responsive to the question.

     3            MR. ADAMS:  Can you repeat the question, please.

     4            (Read record.)

     5    BY MS. WALLET:

     6       Q.    Would you like to elaborate on your answer, sir?

     7       A.    Well, receive the complaint, review the

     8    complaint, to take appropriate action.

     9       Q.    I believe my question, sir, is:  What was the

    10    policy if an individual was complaining about sexual

    11    harassment?  What procedure would that person use?

    12       A.    It would depend on the specific complaint, but

    13    the procedure would be to respond to the complaint and

    14    attempt to resolve it.

    15       Q.    Do you know what the procedure was prior to 1997

    16    for someone wanting to complain about sexual harassment?

    17       A.    Just to make an attempt to resolve it.

    18       Q.    So you don't know what the policy was?

    19       A.    I really -- I'm not sure of a specific policy.

    20       Q.    Do you even know if there was a specific policy

    21    prior to 1997?

    22       A.    I don't recall, you know, if there was.

    23       Q.    When Barbara Varner came to you and made her

    24    complaint in February or March, did you refer her anywhere

    25    else to make her complaint to someone above you?

Joseph Osenkarski                                        34


    1            MR. ADAMS:  Complaint about cases?

    2            MS. WALLET:  Complaint about anything.

    3            THE WITNESS:  No.

    4    BY MS. WALLET:

    5        Q.     Did you at any time ever tell Barbara Varner if

    6    she had a complaint that she thought had not been resolved by

    7    you, that she should take that complaint somewhere else?

    8            MR. ADAMS:  Objection.  What kind of complaint?

    9    Again --

   10            MS. WALLET:  Any kind of complaint.

   11            THE WITNESS:  I did not specifically advise her

   12    to do that.  I did advise her to come back to me if it was

   13    unresolved after making attempts.

   14    BY MS. WALLET:

   15        Q.     She comes to you, we have the conversation you

   16    described a little bit earlier.  You believe you spoke to

   17    Ms. Varner shortly thereafter?

   18        A.     I believe I did.

   19        Q.     And what do you recall telling Ms. Varner?

   20        A.     Specifically that Ms. Varner was complaining

   21    about some differences they were having and used a loud

   22    voice.

   23        Q.     I'm sorry, she used a loud voice?

   24        A.     Oh.  No.  That he used a loud voice.

   25        Q.     Did you tell him anything else?

Joseph Osenkarski                                    35


1          A.      I don't specifically remember the entire context

2      of that conversation, but I'm sure I stated that he should

3      attempt to resolve it, because it was not to go on.

4          Q.      He should resolve it?

5          A.      Yes, as a supervisor.

6          Q.      Did you tell him that if he didn't resolve it,

7      you would?

8          A.      I told both of them to come back to me and we

9      would have to look further into the matter for resolution.

10         Q.      Now, in April you became aware, did you not, that

11     Ms. Varner had gone to the Human Resources Department for the

12     county and made complaints about her employment?

13         A.      Yes, I was told that.

14         Q.      And who told you that, sir?

15         A.      I was called into the Commissioners' office and

16     told about the complaint by David Deluce, who did not go into

17     specifics, and stated that he wanted to defuse the matter,

18     and further stated that I was not a defendant at that time.

19         Q.      Okay.  So Mr. Deluce calls you into the

20     Commissioners' office.  Were you told in advance of that

21     meeting that Mr. Deluce wanted to see you?

22         A.      I believe the time frame was him advising me and

23     then immediately telling me that he wanted to discuss the

24     matter with me and several others.

25         Q.      Was that a no, you weren't told in advance that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    36


1    he wanted to meet with you?

2              MR. THOMAS:  Let me interpose an objection.  I'll

3    let you explore this area in general, Deb, but Mr. Deluce was

4    hired as a lawyer on behalf of the county, and I'm not going

5    to permit this witness to divulge conversations that he may

6    have had with Mr. Deluce, based on the attorney-client

7    privilege.

8              If you want to explore the area, the fact that

9    the investigation occurred, I'll let you explore those areas,

10   but I cannot permit this witness to testify as to

11   conversations between himself and Mr. Deluce.

12   BY MS. WALLET:

13       Q.    I'm still not sure I got an answer to my last

14   question, sir.  Were you told in advance that Mr. Deluce

15   wanted to meet with you?

16       A.    When you say advance, what do you mean?

17       Q.    Well, did someone call you and say:  Meet with

18   Dave Deluce at four o'clock tomorrow?  Or did you get a memo

19   that said:  Meet with Mr. Deluce at four o'clock tomorrow?

20       A.    I don't recall if it was verbal, a phone call or

21   memo.

22       Q.    But someone did tell you in advance of this

23   meeting?

24       A.    Yes.  Who that someone was, I don't know.

25       Q.    Did that someone tell you what the purpose of

1    this meeting was?

2         A.       That there was a complaint filed against Gary

3    Graham.

4         Q.       Were you told that there was an investigation of

5    this complaint?

6         A.       Without going into detail, Dave Deluce said he

7    was investigating the complaint.  And I asked him for a copy

8    of it and he wouldn't give it to me.

9         Q.       Did Mr. Deluce ask you for your response to some

10   allegation?

11        A.       No, not the first time he talked to me.

12        Q.       Do you believe at that time that when Mr. Deluce

13   met with you that he was investigating a complaint?

