```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
        Plaintiff,             .   CIVIL ACTION
                               .   NO. 1:CV 01-0725
        vs.                    .
                               .
COMMONWEALTH OF PENNSYLVANIA,  .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,       .
CUMBERLAND COUNTY; CUMBERLAND  .
COUNTY; S. GARETH GRAHAM,      .
Individually, and JOSEPH       .
OSENKARSKI, individually,      .
        Defendants.           .
. . . . . . . . . . . . . . . . . .
```

                          VOLUME 2
                      Pages 71 to 223


        Deposition of:  JOSEPH L. OSENKARSKI

        Taken by     :  Plaintiff

        Date         :  February 11, 2003, 9:14 a.m.

        Before       :  Emily Clark, RMR, Reporter-Notary

        Place        :  Administrative Offices of
                        Pennsylvania Courts
                        5035 Ritter Road, Suite 700
                        Mechanicsburg, Pennsylvania


APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
            For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
            For - Defendant Commonwealth of Pennsylvania
                  Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  PAUL J. DELLASEGA, ESQUIRE
            For - Defendant Cumberland County

```
 1   APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  DAVID J. MacMAIN, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6

 7   ALSO PRESENT:

 8        MS. BARBARA E. VARNER

 9        MR. S. GARETH GRAHAM

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

73

```
 1                    I N D E X

 2                       WITNESS

 3   Joseph L. Osenkarski                    Examination

 4        By Ms. Wallet                      75, 213

 5        By Ms. Williams                      203

 6        By Mr. MacMain                       194

 7        By Mr. Adams                         207

 8

 9

10                  OSENKARSKI EXHIBITS

11   No.  Description                         Identified

12   1    3 pages, "Employee Certification;" attachments    75

13   2    2-page "Memo" 6/30/08, to Sheely from          86
          Osenkarski
14
     3    4-page "Cumberland County Employe Performance   123
15        Review" 12/04/95 to 12/04/06

16   4    4-page "Cumberland County Employe Performance   125
          Review" 12/04/98 to 12/04/99
17
     5    9-page "Cumberland County Employe Performance   125
18        Review" 12/04/98 to 12/04/99

19   6    5-page "Cumberland County Employe Performance   125
          Review" 12/04/99 to 12/04/00
20
     7    5-page "Cumberland County Employee Performance  125
21        Review" 12/04/00 to 12/04/01

22   8    1-page memo, 1/31/96, to Bolze from Herr        139

23   9    1-page handwritten memo, 6/18/96, to POs        144

24   10   1-page memo, 4/6/98, to Hoffer from Hartnett    147

25
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

74

| 1 | OSENKARSKI EXHIBITS | |
|---|---|---|
| 2 | No.  Description | Identified |
| 3 | 11   2-page memo, 3/31/98, to Osenkarski from Varner | 148 |
| 4 | | |
| 5 | 12   10 pages: 2-page memo, 2/28/00, to Osenkarski from Boyer; attachments | 152 |
| 6 | 13   6 pages, seniority lists | 157 |
| 7 | 14   1-page "Memo," 4/2/98, to Varner from Osenkarski | 158 |
| 8 | | |
| 9 | 15   1-page "Memo," 2/8/00, to Patterson from Osenkarski | 165 |
| 10 | 16   4 pages: 1-page handwritten memo, 6/1/98, to Osenkarski from Varner; 1-page handwritten | 170 |
| 11 | memo, 5/26/98, to Kline from Varner | |
| 12 | 17   1-page "Memo," 4/2/02, to Varner from Osenkarski | 181 |
| 13 | | |
| 14 | *   *   *   *   * | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              75


1              (Osenkarski Deposition Exhibit No. 1 was marked.)

2

3              JOSEPH L. OSENKARSKI, recalled as a witness,

4     previously being duly sworn, testified further, as follows:

5     BY MS. WALLET:

6         Q.     Good morning, Mr. Osenkarski.

7         A.     Good morning.

8         Q.     You are still sworn from the other day.

9         A.     Yes.

10        Q.     Is there any reason today why you could not

11    answer my questions completely and truthfully?

12        A.     There's no reason.

13        Q.     All right.  And may we have the same agreement we

14    had the other day regarding answering my question only if you

15    have heard the question and you understand the question?

16        A.     Yes.

17        Q.     Okay.  I believe I asked you when we were here

18    together last week whether you had received county personnel

19    policies and whether you had been asked to sign to indicate

20    that you had received those.  Do you remember that question,

21    sir?

22        A.     Yes.

23        Q.     I'd like to hand you what we'll mark as

24    Osenkarski Deposition No. 1, a three-page set of documents.

25    Would you take a minute, sir, to look at those?  Tell me when

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                          76

1    you're ready, sir.

2         A.    I've reviewed them.

3         Q.    Are these your signatures on these documents,

4    sir?

5         A.    Yes.

6         Q.    Did anybody at any time tell you that you were

7    not subject to the Cumberland County personnel policy

8    manuals?

9         A.    No.

10        Q.    Did you believe that you were subject to them

11   during the course of your employment?

12        A.    Yes.

13        Q.    Now, sir, you know that Ms. Varner wrote a

14   memorandum in April of 1997 to Dan Hartnett who was then the

15   personnel officer for the county; is that correct?

16        A.    Yes.

17        Q.    And did you receive a copy of that document at

18   the time that Ms. Varner sent it to Mr. Hartnett?

19        A.    No.

20        Q.    How did you receive that?

21        A.    I was notified by Mr. Deluce -- you're asking

22   about Barbara Varner's Complaint in April of '97?

23        Q.    Yes.  I'm speaking now specifically of the

24   written Complaint.

25              MR. MacMAIN:  Can you just keep your voice up a

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                 77

1    little?

2            THE WITNESS:  I was notified by Mr. Deluce

3    verbally that a Complaint had been filed against Mr. Graham.

4    BY MS. WALLET:

5        Q.    Did you ever receive a copy of the memo that

6    Ms. Varner wrote in April of 1997 from Mr. Deluce?

7        A.    No.

8        Q.    Do you remember, sir, when it was that Mr. Deluce

9    asked you about this Complaint?

10       A.    Sometime after April of '97.

11       Q.    Do you think it was in the year of '97, or

12   sometime later?

13       A.    It was in the year '97.

14       Q.    Was this during a meeting between just you and

15   Mr. Deluce, or were there others present?

16       A.    It was at a meeting with Mr. Deluce and myself.

17       Q.    And no others?

18       A.    Not to the best of my knowledge.

19       Q.    What did Mr. Deluce ask you to do in response to

20   his questions concerning this memorandum?

21       A.    He asked me some questions, and I tried to answer

22   them.

23       Q.    Did he tell you why he was asking you these

24   questions concerning this memorandum?

25       A.    Because he was doing a review of the Complaint.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      78

1      Q.     Did he say what the purpose of this review was?

2      A.     No, he didn't make it clear to me.

3      Q.     Now, Ms. Varner alleged in her written Complaint

4  in April of '97 that you had allowed Mr. Graham to engage in

5  conduct which Ms. Varner considered to be harassing.

6             Did you understand that to be true when

7  Mr. Deluce spoke with you?

8      A.     No.

9      Q.     What did you understand to be Ms. Varner's

10 complaint against you at that time?

11     A.     Mr. Deluce did not specifically tell me that

12 there was a Complaint filed against me.

13     Q.     Who did he tell you the Complaint was filed

14 against?

15     A.     Mr. Graham.

16     Q.     Anyone else?

17     A.     No.

18     Q.     What did he tell you was the complaint about

19 Mr. Graham?

20     A.     I don't recall specifically.

21     Q.     Well, do you remember whether he asked you about

22 language that was used in the office?

23     A.     To the best of my knowledge he said that the

24 Complaint alleged that Mr. Graham was loud, and I don't

25 recall specifically any more details.  It was seven years

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    79


1    ago.

2        Q.      Well, do you recall whether he told you at the

3    time that she made a complaint of sexual harassment?

4        A.      I don't recall if it was specifically sexual

5    harassment.

6        Q.      Did Mr. Deluce ask you about sexual language in

7    the workplace?

8        A.      I don't recall.

9        Q.      Do you recall anything else about what Mr. Deluce

10   discussed with you sometime in 1997?

11       A.      Not specifically.

12       Q.      Did you express to Mr. Deluce any concerns about

13   Mr. Graham?

14              MR. DELLASEGA:  I would assert the attorney-

15   client privilege and instruct the witness not to divulge

16   communications to his counsel, Mr. Deluce.

17              MS. WALLET:  I'm sorry, is it your position that

18   Mr. Deluce was Mr. Osenkarski's counsel at the time?

19              MR. DELLASEGA:  It's our position that the

20   communications made by Mr. Osenkarski to Mr. Deluce would be

21   covered by the privilege, particularly since you have alleged

22   the joint employer relationship.

23              MS. WALLET:  Is it your position that Mr. Deluce

24   was representing Mr. Osenkarski at that time?  I believe that

25   was my question.

1              MR. DELLASEGA:  It's our position that the

2    communication made at that time was made by a putative

3    employee of Mr. Deluce's client.

4              MS. WALLET:  I'm sorry, I missed the end of that

5    a bit.

6              MR. DELLASEGA:  By a putative employee of

7    Mr. Deluce's client.

8              MS. WALLET:  Are you instructing this witness not

9    to answer with respect to any of the investigation done by

10   Mr. Deluce?

11             MR. DELLASEGA:  I'm asking him not to divulge the

12   contents of his communications to counsel for his putative

13   employer.

14             MS. WALLET:  So you're asserting that I may not

15   ask today any questions that would involve responses by

16   Mr. Osenkarski at the time that Mr. Deluce spoke with

17   Mr. Osenkarski?

18             MR. DELLASEGA:  In the context of communications

19   between Osenkarski and Deluce, yes.  In the context of

20   communications between Osenkarski and other parties, no.

21             MS. WALLET:  And are you instructing the witness

22   not to answer any of my questions concerning what he told

23   Mr. Deluce at that time?

24             MR. DELLASEGA:  Based on the privilege, yes.

25             MR. ADAMS:  Off the record for a second.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          81


1          (Discussion held off the record.)

2     BY MS. WALLET:

3          Q.    Mr. Osenkarski, as a result of this meeting were

4     you requested to do anything?

5          A.    Nothing specific.

6          Q.    And when I say were you requested, do you

7     understand my question to include requested by anyone to do

8     anything?

9          A.    I don't recall being requested to do anything

10    specific by anyone.

11         Q.    Were you given any instructions at any time after

12    April of 1997 that you were to monitor the relationship

13    between Mr. Graham and Ms. Varner?

14         A.    No.

15               MR. ADAMS:  What do you mean by monitor?

16               MS. WALLET:  Observe the conduct between them.

17               THE WITNESS:  No.

18    BY MS. WALLET:

19         Q.    Were you given any instructions by anyone after

20    April of 1997 to ensure that Mr. Graham did not retaliate

21    against Ms. Varner?

22               MR. ADAMS:  Objection to the form.  That calls

23    for a conclusion, for one thing.  It's not appropriate for

24    him to respond to.  Can you rephrase another question?  I'm

25    going to object based on it requires Mr. Osenkarski to draw a

Joseph Osenkarski                              82


1    conclusion of law which he cannot do.

2              MS. WALLET:  Well, I don't agree with that.  I'm

3    asking --

4              MR. ADAMS:  Retaliation?

5              MS. WALLET:  I'm asking was he instructed to do

6    anything to avoid retaliation by Mr. Graham against

7    Ms. Varner.

8              MR. ADAMS:  Same objection, based on the word

9    retaliation.

10             MS. WALLET:  Are you instructing him not to

11   answer that question?

12             MR. ADAMS:  Based on the conclusion of law, yes.

13   BY MS. WALLET:

14        Q.    Mr. Osenkarski, did anybody ever say to you:

15   Don't you do anything that would go against Ms. Varner

16   because of her Complaint?

17        A.    No.

18        Q.    Were you told to ensure in any way that

19   Mr. Graham continued to treat Ms. Varner in a

20   non-discriminatory fashion?

21             MR. ADAMS:  Objection to non-discriminatory.  Can

22   you rephrase the question?

23   BY MS. WALLET:

24        Q.    Were you told by anyone at any time to ensure

25   that Mr. Graham acted toward Ms. Varner the same way that he

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                83

1    acted toward others in the office?

2          A.     No.

3          Q.     As a result of your meeting with Mr. Deluce, did

4    you believe that any act was required on your part as a

5    supervisor?

6          A.     That I believe?

7          Q.     Yes, sir.

8          A.     Nothing specific.

9          Q.     That's a no, you didn't believe that any action

10   was required on your part as a supervisor?

11                MR. ADAMS:  Objection.  That's not the same

12   question you just asked.

13                Do you understand the question?

14                THE WITNESS:  I'm a little confused.

15                MS. WALLET:  Okay.  Maybe it's my hearing today

16   but could everybody speak up a little bit?  I'm having

17   trouble hearing all of you.

18                MR. ADAMS:  I can hear you well.

19                MR. DELLASEGA:  I do have some problems hearing

20   Mr. Osenkarski because I have a deaf ear, so if you would

21   speak up.

22                MR. ADAMS:  Does everyone want to slide down?

23                MS. WALLET:  I think if everybody speaks up as

24   they did the last time, I don't think we'll have a problem.

25   BY MS. WALLET:

1     Q.     Let me try that question again.  Mr. Osenkarski,

2  as a result of your meeting with Mr. Deluce in April of 1997

3  did you believe that any action was required by you as a

4  supervisor with respect to Mr. Graham?

