Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          172

1        Q.      Did you have any knowledge that Ms. Varner had

2    written this memo to Mr. Ward in or about February of '99

3    making some statements about her interaction with Barbara

4    Graham?

5        A.      No.

6        Q.      Did anyone come to you and ask you if you had

7    observed any of the interaction between Ms. Varner and

8    Ms. Graham?

9        A.      No.

10       Q.      Anybody ask you at any time if you had observed

11   anything between Ms. Varner and Ms. Graham?

12       A.      Not that I recall.

13       Q.      Would you look at the last document of Exhibit

14   16, please?  This is a handwritten document from Ms. Varner

15   to Tom Kline.

16       A.      Yes.

17       Q.      Who is Tom Kline?

18       A.      He is the sheriff of Cumberland County.

19       Q.      Do you recall seeing this document, specifically,

20   the fourth page of Exhibit 16?

21       A.      I do not recall seeing this document.

22       Q.      Did you have any discussions with Tom Kline

23   regarding Barbara Varner?

24       A.      No, I did not.

25       Q.      Did you have any discussions with Tom Kline

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    173


 1   regarding Barbara Graham?

 2        A.     No, I did not.

 3        Q.     Mr. Osenkarski, were you present at a meeting

 4   that involved Mr. Graham and his attorney and Judge Sheely on

 5   July 10 of 1997?

 6        A.     No.  I wasn't present.

 7        Q.     Were you ever present in any meeting at which

 8   Mr. Graham and his attorney discussed matters relating to

 9   Ms. Varner?

10        A.     No.

11        Q.     Did you know that Mr. Graham had engaged an

12   attorney to speak to Judge Sheely?

13        A.     Not specifically.  I think I heard, from where I

14   don't know, that he had engaged Dave Foster, I believe, but I

15   wasn't privy to any information.

16        Q.     Did Mr. Graham tell you that he had obtained

17   someone to advocate for him?

18        A.     He may have.

19        Q.     Do you think it was in or about the time of July

20   10, 1997?

21        A.     Approximately that time.

22        Q.     Do you remember if Mr. Graham told you why he was

23   engaging an attorney?

24        A.     Not specifically.

25        Q.     Do you remember anything he told you about that?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    174


1              MR. ADAMS:  Engaging an attorney?

2              MS. WALLET:  About counsel.

3              THE WITNESS:  I presume it was because of the

4     Complaint, but I didn't know any specifics and I was never

5     told anything.

6     BY MS. WALLET:

7         Q.      When you gave the directions to Ms. Varner that

8     had been given to you from Judge Hoffer about staying out of

9     a certain area in the courthouse, had you ever been given

10    such directions previously?

11        A.      No, but I told him I didn't think it was such a

12    good idea, to remove her from that area.  That was my gut

13    reaction.

14        Q.      So this was the first time your supervisor had

15    ever suggested to you that one of your employees, an employee

16    you supervised, should be restricted from some portion of the

17    courthouse?

18        A.      Yes.

19        Q.      And that would be true for your 32 years of

20    employment?

21        A.      Yes.  I mean --

22             MR. ADAMS:  Just for clarification, you haven't

23    been -- I don't think he's been in a managerial, you know, in

24    a managerial position those 32 years, so it wouldn't be

25    totally accurate.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          175


1              MS. WALLET:  Okay.

2    BY MS. WALLET:

3         Q.     How many of those years were you in a supervisory

4    responsibility?

5         A.     I was promoted to supervisor, I believe it was in

6    September of 1977.

7         Q.     So some 24 years?

8         A.     Yeah.

9         Q.     This was the first time?

10        A.     Yes.

11        Q.     In the previous period of time earlier than 24

12   years ago up till about 32 years ago when you started, did

13   you ever hear of anybody being so restricted?

14        A.     No, I didn't.

15        Q.     Why did you tell the judge you didn't think it

16   was such a good idea?

17        A.     Because common sense told me it's a public area,

18   it was our area, and there was a remote possibility that she

19   could have conducted business with either Juvenile, other

20   Juvenile officers or Adult officers.

21        Q.     So there may have been a legitimate business

22   reason for her to go to that location?

23        A.     Yes.

24        Q.     And what did Judge Hoffer say?

25        A.     He said, do what I asked you to do, I've got

1   concerns about a potential conflict and I want to avoid it.

2        Q.    To the best of your knowledge, were there any

3   restrictions imposed on Barbara Graham as to where she could

4   go in the courthouse?

5        A.    I was not aware of any restrictions.

6        Q.    Did Judge Hoffer offer to you during that

7   conversation that he was restricting not only Ms. Varner but

8   also Ms. Graham?

9        A.    In the brief conversation that he had with me, he

10  stated that he was restricting Ms. Varner.

11       Q.    Did you ever observe any conflict between Barbara

12  Varner and Barbara Graham?

13       A.    No.

14       Q.    Now, at some point Ms. Varner asked to move her

15  office.  Is that correct?

16       A.    Yes.

17       Q.    What do you remember about the request to move

18  the office?

19       A.    It was granted.

20       Q.    Well, what did she ask to do?

21       A.    After the bomb threat, Barbara advised that

22  she -- Barbara didn't advise me, but I believe Barbara

23  consulted with the Human Resource office, specifically Chris

24  Miller, the HR director, and she wanted to be moved from the

25  office where she was when the bomb threat occurred, to the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                177

1    annex area.

2          Q.     And were you supportive of that request?

3          A.     Yes, I was.

4          Q.     Why?

5          A.     Because after consulting with Chris Miller, Chris

6    Miller felt that it would be a good idea.  So I went along

7    with it.

8          Q.     And did Ms. Miller tell you why she thought it

9    was a good idea?

10         A.     Because Barbara Varner had some fears about

11   remaining in the office where the bomb threat occurred.

12         Q.     And Ms. Miller thought that this might remedy

13   that situation?

14         A.     Yes.

15         Q.     Did you discuss the matter of the move of the

16   office with the judge at that time?

17         A.     I believe I may have sent a memo, perhaps sent a

18   memo, and I'm not sure of this, to the judge advising him

19   that I approved of the move after consulting with Chris

20   Miller, who recommended the move be made.

21         Q.     And what did Judge Hoffer say?

22         A.     I don't recall.  There wasn't much of a reaction

23   I think after I told him that it was recommended by the HR

24   director.

25         Q.     Did Judge Hoffer tell you to get Ms. Varner to

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                178

1    put it in writing?

2        A.      I don't recall.

3        Q.      Did you ask Ms. Varner to put it in writing?

4        A.      I don't honestly recall whether I did.

5        Q.      Was she ultimately moved?

6        A.      Yes.

7        Q.      And that's where her office is now?

8        A.      Yes.

9        Q.      Did judge Hoffer ever rescind his directive to

10   Ms. Varner conveyed through you that Ms. Varner was not to go

11   into the annex area?

