IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                  .
     Plaintiff,                    .    CIVIL ACTION
                                   .    NO. 1:CV 01-0725
    vs.                             .
                                   .
COMMONWEALTH OF PENNSYLVANIA,        .    (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,             .
CUMBERLAND COUNTY; CUMBERLAND        .
COUNTY; S. GARETH GRAHAM,            .
Individually, and JOSEPH            .
OSENKARSKI, individually,            .
     Defendants.                   .
. . . . . . . . . . . . . . . . . .

VOLUME 1
Pages 1 to 183


     Deposition of:  S. GARETH GRAHAM

     Taken by      :  Plaintiff

     Date          :  January 29, 2003, 9:27 a.m.

     Before        :  Emily Clark, RMR, Reporter-Notary

     Place         :  Administrative Offices of
                      Pennsylvania Courts
                      5035 Ritter Road, Suite 700
                      Mechanicsburg, Pennsylvania


APPEARANCES:

     DEBRA K. WALLET, ESQUIRE
         For - Plaintiff

     ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
     BY:  A. TAYLOR WILLIAMS, ESQUIRE
         For - Defendant Commonwealth of Pennsylvania
            Ninth Judicial District, Cumberland County

     THOMAS, THOMAS & HAFER
     BY:  JAMES K. THOMAS, II, ESQUIRE
         PAUL J. DELLASEGA, ESQUIRE
         For - Defendant Cumberland County

Emily R. Clark, RMR
717-233-1744, emily.clarkk@worldnet.att.net

APPEARANCES (continued):

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
BY:  DAVID J. MacMAIN, ESQUIRE
     For - Defendant S. Gareth Graham

SWEENEY & SHEEHAN, P.C.
BY:  JASON G. BATES, ESQUIRE
     For - Defendant Joseph L. Osenkarski

ALSO PRESENT:

