Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                        101


1   husband to see her car somewhere, so what she would do is

2   park it at the Giant so she would have an alibi in case he

3   saw her car and tried to find her.

4        Q.    Did she tell you this?

5        A.    Sure.  She told me that, and she said if he ever

6   comes in the grocery story I'll tell him I was in the

7   bathroom.

8              And lot of times she took groceries home to cover

9   the fact that she had parked in the parking lot and had gone

10  with me for an hour and a half.  So she intentionally bought

11  groceries to take home to provide an alibi of around these

12  encounters.

13       Q.    Did you have anal intercourse with her on more

14  than occasion?

15       A.    One occasion, ma'am.

16       Q.    Just one?

17       A.    Just one.

18       Q.    You didn't like it?

19       A.    I did it at her, basically at her request,

20  because she was somewhat angry with me that I would never

21  ejaculate in her.  So she saw this as a way that I could

22  ejaculate in her butt as opposed to in her vagina.

23       Q.    She told you that?

24       A.    Yes, she did.

25       Q.    Did she like it?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    102

1        A.     I don't know.  I mean, she was happy that I
2    fulfilled a consummation of ejaculation inside her.  That was
3    what she was wanting and that's what I did.
4        Q.     Why didn't you do it again?
5        A.     I don't know.  We just never got into that again.
6        Q.     And this occurred, this anal intercourse, one
7    occasion, near the correctional facility?
8        A.     Right on the road directly beside the state
9    correctional institution.  There's a single tree and then
10   there's a high bank, and it was in a secluded area where
11   nobody in the yard of the state correctional institution
12   could see you.
13              We would always park in a location where there
14   was a long area in front of us and a long area in back of us
15   and no -- you know, we would find a road, we would find roads
16   that had a seclusion atmosphere or environment.  And then
17   that way -- most of the time she would wear a dress.
18              She would call me up on the phone at work and she
19   would say:  I have no panties on today, I'm wearing a teddy
20   today.  And usually the days that we were going to and
21   pre-planned to have sex, she wore a dress, and then she would
22   crawl over onto my lap and we would have sex in my car.  And
23   it was a -- it's not the most flattering way to have sex but
24   we were involved with each other in those terms.
25       Q.     Your car or her car for the anal intercourse?

 1       A.     My car.

 2       Q.     Did it generally occur in your car rather than

 3  hers?

 4       A.     Yes, ma'am.

 5       Q.     Did you have the same car throughout this sexual

 6  relationship?

 7       A.     I had different cars.  I had, like, an old Jeep,

 8  I don't know the year.  It was a Grand Wagoneer.  And I had a

 9  Toyota car that I still drive today because I bought that in

10  1990.  So a lot of it was in my Toyota and some of it was in

11  my Jeep.

12       Q.     What cover did you use with your wife?

13       A.     What cover?

14       Q.     Yeah.

15              MR. MacMAIN:  Do you understand what she means by

16  cover?

17              THE WITNESS:  Yeah.  What in regard to, the trip,

18  like, the Atlantic City or something?  The time we went down

19  to Atlantic City?

20  BY MS. WALLET:

21       Q.     Did you tell your wife you were working at these

22  times?

23       A.     I don't think I told my wife anything.

24       Q.     I see.  You just wouldn't show up after work on

25  this occasion and --

```
 1        A.      Ma'am, these incidents only lasted about -- our

 2   infatuation with each other would consummate the act of sex

 3   and we were done within an hour most times.  It wasn't a real

 4   flattering sexual type of loving relationship.  It was more

 5   of an infatuation and excitement drove the moment.

 6        Q.      I see.  Did you love her?

 7        A.      Did I love who?

 8        Q.      Ms. Varner.

 9        A.      No.

10        Q.      Did you ever tell her that you loved her?

11        A.      No.

12        Q.      Did she ever tell you that she loved you?

13        A.      No.

14        Q.      It was purely for sex?

15        A.      Yes, ma'am.

16        Q.      And she used the words mature adult relationship?

17        A.      Yes.

18        Q.      And she said:  We're simply having this mature

19   adult relationship and it's not really an infidelity?

20        A.      No.  She said that she was dissatisfied with her

21   husband's performance at home, she was dissatisfied with him

22   going golfing, she was dissatisfied with him paying a country

23   club tuition, she was dissatisfied with him in his sexual

24   performance and watching X-rated movies.

25        Q.      What else did she tell you about her relationship
```

S. Gareth Graham                              105

1    with her husband?

2         A.    That's pretty much the list.  She didn't like his

3    smoking.  She didn't like his flirting at work.  She gave me

4    the name of Blaine Budman, a guy that worked at PPG, and her

5    husband and Blaine's wife had been engaged in some, I don't

6    know, type of horseplay.  I don't think it was anything

7    sexual, but -- and she was jealous of that and told me that,

8    like, she was wanting to retaliate for those type of things,

9    how he acted.

10              She was basically resentful of his position and

11   his traveling because, you know, I mean, I guess she thought

12   she was controlled.  She had related on her first husband

13   that he was controlling.  She had come to me, she had come to

14   Joe, she had said when she was hired first in Probation that

15   she was an abused woman.  Her husband was a truck driver for

16   UPS, this Mr. Spidle, he was abusive to her, according to

17   her.  And she resented some of the things, you know, he did.

18        Q.    Okay.  Now, we're back to you didn't have to tell

19   your wife anything because it wasn't unusual for you to be

20   not at home?

21              MR. MacMAIN:  Objection.  That's not what he

22   said.  He said there was an hour period of time.

23              MR. THOMAS:  At some point, Deb, I need a break,

24   but I don't want to interrupt your line of questioning.

25              MS. WALLET:  Okay.  We'll break within a half

1    hour.  Is that acceptable?  Is that all right for you,

2    Ms. Williams?

3              (Discussion held off the record. Recess taken

4    from 12:03 until 12:11 p.m.)

5    BY MS. WALLET:

6        Q.    We were discussing whether you needed to tell

7    your wife that you were somewhere else in order to avoid

8    periods of time when you were not at home, and you said no,

9    you did not need to do that?

10       A.    I didn't discuss with my wife, you know, period

11   of time, because usually it occurred between noon at work and

12   ended before 5:00, so my wife didn't have any knowledge of

13   this whatsoever.

14       Q.    Did you have occasion to tell your wife that you

15   were somewhere other than with Ms. Varner?

16       A.    The time I went to Atlantic City on that bus trip

17   with her, I told my wife that I was going down to my sister's

18   and just taking the day off to go down there.

19       Q.    Did you tell your wife on any other occasions

20   that you were somewhere else when, in fact, you were with

21   Ms. Varner?

22       A.    No.

23       Q.    Now, at some time this sexual relationship ended,

24   correct?

25       A.    Yes.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    107


    1       Q.      When did it end?

    2       A.      In State College, somewhere in October during a

    3   DUI conference that she testified to yesterday.  I don't know

    4   the exact date.

    5       Q.      Do you know what year it was?

    6       A.      Not exactly.  Maybe '96.  '97.  '97.  I'm not

    7   sure.

    8       Q.      And how did the sexual relationship end?

    9       A.      We were on a -- we were on a commitment trip to

   10   George Junior Republic.  I'm not sure of the guy's name; I

   11   think it was Chauncey Shields.  We had taken a juvenile out.

   12              And after I got promoted to supervisor I told

   13   Mrs. Varner that this couldn't keep -- this couldn't work,

   14   this couldn't keep going on.  And I watched her then

   15   associate with people in the office, and there was a lot of

   16   disgruntled employees because we had recently split the

   17   department --

   18              MR. MacMAIN:  Her question was when did it end?

   19   When was it ended?

   20              THE WITNESS:  That DUI conference was the last

   21   sexual experience I had with her in State College at the

   22   Nittany Lion Inn.  She had called my room five o'clock in the

   23   morning.  I was rooming with Hank Thielemann.  He can

   24   validate that she made the call.  I didn't meet her as she

   25   testified yesterday in the evening.  She called me at five

1    o'clock in the morning.  Hank said to me, what's she calling

2    for.  And I said, she wants to go walking.  She wants to go,

3    you know, on a morning walk.

4              I went down to her room.  She invited me in, and

5    we had sex there.  That was the end of it.

6              During the DUI conference there was a number of

7    people, Sam Miller, Denny Drachbar, Hank, I don't know who

8    else.  Barb.  Barb had gone up early on Monday.  She

9    testified yesterday that she had a -- didn't -- the reason

10   she went up early was she had failed the CRN evaluation for

11   the Pennsylvania Drunk Driving program.  Yesterday she

12   testified that that didn't happen, but it did.  She had

13   failed the test originally for the CRN evaluator test.  So

14   she went up to retake the test the Monday before the

15   conference started on Tuesday.  And she wanted me to go up

16   early with her, and I refused, and I said, I cannot make

17   alibis to cover our activities and these guys will be

18   suspicious.

19             So I would not go up with her Monday, and she was

20   pissed at that.  So she went up, took her test.  I met with

21   her Tuesday morning.  I think that was the Tuesday morning

22   she called.  Hank will validate that she called my room or

23   our room I was sharing with Hank.  And I left and went down,

24   engaged in sex with her, and then went walking with her, to

25   cover our early-morning activities.

1              She became angry at me at this conference because

2    I didn't use this conference as exclusive time with her.  She

3    felt that this was an opportunity for the two of us to have

4    extra time together that we wouldn't normally have.  And I

5    had gone out with different guys and I said, well, I'm not

6    going to just go with you out to dinner, I'm going to go with

7    the rest of the people, and she was angry at that.

8              She did leave the conference early.

9        Q.    And is it your testimony that she left early

10   because she was angry with you?

11       A.    She left early because she was angry that I

12   wouldn't spend exclusive time with her up there as opposed to

13   going out to eat with Denny Drachbar, Sam and the rest of the

14   people.

15       Q.    How many people were at this conference?

16             MR. MacMAIN:  Total?  Or from the county?

17             MS. WALLET:  Total.

18   BY MS. WALLET:

19       Q.    Hundreds?

20       A.    No.

21       Q.    Dozens?

22       A.    Wait a minute.  Wait a minute.  It's an annual --

23   I would say hundreds.  Maybe a hundred, 130.  That's a

24   guesstimate.

25       Q.    And your recollection is this conference was what

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                110

1   kind of conference?

2       A.     It was a DUI annual conference.  The Driving

3   Under the Influence Association every year has a yearly

4   conference, and at that conference you attend training

5   sessions to get and to keep your certification to teach as an

6   instructor for the DUI schools, and as a CRN evaluator to

7   administer a Court Reporting Network instrument to anybody

8   that gets arrested for drunk driving.

9       Q.     How many individuals from Cumberland County

10  attended this conference?

11      A.     What I remember is Denny Drachbar, Sam Miller,

12  Hank Thielemann, Barb, and myself.  I can't remember.  Or I

13  mean, there could have been, you know, a couple others.  We

14  have a number of DUI instructors in our office.  A lot of

15  them elect not to go to the annual conference.  But that's

16  the people I know of that were there.

17      Q.     You think Barb Varner was the only woman from the

18  Probation office at that time?

19      A.     At that conference --

20          MR. MacMAIN:  I'll object.  That's not what he

21  said.  He said there may have been other people, he couldn't

22  recall.

23  BY MS. WALLET:

24      Q.     Do you remember any other women besides

25  Ms. Varner?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          111


     1      A.      No, because she had a room to herself, and if

     2   there would have been another woman, she would have been

     3   sharing that conference room with another woman.  And she

     4   went up early, so I don't know if maybe that was the reason,

     5   I mean, that she got her single room.  I'm not sure about

     6   that.  But that could be her contention.

