```
                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                  .
        Plaintiff,                  .   CIVIL ACTION
 vs.                                .   NO. 1:CV 01-0725
                                    .
COMMONWEALTH OF PENNSYLVANIA,       .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,            .
CUMBERLAND COUNTY; CUMBERLAND       .
COUNTY; S. GARETH GRAHAM,           .
Individually, and JOSEPH            .
OSENKARSKI, individually,           .
        Defendants.                 .
. . . . . . . . . . . . . . . . . .
                            VOLUME 2
                        Pages 184 to 334
```

Deposition of:  S. GARETH GRAHAM

Taken by     :  Plaintiff

Date         :  February 14, 2003, 9:11 a.m.

Before       :  Emily Clark, RMR, Reporter-Notary

Place        :  Administrative Offices of
                Pennsylvania Courts
                5001 Louise Drive
                Mechanicsburg, Pennsylvania

APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
             Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY: PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

APPEARANCES (continued):

    MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
    BY:  DAVID J. MacMAIN, ESQUIRE
        For - Defendant S. Gareth Graham

    SWEENEY & SHEEHAN, P.C.
    BY:  JASON G. BATES, ESQUIRE
        For - Defendant Joseph L. Osenkarski

ALSO PRESENT:

    MS. BARBARA E. VARNER

    MR. JOSEPH OSENKARSKI

I N D E X

WITNESS

| S. Gareth Graham | Examination |
|---|---|
| By Ms. Wallet | 187 |
| By Ms. Williams | 332 |

GRAHAM EXHIBITS

| No. | Description | Identified |
|---|---|---|
| 3 | 1-page photocopy of birthday card | 201 |
| 4 | 1-page memo, 6/13/97, to Varner from Osenkarski | 278 |
| 5 | 1-page memo, 4/2/97, to Sheely and Graham from Varner, annotated | 288 |
| 6 | 1-page memo, 7/17/97, to Ward and Deluce from Sheely | 330 |

\*   \*   \*   \*   \*

S. Gareth Graham                    187

1        S. GARETH GRAHAM, recalled as a witness, previously

2    being duly sworn, testified further, as follows:

3    BY MS. WALLET:

4        Q.    Good morning, Mr. Graham.

5        A.    Good morning.

6        Q.    May I remind you that are still under oath.   Do

7    you understand that that oath requires you to testify to the

8    truth today?

9        A.    Sure.

10        Q.    Is there any reason today why you could not

11    answer my questions completely and truthfully?

12        A.    No.

13        Q.    And if at any time you have not heard my

14    question, I will expect that you will ask me to repeat it,

15    and that if you answer a question, you have both heard it and

16    understood it.   Is that agreed?

17        A.    Understood.

18        Q.    You heard a lot of testimony at the last day of

19    depositions about the seniority issue.   Did you have an

20    opinion with regard to how seniority should be credited for

21    probation officers?

22        A.    I had no opinion.

23              Seniority was an issue in our office that was

24    debated for probably 11 years, the entire time Ken Bolze was

25    the chief of the Probation office.   There was numerous

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                          188

1    memorandums.  I think there's possibly a real thick file that

2    was attributed to different people making different

3    suggestions to Mr. Bolze over the years.  I think there was a

4    number of people that contributed trying to be in a position

5    to identify what seniority we should go with and how that

6    should be established.  And I'm positive that Dirk Madison

7    wrote a memorandum to Ken Bolze about the seniority issue.

8    I'm sure that Tom Boyer wrote a memo about the seniority

9    issue.  And it was just something that was never quite

10   resolved in the entire time that I was in Probation.

11           So as far as my opinion of it, it didn't really

12   matter, because Mr. Bolze controlled most of the seniority

13   and it was his decision on how he was going to apply

14   seniority in our office, and he did it unfairly and unjustly.

15       Q.    And why do you say that?

16       A.    Because he counted time for part-time service.

17   And nowhere in the county manual or nowhere in the county

18   history was anybody else being attributed part-time service.

19   So he -- and other men in the office such as Tom Boyer felt

20   that was discriminatory towards him especially, and that's

21   why everybody was invited into this issue and out of this

22   issue and around this issue for almost 11 years.

23       Q.    Now, you had prior county time outside the

24   Probation office, correct?

25       A.    Yes, ma'am.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          189

1      Q.      And under the Bolze policy which counted the

2   county time, you benefitted from that policy, correct?

3      A.      In what regard did I benefit?

4      Q.      Well, you were granted more seniority because

5   your time outside the Probation office was counted towards

6   seniority.

7      A.      No, ma'am.  I was granted county seniority

8   because the county seniority policy was continuous service,

9   years of continuous service.  That didn't, that wasn't

10  necessarily the case with Probation seniority.  Mr. Bolze

11  dated that I understand Probation seniority sometime from the

12  point where you came into the office for office, some

13  office-related matters.

14          So your questions I think the other day were

15  attributed to Mr. Osenkarski about how was this certain

16  policy, and that was the October factor that was used in

17  promotions, and that's just not true, because there was a man

18  promoted years ago named John Roller who sits in the Adult

19  chief that was promoted over a man named Bob Houser.  And my

20  recollection of that was the fact that I think maybe

21  Mr. Houser had more seniority than Mr. Roller.  So that

22  wasn't the only situation.

23          And then there was a situation I think on the

24  Adult side that transpired where Lyle Herr was, who sits as

25  the Adult supervisor, was promoted over a man by the name of

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          190


1    Charles McKenrick, who had more Probation seniority.  And

2    this is, this was a very hot potato as far as how they count

3    seniority, because Mr. McKenrick had been over in Perry

4    County working as a probation officer in Perry County for a

5    number of years, and he was disappointed that here we were

6    counting, according to Mr. Bolze, in some regards all county

7    probation.  That meant if you worked in Children and Youth,

8    that meant if you worked as a maintenance man, that meant if

9    you worked as a, in any capacity in any county position, you

10   would be in a position to have continuous county service.

11   And I think what we tried to do when we split the staffs is

12   to try to make a decision on how we were going to look at

13   different individuals in the Probation office so that we

14   would have an element of fairness.

15        Q.    Now, you said you had no opinion with regard to

16   this issue.  Is that correct?

17        A.    I wasn't involved in the mechanics of realigning

18   this seniority issue.  I was consumed in other office

19   affairs.

20        Q.    Did you ever express your opinion on the

21   seniority issue?

22        A.    It didn't matter if you expressed your issue.

23   With Mr. Bolze, he made up his mind on how he was going to

24   apply seniority, and sometimes it would be one way, and

25   sometimes it would be some other way.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              191

1      Q.     So your position was that Bolze was not

2  consistent on his policy?

3      A.     He was never consistent, you're absolutely right.

4  I don't see him being consistent in any of that, because, you

5  know, there was so much issues where McKenrick had gone to

6  him and said here you're going to count county seniority and

7  they might have worked in a completely different office with

8  different responsibilities.  We had that.  We had Lyle Herr

9  coming from the Sheriff's Department, we had Mike Piper

10  coming from the Sheriff's Department.  But here we had a man

11  that had probation experience in the same venue of what we,

12  how we operate in Probation, and he was just ignored because

13  he came from another county.  So it didn't make any sense to

14  be in a position to try to align Probation seniority without

15  looking at relative probation experience.  And that's exactly

16  what we tried to do.

17      Q.     Now, you had time in the Recorder of Deeds

18  office, correct?

19      A.     Yes, ma'am.

20      Q.     Did you have time in any other county offices

21  prior to assuming your probation work?

22      A.     No, ma'am.

23      Q.     But you got credit for your Recorder of Deeds

24  time, did you not?

25      A.     It's interesting, if you look at the documents

1   that supposedly are in this seniority issue, my seniority was

2   dating back from my date of hire in the Probation office,

3   which was sometime in 19 -- September 1977.

4        Q.    So you're saying your understanding is you got no

5   credit for your time in the Recorder of Deeds office?

6        A.    I got county seniority, ma'am.  I got county

7   seniority from the time that I started with the county in

8   July 26th of 1976.  And I worked a little over a year in the

9   Recorder of Deeds office, and then had applied to Probation,

10  took a pay cut, took a pay cut and went into the field of my

11  endeavors with my college and everything else.

12       Q.    And when you were promoted from a PO-I to a PO-II

13  in 1985, your time with the Recorder of Deeds was counted,

14  wasn't that correct?

15       A.    You would have to ask Mr. Bolze that question.

16       Q.    You don't know?

17       A.    I don't know in -- no, I don't know.

18       Q.    Are you aware of any other individuals in the

19  Juvenile Probation office that county time, counting it or

20  not counting it, applies to, other than Barbara Varner?

21       A.    I don't understand your question, ma'am.

22       Q.    Are you aware of anyone else in the Juvenile

23  Probation Department for whom there is a significance with

24  regard to counting prior non-Probation office time?

25            MR. MacMAIN:  Objection to form.  I'm not sure I

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          193

1   understand your question.

2   BY MS. WALLET:

3        Q.    Well, do you agree, sir, the issue is do you

4   count only time beginning when you started in the Probation

5   office or do you count time when you began with the county

6   outside the Probation office?

7             MR. MacMAIN:  At what time?  What time period are

8   we talking?

9   BY MS. WALLET:

10       Q.    The controversy over 11 years.  Wasn't that part

11  of the controversy?

12       A.    That was some of the controversy, right.

13       Q.    And some of the other controversy was part-time

14  versus full-time?

15       A.    Yes.  And credit for other out-of-county service

16  was another issue, whether Mr. McKenrick should be punished

17  for not being in a position of having any credit towards his

18  probation experience in Perry County.  So there was --

19       Q.    Okay.  Anything else?

20       A.    No.

21       Q.    Those were the three issues?

22       A.    That I'm aware of.

23       Q.    I'm asking you about only one of those issues,

24  that's the issue of whether or not you count prior time with

25  the county before you joined the Probation office.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    194

1    A.    You're asking me to define something that I don't

2    know how Mr. Bolze applied this.  That's what you're asking

3    me to define.  I don't know how he applied what he used as

4    opposed to seniority or when he started or when he stopped.

5    It was never clear, ma'am.  There was never that I understand

6    a written policy.  I've seen the documents that you've

7    provided, but I never knew the issue to be resolved.

8    Q.    Okay.  Now, at some time after the split it was

9    resolved, correct?

10    A.    We made an attempt in Probation, Juvenile

11    Probation, to resolve it.  But the interesting paradox to

12    this is I don't even know where the seniority list, since

13    I've been relegated to the prison for the last five years, I

14    don't even know where I stand on the seniority list in the

15    Adult Probation office.  I don't think there's one of those

16    that exists, either, after five years of this controversy.

17    So there is no Adult, that I know of or am aware of where I

18    stand on my seniority in the Adult Probation office.

19    Q.    Let's talk about the period between the time of

20    the split and the time that you were demoted to the prison.

21    Okay?  Are we clear on the time frame?

22    A.    The time of the split up until where I'm working

23    now.

24    Q.    Correct.  Are you clear on what time I'm speaking

25    about?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          195

1      A.    Yes, ma'am.

2      Q.    All right.  During that period of time, there was

3   a change in the prior policy; no matter what Mr. Bolze's

4   policy was, it was changed.  Correct?

5            MR. MacMAIN:  If you can answer it.  If you're in

6   a position to know what the policy was, you can answer it.

7   If you don't, then you can't.

8            THE WITNESS:  There was a proposal made to try to

9   identify and rectify the seniority issue in the Probation

10  office at the time of the split by the Juvenile Probation

11  Department.  The Adult side did not clarify the issue, did

12  not approach the issue, and did not by default make a

13  position on seniority.

14           They have also been in a position to try to

15  identify where a seniority list lies, because they have an

16  obligation by receiving state and federal reimbursement,

17  there are certain regulations and one of the regulations is

18  that they have a posted seniority list.

19           MR. MacMAIN:  Gary.

20           THE WITNESS:  And the Adult side has no posted

21  seniority list to identify the seniority issue.

22  BY MS. WALLET:

23     Q.    Did you ever ask for one?

24     A.    No.

25     Q.    Talking about the time between the split and when

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                         196

1    you left for the prison.  Did you play any role in that

2    proposal to change the existing seniority policy?

3         A.      Mr. Osenkarski delegated that issue of seniority

4    to Mr. Boyer.  And did I play any role in that?  Not until

5    the document was proposed, and I don't know when it was

6    adopted, because that's when this other controversy came up.

7         Q.      Did anybody ask you your opinion with regard to

8    the proposed change?

9         A.      My opinion was that we needed to clarify the

10   seniority issue once and for all and that we should probably

11   be in a position to identify relevant probation experience.

12        Q.      Did anyone come to you, sir, and ask you your

13   opinion on the seniority issue?

14        A.      I think Mr. Boyer asked my opinion.

15        Q.      And what did you respond?

16        A.      And I said that the seniority regarding the

17   Probation office should date from the time someone comes in

18   and starts full-time service in the Probation, in the

19   Cumberland County Probation office.  I wasn't interested in

20   giving total credit for out-of-county service because that

21   didn't seem to be fair for the people that chose to work in

22   Cumberland County and commit to the cause and, you know, and

23   commit to the organization.  So you couldn't be in a position

24   to give credit for, you know, out-of-county when even though

25   it was relevant experience.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                        197


1        Q.     Okay.  What was your position on full-time versus

2    part-time?

3        A.     I have very, very strong opinions against

4    part-time work, and that's due to a lot of the shenanigans

5    that have transpired in the county courthouse about who's on

6    part-time and who's not on part-time, who's working full-time

7    jobs and/or and actually being in the office.  I have very

8    strong opinions against part-time credit being given.

