S. Gareth Graham                                    285

1       A.      I don't recall.

2       Q.      You don't recall that you sat across from her?

3       A.      I recall being in the room and had my -- and

4   talking to the trainer for some reason.  I don't know if I

5   had known him from a previous employment he was involved

6   with, or but I was conversing with him.  And then Ms. Varner

7   and the rest of the probation officers came in the room.

8               As far as knowing where I sat, I had probably

9   already established my seat with my tablet where I sat that

10  day, so.  Where it was in relation to her, I couldn't tell

11  you.

12      Q.      You believe you sat down first?

13      A.      I was in the room first and sat -- and had my

14  material in the room first, yes.

15      Q.      And you believe that you selected your place --

16      A.      Absolutely.

17      Q.      -- at a chair first?

18      A.      Sure.

19      Q.      But you weren't in your chair at the time?

20      A.      I just said I was, I think I was talking to the

21  facilitator, because it was some connection I knew with this,

22  that I had known this guy or thought I knew this guy.

23      Q.      Did you glare at Ms. Varner during this seminar?

24      A.      No, ma'am.

25      Q.      If someone said you did, that would be a lie?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                286

1    A.    Absolutely.

2    Q.    Now, you had another seminar after you were

3    transferred to the prison?

4    A.    I've had probably yearly seminars that the county

5    has provided on sexual harassment, and I've been in

6    attendance to all those.  So however many years I've been

7    down there they've had them, a yearly seminar on this.

8    Q.    What you say down there, what do you mean?

9    A.    At the prison.

10    Q.    And were you there with other prison employees?

11    A.    Yes, ma'am.

12    Q.    So this was a seminar for prison employees held

13    at the prison and you were a part of it?

14    A.    It was -- right.  It was a seminar held

15    countywide by a Human Relations facilitator that set up

16    sexual harassment training for everybody in the entire

17    county.  It made sense for me to attend the prison seminar as

18    opposed to run up to the courthouse to go to the Probation

19    seminar when they were being held.

20    Q.    Were you prohibited in any way from being at the

21    courthouse after you were transferred to the prison?  Do you

22    understand my question?

23    A.    Yeah.  That's kind of a multi-leveled, too,

24    response to that.

25    Q.    Well, let me be more specific.  Did you ever get

S. Gareth Graham                                    287


1   a memo that said:  Now that you've been transferred to the

2   prison you are not to enter the courthouse as part of your

3   duties?

4        A.     No, I didn't.

5        Q.     Did any of your supervisors, including Judge

6   Hoffer, tell you that you were prohibited from coming into

7   the courthouse?

8        A.     No, ma'am.

9        Q.     Were you at any time after you were transferred

10  to the prison told that you should not associate or come near

11  Ms. Varner?

12       A.     No, ma'am.

13       Q.     Did you believe that you had any restrictions

14  with regard to your interaction with Ms. Varner?

15       A.     Only my self-imposed restrictions of not wanting

16  to have any interaction with her, and not having any -- I

17  didn't want to have any direct or indirect association with

18  her.

19       Q.     And that wasn't because of what somebody told

20  you, but you just thought that would be prudent to do?

21       A.     That's correct, ma'am.

22       Q.     Did you park next to her car at the prison last

23  week?

24       A.     I think I did.

25       Q.     There were lots of parking spaces at the prison?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                288


1      A.      I didn't recognize that to be her car until I

2   went in the prison and she was out there.

3              MS. WILLIAMS:  A short break?

4              MR. MacMAIN:  Why don't we take five minutes.

5              (Recess taken from 12:01 until 12:10 p.m.)

6              (Graham Deposition Exhibit No. 5 was marked.)

7   BY MS. WALLET:

8      Q.      Mr. Graham, do you have what we've marked as

9   Deposition Exhibit 5?

10     A.      Yes.

11     Q.      What do you recall about this document?

12     A.      It was a recommendation sheet submitted on Mark

13  Roderigo and --

14     Q.      Actually, I think wasn't our agreement that we

15  were going to black that out?  And I neglected to do that.

16             Was this a juvenile?

17     A.      Yes, it was.

18             MS. WALLET:  Okay.  I would ask that we just say

19  Mark R., and I'll mark sure that the rest of the name is

20  blocked.

21             MR. MacMAIN:  Agreed.

22             THE WITNESS:  Okay.  A recommendation memo that

23  Barb submitted along with a report.  She had submitted this I

24  think on one or two previous occasions.  I think she

25  submitted it prior to April 7th, 1997, and I had reviewed it

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          289


1    and found some things that she needed to add into her report.

2    I itemized those, and this was the second or third go-around

3    over the same material that she submitted.

4    BY MS. WALLET:

5        Q.    Okay.  Now, how do I know that this is a second

6    or third go-around?  Is there any way of telling that from

7    this document?

8                MR. MacMAIN:  From this single sheet of paper?

9                MS. WALLET:  Yes.  I'm still talking about

10   Deposition Exhibit 5.

11               MR. MacMAIN:  Sure.

12               THE WITNESS:  Well, I responded back to her on

13   the 18th of April with -- and I had also given her a memo to

14   you on April 7th that I referred to.

15   BY MS. WALLET:

16       Q.    You don't mean to me.  To Ms. Varner?

17       A.    To Ms. Varner.

18       Q.    Okay.  My question, sir, is:  Can I tell by

19   looking at this document that this is something submitted

20   other than on April 2nd, 1997?

21               MR. MacMAIN:  Let me just interject for

22   clarification.  He says "see me about these cases," he's

23   referring to other documents, and I think the documents I

24   gave to you earlier today are going to have the other

25   documents he's referring to.  So that would make things

S. Gareth Graham                                    290


1   easier instead of this guessing game.  What he's referring to

2   is other documents I believe you can question him about.

3   BY MS. WALLET:

4        Q.     Did you understand my question, though?

5        A.     I think so.

6        Q.     And are you able to answer my question?

7        A.     What does this memo refer to?

8        Q.     My question is:  How can I tell by looking at

9   this document that it was something submitted other than on

10  April 2, 1997?

11       A.     I imagine that this report was prepared on April

12  2nd.  Can I validate that that's when it was sent to me or

13  given to me?  No, I can't.

14       Q.     You said you thought this was the second or third

15  go-around.  That's what I'm really asking you about.

16       A.     Okay.

17       Q.     How can I tell from this document that it was

18  some revision?

19       A.     Well, based on my response to her on the 18th of

20  April, the handwritten note at the bottom, it says, "see me

21  about these cases," and, "you did not include what I asked

22  for in my memo to you on April 7th, 1997."

23              So evidently I gave her a memo after she

24  submitted this somewhere between the 2nd of April and the 7th

25  of April, and I had given her some corrections to put on the

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          291

1    report, and she resubmitted it again on the 18th of April is

2    when I made these comments.

3         Q.     Okay.  So you believe that this document was the

4    version that was submitted to you by Ms. Varner sometime

5    after April 2nd, after April 7, but before April 18?

6         A.     Yes, ma'am.

7         Q.     But you would agree the document itself doesn't

8    indicate that?

