IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . . .

BARBARA E. VARNER,            .

      Plaintiff,          .   CIVIL ACTION

                        .   NO. 1:CV 01-0725

      vs.              .

                        .

COMMONWEALTH OF PENNSYLVANIA,  .  (JUDGE YVETTE KANE)

NINTH JUDICIAL DISTRICT,     .

CUMBERLAND COUNTY; CUMBERLAND .

COUNTY; S. GARETH GRAHAM,    .

Individually, and JOSEPH      .

OSENKARSKI, individually,     .

      Defendants.       .

. . . . . . . . . . . . . . . . . .

Deposition of:  KERRY HOUSER

Taken by     :  Defendants

Date        :  March 3, 2003, 9:24 a.m.

Before      :  Emily Clark, RMR, Reporter-Notary

Place       :  12 West High Street
                   Carlisle, Pennsylvania

APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
            Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY:  PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

```
 1   APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  L. KRISTEN BLANCHARD, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
     ALSO PRESENT:
 7
          MS. BARBARA E. VARNER
 8
          MR. S. GARETH GRAHAM
 9
          MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X

 2                     WITNESS

 3   Kerry Houser                         Examination

 4        By Ms. Blanchard                        4, 102

 5        By Mr.  Adams                           45, 107

 6        By Mr. Dellasega                    57, 80, 105

 7        By Ms. Williams                        72, 103

 8        By Ms. Wallet                              81

 9

10                     EXHIBITS

11   Houser Deposition
     Exhibit Number                                   Page
12
     1    4 pages: 2-page letter, 12/10/93, to          84
13        Kenneth Bolze from Kerry Vohs; attachment

14

15                    *   *   *   *   *

16

17

18

19

20

21

22

23

24

25
```

```
 1                      STIPULATION

 2              It is hereby stipulated by and between the

 3         respective parties that signing, sealing, certification

 4         and filing are waived; and that all objections except

 5         as to the form of the question are reserved until the

 6         time of trial.

 7

 8              KERRY HOUSER, called as a witness, being duly

 9         sworn, was examined and testified, as follows:

10   BY MS. BLANCHARD:

11   Q.    Ms. Houser, my name's Kristen Blanchard.  I'm an

12         attorney for Gary Graham.  I'm just going to be asking

13         a few questions today.

14              Have you ever been deposed before?

15   A.    No.

16   Q.    Okay.  Just so you understand how a deposition works,

17         everything we say is being taken down by this nice lady

18         over here.  So what that means is you need to

19         articulate your responses, can't shake your head, nod

20         your head --

21   A.    I've testified in court but never --

22   Q.    Okay, very good.  So you understand how this works?

23   A.    Right.

24   Q.    Good.  If at any point I ask you a question that you

25         don't understand, please ask me to repeat it, because
```

```
 1              if you answer I'm going to presume that you understood

 2              the question.

 3    A.    Okay.

 4    Q.    If you need a break at any point in time, let me know.

 5              I'll be happy to give you one.

 6    A.    Okay.

 7    Q.    Are you on any medication today?

 8    A.    No.

 9    Q.    Okay.  Any reason you wouldn't be able to answer

10              questions today?

11    A.    Not that I know of.

12    Q.    Okay.  Be sure you speak up not only so that she can

13              hear you, but also so everyone else in the room can

14              hear.  Otherwise, you're going to have a lot of people

15              asking you to repeat what you said.  Okay?

16    A.    Okay.

17    Q.    Did you review any documents before you came to this

18              deposition today?

19    A.    No.

20    Q.    Not in preparation for this deposition?

21    A.    For this?  For me to testify?  Since I got the

22              subpoena?

23    Q.    Yes.

24    A.    No.

25    Q.    How about prior to the subpoena?
```

6

```
 1   A.   Prior to the subpoena I dug out of a file a letter
 2        that, a Complaint that I had filed previously and a
 3        letter that came subsequent to that from the former
 4        Chief Probation Officer Ken Bolze.
 5   Q.   Okay.  We'll get to that in a bit.
 6   A.   Okay.
 7   Q.   Did you speak with anybody prior to this deposition
 8        regarding your testimony in this matter?
 9   A.   No.
10   Q.   Have you ever spoken with Deb Wallet?
11   A.   Yes.
12   Q.   When did you speak with her?
13   A.   I spoke to her on a Monday night, I don't know, three
14        weeks ago.  It was before Barb was going to give her
15        deposition.
16   Q.   Is that the only time you've spoken to Deb Wallet prior
17        to today?
18   A.   Prior to today, no.  Once, this would have been in 1993
19        I talked to her about a prior complaint.
20   Q.   And is this the complaint that you mentioned earlier?
21   A.   Um-hum, right.
22   Q.   Did she represent you regarding that prior complaint?
23   A.   I didn't pursue to take it any further than what
24        happened in the office.
25   Q.   How many times did you meet with her regarding that
```

```
 1          prior complaint?
 2     A.   Just once.
 3     Q.   And how long would you say that meeting was?
 4     A.   An hour.
 5     Q.   Did Gary Graham's name come up at all during that
 6          conversation?  If you can recall.  I realize we're
 7          going back 10 years here.
 8     A.   I don't think so.
 9     Q.   Okay.  The conversation that you had with her three
10          weeks ago, was that face-to-face or was that on the
11          telephone?
12     A.   On the telephone at my house.
13     Q.   And how long was that conversation?
14     A.   Again, I'd say an hour.
15     Q.   And is she representing you now?  Is she your counsel
16          now?
17     A.   No.  I don't have any counsel.
18     Q.   What did you two talk about during that conversation?
19               MS. WALLET:  Objection.
20               MR. DELLASEGA:  What's the form of the objection?
21               MS. WALLET:  I'll withdraw the objection.
22               THE WITNESS:  She just asked about the Complaint
23          that I had filed, the background when Barbara Varner
24          and I shared an office together.  Just any involvement
25          I had with Gary and Joe.
```

1  BY MS. BLANCHARD:

2  Q.    What did you tell her about your 1993 Complaint?

3  A.    I pretty much just read it to her and tried to remember

4        what had happened.

5  Q.    And what did you tell her about what happened?

6  A.    Why I filed it?  Or what the procedure --

7  Q.    Whatever it was you said to Deb.

8  A.    I told her what I heard had been said and why I filed a

9        Complaint.

10 Q.    And what had you heard had been said?

11 A.    That females in our office were referred to as -- I

12       prefer not to say the word.

13 Q.    I'm going to have to ask you to say it for the record.

14 A.    We were referred as to members of the cunt club.  And

15       at that time in 1993 there were very few females

16       employed in the Probation office.

17 Q.    And did you actually hear the term cunt club used?  Or

18       had you been told that that term was used?

19 A.    I had been told by other people that it had been used.

20       I did not hear it directly.

21 Q.    And from whom had you heard that that term was being

22       used?

23 A.    Who said it?

24 Q.    Yes.

25 A.    Joe Osenkarski.

1  Q.   Is Joe the person who told you that it was being used?

2       Or were you told that Joe was using that term?

3  A.   I was told that Joe was using that term.

4  Q.   Okay.  Were you told that anybody else was using that

5       term?

6  A.   No.

7  Q.   Who told you that Joe was using that term?

8  A.   Two people:  A former probation officer, Julie Staver,

9       and Bill Brandt.  Julie had heard it from Tom Boyer.

10 Q.   So to the best of your knowledge, Julie didn't have

11      firsthand knowledge, she had heard it from Tom?

12 A.   She heard it from Tom.

13 Q.   Is there anything else that you told Deb during your

14      telephone conversation regarding your 1993 Complaint?

15      Did you tell her the outcome?

16 A.   Yes.

17 Q.   What was the outcome?

18 A.   The outcome was that -- this was after a long, long

19      time, and all the time restraints were not met by the

20      county, I accepted an apology from Joe and a letter was

21      written by the former chief of Probation saying what

22      had happened, that -- the letter said something to the

23      effect of there was no finding of sexual harassment,

24      however, inappropriate language was used.  I think

25      that's what it said, and that a copy of the letter

```
 1          would be included in the files of the people who were

 2          involved, for our protection.

 3               MS. BLANCHARD:  Off the record.

 4               (Discussion held off the record.)

 5     BY MS. BLANCHARD:

 6     Q.   Anything else that you can recall from your

 7          conversation with Deb regarding your 1993 Complaint?

 8     A.   I don't recall anything specific.  I think that's all I

 9          could pretty much tell you or anybody about it.

10     Q.   Did you at any point --

11     A.   I did tell her that the day that I filed the written

12          Complaint, that was on Friday, and that next day, it

13          was a Saturday, I found out that Joe had called -- I

14          had given Joe a copy of the Complaint and I had put a

15          copy on Ken Bolze's desk and I left that day.  And I

16          found out that the next morning Joe had called people

17          that I worked with, people who had worked in Probation,

18          and asked them about the Complaint, if they had ever

19          heard him say anything about women, whose side would

20          they be on, that kind of stuff, that I was going to

21          take his retirement and pretty -- he called everybody

22          in the office.

23     Q.   Was Gary Graham's name mentioned in your Complaint,

24          that 1993 Complaint?

25     A.   No, not to my -- I just looked at it a couple weeks
```

1              ago, but I don't think -- I can't imagine why Gary's

2              name would be in this.

3    Q.    Did you mention to Deb during your conversation about

4              three weeks ago that Gary had anything to do regarding

5              that 1993 Complaint?

6    A.    No.

7    Q.    Okay.

8    A.    The only -- I mean, he didn't have anything to do with

9              the Complaint.  He supervised me while, during that

10             investigation.

11   Q.    Did you complain about his behavior in 1993?

12   A.    No.

13   Q.    Okay.  Did you think he was using the term cunt club in

14             1993?

15   A.    No.

16   Q.    Have you ever heard him use that term?

17   A.    No.

18   Q.    Have you ever heard that he's used that term?

19   A.    No.

20   Q.    You also mentioned during your conversation with Deb

21             that you discussed your background or the background

22             regarding your sharing an office with Barb Varner?

23   A.    Um-hum.

24   Q.    Can you tell me what you told Deb?

25   A.    That she and I became decent friends.  Our relationship

```
 1            to me at first was strained, because Gary didn't speak

 2            to me and Barb was kind of caught in the middle of Gary

 3            doesn't speak to Kerry so I better not, so.  But we did

 4            get to become decent friends.  And at the time Barb

 5            portrayed nothing to me other than being happily

 6            married to Lee.

 7   Q.       And why did you mention to Deb that Barb portrayed

 8            nothing other than being happily married to Lee?

 9   A.       She asked if I had thought there was any type of

10            relationship outside of work between Barb and Gary.

11   Q.       Did you tell her anything other than that statement you

12            just gave to me?

13   A.       No.  Oh, we -- I did say that in our office Gary would

14            talk, and it wasn't just Gary, other people would talk

15            of their past sexual experiences.  And I think, I can

16            only think if that was going on, it would not have been

17            a secret, that it would have been known.

18   Q.       You say Gary and others.  Who were the others who spoke

19            of past sexual experiences, in the office?

20   A.       Paul Meuron, Tom Boyer.  Those are just two that I can

21            remember specifically.

22   Q.       No other names come to mind?

23   A.       No.

24   Q.       Okay.  If at any point in time during --

25   A.       Oh, and Gary did, too.
```

```
 1    Q.    Aside from Gary.  One instruction I forgot to give you.
 2          If you answer a question and then realize later on that
 3          you have something to add, or you want to change your
 4          answer, stop me, let me know.  I'll be happy to let you
 5          do that.  So if you think of any other names, just hold
 6          up your hand or tell me you want to let me know some
 7          more information, okay?
 8               Now, you said that at first your relationship with
 9          Ms. Varner was strained because Gary wasn't speaking to
10          you.  Is that correct?
11    A.    Um-hum.  Yes.
12    Q.    Why was Gary not speaking to you, do you know?
13    A.    Oh, a variety of reasons.
14    Q.    Let me ask you this first.  What time frame are we
15          talking about, what year, if you know?
16    A.    I would say '89, '90.  Was it just in and around this
17          time, or was it any other time that he stopped talking
18          to me?
19    Q.    For the period -- did he ever start talking to you
20          again?
21    A.    No.  Only for work-related reasons.
22    Q.    Okay.  In 1989 were you working for Gary?
23    A.    Not exactly.  Our office structure was, like, much
24          different then.  So if Joe was my supervisor on my -- I
25          had a small juvenile caseload at the time.  Joe was my
```

```
 1          supervisor for my juvenile cases.  And in Joe's

 2          absence, Gary was next in line, if that makes sense to

 3          you.

 4    Q.    Sure.  How much interaction, how much daily interaction

 5          did you have with Gary back in 1989?

 6    A.    The juveniles went on different cycles, but it wouldn't

 7          be daily.  I would say maybe at most, weekly, maybe.

 8    Q.    Okay.  How many times, just once a week or --

 9    A.    That I needed, like, supervision, like an authorization

10          for detention or review?

11    Q.    Or that you saw him, that you passed one another.

12    A.    I saw him every.

13    Q.    Every day?

14    A.    Uh-huh.  His office was right behind mine.

15    Q.    Okay.  And how often did you need supervision from him?

16    A.    Depending on Joe's schedule and depending on my

17          caseload, at most probably once a week.  I remember one

18          particular case that, I think it was in the summer and

19          Joe was out and I worked with Gary on, but -- more than

20          once a week, but there were no problems with that.

21    Q.    At any point in time did Gary cease being in your

22          supervisory chain?  And by that what I mean is did

23          there ever come a point in time where he was no longer

24          your supervisor as you just described?

25    A.    Yes.
```

```
 1    Q.    Or in any sort of supervisory position over you?

 2    A.    Right.

 3    Q.    When was that?

 4    A.    That would have been in, I think it was 1996, when our

 5          office split to distinctly all adult and all juvenile.

 6          And I was on the Adult side.

 7    Q.    So as of 1996, do you remember what month in 1996?

 8    A.    I'm going to guess June.  Somewhere in the late spring

 9          or early summer of 1996.

10    Q.    So as of late spring, early summer 1996, Gary had no

11          supervisory authority over you; is that correct?

12    A.    I believe that's correct, if I have my dates correct.

13    Q.    Okay.

14    A.    Whenever the split became official, Gary was on the

15          Juvenile side and I was on the Adult side.

16    Q.    Okay.  So as I understand it, from 1989 to 1996, in

17          your opinion, he stopped talking to you; is that

18          correct?

19    A.    Unless there was something we had to talk about work.

20    Q.    So something job -- aside from anything job related?

21    A.    Right.

22    Q.    He stopped talking to you?

23    A.    Right.

24    Q.    Okay.  And you started to tell me the reasons you

25          thought he stopped talking to you.  Please go ahead
```

```
 1          with that.
 2    A.    The first rift that I remember is about the DUI school
 3          money.  We -- the DUI school money is a big extra
 4          income, and at the time there was only a real select
 5          few who taught the class.  We had gotten a memo that if
 6          I have a client, say, Joe, who is paying regularly on
 7          restitution of a prior offense, like a burglary, if a
 8          victim is getting regular money, that that, those
 9          payments are to cease until the DUI instructors get
10          their hundred dollars before the victims.  And I'm,
11          like, we're going to pay a hundred dollars to our own
12          people before victims get the money?
13              So, Ken, I don't know, you haven't heard anything
14          about Ken, but he kind of wasn't real big on making
15          decisions; everything went to the judge.  So he went up
16          and talked to Judge Sheely.  And Judge Sheely was,
17          like, yeah, I can kind see that wouldn't look too good,
18          let's change it that -- and then the guys who taught
19          DUI went up and talked to Judge Sheely and Judge Sheely
20          reversed his decision again.
21              So to my knowledge, I think the DUI instructors
22          get paid before anybody else.  But that was the first
23          rift, because he thought I was trying to take his DUI
24          money.
25              And then there were just a variety of -- I mean,
```

```
 1            once you've done one thing to Gary you're pretty much

 2            done, anyway.

 3    Q.      Did he tell you that the DUI issue was a reason that he

 4            didn't want to talk to you?

 5    A.      I don't remember if he -- what he said about it,

 6            anything specific what he said about it.

 7    Q.      Okay.  What other reasons do you think that he stopped

 8            talking to you?

 9    A.      Because he didn't approve of the Complaint that I filed

10            against Joe.

11    Q.      Did he ever tell you that, that he didn't approve of

12            that Complaint?

13    A.      No.  I heard him tell other people that.  I overheard

14            him telling an intern in our office.

15    Q.      What was the name of the intern?

16    A.      Lynn, it's either Dickerson or Dickinson, I forget what

17            it was.

18    Q.      And what did you hear Gary say?

19    A.      That it was false and that I shouldn't have done that,

20            and just how wrong it was for me to have done that.

21    Q.      Anything else you heard him say to Lynn?

22    A.      No.  I mean, I don't specifically remember anything

23            else.

24    Q.      Do you remember when that statement was made?

25    A.      I remember it was up on the fourth floor of the
```

