```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
        Plaintiff,             .    CIVIL ACTION
                               .    NO. 1:CV 01-0725
        vs.                    .
                               .
COMMONWEALTH OF PENNSYLVANIA,  .    (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,       .
CUMBERLAND COUNTY; CUMBERLAND  .
COUNTY; S. GARETH GRAHAM,      .
Individually, and JOSEPH       .
OSENKARSKI, individually,      .
        Defendants.            .
. . . . . . . . . . . . . . . . .
```

          Deposition of:  RONNA BOYLES

          Taken by      :  Defendants

          Date          :  March 3, 2003, 12:22 p.m.

          Before        :  Emily Clark, RMR, Reporter-Notary

          Place         :  12 West High Street
                           Carlisle, Pennsylvania


APPEARANCES:

          DEBRA K. WALLET, ESQUIRE
                For - Plaintiff

          ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
          BY:  A. TAYLOR WILLIAMS, ESQUIRE
                For - Defendant Commonwealth of Pennsylvania
                      Ninth Judicial District, Cumberland County

          THOMAS, THOMAS & HAFER
          BY:  PAUL J. DELLASEGA, ESQUIRE
                For - Defendant Cumberland County

2

```
 1   APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  L. KRISTEN BLANCHARD, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
     ALSO PRESENT:
 7
          MS. BARBARA E. VARNER
 8
          MR. S. GARETH GRAHAM
 9
          MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X

 2                    WITNESS

 3   Ronna Boyles                        Examination

 4        By Mr. Dellasega                4, 47, 49, 51

 5        By Ms. Wallet                  26, 49, 50, 51

 6        By Ms. Williams                    41, 50

 7        By Mr.  Adams                         43

 8

 9

10                    EXHIBITS

11
     (None marked)
12

13                    *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    STIPULATION

 2              It is hereby stipulated by and between the

 3         respective parties that signing, sealing, certification

 4         and filing are waived; and that all objections except

 5         as to the form of the question are reserved until the

 6         time of trial.

 7

 8              RONNA BOYLES, called as a witness, being duly

 9         sworn, was examined and testified, as follows:

10   BY MR. DELLASEGA:

11    Q.   Mrs. Boyles, we talked over the phone last week.  I'm

12         Paul Dellasega.  I represent the county.  We're taking

13         your deposition today as part of a lawsuit brought by

14         Barbara Varner against the county, the court, and

15         Osenkarski and Gram in the nature of a sexual

16         harassment suit.

17              Have you ever been deposed before?

18    A.   No.

19    Q.   Okay.  You have to answer questions under oath, and

20         it's important to us that you understand the question

21         before you answer it.  So that if you don't understand

22         a question, ask me to rephrase it, and I'll do so as

23         many times as need be until you understand it.

24    A.   Okay.

25    Q.   If you don't know the answer, it's satisfactory to tell
```

```
 1            us you don't know the answer.  If you need to stop and
 2            think about it for a few minutes, we've got plenty of
 3            time.
 4     A.     Okay.
 5     Q.     Okay?  When were you employed by the county or the
 6            court?
 7     A.     I was a part-time at the law library, and then I forget
 8            what year I went over to Probation, but I worked
 9            Juvenile Prosecution and Adult Probation.  And then
10            when they split I went over to the Adult.
11     Q.     Would you be able to tell us what year you went to
12            Juvenile or the precursor to Juvenile, the unified
13            department?
14     A.     No, I can't remember.
15     Q.     Okay.  How many years in total were you a Probation
16            secretary?
17     A.     Nine.
18     Q.     Nine.
19     A.     I was fired.
20     Q.     What was the last year?
21     A.     '97.  '99.  '97 or '99.  I was fired.
22     Q.     Prior to the split did you work for one person in
23            particular?
24     A.     No.  I worked for several probation officers.
25     Q.     Who did you work with?
```

```
 1    A.    Gary, Joe, Barb, Debra, Nick, Denny, Sam.

 2    Q.    How many secretaries were in Probation?

 3    A.    There were two.

 4    Q.    And how many probation officers, roughly?

 5    A.    10.

 6    Q.    And the two of you divided all the probation officers?

 7    A.    Right.  Well, whoever brought the typing to us, we did.

 8    Q.    Was it the case you could do typing for any probation

 9          officer?

10    A.    Yes.

11    Q.    And your other secretary could do typing for any

12          probation officer?

13    A.    Yes, um-hum.

14    Q.    I've heard you referred to at various points as Gary's

15          secretary.  Would that be an accurate description?

16    A.    Um-hum.

17    Q.    Did you consider yourself Gary's secretary?

18    A.    Um-hum.  Yes.

19    Q.    Did Gary provide to you the bulk of your work?

20    A.    Yes.

21    Q.    And did that last until --

22    A.    Till the split.

23    Q.    Till the split?

24    A.    And then later on he became the institutional officer

25          and I started doing typing for him again.
```

```
 1   Q.   Okay.  So you would have been his secretary for a
 2        period of several years?
 3   A.   True.
 4   Q.   Okay.  And you were his secretary the entire time after
 5        Mrs. Varner came until the split; is that correct?
 6   A.   Correct.
 7   Q.   And did you do the bulk of Mrs. Varner's work?
 8   A.   Yes.
 9   Q.   Did you know Mrs. Varner before she came into
10        Probation?
11   A.   Only to say hello.  I only recognized her as a face.
12   Q.   And how did it come about that you recognized her as a
13        face?
14   A.   I think some friends, some other people that worked --
15        Sherry McGinty I think introduced me to her and, you
16        know, so I knew who she was.  She said, you know, she's
17        with Children and Youth.
18             And then right before she was hired on, during the
19        hiring process, I had talked with her with Gary in the
20        lunch room, just to say hello.
21   Q.   Prior to her coming on board she had been over in your
22        offices; is that what you're telling me?
23   A.   Occasionally.
24   Q.   And on those occasions when she was over in your
25        offers, it's your recollection was the purpose to see
```

