IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                 .
        Plaintiff,                 .   CIVIL ACTION
                                   .   NO. 1:CV 01-0725
        vs.                        .
                                   .
COMMONWEALTH OF PENNSYLVANIA,      .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,           .
CUMBERLAND COUNTY; CUMBERLAND      .
COUNTY; S. GARETH GRAHAM,          .
Individually, and JOSEPH           .
OSENKARSKI, individually,          .
        Defendants.                .
. . . . . . . . . . . . . . . . .


          Deposition of:  WILLIAM A. BRANDT

          Taken by    :  Defendant Cumberland County Court

          Date        :  April 4, 2003, 9:30 a.m.

          Before      :  Emily Clark, RMR, Reporter-Notary

          Place       :  Cumberland County Courthouse
                         One Courthouse Square
                         Carlisle, Pennsylvania


APPEARANCES:

          DEBRA K. WALLET, ESQUIRE
                For - Plaintiff

          ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
          BY:  A. TAYLOR WILLIAMS, ESQUIRE
                For - Defendant Commonwealth of Pennsylvania
                      Ninth Judicial District, Cumberland County

          THOMAS, THOMAS & HAFER
          BY:  JAMES K. THOMAS, II, ESQUIRE
               PAUL J. DELLASEGA, ESQUIRE
                For - Defendant Cumberland County

2

```
 1    APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  L. KRISTEN BLANCHARD, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
      ALSO PRESENT:
 7
          MS. BARBARA E. VARNER
 8
          MR. S. GARETH GRAHAM
 9
          MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                    I N D E X

2                    WITNESS

3   William Brandt                    Examination

4       By Mr. Dellasega                  4

5       By Mr. Adams                     47

6       By Ms. Williams                  56

7       By Ms. Wallet                    59

8

9

10                   EXHIBITS

11   (None marked)

12                *   *   *   *   *
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        STIPULATION
 2              It is hereby stipulated by and between the
 3         respective parties that sealing, certification and
 4         filing are waived; and that all objections except as to
 5         the form of the question are reserved until the time of
 6         trial.
 7
 8              WILLIAM BRANDT, called as a witness, being
 9         duly sworn, was examined and testified, as follows:
10    BY MR. DELLASEGA:
11    Q    Mr. Brandt, my name is Paul Dellasega, I represent the
12         county in this matter.
13              Have you testified before in any proceeding, sir?
14    A.   No.
15    Q    In any court proceeding?
16    A.   In something of this matter?  Or just generally?
17    Q    Have you ever testified?
18    A.   Yes, sir.
19    Q    Okay.  Have you ever been deposed?
20    A.   No.
21    Q    Okay.  You understand that if we ask you a question, if
22         you don't understand the question, you should tell me
23         that?
24    A.   Okay.
25    Q    All right?  And if you answer it, we'll assume you did
```

5

1          understand the question?

2    A.    (Witness nodded head affirmatively.)

3    Q     When were you first hired by the county?

4    A.    1990.

5    Q     In what capacity?

6    A.    As an intern originally, and then eventually as a

7          probation officer.

8    Q     As an intern in the Probation Department?

9    A.    Correct.

10   Q     When you became a probation officer, were you probation

11         officer 1?

12   A.    Actually, the confusion is that I started as a probation

13         officer but not with full benefits for a period of two

14         months.  But eventually, yes, as a probation officer 1,

15         within the 1990 year.

16   Q     Let me ask you this.  What is your date of hire?

17   A.    That's also very confusing.  It's either August of '90

18         or October of '90, depending on who you ask.

19   Q     All right.  Why would some people contend it's August of

20         '90?

21   A.    I would, because I was a full-time probation officer in

22         August of 1990; however, it was not with benefits paid

23         by the county.  October 13th of '90 is when I became

24         full-time with benefits as a probation officer 1.

25   Q     When were you hired as an intern?

6

```
 1    A.    June 4th of that year.

 2    Q     So you were an intern for two months --

 3    A.    Correct.

 4    Q     -- roughly, and then you became a probation officer

 5          without benefits?

 6    A.    Correct.

 7    Q     And two months later, you became a probation officer

 8          with benefits?

 9    A.    Correct.  I actually covered for a gentleman, another

10          probation officer who was fighting in Desert Storm for

11          August and September of that year, and it worked out

12          that I covered for him at that time period.

13    Q     When you came in as an intern, were you a college

14          graduate?

15    A.    I had walked through graduation in May.  I had to

16          complete my internship to actually fulfill my practicum,

17          but technically, no, I didn't graduate until August.

18    Q     Had you previously been employed by the county?

19    A.    Never.

20    Q     By the court?

21    A.    No.

22    Q     By any county?

23    A.    No.

24    Q     By any court?

25    A.    No.
```

7

1   Q   Was this your first job after college?

2   A.   Correct.

3   Q   As an intern were you a regular full-time employee of

4        the county?

5   A.   Yes, I was.

6   Q   Did you receive benefits?

7   A.   No, I did not.

8   Q   How did your status change from intern to probation

9        officer without benefits?

10  A.   I don't think I understand that question, how did it

11       change?

12  Q   After two months you stopped being an intern.

13  A.   Correct.

14  Q   And became a probation officer who did not get benefits.

15  A.   Correct.

16  Q   How did that change in status come about?

17  A.   I don't understand what you mean by status.  I mean, I

18       had assumed a caseload.

19  Q   One day you were called an intern and the next day you

20       were called a probation officer, correct?

21  A.   Correct.

22  Q   And you changed in title --

23  A.   Correct.

24  Q   -- from intern to probation officer --

25  A.   Correct.

1   Q    -- who happened not to have benefits.  How did what

2        change in title come about?

3   A.   As I explained, Dave, another probation officer, got

4        called to war, and I fulfilled his obligations during

5        the period of time of August and September, part of

6        October, until another position became available within

7        the Department.  Then I was hired full-time at that

8        time.

9   Q    When did your title change next from probation officer 1

10       to something else?

11  A.   I honestly can't answer that.  '97?  '6, '7, '8, I'm not

12       sure.

13  Q    What change occurred?  What change in title occurred?

14  A.   I had became a senior.

15  Q    And when did you next experience a change in title?

16  A.   I never did again.

17  Q    You are currently a senior probation officer?

18  A.   Correct.

19  Q    Is there such a title as probation officer 2?

20  A.   Yes, there is.

21  Q    You are not a PO-II?

22  A.   Correct.

23  Q    Do you have the same title as Mrs. Varner does, correct?

24  A.   I believe so.

25  Q    When you were first hired in between '91 and '95, the

```
 1          Juvenile and Adult Departments were one department; is
 2          that correct?
 3     A.   Correct.
 4     Q    Did you primarily work Juvenile or Adult?
 5     A.   I did both.
 6     Q    Where do you work now?
 7     A.   Juvenile.
 8     Q    When the split occurred, did you immediately go to
 9          Juvenile?
10     A.   Correct.
11     Q    And you've been in Juvenile continuously since --
12     A.   Since '96 I believe it was.
13     Q    When did you first meet Mr. Graham?
14     A.   My guess is my first day as an intern.  I don't think I
15          knew Gary before that.
16     Q    Was Mr. Graham influential in any way in your change in
17          title from intern to probation officer?
18     A.   He could have been.  I don't -- he certainly could have
19          been.  I don't know if he, in fact, was.
20     Q    Do you know whether he was influential in any way in
21          your change in title to probation officer with benefits?
22     A.   No.  I don't think that -- that was simply by rule by
23          the county as a full-time employee.
24     Q    Do you know whether he was influential at all in your
25          change in title to senior probation officer?
```

1  A.  He probably was.

2  Q  Do you know what that influence was?

3  A.  I think he was in favor of it.

4  Q  And you think that because of what information?

5  A.  He was my supervisor at the time, and I'm not aware of

6     any hardships between Mr. Graham and myself that would

7     have created a position where I couldn't have been

8     accepted for that or denied, that I'm aware of.

9  Q  When did Mr. Graham become your supervisor?

10  A.  I guess when we -- when the office split, I believe.

11  Q  Prior to the split, did he have any supervisor capacity

12     over you?

13  A.  In the role of a probation officer 2, I believe.  He

14     would be asked to do supervisory duties in the absence

15     of a supervisor, and I know that on many occasions I had

16     to go to him as a superior officer.

17  Q  It would be your sense that he functioned as a de facto

18     supervisor on a number occasions --

19  A.  Absolutely.

20  Q   -- prior to the split?

21  A.  Absolutely.

22  Q  And who was your formal supervisor prior to the split?

23  A.  For Juvenile or Adult side?

24  Q  Juvenile.

25  A.  Mr. Osenkarski.

1    Q    And for Adult?

2    A.   John Roller.

3    Q    When did you first meet Mrs. Varner?

4    A.   As an intern.

5    Q    And how did you meet her?

6    A.   She worked in Children and Youth as a caseworker.  I

7         don't know that we shared cases, but I met her because

8         of close proximity to our offices.

9    Q    Did you ever share any cases with her prior to her

10        joining the Probation Department?

11   A.   My goodness.  I'm sorry, I don't know that we did.  We

12        may have.

13   Q    You don't recall having any?

14   A.   Correct.

15   Q    Did you ever have any formal business dealings with her?

16        Or did you simply know her as a colleague in another

17        department prior to the split?  I mean, prior to her

18        coming on board as a probation officer.

19   A.   Knew her as a friend of someone who I was dating at the

20        time, also a Children and Youth caseworker, and that's

21        primarily how I knew Barb.

22   Q    Did you ever know Mrs. Varner or did you ever see

23        Ms. Varner in the probation office while she was at CYS?

24   A.   Oh, yes.

25   Q    For what purposes would she be there?

1   A.   I would assume professional reasons, sharing cases with

2        Juvenile probation officers.

3   Q    From your observations of her when you saw her as a CYS

4        worker and a probation officer, can you identify the

5        probation officer she was working with?

6   A.   No.

7   Q    Did you ever see her work with Mr. Graham?

8   A.   I really couldn't remember.

9   Q    Do you have any knowledge of whether she or Mr. Graham

10       shared cases while she was in CYS?

11  A.   No.

12  Q    Did you ever see her and Mr. Graham talk to each other

13       or interact with each other in any way --

14  A.   Yes.

15  Q     -- before she was hired as a probation officer?

16  A.   Yes.

17  Q    What did you see?

18  A.   I saw normal conversation.  At the time I actually

19       shared my office, this is as an intern, I shared an

20       office with Mr. Osenkarski during that summer.  And in

21       Gary's capacity as a PO-II and someone who I described

22       close with Joe, he was in that office a great deal of

23       time.  And I recall Barb being in that particular office

24       on various occasions, having conversations with us.

25  Q    When you observed Mr. Graham and Mrs. Varner having

```
 1          conversations while together while she was a CYS
 2          employee, did you observe any hostility between them?
 3    A.    No.
 4    Q     Any antagonism of any kind?
 5    A.    Not that I recall.
 6    Q     Did you ever see Mr. Graham being polite to her?
 7    A.    I assume.  I don't recall anything different.
 8    Q     From your own personal observation.
 9    A.    Yes.
10    Q     Did you ever observe Mr. Graham to raise his voice at
11          her?
12    A.    No.
13    Q     Yell at her?
14    A.    No.
15    Q     Say anything offensive towards her?
16    A.    No.
17    Q     Treat her with anything other than respect?
18    A.    Correct.
19    Q     Did they seem to have a good working relationship, to
20          you?
21    A.    I don't know that I evaluated it in that depth, but I
22          assumed so, yes.
23    Q     Did you see anything that would indicate the absence of
24          a good working relationship?
25    A.    No.
```

1  Q    Did you see any hesitency or reluctance on the part of

2       Mrs. Varner to work with Mr. Graham?

3  A.   No.

4  Q    Did you ever know them to go on business trips together

5       while she was in CYS?

6  A.   No.

7  Q    Did you ever observe them to have coffee or soda or a

8       snack together in the lunch room or coffee room?

9  A.   I don't recall.

10  Q    Did you ever observe or hear Mr. Graham comment about

11       her abilities while she was a CYS employee?

12  A.   No.

13  Q    Did you ever hear Mr. Graham recommend her for hire in

14       the Probation office while she was a CYS employee?

15  A.   Not to me.  I don't know if he recommended her or not.

16       I don't recall him making that statement to myself.

17  Q    Do you know that he recommended her to anyone else for

18       hire within the Probation office?

