IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                    .
      Plaintiff,                   .   CIVIL ACTION
                      .   NO. 1:CV 01-0725
      vs.                          .
                      .
COMMONWEALTH OF PENNSYLVANIA,         .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,              .
CUMBERLAND COUNTY; CUMBERLAND         .
COUNTY; S. GARETH GRAHAM,             .
individually, and JOSEPH              .
OSENKARSKI, individually,             .
      Defendants.                  .
. . . . . . . . . . . . . . . . . . .


Deposition of:  HON. HAROLD E. SHEELY

Taken by      :  Defendant Cumberland County

Date          :  February 25, 2003, 10:10 a.m.

Before        :  Emily Clark, RMR, Reporter-Notary

Place         :  Administrative Offices of
                 Pennsylvania Courts
                 5035 Ritter Road, Suite 700
                 Mechanicsburg, Pennsylvania


APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
           Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY:  JAMES K. THOMAS, II, ESQUIRE
        PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

APPEARANCES (continued):

    MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
    BY:  DAVID J. MacMAIN, ESQUIRE
        For - Defendant S. Gareth Graham

    SWEENEY & SHEEHAN, P.C.
    BY:  PAUL LANCASTER ADAMS, ESQUIRE
        For - Defendant Joseph L. Osenkarski


ALSO PRESENT:

    MS. BARBARA VARNER

    MR. S. GARETH GRAHAM

```
            I N D E X
```

### WITNESS

Hon. Harold E. Sheely                    Examination

    By Ms. Wallet                         4, 120

    By Mr. Thomas                         99

    By Mr. MacMain                        113

    By Mr. Adams                          118

### EXHIBITS

Sheely Deposition
Exhibit Number                                        Page

1    3-page memo, 7/11/97, to Ward and Deluce          21
     from Sheely

2    5-page memo, 4/25/97, to Hartnett from            65
     Varner

3    1-page memo, 7/17/97, to Ward and Deluce          76
     from Sheely

4    1-page memo, 7/8/97, to Sheely from               84
     Hartnett

```
            *   *   *   *   *
```

```
 1                    STIPULATION

 2          It is hereby stipulated by and between the

 3   respective parties that sealing, certification and filing are

 4   waived; and that all objections except as to the form of the

 5   question are reserved until the time of trial.

 6

 7          HON. HAROLD E. SHEELY, called as a witness, being

 8   duly sworn, was examined and testified, as follows:

 9   BY MS. WALLET:

10       Q.    Good morning, Judge Sheely.

11       A.    Good morning, Ms. Wallet.

12       Q.    I'm Debra Wallet.  I'm here representing Barbara

13   Varner in an action that has been brought against Mr. Graham,

14   Mr. Osenkarski, Cumberland County and the Ninth Judicial

15   District.

16          Is there any reason, sir, today, why you could

17   not answer my questions truthfully and completely?

18       A.    Not to my knowledge.

19       Q.    If at any time you do not hear me, may we please

20   have an agreement that you will ask me to repeat the

21   question?

22       A.    I will.

23       Q.    Or if at any time you don't understand my

24   question, can we agree that you will ask me to repeat that

25   question so that you do understand it before you attempt to
```

1  answer it?

2      A.    I will.

3      Q.    Tell me, sir, what preparation did you make today

4  for your deposition?

5      A.    Yesterday I had a meeting with Attorney Williams

6  for several hours, and we went over generally who had

7  testified before and, I don't know, we just talked generally

8  about the case.  I told her about my background, what I did

9  before, and --

10     Q.    Did you review any transcripts?

11     A.    I got several places I was given a transcript of

12  where I was named, I believe, by Mrs. Varner in her

13  deposition.  I did see most of that.

14     Q.    Okay.  And did you review any documents in

15  preparation for today?

16     A.    I think the documents I already had.  I don't

17  think we reviewed any specific documents yesterday except the

18  deposition documents.  That was it.

19     Q.    Okay.  Now, you said that you already had these

20  documents.  Was there a file that you had taken with you when

21  you retired from the court?

22     A.    No.  This is all.  The first thing I got was a

23  copy of the Complaint that was filed I see about April of

24  2001.  At some point after that, why, I was given a copy of

25  the Complaint by Ms. Williams.

1    Q.    And did you have any of the documents that you

2    had authored as part of this Complaint or charge?

3    A.    No.  The only thing that I have was given to me.

4    Q.    Did you speak to anyone else who is a witness to

5    any of the facts involved in this case, prior to today?

6    A.    I spoke to Judge Hoffer here several weeks ago,

7    when I found -- after I found out when I was supposed to

8    appear for a deposition I spoke to Judge Hoffer and asked him

9    if he was involved, and he told me, yes, he was going to have

10   a deposition, also.

11          As far as speaking to any of the other parties, I

12   have not.

13   Q.    Okay.  Have you seen any of the other parties

14   since your retirement?

15   A.    I've seen Mrs. Graham.  I've seen her since I

16   retired.  I was at the courthouse several weeks ago and I saw

17   my former secretary and I saw some of the court reporters.  I

18   stopped in the office there.

19   Q.    Have you talked to any of those people about this

20   case?

21   A.    No.  I've tried to avoid that.

22   Q.    And when you said you saw your former secretary,

23   which secretary was that?

24   A.    Sandy Davis.  I've only ever had two secretaries:

25   Mrs. Fry and Mrs. Davis.

1      Q.      Would you tell me, sir, when did you first learn

2   that Barbara Varner had made some allegations of sexual

3   harassment?

4      A.      You mean timewise?  Probably somewhere around

5   June or early July of 1997, somewhere in that area, I

6   believe.

7      Q.      And how did you learn it?

8      A.      I learned it, one of the county solicitors had

9   made a call to my office wanting an appointment to see me,

10   and it was Mr. Deluce.  And he did come in and see me.  And

11   that was the first that I ever heard anything about these

12   problems between Mrs. Varner and Mr. Graham.

13      Q.      Prior to that time, Mr. Osenkarski had not

14   brought this matter to your attention?

15      A.      Not to my knowledge, no.  I never knew anything

16   about it.

17      Q.      Now, when Mr. Deluce called you to make an

18   appointment, did he tell you the purpose of his appointment?

19      A.      I don't believe he did.

20      Q.      And when you met with him, was it just the two of

21   you?

22      A.      Yes.

23      Q.      What did he tell you, sir?

24              MR. THOMAS:  Objection.  This is obviously

25   complicated a little bit.  We do continue to assert the

1    attorney-client privilege with respect to Mr. Deluce, who was

2    a county solicitor.  We would object to any questions asking

3    what the nature of the conversation was between counsel for

4    the county and the Court in this circumstance.  It's a little

5    bit awkward because normally I would instruct the witness not

6    to answer the question, although in the circumstances of this

7    case I don't technically represent the judge.

8           MS. WILLIAMS:  I join in the objection, and when

9    there is a question that infringes on the privilege I will

10   direct the deponent not to answer.

11   BY MS. WALLET:

12        Q.    Did you understand my question, sir?

13        A.    I understood the question but I understand I'm

14   not supposed to answer it; is that correct?

15          MS. WILLIAMS:  Would you repeat the question?

16   BY MS. WALLET:

17        Q.    What did Mr. Deluce tell you?

18        A.    Am I supposed to answer that?

19          MR. THOMAS:  Can we have one minute, Deb?

20          MS. WALLET:  Sure.

21          (Recess taken from 10:16 until 10:20 a.m.)

22          MS. WALLET:  I believe when we broke I had asked

23   my question and we were waiting for whether or not you would

24   instruct the witness not to answer the question.

25          MS. WILLIAMS:  I am going to instruct the witness

1  not to answer the questions involving Mr. Deluce and the

2  conversation he had with him.  And that's a continuing

3  objection as to any questions that go to conversations Judge

4  Sheely might have had with Mr. Deluce.

5          MS. WALLET:  And the basis of your objection is

6  attorney-client privilege?

7          MS. WILLIAMS:  It is attorney-client privilege.

8          MS. WALLET:  Any other basis?

9          MS. WILLIAMS:  No.

10          MR. THOMAS:  And we obviously join in the

11  objection.

12  BY MS. WALLET:

13      Q.    Judge Sheely, did you consider Mr. Deluce to be

14  your attorney?

15      A.    No.  I know he was of a firm that represented the

16  county.

17      Q.    Describe for me the relationship between

18  probation officers who were employed by the court system and

19  the county employees.

20      A.    At the time I became president judge in '83, at

21  that time the president judge handled all the dependence and

22  delinquency juvenile cases.  Since I handled all them, I had

23  occasion on a weekly basis to see probation officers when

24  they brought either defendant juveniles or delinquent

25  juveniles into court.  So I did see all of them, you know,

1    off and on on pretty much of a regular basis.

2              The other county employees I just would see as I

3    walked through the county.  I knew who they were because I

4    had been in the DA's office for 12 years before I became a

5    judge, so I knew the other county employees but I really had

6    no direct relationship with them.

7         Q.      Who did you have the ability to hire and fire in

8    the Probation office?

9         A.      Any of the probation officers.

10        Q.      Did you have the ability to discipline

11   individuals in that office?

12        A.      I had the ability.

13        Q.      Did you ever discipline any of them?

14        A.      I'm just -- since you asked me that, in all the

15   years I was the president judge I think we only ever had one

16   probation officer that had to be disciplined, and he was

17   taking money on -- he was collecting money from people on DUI

18   cases, and he was terminated.  But other than him, I don't

19   recall any other discipline problems that I had to get

20   involved in.

21        Q.      Who was the person who was terminated?

22        A.      I think it was Paul Meuron, if I recall.

23        Q.      And you would have taken the action to terminate

24   him?

25        A.      He did it -- yes, I would have, but he did it --

1  my recollection is he, after talking, he did it, he resigned

2  on his own.

3      Q.     He resigned under threat of some termination?

4      A.     I would say so, yes.

5      Q.     Did you have the ability to set the hours of work

6  for the probation officers?

7      A.     I did not.

8      Q.     Did you have the ability to set a salary for the

9  probation officers?

10     A.     I did not, no.

11     Q.     How was that done, sir?

12     A.     That was set by the county.

13     Q.     And do you know, sir, was that simply an

14  agreement between the court and the county that you would use

15  the county compensation system?

16     A.     Yes, I think that's correct.  I had, I mean, when

17  we talked about people who were being, who were going to be

18  hired, why, we used the county pay scale for those people.  I

19  didn't set it.  I knew what it was at the time.

20     Q.     Is that something that was just in Cumberland

21  County, or was that a statewide policy?

22         MS. WILLIAMS:  If you know.

23         THE WITNESS:  I don't know.  I don't know.  I

24  don't know what the other counties did.

25  BY MS. WALLET:

1    Q.    As the president judge, sir, to whom did you

2    directly report?

3    A.    I didn't report to anyone.  I reported to the

4    Administrative Office of Pennsylvania Courts to some extent.

5    But as far as anyone in the county, I didn't report to

6    anyone.

7    Q.    Do you know whether probation officers had a

8    county badge issued to them?

9    A.    I don't know.  I think they did.

10    Q.    Do you know whether they were subject to the

11    rules and regulations, some sort of manual for county

12    employees?

13    A.    They would have been subject to any rules or

14    regulations that the county had set for other employees, yes.

15    Q.    Would you agree that they were sort of hybrid

16    employees; they reported to you, you had the ability to hire

17    and fire, but for basically everything else they were treated

18    like county employees?

19    A.    I think that's probably --

20        MR. THOMAS:  Objection to form.

21        THE WITNESS:  Okay.

22        MR. THOMAS:  You can answer, Judge.

23        MS. WILLIAMS:  You can answer, yes.

24        THE WITNESS:  Yes, I would say that's probably

25    correct.

1    BY MS. WALLET:

2        Q.      Now, Mr. Deluce came to see you and told you for

3    the first time about these allegations that Ms. Varner had

4    made; is that correct?

5        A.      Am I supposed to answer that?

6                MS. WILLIAMS:  That falls within the objection

7    that we've articulated earlier as to the conversation between

8    Mr. Deluce and Judge Sheely and, therefore, I'm directing

9    Judge Sheely not to answer that question.

10   BY MS. WALLET:

11       Q.      Did Mr. Deluce give you any documents at that

12   time?

13               MS. WILLIAMS:  Hold on.

14               Objection to that question as well, Ms. Wallet.

15   We believe that goes to the privilege we've asserted, and I'm

16   going to direct Judge Sheely not to answer that question.

17               MR. THOMAS:  We join in the objection.

18   BY MS. WALLET:

19       Q.      As a result of this meeting with Mr. Deluce did

20   you do anything?

21       A.      Yes.

22       Q.      What did you do?

23       A.      I wrote a letter to, a memorandum to, I believe

24   it was John Ward and to Mr. Deluce.

25       Q.      Why did you write that memo?

1      A.      I wanted them to know what action I had taken as

2    a result of the information I had at the time.

3      Q.      After you met with Mr. Deluce but prior to

4    writing your memorandum, did you attempt to acquire any

5    information about the charges of Ms. Varner?

6      A.      I'm sure I probably spoke to Mr. Osenkarski about

7    what I had heard.  I don't recall any specific meetings, but

8    I'm sure I would have, because it involved his department.

9      Q.      Is it your recollection, sir, that after you met

10   with Mr. Deluce you called Mr. Osenkarski and met with him?

11     A.      I don't recall the specifics of calling him.  I'm

12   sure I would have met with Mr. Osenkarski after I found out

13   about this.

14     Q.      Do you recall whether it was just the two of you,

15   you and Mr. Osenkarski?

16     A.      I'm sure it was, yes, at that time.

17     Q.      What do you remember about that conversation?

18     A.      I don't remember anything specifically about it.

19   Unfortunately, I don't remember any specifics.

20     Q.      Well, do you think you said to him:  I've learned

21   about something in your office?

22            MR. ADAMS:  Objection.  You're asking the judge

23   to speculate and it's not an appropriate question.  Either he

24   knows or he doesn't know.

25            MS. WILLIAMS:  You can answer, judge.

```
 1              THE WITNESS:  Would you ask me the question

 2   again?

 3   BY MS. WALLET:

 4       Q.     Did you say something to him such as:  I've

 5   become aware of a problem involving a probation officer?

 6       A.     I'm sure -- Ms. Wallet, I don't recall any

 7   specifics, that's a long time ago, but I'm sure that I did.

 8   That's why I would have went to see him, and I was trying to

 9   find out what was going on at that time then between

10   Mr. Graham and Mrs. Varner as far as the office was

11   concerned.

12       Q.     Do you remember what Mr. Osenkarski told you in

13   response to your questions?

14       A.     Not specifically, no.

15       Q.     Do you remember whether he made any comments

16   about the validity of Ms. Varner's charges?

17       A.     I cannot honestly say that I remember any

18   specific remarks that Mr. Osenkarski made.  It's been too

19   long a time.

20       Q.     Did you make any notes of that meeting?

21       A.     No.

22       Q.     Do you recall anything about the meeting with

23   Mr. Osenkarski?

24       A.     The only thing I can say at this time, and I'm

25   saying this from what I wrote in my letter of July 11th, I
```

1    think it was probably Mr. Osenkarski had told me that

2    Mr. Graham had used -- he had heard him use some abusive

3    language towards Mrs. Varner, some swear words. And I'm

4    certain that's who told me that. And that's the reason I

5    suspended Mr. Graham then for three days for any improper

6    language that he might have used. I'm sure it's

7    Mr. Osenkarski that told me.

8        Q.    When you met with Mr. Osenkarski, did you have

9    any information at that time that there was an alleged affair

10   between Mr. Graham and Ms. Varner?

11            MR. THOMAS: Objection to the form. I'm not sure

12   his testimony was that he met with Mr. Osenkarski. I may

13   have misheard, but I thought his testimony was that he had a

14   conversation with him. He may answer.

15            MS. WILLIAMS: Go ahead, Judge.

16            THE WITNESS: I did not know anything about the

17   affair until sometime after Mr. Deluce came in and sometime

18   after I saw Mr. Osenkarski. Mr. Graham and his wife appeared

19   in my office and that's when I found out about the affair.

20   BY MS. WALLET:

21       Q.    Okay. Well, let's clarify Mr. Thomas's

22   objection. Did you meet with Mr. Osenkarski, or did you just

23   have a conversation with him perhaps over the telephone?

24       A.    I think I went down to the Probation office and

25   spoke to him down there. That would be my recollection.

1    Q.    Would that have been customary for you to do,

2  rather than to call him to your office?

3    A.    Yes.  Very often I would walk down to the

4  Probation office.  They were down on the third floor, I was

5  on the fourth floor.  A lot of times I would just walk

6  directly down there if I had something to discuss with a

7  probation officer.  If I didn't want anyone to hear what was

8  going on, why, I would call them up to my office, but other

9  than that, I would go down there quite often.

10    Q.    So you think Mr. Osenkarski did confirm that

11  Mr. Graham used the F word?

12    A.    I think he did, yes.  That was the reason why I

13  felt that this type of thing should not go on and the reason

14  I suspended Mr. Graham for three days.

15    Q.    Did you ask Mr. Osenkarski whether Mr. Graham

16  used any other language particularly toward the women in the

17  office?

18    A.    No, I didn't ask him that, to my knowledge.  He

19  obviously told me this or I wouldn't have known about it.

