1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
     . . . . . . . . . . . . . . .
 3   BARBARA E. VARNER,          .  CIVIL ACTION
                 Plaintiff       .
 4                               .
         vs.                     .  NO: 1:CV 01-0725
 5                               .
     COMMONWEALTH OF PENNSYLVANIA, .
 6   NINTH JUDICIAL DISTRICT,    .
     CUMBERLAND COUNTY;          .
 7   CUMBERLAND COUNTY; S. GARETH .
     GRAHAM, individually; and   .
 8   JOSEPH OSENKARSKI,          .
     individually,               .
 9               Defendants      .
     . . . . . . . . . . . . . . .
10

11

12

13            Deposition of:  DAVID  W. DeLUCE

14            Taken by   :  Plaintiff

15            Date       :  October 24, 2003, 10:42 a.m.

16            Place      :  5001 Louise Drive
                            Mechanicsburg, Pennsylvania
17
              Before     :  Ann M. Wetmore
18                          Reporter - Notary Public

19

20

21

22

23

24

25
```

2

```
 1   APPEARANCES:

 2        LAW OFFICES OF DEBRA K. WALLET
          By:  DEBRA K. WALLET, ESQ.
 3
                For - Plaintiff
 4
          ADMINISTRATIVE OFFICE OF
 5        PENNSYLVANIA COURTS
          SUPREME COURT OF PENNSYLVANIA
 6        By:  A. TAYLOR WILLIAMS, ESQ.

 7                For - Defendant Ninth Judicial District

 8        THOMAS, THOMAS & HAFER
          By:  JAMES K. THOMAS, II, ESQ.
 9             PAUL J. DELLASEGA, ESQ.

10                For - Defendant Cumberland County

11        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          By:  DAVID J. MacMAIN, ESQ.
12
                For - Defendant Gary Graham
13
          SWEENEY & SHEEHAN, P.C.
14        By:  PAUL LANCASTER ADAMS, ESQ.

15                For - Defendant Joseph Osenkarski

16   ALSO PRESENT:

17        PETER ZANGARDI, ST. PAUL INSURANCE CO.
          BARBARA VARNER
18        GARY GRAHAM
          JOSEPH OSENKARSKI
19

20

21

22

23

24

25
```

3

1                              INDEX

                             WITNESS

2
                           Examination

3
     DAVID DeLUCE
4
          By Ms. Wallet                        4
5
          By Mr. MacMain                      109
6
          By Mr. Adams                        132
7
          By Ms. Williams                      -
8
          By Mr. Thomas                        -
9
          By Mr. Dellasega                     -
10

11                           EXHIBITS

12   DeLuce Deposition
     Exhibit_Number                          Page

13
     1    Handritten notes authored by        4
14        David W. DeLuce and fax cover
          Sheet dated October 22, 2003
15
     2    Confidential Attorney Impressions   4
16        Memorandum to HAJ from DWD,
          dated April 30, 1997
17
     3    Confidential Attorney Impressions   4
18        Memorandum to HAJ from DWD,
          dated June 4, 1997
19
     4    Letter to Daniel Hartnett from     11
20        Horace Johnson, dated June 26, 1997

21   5    Handwritten Memo to Dan from Joe O. 121
          dated April 30, 1997, with case
22        assignments

23

24

25

4

```
 1                        STIPULATION

 2            It is hereby stipulated by and between

 3         counsel for the respective parties that sealing,

 4         certification and filing are hereby waived; and

 5         all objections except as to the form of the

 6         question are reserved to the time of trial.

 7            (DeLuce Deposition Exhibits #1, #2 and #3

 8         marked for identification)

 9            DAVID W. DeLUCE, called as a witness, being

10         duly sworn, testified as follows:

11                        EXAMINATION

12    BY MS. WALLET:

13    Q.   Good morning, Mr. DeLuce, my name is Debra Wallet.

14         I'm here representing Barbara Varner in an action

15         that has been brought against the county, the

16         court and two individuals.  Before I begin my

17         questioning of you, I'd like to get some matters

18         on the record if I may.

19            I've had the court reporter mark for me as

20         DeLuce Deposition Exhibit Number 1 a multiple-page

21         document.  The first page is an October 22, 2003,

22         fax cover sheet memo/letter from Paul Dellasega to

23         counsel.  "Please find enclosed a copy of notes

24         offered by David W. DeLuce, Esquire, which Judge

25         Kane ordered be produced."  And attached to that
```

1    document are I believe some -- it's hard to

2    tell -- 37 pages perhaps.  I can't tell because

3    some of this came over the fax twice so it may be

4    that I have some additional things two times.

5        Before we move off DeLuce Deposition Exhibit

6    Number 1, I'd like counsel for the County to

7    examine this document and tell me whether it

8    accurately reflects what you have in your file as

9    far as the notes for David DeLuce; and, second,

10   why it appears that there are some notes contained

11   in that package that were identified previously as

12   notes from Judge Hoffer.

13       MR. THOMAS:  Jim Thomas on behalf of the

14   County and I will respond.  And actually, Deb,

15   before I respond to your request in that regard,

16   let me indicate for the record that we are

17   producing Mr. DeLuce here today for deposition

18   pursuant to Judge Kane's order on your motion to

19   compel production of documents and the deposition

20   of Dave DeLuce, which memorandum and order was

21   dated September 25, 2003.

22       While we've read that opinion and order and

23   have produced him, perhaps out of a sense of

24   excess caution, I'd like you to agree that we have

25   a continuing objection.  We continue to believe,

1    with all due respect, that Judge Kane is incorrect

2    in her ruling in this matter.  I'd like your

3    agreement that we have a continuing objection to

4    any and all questions that are asked today on the

5    basis that we oppose Mr. DeLuce and in general but

6    not exclusively on the basis of attorney client

7    privilege and attorney work product.  Can we have

8    that agreement?

9        MS. WALLET:  I will be happy to agree so long

10   as you state specifically the nature of your

11   objections today.

12       MR. THOMAS:  Well, the nature of our

13   objections is that Mr. DeLuce in general I would

14   rely on the briefing which was done, but in

15   general Mr. DeLuce was hired as an attorney,

16   worked as an attorney on behalf of the County to

17   gather information and facts and made certain

18   recommendations and rendered legal opinions

19   included in those recommendations to the County.

20       We believe that much of his communication was

21   entitled to be protected because it was

22   communications to and on behalf of a client.  We

23   believe much of what you will make inquiry into

24   today was, in fact, attorney work product.  That's

25   the general nature of the objection.

1          MS. WALLET:  So, you are raising today as a

2     continuing objection two bases, attorney client

3     privilege and attorney work product.

4          MR. THOMAS:  Yes.  And I assume we will have

5     the usual stipulations with respect to other

6     objections?

7          MS. WALLET:  And that being that everything

8     say for the objection as to the form of the

9     question will be preserved until later?

10          MR. THOMAS:  Correct.  Do we have such an

11     agreement?

12          MS. WALLET:  We certainly have an agreement

13     that all objections except as to the form of the

14     question will be preserved.  We have an agreement

15     that you continue to believe that all of the

16     testimony of Mr. DeLuce is subject to attorney

17     client privilege and attorney work product, that

18     and that alone.

19          MR. THOMAS:  And you agree that I don't have

20     to object to every question, that we will have a

21     standing objection to the questions and inquiry

22     today on that basis.  Fair?

23          MS. WALLET:  That's correct.

24          MR. THOMAS:  All right.  With respect to your

25     inquiry with respect to what has been marked as

1      DeLuce Number 1, these do represent the notes

2      prepared by Mr. DeLuce as part of his

3      investigation.  They also include notes that were

4      apparently prepared by Judge Hoffer and out of a

5      sense of being complete we have produced both for

6      you.  Certainly this witness can identify for you

7      today those notes which are in his handwriting and

8      those which are not.

9          MS. WALLET:  Do you believe that the package

10     that we've marked as Deposition Exhibit Number 1

11     is a complete package of all of the notes that

12     exist, were in the care and custody of David

13     DeLuce prior to being turned over to your office?

14         MR. THOMAS:  We do with the exception of

15     Judge Hoffer's notes.  I don't know that the notes

16     of Judge Hoffer were in Mr. DeLuce's possession.

17     In fact, I believe they were not.

18         MS. WALLET:  Okay.

19         MR. THOMAS:  Okay.

20         MS. WALLET:  Now we've marked as Deposition

21     Exhibit Number 2 what has been produced by your

22     office as being the investigative report of David

23     W. DeLuce.  I would like you to look at this

24     package and tell me whether you believe this to be

25     the report prepared by Mr. DeLuce and tell me

1    whether or not this is some draft or a version,

2    what the nature of this report is.

3        MR. THOMAS:  This is a report that contains a

4    date of April 30, 1997.  The document which has

5    been referred to the Court as the DeLuce report

6    was an evolutionary document.  This investigation

7    took a substantial amount of time.  It involved

8    the interview of numerous witnesses, significant

9    legal research and compilation of the facts

10   compares to the law, in addition to certain

11   recommendations or impressions with respect to Mr.

12   DeLuce.

13       The document evolved over time as I noted.

14   This is a version which I would note while

15   containing a date of April 30, a close review will

16   reflect it was obviously not prepared on April 30

17   because it makes reference to certain events that

18   occurred in May within the context of the report.

19   This was the report that was in our possession and

20   was subject of the motion practice before Judge

21   Kane and is the one that was produced.

22       As part of the preparation of Mr. DeLuce for

23   this deposition yesterday, because of our

24   discussions -- and let me add was the report in

25   the possession of Mr. DeLuce and that's the reason

Exam./Wallet - DeLuce                    10

1      it was produced.  As part of deposition

2      preparation yesterday, I perhaps out of a sense of

3      caution, there were certain things that I'm

4      obviously not going to reveal here today that led

5      me to believe there may be another version, later

6      version of this evolving document.  As a result, I

7      called Taylor, counsel for the Court, asked her to

8      look at the copy of this report that was contained

9      in her files which would have been obtained from

10     the Court.  I at that time determined that there

11     was, in fact, a later report I believe dated June

12     7.

13          MS. WILLIAMS:  4.

14          MR. THOMAS:  June 4.  That report was then

15     produced for you yesterday by Taylor prior to the

16     commencement of this deposition.

17          MS. WALLET:  Mr. Thomas, is what has been

18     marked as Deposition Number 2 what was produced to

19     Judge Kane as a result of your order that you

20     produced these documents in camera?

21          MR. THOMAS:  It was.

22          MS. WALLET:  And did you produce what has

23     been marked as Deposition Exhibit 1 to Judge Kane

24     in camera?

25          MR. THOMAS:  It was.  Well, let me put a

1      caveat on that.  I'm not certain at this moment

2      without comparing them page by page whether the

3      documents that were produced for Judge Kane

4      included or excluded the notes that are Judge

5      Hoffer's notes, that appear to be Judge Hoffer's

6      notes.

7           MS. WALLET:  Did you produce for Judge Kane

8      in camera other than Deposition 1 or Deposition 2?

9           MR. THOMAS:  We did produce for the judge the

10     letter which has generally been referred to as the

11     Johnson letter to the County also.

12          MS. WALLET:  Let the record show that I'll

13     hand to Mr. Thomas a letter dated June 26, 1997,

14     from Horace A. Johnson to Daniel J. Hartnett.

15     Would that be the letter to which you just

16     referred?

17          MR. THOMAS:  It appears to be.

18          MS. WALLET:  And did it include the

19     documents, four pages attached to this letter?

20          MR. THOMAS:  Yes, I believe so.

21          MS. WALLET:  Let's mark that for

22     identification as Deposition Exhibit Number 4.

23          (DeLuce Deposition Exhibit #4 marked for

24     identification)

25          MS. WALLET:  So, if I understand correctly,

1      Deposition Exhibits 1, 2 and 4 were produced to

2      Judge Kane for her examination in camera?

3           MR. THOMAS:  Give me the numbers again.

4           MS. WALLET:  1, 2 and 4.

5           MR. THOMAS:  Correct.

6           MS. WALLET:  To the best of your knowledge,

7      was anything else produced for the judge?

8           MR. THOMAS:  No.

9           MS. WALLET:  And I understand your

10     clarification with regard to Deposition Exhibit 1,

11     you are not certain whether it included the Hoffer

12     notes as well?

13          MR. THOMAS:  That's correct.

14          MS. WALLET:  Now let me hand you what we've

15     marked as Deposition Exhibit 3.  This is the one

16     that was received by me by fax late yesterday

17     afternoon.

18          MR. THOMAS:  This is the document I made

19     reference to we learned of its existence, it was

20     not contained in Mr. DeLuce's file, we learned of

21     its existence late yesterday and it was produced

22     following the deposition preparation to all

23     counsel.

24          MS. WALLET:  To the best of your knowledge,

25     have you produced for me in response to the

Exam./Wallet - DeLuce                    13

1    judge's order all of the investigative documents

2    created or used by David DeLuce as part of his

3    investigation of the complaints made by Barbara

4    Varner?

5         MR. THOMAS:  We believe that we have complied

6    with the court's order and produced those

7    documents which have been ordered produced.  In

8    fact, arguably we may have gone beyond the

9    requirements of the court order in terms of

10   documents produced.  To our knowledge, we believe

11   that we've produced the DeLuce investigative

12   materials in accordance with the court's ruling.

13        MS. WALLET:  Thank you, Mr. Thomas.

14        MR. THOMAS:  You're welcome.

15        MR. ADAMS:  Off the record.

16        (Discussion held off the record)

17        MR. ADAMS:  Mr. Adams on behalf of Mr.

18   Osenkarski.  I just want to put on the record that

19   the agreement between plaintiff's counsel and

20   County counsel is that of those two parties in

21   terms of waiving the objections except for that of

22   form, there's been some evidence through this

23   litigation that has included items that may

24   warrant objections beyond objections simply just

25   for form, that of conclusions of law,

1    mischaracterizations, and questions that may be

2    designed to have a witness speculate and, so,

3    therefore, Osenkarski has not waived objections

4    for such things.

5        MR. THOMAS:  Does that mean you intend to

6    assert those objections today, Paul, or are you

7    simply making certain that the record is clear

8    that you're not waiving them?

9        MR. ADAMS:  The second, the latter.

10        MR. THOMAS:  Okay.

11        MR. MacMAIN:  I'll join in that objection I

12    suppose.

13        MS. WILLIAMS:  And I will join Paul's

14    objections as well.

15        MS. WALLET:  I'm still missing Deposition 2.

16        MR. THOMAS:  (Handing)

17        MS. WALLET:  Thank you, Mr. Thomas.

18        MR. THOMAS:  You're welcome.

19  BY MS. WALLET:

20  Q.   Mr. DeLuce, finally this is the opportunity for me

21        to ask you some questions regarding this lawsuit.

22        I will do my best inasmuch as this room is

23        somewhat large to keep my voice up.  May we please

24        have an agreement that if you would attempt to

25        answer one of my questions you have at least heard

Exam./Wallet - DeLuce                    15

1          that question?

2    A.    Yes.

3    Q.    And may we also have an agreement that if you

4          attempt to answer my question you have understood

5          that question, and if you do not understand it,

6          you will ask for a clarification before you

7          attempt to answer it?

8    A.    Yes.

9    Q.    Is there any reason, sir, physical or otherwise

10         why you could not answer all of my questions

11         truthfully today?

12   A.    No reason.

13   Q.    Where are you employed presently, sir?

14   A.    I'm employed by the law firm of Johnson, Duffie

15         Stewart and Weidner.

16   Q.    And you are an attorney at law?

17   A.    I am an attorney at law.

18   Q.    How long have you been at your current law firm?

19   A.    18 years.

20   Q.    Did you have prior employment after law school?

21   A.    For one year I was a judicial law clerk at the

22         York County Court of Common Pleas for Judge

23         Buckingham.

24   Q.    When did you graduate from law school?

25   A.    In 1984.

Exam./Wallet - DeLuce                        16

1   Q.   Where did you get your law degree?

2   A.   Widener University in Delaware.

3   Q.   Did you have employment prior to law school but

4        after undergraduate school?

5   A.   Yes.  I worked for two years for a company called

6        Grove Manufacturing in Shady Grove, Pennsylvania.

7   Q.   What did you do for them?

8   A.   I was a district manager in the field.

9   Q.   What's the nature of their manufacturing

10       operation?

11  A.   They manufacture and sell hydraulic cranes.

12  Q.   Where did you get your bachelor's degree?

13  A.   Pennsylvania State University, University Park,

14       1979.

15  Q.   In what field?

16  A.   School of business, concentration in finance.

17  Q.   Do you have any other advanced degrees other than

18       a law degree?

19  A.   No, I do not.

20  Q.   Did you have any other postgraduate training other

21       than what you've described?

22  A.   No, I do not.  You mean graduate from college?

23  Q.   Correct.

24  A.   No, I do not.

25  Q.   In your job with Grove Manufacturing, did you have

```
 1        any responsibilities for EEO compliance?

 2   A.   No, I did not.

 3   Q.   Describe briefly what your district manager job

 4        was.

 5   A.   Primarily manage a district with distributors.  It

 6        was sales and service coordination.  It was field.

 7        I was located in the western United States.  I had

 8        no employees under me.

 9   Q.   Describe the nature of your law practice for the

10        past 18 years.

11   A.   General practice of law.  Initially probably more

12        family law, criminal, civil litigation.  It has

13        evolved into health law, small business, labor and

14        real estate.

15   Q.   How long have you been doing work for the County

16        of Cumberland?

17            MR. THOMAS:  You mean him specifically or the

18        law firm?

19            MS. WALLET:  Him specifically.

20   A.   I don't know for sure.  My partner, Hank Johnson,

21        was the county solicitor I believe through 1998.

22        At times during his term as solicitor I was used

23        as special counsel on certain matters.  He became

24        a solicitor I believe in 1986, so it would have

25        been during that time.
```

1   BY MS. WALLET:

2   Q.    What kind of work did you do for the county

3         between 1986 and 1998?

4   A.    I recall working on contract matters.  I recall

5         working on labor matters.

6   Q.    Can you be more specific in the labor matter?

7   A.    Personnel issues.  I was consulted frequently by

8         the personnel director at the time.  It might have

9         dealt with family medical leave, it might have

10        dealt with Fair Labor Standards Act, it might have

11        dealt with other employment related issues.

12  Q.    Which personnel directors have you worked directly

13        with?

14  A.    Dan Hartnett, Dan Monkin.

15  Q.    Anyone else?

16  A.    No, no one else to my knowledge or my

17        recollection.

18  Q.    I thought you were struggling to remember another

19        name.

20  A.    No, I'm not.  I don't remember any other names.

21  Q.    Mr. DeLuce, tell me how you first became aware

22        that Barbara Varner had filed a complaint or a

23        charge involving Gary Graham.

24          MR. THOMAS:  Objection to the form.  You may

25        answer.

