IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                   .
        Plaintiff,                   .   CIVIL ACTION
                                     .   NO. 1:CV 01-0725
        vs.                          .
                                     .
COMMONWEALTH OF PENNSYLVANIA,        .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,             .
CUMBERLAND COUNTY; CUMBERLAND        .
COUNTY; S. GARETH GRAHAM,            .
Individually, and JOSEPH             .
OSENKARSKI, individually,            .
        Defendants.                  .
. . . . . . . . . . . . . . . . . .


            Deposition of:  HON. GEORGE E. HOFFER

            Taken by     :  Defendant Cumberland County Court

            Date         :  April 4, 2003, 1:46 p.m.

            Before       :  Emily Clark, RMR, Reporter-Notary

            Place        :  Cumberland County Courthouse
                            One Courthouse Square
                            Carlisle, Pennsylvania


APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
            For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
            For - Defendant Commonwealth of Pennsylvania
                  Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  JAMES K. THOMAS, II, ESQUIRE
             PAUL J. DELLASEGA, ESQUIRE
            For - Defendant Cumberland County

```
 1   APPEARANCES (continued):

 2       MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
         BY:  L. KRISTEN BLANCHARD, ESQUIRE
 3            For - Defendant S. Gareth Graham

 4       SWEENEY & SHEEHAN, P.C.
         BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5            For - Defendant Joseph L. Osenkarski

 6
     ALSO PRESENT:
 7
         MS. BARBARA E. VARNER
 8
         MR. S. GARETH GRAHAM
 9
         MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                          WITNESS

3    Hon. George E. Hoffer                    Examination

4        By Ms. Wallet                        4, 78

5        By Mr. Dellasega                     66

6        By Ms. Blanchard                     77

7
                          EXHIBITS
8
     No. Description                          Identified
9
     1    5 pages, handwritten notes          9
10
     2    2-page memo, 3/31/98, to Osenkarski  31
11        from Varner

12   3    1-page "Personnel Action Form"      33

13   4    1-page handwritten letter, 6/1/98, to  41
          Osenkarski from Varner
14
     5    3 pages, handwritten notes          42
15
     6    2 pages: 1-page memo, 2/11/98, to Hoffer  49
16        from Hartnett; 1-page memo, 2/4/98, to
          Hartnett from Varner
17
     7    2-page letter, 3/3/98, to Hartnett from  50
18        Varner

19   8    1 page, handwritten notes, 3/4/98   51

20   9    1-page letter, 2/16/99, to Varner   54
          from Hoffer
21
     10   1 page, handwritten notes          55
22
     11   1-page memo, 3/27/92, to Hoffer    57
23        from Varner

24   12   1-page memo, 4/5/02, to Varner from  59
          Miller
25                          *   *   *   *   *

```
 1                          STIPULATION
 2               It is hereby stipulated by and between the
 3          respective parties that sealing, certification and
 4          filing are waived; and that all objections except as to
 5          the form of the question are reserved until the time of
 6          trial.
 7
 8               HON. GEORGE E. HOFFER, called as a witness,
 9          being duly sworn, and testified as follows:
10     BY MS. WALLET:
11     Q    Judge Hoffer, my name is Debra Wallet.  I'm here
12          representing Barbara Varner in the action that she has
13          brought against the county, the court, Mr. Graham, and
14          Mr. Osenkarski.
15               Have you ever been deposed before?
16     A.   No.
17     Q    You understand that this is the time when the lawyers
18          will be asking you questions relative to this lawsuit.
19          Is there any reason today why you could not answer our
20          questions truthfully and completely?
21     A.   No, ma'am.
22     Q    If at any time you do not hear my question, would you
23          please ask me to repeat it before you attempt to answer
24          that question?
25     A.   I will, but please keep your voice up.  I have a cold
```

Hon. George Hoffer                              5

1           and I have problems with my ears.

2    Q.     I'll do what I can, sir.  If at any time you can't hear

3           me, just stop and I'll be happy to repeat it.  However,

4           I must have an agreement with you that if you do answer

5           a question, that you have both heard that question and

6           then that you have understood it.  Is that agreed?

7    A.     Yes, ma'am.

8    Q.     Tell me, sir, what did you do to prepare for this

9           deposition today?

10   A.     I suppose I reviewed my file.  Reviewed whatever counsel

11          sent to me.

12   Q.     Did you -- I'm sorry?  Were you finished?

13   A.     Um-hum.

14   Q.     Did you review any of the transcripts from the prior

15          testimony of other witnesses in this case?

16   A.     Judge Sheely's.

17   Q.     Any others?

18   A.     Not that I recall.

19   Q.     Did you talk to any witnesses before today in

20          preparation for today?

21   A.     No, ma'am.

22   Q.     Would you tell me, sir, when you first learned that

23          Barbara Varner had made allegations against Joe

24          Osenkarski and Gary Graham?

25   A.     That would have been either when I took over as

Hon. George Hoffer                                          6

```
 1           president judge, or if it was earlier, it would have
 2           been after Judge Sheely told me about his conversation
 3           with Gary Graham, one of the two.
 4    Q      All right.  Did you at some time after becoming
 5           president judge review the allegations that she, Barbara
 6           Varner, had made?
 7    A.     In what form, ma'am?
 8    Q      In written form.
 9    A.     You mean a Complaint?
10    Q      Or some memorandum spelling out --
11    A.     I don't think I saw a Complaint until after it was
12           filed, whenever that was.
13    Q      And when you say a Complaint, you're speaking of the
14           Complaint that was filed in federal court?
15    A.     Yes, ma'am.
16    Q      Do you remember reviewing any memoranda that Barbara
17           Varner had written regarding her allegations against
18           Mr. Graham or Mr. Osenkarski?
19    A.     Graham per se?
20    Q      Yes, sir.
21    A.     I have no recollection there, ma'am.
22    Q      When you assumed the position of president judge, and I
23           believe that was on January 1st of 1998; is that
24           correct?
25    A.     The first Monday in January.
```

Hon. George Hoffer                         7

1    Q    Okay.  Do I have the year correct, 1998?

2    A.   '98.

3    Q    After you became president judge, what did you

4         understand the status of Ms. Varner's allegations to be

5         at that time?

6    A.   I think I knew she filed a Complaint with the EEOC.  Is

7         that the correct initials?

8    Q    Yes, sir.

9    A.   And I suppose that's the extent of it.

10   Q    After you became president judge, did you do anything to

11        investigate the allegations that Ms. Varner had made

12        against Mr. Graham?

13   A.   Yes, ma'am.

14   Q    What did you do?

15   A.   After I took over, I had reference to a report done by

16        the county.  I examined that report.

17   Q    What was your understanding of the role of the county

18        with regard to that report?

19   A.   I don't understand your question.

20   Q    Did you know whether the Court had designated someone to

21        investigate these allegations?

22   A.   The Court meaning myself or Judge Sheely?

23   Q    Either.

24   A.   I know I didn't, ma'am.  What Judge Sheely did is best

25        known to him.  I don't believe so.

Hon. George Hoffer                    8

1  Q    Did you at any time, sir, hire an investigator to

2       investigate the allegations brought by Barbara Varner?

3  A.   No.

4  Q    Now, this report that you had referenced that was done

5       by the county, is that the report done by Mr. Deluce?

6  A.   Yes, ma'am.

7  Q    Are you aware of any other reports done by the county to

8       which you had access when you became president judge?

9  A.   No, ma'am.

10  Q    So you reviewed this report from David Deluce.  Did you

11       do anything else by way of your investigation?

12       MR. THOMAS:  When?

13  BY MS. WALLET:

14  Q    At that time when you became president judge.

15  A.   Over a period of time, did something, yes.

16  Q    Okay.

17  A.   It didn't all happen in one day.

18  Q    What did you do in response to the Deluce report?

19  A.   Well, I know I had certain of the officers up to talk to

20       them about the report.

21  Q    Who?

22  A.   I have a note somewhere.

23  Q    Well, we were given some notes that were provided to us

24       by your counsel, and some of these notes I'm not sure I

25       understand so I was going to ask you about them.  If you

Hon. George Hoffer                                    9

1        would like to look at what I've made as copies of these

2        notes and tell me which ones --

3    A.  What you're referring to would be on one sheet with some

4        names on it, ma'am, on the left-hand side of the sheet.

5    Q.  All right.  Would this be the sheet, sir?

6    A.  I think so.

7        MS. WALLET:  Let's mark for identification as

8        Hoffer Deposition No. 1 a couple of sheets stapled

9        together.  I've attempted to copy them together as they

10       were given to me, but you may have to explain to us

11       whether they are related or not related.

12           (Hoffer Deposition Exhibit No. 1 was marked.)

13       MS. WALLET:  I've handed the witness what we've

14       marked for identification as Hoffer Deposition No. 1.

15   BY MS. WALLET:

16   Q.  Could you go through this document, please, and tell

17       me whether all of these are notes in your handwriting?

18   A.  Exhibit 1 is in my handwriting.

19   Q.  Okay.  Is that true with respect to all of the pages in

20       Exhibit 1?

21   A.  They're all in my handwriting.

22   Q.  Okay.  Judge, were --

23   A.  They're not necessarily compiled in the order that I

24       compiled them, though, ma'am.

25   Q.  All right.  Can you explain to me what these notes

1        reflect?

2   A.   Well, I suppose to put them in the correct order would

3        be page 3 of this exhibit with the individual names on

4        it.

5   Q    All right.  Let's start with that one.

6   A.   And my recollection is those would have been people I

7        asked to come up to my office to talk to.

8   Q    Okay.  There are checkmarks by some of these names.  Is

9        there any significance to those checkmarks?

10  A.   My recollection would be that those people actually came

11       into the office, not necessarily the others.

12  Q    Did you speak to everyone on this list?

13  A.   I can't tell you, ma'am.

14  Q    Why can't you tell us?

15  A.   Well, as I tried to tell you, if I checkmarked the name,

16       I believe I had them in my office to talk to them.  If I

17       didn't checkmark the name, they may not have been into

18       my office to talk to me.

19  Q    All right.  If these notes were in the correct order

20       what would be the next page?

21       MR. ADAMS:  Can we all agree as counsel to whatever

22       order the judge puts them in from his mind-set and the

23       chronology of the testimony, put them in that proper

24       order as an exhibit?  For example, just unstapled and

25       make this 1, 2, for whatever pages?  As he goes through

Hon. George Hoffer                          11

1          them?

2                 MS. WALLET:  Doesn't matter to me.

3                 THE WITNESS:  If that's important.  I didn't hear

4          what he said.

5                 MS. WILLIAMS:  We could do Exhibit 1A, B, C, D, E,

6          would that help?

7                 MR. ADAMS:  And the way he's testifying I'd like

8          them in that order, that's all.

9                 MS. WALLET:  We'll label the page with the list of

10         names and the checkmarks as A.

11                THE WITNESS:  Your question?

12    BY MS. WALLET:

13    Q    My question is:  Which page should come next?

14    A.   It would either be the two pages marked Nick, or the one

15         marked Debbie Green.

16    Q    Let's mark the first page B1 the second page B2 and the

17         one marked Debbie Green, C.  Is that acceptable?

18                I take it that B1 and B2 indicate your notes from

19         when you spoke to Nick who?

20    A.   That would have been Nick Barolet, I believe.  It's the

21         only Nick I have.  And he's since left the office.

22    Q    Who was Mr. Barolet?

23    A.   A PO.

24    Q    Frankly, sir, I can't read your handwriting, and I'm

25         hoping that you can simply read this for us before we

1         begin.  Would you do that?

2    A.   You want me to read from the top on Nick?

3    Q    Correct.

4    A.   "Boyer doesn't know what he is doing.  Good as

5         administrator.  Should Tom do some cases.  Debbie

6         Reitzell over her --" this is from Nick Barolet "-- over

7         her head. Gary made lewd comments."  Inartful English on

8         my part.

9              "No policies or procedures manual, no standard of

10        operations.  No staff meetings.  Need explanations on

11        memos."  Or is that "or memos," I'm not sure.  "Have

12        meetings every two months."

13             "When Graham had Nick and Varner he had different

14        standards for the both of them."

15             Page 2 of Nick.  "They're doing full-blown social

16        history on informal probations.  Not necessary.

17        Atmosphere is tense.  Tom Boyer has different standards

18        than Gary.  All standards should be the same."

19             These are suggestions made by Barolet in response

20        to my asking him for suggestions.

21   Q    All right.  Are you able to pinpoint for us a date or a

22        time frame when you met with Nick Barolet?

23   A.   The time frame would have been between the first day

24        that I took over and the date that I demoted Gary

25        Graham.

Hon. George Hoffer                              13

1   Q   So sometime between January and mid March of 1998?  That
2       was a question, sir.

3   A.  Yes.

4   Q   Now, how did you arrive at the list that is contained on
5       page A of Deposition 1?

6   A.  I can't be sure, ma'am.

7   Q   Did someone suggest to you that you talk with these
8       people?  Or was that your idea?

9   A.  I doubt if anybody suggested it.  It would have been my
10      idea.  If anything, I got the names out of the report.

11  Q   Okay.

12  A.  That would have been the logical place for me to get
13      them.

14  Q   At that time did you meet with Barbara Varner?

15  A.  Her name's not on the list, so I didn't meet with her.

16  Q   Did you meet with Gary Graham?

17  A.  If his name's not on the list, I didn't meet with him.

18  Q   Why didn't you meet with Barbara Varner at that time?

19  A.  I don't understand your question, ma'am.  Why didn't I
20      meet with her?

21  Q   She was the one making the allegations.  Why didn't you
22      meet with her and ask her about those allegations?

23  A.  I met with people who I wanted to find out about what
24      they said in the report.

25  Q   Were there any statements from Ms. Varner in the report?

Hon. George Hoffer                    14

1   A.    I don't have any recollection about that.  I suppose so,

2         but I don't recollect.

3         MR. THOMAS:  Once again, let me interpose the

4         objection to the report.  We'll interpose our objection

5         to that based on attorney-client privilege and attorney

6         work product.  And I've let you ask a couple of

7         questions about it without waiving that objection, but I

8         will object and instruct the witness not to answer

9         questions dealing with the content of the Deluce report.

10  BY MS. WALLET:

11  Q     Judge Hoffer, was David Deluce acting as your attorney

12        at the time?

13  A.    No, ma'am.  No, ma'am, absolutely not.

14        MR. THOMAS:  I would point out for the record at

15        that point that the plaintiff in this case has made an

16        allegation that this was joint employment, and

17        Mr. Deluce, of course, was employed by the county.  And

18        it's the plaintiff's allegations that contend that this

19        was a joint employment situation.

20  BY MS. WALLET:

21  Q     Do you know whether or not Mr. Graham had made some

22        statements that were contained in this report?

23        MR. THOMAS:  Again, I would object to asking this

24        witness questions about the content of that report and I

25        would instruct him not to answer.

Hon. George Hoffer                              15

