```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
        Plaintiff,             .   CIVIL ACTION
                                .   NO. 1:CV 01-0725
        vs.                     .
                                .
COMMONWEALTH OF PENNSYLVANIA,   .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
        Defendants.            .
. . . . . . . . . . . . . . . . . .
```

```
        Deposition of:  DENNIS DRACHBAR

        Taken by    :  Defendant

        Date        :  April 28, 2003, 2:58 p.m.

        Before      :  Emily Clark, RMR, Reporter-Notary

        Place       :  Administrative Office of Pennsylvania
                       Courts
                       5034 Ritter Road
                       Mechanicsburg, Pennsylvania
```

```
APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
            For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
            For - Defendant Commonwealth of Pennsylvania
                    Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  PAUL J. DELLASEGA, ESQUIRE
            For - Defendant Cumberland County
```

2

```
 1   APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  DAVID J. MacMAIN, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
     ALSO PRESENT:
 7
          MS. BARBARA E. VARNER
 8
          MR. S. GARETH GRAHAM
 9
          MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                    I N D E X

2                        WITNESS

3    Dennis Drachbar                        Examination

4        By Mr. Dellasega                       4, 33

5        By Ms. Williams                          15

6        By Mr. Adams                          16, 33

7        By Ms. Wallet                         17, 34

8

9

10                       EXHIBITS

11    (None marked)

12

13

14                    *   *   *   *   *

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    STIPULATION

 2              It is hereby stipulated by and between the

 3         respective parties that sealing, certification and

 4         filing are waived; and that all objections except as to

 5         the form of the question are reserved until the time of

 6         trial.

 7

 8              DENNIS DRACHBAR, called as a witness, being

 9         duly sworn, was examined and testified, as follows:

10    BY MR. DELLASEGA:

11    Q.   Mr. Drachbar, my name is Paul Dellasega.  I'm the

12         attorney for the county in the lawsuit brought by

13         Barbara Varner.

14              Have you ever testified previously, sir?

15    A.   No.

16    Q.   Even in court proceedings?

17    A.   Oh.  Yeah, in job related.

18    Q.   Right.  Have you ever been deposed?

19    A.   No.

20    Q.   For some reason if I ask a question you don't

21         understand, will you please tell me you don't

22         understand it?  Then I will repeat it to your

23         satisfaction.

24    A.   Okay.

25    Q.   How long have you been employed in Probation?
```

Drachbar                                                          5

```
 1    A.    With Cumberland County?  Or probation?

 2    Q.    Cumberland County.

 3    A.    Since '84.

 4    Q.    What's your current job title?

 5    A.    Probation officer II.

 6    Q.    How long have you been a PO-II?

 7    A.    I don't know what the date is.

 8    Q.    Were you a PO-II before Juvenile and Adult split?

 9    A.    No.

10    Q.    Do you believe Barbara Varner and Gary Graham had an

11          affair?

12    A.    I don't know of any affair.

13          MR. MacMAIN:  I'm sorry, could you speak up?

14          THE WITNESS:  I said I don't know of anything.

15 BY MR. DELLASEGA:

16    Q.    When did you first meet Mrs. Varner?

17    A.    Oh, whenever she was employed I guess by Cumberland

18          County.

19    Q.    Do you recall her being employed by Children and Youth

20          before coming to Probation?

21    A.    I think I knew she was down there.

22    Q.    Did you know her while she was at CYS?

23    A.    No.  No.

24    Q.    Did you ever hear Mr. Graham speak of Mrs. Varner while

25          she was at CYS?
```

```
 1   A.   No.
 2   Q.   Did you ever see Graham and Varner interact together
 3        before she came to Probation?
 4   A.   No.
 5   Q.   Did you ever hear the phrase Barb 1 and Barb 2?
 6   A.   I have.
 7   Q.   In what context have you heard it?
 8   A.   As far as I think telephone calls that would come in.
 9   Q.   Why would they say Barb 1 and Barb 2 instead of --
10   A.   Well, from what I understood, that when a secretary had
11        a call, I think there was Barb, Barb his wife, there
12        was an another Barb that I believe was a placement
13        representative, and Barb Varner, I guess three
14        different Barbs.  That's all.
15   Q.   Did you ever understand that to have any sexual
16        reference?
17   A.   No.
18   Q.   Before Mrs. Varner raised a complaint against
19        Mr. Graham for sexual harassment, did you ever hear any
20        discussion within the office as to whether or not there
21        was a sexual relationship going on between the two of
22        them?
23   A.   None whatsoever, no.
24   Q.   Before Adult and Juvenile split, did you have occasion
25        to observe the two of them together?
```

