```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,             .
        Plaintiff,             .    CIVIL ACTION
                               .    NO. 1:CV 01-0725
        vs.                    .
                               .
COMMONWEALTH OF PENNSYLVANIA,  .    (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,       .
CUMBERLAND COUNTY; CUMBERLAND  .
COUNTY; S. GARETH GRAHAM,      .
Individually, and JOSEPH       .
OSENKARSKI, individually,      .
        Defendants.            .
. . . . . . . . . . . . . . . . . .
```

```
        Deposition of:  SAMUEL MILLER

        Taken by     :  Defendant

        Date         :  April 28, 2003, 12:11 p.m.

        Before       :  Emily Clark, RMR, Reporter-Notary

        Place        :  Administrative Office of Pennsylvania
                        Courts
                        5034 Ritter Road
                        Mechanicsburg, Pennsylvania
```

```
APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
            Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY:  PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County
```

2

```
 1   APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  DAVID J. MacMAIN, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
     ALSO PRESENT:
 7
          MS. BARBARA E. VARNER
 8
          MR. S. GARETH GRAHAM
 9
          MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                      I N D E X

 2                      WITNESS

 3   Samuel Miller                        Examination

 4        By Mr. Dellasega                    4, 90

 5        By Mr. MacMain                     34, 96

 6        By Mr. Adams                          39

 7        By Ms. Williams                    42, 97

 8        By Ms. Wallet                      46, 98

 9

10

11

12                      EXHIBITS

13   (None marked)

14

15

16                   *   *   *   *   *

17

18

19

20

21

22

23

24

25
```

```
 1                     STIPULATION

 2              It is hereby stipulated by and between the

 3          respective parties that sealing, certification and

 4          filing are waived; and that all objections except as to

 5          the form of the question are reserved until the time of

 6          trial.

 7

 8              SAMUEL MILLER, called as a witness, being

 9          duly sworn, was examined and testified, as follows:

10   BY MR. DELLASEGA:

11   Q.   Mr. Miller, my name is Paul Dellasega.  I'm an

12        attorney for Cumberland County in the action brought by

13        Barbara Varner against the county and others.

14            Have you ever testified before, sir?

15   A.   Yeah.  Not in this, but yeah, I was a police officer.

16   Q.   Okay.  When were you hired by the county or by the

17        court -- that's a loaded question.

18            When did you become a probation officer?

19   A.   With Cumberland County, on December 15th, '83.

20   Q.   When did you first meet Mrs. Varner?

21   A.   Whenever she was hired, I think.  Barb used to work for

22        Children and Youth.  It's possible I met her, I

23        probably met her when she was working for Children and

24        Youth.  I can't say that I specifically recollect.  I

25        know I certainly met her when she came to work for us.
```

```
 1   Q.   During the period of time when she worked for Children

 2        and Youth, did you ever see her interact with Gary

 3        Graham?

 4   A.   You know, I probably did.  I mean, I know they knew

 5        each other.

 6   Q.   How do you know that?

 7   A.   Just I think they were friends, you know.  I can't

 8        remember a specific incident where I could say, well, I

 9        saw Gary and Barb talking, but I think they knew each

10        other.

11   Q.   Okay.  At any point did Mr. Graham ever disclose to

12        you, other than with regard to Mrs. Varner, that he's

13        had a sexual affair?

14   A.   Did Mr. Graham ever tell me that?

15   Q.   Yes.

16   A.   No.

17   Q.   With anybody.

18             MS. WALLET:  I'm not sure your question is clear,

19        Paul.

20   BY MR. DELLASEGA:

21   Q.   Has he ever told you:  I've had an affair with a

22        woman?

23   A.   I don't think so.  I mean, I don't -- I don't think so.

24   Q.   Has he ever discussed with you wanting to?

25   A.   Not like a serious conversation.  You know, sometimes
```

```
 1              we would, like, joke about you, like, you know how guys
 2              are in the office.  There was times that him and I
 3              might have said, wow, isn't she nice looking, or
 4              something like that.  But I never got the impression in
 5              a serious way that Gary was having an affair with
 6              anybody or wanted to.
 7      Q.      Within the office, have you ever heard the phraseology
 8              Barb 1 and Barb 2 used?
 9      A.      Yeah.  I remember -- I don't have specific recollection
10              as to when it was used, but I know that we've talked
11              about it and I know there was a point in time Barb
12              Laburski was a representative from George Junior
13              Republic that was friends of all of us, and, of course,
14              Gary's wife's named Barb, and Barb Varner worked in the
15              office.  So I remember that there was times where
16              certain people would joke about, you know, who's
17              calling, Barb 1, Barb 2, Barb 3, or something like
18              that, you know.  But I don't remember the specifics,
19              but I do remember it was brought up sometimes.
20      Q.      You specifically remember a Barb 3, then, to go with
21              Barb 1 and Barb 2?
22      A.      I think so.  I mean, I don't know if I could really
23              swear to, well, I remember on this date that Barb 3 was
24              joked about.  But that general -- what's the right way
25              to say it -- that general situation where the Barb 1/
```

Miller                                    7

```
 1          Barb 2 thing was joked about, or the Barb 3, I think it
 2          happened.  I can't swear to a specific time or date,
 3          but I think it happened.
 4     Q.   When the Barb 1/Barb 2 thing was joked about, was it
 5          ever joked about in the context of something sexual?
 6     A.   No, not that I recollect.  No.
 7     Q.   Prior to Mr. Graham's transfer, were you aware of the
 8          fact that he had at one point confessed to Judge Sheely
 9          the existence of a sexual relationship between himself
10          and Mrs. Varner?
11     A.   I have to -- I don't think Gary ever told me that
12          personally, you know, that he had talked to Judge
13          Sheely about it.  I might be wrong on that.  But I
14          remember hearing it from other people, you know, that
15          Gary had gone up and talked to Judge Sheely with his
16          attorney.  You know, he had an attorney at the time.
17     Q.   Before you ever heard about it in the context of his
18          confession, was there ever any discussion or debate
19          within the office as to whether there was anything
20          going on between Graham and Varner?
21     A.   No.  I'm not aware of anything.  Maybe other people.
22          Nothing that I was ever a part of.
23     Q.   You never heard any speculation that the two of them
24          were sexually involved?
25     A.   No.  I can tell you, I was surprised when I heard that.
```

Miller                                    8

```
 1    Q.    Directing your attention to the period before Probation
 2          split into two separate departments, did you ever
 3          observe Graham to yell at Mrs. Varner?  Prior to the
 4          split.
 5    A.    Yeah.  I can't say that I specifically remember
 6          observing an instance where Gary was yelling at Barb.
 7          I do have a memory that at one point in time Gary being
 8          upset, where he would come into our office and he was
 9          agitated.  And I think one time I went into his office.
10          I don't remember the specifics, but the general gist of
11          the situation was I think Gary was frustrated or upset,
12          at least that's what I perceived.  And it was -- I
13          said, what's going on?  And he said that this is, I'm
14          paraphrasing, I really don't remember the specifics,
15          but he said that he was frustrated that she had brought
16          some work to him that he was trying to help her with,
17          correct, change, and that he felt she was being
18          defensive and not responding to what he wanted her to
19          do, and that was frustrating him.  And he was, I call
20          it work product, he was frustrated with her work
21          product.  And I remember saying, you know, relax,
22          because he seemed upset to me.  I says, relax, and you
23          guys are friends, you know, work it out.
24    Q.    Let me ask you this.  Was there any point in time where
25          from your observation Graham and Varner were good
```

```
 1           personal friends?

 2     A.    I thought they were friends, yeah.

 3     Q.    Okay.  Was there a point in time where that changed,

 4           your observation?

 5     A.    Yeah.  I mean, obviously.  I can't remember the time

 6           scenario, but right before we became aware of the, I

 7           think it was right before, right before the lawsuit was

 8           filed, you know, we had gone out to Reno as a group and

 9           we came back and then I'm hearing all this secondhand

10           and stuff, but then this lawsuit came down.  Well, I

11           thought they went -- I can't remember the sequence but

12           I thought, my, that they went from being friends to

13           having a strained relationship.

14     Q.    Okay.  That transition from being friends to having a

15           strained relationship, to your recollection was there

16           an abrupt shift or a gradual shift?

17     A.    I'm not sure if I could -- I guess it was over a couple

18           months.  I'm not really sure.  I wasn't real close to

19           it.  I guess considering how long they knew each other,

20           it was relatively abrupt, but I'm not really sure if

21           that's a fair characterization or not.

22     Q.    All right.  Before the relationship became strained,

23           did you ever observe Graham to yell at Varner?

24     A.    It's possible it happened.  I can't remember a

25           specific.
```

```
 1              I'll say this, you know, there was times Gary and
 2          I yelled at each other, you know what I'm saying, where
 3          we would get mad at each other.  Might have been my
 4          fault, might have been his fault.  So it wouldn't have
 5          been unusual in our office at that time to have a loud
 6          exchange.  It wasn't like anything we ever -- that I
 7          ever felt we permanently held a grudge over.  So it's
 8          possible it happened between him and Barb.  I can't
 9          specifically recollect a day that it happened or
10          anything like that.
11   Q.     When you say the relationship became strained, describe
12          their interaction before it became strained as compared
13          with their interaction after it became strained.
14   A.     Well, they were friendlier, they got along better.  I
15          mean, there wasn't -- I guess maybe the most accurate
16          way for me to describe it is that my saying that it
17          became strained was that when I became aware that he
18          was frustrated and upset, and I don't know if
19          uncomfortable is the right word, but didn't like her
20          work product, you know.  Then I realized that he wasn't
21          all that pleased with her work performance.  You know,
22          at least I suspected that.
23              But I thought it was something they would work
24          out, you know.  I didn't think it was a real big deal.
25          I mean, it wasn't unusual in our office at that time
```

Miller                                    11

1          for two people to maybe have a spat over something

2          and/or maybe they -- we had a lot of -- we work in a

3          pseudo science.  There's a lot of, this is just my

4          opinion, there's a lot of different ways to accomplish

5          maybe the same end result.  We don't always have black

6          and white answers to the problems we deal with.  So it

7          wasn't unusual for people to have disagreements about

8          how to accomplish something, sometimes professionally

9          argue it out.  Sometimes somebody would lose their

10         temper and say, you know, you're a bozo, you shouldn't

11         be doing it that way, you know.  That wasn't all that

12         unusual.  It was kind of -- it's kind of the nature of

13         the job, high stress.  A lot of negatives go along with

14         the job in terms of people criticizing us.  So there

15         were those kind of interactions.

16              I can't say that, like I said, I can't

17         specifically remember what days or when they happened

18         or between all of it, I mean, I just felt -- I felt

19         like it was that kind of environment from time to time.

20    Q.   Okay.  After the relationship became strained, did you

21         observe Mr. Graham treat Mrs. Varner worse than he

22         treated any other employee in the office?

23    A.   I did not see specific instances of that occurring.  I

24         mean, obviously I know that Barb feels that way, that

25         things changed.  But I can't -- maybe if someone can

1      refresh my memory or prompt me.  I can't pull out

2      honestly from my memory where I recollected any

3      specific time that because of him being upset with her

4      that something negative happened.

5  Q.  All right.

6  A.  I'm not aware of it.

7  Q.  He would from time to time be upset with other

8      employees?

9  A.  Oh, yeah.  There was times him and I would get upset

10      with each other, but I didn't end up with -- I mean,

11      I've thought about this because I figured you'd ask it.

12      I didn't end up with 15 fouls on my test the next day

13      because him and I cursed and swore at each other.  I

14      mean, it was one of those things we kind of -- we were

15      probably pissed off for a day or two and then we -- I'd

16      forgot about it and I think he did, too.  At least it

17      wasn't evident to me that I got some bad action against

18      me because of it.

19  Q.  So after the relationship became strained until he was

20      transferred, by your observation his relationship with

21      Mrs. Varner wasn't significantly different from that

22      with many other employees in the office?

23  A.  I didn't see it.  I mean, I remember other people --

24  Q.  That's what I'm asking.

25  A.  Yeah, you know, I remember other people talking that.

Miller                              13

1          It's real hard to remember exactly all the time frames.

2          I know that when the lawsuit was filed obviously his

3          relationship with Mrs. Varner was drastically

4          different.  Gary was tense.  The whole office was

5          tense, you know what I'm saying.  It wasn't a good

6          situation.

7               It's real hard for me to remember everything that

8          happened before and after.  Do you know what I'm

9          saying?  I mean, it was definitely -- it was not -- I'm

10         not saying anything necessarily inappropriate happened,

11         but, you know, he wasn't happy for being accused of

12         having a suit filed against him, and that was apparent

13         to me.

14              As far as whether or not I saw specific incidents

15         before the suit was filed, I really -- I can't say that

16         I did.  I mean, I just don't remember.  I think that

17         there was times they might have argued with each other,

18         but boy, I just can't remember the specific instance.

19         If you bring it to my memory, I might be able to.

20   Q.    You've been educated about the law on sexual

21         harassment?

22   A.    Yeah.  Well, the county, you know, we didn't really get

23         much of that kind of training before this happened.

24         But in the last six years they've sent us to a lot of

25         training.  And it's, like, Joe passes out information

```
 1          to us, you know, like, bulletins indicating case laws,
 2          you know, and things like that.  Although I got to be
 3          honest with you, it still confuses me, you know.
 4          There's a lot of different things to it.
 5   Q.     Utilizing what you've learned about sexual harassment,
 6          can you tell me whether, given your own understanding
 7          of sexual harassment, you ever personally observed
 8          Graham sexually harass Mrs. Varner?
 9   A.     Well, I really don't feel qualified to answer that.
10          I'm -- I feel so uncertain about what constitutes a
11          hostile work environment and what doesn't, that I'm
12          telling you honestly I'm confused about those kind of
13          things.
14              I know one thing, we are different in our office
15          now than we were eight, 10 years ago.  I don't want to
16          call it running scared or anything, but you really pay
17          attention to this stuff, you know.  And you pay
18          attention to things that we might not be sensitive to
19          or upset, like a conversation that Gary and I had might
20          not offend him or I, but if someone overheard it it
21          might them, you know.  We really didn't think of stuff
22          like that eight years ago.
23              Now, as an administrator, as a new administrator
24          who is still learning how to deal with it, it's in my,
25          you know, I think of it all the time.  But I don't feel
```

1           very comfortable picking out a specific instance and

2           saying, yeah, that was sexual harassment.  I think in

3           our office you might be able to make a case because we

4           weren't educated because -- I don't know why, how I

5           would characterize it.  Our office might have been in a

6           situation where we all could have acted a little

7           better, you know, been a little more informed about it,

8           you know, things like that, you know.

