```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,             .
         Plaintiff,            .   CIVIL ACTION
                              .   NO. 1:CV 01-0725
     vs.                       .
                              .
COMMONWEALTH OF PENNSYLVANIA,  .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,       .
CUMBERLAND COUNTY; CUMBERLAND  .
COUNTY; S. GARETH GRAHAM,      .
Individually, and JOSEPH       .
OSENKARSKI, individually,      .
         Defendants.           .
. . . . . . . . . . . . . . . . . .
```

Deposition of: DARBY CHRISTLIEB

Taken by    :  Defendant

Date        :  April 28, 2003, 10:17 a.m.

Before      :  Emily Clark, RMR, Reporter-Notary

Place       :  Administrative Office of Pennsylvania
               Courts
               5034 Ritter Road
               Mechanicsburg, Pennsylvania


APPEARANCES:

       DEBRA K. WALLET, ESQUIRE
           For - Plaintiff

       ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
       BY:  A. TAYLOR WILLIAMS, ESQUIRE
           For - Defendant Commonwealth of Pennsylvania
               Ninth Judicial District, Cumberland County

       THOMAS, THOMAS & HAFER
       BY:  PAUL J. DELLASEGA, ESQUIRE
           For - Defendant Cumberland County

2

```
 1   APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  DAVID J. MacMAIN, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
     ALSO PRESENT:
 7
          MS. BARBARA E. VARNER
 8
          MR. S. GARETH GRAHAM
 9
          MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                         WITNESS

 3   Darby Christlieb                       Examination

 4        By Mr. Dellasega                  4, 66, 73

 5        By Ms. Williams                     27, 76

 6        By Mr. Adams                     18, 70, 77

 7        By Mr. MacMain                        28

 8        By Ms. Wallet                      33, 74

 9

10

11

12                        EXHIBITS

13   (None marked)

14

15

16                   *   *   *   *   *

17

18

19

20

21

22

23

24

25
```

```
 1                         STIPULATION
 2              It is hereby stipulated by and between the
 3         respective parties that sealing, certification and
 4         filing are waived; and that all objections except as to
 5         the form of the question are reserved until the time of
 6         trial.
 7
 8              DARBY CHRISTLIEB, called as a witness, being
 9         duly sworn, was examined and testified, as follows:
10    BY MR. DELLASEGA:
11    Q.    Have you testified before, Mr. Christlieb?
12    A.    Yes, I have.
13    Q.    Okay.  How are you currently employed?
14    A.    I'm employed by the Cumberland County Juvenile
15         Probation Department.
16    Q.    Okay.  When were you hired?
17    A.    I was hired by that department in July of 1989.
18    Q.    When did you first meet Mrs. Varner?
19    A.    It would have -- well, she was employed by Children and
20         Youth Services I believe between that time and 1995,
21         whenever she came to our office.  So occasionally I
22         would speak to her on the telephone, but the contact
23         that her and I had were very minimal between '89 and
24         '95.
25    Q.    Did you ever observe Mrs. Varner and Gary Graham
```

```
 1          interact before she was hired in Juvenile Probation or
 2          the combined Probation Department?
 3    A.    No, not too much.
 4    Q.    At all?
 5    A.    Not that I could say, no.
 6    Q.    At any point in time did you ever hear within the
 7          office the phrase Barb 1 and Barb 2 used?
 8    A.    Yes.
 9    Q.    Can you tell me how you heard that?
10    A.    And I don't know exactly where it came from, but it was
11          regarding Gary Graham, in that there was a Barb 1 and a
12          Barb 2, referring to Barb Graham, his wife, and Barb
13          Varner, who worked in our office.
14    Q.    And in what context would that phrase Barb 1 and Barb 2
15          be used?
16    A.    Perhaps whenever we were speaking or someone was
17          speaking to Barbara Varner, to be Barbie 2, or his
18          wife, Barbie 1.
19    Q.    Were there any other Barbaras in the office?
20    A.    No.
21    Q.    Not even in the secretarial pool?
22    A.    No, I don't believe so.
23    Q.    Did you draw from the use of that phrase that there was
24          any type of special relationship between Graham and
25          Barbara Varner?
```

```
 1    A.    No.
 2    Q.    Did you draw any conclusions from the use of that
 3          phrase?
 4    A.    No.
 5    Q.    How often did you hear it used?
 6    A.    This was, of course, after Barb's employment in '95, so
 7          whenever there were interactions with Gary and Gary and
 8          Barb.  It might have been once a week.
 9    Q.    Did you ever hear it used before she was hired by
10          Probation?
11    A.    No.
12    Q.    When Mrs. Varner came on board, did you then have an
13          opportunity to observe her interact with Graham?
14    A.    Yes.
15    Q.    Did she appear to be friends, to you?
16    A.    Yes.
17    Q.    Do you recall the time when the Probation Department
18          split into Adult and Juvenile Probation sections?
19    A.    I do.
20    Q.    And I want to ask you some questions about what you
21          remember before that split occurred.
22    A.    Okay.
23    Q.    Before that split occurred, did you ever observe
24          Mr. Graham yell at Mrs. Varner?
25    A.    No.
```

1   Q.   Curse at Mrs. Varner?

2   A.   No.

3   Q.   Say anything sexually demeaning to Mrs. Varner?

4   A.   No.

5   Q.   Give Mrs. Varner arduous or burdensome assignments

6        compared with what other new officers got?

7   A.   No.

8   Q.   Did you, again, before the split, did you observe

9        Graham treat her with respect?

10  A.   Yes.

11  Q.   Treat her as a friend?

12  A.   Yes.

13  Q.   Treat her, in fact, perhaps better than he treated

14       other people?

15  A.   Yes.

16  Q.   Okay.  Treat her as one of his favorites?

17  A.   Yes.

18  Q.   Okay.  When you said that you observed him treat her

19       better than other people, can you explain to me what

20       you meant by answering yes?

21  A.   There was some favoritism, I thought, where he and Barb

22       were seen a lot together.  And if there would be any

23       travel time when we would place children outside the

24       county, they seemed to be traveling a lot.

25  Q.   Anything else?

```
 1   A.   No.
 2   Q.   Did you yourself work with Mrs. Varner prior to the
 3        split?  Did you ever share cases, any supervisory role?
 4   A.   Prior to -- I believe the split occurred in October or
 5        September of '96.  I handled primarily adult offenders,
 6        so I was handling basically about 80 percent adult, 20
 7        percent juvenile.  So there would be some occasions
 8        that I would have minimal contact before the split.
 9   Q.   Prior to the split, did you ever observe or hear
10        Mrs. Varner complain about Gary Graham?
11   A.   No.
12   Q.   Did you ever observe or hear Mrs. Varner complain about
13        having to take so many trips with Mr. Graham?
14   A.   No.
15   Q.   Prior to the split, did Mrs. Varner appear to accept
16        Graham as a mentor?
17   A.   Yes.
18   Q.   Prior to the split, did Mrs. Varner appear to enjoy
19        Mr. Graham's company?
20   A.   Yes.
21   Q.   Did you ever see Mr. Graham's attitude to Mrs. Varner
22        change?
23   A.   Yes.
24   Q.   Can you tell me whether that was an abrupt or gradual
25        change, as you recall it?
```

1   A.   It seemed to me it was very abrupt.

2   Q.   Are you able to put any kind of time frame on when that

3        abrupt change occurred in relationship to the split in

4        from Probation to Adult and then Juvenile sections?

5   A.   It would have occurred after the split, at least when I

6        took primarily juvenile in October of '96.  So I'm

7        thinking sometime in 1997.

8   Q.   What did you notice that made you conclude there had

9        been some kind of a change?

10  A.   There was one occasion in particular that occurred,

11       like I said, I think in 1997, where I was in the main

12       office, which is right outside of Barb Varner's office,

13       and there was an incident where Gary Graham had come to

14       her office, and there was some type of disagreement and

15       Gary became loud with her.  And that was the first time

16       that I had seen that there was some differences between

17       the two.

18  Q.   On the occasion when Mr. Graham became loud with

19       Varner, did she also become loud with him, do you

20       recall?

21  A.   Not that I can recall, no.

22  Q.   Were you able to actually hear what Mr. Graham was

23       saying?

24  A.   At the time, probably.

25  Q.   Do you recall it now?

```
 1   A.   I can't recall now what it was over.
 2   Q.   Following the split, did you ever hear Mrs. Varner
 3        complain about Graham?
 4   A.   No.
 5   Q.   Did you ever hear Mrs. Varner complain about having to
 6        take trips with Graham?
 7   A.   No.
 8   Q.   Did Mr. Graham appear to continue to act as
 9        Mrs. Varner's mentor?
10   A.   From that period of October of '96 till that date in
11        '97, yes.
12   Q.   After the split, did Mrs. Varner appear to enjoy
13        Mr. Graham's company as you had said she did before the
14        split?
15   A.   Yes.
16   Q.   You've mentioned that Graham's attitude towards Varner
17        seemed to change.  Did you ever notice Mrs. Varner's
18        attitude to Mr. Graham change as well?
19   A.   Yes.
20   Q.   Okay.  Would you describe that again as abrupt or
21        gradual?
22   A.   That seemed to be abrupt, also.
23   Q.   And was it at the same time as Mr. Graham's attitude
24        change?
25   A.   Yes.  Yes.
```

1   Q.   So there was a mutual sudden change in their

2        relationship for the worse?

3   A.   Yes.

4   Q.   Was this change in the tenor of their relationship

5        noticed within the Juvenile Probation Office?

6   A.   Yes.

7   Q.   Talked about?

8   A.   Yes.

9   Q.   Were any theories suggested that you ever heard by your

10       co-officers as to why the change in the tenor of their

11       relationship had occurred?

12  A.   Not that I can recall.  I know we were kind of

13       surprised that it happened so abruptly.

14  Q.   Do you recall anything else?

15  A.   No.

16  Q.   Can you recall anybody ever suggesting that there was a

17       sexual overtone to their relationship and that had

18       played a role in the change in the tenor of their

19       relationship?

20  A.   I guess at some time that came out.  I don't know if it

21       was in late '97 or in '98, but at some point that was

22       made known, yes.

23  Q.   Is your answer referring to the fact that Graham

24       confessed to the judge that he was having an affair

25       with Mrs. Varner?

