```
COMMONWEALTH OF          :   DISTRICT NO. 09-2-01
PENNSYLVANIA             :
                         :
     v.                  :
                         :
BARBARA E. GRAHAM        :
```

## TRANSCRIPT OF PROCEEDINGS

Before:   PAULA P. CORREAL

Date:     January 10, 2000

Place:    East Wing - Courthouse
          One Courthouse Square
          Carlisle, PA  17013

PRESENT:

Janice Martino-Gottshall, Esquire
Office of the Attorney General
For the Commonwealth

David Foster, Esquire
For the Defendant

I N D E X   T O   W I T N E S S E S

| FOR THE COMMONWEALTH | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Barbara Varner | 5 | 11 | 25 | -- |
| Cpl. Brent Griest | 27 | 30 | 36 | -- |
| Barbara Varner | 64 | 65 | -- | -- |

| FOR THE DEFENDANT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Barbara Graham | 41 | 50 | -- | -- |
| Darlene Black | 53 | 55 | 57 | -- |
| Ron Ahlers | 57 | 59 | -- | -- |
| Roberta March | 61 | -- | -- | -- |

```
 1                                      January 10, 2000

 2                                      Carlisle, Pennsylvania

 3                                      1:44 p.m.

 4              THE COURT:  Call this hearing to order.  I'd

 5     like to apologize for keeping you all waiting.  I've been

 6     driving around the block looking for a place to park.  I'm

 7     sure many of you can certainly sympathize with me.

 8     Unfortunately, when I agreed that I would allow to have my

 9     office put in this location, it was with the understanding

10     that they were going to move the judges to park over

11     underneath the overhang, and the three spots out back were

12     to be for my office for me and for anybody coming to this

13     office, police business and so forth.

14                   Unfortunately, now it's become a

15     miscellaneous county parking slot so, therefore, when I

16     come back from lunch, I usually have to look for a place to

17     park, and it's not a very happy time right now for me.  I'm

18     a little irritated, so you'll have to bear with me when I

19     first start here.  Okay.  The case I have before me this

20     afternoon, Commonwealth of Pennsylvania v. Barbara E.

21     Graham.  Who's here with Ms. Graham?

22              MR. FOSTER:  I am.

23              THE COURT:  Counselor.  Mr. Foster, you're

24     here to represent Ms. Graham, is that correct?

25              MR. FOSTER:  That's correct, Your Honor.
```

1          THE COURT:  Pled not guilty to citation

2    P1725110-2, violation of the Pennsylvania Crimes Code,

3    Section 2709, Subsections 2 and 3.

4          MR. FOSTER:  We will waive a formal reading,

5    Your Honor.

6          THE COURT:  Okay.  Commonwealth, are you

7    ready to proceed?

8          MS. MARTINO-GOTTSHALL:  Yes, good afternoon,

9    Your Honor.  I'm Janice Martino-Gottshall.  I'm with the

10   Attorney General's office, and I'm representing the

11   Commonwealth in this case.

12         THE COURT:  Did you find a place to park?

13         MS. MARTINO-GOTTSHALL:  Well, I was with the

14   officer.  Luckily, he knew where he was going.

15         THE COURT:  Parked in the last spot where I

16   should have parked, right?  Okay.  You may call your first

17   witness, please.

18         MS. MARTINO-GOTTSHALL:  Thank you, Your

19   Honor.  Barbara Varner, please.

20                    Whereupon,

21                  BARBARA VARNER

22     having been duly sworn, testified as follows:

23         THE COURT:  Please be seated, and please

24   repeat your name and address for the record.

25         THE WITNESS:  My name is Barbara E. Varner.

4

1    My address is 5 Maple Drive in Etters.  That's 17319.

2              THE COURT:  Okay.  You may proceed.

3              MS. MARTINO-GOTTSHALL:  Thank you, Your

4    Honor.

5                        DIRECT EXAMINATION

6    BY MS. MARTINO-GOTTSHALL:

7         Q    Ms. Varner, I'd like to direct your

8    attention to November 19th, 1999, on a Friday.  Could you

9    please explain to the Court what happened as it relates to

10   this Defendant, Barbara Graham, on that particular day?

11        A    Okay.  On Friday, November 19th, I was

12   leaving the courthouse, the annex, and I was walking,

13   heading towards my car.  It was around 11:45 a.m.  I was

14   walking under the underpass.  As I got to the alley where

15   it intersects with the street, I happened to look to my

16   right, and I saw Barb Graham heading towards the

17   courthouse.  She was around the mailbox area.

18        Q    When you say, heading towards the

19   courthouse, was her face facing you or was her back?

20        A    Her back was to me, what I would believe

21   that she was going to enter into the main door of the main

22   courthouse.

23        Q    She was walking away from you?

24        A    Yes, she was.

25        Q    Now you referenced her this morning.  Would

1    you please identify her, please?

2             A    She's sitting at the table.

3             Q    All right.  Thank you.  Let the record

4    reflect, this witness has identified the Defendant, please.

5             A    So I looked to my right, and I happened to

6    see her walking away from me.  It was a block, half block,

7    whatever, distance.  I continued back to my parking lot,

8    which is the Eagle's lot which is on Pomfret Street.  And

9    as soon as-- I didn't even get to the street, and she was

10   right beside me.  And she started talking to me.  She said,

11   I want to talk to you.

12            I said, I don't want to talk to you, leave

13   it alone.  And I continued to walk.  She continued to say,

14   why are you lying about me?  Why are you ruining my family?

15   I said, Barb, I do not want to talk to you, leave me alone.

16   We came around the building into the parking lot, and I saw

17   the present parking lot attendant and plus the gentleman

18   who used to be the parking lot attendant standing in the

19   first row of the parking-- the cars.  They were in

20   conversation.  I called to them.  And I said, I want you to

21   know, this woman will not leave me alone.  I've asked her

22   to leave me alone.  She will not leave me alone.  I

23   continued on to my parking spot which is, as you go around

24   the parking lot, on the last row, nine cars down.  She

25   continued to walk beside me, continuously saying, I know

1    you're a liar.  Everybody in the courthouse knows you're a

2    liar.  You're sick.  My husband told me, you're sick.

3    You've been sick for years.

4            Q    How are you responding as she's continuing

5    to walk beside you?

6            A    Leave me alone, I do not want to talk to

7    you, let it alone.  I continued to do this, just trying to

8    calm her down.  She was pretty loud, not screaming, but she

9    was loud.  I could tell she was angry.

10           Q    Where was she in relation to you as you were

11   walking?  Where are you walking, by the way?  What was your

12   destination?

13           A    I'm going to my vehicle.

14           Q    Okay.  Where is she?  Is she in front of

15   you?  Behind you?

16           A    At first, she was to my right.  As we got

17   into the parking lot, she moved to my left.  We went around

18   the first corner, down toward my car, and I called to the

19   parking lot attendants.  I said, sirs, would you please see

20   that I have asked her to leave me alone.  She will not

21   leave me alone.  I continued.  I said, Barb, leave it

22   alone.  She called me a bitch.  We continued down to my

23   car.  We got down to my car, and we park parallel, and she

24   came around to the--

25           Q    When you say, we park parallel, are you

1   saying she was parked near you?

2           A    No, she was-- her parking lot is at the--

3   packing spot is at the very top of the parking lot.

4           Q    Approximately how many spaces apart is her

5   car from yours?

6           A    Her number is 45.  I'm 34.  It goes 45, then

7   there's a 44, and then it comes down the row to 34.

8           Q    As you're walking through the parking lot,

9   whose car do you pass first, your's or her's?

10          A    Her's.

11          Q    Did you walk anywhere near her car?

12          A    No, no.

13          Q    Okay.  So you're walking toward your car?

14          A    Right, right.

15          Q    And at this point, her car is not parked in

16  the vicinity of your car?

17          A    No, no, it's around nine cars away until we

18  got down.

19          Q    Did you reach your car?

20          A    Yes, I did.

21          Q    Was she still beside you when you reached

22  your car?

23          A    Yes, she moved-- at first, she started on

24  the right-hand side.  Then she moved to my left and

25  continued to say, why are you doing this, continually, you

8

1    know, harassing me basically, and she called me a bitch.

2    We got to my car.  She moved around to between my car and

3    the next car, sort of blocking it.  She didn't touch me or

4    anything but blocked the way.  I said, Barb, leave me

5    alone.

6              Q    How was she blocking you?

7              A    She just stood, physically standing there.

8              Q    Between-- physically standing where?

9              A    Between my car and the car beside me and on

10   the driver's side.

11             Q    Okay.  Was she blocking at all the door?

12             A    My entrance to the walkway to get to my

13   vehicle, to get to my door.  I said to her, Barb, if you do

14   not leave it alone, I'm going to call in on you.  She said,

15   good.  I hope you call in on me.  Then everybody will know

16   the truth about you.  I said, Barb, just leave it alone.  I

17   got in my car.

18             She was still outside the window, I hope you

19   call in.  I hope everybody finds out about this.  But prior

20   to my getting into the car, I called the parking lot

21   attendants a third time.  Again, I said, please

22   acknowledge, this woman will not leave me alone.  I've

23   asked her to leave me alone.

