IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . .

BARBARA E. VARNER,                    .
      Plaintiff,                    .      CIVIL ACTION
                             .      NO. 1:CV 01-0725
      vs.                           .
                             .
COMMONWEALTH OF PENNSYLVANIA,          .      (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,               .
CUMBERLAND COUNTY; CUMBERLAND          .
COUNTY; S. GARETH GRAHAM,              .
individually, and JOSEPH               .
OSENKARSKI, individually,              .
      Defendants.                   .

. . . . . . . . . . . . . . . .

**VOLUME 1**
*Pages 1 to 228*

Deposition of:  **BARBARA E. VARNER**

Taken by       :  Defendant Cumberland County

Date           :  January 27, 2003, 9:35 a.m.

Before         :  Emily Clark, RMR, Reporter-Notary

Place          :  Administrative Offices of
                     Pennsylvania Courts
                     5035 Ritter Road, Suite 700
                     Mechanicsburg, Pennsylvania

APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
             Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY:  JAMES K. THOMAS, II, ESQUIRE
        PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

```
 1          emphasis was on family involvement and keeping the

 2          children in the home.  So Lynn and I spoke about this,

 3          that she was working on this grant and that she was the

 4          same age, she was a criminal justice major with me at

 5          school.  And --

 6     Q    I thought you were a social science major?

 7     A.   That was my associate degree.  My undergrad was in

 8          criminal justice.

 9     Q    Okay.

10     A.   And she had spoke to me about this position, how it

11          would be a nice blend of my criminal justice degree plus

12          my Family Preservation experience, and recommended that

13          I should apply for the position.

14     Q    When was that conversation?

15     A.   I think her internship was the summer of '94.

16     Q    Were there any other factors that influenced your

17          decision to apply for a transfer to the Probation

18          Department?

19     A.   I had met with Mr. Osenkarski and we had discussed the

20          position.  He was aware that my degree was in criminal

21          justice and he knew what my background was with Children

22          and Youth as protective services.

23               I also liked the idea that it was not a

24          micromanaged department, that you were more independent

25          and that Mr. Osenkarski trusted you to be able to manage
```

```
 1        your own time and do your own thing, which was different

 2        than it was with Children and Youth.

 3             But mostly is my field was criminal justice and I

 4        really wanted to be able to get into it, and this was a

 5        good opportunity.

 6   Q    Did your relationship with Mr. Graham play any role in

 7        your decision to ask for a transfer to the Probation

 8        Department?

 9   A.   I would say no.  In fact, Mr. Graham left me know not to

10        let Mr. Bolze know that I was interested because they

11        did not have a good relationship.  So that was

12        downplayed, the fact I even knew Mr. Graham that well.

13   Q    So you downplayed your --

14   A.   I didn't mention, you know, I was not coming in saying

15        I'm here because Mr. Graham recommended me.  It was none

16        of that.

17   Q    And you say you downplayed your relationship with

18        Mr. Graham.  Downplayed it to whom?

19   A.   Not downplayed it.  I -- not to mention to Mr. Bolze

20        that Mr. Graham was -- or Mr. Osenkarski wanted me to

21        come over into that position.

22   Q    Did Mr. Graham, in fact, want you to come over to the

23        Probation Department?

24   A.   He had spoken to me and Lynn Dickerson about the

25        position, that they needed two probably two females,
```

|    |    |    |
|----|----|----|
| 1  |    | probably in the case worker or social work field and, |
| 2  |    | you know, criminal justice, that they thought it was a |
| 3  |    | more of a woman type position because it was social |
| 4  |    | work, and whether I was interested or not. |
| 5  | Q  | And when did that conversation occur, Barb? |
| 6  | A. | That would probably be while Lynn was there doing her |
| 7  |    | internship. |
| 8  | Q  | 1994?  During the summer of 1994 -- |
| 9  | A. | Right. |
| 10 | Q  | -- Mr. Graham and Mr. Osenkarski both advised you that |
| 11 |    | these positions were going to come -- |
| 12 | A. | Yes. |
| 13 | Q  | -- in the Probation Department, correct? |
| 14 | A. | Yes, that's correct. |
| 15 | Q  | And that they thought it would be an appropriate |
| 16 |    | position for a female? |
| 17 | A. | Yes. |
| 18 | Q  | Did they tell you why they thought it would be an |
| 19 |    | appropriate position for a female? |
| 20 | A. | I think because it was social-worky aspect, it's more |
| 21 |    | social work because you're dealing with families, a lot |
| 22 |    | of intensive -- part of the Family Preservation was |
| 23 |    | teaching parents parenting programs, that kind of thing, |
| 24 |    | intensively in the home. |
| 25 | Q  | And there were female probation officers at that time? |

Barbara Varner

91

1    A.    Yes.

2    Q    Were there any other reasons why you wanted to transfer

3         to the probation?

