```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . .
BARBARA E. VARNER,               .
     Plaintiff,                  .  CIVIL ACTION
                                 .  NO. 1:CV 01-0725
     vs.                         .
                                 .
COMMONWEALTH OF PENNSYLVANIA,    .  (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,         .
CUMBERLAND COUNTY; CUMBERLAND    .
COUNTY; S. GARETH GRAHAM,        .
individually, and JOSEPH         .
OSENKARSKI, individually,        .
     Defendants.                 .
. . . . . . . . . . . . . . . . .
```

Deposition of:  **HON. HAROLD E. SHEELY**

Taken by    :  Defendant Cumberland County

Date        :  February 25, 2003, 10:10 a.m.

Before      :  Emily Clark, RMR, Reporter-Notary

Place       :  Administrative Offices of
               Pennsylvania Courts
               5035 Ritter Road, Suite 700
               Mechanicsburg, Pennsylvania

APPEARANCES:

   DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

   ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
   BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
              Ninth Judicial District, Cumberland County

   THOMAS, THOMAS & HAFER
   BY:  JAMES K. THOMAS, II, ESQUIRE
        PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County



1  off and on on pretty much of a regular basis.

2          The other county employees I just would see as I
3  walked through the county. I knew who they were because I
4  had been in the DA's office for 12 years before I became a
5  judge, so I knew the other county employees but I really had
6  no direct relationship with them.

7      Q.   Who did you have the ability to hire and fire in
8  the Probation office?

9      A.   Any of the probation officers.

10     Q.   Did you have the ability to discipline
11 individuals in that office?

12     A.   I had the ability.

13     Q.   Did you ever discipline any of them?

14     A.   I'm just -- since you asked me that, in all the
15 years I was the president judge I think we only ever had one
16 probation officer that had to be disciplined, and he was
17 taking money on -- he was collecting money from people on DUI
18 cases, and he was terminated. But other than him, I don't
19 recall any other discipline problems that I had to get
20 involved in.

21     Q.   Who was the person who was terminated?

22     A.   I think it was Paul Meuron, if I recall.

23     Q.   And you would have taken the action to terminate
24 him?

25     A.   He did it -- yes, I would have, but he did it --

1                MS. WALLET:  I'm asking him.

2  BY MS. WALLET:

3       Q.     Did you have any other information at that time

4  other than what you had received from Mr. Deluce and

5  possibly, although you're not certain, what you had received

6  from Mr. Osenkarski?

7                MR. ADAMS:  Again, I'll object to as far as it

8  requires the judge to speculate, but he may answer.

9                MS. WILLIAMS:  You may answer, Judge.

10               THE WITNESS:  I don't recall of any other

11  information I had at that time.

12  BY MS. WALLET:

13      Q.     Now, before you wrote your July 11 memorandum,

14  the one that's been marked Sheely 1, did you meet with

15  Ms. Varner to ask her for her response to the allegations

16  that there was a sexual relationship?

17      A.     No.

18      Q.     Why not?

19      A.     To be truthful, I felt very disappointed that

20  Mrs. Varner didn't come to me initially about these problems

21  rather than running over to the personnel director for the

22  county.  Mrs. Varner and I always had had a good

23  relationship, I thought she was a good probation officer, and

24  I felt really hurt that she wouldn't come to me and ask my

25  help in working with this problem rather than running over to

1  the personnel director for the county. I couldn't understand
2  why she did that, and she never asked to see me, that I
3  recall. She never asked for a meeting.
4    I knew at some point here that she had an
5  attorney, so I felt that it wasn't proper for me to call
6  Mrs. Varner in and ask her about this, when she had an
7  attorney. If she would have asked to see me, I certainly
8  would have seen her at any time. But I thought it wasn't
9  proper for me to ask her to come up and talk to me about this
10 once she had an attorney.
11   Q.   Did you at any time consider inviting Ms. Varner
12 and her attorney to come in and talk to you about this?
13   A.   No. I thought if they wanted to see me, I
14 certainly would have seen them. But I never got any calls
15 from anyone, either from her or her attorney that they wanted
16 to meet with me on this matter.
17   Q.   Did you think it slightly irregular that you
18 would meet with one side of this controversy and not the
19 other side?
20   A.   No, because I would have met with both of them,
21 but only the one side asked to come in and see me. The other
22 side didn't.
23   Q.   Why did you believe that Ms. Varner knew that you
24 were about to make a determination?
25   A.   I don't know why. I don't know why I thought

1   this.  I don't know.  But I was about --

2       Q.    You thought at that time that Ms. Varner knew

3   that you were about to make a determination, and if she

4   wanted to talk to you, she should have contacted you?

5       A.    Well, I know she could have contacted me at any

6   time on these proceedings, even before she went over to see

7   the county representative.  I would have been happy to see

8   her at any time.

9       Q.    Did the court, specifically you, have a sexual

10  harassment policy in place prior to July of 1997?

11      A.    I did not have any policy, no.

12      Q.    Do you know whether the county had a policy in

13  place?

14      A.    I think they did.

15      Q.    How did you know that?

16      A.    I had been told that there was a policy, I think,

17  but they never -- I never adopted a separate policy because I

18  felt that that wasn't necessary.

19      Q.    Why didn't you think it necessary?

20      A.    I felt that any -- the policy of the county would

21  apply to all the employees, including the people in the

22  Probation office.  And I think that the policy that they had

23  that I recall was certainly much -- thought out much better

24  than what I could think up of on my own.

25      Q.    What did you understand the policy of the county

1  to be?
2     A.    Well, they had a -- if there was a problem, they
3  had a step method of who the employees were supposed to
4  contact.  That's about as much as I remember, because I never
5  really had to deal with this problem before.  This is the
6  first time that it had ever come up to me.
7     Q.    Okay.  And what did you understand the step
8  method under the county policy to be?
9     A.    All I remember is that someplace along the step
10 policy, why, Mrs. Varner should come in and talk to me about
11 this if she wasn't satisfied with the responses that she was
12 getting, I guess in this case it would have been the first
13 line of response would have been from Mr. Osenkarski.  That's
14 what I thought.  I never had to deal with this before.  But I
15 think that's -- I mean, she could have came to see me first
16 or she -- the policy of the county was I believe she was
17 supposed to have seen Mr. Osenkarski, then to see me.  But
18 she never did come to see me.
19    Q.    All right.  So you believed the policy to be that
20 if you had a problem with sexual harassment, let's say it was
21 your co-worker, what would you do?
22    A.    My thought was, what I knew about it was that you
23 would first go to see your immediate supervisor of any type
24 of a problem, sexual or otherwise.
25    Q.    Okay.