```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
     Plaintiff,                 .   CIVIL ACTION
                                .   NO. 1:CV 01-0725
     vs.                        .
                                .
COMMONWEALTH OF PENNSYLVANIA,   .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
     Defendants.                .
. . . . . . . . . . . . . . . .
```

VOLUME 1
Pages 1 to 70

Deposition of:   JOSEPH L. OSENKARSKI

Taken by      :  Plaintiff

Date          :  January 27, 2003, 3:27 p.m.

Before        :  Emily Clark, RMR, Reporter-Notary

Place         :  Administrative Offices of
                 Pennsylvania Courts
                 5035 Ritter Road, Suite 700
                 Mechanicsburg, Pennsylvania


APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
              Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY:  JAMES K. THOMAS, II, ESQUIRE
         PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

19    question that I have asked of you, will you please ask me to
20    rephrase it before you attempt to answer?
21    A.    Yes, I will.
22    Q.    And if at any time you feel you need to consult
23    with your attorney or you need a break, you will tell me
24    that?
25    A.    Yes, I will.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                          6


1    Q.    Mr. Osenkarski, when did Barbara Varner first
2    complain to you about the conduct of Mr. Graham?
3    A.    Barbara Varner came to me in early 1997, I'm
4    going to guess February, March.  She came to me on one
5    occasion and complained that -- they were unspecified
6    complaints, about Gary's difference with her about I believe
7    some specific cases.  I'm going to give you a detailed answer
8    because I've thought about this, having heard this the last
9    day and a half.
10    Q.    And when you say the last day and a half, you're
11    speaking of the deposition of Ms. Varner that we have just
12    conducted?
13    A.    Yes.  Yes.  When she came to me, of course, I
14    immediately listened to her.  And I believe I had heard a
15    part of the loud conversation but did not understand that,
16    you know, the content of the conversation.

17        As a new manager, again, just being officially
18  appointed several months before that as chief, my new
19  management philosophy which I was developing told me that it
20  was always best to settle a complaint at the lowest level,
21  damage control, so.  Because I told Mr. Graham I would never
22  interfere with case management, because interfering with case
23  management I felt was wrong, because it was done to me as a
24  supervisor for many years.  Specifically, Mr. Bolze at times
25  interfered with me.

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski       7

1        I then told her that I would like her to go back
2  to Mr. Graham.  And again, after watching and observing a
3  number of years of a totally close relationship between both
4  Mr. Graham and Ms. Varner, I felt that they're two
5  intelligent people, and both having college degrees, having
6  worked together, again, for several years, I felt that they
7  would be able to solve it, and I told her that.  And I felt
8  that she should go back and try to resolve it, and if she
9  couldn't, to come back to me, and both of them come back to
10  me and then I would be forced to resolve it my way.
11        The conversation was not lengthy, again, because
12  I didn't want to go into -- in detail about the interference
13  part I spoke about earlier.  Then that was the extent of the
14  conversation.  Barbara Varner did not come back to me.

7          MR. ADAMS: Objection to form. Do you know that?

8          THE WITNESS: She was making in my estimation an
9  unspecified verbal complaint, to which I began to listen.
10 And then upon learning that it was a case management issue,
11 about discussion, disagreement discussions about cases, I did
12 stop it, because I felt that to go any further -- we should
13 go back and try to diffuse the matter at the lowest level
14 possible.

15 BY MS. WALLET:

16     Q.   Did she at that time say something to the effect
17 of: You have to do something about Gary Graham?

18          MR. ADAMS: Objection. He's already answered
19 what she said to him, which as I understand was about cases,
20 and sent her back to Gary Graham to take care of the cases.

21          THE WITNESS: In so many words, yes.

22 BY MS. WALLET:

23     Q.   In so many words she said to you: You have to do
24 something about Gary Graham?

25     A.   I don't know if it was those words. I don't

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                          12

1  recall the exact wording is the safest answer I can give.

