```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
```

| | |
|---|---|
| BARBARA E. VARNER,<br>    Plaintiff, | CIVIL ACTION<br>NO. 1:CV 01-0725 |
| vs. | |
| COMMONWEALTH OF PENNSYLVANIA,<br>NINTH JUDICIAL DISTRICT,<br>CUMBERLAND COUNTY; CUMBERLAND<br>COUNTY; S. GARETH GRAHAM,<br>Individually, and JOSEPH<br>OSENKARSKI, individually,<br>    Defendants. | (JUDGE YVETTE KANE) |

Deposition of:   **DARBY CHRISTLIEB**

Taken by   :   Defendant

Date   :   April 28, 2003, 10:17 a.m.

Before   :   Emily Clark, RMR, Reporter-Notary

Place   :   Administrative Office of Pennsylvania
             Courts
             5034 Ritter Road
             Mechanicsburg, Pennsylvania


APPEARANCES:

   DEBRA K. WALLET, ESQUIRE
       For - Plaintiff

   ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
   BY:  A. TAYLOR WILLIAMS, ESQUIRE
       For - Defendant Commonwealth of Pennsylvania
             Ninth Judicial District, Cumberland County

   THOMAS, THOMAS & HAFER
   BY:  PAUL J. DELLASEGA, ESQUIRE
       For - Defendant Cumberland County

```
 1   Q.   Curse at Mrs. Varner?
 2   A.   No.
 3   Q.   Say anything sexually demeaning to Mrs. Varner?
 4   A.   No.
 5   Q.   Give Mrs. Varner arduous or burdensome assignments
 6        compared with what other new officers got?
 7   A.   No.
 8   Q.   Did you, again, before the split, did you observe
 9        Graham treat her with respect?
10   A.   Yes.
11   Q.   Treat her as a friend?
12   A.   Yes.
13   Q.   Treat her, in fact, perhaps better than he treated
14        other people?
15   A.   Yes.
16   Q.   Okay.  Treat her as one of his favorites?
17   A.   Yes.
18   Q.   Okay.  When you said that you observed him treat her
19        better than other people, can you explain to me what
20        you meant by answering yes?
21   A.   There was some favoritism, I thought, where he and Barb
22        were seen a lot together.  And if there would be any
23        travel time when we would place children outside the
24        county, they seemed to be traveling a lot.
25   Q.   Anything else?
```

