```
               IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
```

```
. . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
     Plaintiff,                 .  CIVIL ACTION
                                .  NO. 1:CV 01-0725
     vs.                        .
                                .
COMMONWEALTH OF PENNSYLVANIA,   .  (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
     Defendants.                .
. . . . . . . . . . . . . . . .
```

```
     Deposition of:  WILLIAM A. BRANDT

     Taken by     :  Defendant Cumberland County Court

     Date         :  April 4, 2003, 9:30 a.m.

     Before       :  Emily Clark, RMR, Reporter-Notary

     Place        :  Cumberland County Courthouse
                     One Courthouse Square
                     Carlisle, Pennsylvania
```

APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY: A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
            Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY: JAMES K. THOMAS, II, ESQUIRE
        PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

```
 1   Q     Were you aware that Mr. Graham had been suspended by
 2         Judge Sheely for three days?
 3   A.    I think.  There's a -- it's common knowledge now.  I
 4         don't know if I knew at the time.  I believe I did,
 5         because there was a joke in the office that he was
 6         suspended with pay, and we -- I'm sorry to bore you, but
 7         we joked that if we ever want to get suspended in the
 8         office we hope that it's with pay, I would take that
 9         kind of suspension.  So that's the jest and that's the
10         context how I knew that he was suspended.
11   Q     In what context did you understand the reason for the
12         suspension?
13   A.    I knew it was involved with Barb in some shape or form
14         but I didn't know details.
15   Q     When did you first become aware of any allegation,
16         contention or rumor that a sexual affair had existed
17         between the two?
18   A.    I think during their friendship, the period of time that
19         I would describe as a friendly relationship.
20   Q     And in what sense did you become aware?  Was it
21         something --
22   A.    I think anyone of reasonable suspicion, maybe I'm not,
23         but seeing a man and a woman spending that much time
24         together that hadn't previously, there was thoughts in
25         the back of my mind that is this something that's more
```

| | | |
|---|---|---|
| 1 | | than -- is this extracurricular. |
| 2 | Q | All right. And was that a thought you ever heard |
| 3 | | anybody else articulate? |
| 4 | A. | Sure. |
| 5 | Q | Okay. Was that a thought you heard articulated |
| 6 | | generally within the office? |
| 7 | A. | Yes. |
| 8 | Q | And were there adherents both pro and con as to whether |
| 9 | | or not an affair was going on? |
| 10 | A. | I think everyone stayed the hell out of it, quite |
| 11 | | frankly. I don't recall. I think it was just general |
| 12 | | suspicions and the rumor mill of an exceptionally small |
| 13 | | office. |
| 14 | Q | When the relationship changed so abruptly between them |
| 15 | | as you've described, was there any subsequent rumor that |
| 16 | | the affair must have ended, to explain this sudden |
| 17 | | change in the relationship? |
| 18 | A. | Yes, but I mean, no one knew anything firsthand. |
| 19 | Q | But there was speculation about it? |
| 20 | A. | There was a lot of hypothesizing, yes. |
| 21 | Q | Did Mrs. Varner ever discuss with you that she was going |
| 22 | | to file a complaint against Graham for sexual |
| 23 | | harassment? |
| 24 | A. | I don't recall. |
| 25 | Q | Has she ever discussed her current case with you? |

```
 1   A.   It's something we all bring on ourselves differently,
 2        but I would argue again, yes, that it would be.
 3   Q    Prior to the split, what was your understanding of how
 4        seniority was calculated in the combined Adult and
 5        Juvenile Probation Department?
 6   A.   My understanding from day one was years of service with
 7        the county.
 8   Q    Inside and outside of probation?
 9   A.   Correct.  So if a maintenance man came to the Department
10        not possessing even the prerequisites for our position,
11        he would be more senior on the list than someone who had
12        his doctorate.
13   Q    Did that seniority system change at or about the time of
14        the split?
15   A.   Let me -- I'm not aware of any in-writing policy other
16        than what I described to you was Judge Sheely's policy.
17        And I never heard Judge Sheely say that out loud.  And
18        we were -- it was never tested, either, so that was
19        something that we assumed.  And there are many things we
20        assumed on a day-to-day basis that never get tested.
21        So, that was a very  -- we don't know if that was the
22        seniority but that was my understanding of it.
23   Q    You did mention a written document, though?
24   A.   Never prior to the split.
25   Q    Oh, okay.  But prior to the split, no written document?
```

```
 1    A.    Not to my recollection.
 2    Q     Mr. Osenkarski didn't discourage persons from
 3          approaching him, did he?
 4    A.    Never.
 5    Q     Would you say Mr. Osenkarski had an open door for issues
 6          that may have come up by his employees?
 7    A.    Absolutely.
 8          MR. ADAMS:  That's all the questions I have.  Thank
 9          you.
10   BY MS. WILLIAMS:
11    Q     Mr. Brandt, I'm Taylor Williams from the Supreme Court
12          of Pennsylvania AOPC.  I'm representing the Commonwealth
13          of Pennsylvania Ninth Judicial District Court of Common
14          Pleas of Cumberland County.  The same ground rules that
15          Mr. Dellasega spoke to you about still apply in our
16          conversation, if you would.
17          You described a meeting that you had with Judge
18          Hoffer?
19    A.    Yes.
20    Q     Did you keep any notes regarding that meeting?
21    A.    Never.
22    Q     Or make any contemporaneous --
23    A.    No.
24    Q     -- notes on a calendar?
25    A.    I'm a horrible note taker, so no, I can emphatically say
```