IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA E. VARNER, PLAINTIFF, | : | CIVIL ACTION NO. 1:CV 01-0725 |
| VS. | : | |
| COMMONWEALTH OF PENNSYLVANIA, NINTH JUDICIAL DISTRICT, CUMBERLAND COUNTY; CUMBERLAND COUNTY; S. GARETH GRAHAM, INDIVIDUALLY; AND JOSEPH OSENKARSKI, INDIVIDUALLY, DEFENDANTS. | : | (JUDGE YVETTE KANE) |

DEPOSITION OF: THOMAS A. BOYER

TAKEN BY: DEFENDANT OSENKARSKI

BEFORE: SUSAN M. SIMON
REPORTER-NOTARY PUBLIC

PLACE: ADMINISTRATIVE OFFICES OF
PENNSYLVANIA COURTS
5035 RITTER ROAD
MECHANICSBURG, PENNSYLVANIA

DATE: SEPTEMBER 17, 2003
BEGINNING 10:25 A.M.

ORIGINAL

That's when I left the unit.

Q Okay. Anything else you can think of in terms of Ms. Varner's situation of being certified with the Alcohol Highway Safety course?

A I don't know of anything else, unless you have a question or what have you.

Q When you -- you said you were surprised that -- or she went, in your opinion, behind your back in order to get certified. Did you ever address that with Ms. Varner at all?

A I do not recall directly with Mrs. Varner.

Q Did she ever explain to you how she was able to acquire the certification not going through you, which was obviously was the way to go through, the process in the office?

A She never did. She never did.

Q Seniority. What do you know about seniority, the seniority system with the Juvenile Probation Department?

Better yet, let's go back to your first interest of seniority in the Probation Department in general. When was that?

A Well, approximately 1982, in the ballpark of 1982 to 1983 approximately, at that point being employed by the county four or five years, the county had a very

non-sophisticated and very small personnel manual for county employees that covered some rules and regulations and guidelines, et cetera.

And it came to my attention back then -- that's over 20 years ago -- that the county's policy on seniority was not complete or thorough, and specifically in two areas.

When the county addressed seniority, they went to some effort to show the difference between a full-time person and a part-time person. And they would show this specifically in a variety of categories. If you're full-time, this is your longevity. If you're part-time, its longevity. If you're full-time, this is sick leave, this is the holidays. This is this, this is that.

But when it came to seniority, they didn't differentiate. I saw that as a flaw in the county policy.

The other thing the old county policy said was seniority was based on continuous service in the county. And that was the second flaw that I saw back in the early eighties. Because I could see right then that if push comes to shove, there could be a potential problem here with employees who transferred over to probation from, say, the nursing home or maintenance or wherever.

So I addressed my concerns as far as back as the early eighties with my superiors in probation, the

county commissioners in a memo, all to no avail, up until such time as 1990 came, and the then commissioners in the county redid the personnel manual, and they completely dropped seniority off the radar screen. They didn't even address it.

So my position was, well, that wasn't right either. Walking away from potential problems wasn't something I thought was the right thing. But that's what the county did. So I, in the department pursued it, but to no success. I had a chief at that time that wasn't interested, didn't see it, didn't think it was important.

So again, my efforts to correct this potential problem fell on deaf ears.

Q Okay. Who was the first chief? And you're talking about chief of the Probation Department?

A The first chief that I dealt with was a man by the name of Irvin Groninger who passed away on April the 25th of 1984. He was the first chief that I addressed this with and didn't get any changes.

The second chief was Ken Bolze who took office April 30th of 1984 and was there until July 31st of '96. He didn't address the issue. Didn't want to address the issue. Wasn't interested in the issue. So I wasn't successful in getting his attention on this matter either.

Q Throughout your testimony about the seniority

issue, you've been saying I've talked to the commissioners, I've talked to management, I've talked to the different chiefs.

Is it just you that's really addressing these issues of seniority at the time?

A Well, I don't know that it was just me. I would say that there were probably others who were also concerned, but whether they yielded to my so-called seniority in the department, I don't know. I don't know that other people didn't bring it up, but I really don't know that answer.

Q Is it true that Ken Bolze retired in '96?

A That's true.

Q What happened with the issue after that?

A Well, on the issue of seniority, Mr. Bolze -- the word that he may retire, as I recall, came out of the box in March or April of 1996, that he, in fact, might be retiring in the summer of '96. So then the talk began all over the office as to, well, gee, what's going to happen, who's going to be the chief, and what kind of changes are coming.

