# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . .

BARBARA E. VARNER,
    Plaintiff,

      vs.

COMMONWEALTH OF PENNSYLVANIA,
NINTH JUDICIAL DISTRICT,
CUMBERLAND COUNTY; CUMBERLAND
COUNTY; S. GARETH GRAHAM,
individually, and JOSEPH
OSENKARSKI, individually,
    Defendants.

. . . . . . . . . . . . . . .

     CIVIL ACTION
     NO. 1:CV 01-0725

     (JUDGE YVETTE KANE)

**VOLUME 1**
*Pages 1 to 228*

Deposition of:  **BARBARA E. VARNER**

Taken by  :  Defendant Cumberland County

Date  :  January 27, 2003, 9:35 a.m.

Before  :  Emily Clark, RMR, Reporter-Notary

Place  :  Administrative Offices of
        Pennsylvania Courts
        5035 Ritter Road, Suite 700
        Mechanicsburg, Pennsylvania

APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
           Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY:  JAMES K. THOMAS, II, ESQUIRE
        PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

Page 6

```
 1      job, then I would say no.
 2  Q   Meaning that even if you had an affair with Mr. Graham,
 3      it would be a valid cause of action?
 4  A.  In any situation, work environment, if at any time a
 5      relationship between two people interferes with that job
 6      or the environment of the employment, it is a problem.
 7  Q   Did you previously degree in our last meeting that if
 8      such an affair existed, that there would be no validity
 9      to this litigation?
10  A.  I don't think I completely answered that, because if it
11      interferes with your work environment in any way, shape
12      or form, then it is a problem.
13  Q   I'm not sure I understand your answer exactly.  You say
14      that there was no such affair, correct?
15  A.  That's correct.
16  Q   And if I recall our previous conversation correctly, you
17      agreed unequivocally that if such an affair had existed,
18      then there would be no merit in this litigation.  Are
19      you changing your mind in that regard?
20  A.  If it did not interfere in the work environment at all,
21      I don't think it's an affair.  Morally it is wrong, but
22      I don't think if it did not interfere with the work
23      environment, cause a hostile environment, positive or
24      negative for myself, then there would not be an issue.
25  Q   Well, how would the affair, a consensual affair not
```

Page 7

```
 1      interfere in your interpersonal relationships in the
 2      work environment?
 3  A.  I think there are people that can probably keep things
 4      separate.  Perhaps they're not in the same department,
 5      perhaps they're not in a supervisory or employee
 6      position.  I don't know that.
 7  Q   Have you ever had occasion to have an extramarital
 8      affair of any kind?
 9  A.  No, I didn't.
10  Q   And this is your second marriage; is that correct?
11  A.  Yes, it is.
12  Q   Did you have any extramarital affairs in your first
13      marriage?
14  A.  I did not.
15  Q   Have you ever had occasion to kiss Mr. Graham?
16  A.  No.
17  Q   Have you ever had any type of intimate physical
18      relationship with Mr. Graham of any type?
19  A.  No.
20  Q   You've had no intercourse with him?
21  A.  No.
22  Q   No oral sex with him?
23  A.  Absolutely not.
24  Q   And no anal sex with him?
25  A.  Absolutely not.
```

Page 8

```
 1  Q   Have you ever held hands with Mr. Graham?
 2  A.  I have not.
 3  Q   Has Mr. Graham ever been inside your residence at Maple
 4      Drive?
 5  A.  Yes, he has.
 6  Q   Can you tell me when?
 7  A.  I had started working for Juvenile Probation.  There was
 8      a time that he picked me up to go to York, I believe to
 9      pick up a kid from detention.  I was getting ready.  My
10      husband was in the house, he was in the shower.
11      Mr. Graham came with the county car to pick me up.  Came
12      in, asked to use the telephone, had a cup of coffee, I
13      believe.  And we left from there to pick up the kid to
14      transport him to court.
15  Q   And this was Maple Drive?
16  A.  Yes, it was.
17  Q   I want to explore that in a little detail.
18  A.  Okay.
19  Q   Do you remember when that was?
20  A.  It had to be in 1995 to '96.
21  Q   Refresh my recollection as to when you started with
22      Juvenile Probation.
23  A.  February 7th, 1995.
24  Q   Is that how you placed the date, because it was within a
25      year of when you commenced?
```

Page 9

```
 1  A.  Yes.
 2  Q   And he was picking you up and you were going to
 3      transport a juvenile?
 4  A.  We were to pick up a juvenile at York Detention Center.
 5      I live halfway between Harrisburg and York, so it was
 6      convenient for him to pick me up.
 7          We took the kid to court, returned him to the
 8      detention center.
 9  Q   Where exactly is your residence at Maple Drive?  Give me
10      directions on how you get there.
11  A.  South 83, off the Yocumtown exit.  And it's
12      approximately a mile and a half from the exit.
13  Q   On this particular occasion Mr. Graham came to the house
14      to pick you up, correct?
15  A.  That's correct.
16  Q   And did you invite him in?
17  A.  He knocked on the door and he asked if he could use the
18      phone to make a personal phone call.
19  Q   What was the nature of your relationship with Mr. Graham
20      at this time in '95 or '96?
21  A.  He was a supervisor.  He was assigned, not officially,
22      but he was to train me.
23  Q   Were you on good terms?
24  A.  Yes.
25  Q   Did you consider him a personal friend?
```

Page 14

1 Q Who did you live there with?
2 A. My husband Lee. My son lived there briefly. And my
3     daughter also had a room. She was in college and she
4     would come home.
5 Q She was in college at West Chester?
6 A. Yes.
7 Q When was that, Mrs. Varner?
8 A. 1990.
9 Q For just one year?
10 A. Approximately a year and a half we lived there.
11 Q How about the residence before that?
12 A. I lived at Apple Drive in Mechanicsburg.
13 Q Was that with your first husband?
14 A. Yes, it is. Was.
15 Q For the record, what was his name?
16 A. Kenneth Spidle, S-P-I-D-L-E, Jr.
17 Q Has Mr. Graham ever seen you naked?
18 A. No.
19 Q Do you have a small scar at the base of your spine?
20 A. No.
21 Q Have you ever had any back surgery?
22 A. No.
23 Q Have you ever told anybody that you have a double nipple
24    on your right breast?
25 A. No.

Page 15

1 Q Do you, in fact, have a double nipple on your right
2    breast?
3 A. No, I do not.
4 Q Do you have any type of cartilage condition on your
5    right breast?
6 A. No.
7 Q On either breast?
8 A. No.
9 Q Have you ever used the term mature adult relationship?
10 A. No.
11 Q Never used that term with anyone?
12 A. Not that I can recall.
13 Q In 1994 did you take a bus trip to Atlantic City?
14 A. Yes, I did.
15 Q Who went with you?
16 A. I went by myself.
17 Q Was Mr. Graham on that trip?
18 A. He was on the bus.
19 Q Where were you going?
20 A. I was going to Atlantic City.
21 Q For what purpose?
22 A. To lay on the beach.
23 Q You were going alone?
24 A. Yes, I was.
25 Q Who knew that you were going to Atlantic City alone?

Page 16

1 A. My husband, my daughter, my mother. Possibly everybody
2    within -- many people in the office. I had just
3    graduated from undergrad and I would make comments as
4    you would hear from the Super Bowl, so what are you
5    going to do. People would say, I'm going to Disney
6    World. My comment would be I'm going to Atlantic City.
7 Q To lie on the beach alone?
8 A. Absolutely.
9 Q How was it that Mr. Graham ended up on the bus?
10 A. I have no idea.
11 Q Did you meet or see anybody else from your employment
12    while you were on the bus?
13 A. Yes. Carol Snokes, a secretary from our office, and I
14    believe it was her fiance was on.
15 Q Wayne Shearer?
16 A. Yes. And I invited them to sit in front of me.
17 Q Where did Mr. Graham sit?
18 A. He was sitting in the back, I believe at the very back
19    row.
20 Q Did you have any conversation with Mr. Graham during the
21    trip?
22 A. Yes. As more people got on at the last stop in
23    Harrisburg is where Carol Snokes and her boyfriend got
24    on. It was after that time Mr. Graham moved up and
25    gave, must have given somebody else his seat, and sat

Page 17

1    down beside me.
2 Q What conversation did you have with Mr. Graham?
3 A. General business. He said he was going to visit his
4    sister. Apparently his wife and children were going to
5    go with him that day.
6 Q He told you he was going to visit his sister?
7 A. That's correct.
8 Q What explanation, if any, did you give Carol Snokes and
9    Wayne Shearer as to why you were on the bus or where you
10   were going?
11 A. I told Carol I was going down to lay on the beach, that
12    I passed my undergrad and that was my goal.
13 Q So if I understand correctly, as the trip progressed
14    after leaving Harrisburg, you and Mr. Graham were
15    sitting together?
16 A. Yes.
17 Q Is that correct?
18 A. That's correct.
19 Q And Carol Snoke and Wayne Shearer were sitting in the
20    seat in front of you?
21 A. That's correct.
22 Q After you got to Atlantic City tell me what you did.
23 A. I walked through one of the casinos and went out to the
24    beach.
25 Q Do you remember which casino?

Page 74

1    worked as a hairdresser for a funeral parlor and that
2    was, say, '83, '84, around this time. I'm just
3    guessing. And then I obtained work at Holiday Hair.
4    That again was part-time.
5  Q  You say that was part-time?
6  A.  Yes. That also was very short-lived.
7      Then in 1980 I -- I started working part-time for
8    the Capital Area Intermediate Unit.
9  Q  In 1980?
10  A.  Yes, around '80.
11  Q  What were you doing for them?
12  A.  I was a swimming instructor.
13  Q  Was that part-time?
14  A.  Yes, until 1985, when I came full-time as a teaching
15    assistant for the Intermediate Unit. And I continued
16    working the school year, full-time school year until
17    1989 when I went to the county.
18  Q  And that was a full-time job at Capital Area
19    Intermediate Unit?
20  A.  Yes, it was.
21  Q  What was your rate of pay there? Approximately.
22  A.  Yes. I'm guessing maybe 9,000 a year.
23  Q  As part of the Capital Area Intermediate Unit did you
24    have an employee handbook or manual?
25  A.  Yes.

Page 75

1  Q  And as early as 1985, since that's when you went
2    full-time, you were aware that sexual harassment or
3    discrimination was prohibited in that workplace?
4  A.  I can't remember reading about it, but I would assume.
5  Q  Do you recall reading the employee handbook at the
6    Capital Area Intermediate Unit at any time?
7  A.  As needed, sure.
8  Q  Did you have occasion to file any claims or complaints
9    against any of the personnel of the Capital Area
10    Intermediate Unit?
11  A.  Claims?
12  Q  Complaints about any of your co-workers or supervisors.
13  A.  No.
14  Q  Did you follow any grievance procedures while employed
15    at the Capital Area Intermediate Unit about anything?
16  A.  No.
17  Q  What did you do as a teaching assistant?
18  A.  I was in the classroom for the first three years, I was
19    in a visually impaired classroom. So I taught Braille.
20    We did a lot of orientation and mobility skills. They
21    were multiple handicapped, they were mentally retarded.
22    Some were physically handicapped. The overriding
23    problem was their vision, though, so we focused on the
24    visual problems. It was aiding the teacher, helping
25    assist the teacher.

Page 76

1  Q  What was your reason for leaving the Capital Area
2    Intermediate Unit?
3  A.  I took a Civil Service exam and applied for a caseworker
4    position. And then I was interviewed by Children and
5    Youth and decided to go there. It was more money. It
6    was also in line with my degree aspirations.
7  Q  How did you learn that the job was available?
8  A.  Civil Service. I scored high on the Civil Service test,
9    was put on a caseworker list, and Children and Youth was
10    I guess the one that came up and they notified me about
11    an interview.
12  Q  Do you remember who you spoke to initially at the
13    county?
14  A.  My interview was with Darlene Orr.
15  Q  And obviously you were hired for Children and Youth,
16    right?
17  A.  Yes, that's correct.
18  Q  And initially hired as a caseworker trainee?
19  A.  Right.
20  Q  At a rate of pay of about $15,000 a year?
21  A.  That's correct.
22  Q  When did you first meet Mr. Graham?
23  A.  Probably the beginning of 1990 somewhere, the first
24    couple months of 1990.
25  Q  How did you meet him?

Page 77

1  A.  One of my fellow case workers was taking me around the
2    different departments, introducing me to different
3    staff.
4  Q  Did you two have occasion to work together?
5  A.  Yes.
6  Q  Tell me when and on what.
7  A.  We shared several cases. I would have the children as
8    dependent children, mostly neglect children, and
9    Mr. Graham was supervising the father in these homes.
10  Q  What was your opinion of Mr. Graham in 1991, 1992?
11  A.  If I would ask for his assistance with the one gentleman
12    who had a very violent temper, he would call him in and
13    talk to him. The gentleman would not let me in to see
14    his children a lot of times, and I had to see the
15    children. So he would call him in. Or he would go down
16    to see the gentleman, which is a block down the street,
17    and try to get him in line, and let him know that I had
18    to see the children. So it was more of an assistant to
19    me as a probation officer and me as a caseworker.
20  Q  What was your opinion of him personally?
21  A.  Personally, I don't think I had a real opinion of him.
22    It's just that he was helpful when I needed the help
23    with certain clients.
24  Q  During the first three years you were at the county, how
25    often did you deal with Mr. Graham on cases?

Page 78

1  A. We had shared two sexual offender cases; he had the
2     offender and I had the children. And the other one was
3     a severe neglect case.
4  Q  So how often?
5  A. As needed if there was a problem.
6  Q  Can you give me an estimate of how many times a year you
7     were dealing with Mr. Graham asking for assistance?
8        MS. WALLET: I'll object to the form of that
9     question. That's sort of a two-part question. You want
10    to break that down?
11       MR. THOMAS: Sure.
12 BY MR. THOMAS:
13 Q  What I'm trying to learn, Barbara, is the amount of
14    contact that you had with Mr. Graham, and we can do it
15    any way you choose. What I'm looking for is how often
16    during a given year, let's take 1991, how many times in
17    1991 did you have occasion to deal with Mr. Graham,
18    either asking assistance or working on a case with him?
19 A. That would be the period where I had the high-risk
20    child, well, three children. I would --
21 Q  The sex offender cases?
22 A. No. This would be the neglect, severe neglect case.
23    And I would say probably contact, maybe once a month.
24    It could be phone conversation, asking for his
25    assistance. To actually physically get involved, that

Page 79

1     might have been two or three times in a year.
2        I would see him in the break room, we would discuss
3     the case, how are things going, that kind of thing.
4  Q  How about 1992, how much contact did you have with
5     Mr. Graham during 1992?
6  A. I would say probably approximately the same, because I
7     know we had two or three cases where, again, the men,
8     the father was volatile, and I was to supervise the
9     children.
10 Q  And so once a month you would have phone contact with
11    him, and maybe two or three times during the year you
12    would actually have to have him physically intervene and
13    you would see him on those occasions?
14 A. When he actually intervened?
15 Q  Yes.
16 A. There was a time when the gentleman would not even let
17    me in the house to see the children. I called him and I
18    asked for his assistance to meet me down there. It was
19    a high-neglect family, real concerned about the youngest
20    one not being able to thrive. So I had to see his
21    children. So I did ask for his assistance to meet me
22    there and do what he had to do with the father.
23 Q  How about 1993?
24 A. '93? Again, cases that we shared, sexual offender kept
25    coming back into the home. He was under Mr. Graham's

Page 80

1     jurisdiction. Asked him for assistance to go, either
2     meet me at the house, because of the fear of what he
3     would, the father would do to me.
4  Q  Was the amount of contact that you had with Mr. Graham
5     about the same? Telephone once a month?
6  A. Probably, yes. I would guess.
7  Q  And maybe a couple, two to three face-to-face occasions?
8  A. Yes.
9  Q  How about 1994?
10 A. If there was a case we shared, it would be the similar.
11    It would be similar to that.
12 Q  So again, once a month?
13 A. Um-hum.
14 Q  And two or three face-to-face visits?
15 A. Right. That's a guesstimate.
16 Q  Understood. And of course, in February of '95 you
17    transferred to Probation and then you worked closely
18    with him after that?
19 A. That's correct.
20 Q  During this period of that we're talking about, and I
21    want to restrict my questions at the moment between 1990
22    and 1994, did you have any other contact or dealings
23    with Mr. Graham other than what we've described?
24 A. Not that were not work related. Like I said, in the
25    break room, there was times I would see him in there.

Page 81

1     General conversation.
2  Q  When you say you saw him in the break room on occasion,
3     can you quantify for me how often in the period 1990
4     through 1994 you saw him in the break room?
5  A. Perhaps maybe once or a couple times a week. All of our
6     lunches and everything were kept in there.
7  Q  And is that when you saw him, over lunch?
8  A. No. I'm just saying that's where we stored our lunch.
9     It would be just going over.
10 Q  When did you see him in the break room?
11 A. There's no really set time. It was just occasionally.
12    A lot of people would eat lunch in the break room as
13    well.
14 Q  Did you ever eat lunch in the break room?
15 A. Once in a while, yes.
16 Q  Did you ever eat with Mr. Graham in the lunch room?
17 A. No.
18       MS. WALLET: I assume that question is seated at
19    the same table?
20       MR. THOMAS: In the room.
21       THE WITNESS: Oh. That's possible. I don't
22    remember.
23 BY MR. THOMAS:
24 Q  If I understand your testimony correctly, it is that
25    and, again, I get the impression that this was a pretty

Page 82

1  infrequent occurrence?
2  A. Um-hum.
3  Q  That you did not -- you have to say yes for the record.
4  A. Yes.
5  Q  You didn't see him on a regular basis in the break room
6  during the work week?
7  A. No.
8  Q  And you didn't see him outside the workplace except on
9  very, very rare occasions; is that fair?
10  A. That's fair. That's true.
11  Q  And the occasions which you saw him in the break room
12  were just coincidence? Just happened to both be there
13  at the same time?
14  A. Yes.
15  Q  The best you're able to tell me is you would estimate
16  that during the period 1990 through 1994 at a couple of
17  times a week? Is that accurate?
18  A. That's accurate.
19  Q  Did you ever call Mr. Graham and ask him to meet you in
20  the break room?
21  A. No.
22  Q  Did you ever call him and ask to meet anywhere?
23  A. Down at the one client's house, yes, I did.
24  Q  And on how many occasions was that? Once?
25  A. Maybe twice.

Page 83

1  Q  So other than those two occasions when you called and
2  asked him to meet down at the client's house, you did
3  not call Mr. Graham and ask him to meet you anywhere?
4  A. No.
5  Q  And the occasions on which you and he ended up in the
6  break room were merely coincidence and happened maybe a
7  couple of times a week?
8  A. That's correct.
9  Q  How would you describe your relationship with Mr. Graham
10  in the period 1990 through 1994?
11  A. Working relationship.
12  Q  Friendly?
13  A. Cordial.
14  Q  How well did you feel that you knew Mr. Graham during
15  that period?
16  A. As well as I would know any other co-worker.
17  Q  And no better?
18  A. No. No.
19  Q  Meaning you didn't feel you knew him any better than any
20  of your other co-workers?
21  A. No.
22  Q  You won't describe your relationship as a close one
23  during that period? Meaning 1990 through 1994.
24  A. No.
25  Q  And I guess would you describe it as sort of a

Page 84

1  professional co-worker type arrangement?
2  A. That's correct.
3  Q  Were you aware of any rumors with respect to you having
4  an intimate relationship or an affair with Mr. Graham
5  during that period?
6  A. No.
7  Q  You don't recall anybody asking you whether or not you
8  were having an affair with Mr. Graham?
9  A. No.
10  Q  There was no discussion with you by anybody suggesting
11  that you were too close to him?
12  A. No.
13  Q  How did it happen that you transferred to the Probation
14  Department in February of 1995?
15  A. I had applied for a position the year before, when I was
16  still doing my undergrad work, with the Chief Bolze. At
17  that time he told me I needed to have an undergrad
18  degree.
19      And then a friend of mine, Lynn Dickerson, was
20  doing her internship in Juvenile Probation, working on a
21  grant that was called Family Preservation. She had
22  spoken to me about how I had worked with a local mental
23  health program, establishing their Family Preservation
24  program. In Children and Youth I was an in-home
25  protective service worker, which meant most of my

Page 85

1  emphasis was on family involvement and keeping the
2  children in the home. So Lynn and I spoke about this,
3  that she was working on this grant and that she was the
4  same age, she was a criminal justice major with me at
5  school. And --
6  Q  I thought you were a social science major?
7  A. That was my associate degree. My undergrad was in
8  criminal justice.
9  Q  Okay.
10  A. And she had spoke to me about this position, how it
11  would be a nice blend of my criminal justice degree plus
12  my Family Preservation experience, and recommended that
13  I should apply for the position.
14  Q  When was that conversation?
15  A. I think her internship was the summer of '94.
16  Q  Were there any other factors that influenced your
17  decision to apply for a transfer to the Probation
18  Department?
19  A. I had met with Mr. Osenkarski and we had discussed the
20  position. He was aware that my degree was in criminal
21  justice and he knew what my background was with Children
22  and Youth as protective services.
23      I also liked the idea that it was not a
24  micromanaged department, that you were more independent
25  and that Mr. Osenkarski trusted you to be able to manage

Multi-Page™

## Page 86

1  your own time and do your own thing, which was different
2  than it was with Children and Youth.
3      But mostly is my field was criminal justice and I
4  really wanted to be able to get into it, and this was a
5  good opportunity.
6  Q  Did your relationship with Mr. Graham play any role in
7     your decision to ask for a transfer to the Probation
8     Department?
9  A. I would say no. In fact, Mr. Graham left me know not to
10    let Mr. Bolze know that I was interested because they
11    did not have a good relationship. So that was
12    downplayed, the fact I even knew Mr. Graham that well.
13  Q  So you downplayed your --
14  A. I didn't mention, you know, I was not coming in saying
15    I'm here because Mr. Graham recommended me. It was none
16    of that.
17  Q  And you say you downplayed your relationship with
18     Mr. Graham. Downplayed it to whom?
19  A. Not downplayed it. I -- not to mention to Mr. Bolze
20    that Mr. Graham was -- or Mr. Osenkarski wanted me to
21    come over into that position.
22  Q  Did Mr. Graham, in fact, want you to come over to the
23     Probation Department?
24  A. He had spoken to me and Lynn Dickerson about the
25    position, that they needed two probably two females,

## Page 87

1  probably in the case worker or social work field and,
2  you know, criminal justice, that they thought it was a
3  more of a woman type position because it was social
4  work, and whether I was interested or not.
5  Q  And when did that conversation occur, Barb?
6  A. That would probably be while Lynn was there doing her
7  internship.
8  Q  1994? During the summer of 1994 --
9  A. Right.
10  Q  -- Mr. Graham and Mr. Osenkarski both advised you that
11     these positions were going to come --
12  A. Yes.
13  Q  -- in the Probation Department, correct?
14  A. Yes, that's correct.
15  Q  And that they thought it would be an appropriate
16     position for a female?
17  A. Yes.
18  Q  Did they tell you why they thought it would be an
19     appropriate position for a female?
20  A. I think because it was social-worky aspect, it's more
21  social work because you're dealing with families, a lot
22  of intensive -- part of the Family Preservation was
23  teaching parents parenting programs, that kind of thing,
24  intensively in the home.
25  Q  And there were female probation officers at that time?

