# Exhibit B

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,          .
       Plaintiff,           .  CIVIL ACTION
                            .  NO. 1:CV 01-0725
       vs.                  .
                            .
COMMONWEALTH OF PENNSYLVANIA,  .  (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,    .
CUMBERLAND COUNTY; CUMBERLAND .
COUNTY; S. GARETH GRAHAM,   .
Individually, and JOSEPH    .
OSENKARSKI, individually,   .
       Defendants.          .
. . . . . . . . . . . . . . . . . .

                VOLUME 1
             Pages 1 to 183

Deposition of: S. GARETH GRAHAM

Taken by      : Plaintiff

Date          : January 29, 2003, 9:27 a.m.

Before        : Emily Clark, RMR, Reporter-Notary

Place         : Administrative Offices of
                Pennsylvania Courts
                5035 Ritter Road, Suite 700
                Mechanicsburg, Pennsylvania

APPEARANCES:

DEBRA K. WALLET, ESQUIRE
     For - Plaintiff

ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
BY:  A. TAYLOR WILLIAMS, ESQUIRE
     For - Defendant Commonwealth of Pennsylvania
           Ninth Judicial District, Cumberland County

THOMAS, THOMAS & HAFER
BY:  JAMES K. THOMAS, II, ESQUIRE
     PAUL J. DELLASEGA, ESQUIRE
     For - Defendant Cumberland County

## Page 2

APPEARANCES (continued):

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
BY:  DAVID J. MacMAIN, ESQUIRE
     For - Defendant S. Gareth Graham

SWEENEY & SHEEHAN, P.C.
BY:  JASON G. BATES, ESQUIRE
     For - Defendant Joseph L. Osenkarski

ALSO PRESENT:

MS. BARBARA E. VARNER

MR. JOSEPH OSENKARSKI

MS. MELANIE McDONOUGH

## Page 3

1  1-page "Employee Certification"          121
   27 March '81
2  1-page "Receipt Acknowledgment"          121

## Page 4

1              STIPULATION
2       It is hereby stipulated by and between the
3  respective parties that signing, sealing, certification and
4  filing are waived; and that all objections except as to the
5  form of the question are reserved until the time of trial.
6
7       S. GARETH GRAHAM, called as a witness, being duly
8  sworn, was examined and testified, as follows:
9  BY MS. WALLET:
10     Q.  What is your name, sir?
11     A.  S. Gareth Graham.
12     Q.  By whom are you employed?
13     A.  The Court of Cumberland County, Ninth Judicial
14 District.
15     Q.  How long have you been so employed?
16     A.  27, 26, 27 years. Started in September of '77,
17 but had a previous employment with the county from July 26th
18 of '96.
19     Q.  Sir, do you have any hearing problems?
20     A.  No, I don't.
21     Q.  Would there be any reason today why you could not
22 answer my questions completely and truthfully?
23     A.  No.
24     Q.  Are you on any medication that would interfere
25 with your ability to listen or to respond?

## Page 13

1  MR. MacMAIN: Just listen to her question and
2  just --
3  THE WITNESS: I just want to --
4  MR. MacMAIN: Okay.
5  BY MS. WALLET:
6  Q. So you requested this meeting primarily to tell
7  them about this greeting card, or for some other reason?
8  A. I requested the meeting to try to defend some of
9  the allegations that Ms. Varner had produced.
10  Q. Other than the card, what did you feel needed to
11  be clarified at that time?
12  MR. MacMAIN: I think it's been answered. He
13  said to clarify what the allegations were.
14  MS. WALLET: And I asked him what did he wish to
15  clarify.
16  THE WITNESS: I just wished to expound on some of
17  the questions they had asked me originally, and then they
18  asked me some additional questions after that.
19  BY MS. WALLET:
20  Q. Well, you went to this meeting to tell them
21  specifically about the greeting card, correct?
22  A. No.
23  Q. What did you go to this meeting to tell them
24  specifically?
25  A. To tell them that I had a defense to her

## Page 14

1  allegations.
2  Q. And your defense involved this greeting card?
3  A. That was one of her allegations, so I just
4  responded to her allegations.
5  Q. What other items did you feel that you needed
6  this meeting in order to clarify?
7  A. Whatever the line of questioning they would have
8  given me: Did I discriminate against her in the workplace;
9  no. Things like that. I did jot some of those down, you're
10  talking how many years ago, to try to -- I just can't recall
11  that from exact memory each question they asked.
12  Q. Do you have notes from either one of these
13  meetings?
14  A. No.
15  Q. You said you jotted something down before you
16  went to see these people?
17  A. No. I basically summarized in my mind what
18  questions they had asked, and then I responded to them.
19  Q. And you jotted that down?
20  A. My response? No, I didn't jot my response down.
21  Q. What is it, sir, that you said that you jotted
22  them down?
23  A. The sequence of questions they were asking me,
24  like, the three questions they had asked me, I tried to, you
25  know, write those down to try to remember what they asked me.

