# Exhibit C

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,             .
     Plaintiff,                .    CIVIL ACTION
                               .    NO. 1:CV 01-0725
  vs.                          .
                               .
COMMONWEALTH OF PENNSYLVANIA,  .    (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,       .
CUMBERLAND COUNTY; CUMBERLAND  .
COUNTY; S. GARETH GRAHAM,      .
Individually, and JOSEPH       .
OSENKARSKI, individually,      .
     Defendants.               .
. . . . . . . . . . . . . . . . . . .

                    VOLUME 1
                 Pages 1 to 70

   Deposition of:   JOSEPH L. OSENKARSKI

   Taken by      :  Plaintiff

   Date          :  January 27, 2003, 3:27 p.m.

   Before        :  Emily Clark, RMR, Reporter-Notary

   Place         :  Administrative Offices of
                    Pennsylvania Courts
                    5035 Ritter Road, Suite 700
                    Mechanicsburg, Pennsylvania

APPEARANCES:

   DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

   ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
   BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
              Ninth Judicial District, Cumberland County

   THOMAS, THOMAS & HAFER
   BY:  JAMES K. THOMAS, II, ESQUIRE
        PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

Page 2

APPEARANCES (continued):

   MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
   BY:  DAVID J. MacMAIN, ESQUIRE
        For - Defendant S. Gareth Graham

   SWEENEY & SHEEHAN, P.C.
   BY:  PAUL LANCASTER ADAMS, ESQUIRE
        For - Defendant Joseph L. Osenkarski

ALSO PRESENT:

   MS. BARBARA E. VARNER

   MR. S. GARETH GRAHAM

   MS. MELANIE McDONOUGH

   MS. PAT LANE

Page 3

                    I N D E X
                    WITNESS

Joseph L. Osenkarski                  Examination
  By Ms. Wallet                            5


                    EXHIBITS
(None marked)

Page 4

STIPULATION

It is hereby stipulated by and between the respective parties that signing, sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved until the time of trial.

JOSEPH L. OSENKARSKI, called as a witness, being duly sworn, and testified as follows:
BY MS. WALLET:
   Q. What is your name, sir?
   A. **Joseph L. Osenkarski.**
   Q. By whom are you employed?
   A. **Cumberland County Juvenile Probation.**
   Q. How long have you been so employed?
   A. **Today is the anniversary of the first day of my 39th year. I started January 28th, 1965.**
   Q. Mr. Osenkarski, we have met before. My name is Debra Wallet.
   A. **Yes, we met before.**
   Q. You know that I am here representing Barbara Varner in the action that she has brought against the county and the court and you and Mr. Graham.
   A. **Yes.**
   Q. I'm going to ask you a number of questions regarding this case. Is there any reason why you could not

**Page 17**

1  Q. Have you used it directed at any individual,
2  including Ms. Varner?
3  A. No.
4  Q. So you never used the F word directed at someone
5  else?
6  A. Like my, in my work with my co-workers are you
7  asking?
8  Q. Or your supervisees.
9  A. No. I've got an extreme opposite temperament or
10 style, and I treat people and have treated people with
11 dignity, including and especially Barbara Varner from day
12 one, which was many years before she became an employee in
13 the Probation office, the Juvenile Probation Department, or
14 the combined office, I'm sorry.
15 Q. How would you describe the use of the F word in
16 the Juvenile Probation office? Was it used frequently, not
17 frequently?
18    MR. ADAMS: By whom?
19 BY MS. WALLET:
20 Q. By anyone.
21 A. Let me generally answer that. Can I answer that
22 in the context of both Adult and Juvenile? Or doesn't it --
23 because we were together for more years than we were split.
24 Q. You may answer it however you wish, sir.
25 A. Okay. Let me think about this a minute.

