# Exhibit D

```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                    .
        Plaintiff,                    .   CIVIL ACTION
                                      .   NO. 1:CV 01-0725
    vs.                               .
                                      .
COMMONWEALTH OF PENNSYLVANIA,         .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,              .
CUMBERLAND COUNTY; CUMBERLAND         .
COUNTY; S. GARETH GRAHAM,             .
individually, and JOSEPH              .
OSENKARSKI, individually,             .
        Defendants.                   .
. . . . . . . . . . . . . . . . . . .
```

Deposition of:  **HON. HAROLD E. SHEELY**

Taken by    :  Defendant Cumberland County

Date        :  February 25, 2003, 10:10 a.m.

Before      :  Emily Clark, RMR, Reporter-Notary

Place       :  Administrative Offices of
               Pennsylvania Courts
               5035 Ritter Road, Suite 700
               Mechanicsburg, Pennsylvania

APPEARANCES:

DEBRA K. WALLET, ESQUIRE
    For - Plaintiff

ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
BY:  A. TAYLOR WILLIAMS, ESQUIRE
     For - Defendant Commonwealth of Pennsylvania
     Ninth Judicial District, Cumberland County

THOMAS, THOMAS & HAFER
BY:  JAMES K. THOMAS, II, ESQUIRE
     PAUL J. DELLASEGA, ESQUIRE
     For - Defendant Cumberland County

---

APPEARANCES (continued):

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
BY:  DAVID J. MacMAIN, ESQUIRE
     For - Defendant S. Gareth Graham

SWEENEY & SHEEHAN, P.C.
BY:  PAUL LANCASTER ADAMS, ESQUIRE
     For - Defendant Joseph L. Osenkarski

ALSO PRESENT:

