# Exhibit F

```
                                                        Page 3
        IN THE UNITED STATES DISTRICT COURT      1              I N D E X
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .              2              WITNESS
BARBARA E. VARNER,              .
     Plaintiff,                 . CIVIL ACTION   3    Ronna Boyles                    Examination
                                . NO. 1:CV 01-0725
     vs.                        .                4       By Mr. Dellasega             4, 47, 49, 51
                                .
COMMONWEALTH OF PENNSYLVANIA,   . (JUDGE YVETTE KANE) 5   By Ms. Wallet              26, 49, 50, 51
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .                6        By Ms. Williams              41, 50
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .                7        By Mr. Adams                 43
OSENKARSKI, individually,       .
     Defendants.                .                8
. . . . . . . . . . . . . . . . . .
                                                 9
    Deposition of:  RONNA BOYLES
                                                10              EXHIBITS
    Taken by      : Defendants
                                                11  (None marked)
    Date          : March 3, 2003, 12:22 p.m.
                                                12
    Before        : Emily Clark, RMR, Reporter-Notary
                                                13              *  *  *  *  *
    Place         : 12 West High Street
                    Carlisle, Pennsylvania      14

APPEARANCES:                                    15

    DEBRA K. WALLET, ESQUIRE                    16
        For - Plaintiff
                                                17
    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE            18
        For - Defendant Commonwealth of Pennsylvania
             Ninth Judicial District, Cumberland County  19

    THOMAS, THOMAS & HAFER                      20
    BY:  PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County       21

                                                22

                                                23

                                                24

                                                25
```

```
                                          Page 2                                               Page 4
 1  APPEARANCES (continued):                      1            STIPULATION
 2    MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP 2        It is hereby stipulated by and between the
      BY:  L. KRISTEN BLANCHARD, ESQUIRE
 3         For - Defendant S. Gareth Graham       3    respective parties that signing, sealing, certification
 4    SWEENEY & SHEEHAN, P.C.                     4    and filing are waived; and that all objections except
      BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5         For - Defendant Joseph L. Osenkarski  5    as to the form of the question are reserved until the
 6                                                6    time of trial.
    ALSO PRESENT:
 7                                                7
      MS. BARBARA E. VARNER
 8                                                8        RONNA BOYLES, called as a witness, being duly
      MR. S. GARETH GRAHAM
 9                                                9    sworn, was examined and testified, as follows:
      MR. JOSEPH L. OSENKARSKI
10                                               10  BY MR. DELLASEGA:
11                                               11  Q. Mrs. Boyles, we talked over the phone last week. I'm
12                                               12     Paul Dellasega. I represent the county. We're taking
13                                               13     your deposition today as part of a lawsuit brought by
14                                               14     Barbara Varner against the county, the court, and
15                                               15     Osenkarski and Gram in the nature of a sexual
16                                               16     harassment suit.
17                                               17        Have you ever been deposed before?
18                                               18  A. No.
19                                               19  Q. Okay. You have to answer questions under oath, and
20                                               20     it's important to us that you understand the question
21                                               21     before you answer it. So that if you don't understand
22                                               22     a question, ask me to rephrase it, and I'll do so as
23                                               23     many times as need be until you understand it.
24                                               24  A. Okay.
25                                               25  Q. If you don't know the answer, it's satisfactory to tell
```

Page 5

1  us you don't know the answer. If you need to stop and
2  think about it for a few minutes, we've got plenty of
3  time.
4  A. Okay.
5  Q. Okay? When were you employed by the county or the
6  court?
7  A. I was a part-time at the law library, and then I forget
8  what year I went over to Probation, but I worked
9  Juvenile Prosecution and Adult Probation. And then
10 when they split I went over to the Adult.
11 Q. Would you be able to tell us what year you went to
12 Juvenile or the precursor to Juvenile, the unified
13 department?
14 A. No, I can't remember.
15 Q. Okay. How many years in total were you a Probation
16 secretary?
17 A. Nine.
18 Q. Nine.
19 A. I was fired.
20 Q. What was the last year?
21 A. '97. '99. '97 or '99. I was fired.
22 Q. Prior to the split did you work for one person in
23 particular?
24 A. No. I worked for several probation officers.
25 Q. Who did you work with?

