# Exhibit H

```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . . .
BARBARA E. VARNER,               .
      Plaintiff,                 .   CIVIL ACTION
                                 .   NO. 1:CV 01-0725
                                 .
     vs.                         .
                                 .
COMMONWEALTH OF PENNSYLVANIA,    .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,         .
CUMBERLAND COUNTY; CUMBERLAND    .
COUNTY; S. GARETH GRAHAM,        .
Individually, and JOSEPH         .
OSENKARSKI, individually,        .
      Defendants.                .
. . . . . . . . . . . . . . . . .
```

                            Volume 1
                         Pages 1 to 92


     Deposition of:   **DEBRA GREEN**

     Taken by      :  Defendant

     Date          :  April 8, 2003, 9:38 a.m.

     Before        :  Emily Clark, RMR, Reporter-Notary

     Place         :  Cumberland County Courthouse
                      Courthouse Square
                      Carlisle, Pennsylvania


APPEARANCES:

   DEBRA K. WALLET, ESQUIRE
         For - Plaintiff

   ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
   BY:  A. TAYLOR WILLIAMS, ESQUIRE
         For - Defendant Commonwealth of Pennsylvania
               Ninth Judicial District, Cumberland County

   THOMAS, THOMAS & HAFER
   BY:  PAUL J. DELLASEGA, ESQUIRE
         For - Defendant Cumberland County

| | | |
|---|---|---|
| 1 | Q | In your experience would you say that Ms. Varner handled |
| 2 | | the Ph.D. program similar to the graduate program, in |
| 3 | | that she was able to successfully go through classes and |
| 4 | | do well while also dealing with full-time employment and |
| 5 | | other things in life as well? |
| 6 | A. | I would say yes, because she never came in and |
| 7 | | complained as in I can't do this, this is horrible, I |
| 8 | | don't like this.  She has made comments that it is |
| 9 | | challenging, but she never has made any comments about |
| 10 | | wanting to quit the program. |
| 11 | Q | Sure.  Are you and Ms. Varner friends? |
| 12 | A. | We are now, since, I mean, since we became employees.  I |
| 13 | | consider myself her friend. |
| 14 | Q | Okay.  And if things were going bad, would you be the |
| 15 | | person or one of the persons she may talk to about |
| 16 | | things going bad? |
| 17 | A. | I would be one, yes. |
| 18 | Q | Going back to the office of the Juvenile Probation |
| 19 | | Department, who do you currently report to now? |
| 20 | A. | Right now it's Sam Miller is my immediate supervisor. |
| 21 | Q | And how long has it been Sam Miller? |
| 22 | A. | Six months, approximately. |
| 23 | Q | And prior to that, who was your immediate supervisor? |
| 24 | A. | Hank Thielemann. |
| 25 | Q | And I'm testing your memory here.  How long would you |

```
 1            correct?
 2   A.       Correct.
 3   Q        And why do you think that difference existed?
 4   A.       Just a bullying part on Mr. Graham's behalf. There was
 5            no reason that he told me. There was no justification
 6            given.
 7   Q        Could Mr. Graham have told other persons that they had
 8            to leave at eight o'clock in the morning as well?
 9   A.       I believe he told Barb. I asked friends, other
10            co-workers if they were told the same. People that I
11            asked didn't know what I was talking about.
12   Q        Would you be surprised if I said to you that a male
13            Juvenile probation officer has indicated that he has to
14            leave at eight o'clock as well when he has to take long
15            trips such as that or when he was working under Gary
16            Graham?
17   A.       That's possible. I maybe just never knew it, if it is.
18            No one ever -- none of the males ever offered that, or I
19            never asked that person.
20   Q        Upon Mr. Graham's instruction in terms of leaving at
21            eight o'clock in the morning, and you teaming up with
22            Ms. Varner, how many times did that scenario occur?
23   A.       Could you repeat that?
24   Q        Did you understand that? Okay. Under Mr. Graham's
25            instruction of you must leave at eight o'clock in the
```

