# Exhibit I

```
                                                      Page 1
 1         IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
 3  BARBARA E. VARNER,          :
             PLAINTIFF,         :  CIVIL ACTION
 4                              :  NO. 1:CV 01-0725
       VS.                      :
 5                              :  (JUDGE YVETTE KANE)
    COMMONWEALTH OF PENNSYLVANIA,:
 6  NINTH JUDICIAL DISTRICT,    :
    CUMBERLAND COUNTY; CUMBERLAND:
 7  COUNTY; S. GARETH GRAHAM,   :
    INDIVIDUALLY; AND JOSEPH    :
 8  OSENKARSKI, INDIVIDUALLY,   :
             DEFENDANTS.        :
 9
10
11
12
13
14  DEPOSITION OF:    THOMAS A. BOYER
15  TAKEN BY:         DEFENDANT OSENKARSKI
16  BEFORE:           SUSAN M. SIMON
                      REPORTER-NOTARY PUBLIC
17
    PLACE:            ADMINISTRATIVE OFFICES OF
18                    PENNSYLVANIA COURTS
                      5035 RITTER ROAD
19                    MECHANICSBURG, PENNSYLVANIA
20  DATE:             SEPTEMBER 17, 2003
                      BEGINNING 10:25 A.M.
21
22
23
24
25
```

```
                                                     Page 2
 1  APPEARANCES:
 2     DEBRA J. WALLET, ESQUIRE
           - FOR - PLAINTIFF
 3
       ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
 4     BY:  A. TAYLOR WILLIAMS, ESQUIRE
           FOR - DEFENDANT COMMONWEALTH OF PENNSYLVANIA
 5               NINTH JUDICIAL DISTRICT, CUMBERLAND COUNTY
 6     THOMAS, THOMAS & HAFER
       BY:  PAUL J. DELLASEGA, ESQUIRE
 7           FOR - DEFENDANT CUMBERLAND COUNTY
 8     MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
       BY:  DAVID J. MacMAIN, ESQUIRE
 9           FOR - DEFENDANT S. GARETH GRAHAM
10     SWEENEY & SHEEHAN, P.C.
       BY:  PAUL LANCASTER ADAMS, ESQUIRE
11           FOR - DEFENDANT JOSEPH L. OSENKARSKI
12
13  ALSO PRESENT:
14     MS. BARBARA E. VARNER
15     MR. S. GARETH GRAHAM
16     MR. JOSEPH L. OSENKARSKI

                        COPY
```

```
                                                      Page 3
 1                  I N D E X
 2  WITNESS                       EXAMINATION
 3  THOMAS A. BOYER
 4     By Mr. Adams                    4
       By Mr. MacMain               48, 135
 5     By Ms. Williams                55
       By Ms. Wallet                  57
 6     By Mr. Dellasega              131
 7
 8
 9
                                    PRODUCED
10  EXHIBITS:                       AND MARKED
11  1.  Five-page Cumberland County
12      Employee Performance Review     100
13
```

```
                                                      Page 4
 1              STIPULATION
 2      It is hereby stipulated by and between counsel
 3  for the respective parties that sealing, filing and
 4  certification are waived; and that all objections except as
 5  to the form of the question are reserved until the time of
 6  trial.
 7      THOMAS A. BOYER, called as a witness, being
 8  duly sworn, testified as follows:
 9              EXAMINATION
10  BY MR. ADAMS:
11  Q   Good morning, Mr. Boyer.
12  A   Good morning.
13  Q   Mr. Boyer, have you ever been deposed before?
14  A   Yes.
15  Q   Okay. Where and when have you been?
16  A   Well, several times, quite a few years ago,
17  as -- I think, both as a former police officer which would
18  be over 25 years ago, and as a probation officer, and I'm
19  guessing maybe 20 years ago roughly.
20  Q   Okay. So you haven't had a deposition within
21  the last 20 years, is that right?
22  A   That's fairly accurate.
23  Q   Do you remember the instructions during the
24  deposition 20 years ago?
25  A   Pretty much so.
```

Page 5

1  Q   Okay. Some of it may be repeated at this
2  time --
3  A   Sure.
4  Q   -- but you can reflect back on that experience
5  as well as the experience this morning.
6      This is your deposition. Everything that you
7  say will be transcribed by the court reporter in written
8  form. You have the ability to look at what's been
9  transcribed to check its accuracy. It's called read and
10 sign. Or you can waive your opportunity to read and sign.
11     I can assure you that all counsel here will
12 look at that deposition transcript at some point to look at
13 its accuracy. I will.
14     But you have the opportunity to look at it
15 before its final form. Would you choose to do that?
16 A   I would. I'd like to do that.
17 Q   Okay. So we'll make arrangements for that.
18     It's important for you to listen to everything
19 that I say. Obviously your testimony is under oath. We
20 assume that everything that you do say today is the truth,
21 to the best of your ability, and the best of your
22 knowledge.
23     Is there anything that would prohibit you from
24 testifying truthfully today that you can think of?
25 A   No.

Page 6

1  Q   Are you under any medications or any
2  influences unofficially that might preclude you from
3  testifying truthfully this morning?
4  A   I am not.
5  Q   Okay. What is your full name?
6  A   Thomas Anders Boyer. A-N-D-E-R-S.
7  Q   And what is your date of birth, Mr. Boyer?
8  A   3-2-1949.
9  Q   And what is your current job title?
10 A   I'm Supervisor, Cumberland County Juvenile
11 Probation Department.
12 Q   How long have you been the Supervisor of
13 Cumberland County Probation Department?
14 A   Since March of 1998.
15 Q   Before I get into your professional
16 background, what is your educational background?
17 A   I graduated from high school in 1967. I
18 graduated with an associate's degree from a community
19 college, Harrisburg Area Community College, in 1973. And I
20 received a bachelor's degree in the criminal justice field
21 from York College of Pennsylvania in 1978.
22     Various military schools. Training,
23 certificates, as a police officer in the City of Harrisburg
24 for six years, various academies.
25 Q   Were you a military policeman with the

Page 7

1  military?
2  A   No, I was military for four years in the
3  United States Air Force from June 15th, '67 until May 26th,
4  1971.
5  Q   Okay. I guess we'll work our way backwards.
6  Prior to becoming the Supervisor of the Cumberland County
7  Probation Department, what job did you hold?
8  A   In the probation department?
9  Q   Were you still with probation prior to your
10 supervisory promotion? I guess it's a promotion from where
11 you were before.
12 A   Yes.
13 Q   Well, let's start -- when did you start with
14 the probation department for Cumberland County?
15 A   October 2nd, 1978.
16 Q   What was your job title then?
17 A   That would have been at that time Probation
18 Officer.
19 Q   At the time were you responsible -- did your
20 case load include juveniles and adults?
21 A   Yes, it did. We were one department in 1978.
22 Q   In 1978, how many probation officers were
23 employed with the Cumberland County Probation Department?
24 A   A total of 17 from the chief down to the
25 person with the least amount of time.