14        A.       I believe he was investigating a complaint

15   against Gary Graham, and I believe that he was attempting to

16   defuse more than investigate because those were his words.

17             MR. THOMAS:  Please, Mr. Osenkarski, do not offer

18   testimony with respect to anything that Mr. Deluce said to

19   you.

20   BY MS. WALLET:

21        Q.       How many times did you meet with Mr. Deluce?

22        A.       Two.

23        Q.       Did he ask you for any documents or anything else

24   in writing?

25        A.       No.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    38

1        Q.      Did you give him any documents or anything else

2    in writing?

3        A.      No.  He had the documents.

4        Q.      Do you know whether the two times that you met

5    with Mr. Deluce were in short succession or a long time went

6    between the two meetings?

7        A.      I would say short succession, but I don't

8    specifically recall.

9        Q.      Not the same day but a couple of days in between?

10       A.      At least.

11       Q.      As much as a week?

12       A.      Perhaps.

13       Q.      Did you ever hear anything about the result of

14   this meeting with Mr. Deluce?

15               MR. THOMAS:  Objection.

16               MR. ADAMS:  From anyone.

17               MR. THOMAS:  I'll permit him to respond to the

18   extent the information may have come from someone other than

19   Mr. Deluce.

20               THE WITNESS:  Only rumor.

21   BY MS. WALLET:

22       Q.      Did you ever see a report of an investigation of

23   the complaints made by Barbara Varner?

24       A.      No.

25       Q.      Not even till today?

Joseph Osenkarski                                    39


```
 1      A.      Only recently in the last several months.

 2      Q.      And in the last several months you did see a

 3 document that purported to be an investigative report?

 4      A.      Yes.

 5              MR. ADAMS:  Do you understand her question?

 6              THE WITNESS:  Perhaps you can --

 7              MR. ADAMS:  I think he's confusing that with the

 8 Complaint, honestly.

 9              THE WITNESS:  The Complaint is what I --

10              MR. ADAMS:  I thought so.  She's not referring to

11 the Complaint.  Listen very carefully to what she's asking

12 you.  She's talking about the investigation by Mr. Deluce,

13 okay?  So she's not talking about the Complaint.

14              THE WITNESS:  All right.

15              MR. ADAMS:  Not at all.  Okay?  You understand?

16              THE WITNESS:  Now I do.

17              MR. ADAMS:  Okay.

18 BY MS. WALLET:

19      Q.      Up until today, have you seen any document that

20 purports to be an investigation of Ms. Varner's allegations?

21      A.      No.

22      Q.      Sir, what did you do to prepare for today's

23 deposition?

24      A.      I refreshed myself to the best of my ability

25 mentally over what transpired or I thought transpired the
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    40

1    last seven years or six.

2        Q.    How did you do that, sir?

3        A.    I spent time alone and thought about it.

4        Q.    Did you review any documents?

5        A.    Some.  Some things that I had, again, with regard

6    to Kerry's investigation.

7        Q.    What else did you review?

8        A.    And had -- went over verbally what I thought my

9    current management team could remember of the -- of the last

10   several years.

11       Q.    You talked to your current management team?

12       A.    Briefly.

13       Q.    Who did you speak with?

14       A.    Sam Miller.  Dennis Drachbar.  I'm sorry, yes,

15   Dennis Drachbar.  Tom Boyer.  And Hank Thielemann, which is

16   the three supervisors and the one PO-II.

17       Q.    Did you ask them for some information that would

18   help you prepare for today?

19       A.    We had general discussions.  I don't recall

20   asking them for any specifics.

21       Q.    Well, did you say to them:  I'm going to be

22   deposed in the Varner matter, can you help me?

23       A.    They were aware of the deposition that was

24   upcoming.

25       Q.    Why would you go to these people?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                        41

1        A.      Because they were managers at the time and knew

2    of the complaint that was made against Gary Graham and

3    myself.

4        Q.      Well, did you go to them because you thought they

5    would have some information that would help you to remember

6    what happened?

7        A.      There were many events over the years I became

8    rusty to mentally, and I may have asked the questions to

9    refresh my memory.  Specifically I don't recall --

10       Q.      Well, I asked you, sir, what did you do in

11   preparation for today's deposition, and you said you spoke

12   with your current management team.  Why did you think that

13   would prepare you for today's deposition?

14       A.      Because I don't remember a hundred percent of the

15   details that occurred in the last six to seven years.  And I

16   went over the Complaint itself.

17       Q.      So did you meet with Miller, Drachbar, Boyer and

18   Thielemann all at one time or separately?

19       A.      I didn't have any formal meetings with them at

20   one time.  I may have asked them or asked questions about

21   things that I may have gotten foggy on.

22       Q.      Well, what did you ask them?

23       A.      I don't remember specifically.

24       Q.      What did you ask Mr. Miller?

25               MR. ADAMS:  Objection, asked and answered.

1              MS. WALLET:  I don't believe so.

2              THE WITNESS:  Was Gary loud, did you feel Gary

3    was loud.

4    BY MS. WALLET:

5         Q.     And why did you think that would help you to

6    prepare for today?

7         A.     Well, I wanted opinions.

8         Q.     And why did you think their opinions would help

9    you in preparation for today?

10        A.     Because they worked there during the time that

11   the complaints, complaint was made.

12        Q.     What did you ask Dennis Drachbar?

13        A.     Nothing.  Nothing specific.  Questions, you know,

14   along the same lines, you know.

15        Q.     Did you ask him if he thought Gary was loud?

16        A.     Yes.

17        Q.     Did you ask him anything else?

18        A.     Not specifically.

19        Q.     Did you meet with these individual individually

20   or all together?

21        A.     As I said, they were just brief encounters, brief

22   questions, individually.

23        Q.     Why did you think that speaking the Tom Boyer

24   would help you in preparation for your deposition today?

25        A.     He was a manager at the time, you know, we split.

Joseph Osenkarski                                    43


 1   And we were involved in many things, reorganizing an entire

 2   department.  Our heads were spinning.  We had to create a new

 3   department, understaffed, underprogrammed, department.

 4        Q.     I'm sorry, sir, I'm going to stop you because

 5   that didn't have anything to do with my question.  I asked

 6   you why would you speak to Mr. Boyer, what information did

 7   you think Mr. Boyer might have that would help you to prepare

 8   for your deposition today?

 9        A.     I don't know specifically.  I just felt that

10   because they were young managers at the time, anything that I

11   could mentally grasp I wanted to have some knowledge of.

12        Q.     What did you ask Mr. Boyer to tell you that would

13   help you in preparation for your deposition today?

14        A.     They may not have been specific questions about

15   Gary Graham.  It was about the department, about how we were

16   focused on big-ticket items.  I felt that it was all

17   intermeshed.  We were very busy, we were brand new, and

18   anything to refresh me I felt was important.

19        Q.     Did you call Mr. Boyer into your office to talk

20   with him about this?

21        A.     I've had Mr. Boyer in my office and I've been in

22   Mr. Boyer's office and we've discussed many things, other

23   than this specifically.

24        Q.     I'm limiting my question, sir, to what you did to

25   prepare for the deposition today.  Do you understand that?