5     A.     No.

6     Q.     Did you believe that any action was required by

7  you with respect to Ms. Varner?

8     A.     No.  It was common sense told me that an

9  investigation was going on, and common sense would tell me

10  that I should not interfere with any investigation.

11     Q.     Do you know whether other individuals under your

12  supervision were interviewed in or about that same time?

13     A.     Yes, I was told that others would be interviewed.

14     Q.     Do you know who was interviewed?

15     A.     No, not specifically.

16     Q.     Did you, sir, at any time tell Ms. Varner that it

17  was not proper for her to go to Mr. Hartnett, a personnel

18  officer for the county, with regard to her complaints of

19  harassment?

20     A.     No.

21     Q.     You wrote a memorandum in or about June 13th of

22  1997 relieving Mr. Graham of any authority or responsibility

23  concerning Barbara Varner.  Do you remember that, sir?

24     A.     Yes.

25     Q.     Did you write that memo before or after you met

Joseph Osenkarski                           85


1   with Mr. Deluce?

2        A.     I believe shortly after.

3        Q.     And did you write that memo as a result of any

4   directions to you to do so?

5        A.     No.

6        Q.     Why did you relieve Gary Graham of any authority

7   or responsibility concerning Ms. Varner in June of '97?

8        A.     Because of the alleged complaint.

9        Q.     Well, did you think that there was some reason to

10  separate Mr. Graham and Ms. Varner?

11              MR. ADAMS:  Objection, asked and answered.

12              THE WITNESS:  Because of the Complaint, which I

13  didn't -- which I didn't see.  Again, common sense tells a

14  supervisor to act accordingly and responsibly.  That's what I

15  felt I had to do because of a Complaint which I asked to see

16  but never was shown.

17  BY MS. WALLET:

18       Q.     Why did you think it was responsible for you to

19  issue your June 13, '97, memo?

20       A.     Because of a Complaint.

21       Q.     Do you always separate an employee from a

22  supervisor whenever you receive any complaint?

23              MR. ADAMS:  Objection.  The question's been asked

24  and answered and it's very argumentative the way it's framed.

25              MS. WALLET:  I said do you always do it.  I never

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    86


1    asked that question before.

2             MR. ADAMS:  It is argumentative.

3             You can answer.

4             THE WITNESS:  I was a new chief, never had

5    received a complaint such as this before.

6    BY MS. WALLET:

7        Q.    Did you speak to someone about what you might do

8    in that circumstance?

9        A.    I don't recall that I did.

10       Q.    In any event, this was your own idea, not a

11   result of any direction to you?

12       A.    To the best of my knowledge.

13            MS. WALLET:  Let's mark as Deposition Exhibit 2 a

14   June 30, 1997, memorandum.

15            (Osenkarski Deposition Exhibit No. 2 was marked.)

16   BY MS. WALLET:

17       Q.    Would you please take a minute, sir, to take a

18   look at what we've marked as Deposition Exhibit 2?

19       A.    (Witness complied.)

20       Q.    First of all, sir, did you write this memorandum?

21       A.    Yes.

22       Q.    Did you write it in or about June 30, 1997?

23       A.    Yes.

24       Q.    Why did you write this memorandum?

25       A.    Because I felt it was appropriate.  Specifically,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                87

1    I did some self study on the matter of sexual harassment.  I

2    went to the federal system.  I had a friend in the federal

3    system who was a person I considered an expert, since this

4    was a part of her job in the federal system.  And she advised

5    me that it was appropriate to prepare an immediate response

6    to when a Complaint such as this was filed.

7         Q.     Why did you send this memorandum to Judge Sheely?

8         A.     Because he was the person who we answered to and

9    was in charge of the Juvenile Probation office.

10        Q.     Did Judge Sheely tell you to write this

11   memorandum?

12        A.     I think I told him I felt it was appropriate, and

13   he agreed.

14        Q.     So it was your idea, not his idea?

15        A.     I would say it was my idea, but he, he responded

16   that it was his idea that it was a good idea, also.

17        Q.     Okay.  Now, you mention in the first paragraph of

18   your memorandum current pending employee-related matter.

19   What did you mean by that?

20        A.     The filing of the Complaint.

21        Q.     By whom?

22        A.     By Barbara Varner.

23        Q.     A Complaint about what?

24        A.     Alleged sexual harassment.  Again, I never saw

25   the Complaint.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    88


1      Q.      And you knew the matter was an alleged sexual

2    harassment because of what was told to you by Mr. Deluce?

3      A.      Yes.

4      Q.      Now, you have essentially five points in your

5    corrective action plan, correct?

6      A.      Yes.

7      Q.      Tell me why you did each of those five things.

8      A.      Because it was my feeling that it was the best

9    attempt at a solution to the situation, the filing of a

10   Complaint.

11     Q.      You mention with regard to number 1, the

12   transfer, that you thought the transfer of the supervision

13   would be for whatever time is deemed appropriate.  Who would

14   deem appropriate the time period?

15     A.      Ultimately the person in charge of the

16   Department, which would have been the president judge.

17     Q.      Did you understand that the president judge would

18   act in some fashion to tell you when this supervision change

19   would end?

20     A.      I would assume sometime during the process, yes.

21     Q.      And did he ever tell you at some time that the

22   transfer of supervision should end?

23     A.      No.

24     Q.      Did anybody ever tell you that the transfer of

25   supervision should end?

Joseph Osenkarski                            89

1      A.      No.

2      Q.      Did you think that it should have ended at some

3   time?

4      A.      I don't really understand -- would you please

5   state the question again?

6      Q.      Certainly, sir.  Did you think at some time later

7   than June of '97 that the transfer of supervision should end?

8              MR. ADAMS:  If you don't understand, if you don't

9   know --

10             THE WITNESS:  I don't know.  I don't know.

11   BY MS. WALLET:

12     Q.      Did you take any action to end the transfer of

13   the supervision of Barbara Varner away from Gary Graham?

14     A.      It was my idea to take Gary Graham, you know,

15   away from supervising Barbara Varner.

16     Q.      I don't think you understand my question, sir.

17   You said in June of '97 we're going to transfer Ms. Varner

18   away from Mr. Graham for whatever period of time is deemed

19   appropriate.  Those are your words, correct?

20     A.      Yes.

21     Q.      Okay.  And at no time after June 30, 1997, did

22   someone say to you:  Okay, it's time to transfer her back?

23   Correct?

24     A.      Correct.

25     Q.      And you at no time transferred her back --

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                90

1       A.      No.

2       Q.      -- to Gary Graham?

3       A.      No, I did not.

4       Q.      Did you at any time think it would have been

5   appropriate for you to do so?

6       A.      No.

7       Q.      Why not?

8       A.      Because the Complaint was filed and it was

9   pending.  And a certain amount of damage was done.

10      Q.      And what kind of damage are you referring to?

11      A.      The Complaint and the repercussions of the

12  Complaint.

13      Q.      Damage to whom, sir?

14      A.      To both parties.  You know, the damage to the

15  relationship.  I can't get any more specific than that.

16      Q.      Now, your subsection (a) talks about changes you

17  thought might occur within the Juvenile Probation Department.

18  Did those changes ever occur?

19      A.      Yes.

20      Q.      And why did you think that those changes would

21  permanently alleviate direct supervision of Varner by Graham?

22      A.      Because I felt we were going to increase our

23  staff, we were going to go into desperately needed

24  programming.  Specifically, it was a major project that I was

25  working on, and that was the implementation of a school-based

1    probation, countywide school-based probation program, which I

2    believe started around November when we hired three

3    school-based probation officers with the anticipation that we

4    would want to even expand to perhaps six the following year,

5    if I could get the funding and the approval of the Court.

6        Q.    Now, why did you think that development of this

7    school-based probation program would somehow permanently

8    alleviate the supervision situation between Mr. Graham and

9    Ms. Varner?

10       A.    Because I had visions of involving Mr. Graham

11   with possibly overseeing at least a part of the school-based

12   probation program.

13       Q.    So you thought that with the development of this

14   program you would give Mr. Graham those responsibilities and

15   that would eliminate the need for him to supervise

16   Ms. Varner?

17       A.    Yes.

18       Q.    Did you believe that that would involve a

19   physical move away from the office for Mr. Graham?

20       A.    Well, I didn't know anything specific but I knew

21   that there would be a lot of work that had to be done,

22   supervisory work, outside the confines of the office in the

23   courthouse, specifically.  I felt that he would be spending a

24   lot of time in the various schools in Cumberland County.

25       Q.    And did Mr. Graham ultimately have any of those

1    responsibilities for the school-based probation program?

2         A.    No, because he was removed from my department

3    because of the decision of Judge Hoffer to take him out of

4    Juvenile Probation completely.

5         Q.    Well, there was some time, was there not, between

6    June of 1997 and when Mr. Graham was removed from your

7    department?

8         A.    Yes, there was.  But we were building a program

9    and it was just a hundred ideas but nothing was in place

10   until we hired people, which wasn't until I believe November

11   of '97.  There was a certain amount of training that had to

12   be done with the new hires.  We had to decide on the schools

13   that these probation officers were going to, to be placed in.

14   And a thousand other things that went along with developing

15   such a program of this magnitude.

16        Q.    Who ultimately ended up supervising these

17   school-based probation staff?

18        A.    Mr. Boyer, primarily.  Thomas Boyer.

19        Q.    Now, your item number 2 said that you were

20   requesting the county personnel office to arrange for some

21   training and education.  Is that accurate?

22        A.    Yes.

23        Q.    First of all, why were you asking the county

24   personnel office to do this?

25        A.    Because it was my feeling that we had not been

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              93

1    given any specific training on the topic of sexual

2    harassment.

3        Q.    And why did you think that such training would be

4    appropriate in June of '97?

5        A.    To educate everyone on that topic, which was

6    sexual harassment.

7        Q.    Why did you believe that it should be mandatory

8    for all staff in both Juvenile and Adult Probation?

9            MR. ADAMS:  I'm going to put on the record an

10   objection to form, but you may answer, and any other

11   questions related to any subsequent remedial measures that

12   may have taken place.

13           MS. WALLET:  I'm sorry, Mr. Adams, I don't

14   understand your objection.

15           MR. ADAMS:  I'm objecting to the line of

16   questioning in terms of what Mr. Osenkarski did in relation

17   to the investigation that's this line of questioning now, his

18   actions related to training and anything that -- I just want

19   the objection to be on the record for later in case it comes

20   up.

21           You may answer.

22           THE WITNESS:  State the question.

23           MR. ADAMS:  Can you ask --

24           MS. WALLET:  I remember the question.

25   BY MS. WALLET:

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    94


1      Q.      Why did you recommend that this training be

2    mandatory for all staff in both Juvenile and Adult Probation

3    Departments?

4      A.      Because there had not been any previous specific

5    training on the topic.

6      Q.      Why did you request to be actively involved in

7    the planning for this agenda and curriculum?

8              MR. ADAMS:  Continuing objection.

9              THE WITNESS:  Because I was a supervisor in the

10   department.  I was a young chief, a new chief or fairly new

11   chief.

12   BY MS. WALLET:

13     Q.      Now, you said that in addition to training within

14   the Probation Department you thought that all department

15   heads and managerial personnel should be trained.  Is that

16   your recommendation, sir?

17     A.      Yes.

18     Q.      And did you believe at that time that none of the

19   department heads and managerial personnel had been properly

20   trained?

21     A.      Yes.

22     Q.      And why did you believe that, sir?

23     A.      Because to use very simple words, this was

24   something that was new that was happening to my knowledge for

25   the first time on the state -- on the local, state and

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      95


1    federal levels.  Just seems to me it was a -- it was

2    something that happened or was happening.

3         Q.    You thought in 1997 that sexual harassment was

4    newly recognized?

5         A.    Well, it seemed to be a topic that was -- that

6    the media was paying a lot of attention to at the time.

7         Q.    Did you believe that there were problems of

8    sexual harassment within other departments?

9         A.    I didn't know.  I didn't know if there was.

10        Q.    Your third point in your corrective action plan

11   was to send all Juvenile Probation supervisory staff to

12   management training.  Specifically, who would they be?

13        A.    Well, anyone who had anything to do with

14   management, which would have been the chief.

15        Q.    Yourself?

16        A.    Yes.  Any supervisors, or PO-IIs, because PO-IIs

17   at times do stand in and do managerial things.

18        Q.    Give me names, sir.  Who at that time did you

19   think should get this management training?

20        A.    Myself, Thomas Boyer, Mr. Graham.  He wasn't

21   transferred at that point.  There's three of us.

22        Q.    So you, Boyer and Graham were the people that you

23   had in mind in item number 3 of your corrective action plan?

24        A.    Yes.

25        Q.    No one else?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                96

1       A.      No, because that was the extent of the, quotes,

2    management team, unquotes.

3       Q.      Did this management training occur?

4       A.      We had training which was conducted for everyone,

5    line as well as managerial staff, by -- it was conducted by

6    Mazzitti and Sullivan, a professional agency within the

7    county system.

8       Q.      And did you believe that that satisfied your

9    request for management training?

10      A.      At the time, yes.

11      Q.      Okay.  Your fourth point was to create a

12   committee that would handle any issues of importance.  Your

13   underline is under the word any.

14      A.      Well, anything that became controversial, I felt

15   a committee should be formed to step in and defuse any

16   situation that could result in any kind of formal complaints.

17      Q.      Did such a committee come about?

18      A.      No, because -- I'm foggy as to why, but I believe

19   we, you know, we didn't have any further complaints.  That

20   was the primary issue.  And we were, again, very busy on

21   building the professionalism of a brand new department that

22   was severely understaffed and severely underprogrammed, and

23   that that was the main focus, to bring that department back,

24   up to snuff, up to state standards.