12       A.      It was not conveyed through me.  I shortly after

13   the bomb threat was out of the office for about a week and

14   actually out of the area in Houston, Texas, for a training

15   conference.  So I wasn't available for a conference, for any

16   conferencing.

17       Q.      Okay.  So after the bomb threat you were gone for

18   a period of time?

19       A.      Yeah.  I left the following day for State College

20   to a statewide chiefs meeting.  Came back early the next

21   morning, which was Saturday, I flew to Texas.

22       Q.      How long were you out of work, sir?

23       A.      I was out of the office but working at the

24   conference I believe till the following Friday.

25       Q.      Two weeks?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          179


1        A.      No, it was about a week.

2        Q.      Okay.  Well, let me ask a more specific question.

3    Based on Exhibit 16, if you accept the date, you told

4    Ms. Varner on May 26th that she was restricted from the third

5    floor east wing of the courthouse, correct?

6        A.      Yes.

7        Q.      At any time after May 26th, 1998, did Judge

8    Hoffer rescind that restriction?

9        A.      Not to the best of my knowledge.

10       Q.      Did the move of the office to the annex area, did

11   that violate the restriction that you relayed to Ms. Varner

12   on May 26th?

13       A.      I don't recall if -- it was a different set of

14   circumstances and it was a recommendation of the Human

15   Resources Department, and under the circumstances I felt it

16   was appropriate to go along with the recommendation of Chris

17   Miller, the HR director.

18       Q.      Is her office, Ms. Varner's office presently in

19   the part of the courthouse where she was restricted from?

20       A.      Yes.

21       Q.      To the best of your knowledge, is she still under

22   any restrictions based on Judge Hoffer's directive?

23       A.      No.

24       Q.      When do you believe those restrictions were

25   lifted?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              180


1      A.    Well, they eased after the court stenographers

2  would have left the area and gone to their permanent

3  headquarters on another floor in another area.

4      Q.    And when was that, sir?

5      A.    I'm not sure.

6      Q.    Well, was it closer in time to June of '98 or

7  closer in time till today?

8      A.    Closer in time to June of '98.

9      Q.    Do you think the stenographers moved before 2000?

10     A.    I believe so.

11     Q.    Did Ms. Varner complain to you that she was

12  humiliated by this restriction on her ability to go into the

13  annex area?

14     A.    I don't know that specifically she says she was

15  humiliated.  I recall that she felt that it was unfair to

16  restrict her.

17     Q.    And you were somewhat in agreement?

18     A.    Yeah.  I told the judge it wasn't such a good

19  idea.

20     Q.    She did complain to you, though, about that

21  decision, did she not?

22     A.    She told me she felt it was a public area and

23  that she should have access to because of the potential for

24  having the need to consult with, work with both other Adult

25  and other Juvenile officers who were physically housed in

1   that area.

2       Q.    If she didn't say she was humiliated, did she say

3   she was embarrassed about it?

4       A.    I don't recall her saying humiliated or

5   embarrassed.

6       Q.    What do you recall her saying?

7       A.    That she felt it was unfair because it was a

8   public building, and secondly, that there was the possibility

9   she would have to consult with others, both adult and

10  juvenile officers, professionally.

11      Q.    Did you write Ms. Varner a memo about the bomb

12  scare in March of 2002?

13      A.    Yes.

14      Q.    Why did you write that memo?

15      A.    Because she wrote me a memo I believe asking for

16  a response.  And secondly, I felt that it was appropriate for

17  me to respond that I acted in good faith since there was no

18  office protocol, county protocol, about whose responsibility

19  it was to clear buildings.

20          MS. WALLET:  I'd like to mark as Deposition

21  Exhibit 17 a one-page document.

22          (Osenkarski Deposition Exhibit 17 was marked.)

23  BY MS. WALLET:

24      Q.    Are you familiar with the document we've marked

25  Deposition Exhibit 17?

1        A.      Yes.

2        Q.      Is that the memo you wrote in or about April 2,

3    2002, about the bomb threat in March?

4        A.      Yes.

5        Q.      And this was in response to the memo that she

6    wrote to you?

7        A.      Yes.

8        Q.      Just curious, sir.  Why did you write in the

9    third paragraph in a memo from you to her:  I advised her

10    that there was no deliberate attempt to avoid notifying you?

11        A.      Because I was -- it was a grammatical thing and I

12    most likely was responding -- I was angry because I felt I

13    acted in good faith, and received a memo of reprimand from

14    the chief clerk that I didn't evacuate the office.

15            And I advised the chief clerk that there was no

16    procedure established and that I waited as long as I could

17    before removing myself from our office area along with the

18    last secretary, and was blamed for something I felt that I

19    shouldn't have been blamed for doing.

20        Q.      You're writing this memo, this is you to Barb

21    Varner, correct?

22        A.      Yes.

23        Q.      Why didn't you just say to her:  Barb, I'm sorry,

24    I didn't make any deliberate attempt to avoid notifying you?

25        A.      It was just a, I imagine it was a grammatical

1    error on my part without proofreading it.  I can't offer any

2    other further explanation.

3        Q.    In fact, you never came to her afterwards and

4    told her:  I really didn't deliberately attempt to avoid

5    notifying you, did you?

6        A.    I didn't go to her specifically, no.

7        Q.    You were present during the testimony of

8    Ms. Varner and I believe the testimony of Mr. Graham about

9    shoes that were available from a charitable entity?  Do you

10   remember that conversation, sir?

11       A.    Yes.

12       Q.    What do you know about those shoes?

13       A.    I don't recall anything specific about those

14   shoes but I'll explain to you, even though I don't have to,

15   about my involvement with charities, if you want to hear it.

16       Q.    Well, I only want to hear about these shoes.  Are

17   you aware that there was a charitable entity that provided

18   shoes for individuals who received services in your office?

19       A.    Yes.

20       Q.    And did you have occasion to pick up those shoes?

21       A.    Yes.

22       Q.    What was the charitable entity?

23       A.    You mean the organization that provided the --

24       Q.    Yes, sir.

25       A.    There was a corporation, a shoe corporation.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          184


1      Q.     How did you find out about these?

2      A.     I did it on my own without any contract with the

3   county.  It was just a kind gesture on my part that I did for

4   15 to 20 years.

5      Q.     And for 15 to 20 years you would go and pick up

6   these shoes?

7      A.     Yes.

8      Q.     And what did do you with the shoes?

9      A.     I provided institutions, detention centers,

10  individuals, with these charity shoes.  These were returns,

11  rejects, that couldn't be marketed by the shoe corporation.

12     Q.     And were they given to you by this corporation

13  for use by the juveniles under your supervision?

14     A.     Yes.

15     Q.     Did you keep any of these shoes for your personal

16  use?

17     A.     I had the prerogative to provide these shoes to

18  whoever I deemed was, you know, in need of these products.