MS. BARBARA E. VARNER

MR. JOSEPH OSENKARSKI

MS. MELANIE McDONOUGH

Emily R. Clark, RMR
717-233-1744, emily.clarkk@worldnet.att.net

I N D E X

WITNESS

S. Gareth Graham                                    Examination

   By Ms. Wallet                                        4

EXHIBITS

No.  Description                               Identified

1    1-page "Employee Certification"              121
    27 March '81

2    1-page "Receipt Acknowledgment"              121
    4/17/01

*   *   *   *   *

Emily R. Clark, RMR
717-233-1744, emily.clarkk@worldnet.att.net

S. Gareth Graham

4

```
 1                 STIPULATION

 2            It is hereby stipulated by and between the

 3   respective parties that signing, sealing, certification and

 4   filing are waived; and that all objections except as to the

 5   form of the question are reserved until the time of trial.

 6

 7            S. GARETH GRAHAM, called as a witness, being duly

 8   sworn, was examined and testified, as follows:

 9   BY MS. WALLET:

10        Q.    What is your name, sir?

11        A.    S. Gareth Graham.

12        Q.    By whom are you employed?

13        A.    The Court of Cumberland County, Ninth Judicial

14   District.

15        Q.    How long have you been so employed?

16        A.    27, 26, 27 years.  Started in September of '77,

17   but had a previous employment with the county from July 26th

18   of '96.

19        Q.    Sir, do you have any hearing problems?

20        A.    No, I don't.

21        Q.    Would there be any reason today why you could not

22   answer my questions completely and truthfully?

23        A.    No.

24        Q.    Are you on any medication that would interfere

25   with your ability to listen or to respond?
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    5

1        A.      No.

2        Q.      Can we agree, please, that if you for some reason

3   have not heard my question or did you not understand my

4   question, that you will ask me to repeat it?

5        A.      Okay.

6        Q.      If you answer my question, I will assume that you

7   have both heard it and you understood it.  Is that agreeable?

8        A.      That's correct.

9        Q.      You have counsel here today.  Has that counsel

10  been paid for by you personally?

11       A.      No.

12       Q.      Has the county provided counsel to you in this

13  litigation?

14       A.      Yes.

15       Q.      Are you being paid by the court system for your

16  appearance here today?

17       A.      Yes.

18       Q.      You receive your full salary today?

19       A.      Yes.

20       Q.      Are you required to take any leave to attend

21  these depositions?

22       A.      I have not clarified that.  On the reporting

23  instrument that I report on, I put county meetings or county

24  depositions, so I did not get prior approval or clarification

25  to your question.

1      Q.      Have you submitted a leave slip?

2      A.      No, ma'am.

3      Q.      Mr. Graham, when did you first learn that any

4    complaints had been made about you by Barbara Varner?

5      A.      I don't know the exact date.

6      Q.      Do you know what year?

7      A.      Probably 19 -- I think she began her complaining

8    in 1996, and she filed in 1997 with the EEOC in the early

9    part of the year.

10     Q.      Do you believe that you first learned about the

11   complaint of Ms. Varner when you were told that an EEOC

12   complaint had been filed?

13     A.      I was called down to the Human Relations office

14   on the 29th of April, I think it was '97, and I was

15   questioned by David Deluce and Dan Hartnett as to sexual

16   harassment allegations made by Mrs. Varner.

17     Q.      Is that your recollection of the first time that

18   anyone told you about complaints that had been made by

19   Ms. Varner?

20     A.      My recollection occurred prior to that, because

21   Ms. Varner was engaged in clandestine or office meetings

22   every morning with different members of the Probation staff,

23   and for about a year these rumors, she would meet early in

24   the morning with different members of the Probation

25   Department in closed-door sessions.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              7


 1            And I was first informed because she -- Tom Boyer

 2    came to me and said, did you know she, Barb Varner, is filing

 3    a petition or complaint against you for sexual harassment.

 4    And he knew that from Fran Rose, and Fran Rose knew that from

 5    Lyle Herr, because this conversation had occurred in the

 6    Adult side of the Probation Department, and this had got past

 7    me.  So the first inkling of my recollection of anything that

 8    she was doing was given to me by Tom Boyer.

 9        Q.    And do you recall when that was, sir?

10        A.    Around December of '96.

11        Q.    What did Tom Boyer tell you at that time?

12        A.    I just told you that, ma'am.

13        Q.    Did he tell you anything else?

14        A.    No.

15        Q.    What did you say to him?

16        A.    And I said, well, that's her prerogative.

17        Q.    Prior to being called into the HR office in April

18    of '97, did anyone in your supervisory chain of command tell

19    you that Ms. Varner had made complaints about you?

20        A.    No.  I think Joe had a call from Human Relations

21    or David Deluce a few days before.  I was out on supervision

22    on the 29th of April, and he was, you know, trying to reach

23    me and find out, because they were downstairs assembled to

24    question me about the complaint.  So that's --

25        Q.    He, Joe Osenkarski, was trying to reach you on

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    8


1   the 29th of April?

2        A.    Right.

3        Q.    And did he reach you that day?

4        A.    I came into the office after doing a supervision

5   matter in the morning, and then came in and he said, they're

6   looking for you downstairs, you know, they're assembled and

7   questioning people regarding that.

8              And I think prior to that they had questioned

9   other members of the Probation Department.

10       Q.    How do you know that?

11       A.    Just from the office rumor mill.

12       Q.    Did someone tell you that they had been

13  questioned?

14       A.    No one specific.  Just that different people were

15  being called down on her behalf to validate concerns of her

16  sexual harassment issue.

17       Q.    So you met with Mr. Deluce you think sometime

18  after the 29th of April?

19       A.    No.  I think it was on that date, the 29th.  I'm

20  pretty -- you could get that from when they conducted their

21  first investigation.

22       Q.    And how long did you meet with him?

23       A.    Well, the first meeting was really short.  He

24  asked me a number of simple questions, and did you sexually

25  harass Mrs. Varner; no.  And a whole periphery of questions

1    regarding did you talk to her about things about your wife,

2    did you -- just questions of that nature of -- and have you

3    been sexually harassing her.  And I said no.  He asked me

4    just a few small questions at the beginning.

5              And then about a week later when he was still

6    conducting his investigation, I called down to Dan Hartnett

7    and asked him if I could have another appearance to talk

8    about this situation.  And on the second occasion I went

9    down, I had gone back and resurrected some of my notes of

10   contacts with Ms. Varner.  I provided to David Deluce or I

11   shared with David Deluce a list of contacts that I had with

12   Ms. Varner.

13             She was alleging that sexual harassment, she was

14   afraid of me, I was basically made out to be a monster.  And

15   she was in a position to -- and I said, well, if that's the

16   case, sir, here's all the trips that she went on.  And I

17   produced a document, not to them, I wouldn't give them a copy

18   of it, but that document said it was 24 separate trips.  I

19   identified all the trips that I was on with Ms. Varner, and I

20   identified all the mileage that I was on with Ms. Varner, and

21   I identified all the hours I had spent with Ms. Varner.

22             And my contention to David Deluce was the fact

23   that if this woman is terrified of me and afraid of me and

24   purporting and alleging that I'm sexually abusing her, she's

25   only traveled with me all these distances, all these times

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          10


1    and to all these events.  And I wouldn't think that she would

2    put herself in the close proximity of a vehicle with me for

3    20 hours on one particular occasion when we drove to New

4    Jersey, if she was being subjected to being sexually harassed

5    and worried about me personally and physically and

6    emotionally and whatever.

7         Q.    Let's go back to the first meeting.  You said it

8    was rather short.  Was there anyone else present in that

9    meeting besides you and Mr. Deluce?

10        A.    David Deluce, Dan Hartnett.

11              MR. THOMAS:  I'm sorry to interrupt.  Let me

12   place an objection on the record.  As you know, Deb, we do

13   contend that Mr. Deluce was counsel for the county and that

14   this investigation may be protected pursuant to the

15   attorney-client privilege or attorney work product

16   exclusions.  And I don't want to limit your deposition, but I

17   obviously anything that Mr. Deluce said we will object to and

18   instruct this witness not to answer it.  I'm prepared to

19   permit you to continue the examination.  I think you're

20   entitled to know that an investigation occurred.

21              I would like an ongoing objection to the

22   testimony and I would like your agreement that there will not

23   later be a waiver, an argument that we have waived any

24   privilege that we may have.

25              MS. WALLET:  I don't intend to raise an issue of

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           11


 1    waiver.  I understand your position.

 2              MR. THOMAS:  Okay.  Thanks.

 3    BY MS. WALLET:

 4        Q.    How long do you think that that first meeting

 5    which you described as short with Mr. Deluce and

 6    Mr. Hartnett, lasted?

 7        A.    Most likely less than 10 minutes.

 8        Q.    Did you give Mr. Deluce anything at that time?

 9        A.    No, I did not.

10        Q.    You had a second meeting which you requested; is

11    that correct?

12        A.    That's correct.

13        Q.    And who was present at that meeting?

14        A.    Dan Hartnett and David Deluce.

15        Q.    Anyone else?

16        A.    No.  Myself.

17        Q.    And why did you request this meeting?

18        A.    To clarify some of the allegations that she had

19    made in her complaint, that they had read on the second

20    occasion they had expounded on the questions that they were

21    asking me.  And in response to that, I wanted to provide a

22    defense.

23              They asked me about a personal birthday card that

24    I had given her, and I responded and -- I'm sorry to

25    jeopardize Mr. Thomas's objection, but I responded and said I

1    don't remember any card, would you show me the card.  And

2    they failed to show me the card.  I said I don't remember.

3              I said to them, my dad used to operate a little

4    cut-rate store, we sold greeting cards and everything.  And I

5    said, you know, the card manufacturer could probably validate

6    by turning the card over on the back side, the manufacturing

7    date of the card.  And I had asked Mr. Deluce and them to go

8    and validate when the card was printed from the printing

9    manufacturer.  And Ms. Wallet, I have done that.  I have gone

10   to the printing manufacturer of that card, and I think it's

11   Sussex, Maine, and that card was produced into publication in

12   1991.

13             And my contention was that they, she, Ms. Varner

14   has alleged that I gave her that card in '96, and I didn't.

15   I did not.  And that was a question they asked me and that's

16   the reply I gave them.  I did not give them the call.

17             Subsequently when I finally received this card,

18   this birthday card, just recently in some of this discovery

19   discussions, I then called the card manufacturer.  I have the

20   name of the lady, I have the company, I have the producer of

21   the card, and when it was placed into production.  My

22   contention was I didn't understand, you know, that I did not

23   give her the card in '96 as she alleged.  I had given her the

24   card in 19 -- probably '91 or '92 or '93.  I didn't remember

25   the card.  And that's the truth.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    13


1              MR. MacMAIN:  Just listen to her question and

2    just --

3              THE WITNESS:  I just want to --

4              MR. MacMAIN:  Okay.

5    BY MS. WALLET:

6        Q.    So you requested this meeting primarily to tell

7    them about this greeting card, or for some other reason?

8        A.    I requested the meeting to try to defend some of

9    the allegations that Ms. Varner had produced.

10       Q.    Other than the card, what did you feel needed to

11   be clarified at that time?

12             MR. MacMAIN:  I think it's been answered.  He

13   said to clarify what the allegations were.

14             MS. WALLET:  And I asked him what did he wish to

15   clarify.

16             THE WITNESS:  I just wished to expound on some of

17   the questions they had asked me originally, and then they

18   asked me some additional questions after that.

19   BY MS. WALLET:

20       Q.    Well, you went to this meeting to tell them

21   specifically about the greeting card, correct?

22       A.    No.

23       Q.    What did you go to this meeting to tell them

24   specifically?

25       A.    To tell them that I had a defense to her

1   allegations.

2        Q.     And your defense involved this greeting card?

3        A.     That was one of her allegations, so I just

4   responded to her allegations.

5        Q.     What other items did you feel that you needed

6   this meeting in order to clarify?

7        A.     Whatever the line of questioning they would have

8   given me:  Did I discriminate against her in the workplace;

9   no.  Things like that.  I did jot some of those down, you're

10  talking how many years ago, to try to -- I just can't recall

11  that from exact memory each question they asked.

12       Q.     Do you have notes from either one of these

13  meetings?

14       A.     No.

15       Q.     You said you jotted something down before you

16  went to see these people?

17       A.     No.  I basically summarized in my mind what

18  questions they had asked, and then I responded to them.

19       Q.     And you jotted that down?

20       A.     My response?  No, I didn't jot my response down.

21       Q.     What is it, sir, that you said that you jotted

22  them down?

23       A.     The sequence of questions they were asking me,

24  like, the three questions they had asked me, I tried to, you

25  know, write those down to try to remember what they asked me.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          15


1        Q.      And what happened to those notes?

2        A.      I have no idea.

3        Q.      You don't presently have them?

4        A.      I don't have them.

5        Q.      And you don't have any other notes from either

6    one of these meetings?

7                MR. MacMAIN:  You mean notes taken during the

8    meeting?  Or notes I may have asked him to write down things

9    as part of the defense of this case?

10   BY MS. WALLET:

11       Q.      Other than what you have provided to your

12   counsel, do any notes of those meetings exist?

13       A.      No.

14       Q.      Did you give them anything at this second

15   meeting?

16       A.      Absolutely not.

17       Q.      Do you have in your possession now the

18   information regarding the production of this greeting card?

19       A.      No.

20       Q.      Did you take notes of what the manufacturer told

21   you?

22       A.      I think I have -- yeah, I think I did take a note

23   and I wrote it on the back of the card, because I called just

24   recently, maybe a month or two months ago.

25               MS. WALLET:   And you'll provide those to me, I

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              16


1    assume?

2              MR. MacMAIN:  I may.  I mean, I think there might

3    be issues of work product and so forth, but I'll certainly

4    consider it and if I think it's appropriate, I'll produce it.

5    If I don't, I'll let you know that as well.

6              MS. WALLET:  You can consider this my formal

7    request that those be produced.

8              MR. MacMAIN:  I'd prefer if you sent me a letter.

9    And I'll make a list so it's not missed.  If you want to send

10   me a letter with whatever items would you like.

11             MS. WALLET:  I believe it falls within the

12   interrogatory that I think you have a duty to supplement.

13   BY MS. WALLET:

14        Q.    Other than those two times that you just

15   described, Mr. Graham, did you meet with anyone who told you

16   that they were investigating the charges made by Ms. Varner?

17        A.    I had gone to the EEOC.  I had gone to the