     7      Q.      Okay.  And you had sex with her on which day of

     8   the conference?

     9      A.      I think it was a Tuesday.

    10      Q.      And did she leave immediately thereafter?

    11      A.      It might have been -- I'm sorry.  It might

    12   have -- I'm trying to think.  It might have -- because we

    13   went up a day later.  If she went up on Monday, we would have

    14   gone up on Tuesday.  It might have been Wednesday of that.  I

    15   would say Wednesday is my estimation of when she called the

    16   room.  But Hank was there and he said, who the hell's that

    17   calling in the middle of the night, or in the middle of the

    18   morning.

    19      Q.      Did you identify her as Barb Varner?

    20              MR. MacMAIN:  You mean when the call came in and

    21   Hank said who was that?

    22              THE WITNESS:  Yes.

    23   BY MS. WALLET:

    24      Q.      So you told Hank that Barb Varner was on the

    25   phone?

1       A.      Yes.  He asked me who the hell was that.

2       Q.      You didn't just say Barb?

3       A.      No.

4       Q.      It's your belief that you said Barb Varner?

5       A.      I said Barb Varner, because I left and went to

6    her room, had sex and then went walking with her to disguise

7    that.

8       Q.      But you didn't tell Mr. Thielemann that you had

9    gone to her room to have sex?

10       A.      I told him I was going to her room to meet her.

11       Q.      What else did you tell him as a result of that

12    telephone conversation?

13       A.      Nothing.  I just left.

14       Q.      Okay.  So the phone rings at five o'clock in the

15    morning?

16       A.      Right.

17       Q.      Do you answer it or does he answer it?

18       A.      5:30.  I think I answered it.

19       Q.      Okay.  Tell me what happened in this

20    conversation.  Hello.  Give me the rest of it.  Are we going

21    to get together at this conference, she says?

22       A.      Um-hum.

23       Q.      Okay.  What do you say?

24       A.      And I said yes.  And she said, well, you want to

25    come down to the room.

1        Q.      And you said?

2        A.      And I said yes.  And she said, we can disguise

3    this that we went walking, tell Hank that we went walking.

4        Q.      And you said?

5        A.      Okay.

6        Q.      Good-bye?

7        A.      Hang up.

8        Q.      During this conversation did you say anything

9    like, something, Barbara?  Did you use her name?

10       A.      Yes.  Hank asked me who was on the phone, and I

11   said Barbara Varner, she wants to go walking.

12       Q.      Well, that's not my question.  My question is:

13   During this conversation did you say something followed by

14   the words Barb or Barbara?

15              MR. MacMAIN:  What she wants to know is what

16   words Hank would have heard you say on the phone call.

17              MS. WALLET:  Precisely.

18              MR. MacMAIN:  Right.  Do you understand?  Hank's

19   hearing your end of the conversation.  She wants to know

20   other than what you've said, yes, yes and okay, was there

21   anything else you said?

22              THE WITNESS:  I don't know what Hank would have

23   heard about my conversation because he was just waking up and

24   he was saying to me, who the hell's on the phone, and I said

25   that's Barb Varner and she wants to go walking.  So that's

S. Gareth Graham                              114


1    the extent of it.

2    BY MS. WALLET:

3         Q.    Okay.  Now, is it your testimony, sir, that

4    Ms. Varner left the conference early because you told her

5    that you were ending the sexual relationship?

6         A.    No.  I just didn't pay any attention to her

7    individually up there.  And she wanted to go out and have

8    dinner and have a time to ourselves, and I said that can't

9    happen because all these guys are here and they're going to

10   ask where I went to eat and, you know.

11        Q.    This was a three-day conference?

12        A.    Usually they're three-day conferences, right.

13        Q.    And you went Monday?

14        A.    No.  She went Monday.  I went up Tuesday morning,

15   and I think Wednesday morning was the call she made to me.

16        Q.    And you think the conference was Tuesday,

17   Wednesday, Thursday?

18        A.    Yes.

19        Q.    Okay.  And you were there and she was there on

20   Tuesday.  She wanted to have dinner with you Tuesday?

21        A.    I think we -- I don't recall.

22        Q.    Did she want to have dinner with you Wednesday?

23        A.    After the -- yeah, that evening, after we had --

24   I had met her in the morning.

25        Q.    And you thought that she wanted to have dinner

S. Gareth Graham                          115

1    with you Thursday?

2        A.    Yes.  Or Thursday --

3        Q.    So those were the three dinners that you thought

4    she wanted to have with you, and she was mad because you

5    wouldn't?

6        A.    Not three dinners.  She didn't specify, you know,

7    which.  She just wanted to have some time together up there

8    by ourselves.  I'm not going to say there was three meals.

9        Q.    How did you travel to this conference?

10       A.    That's interesting.  I don't know, either -- I

11   think Hank drove.

12       Q.    Personal car or county car?

13       A.    Personal car, his car.

14       Q.    You don't think you drove?

15       A.    No.

16             MS. WALLET:  We'll take a lunch break.

17             (Recess taken from 12:28 until 1:02 p.m.)

18   BY MS. WALLET:

19       Q.    We're back after the break.  You understand

20   you're still under oath, Mr. Graham?

21       A.    Yes.

22       Q.    I may be a bit distracted here, so if I repeat

23   something, I ask you to forgive me.

24             We're still at the Penn State conference.

25       A.    Okay.

1      Q.     Did you tell her at the Penn State conference

2   that you were ending this relationship?  Or did you identify

3   this time only as the last time you had sex with her?

4      A.     I identified that as the last time I was having

5   sex with her.

6      Q.     So at some later time you broke off the

7   relationship?

8      A.     Yes.  We had taken one trip together out, after

9   that October date, I think it was a December trip out to

10  George Junior Republic.

11     Q.     Did you have sex on that trip?

12     A.     No.

13     Q.     Okay.

14     A.     It was a commitment trip.

15     Q.     And it was during that trip that you broke off

16  this relationship?

17     A.     Yes.

18     Q.     And how did you do that?

19     A.     I advised Mrs. Varner that this couldn't keep

20  working.  Since I had been promoted to her boss, we couldn't

21  keep this affair together, it wasn't going to work.

22            What I experienced at work is when I would

23  correct her, some of her deficient reports, she would get

24  angry at me.  She had submitted time sheets asking for

25  basically extra favors out of me that she never asked out of

1   Joe, and that was when she was attending the master's degree

2   program at Shippensburg University.  She wanted me to approve

3   training hours to go to a free master's degree program that

4   she was participating in.  And I said, you didn't submit your

5   request to Joe for payment of those hours, and she took

6   offense to that.  That was one of the things.

7            And basically, quite honestly, I just got

8   consumed with the amount of work I had dumped in my lap as a

9   supervisor, and our relationship deteriorated.  I watched her

10  align with all the disgruntled employees in our office and I

11  just lost interest in her, and I think she lost interest in

12  me.

13       Q.    Would you say that this ending was mutual?

14       A.    Neither one of us had any other episodes to

15  resurrect anger that we had towards each other, so I would

16  say it was mutual.

17       Q.    So you were angry at her at the time?

18       A.    No.

19       Q.    She was angry at you?

20       A.    Yes.

21       Q.    And what did she do to express her anger?

22       A.    She was just angry that I had totally ignored her

23  and not made an effort to resurrect the kind of relationship

24  we had previously.

25       Q.    My question was:  What did she do to express her

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          118

1   anger?  Did she tell you that she was angry?  Did she do

2   something?

3        A.      She went to other co-workers and complained about

4   my supervision level.  She complained about me as a

5   supervisor.  She complained about assignments being unfair.

6   She complained to Judge Sheely about the seniority list being

7   unfair.  And just a multitude of different complaints.  And

8   there was no attraction at that point where I found that she

9   aligned with all these angry people in our office.

10           And I'm not saying that everyone was angry every

11  day, but the workload was phenomenal.  When we split those

12  departments there was 650 referrals, and I'm not going to go

13  on a tirade.  There was 12 people in each department.  Just

14  in less than three years later they have 20 people in the

15  Adult section and 21 people in the Juvenile section.  I don't

16  know what percentage increase between 12 and 21 people are.

17  I was replaced with three supervisors.  So I'm not telling

18  you that I didn't -- I was overwhelmed, Ms. Wallet.

19           Joe came to the job, he was angry of what Ken

20  Bolze had done.  He was angry also that --

21       Q.     He, Mr. Osenkarski?

22       A.     Mr. Osenkarski, and he was angry and the rest of

23  the staff were angry about what John Ward had done, trying to

24  take the chief's positions out of a 40-year operation by a

25  partisan political process and try to be a numbers cruncher

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                               119

1   and be in a position to not promote those men to the job that

2   they were deserving.

3        Q.    Now, you're saying that she was angry at you for

4   ending this affair and that's why she did these things?  Or

5   something else?

6            MR. MacMAIN:  Objection.  I'm not sure that

7   that's what he said.

8            MS. WALLET:  That's why I've asked him.

9            THE WITNESS:  I'm sorry.

10  BY MS. WALLET:

11       Q.    Are you saying that she was angry at you for

12  ending this affair and that's why she did those other things?

13       A.    Yes.  I think it was a way of retaliating against

14  me for ignoring her.

15       Q.    Now, you never made any claim that you were the

16  victim of some retaliation here, have you?

17       A.    I've been -- I was angry at Judge Hoffer and the

18  action he took against me.  Did I make a claim?  I don't

19  think I have a claim as an at-will employee.  I don't even

20  know who I'm really employed by.  I don't think you know who

21  is my true employer, and I don't think the Federal Court

22  knows who my true employer is.  I mean, that distinction I

23  think gave you trouble when you first applied to, for her

24  comments towards what forum to hear this case.  It's really

25  unfortunate that, you know, you work in a correctional -- you

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              120

1    work for judges and -- I won't go on to that.

2         Q.    Why are you confused about where you're employed

3    or who employs you?

4         A.    Well, when I needed representation, I had an

5    attorney seek out who could represent me, and I was told by

6    the -- I got a letter from the AOPC that I was not a -- from

7    Zygmont Pines that I was not a court employee.

8         Q.    Okay.

9         A.    And I think Mr. Thomas and Mr. Dellasega's last

10   brief indicated that I'm not really a county employee, or

11   it's their contention that I might not be a county employee.

12   So that the paradox is between, you know, who belongs to

13   what.

14        Q.    Did you think that you were subject to the county

15   personnel policies?

16        A.    Absolutely.

17        Q.    Why did you believe that?

18        A.    That was the personnel manual that the county

19   distributed to all the county personnel.

20        Q.    To the best of your knowledge, while you've been

21   employed in the Probation office, let's limit it to the

22   Probation office, did you believe that the county personnel

23   policy manual had a no-harassment policy?

24        A.    Yes, it did.  I mean, I think it was covered in

25   general terms under, you know, harassment policy, and it was

S. Gareth Graham                                    121

1   a procedure clearly outlined in that policy, in that manual

2   that allowed people to have relief from that, from those

3   situations.

4        Q.      And do you agree that periodically you were given

5   a county personnel policy and you were asked to sign

6   indicating that you had received it and acknowledged that you

7   were subject to it?

8        A.      How far back do you want to go?  I have an '84

9   one.  I have maybe an '88 one.  I have every one that they

10  ever produced.