9        Q.     Okay.  And what shenanigans are you referring to,

10   sir?

11       A.     Just other issues where there's other employment

12   throughout the county where people have been given credit for

13   working full-time and maybe pursuing their law degree during

14   the day at the local law school at Dickinson.

15       Q.     Specifically what people?

16       A.     I don't know if I want to mention that today.

17       Q.     Why not?

18       A.     Well, I don't know if I would be in a position to

19   be sued if I would relate that information.

20       Q.     Which people?

21              MR. MacMAIN:  I'm going to object.  Does this

22   have any relevance to the issue, the probation seniority

23   issue?

24              MS. WALLET:  I don't know.

25              MR. MacMAIN:  I'll ask this.  Is there anybody in

```
 1   the Probation Department that would be responsive to the

 2   question?  Or is it other departments besides Probation?

 3            THE WITNESS:  It has nothing to do with the

 4   Probation Department.

 5   BY MS. WALLET:

 6       Q.    So these shenanigans that you identified are

 7   something outside the Probation office?

 8       A.    Absolutely.

 9       Q.    What offices are they in?

10       A.    Mostly out of the commissioners' office.

11       Q.    Did you prepare any writings with regard to the

12   seniority issue?

13       A.    Absolutely not.

14       Q.    Now, at the time of the split you were already a

15   senior probation officer II, correct?

16       A.    No.

17       Q.    At the time of the split you were only a PO-I?

18       A.    No.

19       Q.    What was your position at the time of the split?

20       A.    I was a PO-II.

21       Q.    But not senior PO-II?

22       A.    No.

23       Q.    When were you made senior PO-II?

24       A.    The confusing part of this, Ms. Wallet, is the

25   senior PO position is a position underneath the PO-II
```

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                        199

1    position.

2         Q.    Okay.

3         A.    So I'll just try to clarify that for you.

4         Q.    So at the split you were a supervisor?

5         A.    No.  I was a PO-II.

6         Q.    But you acted as a supervisor?

7         A.       No.  I had a regular caseload, and the only time

8    I was in a supervisory capacity is when I was delegated to

9    be.  I had no administrative position, nor did David Meyers

10   have any administrative positions to handle under that

11   position.

12        Q.    Well, now I am confused, sir.  At the time of the

13   split did you have probation officers reporting to you?

14        A.    At the time of the split I became -- I'm sorry.

15   I became a supervisor.

16        Q.    Okay.  And you had probation officers reporting

17   to you, did you not?

18        A.    Yes.

19        Q.    And who were those individuals?

20        A.    Whoever was in the office at that time.

21        Q.    All of them?

22        A.    Yes.

23        Q.    Did you do their performance evaluations?

24        A.    You know, I don't think I did.  I contributed to

25   the performance evaluation but I think Mr. Osenkarski did the

1    performance evaluation, as I recall.  Because I was just

2    newly assigned and didn't have any experience with that.  So

3    I talked to him about case assignments, I talked to him about

4    other things that he asked me to contribute to in regard to

5    the performance of people, yes.  Did I actually do it?  I

6    think we co-did it, or we --

7         Q.    Were you paid more for your supervisory duties?

8         A.    Yes, ma'am.

9         Q.    And what supervisory duties did you perform that

10   warranted your being paid more?

11        A.    I was in charge of basically case management in

12   the Probation Department.

13        Q.    And what did that mean?

14        A.    That meant from the time cases were referred they

15   were sent to my office to distribute to the rest of the staff

16   on assignment.

17        Q.    And Mr. Osenkarski gave you that position,

18   correct?

19        A.    No.  Judge Sheely gave me that position.

20        Q.    Do you know whether Mr. Osenkarski made a

21   recommendation that you be placed in this position?

22        A.    I think he and Mr. Bolze and Mr. Roller presented

23   that as an option to the Court on how to divide the staffs

24   and who would be moving to the responsible positions.

25             MS. WALLET:  I'd like to show you what we'll mark

S. Gareth Graham                        201


 1    as Deposition Exhibit 3.

 2              (Graham Deposition Exhibit No. 3 was marked.)

 3    BY MS. WALLET:

 4         Q.    Do you have what we've marked as Deposition 3?

 5         A.    Yes.

 6         Q.    Do you recognize that, sir?

 7         A.    Faintly.  I recognize my name on the bottom of

 8    it.

 9         Q.    Is that your signature on Deposition 3?

10         A.    It's my name.

11         Q.    Well, is it your signature?

12         A.    I think it is.

13         Q.    Why aren't you sure?

14         A.    I don't remember the card specifically.

15         Q.    Well, do you know whether you gave this card to

16    Barbara Varner?

17         A.    I would imagine I did.  I don't totally remember

18    the card.

19         Q.    Do you remember purchasing this card?

20         A.    Not really.

21         Q.    Well, do you remember your testimony that you

22    made some efforts to try to find when this card was

23    manufactured?

24         A.    Absolutely.

25         Q.    Why did you do that?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                202


 1      A.      Because the county, when they called me in on

 2   April 29th, questioned me about a card.  And I asked

 3   Mr. Deluce, I said, well, I don't remember any card.  I said,

 4   I don't think I gave her any card.  I said, I want to see a

 5   copy of the card, I said, because I couldn't remember it.

 6   And he never provided the card.

 7              And just recently did I ever see the card.  I

 8   mean, just within the past probably four months is the first

 9   time the card was ever produced for me to visualize and

10   identify.

11      Q.      And when did you see this card in the last four

12   months?

13      A.      I don't know.  It was part of a --

14              MR. MacMAIN:  I'll represent it was part of

15   obviously the litigation process.

16   BY MS. WALLET:

17      Q.      Did your lawyer give you this card?

18      A.      Yes.

19      Q.      Now, having looked at this card within the last

20   four months and today, do you remember anything about this

21   card?

22      A.      I remember -- I remember that that's my signature

23   and I remember that I probably gave her that card at some

24   juncture.

25      Q.      Do you remember whether you gave it to her on her

S. Gareth Graham                                    203


1    actual birthday?

2        A.    Well, I know her birthday to be January 18th, so

3    I probably would have given it to her on her birthday.

4        Q.    Did you give it to her personally or did you mail

5    her the card?

6        A.    Personally.

7        Q.    Did she open it in your presence?

8        A.    I don't remember that.  Probably.  I wouldn't

9    have sent it to her.

10       Q.    Why did you give her this card?

11       A.    Because we were involved in a relationship since

12   1990 to 1996.

13       Q.    And do you believe you gave this to her sometime

14   close in 1990 or sometime closer to 1996?

15       A.    That's what I've recalled since I've seen the

16   card, and I recall that once I saw the card, that it, when

17   the county was questioning me whether I gave her a birthday

18   card in 1996, my answer was no, I didn't.  And that card was

19   not given to her in 1996.

20       Q.    Okay.  So we know it wasn't 1996.

21       A.    Do I know when it was?  It could have been

22   anywhere during the period of 1990 to probably in the

23   beginning of our relationship.

24       Q.    Okay.

25       A.    So I would say probably the first three or four

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                204

1  years of the affair.

2       Q.    Okay.  Did you ever give her any other cards for

3  her birthday?

4       A.    I don't think so.

5       Q.    Why not?

6       A.    Why not?

7       Q.    Why not?

8       A.    Probably I was too cheap.

9       Q.    Did you give her any Valentine?

10      A.    No.  But I kind of recall our first relationship

11 was on Valentine's Day, first time we had intercourse.

12      Q.    Did you give her any gifts other than cards?

13      A.    I had bought some small gifts.  Do I have any

14 receipts?  No.  I mean, I think I got her a couple bracelets

15 from Boscov's.

16      Q.    How many bracelets?

17      A.    I don't know.  I wouldn't know.

18      Q.    Were these on the occasion of some event?

19      A.    Just different type of interactions that we had

20 over the years.  You know, when it would become more positive

21 and more intimate, maybe something like that was done other

22 than going out to eat with her.

23      Q.    Okay.  Other than these more than one bracelet do

24 you remember any other gifts you gave her?

25      A.    No.

S. Gareth Graham                                    205


1          Q.     Did you give her any other gifts?

2          A.     I just answered that.

3          Q.     Well, I guess it's a different question.  Did you

4    give her any gifts, you think but you can't remember what,

5    or --

6          A.     No, I didn't say that.

7          Q.     Okay.  Let me ask the question.  Did you give her

8    any other gifts besides the bracelets that you just

9    mentioned?

10             MR. MacMAIN:  That he can recall.

11             THE WITNESS:  I said I couldn't recall anything

12   else.

13   BY MS. WALLET:

14         Q.     Did you mark any of your anniversaries of

15   beginning your relationship with her?

16         A.     No.

17         Q.     Did you ever tell her that you loved her?

18         A.     No.

19         Q.     Did you love her?

20         A.     No.

21         Q.     Did you ever give her any notes that were of a

22   personal nature?

23         A.     Don't know.  I don't remember any but I won't

24   say, I won't deny I wrote her a note here and there.  In what

25   regard?  Kind of note?  I mean, it might have been do you

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    206


1    want to meet somewhere, or you want to -- I mean, I don't

2    know what type of note you're talking about.

3        Q.    Any kind of note.

4        A.    Any intimate note, I don't remember ever giving

5    her any intimacy note in any regard.

6        Q.    Okay.  But you might have given her some piece of

7    paper that indicated where and when to meet?

8        A.    Something to that nature.  I'm not admitting

9    that.  I'm saying something like that could have happened, I

10   could have scribbled a note to her.  We met clandestinely,

11   you know, at a lot of different locations.  So could I have

12   scribbled a note and gave it to her?  I might have.  I don't

13   remember, though.

14       Q.    Do you remember what you wrote on the envelope

15   for this particular card marked Deposition 3?

16       A.    No, ma'am.

17       Q.    What did you call her?

18       A.    Barb.

19       Q.    Did you have any other pet names for her?

20       A.    No, ma'am.

21       Q.    Nothing like sweetheart, honey, any of those?

22       A.    No.

23       Q.    Now, there was Barb 1 and Barb 2.  Which was your

24   wife and which was Ms. Varner?

25       A.    That was a rumor that was circulated in the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                207


1    office.  I had nothing to do with any of that, and you'll

2    have to ask the people that authored the Barb 1 and Barb 2

3    who was who.

4         Q.    And who would that be?

5         A.    I don't know.  I just told you that.

6         Q.    I see.  So you never heard anybody say Barb 1,

7    Barb 2?

8              MR. MacMAIN:  That's not what he said.

9              THE WITNESS:  That's not what I said.

10   BY MS. WALLET:

11        Q.    Did you hear anyone use the term Barb 1, Barb 2?

12        A.    I heard it used in the office.  I don't know

13   specifically who to attribute it to.

14        Q.    Well, who do you remember using this term?

15        A.    Maybe some of the secretaries.  Maybe Tom Boyer.

16   Maybe Darby Christlieb.  I don't know.  Maybe Denny Drachbar.

17   Maybe Sam Miller.

18        Q.    Well, it could be maybe anybody in the office,

19   correct?  I'm asking you, what do you remember about

20   individuals who used this term Barb 1 Barb 2?

21        A.    And I testified earlier that I didn't remember

22   who was attributed to the remarks.

23        Q.    Well, did you ever get a telephone message from

24   someone that said Barb and you had difficulty deciding

25   whether it was your wife or Barbara Varner?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                208

1       A.      No.  We had a type of a clandestine relationship

2   with the phone business where when Mrs. Varner would contact

3   me or Barb would contact me, she would let it ring three

4   rings.  If I didn't pick up in three rings, we knew that the

5   message then would go out to the front secretary so she would

6   always hang up the phone.

7               So due to the multitude of hang-ups when the

8   secretaries received the call coming through on my phone,

9   they became suspicious of our relationship because we had a

10  personal friendship and throughout the -- we had a personal

11  relationship that people wanted to gossip about.

12      Q.      I don't understand, sir.  What was suspicious

13  about Ms. Varner calling you on your office phone?

14      A.      The multitude of times that she would call and

15  the multitude of times that the receptionist, Ronna Boyles

16  or -- would pick up the phone and there would be nobody on

17  the other end.

18      Q.      And Ronna Boyles assumed that was Barbara Varner?

19      A.      I think so.  And so did Denny Drachbar.

20      Q.      And how would they know that that would be

21  Barbara Varner allowing it to ring three times and then

22  hanging up?

23      A.      Not just the phone call.  They would know just

24  due to the interaction between Barb and I on individual

25  cases.  I testified the other day that we had -- we shared

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        209

 1    companion cases quite frequently, and we would go out and

 2    supervise, or she would implore me to go with her to a

 3    dangerous situation.

 4        Q.      In fact, you insisted that she come with you on

 5    those trips, did you not?

 6        A.      That was both ways.  No, that went both ways.  In

 7    regard to the Fahnestocks, you know, she wanted me to come

 8    along because the defendant I was working with had been

 9    involved in a gun incident with his father, and that's why he

10    was under parole, because of the pulling the gun and

11    displaying the gun, a rifle.  That happened to be a very

12    secluded location back in the woods behind the PPG plant out

13    in Mount Holly.  So it was -- it wouldn't have been a

14    comfortable setting for any woman to drive back this long

15    lane in back of the PPG plant in the mountains to go visit

16    her kids that she had on the dependency concerns with that

17    family.

18        Q.      Okay.  Ms. Varner was assigned to supervise a

19    part of that family, you were assigned to supervise another

20    part of that family?

21        A.      Yes.

22        Q.      So it certainly wouldn't be unusual that the two

23    of you would go to this location at the same time, correct?