9         A.     You know, I'd have to pull -- I've had no

10   opportunity for discovery to pull those cases and to find

11   out, you know, what's actually in those cases and if they

12   contain the originalities of what were in them from the

13   beginning.  So these are notes that, you know, I had when I

14   packed everything up from the courthouse to go out of the

15   courthouse.

16        Q.     Okay.  So the pack of documents that I received

17   from your counsel today, they were documents that you had

18   with you when you left the Probation offices in the

19   courthouse in or about March of '98?

20        A.     Yes, ma'am.

21        Q.     And what caused you to take these documents at

22   that time?

23        A.     I had some documents on different people that

24   were in the office of court corrections that I had gone

25   through with them, and I had kept these documents because we

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                292

1    were -- we had hired some new probation officers and they

2    were inexperienced and basically they had errors in their

3    reports and omissions in their reports.  And I had kept

4    documents on different individuals that I made corrections

5    on.

6         Q.    So you had some sort of a folder that said

7    Barbara Varner and you had documents in that related to her?

8         A.    No.  I had a work-related folder just on

9    different just work-related memorandums.

10        Q.    Okay.  But in that folder you had things related

11   to probation officers other than Ms. Varner?

12        A.    Absolutely, um-hum.

13        Q.    And then at some point in time you went through

14   that folder and picked out the things that your counsel gave

15   me today?

16        A.    Well, when you produced this memo the other day,

17   you know, that you made reference to.

18        Q.    Now, do you recall answering some requests for

19   documents that I served upon you sometime in or around July

20   or September of 2002?

21        A.    I don't know what you're referring to.

22        Q.    Okay.  Well, let me just hand you what purports

23   to be S. Gareth Graham's Responses to Plaintiff's First Set

24   of Interrogatories.  I believe they were served on me by fax

25   November 18 of 2002.  Take a look at that.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                       293

1      A.      Okay.

2      Q.      Have you had a chance to look at those responses?

3      A.      Sure.

4      Q.      Did you assist your counsel in preparing those

5    responses?

6              MR. MacMAIN:  Well, I'll represent I certainly

7    worked with Mr. Graham when we prepared responses based on

8    information provided and based on information that was set

9    forth in the Complaint.

10   BY MS. WALLET:

11     Q.      And I asked you to identify anything that you

12   might have in your possession relating to Barbara Varner or

13   her claims of sexual harassment and sex discrimination.  Do

14   you recall that question?

15     A.      Not really.

16     Q.      Well, did you have these documents that have been

17   provided to me today at the time that you answered this

18   request in or about November of '02?

19     A.      I knew I had them somewhere if I -- I knew I had

20   most of my material from my exit packed in boxes down in the

21   garage in my house, and I didn't go down there to discover

22   anything as far as -- until this became an issue here.

23     Q.      Okay.  You think you had them at that time; you

24   just hadn't gone through them?  Is that your testimony?

25             MR. MacMAIN:  Well, let me -- hold on a second.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    294

1    Let me represent, the question that was asked was any

2    documents regarding sexual harassment.  At the time these

3    were answered -- and the Complaint set forth specific

4    instances that she's claiming harassment took place.  These

5    documents go to a different issue altogether, and that

6    specifically has to do with allegations she raised in her

7    deposition as to that he was unfair in terms of his

8    evaluation, screamed at her and so forth.

9              So I think if your implication is he didn't

10   provide documents that were responsive to a question, they're

11   not responsive to that document request, and we will

12   supplement it based on assertions that she has made at her

13   deposition now that we have a more clear picture of exactly

14   what it is she's claiming Mr. Graham did or did not do.

15             MS. WALLET:  Okay.  I'm not casting any

16   aspersions on anyone, Mr. MacMain, but the question was:

17   Identify all documents in your possession relating in any way

18   to Barbara Varner or to her claims of sexual harassment and

19   sex discrimination.

20             MR. MacMAIN:  Correct.  And the allegation of

21   sexual harassment is what is set forth in the Complaint.

22   These documents go to a different issue.

23             MS. WALLET:  I'm simply asking your client did he

24   have these documents in his possession at the time that he

25   answered this discovery request in November.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    295


 1          THE WITNESS:  No.  I didn't -- I hadn't retrieved

 2    them.  I didn't know if I even had them.

 3    BY MS. WALLET:

 4          Q.    Okay.  And you say they were in your garage?

 5          A.    Sure.

 6          Q.    You didn't think something in your garage was in

 7    your possession?

 8          A.    I didn't know what was in the boxes of materials

 9    that I had -- I exited the courthouse in one day.  Judge

10    Hoffer called me up on March 9th and said, you need to go

11    downstairs, pack your bags, take the rest of the day off, and

12    leave.  That evening or that afternoon I packed everything in

13    boxes, actually computer boxes, and I threw everything in a

14    computer box and left the office.

15          Q.    Did you have one box or more than one box?

16          A.    I don't recall how many boxes I had.  Numerous

17    boxes.  Personal items and --

18          Q.    Can you estimate for me how many documents you

19    might have taken when you left the courthouse that would be

20    similar to the ones that have been provided to me today?

21          A.    I can't estimate anything like that.  I don't

22    know.

23          Q.    Well, you've looked through the boxes now,

24    correct?

25          A.    Sure.

S. Gareth Graham                         296

1      Q.     All right.  And my question, sir, is:  How much

2   material do you have relating to specific cases in your

3   possession?  One box?  Two boxes?  One folder?  A half inch?

4      A.     I don't know.  I don't know how many -- I

5   wouldn't be able to quantify what I have.

6      Q.     Okay.  After we had the deposition of Ms. Varner

7   did she raise certain issues and you said to yourself, oh, I

8   might have some of that stuff at home?  Correct?

9      A.     Sure.

10     Q.     Okay.  And then you went home and you looked

11  through what you had, and you came up with this package,

12  correct?

13     A.     Correct.

14     Q.     Okay.  I'm asking you, sir, how much material did

15  you have to go through in order to find this package?

16     A.     Maybe one folder.

17     Q.     One folder.  Is it half an inch thick, an inch

18  thick, three inches thick?

19     A.     Probably less than a quarter of an inch thick.

20     Q.     Okay.  Are you satisfied, sir, that you have gone

21  through all of your documents and that you have pulled out

22  all of the documents that relate in any way to Barbara

23  Varner?

24            MR. MacMAIN:  I'll object to that, because I

25  still need to review documents with him and provide

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                      297

1    supplementations if need be.  So I'm not going to let him

2    answer whether he's gone through everything or he hasn't.

3                MS. WALLET:  Okay.  Are you going to let him

4    answer that he's gone through it but he's given some of it to

5    you?

6                MR. MacMAIN:  If you can answer that.  Have you

7    gone through all of -- well, no, because I need to consult

8    with him and determine what documents may be responsive and

9    which documents may not, which documents he has which may be

10   letters from counsel, either myself or prior counsel.  So

11   we'll certainly supplement our discovery responses for

12   documents that are related to documents that have been asked

13   for or are relevant in the litigation, as I expect you would

14   as well.