1         courthouse but I don't remember when it was.  Sometime

2         after 1993 and -- whenever she was an intern.  I don't

3         know who would have those records.  Whenever she was an

4         intern with our office.

5   Q.   How long was she an intern with your office, do you

6         remember?

7   A.   I think it was just a summer.  I don't -- well, she

8         might have stayed -- it was a summer and possibly she

9         came in the next fall semester, less than a year, so.

10   Q.   Did you ever hear Gary make that statement to anybody

11         else?

12   A.   I don't recall anybody specific that he said would have

13         said that.

14   Q.   And do you remember being told by anybody that they

15         heard Gary say that?

16   A.   I don't recall that, no.

17   Q.   Did you say anything to Gary when you heard that?

18   A.   No.

19   Q.   Did you tell anybody that he had made that statement?

20   A.   Probably.

21   Q.   Do you remember who?

22   A.   I don't remember who.  I don't remember who even worked

23         there at the time, everyone specifically.

24   Q.   Did you tell any of your supervisors that he made that

25         statement?

```
 1    A.    Well, at the time he was, I mean, it was -- who would I

 2          have told?  Joe?  Or Gary?

 3    Q.    Well, Joe was your immediate supervisor, correct?

 4    A.    Right.

 5    Q.    And you didn't tell Joe?

 6    A.    No.  He was my supervisor, he was one of my

 7          supervisors, but I wasn't going to rehash the issue

 8          with him.  It was difficult the first time, so.

 9    Q.    Who were your other supervisors at the time?

10    A.    John Roller was the Adult supervisor at the time, and

11          then the comparable position to Gary on the Adult side

12          was Dave Meyers.

13    Q.    Okay.  And you didn't tell John or Dave about the

14          statement?

15    A.    No.

16    Q.    Any other reasons you thought Gary had stopped talking

17          to you?

18    A.    He didn't like me.  I mean, once -- I mean, Gary didn't

19          talk to a lot of people in the office unless he had to.

20    Q.    Do you happen to know anybody else that he stopped

21          talking to?

22    A.    Well, at different times he wasn't talking to Tom

23          Boyer, Paul Meuron, Mike Dunsmore.  I mean, just a

24          variety of people.  Greg Miller, Lyle Herr.

25    Q.    So he would get upset at people and just stop talking
```

```
 1              to them; is that your perception?
 2    A.    They would be punished.
 3    Q.    Any other reasons you can think of now that Gary
 4              stopped talking to you?
 5    A.    Nothing specific, no.
 6    Q.    Anything else you can recall telling Deb Wallet
 7              regarding the reasons that Gary stopped talking to you?
 8    A.    No.
 9    Q.    You also mentioned that you told Deb about your
10              involvement with Gary and Joe?  That's what I have
11              written down.
12    A.    Just work involvement.  Maybe I should have said
13              history, I guess, work or involvement.
14    Q.    Can you tell me what you told Deb?
15    A.    I've told you everything.
16    Q.    Okay.
17    A.    Oh, about Joe, too?  Or just Gary?
18    Q.    Gary and Joe.  Everything that you told Deb is what I'm
19              looking for.
20    A.    I told her -- the Complaint was a big one.
21    Q.    The 1993 Complaint you're talking about?
22    A.    Right.  Oh, I discussed when we went to trainings at
23              Penn State, at the time we went to some trainings in
24              State College there were one instance that the -- it
25              was me, another probation officer who doesn't work
```

1           there anymore, Deb Graef, Gary, Joe and Mike Dunsmore

2           were there.  And everybody but Joe was -- usually when

3           we went up there we would go out and have fun.  But

4           that particular time we all kind of pooped out early

5           except for Joe.  And Joe was upset about that, and kept

6           banging on our door till all hours of the night trying

7           to get me to come out.  And then he tried to get Deb

8           Graef to come out, and we were just really

9           uncomfortable with it, because Joe had been drinking.

10              And then on the way home, I remember we had Mike

11          Dunsmore's van, because he was mad that Joe spilled

12          beer in it.  And we didn't want to stop for dinner on

13          the way back on the second day of training, we wanted

14          to get home.  And Joe said that we were going to be

15          punished for not stopping for dinner.

16    Q.    Did he explain what he meant by punished?

17    A.    Punished in our office meant get more cases.

18    Q.    You said that he banged on your door and Deb's door, I

19          presume your hotel doors?

20    A.    We were in the same room.

21    Q.    You were in the same room.  Do you know if he banged on

22          anybody else's door to try to get them out that night?

23    A.    I think the guys were all in one room.  Maybe he had

24          his own room and Gary and Mike were in another room, I

25          don't remember.

1   Q.   Did you hear that he tried to get the other guys to go

2        out that night?

3   A.   I think when they told him no and went to bed, he

4        started banging on our door.

5   Q.   And after the dinner incident, you said Joe said you

6        would be punished.  Did you get more cases?

7   A.   Different times we got different -- I don't remember

8        specifically what happened after that, if I got more --

9        the other female who was with me, she would have been

10       punished, too.  So I don't know what happened to both

11       of our caseloads.

12  Q.   Okay.  But you don't recall a spike in your caseload

13       shortly after that incident?

14  A.   Shortly after that incident?  Not specifically.

15  Q.   Okay.  Do you remember at any point after this incident

16       thinking, oh, I'm getting this case or that case as

17       punishment that Joe mentioned earlier or in retaliation

18       for the dinner incident?

19  A.   In -- not specifically in retaliation to the dinner

20       incident, no.

21  Q.   Okay.  Any other, anything else regarding work

22       involvement with Gary and Joe that you told Deb about

23       that you haven't told us here today?

24  A.   The only other thing that I just remember telling her

25       was, this would have been the Christmas of, I think it

1        would have been '88 or '89, we had had -- there was an

2        open house Christmas party at our office.  And that was

3        the first Christmas that I worked there, that had been

4        to the party.  And I don't remember if that was the

5        year where -- there was some years where there was

6        controversy over whether alcohol is going to be served

7        or not served, and I don't remember if on that party

8        alcohol was served.

9            But there were plans for after the party that a

10       group of us were going to a place that Joe liked to go

11       to.  I think it's called the North Mountain Inn.  I

12       think that's what it's called.  And I know I was there,

13       Joe was there, Gary was there, Tom Boyer was there, and

14       I think Mike Dunsmore.  And I drove myself up.  And at

15       the time I was 25 years old and happy to be working at

16       Probation, and I went to this bar completely voluntary,

17       didn't have a problem going, drove myself there.

18           So we didn't stay long.  And I didn't realize what

19       had happened until after I got home, what I perceived

20       had happened.  All of a sudden everybody left and it's,

21       like, you don't mind taking Joe home, do you.  And I

22       didn't think anything about it.  I'm like, no, I'll

23       drop him home.  So I dropped him home, and he had me

24       come in the house.  And I just had a very difficult

25       time leaving the house.

1    Q.   What do you mean you had a difficult time leaving the

2         house?

3    A.   First he just talked -- he had a picture of his ex-wife

4         or a picture on the wall, and he talked about her for a

5         while.

6              And then when I was leaving, trying to leave the

7         house, he tried to kiss me.  And I didn't know what to

8         say.  I'm, like, Joe, you're my boss, we can't do this.

9         And physically he didn't attempt anything more, but

10        verbally he tried to get me to stay.

11   Q.   Okay.  And he tried to kiss you on the lips?

12   A.   Um-hum.  Well, he reached for my face.  I don't know

13        where he tried to kiss me.  I assumed my lips.

14   Q.   And did he have his hands on your arms or anywhere else

15        at the time that he was trying to kiss you?

16   A.   I think on my arms.

17   Q.   Was he grabbing you?  Or did he just have his hands

18        resting on your arms?

19   A.   Grab me as in trying to force me to stay?

20   Q.   Did you feel physically restrained?

21   A.   No.

22   Q.   Okay.  Did you complain to anybody about that incident?

23   A.   No.

24   Q.   You didn't complain to anybody?

25   A.   Huh-uh.

```
 1   Q.   Why not?

 2   A.   Well, like I said, I was 25 at the time and I just

 3        didn't know who you would go to.  And after I got home

 4        I thought, well, that was dumb, I should have seen what

 5        was orchestrated there to start with.

 6   Q.   Did you include in your 1993 Complaint mention of this

 7        incident?

 8   A.   No.

 9   Q.   Has Joe ever again attempted to kiss you since that

10        time?

11   A.   No.

12   Q.   Anything else you can recall telling Deb Wallet in your

13        conversation approximately three weeks ago?

14   A.   I don't know if I told her this or not.  The only other

15        thing I would have possibly told her was, again, in a

16        training, we were sitting -- there was a table in

17        the -- we always tried to sit in the back.  Joe was

18        sitting next to me.  I was in the middle, and I think

19        it was Deb Graef on this side.  And Gary was at the

20        table in front of us.  And Joe passed Gary a note that

21        said Kerry's single room such and such, Joe's single

22        room such and such.  And that was the first overnight

23        training I was at, and I was a little bit concerned.

24   Q.   Do you remember when this was, what year?

25   A.   I started in '88, so I don't know.  Sometime after
```

```
 1          that.

 2    Q.    Would it have been before 1990?

 3    A.    Yeah, I would guess.

 4    Q.    Okay.  And what did that note mean to you?  Why did it

 5          concern you?

 6    A.    Because I was concerned he thought something physically

 7          sexually was going to happen between us.

 8    Q.    Did the note say anything other than what you just

 9          described?

10    A.    No.

11    Q.    Had Joe said anything to you prior to that note --

12    A.    No.

13    Q.    -- to lead you to believe that he had any sexual

14          interest in you?

15    A.    No.

16    Q.    Do you recall if Gary Graham responded in any fashion

17          to that note either to Joe or to you?

18    A.    Not to me.  They didn't even know that I had seen it.

19    Q.    Okay.  Do you have any awareness of what Gary's

20          reaction to that note was?

21    A.    No, I didn't -- I saw it laying on the -- after Gary

22          handed it back, I didn't see what he said to Joe.

23    Q.    Did you tell anybody you worked with about that note at

24          the time?

25    A.    I might have said something to Deb Graef, who was --
```

1          who I shared a room with, who was with -- she would

2          have been the only person I would have told.

3     Q.   Was Deb one of your supervisors or was she a co-worker?

4     A.   She was a co-worker.

5     Q.   Did you include mention of that note in your 1993

6          Complaint?

7     A.   No.

8     Q.   Anything else you told Deb Wallet?

9     A.   That's all I can come up with.

10    Q.   Okay.  Prior to speaking with Deb out in the hallway

11         right before this deposition, had you spoken with her

12         today?

13    A.   No.  I mean, we just spoke in the hallway of not about

14         this, just I was talking to Barb about stuff, but we

15         weren't discussing this case.

16    Q.   Okay.  Other than today, have you spoken with Barbara

17         Varner about her Complaint in this matter?

18    A.   Um-hum.

19    Q.   You have to say yes or no.

20    A.   Yes.  I'm sorry.

21    Q.   It's easy to forget.

22              When did you first speak with her about her

23         Complaint?

24    A.   It would have been sometime after 1996, because our

25         office had been split at the time and I didn't really

```
 1              see her very often anymore.  And I had heard from some
 2              of the secretaries or the women who were on that side
 3              that Gary was yelling at Barb about a bunch of stuff,
 4              and that these other women were, like, half afraid
 5              of -- because of his yelling.
 6                   And then one time I saw Barb in the bathroom and
 7              she said that things were real bad, that he was yelling
 8              at her all the time and she didn't know what to do.
 9                   And then the only other time I remember, I
10              remember a group of women went to Hoss's at Christmas
11              time just for, like, a little lunch before the
12              holidays, and the secretaries were saying stuff to Barb
13              about how can you take that, he yells at you all the
14              time.
15                   And then at some point I remember Barb telling me
16              she went to the EEO -- or went to different, whoever
17              you go to, to file the Complaint.
18      Q.     Did you ever hear Gary yell at Barb?
19      A.     No.
20      Q.     Did Barb tell you what Gary was yelling at her about?
21      A.     Probably, but I don't remember specifically what it
22              was, what she had told me.
23      Q.     Okay.  And I'm talking about just at this time --
24      A.     Right.
25      Q.     -- when this first happened.  Okay.
```

```
 1    A.    When I shared an office with Barb he went out of his

 2          way to be nice to her.

 3    Q.    Who went out of his way to be nice?

 4    A.    Gary.

 5    Q.    To be nice to her?

 6    A.    Um-hum.  I mean, I thought, I mean, whatever Gary did,

 7          Barb had to be with him.

 8    Q.    What do you mean by that?

 9    A.    He just looked for reasons to have Barb with him.  I

10          mean, we all kind of joked -- Barb worked at Children

11          and Youth before she was hired, and it was just an

12          unspoken rule that Barb would get hired because Gary

13          liked her.

14    Q.    And what time frame are we talking about right now?

15    A.    I'd say -- I started in '88.  I don't remember when she

16          started, in Children and Youth.  It was before or

17          after, between then and whenever she was hired, while

18          she was working at Children and Youth then before she

19          got hired in Probation.

20    Q.    So you didn't see Gary ever yell at Barb?

21    A.    No.

22    Q.    Did you ever see him act in way that you thought was

23          demeaning toward her?

24    A.    Huh-uh.  No.

25    Q.    Did you ever see him act in a way that you thought was
```

1         unkind toward her?