8

```
 1          Mr. Graham for some business reason?
 2    A.    I think it was for Gary and Joe that she talked,
 3          because it was right before she was being hired.
 4    Q.    And I think you said you had lunch with them, or saw
 5          them in the lunch room?
 6    A.    Um-hum.
 7    Q.    Which one was it?  You saw them or had lunch with them?
 8    A.    No, no.  Just in the lunch room, getting a soda or
 9          something.
10    Q.    Did you see them together in the lunch room more than
11          once?
12    A.    Yeah.
13    Q.    Frequently?
14    A.    No, not frequently.  I'd say two, three times.
15    Q.    Two or three times ever, or two or three times a month?
16    A.    Two, three times ever.
17    Q.    When a phone call came for Mr. Graham, what was the
18          protocol?  Did he answer his phone himself or did you
19          answer it?
20    A.    It depended.  Sometimes it went right to his phone, and
21          sometimes the calls came to me and then I would
22          transfer them to him.
23    Q.    Did he get frequent phone calls?
24    A.    Yes.
25    Q.    Before Mrs. Varner came on board in Probation do you
```

```
 1          recall him getting phone calls from Mrs. Varner?
 2   A.     No.
 3   Q.     After she came on board, do you recall him getting
 4          phone calls from Mrs. Varner?
 5   A.     If she was out in the field, yes.
 6   Q.     Do you recall the phraseology Barb 1 and Barb 2 ever
 7          being used?
 8   A.     Yes.
 9   Q.     Did you ever use it yourself?
10   A.     Yes.
11   Q.     Why did you use that term of art?
12   A.     Barb 1 is his wife and Barb 2 was the co-worker, so I
13          could distinguish between the two for him.
14   Q.     Was it your idea to coin that phrase, or did someone
15          else?
16   A.     I'm not sure.  I just know we set it as Barb 1 and
17          Barb 2.
18   Q.     Did the other secretary also use the phrase Barb 1 and
19          Barb 2?
20   A.     I think so.
21   Q.     And who was the other secretary?
22   A.     Jenny was it for a while.
23   Q.     Jenny, and the last name?
24   A.     Crum.
25   Q.     And was there another secretary besides her?
```

```
 1    A.    Fran was there, Fran Rose.  And Kathy Zeigler.
 2    Q.    Did you hear all those women use the phraseology Barb 1
 3          and Barb 2?
 4    A.    I think so.
 5    Q.    Other than the secretaries, did you ever hear of
 6          probation officers use the phrase 1 Barb 1 and Barb 2?
 7    A.    I believe so.
 8    Q.    Did you ever hear Gary being teased about Barb 1 or
 9          Barb 2?
10    A.    Yes.
11    Q.    Can you give me an example of somebody teasing him?
12    A.    Just that they would say, you know, you've got a phone
13          call, you know, is it Barb 1 or is it Barb 2.  I never
14          heard anything other than that.
15    Q.    Was there in your estimation any sexual undertones to
16          saying it's your first Barb or your second Barb?
17    A.    No.
18    Q.    Did you understand -- from your observations of Barbara
19          Varner and Gary Graham together before the split, how
20          would you describe their working relationship?
21    A.    Very good.
22    Q.    Better than average?
23    A.    Yes, I think so.
24    Q.    Were there people with whom Mr. Graham did not have a
25          working relationship, that you observed?
```

```
 1   A.   Not -- I mean, he would get frustrated now and then,
 2        but no.
 3   Q.   Did you observe him treat Mrs. Varner in any different
 4        manner than he treated other employees?
 5   A.   When she first came on, Mr. Graham and Mr. Osenkarski
 6        would take her on all the -- when they go to visit
 7        clients or go to different seminars and stuff like,
 8        that they would -- she would go along.  That seemed to
 9        be, I thought they were showing her the ropes, you
10        know, how things were handled.
11   Q.   Are you referring to routine training, or some type of
12        preferential treatment?
13   A.   Routine training.  And then also, like, when they would
14        have to go to visit different facilities where they
15        might have had people placed.
16   Q.   Do you ever recall her being asked to go on some trip
17        that normally a new probation officer would not be
18        asked to go on?
19   A.   No.
20   Q.   Any conference that normally a new probation officer
21        would not be asked to go on?
22   A.   No.  The only thing I thought was different, I think,
23        Gary also did DUI training, and I think Barb was asked
24        to do that, and I was surprised about that.
25   Q.   Why were you surprised about that?
```

```
 1   A.   Because I thought that there was a set number of people
 2        who did it and that was the way it was.
 3   Q.   And the set number of people was old timers in the
 4        Probation Department?
 5   A.   Yes.  Yes.
 6   Q.   And it was unusual for a brand new probation officer to
 7        be part of the DUI training?
 8   A.   Right.  Right.
 9   Q.   Was that because there was some financial reward for
10        being a DUI instructor?
11   A.   I have no idea.
12   Q.   Before Mrs. Varner was hired did you ever hear a
13        discussion about whether she would be considered as a
14        candidate for employment?
15   A.   I just heard them say she would be a really good person
16        to have on board, that she was a good worker.
17   Q.   And you heard them say it.  Who was them?
18   A.   Gary and Joe.
19   Q.   Can you recall in particular what Mr. Graham would have
20        said?
21   A.   Just that she was really conscientious, a good worker
22        and it would be good having her on the staff.
23   Q.   Would you characterize it as he glowed about her
24        abilities?
25   A.   Yes.
```

```
 1   Q.   And with Mr. Osenkarski, what would he say?

 2   A.   About the same thing.

 3   Q.   Would you characterize Osenkarski also glowed about her

 4        abilities?

 5   A.   Yes, like she would be an asset to us.

 6   Q.   And when you say they glowed about her abilities, were

 7        they more complimentary about her abilities coming in

 8        than was typical?

 9             MS. WALLET:  I'm just going to object to the form

10        of the question.  You were the one that used the word

11        glowed.  She didn't say glowed, she agreed with that,

12        however.

13             But you may answer the question.

14             THE WITNESS:  No.  If there were other ones that

15        they felt would be a great asset, the same thing.

16   BY MR. DELLASEGA:

17   Q.   Did Mrs. Varner seem to be the recipient of any

18        special treatment when she came in?

19   A.   No.

20   Q.   Now, where did you sit in relationship to Graham's

21        office?

22   A.   He was down the hall and to the right.

23   Q.   You could not see him from your desk?

24   A.   No.

25   Q.   How about Mrs. Varner's office?
```

1    A.    She was behind me.

2    Q.    Can you see her from your desk?

3    A.    If I turned around.

4    Q.    Did you have occasion to see the two interact on a

5          daily basis?

6    A.    On some things, yes.

7    Q.    Would you ever see Mr. Graham treat her, Mrs. Varner,

8          rudely?

9    A.    Once.

10   Q.    What do you recall seeing?

11   A.    I recall him yelling at her about some case that she

12         was working on, or some papers that she did. I don't

13         remember.

14             I also remember him saying at the time that a

15         reference to hiring middle-aged people or something

16         like that.

17   Q.    When you say he yelled at her, did he raise his voice?

18   A.    Yes.

19   Q.    Was it unusual for Mr. Graham to raise his voice within

20         the office?