19  A.   I wouldn't be privy to that information.  I don't know,

20       really.

21  Q    When she was hired, was there any discussion within the

22       office that you participated in as to who had sponsored

23       her or urged her hiring within the office?

24  A.   Not to my recollection.

25  Q    By the way, all the questions I've asked about Graham's

```
 1              interaction with Mrs. Varner during that period of time,
 2              would that be true for Mr. Osenkarski with respect to
 3              raising his voice to her, was not abusive?
 4    A.        Yeah, I don't recall any.
 5    Q         To be more specific, during that same period of time,
 6              which is again while she was a CYS employee, did you
 7              ever observe Mr. Graham do anything that would in any
 8              sense of the word constitute sexual harassment towards
 9              Mrs. Varner?
10    A.        Not in my presence.
11    Q         Did you hear any other employee describe any conduct --
12              again, this is during the time when she was a CYS
13              employee -- any conduct by Mr. Graham that in the
14              broadest sense of the word could constitute sexual
15              harassment?
16    A.        I don't believe so.
17    Q         Did you ever hear the phrase Barb 1 and Barb 2 used
18              within the office?
19    A.        Within the office, yes.
20    Q         What was your understanding of that phraseology?
21    A.        That was something in jest, designating Mr. Graham's
22              wife and Mrs. Varner.
23    Q         Who was Barb Varner?
24    A.        I wouldn't know which was which.
25    Q         When you say it was in jest, what was the jest?  What
```

1      was the content of the jest?

2  A.  I don't recall using it even myself, but as I said, I

3      recall hearing it.  And I could very well be confusing

4      what's taken place in the last seven years compared to

5      prior to that, so I -- to think specifically what was

6      the joke, I don't recall.

7  Q   Who did you hear using that phrase, do you recall?  Is

8      it something that you heard frequently?

9  A.  No.

10 Q   More than 10 times?

11 A.  Probably.

12 Q   Did you ever hear Mr. Graham use that terminology,

13     Barb 1 or Barb 2?

14 A.  No.

15 Q   You never inquired yourself as to what the joke was with

16     regard to the use of that phraseology?

17 A.  Did I understand what it was?

18 Q   Did you ever inquire of anybody else as to why are they

19     saying Barb 1 and Barb 2?

20 A.  No, but I certainly understood its meaning.

21 Q   And other than the fact it was the two Barbs, did you

22     understand anything else about its meaning?

23 A.  Certainly.

24 Q   What else did you understand?

25 A.  Are we talking about a time period that's still while

1          Mrs. Varner is at CYS?

2    Q    Yes.

3    A.   No.  I've never heard it at that time.

4    Q    While she was a CYS  employee did you ever hear anyone

5          within the office speculate that Mr. Graham and/or

6          Mrs. Varner and Mr. Graham were anything other than

7          business colleagues?

8    A.   Never.

9    Q    Never heard any rumors, suggestion or speculation that

10         they dated or had any kind of sexual --

11   A.   No.

12   Q    -- connotation to their relationship?

13   A.   No.

14   Q    And never thought so yourself?

15   A.   Again, as a CYS worker?

16   Q    Yes.

17   A.   No.

18   Q    Did you ever hear Mr. Graham talk about having affairs

19         with anyone?

20   A.   No.

21   Q    Has he ever divulged to you that he had an affair?

22   A.   No.

23   Q    Has he ever divulged to you that he had any interest in

24         any woman other than his wife?

25   A.   Well, Gary and I shared a friendly relationship at one

```
 1            time where we joked about maybe a college fling or
 2            something like that, but anything post marriage, I
 3            don't -- no, emphatically no.
 4    Q       You say you shared a friendly relationship at one time.
 5    A.      I would say from the day I was hired as an intern up
 6            until shortly before his departure from the Juvenile
 7            office.  Friendly, I would say friendly.
 8    Q       Nonetheless, you used past tense.  Do you have a
 9            friendly relationship with him today?
10    A.      I don't -- not anything on my part, but I'm fearful
11            that, no, we do not have any friend -- we no longer have
12            a friendly relationship.
13    Q       How did the relationship change?
14    A.      We don't have contact.
15    Q       Was there any change in it other than you don't have
16            contact?
17    A.      Not on my part.
18    Q       On Mr. Graham's part?
19    A.      Only through what I hear from friends, statements that
20            are said.
21    Q       Nothing that he has ever personally said to you?
22    A.      Never in words, no.
23    Q       In anything other than words?
24    A.      I don't think he -- he has displayed behavior or just
25            gestures that I can, that I would take that he is not
```

```
 1          happy with me.
 2     Q    Can you tell me what those gestures are?
 3     A.   Maybe the way he looks at me in passing, the few times
 4          we've had passing.  Or I know on occasion -- I work a
 5          second and third job, actually performing security where
 6          his daughters go to school, and I have to have passing
 7          with him and I can -- it's obvious that he has
 8          displeasure for my presence.  But he has done nothing to
 9          harm me.
10     Q    What have you heard from third parties?
11     A.   That his displeasure for me speaking possibly or having
12          anything to do with his departure from the office.
13     Q    Did you have anything to do with his departure from the
14          office?
15     A.   Absolutely not.  I spoke with Judge Hoffer, who demanded
16          that I meet with him, and we spoke about Gary.
17     Q    Do you recall when this was?
18     A.   I couldn't remember the date but I can tell you I
19          remember the day very well.
20     Q    Tell me what you remember about the day.
21     A.   I was about to have a six-month review hearing for a
22          person placed in Philadelphia.  Courtroom was full of
23          people.  I can remember the kid.  Judge Hoffer came out
24          of chambers, pointed at me, said:  Get in my office now.
25               Everyone looked at me as if what did you do now.
```

```
 1           And I proceeded to go Judge Hoffer's chambers, where we

 2           had a very long conversation while the entire courtroom

 3           waited for us for over an hour to maybe closer to two

 4           hours.

 5    Q      Tell me what you recall about that one- to two-hour

 6           conversation.

 7    A.     Surprisingly, there wasn't any question of Barb dating

 8           Gary and the relationship between the two of them.  I

 9           don't think he -- if he did, I apologize, but I don't

10           remember him even asking that.

11    Q      Okay.

12    A.     He wanted to know more on the lines of who does what

13           within your department.  And it was as if he was for the

14           first time trying to learn our hierarchy and whose

15           performance and who's responsible for and those types of

16           questions.

17    Q      Would this conversation have been after the split?

18    A.     I believe so.  I believe it was in '97.

19    Q      So when he was asking who does what, it was who does

20           what within Juvenile Probation?

21    A.     Correct.  I'm sorry.

22    Q      What else do you recall about the conversation?

23    A.     I really think it was more generated towards

24           Mr. Osenkarski than it was towards Mr. Graham.

25    Q      Tell me what you recall him asking about Osenkarski and
```

1        Graham.

2   A.   Okay.  What he does between 8:00 and 4:30 every day, and

3        is he accountable and does he perform many tasks.  Is

4        he -- how long has he been or hasn't he been, and who's

5        performing what tasks when he's not available.  And who

6        is powerful and who is not, and so forth and so on.

7            To answer specifics, I mean, we're going back quite

8        some time, so bear with me.  But it was more geared

9        towards our administration, Juvenile again, than

10       anything else, and certainly any relation between these

11       two.

12  Q    Did he ask the same type of questions about Mr. Graham?

13  A.   He did, because the response, my answers were, you know,

14       Gary was certainly as much involved in running the

15       department as Mr. Osenkarski and all those capacities

16       and such.  So, I mean, in a sense, speaking about one

17       and the other was synonymous.

18  Q    Did he ask you whether there was any misconduct within

19       the office?

20  A.   No.

21  Q    In particular, did he ask you whether you had ever

22       observed anything inappropriate from the standpoint of

23       sexual harassment?

24  A.   No.

25  Q    Did he ask you whether any foul language was used on a

1      routine basis or otherwise?

2  A.  Other than what Judge Hoffer was using, no, I don't

3      recall that.

4  Q  Did he ask you whether women were treated differently

5      than men in any respect in the office?

6  A.  No.  No.

7  Q  Did he ask you whether the supervisors were harsher on

8      women than they were on men?

9  A.  I don't believe so.

10  Q  Did he ask you whether any probation officers were

11      singled out for harsher treatment than others?

12  A.  I don't believe so.

13  Q  Did he ask you whether there were any favorites within

14      the department?

15  A.  No.

16  Q  Did he ask you, did the name Barbara Varner come up at

17      all, to your recollection, during that --

18  A.  I don't think so.  I don't believe.

19  Q  Did this conversation occur after you had heard that

20      Mrs. Varner had filed some type of complaint regarding

21      Mr. Graham?

22  A.  I know things were getting heated within our very small

23      office, keeping in mind things spread like wildfire.

24      But the series of events, I could just say I -- things

25      were happening.  What that means exactly, it was at a

```
 1          time where things were beginning to become tense within
 2          the department, and I don't recall exactly the time
 3          frame, I'm sorry.
 4     Q    When you used the phrase "time when things were
 5          beginning to become tense," at some point in time did
 6          there come a change in your department, increasing
 7          tension?
 8     A.   Keeping in mind, again, how small our office is, yes,
 9          and the parameters.
10     Q    Describe when that changed, to the best of your ability.
11     A.   Well, it was very obvious that Barb and Gary were
12          singled out as being involved in whatever it was at the
13          time, and many were not privy to what exactly it was.
14          And it was obvious that both were upset.
15              I recall a period of time where Gary did nothing to
16          me but there was a period of time where he was obviously
17          not approachable because he was visibly upset with
18          whatever was going on.  That didn't mean I couldn't go
19          to him for something work-wise throughout the course of
20          day, but he was obviously distraught over something.
21     Q    And this was a change as compared from prior years
22          within the office?
23     A.   Yeah.  We had a very jovial office.
24     Q    And if you were asked to put a year on when this change
25          occurred?
```

1   A.   It was within that time frame.

2   Q    '97?

3   A.   Bear with me, but in a broad sense, yes.

4   Q    All right.  Was it after the split?

5   A.   Definitely.

6   Q    Okay.  And the split was in early '95?

7   A.   No.  I thought it was in '96.  I believe it's in '96.

8   Q    You would know better than me.  Was it several months

9        after the split?

10  A.   It could have been a series of things that started at

11       one point.  But again, my recollection, picking up what

12       I knew, I mean, yes, possibly, but I don't know.  It

13       could have been going on longer, I don't know.

14  Q    From your perception, did Mr. Graham and Mr. Osenkarski

15       have favorites in the office at that point in time?

16  A.   As far as personal friends?

17  Q    People who were favored in any respect regarding terms

18       and conditions of employment.

19  A.   They were much closer with certain people than others,

20       yes.

21  Q    Did you from your own personal observation come to the

22       conclusion at the time you were talking to Judge Hoffer

23       that Graham and Osenkarski favored any people with

24       regard to getting better treatment than other similarly

25       situated probation officers?

```
 1   A.   I may answer that question differently now than I would

 2        have actually to Judge Hoffer then.  But to senior

 3        members of the Juvenile staff at that time and myself

 4        not being a senior member at that time, my perception

 5        would have been they had a gravy detail in comparison to

 6        what I had at the current time.  If we were able to move

 7        to 2003 I'm sure there's a lot of 20-year-olds

 8        downstairs who think I'm sitting in a gravy position as

 9        we speak.  So, perception and age may have changed my

10        opinion on that.

11   Q    Is a gravy position reduced caseload?

12   A.   I wouldn't say reduced caseload, but it's not difficult

13        to determine the volatility of a case at the beginning,

14        and should one set of people get -- it would be very

15        hard to put this in and show this for anyone to

16        understand it, but comparing apples to apples, those of

17        us in the profession, we would understand who has a more

18        difficult caseload, so to speak, in terms of more

19        difficult juveniles versus someone who is supervising a

20        phrase I use, cupcake type kids who do not require quite

21        the level of supervision.

22   Q    And to the degree that you observed this distinction, it

23        was between old timers and newer probation officers?

24   A.   Myself being a newer one at the time, relatively

25        speaking.
```

1    Q    Was the distinction, in your mind, limited to the

2         distinction between old timers and new officers?  Or

3         political allies and political enemies?