20    Q.    Do you believe that you had information about the

21  use of the F word and you brought up the subject with

22  Mr. Osenkarski?  Or did he bring that subject up to you?

23         MR. MacMAIN:  Objection.  He didn't say F word,

24  he said swear word.

25         MS. WALLET:  I thought he did use the F word.

1    Well, let me be clear.

2    BY MS. WALLET:

3        Q.     Did Mr. Osenkarski tell you that Mr. Graham used

4    the F word?

5        A.     I think he did, yes.

6        Q.     And my question, sir, was:  Did you ask

7    Mr. Osenkarski:  Have you ever heard this?  Or did

8    Mr. Osenkarski volunteer that information?

9        A.     I cannot answer that.  I cannot accurately say

10   whether I asked him or whether he told me without being

11   asked, I don't know.

12       Q.     What was your purpose in having this conversation

13   with Mr. Osenkarski?

14       A.     My purpose primarily was, you know, I knew

15   Mr. Graham, I knew Ms. Varner for many years, and no employee

16   deserves to be abused or harassed by another employee.  So

17   that's the reason I went down, to find out what I could.  And

18   that was the reason I suspended Mr. Graham, because I felt

19   that by using this type of language that was not appropriate.

20       Q.     Did you suspend Mr. Graham for any other reason?

21       A.     No.

22       Q.     Did you tell Mr. Graham why he was being

23   suspended?

24       A.     I don't recall if I did or not.  I'm just trying

25   to think who I -- I sent a copy of this letter to

1    Mr. Osenkarski.  I don't know if he gave it to Mr. Graham or

2    not.

3         Q.    Who decided on a three-day suspension?

4         A.    I did.

5         Q.    How did you decide that, sir?

6         A.    Just decided that for using that type of

7    language, why, that he shouldn't have used, why, I felt that

8    the first time that would be an appropriate penalty for doing

9    that.  And I thought that up on my own.

10        Q.    Did you discuss that with anyone, specifically

11   anyone in the Human Resources Department at the county?

12        A.    I don't think so.  I think I did that on my own.

13        Q.    At any time up until your retirement did you seek

14   any advice from anyone at the Administrative Office for the

15   Courts?

16        A.    Advice?  No.

17        Q.    Did anyone in the Administrative Office for the

18   Courts give you any advice, whether or not you had solicited

19   it?

20        A.    I don't recall.  I don't think so.  I wouldn't

21   say definitely they didn't, but I don't recall of any advice

22   ever given to me.

23        Q.    Did you direct Mr. Osenkarski to do anything as a

24   result of the allegations that were brought by Ms. Varner?

25        A.    In my letter, I think in my letter with better

1    supervision both parties can continue their good work in the

2    office, and I would -- up to this time I believe that

3    Mrs. Varner received her work assignments I guess from

4    Mr. Graham.  And I directed that this type of relationship be

5    terminated and one of the other probation officers, Sam

6    Miller was supposed to work in the future with Mrs. Varner on

7    assignments and not Mr. Graham.

8         Q.    And whose idea was that, sir?

9         A.    I think it was mine.  I don't think -- I don't

10   think Mr. Osenkarski is the one who set this up.  In any

11   event, I thought it was a good way to do it.  Either if it

12   was suggested by Osenkarski or me, I thought that the two of

13   them, with what was going on now, be better off to have

14   another PO involved with Mrs. Varner.

15        Q.    And when you say what was going on, what do you

16   mean by that?

17        A.    Well, what was going on in their relationship and

18   then in the office where these, that resulted in this

19   language being used.  It's obvious that the two of them

20   weren't getting along, and that was -- they had always gotten

21   along well in the past.

22        Q.    When you say "in my letter," are you referring to

23   your July 11 memorandum to John Ward and David Deluce?

24        A.    Yes, that's correct.

25        Q.    Let's mark that so that you and everyone else

1    have that in front of us.

2         A.    I do have copy of that.  I do.

3               (Sheely Deposition Exhibit No. 1 was marked.)

4    BY MS. WALLET:

5         Q.    Judge Sheely, would you look at what has been

6    marked as Sheely Deposition No. 1?

7         A.    I will.

8         Q.    And is that what you referred to previously as

9    your letter?

10        A.    It was.

11        Q.    Do you recall writing anything else about the

12   subject Varner, Graham in Juvenile Probation other than what

13   has been marked as Sheely 1?

14        A.    I don't recall of anything.  It's possible maybe

15   that I did, but I don't recall.

16        Q.    Had you met with Mr. Graham prior to writing

17   Sheely 1?

18        A.    Yes.  I had met with Mr. Graham and his wife.

19        Q.    When did you meet with them in relation to this

20   July memorandum?

21        A.    I can't honestly say that -- this was written

22   July 11th.  I don't know if I met with them the same day or

23   the day before.  I really can't answer that.

24        Q.    When you met with Mr. and Mrs. Graham was there

25   anyone else present?

1        A.        No.  I think we were the only ones present.  I

2    don't think their attorney was present on that occasion.

3        Q.        Would you tell us what you remember about the

4    conversation between you and Mr. and Mrs. Graham?

5        A.        Of course, I had no idea about any prior

6    relationship that was going on between Mrs. Varner and

7    Mr. Graham.  Mr. Graham told me that he and Mrs. Varner had

8    been carrying on a relationship for some time.  And I did

9    know that they used to make trips to George Junior Republic,

10   which was several hours away, and it always took two

11   probation officers to take juveniles out there.  I knew that

12   this had taken place, but obviously I didn't know of any

13   relationship.  So basically that's what he told me in the

14   presence of his wife, that he and Mrs. Varner had been

15   carrying on this relationship for some time.

16       Q.        What else do you remember about the conversation?

17       A.        That's about all it was about, this relationship

18   between he and Mrs. Varner.

19       Q.        When the three of you met, where was this

20   meeting?

21       A.        I believe it was in my office.

22       Q.        Had someone asked to have this meeting with you?

23       A.        Mr. Graham I'm certain asked to have the meeting.

24       Q.        Was it during working hours or after working

25   hours?

1       A.      I think it was during working hours.

2       Q.      Did Mr. Graham tell you why he wanted to meet

3  with you?

4       A.      I don't -- I don't know if he told me why.  He

5  just wanted to tell me why he and Mrs. Varner had been having

6  these problems.  I guess that's why he came in, that this

7  relationship had been terminated, the result of it was this

8  conflict between he and Mrs. Varner in the office.

9       Q.      Well, did Mr. Graham at that time tell you he

10 knew that you were contemplating some disciplinary action

11 against him?

12      A.      I don't recall if he told me that or not, but I

13 think he might have.  I don't recall.  I don't know when I

14 made up my mind about the three-day suspension, if I had told

15 Mr. Osenkarski that prior to writing the letter to him on

16 July 11th, or -- I don't really remember, if he knew about

17 that at that time or not.

18      Q.      Well, when Mr. and Mrs. Graham came into your

19 office, did you think that that was unusual?

20      A.      Yes, I sure did.

21      Q.      Why was it unusual?

22      A.      I never had Mr. Graham and Mrs. Graham in my

23 office before.  Mrs. Graham had been my court reporter in

24 prior years, and obviously I knew her from that standpoint,

25 but I never had any prior meetings between the two of them in

1    my office.

2        Q.      What did Mr. Graham tell you at that time?

3        A.      He told me about, my recollection, about the

4    relationship, that he and Mrs. Varner had a sexual

5    relationship over a period of years, that they would stop in

6    motels, I think sometimes on their way from home from taking

7    juveniles out to George Junior Republic.  I don't recall if

8    he mentioned any other places or not.

9        Q.      What was your reaction to this?

10       A.      I was really surprised, because I had always -- I

11   always had a good relationship before with Mrs. Varner and

12   Mr. Graham and I never had any idea that something like this

13   was going on.

14       Q.      Well, did Mr. Graham say to you why he would come

15   to his superior and suddenly confess that he had had a

16   relationship?

17       A.      I don't recall why he actually come in.  I don't

18   recall the specifics of that.  But apparently he had heard

19   something about something, and he wanted to come in and to

20   tell me about this.

21       Q.      Was this an emotional meeting for the two of

22   them?

23       A.      Yes, I think I remember it was.  They were both

24   crying, I think, from time to time.

25       Q.      Do you believe that prior to this meeting

1    Mrs. Graham had been told of the affair?

2        A.    I don't think so.  I don't recall any indication

3    that she knew about it before this.

4        Q.    And what was her reaction to Mr. Graham's

5    statements to you about the affair?

6        A.    Well, she was obviously upset.  She was crying, I

7    know that.  I remember that.  Just like any other wife, I

8    guess, when you're told something like this.

9        Q.    What did you say to them?

10       A.    I don't recall what specifics I would have told

11   them.  I'm certain that I told them I didn't approve of such

12   a relationship.  And I knew they had children.  I certainly

13   I'm sure told them that I hoped that they could get these

14   matters resolved, that they would not involve some type of a

15   separation that would certainly involve the children, if that

16   had to happen.

17       Q.    Did you believe Mr. Graham when he told you that

18   he had had a sexual relationship with Ms. Varner?

19       A.    Yes.

20       Q.    Why did you believe him?

21       A.    I guess I thought, you know, for a man to bring

22   his wife in to the president judge and admit to having a

23   sexual relationship with one of his co-employees in front of

24   his wife, that -- I don't think men would do that unless what

25   they're saying was true.  That would be my thinking on that.

1    Actually, of course, I wasn't with him so I don't know.  But

2    that would be my reason for believing him:

3              And also, you know, I know he and Mrs. Graham had

4    always had a good relationship.  In fact, it was Mr. Graham

5    that I remember was really anxious to have Barbara hired, and

6    they had always had a good relationship, and I couldn't

7    believe that all of a sudden they were at each other or he

8    was at her or making comments or something in the office

9    unless there would be some reason for it.  So that would be I

10   guess was why I believed him at that time as to what was

11   taking place.

12        Q.    I believe you said that you thought that Gary

13   Graham and Barbara Graham had had a good relationship.

14        A.    I'm sure they are.  Both Barbaras are -- I meant

15   Barbara Varner.  I know they did, over a period of years.

16        Q.    Now, you said that you believed that Mr. Graham

17   had something to do with Ms. Varner being hired?

18        A.    I remember that, yes.

19        Q.    What do you remember about that?

20        A.    The only thing I remember -- of course, I had to

21   approve it.  Now, I wasn't initially involved in why she

22   wanted the job there, but I know, I can remember that

23   Mr. Graham definitely thought that she would be a good

24   employee for the county.  I remember that.

25        Q.    And do you recall whether you asked him his

1    opinion of Ms. Varner, or whether he came to you to offer

2    that opinion?

3        A.    I don't remember how it came about.  It certainly

4    came about, and whether the discussion was had between me and

5    Mr. Osenkarski and Mr. Graham, I guess, as to whether or not

6    she should be hired as a probation officer, I think he was --

7    thought she had done a good job, at least what he told me,

8    with Children and Youth Services.

9        Q.    Had you had any association with Ms. Varner when

10   she worked at Children and Youth?

11       A.    I'm certain that possibly she had some cases

12   involving me in court.  I don't remember that specifically.

13   I can't say specifically.

14       Q.    Is it your recollection that you really didn't

15   know Mrs. Varner at the time that you hired her into the

16   Probation office?

17       A.    Just from seeing her around, I'm sure I saw her

18   around, because I think at the time they were on the third

19   floor of the courthouse, we were on the fourth floor, and I'm

20   sure Mrs. Varner might have had some cases before me.  I

21   don't remember how many.  I'm sure I knew who she was.

22       Q.    Back to the time of the meeting between you and

23   Mr. Graham and Mrs. Graham.  At that time did you have any

24   evidence other than Mr. Graham's statements that Mr. Graham

25   was having an affair with Ms. Varner?

1       A.      No, I did not.

2       Q.      Did he offer to you at that time, he, Mr. Graham,

3   offer to you at that time any evidence of this affair?

4       A.      I don't recall of any evidence being offered.  I

5   think he might have said that he thought he might be able to

6   get some motel receipts or something at that time, but I

7   don't -- I don't recall any evidence that was presented other

8   than what he told me at that time.

9       Q.      Did Mrs. Graham confirm that she had believed an

10  affair was going on?

11      A.      I don't recall any statements that she made, that

12  she felt before this meeting that her husband was having an

13  affair with anyone.

14      Q.      Did Mrs. Graham ask you to do anything with

15  regard to her husband and his continued employment as a

16  probation officer?

17      A.      I don't remember that, whether she asked me

18  anything or not.

19      Q.      Did you tell Mr. and Mrs. Graham that you

20  intended to do anything to investigate these allegations of

21  an affair?

22      A.      I don't recall.

23      Q.      How long would you say that Mr. and Mrs. Graham

24  were in your office?

25      A.      I don't recall that, either, really.

1     Q.     Well, do you think it might have been five

2     minutes or fewer, or a half hour?

3     A.     I would say, you know, if I was to guess I would

4     say a half hour, 45 minutes, maybe.

5     Q.     During that half-hour conversation did you give

6     any assurances to either Mr. or Mrs. Graham that you would

7     take care of this matter?

8     A.     I don't recall.  I don't -- I don't recall.

9     Really, I couldn't do much about their marital relationship.

10    That was something that they had to work out and I couldn't

11    do anything about that.

12    Q.     Did you make any suggestions to them about this?

13    A.     I don't recall.  I'm certain I told them I didn't

14    approve of what he was doing.  I'm sure I would have said

15    that.  But as far as working on their relationship, I don't

16    recall saying about that because that's something I couldn't

17    do anything about.

18    Q.     Did you raise the issue of the use of the F word

19    by Mr. Graham during this meeting between the three of you?

20    A.     I don't know if it come up in that meeting.  I

21    think that I was told about the use of the F word by

22    Mr. Osenkarski, and I don't know exactly when that was.  I'm

23    sure I knew it before I wrote the letter of July 11th, but I

24    don't know exactly when I found out about that.

25    Q.     Do you remember anything else, sir, about the

```
 1   meeting that you had in your office that lasted a half hour,

 2   maybe 45 minutes, involving you, Mr. Graham and Mrs. Graham?

 3        A.    No, I don't think anything else other than what

 4   I've already said.

 5        Q.    Did Mr. Graham cry during that meeting?

 6        A.    I think he did.

 7        Q.    Did Mrs. Graham cry?

 8        A.    I know she did, yes.

 9        Q.    Did you make any emotional reaction?

10        A.    Not that I'm aware of.  Obviously, I was very

11   sorry to hear that this was taking place with a family.  I

12   dealt with the breakup of families for many years in my job

13   and I hate to see this take place.  I'm certain I expressed

14   that feeling, anyhow.

15        Q.    Now, was there another meeting at which

16   Mr. Graham was represented by an attorney?

17        A.    Yes, there was.  I know there was a meeting but I

18   don't know of anything that took place at that time.  I

19   really don't recall.  I didn't write anything about it.  And

20   what took place at that meeting, I don't remember.

21        Q.    Well, you listed on your July 11 memorandum David

22   Foster as attorney for Mr. Graham.

23        A.    That's correct.  David was the attorney who came

24   in with him at that time.

25        Q.    Did you know that Mr. Foster represented
```

1    Mr. Graham prior to your writing this July 11 memorandum?

2         A.    Yes, I think I did.  I think they were in before

3    that time.

4         Q.    And who was present at that meeting?

5         A.    Just the three of us, to my recollection.

6         Q.    You, Mr. Foster and Mr. Graham?

7         A.    Yes.

8         Q.    How did that meeting take place?

9         A.    I think, well, it was at the request of either

10   Mr. Graham or Mr. Foster.  I'm not sure which one of the two

11   requested the meeting, but it would be, it would have been

12   one of those two.  I didn't call them in, that's for sure.

13        Q.    And did whoever asked you for the meeting, tell

14   you what the subject would be?

15        A.    No.  They didn't tell me but I assumed it had

16   something to do with the problems between Gary and

17   Mrs. Varner.

18        Q.    Why did you assume that?

19        A.    Why?  Because I didn't have any other reason they

20   would have been coming to see me.  And obviously I had had

21   this meeting with Mr. Deluce prior to this, so I was aware of

22   some of the problems that there were.

23        Q.    Did you meet with Mr. Graham, Mr. Foster and

24   yourself before the meeting with the two Grahams, or after?

25        A.    I think it was before, but I wouldn't say that

1   for certain.

2        Q.      Do you recall whether the meeting with you,

3   Mr. Foster and Mr. Graham occurred during regular business

4   hours?

5        A.      Yes, I'm sure that it did.

6        Q.      And no one else was there, just the three of you?

7        A.      That's correct.

8        Q.      But it happened in your office?

9        A.      In my office.

10       Q.      What do you remember, sir, about that

11   conversation?

12       A.      I don't remember really what the specific

13   conversation was.  I made no notes and did not write any

14   letters about it.  Like I say, it's been so many years ago, I

15   really don't remember.

16       Q.      Well, they asked for the meeting, so did one of

17   them start the conversation?

18       A.      I really can't say, Ms. Wallet.  I'm sure

19   Mr. Foster was the one who was asking me questions, but I

20   don't know really what they were or what my response was at

21   the time.  I wrote no letters to Mr. Foster except the, I'm

22   trying to think, yeah, I sent him a copy of my July 11th

23   letter.