```
 1   A.   I was notified I believe by my partner, Hank

 2        Johnson, that some type of complaint had been

 3        filed or had been made and that I was to

 4        communicate with Mr. Hartnett and assist him and

 5        advise him in whatever way.

 6   BY MS. WALLET:

 7   Q.   Was this a verbal communication with Mr. Johnson

 8        or did you receive something in writing?

 9   A.   It was verbal.

10   Q.   Do you recall when this was, sir?

11   A.   I suspect based on reviewing the report that it

12        was in April of 1997, but I can't recall anything

13        more specific than that.

14   Q.   Now, at that point in time your firm was the

15        solicitor for the County of Cumberland?

16   A.   Hank Johnson, Horace H. Johnson was the county

17        solicitor.  We were hired at times as special

18        counsel on various matters as were other law

19        firms.

20   Q.   Do you know, sir, why the relationship between Mr.

21        Johnson as solicitor and the County of Cumberland

22        ended?

23   A.   He resigned.

24   Q.   To the best of your knowledge, sir, has your firm

25        had any responsibilities with regard to the County
```

1           of Cumberland since Mr. Johnson resigned in 1998?

2    A.    I believe there may have been a couple files that

3          had been opened during Mr. Johnson's tenure by our

4          firm that we continued until they were completed.

5          What they were, I have no recollection.

6    Q.    Did you engage in any professional relationship

7          with the county after 1998?

8    A.    If there were any open files that I was handling,

9          yes.  I have no present recollection of what they

10         are.

11   Q.    Did you continue to be engaged as labor counsel

12         after 1998?

13   A.    No, unless there was a file already opened and I

14         was already working on it prior to that time.

15   Q.    Sir, have you had any special training in sex

16         discrimination cases?

17             MR. THOMAS:  Objection to the form.  You may

18         answer if you understand.  I'm not sure what you

19         mean by special training.

20   A.    I have spent or did spend and continue to spend

21         time going to seminars and training sessions on

22         the legal topic.  Continuing legal education is

23         probably the best way to sum it up on a regular

24         basis.

25   BY MS. WALLET:

1    Q.    And did that occur both before and after 1997?

2    A.    Yes.

3    Q.    Can you tell me what training you received before

4          1997?

5    A.    On the job by working on cases that came into our

6          firm with another attorney of our firm as well as

7          attending seminars.  I cannot be anymore specific

8          because I have no recollection.

9    Q.    So, Mr. Johnson came to you and asked you to be in

10         contact with someone at the county?

11   A.    That's my recollection.

12   Q.    What did he tell you about the nature of the

13         complaint at that time?

14   A.    I don't recall him giving me any specifics.  I

15         recall him telling me to contact Mr. Hartnett to

16         get information.

17   Q.    Did anyone else in your firm at that time do any

18         of the labor or employment work for the county?

19   A.    Not that I can recall.

20   Q.    So, if it was a labor problem it got referred to

21         you?

22   A.    Yes, if the county wanted us to do it.

23   Q.    Did Mr. Johnson do some of that work himself?

24   A.    I don't know.

25   Q.    Is there anyone else in the firm who did work for

Exam./Wallet - DeLuce                    22

1          the County of Cumberland other than you and Mr.

2          Johnson?

3   A.     Yes.

4   Q.     Who was that?

5   A.     I am not certain exactly who.  I know that Roy

6          Weidner did.  I know that James Johnson did.

7          There may have been others, I can't recall, it's

8          been six or seven years ago.

9   Q.     Did Mr. Johnson tell you why he picked you for

10          this particular assignment?

11   A.     No.

12   Q.     Did you ask?

13   A.     No.

14   Q.     What did you do as a response to Mr. Johnson's

15          assignment?

16   A.     My recollection is that I contacted Mr. Hartnett

17          and asked him what he knew.

18   Q.     What did he tell you?

19   A.     I have no present recollection of what he told me

20          other than to say that an employee in the

21          probation department had complained about some

22          form of sexual harassment.

23   Q.     What did Mr. Hartnett ask you to do?

24   A.     He wanted a recommendation as to what the county

25          should do.

1    Q.    Did you speak with him on the phone or in person?

2    A.    I'm sure initially I spoke to him on the phone and

3          I also know that I discussed the situation with

4          Mr. Johnson because of the unique nature of the

5          probation department.

6    Q.    And what do you mean by that, sir?

7    A.    Well, they both pointed out to me, as I recall,

8          that the probation department is under the control

9          of the president judge and not the county.

10         Therefore, the first issue was what would be our

11         role.

12   Q.    Who first raised that issue?

13   A.    I believe it was Hank Johnson, that's my

14         recollection.

15   Q.    Now, if I might ask you, sir, to take a look at

16         what we have marked as DeLuce Deposition Number 1.

17         Can you identify for us which of that package

18         constitutes notes in your handwriting?

19   A.    It looks like mine start on Page 5 of 37 at the

20         top of the fax and continue -- well, it looks like

21         it's 5 of 37 through to 37 of 37, and then behind

22         that it looks like 24 more pages and that does

23         appear to be my handwriting.

24   Q.    Did you keep any notes, sir, of any of your

25         telephone conversations with Dan Hartnett or any

Exam./Wallet - DeLuce                    24

1          other individuals at the county?

2    A.   No.

3    Q.   Did you take notes but they are no longer

4          available or you just didn't take any notes?

5    A.   I did not take any notes of our phone

6          conversations to my recollection.

7    Q.   Describe for me what your file for this matter

8          looked like.

9    A.   Legal research was a large part of it, my notes of

10         meetings with witnesses that were interviewed by

11         Mr. Hartnett and myself, I'm sure there were some

12         correspondence.  The file also contains documents

13         from the EEOC, Thomas, Thomas & Hafer and the

14         federal lawsuit.

15   Q.   Do I understand, sir, you no longer have that in

16         your possession?

17   A.   A complete copy of my file was provided to

18         counsel.  I still have my file.

19   Q.   Do you have the originals or does counsel have the

20         originals?

21   A.   I have the originals.

22   Q.   Did you bring those with you today?

23   A.   No, I did not.

24   Q.   When you say counsel, could you be specific?  We

25         have a lot of lawyers here.

Exam./Wallet - DeLuce                      25

1   A.    Counsel for the County who is here with me today,

2         Thomas, Thomas & Hafer.

3   Q.    And that would Mr. Thomas and Mr. Dellasega?

4   A.    Mr. Thomas and Mr. Dellasega.

5   Q.    What was your understanding of the role of Thomas,

6         Thomas & Hafer in this matter?

7             MR. THOMAS:  Well, obviously we've been

8         retained to defend a federal lawsuit and I do not

9         want you to make inquiry of this witness of

10        conversations he's had with us.  I think that goes

11        well beyond the court's order.

12  BY MS. WALLET:

13  Q.    Did Thomas, Thomas & Hafer have some role prior to

14        being retained to defend the county in this

15        lawsuit?

16  A.    My recollection is they were not brought in until

17        the EEOC complaint stage, but I cannot give you

18        any date certain.  That's not something that I can

19        recall.

20            MR. THOMAS:  Nor would I permit him to

21        testify to that.

22  BY MS. WALLET:

23  Q.    Did you enter your appearance, yours personally,

24        in any administrative or court?

25  A.    My recollection is that I did file an answer on

Exam./Wallet - DeLuce                    26

1          behalf of the county with the EEOC.

2    Q.    To the best of your recollection, sir, did you do

3          anything else to formally represent the county?

4    A.    What do you mean by formally?

5    Q.    In an administrative agency or the court.

6              MR. THOMAS:  You mean other than everything

7          he did in terms of the investigation and including

8          filing the answer to the EEOC complaint?

9              MS. WALLET:  Yes.

10   A.    Not that I can recall.

11   BY MS. WALLET:

12   Q.    Did you engage in any settlement negotiations with

13         anyone regarding this case?

14   A.    Yes.

15   Q.    With whom?

16   A.    I recall attending a meeting where you were

17         present, your client was present, Mr. Thomas and

18         Mr. Dellasega were present at Thomas, Thomas &

19         Hafer.  The date I have no present recollection.

20   Q.    And what was your role in that meeting?

21   A.    I was there on behalf of the County of Cumberland.

22   Q.    Were you their counsel at that time?

23   A.    I was one of their counsel at that time.

24   Q.    Did you enter into any engagement letter with the

25         county with regard to your role in the

Exam./Wallet - DeLuce                    27

1       investigation of Ms. Varner's complaints?

2   A.  No.

3   Q.  Was there any memorialization of what your role

4       was to be in this matter?

5   A.  No.

6   Q.  Were you paid by the hour for your work?

7   A.  Yes.

8   Q.  To whom did you transmit your invoices?

9   A.  I can't recall for sure.

10  Q.  Was this matter invoiced separate from the

11      invoices that may have been submitted by Mr.

12      Johnson as solicitor for the county?

13  A.  Yes.

14  Q.  Do you know who paid your invoices?

15  A.  Do I know who paid it?  I believe the county paid

16      the invoices, but I have no firsthand knowledge of

17      that.  They have been satisfied, I know that.

18  Q.  How much were you paid for your role in dealing

19      with the Varner complaint?

20  A.  I don't know.

21  Q.  Do you have an estimate?

22  A.  No.

23  Q.  More than $10,000?

24  A.  No.

25  Q.  Not more?

Exam./Wallet - DeLuce                          28

1    A.    No.   That's an estimate that it was not.

2    Q.    Do you know what period of time you submitted

3          invoices for this matter?

4    A.    I would suspect in 1997 and I believe there were

5          some subsequent ones after '97.

6    Q.    Do you believe after 1998?

7    A.    Yes.

8    Q.    And what do you recall doing in that period after

9          1998?

10   A.    I assisted Mr. Dellasega and Mr. Thomas in their

11         roles.

12   Q.    Have you had any experience in doing

13         investigations of sex discrimination?

14   A.    When you say experience, would you please explain

15         that?

16   Q.    Prior to your being engaged to follow up on a

17         complaint filed by Ms. Varner, had you previously

18         conducted any investigations into matters of sex

19         discrimination?

20   A.    Not that I can recall.

21   Q.    Same question with regard to matters of sexual

22         harassment?

23   A.    I have advised clients what their legal duties and

24         obligations are and assisted them carrying them

25         out.

Exam./Wallet - DeLuce                    29

1    Q.    Was this your first investigation into allegations
2          of sexual harassment?
3    A.    As I recall, this is the first one where I
4          participated in the questioning of witnesses.
5    Q.    Do you consider yourself to have expertise in the
6          area of sex discrimination or sexual harassment?
7    A.    What do you mean by expertise?
8    Q.    Do you believe that by virtue of your training or
9          experience you have a particular knowledge in this
10         area?
11   A.    I believe that by my training and experience I
12         have knowledge of the law in this area and can
13         advise my clients accordingly and assist them in
14         carrying out their duties.
15   Q.    Did you consider yourself to be an expert at the
16         time that you engaged in your investigation of Ms.
17         Varner's allegations?
18   A.    Again, I'm not sure what you mean by an expert.  I
19         considered myself an attorney who practiced in the
20         area of labor law and had knowledge of the law in
21         this area.
22   Q.    Okay, so Mr. Johnson tells you to call the county
23         and you call Dan Hartnett.  Tell me to the best of
24         your recollection what Mr. Hartnett told you
25         during that first conversation regarding these

1            matters.

2    A.     I cannot recall specifics of the conversation.  I

3            know that we had a conversation and I'm sure that

4            Barbara Varner's name came up and that she was an

5            employee in probation, the basics I'm sure came

6            up, but I have no present recollection of that

7            conversation.

8    Q.     Do you believe that first conversation was on the

9            telephone?

10   A.     Yes.

11   Q.     Did you later meet with Mr. Hartnett?

12   A.     Yes.

13   Q.     Do you recall whether the meeting was shortly

14           after the telephone conversation?

15   A.     I believe that it was, but in the interim I also

16           know that we did some legal research on the

17           county's role with a probation employee and the

18           court's role.

19   Q.     Ultimately you did meet with Mr. Hartnett I take

20           it?

21   A.     Yes, yes.

22   Q.     Was it just you and Hartnett?

23   A.     Yes.

24   Q.     Describe for me what happened during that first

25           meeting.

```
 1   A.   I can't remember.  I have no present recollection.

 2        It's been six and a half years ago.  I'm certain

 3        we met and my recollection is that we sometime

 4        thereafter, whether it was the same meeting or at

 5        another time, had Barbara Varner meet with us in

 6        the conference room in the personnel department

 7        and had her tell us her complaints that she had

 8        apparently initially told to Mr. Hartnett.

 9   Q.   Did you exchange any documents with Mr. Hartnett

10        prior to your meeting with Ms. Varner?

11   A.   I can't recall.

12   Q.   Do you believe that you may have had a copy of the

13        written complaint prior to your meeting with Ms.

14        Varner?

15   A.   I can't recall.  I believe that we asked Ms.

16        Varner to prepare a written complaint.  I don't

17        know whether that was at the first meeting or

18        whether Mr. Hartnett asked her to do so for our

19        first meeting.  I have no recollection.  I do

20        recall that we asked her to put her allegations in

21        writing.

22   Q.   Describe for me what you believed your mission was

23        in this matter.

24             MR. THOMAS:  Objection to the form.  You may

25        answer.
```

1    A.    Was to assist Mr. Hartnett on behalf of the county

2          and conduct an investigation and report findings

3          to the county solicitor.

4    BY MS. WALLET:

5    Q.    That being Mr. Johnson?

6    A.    Yes.

7    Q.    Were you given any instructions as to how to

8          conduct this investigation?

9    A.    By whom?

10   Q.    By anyone.

11   A.    Not me personally.

12   Q.    Did your firm or any other members of your firm

13         get some instructions?

14   A.    It's my understanding that someone spoke to the

15         president judge and he authorized that the matter

16         be investigated by the county on his behalf, but I

17         did not participate in those discussions.

18   Q.    And would that have been President Judge Sheely?

19   A.    Yes.

20   Q.    And how did you learn of that information?

21   A.    Either from Mr. Hartnett or Mr. Johnson, I cannot

22         recall.

23   Q.    And you believed prior to your beginning this

24         investigation that the president judge in

25         Cumberland County knew that you were going to do

Exam./Wallet - DeLuce                          33

1        this investigation?

2   A.   I believe that he knew that because I had a

3        concern that if the employees and the supervisors

4        didn't cooperate, what authority did we have to

5        make them cooperate.

6   Q.   Were you given any assurance that these employees

7        would be required to cooperate with you?

8   A.   I was not.

9   Q.   Did you understand that someone from your firm was

10       given such assurance?

11  A.   I can't recall whether that assurance was given to

12       Mr. Johnson or somebody else at the county, but I

13       believe Mr. Hartnett told me that somehow that

14       communication came down the chain but I was not

15       part of it.

16  Q.   Did you at any time meet directly with President

17       Judge Sheely?

18  A.   One time that I can recall.

19  Q.   Do you recall when that was?

20  A.   I believe that was in early June while we were

21       still meeting with witnesses.

22  Q.   That would be June of '97?

23  A.   Yes.

24  Q.   Do you believe you met with Judge Sheely before

25       you had interviewed all of the individuals that

1          you intended to talk with?

2     A.   We met with Judge Sheely after I had spoken to

3          quite a few witnesses and gave him some

4          preliminary indications of what we were hearing

5          and then we went back and called on a few more

6          people to meet with us again to gather further

7          information.

8     Q.   When you say we, who was present at that meeting?

9     A.   My recollection is that all meetings with

10         witnesses Dan Hartnett was with me.  He arranged

11         them, he coordinated them, and he participated in

12         those with me.

13    Q.   Actually my question wasn't very clear, but I

14         meant the meeting with Judge Sheely who was there?

15    A.   I know that I was there, I know that Dan Hartnett

16         was there, I know that Hank Johnson was there.

17         There may have been others, but I have no present

18         recollection.

19    Q.   Did you request this meeting?

20    A.   I don't recall who requested the meeting.

21    Q.   Do you think Judge Sheely requested it?

22    A.   I don't recall.  I don't recall.

23    Q.   What did you understand the purpose of the meeting

24         to be?

25    A.   To update him on what the employees were telling

```
 1           us and to get some guidance on where to go from

 2           there.

 3    Q.     What guidance did you receive at that time?

 4    A.     Go back and talk to a couple witnesses, including

 5           the two employees that were accused, and get some

 6           further information from them.  And also talk to

 7           them and ask them to come up with a plan to

 8           address the situation.

 9    Q.     And when you say the two individuals who were

10           accused, are we speaking of Gary Graham and Joe

11           Osenkarski?

12    A.     Yes.

13    Q.     Anybody else?

14    A.     No.

15    Q.     Did you talk to anybody other than Gary Graham or

16           Joe Osenkarksi as part of your investigation after

17           you met with Judge Sheely?

18    A.     I believe that we did, but I cannot tell you who,

19           and I note that on my notes of meetings I did not

20           always put the dates of the meetings.

21    Q.     In this meeting with Judge Sheely, did you

22           understand that you were expected to report back

23           to Judge Sheely after you had done these things?

24    A.     I understood that someone was to report back to

25           Judge Sheely.  I don't recall who it was, but it
```

```
 1        did not end up being me.

 2   Q.   Do you know why it wasn't you?

 3   A.   I think because Mr. Hartnett and I met with the

 4        county commissioners, Mr. Ward, Mr. Johnson, and

 5        told them what we were hearing from the witnesses,

 6        and I believe it was them who indicated either

 7        they or Mr. Ward would talk to the president

 8        judge.

 9   Q.   Mr. DeLuce, could you run down for me the

10        significant events that occurred as part of your

11        investigation, in other words, could you just tell

12        me who you met with and what the series of events

13        were?

14            MR. THOMAS:  Objection to the form.  I don't

15        think that's a fair question because it requires

16        him to make a qualitative evaluation of what the

17        significant events were.

18   BY MS. WALLET:

19   Q.   Strike the word significant.  Could you tell us

20        what events occurred from the time that you had

21        your first we'll say meeting with Mr. Hartnett?

22            MR. THOMAS:  To the extent that you can

23        recall.