```
 1              THE WITNESS:  I don't recollect.
 2              MS. WILLIAMS:  Your Honor, we're not going to
 3          answer questions about the report specifically.  So
 4          we'll wait for the next question.
 5              THE WITNESS:  All right.
 6   BY MS. WALLET:
 7   Q    Do you consider Mr. Thomas to be your attorney today?
 8   A.   Absolutely not.
 9              MS. WILLIAMS:  I will state for the record that
10          because of the joint employment situation, we have
11          joined Mr. Thomas in the objection to the Deluce report,
12          and we have in the past instructed other witnesses not
13          to answer questions on that report and we're so doing
14          today.
15   BY MS. WALLET:
16   Q    I'm back to the list, sir.  Do I understand from what
17        you've testified to earlier that in or about the time
18        frame between January and March of 1998 you talked to
19        Bill Brandt, Debbie Green, Nick Barolet, Jenny Crum, is
20        it?
21   A.   Looks like C-R-U-M-B.
22   Q    C-R-U-M-B?
23   A.   That's what it looks like to me.
24   Q    Okay.  Mrs. Rose.  Anyone else?
25   A.   I just have no way to recollect anymore, ma'am.
```

1   Q   Now, you have two pages of notes about your meeting with

2         Mr. Barolet and we have at least one page of notes of

3         meetings with Debbie Green.

4            To the best of your knowledge, sir, are there any

5         other notes of meetings that took place in this time

6         frame?

7   A.   Again, ma'am?

8   Q   To the best of your recollection, do you have any other

9         notes of any of your meetings with these individuals

10        whose names are checked?

11   A.   Brandt, Crum and Mrs. Rose.  No, ma'am.  No notes.

12   Q   Who is Jenny Crum?

13   A.   I think she was an office secretary, but I'm not sure

14        about that.

15   Q   How about Mrs. Rose?

16   A.   Mrs. Rose, definitely an office secretary.

17   Q   Is there a reason why you would have taken notes during

18        some of these meetings and not others?

19   A.   Well, in Barolet's case I think I knew that Nick was

20        leaving for another job, or had reason to believe that

21        he was leaving, I'm not sure.  But I wanted to get ideas

22        from him about what changes he thought we should make

23        down there for the better, and most of the notes are to

24        do with that.

25   Q   Okay.  Do you recall today, sir, what Mr. Barolet told

1         you about the comments that caused you to make the

2         notation Gary made lewd comments?

3    A.   No independent recollection of anything other than what

4         my note says.  And remember, this was Nick reporting

5         something that he heard from somebody else.

6    Q    When Nick told you that the atmosphere was tense, was

7         tense between whom?

8    A.   In the office.

9    Q    Did you do anything as a result of the statements that

10        you obtained from Nick Barolet?

11   A.   Well, do you want to get specific, ma'am?

12   Q    Well, after Mr. Barolet told you certain things, did it

13        cause you to take some action?

14   A.   Later on after Gary's demotion I called a total staff

15        meeting in the Human Services Building and said some

16        things that were on my mind, including the operation of

17        the office, what I expected.

18   Q    When you say a total staff meeting, you mean with all of

19        the Probation officers?

20   A.   As far as I know, everyone was there that was in

21        Juvenile Probation.  Certainly that was my intention to

22        have everyone there.

23   Q    Was it just the professional staff, or did it include

24        the clerical staff?

25   A.   I don't think the secretaries were there.  At least I

1           don't have any recollection of them being there.

2      Q    And was it all of the probation officers, both Juvenile

3           and Adult?

4      A.   Only Juvenile.

5      Q    What, if you recall today, did you tell them at that

6           staff meeting?

7      A.   Looking back on everything, ma'am, I probably should

8           have had a stenographer there.  But I don't have too

9           much of an independent recollection.  It was kind of a

10          pep talk, there were elements of that in it.  There were

11          elements of I want everybody to pick up the professional

12          level.  I explained some things that I didn't like that

13          were going on and I didn't expect them to happen again.

14              I do remember telling them if I have to micromanage

15          this office, I'll do it, but I didn't want to do it.

16          That's one of the big things I remember saying.  How big

17          it was, I don't know.

18     Q    Did this meeting with the staff occur before or after

19          you transferred Mr. Graham?

20     A.   Oh, I think it would have been after.

21     Q    Was Mr. Graham there?

22     A.   No.

23     Q    Did you say anything at this meeting about sexual

24          harassment?

25     A.   I have no recollection, ma'am.  I've told you the best

1      recollection I have on what I said.

2   Q   Let's go back to Deposition No. 1.  Would you read for

3      us your notes concerning your conversation with Debbie

4      Green?

5          MR. ADAMS:  What are we calling that?

6          MR. THOMAS:  C.

7          MS. WALLET:  C.

8          MR. ADAMS:  Okay.

9          THE WITNESS:  "Debbie Green," circle drawn around

10     it, "said Nicole was told by Graham six months ago I'll

11     get everyone back.  Debbie," I guess this is was in

12     response to a similar type question I put to Nick

13     Barolet, do you have any changes down there, is there

14     anything we can do better than we're doing.  Ms. Green

15     suggested that we didn't have any guidelines -- she

16     said, quote, "no guidelines on how to do a social

17     history."  My independent note is "subject for a staff

18     meeting."

19         "Saw Gary grab Barbara's butt several years ago.

20     Has singled Barb out for trips.  Office is more tense

21     with Gary around.  Tom Boyer not up on placements work.

22     Says Gary must go, too tense."

23   Q   Do you believe those notes accurately reflect what

24     Ms. Green told you in that time frame?

25   A.  I have no reason not to, ma'am.  These are my notes, I

Hon. George Hoffer                                    20

1           wrote them down.

2    Q      Do you agree she may have told you additional things but

3           these are the only subjects you wrote down?

4    A.     I don't disagree with that statement.

5    Q      All right.  Were you concerned, sir, when Debbie Green

6           told you that Graham apparently told Nicole that he

7           would get everyone back?

8    A.     If it was true, of course.

9    Q      Did the county or the Court at that time have a policy

10          with regard to workplace violence?

11   A.     Yes, ma'am.

12   Q      Could you explain for me, did you as the president judge

13          issue policies or procedures independent of the county?

14   A.     No, ma'am.

15   Q      What was your understanding of the applicability of the

16          county's policy and procedures to the probation

17          officers?

18   A.     They applied.

19   Q      Did you have the ability not to apply those policies and

20          procedures to the probation officers?

21   A.     Did I have the ability to disregard the county book?  Is

22          that what you're asking me?

23   Q      Yes sir.

24   A.     No, I never felt I had.

25   Q      I guess maybe the better word would be authority as

Hon. George Hoffer                          21

1          opposed to ability.

2     A.    Oh.

3              MS. WILLIAMS:  Maybe you could rephrase that

4          question, make it a little clearer for the judge.

5     BY MS. WALLET:

6     Q    Did you believe that the probation officers were bound

7          by the policies issued by the county?

8     A.    As far as the behavior is concerned, yes, ma'am.

9     Q    Did you believe that you as the president judge had the

10         authority to issue different policies or contradictory

11         policies?

12    A.    I would imagine I did.  I would have had, since I hired

13         and fired everybody.

14    Q    Did you ever choose to do that?

15    A.    No, ma'am.

16    Q    You may not know, but we had the deposition this morning

17         of Bill Brandt.  He said that you called him into your

18         chambers and talked with him at some length about what

19         was happening in the Probation office.  Do you agree

20         with that?

21    A.    He's on the list, he's checked.  I talked to him.

22    Q    Do you have any recollection today of what Mr. Brandt

23         told you in response to your questions of Mr. Brandt?

24    A.    No, ma'am.

25    Q    You don't remember anything that he told you?

Hon. George Hoffer                          22