Drachbar                                        7

```
 1   A.   No.
 2   Q.   Before the split, did you have an opinion as to whether
 3        they were friends?
 4   A.   No.
 5   Q.   You had no opinion?
 6   A.   No.
 7   Q.   Did you ever observe the tenor of their relationship to
 8        change?
 9   A.   No.
10   Q.   In 1995 before the split and in 1997 when Sam Miller
11        became her supervisor, as far as you observed, Graham
12        and Varner acted together the same way constantly?
13   A.   Are you saying at what point in time?
14   Q.   At any point in time did the tenor of their
15        relationship change the your observation?
16   A.   I'm not aware of anything, no.
17   Q.   So you would never categorize them as friends one day
18        and as enemies or hostile to each other on another day?
19   A.   No.
20   Q.   You've had sexual harassment training with the county?
21   A.   Yes.
22   Q.   On two occasions, I believe?
23   A.   I don't know how many.
24   Q.   Based on the understanding you've acquired in the
25        training they've given you about sexual harassment,
```

```
 1             have you ever observed Mr. Graham to sexually harass
 2             anyone?
 3     A.      I can't even refer back to the training.  You know, I
 4             have no idea what the -- without having something in
 5             front of me spelling out, you know, whatever the sexual
 6             harassment policy would be, I mean, as a general
 7             answer, no, I haven't seen any.
 8     Q.      Okay.  Well, let me ask you this.  After receiving
 9             training do you have any understanding of what sexual
10             harassment is as a consequence of that training?
11     A.      Yeah, I would hope so.
12     Q.      Okay.  And what is your understanding?
13     A.      You can't make inappropriate comments or so forth
14             towards anyone.
15     Q.      Using that understanding, have you ever seen Mr. Graham
16             sexually harass any individual?
17     A.      No.
18     Q.      Specifically, Mrs. Varner?
19     A.      No.
20     Q.      Have you ever observed Graham to yell at Mrs. Varner?
21     A.      No.
22     Q.      To curse at Mrs. Varner?
23     A.      No.
24     Q.      To say anything sexually demeaning to Mrs. Varner?
25     A.      No.
```

Drachbar                                                    9

1    Q.   To give Mrs. Varner arduous or burdensome assignments?

2    A.   No.  Well, again, I'm not -- as far as giving

3         assignments and so forth, I have no knowledge of that.

4         You know, I'm not aware of anything.

5    Q.   Did you observe Graham to treat Mrs. Varner with

6         respect?

7    A.   Yes.

8    Q.   Did he treat her as a friend?

9    A.   I think he treated her as an employee, as far as I

10        could tell.

11   Q.   The same way he treated every other employee?

12   A.   Yeah.

13   Q.   Before Mrs. Varner lodged a complaint regarding

14        Mr. Graham's conduct, did you have any idea there was

15        any problem in that relationship?

16   A.   None.

17   Q.   Had you ever heard Mrs. Varner make a complaint about

18        Graham before --

19   A.   No.

20   Q.   -- she formally filed?

21   A.   No.

22   Q.   Had you ever heard her complain about trips she had,

23        commitment trips she took with Graham?

24   A.   No.

25   Q.   Did Mr. Graham appear to be her mentor?

Drachbar                                    10

```
 1   A.   No.

 2   Q.   Did she have a mentor, do you know?

 3   A.   I'm not aware of it.

 4   Q.   After the charges were filed, did you ever become aware

 5        that Graham had told Judge Sheely that he and

 6        Mrs. Varner had an affair?

 7   A.   Not from Gary, no.

 8   Q.   From anyone?

 9   A.   I think it was office type information, you know.  I

10        don't know where it came from, but.

11   Q.   Scuttlebutt known within the office?

12   A.   Yeah, I think so.

13   Q.   Did you ever hear anybody express an opinion that they

14        thought the affair had occurred?

15   A.   No.

16   Q.   Did you ever hear anybody express an opinion that they

17        thought the affair had not occurred?

18   A.   No.

19   Q.   You never heard it discussed at all?

20   A.   Well, I heard that's what Gary told Judge Sheely, but

21        other than that, nothing.

22   Q.   Using the understanding of sexual harassment that you

23        previously expressed, have you ever seen Mr. Osenkarski

24        sexually harass anyone?

25   A.   No.
```

1    Q.    Have you ever heard him treat any woman rudely?

2    A.    No.

3    Q.    Speak demeaningly of women within the office?

4    A.    No.

5    Q.    Have you ever heard Mr. Osenkarksi discuss intimate

6          details of his own personal sex life within the office?