9       Q.  But to be specific, you never heard Graham ask

10          Mrs. Varner for any type of sexual favor?

11      A.  Oh, no.  No, I never -- I wasn't aware of anything like

12          that.

13      Q.  You never heard Graham say anything to Mrs. Varner that

14          had sexual overtones to it?

15      A.  I don't think so, no.  No.

16      Q.  Comparing female probation officers with male probation

17          officers, did Graham treat the female probation

18          officers as a class any worse than he treated male

19          probation officers as a class?

20      A.  I don't know.  I really don't know.

21      Q.  Can you think of any instance where he treated a woman

22          worse than a man because she was a woman?

23      A.  I don't know.  I mean, I know that Gary treated

24          every -- like, him and I were on friendly terms so I

25          know that -- I felt like Gary and I had a good

```
 1            relationship when I worked in the office.  And I
 2            believe there was other people in the office that
 3            probably felt like they were treated differently by
 4            Gary than someone like me was.  But I don't know if
 5            that extends to a specific class or not as far as, you
 6            know, the women feeling -- well, obviously, there's
 7            been plenty of dialogue about this whole suit.  They
 8            probably do feel somewhat differently.  Certainly Barb
 9            feels that way, and maybe some of the other ones do.
10            But I can't say that I know of a specific situation
11            that pointed that out to me.
12       Q.   When you look at Mr. Graham's friendships, can you
13            comment for me as to whether he tended to be friendlier
14            and act nicer with the older, more senior probation
15            officers as compared with the newer ones?
16       A.   I have to think about that.  I mean, I -- he was
17            certainly, my perception was that Gary was friendly
18            with us, me, Denny, Hank, you know, Tom Boyer.  We had
19            been there longer and I think, you know, we had worked
20            with him a long time, you know, so I thought we had a
21            friendly relationship, some of us more than others, you
22            know.  But I thought Barb was friendly with him.
23                 I don't think I would say that the new people
24            weren't friendly with him or anything like that, you
25            know what I'm saying, but he was probably more
```

Miller                          17

```
 1            comfortable with us just because we had been through
 2            the war, so to speak, we had had a lot of case work
 3            between us and things of that nature.  I mean, that's
 4            my perception.  I don't know.  I guess I'm not
 5            answering your question.  I really don't know.  I think
 6            he was okay with the younger POs.
 7    Q.      Have you ever heard Osenkarksi treat a woman rudely?
 8    A.      I'll hesitate before I answer that.  I just -- I'm not
 9            sure I ever heard an instance where Joe overtly has
10            mistreated somebody.  I don't think it's his
11            personality, you know what I'm saying?  He's a, what I
12            would consider to be an accommodating person.
13    Q.      So if we focus on women particularly, you've never
14            heard of an incident where he's treated a woman
15            inappropriately?
16    A.      Well, I know that's the basis of this suit, that
17            they're accusing him of that.
18    Q.      What I want to know is what you know about his
19            relationship with the female employees.
20    A.      I haven't seen it firsthand.  I mean, to me, I don't
21            know if he thinks -- I don't know what's in his head or
22            anything, but I've not seen specific instances where
23            Joe has said to me I'm going to deal with this
24            differently because this is a woman or this is a guy,
25            you know, I haven't seen that from him.  Joe's
```

```
 1           pretty -- I think he wants to get along with everybody.
 2    Q.    Okay.
 3    A.    You know.
 4    Q.    Have you ever heard Osenkarksi speak in a demeaning
 5           manner about any woman?
 6    A.    No.  I can't recall.  I mean, I'm aware of, you know,
 7           that you had the issue of referring to the cunt club,
 8           that whole scenario.  I was really kind of on the
 9           outside.  I remember people talking about that and I
10           know he was accused of that and he had to go through
11           some kind of formal process, but I wasn't -- I wasn't a
12           part of that and I really don't know the specifics of
13           that other than he was accused of that.
14    Q.    Have you ever heard Osenkarksi discuss amongst other
15           probation officers his own personal sex life?
16    A.    I don't think so.  It kind of blows over, you know.
17           I've heard the stories about the lawsuit and stuff, you
18           know, but I don't think I've ever heard Joe talk in the
19           office with me present about something he was doing
20           sexually with a woman or anything like that.  He's kind
21           of -- he wasn't that way with me.  I'm not trying to
22           make myself out to be an angel.  I could see us having
23           that conversation, we just didn't -- we just didn't go
24           there.  I mean, I don't remember that happening.
25    Q.    Prior to the split, what was your understanding of the
```

```
 1        role of seniority in your office?  What were the

 2        seniority rules?

 3   A.   Well, let me think about that, because I know that

 4        changed.  I remember when Ken Bolze was there, as a

 5        staff we were all generally confused.  Ken's process of

 6        leadership was not a very clear one, in my opinion.  I

 7        do remember him having, I think this is an accurate

 8        statement, him having seniority rules I was opposed to.

 9        It affected me personally, so I'll be the first to

10        admit, I had a person -- I remember, I think Ken, I

11        think he implemented seniority rules which included all

12        county service.

13            I remember a little bit about this, although I

14        can't say I have everything absolutely accurate,

15        because there was a fellow and me that were hired about

16        the same time.  I was hired three weeks before him.  He

17        had worked in the Sheriff's Department, he had more

18        seniority than me.  So I admit I was personally vested.

19        I was, like, boy, that sucks, you know, he's got more

20        seniority than me but I came to the department before

21        he did.

22            So my recollection is that Ken allowed seniority

23        for all county work and that there was a group of us

24        that were opposed to that.  I mean, there's nothing we

25        could do about it, but we would gripe about it to him
```

1    and stuff, you know.

2        Then after Ken left, I believe it was addressed

3    and changed by management at that time.  I don't know

4    the exact process that they went through, but I assume

5    it was Joe, Gary and probably Tom Boyer.  I think Tom

6    was involved with, you know, writing up the policy.

7    And I remember honestly I realized that it's like a

8    personal thing with me, I was happy about it.  As a

9    matter of fact, I remember having a conversation with

10   Barb about it.  I don't remember all the specifics.  I

11   remember us coming back from the Poconos, we were at a

12   training.  And her and I disagreed.  We were sitting in

13   the back seat, and I don't remember all the specifics,

14   but we talked about it.  I think it was me, her and

15   Gary and I don't know, Denny?  Was it Denny that was in

16   the car?  And Barb and I talked about it.  Her and I

17   disagreed, you know.

18       She and I understood, it was like we were both --

19   it benefitted her to have the seniority because she had

20   worked Children and Youth; it benefitted me not to

21   because I was competing with people that were getting

22   more seniority.  So I was happy to see it changed, but

23   I wasn't involved in the mechanics of changing it, you

24   know.  I wasn't administration at that time.

25   Q.   What is your understanding as to why it changed?

```
 1   A.   I thought -- there might have been more to this than
 2        what I know.  I thought it was because we really
 3        thought that it was unfair, what Ken Bolze had
 4        implemented.  And the reason it changed was I think --
 5        my perspective was we were righting a wrong, you know.
 6        Just because Ken Bolze said it, he said a lot of things
 7        that were wrong, you know.  We thought we were changing
 8        something to make it right that had been wrong.  I
 9        realize not everybody felt that way, but that's the way
10        I felt.
11   Q.   Did you ever consider that it might have changed so as
12        to punish Mrs. Varner?
13   A.   Well, I think Barb felt that way, but I didn't think
14        so.  I don't really know.  I thought Gary, Joe and Tom
15        changed it because they thought it was wrong.  The
16        common example we threw out was if somebody worked in
17        maintenance or as a janitor in the county for, like,
18        eight years, and after a year or two on the job, on our
19        job, you were giving him 10 years as seniority.  And,
20        say, I was a probation officer for seven or eight
21        years, that they were going to have more seniority than
22        me, which was always a heavy factor in determining
23        promotions and obtaining certain levels.  Well, you
24        know, that was the example we used.  I'm sure that the
25        other side could have examples, too.  But it was, like,
```

```
 1           come on, that ain't right, you know, you need to make
 2           that right, you know.
 3                I think that's why it was changed.  That was my
 4           perspective as to why it was changed.  But I wasn't a
 5           part of the conversations with Joe, Gary and Tom.  I
 6           think their intent was genuine.  I don't think they
 7           were out to get anybody.  I think they were trying to
 8           make a wrong a right.
 9      Q.   Did you ever hear either Graham or Osenkarksi use the
10           phrase peter meter?
11      A.   No, I never heard that.
12      Q.   Use the phrase black bush to refer to a woman's genital
13           area?
14      A.   No.  I've never heard that, either.
15      Q.   Use the phrase jeehoobees to refer to a --
16      A.   Say that again?
17      Q.   Jeehoobees to refer to female breasts?
18      A.   No.  I never heard that, either.
19      Q.   Did you ever hear anything about female interns being
20           asked to dance on tabletops?
21      A.   I remember that being talked about.  That was an
22           accusation.  I'm trying to think.  I didn't hear that
23           comment being made, I don't think, but I remember that
24           being discussed.  I think that -- boy, I hope I'm not
25           wrong on this.  I think the accusation was that Joe had
```

Miller                                    23

1          said that about I guess an intern.  I don't know.  You

2          know, I didn't hear it.  I heard people in the office

3          talking about it.

4   Q.    But you have no personal knowledge of it?

5   A.    No. I don't think I was there when Joe said it or when

6          he was accused of it being said.

7   Q.    Have you ever heard anything said about new interns in

8          general being told at the first department meeting you

9          have to dance on the tabletop for us?

10  A.    Us telling interns to go in --

11  Q.    Right.

12  A.    I've never been in any meeting -- I can't -- we're not

13         going to do that.  You know, that's pretty dumb.

14  Q.    Did you ever hear Graham tell Varner any of the

15         following:  That she has no fucking sense, no fucking

16         training or no fucking ability?

17  A.    No.  I never heard that.  I'm not saying he didn't say

18         that when he was mad, but I don't recollect him saying

19         that, you know.  He told me that once or twice.

20  Q.    Told you that?

21  A.    No, I'm just kidding.  I'm sorry.

22  Q.    If you and he had a heated conversation, would that be

23         typical language he might have addressed you to?

24  A.    We might have swore at each other.  I think I was worse

25         than him in that regard.

Miller                                    24

1    Q.    Have you ever been counseled not to help Barbara Varner
2          with regard to any complaint she's made about Graham?
3    A.    No.  No.  As a matter of fact, I figured I'd end up
4          here some day if this thing proceeded, because I was
5          made her supervisor as part of a corrective action
6          plan.  As a matter of fact, Barb and I were just
7          talking about this the other day, because I couldn't
8          remember the date and she was able to get me the date.
9          It was June 17th of '97.
10               And it wasn't my idea.  But Joe came to me -- I
11         don't really remember Gary coming to me.  He might have
12         because it's been a while.  But I remember Joe coming
13         to me and saying we need to you do this.  My perception
14         was that I was doing him a favor, that it was something
15         that needed to be done to help correct the problem in
16         the office.
17               And I will say this.  I knew that Gary, after the
18         suit was filed it was apparent to me, not maybe by a
19         specific action but just in general my sense was that
20         Gary wasn't happy with the situation.  But I'll give
21         him credit, he never came to me at the time I
22         supervised Barb Varner, and we were pretty comfortable
23         with each other.  I wouldn't say we were best-best
24         friends, like, we didn't grow up together, but we were
25         friendly.  But he never came to me and said, you better

1      be tough on her, or you better do this, or you better

2      do that.  I was, you know, I didn't feel like I was in

3      a very comfortable position because I didn't really

4      have authority.  I had just been put in charge of her

5      because Joe thought that would be best.

6          I found out later I think Barb requested it.  You

7      know, I had never had any conversation with Barb about

8      that, you know, prior to that.  I didn't know that was

9      going to be -- it wasn't something I solicited or that

10     I anticipated.  I guess I'm rambling on.  But you know,

11     Gary never came to me and said, please do this, or

12     check on this, or blah blah blah blah blah.  That

13     didn't happen.

14  Q.  Do you have any supervisory role over Mrs. Varner

15     today?

16  A.  Yeah, I'm her supervisor.  Since, I think I have this

17     straight, since May 1st when we did the reorganization

18     I directly supervise her.  Prior to that, May 1st of

19     2000, and this is '03, 2002, we did a reorganization in

20     our office and I directly supervise her.

21         Prior to that, I was one of the supervisors in the

22     office since July 1st, '01.  So it hasn't been very

23     long.  So I was a supervisor but I directly became her

24     supervisor in on May 1st, 2002.

25  Q.  Can you discuss for us whether it takes a period of

1    time in terms of months or years when you're first

2    hired to become an effective and skilled probation

3    officer?

4  A.  I think it does.  Yeah, I think it does.  I think it's

5    a hard job.

6  Q.  Going back to the period of time when in '97 when you

7    first became her supervisor as compared to today where

8    you're currently her supervisor, is she a better

9    probation officer today than she was in '97?

10  A.  Probably.  I mean, we all grow and get better.  I

11    thought she did fine back then and I think she's, I

12    guess she's even doing better now.  She's got more

13    experience.  Every year you get more experience.

14       And she's kind of regarded in our office as the

15    foremost authority on sexual offense cases, including

16    the changes in the law regarding DNA testing and

17    analysis and things of that nature.  It's become real

18    complicated.  Not that the other probation officers

19    can't do it, but if I have a question, many times, you

20    know, I'll go to her and ask her.

21  Q.  When you first began supervising her in '97, did that

22    supervision include any element of training and

23    counseling?