Christlieb                    12

```
 1   A.   Yes.
 2   Q.   Okay.  Prior to Graham's confession, had you ever heard
 3        the possibility that the two of them were having an
 4        affair discussed within the office?
 5   A.   I could have heard that possibility, but I never
 6        thought there was much truth to it.
 7   Q.   When you say you could have heard that possibility,
 8        does that mean that you did hear that possibility?
 9   A.   It could have been discussed.  I'm not sure.  I'm sure
10        that probably was somebody's theory in the office.  I
11        don't recall if I heard it, but I know personally I
12        didn't think that it was a viable theory.
13   Q.   Mr. Graham ever tell you he had any sexual affairs?
14   A.   While I was employed?
15   Q.   Yes.
16   A.   No.
17            MS. WALLET:  Let's just clarify that.  Are you
18        asking did he have any sexual affairs while he was
19        employed, or --
20            MR. DELLASEGA:  I'm sorry?
21            MS. WALLET:  Or are you asking while he was
22        employed did he tell of sexual affairs?
23            MR. DELLASEGA:  That's a good objection.
24   BY MR. DELLASEGA:
25   Q.   Has Mr. Graham ever disclosed to you the fact that
```

Christlieb                          13

```
1            he's had an affair with anybody other than Mrs. Varner?
2     A.     No.  He never disclosed to me that he had an affair
3            with Mrs. Varner, either.
4     Q.     After you observed the change in their relationship,
5            did the use of the phraseology Barb 1 and Barb 2
6            continue or stop?
7     A.     It probably continued.
8     Q.     Have you had sexual harassment training?
9     A.     Yes.
10    Q.     On one occasion or more than one?
11    A.     I think it's been twice since 1998.
12    Q.     As you've been instructed about sexual harassment,
13           using your understanding that you've acquired from your
14           education, have you ever observed Mr. Osenkarski
15           sexually harass anyone?
16    A.     No.
17    Q.     Have you ever observed Mr. Graham sexually harass
18           anyone?
19    A.     No.
20    Q.     With regard to the female probation officers in your
21           department, have you ever heard the female officers
22           ever speak demeaningly about men?
23    A.     No.
24    Q.     About men they date?
25    A.     No.
```

```
 1   Q.   Boyfriends or ex-husbands?
 2   A.   No.
 3   Q.   What is your understanding of the seniority rules in
 4        your office?
 5   A.   The seniority rule that I understand is whenever your
 6        date of hire within the Probation Office is how
 7        seniority falls.
 8   Q.   Has that always been your understanding?  Or is that a
 9        change from when you were originally hired?
10   A.   That has always been my understanding.  However, there
11        have been others that have understood differently, and
12        that always was a question, even before Joe was chief,
13        the previous chief tried to address.
14   Q.   Were you ever consulted by Tom Boyer about your opinion
15        as to what seniority should be within the office or
16        what role seniority should have?
17   A.   No.
18   Q.   Your current title is what, sir?
19   A.   Senior probation officer.
20   Q.   Have you ever heard Mr. Graham or Mr. Osenkarski use
21        the phrase peter meter?
22   A.   No.
23   Q.   The phrase black bush, referring to a woman's genital
24        area?
25   A.   No.
```

1    Q.    The phrase jeehoobees, referring to a woman's breasts?

2    A.    No.

3    Q.    Have you ever seen or heard talked about the concept of

4          female interns in your office being forced to dance on

5          tabletops?

6    A.    No.

7    Q.    Have you ever heard Mr. Graham say to Mrs. Varner that

8          she has no fucking sense, no fucking training or no

9          fucking ability?

10   A.    No.

11   Q.    Other than Mrs. Varner, have you ever heard Mr. Graham

12         yell at anybody else?

13   A.    Yes.

14   Q.    Have you heard him yell at everyone there?

15   A.    Yes.  I can't say everyone, but.

16   Q.    Most people there?

17   A.    Yes.

18   Q.    Within the cohort of people who he's yelled at, does

19         there appear to be any distinction between yelling at

20         men more frequently than women, women more frequently

21         than men?

22   A.    No.

23   Q.    He's an equal opportunity yeller?

24   A.    Yes.

25   Q.    Within the Probation office among both Probation

Christlieb                                16

```
 1        officers and clients, is the use of foul language
 2        common?
 3   A.   It occurs, yes.
 4   Q.   And when it occurs, is there a differentiation between
 5        it coming from both female as well as male probation
 6        officers?
 7   A.   Do you mean with our interaction with clients, or our
 8        interactions amongst ourselves?
 9   Q.   Let's take it first amongst yourselves.
10   A.   It probably comes from males more than females.
11   Q.   But there is some from females?
12   A.   There could be.
13   Q.   How about in interactions with clients?
14   A.   Very seldom, I would think.
15   Q.   Can you discuss for me whether the Probation office is
16        in any way different from a business office where you
17        deal with profit-making matters as opposed to criminal
18        matters?
19   A.   Well, I've been in probation since I graduated from
20        college, so it's kind of difficult for me to compare
21        those two.  I would say there's probably very little
22        difference.
23   Q.   Very little?
24   A.   Yes.
25   Q.   Do you feel you've ever been harassed by your
```

```
 1          superiors?
 2     A.   Yes.
 3     Q.   And harassed in what sense?
 4     A.   Well, there were numerous times -- and I said Gary
 5          didn't discriminate with hollering.  There were a few
 6          times that Gary and I would go toe-to-toe at each
 7          other.  I always said that Gary would charge, try and
 8          convict you within a matter of a few minutes over
 9          something, and so there were several incidents,
10          probably a handful, a dozen, maybe.
11     Q.   From your own observation, can you describe for me
12          whether there's any difference in the way of
13          Mr. Graham's conduct towards you that you thought was
14          harassing, and his conduct towards Mrs. Varner after
15          their relationship changed and she was no longer one of
16          his favorites?
17     A.   He appeared in that incident that occurred -- I only
18          witnessed that one incident in late '97 or '98.  It
19          seemed to be much more vicious than any kind of
20          conflict that I had with him.
21     Q.   Other than that one incident, did you ever witness any
22          other incident where he yelled at her or otherwise
23          behaved inappropriately?
24     A.   No.
25     Q.   Mr. Graham a difficult person to get along with, in
```

Christlieb                                18

```
 1        your opinion?
 2   A.   At times.
 3   Q.   Does Mr. Graham appear to have favorites?
 4   A.   Yes, there were favorites.
 5   Q.   Does he appear to have people he doesn't like?
 6   A.   Yes.
 7   Q.   With regard to those people he doesn't like, is he
 8        uniformly rude to all of them?
 9   A.   I would say so, yes.
10   Q.   Yells at all of them?
11   A.   Yes.
12   Q.   Acts in a belligerent manner towards all of them?
13   A.   Yes.
14   Q.   And those, that cohort of people he doesn't like,
15        includes both men and women?
16   A.   Yes.
17   Q.   Have you ever observed anything within your office that
18        you felt would raise a concern about Mrs. Varner's
19        personal safety?
20   A.   No.
21           MR. DELLASEGA:  That's all I have.
22   BY MR. ADAMS:
23   Q.   Mr. Christlieb, am I pronouncing it right?
24   A.   Yes.
25   Q.   Thank you.  My name is Paul Lancaster Adams.  I
```

Christlieb                                    19

```
 1          actually represent Mr. Osenkarski in this matter.  Just

 2          a few follow-up questions to Mr. Dellasega's

 3          questioning of you.

 4              You had mentioned your familiarity with the phrase

 5          Barb 1 and Barb 2.  Do you remember those questions by

 6          Mr. Dellasega?

 7     A.   Yes.

 8     Q.   Maybe it's a long way down the end of the table.  Did

 9          you also indicate that you had heard the phrase Barbie

10          1 and Barbie 2?

11     A.   Yes.

12     Q.   Okay.  When did the Barbie 1 and Barbie 2 phrase be

13          used?  When was that used in comparison to Barb 1 and

14          2?

15     A.   I don't even know if it was used by Mr. Osenkarski or

16          Mr. Graham, I can't recall, but I know that was a

17          phrase that was used maybe by other co-workers in the

18          office, when referring to Gary was going to be with

19          Barb Varner.

20     Q.   Okay.  Do you have an idea at all of the distinction

21          between the name Barbara or Barbie?  Was it more

22          playfully when Barbie was used versus Barbara?  I'm

23          just --

24     A.   No.  I don't think there was any distinction between

25          them.
```

1    Q.    Okay, thanks.

2          You also mentioned that you did notice an abrupt

3          change in the relationship between Mrs. Varner and

4          Mr. Graham at some point late 1997.  Do you remember

5          that?

6    A.    Yes.

7    Q.    Do you remember an incident where Mr. Graham had raised

8          his voice and had, I guess had yelled at Mrs. Varner?

9    A.    Yes.

10   Q.    Okay.  I know you said you don't remember exactly what

11         was said.  Could you describe the tone of the

12         conversation?  Sometimes a person doesn't remember

13         exactly what's said but they can remember the tone.

14   A.    I assumed it was work-related because at that time I

15         believe Barb was in her office, and Gary came into her

16         office with a file in his hand and seemed to be angry

17         over some work-related incident.

18   Q.    The seniority system that you were asked about, when

19         did someone first in your office approach you about the

20         seniority system as it existed in the Probation

21         Department?

22   A.    That's always been an issue, because there are certain

23         probation officers that have county experience such as

24         with the Sheriff's Department, and the opinion of those

25         people is that whenever, say, they would start with the

1     Sheriff's Department in '84 and come to the Probation

2     Office in '89, they, of course, want credit for all

3     county service.

4          The other side of the coin is that no -- whenever

5     you start for the county probation office, that's when

6     your seniority starts.  So there's always been

7     disagreements ever since I started in '89 about

8     seniority.  And basically it's the ones who want the

9     time from the full county against those who don't think

10    that they deserve it.

11  Q.  And it's actually a separation in the office of wants

12      versus don't wants --

13  A.  For the most part.

14  Q.  -- full county time?

15  A.  Yes.

16  Q.  Just by chance, do you have any numbers off the top of

17      your head what the split of thought might be with the

18      Probation Department as a whole going back to 1989?  Do

19      you remember if there were more persons that wanted the

20      full county time, or were there more persons who were

21      pro the time actually in the Probation Department, do

22      you recall that far?