24             Q    Did they answer you at all?

25             A    They looked at me.  I don't know if they

1    exactly knew what I was saying, but they acknowledged where

2    we were and that something was going on.  I got into my

3    car.  I called the sheriff's department.  I made a report.

4    They sent a sheriff down to escort me into the building

5    because at that point I didn't know where she had gone.

6    She left.  And I was under the assumption, perhaps she was

7    getting in her car to back into me.  I had no idea.

8            Q    Okay.  So at the point you got in your car,

9    you said, she continued to say something through the

10   window?

11           A    Right.  Go ahead and call.  Go ahead.  I

12   want you to call.  So then I came into the courthouse, and

13   I filed a complaint.  And at that point, once I got into

14   the sheriff's office, I just sort of lost it.  It was just

15   so-- because it's been a problem for quite a while.  It was

16   just frustration.  And I didn't know what she was going to

17   do.  I really was afraid.

18           Q    Have you had any of these confrontations

19   with her in the past?

20           A    There has been seven incidents where she

21   followed me, one time she physically ran into me.  I've

22   written three letters.

23           Q    What do you mean, physically ran into you?

24   With her car?

25           A    No, physically with her shoulder.

1           Q      With her person and your person?

2           A      I had to move my parking spot.  I moved my

3    park spot because of this.

4           Q      When did you move your parking space?

5           A      It's been over a year.

6           Q      All right.  So you had your parking space

7    moved in order to accomplish what?

8           A      To make-- avoid any contact.  And I've been

9    trying to do that for the last three years.

10          Q      So these previous confrontations that you've

11   had have occurred within the last several years?

12          A      Yes.

13          Q      Who were they initiated by?

14          A      Mrs. Graham.

15          MS. MARTINO-GOTTSHALL:   Nothing else.

16   Cross-examine.

17                        CROSS EXAMINATION

18   BY MR. FOSTER:

19          Q      During that entire time, you and she have

20   parked in the same parking lot, is that correct?

21          A      That's correct.

22          Q      And that parking lot is just right outside

23   this door virtually?

24          A      Yeah, basically behind the building, right,

25   maybe one building over.

1      Q    And your car is parked in that lot?

2      A    Yes.

3      Q    Her car is parked in that lot?

4      A    That's correct.

5      Q    You work in the courthouse?

6      A    Yes, I do.

7      Q    She works in the courthouse?

8      A    Uh-huh.

9      Q    Anyone working in the courthouse who would

10   leave the courthouse and go to their parking space in that

11   lot would walk in the same vicinity as where your car is

12   located, is that correct?

13     A    That's correct.  Well, not where my car is

14   located, no.  If you're at the upper part, there's no

15   reason to be down at my lot.

16     Q    Did you ever have words with Barbara Graham

17   before this day?

18     A    No, I didn't.

19     Q    Has she ever threatened you?

20     A    Physically, yes.  Verbally, no.

21     Q    How did she physically threaten you?

22     A    She would walk several steps behind me on

23   one occasion.  There was-- has been times she's just stood

24   at her car, and when I was parked directly behind her, she

25   stood at her car just glaring with fists clenched, just

1    standing until I got in my car.  She physically ran into me

2    one time with her shoulder.

3            Q    On that occasion--

4            A    Uh-huh.

5            Q    Was that an occasion where she was walking

6    with her husband, Gary Graham?

7            A    That's correct.

8            Q    And they walked around the corner of the

9    building?

10           A    I came around the corner.  I was up on the

11   sidewalk.  I stepped off, and she physically encountered

12   me, yes.

13           Q    Let me put it this way.  You both came

14   around the corner at a time when you did not know the other

15   was approaching, is that correct?

16           A    We were around.  She saw me before it

17   happened.  I was the whole way around the corner before she

18   saw-- before it happened.

19           Q    Before she saw you?

20           A    No, before it happened.

21           Q    I see.  She has never had words with you,

22   and she has never threatened you, is that correct?

23           A    Not verbally, no.

24           Q    On this particular occasion, did she

25   threaten you?

1      A    Threaten me, no.  Well, she threatened to

2  tell everybody in the courthouse about the lies.

3      Q    That you were lying?

4      A    That's what she said.  That's what she

5  alleged.

6      Q    Okay.  And did she threaten to harm you in

7  any way?

8      A    No, she did not.

9      Q    Did she touch you?

10      A    No.

11      Q    Did she raise her voice?

12      A    Her voice was raised, yes.

13      Q    Was it screaming?

14      A    No.  It was raised but not screaming.

15      Q    Was your voice raised?

16      A    No.  Everything I kept saying was, please

17  leave me alone.

18      Q    Now this took place as you walked from the

19  courthouse right here?

20      A    Right.

21      Q    To the parking lot right behind us?

22      A    That's correct.

23      Q    And how long did it take you to walk that

24  distance?

25      A    Several minutes.

1          Q    Several minutes?

2          A    I really never-- it's at least a hundred

3     feet.

4          Q    Pardon me?

5          A    It's at least a hundred feet from the

6     courthouse to my car.

7          Q    Okay.  A hundred feet from the courthouse to

8     your car?

9          A    Right.

10         Q    And you walked that distance going from your

11    car to the courthouse and from the courthouse to your car

12    virtually every workday for the past several years?

13         A    Yes.

14         Q    You don't have any idea how long it takes to

15    walk that distance?

16         A    Five minutes, four minutes.  I don't know.

17         Q    A hundred feet?

18         A    I really don't know.  Several minutes.

19         Q    If you walk directly from the courthouse to

20    your parking space, you say it's about a hundred feet?

21         A    Uh-huh.

22         Q    On this occasion, did you stop at any time

23    on your walk to the courthouse, to the car?

24         A    I stopped and I looked at her.  I said,

25    Barb, leave it alone.  I don't want to talk to you.  And

1  then I continued.

2          Q    Where were you when you stopped?

3          A    On the way to my car.

4          Q    Were you in the alley or in the parking lot?

5          A    No, we were in the parking lot.

6          Q    How long did you stop?

7          A    Just briefly.  Long enough to say, Barb,

8  leave it alone, I don't want to talk to you.

9          Q    Now at that point in time, at any point in

10  time, did she physically obstruct you from walking to your

11  car?

12          A    Yes, when I was going to enter my car.

13  Between the car when I was trying to get into the

14  passenger-- well, the driver's door and the vehicle beside

15  me, she physically placed herself in the walkway.

16          Q    And how long was she there in that position?

17          A    Just briefly, because I walked around her

18  and got into my car, and that's when I said, I'm going to

19  call in on you.

20          Q    So you were able to get in your car?

21          A    Yes, I was.

22          Q    She didn't make any physical effort to

23  prevent you from getting in your car?

24          A    No, she didn't.  Just her physical presence

25  where she was located.

1          Q    How long were you stopped in the vicinity of

2     your car engaged in conversation with Barb Graham?

3          A    Just long enough to say, leave me alone, I

4     don't want to talk about this.

5          Q    So the rest of the--

6          A    Five seconds.

7          Q    Pardon me?

8          A    Five seconds.

9          Q    The rest of the entire conversation took

10    place while you were walking from the courthouse to your

11    car?

12         A    Yes.  Conversation, no.  Her just talking at

13    me.

14         Q    But regardless of how you characterize what

15    it was, it all took place while you were walking?

16         A    Yes.

17         Q    As opposed to standing beside your car?

18         A    Yes.

19         Q    And it's your testimony, you never stopped

20    at your car and waited for her to come, because she called

21    to you?

22         A    No, absolutely not.

23         Q    And you say, there were seven prior times in

24    the past, what did you say, three years?

25         A    Three years.  Well, not quite three years.

1          Q    That you would see her in the parking lot?

2          A    Not in the parking lot.  Throughout-- it was

3    several times in the courthouse.  Several times in the

4    parking lot.

5          Q    Well, she didn't have words with you on

6    those occasions, did she?

7          A    No.  This is the first time it's ever been

8    verbal exchange.

9          Q    And I take it that-- what floor do you work

10   in the courthouse?

11         A    On the third floor.

12         Q    What floor does she work on?

13         A    The fourth.

14         Q    Does your work ever require you to go to the

15   fourth floor?

16         A    Yes, it does.

17         Q    Would it be fair to say that over three

18   years, just on a chance basis, that it's very likely that

19   the two of you would cross paths in the fact that you work

20   in the same area?

21         A    Probably, sure.

22         Q    Were you ever restricted yourself from going

23   to the fourth floor of the courthouse because you were--

24         A    No.

25         Q    Irritating Barbara Graham?

1          A    I was never irritating Barbara Graham, and

2    I've never been told to stay off the fourth floor.

3          Q    How about, were you told to stay off the

4    third floor?

5               MS. MARTINO-GOTTSHALL:  Objection, Your

6    Honor.  I don't know that this is relevant to the incident

7    that we're here today for.

8               THE COURT:  We are going pretty far into the

9    past, counselor.  Are you wishing to establish something

10   here?

11              MR. FOSTER:  The only reason was, they

12   brought up--

13              THE COURT:  I realize that, but we could go

14   on forever about what has happened in the past.  I'd really

15   rather stick with this particular incident.  Let's narrow

16   the scope.

17   BY MR. FOSTER:

18          Q    Do you know what lies she was talking about

19   to you?