4    A.    As I said, I think it was a whole attitude,

5         Mr. Osenkarski, that it was not a micromanaged.  In

6         Children and Youth there was so much meetings, meetings

7         after meetings.  It was not so much time out actual in

8         it field as much time as you should be out in the field,

9         where with Probation Mr. Osenkarski left me know that he

10        doesn't micromanage, he depends on his workers to do

11        their job.  And to me, that was very interesting because

12        Children and Youth when you first start out you were

13        training, so.

14   Q    Did you have any impression from those interviews who

15        you would actually be working with when you were

16        transferred to Probation?  If you were accepted for the

17        job.

18   A.    Mr. Bolze, of course, was chief.  And Mr. Osenkarski

19        was, headed up the juvenile division of the Department

20        at those interviews, the only three people there.

21   Q    Was there any discussion about who you would be working

22        for or working with?

23   A.    I knew the position would be under Juvenile Probation.

24        It was the grant under the juvenile system.

25   Q    And did you know where Mr. Graham was concentrating at

Barbara Varner

1          that time?

2    A.    Yes.  He was in Juvenile Probation.

3    Q     Did you have an understanding that if hired, it was

4          likely that he would be the person responsible for

5          training you?

6    A.    Yes.

7    Q     Did you have any reservations about that?

8    A.    No, because I knew Mr. Osenkarski was still his boss.

9          And Chief Bolze, I had a lot of respect for him and I

10         knew he was still overseeing the whole group.

11   Q     Based on the reputation that Mr. Graham was a hot head

12         and you were either in favor or out of favor, did that

13         cause you any hesitancy or concerns in terms of

14         accepting the job?

15   A.    Maybe a little hesitancy, but like I said, I knew Chief

16         Bolze basically kept them in line.

17   Q     When was the job formally offered to you and by whom?

18   A.    It was offered to me by Chief Bolze, and exactly when, I

19         don't know.  Sometime in January.

20   Q     And you then told Children and Youth you would be

21         leaving and moving over to Probation, correct?

22   A.    That's correct.

23   Q     Who did you understand was ultimately in charge of the

24         Probation Department?

25   A.    Chief Bolze.  Well, Judge Sheely.  Judge Sheely at that

1      time.

2    Q    And why Judge Sheely?

3    A.   Because we were officers of the court and he was the

4       president judge.

5    Q    And it was your understanding that Judge Sheely then had

6       ultimate authority over the probation officers in that

7       department?

8    A.   Yes.

9    Q    And Ken Bolze was the chief of the department and he

10      reported to Judge Sheely?

11   A.   For, yes, hiring, firing, those kind of things.

12   Q    So you took the job, you started there on February 6,

13      1995, correct?

14   A.   I believe it was February 7th, 1995.

15   Q    And your salary there would have been $24,868 when you

16      started; does that sound right?

17   A.   That sounds correct.

18   Q    Describe for me, if you would, what the hierarchy was in

19      terms of management when you got there on February 7th,

20      1995.

21   A.   Chief Bolze was the chief.  Mr. Osenkarski was a

22      supervisor and mostly in juvenile work.  I believe he

23      did split, too, adult and juvenile.  And John Roller was

24      more adult than juvenile.

25   Q    Where did Mr. Graham fall in the pecking order?

1        Mr. Graham's leadership or training to anybody?

2  A.    At the very beginning, no.  In '95, no.

3  Q    When did you first complain about any problems with

4        Mr. Graham's leadership or training?

5  A.    Whenever I went to Mr. Osenkarski, there was a day that

6        I had taken cases in to Mr. Graham in '96 -- '96, '97.

7        I had taken cases in to him.  And I had done everything

8        that was supposed to be done, gotten everything

9        together.  And he started screaming at me and said who

10       the F, meaning, do I think I am, making decisions on

11       these cases.

12           When I worked, turned cases in to Mr. Osenkarski, I

13       never had a problem with going ahead and making a

14       decision on what I would recommend for disposition on

15       the juvenile.  Suddenly, I had done everything wrong,

16       according to him.  He screamed at me, threw me out of

17       his office.  And I went to Mr. Osenkarski and I said,

18       you have to get the guy under control.  And he said,

19       he's in charge, I put my so many years in with the

20       county and he's in charge.