2      Q.   Did she come to your office and tell you about
3  anything at that time other than her complaint concerning
4  Gary Graham?

5     A.    No.

6     Q.    You sent her away?

7           MR. ADAMS:  Objection.

8           MS. WALLET:  What's objectionable about that?

9           MR. ADAMS:  That's not what he testified to.

10          MS. WALLET:  I'm asking.

11          MR. ADAMS:  Sending away sounds very offensive.

12    It's not appropriate.

13          THE WITNESS:  I did not dismiss her from my

14    office.

15    BY MS. WALLET:

16    Q.    Did you welcome her to sit down --

17    A.    She sat down.

18    Q.    -- in your office?  Did she sit down?

19    A.    Yes.

20    Q.    And did you invite her to leave your office?

21    A.    I listened to her conversation, which was, again,

22    an undifferentiated verbal complaint about Gary and the

23    differences they were having about cases, case management.

24          And again, because I felt that both were very

25    good friends and co-workers and professional friends, that

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                              13

1     they could resolve it in my opinion because of their lengthy

2     and I'm saying several-year lengthy professional friendship

```
 3   is the best word.
 4       Q.    Did she use the word harassment during that
 5   conversation?
 6       A.    I do not recall.
 7       Q.    Is it possible she used that word?
 8       A.    I do not recall.
 9       Q.    Do you recall anything else that she said to you
10   at that time?
11       A.    No.
12       Q.    Do you recall anything else that you said to her
13   at that time?
14       A.    I summarized what I said to you earlier about
15   having her attempting to back and to go Gary and to try to
16   resolve it so that the thing would be fixed at the lowest
17   level so that we didn't have to escalate what appeared to be
18   a minor problem, to me at the time.
19       Q.    Why did you conclude it was a minor problem?
20       A.    Well, it was a case-specific situation.  I'm
21   having flashbacks about it in trying to think about one of
22   the cases, but I believe one of the kids was sports oriented
23   and there may have been an issue about whether or not the kid
24   should be considered for placement.  That's the most I can
25   recall about that part of the conversation.
```

1    Q.    And was that based on what Ms. Varner told you in
2    your office, or based on what you had overheard outside the
3    office?
4    A.    Well, I didn't overhear much, but when Ms. Varner
5    came in the office, that's the conclusion I drew.
6    Q.    How long would you say this conversation lasted?
7    A.    My conversation with Ms. Varner and me?
8    Q.    Yes, sir.
9    A.    Or her and Gary?
10   Q.    No.  The conversation that you had with Ms.
11   Varner.
12   A.    I'm going to guesstimate five minutes.
13   Q.    Can you remember anything else that was said
14   during that five-minute conversation?
15   A.    Well, maybe it's not appropriate to comment, but
16   I want to make a comment, I don't know if I should wait until
17   I --
18         MR. ADAMS:  Just answer the question.
19         THE WITNESS:  Do I remember anything else about
20   the conversation?
21   BY MS. WALLET:
22   Q.    Do you remember anything else that was said
23   either by you or by Ms. Varner during that conversation?
24   A.    No.
25   Q.    In your mind, this was not a significant

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

1  conversation?

2          MR. ADAMS:  Objection.  Significant?  What do you
3  mean by significant?
4  BY MS. WALLET:
5      Q.    You didn't think it was very important in your
6  role as a supervisor?
7      A.    Any conversation with me in my office under my
8  management, you know, anything is significant.  But the line
9  I'm drawing was the fact that, again, as a new supervisor, as
10 a new manager, I felt that to try to de-escalate this thing
11 at the lowest level was the most significant thing to do,
12 because I felt there was a possibility of it being resolved.
13     Q.    Did you direct Ms. Varner to report back to you
14 whether or not the problem was resolved?
15     A.    I asked Ms. Varner -- I told Ms. Varner, I didn't
16 ask her, I told her that if it couldn't be resolved, that I
17 would want both of them back to me and then we would have to
18 resolve it at my level.
19     Q.    After Ms. Varner left on that day, did you speak
20 to Gary Graham about Ms. Varner's conversation with you?
21     A.    I made a comment to Mr. Graham, I believe, and
22 this is vague, from my recollection, again, this is seven,
23 six years ago, that Ms. Varner had come in to me and had made
24 a complaint and I would prefer that Gary resolve it with
25 Ms. Varner.