| | | |
|---|---|---|
| 1 | Q. | The phrase jeehoobees, referring to a woman's breasts? |
| 2 | A. | No. |
| 3 | Q. | Have you ever seen or heard talked about the concept of |
| 4 | | female interns in your office being forced to dance on |
| 5 | | tabletops? |
| 6 | A. | No. |
| 7 | Q. | Have you ever heard Mr. Graham say to Mrs. Varner that |
| 8 | | she has no fucking sense, no fucking training or no |
| 9 | | fucking ability? |
| 10 | A. | No. |
| 11 | Q. | Other than Mrs. Varner, have you ever heard Mr. Graham |
| 12 | | yell at anybody else? |
| 13 | A. | Yes. |
| 14 | Q. | Have you heard him yell at everyone there? |
| 15 | A. | Yes. I can't say everyone, but. |
| 16 | Q. | Most people there? |
| 17 | A. | Yes. |
| 18 | Q. | Within the cohort of people who he's yelled at, does |
| 19 | | there appear to be any distinction between yelling at |
| 20 | | men more frequently than women, women more frequently |
| 21 | | than men? |
| 22 | A. | No. |
| 23 | Q. | He's an equal opportunity yeller? |
| 24 | A. | Yes. |
| 25 | Q. | Within the Probation office among both Probation |

```
 1            officers and clients, is the use of foul language
 2            common?
 3    A.      It occurs, yes.
 4    Q.      And when it occurs, is there a differentiation between
 5            it coming from both female as well as male probation
 6            officers?
 7    A.      Do you mean with our interaction with clients, or our
 8            interactions amongst ourselves?
 9    Q.      Let's take it first amongst yourselves.
10    A.      It probably comes from males more than females.
11    Q.      But there is some from females?
12    A.      There could be.
13    Q.      How about in interactions with clients?
14    A.      Very seldom, I would think.
15    Q.      Can you discuss for me whether the Probation office is
16            in any way different from a business office where you
17            deal with profit-making matters as opposed to criminal
18            matters?
19    A.      Well, I've been in probation since I graduated from
20            college, so it's kind of difficult for me to compare
21            those two.  I would say there's probably very little
22            difference.
23    Q.      Very little?
24    A.      Yes.
25    Q.      Do you feel you've ever been harassed by your
```

```
 1         superiors?
 2  A.     Yes.
 3  Q.     And harassed in what sense?
 4  A.     Well, there were numerous times -- and I said Gary
 5         didn't discriminate with hollering.  There were a few
 6         times that Gary and I would go toe-to-toe at each
 7         other.  I always said that Gary would charge, try and
 8         convict you within a matter of a few minutes over
 9         something, and so there were several incidents,
10         probably a handful, a dozen, maybe.
11  Q.     From your own observation, can you describe for me
12         whether there's any difference in the way of
13         Mr. Graham's conduct towards you that you thought was
14         harassing, and his conduct towards Mrs. Varner after
15         their relationship changed and she was no longer one of
16         his favorites?
17  A.     He appeared in that incident that occurred -- I only
18         witnessed that one incident in late '97 or '98.  It
19         seemed to be much more vicious than any kind of
20         conflict that I had with him.
21  Q.     Other than that one incident, did you ever witness any
22         other incident where he yelled at her or otherwise
23         behaved inappropriately?
24  A.     No.
25  Q.     Mr. Graham a difficult person to get along with, in
```

```
 1              your opinion?
 2    A.        At times.
 3    Q.        Does Mr. Graham appear to have favorites?
 4    A.        Yes, there were favorites.
 5    Q.        Does he appear to have people he doesn't like?
 6    A.        Yes.
 7    Q.        With regard to those people he doesn't like, is he
 8              uniformly rude to all of them?
 9    A.        I would say so, yes.
10    Q.        Yells at all of them?
11    A.        Yes.
12    Q.        Acts in a belligerent manner towards all of them?
13    A.        Yes.
14    Q.        And those, that cohort of people he doesn't like,
15              includes both men and women?
16    A.        Yes.
17    Q.        Have you ever observed anything within your office that
18              you felt would raise a concern about Mrs. Varner's
19              personal safety?
20    A.        No.
21              MR. DELLASEGA:  That's all I have.
22    BY MR. ADAMS:
23    Q.        Mr. Christlieb, am I pronouncing it right?
24    A.        Yes.
25    Q.        Thank you.  My name is Paul Lancaster Adams.  I
```

| | | |
|---|---|---|
| 1 | | actually represent Mr. Osenkarski in this matter. Just |
| 2 | | a few follow-up questions to Mr. Dellasega's |
| 3 | | questioning of you. |
| 4 | | You had mentioned your familiarity with the phrase |
| 5 | | Barb 1 and Barb 2. Do you remember those questions by |
| 6 | | Mr. Dellasega? |
| 7 | A. | Yes. |
| 8 | Q. | Maybe it's a long way down the end of the table. Did |
| 9 | | you also indicate that you had heard the phrase Barbie |
| 10 | | 1 and Barbie 2? |
| 11 | A. | Yes. |
| 12 | Q. | Okay. When did the Barbie 1 and Barbie 2 phrase be |
| 13 | | used? When was that used in comparison to Barb 1 and |
| 14 | | 2? |
| 15 | A. | I don't even know if it was used by Mr. Osenkarski or |
| 16 | | Mr. Graham, I can't recall, but I know that was a |
| 17 | | phrase that was used maybe by other co-workers in the |
| 18 | | office, when referring to Gary was going to be with |
| 19 | | Barb Varner. |
| 20 | Q. | Okay. Do you have an idea at all of the distinction |
| 21 | | between the name Barbara or Barbie? Was it more |
| 22 | | playfully when Barbie was used versus Barbara? I'm |
| 23 | | just -- |
| 24 | A. | No. I don't think there was any distinction between |
| 25 | | them. |

1  Q.   Okay, thanks.

2       You also mentioned that you did notice an abrupt

3       change in the relationship between Mrs. Varner and

4       Mr. Graham at some point late 1997.  Do you remember

5       that?

6  A.   Yes.

7  Q.   Do you remember an incident where Mr. Graham had raised

8       his voice and had, I guess had yelled at Mrs. Varner?