About that time also there were initially rumors that the court may, in fact, support the splitting of this Probation Department into two separate departments. So that was a rumor there for a couple months

in 1996, while Mr. Bolze was still the chief of the single department.

And then approximately June, July, and I don't know exactly when, but both Joe and Gary -- I don't know exactly when -- communicated with me about if we have a split department, would I consider coming with Juvenile Probation.

They came to me. They talked to me. They wanted to know which way I was going to go, because again more rumors including what would likely happen is the more senior staff on the single department would probably get first option to join whatever separate department they wanted to do.

So anyway, Joe and Gary communicated with me informally on several occasions, asking me if I would consider -- because I had a lot of seniority in the single department -- would I consider coming with Juvenile Probation, if, in fact, that happened and we had two departments.

Q Okay.

A Among the things that I mentioned to them, and they were both aware of the seniority concern that I had plus some other -- I can't remember offhand right now anything specifically other than just general hopes to have a, you know, good department, clean up some things that we

all agreed probably needed some attention.

But the issue of seniority came up, and basically I just said to Joe and Gary, well, one of the things that we have to address here is I want this seniority thing fixed. And they both said they knew that it was of interest to me. They understood the problem. And there was no problem. You work on that, and that will be our department's policy.

So through that, I did some drafts, and the chief and Gary reviewed them, and eventually when we did become a separate department, that's how the specific policy was written and issued.

But more importantly before the final split of the two departments, only in the rumor stage -- July, August, before we knew, one, was there going to be two departments, but more importantly who was going to be in each department -- on this issue of seniority, I went and I pulled in a number of less than senior personnel to personally address, one-to-one, what I thought was going to be the Juvenile Probation policy on seniority. Because I thought it was important to be up front and honest and thorough with the potential employees of this new department.

Q What did you think would be the Juvenile Probation Department's policy on seniority?

A Well, it was very simple. It closed two leaks in the previous system. One, it addressed the issue of full-time versus part-time. And two, it addressed the specific issue, is your employment with the probation or is it in the county. Those are the two leaks that the future policy was going to close. So as to read, that seniority for the department's purposes would involve full-time continuous probation, period. That was it.

That closed both leaks. No question about it. To the extent that this seniority policy would affect an employee, there it was, black and white, clear, everybody understood it.

Q You said you talked to a bunch of junior level probation officers?

A That is correct.

Q About the concerns about whether or not this would be something that would be acceptable to them or not, is that correct?

A Well, that's basically correct. What I did is I looked at the list of staff that were employed as probation officers, and not knowing exactly where the individual probation officers wanted to go if they had a choice -- did they want to go adult, did they want to go juvenile -- and knowing the importance of the issue of seniority, I pulled a number of these people, including

Mrs. Varner one-to-one in my office, because I felt that everybody that might end up in the Juvenile Probation Department should know about this to the extent that it could affect them. I thought it was important.

Q Just for clarity. One of the persons you talked to was Ms. Varner?

A That is correct.

Q This is prior to the decision on the split of juvenile and adult probation?

A It was approximately July, August. It was before -- and you have to go back -- I want to explain this. There was an informal period of time when we were beginning to pick sides, so to speak. It's a little foggy as to the exact date that happened. I say July, August, but my discussions with potential employees in the separate juvenile took place before the final people were in the final spots.

Q Before the people selected which area they were going to go to, either juvenile or adult?

A Exactly.

Q Okay.

A So what I basically -- this conversation with the number of probation officers that I had it with just basically said, listen, to the extent that it's of interest to you, this is going to be -- this looks like it's going

to be the seniority policy in the Juvenile Probation Department. Full-time, continuous probation experience. And I clarified what that meant, everything it didn't mean, et cetera, with the number of potential employees.

Q When you sat down and talked to Ms. Varner, what was her reaction to this?

A When I brought this topic up with Barb, she responded that she understood it, didn't have any problem with it, sounded very fair to her. And that was the extent of that one-to-one.

Q What would be the purpose -- and this is after the seniority system is actually in place now, Juvenile Probation Department -- what's the purpose of that seniority system?

A Well, number one, frequency-wise, it's a tool that is, on the one hand, probably not going to be put into play very often.

Q Okay. What do mean by that?

A Well, you have a county that doesn't -- basically doesn't address seniority, but I felt that the department needed to clean this potential issue up in case down the road we would run into a situation that we'd have a policy to cover.

For example, we're small staff-wise, relatively small. So come deer season, for example, if 15