## Page 88

1  A. There was, I believe there was three at that time.
2  Q  And in searching for this job they were actively out
3     soliciting you as an interested female in that position,
4     correct?
5  A. I think it was more I approached them. I talked to
6     Mr. Osenkarski about it. Mr. Graham -- I knew they were
7     writing the grant. He had brought Lynn Dickerson down
8     to meet me. And like I said, I already knew Lynn from
9     going to class with her at HACC.
10  Q  And this conversation that you've described occurred
11    with each of them? Or the two of them at the same time?
12  A. Possibly both. Probably with both of them at one time
13    and on separate occasions. He would come down and ask
14    me when I was with Children and Youth, which is right
15    down the hall, he would come down and ask for some
16    paperwork of what we used, like maybe the family service
17    plan that we used with Children and Youth, those kind of
18    things, tools, that could be translated into the Family
19    Preservation program.
20  Q  When you say he came down the hall, can you identify he
21    for me?
22  A. Mr. Graham.
23  Q  How often did he come down the hall to see you and make
24    requests of any type?
25  A. I would say that was only maybe two times. It was

## Page 89

1  mostly for paperwork.
2      And I know Lynn came down as well, trying to get
3  paperwork from me regarding the Family Preservation
4  program that I had been involved in.
5  Q  So as a result of those conversations, you made formal
6     application for the job?
7  A. Yes.
8  Q  Did you complete a formal written application?
9  A. No.
10  Q  Who did you advise that you were interested in the job?
11  A. Ken Bolze. Chief Ken Bolze.
12  Q  Tell me how you got hired.
13  A. I was interviewed by Chief Bolze, John Roller, who was
14    an adult supervisor, and Mr. Osenkarski. And I believe
15    that, by the three gentlemen.
16  Q  I gather from the testimony you've given already that
17    Children and Youth and Probation had occasion to work
18    together?
19  A. Absolutely.
20  Q  And where were they physically located within the
21    courthouse? Were they close together?
22  A. Yes. We were all on the third floor. The only thing
23    that separated us was a door. We were in what's called
24    the east wing and they were on the main courthouse. So
25    it was a matter of just around the corner and down the

Page 86 - Page 89

Page 90

1  hall.
2  Q  So there was a fair amount of interaction and close
3     proximity in terms of physical location, between the two
4     departments?
5  A.  Yes.
6  Q  Is that fair?
7  A.  It was a common lunch room as well.
8  Q  What was your understanding of the reputation of
9     Mr. Graham when you were interviewed for this position
10    in late 1994 or early 1995?
11  A.  Reputation?  I had heard he was a hot head, that he
12     really would get angry quickly.  And I was, knew that
13     Mr. Osenkarski and Mr. Graham, either you were in good
14     favor with them or you were basically being punished.
15     And at that point I appeared to be in good favor.
16  Q  Why do you say that?
17  A.  Because I did – it seems like they wanted me to come to
18     that position.  They were very positive about that.
19  Q  And you wanted to go to the position, also?
20  A.  Yes, I did.
21  Q  And as I understand it, it was because it was within
22     your area of study, which was criminal justice?
23  A.  That's correct.
24  Q  And also, there was a $9,000 pay raise or something like
25     that involved, right?

Page 91

1  A.  Yes.
2  Q  Were there any other reasons why you wanted to transfer
3     to the probation?
4  A.  As I said, I think it was a whole attitude,
5     Mr. Osenkarski, that it was not so much micromanaged.  In
6     Children and Youth there was so much meetings, meetings
7     after meetings.  It was not so much time out actual in
8     it field as much time as you should be out in the field,
9     where with Probation Mr. Graham left me know that he
10     doesn't micromanage, he depends on his workers to do
11     their job.  And to me, that was very interesting because
12     Children and Youth when you first start out you were
13     training, so.
14  Q  Did you have any impression from those interviews who
15     you would actually be working with when you were
16     transferred to Probation?  If you were accepted for the
17     job.
18  A.  Mr. Bolze, of course, was chief.  And Mr. Osenkarski
19     was, headed up the juvenile division of the Department
20     at those interviews, the only three people there.
21  Q  Was there any discussion about who you would be working
22     for or working with?
23  A.  I knew the position would be under Juvenile Probation.
24     It was the grant under the juvenile system.
25  Q  And did you know where Mr. Graham was concentrating at

Page 92

1     that time?
2  A.  Yes.  He was in Juvenile Probation.
3  Q  Did you have an understanding that if hired, it was
4     likely that he would be the person responsible for
5     training you?
6  A.  Yes.
7  Q  Did you have any reservations about that?
8  A.  No, because I knew Mr. Osenkarski was still his boss.
9     And Chief Bolze, I had a lot of respect for him and I
10     knew he was still overseeing the whole group.
11  Q  Based on the reputation that Mr. Graham was a hot head
12     and you were either in favor or out of favor, did that
13     cause you any hesitancy or concerns in terms of
14     accepting the job?
15  A.  Maybe a little hesitancy, but like I said, I knew Chief
16     Bolze basically kept them in line.
17  Q  When was the job formally offered to you and by whom?
18  A.  It was offered to me by Chief Bolze, and exactly when, I
19     don't know.  Sometime in January.
20  Q  And you then told Children and Youth you would be
21     leaving and moving over to Probation, correct?
22  A.  That's correct.
23  Q  Who did you understand was ultimately in charge of the
24     Probation Department?
25  A.  Chief Bolze.  Well, Judge Sheely.  Judge Sheely at that

Page 93

1     time.
2  Q  And why Judge Sheely?
3  A.  Because we were officers of the court and he was the
4     president judge.
5  Q  And it was your understanding that Judge Sheely then had
6     ultimate authority over the probation officers in that
7     department?
8  A.  Yes.
9  Q  And Ken Bolze was the chief of the department and he
10     reported to Judge Sheely?
11  A.  For, yes, hiring, firing, those kind of things.
12  Q  So you took the job, you started there on February 6,
13     1995, correct?
14  A.  I believe it was February 7th, 1995.
15  Q  And your salary there would have been $24,868 when you
16     started; does that sound right?
17  A.  That sounds correct.
18  Q  Describe for me, if you would, what the hierarchy was in
19     terms of management when you got there on February 7th,
20     1995.
21  A.  Chief Bolze was the chief.  Mr. Osenkarski was a
22     supervisor and mostly in juvenile work.  I believe he
23     did split, too, adult and juvenile.  And John Roller was
24     more adult than juvenile.
25  Q  Where did Mr. Graham fall in the pecking order?

Multi-Page

Page 94

1  A.  Mr. Graham would have been emphasis on juvenile under
2      both John Roller and Chief Bolze, but predominantly
3      working for Mr. Osenkarski.
4  Q  Where were you assigned when you first started in
5      February?
6  A.  I was assigned to the Family Preservation unit.
7  Q  And who did you report to?
8  A.  Mr. Graham was my trainer.  He's the one that was
9      supposed to be training me how to be a probation
10     officer.  Mr. Osenkarski was the supervisor.  And
11     ultimately it would be Ken Bolze.
12 Q  So the chain of command from you was to Graham,
13     Osenkarski, and Bolze?
14 A.  That's correct.
15 Q  Did you have any problems with Mr. Graham when you first
16     started to work there in February of 1995?
17 A.  No.
18 Q  Did you work with him on a daily basis?
19 A.  Pretty fairly, yes.  Pretty much.
20 Q  Did you share an office?
21 A.  Yes.  Not with -- with who?
22 Q  And with whom did you share it?
23 A.  I did share an office.  I was with Buck McKenrick and
24     Mike Piper.
25 Q  What did your training consist of?

Page 95

1  A.  Writing petitions, the paperwork, the court work.  Doing
2      a case from the beginning to end, from intake to
3      deposition -- disposition, I'm sorry, to disposition.
4      Supervising the juveniles, wherever they are.
5      Placement.  Paperwork.  Basically all the paperwork
6      that's needed to do the job.  Time sheets.  Mileage
7      sheets.
8  Q  How would you describe your relationship with Mr. Graham
9      as your trainer?
10 A.  I would describe him as a poor trainer.
11 Q  In what way?
12 A.  Just getting by with a minimal, just basically whatever
13     you can get away with.
14 Q  Give me some examples.
15 A.  Supervision, if he would take me out to show me how to
16     supervise, he would pretend to throw a card at
17     somebody's house and say there's a contact, rather than
18     actually doing the face-to-face with the kids.  Just
19     basically poor leadership.
20 Q  And you say poor leadership, what do you mean by that?
21 A.  If you're supposed to learn by example, that was a poor
22     example.  That you needed to, in my job as a caseworker
23     at any time I have worked it's important that you see
24     your clients, you do the face-to-face, you take time to
25     know the families.  That didn't seem to be relevant to

Page 96

1      him.  His interest seemed to be in making it, his job
2      convenient for him.
3          That would -- if he's on the way to somewhere he
4      might make a stop someplace on his of personal interest.
5      Like I said, he would pretend to throw cards at the
6      houses and say that would be a contact.  That's poor
7      leadership.
8  Q  Any other examples of what you would describe as poor
9      leadership or poor training?
10 A.  Inconsistent in how he wanted paperwork done, petitions,
11     court paperwork.
12 Q  Did you have occasion to discuss what you've described
13     as poor leadership or poor training with either of the
14     other direct reports above you?  And by that I mean with
15     either Mr. Osenkarski or Mr. Bolze.
16 A.  During that time I also was aware that either you're in
17     favor or you're punished, and I really did not want to
18     fall into the punishment mode.  So to question things at
19     that point, just sort of left them ride.  And that I
20     learned from other people in our department it was easy
21     to go from one officer to another for training to get
22     information.  And I found a lot of other resources.  I
23     could learn to do petitions and, you know, social
24     histories from them.
25 Q  So I guess the answer is you never complained about

Page 97

1      Mr. Graham's leadership or training to anybody?
2  A.  At the very beginning, no.  In '95, no.
3  Q  When did you first complain about any problems with
4      Mr. Graham's leadership or training?
5  A.  Whenever I went to Mr. Osenkarski, there was a day that
6      I had taken cases in to Mr. Graham in '96 -- '96, '97.
7      I had taken cases in to him.  And I had done everything
8      that was supposed to be done, gotten everything
9      together.  And he started screaming at me and said who
10     the F, meaning, do I think I am, making decisions on
11     these cases.
12         When I worked, turned cases in to Mr. Osenkarski, I
13     never had a problem with going ahead and making a
14     decision on what I would recommend for disposition on
15     the juvenile.  Suddenly, I had done everything wrong,
16     according to him.  He screamed at me, threw me out of
17     his office.  And I went to Mr. Osenkarski and I said,
18     you have to get the guy under control.  And he said,
19     he's in charge, I put my so many years in with the
20     county and he's in charge.
21 Q  When was this?
22 A.  It was in '97.
23 Q  So from February 1995 when you started until sometime in
24     1997, you never complained about Mr. Graham's leadership
25     or training?

Page 94 - Page 97

Page 98

1  A. Not to him. To other people. Other people agreed with
2     me, other staff members, co-workers.
3  Q  But you never went up the chain of command to
4     Mr. Osenkarski prior to 1997?
5  A. Like I said, I sought out other help as far as
6     petitions. He was not -- he was not screaming at me or
7     those kind of things, which happened later on. But I
8     was aware that he was inconsistent.
9  Q  We'll come back to that in a minute. But what do you
10    attribute the change of behavior to?
11 A. Whenever Chief Bolze retired and we split adult and
12    juvenile and there was not that person who could
13    basically keep the lid on Mr. Graham, which would have
14    been Chief Bolze. It was now only Mr. Osenkarski.
15 Q  Up until the time of Bolze's retirement, you and
16    Mr. Graham had a good relationship?
17 A. Working relationship.
18 Q  And would you describe it as no better than a working
19    relationship?
20 A. I would say no better than that, no.
21 Q  When did Bolze retire?
22 A. August of '96.
23 Q  So from February 1995 until August of 1996 you had no
24    particular problem with Mr. Graham?
25 A. Not with any nasty or yelling at me, no.

Page 99

1  Q  No screaming?
2  A. No, not at that point.
3  Q  No sexual harassment?
4  A. Yes, there was incidents of that, but not of the
5     violence or fear that I had experienced later on.
6  Q  We'll talk about the sexual harassment in a minute. But
7     the episode of deterioration in the relationship, at
8     least the screaming or fear as you've described it,
9     didn't materialize until after August of 1996?
10 A. Until after Chief Bolze had retired.
11 Q  At that point you had been working with him for a year
12    and a half, or approximately that long, correct?
13 A. That's correct.
14 Q  And had had no episodes of him losing his temper with
15    you or screaming at you?
16 A. Not at me. With other people, but not at me.
17 Q  Had he been complimentary of your work for that year and
18    a half?
19 A. Chief Osenkarski at times was, but Graham, no.
20 Q  Who was responsible for doing reviews on you?
21 A. Mr. Osenkarski and Mr. Graham signed as well.
22 Q  Did you receive unfavorable reviews during the 18 months
23    from February '95 until August of '96?
24 A. Initially Ken Bolze, when he was there he was also
25    involved in evaluations, and they were fine. I had no

Page 100

1     problems with my evaluations.
2  Q  At any time?
3  A. No.
4  Q  Was there any particular event or happening that
5     occurred as best you understand it in August of '96 that
6     caused Mr. Graham to suddenly start screaming at you?
7  A. I think he had free reign. Mr. Osenkarski took a back
8     seat and turned everything over to Mr. Graham.
9  Q  But there was no specific event? Other than the
10    retirement of Chief Bolze.
11 A. It was a slow progression. Slow progression that you
12    could see the power and the authority he was just
13    gaining, gaining the power, and you could feel that. He
14    was angry most of the time.
15 Q  What was he angry about?
16 A. It could be basically anything that I did.
17 Q  And when did that start?
18 A. That would be after Chief Bolze retired.
19 Q  After August of '96?
20 A. Yes. Things that I had done right one time, that were
21    acceptable, now were wrong.
22 Q  Give me some examples of those things.
23 A. Could be the way you do petitions. He just -- suddenly
24    the wording wasn't right. No matter what I did, it was
25    wrong. He didn't want me --

Page 101

1  Q  Referring to the petition now?
2  A. Petitions, court petitions, yes. Making decisions on
3     cases he didn't agree with. And prior to that, that had
4     been normal procedure. It was just a constant thing, no
5     matter what it was, I was in the wrong.
6  Q  I need you to be specific for me now in terms of what
7     they were. You've described the petitions, he didn't
8     like your wording. He was critical of some of the
9     decisions or recommendations you made with respect to
10    particular juveniles.
11 A. Right.
12 Q  What else was he unhappy about?
13 A. He was unhappy that I would take trips with Ms. Green
14    and we would leave after eight o'clock in the morning.
15    And he screamed and he screamed and F word at me, that
16    all placement trips, placement meaning placing juveniles
17    start at eight o'clock in the morning.
18       He told me that Debra Green and I had lied about a
19    trip we had been on. It was a trip where we traveled up
20    north, we ran into an icy area, had to detour, were an
21    hour longer than he thought we should have been.
22    Screamed and yelled, took an hour overtime from both of
23    us. He said he would check the odometer. He said we
24    were lying to him, where we were. There was not too
25    many places to go.

## Page 102

1    He came in, he would take a piece of paper out of a
2  file -- I had done an extensive list of victims of a
3  crime spree that juveniles had committed --
4  Q  Sorry to interrupt you, but before we leave the trip,
5     this criticism of you and Ms. Green and the trip up
6     northeast, did that occur on more than just that one
7     occasion?
8  A.  Not yelling about the trip, no.  But informing us that
9     we should have known the -- screaming that all
10    commitment trips start at eight o'clock in the morning,
11    which was not a pattern anybody else had to follow.  We
12    would observe males coming and going at will anytime
13    they chose to go.
14 Q  Well, what about the other female probation officers,
15    when did they come and go?
16 A.  There was only one other juvenile probation officer and
17    that was Debra Green on the juvenile side.
18 Q  And this conversation or this episode that you're
19    talking about was on the one occasion when you two took
20    that trip to the northeast?
21 A.  Yes, it is.
22 Q  And he informed you that you were to come and go at
23    eight o'clock on placement trips, period?
24 A.  Yes.
25 Q  And screamed at you?

## Page 103

1  A.  And screamed at me, yes.
2  Q  And used a loud tone of voice?
3  A.  He screamed at me on the phone and in the office at both
4     Debra and myself, screamed and used the F word at us,
5     and just constant.  And probably used every swear word
6     you could find.
7  Q  How long did he do this?  You said he did it on the
8     phone, he did it when he saw you in person in the
9     office?
10 A.  Yes.  On the cell phone, yes.
11 Q  And those two episodes, was that the extent of the
12    reprimand for that eight o'clock departure?
13 A.  He took an hour of overtime from us.  He said we had
14    lied about where we were.
15 Q  And other than that, did he continue any other conduct
16    toward you after that with respect to placement trips?
17 A.  With respect to that particular trip?  I heard about it
18    over and over again, reminding me that, you know, we had
19    done that.
20 Q  And I interrupted you, I'm sorry.
21 A.  That's okay.
22 Q  Other episodes?
23 A.  There was an occasion --
24 Q  You were talking about a paper that you prepared?
25 A.  Right.  I had an extensive list of victims of a robbery,

## Page 104

1     and it was an extensive list, how I had made all the
2     contacts, extensive calling contacting.  For some reason
3     it was -- he was not happy with that.  He brought the
4     file into -- well, I guess the file was on my desk.  He
5     came in and he picked up the paper that had the victims'
6     names on.  Debra Green was in my office with me.  He
7     threw the paper at me, hit me with a wadded paper, just
8     saying this is no F-ing good, is not acceptable.  Tried
9     to ask him what was wrong with it.  He just wouldn't
10    hear it.  He started moving pictures across my desk,
11    putting his finger in my face in a very, very
12    threatening manner, and just screaming.
13 Q  When was this?
14 A.  That would be early '97.
15 Q  Do you know the month?
16 A.  I can't recall at this time.
17 Q  And what was his objection to the piece of paper which
18    you had prepared with the victims' names on it?
19 A.  I have no idea.  He was just screaming it was not right.
20    I don't know how else I could have done it any
21    differently.  Names, address, how I contacted them,
22    whether I made contact or not.  It was extensive.
23 Q  Did you report that behavior to anybody at that time in
24    early '97?
25 A.  No.  The whole office heard that.  No.  Mr. Osenkarski

## Page 105

1     was not in the office too often.
2  Q  When you say that you felt threatened by his conduct
3     that day, threatened in what way?
4  A.  He moved closely to me, within a foot of me.  His finger
5     was in my face.  He was saying you don't know what the F
6     you're doing.  And using the word, the F word at me.
7     Just very scary.
8  Q  Have you ever used the F word?
9  A.  Me?
10 Q  Yes.
11 A.  Only in describing perhaps what a kid has said to me.
12 Q  That's not something you use in your language?
13 A.  No, I don't.
14 Q  Certainly in working in the Probation Department that
15    word doesn't come as a shock to you, though, does it?
16 A.  No, it doesn't shock me.  It's offended once at me.  I
17    can hear it, but not at me, directed at me.
18 Q  Can I assume that in some of the episodes you had with
19    your first husband that he may have used inappropriate
20    language in his arguments with you?
21 A.  I can't recall him ever using the F word at me.
22 Q  Did he use other adjectives or adverbs that you found
23    troubling at the time?
24 A.  I'm sure he did.
25 Q  Is there any other, and we'll go through your Complaint

Page 106

1   here in a minute, but are there any other specific
2   incidents in terms of difficulties with training or
3   leadership that you want to bring to my attention at
4   this time?
5   A. There may be others but I can't, at this time I can't
6   think of any, but I'm sure there's others.
7   Q So in general, I gather, that you had at least a decent
8   working relationship with Mr. Graham up until
9   Mr. Bolze's retirement, correct?
10  A. Yes.
11  Q But you would again describe it as no more than a
12  working relationship?
13  A. That's correct.
14  Q There was no chemistry between the two of you?
15  A. No.
16  Q You wouldn't describe it as a flirtatious relationship?
17  A. On Mr. Graham's part, yes.
18  Q How about on your part?
19  A. No.
20  Q You never had any interest in him?
21  A. No.
22  Q Didn't consider him to be a close personal friend?
23  A. No.
24  Q It was strictly a business relationship?
25  A. Comfortable business, yes. I was comfortable with him,

Page 107

1   but not on a friendly basis.
2   Q Prior to your move to the Probation Department were you
3   aware that Kerry Houser had filed a sexual harassment
4   claim?
5   A. Yes, I had heard about it.
6   Q What had you heard?
7   A. I had heard that she had filed a sexual harassment case
8   in the Probation Department.
9   Q What did you know about it? Or what were you told?
10  More appropriately.
11  A. Just that there was problems after she had filed it.
12  Q That claim was filed against Mr. Osenkarski?
13  A. I believe so.
14  Q And you knew that before you joined the Department?
15  A. It was a rumor I had heard.
16  Q Did you ever talk to Kerry Houser about it before you
17  accepted the job in the Probation Department?
18  A. No, I didn't.
19  Q Did you talk to her about it after you were --
20  A. Yes.
21  Q Did that give you any reason for concern?
22  A. Yes, it did, but I was in favor at that time rather than
23  on the punishment side.
24  Q How would you describe the culture of the Probation
25  Department when you got there in February of 1995?

Page 108

1   A. Everybody really got along very well with each other,
2   the adult and juvenile, because there was so much
3   blending. I liked the people. I always have liked the
4   people that worked in Probation. Very accommodating.
5   Q It's pretty tough subject matter, isn't it? I mean,
6   you're dealing with people who are on probation who are
7   in trouble with the criminal justice system?
8   A. Certainly.
9   Q It's certainly not a highly professional office like a
10  law office or something like that in terms of subject
11  matter; is that fair?
12  A. I think they're very professional.
13  Q Professional in the way they do their work?
14  A. Absolutely.
15  Q But the subject matter tends to be pretty tough stuff,
16  doesn't it, some of it?
17  A. Certainly. Certainly.
18  Q As you've described earlier, you were dealing with
19  children who were either malnourished, correct?
20  A. That's correct.
21  Q Or who were involved in some sort of sexual
22  molestation --
23  A. Correct.
24  Q -- in some manner?
25  A. Right.

Page 109

1   Q So the subject matter is pretty tough?
2   A. Certainly.
3   Q What were your long-term goals when you took the job
4   with Probation in February of 1995?
5   A. Long-term goals? I was happy with the position, because
6   I had earned my undergrad, it was in criminal justice, I
7   liked working with the juveniles. At that time it was
8   just to work there, be a good employee.
9   Q So you had no long-range aspirations?
10  A. Not at that point, no.
11  Q Did you develop those later?
12  A. Yes, I did.
13  Q Tell me when.
14  A. I applied for the master's program through the Juvenile
15  Court Judges Commission. I completed the master's
16  program. It was in 1988.
17  Q Let me interrupt you for a minute, because that's one
18  thing we haven't done is finished your education.
19  A. Okay.
20  Q You told me that you went to cosmetology school, right?
21  A. That's correct.
22  Q And that was directly after Mechanicsburg High?
23  A. Correct.
24  Q At some time later I know that you went back to HACC?
25  A. Yes. That was in '86 I went back the HACC. I went to

Multi-Page

Page 110

1    HACC the first time.
2  Q  And that was part-time?
3  A.  Yes.
4  Q  And your major there was social?
5  A.  Social, well, social sciences they called it.
6  Q  Did you obtain a degree from HACC?
7  A.  Yes, an associate degree.
8  Q  And when was that?
9  A.  1990.
10  Q  When was your next education after that?
11  A.  I went directly from there to Penn State Middletown.  My
12     major was criminal justice.
13  Q  You started there in 1990?
14  A.  Yes.  Was criminology, I'm sorry.  Criminology.
15  Q  Did you graduate from Penn State Middletown?
16  A.  Yes, 1994.
17  Q  You went there part-time?
18  A.  Yes.
19  Q  How was the tuition paid there?  Who paid the tuition?
20  A.  Tuition was paid, the county paid a small portion.  I
21     believe at that time they allowed, I'm just estimating,
22     I think it's $800 a year.  And the rest was paid by
23     myself.  And it had to qualify as a necessary course
24     with my.
25  Q  Job?

Page 111

1  A.  With my job, yes.
2  Q  Did that qualify?
3  A.  Some did.  Some didn't.
4  Q  Education after that?
5  A.  JCJC program, I earned my master's degree in
6     administration of justice.
7  Q  What's JC?
8  A.  Juvenile Court Judges Commission.
9  Q  Okay.  When did you earn your master's degree?
10  A.  That was in '98.
11  Q  Did you receive tuition reimbursement for that study?
12  A.  No.
13  Q  Was it paid for by the Commission?
14  A.  Court Administrators, yes.
15  Q  So you had no out-of-pocket tuition for that --
16  A.  Just books.
17  Q  -- further education?
18  A.  Yes.  I enrolled at Penn State Middletown in 2000 in a
19     Ph.D. program in adult education.  I took two classes.
20  Q  Where do you stand with respect to your master's degree,
21     or I'm sorry, with respect to your Ph.D.?
22  A.  I stopped going to Penn State in spring of 2001.  It
23     just wasn't a good fit for me as far as the program.  I
24     made application to IUP in the administration leadership
25     Ph.D. program.

Page 112

1  Q  Where do you stand on that application?
2  A.  I'm waiting to see if I'm accepted for the fall class.
3  Q  How was the tuition at Penn State Middletown paid for?
4  A.  Like I said, Penn State Middletown was, like I said, the
5     county paid I believe, I'm just estimating, I believe
6     it's $800 a year is what they would pay if it was
7     qualified, if they felt it qualified with my employment.
8  Q  And did it qualify?
9  A.  Like I said, several did.
10  Q  At Penn State Middletown?
11  A.  Right.
12  Q  And what about the IUP program, same?
13  A.  I have not attended there yet.
14  Q  But do you expect that that will also be compensated
15     for, a partial reimbursement by the county?
16  A.  If it qualifies, if the courses qualify.  There's an
17     application you have to make through Personnel for that.
18     Human Resources, rather.
19  Q  What influence, if any, did Gary Graham have on your
20     decision the move to the Probation Department?
21        MS. WALLET:  Objection.  I think that was asked and
22     answered.
23  BY MR. THOMAS:
24  Q  Favor me with another answer, will you please?
25  A.  The influence?

Page 113

1  Q  Um-hum.
2  A.  I don't think he had much influence at all on me going
3     there.  Letting me know that the position was open, yes.
4     But as far as my getting the position, no.
5  Q  Did he encourage you to apply?
6  A.  He thought Lynn and I would be good people because of
7     having the caseworker back -- well, myself, caseworker
8     background and the criminal justice degree.  And he had
9     worked with me as a caseworker so he knew what kind of
10     work I would do.
11  Q  In October of 1996 there was a conference at Penn State
12     that you attended; is that correct?
13  A.  Yes.
14  Q  Can you tell me what the nature of that conference was?
15  A.  A DUI association.
16  Q  Why were you there?
17  A.  I was being certified as a, I believe that was a CRN,
18     CRN instructor.
19        MR. MacMAIN:  I'm sorry, I didn't hear that.
20        THE WITNESS:  Court Reporting Network instructor.
21  BY MR. THOMAS:
22  Q  Were there other members of the Probation Department
23     there also?
24  A.  Yes.
25  Q  Was Mr. Graham there?

Page 114

1  A.  **Yes.**
2  Q  Were there any problems while you were at that
3     conference?
4  A.  **Yes.  He tried to get entrance to my hotel room.**
5        MR. ADAMS: I'm sorry?
6        THE WITNESS: He tried to get entrance to my hotel
7        room.
8  BY MR. THOMAS:
9  Q  When was that?
10 A.  **It was in the evening.**
11 Q  The conference was what days of the week?
12 A.  I had gone up Sunday evening because my -- the class I
13     needed to be qualified was first thing Monday morning.
14     I don't believe the conference actually started till
15     Tuesday.  So I had arrived on Sunday evening.  And I
16     believe it went till Thursday.
17 Q  When did Mr. Graham try to gain access to your room?
18 A.  It would have been the Tuesday evening after the
19     conference had started.
20 Q  What happened?
21 A.  He continued to knock on my door.  I chose not to answer
22     it.  And then he called my room.
23 Q  Did you have a conversation with him?
24 A.  I answered the phone and found out who it was, and he
25     said he wanted to stop in.  And I said I was studying.

Page 115

1  Q  And what did he do?
2  A.  **I don't know what he did at that time.**
3  Q  That was the end of the conversation?
4  A.  **Yes.**
5  Q  And he didn't come back to your door?
6  A.  **Not that I can recall, no.**
7  Q  Did you at any point call his room during that
8     conference?
9  A.  **No, I did not.**
10 Q  Did you call his room during the early morning hours of
11     any of the days that you were there?
12 A.  **No.**
13 Q  Would you have had any reason to call his room?
14 A.  **The only time I would ever call anybody's room is
15     because I was a runner and I would run first thing in
16     the morning, would be to let them know where I was so at
17     least somebody knew where I was.**
18 Q  When you say you ran first thing in the morning, what
19     was first thing in the morning?
20 A.  **Daybreak.  Six o'clock, six-thirty.**
21 Q  You do not remember calling his room?
22 A.  **No, I don't.**
23 Q  And I assume by October of 1996 that the relationship
24     between the two of you was not good?
25 A.  **That's correct.**

Page 116

1  Q  So if you were going to call somebody, he wouldn't have
2     been your first choice?
3  A.  **Right.  No.**
4  Q  Did you leave the conference early?
5  A.  **Yes, I did.**
6  Q  Why?
7  A.  When I went up the week before, Mr. Graham had said that
8     he would be riding with other people, I think Dennis
9     Drachbar and maybe Sam Miller, that he wanted me to give
10     him a ride home.  I was just really uncomfortable.
11     (Interruption.  Discussion held off the record.)
12 BY MR. THOMAS:
13 Q  Was there more to that answer?
14 A.  **Which is unusual, because usually he would drive, I
15     think to get the mileage.  So it was just a red light, I
16     just don't want any -- didn't want him asking for a
17     ride.**
18 Q  Was there ever a period of time when you heard anybody
19     in the Probation Department discussing Barb 1 versus
20     Barb 2?
21 A.  **Not in those words, no.**
22 Q  Did you ever hear any reference to Barb 1 or Barb 2?
23 A.  **Not Barb 1 and Barb 2, no.**
24 Q  What have you heard?
25 A.  Several of the gentlemen in our department have said, I

Page 117

1     think Graham is getting his Barbs mixed up, that when he
2     comes to work angry it's not me he's probably angry at,
3     it's probably his wife and he's taking it out on me.
4  Q  You never heard any reference to this as it related to
5     phone calls that were received in the Department?
6  A.  No.
7        MR. THOMAS: Let's take a couple of minutes.
8        (Recess taken from 12:38 until 1:54 p.m.)
9  BY MR. THOMAS:
10 Q  Barb, I've had your counsel place in front of you a
11     copy of the Complaint that's been filed in this matter,
12     and I want to talk to you about the Complaint and some
13     of the allegations that are in there and get some of the
14     details from you, just by way of background so you know
15     where we're going.  Okay?
16 A.  **(Witness nodded head affirmatively.)**
17 Q  This Complaint you have reviewed, obviously, correct?
18 A.  **Yes.**
19 Q  And to the best of your ability, did you set forth all
20     of the activities by anybody on behalf of the county
21     that you consider to be a violation of your rights?
22 A.  **Yes, all that I considered at the time.**
23 Q  Are there any that have come to your attention since
24     that you would like to make me aware of now?
25 A.  There has recently been an incident, and I would say it

Page 118

1    would be discrimination.
2    Q   What was that activity?
3    A.  Just against myself, is that what you're asking?
4    Q   Yes, in any way.
5    A.  That I was offended by?
6    Q   Yes.
7    A.  Okay. Recently we had a female intern who was doing her
8        internship, and it was found at the very beginning of it
9        that she had had -- was in the ARD program. She was
10       left go, she was fired. Prior to that last, it would
11       have been the winter of 2002, we had a male intern who
12       in the middle of his internship they found out he had
13       had an ARD, a DUI, I believe, himself, and he was
14       allowed to complete his internship. And I didn't
15       understand why one was left go and the other one wasn't.
16   Q   Are you familiar with all the facts associated with the
17       activities of those two interns?
18   A.  No. All I know is that I heard that's what, that
19       happened to her.
20   Q   So you heard that as a rumor in the workplace; is that
21       fair?
22   A.  Yes, um-hum.
23   Q   You were not involved in the supervisory chain?
24   A.  No.
25   Q   And weren't consulted with respect to the reasons?

Page 119

1    A.  No, I was not.
2    Q   Is it fair to say that you have not been apprised of any
3        of the other details by anybody in management as to why
4        there may have been different treatment of those two
5        interns?
6    A.  The only thing I heard, again, was through secondhand
7        information, and that was from Darby Christlieb, where
8        Mr. Boyer, who was one of our supervisors, made the
9        statement if he would have been on vacation and Joe
10       would have been making decisions, the girl would have
11       stayed. Mr. Osenkarski would have, you know, been in
12       charge, that the girl would have stayed. That Mr. Boyer
13       had the final say in that.
14   Q   And it was Boyer who made the decision with respect to
15       the female intern? Is that what you've heard?
16   A.  That was my perception.
17   Q   And who made the decision with respect to the male
18       intern?
19   A.  I don't know. I don't know that information.
20       Mr. Osenkarski was our chief.
21   Q   Do you know whether the court anybody on the court, the
22       President Judge Hoffer, may have been involved in the
23       decision?
24   A.  I don't know.
25   Q   Okay.

Page 120

1    A.  I don't know that.
2    Q   So is it fair to say that you're not familiar with the
3        decision-making process or who was actually involved in
4        the two episodes?
5    A.  No, I'm not.
6    Q   Okay. Other than that, does the Complaint at least by
7        your attempt set forth all the allegations that you
8        contend violated your rights as an employee for the
9        Probation Department?
10   A.  Yes.
11   Q   What I would like to do is take you through some of
12       those and ask you certain questions about them. Let's
13       start at paragraph 16, if we could. In paragraph 16 you
14       allege that Mr. Graham sexually harassed you from
15       November 20, 1996, until March of '98, correct?
16   A.  That's correct.
17   Q   What's the reason behind the dates that you've alleged
18       there? For instance, what's the significance of
19       November 20, 1996?
20   A.  That's the day that Mr. Graham when I gave him a social
21       history of a female having suicidal tendencies related
22       to her premenstrual problems as documented by a
23       physician and it took it into his office to give him the
24       case, he made the statement do I have to get a peter
25       meter in my office. And using the words Jesus Chris

Page 121

1        prior to that.
2    Q   Did you make a contemporaneous note of that comment by
3        him at the time?
4    A.  Yes.
5    Q   And where did you keep that note?
6    A.  I had a running little notepad that -- I'm a scribbler
7        so I would just make a note.
8    Q   Is that why you're able to identify that date
9        specifically as November 20, 1996?
10   A.  Yes.
11   Q   Where are those notes now?
12   A.  They were provided. They were a packet of notes I
13       believe that was in my little scratch notes.
14   Q   You're indicating it was provided as part of discovery
15       in this matter?
16   A.  Yes, I believe it was.
17   Q   Do you still have possession of the originals, you or
18       your lawyer?
19   A.  They would be -- I have the originals.
20   Q   Had you ever heard a comment like that by Mr. Graham
21       prior to November 20, 1996?
22   A.  Specifically like that? No.
23   Q   Had you ever heard at any time in your life reference to
24       a peter meter?
25   A.  No.

Page 122

1  Q  What is a peter meter?
2  A.  I'm just — my idea of it would be something to measure
3     a males penis, or regulate, whatever.
4  Q  What was the context of that conversation?
5  A.  I had taken a case in to have approval of it, a file on
6     this young girl. And I was trying to explain to him,
7     you know, the diagnosis and what, about the girl, and
8     that was the reaction I got from him.
9  Q  Did he have to approve every case that you handled?
10 A.  Yes.
11 Q  You had been with the Department at that point for a
12    year and what, nine months?
13 A.  Something like that, yes.
14 Q  And during the preceding 21 months he had made no
15    similar comment to you?
16 A.  Not like that, no.
17 Q  After November 20, 1996, did you ever hear him use the
18    term peter meter again?
19 A.  No.
20 Q  What was your response to him when he mentioned the
21    peter meter?
22 A.  I was very embarrassed. It was in front of his office
23    mate, Hank Thielemann. I was very embarrassed, really
24    shocked.
25        We deal with a lot of young females and this was a

Page 123

1     diagnosed problem this girl had. It interfered with her
2     life, probably helped -- it was a facilitating issue for
3     her to commit the crime, because it was, I believe it
4     was an assault, and that she would have these problems
5     monthly and it was legitimate concern, and I was
6     offended that he minimized her condition.
7  Q  What was the basis for your concern that he minimized
8     the problem?
9  A.  That, you know, a woman can have this problem and it can
10    cause her problems, and it's a psychological problem and
11    it's been medically diagnosed and it was not just her
12    telling me this, she had medical proof of it.
13 Q  The context of the conversation with him about the peter
14    meter was in reference to the juvenile that you were in
15    charge of?
16 A.  Yes.
17 Q  It was no reference with respect to you personally?
18 A.  No, but I was offended by it.
19 Q  I understand. And what I'm trying to understand is the
20    basis for your offense. Your offense, I gather, was
21    that he made light of her medical problem?
22 A.  Yes.
23 Q  Is that right?
24 A.  And minimized. Yes, absolutely minimized it.
25 Q  And that was November 20 of 1996. Was that the first

Page 124

1     time that you were offended by his behavior in any
2     sexual context?
3  A.  No.
4  Q  What was the first time?
5  A.  He had given me a birthday card.
6  Q  And when was that? January '96?
7  A.  Yes, around that time.
8  Q  And what about the birthday card offended you?
9  A.  It was inappropriate.
10 Q  Why?
11 A.  Because it indicated that there had been a past or some
12    kind of relationship with us.
13 Q  Are you talking about some inscription on the card?
14 A.  Yes. Yes.
15 Q  What do you remember the inscription said?
16 A.  Something remembering good times or something, or
17    looking forward to more, whatever. It was just
18    inappropriate. From --
19 Q  Was it the inscription on the card that was handwritten?
20 A.  No. It was printed.
21 Q  It was printed, so it was part of the formal card?
22 A.  Right.
23 Q  And what did it say, happy birthday?
24 A.  Yes. As I'm thinking back over the good times we had
25    before, and he signed it. It was just inappropriate for

Page 125

1     a supervisor male to be giving to -- I was a married
2     woman. It was inappropriate.
3  Q  What did you do when you received the card?
4  A.  He had put it in the side of my briefcase and I didn't
5     really find it till a day or so later when I was taking
6     things out of my briefcase, and I found it.
7  Q  And after you opened it and read it, what did you do?
8  A.  I put it away. I put it in -- I have stuff where I just
9     throw papers, old time sheets. I just threw it in
10    there.
11 Q  And that was January 1996, correct?
12 A.  Yes, um-hum.
13 Q  Did you say anything to him about the card?
14 A.  No. I was uncomfortable and I didn't know how to
15    approach it. Again, I knew Mr. Graham, his anger, I
16    didn't want to even start anything. I thought, well,
17    just best to let it go at that point.
18 Q  Up to this point, January of 1996, had he had occasion
19    to be critical of you? Had there been any screaming
20    episodes up to this point?
21 A.  Not directed at me, no.
22 Q  How would you describe your relationship with him at
23    work in January of 1996?
24 A.  Comfortable co-workers. He was my supervisor. Not
25    supervisor but assigned to train me.

Page 126

1  Q   He was not a formal supervisor for you at that time, was
2      he?
3  A.  He was appointed by Mr. Osenkarski as my supervising
4      trainer.
5  Q   Trainer?
6  A.  Yeah.
7  Q   Did he have the right to hire or fire you?
8  A.  He had the right to make suggestions, but no.
9  Q   Did he have the right to change your job duties?
10 A.  Yes, I think he could have.  Yes.
11 Q   Did he have anything to say about how much you got paid?
12 A.  No.
13 Q   So you received this card in January of '96, you thought
14     it was inappropriate.  You made no complaint to him,
15     correct?
16 A.  I didn't mention it.
17 Q   Did you mention it to anybody else?
18 A.  No.  As a matter of fact, like I said, I put it away and
19     just forgot about it.
20 Q   You were aware in January of 1996 that the county had a
21     sexual harassment policy, weren't you?
22 A.  I don't -- I'm sure I was aware that they had it.  I
23     can't say that I actually sat down and read it, but I
24     was aware there was one in place.
25 Q   You were aware that there was a policy --

Page 127

1  A.  Yes.
2  Q   -- in the county that prohibited sexual harassment or
3      discrimination, correct?
4  A.  That's correct.
5  Q   And you were aware that in the personnel manual there
6      was a complaint procedure that had been published?
7  A.  Yes.
8  Q   You did not utilize that complaint procedure when you
9      received the birthday card in January of '96, correct?
10 A.  That's correct.
11 Q   And in fact, mentioned the birthday card, which you
12     found offensive, to no one?
13 A.  That's correct.
14 Q   Were there any other events between January of '96 and
15     November 20, '96, that you believe violated your rights?
16 A.  What was the dates again?
17 Q   The birthday, I'm expanding now from the birthday card
18     in January of '96 to the date published in your
19     paragraph 16, November 20 of '96.
20 A.  November 20?  I'm sorry, would you repeat the dates
21     again?
22 Q   I'm looking at your paragraph 16 --
23 A.  Okay.
24 Q   -- where you allege that you were sexually harassed by
25     Graham from November 20, '96, to March of '98.

Page 128

1  A.  Okay.
2  Q   I asked you whether there was anything before November
3      of '96, and you've identified this birthday card in
4      January.  My question now for you is:  Was there
5      anything between the time of the birthday card and this
6      date that you've alleged in your Complaint, November 20,
7      of '96 that you believe violated your rights?
8  A.  That is -- okay.  You mean from January through -- yes,
9      from January to November?
10 Q   Correct?
11 A.  Is what you're asking.
12 Q   I am.
13 A.  Mr. Graham would tell me stories about the sexual
14     problems he was having with his wife.
15 Q   When did those occur?
16 A.  That was quite a few of the trips that we took, he would
17     talk about it, allude to it.
18 Q   Can you tell me when those, what the dates of those
19     trips were?
20 A.  '96 through '97.
21 Q   Were they before November 20?  Were any of them before
22     November 20 of 1996?
23 A.  It's possible, because he was always talking about
24     problems he was having with his wife.  A lot of times it
25     would be in the open office, he would talk about

Page 129

1      problems with her, he would come in complaining about
2      her.
3  Q   Let's stick to the trips for a moment.
4  A.  Okay.
5  Q   How often in 1995 and 1996 were you taking trips with
6      Mr. Graham?
7  A.  Oh, I would say just an approximate would be maybe once
8      a month, sometimes more.
9  Q   So during that slightly less-than-two-year period you
10     would estimate that perhaps there were 24 trips?
11 A.  Probably a little less than that, but around that, yes.
12 Q   On how many of these trips did he talk to you about his
13     sexual problems with his wife?
14 A.  I'd say he would start talking about -- first he started
15     to allude to problems, that he wasn't getting anything
16     from her, that he was angry at her.  He would talk about
17     smashing her figurine collection in anger as a
18     punishment for her.  And he would make statements that
19     he'll do anything he can to get even with her.
20 Q   Can you give me an estimate of how many times out of
21     this 24 trips that he may have talked to you about
22     sexual problems with his wife?
23 A.  Sometimes he would just gripe about it.  And then --
24 Q   Was it every trip?
25 A.  No.  I would not say it's every trip, no.  No.

Page 126 - Page 129

Page 130

1  Q  Half the trips?
2  A.  Maybe a third of the trips. Most of the time at the
3      very beginning he wouldn't get too explicit, it was more
4      displays of his anger, how he was punishing her.
5  Q  Where did these trips -- I guess I need to know the
6      basis on which these trips occurred.
7  A.  It was juvenile placement. We had a juvenile in the car
8      with us and we would be transporting them to placement
9      or generally some -- to or from placement to court,
10     whatever.
11 Q  What were the range of the trips?
12 A.  Distance?
13 Q  Yes.
14 A.  There was -- the furthest one was above Pittsburgh,
15     Grove City, George Junior Republic. And then some
16     toward Philly. Really, some were in New Jersey.
17 Q  And George Junior is probably a four-hour drive?
18 A.  Oh, I would say at least, yes.
19 Q  So the two of you were in the car together for eight
20     hours?
21 A.  Yes, at least.
22 Q  And the one around Philly would be --
23 A.  There was one to New Jersey as well.
24 Q  Which is a couple hours down?
25 A.  We went north first, north to Clarks Summit, and picked

Page 131

1      up a juvenile and took her to New Jersey for an
2      evaluation for her to enter a college. And then
3      returned her to the same place.
4  Q  How long a trip was that, round trip?
5  A.  Oh, I'm just guessing, 13, 14 hours.
6  Q  How did it happen that you and he traveled together on
7      those two trips that we're talking about specifically
8      now, George Junior and the one to Philadelphia?
9  A.  George Junior I didn't have -- never had a juvenile
10     under my supervision at George Junior. Mr. Graham would
11     instruct me that I needed to go on the trips with him.
12     We would be taking kids that I had no contact with, no
13     need for me to have contact. They were males. George
14     Junior was only a male placement. Ideally it should
15     have been two males because if the juvenile had to go to
16     the restroom or whatever. But I was instructed I had to
17     go on the trips with him.
18 Q  And who instructed you?
19 A.  Mr. Graham.
20 Q  Was that true with respect to all 24 of the trips?
21 A.  No. There were several that were my children, my girls,
22     that I had to do supervision.
23 Q  How many of them were yours?
24 A.  I can only think of four females.
25 Q  Where were those trips to?

Page 132

1  A.  One was up to Clarks Summit. One was in the
2      Philadelphia area. One was out to around Pittsburgh
3      area. And the other one, like I said, was the one
4      from -- even the one from to New Jersey wasn't my
5      juvenile, she wasn't under my supervision.
6  Q  All those trips that you've described, all three or four
7      of those are all trips that would be at least four hours
8      round trip, would they not?
9  A.  Yes. Yes.
10 Q  Are there any other trips that you can think of? We've
11     talked about the one to George Junior, we've talked
12     about the round robin to Clarks Summit and then to New
13     Jersey and back, we talked about another one to Clarks
14     Summit, Philadelphia.
15 A.  There was one to Maryland. We met halfway, to a -- with
16     a detention center personnel and dropped a girl off.
17 Q  How long a trip was that?
18 A.  To the Maryland line. Maybe two hours, four hours round
19     trip.
20 Q  Okay. Others that you recall?
21 A.  I can't recall any more at this time.
22 Q  Okay.
23 A.  But the majority of the cases, the trips were not my
24     kids.
25 Q  And you've described four that were your kids, correct?

Page 133

1  A.  Yes.
2  Q  What did you do in the car during these trips? I gather
3      one of you was driving while the other was riding as
4      passenger?
5  A.  Mr. Graham always drove.
6  Q  What did you do?
7  A.  The juvenile was in the back, so usually conversation
8      with them.
9  Q  What were the subject matters with the juveniles?
10 A.  School, what they plan to do, explaining to them about
11     the placement.
12 Q  Any of it that you considered to be rehabilitation type
13     discussions?
14 A.  Certainly. Sure. About their families.
15 Q  And after you dropped the juvenile wherever they were
16     going, what did you do on the way back?
17 A.  We stopped to get something to eat and then drove back.
18 Q  What was the nature of the conversation?
19 A.  Usually hearing what Mr. Graham was doing. He liked to
20     tell you everything that he was doing. He was a lot of
21     the -- he was considered basically the gossip of the
22     office, so you heard, of course, about everything
23     everybody else was doing.
24 Q  Did you participate in the conversations?
25 A.  With Gary you just listened. With Mr. Graham you just

## Page 134

1 listened.
2 Q And some of the conversations centered around things
3 that were happening in the office?
4 A Yes.
5 Q Some of it centered around educational matters or
6 training?
7 A No.
8 Q Not at all?
9 A Probably not, no.
10 Q And some of the conversation had to deal with his
11 complaints with his wife, I gather. Yes?
12 A Complaints about anybody else in the office. Just
13 complaints.
14 Q When he started to complain to you about problems with
15 his wife, what was your participation, if any?
16 A When it was not explicit you just sort of listened and
17 just say, you know, maybe you ought to go to counseling.
18 When he got really explicit, and I mean, in detail, I
19 said you know, you two need to go to counseling. You
20 could see it was getting worse, you need to go to
21 counseling.
22 Q And you've described two subcategories there, one where
23 he wasn't very explicit, and one where he was.
24 A Yes.
25 Q What was the subject matter that was not very explicit?

## Page 135

1 A Just complaining that she won't do what he wants her to
2 do. She -- he would complain because she was reading,
3 oh, the books, I'm trying to think, the love story
4 books, the magazine, little, the little paperback books.
5 He hated her -- Harlequin, Harlequin romances. He hated
6 her reading those. It appeared that he was jealous that
7 she would read those.
8 He would complain because he would see his wife
9 talking to the court administrator. If he saw her
10 talking to an attorney, he would go on and on and on and
11 on about I guess just a jealousy. But he was just angry
12 at her, angry at his wife.
13 Q These conversations weren't directed at you?
14 A No, those weren't.
15 Q And your response to that was to suggest to him that
16 they needed to seek counseling.
17 A When he was talking that way, you just sort of listened
18 to him. He was just sort of blowing off.
19 When he started talking explicitly about sexual,
20 her sexual behavior and how she was denying him sex, I
21 just said, Gary, you know, you need counseling, you and
22 your wife need to go to counseling.
23 Q What was the explicit behavior that he talked to you
24 about?
25 A He would tell me that he would wake up in the middle of

## Page 136

1 the night and the bed would be shaking, and he would
2 pull her hand out of her underwear and her hands,
3 fingers would be wet. He said he would keep a calendar
4 of how often they had sex and he would show that to her.
5 Q How often did that conversation occur?
6 A That explicit, that was really one time he was that
7 extremely explicit.
8 Q When was that?
9 A It was in -- I'm not sure of the date. One of the
10 trips, '96, '97. More I believe '97 area.
11 Q What was your response to him while he was going through
12 this explanation?
13 A I said, Gary, Mr. Graham, well, you need to get
14 counseling. I really don't want to hear this, you need
15 to get counseling. And his response was that he was
16 furious. He said, I don't need counseling, there's
17 nothing wrong with me. And we accelerated to around 95
18 miles per hour on a construction zone on 81.
19 Q Did you call him Gary in those days or did you call him
20 Mr. Graham?
21 A I called him Gary.
22 Q Was there ever any period of time where you called him
23 Mr. Graham?
24 A I don't believe so.
25 Q Why was he confiding in you with respect to his concerns

## Page 137

1 or difficulties with his wife?
2 A I have no idea. I think I was a captive audience in the
3 car.
4 Q Did these conversations offend you?
5 A Absolutely.
6 Q Why?
7 A I don't need to hear details of his sexual behavior or
8 his problems with his wife. I offered names of
9 counselors, family counselors, whatever. He just didn't
10 want to hear it.
11 Q Did you ever ask him not to describe his problems with
12 his wife to you?
13 A Yes, I did.
14 Q When?
15 A It was the same day.
16 Q On the day where?
17 A He was very explicit. I said, I don't need the hear
18 this, I don't want to hear this, it's a problem between
19 you and your wife, you need counseling.
20 Q Other than that one episode, were there any other
21 occasions where you said to him stop it, I don't want to
22 hear it?
23 A Whenever he would use the F word at me.
24 Q I want to restrict that question really just to the
25 discussions that he had with you in the car about his

Page 138

1   wife. Was there ever more than one occasion when you
2   told him stop, I don't want to hear it?
3   A.  I would recommend counseling. Anytime he talked about
4       problems with his wife, I would suggest counsel for him.
5   Q   And on one occasion, the occasion where he was explicit
6       about her night problems, you said to him, stop, I don't
7       want to hear it?
8   A.  Right.
9   Q   Right?
10  A.  Right.
11  Q   Did you report that episode to anybody else at work?
12  A.  I told somebody else but I did not report it.
13  Q   Who did you tell?
14  A.  I discussed it with Debra Green.
15  Q   Is Deb Green your best friend at work?
16  A.  She's my co-worker, yes.
17  Q   You did not report to anybody in a position of
18      authority?
19  A.  Again, knowing to start talking about this, the
20      punishment element, I knew that if I started to say
21      anything it might cause really big problems for me.
22  Q   But whatever the reason, you did not report it?
23  A.  No, I didn't. Not at the time. I did later, yes.
24  Q   Sure, and we'll get to that.
25          Did you at any point raise a concern with

Page 139

1   management about going on these placement trips with
2   Mr. Graham?
3   A.  I talked to Mr. Graham about it. I said, I really
4       didn't want to go on these trips. You know, I had other
5       work to do. This is a whole day out of the office and I
6       was at that time, well, one Family Preservation, which
7       required intensive supervision, and he said if I didn't
8       like it I could go back to doing my former work as
9       social work.
10  Q   But I guess the answer to that is the only person you
11      told was Mr. Graham?
12  A.  (Witness nodded head affirmatively.)
13  Q   You didn't tell Mr. Osenkarski?
14  A.  No, I did not.
15  Q   You didn't tell Mr. Bolze while he was still there?
16  A.  Mr. Bolze was not there at that time.
17  Q   He was gone?
18  A.  He was gone.
19  Q   You didn't tell anybody in HR, Human Relations?
20  A.  At the time, no.
21  Q   And didn't tell Judge Hoffer or Judge Sheely?
22  A.  There really was minimal contact with them.
23  Q   Did you have some contact with the president judge
24      during your employment with the county?
25  A.  With Judge Sheely?

Page 140

1   Q   Um-hum.
2   A.  Yes, of course.
3   Q   What was the nature of that contact?
4   A.  Could be taking cases up. He heard my cases.
5   Q   He knew who you were?
6   A.  Absolutely. He hired me.
7   Q   In paragraph 16 in the subparts you start to detail some
8       of the allegations which you've talked about in general,
9       and I'd like to go over a few of those, if we could.
10  A.  Okay.
11  Q   We might as well start with A. We've already talked
12      about A, and that was the girl who had the premenstrual
13      problems, correct?
14  A.  Correct.
15  Q   And the peter meter. Is there anything else you want to
16      add with respect to that allegation?
17  A.  No.
18  Q   B is the inappropriate birthday card. We've talked
19      about that, right?
20  A.  Yes.
21  Q   B also includes inappropriate touching.
22  A.  Yes.
23  Q   What do you mean by that allegation in paragraph B?
24  A.  During a Mace, a Mace training at the prison, it was in
25      '95, Mr. Graham patted my behind in front of Debra

Page 141

1       Green.
2   Q   When in 1995?
3   A.  I'm not sure of the date.
4   Q   Spring, summer?
5   A.  Probably -- I'm just guessing, speculating spring.
6   Q   What were the circumstances where he patted you?
7   A.  We were walking down the hall to a training area. It's
8       a large gymnasium at the prison.
9   Q   You were walking with him or beside him?
10  A.  No. I was with Debra Green. I think I was walking past
11      him.
12  Q   Were you all going the same direction?
13  A.  Yes.
14  Q   Was there any conversation between the two of you before
15      he patted you?
16  A.  No.
17  Q   Describe to me what happened.
18  A.  As I was walking past, it's not very clear to me what
19      happened, but Debra Green witnessed it, and he patted my
20      behind. And I just took off into the training room.
21  Q   Were there any words exchanged between you and he when
22      that happened?
23  A.  No. I just went into the class and we started the
24      training session.
25  Q   Were you running when you went into the training room?

**Multi-Page**

Page 142

1　A. Moving quickly.
2　Q　Were you laughing?
3　A. I was embarrassed.
4　Q　Were you laughing?
5　A. Embarrassed laugh.
6　Q　Was anything else said after that?
7　A. No.
8　Q　So you went through the training session?
9　A. Right.
10　Q　Were there any other occasions where he touched you
11　　inappropriately other than this one pat in the spring of
12　　'95?
13　A. No.
14　Q　So the inappropriate touching was limited to one event,
15　　correct?
16　A. Yes.
17　Q　B also includes appearing uninvited at your home.
18　A. Yes.
19　Q　Which home are we talking about?
20　A. On Maple Drive in Etters.
21　Q　When was that?
22　A. May of '96.
23　Q　What time of day?
24　A. It was early evening, just dusk.
25　Q　Tell me what occurred.

Page 143

1　A. I was at my home. Like I said, we have a bi-level
2　　house. I had the doors, the back door open, and I was
3　　up in the living room area. And I got a call on my
4　　phone and it was from Mr. Graham. He said he's come
5　　down to see me. And I said, you know, well, my
6　　husband's not home, I really didn't -- he said, I know
7　　he's not home, and then he hung up. And the next thing
8　　within maybe --
9　Q　He didn't say good-bye?
10　A. No. No.
11　Q　Okay.
12　A. I hung up. The next thing I know, he was -- our house
13　　is on a dead-end road that runs beside our home. And
14　　the next thing I know he was outside at our back yard
15　　yelling my name. And I didn't go, I didn't go out. I
16　　knew who it was. I had pretended like I wasn't home.
17　Q　Did anybody see him there?
18　A. No, not that I know of.
19　Q　Have your neighbors ever told you that they saw him
20　　there?
21　A. No. We live -- the back of our house are over
22　　apartments, like an apartment complex beside the back of
23　　our house.
24　Q　Did he ever gain access to your home that evening?
25　A. No, he did not.

Page 144

1　Q　Did he eventually leave?
2　A. Yes.
3　Q　And he left without being inside the house?
4　A. Yes.
5　Q　Do you know why he was there?
6　A. I can't speak for him, but I assume he came down to see
7　　me when he knew my husband was not home.
8　Q　And this was May of 1996?
9　A. Yes.
10　Q　Was that the only occasion on which he appeared
11　　uninvited at your home?
12　A. Yes, it is.
13　Q　Did you report that episode to anybody at Probation?
14　A. No, I didn't.
15　Q　Did you ever ask him why he showed up on that evening in
16　　May of 96?
17　A. Again, it was I would rather not even approach it. I
18　　didn't want to get into anything, because if I would say
19　　anything to make a big deal out of it I'm afraid there
20　　would be punishment.
21　Q　So you never raised it with him, correct?
22　A. No.
23　Q　Never raised it with any superior?
24　A. No.
25　Q　And never filed any written complaint in accord with the

Page 145

1　　complaint procedures in the employee manual, correct?
2　A. No, I did not.
3　Q　You'll have to say no.
4　A. No. I'm sorry.
5　Q　Paragraph C deals with the hotel room at Penn State, and
6　　we've already talked about that, haven't we?
7　A. Yes.
8　Q　Is there anything in our earlier discussions that you
9　　know that you didn't reveal to me about that episode?
10　A. Not that I can think of at this time.
11　Q　Did you ever report that episode to management?
12　A. Not at the time. I assumed I could handle it.
13　Q　In paragraph D you say that when Graham -- or when you
14　　showed a lack of interest in his sexual overtures, that
15　　his attitude toward you changed.
16　　Tell me what it is about his overtures that led you
17　　to believe that there was a sexual interest in you.
18　A. I think coming to my home, obviously, knowing when my
19　　husband wasn't home. Trying to get entrance to my hotel
20　　room at Penn State. I think it was pretty well known
21　　that Mr. Graham had -- was -- I guess had an interest in
22　　me. It was pretty apparent to most people.
23　Q　Did you do anything to encourage that interest?
24　A. No, I did not.
25　Q　When did his attitude toward you change?

Page 146

1  A.  Most of it changed whenever he had -- whenever Mr. Bolze
2      retired and you could see that Mr. Graham was becoming
3      much more authoritative, and angry.
4  Q  Had he expressed an interest, sexual interest in you as
5      you described it, right from the outset of your
6      employment with Probation?
7  A.  It was something -- it was, like, it was apparent -- in
8      hindsight it was apparent to everybody that he had an
9      interest in me.
10  Q  And did that predate your employment with Probation?
11  A.  Yes, it did.
12  Q  Went all the way back to your employment with Children
13      and Youth?
14  A.  It was a joke that Mr. Graham liked me, which I thought
15      was ridiculous.  He's a grown man, married, as I was.
16  Q  Why was it a joke?
17  A.  Because we were both married and it was such a childish
18      behavior.
19  Q  And who was it a joke among?
20  A.  Caseworkers.
21  Q  Your fellow employees?
22  A.  Yes.
23  Q  Did they say something to you?
24  A.  They would say, you know, Graham is interested in you,
25      and they would laugh.  They were young girls, early

Page 147

1      twenties.
2  Q  Who said that?
3  A.  A girl named Kelly Miller.  Well, it was Kelly Zeager at
4      the time.  She was dating one of the Probation officers.
5  Q  She was working in the Department and dating one of the
6      probation officers?
7  A.  She was in my department.  She was a caseworker and she
8      was dating one of the probation officers.
9  Q  So she was in Children and Youth at that time?
10  A.  Yes, she was.  Yes, she is.  And I had asked her not to
11      repeat that at all, because Mr. Graham's cousin worked
12      in Children and Youth, didn't want rumors starting.
13  Q  Did rumors get started?
14  A.  No.
15  Q  You're not aware of any rumors that the two of you were
16      having an affair?
17  A.  No.  It was only his interest in me.
18  Q  Well, irrespective of whose interest it was, were you
19      aware that there were rumors in the courthouse that you
20      and he were having an affair?
21  A.  I never heard of any rumors.
22  Q  Looking back on it, in view of the relationship that you
23      two had, can you understand why people might have
24      reached the conclusion that you were having an affair?
25  A.  No, I don't.

Page 148

1  Q  Because in your mind, the relationship was always an
2      arm's length professional relationship?
3  A.  I traveled with Mr. Graham.  It was necessary for my
4      job.
5  Q  The allegations contained in E are the description of
6      the sexual problems he was having with his wife, as
7      you've already testified, correct?
8  A.  Yes.
9  Q  Do you want to add anything to that?
10  A.  Not at this time.
11  Q  Are there any facts that you have in regard to this that
12      you haven't previously disclosed to me or that I haven't
13      asked you?
14  A.  Not -- not to be noted at this time.
15  Q  F refers to a smashing of a wife's figurines.  Do you
16      recall that?
17  A.  Yes.
18  Q  When did that occur?
19  A.  Again, it was on trip and it was prior to his detailing
20      his, the problems with his wife.  He had bragged that he
21      smashed her figurine collection against the fireplace to
22      punish her.
23         The birthday cake incident to me was just horrible.
24      His -- he had young girls, and I understand his
25      mother-in-law had made this special birthday cake for

Page 149

1  his wife.  Mr. Graham was angry at his wife, I don't
2  know exactly what it was for, but he told me he said he
3  punished her and he destroyed the cake in front of the
4  little girls.
5  Q  Well, on the trip where he discussed the figurines, do
6      you remember where you were coming from or going to?
7  A.  No, I don't.
8  Q  Do you remember anything about the date of that
9      particular trip?
10  A.  It was just prior to the trip where he explained in
11      detail about the sexual behavior.
12  Q  Well, you told me earlier that you kept a notepad with
13      respect to these episodes.  Was there a specific note
14      with respect to the discussions involving figurines?
15  A.  No.  No, I don't believe there was a note about that.
16      It was just something I recalled that he had -- well,
17      that sort of stays in your mind when you hear about
18      somebody smashing things like that.  As far as dates,
19      I'm not sure.  I know it was on trip.
20  Q  What was the context of the conversation where he
21      brought that up?
22  A.  Again, anger at her.  He was punishing her.  He was
23      angry because -- I don't even know why he was angry.  He
24      was always angry at his wife.
25  Q  Because of his personal problems with her?

Multi-Page

Page 150

1   A.  Yes, personal problems with her.
2   Q   So the sort of the context of the conversation was that
3       he was upset with her, that they had some disagreement
4       over something, and --
5   A.  Right.
6   Q   -- he smashed the figurine as part of this?
7   A.  As part of his punishment.
8   Q   Punishment, okay.  And the birthday cake episode, did
9       that occur on the same trip?
10  A.  No, I don't believe.  I believe he talked about that on
11      a different time.  I'm not sure.  I remember they were
12      on trips when I would hear about these things.
13  Q   Did you ever complain about your relationship with
14      Mr. Varner as part of these trips?
15  A.  No, absolutely not.
16  Q   Did you ever return conversations about any problems in
17      your life when he was describing problems in his?
18  A.  My husband Lee and I really have not had any problems to
19      complain about.
20  Q   Have you had any problems of any type in your life?
21  A.  Of course.
22  Q   Did you share with Mr. Graham any of those conversations
23      while traveling with him?
24  A.  Problems?  Maybe stories about maybe some teen-age
25      problems when my kids were growing up, just as an aid to

Page 151

1       him.  More parenting, parenting techniques that I would
2       use with my children.
3   Q   What other subjects did you share with him during the
4       travels?
5   A.  Subjects.
6   Q   What did you talk about?
7   A.  I know.  Like I said, most of the time you would listen
8       to Mr. Graham.  He would be on the phone a lot.  It was
9       just generally listening to his stories.
10  Q   And the only thing you can remember sharing with him was
11      some conversation about parenting techniques involving
12      your children?
13  A.  Yes, about my children in general.
14  Q   Did you report the difficulties or the conversation
15      involving the figurine or the birthday cake to anybody
16      in management at the time those discussions occurred?
17  A.  That, I mean, it wasn't offensive to me.  I felt bad for
18      his wife and his children, but it did not offend me.
19  Q   Neither of those conversations?
20  A.  No.  All, mostly what that did to me was remind me of
21      how he can dole out punishment and how he was willing to
22      do that to people that he loved, that he would use that
23      punishment mode.  It put me on guard, made me aware of
24      what he could do.
25  Q   But the conversations in and of themselves you recognize

Page 152

1       weren't directed to you?
2   A.  They were not directed at me, just --
3   Q   And you recognize -- and I'm sorry to interrupt you --
4   A.  That's all right.
5   Q   And they didn't particularly offend you but you felt
6       badly for his wife and for his children?
7   A.  And put me on notice of what Mr. Graham, how angry he
8       can get and what he's possibly, you know, what he's
9       possible to do.
10  Q   And neither of those conversations had anything to do
11      with his purported sexual interest in you?
12  A.  No.
13  Q   In G you make reference to an instruction that you
14      apparently received from him not to talk to another
15      female probation officer who had complained of sexual
16      harassment.
17  A.  That's correct.
18  Q   Who was that?
19  A.  Kerry Houser.
20  Q   And you knew about her prior complaint of sexual
21      harassment before you took the job in Probation,
22      correct?
23  A.  Yes, I had heard about it.
24  Q   Do you recall when he gave you that instruction?
25  A.  Not too long after I started in the Department.

Page 153

1   Q   It was sometime after February of '95?
2   A.  Yes.
3   Q   Had you talked to Kerry Houser before that, before you
4       got the instruction?
5   A.  Yes.
6   Q   Had you talked to her about her sexual harassment claim?
7   A.  At that point we had not really discussed it, no.  I
8       just heard about it when I was with Children and Youth.
9   Q   What did you hear about it while you were in Children
10      and Youth?
11  A.  Just that she had filed a suit against the Department,
12      Juvenile Department.
13  Q   Did you hear what the outcome was?
14  A.  No, I didn't.
15  Q   Do you know whether there was any financial aspect to
16      the resolution of it?
17  A.  I don't know that.
18  Q   Did you ever find out?
19  A.  No, I didn't.
20  Q   What did Mr. Graham instruct you with respect to Kelly
21      Houser?
22  A.  Kerry Houser.  He told me not to talk to her.
23  Q   Did he tell you why?
24  A.  He said, she's an angry woman, she's divorced, she's an
25      angry woman, all divorced women are angry.

Page 154

1  Q  You were a divorced woman at the time, were you not?
2  A.  Yes, I was.
3  Q  Did he tell you that you were an angry woman?
4  A.  No.
5  Q  And in fact, he had expressed or at least as far as you
6     were concerned, exhibited a sexual interest in you,
7     correct?
8  A.  Yes.
9  Q  Did you follow his instructions not to talk to her?
10 A.  No.
11 Q  Did you make a notation of when that conversation
12    occurred?
13 A.  I believe I did.
14 Q  What date did it occur on?
15 A.  I don't know the date at this time.
16 Q  Did you have any conversation with him about whether
17    that conversation was appropriate or inappropriate?
18 A.  I don't think we had a discussion on it. It was just he
19    told me not to talk to her because of a prior suit that
20    they had and that she was angry.
21 Q  Did you respond to him in any fashion when he told you
22    that?
23 A.  I don't remember. I don't believe.
24 Q  Did you report that statement by him to anybody in
25    management?

Page 155

1  A.  Mr. Osenkarski was part of that suit. He would be the
2     next in line to complain to, and I chose not to. Again,
3     punishment issue.
4  Q  Could you have taken your complaint to Judge Sheely?
5  A.  In hindsight, he probably wouldn't have done anything.
6  Q  Could you have taken the complaint to him?
7  A.  I could have.
8  Q  There was nothing that prevented you from doing that,
9     was there?
10 A.  No. No.
11 Q  In fact, you never complained to Judge Sheely about the
12    treatment you received from Mr. Graham, did you?
13 A.  No, not until after.
14 Q  Not until after you filed the --
15 A.  Right.
16 Q  -- EEOC Complaint?
17 A.  Right.
18 Q  But you did understand that Judge Sheely was the head of
19    the Probation Department, didn't you?
20 A.  Certainly.
21 Q  In paragraph H you make reference to a conversation that
22    you had with Mr. Graham involving seniority and the need
23    to satisfy all parties involved.
24 A.  Yes.
25 Q  Do you recall that conversation?

Page 156

1  A.  I certainly do.
2  Q  When did it occur?
3  A.  It was -- I can tell you where. It was after August of
4     '96, it was in my office. Mr. Graham was explaining
5     what he called a balanced approach where it's necessary
6     for you to satisfy the victim, the community and as well
7     as the juvenile to make sure that they're rehabilitated.
8     Mr. Graham told me that I have to satisfy the victim,
9     the community, and he looked at me and he pointed at
10    himself, that those are the things that I have to
11    satisfy. And the smile on his face letting me know what
12    he meant.
13 Q  Did he make any oral reference to a sexual component to
14    that satisfaction?
15 A.  His expression saying that I had to satisfy him
16    certainly meant sexual to me.
17 Q  Did you challenge him in that regard? Did you ask him
18    what he meant specifically?
19 A.  I said, I don't want to hear it, and that was it. He
20    left my office. I didn't want to hear it. And he left
21    my office.
22 Q  What was it that led you to believe that the innuendo
23    there was toward some sort of sexual favor?
24 A.  It was his smile, the way he smiled at me. It wasn't
25    like a friendly smile, it was a provocative smile I

Page 157

1     guess you would say. It was just a flirtatious smile.
2  Q  Did he ever openly solicit you for sex?
3  A.  No.
4  Q  He never asked you to have intercourse with him?
5  A.  No.
6  Q  He never said, hey, let's get a hotel room and go have
7     sex?
8  A.  No.
9  Q  He never asked you for any form of sex?
10 A.  No.
11 Q  What he did on this occasion was reviewed the balanced
12    approach, as you described it, and then smiled at you
13    and pointed at himself, correct?
14 A.  That I need, I needed, he said, in our department we
15    have to satisfy the victim, the community, and to make
16    sure the juvenile's rehabilitated. He said, you have to
17    satisfy the victim, the community and (indicating), and
18    smiled at me, a very sexual provocative.
19 Q  And that was the way you interpreted it?
20 A.  Yes, it is.
21 Q  Was there anybody else present when he did that?
22 A.  No.
23 Q  So it was just you and him?
24 A.  Yes.
25 Q  In I you make reference to Graham calling attention to

## Page 158

1  your gender and making inappropriate comments about
2  females.  What do you mean by that?
3  A.  It goes to the sentence that he made a comment to me
4  about how dark he believes a young female's, quote, bush
5  is.
6  Q  Did he ever make any comments about your body?
7  A.  He would just compliment me on just -- anytime I would
8  see him he would say how nice I was dressed, you look
9  nice in your white pants, those kind of comments.
10 Q  Did he ever say anything about your breasts?
11 A.  No.  Well, there was a time where we were measuring for
12 bulletproof vests, and he thought it was so amusing to
13 let us know, the females know that he knew what cup size
14 we wore, because they're measured in cup size.  He
15 thought that was hilarious that he knew everybody's cup
16 size.  And he told me that I was not as big as one of
17 the other girls in the department.
18 Q  When was that?
19 A.  Probably, I'm just speculating, '97.
20 Q  Do you recall when in '97?
21 A.  No.
22 Q  Was anybody else present when that conversation
23 occurred?
24 A.  Other girls heard him talk about that, that he knew the
25 cup size.  He was back there when they were measuring.

## Page 159

1  Q  Who were the other girls?
2  A.  Nicole Galbraith.  She wasn't married at the time.
3  Debra Green.  Kerry Houser was also a female.  I believe
4  that was all females at the time.
5  Q  Was there any solicitation associated with that, or was
6  it just a reference to your cup size?
7  A.  Just letting me know that he thought --
8  Q  That he knew your cup size?
9  A.  Yes.  It was humorous for him.
10 Q  Did he ever discuss or mention to you anything about any
11 other part of your body?
12 A.  No.
13 Q  Were there any other occasions when he mentioned
14 anything about your cup size or breasts?
15 A.  No.
16 Q  The comment that's contained in paragraph I with respect
17 to a young girl's bush, tell me how that occurred.
18 A.  I was in my office, which is right off the main area of
19 the office.  And there was a girl who worked in the
20 District Attorney's Office, a young girl, young new
21 girl, and I think he knew her from the Newville area.
22 And he just came in just so happy with himself, he said,
23 I wonder how -- I believe how dark her bush is.
24 Q  Did you make any note with respect to that?
25 A.  Yes, I did.

## Page 160

1  Q  Did you date that note?
2  A.  Yes.
3  Q  What date was that?
4  A.  I don't have those dates with me.
5  Q  Did you protest to him when he made that comment?
6  A.  I was embarrassed and I said, you shouldn't talk about
7  that, you shouldn't talk like that.
8  Q  Was there anybody else present when he made that
9  comment?
10 A.  I don't -- no, I don't believe so.
11 Q  At any time, Barbara, during these various episodes
12 you've indicated at one time or another that you
13 protested to him, correct?
14 A.  That's correct.
15 Q  Did you at any point during any of those episode ever
16 say to him, please stop it or I'm going to have to go up
17 the chain of command and report your behavior?
18 A.  Yes.  And he said, go ahead and I'll have you
19 reprimanded, I'll take you up to the judge and have you
20 reprimanded.
21 Q  When did that occur?
22 A.  It would have been in '97.  Probably --
23 Q  When in '97?
24 A.  I would say probably beginning of '97.
25 Q  And what was the episode?

## Page 161

1  A.  I would tell him I'm tired of hearing him use the F word
2  at me, I'm tired of him screaming at me.  And that's
3  when he threatened to take me up to the judge and have
4  me reprimanded.
5  Q  All right.  Let's take that in steps.
6  A.  Okay.
7  Q  And what I want to deal with is him screaming at you and
8  using the F word with respect to you separately.
9  A.  Right, okay.
10 Q  With respect to the other episodes that we've been
11 talking about now for last hour or so, was there ever a
12 time when you said to him with respect to one of those,
13 where you said to him, enough?  Was there ever a time
14 when you said to him, if you don't stop talking about
15 those things I'm going to go up the chain of command and
16 take you upstairs?
17 A.  If I would say that and mentioned like, you know, you've
18 got to stop talking to me like this, he would say, go
19 ahead and take it to Joe, Joe won't do anything,
20 Mr. Osenkarski, he won't do anything.
21 Q  My question to you is:  Did you ever do that?  Did you
22 ever say to him, I'm going to take you upstairs?
23 A.  I said I was going to talk to Joe.
24 Q  About these things that we've been talking about?
25 A.  Yes.  I was tired of hearing about it, yes.

Page 162

1  Q  When did that conversation occur with Joe, or with
2     Mr. Graham?
3  A. I would say probably late '96 I'm guessing.
4  Q  Did you ever report Mr. Graham's behavior to
5     Mr. Osenkarski?
6  A. The one time when he threw me out of his office, and
7     that was about a file, that he just was calling me F-ing
8     this and F-ing that.
9  Q  We're going to get to that.  Okay?
10 A. Okay.
11 Q  All right?  But other than that?
12 A. No, I didn't.
13 Q  Okay.  So you never actually reported Mr. Graham's
14    offensive language to Mr. Osenkarski?
15 A. No.  I was in fear of reprisal.  I was afraid of
16    reprisal from him and from Mr. O, Mr. Osenkarski.
17 Q  Now, you say that Mr. Graham on occasion used the F word
18    with respect to you.
19 A. Yes.
20 Q  And actually in paragraph 17, actually it looks like
21    it's in J and also in 17 D.  Take a look at those.
22      MS. WALLET:  You're referring to 16 J?
23      MR. THOMAS:  Yes.
24      THE WITNESS:  Yes.
25 BY MR. THOMAS:

Page 163

1  Q  And those are two episodes where he either used the F
2     word or --
3  A. Yes.
4  Q  -- or you challenged him with respect to its use,
5     specifically dealing with you, correct?
6  A. That's correct.
7  Q  When did those two conversations occur?
8  A. One in J, I heard that several times.  I would say
9     whenever he would start ranting with the F word in my
10    office, he did that, and that would have been in early
11    '97 that I told him I didn't want to hear that word
12    anymore.  And I know at a time before that he had said,
13    he would say, go back to doing your social work if you
14    can't take it.
15      The one in D, that was said Debra Green is the one
16    that heard him saying that.  It was a -- the office was
17    open for business.  He was going back and forth between
18    two offices just ranting and raving about no F-ing
19    sense, no F-ing training, no F-ing ability.  To my
20    understanding it continued on for approximately 10
21    minutes.
22 Q  Would those comments have offended you had he left the
23    word fuck out?
24 A. No.  I'm sorry, yes, they would have offended me.
25 Q  If he had said no sense and no training and no ability,

Page 164

1     it still would have offended you?
2  A. Absolutely.
3  Q  Does the expletive add anything to the sense of outrage
4     that you felt with him screaming at you that you had no
5     sense, no training, and no ability?
6  A. Of course it did.
7  Q  In what way?
8  A. I find the F word offensive.  It just makes it more
9     derogatory towards me.
10 Q  After the tirade, as you described it outlined in 17 D,
11    what did you do?
12 A. Like I said, that was said in front of Ms. Green.  I was
13    on my way to the office and she called and told me what
14    he had said.  She was afraid for my safety.  She said,
15    he is in a tirade, go anywhere but don't come into the
16    office, he is just on a tirade.
17 Q  Were you not there when he said that?
18 A. No, I was not.  It was in front of Miss Green and he was
19    saying it between I believe it was Mr. Thielemann and I
20    believe Mr. Miller.
21 Q  So you weren't even physically present when the outburst
22    occurred that's alleged in 17 D?
23 A. No, I was not.
24 Q  You were not in the office?
25 A. No, I was not.  I was on my way to the office and Miss

Page 165

1     Green called and told me what Mr. Graham said.
2  Q  All right.  So it wasn't as if he was confronting you in
3     person and saying those things; he was doing it in
4     response to something that set him off in the office?
5  A. He had told me before he felt I had no F-ing ability.
6     He told me that in the office.
7  Q  Did you report that to anybody?
8  A. Yes.  That was whenever, probably almost at the point
9     where I went down to Human Resources.  Well, it was
10    called the, yeah, Human Resources.
11 Q  And that was in April of 1997?
12 A. Yes.
13 Q  And was it that outburst or something like it that
14    caused you to go to Human Resources?
15 A. I think it was just a combination of everything.  It was
16    getting worse.  No matter what I did, it was wrong.
17    Anything I did in the past, if I did it now it was
18    wrong.
19      Comments were made to me by other probation
20    officers saying, well -- if I would say, how are you
21    doing this, show me how you do this, and they said don't
22    come to me because we can do it one way but he won't
23    allow you to do it that way.
24      And one of the co -- another probation officer had
25    copied the harassment discrimination policy from the

## Page 166

1    county handbook, almost like as a reminder, like I was
2    so caught up in this that he reminded me, he said, you
3    need to go see somebody. He was observing what was
4    going on.
5  Q   And who was that?
6  A.  That was Darby Christlieb.
7  Q   Do you remember when that was?
8  A.  It was right before I went down and spoke to
9    Mr. Hartnett.
10  Q   But you knew that that policy existed, correct?
11  A.  Yes, I did. But I think I was so caught up in wondering
12    what I was doing wrong that I wasn't even thinking
13    beyond that. I, you know, to complain to
14    Mr. Osenkarski, I knew it wouldn't do me that much good
15    because he was not in the office that much. He really
16    had relinquished his power to Mr. Graham.
17  Q   And I gather you never pursued that route, you never
18    complained to Mr. Osenkarski?
19  A.  Yes, I did. One day I did complain to Mr. Osenkarski.
20  Q   When was that?
21  A.  That was --
22  Q   About this same time, about April of '97?
23  A.  It would have been a couple, yeah, a couple months, yes.
24  Q   Well, a couple of months or a few days?
25  A.  It was not a few days. It was probably prior to that.

## Page 167

1    It was -- I can't come up with the date right now.
2  Q   You filed your complaint with Dan Hartnett on April 25,
3    1997.
4  A.  That's correct.
5  Q   When would it have been in reference to that?
6  A.  I would say probably guessing, February, March.
7  Q   And you actually met with Mrs. Osenkarski?
8  A.  Yes, I did.
9  Q   In February or March of 1997?
10  A.  Right.
11  Q   Where did you meet with him?
12  A.  In his office.
13  Q   What did you say to him?
14  A.  Mr. Graham had just got done screaming and throwing me
15    out of his office because he didn't like how I had
16    handled several cases. And I went into Mr. Osenkarski
17    and I said, you've got to stop, you've got to get this
18    man under control.
19  Q   Why was he unhappy with you in February or March of '97?
20    Meaning Mr. Graham.
21  A.  I have no idea.
22  Q   Why was he screaming at you?
23  A.  He just was unhappy with the way I handled the cases, I
24    presume, the pattern I had done a hundreds of times
25    before. No, a hundred times, 50 times before.

## Page 168

1  Q   So the basis for him screaming at you had to do with his
2    assessment of your performance?
3  A.  Yes.
4  Q   And he was unhappy with your performance, he told you --
5    screamed at you and told you to get out of his office?
6  A.  Threw me out of his office.
7  Q   Did he give you any instructions in terms of how he
8    wanted you to do it differently?
9  A.  No.
10  Q   So just threw you out of the office over a performance
11    issue. You then went to Mr. Osenkarski in February
12    March, and said, you've got to get this guy under
13    control?
14  A.  Right.
15  Q   What details did you give Mr. Osenkarski in February
16    March of 1997 about Graham's behavior?
17  A.  He had been back in the office to begin with when I had
18    started discussing this case with Mr. Graham. And I had
19    looked to Mr. Osenkarski, I said, is this not the way we
20    always proceed, the same thing we've always done? And
21    he said, yes, but Mr. Graham's in charge. He verified
22    that that, indeed, was the way, you know, when we turned
23    cases in to Mr. Osenkarski that he was fine with it, but
24    Mr. Graham was in charge.
25  Q   So if I understand correctly, there was an issue about

## Page 169

1    the manner in which you were doing some paperwork, I
2    guess?
3  A.  Right.
4  Q   Graham started to challenge you, Osenkarski was present.
5    You said to Osenkarski, isn't this the way we always do
6    it?
7  A.  Um-hum.
8  Q   And Osenkarski said, yeah, but Graham's in charge?
9  A.  And he exited and went to his office.
10  Q   Graham then proceeded to scream at you?
11  A.  Right, and threw me out of the office.
12  Q   Over the manner in which you were doing certain
13    paperwork?
14  A.  Right.
15  Q   Threw you out of the office and you went to Osenkarski?
16  A.  Osenkarski's office.
17  Q   And said, you've got to get this guy under control?
18  A.  Absolutely.
19  Q   Was there any solicitation of sex involved?
20  A.  No.
21  Q   What was it about the conversation or comments by
22    Mr. Graham that you found to be demeaning? If you did.
23  A.  Telling me that I wasn't doing -- like I said, things
24    that I had done before were okay, now all of a sudden
25    they were not okay. The yelling at me, not even

## Page 170

1     explaining anything.

2 Q   Had you done similar or identical paperwork in the same

3     fashion previously?

4 A.   Yes.

5 Q   Without complaint from him?

6 A.   Yes.

7 Q   Did you ever get an explanation from him as to why it

8     was okay before but it wasn't okay now?

9 A.   No, I didn't.

10 Q   Other than Mr. Osenkarski, did you report that episode

11     to anybody else?

12 A.   To Mr. Hartnett.

13 Q   Is that when you went to Mr. Hartnett?

14 A.   It was about that time, yes.

15 Q   Do you remember the date on the first occasion in which

16     you complained to Mr. Hartnett?

17 A.   No, I don't. It was probably the beginning of --

18 Q   April?

19 A.   April, yes.

20 Q   Of 1997?

21 A.   Um-hum.

22 Q   In 17 B, you mentioned this during your earlier

23     testimony today, you make reference to wadding up paper.

24     Do you recall exactly when that occurred?

25 A.   Again, it was '97 -- I believe it was '97.

## Page 171

1 Q   Was that something else that you noted in your personal

2     notes?

3 A.   Yes.

4 Q   And is there a date contained in those notes, to the

5     best of your recollection?

6 A.   Yes. Yes, there is.

7 Q   What was the subject matter of the discussion that

8     morning? If it was morning.

9 A.   It was morning. I was in my office. Debra Green was

10     also sitting in my office with me. Mr. Graham came in.

11     I believe I had the file in my desk. Again, it was the

12     composite of the victims I had listed extensively for

13     the crime. He was for some reason not happy with how I

14     had done that. He came in, wadded the paper up, and

15     this is, I don't know what he called it but he was not

16     happy with it. He wadded the paper up and threw it at

17     me.

18     He pointed his finger in my face and started

19     saying, you have no -- don't know what you're doing,

20     just on and on, you have no fucking idea what's going on

21     here. He was pushing my pictures on my desk towards me,

22     moving them around and getting right in my face.

23     My office, I only had the one entrance and he was

24     blocking the entrance and he had his hand in my face,

25     his finger in my face shaking at me.

## Page 172

1 Q   Was Debra Green there for the entire event?

2 A.   Yes, she was. And he was loud when he did this. And

3     it's an open office.

4 Q   It was loud?

5 A.   He was very loud and it was an open office. My door

6     wasn't shut. He was letting me know.

7 Q   And he was letting you know that is he --

8 A.   He was very angry.

9 Q   And very angry, again, about your performance on some

10     given task?

11 A.   Right.

12 Q   He used the word fuck?

13 A.   Yes, he did.

14 Q   How long did that episode last?

15 A.   Felt like an eternity. Probably he went on and on for

16     several minutes. I'd say at least three, four minutes,

17     he went on and on.

18 Q   How close did he get to you?

19 A.   His finger was right in my face. He came around to my

20     desk, his finger was right in my face.

21 Q   He was pointing at you?

22 A.   Yes, he was.

23 Q   And saying what? You have no idea what you're doing?

24 A.   Yes. F-ing this, and yes, he would scream when he would

25     talk.

## Page 173

1 Q   Other than Deb Green did anybody else witness that

2     episode?

3 A.   I'm sure other people heard it. The secretary's desk is

4     right outside of my door. But Debra was right in there

5     when it happened.

6 Q   Did you ever hear Mr. Graham scream at anybody else?

7 A.   Yes, I've heard him scream at other people.

8 Q   Who?

9 A.   The director of Children and Youth.

10 Q   Who's that?

11 A.   Gary Shuey. There was a meeting in the one of the back

12     rooms.

13 Q   Do you know what that was about?

14 A.   I don't know. I have no idea. We just heard the voices

15     and him screaming.

16 Q   Who else has he screamed at?

17 A.   He had raised his voice to quite a few people. As far

18     as screaming, that kind of thing, I never heard him do

19     that at anybody but me.

20 Q   So the only person that you've heard him, the only two

21     people you've heard him ever scream at are you and

22     Mr. Shuey?

23 A.   That I can recall, yes.

24 Q   But you have heard him raise his voice with others?

25 A.   Yes.

**Multi-Page**

Page 174

1  Q  Can you tell me who those people are? Let me ask it to
2     you a different way.
3        Is there anybody who you haven't heard him raise
4     his voice with?
5  A.  Many people.
6  Q  Who?
7  A.  Sam Miller. Hank Thielemann. Dennis Drachbar. The
8     secretaries, I can't recall him doing that.
9  Q  How long have Miller, Thielemann and Drachbar been with
10    the Probation Department?
11 A.  I'd say probably over 20 years now.
12 Q  Was his elevated tone of voice something that he used
13    with newer employees?
14 A.  No, not that I believe. No.
15 Q  So who else did you hear him raise his voice with?
16 A.  Those are the only three -- I heard him, he would go in
17    to Chief Bolze, he would get loud with him. And with
18    **Mr. Osenkarski, he would get very loud with**
19    Mr. Osenkarski. Not to the point of screaming, but he
20    basically told Mr. Osenkarski what he would do or what
21    he wouldn't do.
22 Q  Dictating to Osenkarski?
23 A.  Absolutely. Absolutely.
24 Q  And he did that in a very loud and forceful manner?
25 A.  Yes. I saw him do that several times.

Page 175

1  Q  Did you ever hear him use the fuck word with Osenkarski
2     or Bolze?
3  A.  No.
4  Q  How about anybody else?
5  A.  Yes, he would. Just in conversation, describing things,
6     not in an angry manner.
7  Q  So he used the fuck word as part of his regular
8     vocabulary?
9  A.  I wouldn't say regular, but you heard it occasionally.
10 Q  How about any other swear words, was there anything else
11    that was part of the vocabulary?
12 A.  Not that I can recall.
13 Q  So the principal word that you heard or at least
14    remembered was fuck?
15 A.  Seemed to be.
16 Q  Is there anything else in 17 A through E that we haven't
17    talked about?
18 A.  I don't believe.
19 Q  In paragraph 19 you allege that Mr. Osenkarski also is
20    guilty of harassment, correct?
21 A.  That's correct.
22 Q  Let's look at those allegations, if we could. In 19 A
23    you say he called attention to your gender and made
24    inappropriate comments about other females.
25    Specifically, what did he say?

Page 176

1  A.  He made the comment when I was standing at the door of
2     our office talking to another probation officer, Mike
3     Varner, he walked past -- Mr. Varner and I had no
4     relation -- were engaged in a conversation, and he just
5     walked past and he said about a female intern's breasts,
6     that she had a nice said of jehoobees, and then
7     continued to walk out the door.
8  Q  Did he ever make any inappropriate comments with respect
9     to you personally?
10 A.  No.
11 Q  Other than this one episode where he made a comment
12    about the young girl's breasts, were there any other
13    episodes where Mr. Osenkarski said something that you
14    thought was inappropriate?
15 A.  Yes. There was a time that Mr. Osenkarski was
16    discussing his girlfriend's genital area, Debra Green
17    was a witness to this, that he spoke about when he was
18    canning hot peppers that their fingers would get hot,
19    and he had learned his lesson about inserting them in
20    her because it burned her. And this comment was made,
21    Ms. Green heard this and there was other secretaries
22    there.
23 Q  When did that occur?
24 A.  I'd say '98. I'm speculating on this date. '99.
25 Q  Was that something else that you also noted on your

Page 177

1     notepad?
2  A.  Yes. Correction. It looks in here it says in September
3     of 2000 when he made that comment.
4  Q  That was September of 2000?
5  A.  Yes, according to my reporting.
6  Q  So the inappropriate comments made by Chief Osenkarski
7     from the time you joined the Probation Department in
8     February of '95 until September of 2000, a period of
9     five years, you can identify two, correct?
10 A.  No, there are others.
11 Q  Okay.
12 A.  On September 12th, 2000, Mr. Osenkarski informed two new
13    female probation officers they would have to dance on
14    the table at their first staff meeting. Ms. Green heard
15    this comment. It was a staff meeting that was about to
16    begin.
17 Q  So we're now up to three; is that correct?
18 A.  There was also Mr. Osenkarski commented to a new female
19    probation officer that hysterectomies ruin women. To my
20    knowledge, I was possibly the only one in the office
21    that had that.
22 Q  Did he know that you had had a hysterectomy?
23 A.  Yes, he did.
24 Q  Did you interpret that comment as being directed to you
25    personally?

Page 178

1  A.  Yes, I did.
2  Q  Was he looking at you when he said it?
3  A.  No.  I was not present when he said that.
4  Q  You were not present?
5  A.  No, I was not.  I was --
6  Q  How did you learn of the comment?
7  A.  The girl herself told me, Gail Schuhart, a probation
8     officer.  Mr. Osenkarski would tell Ms. Schuhart that
9     she reminded him of his ex-wife.
10 Q  Was that somehow inappropriate?
11 A.  She was uncomfortable.
12 Q  Ms. Schuhart was?
13 A.  Yes.
14 Q  The comment about dance on the table?
15 A.  Yes.
16 Q  What is it about that comment that you find offensive?
17 A.  It's demeaning.  I don't believe he ever told men, guys
18    that they had to dance on the table at the first staff
19    meeting.  You usually don't see guys dancing on tables.
20    That's probably presumed by most people it's
21    provocative.
22 Q  Was that said in jest?
23 A.  I was not there.  Debra Green was there when it happened
24    as well as other probation officers.
25 Q  So you were not present to hear that comment, either?

Page 179

1  A.  No, I was not.
2  Q  Were you aware of any of the new female probation
3     officers that actually had to dance on tables?
4  A.  No.
5  Q  Are you aware of any female that ever danced on a table
6     at any probation meeting?
7  A.  Not that I know of, no.
8  Q  So of the allegations contained in your paragraph 19,
9     you were present for the comment about the intern's
10    breasts, correct?
11 A.  Correct.
12 Q  Were you present for any of the other comments?
13 A.  No.  I was just informed about those.
14 Q  Okay.  So in your presence, the only comment that was
15    made by Mr. Osenkarski amounted to the comment about the
16    young girl's breasts, right?
17 A.  Yes.
18       There was one other incident where I was at a
19    training with Mr. Osenkarski and Mr. Graham in Penn
20    State, and it was on sexual, juvenile sexual offenders I
21    believe is how it was defined.  And Mr. Osenkarski had
22    on him a Bic lighter, Bic type lighter, and when he
23    flicked it, it was a penis.  And he flicked it at the
24    female presenter several times.
25 Q  When was that?

Page 180

1  A.  It was '96.
2  Q  Do you know when in 1996?
3  A.  No, I don't.
4  Q  And who attended the Penn State conference?
5  A.  Juvenile Probation officers.
6  Q  Did he ever flick the Bic at you?
7  A.  Yes, he did.  He did that wherever he was.
8  Q  Was there any comment or solicitations associated with
9     it?
10 A.  No.  Not towards me, no.
11 Q  What was his purpose in doing so?
12 A.  Just amusing people, I guess, because it was a sexual
13    offenders program and this woman was presenting on
14    sexual offenders.
15 Q  In paragraph 20 you allege that you've been given less
16    desirable assignments.
17 A.  Yes.
18 Q  Tell me what you mean by that.
19 A.  In the past.  I have been, there were times where
20    assignments were not given out to males to supervise
21    females because of concerns of maybe inappropriate
22    allegations being made.  That was never the issue with
23    me.  I was given cases where the boys would need urine
24    tests, they might not even be in school.  Schools do not
25    want to do urines for us.  It just puts me in the same

Page 181

1     position.  But I was required to do the urine testing,
2     drug users, who needed that constant urine testing.  It
3     was almost impossible for me to get a good urine because
4     I can't observe what they're doing.
5        I was given cases of large males, large aggressive
6     males -- obviously, I'm not a very large person -- that
7     I was to supervise them in their home by themselves,
8     assaultive.  It was just -- size-wise it was an
9     inappropriate assignment.
10 Q  Did you protest that assignment to anybody?
11 A.  I talked to at the time it was Mr. Thielemann who had
12    assigned that case, concerns about that, that I can't
13    urine test.  And physical-ness.  And --
14 Q  Are we talking about one case involving urine tests of
15    males?
16 A.  No, there were several.  I would get, you know,
17    routinely cases that needed a urine screening,
18    where I would see males not getting assigned to females
19    who needed the same thing.
20 Q  How many cases involving this urine-sampling problem got
21    assigned to you?
22 A.  Really, now, all males need to be urined and I have, you
23    know, cases with males.
24 Q  Do you have any idea of the relative caseload of male to
25    female in the Probation Department?

## Page 182

1  A.  The girls are getting more and more. Males, I would
2      just speculate probably 75 percent male, 25 percent
3      female. It could be more than that for females now.
4  Q.  And how about in the time frame 1995 to 1996?
5  A.  I would say it probably would be about the same then. I
6      think it's getting more now, more females.
7  Q.  What else, other than the urine testing or the size of
8      the particular male probation people, are you referring
9      to when you say you got less desirable assignments?
10 A.  The numbers. My assignment numbers were extremely high
11     compared to others for while. That is not -- now it's
12     not happening.
13 Q.  You had a high caseload?
14 A.  Yes, I did, compared --
15 Q.  When was that?
16 A.  That would be in '96, '97.
17 Q.  What was your caseload?
18 A.  I don't know the numbers right now, but just looking in
19     comparison, mine was a lot higher.
20 Q.  What do you mean by a lot higher?
21 A.  Perhaps six, seven more than other ones.
22 Q.  What was your average caseload in the '96-'97 period?
23 A.  I'm guessing, speculating 25, 30, 35, somewhere around
24     there.
25 Q.  In 20 B you say that other probation officers

## Page 183

1      continually reminded that you were in physical danger of
2      retaliation by Graham?
3  A.  Yes.
4  Q.  Who were the probation officers that told you that?
5  A.  Sam Miller. Dennis Drachbar. Darby Christlieb. Debra
6      Green. Kerry Houser. I've been told to always be
7      careful where I go because of Mr. Graham by the sheriff
8      and by the CID Department.
9  Q.  What's CID?
10 A.  Central Investigation Department of the DA's office.
11     They had advised me to call my local police and inform
12     them of Mr. Osenkarski's type of car and Mr. Graham's
13     type of car. They also asked me to get a phone
14     monitoring -- number monitor on my phone.
15 Q.  Did you did that?
16 A.  Yes, I did. My own cost.
17 Q.  Did you ever receive any crank calls?
18 A.  We receive lots of crank calls. My husband could verify
19     that. Probably for a while it was one to two a day,
20     hang-up calls. We could not trace the number, it would
21     be unavailable or anonymous. Usually unavailable.
22 Q.  Do you have any reason to believe that any of those
23     calls were made by Mr. Graham or Mr. Osenkarski?
24 A.  Yes, I do.
25 Q.  On what basis?

## Page 184

1  A.  Just knowledge of the potential, what they could do.
2      And the police, like I said, the CID are the ones that
3      informed me that that would be a good idea for me to do.
4  Q.  When did Mr. Miller tell you that you should be
5      concerned about physical danger?
6  A.  Specifically, he told me on, it was it 1999. He said
7      that he was aware and he was concerned about how angry
8      he had heard Mr. Graham was, and that I needed to watch
9      myself.
10 Q.  Did he indicate that he had received any firsthand
11     information from Mr. Graham that he was threatening you?
12 A.  I don't think they would ever tell me specifically that
13     they would. They were just sort of alerting me just to
14     be careful.
15 Q.  How about Mr. Drachbar?
16 A.  Mr. Drachbar, again, he was concerned -- most of them
17     expressed concern to me or they'll just say, watch your
18     back, be careful, you know. Or else they'll say
19     Graham's around or those kind of things, to let me know.
20 Q.  Has Mr. Graham ever physically threatened you?
21 A.  He has threatened me that he'll punish me. He will punish
22     anybody who crosses him. And knowing his history with
23     his wife, I absolutely believed him.
24 Q.  When did he threaten to punish you?
25 A.  That was an ongoing thing after he was starting to get

## Page 185

1      angry. And we were always told ahead of time even
2      before that, just letting us know what they had done to
3      people before, Mr. Osenkarski, Mr. Graham, that they
4      punished people. They liked to say that.
5  Q.  Was this '96-'97?
6  A.  Even before -- well, after I -- once I started there,
7      these are comments I heard.
8  Q.  From February '95 on?
9  A.  Right, about the punishment phase.
10 Q.  Mr. Graham no longer has any supervisory
11     responsibilities over you; is that correct?
12 A.  No, he did not.
13 Q.  And hasn't had since the summer of '97? Let's approach
14     it this way.
15 A.  Right.
16 Q.  Sometime after you filed your Complaint --
17 A.  Right.
18 Q.  -- you received a letter, did you not, removing all
19     supervisory responsibilities with respect to Mr. Graham?
20 A.  Yes, I did. It would have been spring of '97, I think.
21     Late spring, probably.
22 Q.  And we'll get to that at some point.
23 A.  Okay.
24 Q.  And Mr. Osenkarski, of course, has remained in the
25     Department throughout, correct?

Page 186

1  A.  Yes, he has.
2  Q  Has he retaliated against you in any fashion whatsoever?
3  A.  Not directly, no.
4       MR. THOMAS: Let's take a couple of minutes, okay?
5       (Recess taken from 3:31 until 3:44 p.m.)
6  BY MR. THOMAS:
7  Q  Barb, before we took the break you were talking a
8     minute ago about the comments or concerns involving
9     Mr. Osenkarski, and remember, we reviewed those and you
10    were only personally present for one of those, as I
11    recall.  Do you recall that conversation?  It's
12    paragraph 19 of your Complaint.
13         One of the things I forgot to ask you there was,
14    you indicated that other probation officers informed you
15    of the comments that he had made.
16 A.  Yes.
17 Q  Who were those probation officers?
18 A.  As regard to E would have been Debra Green.  D would be
19    Debra Green observed it.  The two females would have
20    been Gail Schuhart and Jill Grim-Rhoads, that's
21    hyphenated.
22       MR. MacMAIN: Would you repeat that last name?
23       THE WITNESS: Grim-Rhoads, G-R-I-M-E, hyphen,
24    R-H-O-A-D-S, I believe.
25         C would have been Gail Schuhart.  I think I already

Page 187

1     said that.
2          And that would --
3  BY MR. THOMAS:
4  Q  Let's go back to paragraph 20, now, I believe is where
5     we were.  In D you make reference to seniority problems.
6     There was a dispute at one point, was there not, over
7     whether probation officers got credit for all county
8     time or only time in the Probation Department; is that
9     correct?
10 A.  After we split, after we became juvenile and adult.
11    Prior to that, they had already established a policy.
12 Q  And that dispute arose, and as I understand it, you
13    correct me if I'm wrong, I gather that seniority problem
14    has been solved to your satisfaction?
15 A.  No.  I'm still below on the seniority list.  I'm still
16    below the gentleman who I had been above when I was
17    hired.
18 Q  Based on total time?
19 A.  Yes.
20 Q  And who is that gentleman?
21 A.  That's William Brandt.
22 Q  And the dispute centers around whether or not a
23    probation officer, in terms of seniority, gets credit
24    for all time while employed in any branch of county
25    government, or whether the only time that applies is the

Page 188

1     Probation Department, correct?
2  A.  That's correct.
3  Q  And you say that still has not been solved to your
4     satisfaction?
5  A.  No.  I'm still below him.  I had -- when I first started
6     with Probation I was above him, and then he was moved
7     down when we split.  Well, not when we split, whenever
8     the -- yes, when the seniority list was changed.
9  Q  And what aspects of your employment does that seniority
10    list affect?
11 A.  It could be an on-call.  We have to go by seniority when
12    you put down for on-call.  Any kind of promotion has
13    always been historically longevity.  And I think it's --
14    I don't know of any other times that promotions were not
15    based on longevity and, well, seniority list.  And so
16    that would affect me when that occurs.
17 Q  Have you ever been passed over for a promotion?
18 A.  When the senior -- a senior probation officer position.
19    And I said, wait a minute, that I had more seniority
20    than Bill Brandt.
21 Q  Are you now a senior probation officer?
22 A.  Yes, I am.
23 Q  When were you made a senior probation officer?
24 A.  I don't know the exact date.  '98, I believe.
25 Q  How about May 7, 1998?

Page 189

1  A.  Okay.
2  Q  When did you think you were eligible to become a senior
3     probation officer before that?
4  A.  They had promoted -- they had -- Mr. Osenkarski had
5     posted that Mr. Brandt would be a senior probation
6     officer, and I'm not sure when that had happened, but it
7     was in the prior probably six-month period.
8  Q  Do you know as a matter of fact or is it merely your
9     suspicion that you weren't promoted to a senior
10    probation officer at the same time as Mr. Brandt?  That
11    was a very awkward question.  Do you understand it?
12 A.  No, I don't.  Would you rephrase that?
13 Q  What I want to know is why you believe that Mr. Brandt
14    was made a senior probation officer before you were.
15 A.  They changed the seniority list, one thing, and put him
16    above me.  So again, the seniority.
17         And also, Mr. Graham had told me that I didn't need
18    it as much as Mr. Brandt did, that I had a rich husband,
19    and that Mr. Brandt -- I'm sorry, and Mr. Brandt would
20    have a family, eventually get married and have a family
21    and he would need it more than I would.
22 Q  Do you know as a matter of fact that Mr. Brandt was made
23    a senior probation officer before you were?
24 A.  He was, until I complained.
25 Q  And then what happened?

Page 190

1  A.  **Then I guess there was discussion about that,**
2      **Mr. Osenkarski and -- I don't know who all. All I know**
3      **is discussion was held and that seniority move was put**
4      **on hold.**
5  Q  What was the end result?
6  A.  **We were both promoted. He still remained senior to me,**
7      **though.**
8  Q  So you were both made senior probation officers at the
9      same time?
10 A.  **Yes.**
11 Q  What other effect has it had on your employment, if any?
12 A.  **At this point, nothing. It's just potential, as I said.**
13      **If there's promotions, looking at the seniority list, he**
14      **is above me.**
15 Q  Is he the only one that's affected?
16 A.  **Yes, he is.**
17 Q  In paragraph 21 of your Complaint you indicated that you
18      complained about harassment, sexual harassment by Graham
19      and Osenkarski to Mr. Hartnett on April the 8th, 1997.
20      You see that allegation in paragraph 21?
21 A.  **Yes, I do.**
22 Q  Is that, in fact, the first time that you filed a formal
23      complaint?
24 A.  **That's the first time I went down and spoke to**
25      **Mr. Hartnett about that, yes.**

Page 191

1  Q  And was that pursuant to the policies and procedures
2      that you were aware of regarding harassment and
3      discrimination?
4  A.  **Yes, it was.**
5  Q  Did you follow that meeting up with a written
6      memorandum?
7  A.  **Yes, I did, on April 25th.**
8      (Varner Deposition Exhibit No. 1 was marked.)
9  BY MR. THOMAS:
10 Q  I've placed in front of you what we've marked as your
11      Deposition Exhibit No. 1. Do you recognize that
12      document?
13 A.  **Yes, I do.**
14 Q  And is that, in fact, the April 25, memorandum that you
15      filed with respect to your claims here?
16 A.  **Yes, it is.**
17 Q  And was that filed pursuant to the harassment and
18      discrimination policy that you were aware of as part of
19      your employment?
20 A.  **Yes, it is.**
21 Q  Did you attempt to detail in that document all the
22      various events, some of which we've discussed here
23      today?
24 A.  **Yes, I did.**
25 Q  And at the time, that was your recitation in terms of

Page 192

1      the behavior that you thought violated your rights,
2      correct?
3  A.  **That's correct.**
4  Q  Are you aware that following your submission of that
5      document that an investigation was commenced?
6  A.  **Yes, it was.**
7  Q  And it was commenced by or on behalf of individuals in
8      the county; is that fair?
9  A.  **To my knowledge, yes.**
10 Q  County and the court?
11 A.  **Yes.**
12      (Varner Deposition Exhibit No. 2 was marked.)
13 BY MR. THOMAS:
14 Q  I've placed in front of you a document which we've
15      marked as your Deposition Exhibit No. 2. Do you
16      recognize that document?
17 A.  **Yes.**
18 Q  Do you recognize and can you identify that as a document
19      authored by Joe Osenkarski?
20 A.  **His initials are on that, yes.**
21 Q  And you received a copy of this document at about the
22      time it was published on June 13, 1997?
23 A.  **Yes.**
24 Q  And was this one of the actions taken as a result of
25      your complaint?

Page 193

1  A.  **I believe so.**
2  Q  You filed your complaint on April 25th, 1997, and on
3      June 13 Mr. Osenkarski removed Mr. Graham from any
4      authority or responsibility concerning your employment;
5      is that fair?
6  A.  **That's correct.**
7  Q  Were you interviewed as part of the investigation?
8  A.  **Yes, I was.**
9  Q  And did you talk to the investigator?
10 A.  **Yes, I did.**
11 Q  Described in detail the facts and circumstances of your
12      employment that troubled you?
13 A.  **Yes, I did.**
14 Q  And that you felt violated your rights?
15 A.  **Yes.**
16 Q  Were you subsequently advised that some corrective
17      action was going to be taken?
18 A.  **We were told that we would be very happy with the result**
19      **of the investigation.**
20 Q  Who told you that?
21 A.  **Mr. Deluce gave my attorney, Deb Wallet, that**
22      **information. We were never told what the results were**
23      **or the recommendation.**
24      (Varner Deposition Exhibit No. 3 was marked.)
25 BY MR. THOMAS:

Page 194

1  Q  I've placed in front of you a document which we've
2     marked as your Deposition Exhibit No. 13, and it shows a
3     copy to --
4        MS. WALLET: 13?
5  BY MR. THOMAS:
6  Q  I'm sorry, No. 3, that shows a copy to your attorney,
7     Debra Wallet.  Do you see that?
8  A.  Yes, I do.
9  Q  Have you seen this document in the past?
10 A.  Yes.
11 Q  And do you recall having received or reviewed a copy of
12    this document in the summer of 1997?
13 A.  Yes.
14 Q  And the document, there's really two parts.  It consists
15    of two letters, a letter of July 11 authored by Judge
16    Sheely, and a letter authored by him on July 17,
17    correct?
18 A.  I never saw the first page, but the second page I'm
19     aware, the July 11th one.
20 Q  And you're aware that on July 11 Judge Sheely imposed a
21    punishment against Mr. Graham, correct?
22 A.  Yes, three-day suspension.
23 Q  And the letter of July 17 amends the dates of the
24    suspension to July 25, 28 and 29, correct?
25 A.  Yes.

Page 195

1  Q  So you are aware that as a result of your complaint
2     initiated on April 25, by July 17, I guess more
3     appropriately by July 11, Judge Sheely, after an
4     investigation, gave Mr. Graham a three-day suspension,
5     correct?
6  A.  Yes.
7  Q  Did you agree with that --
8        MS. WALLET: Let me just object to that.  Aware
9     when?  Aware in July or aware now?
10       MR. THOMAS: Aware in July.
11 BY MR. THOMAS:
12 Q  Were you aware in July of 1997 that Judge Sheely had
13    given Mr. Graham a three-day suspension?
14 A.  According to his Order.
15 Q  Yes.
16 A.  Yes, I see that.
17 Q  When did you first file a complaint with the EEOC
18    office, if you recall?
19 A.  I first filed with Human Relations and they informed me
20    that I needed to file with the EEOC in that it was the
21    courts were involved.
22       (Varner Deposition Exhibit No. 4 was marked.)
23 BY MR. THOMAS:
24 Q  I've placed in front of you, Barb, a handwritten
25    letter dated July 21, 1997.  It's marked as your

Page 196

1     Deposition Exhibit No. 4.  Do you recognize that
2     document?
3  A.  It's my writing, I can't -- Joanne, yes.  She was with
4     EEOC, Joanne.
5  Q  You say that is your handwriting?
6  A.  Yes.
7  Q  And Joanne was with EEOC, correct?
8  A.  I believe so.
9  Q  And this is a note that you wrote to her?
10 A.  Yes.
11 Q  Would you read it for the record, please?  It's only two
12    sentences long.
13 A.  I appreciate -- Dear Joanne, dated 7/21/97.  I
14    appreciate any help you can give me to expedite this
15    procedure.  As I explained to you, I am a court worker
16    and have had to go directly to you after Human Resources
17    denied being able to help.
18 Q  Who are you referring to when you say Human Resources?
19 A.  Probably perhaps maybe Human Relations rather than Human
20    Resources.
21 Q  You're talking about a state agency there?
22 A.  Yes.  Yes, I believe.
23 Q  And you've identified yourself there as a court worker,
24    correct?
25 A.  Um-hum.

Page 197

1  Q  And was that because you understood that you were, in
2     fact, working for the court?
3  A.  I work for both county and court.  I was an officer of
4     the court in the Juvenile Probation Department, but I'm
5     also a county employee.  I follow the guidelines of the
6     county book, procedural book.  I'm paid by the county.
7  Q  Who had the right to hire or fire you?
8  A.  That would be Judge Sheely.  The Court.
9  Q  Did anybody else have the right to hire or fire a
10    probation officer?
11 A.  No.  I would say no.
12 Q  It had to be done by the president judge?
13 A.  I'm sure -- yes, final thing, yes.  Final say.
14 Q  You asked for, in a number of documents later you asked
15    for a number of things to be done, correct?
16 A.  Um-hum.  Yes.
17       (Varner Deposition Exhibit No. 5 was marked.)
18 BY MR. THOMAS:
19 Q  At the time Mr. Graham was suspended by Judge Sheely,
20    did you have any objection to that action that was taken
21    by him, by Judge Sheely?
22 A.  I didn't think it was nearly enough.
23 Q  You thought it was an inadequate penalty?
24 A.  Absolutely.
25 Q  Why do you believe that?

Page 198

1   A.  Because it was a recurring derogatory threatening me. I
2       don't think that justified only three days. I was
3       suffering problems at that point because of this, fear
4       of my own safety. I didn't think it was enough.
5   Q.  So your objection to the penalty imposed was that it was
6       an inadequate penalty?
7   A.  He still would have access to me. He would still be in
8       our office. He would still be an employee of the
9       county. Still be able to come across, be around the
10      area.
11  Q   At that point he had been removed from any supervisory
12      responsibility over you, correct?
13  A.  That's correct.
14  Q   And he had been given a reprimand and a three-day
15      suspension?
16  A.  Right.
17  Q   And what you wanted at that point was you wanted him
18      fired from the county?
19  A.  I -- what I had asked, that I did not think he should
20      supervise any other females, and I wanted to not have
21      any contact with him whatsoever.
22  Q   You personally?
23  A.  Yes.
24  Q   I've placed in front of you what we've marked as your
25      Deposition Exhibit No. 5. Can you identify that for us,

Page 199

1       please?
2   A.  Yes.
3   Q   What is it?
4   A.  This was my initial complaint to the EEOC.
5   Q   Do you know when it was filed?
6   A.  I dated it 7/21/97. The date it was filed, let's see
7       the date on here. That's when I sent it.
8   Q   That's when you sent it to EEOC?
9   A.  Right.
10  Q   Does this appear in your handwriting?
11  A.  Yes, it is.
12  Q   And the beginning on page 3 of the document and for
13      several pages thereafter you detail the events that
14      you're complaining about, correct?
15  A.  Yes.
16  Q   When you filed that action or claim in July of 1997,
17      what is it that you wanted done?
18  A.  I wanted the harassment and the discrimination to stop.
19      I wanted to be, have a safe environment that I could go
20      to work and not worry about my supervisors, well,
21      Mr. Graham, or Mr. Osenkarski, retaliating against me.
22      I wanted what Title 7 said that I'm allowed to have, a
23      harassment-free environment, safe environment to work
24      in. I wanted to be treated equally. I wanted my
25      seniority addressed.

Page 200

1   Q   As of now, Mr. Graham has been physically removed from
2       the courthouse, correct?
3   A.  His office, he's located at the prison. I believe he
4       does come to the courthouse sometimes. I'm not sure
5       when.
6   Q   But Judge Hoffer actually invoked a physical transfer
7       which moved him out of the courthouse, correct?
8   A.  That's correct.
9   Q   So he is no longer in the same work premises that you're
10      in on a day-to-day basis, correct?
11  A.  Correct. That is correct.
12  Q   He no longer has any supervisory responsibility over
13      you, correct?
14  A.  No, he does not.
15  Q   Who's currently supervising you?
16  A.  Sam Miller.
17  Q   Do you have any complaints or concerns with respect to
18      Mr. Miller?
19  A.  No, I do not.
20  Q   And how long has he supervised you?
21  A.  He was assigned as my supervisor back at this, when that
22      was.
23  Q   July of '97?
24  A.  Yes. And then, I'm not sure about the time frame, but
25      then Mr. Thielemann became my supervisor for a period.

Page 201

1       And then it returned to Mr. Miller maybe six months ago,
2       or, he was -- he was assigned me as a person to
3       supervise.
4   Q   Did you have any complaints with respect to your
5       treatment by Mr. Thielemann while he was supervising
6       you?
7   A.  I think at the very beginning he was -- I think he was
8       maybe angry about the whole thing. I felt some, you
9       know, resistance towards me. But he appears to be
10      mellowing, I can use the word mellowing. He still
11      supervises me for placement cases if I have children in
12      placement. And Tom Boyer also supervises to the point
13      of daily logs, close-out cases. But Mr. Miller is my
14      primary supervisor.
15  Q   Now?
16  A.  Yes.
17  Q   Did you have occasion to ever complain about
18      Mr. Thielemann in terms of any discrimination or
19      harassment toward you?
20  A.  No, I didn't.
21  Q   So other than feeling some resistance as you described
22      it, you've had a good working relationship with
23      Mr. Thielemann?
24  A.  Yes. He had done some of the stacking-on of
25      assignments, the numbers were up. He was party to that.

Page 210

1  some time.
2      That was something that was recommended by my
3  doctor. I felt I would rather work than go on any kind
4  of medical leave. I prefer -- because a lot of my work
5  can be done from home. And it worked out fine except
6  for court appearances.
7  Q  How long was that?
8  A. Several months until I could be returned to work.
9  Q  And was there some sort of air-filtration system
10  installed in your office?
11  A. Yes. I was given an air-purifying system for my office.
12  Q  And has that solved your allergic problems?
13  A. It seems to, yes.
14  Q  So since then, you've been relocated back in the
15  building with air filtration in a private office, so to
16  speak?
17  A. I'm sharing an office at this time, but yes.
18  Q  Initially was it a private office?
19  A. Yes, it was.
20  Q  What requests have you made that have not been
21  satisfied?
22  A. I want to be assured that there's no retaliation against
23  me for filing this claim.
24  Q  Has there been any retaliation to date?
25  A. Yes, there has been.

Page 211

1  Q  In what manner?
2  A. In the CASA position. I had applied for a position, a
3  court-appointed special advocate program. It was a new
4  program under the direction of Judge Guido. I had
5  applied for that, been -- well, the judge had said in a
6  meeting in 2000, March 1st, 2000, that he had chosen me
7  as the designee to be the CASA director.
8      We proceeded with -- they made the grant
9  application using my salary as the salary for the
10  position. Up to the very last minute, really, the 11th
11  hour, I was in the process of getting things transferred
12  over from Juvenile Probation to them, and my attorney
13  was informed that I could not have the position unless I
14  was willing to withdraw my Complaint.
15  Q  Were you offered a settlement in this case based upon
16  taking the CASA position and maintaining your current
17  salary?
18  A. I didn't think my Complaint had anything to do with the
19  CASA position. I was offered the position at a lower
20  salary, which was, I believe it was $29,000, which was
21  almost 11,000 less than what I'm making, to withdraw the
22  suit.
23  Q  You were, in fact, offered the CASA job but at a lower
24  salary, as I understand your testimony?
25  A. Yes, I was.

Page 212

1  Q  Okay. And you were offered the CASA position at your
2  current salary in conjunction with a settlement of this
3  litigation; is that also accurate?
4  A. For withdrawing my suit, yes. Not settlement.
5  Withdrawing my suit.
6  Q  We can argue about whether there's a difference or not.
7  A. Yes.
8  Q  In any event, you chose not to take the position under
9  either condition, correct?
10  A. Yes.
11  Q  Other than the CASA job, have you been retaliated
12  against in any other fashion?
13  A. I think retaliation, knowing that I'm in fear, knowing
14  that Mr. Graham has let people know that he will punish
15  anybody, as well as Mr. Osenkarski will punish anybody
16  who crossed them. Just having that awareness.
17  Q  Have you been punished?
18  A. Not at this point.
19  Q  Let me talk to you about your damages for a few minutes.
20  A. Okay.
21  Q  Who is your current family doctor?
22  A. Dr. Theresa Burick, B-U-R-I-C-K.
23  Q  Where is she located?
24  A. She's located on Poplar Church Road in Camp Hill.
25  Q  How long has she been your family doctor?

Page 213

1  A. I'm guessing six years, six, seven years. I believe
2  '96.
3  Q  So back to 1996?
4  A. I believe so.
5  Q  Who was your family doctor before that?
6  A. I really didn't have a family -- Dr. Sullivan, who I
7  rarely saw.
8  Q  Where was Dr. Sullivan?
9  A. He was located in Mechanicsburg.
10  Q  Is he still in practice?
11  A. I believe he is. John Sullivan.
12  Q  How long were you with Dr. Sullivan?
13  A. Maybe two years. He had broke off from another group.
14  Q  What was that group?
15  A. Mazzitti Sullivan. Mazzitti and Sullivan. Cincotta,
16  Mazzitti and Sullivan.
17  Q  Who did you see in that group?
18  A. Whoever was available.
19  Q  And that's where you got your internal medicine, family
20  physician type stuff?
21  A. Yes.
22  Q  How long were you with that group?
23  A. We were there from, my family was there, I'm guessing
24  probably '72 till -- and Dr. Sullivan, carrying him
25  over, probably till '96.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . .

BARBARA E. VARNER,        .
     Plaintiff,        .    CIVIL ACTION
               .    NO. 1:CV 01-0725
     vs.        .
               .
COMMONWEALTH OF PENNSYLVANIA,    .    (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND    .
COUNTY; S. GARETH GRAHAM,        .
Individually, and JOSEPH        .
OSENKARSKI, individually,        .
     Defendants.        .

. . . . . . . . . . . . . . . .

**VOLUME 2**
*Pages 229 to 424*

Deposition of:    **BARBARA E. VARNER**

Taken by    :    Defendant Cumberland County

Date    :    January 28, 2003, 9:27 a.m.

Before    :    Emily Clark, RMR, Reporter-Notary

Place    :    Administrative Offices of
              Pennsylvania Courts
              5035 Ritter Road, Suite 700
              Mechanicsburg, Pennsylvania

APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
            Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY:  JAMES K. THOMAS, II, ESQUIRE
        PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

Page 246

1  Q  How did you know that?
2  A.  Probably there are exit signs, I would assume, and
3     stairways. I know the elevator's right beside the
4     stairway. Of course, it says don't use the elevator.
5     But there's an exit out.
6  Q  Okay. No one told you that that's the exit you use for
7     emergencies when you were in Children and Youth
8     Services, right?
9  A.  There probably -- we probably had fire drills, yeah, and
10    they would say which way to exit.
11 Q  Who would say that to you?
12 A.  That would be, then it was the personnel -- the county
13    would run fire drills. I assume it came through the
14    Sheriff's Department or the fire companies, I don't
15    know. But we would have fire drills.
16 Q  Okay. So you think the county's responsibility,
17    emergency process in fire drills, you think that goes
18    back to the county's responsibility; is that correct?
19 A.  To ensure safety, sure, of the workers. Absolutely.
20 Q  When you were with Children and Youth Services is that
21    when the Sheriff's Department would come and help with
22    the evacuation in case of an emergency, things like
23    that?
24 A.  I don't recall. I just remember our director saying,
25    and in an evacuation we more sort of followed each other

Page 247

1     knowing how to get out, it was that type of thing. I
2     don't remember any actual training or anything.
3  Q  Or any protocol?
4  A.  No. Just, you know, us being told and signs saying you
5     exit this way.
6  Q  So the key with you when you were with Children and
7     Youth Services in terms of exiting for an emergency or
8     even a fire drill was you follow everyone else; is that
9     correct?
10 A.  In general, yes.
11 Q  Would that be the same with the Probation Department,
12    that basically in an emergency or something happens,
13    everyone follows everyone else out of the building?
14 A.  I think just common knowledge you use the stairways as
15    in any building, you would not take the elevator, use
16    the stairway closest to you, and that would be common
17    knowledge, I would think, anywhere.
18 Q  You follow everyone else to exit?
19 A.  Basically, yes.
20 Q  Okay. At some point when you were with the Probation
21    Department you were given an office that was, it was a
22    closed-door office; is that correct?
23 A.  Yes.
24 Q  Okay. And that office didn't have any window, did it?
25 A.  Yes, it does. It has a window out to the secretarial

Page 248

1     area. It's not to the outside, but there's a sliding
2     glass window that right outside there the secretaries
3     sit.
4  Q  And while you're sitting down can you see the
5     secretarial staff as you just described?
6  A.  Generally I would -- we had, like, little mini blinds.
7     I would keep them turned so that the secretaries
8     couldn't see the clients that I had in there. But I
9     could see enough I could see the clock. But I really
10    didn't want my clients or them to see, you know, what
11    was going on in the office with clients.
12 Q  Okay. And you had this office, this closed-door office
13    at the time of the incident which you felt you were left
14    in the building; is that correct?
15 A.  Yes, I did.
16 Q  Okay. So when there's a fire drill that actually
17    happened on that day that you just described, you
18    couldn't see people going back and forth; is that true?
19 A.  No, I did not. I was dictating. But everybody in the
20    office was aware that my door was shut.
21 Q  How do you know that?
22 A.  Because it was just common. They knew I had the air
23    purifier in there. It was just a common thing. My door
24    was shut most of the time.
25 Q  Is that why you had that office to yourself, because of

Page 249

1     the air purifier?
2  A.  No, I had gotten that office seniority-wise. It was one
3     of those things, that's the thing as you move up in the
4     seniority, if there's an office by yourself, that's sort
5     of something you sort of achieve to. And I was senior
6     and able to take that. When we really -- it was when we
7     split our departments.
8          Like I said, Mr. Osenkarski was aware I was in the
9     building. So were the other, the secretaries and stuff
10    were aware that I was there. And I had signed in on the
11    board which is directly outside of his door. At a very
12    glance you can see who was in and who was out.
13 Q  Okay, okay. When Gary Graham was a supervisor in the
14    Probation Department he used to yell at other folks as
15    well; is that correct?
16 A.  Not as much as he did me. Not nearly as much.
17 Q  How much would he yell at others?
18 A.  I don't -- it really wasn't, not so much. He would get
19    loud with them. Never that much derogatory to them,
20    like your F-ing ability or actually making direct
21    comments to them about them. It was more in anger
22    talking about other things, F this, F that, or about
23    other people, about the chief, about everybody.
24 Q  So he would say F that hypothetically about anything or
25    everyone?

**Multi-Page™**

Page 250

1   A.   You heard him use that quite a bit, yes.
2   Q   And Mr. Osenkarski was familiar with Mr. Graham's
3        language; is that correct?
4   A.   Oh, yes.
5   Q   Okay. But isn't that sort of the climate of the
6        department, persons are sort of free for all speaking
7        all types of ways?
8   A.   You don't -- no. You don't hear that constantly in the
9        offices at all. That was not a constant thing. I can't
10       really think of anybody else who would be that -- he was
11       always just an angry, angry man, after we split and he
12       basically got power, got the authority that he could do
13       what he wanted.
14          He would be angry before that, about his wife,
15       about situations, about bosses, about anything. But it
16       was directed at me is what caused the problems for me,
17       when it was actually at me, the language, the anger,
18       that kind of, and the threats.
19   Q   Okay. When you say split, you mean that you and Gary
20       stopped seeing each other?
21   A.   No, no, no. When the Department split, the juvenile and
22       adult, after the Department split.
23   Q   Okay, thanks.
24   A.   And he sort of was left to be in power. Mr. Osenkarski
25       started delegating it to him.

Page 251

1   Q   But you were aware that Mr. Osenkarski's style
2        nevertheless was a hands-off approach to management?
3   A.   I didn't know it was that extreme, that he would let
4        Gary do whatever he wanted to do.
5          When I started there, Ken Bolze was still chief.
6        Ken Bolze kept basically a lid on Mr. Graham and on
7        Mr. Osenkarski, that, you know, they had to go through
8        him before -- they had to answer to Mr. Bolze.
9   Q   In terms of emptying out the building, clearing the
10       building of personnel when there's an emergency or a
11       fire drill, what do you think the responsibility is of
12       the Sheriff's Department in that situation for the
13       building?
14   A.   My understanding is they come around and they assure
15       that every office has been cleared out. They look to
16       the directors of the department, whoever -- they always
17       look to whoever is senior officer in there, whether it's
18       chief or whoever is there, to assure that their office
19       is cleared.
20          And I believe they checked when they get out and
21       it's the chief or whoever is in charge, to meet with.
22       I'm not sure whether -- it's another department, they
23       have to meet with them and assure that their department
24       is clear, that everybody was out. And then I know the
25       sheriffs will go around afterwards with their dogs and,

Page 252

1        you know, checking for bombs.
2           But ultimately it is the department head, whoever
3        is the department head at that time when it happens, to
4        make sure the office is cleared.
5   Q   Okay. And how do you know that?
6   A.   We had one prior to that, and we were evacuated. And at
7        that time they were going around getting all the
8        department heads together as soon as everybody was
9        cleared, saying, is all your people out, have you gone
10       down the roster, who was there, gonna down the roster and
11       made sure they were out. And I assume that's the same
12       procedure they would follow.
13   Q   The Sheriff's Department goes to the department head in
14       most cases?
15   A.   I believe it's Personnel, well, Human Resources that
16       goes around and says -- the departments make a list of
17       who was in that building -- did you make sure they were
18       out, assuring that they were all left the building.
19   Q   Okay. So during the drill, fire drill or emergency,
20       you're saying that --
21   A.   During the bomb scare yes.
22   Q   Bomb scare, I'm sorry, in this instance --
23   A.   Right.
24   Q   HR was the person, someone from HR would go to the
25       department heads and to determine if everyone was

Page 253

1        accounted for?
2   A.   Yeah. I believe was the Clerk of Courts. No, chief
3        clerk, chief with personnel. Those were the two people
4        that were in charge of in that the department had to
5        contact them to make sure everybody was out of the
6        building. So it was sort of that chain of command.
7   Q   The bomb scare that you are referring to today, on that
8        particular occasion isn't it true that you were
9        physically already outside the building by the time HR
10       actually requested that Osenkarski report to them about
11       who was in and who was out?
12   A.   I would have no idea about that. I know during the
13       initial bomb scare that they were on top of that very
14       quickly, wanting to know and saying you make a list as
15       soon as you got out. I heard them tell our secretaries,
16       telling our secretaries, who was there, make a list,
17       let's make sure they were all out of building. And so
18       they seemed to be on top of it in our first bomb scare.
19   Q   Okay. Are you aware that Mr. Osenkarski after the
20       incident and with the bomb scare, actually went to the
21       HR department and advised them that there needed to be
22       more established protocols so that this would not happen
23       to you again?
24   A.   It was my knowledge that Chris Miller, who was Human
25       Resources director at that time, called Mr. Osenkarski

Page 266

1   his regular secretary was not there but he had one of
2   his law clerks, she was typing, in the process of typing
3   a letter. And what I found out that it was the order he
4   was making or what he planned to do as a result of my
5   complaint, what his resolution would be. When I walked
6   into the office the judge said, come over here. And he
7   said, I just want you to know I've made a decision, and
8   then he said, why don't you come into my office with me.
9        So I walked into the judge's chambers with him, and
10  he proceeded to tell me that Mr. Graham and his wife and
11  Attorney Dave Foster had come to him, I believe it was
12  the day before, I believe, that they had, Mr. Graham had
13  confessed to this alleged affair to Judge Sheely. Judge
14  Sheely told me that he felt so sorry for them, that I
15  had ruined their family.
16       And I explained to Judge Sheely that it was all an
17  orchestrated thing, because up to that point as far as I
18  know, this alleged affair had never come up during the
19  whole investigation into anybody else. And I said to
20  Judge Sheely, if you were a man would you confess in
21  front of public, would you confess in front of a judge,
22  in front of an attorney, or wouldn't you be more
23  discreet and tell your wife at home and then handle it?
24       I feel it was a ploy, because I knew Barb Graham
25  had worked with Judge Sheely. He had basically a tender

Page 267

1   spot for Barb Graham. And I said to the judge, it did
2   not happen. And he said, well, I'm telling you, it was
3   just horrible, they were both crying. And just, you
4   could tell he had been -- it had been emotional for
5   Judge Sheely.
6   Q  Is this the first time you had talked with Judge Sheely
7      about your complaints?
8   A. Yes, it is.
9   Q  You never asked for an opportunity to speak with him
10     prior to this?
11  A. No. And I was surprised he did not ask for my attorney
12     and myself to meet with him prior to making this
13     decision. It was just made on an emotional time when --
14     and he just decided he was going to make this decision.
15       And he said to me, at that time he said that he
16     knows that they, well, meaning Joe and Gary, have been
17     asshole buddies for years. He said, I know they get
18     into a lot of stuff, they've been asshole buddies. And
19     he said, I'm not going to do anything else, you --
20     meaning me -- you have damaged this family enough. And
21     I said, I did not damage this family, the man who is
22     causing this is Mr. Graham, and I said, I just wanted
23     the harassment, I just wanted it to stop. And --
24  Q  Could you and your attorney, and/or your attorney, have
25     requested a meeting with Judge Hoffer?

Page 268

1   A. He was writing the order at that time.
2   Q  I'm sorry, I meant Judge Sheely. Strike that.
3   A. He was in the process of writing the order. He said,
4      I've made my decision.
5   Q  Prior to that, could you have made an appointment with
6      Judge Sheely and spoken to him?
7   A. We didn't know where it was at. Dave Deluce had told my
8      attorney that we would be very happy with the
9      recommendation that they had made as a result of the
10     their investigation, and we assumed we would be hearing
11     from them. This was a sudden thing as far as I was
12     concerned. But I was just surprised that the judge did
13     not give us the courtesy of meeting with us and letting
14     us have our say.
15  Q  But did you ask for such a meeting?
16  A. I believe I did mention it to him.
17  Q  When?
18  A. At that, when I was in his office talking to him.
19  Q  And what did he say to you?
20  A. He said, he had told -- he said, I have made my
21     decision. He was just so emotionally taken up by what
22     he had witnessed in his office.
23  Q  Is it your understanding that Barbara Graham was there
24     when Judge Sheely talked with Gary about the affair?
25  A. That's when the confession was supposed to have

Page 269

1   happened. At least that's what Judge Sheely told me.
2   He said, they came up before me and they confessed, they
3   were both crying, and said it was horrible. And he kept
4   saying, look what you have done to their family. And I
5   said, Judge Sheely, I, I did not do anything to the
6   family, I did not have the affair, it was all a
7   performance for you.
8   Q  Do you know for sure that Gary had not told his wife
9      about the alleged affair in private before meeting with
10     Judge Sheely?
11  A. I have no idea. All I know is I think it was using the
12     emotional time and bringing Barb in there. Why would
13     you want to embarrass her again in front of the judge
14     and in front of your attorney if not to use it as an
15     emotional ploy.
16  Q  I need you to clear something up for me. I have two
17     documents, both of which have been verified by you.
18     I'll show you the verification. This is titled
19     Plaintiff's Response to Defendant Joseph Osenkarski's
20     Interrogatories, and this is a verification. Is that
21     your signature?
22  A. Yes, it is.
23  Q  And I also have there was responses to Defendant
24     Commonwealth of Pennsylvania's Ninth Judicial District's
25     Interrogatories, and that also contains a verification

Page 382

1 been shredded?
2 A. Well, I'm saying they -- the whole idea is whenever you
3 have these things you've got to get rid of the fact that
4 it's the juvenile. You've got to get rid of it so
5 people can't go through the trash and find out
6 information like this.
7 I don't know whether they took it down to central,
8 you know, shredding machine, or what. I know we have
9 one in our office now and they had one at Children and
10 Youth, but I just don't remember this time frame whether
11 we actually had one there or not. But I know it was
12 taken care of so these were not found in the trash cans.
13 Q Is this the document that you were referring to before
14 that Mr. Graham wadded up and threw at you?
15 A. This one?
16 Q Yes.
17 A. No, it is not.
18 Q Was it a document similar to this?
19 A. It was part of this. It was a list of victims and the
20 contacts I had had with them.
21 Q You said that he actually wadded up this piece of paper
22 and threw it in your face?
23 A. Yes, he did.
24 Q And you're sure he threw it in your face?
25 A. Yes, I am.

Page 383

1 Q Do you still have Varner 7 in front of you? Varner 7
2 was the running diary that you had kept.
3 A. Yes.
4 Q Turn to the page that's marked 5 at the top.
5 A. (Witness complied.)
6 Q Are you with me?
7 A. Yes.
8 MS. WALLET: I'm not.
9 (Discussion held off the record.)
10 BY MR. MacMAIN:
11 Q Looking at paragraph, about a third of the way down it
12 says discussed cases, some direction?
13 A. Right.
14 Q I can't read your handwriting. Another list has to?
15 A. Be in separate, has to be in separately. I already had
16 one list and he was asking for another list.
17 Q And then reading on further: Crumpled victim list,
18 threw it on the desk. You see that?
19 A. Yes.
20 Q Did he throw it in your face or did he throw it on the
21 desk?
22 A. I was sitting at the desk and he threw it at me and it
23 landed on the desk. But he threw it at me.
24 Q Did it hit you in the face first?
25 A. No, it didn't hit me, but he threw it at me.

Page 384

1 Q Did you testify yesterday that he hit you in the face
2 with the paper?
3 A. He threw it at my face.
4 Q Did you write that in your statement at the time, that
5 he threw it at your face? Or did you put on there he
6 threw it on the desk?
7 A. It says here: Threw it on the desk. It was at the
8 direction of my face. I was sitting at the desk and he
9 was standing.
10 Q But you would agree with me it says nothing in here when
11 you took your notes that he threw it at your face?
12 A. I was sitting at my desk, he was standing above me and
13 he threw it at me. It came right at me. And he didn't
14 throw it down, he threw it towards my face direction.
15 Q But you would agree on your notes that you took at the
16 time this occurred you mentioned nothing about being
17 thrown at your face?
18 A. It says threw it on the desk. It doesn't say where it
19 went before it hit my desk. He didn't throw it down at
20 my desk, he threw it at me.
21 Q You had said yesterday that someone in the office
22 commented to you about you think that Gary was getting
23 his Barbs mixed up. Do you remember stating that?
24 A. Yes.
25 Q Who said that?

Page 385

1 A. Mr. Christlieb. Darby Christlieb.
2 Q Did anybody else say that to you?
3 A. Not that I can recall.
4 Q You were asked yesterday about an incident in which you
5 claim Mr. Graham made a comment about a peter meter.
6 A. Yes.
7 Q And you also said that someone had, the female at issue
8 had a medical diagnosis, correct?
9 A. Yes.
10 Q Was there a doc's note or anything, medical proof of
11 that?
12 A. Yes. Within her file she had seen a psychologist and
13 also medical doctor, and I believe there was -- I know
14 there's a report from the doctor and I'm not sure if I
15 had a -- I don't believe I actually got anything from
16 the therapist. But the doctor had diagnosed her and I
17 did have reports on that.
18 Q Did you provide reports as part of the case file?
19 A. Yes. I requested medical records.
20 Q The comment that Mr. Graham had made, did you actually
21 hear it or did somebody tell you he said that?
22 A. No, he said it directly to me.
23 Q Do you recall Mr. Graham speaking in his office with
24 someone else about this issue?
25 A. No.

Multi-Page™

Page 386

1  Q  He said it to you directly?
2  A.  He said it directly to me. Mr. Thielemann was in his
3     office but he said it directly to me.
4  Q  You were asked about a birthday card that Mr. Graham had
5     given you, and I think you said it was January of '96?
6  A.  Yes.
7  Q  How do you know? How can you date it? How do you know
8     the year?
9  A.  That was my -- well, I remember that's the year it
10    happened.
11 Q  How is it that '96, is there some something that
12    triggers that year in your mind?
13 A.  I was not working in Juvenile Probation in January of
14    '95. It had to be '96, because in '97 there was a lot
15    of problems. That's when all these things were
16    happening. So that's the only year that's left.
17 Q  So you're certain it was January of '96?
18 A.  Yes, I am.
19 Q  Okay. When you received that card, did you say anything
20    to Mr. Graham?
21 A.  I did not.
22 Q  And you didn't tell anybody else in the office about it?
23 A.  Like I said yesterday, he put it inside of my briefcase,
24    I took it home. As I redd out my briefcase several, I'm
25    not even sure it was weeks, not even weeks, days ago,

Page 387

1     after that, I just filed it away with a lot of other
2     miscellaneous papers to clean out my briefcase.
3  Q  You said you had gone on 20, approximately 20 trips with
4     Mr. Graham prior to coming into the Department?
5  A.  Prior to coming?
6  Q  Prior to coming into the Department you had, I forget
7     the term you used, called these trips, visits?
8  A.  I was part of Juvenile Probation when those trips
9     happened.
10 Q  Did you take any of these trips with him -- and you
11    talked about Debra Green -- anyone else that you took
12    these type of trips with?
13 A.  Yes. I went with Hank Thielemann, Nick Barolet. I went
14    supervising -- no, that's not when I was in Probation.
15    Kerry Houser. I cannot think of any other at this time.
16 Q  Any of those people that you mentioned, can you estimate
17    how many trips you took with each?
18 A.  Debra Green, maybe two or three. Kerry, one that I
19    recall. Hank, one that I recall. And Nick, I believe
20    two.
21 Q  You talked about yesterday about an incident in which
22    you were in the car with Mr. Graham and he told you
23    about his wife's problems and you had suggested that
24    they ought to see a counselor?
25 A.  Right.

Page 388

1  Q  Did you give names of counselors?
2  A.  Yes, I did make suggestions of places they could go for
3     counseling.
4  Q  How were you aware of these places?
5  A.  Because I was always considered the resource person in
6     Children and Youth and in Probation, hooking families up
7     with counseling services. That was part of my job.
8  Q  Had you seen any of these marital counselors yourself?
9  A.  No, I had not.
10 Q  Have you ever seen a marriage counselor?
11 A.  No, I have not.
12 Q  You said Mr. Graham was driving 90 miles an hour?
13 A.  About 95 miles an hour.
14 Q  How long was he driving at that speed?
15 A.  It seemed like an eternity. I'd say at least five
16    minutes, through construction.
17 Q  This was on I-81?
18 A.  Yes.
19 Q  And was the entire five minutes through a construction
20    zone, or only a portion?
21 A.  Most of it's through construction.
22 Q  How do you know? Did you actually look at his
23    speedometer?
24 A.  Yes, I did.
25 Q  And did Mr. Graham get a ticket, pulled over?

Page 389

1  A.  No, he did not.
2  Q  During any of the other times that you drove with
3     Mr. Graham, had he ever driven at that rate of speed
4     before?
5  A.  Not quite that high, but he would go very -- he would
6     travel maybe 80 miles an hour. And a lot of concerns
7     you had, Gary was on the phone, a lot of his -- while he
8     was driving a lot of times. And another concern, he had
9     a juvenile usually in the back with us.
10 Q  On a cell phone?
11 A.  Um-hum.
12 Q  Did you report this to anybody?
13 A.  Mr. Drachbar, another officer in our department, was
14    well aware of that, because he said he drives way too
15    fast. But who was I going to say anything to?
16    Mr. Osenkarski, I think he had already let me know that
17    Mr. Graham was in charge.
18 Q  My question was: Did you report this to anybody?
19 A.  No, I didn't.
20 Q  Did Mr. Graham ever get a ticket while you were driving
21    with him?
22 A.  No, he didn't.
23 Q  Did he ever get pulled over?
24 A.  Not that I recall.
25 Q  I assume the vehicle you were driving in didn't look

Page 394

1  criminal justice system you couldn't file a Protection
2  From Abuse on your own?
3  A.  I never went through that process.  No.
4  Q  Did you deal with any of your cases over the years in
5    which there were PFAs as part of the file or part of the
6    procedure that you dealt with?
7  A.  Certainly.  But I just was never in that part of the
8    procedure, in that process.  I would send them to -- I'd
9    always send it to Legal Services.  That's where I would
10   refer my clients to.
11 Q  You said it was a complicated procedure.  You do have a
12   master's degree and you're working on a --
13 A.  Right, Ph.D.
14 Q  -- Ph.D.  You thought it would be too complicated for
15   you to be able to fill out?
16 A.  Not too complicated.  I just didn't want to get -- I
17   was hoping, like I said, that we could handle this
18   internally, I did not have to go through the process of
19   bringing criminal charges against.  I had my faith in
20   the county that they would do what had to be done.  And
21   we were informed that we would be pleased with their
22   investigation.
23 Q  Did you ever ask anybody from the county to fill out a
24   PFA for you?
25 A.  No, I did not.

Page 395

1  Q  The preparation of a PFA, and I don't want you to tell
2    me what you may have discussed with legal counsel, but
3    did that issue ever come up?
4      MS. WALLET:  Objection.  How can she possibly
5    answer that question unless it would call for an answer
6    related to a discussion with an attorney?  I object and
7    I instruct her not to answer.
8  BY MR. MacMAIN:
9  Q  You had legal counsel since early '97, correct?
10   Relating to these episodes?
11 A.  In '97, yes, I contacted counsel.
12 Q  And that would be your current attorney?
13 A.  Yes, it is.
14 Q  Have you ever consulted any other attorneys besides
15   Attorney Wallet?
16 A.  As far as the case?  No.
17 Q  Can you tell me when you first retained Attorney wallet?
18 A.  I don't have Tony Wallet, I have Debra Wallet.
19 Q  I said Attorney Wallet, I'm sorry.
20 A.  I thought you said Tony Wallet.
21     MS. WALLET:  It's that New York accent.
22     THE WITNESS:  I don't remember the exact date.  I
23   know it was spring of '97.
24 BY MR. MacMAIN:
25 Q  At any point prior to making your complaint with the

Page 396

1  county, did you ever speak to Mrs. Graham?
2  A.  There was an occasion she came into the office.  I
3    remember speaking with her maybe once or twice.
4  Q  Would this be small talk?
5  A.  Yes.  Yes.
6  Q  Did you ever consider speaking to her about -- speaking
7    to her directly about getting counseling?
8  A.  No.  I didn't know her that well, and I didn't have the
9    occasion to see her.
10 Q  Did you ever speak to her about her husband?
11 A.  No, I did not.
12 Q  You talked yesterday about an incident involving being
13   measured for a bulletproof vest and Mr. Graham made a
14   comment?
15 A.  Yes.
16 Q  Can you tell me when that was?
17 A.  '96.  '95 to '97.  '95 to '96.  In that time frame.  I
18   don't remember exactly when it was.  I know they were
19   talking about, you know, gun training and all that and
20   that's the reason we were looking at getting bulletproof
21   vests.
22 Q  Do you actually wear a bulletproof vest, or did you?
23 A.  I have, as needed.
24 Q  Do you remember when you were first issued a bulletproof
25   vest?

Page 397

1  A.  I don't remember the date, no.
2  Q  Can you tell me the year?
3  A.  I'm guessing '96.
4      MS. WALLET:  Can I have a five-minute break,
5    please?
6      MR. MacMAIN:  Sure.
7      (Recess taken from 2:39 until 2:50 p.m.)
8  BY MR. MacMAIN:
9  Q  You had said yesterday you've seen three mental health
10   professionals since all this occurred?
11 A.  Yes.
12 Q  Dr. Morand, Laurie Walker, and Elaine McKenna?
13 A.  Alaine McKenna, yes.
14 Q  Who was the first?
15 A.  Laurie Walker.
16 Q  Was the first person you saw?
17 A.  Yes, she was.
18 Q  How did you come to see Laurie Walker?
19 A.  Went through the EAP program at work.
20 Q  Do you recall when you first saw Laurie Walker?
21 A.  I don't recall the date.  Spring of '97.
22 Q  As a result of the alleged incidents in this case, have
23   you sought any type of marital counseling?
24 A.  I have not.
25 Q  Have you had any marital problems as a result of these

Page 402

1  Q  Did someone tell you it might be a good idea to keep a
2     list?
3  A.  After I met with my therapist she advised that I do.
4  Q  But you had already started keeping the list before you
5     met with your therapist.
6  A.  Yes, but she suggested I continue on.  And my attorney
7     also recommended I do this, just for documentation sake.
8  Q  So you kept the list but you didn't tell anybody until
9     the spring of '97, correct?
10 A.  Right.  Just my therapist, that's correct.
11 Q  But prior to the spring of '97 you had not told anybody
12    at the county or the courts about these various things
13    that you were keeping a diary on?
14 A.  No.  No, I did not.
15        MS. WALLET:  I have to object to the form of the
16    question.  Was your question did you tell anyone at the
17    county about the documents?  Or did you tell anybody at
18    the county about the things recorded in the document?
19        MR. MacMAIN:  I thought the question was clear but
20    I'll ask it again.
21 BY MR. MacMAIN:
22 Q  Did you tell anybody at the county or the courts about
23    the things that you had written about, not the document,
24    but the various things you kept your running list on
25    prior to the spring of '97?

Page 403

1  A.  Well, some of the things, like things that occurred with
2     other people, like with Debra Green, she was aware of
3     the document, the things that had happened in here.
4  Q  If you turn to about halfway through, the pages that
5     have dates and just little notations next to them?
6  A.  Right, right.
7  Q  The first page will have, looks like a 30 with a slash
8     and a 6 at the top?
9  A.  Right.
10 Q  And then the list of dates appears to go on for four
11    pages?
12 A.  Yes.
13 Q  Can you tell me where these dates came from?
14 A.  These were from daily logs.  My daily logs of, you know,
15    daily activities.  I was trying to compile a list of
16    trips I had taken with Mr. Graham, or any trips I had
17    taken.
18 Q  Where did these dates come from?  Did these come from a
19    calendar that you kept?
20 A.  No.  From my daily logs, daily we turn in every two
21    weeks.
22 Q  And you believe that these are all the trips that you
23    had taken with Mr. Graham?
24 A.  Some are not with Graham.  They're just lists of --
25    there are a few that are not, but most of them were with

Page 404

1     Mr. Graham.
2  Q  Why did you write all these down?  What was the reason
3     why you did this list?
4  A.  It was in compiling all the paperwork for this.
5  Q  Why specifically would you keep a list of all the trips
6     that you had taken primarily with Mr. Graham?
7  A.  In preparation, after I started filing this and we
8     started realizing how many, just looking at the
9     documentation, trying to compile a list of how many
10    trips I had taken with him.
11 Q  Were these dates that someone at the county suggested
12    you write down or check into?
13 A.  No.  I believe the conversation was with my attorney
14    about this.
15 Q  If you turn a few pages back, five pages from the end of
16    the document?
17 A.  Five pages from the back?
18 Q  From the back.  At the top it will say called
19    Ms. Something, I can't read the name, it says 8/4.
20 A.  Called Ms. Gamiter.
21 Q  Right.
22 A.  Yes.
23 Q  Who is Ms. Gamiter?
24 A.  She was from the EEOC.
25 Q  Is this a narration of a conversation you had with Miss

Page 405

1     Gamiter?
2  A.  No.  I was just noting the day I called her.
3  Q  Looking at the entry for 5/29 --
4  A.  Okay.
5  Q  Called to Dave, it says, parenthesis.  Who's Dave?
6  A.  Dave Deluce.
7  Q  And then after that it says, need to tell him, and
8     there's a series of names?
9  A.  Yes.
10 Q  Okay.  The first name is Andy --
11 A.  Anderson.
12 Q  Who is Andy Anderson?
13 A.  He's assistant sheriff.
14 Q  Assistant chair what?
15 A.  Cumberland County.
16 Q  Why did you --
17        MS. WALLET:  I'm sorry, I think she said sheriff.
18        MR. MacMAIN:  I thought you said chair.
19        MS. WALLET:  I can translate between Philadelphia
20    and Harrisburg.
21 BY MR. MacMAIN:
22 Q  What did you need to tell Mr. Deluce about Andy --
23 A.  Anderson.
24 Q  -- Anderson?
25 A.  These were names that were, people were telling me of

Page 406

1  people that Mr. Graham had had arguments with or gotten
2  in arguments with over the last years.
3  Q  Andy I assume is a guy?
4  A.  Yes, he is.
5  Q  The next name is DJ Paula Correal?
6  A.  Yes.
7  Q  And that also was someone who you understood that
8  Mr. Graham had had an argument with?
9  A.  Yes.
10  Q  Where do these names come from?  Who gave these names to
11  you?
12  A.  They were just names that were given to me by people in
13  the office.  Well, Gary Shuey, I had heard him yelling
14  at him.  Wendy Hoverter herself had told me, she was one
15  of the supervisors at Children and Youth, she had told
16  me about an argument, that was before, you know, years
17  ago.
18      And Sarah Costicki, I'm not sure who -- I think she
19  might have been a victim witness person, I believe.
20  This information was given to me -- I believe Sarah was
21  from Kerry Houser.
22      And Paula Correal, I don't remember who but
23  somebody in the office.  It was just a list of names
24  that he had screamed at or had an argument that he was
25  angry at them.

Page 407

1  Q  They weren't people that Mr. Graham had allegedly
2  sexually harassed, just that he had words with?
3  A.  Yelled and screamed at them, that's all I knew.
4  Q  And DJ Paula Correal, she's the district justice that
5  found Mrs. Graham not guilty of harassment?
6  A.  She's the district justice who heard the hearing, who
7  heard the --
8  Q  And she found Mrs. Graham not guilty of harassment?
9  A.  She, as I said before, she told Mrs. Graham to not
10  repeat the behavior and that she felt it would be
11  handled in another court.
12  Q  I'm not going to quibble with you over what was said,
13  but Mrs. Graham was not convicted of the charges that
14  were brought?
15  A.  She was not convicted, that's correct.
16  Q  Have you ever spoken to DJ Paula Correal about him?
17  A.  No, I've not.
18  Q  How about Andy Anderson?
19  A.  I have not.
20  Q  How about Wendy Hoverter?
21  A.  Yes.
22  Q  Ever spoken to her about Mr. Graham?
23  A.  Yes.
24  Q  And does she have a claim that Mr. Graham had ever
25  sexually harassed her?

Page 408

1  A.  No.  Just screamed.
2  Q  How about, same question with regard to Gary Shuey, have
3  you ever spoken to him about Mr. Graham?
4  A.  No.  I overheard him screaming at Mr. Shuey.
5  Q  How about Sarah Costicki?
6  A.  I don't -- I've only heard the name.  I do not know her.
7  Q  You talked this morning about Mr. Osenkarski getting
8  shoes donated and then using them for personal use?
9  A.  That's correct.
10  Q  You did also get a pair of shoes from Mr. Osenkarski
11  from the same group of free shoes?
12  A.  I did not.
13  Q  You didn't take any for your son or your daughter, your
14  grandson?
15  A.  I did not, no.
16  Q  Was it your understanding that these shoes were, in
17  fact, donated in large part to charitable organizations
18  and so forth?
19  A.  They were supposed to be given to detention centers, but
20  Mr. Graham had told me not to ever say anything to
21  anybody, especially Mr. Osenkarski, that nobody was to
22  know that they were doing this.  So it was obviously --
23  if it was just for that purpose there was no reason for
24  the secrecy.  But that was kept very -- I was to keep
25  that very confidential.

Page 409

1  Q  How did you even know about it?
2  A.  He had taken pairs -- he told me he was picking them up.
3  They would go down and pick up several boxes with a
4  trailer of his.  And on one of the trips, when I spoke
5  about going up to Clarks Summit to pick up a girl and
6  taking her to New Jersey, he had several pairs of shoes
7  in the car for his sister and for his niece and he gave
8  them to them.
9  Q  When you're talking about he, is that Mr. Graham or
10  Mr. Osenkarski?
11  A.  Mr. Graham.
12  Q  And you at no point ever took any shoes for yourself --
13  A.  I did not take --
14  Q  -- or your family members?
15  A.  No.  I did not.
16  Q  You were asked some questions this morning about who was
17  involved in this conspiracy, who you believe was
18  involved in this conspiracy, and you mentioned Mr. and
19  Mrs. Graham and you had also said you believe Judge
20  Sheely was involved in this conspiracy.  Do you recall
21  answering that question?
22  A.  I remember having a discussion on that, being questioned
23  about that.
24  Q  Do you believe that Judge Sheely wanted to believe there
25  had been an affair?

### Page 410

1  A.  I think Judge Sheely wanted to resolve the thing and I
2  believe he was very sympathetic to Mrs. Graham because
3  of her crying.
4  Q  Was it your belief that Judge Sheely doesn't think there
5  was an affair, this whole thing was a hatched plan?
6  A.  I don't think Judge Sheely really knows what happened,
7  and I don't think he was willing to look into it more
8  than what he did, from that one time, the alleged
9  confession.
10  Q  You made reference to a long meeting that you understand
11  took place between Mr. Graham, his wife and David
12  Foster?
13  A.  That's correct.
14  Q  Do you believe Mr. Foster is in on this conspiracy?
15  A.  I don't know that.
16  Q  And it's your belief that Mr. Graham made up this whole
17  story about the affair?
18  A.  Yes, it is my belief.
19  Q  And you believe he would reveal or make up this story
20  about an affair and jeopardize his marriage?
21  A.  He always told me that there's no fear of divorce
22  because his wife's Catholic and she'll never leave him.
23  Q  You believe that Mr. Graham would make up this story at
24  the expense of hurting his children?
25  A.  What I heard about Mr. Graham about smashing the

### Page 411

1  birthday cake and such, I don't think his agenda was
2  what was best for his children. His agenda appeared to
3  be what was best for him.
4  Q  Did you ever speak to your husband about this accusation
5  of having an affair with Mr. Graham?
6  A.  Yes, I did.
7  Q  When did you discuss it with your husband?
8  A.  When the allegations were first made, when this whole
9  thing, with Judge Sheely, the day after I spoke, or the
10  day of my speaking with Judge Sheely.
11  Q  And I assume you told your husband there wasn't an
12  affair?
13  A.  It never came up. He knows I did not have an affair.
14  Q  Did you have a discussion with him about it?
15  A.  He didn't ask me if I did or not. He knows I did not.
16  Q  He didn't question you at all?
17  A.  No. I told him I did not, and he believed me.
18  Q  Just a couple questions. In your Complaint you talked
19  about yesterday, and I'll just read the portions I'm
20  specifically interested in, paragraph 54, you made the
21  allegation that individuals Graham and Osenkarski have
22  aided and abetted violations of the PHRA by directly
23  discriminating against Varner and by conspiring with the
24  county and the Court to engage in acts which violate the
25  PHRA.

### Page 412

1  Can you tell me what specifically Mr. Graham did to
2  conspire with Mr. Osenkarski and/or the courts and/or
3  the county?
4  A.  I believe there's discussion between him and
5  Mr. Osenkarski about the case, about what they just --
6  discussion on the case. I think there was discussion
7  with Judge Sheely about the case, without us being
8  involved.
9  Q  Do you believe that Mr. Graham and Mr. Osenkarski spoke
10  to Judge Sheely together, the two of them?
11  A.  I believe Mr. Graham did and I believe Mr. Osenkarski
12  did as well, yes.
13  Q  Do you believe that -- tell me specifically what you
14  believe Mr. Osenkarski's role in this conspiracy is.
15  A.  I believe there was a discussion with Judge Sheely and
16  even with Judge Hoffer about this whole case. I think
17  there's an ongoing rapport between all of them about
18  this case.
19  Q  Can you point to any specific dates or months you think
20  these conversations have taken place?
21  A.  I would not be privileged to the dates and times. I
22  just feel it was an ongoing discussion.
23  Q  You believe the conspiracy is continuing to today?
24  A.  I think it is. I think that there's -- not, maybe not
25  with Mr. Graham and Judge Hoffer, but with

### Page 413

1  Mr. Osenkarski and Judge Hoffer, yes.
2  Q  I show you a document I don't think we've marked before.
3  This will be Varner 16. We'll have to make copies.
4  (Varner Deposition Exhibit No. 16 was marked.)
5  BY MR. MacMAIN:
6  Q  I just want to ask you about one reference. We're
7  looking at Varner 16, a memo from Dan Hartnett to you
8  April 25, 1997. There appears to be a Post-It note on
9  the upper right-hand corner. Dan, slash, Dave to let
10  you know Joe and Gary both have guns locked in our
11  office with ammo locked in a closet, Barb Varner.
12  Did you write that?
13  A.  Yes, I did.
14  Q  Do you believe that Mr. Graham and Mr. Osenkarski had a
15  locked gun?
16  A.  Yes, they did.
17  Q  And have you actually seen these guns?
18  A.  Yes, I did.
19  Q  Did anybody else see these guns?
20  A.  Yes. Everybody in the office knew they were there.
21  Q  And you've actually seen those guns locked in the gun
22  cabinet?
23  A.  Yes, I have.
24  Q  When did you see them?
25  A.  Just as soon as we started getting guns, we would see

## Page 418

1  Some of them are not legible here today. I've not had
2  an opportunity to review them in detail, and some of
3  them I can't read. I will ask Deb for the opportunity
4  to review the originals, and depending on what I find in
5  them, if there's something there that has not been
6  adequately covered in the deposition, I would reserve
7  the right to request to recall Mrs. Varner to question
8  her about anything here, since the documents were not
9  earlier produced and should have been.
10      With that, I have nothing further.
11      MS. WALLET: For the record, I'd like to note that
12  they were produced in July with a specific note that
13  they were being sent to the requesting counsel and that
14  they would be made available at any mutually convenient
15  time or a set would be produced.
16      MR. THOMAS: If fairness, they should have been
17  provided to each counsel and served on them. I don't
18  know whether -- I don't want to get in a fight over it.
19  I don't know whether that's adequate or not. The fact
20  of the matter is, they weren't produced before today,
21  and I saw them for the first time this morning. And it
22  may be that there's nothing there. She's obviously been
23  examined intensively, and I know that some of these
24  notes were probably used in conjunction with the
25  Complaint, so I'm not sure there will be any surprises.

## Page 419

1      Let me ask her one question about that.
2  BY MR. THOMAS:
3  Q  Barb, these notes that you've testified about
4     extensively today I assume were made contemporaneous
5     with the dates that are contained in the notes; is that
6     correct?
7  A. That's correct.
8  Q  So for instance, on the first page I see a note of
9     December 16th, and as I understand that note, then,
10    would have been transcribed by you on that date, the
11    date of December 16th, correct?
12 A. That's correct.
13 Q  So they were made contemporaneous with whatever date
14    appears on the particular page, and there are 28 pages
15    of notes here or something like that, right?
16 A. The only one that would be an exception would be the
17    trips that I went back through to try to compile that
18    off my daily logs.
19 Q  And to the extent that there may be any conflict between
20    your recollection as you've described it over the last
21    two days, and these notes, I assume that you would agree
22    the notes would be more accurate than your recollection
23    today some years after the events? Is that fair?
24 A. I would think so.
25      MR. THOMAS: That's all I have.

## Page 420

1      MR. ADAMS: I have a few more questions. It won't
2  take long.
3  BY MR. ADAMS:
4  Q  Ms. Varner, do you have any correspondence, notes,
5     memos or any document or piece of evidence at all
6     supporting your claim that Mr. Osenkarski's conspired
7     against you in violation of PHRC?
8  A. I don't have paperwork. I've just heard that he's had
9     conversations with Judge Hoffer.
10 Q  Who did you hear that from?
11 A. At this time I can't recall names. It's just been
12    information, word of mouth in the office.
13 Q  Okay. So would you agree at this time you can't
14    identify any witness person at all to support your claim
15    that you have, that you can testify and support your claim that
16    Mr. Osenkarski has conspired against you in violation of
17    PHRC? Is that correct?
18      MS. WALLET: I'm sorry, did you say witness?
19      MR. ADAMS: Witness or person who can testify in
20    support of her claims of a violation by Mr. Osenkarski.
21      THE WITNESS: I think the fact that I was kept out
22    of that office for four years, and that was a discussion
23    between Mr. Osenkarski and Judge Hoffer, I think
24    whatever that discussion was, Mr. Osenkarski I'm sure
25    and Judge Hoffer was aware that it was a public office.

## Page 421

1      I'm sure there was discussion, and to me, that was a
2  retaliation.
3  BY MR. ADAMS:
4  Q  But did you hear that discussion? Did you hear any
5     remnants of that discussion yourself?
6  A. From Mr. Osenkarski, yes.
7  Q  You heard from Mr. Osenkarski that he was going to
8     conspire against you?
9  A. Well, no. That he had met with Judge Hoffer and that he
10    had been given this direction to keep me out of there.
11    To me, even those two talking about it is something that
12    is illegal to keep me out of a public office.
13 Q  But you don't know, yourself, from anything you heard,
14    that Mr. Osenkarski conspired against you in violation
15    of the PHRC; is that correct? Yes or No.
16 A. I'm just trying to think.
17      I did not personally witness that.
18 Q  And you can't identify any person at all who witnessed
19    or heard any type of conversation by Mr. Osenkarski or
20    Judge Hoffer that would be in violation of the PHRC
21    based on conspiracy?
22 A. I think those two would be the ones to be able to
23    testify because it would have been private information,
24    private conversations.
25 Q  Would you agree that's strictly related to conversations