## Page 15

1  Q. And what happened to those notes?
2  A. I have no idea.
3  Q. You don't presently have them?
4  A. I don't have them.
5  Q. And you don't have any other notes from either
6  one of these meetings?
7  MR. MacMAIN: You mean notes taken during the
8  meeting? Or notes I may have asked him to write down things
9  as part of the defense of this case?
10  BY MS. WALLET:
11  Q. Other than what you have provided to your
12  counsel, do any notes of those meetings exist?
13  A. No.
14  Q. Did you give them anything at this second
15  meeting?
16  A. Absolutely not.
17  Q. Do you have in your possession now the
18  information regarding the production of this greeting card?
19  A. No.
20  Q. Did you take notes of what the manufacturer told
21  you?
22  A. I think I have -- yeah, I think I did take a note
23  and I wrote it on the back of the card, because I called just
24  recently, maybe a month or two months ago.
25  MS. WALLET: And you'll provide those to me, I

## Page 16

1  assume?
2  MR. MacMAIN: I may. I mean, I think there might
3  be issues of work product and so forth, but I'll certainly
4  consider it and if I think it's appropriate, I'll produce it.
5  If I don't, I'll let you know that as well.
6  MS. WALLET: You can consider this my formal
7  request that those be produced.
8  MR. MacMAIN: I'd prefer if you sent me a letter.
9  And I'll make a list so it's not missed. If you want to send
10  me a letter with whatever items would you like.
11  MS. WALLET: I believe it falls within the
12  interrogatory that I think you have a duty to supplement.
13  BY MS. WALLET:
14  Q. Other than those two times that you just
15  described, Mr. Graham, did you meet with anyone who told you
16  that they were investigating the charges made by Ms. Varner?
17  A. I had gone to the EEOC. I had gone to the
18  Pennsylvania Human Relations Commission to try to get
19  included in discovery of that information once I found that
20  those things were, they're filed there, yes. And I was
21  denied access there.
22  Q. When did you contact the EEOC?
23  A. Numerous times.
24  Q. And who did you contact there?
25  A. Sylvia Williams. I had driven to Philadelphia

### Page 17

1 and went to the Bourse Building on the, I think it's the 15th
2 floor, and I talked to Ms. -- it was a supervisor there, I
3 think it was, her name's Joan Gamiter. And I had asked to be
4 included in the EEOC's investigation. And she had informed
5 me that since you and Ms. Varner had not named me as a
6 defendant I was not entitled to any information from the EEOC
7 at that juncture.
8  Q. Did you at any subsequent time receive
9 information from the EEOC?
10  A. The only information I received from the EEOC
11 was -- and I made requests, I think I did send a letter
12 through another counsel, I don't have the copy of that, I
13 wouldn't know where that's at, but I was seeking out counsel
14 to try to -- for defending this claim. And I had been to a
15 multitude of different lawyers to assist me. So I can't
16 recall exactly who made that request or who -- I think he
17 directed me to send the letter myself to the EEOC under
18 freedom of information discovery.
19  Q. And who is he?
20  A. Cowden, William Cowden, in Harrisburg.
21  Q. In any event, did you receive --
22  A. Strokoff and Cowden. Are you familiar with that
23 firm?
24  Q. I am.
25  A. Okay. So do I have that right?

### Page 18

1       MR. MacMAIN: She doesn't want to know what you
2 discussed with any counsel.
3       MS. WALLET: Correct.
4       MR. MacMAIN: Just did you make the request, and
5 you've answered it, so.
6       THE WITNESS: Yes. Okay.
7 BY MS. WALLET:
8  Q. Did you go to the EEOC during work time?
9  A. No, I did not.
10  Q. Did you take leave?
11  A. Yes.
12  Q. When did you do that?
13  A. I don't know. I can't recall the date.
14  Q. Do you remember what month?
15  A. No.
16  Q. Do you remember what year?
17  A. I took a witness with me down there to meet Miss
18 Gamiter.
19  Q. And who did you take with you?
20  A. Charlie Mallios, a college roommate of mine.
21  Q. And who is Mr. Mallios, other than your
22 college -- other than your college roommate, who is he?
23  A. He's just a friend of mine and he was a college
24 roommate of mine.
25  Q. Does he own some business?

### Page 19

1  A. He owns the Deer Lodge restaurant.
2  Q. You've known him since college?
3  A. Yes.
4  Q. How often do you see him?
5  A. Weekly.
6  Q. Social friends?
7  A. Yes. Our children go to school at the same high
8 school.
9  Q. Any other relationship with Mr. Mallios? Are you
10 in business with him in any fashion?
11  A. No, I'm not.
12  Q. No other relationship?
13  A. None.
14  Q. Why did you take Mr. Mallios with you to the
15 EEOC?
16  A. Probably I was intimidated by the driving into
17 Philadelphia a little bit, and I wanted somebody, like proof
18 positive to show that they denied me access to the EEOC
19 investigation.
20  Q. Why did you think when you went that they were
21 going to deny you access?
22  A. I didn't know when I went. I wouldn't have
23 driven down there if I knew they were going to deny me
24 access. I asked to be included in their investigation.
25  Q. Well, if you took Mr. Mallios with you in order

### Page 20

1 to have a witness that they would deny you information --
2  A. No, I didn't say they would deny me information,
3 Ms. Wallet. I said I went down there to try to be
4 interviewed firsthand so -- because they wouldn't answer my
5 phone calls and they wouldn't include me. They just said
6 that you're not a named defendant and you have no rights to
7 defend this claim.
8      I don't know why you didn't, you know, sue myself
9 and Mr. Osenkarski from the beginning and include us in that
10 investigation. And that perplexes me as to why you wouldn't
11 include us at that juncture in the -- and maybe I don't
12 understand the law, but here I was being named as a
13 defendant. I was feeling that my Constitutional rights to
14 discovery had been limited because I couldn't even discover
15 anything that she had said about me. I couldn't see any
16 complaints that she had made about me. And I think it's a
17 flawed federal process, and I'm not saying that as -- as in
18 layman terms, I don't know -- I didn't know the process, I
19 was ignorant to the process, and I tried to intelligently
20 deal with defending this accusation against me. That's what
21 I was trying to do. That was my intent.
22  Q. So you took Mr. Mallios with you to be a witness
23 to what the EEOC did or didn't do?
24      MR. MacMAIN: I think it's been asked and
25 answered.

Page 21

1   THE WITNESS: I answered that a couple times.
2   MR. MacMAIN: He said that he tried to get the
3 information through letters and phone calls, and when he
4 didn't, he drove down there. So I think it's been asked and
5 answered.
6 BY MS. WALLET:
7   Q. And you took him to help you to navigate the
8 Philadelphia traffic, correct?
9   A. I took him to allow him to witness that they were
10 going to deny me or I thought they would deny me access. I
11 thought maybe they would -- I didn't know where the parking
12 was, you know. I had been down even to another Philadelphia
13 lawyer down there and he went down with me to that
14 Philadelphia lawyer named Alice Ballard. I had been down to
15 her to try to get representation. I didn't know where the
16 parking was.
17     He dropped me off on that juncture and went up to
18 the office to have the interview, and then he did some other
19 dealings that he had to do at Temple at the time or Temple
20 University. And then he came back and picked me up after I
21 was done with that. So he rode along the second time for the
22 same reason.
23   Q. Did you take Mr. Mallios because you believed
24 Mr. Mallios had information relative to Ms. Varner's claim?
25   A. Mr. Mallios didn't know anything about

Page 22

1 Ms. Varner's claim.
2   Q. Did he know anything about your relationship
3 between Ms. Varner and yourself?
4   A. No, he did not.
5   Q. So Charlie Mallios doesn't know anything about
6 this case?
7   A. That's correct.
8   Q. Only what you've told him?
9   A. That's correct.
10   Q. Would you consider Mr. Mallios to be your best
11 friend?
12   A. Yes, probably.
13   Q. How long do you think he's been your best friend?
14   A. Well, since I met him in college around 1974 or
15 '75.
16   Q. And have you seen him weekly since then?
17   A. No, not weekly.
18   Q. You've seen him weekly only in the last several
19 years because of your children?
20   A. Right.
21   Q. Have you seen him weekly since, let's say, 1990?
22   A. Yes.
23   Q. Does he know your wife?
24   A. Yes, he does.
25   Q. Does he know your children?

Page 23

1   A. Yes.
2   Q. Know the rest of your family?
3   A. That's my immediate family. My parents are both
4 deceased. He did know my parents.
5   Q. Okay. You said you went to the PHRC. Did you
6 just phone them, or did you go?
7   A. I think I sent a letter to a Louise Oakley or she
8 sent me a letter from Louise Oakley, that she sent me a
9 response that there had been no claim filed with them.
10   Q. Do you have any of those documents?
11   A. I would have to find them. I don't know where
12 they're at. I might have them, I might not. I had them at
13 one point. I mean, I had the letter she sent back to me.
14   Q. Now, I asked you did you meet with anyone who
15 indicated that they were investigating the allegations made
16 by Ms. Varner, and you told me, of course, of the two
17 meetings with Mr. Deluce, your efforts to obtain information
18 from the PHRC and the EEOC --
19   A. That's correct.
20   Q. Anyone else?
21   A. I had met with Jim Thomas and Paul Dellasega on
22 July 26th, 19 -- I think '99. I remember that because it was
23 my mother's birthday, so.
24   Q. And did they ask you to come to meet with them,
25 or did you request that meeting?

Page 24

1   A. I think they had asked to talk with me because
2 they were new counsel for the county. And the meeting took
3 place in Dave Foster's office.
4   Q. Why was that?
5   A. Truthfully? I wanted them to come to my
6 attorneys. I didn't want to go to their office to be
7 interviewed.
8   Q. And you considered Mr. Foster to be your attorney
9 at that time?
10   A. I'm sure, you know, that because he had contacted
11 you, Ms. Wallet, so that's self explanatory.
12   Q. Did you consider Mr. Foster to be your attorney
13 at that time?
14   A. No. He was providing me with some legal advice.
15     MR. MacMAIN: Her question very simply is:
16 Mr. Foster was your attorney, you had retained him.
17     THE WITNESS: I had paid him funds, right.
18 BY MS. WALLET:
19   Q. And did you retain him to represent you with
20 regard to the complaints made by Ms. Varner?
21   A. No. He advised me his specialty was not civil
22 litigation.
23   Q. So you had him as your attorney in other matters
24 but you spoke to him about these matters as well?
25   A. No. I never had him retained as an attorney. He

Page 21 - Page 24

## Page 53

1  there was a big flap.
2      MR. MacMAIN: Gary, all she asked was what Ward's
3  role.
4  BY MS. WALLET:
5      Q. And Mr. Ward is an employee of the County of
6  Cumberland?
7      A. He was the chief clerk.
8      Q. Is that a yes?
9      A. Yes.
10     Q. Is he still the chief clerk?
11     A. No.
12     Q. Who is the chief clerk now?
13     A. John Connelly.
14     Q. Do you know when Mr. Ward left and Mr. Connelly
15  took over?
16     A. I think recently this year, April of this year.
17     Q. 2002?
18     A. Yes.
19     Q. We're now in 2003, but you mean 2002?
20     A. 2003, I'm sorry.
21     Q. 2000 --
22     A. No. He left -- I'm sorry. 2002.
23     Q. So you were telling me what happened after the
24  split. When did the split occur?
25     A. Whenever we received the promotions and Judge

## Page 54

1  Sheely put a letter to that effect out to the commissioners
2  on how he was going to realign the two staffs.
3      Q. Did you have to compete for a promotion at that
4  time?
5      A. Are you asking was it advertised or was it --
6      Q. Whatever you know about how you got the job.
7      A. I think Ken went upstairs and highlighted the
8  expletives to our employment and our performance. And when
9  Judge Sheely made this memorandum, he said Gary Graham
10  graduated from York College in 1975, he holds a bachelor of
11  science degree in this, he has been a PO-II in good standing
12  for so many years. And he was -- and Judge Sheely and Ken
13  and Joe and John basically made the decision.
14     MR. MacMAIN: Can I just ask one question? You
15  used the term expletives, expletives meaning curse words?
16  Did you mean experiences?
17     THE WITNESS: Experiences, I'm sorry.
18     MR. MacMAIN: I thought that's what you meant.
19  BY MS. WALLET:
20     Q. Okay. So after this split, what position did you
21  have?
22     A. After the split I was the Juvenile supervisor.
23     Q. And how many individuals did you supervise?
24     A. There was a total staff complement of 12 POs.
25     Q. My question was: How many did you supervise?

## Page 55

1      Q. Did you supervise all 12?
2      A. Yes, ma'am.
3      Q. And in your supervisory role, what duties did you
4  have?
5      A. To review the daily time sheets that were
6  submitted.
7      Q. That's what was used to pay overtime, for
8  example?
9      A. Yes. That was, um-hum.
10     Q. Okay.
11     A. I also did case review, close-out review. I
12  helped prepare the new budget that we had no experience on.
13     I had been a previous member of the Woodside
14  Detention Center, the detention facility that we used in
15  Harrisburg, and then became Woodside, and it was -- I was on
16  there for 11 years. And I was there during the construction
17  of the Schaffner Youth Center, which it is today. And I was
18  the Court board representative. They had a you, know
19  advisory, board it was called.
20     Q. And who you appointed you to that?
21     A. Judge Sheely. And I filled Joe's position. Joe
22  had been on it for a number of years. Its inception,
23  Woodside was somewhere around 1977, when they built Woodside.
24  Joe was on it shortly thereafter. And then when he assumed,
25  when he assumed, when I think I became a PO-II somewhere

## Page 56

1  around '85, that would make about 11 years I was on it, till
2  '96. So then I took that position.
3      Q. Okay. So you were listing for me your
4  supervisory duties.
5      A. Okay.
6      Q. To whom did the budget information go?
7      A. To the county commissioners, eventually. I think
8  to the chief clerk to review.
9      Q. Do you agree that it's the county that determines
10  the budget for the Juvenile Probation Department?
11     MR. MacMAIN: If you know.
12     THE WITNESS: No, I'm not exactly sure. I know
13  there's state grant money given in the Adult section and the
14  Juvenile section. There's different contributions from the
15  state that appropriate money for the operation of the
16  Juvenile Probation office and the Adult Probation office.
17  And I think the budget gets submitted with those figures and
18  then the county makes a decision as to what items are
19  approved or disapproved.
20  BY MS. WALLET:
21     Q. As a supervisor, did you make case assignments?
22     A. Yes, I did.
23     Q. You determined which of your officers got which
24  cases?
25     A. Yes.

Case 1:01-cv-00725-YK   Document 92-2   Filed 12/29/2003   Page 7 of 10
Multi-Page™

## Page 61

1  in my car. I never had a gun in my car during supervisions.
2  Q. So if Ms. Varner says she saw a gun in your glove
3  compartment, that's a lie?
4  A. Absolutely.
5  Q. And if someone else said they saw a weapon in
6  your glove compartment, that's a lie as well?
7  A. Absolutely.
8  Q. Now, were you required to have weapons training
9  as a probation officer?
10  A. It was an elective. People that wanted to have,
11  wanted it, were able to participate in it as part of their
12  training, if they chose.
13  Q. Did you elect to do that?
14  A. I did for a couple years.
15  Q. Are you certified in weapons of any kind?
16  A. Not at all.
17  Q. Is there a certification program that you could
18  be eligible for?
19  A. Absolutely, yes.
20  Q. But you've chosen not to do that?
21  A. I've chosen not to do that.
22  Q. Is there any requirement that you show any
23  proficiency in the use of a weapon in your position as a
24  probation officer?
25  A. No.

## Page 62

1  Q. Is there any requirement that you show
2  proficiency in the use of a weapon for any of the duties
3  related to your employment as a probation officer?
4  A. No.
5  Q. Are you licensed to carry a handgun?
6  MR. MacMAIN: Licensed unrelated to work --
7  THE WITNESS: Licensed related to work?
8  MR. MacMAIN: -- I think your question is.
9  BY MS. WALLET:
10  Q. My question is: Are you licensed to carry a
11  handgun?
12  A. Now? No.
13  Q. At any time since 1990?
14  A. I think I had a license to carry a handgun from
15  the Sheriff's Department.
16  Q. What kind of license was it?
17  A. Typical five-year protection permit or whatever
18  they used to call it, I don't know.
19  Q. And when do you think you had such a permit?
20  A. I had it for five years, so I don't know when it
21  was renewed. You could get those records from the Sheriff's
22  Department.
23  Q. So you're not sure when you had a permit?
24  A. Probably the last five years, the previous five
25  years, and probably the previous 10 years. I think I renewed

## Page 63

1  it once.
2  Q. But you don't have it now?
3  A. No.
4  Q. And why don't you have it now?
5  A. I didn't reapply.
6  Q. And do you remember when it was that you would
7  have come up for reapplication?
8  A. Last year sometime.
9  Q. Was there a reason why you didn't reapply?
10  A. I have no interest in carrying a handgun.
11  Q. Why do you own three or four of them?
12  A. I'm a hunter. I'm a -- that's why I own them.
13  Q. You're just a gun guy?
14  A. Well, I'm a hunter.
15  Q. Okay.
16  MR. MacMAIN: Are we going to go on to a
17  different area? A short break?
18  MS. WALLET: Yes, that's fine. Let's take a
19  short break.
20  (Recess taken from 10:49 until 10:59 a.m.)
21  BY MS. WALLET:
22  Q. Mr. Graham, when did you first meet Barbara
23  Varner?
24  A. 1990.
25  Q. On what occasion did you meet her?

## Page 64

1  A. Bob Holtzberger, a Cumberland County Children and
2  Youth worker, brought her around to introduce her to the
3  Probation staff after she was hired in Children and Youth
4  Services.
5  Q. And when did you first have some supervisory
6  relationship over Ms. Varner?
7  A. When I was promoted to supervisor.
8  Q. Did you play any role in the hiring of Ms. Varner
9  in the Probation office?
10  A. I talked to Joe that I had worked companion cases
11  with Mrs. Varner and I thought that she handled them well.
12  And I conveyed that to Joe and Ken Bolze when we were looking
13  for applicants for the -- we had a Family Preservation grant
14  and we had three positions available.
15  Q. Did you recommend her for one of those positions?
16  A. No.
17  Q. Now, prior to her coming to the Probation staff,
18  how much association did you have with Ms. Varner?
19  A. Extensive.
20  Q. Would you describe what would cause you to be
21  associated with her?
22  A. In a work environment or a personal environment?
23  Q. Either. Let's start with work.
24  A. I worked companion cases with her. Am I allowed
25  to say the names or are we going to -- is the record still

**Page 93**

1  Did you deny her access to gun training, did you sexually,
2  you know, harass her. No. No. No, no, no. That's all I
3  answered.
4     Q.  And then the second meeting which you
5  initiated --
6     A.  I went down --
7     Q.  -- you could tell him whatever you wanted,
8  correct?
9     A.  That's correct.
10    Q.  But you didn't tell him then, either?
11    A.  No, I didn't. Because I had --
12    Q.  I'm sorry?
13    A.  I hadn't told my wife, I hadn't told anybody, so,
14 at the juncture that he was interviewing me. That was April
15 29th of I think '97.
16    Q.  So in April of '97 you hadn't told anyone that
17 you were having sex with Ms. Varner?
18    A.  No one.
19    Q.  Did you tell your friend Charlie Mallios?
20    A.  No one.
21    Q.  Did you ever tell your friend Charlie Mallios?
22    A.  No, not till after this thing came out.
23    Q.  Okay. Did he know it when he went with you to
24 the EEOC?
25    A.  No.

**Page 94**

1     Q.  How much later did you wait to tell Mr. Mallios?
2     A.  I don't remember that.
3     Q.  Well, do you remember whether, in fact, you told
4  him?
5     A.  Yes, I told him.
6     Q.  And do you remember whether you initiated the
7  conversation in which you said: I need to tell you
8  something?
9     A.  Yes, I did.
10    Q.  What did you tell him?
11    A.  I told him that I had an affair with her.
12    Q.  Did you tell him anything else?
13    A.  No.
14    Q.  Did you tell him specifically you had sex with
15 her?
16    A.  Sure.
17    Q.  Have you seen Ms. Varner naked?
18    A.  Yes.
19    Q.  Totally naked?
20    A.  Yes.
21    Q.  On what occasions?
22    A.  Different occasions. I mean, she rented a room,
23 oh, man, at the Fairfield Inn.
24    Q.  When was that, sir?
25    A.  I'm not --

**Page 95**

1        MR. MacMAIN: If you don't know the date --
2        THE WITNESS: Somewhere in May of '93. Maybe the
3  23rd or 26th of May, I'm not sure. Something like that.
4  26th of May. She rented a room.
5  BY MS. WALLET:
6     Q.  She rented the room?
7     A.  Yeah. We had got together, wanted to have more
8  time together other than activities that were in our car or
9  in her home or at my house.
10    Q.  So prior to the Fairfield Inn, you had had sex
11 with her in the car, in her house, and --
12    A.  In my home.
13    Q.  -- at other locations?
14    A.  In my home, um-hum, three times. Twice in the
15 house and once in the garage.
16    Q.  When you say house and garage, are you talking
17 about her home or your home?
18    A.  My home. My home, two times in the house, one in
19 the back room, one in the living room, and one in the garage.
20    Q.  Okay.
21    A.  And at her home.
22    Q.  Let's go back to the Fairfield Inn and then we'll
23 move to the others.
24    A.  Okay.
25    Q.  So tell me what happened on the occasion that you

**Page 96**

1  had sex with Ms. Varner at the Fairfield Inn.
2     A.  She rented a room with her credit card under her
3  previous married name, Barb Spidle. She paid for the room
4  with her credit card. And we went down to, I think it was
5  room 106. It was on the end of the Fairfield Inn. And I met
6  her after work around three o'clock. I took off early. I
7  went to the West Shore Diner, purchased some club sandwiches,
8  brought a bottle of Amaretto. We went into the room, we had
9  oral and vaginal sex till about from 3:00 till I think 6:30
10 that night. I had to teach DUI school at Trinity, so I left.
11        She signed the registration card there at the
12 Fairfield Inn. And I tried to retain, you know, I tried to
13 receive that card, and that company is -- it was Sage
14 Industries and it was associated with the Marriott at the
15 time. And I went down later to that Fairfield Inn and tried
16 to get a copy of her receipt and a copy of the registration
17 form she signed. And I talked --
18    Q.  And when did you do that, sir?
19    A.  That was a couple years when she -- that was
20 after she started this sexual harassment complaint.
21    Q.  So after 1997?
22    A.  Yes. So that might have been four years later.
23 But I talked to a Daniel Hoy and a Dan Matiattose and then I
24 called an attorney for Sage Industry, Dan Queen out in
25 Colorado Springs, to try to get the receipt.

Case 1:01-cv-00725-YK   Document 92-2   Filed 12/29/2003   Page 9 of 10
Multi-Page™

Page 97

1  Q. Were you successful in getting the receipt?
2  A. I haven't been permitted to access that because
3  it was charged on her credit card.
4  Q. Does that mean no, you weren't successful?
5  A. No, that doesn't mean that. That means it can
6  still be accessible if I show cause. But I wasn't named in
7  any lawsuit at that time because you and Mrs. Varner had
8  proceeded through the EEOC proceedings which I was prohibited
9  to try to get discovery from.
10 Q. My question, sir, is: Do you have in your
11 possession now any document related to a registration card or
12 any credit card information related to the Fairfield Inn
13 sexual encounter?
14 A. I answered that. I do not. But that's not to
15 say that they haven't retained tape it.
16     MR. MacMAIN: She isn't interested -- she just
17 wants to know if you had anything now.
18     THE WITNESS: No.
19     MR. MacMAIN: The answer was no.
20 BY MS. WALLET:
21 Q. All right. So you spent the afternoon at the
22 Fairfield Inn between approximately three o'clock and six
23 o'clock?
24 A. Right.
25 Q. Okay. And what were Ms. Varner's sexual

Page 98

1  preferences?
2  A. To have intercourse, oral and vaginal
3  intercourse.
4  Q. What was her preference?
5  A. Both.
6  Q. What was your preference?
7  A. Both.
8  Q. Did you ever have anal intercourse with her?
9  A. On one occasion.
10 Q. When was that, sir?
11 A. I don't know the date. It was after a DUI
12 school. She would meet me. And previous to that she had
13 shown me a Redbook article on anal sex as we were delivering
14 a juvenile up to State College.
15 Q. Do you still have that article?
16 A. No. She showed me the article.
17 Q. What did she say?
18 A. She was interested in having anal sex.
19 Q. How long was it after she showed you the article
20 that you did it?
21 A. I don't know.
22 Q. Months, weeks?
23 A. I don't know.
24 Q. Days?
25 A. I have no idea. I don't know the date that we

Page 99

1  had it. I know the place that we had it. I know it was
2  after a DUI school. It was along the road to the state
3  correctional institution, because we would meet at where she
4  used to work at the Cedar Run, yeah, Cedar Run School. She
5  used to work there. So when I would meet her after the DUI,
6  she would say that she would meet me at the Cedar Run Capital
7  Area Intermediate School.
8       So we met there after a DUI school and engaged in
9  anal sex along a road, right -- there's a lime quarry right
10 there, and there's a single tree right along the gates of the
11 state correctional institution, and that's exactly where it
12 happened.
13 Q. So you just pulled right in there and had anal
14 sex?
15 A. I met her earlier in the evening at the parking
16 lot of Capital -- or Cedar Run, and Cedar Run was right
17 beside there. So we drove to the area, got involved in a
18 sexual encounter and then had anal sex.
19 Q. Was it during daylight hours?
20 A. Nighttime.
21 Q. Middle of the night?
22 A. It would have probably been around 9:00, 9:30 --
23 between 9:30 and 10:00.
24 Q. And how long did that last?
25 A. Not long.

Page 100

1  Q. A couple minutes?
2  A. 10 minutes.
3  Q. Were you fearful of being discovered doing this
4  along the side of the road?
5  A. Sure. You know, we would take a remote location
6  each time. I mean, we took those type of precautions because
7  I was aware and she was aware that you can be arrested in
8  your car for having sex. So usually we would drive to
9  out-of-county destinations so in case we would ever get
10 interrupted we wouldn't be cited with a disorderly conduct
11 citation by a police department and that wouldn't go through
12 the Cumberland County, you know, court authorities.
13 Q. So you thought if you got cited in another county
14 that that wouldn't get back to Cumberland County?
15 A. Sure. Yeah.
16 Q. I don't understand. Why would you do it out of
17 county?
18 A. We would drive to out-of-county locations and
19 engage in sex during this time that we were driving around
20 together and meeting one another.
21 Q. Is New Cumberland in Cumberland County?
22 A. No, that's -- we would go to Goldsboro. We would
23 park -- she would park her car. She drove a Cabriolet and it
24 was quite a significant car because it was an aqua blue car
25 and it had a white roof on. She was always fearful for her

Page 161

1 over?
2  A.  No.
3  Q.  What did you think would happen after that?
4  A.  I didn't know what was going to happen.
5  Q.  When was the first time after you had the meeting
6 with Judge Sheely that someone spoke to you about
7 Ms. Varner's complaints?
8  A.  The first time that somebody spoke to me about
9 Ms. Varner's complaint after talking with Judge Sheely, I
10 don't know.  I don't know if anybody spoke to me about it.
11  Q.  Do you know whether someone spoke to you before
12 you learned that you had been named as a defendant in the
13 federal court suit?
14  A.  I think the formal notice that I received was
15 from your office asking me to acknowledge your federal
16 lawsuit, and I didn't ever send you an acknowledgment of your
17 notice because I didn't want to --
18  Q.  Okay.  So you think between the time you met with
19 Judge Sheely and when you received the federal Complaint, no
20 one spoke to you about Ms. Varner's allegations?
21  A.  No.
22  Q.  No, you don't think so?  Or no, no one did?
23  A.  No, no one spoke to me about anything further.
24  Q.  Were you angry at being sent to the prison?
25  A.  No.  Furious.

Page 162

1  Q.  And what, if anything, did you do to express your
2 anger and furiousness?
3  A.  There was nothing I could do.
4  Q.  Did you complain to anyone in the supervisory
5 chain?
6  A.  No.  It was a decision by Judge Hoffer.
7  Q.  Did you express displeasure to Judge Hoffer at
8 his action?
9  A.  The day that he -- it was a Monday.  It was
10 more -- he called me into his office said that I'm
11 transferring you to the Adult Probation office.  I was there
12 less than three minutes.  I implored him to let me speak and
13 to the events that have happened over the last couple years,
14 and I asked him not to put me in Adult Probation and put me
15 down in -- he said, you're going down, you're going to be
16 transferred to the Adult Probation office, go clean out your
17 desk, take the rest of the day off and report to John Roller
18 the next day.
19       I said, would you please let me explain the
20 circumstances around the last year and a half, and he said
21 no.  And he said -- I said, can you give me a reason why I'm
22 being transferred, and he said, I've lost confidence in you.
23       Prior to that week --
24       MR. MacMAIN:  Gary, just answer her question.  If
25 she wants more, she'll ask you for more.

Page 163

1 BY MS. WALLET:
2  Q.  Do you remember anything else about what you said
3 or what Judge Hoffer said at that time?
4  A.  I just remember -- I didn't make any comments but
5 I remember feeling that he treated me like a dog, where I had
6 to sit in front of him and I couldn't speak and I couldn't
7 give an explanation as to my frustration in defending these
8 accusations.
9  Q.  Did he tell you at that time that your transfer
10 to Adult Probation had anything to do with the allegations
11 that were made by Ms. Varner?
12  A.  No.
13  Q.  Did you believe that they were related to the
14 allegations that Ms. Varner made?
15  A.  Did I believe?  Sure, I believed that.
16  Q.  Why did you believe that?
17  A.  I didn't know what other reason he would transfer
18 me.
19  Q.  Did you tell anybody that day that you had been
20 transferred?
21  A.  I think so.
22  Q.  Who did you tell?
23  A.  I walked in the Probation office.  Denny Drachbar
24 caught me at the first counter and was giving me a raft of
25 baloney over being upstairs talking to Hoffer about, you

Page 164

1 know, why are we having staff meetings now again.  And I just
2 said, well, you won't have to worry about that, you won't
3 have to be bugging me about it because I've been sent to the
4 prison or, yeah, sent to the prison.
5  Q.  Did you tell anybody else?
6  A.  I think I told Joe.
7  Q.  What did you tell Joe?
8  A.  I think Tom Boyer was in his office.  I said,
9 I've just been terminated and I've been terminated from my
10 position and I'm to report to John Roller tomorrow morning.
11  Q.  Did you use the F word?
12  A.  I don't think so.
13  Q.  Anybody else at that little gathering use the F
14 word?
15       MR. MacMAIN:  Objection as to form, that little
16 gathering.
17 BY MS. WALLET:
18  Q.  Just my reference to Joe and Tom Boyer.
19  A.  Joe and Boyer being in Joe's office.
20  Q.  Yes.
21  A.  No, I didn't use the F word.
22  Q.  My question was:  Did anyone else use the F word?
23  A.  No.  No, they didn't.  They were as shocked as I
24 was.
25  Q.  Were you angry at that time?