**Page 18**

1    We work, I'm talking about Juvenile and Adult
2  Probation, in a very, very unnatural atmosphere, 40 hours a
3  week or 36 to 40 hours a week. Over the years this
4  environment hasn't changed. What appears to be natural in a
5  regular office situation is not natural in Juvenile
6  Probation. Anybody is capable of anything, because we work
7  with a criminal element, a delinquent element, a sick
8  element. They're in there because they're troubled people
9  and they're not normal. And it's not unnatural to have
10 conversations that are off-color, sometimes vulgar, sometimes
11 humorous to keep your sanity, but they do touch on other than
12 pleasantries. And so I'm going to say that it's sometimes or
13 frequently, or it can be frequently but not frequently all
14 the time, it's just a colored separate kind of people we deal
15 with, and I describe it as unnatural.
16    There have been verbal -- there's been verbal
17 violence, there's been physical violence over the years that
18 I've been in that office. There's been physical violence
19 upstairs in the courtrooms. Shortly -- well, several years
20 before I got there, a judge was shot, a defendant was killed.
21 Not -- the defendant was arrested and later died in prison.
22 But it's a violent, it can be a violent place, but it can be
23 sometimes normal.
24    MR. ADAMS: Try to just answer the question.
25 BY MS. WALLET:

**Page 19**

1  Q. You cannot always control the conduct of the
2  clients that come into your office; would you agree?
3    MR. ADAMS: Objection.
4    MS. WALLET: What's the objection?
5    MR. ADAMS: Control the clients that come into
6  his office would seem to lead to the direction that he's not
7  doing his job. I think it's not an appropriate question.
8    But you can answer.
9    THE WITNESS: Our job is to control
10 uncontrollable people, and we have to try. Sometimes it's
11 difficult.
12 BY MS. WALLET:
13 Q. So you may not be able to control the clients,
14 but you can control your employees, can you not?
15 A. Yes. That's part of our duty.
16 Q. As a supervisor, you had both a duty and a
17 responsibility to control the employees under your
18 supervision?
19 A. The answer is yes.
20 Q. Do you believe you did that with regard to Gary
21 Graham?
22 A. I had control of my people.
23 Q. Do you believe you did that with regard to Gary
24 Graham?
25    MR. ADAMS: I'm going to object.

**Page 20**

1    MS. WALLET: What's the objection?
2    MR. ADAMS: Control Gary Graham to? I'm sorry,
3  the question, can you repeat the question? Can you repeat
4  the question, please.
5    (Record read.)
6    THE WITNESS: Yes.
7  BY MS. WALLET:
8  Q. Do you believe you were capable of controlling
9  Gary Graham as one of your supervised employees?
10 A. Yes. Let me give you a but. Gary Graham is a
11 good, was and is a still a good employee. He is at times
12 louder than most. Maybe excitable is a better word.
13 Excitable is a better word. And his voices elevate with his
14 excitability. That's my answer.
15 Q. Did anyone other than Barbara Graham ever
16 complain to you about the conduct of Gary Graham?
17    MR. MacMAIN: Objection to form. Are you asking
18 about sexual harassment conduct, or just conduct generally?
19    MS. WALLET: The word is complaint, any
20 complaint.
21    THE WITNESS: No formal complaints. People did
22 say that Gary was loud, louder than most.
23 BY MS. WALLET:
24 Q. Did you ever at any time tell Mr. Graham that
25 perhaps in a workplace a less-loud tone of voice might be

Page 21

1 appropriate?
2   A.  I believe I've told Gary to tone his voice down.
3   Q.  Did any women come to you besides Barbara Varner
4 and complain to you about Gary Graham?
5       MR. ADAMS: Objection. Complain about what?
6 Because the testimony is about cases that were complained
7 about, so what are you talking about specifically?
8       MS. WALLET: Complain about anything.
9       THE WITNESS: No one ever made any formal
10 complaints about Gary Graham.
11 BY MS. WALLET:
12  Q.  And when you say formal complaint, do you mean
13 some kind of complaint in writing?
14  A.  Complaint in writing, or verbal do something
15 about it.
16  Q.  No other woman ever came to you and made any
17 verbal complaint about Gary Graham?
18  A.  No.
19  Q.  Did any women come to you and complain to you
20 about your treatment of them?
21  A.  Women complaining to me about my treating them --
22  Q.  Correct.
23  A.  -- correctly?  No.
24  Q.  Did Kerry Houser make a complaint to you about
25 her treatment by you?

Page 22

1   A.  Kerry Houser in about 1993 gave a one-page
2 written letter of complaint to me with a copy to Mr. Bolze,
3 the chief at the time. Mr. Bolze immediately investigated it
4 as department head, and gave me a verbal -- a written copy,
5 handwritten copy, of the results of his investigation, which
6 determined the complaint was unfounded.
7   Q.  Based on this one-page written letter, what did
8 Kerry Houser complain about?
9   A.  Kerry Houser made a statement that I was
10 discriminatory with a verbal statement.
11  Q.  And what was?
12  A.  Toward her. Toward her.
13  Q.  I'm sorry, what was that verbal statement, sir?
14  A.  I don't know till today because nothing was -- it
15 was determined that no substantial verbal complaint was made,
16 which is why Mr. Bolze dismissed it.
17  Q.  My question, sir, was: Based on the one-page
18 written letter that Ms. Houser wrote, what did she complain
19 about?
20      MR. ADAMS: Objection, asked and answered.
21 BY MS. WALLET:
22  Q.  Do you know?
23  A.  No.
24  Q.  Do you remember the term cunt club?
25  A.  Do I remember it?

Page 23

1   Q.  Yes.
2   A.  I've heard that word. I didn't -- I don't recall
3 making it.
4   Q.  Did Ms. Houser allege that you had made that
5 statement directed at women in the office?
6   A.  She made that statement, but Mr. Bolze did not
7 determine, was unable to substantiate it, which is why he
8 dismissed the action.
9   Q.  Do you agree, sir, that Ms. Houser complained
10 about the language in the office?
11  A.  I don't recall. I'd have to go back through the
12 documents, which is -- which I'd have to dig up. I don't
13 have access to right here and now.
14  Q.  Did you ever make the statement in public about
15 the cunt club?
16  A.  I don't recall.
17  Q.  You said she complained about discrimination.
18 Can you remember anything about the nature of her complaint
19 of discrimination?
20  A.  No.
21  Q.  Well, do you remember, sir?
22  A.  It was allegedly my language, but again, nothing
23 was substantiated.
24  Q.  Do you recall whether she complained about the
25 use of the F word?

Page 24

1   A.  No.
2   Q.  No, you don't recall? Or no, she did not
3 complain?
4   A.  I don't recall. And Ms. Houser herself used
5 off-color language, which I did hear.
6   Q.  Is there anything else about this complaint that
7 was made by Ms. Houser in the one-page letter that you
8 remember?
9   A.  No, except that it was unsubstantiated.
10  Q.  Did you get any letter to you saying that this
11 was unsubstantiated?
12  A.  Yes.
13  Q.  Do you have a copy of that letter?
14      MR. ADAMS: If you don't, if it's unsubstantiated
15 I don't want anybody to have this.
16      THE WITNESS: But not -- this is a document of
17 Mr. Bolze stating it is my finding that the utterances --
18      MR. ADAMS: Let me see it. Excuse me.
19      MS. WALLET: We'll take a minute, Mr. Adams.
20 BY MS. WALLET:
21  Q.  But my question was: Do you have a copy of the
22 written document saying that Ms. Houser's complaint was
23 unsubstantiated? That's a yes or a no, sir. Do you have a
24 document?
25  A.  No evidence to support --

```
                                                    Page 71
       IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
       Plaintiff,               .  CIVIL ACTION
                                .  NO. 1:CV 01-0725
    vs.                         .
                                .
COMMONWEALTH OF PENNSYLVANIA,   .  (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
       Defendants.              .
. . . . . . . . . . . . . . . .

                  VOLUME 2
              Pages 71 to 223

  Deposition of: JOSEPH L. OSENKARSKI

  Taken by   : Plaintiff

  Date       : February 11, 2003, 9:14 a.m.

  Before     : Emily Clark, RMR, Reporter-Notary

  Place      : Administrative Offices of
               Pennsylvania Courts
               5035 Ritter Road, Suite 700
               Mechanicsburg, Pennsylvania

APPEARANCES:

   DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

   ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
   BY: A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
              Ninth Judicial District, Cumberland County

   THOMAS, THOMAS & HAFER
   BY: PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County
```

```
                                                    Page 72
 1  APPEARANCES (continued):
 2     MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
       BY: DAVID J. MacMAIN, ESQUIRE
 3          For - Defendant S. Gareth Graham
 4     SWEENEY & SHEEHAN, P.C.
       BY: PAUL LANCASTER ADAMS, ESQUIRE
 5          For - Defendant Joseph L. Osenkarski
 6
 7  ALSO PRESENT:
 8     MS. BARBARA E. VARNER
 9     MR. S. GARETH GRAHAM
10
...
25
```

```
                                                    Page 73
 1                I N D E X
 2                 WITNESS
 3  Joseph L. Osenkarski           Examination
 4      By Ms. Wallet                 75, 213
 5      By Ms. Williams               203
 6      By Mr. MacMain                194
 7      By Mr. Adams                  207
 8
 9
10              OSENKARSKI EXHIBITS
11  No.  Description                         Identified
12  1    3 pages, "Employee Certification;" attachments   75
13  2    2-page "Memo" 6/30/08, to Sheely from            86
         Osenkarski
14
    3    4-page "Cumberland County Employe Performance    123
15       Review" 12/04/95 to 12/04/06
16  4    4-page "Cumberland County Employe Performance    125
         Review" 12/04/98 to 12/04/99
17
    5    9-page "Cumberland County Employe Performance    125
18       Review" 12/04/98 to 12/04/99
19  6    5-page "Cumberland County Employe Performance    125
         Review" 12/04/99 to 12/04/00
20
    7    5-page "Cumberland County Employee Performance   125
21       Review" 12/04/00 to 12/04/01
22  8    1-page memo, 1/31/96, to Bolze from Herr         139
23  9    1-page handwritten memo, 6/18/96, to POs         144
24  10   1-page memo, 4/6/98, to Hoffer from Hartnett     147
25
```

```
                                                    Page 74
 1              OSENKARSKI EXHIBITS
 2  No.  Description                         Identified
 3  11   2-page memo, 3/31/98, to Osenkarski from         148
         Varner
 4
    12   10 pages: 2-page memo, 2/28/00, to Osenkarski    152
 5       from Boyer; attachments
 6  13   6 pages, seniority lists                         157
 7  14   1-page "Memo," 4/2/98, to Varner from            158
         Osenkarski
 8
    15   1-page "Memo," 2/8/00, to Patterson from         165
 9       Osenkarski
10  16   4 pages: 1-page handwritten memo, 6/1/98, to    170
         Osenkarski from Varner; 1-page handwritten
11       memo, 5/26/98, to Kline from Varner
12  17   1-page "Memo," 4/2/02, to Varner from            181
         Osenkarski
13
14                * * * * *
...
25
```

### Page 83

1  acted toward others in the office?
2  A. No.
3  Q. As a result of your meeting with Mr. Deluce, did
4  you believe that any act was required on your part as a
5  supervisor?
6  A. That I believe?
7  Q. Yes, sir.
8  A. Nothing specific.
9  Q. That's a no, you didn't believe that any action
10 was required on your part as a supervisor?
11       MR. ADAMS: Objection. That's not the same
12 question you just asked.
13       Do you understand the question?
14       THE WITNESS: I'm a little confused.
15       MS. WALLET: Okay. Maybe it's my hearing today
16 but could everybody speak up a little bit? I'm having
17 trouble hearing all of you.
18       MR. ADAMS: I can hear you well.
19       MR. DELLASEGA: I do have some problems hearing
20 Mr. Osenkarski because I have a deaf ear, so if you would
21 speak up.
22       MR. ADAMS: Does everyone want to slide down?
23       MS. WALLET: I think if everybody speaks up as
24 they did the last time, I don't think we'll have a problem.
25 BY MS. WALLET:

### Page 84

1  Q. Let me try that question again. Mr. Osenkarski,
2  as a result of your meeting with Mr. Deluce in April of 1997
3  did you believe that any action was required by you as a
4  supervisor with respect to Mr. Graham?
5  A. No.
6  Q. Did you believe that any action was required by
7  you with respect to Ms. Varner?
8  A. No. It was common sense told me that an
9  investigation was going on, and common sense would tell me
10 that I should not interfere with any investigation.
11 Q. Do you know whether other individuals under your
12 supervision were interviewed in or about that same time?
13 A. Yes, I was told that others would be interviewed.
14 Q. Do you know who was interviewed?
15 A. No, not specifically.
16 Q. Did you, sir, at any time tell Ms. Varner that it
17 was not proper for her to go to Mr. Hartnett, a personnel
18 officer for the county, with regard to her complaints of
19 harassment?
20 A. No.
21 Q. You wrote a memorandum in or about June 13th of
22 1997 relieving Mr. Graham of any authority or responsibility
23 concerning Barbara Varner. Do you remember that, sir?
24 A. Yes.
25 Q. Did you write that memo before or after you met

### Page 85

1  with Mr. Deluce?
2  A. I believe shortly after.
3  Q. And did you write that memo as a result of any
4  directions to you to do so?
5  A. No.
6  Q. Why did you relieve Gary Graham of any authority
7  or responsibility concerning Ms. Varner in June of '97?
8  A. Because of the alleged complaint.
9  Q. Well, did you think that there was some reason to
10 separate Mr. Graham and Ms. Varner?
11       MR. ADAMS: Objection, asked and answered.
12       THE WITNESS: Because of the Complaint, which I
13 didn't -- which I didn't see. Again, common sense tells a
14 supervisor to act accordingly and responsibly. That's what I
15 felt I had to do because of a Complaint which I asked to see
16 but never was shown.
17 BY MS. WALLET:
18 Q. Why did you think it was responsible for you to
19 issue your June 13, '97, memo?
20 A. Because of a Complaint.
21 Q. Do you always separate an employee from a
22 supervisor whenever you receive any complaint?
23       MR. ADAMS: Objection. The question's been asked
24 and answered and it's very argumentative the way it's framed.
25       MS. WALLET: I said do you always do it. I never

### Page 86

1  asked that question before.
2       MR. ADAMS: It is argumentative.
3       You can answer.
4       THE WITNESS: I was a new chief, never had
5  received a complaint such as this before.
6  BY MS. WALLET:
7  Q. Did you speak to someone about what you might do
8  in that circumstance?
9  A. I don't recall that I did.
10 Q. In any event, this was your own idea, not a
11 result of any direction to you?
12 A. To the best of my knowledge.
13       MS. WALLET: Let's mark as Deposition Exhibit 2 a
14 June 30, 1997, memorandum.
15       (Osenkarski Deposition Exhibit No. 2 was marked.)
16 BY MS. WALLET:
17 Q. Would you please take a minute, sir, to take a
18 look at what we've marked as Deposition Exhibit 2?
19 A. (Witness complied.)
20 Q. First of all, sir, did you write this memorandum?
21 A. Yes.
22 Q. Did you write it in or about June 30, 1997?
23 A. Yes.
24 Q. Why did you write this memorandum?
25 A. Because I felt it was appropriate. Specifically,

Page 135

1  Q. Okay. Can you think of anything else?
2  A. No.
3  Q. Now, there's been quite a controversy, would you
4  agree, within the Juvenile Probation office and to a lesser
5  extent within the Adult Probation office regarding the matter
6  of seniority?
7     MR. ADAMS: Objection. What do you mean by
8  controversy?
9     MS. WALLET: He can tell me whether he thinks
10 there was a controversy.
11    THE WITNESS: I'm prepared to respond. Let's --
12 I'm going to give you a historic answer. There has been
13 controversy over the seniority policy for years, especially
14 when we were a combined office. So much so that it was one
15 of the first things I took the responsibility to try to fix
16 when I was given a desperately understaffed and
17 underprogrammed office. So because of that, even before we
18 were formally split in January 1st of 1997, I called a
19 meeting right after Mr. Bolze left and I decided that it
20 should be one of the first of the many, many things that had
21 to be fixed
22 BY MS. WALLET:
23 Q. Why did you think it should be first?
24 A. Because of the complaints by other staff,
25 unhappiness with people who are still on staff and with

Page 136

1  people who have since left.
2     I'm going to go back and say that the entire time
3  Mr. Bolze was chief he was approached by several staff who
4  disagreed with the seniority policy, because there were
5  several factors that were used to make up what was the then
6  seniority list, and it was ongoing. For example, there was
7  credit given for part-time service, credit given for service
8  generally with the county. For example, I'm just using this
9  as an example, you know, a nurse could come in or a
10 maintenance worker into the then-combined Probation office
11 and be given credit for service, full-time service and
12 part-time service in other departments. And then there was
13 an inherent unfairness to that policy, which was felt by a
14 lot of people.
15    So I decided, again, being a brand new chief,
16 before we were formally split, to call this meeting and said
17 we've got to do something about this nagging seniority policy
18 and now we've got to come up with a fair factor. So after we
19 met --
20 Q. And who is we, sir?
21 A. Myself and I think Gary Graham and Tom Boyer. We
22 decided we were going to do something about it. So we
23 consulted with the then-chief of Adult Probation, and --
24 Q. And who was that, sir?
25 A. That's John Roller. And we told him we were

Page 137

1  looking into making changes. And he decided that he was
2  going to let his policy alone for the time being, so.
3  Because we were splitting we said we were going to do
4  something about it.
5     So after meeting, talking, pulling together old
6  policies, I delegated I believe it was Tom Boyer to go to all
7  of the people who are coming into Juvenile Probation, and I
8  also consulted with some of the people or all of the people
9  who were staying with the Adult side, to tell them we were
10 going to make changes and to take suggestions.
11    I further told him that our decision was to come
12 up with the fairest way, and I felt the fairest way to fix
13 this broken seniority policy was to come up with a single
14 common denominator, for lack of a better word, and that was
15 the useful time service in Juvenile Probation.
16    I further told Tom, because I was crazily looking
17 into, you know, going through trying to find money for, you
18 know, the school-based probation program, which was my idea
19 and Gary's idea, and that was a big thing we had to do
20 amongst other things, I told Tom to just tell these people
21 what we had planned, and I said, make sure you go over it
22 with everybody. I don't want -- if we fix this thing or if
23 we make it fairer I don't want to redo it.
24    So he went to everybody, and I gave him the time
25 to do it. And I said, come back to me with a report, verbal

Page 138

1  report, and tell me how people felt about the plan single
2  common denominator, which was full-time service in Juvenile
3  Probation and Juvenile Probation only.
4     So he did that. Came back and said, everybody's
5  happy with it. I'm summarizing, you know, because we're
6  going back to 1996. So I said, fine, we'll not even wait
7  until the 1st of the year when we officially split and we'll
8  go ahead and implement it. So we did.
9  Q. Okay. Now, let's --
10 A. Sorry about the long explanation, but it's just
11 something that was, you know, something that I felt we had to
12 do first and do it quick and -- not quick, but make it
13 better.
14 Q. Okay. There were two controversial issues, will
15 you agree? The question of whether part-time should be
16 counted the same as full-time, correct?
17 A. Part-time the same as full-time, and secondly --
18 Q. The second issue was whether county service
19 outside of the Probation office should be counted towards
20 seniority, correct?
21 A. Yes.
22 Q. Okay. Now, is it accurate, sir, that when
23 Mr. Bolze was the chief, full-time and part-time service was
24 counted?
25 A. Yes.

### Page 191

1  it's not just a numbers game. It's a process that involves
2  the supervisor making sure that he knows the expertise of his
3  probation officers under him, and make sure that the,
4  secondly, that the cases are fairly distributed to the most
5  appropriate probation officers.
6      Q.  Do you keep these statistics on a quarterly or
7  monthly, weekly basis?
8      A.  Well, we have assignment sheets. Each individual
9  probation officer has a list of cases or a list that's kept
10 of the case assignments on a regular basis. That's ongoing.
11     Q.  But if I said tell me how many cases Ms. Varner
12 had in June of 1999, is there a readily available statistic
13 where I could find that information?
14     A.  I believe that the office manager can provide a
15 list of cases, assignment dates and completion dates.
16     Q.  So somewhere there's a chart --
17     A.  Yeah, there's a chart.
18     Q.  -- that would show each person?
19     A.  Numbers. Again, numbers. It's not just a
20 numbers game distribution, it's an expectation that I've
21 always had that supervisors should fairly distribute work,
22 and we cannot just look at numbers to get a refined defined
23 estimate of workload. It's not only numbers but it's
24 difficulty level, and one learns difficulty levels only after
25 being experienced himself or herself. So it's a dual

### Page 192

1  responsibility.
2      Q.  My question, sir, is: If I ask you what were the
3  numbers of cases assigned to one of your individual juvenile
4  probation officers at any given time, does that document
5  exist now? Or would someone have to create that?
6      A.  We have a -- we could give you a document that
7  would show case assignments.
8      Q.  And you believe that that would be done on a
9  monthly basis?
10     A.  It's an ongoing -- it's a daily basis.
11     Q.  What's your understanding of the office policy
12 with regard to leaving on commitment trips?
13     A.  There isn't any specific time that one should
14 leave. It's a matter of time of the day, time court is over
15 with, the kid himself or herself, whether or not there's
16 space in detention to either house overnight or proceed with
17 a placement. Any number of factors.
18     Q.  Do you pay your probation officers from what I'll
19 call portal to portal, when they leave their home till they
20 return to their home?
21     A.  As long as it's legitimate work time, yes. It
22 can be taken in comp time or overtime.
23     Q.  And there's no restriction on not leaving at some
24 particular time after, let's say, eight o'clock in the
25 morning?

### Page 193

1      A.  No. But common sense would dictate that a PO or
2  two POs wouldn't take a child at 4:30 in the afternoon on a
3  snowy day after a placement's made when there was space in
4  detention, the child could be housed overnight and then
5  realistically taken the following day in the earlier part of
6  the day.
7      Q.  Were you aware that Ms. Varner was docked pay by
8  Mr. Graham?
9      A.  I think, this goes way back, six or seven years
10 ago, there was an incident, and I'm not that -- I'm fuzzy on
11 details, but there may have been a one-hour pay on one
12 occasion that was taken away from Ms. Varner. But again, I'm
13 not -- I'm fuzzy on details and I don't recall the
14 circumstances.
15     Q.  Was it just Ms. Varner, or was it someone else?
16     A.  Perhaps Debra Green. But again, I'm not --
17        MR. ADAMS: Don't guess. If you know, you know.
18 If you don't --
19        THE WITNESS: I may -- I don't know.
20 BY MS. WALLET:
21     Q.  Are you aware of any male probation officers who
22 were docked pay?
23     A.  No.
24        MS. WALLET: That's all the questions I have,
25 Mr. Osenkarski.

### Page 194

1         THE WITNESS: Thank you.
2         MR. DELLASEGA: No questions.
3         MR. MacMAIN: I have some follow-up. You want me
4  to go?
5         MS. WILLIAMS: Yes.
6  BY MR. MacMAIN:
7      Q.  Mr. Osenkarski, we've met before. My name's
8  David MacMain. I represent Mr. Graham. I just have a few,
9  what's the word we used before lunch, smattering of questions
10 in areas maybe I wanted to follow up both on today as well as
11 from prior days.
12        MR. DELLASEGA: Slogging.
13        MR. MacMAIN: Slogging.
14 BY MR. MacMAIN:
15     Q.  Going back to the first day of depositions, let
16 me start there. Had you ever, other than this particular
17 occasion, ever received any type of complaint about
18 Mr. Graham's sexually harassing anyone?
19     A.  I never received a complaint about Gary Graham's
20 sexually harassing anyone.
21     Q.  Okay. And that would include no complaints by
22 Ms. Varner prior to this occasion of Mr. Graham in any way
23 sexually harassing her or creating a hostile work
24 environment?
25        MS. WALLET: Objection to the form of the

### Page 195

1  question. What do you mean by this occasion?
2         MR. MacMAIN: The occasion that we're here for
3  today.
4         MS. WALLET: She made a whole lot of complaints.
5  BY MR. MacMAIN:
6    Q. Prior to her first complaint to you, which is set
7  forth in the Complaint, have there been any other complaints
8  brought by Ms. Varner against Mr. Graham?
9    A. No.
10   Q. You had said that you described Mr. Graham as
11 having a loud voice and being excitable. Correct?
12   A. Excitable, yes.
13   Q. Would that be as to just Ms. Varner, or would
14 that be as to various people in the office?
15   A. Mr. Graham has an excitable personality is the
16 best way I can use to describe it.
17   Q. And my question then is: That excitable
18 personality and loud voice, that's the way he is with
19 everybody; would that be fair to say?
20   A. Yes. Yes.
21   Q. You talked the other day that the Probation
22 office is an unnatural environment, and I think you started
23 to explain that cases you deal with involve difficult
24 personalities, difficult issues and that type of thing.
25 Could you explain, I guess, in more detail what you meant by

### Page 196

1  that?
2    A. Well, we work with difficult people. The only
3  people we work with are people who are in trouble with the
4  law for any number of reasons. It's common criminality,
5  criminality that displays itself because of a host of
6  individual, personal problems, mental illness, social
7  disabilities on and on and on.
8    Q. And is part and parcel of the nature of the job
9  dealing with cases or individuals that may have -- cases or
10 individuals involving unnatural or difficult sexual
11 relations?
12   A. Yes.
13   Q. Would the cases and the clients you're involved
14 with also use profanity?
15   A. Yes.
16   Q. Cases your office deals with or clients your
17 office deals with, involved in physical violence?
18   A. Yes.
19   Q. When clients come in -- I assume clients come
20 into your offices on occasion?
21   A. Yes, regularly.
22   Q. Regularly. Do any of the clients ever use
23 profanity around the employees?
24   A. That's possible, yes.
25   Q. Have you heard profanity used by clients that are

### Page 197

1  in the office?
2    A. Yes.
3    Q. Do any of the clients have loud voices and yell
4  at their probation or parole officers?
5    A. At times it's possible.
6    Q. Do they use profanity towards their probation or
7  parole officers?
8    A. Yes.
9    Q. Would you agree with me that that unfortunately
10 is part of the job?
11   A. Yes.
12   Q. You talked today about the complaints regarding
13 the seniority issue, correct?
14   A. Yes.
15   Q. And you had said people were not happy with, some
16 people were not happy with changing it and some people were
17 unhappy with the way it was; would that be fair?
18   A. Yes.
19   Q. And that would involve both males and females had
20 differences of opinion one way or the other?
21   A. Yes.
22   Q. Do you have the pile of exhibits there in front
23 of you? I want you to look at what we marked as Osenkarski
24 12, if you'd turn to the page that has a Bates number of
25 210296 at the bottom? And what I'm looking at is a memo from

### Page 198

1  Thomas Boyer.
2    A. I have that.
3    Q. Okay. Would it be fair to say that Mr. Boyer
4  wasn't happy with the proposed changes to the seniority
5  system?
6    A. Was he?
7    Q. He was not happy with changing the system in some
8  way, the seniority system; would that be fair to say?
9    A. Well, he was I would say wanting changes in the
10 old seniority system because of the number of factors that
11 were used to come up with the seniority list.
12   Q. So is Mr. Boyer wanting the new system or opposed
13 to a new system?
14   A. He was wanting a new system.
15   Q. If you turn to page 4 of this memo, the Bates
16 number at the bottom is 210299.
17   A. I have it.
18   Q. I'm looking at the I guess comparison that
19 Mr. Boyer had done under the two different seniority systems?
20   A. Right.
21   Q. And Mr. Boyer actually, he would be affected by a
22 change in the system, right? On one list he would have been
23 second in seniority, and the other list he would have been
24 first, correct?
25   A. Yes.