MS. BARBARA VARNER

MR. S. GARETH GRAHAM

---

                    I N D E X

                    WITNESS

Hon. Harold E. Sheely                     Examination

By Ms. Wallet                                4, 120

By Mr. Thomas                                   99

By Mr. MacMain                                 113

By Mr. Adams                                   118


                    EXHIBITS

Sheely Deposition
Exhibit Number                                Page

1   3-page memo, 7/11/97, to Ward and Deluce    21
    from Sheely

2   5-page memo, 4/25/97, to Hartnett from      65
    Varner

3   1-page memo, 7/17/97, to Ward and Deluce    76
    from Sheely

4   1-page memo, 7/8/97, to Sheely from         84
    Hartnett


              * * * * *
```

---

4

STIPULATION

It is hereby stipulated by and between the respective parties that sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved until the time of trial.

**HON. HAROLD E. SHEELY,** called as a witness, being duly sworn, was examined and testified, as follows:

BY MS. WALLET:

Q.  Good morning, Judge Sheely.

A.  Good morning, Ms. Wallet.

Q.  I'm Debra Wallet.  I'm here representing Barbara Varner in an action that has been brought against Mr. Graham, Mr. Osenkarski, Cumberland County and the Ninth Judicial District.

Is there any reason, sir, today, why you could not answer my questions truthfully and completely?

A.  Not to my knowledge.

Q.  If at any time you do not hear me, may we please have an agreement that you will ask me to repeat the question?

A.  I will.

Q.  Or if at any time you don't understand my question, can we agree that you will ask me to repeat that question so that you do understand it before you attempt to

**5**

1  answer it?

2    A.  I will.

3    Q.  Tell me, sir, what preparation did you make today

4  for your deposition?

5    A.  Yesterday I had a meeting with Attorney Williams

6  for several hours, and we went over generally who had

7  testified before and, I don't know, we just talked generally

8  about the case.  I told her about my background, what I did

9  before, and --

10    Q.  Did you review any transcripts?

11    A.  I got several places I was given a transcript of

12  where I was named, I believe, by Mrs. Varner in her

13  deposition.  I did see most of that.

14    Q.  Okay.  And did you review any documents in

15  preparation for today?

16    A.  I think the documents I already had.  I don't

17  think we reviewed any specific documents yesterday except the

18  deposition documents.  That was it.

19    Q.  Okay.  Now, you said that you already had these

20  documents.  Was there a file that you had taken with you when

21  you retired from the court?

22    A.  No.  This is all.  The first thing I got was a

23  copy of the Complaint that was filed I see about April of

24  2001.  At some point after that, why, I was given a copy of

25  the Complaint by Ms. Williams.

**6**

1    Q.  And did you have any of the documents that you

2  had authored as part of this Complaint or charge?

3    A.  No.  The only thing that I have was given to me.

4    Q.  Did you speak to anyone else who is a witness to

5  any of the facts involved in this case, prior to today?

6    A.  I spoke to Judge Hoffer here several weeks ago,

7  when I found -- after I found out when I was supposed to

8  appear for a deposition I spoke to Judge Hoffer and asked him

9  if he was involved, and he told me, yes, he was going to have

10  a deposition, also.

11    As far as speaking to any of the other parties, I

12  have not.

13    Q.  Okay.  Have you seen any of the other parties

14  since your retirement?

15    A.  I've seen Mrs. Graham.  I've seen her since I

16  retired.  I was at the courthouse several weeks ago and I saw

17  my former secretary and I saw some of the court reporters.  I

18  stopped in the office there.

19    Q.  Have you talked to any of those people about this

20  case?

21    A.  No.  I've tried to avoid that.

22    Q.  And when you said you saw your former secretary,

23  which secretary was that?

24    A.  Sandy Davis.  I've only ever had two secretaries:

25  Mrs. Fry and Mrs. Davis.

**7**

1    Q.  Would you tell me, sir, when did you first learn

2  that Barbara Varner had made some allegations of sexual

3  harassment?

4    A.  You mean timewise?  Probably somewhere around

5  June or early July of 1997, somewhere in that area, I

6  believe.

7    Q.  And how did you learn it?

8    A.  I learned it, one of the county solicitors had

9  made a call to my office wanting an appointment to see me,

10  and it was Mr. Deluce.  And he did come in and see me.  And

11  that was the first that I ever heard anything about these

12  problems between Mrs. Varner and Mr. Graham.

13    Q.  Prior to that time, Mr. Osenkarski had not

14  brought this matter to your attention?

15    A.  Not to my knowledge, no.  I never knew anything

16  about it.

17    Q.  Now, when Mr. Deluce called you to make an

18  appointment, did he tell you the purpose of his appointment?

19    A.  I don't believe he did.

20    Q.  And when you met with him, was it just the two of

21  you?

22    A.  Yes.

23    Q.  What did he tell you, sir?

24    MR. THOMAS:  Objection.  This is obviously

25  complicated a little bit.  We do continue to assert the

**8**

1  attorney-client privilege with respect to Mr. Deluce, who was

2  a county solicitor.  We would object to any questions asking

3  what the nature of the conversation was between counsel for

4  the county and the Court in this circumstance.  It's a little

5  bit awkward because normally I would instruct the witness not

6  to answer the question, although in the circumstances of this

7  case I don't technically represent the judge.

8    MS. WILLIAMS:  I join in the objection, and when

9  there is a question that infringes on the privilege I will

10  direct the deponent not to answer.

11  BY MS. WALLET:

12    Q.  Did you understand my question, sir?

13    A.  I understood the question but I understand I'm

14  not supposed to answer it; is that correct?

15    MS. WILLIAMS:  Would you repeat the question?

16  BY MS. WALLET:

17    Q.  What did Mr. Deluce tell you?

18    A.  Am I supposed to answer that?

19    MR. THOMAS:  Can we have one minute, Deb?

20    MS. WALLET:  Sure.

21    (Recess taken from 10:16 until 10:20 a.m.)

22    MS. WALLET:  I believe when we broke I had asked

23  my question and we were waiting for whether or not you would

24  instruct the witness not to answer the question.

25    MS. WILLIAMS:  I am going to instruct the witness

**13**

BY MS. WALLET:

Q. Now, Mr. Deluce came to see you and told you for the first time about these allegations that Ms. Varner had made; is that correct?

A. Am I supposed to answer that?

MS. WILLIAMS: That falls within the objection that we've articulated earlier as to the conversation between Mr. Deluce and Judge Sheely and, therefore, I'm directing Judge Sheely not to answer that question.

BY MS. WALLET:

Q. Did Mr. Deluce give you any documents at that time?

MS. WILLIAMS: Hold on.

Objection to that question as well, Ms. Wallet. We believe that goes to the privilege we've asserted, and I'm going to direct Judge Sheely not to answer that question.

MR. THOMAS: We join in the objection.

BY MS. WALLET:

Q. As a result of this meeting with Mr. Deluce did you do anything?

A. Yes.

Q. What did you do?

A. I wrote a letter to, a memorandum to, I believe it was John Ward and to Mr. Deluce.

Q. Why did you write that memo?

**14**

A. I wanted them to know what action I had taken as a result of the information I had at the time.

Q. After you met with Mr. Deluce but prior to writing your memorandum, did you attempt to acquire any information about the charges of Ms. Varner?

A. I'm sure I probably spoke to Mr. Osenkarski about what I had heard. I don't recall any specific meetings, but I'm sure I would have, because it involved his department.

Q. Is it your recollection, sir, that after you met with Mr. Deluce you called Mr. Osenkarski and met with him?

A. I don't recall the specifics of calling him. I'm sure I would have met with Mr. Osenkarski after I found out about this.

Q. Do you recall whether it was just the two of you, you and Mr. Osenkarski?

A. I'm sure it was, yes, at that time.

Q. What do you remember about that conversation?

A. I don't remember anything specifically about it. Unfortunately, I don't remember any specifics.

Q. Well, do you think you said to him: I've learned about something in your office?

MR. ADAMS: Objection. You're asking the judge to speculate and it's not an appropriate question. Either he knows or he doesn't know.

MS. WILLIAMS: You can answer, judge.

**15**

THE WITNESS: Would you ask me the question again?

BY MS. WALLET:

Q. Did you say something to him such as: I've become aware of a problem involving a probation officer?

A. I'm sure -- Ms. Wallet, I don't recall any specifics, that's a long time ago, but I'm sure that I did. That's why I would have went to see him, and I was trying to find out what was going on at that time then between Mr. Graham and Mrs. Varner as far as the office was concerned.

Q. Do you remember what Mr. Osenkarski told you in response to your questions?

A. Not specifically, no.

Q. Do you remember whether he made any comments about the validity of Ms. Varner's charges?

A. I cannot honestly say that I remember any specific remarks that Mr. Osenkarski made. It's been too long a time.

Q. Did you make any notes of that meeting?

A. No.

Q. Do you recall anything about the meeting with Mr. Osenkarski?

A. The only thing I can say at this time, and I'm saying this from what I wrote in my letter of July 11th, I

**16**

think it was probably Mr. Osenkarski had told me that Mr. Graham had used -- he had heard him use some abusive language towards Mrs. Varner, some swear words. And I'm certain that's who told me that. And that's the reason I suspended Mr. Graham then for three days for any improper language that he might have used. I'm sure it's Mr. Osenkarski that told me.

Q. When you met with Mr. Osenkarski, did you have any information at that time that there was an alleged affair between Mr. Graham and Ms. Varner?

MR. THOMAS: Objection to the form. I'm not sure his testimony was that he met with Mr. Osenkarski. I may have misheard, but I thought his testimony was that he had a conversation with him. He may answer.

MS. WILLIAMS: Go ahead, Judge.

THE WITNESS: I did not know anything about the affair until sometime after Mr. Deluce came in and sometime after I saw Mr. Osenkarski. Mr. Graham and his wife appeared in my office and that's when I found out about the affair.

BY MS. WALLET:

Q. Okay. Well, let's clarify Mr. Thomas's objection. Did you meet with Mr. Osenkarski, or did you just have a conversation with him perhaps over the telephone?

A. I think I went down to the Probation office and spoke to him down there. That would be my recollection.

17

```
 1        Q.    Would that have been customary for you to do,
 2   rather than to call him to your office?
 3        A.    Yes.  Very often I would walk down to the
 4   Probation office.  They were down on the third floor, I was
 5   on the fourth floor.  A lot of times I would just walk
 6   directly down there if I had something to discuss with a
 7   probation officer.  If I didn't want anyone to hear what was
 8   going on, why, I would call them up to my office, but other
 9   than that, I would go down there quite often.
10        Q.    So you think Mr. Osenkarski did confirm that
11   Mr. Graham used the F word?
12        A.    I think he did, yes.  That was the reason why I
13   felt that this type of thing should not go on and the reason
14   I suspended Mr. Graham for three days.
15        Q.    Did you ask Mr. Osenkarski whether Mr. Graham
16   used any other language particularly toward the women in the
17   office?
18        A.    No, I didn't ask him that, to my knowledge.  He
19   obviously told me this or I wouldn't have known about it.
20        Q.    Do you believe that you had information about the
21   use of the F word and you brought up the subject with
22   Mr. Osenkarski?  Or did he bring that subject up to you?
23        MR. MacMAIN:  Objection.  He didn't say F word,
24   he said swear word.
25        MS. WALLET:  I thought he did use the F word.
```

18

```
 1   Well, let me be clear.
 2   BY MS. WALLET:
 3        Q.    Did Mr. Osenkarski tell you that Mr. Graham used
 4   the F word?
 5        A.    I think he did, yes.
 6        Q.    And my question, sir, was:  Did you ask
 7   Mr. Osenkarski:  Have you ever heard this?  Or did
 8   Mr. Osenkarski volunteer that information?
 9        A.    I cannot answer that.  I cannot accurately say
10   whether I asked him or whether he told me without being
11   asked, I don't know.
12        Q.    What was your purpose in having this conversation
13   with Mr. Osenkarski?
14        A.    My purpose primarily was, you know, I knew
15   Mr. Graham, I knew Ms. Varner for many years, and no employee
16   deserves to be abused or harassed by another employee.  So
17   that's the reason I went down, to find out what I could.  And
18   that was the reason I suspended Mr. Graham, because I felt
19   that by using this type of language that was not appropriate.
20        Q.    Did you suspend Mr. Graham for any other reason?
21        A.    No.
22        Q.    Did you tell Mr. Graham why he was being
23   suspended?
24        A.    I don't recall if I did or not.  I'm just trying
25   to think who I -- I sent a copy of this letter to
```

19

```
 1   Mr. Osenkarski.  I don't know if he gave it to Mr. Graham or
 2   not.
 3        Q.    Who decided on a three-day suspension?
 4        A.    I did.
 5        Q.    How did you decide that, sir?
 6        A.    Just decided that for using that type of
 7   language, why, that he shouldn't have used, why, I felt that
 8   the first time that would be an appropriate penalty for doing
 9   that.  And I thought that up on my own.
10        Q.    Did you discuss that with anyone, specifically
11   anyone in the Human Resources Department at the county?
12        A.    I don't think so.  I think I did that on my own.
13        Q.    At any time up until your retirement did you seek
14   any advice from anyone at the Administrative Office for the
15   Courts?
16        A.    Advice?  No.
17        Q.    Did anyone in the Administrative Office for the
18   Courts give you any advice, whether or not you had solicited
19   it?
20        A.    I don't recall.  I don't think so.  I wouldn't
21   say definitely they didn't, but I don't recall of any advice
22   ever given to me.
23        Q.    Did you direct Mr. Osenkarski to do anything as a
24   result of the allegations that were brought by Ms. Varner?
25        A.    In my letter, I think in my letter with better
```

20

```
 1   supervision both parties can continue their good work in the
 2   office, and I would -- up to this time I believe that
 3   Mrs. Varner received her work assignments I guess from
 4   Mr. Graham.  And I directed that this type of relationship be
 5   terminated and one of the other probation officers, Sam
 6   Miller was supposed to work in the future with Mrs. Varner on
 7   assignments and not Mr. Graham.
 8        Q.    And whose idea was that, sir?
 9        A.    I think it was mine.  I don't think -- I don't
10   think Mr. Osenkarski is the one who set this up.  In any
11   event, I thought it was a good way to do it.  Either if it
12   was suggested by Osenkarski or me, I thought that the two of
13   them, with what was going on now, be better off to have
14   another PO involved with Mrs. Varner.
15        Q.    And when you say what was going on, what do you
16   mean by that?
17        A.    Well, what was going on in their relationship and
18   then in the office where these, that resulted in this
19   language being used.  It's obvious that the two of them
20   weren't getting along, and that was -- they had always gotten
21   along well in the past.
22        Q.    When you say "in my letter," are you referring to
23   your July 11 memorandum to John Ward and David Deluce?
24        A.    Yes, that's correct.
25        Q.    Let's mark that so that you and everyone else
```

25

1   Mrs. Graham had been told of the affair?
2       A.   I don't think so.  I don't recall any indication
3   that she knew about it before this.
4       Q.   And what was her reaction to Mr. Graham's
5   statements to you about the affair?
6       A.   Well, she was obviously upset.  She was crying, I
7   know that.  I remember that.  Just like any other wife, I
8   guess, when you're told something like this.
9       Q.   What did you say to them?
10      A.   I don't recall what specifics I would have told
11  them.  I'm certain that I told them I didn't approve of such
12  a relationship.  And I knew they had children.  I certainly
13  I'm sure told them that I hoped that they could get these
14  matters resolved, that they would not involve some type of a
15  separation that would certainly involve the children, if that
16  had to happen.
17      Q.   Did you believe Mr. Graham when he told you that
18  he had had a sexual relationship with Ms. Varner?
19      A.   Yes.
20      Q.   Why did you believe him?
21      A.   I guess I thought, you know, for a man to bring
22  his wife in to the president judge and admit to having a
23  sexual relationship with one of his co-employees in front of
24  his wife, that -- I don't think men would do that unless what
25  they're saying was true.  That would be my thinking on that.

26

1   Actually, of course, I wasn't with him so I don't know.  But
2   that would be my reason for believing him:
3       And also, you know, I know he and Mrs. Graham had
4   always had a good relationship.  In fact, it was Mr. Graham
5   that I remember was really anxious to have Barbara hired, and
6   they had always had a good relationship, and I couldn't
7   believe that all of a sudden they were at each other or he
8   was at her or making comments or something in the office
9   unless there would be some reason for it.  So that would be I
10  guess was why I believed him at that time as to what was
11  taking place.
12      Q.   I believe you said that you thought that Gary
13  Graham and Barbara Graham had had a good relationship.
14      A.   I'm sure they are.  Both Barbaras are -- I meant
15  Barbara Varner.  I know they did, over a period of years.
16      Q.   Now, you said that you believed that Mr. Varner
17  had something to do with Ms. Varner being hired?
18      A.   I remember that, yes.
19      Q.   What do you remember about that?
20      A.   The only thing I remember -- of course, I had to
21  approve it.  Now, I wasn't initially involved in why she
22  wanted the job there, but I know, I can remember that
23  Mr. Graham definitely thought that she would be a good
24  employee for the county.  I remember that.
25      Q.   And do you recall whether you asked him his

27

1   opinion of Ms. Varner, or whether he came to you to offer
2   that opinion?
3       A.   I don't remember how it came about.  It certainly
4   came about, and whether the discussion was had between me and
5   Mr. Osenkarski and Mr. Graham, I guess, as to whether or not
6   she should be hired as a probation officer, I think he was --
7   thought she had done a good job, at least what he told me,
8   with Children and Youth Services.
9       Q.   Had you had any association with Ms. Varner when
10  she worked at Children and Youth?
11      A.   I'm certain that possibly she had some cases
12  involving me in court.  I don't remember that specifically.
13  I can't say specifically.
14      Q.   Is it your recollection that you really didn't
15  know Mrs. Varner at the time that you hired her into the
16  Probation office?
17      A.   Just from seeing her around, I'm sure I saw her
18  around, because I think at the time they were on the third
19  floor of the courthouse, we were on the fourth floor, and I'm
20  sure Mrs. Varner might have had some cases before me.  I
21  don't remember how many.  I'm sure I knew who she was.
22      Q.   Back to the time of the meeting between you and
23  Mr. Graham and Mrs. Graham.  At that time did you have any
24  evidence other than Mr. Graham's statements that Mr. Graham
25  was having an affair with Ms. Varner?

28

1       A.   No, I did not.
2       Q.   Did he offer to you at that time, he, Mr. Graham,
3   offer to you at that time any evidence of this affair?
4       A.   I don't recall of any evidence being offered.  I
5   think he might have said that he thought he might be able to
6   get some motel receipts or something at that time, but I
7   don't -- I don't recall any evidence that was presented other
8   than what he told me at that time.
9       Q.   Did Mrs. Graham confirm that she had believed an
10  affair was going on?
11      A.   I don't recall any statements that she made, that
12  she felt before this meeting that her husband was having an
13  affair with anyone.
14      Q.   Did Mrs. Graham ask you to do anything with
15  regard to her husband and his continued employment as a
16  probation officer?
17      A.   I don't remember that, whether she asked me
18  anything or not.
19      Q.   Did you tell Mr. and Mrs. Graham that you
20  intended to do anything to investigate these allegations of
21  an affair?
22      A.   I don't recall.
23      Q.   How long would you say that Mr. and Mrs. Graham
24  were in your office?
25      A.   I don't recall that, either, really.

57

```
1   well.
2       I think the timewise, Osenkarski I guess was a
3   senior man timewise in the Department. I believe Mr. Graham
4   was probably in the Juvenile section was probably second in
5   time, I think. There were other probation officers in Adult
6   that had maybe more time. So they worked very close together
7   and as far as I knew they were always good friends, yes.
8   Q.  Would you say they were buddies?
9   A.  I don't know of what they did after they left
10  work. I don't know that.
11  Q.  Did you ever describe them as buddies?
12  A.  I don't know. I don't recall saying that. I'm
13  sure they were, though.
14  Q.  Do you recall referring to Mr. Osenkarski and
15  Mr. Graham as asshole buddies?
16  A.  No. I don't recall that, no. I know they were
17  buddies. I don't recall ever saying they were asshole
18  buddies.
19  Q.  Is that a term that you might have used?
20  A.  I don't recall using it.
21  Q.  Do you think you didn't use it?
22  A.  Pardon me?
23  Q.  Do you think you did not use it?
24  A.  I don't think I actually referred to them in that
25  manner.
```

58

```
1       MR. ADAMS:  Objection, asked and answered.
2       THE WITNESS:  I know they were good friends.
3   BY MS. WALLET:
4   Q.  You don't believe that you told Ms. Varner that
5   you thought Mr. Osenkarski and Mr. Graham were buddies or
6   asshole buddies?
7   A.  I don't recall that, no. I'm certain if she
8   would have asked me, if it come up I would have certainly
9   said they were friends. I'm certain she knew that I knew
10  they were friends. But whether or not I ever used the word
11  asshole with it, I don't recall of ever using that.
12  Q.  Now, you said she would know that you knew they
13  were friends. How would she know that?
14  A.  Well, because I was, like I said, our office, the
15  judge's office was fourth floor, their office was third
16  floor. I was down there quite a bit and we would talk and be
17  together. I'm certain she saw that, Barbara saw that. So
18  I'm certain she realized we were all good friends.
19  Q.  Did you know Mr. Graham to have a reputation for
20  being excitable?
21  A.  Yeah, I knew that he was excitable sometimes. I
22  don't recall specifically how that came about, but he would
23  get excited sometimes, I think.
24  Q.  Did you ever observe that?
25  A.  I think I did probably. I don't recall specific
```

59

```
1   instances, but I think there might have been times when I
2   observed this. Not in his work but maybe on other things.
3   That would be my recollection.
4   Q.  And what other things would those be?
5   A.  I don't recall specifically how I knew this. I
6   just had that opinion that he would be excitable sometimes.
7   Just like anyone else when certain things would come up, he
8   might be excitable about them.
9   Q.  Did you ever observe him to be loud?
10  A.  I heard him talk loud already, yes, I'm sure I
11  did that.
12  Q.  Did you observe him to be a hot head of sorts?
13  A.  I don't recall observations of being a hot head,
14  no.
15  Q.  Did you ever hear any complaints about
16  Mr. Graham?
17  A.  You mean how he did his job as a probation
18  officer?
19  Q.  Yes, sir.
20  A.  No, I don't think I heard any specific complaints
21  about how he did his job.
22  Q.  When you campaigned for office at one time did
23  you campaign against Sylvia Rambo?
24  A.  That was a judicial election, yes.
25  Q.  And when was that, sir?
```

60

```
1   A.  That was in 1977.
2   Q.  Were you aware of any allegations at that time
3   that Mr. Graham had made statements about Ms. Rambo?
4   A.  No, not that I recall.
5   Q.  Do you recall any controversy surrounding the
6   campaign of Ms. Rambo and Mr. Graham?
7   A.  No, I don't recall any.
8   Q.  You were aware, sir, that in or about July or
9   August of 1997, a couple of months before you retired, the
10  Probation Office was split into the Juvenile and Adult
11  Probation?
12  A.  Yes. I think maybe that happened, I don't know,
13  I think maybe that happened in '96. I'm not really sure.
14  That's been -- that's when Mr. Bolze left, and at that time
15  we split the Adult and Juvenile in separate sections with
16  separate supervisors. I think it was in '96, although I
17  wouldn't swear to that.
18  Q.  No matter whatever time it was, did you make the
19  decision to split those two offices?
20  A.  Yes.
21  Q.  And why did you make that decision?
22  A.  At the time I believe I checked around and other
23  counties our size, I believe that's the way they had their
24  Probation Departments set up, separate Juvenile, separate
25  Adult. At the time I thought that administratively it would
```

117

1  letter from Ms. Varner following your July 11th, '97, letter?
2      A.  No, I don't recall of any.
3      Q.  Judge, do you recall anybody, either Ms. Varner
4  or anybody on her behalf, I guess, firing back or responding
5  to your July 11th, '97, memo that something was incorrect in
6  there?
7      A.  I don't recall of any, no.
8      Q.  You had said earlier that Mr. Graham on occasion
9  like anyone else can be excitable.  Do you remember stating
10 that?
11     A.  That's what I recall, yes.
12     Q.  At any point did you ever find him to be
13 inappropriately excitable?
14     A.  As of now, no, I don't recall that he was
15 inappropriately excitable.  I don't even remember anymore
16 what the excitement was about.  I know that occasionally it
17 did take place.
18     Q.  You had also mentioned that you were aware or
19 been told that Mr. Graham on occasion was loud.
20     A.  Yes, I was.
21     Q.  At any point did you ever observe or were you
22 told that he was inappropriately loud?
23     A.  No, I don't recall what the situations were that
24 led to that.
25         MR. MacMAIN:  That's all the questions I have.

118

1  Thank you.
2         MR. ADAMS:  10 seconds.
3         MS. WILLIAMS:  Can we go off the record for a
4  second?
5  BY MR. ADAMS:
6      Q.  Good afternoon, your Honor.  Again, I represent
7  Mr. Osenkarski.  I have a few more questions and hopefully
8  we'll be done.
9         As a follow-up to Mr. MacMain's questions of your
10 visits to the Probation Department, I want ask you, did you
11 ever observe any conduct by Mr. Osenkarski which you deemed
12 inappropriate upon your visits to the Probation Department?
13     A.  No, I never observed this.
14     Q.  Did you ever observe any language which you felt
15 was considered sexually explicit by Mr. Osenkarski while
16 visiting that department?
17     A.  No, not while I was there.
18     Q.  And did you ever observe any language from
19 Mr. Osenkarski which you just felt was inappropriate at all,
20 any language at all, your Honor?
21     A.  No, I don't -- I can't recall any.
22     Q.  Okay.  How well did you know Mr. Osenkarski?
23     A.  Well, like I said, I started, I was a DA from '68
24 to '76, and I believe Mr. Osenkarski was employed by the
25 county back in those days.  So I knew him very well.

119

1      Q.  Are you two friends?
2      A.  We never went out socially or anything, but
3  professionally we were good friends.
4      Q.  Other than the courthouse, therefore, you
5  wouldn't see him other than in a courthouse setting?
6      A.  I don't recall ever being in his presence outside
7  of any courthouse function.
8      Q.  This is going to be a different question for you,
9  but did you conspire in any way with Mr. Osenkarski to cover
10 up, hide, not disclose, any allegation of discrimination made
11 by Ms. Varner?
12     A.  No.  I never agreed with them to do anything
13 concerning those allegations.
14     Q.  Okay.  And you certainly -- did you conspire in
15 any way with Mr. Osenkarski to discriminate against
16 Ms. Varner in any way that you can think of at all?
17     A.  I never did, no.
18     Q.  How about Mr. Graham?  Did you ever conspire with
19 Mr. Graham to --
20     A.  No.
21     Q.  -- try to refute any allegations by Ms. Varner?
22     A.  No.
23         MR. ADAMS:  Thank you, your Honor.
24         MS. WILLIAMS:  Are there anymore questions?
25         MS. WALLET:  Yes, I have a few.

120

1  BY MS. WALLET:
2      Q.  Judge Sheely, you said that you never saw
3  Mr. Osenkarski in a setting outside of work.
4      A.  Basically, I don't recall of any.  It's possible.
5      Q.  Did you ever see Mr. Graham on occasions outside
6  of work?
7      A.  I saw -- I think I was present when he was
8  married.  They got married in a Catholic church over in
9  Penbrook somewhere, I saw him then.  But I don't -- I don't
10 recall if I ever went to his home or anything after that or
11 not.  It's possible I did, but I don't recall.
12     Q.  Were you a guest at the wedding, sir, or did you
13 perform the marriage ceremony?
14     A.  No, this was done in the church.
15     Q.  You were a guest?
16     A.  I was just a guest, yes.
17     Q.  Were both you and your wife invited to the
18 wedding?
19     A.  Yes, we were.
20     Q.  Do you recall any other times when you saw
21 Mr. Graham outside the work setting?
22     A.  I don't recall any.  I wouldn't say there weren't
23 any, but at this point I don't recall any.
24     Q.  Did you attend Mr. Graham's mother's funeral?
25     A.  Her funeral?  I don't recall if we did or not, to