Page 6

1  A. Gary, Joe, Barb, Debra, Nick, Denny, Sam.
2  Q. How many secretaries were in Probation?
3  A. There were two.
4  Q. And how many probation officers, roughly?
5  A. 10.
6  Q. And the two of you divided all the probation officers?
7  A. Right. Well, whoever brought the typing to us, we did.
8  Q. Was it the case you could do typing for any probation
9  officer?
10 A. Yes.
11 Q. And your other secretary could do typing for any
12 probation officer?
13 A. Yes, um-hum.
14 Q. I've heard you referred to at various points as Gary's
15 secretary. Would that be an accurate description?
16 A. Um-hum.
17 Q. Did you consider yourself Gary's secretary?
18 A. Um-hum. Yes.
19 Q. Did Gary provide to you the bulk of your work?
20 A. Yes.
21 Q. And did that last until --
22 A. Till the split.
23 Q. Till the split?
24 A. And then later on he became the institutional officer
25 and I started doing typing for him again.

Page 7

1  Q. Okay. So you would have been his secretary for a
2  period of several years?
3  A. True.
4  Q. Okay. And you were his secretary the entire time after
5  Mrs. Varner came until the split; is that correct?
6  A. Correct.
7  Q. And did you do the bulk of Mrs. Varner's work?
8  A. Yes.
9  Q. Did you know Mrs. Varner before she came into
10 Probation?
11 A. Only to say hello. I only recognized her as a face.
12 Q. And how did it come about that you recognized her as a
13 face?
14 A. I think some friends, some other people that worked --
15 Sherry McGinty I think introduced me to her and, you
16 know, so I knew who she was. She said, you know, she's
17 with Children and Youth.
18    And then right before she was hired on, during the
19 hiring process, I had talked with her with Gary in the
20 lunch room, just to say hello.
21 Q. Prior to her coming on board she had been over in your
22 offices; is that what you're telling me?
23 A. Occasionally.
24 Q. And on those occasions when she was over in your
25 offers, it's your recollection was the purpose to see

Page 8

1  Mr. Graham for some business reason?
2  A. I think it was for Gary and Joe that she talked,
3  because it was right before she was being hired.
4  Q. And I think you said you had lunch with them, or saw
5  them in the lunch room?
6  A. Um-hum.
7  Q. Which one was it? You saw them or had lunch with them?
8  A. No, no. Just in the lunch room, getting a soda or
9  something.
10 Q. Did you see them together in the lunch room more than
11 once?
12 A. Yeah.
13 Q. Frequently?
14 A. No, not frequently. I'd say two, three times.
15 Q. Two or three times ever, or two or three times a month?
16 A. Two, three times ever.
17 Q. When a phone call came for Mr. Graham, what was the
18 protocol? Did he answer his phone himself or did you
19 answer it?
20 A. It depended. Sometimes it went right to his phone, and
21 sometimes the calls came to me and then I would
22 transfer them to him.
23 Q. Did he get frequent phone calls?
24 A. Yes.
25 Q. Before Mrs. Varner came on board in Probation do you

### Page 9

1  recall him getting phone calls from Mrs. Varner?
2  A. No.
3  Q. After she came on board, do you recall him getting
4    phone calls from Mrs. Varner?
5  A. If she was out in the field, yes.
6  Q. Do you recall the phraseology Barb 1 and Barb 2 ever
7    being used?
8  A. Yes.
9  Q. Did you ever use it yourself?
10 A. Yes.
11 Q. Why did you use that term of art?
12 A. Barb 1 is his wife and Barb 2 was the co-worker, so I
13   could distinguish between the two for him.
14 Q. Was it your idea to coin that phrase, or did someone
15   else?
16 A. I'm not sure. I just know we set it as Barb 1 and
17   Barb 2.
18 Q. Did the other secretary also use the phrase Barb 1 and
19   Barb 2?
20 A. I think so.
21 Q. And who was the other secretary?
22 A. Jenny was it for a while.
23 Q. Jenny, and the last name?
24 A. Crum.
25 Q. And was there another secretary besides her?

### Page 10

1  A. Fran was there, Fran Rose. And Kathy Zeigler.
2  Q. Did you hear all those women use the phraseology Barb 1
3    and Barb 2?
4  A. I think so.
5  Q. Other than the secretaries, did you ever hear of
6    probation officers use the phrase 1 Barb 1 and Barb 2?
7  A. I believe so.
8  Q. Did you ever hear Gary being teased about Barb 1 or
9    Barb 2?
10 A. Yes.
11 Q. Can you give me an example of somebody teasing him?
12 A. Just that they would say, you know, you've got a phone
13   call, you know, is it Barb 1 or is it Barb 2. I never
14   heard anything other than that.
15 Q. Was there in your estimation any sexual undertones to
16   saying it's your first Barb or your second Barb?
17 A. No.
18 Q. Did you understand -- from your observations of Barbara
19   Varner and Gary Graham together before the split, how
20   would you describe their working relationship?
21 A. Very good.
22 Q. Better than average?
23 A. Yes, I think so.
24 Q. Were there people with whom Mr. Graham did not have a
25   working relationship, that you observed?

### Page 11

1  A. Not -- I mean, he would get frustrated now and then,
2    but no.
3  Q. Did you observe him treat Mrs. Varner in any different
4    manner than he treated other employees?
5  A. When she first came on, Mr. Graham and Mr. Osenkarski
6    would take her on all the -- when they go to visit
7    clients or go to different seminars and stuff like,
8    that they would -- she would go along. That seemed to
9    be, I thought they were showing her the ropes, you
10   know, how things were handled.
11 Q. Are you referring to routine training, or some type of
12   preferential treatment?
13 A. Routine training. And then also, like, when they would
14   have to go to visit different facilities where they
15   might have had people placed.
16 Q. Do you ever recall her being asked to go on some trip
17   that normally a new probation officer would not be
18   asked to go on?
19 A. No.
20 Q. Any conference that normally a new probation officer
21   would not be asked to go on?
22 A. No. The only thing I thought was different, I think,
23   Gary also did DUI training, and I think Barb was asked
24   to do that, and I was surprised about that.
25 Q. Why were you surprised about that?

### Page 12

1  A. Because I thought that there was a set number of people
2    who did it and that was the way it was.
3  Q. And the set number of people was old timers in the
4    Probation Department?
5  A. Yes. Yes.
6  Q. And it was unusual for a brand new probation officer to
7    be part of the DUI training?
8  A. Right. Right.
9  Q. Was that because there was some financial reward for
10   being a DUI instructor?
11 A. I have no idea.
12 Q. Before Mrs. Varner was hired did you ever hear a
13   discussion about whether she would be considered as a
14   candidate for employment?
15 A. I just heard them say she would be a really good person
16   to have on board, that she was a good worker.
17 Q. And you heard them say it. Who was them?
18 A. Gary and Joe.
19 Q. Can you recall in particular what Mr. Graham would have
20   said?
21 A. Just that she was really conscientious, a good worker
22   and it would be good having her on the staff.
23 Q. Would you characterize it as he glowed about her
24   abilities?
25 A. Yes.

## Page 13

1  Q. And with Mr. Osenkarski, what would he say?
2  A. **About the same thing.**
3  Q. Would you characterize Osenkarski also glowed about her
4     abilities?
5  A. **Yes, like she would be an asset to us.**
6  Q. And when you say they glowed about her abilities, were
7     they more complimentary about her abilities coming in
8     than was typical?
9         MS. WALLET: I'm just going to object to the form
10        of the question. You were the one that used the word
11        glowed. She didn't say glowed, she agreed with that,
12        however.
13        But you may answer the question.
14        THE WITNESS: No. If there were other ones that
15        they felt would be a great asset, the same thing.
16 BY MR. DELLASEGA:
17 Q. Did Mrs. Varner seem to be the recipient of any
18    special treatment when she came in?
19 A. **No.**
20 Q. Now, where did you sit in relationship to Graham's
21    office?
22 A. **He was down the hall and to the right.**
23 Q. You could not see him from your desk?
24 A. **No.**
25 Q. How about Mrs. Varner's office?

## Page 14

1  A. **She was behind me.**
2  Q. Can you see her from your desk?
3  A. **If I turned around.**
4  Q. Did you have occasion to see the two interact on a
5     daily basis?
6  A. **On some things, yes.**
7  Q. Would you ever see Mr. Graham treat her, Mrs. Varner,
8     rudely?
9  A. **Once.**
10 Q. What do you recall seeing?
11 A. **I recall him yelling at her about some case that she**
12    **was working on, or some papers that she did. I don't**
13    **remember.**
14    **I also remember him saying at the time that a**
15    **reference to hiring middle-aged people or something**
16    **like that.**
17 Q. When you say he yelled at her, did he raise his voice?
18 A. **Yes.**
19 Q. Was it unusual for Mr. Graham to raise his voice within
20    the office?
21 A. **Not if he was excited.**
22 Q. Did he have a loud voice when he got excited?
23 A. **Yes.**
24 Q. Is he an excitable man?
25 A. **Yes.**

## Page 15

1  Q. So it was a frequent occurrence for him to raise his
2     voice; is that correct?
3  A. **Pretty much, yes.**
4  Q. Now, you only recall the one instance with Mrs. Varner;
5     is that right?
6  A. **Right.**
7  Q. With other male probation officers, was it unusual for
8     Mr. Graham to raise his voice?
9  A. **No.**
10 Q. Would you characterize this as occurring on a frequent
11    basis?
12 A. **Um-hum. Not as frequent as with some of the female,**
13    **but yeah.**
14 Q. In terms of his getting excitable and raising his voice
15    at somebody, did he appear to do so indiscriminately
16    between men and women? Or did he single out one sex
17    more than the other?
18 A. **No. I think it was pretty even.**
19 Q. Did you observe Mr. Graham to have favorites within the
20    office?
21 A. **Um-hum.**
22 Q. Was Ms. Varner a favorite?
23 A. **In the beginning, yes.**
24 Q. Did that change at some point, from your personal
25    observation?

## Page 16

1  A. **Yes.**
2  Q. When did it change?
3  A. **Possibly about the time when we made the switch from**
4     **Juvenile, you know, Juvenile and Adult.**
5  Q. Okay. What did you observe?
6  A. **He was, like, insistent and he became more demanding of**
7     **people, and more critical. And I can remember one time**
8     **saying to him, you know, if you would ask people**
9     **instead of demanding you might get better results.**
10 Q. Are you speaking of he became more critical of all his
11    co-employees?
12 A. **Right.**
13 Q. In general or --
14 A. **But more about Mrs. Varner.**
15 Q. It was enough so that you noticed all of a sudden he
16    was picking on Mrs. Varner?
17 A. **Right.**
18 Q. Did you have any understanding as to why all of a
19    sudden he was picking on Mrs. Varner --
20 A. **No.**
21 Q. -- when she had been a favorite person before?
22 A. **No, I had no idea.**
23 Q. But was that how you perceived it, she had been a
24    favorite person?
25 A. **Oh, yes.**

### Page 17

1  Q. And now was being picked on?
2  A. Yes.
3  Q. And that the change was sudden?
4  A. Yes.
5  Q. All right. And did you ever ask Mr. Graham about that?
6  A. No.
7  Q. From what you observed before that sudden change, would
8     you describe the two of them as being friendly?
9  A. Yes.
10 Q. Would you describe the friendship as disproportionate,
11    Mr. Graham more interested in Varner or more friendly
12    to Varner, or both equally friendly to each other?
13 A. I just perceived them as friendly co-workers, friendly
14    co-workers.
15 Q. Within the office did they appear to be close friends?
16 A. No. Just friends.
17 Q. The answer is no?
18 A. No.
19 Q. Now, the phrase Barb 1 and Barb 2 I think you told me
20    was because of the frequency of calls you got from each
21    Barb; is that right?
22 A. Well, just because when the phone call would come in
23    that's how we would say just which one was which.
24 Q. Did the number of phone calls from Barb 2 decline after
25    their relationship deteriorated?

### Page 18

1  A. I don't know because by then I was gone. I was over.
2  Q. I'm a little unclear as to how you observed their
3     relationship worsen, when you say it worsened after the
4     split and you were gone then.
5  A. I would say it probably declined then, because she
6     was -- she wasn't out of the office as much and she
7     wasn't calling in.
8  Q. Why does this mean the relationship declined?
9  A. I don't know.
10 Q. You took it to mean the relationship declined?
11 A. No. They -- he stopped inviting her to go to the
12    different places. He started yelling at her. He
13    didn't visit in her office. So that's where I took it
14    as the decline.
15 Q. Did you ever hear Mr. Graham curse in the office?
16 A. He may have, but he wasn't the only one.
17 Q. It was, in fact, the use of curse words a common
18    feature in the office?
19 A. Yes. It didn't necessarily, it wasn't necessarily said
20    in anger, just, you know, it was said.
21 Q. When you heard Mr. Graham use curse words, would they
22    be just in general conversation, or directed to
23    anybody?
24 A. Just in general.
25 Q. Did you observe him use curse words more around women

### Page 19

1     than around men?
2  A. No.
3  Q. Less?
4  A. It didn't -- I don't see any difference between.
5  Q. Would you characterize Mr. Graham as treating men and
6     women equally, whether he was really good if he liked
7     them or he was really bad if he did not like them?
8  A. I think he treated the men better.
9  Q. Did you ever hear within the office the discussion of
10    whether any employees within the office were having
11    affairs?
12 A. No.
13 Q. Not once?
14 A. No.
15 Q. Okay. With regard to anybody, not just Graham and
16    Varner.
17 A. No. No.
18 Q. Are you aware that one of the allegations in this case
19    is whether or not Mr. Graham and Mrs. Varner had an
20    affair?
21 A. I wasn't until later, but yes.
22 Q. Did the thought ever cross your mind when you were his
23    secretary and observed them on a daily basis that they
24    were having an affair?
25 A. Never.

### Page 20

1  Q. You said Mr. Osenkarski looked favorably upon
2     Mrs. Varner's arrival in the office?
3  A. Yes.
4  Q. Did his attitude remain favorable throughout your time
5     in the office, or did it change as Graham's attitude
6     changed?
7  A. I think it changed when Graham's attitude changed.
8  Q. What did you observe Mr. Osenkarski do?
9  A. He just again didn't talk to her like he used to.
10    That's the only thing I could see.
11 Q. Have you had sexual harassment training while employed
12    by the court?
13 A. Yes.
14 Q. Okay. And do you recall how many training sessions you
15    went to?
16 A. I think I had two.
17 Q. And from those sessions, did you acquire an
18    understanding of what sexual harassment is?
19 A. Yes. And we've been doing it all along for years.
20        MS. WALLET: How do you mean that? You've been
21    harassing all along?
22        THE WITNESS: Yeah, we were. I mean, you know,
23    things that we would say in the office, like, oh, you
24    look really nice today or, you know, it could all be
25    taken as sexual harassment.

Page 25

1  Q. Were you ever offended by any sexual harassment banter
2     you heard in the office?
3  A. No.
4  Q. Did any women in the office ever tell you they were
5     offended by sexual banter?
6  A. Yes.
7  Q. Who is that?
8  A. **Kerry, Julie Staver, and Deb Anderson.**
9  Q. And they were all secretaries?
10 A. **Julie was a probation officer, Kerry was a probation**
11    **officer, and Deb had been a secretary.**
12 Q. Are we talking about Kerry Houser?
13 A. **Yes.**
14 Q. And what were they talking about?
15 A. **That was about the harassment suit, Kerry.**
16 Q. That was about the '93 harassment?
17 A. **(Witness nodded head affirmatively.)**
18 Q. After that?
19 A. **No.**
20 Q. After the '93 harassment suit do you recall the level
21    of sexual banter dropping?
22 A. **Absolutely.**
23 Q. Some remedial action had apparently been taken?
24 A. **Yes.**
25 Q. At any time did you ever hear Mrs. Varner complain to

Page 26

1     you or to others about Graham?
2  A. **I think just in when he first started nit-picking at**
3     **her reports and stuff like that. She wasn't sure what**
4     **he wanted.**
5  Q. Was not happy about the nit-picking?
6  A. **Right.**
7  Q. But do I understand correctly that Gary could be a
8     nit-picker, nit-pick with other people as well?
9  A. **Yes.**
10 Q. That was his style?
11 A. **(Witness nodded head affirmatively.)**
12 Q. And again --
13 A. **Yes.**
14 Q. -- and he didn't discriminate between men and women?
15 A. **Yes.**
16    MR. DELLASEGA: That's all.
17    MR. ADAMS: I don't have any questions.
18    MS. WILLIAMS: I have no questions for you,
19    Mrs. Boyles.
20    MS. BLANCHARD: I have nothing.
21 BY MS. WALLET:
22 Q. Mrs. Boyles, tell me what you remember about the Kerry
23    Houser's complaint.
24 A. **Reference was made to a cunt club.**
25 Q. Did you hear that?

Page 27

1  A. **Yes, I did.**
2  Q. And who said that?
3  A. **Joe.**
4  Q. And can you tell me what you remember about the context
5     of this?
6  A. **There were, like, three or four probation officers in**
7     **Tom Boyer's office at the time, and they were referring**
8     **to Deb Anderson, Julie Staver, Kerry, and I don't**
9     **remember if there was another person or not, but that's**
10    **what I took it as, and it was just a remark about the**
11    **cunt club.**
12 Q. Were you offended by that reference?
13 A. **I was a little surprised, but I wasn't offended.**
14 Q. Why were you surprised?
15 A. **I didn't expect to hear something like that.**
16 Q. Did you think it was appropriate workplace language?
17 A. **No.**
18 Q. After you heard that, what did you do?
19 A. **Continued typing.**
20 Q. Okay. Did you tell somebody else?
21 A. **No.**
22 Q. Did you tell anybody that you had heard it?
23 A. **I was -- I finally said, yes, I had heard it, when I**
24    **was questioned about it.**
25 Q. Did you ever go to Mr. Osenkarski and tell him that you

Page 28

1     were offended by that?
2  A. **No.**
3  Q. Why not?
4  A. **Just thought I'd let it go, because I didn't think it**
5     **was to my -- it wasn't directed to me.**
6  Q. Is there any doubt in your mind that it was directed to
7     the female probation officers?
8  A. **No.**
9     MR. ADAMS: Directed to or about? I'm a little
10    confused. She said it wasn't directed to anyone.
11    THE WITNESS: Not to any one person, but it was
12    directed to the two probation officers and the
13    secretary, one secretary.
14    MR. ADAMS: You mean as about those persons?
15    THE WITNESS: Right.
16    MR. ADAMS: Okay.
17 BY MS. WALLET:
18 Q. So the cunt club consist consisted of the two
19    probation officers and the other secretary?
20 A. **I believe so, yes.**
21 Q. Now, who came to you to ask you whether you had heard
22    about this?
23 A. **I think the chief did, Ken Bolze.**
24 Q. And what do you remember him asking you about?
25 A. **He asked if I had heard reference, the reference that**

Page 41

1  A. Yes.
2  Q. What did she tell you?
3  A. That I've even -- I even was there. They're very
4     happy.
5  Q. I'm sorry, you were?
6  A. They're very happy together. I was even at her place a
7     few times.
8  Q. Did she ever complain to you about her husband or her
9     relationship with her husband?
10 A. No.
11 Q. Did her husband call her at work?
12 A. Yes.
13 Q. Frequently?
14 A. Yes.
15    MS. WALLET: Thank you very much, Mrs. Boyles.
16    THE COURT: Is that all?
17    MR. DELLASEGA: No.
18 BY MS. WILLIAMS:
19 Q. Ms. Boyles, my name is Taylor Williams. I represent
20    the Ninth Judicial District of Pennsylvania, Court of
21    Common Pleas of Cumberland County.
22       Do you recall, since in your position with the
23    court you answered the telephone, do you recall any
24    time when there were a lot of hang-up calls?
25 A. I had talked to him about that. I can't remember. It

Page 42

1     may have happened but I can't remember.
2  Q. You don't remember at all?
3  A. No.
4  Q. And you can't pinpoint any time frame when that would
5     have happened?
6  A. No.
7  Q. You indicated that you were fired from your position.
8  A. Yes.
9  Q. Can you give me the details of why you were fired?
10 A. Yes. I became chronically ill. I couldn't walk, I
11    couldn't sit. I was missing work. And they said that
12    because I couldn't be there, I was fired.
13 Q. So you were fired for absenteeism is your
14    understanding?
15 A. Yes. Yes.
16 Q. Do you have any ill feelings about that toward the
17    court or the county?
18 A. Very disappointed.
19 Q. You indicated that you thought that men were being
20    treated better than women. What specifically did you
21    observe to form that --
22 A. It's just kind of like --
23 Q. -- impression?
24 A. Like the good old boys club, you know, that
25    camaraderie.

Page 43

1  Q. You've given me an impression, which I understand, but
2     what did you specifically observe?
3  A. Well, they would spend a lot of time together, talking.
4     Like I said, they would go to seminars, where I didn't
5     see the women going, you know, as frequently.
6  Q. Do you have any idea what ratio of times the men went
7     versus the women?
8  A. No, I don't.
9  Q. So you don't have any real specifics on that?
10 A. No. No.
11 Q. It's sort of a general impression you have?
12 A. Right.
13 Q. Is Mark Galbraith still working there as a probation
14    officer?
15 A. No, he's not. He's in business with his father.
16 Q. When did he leave, if you recall?
17 A. I'm guessing '97, '98, somewhere in there.
18    MS. WILLIAMS: Thanks. That's all I have for
19    Mrs. Boyles.
20 BY MR. ADAMS:
21 Q. Ms. Boyles, I represent Mr. Osenkarski. My name's
22    Paul Lancaster Adams. How are you. I'll just be
23    brief.
24       Going back to the reference comment made by
25    Mr. Osenkarski of the cunt club, were there any other

Page 44

1     females nearby other than you to overhear that
2     conversation?
3  A. I don't think so.
4  Q. Okay. Would you agree that that comment is off-color?
5  A. Yes.
6  Q. Were offhand or off-color jokes prevalent in the
7     office?
8  A. Occasionally.
9  Q. Jokes being distinguished from comments, but jokes?
10 A. Yes.
11 Q. And those jokes off-color were made by men?
12 A. Mostly, yes.
13 Q. Also by women?
14 A. Maybe once or twice, but mostly men.
15 Q. Okay. But you did hear some by women as well?
16 A. Yes.
17 Q. You said that you had been to Ms. Varner's home a few
18    times?
19 A. Yes.
20 Q. What were the circumstances of the first visit to her
21    home?
22 A. We both have children the same age and we, you know, we
23    discussed them.
24       I think the first time I went to her place was a
25    birthday party for her grandson.

Page 41 - Page 44

Page 45

1  Q. And were other employees of the Juvenile Probation
2     Department present as well?
3  A. No.
4  Q. Okay. Were you the only --
5  A. Yes.
6  Q. -- employee -- let me finish the question, I'm sorry.
7     Were you the only employee from the Juvenile Probation
8     Department present?
9  A. Yes.
10 Q. With your children?
11 A. I wasn't with my children. My children are grown the
12    same as hers.
13 Q. Okay, okay. So you were clearly the only person from
14    your office?
15 A. Yes.
16 Q. Okay. How about the second time you were in
17    Ms. Varner's home?
18 A. I had done some typing for her, for her class, and she
19    was -- she paid me to do her -- she was going for her
20    master's and I did her typing. And I took it down to
21    her place to drop it off.
22 Q. Okay. Did Ms. Varner often ask you to do typing for
23    her for classes that she was taking?
24 A. I do for both her and Debra.
25 Q. Okay. Debra?

Page 46

1  A. Green.
2  Q. Green, okay. Are you good friends with Debra Green?
3  A. Yes.
4  Q. You have to say yes or no.
5  A. Yes. Yes. Yes.
6  Q. Do you consider yourself good friends with Ms. Varner?
7  A. Yes. Have I seen them a lot lately? No.
8  Q. Does that bother you, that you haven't seen them in a
9     while?
10 A. No, because I know they're busy.
11 Q. Okay, fair enough. Any other visits to Ms. Varner's
12    home that you would like to share?
13 A. No, that was it.
14 Q. Has Ms. Varner ever been to your home?
15 A. Yes, when I first moved in. She came to show me what
16    she thought of how I decorated, to give me some help.
17 Q. When was this?
18 A. 1997.
19 Q. Okay. And was she helpful?
20 A. Yes.
21 Q. Any other visits to your home by Ms. Varner?
22 A. No.
23 Q. How about Debra Green to your home?
24 A. Debra Green has been to my house twice, and both times
25    they were to pick me up: Once to go to dinner, and

Page 47

1     once to take me for a medical procedure.
2  Q. Has anyone else from the Juvenile Probation Department
3     ever been to your home other than those two?
4  A. Mark Galbraith.
5  Q. Okay.
6  A. I'm trying think. Bill Brandt. That's it.
7     MR. ADAMS: No further questions. Thank you.
8     THE WITNESS: Okay.
9  BY MR. DELLASEGA:
10 Q. Did you like working for Gary?
11 A. Yes.
12 Q. Did you like working for Joe?
13 A. Joe? Yeah. I did more for Gary than I did for Joe,
14    yeah.
15 Q. Going back to Barb 1 and Barb 2, was the frequency of
16    Barb 1 and Barb 2 calls roughly equal?
17 A. Yes.
18 Q. Have you ever talked with Ms. Wallet before today?
19 A. I knew her when I worked in the law library. I
20    recognized her.
21 Q. But not about this case?
22 A. Oh, no.
23    MR. DELLASEGA: That's all.
24    THE WITNESS: Okay.
25 BY MS. BLANCHARD:

Page 48

1  Q. A couple questions, sorry. This will be quick, I
2     promise.
3     The conversation with Mark Galbraith in which he
4     told you that Gary made a comment to him about
5     remember, I got -- could you tell me again what that
6     statement was? I didn't quite get it.
7  A. Mark said Gary said: Remember, I got you your job and
8     I can take it away from you.
9  Q. And when did Mark tell you about this statement?
10 A. It was right after he was subpoenaed or asked to give a
11    deposition about the case or testify in the case.
12 Q. Was this recently or was this a few years ago?
13 A. It was a few years ago.
14 Q. And did Mark tell you whether or not he responded to
15    Gary's statement?
16 A. No, he didn't say.
17 Q. Do you know if he did?
18 A. No.
19 Q. Do you know if Gary made any other statements of that
20    nature to Mark?
21 A. I think it was Joe that did. No. I don't think so.
22 Q. What was the statement?
23 A. About owing. He wanted him to do some work at his
24    house and said you owe me or something.
25 Q. Was that in connection with this case?