|    |    |    |
|----|----|----|
| 1  |    | morning for this trip, how many times did that happen in |
| 2  |    | situations where you and Ms. Varner were teamed up? |
| 3  | A. | I'm not a hundred percent sure I get the question, but I |
| 4  |    | don't think it was -- I remember one incident in |
| 5  |    | particular. |
| 6  | Q  | Okay. Just one incident where Mr. Graham said Debra, |
| 7  |    | Ms. Green, you must leave at eight o'clock and you're |
| 8  |    | actually teamed up with Ms. Varner, in that scenario, it |
| 9  |    | only happened once? |
| 10 | A. | I wouldn't say it only happened once, but I remember one |
| 11 |    | incident and that's the incident where he, I'll say |
| 12 |    | reprimanded me for not leaving at eight o'clock. |
| 13 | Q  | Okay. Again, we'll get back to that, I apologize. But |
| 14 |    | could there have been other instances where you were |
| 15 |    | teamed up with Ms. Varner and Mr. Graham said to you, |
| 16 |    | you must leave at eight o'clock because it's a long |
| 17 |    | trip, and those were the guidelines or the instructions? |
| 18 | A. | His instructions were given to me on one time and I |
| 19 |    | followed them ever since, wherever I was able to. |
| 20 | Q  | Where is your -- do you have a desk in the office? |
| 21 | A. | Yes. |
| 22 | Q  | Where, if I were to walk into the Juvenile Probation |
| 23 |    | Department, where would you be seated? |
| 24 | A. | In the main Juvenile Department, I am no longer located |
| 25 |    | there. We have another wing and it's down the hallway. |

| | | |
|---|---|---|
| 1 | | me if you have a problem, did he? |
| 2 | A. | The only time I ever heard him tell me not to call him |
| 3 | | or talk to him was regarding after-hour issues, |
| 4 | | regarding emergencies. He says: Don't call me, I've |
| 5 | | done my time, call someone else. |
| 6 | Q | How long have you known Gary Graham? |
| 7 | A. | I've known of him because of living in the same town, I |
| 8 | | would say I possibly became of aware of who he is or who |
| 9 | | he was, maybe the late '70s, '80s, just because he lived |
| 10 | | between where I lived and my parents' business and I |
| 11 | | would walk past the house where he lived. |
| 12 | Q | And what was your opinion of Gary back then? |
| 13 | A. | He was older so I really didn't have any first -- like, |
| 14 | | we didn't go to school together or anything. I didn't |
| 15 | | have any one-on-one contact that I can recall with him. |
| 16 | Q | All right. Was he energetic? |
| 17 | A. | Yes. |
| 18 | Q | Is Gary an excitable person, would you say? |
| 19 | A. | That he is. |
| 20 | Q | Has he always been excitable? |
| 21 | A. | From what I can recall, from just the atmosphere around |
| 22 | | town. |
| 23 | Q | Do you like Gary, by chance? |
| 24 | A. | Not anymore. |
| 25 | Q | When did you not -- when did you stop liking him? |

```
 1  A.   When he showed that he did not have the ability to be a
 2       decent supervisor or friend.
 3  Q    And when did he show that to you?
 4  A.   From my observations of how he treated people in the
 5       office, back starting in 1995, '96.
 6  Q    You kind of hand gestured toward Ms. Varner.  Are we
 7       really talking about Ms. Varner?
 8  A.   No.  That was just a gesture.  I talk with my hands.
 9  Q    Sorry.  How did he treat people in the office?
10  A.   He was rude.  He would yell if he felt like it.  He
11       would try to belittle people.  Whatever made him feel
12       like a better supervisor, I guess.
13  Q    Is it possible that in Mr. Graham's mind when he was
14       being this way, you say he wanted to be -- was he trying
15       to be a better supervisor?  Is that possible?
16            MS. WALLET:  I'll object to the form of the
17       question.  Anything is possible, and it also asks this
18       witness to speculate on someone's intention.
19  BY MR. ADAMS:
20  Q    Was Gary like that toward everyone in the office?
21  A.   I would say not everyone.  I can't recall him ever being
22       loud, rude, obnoxious, whatever, bullying, towards,
23       like, Sam Miller.  I can't remember him being loud
24       towards Denny Drachbar or towards Hank Thielemann.  I've
25       heard him holler at Joe and I've heard him holler at
```

|    |    |    |
|----|----|----|
| 1  |    | Barb.  I've heard him holler at me, I've heard him |
| 2  |    | holler at Nick, Nick Barrelet. |
| 3  | Q  | Besides those, I think you named four persons in the |
| 4  |    | office that he didn't holler at, Gary probably hollered |
| 5  |    | at everyone else in the office at some time or another; |
| 6  |    | is that safe to say? |
| 7  | A. | Probably. |
| 8  | Q  | Have you personally observed Mr. Osenkarski say anything |
| 9  |    | of a sexual nature in the office? |
| 10 | A. | Yes. |
| 11 | Q  | What did you observe? |
| 12 | A. | The first thing that comes to my mind was a comment that |
| 13 |    | he made when he was standing out in the main office |
| 14 |    | area.  The comment was not made to me.  And it had to do |
| 15 |    | with a lady friend of his.  I'm not sure of the name of |
| 16 |    | who that was, if he even said the name.  Where he |
| 17 |    | commented to canning or pickling peppers from his garden |
| 18 |    | and his hands had pepper residue on his hands, and he |
| 19 |    | referenced to having an intimate relationship with his |
| 20 |    | ladyfriend and how the residue burned her. |
| 21 | Q  | And you said that he wasn't saying it to you? |
| 22 | A. | I believe it was towards the secretaries.  They were the |
| 23 |    | only ones out in the front office at the time.  Fran, |
| 24 |    | Kathy.  I came out of my office to pick up my mail or do |
| 25 |    | a fax, whatever, and I stepped into the middle of that |

```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
      Plaintiff,                .   CIVIL ACTION
                                .   NO. 1:CV 01-0725
     vs.                        .
                                .
COMMONWEALTH OF PENNSYLVANIA,   .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
      Defendants.               .
. . . . . . . . . . . . . . .
```

Volume 2
Pages 93 to 268 (end)

Deposition of:   **DEBRA GREEN**

Taken by        : Defendant

Date            : April 29, 2003, 9:37 a.m.

Before          : Emily Clark, RMR, Reporter-Notary

Place           : Administrative Office of Pennsylvania
                  Courts
                  5034 Ritter Road
                  Mechanicsburg, Pennsylvania


APPEARANCES:

   DEBRA K. WALLET, ESQUIRE
       For - Plaintiff

   ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
   BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
              Ninth Judicial District, Cumberland County

   THOMAS, THOMAS & HAFER
   BY:  PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

1       of my head.
2   Q   Did Mr. Graham lose his temper with other people in the
3       office?
4   A.  I would say he was belligerent and rude to people, but I
5       don't think I would use the word lose control of his
6       temper in the same way that he did with Barb.
7   Q   Can you be specific why you think it was not the same
8       way with Barb as other people that he was belligerent
9       and rude to?
10  A.  He would be loud, like, very attention-seeking and
11      demeaning, but he wouldn't get in your face and he
12      wouldn't specifically, like, embarrass you in front of
13      people.
14          Let me take that statement back. He liked to
15      embarrass people, I believe. But I never saw him get
16      into somebody's face the way he did with Barb. He would
17      get threatening, kind of, like, intimidating stances.
18      If she would be sitting, he would be standing, kind of
19      using the body language, you know, like, leaning over
20      the desk or something.
21          The other men in the office, he would get loud with
22      them and perhaps try to make comments or embarrass them,
23      but it was in a different manner. It wasn't quite so
24      confrontational as he was with her.
25  Q   Can you be specific? How was it less confrontational?

|   |   | |
|---|---|---|
| 1 |    | threatened? |
| 2 | A. | References have been made, like, to Nicole Horick, who |
| 3 |    | is now Nicole Galbraith, that he made threats to -- put |
| 4 |    | the word out, so to speak. I've heard he's done |
| 5 |    | insinuation or intimidation against Bill Brandt, against |
| 6 |    | Darby. And everybody talks. |
| 7 |    | Gary's made it well known that he's going to |
| 8 |    | retaliate. He's not told me that face to face, but he |
| 9 |    | has put the word out and, you know, tell everybody, |
| 10 |   | everybody who testifies against me will pay, sooner or |
| 11 |   | later they'll pay. That's the phrase that's going |
| 12 |   | around the office. |
| 13 | Q | Can you tell me what specifically, not what you've heard |
| 14 |   | thirdhand from someone, but specifically what you've |
| 15 |   | been told and from whom? |
| 16 | A. | From Gary? |
| 17 | Q | Mr. Graham's never threatened you directly? |
| 18 | A. | Correct. |
| 19 | Q | And what you've told me is that you heard thirdhand that |
| 20 |   | the word's out there. Tell me specifically what you've |
| 21 |   | heard and from whom. |
| 22 | A. | With Nicole, seems to me that the word that she was -- |
| 23 |   | from Gary to Nicole to my ears was: You're going to |
| 24 |   | pay, you're all going to pay if you testify against me. |
| 25 |   | That was the big one that stuck with me. Am I answering |

A. Yeah. I have one answer in my head and you move on.

Like, for the joking that went on, neither of those two were present. We didn't tease in front those two. And what I experienced firsthand, Barb never made any derogatory or hateful comments back and said like, you know, quit teasing me or nothing. She didn't know about it through the rumor mill, or if she did, she never confronted me about that.

There were oftentimes jokes, like, it was all one-sided, it was all Gary wanting the relationship, and no one ever seemed to be like, oh, yeah, Barb wants it, too.

I'm not sure if I got all your questions.

Q. Would you describe Mrs. Varner as a favorite of Graham's before the relationship turned sour?

A. Yes, she was.

Q. And would you describe Graham as a man who plays favorites?

A. Yes.

Q. Did you perceive from Mrs. Varner's status as a favorite of Graham's that she got any benefit in the terms and conditions of her employment that were denied to you, a person who had started at the same time?

A. What's come to my mind is the promotion, but Gary wasn't there then. He -- it was after the time he was removed

```
 1              personally.
 2     Q        So you didn't feel slighted that Graham only took you on
 3              one and he took Mrs. Varner on quite a few?
 4     A.       No.
 5     Q        Is there any financial benefit to going on multiple
 6              commitment trips as opposed to only one?
 7     A.       You could get paid or you would have gotten paid comp
 8              time or overtime because some of the trips were longer
 9              than an eight-hour, seven-and-a-half-hour workday.
10     Q        What were the rules regarding comp time and overtime?
11     A.       Back then I guess it was anything over a seven-and-a-
12              half-hour workday could have been time and a half.
13     Q        Did the employee have the option of electing OT or comp
14              time?
15     A.       Yes.
16     Q        Okay.  So would you from your observations as to how
17              often you went on these commitment trips, as opposed to
18              how often Mrs. Varner went on them when she was Graham's
19              favorite, would you believe that in all likelihood
20              Mrs. Varner made a lot more money than you made because
21              of the overtime?
22     A.       She could have, yes.
23     Q        So that was a benefit to her being Graham's favorite?
24     A.       If money's important, it's a big benefit.
25     Q        Before the relationship turned sour did you ever see
```

```
 1              Graham yell at Mrs. Varner?
 2    A.   I can't recall anything.
 3    Q    Curse at Mrs. Varner?
 4    A.   Can't think of anything.
 5    Q    Say anything sexually demeaning to her?
 6    A.   Can't think of anything.
 7    Q    Give her arduous or burdensome assignments compared with
 8         the assignments that went to other POs?
 9    A.   No.
10    Q    In fact, before the relationship turned sour did you see
11         Graham treat her with respect?
12    A.   Yes.
13    Q    Treat her as a friend?
14    A.   I'm not sure if I'd use the word friend, but at least as
15         an equal or a co-worker.
16    Q    Treat her, in fact, better than he treated other people
17         who were new to the office as POs?
18    A.   Yeah, some could say that.
19    Q    Did you ever come to understand that Varner and Graham
20         had worked together on cases during the period of time
21         that she was at CYS?
22    A.   Yes.
23    Q    Okay.  What understanding did you acquire?
24    A.   Simply that some of the families that we had in our
25         system had also Children and Youth caseworkers, and on
```

| | | |
|---|---|---|
| 1 | | officers? |
| 2 | A. | I want to say yes, but I can't say specifically here's |
| 3 | | where it happened, how it happened and who it was. |
| 4 | Q | For example, have you heard him yell at Bill Brandt? |
| 5 | A. | My gut says yes, but don't ask me why. |
| 6 | Q | Darby Christlieb? |
| 7 | A. | Maybe not Darby.  He seemed to have a little more |
| 8 | | respect for Darby than some co-workers. |
| 9 | Q | Well, let me ask this.  Have you heard him yell at |
| 10 | | female probation officers other than Mrs. Varner? |
| 11 | A. | He's raised his voice with me.  At the time we were the |
| 12 | | only -- for the longest time we were the only two female |
| 13 | | probation officers in that office. |
| 14 | Q | Well, would you call him an equal opportunity yeller; he |
| 15 | | would yell at men and women both? |
| 16 | A. | He would yell at anybody equal opportunity, yes. |
| 17 | Q | Okay.  Would he use bad language in front of both men |
| 18 | | and women? |
| 19 | A. | Yes. |
| 20 | Q | I think you acknowledged earlier that he appeared to |
| 21 | | have favorites.  Would the corollary be true, there |
| 22 | | appeared to be people he didn't like? |
| 23 | A. | Yeah.  Yes. |
| 24 | Q | He had strong likes and dislikes? |
| 25 | A. | Yes. |

```
 1   Q    Would it be true that among his strong dislikes were
 2        some male probation officers?
 3   A.   Not among the strong dislike.  There was sort of a
 4        competitive edge to him.  I think of Dirk Madison, I
 5        think of Nick Barrelet.  I don't think he really cared
 6        for Nick, but I don't think it was a strong dislike of
 7        either of those.
 8   Q    Did you ever hear him or observe or ever see him treat
 9        male probation officers with disrespect?
10   A.   Yes.
11   Q    And that occurred on multiple occasions; is that
12        correct?
13   A.   Yes.
14   Q    Treat them in such a manner that you would have felt
15        they had a valid right to go complain about it, in fact,
16        correct?
17   A.   Yes, at least to the supervisor or the chief.
18   Q    So he could be rotten to both men and women in the
19        office, basically?
20            MS. WALLET:  I missed the operative word, he could
21        be what?
22            MR. DELLASEGA:  Rotten.
23            MS. WALLET:  Rotten?
24            MR. DELLASEGA:  Right.
25            MS. WALLET:  Thank you.
```

```
 1         Drachbar, they share an office, they're a team. Barb
 2         and I were hired together and we were the only females,
 3         we've kind of become a team. Mike Rose, Tim DeAngelo,
 4         they're a team.
 5              If I have a commitment trip, I go to Barb first and
 6         ask her if she's available. If Tim has a commitment
 7         trip, he would go to Mike Rose first. And it seemed
 8         rather odd that Gary wouldn't have chosen his office
 9         partner, Hank Thielemann, to do commitment trips, or at
10         least one of the other guys that he's known longer, and
11         you know, as a co-worker.
12              Generally, people team up with their office
13         partners because they know each other's caseloads
14         better. And that's why I thought it was rather odd that
15         he should choose her and not his co-worker, his
16         immediate office co-worker.
17   Q    Now, Mr. Dellasega asked you some questions about
18         whether it might be financially advantageous to take
19         these commitment trips.
20              Did your workload, was your workload reduced in any
21         way when you spent time out of the office for the
22         commitment trips?
23   A    I don't think so.
24   Q    Would there be any negative repercussions to spending
25         days at a time on commitment trips?
```