Page 8

1  Q   Okay. Were you promoted to another position
2  after that?
3  A   In 1996, I was promoted to Senior Probation
4  Officer. And subsequent to that, also in 1996, promoted
5  further to what they called a Probation Officer II
6  position.
7  Q   Okay. Was this still when the probation
8  department was adult and juvenile?
9  A   The senior probation promotion was at the tail
10 end of the joint department. And the Probation Officer II
11 promotion was at the beginning of the separate departments.
12 Q   Okay. In your role as Senior Probation
13 Officer or Probation Officer II, did you have the
14 opportunity to supervise junior probation officers?
15 A   Well, technically the Senior Probation Officer
16 promotion for me was a very short period of time. I'm
17 going -- off the top here, I'm going to say a couple months
18 at the most. So theoretically, yes, I would have been able
19 to assist or advise staff who were not of that particular
20 rank.
21     In the PO-II position, then that is more
22 definite in terms of a position assisting other staff of
23 less rank.
24 Q   Okay. In the PO-II position, did you have the
25 opportunity to ever supervise Barbara Varner?

Page 9

1  A  In the PO-II?
2  Q  Yes.
3  A  Yes.
4  Q  Okay. What time period was that?
5  A  That would have been from approximately August
6  of '96 until approximately April of '97. I'm not sure
7  technically on how many weeks in August, how many weeks in
8  April. I'm saying approximately.
9  Q  And this, of course, is with the Juvenile
10 Probation Department? This is after the split?
11 A  This is the Juvenile Probation Department.
12 Let me also add that that was -- let me phrase that time
13 period as one category of being a PO-II, and being -- with
14 Mrs. Varner, being one of her supervisors.
15    I continued to be a supervisor to her, but I
16 would say in a different category after her filing of the
17 complaint or the filing of dissatisfaction or whatever that
18 I understand took place around April of '97. I just want
19 to clarify that.
20 Q  You said different type of supervise. What do
21 you mean by different type?
22 A  As I recall back in '97, when I'm recalling
23 that she may have filed her initial dissatisfaction or
24 whatever its called, approximately -- shortly after that
25 time, as I recall the court, Judge Sheely at someone's

Page 10

1  request, Barb's or somebody's request, entertained her
2  desire to be immediately supervised by someone other than
3  the chief, the supervisor, the PO-II, and at least one
4  senior probation officer.
5      And as I recall, the judge eventually assigned
6  a lower ranking probation officer to more or less supervise
7  for Barb's questions and casework, et cetera.
8  Q  Okay. And this is after the filing of
9  Ms. Varner's complaint?
10 A  Yes.
11 Q  Okay. What do you know about that complaint
12 filed by Ms. Varner?
13 A  About the complaint?
14 Q  Um-hum.
15 A  Just going back to what I'm saying, around
16 April of '97, was that she was not happy with the chief or
17 the supervisor of the department, and had filed a complaint
18 of dissatisfaction. Factually, I don't know what it all
19 involved, but that's my recollection of the general area of
20 understanding.
21 Q  Okay. Were you surprised that she filed a
22 complaint of such allegations?
23 A  Very, very surprised.
24 Q  Why were you surprised?
25 A  Well, again, in April of '97, when I had heard

Page 11

1  about the filing of whatever it was she filed, I had
2  instant recall of the limited time that we had been a
3  department, roughly from August of '96 until April of '97.
4  And in that eight-, nine-month period, to the extent that I
5  was able to speak with Mrs. Varner or any other staff,
6  because we were busy, building a new department, et cetera,
7  in all cases, from what I could observe and from the
8  conversations that I had had with Barb, had no idea that
9  there was any dissatisfaction on her part about anything
10 with this new department.
11     Informally, and not through any sophisticated
12 system, with Barb and other staff members -- there were
13 only 12 of us at the time in our Department -- I would try
14 to take an informal reading of suggestions and just ask
15 questions like how're we doing or what do you think,
16 et cetera.
17     And on I'm going to say at least four if not
18 more occasions with Barb and I, she verbalized nothing but
19 complete satisfaction, optimistic about the future,
20 specifically complimenting about Joe's management
21 practices, Gary being a good guy.
22     So putting all those things together from my
23 recollection, I was very surprised to discover.
24 Q  Okay. Just for clarity, between August of '96
25 and April of '97, you observed what you just described from

Page 12

1  Ms. Varner, job satisfactory and happiness with her
2  employment working under Gary Graham and Joe Osenkarski, is
3  that correct?
4  A  Absolutely.
5  Q  Okay. Do you remember her ever making
6  comments about Gary Graham that supports your comments
7  about her having job satisfactory? Did she ever make
8  glorifying comments that you may recall today? Even though
9  it's been a little bit of time, but....
10 A  You mean during this period of time?
11 Q  During this time period.
12 A  Positive statements about Gary?
13 Q  Positive statements about Gary from
14 Ms. Varner.
15 A  Absolutely, on numerous.
16 Q  What --
17 A  Well, I think I made reference to at least on
18 four occasions. Or more.
19 Q  Did she ever say he was a great guy?
20 A  Generally, from my recollection of those
21 unscheduled and just sporadic drop-ins in the office, or
22 her office, or if she was at my office, because it was a
23 new department, because we were putting together a lot of
24 things, I would just informally ask her and all other staff
25 also, how're we doing, meaning, hey, what do you think.

Page 13

1  where're we going, et cetera.
2        And she was consistently and always of a
3  positive nature. And then specifically made comments
4  favorable about Joe Osenkarski, the chief. I remember she
5  liked his management style. She felt good about that.
6        And, of course, Gary Graham was a good guy,
7  good manager, and I had no reason to think that she was to
8  any extent displeased with anything. That was my read to
9  the extent that I had time to observe those things.
10  Q   Okay. Between this time period of August '96
11  and April of '97, did you observe much interaction -- other
12  than you stopping by and kind of checking on everyone --
13  did you observe any interaction between Gary Graham and
14  Ms. Varner at all?
15  A   I generally observed everybody at one time or
16  another, but nothing unusual that I could recall.
17  Q   Were they often together?
18  A   My recollection is that they were often
19  together outside of the office. I don't know that they
20  were together any more in the office than Gary would have
21  been with any other employee. But I do recall that
22  oftentimes it seemed that they were together outside of the
23  office.
24  Q   Can you explain that a little further or
25  elaborate on that?

Page 14

1  A   My recollection was that they went on a number
2  of commitment trips where juveniles were transported to
3  placement facilities, that there were training occasions
4  where they were together at the same training locations,
5  local and out-of-town.
6        And just along those lines I recall that there
7  was frequent periods of time when they were in each others
8  company.
9  Q   Okay. You said a number of commitment trips.
10  Did you observe the number of commitment trips taken by
11  Mr. Graham and Ms. Varner as an unusual number, unusually
12  high number?
13  A   I couldn't say that. There were numerous
14  trips. I couldn't label them as, you know, above average,
15  less than average.
16  Q   The training that was local and out-of-town,
17  was it mandatory training?
18  A   Well, generally, all probation officers must
19  obtain 40 hours of official and acceptable training, so we
20  all have that obligation as probation officers. Some of
21  that training is local. Some is out-of-town, in terms of
22  overnight stays and that type of thing.
23  Q   Okay. Is it up to the probation officers
24  individually to make sure they have their training every
25  year?

Page 15

1  A   Well, that is an obligation of each probation
2  officer, to make sure at the end of the fiscal year that
3  they have 40 accredited hours of ongoing related training.
4  Q   Does the training come from management? For
5  example, does management say to their probation officers
6  you must go to this training because we know that you have
7  that commitment and you have to put these hours in, or in
8  the alternative, does the probation officer see
9  opportunities for training and at that point they pick and
10  choose what training they want to attend within a given
11  year?
12  A   Well, it's more likely that the offers of the
13  trainings are presented to the probation officer, and to
14  the extent possible, I think management allows them to pick
15  and choose the specific courses that they want to attend.
16  Q   Okay.
17  A   Sometimes, rarely, there may be a request from
18  management to a PO to attend a specific training.
19  Q   Okay. Did you have an opportunity to observe
20  Mr. Graham and Ms. Varner interact prior to Ms. Varner
21  joining the Probation Department or even the Juvenile
22  Probation Department?
23        Do you remember her being with Children and
24  Youth, I think it was?
25  A   Yes. I do go back to remembering seeing

Page 16

1  Mrs. Varner in the probation office and in the company of
2  Mr. Graham prior to her employment with the Probation
3  Department. This would have been when she was with the
4  Children and Youth of Cumberland County.
5        And back several years that she was in our
6  office and in the company of Mr. Graham on numerous
7  occasions before she was a member of the Probation
8  Department.
9  Q   In what situations did you observe the two of
10  them together?
11  A   Well, not only in the juvenile -- well, it was
12  even before juvenile. It was a joint department. In the
13  Probation Department offices. But historically close to
14  where Mrs. Varner used to work in Children and Youth when
15  they were in the courthouse close to the Probation
16  Department offices, close by both those offices was a snack
17  bar on the third floor of our courthouse in Carlisle.
18        And I was a frequent visitor to what was
19  referred to as the smoke room.
20  Q   Okay.
21  A   They started to eliminated areas where you
22  could smoke. I was a smoker. And this is where the
23  vending machines were, et cetera. And I, on unknown number
24  of occasions, observed while I was in the smoke room, which
25  I would frequent to take a load of work down there smoke

Page 17
1 and work and drink coffee or whatever, on numerous
2 occasions, Barbara Varner and Gary Graham ended up in that
3 same snack bar. On numerous occasions over numerous
4 periods of time. Months, years, probably.
5         And for a couple reasons I remembered those
6 situations.
7   Q   Okay. What are the reasons why you remember
8 it?
9   A   Well, Mr. Graham was not a heavy coffee
10 drinker, and he wasn't a smoker, and he wasn't a
11 purchaser -- he didn't purchase candy. His parents had a
12 grocery, sort of a small corner store, and Gary was not one
13 to frequent, in my observation, he wasn't one to frequent
14 vending machines of any type. And he wasn't a smoker.
15         And in the years before he and Barbara and
16 Gary would have met, I don't recall him being in the snack
17 bar. So just looking back, that's easy for me to
18 recollect.
19   Q   Okay. When you would observe Ms. Varner and
20 Mr. Graham in the snack bar area, did you -- what were they
21 doing? Talking? What were they doing?
22   A   Well, yeah, there was communication. What I
23 recall is if she showed up, he was there shortly
24 thereafter. If he showed up, she was there shortly
25 thereafter. The real quick -- and we're going back years

Page 18
1 now -- but the real quick summary was I don't recall them
2 standing there long.
3         I don't know any more than that. They weren't
4 ones to sit down. I don't know that either one of them --
5 I know Gary didn't smoke. I don't think Barb smoked. So
6 that's what I recall.
7   Q   What year is that? This is going before
8 Ms. Varner joined probation, so what year?
9   A   She didn't come to probation until February of
10 1995. So I'm roughly going back to '90, '91, ballpark
11 figure. Could be off a year there, but ballpark figure I'm
12 going back to that.
13   Q   '90, '91, up until 1995?
14   A   Approximately. Then she was on the Probation
15 Department.
16   Q   Okay. You testified that the relationship or
17 the working relationship between Ms. Varner and Mr. Graham
18 was very positive from Ms. Varner's standpoint when she
19 became part of the Juvenile Probation Department, right?
20   A   That is correct.
21   Q   Did there come an opportunity where that
22 positive relationship ever soured in any way or become
23 negative in any way?
24   A   I never saw any of that.
25   Q   Okay. How about prior to her filing the

Page 19
1 complaint?
2   A   That's what I was talking about. Prior to
3 April '97 -- in fact, when I had heard that she did file
4 some kind of a complaint or grievance or whatever, I was
5 probably one of the most surprised people --
6   Q   Okay.
7   A   -- that would have known Barb and Gary. To
8 me, I remember just being -- what's that all about.
9   Q   How about directly immediately before filing
10 the complaint, do you recall anything happening?
11   A   I do not. I do not. Like I say, I was
12 probably one of the most surprised people.
13   Q   Okay. What has your relationship been like
14 with Gary Graham over the years?
15   A   Well, we have to talk about different periods
16 of time.
17   Q   Okay.
18   A   In fairness to the question.
19   Q   Okay.
20   A   Gary and I met in 1978, and I would say
21 from 1978 to 1989, Gary Graham was probably one of the most
22 active, frequent friends, coworker, very strong, active
23 friendship, and a very close friend of mine. My wife, my
24 family, his family were extremely social, active, and
25 friendly. From 1978 to 1989.

Page 20
1         From 1989 to about 1996, I was in another
2 professional, specific professional position within the
3 Probation Department, namely the DUI Unit.
4   Q   Okay.
5   A   Simultaneously, Mr. Graham's family was
6 starting out with children. I was beginning to have my
7 children. And Mr. Graham and I, for two reasons, beginning
8 to raise our families and no longer actively working
9 together in the same functions of our job, sort of took a
10 parting of the ways. I would say from 1989 to 1996.
11   Q   Okay.
12   A   We rejoined work-wise at the formation of the
13 new Juvenile Probation Department in approximately August
14 of 1996.
15   Q   What was your relationship like with
16 Mr. Graham at that time?
17   A   Well, when we got back working in the same
18 department, of course, he at that point became my
19 superior. He was a supervisor. I was under he and also
20 under the chief. And we were working frequently together
21 to work toward improving and creating and developing this
22 new separate Juvenile Probation Department.
23   Q   Okay. Let me go back a little bit. You
24 testified that you were supervising Ms. Varner between
25 April of '96 and April of '97. Do you recall that?

Page 29

1 ever observed Mr. Osenkarski say anything that you --
2 anything to a woman in a sexual context?
3   A   I don't have any specific recollection. And I
4 would only say, generally, that I do not recall ever being
5 in the company of Joe where someone was offended. If I can
6 give that sort of like a follow-up cover area answer to the
7 initial question.
8   Q   Okay.
9   A   But just setting here listening to your
10 questions, trying to recall when I thought that anybody
11 might have been out of bounds or out of order, I just don't
12 have that recollection.
13   Q   Okay. Just bear with me with these specific
14 questions.
15       Did you ever observe Mr. Osenkarski gesture,
16 motion, do anything physically that may have had a sexual
17 content to it?
18   A   I do not recall that.
19   Q   And that would also include the lack of
20 offensive behavior as well?
21   A   Exactly.
22   Q   How about Gary Graham, any comments or things
23 that were in a sexual nature that you observed?
24   A   I do not recall anything that would be harmful
25 or inappropriate to any other person in the company of

Page 30

1 Mr. Graham, from my recollection.
2   Q   Okay. Can you describe Gary Graham's demeanor
3 while at work?
4   A   Well, I have to go back to the
5 departmentalization, compartmentalization again.
6       Generally, I've known Gary since 1978, and one
7 thing I can say about Gary Graham is I've never known him
8 to be a quiet person.
9   Q   Okay.
10   A   Mr. Graham is not a quiet person. He's a man
11 with emotion, with conviction, with motivation, and a lot
12 of other good, positive assets and attributes, but he is
13 not a quiet person.
14   Q   Would you describe him as excitable?
15   A   Yes. I would say that would be a word that
16 could be put in there.
17   Q   Okay. And you said Gary is not a quiet
18 person. This has been your observation of Gary since the
19 actual meeting of Gary till the present?
20   A   That's right. That's right.
21   Q   And is Gary excitable and not quiet with
22 everyone?
23   A   That's a true statement. That's Gary.
24   Q   Okay. So however Gary treats, you know, Joe
25 Doe, he would also treat Jane Doe the same way?

Page 31

1   A   Exactly.
2   Q   Okay. How about his management style? Has
3 there been a consistency with management style as well,
4 treating Joe Doe versus Jane Doe?
5   A   Generally, yes, that's true. Across the
6 board, he's the same.
7   Q   Okay. How about Mr. Osenkarski, was his
8 treatment of male and females across the board the same?
9   A   I would say yes, from my observation.
10   Q   What is your involvement with the DUI Unit
11 right now? Do you have any involvement with the DUI Unit
12 right now?
13   A   Not really.
14   Q   Okay. What years were you involved with the
15 DUI Unit?
16   A   December of 1989 until some point after August
17 of '96, until I could make a total separation. After the
18 creation of the two departments, there was an overlap there
19 where I was wrapping my professional involvement up with
20 the DUI Unit.
21   Q   So after August of '96, you had no real
22 involvement with the unit?
23   A   Pretty much worked itself out.
24   Q   Okay. What is the DUI Unit? Explain it to
25 me.

Page 32

1   A   Well, the DUI Unit of the former Probation
2 Department -- you have one Probation Department in
3 Cumberland County whose members did both adult and
4 juvenile.
5   Q   Okay.
6   A   With the new and more progressive DUI law of
7 roughly '82, '83, DUI cases began to skyrocket everywhere
8 in Pennsylvania, including Cumberland County. So you had
9 this Probation Department that had adult criminals and
10 juvenile offenders, and DUI's were occasional. And all of
11 a sudden, DUI cases bloomed.
12       So the County Probation Department said these
13 cases are getting so numerous, we're going to have to slice
14 out a couple of employees here and just have them focus and
15 take this huge number of DUI cases. It's just getting
16 overwhelming.
17       So that informally is what was referred to as
18 the DUI Unit where between two and, and at times three, and
19 I think a maximum of four probation officers were purely
20 working DUI cases in Cumberland County Probation.
21       So they didn't have adult criminals, unless it
22 was DUI. And they didn't have juveniles unless -- rarely
23 it was DUI. So that is the DUI Unit of the former
24 Probation Department.
25       And it was in that unit where I was focused

Page 49

1  just have a few areas I want to follow-up on.
2      You had mentioned earlier in your deposition
3  that you recall Ms. Varner having complimentary things to
4  say about Mr. Graham during the time period we talked
5  about. But I don't think you were asked of any specific
6  positive comments you can recall.
7      Anything you recall sticking in your mind that
8  she said positive about Mr. Graham, his management style,
9  his interactions with her?
10  A   Just generally that he was a good guy. The
11  clear flavor I got, there weren't any problems whatsoever.
12  That's the best way I can...
13  Q   She made no complaints to you about Mr. Graham
14  then?
15  A   To me?
16  Q   Correct.
17  A   Never. Never.
18  Q   You were her immediate supervisor, you were
19  the person that she would complain to or would lodge a
20  complaint?
21  A   In the chain of command of our department at
22  that time, that is correct, I would have been the first
23  superior she should have come to if she had any problems.
24  Q   You talked about observations in the smoke
25  room or snack bar room when you would see Ms. Varner and

Page 50

1  Mr. Graham together.
2      On any of those occasions, did Ms. Varner
3  appear to be uncomfortable, not want to be in the company
4  of Mr. Graham?
5  A   Not at all. Let me just clarify that. That
6  whatever it was that was filed in April of '97 by
7  Mrs. Varner, part of my surprise, as I told somebody at
8  some point in time, the flashback that I got was what went
9  wrong here. I had this flashback back years. I went right
10  back to that smoke room, to that snack bar, and I'm saying
11  here's a guy that's never in the snack bar, he doesn't buy
12  candy, he doesn't smoke. And here's a lady, and isn't it
13  something that she shows up, then he shows up. He shows
14  up, then she --
15      But to answer specifically this last question,
16  no, this wasn't something that either party looked painful
17  or in pain or anything else. It was a favorable and
18  positive, a good, willing meeting. Numerous meetings over
19  the years.
20  Q   You were asked some questions about the DUI
21  training that you found out after the fact that Ms. Varner
22  had, I think you used the phrase, went around your back to
23  become certified.
24      Did you every learn whether or not she had
25  flunked any of the tests that were required to obtain the

Page 51

1  certification?
2  A   Well, my recollection after discovering that
3  she was in the process of being certified that I was not
4  aware of, should have been aware of, subsequently she did
5  fail one of the required mandatory tests.
6      There were two certifications. There was the
7  instructing certification to enable you to teach, and there
8  was also a separate what they called a court reporting
9  network certification. This was like a questionnaire that
10  you would ask each DUI defendant.
11      And you had to take a test by the state and
12  past both those tests to be totally certified to do both
13  elements. And she failed the CRN, C-R-N, court reporting
14  network.
15      And the reason I found that out was I got the
16  results mailed to me as DUI coordinator for Cumberland
17  County, and I opened this up and she failed the required
18  test.
19  Q   Do you recall an incident when Ms. Varner came
20  to you and asked about Kerri Houser's boyfriend?
21  A   There was an incident where, as I recall it,
22  Barb came in to my office and asked me -- indicated to me
23  that she had a friend of hers and could she ask me a
24  question. She didn't tell me who the friend was, but she
25  wanted to know if she could ask me a question about a

Page 52

1  possible person that I may have known from my earlier years
2  living back in my home county. And I said, well, go ahead
3  and shoot. What do you want to know.
4      Well, I wanted to know if you knew this girl
5  whose name might have been or was MeeCee Baker. MeeCee
6  Baker. And I said, well, yeah, Barb, I sort of grew up
7  with her. I was older than her. She was five, six, seven
8  years younger than me. She was from my area. I knew her,
9  knew her family, blah, blah, blah, blah.
10      Well, did you know her husband. And I said
11  no, I can't say that I did know him. And I think at that
12  time, I'm thinking here that MeeCee Baker might, in fact,
13  have either been having some marital problems or maybe was
14  even divorced from this husband.
15      So I didn't think anymore about it. That's
16  all I recall saying to Barb. And she left. And
17  subsequently to her leaving our meeting, somebody -- I
18  forget who it was -- came and said, Tom, do you know who
19  Barb was coming to you to ask information, do you know who
20  sent her to get information from you. And I said, well,
21  no, what are you talking about.
22      He said, well, she had a motive. There was a
23  motive why she was coming to you and not telling you
24  everything that she probably should have told you before
25  she asked the question. And I said, what are you talking

Page 101

1  Q  You have had a chance to look at it just for a
2  few minutes, correct?
3  A  Yes.
4  Q  Is it accurate to say that you, as the rater,
5  for the period between December '99 and December of 2000,
6  rated Ms. Varner as outstanding?
7  A  Yes.
8  Q  Do you recall any other periods of time for
9  which you were the rater?
10  A  Specifically, I don't. I very well could have
11  been.
12  Q  Where was your office in relation to
13  Ms. Varner's office since 1996?
14  A  Well, my office has remained the same since
15  1996.
16  Q  Where is that, sir?
17  A  Well, that is in the main juvenile probation
18  side of what they call the new courthouse. But I'm saying
19  it's the main juvenile probation suite of offices.
20  Q  All right. And for some period of time
21  Ms. Varner's office was within the vicinity of yours,
22  correct?
23  A  Yes.
24  Q  Do you remember what period of time that would
25  have been?

Page 102

1  A  I can't be that specific. I know she was in a
2  single unit office, and of course, later changed offices.
3  But I can't even recall if she was somewhere else before
4  the single unit office or what, to be...
5  Q  During the period of time when Ms. Varner's
6  office was in the vicinity of your office, where was
7  Mr. Graham's office?
8  A  His office would have been -- well, Barbara
9  Varner's office would have been about halfway in between
10  Mr. Graham's office and my office. It would have been my
11  office, and then maybe 20, 25 feet her office, and another
12  20, 25, 30 feet roughly and around a couple corners.
13  Q  Okay. Did you ever hear Mr. Graham in a loud
14  voice while you were in your office?
15  A  Well, over the years, I'm sure I did.
16  Q  So at times he would speak in a loud enough
17  voice that you could hear him when he was in his office and
18  you were in yours?
19  A  Oh, no. No, I thought your question was did I
20  hear him speak loud. I can not say that I heard him speak
21  loud when he was in his office and I was in my office.
22  Q  Okay. Did you ever hear him speak loudly in
23  the office area when you were in your enclosed office?
24  A  I would say I probably did. If he was outside
25  my door but in the general area of the open office, yes.

Page 103

1  Q  Do we agree that he has a relatively loud
2  speaking voice?
3  A  Yes.
4  Q  And then when he gets, as you described it,
5  excitable, he gets even louder?
6  A  Well, I don't know that I said he gets even
7  louder. I think I said that Mr. Graham has never, in my
8  opinion, could be considered a quiet person. He is capable
9  of being loud. I've known him to be loud, along with other
10  staff on occasion, et cetera. But I don't know that he
11  gets louder just because he's excitable.
12  Q  Have you observed him to be louder on occasion
13  when he has been in his excited state?
14  A  I'm sure over the many years that we worked
15  together that there were probably times when he was more
16  loud.
17  Q  Do you ever remember Mr. Graham directing his
18  loud voice at any member of the juvenile probation office?
19  A  I do not specifically recall that. General
20  frustration, yes. Specifics, no.
21  Q  You don't remember Mr. Graham ever directing
22  his comments to a particular individual, any particular
23  individual?
24  A  No.
25  Q  In a loud voice?

Page 104

1  A  No.
2  MS. WALLET: We'll take a quick break.
3  (Recess taken from 1:24 p.m. until 1:30 p.m.)
4  BY MS. WALLET:
5  Q  Are you ready, Mr. Boyer?
6  A  Yes, I am.
7  Q  In your observation of Mr. Graham and
8  Ms. Varner, did you ever observe them to have any
9  disagreements in conversation?
10  A  I do not recall that.
11  Q  Does that mean there may have been and you
12  just don't remember, or you don't think so?
13  A  No, I don't think so.
14  Q  Do you recall any instances in which
15  Ms. Varner was the subject of a raised voice by Mr. Graham?
16  A  I do not recall that.
17  Q  Do you know whether in 1996, the county had a
18  sexual harassment policy?
19  A  I don't know the answer to that question.
20  Q  Were you a supervisor in 1996?
21  A  No.
22  Q  When did you first become a supervisor?
23  A  1998.
24  Q  Did the county have a sexual harassment policy
25  in 1998?

Page 113

1   A   I can't recall doing it.
2   Q   Do you remember ever telling secretaries that
3 they could get farther if they spent more time on their
4 knees?
5   A   No.
6   Q   If someone says you said that, do you deny it?
7   A   Yes.
8   Q   Do either Mr. Osenkarski or Mr. Graham have
9 access to firearms at work?
10        MR. ADAMS: Objection. What time period?
11        MS. WALLET: At any time.
12        THE WITNESS: I don't know about Mr. Graham.
13 I believe that Mr. Osenkarski would have access to
14 firearms.
15 BY MS. WALLET:
16   Q   Where would those firearms be, sir?
17   A   To the best of my knowledge, on the firearms,
18 our department has some secured in the courthouse, in a
19 secure area.
20   Q   When you say your department, are you speaking
21 of the --
22   A   Juvenile.
23   Q   Juvenile Probation Office. Do you have access
24 to those firearms, sir?
25   A   Basically, no. I think I could get in to the

Page 114

1 firearms if I went to a couple other personnel in our
2 department. But quickly, no, I don't have access.
3   Q   So they're locked somewhere?
4   A   That's correct.
5   Q   Who has the key?
6   A   Factually, I don't know who has the key. I
7 would say that Chief Osenkarski would have -- would be
8 pretty -- he could easily get the key, if he didn't have it
9 himself.
10   Q   You don't know whether Mr. Osenkarski has a
11 key to the locked firearms?
12   A   I don't know.
13   Q   Do you have a key?
14   A   I do not.
15   Q   Do you have access to a key?
16   A   Only through inquiry, through either going to
17 chief Osenkarski or some other staff who, to the best of my
18 knowledge, may have access to keys.
19   Q   Who do you think has access to keys?
20   A   Well, if I was guessing, I would say
21 Mr. Christlieb or maybe Mr. Brandt. From my recollection,
22 they're both interested in weapons and I think are active
23 in the training programs that we have.
24   Q   Do they have some official capacity with
25 regard to training with respect to firearms?

Page 115

1   A   Well, I don't know exactly. My guess is that,
2 yes, they do. That's an area in my department that I'm not
3 as active in as a lot of other areas, the firearms
4 situation.
5   Q   Why not?
6   A   Well, I have many other things that I do pay
7 attention to, but the firearms in our department is a
8 situation where the chief has -- not only the current
9 chief, but previous chiefs have said, here are the weapons,
10 if people are interested, here's what you have to do to get
11 qualified, stay qualified.
12        If you're not interested, because we don't
13 have a carry policy from the court, then we have staff who
14 are not interested to become certified to carry a weapon.
15        And I am not currently certified to carry a
16 weapon.
17   Q   Do you know who is certified to carry a weapon
18 within the current probation office?
19   A   Totally and specifically, no, I don't know. I
20 could get the answer, but I don't know.
21   Q   Now, when Mr. Osenkarski is away or on
22 vacation, who is in charge of the Juvenile Probation
23 Office?
24   A   Well, it would generally fall to the ranking
25 personnel present on the premises. If it was one of the

Page 116

1 three supervisors, then one of us three would be. If we
2 weren't present, then you'd go down to the PO-II. And if
3 the PO-II wasn't present, on down to the senior PO.
4   Q   When Mr. Osenkarski goes on vacation, does he
5 appoint a particular individual to be in charge for the
6 period of time when he's away?
7   A   I recall that sometimes he has been specific
8 in terms of maybe putting a note on the bulletin board that
9 in my absence supervisor so-and-so will be in charge or
10 what have you.
11        But more likely, Joe would let the supervisors
12 know, I'm going to be off, so you three, you know, unless
13 you're all going to be off at the same time, make sure that
14 everything is taken care of and make sure the office is
15 covered, that type thing.
16   Q   Have you ever been left in charge of the
17 Juvenile Probation Office?
18   A   Yes.
19   Q   Frequently, infrequently?
20   A   Between those two, frequently.
21   Q   In the last year, are you able to give us an
22 estimate as to how many times you have been in charge?
23   A   Well, that's hard to answer, because in the
24 technical sense, anytime that Joe's not there and I am
25 there, if you look at the supervisors and you look within

Page 125

1  MR. ADAMS: Objection. Asked and answered.
2  BY MS. WALLET:
3  Q  Did you ever tell anyone, Mr. Boyer, that you
4  wanted Ms. Varner to leave employment in the Juvenile
5  Probation Office?
6  A  Never.
7  Q  Did you ever express something to the effect
8  that you believe the office would be better off if
9  Ms. Varner would leave employment?
10  A  Never.
11  Q  Has Judge Hoffer ever talked to you about
12  either -- I'll ask it in two parts.
13  Has Judge Hoffer ever asked you about Gary
14  Graham?
15  A  No.
16  Q  Has he ever asked you to express your opinion
17  about Gary Graham? He, meaning Judge Hoffer.
18  A  No.
19  Q  Has Judge Hoffer ever asked you about Joe
20  Osenkarski?
21  A  No.
22  Q  Has Judge Hoffer ever asked you about Joe
23  Osenkarski's management of the Juvenile Probation Office?
24  A  No.
25  Q  Did Judge Hoffer ever ask you about any of the

Page 126

1  allegations made by Barbara Varner against Gary Graham?
2  A  No.
3  Q  Did Judge Hoffer ever ask you anything about
4  the allegations made by Barbara Varner against Joe
5  Osenkarski?
6  A  No.
7  Q  Are you aware of any restrictions on probation
8  officers about when they may begin commitment trips?
9  A  There are some guidelines, but there's a lot
10  of flexibility in that general area. Wasn't always that
11  way. There was a period when there was some other issues
12  that played in to that so-called policy. But currently
13  today, it's -- other than saying it's pretty flexible.
14  Q  So the policy as you understand it right now,
15  today, is that probation officers begin or end their
16  commitment trips when they believe it's prudent to do so?
17  A  Pretty much so, yes.
18  Q  Was there a time when that was not the policy?
19  A  That's true. I want to say that in the
20  beginning of the separate Juvenile Probation Department --
21  so we're going late '96, early '97 -- one of the things
22  that we were, as a new department, confronted with was the
23  budget. And the constraints of the budget.
24  The commissioners had put a certain amount and
25  certain limit on our overtime budget. And I recall vividly

Page 127

1  that as a department we weren't happy with the limited
2  amount of that money, and we were a new department, and we
3  knew that we had to perform a certain number of emergency
4  duties and commitment trips, and we were concerned about
5  are we going to be able to stay within this limited amount
6  of money.
7  So for a brief period of time, '96, '97, I
8  remember talking about, well, can we cut here. Are we too
9  fat in some areas. Can we cut. Can we get a little
10  tighter on this so that we don't run into a problem down
11  the road where we have to go back and ask for more money.
12  For a limited period of time, we talked about
13  in terms of commitment trips, let's shoot to get the trips
14  in a seven-and-a-half-hour work day period. Let's
15  incorporate the normal work hours to hold down the
16  overtime.
17  So there was a brief period of time when we
18  sort of put up some guidelines. We didn't want -- or
19  didn't want to permit ourselves into a situation where we
20  were running out of money. So there was just a brief
21  period -- I want to say like a year maybe, maybe a year --
22  where we sort of said, look, if you have a commitment trip,
23  try to do that where at least seven and a half hours of
24  your day is normal pay and not overtime pay.
25  Q  And that policy was applicable to all of the

Page 128

1  individuals within juvenile probation?
2  A  Yes, it would have been. In the period of
3  time it was in effect.
4  Q  And how was that policy publicized to the
5  officers in juvenile probation?
6  A  I don't have a total recollection of other
7  than -- I don't have any documents on this -- but other
8  than through staff meetings and verbalization between
9  management personnel and employees, and that type of
10  thing. Word of mouth, so to speak.
11  Q  Do you remember whether or not there was a
12  writing to this effect?
13  A  I do not. I do not.
14  Q  Do you believe that there probably was a
15  writing to this effect?
16  A  I really -- I couldn't say. There may have
17  been, there may not have been. I don't recall.
18  Q  And your understanding of the policy was that
19  the trips should be done so as to avoid overtime?
20  A  To try to save on the overtime.
21  Q  Do you recall anytime when the policy was that
22  all commitment trips must begin at 8 a.m.?
23  A  I can't recall that much rigidness, so to
24  speak. I can't recall that being our policy.
25  Q  What is your opinion, sir, of Gary Graham's

Page 129

1 supervisory abilities?
2    A    Well, I only had seven or eight months
3 initially in one regard from August '96 until April '97.
4 That segment of time under Gary Graham, the supervisor,
5 versus Gary Graham, the supervisor, between April '97 and
6 March of '98. I think there were two different Gary
7 Grahams.
8      The first period of time, was a new department
9 with a lot to do. And I know I was very busy, and I'm sure
10 that Joe and Gary were very busy. I don't remember
11 anything of a negative nature that concerned me on behalf
12 of Gary Graham. Busy, trying to build a brand new
13 department.
14      Gary Graham, from April '97 after the
15 complaint to March of '98 when he was transferred, was a
16 different Gary Graham. And I don't remember anything of a
17 difference in the negative sense in that second period of
18 time from my recollection.
19      He was a supervisor. He gave work out, he
20 reviewed work, he dealt with all the staff. So I can't
21 really...
22    Q    Two periods of time. You said he was
23 different the second period. What was different about him?
24    A    Well, I think he was different in the sense
25 that in my perception he was in surprise and perplexed that

Page 130

1 an employee would file a complaint against him. I think
2 that had an effect on Gary. I think it put him into a
3 period where he had never been before. And I sensed that
4 there was somewhat of a change on his part. Not a change
5 that made him happier, but perplexed, confused, what have
6 you.
7      But he continued to be a supervisor and
8 continued to work and that type of thing. But there was a
9 difference between prior and post.
10    Q    Did you agree with the transfer of Mr. Graham
11 to the prison?
12    A    I don't know that I can answer that. I didn't
13 have anything to do with it. That was all at a higher
14 level than my position. That was done and announced
15 without any thought on my part or input on my part. I
16 don't know that I -- it was just done.
17    Q    Did you agree or disagree with it?
18    A    I don't know that I can answer that honestly.
19 I don't know enough about the facts that happened there.
20    Q    Would you say that Mr. Graham was angry during
21 that second period that you have described?
22    A    I would -- I would guess that some of what he
23 was feeling and experiencing likely included anger among
24 probably other emotional feelings too.
25    Q    Did he ever at any time express his anger to

Page 131

1 you?
2    A    Not that I recall.
3    Q    Did he at any time express to you his anger
4 against Barbara Varner?
5    A    No, no.
6    Q    Did Gary Graham ever tell you that he had had
7 an affair with Barbara Varner?
8    A    No.
9    Q    Do you have any evidence that would
10 substantiate the allegation that Gary Graham had a sexual
11 relationship with Barbara Varner?
12    A    I do not.
13      MS. WALLET: That's all I have.
14
15 BY MR. DELLASEGA:
16    Q    I have a question. You became aware at some
17 point in time from some source, did you not, that Graham
18 contends he had a sexual affair with Varner?
19    A    I did hear rumors, and that's exactly what
20 they were. Along with many, many other rumors.
21    Q    When you heard those rumors, did that bring to
22 your mind in any respect your remembrance of their visits
23 together to the snack bar?
24    A    Well, let me answer that question this way.
25 Sexually, I have no facts whatsoever. Rumors are rumors.

Page 132

1      When the complaint was filed in April of '97,
2 my flashbacks to the snack bar were, here were two people
3 who obviously did not dislike each other. They were
4 frequent in each others' company. They were active. They
5 were together. And I did not see any signs that these two
6 people weren't at least close friends.
7    Q    If you could take a look at this employee
8 performance review that Ms. Wallet marked as Exhibit 1.
9 I'm a little unclear about your testimony.
10      You signed the document apparently on December
11 6th, 2000, and Osenkarski signed it December 5th 2000?
12    A    That is correct.
13    Q    What I'm not clear about is the rating of
14 outstanding. Is that a rating and evaluation that you made
15 or a rating or evaluation that you concurred in made by
16 Mr. Osenkarski?
17    A    Well, let me answer that by saying, as a rule
18 sequentially the dates are usually in the opposite
19 direction. So in this particular case, I don't know
20 factually what happened, but I'm assuming that somehow Joe
21 got to look at this evaluation and date it after
22 Mr. Thielemann and I had met and discussed the particulars
23 of the evaluation.
24      The sequence is that Mr. Thielemann and I, to
25 whatever degree we spoke about Mrs. Varner's performance,

### Page 133

1 would have made the findings, the recommendations. And
2 then sequentially it goes to the chief. He reviews and
3 questions or concurs, et cetera.
4     Now, frankly it's a little out of order here.
5 I'm going to say that if Joe signed this on the 5th of
6 December, maybe we already said here it is, he quickly
7 signed it and dated it, and somehow Hank and I didn't get
8 the final draft until the next day or something.
9  Q  Okay. Let me ask you this. Prior to December
10 6th, 2000, when you signed this evaluation form, you were
11 aware that Mrs. Varner was suing both Osenkarski and
12 Graham?
13  A  Yes, sir.
14  Q  The county and the court?
15  A  Yes, sir.
16  Q  Okay. And prior to December 6th, 2000, when
17 you signed this evaluation, you personally had, in your own
18 mind, concerns about Mrs. Varner's credibility, is that
19 correct also?
20  A  That is correct.
21  Q  And prior to December 6th, 2000, did you have
22 knowledge of the fact that Mrs. Varner contended that she
23 had been negatively effected by the seniority system as a
24 consequence of sexual harassment?
25  A  Could you --

### Page 134

1  Q  You're aware that Varner was unhappy with how
2 the seniority system played out with switching her with
3 Brandt?
4  A  Yes, yes.
5  Q  Are you aware that she raises in her lawsuit a
6 connection between her loss of seniority and sexual
7 discrimination?
8  A  I heard that that was one of the specific
9 displeasures.
10  Q  So you knew she had complained about that as
11 well?
12  A  Exactly.
13  Q  Okay. And when you signed this evaluation on
14 December 6th, did you have prior knowledge that she had
15 received an earlier evaluation that was less than
16 outstanding and had complained about that evaluation?
17  A  Yes, I do recall.
18  Q  As a consequence of which that evaluation was
19 changed to outstanding?
20  A  I don't specifically remember the change. I
21 remember there was some concern on her part as to her
22 accepting.
23     Because the process is that the employee
24 looks, and if they object or have questions or aren't
25 happy, they can sort of, you know, talk about that. And I

### Page 135

1 do recall that there was an evaluation where she wasn't, in
2 her opinion, satisfied. and I recall that there were some
3 adjustments made.
4     Or as I recall off the top of my head, we
5 allowed her to put all her thoughts and feelings and
6 attach. And we said, hey, that's fine. We'll do it that
7 way.
8  Q  Okay. You've talked about the initial
9 complaint in April '97.
10     Was it your understanding that the initial
11 complaint, in April '97, was followed by later complaints
12 of additional sexual harassment and discrimination?
13  A  That's my understanding.
14  Q  Let me ask you this. With all this knowledge
15 in your mind prior to December 6th, 2000, did you have any
16 concern when you were presented with this form that if you
17 gave her less than an outstanding rating she might complain
18 about you or sue you?
19  A  I had no hesitation or concern about that.
20     MR. DELLASEGA: That's all.
21     MS. WILLIAMS: I have nothing further.
22
23 BY MR. MacMAIN:
24  Q  You were asked comments -- or you were asked
25 questions about Mr. Graham and commented that he had a loud

### Page 136

1 voice, correct?
2  A  Yes.
3  Q  It was loud just generally much like
4 Mr. Adams may have a soft voice?
5  A  That's correct.
6  Q  So the loud voice was just part and parcel of
7 Gary Graham. It wasn't directed at anybody or caused by
8 any specific event?
9  A  No.
10  Q  At any point in time, did you ever see
11 Mr. Graham engage in what you would consider sexual
12 harassment of any employee including Ms. Varner?
13  A  I did not.
14     MR. MacMAIN: Those are all the questions I
15 have. Thank you.
16     MR. ADAMS: I have a few others.
17
18 BY MR. ADAMS:
19  Q  Sorry, Mr. Boyer.
20     At any time did you observe any actions by
21 Mr. Osenkarski that you considered sexual harassment
22 against Ms. Varner?
23  A  I can not.
24  Q  Against anyone, for that matter, in the
25 office?