```
 1              MR. ADAMS:  Think about what she's asking you.

 2   What did you do to prepare for today for your testimony?

 3   What have you done?

 4              THE WITNESS:  I read the Complaint.

 5              MR. ADAMS:  Okay.

 6              THE WITNESS:  And the wrote notes.  And that's,

 7   you know, the most specific thing I could tell you.

 8   BY MS. WALLET:

 9       Q.     And you said you spoke with your current

10   management team, Mr. Miller --

11       A.     Briefly, yes.

12       Q.     -- Mr. Drachbar, Mr. Boyer, Mr. Thielemann,

13   correct?

14       A.     Briefly.  Yes, briefly.

15       Q.     And did you call Mr. Boyer into your office and

16   say:  I have a deposition, I want you to help me?

17       A.     I advised him that I had a deposition and I

18   wanted to be clear about how busy we were doing this, you

19   know, the beginning of our new department.  And I wanted him

20   to, you know, to reaffirm that we were, you know, that we

21   were very busy, that I was having him focus on certain

22   things.

23              I think the most important thing I asked

24   Mr. Boyer was his recollection of the seniority issue,

25   because I delegated him to study the changes we made when we
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      45

1   made them, which was one of the first tasks we did as a new

2   department, trying to fix the seniority system, which a lot

3   of people felt was unjust and unfair.

4       Q.     Did Mr. Boyer provide any other information to

5   you in response to your request that he help you to prepare

6   for this deposition?

7       A.     Well, we geared it toward, you know, the

8   seniority issue because he was primarily involved in that and

9   was well versed on that topic.

10      Q.     Okay.  And did he give you something that would

11  help you on the seniority issue?

12      A.     He cleared up in my mind the time frames when we

13  began to look into it.  And it was right after we split with

14  the Adult division.  And he basically said that he would be

15  prepared to give testimony if necessary about the seniority

16  issue.

17      Q.     And what did you ask Mr. Thielemann?  Is it

18  Thielemann or Tieleman?

19      A.     Thielemann.

20      Q.     Thielemann with a T-H.  What did you ask him to

21  help you with in preparation for this deposition?

22      A.     I asked him I believe one specific question, and

23  that was was he ever in the presence of Gary when Gary and

24  Barb were together discussing anything of an importance that

25  had anything to do with this Complaint.

1       Q.      And what did he tell you?

2       A.      He said that he was in the presence of Mr. Graham

3   when they there were discussing discussions with Ms. Varner,

4   but he didn't give me any specific -- anything specific.

5       Q.      Did you ask Mr. Thielemann if he thought Gary was

6   loud?

7       A.      I don't recall that I, whether I asked him that

8   or not.

9       Q.      Did you ask any of these people what they

10  intended to testify to?

11      A.      Only Tom Boyer, because I felt he would be in a

12  position to clarify the seniority issue if it needed

13  clarification.

14      Q.      So you never asked Mr. Miller what he might be

15  able to give by way of testimony?

16      A.      I don't recall anything specific.

17      Q.      Did you ask Mr. Drachbar if he would have

18  something that he could give by way of testimony?

19      A.      No.

20      Q.      How about Mr. Thielemann?

21      A.      Nothing of any significance.

22      Q.      Did you meet with anyone else by way of

23  preparation for your testimony today?

24      A.      No.

25      Q.      Did you meet with your counsel?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    47


1      A.      Oh.  I'm sorry.  Except Mr. Adams.

2      Q.      Did you meet with anyone else?

3      A.      And conversation with Barbara O'Connell over the

4   phone when I couldn't get ahold of --

5              MR. ADAMS:  For the record, that's my colleague.

6   BY MS. WALLET:

7      Q.      Mr. Osenkarski, has the county provided you with

8   an attorney to defend you in this matter?

9      A.      Mr. Adams and Barbara O'Connell.

10     Q.      And you are not required to pay the fees for

11  these individuals; they are provided for you?

12     A.      Yes.

13     Q.      And is it your understanding that it is the

14  county or the county's insurance company that is providing

15  this counsel to you?

16     A.      Yes, St. Paul.

17     Q.      Have you met with any of the other counsel who

18  are present here today in preparation for your deposition?

19     A.      Not in preparation, but we have had lunch with

20  Mr. MacMain.

21     Q.      Lunch today or yesterday?

22     A.      Yesterday and today.

23     Q.      Some previous occasion?

24     A.      No.

25     Q.      We're still talking about what you did to prepare

1    for today.  You looked through some stuff that you had, you

2    talked to your current management team, you spoke to your

3    attorney.  Anything else by way of preparation for your

4    deposition today?

5         A.     No.

6         Q.     Let's talk about the organization of the Juvenile

7    Probation office.  You are the chief of the Juvenile

8    Probation, is it a section or an office?

9         A.     We call it a department.

10        Q.     Department, okay.  How many individuals report to

11   you presently?

12        A.     I am the department head, so four support staff

13   and 21 probation staff.

14        Q.     Are all of the 21 probation staff probation

15   officers?

16        A.     Yes.

17        Q.     And your office is located where?

18        A.     In the third floor of the new courthouse,

19   primarily.  But there is a division in the courthouse, in the

20   Bixler annex it's called, where we have four or five, six

21   offices.

22        Q.     And what are your hours of work, sir?

23        A.     8:00 to 4:30.

24        Q.     Would you agree that you spend much of your time

25   outside the offices in the new courthouse?

```
 1       A.      I do not spend much of my time outside of the
 2  offices of the courthouse.
 3       Q.      How much of your time would you say you spend in
 4  the Probation offices?
 5       A.      60 percent.  60/40.  40 out, 60 in.
 6       Q.      And when you're in the 40 out, what are you
 7  doing?
 8       A.      I could be in an office to provide services,
 9  support services to our office.  I could be with the Juvenile
10  Court Judges Commission in either Shippensburg or Harrisburg.
11  I could be in an institution, an institution review.  That's
12  the bulk of the time, meetings in other offices.
13       Q.      Do you carry a cell phone, sir?
14       A.      I carry a cell phone in the automobile, yes.
15       Q.      Did you hear testimony from Ms. Varner earlier
16  today or yesterday, I'm not sure when, that primarily the
17  secretaries in your office reach you by cell phone at home?
18       A.      No.  That's -- I am not reached primarily at
19  home.
20       Q.      How much of the time do you spend working at
21  home?
22       A.      10, 15 percent.
23       Q.      And what do you do at home?
24       A.      Read the multitude of documents that are passed
25  to me, which I must review and react to.
```

Joseph Osenkarski                                          50

     1     Q.     Mr. Osenkarski, do you make a distinction among

     2  the employees reporting to you based on their gender?

     3     A.     No.

     4     Q.     Are you responsible for giving assignments to the

     5  probation officers?

     6     A.     No.  The supervisory staff, and there are three

     7  of them, distribute work assignments.

     8     Q.     Is there any consideration given to the gender of

     9  either the client to be served or the gender of the probation

    10  officer?

    11     A.     A probation officer can serve either male or

    12  female, and that's determined by the supervisor.  Currently,

    13  that particular supervisor is Sam Miller.

    14     Q.     When you say that particular supervisor, what --

    15     A.     We have three supervisors, and the supervisory

    16  work is delegated, split up between the three of them.

    17     Q.     Are you saying that only Mr. Miller has female

    18  probation officers?

    19     A.     No.  Any of the three supervisors can supervise

    20  either the male or female, and do so.  For example, Mr. Boyer

    21  handles all close-outs for male or female probation officers.

    22  He's, Mr. Miller assigns all cases that come in the door for

    23  processing, and they can be assigned to male or female

    24  probation officers.

    25     Q.     Do you have any policies within the Juvenile

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                              51

1    Probation Office regarding the assignment of cases either

2    based on the gender of the client or the gender of the

3    probation officer?

4        A.    No.  We -- the only instruction I have given my

5    supervisory staff is that the distribution should be equal so

6    that there's a fair amount of work done by all officers.

7        Q.    Do you make any effort to determine whether or

8    not the distribution of the work is equal?

9            MR. ADAMS:  Is that currently --

10           MS. WALLET:  Currently.

11           MR. ADAMS:  -- or in general?  Okay.

12           THE WITNESS:  When the Department was new and the

13   supervisors were new, I would always tell, for example, with

14   Gary Graham was a supervisor, I would tell him to document

15   the distribution of work and make sure that it was equal.

16   BY MS. WALLET:

17       Q.    And when you say equal, equal in numbers?

18       A.    Equally distributed so that no one is overwhelmed

19   and another probation officer is underworked.  After a while

20   you develop this expertise, because I was a supervisor myself

21   for a number of years and you grow with it.

22       Q.    What effort, sir, if any, do you make to

23   determine whether or not your direct reports are making an

24   equal distribution of the work?

25       A.    I rely on my supervisors.  But I -- if there was

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                              52

1    a complaint made I would immediately investigate it.  But

2    there haven't been any complaints.

3         Q.      No one has ever complained to you that they

4    thought the distribution of the work was unequal?

5         A.      No, because I -- it was important to me as a new

6    department manager that this issue was taken, the supervisor

7    took a very careful look at it, because, you know, unequal

8    distribution of work could result in morale problems.

9         Q.      Did you ever use the term jeehoobees in response

10   or in reference to a female breast?

11        A.      I don't recall.

12        Q.      You just don't recall?

13        A.      I don't recall.  I may have made that comment

14   sometime in my life, but not directed at any specific person

15   in the probation setting.

16        Q.      Did you ever tell any female probation officer

17   that hysterectomies ruin women?

18        A.      No, I did not.  And I will tell you that I would

19   not do that.

20        Q.      Did you ever tell two relatively new female

21   probation officers that they were going to have to dance on

22   the tables at their first staff meeting?

23        A.      I recall on two occasions, and it was non-gender-

24   specific, I believe I had a staff meeting that I came across

25   my notes by accident, because I keep a staff meeting file,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    53

1    and I made that statement, a purely innocent statement to

2    elicit humor, to use Mr. Jim Thomas's perfect words

3    yesterday, in jest.  Yes, I did, twice.  And I believe the

4    one time it was toward perhaps Jill Grim-Rhoads and Gail

5    Schuhart, and then at another occasion to three male

6    probation officers who were new at the time.

7        Q.    So you said you came across your notes.

8        A.    I wrote a note in my, just -- I have a file for

9    everything, and my staff meeting file I for some reason put a

10   small notation about that, about the statement of dancing on

11   tables.  I think that reference was to, again, three at the

12   time new school-based, male school-based probation officers.

13       Q.    So you have a note in your file and it has the

14   words written on it:  Dancing on tables?

15       A.    Yeah.

16       Q.    And you wrote that after the staff meeting or

17   before the staff meeting?

18       A.    I don't recall.  But it was, it was a -- I do

19   want to state it was a purely innocent comment, non-gender

20   specific.  But it just happened to be I think one time two

21   female probation officers and another time three male

22   probation officers.

23       Q.    So you have notes dancing on tables on two

24   occasions in your file?

25       A.    No.  Just the one time.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                          54

 1      Q.      Okay. Do you remember what staff meeting this

 2   was?

 3      A.      No.  It was in the fall, I believe.

 4      Q.      Was it your entire staff, the 21 probation

 5   officers and your support staff?

 6      A.      Not support staff but the professional staff,

 7   probation officers.

 8      Q.      And where was this meeting held?

 9      A.      I believe it was held in the, where they normally

10   are, in the Commissioners' hearing room on the second floor

11   of the new courthouse.

12      Q.      And tell me what you said to your staff about

13   dancing on tables.

14      A.      I said it's tradition that new staff have to

15   dance on the tables after the meeting was over.

16      Q.      Was that a tradition?

17      A.      No.  It was a comment that was innocent and it

18   was made in jest, the best words I can use the describe it.

19   And it was not carried out.  And I tried to -- it just seemed

20   to be a comment that I thought could elicit some humor.

21      Q.      Did you say anything else at that staff meeting

22   that you thought would elicit humor?  Sir, if you would let

23   me finish my question so you can answer my full question.

24              Did you say anything else at that staff meeting

25   that you thought would elicit a little humor?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                              55

1        A.      No.

2        Q.      Just the dance-on-tables reference?

3        A.      A reference to that.

4        Q.      And did you say this dance on tables on the

5    occasion when the new staff members were female?

6        A.      I recall that one occasion the new members were

7    males and on another occasion the new members were females.

8        Q.      Why did you think this was humorous?

9        A.      I don't know, but I thought it was.

10       Q.      What was the reaction from your staff when you

11   made this statement?

12       A.      There were smiles and a couple of chuckles.

13       Q.      What was the reaction from the new female intern?

14       A.      New female intern?  Or new female regular line

15   probation officers?

16       Q.      Well, I guess the word intern isn't correct.  The

17   new female officers.

18       A.      The same, smile and a chuckle.  That was not made

19   at a staff meeting.  I vaguely recall it was made while we

20   were having some down time in the front office.

21       Q.      So you made the note in your staff meeting file,

22   but the reference was not made at a staff meeting?

23       A.      It was one reference to I believe males at the

24   staff meeting.  And then during down time in the front office

25   setting, not staff meeting setting, I recall that I made a

1    second comment of the same type.

2        Q.    Are you married, sir?

3        A.    I'm divorced.

4        Q.    How long have you been divorced?

5        A.    Since 1986, I believe.

6        Q.    Have you dated since 1986?

7        A.    Occasionally.

8        Q.    Did you ever date anyone who was employed by the

9    county?

10       A.    Nothing serious.

11       Q.    Is that a yes?

12       A.    I had friend but I wouldn't call them having

13   dates.

14       Q.    Did you ever have dates with any woman employed

15   by the county?

16       A.    Not formal dates.

17       Q.    You went out somewhere with a woman employed by

18   the county?

19       A.    I've had conversations with women, but not formal

20   dates.  I don't understand what you would be getting at here,

21   my personal life.  Is it appropriate?

22             MR. ADAMS:  They can ask.

23   BY MS. WALLET:

24       Q.    Unfortunately, the way this works, sir, is I get

25   to ask the questions, you have to answer them.

Joseph Osenkarski                                    57


1              Did you ever talk to your staff, I'm speaking now

2    of the probation officers, about your girlfriends?

3        A.    Nothing of any significance.

4        Q.    Well, did you ever tell them:  I had a date last

5    night?

6        A.    I rarely talk about my personal life to my staff

7    because I've always felt that when you get into personal

8    issues it's just, it's not good business.

9        Q.    Did you ever talk about your personal life to

10   your staff?

11       A.    I may have.  I've talked about my ex-wife to my

12   staff, in an informational session.

13       Q.    Did you ever talk about your sex life to your

14   staff?

15       A.    I recall a conversation that I had with one of

16   our current staff.

17       Q.    Who was that?

18       A.    Gail Schuhart, I believe.  And it was basically a

19   conversation, a sad conversation, about my wife, who had a

20   hysterectomy.  And it was a just a general conversation,

21   non-derogatory.

22       Q.    What prompted you to bring up the subject of

23   your --

24       A.    I don't know how it was brought up or was I

25   asked.  It was an informational session about the sad ending

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                     58

1    to my marriage, which I still feel badly about.

2         Q.    Well, did you tell Ms. Schuhart that this

3    hysterectomy had something to do with the ending of your

4    marriage?

5         A.    In my opinion, it -- yes.  And in summary form, I

6    sadly told her a story about how my wife, who I loved very

7    dearly, ended a marriage because she became very unhappy

8    after being married 20 years and being a happy-go-lucky

9    woman, that became very unhappy after the unfortunate

10   operation, a radical hysterectomy and ovary removal.  Sorry.

11   I'm breaking up because I still feel very sad about it.

12        Q.    Do you need a minute, sir?

13        A.    I'll be all right.

14        Q.    Can you tell me, sir, what would have prompted

15   you to tell one of the probation officers under your

16   supervision about your ex-wife's hysterectomy?

17        A.    I don't know how the subject came up, but

18   perhaps, and I'm not sure, maybe I was asked.  I don't know.

19   I don't normally talk about my private life.  And again, it

20   was not a -- it was not made in a derogatory manner.  I still

21   respect my ex-wife and my family, but I'm sad that I don't

22   have them anymore.

23        Q.    Did you say something to the effect that it

24   ruined her?

25        A.    No, I did not.  I said unfortunately, and I was

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    59

1    very professional about what I said because I still respect

2    my wife, it's something that happened, that perhaps by going

3    to another surgeon, another expert, maybe it could have been

4    prevented.

5         Q.     Did you know that Barbara Varner had had a

6    hysterectomy --

7         A.     No, I did not.  As a matter of fact, I noted in

8    my mind, my head yesterday, that she was supposedly had an

9    operation and a medical note was given to Sam Miller.  It was

10   during the Thanksgiving vacation, and I'm normally out of the

11   office and have been for the last 38 years during that time

12   period because I'm a very avid deer hunter.  I take at least

13   a week to two weeks off.  And I don't ever recall of an

14   excuse that Sam Miller got.  And if he got it, I don't

15   remember it.

16        Q.     I believe the testimony, sir, was that Ms. Varner

17   gave you the medical excuse.

18        A.     I don't recall getting the medical excuse.

19        Q.     Do you agree that for absences after so many

20   number of days, an employee is required to submit a medical

21   excuse?

22        A.     Yes.  But I did not know Barbara Varner had a

23   hysterectomy.  It was none of my business.

24        Q.     Are you aware that there are requirements that

25   the medical excuse give the reason for the absence?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      60


    1        A.      I realize it's procedure, but I do not recall

    2    this specific situation.

    3        Q.      Did you ever make any comments in front of the

    4    probation officers about your girlfriend's genitals?

    5        A.      I do not recall.

    6        Q.      You didn't?  Or you don't recall?

    7        A.      I don't recall.

    8        Q.      Is it possible you made that statement?

    9                MR. ADAMS:  Objection, asked and answered.

   10                THE WITNESS:  I don't recall.

   11                MR. ADAMS:  The answer is I don't recall.

   12    BY MS. WALLET:

   13        Q.      Did you ever talk in front of probation officers

   14    about using vegetables when you had sex?

   15        A.      No, I don't recall.

   16        Q.      Did you ever talk about vegetables in relation to

   17    sex in front of --

   18                MR. ADAMS:  Objection, asked and answered.

   19    BY MS. WALLET:

   20        Q.      -- in front of any of your probation officers?

   21        A.      I don't recall.

   22        Q.      Mr. Osenkarski, that's a pretty unusual topic.

   23    Are you saying you just don't remember that?

   24                MR. ADAMS:  Objection.  The question's been asked

   25    and Mr. Osenkarski has answered it.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                61

1    BY MS. WALLET:

2         Q.    If someone were to say you made reference to

3    vegetables and sex, would that person be lying?

4                MR. THOMAS:  Objection.

5                MR. ADAMS:  Objection.

6                THE WITNESS:  I don't recall.

7    BY MS. WALLET:

8         Q.    Have you ever been disciplined in your position,

9    sir?

10               MR. ADAMS:  What kind of discipline are you

11   referring to?

12   BY MS. WALLET:

13        Q.    Have you ever been reprimanded in your 39 years

14   of employment?

15        A.    I was given a letter of reprimand after I

16   returned from Houston, Texas, in early April of last year,

17   2002.  It was my first and only reprimand, that I felt I was

18   unfairly given by someone other than a judge who I did not

19   work for.  And that specific person was John Connelly, the

20   chief clerk.

21        Q.    And what were you reprimanded for, sir?

22        A.    I was reprimanded because I did not follow

23   procedure in an evacuation for a bomb threat.

24        Q.    Would that have been a county procedure that they

25   alleged you violated?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    62


1       A.      Yes.

2       Q.      Was this the bomb threat in which Ms. Varner

3   remained in the building?

4       A.      Yes.

5       Q.      And you received a written reprimand for that?

6       A.      Yes.

7       Q.      Why did you feel that it was unjustified?

8       A.      Because there was no county protocol, written

9   county procedure or protocol when that bomb threat occurred.

10      Q.      Did you believe at the time of the bomb threat

11  that you might have some responsibility for ensuring that

12  your staff had exited the building safely?

13      A.      Yes.

14      Q.      What did you believe was --

15      A.      Specifically, my responsibility was as a manager

16  to remain on site.  And in that particular case, I remained

17  on site and there were three attempts by the Sheriff's

18  Department came by, announced us to retreat out of the

19  building.  I waited till the third time and thought that the

20  building was or the office area was cleared, along with my

21  secretary, one of my support staff, secretaries, and fully

22  thinking that the building was cleared.  I thought it was the

23  responsibility of the Sheriff's Department that routinely

24  came around and were telling me to leave and were telling

25  people to leave.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    63

1      Q.      What did you do to ensure that the people had

2  left under your supervision?

3      A.      I asked my secretary, Fran, if she thought

4  everyone was gone.  And then she and I departed the area.

5      Q.      Did you look in the offices?

6      A.      I think I looked in some of the offices that

7  were -- that had open doors behind me, and the other office

8  across the common area where the secretaries sit.  But I did

9  not look in Barbara Varner's office because her door was shut

10  and there was no window in the door.  But I fully believed

11  that the area was clear.  Again, I specifically waited,

12  stayed back until I thought everything was clear for the

13  sheriff's people who I thought had the responsibility to come

14  in and physically check, because they had the equipment and

15  dogs.

16      Q.      Do you have a sign-in/sign-out board in your

17  office?

18      A.      Yes.

19      Q.      Do you use it to show when you're in and out?

20      A.      We all use it.  We've all supposed to use the

21  sign-out board.

22      Q.      Do you use it?

23      A.      Do I use it?

24      Q.      Yes.

25      A.      Yes.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    64

1       Q.      Do the other probation officers generally use it?

2       A.      Yes.

3       Q.      Did you check that sign board on the day of the

4   bomb scare to see who was in and who was out of the office?

5       A.      No, because it would not have meant anything,

6   because the -- if the office was evacuated and so quickly and

7   people would not have had time to go and check their specific

8   in or out button.  It's just a name and a button system, in,

9   out, and hour time frames.

10      Q.      And you had no responsibility after everyone

11  exited from the building to take roll call to make sure that

12  all the people present that day were accounted for?

13      A.      No, because I thought that the sheriff's people

14  who were in charge were -- who I thought were in charge of

15  the responsibility for evacuation, would then take over,

16  which is why we were ushered out, evicted, told to go.

17      Q.      Was there any reason why you didn't just go

18  through the office and open all the doors and see who was

19  there?

20      A.      Because I felt that I had overstayed my time

21  already and had deliberately waited back as a, what I thought

22  was a responsible department head, and it was time to go.

23  There was no deliberate attempt to leave anyone in the

24  office.

25      Q.      And after you get outside the building did people

1   gather just on Hanover or High Street?  Where did people

2   gather?

3         A.     People gathered on that particular date in the

4   first area of the first block of Hanover and High.

5         Q.     And you didn't make any effort to try to account

6   for your people after you evacuated the building?

7         A.     I took a, what I saw was a count of the people I

8   thought were there.  I believe it was a Thursday afternoon,

9   and usually half the people are out because our duties and

10  responsibilities call for being out of the office and on the

11  street supervising people.

12        Q.     And when you say you took a count, how many did

13  you count?

14        A.     I didn't take a -- I took a cursory review and it

15  appeared that everything was copasetic.  Again, and in the

16  absence of written protocol to take a count, I didn't feel it

17  was my responsibility to take a head count.

18        Q.     Everyone go home that day?

19               MR. ADAMS:  Objection.  What are you talking

20  about?  After the evacuation?

21  BY MS. WALLET:

22        Q.     After the evacuation, after the bomb scare.

23        A.     I remained about one-half hour on Hanover and

24  High Street.  Had discussions with our people, including Ron

25  Turo, the public defender.  And then I announced to the front

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                66

1   office, the support staff, that I was going to leave, because
2   I had to go home and pack up because the following full day I
3   had to be at a chiefs meeting in State College, statewide
4   chiefs meeting.  And then I had to come back and get ready to
5   leave at eight o'clock in the morning for Houston, Texas,
6   where I would be in training for five days.
7        Q.     So you were in a bit of a hurry to get home that
8   day?
9        A.     Well, I waited -- I don't know, it was late, it
10  was mid to late afternoon when this bomb threat occurred, and
11  because I thought we would be detained on the street until
12  they -- until the sheriffs cleared the building, which they
13  were in with their bomb dogs.  I felt that my time would
14  better be served if I got ready to go to State College and
15  Houston.
16       Q.     And when did you first learn that Ms. Varner had
17  been left in the building on that day?
18       A.     Barb came outside and stated to my surprise that
19  she was inside of the building during the time the building
20  was being cleared by the Sheriff's Department.
21       Q.     And what did you say to her?
22       A.     I don't recall if I said anything, but I was
23  surprised that she would not be at least ushered out by the
24  sheriffs's people who I thought had the responsibility to, of
25  checking physically every office in my department.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                          67

1        Q.      When you saw her, was she distraught?

2        A.      She didn't appear to be distraught.  She just

3    stated:  I was in the building the entire time.

4        Q.      Did you offer any apology to her?

5        A.      I didn't feel an apology was in order so I didn't

6    offer one.  I was not happy that it occurred.

7        Q.      Did you at any time offer an apology to her?

8               MR. ADAMS:  Objection.  About what?

9    BY MS. WALLET:

10       Q.      About leaving her in the building.

11       A.      I wrote Barbara Varner a memo stating that I did

12   not deliberately leave her in the building, and also

13   explained that there was no county protocol.

14              And I -- one step further, I advised, upon my

15   return from Houston, Texas, the following week, the following

16   full week later, to -- I advised the Human Resource director

17   that a protocol should be written immediately.

18              I further went upstairs, went to the president

19   judge and said:  I received this unfair letter of reprimand,

20   the first one in my 38-year work career, 37-and-a-half year

21   work career, and I was not happy with it.  And his response

22   was:  I'm not going to do any intervention for you.

23              So I was still not satisfied and I wrote a

24   full-page memo, went to the Human Resource Department and

25   said:  I am not guilty of anything.  I felt I was doing my

Joseph Osenkarski                                    68


1    responsibility as a department head in the absence of

2    protocol.  Please get some protocol, because I don't like

3    this.  And I requested that the department or the Human

4    Resource director attach it to the letter of reprimand just

5    so that I have some personal satisfaction that I was -- I

6    acted in good faith, it was the best way, and those are the

7    words I used.

8         Q.    You were angry about getting that reprimand?

9         A.    I was not happy, because I was not deserving.  I

10   was not deserving of a letter of reprimand from a person who

11   doesn't supervise me and works outside the court.

12        Q.    Now, we started this because I asked you if had

13   ever been disciplined in your 39 years.  You said this was

14   the only reprimand you had received, correct?

15        A.    To the best of my knowledge, it was the only

16   formal reprimand that I received.

17        Q.    Were you ever suspended?

18        A.    No.

19        Q.    Never suspended?

20        A.    No.

21        Q.    Were you ever suspended and it was later revoked?

22        A.    No.

23        Q.    Did you receive any suspension as a result of the

24   allegations brought by Ms. Varner?

25              MR. ADAMS:  Objection.  What allegations?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                        69


```
 1              MS. WALLET:  Any of the allegations.

 2              MR. ADAMS:  In the Complaint, federal Complaint?

 3              MS. WALLET:  Any of the allegations.

 4   BY MS. WALLET:

 5      Q.    Were you ever suspended as a result of any

 6   allegations made by Ms. Varner?

 7      A.    No.

 8      Q.    Were you threatened with suspension?

 9      A.    No.

10              MS. WALLET:  Well, we've not made much progress

11   here but it is now 5:30 and I believe we'll have to resume at

12   another time, Mr. Osenkarski.  Thank you very much for

13   answering my questions today.

14              THE WITNESS:  You're welcome.

15              (Discussion held off the record.)

16              MS. WALLET:  On the record, counsel will speak to

17   me about rescheduling Mr. Osenkarski's deposition.

18              MR. ADAMS:  Yes, I will.

19              MS. WALLET:  And I understand that he cannot

20   continue tomorrow because of the unavailability of

21   Mr. Osenkarski's counsel?

22              MR. ADAMS:  That's correct.

23              (Whereupon, the deposition was adjourned sine die

24   at 5:33 p.m.)

25                          *  *  *  *  *
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

70

1  COMMONWEALTH OF PENNSYLVANIA  )
                                )
2  COUNTY OF DAUPHIN            )

3          I, Emily R. Clark, a Court Reporter-Notary Public

4  authorized to administer oaths and take depositions in the

5  trial of causes, and having an office in Harrisburg,

6  Pennsylvania, do hereby certify that the foregoing is the

7  testimony of JOSEPH L. OSENKARSKI taken by Plaintiff at the

8  Administrative Offices of Pennsylvania Courts, 5035 Ritter

9  Road, Mechanicsburg, Pennsylvania.

10         I further certify that before the taking of said

11 deposition the witness was duly sworn; that the questions and

12 answers were taken down in stenotype by the said

13 Reporter-Notary, approved and agreed to, and afterwards

14 reduced to computer printout under the direction of said

15 Reporter.

16         I further certify that the proceedings and evidence

17 are contained fully and accurately in the notes taken by me

18 on the within deposition, and that this copy is a correct

19 transcript of the same.

20         In testimony whereof, I have hereunto subscribed my

21 hand this 17th day of February, 2003.

22

23                         _____

24                         Notary Public

25