25      Q.      So no such committee was created?

 1      A.     No.

 2      Q.     And it wasn't created because there were other

 3  things to do and you didn't have any other complaints?

 4      A.     Essentially, yes.

 5      Q.     Any other reason?

 6      A.     Again, the focus was on building our department.

 7  That was my primary goal.

 8      Q.     Your fifth point was to institute a first-level

 9  pre-disciplinary step.  What did you intend by that?

10      A.     Well, if any problem came up, and as soon as it

11  came up, my goal was to fix it at the lowest level.

12      Q.     When you say pre-disciplinary step, are you

13  referring to some kind of disciplinary procedure already in

14  existence?

15      A.     Well, I never -- I'm going to use the word --

16  maybe that was a bad word.  I hated rumor mills.  I hated

17  rumor mills, and I always felt that, you know, that was a

18  first step that, you know, you should take to stop rumor

19  mills and, you know, perhaps avoid problems.  Keep it

20  professional, you know, work in the workplace and then

21  nothing more.  And that's essentially what I meant by that.

22  But if anything was said that was not professional, my idea

23  or goal was to step in and say, hey, this is not tolerated in

24  this workplace.

25      Q.     Was such a first-level pre-disciplinary step

Joseph Osenkarski                                 98

1    implemented?

2          A.      Not -- no.

3          Q.      Why not?

4          A.      Again, the major focus at the time was

5    overwhelmingly getting our department up to the professional

6    level that I felt it had to be gotten up to, specifically,

7    again, getting back to developing the countywide school-based

8    probation program and my plans for three other, at least

9    three other specialized probation programs, i.e., intensive

10   probation, community-based probation, and any other program

11   that became a specialty at that time that the focus statewide

12   was on specialization.  And there was money available through

13   Pennsylvania Commission on Crime and Delinquency grants as

14   well as monies were going to be made available through

15   Governor Ridge's office.  And this money was distributed

16   through, was going to be distributed through the Juvenile

17   Court Judges Commission.  Again, they were ideas that I

18   wanted to jump on every bit of money that was available.  And

19   that was the focus.

20               MR. MacMAIN:  Could I just ask you to keep your

21   voice up again?

22               THE WITNESS:  Sorry.

23   BY MS. WALLET:

24         Q.      Did anyone tell you after July 3rd of 1997 to

25   implement any of these five points?

Joseph Osenkarski                               99


1        A.      Judge Sheely, the president judge at the time,

2    told me to go ahead and make sure that I arranged for

3    training, sexual harassment training.  So I went ahead and

4    made arrangements for that training with Mazzitti and

5    Sullivan.  It was sometime I think before the end of the

6    year.  I'm not quite sure.

7        Q.      Was there any other training other than the

8    Mazzitti and Sullivan training?

9        A.      Subsequently, and I don't know time frames, but

10   the county at a later period through the Human Resource

11   office arranged for further sexual harassment training and

12   issues-in-the-workplace training.

13       Q.      Okay.  Now, you said that this wasn't really your

14   final plan, it was just the plan that was submitted before

15   your vacation.  Did you issue any amendments or additions to

16   this plan?

17       A.      Not that I recall, because --

18       Q.      Did you get -- I'm sorry, go ahead.

19       A.      Not that I recall, because the HR office began an

20   emphasis on doing the trainings.

21       Q.      Okay.  Did you believe that your work with regard

22   to the current pending employee-related matter was done after

23   you submitted your corrective action plan?

24       A.      No.

25       Q.      What more had to be done?

Joseph Osenkarski                          100


1      A.      Well, the continual monitoring, you know, of the

2   behavior of all personnel in the Juvenile Probation office,

3   because that was my ongoing responsibility.

4      Q.      And what did you do, sir, specifically to monitor

5   that behavior?

6      A.      Specifically, I constantly kept abreast of

7   situations, you know, if they arose, and I would intervene

8   when necessary.  But I don't recall anything specific.

9      Q.      Did anybody, Barbara Varner or anyone, come to

10  you after June of 1997 and make any complaints?

11     A.      No.

12     Q.      Did anybody come to you after June of 1997 and

13  tell you that Barbara Varner had made additional complaints?

14     A.      No.

15     Q.      Are you quite certain about that, sir?

16     A.      I knew that the Complaint, the initial Complaint

17  was filed.  And I vaguely recall that it went to -- it went

18  outside the county, I'm not quite sure of this, the EEC

19  office, EEOC office, which it's -- I'm not quite sure.  I

20  remember --

21             MR. ADAMS:  Just answer what you know, if you

22  know.

23             THE WITNESS:  I'm not sure of specifically what

24  other complaints were filed outside the office.

25  BY MS. WALLET:

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                101

1      Q.      In any event, no one came to you at some time

2   after June of '97 and said:  We've got some more problems,

3   take care of it?

4      A.      No, I don't recall.

5      Q.      Were you aware, sir, that in or about July of

6   1997 it was recommended that you be suspended?

7      A.      Not specifically.

8      Q.      What do you mean not specifically?  Either you

9   knew you were recommended for suspension or you didn't.

10     A.      I didn't know.

11     Q.      Did you later learn?

12     A.      I later learned that I was a defendant.  Mr. --

13   I'm going to go back to the initial contact with Mr. Deluce.

14   Mr. Deluce did not allow me to see any Complaint, and to the

15   best of my knowledge, said he wanted to defuse, I think that

16   was his word, the situation.  And I was not told by

17   Mr. Deluce that I was a part of the Complaint.

18     Q.      My question, sir, is:  Did you learn at some

19   later time that it was recommended that you be suspended?

20     A.      I learned at a later time that Judge Sheely was

21   approached, and I'm not sure by who, and was told that I

22   should be, Gary Graham and I should be terminated.

23     Q.      And how did you learn that, sir?

24     A.      I believe it was by Judge Sheely's secretary.

25     Q.      In some formal communication?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              102


 1      A.      No.  And he did not honor any suggestion to have

 2   Gary Graham or myself suspended or terminated.

 3      Q.      And Judge Sheely's secretary's named Patricia?

 4      A.      No, it's not Patricia.  I can't think of her

 5   name, but she's now --

 6              MR. GRAHAM:  Sandy Davis.

 7              THE WITNESS:  Pardon me?

 8              MR. GRAHAM:  Sandy Davis.

 9              THE WITNESS:  Sandy, sorry.

10   BY MS. WALLET:

11      Q.      So Sandy Davis told you, was this in confidence?

12      A.      I don't know.  It was just a statement that was

13   made to me.  And I don't know who --

14      Q.      Tell me, sir, how you learned this.

15      A.      I don't know who else -- pardon me?

16      Q.      Tell me, sir, how you learned this from Sandy

17   Davis.

18              MR. ADAMS:  Objection.  It's been asked and

19   answered already.

20              THE WITNESS:  She told me in a conversation.

21   BY MS. WALLET:

22      Q.      So she called you aside at some point and said:

23   Did you know that you might be terminated?  What did she say?

24      A.      Words to the effect that Judge Sheely was

25   approached and it was suggested that Mr. Graham and I be

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              103


1    terminated.

2         Q.      And did she say who had approached Judge Sheely

3    with this suggestion?

4         A.      I don't remember anymore.  Some county person.

5         Q.      Did she tell you why she was telling you this?

6         A.      Because of this Complaint.

7         Q.      She just said:  I'm telling you this because of

8    this Complaint?

9         A.      Because of the Complaint filed by Barbara Varner.

10        Q.      And what else did Judge Sheely's secretary Sandy

11   Davis tell you?

12        A.      She just said, you didn't do anything, meaning

13   me.  That was it.

14        Q.      How did she know that?

15        A.      I don't know.

16        Q.      So she came to you to tell you this information

17   because she was your friend?

18        A.      She was a -- she was an acquaintance and an

19   employee of the court.

20        Q.      And what, if anything, did you do in response to

21   this information you received from the judge's secretary?

22        A.      I think I may have told Mr. Graham.  I'm not

23   quite sure.  It's a long time ago.

24        Q.      What did you tell Mr. Graham?

25        A.      To the best of my knowledge, words to the effect

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              104

1    that the county wants us terminated.

2         Q.    What was his response?

3         A.    I don't recall.

4         Q.    He made no response at all to the news that he

5    might be terminated?

6              MR. MacMAIN:  Objection.  He said I don't recall.

7              THE WITNESS:  I don't recall what -- it was a

8    shock to me and just as much as a, I suppose a shock to him

9    and a shock to other people.  Again, I don't recall.  It was

10   just -- it was a long time ago and I don't recall any

11   specific words that I said beyond that.

12   BY MS. WALLET:

13        Q.    Do you recall that you obtained this information

14   from the judge's secretary in or about the summer of 1997?

15        A.    Sometime in 1997.  I'm not quite sure when.

16        Q.    So as far as you knew, you thought you were going

17   to be terminated, you weren't necessarily going to be

18   suspended?

19        A.    I wasn't quite sure of any specific plan that

20   anybody had in mind.

21        Q.    In any event, you were not suspended; is that

22   correct?

23        A.    No, I was not suspended.

24        Q.    And you were not terminated?

25        A.    No, I was not terminated.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                    105


1    Q.     Did anyone at any time threaten you with

2    termination?

3    A.     No.

4    Q.     After you told Mr. Graham that you had heard that

5    the two of you might be terminated, did you ever hear

6    Mr. Graham say anything that would constitute a threat

7    against Ms. Varner?

8    A.     No.

9    Q.     After that time did you and Mr. Graham ever

10   discuss the matter of Ms. Varner's complaint against

11   Mr. Graham?

12   A.     I don't recall specifically.

13   Q.     Did you know, sir, that there was a

14   recommendation that you attend Employee Assistance Program

15   sessions?

16   A.     No.

17   Q.     Were you ever required to attend Employee

18   Assistance Program sessions?

19   A.     No.

20   Q.     Did you ever, other than the Mazzitti and

21   Sullivan training, attend any sensitivity training sessions?

22   A.     No.

23   Q.     Were you asked to do so?

24   A.     No.

25   Q.     Did you ever hear Mr. Graham speak of Ms. Varner

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                106

1   in a sexual manner?

2        A.      No.

3        Q.      Did you ever hear him say she was a part of the

4   cunt club?

5        A.      I did not hear -- that phrase was uttered in our

6   office.  He was accused by the rumor mill of saying that.  I

7   never heard him say that.

8        Q.      You said the phrase was uttered in the office.

9   Who uttered it?

10       A.      I don't recall.

11       Q.      Was it someone under your supervision?

12       A.      I was in charge of the entire office, so the

13  answer would be yes.

14       Q.      And what did you do in response to someone making

15  that statement?

16       A.      I don't recall, but I could say that I didn't

17  encourage any kind of communication or words such as that.

18       Q.      Well, what did you do, sir, to discourage it?

19       A.      I don't recall.

20       Q.      I believe I asked you this before but I'll ask

21  you again.  Did you ever use the term the cunt club?

22       A.      No.

23       Q.      Did you ever agree with someone that individuals

24  were members of the cunt club?

25       A.      No.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                            107


1        Q.      Did you ever hear Mr. Graham say what he wanted

2   to do with Barbara Varner sexually?

3        A.      No.

4        Q.      Did Mr. Graham make sexual references about other

5   women?

6        A.      I don't recall specifically.

7        Q.      Did he make sexual references about his wife in

8   the workplace?

9                MR. ADAMS:  Objection, asked and answered.

10               THE WITNESS:  I didn't hear any.

11  BY MS. WALLET:

12       Q.      Did Mr. Graham ever make references to oral sex,

13  in the workplace?

14       A.      No.

15       Q.      Did you ever hear Mr. Graham tell anyone that he

16  would pay people back or make paybacks to those persons who

17  supported Barbara Varner?

18       A.      No.

19       Q.      Were off-color jokes told in the workplace?

20       A.      Yes, in the past.

21       Q.      How much in the past?

22       A.      They were not typical.  Jokes, off-color jokes,

23  as I, as we said the other day when I was first being

24  deposed, were not common.  They were just in jest part of the

25  humor in the workplace.

Joseph Osenkarski                          108


1       Q.      Have off-color jokes been told in the last year?

2       A.      No.

3       Q.      Did you ever tell any off-color jokes?

4       A.      Perhaps in jest a long time ago.

5       Q.      How long ago?

6       A.      I don't know.  I've been there 39, 38 years.  I

7  would say before I was a chief.

8       Q.      You didn't tell any off-color jokes since you've

9  been a chief?

10      A.      I don't recall.  I'm paranoid now, I don't -- I

11  don't know how to joke anymore.

12      Q.      Did you tell any off-color jokes after June of

13  1997?

14      A.      I don't recall.

15      Q.      Did you hear any off-color jokes in the workplace

16  after June of '97?

17      A.      I don't recall specifically.

18      Q.      Did you hear Mr. Graham tell any off-color jokes

19  after June of '97?

20      A.      No.  He wasn't there very long after June of '97.

21      Q.      Have you observed any conduct on the part of Gary

22  Graham that would indicate that he is a vindictive person?

23      A.      No.  I said the other week under oath that Gary

24  was an excitable person.  It's his personality.  I think he's

25  just excitable.  But he's not a vindictive person, in my

1   opinion.

2       Q.     Do you believe that your staff, the Juvenile

3   Probation office, thinks he has the reputation of being a

4   vindictive person?

5              MR. MacMAIN:  I'll object to the form.  You're

6   asking him to speculate on two different levels.  I think

7   that he can't answer that question.

8              MS. WALLET:  I'll ask a different question.

9   BY MS. WALLET:

10      Q.     Does Gary Graham have a reputation within the

11  Juvenile Probation office staff as being a vindictive person?

12             MR. MacMAIN:  Same objection.

13             THE WITNESS:  There are some staff that don't

14  like him.

15  BY MS. WALLET:

16      Q.     Do you know why?

17      A.     No, not specifically.

18      Q.     Anybody tell you why they don't like Gary Graham?

19      A.     Not specifically, but some people say he was loud

20  and excitable.

21      Q.     But not vindictive?

22      A.     Not vindictive, correct.

23      Q.     Did you have any evidence, you, sir, that Gary

24  Graham engaged in an extramarital affair with Barbara Varner?

25      A.     No.  I was shocked and almost fell out of my

Joseph Osenkarski                                    110


1    chair in the judge's chambers, Judge Sheely's chambers, when

2    Judge Sheely advised me that he was told by Gary Graham that

3    Gary admitted to this affair.

4         Q.    Now, when Judge Sheely told you this, was it just

5    you and him?

6         A.    Yes.  I think it was around about July of, July

7    '97.

8         Q.    And do you know whether Judge Sheely's secretary

9    had told you that you might be terminated before Judge Sheely

10   told you that Gary Graham had told him he had an affair with

11   Barbara Varner?

12        A.    It was -- and I'm not -- I can't recall specific

13   dates, but it was in the same time frame.

14        Q.    Do you know, sir, whether you told Gary Graham he

15   was going to be terminated before he told Judge Sheely that

16   he had had an affair with Barbara Varner?

17        A.    I don't recall.

18        Q.    Do you have any evidence that Gary Graham engaged

19   in flirting conduct with Barbara Varner in the workplace?

20        A.    I recall they were very close friends.  I don't

21   recall any flirtatious behavior.

22        Q.    Let me ask you that separately.  Was there any

23   flirtatious behavior by Gary Graham with respect to Barbara

24   Varner?

25        A.    I didn't observe any.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              111


1      Q.      Did you observe any flirtatious behavior by

2   Barbara Varner with respect to Gary Graham?

3      A.      (Witness nodded head negatively.)

4      Q.      I'm sorry, you have to say yes or no.

5      A.      No.

6              MS. WALLET:  I need to take a break.  10 minutes?

7              (Recess taken from 10:28 until 10:48 a.m.)

8   BY MS. WALLET:

9      Q.      Mr. Osenkarski, did you ever hear Gary Graham use

10  profanity in the workplace?

11     A.      On occasion.  Not regularly.

12     Q.      Did he use the word hell?

13     A.      I don't recall specifically.

14     Q.      Did he use the word damn?

15     A.      I don't recall, you know, the specific words that

16  anybody, including Mr. Graham, may have said, but there has

17  been profanity used in the Probation office.

18     Q.      By Mr. Graham?

19     A.      On occasion.

20     Q.      And on those occasions, have you said anything to

21  Mr. Graham about his use of profanity?

22     A.      No.

23     Q.      Why not?

24     A.      The best answer I could give, because it wasn't

25  directed at anybody particularly.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                112

1     Q.     Was this profanity used in the presence of female

2     employees?

3     A.     I don't recall.

4     Q.     If it had been used in front of the female

5     employees, would that make a difference in your reaction as

6     his supervisor?

7     A.     I don't understand.

8     Q.     Well, sir, did you make a distinction between the

9     use of profanity among the guys in the office as opposed to

10    in front of the women in the office?

11    A.     No.  I don't make a distinction.  If he would

12    have used it and a client would have been there, I would have

13    brought him back and objected to his use of it in front of a

14    client.

15    Q.     Male or female client?

16    A.     Male or female.

17    Q.     And what's your objection to that, sir?

18    A.     Well, it's not professional.

19    Q.     Did you ever hear him use the F word?

20    A.     Not specifically in the office.  Outside the

21    office, not on work time, yes.

22    Q.     Do you socialize with Mr. Graham?

23    A.     I did in the past.

24    Q.     Has something changed that you do not do that

25    anymore?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          113

1        A.      Mr. Graham doesn't work with me anymore.

2   Mr. Graham works at the prison and I don't see him anymore.

3        Q.      You have visited in his home?

4        A.      Yes.

5        Q.      He has visited in your home?

6        A.      Yes.

7        Q.      Frequently?  Infrequently?

8                MR. ADAMS:  What time period are you talking

9   about?

10               THE WITNESS:  Different time periods I would give

11  you a different answer.

12  BY MS. WALLET:

13       Q.      Okay.  '80s.

14       A.      Yes, infrequently.

15       Q.      Late '80s?

16       A.      Yes, infrequently.

17       Q.      Early '90s?

18       A.      Yes, a little more frequently.

19       Q.      Why was that?

20       A.      The '90s we, he and I worked closer because he

21  had an elevated position, PO-II.

22       Q.      Okay.  '93 to '96?

23       A.      Yes, infrequently.

24       Q.      I'm sorry, I didn't hear you --

25       A.      Infrequently.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                        114

1      Q.      Infrequently.  And why was that?

2      A.      Well, I don't know.

3      Q.      The occasion just didn't arise?

4      A.      We were work friends, and I can't say that we

5  were closest of friends, and if he was in the area, he

6  stopped.

7      Q.      Okay.  '96 through '99?

8      A.      Infrequently.

9      Q.      '99 to the present?

10     A.      Not at all.

11     Q.      Why is that?

12     A.      Because we don't work together anymore.

13     Q.      Were you drinking buddies at one time?

14     A.      Gary is not a drinker.

15     Q.      Are you?

16     A.      I used to drink.  I drink very infrequently now.

17 I'm too old, it affects me too negatively.

18     Q.      When you say Gary's not a drinker, he doesn't

19 drink at all?

20     A.      I would describe his drinking habits as one beer

21 or two.  He gets excitable when he drinks Pepsi.

22     Q.      Okay.  And on these occasions when you have

23 socialized with Mr. Graham, those are the occasions when he

24 uses profanity?

25             MR. MacMAIN:  Objection.  I don't think that's

Joseph Osenkarski                                115

1   what he said.  He said he may have heard him use the F word

2   outside the work setting.

3   BY MS. WALLET:

4       Q.    And I'm asking, would it be outside the work

5   setting on these occasions when you've seen him?

6             MR. MacMAIN:  I think the phrasing of your

7   question implied that he was used profanity frequently in the

8   non-work setting.  I don't think that's what the testimony

9   was.

10  BY MS. WALLET:

11      Q.    Well, I'll ask you, when you see Mr. Graham or

12  saw Mr. Graham in the past outside the work setting, on these

13  occasions when you visited in each other's home, did he use

14  profanity on those occasions?

15      A.    He may have, if no one was present.

16      Q.    Did you visit in Mr. Graham's home when his wife

17  was present?

18      A.    Yes.

19      Q.    And does he use profanity in front of his wife?

20      A.    I don't recall that he did.

21      Q.    Did you ever admonish Mr. Graham not to use the F

22  word in the work setting?

23      A.    No.

24      Q.    Did he use the word bitch?

25      A.    I don't recall specifically that he used that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              116


1    word.

2         Q.    Has he used the word bitch in reference to

3    Barbara Varner?

4         A.    No.

5         Q.    You never heard him refer to Barbara Varner as

6    the F-ing bitch?

7         A.    No.

8         Q.    Did you ever say that you would get even with

9    anyone who assisted Barbara Varner?

10        A.    No, absolutely not.

11        Q.    So if someone says you said that, that's a lie?

12        A.    That's not true.

13        Q.    Did you ever make any reference about individuals

14   assisting Barbara Varner in her claim?

15        A.    Absolutely not.

16        Q.    Do you know Debra Green?

17        A.    Yes.

18        Q.    If Debra Green says she heard you say that you

19   would get even with anyone who assisted Barbara Varner,

20   that's not true?

21        A.    Not true.

22        Q.    Do you know why Debra Green might say an untruth

23   about you?

24        A.    I have no idea.

25        Q.    Is Debra Green a part of the cunt club?

 1              MR. ADAMS:  Objection.

 2              THE WITNESS:  I don't know what that club is that

 3      you're referring to, so I don't know.

 4      BY MS. WALLET:

 5         Q.    Have you recently fired a female intern?

 6         A.    A female intern who was on staff a few days

 7      resigned.

 8         Q.    Was it a voluntary resignation?

 9         A.    She was asked to resign.

10         Q.    Who asked her to resign?

11         A.    I did.

12         Q.    Why did you ask her to resign?

13         A.    Because she was facing a criminal charge in

14      Cumberland County and did not disclose this fact, this fact

15      to me.

16         Q.    And what was the criminal charge?

17         A.    Harassment and I believe harassment by

18      communication.

19         Q.    Do you know whether it was a misdemeanor or a

20      felony?

21         A.    I'm not sure.

22         Q.    Was she fired because of the charge, or because

23      she failed to disclose it to you?

24         A.    Both, the non-disclosure and the nature of the

25      charge.

Joseph Osenkarski                          118

1     Q.     So if it would have been a more serious charge

2     but she disclosed it, that would be all right?

3     A.     In that particular case it was the nature of the

4     charge.

5     Q.     And what was it about harassment or harassment by

6     communication?

7     A.     It was brought to my attention.

8     Q.     By whom?

9     A.     By a district attorney, a worker from the

10    District Attorney's Office, that this charge or these charges

11    were pending.

12    Q.     Has she been convicted of those charges?

13    A.     No.

14    Q.     Had there been any resolution of the charges at

15    the time that you asked for her resignation?

16    A.     No.

17    Q.     Have you had male interns who have been convicted

18    of, for example, drunk driving charges?

19    A.     We had one male intern who had a DUI.

20    Q.     Was he asked to resign?

21    A.     No.  We were told of the DUI charge near the

22    completion of his internship.

23    Q.     Why was he not asked to resign?

24    A.     Because of the nature of the DUI charge in

25    relation to the nature of a harassment charge.  I felt there

Joseph Osenkarski                          119


1    was a wide degree of difference.

2        Q.      What exactly is that difference?

3        A.      Poor judgment versus deliberate action.

4        Q.      And which is the poor judgment?

5        A.      DUI.

6        Q.      And you felt that the harassment or harassment by

7    communication was a deliberate action?

8        A.      Well, it was more serious.

9        Q.      And the male had been found guilty of the DUI,

10   correct?

11       A.      He was in ARD.

12       Q.      Why didn't you wait to see whether or not the

13   female intern might be admitted into the ARD program?

14       A.      Because of the controversy and the nature and in

15   my opinion the more serious nature of the harassment charge.

16       Q.      Did your staff agree with the decision to ask for

17   the resignation of the female intern?

18       A.      It was a unanimous decision on the part of the

19   management team.

20       Q.      And who is that team?

21       A.      Meaning Thomas Boyer, a supervisor, Sam Miller, a

22   supervisor, and myself.

23       Q.      So all three of them agreed that this female

24   intern should be asked for her resignation?

25       A.      Yes.

Joseph Osenkarski                          120

1       Q.      Including Mr. Boyer?

2       A.      Yes.

3       Q.      Were they aware of the situation in which the

4    male intern was permitted to complete his ARD program?

5       A.      I believe.

6       Q.      Did you discuss that in coming to this decision

7    with your management team?

8       A.      Yes.

9       Q.      So those people, Mr. Miller, Mr. Boyer and

10   yourself, knew about the male intern?

11      A.      Yes.

12      Q.      Now, individuals under your direct supervision

13   are involved in the DUI program, are they not?

14      A.      We have several instructors in the DUI program.

15      Q.      And part of that DUI program involves instruction

16   in such things as responsible drinking, driving activities,

17   that sort of thing?

18      A.      Yes.

19      Q.      Was the male intern a part of that DUI program

20   that was instructed by individuals under your supervision?

21      A.      I don't know.

22      Q.      Have you and Mr. Graham ever discussed in front

23   of others sexual things that you would like to do to some of

24   the women in the office?

25      A.      No.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    121


1      Q.      Did you ever discuss in front of others what you

2   would like to do with the women you have dated, in the county

3   offices?

4      A.      No.

5      Q.      Did you ever talk in the office about how you had

6   hot peppers on your fingers and that your girlfriend

7   complained that it would burn her when you touched her

8   sexually?

9      A.      I don't recall.

10     Q.      Did you ever call Mrs. Varner and ask her whether

11   she thought that you had a chance of making a sexual conquest

12   with an intended hire named Lauren?

13     A.      No.

14     Q.      Did you ever call Mrs. Varner late at night and

15   say:  You think I have a chance with Lauren?

16     A.      No.

17     Q.      Did you ever call Mrs. Varner on a Saturday

18   night?

19     A.      No.

20     Q.      Did you ever call Mrs. Varner while you were

21   intoxicated?

22     A.      Not that I recall.

23     Q.      Did you ever tell any of your probation officer

24   employees that they should not talk about Mrs. Varner's case?

25     A.      I don't recall ever saying that.

Joseph Osenkarski                              122


1      Q.     We talked when we were here before,

2    Mr. Osenkarski, about a charge that was made by Ms. Houser,

3    Kerry Houser, another probation officer.  You recall the

4    discussion you and I had about that?

5      A.     Yeah.  Yes.

6      Q.     Did you ever tell anyone at that time not to talk

7    to Ms. Houser about that charge?

8      A.     No.

9      Q.     Are there any women in the courthouse who work in

10   the courthouse with whom you have had sexual relations?

11     A.     No.

12     Q.     Not one?

13     A.     Not one.

14     Q.     Have you ever said to anyone that you will do

15   anything to get rid of Mrs. Varner?

16     A.     I never said that.

17     Q.     What is your relationship currently with

18   Ms. Varner?

19     A.     I feel I have a good relationship with Ms. Varner

20   and always have, and I've always treated her with respect,

21   since I first met her in the late '80s.

22     Q.     Has your relationship with Ms. Varner changed

23   over the years?

24     A.     No.  I've never had anything but a professional

25   relationship with her.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                         123


1        Q.      How is her work performance?

2                MR. ADAMS:  What time period?  Objection.

3                MS. WALLET:  Present.

4                THE WITNESS:  Satisfactory.

5    BY MS. WALLET:

6        Q.      Has it always been satisfactory?

7        A.      Yes.

8        Q.      And you've always rated her satisfactorily?

9        A.      I don't directly rate her but I oversee the

10   evaluation and sign off on it.

11       Q.      You did at one time rate her directly, correct?

12       A.      When I was a supervisor, I believe I did.

13               MS. WALLET:  Let's have marked as Osenkarski 3 an

14   employee performance review.

15               (Osenkarski Deposition Exhibit No. 3 was marked.)

16               THE WITNESS:  Yes, this was a long time ago but I

17   recall it, that she was a fair new employee.

18               MR. ADAMS:  Take your time and look at it and

19   then wait for her to ask a question.

20               THE WITNESS:  All right.

21   BY MS. WALLET:

22       Q.      Tell me when you're ready.

23       A.      Okay.

24       Q.      I've handed you what has been marked as

25   Osenkarski Deposition Exhibit No. 3.  Your name appears on

Joseph Osenkarski                                124


1    that document on the fourth page; is that correct?

2         A.    Yes.

3         Q.    And you signed both as the rater and as the

4    reviewer?

5         A.    Yes.

6         Q.    And you rated this employee, specifically Barbara

7    Varner, as a commendable overall rating?

8         A.    Yes.

9         Q.    Do you believe that accurately reflected her work

10   during the period of time from 12/04/95 through 12/04/96?

11        A.    Yes.

12        Q.    After this time have you been the person who

13   completes the employee performance rating?

14        A.    No.  I was not the direct rater.

15        Q.    And what is your role with regard to reviewing

16   employee performance reviews?

17        A.    As a chief I review all of the evaluations of all

18   of the subordinates.

19        Q.    And what is your role if an employee disagrees

20   with the rating?

21        A.    We schedule a review hearing, if you want to call

22   it for lack of a better word.

23        Q.    And what is a review hearing?

24        A.    I hear the objection and I hear the rater's

25   response.

1      Q.     And then what do you do?

2      A.     And then I make a finding.

3      Q.     Have you ever changed any ratings that have been

4  made by your supervisors?

5      A.     I don't recall that I did.

6      Q.     So you hold this hearing and then you make a

7  finding?

8      A.     Yes.

9      Q.     Do you do that in writing, sir?

10     A.     If I made a change, we would put it in writing.

11     Q.     But you don't recall ever having made a change

12  for any employee?

13     A.     I don't recall.

14            MS. WALLET:  I'm going to show you what we'll

15  mark as Deposition Exhibit 4.

16            (Osenkarski Exhibits 4, 5, 6 and 7 were marked.)

17            MS. WALLET:  4 is the employee performance review

18  for Barbara Varner from 12/4/98 through 12/4/99.  No. 5 is a

19  second performance review for 12/4/98 through 12/4/99.

20            6 is an employee performance review for 12/4/99

21  through 12/4/OO.

22            MR. ADAMS:  'O1?

23            MS. WALLET:  'OO.  And 7 is 12/4/OO to 12/4/O1.

24  BY MS. WALLET:

25     Q.     Mr. Osenkarski, do you have all four of these

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          126


 1   documents in front of you?

 2              MR. ADAMS:  If he can have a moment to just

 3   review those before you ask questions, that would be good.

 4              MS. WALLET:  Sure.

 5              THE WITNESS:  Go ahead.

 6              (Pause from 11:21 until 11:29 a.m.)

 7   BY MS. WALLET:

 8       Q.    Are you ready, sir?  Before I ask you about the

 9   specific documents, what is the policy with regard to

10   employee performance reviews within, let's say, the Juvenile

11   Probation Department?

12       A.    The supervisors who are directly involved in the

13   supervision of a particular employee do the rating, the

14   direct rating.  And I believe they have a conference with the

15   employee and go over the performance review.

16       Q.    Are these ratings done regularly, sir?

17       A.    Annually.

18       Q.    Are there any rules about how soon after the end

19   of the rating period the rating is to be completed?

20       A.    Not specifically, but promptly, within, let's

21   say, a month.

22       Q.    And do you believe that the individuals under

23   your direct supervision are fairly prompt with doing their

24   employee performance reviews?

25       A.    Yes, the supervisors are prompt.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                               127


1       Q.      Now, I'd like to turn to what has been marked as

2   Deposition Exhibit 4.  Do you have that in front of you, sir?

3       A.      Yes.

4       Q.      And this is the first one for the period between

5   12/4/98 and 12/4/99.  Do you know, sir, why it was not signed

6   by a rater or reviewer?

7               MR. ADAMS:  This particular copy that you

8   submitted, Counsel?

9               MS. WALLET:  Yes.

10              THE WITNESS:  I don't recall specifically, but

11  there's a check block stating that I would like to discuss

12  this rating with my reviewing officer.

13  BY MS. WALLET:

14      Q.      Do you know whether you received what has been

15  marked as Deposition Exhibit 4 before it was given to

16  Ms. Varner in or around December of '99?

17      A.      I don't recall it specifically.

18      Q.      Do you know who the rater was at that time?

19      A.      There were probably two raters:  The supervisors,

20  Thomas Boyer and Henry Thielemann.

21      Q.      Do you have any other knowledge, sir, about the

22  document marked Deposition Exhibit 4?

23      A.      No.

24      Q.      Do you remember, sir, that Ms. Varner did ask to

25  discuss this rating with you?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                128


1      A.      Not specifically, but most likely she did because

2   she didn't sign it and she marked that block.

3      Q.      Do you know whether you did speak with her about

4   this particular rating?

5      A.      Well, my signature appears on Exhibit 5, which is

6   the same rating period.

7      Q.      Yes, sir.

8      A.      So I probably did.

9      Q.      You don't have any independent recollection of

10   the circumstances surrounding Exhibits 4 and 5?

11      A.      No, except that I see that the Exhibit 5, which

12   is the second and signed rating, was an improvement over

13   Exhibit 4, which is the unsigned copy.

14      Q.      And did you play any role in the change from

15   overall satisfactory to overall commendable?

16      A.      I'm sure I did or I wouldn't have signed it.  So

17   the answer is yes, but I don't specifically recall the

18   incident.

19      Q.      Do you believe the document marked Deposition

20   Exhibit 5 accurately reflected Ms. Varner's performance for

21   the period between 12/98 and 12/99?

22      A.      I believe so.  It's a good rating.  Satisfactory,

23   of course, is meets the standards, and of course, commendable

24   exceeds the standards.  And she went from a satisfactory to a

25   commendable.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                               129


 1        Q.        You have no recollection, sir, why there was a

 2    change from Deposition 4 to Deposition 5?

 3        A.        I don't have any recollection, but I'm sure that

 4    I would have asked the supervisors for an explanation.

 5        Q.        Now, with regard to Exhibit 5, Ms. Varner still

 6    disagreed with the rating even though it was a commendable

 7    overall, correct?

 8        A.        Yes, that's what she marked on the final page.

 9        Q.        And she wrote some handwritten comments that are

10    attached with regard to each of the criteria for rating?

11        A.        Yes.

12        Q.        Did you review that document, sir, at the time

13    she submitted it?

14        A.        Because my signature's on the final page, I would

15    say that I did.

16        Q.        And what, if anything, did you do in response to

17    her handwritten comments?

18        A.        I read them and I'm sure I -- I feel I discussed

19    it with the supervisors and perhaps suggested improvements,

20    which is why she went from satisfactory to commendable.

21        Q.        Do you know whether you reviewed the handwritten

22    document before the rating became commendable, or whether she

23    submitted her comments after she had been rated commendable?

24        A.        I don't recall, and there are no dates on the

25    handwritten documents.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                        130


1       Q.      So you just have no recollection, really, of how

2   this came about?

3       A.      No.

4       Q.      Do you have what's been marked as Exhibit 6?  The

5   period '99 through 'OO.

6       A.      Yes .

7       Q.      And your signature appears on this document?

8       A.      Yes, it does.

9       Q.      And do you believe that this document accurately

10  reflects her work performance for the rating period from

11  12/4/99 through 12/4 of '00?

12      A.      Yes.  She would have had an additional year

13  experience, and in looking at this it's a major improvement,

14  which I agreed to as the reviewer.

15      Q.      And she has now been overall rated as

16  outstanding?

17      A.      Yes.

18      Q.      Let's look at the document marked Deposition

19  Exhibit 7.  Does your signature appear on that document?

20      A.      Yes.

21      Q.      And in this period for 12/4/OO through 12/4/O1

22  she was rated as overall outstanding?

23      A.      Yes.

24      Q.      Do you believe it accurately reflects her work

25  performance for that period of time?

Joseph Osenkarski                    131

1      A.    Yes.

2      Q.    Mr. Osenkarski, who does your performance

3  evaluations?

4      A.    The president judge.

5      Q.    Do you receive them regularly?

6      A.    I receive them regularly except for the year

7  before last.  I don't recall receiving one for the year, I

8  guess that would have been two years ago.  I received one

9  just a few weeks ago in January, January 3rd or 4th, I

10  believe, the first week of the new year.

11      Q.    And now President Judge Hoffer does your

12  performance evaluations?

13      A.    Yes.

14      Q.    And prior to that, it was President Judge Sheely?

15      A.    Yes.

16      Q.    And did you have evaluations from President Judge

17  Shughart prior to that?

18      A.    Yes.

19      Q.    Before you were the chief, who actually did your

20  performance evaluations?

21      A.    My performance evaluations were done by Ken

22  Bolze.

23      Q.    So would you have been actually evaluated by

24  Judge Shughart?

25      A.    Yes.  Excuse me.  I don't recall.  I'd have to

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              132


 1   pull my file and -- there were different rating systems done

 2   during different time periods in the last 38 years of my

 3   employment, and I know that the chiefs received ratings from

 4   the president judge.  Supervisors generally received ratings

 5   from the chief.  So I presume that most of the time as a

 6   supervisor I would have received the rating from the chief,

 7   but there were times during that long stretch, which was 1977

 8   until 1996 as a supervisor that Judge Sheely or Judge

 9   Shughart could have asked to review them, but I don't know

10   specifically.

11        Q.     Have you always received satisfactory ratings,

12   sir?

13        A.     Yes, I have always received satisfactory ratings.

14        Q.     Or above?

15        A.     Or above, yes.

16        Q.     In your most recent rating, how were you rated

17   overall?

18        A.     Satisfactory.

19        Q.     Was that an increase or a decrease from the prior

20   rating?

21               MR. ADAMS:  Or the same.

22   BY MS. WALLET:

23        Q.     Or the same.

24        A.     I think a slight decrease, going from memory,

25   maybe, in one category.  It was they were -- I remember that

Joseph Osenkarski                          133

 1    the individual ratings for the job factors either were

 2    satisfactory or commendable.  There were more satisfactories

 3    than commendables this last rating period.

 4         Q.    At any time has the Complaint filed by Ms. Varner

 5    been mentioned in any of your performance evaluations?

 6         A.    I'm going to say no.

 7         Q.    You would say no --

 8         A.    No.  They were never mentioned, to the best of my

 9    knowledge.  The Complaint was never mentioned in my

10    performance review.

11         Q.    Was your plan of correction that has been marked

12    as Exhibit 2 ever mentioned in your performance reviews?

13         A.    No.

14         Q.    Have you ever received any criticism of the way

15    in which you handled the Complaint filed by Ms. Varner?

16         A.    No.

17         Q.    Would you tell me, sir, what your understanding

18    is of the role of seniority with respect to employees in the

19    Juvenile Probation Department?

20         A.    Seniority is one factor which is used to allow

21    employees time off, vacation time, scheduling on-call work

22    weekends.  That's the bulk of it.

23         Q.    How about promotions?

24         A.    It's one factor, but promotions are based more on

25    performance reviews than seniority.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          134

1      Q.      Does it play any role in promotions?

2      A.      I'm going to say a small role.

3      Q.      So if I were to list the way in which seniority

4    was used within the Juvenile Probation office, you listed for

5    me when people are on call, when they can get vacations --

6      A.      Right.  If two POs wanted the same period of time

7    to be taken on vacation, it's generally granted because we

8    have enough POs to cover it.  We're a very employee-friendly

9    office when it comes to selecting vacation.  I don't think

10   anybody's ever been denied.

11            And the other factor would be in scheduling

12   on-call weekends.  And even then an employee who doesn't get

13   the weekend he or she wants, they may go to the other 14 or

14   15 employees and seek a change by switching individual

15   schedules, and we allow that.

16     Q.      Is there any other benefit or -- I'll just leave

17   it at benefit, is there any other benefit that is governed by

18   seniority?

19     A.      I'd say those are the two major, if you want to

20   call them benefits, of seniority.

21     Q.      Did you say two?

22     A.      Those are the major, yes.

23     Q.      I'm considering it three:  On-call, vacations,

24   and to some degree in promotions.

25     A.      To some degree.  Okay.  So we'll call it three.

1      Q.      Okay.  Can you think of anything else?

2      A.      No.

3      Q.      Now, there's been quite a controversy, would you

4    agree, within the Juvenile Probation office and to a lesser

5    extent within the Adult Probation office regarding the matter

6    of seniority?

7              MR. ADAMS:  Objection.  What do you mean by

8    controversy?

9              MS. WALLET:  He can tell me whether he thinks

10   there was a controversy.

11             THE WITNESS:  I'm prepared to respond.  Let's --

12   I'm going to give you a historic answer.  There has been

13   controversy over the seniority policy for years, especially

14   when we were a combined office.  So much so that it was one

15   of the first things I took the responsibility to try to fix

16   when I was given a desperately understaffed and

17   underprogrammed office.  So because of that, even before we

18   were formally split in January 1st of 1997, I called a

19   meeting right after Mr. Bolze left and I decided that it

20   should be one of the first of the many, many things that had

21   to be fixed

22   BY MS. WALLET:

23     Q.      Why did you think it should be first?

24     A.      Because of the complaints by other staff,

25   unhappiness with people who are still on staff and with

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    136

1    people who have since left.

2              I'm going to go back and say that the entire time

3    Mr. Bolze was chief he was approached by several staff who

4    disagreed with the seniority policy, because there were

5    several factors that were used to make up what was the then

6    seniority list, and it was ongoing.  For example, there was

7    credit given for part-time service, credit given for service

8    generally with the county.  For example, I'm just using this

9    as an example, you know, a nurse could come in or a

10   maintenance worker into the then-combined Probation office

11   and be given credit for service, full-time service and

12   part-time service in other departments.  And then there was

13   an inherent unfairness to that policy, which was felt by a

14   lot of people.

15             So I decided, again, being a brand new chief,

16   before we were formally split, to call this meeting and said

17   we've got to do something about this nagging seniority policy

18   and now we've got to come up with a fair factor.  So after we

19   met --

20        Q.    And who is we, sir?

21        A.    Myself and I think Gary Graham and Tom Boyer.  We

22   decided we were going to do something about it.  So we

23   consulted with the then-chief of Adult Probation, and --

24        Q.    And who was that, sir?

25        A.    That's John Roller.  And we told him we were

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                137

1   looking into making changes.  And he decided that he was

2   going to let his policy alone for the time being, so.

3   Because we were splitting we said we were going to do

4   something about it.

5            So after meeting, talking, pulling together old

6   policies, I delegated I believe it was Tom Boyer to go to all

7   of the people who are coming into Juvenile Probation, and I

8   also consulted with some of the people or all of the people

9   who were staying with the Adult side, to tell them we were

10  going to make changes and to take suggestions.

11           I further told him that our decision was to come

12  up with the fairest way, and I felt the fairest way to fix

13  this broken seniority policy was to come up with a single

14  common denominator, for lack of a better word, and that was

15  the useful time service in Juvenile Probation.

16           I further told Tom, because I was crazily looking

17  into, you know, going through trying to find money for, you

18  know, the school-based probation program, which was my idea

19  and Gary's idea, and that was a big thing we had to do

20  amongst other things, I told Tom to just tell these people

21  what we had planned, and I said, make sure you go over it

22  with everybody.  I don't want -- if we fix this thing or if

23  we make it fairer I don't want to redo it.

24           So he went to everybody, and I gave him the time

25  to do it.  And I said, come back to me with a report, verbal

Joseph Osenkarski                        138

1   report, and tell me how people felt about the plan single

2   common denominator, which was full-time service in Juvenile

3   Probation and Juvenile Probation only.

4           So he did that.  Came back and said, everybody's

5   happy with it.  I'm summarizing, you know, because we're

6   going back to 1996.  So I said, fine, we'll not even wait

7   until the 1st of the year when we officially split and we'll

8   go ahead and implement it.  So we did.

9       Q.    Okay.  Now, let's --

10      A.    Sorry about the long explanation, but it's just

11  something that was, you know, something that I felt we had to

12  do first and do it quick and -- not quick, but make it

13  better.

14      Q.    Okay.  There were two controversial issues, will

15  you agree?  The question of whether part-time should be

16  counted the same as full-time, correct?

17      A.    Part-time the same as full-time, and secondly --

18      Q.    The second issue was whether county service

19  outside of the Probation office should be counted towards

20  seniority, correct?

21      A.    Yes.

22      Q.    Okay.  Now, is it accurate, sir, that when

23  Mr. Bolze was the chief, full-time and part-time service was

24  counted?

25      A.    Yes.

Joseph Osenkarski                              139


1      Q.      And is it accurate, sir, that when Mr. Bolze was

2   chief, county service of any kind was counted?

3      A.      Yes.

4      Q.      And for how long do you believe that was the

5   policy?

6      A.      For as long as the time Bolze was chief, which I

7   believe was 11 years.

8      Q.      Now, Bolze retires, you come in as chief,

9   correct?

10     A.      Yes.

11     Q.      And you decide --

12     A.      No, excuse me.  No.  I mean, the quotes,

13   management team --

14     Q.      Mr. Boyer, Mr. Graham, and you decided that this

15   was an issue that needed to be looked at?

16     A.      Yes.

17     Q.      Let me ask you before we get too far along, if

18   you can identify what I'll mark as Exhibit 8.

19             (Osenkarski Deposition Exhibit No. 8 was marked.)

20   BY MS. WALLET:

21     Q.      Have you had a chance to look at what's been

22   marked as Deposition Exhibit 8, Mr. Osenkarski?

23     A.      I'm looking at it right now.

24     Q.      Okay.  I'll give you a minute.  You tell me when

25   you're ready.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          140

1      A.     Go ahead.  I think I understand this.

2      Q.     Okay.  Can you tell me what Deposition Exhibit 8

3  is?

4      A.     It's a memo from a line probation officer, Lyle

5  Herr, who is an Adult supervisor now, to Ken Bolze, the chief

6  at the time.

7      Q.     Okay.  And do you remember seeing this document

8  in or about January of '96?

9      A.     Frankly, no.  It's a long time ago, but I may

10  have, because Mr. Bolze -- I had written more than one memo

11  on this topic because it was an issue.

12      Q.     And is it accurate to say that Mr. Herr wrote

13  this memo to Mr. Bolze because he had a complaint about how

14  seniority was used with regard to a trip to Atlanta?

15      A.     Yes.

16      Q.     Okay.  Now, let me ask you specifically, sir,

17  Mr. Herr writes to Mr. Bolze that the policy is and has been

18  to credit all continuous service an employee has with the

19  county.

20          My question is, sir:  Do you agree that that was

21  the policy under Mr. Bolze?

22      A.     Yes.  All service was the policy.

23      Q.     And do you agree, sir, with Mr. Herr when he said

24  that any modifications to the existing policy will not be

25  retroactive?  Do you have any recollection of that, sir?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                            141

1      A.     No, I don't.

2      Q.     Do you recall any discussions about the

3   retroactivity of any changes to the seniority policy?

4      A.     No.  I recall unhappiness with more than one

5   person, and an ongoing unhappiness with the earlier policy.

6      Q.     Do you recall any representations by Judge Sheely

7   that changes to the seniority policy would not be

8   retroactive?

9      A.     No.  I think that he left it up pretty much to

10   the chief to --

11      Q.     And that would have been Bolze while he was

12   chief, and then you while you were chief?

13      A.     Yes.

14      Q.     Is it accurate to say that Judge Sheely didn't

15   really care about the seniority issue?

16      A.     He didn't spend a lot of time on it, but I

17   wouldn't say he didn't care.  He wanted people to be happy or

18   as happy as they could be in a work environment.

19      Q.     Okay.  Is it accurate to say that Ms. Varner had

20   prior county service outside the Probation office?

21      A.     Yes.  She had a number of years of full-time

22   experience in Children and Youth.

23      Q.     Okay.  And there's no question that she was

24   full-time in that job, not just part-time?

25      A.     I believe she was full-time the entire time, yes.

Joseph Osenkarski                                142


1      Q.      So at least part A of the controversy of

2  full-time versus part-time didn't apply to her, but the

3  second part, whether or not county service would apply, did

4  have application to her?

5      A.      Yes.

6      Q.      Now, you are aware, sir, that Ms. Varner had

7  complaints about someone moving above her in the seniority

8  list based on the policy that you implemented, correct?

9      A.      She -- yes.

10      Q.      And what --

11      A.      But I would like to state that when -- I'm

12  recalling that when I told Mr. Boyer to be sure to go to all

13  parties concerned to get their reaction to the intended

14  changes, again, back to the single common denominator which

15  was going to be the change, full-time Probation service,

16  everyone, including Ms. Varner, was happy with it, or happier

17  with it.

18      Q.      And why would you say that Ms. Varner was happy

19  with it?

20      A.      I don't know.  But that report that was given to

21  me by Mr. Boyer included her in the, quotes, happy people,

22  people that -- the satisfied people.

23      Q.      Okay.  So did Mr. Boyer come to you and say:

24  I've talked to Barb Varner and she's okay with this?

25      A.      I talked to Mr. Boyer and he said that everyone

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          143


1    was happy with it.

2         Q.    He didn't specifically say anything about

3    Ms. Varner?

4         A.    No, I don't recall that.

5         Q.    Okay.  Now, typically how were probation officers

6    made senior probation officers?

7         A.    Well, senior probation officers by a combination

8    of years spent in the Probation Department as well as

9    education.

10        Q.    Okay.  Well, while we're on that subject, there

11   is an education requirement, is there not, to become a

12   probation officer?

13        A.    Yes.

14        Q.    And what is that education requirement?

15        A.    The Juvenile Court Judges Commission hiring

16   standards states that a person will have a degree in social

17   services through criminal justice or another appropriate

18   degree after it's reviewed, X-number of credit hours, 18 or

19   21 credit hours in the social sciences.

20        Q.    Okay.  And do you know whether or not that was

21   the policy at the time Ms. Varner was hired?

22        A.    Yes.

23        Q.    So Ms. Varner had a degree that was deemed at

24   that time to be in criminal justice or an appropriately

25   related degree?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              144

1      A.    Yes.

2      Q.    And in your example of a nurse, for example, who

3  had county time, that individual would still have to have an

4  appropriate degree, correct?

5      A.    Yes.

6      Q.    So your example was for an individual who might

7  have county time in what seemingly was totally unrelated, but

8  could only be hired if she or he had the appropriate degree?

9      A.    Yes.

10     Q.    All right.  So, in your experience can you recall

11  any individual who was made a senior probation officer

12  without having higher seniority than the other individuals

13  who competed for the position?

14     A.    No.

15           MS. WALLET:  I'd like to hand you what we'll mark

16  as Deposition Exhibit 9.

17           (Osenkarski Deposition Exhibit No. 9 was marked.)

18  BY MS. WALLET:

19     Q.    Tell me, sir, when you're ready to talk about it.

20     A.    Go ahead.

21     Q.    Do you recognize what has been marked as

22  Deposition Exhibit 9, sir?

23     A.    Yes.  It's a memo from Mr. Bolze to the line POs,

24  to all line staff as well as supervisors.

25     Q.    And you're the J. Osenkarski who is on the cc

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    145

1    list?

2         A.    Yes.

3         Q.    Do you have any reason to believe that you didn't

4    receive this document in or about May June of '96?

5         A.    I feel I did, yes.

6         Q.    You think you did?

7         A.    Yes.

8         Q.    Is it accurate to say, sir, that this handwritten

9    memo was announcing that certain individuals were being made

10   senior probation officers?

11        A.    Yes.

12        Q.    And the list is the last paragraph just before

13   Mr. Bolze's signature?

14        A.    Yes.

15        Q.    And is it accurate to say that each of these

16   individuals on this list received rather a substantial pay

17   increase --

18        A.    Two steps.

19        Q.    -- from 16 E to 18 D?

20        A.    Yes.

21        Q.    Do you have any idea of how many dollars that

22   might have been?

23        A.    It would have been two steps, 5 percent.

24        Q.    Okay.  So it would be at least a 10 percent pay

25   increase?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                           146

1        A.      Over a two-year period.

2        Q.      What does that mean?

3        A.      Well, 5 percent the first year, and after the

4    successful completion, with a successful annual evaluation,

5    5 percent in the second year.

6        Q.      Okay.  I guess my question is:  What was the

7    percentage increase when you went from 16 E to 18 D?

8        A.      Without having a county salary schedule, I think

9    it's 10 percent, two steps.

10        Q.      And isn't it accurate to say these people got an

11    immediate 10 percent salary increase?

12        A.      I think it's 5.

13        Q.      If you don't know, sir, that's fine.

14        A.      5 and 5, I believe, over a two-year period as

15    best I can answer your question.

16        Q.      Okay.  And is it true, sir, that all of the

17    individuals listed here in this last paragraph received that

18    pay increase based on seniority?

19        A.      And job performance.

20        Q.      Okay.  Well, if you were crappy at your work,

21    presumably you weren't going to get this promotion, correct?

22              MR. ADAMS:  Objection as to form.

23    BY MS. WALLET:

24        Q.      If you were a poor performer presumably you

25    weren't going to be promoted?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                    147


1      A.     Well, you would be passed over if you were a poor

2  performer.

3      Q.     Do you know of anyone with higher seniority than

4  this group of people who was passed over?

5      A.     No.

6             MS. WALLET:  I'd like to show you what we'll mark

7  as Deposition Exhibit 10.

8             (Osenkarski Deposition Exhibit 10 was marked.)

9  BY MS. WALLET:

10     Q.     Tell me when you're ready, sir.

11     A.     Go ahead.

12     Q.     Do you recognize what we've marked as Deposition

13  Exhibit 10?

14     A.     Yes.

15     Q.     And you're the Joe Osenkarski who is listed on

16  the cc list?

17     A.     Yes.

18     Q.     Do you have any reason to believe you did not

19  receive this memo in about April of '98?

20     A.     No.

21     Q.     Is it accurate to say that the purpose of this

22  memo was to put a hold on certain actions?

23     A.     Yes.

24     Q.     I'd like to direct you to the comment sort of in

25  the middle of the second full paragraph, the one that starts

Joseph Osenkarski                          148


 1    "until this point"?

 2        A.    Yes.

 3        Q.    Would you just read that and the following

 4    sentence?

 5        A.    (Reading):  Until this point Ms. Varner has not

 6    been hurt in any financial way through this, throughout this

 7    whole process.  Needless to say, we do not want to add to her

 8    case in any manner.  It is felt, of course, that these

 9    actions may very well give more credence to her allegations.

10        Q.    Now, what, if anything, happened in response to

11    this April 6th, 1998, memorandum?

12        A.    We had a meeting that was discussed in the last

13    paragraph, and we were told I believe by John Ward, who was

14    the chief clerk at the time, that the proposed action would

15    be held up, there would be no promotions.

16              MS. WALLET:  Now, I'd like to show you what we'll

17    mark as Deposition Exhibit 11.

18              (Osenkarski Deposition Exhibit 11 was marked.)

19    BY MS. WALLET:

20        Q.    Do you remember receiving the document we've

21    marked as Exhibit 11 in or around March of 1998?

22        A.    Yes.

23        Q.    And what, if anything, did you do in response to

24    receiving the March 31 memo from Ms. Varner?

25        A.    Well, I remember objecting to the second-last

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                149


1    paragraph, and that objection was that I consider whether the

2    officer has a family to raise as to who gets promoted, and

3    that was not my position.

4         Q.    Did you ever tell Gary Graham that whether or not

5    someone had children or a family would be a consideration in

6    your mind?

7         A.    I didn't, no.

8         Q.    Do you know whether you said anything that would

9    allow Mr. Graham to reach that conclusion?

10        A.    I don't recall ever saying anything along those

11   lines to permit him to make that conclusion.

12        Q.    Now, the complaint that Ms. Varner had was about

13   the promotion of Mr. Brandt, correct?

14        A.    Well, essentially, yes.  He --

15        Q.    Why do you say essentially?

16        A.    He moved up above Barbara Varner.

17        Q.    So as a result of the action that you

18   implemented, and that action being that county service no

19   longer was used for seniority purposes but only service

20   within the Probation Department, Mr. Brandt jumped ahead of

21   Mr. Varner on the seniority list, correct?

22        A.    Yes, because of his number of years in Juvenile

23   Probation.

24        Q.    Was there anyone else who as a result of the

25   implementation of your policy lost status on the seniority

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                150


 1   list?

 2        A.     No.

 3        Q.     So your policy affected only two people:

 4   Mr. Brandt and Ms. Varner?

 5        A.     Yes.

 6             MR. ADAMS:  Objection.  Do you know?

 7             MS. WALLET:  I believe he answered.  I thought he

 8   said yes.

 9             THE WITNESS:  In reality, Mr. Brandt moved up a

10   slot above Barbara Varner.

11   BY MS. WALLET:

12        Q.     But Mr. Brandt's promotion didn't have anything

13   to do with the fact that he had a family and children?

14        A.     He didn't have any children I don't think at the

15   time.  He has two now.  So the answer is no.  Years of

16   service in the Probation --

17        Q.     Okay.

18        A.     -- was the factor.

19        Q.     Now, did you believe that the policy that you had

20   implemented when you became chief, that is, not to count

21   county service but only service in the Probation Department,

22   was established as of March of 1998?

23        A.     I don't recall the date that it was established.

24        Q.     Do you remember, did you have Mr. Boyer look into

25   this issue before or after Ms. Varner wrote her memo in March

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                         151

1  of '98?

2        A.      It was before.

3        Q.      You think it was before.  Okay.

4        A.      And the senior PO concept came up about the same

5  time, just coincidentally, which is what brought this to a

6  head.  It was a -- and let me give you an explanation here.

7  We felt that, we, the administration, under Mr. Bolze, felt

8  that, you know, having -- we had a lot of people with a lot

9  of years of experience, and we felt that an additional step

10  in our structure would be a good professional move.  So we

11  made the recommendation to the county.  It was studied by the

12  county and they approved putting an additional step in our

13  salary structure.

14        Q.      And who approved that, sir?  The salary board?

15        A.      The salary board had to approve it, but

16  specifically who?  It was -- John Ward, the chief clerk,

17  studied it after we made the recommendation to provide this

18  extra step for better incentive.

19        Q.      And who, sir, comprises the salary board?

20        A.      The commissioners, the chief clerk.

21        Q.      And who does the chief clerk work for?

22        A.      The commissioners.  And I believe the controller

23  may be a part of the salary board.

24        Q.      And who does the controller work for?

25        A.      The county controller.  He's a row office holder

Joseph Osenkarski                              152


1    in the county administration.

2        Q.     So the problem, if I may summarize, the problem

3    was once you became a probation officer II there wasn't

4    anywhere you could go from a salary standpoint?

5        A.     We felt that better professionally, you know,

6    enhance the overall department, there was a need for another

7    intermediary step.

8        Q.     So the only real salary bump you could get as a

9    probation officer was to become a senior probation officer?

10       A.     For the bulk of the people, yes.

11       Q.     You have to say yes for the record.

12       A.     Yes.

13              MS. WALLET:  Let's mark as Exhibit 12 a

14   multiple-page document.

15              (Osenkarski Deposition Exhibit 12 was marked.)

16              MS. WALLET:  Tell me when you're ready, sir.

17              (Pause from 12:27 until 12:36 p.m.)

18   BY MS. WALLET:

19       Q.     Have you had a few minutes to look over what

20   we've marked as Deposition Exhibit 12?

21       A.     Yes.

22       Q.     I would ask you, sir, is this the assignment that

23   you had given to Mr. Boyer to look into this issue of

24   seniority?  Or is this something that occurred much later?

25       A.     This was not the specific assignment, but this

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                153

1  was a -- something that was done by Mr. Boyer in 1995,

2  because he was one of the many who felt strongly about all

3  the, you know, the lack of policy or the unclear policy that

4  was in existence to create a seniority policy, which, again,

5  was something that caused a lot of controversy.

6      Q.    You said this was done in 1995.  I believe the

7  date on this is February 28, 2000.

8      A.    Well, did -- there are several memos here from

9  the chief, Ken Bolze.

10     Q.    I'll tell you, Mr. Osenkarski, we're missing some

11 of the attachments.  I'm not sure why we don't have all the

12 exhibits, but --

13     A.    It's a collection of memos.  I recall that it's a

14 collection of memos that were brought together to study this

15 important issue.

16     Q.    Okay.  My question, sir, is:  Did you receive

17 this memorandum marked Exhibit 12 in or about February 28,

18 2000?

19     A.    Yeah.  Yes.

20     Q.    Did you give Mr. Boyer the assignment in February

21 of 2000 to look into the Department's seniority policy?

22     A.    It was a continuation of the assignment because

23 he, you know, he studied it initially and told him to bring

24 all the memos together, and so, yeah, it was a continuation

25 of that assignment.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                154


1     Q.     But I thought you told me that in your mind, the

2     policy had been resolved at least by 1998, you had already

3     implemented the policy that seniority would be only by

4     seniority within the Probation office, correct?

5     A.     Seniority and performance, but -- and the issue

6     came up as I'm recalling this, if I'm not confused, when the

7     Bill Brandt/Barbara Varner issue came up because of an

8     opening or openings in the senior PO assignments or

9     promotions.

10    Q.     Okay.  My question, sir, is:  Do you know what

11    prompted Mr. Boyer to engage in this activity of revisiting

12    the seniority issue in February of 2000?

13    A.     I'm not sure.

14    Q.     You don't know whether or not it was a direction

15    from you to look into this issue once again?

16    A.     I don't recall specifically.

17    Q.     Now, with regard to Exhibit 12, do you agree that

18    the only person who continued to be concerned about the

19    seniority issue was Barbara Varner?

20    A.     Yes.

21    Q.     And do you agree that she was the only person

22    affected by the change?

23    A.     Well, she was affected in that she was dropped

24    one rung on the seniority ladder.  But she was never hurt

25    because -- and I'm trying to summarize this.  Again, we were

Joseph Osenkarski                          155


1    doing a lot of things, having hired 10 people, three the

2    first two years, two the third year.  And again, I was on

3    bigger issues.

4              But through this whole process I recall that it

5    was a combination of my recommending and the county

6    implementing a drop in the number of years that was needed

7    for one to receive a senior PO.  Specifically, John Ward

8    agreed to allow three or four years of seniority if a person

9    received a master's degree.

10             When we first were assigning the senior PO slots

11   it was determined by a group of people that you, a person

12   would need eight years of county service or six years with a

13   master's degree to qualify for a senior PO slot.  And when

14   this issue came up of Barbara dropping one rung on the ladder

15   and Bill Brandt going up one rung because he had his eight

16   years in, the policy was changed to give credit for I believe

17   it was three years of -- four years of service or -- and four

18   years credit for a master's degree, which Barbara Varner

19   received.

20             So as a matter of fact, if I recall, Bill Brandt

21   was held up two months while the county studied dropping the

22   number of years credit that you receive for getting a

23   master's degree, and he was held up about two to three

24   months.  But Barbara Varner and Bill Brandt were given senior

25   PO slots at the same time.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    156


 1          So Barbara Varner, although she was one slot

 2   below Bill Brandt, didn't lose anything because of the policy

 3   change for the number of years credit for a master's degree.

 4   She got the raise at the same time as Bill Brandt.  But Bill

 5   Brandt was held up two months while the matter of changing

 6   the policy was studied, if you understand what I'm saying.

 7   So in reality, she lost nothing, and to today I don't think

 8   has lost anything because she did receive the elevation, the

 9   promotion, and she wasn't denied anything.  But in reality,

10   Bill Brandt lost two months.

11       Q.    Do you agree with page 2 of this memo in which

12   Mr. Boyer writes:  The Adult Probation Department did not

13   change their policy concerning the seniority issue for

14   existing Adult professional staff?

15       A.    I think they may have -- I'm not sure of this but

16   I think they may have made some changes, which I'm not sure

17   of, for new people on staff.  The others were grandfathered,

18   but I don't know specific details.

19       Q.    Is it accurate to say, sir, that the decision of

20   whether or not to implement changes with regard to the

21   seniority policy was made by the chief, that being you for

22   the Juvenile staff, and the chief of the Adult Probation

23   staff?

24       A.    Yes, with consultation of the other managers,

25   supervisors.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                 157


1        Q.      And is it accurate to say you agreed to do one

2    thing, the chief of the Adult Probation Department chose to

3    do something else?

4        A.      Yes.

5                (Osenkarski Deposition Exhibit 13 was marked.)

6    BY MS. WALLET:

7        Q.      Sir, I've handed you what we've marked as Exhibit

8    13.  Do you recognize these documents, sir?

9        A.      Yes.

10       Q.      And I guess it's a number of memoranda --

11       A.      It's a history of --

12       Q.      -- stapled together.  Okay.  Do you believe that

13   these documents accurately reflect the Department seniority

14   list that you issued on the relevant date?

15       A.      Yes.

16       Q.      Do you believe, sir, that you issued any other

17   memoranda entitled Department Seniority List?

18       A.      I don't recall that I did.

19       Q.      Did you put out these lists on any regular time

20   period?

21       A.      Whenever a new hire came on.

22       Q.      Okay.  So what would prompt a new list would be

23   somebody added to the group?

24       A.      That would be, yeah, the staff, full-time.

25       Q.      Would there be any other event that would prompt

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                        158


1    you to issue a new Department Seniority List?

2         A.     Not that I can recall.

3                MS. WALLET:  I'd like to show you what we'll mark

4    as Deposition Exhibit 14.

5                (Osenkarski Deposition Exhibit 14 was marked.)

6    BY MS. WALLET:

7         Q.     Do you recognize this document that we've marked

8    as Exhibit 14, sir?

9         A.     Vaguely.

10        Q.     Do you agree that it was what you wrote in

11   response to Exhibit 11, the March 31 memorandum from Varner

12   to you?

13        A.     Yes.

14        Q.     Did you ever make the written response to her

15   which you promised in this memorandum by April 17, 1998?

16        A.     I don't recall, but I think if I didn't it was

17   because the issue was resolved with Barbara's promotion to

18   the senior PO slot along with Bill Brandt.

19        Q.     And that was a result of the meeting that was

20   referenced in Exhibit 10?

21        A.     Yeah.  Yes.

22        Q.     And that was the meeting with Mr. Deluce,

23   Mr. Ward and Mr. Hartnett?

24        A.     And Judge Hoffer.

25        Q.     Yes?

Joseph Osenkarski                          159


 1     A.     Yes.

 2            MS. WALLET:  That's all the questions I have

 3     before we take a lunch break.

 4            (Recess taken from 12:51 until 1:54 p.m.)

 5     BY MS. WALLET:

 6     Q.     Mr. Osenkarski, did you receive a copy of the

 7     memo from Judge Sheely to John Ward and Dave Deluce about his

 8     conclusions concerning the, what I'll call the Varner matter?

 9     A.     You mean the memo that gave Gary Graham,

10     Mr. Graham, three days of suspension without pay?

11     Q.     Yes.

12     A.     Yes, I did, ma'am.

13     Q.     Did you meet with Judge Sheely before he issued

14     his memorandum?

15     A.     No.  I met with Judge Sheely and -- when, it

16     would have been in July sometime.

17     Q.     Yes, sir.

18     A.     After Gary Graham admitted to Judge Sheely that

19     he had, you know, the long-term affair with Barbara Varner.

20     So, yes, I did meet with him one time.

21     Q.     Okay.  And was it just you and the judge?

22     A.     To the best of my knowledge, yes.

23     Q.     Would you tell us, please, what you recall about

24     that conversation?  Did he call you to his office?

25     A.     Yes.  I was called up to his chambers, and he

1    announced to me that Gary Graham had admitted to having a

2    long-term consensual, meaning both parties were in agreement

3    to have this affair.  And it was just basically an

4    announcement and I was not asked to respond.  I think he may

5    have asked me if I knew about it, and I told him I did not

6    know about it.  And that was the extent of the conversation.

7         Q.     What did you understand the purpose of this

8    meeting to be?

9         A.     To advise me of what Gary Graham had told to

10   Judge Sheely.

11        Q.     And did you say he didn't ask you anything other

12   than did you know about this affair?

13        A.     No, not -- when I told him I didn't know about

14   the affair, that was the extent of his questioning.

15        Q.     Did Judge Sheely ask you at that time whether you

16   had any knowledge of any of the allegations that Ms. Varner

17   had made?

18        A.     I don't recall, but I don't think so.

19        Q.     Had he done so at some prior time?

20        A.     No.

21        Q.     Do you know whether or not he had spoken with

22   Ms. Varner before he spoke with you to tell you about this

23   admission of the affair?

24        A.     I don't know the sequence of the times, but -- so

25   I don't recall whether it was before or after.

Joseph Osenkarski                              161


1    Q.    Well, at that meeting did Judge Sheely tell you

2  anything about what Ms. Varner said by way of allegations or

3  explanation?

4    A.    No, he did not.

5    Q.    So this meeting was basically just to tell you

6  about the affair and that was it?

7    A.    Essentially, yes.

8    Q.    Did he tell you at that time what he planned to

9  do?

10   A.    No.

11   Q.    It was not until you received the memo that you

12 knew what it was that he had decided to do?

13   A.    Yes.

14   Q.    Did he tell you he was going to issue a memo?

15   A.    I expected him to make a decision as to what he

16 was going to do, but I don't recall whether he told me

17 anything ahead of time.

18   Q.    Do you remember anything more about that meeting?

19   A.    No.

20   Q.    Did he tell you at that meeting or later what he

21 expected you to do as a supervisor?

22   A.    He told me in the memo to pay more attention to

23 matters in the office.  I didn't know what he meant by that.

24   Q.    Did you ask him?

25   A.    No, I did not.  I took it as a reprimand, a mild

1    reprimand.

2        Q.    And what did you do to carry out the judge's

3    instructions to pay more attention to matters in the office?

4        A.    Well, I paid more attention to matters in the

5    office.

6        Q.    Did you spend more time in the office?

7        A.    Not necessarily.

8        Q.    Did you spend more time observing the

9    interrelationship among your staff?

10        A.    Yes.

11        Q.    In what way?

12        A.    By being vigilant.  I don't know how to answer

13    any different.  I thought I did pay attention to matters in

14    the office.

15        Q.    So you didn't think that really any change was

16    needed in your behavior?

17        A.    No.

18        Q.    No, that's correct, you didn't think that, or --

19        A.    I didn't think there was any change was needed in

20    my overall behavior.

21        Q.    Do you have any knowledge, sir, as to why the

22    dates for Mr. Graham's suspension were changed?

23        A.    No.

24        Q.    Did Judge Sheely or someone come to you and ask

25    you based on your work when you thought Graham should serve

Joseph Osenkarski                                    163


1    his suspension?

2         A.     No.

3         Q.     Who decided when he was going to serve his

4    suspension?

5         A.     I presume Judge Sheely, since he wrote the memo.

6         Q.     And you don't know why the dates were changed?

7         A.     No, I do not.

8         Q.     Was that true at the time and today?

9         A.     Yes.

10        Q.     Did there come a time, sir, when you were asked

11   for information about Barbara Varner's pay and benefits?

12        A.     I don't recall.

13        Q.     Let me be more specific.  Were you asked by Laura

14   Patterson to provide some information about Ms. Varner's

15   salary and benefits?

16        A.     I may have been asked during the time she was

17   being considered for the court-appointed special advocate

18   position.

19        Q.     Is that the CASA program?

20        A.     Yes.

21        Q.     And what do you remember about any assignments

22   you were given regarding the CASA grant?

23        A.     I was not given any specific assignments.  That

24   grant was being handled outside of the Probation Department

25   between Judge Guido and I believe Laura Patterson, and I was

Joseph Osenkarski                          164


1    not privy to any details.  I was instructed by Judge Guido to

2    realize that I may be forced to lose Barbara Varner to other

3    employment, meaning CASA.

4         Q.    What did Judge Guido tell you?

5         A.    He told me that Barbara Varner was a candidate

6    for the program, the CASA program.  He told me that she was

7    interested in the CASA program.  I believe he may have asked

8    about her work performance, and I told Judge Guido it was

9    very satisfactory, and that was the general conversation.

10             I recall having a concern about losing Barbara,

11   because she was a, you know, a seasoned employee, and

12   specifically a concern about getting a replacement because,

13   you know, I needed all the staff that I had at the time and

14   couldn't afford to lose anyone, nor did I want to.  But I'd

15   have no choice in the matter.

16        Q.    Did the judge tell you what the process would be

17   for selection?

18        A.    No, except for the fact that it would be, the

19   process would occur after the grant was approved and

20   received, the CASA grant.

21        Q.    And do you recall anything about what the time

22   frame was of your conversation with the judge?

23        A.    Not at all.

24             MS. WALLET:  Let's mark as Deposition Exhibit 15

25   a one-page document.

Joseph Osenkarski                        165


1          (Osenkarski Deposition Exhibit 15 was marked.)

2          (Discussion held off the record.)

3    BY MS. WALLET:

4        Q.    Have you had a chance to look at what we've

5    marked as Deposition 15, Mr. Osenkarski?

6        A.    Yes.

7        Q.    Having looked at this, do you recall anything as

8    to why you would have sent this memorandum?

9        A.    Most likely because I was asked to do so.

10       Q.    And do you know who asked you to do so?

11       A.    Oh, I assume Laura Patterson.

12       Q.    Do you recall whether Ms. Patterson would have

13   spoken to you or wrote you a memo?

14       A.    I don't recall.

15       Q.    Do you know why you carboned Judge Guido?

16       A.    Well, because he was involved in the CASA grant,

17   the process for developing the program.

18       Q.    So you believed that it would be prudent for you

19   to keep him informed of this?

20       A.    Yes.

21       Q.    I'm just asking you, sir, why did you think Judge

22   Guido ought to get a copy of this memo?

23       A.    He was in charge of the project and wanted to get

24   it rolling.

25       Q.    Did you have any other discussions with Judge

1    Guido about the CASA program?

2         A.      Just that I had a concern about losing Barbara

3    Varner to the program and not have a replacement given to me.

4         Q.      Perhaps I misunderstood that that happened in

5    that first discussion that you had with Judge Guido.  My

6    question is:  Did you have any later discussions with Judge

7    Guido about the CASA program?

8         A.      I don't recall.

9         Q.      Do you recall finding out that Barbara Varner

10   would not be made the CASA grant director?

11        A.      At some point in time, and I don't recall what

12   point in time, I was told that John Ward may have offered her

13   the position contingent upon her dropping this Complaint.

14        Q.      And how did you learn that, sir?

15        A.      I don't recall.  I think it was just word of

16   mouth.  I was not brought into any formal discussion or

17   meeting.

18        Q.      Did you do anything, sir, to promote Ms. Varner's

19   receiving the CASA position?

20        A.      I believe that I may have told Judge Guido's

21   administrative assistant, Carl Connellan, that she was an

22   experienced person and certainly would be a prime candidate

23   because of her wealth of experience with Children and Youth

24   as well as Probation and knowing the entire system in

25   Cumberland County, meaning the dependency versus delinquency

1    process.

2        Q.      Did you do anything else to promote her for that

3    position?

4        A.      No.

5        Q.      Did you do anything, sir, to discourage someone

6    from putting her in that position?

7        A.      No.

8        Q.      Did you have any other discussions with Judge

9    Guido after Ms. Varner was not selected for the position?

10       A.      No.

11       Q.      Did you have a discussion with Ms. Varner about

12   her access to the third floor east wing of the courthouse?

13       A.      Yes.

14       Q.      What do you remember about that, sir?

15       A.      I was directed by Judge Hoffer to advise Barbara

16   Varner that she should refrain from using that area to

17   conduct any business because of the potential for having some

18   kind of conflict with Barbara Graham, who at that time used

19   that area that was -- that was a temporary use by the court

20   stenographers.

21       Q.      Do you believe that to have been sometime in May

22   of 1998?

23       A.      I don't recall the time frame.  I recall the

24   conversation and so -- I don't recall the time frame.

25       Q.      So Judge Hoffer told you to tell Ms. Varner this,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                168

1    correct?

2         A.    Yes.

3         Q.    How did he do that?  Did he call you in, or did

4    he write you a memo?

5         A.    He called me upstairs.

6         Q.    Anyone else there?

7         A.    No.

8         Q.    And was that the purpose of the meeting, or were

9    there other subjects?

10        A.    That was the purpose of the meeting.

11        Q.    And could you tell me to the best of your

12   recollection what Judge Hoffer told you at that time?

13        A.    He told me to tell Barbara Varner to refrain from

14   using that particular area of the, I'm going to call it the

15   courthouse annex building.  It was commonly called the Bixler

16   annex.

17        Q.    What's located in the Bixler annex?

18        A.    On the third floor there was a series of open

19   offices that were shared by Adult Probation, Juvenile

20   Probation, temporarily by some court stenographers.

21        Q.    Who from Juvenile Probation had their office in

22   the third floor, we'll call it the Bixler annex?

23        A.    It ended up six school-based probation officers

24   and there were several other probation officers, they have

25   used it.  And I don't recall sequentially the time frames,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              169


1    but we were given half the offices and the other half were

2    given to Adult Probation because we both needed extra space.

3         Q.    Did Judge Hoffer give you any reason other than

4    to avoid Barbara Varner and Barbara Graham coming together?

5         A.    No.

6         Q.    That was the only reason he gave?

7         A.    That was the only reason.

8         Q.    And did Judge Hoffer tell you how you were to

9    relay this to Ms. Varner?

10        A.    He told me to see her.  And I scheduled a brief

11   meeting with her in my office with Barbara Varner, and at

12   that time I told her what Judge Hoffer directed me to do.

13        Q.    Just the two of you?

14        A.    Yes.

15        Q.    And you told her exactly what Judge Hoffer had

16   told you?

17        A.    Yes.

18        Q.    You told her that she was not to go to the third

19   floor east wing of the courthouse, correct?

20        A.    Yes.

21        Q.    And you told her it was because the judge didn't

22   want her to run into Barbara Graham?

23        A.    Yes.

24        Q.    What did she say in response?

25        A.    Barbara said she didn't think that was fair

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          170


 1   because it was a public area, and she asked me to put it in

 2   writing, I mean, put the request in writing, and I believe I

 3   did.

 4        Q.    She wrote you a memo, correct?

 5        A.    I think so.

 6            MS. WALLET:  We'll mark as Deposition 16 a

 7   multiple-page handwritten memo.

 8            (Osenkarski Deposition Exhibit 16 was marked.)

 9            MR. ADAMS:  Deb, you want him to review the other

10   documents that he's never seen?

11            MS. WALLET:  Just look at them.  I'm going to ask

12   him about them.

13   BY MS. WALLET:

14        Q.    Tell me when you're ready, sir.

15        A.    Okay.  Okay.

16        Q.    Do you recall seeing the first page of Exhibit

17   16?

18        A.    Yes.

19        Q.    And that's the memo she wrote to you to confirm

20   the instructions you gave her?

21        A.    Yes.

22        Q.    Do you have any reason to believe that it was not

23   May 26 when you informed her of this?

24        A.    No.

25        Q.    Do you believe she accurately sets forth in her

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      171


1    memo, the first page of Exhibit 16, what you told her?

2        A.    I believe that's accurate.

3        Q.    She says that as of June 1 you hadn't put it in

4    writing.  Do you think that's accurate?

5        A.    I don't recall the specific dates.

6        Q.    But you believe you did --

7        A.    I believe I did respond in writing to her

8    request, but again, I don't recall the date that I did so.

9        Q.    Would you look at the second page of Exhibit 16?

10   Actually, the second and third pages --

11       A.    I did.

12       Q.    -- are another handwritten document from Barbara

13   Varner, this time dated 2/12/99.

14             MR. ADAMS:  Let the record reflect that it's to

15   John Ward, parenthesis, commissioners office, and not to

16   Mr. Osenkarski.

17             MS. WALLET:  Correct.  I'm going to ask him

18   whether he received a copy of that document prior to today.

19             THE WITNESS:  No, I did not receive it, a copy of

20   this document.

21   BY MS. WALLET:

22       Q.    Did Mr. Ward ever speak to you about the matters

23   contained in this document?

24       A.    No, because he was, Gary was already transferred

25   outside of my department and I had nothing to do with him.