19     Q.     My question, sir, was:  Did you keep any of these

20  shoes for your personal use?

21     A.     No.

22     Q.     Not one?

23     A.     Oh, I recall giving some shoes that were not

24  needed by the juvenile justice entities because they were not

25  needed.  They were infant, baby shoes, that were mixed in

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    185


1    with the products I received, these charitable products I

2    received.

3           Q.      Sir, would you answer my question?  Did you keep

4    any of these shoes for your personal use or the use of your

5    family?

6           A.      May have kept a couple of pair.

7           Q.      Did you give any of these shoes to your daughter

8    to sell?

9           A.      No.

10          Q.      Did you give any of these shoes to Mr. Graham for

11   his personal use or the use of his family?

12          A.      I don't recall.

13          Q.      Have you used any of the office supplies for your

14   personal use, sir?

15          A.      Personal use?  No.  I have tablets in my car and

16   I have tablets at my home which I use because I use the

17   telephone and I depend on memos written, handwritten memos.

18          Q.      What about tapes?

19          A.      Tapes?

20          Q.      Tapes.

21          A.      I don't recall.

22                  MR. ADAMS:  What do you mean by tapes?

23                  MS. WALLET:  Audio tapes.

24                  THE WITNESS:  I don't recall.

25   BY MS. WALLET:

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          186


1       Q.      You never used the county's audio tapes for music

2   retaping?

3       A.      I don't recall.

4       Q.      You didn't?  Or you just don't remember?

5       A.      I don't remember.

6       Q.      Is it possible you did?

7               MR. ADAMS:  Objection, asked and answered twice.

8               THE WITNESS:  I don't recall.

9   BY MS. WALLET:

10      Q.      What's your understanding of the county's policy

11  with regard to paying for schooling?

12      A.      The county has a policy for paying for certain

13  course work which would be job related.  Undergraduate,

14  graduate or any kind of education that has to do with the --

15  which would help in the performance of the county employee's

16  work performance.

17      Q.      Is this a written policy of some sort?

18      A.      Yes, there is a written policy.

19      Q.      And were you aware that Ms. Varner had requested

20  county payment of certain schooling?

21      A.      Yes.  In fact, it was approved.  She put a

22  request in and it was approved by me.

23      Q.      And was it ultimately approved for payment by the

24  county?

25      A.      I believe so.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          187

1      Q.    Are you aware of any times when Ms. Varner

2   submitted requests for payment by the county that were

3   denied?

4      A.    I believe there was a situation where a request

5   was made and that it was questioned.  And then I believe that

6   when the questioned document came back to me, I reapproved

7   it.

8            Whatever course work that she put in for, I never

9   denied but only approved even after the second time it was

10  submitted.

11     Q.    And you did that because you thought it was work

12  related and fell within the policy of the county?

13     A.    Yes.

14     Q.    Did you ever use cell phones for personal use?

15     A.    No.

16     Q.    Did you ever take a cell phone hunting?

17     A.    I may have carried a cell phone with me some time

18  ago.

19     Q.    Whose cell phone was that?

20     A.    Mine.

21     Q.    Your personal cell phone?

22     A.    I believe.

23     Q.    Did you ever carry the county cell phone?

24     A.    I may have, but I don't recall specifically.

25     Q.    Did you ever carry a cell phone that was assigned

Joseph Osenkarski                                         188


1    to Ms. Varner when you were hunting?

2         A.    I don't recall.

3         Q.    Did you hear the testimony about your use of a

4    Bic lighter?

5         A.    Yes.

6         Q.    Is it true?

7         A.    I vaguely recall having the item.

8         Q.    What was this item, sir?

9         A.    It was a makeshift Bic lighter which when flicked

10   ejected an artificial penis.

11        Q.    And this was your personal property?

12        A.    I believe I got it from someone and had it for a

13   brief period of time.

14        Q.    You owned this lighter?

15        A.    No, it wasn't mine.  I got -- I forget who I got

16   it from, a friend or something.  I had it for a brief period

17   of time.

18        Q.    You borrowed it from a friend?

19        A.    I think so.

20        Q.    And why did you borrow such an item?

21        A.    To use it in jest in a non-work situation.

22        Q.    Did you use it in a work situation?

23        A.    No.

24        Q.    Did you use it at a conference?

25        A.    I may have.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          189


1     Q.    Did you use it at a conference where there were

2     probation officers under your supervision?

3     A.    I don't recall.

4     Q.    Why exactly did you borrow this lighter?

5     A.    To use in jest, to show in jest.

6     Q.    To show to whom?

7     A.    I'm not quite sure I knew.

8     Q.    Just thought it was a neat thing to do?

9     A.    Perhaps.

10    Q.    Mr. Osenkarski, Ms. Varner has alleged that you

11    called attention to her gender.  Have you ever done that?

12    A.    No.

13    Q.    You didn't call her a female or a broad or

14    something that would relate to her gender?

15    A.    No.

16    Q.    Ever call her a bitch?

17    A.    No.

18    Q.    Have you made what might be considered by some

19    women inappropriate comments about women?

20          MR. ADAMS:  Objection.  Calls for speculation.

21    Will you please rephrase the question, maybe?

22    BY MS. WALLET:

23    Q.    Well, have you ever said demeaning things about

24    women?

25    A.    Not that I know of.

1      Q.      Did you ever use the term jeehoobees in reference

2   to some woman's breasts?

3      A.      I think I told you that in the last, during the

4   last deposition, did I ever use that statement in my life?  I

5   may have, but I don't recall, and I told you that with

6   regards to my work situation.

7      Q.      And you didn't make it in reference to a female

8   intern's breasts?

9      A.      I don't recall, no.

10     Q.      Did you ever refer to your girlfriend's genital

11   area in front of women in the office?

12     A.      No, I don't recall.

13     Q.      Did you agree that Ms. Varner has been given some

14   of the most difficult of the Juvenile Probation cases?

15     A.      No.  Our cases are distributed based on the

16   officer's performance, and we strive to make sure they're

17   handed out fairly.  And we strive to ensure that the person

18   with the most expertise to resolve, you know, a particular

19   case, will be given that case to work with.

20     Q.      I know, sir, we had a brief discussion about this

21   the last time, but I had forgotten precisely what I asked

22   you, so I'll ask you again.

23             How do you keep statistics on the cases or

24   numbers of cases that are assigned to individuals?

25     A.      Well, the supervisor does case assigning, and

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              191


 1   it's not just a numbers game.  It's a process that involves

 2   the supervisor making sure that he knows the expertise of his

 3   probation officers under him, and make sure that the,

 4   secondly, that the cases are fairly distributed to the most

 5   appropriate probation officers.

 6        Q.    Do you keep these statistics on a quarterly or

 7   monthly, weekly basis?

 8        A.    Well, we have assignment sheets.  Each individual

 9   probation officer has a list of cases or a list that's kept

10   of the case assignments on a regular basis.  That's ongoing.

11        Q.    But if I said tell me how many cases Ms. Varner

12   had in June of 1999, is there a readily available statistic

13   where I could find that information?

14        A.    I believe that the office manager can provide a

15   list of cases, assignment dates and completion dates.

16        Q.    So somewhere there's a chart --

17        A.    Yeah, there's a chart.

18        Q.    -- that would show each person?

19        A.    Numbers.  Again, numbers.  It's not just a

20   numbers game distribution, it's an expectation that I've

21   always had that supervisors should fairly distribute work,

22   and we cannot just look at numbers to get a refined defined

23   estimate of workload.  It's not only numbers but it's

24   difficulty level, and one learns difficulty levels only after

25   being experienced himself or herself.  So it's a dual

Joseph Osenkarski                                    192

1    responsibility.

2         Q.     My question, sir, is:  If I ask you what were the

3    numbers of cases assigned to one of your individual juvenile

4    probation officers at any given time, does that document

5    exist now?  Or would someone have to create that?

6         A.     We have a -- we could give you a document that

7    would show case assignments.

8         Q.     And you believe that that would be done on a

9    monthly basis?

10        A.     It's an ongoing -- it's a daily basis.

11        Q.     What's your understanding of the office policy

12   with regard to leaving on commitment trips?

13        A.     There isn't any specific time that one should

14   leave.  It's a matter of time of the day, time court is over

15   with, the kid himself or herself, whether or not there's

16   space in detention to either house overnight or proceed with

17   a placement.  Any number of factors.

18        Q.     Do you pay your probation officers from what I'll

19   call portal to portal, when they leave their home till they

20   return to their home?

21        A.     As long as it's legitimate work time, yes.  It

22   can be taken in comp time or overtime.

23        Q.     And there's no restriction on not leaving at some

24   particular time after, let's say, eight o'clock in the

25   morning?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          193


1      A.    No.  But common sense would dictate that a PO or

2  two POs wouldn't take a child at 4:30 in the afternoon on a

3  snowy day after a placement's made when there was space in

4  detention, the child could be housed overnight and then

5  realistically taken the following day in the earlier part of

6  the day.

7      Q.    Were you aware that Ms. Varner was docked pay by

8  Mr. Graham?

9      A.    I think, this goes way back, six or seven years

10  ago, there was an incident, and I'm not that -- I'm fuzzy on

11  details, but there may have been a one-hour pay on one

12  occasion that was taken away from Ms. Varner.  But again, I'm

13  not -- I'm fuzzy on details and I don't recall the

14  circumstances.

15     Q.    Was it just Ms. Varner, or was it someone else?

16     A.    Perhaps Debra Green.  But again, I'm not --

17           MR. ADAMS:  Don't guess.  If you know, you know.

18  If you don't --

19           THE WITNESS:  I may -- I don't know.

20  BY MS. WALLET:

21     Q.    Are you aware of any male probation officers who

22  were docked pay?

23     A.    No.

24           MS. WALLET:  That's all the questions I have,

25  Mr. Osenkarski.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                194

1                THE WITNESS:  Thank you.

2                MR. DELLASEGA:  No questions.

3                MR. MacMAIN:  I have some follow-up.  You want me

4      to go?

5                MS. WILLIAMS:  Yes.

6      BY MR. MacMAIN:

7          Q.    Mr. Osenkarski, we've met before.  My name's

8      David MacMain.  I represent Mr. Graham.  I just have a few,

9      what's the word we used before lunch, smattering of questions

10     in areas maybe I wanted to follow up both on today as well as

11     from prior days.

12               MR. DELLASEGA:  Slogging.

13               MR. MacMAIN:  Slogging.

14     BY MR. MacMAIN:

15         Q.    Going back to the first day of depositions, let

16     me start there.  Had you ever, other than this particular

17     occasion, ever received any type of complaint about

18     Mr. Graham's sexually harassing anyone?

19         A.    I never received a complaint about Gary Graham's

20     sexually harassing anyone.

21         Q.    Okay.  And that would include no complaints by

22     Ms. Varner prior to this occasion of Mr. Graham in any way

23     sexually harassing her or creating a hostile work

24     environment?

25               MS. WALLET:  Objection to the form of the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          195

1   question.  What do you mean by this occasion?

2              MR. MacMAIN:  The occasion that we're here for

3   today.

4              MS. WALLET:  She made a whole lot of complaints.

5   BY MR. MacMAIN:

6       Q.    Prior to her first complaint to you, which is set

7   forth in the Complaint, have there been any other complaints

8   brought by Ms. Varner against Mr. Graham?

9       A.    No.

10      Q.    You had said that you described Mr. Graham as

11  having a loud voice and being excitable.  Correct?

12      A.    Excitable, yes.

13      Q.    Would that be as to just Ms. Varner, or would

14  that be as to various people in the office?

15      A.    Mr. Graham has an excitable personality is the

16  best way I can use to describe it.

17      Q.    And my question then is:  That excitable

18  personality and loud voice, that's the way he is with

19  everybody; would that be fair to say?

20      A.    Yes.  Yes.

21      Q.    You talked the other day that the Probation

22  office is an unnatural environment, and I think you started

23  to explain that cases you deal with involve difficult

24  personalities, difficult issues and that type of thing.

25  Could you explain, I guess, in more detail what you meant by

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              196


1    that?

2        A.    Well, we work with difficult people.  The only

3    people we work with are people who are in trouble with the

4    law for any number of reasons.  It's common criminality,

5    criminality that displays itself because of a host of

6    individual, personal problems, mental illness, social

7    disabilities on and on and on.

8        Q.    And is part and parcel of the nature of the job

9    dealing with cases or individuals that may have -- cases or

10   individuals involving unnatural or difficult sexual

11   relations?

12       A.    Yes.

13       Q.    Would the cases and the clients you're involved

14   with also use profanity?

15       A.    Yes.

16       Q.    Cases your office deals with or clients your

17   office deals with, involved in physical violence?

18       A.    Yes.

19       Q.    When clients come in -- I assume clients come

20   into your offices on occasion?

21       A.    Yes, regularly.

22       Q.    Regularly.  Do any of the clients ever use

23   profanity around the employees?

24       A.    That's possible, yes.

25       Q.    Have you heard profanity used by clients that are

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                197


1   in the office?

2        A.    Yes.

3        Q.    Do any of the clients have loud voices and yell

4   at their probation or parole officers?

5        A.    At times it's possible.

6        Q.    Do they use profanity towards their probation or

7   parole officers?

8        A.    Yes.

9        Q.    Would you agree with me that that unfortunately

10  is part of the job?

11       A.    Yes.

12       Q.    You talked today about the complaints regarding

13  the seniority issue, correct?

14       A.    Yes.

15       Q.    And you had said people were not happy with, some

16  people were not happy with changing it and some people were

17  unhappy with the way it was; would that be fair?

18       A.    Yes.

19       Q.    And that would involve both males and females had

20  differences of opinion one way or the other?

21       A.    Yes.

22       Q.    Do you have the pile of exhibits there in front

23  of you?  I want you to look at what we marked as Osenkarski

24  12, if you'd turn to the page that has a Bates number of

25  210296 at the bottom?  And what I'm looking at is a memo from

Joseph Osenkarski                                    198


1  Thomas Boyer.

2       A.      I have that.

3       Q.      Okay.  Would it be fair to say that Mr. Boyer

4  wasn't happy with the proposed changes to the seniority

5  system?

6       A.      Was he?

7       Q.      He was not happy with changing the system in some

8  way, the seniority system; would that be fair to say?

9       A.      Well, he was I would say wanting changes in the

10  old seniority system because of the number of factors that

11  were used to come up with the seniority list.

12       Q.      So is Mr. Boyer wanting the new system or opposed

13  to a new system?

14       A.      He was wanting a new system.

15       Q.      If you turn to page 4 of this memo, the Bates

16  number at the bottom is 210299.

17       A.      I have it.

18       Q.      I'm looking at the I guess comparison that

19  Mr. Boyer had done under the two different seniority systems?

20       A.      Right.

21       Q.      And Mr. Boyer actually, he would be affected by a

22  change in the system, right?  On one list he would have been

23  second in seniority, and the other list he would have been

24  first, correct?

25       A.      Yes.

Joseph Osenkarski                              199


1     Q.     And Mr. Boyer, of course, is a male, correct?

2     A.     Yes.

3     Q.     And looking at individual 15, 15, Horick?

4     A.     Yes.

5     Q.     And Ms. Horick, that's Nicole Horick?

6     A.     Nicole, right.

7     Q.     A female, of course?

8     A.     Yes.

9     Q.     And again, under the two different lists, she

10    would be affected depending on which system was employed,

11    correct?

12    A.     Right.

13    Q.     And without comparing everyone, there's a number

14    of other individuals both male and female that would be

15    affected differently depending on which system was used?

16    A.     Yes.

17    Q.     Was there ever any discussion that the reason the

18    seniority system was being looked at was because of any

19    discriminatory purpose?

20    A.     What do you mean by discriminatory?

21    Q.     Well, in other words, different people may be

22    affected, but was there ever any motive or any other concern

23    by the people involved in looking at this that this would

24    somehow be discriminatory towards one group or another?

25    A.     Yes.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    200


1       Q.     Okay.  Was that something that was considered as

2   part of looking at the issue?

3       A.     Well, we wanted to rectify the, I'm going to use

4   the word unfairness and use a little different word.

5       Q.      The motive was to try and make the system more

6   fair in some people's minds?

7       A.     Fair.  Yes, it was the only motive.

8       Q.     You were asked some questions about whether or

9   not, I think you had answered some of the staff in the office

10  didn't like Gary Graham.  Would that be fair to say?

11      A.     That's fair to say, yes.

12      Q.     Would it be fair to say that some of the staff in

13  the office don't like Barbara Varner?

14      A.     That's fair to say.

15      Q.     Would it be fair to say that not everybody in

16  your office likes everybody else?

17      A.     No, they don't.

18      Q.     You were asked earlier today about profanity in

19  the workplace and you were asked a series of categories of

20  people if they use profanity.  Are there any females on your

21  staff that have ever used profanity in the office?

22      A.     Yes, in the past.

23      Q.     Are there any females in your office that have

24  ever told off-color jokes?

25      A.     Yes.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                        201


1      Q.      You were asked about Osenkarski 4, which is an

2   evaluation.  Can you pull that out?  If you turn to the

3   second page, okay?  There are X's in the first column.  For

4   example, there's an X under the satisfactory block.  Do you

5   see that?

6      A.      In the satisfactory block?

7      Q.      Right.

8      A.      You're referring to page 2?

9      Q.      On page 2 in the first column under job factors

10  there's an X in the satisfactory block, correct?

11     A.      Right.

12     Q.      And if you look to the far left, there's a very

13  faint X under outstanding?

14     A.      Yes.

15     Q.      And in some of the other blocks there's the same

16  thing, there's a faint X in a different block that's kind of

17  penciled in, it looks like?

18     A.      Yes.

19     Q.      Do you know how those got there?

20     A.      No.

21     Q.      You don't know who put those there?

22     A.      No.

23     Q.      Do you know if Ms. Varner put those there as to

24  the evaluation she thought she should have gotten?

25     A.      I don't know that.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    202


1      Q.     We went through a series of evaluations for

2   Ms. Varner and I'm not going to go through them again, but

3   does it appear that actually her evaluations have increased

4   or gone up over the past three or four years?

5      A.     Yes.  They've increased.

6      Q.     Okay.

7      A.     Dramatically.

8      Q.     That would be despite the fact there was ongoing

9   litigation?

10      A.     Yes.

11      Q.     And despite the fact she's claiming that she

12   feels retaliated against by a number of people; would that be

13   fair?

14      A.     Yes.

15      Q.     You were asked I guess most recently some

16   questions about these charity shoes, and I don't think you

17   were asked the question were any of those shoes given to

18   either Ms. Varner or her family members to use for personal

19   use?

20      A.     Yes.

21      Q.     And was that on more than one occasion?

22      A.     I believe on one occasion.  As I started to refer

23   to there, I had the prerogative to use those shoes for

24   whatever purpose I deem proper.  And the primary reason I

25   receive those shoes is to make sure that these desperate --

Joseph Osenkarski                                    203

1    these kids that we deal with who may at times have only one

2    pair of shoes on their feet, which is all they own, you know,

3    receive something adequate on their feet so that they don't

4    suffer any more than they are suffering.

5              And I would like to say that 99 percent of the

6    stuff -- again, it's my prerogative, it's not a dictate by

7    the county, it's something Joe Osenkarski has done to improve

8    mankind, if you want to speak philosophically, and to improve

9    my position in terms of effectiveness of operating a most, in

10   a most difficult environment with difficult kids, and using a

11   product that normally would be thrown away.

12             Further to say that probably I have distributed

13   hundreds of thousands of dollars worth of shoes.  In fact,

14   when that question was brought up the first day, I thought I

15   had a half-inch or a quarter-inch memo showing the numbers of

16   letters of thank you and what have you for my generosity, and

17   it's two and a half inches.  And I threw one of the files

18   away many, many years ago because it was just collecting

19   space.  So does that tell you anything?

20             MR. MacMAIN:  Those are all the questions I have.

21   Thanks.

22             MS. WILLIAMS:  I have a couple of questions, if I

23   might.

24   BY MS. WILLIAMS:

25        Q.     Mr. Osenkarski, I'm Taylor Williams as you

1    know, representing the court defendant in this case.

2              You had occasion to review a document we've

3    marked as Osenkarski Exhibit No. 12?

4         A.    Okay, I have it.

5         Q.    And the first page of that has a date of February

6    28th, 2000.  It was your testimony, I believe, that you

7    didn't know why this memo was written by Thomas Boyer.

8              Is it possible that the memo was written in

9    relation to the EEOC investigation?

10        A.    Possibly.

11        Q.    And that it might have been an attempt to revisit

12   that in order to answer questions related to the EEOC?

13        A.    Yes.  I now recall that I think there was a

14   request for documents, whether it been from a Howard Holmes?

15   And I now recall that you said that I directed Mr. Boyer to

16   prepare the history of the seniority policy because the

17   information was requested by I believe Howard Holmes from the

18   EEOC.

19        Q.    Or --

20        A.    Or someone.

21        Q.    Or someone related to the EEOC?

22        A.    Yes.

23        Q.    Thanks.  Let me direct your attention to

24   Osenkarski Exhibit No. 10.  I can show you my copy.

25        A.    All right.

Joseph Osenkarski                              205


1      Q.     It's a handwritten memorandum from Barbara Varner

2    to you.  Do you recollect seeing that earlier?

3             MS. WALLET:  Excuse me.  I think that might be

4    something other than 10.

5             MS. WILLIAMS:  It is 16, I'm sorry.  My own

6    handwriting has let me down, you're right.

7             THE WITNESS:  I recall seeing the first page but

8    not --

9    BY MS. WILLIAMS:

10     Q.     Right.  It's the first page I have a question

11   about so that's fortunate.  Is it fair to say that there has

12   never been a situation of conflict between employees like the

13   conflict between Barbara Varner and Barbara Graham, in your

14   experience?

15     A.     Yes, it's fair to say that.

16     Q.     On that exhibit, I'll look over your shoulder, in

17   the second paragraph there is wording that says:  Barbara

18   Graham was distraught when I was there.

19             Where did that language come from?  Is that

20   language that you had seen before or known about before?

21     A.     I had not seen her distraught in that particular

22   area, but it was a language that --

23     Q.     Did you tell Barbara Varner that Barbara Graham

24   was distraught when she was there in the courthouse east

25   wing?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          206


1        A.      No, I did not tell Barbara Varner that Barbara

2   Graham was distraught.  I was delivering a message from Judge

3   Hoffer.

4        Q.      Were those the words Judge Hoffer used?

5        A.      I believe he used the words avoid a potential for

6   conflict.

7        Q.      But to your recollection, he did not say that

8   Barbara Graham was distraught when Barbara Varner was there?

9        A.      I don't recall him saying that.  It was an issue

10  of his attempts to avoid the potential for conflict.

11       Q.      You mentioned that Ms. Varner might have the

12  potential to do business in that third floor east wing of the

13  courthouse.  Do you know if she actually did have some

14  business there?

15              MS. WALLET:  I'm going to object to the form of

16  the question.  She was prohibited from going there.  I'm not

17  sure how she could have had business there.  I just object to

18  the question.

19              MS. WILLIAMS:  Okay.

20  BY MS. WILLIAMS:

21       Q.      Do you know whether she had occasion to have need

22  to do business with somebody who was in that annex?

23       A.      Well, yes, because probation officers interact

24  with other probation officers as a regular part of their

25  duties.

Joseph Osenkarski                                    207


1        Q.      And were there ways to get around her actually

2    physically going to the probation officer?

3        A.      To that particular area?

4        Q.      Yes.

5        A.      There were ways around that, and that was to have

6    the probation officer who was being sought out for consulting

7    to be brought to the main area, the main office area where

8    Barbara Varner's office was located.

9        Q.      Are you aware that there were any problems

10   because she was temporarily restricted from going into the

11   area where Barbara Graham was?

12       A.      No.

13               MS. WALLET:  Objection to the word temporary.

14   BY MS. WILLIAMS:

15       Q.      You can answer.

16       A.      I was not aware of any problems.

17               MS. WILLIAMS:  Thank you.  That's all I have.

18               MR. ADAMS:  Just a few questions.

19   BY MR. ADAMS:

20       Q.      Do you recall counsel for Gary Graham asking you

21   a few questions a moment ago about sexual harassment

22   complaints by Ms. Varner?  Do you remember that?

23       A.      Yes.

24       Q.      And you testified that you had never received any

25   complaints of sexual harassment by Barbara Varner; is that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                      208

1   correct?

2        A.      That's correct.

3        Q.      And you said there was no complaint by

4   Mrs. Varner about Gary Graham of sexual harassment; is that

5   correct?

6        A.      Not that I had seen in this.  I've seen the

7   Complaint.

8        Q.      Okay.  Other than the Complaint, there were no

9   verbal complaints of any sort by -- other than the official

10  Complaint, that being in the court or either in the EEOC

11  setting, there were no complaints by Ms. Varner; is that

12  correct?

13       A.      Yes.

14       Q.      I know you're tired.  Bear with me, okay.

15               But you do recall testifying during your first

16  portion of this deposition indicating that Ms. Varner had

17  come to see to you complain about cases between she and Gary

18  Graham; is that correct?

19       A.      Yes.

20       Q.      Okay.  And upon that occasion when she came to

21  you to complain, did she mention anything about sexual

22  harassment?

23       A.      No.  That was a complaint about the differences

24  they were having with case management issues, arguments.

25       Q.      Had she come to you during that time and said or

1  with a complaint under the premise of sexual harassment by

2  Gary Graham, what would you have done?

3          MS. WALLET:  Objection, calls for speculation.

4          MR. ADAMS:  Well, it's been asked, the question.

5  BY MR. ADAMS:

6      Q.    Go ahead, you can answer.

7      A.    Barbara Varner did not come to me with a sexual

8  harassment complaint against Gary Graham.  She came to me to

9  complain about differences they were having, disagreements

10 they were having with case management issues.

11     Q.    Had she come to you with a complaint of sexual

12 harassment, what would you have done?

13         MS. WALLET:  Objection.  Calls for speculation.

14 BY MR. ADAMS:

15     Q.    You may still answer.

16     A.    I would have taken her to our superior or HR,

17 whatever the role was.

18     Q.    You also received questions today regarding the

19 seniority policy that you implemented upon you becoming

20 chief.  Do you remember those questions?

21     A.    There were a lot of them.

22     Q.    Yeah, I know.  We'll pull you back in this area,

23 okay?

24     A.    Okay.

25     Q.    As a new chief, did you have other policy changes

1   or things that you wanted to implement in the office besides

2   the seniority policy?

3        A.      About a hundred.

4        Q.      Okay.  And --

5        A.      I'm just, not a hundred, but --

6        Q.      What's an unexaggerated answer?

7        A.      Major improvement in personnel and major

8   improvement in programming, specialized probation services.

9   We had nothing when we were thrown into that split situation.

10       Q.      How many persons would you say complained, when

11  you first became chief how many persons would you say

12  complained about the seniority system or policy in effect at

13  the time?

14       A.      There were complaints made for 11 years during

15  the Bolze administration by five, six, that's a guesstimate,

16  people.

17       Q.      Five or six out of how many personnel total?

18       A.      We had 20, 20 people.

19       Q.      Upon the implementation of the new seniority

20  policy, how many persons would you say benefitted?

21       A.      Four or five.

22       Q.      Now, you testified earlier that Ms. Varner was

23  personally asked about the new seniority policy that you

24  wanted to implement.  What is your understanding of that?

25       A.      As I stated earlier, I had Mr. Boyer carefully go

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              211


1    over the planned changes in the seniority policy and

2    specifically that was to come up with one single deciding

3    factor why the seniority list was being made up, a new

4    seniority list was being made up, and that was time spent in

5    full-time service in Probation.

6        Q.    And did Ms. Varner have any objections to the new

7    policy that you wanted to implement?

8        A.    No.

9        Q.    What were her feelings about it initially, do you

10   recall?

11            MS. WALLET:  I'm sorry, her feelings about what?

12   BY MR. ADAMS:

13       Q.    What were her feelings initially about the new

14   change in policy?

15            MS. WALLET:  About it initially?

16            MR. ADAMS:  Yes.

17   BY MR. ADAMS:

18       Q.    If you recall?

19       A.    The intended changes, according to information

20   which was given to me by Mr. Boyer, the person who I

21   delegated the duty of making sure he went over the new

22   changes with all staff.

23       Q.    Do you believe that she felt the new policy that

24   you wanted to implement was fair?

25       A.    Say that again.

1       Q.      Do you believe that Ms. Varner felt the new

2   policy was fair?

3       A.      Initially I thought she was -- she felt it was

4   fair.

5       Q.      When you implemented the seniority policy in the

6   Juvenile Probation Department did you know that it would

7   negatively affect Ms. Varner at all?

8       A.      No.

9       Q.      If this question's already been asked, I

10  apologize, but my last question to you is:  Can you explain

11  about, explain how Ms. Varner was not adversely affected

12  through that whole process with the seniority policy changes

13  going from one to the other?

14      A.      Well, simply, it is a fact that she dropped one

15  notch on the new seniority list, but in reality, she did not

16  lose anything.  She was given a promotion because the

17  criteria for senior PO were changed because she had made a

18  complaint about being dropped a notch and alleged that she

19  was being unfairly treated and that Bill Brandt was being

20  given something that she should have gotten.  But the county

21  accommodated her by dropping the criteria from eight years or

22  six with a master's to four years and three years with a

23  master's.  So she was accommodated.

24              And if anybody lost, it was William Brandt who

25  had to wait two-and-a-half months to three months before he

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                213

1    got the benefit of that initial 5 percent increase in his

2    salary while the county was deciding to drop the criteria

3    from eight years to four years.

4         Q.    Mr. Brandt didn't complain at all about the

5    process, did he?

6         A.    He wasn't happy but he didn't complain.

7         Q.    But Ms. Varner did?

8         A.    She complained but was accommodated.  That's the

9    important thing, I feel.

10               MR. ADAMS:  No further questions.

11               MS. WALLET:  Back to me?

12   BY MS. WALLET:

13        Q.    You said that four or five people benefitted from

14   your seniority policy.  Who?

15        A.    Maybe I'm getting tired, but I don't recall --

16        Q.    Well, name one person.

17        A.    Maybe the word benefitted is a bad word or not a

18   good word to use.  But there were no further complaints made

19   by those who were complaining.

20               I'm drawing a blank.  I don't know.

21               MR. ADAMS:  If you don't recall, you don't

22   recall.

23               THE WITNESS:  I don't recall.

24   BY MS. WALLET:

25        Q.    So when you said four or five people benefitted,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                    214

1   you just kind of pulled that out of the air?

2              MR. ADAMS:  Objection to the form.

3              THE WITNESS:  The complaints ceased and everybody

4   appeared to be happier with the one criterion, full-time

5   service in the Probation Department and not service in other

6   departments, et cetera.

7   BY MS. WALLET:

8       Q.     Isn't it true that the only person who benefitted

9   was Mr. Brandt?

10      A.     You might say that.  Yes.

11      Q.     What shoes did you give to Ms. Varner?

12      A.     I vaguely recall they were some infant shoes.

13      Q.     What use did she have for these infant shoes?

14      A.     I believe she had some grandchildren.

15      Q.     Did you offer them to her or did she ask for

16  them?

17      A.     I believe I offered them to her because there was

18  little use as to their need by juvenile institutions or

19  detention centers because there were no infants at the places

20  that I was getting these shoes and clothing to.

21      Q.     One of your sister agencies is Children and

22  Youth, isn't it?

23      A.     Yes.

24      Q.     You could have given those shoes to Children and

25  Youth to be distributed to those individuals?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                               215

1      A.    Oh, yes.

2      Q.    Did you do that?

3      A.    And I did.  We're talking here about an

4  insignificant number of shoes.  And most importantly, I had

5  the prerogative to distribute, as long as the bulk of the

6  stuff went to where I felt it should go, and that was carried

7  out.

8      Q.    You have a recollection at least one pair of

9  shoes were given to Ms. Varner?

10     A.    I'd say I just vaguely -- maybe three or four.

11 That's just a guesstimate.

12     Q.    All infant shoes?

13     A.    I believe so.

14     Q.    What do you remember about these shoes,

15 Mr. Osenkarski?

16     A.    That I distributed thousands and thousands and

17 thousands of pair to institutions and individuals who were in

18 need of these things.

19     Q.    And you remember a specific pair that you gave to

20 Ms. Varner?

21     A.    I recall vaguely some infant shoes that I gave to

22 Ms. Varner.

23     Q.    Now, when clients used profanity in your offices

24 you objected to that, didn't you?

25     A.    If clients were particularly loud and unruly, I

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          216

1    would object to it.

2         Q.    In fact, you would consider that to be part of

3    your probation officers' discipline, to ensure that they

4    treated individuals with respect; wouldn't you agree?

5         A.    Yes.

6         Q.    So if you got kids in there and they're using the

7    F word, you would expect that your probation officers would

8    put a stop to it, correct?

9         A.    Yes.

10        Q.    Did you do that?

11        A.    If things got out of hand, I would have.

12        Q.    Did they ever get out of hand?  I'm sorry, I

13   missed the answer.

14        A.    I didn't answer yet.

15        Q.    Oh.  That's why I missed it.

16        A.    I'm trying to think if there's situation's where

17   I might have intervened, but I can't recall of anything

18   specific.

19        Q.    Well, did you ever tell your probation officers:

20   When kids use profanity I expect that you will tell them

21   about it and you will stop it?

22        A.    Yes.

23        Q.    Yes, you did?

24        A.    Yes.

25        Q.    I neglected to ask you, sir, do you carry a

1    weapon as part of your responsibilities?

2         A.     I am certified to carry a weapon but we have a --

3    whenever we split I made a training-only with weapons and a

4    no-carry policy, because very few people were certified to

5    carry and my emphasis was to get a number of people certified

6    before I approached the judge about a Juvenile probation

7    officer carry policy.

8               The Adult side continued their carry policy, but

9    we discontinued it as soon as we split.  And several years

10   ago I offered a firearms carry policy to Judge Hoffer and he

11   never responded to implementing the carry policy.  So the

12   policy continues to be a training-only and certification-only

13   policy with regards to weapons.

14        Q.     After the split does the Juvenile Probation

15   office have weapons?

16        A.     Yes, we have weapons.

17        Q.     Where are they?

18        A.     The weapons are in a locked safe in the basement

19   of the annex.  The extra weapons or the individual probation

20   officers who are certified have been issued a weapon which

21   they keep in their home.

22        Q.     So even after the split, individual probation

23   officers may have a weapon; they're just not permitted to

24   carry it --

25        A.     Yes.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                218

1      Q.      -- while at work?

2      A.      Only certified officers.  There's a state

3  certification system, it's I believe Act 158 which was an act

4  which created a department within the state Adult system

5  which developed a training policy.

6      Q.      Okay.  Let's talk about before the split.  Before

7  the split did all of the Juvenile probation officers have the

8  opportunity to be certified to carry weapons?

9      A.      Mr. Bolze had an annual certification process.

10  And I'm not sure of the year that the Commonwealth of

11  Pennsylvania passed this Act 158, but it was shortly before

12  Mr. Bolze retired.

13      Q.      So before the split and before Mr. Bolze retired,

14  you had a weapon and you carried it while you were at work?

15      A.      I never carried a weapon but I trained and

16  participated in the annual trainings which were held once a

17  year.

18      Q.      And before this split and before he was

19  transferred to the institution, did Mr. Graham carry a

20  weapon?

21      A.      I think Mr. Graham may have participated in the

22  annual qualification prior to the split and maybe shortly

23  after the split, but I don't recall that he was interested in

24  carrying or certifying.

25      Q.      So your recollection is that before the split and

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                              219


 1    before he was transferred to the institution, he did not

 2    carry a weapon while on duty?

 3         A.    No, he didn't.  He trained.

 4         Q.    Did he have a weapon assigned to him?

 5         A.    There was a weapon available but I don't recall

 6    that he was ever assigned one.

 7         Q.    If you're not allowed to carry a weapon as a

 8    juvenile probation officer, why do you even have weapons?

 9    Why are they assigned to people?

10         A.    Well, it's training and it's up to the discretion

11    of the juvenile court judge and the president judge as to

12    whether or not he wants his probation officers carrying.  And

13    in the State of Pennsylvania I, my guess is that

14    approximately one-third of the Juvenile Probation Departments

15    in the state have a carry policy.

16         Q.    Who pays for the liability insurance?

17               MR. ADAMS:  Of carrying?

18               MS. WALLET:  For the weapons that are owned by

19    the court system.

20               THE WITNESS:  Well, the county has a liability

21    policy, and it would be my understanding that the liability

22    policy carried by the county would cover the area that you're

23    talking about.

24               MR. ADAMS:  I don't want you to guess.  If you

25    didn't know --

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                          220


1           THE WITNESS:  I don't know.  I'm not sure.  I'd

2     have to refer to the policy I placed on Judge Hoffer's desk

3     over two years ago.

4     BY MS. WALLET:

5           Q.     Before the split, if a probation officer was

6     certified and chose to carry a weapon, where was that weapon

7     kept during the business day?

8           A.     The probation officer's home.

9           Q.     Could you carry it into the courthouse on your

10    person?

11          A.     Yes.

12          Q.     Were there any restrictions about not having it

13    on your person while you were at work?

14          A.     It would have to be secured in a safe place in

15    the courthouse.

16          Q.     And was that this locked safe in the basement?

17          A.     Yes.

18          Q.     Who had access to this safe?

19          A.     I have the master key.

20          Q.     Did your management team also have access to this

21    safe?

22          A.     No.

23          Q.     Who else besides you?

24          A.     No one.

25          Q.     Did Mr. Graham have access to that safe?

Joseph Osenkarski                          221


1       A.      No.

2       Q.      How do you know that?

3       A.      Mr. Graham had no interest.  And he was removed

4   from my department for, you know, within a year and a little

5   bit after we split, so.  And in addition to that, he had no

6   interest.

7       Q.      My question, sir, was:  Did he have access to

8   that safe?

9       A.      No.

10      Q.      He didn't know the combination?

11      A.      No.  There wasn't a combination.  It was a key

12  that I have in my locked desk.

13      Q.      Any provisions if you were away on vacation?

14      A.      No.

15      Q.      So if you were away, nobody had access to the

16  weapons?

17      A.      Right.

18      Q.      What female probation officers told off-color

19  jokes?

20      A.      I believe Kerry Houser.  She's no longer with --

21  she's not with Juvenile Probation, she's on the Adult side.

22              I don't recall others.

23      Q.      Any other female probation officer tell an

24  off-color joke in your presence?

25      A.      I don't recall.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                         222

1       Q.      Is that a no?

2       A.      I just don't recall.

3               MS. WALLET:  That's all I have.

4               MR. MacMAIN:  No further questions.

5               (Whereupon, the deposition was concluded at

6    3:59 p.m.)

7                            *   *   *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

223

1  COMMONWEALTH OF PENNSYLVANIA  )
                                )
2  COUNTY OF DAUPHIN            )

3      I, Emily R. Clark, a Court Reporter-Notary Public

4  authorized to administer oaths and take depositions in the

5  trial of causes, and having an office in Harrisburg,

6  Pennsylvania, do hereby certify that the foregoing is the

7  testimony of JOSEPH L. OSENKARSKI taken by Plaintiff at the

8  Administrative Offices of Pennsylvania Courts, 5035 Ritter

9  Road, Mechanicsburg, Pennsylvania.

10     I further certify that before the taking of said

11 deposition the witness was duly sworn; that the questions and

12 answers were taken down in stenotype by the said

13 Reporter-Notary, approved and agreed to, and afterwards

14 reduced to computer printout under the direction of said

15 Reporter.

16         I further certify that the proceedings and

17 evidence are contained fully and accurately in the notes

18 taken by me on the within deposition, and that this copy is a

19 correct transcript of the same.

20         In testimony whereof, I have hereunto subscribed

21 my hand this 27th day of February, 2003.

22

23

                          _____
24                        Notary Public

25