18   Pennsylvania Human Relations Commission to try to get

19   included in discovery of that information once I found that

20   those things were, they're filed there, yes.  And I was

21   denied access there.

22        Q.    When did you contact the EEOC?

23        A.    Numerous times.

24        Q.    And who did you contact there?

25        A.    Sylvia Williams.  I had driven to Philadelphia

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                               17


 1    and went to the Bourse Building on the, I think it's the 15th

 2    floor, and I talked to Ms. -- it was a supervisor there, I

 3    think it was, her name's Joan Gamiter.  And I had asked to be

 4    included in the EEOC's investigation.  And she had informed

 5    me that since you and Ms. Varner had not named me as a

 6    defendant I was not entitled to any information from the EEOC

 7    at that juncture.

 8        Q.    Did you at any subsequent time receive

 9    information from the EEOC?

10        A.    The only information I received from the EEOC

11    was -- and I made requests, I think I did send a letter

12    through another counsel, I don't have the copy of that, I

13    wouldn't know where that's at, but I was seeking out counsel

14    to try to -- for defending this claim.  And I had been to a

15    multitude of different lawyers to assist me.  So I can't

16    recall exactly who made that request or who -- I think he

17    directed me to send the letter myself to the EEOC under

18    freedom of information discovery.

19        Q.    And who is he?

20        A.    Cowden, William Cowden, in Harrisburg.

21        Q.    In any event, did you receive --

22        A.    Strokoff and Cowden.  Are you familiar with that

23    firm?

24        Q.    I am.

25        A.    Okay.  So do I have that right?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    18


1           MR. MacMAIN:  She doesn't want to know what you

2    discussed with any counsel.

3           MS. WALLET:  Correct.

4           MR. MacMAIN:  Just did you make the request, and

5    you've answered it, so.

6           THE WITNESS:  Yes.  Okay.

7    BY MS. WALLET:

8       Q.    Did you go to the EEOC during work time?

9       A.    No, I did not.

10      Q.    Did you take leave?

11      A.    Yes.

12      Q.    When did you do that?

13      A.    I don't know.  I can't recall the date.

14      Q.    Do you remember what month?

15      A.    No.

16      Q.    Do you remember what year?

17      A.    I took a witness with me down there to meet Miss

18   Gamiter.

19      Q.    And who did you take with you?

20      A.    Charlie Mallios, a college roommate of mine.

21      Q.    And who is Mr. Mallios, other than your

22   college -- other than your college roommate, who is he?

23      A.    He's just a friend of mine and he was a college

24   roommate of mine.

25      Q.    Does he own some business?

1        A.      He owns the Deer Lodge restaurant.

2        Q.      You've known him since college?

3        A.      Yes.

4        Q.      How often do you see him?

5        A.      Weekly.

6        Q.      Social friends?

7        A.      Yes.  Our children go to school at the same high

8    school.

9        Q.      Any other relationship with Mr. Mallios?  Are you

10   in business with him in any fashion?

11       A.      No, I'm not.

12       Q.      No other relationship?

13       A.      None.

14       Q.      Why did you take Mr. Mallios with you to the

15   EEOC?

16       A.      Probably I was intimidated by the driving into

17   Philadelphia a little bit, and I wanted somebody, like proof

18   positive to show that they denied me access to the EEOC

19   investigation.

20       Q.      Why did you think when you went that they were

21   going to deny you access?

22       A.      I didn't know when I went.  I wouldn't have

23   driven down there if I knew they were going to deny me

24   access.  I asked to be included in their investigation.

25       Q.      Well, if you took Mr. Mallios with you in order

1    to have a witness that they would deny you information --

2    A.    No, I didn't say they would deny me information,

3    Ms. Wallet.  I said I went down there to try to be

4    interviewed firsthand so -- because they wouldn't answer my

5    phone calls and they wouldn't include me.  They just said

6    that you're not a named defendant and you have no rights to

7    defend this claim.

8          I don't know why you didn't, you know, sue myself

9    and Mr. Osenkarski from the beginning and include us in that

10   investigation.  And that perplexes me as to why you wouldn't

11   include us at that juncture in the -- and maybe I don't

12   understand the law, but here I was being named as a

13   defendant.  I was feeling that my Constitutional rights to

14   discovery had been limited because I couldn't even discover

15   anything that she had said about me.  I couldn't see any

16   complaints that she had made about me.  And I think it's a

17   flawed federal process, and I'm not saying that as -- as in

18   layman terms, I don't know -- I didn't know the process, I

19   was ignorant to the process, and I tried to intelligently

20   deal with defending this accusation against me.  That's what

21   I was trying to do.  That was my intent.

22   Q.    So you took Mr. Mallios with you to be a witness

23   to what the EEOC did or didn't do?

24         MR. MacMAIN:  I think it's been asked and

25   answered.

1            THE WITNESS:  I answered that a couple times.

2            MR. MacMAIN:  He said that he tried to get the

3    information through letters and phone calls, and when he

4    didn't, he drove down there.  So I think it's been asked and

5    answered.

6    BY MS. WALLET:

7        Q.    And you took him to help you to navigate the

8    Philadelphia traffic, correct?

9        A.    I took him to allow him to witness that they were

10   going to deny me or I thought they would deny me access.  I

11   thought maybe they would -- I didn't know where the parking

12   was, you know.  I had been down even to another Philadelphia

13   lawyer down there and he went down with me to that

14   Philadelphia lawyer named Alice Ballard.  I had been down to

15   her to try to get representation.  I didn't know where the

16   parking was.

17           He dropped me off on that juncture and went up to

18   the office to have the interview, and then he did some other

19   dealings that he had to do at Temple at the time or Temple

20   University.  And then he came back and picked me up after I

21   was done with that.  So he rode along the second time for the

22   same reason.

23       Q.    Did you take Mr. Mallios because you believed

24   Mr. Mallios had information relative to Ms. Varner's claim?

25       A.    Mr. Mallios didn't know anything about

S. Gareth Graham                      22


1    Ms. Varner's claim.

2         Q.     Did he know anything about your relationship

3    between Ms. Varner and yourself?

4         A.     No, he did not.

5         Q.     So Charlie Mallios doesn't know anything about

6    this case?

7         A.     That's correct.

8         Q.     Only what you've told him?

9         A.     That's correct.

10        Q.     Would you consider Mr. Mallios to be your best

11   friend?

12        A.     Yes, probably.

13        Q.     How long do you think he's been your best friend?

14        A.     Well, since I met him in college around 1974 or

15   '75.

16        Q.     And have you seen him weekly since then?

17        A.     No, not weekly.

18        Q.     You've seen him weekly only in the last several

19   years because of your children?

20        A.     Right.

21        Q.     Have you seen him weekly since, let's say, 1990?

22        A.     Yes.

23        Q.     Does he know your wife?

24        A.     Yes, he does.

25        Q.     Does he know your children?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    23


1       A.      Yes.

2       Q.      Know the rest of your family?

3       A.      That's my immediate family.  My parents are both

4    deceased.  He did know my parents.

5       Q.      Okay.  You said you went to the PHRC.  Did you

6    just phone them, or did you go?

7       A.      I think I sent a letter to a Louise Oakley or she

8    sent me a letter from Louise Oakley, that she sent me a

9    response that there had been no claim filed with them.

10      Q.      Do you have any of those documents?

11      A.      I would have to find them.  I don't know where

12   they're at.  I might have them, I might not.  I had them at

13   one point.  I mean, I had the letter she sent back to me.

14      Q.      Now, I asked you did you meet with anyone who

15   indicated that they were investigating the allegations made

16   by Ms. Varner, and you told me, of course, of the two

17   meetings with Mr. Deluce, your efforts to obtain information

18   from the PHRC and the EEOC --

19      A.      That's correct.

20      Q.      Anyone else?

21      A.      I had met with Jim Thomas and Paul Dellasega on

22   July 26th, 19 -- I think '99.  I remember that because it was

23   my mother's birthday, so.

24      Q.      And did they ask you to come to meet with them,

25   or did you request that meeting?

1      A.     I think they had asked to talk with me because

2   they were new counsel for the county.  And the meeting took

3   place in Dave Foster's office.

4      Q.     Why was that?

5      A.     Truthfully?  I wanted them to come to my

6   attorneys.  I didn't want to go to their office to be

7   interviewed.

8      Q.     And you considered Mr. Foster to be your attorney

9   at that time?

10     A.     I'm sure, you know, that because he had contacted

11  you, Ms. Wallet, so that's self explanatory.

12     Q.     Did you consider Mr. Foster to be your attorney

13  at that time?

14     A.     No.  He was providing me with some legal advice.

15            MR. MacMAIN:  Her question very simply is:

16  Mr. Foster was your attorney, you had retained him.

17            THE WITNESS:  I had paid him funds, right.

18  BY MS. WALLET:

19     Q.     And did you retain him to represent you with

20  regard to the complaints made by Ms. Varner?

21     A.     No.  He advised me his specialty was not civil

22  litigation.

23     Q.     So you had him as your attorney in other matters

24  but you spoke to him about these matters as well?

25     A.     No.  I never had him retained as an attorney.  He

1    was a man that worked in the court system, I knew for maybe

2    20 years.  I respected his judgment.  He knew, he advised me

3    that he knew you, you were -- you and him were together in

4    the Dickinson Law class along with Paul Dellasega.  And he

5    advised me that he would like the chance to talk with you,

6    you know, about these allegations.

7                MR. MacMAIN:  Anything you discussed with

8    Mr. Foster is privileged.  She doesn't want to know what you

9    discussed.  Listen carefully to what she's asking you.

10                THE WITNESS:  Okay.

11                MR. MacMAIN:  Okay?

12   BY MS. WALLET:

13       Q.    Who decided that this meeting should be in

14   Mr. Foster's office?

15       A.    I did.

16       Q.    Now, at that time you were represented by

17   Mr. Foster, not by Mr. Thomas and Mr. Dellasega?

18                MR. THOMAS:  Objection to the form.

19                MR. MacMAIN:  Do you understand her question?

20                THE WITNESS:  At that time was I represented by

21   Dave Foster and not Thomas and -- yes.  And I wasn't

22   represented by Thomas and them at that time.

23   BY MS. WALLET:

24       Q.    Was there a time when you were represented by

25   them?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                        26

1       A.      Yes.

2       Q.      Do you remember when that was?

3       A.      Well, that's a matter of I think court record.  I

4   don't know the exact dates of when they came into the case.

5               They were -- they had indicated that they were

6   going to include me as counsel.  I met with Paul at the

7   courthouse with Christine Miller, or Christine Miller.  I

8   think that was in September.  I don't know the year, I don't

9   want to quote a year and misquote it.  But that was on a

10  Friday.  They had entered an entrance of appearance for me in

11  addition to an entry of appearance for Mr. Osenkarski.

12              And then on Monday -- I met with them, like,

13  Friday, and then and maybe a short time later they had

14  indicated that they were going to secure private counsel for

15  Joe and I individually.

16      Q.      Okay.  Did you meet with anyone else who told you

17  that they were investigating the complaints made by

18  Ms. Varner?

19              MR. MacMAIN:  You're not including counsel that's

20  represented him?

21              MS. WALLET:  Correct.

22              MR. MacMAIN:  What she wants to know very simply

23  was did anybody else investigate as opposed to defend

24  allegations or an attorney that you may have retained to

25  defend allegations, anyone else that was an investigator as

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                         27

1    opposed to an attorney?

2            THE WITNESS:  No.

3    BY MS. WALLET:

4        Q.    Did Mr. Osenkarski at any time give you

5    directions regarding your relationship with Ms. Varner?

6        A.    I don't understand the question.

7        Q.    Did Mr. Osenkarski at any time tell you to do

8    something or not do something that related to Ms. Varner's

9    allegations?

10       A.    The only correspondence I received from

11   Mr. Osenkarski was to have Sam Miller review her work.  And I

12   was -- since this allegation had been made I was prohibited

13   from reviewing her social histories which she submitted for

14   approval.  He gave me a letter to that effect.

15       Q.    Other than that, did Mr. Osenkarski tell you to

16   do or not do anything with regard to Ms. Varner?

17           MR. MacMAIN:  With respect to the allegations?

18           MS. WALLET:  Correct.

19           MR. MacMAIN:  After the allegations were made by

20   Ms. Varner of sexual harassment, at that point were you given

21   any instruction?

22           THE WITNESS:  His instructions were to -- he --

23   his interest was to separate the parties.  And that was

24   contingent upon what should happen in any mediation or

25   mitigation that was offered through the EEOC, they tell you

1    to separate the parties.  And he was telling me to separate

2    myself from her activities.

3    BY MS. WALLET:

4         Q.     And how did he tell you to do that?  In writing,

5    or --

6         A.     Verbally.

7         Q.      -- orally?

8         A.     Orally.

9         Q.     And what did he tell you to do that would cause

10   you to be separated from her?

11        A.     What did he tell me to do?

12        Q.     Yes.

13        A.     He just instructed me not to have contact with

14   her.

15        Q.     When do you believe that was?  Was it before or

16   after you met with Mr. Deluce?

17        A.     Oh, it wasn't before I met with Mr. Deluce.  I

18   didn't know anything about this until I met with Mr. Deluce.

19        Q.     Did you receive any written instructions that you

20   were no longer to supervise Ms. Varner?

21        A.     That letter was a written instruction not to

22   review her cases and Sam Miller would be appointed as a

23   reviewing officer for her activities in the office.

24        Q.     Do you know whether Ms. Varner received a copy of

25   that?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    29


1        A.      I think she did, and I think Mr. Miller informed

2   her of that also.

3        Q.      And when do you believe the change from you to

4   Mr. Miller occurred?

5        A.      That's in the memo and that could be produced.  I

6   don't know the date, but there's a memo to that effect.  Joe

7   probably would have that.

8        Q.      Is it accurate to say that you listened to two

9   days of questions of Ms. Varner as a part of these

10  depositions?

11       A.      That's accurate.

12       Q.      You were here during those two days?

13       A.      Yes, I was.

14       Q.      Except for any time that you might have gone to

15  the men's room briefly, you heard everything that she said

16  under oath?

17       A.      Yes, I did.

18       Q.      And you would agree that she was asked a number

19  of things about her personal sexual habits?

20       A.      Yes.

21       Q.      You heard all of those?

22       A.      Sure.

23       Q.      Now, you said that you were hired by the county

24  in 1977, specifically September.  Would you please run me

25  through your --

    1       A.      I was hired by the county in July 26th of 1976.

    2       Q.      I'm sorry.

    3       A.      And that I was hired as the deputy Recorder of

    4   Deeds for Cumberland County.  A man had retired and there was

    5   a position that came available.  And I had just graduated

    6   from college in 1975, and I took a position in 19 -- I worked

    7   a year as a carpenter, and then in 19 -- July 26, 1976, I

    8   started with the Recorder of Deeds office.  And I was deputy

    9   Recorder of Deeds for the County of Cumberland under Al

   10   Kugler.

   11       Q.      Was that a political position?

   12       A.      It was a row office position.  Do you consider

   13   that political?

   14       Q.      I'm sorry, sir.  I ask the questions and you

   15   answer them today.

   16       A.      Okay.  I don't know.  It's a row office position.

   17       Q.      Did you obtain your position as deputy Recorder

   18   of Deeds through political or Civil Service means?

   19       A.      I think the county commissioners -- there was

   20   a --the county commissioners were looking for someone to fill

   21   a short-term position, and I think my dad knew of that and he

   22   said, do you want to try to get your foot in the door with

   23   the county so you can eventually get into a county employment

   24   position.

   25               It was kind of a practice back then that Judge

S. Gareth Graham                                    31


1    Shughart wanted people to be involved with the county in a

2    position and a lot of times they would send -- if probation

3    officers would apply and they weren't considered the first

4    time around, they would go maybe to a prison position.  They

5    would hire that person for a prison position or another

6    county position.  So that's the gist of how I got in there.

7        Q.      So your dad thought this would be a good way for

8    you to get your foot in the door?

9        A.      That's correct.

10       Q.      What was your father's name?

11       A.      C, period, Freemont, F-R-E-E-M-O-N-T, Graham.

12       Q.      And where was his business that you described as

13   a little cut-rate store?

14       A.      The corner of South High Street and Big Spring

15   Avenue in Newville, Pennsylvania.

16       Q.      How long did he have that business?

17       A.      From the time he got out of the war in the '40s

18   up till the early -- '91 or '92.

19       Q.      And did the business close at that time?

20       A.      No.  No, he became ill with cancer, and we

21   continued the store about a year and a half after that.

22       Q.      So the family continued the business and then it

23   was sold?

24       A.      My dad had a gentleman by the name of, a young

25   kid name Kenny Newell, N-E-W-E-L-L, and he kind of ran the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    32

1   store after my dad died, for until my mother and I could sell

2   it.

3       Q.      Did your dad know Judge Shughart?

4       A.      Sure.

5       Q.      How did he know him?

6       A.      My dad was a committee person from, for the Town

7   of Newville.

8       Q.      For what political party?

9       A.      Republican.

10      Q.      Is that the political party that you are

11  affiliated with?

12      A.      Yes, ma'am.

13      Q.      Have you always been so affiliated with that

14  party?

15      A.      Yes.

16      Q.      Have you ever been a committee person?

17      A.      No.

18      Q.      Have you ever had any other party office?

19      A.      No.

20      Q.      You're simply a registered voter?

21      A.      I'm a registered voter.  I was, I was on, like,

22  the water and sewer committee of Newville.  I was on the

23  planning commission of Newville.  I did my -- I secured all

24  the right-of-ways for the sewer laterals when they put the

25  sewer in Newville.  I mean, those.  I'm a member of the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    33


1    library board of Newville.  You know, I'm affiliated with

2    Graham Medical Center.  The library board had built the

3    center trying to get doctors into Newville years ago.  So

4    those are the affiliations I have.

5         Q.    Is the Graham Medical Center in any way

6    affiliated with your family?

7         A.    It's not a direct descendent but it is affiliated

8    with the Grahams.  I am distantly related but it wouldn't be

9    considered being related.

10               What happened, the library board --

11               MR. MacMAIN:  She doesn't need to know the

12   history.  She asked you if you were affiliated.  All you have

13   to do is say yes.  Okay?

14   BY MS. WALLET:

15        Q.    So how did you get this job as deputy Recorder of

16   Deeds?

17        A.    All Kugler called me in and interviewed me.

18        Q.    And he was the recorder?

19        A.    He was the recorder.  He preceded Pat Vance,

20   which you might be familiar with.

21        Q.    And how long did you work as the deputy Recorder

22   of Deeds?

23        A.    July 26, '76, until September of '77.  A little

24   over a year.

25        Q.    And what happened then?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                      34


1      A.     I applied to Probation and was hired in, I don't

2   know the date in '77, but --

3      Q.     Could it have been July 26th?

4      A.     No.  It wasn't a year later.  It was over a year.

5   It was September of '77.

6             What happened is --

7             MR. MacMAIN:  Gary, you don't need to tell her

8   the story.  She just want dates.

9   BY MS. WALLET:

10     Q.     Do you have any reason for why your personnel

11  file might indicate that you were hired in September -- I'm

12  sorry, in July?

13     A.     My personnel file?

14     Q.     Yes, sir.

15     A.     Says -- because that's when I began county

16  employment.

17     Q.     Okay.  So you think the September -- sorry --

18  July 26, '77 date is when you started with the Recorder of

19  Deeds?

20     A.     July 26, '76, is when I started with the Recorder

21  of Deeds office, and I worked there until September of '77.

22  A little over a year.

23     Q.     Okay.  How did you obtain your job in the

24  Probation office?  How did you know there was a job there?

25     A.     I guess through a secretary, you know, somebody

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                35


1    that I would have known, a Mary Rooney or somebody like that,

2    said that there's openings upstairs.

3          Q.    Did you interview for the job?

4          A.    Yes, I did.

5          Q.    Who did you interview with?

6          A.    Irving Groninger.

7          Q.    Who was he?

8          A.    He was the chief PO at the time.

9          Q.    Anybody else?

10         A.    Ken Bolze.

11         Q.    Anybody else?

12         A.    And my eventual final interview was with Judge

13   Shughart.

14         Q.    And who hired you at that time?

15         A.    Judge Shughart.

16         Q.    Did anyone give you letters of recommendation to

17   obtain a job in the Probation office?

18         A.    No.

19         Q.    At least not at your request?

20         A.    Not at my request.  I don't know what you mean by

21   that, I'm sorry.

22         Q.    I suppose it's possible somebody might have

23   recommended you that you wouldn't know about, so the question

24   is:  Did you ask for someone to give you --

25         A.    No.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    36

1       Q.       -- letters of recommendation?

2       A.       No.

3       Q.       And the position that you first held was

4    probation officer trainee?

5       A.       I don't know what it was called.  Probation

6    Officer-I.

7                I took a salary cut to go up upstairs.  I was

8    making more money in the Recorder of Deeds office.  I think I

9    was making 11,000, and I went up there for 9,600.

10      Q.       Did you serve some sort of probationary period?

11      A.       I don't think.  I was just hired and I had to do

12   the job.

13      Q.       Were you a PO-I at one time?

14      A.       Yes, I was.

15      Q.       How long did you remain a PO-I before becoming a

16   PO-II?

17      A.       I don't know the correct date of when I became a

18   PO-II.  That could be found in the records, too.

19      Q.       Do you think May 26th of '85 would be correct?

20      A.       That's probably correct.

21      Q.       And how did you become a PO-II, whatever the date

22   was, in or about May of '85?

23      A.       I was interviewed along with a David Meyers.  And

24   my work performance allowed me to become a, you know, a

25   PO-II.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          37


1       Q.      Did you compete with others for the PO-II spot?

2       A.      I don't think --

3               MR. MacMAIN:  Other than the person he just

4    mentioned?

5               THE WITNESS:  Other than, yeah, David Meyers.  I

6    was informed that -- I just don't recall the sequence of

7    that.

8    BY MS. WALLET:

9       Q.      And Judge Sheely appointed you to the PO-II spot?

10      A.      I would have had to have been recommended by --

11   if Mr. Groninger was still there, I would have had to have

12   been recommended by Mr. Groninger and Mr. Bolze.

13      Q.      Do you know whether Judge Sheely appointed you to

14   the PO-II position?

15      A.      I think he approved their recommendation.

16      Q.      Did seniority play any role in that decision?

17      A.      I'm sure a part of a role, and adequate job

18   performance.

19      Q.      Who did you report to after you became a PO-II?

20      A.      Mr. Osenkarski and Ken Bolze.

21      Q.      What was Mr. Osenkarski's position in or about

22   1985?

23      A.      I think he had been the supervisor, and I don't

24   know when he was promoted to the supervisor, but he was a

25   line person when I first went in in '77, and I think shortly

1    thereafter he was appointed as a supervisor.

2         Q.    At some point did you report directly to

3    Mr. Osenkarski?

4         A.    At the retirement of Ken Bolze, yes.

5         Q.    So when you were first a PO-II your immediate

6    supervisor was Mr. Bolze?

7         A.    Yes.  I would say he would be my immediate

8    supervisor, or Mr. Osenkarski.

9              We split, or we had areas of expertise, and

10   Mr. Meyers was given the area of the adult section and I was

11   given the area of the juvenile section.  So a lot of my

12   reporting duties would then probably have been to Joe first

13   and then Bolze second.  But Bolze was the chief, so everybody

14   reported to him because we had a unified department at that

15   point.

16        Q.    Okay.

17              MR. THOMAS:  Excuse me for a minute, Deb.  We

18   didn't clarify when we started the deposition that these were

19   the usual stipulations?  That we're preserving --

20              MR. MacMAIN:  Yes, I think that was understood.

21   But I think you're right, we should put it on the record.

22              MR. THOMAS:  I think it was, too, but I just

23   wanted to make sure.  Otherwise --

24              MR. MacMAIN:  All objections except as to form

25   are reserved.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          39


1              MR. THOMAS:  Signature?

2              MS. WALLET:  I have no problem with that.

3              MR. MacMAIN:  We'll also have the objection you

4    had made about the investigation report.

5    BY MS. WALLET:

6        Q.    In or about 1985 who did your performance

7    evaluations?

8        A.    Ken Bolze and Joe Osenkarski.

9        Q.    I guess my question --

10       A.    And John Roller.  I think John Roller was

11   included.  The three of them did the performance evaluations

12   on everybody.

13       Q.    Had you known Mr. Osenkarski prior to your

14   employment in the Probation office?

15       A.    Never.

16       Q.    You met him only when you came into the office?

17       A.    Yes, ma'am.

18       Q.    How would you describe your relationship,

19   personal and/or professional, with Mr. Osenkarski?

20       A.    Excellent.

21       Q.    You knew him initially because of your

22   employment?

23       A.    That's what I testified to.

24       Q.    Okay.  Did you eventually become social friends?

25              MR. MacMAIN:  You mean socialize outside of the

S. Gareth Graham                                    40


1    work functions and work seminars and so forth?

2                MS. WALLET:  Correct.

3                THE WITNESS:  Social friend probably began near

4    the time of his divorce.

5    BY MS. WALLET:

6        Q.    Do you remember when that was?

7        A.    No.

8        Q.    Why was his divorce significant?

9        A.    He was, Joe was extremely distraught over his

10   marriage breakup.  And he had two 15-year-old girls, or one

11   was 15, one was 13, or something at the time.

12       Q.    And did he seek out your companionship?

13       A.    Probably.

14       Q.    Do you have any idea, was this mid '80s, mid

15   '90s?

16       A.    He can validate when that was.  I don't know.

17       Q.    When did you begin to see Mr. Osenkarski in a

18   social fashion outside of work?

19               MR. MacMAIN:  I thought he just answered that,

20   which was after his divorce.

21               THE WITNESS:  After his divorce, mostly.

22   BY MS. WALLET:

23       Q.    Okay.  But you're not sure when that was?

24       A.    He can tell you when that was.

25               MR. MacMAIN:  She's just asking if you know.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    41


1              THE WITNESS:  Okay.  I don't know.

2    BY MS. WALLET:

3        Q.    Do you think it was before you became a PO-II?

4        A.    Yes.

5        Q.    Now, Mr. Bolze retired in August of '96.  Do you

6    believe that to be correct?

7        A.    Yes.

8        Q.    And Mr. Osenkarski took Mr. Bolze's job?

9        A.    Not necessarily, no.

10       Q.    Okay.  How would you describe the change at that

11   time?

12       A.    Well, that was an interesting situation, because

13   I had -- in June of '96 Mr. Bolze was interested in splitting

14   the Adult staff.  I think Mr. Osenkarski was the next in line

15   as per seniority and job performance and to get the next nod

16   to be chief of a combined department that had been in

17   existence for 40 years.  And --

18       Q.    To the best of your knowledge, had seniority

19   always been the way in which this was done?

20       A.    One factor.  It wasn't the only -- seniority was

21   not the only reason to promote someone.  Bob Houser had more

22   seniority over John Roller, and John Roller was appointed to

23   the first PO-II position.  So seniority did not always play a

24   part, if you're making that contention.

25       Q.    Do you know anyone else who was promoted not

1   based on seniority?

2        A.    Well, Lyle Herr.

3              MR. MacMAIN:  Hold on a second.  I'm just going

4   to object to the form, because I think what he said was

5   seniority was a part of it, it wasn't the only.  I think the

6   way your question was phrased implied that seniority was the

7   only --

8              THE WITNESS:  She's asking me additional people,

9   too.

10             MR. MacMAIN:  Right.

11             THE WITNESS:  And additional people was Lyle

12  Herr, because Mr. McKenrick, Charles McKenrick had more

13  seniority than Lyle Herr and he was promoted into the Adult

14  supervisor position.

15  BY MS. WALLET:

16       Q.    Okay.  Anyone else that you can think of?

17       A.    No.

18       Q.    And that would include anyone promoted up till

19  today?

20       A.    That's correct.

21       Q.    Seniority was generally used for promotions?

22             MR. MacMAIN:  I'm going to object.

23             THE WITNESS:  No.  It was one factor, I said.  It

24  was one consideration in knowing how long you had worked for

25  the county and did you have adequate work performance.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    43


1    BY MS. WALLET:

2        Q.    Okay.  Now, you were telling me about what

3    happened after Mr. Bolze left.

4        A.    Okay, yeah.  What's your question?

5        Q.    Well, my question is did Mr. Osenkarski take

6    Mr. Bolze's job, and I believe you said, well, that's an

7    interesting question and you were about to tell me why you

8    thought that that was interesting.

9        A.    Okay.  When Mr. Bolze was considering a

10   retirement, he considered it about a year before he, this

11   August '96 date that you're talking about.  He and John

12   Roller and Dave Meyers had had private conversations with

13   Judge Sheely about the splitting of these departments.  And

14   my contention or my interpretation was we were being left out

15   of the loop in the juvenile end of Probation.

16       Q.    Who was we?

17       A.    Joe, me, the guys primarily doing the juvenile

18   work, Hank Thielemann, Sam Miller, Denny Drachbar, whoever

19   else had been there for 10 and 15 years of employment.

20             And Mr. Miller and Mr. Drachbar would -- had come

21   to me and said, we're going to get screwed here, you know,

22   Bolze doesn't like Joe for whatever reason and we're not

23   being represented, can't you advocate for us.

24             So I wrote a memorandum to Judge Sheely in June

25   of '96 about the split of these departments and asked him to

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    44


1    be very careful if he had determined if a split was actually

2    going to happen.

3         Q.    And what happened as a result of your memorandum?

4         A.    As a result of that, Judge Sheely allowed the

5    Juvenile men -- I said, call the men upstairs and talk to

6    them about their concerns.  And he did.  He called Sam Miller

7    up, he called Hank up, he called me up.  And he had listened

8    to the other side, because up until that point Ken Bolze left

9    Joe, left me and left the entire Juvenile department out of

10   the discussions of splitting these departments.

11           And then after that, this -- and then when Judge

12   Sheely had determined that was what he wanted to happen, then

13   there was this aligning of the staff of who was going to go

14   to what side.  And we did interviews in the office of who

15   would be available and the different positions that would be

16   available.  And we called John Roller, David Meyers, Joe and

17   I called everyone into the office and asked them what side of

18   the office they would like to choose, if they had a choice.

19        Q.    Why did you do that?

20              MR. MacMAIN:  I think he said he and other

21   people.

22   BY MS. WALLET:

23        Q.    Well, why did you participate in that?

24        A.    Because I was being -- I was a PO-II, and a PO-II

25   upon delegation was asked to do administrative work upon

1   being delegated.

2        Q.      And who delegated that to you?

3        A.      John Roller and Joe Osenkarski asked us to be

4   included, David Meyers and I.

5        Q.      You said this group got together, the people who

6   did juvenile work, Mr. Thielemann and Mr. Drachbar and

7   Mr. Miller, I believe.  Did you all decide that you were

8   going to try to do something collectively to stop this

9   movement?

10       A.      Yes.

11       Q.      And who decided that you would be the one that

12  would write this memorandum?

13       A.      They asked me to write it.

14       Q.      Why do you think they asked you to write it?

15       A.      Because I had the extensive experience in

16  juvenile work.  When I was first hired, you know, we had a

17  blended case load, we did adult and juvenile work.  But

18  different people in the different positions had different

19  percentages of cases assigned to them.  Some would be 90

20  percent adult and 10 percent juvenile.

21              When I took over upon the retirement of Glenn

22  Love -- that's who I replaced, you had asked me that earlier,

23  you know, why, how did I find out about the position.  But

24  Glenn Love is the guy that retired in '77 and that's the

25  position I took.  He had primarily all juvenile position.  So

1    I handled that caseload and I assumed that type of blended

2    assignment base.

3         Q.     Now, do you think they picked you to write this

4    memo because you knew Judge Sheely pretty well?

5         A.     On, no.  They picked me to write it about to

6    express the concerns, and they helped me contribute to the

7    letter.  You know, I met with them and said, you know -- and

8    I didn't want to work it straight that it was my only my

9    concern.  I wanted to allow the guys, and that's what Judge

10   Sheely did, he allowed the guys to go upstairs and talk to

11   him about it, because we had significant concerns.

12            Ms. Wallet, we had 650 referrals --

13            MR. MacMAIN:  Listen to her question.  She asked

14   if you were chosen because you knew Judge Sheely, and you

15   answered no, and she wants --

16            THE WITNESS:  I wasn't chosen because I knew

17   Judge Sheely.

18   BY MS. WALLET:

19        Q.     Did you feel comfortable in going directly to

20   Judge Sheely with your concerns?

21        A.     I didn't feel comfortable, no.

22        Q.     Why not?

23        A.     Well, because I put in the memorandum that Ken

24   was focused on his retirement and hadn't addressed the

25   concerns.  So I didn't know where I stood on, you know, the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                47


1    pecking order of was I responsible to do this or not.

2         Q.    Did you know Judge Sheely outside of the

3    supervisory relationship that he had over you?

4         A.    Did I know him?  No.

5         Q.    Did you ever campaign for him?

6         A.    No.

7         Q.    Did your family campaign for him?

8         A.    My dad did.

9         Q.    Anybody else in your family?

10        A.    I think my mother was a committee man, too, or

11   committee woman.

12        Q.    But you didn't campaign for him?

13        A.    No.

14        Q.    Did you contribute to his campaign?

15        A.    No.

16        Q.    Do you know whether your parents did?

17        A.    I don't think they did.

18        Q.    Now, you said that Mr. Bolze did not like Joe.

19   You meant Joe Osenkarski?

20        A.    Yes.

21        Q.    Why did you say that Mr. Bolze did not like Joe

22   Osenkarski?

23        A.    Ken was a very officious, offensive in-your-face

24   type of person, similar I guess to what Ms. Varner has

25   described me.  And Joe is completely different than that.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          48


1        Q.     Joe likes to avoid controversy?

2               MR. MacMAIN:  Objection.

3               THE WITNESS:  No, Joe doesn't avoid controversy.

4    He has a blended style where he's not confrontational or

5    argumentative.

6    BY MS. WALLET:

7        Q.     So if I were to ask what Mr. Bolze's reputation

8    was within the cadre of probation officers --

9        A.     I hope you do.

10       Q.      -- the general consensus would be that he was

11   vicious and offensive?

12              MR. MacMAIN:  Objection.  That's not what he

13   said.

14              MS. WALLET:  I'm asking him.

15              MR. MacMAIN:  I think you're trying to categorize

16   something and repackage it.

17              MS. WALLET:  I'm asking him.

18   BY MS. WALLET:

19       Q.     What do you think Mr. Bolze's general reputation

20   was among the cadre of probation officers?

21       A.     He was not liked.

22       Q.     And why was he not liked?

23       A.     Multitude of reasons.  He scrutinized people's

24   reports.  He never applied to the Courts for any relief for

25   the Probation Department.  He never instituted any grants.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                  49


1    He was focused on his individual concerns.

2         Q.      Were there people within the Department who liked

3    Mr. Bolze?

4         A.      Yes.

5         Q.      Who?

6         A.      Probably Mike Varner.  John Roller.

7         Q.      What do you think the reputation of

8    Mr. Osenkarski is among the probation officers?

9         A.      I think he was well respected towards most of the

10   Probation Department.

11        Q.      Some people not like him?

12        A.      Sure.

13        Q.      Who?

14        A.      Kerry Houser.

15        Q.      Anybody else?

16        A.      Nick Barrolet.  Debra Green.  That's all I know.

17        Q.      Would you say that there were kind of two camps

18   within the probation officers, the Osenkarski camp and the

19   not-Osenkarski camp?

20               MR. MacMAIN:  I'll object.  What time frame are

21   you talking about?

22   BY MS. WALLET:

23        Q.      Let's talk about mid '80s to the present.

24        A.      Can you repeat that?  I'm sorry.

25        Q.      Within the Probation office do you think there

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    50

1   was a pro-Osenkarski camp and an anti-Osenkarski camp?

2            MR. MacMAIN:  What do you mean by --

3            THE WITNESS:  I would rather answer it on a

4   percentage basis.  I would rather say that those people,

5   those three or four individuals represented a small

6   percentage of the people that disliked Joe, and the majority

7   of the people liked Joe.

8   BY MS. WALLET:

9       Q.    Okay.  Anybody else in the dislike camp?

10           MR. MacMAIN:  Other than the names he's already

11  given you in the prior question?

12           MS. WALLET:  Yes.

13           THE WITNESS:  No.

14  BY MS. WALLET:

15      Q.    Barbara Varner ever indicate to you that she

16  didn't like Joe?

17      A.    No.  She indicated she liked Joe.  She thought he

18  was the best boss she ever had.

19      Q.    We started out by me asking you why did you say

20  that Bolze did not like Joe Osenkarski, and I'm not sure we

21  ever got that answer.

22           MR. MacMAIN:  Your question is why.

23  BY MS. WALLET:

24      Q.    Why did you say in your earlier testimony Bolze

25  did not like Osenkarski?

1    A.    I think Ken was jealous of Joe.

2    Q.    Do you think that was justified?

3          MR. MacMAIN:  Objection.  Are you asking him to

4    speculate what was in Mr. Bolze's mind?

5          MS. WALLET:  No.  I'm asking would there be

6    reasons why Ken would be jealous of Mr. Osenkarski.

7          MR. MacMAIN:  I'm going to object to the extent

8    you're asking him to get into Mr. Bolze's head.  I don't

9    think that's a fair question.  I don't think it's something

10   he can possibly answer.

11         MS. WALLET:  All right.  I'll withdraw that

12   question.

13   BY MS. WALLET:

14   Q.    Is there any other reason why you think Bolze

15   didn't like Osenkarski besides being jealous?

16   A.    I think Joe had an intelligent aptitude that Ken

17   didn't have.

18   Q.    Anything else?

19   A.    No.

20   Q.    Okay.  So you were a PO-II until you were

21   transferred, correct?

22   A.    Yes.  A PO-I for a number of years, I guess,

23   from -- you gave me a date of 1985?  Right?  I was promoted

24   to PO-II?  Okay.  So from '77 to '85 I was a regular line

25   staff, and then from '85 I was a PO-II.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    52

1          But PO-IIs primarily did direct service work,

2    too.  We only assumed supervisory experience or any -- upon

3    delegation.  And that wasn't included as an administrative

4    position.  Ms. Varner's contention is that I trained her and

5    this and that, and that's just -- that wasn't the case.

6          Q.    Okay.  So you were a PO-II until approximately

7    March of 1998; is that correct?

8          A.    Yes.

9          Q.    And what happened in March of 1998?

10         A.    I was promoted with Dave Meyers to the

11    supervisor, and Joe -- promoted to supervisor position.

12          But when we split the department.  The county

13    chief clerk, John Ward interrupted the split.  And he had

14    published in I think a newspaper article that -- and made a

15    statement that he wanted these guys to be seen as

16    supervisors.  He was going to downsize the position.

17         Q.    And when you say these guys, who do you mean?

18         A.    Joe and John.  Joe and John.  He wasn't going to

19    be in a position to promote them as chiefs, if he was going

20    to retain them as supervisors.

21         Q.    What did Mr. Ward have to do with this?

22         A.    I don't know.  He just -- he has a part in I

23    guess the salary board approving the -- he's the chief clerk,

24    he's advice to the commissioners.  And he plays a part in the

25    salary board making a decision on who gets promoted, and

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    53

1    there was a big flap.

2              MR. MacMAIN:  Gary, all she asked was what Ward's

3    role.

4    BY MS. WALLET:

5        Q.    And Mr. Ward is an employee of the County of

6    Cumberland?

7        A.    He was the chief clerk.

8        Q.    Is that a yes?

9        A.    Yes.

10       Q.    Is he still the chief clerk?

11       A.    No.

12       Q.    Who is the chief clerk now?

13       A.    John Connelly.

14       Q.    Do you know when Mr. Ward left and Mr. Connelly

15   took over?

16       A.    I think recently this year, April of this year.

17       Q.    2002?

18       A.    Yes.

19       Q.    We're now in 2003, but you mean 2002?

20       A.    2003, I'm sorry.

21       Q.    2000 --

22       A.    No.  He left -- I'm sorry.  2002.

23       Q.    So you were telling me what happened after the

24   split.  When did the split occur?

25       A.    Whenever we received the promotions and Judge

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                      54


1    Sheely put a letter to that effect out to the commissioners

2    on how he was going to realign the two staffs.

3         Q.      Did you have to compete for a promotion at that

4    time?

5         A.      Are you asking was it advertised or was it --

6         Q.      Whatever you know about how you got the job.

7         A.      I think Ken went upstairs and highlighted the

8    expletives to our employment and our performance.  And when

9    Judge Sheely made this memorandum, he said Gary Graham

10   graduated from York College in 1975, he holds a bachelor of

11   science degree in this, he has been a PO-II in good standing

12   for so many years.  And he was -- and Judge Sheely and Ken

13   and Joe and John basically made the decision.

14            MR. MacMAIN:  Can I just ask one question?  You

15   used the term expletives, expletives meaning curse words?

16   Did you mean experiences?

17            THE WITNESS:  Experiences, I'm sorry.

18            MR. MacMAIN:  I thought that's what you meant.

19   BY MS. WALLET:

20        Q.      Okay.  So after this split, what position did you

21   have?

22        A.      After the split I was the Juvenile supervisor.

23        Q.      And how many individuals did you supervise?

24        A.      There was a total staff complement of 12 POs.

25        Q.      My question was:  How many did you supervise?

1    Did you supervise all 12?

2         A.     Yes, ma'am.

3         Q.     And in your supervisory role, what duties did you

4    have?

5         A.     To review the daily time sheets that were

6    submitted.

7         Q.     That's what was used to pay overtime, for

8    example?

9         A.     Yes.  That was, um-hum.

10        Q.     Okay.

11        A.     I also did case review, close-out review.  I

12   helped prepare the new budget that we had no experience on.

13               I had been a previous member of the Woodside

14   Detention Center, the detention facility that we used in

15   Harrisburg, and then became Woodside, and it was -- I was on

16   there for 11 years.  And I was there during the construction

17   of the Schaffner Youth Center, which it is today.  And I was

18   the Court board representative.  They had a you, know

19   advisory, board it was called.

20        Q.     And who you appointed you to that?

21        A.     Judge Sheely.  And I filled Joe's position.  Joe

22   had been on it for a number of years.  Its inception,

23   Woodside was somewhere around 1977, when they built Woodside.

24   Joe was on it shortly thereafter.  And then when he assumed,

25   when he assumed, when I think I became a PO-II somewhere

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    56


1    around '85, that would make about 11 years I was on it, till

2    '96.  So then I took that position.

3         Q.    Okay.  So you were listing for me your

4    supervisory duties.

5         A.    Okay.

6         Q.    To whom did the budget information go?

7         A.    To the county commissioners, eventually.  I think

8    to the chief clerk to review.

9         Q.    Do you agree that it's the county that determines

10   the budget for the Juvenile Probation Department?

11             MR. MacMAIN:  If you know.

12             THE WITNESS:  No, I'm not exactly sure.  I know

13   there's state grant money given in the Adult section and the

14   Juvenile section.  There's different contributions from the

15   state that appropriate money for the operation of the

16   Juvenile Probation office and the Adult Probation office.

17   And I think the budget gets submitted with those figures and

18   then the county makes a decision as to what items are

19   approved or disapproved.

20   BY MS. WALLET:

21        Q.    As a supervisor, did you make case assignments?

22        A.    Yes, I did.

23        Q.    You determined which of your officers got which

24   cases?

25        A.    Yes.

1     Q.     Was that true for the entire time until you were

2     moved to the prison?

3     A.     Up until the time where Sam Miller was appointed

4     as her supervisor, contact person or supervisory person.

5     Q.     Okay.  I think you assumed I was asking you about

6     giving assignments to Ms. Varner.  I was asking you, did you

7     have responsibility as a supervisor to give case assignments

8     to those under your supervision --

9     A.     Yes, I did.

10     Q.      -- up until the time you were moved to the

11     prison?

12     A.     Yes, ma'am.

13     Q.     Okay.  After you were moved to the prison, did

14     you continue to have responsibility to make case assignments?

15     A.     None.

16     Q.     Okay.  Did you do anything else as the

17     supervisor?

18     A.     Well, I met with the county personnel, met with,

19     like the Children and Youth director.  I, we had discussions

20     on -- we had discussions on contracts at the Schaffner Youth

21     Center.  The county had contracted for so many beds and in

22     1977 till up until this point when the Schaffner Center was

23     used we only had two beds for any delinquent children to put

24     in.

25                MR. MacMAIN:  She doesn't need to know the

1    history.  Just what were your responsibilities as the

2    supervisor.

3            THE WITNESS:  So I negotiated a -- I helped

4    negotiate the last contract with the Schaffner Youth Center

5    as part of my --

6    BY MS. WALLET:

7        Q.    Okay.  Let me be specific, sir.  Did you sign

8    leave slips for employees?

9        A.    Yes.  Approved vacations.

10       Q.    Did you determine when vacations would be

11   permitted for those individuals under your supervision?

12       A.    Yes.

13       Q.    Did you recommend or otherwise influence times

14   when individuals went to conferences?

15       A.    Did I influence them?  They put a request in and

16   then I would approve it.

17       Q.    So you approved requests to go for training or go

18   to conferences?

19       A.    Correct.

20       Q.    Okay.  Did you do performance evaluations?

21       A.    Yes, I did.

22       Q.    Were you in a position to recommend disciplinary

23   action?

24       A.    Yes, I was.

25       Q.    Did you do anything else like that as a

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              59


1    supervisor?

2              MR. MacMAIN:  Like what?

3    BY MS. WALLET:

4        Q.    Like that list of things that I've just given

5    you.

6        A.    Anything else?

7              MR. MacMAIN:  In other words, she wants to know

8    essentially the different things you did as a supervisor.

9              THE WITNESS:  Yes.

10             MR. MacMAIN:  Is there anything --

11             MS. WALLET:  Correct.

12             MR. MacMAIN:  Is there anything additional?

13             THE WITNESS:  Not that I can recall.

14   BY MS. WALLET:

15       Q.    Okay.  Did you have any control over assignments

16   of weapons?

17       A.    No.

18       Q.    Who did that?

19       A.    Mr. Osenkarski.

20       Q.    Were there weapons assigned to probation

21   officers?

22       A.    I don't know.  I mean, there were weapons

23   purchased by the Probation Department.  I didn't handle any

24   of that.  Mr. Osenkarski handled that.

25       Q.    Okay.  Did you receive a weapon as part of your

1    duties as a probation officer?

2         A.    No, I did not, and never have.

3         Q.    Do you have a personal weapon, sir?

4         A.    In what regard?  A gun?

5         Q.    Do you own a gun?

6         A.    Yes.

7         Q.    How many guns do you own?

8         A.    Three or four.  A couple rifles, a couple

9    shotguns.

10        Q.    Okay.  You own anything that I would consider a

11   handgun, that someone would consider a handgun?

12        A.    Sure.

13        Q.    How many of those do you have?

14        A.    Four, three or four.

15        Q.    Did you ever use any of them as part of your

16   duties and responsibilities as a probation officer?

17        A.    I never carried a weapon on the job whatsoever.

18        Q.    Did you ever have one in your car?

19        A.    No.

20        Q.    There were no occasions when you had a weapon in

21   your vehicle when you were doing probation officer work?

22        A.    No.  The only time I would have had a weapon in

23   my vehicle would have been going maybe to a training that was

24   arranged by Joe and the Carlisle Police to go out and have a

25   qualification shoot.  That's the only time a weapon would be

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    61


1    in my car.  I never had a gun in my car during supervisions.

2         Q.    So if Ms. Varner says she saw a gun in your glove

3    compartment, that's a lie?

4         A.    Absolutely.

5         Q.    And if someone else said they saw a weapon in

6    your glove compartment, that's a lie as well?

7         A.    Absolutely.

8         Q.    Now, were you required to have weapons training

9    as a probation officer?

10        A.    It was an elective.  People that wanted to have,

11   wanted it, were able to participate in it as part of their

12   training, if they chose.

13        Q.    Did you elect to do that?

14        A.    I did for a couple years.

15        Q.    Are you certified in weapons of any kind?

16        A.    Not at all.

17        Q.    Is there a certification program that you could

18   be eligible for?

19        A.    Absolutely, yes.

20        Q.    But you've chosen not to do that?

21        A.    I've chosen not to do that.

22        Q.    Is there any requirement that you show any

23   proficiency in the use of a weapon in your position as a

24   probation officer?

25        A.    No.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    62


1        Q.      Is there any requirement that you show

2   proficiency in the use of a weapon for any of the duties

3   related to your employment as a probation officer?

4        A.      No.

5        Q.      Are you licensed to carry a handgun?

6                MR. MacMAIN:  Licensed unrelated to work --

7                THE WITNESS:  Licensed related to work?

8                MR. MacMAIN:  -- I think your question is.

9   BY MS. WALLET:

10       Q.      My question is:  Are you licensed to carry a

11  handgun?

12       A.      Now?  No.

13       Q.      At any time since 1990?

14       A.      I think I had a license to carry a handgun from

15  the Sheriff's Department.

16       Q.      What kind of license was it?

17       A.      Typical five-year protection permit or whatever

18  they used to call it, I don't know.

19       Q.      And when do you think you had such a permit?

20       A.      I had it for five years, so I don't know when it

21  was renewed.  You could get those records from the Sheriff's

22  Department.

23       Q.      So you're not sure when you had a permit?

24       A.      Probably the last five years, the previous five

25  years, and probably the previous 10 years.  I think I renewed

1    it once.

2         Q.    But you don't have it now?

3         A.    No.

4         Q.    And why don't you have it now?

5         A.    I didn't reapply.

6         Q.    And do you remember when it was that you would

7    have come up for reapplication?

8         A.    Last year sometime.

9         Q.    Was there a reason why you didn't reapply?

10        A.    I have no interest in carrying a handgun.

11        Q.    Why do you own three or four of them?

12        A.    I'm a hunter.  I'm a -- that's why I own them.

13        Q.    You're just a gun guy?

14        A.    Well, I'm a hunter.

15        Q.    Okay.

16              MR. MacMAIN:  Are we going to go on to a

17    different area?  A short break?

18              MS. WALLET:  Yes, that's fine.  Let's take a

19    short break.

20              (Recess taken from 10:49 until 10:59 a.m.)

21    BY MS. WALLET:

22        Q.    Mr. Graham, when did you first meet Barbara

23    Varner?

24        A.    1990.

25        Q.    On what occasion did you meet her?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           64


1      A.     Bob Holtzberger, a Cumberland County Children and

2   Youth worker, brought her around to introduce her to the

3   Probation staff after she was hired in Children and Youth

4   Services.

5      Q.     And when did you first have some supervisory

6   relationship over Ms. Varner?

7      A.     When I was promoted to supervisor.

8      Q.     Did you play any role in the hiring of Ms. Varner

9   in the Probation office?

10     A.     I talked to Joe that I had worked companion cases

11  with Mrs. Varner and I thought that she handled them well.

12  And I conveyed that to Joe and Ken Bolze when we were looking

13  for applicants for the -- we had a Family Preservation grant

14  and we had three positions available.

15     Q.     Did you recommend her for one of those positions?

16     A.     No.

17     Q.     Now, prior to her coming to the Probation staff,

18  how much association did you have with Ms. Varner?

19     A.     Extensive.

20     Q.     Would you describe what would cause you to be

21  associated with her?

22     A.     In a work environment or a personal environment?

23     Q.     Either.  Let's start with work.

24     A.     I worked companion cases with her.  Am I allowed

25  to say the names or are we going to -- is the record still

1    sealed in that regard?

2        Q.      I don't think it's necessary that we know the

3    names.

4        A.      Okay.

5        Q.      When you say companion cases, what do you mean?

6        A.      She had the dependency needs of the family and I

7    happened to have either the adult criminal charges or the

8    delinquency end of the case.

9        Q.      Okay.  And would that cause you to go on trips of

10   any sort prior to her coming to the Probation office?

11       A.      Prior to her coming to the Probation office?  No.

12   Well, yes, I'm sorry.  I want to correct myself on it.  Yes.

13   Because she would ask my assistance to go to places that she

14   felt threatened, and she would call me and I would make

15   arrangements to do that with her.

16       Q.      Did you work with any other individual in the

17   Children and Youth staff with regard to companion cases?

18       A.      Lots of staff, yeah.

19       Q.      Okay.  Female staff?

20       A.      Yes.

21       Q.      Any male staff in Children and Youth that you

22   worked with?

23       A.      Bob Holtzberger I worked with.  Arley Phillips, I

24   had worked with.  I don't know how many men they had there.

25       Q.      Now, you said that you had an association with

1    her personally.

2        A.    Yes.

3        Q.    When did you first have what you would consider

4    to be a personal relationship with her?

5        A.    Around 1990.

6        Q.    What happened in 1990?

7        A.    Well, we had shared companion cases.  We had a

8    case where we had gone to this dependent family and I had put

9    a -- the crib had no slat in it, so -- or the side slats in

10   the crib, one was missing, and I figured that the child could

11   choke.  Ms. Varner testified that they were extremely I think

12   retarded, the girl, the female side of that.  And so what I

13   did is I went home and made a slat and took it back and put

14   it in on another occasion with her.

15            She admired that.  And at that juncture we then

16   began a personal relationship.

17       Q.    Describe for me that personal relationship.

18       A.    She would call my office.  She would make

19   arrangements with her schedule and my schedule to meet in the

20   coffee room.  We talked about our mutual admiration for one

21   another.

22            The first occasion that I met with her and we

23   became intimate was when we drove to Ft. Hunter.  That would

24   have been '90, '91, '92.  She parked her car at the Zembo

25   Shrine parking lot.  She crawled in with my car, crawled into

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                         67


1    my car.  We drove up to Ft. Hunter, parked along the river.

2    We discussed our mutual admiration and feelings for one

3    another.  We spent about an hour there talking.  She had

4    introduced to me that she had been just through a divorce.  I

5    think she had stated she was living with this other man, Lee

6    Varner, and she was confused as to, you know, why she had

7    feelings for me.

8        Q.    Now, is there any work reason for her to meet you

9    at Ft. Hunter?

10       A.    None.

11       Q.    And who initiated this contact, you or Ms.

12   Varner?

13       A.    I think she did.

14       Q.    And how did she do that?

15       A.    Calling me, said, do you want to spend lunch

16   together.

17       Q.    Was this on your lunch hour?

18       A.    No.

19       Q.    So she said, do you want to spend lunch with me,

20   but you went to Ft. Hunter not on the lunch hour?

21       A.    That's correct.

22       Q.    Did you spend lunch with her after she invited

23   you to do that?

24       A.    No.  We went up and we talked about our

25   admiration for one another.  And she was telling me the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                68

1    complications that that presented, because she had been I

2    guess with this Mr. Varner, newly with this Mr. Varner for

3    maybe a year, year and a half, and said that she had feelings

4    for me.

5         Q.     Had you said that you had feelings for her before

6    she said this to you?

7         A.     We both mutually talked about our admiration for

8    one another.

9         Q.     When you say admiration, what do you mean?

10        A.     Interest.  Sexual interest.

11        Q.     What did she say that led you to believe that she

12   had a sexual interest in you?

13        A.     What did she say?  She said that she had feelings

14   for me.  And she thought, like on this occasion, that that

15   was such a nice thing to do for this family, and she's never

16   been around that type of kindness.

17               And we didn't engage one another physically at

18   Ft. Hunter, but when we went back to her car --

19        Q.     What time of day was this?

20        A.     It was lunch, over the lunch hour.  So it would

21   have been 12:00, 1:30, something like that.

22        Q.     Was this a workday?

23        A.     I don't remember.

24        Q.     Were you in your personal car?

25        A.     I was, and she was.

S. Gareth Graham                                    69


1       Q.      And you spent how long at Ft. Hunter?

2       A.      An hour and a half.  An hour.

3       Q.      So you were gone from work at least two hours?

4       A.      Probably.

5       Q.      Do you think you took leave for this time?

6       A.      Sure.

7       Q.      Some kind of vacation leave?

8       A.      I don't remember -- I don't remember if it was

9   exactly a workday or it wasn't a workday.  I told you that

10  before.  I don't know.  I don't remember that.  But it could

11  have been a workday.  We would have taken our lunch hour to

12  have this conversation, if it happened to be a workday.

13      Q.      Who decided that you were going to meet at the

14  Zembo parking lot?

15      A.      She did.  Or she asked me where -- no.  I decided

16  to park her car there.  But she asked me where she could meet

17  me, and I said there's the Zembo parking lot there.  And then

18  she said, well, let's drive up to Ft. Hunter.

19      Q.      So initially you were going to meet at the Zembo

20  parking lot and you were going to go to lunch?

21      A.      I think, yes.

22      Q.      Where were you going to go to lunch?

23      A.      I don't know.  We were just going to find lunch

24  together.

25      Q.      Okay.  Now, how far is it from the Zembo parking

1   lot to Ft. Hunter?

2         A.      Four or five miles.

3         Q.      Who decided to go to Ft. Hunter, you or she?

4         A.      I had testified it was her decision to go to

5   Ft. Hunter where we could get a place to talk with one

6   another about her --

7         Q.      So you went, you drove?

8         A.      I drove.

9         Q.      She's in the car?

10        A.      She climbed in my car.

11        Q.      No one else is there?

12        A.      No one.

13        Q.      Anyone see you at Ft. Hunter?

14        A.      No.

15        Q.      Did you spend the entire time in your vehicle?

16        A.      Yes.

17        Q.      You didn't get out and walk around?

18        A.      No.

19        Q.      Okay.  And you said that you were intimate with

20  her on this occasion?

21        A.      She -- I was not intimate with her on that

22  occasion until I had dropped her off at her car, and she

23  leaned over and kissed me.

24        Q.      Okay.  Did you discuss having a sexual

25  relationship at that time?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    71


 1      A.      That was the first time she kissed me.  I don't

 2   know what that meant.  I mean, no, we didn't discuss, you

 3   know, where we were going with this.

 4      Q.      Did you object to the kiss?

 5      A.      No.  I was flattered by it.

 6      Q.      Okay.  And was that the end of --

 7      A.      That was it.

 8      Q.      -- that incident?

 9      A.      Um-hum.

10      Q.      Did you ever eat lunch?

11      A.      No.

12      Q.      When was the next time that you had what you

13   considered to be a personal meeting with Ms. Varner?

14      A.      It probably started at least twice a month after

15   that.  We would get together in the coffee room at work and

16   then we would talk about spending some time together and we

17   would determine where that time would be, and then we would

18   go to meet each other.  And that occurred from 1990 to around

19   '92.

20      Q.      And how often do you believe you saw Ms. Varner

21   for reasons other than work between 1990 and 1992?

22      A.      Probably once or twice a month.  Maybe every two

23   weeks, as a guesstimate.  I'm not exactly accurate.  I would

24   meet with her.  She would call me at the Probation office

25   from the Children and Youth Department she was in, and I

1    would call her.

2         Q.    Okay.  So approximately 20 to 50 times between

3    '90 and '92?

4         A.    Yes.

5         Q.    Were these during work hours or after work hours?

6         A.    Both.

7         Q.    Okay.  Tell me how many times you think you met

8    during work hours.

9         A.    I would say the same type of estimation, maybe

10   once or twice a month.

11        Q.    And would you initiate this or would she initiate

12   it?

13        A.    It occurred both ways.

14        Q.    Was it primarily during the lunch hour or regular

15   working hours?

16        A.    It was, I would say it was primarily over lunch

17   breaks, if you want a definition of how to do that.  I mean,

18   and then she would call me regarding any cases that she had,

19   like, in the Newville area or any cases I would have in the

20   Newville area, we might go up there, you know, supervising

21   independently and then hook up up there somewhere in

22   Newville, somewhere in New Cumberland.

23             After the relationship progressed -- I'll let you

24   ask the questions, I'm sorry.

25        Q.    Good idea, Mr. Graham.  Between '98 and '92 you

1   had no supervisory relationship over Ms. Varner; is that

2   correct?

3        A.      No.  She was an employee at Children and Youth

4   and I was an employee of the Probation Department.

5        Q.      The only reason that you would have to meet from

6   a work standpoint would be these companion cases that you

7   mentioned to me?

8        A.      Yes, ma'am.

9        Q.      And it's your testimony that she initiated this

10  personal relationship?

11       A.      No.  It was a mutual admiration of one another.

12       Q.      I see.  But she made the first call to say:  Meet

13  me at lunch?

14       A.      No.  I didn't -- I don't know who made the first

15  call to say meet me at lunch.  I said I don't know who made

16  the first call in 1990, I'm sorry.

17       Q.      Were you sexually attracted to her at that time?

18       A.      Yes, I was.

19       Q.      You were married at that time?

20       A.      Yes, I was.

21       Q.      How long had you been married?

22       A.      20 years.

23       Q.      When were you married?

24       A.      August 14th of '82.

25       Q.      You're presently married?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           74


    1      A.      Yes.

    2      Q.      Still living with your wife?

    3      A.      Yes.

    4      Q.      Two children?

    5      A.      Two girls.

    6      Q.      Any other marriages?

    7      A.      No.

    8      Q.      Have you been unfaithful to your wife with anyone

    9   other than Ms. Varner?

   10      A.      No, ma'am.

   11      Q.      Have you had any sexual relationship with any

   12   other woman during your marriage?

   13      A.      No.

   14      Q.      So Ms. Varner was the only one?

   15      A.      Yes, ma'am.

   16      Q.      And you're not sure whether she initiated it or

   17   you initiated it?

   18              MR. MacMAIN:  It's been asked and answered

   19   several times, I believe.  You want him to answer it again?

   20              MS. WALLET:  Sure.

   21              THE WITNESS:  Who initiated the initial meeting?

   22   I don't know.

   23   BY MS. WALLET:

   24      Q.      When did you first have sex with Barbara Varner?

   25      A.      Valentine's Day of '92.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    75


1      Q.      Obviously, you remember that pretty well.  What

2  happened on that day?

3      A.      We met in New Cumberland.  She parked her car at

4  the Giant parking lot.  I think we met for lunch at Coakley's

5  restaurant on Bridge Street in New Cumberland.  We had lunch.

6  We went down to a remote area of Goldsboro, which is along

7  the railroad tracks right beside the river in view of the --

8  and we engaged in sex in my vehicle.

9      Q.      Sexual intercourse?

10     A.      Sexual intercourse.

11     Q.      Describe for me what you did on that occasion.

12     A.      What I did?  I pulled my car in a remote area

13  along the railroad tracks.

14     Q.      What vehicle did you have?

15     A.      A Jeep Grand Wagoneer at the time.  And we began

16  by petting one another and got into the foreplay, and we

17  consummated the act of intercourse in my vehicle.

18     Q.      In the front seat or the back seat?

19     A.      In the front seat.

20     Q.      Was it a bench seat or split seats?

21     A.      Back then it was a, I think it was a bench seat.

22  Wait.  I'm not sure.  No, it was split seats.

23     Q.      Were you naked?

24     A.      From my waist down, I was.

25     Q.      Was she naked?

 1     A.     No.  From her waist down, she was.  She had wore

 2   a dress.  And she climbed over onto me.

 3     Q.     She initiated the sexual encounter?

 4     A.     No.  Both of us did.

 5     Q.     How long did this encounter last?

 6     A.     Probably less than five minutes.

 7     Q.     Was it during the day or after work?

 8     A.     During the day.

 9     Q.     Do you know what time of day?

10     A.     Afternoon, probably after lunch, probably 1:30.

11     Q.     Were you on the clock?

12     A.     I can't recall.  I don't think we were.

13     Q.     You think you took leave?

14     A.     We were allowed a lunch break and we were I think

15   engaging in our activity -- I think I took leave, yes, ma'am.

16     Q.     So you met her somewhere between 20 and 50 times

17   in the early '90s before you actually had sex with her on

18   Valentine's day in 1992?

19     A.     I met her in '90 and the first conception of

20   sexual intercourse was in about two years later.  Prior to

21   that on these meetings we would engage in kissing and

22   fondling one another in my vehicle, sometimes in her vehicle.

23     Q.     To the best of your knowledge, did anyone see

24   this activity?

25     A.     No.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    77


1      Q.      To the best of your recollection, did most of

2   these take place during the day or after work?

3      A.      Basically in the, like, afternoon hours.

4      Q.      So at four, five o'clock?

5      A.      Yes.

6      Q.      And you believe you took leave for this time?

7      A.      Yes.

8      Q.      So your leave for that period of time would show

9   a number of leave slips for the afternoon hours?

10      A.      Not for the afternoon hours.  For lunch hours.

11   For the lunch hours.

12      Q.      You don't have to take leave for lunch, do you?

13      A.      We count our time by increments of seven and a

14   half hours a day, you know.  And then we have a compensatory

15   time that you have the opportunity to take leave at your

16   discretion.

17           MR. MacMAIN:  I think what she's asking you, did

18   you fill out a leave slip or was there anything, was there

19   any paperwork documenting --

20           THE WITNESS:  No.

21   BY MS. WALLET:

22      Q.      What were your regular hours of work in the early

23   '90s?

24      A.      8:00 to 4:30.

25      Q.      Did you have any requirement to sign in or out?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    78

1      A.      There was a sign-in tablet, um-hum.

2      Q.      And how did you submit your hours to be paid

3  during that period of time?

4      A.      Just through daily report of activity and through

5  a -- later it became, there was a, I don't know what you call

6  the document, a time sheet.  They call it a time sheet.  I

7  guess that's the proper.

8      Q.      So these times that you met Ms. Varner in the

9  afternoon, would you indicate that there were periods of time

10  in the afternoon where you were not working?

11      A.      Yes.

12      Q.      And then would you make it up at the end of the

13  day, or how did this work?

14      A.      Made it up at the end of the week.  You had to

15  have your, you know, your time in by the end of the week.

16  You were allowed back then, you know, unlimited amounts of

17  compensatory time, because we had -- we tried to hold down

18  the overtime.  So the job required a lot of extra amounts of

19  time when you develop these cases.

20      Q.      To the best of your recollection, sir, did you

21  charge the county for any of the time that you spent in your

22  personal relationship with Ms. Varner?

23      A.      Never.

24      Q.      Did she, to the best of your knowledge?

25      A.      I don't know what she did.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              79

1      Q.      After Ft. Hunter, do you remember what your next

2    contact was with Ms. Varner?

3      A.      Well, we just had -- after Ft. Hunter, well, no,

4    I don't remember the exact next -- no, not specifically.

5      Q.      You don't remember whether it was lunch, whether

6    it was a meeting?

7      A.      It was always lunch, and then it was usually

8    taking off in the afternoons.

9      Q.      When did you first have sex with Ms. Varner after

10    work?

11      A.      I'm not sure.  That would have to depend on --

12    I'm not sure.  I don't know.

13      Q.      Well, do you recall any time that you had sex

14    with her after normal working hours?

15      A.      The only times were when her husband was away

16    from the home and she would call and invite me to her home.

17      Q.      And how many times did she call you and invite

18    you to her home?

19      A.      Usually every time her husband went away.

20      Q.      Are we talking about once a month, twice a month?

21      A.      She testified yesterday he took what, four or

22    five trips a year.

23      Q.      So every time he went, she would call you and you

24    would meet for sex?

25      A.      She would call me and invite me to her home

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                80

1    saying -- and she would give me her husband's travel

2    schedule.

3              She would also take him to the airport and drive

4    him to the airport so he had an accountability of where his

5    car was at and no access to come back to the home.

6         Q.    And she told you this?

7         A.    Yes, she did.  She did this.

8         Q.    Where did Mr. Varner take trips to?

9         A.    He was employed at AMP at the time, and I think

10   he went out to San Diego.  He took some trips with her, but

11   he also took the majority, I guess, of the trips on his own.

12   That's what she was telling me.

13        Q.    Where did you remember that she told you that he

14   was on trips, what locations?  San Diego?

15        A.    Different.  San Diego.  Cincinnati, Ohio.

16   Different places.

17        Q.    Any others that you remember?

18        A.    I didn't pertain -- I don't remember exactly

19   where he went, no.

20        Q.    Did you use birth control during this sexual

21   encounter?

22        A.    The very first encounter back in February 14th of

23   that Valentine's Day, I used a condom.  After that, she had

24   purchased as I understand some vaginal gel.

25        Q.    So when you went to meet her on Valentine's Day

1    in '92 you had a condom with you?

2         A.    Yes, I did.

3         Q.    Did you have a condom with you because you

4    believed you were going to have sex with her on that

5    occasion?

6         A.    Yes.

7         Q.    Do you use birth control with your wife?

8         A.    You mean is she on the pill?

9         Q.    I'm asking you, do you use birth control when you

10   have sex with your wife?

11        A.    In what form?  I mean, I don't understand.

12        Q.    What part of that question don't you understand,

13   Mr. Graham?

14        A.    Do I use birth control with my wife?  My wife was

15   on birth control pills.

16        Q.    Anything else?

17             MR. MacMAIN:  Anything else what?  Any other

18   birth control beside pills?

19             MS. WALLET:  Correct.

20   BY MS. WALLET:

21        Q.    Any other birth control beside pills?

22        A.    She's not currently on birth control pills.  I

23   mean, it's a multi-level question.

24        Q.    Well, let me ask you this.  Were you having sex

25   with your wife at the same time as you were having sex with

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                82

1    Ms. Varner?

2        A.    Yes, I was.

3        Q.    And during those occasions, same time period,

4    were you using birth control when you had sex with your wife?

5        A.    Yes.

6        Q.    And it was her on the pill?

7        A.    Yes.

8        Q.    No others?

9        A.    No others.

10       Q.    So when you bought condoms, you bought them

11   specifically to have sex with Ms. Varner?

12       A.    I only used the condom one time with Ms. Varner.

13   After that, she went and purchased some vaginal birth control

14   preventative gel.

15       Q.    Were you concerned about conceiving a child

16   during this period?

17       A.    Absolutely.

18       Q.    And what steps did you take to make sure that you

19   did not conceive a child with Ms. Varner?

20       A.    I would always ejaculate outside of her.

21       Q.    I'm sorry, Mr. Graham, I have to ask you these

22   questions, but how did you do that?

23       A.    I would exit her at the time I was ready to

24   ejaculate.

25       Q.    And did you believe that might be an effective

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    83


1   birth control method?

2        A.    Yes, I did.

3        Q.    Sir, would you consider yourself to be sexually

4   experienced?

5              MR. MacMAIN:  Can you define what you mean by

6   sexually experienced?

7   BY MS. WALLET:

8        Q.    Did you have sex before you married your wife?

9        A.    Yes, ma'am.

10       Q.    With how many people did you have sex prior to

11  your marriage?

12       A.    I don't know.

13       Q.    Well, five, more than five, more than 10?

14       A.    Probably five.

15       Q.    And when, at what date did you lose your

16  virginity?

17       A.    11th grade.  I graduated in '71, so that would

18  have been 1970.  1970.

19       Q.    And was this an older or a younger woman?

20       A.    She was a year younger than me.  She was my high

21  school sweetheart.

22       Q.    And did you have sex with her on more than one

23  occasion?

24       A.    Yes.

25       Q.    Did that continue through school?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          84


1        A.      Yes.

2        Q.      Did you have other sexual encounters while you

3   were in high school?

4        A.      No.

5        Q.      Let's talk about your educational background, I

6   think we missed that.

7        A.      Okay.

8        Q.      Graduated from what high school?

9        A.      Big Spring High School, 1971.

10       Q.      Go immediately to college?

11       A.      I went to HACC for two years between '72 and '73.

12       Q.      Okay.

13       A.      Went to York College from '73 and graduated from

14   in '75. Attended Shippensburg University I think back in the

15   early '80s for human -- just for a couple classes towards my

16   master's degree, but I never finished.

17       Q.      You hold a bachelor's degree?

18       A.      Yes.

19       Q.      What's that degree in?

20       A.      Criminal justice.

21       Q.      And that's from York College?

22       A.      Yes.

23       Q.      Do you hold any other advanced degrees?

24       A.      No.

25       Q.      You do not hold a master's; you took some classes

1    toward it?

2         A.    I took two summer classes, one in statistics and

3    one in theories of personality.  And I had no -- and I just

4    didn't develop an interest.  I think I got married right

5    after that, that was in '81, and I started building a house.

6    And I lost interest in it.

7         Q.    Now, these four, five people or more that you had

8    sex with before you got married, were they in primarily

9    college?

10        A.    Yes.

11        Q.    Other than your high school sweetheart?

12        A.    Well, I kept my high school sweetheart through

13   three years of college, too, so.  You're asking me, so.  I

14   don't know.

15        Q.    Were you shocked when Ms. Varner suggested to you

16   that you have a sexual relationship?

17             MR. THOMAS:  Objection to the form.

18             THE WITNESS:  Was I shocked?  She had described

19   our relationship as a mature adult relationship.

20   BY MS. WALLET:

21        Q.    In what context did that come up?

22        A.    In the context of the infidelity that we were

23   committing.

24        Q.    Was she married at the time?

25        A.    She wasn't married to Lee Varner at the time.

1  She was living with him at a Weatherburn address in New

2  Cumberland, a townhouse.

3      Q.    Okay.  So she had already initiated the

4  relationship with Mr. Varner at the time that you began to

5  have sex with her?

6      A.    She had been -- from what she had told me, she

7  had been through a divorce, met Mr. Varner at HACC while she

8  was going to school there.  Yesterday was the first time I

9  ever heard this her during her testimony, that she resided

10 with Mr. Varner in Harrisburg on this Sussex Street or

11 whatever she said.  I wasn't aware of that.  And -- but I was

12 aware that he lived with her in her townhouse apartment.  And

13 I think she, what she told me is she bought that house, that

14 townhouse, with the money she got from her divorce

15 settlement.  And he was living with her at the time at that

16 Weatherburn address.

17     Q.    Did you ever brag to people at work that you

18 wanted to do sexual things to Barbara Varner?

19     A.    In what respect?

20     Q.    Well, what part of that don't you understand?

21 Did you ever tell somebody at work you wanted to do something

22 sexual with Barbara Varner?

23     A.    Yes.

24     Q.    Who did you tell?

25     A.    Probably Mark Galbraith.

1      Q.    Did you tell Mr. Osenkarski that you were

2    interested in having sex with her?

3      A.    No.

4      Q.    Did you tell Mr. Osenkarski that you were,

5    indeed, having sex with her?

6      A.    Never.

7      Q.    Did you tell anybody at work that you were having

8    sex with Ms. Varner?

9      A.    No.

10     Q.    I'm assuming now until you made this revelation

11   in July of '97 to Judge Sheely, correct?

12          MR. THOMAS:  Objection to the form.

13          MS. WALLET:  Sorry?

14          MR. THOMAS:  Objection to the form.  He can

15   answer.

16          THE WITNESS:  Not -- I didn't tell anyone about

17   our relationship.

18   BY MS. WALLET:

19     Q.    Let me withdraw that.  Let's make it clear.

20     A.    Okay.

21     Q.    Who was the first person at work that you told

22   that you were having a sexual relationship with Ms. Varner?

23     A.    Judge Sheely.

24     Q.    And you did that on the 9th or 10th of July of

25   1997?

S. Gareth Graham                                88

1        A.      Yes.

2        Q.      Now, did you ever tell Mr. Deluce or anyone else

3    who was investigating the allegations that Ms. Varner had

4    made against you, that you had a sexual relationship with her

5    prior to your telling Judge Sheely?

6        A.      That question didn't come up.

7        Q.      So because nobody said, are you having sex with

8    Barbara Varner, you didn't think that it was important to

9    tell them?

10               MR. MacMAIN:  Objection to the form.

11   BY MS. WALLET:

12       Q.      You have to answer the question, sir.

13       A.      Repeat it again?  I'm sorry.

14               MR. MacMAIN:  Her question was, I think it's

15   already been asked and answered, is:  Did you tell anybody at

16   work that you were having sex with Barbara Varner before you

17   told Judge Sheely?

18               MS. WALLET:  No, that wasn't my question.

19   BY MS. WALLET:

20       Q.      My question was -- your answer was you didn't

21   tell anyone because it didn't come up.

22       A.      No.

23       Q.      My question was:  Did you expect someone to ask

24   you:  Are you having sex with Barbara Varner?

25       A.      You asked me about David Deluce.  You didn't ask

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              89

1    me about anyone else at work.  Your general -- I mean, that's

2    a generalized statement you made.  You asked me about David

3    Deluce, Ms. Wallet.

4         Q.    My question --

5         A.    I said David Deluce did not bring that subject up

6    when he interviewed me.

7         Q.    And you didn't bring it up, either?

8         A.    Absolutely.

9         Q.    Because you didn't think it was important at that

10   time?

11        A.    Not because I didn't see it was important, I

12   saw --

13             MR. THOMAS:  Objection.

14             THE WITNESS:  I saw that they had called down a

15   series of people that didn't like me and started this

16   interviewing process.  And I could see that I had no friend

17   in the room when he started his interview of me in regard to

18   this situation.

19             And then when I provided him with a list of all

20   the trips and things and somewhat of a defense to some of the

21   questions he asked, he went back to her, David Deluce went

22   back to her and then I saw that the county was sharing the

23   information I confidentially gave them and then preparing a

24   defense against me.

25             So I didn't share anything with him.  Wouldn't

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                     90

1    give him a copy of anything.  I wouldn't give Mr. Thomas or

2    anybody a copy of anything, you know, even when this matter

3    came up.  I wasn't going to share my personal life with those

4    people that were out head-hunting for my head.

5    BY MS. WALLET:

6        Q.     Okay.  So you did tell somebody at work that you

7    wanted to have sex with Ms. Varner, correct?

8        A.     That was a -- yes.  And that was mostly because

9    it was a disguise, because they had seen that her and I had

10   so much contact together.  We had, you know, we would be seen

11   in the coffee room.  The rumor mill at the office was that we

12   were having some type of an affair, so would I would try to

13   diffuse that or deflect that by saying that I was interested

14   in having, when I was already involved with her.  But I would

15   go around and say that I was interested in having some type

16   of affair, trying to divert that rumor and act like I hadn't

17   been having an affair with her.

18       Q.     So you were telling people at work, at least one

19   person, I'd really like to have sex with Barbara Varner,

20   when, in fact, you were having sex with Barbara Varner but

21   you were saying this to disguise that fact?

22       A.     Absolutely.  That's accurate.

23       Q.     I see.  Who else at work did you tell that you

24   were interested in having sex with Barbara Varner?

25       A.     I can't recall.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                91

1      Q.      Do you believe there was no one else except for

2   the name you mentioned?

3      A.      Do I believe there was no one else?  I might have

4   said something, you know, in passing, giving her compliments

5   and saying, you know, I'd like to be involved with her.

6      Q.      Did you say anything specific about what you

7   wanted to do to her in a sexual way?

8      A.      No.

9      Q.      You just said:  I want to have sex with her?

10     A.      I think I said she was an attractive woman and I

11   was interested in her.

12     Q.      And you didn't tell Mr. Deluce anything about

13   that interest or your statements --

14     A.      Why would I tell him when he didn't ask me the

15   question?

16           MR. MacMAIN:  Gary, listen to her question.  She

17   had asked you before if you told Mr. Deluce.  You said no.

18   And she's asking you again if you told Mr. Deluce.

19           MS. WALLET:  No, I'm asking a different question

20   but you interrupted me, sir.

21           THE WITNESS:  I'm sorry.

22   BY MS. WALLET:

23     Q.      Did you tell Mr. Deluce that you had, indeed,

24   indicated to someone at work that you might be interested in

25   having sex with Ms. Varner?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                      92


1          A.     No.  That didn't even come up.

2          Q.     So he didn't ask you that?

3          A.     That's what I said earlier.

4          Q.     So you didn't bring anything up?

5          A.     I didn't bring a thing up.

6          Q.     The only thing you did was answer his specific

7    questions?

8          A.     Right.

9          Q.     And he asked you did you sexually harass

10   Ms. Varner, correct?

11         A.     Yes.

12         Q.     And did he ask you whether you had had any

13   contact with Ms. Varner?

14         A.     No.

15         Q.     Did he ask you if you touched her?

16         A.     No.

17         Q.     The only question he asked was did you sexually

18   harass her, and you said no?

19         A.     That's right.

20                There was two meetings with Deluce.  The first

21   meeting he only asked a minimal amount of questions.  Did

22   you, you know, discriminate against her with seniority, did

23   you deny her access to the DUI school, did you -- I mean, I

24   can think of some of these as we go through but I can't

25   remember back to that specific date all specific questions.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              93


1   Did you deny her access to gun training, did you sexually,

2   you know, harass her.  No.  No.  No, no, no.  That's all I

3   answered.

4        Q.    And then the second meeting which you

5   initiated --

6        A.    I went down --

7        Q.     -- you could tell him whatever you wanted,

8   correct?

9        A.    That's correct.

10       Q.    But you didn't tell him then, either?

11       A.    No, I didn't.  Because I had --

12       Q.    I'm sorry?

13       A.    I hadn't told my wife, I hadn't told anybody, so,

14   at the juncture that he was interviewing me.  That was April

15   29th of I think '97.

16       Q.    So in April of '97 you hadn't told anyone that

17   you were having sex with Ms. Varner?

18       A.    No one.

19       Q.    Did you tell your friend Charlie Mallios?

20       A.    No one.

21       Q.    Did you ever tell your friend Charlie Mallios?

22       A.    No, not till after this thing came out.

23       Q.    Okay.  Did he know it when he went with you to

24   the EEOC?

25       A.    No.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              94


1      Q.      How much later did you wait to tell Mr. Mallios?

2      A.      I don't remember that.

3      Q.      Well, do you remember whether, in fact, you told

4    him?

5      A.      Yes, I told him.

6      Q.      And do you remember whether you initiated the

7    conversation in which you said:  I need to tell you

8    something?

9      A.      Yes, I did.

10     Q.      What did you tell him?

11     A.      I told him that I had an affair with her.

12     Q.      Did you tell him anything else?

13     A.      No.

14     Q.      Did you tell him specifically you had sex with

15   her?

16     A.      Sure.

17     Q.      Have you seen Ms. Varner naked?

18     A.      Yes.

19     Q.      Totally naked?

20     A.      Yes.

21     Q.      On what occasions?

22     A.      Different occasions.  I mean, she rented a room,

23   oh, man, at the Fairfield Inn.

24     Q.      When was that, sir?

25     A.      I'm not --

1          MR. MacMAIN:  If you don't know the date --

2          THE WITNESS:  Somewhere in May of '93.  Maybe the

3    23rd or 26th of May, I'm not sure.  Something like that.

4    26th of May.  She rented a room.

5    BY MS. WALLET:

6          Q.     She rented the room?

7          A.     Yeah.  We had got together, wanted to have more

8    time together other than activities that were in our car or

9    in her home or at my house.

10          Q.     So prior to the Fairfield Inn, you had had sex

11    with her in the car, in her house, and --

12          A.     In my home.

13          Q.     -- at other locations?

14          A.     In my home, um-hum, three times.  Twice in the

15    house and once in the garage.

16          Q.     When you say house and garage, are you talking

17    about her home or your home?

18          A.     My home.  My home, two times in the house, one in

19    the back room, one in the living room, and one in the garage.

20          Q.     Okay.

21          A.     And at her home.

22          Q.     Let's go back to the Fairfield Inn and then we'll

23    move to the others.

24          A.     Okay.

25          Q.     So tell me what happened on the occasion that you

1    had sex with Ms. Varner at the Fairfield Inn.

2        A.      She rented a room with her credit card under her

3    previous married name, Barb Spidle.  She paid for the room

4    with her credit card.  And we went down to, I think it was

5    room 106.  It was on the end of the Fairfield Inn.  And I met

6    her after work around three o'clock.  I took off early.  I

7    went to the West Shore Diner, purchased some club sandwiches,

8    brought a bottle of Amaretto.  We went into the room, we had

9    oral and vaginal sex till about from 3:00 till I think 6:30

10   that night.  I had to teach DUI school at Trinity, so I left.

11           She signed the registration card there at the

12   Fairfield Inn.  And I tried to retain, you know, I tried to

13   receive that card, and that company is -- it was Sage

14   Industries and it was associated with the Marriott at the

15   time.  And I went down later to that Fairfield Inn and tried

16   to get a copy of her receipt and a copy of the registration

17   form she signed.  And I talked --

18       Q.      And when did you do that, sir?

19       A.      That was a couple years when she -- that was

20   after she started this sexual harassment complaint.

21       Q.      So after 1997?

22       A.      Yes.  So that might have been four years later.

23   But I talked to a Daniel Hoy and a Dan Matiattose and then I

24   called an attorney for Sage Industry, Dan Queen out in

25   Colorado Springs, to try to get the receipt.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              97

1       Q.      Were you successful in getting the receipt?

2       A.      I haven't been permitted to access that because

3    it was charged on her credit card.

4       Q.      Does that mean no, you weren't successful?

5       A.      No, that doesn't mean that.  That means it can

6    still be accessible if I show cause.  But I wasn't named in

7    any lawsuit at that time because you and Mrs. Varner had

8    proceeded through the EEOC proceedings which I was prohibited

9    to try to get discovery from.

10      Q.      My question, sir, is:  Do you have in your

11   possession now any document related to a registration card or

12   any credit card information related to the Fairfield Inn

13   sexual encounter?

14      A.      I answered that.  I do not.  But that's not to

15   say that they haven't retained tape it.

16              MR. MacMAIN:  She isn't interested -- she just

17   wants to know if you had anything now.

18              THE WITNESS:  No.

19              MR. MacMAIN:  The answer was no.

20   BY MS. WALLET:

21      Q.      All right.  So you spent the afternoon at the

22   Fairfield Inn between approximately three o'clock and six

23   o'clock?

24      A.      Right.

25      Q.      Okay.  And what were Ms. Varner's sexual

1    preferences?

2        A.      To have intercourse, oral and vaginal

3    intercourse.

4        Q.      What was her preference?

5        A.      Both.

6        Q.      What was your preference?

7        A.      Both.

8        Q.      Did you ever have anal intercourse with her?

9        A.      On one occasion.

10       Q.      When was that, sir?

11       A.      I don't know the date.  It was after a DUI

12   school.  She would meet me.  And previous to that she had

13   shown me a Redbook article on anal sex as we were delivering

14   a juvenile up to State College.

15       Q.      Do you still have that article?

16       A.      No.  She showed me the article.

17       Q.      What did she say?

18       A.      She was interested in having anal sex.

19       Q.      How long was it after she showed you the article

20   that you did it?

21       A.      I don't know.

22       Q.      Months, weeks?

23       A.      I don't know.

24       Q.      Days?

25       A.      I have no idea.  I don't know the date that we

S. Gareth Graham                                    99


1    had it.  I know the place that we had it.  I know it was

2    after a DUI school.  It was along the road to the state

3    correctional institution, because we would meet at where she

4    used to work at the Cedar Run, yeah, Cedar Run School.  She

5    used to work there.  So when I would meet her after the DUI,

6    she would say that she would meet me at the Cedar Run Capital

7    Area Intermediate School.

8              So we met there after a DUI school and engaged in

9    anal sex along a road, right -- there's a lime quarry right

10   there, and there's a single tree right along the gates of the

11   state correctional institution, and that's exactly where it

12   happened.

13        Q.    So you just pulled right in there and had anal

14   sex?

15        A.    I met her earlier in the evening at the parking

16   lot of Capital -- or Cedar Run, and Cedar Run was right

17   beside there.  So we drove to the area, got involved in a

18   sexual encounter and then had anal sex.

19        Q.    Was it during daylight hours?

20        A.    Nighttime.

21        Q.    Middle of the night?

22        A.    It would have probably been around 9:00, 9:30 --

23   between 9:30 and 10:00.

24        Q.    And how long did that last?

25        A.    Not long.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          100

1      Q.    A couple minutes?

2      A.    10 minutes.

3      Q.    Were you fearful of being discovered doing this

4    along the side of the road?

5      A.    Sure.  You know, we would take a remote location

6    each time.  I mean, we took those type of precautions because

7    I was aware and she was aware that you can be arrested in

8    your car for having sex.  So usually we would drive to

9    out-of-county destinations so in case we would ever get

10   interrupted we wouldn't be cited with a disorderly conduct

11   citation by a police department and that wouldn't go through

12   the Cumberland County, you know, court authorities.

13     Q.    So you thought if you got cited in another county

14   that that wouldn't get back to Cumberland County?

15     A.    Sure.  Yeah.

16     Q.    I don't understand.  Why would you do it out of

17   county?

18     A.    We would drive to out-of-county locations and

19   engage in sex during this time that we were driving around

20   together and meeting one another.

21     Q.    Is New Cumberland in Cumberland County?

22     A.    No, that's -- we would go to Goldsboro.  We would

23   park -- she would park her car.  She drove a Cabriolet and it

24   was quite a significant car because it was an aqua blue car

25   and it had a white roof on.  She was always fearful for her