11            MS. WALLET:  Let's mark this as Graham

12  Deposition 1.  We'll mark both of them 1 and 2.

13            (Graham Deposition Exhibits 1 and 2 were marked.)

14  BY MS. WALLET:

15       Q.      I've handed you what we've had marked as

16  Deposition Exhibits 1 and 2.  Do you recognize your

17  signatures on those documents?

18       A.      Yes, ma'am.

19       Q.      Let me ask you about Deposition No. 1.  You

20  signed your name as Stewart G. Graham.

21       A.      Correct.

22       Q.      Is that your name?

23       A.      That's my full name.

24       Q.      You told the county in 1981 that you were

25  changing your name or you wanted to change your name to S.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    122

1    Gareth Graham.  Is that correct?

2         A.    That's correct.

3         Q.    Why did you do that, sir?

4         A.    Because everybody knows me as Gary and nobody

5    knows me as Stewart.

6         Q.    So your formal name is Stewart G. Graham?

7         A.    Stewart Gareth Graham, yes.

8         Q.    In any event, Deposition No. 1 has something

9    stricken out.  Do you know who did that?

10        A.    No.

11        Q.    Do you believe that it was stricken before you

12   were asked to sign this?

13        A.    That's 22 years ago.  I don't know.  I don't --

14              MR. MacMAIN:  If you don't know, you don't know.

15              THE WITNESS:  I don't know.

16   BY MS. WALLET:

17        Q.    Deposition No. 2 references a county sexual

18   harassment policy dated 3/9/01.  I assume your signature

19   indicates that you received that policy?

20        A.    Yes.

21        Q.    And you agreed at that time to be bound by it,

22   correct?

23        A.    Yes.

24        Q.    Do you know, sir, why a sexual harassment policy

25   was issued on March the 9th of '01?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          123

1       A.      No, I would be -- I guess that came from the

2  Human Resources section.

3       Q.      Do you believe it had anything to do with the

4  case filed by Ms. Varner?

5       A.      I don't know what it had to do with.

6       Q.      Have you received any sexual harassment training

7  while you've been employed?

8       A.      Yes.

9       Q.      When was that?

10      A.      In the recent years, '96 or '97.  '97.  And then

11 I think every subsequent year thereafter we've had sexual

12 harassment training.

13      Q.      Were you aware that there was a requirement that

14 the Probation officers attend training in sexual harassment

15 as a result of the complaints filed by Ms. Varner?

16      A.      I don't know that to be true, no.

17      Q.      Were you ever told that you were being required

18 to attend sexual harassment training because of something

19 Ms. Varner did?

20      A.      I was told that it was a requirement to attend

21 sexual harassment training because it was an adopted county

22 policy, and nothing to the -- any further, nothing having to

23 do with Mrs. Varner.

24      Q.      Did you attend sexual harassment training at the

25 same time as Ms. Varner?

1        A.      On what Joe referred yesterday to the corrective

2    action plan, and as part of that plan he was, I guess Joe was

3    charged with setting up an exclusive sexual harassment

4    training for the Probation staff.  And I guess, I think Joe

5    had arranged that through Mazzitti and Sullivan like he

6    testified to yesterday, and I attended that.

7        Q.      So when you just told me that you didn't think

8    you had to attend sexual harassment training because of

9    anything related to the Varner complaints, did you forget

10   this time?

11               MR. MacMAIN:  Objection to the form.  He didn't

12   say that.

13               THE WITNESS:  I didn't say that, no.

14   BY MS. WALLET:

15       Q.      Let me ask it more clearly.  Was there ever a

16   time when you were required to attend sexual harassment

17   training because of complaints that Ms. Varner had filed?

18       A.      No.

19       Q.      So you didn't think your having to attend this

20   particular sexual harassment training had anything to do with

21   Ms. Varner's complaints?

22       A.      No.

23       Q.      What kind of corrective action plan was it?

24       A.      I would let Joe speak to that because I didn't

25   have anything to do with it.

 1      Q.      Have you seen this corrective action plan?

 2      A.      No.

 3      Q.      How did you know there was a corrective action

 4  plan?

 5      A.      That's what Joe testified to yesterday.

 6      Q.      And you didn't know about it before yesterday?

 7      A.      I think he was charged by Judge Sheely, or I

 8  don't know who it was from.  No.  I don't.  I don't know.  I

 9  don't know.  I just know that I never saw a plan of

10  corrective action from Joe's desk.  I just heard him talk

11  about a corrective action plan.

12      Q.      Mr. Graham, were you angry that you had to attend

13  the sexual harassment seminar at which Ms. Varner was also in

14  attendance?

15      A.      No.

16      Q.      Did you display any anger at that sexual

17  harassment training?

18      A.      I think she alleged in her Complaint that I read

19  that I glared and stared at her, I positioned myself to look

20  at her, and I didn't do any of those things.

21      Q.      You didn't glare at her?

22      A.      No.

23      Q.      You didn't seat yourself directly across from

24  her?

25      A.      No.  I was in the room before she came in.  She I

S. Gareth Graham                                126

 1   think sat with Debra Green is what I remember how that came

 2   about.

 3        Q.     And you did nothing at that harassment training

 4   to indicate some displeasure with Ms. Varner?

 5        A.     Nothing at all.

 6        Q.     Mr. Graham, you indicated that you had had sex in

 7   Mrs. Varner's home.

 8        A.     Correct.

 9        Q.     Was that in one location or more than one

10   location?

11        A.     Multiple locations.

12        Q.     Tell me where you had sex with Mrs. Varner in her

13   home.

14        A.     In her master bedroom.

15        Q.     Actually, that's not what I meant.

16        A.     Okay.  On the bed or?

17        Q.     I meant the address.

18               MR. MacMAIN:  The address of the home.

19   BY MS. WALLET:

20        Q.     What addresses?

21        A.     Her York address.

22        Q.     And what was the address of that location?

23        A.     Is it Etters?  I don't know the number.  I mean,

24   it's an Etters address.  I don't even remember the street.  I

25   know it's back the end of the, like, a cul-de-sac, or a

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    127

1    one-way road.  You can only go in one way and out one way.

2         Q.     Okay.  How many times did you have sex at that

3    location?

4         A.     Probably eight or nine.  Probably less than 10.

5    I'm not exact -- I don't know exactly if that's the right

6    amount.  Frequently.

7                She had called me one time she was having a gas

8    fireplace, gas fireplace, what do you call that when they

9    convert your fireplace in the basement to gas.  You know,

10   they ran a gas line into her fireplace in the basement of the

11   home.  And she was off so that -- she had to be off work that

12   day so that they could install this gas fireplace insert.  I

13   mean, whether it was just the gas line coming in or the --

14   and she called me that day and said, do you want to come

15   down, they've come here early, I have the rest of the day

16   free and Lee's out of town, or he's out on business.

17               So I went, I had sex with her that day in her

18   basement.  She has berber carpet in her basement we covered

19   up with a red wool, like, an Indian blanket.

20               I can narrate, you know, the description of the

21   room.  We had sex on the floor and on the couch there.  Her

22   husband had a Brooklyn Dodgers, I think it was a baseball

23   uniform hanging up on the wall.  I think she had two

24   different cameras downstairs.  She had pictures of her kids.

25   She told me to not go near the doors because her neighbors

1    nextdoor, they were -- he was a well driller and that I

2    shouldn't go near the window for fear that the neighbors

3    would see.

4         Q.    And this was at the Etters address in York?

5         A.    Yes.

6         Q.    Eight or nine times you had sex there?

7         A.    Yes, ma'am.

8         Q.    Okay.

9         A.    And you said where else, and I --

10              MR. MacMAIN:  She'll ask you.  Just listen to her

11    questions.  She said Etters right now.

12    BY MS. WALLET:

13        Q.    What other address?

14        A.    That I had sex with her?

15        Q.    Yes.

16        A.    At my home.

17        Q.    No.  What other address that was the home of

18    Ms. Varner.

19        A.    I had met with her at the Weatherburn Drive

20    address in outside of New Cumberland, Beacon Hill

21    development.  What I remember, she had a townhouse, it was on

22    the end she bought.

23              Actually, she sold that townhouse to a former

24    Cumberland County Commissioner's daughter, Rose Mary Peifer,

25    I think, Howard's daughter.  And she was in a position that

S. Gareth Graham                                    129


1    she didn't know how to do her taxes that year, so she asked

2    my advice.  And her, I think her tax, income tax form, her

3    and her husband's income tax form was done by my accounting,

4    at Howard accounting in Newville.  And I think that's

5    probably a matter of record, too.  I'm not positive.

6         Q.    How many times did you have sex in the

7    Weatherburn address?

8         A.    I never had sex in the Weatherburn house, but I'm

9    familiar with the layout of the house.  We would embrace

10   inside the front door.  We would sit on her couch and pet and

11   fondle each other.

12        Q.    But no sex there?

13        A.    No sex there, ma'am.

14        Q.    So the only location where Ms. Varner had her

15   home where you had sex was the Etters address somewhere

16   outside of York?

17        A.    The Etters address, and --

18              MR. MacMAIN:  She was just asking about her

19   addresses.

20              THE WITNESS:  Her address, yes.  Okay, I'm sorry.

21   BY MS. WALLET:

22        Q.    No other locations that Ms. Varner had as her

23   home where you had sex?

24        A.    No.

25        Q.    Now, let's go back to sex at the Etters address.

S. Gareth Graham                           130


 1   Is that how you want to refer to it?

 2        A.     That's fine.

 3        Q.     Okay.  More than five occasions, you're not sure?

 4        A.     I'd say almost 10 or maybe more.  I would have to

 5   look at her husband's travel schedule.

 6               MR. MacMAIN:  Gary, just listen to her question.

 7   She wanted you to give an estimate.  You gave an estimate.

 8               THE WITNESS:  Okay.

 9   BY MS. WALLET:

10        Q.     Were these always times when Mr. Varner was

11   traveling?

12        A.     Not always.

13        Q.     What dates would you have had sex with her in her

14   home when Mr. Varner was not away?

15        A.     I wouldn't know when he was away or not away,

16   only on what she would tell me.  So I don't have any validity

17   to validate when he was actually there or when he was away or

18   he wasn't away.  I only could go on what she would tell me,

19   so I didn't know, Ms. Wallet.

20        Q.     Okay.  Well, were there times when you had sex in

21   the Etters address where she told you her husband was not

22   away?

23        A.     Well, that, I think that gas fireplace insert was

24   one of the times that he wasn't away, but she was there at

25   the house alone by herself.  And since the installation had

1    occurred I think earlier than she anticipated, it gave her a

2    free afternoon, you know, because he was on business

3    somewhere.

4        Q.    Did she call you at work?

5        A.    Sure.

6        Q.    Would she call you on your regular desk phone or

7    on your cell phone?

8        A.    I don't know if we had cell phones back then.

9        Q.    So the phone would ring on your desk?

10       A.    Yes.

11       Q.    Was there a receptionist of some sort?

12       A.    Well, that -- yes.  What would happen is after

13   she -- it would ring directly, and after three rings it would

14   go out to the front desk.

15       Q.    Okay.  So if you picked it up on the first three

16   rings, you got it and you avoided the receptionist?

17       A.    That's correct.  And that was kind of a plan that

18   we had originated between the two of us, to make sure that we

19   answered.

20       Q.    Okay.  Now, you wanted to tell me where within

21   this home you had sex.  On the floor, on the couch in the

22   basement.  Where else?

23       A.    In her bedroom, master bedroom on her bed.

24   Directly across from the bedroom there's a room that she used

25   to call her sewing room.  That was, I think that was the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                132

1   first, that was -- the first time I had sex with her there

2   that's where we had sex, in the sewing room.

3       Q.      Was there a bed in the sewing room?

4       A.      I think so.  Yeah.

5       Q.      Anywhere else?

6       A.      Mostly in the basement of the house, because I

7   would park behind her residence.  There was a -- adjacent to

8   her property there was a rental unit, and I would usually

9   park my car over near the rental unit, walk in and she would

10  plan to meet me at the back sliding glass door.

11      Q.      Okay.

12      A.      And I could walk in the back without having my

13  car disclosed.

14      Q.      Describe the master bedroom in the Etters

15  residence.

16      A.      She has a split-level house.  When you go up the

17  front steps you turn to the right, the first room you come to

18  is the bathroom.  The second room you come to on the

19  left-hand side is the master bedroom.

20      Q.      One bed, two beds?

21      A.      I think one bed.  Maybe a king size or queen

22  size, I'm not sure.  The bed against the inside wall facing

23  outside.

24      Q.      What color is it?

25      A.      I don't know.

S. Gareth Graham                              133

 1      Q.      Any other furniture in that room?

 2      A.      I don't recall.  I think there was a TV in that

 3   room.

 4      Q.      Do you recall anything else about the master

 5   bedroom?

 6      A.      No.

 7      Q.      Any other locations in that house where you had

 8   sex with Ms. Varner?

 9      A.      No.  Mostly in the basement.  I think one

10   occasion in the sewing room, and one occasion in the master

11   bedroom.  That's it.

12      Q.      Now, you had sex in your home, correct?

13      A.      Yes, ma'am.

14      Q.      And what address was your home where you had sex

15   with Ms. Varner?

16      A.      2037 Ritner Highway, Carlisle, PA.

17      Q.      Who resided in that home with you at the time?

18      A.      My wife and children.

19      Q.      Two children?

20      A.      Two girls, right.

21      Q.      How many occasions did you have sex with

22   Ms. Varner at the 2037 Ritner Highway address?

23      A.      You asked me that earlier.  I said three times:

24   Once in the garage, once in living room, and once in the,

25   what I call Florida room.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    134


1      Q.    I didn't ask you, but when you told us about the

2  sex at Ms. Varner's house, are we talking about three

3  separate occasions, or sex in three places on one occasion?

4            MR. THOMAS:  Objection to form.

5            MR. MacMAIN:  Objection.  I don't understand --

6  hold on.  I don't understand the question, so.

7  BY MS. WALLET:

8      Q.    Okay, I'll be happy to clarify it.  You told me

9  that you had sex eight or nine times in the Etters address.

10     A.    I know.  Right.

11     Q.    Would you have sex one time on each of those

12 visits?  Or are we talking about you had sex eight or nine

13 times but might have only been in one visit?

14     A.    No.  It was all separate visits.

15     Q.    Separate visits.

16     A.    One time in the master bedroom, one time in the

17 sewing room, and all the rest were downstairs in the

18 basement.

19     Q.    Okay.

20     A.    We did it, we engaged in sex on the floor and on

21 her sectional couch down there.

22     Q.    Now, I'm back to sex at 2037 Ritner in Carlisle.

23     A.    Okay.

24     Q.    Three separate occasions?

25     A.    Yes.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                 135

 1      Q.      During the day or after work?

 2      A.      During the day, over the lunch hour.

 3      Q.      Where did you park when you went to your house?

 4      A.      Usually put the car in the garage.  That's how we

 5  had sex in the garage.  We just parked, I parked my car in

 6  the garage so my wife wouldn't see that there was a car at

 7  the residence for any reason.  I have a separate detached

 8  garage that we pulled into, and had sex in the car.

 9      Q.      Okay.

10      A.      And then the other occasions I think I went in

11  and let the garage door come down and put my vehicle inside.

12      Q.      Did your wife work for the county at this period

13  of time?

14      A.      Yes, ma'am.

15      Q.      Did she work full-time?

16      A.      Yes.

17      Q.      Did she ever go home for lunch?

18      A.      Yes.

19      Q.      Were you fearful of being discovered having sex

20  with someone not your wife by your wife?

21      A.      Yes, I was.

22      Q.      But you did it, anyway?

23      A.      Yes, I did.

24      Q.      Did you select this location as the place to have

25  sex?

S. Gareth Graham                                    136

```
 1      A.      Yes.  I would have made that decision based on

 2   variables of where I thought my wife was at, maybe.

 3      Q.      How old were your children at that time?

 4      A.      Well, I'll let you figure out the math, but my

 5   daughter, my oldest daughter was born in '84 and my youngest

 6   daughter was born in '88.  So it was early '90s.  No.  It was

 7   not till '92 I had the first sex, so it was after that.  '93,

 8   '94, '95.  Something like that.  Whatever my children's ages

 9   were.

10      Q.      So this sexual relationship spanned at least two

11   years, if not more?

12      A.      It spanned -- the sexual relationship went from

13   that February, Valentine's Day back in '92 the whole way

14   until the Nittany Lion Inn in 1996.

15      Q.      Does Ms. Varner have any distinguishing marks

16   that are not visible when she's wearing clothes?

17      A.      She has a scar at the base of her back, about her

18   waistline.

19      Q.      Describe the scar.

20      A.      A one-inch scar, no particular -- might have a

21   slight curve in it.

22      Q.      Do you know why she got that scar?

23      A.      She testified yesterday that she got that scar as

24   a result of an injury that she had received as a child, I

25   think.  The day before, she testified that she didn't have a
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              137

1    scar anywhere about her body.

2              What she told me was -- I asked her, you know,

3    did she have -- I asked her if she had back surgery, and I

4    was under the understanding that she might have had back

5    surgery because I don't know, I think she told me that.  But

6    evidently she didn't have back surgery, so.  And that's why I

7    remember the mark, because, you know, I questioned, I said,

8    do you have a disc problem or something.  It's at her lower

9    back on -- near the top of her butt.  Not as far down as the

10   tailbone or anything, it's up further near her waistline or

11   something.

12        Q.    Any other distinguishing marks?

13        A.    Well, she told me she had dental surgery to

14   correct, like, her teeth, she had all her teeth capped, but

15   she testified that she didn't have her teeth capped.  So I

16   don't know without getting her dental records if what she

17   told me was the truth or what she's telling during this

18   deposition is to be the truth.  I don't know.  I mean, I

19   guess only her dentist would know if she had her teeth

20   redone.  But she told me that.

21             I think she told me things like she had broken a

22   few toes or something at one time.  And I don't know what

23   that was a result of.

24        Q.    Any other distinguishing marks?

25        A.    Not that I can recall.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    138

1       Q.     Is there any other intimate detail about

2   Ms. Varner that only someone who had a sexual relationship

3   with her would know about her?

4              MR. MacMAIN:  Objection as to form.  You want to

5   narrow that?  You mean personal information that was

6   revealed?  It's pretty --

7              MS. WALLET:  It doesn't matter.  Either.

8              MR. MacMAIN:  I'll continue to object to the

9   form, but if you can answer that.

10             THE WITNESS:  I mean, she was very orgasmic.  I

11  don't know if that's a specific incident or not.

12             Anything else that I would know?  Things that she

13  testified to yesterday that she wasn't into oral sex with her

14  first husband at all and had only been introduced to oral sex

15  with her new husband, Lee.

16             She described -- not -- I mean, this gets off the

17  point, to her first husband where she said he used to dig at

18  his crotch until he wore his jeans out.  I mean, you can ask

19  Mr. Spidle about that.  She said he reeked of fuel oil all

20  the time I guess from being a truck driver.

21             Things like her daughter had hooked up with a

22  black gentleman, Cindy had hooked up with a black gentleman

23  down in North Carolina, and she was concerned about her

24  ending up with a black man.  I don't know if she's a racist

25  or not, but she was concerned about that.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          139


1              And how her daughter got introduced to the black

2    man is because Lee's daughter Sherry was also hooked up with

3    some black man and having a relationship.  And I remember

4    explicitly, you know, she had sought out my advice on what

5    she could do to end this relationship between her daughter

6    Cindy and this Kevin was his name.

7              And actually, I think she even employed her first

8    husband to take Cindy back to North Carolina for some reason

9    so that he could talk to her about not ending up with this

10   guy named Kevin.  And he had been up I think at Ms. Varner's

11   house for a Thanksgiving dinner or something, and she showed

12   up with this black guy.

13             So, those kind of, that I mean, that's not a

14   physical thing but those are some of the intimacies hat she

15   had shared with me.  I mean --

16        Q.    Is there anything physical that you would know or

17   only someone who had sex with her would know?

18             MR. MacMAIN:  Same objection.

19             Is there anything else that you can recall about

20   her physically other than what you've testified to?

21             THE WITNESS:  That she has olive skin.  I mean,

22   and -- she worked out quite a bit at the gym and she had

23   solid calves.  She was proud of the strength of her legs for

24   some reason.  I mean, she was always bragging about, you

25   know, going to the Y and when she would run into Kerry Houser

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                  140


1   or something like that, and the police chief up there in

2   Carlisle, and she was always telling me about how he would

3   try to hit on her.  Margeson.  Margeson is his name.

4              She also told me, too, at the --

5              MR. MacMAIN:  She asked you physical.  Is there

6   anything else physical?

7              THE WITNESS:  Not other than her teeth, her toes,

8   scar on her back.

9              She always -- she said to me about her self

10  professed, like, double nipple.  And that was some kind of a

11  cartilage.  It wasn't an exterior type of thing but an

12  interior type of thing, you know, it was involved with her

13  breast, I mean --

14  BY MS. WALLET:

15       Q.    Did you observe that?

16       A.    There's nothing to observe.  I mean, it's what

17  she told -- basically what she told me.  It doesn't protrude

18  or anything else, it's just something that she claimed was

19  unique to her.

20       Q.    So she doesn't have a double nipple?

21              MR. MacMAIN:  If you can answer the question.

22  The question, I think the original question was --

23              THE WITNESS:  No.  I mean, she has some type of

24  cartilage under her nipple that's enlarged is what she told

25  me.

S. Gareth Graham                          141

 1   BY MS. WALLET:

 2       Q.     Well, did you observe that, sir?  Is my question.

 3       A.     I don't recall that.  I don't remember it.  I

 4   mean --

 5       Q.     Did you ever kiss her breast?

 6       A.     Yes, ma'am.

 7       Q.     More than once?

 8       A.     Sure.

 9       Q.     In a position to observe her nipple?

10       A.     Sure.

11       Q.     And you didn't observe anything?

12              MR. MacMAIN:  Objection.  He said it wasn't

13   observable, it was under the skin so there was nothing to

14   observe.

15              THE WITNESS:  Yes.

16   BY MS. WALLET:

17       Q.     Could you feel it?

18       A.     I think she was -- she had pointed it out to me.

19   I don't really remember feeling it, no.

20       Q.     Is there anything, sir, that wasn't discussed

21   over the last two days that you know about Barbara Varner of

22   an intimate nature that you haven't already told us about?

23       A.     Well, she said that when her first husband kicked

24   her out because he always accused her of peddling her ass

25   around Mechanicsburg, she had gone to live with somebody that

S. Gareth Graham                                      142

1    owns Wilcox Forging.  Now, I don't know, I think Mr. MacMain

2    asked the question do you know a Kay Wilcox, but maybe it

3    wasn't, maybe it was a different name.  Some Kay lady that

4    she had lived with and her husband had taken her in because

5    she told me she was living on the street and out of her car.

6    And this former friend of hers, okay, and this, I think they

7    were involved with Wilcox Forging, a forging company in

8    Mechanicsburg, that she had -- she was taken in when her

9    first husband kicked her out.  And then she said they really,

10   they helped her, you know, get through her first episode of

11   separation.

12        Q.     Mr. Graham, were you aware of any gynecological

13   problems that Ms. Varner had during the period of time that

14   you were having sex with her?

15        A.     I think she had a bladder problem.  I think she

16   would have a, like, a leaky bladder, because on occasion when

17   we would have sex, you know, she would be embarrassed because

18   she would, you know, when she would -- she would sometimes,

19   you know, just I guess pee, you know.  I don't know how else

20   to describe it.

21        Q.     Would she bring a change of clothes with her?

22        A.     No, not usually.

23        Q.     On those occasions where you had sex in the car

24   during lunch time, did she return to work?

25        A.     Not usually, no.  Neither one of us did.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                143

1      Q.      So you would have sex at lunch time and then you

2   would both go home?

3      A.      Sometimes.

4      Q.      Ever return to work after sex?

5      A.      Not often.

6      Q.      More than five times?

7      A.      I can't give an estimation on that when we

8   returned home after sex and when we didn't.

9      Q.      Any other gynecological problems that you were

10  aware of?

11     A.      I think she told -- yeah.  I think she told me

12  she had a, like, a D&C procedure done before.  She had a

13  procedure done to put salt in her varicose veins.  That's

14  something that just came back to memory since you're talking

15  about that.  She had been treated for salt solution in some

16  of her -- spider veins, she didn't have varicose veins.

17  Spider veins.

18            She had a D&C.  And we had had sex before that

19  and she wanted me to ejaculate in her because, like, it was

20  an opportunistic time to consummate the entire act of

21  ejaculation inside her due to this D&C that she was going to

22  have performed the next day or something like that.  So she

23  said that would be a way to avert having her get pregnant.

24     Q.      She indicated that she wanted to get pregnant to

25  you?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    144

1       A.     No.  I just never trusted her the whole way.

2   That's why I didn't ejaculate in her.

3       Q.     Well, what was the reference to pregnancy?

4       A.     The pregnancy would occur if I would ejaculate in

5   her.  That was the reference.  And the D&C would be -- I

6   don't know what's the procedure, but it's a scraping of the

7   uterine wall, and evidently that would kill any sperm that

8   would happen to be in there or something.  I'm not a doctor,

9   I don't know.

10      Q.     So she wanted to have sex with you immediately

11  after the D&C procedure or immediately before?

12      A.     I think before.

13      Q.     And she told you why?  That was a question.  What

14  reason did she give you as to why?

15      A.     That would be a way to consummate the act fully

16  of ejaculating in her and not worry about getting her

17  pregnant, because she was worried about getting pregnant and

18  I was worried about her getting pregnant.  I had a vasectomy

19  after my relationship ended with Ms. Varner but I didn't have

20  it before.

21      Q.     When did you have a vasectomy, sir?

22      A.     I knew you were going to ask.  I don't know.

23  Just -- it was after, within the last four years.

24      Q.     Well, was it before or after you were transferred

25  to the prison?

      1        A.     It was after I transferred, after I lost my job

      2     in Probation.

      3        Q.     You think it was within the last four years?

      4        A.     Yes, ma'am.

      5        Q.     Any other gynecological information that you have

      6     about Ms. Varner?

      7        A.     No.  No.

      8        Q.     Did anyone witness any of these sexual liaisons?

      9        A.     No.

     10        Q.     Did anyone come upon the two of you after you had

     11     had a sexual liaison?

     12        A.     No.

     13        Q.     No one ever discovered this?

     14        A.     Somebody -- I mean, on occasion there were people

     15     that had come up, where we were in the act in the car and

     16     they had come up without us noticing them.  But no one had

     17     ever interrupted us or stopped us or seen us.  I mean, it

     18     just scared the daylights out of us.

     19        Q.     And where did that occur?  What location?

     20        A.     Down at the Goldsboro location, near the railroad

     21     tracks.

     22        Q.     Was that a frequent site of your sexual

     23     encounters?

     24        A.     Yes, it was, ma'am.

     25        Q.     How many times did you have sex in or near

S. Gareth Graham                                146

1    Goldsboro?

2         A.      Frequently.  I mean --

3         Q.      More than five?

4         A.      Two or three times a month.  It would depend -- I

5    mean, it would depend.  I mean, if it was a -- I mean, I

6    remember when it rained she would call me, you know, and

7    usually in the middle of the week we had sex.  I mean, there

8    was a lot of Wednesdays.

9         Q.      What was it about Wednesdays?

10        A.      There wasn't Juvenile court on Thursday, there

11   wasn't Adult court on Tuesday, things like that.  I mean,

12   there was -- it's kind of, like, a middle-of-week day.

13        Q.      A couple times of month in Goldsboro, a few of

14   those times somebody would come upon you?

15        A.      No.  Only one time a guy got behind us and he

16   beeped the horn.  That was it.

17               I remember one occasion I was up in Roxbury and I

18   think another Probation officer named Mike Dunsmore had seen

19   us in the car, and he came back and confronted me about it.

20        Q.      What had he seen?  Just the two of you in the

21   car?

22        A.      Just the two of us.  But he didn't have an

23   identity of who the other -- who Barb was.  And he said, that

24   was Barb Varner in with you, what were you doing up in

25   Roxbury.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    147

1       Q.      And what did you say?

2       A.      I said we were supervising.

3       Q.      Is that true?

4               MR. MacMAIN:  Is what true, that he was

5       supervising?

6               MS. WALLET:  Yes.

7               MR. MacMAIN:  Or did Mike Dunmore --

8               MS. WALLET:  No.  That you were supervising.

9               THE WITNESS:  Yes.  We had a case and it was an

10      adult case so it's not protected under confidentiality.  It

11      was a guy named Steve Wilson, and she had his wife or his

12      girlfriend, some Naylor girl.  I'll just say Naylor, Kathy

13      Naylor.  And again, she was, like, slow --

14              MR. MacMAIN:  She didn't ask you about the case.

15      Just --

16              THE WITNESS:  Okay, okay.  And we had seen that

17      case and then gone on up to Roxbury over the lunch hour.

18      BY MS. WALLET:

19      Q.      And you had sex in the car?

20      A.      No.  We fondled and kissed each other up there on

21      the other side of the mountain at Roxbury.

22      Q.      When did you tell your wife of this liaison with

23      Ms. Varner?

24      A.      The day after I talked to Judge Sheely.

25      Q.      So you went to Judge Sheely, told him that you

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        148

1    had had a sexual relationship with Barb Varner and didn't

2    tell your wife till the next day?

3         A.     No.  Hank Thielemann had come down to my office

4    and said, Gary, this county has been upstairs, David Deluce

5    has been up there, Horace Johnson was up there, Ward was up

6    there and Hartnett was up there and they were all basically

7    gunning to have my job over this sexual harassment

8    investigation that they had done.  Hank said that Judge

9    Sheely's going to end up -- he's going to transfer you, Gary.

10   He said, you're going to the prison.

11        Q.     How did he know that?

12        A.     I don't know.  I think -- I don't really know.  I

13   think -- and he said, you better get upstairs, you know.  He

14   said, you know, it's time for you to -- I mean, he just said

15   something in that regard.  I don't know his exact words.  But

16   I said, I'm going to take care of this, and I went upstairs.

17        Q.     So the reason you went to Judge Sheely was at the

18   suggestion of Hank Thielemann?

19        A.     No.  He just -- he said that you're going to be

20   losing your job, that's what the rumor is, and you better,

21   you know, you better go upstairs or you better talk to Judge

22   Sheely.

23        Q.     And you thought that was a good idea?

24        A.     Yes.

25        Q.     Okay.  So, what did you do?

S. Gareth Graham                                    149

1      A.    I went up to see Judge Sheely.  I went --

2      Q.    Did you call him, ask for time?

3      A.    No.  I went up to see him.  Asked the secretary,

4   I guess Sandy, if I could speak with the judge.

5      Q.    What happened?

6      A.    And I said, you know, Judge Sheely, there's

7   concerns that you're going to transfer me or put me over in

8   Adult Probation, and I said, I'm here to tell you that I did

9   not sexually harass Barbara Varner, I'm here to tell you that

10  I had an extramarital affair with this woman.  And I broke

11  down.  My wife was not there.  There was nobody there but me.

12     Q.    What did you tell Judge Sheely about this affair

13  at that time?

14     A.    I told him I had an extramarital affair with this

15  lady and the county was not responsible for her claims of

16  sexual harassment.  It was I was involved with her on a

17  consensual relationship, infidel relationship.

18     Q.    When do you mean the county was not responsible?

19     A.    There was no basis to her claims.

20     Q.    What did Judge Sheely say?

21     A.    He said, have you told your wife?  And I said no.

22  And I said, but I'm going to.  So the next day I think I went

23  in with Dave Foster.

24          MR. MacMAIN:  She just asked you about the

25  conversation with Judge Sheely.

S. Gareth Graham                          150


 1            THE WITNESS:  Okay.  And then I went home and

 2    told my wife.

 3    BY MS. WALLET:

 4         Q.     What did Judge Sheely say to you that ended that

 5    conversation?

 6         A.     He said, I'm glad you came to me.

 7         Q.     Do you need a break?

 8         A.     No.  I'll just be all right.  He said, I'm glad

 9    you came to me, I'm going to put this matter to rest.  He

10    said, I'm going to call her up, meaning Barb Varner, and I'm

11    going to put you out on the street for your bad language.

12         Q.     Was there anyone else present at that meeting?

13         A.     I don't think so.  I am a little confused whether

14    Dave Foster walked in with me.  I'm confused whether he was

15    there or not at the time.  I'm not sure.

16         Q.     Well, do you remember Mr. Foster being there with

17    you with Judge Sheely on more than one occasion?

18         A.     I think on one occasion, and not the second

19    occasion, or, you know, on the second occasion, not the first

20    occasion.  But I'm not -- I don't know that to be in stone.

21    I don't know.  I can't remember exactly.

22         Q.     So you see Judge Sheely, you tell him you had

23    this relationship with Ms. Varner.  He suggests you tell your

24    wife.  Did he suggest that you tell your wife?

25         A.     No.

1      Q.     He asked you if you had told your wife?

2      A.     Correct.

3      Q.     And you said you were going to?

4      A.     Correct.

5      Q.     Okay.  The conversation ends, he's going to put

6   this to rest.  Anything else --

7      A.     He said he's going to take care of this.

8      Q.     Is there anything else about that meeting that

9   you remember?

10     A.     No.  I didn't even know -- I didn't even know he

11  had called her up, I mean, till later.  He just later, you

12  know, I mean, down the road I guess he made some -- that

13  document that he performed, you know, I mean, he come up with

14  that.

15              MR. MacMAIN:  Gary, she just asked you about your

16  conversation.

17              THE WITNESS:  That was it.

18              MR. MacMAIN:  Hold on.  She's not asking what

19  other people may have said or other people may have done.

20  Simply your conversation with Judge Sheely the first time.

21              MS. WALLET:  Right.

22              THE WITNESS:  That was it.

23  BY MS. WALLET:

24     Q.     Is there anything else about that conversation,

25  either what you said or what he said, that you remember now?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          152

1       A.      That's it.

2       Q.      All right.  So you go home, tell your wife.

3       A.      Right.

4       Q.      What do you tell your wife?

5       A.      That I was involved in a -- she asked me on the

6    way home, she said, now -- no.  The next day I told my wife,

7    because I went home that night and didn't tell her.  And the

8    next day at noon I told her.

9       Q.      Okay.  Why did you pick the next day at noon to

10   tell your wife?

11      A.      I think I talked to David Foster and he said,

12   Gary, he said, that's a long relationship -- well, you know,

13   don't tell details.  I mean, that's all he said, just don't

14   tell her details, it will hurt her.

15      Q.      Did you talk to Foster immediately after you met

16   with Judge Sheely --

17      A.      I think so.

18      Q.      -- or the next day?

19      A.      I think so, right after I talked to Judge Sheely.

20   And I don't know whether it was in person or on the phone.

21      Q.      Do you know what time of day your meeting the

22   first time with Judge Sheely was?

23      A.      Probably middle of the day.  I don't know.  I

24   can't remember.

25      Q.      Before or after lunch?

1      A.      Before lunch.

2      Q.      Did you go back to work?

3      A.      I don't know.  I can't tell you.

4      Q.      You don't remember?

5      A.      I don't remember.

6      Q.      Did you and your wife customarily drive back and

7   forth to the courthouse together?

8      A.      No.  We drove separately.

9      Q.      Always?

10      A.      99 percent of the times we drove separately.

11      Q.      Why was that?

12      A.      Well, because she had different duties than I

13   did, and I had supervision duties.  I would go out and

14   supervise, so she wouldn't have a car, and if she wanted to

15   go home for lunch she would not have a vehicle.

16      Q.      Okay.  So you went home that night, didn't tell

17   your wife anything.

18      A.      Correct.

19      Q.      Did she know at that time that there was some

20   possibility that you would be disciplined as a result of the

21   complaints made by Ms. Varner?

22      A.      She didn't know a thing.  I think the next day

23   since I had told Judge Sheely I was going home to tell her

24   and I hadn't told her, you know, he ran into her somewhere, I

25   don't know, you know, being the elevator or in the office,

1    but he had said, you know, did Gary talk to you, or

2    something, I think.  You'll have to ask him what he said.

3    But he -- I think he said, did Gary talk to you, and he said,

4    do you think Gary had an affair.

5              And that next day we got in the car to go home

6    for lunch, and I didn't even get out of the parking lot when

7    she looked at me and said, did you have an affair with this

8    woman, is that why you're in this mess.  And I said, yes, I

9    did.  And then we went home.  I remember sitting on the patio

10   and confessing.

11        Q.    Okay.  What prompted you to be going home for

12   lunch with your wife on this day?

13        A.    I don't know.  I had gone home for lunch on

14   occasion with her.  I might have exaggerated my 99 percent,

15   but most often we drove separately, and even though we drove

16   separately we still went home to lunch together.

17        Q.    So is it your testimony that it was actually

18   Judge Sheely who told your wife?

19        A.    No.  I told my wife.  He didn't say anything to

20   her.  He said, could he have had an affair with this woman to

21   make her file these complaints.  So he was seeing if I told

22   her the night before.  That was his way of expressing

23   himself.

24        Q.    And that was the first notice she had about any

25   affair, when Judge Sheely asked her about it?

1      A.      He made a generalized comment, as I remember, and

2   said that do you think Gary could have been having an affair

3   with this woman or have you considered that, Barb.

4           She got in the car, we went home, and before we

5   got out of the parking lot, bang, that was it.

6      Q.      What did she say to you?

7           MR. MacMAIN:  You mean in the car other than what

8   he's just told you?

9   BY MS. WALLET:

10     Q.      Yes, in the car.

11     A.      How could you.

12     Q.      And what did you say to her?

13     A.      I said I was sorry.

14     Q.      Did she ask you for details of this relationship?

15     A.      I think I told her what Dave Foster said to me,

16   not to discuss details, it would just hurt her further.

17     Q.      Have you at any time since told her the details?

18     A.      Yes, she knows most of the details.  She doesn't

19   know the anal sex part of the details.

20     Q.      Is that because you told her?

21     A.      Yes.

22     Q.      Did she get any information about this

23   relationship from anyone else, to the best of your knowledge?

24     A.      No one.

25     Q.      Now, did you meet with Mr. Foster at the

1   workplace the day after you told Judge Sheely of this affair?

2       A.      I'm not clear on those details.  I mean, I might

3   have called Dave Foster and said, you know --

4               MR. MacMAIN:  Gary, hold on a second.  Mr. Foster

5   is an attorney.  Whatever he and you discussed would be

6   privileged, so she's not asking you what Mr. Foster said or

7   you said.  All she asked is whether or not you met with him.

8               THE WITNESS:  I met with him, I'm pretty sure.  I

9   mean, I know I met with him, but I don't know the sequence.

10  BY MS. WALLET:

11      Q.      You heard the testimony yesterday or the day

12  before where Ms. Varner said that you met with Mr. Foster and

13  your wife behind closed doors for a period of time?

14      A.      That's totally incorrect.  Well, met behind

15  closed doors or met with Judge Sheely?  I mean, there was --

16  where are you referencing behind closed doors?

17      Q.      My question is:  Did you meet with Mr. Foster at

18  the workplace before you went to see Judge Sheely the second

19  time?

20      A.      Yes.

21      Q.      You called him and asked to meet with him,

22  correct?

23      A.      As I remember, right.

24      Q.      Now, did you intend when you called him that you

25  were going to take him with you to see Judge Sheely?

S. Gareth Graham                              157


     1          MR. THOMAS:  Him?  I'm sorry?  Take him?  Meaning

     2    Mr. Foster?

     3          MS. WALLET:  Correct.

     4          MR. THOMAS:  Okay.

     5          THE WITNESS:  I think he volunteered to be -- to

     6    go up with me.  I don't think I took him by design, I think

     7    he just said, do you want me to go up with you.

     8    BY MS. WALLET:

     9      Q.    Okay.  And who was present at this second meeting

    10    with Judge Sheely?

    11      A.    Just myself and Dave Foster and Judge Sheely.

    12      Q.    Your wife was not there?

    13      A.    That's incorrect.  She was not there.

    14      Q.    And what was the purpose of this second meeting

    15    with Judge Sheely?

    16      A.    I'm trying to make sure I have the sequence

    17    correct, Ms. Wallet.  I'm not -- I want to amend the record

    18    to reflect I'm not sure what day David Foster went up with

    19    me.  Either it was the first day or the second day.  He might

    20    have gone in with me to Judge Sheely the first day when I

    21    confessed the affair, instead of the second day.  But I don't

    22    remember my wife being in on that meeting at all on the first

    23    occasion I saw Judge Sheely.

    24      Q.    Okay.  Were you with your wife at any meeting

    25    with Judge Sheely?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                               158

1       A.      No, not that I remember.  I went in with Dave

2  Foster.  I don't think I went in with Barb the next day.  I

3  don't think my wife Barb was included in that meeting.  She

4  could have been, I'm not sure.  That was a traumatic time.  I

5  can't recall that.

6       Q.      My question was:  What was the purpose of this

7  second meeting with Judge Sheely?

8       A.      I don't know.  I mean, I don't know what -- I

9  don't even -- maybe there wasn't even a second meeting, maybe

10  I'm running them together.  I just don't -- I don't know.

11  I'm confused on that topic, Ms. Wallet, I don't know.

12  Because I thought I originally told my wife, and then I

13  checked with her last night and she said, no, you didn't tell

14  me the first day that I think you and David went in there,

15  you told me the next day, because Judge Sheely come up to me

16  and said do you think he could have been having an affair.

17  And then she said, I questioned you in the car on the ride

18  home.  And she said, I remember her saying it was Lainey's

19  birthday.  I mean, what a time to remember.  That's her

20  cousin.

21              As far as the second day, maybe I'm running the

22  two days together.  Maybe there was only one contact with

23  Judge Sheely.  I was thinking I went in myself and then Dave

24  Foster later, but -- and I'm not trying to confuse the

25  record, I'm just -- poor Emily.  I don't -- maybe there was

S. Gareth Graham                                159

1  only one meeting with Judge Sheely and then -- I don't know

2  if I had the second meeting.  I just do not recall.  I'm

3  confused.

4      Q.      Well, do you remember Judge Sheely telling you

5  anything other than:  I'm going to put you on the street for

6  your bad language?

7      A.      No, he didn't say a thing.  He didn't say what

8  type of disposition he was going to make.  He said, I'm going

9  to take care of this matter, and that was it.

10     Q.      Did he ask you anything about the specific

11 allegations by Ms. Varner of sexual harassment?

12     A.      Not after I told him I had a consensual affair

13 with her, no, not that I recall.

14     Q.      So after you said you had a consensual affair,

15 your recollection is Judge Sheely said:  I'm going to take

16 care of this matter?

17     A.      Yes, ma'am.  And he didn't say anything further.

18     Q.      How did you learn that you did get three days on

19 the street?

20     A.      He put it in a document and sent it down to, I

21 guess Joe.

22     Q.      And the original days that you were going to be

23 suspended were changed, correct?

24     A.      Yes.

25     Q.      Why were they changed?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                     160


 1        A.     I don't know.  I don't know.  I don't have any

 2    idea.

 3        Q.     You don't remember why there was a change in the

 4    days of your suspension?

 5               MR. MacMAIN:  He just said he doesn't.

 6               THE WITNESS:  I don't.  I don't remember why.

 7    BY MS. WALLET:

 8        Q.     Had you previously received any disciplinary

 9    action while you worked for the county?

10        A.     No.

11        Q.     How about for the courts?

12        A.     No.

13        Q.     So this three-day suspension was the first

14    disciplinary action you had ever suffered?

15        A.     Yes, ma'am.

16        Q.     Did you believe that you had been disciplined in

17    any other way as a result of the allegations of Ms. Varner

18    other than the three-day suspension?

19        A.     Did I?  I'm sorry, you'll have to repeat that.

20               MS. WALLET:  Let's take a short break.  Let's

21    talk about what our plan is for today.

22               (Recess taken from 2:21 until 2:24 p.m.)

23    BY MS. WALLET:

24        Q.     After you met with Judge Sheely and he said he

25    would take care of it, did you think that this matter was

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              161

1   over?

2       A.      No.

3       Q.      What did you think would happen after that?

4       A.      I didn't know what was going to happen.

5       Q.      When was the first time after you had the meeting

6   with Judge Sheely that someone spoke to you about

7   Ms. Varner's complaints?

8       A.      The first time that somebody spoke to me about

9   Ms. Varner's complaint after talking with Judge Sheely, I

10  don't know.  I don't know if anybody spoke to me about it.

11      Q.      Do you know whether someone spoke to you before

12  you learned that you had been named as a defendant in the

13  federal court suit?

14      A.      I think the formal notice that I received was

15  from your office asking me to acknowledge your federal

16  lawsuit, and I didn't ever send you an acknowledgment of your

17  notice because I didn't want to --

18      Q.      Okay.  So you think between the time you met with

19  Judge Sheely and when you received the federal Complaint, no

20  one spoke to you about Ms. Varner's allegations?

21      A.      No.

22      Q.      No, you don't think so?  Or no, no one did?

23      A.      No, no one spoke to me about anything further.

24      Q.      Were you angry at being sent to the prison?

25      A.      No.  Furious.

```
 1      Q.      And what, if anything, did you do to express your

 2   anger and furiousness?

 3      A.      There was nothing I could do.

 4      Q.      Did you complain to anyone in the supervisory

 5   chain?

 6      A.      No.  It was a decision by Judge Hoffer.

 7      Q.      Did you express displeasure to Judge Hoffer at

 8   his action?

 9      A.      The day that he -- it was a Monday.  It was

10   more -- he called me into his office said that I'm

11   transferring you to the Adult Probation office.  I was there

12   less than three minutes.  I implored him to let me speak and

13   to the events that have happened over the last couple years,

14   and I asked him not to put me in Adult Probation and put me

15   down in -- he said, you're going down, you're going to be

16   transferred to the Adult Probation office, go clean out your

17   desk, take the rest of the day off and report to John Roller

18   the next day.

19          I said, would you please let me explain the

20   circumstances around the last year and a half, and he said

21   no.  And he said -- I said, can you give me a reason why I'm

22   being transferred, and he said, I've lost confidence in you.

23              Prior to that week --

24              MR. MacMAIN:  Gary, just answer her question.  If

25   she wants more, she'll ask you for more.
```

1    BY MS. WALLET:

2        Q.    Do you remember anything else about what you said

3    or what Judge Hoffer said at that time?

4        A.    I just remember -- I didn't make any comments but

5    I remember feeling that he treated me like a dog, where I had

6    to sit in front of him and I couldn't speak and I couldn't

7    give an explanation as to my frustration in defending these

8    accusations.

9        Q.    Did he tell you at that time that your transfer

10   to Adult Probation had anything to do with the allegations

11   that were made by Ms. Varner?

12       A.    No.

13       Q.    Did you believe that they were related to the

14   allegations that Ms. Varner made?

15       A.    Did I believe?  Sure, I believed that.

16       Q.    Why did you believe that?

17       A.    I didn't know what other reason he would transfer

18   me.

19       Q.    Did you tell anybody that day that you had been

20   transferred?

21       A.    I think so.

22       Q.    Who did you tell?

23       A.    I walked in the Probation office.  Denny Drachbar

24   caught me at the first counter and was giving me a raft of

25   baloney over being upstairs talking to Hoffer about, you

1   know, why are we having staff meetings now again.  And I just

2   said, well, you won't have to worry about that, you won't

3   have to be bugging me about it because I've been sent to the

4   prison or, yeah, sent to the prison.

5        Q.    Did you tell anybody else?

6        A.    I think I told Joe.

7        Q.    What did you tell Joe?

8        A.    I think Tom Boyer was in his office.  I said,

9   I've just been terminated and I've been terminated from my

10  position and I'm to report to John Roller tomorrow morning.

11       Q.    Did you use the F word?

12       A.    I don't think so.

13       Q.    Anybody else at that little gathering use the F

14  word?

15            MR. MacMAIN:  Objection as to form, that little

16  gathering.

17  BY MS. WALLET:

18       Q.    Just my reference to Joe and Tom Boyer.

19       A.    Joe and Boyer being in Joe's office.

20       Q.    Yes.

21       A.    No, I didn't use the F word.

22       Q.    My question was:  Did anyone else use the F word?

23       A.    No.  No, they didn't.  They were as shocked as I

24  was.

25       Q.    Were you angry at that time?

S. Gareth Graham                          165

1       A.      I was numb at that time.

2       Q.      Did you tell anybody at that time or shortly

3    thereafter that there would be punishment for those who sided

4    with Ms. Varner?

5       A.      No.  That's not true.

6       Q.      You never said that?

7       A.      I never said that.

8       Q.      Never said something like:  I'll get even?

9       A.      I said, this isn't right.  I said, I worked 22

10   years advancing good will in this office, to be dismissed in

11   three minutes with not even being able to utter a word, yes,

12   I was angry.

13              I had just gone through my mother's death on

14   January 4th, and less than 40 days later he was taking my job

15   away.  So I was pretty emotionally numb to this.

16      Q.      Have you threatened anyone who may be a witness

17   in this case?

18      A.      Not at all.

19      Q.      Did you call any other individual within the

20   Probation Department disloyal to you?

21      A.      No.

22      Q.      Have you talked to any potential witnesses in

23   this case about this case?

24      A.      No one will talk to me, ma'am.

25      Q.      You haven't talked to Hank Thielemann?

1       A.      No.

2       Q.      You haven't talked to Hank Thielemann about the

3   Penn State conference?

4       A.      No.

5       Q.      Have you talked to Tom Boyer?

6       A.      No.

7       Q.      Have you had Mr. Osenkarski talk to these people

8   on your behalf?

9       A.      No.

10      Q.      Have you asked anybody that you think might be a

11  witness in this case what they are going to say about the

12  circumstances of the case?

13      A.      No.

14      Q.      You haven't talked to anybody at the Probation

15  office about this case?

16      A.      I said I was falsely accused.

17      Q.      Who did you tell that to?

18      A.      Probably a number of people.  John Roller.  Lyle

19  Herr.  Mike Varner.  Heime Rivera.  Charles McKenrick.

20      Q.      Is there a difference in the weapons policy

21  between Juvenile Probation and Adult Probation?

22      A.      Yes, there is.

23      Q.      What is the difference?

24      A.      I think Adult officers are allowed to carry a

25  firearm if they complete firearm training that the state

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           167


 1   provides.

 2      Q.     Do you have any interest in doing that?

 3      A.     Not at all.

 4      Q.     Did anyone tell you that you would not be

 5   permitted to carry a firearm as part of your duties and

 6   responsibilities in Adult Probation?

 7      A.     No, not at all.  In fact, Mike Varner had given

 8   me an application saying that if I had any interest, you

 9   know, I could sign up for being equipped with a weapon and

10   training.

11      Q.     Let's talk about the Atlantic City trip.

12      A.     Okay.

13      Q.     Was this trip, in your opinion, planned with

14   Ms. Varner in advance of the day of the trip?

15      A.     Yes, it was.

16      Q.     Tell me how it was planned.

17      A.     We had talked about having, like, a day that we

18   could escape when her husband was away.  She testified that

19   he wasn't -- he was home when she went on that trip.  He

20   wasn't, he was away, is what she told me, so -- and I suspect

21   that you can get his travel record to find that he was away

22   on this date.

23             What do you want know about it?  I bought the

24   tickets at the Personal Tees booth in the MJ Mall.

25      Q.     Did you buy one or two tickets?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              168

1      A.      Two tickets.

2      Q.      Charge them or pay cash?

3      A.      Cash.

4      Q.      Did you buy a ticket specifically for Barbara

5  Varner?

6      A.      Yes, I did.

7      Q.      What was the plan?

8      A.      The plan was to go down, my -- under the guise of

9  me going to see my sister, and her going because her husband

10  was out of town for that day.

11      Q.      Why did you get on at separate stops?

12      A.      Because there was a Carlisle stop, a Camp Hill

13  stop, and a Harrisburg stop.  We both drove down.  I drove to

14  Camp Hill so that my car would not be, you know, in Carlisle.

15  And I -- we both got on at the Bon-Ton beside the Capital

16  City Mall, the parking lot behind Burger King.  I don't know

17  what the address is there, but that was the bus pickup.  And

18  we both --

19      Q.      So your testimony is you got on at the same stop?

20      A.      Absolutely.

21      Q.      And you got on at the Bon-Ton stop?

22      A.      Yes, I did.  We both parked our cars there.

23      Q.      And when you got onto the bus, did you

24  immediately sit together?

25      A.      Yes, we did.

1      Q.      Where did you sit on the bus?

2      A.      Back of the bus.

3      Q.      Very back?

4      A.      I think we moved back there.  But we sat in near

5      the back, within three seats of the back of the bus.  Yes.

6      Q.      Anybody on the bus that you knew?

7      A.      Not at the time we got on it, but when the bus

8      stopped in Harrisburg, Barb jumped up and said, oh, my God,

9      there's Carol Shearer, or Carol Snoke.  And it was a

10     secretary that she had worked with at Children and Youth.

11     And her husband-to-be, Wayne Shearer.

12     Q.      Okay.  Did she move her seat?

13     A.      She jumped up and we separated seats and we

14     pretended that we were just on the bus separately.

15     Q.      And then eventually did you sit together?

16     A.      Yeah.  We sat together going down.  I think the

17     bus was full, so I think -- and then we sat together going

18     down and we sat together coming home.

19     Q.      Did you know anybody else on the bus?

20     A.      No, ma'am.

21             MR. MacMAIN:  You mean other than the people he's

22     mentioned?

23             MS. WALLET:  The people that were identified.

24     Anyone else meant somebody in addition.

25     BY MS. WALLET:

S. Gareth Graham                           170

1      Q.      Okay.  What did you do when you got to Atlantic

2   City?

3      A.      Went to -- we didn't get off at different stops.

4   I think she testified yesterday we got off at different

5   stops.  I don't even remember the bus having a different

6   stop.

7              She is correct with the, I think we got $15 in

8   coin to spend.  And Ms. Varner's testimony is correct that I

9   called my sister.

10             I then purchased a room with cash funds at the

11  Bally's resort, and it's now the Hilton.  They've changed

12  names from when I registered for the room.  We went to --

13     Q.      Did you register in your own name?

14     A.      You know, it's interesting.  I don't know.  I

15  might have used Stewart.  I might have used Stewart Graham,

16  or just a single initial.  I paid cash, though.

17             And we went to a room on the fifth floor

18  overlooking the air conditioners.  We engaged in oral and

19  vaginal sex there for the afternoon.  We got a shower

20  together, a bath together.  We went down and ate at the

21  buffet restaurant.  I don't think we set foot on the beach

22  that whole day.  So that directly conflicts with what she

23  testified to.

24     Q.      Okay.  Did you do anything else that day that you

25  remember?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                               171


 1      A.      No.  We just went, spent the day in the room.  I

 2  remember talking about, I don't know how this happened, but

 3  we -- she was talking about her dad, I think, and my dad, and

 4  we got to talking about, like, war stories, or World War II

 5  or something.  I mean, we got to talking about something like

 6  that, of all things, when we were intimate together and

 7  spending time, we were talking about that.

 8              MR. THOMAS:  Someone's ringing.

 9              (Discussion held off the record.)

10  BY MS. WALLET:

11      Q.      I don't remember whether we were in mid question

12  or mid answer.

13              MR. MacMAIN:  You had answered.

14              MR. THOMAS:  We were mid answer.

15              THE WITNESS:  So we had spent the afternoon -- we

16  got there at 11 o'clock and we left there around five

17  o'clock.  We had sex in the room after I registered.  And

18  then we went down to the buffet and ate.

19  BY MS. WALLET:

20      Q.      Okay.  Why didn't you just drive to Atlantic

21  City?

22      A.      Probably because I would have to give my wife an

23  explanation why I was going there.

24      Q.      What explanation did you give your wife for going

25  on the bus?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    172


    1        A.    I said I was just going to go down for the day.

    2        Q.    When you paid cash for this room, do you remember

    3   how much it cost?

    4        A.    50-some dollars.  It was a -- yes, it was a

    5   midweek type of deal, I think.

    6        Q.    How did you explain these cash expenditures to

    7   your wife?

    8        A.    I didn't.

    9        Q.    Did you do anything else in Atlantic City

   10   together?

   11              MR. MacMAIN:  Other than what you've already told

   12   her.

   13              THE WITNESS:  Nothing.

   14   BY MS. WALLET:

   15        Q.    How many times have you had dinner with

   16   Ms. Varner at the Deer Lodge?

   17        A.    On a couple occasions, maybe two.

   18        Q.    Alone?

   19        A.    Three.  Yes.

   20        Q.    Just the two of you?

   21        A.    Yes.

   22        Q.    And do you remember any work-related reason for

   23   why you may have stopped at the Deer Lodge?

   24        A.    Well, we wanted to get a good place to eat at the

   25   end of an institutional trip, so we would come back the whole

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                            173

1   way to Carlisle to eat at a good place.

2       Q.      And who suggested the Deer Lodge?

3       A.      Well, she had been there with her husband, she

4   had, you know, on a weekend.  And then I think they had just

5   opened a new deck.  And she and her husband were up, and we,

6   me and my wife were out there.  My wife and I were out there

7   one night.  And we made introductions.

8       Q.      Do you agree that you went to the Deer Lodge on a

9   day that you had been on a business trip?

10      A.      I think so, yeah.

11      Q.      Both times?

12      A.      Probably.

13      Q.      Did you consider these dates?

14      A.      Oh, no.  No.  That was -- it was a county policy

15  that allowed if you were outside the area after the dinner

16  hour you were allowed to put reimbursement in for a meal,

17  which generally meant around five o'clock or something, if

18  you were outside of town and weren't home after a business

19  trip.

20      Q.      So if you came home from a business trip and you

21  went right to your car and went home, you didn't get a meal

22  allowance, correct?

23      A.      They gave you a meal allowance if -- yes, because

24  you could take a meal home with you.  If you chose at that,

25  at the end of that trip not to go somewhere, you could do

1    what Ms. Varner did and Ms. Green did, went to a restaurant,

2    buy a meal, take it home and end your day earlier than you

3    would just eat, you know, the last hour on the county

4    overtime.

5        Q.      Could you get paid for the hour of your meal if

6    you took a meal at the end of your trip?

7        A.      Yes, you do.

8        Q.      That was the whole reason to do it, right?  The

9    county paid the meal and you got an extra hour of wage?

10       A.      You'd have to ask Joe or Ken Bolze on that, on

11   reimbursement.  I don't know if they took away from your

12   overtime or just paid your regular pay at that time.  I

13   don't -- they might have only paid you regular pay for that

14   hour instead of overtime pay.  I'm not sure.

15       Q.      Well, was there an advantage to eating and

16   getting a receipt for food at the end of a business trip at

17   the end of the business day?

18       A.      Sure.

19       Q.      What was the advantage?

20       A.      The advantage is to get reimbursed for the meal

21   you ate.

22       Q.      Anything else?

23       A.      And probably add that to the amount of total time

24   that you spent delivering the juvenile.

25       Q.      Okay.  How many times did you meet Barbara Varner

1    for what you considered to be a date at the Silver Springs

2    flea market?

3         A.      Multiple Sunday mornings.  And as far as number,

4    probably during the whole summer season, you know, seasons,

5    you know, she said --

6         Q.      Every Sunday?

7         A.      A good bit of Sundays.  Not every Sunday.

8    Every -- three Sundays out of a month, maybe.  Sometimes two

9    Sundays out of a month.

10        Q.      Okay.  Always on Sunday?

11        A.      Yes.  Sunday morning.

12        Q.      And what did you tell your wife about where you

13   went on Sunday morning?

14        A.      I still go to the flea market on Sunday mornings,

15   and I still do that.  So I just told her I was going to the

16   flea market.

17        Q.      Did she ever ask to come with you?

18        A.      She -- no.  She doesn't care to do that.

19        Q.      Did you go to the flea market before you began to

20   meet Ms. Varner?

21        A.      Yes.

22        Q.      So this was a rather regular routine for you; you

23   liked to go to the Silver Springs flea market and you've done

24   that for many years?

25        A.      I've done it for a number of years.  Probably

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          176

1    what, I was -- most of my motivation at that juncture was to

2    go and meet with her, because that provided a facility and a

3    time frame that we could meet.

4         Q.    Did you have sex during or after any of those

5    flea market meetings?

6         A.    Yes, we did.

7         Q.    Where would you have sex?

8         A.    Up on the top of, I think it was on McClure's

9    Gap, but it was out in back of on 944 on back of Visaggio's

10   there's a road that goes up over the top of the mountain.  I

11   can't think of what gap it's called.  There's a number of

12   different gaps there.  We'd drive my vehicle up to the top of

13   the mountain and have sex in my car.

14        Q.    So she would come in her vehicle, you would come

15   in your vehicle.

16        A.    Right.

17        Q.    Then what happened?

18        A.    Then we would leave, go have sex at the top of

19   the mountain.

20        Q.    And then return to the flea market?

21        A.    Yes, ma'am.

22        Q.    How long did all of this take?

23        A.    Well, we would usually be there around 7:00 and

24   we were usually home by 10:30, 11 o'clock.

25              She told me her husband, she was repulsed at her

1  husband golfing every Sunday morning, and that was I guess

2  her way of retaliating.

3      Q.     Did she ever meet any of her children --

4      A.     Sure.  I met her children there.

5      Q.     How many times did you meet her children?

6      A.     A couple times.

7      Q.     More than five?

8      A.     I advocated for her son to get hired at Schaffner

9  Youth Center.

10     Q.     That's not responsive to my question.

11     A.     Okay.  More than five.

12     Q.     Did you meet more than five?

13     A.     Probably less than five.

14     Q.     And were they occasions when you met both her son

15  and her daughter on the same day?  Or you met different

16  children on different days?

17     A.     Different children on different days.  I think

18  her daughter was in college.  She was only there, you know,

19  just if she was visiting on a weekend.  She would mostly go

20  alone.

21     Q.     Were there times when Ms. Varner would have the

22  grandchild?

23     A.     I don't think ever, that I remember.  I think the

24  grandchild was picked up after our activities had ceased and

25  she picked him up on the way home.

1      Q.      When you say after your activities had ceased,

2   meaning after 11 o'clock or 11:30?

3      A.      Yes, ma'am.

4      Q.      Not after in months of time?

5      A.      No.  After we had concluded having our sex at the

6   top of the mountain.

7      Q.      Anybody see you at the Silver Springs flea market

8   with her?

9      A.      Yes.  Becky Over.  I don't know what her married

10   name is.  She provided that yesterday.

11           Her son saw us there.  Jeanie, her son's wife,

12   saw us there.

13           Her son I think purchased some baseball gloves

14   for me.  I was hunting some extra baseball gloves and he

15   ended up, I think he got baseball gloves for me.

16      Q.      Did Ms. Over observe any activity between the two

17   of you that would suggest a romantic relationship?

18      A.      No.

19      Q.      Anybody that you know see you at the Silver

20   Springs flea market engaging in any conduct which would be

21   considered, which someone might consider to be a romantic

22   conduct?

23      A.      No.

24           MR. MacMAIN:  Objection as to what someone might

25   believe that they saw.

1    BY MS. WALLET:

2        Q.    Something like holding hands or kissing?

3        A.    No, none of that.

4        Q.    Is it your testimony, sir, you were very discreet

5    about not allowing anyone to see the two of you together?

6        A.    I don't think we were -- no, we didn't make any

7    extra steps during those flea market days to, I mean, during

8    the flea market activities to be real discreet.  We didn't

9    walk around totally together, because once we saw each other

10   and once we hooked up, then we took off and went up to the

11   top of the mountain.

12       Q.    Are you aware of any witnesses, sir, on any of

13   these occasions when you were with Ms. Varner who observed

14   conduct that would be suggestive of a romantic relationship?

15            MR. MacMAIN:  Same objection as before.  Be

16   specific.  I'm not sure what someone's --

17   BY MS. WALLET:

18       Q.    Such as kissing, holding hands, arm in arm?

19       A.    I think we were pretty discreet in most of our --

20   in concealing our infidelity.  That's how I can answer that.

21   I don't...

22       Q.    Is it your testimony that you had sex with

23   Ms. Varner at your father's store?

24       A.    No.  I was -- I'll let you ask.

25       Q.    Ms. Varner was asked about whether or not she was

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                               180

1   in your father's store.  Do you know why she was asked that

2   question?

3               MR. MacMAIN:  Objection --

4               THE WITNESS:  Yes.

5               MR. MacMAIN:  -- but you can ask him whether or

6   not she was ever at his father's store.

7               THE WITNESS:  She was at my father's store.  I

8   had been repairing an apartment above my dad's store and

9   during the early interludes that we would meet, she came up

10  there.  That was early, early in the relationship, between

11  '90 and '92, it was early, because my dad was still living

12  there.  He died in '91, so.  And she had come up to the

13  apartment while I was working on it, in the evening, and we

14  kissed and fondled one another upstairs in the apartment.

15  BY MS. WALLET:

16      Q.    And this apartment is directly upstairs from the

17  store?

18      A.    Well, my dad had a store -- we owned the entire

19  corner building.  And there was a store and then what was to

20  be a video shop beside it, and the apartment was directly

21  above it.  So, it was four units there, two storerooms

22  downstairs and two apartments upstairs.

23      Q.    Could you access the apartment from the store?

24      A.    No.

25      Q.    Were you concerned that your father would see you

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    181

1    there with another woman?

2        A.     Somebody did see us there.  The boy that ran our

3    store was name of Kenny Newell, N-E-W-E-L-L.  And Ms. Varner

4    and I were up there an extensive period of time, being it

5    possibly an hour and a half, and she was there under the

6    guise that she was looking for an apartment maybe for her

7    daughter.  And she was coming -- and her position was that if

8    somebody asked, you know.  And when we went down the back

9    steps, not the front steps but the back steps, Kenny Newell

10   was just locking the stock room and he looked up and saw us

11   coming down.

12       Q.     What did you tell Mr. Newell?

13       A.     I didn't say a thing to him.  I later said to him

14   that that was a woman looking for an apartment for her

15   daughter.

16       Q.     Okay.  Again, I ask you, you weren't concerned

17   about your father seeing you with another woman there?

18       A.     My father wasn't there at the time.

19       Q.     Is that the only occasion when Ms. Varner was in

20   the apartment above your father's store?

21       A.     Yes, ma'am.

22              MR. MacMAIN:  Debra, I would note it's just about

23   three o'clock.  I don't know if you're done this area or if

24   this is a good break point.

25              MS. WALLET:  It's fine.  We'll break so long as

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              182

1    you'll produce Mr. Graham on another occasion and allow me to

2    finish.

3               MR. MacMAIN:  Sure.  Absolutely.

4               (Whereupon, the deposition was continued sine die

5    at 3:01 p.m.)

6                          *   *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

183

1   COMMONWEALTH OF PENNSYLVANIA  )

2                               )

3   COUNTY OF DAUPHIN           )

4        I, Emily R. Clark, a Court Reporter-Notary Public

5   authorized to administer oaths and take depositions in the

6   trial of causes, and having an office in Harrisburg,

7   Pennsylvania, do hereby certify that the foregoing is the

8   testimony of S. GARETH GRAHAM taken by Plaintiff at the

9   Administrative Offices of Pennsylvania Courts, 5035 Ritter

10  Road, Mechanicsburg, Pennsylvania.

11       I further certify that before the taking of said

12  deposition the witness was duly sworn; that the questions and

13  answers were taken down in stenotype by the said

14  Reporter-Notary, approved and agreed to, and afterwards

15  reduced to computer printout under the direction of said

16  Reporter.

17           I further certify that the proceedings and

18  evidence are contained fully and accurately in the notes

19  taken by me on the within deposition, and that this copy is a

20  correct transcript of the same.

21           In testimony whereof, I have hereunto subscribed

22  my hand this 21st day of February, 2003.

23

24                        _____

25                        Notary Public