24        A.      I don't recall being at the location other than

25    the time she requested me to go along with her out there.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                  210

1      Q.    Okay.  But the request that you go with her would

2   not be unusual, inasmuch as you had work-related reasons to

3   be there and so did she?

4           MR. MacMAIN:  Objection.  I think he just

5   answered it that sometimes it would be requested, sometimes

6   it wouldn't.

7           MS. WALLET:  Well, my question was was it an

8   unusual request.  I don't think he answered that.

9           THE WITNESS:  I don't know what unusual or usual

10  is.  I don't understand what you mean by usual or unusual.

11  It wasn't unusual to supervise the same family that we were

12  involved in.  But there was unusual times where she would

13  make extra requests for me to go along where I didn't have

14  anyplace to go along

15  BY MS. WALLET:

16     Q.    Okay.  And were there times when you made

17  requests that she go along when she ordinarily would not have

18  had any reason to go?

19     A.    Absolutely, sure.  She went on commitment trips

20  with me where she had no relevance to the actual case, but

21  she was a volunteer that would ride along with me to

22  different institutions.

23     Q.    And your testimony is that it was totally her

24  idea, not your idea?

25           MR. MacMAIN:  Objection.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    211

1              THE WITNESS:  That's not my testimony.

2              MR. MacMAIN:  Objection.  What he said is

3    sometimes it was her idea and sometimes it was his idea.

4    BY MS. WALLET:

5       Q.    Okay.  You would agree there were times when you

6    as her supervisor assigned her to come on commitment trips

7    with you?

8       A.    No.  No, ma'am.

9       Q.    No assignment?

10      A.    No assignments.

11      Q.    I see.

12      A.    Commitment trips were a volunteer basis for the

13   most part.  Most times when it was your own kid that you were

14   dealing with that was committed, those were the people

15   responsible.  But there was a lot of people in the office did

16   not like to go on these commitment trips because they

17   required extended hours, extensive travel.  And we,

18   Mr. Osenkarski had a flexible schedule to that.  He said if

19   you can find somebody else that wants to go along or will go

20   along, you may take them, you know, those two people may go

21   on the trips.

22      Q.    Was there any requirement that more than one

23   probation officer go on these commitment trips?

24      A.    There was always a requirement two probation

25   officers went on those trips.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                212

1    Q.    And why was that, sir?

2    A.    Just for liability concerns and safety concerns.

3    Q.    Specifically what safety concerns?

4    A.    Oh, my.  Plenty.  Fights.  Arguments.

5  Contraband.  I can testify most of the morning as to the

6  safety concerns.  We had kids fighting in the courthouse.  We

7  had kids throwing the defendant's tables in the judge's

8  chambers.  We had kids fighting in the hall.  We had kids

9  fighting in our offices.

10          It was a traumatic time for a kid to be sent away

11  by judicial order to an institution for the next 12 months of

12  his life, and they weren't willing to go sometimes.

13    Q.    So the safety concern was it was thought that it

14  was better to have two adults along with one juvenile in case

15  there were problems?

16    A.    Yes, ma'am.

17    Q.    Were there any rules about having a probation

18  officer of the same sex go on these commitment trips?

19    A.    I don't recall any rules of any gender

20  differentiation between who you would take or who wouldn't

21  take.  I mean, Ms. Varner was included the same as was Nicole

22  Galbraith, or Nicole Horick at the time.  She went with me on

23  trips.  There was different people.  And I usually went on a

24  lot of trips because I enjoyed that part of the job and it

25  gave me the opportunity to meet with the administrators at

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              213

1    the placement facilities.

2         Q.    In fact, you volunteered for as many of those

3    trips as you could, correct?

4         A.    No.  I would volunteer when somebody else would

5    not want to go.

6         Q.    Now, was it ordinary that the person who had

7    previously supervised a particular juvenile take that

8    juvenile on the commitment trip?

9         A.    I testified earlier that usually the

10   responsibility remained with the person that was assigned the

11   juvenile, and if that juvenile got placed, that would be the

12   PO that was responsible to make arrangements for the

13   transportation of that juvenile to the institution he was

14   placed at.

15        Q.    And that probation officer would either take the

16   juvenile him or herself, or get somebody else to do it?

17        A.    He would decide on taking the person and then

18   recruiting another person to accompany him.

19        Q.    And it became known, did it not, that you were

20   one of the individuals who liked to take these trips?

21        A.    Known to who?

22        Q.    The other probation officers.

23             MR. MacMAIN:  I'll object as to what other people

24   thought or believed or knew.

25             THE WITNESS:  I don't know how to answer that.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          214


1   BY MS. WALLET:

2       Q.    Well, if a probation officer needed to recruit

3   someone to accompany him or her, there were certain people in

4   the office who didn't like to do it, and there were other

5   people who did, correct?

6       A.    Yes.

7       Q.    Okay.  Give me the list of the people who didn't

8   like to do it.

9       A.    I don't know.  You're asking me to recount things

10  that were back 10 and 15 years ago and who wanted to go on a

11  certain commitment trip.  That's ludicrous.

12      Q.    You don't remember?

13      A.    I don't remember.

14      Q.    You do remember you liked to go?

15      A.    Yes.

16      Q.    And you think you kept that completely to

17  yourself, you didn't tell anybody else that you liked to go?

18      A.    Oh, come on.

19            MR. MacMAIN:  Objection.  That's argumentative.

20  He's already testified he likes to go.  He also testified he

21  can't tell you who, what other people thought.  I think

22  that's been asked and answered, and I think we can move on.

23  BY MS. WALLET:

24      Q.    If I looked at the statistics, sir, of how many

25  commitment trips the individual probation officers took,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                     215


1    would you be on the list of having among the highest of the

2    trips?

3        A.    Yes.

4        Q.    Now, did Ms. Varner like to go on these

5    commitment trips?

6        A.    She evidently did, because she was with me for

7    almost 24 trips between '95 and the time she made her

8    Complaint.

9        Q.    Did she ever complain to you that she did not

10   want to go on these commitment trips?

11       A.    Not at all.

12       Q.    Did you ever say to her:  If you don't like to do

13   this kind of work, you can go back to your work in Children

14   and Youth?

15       A.    That's not true at all.

16       Q.    You never said that?

17       A.    Never said that at all.  That's a complete

18   fabricated lie if that's what her testimony is.

19       Q.    Did you ever say that in reference to any other

20   work besides commitment trips?

21       A.    No.

22       Q.    Did you ever say anything to her that suggested

23   that you thought social work was somehow lesser work than

24   probation officer work?

25       A.    That's another fabricated lie, if that's the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                216

1    testimony.  No, I never said that.

2        Q.      Did you think that?

3        A.      No.

4        Q.      How many siblings in your family?

5        A.      Two children.

6        Q.      And was the other child a boy or a girl?

7        A.      Both children were girls.

8                MR. MacMAIN:  She's asking about his family,

9    whether he has siblings.

10               THE WITNESS:  Oh, I'm sorry.

11               MR. MacMAIN:  That's fine.  It wasn't clear.

12               THE WITNESS:  Okay.  You want to know in my

13   immediate family.  I have one sister.

14   BY MS. WALLET:

15       Q.      And what was your relationship to your sister?

16       A.      A brother.

17       Q.      Well, I'll grant you that.  How would you

18   describe your relationship with your sister?

19               MR. MacMAIN:  That's a better question.

20               THE WITNESS:  Very positive.

21   BY MS. WALLET:

22       Q.      Is she an older or younger sibling?

23       A.      She's an older.

24       Q.      How much holder?

25       A.      Almost two years.  Within a few months of two

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                        217


1   years older.

2        Q.      Does she work outside the home?

3        A.      Yes.

4        Q.      What does she do?

5        A.      She's a school nurse in the Ocean City, New

6   Jersey, school system.

7        Q.      Is she a registered nurse?

8        A.      Yes, ma'am.

9        Q.      Where did she go to school?

10        A.      Temple University.

11        Q.      Is she married?

12        A.      Yes.

13        Q.      Does she have children?

14        A.      Two children.

15        Q.      Boys or girls?

16        A.      One boy and one girl.

17        Q.      Hold are they?

18        A.      Sarah just turned 21, and Mark is 18, or he'll be

19   18 on April 11th.  So he's 17, soon to be 18.

20        Q.      Were your parents married more than one time?

21        A.      One time.

22        Q.      For life?

23        A.      Yes, ma'am.

24        Q.      And I know that your father is deceased.  Is your

25   mother still alive?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                        218

1        A.      No, she's deceased.

2        Q.      And did your father die before your mother?

3        A.      He died in I think 1991.  August 22nd.

4        Q.      And when did she die?

5        A.      January 4th of '98.

6        Q.      Did you ever tell your mother about your

7    relationship with Ms. Varner?

8        A.      No, ma'am.

9        Q.      Why not?

10       A.      No specific reason.  I was probably embarrassed.

11       Q.      I believe I asked you this before.  You did not

12   tell your father, either, correct?

13       A.      No.  No.

14       Q.      He was really deceased before you began this

15   relationship?

16       A.      He was dying of cancer about the time I met

17   Mrs. Varner.  And that was one of the things I confided with

18   her about, how upset I was, you know, for him dying of

19   cancer.

20       Q.      How would you describe your relationship with

21   your mother?

22       A.      Wonderful.

23       Q.      Were you close to her?

24       A.      Sure.

25       Q.      Was she close to you?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                219

1       A.      Yes.

2       Q.      What was your childhood like?

3       A.      Wonderful.

4       Q.      What was wonderful about it?

5       A.      Just very satisfying, very fulfilling.  Very

6    loving, very nurturing.

7       Q.      How would you describe --

8       A.      A lot of commotion.  My parents had a store,

9    Ms. Wallet, and a lot of my excitability and a lot of my

10   personality is probably developed over that drugstore,

11   because what my dad did was run a little convenience store,

12   and he was in that store from seven o'clock in the morning

13   till ten o'clock at night.  So what that meant is our family

14   interactions were limited.  As far as having a sit-down meal,

15   it was unheard of.  And my recollection of what my mom used

16   to say, get the hell down to the store and let him come home

17   to eat.  That's how we had meals.

18           So some of my personality probably is formulated

19   by the rearing process of having a store being open 365 days

20   a year, my dad being in that store from seven o'clock in the

21   morning sometimes till 10 ten o'clock at night, and my

22   personality as well as my sister's probably are adaptive to

23   that type of setting.  And that's why I talk fast, I reason

24   fast, and because we had no time to settle, you know,

25   differences in the family or differences in things that would

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                220


1  come up.  We just, our life revolved around that store.

2        Q.     Did your parents have a good sexual relationship?

3               MR. MacMAIN:  Objection.  If you know.

4               THE WITNESS:  I don't know.  They consummated two

5  children so I'm sure they had something that was positive.

6  BY MS. WALLET:

7        Q.     To the best of your knowledge, did either of them

8  have any affairs?

9        A.     Not at all, that I know of.

10       Q.     Do you believe that you would know if that were

11 the case?

12       A.     Absolutely.  My family was in a public arena.  I

13 mean, we operated a store in a small town.  Everybody knew

14 everything about everybody.  I'm sure I would have heard

15 that.

16       Q.     Did you ever say to anyone in the workplace:  In

17 Newville men own their women?

18       A.     That's not true.

19       Q.     You never said that?

20       A.     No.  I think that was attributed to Kerry Houser

21 claiming I said that when Joe was going through his first

22 business with her.  Kerry says a lot of things, Ms. Wallet.

23       Q.     You believe her to be untruthful?

24       A.     Yes.

25       Q.     Could you give me some examples of why you

S. Gareth Graham                          221

1   believe her to be untruthful?

2       A.      Just different defendants I even work with in the

3   Adult section feel that she's less -- she's disingenuous with

4   her cases.

5       Q.      Well, I'm not asking about anyone else.  I'm

6   asking you, what has caused you to conclude that she is

7   untruthful?

8       A.      Because I think she was part of the rumor mill

9   that established two probation officers in our office being

10  arrested by the Attorney General's Office over 10 years ago,

11  and/or and then -- or not arrested, I'm sorry, investigated

12  by the Attorney General's Office.  And subsequent

13  investigation proved that they were innocent and there was

14  never any charges pending.

15          But there was a vicious rumor mill regarding a

16  Mike Dunsmore and a Paul Meuron, and that rumor got

17  circulated in our office, and I believe Kerry to pass that

18  rumor on, maybe to Judge Bayley.  That's what I had heard.  I

19  don't have any person and I have no firsthand knowledge of

20  that.  But Kerry was one of the ones that was circulating

21  trying to have these men arrested, you know, for something

22  that they really didn't do.

23      Q.      So you believe that Kerry Houser made some

24  allegations against Mike Dunsmore and Paul Meuron?

25      A.      She was part of the office parade that were

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                222

1   making accusations against those two men 10 years ago, or

2   longer than that.  It's 15 years ago now, I think.

3        Q.     And how do you know that, sir?

4        A.     There was newspaper articles and -- how do I know

5   about what?

6        Q.     How do you know that she was the one that made

7   the allegations?

8        A.     I think it was told to me that she was the one

9   that went up to Judge Bayley and was complaining to Judge

10  Bayley about the commotion about these two men with this DUI

11  school.

12       Q.     Okay.  And were either Mr. Dunsmore or Mr. Meuron

13  terminated?

14       A.     No.  They both had sought other employment and

15  left.

16       Q.     And your understanding --

17       A.     They were vindicated by the Attorney General's

18  Office.  They were never charged.

19       Q.     And what did you believe the allegations of

20  Ms. Houser were against these two men?

21       A.     What I believe is that I was told she was one of

22  the persons that went up to Judge Bayley to try to have this

23  matter investigated.

24       Q.     And what was this matter, sir?

25       A.     This matter of these men supposedly forging names

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                     223

1   on some DUI rosters.

2        Q.     It had something to do with individuals being

3   paid based on the number of individuals in the DUI school?

4        A.     It had to do with -- what I understand of that

5   mess was that Mr. Meuron ran the DUI program and the ARD

6   program along with Mike Varner, and Mr. Meuron and

7   Mr. Dunsmore taught together.  And during their teaching they

8   evidently had excused a member of one of their classes to go

9   up, move on out to Colorado, and one of the other members

10  evidently signed the man in, thinking he was there and forgot

11  his signature.  So this was concocted to mean that this was a

12  criminal offense, a forgery, when it was more of a

13  bookkeeping issue.  And I think the Attorney General came in,

14  interviewed all the members of our staff in the DUI at that

15  point and then concluded there was not enough evidence to

16  prosecute these men.  And --

17             MR. MacMAIN:  Just answer what she's asking you.

18  BY MS. WALLET:

19       Q.     And did they leave shortly thereafter?

20       A.     One left early, and then -- one left because he

21  went on to a treatment center, and another one left maybe a

22  year later.

23       Q.     Which one left first?

24       A.     I think Meuron left first.  He was hired by Matt

25  Talbott House.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    224


     1        Q.      And then Dunsmore left later?

     2        A.      Right.

     3        Q.      What was your professional relationship to these

     4   two men?

     5        A.      Just as co-workers.

     6        Q.      Why do you believe that Ms. Houser made these

     7   allegations?

     8              MR. MacMAIN:  Objection.  If you have any

     9   personal knowledge or belief, you can answer that.  I don't

    10   want you to guess.

    11              THE WITNESS:  I don't know.

    12   BY MS. WALLET:

    13        Q.      Did you believe those allegations to be

    14   untruthful?

    15        A.      What allegations?

    16        Q.      The allegations against Meuron and Dunsmore.

    17        A.      Made by whom?

    18        Q.      Made by Ms. Houser.

    19        A.      I don't know what Ms. Houser exactly said other

    20   than she wanted the matter investigated.

    21        Q.      If you remember, sir, I asked you why did you

    22   believe that Kerry Houser was untruthful, and I understood

    23   your response to be she was involved in this mess with

    24   Dunsmore and Meuron, that was one of your reasons why you

    25   thought she was untruthful.  Did I misunderstand?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          225


1     A.     No, not at all.

2     Q.     And what was it that you believed she had done

3     that was untruthful with regard to this incident?

4     A.     I don't think it was in her place to be assessing

5     blame to individuals that were innocent of a charge, or

6     innocent, and I think she along with other members of the

7     office assessed blame to these men before anything was ever

8     proven.

9     Q.     Was it not in her place to bring some evidence of

10    impropriety to the judge?

11    A.     You would have to ask her that.

12    Q.     Well, you said you didn't think it was in her

13    place.  Why not?

14    A.     I didn't think it was in her place to pass a

15    rumor without any evidence to substantiate the rumor.  And

16    that went as well to anybody else that passed the rumor about

17    that.

18    Q.     Was she allied with other people making this

19    allegation?

20    A.     She might have been.  Not that -- I don't know if

21    she was aligned with them.  She was just one of the ones

22    along with the others that had contributed to this commotion.

23    Q.     And who else contributed to the commotion?

24    A.     Probably Hank Thielemann and Tom Boyer.

25    Q.     Anyone else?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                226


1      A.      You would have to ask Mr. Bolze.  He handled that

2   investigation initially.

3      Q.      I'm asking, sir, who else you know was involved

4   in this incident?

5              MR. MacMAIN:  If you know of anyone else that you

6   believe.

7              THE WITNESS:  No.  No.

8   BY MS. WALLET:

9      Q.      So Kerry Houser, Hank Thielemann and Tom Boyer

10  were the only ones you knew --

11     A.      And Ken Bolze.

12     Q.      Who you knew were involved in this?

13     A.      Who I knew, right.

14     Q.      Okay.  Now, what other incidents are you aware of

15  that has caused you to conclude that Ms. Houser is

16  untruthful?

17     A.      Well, it might not be a total matter of

18  untruthfulness, but I had had some problems with Mr. Meuron

19  when he ran the DUI school, and one particular problem was he

20  had --

21             MR. MacMAIN:  Gary, listen.  She asked you if you

22  can point to any examples, and if you can't, if it's just

23  your sense that you don't think that Kerry Houser is

24  completely truthful, okay?  So let's just stick with Kerry

25  Houser, and if you can, give examples.  If it's just your

S. Gareth Graham                                    227


1    sense that you don't believe she's credible or truthful, then

2    that's fine as well.  That's all she wants to know.

3              THE WITNESS:  And that's what I'm getting to.  I

4    just take a lot longer to get it out.

5              What happened was Meuron had purchased some books

6    like Don't Help and Under the Influence, and they were a type

7    of paperback books that were attributed to the DUI situation.

8    And they were like what we consider the Bibles on looking at

9    alcohol and alcoholism.  So he had purchased these books, and

10   he purchased maybe 11 of them.  And Mr. Bolze asked me -- you

11   know, I said, I didn't get a book.

12             And on those books -- I went around to different

13   people that Mr. Meuron had distributed the books to and

14   said -- I was frustrated because he didn't give me the

15   manual, or he didn't give me the book to read, and I was

16   complaining about Mr. Meuron.  And one of the persons I

17   complained to was Kerry Houser.  And I -- and she said, well,

18   in her quote and in her language, she said, don't you

19   understand, Gary, Mr. Bolze lives vicariously through Paul

20   Meuron's penis.  That was her quote to me.  So that's the

21   nature of Ms. Houser's comments.  And that was one of the

22   reasons I never liked Ms. Houser or professionally got along

23   with her.

24        Q.    So you didn't like her language?

25        A.    I didn't like her language.  And in that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          228


1   particular situation that's how she viewed how the

2   relationship between Mr. Bolze and Mr. Meuron, that Ken lives

3   vicariously through Paul's penis, attributing that to Paul

4   Meuron, who was a single man that had different escapades and

5   evidently he shared those with Mr. Bolze.  So in Kerry's

6   glossary review of those two people was summarized in that

7   comment.

8       Q.      And why did that incident lead you to conclude

9   that Kerry Houser was untruthful?

10      A.      That incident made me not trust Kerry Houser

11  because I thought it was very inflammatory.  I thought it was

12  very gender specific, I thought it was, you know, it's very

13  frightful.

14      Q.      What was frightful about it?

15              MR. MacMAIN:  He just answered that.  He

16  explained to you.

17  BY MS. WALLET:

18      Q.      Do you have any other incidents that led you to

19  conclude that Kerry Houser was an untruthful person?

20      A.      Not during the Juvenile Probation office.  From,

21  I've had different people and there's different people

22  written letters to the Adult staff and the supervisors

23  attributing her to not being truthful.  But that can happen

24  to any probation officer, so I'm not just saying that happens

25  to her specifically.  Clients that you deal with always

1  complain about you.

2       Q.    Do you know any other incidents, you personally,

3  know of any other incidents that caused you to conclude that

4  Houser was untruthful?

5       A.    Well, there was an incident where Barbara Varner

6  shared with me is that Kerry was -- Barb Varner shared with

7  me that Kerry was I guess cited by the Carlisle Police

8  Department for a criminal trespass charge for going into her

9  husband's lawyer's office when she was going through a

10  divorce.  And supposedly, according to Ms. Varner who was

11  repeating this to me, there was a notice going to be sent to

12  our office.  And I did see a certified mail laying on Ken

13  Bolze's desk regarding that she had had a notice of trespass

14  because she was going to Chuck Vohs's professional office,

15  who she was married to and had a baby to, and going there and

16  in short words, raising hell during the middle of the day to

17  the point where the lawyers, Mr. Vohs and his partner, had

18  her cited with criminal trespass and was served a criminal

19  trespass notice.  So that's the other only other incident

20  that I know of that came through Mrs. Varner because

21  Mrs. Varner told me that.

22       Q.    And what about that incident involved

23  untruthfulness?

24       A.    It's not an issue of untruthfulness, it's an

25  issue of whether I trusted her.  And I didn't trust her

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          230

1   because of the vicious things that she had done and said.

2        Q.     Did she say anything vicious about you?

3        A.     You would have to ask the other people.

4        Q.     I'm asking you, sir.  Do you know of anything

5   that she said that was vicious toward you?

6               MR. MacMAIN:  If you know.

7               THE WITNESS:  I don't know.  I don't remember.

8   BY MS. WALLET:

9        Q.     Did she say anything vicious toward anyone else

10  in the Probation office?

11              MR. MacMAIN:  Again, Gary, that you know of.

12              THE WITNESS:  No, that I know of.

13  BY MS. WALLET:

14       Q.     Now, you mentioned that you thought other people

15  believed her to be untruthful.  Correct?

16       A.     No, I don't remember saying that.

17       Q.     Well, you said other people wrote letters about

18  her untruthfulness.  Did I mishear that?

19       A.     Yeah.

20       Q.     Okay.  Well, were there others who thought she

21  was, she, Kerry Houser, was untruthful?

22       A.     I don't know.

23       Q.     Well, did other people tell you:  I don't trust

24  her, she doesn't tell the truth?

25              MR. MacMAIN:  Other people besides these letters

S. Gareth Graham                                231


1    he spoke about?

2              MS. WALLET:  Yes.

3              THE WITNESS:  No.  I don't know of any other

4    incidents that I can recall.  I just don't remember.  The two

5    incidents that I cited were the glaring examples of what I

6    remember.  I mean, there could have been other incidents.

7    BY MS. WALLET:

8         Q.    Were there people in the Juvenile Probation

9    office who didn't like Kerry Houser?

10        A.    There again, I don't have any specific knowledge

11   of who liked her and who didn't like her.

12        Q.    Did you like her?

13        A.    Not particularly, ma'am.

14        Q.    Why not?

15             MR. MacMAIN:  It's been asked and answered.  He's

16   already given you reasons and said why.  You want him to

17   answer again?

18             MS. WALLET:  Well, I asked him about

19   untruthfulness.  That's different from whether you like

20   somebody.

21             MR. MacMAIN:  You also asked about like and he

22   gave you examples.  He said she was vicious and he gave some

23   examples of those things.

24   BY MS. WALLET:

25        Q.    Any other reasons why you didn't like her?

1        A.      I remember before she was even hired we had a

2    Christmas party one time, and at the counter, she stood at

3    the counter and told Judge Sheely dirty jokes.  And Denny

4    Drachbar, you know, brought that to me, too.

5        Q.      When you say brought that to you --

6        A.      Well, he heard her out there talking and telling

7    the jokes.

8        Q.      Did you hear her tell the jokes?

9        A.      I heard her telling the jokes, sure.

10       Q.      And then you and Drachbar talked about it later?

11       A.      Yeah, probably, um-hum.

12       Q.      And what was Drachbar's reaction?

13       A.      I don't know.  I think he said something about

14   maybe Judge Sheely will end up hiring her because he, you

15   know, she's out there personalizing things to him.

16       Q.      Why would Drachbar be of that opinion?

17       A.      Well, I think she had applied at our office.

18       Q.      Drachbar thought that Judge Sheely would be

19   impressed by the fact that she was telling dirty jokes?

20       A.      You'll have to ask him.  I don't -- that's...

21       Q.      Do your daughters know of your affair?

22       A.      Yes, they do.

23       Q.      Are either of your daughters married?

24       A.      No, ma'am.

25       Q.      Are they sexually active?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          233


1       A.      Not that I'm aware of.

2       Q.      Do you believe you would be aware of it?

3       A.      I think so, um-hum.

4       Q.      How would you describe your relationship to your

5    daughters?

6       A.      Excellent.

7       Q.      How did you tell your daughters about this

8    affair?

9       A.      Just by confessing.

10      Q.      Well, did you tell them one at a time or both

11   together?

12      A.      I told them individually.

13      Q.      Which one did you tell first?

14      A.      I think Andrea, the oldest one, and then Julie.

15      Q.      All right.  When did you do this in relation to

16   telling your wife?  Was it shortly thereafter, a couple weeks

17   after, months after?

18      A.      No.  It was quite a significant amount of time

19   after.  Maybe two years after.  Maybe longer.

20      Q.      And what prompted you to tell your daughters

21   about this?

22      A.      I think they had seen that my wife and my, our

23   relationship had deteriorated after these allegations in this

24   lawsuit, and I just felt somewhere along the line they needed

25   to know.  I wanted to protect them, because they were pretty

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              234


1    young teenagers, you know, at the time.  So I -- that's what

2    prompted me, just a cleansing.

3         Q.     And what did you tell Andrea about this affair?

4         A.     I just said that I had been involved in an

5    extramarital affair and that I was sorry.

6         Q.     Did you tell her with whom?

7         A.     I think Barb Varner -- I don't think she knew who

8    that was.

9         Q.     Did you mention Barb Varner by name?

10        A.     I think so.  Or a lady at work.  And I think she

11   knows it was Barb Varner.

12        Q.     Did your daughters ever meet Ms. Varner?

13        A.     On one occasion my oldest daughter met her.  She

14   come into the courthouse and we met, Barb and I had met in

15   the coffee room.  And Andrea was a swimmer at the time and

16   Barb had, Barb Varner had talked about her being a water

17   safety instructor.  And actually, Barb Varner I think gave my

18   daughter some, I don't know, I think it was comic books at

19   the time or something, that pertained to swimming.  My

20   daughter's been a swimmer and was a water safety instructor

21   and was a lifeguard.

22        Q.     And did you tell Andrea that this was the woman

23   that she had met and gave her the comic books?

24        A.     I don't think she remembers, though.

25        Q.     Did you tell Andrea that it went on for a number

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    235

1    of years?

2        A.      Yes, ma'am.

3        Q.      What was her reaction?

4        A.      She's disappointed.

5        Q.      What did she say that caused you to believe she

6    was disappointed?

7        A.      She said, how could you do that to us.

8        Q.      And what did you respond?

9        A.      I responded that it was a very selfish thing to

10   do.

11       Q.      And now, you spoke to your daughter Julie on a

12   separate occasion, correct?

13       A.      Yeah.

14       Q.      Shortly after Andrea?

15       A.      No.  I don't know the time frame, no.  It

16   wouldn't have been shortly -- I think Andrea knew it for a

17   longer period.  And I think her mother had told them both,

18   that it was -- and I had told them my part of it.

19       Q.      Did their mother tell them before you told them?

20       A.      She might have, yes.

21       Q.      Why do you believe that?

22       A.      Well, I think -- I had asked my wife to try to

23   conceal this from the kids and not interrupt them, and she

24   said, well, it's going to have to come out sometime.  So I

25   think she mentioned it to them at one juncture.  And then

1    them individually, you know, came to me and asked probing

2    questions to the point where I talked to them about it.

3            I think Julie, I remember I was coming back from

4    the York fair and said something in the car and --

5        Q.    Just you and she?

6        A.    Yeah.

7        Q.    And you brought up the subject?

8        A.    She brought up the subject.

9        Q.    What did she say to you?

10       A.    Did you have a affair with this woman, why would

11   you do that.

12       Q.    And then you were --

13       A.    Can I get a drink?

14             MS. WALLET:  Sure.

15             MR. DELLASEGA:  I wouldn't mind five minutes.

16             (Recess taken from 10:26 until 10:35 a.m.)

17   BY MS. WALLET:

18       Q.    When we took the break I believe you were telling

19   me she brought up the subject when you and she were coming

20   home from York?

21       A.    Yes, coming home from the York fair.

22       Q.    What did she say to you?

23       A.    Just said, Dad, you know, how could you have done

24   that to Mom and us.

25       Q.    And how did you respond to Julie?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          237


1     A.     I told her the same thing, it was a very selfish

2     thing to do, and her mother and I's relationship had

3     deteriorated over the years, and I stepped outside the

4     marriage.

5     Q.     Now, you married your wife on what day?

6     A.     August 14th of '82.

7     Q.     And did you marry in a traditional religious

8     service?

9     A.     Yes, ma'am.

10    Q.     And did you take what I would consider to be

11    traditional religious vows?

12    A.     Yes.

13    Q.     Did you believe that this relationship with

14    Ms. Varner was a breaking of those vows?

15    A.     Yes, it was.

16    Q.     I believe I asked you this question, but indulge

17    me, it's been a while since I talked to you.  Did you break

18    your vows with regard to any other individual during the

19    course of your marriage?

20    A.     No, ma'am.

21    Q.     Now, you said that your marriage had deteriorated

22    and you thought that your daughters were aware of that.

23    Correct?

24    A.     Maybe deteriorated wasn't a good word.  It was --

25    maybe I could use the word just a matter of consumption.  We

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                      238


1    were just at -- we were just consumed with everything in the

2    marriage, trying to earn a living, trying to both occupy two

3    separate jobs, trying to raise two children.

4         Q.     From 1982 until when you initiated this affair

5    with Ms. Varner, would you consider your marriage to have

6    been a happy one?

7         A.     Yes, ma'am.

8         Q.     Did you complain to anyone in the Probation

9    office about the condition of your marriage?

10        A.     In what time frame?

11        Q.     Between 1982 and approximately 1990 when I

12   believe you've said you began this relationship.

13        A.     No.  No.

14        Q.     Did you ever talk about your wife's sexual

15   preferences in the office during that time period?

16        A.     No, ma'am.

17        Q.     Did you ever talk about you and your wife's

18   sexual relationship with others in the office?

19        A.     In what regard?

20        Q.     Her sexual appetites, your sexual appetites?

21        A.     No, to those questions.

22        Q.     How about preferences?

23        A.     No.

24        Q.     Did you complain about her love making, in the

25   office?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           239

1      A.      I would probably say that we weren't active

2   enough, however.

3      Q.      You wanted sex more often than she did?

4      A.      Yes, ma'am.

5      Q.      And you would have said that in the office?

6      A.      I might have, sure.

7      Q.      Was there some one individual in the office with

8   whom you were particularly close and you confided these

9   things?

10     A.      Not really.  Just shared on a general basis, just

11  shared conversation between guys, mostly.  Not girls or gals

12  that were in the -- or the women that were in the office.

13     Q.      Did you have one person that you considered to be

14  your best friend in the office?

15     A.      I didn't have a real best friend.  I could have a

16  best co-worker, I would say.  Denny Drachbar and I did a lot

17  of things together, as well as Joe and I did a number of

18  things together.  And Tom Boyer and I used to have a good

19  relationship.  So there was some that I had better

20  relationships than others.

21     Q.      Okay.  Now, I'm talking about the period between

22  1982 and 1990.  Did you go out drinking with individuals in

23  the office?

24     A.      I can't recall.  I could have.

25     Q.      Did you go out drinking with Mr. Osenkarski?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          240


 1      A.      No.  Not specifically, no.

 2      Q.      Well, did you go out in groups where

 3  Mr. Osenkarski was there and you were there?

 4      A.      Probably.  I think when Kerry first joined the

 5  staff she lived above the hardware store across from the

 6  courthouse and she hosted a couple parties over there.  And I

 7  think when Deb Graeff retired, I think Kerry hosted a party

 8  there.  But specifically to go out with somebody to drink,

 9  I'm not really a -- I wouldn't consider myself a drinker.

10      Q.      Do you keep alcohol in your home?

11      A.      No, ma'am.

12      Q.      Why is that?

13      A.      I don't use it.  My wife doesn't use it.

14      Q.      Is your wife opposed to it?

15      A.      We just don't use it.  She's not opposed to it.

16      Q.      Does she drink socially?

17      A.      No.

18      Q.      Would you say you are a social drinker?

19      A.      No.  I wouldn't describe myself as a social

20  director, either.

21      Q.      But you're not opposed to the intake of alcohol?

22      A.      No.

23      Q.      Now, these gatherings that involved probation

24  officers, did you take your wife to those gatherings?

25      A.      I don't really recall, no, taking my wife to

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          241


1    Kerry's place.

2        Q.    Do you believe that your wife was present with

3    you when you were socializing with any of the groups of

4    probation officers?

5        A.    I think she was on occasion, sure.

6        Q.    Did you ever lie to your wife about where you

7    were going when you were going to go out with other probation

8    officers?

9        A.    No.

10       Q.    Did you ever tell other probation officers that

11   you had lied to your wife about where you were?

12       A.    You'll have to give me specifics.  I don't know,

13   that's a generalized -- I don't even know what you're getting

14   at.

15       Q.    You don't remember?

16            MR. MacMAIN:  Objection.  He said he didn't

17   understand your question.

18            THE WITNESS:  I don't understand.

19            MR. MacMAIN:  He can't answer your question, he

20   doesn't understand it.

21   BY MS. WALLET:

22       Q.    Did you ever tell any other probation officer

23   that you had lied to your wife about where you were?

24       A.    Not that I recall.

25       Q.    Did you ever observe Mr. Osenkarski in an

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                242

1   intoxicated state?

2        A.     Does intoxicated state imply that he was out of

3   control or in control?

4        Q.     Either one.

5        A.     Probably -- I've seen Joe many times when he's

6   been drinking and maybe somebody would call him intoxicated.

7   Was he out of control?  No.

8        Q.     Were there any times when the individuals present

9   would not permit him to drive?

10       A.     I don't -- no, I don't have any idea what you're

11  talking about there.

12       Q.     Were there times when you observed Mr. Osenkarski

13  in a state in which you would not want him to be behind the

14  wheel?

15       A.     No.

16       Q.     Did you ever take him home because you thought he

17  was intoxicated?

18       A.     No.

19       Q.     Are you aware of other times when individuals

20  took him home because they thought he was intoxicated?

21              MR. MacMAIN:  Objection to form of the question.

22              THE WITNESS:  I don't know what other people did

23  with Mr. Osenkarski.

24  BY MS. WALLET:

25       Q.     Did you ever observe Mr. Osenkarski to drink

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    243


1    alcoholic beverages during the workday?

2         A.      I never observed him drinking during the workday.

3         Q.      Including lunch time?

4         A.      Including lunch time.

5         Q.      Are you currently engaged in a dispute with your

6    sister regarding your parents' estate?

7               MR. MacMAIN:  Objection.  What --

8               THE WITNESS:  No.  I can just answer that.

9    BY MS. WALLET:

10        Q.      Is there a dispute regarding the distribution of

11   your parents' estate?

12        A.      Not at all, ma'am.  In fact, that was finalized

13   and you can look it up in the courthouse.

14        Q.      And when was that finalized?

15        A.      Well, after my mom's death in 1998.  Steve Tiley

16   was her attorney and he was -- and you can check with that.

17        Q.      Did you make any claims against the estate for

18   expenses that you believed were incurred during your mother's

19   lifetime?

20               MR. MacMAIN:  Let me just object.  Hold on.  I

21   don't see how there's any conceivable relevance to any

22   disputes in his mother's estate or could lead to relevant

23   evidence.  If you want to make an offer of proof as to how in

24   the world this could have any conceivable relevance to the

25   issues in the case, I'm happy to reconsider.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    244


 1          MS. WALLET:  Well, as I understand it, the expert

 2     that's been retained by the county defendant is going to

 3     review the deposition transcript as part of his expert

 4     report.  The relationship of Mr. Graham to other women is

 5     certainly very relevant to the issue of whether or not he has

 6     the predisposition to be a sexually harassing individual, and

 7     his relationship to other women includes his family.

 8          MR. MacMAIN:  I don't see how a dispute over an

 9     estate, which he's already said there wasn't, could have any

10     relevance to that issue.

11          But I mean, I would just also note that we went

12     five-and-a-half hours the other day and we're getting -- I'm

13     going to allow you some liberty, as you did with us with more

14     than the seven hours, but not a whole lot beyond that.  And

15     I'd like to get to the issues that are directly related to

16     the issues in this case that you may want to explore rather

17     than I think on awful tangential issues, if even tangential

18     at all.

19          MS. WALLET:  I understand.

20     BY MS. WALLET:

21     Q.     Did you understand my question?

22     A.     You'll have to repeat it, I'm sorry.

23     Q.     Did you make any claims against the estate

24     regarding expenses that you incurred during your mother's

25     lifetime?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    245

1        A.      No, ma'am.

2        Q.      Did you assert a claim for a less-than-even

3    distribution of your mother's estate?

4        A.      No, ma'am.

5        Q.      So there were no disputes whatever regarding the

6    settlement of your mother's estate?

7        A.      None whatsoever.

8        Q.      At least no disputes with your sister?

9        A.      It's the only other remaining person.

10       Q.      Now, you said that your relationship with your

11   wife had deteriorated.  Is that one of the reasons why you

12   sought out a extramarital affair?

13       A.      That could have been one the factors.  I did

14   clarify that deteriorated isn't the best word.

15       Q.      Well, how would you --

16       A.      Strained.  I would say it was strained.

17       Q.      Did you ever use the term:  I will punish my

18   wife?

19       A.      No, ma'am.

20       Q.      Did you ever use words to that effect?

21       A.      No.

22       Q.      Did you ever use that term in relationship to

23   women who worked with you in the Probation office?

24       A.      No, ma'am.

25       Q.      Since the revelation of this affair, would you

S. Gareth Graham                              246


 1   describe your marriage as a happy one?

 2        A.     Since this relevation, what do you mean by

 3   relevation?  Coming to light?

 4        Q.     Since you told your wife about the affair how

 5   would you describe your marriage?

 6        A.     Good.

 7        Q.     Immediately good, or take a while?

 8        A.     My wife's a very forgiving individual, but it

 9   took quite some time.

10        Q.     Did she ever make any statements to you about

11   Barbara Varner?

12        A.     In what context?

13        Q.     Well, did she ever say:  I dislike Barbara

14   Varner?

15        A.     Sure.

16        Q.     What did she say?

17        A.     Well, she was resentful towards her as well as

18   me.

19        Q.     What did she say about Barbara Varner?

20        A.     I think she said how selfish Ms. Varner was.  I

21   think she made a comment about, you know, her children were

22   raised and her children were out of her home, and our

23   children were still within our home, and my wife saw that as

24   a very selfish issue with Ms. Varner.

25        Q.     Did your wife call Barbara Varner a bitch?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          247


 1      A.      No, ma'am.

 2      Q.      Did she use any other terms?

 3      A.      Other than liar, I don't think anything else.

 4      Q.      Did your wife express to you a hatred toward

 5   Barbara Varner?

 6      A.      No, I don't think my wife would hate her.  I

 7   think my wife was disappointed in myself and her.  I wouldn't

 8   say she hated her, no.  She never displayed any hatred toward

 9   Barb Varner.

10      Q.      Now, you're aware, are you not, that Ms. Varner

11   made some complaints about your wife's conduct, correct?

12      A.      Yes, I am, ma'am.

13      Q.      And were you present on any of the occasions when

14   Ms. Varner and your wife were in the same vicinity?

15      A.      The only occasion I recall is the one day in

16   March, I think right before I was terminated, this happened

17   on a -- we had, my wife and I had gone home to eat.  And we

18   met Ms. Varner at a blind corner walking out of the

19   courthouse, and Ms. Varner walked directly into the path of

20   my wife and they bumped shoulders.

21      Q.      What was said at the time?

22      A.      I think just excuse me.

23      Q.      Who said that?

24      A.      I think both of them said it to each other.  This

25   is a -- I don't know how to explain it but it's a completely

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    248

1    blind corner, and Ms. Varner was coming out of the parking

2    lot and we were coming down the street on a narrow sidewalk,

3    and we were walking right beside this building.  And it was

4    like, I guess, I think it was, I guess I interpreted it as

5    a -- I saw her coming just at the last minute and stopped,

6    and my wife never saw her coming and they neither one would

7    fail to yield the right of way to each other.  So they

8    brushed shoulders.

9        Q.    And the only thing that was said was excuse me?

10       A.    Yeah.

11       Q.    Your wife didn't say anything else to Ms. Varner?

12       A.    No.

13       Q.    Ms. Varner didn't say anything else to your wife?

14       A.    No.  Or I don't recall.  I don't recall any other

15   conversation.

16       Q.    Now, your wife and Ms. Varner parked in the same

17   parking lot, correct?

18       A.    Yes, ma'am.

19       Q.    And were you aware that Ms. Varner moved her

20   parking space from closer to your wife's space to farther

21   away?

22       A.    No.

23       Q.    You never knew that?

24       A.    I knew it after -- I knew after this came out,

25   you know.  But my wife never told me about it, no.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           249


1       Q.      Were you present at the district justice hearing?

2       A.      No, ma'am.

3       Q.      What did your wife tell you about that district

4   justice hearing?

5       A.      She didn't tell me anything other than she was

6   vindicated from the charges that Ms. Varner brought.

7       Q.      Is your wife a quiet or a loud person?

8       A.      Quiet.

9       Q.      Does she talk a lot about personal things?

10      A.      Give me an example.

11      Q.      Well, does she speak with girlfriends about her

12  personal relationship with you?

13      A.      No.  My wife's a very private person.

14      Q.      Does she have a best friend?

15      A.      Probably.

16      Q.      You don't know?

17      A.      I don't know what you mean by best friend.

18      Q.      Does she have a person in whom she confides her

19  private things?

20      A.      Probably not.

21      Q.      Does she confide in you?

22      A.      Yes.

23      Q.      Was there a time when that was not so?

24      A.      Not that I can recall.

25      Q.      Is it accurate to say that your wife was angry

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    250


 1   with you that you had an extramarital affair?

 2        A.    Probably disappointed.

 3        Q.    Not angry?

 4        A.    What do you mean by angry, then?

 5        Q.    Did she shout at you?

 6        A.    No.

 7        Q.    Did she give you the cold shoulder for a while?

 8        A.    Yes.

 9        Q.    Did she deny you sexual relations for a while?

10        A.    No.

11        Q.    Did you go to marital counseling?

12        A.    Yes.

13        Q.    When?

14        A.    I don't recall.

15        Q.    Well, shortly after you told her of the affair,

16   or before?

17        A.    After.

18        Q.    Shortly after, or several years after?

19        A.    Probably within -- it was June.  Probably within

20   a couple, maybe five months, six months.

21        Q.    And how long did you go to counseling?

22        A.    Maybe one or two years.

23        Q.    How often?

24        A.    Infrequently.  We used the EAP services of the

25   county, or what's the acronym, I'm not sure.

S. Gareth Graham                              251


1        Q.       The EAP program?

2        A.       The Employee Assistance Program, EAP, yeah.

3        Q.       Did you go to the same counselor, that is, you

4   and she went to the same counselor?

5        A.       Initially, no.  And then I ended up going to the

6   counselor she used.  There was -- or the counselor she was

7   seeing.

8        Q.       So initially she went to one person.  Did you go

9   to someone else?

10       A.       Yes.

11       Q.       And then you stopped going to your person and you

12  went to hers?

13       A.       Correct.

14       Q.       Was that a recommendation, that you use the same

15  counselor?

16       A.       No.  It just seemed to be more productive.

17       Q.       Are you in counseling now?

18       A.       No.

19       Q.       Other than marital counseling, have you engaged

20  in any personal counseling?

21       A.       No, ma'am.

22       Q.       So other than the individuals that you saw during

23  this one- to two-year period, you've not seen anyone else for

24  counseling of yourself?

25       A.       That's correct.

1       Q.      Mr. Osenkarski testified that he told you that he

2    had been told by the judge's secretary that you might be

3    fired.  Do you remember that testimony?

4       A.      I don't recall that testimony, no.

5       Q.      Did Mr. Osenkarski tell you that the judge's

6    secretary had told him that the both of you may be fired?

7       A.      No.  I don't think Joe said anything to me about

8    that.  I think -- I wouldn't say a definitive no, but I think

9    the entire office knew what Ms. Varner's pursuits were.

10      Q.      And how did they know that?

11      A.      I have no idea.  I think she -- well, for six

12   months she ran around and had secret clandestine meetings

13   with a select group of disgruntled employees.  I mean, every

14   morning she would meet with Barry Hair, prior to at 7:30 in

15   the morning she would meet with Mark Galbraith, she would

16   meet with Nicole Galbraith, Kerry Houser.  It was a regular

17   routine for her to go around and tell these different people,

18   you know, what she was involved with against Joe and I.  And

19   so I mean, that's just the nature of how it happened.

20              My mother was dying from September of '97 till

21   January of '98.  When she was dying, she was diagnosed as a

22   terminal patient with aortic aneurysms and I was consumed

23   with taking care of my mother.  And this woman, Barbara

24   Varner, just went around every morning with a heyday trying

25   to tell exactly any story she could tell about Joe and I and

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              253

1   trying to get us fired and trying to get us demoted.

2       Q.    You weren't very happy about that, were you?

3       A.    I didn't know anything about it because -- I

4   didn't have a happy or sad face about it.

5       Q.    You didn't know anything about it because you

6   weren't in the Juvenile Probation office at the time?

7       A.    Oh, yeah, I was in Juvenile Probation at the

8   time.

9       Q.    Well, did you observe this conduct or didn't you?

10      A.    I watched her do this, right.

11      Q.    So when you say I didn't know anything about

12  it --

13      A.    I don't know what the --

14      Q.    You watched it happen?

15      A.    I watched her go have these office meetings with

16  these individuals, sure.

17      Q.    And what did you say about that?

18      A.    I didn't say a thing about it.

19      Q.    You didn't go to Joe Osenkarski and say:  What's

20  she wasting time doing this for?

21      A.    I probably did say that.

22      Q.    What else did you tell him?

23      A.    Tell who?

24      Q.    Mr. Osenkarski.

25      A.    Nothing.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                254


1      Q.      Well, did you complain at any time about Barbara

2   Varner and the way in which she acted toward you?

3      A.      I don't recall any specific complaints.

4      Q.      Did you ever make any written complaints about

5   Barbara Varner?

6      A.      No, ma'am.

7      Q.      Did you make any oral complaints that you

8   remember right now to Mr. Osenkarski about Barbara Varner?

9      A.      No.

10     Q.      What did you think of Ms. Varner's professional

11  capability?

12     A.      She was adequate.  Adequate.

13     Q.      Limit it to the period of time that you

14  supervised her.

15     A.      Okay.  Adequate.

16     Q.      How would you rank her among the probation

17  officers that you supervised?

18     A.      In what regard of ranking?

19     Q.      Let's talk about total conduct in the workplace.

20     A.      She was appropriate as far as her conduct in the

21  workplace.

22     Q.      What about quantity of work?

23     A.      Probably marginal --

24     Q.      How about quality?

25     A.      -- to average.  Marginal to average.  She didn't

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    255


1   excel, so.

2              What was your other question, I'm sorry?

3        Q.    Quality of work.

4        A.    Satisfactory.  Sometimes commendable.

5        Q.    Relationship with others?

6        A.    Good.  Commendable.

7        Q.    Knowledge of her professional work?

8        A.    She was inexperienced when I -- she was

9   inexperienced, so her knowledge was lacking as to how to

10  prepare reports.

11       Q.    Did you make any complaints about Ms. Varner's

12  work performance to anyone during the period of time that you

13  supervised her?

14             MR. MacMAIN:  Including Ms. Varner?  Or are you

15  talking about --

16             MS. WALLET:  Correct.

17             MR. MacMAIN:  Or are you talking about people

18  above them?

19             THE WITNESS:  I complained to her.

20  BY MS. WALLET:

21       Q.    What complaints did you make to her?

22       A.    Just different things that she was omitting on

23  her reports.

24       Q.    Specifically what was she omitting?

25       A.    Petition numbers.  She was dropping charges.  She

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    256

1    didn't carry the charge from the police report onto the

2    juvenile petitions.  She didn't identify victims and where

3    the restitution went.  She didn't differentiate between adult

4    co-defendants and juvenile accomplices, because we would get

5    juveniles charged with certain crimes and we would be

6    processing them much sooner than the adult counterpart, and

7    she would never differentiate between who was involved and

8    what their status was.  She -- there was a multitude of

9    different memorandums I gave to her.

10        Q.    And after you brought these to her attention, did

11   she change the way in which she did reports?

12        A.    Sometimes she resented my corrections.  And as

13   Joe testified to yesterday, we were consumed with other

14   things, I mean, other areas of trying -- pursuits when we

15   split these staffs.  So I finally got so frustrated after

16   giving her the memos two and three different times, I'd say,

17   please get your work reviewed by one of the senior POs before

18   you give it to me.

19        Q.    And who did you expect would review her work

20   before it came to you?

21        A.    Either Sam Miller or Denny Drachbar or Darby

22   Christlieb, any of the senior POs that could help her with

23   correcting the deficiencies in her work.

24        Q.    Did you complain to Sam Miller about Ms. Varner's

25   work?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    257

1        A.      He complained to me about her work.  And he
2    complained to me about always helping her, and he thought it
3    was unfair that I was always assisting her and in writing her
4    petitions, assisting her in writing her reports.  He and
5    Drachbar.  They were very experienced men, been on staff for
6    a long time, handled, you know, a lot of intensive work.  And
7    he thought -- they were giving me a hard time all the time
8    for helping her with her work.
9            Fran Rose would give me a hard time how -- she
10   was a secretary, kept coming to me where Ms. Varner would be
11   omitting things that the judge wanted on the reports.
12       Q.      Okay.  Now, you said that Miller and Drachbar
13   complained to you?
14       A.      For helping her.
15       Q.      Because they had to help Ms. Varner?  Didn't I
16   understand that correctly?
17       A.      No.  They complained to me for overly helping
18   Ms. Varner all the time, in saying, you know, you don't offer
19   that service to anyone else in here, how come she's the only
20   one that gets, you know, all the time, and why are you always
21   doing her petitions, she's never going to learn how to do
22   them while you keep doing them for her.
23       Q.      I understood you to say that you got tired of it
24   after a while and you told her to take her work to one of the
25   other senior POs?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                        258


1          A.      On a couple occasions I gave her the same

2    correction memorandum two and three different times.

3          Q.      Okay.  And one of those individuals would be

4    Mr. Miller.  Is it your testimony that Mr. Miller complained

5    to you because he didn't want to review Ms. Varner's work?

6          A.      No.  No.  He was obligated, you know, to review

7    her work since I had asked him to help her with her

8    deficiencies in her reports.

9          Q.      Now, did Mr. Drachbar complain to you about

10   having to review Ms. Varner's work?

11         A.      No.

12         Q.      But Fran Rose, the secretary, did?

13         A.      Fran Rose came to me repeatedly in things that

14   she would miss on her reports.  And Judge Sheely would call

15   down and say, you know, I've been through this before,

16   there's no petition numbers on this juvenile petition.

17         Q.      Was Ms. Varner the only individual about whom

18   there were these complaints?

19         A.      No, ma'am.

20         Q.      Was it a common complaint?

21         A.      Well, there was a -- in that one time period

22   there was probably a couple memos a month, you know, or a

23   couple, you know, just one right after the other probably

24   leading into this April 29th meeting down when she made her

25   complaints with the county.  I had probably gave her a memo

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          259


1   every month that preceded that from November or December.

2   I'm not sure.  You're asking me to go back six, seven years

3   on memos on specific cases that I haven't had any access to.

4       Q.    Do you have any of those memos in your personal

5   possession?

6       A.    Sure.

7             MS. WALLET:  Are you going to supplement your

8   interrogatories?

9             MR. MacMAIN:  Yes.  I can give them to you.  I

10  figured these questions would be asked so I made --

11            MS. WALLET:  Do I take this to be the complete

12  supplementation of the production request?

13            MR. MacMAIN:  Not complete.  This is one packet

14  of information in regard to your question.  You want to mark

15  this or do you want to ask about it?

16            MS. WALLET:  No.  We'll have to take that up at

17  another time, I'm afraid.

18  BY MS. WALLET:

19      Q.    You said earlier, prior to your being terminated.

20  Was that just a slip of the tongue?  Mr. Graham?

21      A.    A slip of the tongue?  I was terminated from the

22  Juvenile Probation office.

23      Q.    Why do you believe that you were terminated as

24  opposed to simply transferred?

25      A.    Because I went out of one department and into a

S. Gareth Graham                                    260


1   completely different department.

2        Q.    And that was not your choice?

3        A.    No, ma'am.

4        Q.    That was Judge Hoffer's choice?

5        A.    Well, that's interesting, too.  I don't know

6   whose choice it was because I don't know who employs me.

7        Q.    When you say you don't know who employs you, what

8   do you mean by that?

9        A.    Be it the county did the investigation, and the

10  Court, you know, provided me direction on where I was headed.

11       Q.    Okay.  Well, did you doubt that Judge Hoffer had

12  the ability to transfer you?

13       A.    I've never agreed with the action he took against

14  me, Ms. Wallet.

15       Q.    My question would be:  Whether or not you agreed,

16  did you have any reason to believe he did not have the

17  authority to take some action against you?

18             MR. MacMAIN:  Do you understand the question?

19             Do you mind if I attempt to rephrase it?

20             MS. WALLET:  Sure.

21             MR. MacMAIN:  What she wants to know is, it was

22  not your decision to be transferred to your current position,

23  but now I guess her question is do you know who had the

24  authority to make the decision?  And if you don't, you don't.

25  If you do, you do.  What she's asking is what you know.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          261


1          THE WITNESS:  I don't know if he had the

2    authority to do what he did.

3    BY MS. WALLET:

4          Q.    Why is it that you don't know?

5          A.    I think it's the same issue that's been debated

6    for years, whether Probation staff is a court-related

7    function or a county-related function.

8          Q.    What do you think?

9          A.    Oh, I think it's a court-related function.

10         Q.    So if it's court related why didn't Judge Hoffer

11   have the ability to transfer you?

12         MR. MacMAIN:  Let me object.  I think you're

13   asking him really a legal conclusion on what he believes the

14   law to be.  I don't think he can answer that.  He's told you

15   what he thinks.  I think going further why he -- his opinion

16   on a legal issue I think would be inappropriate.

17         MS. WALLET:  Well, I don't think I'm asking him a

18   legal issue.  I'm asking him why he believes that Judge

19   Hoffer might not have the ability to transfer him.  That's a

20   fact, that's not a legal conclusion.

21         MR. MacMAIN:  If you know, Gary.

22         THE WITNESS:  I don't know.

23   BY MS. WALLET:

24         Q.    Did you think that the county, i.e., the county

25   personnel officer, would have the ability to transfer you?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                           262


     1              MR. MacMAIN:  Same objection, but answer it if

     2     you know.

     3              THE WITNESS:  I don't know.  I don't know.

     4     BY MS. WALLET:

     5        Q.    Well, what did you think would happen as a result

     6     of an investigation of some complaint against you?

     7        A.    What did I think would happen?

     8        Q.    Well, let me be more precise.  What did you think

     9     the procedure should have been?  Someone makes a complaint

    10     about you.  What did you think the procedure should have

    11     been?

    12        A.    I think the complaint should have been made to

    13     Judge Sheely initially and not to the county Human Relations

    14     division.

    15        Q.    And why do you believe that?

    16        A.    Because I considered him as the employer.

    17        Q.    Okay.

    18        A.    I mean, he's the man that hired and disciplined

    19     and reviewed our work, and we did 99.9 percent of our

    20     activities as court-related matters.

    21        Q.    Okay.  And who would have investigated that

    22     complaint?

    23        A.    Probably the judge, if it would have gone to him,

    24     but it didn't.

    25        Q.    So you thought the judge should have done all of

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                        263


 1    this?

 2        A.      Absolutely.  You know, not Judge Hoffer.

 3        Q.      Now, if Judge Sheely had the ability to do it,

 4    why wouldn't Judge Hoffer?

 5        A.      Because the incident of complaints preceded any

 6    involvement of Judge Hoffer.  Judge Hoffer was only on the

 7    bench in January of '98.  The complaints that Ms. Varner was

 8    making had preceded all those.  So his authority -- like

 9    Mr. MacMain said, I'm not trying to offer some legal

10    explanations, but I don't know where his authority extended

11    into the activities I had been alleged to have done prior to

12    him sitting in the administrative judge's position on the

13    bench.  And he was, you know, he was put there in January of

14    '98.  And I was -- he made a decision against me in March

15    9th, I think or March 7th, March 9th of '98, less than 40

16    days thereafter.  Because I was off two weeks for my mother's

17    death and for my wife's grandmother's death.  So there was a

18    juncture of about 40 days of employment that I was under

19    Judge Hoffer's jurisdictional bounds.

20        Q.      And you didn't think that was long enough for him

21    to reach any conclusion about your performance?

22        A.      I didn't say that.  No.

23        Q.      What's the significance of the 40 days, sir?

24        A.      That's the threshold of time that I considered

25    myself under Judge Hoffer's purview of employment.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                            264


1        Q.     And you didn't think that was long enough?

2        A.     No.  That's just factually how long he was on the

3    bench as president judge as an administrator of the Probation

4    Department, during that juncture from January 1st till I was

5    demoted and sent to the prison.

6        Q.     Well, did you think he had long enough to judge

7    your work performance?

8               MR. MacMAIN:  Objection.  It's been asked and

9    answered.

10              THE WITNESS:  It's his prerogative.

11   BY MS. WALLET:

12       Q.     Would you agree, sir, that your performance

13   evaluations have always been at least satisfactory, if not

14   commendable?

15       A.     I would think they were satisfactory and

16   commendable, yes.

17       Q.     Do you recall, sir, that the one area that you

18   tended to be rated lower in was interpersonal relations and

19   Affirmative Action?

20       A.     You would have to show me those, because I don't

21   recall that.

22       Q.     Did anyone ever come to you and explain to you

23   why you were rated lower in that area than in the other

24   areas?

25              MR. MacMAIN:  Object.  He said he couldn't --

S. Gareth Graham                                265


             1              THE WITNESS:  I don't know what you're saying.

             2              MR. MacMAIN:  Hold on, Gary.

             3              I object.  He said he doesn't know that he was

             4    rated lower in those areas, so to ask him other questions

             5    you're assuming something he doesn't know whether it's true

             6    or not.

             7    BY MS. WALLET:

             8         Q.     Did anyone ever speak to you, sir, about your

             9    conduct in the area of interpersonal relations or Affirmative

            10    Action?

            11         A.     No, ma'am.

            12         Q.     And that would be true of Mr. Osenkarski?

            13         A.     Mr. Osenkarski.

            14         Q.     Mr. Bolze?

            15         A.     Yes, ma'am.

            16         Q.     And who currently does your performance

            17    evaluations, sir?

            18         A.     Lyle Herr and I guess John Roller, I guess the

            19    two of them.  And Mike Varner has done them in the past.

            20    I've been given three different supervisors, so it started

            21    with Herr, it went to Varner, now it's back to Herr again,

            22    so.

            23         Q.     And your testimony, sir, is none of those

            24    individuals has ever spoken to you about the area of

            25    interpersonal relations, slash, Affirmative Action?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          266

1        A.    No, ma'am.

2        Q.    Before you met with Judge Sheely did you know

3    that you might possibly be terminated from your employment?

4        A.    No, ma'am.

5        Q.    Did you think that that was at least a

6    possibility in the range of potential disciplinary action?

7        A.    You're asking me what I thought on --

8        Q.    Yes.

9        A.    In regard to what?  Whether I would be

10   terminated?  Is that what you're saying?

11       Q.    I asked you, did you think that there was a

12   possibility that you might be terminated before you met with

13   Judge Sheely in or about July of 1997?

14       A.    I don't know a thing about anything that was

15   going on, and I didn't interrupt anything that was going on

16   and I knew nothing about what was going on other than what

17   the county had called me down on the 29th of April.  So any

18   subsequent investigation, any subsequent report, any

19   subsequent actions, I knew nothing about and heard nothing

20   about, period.

21       Q.    Did you have any discussions with the judge's

22   secretary about the possibility of your being terminated?

23       A.    No.

24       Q.    If the judge's secretary, and I'm speaking of

25   Sandy, now, did she ever engage you in a conversation about

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    267

1    your employment in the Probation office?

2         A.    No, ma'am.

3         Q.    When you went to see Judge Sheely the first time,

4    I believe you told me you had two conversations with him,

5    correct?

6         A.    Yeah.  I think I have that straight now.  I

7    wasn't very clear the last time, so.

8         Q.    Okay.  Well, tell me what you remember now about

9    how many times you met with him and when.

10        A.    I only met with him -- I testified earlier that

11   Hank Thielemann came downstairs and I think he had summoned

12   different people upstairs over the course of the events to

13   find out what was going on, or what he knew, what they knew

14   about what was going on.  I'm not sure of that.  That's just

15   another rumor that passed around.

16        Q.    I'm not asking you, sir, for rumors.  I'm asking

17   you to tell me how many times did you meet with Judge Sheely

18   regarding --

19        A.    I think twice.

20        Q.      -- Ms. Varner's complaints?

21        A.    Twice.  I went up on my own after Hank said, I

22   think he's going to transfer you, Gary.  I said, what do you

23   mean he's going to transfer me.  And he said, you better go

24   up there and just talk to him.

25              And so I went up and I asked if I could have time

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          268


 1    to talk to him.  And I went in and I basically at that

 2    juncture said, Judge Sheely, this is not about sexual

 3    harassment in our office, it's about me having a consensual

 4    affair with Barb Varner.

 5         Q.    Just the two of you?

 6         A.    Yeah.

 7         Q.    Okay.

 8         A.    Then I think I got together with Dave Foster the

 9    next day at, like, 11 o'clock or something, or 11:30, right

10    before lunch, I think we both went in.

11         Q.    Okay.  And who was there that time?

12         A.    Just I think Dave Foster and myself and Judge

13    Sheely.

14         Q.    Do you remember anything more about what happened

15    at that 11 o'clock meeting the next day?

16              MR. MacMAIN:  You mean more than what he

17    testified the first day of his deposition?

18              MS. WALLET:  Earlier, yes.

19              MR. MacMAIN:  Anything else you want to add to

20    what you have already told us before?

21              THE WITNESS:  Not really, no.

22              MR. MacMAIN:  That's it, then.

23    BY MS. WALLET:

24         Q.    And did you review something between the time

25    that we took your first day of deposition and today that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                269

1    caused you to remember these things?

2        A.    I just kind of recall, I was trying to separate

3    that out and I was trying to -- and I had talked to my wife

4    about it, and I said, you know, I was down there giving

5    disjointed information the other day and probably driving the

6    court reporter nuts because I couldn't remember the exactness

7    of if I would have been in first or if I would have been in

8    with David Foster.  And then I said, I said -- and she didn't

9    know because she didn't know when I went in.  And I said, I'm

10   almost positive I went in myself when Hank came down and said

11   something to me, I went directly upstairs.

12            And then the next day I met with Judge Sheely

13   and, you know, with Dave Foster at noon.

14       Q.    Okay.  And you answered that your wife was not

15   present for either of these meetings, correct?

16       A.    No, in ma'am.  Not -- no.

17       Q.    And did you ask your wife recently whether she

18   recalled something different?

19       A.    I think I reviewed that with her the other day

20   after our testimony.  And she said, I wasn't in there with

21   you, she said.

22       Q.    Did your wife tell you anything else that

23   refreshed your recollection --

24       A.    No.

25       Q.    -- of these events?

1      A.    No, ma'am.

2      Q.    Is her recollection generally better than yours?

3      A.    I would think it might be, because I was pretty

4   traumatized when I went in there and that's probably why I

5   can't remember.

6      Q.    And she wasn't --

7      A.    She wasn't there.

8      Q.    She wasn't traumatized?

9      A.    Sure.

10     Q.    Who is Jody Nelson?

11     A.    I have no idea.

12     Q.    Did you ever visit the homes of any of the

13  probation officers who worked with you other than Ms. Varner?

14     A.    I think I had been to Kerry Houser's apartment

15  for a party.  I think I had been to Deb Graeff's house at one

16  point.

17     Q.    For what reason?

18     A.    For, might have been a party when she was

19  retiring.  That's all I can remember.

20     Q.    Ever pick up any of the other probation officers

21  at their homes to go on some work-related trip?

22     A.    I don't recall, no.  Mary Jo Keffer 25 years ago,

23  I remember going to her house in Camp Hill.

24     Q.    And who was she?

25     A.    She was a probation officer.  But that, I can

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          271


1    just remember picking her up at her house.  She wanted to be

2    picked up at her house.

3         Q.    Anybody else?

4         A.    Not that I can remember, recall.  I just can't

5    recall.

6         Q.    Did you ever visit any probation officer

7    uninvited at his or her home?

8         A.    No, ma'am.

9         Q.    Did you know Lynn Dickerson?

10        A.    Yes.

11        Q.    Ever visit her home?

12        A.    Yes, I did.

13        Q.    On what occasion?

14        A.    Under what circumstances or what occasion?  I

15   don't understand what you mean.

16        Q.    Well, what do you remember about visiting Lynn

17   Dickerson at her home?

18        A.    Lynn Dickinson -- I have to go into a periphery

19   here of a story to tell you why I was at her home.

20        Q.    Fine.  I have plenty of time, Mr. Graham.

21        A.    Okay.  What happened is Lynn Dickinson was one of

22   the probation officers that was hired along with Barb Varner

23   and Mark Galbraith when we hired the Family Preservation

24   grant in probation.  She was hired under that, those, that

25   grant proposal.  Mr. Osenkarski and Lynn Dickinson worked

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    272

1    regularly on that grant reporting.  Lynn basically took her

2    summer internship and worked on that proposal.  And it just

3    so happened that Ms. Varner and Lynn Dickinson were in school

4    together at Penn State and I guess they were friends or

5    acquaintances.

6            And what happened is when Lynn Dickinson, after

7    she was hired she decided not to take the position in

8    Probation and go on further to pursue her master's degree.

9    And I received a call at my home by Lynn Dickinson's husband

10   who is an attorney with the Governor's office, and he was

11   distraught because Lynn Dickinson had received a call from

12   Kerry Houser at her personal residence.  And he was angry

13   because Kerry evidently said that in glossary or in

14   conclusatory form, nobody in Probation likes Lynn and she's

15   really not welcome.  And this man was devastated and he said,

16   can you share any light what did Lynn do wrong.  And I said,

17   she did nothing wrong.

18           And I went down and I talked to him and I talked

19   to Lynn about that situation, and that's the only time I was

20   at her home.

21       Q.    Were you invited to the home on that occasion?

22       A.    Her husband called me and said, can we discuss

23   this.

24       Q.    Did he invite you to his home on that occasion?

25       A.    I think so is what I recall.  I don't remember,

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              273


1    like, being inside.  I think I even talked to him on the

2    street or at the front door.  I don't remember ever being

3    inside the home.  I just remembered it was located near

4    Rolling Green cemetery.

5         Q.    Do you remember visiting the Dickinson home on

6    any other occasions?

7         A.    No.  No, none, that I recall.

8         Q.    Only one time?

9         A.    Only the time when he was extremely upset about

10   Lynn getting this phone call from Kerry and saying that

11   nobody wanted her in the Probation office.

12        Q.    Did you hear that directly from Lynn or just from

13   Lynn's husband?

14        A.    From her husband.

15        Q.    Why do you think her husband called you?

16              MR. MacMAIN:  Objection.  If you know why her

17   husband called you.  If you don't, then say you don't.

18              THE WITNESS:  I have no idea why he called me

19   other than --

20              MR. MacMAIN:  If you don't know --

21              THE WITNESS:  I don't know.  I won't summarize.

22   BY MS. WALLET:

23        Q.    Had he known you previously?  Is really the

24   question.

25        A.    No, ma'am.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                274

1    Q.    You never met him before?

2    A.    No, ma'am.

3    Q.    Since you've been at the prison, sir, did you

4    brag about having sexual relations with anyone?

5    A.    No, ma'am.

6    Q.    Did you brag about someone that you had sexual

7    relations with and the father-in-law came to complain?

8    A.    You'll have to be more specific.  I have no idea

9    what you're talking about.

10   Q.    You have no recollection of that?

11   A.    What, a father-in-law -- I don't have any idea

12   what you're talking about or what your question is.

13   Q.    Did you ever date someone whose father-in-law

14   works at the prison?

15   A.    I don't know who you're referring to.

16   Q.    Did you meet with Mr. Foster in your offices in

17   the Probation Department?

18   A.    I think Mr. Foster came into my office the day we

19   were going to go up to see Judge Sheely.

20   Q.    And did you meet with him there?

21   A.    Sure.

22   Q.    Do you recall how long that meeting was?

23   A.    Probably a couple minutes.  Less than five

24   minutes.

25   Q.    Had you met with Mr. Foster on any other occasion

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              275

1   prior to your going to meet with Judge Sheely at which

2   Mr. Foster -- let me try that again.

3        A.      I'm following you so far.

4        Q.      Did you meet with Mr. Foster at any time except

5   for the meeting in your office before you went to see Judge

6   Sheely and Mr. Foster accompanied you?

7        A.      No, ma'am.

8        Q.      Did anyone in the Probation office ever tell you

9   not to raise your voice to Barbara Varner?

10       A.      No, ma'am.

11       Q.      No one?

12       A.      No one.

13       Q.      Did Mr. Osenkarski share his corrective action

14  memo with you?  I'm going to show you --

15       A.      You'll have to remind me.

16       Q.      -- what has been marked previously as Osenkarski

17  Deposition Exhibit 2.

18       A.      I don't recall, ma'am.  I don't remember it.

19       Q.      Did he tell you in or about June of '97 that he

20  was preparing some sort of a corrective action plan?

21       A.      No.  He basically told me that he was researching

22  the, you know, the correction course or the proper course to

23  take for sexual harassment complaints.  That's what I

24  remember him telling me about.

25       Q.      You don't remember him talking to you at all

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              276

1   about what he was doing in response to Ms. Varner's

2   complaints?

3       A.      No.  That's basically what he felt, how he, what

4   he wanted -- no.  I don't know.  He didn't tell me anything

5   of what he was including or investigating in regard to a

6   corrective action plan.

7       Q.      Did he ever suggest to you that you should attend

8   some kind of sexual harassment training?

9       A.      No, ma'am.

10      Q.      Did he ever tell you that he thought you should

11  attend some management training?

12      A.      Sure.

13      Q.      When was that?

14      A.      I think Tom Boyer and I both went to management

15  seminars, you know.  I don't know when, but I recall going to

16  one or two that were put on for management.

17      Q.      And was it after June of '97?

18      A.      It was after I was promoted to supervisor, I can

19  tell you that.  I don't know when it occurred after that.

20      Q.      So you're not sure whether it was before or after

21  June of '97?

22      A.      I think it was after, well, whenever I was

23  promoted.

24          MR. MacMAIN:  She's asking you very specifically,

25  Gary, after these complaints were made.  Do you know if your

S. Gareth Graham                                      277


1    management training was after those complaints were made?  Or

2    before, or alternatively if you don't know, you don't know.

3                THE WITNESS:  No.  It preceded that, the

4    complaints.

5    BY MS. WALLET:

6        Q.     And were you aware of any kind of creation of a

7    committee that was to handle complaints of any issues within

8    the Probation office?

9        A.     I recall Joe talking about that.

10       Q.     What do you recall about that?

11       A.     Just that we want to be able to resolve the

12   differences in the amount of animosity that was generated by

13   the split of these staffs, and he felt it was counter

14   productive and unhealthy.  And he said, you know, where Bolze

15   never left anybody in on the administrative side to make

16   corrections, he was not going to do that.  He was going to

17   try to resolve differences between people, you know, in a

18   least restrictive setting or least, something like that.

19   That's what I remember.

20       Q.     Do you know whether such a committee was ever

21   created?

22       A.     I think he went around and asked people if they

23   would be willing to sit on a panel or whether they thought

24   that was a good idea, to try to lower the office commotion.

25       Q.     Did he ask you?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                278

1      A.     No, I don't really think he asked me.

2      Q.     How do you know he asked others?

3      A.     Because I think he went around and I knew about

4   him going around.  Specifically asking me individually about

5   it?  I don't recall him doing that.

6      Q.     Do you know who he asked about whether or not

7   this committee was a good idea?

8      A.     I would imagine he --

9             MR. MacMAIN:  She's not asking for guesses.  Do

10  you know of any specific people that you have firsthand

11  knowledge of who he asked to be on the committee?  And if you

12  don't, you can say that.

13            THE WITNESS:  No, I don't have specific

14  knowledge.  He polled the offices, his words.

15  BY MS. WALLET:

16     Q.     So you know this because of what Mr. Osenkarski

17  told you, not because of what you observed?

18     A.     I just don't remember.

19     Q.     Have you ever gotten into trouble because of your

20  anger management?

21     A.     No, ma'am.

22            MS. WALLET:  Let's mark as Deposition 4 a

23  one-page document.

24            (Graham Deposition Exhibit No. 4 was marked.)

25  BY MS. WALLET:

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                  279


1        Q.      Do you have that front of you, sir?

2        A.      Sure.

3        Q.      Tell me if you're the S. Gareth Graham listed on

4     this memorandum?

5        A.      Sure.

6        Q.      Do you believe you got a copy of this memo in or

7     about June of 1997?

8        A.      Sure.

9        Q.      And did someone hand you this memo?  How did you

10    receive it?

11       A.      I think Joe gave it to me.

12       Q.      Did you talk with him about this memo at the time

13    that he gave it to you?

14       A.      I think so, yes.

15       Q.      What do you recall about that conversation?

16       A.      He basically had said that when a sexual

17    harassment complaint has been lodged it's a suggestion that

18    the parties are separated so that there isn't anymore hostile

19    work environment or there's no more, what's the right word,

20    there's just no more interaction between the parties.

21       Q.      And did he use the term hostile work environment?

22       A.      Probably.

23       Q.      What did you say to him?

24       A.      And I said, well, that's your decision to make.

25       Q.      Were you happy about this decision, or unhappy?

S. Gareth Graham                                    280


1      A.      I didn't agree with it.

2      Q.      Did you tell him that?

3      A.      Sure.

4      Q.      What did you tell him?

5      A.      I told him I didn't agree with it.

6      Q.      What did he say?

7      A.      That's the way it's going to be.

8      Q.      Did you follow this memo?

9      A.      Absolutely.

10     Q.      Do you know who was placed as supervisor, other

11   than Mr. Miller, over Ms. Varner?

12     A.      Just Denny Drachbar.  I mean, he was to fill in

13   if Sam wasn't available.

14     Q.      Do you know whether anyone else actually

15   supervised Ms. Varner after this memo in June of '97?

16     A.      No, I don't.  I don't know who else would have

17   supervised her.

18     Q.      Were you told at any time, sir, after June 13 of

19   1997 that you were not to associate with Ms. Varner?

20     A.      I don't understand your question on association.

21     Q.      Were you told to stay away from her?

22     A.      No.

23     Q.      You continued to work in the same office after

24   June 13 of 1997 until you were transferred to the prison, and

25   I believe that was effective --

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                281

 1      A.      March '98.

 2      Q.      -- March of '98.

 3      A.      Yes, ma'am.

 4      Q.      Where was your office in relation to Ms. Varner's

 5 office between June of '97 and March of '98?

 6      A.      My office was back the hall from hers.  She had a

 7 cubicle, enclosed office out where the secretaries were, and

 8 my office was in the back, in the back of the office.

 9      Q.      Did you have to go past her cubicle to exit the

10 office?

11      A.      Yes, I did.  I had to go out into the secretarial

12 area.  I don't know whether you're claiming that's directly

13 past her -- it's a small quarters so it's probably within 10

14 feet of her office, yes, ma'am.

15      Q.      There was only one exit from the office at that

16 time, correct?

17      A.      That's correct.

18      Q.      And that exit was essentially past Ms. Varner's

19 cubicle?

20      A.      It was out into the secretarial area of the

21 office, and her office was back in the far corner of the

22 secretarial area of the office.

23      Q.      Did you have occasion to work on the same cases

24 after June 13, '97, until you were transferred to the prison

25 in March of '98?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    282


 1        A.    I just don't recall.  I might have had other

 2    cases with her.

 3        Q.    You don't remember?

 4        A.    I don't remember.

 5        Q.    Now, after you were transferred to the prison you

 6    participated in some kind of a sexual harassment seminar,

 7    correct?

 8        A.    Yes, ma'am.

 9        Q.    And it was after you were transferred to the

10    prison?

11        A.    It was before and after.

12        Q.    Do you recall a sexual harassment seminar after

13    you were transferred to the prison?

14        A.    Sure.

15        Q.    And was Ms. Varner also in attendance at that

16    seminar?

17        A.    Not that I recall.  I just don't know.  I don't

18    think so.

19        Q.    Do you believe that all of the probation

20    officers, adult and juvenile, were required to attend this

21    seminar?

22        A.    It was a county -- the one at the prison was a

23    county Human Resources seminar.

24        Q.    My question, sir, was:  Were all of the probation

25    officers required to attend this Human Relations seminar?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                   283


1            MR. MacMAIN:  Is your question at the same time,

2    or just at some point they all had to take it?

3            MS. WALLET:  At the same time.

4            MR. MacMAIN:  Do you understand?

5            THE WITNESS:  No.  I'm confused.

6            MR. MacMAIN:  She wants to know if the training

7    that you recall taking at the prison, whether the entire

8    department was there at the same time.  If you know.

9            THE WITNESS:  I've had, like, two or three

10   different or yearly sexual harassment trainings that have

11   been offered at the prison, and it's my recollection that I

12   don't think there was any probation officers in attendance at

13   any of those.

14           MR. MacMAIN:  It perhaps would be easier, I don't

15   know if you want to focus, I believe that's one of the

16   assertions in the Complaint.  Is that the one you're

17   referring to?

18           THE WITNESS:  Well, that one happened at the

19   courthouse, though, the one she's referring to in her

20   Complaint.  That was the one that was set up by I guess the

21   judge and the Human Relations Commission and/or -- and Joe

22   and the rest of the people that used Mazzitti and Sullivan

23   to.

24   BY MS. WALLET:

25       Q.    Okay.  Do you know when that was, sir?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    284


 1        A.     You'll have to give me the date.  I don't know.

 2   Or judge, you know, can recall, maybe he can recall when that

 3   was.

 4        Q.     How about October 17 of '97?

 5        A.     Yes.

 6        Q.     Okay.

 7        A.     But that wasn't at the prison.

 8        Q.     I had originally asked you about seminars after

 9   you were transferred to the prison.  But this was before you

10   were transferred, correct?

11        A.     Yes, ma'am.  Yes, ma'am.

12        Q.     So you have a recollection of the October 17,

13   '97, Mazzitti and Sullivan training?

14        A.     Yes, ma'am.

15        Q.     Okay.  And who was present at that training?

16        A.     A representative from Mazzitti and Sullivan, and

17   all the probation officers.

18        Q.     Were there other county employees at that

19   seminar?

20        A.     There might have been.  I just don't recall.

21   There might have been other people.

22        Q.     Was Ms. Varner present at the October 17, '97,

23   seminar?

24        A.     Yes, ma'am.

25        Q.     Where did you sit in relation to her?