15               MS. WALLET:  Sure.

16   BY MS. WALLET:

17        Q.     Other than this folder that you indicated, do you

18   have any other documents in your house, in your garage, in

19   some storage area, someplace that you have access to that

20   relate to Barbara Varner?

21        A.     No, ma'am.

22        Q.     This handwriting on the document marked

23   Deposition 5, is all of that your handwriting?

24        A.     Yes.

25        Q.     The initials up at the top, BEV, I assume those

S. Gareth Graham                                  298


1    are Ms. Varner's initials?

2        A.      Yes, ma'am.

3        Q.      Everything else that's not typed belongs to you?

4        A.      Yes, ma'am.

5        Q.      Sir, have you talked to anyone other than your

6    wife since the deposition, the first day of your deposition,

7    regarding the matters surrounding Ms. Varner's Complaint?

8    We'll exclude counsel at this point.

9        A.      No.

10       Q.      Did you talk to Mr. Osenkarski?

11       A.      No.

12       Q.      Have you talked to any of the individuals who

13   have been identified as potential witnesses in this case?

14       A.      No.

15       Q.      Mr. Graham, did you ever threaten John Ward?

16       A.      No, ma'am.

17       Q.      Did you ever say that Mr. Ward would get his for

18   his activities relating to this Complaint?

19       A.      No, ma'am.

20       Q.      Do you harbor any ill will toward Mr. Ward as a

21   result of his actions concerning this Complaint?

22       A.      Do I like him?  No, I don't like him.  Do I

23   harbor any ill will?  No.

24       Q.      Why don't you like him?

25       A.      A multitude of reasons.  I think he was a -- he

1    interrupted the Probation office that was basically

2    unencumbered by partisan political process until he became

3    the chief clerk.

4          I didn't like what he did to our detention

5    center, where he tried to accuse Joe and I of negotiating

6    contracts without fiscal concerns.  He talked clandestinely

7    that I can relate that behind our backs to the chief clerk in

8    Dauphin County over the Woodside and the Schaffner Youth

9    Centers.

10          He denied us compensation for after-hours duties,

11   where he would pay Children and Youth $30,000 at the time to

12   have a night call person, and then finally corrected that and

13   I guess Joe has a night call person to handle after-hours

14   emergency calls.

15          He accompanied Gary Shuey into our office and was

16   angry that we were -- that dependency kids could not be kept

17   in the new Schaffner Youth Center that was being built.  And

18   that was a decision Dauphin County had made to prohibit

19   dependency referrals being included into the detention

20   center.

21          There was an issue where he was advocating on

22   behalf of the 911 center because the probation officers

23   supposedly weren't answering their phones after emergency

24   call duty.  And I think he had written a memorandum that

25   chastised the probation officers' wives and husbands for

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                          300

1    nobody answering the phone after emergency-duty calls.

2              He tried to demote a secretary of ours, Kathy

3    Zeigler, when we split the Juvenile Probation Departments.

4    And what I understand, it was the first time in the history

5    of the county where he tried to demote somebody moving

6    towards a, moving into a lateral position.

7              That's some of the things that I can recall.

8    That's probably not all of them.

9         Q.    Do you disklike him for any of the actions that

10   were taken with regard to Ms. Varner's complaints?

11        A.    I don't really know what he did in regard to

12   Ms. Varner's Complaint .

13        Q.    Have you expressed your displeasure about

14   Mr. Ward's actions to Mr. Ward?

15        A.    No.

16        Q.    Have you expressed your displeasure about

17   Mr. Ward's actions to anyone in the Probation Department?

18        A.    I don't think Mr. Ward is a fan of anyone in the

19   Probation office.  Did I -- in generality terms, probably,

20   yes.  I mean, from denial of grants to denial of, you know,

21   all those -- parking spaces.  I advocated to try to get

22   parking spaces to transport secured juveniles, and he

23   wouldn't give us any of those or advocate on our behalf to

24   get a secure parking arrangement to be able to take juveniles

25   in and out of the court setting.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    301


     1        Q.      My question, sir, was:  Did you express your

     2    displeasure about Mr. Ward to anyone in the Probation office?

     3        A.      I probably said some things that I was displeased

     4    about, just -- and the list is what I've just told you about.

     5        Q.      But you didn't say:  He'll get his?

     6        A.      No.

     7        Q.      Mr. Graham, did you ever brag about having sex

     8    with a woman who was wearing only a trench coat?

     9        A.      I think I did, yes.  Not brag.

    10        Q.      What did you say?

    11        A.      I had had a relationship with a woman prior to my

    12    marriage, that I was visited by a lady that wore a trench

    13    coat and she had nothing underneath it.

    14        Q.      And did you make this statement during work

    15    hours?

    16        A.      I might have.

    17        Q.      Was it during times when other probation officers

    18    were present?

    19        A.      Sure.

    20        Q.      Were there female probation officers present at

    21    that time?

    22        A.      No, ma'am.

    23        Q.      None?

    24        A.      Not that I recall.

    25        Q.      And what prompted you to bring up your prior

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    302

1    sexual relation at work?

2        A.    I think what prompted that was the amount of

3    phone calls that Ms. Varner made to me in regard to trying to

4    meet with me, and when the secretaries went to pick up the

5    phone they were suspicious that I had been involved with

6    somebody else or someone else, or somebody, so that's what

7    kind of prompted that.

8        Q.    So you led them to believe that it was this woman

9    who was only wearing the trench coat that was making these

10   calls?

11       A.    No.  I didn't lead them to believe anything.

12   They can believe what they want to believe, you know.  I

13   didn't say anything about that.

14       Q.    I don't understand your answer, sir.  I asked you

15   what prompted you to bring up this subject of having sex with

16   someone only wearing a trench coat, and you said it had

17   something to do with the calls you were receiving from

18   Ms. Varner.  I don't understand your answer.

19       A.    Well, they were suspicious of me having an

20   interaction with another woman.

21       Q.    Who was suspicious?

22       A.    Oh, my.  Denny Drachbar, Sam Miller, Ronna

23   Boyles.  Who else?  I don't know.  Fran Rose.  I don't know

24   who else.

25       Q.    What did they say or do that led you to conclude

S. Gareth Graham                                303

1   that they were suspicious of your relationship with

2   Ms. Varner?

3        A.    Ronna was always saying, why are you getting all

4   these phone calls and I'm getting hang-ups?

5        Q.    And what did you say?

6        A.    Nothing.

7        Q.    And what did Mr. Drachbar say or do that led you

8   to believe he was suspicious about your relationship with

9   Ms. Varner?

10       A.    I don't know.  I don't remember.  That's too far

11  long ago.

12       Q.    What did Mr. Miller say or do which led you to

13  believe that he was suspicious about your relationship with

14  Ms. Varner?

15            MR. MacMAIN:  If you know.

16            THE WITNESS:  I don't know.

17  BY MS. WALLET:

18       Q.    What did Rose say or do that led you to believe

19  that she was suspicious of your relationship with Ms. Varner?

20       A.    Just the complaints of Ronna receiving the calls

21  and nobody ever on the other end when they went to pick up.

22       Q.    Well, I asked you this before, but why did you

23  think someone thought that that was Barb Varner?

24       A.    Because Barb Varner and I shared companion cases.

25  We shared a personal relationship that was probably viewed by

1    in the office that was closer than most.  The fact that she,

2    you know, she was always confiding in me, you know, with some

3    of her personal situations.  And the fact that she was using

4    me to sometimes write her reports and help her write her

5    reports.  And all that interaction together was a position

6    that they thought I was showing her favoritism and

7    unfairness, or favoritism and it was unfair to them, that I,

8    they -- special audiences with her all the time as opposed

9    to, you know, giving them a correction.  I would just tell

10   them about it or, you know, write them a note.

11        Q.    Do you have a single fact that would link

12   Ms. Varner to your hang-up calls?

13        A.    I don't think so, no.

14        Q.    So Ms. Boyles comes to you and says something to

15   the effect of:  Why are we getting all these hang-up calls?

16        A.    Sure.  Ronna narrated a lot of things to me, you

17   know, about -- she was from the hometown I came from, and she

18   was going through a divorce at the time of this business that

19   was going on in the office.  And --

20              MR. MacMAIN:  She just wants to know do you have

21   anything, any direct evidence that the hang-up calls were

22   from Ms. Varner as opposed to someone else.

23              THE WITNESS:  No, I don't.  No.

24   BY MS. WALLET:

25        Q.    So Ms. Boyles comes you and says:  We've been

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    305


1    having all these hang-up calls.  Who brought up the subject

2    of Barbara Varner in reference to these hang-up calls?

3        A.      She did.

4        Q.      And why did she say she thought it might be

5    Barbara Varner?

6        A.      Because she thought that we were meeting in the

7    coffee room.  And people would see us meeting in the coffee

8    room.  We were having close interaction with one another.

9    And she knew that, I think, that I had advocated for

10   Ms. Varner's son, to get him a job at the Schaffner Youth

11   Center after he had failed to pass the first or second

12   interview that he was on.

13           So you know, those are the things that she, you

14   know, saw me extending myself to her benefit and figured

15   there might be something going on.  And that was pretty much

16   like the office rumor mill that there might be something

17   going on between the two of us.

18       Q.      And then this caused you to bring up the subject

19   of the woman wearing only the trench coat?

20       A.      That was around -- right.  That was around the

21   subject of -- Ronna said to me, well, you know, something

22   about, you know, something about who was that in reference,

23   or she said, I think Ronna said to me, I'll bet you were

24   pretty wild in your day, you know, in Newville.  And I think

25   I had talked to Boyles about living above my dad's store as a

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    306

1   single man and talked to her about different things in that

2   regard.  And she, Ronna was after finding out if I knew any

3   information about who her husband --

4               MR. MacMAIN:  Gary, she just --

5               THE WITNESS:  -- was running around with up in

6   Newville.

7               MR. MacMAIN:  Gary, she asked about the trench

8   coat, and if you don't have any more answer than what you've

9   given, then that's fine.

10              THE WITNESS:  Did I give you the answer yet?

11  BY MS. WALLET:

12      Q.    Well, my question, sir, was:  What about these

13  circumstances could possibly have prompted you to blurt out

14  that you once had sex with a woman wearing only a trench

15  coat?

16      A.    And my response to that is Ronna had shared

17  information and been in request of information about her

18  husband who she was going through a divorce, and during those

19  conversations she would relate that I'll bet you were pretty

20  wild.

21              And there was a connection between Ronna and my

22  dad's store because the first owners that tried to buy my

23  dad's store was Robert and somebody Barrick, Cheryl Barrick.

24  I know their last name is Barrick, I don't remember her name.

25  Well, this Cheryl Barrick and Ronna's husband ended up

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    307

1   together and in a marital infidelity.  And Ronna was

2   questioning me as to if I knew anything.  And actually, she

3   was asking me daily, you know, what was going on, did you

4   hear anything about this Barrick girl and my husband.  And I

5   had -- the boy that was running our store at the time,

6   because my dad had just been deceased, he one day said to me,

7   he said, I think Ronna Boyles' husband Ken moved in with this

8   Barrick woman down the street across from the fire company.

9           So those are the kind of conversations that we

10  had that were of intimate interactions.  And I think during

11  those conversations with Ronna I got to talk to her about

12  I'll bet -- her making the introductory statement of saying,

13  I'll bet you were pretty wild in your day, and I said sure, I

14  was wild, you know, and I did things, so.

15     Q.     And this was an example of how wild you were?

16     A.     Well, if that's wild, Ms. Wallet.  I don't know

17  if that's wild or what that is.  I don't know if that -- I

18  don't know, what does that mean.

19     Q.     Did you give her any other examples of how wild

20  you were at that time?

21     A.     I don't remember anything else.

22     Q.     Now, there were others that overheard this

23  conversation, correct?

24     A.     I have no idea who overheard the conversation.

25  No, I don't know.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                              308

1      Q.      Did you consider this to be appropriate

2    discussion for the work setting?

3      A.      In the private confines of my office and

4    responding to a desperate type of lady that was facing

5    divorce and inquiring about information that she was asking

6    me about, sure.  It was a matter of, you know, maybe of, I

7    don't know, kind of pitying Ronna over the situation she

8    found herself.  And I said everybody finds themselves in

9    different situations that they regret somewhere in their

10   life.  Does that answer your question?

11     Q.      Let me hand you a copy of the Complaint.  Perhaps

12   this will make things a bit easier.

13             Would you turn to page 3 of the Complaint filed

14   by Ms. Varner in this action?

15     A.      Okay.

16     Q.      Specifically, paragraph 16.  I'm going to ask you

17   about these paragraphs, sir, and I'll try to be specific in

18   my questions and if you could try to be specific in your

19   answers perhaps we might finish a little more quickly.

20             Ms. Varner has alleged that you made comments

21   about a female juvenile relating to premenstrual problems:

22   Jesus Christ, do I need to get a peter meter in my office.

23             Did you make that statement?

24     A.      Not in front of Ms. Varner.

25     Q.      Did you make it in front of someone else?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          309

    1        A.      Hank Thielemann.  I don't remember saying Jesus

    2   Christ.

    3        Q.      But you asked about the peter meter?

    4        A.      I made a comment to Hank after she turned the

    5   case in of simple assault on a juvenile, I think it might

    6   have been even a transfer case from Harrisburg, that this

    7   girl's premenstrual cycle was the causation factors of the

    8   girl's delinquency.  And I looked at Hank and said, you know,

    9   if we're going to look at premenstrual cycle being the

   10   determinant of delinquency, then we're going to have to get a

   11   peter meter for any sex crimes that we end up having.

   12              And what I was referring to, Ms. Wallet is, a

   13   peter meter is not the appropriate term but there is a

   14   mechanism called an phylesmograph which is the proper term of

   15   an instrument that's used to measure sexual arousal on sexual

   16   offenders.  So that's what my inclination was at the time I

   17   made the off-the-cuff remark.

   18        Q.      So your reference to a peter meter was to this

   19   particular instrument?

   20        A.      It was lack of a better word of understanding

   21   exactly what a phylesmograph was properly called, yes.

   22   Because I knew there was an instrument they measure sexual

   23   arousal on sexual cases.  And they also have, you know,

   24   different modalities like showing videos and other things

   25   that coincide with understanding how to measure sexual

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                310

1    stimulation in different cases.

2        Q.    Did you think it inappropriate of Ms. Varner to

3    reference something that was in this juvenile's medical

4    history?

5        A.    You know, I'd have to see the report, and I've

6    never seen -- I can't recall the issues.  You're asking me to

7    recite from memory something that's happened six and seven

8    years ago, and I can't recite those, that, those

9    circumstances.  I just don't remember.

10            I remember that she didn't have medical concerns

11   or suicidal concerns that I was aware of.  I don't remember

12   reading that in her report on the review.  I remember her

13   highlighting the premenstrual problems, that that was the

14   causation factor, not the suicidal tendencies that she now

15   reports in her Complaint.  I don't remember that.  Could it

16   have been in there?  It might have been.  Could I have missed

17   it?  Absolutely.  I don't recall it being there.  I recall it

18   just being a premenstrual problem that was highlighted in one

19   of her paragraphs.  And I looked at Hank and said -- and she

20   wasn't even in the room.  So that's an error, too.  She

21   wasn't in the room when I made the comment.

22       Q.    Were there others in the room then that overheard

23   the comment?

24       A.    Only Henry Thielemann and myself.  Hank

25   Thielemann and myself.

S. Gareth Graham                          311

1        Q.      And where did this conversation take place?

2        A.      In my office.

3        Q.      Do you know whether Mr. Thielemann repeated this?

4        A.      No.  What happened was she came back into the

5    office, she came back into the office and Hank was smiling at

6    her, and she said, well, what are you guys smiling about?

7    And I said, Barb -- I made a comment about the juvenile

8    social history that you submitted and Henry found humor in

9    that.

10       Q.      And was the comment repeated?

11       A.      She asked for it to be repeated.  She -- I said,

12   I don't want to repeat the comment because you will be citing

13   me for harassing and you will find it distasteful.  And she

14   said, I'm fine with it, will you tell me what you said.  And

15   I told her.  And then she authored me with this Complaint.

16       Q.      Now, why did you think at that time to say:  I

17   don't want to repeat this because this might be sexual

18   harassment?

19       A.      Because of what Joe had been through years before

20   on the Complaint with Kerry Houser.

21       Q.      Had you received any sexual harassment training

22   before you made the statement about the peter meter?

23       A.      I made it to another male individual in a private

24   setting, and I didn't see that as a matter of sexual

25   harassment.  It might have been distasteful, it might have

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    312

1   been out of order.  It probably was out of order for me to

2   make the comment about it.  But was it sexual harassment?

3   No.  Did it pertain to Ms. Varner specifically?  No.

4        Q.    Did you consider it to be demeaning?

5        A.    No.

6        Q.    Did you consider it to be demeaning to the female

7   juvenile about which this statement was made?

8        A.    Oh, no.

9        Q.    And that was because the female juvenile would

10  never know about this?

11       A.    The female juvenile, it was something that

12  Ms. Varner was reporting that the female juvenile had

13  experienced.  I don't even know if the female juvenile, you

14  know, was talking about a premenstrual cycle.  Maybe

15  Ms. Varner is the author of that premenstrual cycle comment.

16  You would have to talk to that juvenile, I guess.

17       Q.    Now, B is the personal birthday card.  You don't

18  deny sending that card?

19       A.    I don't, ma'am.  I didn't send it.  I would have

20  given it to her.

21       Q.    Okay.  Do you deny any inappropriate touching?

22            MR. MacMAIN:  Let me object.  Do you mean -- we

23  went through this the other day, that it's his position this

24  was a consensual sexual affair.  You're asking anything

25  beyond that?

S. Gareth Graham                              313

1                MS. WALLET:  Correct.

2                THE WITNESS:  No, ma'am.

3    BY MS. WALLET:

4        Q.    Well, the question was:  Do you deny any

5    inappropriate touching?

6                MR. MacMAIN:  Well, I'm just clarifying what you

7    mean by inappropriate touching.  Certainly -- Gary, let me

8    finish, please.

9                And if he believes, it's his position that it was

10   a consensual affair, I don't think under your definition it

11   would be inappropriate.

12               MS. WALLET:  Right.  And I asked the question

13   again because I don't think he understands the question.

14               THE WITNESS:  You're right.  I'm sorry, I don't.

15   BY MS. WALLET:

16       Q.    Did you engage in any inappropriate touching

17   other than related to your consensual affair?

18       A.    No, ma'am.

19       Q.    You didn't go past her desk and touch her?

20       A.    No, I didn't.

21       Q.    Did you touch her at all in the workplace?

22       A.    No.

23       Q.    Did you ever appear uninvited at her home?

24       A.    Absolutely not.

25       Q.    Did you go into her back yard and shout for her?

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    314

1      A.      No, ma'am.

2      Q.      Never?

3      A.      Never.  I testified the other day that I would

4   meet her through her back entrance of her house.  That's

5   where -- when she would call me down to her house and we

6   would meet at her house I would go in the back door, the back

7   sliding glass doors where she would stand and wait for me to

8   park in an adjacent parking lot in a, it was an apartment

9   building adjacent from her house.  So I would park in there,

10  walk in the back, and then she would let me in the back so

11  that her neighbors Gilbert and Crystal wouldn't see me, the

12  neighbors nextdoor.  They were well -- he was in the well

13  drilling business.  He was home quite a bit, so.

14     Q.      Where did Gilbert and Crystal live?

15     A.      Right across the street from Barb Varner.

16     Q.      Across from the front door?

17     A.      Right.

18     Q.      You're sure about that?

19     A.      Only what she told me.

20     Q.      Okay.  You're looking at C on page 4?

21     A.      Yes, ma'am.

22     Q.      Do you deny that allegation?

23     A.      Absolutely.  I had been to her room, though, on

24  her invite at five o'clock in the morning under the auspices

25  of going walking in the morning.  But I had not been at her

S. Gareth Graham                                  315


 1   room on any other times and had not requested to be in her

 2   room at any other juncture up there at State College.

 3        Q.      Did you call her room repeatedly?

 4        A.      No, ma'am.

 5        Q.      Did you take any action, sir, that Ms. Varner

 6   might consider to be hostile or abusive?

 7               MR. MacMAIN:  Objection as to the form.  How

 8   would he know what she would consider hostile or abusive?

 9               MS. WALLET:  Well, I know when I say something to

10   a pet, that that pet is taking it as hostile or abusive.  I

11   don't have to be in the pet's mind.

12               MR. MacMAIN:  I'm not going to allow him to

13   answer what was in her mind.  Unless you want to rephrase the

14   question, I'm not going to let him answer that.

15   BY MS. WALLET:

16        Q.      Did you ever shout at Ms. Varner in the

17   workplace?

18        A.      No, ma'am.

19        Q.      Never?

20        A.      Never.

21        Q.      Did you ever raise your voice to her in the

22   workplace?

23        A.      I might have raised my voice on being

24   disappointed in having to revisit the same issue three and

25   four times.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          316

1      Q.      Did you ever swear at her?

2      A.      Not at her.  No, ma'am.

3      Q.      Did you swear in her presence in the workplace?

4      A.      I reverted to saying the F word on occasions.

5      Q.      But you say that wasn't directed at her?

6      A.      Not directed at her.

7      Q.      She was present but it wasn't directed at her?

8      A.      What do you mean by present?  She was in the

9   office when I might have been angry about something and that

10   might not even have pertained to her and I used the F word.

11      Q.      Is it your testimony that she never once told you

12   not to use the F word in speech with her?

13      A.      That's my testimony, that's correct.

14      Q.      She never objected to any of the language that

15   you used in front of her?

16      A.      No, ma'am.

17      Q.      Looking at page 4, subsection E.

18      A.      Okay.

19      Q.      Did you tell Ms. Varner any stories about your

20   sexual problems with your wife?

21      A.      Other than I was disappointed in the amount of

22   sex that my wife and I were having, yes, I told her that.

23      Q.      Did you talk about your wife's masturbation

24   habits?

25      A.      No, ma'am.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                317

1     Q.     Did you tell her that you kept a calendar of the

2  times when she would refuse to have sex with you?

3     A.     No, ma'am.  I did say that I probably not had sex

4  in maybe only two times a month, I would share that with her.

5  No calendars.

6     Q.     Did you threaten to get even with your wife

7  because she wouldn't have sex with you?

8     A.     No, ma'am.

9     Q.     Did Ms. Varner ever suggest to you that you go to

10 counseling?

11    A.     Not at all.

12    Q.     Did you scream at her as part of these

13 discussions about you and your wife's sexual habits?

14    A.     No.

15    Q.     And do you deny driving at a high rate of speed?

16    A.     That's questionable as far as -- I'm not a

17 conformist to the speed limit like most people aren't

18 probably even in this room, so -- but do I drive at a high

19 rate of speed?  I've never been given a ticket, Ms. Wallet,

20 in my personal car or the county car in the extensive amount

21 of trips that I took for speeding, and never been pulled over

22 for that, ma'am.  So that's not true.

23    Q.     Did you speed up the car in order to frighten

24 her?

25    A.     Not at all.  That's completely false.

S. Gareth Graham                          318

1        Q.      Did your wife have a figurine collection?

2        A.      Yes, she does.

3        Q.      Did you tell Ms. Varner that you had smashed some

4    of it?

5        A.      I think I told Denny Drachbar one time that I had

6    smashed a figurine.

7        Q.      And what prompted you to tell Mr. Drachbar that

8    fact?

9        A.      Our kitten had -- or our cat had had a litter of

10   kittens and there was one particular kitten that I liked, it

11   was striped, and my wife, I asked her to save it, because her

12   grandmother wanted some cats and her nieces and nephews

13   wanted a couple cats.  And she gave the cat away that I liked

14   the most, and I was angry about it.  And I don't know, I

15   guess we were talking about it in the living room, and I just

16   got consumed with my anger and I remember knocking the head

17   off of a figurine.  I guess I picked this figurine up and I

18   just snapped it on the fireplace or something.  But I was

19   angry over a kitten that she had given away, not I guess

20   what's in this Complaint.

21       Q.      Did you ever tell Ms. Varner that you smashed

22   some of the figurine collection in response to her sexual

23   denials?

24       A.      Not at all.  That's a fabricated lie.

25       Q.      What prompted you to tell Mr. Drachbar that you

S. Gareth Graham                                    319


1    had done this?

2        A.      I don't know.  I just -- I think I had, he was --

3    I don't know.  I don't know what prompted me.  I just said I

4    got consumed by my anger the other evening.

5        Q.      Ever destroy a birthday cake in front of your

6    daughters?

7        A.      Not in front of my daughters, but I think I

8    was -- I think that's the situation where I was angry at my

9    wife because Denny Drachbar and Sam Miller repeatedly had

10   come down to my office and was basically what males would

11   call ribbing, teasing me or whatever, about this particular

12   law clerk named Tom Placey being in my wife's office and

13   having extended periods of discussions with her.  And that

14   made me angry.  And I think we got into an argument about why

15   he's having these extra, what I called it was bird-dogging,

16   he was up there following my wife, having extra amounts of

17   conversations, which totally that I interpreted much further

18   than it actually was meant.  And I was jealous of that,

19   Ms. Wallet.

20       Q.      So you thought Tom Placey was interested in your

21   wife sexually?

22       A.      Yes, ma'am.

23       Q.      And you were getting some ribbing about this from

24   your co-workers?

25       A.      Yes, ma'am.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    320

1      Q.      Because they had observed him hanging around your

2   wife?

3      A.      Yes, ma'am.

4      Q.      And what did you do in response to this?

5      A.      I think we got into an argument and that's --

6      Q.      We who?

7      A.      My wife and I.  And that's one of the nights I

8   must have smashed a piece of birthday cake.  But it was not

9   in front of my daughters.  That's not true.

10     Q.      What did you do with this birthday cake?

11     A.      I said I might have smashed it, or she might have

12  went to serve me cake and I said I don't want it, I want to

13  get back to the argument that we were in about him being

14  upstairs with her extended periods of time.

15     Q.      And whose birthday cake was this?

16     A.      I don't remember.

17     Q.      Well, was it your birthday?

18     A.      I don't recall.  It wasn't my birthday, I don't

19  think.

20     Q.      Was it her birthday?

21     A.      It might have been.  Might have been her

22  birthday.

23     Q.      And why did you tell somebody about this incident

24  between you and your wife and the birthday cake?

25     A.      I told Ms. Varner this.  And why did I tell her?

1   Because I guess I was asking for or looking to her for

2   sympathy, you know, since that would maybe enhance our

3   relationship or our involvement with each other.

4        Q.     So you thought it would improve your chances of

5   having sex with Ms. Varner if you made it clear you were

6   fighting with your wife?

7        A.     It was having sex with Ms. Varner.  It didn't --

8   I don't follow your question.  That wasn't accurately stated,

9   or I don't understand what you're trying to allege.

10       Q.     My question is:  What would have prompted you to

11  say to someone:  You know, last night my wife served me

12  birthday cake and I smashed it in front of her?

13              MR. MacMAIN:  He just answered your question.

14              MS. WALLET:  Well, I didn't get the answer.

15              THE WITNESS:  The answer was I thought it would

16  enhance the involvement I would have with Ms. Varner if she

17  knew I was mad at my wife.  We were trying to justify our

18  illegitimate selfish behaviors, and we were always looking

19  for excuses to do that.  It wasn't right but that's what

20  people do, I guess, that get involved with affairs.

21  BY MS. WALLET:

22       Q.     Did you think that Ms. Varner when she heard this

23  might are fearful of you?

24       A.     No.  I thought it would enhance, I might even --

25  I thought she would interpret that as an enhancement towards

S. Gareth Graham                               322


1    having our relationship be more cemented or more fruitful.

2         Q.     Did you tell other probation officers,

3    specifically female probation officers, that they were off

4    limits to Ms. Varner because they had made complaints?

5         A.     No, ma'am.

6         Q.     Did you warn Ms. Varner about Kerry Houser?

7         A.     No, ma'am.

8         Q.     Never said anything to Ms. Varner that was

9    negative about Kerry Houser?

10        A.     I said I didn't like her.

11        Q.     What did you tell Ms. Varner about Kerry Houser?

12        A.     What did I tell Ms. Varner?  Probably the same

13   stories I've testified earlier to, the fact that she had made

14   that revelation when I had an argument with Paul.  She was

15   angry.  She had made a call to Lynn Dickinson and her husband

16   out of the blue called me at my house.  And actually

17   interrupted the woman's hiring.  The woman was so what I

18   understand, and she can testify to this, she was so

19   traumatized she left and went to pursue her master's degree.

20             MR. MacMAIN:  Gary, let me just interrupt.  Is it

21   the same stuff we've already talked about before is what you

22   told Ms. Varner?

23             THE WITNESS:  Yes.

24             MR. MacMAIN:  We don't need to go through it all

25   over again.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    323

1              THE WITNESS:  Okay.

2              MS. WALLET:  I agree.

3    BY MS. WALLET:

4         Q.    Did you tell Ms. Varner to stay away from Kerry

5    Houser?

6         A.    No, I did not, ma'am.

7         Q.    Did you tell Ms. Varner that she shouldn't talk

8    to Kerry Houser?

9         A.    No, I did not.

10        Q.    Did you make the statement about how dark you

11   thought a young female's bush was?

12        A.    No, ma'am, I did not make that statement.

13        Q.    At no time?

14        A.    At no time.

15        Q.    Did you ever move closer to Ms. Varner in an

16   aggressive manner?

17        A.    No, ma'am.

18        Q.    Did you ever point your finger in her face?

19        A.    No.

20        Q.    Did you ever point at her?

21        A.    No.

22        Q.    Did you ever throw something wadded up at her?

23        A.    I looked at that Complaint and I do recall, it

24   might have been one of these sheets that she submitted after

25   the second or third time, and I rolled it up and I said, I

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          324

1  think it was in regard to that victim sheet, she kept -- this

2  was a case of it was a trinity, there was a four or five

3  different individuals that were involved with this, and --

4          MS. WALLET:  Let the record show that he's

5  referring now to Deposition Exhibit 5.

6          MR. MacMAIN:  Gary, she didn't ask you about the

7  whole background.

8          THE WITNESS:  What I'm saying is I balled the

9  paper up and threw it in the waste can and said, you know,

10 you didn't do what I asked you to do.  You didn't put what I

11 asked you to put in these things.  So I balled the paper up

12 and threw it in her trash can.  And she's made the allegation

13 that I threw it at her, and I not do that, ma'am.

14 BY MS. WALLET:

15     Q.     And you did that real quietly, didn't raise your

16 voice?

17     A.     I didn't say I didn't raise my voice.

18     Q.     You did raise your voice?

19     A.     Sure.

20     Q.     What did you say to her?

21     A.     I just said, this isn't what I asked you, and I

22 asked -- and I've been through this three or four different

23 times with you.  And I balled it up and threw it in the waste

24 can.  And she's made the interpretation now that I threw it

25 at her, which I did not do.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                          325

1           And did I raise my voice?  Yes.  Did I swear?  I
2     don't remember swearing.  I just remember I was frustrated
3     about seeing the same report three and four different times
4     submitted.
5           Q.    Did you ever say anything to Ms. Varner that
6     would suggest that you and Mr. Osenkarski would punish people
7     in the office?
8           A.    No, not at all.
9           Q.    Did you ever say anything that would indicate
10    that people owed you for favors that you had given them?
11          A.    No, ma'am.
12          Q.    Did you ever tell Ms. Varner you thought she owed
13    you?
14          A.    No, not at all.  I did a number of different
15    things for a number of different people in that office over
16    the years, and that's just, that's the nature of what I was
17    like, not the nature of what you've reported in this
18    particular document and Complaint.
19          Q.    Did you ever make the statement that all divorced
20    females are angry at men?
21          A.    No, ma'am.
22          Q.    Did you ever make the statement that women would
23    do a lot better if they spent more time on their knees?
24          A.    Not at all.  Never said anything like that.
25          Q.    Never said that?

S. Gareth Graham                                    326

1        A.      Never.

2        Q.      Did you ever brag that you could have Nicole

3    Galbraith Horick in a sexual fashion any time you wanted?

4        A.      That's not true, ma'am.  No.  I had an excellent

5    relationship with Nicole Galbraith, or Horick.

6        Q.      Did you have any sexual interest in her?

7        A.      None whatsoever, ma'am.

8        Q.      Did you ever do or say anything that someone

9    might interpret as a sexual interest in her?

10        A.      No, ma'am.

11        Q.      Do you believe that your affair with Ms. Varner

12    interfered in any way with the work that you were paid to do?

13        A.      No, ma'am, not at all.

14        Q.      I think I asked you this before.  All of the time

15    that you spent during the workday in this affair, sexual

16    relations, were not on the clock?

17        A.      Were not on duty.

18        Q.      Even the ones that occurred during the middle of

19    the day?

20        A.      We would take the afternoon off.

21        Q.      I believe you told me there were sometimes when

22    you would sneak away for your liaison and go back to work,

23    correct?

24        A.      That might have been in the early development

25    where we wouldn't do anything, we would just sneak away and

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                      327


 1   be with one another and talk about our disappointments in our

 2   partners' performances or sexually or something like that,

 3   but we wouldn't really do anything.

 4        Q.     Did you ever take Ms. Varner in the car with you

 5   when you visited a juvenile offender's mother in

 6   Shippensburg, make her spend time in the car?

 7        A.     There again, you would have to give me a

 8   reference point of who you're referring to or --

 9        Q.     Someone who worked at a dry cleaner's?

10        A.     Yes.

11        Q.     Do you know which individual I'm talking about

12   now?

13        A.     Not specifically.

14        Q.     This was someone who worked at a dry cleaner's,

15   lived in Shippensburg?

16        A.     Yes.

17        Q.     And what professional responsibility did you have

18   with regard to this woman or her family?

19        A.     I think I handled her kid.

20        Q.     And when you say handled, meaning it was a

21   juvenile that you were assigned to supervise?

22        A.     Yes, ma'am.  Yes, ma'am.

23        Q.     And did you visit the home?

24        A.     Whose home, the lady's home?

25        Q.     Yes.

S. Gareth Graham                                    328

1        A.     Yes, ma'am.

2        Q.     On more than one occasion?

3        A.     Probably a few occasions, yes.

4        Q.     And was Ms. Varner with you on any of those

5   occasions?

6        A.     She might have been.

7        Q.     You don't remember?

8        A.      I don't recall.  She could have been, sure.

9   Because we handled cases, I mean, Steve Wilson, I mean, I

10  remember, and that's an adult, so, and some other cases in

11  Shippensburg that, you know, she could have been along with

12  me and then we made a circle and stopped at other peoples'

13  homes.

14       Q.     Did you ever tell her to stay in the car while

15  you went to visit this woman?

16       A.     No, ma'am.  I mostly saw the woman I guess at the

17  dry cleaner's or her house.  I mean, that's what remember --

18  or the dry cleaning facility there in Shippensburg.

19       Q.     Were you sexually attracted to this woman?

20       A.     No, ma'am.

21       Q.     Did you ever make any statements that would

22  indicate that you were sexually attracted to her?

23       A.     No, ma'am.

24       Q.     Mr. Graham, you were suspended for three days?

25       A.     Yes, ma'am.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                                    329

1        Q.      As a result of the allegations that Ms. Varner

2   made, correct?

3        A.      No, ma'am.

4        Q.      Didn't have anything to do with the allegations

5   that Ms. Varner made?

6        A.      It had to do with swearing in the office.

7        Q.      And how do you know that?

8        A.      I think that's what Judge Sheely made in a

9   memorandum, that memorandum that he wrote or something.

10       Q.      It was your belief that that didn't have anything

11  to do with Ms. Varner?

12               MR. MacMAIN:  Objection.  That's not what he

13  said.  I think your question was anything to do with sexual

14  harassment, and he said no, his understanding was poor

15  language.

16  BY MS. WALLET:

17       Q.      I thought my question was:  Was it related to the

18  complaints made by Ms. Varner.

19               Did it have anything to do with the complaints

20  that Ms. Varner made?

21       A.      You would have to ask him.

22       Q.      In any event, you were told that you were going

23  to be suspended for three days.

24       A.      Right.

25       Q.      And then a different three days were picked,

S. Gareth Graham                                330

 1  correct?

 2      A.      Yes.

 3      Q.      What do you remember about those circumstances?

 4      A.      Not a thing.  I've tried to remember that, and I

 5  don't know what the circumstances are, why they were changed.

 6  I thought maybe they were a holiday.  Did I ask him?  No.

 7      Q.      Do you know whether this was Judge Sheely's idea

 8  to change these dates?

 9      A.      You would have to ask him.  I don't know.  I

10  don't remember why the dates were changed.  That's beyond me.

11          MS. WALLET:  Okay.  We'll still mark this

12  document.  I think we're up to 6.

13          (Graham Deposition Exhibit No. 6 was marked.).

14  BY MS. WALLET:

15      Q.      Do you have Deposition 6 in front of you?

16      A.      Um-hum, yes.

17      Q.      I don't see your name on this document, but did

18  you get a copy of this document either through your counsel

19  or in some other fashion?

20          MR. MacMAIN:  Through your counsel, you mean in

21  this litigation?  Or do you mean Mr. Foster back when all

22  this was happening?

23          MS. WALLET:  From Mr. Foster back when all of

24  this was happening.  Strike all of that.  We'll start again.

25  BY MS. WALLET:

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    331


1          Q.      Did somebody give you what has been marked as

2    Deposition Exhibit 6?

3          A.      Not that I recall, no.

4          Q.      You don't think you received it in or about July

5    17, 1997?

6          A.      I don't remember this corrected dates of

7    suspension.  I don't remember it at all.

8          Q.      Okay.  Do you believe you got some other memo

9    telling you that the dates for your suspension had been

10   changed?

11         A.      No, ma'am.

12         Q.      Do you know who set the original dates when you

13   were to be suspended?

14         A.      No.  I mean, I imagine it was Judge Sheely.

15         Q.      And you don't remember anything else about why

16   you were given the suspension or the date that you were to

17   serve the suspension?

18         A.      Why I was given the suspension is because I used

19   foul language in the office.  And what was the other part of

20   the question?  Did I --

21         Q.      Why it was changed, why the dates were changed.

22         A.      I don't know.  I don't know why, no.

23         Q.      Did you disagree with this suspension?

24         A.      I was guilty of using foul language in the

25   office.  I didn't disagree with it at all.

S. Gareth Graham                                    332


1        Q.      And what language did you consider to be foul

2    that you admit you used?

3        A.      Using the F word.

4        Q.      Did Judge Sheely ask you whether or not you had

5    used the F word?

6        A.      Yes.

7        Q.      And how did you respond?

8        A.      Yes.

9             MS. WALLET:  Okay.  I think I'm finished with my

10   questioning at this time, and simply reserve the right to

11   recall Mr. Graham after I've reviewed these documents.  I'm

12   not saying that I'm going to, but I'd like to have the

13   opportunity to ask him a few more questions if I feel that's

14   necessary.

15            MR. MacMAIN:  Sure.  And the same, I think it's

16   the same reservation we had regarding Ms. Varner since we had

17   not gotten Answers to written discovery as well.  It's

18   something counsel can amicably work out if it comes up in

19   either case.

20            MS. WALLET:  Okay.  That's all the questions I

21   have for today.

22            MS. WILLIAMS:  I have just one quick

23   clarification.

24   BY MS. WILLIAMS:

25       Q.      Mr. Graham, I think you know who I am by now.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

S. Gareth Graham                    333


1    I'm Taylor Williams representing the Court.

2              Can you clarify for me who initiated the affair

3    that you had with Barbara Varner?

4         A.    What I would justify initiation is when she

5    leaned over in the parking lot of the Zembo Shrine in

6    Harrisburg and kissed me, on the way out.  That's what I

7    would say is an initiation.

8              Did we probably flirt with one another before

9    that?  We probably both flirted, both each way.

10        Q.    Did you actively pursue Mrs. Varner?

11        A.    No, ma'am.

12        Q.    So Ms. Wallet's characterizations in her

13   deposition questions that you sought this affair or initiated

14   that affair, would you say that those were correct or

15   incorrect characterizations?

16        A.    They're incorrect.

17             MS. WILLIAMS:  Thank you.  That's all I have.

18             MR. BATES:  I have no questions.

19             MS. WALLET:  I think we're finished for today.

20             (Whereupon, the deposition was concluded at

21   1:27 p.m.)

22                        *   *   *   *   *

23

24

25

1  COMMONWEALTH OF PENNSYLVANIA  )
                                )
2  COUNTY OF DAUPHIN            )

3      I, Emily R. Clark, a Court Reporter-Notary Public

4  authorized to administer oaths and take depositions in the

5  trial of causes, and having an office in Harrisburg,

6  Pennsylvania, do hereby certify that the foregoing is the

7  testimony of S. GARETH GRAHAM taken by Plaintiff at the

8  Administrative Offices of Pennsylvania Courts, 5001 Louise

9  Drive, Mechanicsburg, Pennsylvania.

10     I further certify that before the taking of said

11 deposition the witness was duly sworn; that the questions and

12 answers were taken down in stenotype by the said

13 Reporter-Notary, approved and agreed to, and afterwards

14 reduced to computer printout under the direction of said

15 Reporter.

16         I further certify that the proceedings and

17 evidence are contained fully and accurately in the notes

18 taken by me on the within deposition, and that this copy is a

19 correct transcript of the same.

20         In testimony whereof, I have hereunto subscribed

21 my hand this 27th day of February, 2003.

22

23

24                           _____
                             Notary Public

25