2    A.   No.

3    Q.   Did you ever see him act in a way that you thought was

4         physically threatening toward her?

5    A.   No.

6    Q.   Did Barb ever complain to you about Gary's behavior?

7    A.   Only after the split.

8    Q.   Only after the split.  Prior to the split, did she have

9         any comments about Gary's behavior toward her, good,

10        bad or otherwise?

11   A.   The only thing I remember her saying was I remember a

12        story where she and he went to a juvenile facility for

13        a graduation, I think it was South Mountain, I don't

14        know where it was, but Gary was complaining about her

15        car the whole time, that it was this, that and the

16        other thing.  I just remember her telling a story like

17        that.

18   Q.   Do you remember what types of complaints about the car?

19   A.   He didn't like the car.  Just a -- I forget

20        specifically, but the car, the roof -- it was a

21        convertible.  I mean, he just had a bunch of complaints

22        about the car.

23   Q.   Did she ever tell you, did Barb ever tell you that Gary

24        made inappropriate comments to her when they were

25        riding around together?

```
 1   A.   No.
 2   Q.   Getting back to my original question, prior to this
 3        deposition did you speak with Barb Varner about this
 4        deposition?
 5   A.   Yes.
 6   Q.   And when was that?
 7   A.   After the times I've told you about?
 8   Q.   Yes, after the times you've told me about.
 9   A.   I mean, I don't remember specific dates, but --
10   Q.   What was the most recent conversation you had with her
11        about this case prior to today?
12   A.   Prior to today?  Would have been last week when I told
13        her that I was subpoenaed to come here.
14   Q.   And how long did you talk to her last week?
15   A.   About that?
16   Q.   About that.
17   A.   About me being here?  Not a whole lot.  But I mean,
18        she, I talked to her -- I guess I got the subpoena on a
19        Monday.  I don't think I saw her again till Wednesday.
20        I think she was out on Tuesday.  But after I got the
21        subpoena I told her about it, and I think there was,
22        like, two days lapse before I saw her again.  And then
23        she told me that she had been somewhere where Judge
24        Sheely had been deposed, but --
25   Q.   Did she tell you what Judge Sheely said during his
```

```
 1          deposition?

 2    A.    She said that he didn't recall a lot of information.

 3    Q.    Did she tell you anything that he did recall?

 4    A.    Oh, that he, something about how it had transpired.

 5          And I don't recall specifically what was said, about if

 6          Gary told his wife Barb about their alleged

 7          relationship in front of Judge Sheely or at home the

 8          night before.  I think that's what it was.

 9    Q.    Did she tell you about any of the attorneys who were in

10          attendance at that deposition?

11    A.    Oh, I mean, she told me that Joe has an attorney, Gary

12          has an attorney, the county has an attorney.  But I

13          don't know, I'm assuming that's Joe's attorney next to

14          him but I don't know who any of them are.

15    Q.    Did she tell you what any of the questions were, the

16          specific questions that were asked?

17    A.    No.

18    Q.    Did she tell you about Gary's deposition at all, at any

19          point in time?

20    A.    Yeah.

21    Q.    When did she do that?

22    A.    I don't remember when it was, but -- when Gary's

23          deposition was, but it was a couple days after that.

24    Q.    And what did she tell you about Gary's deposition?

25    A.    That he didn't -- that he didn't recall a lot of stuff.
```

```
 1            That she had, was supposed to have some scar on her
 2            back.  Oh, and I'm disingenuous with my clients.
 3    Q.    She said that Gary said that about you?
 4    A.    Yeah.  Oh, that he was offended with a joke that I told
 5            at a Christmas party.  Oh, that I was -- oh, that I had
 6            allegedly been given some criminal citation from an
 7            ex-husband.  Those are the key things I remember.
 8    Q.    Did she mention any of the attorneys who were present
 9            at that deposition?
10    A.    Not that I recall.  You mean specific names?
11    Q.    Specific names.
12    A.    No.  I don't know any -- I know Mr. Dellasega because
13            of the subpoena, but I'm sorry, I don't even know your
14            name.  Oh, and I know Deb Wallet.
15    Q.    And I apologize.  Kristen Blanchard's my name.
16    A.    Okay.
17    Q.    And aside from the answers that Gary gave during his
18            deposition that you just told me, did Barb tell you any
19            of the questions that were asked during that deposition
20            by any of the attorneys?
21    A.    No, I don't think so.
22    Q.    Did she tell you what she thought of the deposition?
23    A.    I think -- she didn't say what she thought, but what I
24            thought she got out of it was that she was kind of
25            relieved that it had -- the process had started,
```

```
 1              because it's been going on for a while.
 2     Q.      Did she tell you about Joe Osenkarski's deposition?
 3     A.      Yeah, I was trying -- she did, and I'm trying to
 4              remember.  I think Joe had a lot of answers of he
 5              didn't recall.  And he's -- she told me that he said
 6              that he -- I think what she said was he was never told
 7              what the Complaint was, what it was, what was in the
 8              Complaint.
 9     Q.      That Joe said that during his deposition?
10     A.      I think that's what she told me.
11     Q.      Okay.  Do you remember anything else she told you about
12              that deposition?
13     A.      That Joe had never heard Gary yell.
14     Q.      Anything else you can recall she said about that
15              deposition?
16     A.      No, I don't recall anything.
17     Q.      Okay.  Did he mention the attorneys?
18     A.      No.
19     Q.      Didn't mention specific questions asked?
20     A.      No.
21     Q.      Did she tell you what she thought of that deposition?
22     A.      Again, I just got the impression that she was relieved
23              that this thing had -- was ongoing.
24     Q.      Did she talk to you about Joe's deposition during the
25              same conversation in which she talked to you about
```

```
 1          Gary's, or was that a separate conversation?
 2     A.   I think it was separate.  I think.  I don't remember if
 3          they were even done on the same day.
 4     Q.   How many times -- well, you said in the past week
 5          you've spoken with Barb twice about this case, correct?
 6     A.   Right.  Now, I mean, our offices are, like, in the same
 7          part of the building, so I mean, we speak about a
 8          variety of things, not all of them about this.
 9     Q.   Okay.  Would you say that you speak with her about this
10          case on a weekly basis?
11     A.   Yeah, I would say yes.
12     Q.   How many times in a week do you think you speak with
13          her about this case?
14     A.   It depends.  I mean, some weeks it wasn't mentioned
15          because there was nothing happening with it.  But the
16          last couple weeks when there's been things happening, I
17          would say maybe once or twice a week.
18     Q.   And do you consider yourself to be Barb's friend?
19     A.   I think we're friends, yeah.
20     Q.   Do you socialize outside of work?
21     A.   Not often.  We have -- it's been a while -- have gone
22          out after work for a drink.
23     Q.   And how long would you say the two of you have been
24          friends?
25     A.   I would say since we shared an office together.
```

```
 1   Q.   Okay.  And when did that start, again?

 2   A.   I would say maybe '94 to '96.

 3   Q.   Did Barb ask for your help in this case?

 4   A.   No.

 5   Q.   No?  Did she tell you she was counting on you in this

 6        case?

 7   A.   No.

 8   Q.   Okay.  Has she expressed to you anxiety about this

 9        case?

10   A.   What do you mean by that?

11   Q.   Is she nervous about the proceedings?

12   A.   I don't think at this point she's nervous about them.

13        I think she was nervous years ago when it all started,

14        but I don't think at this point.  I could be wrong, I

15        don't know.

16   Q.   What is your understanding of her allegations against

17        Gary?

18   A.   I guess that he yelled at her unreasonably.

19   Q.   Anything else you're aware of that she's accusing Gary

20        of?

21   A.   I don't know what the Complaint says, no.

22   Q.   Do you know what she thought was unreasonable about

23        Gary's yelling?

24   A.   Just that there was no basis for it.  And sometimes I

25        think, if I recall it involved other of her co-workers.
```

```
 1   Q.   What do you mean by that?

 2   A.   I think he would yell at other Juvenile probation

 3        officers about Barb to them.

 4   Q.   To the other officers?

 5   A.   Right.

 6   Q.   Do you know who those officers are?

 7   A.   I wasn't working there at the time.  I don't remember.

 8        I mean, I can tell you who I remember the Juvenile

 9        probation officers were then.  Denny Drachbar, Sam

10        Miller, I don't know who -- again, I wasn't over there

11        so I don't know who would have been involved.

12   Q.   Okay.  At any point in time has Barb told you that she

13        thought Gary sexually harassed her?

14   A.   Only one -- one time I remember, again, this was at a

15        training.  I wasn't at the training, it was a DUI

16        training.  She was in her room studying, and he kept

17        trying to get her to come somewhere with him, I don't

18        know, downstairs to the bar area somewhere, and she

19        refused to go.

20             And I think she said either she left early the

21        next day or he left early.  One of them left early.

22             And I remember, and I think this was after she

23        filed the Complaint, she told me that Gary had stopped

24        by her house unannounced on occasion.  Or maybe just

25        once, I shouldn't say on occasion, stopped by her house
```

```
 1              when her husband was out of town.
 2    Q.   And did she tell you why she thought this was sexual
 3         harassment?
 4    A.   I don't recall her specifically -- I just remember what
 5         she told me, the details.
 6    Q.   Anything else that she told you about Gary's behavior?
 7    A.   She showed me a card that Gary had given her, a
 8         birthday card.
 9    Q.   Okay.  Did she tell you when she received that card?
10    A.   On her birthday.  I know her birthday's sometime in
11         January because mine is, too, and we joke about that.
12         But I don't recall a year.
13    Q.   Do you remember when she told you about the birthday
14         card?  Was it the past year, in the past five years?
15    A.   In the past five years.
16    Q.   Okay.  But you don't know exactly when?
17    A.   No.
18    Q.   Okay.  I apologize if I already asked you this, but did
19         you ever hear a rumor that Gary and Barb were having an
20         affair?
21    A.   No, I did not.
22    Q.   Never heard a rumor along those lines?
23    A.   (Witness shook head negatively.)
24    Q.   Okay.  Never heard people in the office talk about
25         something like that?
```

```
 1    A.    Not until -- I mean, this all transpired after Gary

 2          said, allegedly said something to Judge Sheely was the

 3          only time.  I mean, I was just, like, taken aback when

 4          I heard it.

 5    Q.    Did you ever hear Barb and Gary's wife referred to as

 6          Barb 1 and Barb 2?

 7    A.    Yes.

 8    Q.    What was the meaning of that, as far as you understood?

 9    A.    It was mostly used by, if I recall, our clerical staff

10          and maybe some of the -- I just remember the clerical

11          staff.  I know Gary would get a phone call, who it was,

12          Barb 1 or Barb 2.

13    Q.    And you understood that one of those Barbs was Barb

14          Varner and one of those Barbs was Gary's wife?

15    A.    Right.

16    Q.    Okay.  And how is it that you came to understand that

17          that's what that meant?

18    A.    I don't recall specifically.  They're the only two

19          Barbs, I guess, that Gary knew or -- I don't recall who

20          came up with that or how that came about.

21    Q.    Did it ever occur to you that the two of them might be

22          having an affair?

23    A.    No.

24    Q.    Did Barb ever mention having an affair with Gary?

25    A.    No.
```

```
 1   Q.   Did you ever ask her about having an affair with him?

 2   A.   No.  Never even was even a suspicion of mine, or even,

 3        I would never have had any reason to think there was

 4        anything going on between them.

 5   Q.   Okay.  Are you aware of whether Barb ever had an affair

 6        at any point in time?

 7   A.   To my knowledge, no.

 8   Q.   And I don't mean with Gary, I mean with anybody.

 9   A.   Right.

10   Q.   During your telephone conversation with Deb Wallet

11        approximately three weeks ago, was anybody else

12        participating in that phone conversation, or was it

13        just --

14   A.   No.  I was at home.

15   Q.   So as far as you know, it was just the two of you on

16        the line?

17   A.   Yes.

18   Q.   During the conversations that you've had with Barb

19        Varner regarding this lawsuit, has anybody else

20        participated in those conversations?

21   A.   You mean, like, been in the room?

22   Q.   Sure.

23   A.   I don't remember if it was at that lunch at Hoss's, I

24        know Jen Crum, Winnie, me, Nicole Galbraith, I think

25        they were all there.
```

```
 1                 Then recently the only other people maybe would
 2            be, and Ronna hasn't worked there in a while, but Ronna
 3            Boyles.  And I'm going to guess Debra Green.  But they
 4            would be the only people that I would know.
 5    Q.      Did any of these individuals, to the best of your
 6            recollection, participate in the conversation about
 7            this lawsuit?
 8    A.      I mean, I'm sure they said something.  What they said,
 9            I don't remember.  And I don't know if we were talking
10            about it as a lawsuit or just basically what was going
11            on, like, what the next step was or something.
12    Q.      Okay.  Do you recall at any point in time speaking with
13            Dave Deluce about this case, or about Barb's Complaint?
14    A.      When it first started, like, years ago?  Was he the --
15            did he work for the county?
16    Q.      I have to ask you the questions, unfortunately.
17    A.      If he was the one who originally, like, investigated
18            the case, I remember talking to him.
19    Q.      Do you remember when?
20    A.      I don't recall how many years ago it's been since this
21            has been going on, but it was shortly after Barb had
22            raised concerns or filed a Complaint.  I don't know
23            what proceeding, what was happening at the time
24            legally.
25    Q.      Do you remember how many times you spoke with him?
```

42

```
 1    A.    I think just once.

 2    Q.    Okay.

 3    A.    I remember once.  I don't -- I know at least once.

 4    Q.    You mentioned and we talked about the 1993 Complaint

 5          that you filed against Joe.  Did that proceed to

 6          litigation, or was that only at the agency level?

 7    A.    At the office level, right.

 8    Q.    Okay.  Oh, the office level.  So it was an internal

 9          complaint, or was it with the EEOC?

10    A.    No, just internal.

11    Q.    Internal, okay.  Have you ever filed a lawsuit before?

12    A.    No.

13    Q.    Are you married?

14    A.    Yes.

15    Q.    For how long?

16    A.    Seven years.  Well, June of '96.

17    Q.    Is this your first marriage?

18    A.    No, it's my third.

19    Q.    Do you have any kids?

20    A.    Yes.

21    Q.    How many?

22    A.    One daughter, Bailey.

23    Q.    And how old is Bailey?

24    A.    She's nine.

25    Q.    And did you graduate from high school?
```

```
 1    A.    Yes.

 2    Q.    What year?

 3    A.    1980.

 4    Q.    And what school?

 5    A.    Carlisle High School.

 6    Q.    Did you graduate from college?

 7    A.    Yes, 1984 from Bloomsburg.

 8    Q.    What was your major area of concentration?

 9    A.    Sociology.

10    Q.    Do you have any professional degrees or licenses?

11    A.    Just that.  I mean, just my degree.

12    Q.    So no graduate school or anything like that?

13    A.    No.

14    Q.    And what is your current job title?

15    A.    Senior probation officer.

16    Q.    How long have you had that title?

17    A.    I think since '96 when we made the split.

18    Q.    And who is your supervisor now?

19    A.    Lyle Herr.

20    Q.    Do you know how to spell Lyle's last name?

21    A.    H-E-R-R.

22    Q.    Okay.  Is Lyle your only supervisor?

23    A.    He's my direct supervisor.  We have two supervisors on

24          the Adult side.  The other one is Mike Varner.

25    Q.    And you do not work with Gary Graham now; is that
```

```
 1          correct?

 2     A.   I mean, in the same building?  Or --

 3     Q.   Do you have any professional interaction with him now?

 4     A.   Occasionally.  He's our institutional parole officer

 5          and I send paperwork down to him, and talk to his voice

 6          mail a lot about messages.  He might call me up about

 7          when do you want to parole this person or those kind of

 8          things.

 9     Q.   Okay.  And do you have any problems in your

10          professional interactions with him?

11     A.   No.

12     Q.   Okay.  And if you have questions, you get the answers

13          you need from him?

14     A.   I mean, I can talk to him about a case.  I mean, I

15          can't say I agree with everything he does or he agrees

16          with everything I do.

17     Q.   Sure.  Did you ever socialize with Gary outside of

18          work?

19     A.   At trainings, when I worked there.  Before I worked

20          there I worked at Children and Youth and my supervisor

21          was a friend of his, and I know I had a going-away

22          party for this girl named Nancy, and Gary was at that.

23               And I know Gary came one time -- I lived in a

24          third floor apartment and he helped me move to a second

25          floor apartment, up with some other probation officers.
```

```
 1              I would guess, I don't recall specifically but

 2         when I first started there I'm going to guess that I

 3         had been to lunch with, like, a group, him and some

 4         other people.  Oh, and that time, the Christmas thing.

 5              You know, there were times, I don't recall all of

 6         them or how many.

 7    Q.   Okay.  And did you ever complain formally or informally

 8         to any of your supervisors about Gary?

 9    A.   No.

10    Q.   Did you ever have any, aside from your belief that he

11         doesn't talk to you, ever have any professional

12         problems with him?

13    A.   No.

14    Q.   Ever have any personal problems with him, aside from

15         him not talking to you?

16    A.   What do you mean personal problems?

17    Q.   Any problems we haven't talked about.

18    A.   No.

19              MS. BLANCHARD:  Off the record.

20              (Discussion held off the record.)

21  BY MR. ADAMS:

22    Q.   Good morning, Ms. Houser.  My name is Paul Lancaster

23         Adams, and as you guessed earlier, I do represent

24         Mr. Osenkarski in this matter.

25              I'll ask you that you please follow the same rules
```

1          that Ms. Blanchard explained to you before, and that I
2          expect the questions, if she did not say that to you, I
3          want to add to that any question that I ask you and you
4          actually respond to, I'm going to assume that it is the
5          correct answer to the best of your ability.
6     A.   Yes.
7     Q.   I don't want you to guess.  Just answer what you know,
8          and I don't want to you speculate.  Is that okay?
9     A.   Okay.
10    Q.   Okay.  Some of these questions are going to be kind of
11         weird for you, and I apologize.
12              You didn't like Mr. Osenkarski?
13    A.   At this point I'd probably say no.
14    Q.   Would you say that you hate Mr. Osenkarski?
15    A.   No.
16    Q.   Do you like Gary Graham?
17    A.   At this point, no.
18    Q.   Do you like Ms. Varner?
19    A.   Yes.
20    Q.   Referring to your 1993 incident involving, or the
21         allegation involving Mr. Osenkarski, he wasn't chief of
22         the Juvenile Probation Department at that time, was he?
23    A.   No.  He was the Juvenile supervisor.
24    Q.   Was he your supervisor?
25    A.   Yes, for my juvenile cases.

```
 1   Q.   Okay.  And I think Ken Bolze, is he the one that
 2        actually conducted an investigation based on --
 3   A.   Yes.
 4   Q.   I'm sorry.  Wait until I finish the question.  Was Ken
 5        Bolze the person who actually conducted an
 6        investigation based on your complaint of
 7        Mr. Osenkarski?
 8   A.   Yes.
 9   Q.   Okay.  And he actually interviewed persons in your
10        office about your complaints; is that correct?  Ken
11        Bolze.
12   A.   I believe the people who had heard what had been said.
13   Q.   Do you have a reason to believe that Mr. Bolze didn't
14        interview persons in your office about your allegation?
15   A.   No.  I don't recall specifically when he did that or
16        what he would have asked.
17   Q.   Okay.  He interviewed you; is that correct?
18   A.   Yes.
19   Q.   And do you have any reason to believe that Mr. Bolze's
20        investigation of your complaints against Mr. Osenkarski
21        was not a comprehensive one?  Do you have any reason to
22        believe that it was not comprehensive?
23   A.   No.
24   Q.   Okay.  And he supplied you, again, Mr. Bolze supplied
25        you with his conclusions of the investigation; is that
```

1        correct?

2    A.   Yes.

3    Q.   Referring to 1993 complaint of Mr. Osenkarski, did you

4         ever ask Debra Wallet to consider taking your case?

5    A.   I'm sorry, could you say that again?

6    Q.   Did you ever ask Debra Wallet to consider taking your

7         case, a legal case against Mr. Osenkarski?

8    A.   I talked to her about that, on what I should do.

9    Q.   Did you ask her to consider your case?

10   A.   I think I just asked for her opinion, and I didn't

11        pursue it outside of the office after that.

12   Q.   Okay.  Did you talk to Ms. Wallet before or after

13        Mr. Bolze's investigation and conclusion?

14   A.   Before the conclusion.

15   Q.   Okay.  Did you ever consider talking to any other

16        attorneys about your complaints against Osenkarski from

17        1993?

18   A.   No.  Well, that probably isn't totally correct, because

19        at the time my ex-husband was an attorney, so I mean,

20        if you want to consider that.

21   Q.   What's your ex-husband's name?

22   A.   Chuck Vohs.

23   Q.   Did he specialize in employment law?

24   A.   No, he did not.

25   Q.   But he considered taking your case at some point?

```
 1    A.   No, he did not.  But I mean, I talked to him about it

 2         because he was my husband and he was an attorney, so I

 3         just thought I'd answer the question.

 4    Q.   Okay.  I appreciate that.

 5              The comment, I know you don't want to keep

 6         repeating this so I'll repeat it for you, members of

 7         the cunt club, do you remember the discussions about

 8         that this morning?  You have to answer affirmatively --

 9    A.   Yes.  I'm sorry.

10    Q.   -- so she can take it down.  Mr. Osenkarski never said

11         that directly to you, did he?

12    A.   No, he did not.

13    Q.   And Mr. Osenkarski never said that directly to any

14         female, from your understanding; is that correct?

15    A.   I believe a female overheard that conversation but it

16         was not said directly to her.

17    Q.   Okay.  And the allegations of sexual harassment filed

18         by you that Ken Bolze actually investigated were

19         unfounded; is that correct?

20    A.   That was his finding, right.

21    Q.   At the time you were satisfied with that; is that

22         correct?

23    A.   I was relieved it was over.  It took forever.

24    Q.   When did you meet Ms. Varner, again?

25    A.   I knew of her professionally when she worked at
```

```
 1              Children and Youth.  I don't recall when that was.  I
 2              started in Probation in '88 so it was sometime after
 3              that.
 4     Q.       Okay.  Ms. Varner started in 1995 with the Juvenile
 5              Probation Department; is that correct?  Does that sound
 6              familiar?
 7     A.       I don't know.
 8     Q.       Okay.  Did you know Ms. Varner before 1995?
 9     A.       Yes.  I mean, I knew her, I know that we had had one
10              case where I had one of the members of the family in
11              Adult Probation and she was the caseworker at Children
12              and Youth, and I know that we had been to their house
13              together.
14     Q.       Okay.  Were you friends with Ms. Varner before she
15              started to work in the Juvenile Probation Department?
16     A.       No.  We just knew each other from work.
17     Q.       Okay.  When did you tell Ms. Varner of your complaint,
18              of the 1993 complaint against Mr. Osenkarski?
19     A.       I don't think I did tell her about it.
20     Q.       Do you have any idea how she knew about that complaint?
21     A.       I don't know if I can -- if this is accurate or not,
22              but I think she heard about it from Joe and Gary.
23     Q.       From Joe Osenkarski himself?
24     A.       Right.
25     Q.       And Gary Graham?
```

```
 1   A.   Right.

 2   Q.   Why do you say you think that?  Why do you say that?

 3   A.   I think that's where she got her knowledge of it from.

 4   Q.   Okay.  But she never told you that she heard that from

 5        Mr. Graham or Mr. Osenkarski?

 6   A.   I know that what she told me was that it had been asked

 7        and that I, if I -- I don't know if I have the details

 8        right, that Joe was supposed to go to a sensitivity

 9        class or some type of something, I don't know, and that

10        he didn't go and that he joked about it.

11   Q.   Did you ever encourage Ms. Varner to file a complaint

12        of sexual harassment against Mr. Graham and

13        Mr. Osenkarski?

14   A.   No.

15   Q.   Did you refer Mrs. Varner to Debra Wallet?

16   A.   I tried to remember that this morning.  I don't think

17        that I did.  I don't recall where Barb would have

18        gotten Deb's name from.  I don't recall if I did or did

19        not.

20   Q.   Okay.  How do you know Debra Wallet?

21   A.   I met her the first time back in I guess it was 1993,

22        and I guess just working at the courthouse asking who

23        dealt with employment law.  That was how.

24   Q.   You said that, during your testimony this morning you

25        had mentioned an incident at the open house Christmas
```

```
 1            party years ago and that persons from the department

 2            went to the North Mountain Inn.  Do you remember that

 3            testimony?

 4    A.      Yes.

 5    Q.      Okay.  And you said it became a time in the night where

 6            you --

 7    A.      It was, like, evening.  It wasn't like -- well, by the

 8            time we got to Joe's house I think I was home before

 9            seven or eight o'clock at night.

10    Q.      So it was early evening?

11    A.      Right.

12    Q.      Like, after work hours?

13    A.      Right.

14    Q.      Okay.  When you were at Mr. Osenkarski's house, you had

15            testified this morning, and correct me if I'm wrong,

16            you said that when you were at his home after going,

17            after you returned home you said you thought that was

18            dumb, I should have seen what was being orchestrated.

19            What exactly did you mean by that?

20    A.      I think it was planned that they would all leave and

21            that I -- and Joe didn't have a car up there, that I

22            would take him home.

23    Q.      You understand that to be orchestrated in some way?

24    A.      Pardon me?

25    Q.      What do you mean by orchestrated?
```

```
 1   A.   I didn't see that that -- that that had possibly been
 2        planned before we all had got there.
 3   Q.   Okay.  So why do you think that you were dumb by not
 4        staying at Mr. Osenkarski's home?
 5   A.   I think I was dumb for staying there.
 6   Q.   You think you were dumb for staying there?
 7   A.   Right.  For going in in the first place.
 8   Q.   Okay.  Is that different from your testimony this
 9        morning?
10   A.   I don't think that it is.  I mean, that's what I meant.
11   Q.   Okay.
12   A.   That's why I said I didn't -- another reason I didn't
13        file a complaint, because I just felt like I had been
14        set up and I should have seen it and never should have
15        allowed myself to be in that situation to begin with.
16   Q.   That's what you meant?
17   A.   Right.
18   Q.   Okay.  Very good.  Are you vicariously living through
19        Ms. Varner with respect to her complaint of
20        Mr. Osenkarski?
21   A.   No.  I don't have to see Joe or -- I don't have any
22        contact with Joe since 1996.
23   Q.   You know that there's a complaint by Ms. Varner against
24        Mr. Osenkarski, correct?
25   A.   Well, I knew it originated with Joe -- I mean, with
```

```
 1              Gary, and somehow because Joe's his supervisor that

 2              he's involved with it, too.

 3       Q.     Okay.  So you do know there's a complaint against

 4              Mr. Osenkarski --

 5       A.     Right.

 6       Q.     -- by Ms. Varner?

 7       A.     Yes.

 8       Q.     And honestly, would you like to see Ms. Varner prevail

 9              over Mr. Osenkarski in some sort of way via this

10              lawsuit?

11       A.     It's been going on for so long, I guess I just would

12              like to see it end or resolve one way or the other,

13              whatever that outcome happens to be.

14       Q.     Would you like to see Ms. Varner somehow triumph over

15              Mr. Graham via this lawsuit?

16       A.     What do you mean triumph?

17       Q.     Win the lawsuit against Mr. Graham.

18       A.     What does it mean to win?  I mean, what do you consider

19              a win?

20       Q.     Well, you can't ask the questions, I have to ask the

21              questions.  Whatever you interpret as winning versus

22              losing in a lawsuit.  I'd like to know what you think.

23       A.     Well, I've never been involved with anything like this

24              before, so I don't know what the outcomes could be.  I

25              just -- I mean, I've worked for the court system my
```

```
 1            whole professional life.  I just leave -- I'm used to

 2            just leaving outcomes to the Court.  I don't know what

 3            is going to happen.

 4    Q.      Okay.  Without taking too much time, you realize that

 5            there are two types of litigation, criminal and civil

 6            litigation; is that correct?  Is that correct?

 7    A.      Correct.

 8    Q.      Okay.  And you realize that this is a civil proceeding?

 9    A.      Well --

10    Q.      Because it's not a criminal proceeding?

11    A.      I don't know anything about civil law other than I've

12            been divorced.

13    Q.      Okay.  Do you realize that the remedies or part of the

14            remedies of a civil lawsuit is monetary gain?

15    A.      From watching TV, sure, I know that it's monetary gain.

16    Q.      So with that understanding, would you feel happy for

17            Ms. Varner if she were to monetarily gain from her

18            lawsuit against Mr. Graham and Mr. Osenkarski?

19    A.      Sure.  If that's what you guys felt happened, sure.

20    Q.      Based on what you feel happened, would you like to see

21            her monetarily gain?

22    A.      I mean, all I can tell you is my involvement with Joe

23            and Gary.  I didn't see anything that happened with

24            Gary and Barb or Joe and Barb, so I mean, I can't

25            answer that question.
```

```
 1   Q.   Okay.  What joke did you tell during a Christmas party
 2        that you had mentioned earlier this morning?
 3   A.   That was before I worked in Probation, and I'm trying
 4        to remember after Barb told me about it.  It was
 5        something about Santa Claus and -- I don't remember all
 6        the things leading up to, but the brunt, the joke of
 7        the thing was Santa Claus saying, part of the joke was
 8        ho ho ho, gotta go gotta go, and at the end the joke
 9        was hey hey hey, gotta stay, gotta stay, can't get up
10        the chimney with my penis this way is what the end was.
11   Q.   Okay.
12   A.   I don't remember the things -- it was something with
13        Santa and different women or kids and then finally a
14        woman at the end.
15   Q.   This is a joke you told during a Christmas party?
16   A.   Right.
17   Q.   Do you recall a time when Ms. Varner and Gary Graham
18        ever got along or got along favorably?
19   A.   Yes.
20   Q.   What time period was that?
21   A.   The time period I shared an office with her, that I
22        considered it favorably.
23   Q.   Okay.  Do you recall a time when that interaction went
24        sour or it was no longer favorable?
25   A.   Again, it was after the split when I didn't have much,
```

```
 1            if any, contact with Barb.  I heard about it from other
 2            people, and then at some point I heard about it from
 3            Barb.
 4     Q.     Do you have any idea why their relationship, work or
 5            whatever, became sour or went unfavorably?
 6     A.     I remember I was surprised, because I shared an office
 7            with her and, I mean, Barb could really do no wrong as
 8            far as Gary was concerned.
 9     Q.     So you were surprised that they all of a sudden weren't
10            getting along favorably?
11     A.     Right.
12     Q.     And so it was pretty abrupt, from your understanding?
13     A.     I think, yes.
14            MR. ADAMS:  Okay.  I have no further questions.
15            Thank you.
16  BY MR. DELLASEGA:
17     Q.     You've had the sexual harassment training, then?
18     A.     Through the county, yes.
19     Q.     How many times?
20     A.     I would say two, maybe three times that the county's
21            offered it.  However many times the county has -- it's
22            always been, like, mandated training.  So however many
23            times we've had that.  I'm going to guess three.
24     Q.     With the understanding you learned in those training
25            sessions of what constitutes sexual harassment, let me
```

```
 1          ask you, have you ever observed Mr. Graham sexually

 2          harass Barbara Varner?

 3    A.    No.

 4    Q.    Have you ever observed him sexually harass anybody?

 5    A.    No.

 6    Q.    Other than the Complaint you filed against

 7          Mr. Osenkarski regarding that particular epithet, have

 8          you ever observed Mr. Osenkarski sexually harass

 9          anybody?

10    A.    I would say I've heard, been in rooms with

11          conversations with both of them that the conversations

12          were disgusting enough that I felt like I couldn't wait

13          to get out of there, in regard to conversations were

14          about not me but about other women.

15    Q.    You say both of them, you're referring to Osenkarski

16          and Graham?

17    A.    Yes.  Right.

18    Q.    And --

19    A.    Joe more so than Gary.

20    Q.    All right.  Give me an example of what Mr. Osenkarski

21          would say that you felt rose to the level of sexual

22          harassment.

23    A.    I know one instance, again, at a training where we were

24          at a restaurant, I think it's called The Tavern, Joe

25          had had a lot to drink and was talking very loudly
```

```
 1              about how his daughters looked in underwear and about

 2              how Polish people had sex -- or they wouldn't get

 3              pregnant because if -- before you were married, it was,

 4              would have been a big deal.

 5                   He also talked about his ex-wife having to use the

 6              bathroom on the way home from a trip from State

 7              College, she went to the bathroom outside and he said

 8              that she got an infection and he used the word pussy.

 9     Q.       Is that the worst example you can think of of comments

10              made by Mr. Osenkarski that you feel rise to the level

11              of sexual harassment?

12     A.       I thought it was inappropriate conversation.  I mean,

13              I'm sure I could, if we sat here for a while I could

14              think of some other ones.

15     Q.       Sitting here right now, to the best of your

16              recollection, can you recall him saying anything worse

17              than what you've just told us?

18     A.       No.

19     Q.       You had said early on in your testimony to

20              Ms. Blanchard that when you first met Barbara Varner

21              your relationship was a bit strained because Gary

22              wasn't talking to you.  Do you recall that?

23     A.       Right.

24     Q.       Okay.  Why would the fact Gary was not talking to you

25              make your relationship with Mrs. Varner strained?
```

```
 1    A.   Because if -- you have to understand the dynamics of

 2         our office, because if she was talking to me, that

 3         would mean in Gary's eyes that she was going against

 4         Gary.  I mean, you pretty much had to pick your allies

 5         in there.  So I just kind of, knowing that I just

 6         stayed away from Barb, not to make her life difficult,

 7         and she followed suit.

 8    Q.   You stayed away from Mrs. Varner because --

 9    A.   I just didn't like to pursue, like, any ongoing -- I

10         didn't pursue a lot of contact with her because I knew

11         she didn't want to because she and Gary were friends.

12    Q.   Let me ask you.  Did you also avoid other people who

13         Graham wasn't talking to?  You ran down a list of five

14         or six names that people you recalled he did not talk

15         to.  Did you avoid them so they wouldn't feel

16         uncomfortable with their relationship with Graham?

17    A.   With people he wasn't talking to?

18    Q.   Right.

19    A.   Not the people he wasn't talking to.  The people he was

20         talking to, I did.

21    Q.   So was Ms. Varner like everybody else he was talking

22         to, you would avoid all of them?

23    A.   There wasn't very much.  There was just a couple of

24         them.

25    Q.   That he would talk to?
```

```
 1    A.    Right.

 2    Q.    Ms. Varner was one of them?

 3    A.    Yes.

 4    Q.    And you can only think of perhaps two more?

 5    A.    Were there two more?

 6    Q.    Yes.

 7    A.    I'd say two -- Joe.  Usually Sam and Denny, they were

 8          about the only ones.

 9    Q.    So Mrs. Varner was in a select group of people who he

10          would talk to?

11    A.    Yes.

12    Q.    And the other female in that group that you've

13          identified?

14    A.    Professional female, right.

15    Q.    And when you say that your relationship was strained,

16          are you talking about when you first became office

17          mates in '94?  Or when Mrs. Varner first came, was it

18          CYS?

19    A.    Not at CYS, but when we became office partners, I was a

20          little nervous how it would go, just because I knew I

21          didn't -- Gary and I didn't get along and I knew she

22          was good friends with Gary.  But we got -- Gary didn't

23          come in our office if I was there and we didn't talk

24          about Gary.

25    Q.    When you say good friends, they were both good friends
```

```
 1          with each other?

 2   A.     I perceived that, yes.

 3   Q.     That was unusual?

 4   A.     What, that --

 5   Q.     For Graham to be good friends with anybody?

 6   A.     I wouldn't say unusual.  I mean, I had known he had

 7          liked her when she worked at Children and Youth, so I

 8          wasn't surprised by it.

 9   Q.     What did you observe by when she worked at Children and

10          Youth that made you think he liked her?

11   A.     That he would go out with her on a lot of cases.  That

12          they would talk more about cases than other probation

13          officers and caseworkers would.

14   Q.     Anything else?

15   A.     He and Joe knew stuff about her personal life

16          personally on the outside of work that I doubt they

17          knew about many other caseworkers down there.

18   Q.     And from what you observed, Mrs. Varner liked Gary as

19          well; is that correct?

20   A.     She was polite to him.  I assume she liked him.

21   Q.     Did you observe a degree of friendship on Mr. Graham's

22          part that was disproportionate to the degree of

23          friendship Mrs. Varner displayed?

24   A.     Well, he was her supervisor so he would, like, initiate

25          more of the contact.  But that might have been just
```

```
 1        based on his role with her.  So I don't have any direct
 2        answer to give that, I mean, he might have seemed more
 3        friendly, but again, he was her supervisor and he would
 4        have to initiate some of the conversations.
 5   Q.   In other words, when she worked at CYS he was not her
 6        supervisor; is that correct?
 7   A.   Correct.
 8   Q.   But you observed them being good friends when she was
 9        at CYS; is that correct?
10   A.   I remember him talking with her a lot.  And I remember
11        meeting her up in our office, and I think it was when
12        she was up there to talk with Gary.
13   Q.   Would you again, though, characterize your observation
14        of them while Mrs. Varner was at CYS as two people who
15        were good friends?
16   A.   Friends, yeah.  I think they became better friends when
17        they -- I thought they became better friends once she
18        started in Probation.
19   Q.   Was there any advantage to having Mr. Graham like you?
20   A.   Yes.
21   Q.   And what was that?
22   A.   Your stress level.  You wouldn't be on the punishment
23        list.  I mean, when Gary didn't like you, your life
24        could be miserable.
25   Q.   Because?
```

```
 1    A.    Because he's mean, he's vengeful, and he was a

 2          supervisor.  I mean, he had some role of authority over

 3          us.

 4    Q.    Did you observe Mr. Graham raise his voice to people?

 5    A.    Yes.

 6    Q.    Yell at them?

 7    A.    I heard him yell at other people, yes.  Not to Barb.

 8    Q.    Is he indiscriminate in yelling at both men and women?

 9    A.    Yes.

10    Q.    Is he indiscriminate in being rude to both men and

11          women he dislikes?

12    A.    Yes.

13    Q.    Is he indiscriminate in attempting or threatening to

14          punish people he doesn't like?

15    A.    Yes.

16    Q.    He treats both men and women equally poorly?  You would

17          agree with that statement?

18    A.    Yeah, I would say.  He might be a little -- I would say

19          with the women he -- with some women he's not as

20          overtly mean to.

21    Q.    Between '89 and Mrs. Varner's arrival, you never

22          observed him to sexual harass another woman there; is

23          that correct?

24    A.    No.

25    Q.    Did Mr. Graham ever acknowledge to you or did you ever
```

```
 1          hear from other persons in Probation Mr. Graham

 2          acknowledge an affair with any woman or relationship

 3          with any woman other than his wife?

 4    A.    He talked about stuff that happened prior to his

 5          marriage.

 6    Q.    But did he talk about any instance of infidelity that

 7          you ever heard of?

 8    A.    No.

 9    Q.    Even by rumor?

10    A.    No.

11    Q.    Did he to your knowledge appear sexually interested in

12          any women other than his wife at any time prior to the

13          split?

14    A.    I'm sorry, I didn't hear you.

15    Q.    Did he appear sexually interested in any woman at all

16          other than his wife prior to the split?

17    A.    I mean, he talked about other women.  I mean, he talked

18          about other women.  I don't know what his interest in

19          them, outside of just men talking, what his interest

20          was.

21    Q.    When you say he talked about other women, are you

22          including Mrs. Varner in that group?

23    A.    I don't recall him talking about Mrs. Varner in any way

24          to me.

25    Q.    He would evaluate other women in the context of how
```

```
 1         sexually attractive they were?
 2    A.   I remember him one time saying about an intern had nice
 3         legs, that kind of stuff.  But I never heard him say
 4         anything about Barb Varner.
 5    Q.   Now, during the period of time that you shared the
 6         office with Mrs. Varner, am I correct in assuming
 7         Mrs. Varner never complained to you about Graham?
 8    A.   No, just the one thing about I remember about the card,
 9         that she was kind of like laughing and complaining.  I
10         mean, that was just how Gary was.  He was always, like,
11         quick and hyper, and I mean, we joked about that.
12    Q.   Did Mrs. Graham ever acknowledge to you what you
13         observed, that Gary tried to involve her in as many
14         things as --
15              MS. WALLET:  Excuse me.  You asked about
16         Mrs. Graham.  Did you mean that?
17              MR. DELLASEGA:  I meant Mrs. Varner.
18              THE WITNESS:  Okay, did Mrs. -- no.  She never
19         talked to me.  About what --
20   BY MR. DELLASEGA:
21    Q.   Gary wanting her to go everywhere with him.
22    A.   She would just say "I have another trip with Gary," but
23         she never, I mean, talked about it other than like a
24         day-to-day routine sort of way.
25    Q.   Never complained about having to go anywhere with
```

1          Graham; is that correct?

2    A.    No.

3    Q.    Mr. Graham cuss in the office?

4    A.    Yeah.  Yes.

5    Q.    Is that a rarity in your office?

6    A.    No.

7    Q.    Was he typical of many others in that respect?

8    A.    Yes.

9    Q.    Within Probation would you describe for me your

10         understanding as to how seniority affects your ability

11         to be promoted?

12   A.    That has always, up until we're speaking, been how

13         promotions have taken place.

14   Q.    Strictly based on seniority?

15   A.    Correct.

16   Q.    Without any other consideration?

17   A.    Correct.

18   Q.    Are you able to identify any junior person who was

19         promoted over somebody with more seniority?

20   A.    Not since I've worked there.  But then again, I mean,

21         it hasn't happened since I've been there.  And

22         promotions just don't happen very often, just based on

23         longevity.  There aren't many positions to be promoted

24         to.

25   Q.    Have you ever seen anywhere in writing that seniority

```
 1          plays a role in promotions?

 2    A.    Played a role?

 3    Q.    In being promoted.

 4    A.    Just seniority lists come out periodically.  And I

 5          mean, we just always have assumed, like, when Ken

 6          retired we would know who -- we knew who would move up.

 7          I mean, it wasn't even an issue of interviewing or

 8          posting the job.

 9    Q.    Other than your assumption, in other words, you've

10          never seen any written document that says people will

11          be promoted in order of seniority?

12    A.    No.

13    Q.    And other than your assumption, you've never been told

14          orally by any supervisor, have you, that people are

15          being promoted solely in order of seniority?

16    A.    No.

17    Q.    So you're basing your assumption on past practices?

18    A.    Correct.

19    Q.    Past experience, correct?  And only on that?

20    A.    Correct.

21    Q.    To your knowledge does Mrs. Varner read Redbook

22          magazine?

23    A.    I don't have any idea.

24    Q.    You never talked about it with her?

25    A.    I know she gave me a copy of an Oprah magazine once,
```

```
 1            but I don't know anything about Redbook.
 2    Q.      The usage of the phraseology Barb 1 and Barb 2, was
 3            that something that existed while Mrs. Varner was at
 4            CYS as well as when she was in the Probation office?
 5    A.      I don't remember when it started.
 6    Q.      Do you recall it being something that lasted for a
 7            period of years?
 8    A.      I'm going to guess yes, but that's all I can remember.
 9            I mean, I don't remember how long it was used or --
10    Q.      Do you recall it ever being use jocularly?
11    A.      That's kind of how I assume that it was.
12    Q.      And your understanding of the reason for it being used
13            was because there was a frequency of calls from both
14            Barbara Graham and Barbara Varner to Gary?
15    A.      Correct.
16    Q.      Never heard the phrase jahoobees used in your office?
17    A.      I heard that it was used.  I didn't -- I've never --
18            I've heard it because people have told me a story of
19            other people who have used it, but I never -- no one
20            said anything to me directly.
21    Q.      The same question for peter meter.
22    A.      No, I never heard that.
23    Q.      Have you ever heard a woman being referred to as having
24            a nice bush?
25    A.      No.  If it -- I mean, maybe with clients, but not
```

 1          from -- I mean, not from professional staff that I

 2          worked with.

 3     Q.   Do you recall a bomb scare that resulted in the

 4          evacuation of the courthouse last year?

 5     A.   There was a couple of them, yes.

 6     Q.   More than one?

 7     A.   Yes.

 8     Q.   On those occasions do you have any understanding of who

 9          is responsible for evacuating the Probation Department?

10     A.   The first one, Mike Varner got us out of the building.

11          He's an Adult supervisor.

12              And I think the next one I was not in the building

13          that day.  I was at a training in Harrisburg.

14              And then the third one, Lyle Herr got us out of

15          the building for.

16     Q.   Is there any formal protocol that you know of for who

17          is responsible for seeing that --

18     A.   After the first bomb scare, the Adult side came up with

19          a protocol for getting people out.

20     Q.   And what is that?

21     A.   We have a new sign-out sheet that's by our secretary,

22          and you have to put when you're leaving, when you're

23          returning so they know who is in the building and

24          who's, like, out, because we're out quite a bit of the

25          time.  And one of the supervisors will get us out of

```
 1              there and someone has this master list.

 2                  I know the third one, bomb scare, I had the master

 3              list and I had to keep account of everybody who was

 4              there.  And we all went down to the old movie theater.

 5              And then I had to take ROLL call again.

 6    Q.   Has Mrs. Varner ever discussed with you being left in

 7         the building during a bomb scare?

 8    A.   I knew afterward that she had, but I wasn't in the -- I

 9         wasn't working in the courthouse that day, I was at a

10         training at PennDOT building.

11    Q.   You referred to three bomb scares.  Do you know whether

12         the one where Mrs. Varner was left in the building was

13         number one, two or three?

14    A.   I think it was two, because I think I wasn't there the

15         second one.  I know I wasn't there.  I know I wasn't

16         there the day that that happened.

17    Q.   Have you ever heard from anybody in Juvenile Probation

18         as to whether they have a protocol similar to Adult

19         Probation's for evacuation of the building during bomb

20         scares?

21    A.   No, I haven't.  I know on Juvenile Probation and Adult

22         we're kind of, like, have different buildings,

23         different offices.  And she and some other Juvenile POs

24         are on my side.  So I think our Adult supervisors have

25         been the only ones who have gotten them out just based
```

```
 1        on luck.

 2   Q.   When you filed your '93 Complaint were you aware at

 3        that time of whether or not a formal policy existed

 4        regarding sexual harassment complaints?

 5   A.   There was a policy in the county manual that I assumed

 6        that I followed to file my complaint.

 7             MR. DELLASEGA:  That's all.

 8   BY MS. WILLIAMS:

 9   Q.   Ms. Houser, my name is Taylor Williams.  I represent

10        the Ninth Judicial District Court of Common Pleas of

11        Cumberland County.  The same guidelines apply as you

12        discussed with Ms. Blanchard in my questioning.

13   A.   Okay.

14   Q.   Did you ever talk with Judge Sheely about your 1993

15        Complaint against Mr. Osenkarski?

16   A.   No.

17   Q.   Did you ever complain to Judge Sheely about any of the

18        comments or concerns you testified to in the

19        deposition --

20   A.   No.

21   Q.   -- as to either Gary Graham --

22   A.   No.

23   Q.   -- or Joe Osenkarski?

24   A.   No.

25   Q.   Did you ever complain to Judge Hoffer about any of the
```

1           concerns or comments --

2    A.     No.

3    Q.      -- as to Gary Graham?

4    A.     No.  Never talked to him about Gary Graham or Joe.

5    Q.     Or as to Joe.  You testified that the DUI issue was

6           taken to Judge Sheely.  Do you remember that testimony?

7    A.     Yes.

8    Q.     How do you know that?

9    A.     Because I was there.  Ken Bolze and I went up to Judge

10          Sheely about that.

11   Q.     So you actually heard Judge Sheely speak on the issue?

12   A.     That one time, yes.

13   Q.     What precisely did he say?

14   A.     Just pretty much that, okay, we won't pay the DUI

15          instructors, we won't stop to pay the DUI instructors,

16          we'll just keep it the way it is.  Now, those weren't

17          his exact words but that was the gist of what came out.

18   Q.     Did he ever issue an order or a written memo related to

19          that subject?

20   A.     I don't know.  I didn't -- I've never taught DUI school

21          so I wouldn't have been given a memo.

22              I think, well, I think maybe a memo -- well, I

23          guess maybe something came out that the original memo

24          was what was going to be in effect, that DUI

25          instructors would get paid first.

```
 1    Q.    Do you have a copy of that?

 2    A.    No.

 3    Q.    Do you recall when that might have come out, what date?

 4    A.    No.

 5    Q.    Did Barbara Varner ever tell you any conversations she

 6          had with Judge Sheely about her allegations?

 7    A.    The only conversation I know she had with him was, I

 8          don't remember when, but I think Judge Sheely called

 9          her up to his office, and I don't know exactly what he

10          said, but that Gary had told his wife Barb that they

11          had been having an affair.  And pretty much of what I

12          remember is Judge Sheely dropped everything or said he

13          wasn't going to do anything.

14    Q.    Did she say anything else about her conversation with

15          Judge Sheely?

16    A.    Not that I recall.

17    Q.    Have you ever talked with her about any conversation

18          she might have had with Judge Hoffer regarding her

19          allegations of harassment?

20    A.    Oh, okay.  About the bomb scare.  I don't know if she

21          had conversation -- I know there was some finagling

22          over she was going the stay on one side versus the

23          other.  I know that Judge Hoffer was involved with

24          that.

25    Q.    What specifically did she tell you?
```

```
 1   A.   I remember something about having to put in writing why
 2        she wanted to move down to the other end and how long
 3        she thought that would have to last.
 4   Q.   What did you say to her when she told you this?
 5   A.   I asked her why.  Nobody else has to ask or put in
 6        writing when they move down to the other end.
 7   Q.   How do you know that?
 8   A.   They haven't.  I mean --
 9   Q.   You know of no other?
10   A.   Right.
11   Q.   But would you be in a position to know whether anyone
12        had to do that or not?
13   A.   The people I know down there haven't been asked to put
14        it in writing.  It's just, like:  Your office is being
15        moved.
16   Q.   Are you aware of Ms. Varner's complaints against
17        Barbara Graham?
18   A.   Against Barb Graham?
19   Q.   Yes.  Do you know whether or not she swore out a
20        criminal complaint against Barbara Graham?
21   A.   Oh, yes.  About something that happened in the parking
22        lot?  I'm asking you questions.  Something allegedly,
23        something happened in the Eagle's parking lot.
24   Q.   So you know there was an issue between Barbara Graham
25        and Barbara Varner?
```

```
 1   A.    Right.  I don't know too much about it.
 2   Q.    Do you know if she complained, if Barbara Varner
 3         complained to Judge Hoffer about being harassed by
 4         Barbara Graham?
 5   A.    I don't know that.
 6   Q.    Did you ever have any conversations with Barbara Varner
 7         about Judge Guido?
 8   A.    About a position that was opening or opened that Judge
 9         Guido was interviewing her for.
10   Q.    What specifically did she tell you, do you know?
11   A.    Just that she had met with him, and I think there was
12         some other people who, like, would be involved with it
13         who she had met with as well.
14   Q.    You don't have any firsthand information about the job
15         that she discussed with Judge Guido?
16   A.    I know it exists.  I still don't know what it is.
17   Q.    You weren't involved in any of the plans for that job?
18   A.    No, none at all.
19   Q.    Did you ever hear Gary Graham use profanity
20         specifically toward Barbara Varner?
21   A.    No.
22   Q.    At some point did you talk to an EEOC investigator
23         about the charges that Barbara Varner had brought?
24   A.    Yes.  Someone called me at home.
25   Q.    Did you tell that investigator anything different than
```

```
 1          you've told us today --
 2    A.    I don't believe.
 3    Q.    -- to your recollection?
 4          You testified that Joe and Gary knew more about
 5          Barbara Varner's personal life than they knew about
 6          other probation officers.  Am I correctly --
 7    A.    Yes.
 8    Q.    -- characterizing that testimony?  How did they know
 9          that?
10    A.    Personal information I guess from a lot of contact with
11          her.
12    Q.    Did she ever tell you personally that they knew a lot
13          about her?
14    A.    I just knew from them.  I remember talking about
15          student -- Joe talking about student loans, that he had
16          given Barb -- I guess her two kids were in college at
17          the time, and Joe also had one or both of his daughters
18          in college at the time, and he had said he had given
19          Barb some information on student loans that she didn't
20          know about before.
21          Before Barb worked there I didn't really know her
22          very well, but the way that Joe and Gary described her,
23          she was described to me as, like, as at times like
24          Barbie, like an air head, and Joe's, like, I gave her
25          the information on such and such student loans, she
```

```
 1          owes me.
 2     Q.   Were you ever led to believe that Barbara Varner had
 3          shared personal information with Joe Osenkarski and
 4          Gary Graham?
 5     A.   I mean, I don't -- she must have.  I mean, I don't
 6          think they hired a detective to find that out.
 7     Q.   You told us about a Santa Claus joke that you had told.
 8     A.   Yes.
 9     Q.   Did you ever tell any other off-color jokes in the
10          workplace?
11     A.   I don't recall of any, no.
12     Q.   Did you ever tell anyone that Joe Osenkarski was
13          supportive and helpful when you sought out assistance?
14     A.   When I needed stuff on an -- information on a case
15          about a placement or a question, I always I can say I
16          got good answers from him.
17     Q.   Do you know a probation officer named Paul?
18     A.   Paul Meuron.
19     Q.   Did you ever say in a group of other probation officers
20          that Paul was living through his penis?
21     A.   No.  I mean, I know what you're referring to, but
22          that's not what was said.
23     Q.   Okay.  It sounds like you have a different version.
24          Will you tell me that version, when those words were
25          used Paul is living through his penis?
```

```
 1    A.   What was said was in an open lobby of our then office,
 2         the Juvenile, that was then the Juvenile side.  There
 3         was a group of people, men out there.  Paul was one,
 4         and Ken Bolze, the chief, was there, and I'm going to
 5         guess Gary was there.  And the guys liked to talk about
 6         what they -- what were their past sexual experiences,
 7         their present ones.  You know, whether they were true
 8         or not, I don't know.  But Ken enjoyed these stories.
 9         And I was sitting there listening to it and I said that
10         it's ridiculous that Ken lives vicariously through
11         Paul's penis.
12    Q.   Did you ever make any complaints about those
13         conversations?
14    A.   No.
15    Q.   Did you ever talk to Judge Sheely about Barbara Varner?
16    A.   No.
17    Q.   Did you ever talk to Judge Hoffer about Barbara Varner
18         or any of her allegations?
19    A.   The only thing that was ever said was Judge Hoffer came
20         down to where I am now, into the side that I'm in now
21         and was looking for our chief and supervisor.  And he
22         said to me something, if I have any business with Barb
23         Varner could I keep it at the other end.
24    Q.   Okay.  And what did you say?
25    A.   I said sure.  He's my boss.  I mean, I didn't have a
```

```
 1          problem with that.
 2    Q.    Did Judge Hoffer tell you why he wanted you to do that?
 3    A.    I don't think much more than that was said.  He talked
 4          to me about another job opening in the office and
 5          talked about that.  I mean, Judge Hoffer just isn't
 6          real communicative, so I mean.
 7    Q.    Did you have an impression from other sources as to why
 8          you were asked to, as you say, keep business with Barb
 9          at the other end?
10    A.    Just because at the time the courthouse was being
11          remodeled and Barb Graham was on that side as well.
12    Q.    Did you ever have any impression that he was trying to
13          keep Barbara Varner and Barbara Graham separate to
14          eliminate conflict between the two women?
15    A.    That was what I perceived.
16    Q.    Do you know if Barbara Varner ever took an examination
17          to become a DUI instructor?
18    A.    I assume she did.  She teaches DUI.
19    Q.    Do you know if she ever failed such an exam?
20    A.    I don't know.
21          MS. WILLIAMS:  That's all I have for you.  Thank
22          you, Ms. Houser.
23 BY MR. DELLASEGA:
24    Q.    I have one.  During the period of time you were office
25          mates, can you think of anybody in Probation who would
```

```
 1            have had a better vantage point than you to observe the

 2            interactions between Graham and Varner?

 3    A.      Joe, maybe.

 4    Q.      Anybody else?

 5    A.      Maybe Debra Green.  I don't know.  She did a lot -- her

 6            and Deb Green were on the same grant position when they

 7            started, so they had a lot of contact with each other.

 8                 MR. DELLASEGA:  That's all.

 9  BY MS. WALLET:

10    Q.      Mrs. Houser, my name is Debra Wallet.  We've met

11            before.

12                 After you filed your Complaint in 1993, did you

13            believe that there was any retaliation against you?

14    A.      I was first concerned about it when I found out that

15            Joe had called all my co-workers on the phone.

16    Q.      And why did people tell you that Joe had called them?

17            If you know.

18    A.      I'm assuming because they were scared for me.

19    Q.      Did you think at that time that you had reason to be

20            scared?

21    A.      Well, Joe is my boss.  I was concerned that way.

22    Q.      Do you know who the secretary was who overheard the

23            comments about the cunt club?

24    A.      Ronna Boyles.

25    Q.      Did you ever receive the apology that Mr. Osenkarski
```

```
 1          was directed to give?

 2    A.    He in my old office, it was Ken Bolze, myself and Joe,

 3          he read me something that he had prepared.

 4    Q.    And when you say he, you mean Mr. Osenkarski?

 5    A.    Joe, yes.  I'm sorry.

 6    Q.    He read it to you?

 7    A.    Yes.

 8    Q.    Do you remember what it was?

 9    A.    No, I don't remember what it said.  The only thing I

10          remember that stood out was something that, he said

11          something about that I should know that he has always

12          had good relationships with women.

13    Q.    Did you believe that to be the case?

14    A.    I just kind of thought it was amusing.

15    Q.    Why?

16    A.    Because I just -- maybe he perceives that he does, but

17          I just think he can be very degrading towards women.

18    Q.    Did you believe the atmosphere under Mr. Osenkarski's

19          supervision was a professional one for women?

20              MR. ADAMS:  Objection as to form, professional

21          atmosphere.

22    BY MS. WALLET:

23    Q.    Do you understand the question, Ms. Houser?

24    A.    I could deal with Joe if I needed something, a

25          professional question, I could get an answer that I was
```

```
 1            confident with.  There at times was other conversation
 2            that wasn't necessary.
 3      Q.    Was it a comfortable employment relationship for women
 4            in the office?
 5      A.    I mean, I can only speak for myself, but, I mean, and
 6            for me a lot of the time it was uncomfortable just
 7            because I got on Joe and Gary's bad side.
 8      Q.    Can you pinpoint any time when things became
 9            uncomfortable for you?
10      A.    I mean, I can say definitely 1993.
11      Q.    And do you know what might have triggered the change in
12            attitude toward you?
13      A.    Well, because I filed a Complaint.
14      Q.    So before your filing the Complaint it was okay, and
15            after that it was not so okay?
16      A.    Well, I don't remember specifically, but I mean, I
17            assume I wasn't one of Joe's favorites at the time,
18            and -- but I mean, professionally if I needed
19            something, he would give me an answer, so I didn't
20            really pay too much attention to him.
21      Q.    The attempt that you described earlier that
22            Mr. Osenkarski made to kiss you, was that before or
23            after you filed your Complaint?
24      A.    Before.
25      Q.    Had he given you any other indications that he might be
```

```
 1          interested in you sexually?
 2   A.     No.
 3   Q.     Now, have you provided a copy of your Complaint, your
 4          1993 Complaint, to Barb Varner?
 5   A.     Yes.
 6              MS. WALLET:  Let's mark that as Deposition 1.
 7              (Houser Deposition Exhibit No. 1 was marked.)
 8   BY MS. WALLET:
 9   Q.     This document consists of four pages.  Would you tell
10          me what those four pages are?
11   A.     The first two are just a copy of my Complaint.  And the
12          last two are, is a copy of the letter that Ken Bolze
13          wrote as the resolution to the Complaint.
14   Q.     And you gave this to Ken Bolze.  Why did you do that?
15   A.     My recollection is that's what the -- I had made an
16          oral complaint, which is the first, what I remember is
17          the first step in the county policy.  And then I think
18          the second step was a written complaint.
19   Q.     And when you made your oral complaint to
20          Mr. Osenkarski, was the --
21   A.     I didn't make it to Mr. Osenkarski.  I made it to Ken
22          Bolze.
23   Q.     I'm sorry.  When you made your complaint to Mr. Bolze,
24          what exactly was your complaint?
25   A.     I don't remember specifically.  Just what I had heard
```

```
 1          was said.
 2   Q.     You told him about the reference to the cunt club?
 3   A.     Right.
 4   Q.     And what did you expect him to do as a result of your
 5          complaint?
 6   A.     I don't remember, but I just remember thinking
 7          something should happen.
 8   Q.     You said in your complaint, your written complaint to
 9          Mr. Bolze:  I am afraid of repercussions stemming from
10          my complaint.  That's paragraph 3 here on page 1.
11              Why did you say that?
12   A.     Well, because he was my boss, and I mean, when Ken
13          left, I mean, he could -- he was next in line to be
14          chief.  He could get rid of me.
15   Q.     You mentioned that there were references to punishing
16          people in the office.  Would you describe for us what
17          you understood punishment to be?
18   A.     My understanding was that you would get more cases or
19          the cases with, like, a lot of victims in it, just
20          cases that had more work involved.
21   Q.     Did people say in the office:  There will be punishment
22          as a result of this?
23   A.     They would joke about, oh, I must be getting punished,
24          I got this many cases, that sort of thing.
25   Q.     And were there statements by individuals indicating
```

| 1  |     | that punishment might be meted out? |
|----|-----|-------------------------------------|
| 2  | A.  | Might be what? |
| 3  | Q.  | Meted out? |
| 4  | A.  | I don't recall. |
| 5  | Q.  | Do you remember having your conversation with the EEOC |
| 6  |     | investigator in which you said that GG was a vindictive |
| 7  |     | type of person who used phrases such as punish for |
| 8  |     | those who were disloyal, Joe had the same attitude? |
| 9  | A.  | I don't recall specifically saying that but I know I've |
| 10 |     | said it today.  I'm sure I did say it.  I don't know |
| 11 |     | how long ago the interview was.  I believed that. |
| 12 | Q.  | Why do you believe that? |
| 13 | A.  | All I can tell you is just based on working with them |
| 14 |     | for a number of years. |
| 15 | Q.  | I'm looking again at the notes from your interview back |
| 16 |     | in March of 2000 with the EEOC.  These notes say you |
| 17 |     | firmly believe that all this with BV is a result of GG |
| 18 |     | not getting his way with her.  He is that type of |
| 19 |     | person. |
| 20 |     | Do you believe you told that to the EEOC |
| 21 |     | investigator? |
| 22 | A.  | Yes. |
| 23 | Q.  | Why? |
| 24 | A.  | For whatever reason, Barb wasn't doing what Gary |
| 25 |     | wanted, and he turned against her. |

1   Q.   Did you have any evidence at all that there was an

2        intimate relationship between Barbara Varner and Gary

3        Graham?

4   A.   No.

5   Q.   You said you were surprised when you heard that that

6        was the confession that Mr. Graham had made.  Why were

7        you surprised?

8   A.   I mean, I had shared an office with Barb and I've

9        worked there for years and know that that kind of stuff

10       is talked about, and I just -- I'm thinking if that

11       were true, Barb certainly wouldn't have wanted it to

12       come out.  She wouldn't have -- I mean, there would

13       have been no point in her filing a Complaint or she

14       would have revealed it beforehand.

15  Q.   Do you believe that Barb Varner had an intimate

16       relationship with Gary Graham?

17  A.   No.

18  Q.   Why not?

19  A.   I just know Barb.  And I like I said, I don't believe

20       Gary -- that it would have been a secret to everybody

21       if Gary were involved.

22  Q.   Now, you told the EEOC investigator, according to these

23       notes, and what I'm really asking you, Ms. Houser, is

24       are these notes accurate?  Gary Graham goes around

25       saying that Barbara Varner is lying and that he's

```
 1              coming back to Probation which scares Barbara Varner.
 2                  Do you remember saying that?
 3     A.   He's never said that to me but I've heard that he's
 4          said that.
 5     Q.   And did someone tell you that he said that?
 6     A.   I heard it from, I think Denny Drachbar.
 7     Q.   Do you think Barbara Varner was scared in or around
 8          March of 2000 of Gary Graham?
 9     A.   Sure.  I'm sure she still is.
10     Q.   Do you think her fear is justified or unjustified?
11     A.   I would say justified.
12     Q.   Why?
13     A.   Just based on Gary's -- I mean, he can be mean.
14     Q.   Can you give me any examples of how he has been mean?
15     A.   I heard him yell at District Justice Correal at one
16          time, I mean, just ranting and raving at her.
17              I heard him one time go off on a probation officer
18          because he parked in Gary's spot for an hour when Gary
19          was signed out for the day, and Gary said he owed him
20          15 cents or something.  I mean, just weird stuff.
21     Q.   Have you heard Mr. Graham make any threats about John
22          Ward?
23     A.   He on the phone to me has said stuff about -- we had
24          one conversation where I don't know why but John Ward's
25          name was brought up.
```

1   Q.   What do you recall about that conversation?

2   A.   We were talking about work, a work-related thing, and

3         that's all Gary and I have talked about in years, and

4         he was talking about something with medical benefits

5         and married people.  And it didn't affect me.  And he

6         said something about John Ward's going to get his for

7         doing that to married benefits.

8             And he said something about Rick Ravino, that he

9         called the commissioners and/or was going to call the

10        commissioners to tell them that if Rick Ravino wants to

11        mingle with prostitutes, because there was something in

12        the paper about Rick Ravino, they could switch jobs.

13            And he said something, he was upset that certain

14        county employees were given extra vacation.  I forget

15        what their title is.  But Gary being at the prison

16        wasn't eligible for that benefit now and he was upset

17        about that.

18   Q.   Back to what we've marked as Deposition No. 1, I'd ask

19        you to look at page 2 of that document.  Right before

20        your closing of "your prompt attention to this matter

21        is greatly appreciated," would you look at that

22        paragraph, please, and tell me why you wrote that?

23   A.   Tell you why I wrote that paragraph?

24   Q.   Yes.

25   A.   Just because I just wanted to reiterate that foul

```
 1          language is used in our office.  Just police reports --
 2          I mean, it wasn't that I get offended by words.  It was
 3          the way in which it was used.
 4     Q.   While you were there, and let's say from 1988 through
 5          the time of the split in 1996, how many female
 6          probation officers were there?
 7     A.   When I first started there were three:  Me and two
 8          others.  And then I think at one point there might have
 9          been four.  I forget if, when Julie Staver -- I think
10          there was definitely four.  At one point there was
11          four.
12              And then when Barb and Debra came, I think that
13          might have been five.  I think that they replaced one
14          of the female probation officers with a male at one
15          point.
16              Now there's a lot of them.
17     Q.   Do you know whether the women in the office talked
18          about the atmosphere for probation officers who were
19          female?
20     A.   No.  The only thing I can recall quickly is the time
21          that a Juvenile position, a female position was getting
22          replaced by a male.  That was all.
23     Q.   And what was the talk at that time?
24     A.   We were just upset about it.
25     Q.   Why was that?
```

```
 1    A.   Because it was Betsy Baker and I who would have been
 2         left, the other two females.  We thought our caseload
 3         would be higher.  And also, the person who was getting
 4         hired had been an intern and had done favors for Joe
 5         and we knew that's why he was getting hired.
 6    Q.   What kind of favors?
 7    A.   I don't recall specifically.  I know there was one
 8         intern who loaded firewood for him.
 9             I forget what  Dirk had to do.
10    Q.   Would you say that during the period of time prior to
11         the split that Mr. Osenkarski was a hands-on manager?
12    A.   No.
13    Q.   How would you describe his supervisory style?
14    A.   If you needed something, you went and asked him.  That
15         was -- oh, and our cases, like, if we did a PSI or
16         juvenile summary, he would review that and put it back
17         on your desk.
18    Q.   What's PSI?
19    A.   Presentence investigation.  For juveniles we don't, it
20         was called a summary, I think.
21    Q.   Did he spend a lot of time in the office?
22    A.   No.
23    Q.   Where was he?
24    A.   I don't know.
25    Q.   Was he there on a daily basis?
```

```
 1   A.   I would say most days he was there at some point.

 2   Q.   Did he work eight hours in the office?

 3   A.   I don't think often.

 4   Q.   Did he ever explain why he was out of the office

 5        frequently?

 6   A.   Not to me.  I mean, I worked for him.

 7   Q.   Were there any jokes around the office about where Joe

 8        Osenkarski was during the day?

 9   A.   I don't recall.  I don't remember.  It was just one of

10        those assumed things that he wasn't there.

11   Q.   When he wasn't there, who was in charge?

12   A.   Of the Juvenile side would have been Gary.

13   Q.   Was it frequent that Gary Graham was left in charge?

14   A.   Sometimes.

15   Q.   Do you know whether Mr. Osenkarski used office supplies

16        for personal use?

17   A.   I don't know -- I mean, I don't -- I never saw him take

18        any.  I heard.  I was in his car once going to a

19        training and he joked about having Grateful Dead music

20        on an office cassette.  But that's the only thing I

21        ever saw.

22   Q.   Did you see the cassette?

23   A.   Yes.

24   Q.   Did you believe it came from the office?

25   A.   It was like the Lanier ones that at the time we used
```

1           for dictating.

2    Q.    Did you think that Mr. Osenkarski had a drinking

3           problem?

4    A.    I saw him drink a lot.  I don't know if he had a

5           problem or not.

6    Q.    Did Mr. Osenkarski use the F word?

7    A.    I don't know.  I don't recall.  I can't say I ever

8           specifically remember him saying that.

9    Q.    Did Mr. Graham use the F word?

10   A.    Again, I don't recall any specific time.

11   Q.    Did Mr. Graham show some interest in a woman named

12          Nancy Kessler?

13   A.    Yes.  That was my supervisor at Children and Youth.

14   Q.    What did you observe about the relationship between

15          Mr. Graham and Ms. Kessler?

16   A.    I just knew they were friends when I worked at Children

17          and Youth.  That's how I first was exposed to Gary.

18   Q.    And why did you believe that he was interested in her?

19   A.    He came down a lot to talk to her.  I mean, I didn't

20          perceive it as -- I mean, I just perceived it as he

21          would come down for work.

22   Q.    You don't have any evidence that he had a sexual

23          relationship with Ms. Kessler?

24   A.    No.  No.

25   Q.    I'm back to the document marked Deposition 1 now, the

1       handwritten part that was written by Mr. Bolze?

2  A.   That's correct.

3  Q.   Do you know what Mr. Bolze did to investigate your

4       complaint?

5  A.   He talked to, I know he talked to the two people that

6       are mentioned in here.  Other than that, I don't recall

7       what all he did.  I know he talked to, I think it was

8       Dan Hartnett at the time, or someone with the county,

9       but I don't recall specifically or what they would have

10      talked about.

11  Q.  You didn't actually speak to Judge Sheely about this

12      matter, correct?

13  A.  I didn't, no.

14  Q.  Did Mr. Bolze tell you that he had provided a copy of

15      this Complaint to Judge Sheely?

16  A.  He never told me he gave a copy of the Complaint to

17      Judge Sheely.  When I first made an oral complaint to

18      Ken, he said something to Judge Sheely, and Judge

19      Sheely said, well, that's certainly hunting camp talk

20      and doesn't belong in the office, and he kind of told

21      Ken to tell me to drop it or something.

22  Q.  Is that what Mr. Bolze relayed to you, that you ought

23      to just drop it?

24  A.  Not in that many words, but pretty much that Judge

25      Sheely was, like, that's hunting camp talk, he

```
 1            shouldn't say that, but kind of like, oh, well.
 2     Q.     When you found out that Judge Sheely accepted the
 3            information from Mr. Graham that he had had a sexual
 4            relationship with Ms. Varner, were you surprised at
 5            that?
 6     A.     I was just surprised about everything, about the whole
 7            allegation, that he accepted it and that for some
 8            reason that would dismiss any other allegations.
 9     Q.     You had prior service with the county and Children and
10            Youth, correct?
11     A.     Right.
12     Q.     And did you understand there to be a seniority issue
13            involving whether you were given credit for prior
14            county service outside the Probation office?
15     A.     When I was hired I was given credit for my time worked
16            as a prison guard and as a Children and Youth worker.
17     Q.     And when you were hired did you understand that to be
18            the policy in the Probation office?
19     A.     At the time it was the policy.
20     Q.     And did you see seniority lists that gave you credit
21            for your time prior to your time in Probation office?
22     A.     Yes.
23     Q.     And at some time was there a change in that policy?
24     A.     The Juvenile side, that change happened after I left on
25            the Adult side.  The change happened six months ago,
```

1      maybe eight months ago.

2   Q.   Okay.  So after the split, you went to the Adult

3        side --

4   A.   Correct.

5   Q.   -- correct?  Why did you go to the Adult side?

6   A.   Because I didn't want to work with Joe and Gary.

7   Q.   Why not?

8   A.   I really felt very strongly that would be their

9        opportunity to fire me and that they would make my life

10       difficult.

11  Q.   And when you went to the Adult side, were you still

12       given credit for your time outside the Probation office

13       but time with the county?

14  A.   Yes.

15  Q.   And you say that that lasted until about six months

16       ago?

17  A.   Six to eight months.  I forget when the policy changed.

18  Q.   And how was the policy changed?

19  A.   That seniority is based on office seniority.  And I

20       think how it works, too, is you can get credit for

21       experience worked in other probation offices, but not

22       other county offices.

23  Q.   When you left the Juvenile side and went to the Adult

24       side, was there anyone other than Barbara Varner who

25       was in the position of having prior county service

```
 1          outside the Probation office?

 2   A.     When we split?

 3   Q.     Yes.

 4   A.     Gary, Lyle.  I think that's all.

 5   Q.     Do you remember the EEOC investigator asking you

 6          whether you thought that Juvenile seniority was changed

 7          because of Barb Varner?

 8   A.     Um-hum.

 9   Q.     Do you remember what your response was at that time?

10   A.     I thought that's why it was changed.

11   Q.     And why did you think that?

12   A.     Just the timing of it just seemed unusual and how long

13          it had been in effect, the old policy.

14   Q.     Do you still believe that today?

15   A.     Probably, but then the Adult side was switched, too, so

16          it would have happened probably now if it hadn't

17          happened then.

18   Q.     You said you had been to some sexual harassment or

19          sensitivity type training.  Do you remember going to

20          any training in October of '97 that was sponsored by

21          Mazzitti and Sullivan?

22   A.     I remember, I think so.

23   Q.     Do you remember observing anything at that time between

24          Barbara Varner and Gary Graham?

25   A.     No.
```

1    Q.    In the office, among the men particularly, were there

2            references to sexual matters in the office during the

3            working hours?

4    A.    I mean, not on a daily basis, but I heard a couple

5            stories.

6    Q.    Do you remember any stories about Gary Graham and a

7            strip club?

8    A.    I'm going to guess it has to do with a football game

9            that him and some other POs used to go to at the time

10           in New York, I think it was Buffalo.  And I don't know

11           exactly what, it was something, Gary and the other

12           people tried to tell me this story, that they were at a

13           strip club and for some reason Gary had to go to the

14           emergency room when they got back for an enema or

15           something because he had trouble at the strip club.

16    Q.    Do you know why he told you this?

17    A.    I mean, it wasn't just me.  He told a variety of

18           people.  I don't know why.

19    Q.    Do you remember any talk between Mr. Osenkarski and

20           individuals in the office about his wife or about sex?

21    A.    He talked about his ex-wife a lot, when they were

22           getting a divorce, after the divorce.

23    Q.    Do you remember any references to hysterectomies?

24    A.    He never made a reference to that to me, I don't think.

25           Oh, maybe he did say something at a training, that his

```
 1            ex-wife wasn't the same after her hysterectomy, that
 2            her mind changed or something.  I don't know if he said
 3            it to me, but I heard that story through other people.
 4    Q.      You didn't actually hear it?
 5    A.      I don't recall.
 6    Q.      Did you ever hear Mr. Graham talk about a woman coming
 7            to his house with only a trench coat on?
 8    A.      Yes.
 9    Q.      What do you remember about that?
10    A.      I don't know her name but it was someone who both Joe
11            and Gary were kind of interested in, and she somehow
12            for whatever reason came to Gary's house with just a
13            coat on, the trench coat on.
14    Q.      Do you know why Gary Graham was talking about this in
15            the office?
16    A.      I assume because he was proud of it or happy about it.
17    Q.      Did Mr. Graham talk about his wife and their sexual
18            relationship in the office?
19    A.      No.  Not to me.
20    Q.      Did he ever make a comment to you about men and women
21            in Newville?
22    A.      Oh, yes.  One time there was a group of probation
23            officers in, it was Paul Meuron's office, and Gary told
24            us that the night before his wife was on the phone with
25            a friend and Gary was waiting for her to come back to
```

```
 1          bed, and she didn't come, and he finally fell asleep.

 2          And the next morning he asked her what she was talking

 3          about with this friend, and she made the comment

 4          "nothing that concerns you."  And I looked at him and

 5          said, "what's the problem?"  And he said, "Kerry, in

 6          Newville you don't understand, men own their women."

 7          And I reminded him of that a couple times, that he had

 8          said that.

 9    Q.    Did Ms. Varner ever talk to you about the physical

10          problems that she was having?

11    A.    I knew she had a hysterectomy and I know she has some,

12          still has had some stomach problems.

13    Q.    What did you observe about her work efforts after let's

14          say 1996?

15    A.    She appears hard-working and conscientious.

16    Q.    Do you have occasion now to work with her on a

17          professional basis?

18    A.    No, we haven't.  I mean, we could, to my knowledge --

19          well, I think we've had, maybe she's had a juvenile and

20          I've had, like, the boyfriend of the adult, but -- and

21          we did have one case together, a woman who was addicted

22          to pills and Barb I think had her daughter, now that I

23          remember.  But it's rare.

24    Q.    And where is your office physically located now?

25    A.    Physically on the east wing, third floor.
```

1    Q.    And Ms. Varner's office is somewhere close to yours

2          now?

3    A.    Yes.

4    Q.    Do you know whether individuals in the Juvenile

5          Probation Office have occasion to visit the third floor

6          of the east wing?  Let's talk about a period of time

7          after the split but before she moved her office there.

8    A.    To visit down there?

9    Q.    Yeah.

10   A.    They would, I mean, some Juvenile probation officers

11         were down there after I think the stenographers got

12         settled in their office.  Juvenile Probation officers

13         were down on that side.

14   Q.    Do you know about Ms. Varner's restrictions in going

15         into certain places in the courthouse?

16   A.    I think Barb had told me she wasn't allowed down there,

17         or wasn't supposed to be down there.  I don't know what

18         her words were.

19   Q.    Would there be any reason why someone might need to go

20         there if one were a probation officer?

21   A.    If she had to talk to some of the Juvenile POs I would

22         assume she would have to go down there.

23   Q.    Ms. Houser, are you fearful of retaliation now?

24   A.    No.

25   Q.    Are you happy in your position in the Adult Probation

```
 1          Office?
 2    A.    Yes.
 3    Q.    How would you compare the atmosphere in the Adult
 4          Probation Office with your prior atmosphere in the
 5          Juvenile Probation Office?
 6    A.    Totally different.
 7    Q.    What do you mean by that?
 8    A.    It's calm, it's relaxed.  There's no yelling,
 9          screaming, doors slamming.
10    Q.    Is this a preferable or not-as-preferable relationship?
11    A.    For me it's preferable.
12          MS. WALLET:  That's all the questions I have.
13  BY MS. BLANCHARD:
14    Q.    I have a question going back to the statement to the
15          EEOC in which you said that all of this with Barb
16          Varner is the result of Gary Graham not getting his way
17          with her.
18          What did you mean by not getting his way with her?
19    A.    I think what it was, after Barb had told me what had
20          happened at Penn State, when Gary wanted her to go out
21          with him a couple nights, or that he got -- that that's
22          when she pinpointed that he really started getting
23          angry.
24    Q.    And do you know what Mrs. Varner meant by going out
25          with her?  Was it out for drinks with the group?  Was
```

```
 1          it out on a date?
 2     A.   I don't know what it was.
 3               MS. BLANCHARD:  Okay.  That's all.
 4               THE WITNESS:  But she declined.  She stayed -- she
 5          was at the time taking graduate classes and says she
 6          stayed in her room to study.
 7               MS. WILLIAMS:  I have a couple.  Were you
 8          finished, Kristen?
 9               MS. BLANCHARD:  I'm done.
10     BY MS. WILLIAMS:
11     Q.   Ms. Houser, you never brought a complaint of
12          retaliation to Ken Bolze, did you?
13     A.   No.
14     Q.   Never brought a complaint of retaliation to Judge
15          Sheely, did you?
16     A.   No.
17     Q.   Or to Judge Hoffer?
18     A.   No.
19     Q.   And in fact, that matter was resolved?
20     A.   Yes.
21     Q.   The 1993 matter.  Did you ever talk with Barbara Varner
22          about sex?
23     A.   No.
24     Q.   Did you ever talk about anal sex?
25     A.   No.
```

```
 1    Q.    Oral sex?

 2    A.    No.

 3    Q.    You testified to some comments that were made in the

 4          workplace about a trench coat?

 5    A.    Yes.

 6    Q.    What time period was that, do you recall?

 7    A.    That would have been maybe '88 to '90.

 8    Q.    And you testified to something about a strip club.

 9          What time period was that?

10    A.    I would say the same time period.

11    Q.    And you mentioned the men and women in Newville --

12    A.    Yes.

13    Q.    -- comment.  What time period would that have been?

14    A.    I would say that would have been '88, shortly after I

15          started.

16    Q.    Okay, thank you.  You testified that Barbara Varner

17          indicated that she had stomach problems.

18    A.    Yes.

19    Q.    When did she tell you about stomach problems?

20    A.    The office was split.  She was on the other side, and I

21          don't know why, I think she was over talking to Ronna,

22          who was -- Ronna Boyles, who was a secretary on the

23          Adult side, and talking to her about stomach problems.

24          And I came up to talk to Ronna, and she had mentioned

25          that she was going to a doctor, that she was having a
```

```
 1         lot of stomach problems because of anxiety.

 2    Q.   And at what point was that?  1996?

 3    A.   '96, '97.  Sometime after all this with Gary started.

 4    Q.   Has she mentioned stomach problems since that time, to

 5         you?

 6    A.   Certain times.  She's mentioned that she -- when she

 7         gets nervous about things going on, she, her stomach

 8         makes flip-flops, or I forget the word that she uses,

 9         makes noises or rolls or something.

10    Q.   When you say when things happen, what kind of things do

11         you mean?

12    A.   I know when she was nervous about Barb Graham or if

13         she's worried about something that might happen with

14         Joe or Gary.

15    Q.   When she's worried about cases, specific cases that she

16         has under her --

17    A.   Not that she's ever said.

18              MS. WILLIAMS:  I have nothing further.

19              MR. DELLASEGA:  I have one more.

20  BY MR. DELLASEGA:

21    Q.   Why did Adult Probation change their seniority policy?

22    A.   I don't know.  Just -- I can't answer that.  I don't

23         know.

24    Q.   Was the change imposed upon the probation officers by

25         the department head?  Or was there input given to the
```

1          department head by individual officers such as

2          yourself?

3     A.   I didn't give any input.  It just came out at a staff

4          meeting.  We got a memo, the county were changing the

5          seniority of the office.

6     Q.   There was no explanation of why?

7     A.   No.  I mean, but it was based on things that had been

8          an issue in the past because some people objected to,

9          for example, me getting credit for three-and-a-half

10         years I served in other offices outside of Probation.

11         It wasn't -- so it was based on arguments that they had

12         heard before, if that makes any sense to you.  But we

13         didn't have any ongoing conversations about it at the

14         time.  Just we got a memo.

15    Q.   The debate that you recall that centered on you, was

16         that at or --

17    A.   I didn't have to debate it.  I just used me an example.

18    Q.   You recall yourself being used as an example.  You said

19         people were resentful of you getting three-and-a-half

20         years --

21    A.   I'm sure.

22    Q.   Was that at or about the time of the split?

23    A.   Probably, because there was one probation officer who

24         was affected by that.

25    Q.   And do you recall in general seniority being more of an

```
1          issue at or about the time of the split than later on?

2     A.   Probably, because there was quite a few promotions at

3          the time, and that would be the only time it would

4          really be an issue.

5               MR. DELLASEGA:  That's all.

6               MR. ADAMS:  I have some more questions.

7     BY MR. ADAMS:

8     Q.   Is there a reason why you didn't include the incident

9          at Mr. Osenkarski's home in your 1993 complaint?

10    A.   Well, because at the time, I mean, that happened in

11         probably '88, and it was '93.  I didn't see any point

12         in doing that.

13              MR. ADAMS:  Okay.  No further questions.

14              MS. WALLET:  Thank you very much for your time.

15              MS. WILLIAMS:  Thanks, Mrs. Houser.

16              (Whereupon, the deposition was concluded at

17         12:01 p.m.)

18                        *   *   *   *   *

19

20

21

22

23

24

25
```

108

COMMONWEALTH OF PENNSYLVANIA      )
                                  )  SS.
COUNTY OF DAUPHIN                  )


        I, Emily R. Clark, Reporter and Notary Public in
and for the Commonwealth of Pennsylvania and County of
Dauphin, do hereby certify that the foregoing testimony
was taken before me at the time and place hereinbefore
set forth, and that it is the testimony of:


                    KERRY HOUSER


        I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

        I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

        Dated at Harrisburg, Pennsylvania, this 27th day
of March, 2003.



                    _____
                    Emily R. Clark
                    Reporter - Notary Public



(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)