21   A.    Not if he was excited.

22   Q.    Did he have a loud voice when he got excited?

23   A.    Yes.

24   Q.    Is he an excitable man?

25   A.    Yes.

```
 1   Q.   So it was a frequent occurrence for him to raise his
 2        voice; is that correct?
 3   A.   Pretty much, yes.
 4   Q.   Now, you only recall the one instance with Mrs. Varner;
 5        is that right?
 6   A.   Right.
 7   Q.   With other male probation officers, was it unusual for
 8        Mr. Graham to raise his voice?
 9   A.   No.
10   Q.   Would you characterize this as occurring on a frequent
11        basis?
12   A.   Um-hum.  Not as frequent as with some of the female,
13        but yeah.
14   Q.   In terms of his getting excitable and raising his voice
15        at somebody, did he appear to do so indiscriminately
16        between men and women?  Or did he single out one sex
17        more than the other?
18   A.   No.  I think it was pretty even.
19   Q.   Did you observe Mr. Graham to have favorites within the
20        office?
21   A.   Um-hum.
22   Q.   Was Ms. Varner a favorite?
23   A.   In the beginning, yes.
24   Q.   Did that change at some point, from your personal
25        observation?
```

```
 1   A.   Yes.

 2   Q.   When did it change?

 3   A.   Possibly about the time when we made the switch from

 4        Juvenile, you know, Juvenile and Adult.

 5   Q.   Okay.  What did you observe?

 6   A.   He was, like, insistent and he became more demanding of

 7        people, and more critical.  And I can remember one time

 8        saying to him, you know, if you would ask people

 9        instead of demanding you might get better results.

10   Q.   Are you speaking of he became more critical of all his

11        co-employees?

12   A.   Right.

13   Q.   In general or --

14   A.   But more about Mrs. Varner.

15   Q.   It was enough so that you noticed all of a sudden he

16        was picking on Mrs. Varner?

17   A.   Right.

18   Q.   Did you have any understanding as to why all of a

19        sudden he was picking on Mrs. Varner --

20   A.   No.

21   Q.   -- when she had been a favorite person before?

22   A.   No, I had no idea.

23   Q.   But was that how you perceived it, she had been a

24        favorite person?

25   A.   Oh, yes.
```

```
 1   Q.   And now was being picked on?

 2   A.   Yes.

 3   Q.   And that the change was sudden?

 4   A.   Yes.

 5   Q.   All right.  And did you ever ask Mr. Graham about that?

 6   A.   No.

 7   Q.   From what you observed before that sudden change, would

 8        you describe the two of them as being friendly?

 9   A.   Yes.

10   Q.   Would you describe the friendship as disproportionate,

11        Mr. Graham more interested in Varner or more friendly

12        to Varner, or both equally friendly to each other?

13   A.   I just perceived them as friendly co-workers, friendly

14        co-workers.

15   Q.   Within the office did they appear to be close friends?

16   A.   No.  Just friends.

17   Q.   The answer is no?

18   A.   No.

19   Q.   Now, the phrase Barb 1 and Barb 2 I think you told me

20        was because of the frequency of calls you got from each

21        Barb; is that right?

22   A.   Well, just because when the phone call would come in

23        that's how we would say just which one was which.

24   Q.   Did the number of phone calls from Barb 2 decline after

25        their relationship deteriorated?
```

18

```
 1    A.    I don't know because by then I was gone.  I was over.
 2    Q.    I'm a little unclear as to how you observed their
 3          relationship worsen, when you say it worsened after the
 4          split and you were gone then.
 5    A.    I would say it probably declined then, because she
 6          was -- she wasn't out of the office as much and she
 7          wasn't calling in.
 8    Q.    Why does this mean the relationship declined?
 9    A.    I don't know.
10    Q.    You took it to mean the relationship declined?
11    A.    No.  They -- he stopped inviting her to go to the
12          different places.  He started yelling at her.  He
13          didn't visit in her office.  So that's where I took it
14          as the decline.
15    Q.    Did you ever hear Mr. Graham curse in the office?
16    A.    He may have, but he wasn't the only one.
17    Q.    It was, in fact, the use of curse words a common
18          feature in the office?
19    A.    Yes.  It didn't necessarily, it wasn't necessarily said
20          in anger, just, you know, it was said.
21    Q.    When you heard Mr. Graham use curse words, would they
22          be just in general conversation, or directed to
23          anybody?
24    A.    Just in general.
25    Q.    Did you observe him use curse words more around women
```

```
 1          than around men?
 2     A.   No.
 3     Q.   Less?
 4     A.   It didn't -- I don't see any difference between.
 5     Q.   Would you characterize Mr. Graham as treating men and
 6          women equally, whether he was really good if he liked
 7          them or he was really bad if he did not like them?
 8     A.   I think he treated the men better.
 9     Q.   Did you ever hear within the office the discussion of
10          whether any employees within the office were having
11          affairs?
12     A.   No.
13     Q.   Not once?
14     A.   No.
15     Q.   Okay.  With regard to anybody, not just Graham and
16          Varner.
17     A.   No.  No.
18     Q.   Are you aware that one of the allegations in this case
19          is whether or not Mr. Graham and Mrs. Varner had an
20          affair?
21     A.   I wasn't until later, but yes.
22     Q.   Did the thought ever cross your mind when you were his
23          secretary and observed them on a daily basis that they
24          were having an affair?
25     A.   Never.
```

```
 1   Q.   You said Mr. Osenkarski looked favorably upon
 2        Mrs. Varner's arrival in the office?
 3   A.   Yes.
 4   Q.   Did his attitude remain favorable throughout your time
 5        in the office, or did it change as Graham's attitude
 6        changed?
 7   A.   I think it changed when Graham's attitude changed.
 8   Q.   What did you observe Mr. Osenkarski do?
 9   A.   He just again didn't talk to her like he used to.
10        That's the only thing I could see.
11   Q.   Have you had sexual harassment training while employed
12        by the court?
13   A.   Yes.
14   Q.   Okay.  And do you recall how many training sessions you
15        went to?
16   A.   I think I had two.
17   Q.   And from those sessions, did you acquire an
18        understanding of what sexual harassment is?
19   A.   Yes.  And we've been doing it all along for years.
20             MS. WALLET:  How do you mean that?  You've been
21        harassing all along?
22             THE WITNESS:  Yeah, we were.  I mean, you know,
23        things that we would say in the office, like, oh, you
24        look really nice today or, you know, it could all be
25        taken as sexual harassment.
```

```
 1   BY MR. DELLASEGA:

 2   Q.    Let me ask you this.  Within your concept of sexual

 3         harassment, which would include things as simple as how

 4         are you doing today or you look nice today, would you

 5         say women harassed men just as men harassed women?

 6   A.    Absolutely.

 7   Q.    And within that concept as you understand it, did

 8         Mr. Graham ever harass Varner?

 9   A.    Not -- the only thing I can think of is like I said,

10         the remark about age.  That's it.

11   Q.    Did you ever hear Mrs. Varner say anything that would

12         fall within your concept of sexual harassment?

13   A.    No.

14   Q.    Oh, Gary, you look nice?

15   A.    No.

16   Q.    Complimented him?

17   A.    No.

18   Q.    Flirt with him?

19   A.    No.

20   Q.    Did you ever hear of Mr. Graham describe sexual

21         escapades that he participated in within the four walls

22         of the office?

23   A.    He would tell me stories from college.

24   Q.    Would he ever tell you stories of any of his contacts

25         with women this postdated his marriage?
```

```
 1    A.    No.

 2    Q.    Did he ever tell you about being interested in any

 3          women that worked in the office?

 4    A.    No.

 5    Q.    Any women that worked in the courthouse?

 6    A.    No.

 7    Q.    Did you ever have any reason to believe he had any

 8          sexual interest in any women that worked in the

 9          courthouse?

10    A.    No.

11    Q.    When you were a secretary, who did you view as your

12          boss?

13    A.    Joe.

14    Q.    And on top of him?

15    A.    At the time, Ken Bolze was.

16    Q.    And on top of Bolze?

17    A.    Then it was, when I switched over, it was John.

18    Q.    I guess what I'm getting at is ultimately was the judge

19          or the county your boss?

20    A.    I guess, yes.  The judge.

21    Q.    The judge?

22    A.    (Witness nodded head affirmatively.)

23    Q.    Okay.  Did you understand who had the power to

24          discipline or discharge you compared with the judge or,

25          say, the county commissioners?
```

```
 1   A.    I didn't, at the time, no.

 2   Q.    Did you ever acquire such an understanding?

 3   A.    (Witness shook head negatively.)

 4              MS. WALLET:  I'm sorry, was that an audible --

 5              THE WITNESS: No.  I'm sorry.

 6              MS. WALLET:  You have to say yes or no.

 7              THE WITNESS:  Okay.

 8  BY MR. DELLASEGA:

 9   Q.    After you moved over to Adult Probation did you hear

10         any stories about the Varner-Graham relationship?

11   A.    The only thing I heard was that Gary was saying things

12         and that Barb had filed a suit.  That's all I knew.

13   Q.    Did you ever hear any stories of Mr. Graham doing

14         anything that would constitute in your mind sexual

15         harassment?

16   A.    No.

17   Q.    Did you ever see Mr. Osenkarski do anything in your

18         mind that would constitute sexual harassment?

19   A.    No.

20   Q.    When you say that women as well as men made some

21         comments that you thought fell within that definition

22         of sexual harassment, can you tell me what women you're

23         talking about?

24   A.    Me, for one.  Not right off the top of my head.

25   Q.    Kerry Houser?
```

```
 1    A.    No.

 2    Q.    Debra Green?

 3    A.    No.

 4    Q.    Are you familiar with the fact that Houser had a sexual

 5          harassment complaint in 1993?

 6    A.    Yes.

 7    Q.    Other than Ms. Houser's complaints and Mrs. Varner's

 8          complaint, do you know of any other women in Probation

 9          who complained of sexual harassment?

10    A.    No.

11    Q.    Did you ever hear the phrase jahoobees used within the

12          office?

13    A.    Um-hum.

14          MS. BLANCHARD:  You have to say yes or no.

15          THE WITNESS:  Yes.  Yes.

16  BY MR. DELLASEGA:

17    Q.    How did you hear that?

18    A.    Just heard it.  Somebody stated it, I don't know.

19    Q.    Anybody you can put a face on?

20    A.    No.

21    Q.    How about the phrase peter meter?

22    A.    Never heard that.

23    Q.    Ever hear anybody comment that a woman or female intern

24          had a nice bush?

25    A.    No, I don't think.
```

```
 1    Q.    Were you ever offended by any sexual harassment banter

 2          you heard in the office?

 3    A.    No.

 4    Q.    Did any women in the office ever tell you they were

 5          offended by sexual banter?

 6    A.    Yes.

 7    Q.    Who is that?

 8    A.    Kerry, Julie Staver, and Deb Anderson.

 9    Q.    And they were all secretaries?

10    A.    Julie was a probation officer, Kerry was a probation

11          officer, and Deb had been a secretary.

12    Q.    Are we talking about Kerry Houser?

13    A.    Yes.

14    Q.    And what were they talking about?

15    A.    That was about the harassment suit, Kerry.

16    Q.    That was about the '93 harassment?

17    A.    (Witness nodded head affirmatively.)

18    Q.    After that?

19    A.    No.

20    Q.    After the '93 harassment suit do you recall the level

21          of sexual banter dropping?

22    A.    Absolutely.

23    Q.    Some remedial action had apparently been taken?

24    A.    Yes.

25    Q.    At any time did you ever hear Mrs. Varner complain to
```

```
 1        you or to others about Graham?
 2   A.   I think just in when he first started nit-picking at
 3        her reports and stuff like that.  She wasn't sure what
 4        he wanted.
 5   Q.   Was not happy about the nit-picking?
 6   A.   Right.
 7   Q.   But do I understand correctly that Gary could be a
 8        nit-picker, nit-pick with other people as well?
 9   A.   Yes.
10   Q.   That was his style?
11   A.   (Witness nodded head affirmatively.)
12   Q.   And again --
13   A.   Yes.
14   Q.   -- and he didn't discriminate between men and women?
15   A.   Yes.
16        MR. DELLASEGA:  That's all.
17        MR. ADAMS:  I don't have any questions.
18        MS. WILLIAMS:  I have no questions for you,
19   Mrs. Boyles.
20        MS. BLANCHARD:  I have nothing.
21   BY MS. WALLET:
22   Q.   Mrs. Boyles, tell me what you remember about the Kerry
23        Houser's complaint.
24   A.   Reference was made to a cunt club.
25   Q.   Did you hear that?
```

```
 1    A.    Yes, I did.

 2    Q.    And who said that?

 3    A.    Joe.

 4    Q.    And can you tell me what you remember about the context

 5          of this?

 6    A.    There were, like, three or four probation officers in

 7          Tom Boyer's office at the time, and they were referring

 8          to Deb Anderson, Julie Staver, Kerry, and I don't

 9          remember if there was another person or not, but that's

10          what I took it as, and it was just a remark about the

11          cunt club.

12    Q.    Were you offended by that reference?

13    A.    I was a little surprised, but I wasn't offended.

14    Q.    Why were you surprised?

15    A.    I didn't expect to hear something like that.

16    Q.    Did you think it was appropriate workplace language?

17    A.    No.

18    Q.    After you heard that, what did you do?

19    A.    Continued typing.

20    Q.    Okay.  Did you tell somebody else?

21    A.    No.

22    Q.    Did you tell anybody that you had heard it?

23    A.    I was -- I finally said, yes, I had heard it, when I

24          was questioned about it.

25    Q.    Did you ever go to Mr. Osenkarski and tell him that you
```

```
 1          were offended by that?
 2     A.   No.
 3     Q.   Why not?
 4     A.   Just thought I'd let it go, because I didn't think it
 5          was to my -- it wasn't directed to me.
 6     Q.   Is there any doubt in your mind that it was directed to
 7          the female probation officers?
 8     A.   No.
 9               MR. ADAMS:  Directed to or about?  I'm a little
10          confused.  She said it wasn't directed to anyone.
11               THE WITNESS:  Not to any one person, but it was
12          directed to the two probation officers and the
13          secretary, one secretary.
14               MR. ADAMS:  You mean as about those persons?
15               THE WITNESS:  Right.
16               MR. ADAMS:  Okay.
17   BY MS. WALLET:
18     Q.   So the cunt club consist consisted of the two
19          probation officers and the other secretary?
20     A.   I believe so, yes.
21     Q.   Now, who came to you to ask you whether you had heard
22          about this?
23     A.   I think the chief did, Ken Bolze.
24     Q.   And what do you remember him asking you about?
25     A.   He asked if I had heard reference, the reference that
```

```
 1              was made, and I said yes.  And then I had to go back

 2              and discuss it.  And he gave me a paper for my file so

 3              that no retaliation would come against me.

 4    Q.        Did you think that there might be some retaliation?

 5    A.        Not at the time, no.

 6    Q.        Sometime later?

 7    A.        No.  I didn't think there would be, but they -- he just

 8              did that to cover me in case there would be.

 9    Q.        Do you think there was any retaliation against Kerry

10              Houser as a result of her complaint?

11    A.        She was kind of shunned.

12    Q.        What do you mean by kind of shunned?

13    A.        No one would talk to her much.  The male probation

14              officers, none of them talked to her much.

15                   She had a lot of work, but I don't know that she

16              was given extra because of it or if that's just the way

17              things fell.

18    Q.        Did you have anything to do with how the cases were

19              assigned to the probation officers?

20    A.        No.

21    Q.        Do you know whether there were charts of the number of

22              cases that were assigned?

23    A.        I think there were.

24    Q.        Did you have anything to do with those charts?

25    A.        No.
```

```
 1   Q.   Do you know who did?

 2   A.   I thought the -- Gary and Joe and John.

 3   Q.   How would you describe Mr. Osenkarski as a supervisor?

 4   A.   He wasn't there a whole lot.  I didn't see him as a

 5        very strong supervisor.

 6   Q.   Do you think that he was the one that took some action

 7        after Kerry Houser filed her Complaint to stop the

 8        office banter?

 9   A.   I don't know.

10   Q.   Who do you think took some action that you thought was,

11        I believe Mr. Dellasega described it as remedial

12        action?  Who do you think took that action?

13   A.   I would think probably Ken Bolze.

14   Q.   Do you know what he did?

15   A.   No, I don't.

16   Q.   Do you think Mr. Bolze thought it appropriate that

17        persons were using this comment about the cunt club?

18            MR. ADAMS:  Object.  It requires speculation.  But

19        you can answer.

20            THE WITNESS:  I was going to say, I really don't

21        know.

22 BY MS. WALLET:

23   Q.   Did you ever hear talk in the office about people

24        being punished for certain things?

25   A.   Yes.
```

```
 1   Q.   What do you remember hearing?

 2   A.   I remember on occasion, an occasion where Mark

 3        Galbraith I think was going to testify for this case,

 4        and he was told, remember, I got you this job, I can

 5        take it away from you.

 6   Q.   And who said that?

 7   A.   Gary.

 8   Q.   And you heard Gary Graham say this to Mark Galbraith?

 9   A.   No.

10   Q.   Mark Galbraith told that to you?

11   A.   Yes.

12   Q.   Do you know whether Mr. Graham had some role in

13        Mr. Galbraith getting the job?

14   A.   No, I don't.  Mark was an intern with us first.

15   Q.   Do you know anything about individuals being asked to

16        perform personal services for any of your supervisors?

17   A.   Again, Mark went to Joe's house to do some work.

18   Q.   How do you know that?

19   A.   Mark told me.

20   Q.   Did anybody ask you to do anything of a personal

21        nature?

22   A.   No.

23   Q.   How about the office supplies, do you know whether

24        there was any misuse of office supplies?

25             MR. ADAMS:  Objection as to form.  You may answer.
```

```
 1              THE WITNESS:  They were missing a lot.

 2   BY MS. WALLET:

 3   Q.    What kind of supplies?

 4   A.    Notepads, pens.

 5   Q.    Did you have any responsibility over --

 6   A.    No.

 7   Q.    -- the supplies?

 8   A.    No.

 9   Q.    And did you notice that they were missing?

10   A.    Yes.

11   Q.    What do you think happened to them?

12   A.    I have no idea.

13   Q.    Was there talk that Mr. Osenkarski had taken some of

14         these things?

15   A.    Yes.

16   Q.    Did you believe that that may be true?

17   A.    It could have been, I didn't know.

18   Q.    Did you take telephone calls from Mr. Osenkarski as

19         well?

20   A.    The same way, yes, if they didn't go directly to his

21         phone.

22   Q.    Did you take telephone messages for Mr. Osenkarski when

23         he was not in the office?

24   A.    Yes.

25   Q.    And would you describe that as frequently,
```

```
 1          infrequently?
 2    A.    Infrequently.
 3    Q.    Did he come into the office nearly every day?
 4    A.    No.
 5    Q.    Did he stay for eight hours during the day?
 6    A.    On occasion.
 7    Q.    More frequently than not?
 8    A.    No.
 9    Q.    How would you describe his work schedule?
10    A.    Whenever he felt like coming in.
11    Q.    When he wasn't there, did he give any explanation to
12          you as to what was doing?
13    A.    No.
14    Q.    Did you ever ask?
15    A.    No.
16    Q.    Did you ever have numbers where you could reach him if
17          there was some emergency in the office?
18    A.    No.
19    Q.    Did Mr. Osenkarski talk about sexual relationships with
20          women?
21    A.    No.
22    Q.    Did he talk about his wife?
23    A.    Just that he had had one.
24    Q.    Mr. Dellasega asked you if you had any evidence about
25          Mr. Graham talking about relationships after his
```

```
 1          college years.
 2              Did Mr. Osenkarski talk about his relationships?
 3   A.   No.
 4   Q.   Did you have any evidence to believe that
 5        Mr. Osenkarski was seeing somebody in the courthouse?
 6   A.   No.
 7   Q.   Did you hear any rumors to that effect?
 8   A.   I heard rumors, but I don't know.
 9   Q.   What did you hear?
10   A.   That he was seeing Wilma.
11   Q.   Does she have a last name?
12   A.   Clippinger.
13   Q.   Did Ms. Clippinger call him at the workplace?
14   A.   Yes.
15   Q.   Frequently?
16   A.   Yes.
17   Q.   How frequently?
18   A.   I'd say the days that he was there, that they usually
19        talked.  And the only way I could tell that was by the
20        numbers.
21   Q.   And when you say the numbers, explain what you mean.
22   A.   The extensions.
23   Q.   Can you explain to me, could you see on your telephone
24        who people were talking with?
25   A.   Yes.  Within the court, within our department.
```

```
 1   Q.   Okay.  Did you have any discussions with Judge Sheely
 2        about Barbara Varner?
 3   A.   No.
 4   Q.   Did you have any discussions with Judge Sheely about
 5        Gary Graham?
 6   A.   No.
 7   Q.   Did Judge Sheely or someone that he had sent ever
 8        interview you about what was happening in the office?
 9   A.   No.
10   Q.   Did anyone who identified him or herself as being from
11        the EEOC ever talk with you?
12   A.   No.
13   Q.   Do you know what the EEOC is?
14   A.   Equal Opportunity.
15   Q.   Employment Opportunity Commission.  Did anyone ever
16        interview you about what was happening in the Probation
17        office before the split?
18   A.   No.
19   Q.   When did you first learn that there was a lawsuit
20        brought by Ms. Varner?
21   A.   I guess it was right before the time that they were
22        ready to split.
23   Q.   Do you remember who told you?
24   A.   No.  I know it wasn't Barb and it wasn't Gary, but I
25        don't remember who told me.
```

```
 1   Q.   Do you know what you learned?

 2   A.   No.  Just that there -- that's all I heard, is that a

 3        suit had been filed.

 4   Q.   Do you remember any other specific things that caused

 5        you to believe that there was a change in the

 6        relationship between Mr. Graham and Ms. Varner?

 7   A.   No, nothing else that I can think of.

 8   Q.   Do you think it was obvious to other people in the

 9        office?

10   A.   I would think so, yes.

11   Q.   And why did you think that?

12   A.   Because it was so abrupt.

13   Q.   Did Ms. Varner ever say anything to you of a negative

14        nature about Mr. Graham?

15   A.   No.

16   Q.   Did any of the women probation officers complain to you

17        about the treatment they received within the office?

18   A.   No.

19   Q.   You said, I believe, in response to one of

20        Mr. Dellasega's questions that you thought the women

21        were treated differently than the men.  What did you

22        mean by that?

23   A.   I thought, I would say, like, the cases they were

24        given.  Maybe getting to go on more trips.

25   Q.   Who got to go on more trips?
```

```
 1   A.   The men.

 2   Q.   Do you know who determined that?

 3   A.   No, I don't.

 4   Q.   And you said about the cases that were given.  You

 5        thought one group got better cases than the other

 6        group?

 7   A.   Yes.

 8   Q.   Why would you say that?

 9   A.   I would say it was just -- maybe I'm wrong, maybe they

10        had set types of cases that they took -- that they were

11        given and it just -- that's the ones they always got.

12   Q.   Did you know Nancy Kessler?

13   A.   No.

14   Q.   Did you ever hear any talk in the office besides what I

15        think you already testified to, about people owing

16        somebody something for having been helped?

17   A.   (Witness nodded head affirmatively.)

18   Q.   What do you remember about that?

19   A.   I can remember that being said but I don't know why.  I

20        don't remember what the occasion was.

21   Q.   Do you ever remember hearing Mr. Graham say someone

22        owes me for something?

23   A.   Yes.

24   Q.   What do you remember?

25   A.   And I remember hearing Joe say it, too, but I don't
```

1       remember on what occasion it was.

2  Q.  Did Ms. Varner ever talk to you about her health?

3  A.  On some things, yes.

4  Q.  What did you know?

5  A.  I knew she had a hysterectomy.  I knew she had stomach

6       problems.  In fact, she was going to the same doctor

7       that I go to.

8         I know she had problems with hives when she came

9       over to this building for a while.

10  Q.  Did she ever relate any of her health problems to

11       stresses at work?

12  A.  Her stomach problems.

13  Q.  What did she tell you?

14  A.  She just said that it's the only thing that they could

15       figure out, that it was all the stress she was under.

16  Q.  Did you believe that she was under stress?

17  A.  Yes.

18  Q.  Why would you say that?

19  A.  I admire her for sticking in there and going through

20       what she went through.  I don't think I could have done

21       it.  I mean, she was ignored by some of the

22       secretaries.  You know, a lot of the probation officers

23       wouldn't speak to her, so.  I admire her for hanging in

24       there.

25  Q.  Did you ever have any discussions with Mrs. Graham

```
 1         about any of the work situation?

 2    A.   I saw her once at the K-Mart, I think it was the

 3         K-Mart, or the Giant, and she came up to me and told me

 4         that, you know, she couldn't believe Barb was doing

 5         this, and that she, you know, they had had an affair.

 6         And I said, well, I don't know what's going on.  And

 7         she made reference to my marital situation, because she

 8         had been the court reporter for it.

 9    Q.   What did she say about your marital situation?

10    A.   She said, well, I didn't judge anything about you.  And

11         I said, you know, there was nothing there to judge.

12    Q.   Did she tell you why she initiated this conversation?

13    A.   No.  I guess just because we had run into each other,

14         you know.

15    Q.   Do you know Winnie Stern?

16    A.   Yes, I do.

17    Q.   Who is she?

18    A.   She was another secretary.

19    Q.   How did Mr. Graham treat Ms. Stern?

20    A.   Not just Mr. Graham but some of the other ones, I think

21         they felt she was a little slow.

22    Q.   Did they raise their voices at her?

23    A.   They may have.

24    Q.   What did you observe?

25    A.   I don't know that I was over there then.  I can't
```

```
 1          remember.  I can't remember if it was Jenny and Winnie
 2          that were there at the same time or not.  I can't
 3          remember.
 4     Q.   Okay.  How did Mr. Graham treat Mark Galbraith?
 5     A.   Okay, fine, except for the few remarks.
 6     Q.   Do you think Mr. Galbraith had some axe to grind with
 7          Mr. Graham?
 8     A.   No.  No, I don't.
 9     Q.   What would you say Mr. Graham's reputation is for
10          truthfulness?
11     A.   A lot of people felt that he exaggerated things.
12     Q.   Did you?
13     A.   At times.
14     Q.   Did you have any occasions when you thought Mr. Graham
15          had told you an untruth?
16     A.   No.
17     Q.   How about Mr. Osenkarski's reputation for truthfulness?
18     A.   Exaggeration, also.
19     Q.   Before the split did Mr. Osenkarski act as if he was in
20          charge of the office?
21     A.   He would say he was, but he always delegated for
22          decisions to be made.
23     Q.   And who did he delegate to?
24     A.   Gary.  I think Tom Boyer, also.
25     Q.   Did Mrs. Varner talk to you about her marriage?
```

```
 1   A.   Yes.

 2   Q.   What did she tell you?

 3   A.   That I've even -- I even was there.  They're very

 4        happy.

 5   Q.   I'm sorry, you were?

 6   A.   They're very happy together.  I was even at her place a

 7        few times.

 8   Q.   Did she ever complain to you about her husband or her

 9        relationship with her husband?

10   A.   No.

11   Q.   Did her husband call her at work?

12   A.   Yes.

13   Q.   Frequently?

14   A.   Yes.

15            MS. WALLET:  Thank you very much, Mrs. Boyles.

16            THE COURT:  Is that all?

17            MR. DELLASEGA:  No.

18   BY MS. WILLIAMS:

19   Q.   Ms. Boyles, my name is Taylor Williams.  I represent

20        the Ninth Judicial District of Pennsylvania, Court of

21        Common Pleas of Cumberland County.

22            Do you recall, since in your position with the

23        court you answered the telephone, do you recall any

24        time when there were a lot of hang-up calls?

25   A.   I had talked to him about that.  I can't remember.  It
```

1       may have happened but I can't remember.

2   Q.   You don't remember at all?

3   A.   No.

4   Q.   And you can't pinpoint any time frame when that would

5        have happened?

6   A.   No.

7   Q.   You indicated that you were fired from your position.

8   A.   Yes.

9   Q.   Can you give me the details of why you were fired?

10  A.   Yes.  I became chronically ill.  I couldn't walk, I

11       couldn't sit.  I was missing work.  And they said that

12       because I couldn't be there, I was fired.

13  Q.   So you were fired for absenteeism is your

14       understanding?

15  A.   Yes.  Yes.

16  Q.   Do you have any ill feelings about that toward the

17       court or the county?

18  A.   Very disappointed.

19  Q.   You indicated that you thought that men were being

20       treated better than women.  What specifically did you

21       observe to form that --

22  A.   It's just kind of like --

23  Q.   -- impression?

24  A.   Like the good old boys club, you know, that

25       camaraderie.

```
 1   Q.   You've given me an impression, which I understand, but
 2        what did you specifically observe?
 3   A.   Well, they would spend a lot of time together, talking.
 4        Like I said, they would go to seminars, where I didn't
 5        see the women going, you know, as frequently.
 6   Q.   Do you have any idea what ratio of times the men went
 7        versus the women?
 8   A.   No, I don't.
 9   Q.   So you don't have any real specifics on that?
10   A.   No.  No.
11   Q.   It's sort of a general impression you have?
12   A.   Right.
13   Q.   Is Mark Galbraith still working there as a probation
14        officer?
15   A.   No, he's not.  He's in business with his father.
16   Q.   When did he leave, if you recall?
17   A.   I'm guessing '97, '98, somewhere in there.
18             MS. WILLIAMS:  Thanks.  That's all I have for
19        Mrs. Boyles.
20   BY MR. ADAMS:
21   Q.   Ms. Boyles, I represent Mr. Osenkarski.  My name's
22        Paul Lancaster Adams.  How are you.  I'll just be
23        brief.
24             Going back to the reference comment made by
25        Mr. Osenkarski of the cunt club, were there any other
```

```
 1            females nearby other than you to overhear that
 2            conversation?
 3    A.      I don't think so.
 4    Q.      Okay.  Would you agree that that comment is off-color?
 5    A.      Yes.
 6    Q.      Were offhand or off-color jokes prevalent in the
 7            office?
 8    A.      Occasionally.
 9    Q.      Jokes being distinguished from comments, but jokes?
10    A.      Yes.
11    Q.      And those jokes off-color were made by men?
12    A.      Mostly, yes.
13    Q.      Also by women?
14    A.      Maybe once or twice, but mostly men.
15    Q.      Okay.  But you did hear some by women as well?
16    A.      Yes.
17    Q.      You said that you had been to Ms. Varner's home a few
18            times?
19    A.      Yes.
20    Q.      What were the circumstances of the first visit to her
21            home?
22    A.      We both have children the same age and we, you know, we
23            discussed them.
24                I think the first time I went to her place was a
25            birthday party for her grandson.
```

```
 1    Q.    And were other employees of the Juvenile Probation
 2          Department present as well?
 3    A.    No.
 4    Q.    Okay.  Were you the only --
 5    A.    Yes.
 6    Q.    -- employee -- let me finish the question, I'm sorry.
 7          Were you the only employee from the Juvenile Probation
 8          Department present?
 9    A.    Yes.
10    Q.    With your children?
11    A.    I wasn't with my children.  My children are grown the
12          same as hers.
13    Q.    Okay, okay.  So you were clearly the only person from
14          your office?
15    A.    Yes.
16    Q.    Okay.  How about the second time you were in
17          Ms. Varner's home?
18    A.    I had done some typing for her, for her class, and she
19          was -- she paid me to do her -- she was going for her
20          master's and I did her typing.  And I took it down to
21          her place to drop it off.
22    Q.    Okay.  Did Ms. Varner often ask you to do typing for
23          her for classes that she was taking?
24    A.    I do for both her and Debra.
25    Q.    Okay.  Debra?
```

```
 1    A.    Green.

 2    Q.    Green, okay.  Are you good friends with Debra Green?

 3    A.    Yes.

 4    Q.    You have to say yes or no.

 5    A.    Yes.  Yes.  Yes.

 6    Q.    Do you consider yourself good friends with Ms. Varner?

 7    A.    Yes.  Have I seen them a lot lately?  No.

 8    Q.    Does that bother you, that you haven't seen them in a

 9          while?

10    A.    No, because I know they're busy.

11    Q.    Okay, fair enough.  Any other visits to Ms. Varner's

12          home that you would like to share?

13    A.    No, that was it.

14    Q.    Has Ms. Varner ever been to your home?

15    A.    Yes, when I first moved in.  She came to show me what

16          she thought of how I decorated, to give me some help.

17    Q.    When was this?

18    A.    1997.

19    Q.    Okay.  And was she helpful?

20    A.    Yes.

21    Q.    Any other visits to your home by Ms. Varner?

22    A.    No.

23    Q.    How about Debra Green to your home?

24    A.    Debra Green has been to my house twice, and both times

25          they were to pick me up:  Once to go to dinner, and
```

```
 1          once to take me for a medical procedure.

 2    Q.    Has anyone else from the Juvenile Probation Department

 3          ever been to your home other than those two?

 4    A.    Mark Galbraith.

 5    Q.    Okay.

 6    A.    I'm trying think.  Bill Brandt.  That's it.

 7              MR. ADAMS:  No further questions.  Thank you.

 8              THE WITNESS:  Okay.

 9  BY MR. DELLASEGA:

10    Q.    Did you like working for Gary?

11    A.    Yes.

12    Q.    Did you like working for Joe?

13    A.    Joe?  Yeah.  I did more for Gary than I did for Joe,

14          yeah.

15    Q.    Going back to Barb 1 and Barb 2, was the frequency of

16          Barb 1 and Barb 2 calls roughly equal?

17    A.    Yes.

18    Q.    Have you ever talked with Ms. Wallet before today?

19    A.    I knew her when I worked in the law library.  I

20          recognized her.

21    Q.    But not about this case?

22    A.    Oh, no.

23              MR. DELLASEGA:  That's all.

24              THE WITNESS:  Okay.

25  BY MS. BLANCHARD:
```

1   Q.   A couple questions, sorry.  This will be quick, I

2        promise.

3             The conversation with Mark Galbraith in which he

4        told you that Gary made a comment to him about

5        remember, I got -- could you tell me again what that

6        statement was?  I didn't quite get it.

7   A.   Mark said Gary said:  Remember, I got you your job and

8        I can take it away from you.

9   Q.   And when did Mark tell you about this statement?

10  A.   It was right after he was subpoenaed or asked to give a

11       deposition about the case or testify in the case.

12  Q.   Was this recently or was this a few years ago?

13  A.   It was a few years ago.

14  Q.   And did Mark tell you whether or not he responded to

15       Gary's statement?

16  A.   No, he didn't say.

17  Q.   Do you know if he did?

18  A.   No.

19  Q.   Do you know if Gary made any other statements of that

20       nature to Mark?

21  A.   I think it was Joe that did.  No.  I don't think so.

22  Q.   What was the statement?

23  A.   About owing.  He wanted him to do some work at his

24       house and said you owe me or something.

25  Q.   Was that in connection with this case?

```
 1   A.    No.

 2   Q.    Okay.  Any other statements that you're aware of that

 3         Gary made to Mark in connection with this case?

 4   A.    No.

 5   Q.    Do you have any idea if Gary took any retaliatory

 6         action again Mark for --

 7   A.    No, I do not.

 8             MS. BLANCHARD:  That's all I have.

 9   BY MS. WALLET:

10   Q.    Mrs. Boyles, did you think the number of calls

11         received from Ms. Varner were unusual?

12   A.    No.

13   Q.    Was there anything about the fact that Barbara Varner

14         would call Mr. Graham occasionally that seemed odd to

15         you?

16   A.    No.

17             MS. WALLET:  That's all.

18   BY MR. DELLASEGA:

19   Q.    Anybody call in more than the two Barbs?

20   A.    Did what?

21   Q.    In terms of the frequency of calls Gary got, were the

22         calls from Barb 1 or Barb 2 the largest in terms of

23         volume?

24   A.    Oh, no.

25   Q.    Who called him more?
```

```
 1    A.    Clients.  People from -- some of the directors and

 2          stuff from some of the different facilities.  So you

 3          know, sometimes people from Children and Youth.  So I

 4          couldn't say it was --

 5              MR. DELLASEGA:  Okay.

 6    BY MS. WILLIAMS:

 7    Q.    Ms. Boyles, one quick question.  You indicated that

 8          you had been to Ms. Varner's home for her grandson's

 9          birthday party.

10    A.    Yes.

11    Q.    When was that, if you recall specifically the year?

12          Was it within the last year?

13    A.    Oh, no.  It's been -- it was before all of this.

14    Q.    Before 1996?

15    A.    I think so.  I'm not positive.

16    Q.    Have you talked with Ms. Varner since you received the

17          subpoena and request to come for a deposition?

18    A.    No.

19              MS. WILLIAMS:  Thank you.

20    BY MS. WALLET:

21    Q.    Did you ever visit the Graham home?

22    A.    No, I did not.

23    Q.    How about the Osenkarski house?

24    A.    I took Joe home from work one night.

25              MS. WALLET:  That's all.
```

```
 1   BY MR. DELLASEGA:

 2   Q.   One last one.  When you had the conversation with Barb

 3        Graham, you ran into her and she had mentioned this

 4        business about the affair, did Mrs. Graham appear in

 5        your estimation to be distraught about the affair?

 6   A.   Yes.

 7             MR. DELLASEGA:  That's all.

 8             THE WITNESS:  Very upset about it.

 9             MR. DELLASEGA:  That's all.

10   BY MS. WALLET:

11   Q.   Was she angry toward Ms. Varner?

12   A.   Yes.

13   Q.   Did she say anything that you thought was threatening

14        toward Ms. Varner?

15   A.   She just said that she didn't know why she was lying

16        like that.  But nothing that I would...

17   Q.   Did you ever observe any, I'll use the word encounters

18        for lack of another word, encounters between Barbara

19        Varner and Barbara Graham?

20   A.   No.

21             MS. WALLET:  That's all.

22             (Whereupon, the deposition was concluded at

23        1:25 p.m.)

24                           *   *   *   *   *

25
```

COMMONWEALTH OF PENNSYLVANIA      )
                                  )  SS.
COUNTY OF DAUPHIN                 )


    I, Emily R. Clark, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Dauphin, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:


                RONNA BOYLES


    I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

    I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

    Dated at Harrisburg, Pennsylvania, this 27th day of March, 2003.



                                    _____
                                    Emily R. Clark
                                    Reporter - Notary Public



(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)