4    A.   It just so happened that it was more senior members.  So

5         in your words, the two specifically older employees who

6         had the positions of intensive officers at the time who

7         had many more years of working there than myself, I, my

8         opinion was that they were given a much lighter detail

9         than myself.  But now again, looking back at that

10        through older eyes I understand how perceptions change.

11   Q    When Mrs. Varner first came on board as a probation

12        officer, did you at that time observe her interactions

13        with Mr. Graham?

14   A.   I'm sorry, I didn't understand the second part.

15   Q    When she came first came on board as a probation

16        officer, did you observe her interactions with Graham at

17        that time?

18   A.   Yes.

19   Q    All right.  And did she seem to work more closely with

20        Graham than other senior probation officers?

21   A.   I don't believe I was a senior probation officer at the

22        time, I believe Barb came in '95.  But to answer your

23        question, my opinion was, yes, she did work closer with

24        him.

25   Q    And how would you describe their working relationship

 1        when they were both probation officers together?

 2  A.    Very friendly.

 3  Q     Can you explain that in any greater detail?

 4  A.    There was a period of time, I don't know the length,

 5        that there was obviously some type of relationship.  And

 6        I use that word in the broadest sense, I'm not

 7        insinuating, but there were certainly friendly

 8        relations.  And it was for a long period of time, maybe

 9        a year or more, and they certainly spent a lot of time

10        together.

11            Now, to make sure we understand, I mean, my office

12        partner and I have been together for 13 years, and

13        someone could say that he and I spend a lot of time

14        together more so than me and my wife, unfortunately.  So

15        that could be just out of -- I say that in a very broad

16        sense of relationship.

17  Q     There are office partners who get along better with each

18        other than other office partners; is that right?

19  A.    Yes, sir.

20  Q     All right.  And you're saying that the relationship

21        between Graham and Varner appeared to be one that was a

22        very friendly working relationship, they got along

23        extremely well together?

24  A.    Yes.

25  Q     And from your observation, those feelings were mutual?

```
 1   A.   Yes.

 2   Q    But your observations did not include any sexual

 3        overtones?

 4   A.   No.

 5   Q    And that relationship at some point changed?

 6   A.   Yes, it did.

 7   Q    It had changed, in looking back at it from the vantage

 8        point of several years, was that change an abrupt

 9        change?

10   A.   I didn't see any signs of a change, but there was a day,

11        a specific day which seemed to be a change.  Don't ask

12        me the date because I wouldn't recall, but there was one

13        day specifically where there appeared to be great

14        hostility.

15   Q    The change was abrupt enough it seemed almost overnight

16        to you; is that what you're telling me?

17   A.   Yeah.  I didn't see anything from my vantage point that

18        changed their relationship.

19   Q    But nonetheless, you observed a change?

20   A.   Yes.

21   Q    In a sense there was almost an overnight change?

22   A.   Correct.

23   Q    That's what you're saying, okay.  And after you observed

24        that overnight change, how did Mr. Graham treat

25        Mrs. Varner?
```

1   A.   I think he was -- he distanced himself from her.  But I

2        didn't see from firsthand knowledge him treating her in

3        any manner -- they were not friendly any longer, but I

4        didn't see anything from, again, my point where it was

5        anything other than there was a separation.

6   Q    You personally didn't see him yell at her?

7   A.   I heard him on one occasion, and again, the day where

8        there was a -- something significant changed, where the

9        two of them were alone in an office in the middle of our

10       main office, so it would be very difficult for many not

11       to have heard it had you been in the Department on that

12       specific day, and again, I don't know the day, where the

13       both of them were very upset.  And I don't know if it

14       was yelling but it was definitely above normal

15       conversation that everyone could hear.  The details, I

16       don't know.  And it was something that went on, whatever

17       the conversation was, I recall coming in and out of my

18       office and it was still continuing.  So it wasn't a

19       30-second thing, it's something that took place for a

20       while.

21  Q    But you didn't hear any detail of the conversation?

22  A.   I didn't want to, to be honest with you.

23  Q    I understand that you didn't want to.  Did you

24       nonetheless hear any detail of the conversation?

25  A.   Not that I recall.

1    Q    Do you have any idea what the dispute was about?

2    A.   No, not at all.

3    Q    Did the dispute seem mutual?

4    A.   That's hard to answer.  Like myself --

5    Q    Let me rephrase it.  Did the tone of voice of both

6         parties appear upset or agitated?

7    A.   Gary's did.  But Gary has much like myself, speaks very

8         loudly so that the entire office will hear it.  And that

9         was par for the course for either me or Gary.  So it was

10        loud.  And he gets very excited when he discusses

11        things, and so I don't think it was completely out of

12        the norm for Gary.

13   Q    How about Mrs. Varner, was her tone of voice out of the

14        norm for her?

15   A.   Well, she was behind closed doors, and she doesn't have

16        a voice that carries like Mr. Graham's, so I don't

17        remember hers.

18   Q    I had understood you to mean that it sounded like both

19        were upset, and what I'm trying to get at is what you

20        know about how Mrs. Varner exhibited being upset.

21   A.   As I said, both their voices seems to be elevated, and

22        that's the only way I could offer that I knew that both

23        were not having an average day.

24   Q    But other than that, you do not recall Mr. Graham

25        yelling at Mrs. Varner?

1   A.   Other than that day?

2   Q    Yes.

3   A.   No.

4   Q    All right.  Do you ever recall Mr. Graham doing anything

5        towards Mrs. Varner after that day which in the broadest

6        sense of the word would constitute sexual harassment?

7   A.   No.

8   Q    Did you ever recall Mr. Osenkarski, by the way, ever

9        doing anything towards Mrs. Varner that in the broadest

10       sense of the word would constitute sexual harassment?

11  A.   I don't recall, no.

12  Q    Did you ever observe Mrs. Varner being treated in a

13       manner you thought was unfair after that day by

14       Mr. Graham?

15  A.   No.

16  Q    By Mr. Osenkarski?

17  A.   No.

18  Q    Have you ever observed any female probation officer

19       being treated in a manner that you thought was unfair by

20       either Graham or Osenkarski?

21  A.   No.

22  Q    Your conversation with Judge Hoffer, how did it end?

23  A.   About as violently as it began.  I refused to answer any

24       of his questions to begin with.  He and I have a

25       personal relationship, so it was very -- or difficult.

```
 1              I think he told me that should I need to come talk to
 2              him any longer or anymore, that his door was open, which
 3              that's par for the course.
 4      Q      I'm sorry, please continue.
 5      A.     I don't recall exactly how it ended, but something,
 6              should I need to approach him about anything that we
 7              discussed, that his door was open.
 8      Q      Did you have any understanding at the time of that
 9              conversation whether the Varner-Graham dispute was a
10              catalyst for the conversation?
11      A.     Sure.
12      Q      And what was your sense of why it was a catalyst?
13      A.     Well, if I recall, my knowledge is fairly limited, but
14              if I recall, before Judge Hoffer became president judge,
15              this was an issue that was before Judge Sheely.  The
16              details of what took place in front of Judge Sheely, I
17              don't recall.  But I remember that -- my thoughts were
18              he had made a final determination on this in some way,
19              he retired, Judge Hoffer became president judge, and all
20              of a sudden this was an issue again before Judge Hoffer.
21              So, yes, I had some prior knowledge, but I don't know
22              that I knew intimate details.
23      Q      Did Judge Hoffer tell you at the end of the conversation
24              he was going to implement any changes?
25      A.     Absolutely not.
```

1   Q    Were you aware that Mr. Graham had been suspended by
2        Judge Sheely for three days?
3   A.   I think.  There's a -- it's common knowledge now.  I
4        don't know if I knew at the time.  I believe I did,
5        because there was a joke in the office that he was
6        suspended with pay, and we -- I'm sorry to bore you, but
7        we joked that if we ever want to get suspended in the
8        office we hope that it's with pay, I would take that
9        kind of suspension.  So that's the jest and that's the
10       context how I knew that he was suspended.
11  Q    In what context did you understand the reason for the
12       suspension?
13  A.   I knew it was involved with Barb in some shape or form
14       but I didn't know details.
15  Q    When did you first become aware of any allegation,
16       contention or rumor that a sexual affair had existed
17       between the two?
18  A.   I think during their friendship, the period of time that
19       I would describe as a friendly relationship.
20  Q    And in what sense did you become aware?  Was it
21       something --
22  A.   I think anyone of reasonable suspicion, maybe I'm not,
23       but seeing a man and a woman spending that much time
24       together that hadn't previously, there was thoughts in
25       the back of my mind that is this something that's more

1        than -- is this extracurricular.

2  Q    All right.  And was that a thought you ever heard

3        anybody else articulate?

4  A.   Sure.

5  Q    Okay.  Was that a thought you heard articulated

6        generally within the office?

7  A.   Yes.

8  Q    And were there adherents both pro and con as to whether

9        or not an affair was going on?

10  A.   I think everyone stayed the hell out of it, quite

11        frankly.  I don't recall.  I think it was just general

12        suspicions and the rumor mill of an exceptionally small

13        office.

14  Q    When the relationship changed so abruptly between them

15        as you've described, was there any subsequent rumor that

16        the affair must have ended, to explain this sudden

17        change in the relationship?

18  A.   Yes, but I mean, no one knew anything firsthand.

19  Q    But there was speculation about it?

20  A.   There was a lot of hypothesizing, yes.

21  Q    Did Mrs. Varner ever discuss with you that she was going

22        to file a complaint against Graham for sexual

23        harassment?

24  A.   I don't recall.

25  Q    Has she ever discussed her current case with you?

1   A.   No.  She may have -- I don't recall us having a

2        conversation in detail.  No, I really don't think we've

3        really talked about it other than maybe I had a, you

4        know, a hearing or someone else had gone through this

5        and she mentioned that I would be next, or something

6        like that.  But nothing in depth.

7   Q    Has she ever asked you to provide any assistance with

8        regard to this litigation?

9   A.   No.

10  Q    Indicated that you would be called to testify as a

11       witness on her behalf or as part of this litigation?

12  A.   I don't believe so.

13  Q    Have you ever talked to her attorney, Ms. Wallet, about

14       any facts regarding this case?

15  A.   No.

16  Q    Have you ever provided any written statement to anybody

17       regarding the facts of this case?

18  A.   I met with an attorney, as many of us did, many years

19       ago downstairs somewhere.  I don't recall the

20       gentleman's name; I could picture him.

21  Q    Other than that attorney, have you ever provided a

22       statement to anybody?

23  A.   No.

24  Q    Within the Probation office is the use of bad language

25       common?

```
 1   A.   Unfortunately.  Myself guilty as well.

 2   Q    And is that something that's limited to the male

 3        probation officers, or is it both genders?

 4   A.   I think it's a product of the horrible environment that

 5        we work with.

 6   Q    So it would be both genders?

 7   A.   Yes.

 8   Q    And can you describe for me that horrible environment?

 9   A.   Well, we deal with people who inflict harm on others on

10        a daily basis, and go into the homes that others would

11        feel are very -- less desirable, and common language for

12        them is four-letter words.  And I think to a certain

13        degree, whether you like it or not, you begin to assume

14        some of that.

15   Q    So the routine day-in/day-out environment within the

16        Probation office is different from a regular business

17        office not involved in the criminal justice procedure?

18   A.   I would argue -- well, not in a police department, but I

19        would argue that, yes.

20   Q    And would you argue that such an environment is more

21        stressful than --

22   A.   Absolutely.

23   Q    And that the job of a probation officer is more

24        stressful inherently than somebody not involved in the

25        criminal justice system?
```

1  A.   It's something we all bring on ourselves differently,

2       but I would argue again, yes, that it would be.

3  Q    Prior to the split, what was your understanding of how

4       seniority was calculated in the combined Adult and

5       Juvenile Probation Department?

6  A.   My understanding from day one was years of service with

7       the county.

8  Q    Inside and outside of probation?

9  A.   Correct.  So if a maintenance man came to the Department

10      not possessing even the prerequisites for our position,

11      he would be more senior on the list than someone who had

12      his doctorate.

13 Q    Did that seniority system change at or about the time of

14      the split?

15 A.   Let me -- I'm not aware of any in-writing policy other

16      than what I described to you was Judge Sheely's policy.

17      And I never heard Judge Sheely say that out loud.  And

18      we were -- it was never tested, either, so that was

19      something that we assumed.  And there are many things we

20      assumed on a day-to-day basis that never get tested.

21      So, that was a very  -- we don't know if that was the

22      seniority but that was my understanding of it.

23 Q    You did mention a written document, though?

24 A.   Never prior to the split.

25 Q    Oh, okay.  But prior to the split, no written document?

1   A.   Correct.

2   Q    Just kind of a vaguely understood concept it was

3        seniority within the county --

4   A.   To my recollection, correct.

5   Q    -- regardless of the type of county employment?

6   A.   Correct.

7   Q    And that did change at or about the time of the split?

8   A.   I believe so.

9   Q    How did it change?

10  A.   I believe someone within the Juvenile administration

11       came up with their own policy, and I know that the Adult

12       side as well came up with their own policy.

13  Q    And within Juvenile, how did it change?

14  A.   I don't know the details, but I believe it's time spent

15       within our department.

16  Q    Is there a written document now?

17  A.   I've heard there is.  I've never seen it.

18  Q    You've never seen it, okay.  At or about the time of the

19       split did Mr. Boyer ever comment, discuss with you the

20       issue of seniority and whether it should be changed and

21       if so, what your view would be on how it should be

22       calculated?

23  A.   Ad nauseam.

24  Q    What do you recall of those conversations?

25  A.   That our seniority would be date of hire within the

1        department.

2    Q    And you were asked your opinion about that?

3    A.   I usually give my opinion.  I don't recall being asked.

4        I possibly offered.

5    Q    What would your opinion offered have been?

6    A.   That I agreed with that, or years of probation

7        experience outside of our department as well.

8    Q    As a consequence of the change that was implemented, was

9        your seniority affected?

10   A.   I've been told that it was, yes.

11   Q    What have you been told?

12   A.   I was told that mine was delayed as a result of -- a

13       promotion that I was instructed that I would receive,

14       that it was delayed as a result of questioning the

15       current seniority policy.

16   Q    Well, let me ask you this.  Before the split were you

17       senior or junior to Mrs. Varner, to your knowledge?

18   A.   That would have been an opinion question, and yes, I

19       would have believed myself to be senior based on my

20       years of probation experience.

21   Q    Before the split?

22   A.   Correct.

23   Q    Okay.  And after the split?

24   A.   The same.

25   Q    The same, all right.  So as far as you're concerned, the

 1   change in the seniority system did not affect where you

 2   stood with regard to Mrs. Varner on the seniority list?

 3 A. If there is such a hierarchy, yes.

 4 Q All right.  When your promotion was delayed did you

 5   understand in any way, shape or form that Mrs. Varner's

 6   situation played any factor in the delay of your

 7   promotion?

 8 A. Yes.

 9 Q What is your understanding?

10 A. That she was questioning my promotion in front of hers,

11   because she was questioning the seniority policy, I

12   think, quoting Judge Sheely's opinion of what his was.

13   Any details past that I don't think I recall.

14 Q Did Osenkarski ever discuss that with you?

15 A. Yes.

16 Q Do you recall him telling you anything other than what

17   you've just told us?

18 A. No.

19 Q All right.  Did Graham ever discuss that with you?

20 A. I don't remember if Gary was still in our department at

21   that time.

22 Q How about Boyer?

23 A. Ad nauseam, yes.

24 Q When you finally were promoted to senior probation

25   officer, was Mrs. Varner promoted at the same time?

```
 1   A.   Same day.

 2   Q    Same day, okay.  Sitting here today, who is more senior?

 3   A.   I am.

 4   Q    Sitting here today, what benefit does that seniority

 5        provide to you?

 6   A.   Nothing.

 7   Q    Why do you say nothing?

 8   A.   The unfortunate part within this county, not only

 9        department-wide but maybe county-wide, is that the next

10        senior person has always been the next to get promoted.

11        Maybe that person's not so deserving, but that's just

12        the chain of events.  So, I don't know that -- I hope

13        that our department has made a change in that thinking

14        in the future, but as far as what does it get me?

15        Nothing.  It doesn't give me anything additional on my

16        paycheck or any more or less support from those below

17        me.

18   Q    I'll put it to you this way.  Vis-a-vis you and

19        Mrs. Varner, does your spot ahead of her on the

20        seniority list provide you any advantage in promotion,

21        to your understanding?

22   A.   Under the old school of promotion, maybe, because if I

23        am, in fact, ahead of her, then I would be next in line

24        for whatever became available.  So possibly.

25   Q    The old school was what?
```

1   A.   The next in line gets the next available position

2        regardless of performance.

3   Q    All right.  And regarding promotion, is that rule

4        currently in effect, or as you call it, the old school

5        rule?

6   A.   We haven't had a position become available for some

7        time, so it's hard to say whether or not.  And Judge

8        Hoffer would be the one who would finalize that based on

9        Mr. Osenkarski's recommendation.  But I don't know how

10       to answer that.  I don't know.

11  Q    Have never seen a written document that addresses that?

12  A.   Correct.

13  Q    And no supervisor has ever given you a definitive

14       statement regarding that issue; is that correct, also?

15  A.   Correct.

16  Q    And in any event, whatever the rule is, Hoffer could

17       cancel it?

18  A.   Correct.

19  Q    Do you know of anybody in either Probation Department

20       who was promoted over a more senior employee?

21  A.   Only because a more senior employee turned it down.

22  Q    And that example was?

23  A.   On the Adult staff.

24  Q    Did you ever hear Mr. Graham use the phrase peter meter?

25  A.   Never.

1    Q    Did you ever hear Mr. Graham or Mr. Osenkarski refer to

2         a woman's genitalia as a bush?

3    A.   Never.

4    Q    Ever hear either of them refer to a woman's breasts as

5         jeehoobees?

6    A.   Never.

7    Q    Ever hear either of them discuss or request female

8         interns to dance on tabletops?

9    A.   No.

10   Q    Did you ever hear Mr. Graham referring to Mrs. Varner as

11        she has no fucking sense, no fucking training or no

12        fucking ability?

13   A.   No.

14   Q    As part of this litigation there were complaints brought

15        before, there was a federal court Complaint, there was a

16        Complaint filed with the EEOC which included an

17        allegation by Mr. Varner that she had been discriminated

18        because of her age.

19             Did you ever observe any conduct within the office

20        that would indicate her age played any negative role in

21        her terms and conditions of employment?

22   A.   No.

23   Q    By the way, would it be correct that you have no

24        evidence yourself from firsthand knowledge that she's

25        ever been sexually discriminated against or sexually

1        harassed?

2    A.   No.

3    Q    Do you know whether Mrs. Varner was ever restricted from

4         access to any area of the courthouse while she was a

5         probation officer?

6    A.   I believe I've heard as a result of whatever this

7         process is, and because of the proximity of where

8         Mr. Graham's wife works, that she possibly isn't

9         allowed -- I don't know any details but my recollection

10        is was, yes, there are designated areas, maybe, that

11        she's not to be.  And I could be wrong that the two of

12        them are related, but that's my recollection.

13   Q    You essentially know that as scuttlebutt, right?

14   A.   Correct.

15   Q    You don't have any recollection of any superior officer

16        telling you that?

17   A.   Absolutely.

18   Q    Have you ever been personally threatened with adverse

19        consequences if you were to provide any assistance to

20        Mrs. Varner in this litigation?

21   A.   No.

22   Q    To testify for her?

23   A.   No.

24   Q    To be friendly with her?

25   A.   No.

1    Q    There was a previous complaint many years ago by Kerry
2         Houser regarding sexual harassment.  Are you familiar
3         with that?
4    A.   Unfortunately.
5    Q    Did you experience any adverse consequence yourself as a
6         result of Mrs. Houser's complaint of sexual harassment?
7         I think it was in 1993.
8    A.   My perception was, yes.
9    Q    Can you describe that for me?
10   A.   Again, my opinion may change as I become wiser and
11        older, but my assessment was that I was treated unfairly
12        as a result of whatever my involvement was with that, in
13        the nature of the types of cases that I was being
14        assigned versus those gentlemen in the office who were
15        supposed to be getting those types of assignments.
16        Again, that simply was my own assessment and no way
17        could I probably prove that.
18   Q    Treated unfairly by whom?
19   A.   By Mr. Osenkarski.
20   Q    Not by Graham?
21   A.   Not to my knowledge.
22   Q    Is sexual banter unusual within your office?
23   A.   I'll say between males.
24   Q    It's common?
25   A.   Please describe sexual banter.

```
 1   Q     References by men regarding women's looks, comments

 2         within your office?

 3   A.    Yes.

 4   Q     Or expressions by men of the degree to which a woman is

 5         attractive are common within the office?

 6             MS. WALLET:  I'm sorry, I didn't hear that, either.

 7         The degree to which?

 8   BY MR. DELLASEGA:

 9   Q     Expressions by men of the degree to which particular

10         women may or may not be attractive, is that common

11         within the office?

12   A.    Yes.

13   Q     Not limited to Graham or Osenkarski?

14   A.    Correct.

15   Q     Virtually universal?

16   A.    Yes.

17   Q     Have you heard the same thing from women?

18   A.    Yes.

19   Q     In that sense, would you say sexual banter is common

20         among both genders in your office?

21   A.    Absolutely.

22   Q     Do you have any evidence or reason to believe that

23         Mrs. Varner's personal safety has ever been in danger

24         because of the change in her relationship with

25         Mr. Graham from friendly to --
```

1    A.    No to my knowledge, no.

2    Q    -- otherwise?  Has anyone ever told you that?

3    A.    I've heard rumors that there was additional security

4          needed at some prior event, if you will, for whatever

5          this process has been, as a result of an allegation.

6          But I mean, that's the extent of what I know.  I don't

7          know any details.

8    Q    Other than rumors, you have no reason to believe that

9          she has any reason to fear for her personal safety?

10   A.    Correct.

11         MR. DELLASEGA:  That's all.

12   BY MS. WILLIAMS:

13   Q    Hi, Mr. Brandt.  I'm Paul Lancaster Adams and I

14         actually represent Mr. Osenkarski in this matter.

15         Mr. Dellasega has done a pretty thorough job of

16         asking you questions in the various areas, but I'm just

17         going to pinpoint a few, and I promise I won't take as

18         much time, okay?  Thanks.

19         You testified a few moments ago that in the office

20         there was a suspicion of a relationship between

21         Ms. Varner and Mr. Graham.  Do you remember those

22         questions by Mr. Dellasega?

23   A.    Yes.

24   Q    Were those suspicions shared by women in the office as

25         well?

1   A.   I don't remember hearing conversations.

2   Q   Anything that you may have heard through the rumor mill?

3   A.   Not from a female, no.

4   Q   So you wouldn't know if Kerry Houser was familiar with

5       the suspicion of a relationship between the two of them?

6   A.   Only what she would have witnessed with her own eyes.

7   Q   Okay.  But you're not aware of yourself whether --

8   A.   Kerry and I didn't speak to each other for quite a

9       period of time, so.

10   Q   Why is that?  If you don't mind me asking.

11   A.   There was some resentment on my part for what took place

12       a long time ago, between myself, we touched on it, with

13       Mr. Osenkarski.  I felt that that was entered into,

14       didn't need to be.  As a matter of fact, Kerry promised

15       me in a probation function party, if you will, that she

16       wasn't going to pursue that, whatever it was that took

17       place, when, in fact, that's not what happened.  As a

18       matter of fact, her husband at the time who was a very

19       good friend of mine was her attorney as well.  And so

20       it's something that still to this day is very

21       uncomfortable, unfortunately.

22   Q   I'm sorry this is an uncomfortable subject.  Did

23       Ms. Houser share with you why she wasn't going to pursue

24       anything based on the comment?

25   A.   Because she was fearful of what might happen to me.

| | | |
|---|---|---|
| 1 | Q | What could happen to you? |
| 2 | A. | I wasn't going to be harmed or anything like that. |
| 3 | Q | How about Debra Green, do you know if Debra Green had |
| 4 | | any suspicions of Ms. Varner and Mr. Graham's |
| 5 | | relationship? |
| 6 | A. | Not that we discussed. |
| 7 | Q | What's your relationship with Ms. Green? |
| 8 | A. | Very good. |
| 9 | Q | You testified a moment ago also about the situation with |
| 10 | | Kerry Houser and the complaint in 1993.  Going back to |
| 11 | | that moment for a moment, was Ms. Varner employed with |
| 12 | | the Department at that time? |
| 13 | A. | No. |
| 14 | Q | Do you have any idea where she could have possibly heard |
| 15 | | about such an event? |
| 16 | A. | Well, I can only assume.  Kerry was a Children and Youth |
| 17 | | worker at one time, but I don't know that they were -- |
| 18 | | Children and Youth workers at the same time, and they |
| 19 | | may have had a friendship even at that time.  But I |
| 20 | | don't recall.  And many of us had relationships, working |
| 21 | | and friendly, and I dated a co-worker of Barb's at that |
| 22 | | time.  So there was great commingling, if you will. |
| 23 | Q | Okay.  Would you say that Kerry Houser's relationship |
| 24 | | with Ms. Varner is a close one, even today? |
| 25 | A. | I think so. |

1    Q    Okay.  How about her relationship with Debra Green?

2    A.    As well.

3    Q    And that goes outside the workplace for both of those

4         individuals?

5    A.    I don't know.

6    Q    You spoke about Thomas Boyer's conversations with you

7         about the seniority system and you said he -- you

8         described it as conversations ad nauseam.

9              Can you, as much as it may be nauseating, can you

10        describe what you meant by that?

11   A.    I think you'll all find out at some point, but he will

12        probably talk to you for several days about it.  And

13        that's just the nature of Tom Boyer.

14   Q    Okay.  Did he, for example, ask you and other Juvenile

15        probation officers your opinion about the process?  I

16        mean, what would be the ad nauseam part of it besides

17        him being --

18   A.    The fact that he probably talked to me three days a week

19        about it for the last seven years.

20   Q    Why did he do that?

21   A.    That's just his nature and his personality.

22   Q    During the time of the split when there was a change of

23        the seniority system, did Mr. Boyer ask you your

24        personal opinion of the possible changes that will give

25        you, or give you scenarios as to what, how you thought

```
 1          things should be in the seniority system?
 2     A.   Not to that detail.  Only again, what he would present
 3          as this supposed new hierarchy dates of hire.
 4     Q    Okay.
 5     A.   There was no breakdown of what the structure would be
 6          like.
 7     Q    Do you know if he asked other probation officers --
 8     A.   Oh, sure.
 9     Q    -- their opinion?
10     A.   I'm sure.
11     Q    Did he ask Ms. Varner her opinion about the change?
12     A.   I'm sure -- well, I don't know.  I don't know what his
13          relationship is with Ms. Varner.
14     Q    Sure.  Do you know what the consensus of the office was
15          in terms of the change?  Did they like the change or did
16          they dislike the change?
17     A.   It depended on whether or not you had previous
18          employment as a county employee in another department,
19          so that that may have changed from one person to the
20          next.
21     Q    What's your opinion of Mr. Osenkarski?
22     A.   I have no problems with Mr. Osenkarski.
23     Q    How about Mr. Graham?
24     A.   It was very friendly at one time.  Unfortunately, I
25          don't know, not -- we don't have contact.  This is maybe
```

1      the sixth time I've seen him in several years.

2   Q   Okay.  How about Ms. Varner?

3   A.  We're friendly.

4   Q   Are you friendly in the office currently?

5   A.  Yeah.  I have resentment towards what took place.  I

6       didn't think that this was personal towards me as far as

7       this seniority issue, I may have just been the person

8       who was at that spot on our seniority line, but

9       naturally I felt some resentment and carried that.  But

10      I'm over it.

11  Q   You felt some resentment for Ms. Varner during that

12      process?

13  A.  Sure.

14  Q   Now that you both have been promoted or when you both

15      were promoted the same day, did the resentment by

16      Ms. Varner towards you leave at that point?

17          MS. WALLET:  I'm sorry, I don't believe he said

18      Ms. Varner had resentment toward him.

19          THE WITNESS:  I didn't feel there was resentment.

20      I perceived it as possibly being personal; however, she

21      had never done anything to me that would give any merit

22      to my thought.

23  BY MR. ADAMS:

24  Q   Just for clarification, Ms. Varner possibly could have

25      had some resentment towards you because of you maybe

1        being promoted before her?  Is that a feeling that you

2        were describing?

3  A.    No.  I just thought that this issue was sort of a

4        no-brainer with myself being employed as a probation

5        officer for five years more than her, with the old

6        system, that I couldn't see questioning that.  I don't

7        know what's in question.  However, she has her own

8        opinion and she's been a caseworker actually longer than

9        I've been a probation officer, so that's her argument.

10  Q    Okay.  Have you ever --

11  A.    And if I may also, I don't believe she had her

12       bachelor's degree until after I became a probation

13       officer, which is a prerequisite for earning the

14       position of probation officer.  Now, my example of the

15       maintenance worker is a little -- stretches it, but I

16       mean, I think you can understand what my opinion is.

17  Q    I appreciate that, thank you.

18       Did you ever observe in the Probation, in the

19       Juvenile Probation Department, staff members meeting

20       with Mr. Osenkarski for issues of any sort?  That's kind

21       of a broad question.

22  A.    Sure.

23  Q    Did you ever approach, you yourself, approach

24       Mr. Osenkarski about problems you may have had in the

25       workplace or personal?

1   A.   Never.  Well, prior to unfortunately what took place

2         between he and I in '93, I don't think he and I have had

3         any discussions like that since then.

4   Q    Have you ever observed anyone approaching Mr. Graham for

5         issues or problems of any sort while in the Juvenile

6         Probation Department?

7   A.   Sure.

8   Q    How would you describe Ms. Varner, I guess her demeanor

9         while at work?

10  A.   It's appropriate.

11  Q    Would you describe Ms. Varner as a passive person or an

12        aggressive person?

13  A.   Neither.

14  Q    Somewhere in the middle?

15  A.   Sure.

16  Q    Would you say she was assertive?

17  A.   Are you asking me her job performance?  I don't know

18        that.

19  Q    Whatever observations you would have come -- whatever

20        you would have observed while in the workplace.

21           If there was a need to do something, was she

22        assertive in doing --

23  A.   I think she would make herself available, yes.

24  Q    From your understanding, who were Ms. Varner's

25        supervisors while in the Juvenile Probation Department?

```
1   A.   Joe or Gary.

2   Q    Did you ever observe --

3   A.   And Mr. Boyer.  Are we talking presently or just --

4   Q    At all, on any occasion.

5   A.   Well, Mr. Miller, and Mr. Thielemann.

6   Q    Feelman?

7   A.   Thielemann.

8   Q    Fieldman?

9   A.   T-H-I-E-L-E-M-A-N.

10  Q    Did you ever observe Ms. Varner approach Mr. Thielemann

11       about any work-related issues?

12  A.   No.

13  Q    How about Mr. Miller?

14  A.   I'm not aware of that.

15  Q    How about Mr. Boyer?

16  A.   Seen her approach him?

17  Q    Sure.

18  A.   No.

19  Q    Okay.  And more importantly, have you ever seen her

20       approach Gary Graham about a work issue?

21  A.   No.

22  Q    How about Mr. Osenkarski?

23  A.   I don't recall, no.

24  Q    How about approaching Mr. Graham or Mr. Osenkarski about

25       a personal issue?
```

```
 1    A.    Not to my recollection.

 2    Q     Mr. Osenkarski didn't discourage persons from

 3          approaching him, did he?

 4    A.    Never.

 5    Q     Would you say Mr. Osenkarski had an open door for issues

 6          that may have come up by his employees?

 7    A.    Absolutely.

 8               MR. ADAMS:  That's all the questions I have.  Thank

 9          you.

10    BY MS. WILLIAMS:

11    Q     Mr. Brandt, I'm Taylor Williams from the Supreme Court

12          of Pennsylvania AOPC.  I'm representing the Commonwealth

13          of Pennsylvania Ninth Judicial District Court of Common

14          Pleas of Cumberland County.  The same ground rules that

15          Mr. Dellasega spoke to you about still apply in our

16          conversation, if you would.

17               You described a meeting that you had with Judge

18          Hoffer?

19    A.    Yes.

20    Q     Did you keep any notes regarding that meeting?

21    A.    Never.

22    Q     Or make any contemporaneous --

23    A.    No.

24    Q     -- notes on a calendar?

25    A.    I'm a horrible note taker, so no, I can emphatically say
```

1            no.

2    Q    Do you remember the exact date of that meeting?

3    A.   I could get it, because as I -- I can remember the

4            juvenile who -- well, maybe his file's destroyed now.

5            But I remember the juvenile and the purpose of the

6            hearing, so that wouldn't be very difficult to figure

7            out.

8    Q    Would you get that date and report back to me on that?

9    A.   If it's a must.

10   Q    Yes, I would appreciate that.  Thank you.

11           Did Judge Hoffer explain to you why he was asking

12           the questions he asked you?

13   A.   No.

14   Q    You mentioned that you had a personal relationship with

15           Judge Hoffer.  Can you describe the nature of that

16           relationship?

17   A.   Only that he and I have -- I mean, we don't call each

18           other on the phone or anything like that.  But he and I

19           have always been friendly, I would say more so than some

20           others, only because I'm a social person, Judge Hoffer

21           is a social person, for many years, I see him out in

22           social settings.  He and myself are both avid golfers,

23           so we see each other frequently there as well and have

24           some friendly competition in local tournaments, if you

25           will.

```
1              So I mean, from that sense, that's the

2         relationship.  And many people for some reason struggle

3         with Judge Hoffer, and I just -- I find him to be very

4         approachable and personable with me personally.

5    Q    Did you know Judge Hoffer prior to your employment at

6         the Probation office?

7    A.   Never.

8    Q    Did you ever talk with Judge Sheely about Gary Graham?

9    A.   Never.

10   Q    Did you ever talk to Judge Sheely about Ms. Barbara

11        Varner?

12   A.   Never.

13   Q    Did you ever have a conversation with an EEOC

14        investigator related to this matter?

15   A.   Possibly.  Maybe.

16   Q    You're saying maybe.  Do you remember?

17   A.   No.

18   Q    Any particular conversation with an EEOC investigator?

19   A.   The only thing I remember is meeting with an attorney

20        downstairs many years ago.  I don't really recall

21        anything other than that.

22   Q    You don't recall getting a phone call from any EEOC

23        investigator?

24   A.   I don't think so.

25   Q    Did you ever talk to Judge Sheely regarding the
```

```
 1          seniority policy?

 2     A.   Never.

 3     Q    Did you ever talk to Judge Hoffer regarding the

 4          seniority policy --

 5     A.   Never.

 6     Q    -- in the Probation Department?

 7               MS. WILLIAMS:  That's all I have.  Thank you,

 8          Mr. Brandt.

 9               MS. BLANCHARD:  No questions.

10     BY MS. WALLET:

11     Q    I am Debra Wallet, I represent Barbara Varner.  I do

12          have a number of questions for you.  Would you like to

13          take a break?

14     A.   No.

15     Q    All right.  I would not mind taking a break, if that

16          would be acceptable to you.  Do you mind taking a

17          10-minute break?

18     A.   Go ahead.

19               (Recess taken from 10:41 until 10:56 a.m.)

20     BY MS. WALLET:

21     Q    Mr. Brandt, before we took the break I introduced

22          myself.  My name is Debra Wallet.  I'm here representing

23          Barbara Varner in the litigation.  Unfortunately, I do

24          have to require you to go back to some ancient history.

25               Did you hear the comment, sir, about the cunt club
```

```
 1          back in 1993?

 2    A.    Yes.

 3    Q     What did you hear?

 4    A.    Exactly what was taking place was I asked Mr. Osenkarski

 5          about an application process.  It was at the time the

 6          hire of a young lady at the time who was named Nicole

 7          Herick, who is now Nicole Galbraith.  I inquired as to

 8          what type of person she was.  And Joe said that she was

 9          a nice young girl, then that she would not become a

10          member or a part of the cunt club.

11    Q     And what did you understand that reference, the cunt

12          club, to be?

13    A.    A group of -- maybe not a group, maybe only a pair of

14          people consisting of Kerry, I don't know what her last

15          name was at the time, and Julie Staver, someone who is

16          no longer employed with us as well.

17    Q     Were they the only two female probation officers at that

18          time?

19    A.    That would be my perception.  I don't know if we had a

20          list of who the cunt club was.

21    Q     Now, you told this to someone else, correct?

22    A.    I told it to Julie Staver, who was a personal friend of

23          mine at the time.

24    Q     And what, if anything, did Julie do?

25    A.    I imagine she said something to Kerry.
```

1    Q    And did Kerry ask you whether you had heard this?

2    A.    I'm sure we did.  We shared an office at the time.

3    Q    At any time after Kerry Houser made her complaint

4         regarding this comment about the cunt club, did someone

5         come to you and ask you whether you had heard it?

6    A.    Ken Bolze.

7    Q    Did Mr. Bolze tell you why he was asking you about this

8         incident?

9    A.    He headed the so-called investigation, I believe.

10   Q    Did you give a written statement at that time?

11   A.    I may have, but I don't recall.

12   Q    And I take it you didn't deny that you had heard this?

13   A.    Correct.

14   Q    Now, you said that you thought initially that Ms. Houser

15        was not going to make a complaint?

16   A.    That's what she and her husband told me.

17   Q    Did she tell you why she initially was not going to make

18        a complaint?

19   A.    That she didn't want to put me through whatever -- I

20        think it was something to that extent.  And that may not

21        even be completely accurate any longer.  Or it could

22        have been her husband.  As I mentioned, he is to this

23        day one of my closest friends, her ex-husband.

24   Q    Okay.  In any event, you later learned that the

25        complaint had been made?

```
 1   A.   Yes.

 2   Q    And Mr. Bolze came to you and asked you about the

 3        incident?

 4   A.   I believe.  I believe he was the person.

 5   Q    Do you recall whether anyone else asked you about the

 6        incident?

 7   A.   Asked me if it took place?

 8   Q    Yes, sir.

 9   A.   I think by that time it had become scuttlebutt, but I

10        don't recall anyone asking me.  I knew that it, its

11        event had leaked out and probably become a hot topic

12        within the Department, but I don't recall anyone

13        officially asking me.

14   Q    Had you heard this term cunt club before?

15   A.   I don't recall.

16   Q    Have you heard it since?

17   A.   Well, yeah.  I've lived it for the last 10 years.

18   Q    And what do you mean by that, sir?

19   A.   Well, I mean, it happened.

20   Q    Did Joe ever speak to you, Joe Osenkarski, about this

21        incident after Ms. Houser made the complaint?

22   A.   One time.

23   Q    What did he say to you?

24   A.   I think he asked me that he wanted to make sure that he

25        got my version of this accurate, and that he was denying
```

```
 1            that this had happened.  And he had -- I believe he told
 2            me -- he called me in the evening and he may have said
 3            something to the effect that -- I knew that he had been
 4            calling other employees to talk to them about what took
 5            place, because I have many friends within the Department
 6            who told me that Joe had called them.  Who exactly, I
 7            don't recall.  So I didn't know if I was expecting a
 8            phone call and it did come, or if it was by surprise,
 9            but I had knowledge that he had spoken with others.  And
10            the reason for such calls were that he was speaking to
11            them and getting their understanding of what their
12            knowledge was and whether it happened or whether anyone
13            heard him say that.  And as I said, he eventually called
14            me and the basis of it was he wanted to find out for
15            sure whether or not -- what I was going to be telling
16            happened.
17     Q      Did he suggest to you that you be anything other than
18            truthful?
19     A.     He called me a liar.
20     Q      Had your relationship with Mr. Osenkarski prior to this
21            incident been good?
22     A.     Fantastic.
23     Q      After this incident, did it change?
24     A.     Yes.
25     Q      How did it change?
```

```
 1    A.    We have little conversation.  We get by the day

 2          professionally.

 3    Q     Do you respect Mr. Osenkarski as your supplier?

 4    A.    Not as a result of what took place then.  He's done

 5          nothing else to me since this event.  It's just this

 6          whatever has come to rest.

 7    Q     Did you believe that Mr. Osenkarski changed the nature

 8          of the assignments that you were given?

 9    A.    It was my perception, yes.

10    Q     And you believed that it was because of your telling

11          what he had said concerning the cunt club?

12    A.    The timing of it would have made it too much of a

13          coincidence.

14    Q     Now, you said that there were some in the favored group

15          and some in the not-so-favored group.

16    A.    Correct.

17    Q     I believe you identified that primarily as the senior,

18          more senior people versus the less senior people.

19    A.    I did not describe them as favored or not favored.  Yes,

20          senior and less senior.

21    Q     All right.  Do you agree that there were individuals who

22          appeared to be favored with regard to assignments?

23    A.    Only in comparison to what I was receiving as

24          assignments.  And the reason for that is because they

25          held a position within the Department that was
```

```
 1          supposedly only intensive probation supervision, meaning
 2          those children who proved to be the most difficult and
 3          most time-consuming from our point of view.
 4               At the time, I was maintaining a caseload of
 5          additionally about 40 to 60 adults and 20-some-odd
 6          juveniles.  My perception was that my juveniles in
 7          addition to all the adults I had to worry about, were
 8          far worse than any that the two intensive officers were
 9          receiving during a period of time.  Could I prove that?
10          No.
11     Q    Did you express the opinion that you believed you had
12          been retaliated against because you had reported this
13          statement?
14               MR. ADAMS:  Objection to form.  Retaliation, it's
15          not appropriate.
16     BY MS. WALLET:
17     Q    Did you believe that the attitude toward you had
18          changed as a result of this, and did you report that to
19          any of your co-workers?
20     A.   Did it change?  Yes.  Did I report it?  No.
21     Q    Did you complain to any of your co-workers, for example,
22          Ms. Houser, that you believed that as a result of this,
23          something had happened differently to you?
24     A.   I don't -- I mean, did I complain to any one person?  I
25          don't recall.
```

1    Q    Did you complain to anyone?

2    A.   I think I complained probably every day for a period of

3         a couple years, that running around in the type of work

4         I was doing.  I can't recall exactly what I said to any

5         one person.

6    Q    Now, at that time, back in 1992, '93, was Joe Osenkarski

7         in the office regularly during the day?

8    A.   I believe so.

9    Q    When he was out either for vacations or some business

10        reason, who took his place?

11   A.   Mr. Graham.

12   Q    Do you know whether Mr. Graham had any responsibility

13        with regard to the assignment of cases?

14   A.   Absolutely.

15   Q    You said that you believed Mr. Osenkarski may have

16        changed the kind of cases assigned to you as a result of

17        your reporting the cunt club incident.

18            Do you have any reason to believe Mr. Graham was

19        involved in those assignments?

20   A.   No.

21   Q    Did your perception of Mr. Graham's attitude toward you

22        change?

23   A.   No.

24   Q    After the cunt club incident.

25   A.   Correct.  No.

1    Q    Do you recall anyone who told you that Mr. Osenkarski

2         had called them about the cunt club incident?

3    A.   I can't recall a name, but I know that he had called

4         others.  It's a pretty small office so there's slim

5         pickings here.

6    Q    And those persons told you that Mr. Osenkarski had

7         called them?

8    A.   I believe so.

9    Q    Do you have any recollection as to who told you that

10        they had received a call from Mr. Osenkarski?

11   A.   I know Darby Christlieb did, but I don't recall anyone

12        else at the time.

13   Q    And what did Mr. Christlieb tell you Mr. Osenkarski

14        discussed with him?

15   A.   I don't recall the details.  Just the fact that he had

16        called him.

17   Q    Mr. Brandt, you were called into the judge's chambers by

18        Judge Hoffer on a particular day and you're going to

19        provide to us that day.  You said that the conversation

20        lasted more than an hour?

21   A.   I think it did.  It was a lengthy conversation.  Don't

22        hold me to the exact time, but we spoke for -- we spoke

23        for a while.

24   Q    Okay.  And to the best of your recollection, he did not

25        mention that this was a result of the Barbara Varner-

1       Gary Graham situation?

2  A.   I think I had to assume that it was the tool that

3       brought it to that level.  But I, again, I specifically

4       don't recall he and I discussing Barb and Gary.

5  Q   And had you had what you've described today as a

6       somewhat personal relationship with him as a result of

7       golf?

8  A.   Maybe I should rephrase personal because that's been

9       taken out of context.  I would say a friendly work

10      relationship.

11  Q   Okay.

12  A.   Okay?  That has on occasion been in the same place

13      outside of this building at the same time and we are

14      also friendly there.  And he has a very friendly

15      relationship with my wife, who is a former employee of

16      this building, who my perception was he loved dearly.

17      So maybe because of that relationship I rode her coat

18      tails, I don't know.

19  Q   Okay.  In any event, Judge Hoffer you believe trusted

20      your opinion about what was going on in the office?

21  A.   I believe he did.

22  Q   And he was interested in hearing your opinion about how

23      things were operating in the Probation office at that

24      time?

25  A.   Yes.

```
1   Q    Now, he asked you specifically about how Mr. Osenkarski
2        ran the office.
3   A.   Yes.
4   Q    What did you tell him?
5   A.   I don't recall exactly what we -- what my answer was.
6   Q    Did you indicate to Judge Hoffer that you had lost some
7        respect for Mr. Osenkarski as a supervisor?
8   A.   As I stated earlier, as a result of something different,
9        I had lost respect.  But did I say it to Judge Hoffer?
10       That I don't remember.
11  Q    I did not understand what you just said.
12  A.   I don't remember if I told him I lost respect for Joe.
13  Q    Okay.  Were you critical of Mr. Osenkarski in your
14       conversation with Judge Hoffer?
15  A.   I don't think he, and knowing Judge Hoffer, cared about
16       opinions.  He was looking for firsthand information.
17       So, I don't recall him asking my deepest darkest
18       thoughts.  I think he was asking what do you see with
19       your own eyes.
20  Q    All right.  Do you recall what facts you reported --
21  A.   No.
22  Q    -- to Judge Hoffer at that time?
23  A.   It would have been strictly information on the hierarchy
24       and whose performance, who does what, who's responsible
25       for what, and how does the chain of command flow down
```

1   through your own department.

2 Q Okay.  Now, you said that you initially refused to

3   answer his questions.

4 A. Sure.

5 Q Why did you initially refuse?

6 A. Because I didn't want to sit here.  I knew this was

7   coming.

8 Q And when you say sit here, you didn't want to be

9   involved in some litigation?

10 A. Correct.

11 Q That was your initial reaction.  Did that change during

12   the course of the conversation with Judge Hoffer?

13 A. When he told me that I wouldn't have to worry about

14   repeating any of this again.

15 Q And so then you were forthcoming with him?

16 A. Yes.

17 Q Isn't this a situation where he was asking you specific

18   questions and you would respond to those questions?  Or

19   did he --

20 A. Just like this.

21 Q Open-ended question?

22 A. He deals with me like an attorney at all times, so it's

23   always as if I was on the stand.

24 Q So he would pepper you with specific questions?

25 A. Yes.

1   Q   Now, by that point in time, and you think this could

2       have been '97, '98, do you know whether he was president

3       judge at the time of this conversation?

4   A.  I have to think yes.  Well, he had to have been because

5       Judge Sheely was Juvenile judge.

6   Q   Okay.

7   A.  And he had retired and Hoffer had become Juvenile judge

8       then.

9   Q   All right.  And if I were to tell you that the change

10      between Judge Sheely and Judge Hoffer occurred at the

11      beginning of the year of 1998, would you believe that to

12      be correct?

13  A.  That could be.

14  Q   All right.  So you think this conversation was sometime

15      after the beginning of the year of 1998?

16  A.  Bear with me.  I don't know.

17  Q   Okay, fine.  By that point in time was Mr. Osenkarski

18      spending a full day in the office?

19  A.  Define full day.

20  Q   Well, let me ask more directly.  Did you observe in or

21      around 1996, '97, '98, that Mr. Osenkarski was not

22      spending as much time in the office?

23  A.  As a rule I know that Joe comes into the office late in

24      the morning.  What he does after I leave here at 4:30, I

25      can't answer to.  I know that when I was a much more

```
 1          dedicated employee, that I would see him numerous
 2          occasions in the evening hours here, if I would be here.
 3          So a full day, again, may have been something that
 4          started much later in the day than my full day had
 5          become.  So I don't -- would he come in later in the day
 6          than I did?  Yes.
 7    Q     Okay.  And did you discuss that issue with Judge Hoffer?
 8    A.    Possibly.
 9    Q     Did you think it was strange the hours that
10          Mr. Osenkarski put in as a supervisor?
11               MR. THOMAS:  Objection to form.
12    BY MS. WALLET:
13    Q     You may answer.
14    A.    Strange?  Not normal.
15    Q     You thought it was not normal?
16    A.    I would think the Department head would be there when
17          his employees are there for the most part.  I mean, I
18          know there's exceptions, but that's not my -- I've never
19          walked a mile in his shoes, so I don't know that.
20    Q     Okay.  In any event, you don't recall that that was a
21          specific topic with Judge Hoffer?
22    A.    It very well could have been, but I don't recall that.
23    Q     Did Judge Hoffer ask you any specific questions about
24          the relationship between Mr. Osenkarski and Mr. Graham?
25    A.    I don't recall if he did.
```

1    Q    Do you remember anything today about that meeting with

2         Judge Hoffer, specifically the subjects that were

3         covered?

4    A.   Again, responsibilities of certain people.

5    Q    When you say responsibilities, can you be more specific?

6    A.   What does each supervisor in our chain of command do

7         between 8:00 and 4:30, what are his functions and

8         responsibilities.

9    Q    Okay.  Do you remember any other topics of conversation

10        during that meeting with Judge Hoffer?

11   A.   No.

12   Q    You made a decision to remain on the Juvenile Probation

13        side after the split.  Why was that, sir?

14   A.   I enjoy -- well, I prefer working with a juvenile than

15        an adult.

16   Q    Was it your choice --

17   A.   Absolutely.

18   Q    -- whether or not to stay or go?

19   A.   Absolutely.

20   Q    Were you given any promises to stay in Juvenile?

21   A.   No.

22   Q    As a result of your staying in Juvenile, did you report

23        to someone other than Mr. Osenkarski?

24   A.   I don't recall at what point Mr. Graham became my

25        supervisor versus Mr. Osenkarski, but it was in that

```
 1        time frame.
 2             Mr. Osenkarski as our chief has little to zero
 3        effect on what I do between 8:00 and 4:30, and it
 4        remains that way there today.  So I'm assuming that
 5        around that time frame all questions went to Mr. Graham.
 6        Or even Mr. -- I don't know what time Mr. Boyer became a
 7        supervisor, but it was roughly within the year,
 8        thereabouts.  I'm not sure.
 9   Q    Okay.  Run through with me the supervisory chain.
10        Initially you reported directly to Mr. Osenkarski when
11        you were an intern?
12   A    He was the Juvenile supervisor at the time.  I also had
13        interaction with the chief, who was Ken Bolze at that
14        time.  And he would have been chief over all operations.
15        Joe specifically was supervisor of the Juvenile
16        operations.  And underneath him at that time dating back
17        would have been Gary as a PO-II with supervisory
18        responsibilities.
19   Q    Over you?
20   A    Over any Juvenile matter.
21   Q    Okay.  And did Mr. Graham remain your supervisor until
22        the split?
23   A    Well, Mr. Osenkarski -- I apologize if it's confusing --
24        he was my supervisor I believe until the split or the
25        leaving of Chief Bolze, at which point Gary became my
```

1          supervisor.

2    Q     Okay.  And was Mr. Graham your supervisor until

3          Mr. Graham left to go to the institution?

4    A.    Yes.

5    Q     And then after Mr. Graham left, who became your

6          supervisor?

7    A.    Well, we -- not we, they itemized responsibilities

8          administratively and changed some things drastically

9          from the way we used to operate.  And Mr. Boyer had

10         taken over as a supervisor of certain functions.  At

11         some point shortly thereafter, Mr. Thielemann became a

12         supervisor of certain functions.  And most recently,

13         Mr. Miller has become.

14   Q     So currently Mr. Miller is your supervisor?

15   A.    He's actually my, yes, immediate supervisor.

16   Q     He does your performance evaluations and such?

17   A.    Yes.

18   Q     Now, you said that, and let's talk about the time, oh,

19         let's say between 1993 and the split, let's focus on

20         that time until we change the time frame.  Are we clear

21         on that?

22   A.    Um-hum.

23   Q     Okay.  During that period of time, do you know how many

24         female probation officers there were?

25   A.    We were a combined office then.

1   Q   Yes.

2   A.   Well, I'll have to name them out loud, it's the only

3        way. Betsy Baker. Kerry Gorman Smith Houser Vohs, I'm

4        not sure what her last name was at the time. Nicole.

5   Q   Galbraith?

6   A.   Well, she was Herick at the time. Julie Staver left in

7        '93 or '94. Debra Graef left -- no, I'm sorry she left

8        in '92. And I apologize to anyone that I'm forgetting,

9        but I don't recall anyone else.

10   Q   Mr. Brandt, did you believe that the assignments that

11        were given to Ms. Houser were less favorable after she

12        made her complaint regarding the cunt club?

13   A.   No, I don't, because she -- we didn't have a lot of

14        female Juvenile specific -- we didn't have any specific

15        female-only Juvenile probation officers. But as it only

16        makes sense for some reasons for a female to supervise a

17        female client, and you know, Kerry for a long period of

18        time handled some of our worst female juveniles, and

19        there weren't that many options for her to go to. You

20        don't want a male hand to hand with a young female

21        because of allegations. So you know, it just so happens

22        she was a -- because of the way things worked out, I

23        think for a long period of time she did handle our worst

24        kids, female kids.

25   Q   Okay. Did she ever complain to you she thought her

1       treatment was different after she made the complaint?

2  A.   No.

3  Q    Do you believe that the females were treated the same as

4       the male probation officers?  And I'm talking about the

5       same time frame up until the split.

6  A.   Yes.

7  Q    Did you see any difference in which the females were

8       treated as opposed to the male probation officers?

9  A.   The only difference in that you would rarely see a

10      female probation officer assigned a male of incredible

11      physical stature, for obvious reasons.  I don't recall

12      any of our female probation officers receiving

13      exceptionally large men that they might have to arrest

14      some day.  Other than that, no.

15  Q    Were there any rules about when commitment trips needed

16      to start?  Do you understand the question?

17  A.   The time of day?

18  Q    Yes.

19  A.   I guess it would depend on whether or not there was a

20      court proceeding the same day, or if the commitment was

21      on a day -- some day later than a court process.  It was

22      at the -- to easily answer it, it was always at the

23      discretion of the probation officer.  We were never

24      questioned because, I mean, it took up a great deal of

25      your time, so I mean, it had to fit your own schedule.

1   Q   All right.  So that when you had an assignment for

2       taking a juvenile to someplace for commitment, you would

3       use your professional judgment as to when you would

4       leave and when you would return?

5   A.  Sure.

6   Q   Did anyone ever tell you that you needed to start those

7       commitment trips only at eight o'clock in the morning?

8   A.  No, because I as a rule woke up very early in the

9       morning to do them, so I know that no one could have

10      told me not to.

11  Q   Were there times when you left for commitment trips

12      prior to 8:00 a.m.?

13  A.  All the time.

14  Q   Now, did you have an incident in a stairway with

15      Mr. Graham in which you and he had some discussion?

16  A.  No words were said.

17  Q   What happened?

18  A.  I don't recall the date.  It was within the last two

19      years.  I was walking down a staircase within the

20      building here.  Simultaneously, Gary had come out of a

21      door a half a staircase above me.  As he came down and I

22      was walking up, when he went to turn the staircase, he

23      struck with his hand the metal railing hard enough that

24      I thought he may have hurt his hand but he must have hit

25      it with a ring because it created a very loud noise.

```
 1           And I just perceived that to be Gary's disinterest -- or

 2           not disinterest, but being upset with me.

 3      Q    Do you believe this was a deliberate act directed at

 4           you?

 5      A.   I don't think he tripped.

 6      Q    Do you believe it was a deliberate act directed at you?

 7      A.   Yes.

 8      Q    And why do you think he took that action?

 9      A.   Out of frustration.

10      Q    Did you take it to be threatening?

11      A.   I'm not afraid.

12      Q    Did you believe Mr. Graham intended it to be threatening

13           to you?

14              MR. ADAMS:  Objection.

15              MS. BLANCHARD:  Objection.

16              MR. ADAMS:  Requires speculation.

17  BY MS. WALLET:

18      Q    You may answer.

19      A.   Possibly.

20      Q    Why do you think Mr. Graham did this?

21      A.   Frustration.

22              MS. BLANCHARD:  Objection.

23  BY MS. WALLET:

24      Q    Was he frustrated at you?

25      A.   I think Gary perceives me as being a portion of or a
```

```
 1        part of or a percentage of where he is at the current
 2        time.
 3   Q    And that meaning?
 4   A.   Where his place of employment is.
 5   Q    Do you know whether Mr. Graham knew that you had had
 6        this conversation with Judge Hoffer about what happened
 7        in the office?
 8   A.   I had only heard rumors that his perception was that I
 9        willingly went to Hoffer to offer opinions or what have
10        you about him.  But again, that got to me through
11        rumors.  He had never said that to me.
12   Q    Had you observed Mr. Graham to engage in conduct which
13        could be described as punishing?
14   A.   Not to me.
15   Q    Was it understood within the office that Mr. Graham
16        would reward or punish individuals depending upon his
17        perceived -- his perception of their loyalty to him?
18   A.   I never heard that.
19   Q    Did Mr. Graham ever make any other threatening gestures
20        to you?
21             MR. ADAMS:  Objection.  Has it been described as
22        threatening?  I don't think it's been characterized as
23        threatening.
24             MS. WALLET:  I'll withdraw that.
25   BY MS. WALLET:
```

1    Q    Did Mr. Graham ever engage in any other conduct such

2         as what you described in the stairwell that might be

3         threatening to you?

4              MR. ADAMS:  Objection again.  You may answer.

5              THE WITNESS:  On one occasion as employed as a

6         security officer at the Trinity High School, I knew that

7         his daughter was there for a dance, I believe it was a

8         dance.  And I had been working there doing security type

9         things for them for several years and have watched, I

10        can't remember the names of his daughters anymore, but I

11        know that one shows up for functions, not very often,

12        but I do see Gary occasionally.  And generally Gary or

13        his wife will come and pick them up after an event.

14             On that particular night I think Gary knew that I

15        was there, either that he saw me, I knew that -- he knew

16        I was there.  And he was one of the very last people --

17        I was in the parking lot.  I had left the school walking

18        out to my vehicle and sat in it.  And the parking lot

19        had cleared.  And Gary picked up his daughter and I

20        believe her date or a friend, and had people in the car.

21        And as he turned to depart the parking lot, he drove

22        within half of a car's length beside me, passing me.

23             I don't know if it was intended in a threatening

24        manner, but he could have exited the parking lot by many

25        hundreds of feet in any other direction, and he chose to

```
 1          drive right past my vehicle, I don't know, to show that

 2          he knew I was there or what.  But that's the only other

 3          incident.

 4     Q    Did you believe your safety at that time was threatened?

 5     A.   No.

 6     Q    Did you believe the act was deliberate?

 7     A.   Yes.

 8     Q    Why did you believe that act was undertaken by

 9          Mr. Graham at that time?

10              MR. THOMAS:  Objection.  Why did he believe

11          Mr. Graham believed?

12              MS. WALLET:  Yes.

13              MR. THOMAS:  You're asking him to speculate as to

14          Mr. Graham's state of mind?

15              MS. WALLET:  I am.

16              MR. THOMAS:  I'm going to object.

17              You can answer.

18     BY MS. WALLET:

19     Q    You may answer.

20     A.   Just so that I knew that he knew that he was there, if

21          you understand what I mean by that.

22     Q    You said that bad language was pretty customary in this

23          office.  Did you hear bad language from the female

24          probation officers?

25     A.   You mean in the form of a four-letter word?
```

1   Q      Yes, sir.

2   A.     Sure.

3   Q      Which female probation officers used the F word?

4   A.     Are we talking about repeating what someone else said?

5          Or just as a part of their normal vernacular?

6   Q      Let's take it separately.  There might be occasions when

7          a female probation officer would repeat what had been

8          said to her or in conversation with someone that was

9          being supervised, correct?

10  A.     Um-hum.

11  Q      Okay.  Were there other instances where female probation

12         officers used the F word directed at someone or in

13         conversation?

14  A.     I don't recall specifically.

15  Q      Did you ever hear Ms. Varner use the F word?

16  A.     No.

17  Q      You've known her for 10 or 12 years?

18  A.     13, almost.

19  Q      Okay.  Are you fairly familiar with her speech patterns?

20  A.     Yes.

21  Q      Does she use foul language?

22  A.     No.

23  Q      Can you think of any other female probation officers

24         that would have used the F word in some direct address?

25  A.     No.

1    Q    Was it used by the male probation officers?

2    A.   Yes.

3    Q    Was it used in front of the female probation officers?

4    A.   I'm sure it has on occasion.

5    Q    Are you familiar with the reputation of Mr. Graham

6         within the Adult Probation office?

7    A.   Reputation?

8    Q    What do the Adult probation officers think of

9         Mr. Graham?

10   A.   I only know that he has conversations with them about

11        this entire process and I think they are generally tired

12        of that, but other than that, I don't know.  No one

13        talks about him.  I think many of them, as the office

14        has evolved and changed, didn't even know about this

15        whole thing and probably are fairly clueless.

16   Q    Would you say that Mr. Graham has a reputation for being

17        an excitable individual?

18   A.   Yes.

19   Q    Does he have a reputation for being a violent

20        individual?

21   A.   Violent?

22   Q    Yes.

23   A.   No.

24   Q    Does he have a reputation for punishing individuals who

25        he perceives not to side with him?

1    A.    As far as assigning work?

2    Q    Punish in any sense.

3    A.    Not that I'm aware of.

4    Q    Are you concerned today about any retaliation against

5         you for participating in this deposition?

6              MR. ADAMS:  Objection to form.

7              THE WITNESS:  From who?

8    BY MS. WALLET:

9    Q    From anyone.

10   A.    No.

11   Q    Has any other probation officer expressed to you their

12        fear that there may be retaliation if they participate

13        in this litigation?

14             MR. ADAMS:  Again, I'm going to object to the word

15        retaliation.  It's a conclusive statement, it's not

16        appropriate.

17             But you may answer.

18             THE WITNESS:  I have heard numerous people say they

19        were fearful, but I don't know if it's retaliation.

20        Again, Mr. Osenkarski does not affect what I do between

21        8:00 and 4:30.  As the Department head he doesn't have

22        his hands in what I would refer to as probation work.

23   BY MS. WALLET:

24   Q    You feel that you've been insulated from him as far as

25        his ability to affect your work performance?

1          MR. ADAMS:  Objection.  That's not what he

2     described.

3          THE WITNESS:  As an administrator he has

4     responsibilities that are far separate to things I have

5     to worry about, and he doesn't have to worry about what

6     I do.  So his responsibilities and mine are far

7     different and doesn't have anything to do with what I do

8     between 8:00  and 4:30, so I don't believe that he can

9     affect me.

10  BY MS. WALLET:

11  Q    Who told you they might be fearful about participating

12       in this litigation?

13  A.   Debra Green.

14  Q    What did she tell you?

15  A.   She was afraid that Tom Boyer and Kathy Zeigler would

16       be -- would punish her as a part of becoming a part of

17       this.

18  Q    Did you think she had any reason to believe that this

19       might be the case?

20  A.   I think her perception is that they're very close with

21       Joe.

22  Q    Do you think that's accurate?

23  A.   I think it's a little worrisome, quite honestly.

24  Q    And why would you say it's a little worrisome?

25  A.   I don't perceive it to be a threat, if that's the word

1   we're using here, so I don't -- I think anyone else

2   looking at it from their own point of view shouldn't

3   also see it as a threat.

4 Q I guess my question, sir, is:  Do you think Ms. Green

5   has some reasonable basis to believe --

6 A. In her mind, I guess she does.  I think that there

7   are -- there's nothing to merit that.

8 Q Have you observed any times when Mr. Boyer has changed

9   his relationship with individuals because of a perceived

10   siding with Mr. Graham as opposed to siding with

11   Ms. Varner?

12    MR. THOMAS:  Objection to the form.

13    You may answer it if you understood it.

14    THE WITNESS:  I mean, because of specifically those

15   reasons?  I don't recall him changing his relationship

16   specifically because of this, these two individuals.

17 BY MS. WALLET:

18 Q For reasons maybe unrelated to this, has Mr. Boyer

19   changed his attitude toward individuals?

20 A. Yes.

21 Q In what way?

22 A. He's his own person.  He's very different.  I don't know

23   how his mind works.

24 Q Would you say that Mr. Boyer tends to be allied more

25   with Mr. Graham as opposed to Ms. Varner?

1   A.    No.

2   Q    The other way around?

3   A.    No.  Neither.  I'd say he was, is somewhere in the

4           middle of the fence.

5   Q    Sir, do you have any evidence of your own personal

6           knowledge that there was a sexual relationship between

7           Mr. Graham and Ms. Varner?

8   A.    I have no firsthand knowledge.

9   Q    Do you have any secondhand knowledge?

10   A.    Only in seeing them interact as very friendly and

11          pondering whether or not there's something more than a

12          work relationship.

13   Q    Did anybody ever tell you that they had seen Mr. Graham

14          and Ms. Varner engage in a personal relationship?

15   A.    No.

16   Q    Now, I believe you told us that you thought the women in

17          the office, the female probation officers generally

18          didn't think that there was an affair between Mr. Graham

19          and Ms. Varner.  Is that correct?

20          MR. ADAMS:  Objection.  That's not what he said.

21          He said he didn't know, I think.

22 BY MS. WALLET:

23   Q    Well, I believe you were asked whether the men in the

24          office thought that there was such an affair and I

25          thought you answered yes.  Did I misunderstand?

1   A.   I think a person of reasonable mind would have assumed

2         or thought or pondered for a half of a second as to the

3         likelihood.  But I don't recall people sitting around

4         and discussing it, men, discussing this relationship, if

5         it was something like that.

6   Q    Okay.  Do you remember the women doing that?

7   A.   No.

8   Q    Who was your office partner for some 13 years?

9   A.   Well, he hasn't been my office partner, but we have

10        partnered, if you will.  Darby Christlieb.

11   Q    Now, you said that you believed that you met with an

12        attorney but you did not know his name.  Someone who

13        asked you questions about --

14   A.   Yes.

15   Q    -- this litigation.

16   A.   Correct.

17   Q    If I were to suggest the name of David Deluce?

18   A.   That's it.

19   Q    Okay.  Do you believe that Mr. Deluce met with you on

20        more than one occasion, or just one?

21   A.   I know we had many conversations over the phone trying

22        to align the meeting.  I know we met at least once.  I

23        can't recall if it was more than that.

24   Q    Did you provide to him any kind of a written statement?

25   A.   I don't remember if I did.  I really don't think I did.

```
 1   Q    Okay.  And what kinds of things did Mr. Deluce ask you

 2        about this litigation?

 3   A.   I can't remember that.  I remember him and what he looks

 4        like, and that he wrote in red, but I don't recall any

 5        longer what he and I discussed.

 6   Q    Do you remember anything that he might have asked you?

 7             MR. THOMAS:  I'm going to interpose an objection.

 8        We continue to assert our objection to this as attorney

 9        work product or attorney-client material.  You're now

10        asking him specific information which he may have

11        rendered to counsel retained by the county, and I'm

12        going to object to that line of questioning and instruct

13        him not to answer.

14   BY MS. WALLET:

15   Q    Did Mr. Deluce give you any legal advice?

16   A.   Not that I -- I wish.  I don't recall.  I've been

17        waiting for my court-appointed counsel.

18   Q    Did Mr. Deluce ask you questions and you answer them?

19        Or did he ask you to tell him everything that you knew

20        about the situation?

21   A.   Our meeting wasn't long, so I'm sure he didn't ask me

22        opinions.  I don't think it was lengthy.  I think it was

23        a question-and-answer form.

24   Q    Did Mr. Deluce tell you why he wanted to talk to you

25        about this matter?
```

```
 1              MR. THOMAS:  Objection to the question.  Don't
 2          answer that.
 3    BY MS. WALLET:
 4    Q    Did Mr. Deluce at any time tell you that he was
 5          investigating something?
 6    A.    Again, I don't remember.
 7    Q    Do you remember anything more about your conversation
 8          with Mr. Deluce than what you've already told me?
 9    A.    He had dark hair.
10    Q    Did you hear a rumor that Mr. Graham was going to be
11          fired?
12    A.    As a result of this entire process?
13    Q    For any reason.
14    A.    Sure.
15    Q    Do you recall when you heard that rumor?
16    A.    No.  To a specific day?  No.  But has the entire office
17          sat around and fantasized or theorized about the outcome
18          of this on a zillion occasions, with that being one of
19          the possible outcomes?  Yes.
20    Q    Did Mr. Osenkarski ever say to you or say that you had
21          overheard that Mr. Graham might be fired?
22    A.    Never.
23    Q    Did you have any discussions with Mr. Osenkarski about
24          the allegations that Ms. Varner brought against
25          Mr. Graham?
```

```
 1    A.    Never.

 2    Q     Did you have any specific conversations with Mr. Graham

 3          about the allegations that Ms. Varner brought against

 4          him?

 5    A.    Never.

 6    Q     Did you ever hear any other comments in the office that

 7          were demeaning toward the other female probation

 8          officers?

 9    A.    Other than the cunt club?

10    Q     Yes, sir.

11    A.    No.

12    Q     Did you ever hear Mr. Boyer make any comments about

13          women getting further on their knees?

14    A.    No.

15    Q     You said you did have some conversations with Mr. Graham

16          about some, I think you described it as flings that he

17          had before his marriage.  Is that correct?

18    A.    Correct.

19    Q     What do you remember about that, sir?

20    A.    I don't recall details, but I recall him speaking about

21          someone that he had dated.  I don't even know what age

22          he would have been, but I mean, the details of what took

23          place I don't recall.

24    Q     Did he indicate that he had had a sexual relationship

25          with these people?
```

1   A.   I'm assuming so.  That's what the discussion was.

2   Q    Did you ever hear him say that a woman had appeared at

3        his door wearing a coat and nothing more?

4   A.   Yes, I've heard that.  I don't recall if Gary told me

5        that.

6   Q    What do you remember about that?

7   A.   You saying it, I certainly remember that.

8   Q    Now, under the, what I'll call the Sheely position, did

9        you see seniority lists that were posted that listed the

10       probation officers based on their seniority rank?

11  A.   What I saw was a list of probation officers simply

12       categorizing them by their date of hire and as a

13       reference, so.  But I mean, it wasn't headed as our

14       current seniority list.

15  Q    Okay.

16  A.   But I have seen a list like that with dates of hire on

17       them for the purposes of everyone must drive our county

18       vehicles, we have to have their drivers' licenses and

19       all that and insured and such.  I mean, I've seen lists

20       for those reasons, but not because it was a seniority

21       list.

22  Q    Okay.  And on those lists, what date of hire was listed

23       for you?

24  A.   Generally speaking, my anniversary and my check, because

25       I guess that's the most significant thing here, comes in

```
 1          October of '90 -- yes, October of '90 being the start.
 2     Q    Did you ever see any lists that ranked the probation
 3          officers in order of seniority?
 4     A.   No.
 5     Q    In your experience has anyone ever received a promotion
 6          within the Probation office other than on the basis of
 7          seniority and other than the one you described where the
 8          most senior turned the job down?
 9     A.   I haven't seen it happen yet.
10     Q    So based on your experience, the only time anyone ever
11          got promoted was when they were the most senior?
12     A.   Correct.
13             MS. WALLET:  Mr. Brandt, thank you very much for
14          your time.  That's all the questions I have.
15             MR. DELLASEGA:  Anybody else have anything?
16          Mr. Brandt, I think you're done.
17             MS. WILLIAMS:  Mr. Brandt, I'm going to give you my
18          card, and if you would find that date, please.
19             THE WITNESS:  I'm leaving today -- what time frame
20          are we talking here?
21             MS. WILLIAMS:  You don't need to do it -- within
22          the next week or so, if you could and just give me a
23          call.  The county won't have any problem with the phone
24          bill.  Just give me a call and I'll let other counsel
25          know.
```

1           MS. WALLET:  Mr. Brandt, I don't know that it's my

2       job, but I think someone should tell you that you do

3       have the ability to review the transcript of this

4       deposition and to determine whether or not you believe

5       that it was accurate or whether you wanted to make any

6       changes in that transcript.  You have the ability to do

7       that.  Would you like to do it?

8           THE WITNESS:  Absolutely.

9           MR. DELLASEGA:  That's fine.

10          (Whereupon, the deposition was concluded at

11      11:50 a.m.)

12                          *   *   *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA      )
                                  )  SS.
COUNTY OF DAUPHIN                 )


    I, Emily R. Clark, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Dauphin, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:


          WILLIAM A. BRANDT


    I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.


    I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.


    Dated at Harrisburg, Pennsylvania, this 17th day of April, 2003.


                        _____

                        Emily R. Clark
                        Reporter - Notary Public


(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)