24       Q.      Well, did Mr. Foster make some appeal to you on

25   behalf of Mr. Graham?

```
 1        A.      I don't recall any specifics.  I'm sure he
 2   probably did, that's the reason he was there, but as far as
 3   making any specific request or getting information from me, I
 4   don't recall that.  He was there representing Gary, so I'm
 5   certain he was trying to find out what I was proposing to do,
 6   I guess.
 7        Q.      Did he ask you that?
 8        A.      I don't recall that, but I'm sure he probably
 9   did.
10        Q.      Did you respond?
11        A.      If he asked me, I would have responded, yes, but
12   I don't recall specifically that taking place.
13        Q.      And at that time do you recall what your
14   intention was with regard to some action against Mr. Graham?
15        A.      Before I spoke with Mr. Graham and Mrs. Graham,
16   after speaking with Mr. Osenkarski, in addition to the
17   three-day suspension I considered transferring Mr. Graham to
18   Adult Probation, because that way then there would be not
19   very many problems with he and Mrs. Varner confronting or
20   working with each other in their office.  That was one of my
21   considerations, yes, probably, at that time.
22                And at the time I spoke to them, I was, like I
23   say, I wasn't aware of any relationship, really, sexual
24   relationship that was taking place between Mr. Graham and
25   Mrs. Varner until he and his wife came in and told me about
```

1   it.  So once I found out about what, when he and his wife

2   come in, I figured at that time that if they were having that

3   type of relationship I wasn't going to penalize him solely

4   for this type of conduct when both of them were involved in

5   it.

6       Q.    Now, you said you considered a transfer.

7       A.    Yes.

8       Q.    Did you consider any other penalty?

9       A.    No.  That, and the suspension for three days, I

10  think that was all I was considering at that time.  Plus, I'm

11  sure I told him at that time that, you know, people have to

12  work together and I would require that they be respectful

13  towards each other, and if he was doing this other type of

14  conduct, why, to have it stopped.

15          And I think I told Mr. Osenkarski, too, to keep

16  an eye on things and let me know if things developed after

17  that.  And I don't think I ever heard anymore from

18  Mr. Osenkarski.

19      Q.    Had you considered termination of Mr. Graham at

20  the time that you met with Mr. Graham and Mr. Foster?

21      A.    No.  I don't think I ever considered terminating

22  him.

23      Q.    Why not?

24      A.    Like I said, if he was, he and Mrs. Varner were

25  having a sexual relationship, I felt that why should he get a

1    more severe penalty than what she got.  And really, she got

2    no penalty at all.  That was my thinking.

3        Q.    Well, now, my question, sir, was:  At the time

4    that you met with Mr. Foster and Mr. Graham, I believe you

5    told me you didn't know of the sexual relationship?

6        A.    No.  I didn't know about it at that time, no.

7        Q.    Okay.  So at the time that you met with

8    Mr. Foster and Mr. Graham, had you considered termination?

9        A.    I don't think I did, no.

10       Q.    Why not?

11       A.    Because I didn't think what information I had at

12   that time would certainly deserve terminating a person's

13   employment.

14       Q.    And the information you had at that time was

15   solely the information that was given to you by Mr. Deluce?

16       A.    I think that's probably correct, yeah.

17       Q.    Would it have included your conversation with

18   Mr. Osenkarski, or not?

19       A.    I don't recall.

20       Q.    In any event, it was only those two things, the

21   information you had from Deluce and possibly the information

22   from Osenkarski?

23             MR. ADAMS:  Objection.  That's not what he

24   testified to.  He said he didn't know.  He referenced

25   Osenkarski.

1          MS. WALLET:  I'm asking him.

2    BY MS. WALLET:

3        Q.     Did you have any other information at that time

4    other than what you had received from Mr. Deluce and

5    possibly, although you're not certain, what you had received

6    from Mr. Osenkarski?

7            MR. ADAMS:  Again, I'll object to as far as it

8    requires the judge to speculate, but he may answer.

9            MS. WILLIAMS:  You may answer, Judge.

10            THE WITNESS:  I don't recall of any other

11    information I had at that time.

12    BY MS. WALLET:

13        Q.     Now, before you wrote your July 11 memorandum,

14    the one that's been marked Sheely 1, did you meet with

15    Ms. Varner to ask her for her response to the allegations

16    that there was a sexual relationship?

17        A.     No.

18        Q.     Why not?

19        A.     To be truthful, I felt very disappointed that

20    Mrs. Varner didn't come to me initially about these problems

21    rather than running over to the personnel director for the

22    county.  Mrs. Varner and I always had had a good

23    relationship, I thought she was a good probation officer, and

24    I felt really hurt that she wouldn't come to me and ask my

25    help in working with this problem rather than running over to

1    the personnel director for the county.  I couldn't understand

2    why she did that, and she never asked to see me, that I

3    recall.  She never asked for a meeting.

4              I knew at some point here that she had an

5    attorney, so I felt that it wasn't proper for me to call

6    Mrs. Varner in and ask her about this, when she had an

7    attorney.  If she would have asked to see me, I certainly

8    would have seen her at any time.  But I thought it wasn't

9    proper for me to ask her to come up and talk to me about this

10   once she had an attorney.

11   Q.     Did you at any time consider inviting Ms. Varner

12   and her attorney to come in and talk to you about this?

13   A.     No.  I thought if they wanted to see me, I

14   certainly would have seen them.  But I never got any calls

15   from anyone, either from her or her attorney that they wanted

16   to meet with me on this matter.

17   Q.     Did you think it slightly irregular that you

18   would meet with one side of this controversy and not the

19   other side?

20   A.     No, because I would have met with both of them,

21   but only the one side asked to come in and see me.  The other

22   side didn't.

23   Q.     Why did you believe that Ms. Varner knew that you

24   were about to make a determination?

25   A.     I don't know why.  I don't know why I thought

1    this.  I don't know.  But I was about --

2        Q.    You thought at that time that Ms. Varner knew

3    that you were about to make a determination, and if she

4    wanted to talk to you, she should have contacted you?

5        A.    Well, I know she could have contacted me at any

6    time on these proceedings, even before she went over to see

7    the county representative.  I would have been happy to see

8    her at any time.

9        Q.    Did the court, specifically you, have a sexual

10   harassment policy in place prior to July of 1997?

11       A.    I did not have any policy, no.

12       Q.    Do you know whether the county had a policy in

13   place?

14       A.    I think they did.

15       Q.    How did you know that?

16       A.    I had been told that there was a policy, I think,

17   but they never -- I never adopted a separate policy because I

18   felt that that wasn't necessary.

19       Q.    Why didn't you think it necessary?

20       A.    I felt that any -- the policy of the county would

21   apply to all the employees, including the people in the

22   Probation office.  And I think that the policy that they had

23   that I recall was certainly much -- thought out much better

24   than what I could think up of on my own.

25       Q.    What did you understand the policy of the county

1    to be?

2        A.    Well, they had a -- if there was a problem, they

3    had a step method of who the employees were supposed to

4    contact.  That's about as much as I remember, because I never

5    really had to deal with this problem before.  This is the

6    first time that it had ever come up to me.

7        Q.    Okay.  And what did you understand the step

8    method under the county policy to be?

9        A.    All I remember is that someplace along the step

10   policy, why, Mrs. Varner should come in and talk to me about

11   this if she wasn't satisfied with the responses that she was

12   getting, I guess in this case it would have been the first

13   line of response would have been from Mr. Osenkarski.  That's

14   what I thought.  I never had to deal with this before.  But I

15   think that's -- I mean, she could have came to see me first

16   or she -- the policy of the county was I believe she was

17   supposed to have seen Mr. Osenkarski, then to see me.  But

18   she never did come to see me.

19       Q.    All right.  So you believed the policy to be that

20   if you had a problem with sexual harassment, let's say it was

21   your co-worker, what would you do?

22       A.    My thought was, what I knew about it was that you

23   would first go to see your immediate supervisor of any type

24   of a problem, sexual or otherwise.

25       Q.    Okay.

1      A.      And they were probation officers.  If they

2  couldn't get it resolved there, then they were supposed to

3  come to see me.  Or they could have come to see me initially.

4      Q.      So if Mrs. Varner had a problem with a co-worker,

5  she was to take that up with her immediate supervisor,

6  correct?

7      A.      That's what I thought, yes.

8      Q.      And in this case, who was that immediate

9  supervisor?

10     A.      It would have been Mr. Osenkarski.

11     Q.      Mr. Graham wasn't her immediate supervisor at

12 that time?

13     A.      Well, he was a supervisor of some, to some extent

14 to my knowledge.  But Mr. Osenkarski was the supervisor in

15 charge of all the Juvenile Probation delinquents and

16 dependents.  He was in charge of the Probation Office.

17 Mr. Graham had some lesser position in Probation.  I'm not

18 even sure at this point what that was.

19     Q.      So you weren't aware in July of 1997 what the

20 relationship was between Mr. Graham and Ms. Varner from a

21 supervisory standpoint?

22             MR. THOMAS:  Objection to the form.

23             You can answer.

24             MS. WILLIAMS:  You can answer, yes.

25             THE WITNESS:  I specifically at this time do not

1    recall what type of supervision Mr. Graham had over

2    Mrs. Varner prior to this taking place. I don't know if

3    Mr. Osenkarski had delegated certain responsibilities to

4    Mr. Varner over the other probation officers.

5            I read someplace or heard someplace here that

6    prior to this taking place that Mr. Graham apparently did

7    assign duties to Mrs. Varner. I don't know when I acquired

8    that information. I don't recall if I knew that before this

9    incident or not, really. I knew that he had some position in

10   the Probation Office but I wasn't sure what all this

11   entailed.

12   BY MS. WALLET:

13       Q.    So today, you don't know whether in July of 1997

14   you knew that Mr. Graham had supervisory responsibilities

15   over Ms. Varner?

16       A.    I don't recall today whether I knew that or not.

17       Q.     In any event, you knew that Mr. Osenkarski had

18   supervisory responsibilities over Ms. Varner?

19       A.    Definitely. Definitely.

20       Q.    In July of 1997 did you know whether or not

21   Ms. Varner had taken her complaints to Mr. Osenkarski?

22       A.    I didn't know that. I don't have any

23   recollection of being told that she ever went to see

24   Mr. Osenkarski.

25       Q.    When you went to see Mr. Osenkarski before you

1    wrote your July 11, 1997 memorandum, did you ask

2    Mr. Osenkarski if Ms. Varner had brought to him any of her

3    complaints?

4        A.    I don't recall if I did or not.

5        Q.    Now, I'm back to the step method that you

6    identified under the county policy.  If someone complained

7    about sexual harassment to the immediate supervisor and there

8    was no resolution that was satisfactory, where would that

9    employee go next?

10       A.    As far as if they were in the Probation Office,

11   they would come to me.

12       Q.    And how would someone know that?

13       A.    I think that was on the county policy, that as to

14   how they were supposed to proceed.  I think there was a

15   policy that the county had that would tell them how to do

16   this, I think.

17       Q.    Did you know whether the county policy

18   recommended that someone make a complaint to the Human

19   Resources Department for the county?

20       A.    I don't recall if I did or not.  The reason I

21   don't know much about this is because I never had to deal

22   with this in all my years as president judge or working with

23   Probation.  We never had this type of problem before.  And I

24   had heard once about the county had adopted some policy on

25   this.

1              And the only thing I can recall is that they

2      would first go to their own supervisor.  Then in the case of

3      Probation, I would be next in line and they would come to see

4      me.  That's -- the rest of the policy, what it said, I really

5      don't remember because I never had to use it.

6          Q.     Did you at any time ever tell Ms. Varner that she

7      shouldn't go to the county Human Resources Department with

8      her complaints?

9          A.     I don't recall if I ever told her that or not.  I

10     might have told her that I thought she should come to me

11     first to see if I couldn't get the matter resolved.  I don't

12     think I ever told her not to go to any other place.

13         Q.     Do you recall a conversation that you had with

14     Ms. Varner in the elevator area shortly before your

15     retirement?

16         A.     No.

17         Q.     Do you have any recollection of a conversation in

18     the hall with Ms. Varner shortly before your retirement?

19         A.     No, I can't say really that I did.

20         Q.     Did you believe that Ms. Varner had failed to

21     follow the sexual harassment policy with respect to her

22     complaints about --

23         A.     I sure did.  I sure did.  I thought that Barbara

24     should have come to me, even initially, before she even went

25     to Osenkarski.  But if she went to Osenkarski first and was

1    not satisfied, then I believe that she should have come to me

2    and I would hope that I could have had a meeting between she

3    and Mr. Graham and we would have got these matters resolved.

4              But like I said, I always thought Mrs. Varner was

5    a good probation officer.  We never had any ill feelings

6    between us, and I would have certainly tried to look ought

7    for her interests if she would have given me the chance.

8         Q.    Did you believe she violated the county sexual

9    harassment policy?

10        A.    Yes, I believe she did.

11        Q.    And that was because she didn't come to you?

12        A.    Yes, ma'am, that's correct.

13        Q.    Back to this meeting that you had with Mr. Graham

14   and Mr. Graham's attorney and yourself, do you recall

15   anything more about that meeting?

16        A.    I do not.  I don't recall any specifics from the

17   meeting.  Obviously, I'm sure that Mr. Graham was there with

18   his attorney and his attorney was seeking information, but I

19   don't recall specifically what he was seeking or what I said.

20        Q.    And did you believe that Mr. Foster on behalf of

21   Mr. Graham was seeking to influence you with regard to any

22   disciplinary action against Mr. Graham?

23             MR. THOMAS:  Objection to the form.

24             MR. MacMAIN:  Objection.

25             THE WITNESS:  I don't recall what he said along

1    those lines.  I would think that since he was representing

2    Mr. Graham he would try to intervene on his behalf the best

3    he could.  But I don't recall any specifics as what he asked

4    me to do or what I would do or anything like that.

5    BY MS. WALLET:

6         Q.    And during that meeting there was no statement by

7    Mr. Graham that he had had a sexual relationship with

8    Ms. Varner?

9         A.    I don't recall him saying it at that time.  My

10   recollection is that the first I was aware of this is when he

11   and his wife came in to see me.

12        Q.    Do you recall a meeting with Mrs. Graham either

13   before or after this meeting with you, Mr. Graham and

14   Mrs. Graham, in which you discussed the matter of the sexual

15   relationship?

16        A.    I know I didn't -- I know I didn't discuss

17   anything with her before this meeting between the two of them

18   because I didn't know anything about it.

19             Now, whether or not after this meeting with her

20   and her husband, whether or not I said anything to her about

21   this, I don't know.  I might have.  Like I say, she had been

22   my court reporter for many years and I always thought she was

23   a very nice lady, and I would certainly have tried to do

24   anything I could do to help.  But I don't recall any specific

25   additional meetings that we had.  It's possible maybe that we

1    did, but I don't recall that.

2        Q.    Do you remember having any conversations with

3    Mrs. Graham after July 11, 1997, involving Mrs. Varner?

4        A.    I don't recall any specific conversations with

5    Mrs. Graham after this July meeting.  It's possible maybe

6    that I did, but I don't recall that.

7        Q.    You said that this was your first experience with

8    an allegation of sexual harassment; is that correct?

9        A.    That's my recollection.

10        Q.    Were you aware of any complaints brought by a

11    probation officer named Kerry Houser?

12        A.    There were no complaints made to me, I'm certain.

13        Q.    Did you play any role in a complaint made by

14    Kerry Houser of a sexual harassment nature?

15        A.    Can you tell me who this nature involved -- who

16    this alleged incident involved?  Was it one of the other

17    probation officers?

18            MR. ADAMS:  There's no question, your Honor.  I

19    apologize.  I'd rather you respond to her questions, if you

20    don't mind.

21            THE WITNESS:  The answer to that would be no, the

22    nature of the question.

23    BY MS. WALLET:

24        Q.    Okay.  You don't remember any complaints that

25    Kerry Houser made about her supervisor?

1      A.      Not to me, I don't, no.

2      Q.      Were you ever aware of any complaints made by

3   Ms. Houser about the Probation Office?

4      A.      I don't recall of any complaints, I really don't.

5   I'm not saying she didn't, but I don't recall of any.

6      Q.      Do you know how long the county had had a sexual

7   harassment policy in place prior to July of 1997?

8      A.      Exactly how long, no, I do not.  I know that

9   there was a policy but I don't know how long it had been in

10   effect.

11      Q.      Are you, sir, considered to be a county employee?

12      A.      No, I'm not.

13             MR. ADAMS:  Presently or in the past?

14   BY MS. WALLET:

15      Q.      Let's have an --

16      A.      I think she knows I'm retired.

17      Q.      Let's have an agreement that when I ask you

18   questions here today, I'm really only talking about the

19   period up until you retired --

20      A.      Yes I understand.

21      Q.      -- and I believe that was the end of December of

22   1997 --

23      A.      That's correct.

24      Q.      -- correct?

25      A.      That's correct.

1     Q.     So may we have that agreement?

2     A.     Yes.

3     Q.     Did you receive a county employee handbook?

4     A.     No, not to my knowledge.

5     Q.     Sir, you served as a judge of what was then the

6   Court of Common Pleas of Cumberland County from 1983; is that

7   correct?  Through 1997?

8     A.     No.  I was a judge since January 1, 1978.  I

9   became the president judge when Judge Shughart had to resign

10  in 1983.

11    Q.     And prior to your tenure on the bench, that is,

12  prior to 1978, what position did you hold?

13    A.     I was a district attorney from 1968 to 1976.  I

14  was an assistant district attorney from 1964 to 1968.

15    Q.     And did you have employment in the practice of

16  law prior to 1964?

17    A.     Yes. I think I was admitted to the bar around

18  1959.  I graduated from law school in '58.  And, of course,

19  in those days you could, even when I was district attorney

20  you could still have a private practice of law.  It was not a

21  full-time position back at that time.

22    Q.     Did you practice law between 1959 and 1964?

23    A.     Yes.

24    Q.     Where did you practice, sir?

25    A.     In Shiremanstown.

1      Q.      Was that a solo practice?

2      A.      Yes, it was.

3      Q.      And then after 1964, did I understand you to say

4   you continued with a part-time private practice and served in

5   the District Attorney's Office as well?

6      A.      That's correct.

7      Q.      Is the position of district attorney an elected

8   position, sir?

9      A.      Yes.

10      Q.      And you were elected to that position in 1968?

11      A.      That's correct.

12      Q.      And you were elected as a member of the

13   Republican party?

14      A.      Yes.

15      Q.      And you were elected to the position of judge at

16   some point?

17      A.      That was in 1997.

18      Q.      Okay.  Were you appointed in January of '78?

19      A.      No.  I was elected and I took office in January

20   of '78.  I was elected in November of 1977, I'm sorry.  1977

21   I was elected and I took office January 1, 1978.

22      Q.      Thank you, sir.  I think I managed to muddle that

23   a little bit.

24              And when you were elected to the bench, sir, were

25   you elected as a member of the Republican party?

1      A.      Yes.

2      Q.      Where did you do your legal training, sir?

3      A.      Dickinson School of Law.

4      Q.      And you graduated in 1958?

5      A.      Yes.  I got out of the Marine Corps in 1955 and

6   entered law school in September of 1955.

7      Q.      Between 1968 and 1976 when you were the district

8   attorney, were you subject to the county employment policies?

9      A.      Yes.  Pretty much so, yeah.  They paid my salary.

10     Q.      And how about when you were an assistant district

11  attorney, from '64 to '68?

12     A.      The county paid my salary during those years,

13  too.

14     Q.      I guess my specific question was:  Were you

15  subject to the county employment policies from 1964 through

16  and including 1976?

17     A.      I was to the extent of my salary was paid by

18  them.  The retirement policies of the county were -- I was

19  governed by them.

20             As far as my hours went, when I was an assistant

21  my hours were pretty much set by the district attorney.  I

22  did not have any county policy as far as the hours I was

23  required to spend at that time.

24     Q.      Do you know whether you had a county badge?

25     A.      A what?

1      Q.      A county identification badge?

2      A.      No.  I didn't have any bandages.

3      Q.      And do you know whether you received any copies

4    of the county employment manuals during that period of time?

5    I'm speaking now between '64 and '76.

6      A.      I knew we received information on our medical

7    benefits.  I do know we received information as to how much

8    of our salary was being deducted, what retirement was being

9    deducted from that, those type of things.  But as far as any

10   other policies go, I don't recall of any.  Like I say, the DA

11   pretty much directed how I was to conduct my affairs at that

12   time.

13     Q.      While you were an employee of the county

14   otherwise, did you receive any specific training in sexual

15   harassment?

16     A.      No.

17     Q.      Have you ever received any specific training in

18   sexual harassment?

19     A.      No.

20     Q.      Is that a subject that would have come before you

21   as a member of the Court of Common Pleas of Cumberland

22   County?

23     A.      Is that a subject that would have come before me?

24   I mean, I was aware of what sexual harassment is, I think.

25   But as far as any specific training, I don't recall even as a

1   judge that we had any seminars on sexual harassment, at least

2   not to my knowledge.

3       Q.    I guess my question not very artfully presented

4   was:  When you were a judge, did you have any cases before

5   you that involved sexual harassment?

6       A.    I'm sure -- we had a lot of criminal cases.  I

7   don't know, I assume you mean where one party filed a civil

8   suit against someone?  We didn't get involved in sexual

9   harassment suits.  I think that pretty much was restricted to

10  federal jurisdiction, to my knowledge.  I never had any civil

11  suits filed by one person against another person for sexual

12  harassment.  I never did.

13      Q.    Now, you knew Barbara Varner before she became a

14  probation officer, correct?

15      A.    I knew her when she worked for Cumberland County

16  Children and Youth Services.

17      Q.    Did you live near Ms. Varner at one time?

18      A.    I don't know.  I heard, I read someplace that she

19  had said that we were neighbors.  Now, I don't know, I lived

20  at 14 South Center Avenue and I don't remember, really,

21  honestly, of knowing Mrs. Varner when she lived in

22  Shiremanstown.  Her --

23      Q.    Do you remember meeting her husband at that time?

24      A.    No, I do not.  Not at that time.

25      Q.    So your only knowledge of Ms. Varner occurred

1    because of her employment with Children and Youth and in the

2    Probation Office?

3        A.    I think basically that's correct.  I lived next

4    to her ex-husband at one time, but -- and I knew of her then.

5    I met her son.  But other than that, my knowledge of her was

6    very remote until she -- until I met her when she went to

7    work for the county.

8        Q.    You said that you lived next to her ex-husband.

9    Was that at the same location?

10       A.    That was at Mechanicsburg.

11       Q.    Shiremanstown?

12       A.    We lived in Shiremanstown 1961.  We moved out of

13   Shiremanstown in 1993.  In 1993 we moved to Mechanicsburg and

14   we bought our house in Mechanicsburg.  And then later I found

15   out that her ex-husband, Ken Spidle, was our immediate

16   neighbor in Mechanicsburg.

17            Now, when Mrs. Varner lived in Shiremanstown, I

18   really don't know.  Obviously, it must have been sometime

19   after 1961, but I don't ever recall meeting either she or her

20   husband at that time in Shiremanstown.

21       Q.    Had you known Mr. Graham prior to his employment

22   with the county?

23       A.    I don't believe I knew him.  I knew his father.

24       Q.    And how did you know Mr. Graham's father?

25       A.    When I ran for district attorney, obviously that

1   was a political office.  Mr. Graham's father was a Republican

2   committee man in Newville and that's how I knew his father.

3   But I don't remember of actually, I don't remember knowing

4   Gary Graham until he came to work for the county.

5       Q.    Did you play any role in hiring Gary Graham?

6       A.    I don't think so.  I think he was hired by Judge

7   Shughart, as far as I remember.  I had no role in that.  I

8   was -- Judge Shughart was in charge of Probation at that

9   time.  I don't think I had any role in hiring.  I'm sure he

10  wouldn't have permitted me to do that, anyway.

11      Q.    Had you known Mr. Graham's mother?

12      A.    Yes, I did.

13      Q.    How did you know her?

14      A.    I knew her from some of the political meetings

15  that we used to go to.  They used to have functions,

16  political functions, all the committee people would go and

17  other people in the Republican party, and I knew, I met his

18  mother through that.

19          I even knew one time I remember when she was very

20  seriously ill and she was in a place there near Mechanicsburg

21  and we went out to visit her.  So I knew who she was, yes.

22      Q.    Do you know whether Mr. Graham's father supported

23  you in your races for political office?

24      A.    Yes, he did.  I know that he did.  I'm sure he

25  did.

1      Q.      Do you recall how he supported you?

2      A.      The committee people at that time would go around

3    town and try and get the people to come out and vote for you.

4    I think that's pretty much it.  I never received any money

5    from him or anything like that.

6      Q.      Do you recall whether Mr. Graham's father

7    supported you when you ran for both DA and for judge?

8      A.      Yes, I'm sure he did.

9      Q.      And was his mother active in politics in any

10   official capacity?

11     A.      I don't recall of his mother ever being directly

12   involved, in any official positions, anyhow.

13     Q.      Do you know whether she supported you in your

14   political efforts for district attorney or judge?

15     A.      I would think she did, yes.

16     Q.      Did you ever receive any correspondence from any

17   of the Graham family concerning their support of you

18   politically?

19     A.      I don't recall of any specific correspondence,

20   but I was always felt that they did.

21     Q.      How would you describe Gary Graham's personality?

22     A.      I don't know how you'd describe it.  I always

23   thought he was very capable, the same as Mrs. Varner, in

24   doing their jobs as a probation officer.  I didn't have that

25   many dealings with him that I could really speak on what type

1    of personality he was.

2        Q.      Did Mr. Osenkarski give you any information about

3    Mr. Graham's work or his behavior at work?

4        A.      I don't recall if he ever gave me any direct

5    correspondence, no.  About his work, no.

6               I knew, like I said, I had pretty close

7    relationships with all our probation officers.  They were

8    involved in court proceedings.  I'm the only one that did it.

9    So I really didn't need any information from Mr. Osenkarski

10   as to how well they were doing their jobs.  I felt I knew

11   that.  But other than that, I don't think he ever wrote to me

12   about anything.

13       Q.      And you described both of them in your July 11,

14   1997 memorandum as excellent employees?

15       A.      As far as I was concerned, they did their jobs

16   very well as probation officers, both of them.

17       Q.      Did you know Mr. Osenkarski and Mr. Graham to be

18   good friends?

19       A.      I think they were, yes.

20       Q.      How did you know that?

21       A.      Well, I started in the county in 1964 and became

22   DA in '68, and I think both of them at that time had or about

23   where they were hired at that time or -- I know that they had

24   worked together for many, many years, 20 years.  So I know

25   that in all appearances to me they always got along very

1    well.

2              I think the timewise, Osenkarski I guess was a

3    senior man timewise in the Department.  I believe Mr. Graham

4    was probably in the Juvenile section was probably second in

5    time, I think.  There were other probation officers in Adult

6    that had maybe more time.  So they worked very close together

7    and as far as I knew they were always good friends, yes.

8         Q.    Would you say they were buddies?

9         A.    I don't know of what they did after they left

10   work.  I don't know that.

11        Q.    Did you ever describe them as buddies?

12        A.    I don't know.  I don't recall saying that.  I'm

13   sure they were, though.

14        Q.    Do you recall referring to Mr. Osenkarski and

15   Mr. Graham as asshole buddies?

16        A.    No.  I don't recall that, no.  I know they were

17   buddies.  I don't recall ever saying they were asshole

18   buddies.

19        Q.    Is that a term that you might have used?

20        A.    I don't recall using it.

21        Q.    Do you think you didn't use it?

22        A.    Pardon me?

23        Q.    Do you think you did not use it?

24        A.    I don't think I actually referred to them in that

25   manner.

1          MR. ADAMS:  Objection, asked and answered.

2          THE WITNESS:  I know they were good friends.

3  BY MS. WALLET:

4     Q.    You don't believe that you told Ms. Varner that

5  you thought Mr. Osenkarski and Mr. Graham were buddies or

6  asshole buddies?

7     A.    I don't recall that, no.  I'm certain if she

8  would have asked me, if it come up I would have certainly

9  said they were friends.  I'm certain she knew that I knew

10  they were friends.  But whether or not I ever used the word

11  asshole with it, I don't recall of ever using that.

12     Q.    Now, you said she would know that you knew they

13  were friends.  How would she know that?

14     A.    Well, because I was, like I said, our office, the

15  judge's office was fourth floor, their office was third

16  floor.  I was down there quite a bit and we would talk and be

17  together.  I'm certain she saw that, Barbara saw that.  So

18  I'm certain she realized we were all good friends.

19     Q.    Did you know Mr. Graham to have a reputation for

20  being excitable?

21     A.    Yeah, I knew that he was excitable sometimes.  I

22  don't recall specifically how that came about, but he would

23  get excited sometimes, I think.

24     Q.    Did you ever observe that?

25     A.    I think I did probably.  I don't recall specific

1    instances, but I think there might have been times when I

2    observed this.  Not in his work but maybe on other things.

3    That would be my recollection.

4         Q.    And what other things would those be?

5         A.    I don't recall specifically how I knew this.  I

6    just had that opinion that he would be excitable sometimes.

7    Just like anyone else when certain things would come up, he

8    might be excitable about them.

9         Q.    Did you ever observe him to be loud?

10        A.    I heard him talk loud already, yes, I'm sure I

11   did that.

12        Q.    Did you observe him to be a hot head of sorts?

13        A.    I don't recall observations of being a hot head,

14   no.

15        Q.    Did you ever hear any complaints about

16   Mr. Graham?

17        A.    You mean how he did his job as a probation

18   officer?

19        Q.    Yes, sir.

20        A.    No, I don't think I heard any specific complaints

21   about how he did his job.

22        Q.    When you campaigned for office at one time did

23   you campaign against Sylvia Rambo?

24        A.    That was a judicial election, yes.

25        Q.    And when was that, sir?

1      A.      That was in 1977.

2      Q.      Were you aware of any allegations at that time

3   that Mr. Graham had made statements about Ms. Rambo?

4      A.      No, not that I recall.

5      Q.      Do you recall any controversy surrounding the

6   campaign of Ms. Rambo and Mr. Graham?

7      A.      No, I don't recall any.

8      Q.      You were aware, sir, that in or about July or

9   August of 1997, a couple of months before you retired, the

10  Probation Office was split into the Juvenile and Adult

11  Probation?

12     A.      Yes.  I think maybe that happened, I don't know,

13  I think maybe that happened in '96.  I'm not really sure.

14  That's been -- that's when Mr. Bolze left, and at that time

15  we split the Adult and Juvenile in separate sections with

16  separate supervisors.  I think it was in '96, although I

17  wouldn't swear to that.

18     Q.      No matter whatever time it was, did you make the

19  decision to split those two offices?

20     A.      Yes.

21     Q.      And why did you make that decision?

22     A.      At the time I believe I checked around and other

23  counties our size, I believe that's the way they had their

24  Probation Departments set up, separate Juvenile, separate

25  Adult.  At the time I thought that administratively it would

1    be a much better way to do it rather than having one man at

2    the top and then having separate supervisors for Adult and

3    Juvenile.  So that's the reason we did it.

4        Q.    And why did you think it would be better not to

5    have just one person at the top?

6        A.    I thought it would be better to have one person

7    responsible for Adult and one person specifically responsible

8    for Juvenile rather than having one guy at the top trying to

9    supervise both departments.  That's what I thought.

10       Q.    What was your relationship with Mr. Bolze?

11       A.    It was an excellent relationship.  Still do, as a

12   matter of fact, even as of this time.  We're on the prison

13   board together.

14       Q.    Did you have any problems with the way in which

15   he did his job?

16       A.    Problems?  No.  I think the reason we split it up

17   was he resigned.  He left the county as an employee and that,

18   at that time was when I decided to do this.  I don't recall

19   thinking about this or making any decisions on this before he

20   left.  He was always as far as I was concerned a very good

21   employee.

22            MR. MacMAIN:  Debbie, can we take a short break?

23            MS. WALLET:  Sure.

24            (Recess taken from 11:43 until 11:53 a.m.)

25   BY MS. WALLET:

 1        Q.     I believe when we took our break, Judge, we were

 2    talking about the split between the Adult and the Juvenile

 3    Probation Office.  So it was your decision to do that split

 4    after Mr. Bolze left?

 5        A.     That's correct.

 6        Q.     And you think that that was implemented

 7    coincident in time with Mr. Bolze leaving, or sometime

 8    thereafter?

 9        A.     I think it was probably sometime thereafter.  I

10    don't remember the exact date when I split it in relation to

11    when the exact date was that he left.

12        Q.     During the period of time that Mr. Bolze was the

13    director, was there an issue concerning how seniority should

14    be calculated?

15        A.     I'm not sure --

16               MS. WILLIAMS:  What do you mean by issue?

17    Perhaps you can clarify it.

18    BY MS. WALLET:

19        Q.     All right.  Do you recall there being a question

20    about whether probation officers should receive credit only

21    for the period of time that they worked in the Probation

22    Office, or whether they could also receive time for their

23    county service but outside the Probation Office?

24        A.     I don't recall if there was a question or not.

25    It was my thinking now that we -- seniority was based pretty

1    much on the time they spent in the Probation Office and other

2    county time was not considered, as far as advancements in the

3    Probation Office.  I think everything that I can recall was

4    done on seniority in the Probation Office.

5        Q.    Do you remember any issue at all about the

6    relationship between county time and Probation Office time?

7        A.    I don't recall any.  We had very few employees

8    that did not come directly to Probation.  I guess Mrs. Varner

9    came from other county employment, but I don't believe we had

10   too many other people that did that.

11       Q.    Let me show you, I don't think we'll mark this

12   although it was already marked as Osenkarski Exhibit No. 8.

13   Let me show you a memorandum, sir, from Lyle Herr to Ken

14   Bolze dated January of 1996.

15       A.    I've read the memo from Mr. Herr to Mr. Bolze.

16       Q.    My question, sir -- let's trade, I'll give you

17   the one with the sticker -- having looked at this memorandum

18   does that refresh your recollection at all about the existing

19   policy and Mr. Herr's disagreement with that policy?

20       A.    To my recollection, I never recall of this

21   memorandum from Mr. Herr to Mr. Bolze.  I don't think it was

22   ever discussed with me.

23       Q.    Do you think the issue of county time versus

24   Probation Office time was discussed with you by Mr. Bolze?

25       A.    I can't say that I discussed it with him.  It may

1  have been, but I don't remember.

2           Like I said, my feeling, my recollection was that

3  Probation, promotions in Probation were based on time in the

4  Probation Office and not considering other various employment

5  someone might have had.

6      Q.     Did Ms. Varner ever come to you and raise a

7  complaint or an issue about seniority?

8      A.     I don't recall of any such meeting.

9      Q.     Did the issue of seniority come up at the split

10  between the Juvenile and the Adult Probation Office?

11      A.     I think it did, yes.

12      Q.     Do you recall how it came up?

13      A.     Not really.  I think that John Roller, who was

14  set up as the head of Adult Probation, and Mr. Osenkarski,

15  who was set up as head of Juvenile Probation, I believe they

16  were the two senior people in time and that's the reason they

17  were given those positions.

18      Q.     And do you know whether they were the most senior

19  if we use county time together with Probation Office time, or

20  whether you just use Probation Office time?

21      A.     To my knowledge it was just Probation Office time

22  that determined their seniority.

23      Q.     After the split were you aware that the seniority

24  policy was different from --

25      A.     I wasn't, no.

1    Q.    So to the best of your recollection, nobody ever

2    brought this issue to you for resolution?

3    A.    Not that I recall.

4    Q.    Do you remember making any statements that if the

5    policy were changed, that the people would be grandfathered

6    into the old policy?

7    A.    I don't recall that, no.

8    Q.    Is it possible that you might have made such a

9    statement?

10    A.    Anything's possible, but I don't recall it.

11    Q.    In your mind it just wasn't an issue at all?

12    A.    In my mind, now, no.  My recollection is it

13    wasn't an issue, no.  I know, like I said, that when the

14    offices were split, Mr. Osenkarski and Mr. Roller were set up

15    as the heads of those departments because of their seniority

16    in the Probation Office.  They both had over 20 years, if I

17    recall.

18          MS. WALLET:  Let's mark for identification as

19    Deposition Exhibit 2 a multiple-page document.

20          (Sheely Deposition Exhibit No. 2 was marked.)

21    BY MS. WALLET:

22    Q.    Tell me when you're prepared to answer questions

23    about this memo.

24    A.    Am I supposed to read it first?

25    Q.    Well, I'm going to ask you if you ever saw this

1   memo.

2       A.      I'm sorry?

3       Q.      I'm going to ask you, sir, if you ever saw this

4   memo?

5       A.      No, I never saw this.

6       Q.      Were you aware, sir, in or about April of 1997

7   that Ms. Varner had made a written complaint concerning what

8   she called harassment or discrimination in the Cumberland

9   County Probation Office?

10      A.      To the best of my recollection I was not aware of

11  such a letter.

12      Q.      Were you aware of such a letter at the time that

13  you wrote your July 11 memorandum?

14      A.      I don't think so.  I don't think Mr. Hartnett

15  ever gave me a copy of this correspondence or let me know

16  that he had one.

17      Q.      Let me show you what's previously been marked as

18  Barbara Varner Deposition Exhibit No. 16.  Judge Sheely, tell

19  me when you're prepared to answer questions.

20      A.      I'm prepared.

21      Q.      I've handed you what has previously been marked

22  as Varner Deposition Exhibit 16.  It's entitled" my solution

23  to the problem, from Barbara Varner to Dan Hartnett dated

24  April 25, 1997.

25              Do you recall seeing this memo before today?

1      A.      No.  I was never copied on that.  I never saw it

2  before.

3      Q.      Would that include the handwritten block in the

4  corner, Dan, Dave, Barb Varner?

5      A.      I never saw that before, either.  I was never

6  aware of that issue.  Guns locked in our office, no.  I never

7  saw that before.

8      Q.      Thank you, sir.

9              Did you ever direct Mr. Osenkarski in or about

10  June of 1997 to prepare some kind of a corrective action plan

11  in response to allegations made by Ms. Varner?

12      A.      I don't think I did.  I think maybe in working

13  with Mr. Hartnett I think he, Mr. Osenkarski came up with a

14  plan.

15      Q.      Let me show you what has previously been marked

16  as Osenkarski Deposition Exhibit No. 2.

17      A.      Go ahead.

18      Q.      Do you recall having seen Osenkarski Deposition 2

19  prior to today?

20      A.      I don't recall it.  It's directed to me.  I don't

21  recall specifically when it was.

22      Q.      Do you have any reason to believe today that you

23  didn't receive this memo?

24      A.      No, I don't have that.  I'm sure, it's directed

25  to me, it probably was given to me.  I just don't recall

1    receiving it or anything else about it.

2        Q.    Okay.  What you got this memorandum which

3    referenced the current pending employee-related matter, did

4    you know what that matter was?

5        A.    I was not aware of any problems between

6    Mrs. Varner and Mr. Graham until Mr. Deluce came into my

7    office.  I'm not sure when that was.  This I see is dated

8    June 30th.  Whether or not that was after Mr. Deluce came to

9    my office, I would think probably it was.  So I would, in

10   answer to your question, yes, I was probably aware at that

11   time of the problems between Mr. Graham as Mrs. Varner.

12       Q.    All right.  When you got this memorandum marked

13   Osenkarski Deposition Exhibit 2, what did you do?

14       A.    I don't recall.  I don't know if I did anything

15   or not.  I see here that the recommendation was transfer

16   supervision of Mrs. Varner to someone else.  I know that that

17   was taking place.  But the other thing things, I don't recall

18   taking any action on them.

19       Q.    In any event, you never asked Mr. Osenkarski to

20   prepare this document?

21       A.    I never did.  I think this was something that he

22   and Mr. Hartnett, the personnel director, had worked out.

23       Q.    Did you do anything to stop Mr. Osenkarski from

24   implementing this plan?

25       A.    My recollection would be no, I did not do

1    anything to stop it.

2        Q.    He says in his second-to-the-last paragraph that

3    this was not a complete and final plan.

4              Do you know whether he provided anything further

5    to you after this June 30 memo?

6        A.    I do not recall of any further memo being

7    provided to me.

8        Q.    I note that page 2 of this document is dated July

9    3, 1997, and page is dated June 30.  Do you know anything

10   about that?

11       A.    No, I don't.  I don't recall why they were

12   different dates.

13       Q.    Did you know, sir, prior to July 11, 1997, that's

14   when you wrote your memorandum to Mr. Ward and Mr. Deluce,

15   that Ms. Varner had stated that she believed she had a fear

16   of retaliation or reprisal against her?

17             MR. THOMAS:  Objection to the form.

18             THE WITNESS:  I wasn't -- she never told me that.

19   BY MS. WALLET:

20       Q.    And nobody ever told you that she had made that

21   allegation in writing?

22       A.    Not that I recall.

23       Q.    Did anybody tell you that she had alleged that

24   Mr. Graham had screamed at her?

25       A.    I don't recall that.  I don't think she ever told

1    that to me.

2    Q.    Do you recall, sir, prior to July 11, 1997, that

3    Mrs. Varner had used the actual words "sexual harassment"?

4    A.    I don't recall that.

5    Q.    Did you know prior -- I'm sorry?

6    A.    I'm sorry, go ahead.

7    Q.    Did I interrupt you, sir?

8    A.    No, that's fine.

9    Q.    Did you know prior to July 11 of 1997 that she

10   alleged that she had been harassed and admonished by

11   Mr. Graham for taking her issues to Mr. Osenkarski?

12   A.    I don't recall that being said.  Again, she never

13   said that to me.

14   Q.    And did you know prior to July 11, 1997, that

15   Ms. Varner had alleged that Mr. Osenkarski had washed his

16   hands of the matter and had stated to her he had put in, I'm

17   quoting now, fucking 35 years in and now Mr. Graham is in

18   charge.

19   A.    I don't recall -- she never made that statement

20   to me, and I don't recall it being made.

21   Q.    Did you know in or about July 11, 1997, that she

22   had used the terms "hostile work environment" in respect to

23   her time in the Probation Office?

24   A.    I never recall that -- I don't recall that ever

25   being said to me, and I don't recall if she made that

1    statement to anyone else or not.

2        Q.    Were you aware in July of 1997 that she alleged

3    she had been harassed by Mr. Graham because she had revealed

4    information concerning Mr. Graham and Mr. Osenkarski's

5    out-of-the-office activities?

6        A.    I wasn't aware of that.

7        Q.    Were you aware that she had made allegations

8    about use of county phones with respect to Mr. Osenkarski and

9    Mr. Graham?

10       A.    They were never made to me, and I was not aware

11   that they were made.

12       Q.    Were you aware at all in or about July of 1997

13   that Ms. Varner had made complaints of sex discrimination?

14       A.    No.  They were never made to me.

15       Q.    Do you have the memorandum of July 11, 1997,

16   marked Sheely 1?

17       A.    Yes, I do.

18       Q.    You say in your memorandum that you had planned

19   to transfer Mr. Graham to Adult Probation and that you told

20   Dan Hartnett of this decision.

21             I assume that was an accurate statement at the

22   time that you wrote it?

23       A.    I'm sure it was.

24       Q.    Do you recall why you talked to Dan Hartnett

25   about your decision to transfer Mr. Graham?

1        A.      Well, by this time I was aware that Mrs. Varner

2   had made her complaints to Mr. Hartnett, and that's probably

3   why I told him what I had been thinking about doing as far as

4   a transfer to Adult Probation.

5        Q.      Do you recall when you told Mr. Hartnett of that

6   decision?

7        A.      No, I don't.  I see here I said I previously told

8   him, so it would have been sometime prior to July 11th.

9        Q.      Do you know whether it was before you met with

10  Barbara Graham and Gary Graham?

11       A.      I think it was before I met with them.

12       Q.      Do you know whether it was before you met with

13  Gary Graham and David Foster?

14       A.      I can't say that I knew that before, no.

15       Q.      You said that you had received information that

16  if true, and I'm quoting now, would nullify in my judgment

17  any sexual harassment claim involved in this relationship.

18              My first question is:  What information was that

19  that you believed would nullify your judgment about the

20  sexual harassment claim?

21       A.      That was the information I received when

22  Mrs. Graham and Mr. Graham came into my office and the

23  information was told to me about the relationship between

24  Mr. Graham and Mrs. Varner.

25       Q.      Anything else?

1     A.     Not that I recall.

2     Q.     And why did you believe in July of 1997 that that

3   information would nullify in your judgment any sexual

4   harassment claim?

5     A.     Well, I felt that if this relationship between

6   Mr. Graham and Mrs. Varner had been going on over these

7   years, that for me to take all this corrective action against

8   Mr. Graham and not do anything with her, that that would not

9   be proper.  She was involved, I thought, the same as he was.

10  And I didn't -- and at the time I had planned to transfer

11  Mr. Graham I didn't know about this relationship, and that

12  changed my mind.

13    Q.     Did you believe that a sexual relationship

14  between co-workers would necessarily cause you to impose

15  disciplinary action?

16    A.     No.  If it wasn't brought to my attention, what

17  they did on their own time, that was their own business.

18    Q.     And what was it about this particular

19  relationship of a sexual nature that would cause you to

20  potentially take disciplinary action against Ms. Varner?

21         MR. THOMAS:  Objection to form.

22         MS. WILLIAMS:  Objection.

23         THE WITNESS:  Really, I didn't take any

24  disciplinary action against Mrs. Varner.  I did nothing --

25  she kept her job, she got no time off.  To my knowledge, I

1  didn't do anything as far as Mrs. Varner was concerned.

2  BY MS. WALLET:

3     Q.     Well, if I understand your testimony, you said

4  you were going to take more action against Mr. Graham?

5     A.     That's right.  I was going to do that before I

6  found out about this relationship.

7     Q.     And then you found out about the relationship and

8  you changed your mind.

9     A.     That's what I did, yes.

10    Q.     And the reason was you didn't think it would be

11 fair to punish one but not Ms. Varner?

12    A.     That was part of it, yes.

13    Q.     Did you think that Ms. Varner would be deserving

14 of some disciplinary action as a result of this alleged

15 relationship?

16    A.     Not really.  But I didn't think because of the

17 relationship that he was, either.

18    Q.     You mentioned that you thought with better

19 supervision in Juvenile Probation that both of these people

20 could continue to work there.

21           What did you do to ensure that there would be

22 better supervision in this department?

23    A.     I think based on my discussions with

24 Mr. Osenkarski, I wanted him to be more personally involved

25 in this relationship, and if there were any further problems,

1    to let me know.  And I don't recall of hearing any further

2    problems.

3            As I said, both of these parties are college

4    graduates, they're adults, and I feel that they ought to be

5    able to treat each other decently in their work relationship,

6    and I was hoping that that's what would take place after all

7    this, after all this was done by me.  And I wanted

8    Mr. Osenkarski to supervise this and if there was any other

9    problems, to let me know.  And that's what I did.

10    Q.    Do you recall what you told Mr. Osenkarski to do?

11    A.    No, I don't recall what I told him to do.  I felt

12    that he would be able to act on his own on any problems that

13    later developed then between Mrs. Varner and Mr. Graham.

14    Q.    Judge Sheely, did you have any information in

15    July of 1997 that Ms. Varner had acted in any way improperly

16    toward Mr. Graham in the workplace?

17    A.    I don't recall of any information that I had that

18    she had acted improperly towards him.

19    Q.    Did you have any allegations that she yelled at

20    him?

21    A.    No, I wasn't aware of that.

22    Q.    Did you have any allegations that she used foul

23    language?

24    A.    No, I never recall hearing those allegations.

25    Q.    Did you have any allegations at that time that

1   Ms. Varner had acted unprofessionally in any way in the

2   workplace?

3       A.    I'm just trying to think.  To my recollection,

4   no.  I don't recall of any.

5       Q.    You decided to suspend Mr. Graham for three days,

6   July 25, 26 and 27.  Correct?

7       A.    That's what this says here, yes.

8       Q.    Did you decide on those three days?

9       A.    Yes, I did at the time, I decided on those days.

10      Q.    How did you decide on those days?

11      A.    I don't recall.

12      Q.    Did you consult with Mr. Osenkarski about whether

13  or not Mr. Graham could be out of the office for those days?

14      A.    I really don't recall doing that but I think I

15  probably did.  I would certainly let him know what I was

16  going to do.  And he got a copy of this letter, so he knew

17  it.

18      Q.    Do you recall, sir, that eventually the effective

19  dates of the suspension was changed?

20      A.    I don't recall that, no.

21            MS. WALLET:  Let me hand you what we'll marked as

22  Deposition Exhibit 3.

23            (Sheely Deposition Exhibit No. 3 was marked.)

24            MS. WALLET:  I've handed the witness what we've

25  marked as Sheely deposition No. 3, which I'm told is the same

1    as Varner Deposition No. 3.

2    BY MS. WALLET:

3        Q.    Do you recall seeing that, sir, prior to today?

4        A.    No, I don't recall seeing it.

5        Q.    Those are your initials?

6        A.    They certainly are, yes.

7        Q.    Okay.  Do you have any reason to believe you

8    didn't issue this memo in or around July 17, 1997?

9        A.    No.  I'm satisfied that the information on the

10   memo is correct.

11       Q.    Do you have any recollection as to why you

12   changed the dates of the suspension?

13       A.    No, I do not.

14       Q.    You said in your July 11 memo that you were not

15   in a position to hold a hearing with witnesses under oath.

16   Why did you say that?

17       A.    When I wrote this I then knew that both parties

18   were represented by attorneys, and I felt at that time that I

19   was not in a position, for instance, to order Mrs. Varner to

20   come in and be subject to questioning by me as to what had

21   taken place.  And I was not going to order Mr. Graham to come

22   in and talk to me without his attorney being present, either.

23           So that's what I meant by that, that I'm not in a

24   position to hold any hearings because now both parties are

25   represented by attorneys, and for me to order them to come in

1    I thought would certainly have been improper.

2        Q.    They both worked for you, correct?

3        A.    They sure did, yes.  And I would have been happy

4    to speak with either one of them, which I did speak to

5    Mr. Graham, if they wanted to come in and see me.  But I felt

6    it was improper for me to order them to come in when they had

7    counsel in this matter.

8        Q.    How did you know that Ms. Varner had counsel?

9        A.    I knew that at the time because I copied you.  I

10   don't recall specifically how I knew that she was represented

11   by you, but I certainly did at the time I wrote this memo.

12       Q.    Did you believe that a copy of this memo was sent

13   to me in or about July 11 of 1997?

14       A.    I assume.  I would believe that anybody that was

15   copied would have gotten a copy of this.

16       Q.    And you would have delegated that to your

17   secretary?

18       A.    I would think my secretary would probably have

19   done that.  She usually did.

20       Q.    Who was your secretary at this time?

21       A.    Sandy Davis.

22       Q.    Did you have any discussions with Sandy Davis

23   about the investigation into the allegations of Ms. Varner?

24       A.    I probably did have some discussions with her.  I

25   don't recall when and what they were, but she was my

1    secretary and I'm certain that she typed up this memo, I

2    guess, and I'm certain I would have discussed matters with

3    her, yes.

4        Q.    What do you recall saying to Sandy Davis about

5    this matter of the allegations made by Ms. Varner?

6        A.    I don't recall any specific discussions I had

7    with her about that.

8        Q.    Did you talk with her about the possibility of

9    disciplining Mr. Graham?

10       A.    I don't recall if I spoke specifically with her

11   about that issue or not.  If she typed this memo I'm certain

12   she saw it on there.

13       Q.    Do you know whether Ms. Davis had access or

14   otherwise read the Deluce memo?

15       A.    No, I'm sure she didn't, because I never got a

16   copy of it, either.  I read it but he never gave me a copy,

17   to my knowledge.

18       Q.    And you believe he gave that to you personally by

19   handing it to you?

20            MR. THOMAS:  Objection to form.  That misstates

21   his testimony.  He said he never had a copy.  He said he read

22   it.  He didn't have a copy.

23   BY MS. WALLET:

24       Q.    So Mr. Deluce at some point handed you a

25   document, you read it and then you gave it back?

1      A.      That's my recollection, yes.  I know I never had

2  that in my file.

3      Q.      Did you know, sir, prior to today that

4  Mr. Osenkarski had testified to a conversation he had with

5  Sandy Davis regarding this matter?

6      A.      No, I did not.  I don't recall that.

7      Q.      Did you know at any time that Sandy Davis had had

8  a conversation with Mr. Osenkarski regarding these matters?

9      A.      I don't know that as a fact, no.

10     Q.      Did Sandy Davis discuss with you the allegations

11 of Ms. Varner against Mr. Graham?

12     A.      Not to my knowledge.

13     Q.      Did she give you any advice about this

14 allegation?

15     A.      No, not to my knowledge.

16     Q.      Did you ask her about this matter?

17     A.      Not to my knowledge.  I wouldn't think I would

18 ask my secretary for some information on something like this.

19     Q.      Did Mr. Osenkarski ever say to you:  Sandy Davis

20 told me that I might be dismissed as a result of this

21 allegation of Ms. Varner's?

22     A.      I don't recall such a statement ever being made

23 to me.

24     Q.      You have absolutely no knowledge of any

25 conversation between Sandy Davis and Mr. Osenkarski regarding

1   these allegations?

2      A.    No, I have no recollection of any such

3   conversation.

4      Q.    Sir, at any time did you hire anyone to

5   investigate the allegations that were made by Ms. Varner

6   against Mr. Graham?

7      A.    No.

8      Q.    Did you assign to anyone the responsibility to

9   investigate these complaints by Ms. Varner against

10  Mr. Graham?

11     A.    No.

12     Q.    Did you yourself engage in any investigation of

13  these allegations of sexual harassment by Ms. Varner against

14  Mr. Graham?

15           MR. THOMAS:  You mean other than the things he's

16  already testified to?

17           MS. WALLET:  Correct.

18           THE WITNESS:  In addition to those things?  No.

19  BY MS. WALLET:

20     Q.    Well, did you consider any of those things to be

21  the assignment of an investigation?

22     A.    No.  I thought it was no obligation on me to

23  investigate any further than the information I already had.

24     Q.    And the information was what you had gotten from

25  Mr. Deluce, what was told to you by Mr. Osenkarski, and what

1   had been told to you by Mr. Graham?

2      A.    I think that was basically it, yes.

3      Q.    Other than the discussion that's referenced in

4   the July 11, '97, memo, Sheely 1, this conversation with Dan

5   Hartnett, did you have other conversations with Mr. Hartnett

6   about this matter?

7      A.    I don't believe.

8      Q.    Would that include the period after July 11,

9   1997?

10     A.    I don't recall of any specific conversations I

11   had with Mr. Hartnett.  He got a copy of this memo.  I don't

12   recall any further ones, either conversations or memos.

13     Q.    Did you have any conversations with Mr. Deluce

14   after July 11, 1997?

15     A.    I don't believe.

16     Q.    Your memo says that you met with Mr. Graham on

17   July 9, 1997, when he came to your office.  Do you have any

18   reason to believe that that's not an accurate date?

19     A.    I don't.  I'm sure at that time I knew when July

20   9th was, I would assume it would have been accurate.

21     Q.    And was that the meeting that you described

22   earlier between you, Mr. Graham and Mrs. Graham?

23     A.    I don't -- I can't say that that was the date.  I

24   really don't remember.  It could have been.  I think that's

25   probably correct.

1     Q.    Do you have any reason, sir, today to believe

2  that your statement in the next sentence that you spoke with

3  Mr. Graham and his attorney on Thursday, July 10, 1997, at

4  their request, is inaccurate?

5     A.    No, I think it's accurate.

6     Q.    Do you have any explanation, sir, as to why there

7  was a delay between April when Ms. Varner made her Complaint,

8  and when you issued your memorandum in July of '97?

9        MR. ADAMS:  I'm going to object.  I don't know

10  that any evidence has been presented that Ms. Varner made her

11  complaint in April of that year.

12        MS. WALLET:  Well, I think we've already marked

13  the Varner memo of April 25, 1997.

14        MR. ADAMS:  Okay.

15        MS. WILLIAMS:  I'll object, because the judge has

16  already testified that he had no knowledge of that memo.

17  BY MS. WALLET:

18     Q.    This is a different question, sir.  My question

19  is:  Do you have any knowledge as to why there was a delay

20  between the time that Ms. Varner made her Complaint in April

21  and when you issued your memorandum in July?

22        MR. THOMAS:  Objection to form.

23        THE WITNESS:  No, I have no idea about that.

24  That was a matter between the county and the county attorney,

25  and so I don't know why the delay was.

1    BY MS. WALLET:

2        Q.      Did you make any recommendation that

3    Mr. Osenkarski receive any disciplinary action?

4        A.      No.

5        Q.      Do you know whether anyone else made a

6    recommendation that Mr. Osenkarski receive disciplinary

7    action in or around July of 1997?

8        A.      I think I just saw this memo from Ms. Varner, she

9    made the recommendation to Mr. Hartnett.

10       Q.      Did anyone else make such a recommendation

11   regarding discipline of Mr. Osenkarski?

12       A.      Not to my recollection.

13               MS. WALLET:  Let's mark as Deposition Exhibit 4 a

14   one-page memo.

15               (Sheely Deposition Exhibit No. 4 was marked.)

16               THE WITNESS:  I've read it.

17   BY MS. WALLET:

18       Q.      Do you recall having seen this memorandum prior

19   to today?

20       A.      I don't recall seeing it.

21       Q.      Do you have any reason to believe that you didn't

22   get this memo in or about July of 1997?

23       A.      I don't know if I got -- I have no recollection

24   of ever getting this.

25       Q.      This references a meeting and it says involving

1    you, and I take that to mean you, Judge Sheely, Dave Deluce,

2    John Ward, and Mr. Hartnett.  Do you recall that meeting?

3         A.    No, I do not.

4         Q.    Do you have any reason to believe you didn't have

5    such a meeting?

6         A.    I don't recall it.  Whether or not there was one,

7    I don't recall.

8         Q.    The memo goes on to say:  We are in agreement

9    with your position involving a suspension of Mr. Osenkarski.

10             Did you ever take the position that

11   Mr. Osenkarski should be suspended?

12        A.    I never recall making a statement to Dan Hartnett

13   that I recommended that Mr. Osenkarski be dismissed.  I don't

14   recall making such a statement.

15        Q.    Well, the question, sir, wasn't that he be

16   dismissed, but rather, that he be suspended.

17        A.    I don't recall ever making a statement to

18   Mr. Hartnett that I felt Mr. Osenkarski should be suspended.

19             MR. ADAMS:  Can we go off the record for a

20   moment?

21             (Discussion held off the record.)

22   BY MS. WALLET:

23        Q.    Do you have any recollection, sir, of any

24   discussion regarding sending Mr. Osenkarski to an Employee

25   Assistance Program?

1        A.        No, I do not.

2        Q.        Do you believe that you took some action after

3    you received this July 8, 1997, memorandum?

4        A.        Involving Mr. Osenkarski?

5        Q.        Or anyone.

6        A.        I don't recall ever taking any action against

7    Mr. Osenkarski.

8        Q.        Well, you got this memo after you got this memo

9    that said we agree with your position involving suspending

10   Mr. Osenkarski.  Did you ever fire back a memo saying:  I

11   never recommended that?

12       A.        No, I never --

13            MR. THOMAS:  Objection to the form and the

14   characterization.  What the sentence says is:  We are in

15   agreement with your position involving a suspension of

16   Mr. Osenkarski.  It doesn't say that Judge Sheely advocated a

17   suspension, necessarily; merely that apparently the writer

18   was in agreement with the judge's position.  I don't want you

19   to mischaracterize the document.

20   BY MS. WALLET:

21       Q.        My question, sir is:  Did you take some action

22   after this July 8, 1997, memo to either clarify your position

23   or to correct it in some fashion?

24       A.        I recall no action being taken by me.

25       Q.        Did you express a position regarding the

1    suspension of Mr. Osenkarski in or about July of '97?

2        A.    I don't recall making such a statement, no.

3        Q.    Do you recall anybody recommending to you that

4    Osenkarski be suspended?

5        A.    I don't recall.  It's possible.  I don't recall.

6        Q.    Do you know whether Gary Graham was suspended for

7    three days?

8        A.    I don't know for sure.  I assumed that he was.

9        Q.    Why do you assume that?

10       A.    Because I directed that he be suspended for three

11   days.  I possibly checked up on it at the time, but I don't

12   recall now knowing for sure that he served his three days or

13   not.

14       Q.    When you directed that Mr. Graham be suspended

15   for three days, was it your intention that he lose pay for

16   three days?

17       A.    Pardon me?

18       Q.    Was it your intention, sir, that he lose pay for

19   three days?

20       A.    I don't recall if that was my intention or not.

21   I didn't put it on there, so I don't recall if he lost three

22   days' pay or not.

23       Q.    Did you believe that your directions would be

24   carried out if he was suspended but he continued to be paid?

25       A.    My direction was that he be suspended without

1    pay.  I would assume that this was done, although I never

2    checked on it to see whether that was done or not.

3        Q.     And who would have had responsibility for doing

4    that, sir?

5        A.     That would have been from the controller's office

6    in the county, they would deduct the three days' pay.  I

7    would assume that's how it would have been done.

8        Q.     Would Mr. Osenkarski as Mr. Graham's direct

9    supervisor have had some responsibility for that?

10       A.     He would have to notify the controller's office

11   to deduct three days' pay from Mr. Graham.

12       Q.     And you don't know whether that ever happened?

13       A.     I don't recall of ever following that up or not,

14   no, I don't.

15       Q.     After your July 11, '97, memorandum, did you hear

16   anything more about Ms. Varner's allegations?

17       A.     No, I don't recall.  I thought that the

18   appointment of Mr. Miller to work with Barbara in the office

19   as far as her assignments are concerned, and I hoped that

20   there would not have been any further problems between she

21   and Mr. Graham.  So I don't recall of any further complaints

22   about what was taking place between she and Mr. Graham.

23       Q.     After July of '97 did you ever go to

24   Mr. Osenkarski and ask him how things were going?

25       A.     I cannot honestly say at this time whether I did

1   or did not.

2       Q.      Did you tell Ms. Varner that you were preparing

3   to issue the memorandum of July 11, 1997?

4       A.      I don't recall making any statement to her that I

5   was preparing to do this.

6       Q.      Did you see her at all in or around July 11 of

7   1997?

8       A.      I don't recall seeing her.  I don't recall.

9       Q.      Do you recall telling Ms. Varner that Mr. and

10  Mrs. Graham had made a tearful confession to you about the

11  extramarital relationship between Mr. Graham and Ms. Varner?

12      A.      No, I don't recall telling Mrs. Varner that, but

13  what you said was truthful.

14      Q.      You don't recall any conversation in which you

15  told her that they were both crying and that --

16      A.      I don't recall such a conversation, but what you

17  said is truthful, but I don't recall telling her that.

18      Q.      Did you ever tell Ms. Varner that she would just

19  have to put up with the environment in the Probation Office?

20      A.      I don't recall saying that.

21      Q.      Judge, do you recall having any conversations

22  with Ms. Varner between July of '97 and when you retired from

23  county employment in December of '97?

24      A.      No, honestly I cannot say that I recall any

25  conversations with Mrs. Varner.  I may have, but I don't

1    recall any.

2        Q.      When you retired in December of '97 did you think

3    that this whole matter of Ms. Varner's allegations had been

4    resolved?

5        A.      I think I did, yes, basically.  I don't think I

6    heard anymore for a period of months that there was any

7    additional problems.

8        Q.      Do you recall hearing that Ms. Varner had filed a

9    charge at the Human Relations Commission or at the EEOC

10   regarding these matters?

11       A.      I think I did, but I can't recall when I received

12   that information.  And I don't think it was while I was still

13   a judge, I don't think.  I don't know when those charges were

14   filed.

15       Q.      You think you might have learned of this after

16   you had already retired?

17       A.      That's what I think.

18       Q.      Did you keep any kind of a file on Ms. Varner's

19   allegations?

20       A.      No, I did not.  Like I say, I never received any

21   direct allegations from Mrs. Varner, to my knowledge.

22       Q.      Do you know where in your office you would have

23   filed the July 11, 1997, memorandum?

24       A.      No, I don't.

25       Q.      Did you think that your involvement in this

1    matter was finished when you issued the July 11, '97, memo?

2        A.      I was hoping that it would be finished.

3        Q.      And what would happen that would cause you to

4    believe that you weren't finished?

5        A.      That I was finished or was not finished?

6        Q.      Not a good question.  Let me strike that and try

7    again.

8                You hoped, you said, that your involvement was

9    finished.

10       A.      Yes.

11       Q.      What actions or circumstances after July would

12   cause you to become re-involved?

13       A.      I don't recall being re-involved after this

14   memorandum was issued.  As far as taking any action against

15   anyone, I don't recall.  I thought the problem -- I think now

16   I thought the problem was resolved with what was done in

17   relation to this memo.

18       Q.      If you had known then that Ms. Varner had made

19   allegations of a hostile work environment, would you have

20   acted differently?

21       A.      Would I have what?

22       Q.      Acted differently.

23               MR. THOMAS:  Objection to the form.

24               THE WITNESS:  If she would have came to me and

25   told me about her problems and if I believed that they were

1   true, depending on what the nature of the problems was, I

2   might have done something more.  I don't know.

3   BY MS. WALLET:

4      Q.    When you left county employment in December of

5   '97, did you brief then-President Judge Hoffer on matters

6   that were still pending at the time of your retirement?

7         MS. WILLIAMS:  Objection to the form.  Judge

8   Sheely never testified that he was a county employee.

9         THE WITNESS:  I was state employee.

10  BY MS. WALLET:

11      Q.    I'm sorry?

12      A.    I think I did talk --

13         MS. WILLIAMS:  Maybe you can clarify --

14   hold on a second, Judge.

15  BY MS. WALLET:

16      Q.    Let me just ask another question.

17         When you left the bench in December of 1997 did

18  you brief your successor on matters that were pending in the

19  Probation Office?

20      A.    I don't recall if I did.  I'm sure I discussed

21  with Judge Hoffer the problems involving Mr. Graham and

22  Mrs. Varner.  I didn't put them in writing, but I'm certain

23  that before I left I had discussions with Judge Hoffer about

24  what these prior problems had been, because he was going to

25  have to resolve them if they come up again.

1    Q.    And what do you recall telling Judge Hoffer about

2  these matters?

3    A.    I don't recall any specific information I told

4  him.  Whatever I was aware of at the time I'm certain I told

5  him, but I don't remember now what it was.

6    Q.    Well, do you know whether Judge Hoffer had had

7  prior knowledge of the allegations of Ms. Varner?

8    A.    I don't know that as a fact, but I'm certain that

9  all the judges in the county were aware that there had been

10  some problems.  You know, this information spreads pretty

11  quick.  I don't know that as a fact, but the other judges, I

12  know I told, discussed this with Judge Hoffer before I left.

13    Q.    Do you think you discussed this with the other

14  judges in or around July of '97?

15    A.    No, I'm sure I didn't discuss it with them then,

16  because I didn't discuss it with Judge Hoffer then, either,

17  I'm sure.

18    Q.    And you don't recall what you told Judge Hoffer

19  when you left your employment on the bench?

20    A.    No, I'm sorry, I don't recall what the specific

21  information was that I told Judge Hoffer then.

22    Q.    Do you remember anything about what you told him

23  at that time?

24    A.    No, I do not.

25    Q.    At the time that you left in December of 1997 was

1   this Varner-Graham situation just not important to you?

2              MR. THOMAS:  Objection to the form.

3              MR. ADAMS:  Objection.

4              THE WITNESS:  I thought that the problem had been

5   resolved because I hadn't heard anything about any further

6   problems for months.  I was not aware of any other problems

7   going on when I left.

8   BY MS. WALLET:

9       Q.     How long did Barbara Graham work as your court

10  stenographer?

11      A.     I don't recall the dates.  I think, I know when I

12  became a judge she started as my court stenographer at the

13  same time.  I believe that when Barbara had children she

14  resigned for a while, I'm not -- so I don't really know how

15  many years she did work for me.

16      Q.     Do you think it was years as opposed to months?

17      A.     Oh, yeah.  It was definitely years, I'm certain.

18      Q.     And was a specific stenographer assigned to do

19  all your court work?

20      A.     She did all my court work except if she couldn't

21  get it done, then we would get another court stenographer to

22  come in.

23      Q.     Or if she were absent for some reason?

24      A.     That's right.

25      Q.     Did Ms. Graham work as your court stenographer

1   while she was pregnant?

2       A.    I don't recall.

3       Q.    Did you have a policy with regard to having

4   pregnant employees?

5       A.    No.  As far as I was concerned they could work

6   with me as long as they were able to work.

7       Q.    Did you have any other employees who were

8   pregnant?

9       A.    You mean in the Probation Office?

10      Q.    Anywhere, sir.

11      A.    I don't recall at this time whether or not any of

12  the girls were pregnant about this time or not.

13      Q.    How did you learn that Gary Graham had been

14  transferred to the prison?

15      A.    After I retired I used to go up to the courthouse

16  once in a while, and I don't know if Judge Hoffer -- I ran

17  into Judge Hoffer and he told me, or someone else told me,

18  but I did find out on one of my visits that Mr. Graham had

19  been transferred to the prison.

20      Q.    And of course, you were gone by then so you

21  didn't play any role in that, correct?

22      A.    No.  I never had any knowledge of that, no.  That

23  was Judge Hoffer's decision.

24      Q.    Did Judge Hoffer ever consult with you about his

25  decision to transfer Mr. Graham to the prison?

1      A.    No, I don't think so.  I wasn't aware of this

2  until it was done.  I had no knowledge of that.

3      Q.    Did Judge Hoffer tell you why he had taken this

4  action?

5      A.    No.  I didn't ask him why.  I thought that was

6  his own business.  He was now the president judge, and he

7  never told me and I never asked him.

8      Q.    Did Mr. Graham come to you and talk to you about

9  his transfer to the prison?

10      A.    Not to my knowledge.  I might have -- I might

11  have spoke to him on the phone sometimes after this had been

12  done, but he never -- I don't recall him coming to me.  If he

13  did, I don't recall that.  I certainly never tried to

14  intervene or anything else in this matter.  I thought it was

15  Judge Hoffer's decision.

16      Q.    And this phone conversation you just referenced,

17  would that have been a conversation that you initiated to

18  Mr. Graham or that he initiated to you?

19      A.    No, that would be one he initiated to me.

20      Q.    Do you recall why Mr. Graham told you he was

21  calling you?

22      A.    I don't recall.  I think at that time he was

23  thinking about maybe getting an attorney.  I think that came

24  up during that conversation.  But other than that, I don't

25  recall what the specifics were.

1      Q.     Well, did you think it unusual that he would call

2    you after you were no longer on the bench?

3      A.     No, I didn't think it was unusual.  I get calls

4    from former county employees from time to time.  I think the

5    purpose of the call primarily was to let me know that he was

6    thinking about getting an attorney or was going to get one,

7    that was my recollection.

8      Q.     And did you give him any advice at that time?

9      A.     No, I didn't give him any advice.  I think what

10   he was going to do at that time would have been up to him.

11     Q.     Did you express any opinions during that

12   conversation about the Varner-Graham matter?

13     A.     I don't believe I expressed any opinion.  I think

14   my memo had already set forth my opinion about that

15   relationship, and so what Judge Hoffer did, that was up to

16   him.

17     Q.     Did you ever observe Mr. Graham relate to women

18   in less than a professional manner?

19     A.     Did I ever?  Not to my knowledge.

20     Q.     Did any woman who worked in the Probation Office,

21   other than Ms. Varner, ever come to you to discuss Gary

22   Graham?

23     A.     Not to my knowledge.  If they did, I don't recall

24   it at this time.

25     Q.     Whose idea was it, sir, to remove Gary Graham

1    from supervisory responsibilities over Ms. Varner?

2        A.    Well, I made the decision.  I don't know if

3    Mr. Osenkarski recommended that this be done or who

4    recommended it.  I know I made the decision, and I thought

5    that was proper, that that would eliminate any close contact

6    the two had to have with each other.  So I made the decision.

7    Whether or not it was recommended by someone else, I don't

8    recall.

9        Q.    Do you remember, sir, what facts you were aware

10    of at that time that caused you to believe that removing him

11    from her supervision would be required?

12        A.    Just a general involvement of the parties.  I

13    felt that Mr. Graham should not be in direct relationship

14    anymore with Mrs. Varner.  And I also at that time had made a

15    suspension based on improper language that Mr. Graham had

16    used toward her.  I thought that that was a proper thing to

17    do.

18        Q.    So you believe that the removal of the

19    supervision came in or about July of '97?

20        A.    I'm sorry?

21        Q.    You think the removal of the supervision by

22    Graham over Varner came in or about July of '97?

23        A.    I think so.  I don't recall the exact time.  I

24    saw in my letter here that I -- I said here Sam Miller would

25    work with Mrs. Varner on her assignments.  I think it was

1    about this time, I guess, that that took place.

2              MS. WILLIAMS: Off the record.

3              (Recess taken from 1:04 until 1:10 p.m.)

4              MS. WALLET:  Judge Sheely, I have no more

5    questions.

6    BY MR. THOMAS:

7        Q.    Judge, Jim Thomas.  Nice to see you.  I have a

8    few questions for you.

9              If I understand the hierarchy in the Probation

10   Department, judge Shughart before you was sort of the head of

11   the Probation Department.  Is that fair?

12       A.    That's correct.

13       Q.    And you then assumed that role when you assumed

14   the position as president judge, correct?

15       A.    That's correct.

16       Q.    The probation officers reported directly to you?

17       A.    They did to me as far as any of their cases that

18   they had, yes.

19       Q.    Right.  And I gather that you had the ultimate

20   say in who got hired to fill positions in the Probation

21   Department?

22       A.    That's correct.

23       Q.    And you had the right, if anybody had a right, to

24   fire people in the Probation Department?

25       A.    I had that right and never had to use it except

1    on one occasion.

2        Q.    Which you described to us earlier?

3        A.    Which I described before, right.

4        Q.    And with respect to the right to discipline

5    probation officers, again, that rested with you, correct?

6        A.    Yes.

7        Q.    There wasn't any employee of the county who had

8    the right to hire, fire, or discipline probation officers; is

9    that correct?

10       A.    That's correct.

11       Q.    And in fact, in this instance when you ultimately

12   decided to suspend Mr. Graham for a couple of days, for three

13   days, that was a decision that you made, correct?

14       A.    That's correct.

15       Q.    There was a decision to divide the Probation

16   Offices between Adult and Juvenile at the time Mr. Bolze

17   retired.  Do you recall that testimony?

18       A.    I do.

19       Q.    And again, that was a decision I gather that you

20   made?

21       A.    That's correct.

22       Q.    And made it without the input or approval or

23   sanction of the employees of Cumberland County, correct?

24       A.    I'm sure I discussed it with Mr. Osenkarski and

25   Mr. Roller, but I didn't need their approvals.  I think I

1    discussed it with them before I did it.

2        Q.      In other words, you sought their counsel in terms

3    of whether or not that made sense, but the ultimate decision

4    was yours, correct?

5        A.      That is correct.

6        Q.      You mentioned earlier, I think, in your testimony

7    that the county provided certain services in terms of

8    probation officers, correct?  For instance, they cut the

9    paychecks, I assume, for the probation officers, right?

10       A.      That's correct.

11       Q.      And the salary scales were something that you

12   followed as provided by the county, correct?

13       A.      We had set salary scales for our probation

14   officers, yes.

15       Q.      At the time that -- and I may remember this

16   testimony incorrectly, so you correct me if I'm wrong -- if

17   the Barbara Varner was hired, I thought I heard your earlier

18   testimony to be that Mr. Graham was advocating for her hire.

19              Did I hear that correctly?

20       A.      That's correct.

21       Q.      What are you able to tell me about that?

22       A.      All I remember, really, is that Mr. Graham was

23   recommending that she be hired in the Probation Office, that

24   she had, I think he had mentioned that she had done her job

25   well at Children and Youth.  And she was then recommended by

1  Mr. Osenkarski, I guess, and I went along with their

2  recommendation.

3      Q.    Do you remember anything about the relationship

4  at that point between Ms. Varner and Mr. Graham?

5      A.    No.

6            (Interruption.  Discussion held off the record.)

7  BY MR. THOMAS:

8      Q.    Do you know why Mr. Graham was advocating on

9  behalf of Ms. Varner at that time?

10     A.    No.  I assumed that he had contacts with her and

11 she being in Children and Youth and he being in Probation,

12 and she thought -- he thought that she would make a good

13 probation officer.

14     Q.    In hindsight following Mr. Graham's confession to

15 you about the consensual affair with Ms. Varner, does any of

16 that with the perfect vision of hindsight look any different

17 to you?

18            MS. WALLET:  Objection to the form of the

19 question.  Causes the witness to speculate.

20            THE WITNESS:  No.  Well, you mean as far as what

21 I did, I should have did something different now with

22 hindsight?

23 BY MR. THOMAS:

24     Q.    No.  Whether or not after the confession by

25 Mr. Graham, his advocating for her employment now causes you

1   to wonder what the nature of their relationship was at that

2   time?

3        A.    I had no reason to believe that there was any

4   involvement between those two at that time.  I don't know.  I

5   think he had mentioned to me that there was, but I don't -- I

6   certainly had no knowledge of any relationship at the time

7   that Mrs. Varner was hired as a probation officer.

8        Q.    During the period of time that Mrs. Varner worked

9   under your authority as a probation officer, are you able to

10  describe the nature of the relationship between her and

11  Mr. Graham?

12       A.    I never knew that there were any problems and I

13  never saw any, so I thought they had a good relationship.

14       Q.    And in fact, in your report of July 11th you

15  described them as best of friends?

16       A.    That's correct.

17       Q.    Is that correct?

18       A.    That's correct.

19       Q.    What was the basis for your characterization of

20  their relationship as best of friends, in your memo of July

21  11, '97?

22       A.    I think just from seeing them around the

23  courthouse, talking, and that's how I would describe it.  And

24  I know that they, you know, they had made a lot of trips to

25  take juveniles away.  I'm certain they wouldn't have had to

1    do that, so I assumed that they were friends.

2        Q.      Well, you obviously as their supervisor had an

3    opportunity to I gather observe their interaction with each

4    other?

5        A.      Yes, um-hum.

6        Q.      And you had known both of them for a substantial

7    period of time, obviously Mr. Graham longer than Ms. Varner,

8    right?

9        A.      That's correct.

10       Q.      But based on all of those observations, you

11   characterized their relationship as best of friends in your

12   memo of July 11, right?

13       A.      That's what I thought, yes.

14       Q.      Now, you were asked a number of questions by

15   plaintiff's counsel about the nature of the relationship

16   between Mr. Osenkarski and Mr. Graham, and I think described

17   them as friends, also, correct?

18       A.      I was under the opinion that they were friends,

19   yes.

20       Q.      And did that apply equally to the relationship

21   between Gary Graham and Barbara Varner as between Osenkarski

22   and Graham?

23       A.      I think so.

24       Q.      When was the first time that you realized that

25   this relationship which you characterized as best of friends

1    had deteriorated?

2    A.    I think it's when Mr. Deluce came in to me and

3    told me about the, apparently Mr. Hartnett who was the

4    personnel director had, when he got the letter from

5    Mrs. Varner, when Mr. Hartnett had contacted Mr. Deluce.  And

6    then Mr. Deluce came in and told me about this.  To my

7    recollection, that was the first time.

8    Q.    Were you surprised that your first notice of any

9    problem came from Mr. Deluce?

10    A.    Yes, I think I was surprised.  I would have hoped

11    otherwise, as I mentioned before, I would have hoped that

12    Mrs. Varner would have came to me before she went to

13    Mr. Hartnett.

14    Q.    You testified earlier that, in fact, you would

15    have expected her to come to you with any type of complaints

16    or problems; is that correct?

17    A.    Of this nature I would have thought she would

18    have, yes.

19    Q.    Was that because from your relationship with your

20    probation officers you believed that they saw you as the

21    person to go to with problems?

22    A.    Yes, I would have hoped that, if they couldn't

23    get them resolved with their direct superiors, that they

24    would come to me, yes.

25    Q.    And they did see you as their immediate superior?

1    A.    I think they did.

2    Q.    And you would have expected her to come to you

3  with a problem of this nature and explain it to you to see if

4  it couldn't be solved; is that accurate?

5    A.    I would have expected that, yes.

6    Q.    And she never did that, I gather?

7    A.    No.

8    Q.    Did you have occasions to meet with probation

9  officers about problems, either interpersonal problems or

10  problems in the department?

11    A.    Not very often.  I don't recall.  I don't recall.

12  I'm certain that if there would have been any, they certainly

13  could have came and talked to me about it.  Usually I think

14  problems got resolved in the department with their

15  supervisors.

16    Q.    So if I understand correctly, as far as you were

17  aware, these two were friends, as other people in the

18  department were, and suddenly in June sometime Mr. Deluce

19  shows up in your office and tells you there's a problem,

20  correct?

21    A.    That's what happened to me, yes.

22    Q.    And that was the first time you were aware that

23  there was a particular problem between those two, right?

24    A.    That's correct.

25    Q.    As a result of your meeting with Mr. Deluce,

1   apparently you made the decision or at least a tentative

2   decision to take certain action, right?

3       A.      Yes.  And that might have been discussions with

4   other people, Mr. Osenkarski and other people.

5       Q.      And at some time you made the decision to

6   transfer Mr. Graham, correct?

7       A.      I had thought about doing that, yes.

8       Q.      And it was at about this time that Mr. Graham and

9   Mrs. Graham showed up in your office and Mr. Graham confessed

10  to the consensual affair with Ms. Varner, correct?

11      A.      It was, their coming in was after I had

12  previously thought about making the decision to transfer

13  Mr. Graham.

14      Q.      All right.  So if I got the sequence correct,

15  Mr. Deluce shows up, you may have talked to Mr. Osenkarski

16  and some others, you think, about transferring Mr. Graham,

17  and then Mr. Graham and Mrs. Graham show up and have the

18  confession with you, correct?

19      A.      That's correct.

20      Q.      And if I understand your testimony, your earlier

21  testimony correctly, and again, you correct me if I'm wrong,

22  sort of at that point or shortly thereafter, the fact that

23  the consensual affair had occurred changed your judgment

24  about what punishment, if any, was appropriate, correct?

25      A.      That's correct.

1      Q.      I gather that you believed that the affair

2   occurred?

3              MS. WALLET:  Objection.  What you gather isn't

4   relevant.

5   BY MR. THOMAS:

6      Q.      Did you believe that the affair occurred?

7      A.      I believed that it did, yes.

8      Q.      And did you reach that conclusion based on your

9   long-standing occupation of judge and of judging credibility

10   of people?

11      A.      That, and I think I already mentioned the fact

12   that being a man, that for a man to come before another

13   party, his boss, with his wife present, and admit that he had

14   been having an affair with someone else.  You know, men don't

15   do that usually unless there's some reason, and I didn't know

16   of any reason why he would come in and do that.  So I did

17   believe him, yes.

18      Q.      There was also a substantial change in the nature

19   of the relationship between those two, was there not?

20      A.      Apparently so.  You know, I wasn't aware of this,

21   and maybe it had been going on for a while down in their

22   office, that there had been a change.  I wasn't aware of that

23   until I got the interview with Mr. Deluce.

24      Q.      So what you had was the appearance that they made

25   to you, you had the fact that he confessed to you in the

1  presence of his wife, and you had a very dramatic change in

2  the nature of the relationship between the two of them,

3  correct?

4       A.    That's correct.

5       Q.    And those things all led you to believe that the

6  affair had, in fact, occurred?

7       A.    I believed it, yes.

8       Q.    And as a result of that, you decided that your

9  original punishment, for lack of a better term, was too harsh

10 under the circumstances, correct?

11      A.    That's correct.  That's the reason.

12      Q.    And you didn't think it was appropriate under

13 these circumstances where a consensual affair had occurred,

14 to single out Mr. Graham for punishment, right?

15      A.    That's what I thought, yes.

16      Q.    And I assume the fact that Mrs. Graham was there

17 and you saw the amount of emotion involved, may have also had

18 some impact on your decision-making process?

19      A.    I saw what the emotion occurred, right.

20      Q.    And you knew from your job as a judge what

21 happens with families in divorce and separation, as you

22 testified earlier, correct?

23      A.    That's correct.

24      Q.    Is it possible that you received recommendations

25 either from Mr. Osenkarski or others with respect to what

1   punishment was appropriate for Mr. Graham under the

2   circumstances?

3        A.     It's possible.  I don't --

4        Q.     Do you recall anybody recommending -- I'm sorry,

5   Judge, were you done?

6        A.     Yeah, I was done.

7        Q.     Do you recall anybody recommending that

8   Mr. Graham should be terminated or fired?

9        A.     Not terminated or fired.  I'm sure I got some

10  recommendations from Mr. Osenkarski, you know, about the

11  appropriateness of the three-day suspension and removing

12  Mr. Graham as a direct supervisor of Mrs. Varner.

13       Q.     The decision ultimately to suspend him was your

14  decision?

15       A.     Yes, that was my decision.

16       Q.     The punishment that you imposed as I understand

17  your memo of July 11 was that you suspended him without pay,

18  at least pursuant to your order, without pay for three days,

19  right?

20       A.     That's correct.

21       Q.     And you removed any supervisory responsibilities

22  with respect to Barbara Varner from Mr. Graham, right?

23       A.     That's correct.

24       Q.     But you did something else in your memo of July

25  11 in the last sentence, did you not?  Do you have that in

1    front of you?  And actually the last two sentences.  Let me

2    read them to you:  I direct his supervisor, Mr. Osenkarski,

3    to pay better attention to matters taking place in the

4    office.  I will take more severe action if conduct of any

5    employee warrants it.

6              So in addition to the two things you did with

7    respect to Mr. Graham, you also told Mr. Osenkarski to pay

8    more attention, correct?

9        A.    That's correct.

10       Q.    And you also said that if there are other

11   activities or actions that warrant it, you would implement

12   more severe action, right?

13       A.    That's what I said.

14       Q.    Plaintiff's counsel asked you a number of

15   questions, your Honor, about your prior knowledge and

16   experience with Mr. Graham's parents.

17       A.    Right.

18       Q.    Do you recall that testimony?

19       A.    Yes, I do.

20       Q.    Did the fact that you knew Gary Graham's father

21   or that he may have been a committee man from Newville in any

22   way influence your decision about what remedial action was

23   appropriate here?

24       A.    No, it did not.

25       Q.    How about the fact that you knew his mother and

1    that you apparently her visited with her during a period of

2    illness, did that in any way affect your decision or judgment

3    in terms of what action was appropriate here?

4        A.    No, I don't think so.  Not that I recall.  I of

5    course knew them for a long time, they were my friends.  I

6    was politically involved when I was running for DA, but after

7    I became a judge I had no more political involvements with

8    Mr. Graham's father or mother.  Just a friendship, that's all

9    it was.

10        Q.    Plaintiff's counsel showed you a copy of a letter

11    dated July 8th to you from Dan Hartnett.  Do you have that in

12    front of you?

13        A.    I have it right in front of me, yes.

14        Q.    It relates to Mr. Osenkarski, at least in part,

15    right?

16        A.    It does, yes.

17        Q.    It says:  We are in agreement with your position

18    involving a suspension of Mr. Osenkarski.

19            Did you ever recommend or suggest a suspension of

20    Mr. Osenkarski?

21        A.    That's what I said, I do not ever recall making a

22    recommendation to Mr. Hartnett that Mr. Osenkarski be

23    suspended.  I don't ever recall making such a statement, and

24    I'm not really sure at this point in the proceedings, either,

25    why I would do that.

1        Q.     The decision about what to do with

2   Mr. Osenkarski, if anything, was exclusively yours, was it

3   not?

4        A.     It would have been, yes.

5        Q.     Mr. Hartnett could not have suspended

6   Mr. Osenkarski, could he?

7        A.     No, he could not have suspended him.

8        Q.     Nor could he have suspended or terminated

9   Mr. Graham, correct?

10        A.     That's correct.

11             MR. THOMAS:  That's all I have, Judge.  Thank

12   you.

13   BY MR. MacMAIN:

14        Q.     Good afternoon, your Honor.  My name is David

15   MacMain and I represent Mr. Graham, and we'll possibly make

16   eye contact here if people move back and forth.  I have just

17   a few follow-ups on what's been covered already.

18             You had said that you frequently made visits to

19   the Probation Office?

20        A.     Very often, yes.

21        Q.     At any point did you ever observe any kind of

22   conduct from Mr. Graham that you considered inappropriate?

23        A.     No.  I didn't observe it, no.

24        Q.     Did you ever hear any conduct or hear any words

25   or language or tone of voice while you were in the Probation

1  Office from Mr. Graham that you thought was inappropriate?

2      A.    No, I did not hear that from him.

3      Q.    Did Ms. Varner at any point prior to your meeting

4  with Mr. Deluce ever come to you and make any complaints

5  whatsoever about Mr. Graham?

6      A.    Not to my knowledge.

7      Q.    Did anyone on her behalf ever make any complaints

8  about Mr. Graham prior to your meeting with Mr. Deluce?

9      A.    Not to my knowledge.  I don't recall any.

10     Q.    You were asked, and I'm going to be brief, about

11  the meeting you had with Mr. Graham and his wife in your

12  office in which this affair was confessed to you, correct?

13     A.    That's correct.

14     Q.    And you were already asked a number of questions

15  as to whether you believed that, in fact, it was true and you

16  believed Mr. Graham's confession, correct?

17     A.    That's correct.

18     Q.    It's been suggested at prior depositions,

19  including by Ms. Varner, that you were aware that there was

20  no affair and you kind of looked the other way because of

21  your friendship or like of the Grahams.  Is that true?

22     A.    Would you ask me that question again?

23     Q.    Sure.  It's been suggested by Ms. Varner in her

24  deposition that when this confession was made to you, you

25  knew it not to be true, yet kind of played along, anyhow,

1    because you liked Mrs. Graham and felt sorry for her.  Is

2    that true?

3        A.    No.  I thought it was true for the reasons I've

4    said.  Now, whether -- I thought it was true.

5        Q.    You said you were told that the relationship had

6    been terminated, it ended, right?

7        A.    That's what I was told, yes.

8        Q.    Did Mr. Graham say who ended it?

9        A.    I think he said he did, but -- I think that's my

10   recollection.  He didn't say how.  I don't recall him saying

11   how it ended or exactly when it ended, I think he just said

12   it was ended.

13       Q.    I'm going to ask you some questions about what

14   was marked as Sheely 1, which was your July 11, '97, memo.

15       A.    Okay.

16       Q.    And I'm turning to the second page in the last

17   paragraph.  It has:  I have never spoken to Ms. Varner about

18   the allegations until today.

19             Do you recall speaking to Ms. Varner on July

20   11th, 1997?

21       A.    I don't specifically recall it, but obviously I

22   did or I wouldn't have put that in there.

23       Q.    You don't recall any specifics about what was

24   said or what was discussed?

25       A.    No, I don't.

1      Q.      Do you know whether or not you would have asked

2   her about this affair that Mr. Graham had told you about a

3   couple of days earlier?

4              MS. WALLET:  Objection.  He already said he

5   doesn't recall.

6              MS. WILLIAMS:  You can answer, Judge.

7              THE WITNESS:  I don't recall this conversation.

8   I certainly never asked Mrs. Varner to come in and talk to me

9   about this.  If we had a conversation some other place or in

10  the hall or something, it's possible, but I don't recall it

11  taking place.

12  BY MR. MacMAIN:

13     Q.      On the third and final page there's a carbon copy

14  of your memo to a number of people.

15     A.      Yes.

16     Q.      One of the carbon copies is to Debra Wallet,

17  Ms. Varner's attorney?

18     A.      Yes.

19     Q.      Did you ever receive any type of letter following

20  your memo from Ms. Wallet?

21     A.      I don't recall of ever receiving one.

22     Q.      Did you ever receive any kind of phone call from

23  Ms. Wallet following your July 17th memo?

24     A.      I don't recall today, no.

25     Q.      Did you ever receive any type of phone call or

1    letter from Ms. Varner following your July 11th, '97, letter?

2        A.    No, I don't recall of any.

3        Q.    Judge, do you recall anybody, either Ms. Varner

4    or anybody on her behalf, I guess, firing back or responding

5    to your July 11th, '97, memo that something was incorrect in

6    there?

7        A.    I don't recall of any, no.

8        Q.    You had said earlier that Mr. Graham on occasion

9    like anyone else can be excitable.  Do you remember stating

10   that?

11       A.    That's what I recall, yes.

12       Q.    At any point did you ever find him to be

13   inappropriately excitable?

14       A.    As of now, no, I don't recall that he was

15   inappropriately excitable.  I don't even remember anymore

16   what the excitement was about.  I know that occasionally it

17   did take place.

18       Q.    You had also mentioned that you were aware or

19   been told that Mr. Graham on occasion was loud.

20       A.    Yes, I was.

21       Q.    At any point did you ever observe or were you

22   told that he was inappropriately loud?

23       A.    No, I don't recall what the situations were that

24   led to that.

25            MR. MacMAIN:  That's all the questions I have.

1    Thank you.

2                    MR. ADAMS:  10 seconds.

3                    MS. WILLIAMS:  Can we go off the record for a

4    second?

5    BY MR. ADAMS:

6        Q.    Good afternoon, your Honor.  Again, I represent

7    Mr. Osenkarski.  I have a few more questions and hopefully

8    we'll be done.

9                    As a follow-up to Mr. MacMain's questions of your

10   visits to the Probation Department, I want ask you, did you

11   ever observe any conduct by Mr. Osenkarski which you deemed

12   inappropriate upon your visits to the Probation Department?

13       A.    No, I never observed this.

14       Q.    Did you ever observe any language which you felt

15   was considered sexually explicit by Mr. Osenkarski while

16   visiting that department?

17       A.    No, not while I was there.

18       Q.    And did you ever observe any language from

19   Mr. Osenkarski which you just felt was inappropriate at all,

20   any language at all, your Honor?

21       A.    No, I don't -- I can't recall any.

22       Q.    Okay.  How well did you know Mr. Osenkarski?

23       A.    Well, like I said, I started, I was a DA from '68

24   to '76, and I believe Mr. Osenkarski was employed by the

25   county back in those days.  So I knew him very well.

1       Q.      Are you two friends?

2       A.      We never went out socially or anything, but

3  professionally we were good friends.

4       Q.      Other than the courthouse, therefore, you

5  wouldn't see him other than in a courthouse setting?

6       A.      I don't recall ever being in his presence outside

7  of any courthouse function.

8       Q.      This is going to be a different question for you,

9  but did you conspire in any way with Mr. Osenkarski to cover

10  up, hide, not disclose, any allegation of discrimination made

11  by Ms. Varner?

12      A.      No.  I never agreed with them to do anything

13  concerning those allegations.

14      Q.      Okay.  And you certainly -- did you conspire in

15  any way with Mr. Osenkarski to discriminate against

16  Ms. Varner in any way that you can think of at all?

17      A.      I never did, no.

18      Q.      How about Mr. Graham?  Did you ever conspire with

19  Mr. Graham to --

20      A.      No.

21      Q.       -- try to refute any allegations by Ms. Varner?

22      A.      No.

23              MR. ADAMS:  Thank you, your Honor.

24              MS. WILLIAMS:  Are there anymore questions?

25              MS. WALLET:  Yes, I have a few.

1    BY MS. WALLET:

2        Q.     Judge Sheely, you said that you never saw

3    Mr. Osenkarski in a setting outside of work.

4        A.     Basically, I don't recall of any.  It's possible.

5        Q.     Did you ever see Mr. Graham on occasions outside

6    of work?

7        A.     I saw -- I think I was present when he was

8    married.  They got married in a Catholic church over in

9    Penbrook somewhere, I saw him then.  But I don't -- I don't

10   recall if I ever went to his home or anything after that or

11   not.  It's possible I did, but I don't recall.

12       Q.     Were you a guest at the wedding, sir, or did you

13   perform the marriage ceremony?

14       A.     No, this was done in the church.

15       Q.     You were a guest?

16       A.     I was just a guest, yes.

17       Q.     Were both you and your wife invited to the

18   wedding?

19       A.     Yes, we were.

20       Q.     Do you recall any other times when you saw

21   Mr. Graham outside the work setting?

22       A.     I don't recall any.  I wouldn't say there weren't

23   any, but at this point I don't recall any.

24       Q.     Did you attend Mr. Graham's mother's funeral?

25       A.     Her funeral?  I don't recall if we did or not, to

1    tell the truth.  I think maybe we might have went to the

2    viewing.  I don't recall going to the funeral.

3        Q.    How about his father's funeral or viewing?

4        A.    I don't recall going to the funeral.  There

5    again, I'm sure we would have went to the viewing.

6        Q.    When you say we, you're saying --

7        A.    My wife and I.

8        Q.    -- you and your wife.

9              You said that you would make visits to the

10   Probation Office.  How frequently would you say that you

11   visited the Probation Office?

12       A.    It's hard to say.  You know, I would say

13   generally several times a week I'd go down.  Maybe more if

14   there was some reason for me to go.  But usually it was

15   several times a week.

16       Q.    And would this be your going to deliver something

17   or pick up something, or to talk with someone?

18       A.    No.  Usually it was just going down to talk to

19   somebody about something.  I don't recall picking up things

20   from these visits.

21       Q.    Would you say these visits were short visits,

22   long visits?

23       A.    No, I think they were more short visits.  I know

24   I used to talk to Mr. Osenkarski about deer hunting.  We used

25   to talk -- he liked to go deer hunting and so did I, I know

1    we used to talk about that on occasions.  Sometimes business,

2    sometimes just things like that.

3         Q.    Would this depend on whether or not it was court

4    week or something other than court week?

5         A.    It would depend on whether or not I was involved

6    in any court proceedings, obviously.  I wouldn't stop then to

7    go down there and talk.

8         Q.    Is it accurate to say that during court week you

9    wouldn't be spending much time in the Probation Office?

10        A.    That's correct.  I wasn't down there at all

11   hardly in court weeks.

12        Q.    That's basically one week out of the month?

13        A.    Well, some months we had court for about three or

14   four weeks straight.  So during that period of time I

15   possibly wouldn't be down hardly at all.  I would still do

16   the emergency juveniles at that time, but it didn't require

17   me going down to the Probation Office.

18        Q.    Do you know whether Mr. Graham recommended any

19   other individuals for employment in the Probation Office?

20        A.    I don't recall.

21        Q.    Is it possible that he did?

22        A.    It's possible.

23        Q.    Who would you say were better friends, Osenkarski

24   and Graham, or Graham and Varner?

25        A.    I didn't know anything about this relationship

1   between Barbara and Gary, so I can't say anything about their

2   friendship then because I didn't know about it.

3           I would say generally, probably, that better

4   friends probably from what I observed were Mr. Osenkarski

5   rather than Mrs. Varner.

6       Q.     It's been a long day, excuse me, but did you tell

7   me that you did not know at the time that you wrote the July

8   11, 1997, memo marked Sheely 1 that Ms. Varner had made

9   allegations against Mr. Osenkarski as well?

10          MR. THOMAS:  Objection to form.

11          THE WITNESS:  I knew about these allegations when

12  I met with Mr. Deluce, and that would have been prior to the

13  July 11th memo.  I'm not sure when that was.

14  BY MS. WALLET:

15      Q.     Prior to July 11, 1997, did you know that

16  Ms. Varner had made allegations of inappropriate activities

17  against Mr. Osenkarski?

18      A.     Yes, I think I knew that.  I think the county

19  solicitor when he came in to see me set forth that there were

20  allegations made.

21          MS. WILLIAMS:  I'm going to stop you there,

22  Judge.  We have a running objection as to anything involving

23  your conversation with Mr. Deluce.

24          THE WITNESS:  You tell me when I'm not supposed

25  to.

1  BY MS. WALLET:

2      Q.      You knew that Ms. Varner and Mr. Graham went on

3  commitment trips together?

4      A.      That's right.

5      Q.      How did you know that?

6      A.      Sometimes I would be told who transported

7  juveniles.  Sometimes we would make a finding of they were

8  delinquent and they would go right after I made that finding

9  and I would know then usually who was going to take them out

10  there and when they were going to go.

11      Q.      Did you know that it was Mr. Graham who made the

12  assignments of who went on those trips?

13      A.      Yeah, I would think --

14          MR. MacMAIN:  Objection.

15          MS. WILLIAMS:  Objection to the form.

16          THE WITNESS:  I would think that between

17  Mr. Graham and Ms. Varner, he made the assignment.  He was

18  her supervisor back in those times.  I don't think she made

19  the decision.

20          MS. WALLET:  Thank you.  That's all I have.

21          MS. WILLIAMS:  Any other questions?

22          MR. THOMAS:  No.

23          MS. WILLIAMS:  For the record, perhaps we should

24  have stated in the beginning that we had agreed to the usual

25  stipulations, except that I would not waive reading and

125

1    signing and would like the judge to have an opportunity to

2    read and sign his deposition.

3              MS. WALLET:  That's acceptable.

4              (Whereupon, the deposition was concluded at

5    1:48 p.m.)

6                         *   *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

126

```
 1    COMMONWEALTH OF PENNSYLVANIA  )
                                    )
 2    COUNTY OF DAUPHIN             )

 3             I, Emily R. Clark, a Court Reporter-Notary Public

 4    authorized to administer oaths and take depositions in the

 5    trial of causes, and having an office in Harrisburg,

 6    Pennsylvania, do hereby certify that the foregoing is the

 7    testimony of HON. HAROLD E. SHEELY taken by Plaintiff at the

 8    Administrative Offices of Pennsylvania Courts, 5035 Ritter

 9    Road, Mechanicsburg, Pennsylvania.

10             I further certify that before the taking of said

11    deposition the witness was duly sworn; that the questions and

12    answers were taken down in stenotype by the said

13    Reporter-Notary, approved and agreed to, and afterwards

14    reduced to computer printout under the direction of said

15    Reporter.

16              I further certify that the proceedings and

17    evidence are contained fully and accurately in the notes

18    taken by me on the within deposition, and that this copy is a

19    correct transcript of the same.

20              In testimony whereof, I have hereunto subscribed

21    my hand this 17th day of March, 2003.

22

23                        _____

24                        Notary Public

25
```