24   A.   My recollection is that we met with Mrs. Varner,

25        got her verbal statement, asked her to put it in
```

1       writing.  She did.  And she also indicated to us

2       people that we should talk to regarding the

3       matter.  So, we began the process of talking to

4       other employees as well as to Mr. Osenkarski and

5       Mr. Graham and there were many meetings a couple

6       times with certain individuals as more facts came

7       out that we wanted to verify or reverify or get

8       versions of what may have transpired.  It was an

9       ongoing process that lasted for obviously

10      sometime, I believe it started in April, and we

11      were still continuing to meet with people into

12      June of 1997.

13  BY MS. WALLET:

14  Q.    So, you met with Varner, you interviewed some

15        people, you went back to the meeting with Judge

16        Sheely, met with some additional potential

17        witnesses, then what?

18          MR. THOMAS:  Well, he's already indicated to

19        you earlier that he also conducted some legal

20        research, reviewed legal precedents.  That's my

21        problem with the question.  I do not want this

22        question or the answer to be considered to be a

23        complete analysis of his investigation.  You have

24        his very lengthy report which details in some

25        detail the interviews, the things that he

1          conducted.  So, I object to the question because I

2          think it's misleading.

3    A.   Throughout the process I would take my notes and

4          dictate a summary and that's how this report that

5          you have before you was evolved.  And I think that

6          is why there are different dates and different

7          versions because I would add to it as I learned

8          more information.  My impressions would change, my

9          thoughts would change and it was an ongoing in my

10         view work product that was my own impressions, but

11         I included in that research that I had in my

12         office from my research on these topics or as I

13         thought I needed and I used that to help formulate

14         legal opinions based on the facts after Mr.

15         Hartnett and I would discuss them after talking

16         with witnesses.

17   BY MS. WALLET:

18   Q.   So, again, you met with some additional people,

19         then someone met again with Judge Sheely, but not

20         you?

21   A.   Not me.

22   Q.   When in this time frame did you meet with the

23         Cumberland County commissioners?

24   A.   I believe I met with them sometime in mid June and

25         gave them verbally -- Mr. Hartnett and I both did

1           and gave our impressions after what we were told

2           by the many witnesses.  I also gave them a

3           synopsis of what my opinion of the law is and

4           discussed their role as the county versus the

5           court's.  That was also an issue.

6      Q.   And who was present at that meeting?

7      A.   The county commissioners, John Ward, Horace

8           Johnson, Dan Hartnett, myself.

9      Q.   Could you identify the commissioners for me?

10     A.   Earl Keller, Nancy Besch, Marcia Myers.

11     Q.   Was anyone else present at that meeting to the

12          best of your recollection?

13     A.   No.

14     Q.   Were you given any additional assignments as a

15          result of that meeting with the Cumberland County

16          commissioners?

17     A.   No.

18     Q.   Did you make any recommendations to the Cumberland

19          County commissioners at that time?

20     A.   I believe Mr. Johnson made some recommendations

21          but not myself.  I believe I was there to provide

22          them with the legal issues and what the witnesses

23          were telling myself and Mr. Hartnett.

24     Q.   Did you give them anything in writing at that

25          time?

1   A.   No.

2   Q.   Did you ever give the county commissioners

3        anything in writing?

4   A.   No.

5   Q.   Did you ever give Dan Hartnett anything in

6        writing?

7   A.   If I did -- I may have, I can't recall.  It may

8        have been cases, it may have been summary of the

9        law, but I did not give him my memorandum that's

10       the subject of the court's motion.

11  Q.   After you met with the Cumberland County

12       commissioners, did you interview any other

13       individual?

14  A.   I have no recollection that I did anything further

15       other than maybe conferring with Mr. Hartnett,

16       but, no, I did not interview anybody else.

17  Q.   Did you consider your investigation to be complete

18       at least by mid June of 1997?

19  A.   I'm not sure if I would use the term complete.  I

20       think my role at that time was terminated or no

21       longer -- I was no longer to continue the

22       investigation.

23  Q.   How did you come to the conclusion that your role

24       was terminated?

25  A.   My recollection was Mr. Ward indicated that he

1        would go talk to the president judge to discuss

2        the matter.

3    Q.   And that being President Judge Sheely?

4    A.   Yes.

5    Q.   Did you participate in any other meetings

6        regarding this investigation except for the

7        meeting you described earlier at Thomas, Thomas &

8        Hafer after you met with the Cumberland County

9        commissioners?

10           MR. THOMAS:  Objection to the form.  You may

11       answer.

12   A.   I'm sure that I did in preparing responses to the

13       EEOC, but I have no present recollection.  My

14       role -- or I was still involved as special counsel

15       for the county on this matter.  What exactly I did

16       I have no present recollection.

17   BY MS. WALLET:

18   Q.   What did you do in order to prepare the response

19       to the EEOC?

20   A.   I can't recall specifically.

21   Q.   Do you know who verified the answer to the EEOC?

22   A.   Not offhand, no, I do not.

23   Q.   Do you know whether it was verified?

24   A.   Not offhand.  I don't have the document in front

25       of me.

```
 1   Q.   Could you describe the process?  Did you draft the
 2        answers and then did someone look at--
 3             MR. THOMAS:  Let me have a moment with the
 4        witness if I may.
 5   A.   Yeah.
 6             MS. WALLET:  Let the record reflect that Mr.
 7        Thomas and Mr. Dellasega have now left the room
 8        with Mr. DeLuce.
 9             (Recess taken)
10   BY MS. WALLET:
11   Q.   Now, I believe when we broke I had just asked you
12        to describe the process whereby the EEOC response
13        was filed by you.
14   A.   My recollection is that I drafted the response and
15        I'm sure that I had input from Mr. Hartnett and
16        Mr. Ward.  But my response, as I recall, was that
17        you sued the wrong party, that we had no control
18        over the probation department and the employees in
19        question; therefore, the Administrative Office of
20        Pennsylvania Courts should have been the
21        defendant.  So, my recollection is that it was
22        basically a legal argument.
23   Q.   While we were off the record, did you have the
24        opportunity to review any documents that refreshed
25        your recollection?
```

```
 1   A.   No, and I knew -- I recalled that -- no, I didn't

 2        look at any documents to refresh my memory.

 3   Q.   All right.  We were still in the events that you

 4        participated in as part of your assignment from

 5        the county to investigate this complaint from Ms.

 6        Varner.

 7            MR. THOMAS:  Objection to the form.  Go

 8        ahead.

 9            MS. WALLET:  I didn't get to the question

10        yet.

11            MR. THOMAS:  That's why I'm objecting, it

12        wasn't a question.

13   BY MS. WALLET:

14   Q.   My question is after you filed the EEOC response,

15        whatever that response might have been, did you

16        participate in any other meetings?

17   A.   I believe that I did, but I cannot give you

18        specifics.  I know that I had discussions and

19        meetings with Jim Thomas, Paul Dellasega, a

20        representative from the county and/or Mr. Ward,

21        but I cannot give you specifics in any way, shape

22        or form.

23   Q.   How would you describe the level of compliance of

24        the individuals that you spoke with as part of

25        this investigation?
```

1              MR. THOMAS:  Objection to the form.  You may

2         answer it if you understand.

3    A.   Some were very forthcoming, some were not.

4    BY MS. WALLET:

5    Q.   Did you believe you had sufficient cooperation by

6         the individuals that you interviewed to allow you

7         to come to some conclusions regarding these

8         complaints?

9              MR. THOMAS:  Objection to form.  You may

10        answer.

11   A.   I felt that I had cooperation from plenty of

12        witnesses.  Some that didn't cooperate I tried to

13        determine why.  And in my view sometimes the lack

14        of cooperation or being forthright with me or

15        providing us with everything affected credibility

16        issues.

17   BY MS. WALLET:

18   Q.   Had you known or worked with -- let's ask it

19        separately.  Had you known any of the individuals

20        that you spoke with as part of your investigation

21        prior to undertaking the investigation?

22   A.   The two individuals that were accused I did not

23        know.  In the probation department there may have

24        been one or two that years ago when I did criminal

25        work were involved with a defendant that I may

```
 1              have represented.  I recognized a couple names and

 2              a couple persons, but they were not personal

 3              friends and they were tangential business

 4              acquaintances by virtue of them being a probation

 5              officer for someone who I may have been

 6              representing.

 7     Q.       And other than that description you just gave me

 8              of a professional acquaintance, did you have any

 9              professional responsibilities to represent any of

10              these individuals that you interviewed?

11     A.       I do not recall ever representing any of the

12              persons that I interviewed as their attorney.

13     Q.       Did you conduct all of these interviews in

14              basically the same way or did the way in which you

15              conducted the interview differ depending on who

16              was being interviewed?

17     A.       I'm not sure I understand the question.

18     Q.       Did you have some sort of a predetermined script

19              or a method of operation?

20     A.       Yes.  We took the complaints that were provided to

21              us by Mrs. Varner and the person she said who

22              either witnessed it or part of it, part of the

23              incident, and we would question them on their

24              role, what they saw or heard.  And then if they

25              told us of persons who may have seen or heard
```

1           something or witnessed something, we would call

2           them in and direct their attention to those issues

3           to get their version of what transpired.

4    Q.     Did you give any of these individuals with whom

5           you spoke any documents?

6    A.     I have no recollection of doing that.

7    Q.     Do you have any recollection of showing them any

8           documents?

9    A.     I have no recollection.  I may have or I may not,

10          I don't recall.

11   Q.     I ask you to look, please, at Deposition Exhibit

12          Number 1.  It's the package of your notes.  I

13          believe I asked you this question before, but as

14          an abundance of caution I will ask you again.  Do

15          you believe that there were any notes of

16          interviews that are not contained in this package?

17              MR. THOMAS:  Objection, asked and answered.

18   A.     My belief is that these are all of those

19          documents.  The only concern I have is John Roller

20          and I just want to make sure my notes -- oh, it

21          is, John Roller's notes are in here also.

22   Q.     Would that be at the document marked 20 of 24?

23   A.     Yes.  Yes.

24   Q.     And continuing through to 21 of 24?

25   A.     20 and 21.  To be honest with you, I cannot

```
 1       decipher what I was doing with 22.  Obviously 23
 2       is self-explanatory.  I don't have 24 of 24 here.
 3   Q.  Take a look at 24.  We'll add it to the package.
 4   A.  That looks -- that is the same, that's 23 of 24 in
 5       my packet.
 6   Q.  I'm sorry, I stand corrected.
 7   A.  I have no 24 of 24 in front of me.
 8           MS. WALLET:  Jim, do you know whether we have
 9       24?
10           MR. THOMAS:  I do not.  The last page of
11       notes that I have is the document that you have as
12       marked 23 of 24.
13           MS. WILLIAMS:  I have 24 of 24 being the fax
14       sheet, the concluding fax sheet from Thomas,
15       Thomas & Hafer.
16           MS. WALLET:  Thank you.
17   A.  Thanks.
18   BY MS. WALLET:
19   Q.  Do you believe, sir, that you conducted any
20       interviews of anyone for which you did not have
21       notes?
22   A.  Not to my recollection.
23   Q.  Sir, let's exclude the first several pages of this
24       document which I believe we've already determined
25       are not in your handwriting, and if you could just
```

1       tell me which of those documents using the numbers

2       at the top are not your notes?

3   A.  2 of 37, 3 of 37, 4 of 37 are not my notes.

4   Q.  Let's start with 5 of 37 and could you identify

5       for me what these are, whose interview notes they

6       were?

7   A.  This is my handwriting of a meeting that I had

8       with Mike Varner.  The date I am not certain.

9   Q.  6 of 37?

10  A.  My handwritten notes of a meeting I had with Darby

11      Christlieb in my handwritten notes.  7 is a

12      continuation of that.

13  Q.  Do we know what date you interviewed Darby

14      Christlieb?

15  A.  No.

16  Q.  Do you know, sir, whether there is any

17      significance to the order in which these notes are

18      contained in this package?

19  A.  I don't think there is any significance.  I did

20      not make this order.

21  Q.  Did your original file have any ordered note?

22  A.  No.

23  Q.  So even if we saw your original file, we wouldn't

24      be able to tell who you did first, who you did

25      second, who you did third?

1   A.   No.  All I can recall is we met with Mrs. Varner

2        first.  After that, I can't say for certain,

3        because some of these people we met with more than

4        once.

5   Q.   Could you continue with the package, please?

6   A.   Sam Miller, 8 of 37, Pages 1 and 2 -- or actually,

7        8 and 9; Deborah Reitzel, Pages 10 and 11; Greg

8        Miller, Pages 12 and 13; Mark Galbreath, Pages 14,

9        15 and 16; Nick Baralett, Pages 17, 18; Jennifer

10       Crum, and you can see I have a date there 4/22/97,

11       I believe that to be the date I met with Jennifer,

12       Pages 19 and 20.

13  Q.   Page 20 has a lot of bleed through.  I take it

14       that your notes are only the top three lines?

15  A.   Yes.

16  Q.   And that any of this other document related to the

17       reverse side of the sheet when it was copied?

18  A.   Probably.

19            MR. THOMAS:  Objection to the form.  The

20       representation, again, Deb, is what, the first

21       three lines?

22            MS. WALLET:  Yes.

23            MR. THOMAS:  Oh, all right.  I'm sorry, for

24       the second page?

25            MS. WALLET:  Correct.

 1   A.    Want me to continue?

 2   BY MS. WALLET:

 3   Q.    Please.

 4   A.    Page 21 is Gary Graham, Page 22 is Gary Graham,

 5         Page 23 is Gary Graham, Page 24 is Gary Graham.

 6   Q.    Do we know when you conducted that interview?

 7   A.    No, I do not.  Page 25 is Joseph Osenkarski and

 8         that was conducted on 4/29/97.  Page 26 is also

 9         Joseph Osenkarski.  Page 27 is Kerry Howser, 28 is

10         Kerry Howser, 29 is Kerry Howser, 30 is Kerry

11         Howser.  31 is Deborah Green, 32 is Deborah Green,

12         33 is Deborah Green, 34 is Deborah Green, 35 is

13         Deborah Green, 36 is Deborah Green.  Page 37 is

14         Barbara Varner and we met with her on May 6th,

15         1997.

16   Q.    Again, the we is you and Mr. Hartnett?

17   A.    Yes.  Page 1 of 24--

18   Q.    Is more of Ms. Varner?

19   A.    I do not believe.  Yes, I believe that Page 1 of

20         24 -- I'm not certain what 1 of 24 is.  I can't

21         tell.  There's obviously 2 of 24, which is a

22         continuation of that.  It may be all three for

23         Barbara Varner, I don't know.

24   Q.    If you could go back to 1 of 24, I call your

25         attention to the note "when she was at C&Y," which

1       I assume means Children and Youth, "he would" does

2       that refresh your recollection?

3   A.  You're on 1 of 24?

4   Q.  Correct.

5   A.  That is probably the second page of the Barbara

6       Varner interview that occurred on 5/6/97.

7   Q.  Now we're up to 2 of 24?

8   A.  2 of 24 is also a continuation of Barbara Varner

9       and 3 of 24 is the last page of that Barbara

10      Varner interview.

11  Q.  All right.

12  A.  The next one, 4 of 24, is Barbara Varner.

13  Q.  Do you believe that these notes were taken before

14      or after the earlier notes?

15  A.  These look to have been taken before the earlier

16      notes.  I don't know what date they were taken.

17      But 4 of 24, 5 of 24, 6 of 24, 7 of 24, 8 of 24, 9

18      of 24, 10 of 24, 11 of 24, appear to all be the

19      same interview.

20  Q.  And that being the interview with Barbara Varner?

21  A.  Yes.  Page 12 of 24 appears to be the second time,

22      it says BV-2, I assume that's the second time that

23      I met with Mrs. Varner and that would have been on

24      4/22/97.  Page 13 of 24 is the second page of that

25      interview.  14 of 24 I cannot identify what that

```
 1         is from, whether that is a continuation of the

 2         previous two pages or it is something independent

 3         of that, because I have at the top 2/4 telephone

 4         call.  I can't identify that page.

 5    Q.   It is in your handwriting?

 6    A.   It is my handwriting.

 7    Q.   So, you are not sure whether it's notes of a

 8         telephone call with Barbara Varner or with someone

 9         else?

10    A.   I can't identify that.  I don't know who I had

11         that conversation with.

12    Q.   Do you believe it might have been a conversation

13         with Debra Wallet?

14    A.   Very possible.

15    Q.   What about 15 of 24?

16    A.   These are my own personal notes, but not of any

17         witness.

18    Q.   Do you recall--

19    A.   Frankly, let me go off the record.

20             (Discussion held off the record between Mr.

21         DeLuce and Mr. Thomas)

22    A.   15 of 24 is clearly my handwriting and I do not

23         believe it is of any specific witness.  The

24         language at the bottom may have been from a

25         conversation that we had with Mr. Osenkarski and
```

1       this may have been his plan as to what to do that

2       we asked him to come up with.

3           16 of 24, obviously it's my handwriting

4       addressing Barb.  I put her name at the top, Barb

5       Varner.  It looks like it might be her work

6       schedule when she will be available to talk to us,

7       but I am not certain.

8   BY MS. WALLET:

9   Q.  Do you have any recollection of the "let me in"

10      quote?

11  A.  I don't have any present recollection.  I believe

12      though there is a reference to that in my report.

13      And I can tell you that my report what I would

14      typically do is when I would be back at my office

15      I would dictate a summary of my notes as to what

16      the witnesses said while things were fresh in my

17      mind because my notes are so cryptic it's very

18      hard sometimes for me to recreate them six or

19      seven years later.

20  Q.  And were the summary of your notes contained in

21      what has been marked as DeLuce Deposition Exhibit

22      2?

23  A.  Yes.  You can see at the top Confidential Attorney

24      Impressions.  Those were my impressions.  Do you

25      want me to continue?

1   Q.   Please.

2   A.   16 and 17 I recognize as my handwriting and this

3        must be information I suspect that Barb gave us,

4        I'm not sure.  I believe 18 is a summary of

5        salaries of various employees.  19 is my

6        handwriting.  I have no present recollection of

7        what that is.

8   Q.   Do you know who Christy Steinbacher is?

9   A.   No idea.  20 I believe is John Roller.  21 is John

10       Roller.  22 is my own cryptic notes.

11  Q.   Do you know what they relate to?

12  A.   I would be speculating at this point.  I can't

13       recall presently.

14            MR. THOMAS:  Don't speculate.

15  BY MS. WALLET:

16  Q.   Can you at least tell me on 22 of 24 is that SM,

17       GM with an underline on the left-hand side?

18  A.   The left hand at the top is an SM, below that is

19       an HT, below that is DC, below that is a GG, to

20       the right it's JO, BV and obviously at the top I

21       have Mike Varner.

22  Q.   Can you identify any of those initials?

23  A.   SM is Sam Miller, HT is Hank Thielemann, DC is

24       Darby Christlieb, GG is Gary Graham, BV I believe

25       is Barbara Varner, JO is Joseph Osenkarski.

 1   Q.   I have to ask just one question under JO, do you

 2        know what a-s-p-a-r-g-u-s refers to?

 3   A.   That was an incident that is referred to in my

 4        report.

 5   Q.   Is it a spelling of--

 6   A.   Asparagus.

 7   Q.   Thank you.

 8   A.   Page 23 of 24 looks like is my handwriting.  I

 9        don't know the source of that information, but

10        that's my handwriting.

11   Q.   Were those pages that were identified as notes of

12        interviews, were there any writings on those notes

13        that did not belong to you?

14   A.   I did not see any when I reviewed those pages at

15        this time.

16   Q.   And except for the documents marked 1 through 4 of

17        37, the rest of this package is your handwriting?

18   A.   Yes.

19   Q.   Do you believe that these notes, at least with

20        respect to notes of interviews, accurately reflect

21        what was told to you by the person being

22        interviewed?

23        MR. THOMAS:  Objection to the form.

24   A.   I think it's my cryptic notes of what people were

25        telling me and I certainly believe that I was

1      accurate in what I wrote down.  I think I was not

2      complete in all areas.

3   Q.  Now, as I understand the process, you would take

4      these notes, go back to your office and dictate

5      something?

6   A.  Yes.

7   Q.  Did you do the dictation on the same day or the

8      next day after you did the interviews?

9   A.  I tried to do it as soon thereafter as possible

10     while the information was fresh in my mind.

11     Whether it happened the same day, the next day, I

12     can't tell you.

13  Q.  Are there any other dictated versions of your

14     interviews other than that contained in Deposition

15     Exhibit Number 2 or Deposition Exhibit Number 3?

16  A.  Not to my knowledge.

17  Q.  So that if you interviewed someone and you took

18     notes contained in Deposition Number 1, there

19     would be a typed version contained either in

20     Deposition Number 2 or Number 3?

21  A.  I cannot say for certain there is a typed version

22     of every interview.  Attempts were made to have it

23     that way, but whether that actually turned out, I

24     can't tell you.

25  Q.  Let's look at Deposition Number 2.  Do you

1        recognize that document, sir?

2   A.   This document is dated April 30, 1997.  Yes, I

3        recognize it.  It's a memorandum that says from

4        me, DWD, to HAJ, Horace A. Johnson, of my office.

5   Q.   Do you believe you prepared that document in this

6        version, this version being the one that's marked

7        Deposition 2, on or about April 30, 1997?

8   A.   No.

9   Q.   Describe for me when you believe that you prepared

10        Deposition 2.

11   A.   Deposition 2 was a work in process that after

12        interviews I would add to it primarily the facts

13        section.  Therefore, I suspect what happened is no

14        changes were made to the original date on Page 1

15        even though changes were made to the body of the

16        document.  And I don't see it offhand, but I do

17        recall when I looked at this, yes, Page 10 there's

18        a reference that I met with Varner on May 6th,

19        1997, so it was obviously after it.  That's why

20        this document was a work in process that would

21        change from interview to interview and the date on

22        the front cover is not the date of the last

23        addition or change.

24   Q.   Do you believe Deposition Number 2 to be your last

25        version of what you've described as this work in

Exam./Wallet - DeLuce                    58

1        progress?

2   A.   No.

3   Q.   Would you just look for a moment at Deposition

4        Exhibit 3 and tell me whether you believe that's

5        the last version of the work in progress?

6   A.   To the best of my knowledge today, I believe this

7        is the last version of this memorandum.

8   Q.   Let me ask you, sir, with respect to Deposition

9        Number 2, does it accurately reflect in the

10       section marked Facts the information that was

11       relayed to you by the individuals noted in

12       Deposition Number 2?

13            MR. ADAMS:  Facts or background?

14            MS. WALLET:  Facts.

15            MR. THOMAS:  Objection to the form.  You may

16       answer.

17  A.   Yes.

18  BY MS. WALLET:

19  Q.   Do you believe that there's anything contained in

20       the Facts section of Deposition Number 2 that is

21       inaccurate?

22  A.   Well, let me say this.  I think it's an accurate

23       depiction by me of what the witnesses told me at

24       that time.  Whether the statement or allegation is

25       true, they may not be true.  It's based on what

Exam./Wallet - DeLuce                              59

1           the witness told me at the time.

2    Q.     Is there anything contained in Deposition 2 in

3           Roman Numeral III entitled Facts on Page 6 through

4           and including 24 that you believe does not

5           accurately depict what was told to you by the

6           individuals indicated?

7                MR. THOMAS:  Objection to the question.  I

8           think it's exactly the same question that was

9           responded to and he's testified that he believes

10          that portion of the report accurately reflects

11          what he was told without any comment on whether or

12          not the facts as such are actually correct.

13   A.     I agree.

14   BY MS. WALLET:

15   Q.     Some time has passed since April 30, 1997.  In the

16          period of time since April 1997 have you become

17          aware of any inaccuracies in your report marked

18          Deposition 2?

19                MR. THOMAS:  Objection to the form.  You may

20          answer.

21   A.     I was advised by Mr. Hartnett I believe in July of

22          1997 that Mr. Graham indicated that he and Mrs.

23          Varner had a relationship and that he indicated

24          this to Judge Sheely.  He and Mrs. Varner both

25          denied that they had a relationship when I spoke

1          to them.

2     BY MS. WALLET:

3     Q.    Did Graham at any time ever tell you directly that

4           he had had a sexual relationship with Barbara

5           Varner?

6     A.    He told me that only one time -- strike that.  No,

7           he told me they did not have a sexual

8           relationship.

9     Q.    And that would be with respect to any of the times

10          that you interviewed Mr. Graham directly?

11    A.    Yes.  I don't know that I asked him every time.

12    Q.    Now, with respect to Deposition Exhibit Number 3,

13          they have the same basic divisions, a Background

14          section and Section III again is Facts.  With

15          respect to Deposition Exhibit 3 between Pages 6

16          and 25 up to the part marked Attorney Impressions,

17          do you believe that the facts contained here

18          accurately reflect what was told to you by the

19          individuals noted?

20    A.    Yes.

21    Q.    Since the writing of this version, this being

22          Deposition 3, have you come to any realization

23          that any of these facts are incorrect?

24    A.    Again, as I stated with Deposition 2, I later

25          learned that Mr. Graham indicated that there was a

1        relationship between him and Mrs. Varner and

2        obviously that is not reflected in my report.  I

3        reflected that there was not one as I recall.

4    Q.   Would you describe for me what occurred between

5        Deposition Number 2 and Deposition Number 3?

6    A.   My recollection is that I became less concerned

7        that we had a sexual harassment issue and more

8        concern if we had anything it was an employment

9        supervisory issue.

10   Q.   And why did you come to that conclusion?

11   A.   Based upon the treatment or management style

12        towards the employees in the department.

13   Q.   Whose management style?

14   A.   I would say it's Mr. Osenkarski and Mr. Graham who

15        were the accused here.

16   Q.   Do you know whether you conveyed to Judge Sheely

17        any recommendations as indicated in Deposition

18        Number 2?

19   A.   My recollection is that I felt that some type of

20        suspension based on what I was hearing to date,

21        sensitivity training, training on what is sexual

22        harassment, and some transfer of supervisory

23        responsibilities should be seriously considered,

24        as well as the role of the overall supervisor in

25        juvenile probation based on what he told me and

1       what the others told me, his nonactive role in the

2       day-to-day management I felt that since the

3       president judge is busy trying cases and hearing

4       cases and cannot be there to watch what goes on in

5       that department, that he should have someone there

6       who does.

7   Q.  And did you convey that directly to Judge Sheely?

8   A.  I conveyed those issues and concerns along with

9       Mr. Hartnett to Judge Sheely in the one meeting

10      that I can recall having with him.

11  Q.  And what if any response did you receive from

12      Judge Sheely to those recommendations?

13  A.  Go go back and talk to Gary and Joe and ask them

14      to come up with a plan and let's see what they

15      come up with and indicate that you have some

16      concerns with some of the things that you have

17      heard to date from other employees.  And we did

18      meet with them again and tell them that.

19  Q.  And this meeting was with Mr. Graham and Mr.

20      Osenkarski at the same time?

21  A.  My recollection is that it was separate.  And my

22      recollection is that it was separate and I think

23      we put more of the burden on Mr. Osenkarski who

24      was the overall supervisor.

25  Q.  So, there was a meeting or more than one meeting

1    between you, Gary Graham, Dan Hartnett after you

2    met with Judge Sheely?

3  A.   I can't recall specifically.  My belief is it was

4    one meeting with Mr. Graham and two meetings with

5    Mr. Osenkarski, one when we gave him the directive

6    to come back with something, and two when he came

7    back to meet with us to give us some indications.

8  Q.   Describe for me the meeting with you, Dan Hartnett

9    and Gary Graham.

10  A.   Which meeting?

11  Q.   Immediately after your meeting with Judge Sheely

12    in which he instructed you to go to Graham and ask

13    for his suggestions.

14       MR. THOMAS:  Objection to the form.  You may

15    answer.

16  A.   My recollection is -- I don't have any specific

17    recollection of specific discussions.  I think the

18    meetings would start out calm and escalate through

19    the discussions with Mr. Graham.

20  BY MS. WALLET:

21  Q.   Do you know where this meeting took place?

22  A.   In the personnel conference room next to Mr.

23    Hartnett's office at the county courthouse.

24  Q.   Just the three of you?

25  A.   Just the three of us.

1   Q.   Tell us what you recall about that meeting.

2        MR. THOMAS:  Asked and answered.

3   A.   That's all I can recall.

4   BY MS. WALLET:

5   Q.   Well, who started the meeting?

6   A.   I'm sure that I did and Mr. Hartnett had a role in

7        it and we asked, we indicated I'm sure that there

8        were concerns that we had what we heard from the

9        witnesses and we wanted him and we were going to

10       ask Mr. Osenkarski to come up with some

11       recommendations as to how to address them in order

12       to protect them and their employer.

13  Q.   Do you have at least a month when you think that

14       this meeting occurred?

15  A.   It happened after we met with Judge Sheely.  My

16       recollection is we met with Judge Sheely sometime

17       in early June, but I'm not certain of dates.

18  Q.   Do you know whether you met with Gary Graham

19       before you met with Joe Osenkarski?

20  A.   I don't know that.

21  Q.   Do you remember anything about the order in which

22       these meetings occurred?

23  A.   No.

24  Q.   Okay, I'm still on the meeting with Gary Graham.

25       MR. THOMAS:  There's no question I don't

Exam./Wallet - DeLuce                              65

1          think.  Ask a question, please.

2    BY MS. WALLET:

3    Q.    What else do you remember occurring at that

4          meeting?

5    A.    Gary disagreed with what some of the witnesses had

6          told us, said they were lying and it was

7          untruthful.

8    Q.    Did you tell Mr. Graham who said what?

9    A.    I can't recall.

10   Q.    Do you believe you did?

11   A.    I think that if I recalled incidents he would have

12         an idea of who I was talking about, but I can't

13         recall specifics.  I felt my role was to alert him

14         to the allegations against him and get his version

15         of what is being claimed.

16   Q.    Do you recall any other response that Mr. Graham

17         made?

18   A.    I remember him having some documents that he

19         indicated would prove he was right and they were

20         wrong.  And he let me see them from a distance and

21         he said I don't think I'm going to give them to

22         you and he pulled them back.

23   Q.    Do you know what kind of documents they were?

24   A.    No, I did not.  No, they weren't prepared by me

25         and I do not know.

1   Q.   Do you know whether they were handwritten or

2        typed?

3   A.   I can't recall.

4   Q.   Did you ask to have copies of them?

5   A.   Yes.

6   Q.   What response did you get?

7   A.   Whatever I said in my report.  I can't -- whatever

8        I said there.

9   Q.   You said that it started calm and then it

10       escalated.  What do you mean by that?

11  A.   Gary was upset and disagreed with what the

12       witnesses said and felt they were not being

13       truthful.

14  Q.   Did he raise his voice?

15  A.   He got excited would be how I would phrase it.

16  Q.   Did he raise his voice?

17  A.   Oh, sure.

18  Q.   Did he swear?

19  A.   I do not recall that, no.

20  Q.   Did he have any suggestions for what ought to be

21       done here?

22  A.   Not that I can recall.

23  Q.   Well, did he tell you what he thought you should

24       do?

25  A.   I think Gary felt that there was no harassment or

Exam./Wallet - DeLuce                              67

```
 1          any problems here and it was, therefore, nothing

 2          needed to be done.

 3    Q.    How did the meeting end?

 4    A.    I don't recall except that it, you know, we

 5          reached -- it ended.  I don't know of anything in

 6          particular that I can recall at six and a half

 7          years ago.

 8    Q.    Tell me about the first meeting that you had with

 9          Joe Osenkarski, Dan Hartnett and yourself after

10          you had spoken to Judge Sheely?

11    A.    I think it would have been much the same, that we

12          indicated that we have heard some statements from

13          some witnesses that raise concerns to us that

14          could cause some liability to the employer and

15          that some action needed to be taken to address the

16          situation for all parties involved.  And we asked

17          him to come up with a plan.

18    Q.    What was Mr. Osenkarski's response?

19    A.    He said he had some ideas, he would work on them

20          and get back to us.

21    Q.    What prompted you to have a second meeting with

22          him?

23    A.    He was to present those ideas to us.

24    Q.    Back at the first meeting what else did you tell

25          Mr. Osenkarski that you recall about the
```

1        allegations?

2    A.   I believe -- I have no present recollection except

3         to say I would have done the same as I did with

4         Gary, that is, review the allegations with him.  I

5         can't recall him having any specific response

6         except that he was not aware of them.

7    Q.   He was not aware of what?

8    A.   I think you're better off to look at my report

9         where I summarize what Mr. Osenkarski said to us

10        regarding the incidents that we reviewed with him.

11   Q.   And you are looking at which version?

12   A.   Why don't we go to version Deposition Exhibit 3?

13   Q.   That being the June 4, '97 version?

14   A.   Yes.

15   Q.   And you are referring us to what page?

16   A.   I don't know.  I'm looking for it.

17            MR. THOMAS:  While you're looking for that,

18        off the record for a minute.

19            (Discussion held off the record)

20   A.   The question was?

21   BY MS. WALLET:

22   Q.   When we got a little off the record discussion you

23        were looking for the page that would indicate your

24        notes of this meeting.

25   A.   I'm not sure that Page 22 reflects specifically my

1        notes of the meeting.  Page 22 reflects a summary

2        of what Mr. Osenkarski told us in our interviews,

3        which was just a denial of everything in a summary

4        word or words.

5   Q.   Mr. Osenkarski told you that he had never seen

6        Graham lose his temper?

7   A.   Whatever I have in here is an accurate depiction

8        of what I was told and what Mr. Hartnett was told.

9   Q.   I'd ask you to read that paragraph please and then

10       I'll ask you a couple of questions about it.

11            MR. ADAMS:  The entire paragraph on Page 22?

12            MS. WALLET:  Yes.

13  A.   Yes, your question?

14  BY MS. WALLET:

15  Q.   Did Mr. Osenkarski tell you that he had never seen

16       Graham lose his temper?

17            MR. THOMAS:  He's already told you that

18       whatever Mr. Osenkarski told him is reflected.

19       What are you asking him to do?

20            MS. WALLET:  I'm asking him to confirm that

21       Mr. Osenkarski told him that Graham never lost his

22       temper.

23            MR. THOMAS:  Do you have any independent

24       recollection today of what Mr. Osenkarski told you

25       during your interviews six and a half years ago?

 1   A.    No.

 2             MR. THOMAS:  Other than what's written?

 3   A.    Other than what's written here on my notes, no.

 4   BY MS. WALLET:

 5   Q.    Well, let me ask it this way.  You wrote on Page

 6         22, quote:  "He claims he has never seen Graham

 7         lose his temper, never use the "f" word, although

 8         upon further questioning admitted that at times

 9         Gary gets very excitable."  Is that an accurate

10         statement of what Mr. Osenkarski told you?

11             MR. THOMAS:  We'll agree that you've read it

12         correctly.

13             MS. WALLET:  That's a different question.

14             MR. THOMAS:  The question has been asked and

15         answered.

16   BY MS. WALLET:

17   Q.    Does that accurately reflect what Mr. Osenkarski

18         told you?

19             MR. THOMAS:  Objection to form.  You can

20         answer it.

21   A.    Yes.

22   BY MS. WALLET:

23   Q.    Do you have any written confirmation, typed

24         confirmation, of what occurred when you met with

25         Mr. Osenkarski the second time?

Exam./Wallet - DeLuce                        71

1   A.   If it's not in this report, the answer is no.

2   Q.   And this report meaning Deposition?

3   A.   2 or 3.

4   Q.   Well, did Mr. Osenkarski ever give you any

5        suggestions as to what he thought should be done

6        here?

7   A.   Yes.

8   Q.   Did you receive them in writing or otherwise?

9   A.   I know we received them verbally.  Whether they

10       were in writing, I have no recollection of that.

11  Q.   And what were Mr. Osenkarski's suggestions?

12  A.   I can't remember specifically what they were.  I

13       don't have a present recollection of what they

14       were.

15  Q.   Do you remember anything?

16  A.   I know that--

17            MR. ADAMS:  Object to form.

18  A.   I know that there were -- I believe there were

19       some type of training or seminar or some type of

20       educational program on what is sexual harassment.

21       Beyond that I have no present recollection.

22  BY MS. WALLET:

23  Q.   Did he recommend any transfers?

24  A.   Not that I can recall.  Not that I can recall

25       other -- not that I can recall.

Exam./Wallet - DeLuce                    72

1   Q.   Did he recommend any suspensions?

2   A.   No.

3   Q.   Did he recommend any action be taken against Gary

4        Graham?

5   A.   No, except -- and I can't remember the time

6        frame -- whether by then we had indicated that

7        another senior PO should be reviewing her work and

8        recommended that Gary not have direct supervisory

9        control over her.  When that went into effect,

10       what he did in carrying it out, I can't remember,

11       but I do believe that at some point that that

12       occurred.  I don't know when.  You have to

13       understand we didn't have authority.  We could

14       only make recommendations.

15  Q.   Did you take any of the recommendations from Mr.

16       Osenkarski back to Judge Sheely?

17  A.   I did not.

18  Q.   Do you know if anyone else did?

19  A.   I do not know if Mr. Hartnett or anyone else did.

20  Q.   You did not meet again with Judge Sheely after you

21       spoke with Osenkarski and Graham to receive their

22       recommendations?

23  A.   I have no memory of any subsequent meeting with

24       Judge Sheely.

25  Q.   Do you know whether Judge Sheely received a copy

```
 1        of what has been marked as Deposition Number 3?
 2             MR. THOMAS:  Objection to form.  Misstates
 3        the testimony.
 4   A.   I did not give him a copy of that Deposition
 5        Number 3.  If he received it, it came from
 6        somebody else.
 7   BY MS. WALLET:
 8   Q.   Did you give Deposition Number 3 to anyone other
 9        than Horace A. Johnson?
10   A.   I never gave Deposition Number 3 to Horace A.
11        Johnson.
12   Q.   After you did Deposition Number 3, what did you do
13        with it?
14   A.   Stuck it in the file.
15   Q.   Did you give it to Dan Hartnett?
16   A.   No.
17   Q.   Did Dan Hartnett ever receive anything that could
18        be considered a written report from you of your
19        investigation?
20   A.   Not directly from me.
21   Q.   Do you believe that Mr. Johnson gave a written
22        report to Mr. Hartnett?
23   A.   I have come to learn that there was a letter from
24        Mr. Johnson to Mr. Hartnett -- strike that.  Can I
25        see that letter?  I'd just like to see that first
```

Exam./Wallet - DeLuce                    74

1         before I make any comments.

2    Q.   Let the record reflect that I'm handing what's

3         been marked as Deposition Number 4.

4    A.   I have come to learn that a letter was sent by Mr.

5         Johnson to Mr. Hartnett on June 26th, 1997.

6    Q.   And how did you come to that knowledge?

7    A.   I was told by Mr. Johnson at some subsequent point

8         that he retrieved the report from my file and

9         delivered it to the county.  Who he delivered it

10        to, I was not certain.  I saw this letter of June

11        26th, 1997, just recently.

12   Q.   Do you know what copies were attached or enclosed

13        with the June 26th, 1997, letter marked Deposition

14        4?

15   A.   No, I do not.

16   Q.   So, today you are not sure what went to Dan

17        Hartnett except for this letter dated June 26th,

18        1997?

19             MR. THOMAS:  Objection to the form.  He's not

20        even sure -- you can't put him in a position to

21        tell you what went to Hartnett.  All he can say is

22        he has seen the letter that was addressed to him.

23        He would have no way of knowing whether Hartnett

24        got it or not.

25   A.   I'm sorry, your question is?

1    BY MS. WALLET:

2    Q.    Do you know whether anything other than Deposition

3          Number 4 went to Dan Hartnett?

4    A.    I don't know what went to Dan Hartnett other

5          than -- I don't even know that Deposition Number 4

6          went to Daniel Hartnett.  I presume it does

7          because I see a letter addressed to him with the

8          date with attachments, but I don't know that that

9          went to him.  I have no recollection of a

10         discussion with Mr. Hartnett that he received this

11         letter.

12   Q.    Did you have any discussions with Mr. Johnson

13         after June 26th, 1997, relative to this letter?

14   A.    Yes -- no, relative to the letter, no.

15   Q.    Did you have any discussions with Mr. Johnson

16         relative to this investigation after June 26th,

17         1997?

18   A.    I'm sure that I did.

19   Q.    Do you recall the substance of any of those

20         discussions?

21   A.    I believe they are confidential between two

22         attorneys in the same law firm.

23   Q.    When did you learn that any action had been taken

24         against Gary Graham or Joseph Osenkarski?

25   A.    I got a telephone call from Mr. Hartnett somewhere

Exam./Wallet - DeLuce                    76

1         on or near the 4th of July because I was off and

2         he called me at home to tell me what he had heard

3         transpired.

4    Q.   So, Hartnett calls you at home and what does he

5         tell you?

6    A.   He said that there was a meeting with Judge Sheely

7         and Mr. Graham and that his wife was present and

8         that Mr. Graham indicated that he had had an

9         affair or relationship with Barbara Varner and

10        they discussed that with Judge Sheely and then he

11        told me what Judge Sheely did as far as any

12        disciplinary action regarding that.

13   Q.   And what did Hartnett tell you that Sheely did?

14   A.   My recollection is there was a couple days'

15        suspension and I can't remember the rest of it,

16        that's over six years ago, but I know that there

17        was a suspension.  Beyond that I don't recall.

18   Q.   Do you know who was suspended?

19   A.   I believe that Mr. Graham was suspended.

20   Q.   Do you know whether Mr. Osenkarski was suspended?

21   A.   I do not recall that he was, but I'm not certain.

22   Q.   Do you know whether any disciplinary action was

23        taken against Mr. Osenkarski?

24   A.   I do not know what Judge Sheely may have done.

25   Q.   Did you have any discussions with Mr. Hartnett

1          after the July 4th conversation?

2    A.    Sure.

3    Q.    Relative to this matter?

4    A.    Well, certainly we discussed the revelation by Mr.

5          Graham and what impact that may have had upon our

6          investigation.

7    Q.    What do you recall about that discussion?

8    A.    Well, I think it's a fact that I think would have

9          been relevant for us to be aware of in what we

10         did.  And if you notice the cases that I cited in

11         my memorandum, they did not, as I recall, deal

12         with a situation where the parties had some type

13         of relationship.  It was simply claims of sexual

14         harassment as I recall.  I certainly would have

15         looked at the situation differently.

16   Q.    In what way?

17   A.    Well, you're asking me to speculate.  I think I

18         would have liked to have asked some more questions

19         of the parties regarding the matter to get a

20         better understanding of what transpired, look at

21         the relevant case law and come up with further

22         recommendations is the way I would have handled

23         it.

24   Q.    But you were not asked to do that?

25   A.    No.

Exam./Wallet - DeLuce                    78

1    Q.   Were you asked to do anything after June 26th,

2         1997?

3    A.   Continue representing the county on any legal

4         matters involving this situation which included --

5         I have no present recollection of when we were

6         served with the EEOC documents, but I know that I

7         was involved in that.

8    Q.   You were not asked to do anything else with

9         respect to investigating Barbara Varner's

10        complaint after June 26th, 1997?

11   A.   No, in my view the employer made their

12        determination.  The judge decided what was to be

13        done.

14   Q.   Did you believe that your investigation was

15        concluded by June 26th, 1997?

16             MR. THOMAS:  June what?

17             MS. WALLET:  26th.

18   A.   I believe that it was based on the facts that were

19        given to us to date.

20   BY MS. WALLET:

21   Q.   To date meaning today or June 26th of '97?

22   A.   June 26th of 1997.

23   Q.   In any event, nobody asked you to do anything

24        after June 26th, 1997?

25   A.   No.

```
 1              MS. WALLET:  Okay, let's take a break now.
 2              (Lunch recess taken)
 3   BY MS. WALLET:
 4   Q.    Mr. DeLuce, you are certainly still under oath.
 5         You understand that?
 6   A.    I understand that.
 7   Q.    Would you tell me, please, what recommendation you
 8         made to Judge Sheely as a result of your
 9         investigation?
10   A.    I made no recommendation to Judge Sheely.  I
11         indicated to him that I had some concerns with
12         what I saw -- or what I heard from the witnesses,
13         not only from there was some concern about
14         potential sexual harassment, but also management
15         issues, and I felt that some action needed to be
16         taken and movement of personnel also needed to be
17         done in order to terminate this matter from a
18         legal standpoint and also from the employees'
19         perspective.
20   Q.    And when you say from the employees' perspective,
21         who are you referring to?
22   A.    Well, I think my report reflects that there was
23         some issues by many members of the department with
24         management of the department and there were
25         concerns and I thought from a personnel standpoint
```

1       that somebody needed to address those issues as

2       well.

3    Q.    And did you make any specific recommendations

4          about what should be done?

5    A.    To Judge Sheely, no, I did not.

6    Q.    Was there anything else that you recommended to

7          Judge Sheely that you haven't just told me?

8    A.    No.

9          MS. WILLIAMS:  I'm going to object to the

10         form of that question.  I think his testimony was

11         that he made no recommendations.  So, I would

12         object to your characterization as a

13         recommendation.

14   BY MS. WALLET:

15   Q.    Did you make any recommendations at all as a

16         result of your investigation to Judge Hoffer?

17   A.    No.

18   Q.    Did you make any recommendations at all to anyone

19         with the County of Cumberland?

20   A.    I did indicate to the county commissioners and Mr.

21         Ward that they should urge the judge to take some

22         action based upon what we had heard from the

23         witnesses and my concerns would be to both the

24         court and what my concerns would be to my client,

25         the county, and I think they are stated in my

Exam./Wallet - DeLuce                    81

1          Deposition Exhibit Number 2.

2    Q.    So, what is contained in Deposition Exhibit Number

3          2 on Page 24 and 25 is your summary of what you

4          told the county commissioners?

5              MR. THOMAS:  I have an objection to the form

6          in terms of date.  I think my recollection is that

7          the meeting with the commissioners was after the

8          later report.

9    A.    It was after the later report and my recollection

10         is that there should be some action taken, but of

11         course the county could not do it.  They were

12         going to go talk to Judge Sheely, but I felt there

13         should at least be a suspension, sensitivity

14         training, maybe a management change and monitoring

15         of the situation because of the concerns that Mr.

16         Hartnett and I had after talking to the witnesses.

17         But we didn't give anything specific.  We gave

18         them a range of what can be done and then they

19         were going to take that in some manner and go see

20         Judge Sheely.

21   BY MS. WALLET:

22   Q.    They meaning?

23   A.    The commissioners and Mr. Ward.

24   Q.    Do you know whether that occurred?

25   A.    I was not personally present.

1  Q.  Do you have any information to believe that that

2      occurred?

3  A.  I believe that there was a meeting.  Who attended

4      and what was said, I do not know.

5  Q.  Now, you said your recommendation of action

6      included suspension.  Suspension of whom?

7  A.  The supervisors involved with this situation.

8  Q.  Specifically?

9  A.  Mr. Osenkarski and Mr. Graham.

10 Q.  And did you make a recommendation even though it

11     be a range for what those suspensions should be?

12 A.  I gave no range.

13 Q.  Did you recommend specifically what kind of

14     management change you would recommend?

15 A.  I felt that based on what the witnesses had told

16     me Joe was not running the day-to-day operations

17     of the department and they needed somebody in

18     there to oversee and do that and keep an eye on

19     the situation.  And I suggested that they consider

20     talking to Mr. Osenkarski about retiring since he

21     was vested in his retirement plan -- but you have

22     to understand the county could not do that, that

23     would have been up to the judge -- and then have

24     somebody else maybe supervise the department and

25     Mr. Graham.

 1   Q.   Someone could supervise Mr. Graham?

 2   A.   Yes.

 3   Q.   Did you recommend any change in physical location

 4        for either Mr. Osenkarski or Mr. Graham?

 5   A.   Specifically, no, because I've never seen the

 6        department myself.

 7   Q.   Did you recommend that Graham be separated from

 8        Varner?

 9   A.   Yes.

10   Q.   What was the nature of your recommendation?

11   A.   Well, I felt that it was a situation that would

12        continue and in order to stop that for both

13        parties involved and to remove the allegation of

14        sexual harassment that there should be some

15        separation of the parties in the workplace from

16        supervisory control.

17   Q.   Why did you think the situation would continue?

18   A.   As I said, the judge who has ultimate supervision

19        is busy, he's trying cases, he's in a different

20        floor.  This is not something that he is able to

21        stay close to from what I could tell and it was

22        clear from the witnesses and even Mr. Osenkarski

23        that he was not into handling the day-to-day

24        activities.

25   Q.   What monitoring did you have in mind?

1   A.   I had none in mind that I could specify to you.

2   Q.   I believe that was one of your list of

3        recommendations?

4   A.   Yeah, but it's not -- I think that's for the judge

5        to decide that, not me.

6   Q.   Did you make any recommendation with regard to the

7        what I'll call seniority issue, do you understand

8        what I mean by the seniority issue?

9   A.   I have no present recollection of making a

10       recommendation regarding the seniority issue.

11  Q.   Did you believe that the county could issue any

12       regulations or policies with regard to how

13       seniority was treated?

14            MR. ADAMS:  Objection.  How would this

15       witness be qualified to answer that question?

16            MS. WALLET:  He represents the county, so he

17       says.

18            MR. ADAMS:  Are you asking him to interpret a

19       policy by the county?

20            MS. WALLET:  Is that an objection?

21            MR. ADAMS:  Objection based on the fact that

22       he's not qualified to respond based on the

23       policies.

24  BY MS. WALLET:

25  Q.   You may answer the question.

1    A.    Should I answer the question?

2          MR. THOMAS:  Yeah.

3    A.    My understanding was that these type of policies

4          were developed by the judge and not the county

5          and, in fact, I was told that employees who were

6          dissatisfied with the policy went to see the judge

7          to give their viewpoint.  This was not in my view

8          within the county's domain.

9    BY MS. WALLET:

10   Q.    Did you believe the county had any ability to

11         remedy any of this situation?

12         MR. THOMAS:  Objection to the form.

13         MR. ADAMS:  What situation?

14         MS. WALLET:  Complaints brought by Ms.

15         Varner.

16   A.    No.

17   BY MS. WALLET:

18   Q.    No, you believe that they had no ability to

19         remedy?

20   A.    That's correct.

21   Q.    Who did you believe had the ability to remedy?

22   A.    If any changes were to be made or a remedy was

23         needed, it would be up to the president judge who

24         controlled that department, not the county.

25   Q.    Why did you bother to make recommendations if you

1       didn't think that the county had any ability to

2       implement them?

3   A.  Who are you referring that those recommendations

4       were made to?

5   Q.  Well, let's start with Deposition 2.

6   A.  First of all, you have to understand that

7       Deposition 2 was a work in process.  It evolved

8       into Deposition 3, just so you understand that.

9       I'm sorry, repeat your question, please.

10  Q.  Why did you bother to make recommendations if you

11      didn't think the county had any ability to

12      implement them?

13  A.  Because the county certainly had the ability to

14      recommend those to the president judge and they

15      wanted something from their legal counsel as to

16      what the options were.

17  Q.  Did you consider that you were an investigator for

18      the court?

19  A.  I considered myself as an attorney for the county

20      who was conducting an investigation.

21  Q.  For whom?

22  A.  The investigation in my view was at the request of

23      the president judge and with his authority.  It

24      was done though by the county personnel office and

25      myself.

1   Q.   Did you consider yourself to be the president

2        judge's lawyer?

3   A.   No.

4   Q.   Why did you believe that you were investigating at

5        the request of the president judge?

6   A.   Because I knew very early on that the county had

7        no authority to make personnel changes in the

8        probation department.

9   Q.   Did the president judge give you any direction

10       with regard to conducting an investigation into

11       the allegations made by Barbara Varner?

12  A.   Not that I can recall except for the one meeting

13       we had, which I've already explained my

14       recollection of what transpired.

15  Q.   To the best of your knowledge, did the court pay

16       for any of your investigative activity?

17  A.   I didn't see the checks when payments were made,

18       but to the best of my knowledge it was paid by the

19       county.

20  Q.   Now, this memo marked Deposition 2 was actually

21       from you to your would you call him your superior,

22       Horace Johnson?

23  A.   I would call him my partner at the time.

24  Q.   Did Mr. Johnson direct you to write this memo to

25       him as opposed to someone else?

Exam./Wallet - DeLuce                         88

1   A.   I can't recall what he may have directed at that
2        time.  I obviously -- the way I drafted it, it was
3        addressed to him, but I never physically gave it
4        to him.
5   Q.   How did he get it?
6   A.   I presume he took it out of the file.
7   Q.   And you don't know when that happened?
8   A.   I suspect it was -- I believe it was during the
9        last week of June of 1997.
10  Q.   Why didn't you write a report directed to Dan
11       Hartnett?
12  A.   Because these were my own impressions and my own
13       thoughts as an attorney after talking to witnesses
14       and doing my own research.  I did not prepare this
15       with the intention of giving it to my client.  I
16       would have done it differently.
17  Q.   Did you consider yourself to be an independent
18       investigator?
19  A.   What do you mean by independent?
20            MR. THOMAS:  Objection to form.
21  BY MS. WALLET:
22  Q.   Independent to the parties involved.
23  A.   No, I felt myself as counsel for the county.
24  Q.   What caused you to change what was Roman Numeral
25       Number IV, Recommendation, in the April 30, '97

Exam./Wallet - DeLuce                    89

1      memo to Attorney Impressions in the June 4 '97

2      memo marked Deposition 3?

3  A.  As the process continued and the interviews

4      continued, I became less and less concerned with

5      the sexual harassment and more concerned with a

6      management personnel issue in the department and

7      that is why I recall making changes to my

8      recommendations.

9  Q.  Did you believe that the change from

10     recommendation to attorney impressions would

11     somehow protect this document from future

12     disclosure?

13 A.  I typically put that on my file memorandums that I

14     want to keep for my future reference and because

15     they are for me.  If they are intended for the

16     client, I would do it differently.

17 Q.  So, you really never intended to conduct an

18     investigation, prepare a report and submit that

19     report to someone?

20         MR. THOMAS:  Objection to the form.

21 A.  If my client had asked me for a written report, I

22     would discuss that with them, and if they wanted

23     that, I certainly would give them a written

24     report.

25 BY MS. WALLET:

1   Q.   And they never asked you for that?

2   A.   I have no recollection of Mr. Hartnett asking me

3        for a written report.

4   Q.   When you say if my client had asked me for a

5        written report, you are speaking to someone in

6        authority with the County of Cumberland?

7   A.   Well, Mr. Hartnett would have been sufficient for

8        me or the chief clerk or the commissioners.

9   Q.   And not one of those three entities ever asked you

10       for a report?

11  A.   I have no recollection of any of them asking me

12       for a written report.

13  Q.   Would you look, please, at Deposition Exhibit 3,

14       the first page?  You write at the bottom of the

15       first full paragraph:  "The written complaint from

16       Barbara Varner as well as her proposed solution to

17       the problem were submitted in writing at my

18       request."  Were those the written complaints that

19       were referenced in the prior sentence?

20  A.   Yes.

21  Q.   So, you had in your possession the complaint that

22       Barbara Varner had written to Dan Hartnett dated

23       April 28, 1997?

24  A.   Yes.

25  Q.   Did you have anything else in writing from her?

```
 1   A.    I don't know.  I can't recall.

 2   Q.    Did you believe that you had a satisfactory

 3         description of Ms. Varner's complaint prior to

 4         your engaging in the interview of witnesses?

 5              MR. MacMAIN:  Objection.  Do you mean based

 6         on the writing or you said the first thing he said

 7         was interview her or--

 8              MS. WALLET:  Based on the writing.

 9   A.    I'm not sure what you mean by satisfactory.  She

10         provided us verbally and then in writing her

11         allegations and then we embarked upon talking to

12         her and witnesses that she either told us or that

13         we thought had relevant knowledge of these

14         incidents to try and determine the facts.

15   BY MS. WALLET:

16   Q.    My question was did you believe that you

17         sufficiently understood what Barbara Varner was

18         complaining about in order to engage in some

19         investigation of those complaints?

20              MR. THOMAS:  Objection to form.  You may

21         answer.

22   A.    Yes.

23   BY MS. WALLET:

24   Q.    What was your understanding of what Barbara Varner

25         was complaining about?
```

1    A.    That she was working in a hostile environment, it

2          was made hostile by her immediate supervisor, Mr.

3          Graham, and that he treated her differently than

4          others.

5    Q.    And did she indicate that she believed she was

6          treated differently because of her gender?

7    A.    I don't have the written complaint in front of me

8          so I don't know what's in there.  If you're asking

9          me to comment about whether that's in there or

10         not, I don't know.  I certainly recall verbally

11         that her concern was that she was treated

12         differently because of her gender.  I don't know

13         whether it's in the written complaint.

14   Q.    Did she have any complaints about Joseph

15         Osenkarski and his treatment of her because of her

16         gender?

17   A.    Without looking at her complaint and my notes, I

18         can't recall that independently.  But certainly

19         her complaint was against him as well as Mr.

20         Graham, that I do recall.

21   Q.    Did she complain to you about Joseph Osenkarski's

22         failure to stop what she considered to be the

23         harassment by Gary Graham?

24   A.    Yes.

25   Q.    Did you understand her complaint to be that she

Exam./Wallet - DeLuce                    93

1        was treated differently with regard to seniority

2        because of her gender?

3    A.   Did I understand that was her complaint that she

4        felt she was treated differently because of her

5        gender and seniority?

6    Q.   Yeah.

7    A.   I think that was her complaint.  That doesn't mean

8        that I necessarily agreed with that.

9    Q.   I understand.  I'm just asking you what you

10       understood to be the complaint that you were

11       investigating.  Did you understand Ms. Varner's

12       complaint to be that she had been treated

13       differently after she had complained about Mr.

14       Graham's treatment of her?

15   A.   She expressed to us a concern for retaliation,

16       yes.

17   Q.   Did you understand her complaint to be that she

18       was treated differently because of her age?

19   A.   I do not recall any age basis to her claims.  I

20       qualify that and all of this line of questions

21       with the fact I don't have the written complaint

22       in front of me.

23   Q.   If it was in the written complaint, you believe

24       that you had a duty to investigate?

25   A.   Yes.

1  Q.   Were there any complaints in this written

2       complaint form dated April 28, 1997, that you

3       believed you did not have a duty to investigate?

4  A.   Can I see the complaint?

5  Q.   Maybe.

6            MR. THOMAS:  Note my objection to the form.

7            MS. WALLET:  Your objection being to your

8       witness asking for something?

9            MR. THOMAS:  No, to the form of your prior

10      question.

11 BY MS. WALLET:

12 Q.   I'd like to show you what has previously been

13      marked in this matter as Varner Deposition Number

14      1.

15 A.   The document you handed to me is dated April 25,

16      1997.  I don't know why my memorandum refers to

17      April 28th, 1997.  I presume it's the same

18      document, but I do not know that for certain.  I

19      see in her complaint she says she feels she has

20      been discriminated or harassed in relation to her

21      age, sex and marital status.  I'm sorry, your

22      question is?

23 Q.   I don't remember exactly what my question was, but

24      let me ask a different question.  Now that you've

25      had a chance to review Varner Deposition Number 1,

1    do you believe that to be the writing that you had

2    in your possession at the time you engaged in the

3    investigation of Ms. Varner's complaints?

4    A.   It looks like the document that I had previously

5         seen.

6    Q.   Is it the document that you referenced in

7         Paragraph 1 of Deposition Number 3?

8    A.   Again, I believe it is, but there are different

9         dates.

10        MR. THOMAS:  They deviate by a day.

11   A.   Actually April 28th is what my memo says and this

12        is dated April 25th.

13        MR. THOMAS:  I'm sorry, three days.

14   A.   I don't know whether it is the -- I don't know

15        what I'm referring to, whether it's the date it

16        was given to me or the actual date of the memo.

17   BY MS. WALLET:

18   Q.   Mr. DeLuce, if we had your original file would it

19        have attached to Deposition Number 3 or some

20        version of Deposition Number 3 documents that you

21        had to work with at the start of your

22        investigation?

23   A.   I believe a memorandum from Barbara Varner would

24        be in the file.  Whether it's attached to this

25        document, I don't know.  I can tell you I do not

Exam./Wallet - DeLuce                    96

1          have in my file Deposition Exhibit Number 3.  I

2          only have in my file Deposition Exhibit Number 2.

3     Q.   Could I have Varner 1 back, please?

4     A.   Sure.

5     Q.   Now let me ask you, sir, did you come to any

6          conclusions regarding whether or not there was a

7          hostile environment for Barbara Varner when you

8          conducted your investigation?

9               MR. ADAMS:  Objection, calls for a legal

10         conclusion I would think and it's inappropriate

11         for this witness.

12              MR. THOMAS:  Objection to the form.  You may

13         answer.

14    A.   I felt that at times there was a hostile

15         environment, especially as perceived by the

16         employee.

17    BY MS. WALLET:

18    Q.   And when you say the employee, you mean Barbara

19         Varner?

20    A.   Barbara Varner.

21    Q.   Did you find any evidence that other individuals

22         in the office believed that Barbara Varner was

23         subjected to a hostile environment?

24              MR. ADAMS:  Same objection.

25              MR. THOMAS:  Same objection.  Any employees?

1          MS. WALLET:  Any employees.

2    A.    I think what's reflected in my report, who and

3          what they said to me, you can make your own

4          conclusions from what they said.

5    BY MS. WALLET:

6    Q.    Did any employees confirm the allegations of

7          Barbara Varner regarding hostile environment?

8    A.    Yes.

9    Q.    Which employees?

10   A.    You want me to go through the report and specify

11         them?  I think my report speaks for itself.  I

12         have no present recollection and, in fact, would

13         not recognize most of those people if they walked

14         in this room today.

15   Q.    Did you reach any conclusions as to whether or not

16         Joseph Osenkarski engaged in treatment of Ms.

17         Varner differently because of her gender?

18         MR. ADAMS:  Same objection.

19         MR. THOMAS:  For his conclusion?

20         MS. WALLET:  Yeah.

21   A.    I can't recall.  I think what you're asking me is

22         did I conclude whether Mr. Osenkarski treated her

23         differently or engaged in sexual harassment

24         because she was a woman?

25   BY MS. WALLET:

Exam./Wallet - DeLuce                    98

1   Q.   Well, I asked you treated differently.

2   A.   I think my report speaks for itself.  My

3        recollection now is only what I see in here and

4        I'm going to stick by what I said in my report

5        because that was contemporaneous with the

6        investigation.

7   Q.   So that any of the facts that you would testify to

8        now have been, shall we say, impaired by the

9        passage of time?

10  A.   Yes.

11  Q.   So, you believe the best evidence of what you

12       concluded at the time is contained in Deposition 2

13       and 3?

14  A.   Yes.

15            MR. THOMAS:  With the caveat that he's

16       already told you earlier in his testimony today

17       that had he known about a consensual affair, his

18       research, investigation, conclusions may have been

19       different.

20  BY MS. WALLET:

21  Q.   At the time did you believe that there may be

22       retaliation against Barbara Varner because of her

23       complaints?

24            MR. THOMAS:  Present tense, past tense,

25       future tense?

Exam./Wallet - DeLuce                    99

1   BY MS. WALLET.

2   Q.    At the time meaning at the time that you wrote

3         Deposition 2 and 3.

4   A.    My recollection is that my report indicates I had

5         some concerns about retaliation.

6   Q.    Why did you believe there might be some

7         retaliation against Barbara Varner?

8   A.    Because of the information given to me by other

9         employees that's indicated in my report.

10  Q.    The information that people told you Gary Graham

11        was prone to punish people?

12        MR. THOMAS:  Objection to the form.  You may

13        answer.

14  A.    I can't recall if that's the exact words, but I

15        believe there is some language in there that I

16        quoted from witnesses regarding that topic.

17  BY MS. WALLET:

18  Q.    Did you find those witnesses to be credible?

19        MR. THOMAS:  Which witnesses?

20  A.    Yeah.  I guess the witnesses dealing with the

21        concern of retaliation?

22  BY MS. WALLET:

23  Q.    Correct.

24  A.    I did at the time.

25  Q.    Mr. DeLuce, in your experience did you find it

1       unusual that the court would ask you to go back to

2       Gary Graham and Joseph Osenkarski and ask them

3       what ought to be done in response to Ms. Varner's

4       complaint?

5   A.  When you say did I find it unusual, if you're

6       asking me is how would I have handled it, that's a

7       different question.  I think that decision of how

8       to handle it was up to the president judge, not

9       me.  I mean you're asking me to speculate why he

10      did that and that's what I would be doing.  All I

11      can say is he was the supervisor and I think he

12      wanted to hear what their suggestions were on how

13      to resolve it.

14  Q.  Had you ever done a sexual discrimination or

15      sexual harassment investigation prior to this

16      time?

17          MR. THOMAS:  Asked and answered.  Don't

18      answer it.

19  BY MS. WALLET:

20  Q.  Have you done any since?

21  A.  I have assisted clients and my recollection is

22      that I did join in with a client's personnel

23      director on obtaining information.

24  Q.  Did you ever share any portions of Deposition

25      Exhibit 2 with Barbara Varner?

```
 1   A.   I have no recollection of sharing.  When you say
 2        portions of it, do you mean the physical report or
 3        the content?
 4   Q.   The physical report.
 5   A.   I have no recollection of sharing this report with
 6        Barbara Varner.
 7   Q.   Do you have any recollection of sharing any
 8        portions of the physical report of Deposition 3
 9        with Barbara Varner?
10   A.   I have no recollection of doing that.
11   Q.   Did you share any of the portions of these reports
12        with Gary Graham?
13   A.   Again, do you mean the content or the physical
14        document?
15   Q.   Physical document.
16   A.   I have no recollection of showing him any of this,
17        either memorandum.
18   Q.   Did you share any of the document or portions of
19        the document Deposition 2 or Deposition 3 with
20        Joseph Osenkarski?
21   A.   The physical document I have no recollection of
22        doing that.
23   Q.   However, you did share with both of them the
24        findings, or at least some of the findings and
25        facts contained in those reports at the direction
```

Exam./Wallet - DeLuce                    102

1        of Judge Sheely?

2            MR. THOMAS:  Objection to the form.

3    A.    We shared with both Mr. Osenkarski and Mr. Graham

4          statements and allegations, allegations made by

5          Barbara Varner and statements made by certain

6          witnesses as to what happened or what they saw to

7          get his version and confront him with the

8          allegations.

9    BY MS. WALLET:

10   Q.    And you did that at the direction of Judge Sheely?

11   A.    The answer is in my view, yes, as part of the

12         investigation.

13   Q.    Did you share any of the facts or information

14         contained in your report -- let's say reports, I'm

15         referring now to Deposition 2 and Deposition 3,

16         with Barbara Varner after you met with Judge

17         Sheely?

18   A.    I can't recall.

19   Q.    Did Judge Sheely tell you to go back to Barbara

20         Varner and ask her what her suggestions were?

21   A.    I don't recall him doing that.

22   Q.    Did you ever have any discussions with counsel for

23         Gary Graham in or about the April to June 1997

24         time frame?

25   A.    I recall being contacted by Attorney David Foster.

1        I recall that he indicated he was representing

2        Gary Graham.  I cannot recall the substance of the

3        conversations.

4    Q.  How did he know to call you?

5    A.  I suspect Mr. Graham, but I -- I didn't -- I mean

6        I didn't contact him.

7    Q.  Do you remember what Mr. Foster wanted you to do?

8    A.  I don't recall the substance of our conversations.

9    Q.  You had no notes of those -- I'm sorry, I didn't

10       mean to say those.

11   A.  My recollection is I have no notes of it and I

12       don't know if there was one or a couple or how

13       many, but I do know that he contacted me.

14   Q.  Do you know whether Mr. Foster told you any facts

15       relating to the relationship between Ms. Varner

16       and Mr. Graham?

17   A.  I have no recollection of him discussing facts

18       with me.

19   Q.  Did Mr. Foster at any time tell you that Gary

20       Graham had had a sexual relationship with Barbara

21       Varner?

22   A.  I don't recall him ever saying that to me.  I

23       think that's something I probably would have

24       remembered.

25   Q.  Did you have any conversations with Debra Wallet

1           regarding your investigation into the complaints

2           of Ms. Varner?

3    A.     I can't recall.  I may have.  I can't recall.  I

4           know that we spoke at a certain point in time, but

5           I cannot tell you when that was.

6    Q.     Do you remember any of the substance of the

7           conversation with Debra Wallet?

8    A.     Are you talking April to June of 1997?

9    Q.     Or any other time.

10   A.     I know that we had discussions regarding how to

11          resolve or settle the issue or the -- I suspect it

12          was after the EEOC complaint was filed because I

13          know that I believe that we had those discussions.

14          Exact terms, time, I can't recall.

15   Q.     Did you initiate those calls or did Debra Wallet?

16   A.     I can't recall.

17   Q.     During your interviews with the individuals listed

18          in Deposition 2 and 3, did you give any assurances

19          to those individuals that what they told you would

20          be kept confidential?

21   A.     I can't recall specifically.  I do know that some

22          of the witnesses had concerns that what they were

23          telling us would get back to their supervisors.

24          And Mr. Hartnett and I were conscious of that

25          issue, but what assurances I gave I cannot recall.

1    Q.   Do you believe that you told anybody that they

2         could feel free to talk to you because the

3         information they gave you would not be revealed?

4    A.   You are asking me do I believe I said that and you

5         are asking me to speculate what I may have said

6         six and a half years ago and I cannot recall what

7         I said.

8    Q.   Did you have any kind of a script that you used

9         when you began each of the interviews?

10            MR. THOMAS:  Objection, asked and answered.

11        Don't answer it.

12   BY MS. WALLET:

13   Q.   Did you have any mental list of what you would

14        tell each of the individuals that you interviewed?

15   A.   Should I answer it?

16            MR. THOMAS:  Sure.

17   A.   I'm sure that we did have some type of thought

18        processes as to what we were going to ask the

19        witnesses when they came to that conference room.

20   BY MS. WALLET:

21   Q.   What did you tell these witnesses that you were

22        there to do?

23   A.   I can't specifically recall what I said to them.

24        The witnesses that Barb asked us to interview and

25        said they would be willing to talk to us, I'm sure

```
 1            they knew what was going on.  The other witnesses

 2            that we wanted to talk to, I think by the time we

 3            got to them word had spread through the department

 4            and they had a good idea of what the heck was

 5            going on.  I can't recall specifically what we

 6            told them.

 7    Q.      Did you tell these witnesses that you were

 8            investigating allegations by Barbara Varner

 9            against individuals in the department?

10    A.      I can't recall exactly what I said to them.  I

11            can't recall exactly what I said to them.

12    Q.      Did you give any of the individuals that you

13            interviewed any assurance that there would be no

14            retaliation against them as a result of their

15            talking with you?

16    A.      Didn't you already ask me that?  I think I recall

17            that being a concern, especially with some of the

18            witnesses who came to see us.  And what I would

19            have explained to them was that if there was any,

20            they needed to report it, because that should not

21            be going on.  What exactly I said to them I cannot

22            recall, but I can tell you that's the way I would

23            have answered their concerns.

24    Q.      Did you tell them who they should report it to?

25    A.      I believe -- no, I don't recall that we did
```

1        specifically, but we may have.  I can't remember

2        whether we told them to report it to Mr. Hartnett

3        or to the judge, but we would have told them to

4        report it.

5   Q.   Was there a sexual harassment policy in place in

6        or about April through June of 1997?

7   A.   I don't have it in front of me, but my

8        recollection is that there was.

9   Q.   Do you know whether that policy was issued by the

10       County or by the County of Cumberland?

11            MR. THOMAS:  Objection to the form.  You may

12       answer.

13  A.   I don't know who issued it.  I don't know who

14       issued it.  My recollection is that it was part of

15       the -- I'm not sure.  I'm speculating.

16  BY MS. WALLET:

17  Q.   Did you have a copy of a written policy at the

18       time that you began your investigation?

19  A.   My recollection is that I asked for it and

20       something was provided to me.

21  Q.   Do you know whether or not that policy was

22       contained in your file?

23  A.   I have to tell you that I don't recall seeing it

24       in there, but it may be in there.

25            MS. WALLET:  Mr. Thomas, I'm going to ask you

Exam./Wallet - DeLuce                    108

1     to make available to me the entire investigative

2     file.

3          MR. THOMAS:  We will certainly obtain his

4     original and review it and take your request under

5     advisement.

6          MS. WALLET:  I take it that means there's no

7     assurance I'm going to get to look at it?

8          MR. THOMAS:  That's what that means.  I will

9     review it to see whether or not you've been

10    provided with the things that we believe are not

11    protected.  If there are things that I believe are

12    protected, we will provide you with a privilege

13    log.

14         MS. WALLET:  With a privilege?

15         MR. THOMAS:  Privilege log.

16         MS. WALLET:  Log, thank you.  And could I ask

17    that you do that within a week?

18         MR. THOMAS:  Sure.

19         MS. WALLET:  Thank you, Mr. DeLuce.  That's

20    all of the questions I have for you today.

21         MR. THOMAS:  I would ask that you fax me a

22    letter today or Monday reminding me to do that so

23    that it gets done.

24                          EXAMINATION

25    BY MR. MacMAIN:

```
 1   Q.   Mr. DeLuce, my name is David MacMain.  I represent
 2        Mr. Graham and I had some things that I want to
 3        ask you about that you have been asked about in
 4        follow-up and some additional areas.  Now, you had
 5        said earlier that you interviewed some witnesses
 6        that had been suggested to you by Ms. Varner.
 7        Correct?
 8   A.   Correct.
 9   Q.   Did you ask Mr. Graham when you interviewed him
10        for witnesses that he might suggest you interview?
11   A.   Yes, I asked him to give me anything he could to
12        help me in addressing this, especially if he said
13        the allegations were untrue or false.
14   Q.   And do you recall what witnesses, the names of any
15        of the witnesses that he provided to you to
16        interview?
17   A.   Certainly they are in the report.  Whether I said
18        in here Gary or Joe told me to interview X, I
19        don't think I did that.  He gave me names.  I
20        cannot presently recall who they were.
21   Q.   Now, you did not interview everybody in the
22        probation department.  Correct?
23   A.   I don't know that.  I don't think that we did, but
24        I don't know that for a fact.
25   Q.   Anybody that you would have interviewed would be
```

1       contained in your notes which was DeLuce 1.

2       Correct?

3   A.  Correct.

4   Q.  So, if someone had been interviewed, their name

5       would be reflected in the interview notes

6       somewhere in Number 1?

7   A.  That is my recollection.

8   Q.  Now, you said you never physically had been in the

9       office, the probation office?

10  A.  During the time that this was going on the answer

11      is no.  I had been in the probation office prior

12      to that when I did some criminal work.  Where

13      their offices are located I have no -- I didn't

14      have any knowledge.  I mean I knew they were on

15      the second floor, but that's all I knew.

16  Q.  You said these interviews were conducted with both

17      yourself and Mr. Hartnett.  Was there any breakout

18      of who asked the questions, for example, did you

19      ask the majority of the questions, did Mr.

20      Hartnett, was it--

21  A.  We both asked the questions and I would have

22      viewed it as a team approach.  He asked a lot of

23      questions.  He was experienced in his field and he

24      asked a lot of questions and I mean he was part of

25      the process.  We both did.

```
 1   Q.   Do you know if Mr. Hartnett took any notes?  We
 2        have your notes here.
 3   A.   You'll have to ask him.  I don't have his notes.
 4   Q.   I'm looking at DeLuce 2.
 5   A.   Okay.
 6   Q.   I want to go through some of the documents and ask
 7        you select questions about some things.  Second
 8        paragraph about four lines down it says Graham and
 9        Varner shared an office?
10   A.   Um-hum.
11   Q.   Do you know whether or not they ever shared an
12        office?  Where did you get that information from I
13        guess would be a better question?
14   A.   That came I think from Barbara Varner.  I don't
15        know whether that also came from Gary Graham.  But
16        this looks familiar to me to be part of my first
17        interview with Barb Varner.
18   Q.   And was it your understanding that they actually
19        shared a I don't want to say an office, I mean a
20        specific office where people sit, as opposed to
21        the more general probation office generally?
22   A.   All I know is what I have here is they shared an
23        office.  What type of office or what that meant,
24        I'm not sure.
25   Q.   Did she tell you how long they had shared an
```

1          office?

2    A.    If it's reflected in my notes, then she did.

3    Q.    Did you have any understanding of prior to the two

4          of them working together in probation whether they

5          worked together while she was located and working

6          for a different county office, Children and Youth

7          Services?

8    A.    Well, I think what it reflects here and in my

9          notes that they had some contact in their jobs by

10         virtue of her being at Children and Youth and him

11         being in juvenile probation and they worked

12         together on certain cases.  I recall that's how

13         they had their connection prior to her moving to

14         the probation department.

15   Q.    And it was your understanding that her hiring in

16         the probation department was actually at the

17         recommendation of Mr. Graham?  I'll cut right to

18         the chase.  I'm looking at DeLuce 2, second

19         paragraph, it says she was hired as juvenile

20         probation officer upon the recommendation of Mr.

21         Graham.

22   A.    Yes, I thought that was the case, but I wanted to

23         find it somewhere.

24   Q.    Sure.  And was it your understanding that for a

25         number of years prior to her hire in the probation

1          department they actually worked together and took

2          trips together in their respective roles with the

3          different departments?

4    A.    I recall seeing that in my notes.

5    Q.    Do you know whether or not Ms. Varner had ever

6          lodged any complaints against Mr. Graham during

7          that time period?

8    A.    To my knowledge, I have no recollection of her

9          lodging any such complaints prior to this one.

10   Q.    Did you as part of your investigation look at Mr.

11         Graham's personnel file to see if anybody had ever

12         made any type of complaints against him during his

13         tenure with the county?

14   A.    My recollection is Mr. Hartnett did that.

15   Q.    And would it be fair to say that if there had been

16         any prior similar complaints against Mr. Graham

17         that that would be reflected somewhere in your

18         notes or in your report?

19   A.    If that was told to me, it likely would be in this

20         report.

21   Q.    And would it be fair to say the reason it would be

22         in the report is if there had been prior

23         complaints that would be of some significance in

24         your mind as the investigator?

25   A.    In my mind I would want to know about it and I

Exam./MacMain - DeLuce                    114

1              would want to know what the outcome was.

2    Q.   And were you aware of whether or not Ms. Varner

3         had ever made any complaints against any employees

4         prior to this complaint in 1997?

5    A.   I was not aware of her making any complaint of

6         sexual harassment or discrimination while a county

7         employee.

8    Q.   Now, you were asked by Ms. Wallet whether or not

9         it was your belief that some employees' opinion

10        was that there was a hostile environment within

11        the office and I think you said some employees

12        believed that there may be.  Correct?

13   A.   Correct.  I think that's reflected in my report.

14   Q.   Were there also employees that felt that there was

15        not a hostile environment?

16   A.   Correct, and I think that is reflected in my

17        report.

18   Q.   People had different personal opinions as to the

19        environment of the office?

20   A.   Yes.

21   Q.   You were asked by Ms. Wallet whether or not there

22        was some people you interviewed that expressed

23        some concern about retaliation.  Do you know

24        whether, in fact, there's been any retaliation

25        against any employees in the six years since this

1        investigation took place?

2   A.   I am not aware that there has been.  It's not been

3        reported to me.

4   Q.   DeLuce 2, if you would put that in front of you, I

5        just want to ask you about a few references.

6   A.   Yes.

7   Q.   Turning to Page 12, again, looking at the first

8        full paragraph, last sentence:  "Barb stated many

9        times to me that she has no romantic interest in

10       Mr. Graham."

11  A.   Yes.

12  Q.   Do you recall how many times she told you that

13       during the interviews?

14  A.   No, I'm not -- I mean many times.  All I can say

15       is many times.  I know that I asked the question

16       of both of them and I'm reasonably certain that

17       Mr. Hartnett did as well.  And my recollection

18       based on what's in the report is both denied

19       anything.

20  Q.   But this statement many times she denied a

21       romantic interest, do you have any estimate of how

22       many times she denied any type of a romantic

23       interest?

24  A.   I cannot give you a count.

25  Q.   Did you find it unusual that it would be repeated

1        many times to you that she has no interest?

2    A.   I don't know about unusual.  I do recall that card

3        that she claimed that he gave to her and my

4        recollection is that Mr. Graham denied giving it

5        to her.  I can't quantify many times.

6    Q.   Page 13 of the report, looking at the next to last

7        full paragraph, the last line.  Let's go to my

8        question before about the concern about

9        retaliation, you have written:  "Barb has not

10        relayed any facts where retaliation has occurred

11        since Brandt met with me."  Why did you put this

12        line in, what was the significance of this?

13    A.   Because I think it follows with the lead-in of

14        that paragraph about the reaction of Mr. Brandt

15        after he returned from meeting with myself and Mr.

16        Hartnett and this is what Barb told us.  And that

17        gets into a whole other story about a previous

18        incident that he was the key witness where someone

19        else lodged a complaint of sexual harassment, and

20        I think if you look at my notes what Mr. Brandt

21        said his work conditions were for the previous

22        four years and he did not want any part of this.

23    Q.   Does that statement also relay there's been no

24        retaliation against Barb since the investigation

25        began?

 1  A.  You are asking me whether I'm saying Barb is
 2      stating that there's been no retaliation against
 3      her or no retaliation against Brandt?
 4  Q.  Right.
 5  A.  Both?
 6  Q.  Both.  You've already answered as to Mr. Brandt.
 7      There was no retaliation as to Mr. Brandt based on
 8      his interview.
 9  A.  I didn't clearly word that, but I think I am only
10      referring to Mr. Brandt.  I'm not referring to
11      Barb.
12  Q.  The next paragraph refers to an interview with a
13      Jennifer Crum, a secretary?
14  A.  Um-hum.
15  Q.  Did you interview any other secretaries in the
16      office who may have observed or not observed the
17      environment in the office at the time?
18  A.  My recollection is we interviewed another person
19      who was not a probation officer, but my
20      recollection is she was from witness assistance or
21      something like that.  I think it's reflected in
22      the report.  I think I tried to designate the
23      employment of the person who we interviewed.
24  Q.  Would that be Deborah Reitzel?
25  A.  What page is that on?

1    Q.    If you turn to DeLuce 1, which are your notes,

2          Page 10 of 37.

3    A.    Yes.

4    Q.    And Deborah Reitzel relayed to you at the bottom

5          she never felt uneasy or uncomfortable with Gary

6          Graham.  It's the very last line, I'm sorry.

7    A.    That's my handwriting.

8    Q.    So, according to Ms. Reitzel, there was no hostile

9          environment that she observed in the office?

10   A.    I think what she is saying is towards her.

11   Q.    Did you ask her whether or not there was any

12         hostile environment towards Ms. Varner?

13   A.    I believe we asked her about the incident several

14         weeks ago at the probation office.

15   Q.    The reason I ask, there's nothing reflected in

16         here that Ms. Reitzel said there was any type of

17         hostile environment towards either her or Ms.

18         Varner.  I assume if she did, it would be in your

19         notes?

20   A.    I think she said that she didn't feel uneasy and I

21         think she says earlier Barbara Varner was not in

22         the group at the counter at the time.

23             MR. THOMAS:  Can we take a break for a

24         minute?

25             MR. MacMAIN:  Sure.

```
 1              (Recess taken)

 2    BY MR. MacMAIN:

 3    Q.    Mr. DeLuce, in your report in DeLuce 2, and flip

 4          that over to Page 6, in there you list a number of

 5          people that were interviewed and the last line

 6          there's a Hank Thielemann who you note was

 7          interviewed?

 8    A.    Yes.

 9    Q.    I didn't see any reference to him in your

10          interview notes, nor did I see his name mentioned

11          in your report.  Do you recall as you sit here

12          whether or not he, in fact, was interviewed?

13    A.    Mr. Thielemann was interviewed.  I know Mr.

14          Thielemann because I believe when I did criminal

15          work he was a probation officer of a client of

16          mine.  And I thought I saw reference to Mr.

17          Thielemann.  Yeah, here he is.  On Page 21 there's

18          reference to Mr. Thielemann and I thought I saw

19          file notes with reference to an HT, which would

20          have been Hank Thielemann.  He was one of I think

21          the two probation officers that I knew.  So, I

22          know Hank and I know I spoke to him.

23    Q.    You believe that's reflected in your notes which

24          is DeLuce 1?

25    A.    Well, I'm looking in there now to see if I can
```

```
 1              find it.  I'm certain I spoke to him.  I'm not

 2              seeing notes, but--

 3      Q.      The only reason I ask you is Page 33 of 37 his

 4              initials are in the left-hand margin and it looks

 5              like it's part of an interview with Deborah Green

 6              on Page 33 of 37.

 7      A.      Yeah, I see down about three quarters of the way

 8              down?

 9      Q.      Right.

10      A.      Well, it says other guys.  I assume it's Sam

11              Miller, Denny Drachbar and Hank Thielemann not

12              busy is what she's claiming.  There was an

13              allegation here that Barbara Varner got a higher

14              case load than anybody else.

15      Q.      And that was one of the examples given to you by

16              some witnesses as evidence that she was treated

17              unfairly?

18      A.      Yes.

19      Q.      And further that was claimed to be evidenced by

20              some of the witnesses that the group of more

21              senior employees in the department got a lighter

22              case load?

23      A.      Yes.

24      Q.      Did you do any investigation to see if, in fact,

25              that was true?
```

1    A.    Yes.

2    Q.    And was it, in fact, true?

3    A.    My recollection is I stated something I thought in

4          the report because I saw that.  The answer was the

5          highest cases were with Barbara Varner and I

6          forget after that.  We got a list.  We made Mr.

7          Graham and Mr. Osenkarski produce a list and we

8          went down the list.  And I know that we discussed

9          that throughout this process and I thought I

10         reviewed something on that.

11   Q.    Yeah, if you turn to Page 17 of your report.

12             MS. WALLET:  Which one?

13             MR. MacMAIN:  Of DeLuce 2.

14   A.    There we go.  Yes, there's a reference in the

15         first full paragraph.

16   Q.    Okay.

17   A.    I knew we got statistics.

18             MR. MacMAIN:  Let's mark this as DeLuce 5 I

19         guess we're up to.

20             (DeLuce Deposition Exhibit #5 marked for

21         identification)

22   BY MR. MacMAIN:

23   Q.    On Page 17 of DeLuce 2, the draft or earlier

24         version of your report, it refers to a memo,

25         statistics provided April 29th, '97, from

1          Osenkarski.  If you turn to the first page, this

2          appears to be a cover memo from Joe Osenkarski,

3          April 30th.  Attached is a list of cases, dated

4          April 29th, 1997.  Do you see that?

5    A.    Um-hum.

6    Q.    Is this the memo that was provided to you?

7    A.    I don't know.  I don't know.  This is addressed to

8          Dan, I assume that's Dan Hartnett, April 30th.  I

9          don't know if this is what was given to us or not.

10         I can't answer that.

11   Q.    If you turn to the second page that has the case

12         list on it, you recite in your report that Barb

13         has the most cases with 45?

14   A.    Um-hum.

15   Q.    If you look at the last column and add in the

16         number total and pending, that adds up to 44 which

17         is almost exactly the number that's cited?

18            MR. THOMAS:  Objection.  The number is 45 I

19         think.

20   A.    31 and 14 is 45.

21   BY MR. MacMAIN:

22   Q.    And then the next number that's given is Drachbar

23         with 43?

24   A.    Um-hum.

25   Q.    If you add up the last two columns next to his

```
 1          name, 35 and 8, that equals 43?

 2    A.    Okay.  I see what you're doing.

 3    Q.    Does this refresh your recollection as to whether

 4          or not this was the chart you were given and you

 5          referenced in your report?

 6    A.    Obviously the numbers seem to match what's in my

 7          report.  And I know I saw some type of a report

 8          like this.  Whether this is the same exact one, I

 9          don't know for sure.

10    Q.    And at least according to this report, Mr.

11          Drachbar has only one less case than Ms. Varner,

12          correct, he has 43, Ms. Varner has 44?

13    A.    He has 43, Ms. Varner has 45.

14    Q.    Okay, 45, I'm sorry.

15    A.    Yes.

16    Q.    And Hank Thielemann has 40 cases?

17    A.    Yes.

18    Q.    And Ms. Green who complained that Ms. Varner and

19          she and other people were disfavored actually got

20          more cases, she only has 31 cases.  Correct?

21    A.    Um-hum.

22    Q.    Would this document refute or undercut Ms. Green's

23          contention that the one element to prove that

24          there was discrimination was that the case loads

25          were higher for her and other people and the older
```

Exam./MacMain - DeLuce                    124

1       males had lower case loads?

2   A.  I think you need to ask her that.  I see Mr.

3       Osenkarski's memo and he said when assignments

4       were made it is not simply a numbers game.  Other

5       factors such as complexity of cases and current

6       individual PO's daily activities are taken into

7       consideration.  So, I don't know if it refutes

8       what she said.  I do know that shear numbers alone

9       are not the only answer.

10  Q.  But Ms. Green in the paragraph you recite she

11      believes that Barb and Nick Baralett have the

12      highest case loads because Gary wants to make a

13      point with them, that would not be reflected in

14      this document, would it, that they did not have

15      the highest -- well, Ms. Varner had the highest

16      case load by a case or two?

17  A.  She had the highest case load, that was clear.

18      She felt whatever it says there.  Obviously the

19      numbers panned it out differently and I reflected

20      that accurately in the report.

21  Q.  Did that have any effect on your credibility of

22      placing what Ms. Green had told you?

23  A.  Well, it didn't have a significant impact, no,

24      because the concern I had was that Barbara Varner

25      had the most cases and some of the other things

1      that Deb Green relayed my -- well, whatever my

2      report says Deb Green said says.  I don't want to

3      restate that because it's six and a half years.

4  Q.  Sure.

5  A.  I mean there's no question what I wrote in my

6      notes is what she said to me.  You are saying,

7      hey, the numbers don't pan out.  I'll let you ask

8      her that.

9  Q.  If you turn to Page 20 and, again, we're on DeLuce

10     2, this reflects an interview with a Kerry Howser.

11     She clearly does not like Osenkarski and Graham.

12     I want to go through a couple of the examples Ms.

13     Howser gave to support her belief that there was

14     mistreatment or differential treatment.  She first

15     tells you that DUI instructors got $20,000 extra.

16     Is that correct?

17 A.  That's what I put in the report.

18 Q.  But then the actual amounts are actually one

19     quarter or one half of that.  Correct?

20 A.  That's what we asked, what do they make, and I

21     wanted to correctly reflect that.

22 Q.  Based on looking at the numbers, did that have an

23     impact on your assessment of Ms. Howser's

24     credibility?

25 A.  No, because I don't think they, the individual

1       employees knew how much was made by the DUI

2       instructors.  I think they thought it was a lot

3       more money than it actually was.  The bigger

4       concern was that a lot of these employees didn't

5       get a crack at this additional income.  And that

6       was the issue is how were people selected to get

7       this opportunity.  And I don't think I came to any

8       significant conclusions, but I tried to bear out

9       the facts to address the situation.

10   Q.   And the facts were that Ms. Howser's perception

11       was incorrect?

12   A.   I think her perception of the amount was

13       incorrect.  Her concern as to why certain people

14       got it and why certain people didn't was an issue

15       that needed further investigation.

16   Q.   Was that something that you investigated?

17   A.   I asked questions about it.

18   Q.   And did you do any further investigation beyond

19       asking questions?

20   A.   No.

21   Q.   In other words, did you look at documents?

22   A.   No.  Well, somebody looked at documents because

23       they got us the actual amounts they made.  I

24       believe Mr. Hartnett looked into that.

25   Q.   And the actual amounts were one quarter or one

1      half of what Ms. Howser believed them to be?

2          MS. WALLET:  I'll raise an objection.  Asked

3      and answered.

4  BY MR. MacMAIN:

5  Q.  Is that correct, the numbers reflect one quarter

6      or one half of what Ms. Howser's perception was?

7  A.  Based on the math, yes.

8  Q.  Turning to Page 21, looking at the last paragraph,

9      and Ms. Howser likewise cites as an example of

10     unfair treatment that Mr. Thielemann's case load

11     is very low.  I'm looking at the third line from

12     the bottom.  Do you see where I am?

13 A.  Um-hum.

14 Q.  If we turn back to DeLuce 5, which is the case

15     load assignment, Mr. Thielemann, in fact, has one

16     of the highest case loads.  If my math is correct,

17     he has 40 cases?

18 A.  I think I explained that these notes are these --

19     this report contains my summary of what the

20     witnesses told me.

21 Q.  Sure.

22 A.  It's not -- I didn't make findings of fact that a

23     court would do.

24 Q.  Sure.  All I'm simply asking is what you were told

25     by a witness when you looked at the numbers, in

1      fact, were inaccurate, the witness's either

2      perception was inaccurate -- I mean you can't

3      comment on their state of mind, but what the

4      numbers bear out and what they told you are two

5      different things.  Correct?

6   A.    Yeah, in certain cases.

7         MR. MacMAIN:  Does anyone else have any other

8      questions?  I think I have a few select questions

9      from your notes, but I don't want you to have to

10     sit here for three minutes.

11        (Discussion held off the record)

12  BY MR. MacMAIN:

13  Q.    Mr. DeLuce, let me ask you this.  One of the other

14     things that you were told and I think is reflected

15     in your notes and in your report is that the

16     department had split a short time before all of

17     this occurred.  Correct?

18  A.    Yes.

19  Q.    And was it your understanding that there was some

20     unhappiness generally because of the split?

21  A.    I think whatever my report says, my recollection

22     is that some were probably happy and some were

23     probably unhappy, but I think I explained that

24     some people did not want to work for certain

25     people and went to great lengths to get away from

1        them.

2   Q.   DeLuce 1, which are your notes, looking on Page 14

3        of the 37, and this is notes from your interview

4        with Mark Galbreath?

5   A.   Yes.

6   Q.   Five lines down you note that "worked closely with

7        Barb Varner."  That reflects I assume that Mr.

8        Galbreath worked closely with Barb Varner?

9   A.   If that's what I wrote, I must have gotten that

10       indication.

11  Q.   Did Mr. Galbreath indicate that Ms. Varner ever

12       complained to him about Mr. Graham's conduct?

13  A.   You are asking me if Mark Galbreath told me that

14       Barb Varner ever complained to Mark Galbreath

15       about Gary Graham's conduct?

16  Q.   Correct.

17  A.   And I will answer that by saying if I state it in

18       this summary, my answer is yes.  If it's not in

19       there, my answer is no.

20  Q.   Fair enough.

21  A.   I can't remember what Mark Galbreath told me six

22       and a half years ago.

23  Q.   I'll represent to you there's no indication in

24       your notes that he stated that Ms. Varner

25       complained to him at any point about Mr. Graham.

Exam./MacMain - DeLuce                130

1       So, what you're telling me, if it's not in there,

2       he didn't tell you that.

3           If you turn to Page 30 of the same document,

4       30 of 37, and looking at the very top of the page

5       there's two names written, Fran Rose and Winnie

6       Stern?

7   A.  Um-hum.

8   Q.  These were names provided to you by the person you

9       were interviewing, would that be fair?

10  A.  I don't know.  I presume Kerry Howser gave me

11      these names because this seems to be part of the

12      Kerry Howser interview.

13  Q.  And did you ever interview Fran Rose or Winnie

14      Stern?

15  A.  I have no recollection of interviewing those two

16      individuals.

17  Q.  Did you ever interview Tom Boyer?

18  A.  My recollection is that we did.  Because, again, I

19      know Tom because I believe Tom handled DUIs and,

20      therefore, I had some DUI cases.  But are you

21      telling me I have no notes in here from Tom Boyer?

22  Q.  I did not see any.

23  A.  Well, I -- I'm not going to speculate.  You're

24      asking me did we ever interview Tom Boyer?  I

25      can't recall specifically.

1   Q.   I don't want to ask a question that's already been

2        asked, but if you would have interviewed Mr.

3        Boyer, there would be notes reflected in this

4        package of materials.  Would that be fair?

5   A.   Fair statement is there should be.  Okay?  I

6        turned the entire -- I believe if I interviewed

7        him and took notes, they exist.  And maybe because

8        I knew Tom I thought that I had.  I can't explain

9        the difference.

10  Q.   If you turn to Page 21 of 24, same document you

11       have in front of you.

12  A.   Okay.

13  Q.   This is Page 2 of your interview with John Roller?

14  A.   Yes.

15  Q.   Very last line says GG - "Attila the Hun",

16       different managerial style, can get the work done.

17       This came from Mr. Roller obviously.  Do you

18       recall anymore specifically what he told you?

19  A.   He told me that Mr. Graham's nickname in the

20       courthouse was the Attila the Hun, but he has a

21       different managerial style and he can get work

22       done.  He said though, as I recall, it was not his

23       style.

24  Q.   What was not his style?

25  A.   Mr. Graham's style.

Exam./MacMain - DeLuce                    132

1    Q.    Was the not the same as Mr. Roller's style?

2    A.    Yes.

3    Q.    The reference about can get the work done would

4          indicate that Mr. Graham was able to effectively

5          complete jobs and get the work done?

6    A.    I think that was Mr. Roller's opinion.

7    Q.    Just in a different style than what Mr. Roller

8          would do?

9    A.    I think you need to ask him that, but that -- I

10         think you need to ask him that.

11         MR. MacMAIN:  That's all of the questions I

12         have.  Thank you.

13                              EXAMINATION

14   BY MR. ADAMS:

15   Q.    Mr. DeLuce, you testified at some point today that

16         when you were interviewing witnesses for your

17         report that you took complaints from Ms. Varner

18         and you used them as input to ask questions to

19         witnesses.  Do you recall that?

20   A.    Yes.

21   Q.    Can you give me an example of that by chance?

22   A.    I think if you look at my notes of my meeting with

23         Barbara Varner, which is contained in this

24         packet--

25   Q.    Are you referring to your handwritten notes?

Exam./Adams - DeLuce                    133

1   A.   Yes.

2   Q.   The one set of them?

3   A.   Yes.

4   Q.   Let me raise the question, did you ask the

5        witnesses that Ms. Varner provided to you what

6        they observed or did you ask them specifics based

7        on what Ms. Varner told you?

8   A.   I think it was twofold.  I think we asked them

9        specifically about specific incidents that Ms.

10       Varner told us and then we would ask them some

11       general terms about what they observed regarding

12       the attitude, behavior in the office environment

13       towards other employees, whether they be males or

14       females.

15  Q.   In terms of the sexual harassment that Ms. Varner

16       was alleging, did you ask witnesses that she

17       provided specific questions in that area, for

18       example, did you see Ms. Varner subjected to blank

19       in the sexual harassment area?

20  A.   I can't recall exact questions that were asked.  I

21       tried to reflect in my notes the answers that were

22       given.

23  Q.   Not to belabor this any longer, can you look at

24       Page 9 on Deposition I guess it's Number 2?

25            MR. THOMAS:  The typewritten report.

1            MR. ADAMS:  Right.

2   BY MR. ADAMS:

3   Q.    This is an example.  I don't want to go through

4         all of this, but I just want to ask you one for

5         example.  The last paragraph -- well, the first

6         real paragraph, the paragraph at the bottom starts

7         with Varner.  It says:  "Varner states that Graham

8         frequently screams at her while she is at her desk

9         and in her office, or uses foul language

10        describing her working abilities in the general

11        office area."

12            If you go down a couple of lines, he also

13        indicates that the ranting and raving and putting

14        her down was confirmed by Deborah Green, and I'm

15        not reading the complete sentence, but would that

16        be an example of when you talked to Deborah Green

17        that you asked Deborah Green did she see Mr.

18        Graham do these things, blah, blah, blah, based on

19        what Varner described?

20  A.    Yes, that's what we would do.  And the ranting and

21        raving comments were I'm certain relayed to me by

22        Barbara Varner and then we asked witnesses if they

23        witnessed that and what they saw towards her and

24        others.  I'm reasonably certain that was the

25        context of the type of questioning.

Exam./Adams - DeLuce                    135

1   Q.   Okay, thank you, sir.  Did you ever discover facts

2        by talking to any of the witnesses that Ms. Varner

3        complained to Joe Osenkarski regarding the sexual

4        harassment by Gary Graham?

5   A.   Did I ever discover facts that Ms. Varner

6        complained to Joe Osenkarski regarding the actions

7        by Gary Graham?

8   Q.   Or the sexual harassment allegations by Gary

9        Graham.

10  A.   I think there is some reference in here.  I don't

11       want to speculate, but I thought there was some

12       reference in here that Mrs. Varner indicated that

13       she said something to Joe about it and got

14       nowhere, but -- well, I don't want to speculate.

15       If I say it in here, she told me; if I didn't say

16       it in here, she didn't tell me.

17  Q.   Okay.

18  A.   I hate to go beyond the four corners of this

19       document since it's six and a half years ago.

20  Q.   I'll submit to you that I haven't seen it, but you

21       have no evidence to the contrary, do you, off the

22       top of your head?

23            MR. THOMAS:  Let me make an observation for

24       the record.  I'm not sure that the answer was

25       responsive to the question.  I thought your

1        question was did anybody else confirm that Varner

2        complained to Osenkarski and I think the witness

3        responded by noting that Varner complained to

4        Osenkarski.

5    A.   I misinterpreted the question.  I think the answer

6        is no to your question.

7    BY MR. ADAMS:

8    Q.   That no other person--

9    A.   --confirmed that they heard Barbara Varner

10       complain about Gary Graham to Joe Osenkarski.

11   Q.   Is that the same in terms of anyone coming forth

12       and claiming that Ms. Varner complained to Mr.

13       Osenkarski about different treatment for women

14       versus men in the office?

15   A.   I'm sorry, you're asking me if anyone else

16       complained about different treatment towards women

17       in the office?

18   Q.   Or confirmed Ms. Varner's allegations that Mr.

19       Osenkarski was notified of such or complained to

20       Mr. Osenkarski about such things?

21   A.   No one told me that anyone else complained to Mr.

22       Osenkarski about the treatment of women in the

23       office.

24   Q.   Did anyone tell you that Ms. Varner complained to

25       Mr. Osenkarski about the seniority system and how

Exam./Adams - DeLuce                    137

1         it affected her in the office?

2    A.   I can't recall that.  I know that Ms. Varner

3         complained about it.  Whether someone else did, I

4         can't recall.

5    Q.   If you could turn to Page 22, the first paragraph

6         there which if you go from the bottom of the

7         paragraph up, if you look in the left-hand column

8         side the sentence that starts with Osenkarski, do

9         you see that?

10   A.   Yes.

11   Q.   It reads Osenkarski can only remember Barb coming

12        to him once to discuss a case and that was when

13        her and Gary disagreed, and you have in

14        parentheses, the Trinity basketball player, I

15        guess in regard to a case involving a trendy

16        basketball player.  Is that correct?

17   A.   That's correct.

18   Q.   Did Gary Graham confirm this example of Ms. Varner

19        going to Mr. Osenkarski and complain only of this

20        particular case versus something else?

21            MS. WALLET:  Objection.  That's clearly a

22        compound question.

23   A.   I'm sorry, what are you asking?

24   BY MR. ADAMS:

25   Q.   Let me rephrase the question.  Did you discover

Exam./Adams - DeLuce                 138

1     any evidence to the contrary that Ms. Varner went

2     to Mr. Osenkarski to complain about anything else

3     with regard to Gary Graham other than this

4     particular case involving the trendy basketball

5     player?

6  A.  I can't recall.  If I have it in my notes or it's

7     in this report, she did.

8  Q.  Okay.

9  A.  If I don't, I can't recall any other additional

10    complaints.

11 Q.  Did you, in fact, take into consideration that you

12    didn't have any evidence other than what Ms.

13    Varner shared with you that any notice or

14    complaints were given to Mr. Osenkarski with

15    regarding her treatment in your recommendation

16    that you finally gave to the commissioners and Mr.

17    Hartnett?

18 A.  Could you repeat the question?

19        (Question from Page 138, Lines 11 through 17,

20    read by the Reporter)

21 A.  I'm sorry, I don't understand the question.

22 BY MR. ADAMS:

23 Q.  I think you testified that you gave some

24    recommendations about Gary Graham and Mr.

25    Osenkarski to the commissioners, and I can't

Exam./Adams - DeLuce                    139

1       remember who else was involved, but certainly

2       commissioners heard your recommendations as to

3       what you thought should be done with regards to

4       the office of juvenile probation.  Is that

5       correct?

6           MR. THOMAS:  Objection to form.  I think it

7       mischaracterizes his earlier testimony, but you

8       may answer it.

9   A.  I had a meeting with the commissioners, John Ward,

10      Dan Hartnett, Horace Johnson, where I verbally as

11      well as Mr. Hartnett gave information regarding

12      our investigation and then I gave the

13      commissioners options that could be considered and

14      some thoughts and recommendations in my mind that

15      I thought would help resolve the complaint and

16      improve the department and the employment issues,

17      management issues that were going on.

18  BY MR. ADAMS:

19  Q.  Did you take into consideration when you made that

20      recommendation that other than what Ms. Varner

21      shared with you there was no other evidence that

22      indicated that she complained to Mr. Osenkarski

23      about her seniority issue, sexual harassment or

24      anything else?

25  A.  My recollection is that she complained to Mr.

1       Osenkarski about a couple of issues.  My

2       recollection is she was dissatisfied with the

3       response or lack of response or the fact that a

4       decision had to be made by the president judge and

5       none were forthcoming.

6   Q.  Can you turn to Page 6 of Deposition 2, under

7       facts there, that paragraph, I don't know, maybe

8       four lines down it reads:  "I also spoke with

9       senior probation officer, Kerry Howser, who in

10      1993 filed a complaint of sexual harassment based

11      on a comment made about her by Mr. Osenkarski."

12      You also indicate that it says:  "He was

13      reprimanded informally and required to apologize

14      to her and engage in some type of sensitivity

15      training."  Did you write that?

16  A.  I wrote that.

17  Q.  Did you also in your investigation learn that that

18      particular allegation of sexual harassment was

19      unfounded?

20  A.  I don't recall that.  I got to believe -- well,

21      strike that.  Leave it at that.  I don't recall

22      that.

23  Q.  Can you turn over to Page 7?  That first real

24      paragraph there discusses the seniority system and

25      Ms. Varner's complaint about it, would you agree?

1       Please take your time to look at the paragraph so

2       I can ask you a question or two.

3   A.  This is the seniority list.

4   Q.  Okay.

5   A.  Yes.

6   Q.  And I think you testified that Ms. Varner

7       complained that she felt that the seniority in the

8       system was unfair.  Is that correct?

9   A.  I think she felt it was discriminatory.

10  Q.  Did she share with you that prior to the

11      implementation of the seniority policy that she

12      thought changing it from applying full county time

13      to priority time of probation officers being more

14      paramount, she actually thought that was fair

15      before it actually was applied.  Did she share

16      that with you?

17  A.  I don't recall.  I'm sorry, did she share what

18      with me?  That she felt that her time in Children

19      and Youth should be included in determining

20      seniority?

21  Q.  No.  Did she share with you that prior to the

22      seniority list being implemented which led to her

23      losing ground by one notch that she thought that

24      the change was a fair one for everyone, did she

25      share that with you?

Exam./Adams - DeLuce                         142

1   A.    I have no recollection of that.

2   Q.    What is your opinion of the environment in the

3         juvenile probation department when you were

4         investigating this, did you have an opinion of it

5         at all as a whole?

6               MR. THOMAS:  Objection to the form.

7               MR. ADAMS:  That's okay.

8               MR. THOMAS:  Well--

9               MR. ADAMS:  I'll rephrase it.

10              MR. THOMAS:  Okay.

11  BY MR. ADAMS:

12  Q.    Mr. DeLuce, did you ever receive any information

13        that led you to believe that the environment in

14        the juvenile probation department was one of light

15        humor, jokes in the office?

16  A.    I did not get that feeling from some of the

17        employees and yet from other employees I think it

18        was a comfortable environment for them.  For some

19        I felt it was an uncomfortable environment.

20  Q.    Would the information received on both sides,

21        would that include from women and men the same

22        opinions?

23  A.    I think initially I felt from what the witnesses

24        said that the women felt they were treated

25        differently.  As we went through talking to more

Exam./Adams - DeLuce                      143

1       people, they confirmed that they felt some of the

2       women were treated differently but some of the men

3       were too.  I think that's why my recommendations

4       were changing somewhat from a harassment issue to

5       include an issue regarding management.

6   Q.  Would those thoughts that you gravitated to

7       include the language that was shared in the office

8       among employees, men and women?

9           MS. WALLET:  Objection to the form of the

10      question.

11  A.  I think it was clear that some of the employees

12      were uncomfortable with the language and some of

13      them probably were not.

14  BY MR. ADAMS:

15  Q.  Would that include women and men?  Strike that, if

16      I can strike it.

17  A.  Certainly some of the women--

18          MR. THOMAS:  There's no question.

19  A.  Okay.

20  BY MR. ADAMS:

21  Q.  One last set of questions, Mr. DeLuce.  You

22      testified that you were with the understanding

23      that it was the president judge who made the

24      ultimate decision with regard to Mr. Graham and

25      Mr. Osenkarski.  Is that correct?

1   A.   That's correct.

2   Q.   And you were aware that the president judge

3        actually received a copy of your report, that

4        being the confidential attorney impressions

5        report?

6   A.   I am not personally aware that he received it.  I

7        don't know for sure what the president judge

8        received.  I have seen in Judge Kane's I think

9        opinion reference to the fact that it was

10       disclosed to the president judge.  I didn't

11       deliver it to him.  I didn't sit down with the

12       report and discuss it with him.

13  Q.   But you are aware that the president judge decided

14       not to terminate Mr. Osenkarski's employment as a

15       result of Ms. Varner's complaints--

16  A.   Oh, yes.

17  Q.   --and the investigation.  Is that correct?

18  A.   I'm aware that he decided not to take -- my

19       recollection is he decided not to take any

20       employment action against Mr. Osenkarski.  I'm not

21       aware of any being taken.  If there is, I didn't

22       see it.

23       MR. ADAMS:  That's my last two questions.

24       Thank you.

25  A.   We're done?

Exam./Adams - DeLuce                    145

1            MS. WILLIAMS:  I have no questions for you,

2        Mr. DeLuce.

3            (The deposition concluded at 3:55 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

146

```
1
            COMMONWEALTH OF PENNSYLVANIA   )
2                                          )  ss.
            COUNTY OF CUMBERLAND           )
3

4            I, Ann M. Wetmore, Reporter and Notary Public
        in and for the Commonwealth of Pennsylvania and
5        County of Cumberland, do hereby certify that the
        foregoing deposition was taken before me at the
6        time and place hereinbefore set forth, and that it
        is the testimony of:
7

8                    DAVID W. DeLUCE

9
             I further certify that said witness was by me
10       duly sworn to testify the whole and complete truth
        in said cause; that the testimony then given was
11       reported by me stenographically, and subsequently
        transcribed under my direction and supervision;
12       and that the foregoing is a full, true and correct
        transcript of my original shorthand notes.
13

14           I further certify that I am not counsel for
        or related to any of the parties to the foregoing
15       cause, or employed by them or their attorneys, and
        am not interested in the subject matter or outcome
16       thereof.

17
             Dated at Mechanicsburg, Pennsylvania, this
18       27th day of October, 2003.

19

20                              _____
                                Ann M. Wetmore
21                              Reporter - Notary Public

22
        (The foregoing certification of this transcript
23       does not apply to any reproduction of the same by
        any means unless under the direct control and/or
24       supervision of the certifying reporter.)

25
```