```
 1   A.   I have no independent recollection of it, ma'am.  I
 2        didn't keep any notes of the meeting.
 3   Q    When did you -- well, let's finish this exhibit.
 4        There's a fourth page that looks like for John Ward or
 5        from John Ward?
 6   A.   Um-hum.
 7   Q    Does that appropriately go with the rest of these
 8        documents?  Or is that something different?
 9   A.   That's later.
10   Q    Okay.  Can you give me a time frame for what we'll mark
11        as page D?
12   A.   This would have been shortly before I demoted Gary.
13   Q    So after you had the conversations with Ms. Green and
14        Mr. Barolet?
15   A.   Oh, yes.
16   Q    Could you read for us what you say in D?
17   A.   "For John Ward, what I want," full colon, "1, a new
18        position at jail for a supervising PO, and an office,"
19        at the jail.
20            "2, a new position in Juvenile Probation to fill
21        Graham's spot," dash, "even if he quits."
22   Q    Okay.  Did you prepare this document, Deposition 1 sub
23        D, during your meeting with Mr. Ward, or in anticipation
24        of the meeting with Mr. Ward?
25   A.   It would have been in anticipation of any meeting with
```

Hon. George Hoffer                                    23

1          John Ward.

2     Q    Did you, in fact, meet with him and discuss these issues

3          that are reflected here?

4     A.   I'm sure I did.  I don't have any recollection of it.  I

5          don't have any notes of it.  I got what I wanted.

6     Q    All right.  Why did you decide to send Mr. Graham to the

7          position at the jail?

8     A.   What was your word?

9     Q    Why?

10    A.   I thought you said sentence.

11    Q    Send.  Let me start again.  Why did you decide to send

12         Mr. Graham to a position at the jail?

13    A.   I demoted him out of the office, the Probation office,

14         ma'am.  He was gone.

15    Q    My question, sir, is:  Why did you do that?

16    A.   Why did I demote him?

17    Q    Yes, sir.

18    A.   I lost confidence in him.

19    Q    In what sense?

20    A.   Well, you have the allegations of the Graham-Varner

21         affair.  But even more importantly, I lost confidence in

22         his ability to lead.

23    Q    Did he suffer a loss of pay as a result of this

24         demotion?

25    A.   You'll have to ask him that, but I think he did.

Hon. George Hoffer                                    24

1    Q    Was that your intention?

2    A.   The pay had nothing to do with it, ma'am.

3    Q    Were you able to fill Mr. Graham's spot in Juvenile

4         Probation?

5    A.   I think so.

6    Q    Did you fill it?

7    A.   I think so.

8    Q    Do you know who you filled it with?

9    A.   We'll have to look at the records, ma'am.  I don't

10        remember.

11   Q    How did you give this notice to Mr. Graham that he was

12        going to be demoted?

13   A.   What did I physically do?

14   Q    Yes.

15   A.   After I had made my mind up irrevocably on this, I

16        called him in at about quarter of 12:00 on a Monday and

17        told him.

18   Q    What did you tell him?

19   A.   I said:  You're gone, take a couple days off, report to

20        I think John Roller for a new job.  It was short and

21        sweet.  It wasn't sweet, but it was short.

22   Q    Did he make any response to you?

23   A.   Unhappiness.

24   Q    Did you tell him at that time that this action had

25        anything to do with the allegations that Barbara Varner

Hon. George Hoffer                                    25

1              had made?

2    A.    I think the most I told him, ma'am, since this was a

3          very short meeting:  You have lost my confidence.

4    Q     You don't recall telling Mr. Graham that it had anything

5          to do with the Varner allegations?

6    A.    You've heard the extent of what I remember, ma'am.  It

7          was my intention there was not going to be any

8          discussion here.  It was something I did and there

9          wasn't going to be any debate about it.

10   Q     Now, as a result of your discussing with the individuals

11         listed on page A with the checkmarks, did you learn

12         anything about the way in which Joseph Osenkarski was

13         running the office?

14   A.    Is he mentioned in those notes?

15   Q     I don't see his name anywhere.

16   A.    I don't have any recollection other than what I may have

17         gotten out of the report.

18   Q     Did you take any disciplinary action against Joe

19         Osenkarski?

20   A.    No, ma'am.

21   Q     Why not?

22   A.    I didn't do it.  I didn't do it, ma'am.  I did not take

23         any action.

24   Q     And I said, why not?

25   A.    Ma'am, if I didn't take any action, it was a decision I

1              made not to take any action.

2     Q     Did you have a reason?

3              MR. ADAMS:  Objection, asked and answered.

4              MS. WALLET:  Well, it's certainly been asked but I

5              don't think it's been answered.

6              THE WITNESS:  Did I have a reason to do what,

7              ma'am?

8     BY MS. WALLET:

9     Q     Not to take any disciplinary action against

10              Mr. Osenkarski.

11    A.    Are you asking me if I've stopped beating my wife?

12    Q     No, sir.

13              MS. WILLIAMS:  Can you rephrase the question to

14              make it more understandable?

15    BY MS. WALLET:

16    Q     Well, we know that you didn't take any disciplinary

17              action against Mr. Osenkarski.  Correct?

18    A.    Yes, ma'am.

19    Q     And I'm asking you, why was there no disciplinary action

20              taken against him?  Was it because you didn't think he

21              had done anything to warrant such action?

22    A.    What was the charge, ma'am?

23    Q     Well, there were a number of charges that Ms. Varner had

24              made against Mr. Osenkarski.  Were you aware of those at

25              the time?

Hon. George Hoffer                    27

1    A.    Other than anything contained in the report, if
2          anything, that would have been it.
3    Q     So you relied on the information in the report for a
4          summary of the allegations of Ms. Varner?
5    A.    If there's anything in there, I suppose.
6    Q     Other than sending Mr. Graham to a position at the jail,
7          did you take any other disciplinary action against
8          Mr. Graham?
9    A.    We took his courthouse key away, if that's disciplinary
10         action.
11   Q     Why did you do that?
12   A.    He didn't have any access to the courthouse anymore, he
13         didn't work here.
14   Q     Any other disciplinary action against Gary Graham?
15   A.    None that I can recall, that I did.
16   Q     Was there a sexual harassment policy in place when you
17         came in as president judge in January, the first Monday
18         in January of '98?
19   A.    Any harassment policy would have been contained in the
20         county manual.
21   Q     Did you believe the probation officers to be bound by
22         that sexual harassment policy?
23   A.    Yes, ma'am.
24   Q     Did you at any time tell Ms. Varner that she had failed
25         to follow the sexual harassment policy that was in

Hon. George Hoffer                          28

1          place?

2    A.    No.

3    Q     Sir, as an employer or supervisor, have you had any

4          prior experience with sexual harassment claims?

5    A.    In my life?

6    Q     Yes, sir.

7    A.    What do you mean experience, ma'am?  I've read things in

8          the paper, I've read books, I've read government

9          policies.

10   Q     My question was while you were an employer or a

11         supervisor, did you have any experience with any sexual

12         harassment claims?

13   A.    No.  I'm not aware of anything like that.

14   Q     Were you aware that there was an allegation of sexual

15         harassment brought by Kerry Houser against

16         Mr. Osenkarski in the early '90s?

17   A.    Oh, I have some vague recollection of that somehow.

18         Somehow, somewhere.

19   Q     Do you believe that you knew that that charge or

20         allegation had been made when you conducted your

21         interviews that are reflected in Deposition 1?

22   A.    Would I have known about it at that time?

23   Q     Yes, sir.

24   A.    I don't have any recollection of that, ma'am.

25   Q     After you demoted Mr. Graham, did you do anything else

```
 1          with regard to the allegations that Ms. Varner had made

 2          against Gary Graham?

 3              MR. THOMAS:  You mean other than the earlier

 4          testimony he gave?

 5              MS. WALLET:  Correct.

 6              THE WITNESS:  No.

 7   BY MS. WALLET:

 8   Q    Did you consider the matter to be closed at that time?

 9              MR. ADAMS:  Objection as to form.  What do you mean

10          by closed?

11   BY MS. WALLET:

12   Q    Did you think it was done and over?

13   A.   Ma'am, I knew that an EEOC Complaint had been filed.  It

14          could have hardly been over.

15   Q    Did you believe that you had any further obligation to

16          investigate Ms. Varner's allegations?

17   A.   On my own?

18   Q    Yes, sir.

19   A.   I did not do that, ma'am.

20   Q    My question was:  Did you feel you had an obligation to

21          do anything further?

22   A.   On my own?  No.

23   Q    Yes, sir.

24   A.   No.

25   Q    Sir, what do you know about the use of seniority for
```

Hon. George Hoffer                                    30

1          purposes of promotion within the Probation office at the

2          time that you became president judge?

3    A.    Zero.

4    Q     Did you subsequently learn something about the seniority

5          issue?

6    A.    I have no recollection, ma'am.

7    Q     Did you have any discussions with anyone about seniority

8          county-wide versus that in the Probation office?

9               MR. THOMAS:  Objection to the form.  You may

10         answer.

11              THE WITNESS:  I have no recollection.

12   BY MS. WALLET:

13   Q     Did you have any discussions with Mr. Osenkarski about

14         the use of seniority for promotions within the Probation

15         office?

16   A.    I don't have any recollection of that, ma'am.

17   Q     Did you have any discussions with Tom Boyer about that?

18   A.    I don't remember anything there, either.

19   Q     Did Ms. Varner bring to your attention the issue of the

20         use of seniority?

21   A.    In what fashion did she bring it to my attention?

22   Q     I'm asking you, do you remember having anything brought

23         to your attention by Ms. Varner about the seniority

24         issue?

25   A.    As we sit here, no.

Hon. George Hoffer                          31

1           MS. WALLET:   Let's mark as Deposition No. 2?

2           (Discussion held off the record.)

3           (Hoffer Deposition Exhibit No. 2 was marked.)

4           MR. DELLASEGA:  This is Exhibit 2?

5           MS. WALLET:  It is.

6    BY MS. WALLET:

7    Q    Are you ready, sir?

8    A.   Yes, ma'am.

9    Q    I've handed you what we've marked for identification as

10        Deposition Exhibit 2.  Your name appears on the second

11        page of that document.

12           Have you had a chance to look at it?

13   A.   I glanced over it, yes.

14   Q    Do you recall having received this document in or around

15        March of 1991?

16   A.   No, ma'am.

17   Q    Do you have any reason to believe that you did not

18        receive it at that time?

19   A.   No, ma'am.

20           MR. ADAMS:  Correction.  1998.

21           MS. BLANCHARD:  You said '91.

22           MS. WALLET:  Okay.  Well, I obviously said

23        something other than '98.  Let's ask that question

24        again.

25   BY MS. WALLET:

Hon. George Hoffer                                    32

1    Q    Do you have any reason to believe that you didn't

2         receive this document in or about March of 1998?

3    A.   No reason one way or the other.

4    Q    Do you have any recollection of the seniority and

5         promotion issue, now that you've looked at the document

6         marked Deposition 2?

7    A.   No, ma'am.

8    Q    Have you made any changes in the use of seniority for

9         promotional purposes within the Probation Office since

10        you became president judge?

11   A.   I'm not aware of any seniority issues.  What was the

12        rest of your question?

13   Q    My question, sir, was:  Did you make any changes to the

14        use of seniority when you became president judge?

15   A.   Well, I don't know what use was made of seniority to

16        begin with, ma'am, but seniority has never been high on

17        my books.

18   Q    Okay.  Is that a no, you didn't make any changes?

19             MR. ADAMS:  Objection, asked and answered.

20             MS. WALLET:  Well, I would agree it's been asked.

21             THE WITNESS:  I didn't change anything, if that's

22        your question.

23   BY MS. WALLET:

24   Q    That's my question, sir.

25             I'd like to show you what has previously been

```
 1          marked as Sheely Deposition No. 2, that being an April
 2          25, 1997, memorandum from Barbara Varner to Dan
 3          Hartnett.  Would you take a minute to look at that, sir,
 4          and tell me whether you had a copy of that in or about
 5          March of 1998?
 6     A.   I do not recollect seeing this before.
 7     Q    Before today?  Or before --
 8     A.   Ever.  Ever, before ever.  Before this moment, ma'am.
 9              MS. WALLET:  Okay.  Let's mark as Deposition 3 a
10          one-page document.
11              (Hoffer Deposition Exhibit No. 3 was marked.)
12     BY MS. WALLET:
13     Q    Sir, is that your signature in the middle of the page
14          marked Deposition 3?
15     A.   Yes, ma'am.
16     Q    Across from the word department head?
17     A.   Yes, ma'am.
18     Q    And you dated that for 3/13/98?
19     A.   I did.
20     Q    This personnel action form, is that prepared by you or
21          by someone else?
22     A.   Someone else.
23     Q    Do you know who prepared this particular form?
24     A.   No, ma'am.
25     Q    I note that Dan Hartnett signed as personnel officer on
```

Hon. George Hoffer                                    34

```
 1            the 24th of February, a couple week before you signed
 2            it.
 3                 Was this action a result of your initiation and
 4            your meeting with Mr. Ward?  Or had Mr. Hartnett
 5            recommended this action to you?
 6     A.     What action?  Is this the demotion?
 7     Q      Yes, it is.
 8     A.     Hartnett didn't recommend anything to me except perhaps
 9            to fire Graham.
10     Q      Did he recommend that he be fired?
11     A.     I don't know.  It's a possibility, I don't -- I don't
12            have any recollection of that, ma'am.
13     Q      Did you consult with anyone before you made the decision
14            to transfer and demote Mr. Graham?
15     A.     About my decision?
16     Q      Yes, sir.
17     A.     No, ma'am.  Obviously, I consulted with --
18     Q      John Ward?
19     A.     -- John Ward.  But I had made my decision by that time.
20     Q      It was your decision and your decision alone?
21     A.     Yes, ma'am.
22     Q      When did you learn that there was, for lack of a better
23            word, some tension between Barbara Varner and Barbara
24            Graham?
25     A.     I suppose the beginning of '98 sometime.
```

Hon. George Hoffer                                35

1    Q    What did you learn, sir?

2    A.   Well, aside from what I might have just heard in the

3         courthouse scuttlebutt, I think I saw a note from

4         Ms. Varner to Dan Hartnett, the personnel director,

5         complaining about Ms. Graham.

6    Q    And did you receive that from Mr. Hartnett?

7    A.   As far as I know, everything came from Hartnett.  He

8         copied me with various things.

9    Q    All right.

10   A.   That is, from Ms. Varner.

11   Q    Yes, sir.

12   A.   Ms. Graham's notes came directly.

13   Q    Okay.  When you learned that Ms. Varner had made

14        complaints about Barbara Graham, what, if anything, did

15        you do?

16   A.   Nothing.

17   Q    Did you talk to Ms. Varner about her complaints?

18   A.   She did not ask to see me.

19   Q    Did you speak to Ms. Varner about her complaints?

20   A.   No, ma'am.

21   Q    Did you speak to Barbara Graham about the issue?

22   A.   I did.

23   Q    And when did you do that, sir?

24   A.   I suppose it would have been sometime between the day

25        that I demoted Gary until I finally had a meeting with

Hon. George Hoffer                          36

1              Ms. Varner in my office beginning of June, I believe it
2              was.
3      Q      And it was Barbara Graham who initiated the conversation
4              with you?  Is that correct?
5      A.     I can't say that.  She wanted to see me to intercede on
6              her husband's behalf about the demotion action that I
7              took, and tried to see me many times on that.
8      Q      Did you see her on that issue?
9      A.     On the demotion issue?
10     Q      Yes, sir.
11     A.     Yes.
12     Q      Tell me what you remember about that meeting.
13     A.     Well, they would have been short, ma'am.
14     Q      Was it just you and she?
15     A.     To my recollection, yeah.  They would have been short
16             and to the effect that I did what I did and I'm not
17             changing anything, the demotion stands.  And she wanted
18             to tell me her side of the story and so forth and so on.
19             I didn't listen to too much of that.
20     Q      Do you think that the subject of the relationship
21             between Barbara Graham and Barbara Varner came up at
22             that same meeting or some later meeting?
23     A.     Would you give me that again?
24     Q      Sure.  Barbara Graham comes to you and wants to talk to
25             you about her husband's transfer, and you give her short

Hon. George Hoffer                              37

1    shrift and that's over.  Or were there other subjects at

2    that meeting?

3  A.   Well, it wasn't just one meeting, ma'am.  She tried to

4    see me several times about this.  She wouldn't give up

5    on it.

6  Q    So she tried to see you several times.  Did she succeed

7    in seeing you more than one time?

8  A.   Yes, ma'am.

9  Q    Okay.  So the first time was she talks about the

10   demotion, you give her short shrift.  Was that the end

11   of that meeting?

12 A.   I suppose something along those lines.

13 Q    Did she bring up Barbara Varner at that meeting?

14 A.   Only in the sense that she wanted me to hear Gary

15   Graham's side of the story through her, I suppose.

16 Q    Did you listen to that?

17 A.   No, ma'am.

18 Q    So she came to your office again another time?

19 A.   Um-hum.

20 Q    To discuss Barbara Varner?

21 A.   Well, that would have been later.

22 Q    Okay.  Later meaning before you met with Ms. Varner?

23 A.   Yes, ma'am.  Yeah.

24 Q    And what did she discuss with you on that occasion?

25 A.   I don't remember the specifics, but you didn't have to

Hon. George Hoffer                            38

```
 1        be a genius to see that there was extreme antipathy
 2        between these two women, and that was what it was all
 3        about.  And Barbara Graham mainly wanted to tell me her
 4        side of the story about various incidents.
 5    Q   Did you personally observe any relationship between
 6        Barbara Varner and Barbara Graham?
 7    A.  Relationship?
 8    Q   Did you ever observe the two of them in the same place?
 9    A.  No.
10    Q   You knew about the, what you've described as antipathy
11        between the two of them because of what people told you?
12    A.  Ma'am, I knew about this lawsuit of Ms. Varner's going
13        on.  You have the demotion.  These people aren't
14        friends.
15    Q   Okay.  Did you place some restrictions on Ms. Varner
16        with regard to where she could go within the courthouse?
17    A.  No.
18    Q   Did you call Joe Osenkarski to your courtroom or your
19        chambers and instruct him to tell Ms. Varner that she
20        had some restrictions on where she could go?
21    A.  I don't recollect, but I may have said to Joe please ask
22        Ms. Varner to stay out of the stenographers' room till
23        we get that taken care of, till we get our renovations
24        taken care of.
25    Q   And you thought it was limited to the stenographers'
```

Hon. George Hoffer                    39

1          room?

2    A.    I don't understand your question, ma'am.

3    Q     To the best of your recollection, what did you tell

4          Mr. Osenkarski to tell Ms. Varner?

5    A.    Well, I think you have to understand the situation at

6          the time.  Are you interested in that or not?

7    Q     Sure.

8    A.    At the particular time the old jurors' lounge on the

9          fourth floor of the courthouse used by the lawyers had

10         been used by a judge.  The judge had moved out and we

11         were renovating that space for the court stenographers

12         since we had recently lost their space in the old

13         section of the courthouse.  So the stenographers all had

14         to be moved into what was then occupied by Juvenile

15         Probation and perhaps some Adult Probation in there,

16         too.  Ms. Varner -- excuse me -- Ms. Graham was in this

17         temporary quarters with everyone else.

18             Now, having that understanding I'm ready for your

19         question.

20   Q     Okay.  And these quarters where the stenographers were,

21         is that on the third floor east wing of the courthouse?

22   A.    They were on the third floor at that time, yes,

23         temporarily.

24   Q     You told Mr. Osenkarski to relay something to

25         Ms. Varner?

Hon. George Hoffer                          40

1    A.    I may have said something to Joe routinely.

2    Q     Well, what was routine about that?

3    A.    Well, I may have asked him to have Ms. Varner, whose

4          office was not in this section, anyway, to stay out of

5          there unless we have some exchange between she and

6          Mrs. Graham.  I thought it was routine.

7    Q     Did you ever restrict any of your other probation

8          officers from entering any part of the courthouse?

9    A.    I have not restricted any probation officer at any time

10         other than Gary Graham, whose card we took away.

11   Q     So you didn't consider this a restriction on Ms. Varner?

12   A.    I did not restrict her movements, ma'am.

13   Q     Okay.  You told Mr. Osenkarski that she should stay away

14         from the stenographers' area?

15   A.    Please stay away from the room where Barbara Graham is

16         working.

17   Q     Okay.  To the best of your knowledge, did Mr. Osenkarski

18         carry out your instructions?

19   A.    Well, I suspect he did, because I got a note from

20         Mrs. Varner that day or the very next day:  Put it all

21         in writing.  That's what prompted me to have her up to

22         my office.

23   Q     Okay.

24   A.    I knew we had a problem.

25              MS. WALLET:  Well, let me mark now as Deposition

1              Exhibit 4 a one-page document.

2                   (Hoffer Deposition Exhibit No. 4 was marked.)

3    BY MS. WALLET:

4    Q    Tell me, Judge, when you're ready to answer questions

5         about this document.

6    A.   I am.

7    Q    Did you receive what has been marked as Deposition

8         Exhibit 4 in or around June 1, 1998?

9    A.   I think I did.

10   Q    Now, Ms. Varner says that Joe Osenkarski told her that

11        she was not to conduct business in the Probation offices

12        located on the third floor east wing of the courthouse.

13             Do you have any reason to believe that that's not

14        what Mr. Osenkarski told Ms. Varner?

15   A.   I have no idea what he told her, ma'am, but if I told

16        him, I would have made it a request.

17   Q    Now, Ms. Varner says she wanted it in writing.

18   A.   Um-hum.

19   Q    And Mr. Osenkarski has already testified that he didn't

20        respond to this.

21             Did you respond in some fashion to Deposition 4?

22   A.   I had Ms. Varner in my office the very next day, ma'am.

23   Q    And you made notes of that meeting?

24   A.   I did.

25             MS. WALLET:  We'll mark as Deposition Exhibit 5 a

Hon. George Hoffer                          42

1          package of documents.

2                 (Hoffer Deposition Exhibit No. 5 was marked.)

3                 THE WITNESS:  I wish this was a little clearer.

4     BY MS. WALLET:

5     Q    Whose fault is that, your Honor?

6     A.   Pardon me?

7     Q    I said, whose fault is that?  Clearer meaning your

8          handwriting or clearer meaning the copies?

9     A.   No, the copy.

10                MS. WILLIAMS:  Do you have a better copy?

11                MS. WALLET:  I have the one that you gave me and I

12         don't have any --

13                MS. WILLIAMS:  If it's clearer, maybe he could

14         refer to that.

15                THE WITNESS:  I have my original note in the

16         office.

17    BY MS. WALLET:

18    Q    I'll show you one that was provided to me.  We'll see

19         if that's a little better.

20    A.   Not much better.

21                MS. WILLIAMS:  Is that one a little better?

22                THE WITNESS:  No.

23                MS. WALLET:  It's about the same.

24    BY MS. WALLET:

25    Q    Is what we've marked as deposition Exhibit 5 your

Hon. George Hoffer                                    43

1        notes from the meeting with Ms. Varner?

2    A.   It is.

3    Q    And it consists of three pages?

4    A.   Yes.

5    Q    I think we can read the first page pretty well.  It's

6         the second and third pages we might need some

7         interpretation on.

8             MS. WILLIAMS:  Do you want us to get the original

9         from the judge's chamber?

10            MR. THOMAS:  Let's see if he can read it.  It's not

11        that bad.

12   BY MS. WALLET:

13   Q    Do you think you can read this, sir?

14   A.   I'll try.

15   Q    Okay.  Beginning at page 2, would you read that, please?

16   A.   Dash, "explained that I wanted to eliminate as much

17        contact with Barbara Graham as possible," dash, "I'd

18        move Barbara Graham if possible but can't."  Dash,

19        "asked Barbara Varner to voluntarily stay out of Barbara

20        Graham's office and have officers she needs to talk to

21        come to her office."  Dash, "she," Barbara Varner,

22        "questioned why."  Dash, "she agreed with me that

23        regardless of anything else, Barbara Graham is an

24        innocent victim."

25            Dash, "explained to Barbara Varner that I am not

1        ordering her where or where not to go."  Dash, "wanted

2        Barbara Varner to volunteer to do it to ease tensions.

3        Barbara Varner still questions why."

4            "My position to Barbara Varner," colon, "I'm not

5        ordering her to do anything but if she still insists, I

6        will move any officer Barbara Varner has to see out of

7        that office," where Barbara Graham was, "until Barbara

8        Graham is relocated," period.

9   Q   Do you believe those notes accurately reflect what you

10      told Ms. Varner on June 2nd, 1998?

11  A.   Absolutely.

12   Q   Do you have any other recollection of that meeting other

13      than what is contained in your notes?

14  A.   Well, unless you refresh me with something, ma'am, these

15      were the main points that I wanted to make a note of.

16   Q   Did you tell Ms. Varner that either Mr. Osenkarski had

17      gotten it wrong or that she had gotten it wrong about

18      not being able to go to the third floor east wing at

19      all?

20  A.   I don't remember, ma'am.  And that wouldn't have been

21      important in my mind, either way, anyway.

22   Q   Why not?

23  A.   This was coming from me, a talk with Ms. Varner

24      directly.

25   Q   Did you believe that you had straightened this out as a

1          result of this meeting with Ms. Varner?

2     A.   Straightened what out?

3     Q    Where Ms. Varner could go and not go.

4     A.   I didn't --

5               MR. THOMAS:  Objection to form.

6               THE WITNESS:  I didn't know.

7               MR. THOMAS:  Object to form.  He can answer.

8               THE WITNESS:  I didn't know if it was straightened

9          out or not, ma'am.

10    BY MS. WALLET:

11    Q    Okay.  Did you intend to change the instructions that

12         Mr. Osenkarski had given Ms. Varner?

13    A.   What instructions?

14    Q    That she not go anywhere on the third floor east wing of

15         the courthouse?

16    A.   I don't know what instructions he gave her, ma'am.  I

17         don't have any recollection of discussing any

18         instructions from Osenkarski.  Whatever they were, were

19         irrelevant.  This is myself and Ms. Varner talking

20         directly about this.

21    Q    Well, let me ask you this, Judge Hoffer.  Did she agree

22         as a result of this meeting to what you had asked her to

23         do?

24    A.   My impression was that she did not.

25    Q    Did you give a her an order?

Hon. George Hoffer                                    46

1   A.   What order?

2   Q    An order not to go to the office where Barbara Graham

3        was.

4   A.   Absolutely not, ma'am.

5   Q    So you asked her to do something, she didn't agree, and

6        that's --

7   A.   I said I had the impression that she did not agree.  She

8        never gave me a definitive answer.

9   Q    Did you believe as a result of this meeting that she

10       would stay out of the stenographers' section?

11  A.   I didn't know, ma'am.  That remained to be seen whether

12       she would voluntarily agree to do that or not.

13  Q    Is it your position, sir, that she was never restricted

14       with regard to where she could go in the courthouse?

15  A.   Absolutely no restrictions.

16  Q    Did you place any similar restrictions on Barbara

17       Graham?

18  A.   I haven't restricted anyone, ma'am.

19  Q    Well, let me ask it a different way.  You asked

20       Ms. Varner to stay out of the area where Barbara Graham

21       was.  Did you ask Ms. Graham to stay out of the area

22       where Barbara Varner was?

23  A.   I told Ms. Graham to stay away from Ms. Varner, period.

24  Q    And when did you tell her that?

25  A.   Oh, that was -- I don't recollect.

Hon. George Hoffer                          47

1    Q    Well, was it before or after you had the meeting with
2         Ms. Varner?
3    A.   It would have been around that time, but I don't know
4         when.
5    Q    Did Ms. Varner tell you that she might have some
6         legitimate business reasons for going to the third floor
7         east wing of the courthouse?
8    A.   She did.
9    Q    Did you believe that her reasons were legitimate?
10   A.   My recollection was that she wanted -- she had to talk
11        to Debbie Green, a fellow probation officer who was over
12        there, and she had to talk about cases.  That's what she
13        told me.
14   Q    Did you doubt that?
15   A.   No, ma'am.  But it's in my notes, I said if you have to
16        talk about cases with Debbie Green I'll move Ms. Green
17        over to the new office.
18   Q    Did you think that it might be embarrassing for
19        Ms. Varner to be restricted or to have a part even that
20        would be off limits to her?
21             MR. ADAMS:  Objection.
22             MS. WILLIAMS:  Objection.
23             THE WITNESS:  I did not restrict Ms. Varner's
24        movements, ma'am.
25   BY MS. WALLET:

Hon. George Hoffer                              48

1    Q    Did you think it would be embarrassing to her if she

2         was to honor your suggestion that she not go to the

3         stenographers' area?

4              MR. ADAMS:  A continuing objection.  It requires

5         the judge to speculate as to the feelings of Ms. Varner.

6    BY MS. WALLET:

7    Q    You may answer.

8    A.   I can't read her mind, ma'am.

9    Q    Were there other probation officers other than Ms. Green

10        in that same area?

11   A.   To my recollection, yes.

12   Q    Who else was there?

13   A.   I don't recollect.  Ms. Green was the only one

14        Ms. Varner told me she had to talk to.

15   Q    Would you agree, sir, there were a handful, at least --

16   A.   A what?

17   Q    A handful, several, more than two, probation officers

18        located in that area at that time?

19   A.   I think there were both perhaps Juvenile and Adult.  I

20        don't recollect what the line-up was in there.  But I

21        know we had stenographers in there, so that would have

22        cramped things a little bit.

23   Q    Were the stenographers in exactly the same area?  I

24        mean, is it one big room?

25   A.   It was one large room with various smaller rooms cut off

Hon. George Hoffer                              49

1           and partitioned.  I don't remember the line-up anymore.

2    Q      Was Ms. Varner the only probation officer who didn't

3           have her office there?

4    A.     Could you ask me that again, ma'am?

5    Q      Well, we know that a number of probation officers were

6           on the third floor east wing, and Ms. Varner wasn't.

7           Were there others, other than Ms. Varner, who did not

8           have their offices on the third floor east wing?

9    A.     In Juvenile Probation?

10   Q      Yes, sir.

11   A.     Oh, yes.  Back in the main part of the third floor in

12          the old section, where they all started.

13   Q      Do you recall whether it was about equally divided or

14          more in one area than the other?

15   A.     I can't remember the setup at that time.  I know a lot

16          of the Adults went in there but I don't remember when

17          that was anymore.  Maybe that was later.

18              MS. WALLET:  Just for the record, your Honor, would

19          you look at what we'll mark as Deposition Exhibit 6?

20              (Hoffer Deposition Exhibit No. 6 was marked.)

21   BY MS. WALLET:

22   Q      Tell me when you're ready, sir.

23   A.     I'm ready.

24   Q      Do you remember receiving this memorandum in or around

25          February 11, 1998?

Hon. George Hoffer                                50

1   A.    I thought this was a memo I referred to earlier in my

2         testimony.

3   Q     Do you believe you received this memo along with the

4         attachment in or around February 11, 1998?

5   A.    I have no reason not to believe that I got it about that

6         time.

7         MS. WALLET:  Let's mark as Deposition 7 another

8         one-page memo.

9         (Hoffer Deposition Exhibit No. 7 was marked.).

10  BY MS. WALLET:

11  Q     Are you ready?

12  A.    Yes, ma'am.

13  Q     Okay.  Do you recall receiving Deposition 7 in or about

14        March of 1998?

15  A.    As we sit here now, no, I don't have any independent

16        recollection of receiving it, although some of it does

17        look familiar.

18  Q     This is not directed at you or addressed to you, but do

19        you believe you received it from Mr. Hartnett?

20  A.    I may have, I just don't recollect.  Some of it looks

21        familiar.

22  Q     Did meet with Barbara Varner on March the 4th of 1998?

23  A.    I have no recollection of meeting with her on March 4,

24        ma'am.

25        MS. WALLET:  Well, let's mark as Deposition 8 some

Hon. George Hoffer                          51

1        additional handwritten notes that were provided by your

2        counsel.

3             (Hoffer Deposition Exhibit No. 8 was marked.)

4   BY MS. WALLET:

5   Q    Are these your notes, sir?

6   A.   They are.

7   Q    I can't really tell what the date is.

8   A.   3-4-98.

9   Q    Okay.  Do you recall having a meeting with Barbara

10       Varner on --

11  A.   Now that you've showed me this note, yes.

12  Q    Okay.  And do you believe that you met with Ms. Varner

13       on the 4th because you had received the March 3rd, 1998,

14       memo?  Which we've marked as Deposition 7.

15  A.   I don't know if it was a response to that, but I did

16       know I wanted to find out how the supervision with Sam

17       Miller was going.

18  Q    And did you call Ms. Varner to your chambers?

19  A.   Probably, but I don't know.

20  Q    Do you remember why you had the meeting that was

21       documented 3/4/98?

22  A.   To find out how the supervision with Sam Miller was

23       going and any other complaints she had.

24  Q    And for the record, would you just read what is

25       contained on this document, Deposition 8, under the

Hon. George Hoffer                         52

1          words Barb Varner?

2     A.   "Supervision by Miller is going okay, but Graham's heavy

3          hand is pervasive through the office through little

4          things."

5     Q    Does that reflect what Ms. Varner told you on March 4,

6          1998?

7     A.   It would have.

8     Q    Do you remember what she told you?

9     A.   Other than what I have in my notes, no, ma'am.

10    Q    Did you take any action as a result of your meeting with

11         Ms. Varner on the 4th of March, 1998?

12    A.   Well, Gary Graham was demoted about 10 days later.

13    Q    Did you do it as a result of your meeting with

14         Ms. Varner?

15    A.   No.  Not solely, no.

16    Q    Did you do anything to investigate any of the

17         allegations that Ms. Varner had made in the attachment

18         to Deposition 6 and Deposition 7?

19    A.   No.

20    Q    Did you instruct Mr. Osenkarski prior to your demoting

21         Mr. Graham to take any action to monitor Mr. Graham's

22         activities?

23    A.   To monitor Graham's activities?

24    Q    Yes.

25    A.   After I demoted him?

Hon. George Hoffer                                53

1    Q      Before you demoted him.

2    A.     No.  I don't think before, no.

3    Q      You agree that Mr. Osenkarski was responsible as

4           Mr. Graham's supervisor at that time?

5               MR. ADAMS:  Object.  What do you mean by

6           responsible?

7               MS. WALLET:  Well, I'll ask a different question.

8    BY MS. WALLET:

9    Q      There's no question, is there, sir, that

10          Mr. Osenkarski was the direct supervisor of Mr. Graham

11          until such time as you demoted him and sent him to the

12          prison?

13   A.     No question in my mind, ma'am.

14   Q      Did you at any time tell Mr. Osenkarski to keep an eye

15          on Mr. Graham, particularly with regard to the tension

16          in the office with Ms. Varner?

17   A.     I may have.  I don't have any recollection, ma'am.

18   Q      Did you believe that by sending Mr. Graham to the

19          prison, that he would not have any contact with

20          Ms. Varner that?

21   A.     That's awfully broad, ma'am.  I knew he wouldn't have

22          any contact with Ms. Varner in the courthouse anymore.

23          Outside of the courthouse, I can't say.

24   Q      Did you at any time ever tell Mr. Graham to stay away

25          from Ms. Varner?

1   A.   No.

2   Q    Now, you learned, did you not, that there was a training

3        session at which Mr. Graham and Ms. Varner were both in

4        attendance?

5   A.   In regard to the DUI school?

6   Q    Yes, sir.

7   A.   Yes, ma'am.

8   Q    And how did you learn that Ms. Varner had once again

9        complained about her interaction with Mr. Graham?

10  A.   I think she wrote a note after the session was over.

11  Q    And that came to your attention?

12  A.   Yes, ma'am.  I wrote her a note back.

13           MS. WALLET:  Let's mark as Exhibit 9 a one-page

14       letter from you to Ms. Varner.

15           (Hoffer Deposition Exhibit No. 9 was marked.)

16  BY MS. WALLET:

17  Q    Can you identify for us Deposition 9?

18  A.   My letter ma'am to Mr. Graham.

19  Q    Why did you write that letter?

20  A.   I wrote it in response to her note to John Ward.

21  Q    Did you as a result of her note to you ever call

22       Mr. Graham in, tell him to stay away from Ms. Varner?

23  A.   As a result of what?

24  Q    As a result of her complaint about having to be at the

25       same place as Mr. Graham.  Did you call Mr. Graham in

1          and tell him to stay away from Ms. Varner?

2     A.   I don't have any recollection whether I did or not.

3          This was a routine meeting, ma'am.

4     Q    After February of 1999 did you ever give any

5          instructions to Mr. Graham regarding his relationship

6          with Ms. Varner?

7     A.   After?

8     Q    February of '99, the date of your letter.

9     A.   Did I give him any what?

10    Q    Instructions regarding his relationship with Ms. Varner.

11    A.   No, ma'am .

12             MS. WALLET:  Let's mark as Deposition 10 a one-page

13          document.

14             (Hoffer Deposition Exhibit No. 10 was marked.)

15    BY MS. WALLET:

16    Q    Sir, what we've marked as Deposition 10 was also

17         provided by your counsel.  Can you tell me what this

18         note refers to?

19    A.   That would have preceded what you gave me as Deposition

20         No. 8, ma'am.

21    Q    You agree there's no date on this?

22    A.   No, but it would have been shortly before March 4, or

23         3/4/98.

24    Q    Okay.  And Deposition 10 was simply a note to yourself

25         to call Ms. Varner in?

1  A.  Um-hum.

2  Q  And for the record, could you read me the part after

3      call Varner in with or without attorney?

4  A.  Dash, "how are things going," question mark, question

5      mark, for me to ask her.  I said "Judge Sheely took," or

6      I wanted to say to her "Judge Sheely took steps last

7      summer, has" the steps, "has it been resolved."

8  Q  Do you recall whether you asked Ms. Varner has this been

9      resolved?  When you met with her on the 4th.

10 A.  Well, that would have been then her response:  Graham's

11     heavy hand is still pervasive.

12 Q  What's the 6269 reference, do you know what that is?

13 A.  No.  I don't have any idea what that is.

14 Q  You don't think that has any significance at all to this

15     case?

16 A.  I don't know.  It might be an extension number of a

17     telephone.  I have no idea what it is.

18 Q  Now, in March of 2002 there was a bomb scare in the

19     building.  Do you recall that?

20 A.  Vaguely.

21 Q  In fact, I think you had a couple, did you not?

22 A.  I think so.

23 Q  How did you learn that Ms. Varner had been left in the

24     building and was not evacuated as part of that bomb

25     scare?

1    A.    I think she wrote a letter to someone.

2    Q    Do you think she wrote a letter to you?

3    A.    I don't know if it was to me or to John Ward, personnel,

4          what it was.  I remember seeing something.

5              MS. WALLET:  Well, we'll mark this as Deposition

6          11.

7              (Hoffer Deposition Exhibit No. 11 was marked.)

8              THE WITNESS:  Do you have a question?

9    BY MS. WALLET:

10   Q    My question, sir, is:  Did you receive this memo

11         perhaps without the handwritten part, in or about March

12         27, 2002?

13   A.    I suspect I did.

14   Q    Did you take -- well, let me ask you, this is not your

15         handwriting at the bottom, correct?

16   A.    That is correct, it is not.

17   Q    And do you believe that the memo had no handwriting on

18         it at the time you received it?

19   A.    I don't remember.

20   Q    Now, she says in March of 2002:  As you know, in the

21         past you have restricted me from that office.

22             Did you make any response to that memo to clarify

23         that you never restricted her?

24   A.    I never restricted her, ma'am.  I didn't think I needed

25         to respond to something like that.

Hon. George Hoffer                          58

1    Q    What did you do in response to this March 27, 2002,
2         memo?
3    A.   I think I got ahold of Osenkarski and said:  What's
4         going on, do we have a policy.  I don't recollect, but I
5         think I did get ahold of Osenkarski.  I said:  Take
6         steps to see this doesn't happen again.  Something along
7         that line.
8    Q    Okay.  Do you know whether he did?
9    A.   I think he did.
10   Q    What do you think he did?
11   A.   Oh, I think I saw a policy come out of there sometime
12        after that.
13   Q    Did you have a previous that policy?
14   A.   As far as initialling it or something?  If there was a
15        policy, it was all right with me.
16   Q    She suggests in her memo of March 27, 2002, that she try
17        temporarily working in the east wing Probation Office.
18        Apparently that was the suggestion of Ms. Miller.
19            Did you have any discussions with Ms. Miller about
20        this?
21   A.   I have no recollection of that.
22   Q    Did you play any role in the subsequent move of
23        Ms. Varner to the east wing Probation Office?
24   A.   Oh, well, if she was moved I would have played some role
25        in it, in okaying it.

Hon. George Hoffer                    59

1    Q     Do you know who suggested that she move?

2    A.    No, ma'am.

3    Q     Was it your suggestion that she move?

4    A.    No, I don't remember.

5          MS. WALLET:  Let's mark as Deposition 12 an April

6          5, 2005, memo.

7          (Hoffer Deposition Exhibit No. 12 was marked.)

8          MS. WALLET:  I've handed the witness what we've

9          marked as Deposition 12.

10   BY MS. WALLET:

11   Q     Specifically I want to call your attention to

12         paragraph 5, maybe these where I got 2005.  According to

13         Ms. Miller's memo, an official request has been made to

14         President Judge Hoffer to move Ms. Varner's office.

15         Does that refresh your recollection as to where

16         this suggestion came from?

17   A.    No, other than looking at the paper.

18   Q     Don't have any recollection that someone from the county

19         requested that you do this?

20   A.    I don't have any recollection about the move much at

21         all, ma'am.

22   Q     Did you go to the east wing to take a look at the

23         quarters before you approved Ms. Varner going there?

24   A.    East wing?  Who did she move in with?  Or did she move

25         in by herself?  I'm trying to remember.

Hon. George Hoffer                              60

1    Q    Gail Schuhart?

2    A.   Oh, well, she moved in with Ms. Schuhart.  I guess I

3         would have gone down, I think I went down to the office

4         to see if it was big enough and to see if Ms. Schuhart

5         could operate with somebody else in there.

6    Q    Did you ever do that when someone else asked to move

7         their office?

8    A.   I may have.  I don't recollect.

9    Q    Is it your policy to check out the quarters before you

10        approve a move?

11   A.   My policy?

12   Q    Practice, maybe.

13   A.   You have to remember, ma'am, I was being sued at this

14        point by Ms. Varner.  Do you have a question?

15   Q    Well, the question was:  Do you normally do this, or was

16        this unusual?

17   A.   It is not unusual to find me in any office of any of the

18        Probation offices, or any office in the courthouse, as

19        far as that goes.

20   Q    Did the fact that Ms. Varner had a lawsuit pending at

21        that time cause you to act differently?

22   A.   Differently only in the respect that there was not going

23        to be any further action on my part, if I could help it,

24        to be part of that lawsuit anymore.

25   Q    Ultimately you did approve this move?

Hon. George Hoffer                          61

1    A.    If she moved, I guess I would have approved it.

2    Q    When you became president judge did you think that Judge

3          Sheely had taken care of these incidents between

4          Ms. Varner and Mr. Graham?

5    A.    I had no idea, ma'am.

6               MR. ADAMS:  Objection to the form.

7    BY MS. WALLET:

8    Q    What did Judge Sheely tell you about what he had done

9          and why he had done it?

10   A.    When he told me, I don't remember.  That would have been

11         late, late in his term, I suspect, or perhaps about the

12         time I took over.

13              You're asking me -- why don't you give me that in

14         pieces, ma'am.

15   Q    Okay.  What did Judge Sheely tell you that he had done?

16   A.    I think he gave Gary Graham a three-day suspension.

17   Q    Did he tell you that he had suspended him without pay?

18   A.    I don't remember.

19   Q    Did Judge Sheely tell you that he thought there was an

20         affair between Ms. Varner and Mr. Graham?

21   A.    I know he told me Gary confessed to an affair in front

22         of him with his wife.  I remember him telling me that.

23   Q    Did you have any evidence, sir, that there was an affair

24         or a sexual relationship between Gary Graham and Barbara

25         Varner?

Hon. George Hoffer                              62

1    A.    Any independent evidence?

2    Q     Yes, sir.

3    A.    I didn't even know the allegations were going on until I

4          took over as PJ, and I have no evidence.

5    Q     Did Judge Sheely tell you that he had taken care of

6          this?

7    A.    Are you asking me if he said those words?

8    Q     Or something to that effect.

9    A.    I don't remember his exact words, but I know that he

10         said a three-day suspension for Gary Graham.

11   Q     After you learned that the EEOC charge was pending, did

12         you take any action to try to resolve the matter?

13   A.    In what way?

14   Q     In any way.

15   A.    Well, I didn't have Ms. Varner and Mr. Graham into the

16         office to sit down and try to mediate something, if

17         that's what you're saying, absolutely not.  There was a

18         lawsuit filed, ma'am.  It's going to take its course.

19   Q     Did you have any knowledge at any time, sir, that

20         Mr. Osenkarski made reference to something called the

21         cunt club?

22   A.    If that was in the report of Deluce, yes.

23   Q     And if not?

24   A.    Well, I'm trying to recall now, and I don't have any

25         recollection.  Perhaps if you showed me something.  But

1           that's my answer.

2    Q     Is there, sir, at times, disputes between the county --

3                MS. WILLIAMS:  Could you repeat that?

4    BY MS. WALLET:

5    Q     Is there at times disputes between the county and your

6          office as to how probation officers should be treated

7          with regard to terms and conditions of employment?

8    A.    I still didn't hear that.  Is there a dispute between

9          myself and the county about what?

10   Q     About terms and conditions as they apply to probation

11         officers.

12               MS. WILLIAMS:  Did you hear the question, Judge?

13               THE WITNESS:  Yeah.

14               There's no dispute.  There might be arguments, but

15         I do the hiring and firing, ma'am.  I'm in charge of the

16         Probation Office.

17   BY MS. WALLET:

18   Q     Is there a dispute currently over whether or not a

19         probation officer is permitted to take time off with

20         pay?

21   A.    Oh, one of the boys had been in to see me, yeah, and I

22         guess he's fighting with Human Services.

23   Q     Someone made a request to you for some vacation time

24         which you approved, correct?

25   A.    Verbally, yeah.  I haven't done anything in writing.  I

1          may have, too.  I don't know.

2     Q    And that individual was told by the county human

3          resources department that he couldn't take the time off?

4          Correct?

5     A.   That's what he told me.  I don't have any dealings with

6          the county directly on this myself.  You're referring to

7          Greg Richardson, I believe.  Or someone else?

8     Q    Who will make the determination about that case, you or

9          the county?

10    A.   About what?

11    Q    About that case, the Richardson case.

12    A.   To give you the short answer, I don't know until I look

13         at it a little deeper.  Vacation policy may be a little

14         bit different than the question of me hiring and firing,

15         which is basic, for example, I don't set the hours that

16         the courthouse is open, the commissioners do.  And the

17         probation officers work under those hours by and large

18         unless they're working independently, which some of them

19         do.  It's the nature of the job.  So that's the best I

20         can tell you.

21    Q    Who controls the budget for the payment of your

22         probation officers?

23    A.   The county writes the checks, ma'am.

24    Q    Who controls the budget for your staff?

25              MR. THOMAS:  Are you asking him who writes the

1    paycheck?

2          MS. WALLET:  Yes, sir.

3          THE WITNESS:  We prepare a budget, the court

4    administrator and myself.  We try to get it approved by

5    the county commissioners.

6          What's your question, ma'am?

7          MS. WALLET:  Maybe this is a good spot.  We've had

8    a request to take a break.  Let's take a break for 10

9    minutes?

10          MR. ADAMS:  How about five?

11          (Recess taken from 3:42 until 3:50 p.m.)

12    BY MS. WALLET:

13  Q    Judge Hoffer, is it accurate to say that it is the

14        county that controls the budget for the probation

15        officers?

16  A.    The county sets the budget, ma'am.  Probation is one of

17        the departments that they said a budget for.  We prepare

18        a Probation budget and we go to them with our request.

19  Q    What happens if they turn you down?

20  A.    There are five votes, ma'am.  If I have the votes, I get

21        it.  If I don't have the votes, I don't get them.

22  Q    Do you agree, sir, that you do not have access to any

23        independent sources of funding except through the county

24        for the Probation Office?

25  A.    I have a very small fee, supervision fee.

1    Q     And what is that, sir?

2    A.    Money received from supervision fees.

3    Q     So that when a convicted individual is supervised or --

4    A.    I think that's the way it goes.

5    Q     Okay.  Do you have any access to any other monies

6          besides grant monies to fund the Probation Office?

7    A.    No, ma'am.

8    Q     When you learned what happened during the bomb scare,

9          did you give any consideration to disciplining

10         Mr. Osenkarski?

11   A.    No, ma'am.

12   Q     Why not?

13   A.    I didn't see that anybody had done anything wrong other

14         than through an honest error.

15   Q     Who did you talk to before you reached that conclusion?

16         I didn't talk to anybody.

17             MS. WALLET:  That's all the questions I have.

18             MR. THOMAS:  Can we change places so the judge can

19         hear?

20             MS. WALLET:  Sure.

21   BY MR. DELLASEGA:

22   Q     Good afternoon, Judge.  I'm Paul Dellasega and I

23         represent the county.  I'd like to clarify a couple of

24         your answers, if I could.

25   A.    Could you keep your voice up?

```
 1   Q    Yes, sir.  I'd like to clarify a couple of your answers,

 2        if we can, Judge.

 3            Other than this case, since you've been the

 4        employer, have you had to deal with any other

 5        allegations of adultery between your employees?

 6   A.   No.

 7   Q    Do you approve of adultery between your employees?

 8   A.   Between employees?

 9   Q    Correct.

10   A.   No.

11   Q    In your experience, Judge, have you dealt with other

12        cases or been aware of other adulterous situations that

13        have resulted in hard feelings?

14   A.   I suppose so.

15   Q    In this particular case, when Judge Sheely told you

16        there was an allegation of adultery between Ms. Varner

17        and Mr. Graham and told you that Mr. Graham had

18        confessed in front of his wife, what effect did you give

19        the fact Mr. Graham had confessed in front of his wife?

20   A.   I don't know that I gave it any effect.

21   Q    In deciding what to do about the Graham and Varner

22        situation, did the fact that Mr. Graham had confessed to

23        adultery in front of his wife influence your ultimate

24        decision?

25   A.   I don't -- not per se, I don't think so, no.
```

1    Q    Would you have treated Mr. Graham differently if you

2         felt there had not been adultery and he had simply been

3         a pure sexual harasser?

4              MS. WALLET:  Objection to the form of the question.

5         I don't think that this witness ever admitted that he

6         considered this to have been an adulterous relationship.

7              THE WITNESS:  It is incorrect for a supervisor to

8         have any kind of affair with a person that he or she is

9         supervising.  Absolutely wrong, consensual or otherwise.

10        So what's your question?

11   BY MR. DELLASEGA:

12   Q    The reason that you just articulated the me, that it

13        is incorrect for a supervisor to engage in adultery with

14        an employee --

15   A.   Or any kind of relationship, sexual.

16   Q    Is that the reason why you demoted Mr. Graham in

17        addition to his management deficiencies?

18   A.   That was part of it.

19   Q    What was the --

20   A.   The relationship, yes.

21   Q    What was the other part of it, judge?

22   A.   I had lost my confidence in his ability to be a

23        supervisor.

24   Q    And when you say that, Judge, are you referring to his

25        management skills?

1   A.   Absolutely.

2   Q    Okay.  And did you learn about his management

3        deficiencies through these interviews you conducted that

4        are outlined in Exhibit 1?

5   A.   Through the report and through all the people that I

6        talked to, yes.

7   Q    Okay.  And when you considered what to do about this

8        case, Judge, did you rely on Mr. Deluce's opinions or

9        upon your own conclusions?

10  A.   Well, I drew upon Deluce's report, yes, verified to some

11       extent by my interviews with the various people.

12  Q    Did you use the Deluce report for the factual

13       information it contained or for Mr. Deluce's opinions

14       expressed in the report?

15       MS. WALLET:  Objection.  I'm going to note my

16       objection for the record.  I don't think you can lead

17       this witness.  There is no reason why you can conduct

18       this cross-examination.  He is simply a witness to be

19       deposed.

20       MR. DELLASEGA:  It's a discovery deposition.  I can

21       ask him any question I want to ascertain information.

22       Whether the question is admissible at trial may depend

23       on the form of the question, but there's no rule against

24       leading your own witness, if indeed, he is my own

25       witness.  And that is a contention in this case.

```
 1              MS. WALLET:  And I'm objecting to the form of the
 2         question.
 3              MR. ADAMS:  I need to also add that the judge is
 4         not only a witness but he's actually a party in the
 5         litigation, which probably gives Mr. Dellasega a little
 6         bit more leeway to ask any kind of question, the mere
 7         fact that he's a party.
 8              MS. WILLIAMS:  He's a representative of a party.
 9              MR. ADAMS:  Thank you.
10              THE WITNESS:  Where are we?
11    BY MR. DELLASEGA:
12    Q    You still have to answer my question, Judge.
13              THE WITNESS:  Yes?
14              MS. WILLIAMS:  Yes.  Could you repeat the question,
15         Mr. Dellasega.
16    BY MR. DELLASEGA:
17    Q    Judge, when you decided what to do about this case did
18         you reach your own conclusions and act only on those
19         conclusions, or did you act also on the opinion of
20         others?
21    A    I acted on the factual opinion of others in making up my
22         mind what the facts were.  Then I acted.
23    Q    You referred in one of the exhibits to Barbara Graham as
24         an innocent victim?
25    A    That was in my meeting with Mrs. Varner.
```

Hon. George Hoffer                          71

1    Q    Why did you consider Barbara Graham an innocent victim?

2    A.   No matter what version is true, of Mrs. Varner's

3         statement and Gary Graham's statement, Mrs. Graham is in

4         the middle on it.  She loses any way it comes out.

5         Mrs. Varner agreed with me on that.

6    Q    When Mrs. Graham attempted to talk to you, do you

7         recall, did she appear distraught?

8    A.   She talked to me several times and usually she was

9         distraught, yes.  Mrs. Graham, you said?

10   Q    Mrs. Graham, yes.

11   A.   Yes.

12   Q    Did Mrs. Graham indicate to you that she felt

13        Mrs. Varner was a home wrecker?

14   A.   I don't remember those words.  She mostly wanted me to

15        hear the other side of it.

16   Q    Did she indicate any words that were similar to that?

17   A.   I have no recollection of anything like that.

18   Q    In your note you indicate Mrs. Varner did not oppose

19        your statement that Mrs. Graham was an innocent victim?

20   A.   Yes.  That's what I made a note of in my visit with her.

21   Q    As I understand, Judge, there is a salary board in this

22        county?

23   A.   There is.

24   Q    And when you were referring to votes, were you referring

25        to the votes of the salary board?

Hon. George Hoffer                              72

1   A.   I suppose the salary board -- yeah.  Now that you

2        refreshed me, it is the salary board that we have the

3        votes.  I don't have a vote on the budget per se.

4   Q    As I understand, the salary board is the three

5        commissioners and the controller?

6   A.   Three commissioners, controller, and the department

7        head.

8   Q    And the department head would be the row officer

9        involved; is that right?

10  A.   Or the judge with judicial matters.

11  Q    Okay.  So in the situation where a department head feels

12       there's the need for an additional position in his

13       department, that would have to be approved by the salary

14       board; is that correct?

15  A.   Yes.

16  Q    All right.  And in that event, the department head sits

17       as the fifth vote?

18  A.   Yes.

19  Q    And when you feel the need for an additional court

20       position, you sit as the fifth vote on the salary board

21       to determine whether or not that court position should

22       be created?

23  A.   That's my recollection.  Yes.

24  Q    And when the salary for that position is set, you also

25       sit as the fifth vote; is that correct?

Hon. George Hoffer                              73

1   A.    On the pay per se?  I guess, but I'm a little more vague

2         on that.

3   Q     If the salary board consists of five people and there

4         are three commissioners, the commissioners would always

5         have the majority vote on the salary board?

6   A.    Is that a question?

7   Q     Yes.  Three is a majority of five?

8   A.    Obviously, they would.

9   Q     All right.  Other than the commissioners' ability to

10        control the creation of jobs and the salaries set for

11        the jobs, do you control all the other terms and

12        conditions of employment for your court employees?

13  A.    I think so, yes.

14  Q     As a consequence of the allegation of adultery,

15        Mr. Graham has received negative consequences?

16  A.    Negative what?

17  Q     Has received negative consequences in the form of a

18        demotion.  Can you identify any negative consequence

19        Mrs. Varner has received?

20  A.    She's denied everything.  I don't know of any negative

21        consequence towards her.

22  Q     You have imposed no negative consequence?

23  A.    No.  On her, no.

24  Q     Even though she is accused of adultery, you have

25        attempted to accommodate her complaints?

Hon. George Hoffer                      74

1    A.    She has denied everything.

2    Q     I understand that, Judge.  Having denied the

3          allegations, you have still -- let me rephrase it.

4                In your own mind have you reached a conclusion as

5          to whether or not adultery took place?

6    A.    I have no -- I don't have to make that decision, sir,

7          and I have not made it.

8    Q     All right.

9    A.    That will play out in a court of law.

10   Q     All right.  Having left that as an open issue,

11         Mr. Graham has been demoted but nothing has happened to

12         Mrs. Varner?

13   A.    I think I just said that.

14   Q     Right.  And in fact, you have attempted, even though

15         it's an open issue, to accommodate Mrs. Varner with the

16         complaints that she has expressed over the years; is

17         that right?

18   A.    Well, yes, I think so.  We've promoted her.

19   Q     Judge, if you have two probation officers and one is

20         slightly senior to the other, and a junior probation

21         officer is the better qualified employee, which will you

22         consider for promotion?

23   A.    Quality.  Qualifications, absolutely.

24   Q     Within the Cumberland County bench, Judge, does

25         Mrs. Graham have a reputation for truthfulness?

Hon. George Hoffer                              75

1       MS. WILLIAMS:  Did you hear the question, Judge?

2       THE WITNESS:  Yeah, I heard the question.  You're

3       asking me if I know Mrs. Graham's reputation?

4   BY MR. DELLASEGA:

5   Q    For truthfulness.

6   A.   For truthfulness.  While I'm a judge I don't think

7        you're asking a reputation question in a proper fashion,

8        but you're asking it, sir, do I know her reputation.

9   Q    For truthfulness.

10  A.   As far as the cases that she presents in front of me, I

11       think she presents them in a truthful manner.  That's

12       the only way I see her.  She presents Juvenile cases in

13       front of me.

14       MS. WILLIAMS:  Did you understand the question,

15       Judge?

16       Did you get the response you wanted, Paul?

17       MR. THOMAS:  It was clear that he meant Varner, I

18       think.

19       MS. WILLIAMS:  Okay.  But is the record clear?

20  BY MR. DELLASEGA:

21  Q    What I was asking you was with regard to Barbara

22       Graham?

23  A.   Barbara Graham?

24  Q    Yes, not Mrs. Varner.

25  A.   I thought you just asked me about Mrs. Varner.

1    Q    No, no.

2    A.   I didn't hear you correctly, then.

3    Q    Maybe I misspoke.  With regard to Barbara Graham, my

4         question to you is:  Within the bench of Cumberland

5         County, does she have a reputation for truthfulness?

6    A.   I think so, yes.

7    Q    When you met with your staff and told them if necessary

8         you would micromanage the office, and by staff I mean

9         the Juvenile Probation Department, were you referring to

10        anything other than the leadership deficiencies you had

11        identified in these interviews?

12   A.   Leadership, primarily, and the overall tenor of the

13        office and the working relationships.

14   Q    When Judge Sheely handed over the reins of office to you

15        and communicated to you about the Varner-Graham problem,

16        did he tell you whether or not there had been an affair?

17   A.   He told me that Gary confessed to him in front of his

18        wife in his office that there had been an affair.

19        That's what he told me.

20   Q    Did he tell you that he believed there had been an

21        affair?

22   A.   I don't remember whether he believed it or disbelieved

23        it or whether he took a position.

24        MR. DELLASEGA:  That's all.  Thank you, Judge.

25        MR. ADAMS:  I have no questions.

```
 1              MS. BLANCHARD:  I have a couple questions.
 2    BY MS. BLANCHARD:
 3    Q    Judge, my name is Kristin Blanchard and I represent
 4         Gary Graham.  I'll try to speak up, I know I'm all the
 5         way down here at this end.
 6              Did you talk to Gary Graham before you demoted him
 7         about the reasons for the demotion?
 8    A.   No, ma'am.
 9    Q    Were you interested in hearing Gary Graham's version of
10         events prior to his demotion?
11    A.   No, ma'am.
12    Q    Why not?
13    A.   I made up my mind.
14    Q    Based upon what?
15    A.   The report and the interviews with the various POs that
16         I talked to.
17    Q    Did you have any information regarding what Gary
18         Graham's position on everything was?
19    A.   I may have had some in some fashion, I don't know.  But
20         I didn't ask him anything.
21    Q    Did it occur to you at that time that he may have had
22         something to say that would have changed your mind or
23         altered your decision to demote him?
24    A.   Well, ma'am, I know there was a lawsuit going, and I had
25         made up my mind, partially on the sexual allegations but
```

Hon. George Hoffer                         78

1         even more so on the office leadership.  So that was

2         history.

3    Q    And your decision that Gary -- strike that -- your loss

4         of confidence in Gary's ability to manage, I believe

5         those were your words, was based upon the contents of

6         the Deluce report?

7    A.   And my interviews with other people, other POs.

8              MS. BLANCHARD:  That's all I have.

9              MS. WILLIAMS:  Anybody else?

10             MS. WALLET:  I have one question.

11   BY MS. WALLET:

12   Q    Judge, can you hear me from here?

13   A.   Keep your voice up, ma'am.

14   Q    I will.  Since you took office in the first Monday in

15        January of 1998, have you promoted or approved the

16        promotion of any probation officers?

17   A.   Oh, I suppose I have.  I had to get a replacement for

18        Mr. Graham.  I've also fired one person.

19   Q    Okay.  Did you promote Sam Miller?

20   A.   I think I did.

21   Q    Did you promote Denny Drachbar?

22   A.   I think so, I'm not sure.

23   Q    Did you promote Debra Green?

24   A.   I don't remember anymore, ma'am.  I'd have to look at

25        the records.

Hon. George Hoffer                              79

1    Q    Are you aware of anyone who you promoted or you approved

2         for promotion who is not the most senior individual?

3    A.   I don't remember, ma'am.

4              MS. WALLET:  That's all.

5              MS. WILLIAMS:  Thank you very much, Judge.

6              MS. BLANCHARD:  Thank you.

7              (Whereupon, the deposition was concluded at

8         4:14 p.m.)

9                              *   *   *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

80

COMMONWEALTH OF PENNSYLVANIA      )
                                  )  SS.
COUNTY OF DAUPHIN                 )


     I, Emily R. Clark, Reporter and Notary Public in
and for the Commonwealth of Pennsylvania and County of
Dauphin, do hereby certify that the foregoing testimony
was taken before me at the time and place hereinbefore
set forth, and that it is the testimony of:


               HON. GEORGE E. HOFFER


     I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

     I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

     Dated at Harrisburg, Pennsylvania, this 23rd day of
April, 2003.



                         _____
                         Emily R. Clark
                         Reporter - Notary Public




(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)