7    A.    No.

8    Q.    Have you ever heard Mr. Osenkarski talk about affairs

9          he's had?

10   A.    No.

11   Q.    Have you ever heard Mr. Osenkarski express any desire

12         to be sexually involved with anybody in the courthouse?

13   A.    No.

14   Q.    Within the Probation Office have you ever heard

15         four-letter words used, bad languages?

16   A.    Like what?

17   Q.    Like the F word.

18   A.    I've heard that.

19   Q.    Have you heard it from probation officers as well as

20         clients?

21   A.    Both.

22   Q.    Have you heard it from female as well as male probation

23         officers?

24   A.    I can't really recall.  You know, I don't know.  I

25         can't give you a definite answer.

1   Q.   Have you ever heard a female probation officer complain

2        about the use of off-color language within the office?

3   A.   No.

4   Q.   You're a supervisor now?

5   A.   No.

6   Q.   You don't supervise anyone?

7   A.   No.

8   Q.   As a PO-II, what do you do?

9   A.   I have a caseload function.

10  Q.   As to the female probation officers in the department,

11       have you ever heard them engage in sexual banter about

12       men?

13  A.   No.

14  Q.   To complain about their dates or their boyfriends or

15       their ex-husbands?

16  A.   No.

17  Q.   What is your understanding of the present rule in

18       Juvenile Probation regarding seniority?

19  A.   I have no idea.  I don't.

20  Q.   Prior to the split in Probation when Adult and Juvenile

21       were all in one department, did you have an

22       understanding then as to what the seniority rules were?

23  A.   No.

24  Q.   Do you have an understanding now as to whether

25       seniority plays any role in promotions?

```
 1    A.    No.

 2    Q.    Do you have an understanding as to where you are, in

 3          fact, on the Juvenile Probation seniority list?

 4    A.    Not really, no.

 5    Q.    After the split, did Mr. Boyer ever discuss with you

 6          whether the seniority policy should be changed?

 7    A.    I can't recall, no.

 8    Q.    Have you ever heard either Mr. Graham or Mr. Osenkarski

 9          use the phrase peter meter?

10    A.    No.

11    Q.    Use the phrase black bush, referring to a woman's

12          genital area?

13    A.    No.

14    Q.    Use the phrase jeehoobees, referring to a woman's

15          breasts?

16    A.    No.

17    Q.    Have you ever heard anything, even jokingly, about

18          female interns being asked to dance on tabletops?

19    A.    No.

20    Q.    Jokingly about new interns, whether they're male or

21          female, being asked to dance on tabletops?

22    A.    No.

23    Q.    Have you ever heard Mr. Graham say with respect to

24          Barbara Varner that she has either no fucking sense, no

25          fucking training or no fucking ability?
```

```
 1    A.    No.
 2    Q.    Is that atypical of the type of language Mr. Graham
 3          would use?
 4    A.    I've never, you know, I've never heard anything such as
 5          that from Mr. Graham.
 6    Q.    Mr. Graham customarily did not use bad language in the
 7          office?
 8    A.    No.
 9    Q.    When Mrs. Varner filed her complaint of sexual
10          harassment, did Mr. Graham discuss that with you at
11          all?
12    A.    Not really.
13    Q.    Did he ever threaten you if you were to help Barbara
14          Varner in any way?
15    A.    No.
16    Q.    Did he ever indicate to you that he had hostile
17          feelings toward Varner?
18    A.    No.
19    Q.    Have you ever heard Graham say anything that you
20          believe would lead you to be concerned for
21          Mrs. Varner's personal safety?
22    A.    No.
23    Q.    Have you ever heard Mr. Graham indicate with regard to
24          anybody, that if they did something he didn't like, he
25          would see that they were punished?
```

```
 1   A.   No.

 2   Q.   In general, from your observation, was Mr. Graham

 3        polite to the people he supervised?

 4   A.   Yes.

 5   Q.   And in general, then, was he polite to Mrs. Varner

 6        while he was supervising her?

 7   A.   He was the same as, you know, all employees, it's

 8        just...

 9            MR. DELLASEGA:  That's all I have.

10            MR. MacMAIN:  I have no questions.

11 BY MS. WILLIAMS:

12   Q.   Mr. Drachbar, did you ever have occasion to talk with

13        former President Judge Sheely about Barbara Varner?

14   A.   No.

15   Q.   Did you ever have occasion to have a conversation with

16        President Judge Sheely about Gary Graham?

17   A.   No.

18   Q.   Did you ever have occasion to have a conversation with

19        President Judge Hoffer about Barbara Varner?

20   A.   No.

21   Q.   Did you ever have occasion to have a conversation with

22        President Judge Hoffer about Gary Graham?

23   A.   No.

24   Q.   So you've never talked to either of those two president

25        judges about any of the events in this lawsuit?
```

```
 1    A.    None whatsoever.
 2          MS. WILLIAMS:  Thank you.  That's all I have.
 3    BY MR. ADAMS:
 4    Q.    Hi, Mr. Drachbar.  As you already know from the
 5          hallway, my name is Paul Lancaster Adams and I
 6          represent Mr. Osenkarksi.
 7          Have you ever stated to anyone that Gary Graham
 8          drove too fast?
 9    A.    Yeah, I did.
10    Q.    In what context?
11    A.    When I was with him, he drove too fast.  I told him
12          that.  That's all.
13    Q.    Did you think that in driving fast he was being unsafe?
14    A.    Well, I guess there's always that possibility.
15    Q.    How often would you ride with Gary Graham while he was
16          driving fast?
17    A.    How often?
18    Q.    Yes.
19    A.    Oh, I have no idea.
20    Q.    Would you say it was a dozen times, half dozen times?
21          One or two times?  In your employment together.
22    A.    What, are you giving me choices there or?
23    Q.    Well, what do you think is too fast, driving speed is
24          too fast?
25    A.    Anything over the speed limit.
```

```
 1   Q.    So if Mr. Graham was driving and you're riding with him
 2         and he was going over the speed limit, it was too fast?
 3   A.    Right.
 4   Q.    So hypothetically, if the speed limit was 55 miles per
 5         hour, 60 miles per hour would be too fast, in your
 6         opinion; is that correct?
 7   A.    What's that?
 8   Q.    If the speed limit for a territory where on a road
 9         while you're driving is 55 miles per hour and somebody
10         is driving 60 miles per hour, then that would be too
11         fast, in your opinion; is that correct?
12   A.    Yes.  Yes, that's correct.
13             MR. ADAMS:  I think that's all I have for you.
14   BY MS. WALLET:
15   Q.    Mr. Drachbar, my name is Debra Wallet.  I'm the
16         attorney for Barbara Varner in this matter.
17             Did anyone talk to you before today about your
18         testimony today?
19   A.    Not about my testimony, no.
20   Q.    Did someone talk about this case before today?
21   A.    In what context?
22   Q.    Well, did somebody come to you and say:  I'm
23         investigating something and what do you know about
24         this?
25   A.    No.  No, never.
```

Drachbar                                        18

```
 1   Q.   Did you have any discussions with Mr. Deluce?
 2   A.   No.
 3   Q.   Did you have any discussions with anyone who
 4        represented themselves as being from the EEOC?
 5   A.   No.
 6   Q.   Did you talk to anybody who has been deposed in this
 7        matter previously?
 8   A.   Sam, out there in the waiting room, yeah.
 9   Q.   Anybody else?
10   A.   No.
11   Q.   Did you talk to Bill Brandt?
12   A.   Bill Brandt, I'll say this, that I didn't talk to him,
13        I didn't go to him or anything.  He's talked to me.
14   Q.   And did you ask him what this proceeding would be like?
15   A.   No.  I didn't ask him, no.
16   Q.   What did he tell you?
17   A.   He just said that he was deposed, and that was
18        basically it.
19   Q.   Sir, are you fearful of testifying today for any
20        reason?
21   A.   No.
22   Q.   Do you fear any kind of retaliation against you as far
23        as future promotions or anything like that?
24   A.   No.
25   Q.   Are you reluctant to testify today?
```

1    A.    No.  Reluctant in the sense of, you know, taking time

2          and coming down here, but other than that.

3    Q.    Is there any reason why you could not answer all of the

4          attorneys' questions here today completely and

5          truthfully?

6    A.    In what manner?

7    Q.    Well, do you understand about answering truthfully?

8    A.    Yes.

9    Q.    And is there any reason why you could not do that

10         today?

11   A.    I answered his questions truthfully.

12   Q.    Is there any reason why you couldn't be complete in

13         your answers today?

14   A.    I answered his questions.

15   Q.    Okay.  Mr. Drachbar, did you have any conversations

16         with Darby Christlieb about the relationship between

17         Gary Graham and his sister?

18   A.    No.  Whose sister?

19   Q.    Gary Graham's sister?

20   A.    No.

21   Q.    Mr. Drachbar, we had the deposition of Mr. Christlieb

22         earlier today, and Mr. Christlieb told us that you had

23         talked to him about what you knew regarding Gary

24         Graham's mother's estate.

25   A.    No, I don't recall that.

Drachbar                                         20

```
 1   Q.   Did you have any information about Gary Graham's
 2        mother's estate?
 3   A.   No.
 4   Q.   So if Mr. Christlieb said that you told him that, that
 5        was a lie?
 6   A.   I did not -- I don't recall saying anything to
 7        Mr. Christlieb.
 8   Q.   Do you know Gary Graham?
 9   A.   Yes.
10   Q.   Do you know him from outside of work?
11   A.   Generally.  It was a work-related relationship.
12   Q.   Have you seen him outside of work?
13   A.   What was that?
14   Q.   Have you seen him on social occasions outside of work?
15   A.   Yes.
16   Q.   And what would some of those occasions be?
17   A.   I'm trying to think.  I really can't recall the, you
18        know, what exactly it was, but.
19   Q.   Well, were you at a party with him?
20   A.   Could have been.  I'm really not sure.
21   Q.   Did you socialize with any of the probation officers,
22        including Mr. Graham, in activities after work?
23   A.   No.  No.
24   Q.   Have you ever been to Mr. Graham's home?
25   A.   Yes.
```

```
 1    Q.    On what occasions were you at his home?
 2    A.    For what purpose?  Oh, probably, you know, he wanted to
 3          show me something, you know.  And I have never been to
 4          Mr. Graham's home for a social occasion, but I've been
 5          to his home.
 6    Q.    On more than one occasion?
 7    A.    Yes.
 8    Q.    Several?
 9    A.    I would say so.
10    Q.    How did you come to be employed at the Cumberland
11          County Probation Office?
12    A.    Applied for a job, was interviewed by Judge Sheely, and
13          was hired.
14    Q.    And did you have prior experience in probation officer
15          work?
16    A.    Yes.
17    Q.    Where was that, sir?
18    A.    Franklin County Probation.
19    Q.    How long did you work there?
20    A.    Approximately four years.
21    Q.    Did you have any other probation officer experience
22          prior to Cumberland County?
23    A.    No.
24    Q.    Did you have another profession or occupation before
25          you worked in Franklin County?
```

Drachbar                                              22

```
 1    A.    No.

 2    Q.    So you came out of school, went to work for Franklin

 3          County, then came to work for Cumberland County?

 4    A.    Yes.

 5    Q.    Did Gary Graham play any role in your being hired in

 6          the Cumberland County Probation Office?

 7    A.    No.

 8    Q.    To the best of your knowledge, did you know anybody in

 9          the Cumberland County Probation Office prior to your

10          applying for employment at Cumberland County?

11    A.    No.  The only one that I knew is that Joe on occasions

12          would come to Franklin County on business, and I would

13          talk to Joe.  You know, of course, I just knew him from

14          that relationship work-wise.  And other than that, I

15          didn't know anyone.

16    Q.    When you first came to work in Cumberland County, did

17          you always work in Juvenile Probation?

18    A.    No.

19    Q.    Did you work on the Adult side?

20    A.    We were one department at the time, I believe, when I

21          first came.  It was somewhat of a 50/50 split between

22          Adult and Juvenile.

23    Q.    And after the split, were you given a choice as to

24          which office you would work in?

25    A.    No.  Before the split I believe it was Joe wanted two
```

```
 1          people to be intensive probation officers to try to

 2          alleviate placements of kids, and Joe approached me

 3          about being an intensive officer.

 4    Q.    And that would be only on the Juvenile side?

 5    A.    Right.  Right.  Although at the time, the office was

 6          functioning as both Juvenile and Adult.  There was no

 7          split.

 8    Q.    Is that what you do now?

 9    A.    Yes.

10    Q.    Do you have much interaction with the other probation

11          officers on the Juvenile side?

12    A.    Just normal day-to-day interaction.

13    Q.    Where is your office presently?

14    A.    In the Juvenile Probation Office, third floor.

15    Q.    What part?

16    A.    The main office.

17    Q.    How long have you been there?

18    A.    I was in one office and then Ken retired, and moved

19          into another office.  It's just been a number of years.

20    Q.    And that would be Ken Bolze?

21    A.    Right.

22    Q.    So you've been in the same office most of the time

23          since Ken Bolze retired?

24    A.    The actual physical office?

25    Q.    Yes.
```

```
 1    A.    Yes.

 2    Q.    And that's on the third floor?

 3    A.    Yes.

 4    Q.    Do you participate in some of the office banter that

 5          takes place, or do you just stay in your office?

 6    A.    I keep to myself pretty much.

 7    Q.    Were you aware of the term cunt club?

 8    A.    I was aware of it after I believe there was a complaint

 9          made, but not before, no.

10    Q.    And what did you know about that?

11    A.    Just that, really, just that term.  That's what I've

12          heard.  Other than knowing anything about it, I don't

13          know anything about it.

14    Q.    Well, were you aware that someone had made a complaint

15          about the use of that term?

16    A.    Yes.

17    Q.    Who made the --

18    A.    After the complaint was made.

19    Q.    Okay.

20    A.    Um-hum.

21    Q.    Did you know who made the complaint?

22    A.    I believe it was Kerry.

23    Q.    What else did you know about that complaint?

24    A.    Other than that, you know, beyond that, I don't know of

25          anything about the complaint.
```

1    Q.    Did anyone ask you whether you had heard that term?

2    A.    I don't believe so, no.

3    Q.    Did anyone ask you in or about that time, the time of

4          the bringing of the complaint regarding cunt club, did

5          anyone ask you whether you had observed any sexual

6          harassment?

7    A.    It's been so long, you know, there's a possibility that

8          maybe Ken came around and inquired to people, but I

9          don't recall him doing that.  He might have but, you

10         know, I can't say definitely, yes, Ken came around and

11         inquired during what he was investigating.  I don't

12         know.  I can't remember that.

13   Q.    Did anyone come to you and say:  I'm investigating this

14         issue of how to calculate seniority and I'd like to ask

15         you what your opinion is?

16   A.    Again, I can't recall anyone coming to me and asking,

17         you know, my opinion on that.  I can't say, you know,

18         if someone like Ken or Joe or whoever, I can't remember

19         that, no.

20   Q.    Did you ever offer your opinion with regard to the

21         seniority issue?

22   A.    I can't recall it.  I don't think I did.

23   Q.    Do you have an opinion today as to how seniority should

24         be calculated?

25   A.    I don't.  No.  I don't, you know, know what the issues

```
 1          are.  I don't know.
 2    Q.    Did you ever tell Barbara Varner that you thought she
 3          should be careful with regard to her interactions with
 4          Gary Graham?
 5    A.    I can't recall ever saying that, no.
 6    Q.    Did you ever warn her that perhaps Mr. Graham might do
 7          something to her?
 8    A.    I can't say that I -- I don't recall that I ever said
 9          that to her, no.
10    Q.    Did you ever have a discussion with Ms. Varner about
11          her relationship with Mr. Graham?
12    A.    Me?
13    Q.    Yes.
14    A.    I'm -- again, it's been so long ago.  Perhaps.  I can't
15          definitely say yes, I can't definitely say no.
16          Perhaps.
17    Q.    You don't recall any discussions with her about
18          anything involving this case?
19    A.    Well, just general topic type things, I guess.  You
20          know, I can't specify what they were.
21    Q.    Would she come to you or did you go to her?
22    A.    I really don't know.  I think it was just more like,
23          you know, an office type -- I don't think anyone, you
24          know, seeked one another out.
25    Q.    Sir, do you think your best strategy with regard to
```

1           this case is just to not remember anything?

2                   MR. ADAMS:  Objection to the form.

3                   THE WITNESS:  No.

4                   MR. ADAMS:  It's a little harassing, don't you

5           think?

6    BY MS. WALLET:

7    Q.     Did you understand my question?

8                   THE REPORTER:  I took a no.

9                   THE WITNESS:  I'm just saying, you know, what I

10          know.  That's all.

11   BY MS. WALLET:

12   Q.     Did someone suggest to you that your best strategy

13          might be not to remember anything?

14   A.     No.

15   Q.     Do you understand that there is likely to be a trial of

16          this case and that you will likely be subpoenaed for

17          that trial?

18   A.     I'm not aware of that, no.

19   Q.     No one told you that there might be a trial here?

20   A.     I guess you take it for granted that if the issues,

21          whatever they may be, cannot be resolved, there's

22          always that possibility.  But no one has come to me and

23          has said, you know, there's going to be a trial and so

24          forth, no.

25   Q.     Did anyone explain to you why you were called for this

```
 1        deposition today?
 2   A.   No.  No.
 3   Q.   Do you understand that you're being asked these
 4        questions to determine what you know so that questions
 5        can be asked of you at trial?
 6   A.   I really haven't thought about that, no.
 7   Q.   Do you know anything about Gary Graham's performance
 8        evaluation being changed?
 9   A.   No, I don't.
10   Q.   Did you ever tell anyone that you knew something about
11        that?
12   A.   I don't believe.  No.
13   Q.   Were you aware of any instance where anyone's
14        performance evaluation was changed as a result of that
15        person complaining?
16   A.   I do not know that, no.
17   Q.   Did you ever hear anyone say that Gary Graham punishes
18        people who do not side with him?
19   A.   Anyone?  I can't think of anyone.
20   Q.   Do you believe that Gary Graham punishes people who
21        don't side with him?
22   A.   I'm not aware of that, no.
23   Q.   Do you believe that, sir?
24   A.   No.
25   Q.   Do you believe that Mr. Osenkarski may punish someone
```

```
 1            who does not side with him?

 2     A.     No.

 3     Q.     Have you ever heard any sexual jokes in the office?

 4     A.     If I did, I wouldn't know what they -- I mean, I

 5            couldn't tell you what they were.

 6     Q.     Okay.  My question is:  Did you ever hear any?

 7     A.     I'm trying to think.  I probably did.  I mean, there's

 8            that possibility.  I mean, I can't specify what it was,

 9            but there's that possibility.

10     Q.     Did you ever hear Gary Graham use the F word?

11     A.     I have.

12     Q.     Did he direct it at anyone?

13     A.     No, I don't -- I can't recall that he directed it at

14            anyone, no.

15     Q.     Did you ever hear Mr. Osenkarski use the F word?

16     A.     Yes.

17     Q.     And do you know whether he directed it at anyone?

18     A.     He did not direct it at anyone, no.

19     Q.     And what do you recall about how this word came into

20            conversation in an office?

21     A.     Again, I can't recall the details on it.  You know,

22            maybe as an example just, you know, looking at a

23            referral or something that came in or, you know,

24            referring to it as such.  Something, you know, possibly

25            like that.  But you know, I can't specify in what
```

```
 1              context, you know.

 2      Q.      Sir, when you were made a PO-II did someone recommend

 3              you for that promotion?

 4      A.      I guess Joe did.  But you know, yeah, I would think

 5              that Joe did, with the approval of the president judge.

 6      Q.      And at the time you were made a PO-II, was there anyone

 7              less senior than you who was not made a PO-II?

 8      A.      As far as having the amount of time in the office?

 9      Q.      Correct.

10      A.      How far back does that go?

11      Q.      Well, I'm not sure, because you aren't sure when you

12              were made a PO-II.

13      A.      Yeah.  At the time.  I don't think so, as far as having

14              longevity there.

15      Q.      Were you ever a senior probation officer?

16      A.      Yes.

17      Q.      Do you recall when you were made a senior PO?

18      A.      I don't know the year or date.  I really don't know.

19      Q.      You were made a senior PO before you became a PO-II?

20      A.      Yes.

21      Q.      Okay.  Do you recall how you became a senior PO?  Did

22              someone recommend you for that?

23      A.      From what I recall, I think the judge approved senior

24              PO based on years of service and education, I believe.

25      Q.      Do you recall whether someone recommended you to the
```

1           judge for the senior PO position?

2    A.     I think there was a, from what I can recall, there was

3           a group of people that got senior PO, so it just wasn't

4           me.  I think it was a new category created by the

5           judge.

6    Q.     And do you know who was in that group?

7    A.     Not without a list, no.

8    Q.     You don't recall who was promoted at the same time as

9           you to senior PO?

10   A.     Not without a list in front of me, I don't know.

11   Q.     Did Mr. Graham ever call you at home?

12   A.     Work related, yes.

13   Q.     What reasons did he call you at home?

14   A.     About work, about cases.

15   Q.     Would this be in the nature of an assignment of some

16          sort?

17   A.     I believe just information gathering, or if they had to

18          make a transport or something like that, making

19          arrangements.

20   Q.     Did Mr. Graham ever call you at home and talk to you

21          about Barbara Varner?

22   A.     No.

23   Q.     Did Mr. Graham ever talk to you about Barbara Varner?

24   A.     He did right after I guess this whole thing unfolded,

25          you know, just in general terms.

Drachbar                                                    32

```
 1   Q.   And what did he say to you about Barbara Varner?
 2   A.   He just felt that it wasn't, you know -- I don't know
 3        the exact words, but it wasn't fair and that he's not
 4        involved in, you know, whatever the allegations were
 5        and so forth, or are.  Just like that.
 6   Q.   Was Mr. Graham angry at the time?
 7   A.   No.  No.
 8   Q.   Is Mr. Graham angry at Barbara Varner?
 9   A.   I have no knowledge of that.
10   Q.   Does your office have -- and when I say your office I'm
11        speaking of Juvenile Probation, now.
12   A.   Okay.
13   Q.   Does your office have people who are loyal to
14        Mr. Graham and people who are loyal to Ms. Varner?
15   A.   I don't know of anyone that you would say that, no.
16   Q.   Is Mr. Boyer loyal to Mr. Graham?
17   A.   I do not know.
18   Q.   Are you planning to take any vacations between now and
19        December that you would be unavailable for trial?
20   A.   I'd have to ask my wife.
21   Q.   Do you have any planned vacations currently?
22   A.   No.
23            MS. WALLET:  That's all the questions I have.
24        Thank you.
25            THE WITNESS:  Okay.  Thank you.
```

```
 1   BY MR. DELLASEGA:

 2   Q.   I have a couple more, sir.

 3   A.   Sure.

 4   Q.   In the last four years have you spoken with Gary Graham

 5        about any matter of any type?

 6   A.   No.

 7   Q.   Is there any reason today why you would slant your

 8        testimony to help Mr. Graham?

 9   A.   No.

10   Q.   Who is your current supervisor?

11   A.   I report directly to Mr. Miller.

12   Q.   Sam Miller?

13   A.   Yes.

14   Q.   Was Gary Graham at one time your supervisor?

15   A.   At one time, yes.

16   Q.   When he was your supervisor, did you think he was a

17        good supervisor?

18   A.   He was fine with me.

19   Q.   You think you were treated fairly?

20   A.   Yeah.

21   Q.   Do you think that way now with regard to Mr. Miller?

22   A.   Yes.

23             MR. DELLASEGA:  That's all.

24             MR. ADAMS:  I have a couple.

25   BY MR. ADAMS:
```

```
 1    Q.    Mr. Drachbar, did you ever tell Barbara Varner that
 2          Tom Boyer hates her?
 3    A.    No.
 4    Q.    And did you ever tell Ms. Varner that Tom Boyer said to
 5          you he would do anything he could do to get rid of her?
 6    A.    No.
 7    Q.    Meaning out of the office?
 8    A.    No.
 9              MR. ADAMS:  Thank you very much.
10              MS. WILLIAMS:  Is that it?
11  BY MS. WALLET:
12    Q.    Mr. Drachbar, were you aware that Judge Hoffer had
13          called certain probation officers up to his office to
14          talk about this matter?  This matter meaning the
15          allegations between Ms. Varner and Mr. Graham.
16    A.    Was -- no.  No.
17    Q.    You didn't know that at all?
18    A.    I did not know that Judge Hoffer had in terms that you
19          say, called up probation officers to talk about
20          whatever, no.
21    Q.    Were you aware that Judge Hoffer had notes of his
22          discussions with certain probation officers regarding
23          the allegations between Ms. Varner and Mr. Graham?
24    A.    No.
25    Q.    Did you know that Judge Hoffer wrote that you were a
```

1          friend of Graham, in his notes?

2   A.     No.  I'm not aware of that note.

3   Q.     Do you consider yourself a friend of Graham?

4   A.     No.

5               MR. MacMAIN:  Currently?

6               MS. WALLET:  Currently.

7               THE WITNESS:  No.

8   BY MS. WALLET:

9   Q.     Do you know any reason why Judge Hoffer would indicate

10         that you were a friend of Graham in his notes?

11  A.     No idea.

12              MS. WALLET:  That's all I have.

13              MR. DELLASEGA:  Nothing.

14              MR. ADAMS:  Nothing.

15              MS. WILLIAMS:  Thank you very much.

16              MR. MacMAIN:  No questions, thank you.

17              MR. DELLASEGA:  She's going to type up a

18         transcript of your testimony.  You are allowed, if you

19         wish, to review that transcript and to make corrections

20         as to any typographical errors or phonetic errors she

21         may have.  You are also allowed to waive that right, if

22         you like.  She's going to need to know.

23              THE WITNESS:  What's standard for that?

24              MR. DELLASEGA:  In this case most people will

25         review it.

1            THE WITNESS:  Okay, that's fine.

2            (Whereupon, the deposition was concluded at

3       3:47 p.m.)

4                              *   *   *   *   *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
COMMONWEALTH OF PENNSYLVANIA      )
                                  )  SS.
COUNTY OF DAUPHIN                 )
```

I, Emily R. Clark, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Dauphin, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

DENNIS DRACHBAR

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Harrisburg, Pennsylvania, this 21st day of May, 2003.


_____
Emily R. Clark
Reporter - Notary Public


(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)