24  A.  I don't think so.  Honestly, I mean, I was her

25    supervisor.  You know, I was a line PO who was her

Miller                                        27

```
 1          supervisor as a result of this corrective action plan.
 2          I didn't feel real powerful, like I was really a guy in
 3          the office making decisions.  I'll just being honest
 4          with you.  I was doing this to try to help out, so.
 5          And I was new at it.  I wasn't very good at it, in my
 6          estimation.  It took me a little while.  I'm still, you
 7          know, I'm still learning how to do it.
 8              But the bottom line is I don't really remember
 9          Barb and I getting into any in-depth counseling talks.
10          You know, I think, I think, I don't want to speak for
11          her, but I'm guessing we both regarded the situation
12          about the same way.  We dealt with each other
13          professionally.  We might have subconsciously kept each
14          other a little bit at arm's length.  But I tried to
15          make it comfortable for her because I knew, you know,
16          everybody was tense over the whole situation.  You
17          know, it wasn't good.  And my recollection is we really
18          made an effort not to talk about it.  That we might
19          have, over the last six years Barb and I might have had
20          a couple of conversations about something about the
21          lawsuit, usually prompted by something, but that we
22          really made an effort to play it straight, you know,
23          because I knew I was going to end up here.
24     Q.   Let me ask you this.  As a supervisor have you had
25          occasion to observe that some people you supervised
```

1           need more supervision than others?

2    A.    Yeah.  I think that's a fair statement.  You get people

3           that are newer and everyone -- the job is so

4           multi-faceted that everyone falls into different

5           categories, you know.

6    Q.    Do you have an opinion as to whether today in 2003

7           Mrs. Varner requires less supervision than she did when

8           you first became her supervisor in '97?

9    A.    I don't feel -- I mean, I'm probably more qualified to

10          be a supervisor now than I was in '97.  I don't think I

11          was very qualified.  I think it was one of these things

12          where I was doing a favor.

13              But I think she's the same kind of worker.  I

14          mean, my -- I don't want to sound like I know it all,

15          but it looked to me like Barb's always -- we all have

16          strengths and weaknesses.  Barb, I think her

17          fundamental strengths deal with the therapeutic end of

18          our job.  She came from Children and Youth, she had a

19          background in what I would consider to be therapeutic

20          as opposed to law enforcement.  That's not to say she

21          couldn't do the law enforcement end of her job, but I

22          think she was more comfortable in the therapeutic end.

23          So I'm guessing that over time as she's worked on the

24          law enforcement end of our job, you know, petitions,

25          criminal informations, that she's probably gotten

```
 1              better at them, like we all have, you know.  But I

 2              can't remember, in '97 I thought she was doing fine and

 3              I think she's doing fine now.

 4     Q.       Have you ever given a written statement to anybody

 5              about this case?

 6     A.       A written statement?  No.  I was called in the very

 7              beginning when Deluce, Attorney Deluce, Joe and Gary

 8              asked me to go down and -- I don't think I did the

 9              writing.  I think he took some notes.

10                   And then the EEOC lady from Philadelphia, New

11              Jersey, wherever she was going, called me.  I didn't

12              write anything.  That was over the phone.

13                   And then I got called again -- I don't see the

14              attorney here that talked to me -- I think by the

15              county, maybe a couple months ago.  And I went down and

16              I didn't give any written statement.  They were, like,

17              taking some notes.  There were so many attorneys in and

18              out of there.  I'm pretty sure --

19     Q.       A little bald guy?

20     A.       It was a girl.

21     Q.       It was a girl?

22     A.       Nice-looking blond-haired girl, kind of young, you

23              know.

24     Q.       Have you ever talked to Ms. Wallet about the case?

25     A.       No.  I've talked to her, I know who she is, but we
```

1        never had a conversation about it.

2   Q.   As Ms. Varner's supervisor during the period of time

3        between '97 and today, have you ever felt she's been in

4        any physical danger from Mr. Graham?

5   A.   I don't know.  I know Gary's pretty pissed off, so I

6        don't know.  I don't know.  It would concern me.

7   Q.   I'm sorry?

8   A.   It would concern me.  I mean, he gets angry.  I mean, I

9        think he's angry.  I think he fees like he's been

10       unjustifiably attacked on this.  And my honest

11       impression of his personality is that he's not happy

12       about that.

13           And I probably put a little bit more of my -- too

14       much of myself, if I was in his situation.  I obviously

15       can't tell what he's thinking but I know he's not

16       happy.  And if it was me -- him and I, we have

17       similarities, you know, some similarities, and I think

18       when you get backed into a corner, it's like being a

19       caged animal, you know, if you have that necessary

20       toughness or aggressiveness or whatever it is, I would

21       regard that, I know I regard him, I keep an eye on him

22       when I see him because I don't think he's very happy

23       with any of us.

24   Q.  Have you ever heard him say anything that would lead

25       you to believe Varner's physical safety was in

Miller                                    31

1         jeopardy?

2    A.   I haven't heard him saying anything specifically about

3         harming Barb Varner, no.

4    Q.   Have you ever heard from any third person that he's

5         threatened to harm Varner physically?

6    A.   No.  No, I don't think so, no.

7    Q.   Has it been your experience that Mr. Graham ever plays

8         favorites?

9    A.   Well, I know that -- I believe that some people on

10        staff felt that way.  I didn't feel like -- I thought

11        he was a good supervisor for me.  I thought he dealt

12        with me the way I needed to be dealt with, both him and

13        Joe.  You know, they gave me flexibility.  I thought I

14        earned it, but I realize that might not be other

15        people's perception.

16             Like, there's no question Gary treated me fine,

17        you know.  I didn't feel like he did anything bad to me

18        or anything like that.  I felt like he gave me a lot of

19        flexibility.  My perception was that Gary thought I did

20        a pretty good job, that I was working the intensive and

21        that I was in a tough job, so that he gave me that

22        latitude.

23             I realize that other people in the office might

24        have looked at that and said, Gary likes Sam, he treats

25        Sam differently, you know.  I didn't feel that way.  I

1           mean, I felt like I earned it, you know.  I felt like I

2           was doing a tough job and as a result of doing the

3           tough job that I deserved that latitude.  But I realize

4           every single probation officer in there probably feels

5           the same way, you know.

6    Q.     Have you observed him be critical of younger, newer

7           probation officers in particular?

8    A.     Not in particular.  I mean, he can be critical

9           sometimes.  He can be critical sometimes.  Like I said,

10          there was times he was critical where he would address

11          something I did or we would disagree on something.  But

12          I didn't see it pinpointed at younger POs, that I'm

13          aware of.  I mean, I didn't -- he might have felt -- I

14          don't know, I can't talk for him.  He might have felt a

15          need because they were younger to do it.

16               You have to -- at this point in time I wasn't an

17          administrator.  Where I was at mentally, I had a really

18          independent job.  I considered myself kind of to be on

19          the front lines, like, an intensive PO.  And I was

20          doing about 83 things personally, too, with raising my

21          kids and coaching, and so I was out of the office about

22          half the time.  I did an unusual job.  Sometimes I'd be

23          working at 6:00 in the morning, sometimes 9:30 at

24          night.  Not a lot, but I would do those kind of things

25          if it meant getting my job done.  So I wasn't real

1        tuned in.  I should have probably -- as a supervisor I

2        have to be more sensitive to these things.  I wasn't

3        real turned in to what he was doing with other people

4        all the time.  I really -- and honestly, I didn't

5        really care.  I wasn't -- I mean, I cared how he dealt

6        with me, you know.

7    Q.  Let me ask you this.  Within the range of what is

8        normal behavior for Graham when supervising other

9        employees, did you observe him to act normally with

10       Mrs. Varner, or to be abnormally harsh, abnormal

11       critical, abnormally abusive?

12   A.  I thought they were good friends.  I mean, I thought

13       they were good friends until a brief period of time, a

14       relatively brief period of time either right about the

15       time of the lawsuit or maybe a little before, I can't

16       swear as to my time frame, where I thought their

17       relationship was more strained.

18   Q.  But did that strained relationship manifest itself in

19       Mr. Graham behaving more abusively to Mrs. Varner than

20       to other employees in the office who he also

21       supervised?

22   A.  I think Barb felt that way.

23   Q.  Did you observe that?

24   A.  Did I personally observe that?

25   Q.  Yes.

Miller                                    34

1    A.    No, I can't say that I did.  I remember one time him

2          coming into my office where he was agitated and upset,

3          expressed he was agitated and upset, and as a result of

4          that I went over and had a conversation with him in his

5          office.  He explained to me it was about work product,

6          and I can't remember the specifics, but I -- he

7          basically said he was frustrated because he felt that

8          he was trying to help her do certain things better,

9          that she was being defensive and, you know, he wasn't

10         happy about that.  He was frustrated about that.

11              And I think my take to the whole thing, I don't

12         even know why I was sticking my nose in it, I possibly

13         just was having one of those days and I just said, you

14         know, like, chill out, don't get so worked up over it.

15         And that was about, that was it.  I wasn't really into

16         management at that time.

17              I think, I think it must have on that particular

18         incident elevated me to a point that I was a little

19         concerned that he was pretty upset on that specific

20         incident.

21              MR. DELLASEGA:  That's all I have.

22   BY MR. MacMAIN:

23   Q.    My name's Dave MacMain.  We met just before the

24         deposition.  I represent Gary Graham.  I just have a

25         couple areas I wanted to ask you about.

1           This incident where you said Gary was very

2           frustrated, you said he was frustrated with Barb

3           Varner's work product?

4    A.    Yeah.  I'm calling it work product.  I don't remember

5           what Gary called it.

6    Q.    By work product you mean preparing reports and the

7           detail work that goes into your job?

8    A.    Yeah.  It was some aspects of that.  That's what Gary

9           said.

10   Q.    Do you recall if it was specific to, I think you

11         described it as a law enforcement, preparing

12         complaints, preparing criminal informations and so

13         forth?  Is that what he was frustrated with?

14   A.    I do -- I can't remember the whole thing but I believe

15         the example he gave me was it was about a petition.  He

16         wanted her to change something on a petition and he

17         felt that -- this is my -- I really don't remember his

18         words but my characterization is I think he felt she

19         was being defensive, you know, didn't want to change

20         it.

21   Q.    And I think you had said that basically you break the

22         job into two parts, kind of a law enforcement end and a

23         therapeutic end, and Barb was strong in the therapeutic

24         end but weaker in the law enforcement end?  That was

25         your perception?

Miller                                    36

1    A.    There's more parts than that, but you know, in my
2          opinion it's a very complicated job.  But what I think
3          I said was that Barb's background to the best of my
4          knowledge was in what I would call therapeutic,
5          although she probably doesn't regard it that way
6          because they do plenty of enforcement at Children and
7          Youth.  I'm a dimwit when it comes to Children and
8          Youth stuff because the falls under different regs and
9          we've become more schooled in it recently.

10               But she had a strong background in that, in abuse
11         investigations, things like that, to the best of my
12         knowledge.  And I felt that that was the core strength
13         of her expertise.  Some of the other things that go
14         along with being a probation officer, she's probably
15         like any other probation officer, she had to learn and
16         acquire as she was on the job.

17   Q.    Okay.  And that was your experience when you began
18         supervising her in '97, that that aspect, that last
19         aspect you talked about, that we'll call it the law
20         enforcement end, was an area that she needed, like
21         anybody else who was new to improve upon?

22   A.    I wouldn't real characterize -- I thought she was fine
23         in everything.  I thought -- I don't think I evaluated
24         her.  I mean, I don't think -- I could be wrong on
25         that.  I don't think I ever did a formal evaluation on

```
1              her in '97.  I might be wrong in that, but I don't
2              think I did.  But I at that point in time I thought she
3              did the job as well as any other probation officer on
4              the job.
5    Q.        When you said Gary was frustrated with her, frustrated
6              and upset, correct?  Did that appear to be a genuine
7              concern based on she wasn't putting out the quality of
8              product as her supervisor he was looking for?
9    A.        I don't know.  At that point in time I didn't know what
10             was going on.  I knew they were friends and it appeared
11             that something was going wrong, you know.
12   Q.        This something that was going on wrong, did that happen
13             about the time of this instance you just told us about,
14             this meeting you had where he was very upset with her
15             work product?
16   A.        Yeah, I'm saying that was all one -- I think that
17             was -- I think Gary had come in, seemed upset, this is
18             my recollection of it, in my office, and expressed his
19             frustration to Denny and I.  And it might not even been
20             to me.  I really can't remember the specifics.  He was
21             really good friends with Denny, so he would come in a
22             lot and talk to Denny.  And then I think he went back
23             to his office and I think I waddled over there and --
24   Q.        My question is:  Was that about the time you noticed a
25             change in this very friendly relationship?
```

Miller                                          38

1   A.   I guess.  You know --

2   Q.   If you know.

3   A.   It's really hard for me to keep all the time scenarios

4        straight.  It's just I think at one point in time we

5        thought they were real good -- they were good friends.

6        Didn't think anything was going on, but I did think

7        that they were good friends.

8             And then there came a point in time where it was

9        we thought Barb was distressed with Gary and that Gary

10       was distressed with her, too.

11  Q.   Okay.  My question really simply is:  Did that

12       distress, the change in the relationship, coincide at

13       about the same time period that you had this meeting

14       with Gary where he was frustrated?

15  A.   It was during that time, yeah, he was upset.  Yeah.

16  Q.   You said Barb's currently the foremost authority on sex

17       cases in your office?

18  A.   Well, yeah.  I mean, you know, I hate to label her with

19       that.  But she's -- when I received in -- May 1st when

20       we did a reorganization and I have the intake function

21       now, I got it from Hank Thielemann.  Hank Thielemann

22       said to me, Barb's good at this, I mean, she

23       understands how to get the therapeutic process going,

24       hook them up with the appropriate counseling.  And

25       since that time it's been even more complicated because

Miller                                          39

1       of the DNA testing rules and some of those things, so
2       I've relied on her.
3              Now, I do feel, and her and I talked about this a
4       little bit, not much, because I don't always tell her
5       what I'm thinking, but I do, I rely on other POs, too.
6       But I'm very comfortable, I think it's something that
7       she -- actually, I think it's something that she feels
8       she's very good at.  And I do, too, you know.
9   Q.  So I understand when you say sex case, you mean like
10      sexual abuse and sexual misconduct and that type?
11  A.  Yeah, like anything from rape, yeah -- actually, you
12      can get a kid doing a burglary but he might be getting
13      sexually abused at home, or maybe something, you know,
14      it's a prevalent in our society.
15             And she's not the only one.  I'm not trying to
16      make it out like it's her only -- and that's not the
17      only kind of cases she does.  But I think she's, to me,
18      like, someone like me that is not quite as comfortable
19      dealing with cases like that, for whatever reasons, I
20      think she's more comfortable.  Like, she has an ability
21      to plug them in with the right kind of treatment, you
22      know, so that's what I meant by that.
23             MR. MacMAIN:  Okay, thank you.  That's all the
24      questions I have.
25  BY MR. ADAMS:

1   Q.   Mr. Miller, I represent Mr. Osenkarski.

2        You were describing the seniority system in your

3        discussion with Mrs. Varner and other persons in a car

4        riding back from the Poconos.  You remember that line

5        of questioning?

6   A.   Yeah.

7   Q.   You have to say yes for the record.

8   A.   Yes.  Yes, I'm sorry.

9   Q.   Would you describe your conversation with Ms. Varner as

10       a debate about this seniority system?

11   A.   I guess.  I mean, I know we disagreed, to be honest

12       with you, we disagreed.  And it didn't, like, turn into

13       anything big, to my recollection.  But I know we

14       disagreed.  And I understood why.

15        I think the reason it didn't turn into anything

16       big was she had worked a number of years with Children

17       and Youth, and I knew it affected her and it affected

18       me because of other people that could jump over me in

19       seniority.  I think we understood that, so we just kind

20       of left it at that.  We disagreed.

21   Q.   Okay.  In your opinion, were her arguments about her

22       position on that issue solely due to her own personal

23       interests of seniority or how it applied to her in the

24       office?

25   A.   I guess we're all driven by what affects us.  I mean,

```
 1          I'm sure -- I can't see inside her, but yeah, I think
 2          that was -- I think it was something that affected her
 3          and she felt it was important.  And she'll have to make
 4          her own argument on that.  I can't really remember
 5          everything she said, but I'm sure that was important to
 6          her.
 7    Q.    Quickly, she didn't mention anyone else to you during
 8          this conversation how they would be negatively
 9          affected?
10    A.    She might have, Counselor.  I mean, there was other
11          people, I remember, I understand there was people on
12          both sides of the aisle here, you know, people that had
13          worked like, here the example  of the deputy sheriffs.
14          So there was a group of people on one side of the
15          example aisle, I believe, that felt like they had put
16          in good productive service with other county
17          organizations and they should be given credit for that,
18          understanding that seniority was always probably the
19          most important factor in promotions.
20              And then there was a group of us on the other side
21          of the aisle that said, no, that's, you know, I had
22          worked as a probation officer other places, worked
23          other jobs in criminal justice, that you shouldn't get
24          the extra credit for just working in another county
25          agency, and of course I cited that example.  So I
```

```
 1          understood there was two perspectives.  I thought,
 2          like, we were all personally involved and how it
 3          affected us depended on how that decision went.
 4              MR. ADAMS:  Okay.  I have no other questions.
 5          Thank you.
 6  BY MS. WILLIAMS:
 7  Q.    Mr. Miller, I'm Taylor Williams representing the
 8          Commonwealth of Pennsylvania, Ninth Judicial District.
 9              Back in 1997 when you first supervised Barbara
10          Varner, who informed you that you were going to be her
11          supervisor?
12  A.    Well, the court order was cut by Judge Sheely.  I
13          don't -- I don't think Judge Sheely ever talked to me
14          personally about it.  I could be wrong.  Joe Osenkarksi
15          asked me to do it.  I remember Joe specifically.  Gary
16          might have talked to me about it but I really can't
17          remember that.  I remember Joe coming in and asking me
18          to do it.  He called it a corrective plan of action.
19              And then the personnel guy in Human Services at
20          that time, Dan Hartnett I think was his name, Dan
21          Hartnett called me down and had a conversation with me
22          about how important it was that I act professionally,
23          no retaliatory behavior, no vindictive, you know, that
24          kind of stuff.  And I said yeah, fine.
25  Q.    Did you have any subsequent conversations with Judge
```

```
 1          Sheely about your supervision of Barbara Varner?
 2    A.    I did.  I had one.  I figured this would come up.  I
 3          don't exactly know when it happened.  It would have
 4          been after the lawsuit happened and I believe after I
 5          was appointed her supervisor, somehow where -- you
 6          know, these office environments it's amazing everything
 7          flies all over the place.  Word comes down that
 8          something bad was going to happen to Gary, either, you
 9          know, I'm not saying this is true but this is what I
10          was hearing, he was either going to be fired or
11          transferred or this or that.
12              And Tom Boyer and I went up to Judge Sheely in
13          support of Gary.  And the conversation I had, I didn't
14          do a lot of talking in that meeting, but the
15          conversation I had with Judge Sheely was to the effect
16          I just want you to know, Judge Sheely, you know, with
17          all due respect, it's your decision what you do to
18          Gary, but that the -- I don't know if I called it a
19          corrective action plan, but I said I am currently
20          supervising Barb Varner and to the best of my knowledge
21          everything's going fine, Barb's okay with that, I'm
22          okay with that, I think things are working.  If you
23          want to have time to sort through all this without
24          doing something serious to Gary until you come to a
25          final judgment, I think the current situation's okay.
```

Miller                                      44

1        That was my point to him.

2   Q.   What did Judge Sheely say to you?

3   A.   He -- I don't remember all the specifics.  He was kind

4        of vacillating back and forth what to do.  He was like,

5        oh, geez, you know, what a mess, I think that kind of

6        stuff, you know.  And I said, well, I just wanted to

7        let you know.  And I said, you can talk to Barb Varner

8        about this but I think, I said I think what we're doing

9        is working, Barb's not complaining to me, I'm okay to

10       keep doing.

11            I thought at that time, right or wrong, I was

12       doing the right thing.

13  Q.   Do you remember anything specific that Judge Sheely

14       said to you at that time?

15  A.   Not specific.

16  Q.   Any other conversations with Judge Sheely?

17  A.   No, that's the only one.

18  Q.   Related to either Barbara Graham or Gary Graham?

19  A.   No.  No, not related to Barb or Gary, you know.

20  Q.   Or the lawsuit?

21  A.   The lawsuit, no.  No.  No, I didn't talk to him about

22       it.

23  Q.   Did you ever have any conversations with Judge Hoffer

24       about Barbara Varner?

25  A.   About supervising her?

Miller                                        45

```
 1   Q.   Yes.
 2   A.   No.  About -- I don't know.  Maybe a month ago I went
 3        up.  I initiated it.  I says, hey, I'm called for a
 4        deposition on this, I says, I'm not one of the guys
 5        that came up and talked to you.  I know that -- I knew
 6        that certain people from our office went up and talked
 7        to Hoffer.  I says, you and I have never a never had a
 8        conversation about this, I'm one of your supervisors.
 9        You got any interest in knowing what I'm going to say?
10        And he said -- I guess it was bad timing on my part,
11        but I was kind of like, you know, shouldn't you, like,
12        let your boss know?  We worry about the judges, you
13        know what I'm saying.
14             And he looked at me and he says, well, you know,
15        maybe you should have come to me before or talked to me
16        if you had something on your mind, but, he says, at
17        this point in time, he says, just go in and tell the
18        truth.  He says, that's all I can tell you.
19             So that was the extent of our conversation.
20   Q.   And you've never had any other conversations with Judge
21        Hoffer about Gary Graham, Barbara Varner or the
22        lawsuit?
23   A.   No.  I wasn't one of the guys that, to this day I
24        don't -- I've never even raised Gary's name to Judge
25        Hoffer.  And like I said, when I went up about the
```

Miller                                46

```
 1            giving a deposition, you know, he asked me, he says,

 2            you know, are you still supervising her?  And I said,

 3            yeah.  And he said, is everything going okay?  And I

 4            says, it's going fine, I think.  I says, I'm not going

 5            to lie to you and say that it's the most comfortable

 6            thing in the world, that's not her fault, but, you

 7            know, when there's a lawsuit pending you worry about

 8            stuff like that, you know.  But I says, I'm doing the

 9            best I can.  And I said, I think she is, too.  And he

10            said fine.

11                 MS. WILLIAMS:  Thanks, Mr. Miller.  That's all I

12            have.

13    BY MS. WALLET:

14    Q.    Mr. Miller, do you feel you need a break at this

15          point?

16    A.    I'm okay.  I've got a cold, but I feel okay, it's just

17          a normal cold.

18    Q.    Okay.  My name is Debra Wallet.  I'm here representing

19          Barbara Varner in this matter.  If at any time you

20          don't hear me, particularly because of your cold --

21    A.    Yeah, I'm a little clogged up.

22    Q.    -- will you let me know that?

23    A.    Sure.

24    Q.    And I will certainly repeat the question.

25                 Why did you go to Judge Hoffer just recently?
```

```
 1          What was in your mind that prompted you to do that?
 2   A.     I was worried.  I was really tense.  You know, this was
 3          uncomfortable for us coming in here and giving these
 4          depositions.  I've worked for Joe for 20 years, Gary
 5          was my former supervisor, and I currently supervise
 6          Barb, you know, and my preference would have been that
 7          I didn't have to be here.  You know what I'm saying?
 8   Q.     What were you worried about?
 9   A.     I guess the negative things that can come out of being
10          part of a lawsuit, you know.
11   Q.     Like what?
12   A.     Well, I don't know.  What negative things can come out?
13          You know.  I guess I have to think about that a little.
14          Maybe I shouldn't have gone to Judge Hoffer, you know.
15          I have never had a conversation with Judge Hoffer about
16          anything that went on down there.  And I thought, well,
17          I didn't have any idea what anybody was going to ask me
18          when I come in here and I thought maybe I should give
19          him the courtesy because he was my boss, of letting him
20          know what my perspective was.
21   Q.     And what did you --
22   A.     And so it just concerned me that maybe he would, you
23          know, I'd come in here and say something and he could
24          read a transcript later and say, well, Sam Miller never
25          told me that and he works for me.  You know what I'm
```

1    saying?  And so I thought that the right thing to do

2    was to -- well, I'll be honest with you, the first

3    thing I said was, I've been subpoenaed for this

4    deposition, Judge Hoffer, I don't know anything about

5    these things, do I need an attorney?  And he said I

6    could call Thomas and Thomas and talk to the guy that

7    sent the subpoena, you know.  And me and a couple of

8    guys that have been subpoenaed, we talked about that

9    and, you know, we kind of were like, you know, just

10   suck it up and go do it.

11        And you know, the second issue was do you want to

12   hear some of the things I'm going to say and stuff like

13   that.  And he kind of stopped me and said, hey, just go

14   tell the truth.

15   Q.  What did you intend to tell him, that is, Judge Hoffer,

16       on that day?

17   A.  The same thing that I'm saying here today.  You know, I

18       mean, that it's been -- we've tried to do the best we

19       can, that the lawsuit's been tough for our office

20       because it's kind of like a cloud hanging over us, you

21       know, that needs to be resolved.  And that I personally

22       feel uncomfortable with the whole situation, you know.

23       I feel like my -- I supervise Barb.  I think it's

24       important for me to be fair in my relationship with

25       her, you know.  And Gary was my former supervisor, and

Miller                                        49

```
1              you know, we haven't talked for probably six years.
2              And Joe's my current boss, you know I mean.  It was,
3              like, it's one of those things where I would just as
4              soon keep all my thoughts to myself and not have to say
5              anything about anybody, but I realized that I had to
6              come here and talk about it today.
7      Q.      Now, other than today, you've talked to someone from
8              the EEOC?
9      A.      Um-hum.
10     Q.      Dave Deluce?
11     A.      Um-hum.
12     Q.      And someone from Mr. Dellasega's office; is that
13             correct?
14     A.      Yeah.  It was a young girl.
15     Q.      Okay.  Did anyone else interview you about this case?
16     A.      No.  No, that was it.
17     Q.      Do you believe that you were truthful with the
18             individuals, those three individuals I've identified,
19             about your recollections?
20     A.      I think so.  I mean, you know, each time you --
21             sometimes you can remember something a little
22             differently.  But I don't feel like I was trying to
23             deceive anybody in those interviews.
24     Q.      Okay.  Did you know that there were notes taken by the
25             individual from the EEOC?
```

1    A.    I guess.  I mean, I think what she said to me when she

2          was calling was that she was possibly going to take

3          some notes, but -- and I said fine.

4    Q.    Did you ever see those notes?

5    A.    Huh-uh.

6    Q.    Okay.  According to the individual from the EEOC, you

7          were asked:  Did you ever see Gary Graham sexually

8          harass Ms. Varner?  Hereafter, Barb, which is the name

9          the witness kept calling her.  Miller said he did not,

10         but he did see Gary Graham yell at Barb and demean her.

11         He said it was an awful thing to see.

12              Do you remember saying that?

13   A.    No, I don't.  You know, what might have occurred was I

14         remember there was a time out in the office where it's

15         kind of well known in our office where Gary was loud

16         with Barb outside her office.  I didn't see that but I

17         remember people talking about it.  And I think what

18         happens is over a period of time, you know, there's --

19         you hear so many people talk about it that it's almost

20         like you were there, you know what I'm saying?

21              I don't think -- I searched my mind.  I wasn't

22         there when that occurred but I remember other people

23         talking about it.  And you know, maybe -- I didn't

24         intend to intentionally deceive the EEOC officer, but I

25         don't think I ever personally saw it.

1    Q.   Okay.  Did you ever see Gary Graham yell at Barbara

2         Varner?

3    A.   I don't think so.  It's possible, but I don't recollect

4         a specific incident where I recall Gary yelling at her.

5         I do recall him being upset with her, but I just don't

6         recall a specific incident, you know, where that

7         happened.

8    Q.   You used the term, according to the EEOC, demean her.

9         Do you recall incidents in which he demeaned her?

10   A.   Not that I observed, no.

11   Q.   Do you think you said it was an awful thing to see?

12   A.   That doesn't sound like something -- you know, I

13        can't -- I guess I can't say I didn't say that.  I'm

14        kind of rough around the edges.  I usually don't talk

15        like that.  I'm not a real sensitive guy, you know.

16        I'm kind of, like, I would have said something like it

17        was real bullshit or something like that, you know.

18        But maybe I said it that way.

19   Q.   Well, do you think you didn't say it?

20             MR. MacMAIN:  Objection to the form.

21             THE WITNESS:  All's I can tell you is I've thought

22        long and hard about this, knowing that I had to swear

23        under oath.  I do not recall specifically seeing Gary

24        demean her, okay?  I was aware that things weren't

25        going well between them.  All right?  And that Gary had

```
 1          expressed that frustration in our office.  I was aware
 2          of that.
 3              I don't recall the face-to-face where I was
 4          standing there while they were going at it.  If you can
 5          give me a specific incident -- you've got to remember,
 6          this is over a lot of years, you know.  Debbie, I'm not
 7          saying it didn't happen.  I'm saying I can't remember
 8          that.  I really don't remember a specific incident.
 9   BY MS. WALLET:
10   Q.     Did you believe there was any truth to the rumor that
11          Mr. Graham and Barbara Varner had some sort of a sexual
12          affair?
13   A.     Well, initially I was stunned by that, you know, I just
14          didn't -- that really -- and then, you know, I mean,
15          over the years we've all sat around and gone, geez,
16          could that have happened?  You know.  And you know,
17          that was one of the things I'm really not real
18          comfortable talking about.
19              I don't know.  I don't know what happened between
20          them.  I know Barb has said that nothing happened and
21          Gary has said that there has.  And it surprised the
22          hell out of me.  If something happened, it would
23          have -- it surprises me, you know?  I never picked that
24          up.
25   Q.     According to the EEOC investigator, you said you
```

Miller                                          53

1          doubted that they had an affair.

2     A.   Well, that's fair.  I still doubt that, yeah.  I didn't

3          think -- I'll say that, I mean, it's just an opinion, I

4          just -- I didn't see that happening.  I'm sorry, I just

5          didn't see that happening.

6     Q.   Did you observe anything sexual between Mr. Graham and

7          Ms. Varner?

8     A.   No, I didn't.  I mean, we were all friends and we

9          would -- the office environment, I can't remember

10         specifics but the office environment was such that

11         sometimes people would joke around and kid around what

12         we perceived as joking.  It might not have been

13         appropriate, but -- and I'm not saying -- I can't

14         remember specific incidents where that happened between

15         Gary and Barb, but it might have happened.

16              But I never at any time witnessed what where my

17         little flag went up and said, man, that's a little too

18         comfortable, you know, there's something going on with

19         them or something like that.  I didn't see that.  I

20         didn't pick that up.

21    Q.   Did Gary Graham ever discuss with you his sexual

22         relationships?

23    A.   Gary and I talked about girls sometimes, you know, and

24         women.

25    Q.   Did he talk about his wife?

Miller                                          54

```
 1   A.   Well, I mean, we would both talk about our families
 2        sometimes, but I can't say that I remember the
 3        specifics.  But it wouldn't be unusual, he might talk
 4        about his kids or I might -- we have a -- let me get
 5        this straight.  His oldest daughter is a senior and my
 6        oldest daughter's a senior, and his youngest daughter I
 7        believe is in ninth grade and my youngest daughter is a
 8        ninth grader, so we would, you know, we would compare
 9        notes sometimes.  And of course, there's always that
10        common gripe about our wives not treating us right or
11        something like that, you know.  But I don't remember
12        specifics.  I'm sure that happened.
13   Q.   Did he ever talk to you about his sexual relationship
14        with his wife?
15   A.   No, not -- not like a counseling situation, you know.
16        I mean, I remember that we would sometimes joke about
17        those kind of things.  But I don't remember the
18        specifics.  Like, I can tell you that Gary never came
19        to me and said, hey, I'm really having problems at
20        home, I need to talk to you, you know.  It was a kind
21        of a thing where I think, I thought he had a good
22        family and things were good and everything was fine.  I
23        mean, I'm not the one that knows everything, but I
24        thought everything was okay.
25   Q.   Did you ever hear him talk about sexual relationships
```

Miller                                      55

```
 1         that he had had with people before he was married?
 2    A.   Well, sometimes we -- yeah, when guys got behind closed
 3         doors we would talk about those kind of things.  I
 4         really can't remember the specifics, but -- and I
 5         couldn't even sit here and swear, well, Gary told me
 6         this or Gary told me that.  But I know how I am, and
 7         I'm sure I know I talked to Gary about it, and I'm sure
 8         he talked to me about it, too.  But Debbie, I can't --
 9         I can't tell you a specific incident where he said,
10         well, I was with this girl or that girl or something
11         like that.  It wasn't, it's just been too long, you
12         know.  And it wasn't a big enough impact on me.  It was
13         just kind of, like, guys fooling around with each
14         other.  Half the time I don't think we would tell
15         the -- we tell the truth to each other, you know, it's
16         like one of those type of things.
17    Q.   Did Mr. Osenkarski talk to you about any of his sexual
18         relationships?
19    A.   No, I don't think.  So I can't ever remember -- you
20         know, Joe was older, Gary and I were more the same age,
21         I don't think Joe ever talked to me -- I mean, it's
22         possible.  It sure doesn't stick out in my mind, you
23         know what I'm saying.
24             I knew that Joe had got divorced at one point in
25         time, he went through a divorce and he wasn't very
```

Miller                                        56

1              happy about it.  But you know, he pretty much kept it

2              to himself.  He's kind of, like, a strong guy that just

3              kind of deals with it on his own.

4       Q.     Did Mr. Osenkarski ever use the F word in your

5              presence?

6       A.     I can't specifically remember that.  He might have.  I

7              will tell you this, I'm not proud of it, I probably

8              swear more than him.  When him and I were together I'm

9              sure I used it to him.  He might have said it to me.  I

10             can't give you a specific time or instance that he said

11             it to me, you know, but it wouldn't have been beyond us

12             to curse.

13      Q.     Did Mr. Graham use the F word in your presence?

14      A.     I'm sure that -- Gary has more -- I always considered

15             Gary to have a little more sophistication than I did.

16             I'm a little rougher around the edges.  I curse a lot.

17             It's something I've tried to change, you know.  I

18             realize it's important in an office environment not to

19             do that.

20                  I think sometimes he cursed when we were talking.

21             I think what happens is I possibly started -- you get

22             caught into that kind of conversation, you know, and --

23             but he wasn't as bad as I was when it came to the

24             cursing.  But sometimes when we got together I think we

25             did it.

1  Q.  Were these swear words, and let's limit it to the F

2      word at the moment, used in front of female probation

3      officers?

4          MR. ADAMS:  Used by whom?

5          MS. WALLET:  Either one.

6          THE WITNESS:  It's possible.  I don't specifically

7      recollect.  It wasn't anything that, you know, I would

8      try to have done, you know.  It's possible maybe they

9      overheard me or something at some point in time when,

10     you know, when I didn't mean them to.  I can't -- no

11     one ever came to me and said, hey, stop your cursing

12     or -- that I'm aware of or anything like that, you

13     know.

14 BY MS. WALLET:

15 Q.  Okay.  Let me ask a more specific question.  Did you

16     ever hear Gary Graham use the F word in front of female

17     probation officers?

18 A.  I can't remember.  I'm not telling you that it didn't

19     happen.  It's possible.  I can't remember a specific

20     instance where Gary was F this or F that.

21         We did have -- I mean, I want to be honest with

22     you, we had a pretty, what I considered to be a pretty

23     rough office environment in that, I'm not saying this

24     makes it right, but there would be profanity.  And it's

25     certainly possible that in communicating that there was

```
 1          profanity used in front of female POs.
 2              I kind of, I would consider, you know, like I know
 3          Barb was our friend.  I mean, I wasn't as close to her
 4          as Gary was, you know.  I don't know if you would
 5          consider us friends.  We actually -- we kind of went
 6          our own ways.  But I could have seen people being
 7          comfortable enough to swear in front of her, you know.
 8          Not saying that that's right, but it could have
 9          happened.
10  Q.      Did you ever observe Mr. Osenkarski to use the F word
11          in front of female probation officers?
12  A.      Again, it's possible.  I feel bad, like I'm such a --
13          if you guys swore it wouldn't stick out in my mind
14          enough that I'd say, oh, he shouldn't have done that,
15          you know?  I have to work on those kind of things.
16              He might have.  I don't remember it.  It never --
17          there's no specific incident where I remember him doing
18          that, where I thought to myself, oh, he shouldn't have
19          talked like that to a female probation officer.
20  Q.      Did either Mr. Graham or Mr. Osenkarski ever tell you
21          as your supervisor that such language was not
22          appropriate in the office?
23  A.      I don't think so.  I mean, I don't want to make it
24          sound like it was terrible.  I mean, every once in a
25          while we would get upset and we would curse and swear,
```

Miller                                    59

```
 1                but no one -- I learned that, you know, as a result of
 2                that lawsuit and the education we've had I realize
 3                those kind of things are very important, you know.
 4                Prior, I didn't give it that much thought, you know.
 5      Q.        Mr. Graham and Mr. Osenkarski might have participated
 6                in the general banter in the office?
 7                     MR. MacMAIN:  Objection.  That's not what he said.
 8                You're asking him about profanity.  He says he doesn't
 9                recall whether they did or they didn't.
10      BY MS. WALLET:
11      Q.        Well, let me ask the question.  Did Mr. Osenkarski and
12                Mr. Graham participate in the general banter within the
13                office?
14      A.        If by banter you mean talking and participating in
15                whatever was going on, yeah.  I mean, they weren't
16                excluded from that.
17      Q.        And there were times when that included profanity?
18      A.        I think so.  I mean, I believe so.
19      Q.        And did they on any of those occasions object to the
20                language that was being used?
21      A.        Well, sometimes, you know, Joe would tell me to quiet
22                down or something like that, you know.  I mean, if I --
23                you can't -- you've got to act professionally, you
24                know, and most of the time if those kind of things were
25                happening it would be behind closed doors.
```

Miller                                    60

```
 1              I had a reputation for being loud and, you know, I
 2         don't think I'm a threatening person, but that might be
 3         to someone else.  And there's been once or twice where
 4         Joe held a sign up and said, would you please cool it,
 5         you know, will you tone down.  So you know, I don't
 6         know if that was in regard to profanity or just my
 7         decibel level or whatever, you know.  So he told me
 8         that a couple times.
 9    Q.   During the period of time that you supervised
10         Ms. Varner did you ever find her work performance or
11         her conduct on the job to be unacceptable?
12    A.   No.
13    Q.   How have you rated her as an employee?
14    A.   At the highest category.
15    Q.   And why did you do that?
16    A.   Well, I, you know, I could go through this long trilogy
17         of how our evaluations are tough instruments and all
18         this other kind of stuff.  But the honest truth is
19         Barb's as good as anybody on staff.  She does a good
20         job and so -- you know, I felt a little uncomfortable
21         doing her evaluation this time because I had only been
22         her supervisor for about maybe eight or nine months
23         when I did it, you know what I'm saying?  The truth of
24         the matter is I don't see the weaknesses or the
25         problems that would lead me to bring criticism or to
```

Miller                                      61

1           put her in a category where she doesn't deserve that

2           kind of evaluation.

3   Q.      Do you believe you evaluated her in the same fashion in

4           which you've evaluated the other employees that you

5           supervise?

6   A.      Yeah, I think so.

7                Here's the gist of it, you know.  I'm not stupid.

8           Maybe some of the things I say comes off like that.  I

9           realize anybody we evaluate we can criticize, we can

10          have weaknesses and/or positives.  You make a decision

11          as an administrator -- this is my perspective as to a

12          philosophical approach.  My approach is to play to

13          peoples' strengths.  And I like Blanchard's One Minute

14          Manager, find people doing things right.  I believe

15          that a creates a more positive office atmosphere and

16          environment for your employees.  Does that mean that I

17          couldn't go around and pull one or two criticisms out

18          of just about everybody in the office?  Well, sure.  I

19          have them, too.  I really believe that's human nature.

20          I believe it's very important to work on the positives

21          and to play to peoples' strengths.  That's what I've

22          tried to do in evaluating everybody I've dealt with.

23          And that's the way I feel is the most productive to go

24          about the job in the office.

25                We have a lot of negatives to our job, a lot of

Miller                                    62

```
 1            stressors.  I'm not trying to make excuses but I, you
 2            know, I feel like it's the proper way to treat people.
 3            The job is so tough, the job has so much stress
 4            associated with it, that if I wanted to sit down Barb
 5            Varner or anybody else and say, boy, let's look really
 6            hard and try to find something you could improve on, I
 7            could probably do that if I tried.
 8                 But the point is everything she's done is
 9            certainly acceptable to me.  And I've been in the
10            business a long time, and when I look at her strengths,
11            like many of the employees, I evaluate, I feel that
12            she's done an outstanding job.  So that's the way I
13            choose to approach it.
14    Q.    Now, prior to your coming to Cumberland County
15            Probation Office was your immediately previous
16            experience as a police officer?
17    A.    Yeah.
18    Q.    And what was your experience as a police officer?
19    A.    A lot of midnight shifts.  You know, I was there for --
20    Q.    Where did you work as a police officer?
21    A.    Camp Hill.
22    Q.    Camp Hill?
23    A.    Yeah.  I was there for a couple years.
24    Q.    And was that your first job after your education was
25            completed?
```

Miller                                    63

1   A.      No.  I've been -- I graduated -- if you want me to go

2           through this real quick, I graduated from Penn State in

3           '76.  I worked juvenile detention in Blair County for

4           three, four months.  I was hired as a juvenile

5           probation officer in Blair County for about two years.

6           Enlisted in the military, worked in the intelligence

7           corps in the military as an investigator interrogator

8           for three years.  Finished my tour of duty at Carlisle

9           War College, which is what brought me to this area.

10              Hired as a police officer in Camp Hill, worked

11          approximately two years.  They had a -- it was an

12          unfair labor practice.  There was a union thing filed

13          there and three of us were laid off.  And there was all

14          these court actions that eventually the job was

15          reinstated, but in the meantime I was able to get a job

16          with Cumberland County Juvenile Probation, and when my

17          job was reinstated I liked it more at Cumberland County

18          Juvenile, Juvenile Adult, slash, Probation.

19              I did adult -- when I first came we had a combined

20          office.  I did adult as well as Juvenile.  And then at

21          some point in time Hank Thielemann, who was the

22          previous intensive juvenile probation officer, was

23          tired of it.  You know, it's kind of, like, one of

24          those jobs, it's, like, front lines type stuff.  I took

25          it, did that for, I don't know, 10, 12 years, whatever

1       it was.

2             During that time, I think in '87 I got my master's

3       degree from Shippensburg, and -- because it was free.

4       I promised my -- I told Gary this once, that the

5       biggest reason -- I realize people's experience is more

6       important.  I got my education because I promised my

7       grandfather I would do it, you know, it was, like, a

8       promise I kept to him, you know.

9             I've worked some other, like, part-time jobs.  I'm

10      a DUI instructor and all that other kind of stuff.  I

11      can go through all that crap but you don't want to hear

12      that.

13  Q.  Now, at the time of the split, you had the opportunity

14      to go to Juvenile or to Adult Probation, and you chose

15      Juvenile at that time?

16  A.  I did.

17  Q.  Why did you choose that?

18  A.  A lot of reasons.  Number one, I think my heart's

19      working with kids.  And number two, truthfully, I was

20      much more comfortable with Joe than I was John Roller.

21      I had worked, I've worked for Joe for 20 years.  I felt

22      that, you know, nobody's perfect but Joe's general

23      philosophy about processing kids was similar to mine.

24      You know, I was raised in the '60s, we were kind of,

25      like, more pro kid than we were pro enforcement, you

Miller                                         65

1         know, we like to keep kids out of the system, do what

2         we could to help them without giving them more serious

3         records.  And that's a general, real generalization,

4         but I was comfortable with his philosophy and he was a

5         very good supervisor for me.

6   Q.    And you mean Mr. Osenkarski?

7   A.    Yeah.  For me, because I was kind of, like, a little

8         rebellious, not the easiest person in the world to

9         supervise.  And I felt like I did my job.  But I know

10        that if someone really tried to put their thumb on top

11        of me that I probably wouldn't have reacted real well

12        to that.  Well, Joe, and Gary, for that matter, they

13        gave me flexibility.  I think they felt like I did my

14        job.  But they allowed me to be independent, do some

15        unusual things.  And like, I was coaching and things

16        like that, you know and I might get off work at 2:30,

17        3:00, but then I would work around that and do the

18        extra.

19            All those things added up to me wanting to be a

20        Juvenile PO as opposed to an Adult, where I didn't

21        have -- I didn't really like that kind of work as much,

22        and frankly, I didn't like the people as much, you

23        know, that were administrating the Adult side.

24  Q.    Back to what you told to the EEOC, Mr. Miller.  This

25        says, Miller explained that he was a supervisor, and I

1      guess I have to tell you what precedes it, the transfer

2      of Mr. Graham, that you knew about that.  Basically

3      Hoffer said to Gary that he was disappointed in him and

4      lost faith in him and he was out.  Further, Gary then

5      tried to get support for himself by calling people in

6      the department asking for support.

7          Did you tell the EEOC that Gary called people

8      asking for support?

9  A.   I don't remember that, but I might have.  You know,

10     Gary did call us after he first left.  I know he called

11     me once or twice and talked to me.  He didn't ask me to

12     do anything specific.

13         But I had heard from Hank Thielemann that --

14     you're reminding me now, I think -- I don't know if

15     this is true or not, but I think he wanted Hank to do,

16     like, a petition, you know, to help him to garner some

17     support.

18         My sense was, Gary never told me this, that Gary

19     was angry that we weren't more supportive of him.  I

20     very well could have, you know, I think I probably said

21     that.

22         Now, I don't know if those -- my exact on the

23     exact words I heard that Judge Hoffer used was a couple

24     times removed.  I didn't hear it from Judge Hoffer.

25     But what we heard through the office gossip was that

```
 1            Judge Hoffer told Gary that he no longer had confidence

 2            in him as a supervisor or a manager.  That's what we

 3            heard.

 4    Q.      Okay.  According to Miller, most people thought Gary

 5            was not a nice person.

 6                 Did you tell the EEOC that you thought most people

 7            didn't think he was very nice?

 8    A.      I might have.  I might have.  I mean, I might.

 9    Q.      Nor did they want to go up against the directives of

10            the judge who had the power to fire all of them.

11    A.      Yeah, I mean, I don't -- if you're asking me whether I

12            said that or not?  I probably did.  I know nobody wants

13            to mess with the judge.

14                 And if Gary knows that Hank had -- I should let

15            Hank talk for himself, but I think Hank had

16            reservations as to, you know, when a judge says, hey,

17            you're done, well, if we go up and say something, the

18            judge can very well look at us and say, oh, by the way,

19            you can go down and get an office with him at the

20            prison, too, you know.  So people are lying if they're

21            not a little afraid of the judge, because they are.

22            We're at-will employees, you know.

23    Q.      Miller said Gary treated Barb like shit.

24    A.      Well --

25    Q.      Did you say that?
```

Miller                                        68

```
 1   A.   I don't know.  I don't know.  If she says I did,
 2        then -- during that time frame when their relationship
 3        was strained?  I might have said that.  I might have
 4        been referring to that.
 5   Q.   Further, since that time Gary has refused to even speak
 6        to them and is mad with all of them.
 7             Did you say that?
 8   A.   Yeah, I probably did.  He is.  He's been upset with us.
 9        That's my perception.
10   Q.   Miller also said that Gary is the type of person who
11        believes it is my way or no way.  I'm quoting exactly
12        now.
13             Did you say that?
14   A.   I don't remember, but I do believe that he's a very
15        single-minded, strong-minded individual and I do
16        believe that -- well, I'll put it this way.  I've given
17        a lot of thought to that.  You know, in the
18        beginning -- I've kind of gone through a transition on
19        this, too.  I've felt that Gary was the type of person
20        that if you disagreed with him, you would pay, so to
21        speak.  And when I was being called here for deposition
22        and as this has evolved I sat down and I thought about
23        it, and I can tell you that based on my personal
24        experience, I was wrong about that.  Gary and I
25        disagreed plenty of times.  He never did anything to
```

Miller                                69

1     me, okay?

2          My impression, it's true my impression was that if

3     you messed with Gar and he got upset with you, that he

4     wasn't the type of person that would often be

5     magnanimous and say, well, it's okay if you disagree

6     with me.  That was an opinion I had.  All right?  I

7     can't say that he ever did that to me.

8  Q.  Did he ever use the words in your presence, "people

9     will be punished" or "we'll get even"?

10  A.  It's -- I don't recollect those words specifically.  I

11     mean, I know the guys have joked around the office

12     where, oh, you're in trouble now, you're going to get

13     three cases tomorrow, you're going to be punished.  I

14     mean, we still joke about that somewhat.  I'm sure that

15     he probably said something like that.

16          If you're telling me give you a time, a date and

17     testify under oath that I'm sure he said it, I'm not.

18     I think that sometimes we got into banter like that, if

19     him and I were in an argument where I might have said,

20     hey, don't punish me by giving me three extra cases or

21     something like that, you know, so.  It wasn't a part of

22     dialogue that I can recollect specifically, but it

23     might have been said, you know.

24  Q.  He characterized GG as a vindictive type of person.

25     Did you tell the EEOC that?

Miller                                          70

1    A.    I might have.  I mean, I think he can be if he's upset.

2    Q.    What do you remember about what you told to the EEOC?

3    A.    Here was what I remembered.  Obviously, I don't

4          remember the specifics.  I remember the conversation

5          being that as far as the sexual harassment, I knew

6          nothing.  I had no idea anything was going on between

7          the two of them, and I had no idea as to any specific

8          incidents that had on occurred that in my primitive

9          brain I'd say, well, boy, that's sexual harassment.

10             I do remember saying that, yeah, there was times

11         Gary could lose his temper or be angry and act like an

12         ass.  I mean, I did that, too.  I remember, you know,

13         Gary saying to us one day kind of half jokingly where

14         he said, well, you know, how can it be discrimination,

15         I'm an ass to everybody sometimes, you know, something

16         of that nature, you know.  That was the picture I

17         thought I presented to the EEOC.  Yes, Gary could, if

18         he got upset with you, be hard to deal with, that he

19         could be angry.

20             In terms of discrimination, did he pick Barb out

21         and that there was a sexual discrimination involved?  I

22         just -- I'm not saying it didn't happen, I'm just

23         saying I just didn't have a lot of knowledge about

24         that.  I wasn't tied into being privy to that.  I don't

25         know what conversations occurred.  That's what I

Miller                                             71

```
 1          thought I characterized to the EEOC.
 2    Q.    Did you believe at the time that you spoke to the EEOC
 3          that Barbara Varner might have some reason to be
 4          fearful with regard to Mr. Graham's activities?
 5    A.    Well, you know, there's been a lot of history here.  I
 6          don't want to be melodramatic.  Here's my problem.  I
 7          have a tendency when bad things happen to other people,
 8          and by bad things I mean -- this has been a tough
 9          ordeal for everybody involved.  Barb's been through a
10          lot, Gary's been through a lot.  I've seen the impact
11          it's had on Joe over the last five, six years, you
12          know.  I tend to say, well, what would you be like in
13          that situation?  You know, I put myself.
14              If I was in Gary's situation and based on my
15          opinion of Gary's personality, yeah, I mean, I think
16          Gary's a tough person.  We had some things in common.
17          We were both wrestlers; he was a successful wrestler, I
18          wasn't.  The bottom line is, I saw him as a tough
19          individual who was being backed into a corner, who at
20          one point in time held a position of prestige in our
21          office, was a good family man.  All that changed.  I'm
22          not saying whose fault it was, but that all changed.
23              My perspective was if I was in that scenario, I
24          could see myself being a somewhat dangerous individual,
25          like, not being very happy about it, being angry about
```

Miller                                      72

1          it, being frustrated.  I guess I kind of transferred

2          that to him, I'm thinking, well, he's probably the same

3          way.

4    Q.    Did you tell Barb Varner at any time that she ought to

5          watch her back?

6    A.    I don't remember saying that to her.  Like I said, we

7          haven't had many conversations.  I think it's possible

8          that if we were in a conversation that I might have

9          said something like, I can understand your concern, or

10         it's certainly understandable to me, and that's my

11         perception that -- I heard a lot of things from a lot

12         of other people, don't know if it's true or not, as to

13         how angry Gary was.  And it's not that I didn't

14         understand it, it's just that it worried me.

15             I know people come in here and say, oh, he doesn't

16         worry, you know.  I'll be honest with you, I talked to

17         Billy after he did his deposition a little bit.  Billy

18         said that somebody asked him if he was, like, afraid of

19         Gary or this or that, and he says no, and he laughed

20         about it.  And I says, well, you got more guts than me

21         because I'd go the other way.  That was my impression,

22         I would go the other way.  I wouldn't mess with Gary,

23         you know.

24   Q.    Did anybody ever tell you that commitment trips had to

25         start at eight o'clock or 8:30 in the morning?

1    A.    No, I don't think so no.

2    Q.    Did you participate in commitment trips?

3    A.    Occasionally.  You know, I didn't go on many.  I was

4          one of the -- I did go, I mean, I'm not going to make

5          it sound like I didn't go on a commitment trip, but I

6          was one of the people who didn't like commitment trips

7          and so I would pawn it off when I could.  If one of my

8          kids was getting committed, I would recruit people and

9          say, hey, will you take my kid for me, you know.  And

10         so I went on far less commitment trips than most

11         intensive probation officers did through the course of

12         Cumberland County Juvenile.

13             MS. WILLIAMS:  Could we go off the record for a

14         minute?

15             (Recess taken from 1:45 until 1:57 p.m.)

16   BY MS. WALLET:

17   Q.    Did you ever take any commitment trips that started at

18         a time other than eight clock or 8:30 in the morning?

19   A.    Yeah.

20   Q.    Did anyone tell you that that was not appropriate?

21   A.    I don't remember specific incidents.  It was discussed

22         that we needed to be conscientious and efficient.

23         There would be a lot of times, like a lot times I'd go

24         with Tom Boyer.  Him and I are both early birds, so

25         we'd start at 6:00 in the morning, you know, so we

Miller                                74

1           could get done early.

2               I do remember conversations in the office where

3           there were times you might not take off till noon or

4           1:00 and the gist was you needed to have a good reason

5           for that.  You know, you needed to not be stealing from

6           the county, so to speak.

7       Q.  Did anyone dock your pay for having started a

8           commitment trip at some time other than 8:00 or 8:30 in

9           the morning?

10      A.  Me?  No.  No.

11      Q.  Okay.  Now, you said that you and another probation

12          officer went to see Judge Hoffer prior to the action to

13          transfer Gary Graham to the prison, correct?

14      A.  Judge Sheely.

15      Q.  I'm sorry.

16      A.  Judge Sheely.

17      Q.  Okay.

18      A.  We went to see Judge Sheely.  So, about what point in

19          time was that?  You know, obviously it was after the

20          lawsuit it was filed.  I believe it was after I was

21          appointed Barb's supervisor in June of '97.

22      Q.  So you think it was sometime in the summer of 97?

23      A.  I'm not saying that.  I really don't -- well, Judge

24          Sheely left in December of '97.

25      Q.  Correct.

1   A.   So obviously it was sometime between June and December

2        of '97.  I've thought about this because I figured it

3        would come up.  I don't remember.  Tom Boyer was the

4        other PO, so he might remember.  He's a lot more

5        detailed than I am.

6             MR. MacMAIN:  Can I ask one timing question?  You

7        keep using the term when the lawsuit was filed.  Do you

8        mean when the complaint was first made by Ms. Varner?

9             THE WITNESS:  Yeah.  I'm using the wrong -- the

10       first time I knew about it was in that March or April

11       of '97.

12            MR. MacMAIN:  Okay.  That's fine.

13            THE WITNESS:  Being filed is probably not the

14       right word, you know.

15            MR. MacMAIN:  That's fine.

16            MS. WALLET:  Thanks.

17  BY MS. WALLET:

18  Q.   Who decided to go to Judge Sheely at that time?

19  A.   It was Tom.  I would like to sit here and take credit

20       for it, but it wasn't me.  It was Tom, and I -- he

21       said, do you want to go with me, and I said yeah.

22  Q.   Okay.  Did he ask anyone else to go with him, to the

23       best of your knowledge?

24  A.   No, not to the best of my knowledge.

25  Q.   Did Mr. Boyer ask you or tell you that you ought to do

Miller                                            76

1         this?

2    A.   Oh, no, no.  There was no intimidation involved in

3         that.  I went because I wanted to go.  At that time I

4         felt bad for Gary.

5    Q.   Okay.  And at that time, what had you heard about the

6         possible ramifications for Mr. Graham?

7    A.   Well, I was hearing office rumors that he could

8         possibly be fired, or at the very least wasn't going to

9         be a supervisor anymore.  Something bad was going to

10        happen to him.

11   Q.   Okay.  And so you and Mr. Boyer went to see Judge

12        Sheely.  What was your purpose?

13          MR. ADAMS:  Objection, asked and answered.  He's

14        already testified to it twice.

15   BY MS. WALLET:

16   Q.   What was your purpose?  You may answer.

17   A.   I wanted -- you know, I can't speak for Tom.  I wanted

18        to make it clear to Judge Sheely that what Joe called a

19        corrective action plan, that I thought it was working,

20        that I thought it was okay.  And that if Judge Sheely

21        needed more time to sort out what actually happened

22        before he made a drastic decision, that he could, you

23        know, put off doing something.  Like, once he took Gary

24        out of the position and did whatever it was he was gong

25        to do, whether it would be fire him or send him to the

```
 1          prison, it's pretty hard to rebound off of that, you
 2          know.
 3    Q.    Did you ask Judge Sheely not to take any action against
 4          Gary Graham?
 5    A.    I don't remember those exact words.  What I said to
 6          Judge Sheely was things, I think things are going okay
 7          now, Barb Varner and I have a decent relationship that
 8          I think she's okay with and that I believe the problem
 9          has been solved.
10              I was optimistic that things could be worked out.
11    Q.    Did Judge Sheely at that time ask you anything about
12          the relationship between Gary Graham and Barbara
13          Varner?
14    A.    I don't think he asked me anything, no.
15    Q.    Did he ask you whether you had observed any sexual
16          harassment between Gary Graham and Barb Varner?
17    A.    No, he didn't ask me that.
18    Q.    Did he ask you whether you had observed any
19          inappropriate conduct by Gary Graham with respect to
20          Barbara Varner?
21    A.    No.  No, he didn't ask me that.
22    Q.    What was your understanding of the result of that
23          meeting?
24    A.    Well, you know, Judge Sheely, he's a judge, he played
25          it close to the vest.  He didn't tell us what he was
```

```
 1         going to do, but I walked out of there under the

 2         impression that Gary was in big trouble, you know.

 3    Q.   Did you believe that he might be fired?

 4    A.   I thought it was possible.  But I knew Danny Meyers, a

 5         fellow that worked in the Adult side, had told us that

 6         Judge Sheely had talked to the Adult side about this,

 7         too, and that there was a possibility that they would

 8         do something other than fire him, you know.  So, I

 9         wasn't really privy to all those conversations, but as

10         you can imagine, rumors were swirling all around what

11         was going to happen.

12    Q.   Did you immediately after or shortly thereafter this

13         meeting with Judge Sheely relay what you had done to

14         Gary Graham?

15    A.   I don't think so.  I don't think I ever talked to Gary

16         about it.  I don't think.

17    Q.   Do you know whether Mr. Boyer told Gary Graham?

18    A.   No, I don't.  I don't know if Tom talked to him or not.

19    Q.   After that meeting with Judge Sheely, when was the next

20         time anybody asked you about these complaints that

21         Barbara Varner had made against Gary Graham?

22    A.   No one ever officially asked me in terms of, like, a

23         judge calling me up or an attorney.  The only time I

24         discussed the allegations is when I went down, it must

25         have been March or April, to talk to Deluce, or
```

Miller                                79

```
 1          Deluce's representative.  And then the next time is
 2          maybe two years later or something like that, when EEOC
 3          called me.
 4    Q.    Okay.  Now, did Mr. Deluce ask to speak to you, or did
 5          you ask to speak to Mr. Deluce?
 6    A.    Joe Osenkarksi, I remember Joe specifically, maybe
 7          Gary, came to me and said, there's been a complaint
 8          filed against us.  I don't remember how specific they
 9          were, but they said, will you go down and talk to them,
10          because we think it's unfair, you know, and you need to
11          give your perspective.
12    Q.    Okay.  And did they tell you at that time the subjects
13          that you should discuss with Mr. Deluce?
14    A.    I wasn't coached or anything like that.  No.  They just
15          asked me to go talk to them.
16    Q.    That wasn't my suggestion, but did they say to you go
17          talk to him about something?
18    A.    Probably.  I mean, I think they just said -- I really
19          don't remember for sure, but common sense tells me Joe
20          came to me, he said, we've had complaints filed against
21          us, you know, something to the effect we don't think
22          it's fair, will you go down and give the other
23          perspective or tell them what you know, because we
24          think it's not a good complaint, or something of that
25          nature.
```

```
 1   Q.    And the other perspective being the Osenkarksi-Graham

 2         perspective?

 3               MR. ADAMS:  Objection.  That's not what he

 4         testified to.

 5   BY MS. WALLET:

 6   Q.    Well, what is the other perspective?

 7   A.    They wanted to -- I think what had happened was, this

 8         is my belief, I'm not saying Joe or Gary said this to

 9         me, was that Barb Varner had filed a Complaint and that

10         a number of people had assisted in terms of going to

11         talk to the judge or presenting information that they

12         felt something was wrong with what had occurred between

13         Gary and Barb or Joe and Barb, okay?  They felt that it

14         was unfounded or -- not their exact words but my sense

15         was they felt it was unfounded or that it was

16         one-sided, and they wanted me to present my perspective

17         because they thought it would be fairer to them.

18   Q.    Did they say to you:  Go talk to Deluce and tell our

19         side of the story?

20   A.    I don't remember those words.  I didn't feel any

21         intimidation or you have to.  They just said

22         something's going on, go down and tell what you know

23         about this because we, you know, think this is a bunch

24         of crap, you know, basically.

25   Q.    Now, when you went to see Deluce, what did you go to
```

```
 1        tell him?
 2   A.   Whatever he wanted to know.  He talked to me.  He asked
 3        me -- I'm not saying it was Deluce.  It might have been
 4        somebody else from his office.  I recollect that was
 5        the firm that handled it.
 6            He asked me a bunch of questions and I answered
 7        them.  I can't remember all the questions, but they had
 8        to do, I think, with Gary's treatment of Barb.  Maybe
 9        some things -- I think they asked me about seniority.
10        I mean, it's been a while, you know.  I can't remember
11        everything, but they asked me a whole bunch of stuff
12        about what was --
13   Q.   Do you remember any of the other subjects?
14   A.   It was seniority.  I think it was -- I don't think they
15        asked -- I don't think they asked me about Gary and
16        Barb having an affair.  I don't think that was brought
17        up.  I think it was just stuff like, have you heard
18        Gary Graham curse and swear at Barb Varner.  It was
19        those kind of things, okay?  And you know, I responded.
20        I mean, I talked to him about it.
21   Q.   Okay.  Do you remember anything else that Mr. Deluce
22        asked you during that interview?
23   A.   No.  I mean, that was the general gist, about the
24        complaint and --
25   Q.   What did you know about the complaint that Kerry Houser
```

1          Vohs had made against Joe Osenkarksi?

2    A.    Well, I knew it existed.  I mean, I knew that -- I

3          didn't see myself as involved in that in any way.  I

4          just knew that Kerry had filed a Complaint because of

5          the derogatory term.

6    Q.    Okay.  And had you heard the term cunt club?

7    A.    I can't say that I specifically remember either one,

8          anyone coming in and saying that, you know.  I just --

9          it probably would have bounced off of me.  I probably

10         wouldn't have been paying attention, you know.  I can't

11         specifically recollect.

12   Q.    Did you hear the term cunt club?

13   A.    After the fact I remember people talking about it

14         saying that was said.  Prior to the fact, I don't

15         remember Mr. Graham or Mr. Osenkarski calling it that.

16   Q.    What, if anything, did anyone ask you about the Vohs

17         Complaint?

18   A.    Nothing.  I wasn't interviewed on that or a part of

19         that in any way.

20   Q.    Did you talk to any of the other probation officers

21         about the Vohs complaint or the investigation of the

22         Vohs complaint?

23   A.    No, not about the investigation.  I knew it was

24         happening, and I think there was general conversation

25         in the office about it.  I can't remember -- you know,

1            I didn't go to anybody and -- I don't remember a

2            specific conversation.

3     Q.    Did you express an opinion about what should be done or

4            not done with regard to the Vohs complaint?

5     A.    I don't remember expressing an opinion, to be honest

6            with you, Deb.  Back then I was a line PO.  I probably

7            didn't think it was a big deal.  I mean, I'm not saying

8            that's right, but I was probably, like, you know,

9            what's all the fuss about.

10    Q.    Okay.  You became a senior probation officer

11           approximately what date?

12    A.    You got me on that.  I got my PO-II and my juvenile

13           supervisor date but I don't know when I became a senior

14           PO.

15    Q.    Do you know how it was that you became a senior PO?

16           Was it the recommendation of someone?

17    A.    Yeah, I think so.  I mean, we -- you're testing my

18           memory.  I know that we had to write up some proposals.

19           We were trying to get people advanced in the office,

20           because things had been stagnant for such a long period

21           of time under Ken Bolze.  He did nothing for us.

22               Joe's strength was that he was interested in

23           getting people promoted because he felt that they would

24           be happier, you know.  He was right.  And so we wrote

25           up, we went through a series -- I just don't remember

Miller                                          84

```
 1          how that's involved.
 2              I remember writing, you know -- I think maybe Dave
 3          Meyers and Gary were involved in that, I'm not sure.
 4          They wrote up some things about senior PO descriptions
 5          and what the requirements were, but I don't remember a
 6          lot of the specifics.  I don't think I was one of the
 7          ones involved in helping write it up.  I probably was
 8          griping about it, you know, I wanted to get a
 9          promotion.
10   Q.    Was it Mr. Osenkarski who made the recommendation for
11          you to be promoted to senior PO?
12   A.    I'm guessing.  I mean, it was either Joe or -- yeah.
13          Ken probably would have been gone.  Somebody's got to
14          help me with that.  I don't know.  Ken Bolze left in
15          September of '96.  I was a PO-II in '98.  Or Ken Bolze
16          I think left at the end of '96.  He probably wasn't
17          there when I got senior PO, so it was probably Joe.
18   Q.    Okay.  Was there anyone with more seniority, no matter
19          how you count it, with more seniority than you at the
20          time that you were made a senior PO and they were not?
21   A.    No.  Because Lyle Herr was the fellow I was telling you
22          about that I was hired three weeks before him.  But I
23          think he got senior PO the same time I did, so there
24          wasn't this big issue as to one getting it and one not
25          getting it.
```

Miller                                    85

```
 1   Q.   When you were made a PO-II, was there anyone who had
 2        more seniority than you, no matter how you count
 3        seniority, who was not made a PO-II?
 4   A.   No.  No, that was in '98, June of '98, and we had split
 5        officially January 1st, '97, but I think it kind of
 6        happened in September of '96.  So Lyle would have been
 7        on the other side and I don't -- nobody else had more
 8        seniority than me.
 9   Q.   Are you aware of any individual who did not have the
10        most seniority on the seniority list as posted for
11        purposes of promotion?
12   A.   Yeah.  In the old days, yeah.
13   Q.   What do you mean by the old days?
14   A.   When the department was together.  John Roller was
15        promoted over Bob Houser, and I believe Bob Houser had
16        more seniority than John Roller.
17   Q.   Anyone else?
18   A.   That's the only one I can think of.  I mean, everybody
19        talked about it because you're right, it was very
20        unusual.
21   Q.   Now, did anyone ever come to you and say, in essence,
22        I'm studying this issue of seniority, what do you have
23        to say about it?
24   A.   I don't remember those words, yeah, but I remember
25        talking to Gary about it.  I mean, maybe Joe.  I was
```

```
 1           fairly vocal.  I thought it was wrong, so I remember
 2           griping about it, you've got to change this, you know,
 3           do something about it, you know.
 4    Q.     Listen to my question.  Did anyone come to you and say:
 5           I am investigating or charged with the decision making
 6           regarding the seniority issue and I'm soliciting your
 7           opinion?
 8    A.     Well, yeah.  I mean, I'm not saying they used those
 9           words, but I remember Gary coming to me and saying, do
10           you think it's right?  And I remember talking to him
11           about it and saying, no, it's not right, you know,
12           change it, Ken Bolze was screwed up, he shouldn't have
13           done it that way.
14    Q.     Did Gary Graham ever call you and ask you to support
15           Mr. Osenkarski with regard to the charges brought by
16           Ms. Vohs?
17    A.     I don't think so.  No.
18    Q.     Did Mr. Osenkarski ever call you and ask you to support
19           him with regard to the charges brought by Ms. Houser
20           Vohs?
21    A.     I don't think so.  I mean, I know Joe wasn't happy
22           about it.  Nobody ever questioned me about it.  I
23           wasn't -- I don't think my input was important, so
24           nobody really had to lobby me to support them, you know
25           what I'm saying?  No one ever talked to me about it,
```

1            really.

2    Q.     Where is your office in relation to Ms. Varner

3           presently?

4    A.     We're, like, separate ends of the hall.  She's down,

5           it's west wing, I think it's called west wing.  It's,

6           like, in the new section of the courthouse.  You've got

7           to walk down a hall.  It's probably a two-minute walk.

8    Q.     Okay.  And were you at any time in close proximity to

9           her with regard to where your office and her office

10          was?

11   A.     Closer.  She used to be up at our end and she was in --

12          I don't remember every place she's been, but the last

13          one, all I remember is this cubicle type place, you

14          know, that they built, and I was 25 feet away from her

15          I guess, something like that.

16   Q.     Prior to when Mr. Graham was sent to the prison, where

17          was your office in relationship to Ms. Varner's office?

18   A.     It was, I was -- I think that's when Barb was in the

19          cubicle.  I was always -- I've had two offices, and I

20          was in the old office, which is right beside where I am

21          now, and I think Barb was in the cubicle at that time

22          but I'm not positive.  She might have been in another

23          one.  I think I was about 25 feet away from her, I

24          think.

25   Q.     Did anyone at any time tell you that the reason you

```
 1            were being made the supervisor of Ms. Varner was

 2            because they were separating her from Mr. Graham?

 3     A.     In '97, you mean?

 4     Q.     At any time.

 5     A.     Yeah, in a manner of speaking.  The corrective action

 6            plan was so that Gary wouldn't be in her direct line of

 7            supervision because of the Complaint that had been

 8            filed.

 9     Q.     And who told you that?

10     A.     Well, I know Mr. Hartnett talked to me about it, the

11            personnel director.  And I'm guessing Joe -- I mean,

12            Joe talked to me about the corrective action plan, so

13            -- I don't remember all the specific words but I know

14            that this was -- he was saying you've got to do this

15            because Gary can't be her supervisor.

16     Q.     Did he tell you at that time whose decision it was to

17            make you Ms. Varner's supervisor?

18     A.     Well, I knew because a court order came down, it was

19            Judge Sheely.  He issued a court order and that gave it

20            to me.  So I mean, it was pretty clear to me it was

21            Judge Sheely.

22     Q.     And what did the court order say?

23     A.     To the effect that I was her supervisor from a specific

24            date, I commenced being her supervisor.

25     Q.     Did it give a reason?
```

 1   A.   I should have looked for it.  I think I still have it

 2        at the office but I haven't looked at it for so long.

 3        I don't think it did.

 4   Q.   At the time that you were made Ms. Varner's supervisor,

 5        who was your immediate supervisor?

 6   A.   I guess Gary.

 7   Q.   So Ms. Varner reported to you, you reported to Gary

 8        Graham?

 9   A.   Yeah.  I'm trying to think.  That was in '97, so Gary

10        was the Juvenile supervisor.  Joe was in charge of

11        the -- when did we split?  Yeah, yeah.  That would

12        have -- Gary was the supervisor and Joe was our

13        director.  Okay, what did you ask me again?

14   Q.   Ms. Varner was assigned to report to you?

15   A.   To me, um-hum.

16   Q.   At that time you reported directly to Gary Graham?

17   A.   Yeah.  Well, Tom Boyer was a PO-II.  You know, the

18        chain of command was, I think it was Tom Boyer was a

19        PO-II, then Gary, and then Joe.  It would be -- I mean,

20        Gary was my boss.

21   Q.   Who was your immediate supervisor at the time that you

22        were assigned to become the supervisor of Barbara

23        Varner?

24   A.   Technically I guess it was Tom Boyer, but I felt like

25        it was Gary, in all honesty.  I mean, he ran the

Miller                                                      90

```
 1         office.
 2              MS. WALLET:  That's all I have.
 3    BY MR. DELLASEGA:
 4    Q.   When you met with Judge Sheely did he discuss with you
 5         the fact that there had been an affair?
 6    A.   I don't remember.  He might have.  I don't remember
 7         what he said.
 8    Q.   Okay.  Do you recall a bomb scare last year in the
 9         building?
10    A.   Yeah.
11    Q.   Did Mrs. Varner ever discuss that with you?
12    A.   Yeah.
13    Q.   What did she say?
14    A.   Well, she came out and told me that she had been, I'm
15         paraphrasing here, that we had forgotten, she was left
16         behind, to which I was flabbergasted, you know what I'm
17         saying.  I was like, oh, geez, you know.  And we talked
18         about it a little bit.  Not much, you know.  At first I
19         didn't know that she was upset, you know, and then I
20         realized she was upset.
21              After the incident occurred, Human Services came
22         and talked to us, you know, and interviewed us and
23         stuff.  I felt bad about it, you know.
24              And I went to her -- I don't remember everything
25         but I remember, I think I apologized and said, I'm
```

```
 1              sorry, it wasn't anything on purpose to leave you in
 2              there, you know.  How ironic, it was just -- I just
 3              wasn't thinking.
 4      Q.      Do you have any reason to believe that she consciously
 5              was not advised of the bomb threat because she's
 6              brought this lawsuit?
 7      A.      No, I don't think so.  I mean, I know on my part it was
 8              just an honest mistake.  We were checking -- we got
 9              notified, we were checking and I was, like, I guess,
10              you know, I evacuated the ship pretty fast, you know, I
11              was one of the first ones.  And we got out of there and
12              I -- the office is pretty small.  I thought everybody
13              had been told.  It was pretty loud what was going on.
14              The sheriff's deputies had come in, kind of announced
15              it to everybody.  I thought everybody knew.  I mean, it
16              was just -- it was the wrong assumption but, you know,
17              I thought everybody knew.
18      Q.      Have you ever used the F word yourself in Mrs. Varner's
19              presence?
20      A.      I hope not.  I'm not going to say I haven't.  I don't
21              recall.
22      Q.      Ever used any other four-letter word in her presence?
23      A.      Oh, no.  No, I haven't.  You mean --
24      Q.      She's just in the room, not directly to her.
25      A.      It's possible that I have cursed in front of her, if
```

```
 1            that's what you're asking me.
 2     Q.     Yes, that's what I asking you.
 3     A.     Yeah.
 4     Q.     Has she ever complained to you about it?
 5     A.     No, not directly, but I know from my training it's
 6            something I try hard not to do because it's offensive,
 7            you know.  So I take that for granted not to do it.
 8     Q.     My specific question is:  Has she ever complained to
 9            you about your language?
10     A.     She's never said to me, Sam, clean up your language,
11            stop cursing.  And maybe that's because I did, I don't
12            know.  I hope I've never cursed in front of her, but I
13            might have.
14     Q.     In the period of time you've been her supervisor, has
15            she ever complained to you about bad language within
16            the office?
17     A.     No, I don't think so.  No.
18     Q.     Is the F word still used in the office from time to
19            time?
20     A.     Yeah, from time to time, although we've cleaned up our
21            act a lot.  Things are drastically different than what
22            they used to be.  We're aware that what isn't offensive
23            to us can be offensive to other people.
24     Q.     Since you've been her supervisor, has she ever
25            complained to you about any treatment she's received,
```

1          other than the bomb scare, that she feels is

2          retaliatory because she brought the lawsuit?

3     A.   I don't think so.  I don't recall her complaining to

4          me.  I know she's under a lot of pressure with this

5          whole lawsuit thing, but I don't recall offhand, no, I

6          don't.

7     Q.   Do you think Mrs. Varner is treated with kid gloves as

8          a consequence of the lawsuit?

9     A.   Well, I try really hard not to do that.  I try to be

10         comfortable with her, treat her like I would anybody

11         else.  It would be a lie to say that every time Barb

12         and I interact, of course, I think of the lawsuit, you

13         know.  But I don't think it affects our, my

14         relationship with her, because she does her job and I

15         don't have to give her special privileges, so to speak,

16         you know.  But it is, it's in my mind, you know, I

17         don't want to be sued.

18    Q.   Has anyone else who has been her supervisor ever

19         discussed with you treating her with kid gloves because

20         of the lawsuit?

21    A.   No, I don't think so.  I mean, if they've asked -- you

22         mean have they asked me to do that?  No.  No, they've

23         just asked me to be fair to her.

24    Q.   Do you regularly give out the -- when you're doing an

25         employee evaluation, do you regularly give out the

1          highest category rating to the people you rate?

2   A.     Not to all.  A lot of it depends on how I feel about

3          them.  I've got some younger employees that I think

4          need to develop some skills.  So they have good

5          ratings, I still try to play to their strengths.  But

6          you know, there's, like, four or five categories.

7          There's outstanding, there's, like, five categories,

8          and I might give them one notch down or two notches

9          down in certain categories.

10              But there's no question, I think the evaluations I

11         give to people in general are high evaluations, because

12         I try to be a positive person and I try to play to

13         their strengths.

14  Q.     Have you ever heard of employees complaining about

15         their evaluation ratings to supervisors?

16  A.     Oh, yeah, people are real sensitive about that.  I

17         don't mean -- okay, I should have listened to your

18         whole question.

19              I'm not aware of official complaints, but I know

20         that both when I was an employee and as a supervisor,

21         it's not a fun thing to go through.  No, people don't

22         like criticism, they don't like to assess their own

23         situation.

24  Q.     In your years as a supervisor, have you ever heard of

25         an employee's evaluation being upgraded as a result of

1           them complaining about it?

2    A.    I don't know if that actually happened or not.  I know

3           one year it was joked about.

4    Q.    With regard to who?

5    A.    With regard to Gary.  I don't know if it's true.

6    Q.    With regard to the evaluation Gary received --

7    A.    Yeah.

8    Q.    -- or the evaluation he gave?

9    A.    The evaluation Gary received.

10   Q.    Did Mrs. Varner ever discuss with you complaining about

11          her own employee evaluation from another supervisor?

12   A.    She didn't discuss it with me.  No, I don't think so.

13          I don't think she ever talked to me about a complaint

14          about any of her evaluations.

15   Q.    With regard to the other female POs in the office, did

16          you ever hear any of them use the F word?

17   A.    I think it's probably happened, you know, with some of

18          them.

19   Q.    Okay.

20   A.    Although, you know, I wouldn't be able to say a

21          specific instance.  But you know, they're not all --

22          you know, it's not really a female-male thing, in my

23          perception.  It's kind of, like, what you're

24          comfortable with, your language.  You know.

25              MR. DELLASEGA:  That's all.

Miller                                          96


 1  BY MR. MacMAIN:

 2  Q.    I just have a couple questions.  In the EEOC statement

 3        that you gave I just want to ask about a couple

 4        comments you made about Ms. Varner.

 5             He, meaning you, said that he thinks Barb got into

 6        something that she does not know how to get out of and

 7        is probably paranoid of everything that is happening to

 8        her, i.e., blowing things out of proportion.

 9             Do you remember stating that or something like

10        that to the EEOC investigator?

11  A.    That sounds like something I would have said.  You've

12        got to understand, I can't remember everything I said.

13        But I feel like probably what I was talking about Barb

14        and Gary were friends, something bad happened, she

15        filed a Complaint.  And it's kind of, like, my image

16        was you're kind of fighting for your life, you know,

17        because the sense is once you file that Complaint, it's

18        serious business, you know what I'm saying?  Somebody's

19        going to lose their job or this or that.  There's,

20        like, no turning back.

21             I had always hoped that whatever problem there was

22        was going to get worked out because they were friends.

23        But you know, obviously that didn't happen so I can't

24        deny I said that.

25             MR. MacMAIN:  That's all the questions I have.

```
 1              MR. ADAMS:  I have no questions.
 2   BY MS. WILLIAMS:
 3   Q.    Mr. Miller, when you became Ms. Varner's supervisor
 4         and Gary was still in the office as a supervisor, did
 5         Gary tell you how to supervise Barbara?
 6   A.    No, he didn't.  He -- I was pleased that he didn't put
 7         any pressure on me.
 8   Q.    Okay.  Did he tell you how to evaluate her?
 9   A.    No.  I don't recall that.  I don't know if I did an
10         evaluation on her.  The records would --
11   Q.    So he kept his hands off the supervision?
12   A.    He did.  He played it straight.
13   Q.    Did he have any influence over your supervision of
14         Barbara Varner?
15   A.    No.  Gary knows how I am.  I mean, not that I didn't
16         respond to him, because I did.  But I'm a little out in
17         left field sometimes and he knew it wouldn't have done
18         him any good, anyway, you know what I'm saying.  I was
19         going to handle it the way I saw fit.  But he did not
20         try to influence me in any way.
21   Q.    So you were totally independent of Gary in your
22         supervision of Barbara?
23   A.    I felt that way.  I mean, Gary was still my boss, but I
24         didn't -- I didn't like being in the middle of that,
25         let's be honest.  I knew right away, I went, oh, shit,
```

1          you know, here I am, I'm at the deposition table, you

2          know, but -- so I wasn't pleased about that.  But I did

3          not feel -- well, Gary, he just, he never gave me a

4          hard time about it.  I thought I was doing him a favor.

5    Q.    If he had exerted undue influence, would you have gone

6          to Judge Sheely?  Or taken some other action?

7    A.    No.  I'm not that way.  I would have not -- first of

8          all, I'm really good at some things and other things

9          I'm not.  I would never -- I don't have it in me, I

10         could never have been unfair to Barb because of

11         something that happened between her and Gary.  I had it

12         in my mind I was going to do a professional job, treat

13         her fairly, and just try my best to call the shots the

14         way they were.

15   Q.    And are you satisfied that that did happen?

16   A.    Yeah.  I mean, I things were fine.

17         MS. WILLIAMS:  Thanks.  That's all I have.

18   BY MS. WALLET:

19   Q.    Mr. Miller, I really hate to belabor this, but I did

20         not understand your testimony with regard to someone's

21         evaluation being changed.  I believe you said that you

22         had heard that someone's evaluation was changed and you

23         were asked who, you responded Gary Graham's.  What were

24         you referring to there?

25   A.    Well, I think he asked me had I ever heard of anybody's

Miller                                        99

```
 1            evaluation being changed in the office, and I remember
 2            the guys joking one time that they think Gary's was.
 3            But I don't know if that's true or not.
 4      Q.    And was the joke that his evaluation was raised or
 5            lowered?
 6      A.    Raised.
 7      Q.    And what was the scuttlebutt?
 8      A.    I don't remember it all.  It was, like, that he felt
 9            his evaluation was unfair and he complained about it,
10            and they re-evaluated the evaluation.  I don't know if
11            that's true or not.  That was just, you know --
12      Q.    So you have no personal knowledge of any of that?
13      A.    No.  I was a peon.  I wasn't doing the evaluations.  I
14            was just listening to all the rumors.
15                 MS. WALLET:  That's all.
16                 MS. WILLIAMS:  Thank you very much, Mr. Miller.
17                 MR. MacMAIN:  Thank you for your patience.
18                 (Discussion held off the record.)
19                 MS. WILLIAMS:  You have the opportunity if you
20            want it, to read your deposition testimony, make any
21            corrections that could be that Emily, because she's
22            hungry and tired, has not been able to transcribe it
23            exactly.  She may have heard one word wrong or some
24            such.
25                 Do you want to read and sign?  Or do you want to
```

Miller                              100

1     waive it?  You don't have to read and sign, but if you

2     want to.

3          THE WITNESS:  Yeah, I'd like to read and sign it,

4     if that's okay.  Sure.

5          MS. WILLIAMS:  I guess we'll do it the same way.

6     You'll send the transcript to me.  I'm with the court.

7     So I'll then transmit it to you.  Okay?

8          THE WITNESS:  Okay.

9          MS. WILLIAMS:  And then you'll have the chance to

10    read it and make any corrections.

11         (Whereupon, the deposition was concluded at

12    2:33 p.m.)

13                        *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

101

COMMONWEALTH OF PENNSYLVANIA        )
                                    )  SS.
COUNTY OF DAUPHIN                   )


    I, Emily R. Clark, Reporter and Notary Public in
and for the Commonwealth of Pennsylvania and County of
Dauphin, do hereby certify that the foregoing testimony
was taken before me at the time and place hereinbefore
set forth, and that it is the testimony of:


                    SAMUEL MILLER


    I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

    I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

    Dated at Harrisburg, Pennsylvania, this 20th day
of March, 2003.



                              _____
                              Emily R. Clark
                              Reporter - Notary Public



(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)