23  A.  There were probably more people pro time in the

24      Probation Office only.

25  Q.  And that was what your understanding was in 1989?

1   A.   Yes.

2   Q.   Is it disproportionate?

3   A.   The numbers?

4   Q.   Yes.

5   A.   At that time there was only probably a staff of 20, and

6        there may have been five to seven people who actually

7        wanted credit for entire county time.

8   Q.   And of those five to seven people, were they persons

9        who had transferred from other county jobs and now

10       they're in Probation?

11  A.   Yes.

12  Q.   Okay.  Upon the split do you know if those

13       disproportionate numbers were in existence at that time

14       as well?

15  A.   They probably were, yes.

16  Q.   How many persons or how many probation officers would

17       have been in the Juvenile Probation Department at that

18       time?

19  A.   At that time I think we split and there would have been

20       10 or 11 Juvenile probation officers.

21  Q.   Okay.  And out of those 10 or 11, what persons, if you

22       recall, favored the full county time versus the time

23       just in the Probation Department?

24  A.   I know Barb Varner favored that, on the Juvenile side.

25       There may have been one or two other people.

1   Q.   And I guess obviously you know Barbara Varner was

2        working at a county position before coming to

3        Probation; is that correct?

4   A.   Correct.

5   Q.   Those other two, one or two persons that you think also

6        were pro full county time, had they had some other

7        prior position before going to the Probation

8        Department?

9   A.   The one or two was just off the top of my head.  I'm

10       not sure, you know, vaguely.

11  Q.   Okay.  I know Mr. Dellasega had mentioned Tom Boyer to

12       you.  Do you remember talking to Tom Boyer at all about

13       the seniority system at any point during your

14       employment?

15  A.   I'm sure we may have discussed it at some point.  I

16       don't know.  He didn't come to me whenever he was

17       making the seniority system and ask for my opinion, I

18       know that.

19  Q.   Okay.  When you say making the seniority system, what's

20       your understanding of Tom Boyer's responsibility for

21       making the seniority system?

22  A.   It's my understanding that he came up with how we

23       were -- that issue was given to Tom and Tom resolved

24       it.

25  Q.   Okay.  And what do you mean by resolved it?

```
 1   A.   He made the seniority policy as time in the Probation
 2        Office.
 3   Q.   Okay.  And that was per instructions given to him; is
 4        that your understanding?
 5   A.   The assignment to do that?
 6   Q.   His assignment?
 7   A.   Yes.
 8   Q.   Who gave the assignment?
 9   A.   I assume it was Joe.
10   Q.   Do you know why Mr. Osenkarski, do you know why
11        Mr. Osenkarski would have assigned that to Mr. Boyer?
12   A.   No, I don't.
13   Q.   As a result of the efforts by Mr. Boyer and it was
14        actually a change that was implemented; is that what
15        your understanding is?  In the system, the seniority
16        system?
17   A.   Yes.
18   Q.   Okay.  What was the reaction by the Juvenile Probation
19        officers to the change, from your recollection?
20   A.   I didn't recall much reaction to it.
21   Q.   Is that a good thing or a bad thing, in your opinion?
22   A.   I think the way the seniority policy is written now,
23        that was the way, if I had to choose, I would have
24        written it, too.
25   Q.   And why do you say that?
```

```
 1    A.    Well, my example always is if, say, we have a county
 2          employee who doesn't have a degree -- you need a degree
 3          in order to be a probation officer -- and he's given
 4          credit for his time in the county without a degree, and
 5          then all of a sudden he goes to school, night school,
 6          gets his degree and is hired as a probation officer, my
 7          question is, why when that person isn't qualified for a
 8          probation officer should he be getting credit for time
 9          in the county.
10    Q.    Okay.
11    A.    For seniority.
12    Q.    So you think that the change, though, as implemented by
13          Mr. Boyer, was it fair; is that your opinion?
14    A.    Yes.
15    Q.    And the other example or situation of the seniority
16          system, was that less fair, in your opinion?
17    A.    Yes.  Of course, it benefitted me because I had some
18          other individuals within the office who worked for the
19          Sheriff's office and so if we count entire county time
20          would have been more senior than myself.  So I was one
21          of the benefactors out of it.
22    Q.    When you were first hired in 1989 you were with the
23          full Probation Office, I'm assuming; is that correct?
24    A.    Yes.
25    Q.    And who did you report to immediately at that time?
```

```
 1   A.   The chief at that time was Ken Bolze, and the
 2        supervisor of the -- the Juvenile supervisor was Joe
 3        Osenkarksi and the Adult supervisor was John Roller.
 4   Q.   Okay.  If you had a problem in the office back during
 5        that time, who would you address the problem to?
 6   A.   If it involved juveniles, it would be Joe Osenkarksi.
 7   Q.   Okay.  And if it would have involved --
 8   A.   The Adult system, it would be John Roller.
 9   Q.   Okay, John Roller.  And when you, assuming that you had
10        problems in your tenure of working, when you would have
11        had to approach Mr. Osenkarski, was he approachable?
12   A.   Yes.
13   Q.   Did he ever say to you:  I can't talk to you, I'm too
14        busy?
15   A.   Never.
16   Q.   Did he always have availability time for you when you
17        needed him?
18   A.   Yes.
19   Q.   And that would include not only problems, but if you
20        had something positive to report as well?
21   A.   Yes.
22   Q.   Okay.  Has that relationship changed in terms of
23        approaching Mr. Osenkarski when you've had an issue
24        from your hiring of 1989 till the present?
25   A.   Well, Joe's role, of course, changed whenever he became
```

1       chief when it split, so I didn't have as much contact

2       with him.  But from the period of '89 to '96, if I had

3       a question on any of my cases, I would go to Joe and he

4       would answer it.

5   Q.  Okay.  Do you think because of Mr. Osenkarski's change

6       in role he's become less approachable, or he's just

7       more busy so it's hard to get ahold of him?  What is

8       your analysis of that?

9   A.  I think he didn't have as much contact with the

10      day-to-day operations, so that's why I didn't have as

11      much contact with him after the split.

12  Q.  Do you know why he doesn't have as much contact with

13      the day-to-day operations?

14  A.  Well, because he was elevated to chief.  So the

15      supervisors who replaced him then became those front

16      line people with the more day-to-day contact.

17  Q.  Has it always been your understanding since being

18      employed in 1989 that the front line supervisors are

19      persons that, I guess lesser-hierarchy persons would

20      report to if you had a problem?

21  A.  Yes.

22  Q.  And if that lesser-hierarchy person in the office had a

23      problem with an immediate supervisor, would that person

24      go directly to Joe --

25  A.  Yes.

```
 1   Q.    -- in this example?

 2   A.    Yes.

 3   Q.    Have you ever seen situations where maybe someone down

 4         the line in the hierarchy of the office who had to go

 5         beyond the immediate supervisor and talk to Joe about

 6         an issue?

 7   A.    That's happened, yes.

 8             MR. ADAMS:  Thank you.

 9   BY MS. WILLIAMS:

10   Q.    Mr. Christlieb, I'm Taylor Williams representing the

11         court.

12             Did you ever have any conversation with Judge

13         Sheely about Barbara Varner?

14   A.    No.

15   Q.    Did you ever have any conversation with Judge Sheely

16         about Gary Graham?

17   A.    No.

18   Q.    Did you ever have any conversation with Judge Hoffer

19         about Barbara Varner?

20   A.    No.

21   Q.    Did you ever have any conversation with Judge Hoffer

22         about Gary Graham?

23   A.    No.

24             MS. WILLIAMS:  That's all I have for you.  Thanks.

25   BY MR. MacMAIN:
```

```
 1   Q.   My name's David MacMain.  We met just before the
 2        deposition.  I represent Gary Graham.
 3            Have you ever spoken with Gary Graham about this
 4        lawsuit that we're here for today?
 5   A.   There were times that he would come into my office I
 6        guess in '97, '98, and there would be things that he
 7        would throw out to me.
 8   Q.   Such as?
 9   A.   I can recall, which is kind of ironic, I can recall
10        that he would come into my office and say:  Keep your
11        mouth shut, you know, keep your mouth shut, someone's
12        going to go to jail over this.  You know, the ironic
13        part of this is that's where he ended up, down at the
14        jail.
15   Q.   Have you ever spoken to Barbara Varner about this
16        lawsuit?
17   A.   Probably in more recent times.
18   Q.   When was the last time you spoke to her prior to today
19        about the lawsuit?
20   A.   I guess we had a conversation prior, probably within
21        the last week, and she just told me what to expect here
22        today.
23   Q.   Did she tell you the type of questions you might be
24        asked?
25   A.   No.
```

1   Q.   Did you discuss your testimony with her at all?

2   A.   No.

3   Q.   Prior to I guess within the past week, when was the

4        last time you had spoken to her about this lawsuit?

5   A.   At different intervals since the process began she

6        would come to me and say, you know, we're at this

7        stage, or this is occurring.  More procedural things,

8        and really nothing as to the factual matters of the

9        lawsuit.

10  Q.   Why would she tell you about the procedural status of

11       the litigation or the prior agency hearings?

12  A.   That I don't know.

13  Q.   Have you ever provided her or her counsel with any type

14       of written statement?

15  A.   No.

16  Q.   Have you ever spoken to her counsel prior to today

17       about the events underlying this incident?

18  A.   No.

19  Q.   You and I have never spoken before?

20  A.   Correct.

21  Q.   You had stated there was a change in the relationship

22       between, at least your perception there was a change in

23       the relationship between Barbara Graham and Gary

24       Graham, and I don't think you were asked when

25       approximately that occurred.

```
 1    A.    It would have been probably sometime in 1997 or early
 2          1998.
 3    Q.    Can you put it in relation to this one incident you
 4          observed where Gary Graham and Barbara Varner were
 5          speaking in her office?  Was that the triggering event
 6          that you noticed changed their relationship?
 7    A.    Yes.
 8    Q.    I think you said it appeared to be work related?
 9    A.    Yes.
10    Q.    And I think you had said that Gary and you on
11          occasioned had harsh words as well?
12    A.    Yes.
13    Q.    And was that work related?
14    A.    Yes.  That was always work related.
15    Q.    When the office split -- you were asked questions about
16          pre split and post split.  Would you agree with me that
17          as a result of the split the workload was greater on
18          some of the people in the office?
19    A.    Yes.
20    Q.    Would you agree that people weren't happy about getting
21          a greater workload?
22    A.    Yes.
23    Q.    Would you agree that it put more pressure on not only
24          the probation officers but also the supervisors?
25    A.    I would imagine, yes.
```

```
 1   Q.   Would you agree with me the office generally became

 2        more tense as a result of the split for a period of

 3        time?

 4   A.   Yes.

 5   Q.   Was one of the individuals giving out the workload Gary

 6        Graham?

 7   A.   Yes.

 8   Q.   Did that make him unpopular with the people he was

 9        giving increased workloads to?

10   A.   With some of those, yes.

11   Q.   Was Barbara Varner one of the people that was unhappy

12        about an increased workload?

13   A.   She had never informed me about that.

14   Q.   How about yourself, were you unhappy with getting a

15        greater workload?

16   A.   I was not.

17   Q.   Do you recall speaking to someone from the EEOC?

18   A.   I believe I did receive a telephone call.

19   Q.   And you recall speaking with them by telephone and

20        telling them -- being asked questions similar to what

21        we're doing today?

22   A.   Yes.

23   Q.   Do you recall telling them that you never observed any

24        type of sexual harassment by Gary Graham towards

25        Barbara Varner as you've told us today?
```

```
 1  A.   Yes.

 2  Q.   And if he had, you would have told the investigator?

 3  A.   Yes.

 4  Q.   And if he had, you would have told us today under oath,

 5       correct?

 6  A.   That's correct.

 7            MR. MacMAIN:  I have no further questions.

 8  BY MS. WALLET:

 9  Q.   Mr. Christlieb, my name is Debra Wallet.  I'm here

10       representing Barbara Varner in this lawsuit.  I have a

11       number of questions for you.  If at any time you cannot

12       hear me, will you please ask that I repeat them?

13  A.   Certainly.

14  Q.   And if at any time you don't understand my question,

15       will you ask me to repeat it?  And I will be happy to

16       do so.

17            When you first came to the Probation Office did

18       you have any prior experience as a probation officer?

19  A.   Yes.  I had begun my employment in 1987 in Perry County

20       and worked there approximately two years before moving

21       to Cumberland County.

22  Q.   And how did you learn about the job in Cumberland

23       County?

24  A.   It may have been through the classified section.

25  Q.   Had you known any of the probation officers in
```

1              Cumberland County while you were in Perry County?

2       A.     Yes.

3       Q.     Who had you known?

4       A.     Charles McKenrick, Mike Dunsmore.  I had also known

5              Gary.  And that would have -- Sam Miller I would speak

6              on the telephone when we had some related work from

7              Perry to Cumberland County.  But that would have been

8              the extent of the four people.

9       Q.     Okay.  Did you have any conversations with any of these

10             four individuals, or any others that you might have

11             known at that time, about the Cumberland County

12             Probation Office before you decided to apply for a job

13             there?

14      A.     Not that I can recall.

15      Q.     Did anyone encourage you, any one of those four people

16             or any others that you knew, encourage you to apply in

17             Cumberland County?

18      A.     No.

19      Q.     Why did you apply?

20      A.     It was probably a $10,000 pay increase.  And I'm

21             originally from Cumberland County, so it was kind of

22             coming back home.

23      Q.     Okay.  Now, when you first came in 1989 were there

24             seniority lists, to the best of your recollection?

25      A.     That was always an issue that people would try to pin

```
 1          down our previous chief, Ken Bolze, on.  And I know Ken
 2          did come out with a seniority list.  I can't recall
 3          what that list was.
 4    Q.    But you saw something on the bulletin board that
 5          purported to be a list of the individuals who had
 6          seniority?
 7    A.    I think that he was pressured into that, yes.
 8    Q.    And who do you think pressured him to do that?
 9    A.    There was another gentleman in our office, Lyle Herr,
10          who had an interest, because he came with the Sheriff's
11          Office.  I think he started with the Sheriff's Office
12          in the early '80s and then moved from there to
13          Probation in the mid to late '80s.
14    Q.    Do you know what Mr. Bolze's position was with regard
15          to the counting of prior county service?
16    A.    Well, he flip-flopped so many times I can't recall what
17          was on the board.  I know he did post a seniority list
18          but I can't recall what that list was.
19    Q.    Okay.  Do you, during your tenure since 1989, recall
20          anyone who was promoted who was not the most senior on
21          the list?
22              MR. ADAMS:  Objection.  I think the witness has
23          testified the list changed.  Are you referring to the
24          list he doesn't recall, or to a list in general?
25    BY MS. WALLET:
```

```
1   Q.   Do you recall anyone, sir, who was essentially jumped

2        over the individuals on whatever posting there was?

3   A.   No.

4   Q.   Are you a PO-II?

5   A.   No.

6   Q.   Have you an interest in becoming a PO-II?

7   A.   Yes.

8   Q.   Do you know how many individuals there are with more

9        seniority in county Probation Office work above you on

10       the list?

11  A.   Within the Juvenile Probation Office?

12  Q.   Yes, sir.

13  A.   I would be next in line if we count years in on the

14       current seniority policy.

15  Q.   Now, you've told us that you spoke to this individual

16       from the EEOC.  Did you speak to anyone else in

17       relation to the charges that Ms. Varner brought against

18       Mr. Graham?

19  A.   Early on, probably it was either '97 or '98, I know

20       that Mr. Osenkarski told us that there was an

21       investigation going on and that we were to cooperate

22       with the county.  And I remember speaking to an

23       individual, I don't recall specifically who it was, but

24       it was early on.

25  Q.   Okay.  If I suggested his name was Mr. Deluce, does
```

1          that refresh your recollection?

2     A.   Yes, that would be it.

3     Q.   Okay.  When he met with you, he, Mr. Deluce, did he

4          meet with you just the two of you?

5     A.   Yes.

6     Q.   And what, if anything, did Mr. Deluce ask you about the

7          relationship between Barbara Varner and Gary Graham?

8     A.   They were similar to the questions asked here today.

9     Q.   Do you remember any of the specific questions he asked

10         you?

11    A.   No, I don't.

12    Q.   Well, let me ask it this way.  Were you aware that

13         there were notes taken of the conversation that you had

14         with the gentleman from the EEOC?

15    A.   I don't recall.  I don't know if he informed me of that

16         or not.

17    Q.   Okay.  Maybe I should be specific.  It was a gentleman,

18         was it not?

19    A.   I don't recall that, either.

20    Q.   Okay.  Might have been a woman?

21    A.   Could have been, yes.

22    Q.   If I were to suggest to you that you described Gary

23         Graham as an ass at that time, do you believe that to

24         be accurate?

25    A.   Oh, I could have made that statement, yes.

Christlieb                                    38

1   Q.   And you indicated to the EEOC person, did you not, that

2        you told the investigator that was Mr. Deluce the same

3        thing?

4   A.   Yes, I could have said that.

5   Q.   Now, why would you describe him that way, sir?

6   A.   Gary was very volatile.  And as I said earlier,

7        whenever he thought that you didn't do something his

8        way, you could be charged, tried and convicted within a

9        matter of minutes.

10  Q.   Did he ever use the term punish, to you?

11  A.   There might have been instances where he used that.

12  Q.   And how did you take that, the use of that term?

13  A.   As getting even.

14  Q.   Did you believe that he had a reputation for getting

15       even with individuals who opposed him?

16  A.   Yes.

17  Q.   Did you observe that, sir?

18  A.   As far as the punishment statement, I can't say that

19       there were particular employees that he would say that

20       to.  You know, I can remember in cases where he would

21       say to an individual parolee, you know, that parolee's

22       going to be punished, I'm going to punish him.

23  Q.   Do you recall any instances where Mr. Graham said or

24       did anything that suggested he might punish another of

25       the probation officers?

```
 1   A.    No.
 2   Q.    Did you believe Mr. Graham acted in a way designed to
 3         punish Ms. Varner for any action on her part?
 4             MR. MacMAIN:  Objection to form.
 5   BY MS. WALLET:
 6   Q.    You may answer.
 7   A.    No.
 8   Q.    You said that you believed that the treatment of
 9         Ms. Varner was more harsh than the treatment of some of
10         the other probation officers.  Did I get that correct?
11   A.    Yes.
12   Q.    Why did you say that?
13   A.    Well, any differences that I would have with Gary would
14         usually occur behind closed doors, where he would come
15         to me more on a one-on-one basis.  In this particular
16         instance he came to Barb, and her office is near the
17         main office, and the door was open and there were
18         numerous people in the main office, and it was loud.
19   Q.    Do you believe that it was designed to humiliate her?
20   A.    Oh, I have no idea.
21   Q.    Why would you tell the investigator from the county
22         that you thought Mr. Graham was unprofessional?
23   A.    Just in the way that he handled himself.  For example,
24         the incident with Barb in the office, and incidents
25         with me, whenever he would accuse you of things that
```

```
 1              weren't necessary -- that were not true.  For example,
 2              we talked earlier about our discussions about this
 3              case.  I know that he would come to me and say:  I know
 4              you were upstairs to talk to the judge, I've gotten a
 5              list.  And which obviously he probably didn't have
 6              anything.
 7    Q.        Did Mr. Graham tell you that your name was on the list
 8              that he had gotten from the judge?
 9    A.        Yes.  He said he had disclosure of who was talking to
10              the judge and who spoke to the judge before he was
11              moved and I was one of those individuals, which was
12              incorrect.
13    Q.        Were you aware generally at the time that Judge Hoffer
14              was calling people to his chambers to talk about these
15              issues, were you aware of that at the time?
16    A.        Yes.
17    Q.        And who were you aware that the judge had talked to?
18    A.        I think he spoke to Bill Brandt, who at the time was my
19              office mate.  I think there was another individual,
20              Nick Barrelet, who was a former employee.  Other than
21              that, I couldn't say who else was to see Judge Hoffer.
22    Q.        And did either Mr. Brandt or Mr. Barrelet tell you what
23              had happened when they were summoned to the judge's
24              office?
25    A.        I'm sure they discussed what the conversation was.  I
```

1           can't recall four, five years later exactly.

2      Q.   Do you know whether Mr. Brandt had the same general

3           attitude toward Mr. Graham, for lack of a better word?

4      A.   Yes.

5      Q.   Was Mr. Brandt also disappointed in Mr. Graham's lack

6           of professionalism?

7      A.   Yes.

8      Q.   And he shared that with you at the time?

9      A.   That's correct.

10     Q.   Did he tell you at that time that he had shared that

11          belief with the judge?

12     A.   I don't recall.

13     Q.   How about Mr. Barrelet?

14     A.   Mr. Barrelet and I were not as close as Mr. Brandt and

15          I, so I can't recall any conversations, if we even had

16          any, about it.

17     Q.   Now, when Mr. Graham came to your office and

18          essentially said to you keep your mouth shut, was he

19          speaking in reference to the investigation of

20          Ms. Varner's complaints?

21     A.   I assumed so, yes.

22     Q.   Why did you assume that?

23     A.   Because it was in discussion as we were talking about

24          the complaint or, you know, with things going on with

25          the complaint, about going down and speaking to folks

1        from the county about speaking to Judge Hoffer, that

2        type thing.

3    Q.   Did you consider that conversation to be a threat by

4        Gary Graham against you?

5    A.   No.

6    Q.   Why not?

7    A.   That was kind of normal behavior for him.

8    Q.   Did you believe he was in a position at that time to

9        retaliate in any way against you?

10   A.   As my supervisor he probably could retaliate, yes.

11   Q.   Did you tell anyone else about that conversation

12       between Mr. Graham and you in which he told you to keep

13       your mouth shut?

14   A.   No.

15   Q.   Did you tell the county investigator of that?

16   A.   I don't recall.

17   Q.   Do you know whether it occurred before or after the

18       county investigator asked you questions?

19   A.   With the first gentleman?  I didn't recall his name and

20       I lost it again.

21   Q.   Mr. Deluce?

22   A.   Yeah.  I don't know.

23           I spoke to this gentleman (indicating), and it

24       happened before my conversation with him, yes.

25   Q.   Okay.  And when you say this gentleman, you're speaking

```
 1          of Mr. Dellasega?

 2    A.    That's correct.

 3    Q.    Okay.  So Mr. Dellasega called you?  Or did he speak to

 4          you in person?

 5    A.    Yes.

 6    Q.    And at that time you had not had this conversation with

 7          Mr. Graham; is that correct?

 8    A.    I had had the conversation prior to speaking to

 9          Mr. Dellasega.

10    Q.    Okay.  Did you tell Mr. Dellasega about this incident?

11    A.    I don't know if that came up or not, I can't recall.

12    Q.    He may not have asked you specifically a question that

13          caused you to indicate those --

14    A.    That could be, yes.

15    Q.    -- those words.  Okay.  Did you at some time give

16          Barbara Varner the county sexual harassment policy?

17    A.    I gave her a county harassment policy.

18    Q.    Why did you do that, sir?

19    A.    It was after the incident that occurred that we spoke

20          about, the blowup in the office.  And it was certainly

21          unfair, in my estimation, how Gary treated Barb.  So I

22          laid a copy of the harassment policy, not necessarily

23          sexual harassment, just the basic harassment policy.

24    Q.    Why did you believe Mr. Graham's conduct on that

25          occasion was harassing in nature?
```

1   A.   Basically it was -- it certainly wasn't -- if he had a

2        problem with Gary it shouldn't have been aired with her

3        office door open with the secretarial staff, three to

4        four secretarial staff and maybe two to three other

5        probation officers in the main office.  It was very

6        unprofessional, and that's why I thought it was

7        harassing.

8   Q.   I believe that you said if he had a problem with Gary.

9        Did you mean if he had a problem with Ms. Varner?

10  A.   I'm sorry, yes.

11  Q.   With that correction, your answer stands?

12  A.   Yes.

13  Q.   Did you observe any other occasions on which

14       Mr. Graham's treatment of Ms. Varner was

15       unprofessional?

16  A.   No.

17  Q.   Did things improve after Mr. Graham was transferred to

18       the prison?

19           MR. MacMAIN:  Objection to the form.  Improve how

20       so?

21  BY MS. WALLET:

22  Q.   Did the atmosphere in the office change after

23       Mr. Graham was transferred?

24  A.   Yes.

25  Q.   In your opinion, did it improve or get worse?

1   A.   It improved.

2   Q.   In what way?

3   A.   Mr. Graham tried to -- he tried to run the office with

4        an iron claw, to speak.  So it kind of eased up and

5        people were a little bit more comfortable with the

6        atmosphere.

7   Q.   Now, after the split and Mr. Osenkarski was in charge

8        of the Juvenile Probation Office but Mr. Graham was

9        still there, I'm speaking now of the period after the

10       split but before Mr. Graham was transferred, who were

11       the supervisors at that time?

12  A.   I believe it would have been Gary Graham, and shortly

13       after that Tom Boyer became supervisor.

14  Q.   Do you have any information as to how Mr. Boyer became

15       a supervisor?

16  A.   No, I don't.  It was very unusual to me that he came to

17       the Juvenile side, though.

18  Q.   Why would you say that?

19  A.   Well, he had been a lifetime for the most part Adult

20       probation officer, and seemed like he had very little

21       interest in the Juvenile side.  And then knowing Tom's

22       personality, I thought that would be the last thing

23       that he would want, to come over to the Juvenile side

24       and get cases, which is what was going to happen.  And

25       he made that decision to come over.

1    Q.    Do you have any information as to why Mr. Boyer made

2          the decision to come to Juvenile?

3    A.    No.

4    Q.    What was your opinion of Mr. Boyer's supervisory

5          abilities?

6    A.    Mr. Boyer leads in the same, similar to Gary at times.

7          He and I have had disagreements, also.

8    Q.    Would you say that Mr. Boyer and Mr. Graham were fairly

9          close friends?

10   A.    Yes.

11   Q.    And I'm speaking now still of the time after the split

12         but before Mr. Graham was transferred.  How involved

13         was Mr. Osenkarski in the day-to-day operations of the

14         Juvenile Probation Office?

15   A.    Less than prior to the split.

16   Q.    And why would you say that?

17   A.    Gary kind of took over the day-to-day operations

18         whenever we split.

19   Q.    Could you give me some examples of what he did that

20         previously Mr. Osenkarski had done?

21   A.    Well, as supervisor, I mean, he was in charge of case

22         assignments, case reviews, those types of things.  And

23         Gary took that over.

24   Q.    Was Mr. Osenkarski usually available during the day?

25         I'm speaking now the same period of time after the

1         split but before Mr. Graham was transferred.

2    A.    There would be days that he would be in the office, and

3          there would be days that he would not be in the office.

4    Q.    Did you ever have any explanation as to why

5          Mr. Osenkarski would be out of the office?

6    A.    No.

7    Q.    Did you suspect that he was working on county business

8          when he was out of the office?

9          MR. ADAMS:  Objection.  That requires the witness

10         to speculate.  He doesn't know.

11   BY MS. WALLET:

12   Q.    If you know, sir.

13   A.    I do not know.

14   Q.    Did you have any reason to believe that Mr. Osenkarski

15         was not engaged in county business?

16   A.    I didn't have any reason to believe that.

17   Q.    You just didn't know why he was out of the office at

18         all?

19         MR. ADAMS:  Objection.  Same objection.

20         MS. WALLET:  And the objection was?

21         MR. ADAMS:  He doesn't know.  It requires him to

22         speculate and guess.  He shouldn't guess.

23   BY MS. WALLET:

24   Q.    You don't know why he was out of the office?

25   A.    No.

1   Q.   Did anyone ever tell you, sir, why Mr. Graham was

2        transferred out of the Juvenile Probation Office to the

3        prison?

4   A.   I guess I heard speculation.  Other than that, no, I

5        was not told.

6   Q.   And what speculation did you hear?

7   A.   The speculation was that Judge Hoffer had lost

8        confidence in his supervisory ability.

9   Q.   And do you know where those speculations came from?

10  A.   It had to come within our office, but I can't say

11       exactly where, what the source was.

12  Q.   Do you believe that Mr. Osenkarski explained to anyone

13       under his supervision as to why Mr. Graham was no

14       longer there?

15  A.   I can't recall him ever, you know, at a staff meeting

16       or anything making a public notice to the probation

17       officers the reason why Gary was moved.

18  Q.   Now, you were asked by Mr. Dellasega about foul

19       language.  Were you speaking of the F word, or other

20       words?

21  A.   Yes.

22            MR. MacMAIN:  Yes what?

23  BY MS. WALLET:

24  Q.   Only the F word?  Or other words?

25  A.   Other words, also, yes.

1   Q.   What kind of words were commonly used?

2   A.   Any profanity that you could basically think of was

3        used, but most of it was used behind closed doors.

4   Q.   Do you know whether there was any policy, either an

5        oral policy, something conveyed to you orally, or a

6        written policy, about the use of profanity in the

7        office?

8   A.   There was no policy.

9   Q.   Did Mr. Osenkarski at any time ever tell you, you or

10       others at a staff meeting, that that kind of language

11       was not to be used?

12  A.   No.

13  Q.   Did he engage, he, Mr. Osenkarski, engage in that same

14       kind of language?

15  A.   Behind closed doors, yes.

16  Q.   Did you hear Mr. Osenkarski use the F word?

17  A.   Yes.

18  Q.   Was this a frequent occasion or a very rare one?

19  A.   I wouldn't say it was frequent.  I wouldn't say it was

20       very rare.

21  Q.   Somewhere --

22  A.   I wouldn't say it was very rare.

23  Q.   Somewhere in between?

24  A.   Yes.

25  Q.   Did you ever hear Mr. Osenkarski use the F word in

1          front of female probation officers?

2    A.    Not that I can recall.

3    Q.    Did you ever hear any female probation officer use the

4          F word?

5    A.    Not that I can recall.

6    Q.    Did you ever hear Ms. Varner use the F word?

7    A.    No.

8    Q.    Did you ever hear her use any profanity?

9    A.    No.

10   Q.    Did you ever overhear any conversations between

11         Mr. Graham and Mr. Osenkarski about this lawsuit or the

12         allegations that Ms. Varner made against Mr. Graham?

13   A.    No.

14   Q.    Were you aware of any conversations between Mr. Graham

15         and Mr. Osenkarski about this lawsuit?

16   A.    No, I was not aware of them.

17   Q.    At the time that you gave this harassment policy to

18         Ms. Varner, did you give that policy to anyone else in

19         the office?

20   A.    No.

21   Q.    Did you believe that anyone else in the office was

22         harassed in the same manner that Ms. Varner was at that

23         time?

24   A.    I felt that we were -- there was a number of us that

25         were victims of harassment at that time.  She just

```
 1            happened to be the target at that time.
 2    Q.      And the victims would include what individuals?
 3    A.      Well, there would be myself, Bill Brandt, Debra Green.
 4            Primarily the less-senior staff.  The more-senior staff
 5            didn't seem to get that much of the harassment.
 6    Q.      Do you know why that was?
 7    A.      I know that Gary was close with four or five other
 8            individuals in the Probation Office, so I think there
 9            was more of a friendship bond with those individuals.
10    Q.      And who was he close with?
11    A.      There would be Dennis Drachbar, Sam Miller, Henry
12            Thielemann, and Joe Osenkarksi.
13    Q.      How would you describe --
14    A.      As well as Tom Boyer.
15    Q.      Thank you.  I'm sorry, I didn't mean to cut you off.
16                How would you describe the relationship between
17            Joe Osenkarksi and Gary Graham?
18    A.      I would describe it as very close.
19    Q.      In what way?
20    A.      They seemed to -- they had many conversations during
21            work that would carry on to after the hours.  And I
22            think that there was a friendship that occurred outside
23            of the workplace.
24    Q.      As part of your responsibilities in the Juvenile
25            Probation Office were you ever assigned what I
```

```
1          understand to be commitment trips, taking a juvenile to
2          some location --
3     A.   Yes.
4     Q.   -- where that individual is being committed?  Did you
5          have any rules or were you told of any rules about when
6          those trips must begin?
7     A.   No.
8     Q.   Did anybody ever tell you they had to start at eight
9          o'clock or 8:30 in the morning?
10    A.   No.
11    Q.   Were you aware of any policy that those trips were to
12         begin at a specific time?
13    A.   No.
14    Q.   Did you begin your trips at times other than first
15         thing in the morning?
16    A.   Yes.
17    Q.   Did anyone ever say to you:  This isn't appropriate, we
18         want you to start at a different time?
19    A.   No.
20    Q.   Do you know whether Mr. Graham was aware that you began
21         trips at a time other than first thing in the morning?
22    A.   Yes.
23    Q.   How would he be aware of that?
24    A.   As my supervisor.  And as we have court commitments and
25         so forth, I mean, he would know within an hour or so
```

Christlieb                                          53

1           when I was leaving the courthouse.

2     Q.    And did you have to submit some kind of travel expense

3           voucher requesting reimbursement for your travel

4           expenses?

5     A.    Yes.

6     Q.    And did that indicate the time that you would leave for

7           trips?

8     A.    That did not, no.

9     Q.    Was there anything about the travel expense voucher

10          that indicated the times?

11    A.    No.

12    Q.    Was there any relationship between when you received

13          reimbursement for a meal period and the number of hours

14          that you spent on a commitment trip?

15    A.    No.

16    Q.    Did you get a meal period under any circumstances?

17    A.    For the most part, I mean, most of the trips were

18          three, four-, five-hour trips, so by the time you go to

19          the facility and turn around, it's taken up the entire

20          day, so you would basically get a meal during most of

21          those trips.

22    Q.    Okay.  And would that be the lunchtime meal or the

23          dinnertime meal?

24    A.    It would depend on when you would leave.

25    Q.    If you were out of the office over what would typically

1          be the dinner hour, I'll call it 5:00 to 7:00, was it

2          your understanding that you got time to take a meal

3          period?

4     A.   Yes.

5     Q.   Maybe I should just have you explain to me what was

6          your understanding of when you got a meal period and

7          when you would be reimbursed for a meal.

8     A.   For example, if you would leave for a commitment at two

9          o'clock in the afternoon and you wouldn't get back till

10         seven or eight o'clock, you would then be entitled to a

11         meal, a dinner.

12             On the reverse side, if you would leave in the

13         morning at eight o'clock and get back at 5:00, then you

14         would probably be only able to get a lunch

15         reimbursement.

16    Q.   Okay.  Did Mr. Graham have a reputation for making sure

17         that he got paid for his meal?

18    A.   Yes.

19    Q.   How did you know that?

20    A.   Well, I don't think it was any different than the rest

21         of us.  I mean, we, whenever we were on the road we

22         made sure that we got reimbursed for our meal.  Now,

23         going out of the way to get meals, I don't know of

24         that.

25    Q.   Other than the travel reimbursement voucher, how would

1         Mr. Graham know what time that you had left for a

2         commitment trip?

3   A.   I believe at that time we were also doing daily logs,

4         which accounts for the time that we come to work and

5         every time -- activity, if we leave the office we have

6         to report on a daily log what time we left the office,

7         what time we returned to the office, or what time that

8         we end the workday.

9   Q.   And was there a time when those stopped being required?

10  A.   There was a time before the split that we didn't have

11        daily logs, we had a sign-out sheet.  At some time

12        around the split whenever Joe became chief, we had

13        these daily logs.

14  Q.   And do they continue to today?

15  A.   Yes.

16  Q.   How often do you do those logs, sir?

17  A.   I do my daily log every morning for the previous day.

18  Q.   Is one week or a month or some fixed period on a

19        particular log sheet?

20  A.   On one log sheet there would be one week of time.

21  Q.   One week?

22  A.   Yes.

23  Q.   And were you required to turn those in to your

24        supervisor?

25  A.   Yes.  There is a schedule that they have to be turned

1        in by.

2    Q.   Do you know whether the supervisor signs them

3        indicating approval?

4    A.   I do not know that.  They are -- I don't actually give

5        them to the supervisor.  They're given to one of the

6        secretarial staff.

7    Q.   Who has been your immediate supervisor?  We know up

8        until the split you had at least Mr. Osenkarski for a

9        period of time and Mr. Graham for a period of time.

10   A.   Right.  Since that time?

11   Q.   Yes.

12   A.   Since that time I've had Henry Thielemann as my direct

13       supervisor.  I think also Tom Boyer for a brief time.

14       And now I have Sam Miller.

15   Q.   Are you aware of how any of those individuals came to

16       be supervisors?

17   A.   No, other than time in.

18   Q.   They were the most senior and they were promoted then?

19   A.   That's correct.

20   Q.   Did you observe any contact between Barbara Varner and

21       Barbara Graham?

22   A.   The contact that I observed may have occurred on court

23       dates.  When we have juvenile court it's held on the

24       fourth floor, and Barbara Graham's office is also on

25       the fourth floor and she does most of her court

1          reporting out of the fourth floor.

2    Q.    Did you tell the EEOC individual that you had witnessed

3          a situation where Barbara Graham glared at Barbara

4          Varner?

5    A.    I didn't recall until you brought it up.  I think I

6          did, yes.

7    Q.    What do you remember about that incident?

8    A.    I believe that actually occurred on the third floor

9          where our offices are located at the courthouse.  And

10         it was an incident where the two of them had met at a

11         corner and had pretty close contact.  And at that time

12         Mrs. Graham in my opinion glared at Mrs. Varner and

13         then walked on.  There were no words exchanged or

14         anything like that.

15   Q.    I believe it's reported that Ms. Varner said to you:  I

16         don't know what her problem is?  Do you recall that?

17   A.    I don't recall.

18   Q.    I take it your recollection at the time that you spoke

19         to the EEOC was a little better than several years

20         later?

21   A.    Yes.

22   Q.    Do you believe that what you told to the EEOC at that

23         time in March of 2000 -- first of all, do you believe

24         it was around March of 2000?

25   A.    Yes, if that's reported I could believe that.

Christlieb                                        58

```
 1    Q.    Okay.  And it occurred on the phone?

 2    A.    Yes.

 3    Q.    Do you recall how long you spoke to the EEOC person?

 4    A.    I believe it was very brief.  It might have been five

 5          or ten minutes.

 6    Q.    Do you believe that you told the EEOC what you

 7          truthfully remembered at that time?

 8    A.    Yes.

 9    Q.    Did you ever have any discussions with Dan Hartnett,

10          the Human Resources manager at the county?

11    A.    No.

12    Q.    The only person from the county that you spoke to was

13          Mr. Deluce?

14    A.    That's correct.

15    Q.    Did he ask you to give him any written statements?

16    A.    I don't believe I provided him with any written

17          statements.

18    Q.    Did he ever provide you with any writings confirming

19          what you had told him?

20    A.    No.

21    Q.    Do you believe Mr. Graham to be a vindictive

22          individual?

23          MR. MacMAIN:  Objection.

24    BY MS. WALLET:

25    Q.    You can answer.
```

1    A.    You know, if I answered yes I don't know if I would

2          have anything to back it up, if I have any particular

3          incidents to say that, yes, this pinpoints the point

4          that he's vindictive.  If I would say that I would

5          consider him vindictive it would probably be the

6          opinion of those staff in a conglomerate that he is

7          vindictive.

8    Q.    There are people that you believe would describe

9          Mr. Graham as vindictive?

10   A.    Yes.

11   Q.    And who would they be?

12   A.    Bill Brandt.

13   Q.    Anyone else?

14   A.    No.

15   Q.    You said that you did not believe the rumors that there

16         was a sexual relationship between Mr. Graham and

17         Ms. Varner.  Why didn't you believe that?

18   A.    I believed if there would have been anything to it --

19         Gary always had trouble keeping his mouth shut, so I

20         believe if there would have been anything to it that

21         somebody in the office would have known.  And those

22         types of rumors are rampant, I mean, if they got out,

23         if they got out to one person, and everybody knew

24         everybody's business in the Probation Office.

25   Q.    Did you know anything about the complaint that Kerry

1           Houser had made against Mr. Osenkarski?

2    A.     Somewhat, yes.

3    Q.     What did you know?

4    A.     I know that there was a Complaint filed because of some

5           inappropriate comments that Mr. Osenkarski had made.

6    Q.     Do you know what the result was?

7    A.     Mr. Brandt, who was caught up in the Complaint, had

8           told me, and he may have even shown me at one time that

9           there was a letter written by Mr. Bolze, who was the

10          former chief, that kind of summarized the Complaint and

11          the outcome.  And the outcome being that Mr. Osenkarski

12          gave Mrs. Vohs, who was Gorman at the time, I believe,

13          a written apology or a verbal apology.

14   Q.     Did Mr. Brandt share with you at that time that he

15          believed he had been retaliated against because he

16          confirmed Ms. Houser Vohs's statements?

17   A.     Yes.

18   Q.     Did you observe anything about the treatment of

19          Mr. Brandt after he participated in that incident?

20   A.     Well, it's difficult to pinpoint whenever -- the case

21          assignments are pretty equal amongst the employees.

22          However, it did seem like Mr. Brandt was assigned those

23          cases which required more supervision, those cases that

24          were more of a headache.  However, being able to

25          pinpoint and say I can prove that by the numbers, no.

1   Q.   Do you believe that others, other probation officers in

2        the office, thought that Brandt got worse assignments

3        because he had participated in this?

4   A.   Yes.

5   Q.   Do you have any knowledge, sir, of the relationship

6        between Mr. Graham and his sister involving an estate?

7   A.   The only knowledge that I have is secondhand with that.

8   Q.   And someone told you?

9   A.   Yes.

10   Q.   Who told you?

11   A.   That would have been Mr. Drachbar.

12   Q.   And what did Mr. Drachbar tell you?

13   A.   That after the death of Mr. Graham's mother there were

14        some in-fighting about the estate, about how it was

15        divided and so forth, between Mr. Graham and his

16        sister.

17   Q.   You witnessed nothing that would suggest that there was

18        a problem between Mr. Graham and his sister?

19   A.   No.

20   Q.   The only thing you knew came from Mr. Drachbar?

21   A.   That's correct.

22   Q.   Do you know how Mr. Drachbar knew this?

23   A.   I do not.

24   Q.   Did you ever tell Ms. Varner that you thought she might

25        be in physical danger?

1   A.   No.

2   Q.   Did you ever suggest to her that she might be?

3   A.   There was -- in the recent past there was one incident

4        where she had disclosed to me a letter that was sent by

5        one of the parties in the room describing that -- I

6        believe it was a request for additional marshals

7        because of the possibility of Mr. Graham being volatile

8        at the proceedings.  And at that time we probably had

9        discussed, you know, the aggressiveness that could

10       occur.

11  Q.   Do you believe that there could be some aggressiveness

12       on the part of Mr. Graham toward Ms. Varner?

13            MR. MacMAIN:  I object.

14            THE WITNESS:  Yes.

15  BY MS. WALLET:

16  Q.   Why?

17  A.   Well, with Gary, since he was moved to the prison I

18       don't think, other than today, that maybe early on just

19       after being moved to the prison, you know, we had

20       conversations.  But he has kind of limited his

21       conversations to me and has not really said anything.

22       And there have been indications to me about his

23       aggressiveness towards myself.

24  Q.   I don't understand that, sir.  You'll have to explain.

25  A.   Okay.  Mr. Osenkarksi had, and I believe I was in the

```
 1          room, Mr. Drachbar and Mr. Miller was in the same room,

 2          when Mr. Osenkarksi had said to me that he had spoken

 3          to Mr. Graham, and Mr. Graham was going to bloody me

 4          up.  Now, I don't know what it was over, but that was

 5          just the source of the conversation.

 6    Q.    So Mr. Osenkarski said Graham said to Osenkarksi:  I'm

 7          going to bloody you?

 8    A.    That's correct.

 9    Q.    Did Mr. Osenkarski say this in a joking manner?

10    A.    No.

11    Q.    Did you believe that Mr. Osenkarski was fearful of

12          Mr. Graham at that time?

13    A.    No.

14    Q.    Did you believe that Mr. Osenkarski --

15    A.    I should say --

16    Q.    -- took this serious?

17    A.    In a joking manner?  It was said in a joking manner,

18          like, there goes Gary again, that type of thing.

19    Q.    So in your opinion, Osenkarksi wasn't fearful of Graham

20          at that time?

21    A.    No.

22    Q.    Do you believe he was accurately relaying to you what

23          Mr. Osenkarski told him?

24    A.    Yes.

25              MR. MacMAIN:  Objection.
```

1   BY MS. WALLET:

2   Q.   And why do you believe that?

3   A.   Joe has always been truthful to me, and I didn't

4        believe anything else.

5   Q.   Have you ever been docked any pay for any of your

6        commitment trips?

7   A.   No.

8   Q.   Do you know of any male probation officers who were

9        docked pay because of commitment trips?

10  A.   No.

11  Q.   Do you know of any females who were?

12  A.   No.

13  Q.   Your immediate supervisor at the present time is who?

14  A.   Sam Miller.

15  Q.   And Mr. Miller reports directly to Mr. Osenkarski?

16  A.   Yes.

17  Q.   Do you have any difficulty with Mr. Miller's

18       supervision?

19  A.   No.

20  Q.   Has anyone suggested to you that there may be

21       repercussions against you if you testified against

22       Mr. Graham?

23  A.   No.

24  Q.   Have you expressed any fear of retaliation against you

25       because of any involvement in this matter?

1  A.  No.

2  Q.  Did you have any discussions at any time with Judges

3      Hoffer or Sheely about any of these matters?

4  A.  There was one discussion with Judge Hoffer that was

5      very brief, and it would have occurred after Gary was

6      moved to the prison.  It may have been a week following

7      that, two weeks following that.  When I was in Juvenile

8      court or I was dropping off a file, Judge Hoffer

9      briefly said to me, did I shake things up down there,

10     something to that nature.  And my response was yes, and

11     that was the end of our conversation.

12 Q.  This harassment policy that you gave to Ms. Varner, do

13     you know what that policy said?

14 A.  At the time, I did.

15 Q.  Do you know now?

16 A.  No, not off the top of my head.

17 Q.  Do you know whether it called for someone who believed

18     that they were the victim of some harassing conduct to

19     go to their supervisor?

20 A.  Yes, I would assume so.

21 Q.  Do you know what it said about what to do if the person

22     who is harassing you is your supervisor?

23 A.  No.  I didn't look into it that deep.

24 Q.  If Ms. Varner had complained to Mr. Osenkarski about

25     Mr. Graham's attitude toward her, do you think

```
 1          Mr. Osenkarski would have intervened?
 2              MR. ADAMS:  Objection.
 3   BY MS. WALLET:
 4   Q.    You may answer.
 5   A.    In some fashion.
 6   Q.    In what way?
 7   A.    He may not have given it his full attention, but he
 8         would have tried, I think he would have tried to make
 9         some type of resolution.
10   Q.    Why do you believe that?
11   A.    Well, I think that he and Gary were pretty close, so I
12         don't know if he could separate that friendship in the
13         work atmosphere.
14              MS. WALLET:  Thank you very much, Mr. Christlieb.
15              THE WITNESS:  You're welcome.
16   BY MR. DELLASEGA:
17   Q.    I have a quick question.  When you say Bolze
18         flip-flopped about seniority, what do you mean?
19   A.    It seemed like one, at one point county seniority,
20         county-wide seniority was considered, and the next
21         point just Probation Office seniority.  He could never
22         really be pinned down until I think Lyle Herr in the
23         early '90s went to him and said, we need this seniority
24         list.  And then that's when it was posted on the board.
25   Q.    After this seniority list was posted on the board did
```

```
 1          he flip-flop again?

 2    A.    No, he didn't then.

 3    Q.    You mentioned that there were some people who were in

 4          the Sheriff's Office prior to going to Probation.  You

 5          mentioned Lyle.

 6    A.    Yes.

 7    Q.    Can you think of anybody else?

 8    A.    Mike Piper.  And I believe those are the only two --

 9          the two that I can recall, at least.

10    Q.    Do you know Mrs. Graham?

11    A.    Yes.

12    Q.    Nice lady?

13    A.    Yes.

14    Q.    Do you have any knowledge as to whether she was hurt by

15          the public knowledge in the courthouse that Mr. Graham

16          had confessed to an affair?

17    A.    I could only assume that, yes, she would be hurt.

18    Q.    Is overtime desired?

19    A.    By the employees?

20    Q.    Yes, by probation officers.

21    A.    Yes.

22    Q.    When you go on commitment trips are you more likely to

23          get overtime?

24    A.    Yes.  If it meets the criteria, yes.

25    Q.    And the criteria is?
```

1   A.   The criteria is if you're past your day at 4:30 in the

2        afternoon and you have your 40 hours in at the end of

3        the week, it's time and a half.

4   Q.   So someone who went on a lot of commitment trips with

5        Mr. Graham would make more money than if they had not

6        gone on them?

7   A.   Yes.

8            MR. DELLASEGA:  That's all.

9            MS. WALLET:  Could we just take a five-minute

10       break?

11           (Recess taken from 11:44 until 11:55 a.m.)

12  BY MR. DELLASEGA:

13  Q.   Mr. Christlieb, I just had a few follow-up questions

14       to follow up.  Hopefully this will be the last round

15       for everybody and we'll get you out of here.

16           You were asked some questions about you thought

17       Gary was more harsh towards Barbara Varner, and that is

18       Barb Varner's, the door was open, whereas on other

19       occasions when he yelled at you the door was closed?

20  A.   Correct.

21  Q.   Is that correct?  There's only one time you ever heard

22       Mr. Osenkarski yell at Barbara Varner?

23  A.   Yes.

24  Q.   And he yelled at you 12 times?

25  A.   Somewhere around there, yes.

1   Q.   Okay.  You described Gary as an ass.  Would it be fair

2        to say you don't like Gary very much?

3   A.   I'd say not like is pretty harsh.  I didn't understand

4        the way he handled situations.  I didn't think he was

5        professional as a leader in our office.  I don't think

6        he did our office much good.  But other than that, I

7        wouldn't say I dislike the man or I hate the man.  I

8        can't say that.

9   Q.   But at no time you ever saw him sexually harass

10       anybody, correct?

11   A.   Never, no.

12   Q.   Okay.  You talked about you heard some profanity but it

13       was always behind closed doors?

14   A.   Yes.

15   Q.   Did you ever complain when any profanity was used in

16       your presence behind closed doors?

17   A.   No.

18   Q.   Are you aware of anybody that ever complained about

19       profanity being used behind closed doors?

20   A.   It strikes in my mind, and I probably can't give

21       details, but there may have been a circumstance where

22       some secretarial staff had some concerns years ago, and

23       I can't even pinpoint when that was.

24   Q.   Would that be prior to '95?

25   A.   Probably, yes.

```
 1   Q.   Would it be prior to '90?

 2   A.   No.  It would have been between '89 and '95, probably.

 3   Q.   Did you ever socialize with Ms. Varner?

 4   A.   No, other than the workplace.

 5   Q.   When I say socialize, I mean outside of work.

 6   A.   No.

 7            MR. DELLASEGA:  That's all the questions I had.

 8        Thanks.

 9            MR. ADAMS:  You're too quick.

10   BY MR. ADAMS:

11   Q.   Mr. Christlieb, unfortunately I'm going to go back to

12        the incident where you had observed Mr. Graham yelling

13        at Ms. Varner and you felt compelled to give her a copy

14        of the harassment policy.  Is that okay?

15   A.   Yes.

16   Q.   Okay.  And a moment ago while plaintiff's counsel was

17        asking you questions, she asked you if Varner had gone

18        to Mr. Osenkarski about that harassment, I'm trying to

19        paraphrase and I'm not -- if I'm putting words in your

20        mouth, I apologize if I totally don't get that

21        language -- but you thought Mr. Osenkarski would

22        address it but in a way that would be taking into

23        consideration Graham's friendship, his friendship with

24        Graham?  Is that correct?

25   A.   Yes.
```

1  Q.  Okay.  And that's specifically about the harassment or

2      the actions that you observed on this particular day

3      that you discussed before --

4  A.  Yes.

5  Q.  -- is that correct?  And that is when you noticed that

6      there was an abrupt change in the relationship between

7      Graham and Varner; is that correct?

8  A.  Yes.

9  Q.  Changing gears for one quick moment.  Taking into

10     consideration all that you know in relation to the

11     office and in relation to Ms. Varner, Mr. Graham,

12     Mr. Osenkarski, do you believe if Varner had gone to

13     Osenkarksi, Mr. Osenkarski, and complained that she was

14     being sexually harassed by Graham, would it have been

15     addressed?

16 A.  In some fashion, yes.

17 Q.  Okay.  Do you have any reason to believe that if Varner

18     had, Ms. Varner had gone to Mr. Osenkarski and

19     complained of sexual harassment, that Mr. Osenkarski

20     would not have done the right thing?

21 A.  It all depends what your philosophy is about the right

22     thing.  I think Mr. Osenkarski would have probably

23     discussed the matter with Mr. Graham and then the

24     matter would have been resolved however the two of them

25     would have seen fit.  I don't know if that would have

1          been the appropriate manner or not.

2     Q.   You mentioned the Kerry Houser complaint against

3          Mr. Osenkarski.  You mentioned that you knew some more

4          or bits about it because of Mr. Brandt's involvement;

5          is that correct?

6     A.   That's correct.

7     Q.   And you said that Mr. Brandt had shared a letter or the

8          findings with you; is that correct?

9     A.   That's correct.

10    Q.   Is it also true about that letter that it indicated

11         that there were no conclusions of sexual harassment

12         by -- there were no conclusions of sexual harassment by

13         Mr. Osenkarski against Ms. Houser?

14    A.   I believe you're correct, yes.

15    Q.   And you also testified that you believed Brandt felt

16         that he was being retaliated against?

17    A.   Yes.

18    Q.   Okay.  By whom?

19    A.   At that time Mr. Osenkarski was the supervisor, so he

20         felt that he was being retaliated upon by

21         Mr. Osenkarski.

22    Q.   Brandt did not file a claim of any sort in relation to

23         that action to anyone, did he?

24    A.   Not to my knowledge.

25    Q.   Okay.  And is it true that -- is it possible that at

1              that time when Brandt was receiving I guess more work,

2              other persons were also receiving work in the office,

3              or more work in the office?

4     A.    Yes.

5     Q.    Did you personally observe any retaliation of any sort

6              against Mr. Brandt for his involvement with

7              Ms. Houser's situation?

8     A.    No, other than the fact that Mr. Brandt, it was obvious

9              Mr. Brandt was getting the worst as far as caseload.

10            The referrals that came did seem that they were kids

11            that needed more attention, there were more problem

12            cases, that type of thing.

13    Q.    And this was an unusual period of time for Mr. Brandt

14            to get that type of work as opposed to any other time?

15    A.    Well, typically you'll get those cases scattered

16            throughout, but it appeared that he was getting those

17            cases, a majority of them at one specific time.

18    Q.    Could it have been a coincidence?

19    A.    Could have been, yes.

20                MR. ADAMS:  No further questions.

21                MR. DELLASEGA:  Unfortunately.

22  BY MR. DELLASEGA:

23    Q.    Sitting here today, can you identify any way in which

24            Mrs. Varner has been harmed with regard to any term and

25            condition of employment since she made her complaint

Christlieb                          74

```
 1        about Graham?
 2   A.   No.
 3   Q.   With regard to her caseload, is her caseload
 4        appropriate when compared with other probation
 5        officers?
 6   A.   Yes.
 7   Q.   With regard to the quality of cases she is assigned,
 8        you've indicated some are more demanding than others.
 9        Is the quality of cases she's assigned commensurate
10        with what other probation officers get?
11   A.   As far as I could see, yes.
12   Q.   With regard to the respect and courtesy she is shown by
13        other probation officers, is that commensurate with
14        respect to the courtesy that everyone receives in the
15        Probation Office?
16   A.   Yes.
17   Q.   Can you identify any ways in which she has been treated
18        better as a consequence of filing her Complaint?
19   A.   I know that she has made requests in at the office.
20        For example, there was a problem with the air quality,
21        and the county maintenance department did that pretty
22        immediate.  I assume that if I would have made that
23        request they would have done the same thing.
24            MR. DELLASEGA:  That's all.
25   BY MS. WALLET:
```

```
 1   Q.   Did you answer Mr. Dellasega's questions with regard
 2        to now?  Or did you consider the period of time before
 3        Mr. Graham was transferred?
 4   A.   I believe his question to me was since Mr. Graham's
 5        being transferred.
 6   Q.   Okay.  After the incident that you observed that caused
 7        you to give Ms. Varner the harassment policy but before
 8        Mr. Graham was transferred, did you see any ways in
 9        which Ms. Varner was treated differently?
10   A.   No.
11   Q.   How about the assignment of cases?
12   A.   Not to my knowledge.
13   Q.   Okay.  How about the seniority policy?
14   A.   No.
15   Q.   Okay.  Did you believe there was no change to
16        Ms. Varner's status with respect to seniority from the
17        time Mr. Bolze listed the seniority list to the
18        current?
19   A.   No, I didn't think there was a change.
20   Q.   If there was a change, you didn't know about it?
21   A.   No.
22   Q.   Did Lyle Herr ever discuss with you his status on the
23        seniority list?
24   A.   The way Mr. Bolze had come out with the list, I believe
25        it was not beneficial to Mr. Herr because he had lost
```

1        three or four, five years seniority that he would have

2        had if it would have started with county employment.

3   Q.   But he never discussed that with you?

4   A.   No.

5   Q.   After the incident that you observed that caused you to

6        give Ms. Varner the harassment policy, did Mr. Graham

7        treat Ms. Varner professionally and with respect?

8   A.   That's difficult to answer.  I mean, there was

9        definitely tension.  It certainly was not the same

10       atmosphere that it had been.  It appeared that the

11       friendship was over.  Other than that, I can't say if

12       there was any disrespect towards Mrs. Varner.

13  Q.   Where was your office in relationship to Ms. Varner's

14       office at that time?

15  A.   My office was located in that main complex of offices

16       with Mrs. Varner, probably about 20 feet from her front

17       door, 20 to 25 feet.

18  Q.   So both of you had doors that entered into the common

19       area?

20  A.   Yes.

21  Q.   And that's where the secretaries were?

22  A.   That's correct.

23       MS. WALLET:  That's all.

24 BY MS. WILLIAMS:

25  Q.   I have one short question.

1              Mr. Christlieb, you mentioned that there came a

2        time when the friendship was over between Barbara

3        Varner and Gary Graham.  Do you have any information as

4        to why that friendship ended, as you said?

5   A.   No.  It was a mystery to myself and others how it

6        abruptly ended.

7              MS. WILLIAMS:  Thank you.

8   BY MR. ADAMS:

9   Q.   I have one question.

10             In the hierarchy of the office when this

11       harassment was as you saw it occurred by Graham,

12       Mr. Graham and toward Ms. Varner, who, if Ms. Varner

13       wanted to complain to someone other than obviously

14       Mr. Graham and Mr. Osenkarski, would be the next line

15       person to complain to?

16  A.   I would think it would be Judge Sheely at that time.

17  Q.   Okay.  And do you know if Mr. Graham ever went to Judge

18       Sheely about any involvement or harassment by Gary

19       Graham at all?

20  A.   Mrs. Varner?

21  Q.   Yes.

22  A.   I'm not aware of that.

23  Q.   How about going to Judge Sheely about any harassment or

24       mistreatment by Mr. Osenkarski at all?

25  A.   I'm not aware of that.

1          MR. ADAMS:  You have the right to read this

2     transcript and correct any clerical errors that she

3     might make or if you said one word and she typed

4     another.  You also have the right to waive that.  Many

5     people do.  She needs simply to know where --

6          THE WITNESS:  I'd like a copy of the transcript,

7     please.

8          (Whereupon, the deposition was concluded at

9     12:10 p.m.)

10                         *   *   *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
COMMONWEALTH OF PENNSYLVANIA        )
                                    )  SS.
COUNTY OF DAUPHIN                   )
```

I, Emily R. Clark, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Dauphin, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

DARBY CHRISTLIEB

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Harrisburg, Pennsylvania, this 22nd day of May, 2003.


_____
Emily R. Clark
Reporter - Notary Public


(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)