20          A    I have no idea what she was talking about.

21          Q    You have no idea what she was talking about?

22          A    Except for the sexual harassment case.

23              MS. MARTINO-GOTTSHALL:  Objection, Your

24   Honor.  Again, we're talking about the incident that

25   occurred not everything that might have led up to it,

1    whether or not the incident in reference here constitutes

2    harassment.

3                MR. FOSTER:  Your Honor, if I may?

4                THE COURT:  Uh-huh.

5                MR. FOSTER:  Harassment statute states that

6    someone, as charged against Barbara Graham here, says, a

7    person commits a crime of harassment when, with the intent

8    to harass, annoy, or alarm another person, he engages in a

9    course of conduct or repeatedly commits acts which alarm or

10   seriously annoy another person and which serve no

11   legitimate purpose.

12               THE COURT:  Uh-huh.

13               MR. FOSTER:  If there is a legitimate basis

14   for this communication, then that, as a matter of law,

15   means it's not harassment.  So I'm trying to get into the

16   nature of the communication that is taking place.

17               MS. MARTINO-GOTTSHALL:  Your Honor, I

18   believe that the victim has stated that she indicated a

19   number of times, she had no intention of engaging in

20   conversation with the Defendant.  And this continued.  So

21   the victim has made it very clear that she did not wish to

22   discuss anything, and at that point any purpose the

23   Defendant hoped to achieve was not going to be achieved and

24   that was made clear to the Defendant.

25               THE COURT:  I'm going to sustain the

1   objection.  Stick with this particular incident, counselor.

2                    MR. FOSTER:  Well--

3                    THE COURT:  I made my ruling, counselor.

4                    MR. FOSTER:  I'm not trying to overstep your

5   ruling, but let me phrase it a different way.  And if

6   you're still--

7                    THE COURT:  All right.  Try it again another

8   way.

9   BY MR. FOSTER:

10            Q    She said to you that she wanted you to stop

11  lying?

12            A.   Uh-huh.

13            Q    Is that correct?

14            A    That's what she said.

15            Q    And she said, the truth will come out?

16            A    No.  She said, all the people in the

17  courthouse know you're lying.

18            Q    Okay.  Now do you know what she meant by

19  that?

20            A    I don't know what lies specifically she's

21  talking about, no.

22                    THE COURT:  Any other questions, counselor?

23                    MR. FOSTER:  Yes, Your Honor, if I may.  If

24  the Court will indulge me for a moment.

25  BY MR. FOSTER:

1          Q    You have brought a sexual harassment claim

2    against the county, is that correct?

3               MS. MARTINO-GOTTSHALL:  Objection, Your

4    Honor.  Again, I don't believe there's any relevance shown

5    with these questions and this incident that's in question.

6               THE COURT:  I have to agree, counselor.

7    Sustain the objection.

8               MR. FOSTER:  Okay.

9    BY MR. FOSTER:

10          Q    Do you bear any animosity to Barbara Graham?

11          A    Absolutely not.

12          Q    Do you bear any animosity to her husband,

13    Gary Graham?

14               THE COURT:  I'm looking for relevancy.

15               MR. FOSTER:  Bias and prejudice of the

16    witness, Your Honor.  It relates to her credibility.

17               THE COURT:  Against her husband?  We're here

18    about her not her husband.

19               MR. FOSTER:  Well, Your Honor, the whole

20    incident centers around these two women.

21               THE COURT:  Counselor, most of these types

22    of cases center around something that happened prior to

23    this particular incident.

24               MR. FOSTER:  Right.

25               THE COURT:  I understand that, because I

```
 1    have these kind of cases all the time.

 2                 MR. FOSTER:  Sure.

 3                 THE COURT:  But I don't want to belabor the

 4    point of what happened prior to either.

 5                 MR. FOSTER:  But if-- Your Honor, if I just

 6    may.  If this witness has animosity towards her husband--

 7                 THE COURT:  Because that probably is in a

 8    forum, you know, outside my jurisdiction.  We're looking at

 9    something that's going to take place someplace else, and I

10    have no control over that.

11                 MR. FOSTER:  I understand.

12                 THE COURT:  Okay.  And I don't think we need

13    to get into two different types of hearings here.  We might

14    very well do that if we go too far beyond the scope of this

15    particular incident which happened on 11/19/99.  All right.

16    So let's narrow the scope and try to stick with this

17    particular incident.

18                 MR. FOSTER:  What I was trying to get at is,

19    this is the witness against my client and--

20                 THE COURT:  This is true, yes.

21                 MR. FOSTER:  Criminal prosecution, and I'm

22    trying to develop bias or prejudice of this witness toward

23    my client.

24                 THE COURT:  Uh-huh.

25                 MR. FOSTER:  Now if she has animosity toward
```

```
 1    my client's husband, that would play into her bias and

 2    animosity toward this individual, my client.  That's all I

 3    was asking.

 4                 THE COURT:  Okay.  Do you want to answer

 5    that question?  Yes or no?

 6                 THE WITNESS:  I was not-- not animosity, no.

 7    BY MR. FOSTER:

 8           Q    Anger?

 9           A    Fear.

10           Q    Pardon me?

11           A    Fear.  And that is why I've done all I can

12    to avoid any contact with both of them.  That's why I moved

13    my spot, my parking spot.

14           Q    Anger?

15           A    Fear.

16           Q    Anger?

17           A    I said, fear.

18           Q    I know.  I'm asking you, anger?

19           A    No, at this point, it's fear.

20           Q    Why did you move your parking spot?

21           A    Because I wanted to avoid any contact with

22    Barb Graham and with Mr. Graham.  I just wanted to avoid

23    the contact as much as I possibly can, because I did have

24    the suit pending.

25           Q    And your parking space now is how far from
```

1   Barbara Graham's car?

2          A    I'm around the corner, nine spaces down.  I

3   used to be directly behind her.

4          Q    So you're nine spaces away from her?

5          A    Well, yeah, ten really until you get around

6   the corner, yes.

7          Q    Did you have a sexual relationship with Gary

8   Graham?

9          MS. MARTINO-GOTTSHALL:  Objection, Your

10  Honor.

11         THE COURT:  Sustained.  I don't think that

12  has any relevancy whatsoever to this particular hearing.

13  Counselor, I'm not going to warn you again.  Now, please.

14         MR. FOSTER:  That's all I have.

15         THE COURT:  Any redirect?

16         MS. MARTINO-GOTTSHALL:  I just want to

17  clarify a few things, Your Honor.

18                  REDIRECT EXAMINATION

19  BY MS. MARTINO-GOTTSHALL:

20         Q    Ms. Varner, you indicated that at one point,

21  the Defendant was standing where you would walk to your car

22  door?

23         A    That's correct.

24         Q    How did you walk around her?  Were you able

25  to walk around her within the space of those two cars or

1    did you walk some other direction?

2           A    No, I was able to walk around her.  There

3    was enough space.  I have a very small car.  She was very

4    close to me when I opened up my door.  As I was opening my

5    car door up, I said, I am going to call in.  I left her

6    know.  At that point, leave me alone.  I want to be left

7    alone.  I said, if you don't stop, I'm going to call in.

8    So I was able to get into my car and shut the door, and she

9    was still right outside my window.

10          Q    Defense counsel referenced somebody calling

11   out to somebody.  At any time did the Defendant call out to

12   you to get your attention?

13          A    Whenever she-- well, not really called out.

14   She was right beside me when she said, Barb, I want to talk

15   to you.

16          Q    Okay.  And was that the first piece of

17   conversation or anything that was said between the two of

18   you?

19          A    Yes.

20          Q    All right.  Had you said anything to her

21   prior to that?

22          A    No, because I saw her going into the

23   building.

24          Q    Okay.

25               MS. MARTINO-GOTTSHALL:  That's all I have.

```
 1                    THE COURT:  Recross?

 2                    MR. FOSTER:  No, Your Honor.

 3                    THE COURT:  You may step down.  Thank you.

 4                    MS. MARTINO-GOTTSHALL:  Corporal Griest,

 5       please.

 6                           Whereupon,

 7                    CORPORAL BRENT R. GRIEST

 8            having been duly sworn, testified as follows:

 9                    THE WITNESS:  My name is Brent R. Griest.

10       I'm a corporal with the Carlisle Borough Police Department.

11                    THE COURT:  You may proceed, Commonwealth..

12                       DIRECT EXAMINATION

13       BY MS. MARTINO-GOTTSHALL:

14            Q    Corporal, at one point did you have an

15       opportunity to interview the Defendant in this case,

16       Barbara Graham?

17            A    Yes, I did.

18            Q    And on what date did you interview her?

19            A    It was the same date of the incident,

20       November 19th.  It was approximately 2:39 in the afternoon.

21            Q    Okay.  When you talked to the Defendant, did

22       you ask her who was walking ahead of who?

23            A    Yes, I did.

24            Q    And what was the Defendant's answer?

25            A    Barb Graham stated that Barb Varner was
```

1    walking ahead of her in the alley.

2              Q    Okay.  So the Defendant is stating that the

3    victim was walking ahead of her?

4              A    That's correct.

5              Q    Okay.  Did the Defendant indicate whether or

6    not she was, in fact, at some point walking beside her?

7              A    Yes, she did.

8              Q    Okay.  So at one point, the Defendant

9    admitted that she had caught up with the victim and began

10   walking beside her?

11             A    Yes.

12             Q    All right.  Did the Defendant indicate who

13   approached who in any conversation or discussion that took

14   place?

15             A    Barb Graham told me that she approached Barb

16   Varner and started to ask her questions.

17             Q    Okay.  So the Defendant admitted she

18   approached the victim?

19             MR. FOSTER:  I object to the leading

20   questions.

21             MS. MARTINO-GOTTSHALL:  Your Honor, I'm just

22   trying to identify the parties since we have two Barbaras

23   here.  I'm trying to clarify.  We're using the Defendant

24   and victim.

25             THE COURT:  Be careful about leading,

1    counselor.  Okay.

2    BY MS. MARTINO-GOTTSHALL:

3        Q    Corporal, who initiated conversation?

4        A    Barb Graham initiated conversation,

5    according to her statement.

6        Q    Did the Defendant, Ms. Graham, indicate

7    where the victim was walking to?

8        A    Yes.  She stated that the victim was walking

9    to her vehicle.

10        Q    All right.  Did the Defendant indicate how

11    far she walked alongside of the victim?

12        A    Yes, she stated that she was very close, but

13    she was not like face-to-face.  I asked her if she was

14    face-to-face, and that she wasn't.  At the time of the

15    interview, we were sitting across the table from each

16    other.  I said, about as close as we are?  And she seemed

17    to feel that that was accurate.

18        Q    Okay.  Did the Defendant indicate how long

19    she walked alongside of the victim?

20        A    Time period?  I don't believe she indicated

21    a time period.

22        Q    Did she indicate whether or not the victim

23    had, in fact, reached her car?

24        A    Yes, she stated the victim reached her car.

25        Q    And was the Defendant still alongside of the

1  victim when the victim reached her car?

2          A    Yes.

3          Q    Did the Defendant indicate whether or not

4  the victim was willing to engage in conversation with her?

5          A    I don't believe she said that, you know,

6  that she engaged in any conversation or said anything back

7  to her.  I don't believe.

8          Q    Okay.  And did the Defendant at all indicate

9  whether she felt she was right in approaching the victim?

10         A    Towards the end of her statement, she stated

11  exactly, I know I shouldn't have talked to her at all.

12         Q    All right.

13              MS. MARTINO-GOTTSHALL:  Cross-examine.

14                    CROSS EXAMINATION

15  BY MR. FOSTER:

16         Q    Corporal, was this conversation taped?

17         A    Yes, it was.

18         Q    Was that tape reduced to a transcript?

19         A    Yes, it was.

20         Q    Do you have that?

21         A    Yes, I do.

22         Q    May I see it?

23              (Whereupon, Corporal Griest complied.)

24              MR. FOSTER:  Your Honor, I haven't had a

25  chance to look at this.

```
1    BY MR. FOSTER:

2                Q    Is this 14 pages long?

3                A    That sounds accurate.

4                Q    The whole thing is that statement?

5                A    Yes.

6                MR. FOSTER:  May I have a moment to look

7    through it quickly?

8                THE COURT:  All right.  Make it quick, if

9    you can.

10   By MR. FOSTER:

11               Q    Did she tell you that she came out of the

12   courthouse, and the first thing she did was walk away from

13   the parking lot to put something in the mailbox?

14               A    Yes, she did.

15               Q    Then she went to her car?

16               A    Yes.

17               Q    And it was--

18               A    She did not state she went to her car.  She

19   said she turned and saw the victim standing and that she

20   walked over to the victim.

21               Q    All right.  And did she tell you that the

22   victim waited for her to approach her?

23               A    That's not my recollection, unless you see

24   it in the statement.  I don't recall her stating that the

25   victim waited.
```

```
 1            Q     Okay.
 2                  MR. FOSTER:  May I approach the witness,
 3     Your Honor?
 4                  THE COURT:  You may.
 5     BY MR. FOSTER:
 6            Q     Just look at the very first page.  Is that
 7     her name, G, does that mean Barbara Graham's statement?
 8            A     Yes, she said that.
 9            Q     She kind of stood there.  I walked over to
10     her?
11            A     Yeah, that's what Barb Graham said.
12            Q     Okay.  That's what I mean.  You didn't--
13     your testimony is about what Barb Graham told you, correct?
14            A     Right.
15            Q     And Barb Graham told you that Barbara Varner
16     looked at her and stood there, and then Barb Graham walked
17     over to her?
18            A     According to that, yes.
19            Q     And that they then walked together to the
20     parking lot side-by-side?
21            A     Right.
22            Q     And that's when this conversation took
23     place?
24            A     Right.
25            Q     Now did Barbara Graham explain to you why
```

```
1     she wanted to talk to Barbara Varner?

2              A    We talked in depth about the whole

3     situation.

4              MS. MARTINO-GOTTSHALL:  I'm going to object

5     to this line of questioning.  Again, Your Honor, defense

6     counsel is getting into the same material he was getting

7     into before.

8              MR. FOSTER:  Your Honor, this is the

9     statement the officer took from the Defendant at the time

10    which they are using to introduce against her.  I have the

11    right to explore it, number one.  Number two, if he asked

12    her why she talked to Barbara Varner, why she wanted to

13    talk to Barbara Varner, that is relevant, because that's an

14    element of the statute, no legitimate purpose.

15             THE COURT:  I've told you, counselor, I want

16    to narrow the scope to this particular incident.

17             MR. FOSTER:  I'm just asking what Barbara

18    Graham told this officer in his interview with her.

19             THE COURT:  Evidently.  How long did you

20    talk with Ms. Graham?

21             THE WITNESS:  Quite a while.

22             THE COURT:  We don't need to get into

23    everything that he told her at this point.  What do we have

24    in the--

25             MR. FOSTER:  I'm just asking.
```

1           THE COURT:  Is it in there?  Does it tell

2    you?

3           MR. FOSTER:  I haven't had a chance to read

4    through it.  It's 14 pages, Your Honor.

5           THE COURT:  Is it stated in there exactly

6    everything you talked about?

7           THE WITNESS:  Not initially.  Not the

8    initial past years of problems and all the past problems.

9    Specifically about this incident, it's all in there.

10          THE COURT:  Uh-huh.  Okay.

11          MR. FOSTER:  My simple question was, did she

12   tell him why she wanted to talk to Barbara Varner?

13          THE COURT:  The answer is what?

14          THE WITNESS:  I'm not sure specifically

15   whether that's in there or not.  I know we talked about her

16   being frustrated and upset.

17   BY MR. FOSTER:

18          Q    Did she tell you that her purpose in talking

19   to Barbara Varner was to harass her?

20          A    No, she did not say that her intent was to

21   harass her.

22          Q    Or to annoy her?

23          A    I think we discussed that in there.

24          Q    Did she tell you specifically that that was

25   not her intent?

1    A    I don't remember specifically whether she

2  said it was her intent or not.

3    Q    Did she explain that they both work in the

4  courthouse and they both park in the same parking lot?

5    A    Yes.

6    Q    And that's been the case for several years?

7    A    Yes.

8    Q    Did she tell you specifically, it was

9  approximately 12:00, I was on my way to my car, and Barb

10  Varner was walking ahead of me.  I saw her, and by the time

11  I got to the Eagle's lot, I called out her name.  She

12  turned around and looked at me, and I said, I'd like to

13  talk to you for a minute?

14    A    That's specifically what she said.

15    Q    And then thereafter, she said, you know, she

16  kind of stood there.  I walked over to her.  Is that

17  correct?

18    A    That's correct.

19    Q    Did you determine where their respective

20  parking spaces were?

21    A    Yes.

22    Q    Are they about nine spaces apart?

23    A    That's correct.

24    MR. FOSTER:  That's all I have.

25    THE COURT:  Any redirect?

35

1        MS. MARTINO-GOTTSHALL:  Briefly, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MS. MARTINO-GOTTSHALL:

4        Q    Corporal, in determining where the two

5    respective parking spaces were, which space was further

6    away from the courthouse, the Defendant's or the victim's?

7        A    The victim's is farthest away from the

8    courthouse.

9        Q    Okay.  So in order to get to the victim's

10   car, the way you view it, would the Defendant have to walk

11   past her own car and continue to walk further?

12       A    Yes.

13       Q    To the victim's car?

14       A    Yes.

15             MS. MARTINO-GOTTSHALL:  Okay.  That's all I

16   have.

17             THE COURT:  Okay.  Any recross?

18             MR. FOSTER:  No, Your Honor.

19             THE COURT:  You may step down.  Any other

20   witnesses for the Commonwealth?

21             MS. MARTINO-GOTTSHALL:  No, Your Honor.  If

22   I could just confirm with the officer?

23             Your Honor, the Commonwealth rests.

24             THE COURT:  Okay.  Counsel, do you wish to

25   provide any evidence at this point?

1           MR. FOSTER:  Your Honor, before I do that, I

2    would like to make a motion.

3           THE COURT:  Okay.

4           MR. FOSTER:  In reserving my right, if the

5    Court denies the motion, to call witnesses.  I would demur

6    to the evidence presented in this case on the basis that

7    it's insufficient as a matter of law for one to conclude

8    that Barbara Graham was guilty of a criminal offense beyond

9    a reasonable doubt of harassment.

10          The section states, a person commits the

11   crime of harassment when, the first requirement is, with

12   intent to harass, annoy, or alarm another person.  So first

13   of all, that has to be the Defendant's intent.  That's the

14   reason that they did it.  If someone is upset with another,

15   and they want to communicate with someone, and a byproduct

16   of that communication is that the other person gets upset,

17   that's not harassment unless, in fact, that was the

18   purpose, that was the intent of the communication.  So

19   that's number one.

20          Then she's charged with two subsections.  If

21   you have that intent, and then you follow a person in or

22   about a public place or places.  Here we have two women who

23   work in the same building, walking to the same parking lot

24   where their cars are nine feet apart.  That's not the kind

25   of following that this statute entails.  That talks about

1    following someone down the streets, allies, all around.

2               Ms. Varner, in her testimony, tried to imply

3    that it took five minutes to walk that distance when it's a

4    matter of a hundred feet or a hundred fifty feet or

5    whatever her testimony was.  I submit, that would take 30

6    seconds, at best.  It is not the kind of following that's

7    contemplated by the statute.  If she's walking to her car,

8    and she's walking to her car, and then she didn't stop at

9    her car and walked an additional nine parking spaces to

10   talk to this lady, that is not the kind of following that

11   is contemplated by this statute, this criminal charge.

12               So that's another reason that subsection two

13   does not apply.  Subsection three, if you have that intent

14   to alarm, annoy, or harass, if you engage in a course of

15   conduct or repeatedly commit acts which alarm or seriously

16   alarm another person and which serve no legitimate purpose.

17   A course of conduct, one, is not alleged here in the

18   complaint.

19               This incident, and there was some

20   discussion, and Your Honor's points were quite well taken

21   about not going into the past, and I understand that.  My

22   purpose into going into the past was to show what her

23   intent was.  But the fact of the matter was, as Your Honor

24   has pointed out, we're talking about this incident on this

25   occasion.  And the wording of the complaint is, subject

1    followed the victim a substantial distance and subjected

2    her to verbal communications that substantially annoyed and

3    alarmed her.

4                    Aside from the intent that's required, it

5    must serve no legitimate purpose.  Again, her purpose was

6    to discuss a matter that has been brewing between these two

7    people for some three years which the Court chose not to

8    hear about.  Never have there been verbal words exchanged

9    between these people before.  There's never been any

10   threats made by Barbara Graham.  There were no threats made

11   on this occasion.  She wasn't yelling at her.  There were

12   no obscenities.  There was no physical contact.  And she

13   did not obstruct her.

14                   She said she was standing by the door when

15   she walked right around her and got in her car, no physical

16   contact whatsoever.  Based upon that, the elements for this

17   harassment offense fail on almost every count.  One, they

18   have not established her intent.  They must prove it beyond

19   a reasonable doubt that her intent was to seriously alarm,

20   annoy, or harass another person.

21                   They have not established that the purpose

22   of the conversation served no legitimate purpose.  They

23   have not established that she followed her about in a

24   public place or places.  And they have not established a

25   repeated course of conduct.  That's not even alleged.  So

1   because it's their burden to establish that beyond a

2   reasonable doubt, I'm asking Your Honor to throw it out at

3   this point on that basis.

4                    THE COURT:  Do you have a comment with

5   regard to his request for a demurrer?

6                    MS. MARTINO-GOTTSHALL:  Yes, Your Honor, I

7   believe intent can be proven here, and I submit to the

8   Court that intent can be proven simply by the Defendant's

9   actions and response to the victim's response.  And the

10  victims made it clear that she did not want to have any

11  contact with the Defendant, and the Defendant persisted.

12                   At that point, Your Honor, I believe the

13  Court can find that intent shown through the Defendant's

14  actions, the Defendant continued to persist and, therefore,

15  did display the intent required by the statute here,

16  because it did become at that point the intent to harass

17  and annoy or alarm because it was clear the victim made it

18  clear that there was going to be nothing else accomplished

19  during that confrontation between these two women.

20                   MR. FOSTER:  If I could just--

21                   THE COURT:  No, I think I've heard enough

22  with regard to your motion, and I'm going to deny your

23  motion.  Now would you like to provide any evidence at this

24  point?  Call your first witness, please.

25                   MR. FOSTER:  Yes, Barb Graham.

1          Whereupon,

2              BARBARA E. GRAHAM

3     having been duly sworn, testified as follows:

4              THE COURT:  Ms. Graham, you live at 2037

5     Ritner Highway, Carlisle, PA, is that correct?

6              THE WITNESS:  Yes.

7              DIRECT EXAMINATION

8     BY MR. FOSTER:

9          Q    Barb, would you state your name?

10         A    Barbara E. Graham.

11         Q    And you work at the Cumberland County

12    courthouse, is that correct?

13         A    Yes.

14         Q    And in the court stenographer's office?

15         A    Yes.

16         Q    How long have you worked there?

17         A    Twenty-two years.

18         Q    Do you know Barbara Varner?

19         A    Yes.

20         Q    How long have you known her?

21         A    Probably since 1995.

22         Q    Okay.  Is that roughly the time, as you

23    recall, that she began working at the courthouse?

24         A    Well, she worked in the Children and Youth

25    Services, I think, from 1990 until 1995.  And then she

1    started with the juvenile probation in '95.

2         Q    Okay.  I'm going to direct your attention to

3    this incident which occurred on November 19th.  Do you

4    recall that day and that incident?

5         A    Yes, I do.

6         Q    Before this incident, had you ever spoken to

7    Barbara Varner about any matter of which you were concerned

8    about that day involving her?

9              MR. FOSTER:  I'm trying to-- Your Honor, I'm

10   trying to dodge the bullet here.

11             THE COURT:  Right.  Okay.  I appreciate

12   that, counselor.

13   BY MR. FOSTER:

14        Q    Have you ever had a conversation with

15   Barbara Varner before this day regarding what you were

16   trying to talk to her about that day?

17        A    No.

18        Q    Have you ever threatened Barbara Varner?

19        A    Never.

20        Q    Did you ever physically threaten Barbara

21   Varner?

22        A    Never.

23        Q    Now on this day, at some point, you walked

24   out in the vicinity of the parking lot?

25        A    I left the courthouse.

1     Q    All right.

2     A    I went to the mailbox to mail a letter.   I

3  was going home for lunch.  I went up to the mailbox.  And

4  then I started down Liberty Avenue to the Eagle's parking

5  lot where I park my car.

6     Q    Okay.  Now when you walk to the mailbox,

7  that means, for that moment, you are walking away from the

8  parking lot?

9     A    Yes.

10    Q    And then you put your mail in the mailbox?

11    A    Yes.

12    Q    And then you walked toward the parking lot?

13    A    Yes.

14    Q    At some point, did you see Barbara Varner?

15    A    Yes, I did.

16    Q    Where were you and where was she when you

17 first saw her?

18    A    When I first saw her, I was probably at the

19 sidewalk of the courthouse, across the street.  She was

20 walking down the alley, up Liberty Avenue.

21    Q    How far was she from you?

22    A    Fifty, sixty feet.  She was probably halfway

23 down the parking lot at that point-- halfway down the

24 alley, excuse me.

25    Q    To the parking lot?

1          A    Yes.

2          Q    Did you call out to her?

3          A    I walked down the alley, and I stepped into

4 the Eagle's parking lot.  That is when I called out to her.

5          Q    What did you call out to her?

6          A    I said, Barb, I would like to talk to you.

7          Q    Now where was she at that point?

8          A    She was halfway across the parking lot.

9          Q    When you say, halfway across, to where her

10 car was located?

11         A    Halfway across the width of the parking lot.

12         Q    Okay.  About how far was she from you?

13         A    Sixty feet maybe.  I'm not sure.  I'm not

14 sure of the distance.

15         Q    When you called out to her, what did she do?

16         A    I said, Barb, I would like to talk to you.

17 And she indicated something like, I don't really want to

18 talk.  I said, Barb, I think we should talk.  So she

19 stopped, and she waited for me.

20         Q    Okay.  And you walked that 50 so feet to

21 her?

22         A    Yes.

23         Q    Was there any conversation between the two

24 of you as you walked to her?

25         A    No.  She waited for me.

1          Q    Okay.  How long did it take you to walk that

2     distance?

3          A    I walk pretty fast, so probably less than

4     two seconds.

5          Q    All right.  At that point, she waited for

6     you.  Was she at her car yet?

7          A    No.

8          Q    Were you at your car yet?

9          A    No.  I was past my car at that point.

10         Q    So it's somewhere in between-- is it

11    accurate that your cars are about nine spaces from each

12    other, thereabouts?

13         A    That sounds about right.

14         Q    So it was somewhere between your car and her

15    car that she stopped and waited and you reached her?

16         A    It was closer to my car that she stopped.

17         Q    And did you have a conversation with her?

18         A    Yes, I did.

19         Q    And could you relate to the Court that

20    conversation?

21         A    Okay.

22         Q    And I think it's clear from the judge's

23    rulings earlier that she doesn't want to go into too much

24    historical stuff, so no historical stuff actually, so just

25    relate what the conversation was?

1    A    I looked at Barb Varner, and we started

2  walking, and I said, Barb, I think it's about time you

3  start telling the truth.  And she said, something like,

4  excuse me?  I don't know what you're talking about.  I

5  said, Barb, I think it's about time you start telling the

6  truth.  And I said to her, do you really want your husband

7  to find out about all of this?  And then she said something

8  about her husband.  I don't recall what she said.  She said

9  something about him.

10    And I said, Barb, everybody knows you're

11  lying.  I said, you're a sick woman, and you need help.

12  And she turned to me, and she said, your husband is a sick

13  man, and he needs help.  And there are things you don't

14  know about him.  And I said, I know about the two of you.

15  I said, I know you had an affair.

16    MS. MARTINO-GOTTSHALL:  Objection, Your

17  Honor.  Again, she's getting into much more--

18    MR. FOSTER:  Okay.  I'll-- if you want to

19  cut her off.

20  BY MR. FOSTER:

21    Q    But really, the purpose was to talk about

22  what transpired.  I think the Court doesn't want to hear

23  that.

24    A    And then I said--

25    Q    Let me just ask you this.  Did she tell

1    you-- when she first told you, I don't think I want to talk

2    to you, is that correct, when she-- before you approached

3    her?

4            A    (Witness nodded head affirmatively.)

5            Q    Then you said, I think we should talk?

6            A    She waited for me.

7            Q    Then when this conversation was taking place

8    that you're relaying to the Court, you were walking or were

9    you standing?

10           A    We were walking side-by-side to her car.

11           Q    And how long did it take to get to her car?

12           A    Seconds.  We're talking eight parking

13   spaces.

14           Q    Okay.  And--

15           A    Maybe more than-- maybe a minute.

16           Q    Did the conversation continue after you

17   reached her car or she and you reached her car?

18           A    After she told me that my husband is a sick

19   man and he needs help-- let me think a second.

20                THE COURT:  Do you want me to ask her a

21   couple questions?

22                THE WITNESS:  No, I'm okay.  I just lost my

23   train of thought.

24                THE COURT:  Do you want me to ask her,

25   counselor?

1          MR. FOSTER: Well--

2          THE COURT: You heard the testimony of Ms.

3  Varner indicating that on three separate occasions, I guess

4  it was, she yelled to the parking attendant something to

5  the effect that you won't leave her alone or whatever. Do

6  you remember any of that transpiring?

7          THE WITNESS: I remember that she called out

8  to the parking lot attendant.

9          THE COURT: Do you remember if it was once,

10  more than once, or at all?

11          THE WITNESS: At least one time.

12          THE COURT: Okay.

13          THE WITNESS: And he just ignored her.

14          THE COURT: And after she did that, did you

15  still continue to try to have a conversation with her at

16  that point?

17          THE WITNESS: After she did that, she told

18  me that she was going to have me charged with harassment.

19  And I said, honey, you go do whatever you have to do.

20          THE COURT: Okay. Any other questions,

21  counselor?

22  BY MR. FOSTER:

23          Q    What was your purpose in talking to her?

24          A    I wanted her to start telling the truth. I

25  wanted her to know that I know that she and my husband had

1    an affair.

2                    MS. MARTINO-GOTTSHALL:  Objection, Your

3    Honor.

4                    THE COURT:  No more of that, okay.  Any

5    other questions?

6    BY MR. FOSTER:

7            Q    Was it your purpose-- was your purpose to

8    harass her?

9            A    No, not at all.

10           Q    Or to annoy her?

11           A    No.

12           Q    Had you had any confrontations with her

13   before this day?

14           A    Never.

15           Q    How long has this situation, if you can call

16   it that, been the case?

17           A    I found out--

18           Q    Just give me a time?

19           A    1997 is when I found out they had an affair.

20                    MS. MARTINO-GOTTSHALL:  Objection, Your

21   Honor.

22                    MR. FOSTER:  All right.  Okay.

23                    THE COURT:  Any other questions, Mr. Foster?

24                    MR. FOSTER:  That's all I have.

25                    THE COURT:  Okay.  Cross-examine.

CROSS EXAMINATION

BY MS. MARTINO-GOTTSHALL:

        Q   Ms. Graham, why were you walking into the parking lot?

        A   I was leaving the courthouse.  I was going home for my lunch break.

        Q   But you, in fact, did walk past your own car and continue to walk alongside the victim to her car, is that right?  Yes or no?

        A   I walked--

        Q   Yes or no?

        A   Yes.

        Q   You, in fact, caught up with her, she said, when you were halfway down the alley?

        A   No, ma'am.

        Q   You first saw her when she was halfway down the alley?

        A   Yes.

        Q   All right.  And you caught up with her when she was in the parking lot around your car?

        A   I didn't catch up with her.  That's just when--

        Q   Well, she was walking?

        A   I entered the parking lot.

        Q   But she was walking ahead of you, so you had

1    to catch up with her to have this confrontation, is that

2    right?

3              A    It wasn't a confrontation.

4              Q    Well, however you want to characterize it.

5    She was walking ahead of you, is that right?

6              A    Yes, ma'am.

7              Q    You said you heard her call out to the

8    parking lot attendant how many times?

9              A    At least once.

10             Q    So at that point, it became clear that she

11   was trying to escape this conversation?

12             A    This was at the very end.

13             Q    Isn't it true that she indicated to you a

14   number of times that she did not want to discuss the matter

15   that you were trying to discuss with her?

16             A    She had a conversation with me.  She was

17   talking right along with me.

18             Q    You're not answering my question.  Didn't

19   she indicate that she did not want to discuss this matter

20   with you, this particular matter?

21             A    She did indicate that.

22             Q    All right.  And you walked with her all the

23   way to her car, is that right?

24             A    Yes.

25             Q    And continued to stand there as she got into

1    her car, is that right?

2             A    I stood, and I did not impede her way into

3    her car.  She got right in her car.  I was not in her way

4    at all.

5             Q    But you were there until the point where she

6    got into her car?

7             A    She got in her car, and she got on her

8    phone.

9             Q    And you indicated to Corporal Griest that

10   you knew that you should not, in fact, have approached her

11   and talked with her, is that right?

12            A    I indicated that, but I did not harass this

13   woman.

14            MS. MARTINO-GOTTSHALL:  Nothing further,

15   Your Honor.

16            THE COURT:  Do you have any redirect?

17            MR. FOSTER:  No, Your Honor.

18            THE COURT:  All right.  You may step down.

19   Thank you.  Do you wish to call any other witnesses?

20            MR. FOSTER:  Yeah, I have a couple of brief

21   witnesses, Your Honor.

22            THE COURT:  All right.

23            MR. FOSTER:  Darlene Black.

24            MS. MARTINO-GOTTSHALL:  Your Honor, I'm

25   going to request an offer of proof simply because this is a

1    much bigger picture, and I want to make sure that this

2    truly does relate to the incident in question.

3              MR. FOSTER:  It does.  An eyewitness to the

4    incident.

5              THE COURT:  All right.  Pardon me?

6              MR. FOSTER:  She was an eyewitness.

7              THE COURT:  She was an eyewitness.  Okay.

8    Come forward, Ms. Black.

9              MR. FOSTER:  Very briefly.

10                   Whereupon,

11                 DARLENE BLACK

12        having been duly sworn, testified as follows:

13              THE COURT:  Please be brief, because I'm

14    illegaly parked next door.  We don't want to have any

15    problems with that.  Would you please state your name?

16              THE WITNESS:  Darlene Black.

17              THE COURT:  And your address?

18              THE WITNESS:  1005 Forbes Road, Carlisle.

19                 DIRECT EXAMINATION

20    BY MR. FOSTER:

21         Q    Darlene, do you work in the public

22    defender's office?

23         A    Yes.

24         Q    In the courthouse here?

25         A    Yes.

1          Q    And do you park also in the same parking lot

2     that's been subject to this discussion?

3          A    Uh-huh.

4          Q    On the occasion that we're talking about

5     here, did you have an occasion to walk to your car and see

6     Barb Varner and Barbara Graham?

7          A    Yes, that was it.

8          Q    Okay.  And when did you first see them?

9     Where were you when you first saw them?

10         A    My parking space is number 39, so Barb's is

11    34.  I glanced and got in my car and I drove off.

12              MS. MARTINO-GOTTSHALL:  Excuse me.  We have

13    two Barbaras here.  Which Barb are you referring to?

14              THE WITNESS:  Barb Varner.  Her's is 34, and

15    mine is 39.

16    BY MR. FOSTER:

17         Q    You know Barb Varner and you know Barb

18    Graham?

19         A    Uh-huh.

20         Q    When you were-- in other words, when you

21    were walking to your car, did you see them talking?

22         A    I saw them standing there, yeah.

23         Q    Okay.  And did you see anything out of the

24    ordinary?

25         A    No.

1          Q    Nothing unusual?

2          A    No.

3          Q    Did you hear anything loud?

4          A    No.

5          Q    Any yelling?

6          A    No.

7          Q    Did Barb Varner complain to you?

8          A    No.

9          Q    Did she say anything to you?

10          A    No.

11          Q    Did you notice anything out of the ordinary?

12          A    No.

13          Q    And did you stop and observe or just get in

14    your car and go?

15          A    Just got in my car, like a normal day, and

16    left for lunch.

17              MR. FOSTER:  That's all I have.

18              THE COURT:  Cross-examine.

19                    CROSS EXAMINATION

20    BY MS. MARTINO-GOTTSHALL:

21          Q    What is your last name?

22          A    Black.

23          Q    Black.  All right.  Ms. Black, when was the

24    first time you saw the two women together?  Where were they

25    approximately?

1          A    Like standing in front of me when I was

2    getting into my car.  Like if I was walking toward my car,

3    I could look down and see the two standing there, and then

4    I just got in my car and drove off.

5          Q    Okay.  And were they standing near Ms.

6    Varner's parking space?

7          A    (Witness nodded head affirmatively.)  Yeah,

8    where I could look ahead.

9          Q    Okay.  So they were in the vicinity of her

10   car?

11         A    Right.

12         Q    All right.  Approximately how long did you

13   observe them standing there?

14         A    Two seconds.  Not very long.

15         Q    So at that point, they had pretty much--

16   they were no longer walking through the parking lot, is

17   that right?

18         A    They were standing.

19         Q    And they were standing-- how close in

20   relation to Ms. Varner's car?

21         A    I don't know.  I don't remember.

22         Q    All right.  But they were in that vicinity?

23         A    Uh-huh.

24              MS. MARTINO-GOTTSHALL:  Nothing further,

25   Your Honor.

1                    REDIRECT EXAMINATION

2     BY MR. FOSTER:

3              Q    How long does it take you to walk from the

4     alley to the parking lot?

5              A    I do it every day.  I don't know.  Two

6     minutes.  From here to my parking space?

7              Q    No, from the alley to the parking lot?

8              A    Thirty seconds.

9              MR. FOSTER:  Okay.  Thank you.

10             MS. MARTINO-GOTTSHALL:  Nothing further.

11             THE COURT:  Okay.  You may step down.  Thank

12     you.

13             MR. FOSTER:  Ron Ahlers.

14             MS. MARTINO-GOTTSHALL:  Again, I'd like to

15     request an offer of proof.

16             MR. FOSTER:  Same thing.

17                           Whereupon,

18                           RON AHLERS

19          having been duly sworn, testified as follows:

20             THE COURT:  Please be seated.  Please repeat

21     your name, if you will, and your address for the record.

22             THE WITNESS:  Ron Ahlers.  A-h-l-e-r-s.  20

23     Strawberry Drive, Carlisle, Pennsylvania.

24                      DIRECT EXAMINATION

25     BY MR. FOSTER:

1       Q    Do you also work in the courthouse?

2       A    Yes, I work-- I'm tipstaff for Judge Oler.

3       Q    And how long have you worked in the

4 courthouse?

5       A    Let's see.  I've been retired since '91.  So

6 it would be '92, I started working in the courthouse.

7       Q    Do you know Barbara Graham?

8       A    Yes, I know Barbara Graham.

9       Q    Do you know Barb Varner?

10      A    No, I do not.

11      Q    Do you park, by the way, in the same parking

12 lot?

13      A    Yeah, I park down near the entrance to it,

14 so-- I park close to where the attendant has his office.

15      Q    All right.  Did you have occasion to see

16 Barbara Varner and Barbara Graham on this particular

17 occasion?

18      A    I saw two women talking, and I recognized

19 Barb.

20      Q    Okay.

21      A    There was no significance, so I just kept on

22 going, got in my truck and went home.

23      Q    Was Barbara-- was either woman calling out

24 for help?

25      A    I heard nothing.  That's why it's not

1    significant to me.  I didn't notice anything unusual.

2              Q    Just two women talking?

3              A    Two women talking is all I saw at the time.

4              Q    Were you able to hear any of their

5    conversations?

6              A    Absolutely not.  My hearing is not that good

7    anyway, so I wouldn't be able to answer that question for

8    you.

9                        MR. FOSTER:  That's all I have.

10                         CROSS EXAMINATION

11   BY MS. MARTINO-GOTTSHALL:

12             Q    Mr. Ahlers, where did you see the two women

13   in relation to, if you can describe for me where in the

14   parking lot you saw them?

15             A    Somewhere in the middle of the parking lot.

16   But again, since there was no significance, I just simply

17   passed on and went and got in my car and went home-- or my

18   truck.  So I can't really tell you exactly-- I don't know

19   where their parking spaces are.

20             Q    Okay.  So you didn't know what parking space

21   they might have been near?

22             A    No.

23             Q    How long did you observe them standing

24   there?

25             A    I just looked over and saw and recognized

1    Barb Graham, kept going.  That's all.  I kept walking.

2           Q    So are you saying that perhaps you looked

3    over for a second or two, and that's it?

4           A    Maybe a second or two, that's it.  I mean,

5    it's just a normal reaction when you see somebody, and then

6    you just keep on going.

7                MS. MARTINO-GOTTSHALL:  Okay.  Thank you.

8    Nothing further, Your Honor.

9                THE COURT:  Okay.  Anything further from

10   you?

11               MR. FOSTER:  No, Your Honor.

12               THE COURT:  You may step down.

13               MR. FOSTER:  I have two very brief-- three

14   very brief character witnesses, Your Honor.

15               THE COURT:  How about if I hear from one of

16   them, okay?  You decide which one you want to use.

17               MS. MARTINO-GOTTSHALL:  Your Honor, I'll

18   stipulate then to the other two, that they will testify in

19   accordance.

20               MR. FOSTER:  Robbie.  I'll identify who the

21   other witnesses are.

22               THE COURT:  All right.

23                        Whereupon,

24                      ROBERTA MARCH

25        having been duly sworn, testified as follows:

1          MS. MARTINO-GOTTSHALL:  I would ask that Mr.

2    Foster use the appropriate questions for character

3    witnesses and not go beyond the normal character

4    questioning.

5          MR. FOSTER:  That's correct, that's what my

6    intention is.

7          THE COURT:  Okay.  You are not assuming he

8    would be using improper tactics, are you, counselor?

9          MS. MARTINO-GOTTSHALL:  No, not at all.

10         THE COURT:  I hoped you weren't.  Keep that

11   in mind, counselor.

12         MR. FOSTER:  I will.

13         MS. MARTINO-GOTTSHALL:  Just making sure.

14         THE COURT:  Okay.  Would you please state

15   your name and your address?

16         THE WITNESS:  My name is Roberta March.  I

17   live at 616 Woodland Avenue in Mount Holly Springs.

18                    DIRECT EXAMINATION

19   BY MR. FOSTER:

20         Q    Where are you currently employed?

21         A    I am employed as Judge Hess's secretary here

22   in the courthouse.

23         Q    How long have you been employed in that

24   capacity?

25         A    For 14 years.

1    Q    Do you know Barbara Graham?

2    A    Yes, I do.

3    Q    And how long have you known her?

4    A    For 14 years.

5    Q    So you've known her throughout the time

6    you've worked in the courthouse as Judge Hess's secretary?

7    A    Yes, sir.

8    Q    And during that entire period of time, has

9    she also worked in the courthouse as a court reporter?

10    A    Yes.

11    Q    Do you know other people in the courthouse

12    or in the community that also know Barbara Graham?

13    A    Yes.

14    Q    Are you familiar with Barbara Graham's

15    reputation in the courthouse, among other people's, for

16    being honest and law abiding?

17    A    Yes.

18    Q    What is that-- her reputation for being

19    honest and law abiding?

20    A    I think she has an outstanding reputation

21    for being law abiding and honest.

22              MR. FOSTER:  That's all I have.

23              MS. MARTINO-GOTTSHALL:  I have nothing, Your

24    Honor.

25              THE COURT:  Okay.  You may step down.  Okay.

1          MR. FOSTER:  I would just point out the

2     other individuals.  That's Marie Farley who is also a

3     character witness.  And you work at the courthouse as well?

4          MS. FARLEY:  Yes.

5          MR. FOSTER:  And Al Kern.

6          MR. KERN:  I've known her for 20 years.

7          MR. FOSTER:  And you also work at the

8     courthouse?

9          MR. KERN:  Yes, with her.

10          MR. FOSTER:  Okay.  Your Honor, we rest.

11          THE COURT:  Okay.  Commonwealth, do you have

12     anything further, any rebuttal, or anything before we go

13     into closing statements?

14          MS. MARTINO-GOTTSHALL:  Your Honor, the only

15     thing I would like to present in rebuttal is a diagram of

16     the parking lot just to clarify where these parking spaces

17     were.  If I could just call the victim briefly to the

18     witness stand for the purposes of introducing them into

19     evidence?

20          THE COURT:  Okay.  You're reminded, Ms.

21     Varner, you're still under oath.  Please be seated.

22          THE WITNESS:  Yes.

23               Whereupon,

24               BARBARA VARNER

25          was recalled to the witness stand,

1          having been previously duly sworn

2                  DIRECT EXAMINATION

3    BY MS. MARTINO-GOTTSHALL:

4          Q    Ms. Varner, I'm simply going to give to you

5    a diagram that you drew for me to help me understand where

6    the parking spaces were.  I'm going to give you a yellow

7    highlighter and ask you if you could just indicate the path

8    that you were taking and highlight the two parking spaces?

9          A    Okay.

10              MS. MARTINO-GOTTSHALL:  I'll introduce that

11   into evidence.

12              THE COURT:  Counsel, do you want to step up

13   here so you can see where she's working?

14              MS. MARTINO-GOTTSHALL:  I'll show it to

15   them.

16              MR. FOSTER:  Now, what was the question?

17   I'm sorry.

18              MS. MARTINO-GOTTSHALL:  I asked her if she

19   could just indicate with the yellow marker the path she

20   took and then the two parking spaces.

21              THE COURT:  Let's move this out of your way.

22              THE WITNESS:  This is my space, and this is

23   her space.

24              MS. MARTINO-GOTTSHALL:  Okay.  If I could

25   mark that into evidence as Commonwealth's Exhibit 1.

```
 1                    (Whereupon, Commonwealth's Exhibit 1

 2                    was marked for identification.)

 3    BY MS. MARTINO-GOTTSHALL:

 4          Q    Ms. Varner, I'm showing you what has been

 5    marked as Commonwealth's Exhibit No. 1, and you indicated

 6    there at my request with yellow highlighter the path you

 7    took from the alley as well as the two parking spaces?

 8          A    Yes.

 9          Q    And this is your perception of those parking

10    spaces, is that correct?

11          A    Yes, it is, that's correct.

12               MS. MARTINO-GOTTSHALL:  I'm going to

13    introduce that into evidence.

14               MR. FOSTER:  Uh-huh.

15               MS. MARTINO-GOTTSHALL:  At this time, Your

16    Honor, I would like to introduce this into evidence.

17               THE COURT:  You have no objection,

18    counselor?

19               MR. FOSTER:  No.

20               THE COURT:  Okay.  Very good.

21               MS. MARTINO-GOTTSHALL:  That's all I have.

22               THE COURT:  Any other questions of her,

23    counselor?

24                    CROSS EXAMINATION

25    BY MR. FOSTER:
```

1          Q    I just have one.  Does this show the
2     location of the mailbox?
3          A    Yes, yes.
4               THE COURT:  I see it.  I know where it is.
5     I'm familiar with the parking lots around the courthouse.
6               MR. FOSTER:  I thought you would be.
7               THE COURT:  Counselor, all right.
8               MS. MARTINO-GOTTSHALL:  Nothing further,
9     Your Honor.
10              THE COURT:  Okay.  You may step down.  Thank
11    you.  Let's go into closing arguments then.  We'll start
12    with you, counselor.
13              MR. FOSTER:  Your Honor--
14              THE COURT:  And you don't need to repeat
15    everything you said before, okay.
16              MR. FOSTER:  It all applies, except stronger
17    now because now we're not talking about a prima facie case.
18              THE COURT:  We're looking at beyond a
19    reasonable doubt.
20              MR. FOSTER:  We're looking at proof beyond a
21    reasonable doubt.  And what I want to emphasize is, this
22    incident is not the kind of incident that is contemplated
23    by the legislature or the courts for imposing criminal
24    sanctions upon anyone.  Here we have a woman who wanted to
25    speak to another woman about a matter, about a private

1   matter between the two of them.

2              The law makes it a crime, first and

3   foremost, if the intent upon this woman was to harass or

4   seriously annoy another person, if that was her purpose.

5   She's testified to what her purpose was.  A lot of times,

6   in our society, people speak to each other, people that

7   they don't like.  They say things that other people don't

8   want to hear.

9              What harassment requires is a repeated

10  course of conduct with the intent to harass, annoy, or

11  alarm.  And we have a couple cases, one of which arises

12  right out of this county, Commonwealth v. Daryl Duncan.

13  That one doesn't arise out of this county.  It arises out

14  of Philadelphia, but it's a Superior Court case.  And it

15  says, in enacting a harassment statute, legislature sought

16  to prohibit conduct including speech which does not

17  constitutionally protect which is intended and which is

18  intended to alarm or seriously annoy another person.

19              It was extended-- the individual protection

20  which had long been afforded to the general public for

21  breach of the peace and not to prevent initial impact of

22  unwelcome intrusion upon privacy but rather repeated

23  assaults on individual privacy interests.

24              MS. MARTINO-GOTTSHALL:  Could I see that

25  case?

1          MR. FOSTER:  Yes, you may.  I have that

2     language circled right there.  In other words, people are

3     always having words with each other.  If this amounts to an

4     argument, I don't want to talk to you, and they continue

5     talking, that's not harassment.  It must be a repeated

6     course of conduct with the intent on that particular

7     person.

8              Now there's another case, the one that

9     arises out of Cumberland County is where a Defendant wore

10    an obscene t-shirt to the courthouse, and he did it on a

11    number of occasions.  It had F You on it, except it was

12    spelled out, and he was charged with harassment.  There,

13    the Superior Court threw that case out, saying that only

14    very narrow exceptions such as obscenity defamation,

15    fighting words, have been carved out of the general

16    constitutional protection from governmental interference

17    for freedom of speech.

18              We can't charge somebody with harassment as

19    a criminal offense just because they talk to somebody and

20    they have words with each other and they don't like what

21    they hear.  The testimony in this case was that they

22    walked-- and if you have that map-- may I approach, Your

23    Honor?

24              THE COURT:  Certainly.

25              MR. FOSTER:  Let me get oriented.  Ms.

1    Varner basically walked from here to here.  It's a very

2    short distance.  During this time, a conversation was

3    initiated by Barbara Graham.  That's admitted.  Barbara

4    Graham said, when she was about here, she called to her and

5    Barb Varner waited for her and then they walked together to

6    the car.

7            At any rate, they walked together to a car

8    and they had a conversation.  And that's it.  There was no

9    physical threat, no violence, no loud words.  Two witnesses

10   who saw them talking noticed nothing out of the ordinary.

11   The parking lot attendants did not do anything because they

12   did not see any problem.  And she got into her car

13   uninhibited, unobstructed, and left.  That's not

14   harassment.  You can't charge someone with a criminal

15   offense of harassment because they have a conversation with

16   somebody, and that's all we have here.

17           THE COURT:  Okay.  Commonwealth, do you have

18   a position?

19           MS. MARTINO-GOTTSHALL:  Your Honor, simply

20   that the Defendant is charged with going beyond what is

21   permissible here and engaging in conduct which the

22   Commonwealth submits does constitute a summary offense of

23   harassment simply because the victim has stated she made it

24   very clear she did not wish to engage in any conversation

25   and the Defendant persisted.

1          So, of course, the issue for the Court is

2   whether that did, in fact, constitute harassment, and we

3   leave it up to Your Honor.  Thank you.

4          THE COURT:  Based on the testimony here, and

5   I understand that there is background here.  I don't know

6   all the in's and out's.  I don't wish to even know all the

7   in's and out's.  And I know that there are a lot of people

8   in this room that know more probably about the background

9   than I do.  Maybe that's good.  The only thing I have is

10  the testimony that I heard here today.

11         And although I feel that perhaps maybe, Ms.

12  Graham, you stepped over the line a little bit, I don't

13  think it rises quite to the level of what I consider to be

14  harassment.  I have these kinds of cases on a regular

15  basis.  And believe me, harassment usually is much more

16  severe than this.  I'm not saying that I condone what you

17  did.  And I'm not saying that maybe you might not feel that

18  you had the right to do what you did.  And I'm not saying,

19  Ms. Varner, that you weren't very seriously annoyed by what

20  happened.

21         I'm just simply saying that the evidence is

22  not here beyond a reasonable doubt to have her found guilty

23  of harassment.  I feel that it was maybe inappropriate, and

24  I think that since you two work together in the courthouse

25  and you have to see each other on a regular basis, you're

1    going to have to learn to just kind of stay away from each

2    other.

3                    Ordinarily, I would put you in mediation,

4    but I think that since there is a background to this case,

5    and there's a lot more to it, and there are other hearings

6    in other jurisdictions that, of course, are beyond my

7    control, I don't think I'll do that for you at this time.

8    But I certainly think that it goes without saying that

9    you're both adults.

10                   There may be some problems in the

11   background, but you have to learn how, since you work in

12   such close confines, not to get in each other's faces.   I

13   expect more out of you ladies.  We have to present-- we're

14   held to a higher standard than these men are, you know.

15                   I can say that, I think, because nowadays,

16   us women can speak out more so than we did before.  You

17   don't need to chuckle, counselor.  Commonwealth, I think

18   you understand what I'm saying here, too.  We need to set a

19   good example for how we behave in public.  We've always

20   been the nurturers, and we have to continue to do that in

21   this society, even though we do have some serious problems,

22   and I have some serious concerns that need to be addressed

23   but not in this forum.

24                   Now, having said all of that, I will say

25   that if I have you in here again with anything similar to

1    this, then I will probably find you guilty of harassment,

2    all right, because you've been warned.   Okay.   This court

3    is adjourned.   Thank you.

4                    (Whereupon, the proceeding concluded at

5                 2:50 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I hereby certify that the proceedings are contained fully and accurately in the notes taken by me on the above cause and that this is a correct transcript of same.

_Wendy C. Yinger_
Wendy C. Yinger
Official Court Reporter