21  Q    When was this?

22  A.    It was in '97.

23  Q    So from February 1995 when you started until sometime in

24       1997, you never complained about Mr. Graham's leadership

25       or training?

Barbara Varner

98

1    A.    Not to him.  To other people.  Other people agreed with

2          me, other staff members, co-workers.

3    Q.    But you never went up the chain of command to

4          Mr. Osenkarski prior to 1997?

5    A.    Like I said, I sought out other help as far as

6          petitions.  He was not -- he was not screaming at me or

7          those kind of things, which happened later on.  But I

8          was aware that he was inconsistent.

9    Q.    We'll come back to that in a minute.  But what do you

10         attribute the change of behavior to?

11   A.    Whenever Chief Bolze retired and we split adult and

12         juvenile and there was not that person who could

13         basically keep the lid on Mr. Graham, which would have

14         been Chief Bolze.  It was now only Mr. Osenkarski.

15   Q.    Up until the time of Bolze's retirement, you and

16         Mr. Graham had a good relationship?

17   A.    Working relationship.

18   Q.    And would you describe it as no better than a working

19         relationship?

20   A.    I would say no better than that, no.

21   Q.    When did Bolze retire?

22   A.    August of '96.

23   Q.    So from February 1995 until August of 1996 you had no

24         particular problem with Mr. Graham?

25   A.    Not with any nasty or yelling at me, no.

Barbara Varner

1    A.    Mr. Osenkarski was part of that suit.  He would be the

2          next in line to complain to, and I chose not to.  Again,

3          punishment issue.

4    Q    Could you have taken your complaint to Judge Sheely?

5    A.    In hindsight, he probably wouldn't have done anything.

6    Q    Could you have taken the complaint to him?

7    A.    I could have.

8    Q    There was nothing that prevented you from doing that,

9          was there?

10   A.    No.  No.

11   Q    In fact, you never complained to Judge Sheely about the

12         treatment you received from Mr. Graham, did you?

13   A.    No, not until after.

14   Q    Not until after you filed the --

15   A.    Right.

16   Q    -- EEOC Complaint?

17   A.    Right.

18   Q    But you did understand that Judge Sheely was the head of

19         the Probation Department, didn't you?

20   A.    Certainly.

21   Q    In paragraph H you make reference to a conversation that

22         you had with Mr. Graham involving seniority and the need

23         to satisfy all parties involved.

24   A.    Yes.

25   Q    Do you recall that conversation?

Barbara Varner

1   Q    So the basis for him screaming at you had to do with his

2        assessment of your performance?

3   A.   Yes.

4   Q    And he was unhappy with your performance, he told you --

5        screamed at you and told you to get out of his office?

6   A.   Threw me out of his office.

7   Q    Did he give you any instructions in terms of how he

8        wanted you to do it differently?

9   A.   No.

10  Q    So just threw you out of the office over a performance

11       issue.  You then went to Mr. Osenkarski in February

12       March, and said, you've got to get this guy under

13       control?

14  A.   Right.

15  Q    What details did you give Mr. Osenkarski in February

16       March of 1997 about Graham's behavior?

17  A.   He had been back in the office to begin with when I had

18       started discussing this case with Mr. Graham.  And I had

19       looked to Mr. Osenkarski, I said, is this not the way we

20       always proceed, the same thing we've always done?  And

21       he said, yes, but Mr. Graham's in charge.  He verified

22       that that, indeed, was the way, you know, when we turned

23       cases in to Mr. Osenkarski that he was fine with it, but

24       Mr. Graham was in charge.

25  Q    So if I understand correctly, there was an issue about

Barbara Varner

```
 1        the manner in which you were doing some paperwork, I

 2        guess?

 3   A.   Right.

 4   Q    Graham started to challenge you, Osenkarski was present.

 5        You said to Osenkarski, isn't this the way we always do

 6        it?

 7   A.   Um-hum.

 8   Q    And Osenkarski said, yeah, but Graham's in charge?

 9   A.   And he exited and went to his office.

10   Q    Graham then proceeded to scream at you?

11   A.   Right, and threw me out of the office.

12   Q    Over the manner in which you were doing certain

13        paperwork?

14   A.   Right.

15   Q    Threw you out of the office and you went to Osenkarski?

16   A.   Osenkarski's office.

17   Q    And said, you've got to get this guy under control?

18   A.   Absolutely.

19   Q    Was there any solicitation of sex involved?

20   A.   No.

21   Q    What was it about the conversation or comments by

22        Mr. Graham that you found to be demeaning?  If you did.

23   A.   Telling me that I wasn't doing -- like I said, things

24        that I had done before were okay, now all of a sudden

25        they were not okay.  The yelling at me, not even
```

Barbara Varner

1    Q    Did you ever hear him use the fuck word with Osenkarski

2         or Bolze?

3    A.   No.

4    Q    How about anybody else?

5    A.   Yes, he would.   Just in conversation, describing things,

6         not in an angry manner.

7    Q    So he used the fuck word as part of his regular

8         vocabulary?

9    A.   I wouldn't say regular, but you heard it occasionally.

10   Q    How about any other swear words, was there anything else

11        that was part of the vocabulary?

12   A.   Not that I can recall.

13   Q    So the principal word that you heard or at least

14        remembered was fuck?

15   A.   Seemed to be.

16   Q    Is there anything else in 17 A through E that we haven't

17        talked about?

18   A.   I don't believe.

19   Q    In paragraph 19 you allege that Mr. Osenkarski also is

20        guilty of harassment, correct?

21   A.   That's correct.

22   Q    Let's look at those allegations, if we could.   In 19 A

23        you say he called attention to your gender and made

24        inappropriate comments about other females.

25        Specifically, what did he say?

```
 1   A.   He made the comment when I was standing at the door of
 2        our office talking to another probation officer, Mike
 3        Varner, he walked past -- Mr. Varner and I had no
 4        relation -- were engaged in a conversation, and he just
 5        walked past and he said about a female intern's breasts,
 6        that she had a nice said of jehoobees, and then
 7        continued to walk out the door.
 8   Q    Did he ever make any inappropriate comments with respect
 9        to you personally?
10   A.   No.
11   Q    Other than this one episode where he made a comment
12        about the young girl's breasts, were there any other
13        episodes where Mr. Osenkarski said something that you
14        thought was inappropriate?
15   A.   Yes.  There was a time that Mr. Osenkarski was
16        discussing his girlfriend's genital area, Debra Green
17        was a witness to this, that he spoke about when he was
18        canning hot peppers that their fingers would get hot,
19        and he had learned his lesson about inserting them in
20        her because it burned her.  And this comment was made,
21        Ms. Green heard this and there was other secretaries
22        there.
23   Q    When did that occur?
24   A.   I'd say '98.  I'm speculating on this date.  '99.
25   Q    Was that something else that you also noted on your
```

```
 1            notepad?
 2   A.       Yes.  Correction.  It looks in here it says in September
 3            of 2000 when he made that comment.
 4   Q        That was September of 2000?
 5   A.       Yes, according to my reporting.
 6   Q        So the inappropriate comments made by Chief Osenkarski
 7            from the time you joined the Probation Department in
 8            February of '95 until September of 2000, a period of
 9            five years, you can identify two, correct?
10   A.       No, there are others.
11   Q        Okay.
12   A.       On September 12th, 2000, Mr. Osenkarski informed two new
13            female probation officers they would have to dance on
14            the table at their first staff meeting.  Ms. Green heard
15            this comment.  It was a staff meeting that was about to
16            begin.
17   Q        So we're now up to three; is that correct?
18   A.       There was also Mr. Osenkarski commented to a new female
19            probation officer that hysterectomies ruin women.  To my
20            knowledge, I was possibly the only one in the office
21            that had that.
22   Q        Did he know that you had had a hysterectomy?
23   A.       Yes, he did.
24   Q        Did you interpret that comment as being directed to you
25            personally?
```

Barbara Varner

| | | |
|---|---|---|
| 1 | A. | Yes, I did. |
| 2 | Q | Was he looking at you when he said it? |
| 3 | A. | No.  I was not present when he said that. |
| 4 | Q | You were not present? |
| 5 | A. | No, I was not.  I was -- |
| 6 | Q | How did you learn of the comment? |
| 7 | A. | The girl herself told me, Gail Schuhart, a probation |
| 8 | | officer.  Mr. Osenkarski would tell Ms. Schuhart that |
| 9 | | she reminded him of his ex-wife. |
| 10 | Q | Was that somehow inappropriate? |
| 11 | A. | She was uncomfortable. |
| 12 | Q | Ms. Schuhart was? |
| 13 | A. | Yes. |
| 14 | Q | The comment about dance on the table? |
| 15 | A. | Yes. |
| 16 | Q | What is it about that comment that you find offensive? |
| 17 | A. | It's demeaning.  I don't believe he ever told men, guys |
| 18 | | that they had to dance on the table at the first staff |
| 19 | | meeting.  You usually don't see guys dancing on tables. |
| 20 | | That's probably presumed by most people it's |
| 21 | | provocative. |
| 22 | Q | Was that said in jest? |
| 23 | A. | I was not there.  Debra Green was there when it happened |
| 24 | | as well as other probation officers. |
| 25 | Q | So you were not present to hear that comment, either? |

Barbara Varner

1    A.    No, I was not.

2    Q    Were you aware of any of the new female probation

3         officers that actually had to dance on tables?

4    A.    No.

5    Q    Are you aware of any female that ever danced on a table

6         at any probation meeting?

7    A.    Not that I know of, no.

8    Q    So of the allegations contained in your paragraph 19,

9         you were present for the comment about the intern's

10       breasts, correct?

11    A.    Correct.

12    Q    Were you present for any of the other comments?

13    A.    No.  I was just informed about those.

14    Q    Okay.  So in your presence, the only comment that was

15       made by Mr. Osenkarski amounted to the comment about the

16       young girl's breasts, right?

17    A.    Yes.

18            There was one other incident where I was at a

19       training with Mr. Osenkarski and Mr. Graham in Penn

20       State, and it was on sexual, juvenile sexual offenders I

21       believe is how it was defined.  And Mr. Osenkarski had

22       on him a Bic lighter, Bic type lighter, and when he

23       flicked it, it was a penis.  And he flicked it at the

24       female presenter several times.

25    Q    When was that?

```
 1              angry.  And we were always told ahead of time even
 2              before that, just letting us know what they had done to
 3              people before, Mr. Osenkarski, Mr. Graham, that they
 4              punished people.  They liked to say that.
 5     Q        Was this '96-'97?
 6     A.       Even before -- well, after I -- once I started there,
 7              these are comments I heard.
 8     Q        From February '95 on?
 9     A.       Right, about the punishment phase.
10     Q        Mr. Graham no longer has any supervisory
11              responsibilities over you; is that correct?
12     A.       No, he did not.
13     Q        And hasn't had since the summer of '97?  Let's approach
14              it this way.
15     A.       Right.
16     Q        Sometime after you filed your Complaint --
17     A.       Right.
18     Q         -- you received a letter, did you not, removing all
19              supervisory responsibilities with respect to Mr. Graham?
20     A.       Yes, I did.  It would have been spring of '97, I think.
21              Late spring, probably.
22     Q        And we'll get to that at some point.
23     A.       Okay.
24     Q        And Mr. Osenkarski, of course, has remained in the
25              Department throughout, correct?
```

```
 1    A.    Yes, he has.

 2    Q     Has he retaliated against you in any fashion whatsoever?

 3    A.    Not directly, no.

 4          MR. THOMAS:  Let's take a couple of minutes, okay?

 5          (Recess taken from 3:31 until 3:44 p.m.)

 6    BY MR. THOMAS:

 7    Q     Barb, before we took the break you were talking a

 8          minute ago about the comments or concerns involving

 9          Mr. Osenkarski, and remember, we reviewed those and you

10          were only personally present for one of those, as I

11          recall.  Do you recall that conversation?  It's

12          paragraph 19 of your Complaint.

13          One of the things I forgot to ask you there was,

14          you indicated that other probation officers informed you

15          of the comments that he had made.

16    A.    Yes.

17    Q     Who were those probation officers?

18    A.    As regard to E would have been Debra Green.  D would be

19          Debra Green observed it.  The two females would have

20          been Gail Schuhart and Jill Grim-Rhoads, that's

21          hyphenated.

22          MR. MacMAIN:  Would you repeat that last name?

23          THE WITNESS:  Grim-Rhoads, G-R-I-M-E, hyphen,

24          R-H-O-A-D-S, I believe.

25          C would have been Gail Schuhart.  I think I already
```

```
 1              said that.
 2                   And that would --
 3    BY MR. THOMAS:
 4    Q    Let's go back to paragraph 20, now, I believe is where
 5         we were.  In D you make reference to seniority problems.
 6         There was a dispute at one point, was there not, over
 7         whether probation officers got credit for all county
 8         time or only time in the Probation Department; is that
 9         correct?
10    A.   After we split, after we became juvenile and adult.
11         Prior to that, they had already established a policy.
12    Q    And that dispute arose, and as I understand it, you
13         correct me if I'm wrong, I gather that seniority problem
14         has been solved to your satisfaction?
15    A.   No.  I'm still below on the seniority list.  I'm still
16         below the gentleman who I had been above when I was
17         hired.
18    Q    Based on total time?
19    A.   Yes.
20    Q    And who is that gentleman?
21    A.   That's William Brandt.
22    Q    And the dispute centers around whether or not a
23         probation officer, in terms of seniority, gets credit
24         for all time while employed in any branch of county
25         government, or whether the only time that applies is the
```

Barbara Varner

1           Probation Department, correct?

2   A.   That's correct.

3   Q   And you say that still has not been solved to your

4         satisfaction?

5   A.   No. I'm still below him. I had -- when I first started

6         with Probation I was above him, and then he was moved

7         down when we split. Well, not when we split, whenever

8         the -- yes, when the seniority list was changed.

9   Q   And what aspects of your employment does that seniority

10        list affect?

11   A.   It could be an on-call. We have to go by seniority when

12        you put down for on-call. Any kind of promotion has

13        always been historically longevity. And I think it's --

14        I don't know of any other times that promotions were not

15        based on longevity and, well, seniority list. And so

16        that would affect me when that occurs.

17   Q   Have you ever been passed over for a promotion?

18   A.   When the senior -- a senior probation officer position.

19        And I said, wait a minute, that I had more seniority

20        than Bill Brandt.

21   Q   Are you now a senior probation officer?

22   A.   Yes, I am.

23   Q   When were you made a senior probation officer?

24   A.   I don't know the exact date. '98, I believe.

25   Q   How about May 7, 1998?

Barbara Varner

189

| | | |
|---|---|---|
| 1 | A. | Okay. |
| 2 | Q | When did you think you were eligible to become a senior |
| 3 | | probation officer before that? |
| 4 | A. | They had promoted -- they had -- Mr. Osenkarski had |
| 5 | | posted that Mr. Brandt would be a senior probation |
| 6 | | officer, and I'm not sure when that had happened, but it |
| 7 | | was in the prior probably six-month period. |
| 8 | Q | Do you know as a matter of fact or is it merely your |
| 9 | | suspicion that you weren't promoted to a senior |
| 10 | | probation officer at the same time as Mr. Brandt?  That |
| 11 | | was a very awkward question.  Do you understand it? |
| 12 | A. | No, I don't.  Would you rephrase that? |
| 13 | Q | What I want to know is why you believe that Mr. Brandt |
| 14 | | was made a senior probation officer before you were. |
| 15 | A. | They changed the seniority list, one thing, and put him |
| 16 | | above me.  So again, the seniority. |
| 17 | | And also, Mr. Graham had told me that I didn't need |
| 18 | | it as much as Mr. Brandt did, that I had a rich husband, |
| 19 | | and that Mr. Brandt -- I'm sorry, and Mr. Brandt would |
| 20 | | have a family, eventually get married and have a family |
| 21 | | and he would need it more than I would. |
| 22 | Q | Do you know as a matter of fact that Mr. Brandt was made |
| 23 | | a senior probation officer before you were? |
| 24 | A. | He was, until I complained. |
| 25 | Q | And then what happened? |

1   A.    Then I guess there was discussion about that,

2          Mr. Osenkarski and -- I don't know who all.  All I know

3          is discussion was held and that seniority move was put

4          on hold.

5   Q     What was the end result?

6   A.    We were both promoted.  He still remained senior to me,

7          though.

8   Q     So you were both made senior probation officers at the

9          same time?

10  A.    Yes.

11  Q     What other effect has it had on your employment, if any?

12  A.    At this point, nothing.  It's just potential, as I said.

13         If there's promotions, looking at the seniority list, he

14         is above me.

15  Q     Is he the only one that's affected?

16  A.    Yes, he is.

17  Q     In paragraph 21 of your Complaint you indicated that you

18         complained about harassment, sexual harassment by Graham

19         and Osenkarski to Mr. Hartnett on April the 8th, 1997.

20         You see that allegation in paragraph 21?

21  A.    Yes, I do.

22  Q     Is that, in fact, the first time that you filed a formal

23         complaint?

24  A.    That's the first time I went down and spoke to

25         Mr. Hartnett about that, yes.

Barbara Varner

233

1        typed down.

2    A.   Yes.  I'm sorry.

3    Q    There were some questions asked by Jim Thomas yesterday

4         that I'm going to remind you of today just to have you

5         either elaborate on them or explain more fully.  Is that

6         okay?

7    A.   That's right.  That's fine.

8    Q    I'd like to start off with some of those questions.

9         Yesterday you testified that for the first year and a

10        half with the probationary department, the Probation

11        Department, excuse me, Joe Osenkarski was very

12        complimentary of your work.  Do you remember saying

13        that?

14   A.   He didn't appear to find any problems with my work.

15   Q    Okay.  And can you explain what you mean by

16        complimentary of your work?

17   A.   My first evaluation I received from Joe I had worked

18        with the grant for Family Preservation, he had told me

19        during my first evaluation he was pleased with how that

20        program was going.  It was a one-year grant at that

21        time, and he was pleased with my work.

22             If I turned in a file to Joe, I really had no

23        problems with that.  Joe was fair.  When I first started

24        Probation I was very pleased with Joe.  His criticism

25        was not even -- he really was not a critical type

1    person.  He would make adjustments, corrections, in a

2    very appropriate way.  No, I had no problems with Joe

3    when I would turn cases over to him, just to approve,

4    that kind of thing.

5  Q    Okay.  Did that understanding of Joe's complimentary,

6    complimenting of your work, last your entire stay with

7    the Probation Department, including up to current

8    status?

9  A.    My evaluations from Joe have always been okay, they've

10    been fine.  Joe as the chief, he's not the one doing my

11    major evaluations now, he's part of it.  But my

12    evaluations, the last one I had was done by Hank

13    Thielemann and Tom Boyer, and then Joe signed as well,

14    as chief.

15  Q    When did Mr. Osenkarski stop doing your evaluations?

16  A.    Mr. Osenkarski has always been part of my evaluations

17    because he is the chief, so he still has to sign off on

18    them.  And I'm sure he's told, you know, informed of

19    what my evaluation is.  So he's still involved.

20  Q    Okay.  I want to take you back a little bit a ways

21    before you joined the probationary department.  Is that

22    okay?

23  A.    Okay.

24  Q    I keep saying probationary.  Probation Department.

25        When you found out about the job vacancy there, and

Barbara Varner

235

1        you testified yesterday that prior to working there you

2        actually sought out Mr. Osenkarski and you wanted to

3        discuss your interest in the job vacancy with

4        Mr. Osenkarski.  Do you remember that time period?

5  A.    I remember discussing with him about the position, yes.

6  Q     Okay.  Why did you choose to go Mr. Osenkarski about

7        your job interest?

8        MS. WALLET:  I'm sorry, I missed that.  Was it why

9        or when?

10       MR. ADAMS:  Why.

11       THE WITNESS:  Because Mr. Osenkarski was head of

12       the juvenile division in Probation.  We were combined

13       but still he was part of that division.  The Family

14       Preservation program would be under the juvenile

15       program.

16  BY MR. ADAMS:

17  Q     Okay.  Your understanding at that time was still that

18        Judge Sheely was in charge of Probation, of the

19        Probationary Department; is that correct?

20  A.    I don't even -- I'm not sure if I was even aware of the

21        whole hierarchy at that time.  I knew it would be

22        Probation.  Who exactly they answer to, probably, but I

23        can't say for sure that I knew that, that specifically.

24  Q     When you talked to Mr. Osenkarski were you comfortable?

25  A.    Yes, I was.

Barbara Varner

236

1    Q    Okay.  Was he helpful?

2    A.    Yes, he was.

3    Q    Okay.  Was he informative?

4    A.    Yes, he was.

5    Q    Okay.  Do you believe that he had any influence at all

6         in your receiving the job ultimately with the Probation

7         Department?

8    A.    I believe he did, because he was one of the three

9         gentlemen who interviewed me for my interview, my

10        original interview with them.

11   Q    Okay.  In that line, can you explain that process when

12        you, in fact, did interview for the Probation

13        Department?

14   A.    I sat down with Mr. Osenkarski, John Roller, who was

15        with the adult section, and Ken Bolze who was the chief,

16        and they interviewed me just about how I felt about -- I

17        remember one time they asked about dealing with violent

18        offenders, how I felt about that, sort of my philosophy

19        in coming to the program, what I saw with Family

20        Preservation, and my, of course, my background, what my

21        schooling was in.  I had to provide a resume.

22   Q    Okay.  And that's all the interview process that you

23        went through at the time?

24   A.    That I went through?  Yes.  Yes.

25   Q    Okay.  Did Mr. Osenkarski by chance recommend you for

Barbara Varner

237

1       your current position of senior probation officer?

2    A.    It would have had to be him.  He was the chief.

3    Q.    Okay.  Could anyone else have made that decision for you

4          or on behalf of you?

5    A.    Joe would have the ultimate say in recommending that.

6    Q.    Okay.  Did Gary Graham by chance, I guess, was Gary

7          still involved with your supervision around this time?

8    A.    No, he was not.

9    Q.    This was after that?

10   A.    Right, it was after that.

11   Q.    Okay, thank you.

12            By chance, did Mr. Osenkarski also have any

13         influence in recommending a job for your son?  I think

14         at the Stafford Detention Center, is that the place?

15   A.    Schaffner Detention Center.

16   Q.    Schaffner?  Okay.  Did Mr. Osenkarski help in that or

17         assist in that in any way?

18   A.    Not that I'm aware of.

19   Q.    Did he discuss with you the opportunity for your son to

20         be employed with that particular detention center?

21   A.    I don't believe Mr. Osenkarski mentioned it.  I know his

22         daughter had, when she had started working there, I know

23         she had gotten a job later at the same place, but I

24         can't remember whether he discussed it prior to or after

25         my son getting the job, I don't remember that.

1          MR. ADAMS:  I have a few more questions.  It won't

2       take long.

3    BY MR. ADAMS:

4    Q    Ms. Varner, do you have any correspondence, notes,

5         memos or any document or piece of evidence at all

6         supporting your claim that Mr. Osenkarski's conspired

7         against you in violation of PHRC?

8    A.   I don't have paperwork.  I've just heard that he's had

9         conversations with Judge Hoffer.

10   Q    Who did you hear that from?

11   A.   At this time I can't recall names.  It's just been

12        information, word of mouth in the office.

13   Q    Okay.  So would you agree at this time you can't

14        identify any witness person at all to support your claim

15        that can testify and support your claim that

16        Mr. Osenkarski has conspired against you in violation of

17        PHRC?  Is that correct?

18          MS. WALLET:  I'm sorry, did you say witness?

19          MR. ADAMS:  Witness or person who can testify in

20        support of her claims of a violation by Mr. Osenkarski.

21          THE WITNESS:  I think the fact that I was kept out

22        of that office for four years, and that was a discussion

23        between Mr. Osenkarski and Judge Hoffer, I think

24        whatever that discussion was, Mr. Osenkarski I'm sure

25        and Judge Hoffer was aware that it was a public office.

Barbara Varner

```
 1            I'm sure there was discussion, and to me, that was a

 2            retaliation.

 3   BY MR. ADAMS:

 4   Q     But did you hear that discussion?  Did you hear any

 5            remnants of that discussion yourself?

 6   A.    From Mr. Osenkarski, yes.

 7   Q     You heard from Mr. Osenkarski that he was going to

 8            conspire against you?

 9   A.    Well, no.  That he had met with Judge Hoffer and that he

10            had been given this direction to keep me out of there.

11            To me, even those two talking about it is something that

12            is illegal to keep me out of a public office.

13   Q     But you don't know, yourself, from anything you heard,

14            that Mr. Osenkarski conspired against you in violation

15            of the PHRC; is that correct?  Yes or No.

16   A.    I'm just trying to think.

17            I did not personally witness that.

18   Q     And you can't identify any person at all who witnessed

19            or heard any type of conversation by Mr. Osenkarski or

20            Judge Hoffer that would be in violation of the PHRC

21            based on conspiracy?

22   A.    I think those two would be the ones to be able to

23            testify because it would have been private information,

24            private conversations.

25   Q     Would you agree that's strictly related to conversations
```

Barbara Varner

422

```
 1              between Judge Hoffer and Mr. Osenkarski, so only one of

 2              the two of them or both of them can testify to that?

 3    A.        That's correct.

 4    Q         Okay.  And do you have any correspondence, note, memo,

 5              documentation or any shred of evidence at all supporting

 6              your claim that Mr. Osenkarski purposely left you in the

 7              building during the bomb threat that you spoke of?

 8    A.        There was no effort to get me out and he knew I was

 9              there.

10    Q         Well, I'm sorry.  The question is:  Do you have any

11              documentation, any note, correspondence, any memo,

12              anything that you can turn to as a piece of evidence to

13              say this supports your claim?

14    A.        That he actually said I'm going to leave her behind?

15              No.

16    Q         Okay.

17    A.        I don't have that, but I believe there was well -- he

18              was well informed, he knew I was there.  He had all

19              reason to believe I was there.

20    Q         Okay.  Can you identify any person at all that can

21              testify to support your claim that Mr. Osenkarski

22              purposely left you in the building during the bomb scare

23              you spoke of?

24    A.        I would not have any witnesses except my own testimony

25              that I was left behind and he knew I was there.
```