23   because we were together for more years than we were split.

24      Q.    You may answer it however you wish, sir.

25      A.    Okay. Let me think about this a minute.


Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                              18


1         We work, I'm talking about Juvenile and Adult
2    Probation, in a very, very unnatural atmosphere, 40 hours a
3    week or 36 to 40 hours a week.  Over the years this
4    environment hasn't changed.  What appears to be natural in a
5    regular office situation is not natural in Juvenile
6    Probation.  Anybody is capable of anything, because we work
7    with a criminal element, a delinquent element, a sick
8    element.  They're in there because they're troubled people
9    and they're not normal.  And it's not unnatural to have
10   conversations that are off-color, sometimes vulgar, sometimes
11   humorous to keep your sanity, but they do touch on other than
12   pleasantries.  And so I'm going to say that it's sometimes or
13   frequently, or it can be frequently but not frequently all
14   the time, it's just a colored separate kind of people we deal
15   with, and I describe it as unnatural.
16         There have been verbal -- there's been verbal
17   violence, there's been physical violence over the years that
18   I've been in that office.  There's been physical violence
19   upstairs in the courtrooms.  Shortly -- well, several years
20   before I got there, a judge was shot, a defendant was killed.

717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                           44

1           MR. ADAMS:  Think about what she's asking you.
2  What did you do to prepare for today for your testimony?
3  What have you done?
4           THE WITNESS:  I read the Complaint.
5           MR. ADAMS:  Okay.
6           THE WITNESS:  And the wrote notes.  And that's,
7  you know, the most specific thing I could tell you.
8  BY MS. WALLET:
9      Q.    And you said you spoke with your current
10 management team, Mr. Miller --
11     A.    Briefly, yes.
12     Q.    -- Mr. Drachbar, Mr. Boyer, Mr. Thielemann,
13 correct?
14     A.    Briefly.  Yes, briefly.
15     Q.    And did you call Mr. Boyer into your office and
16 say:  I have a deposition, I want you to help me?
17     A.    I advised him that I had a deposition and I
18 wanted to be clear about how busy we were doing this, you
19 know, the beginning of our new department.  And I wanted him
20 to, you know, to reaffirm that we were, you know, that we
21 were very busy, that I was having him focus on certain
22 things.
23           I think the most important thing I asked
24 Mr. Boyer was his recollection of the seniority issue,
25 because I delegated him to study the changes we made when we

Emily R. Clark, RMR
717-233-1744, emily.clark@worldnet.att.net

Joseph Osenkarski                                                   45

1   made them, which was one of the first tasks we did as a new
2   department, trying to fix the seniority system, which a lot
3   of people felt was unjust and unfair.
4       Q.   Did Mr. Boyer provide any other information to
5   you in response to your request that he help you to prepare
6   for this deposition?
7       A.   Well, we geared it toward, you know, the
8   seniority issue because he was primarily involved in that and
9   was well versed on that topic.
10      Q.   Okay. And did he give you something that would
11  help you on the seniority issue?
12      A.   He cleared up in my mind the time frames when we
13  began to look into it. And it was right after we split with
14  the Adult division. And he basically said that he would be
15  prepared to give testimony if necessary about the seniority
16  issue.
17      Q.   And what did you ask Mr. Thielemann? Is it
18  Thielemann or Tieleman?
19      A.   Thielemann.
20      Q.   Thielemann with a T-H. What did you ask him to
21  help you with in preparation for this deposition?
22      A.   I asked him I believe one specific question, and
23  that was was he ever in the presence of Gary when Gary and