9  A.   Yes.

10 Q.   Okay.  I know you said you don't remember exactly what

11      was said.  Could you describe the tone of the

12      conversation?  Sometimes a person doesn't remember

13      exactly what's said but they can remember the tone.

14 A.   I assumed it was work-related because at that time I

15      believe Barb was in her office, and Gary came into her

16      office with a file in his hand and seemed to be angry

17      over some work-related incident.

18 Q.   The seniority system that you were asked about, when

19      did someone first in your office approach you about the

20      seniority system as it existed in the Probation

21      Department?

22 A.   That's always been an issue, because there are certain

23      probation officers that have county experience such as

24      with the Sheriff's Department, and the opinion of those

25      people is that whenever, say, they would start with the

| | | |
|---|---|---|
| 1 | A. | The chief at that time was Ken Bolze, and the |
| 2 | | supervisor of the -- the Juvenile supervisor was Joe |
| 3 | | Osenkarksi and the Adult supervisor was John Roller. |
| 4 | Q. | Okay. If you had a problem in the office back during |
| 5 | | that time, who would you address the problem to? |
| 6 | A. | If it involved juveniles, it would be Joe Osenkarksi. |
| 7 | Q. | Okay. And if it would have involved -- |
| 8 | A. | The Adult system, it would be John Roller. |
| 9 | Q. | Okay, John Roller. And when you, assuming that you had |
| 10 | | problems in your tenure of working, when you would have |
| 11 | | had to approach Mr. Osenkarski, was he approachable? |
| 12 | A. | Yes. |
| 13 | Q. | Did he ever say to you: I can't talk to you, I'm too |
| 14 | | busy? |
| 15 | A. | Never. |
| 16 | Q. | Did he always have availability time for you when you |
| 17 | | needed him? |
| 18 | A. | Yes. |
| 19 | Q. | And that would include not only problems, but if you |
| 20 | | had something positive to report as well? |
| 21 | A. | Yes. |
| 22 | Q. | Okay. Has that relationship changed in terms of |
| 23 | | approaching Mr. Osenkarski when you've had an issue |
| 24 | | from your hiring of 1989 till the present? |
| 25 | A. | Well, Joe's role, of course, changed whenever he became |

```
 1            chief when it split, so I didn't have as much contact
 2            with him.  But from the period of '89 to '96, if I had
 3            a question on any of my cases, I would go to Joe and he
 4            would answer it.
 5       Q.   Okay.  Do you think because of Mr. Osenkarski's change
 6            in role he's become less approachable, or he's just
 7            more busy so it's hard to get ahold of him?  What is
 8            your analysis of that?
 9       A.   I think he didn't have as much contact with the
10            day-to-day operations, so that's why I didn't have as
11            much contact with him after the split.
12       Q.   Do you know why he doesn't have as much contact with
13            the day-to-day operations?
14       A.   Well, because he was elevated to chief.  So the
15            supervisors who replaced him then became those front
16            line people with the more day-to-day contact.
17       Q.   Has it always been your understanding since being
18            employed in 1989 that the front line supervisors are
19            persons that, I guess lesser-hierarchy persons would
20            report to if you had a problem?
21       A.   Yes.
22       Q.   And if that lesser-hierarchy person in the office had a
23            problem with an immediate supervisor, would that person
24            go directly to Joe --
25       A.   Yes.
```

1  Q.   -- in this example?
2  A.   Yes.
3  Q.   Have you ever seen situations where maybe someone down
4       the line in the hierarchy of the office who had to go
5       beyond the immediate supervisor and talk to Joe about
6       an issue?
7  A.   That's happened, yes.
8            MR. ADAMS:  Thank you.
9  BY MS. WILLIAMS:
10 Q.   Mr. Christlieb, I'm Taylor Williams representing the
11      court.
12           Did you ever have any conversation with Judge
13      Sheely about Barbara Varner?
14 A.   No.
15 Q.   Did you ever have any conversation with Judge Sheely
16      about Gary Graham?
17 A.   No.
18 Q.   Did you ever have any conversation with Judge Hoffer
19      about Barbara Varner?
20 A.   No.
21 Q.   Did you ever have any conversation with Judge Hoffer
22      about Gary Graham?
23 A.   No.
24           MS. WILLIAMS:  That's all I have for you.  Thanks.
25 BY MR. MacMAIN: