# Exhibit J



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA E. VARNER,                      :
     PLAINTIFF              : NO. 1:CV 01-0725
                                        : CIVIL ACTION - LAW
     V                      :
                                        : (JUDGE YVETTE KANE)
COMMONWEALTH OF PENNSYLVANIA,           :
NINTH JUDICIAL DISTRICT,                :
CUMBERLAND COUNTY; CUMBERLAND           :
COUNTY; S. GARETH GRAHAM,               :
INDIVIDUALLY, AND JOSEPH                :
OSENKARSKI, INDIVIDUALLY,               :
     DEFENDANTS             :


DEPOSITION OF:   NICOLE GALBRAITH

TAKEN BY:       DEFENDANT CUMBERLAND COUNTY

BEFORE:         KAREN C. ALBRIGHT, RPR
               NOTARY PUBLIC

DATE:           NOVEMBER 3, 2003, 10:05 A.M.

PLACE:          ADMINISTRATIVE OFFICES OF
               PENNSYLVANIA COURTS
               5001 LOUISE DRIVE
               MECHANICSBURG, PENNSYLVANIA


APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        FOR - PLAINTIFF

    SUPREME COURT OF PENNSYLVANIA
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        FOR - DEFENDANT COMM. OF PA., NINTH JD

(CONTINUED ON PAGE TWO)



Page 4

```
APPEARANCES: (CONTINUED)

THOMAS, THOMAS & HAFER, LLP
  BY:  PAUL J. DELLASEGA, ESQUIRE
       FOR - DEFENDANT CUMBERLAND COUNTY

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP
  BY:  DAVID J. MACMAIN, ESQUIRE
       FOR - DEFENDANT GRAHAM

SWEENEY & SHEEHAN, P.C.
  BY:  PAUL LANCASTER ADAMS, ESQUIRE
       FOR - DEFENDANT OSENKARSKI

ALSO PRESENT:

  S. GARETH GRAHAM
  JOSEPH OSENKARSKI
```

1          STIPULATION
2       It is hereby stipulated by and between counsel
3  for the respective parties that sealing, certification and
4  filing are hereby waived; and that all objections except
5  as to the form of the question are reserved to the time of
6  trial.
7
8       NICOLE GALBRAITH, called as a witness, being
9  duly sworn, testified as follows:
10             EXAMINATION
11 BY MR. DELLASEGA:
12    Q  Miss Galbraith, my name is Paul Dellasega.  I
13 represent the County in this matter.
14       Let me ask you, did you do anything to prepare
15 for today's deposition?
16    A  No.
17    Q  Have you talked to Miss Wallet about your
18 testimony?
19    A  Miss?
20    Q  Wallet.
21    A  No, I haven't.
22    Q  With Miss Varner?
23    A  No.
24    Q  Have you ever been deposed before?
25    A  No.

Page 3

```
                    WITNESSES
1
2   NAME               EXAMINATION
3  NICHOLE GALBRAITH
4    BY:  MR. DELLASEGA        4, 73
5    BY:  MS. WILLIAMS         40, 77
6    BY:  MR. MACMAIN          41, 78
7    BY:  MR. ADAMS            47, 81
8    BY:  MS. WALLET.          48, 81

                    EXHIBITS
12 GALBRAITH EXHIBIT NO.       PRODUCED AND MARKED
13 1.  INTERVIEW - MARCH 23, 2000        44
```

Page 5

1    Q  Have you testified before?
2    A  In court hearings, I have.
3    Q  If I ask you a question and you don't
4  understand it, favor me by telling me I don't understand
5  the question.
6    A  Yeah.
7    Q  If you need me to repeat it we'll repeat it as
8  often as possible.
9    A  Okay.
10   Q  If you need a break, take a break.  Okay?
11   A  Okay.
12   Q  Your full name?
13   A  Nicole H. Galbraith.
14   Q  And you're employed in?
15   A  Adult Probation.
16   Q  When did you join the Probation Department?
17   A  November of '93.
18   Q  When the department split into Adult and
19 Juvenile, did you immediately go into Adult?
20   A  Yes.
21   Q  So you've never actually worked in the formal
22 department of Juvenile Probation --
23   A  No.
24   Q  -- is that right?  Were you given your choice?
25   A  Yes.

### Page 10

1  A  No.
2  Q  When did you first hear rumors that there was a
3  physical or romantic relationship?
4  A  I don't recall exactly hearing that. Maybe
5  more or less after the fact, after all of this was
6  happening, that that came out. I don't know that I had
7  heard that specifically.
8  Q  Did you ever hear it before the split?
9  A  I can't pinpoint. It's so long ago. I
10 don't -- I don't remember.
11 Q  When you heard it, whatever point in time it
12 was, do you recall anything about the context in which you
13 heard those rumors?
14 A  No.
15 Q  When you heard those rumors do you recall being
16 surprised?
17 A  I wasn't surprised about the rumors, no.
18 Q  Why weren't you?
19 A  Well, because any time, you know, within the
20 courthouse people do work closely together, those things
21 tend to be said regardless if they're true or not, you
22 tend to hear those types of things, so it wasn't like a
23 big shock or anything.
24 Q  Did you have occasion to observe Graham and
25 Varner interact before the split?

### Page 11

1  A  I can't think of anything specific, no.
2  Q  Where was your office in comparison to Mrs.
3  Varner's, do you recall?
4  A  I can't even remember where her office was to
5  begin with.
6  Q  Where was it in comparison with Mr. Graham's,
7  can you recall that?
8  A  Yeah, I was -- when you came into our office, I
9  was in the very first office here, like the open area, and
10 my office was there, and then back the hallway around the
11 corner, Gary's office was back there.
12 Q  So about how far away would you have been in
13 terms of feet?
14 A  25 feet.
15    MS. WALLET: From what, from Graham's office?
16    MR. DELLASEGA: Her office from Graham's.
17    MS. WALLET: Thank you.
18 BY MR. DELLASEGA:
19 Q  In that period of time prior to the split, did
20 you observe Graham supervising people other than yourself?
21 A  Yes.
22 Q  Was his supervisory style different from, say,
23 Mr. Roller's who was supervising you?
24 A  Yes.
25 Q  How would you describe Mr. Graham's supervisory

### Page 12

1  style from what you observed of it?
2  A  I don't know how to describe it.
3  Q  How would you describe Roller's?
4  A  I mean, he was more vocal.
5  Q  Let me ask this: Did he raise his voice often?
6  A  I wouldn't say often, but I've heard occasions
7  where he did.
8  Q  By raising his voice, loud or yelling, how
9  would you --
10 A  Some yelling.
11 Q  When he would yell, would he use curse words?
12 A  Occasionally.
13 Q  By the way way, was that unusual in your office
14 to hear curse words?
15 A  Well, I'd say it happens, but not on a regular
16 basis.
17 Q  You heard them from people other than Mr.
18 Graham?
19 A  Not yelled through the office.
20 Q  In conversation?
21 A  Yes.
22 Q  Have you ever heard a female probation office
23 using bad language?
24 A  I can't pinpoint any specific event.
25 Q  Have you heard other male officers use bad

### Page 13

1  language? Let me limit it to before the split.
2  A  I can't pinpoint anything specific. I'm sure,
3  but I don't....
4  Q  When you first got there were you straight out
5  of college?
6  A  I had worked one year in Dauphin County
7  Juvenile Probation.
8  Q  When you got there, did the Probation
9  Department -- was it what you expected or was the
10 atmosphere there coarser and ruder simply because of the
11 nature of the business you're in?
12 A  Well, it was much different from my experience
13 in Dauphin County, so it was kind of -- yeah, different.
14 Q  Tell me how that experience was different.
15 A  Well, they were very strict over there and just
16 more -- I don't know how to -- like supervisors were more
17 on top of what was going on, whereas Cumberland County it
18 was more laid back, you kind, just do your job, and for
19 the most part nobody's really bothering you.
20 Q  Would you characterize Dauphin County's
21 Probation Office from your year there as more professional
22 and formal than Cumberland County's?
23 A  More formal, yes.
24 Q  Before the split, did you ever observe Mr.
25 Osenkarski treat any female with disrespect?

Page 14

1  A  Did I observe it?
2  Q  Yes.
3  A  No.
4  Q  Did you ever observe Graham treat any female
5  with disrespect?
6  A  No.
7  Q  You say Graham could yell and use curse words.
8  Did he appear to direct his yelling and curse words to one
9  gender?
10  A  No, I don't believe so.
11  Q  Was he democratic in directing it to everybody,
12  or did he treat men better than women, or vice versa?
13  A  When he was angry, I would say that it could be
14  anyone. I don't think there was any, you know, specific
15  gender that got more of it, no.
16  Q  Prior to the split did you observe Mr. Graham
17  to show favoritism to any probation officers?
18  A  I didn't see it, no.
19  Q  Let me hit you with the converse. Were there
20  people who he treated worse than other officers? Were
21  there officers who were treated more poorly and seemed to
22  be out of favor with Mr. Graham, from your own personal
23  observation?
24  A  I knew there were people who were out of favor,
25  but I didn't see direct behavior against them.

Page 15

1  Q  From what you knew, was Mrs. Varner in favor or
2  out of favor, or do you have an opinion? At the time. At
3  the time.
4  A  Well, at the beginning she was in favor.
5  Q  She was in favor?
6  A  (Nods affirmatively.)
7  Q  Why do you say that? What evidence or
8  information leads you to express that opinion?
9  A  Well, in reference to the DUI school, I know
10  that Gary spent time helping her get started with that,
11  getting certified to teach and made inroads with the other
12  instructors to get an opening for her to teach. And I
13  know that they did a lot of trips together to different
14  placements.
15  Q  Anything else?
16  A  That's all I can think of.
17  Q  Pardon me?
18  A  That's all I can think of.
19  Q  Did you ever observe conduct between Graham and
20  Varner that you would characterize as flirtatious?
21  A  Not that I observed, no.
22  Q  Did you ever observe Mrs. Varner ever appear to
23  be harassed or bothered by Graham's behavior towards her?
24  A  I never witnessed it, no.
25  Q  You talked about DUI. At that point in time,

Page 16

1  what role did you have in DUI school?
2  A  I didn't have any role in it. I was a DUI
3  probation officer, I handled DUI cases, but I really
4  didn't have anything to do with the running of the actual
5  DUI school.
6  Q  How is a DUI probation officer different from
7  another probation officer?
8  A  Not really any difference except we get
9  assigned DUI cases.
10  Q  Was that all you did, DUI cases at that time?
11  A  Um-hum.
12  Q  A hundred percent of your time?
13  A  Except for those few Juvenile cases I had, yes.
14  Well, they were DUIs as well, but they were Juvenile DUI.
15  Q  Being a DUI probation officer, are there any
16  fringe benefits to that job?
17  A  No, not really.
18  Q  Any extra financial benefit to it?
19  A  Not to being a probation officer, no.
20  Q  Is there any teaching that goes on regarding
21  DUI improvised financial benefit?
22  A  Any probation officer is eligible to teach the
23  DUI school as long as you get certified, you don't have to
24  be a DUI probation officer.
25  Q  What is DUI school?

Page 17

1  A  Every DUI defendant is required to go through a
2  set of DUI classes. We run those through our office and
3  it's set up that the probation officers teach the school,
4  so they get paid for then teaching those classes.
5  Q  Do they get paid over and above their regular
6  salary?
7  A  Yes.
8  Q  And do you recall how much they got paid over
9  and above? Was it an hourly rate, was there a lump sum
10  you got for being a DUI instructor?
11  A  A lump sum, depending on the number of students
12  go through each class.
13  Q  When did you become a DUI instructor?
14  A  I don't teach.
15  Q  You never have?
16  A  No.
17  Q  Even though you're a DUI probation officer, you
18  don't teach?
19  A  Right.
20  Q  That's true even now?
21  A  Yes.
22  Q  Did you have anything to do with who became a
23  DUI instructor?
24  A  Well, at that point?
25  Q  Yes.

Page 34

1  officers were encouraged to try to leave so they'd
2  complete a commitment trip before going on overtime
3  status?
4     A   No, I don't recall that.
5     Q   Were you ever interviewed by anybody in
6  authority regarding the allegations of this case?
7     A   I met with Dan Hartnett. That was the only
8  time.
9     Q   You met with Hartnett while you were in Adult
10 Probation?
11    A   Yes.
12    Q   After the split?
13    A   Yes.
14    Q   Do you recall what Mr. Hartnett was meeting
15 with you about? What was he asking you?
16    A   He was asking me about something that Gary had
17 said to me.
18    Q   Do you recall what that was?
19    A   Well, I don't remember the exact wording, but
20 it was basically like everybody who's telling lies about
21 me now is going to have to pay for it later.
22    Q   Is that something that you heard from Mr.
23 Graham?
24    A   Yes.
25    Q   Do you remember the context of how that came

Page 35

1  up?
2     A   No.
3     Q   Do you remember whether it was after it became
4  known that Mrs. Varner had filed some type of charge
5  against Graham?
6     A   Yeah, I believe it was after that. It was when
7  they were interviewing people, I believe.
8     Q   Were you ever interviewed by anybody other than
9  Hartnett?
10    A   No.
11    Q   Not by David DeLuce?
12    A   No.
13    Q   By Judge Hoffer?
14    A   No.
15    Q   Judge Sheeley?
16    A   No.
17    Q   Who do you view as the person with the power to
18 discipline or discharge you in the court house?
19    A   Well, ultimately?
20    Q   Ultimately.
21    A   Judge Hoffer. I mean, I'm sure John Roller as
22 well, but the ultimate authority is Judge Hoffer.
23    Q   Were you aware that at some point in time an
24 attorney David DeLuce was doing interviews of probation
25 officers regarding allegations brought by Mrs. Varner?

Page 36

1     A   Yes.
2     Q   Was there a discussion about those interviews
3  within Probation?
4     A   Yeah.
5     Q   What do you recall of those discussions?
6     A   Just who was being interviewed, nothing
7  specific about the interviews.
8     Q   Did any other probation officer ever tell you
9  that during one of those interviews with DeLuce or with
10 Hartnett they disclosed information that was negative
11 about Mr. Graham or Mr. Osenkarski?
12    A   Well, my husband was interviewed, and he told
13 me what he said. And there was some negative.
14    Q   Who is your husband?
15    A   Mark Galbraith.
16    Q   And is he in Adult?
17    A   He no longer works with the County.
18    Q   When did he leave?
19    A   December '98.
20    Q   When he left was he in Adult or Juvenile?
21    A   Adult.
22    Q   Did his departure have anything to do with Mr.
23 Graham or Osenkarski?
24    A   At that point, no.
25    Q   Had he ever related to you problems that he had

Page 37

1  with Graham or Osenkarski?
2     A   There were problems at the time of the split,
3  Mr. Graham.
4     Q   Can you describe what your recollection is of
5  those problems as communicated to you by your husband?
6     A   Well, at that point, you know, everybody was
7  told to make their choice, but the lower you got down on
8  the totem pole, there may not be a choice, depending on
9  how things fell. And my husband was told more or less
10 either you go with Juvenile and things will be, you know,
11 good, or you can try to go Adult, and if things don't work
12 out and you end up over here, then things -- you know. I
13 don't know what the exact wording was, but that's what....
14    Q   What's the import of it if you go with
15 Juvenlile things will be good, if you go with Adult things
16 would not be good?
17    A   Well, no, not that things would not be good.
18 If you went with Adult -- if you try to go with Adult and
19 you don't, and you're not able to choose and you end up
20 with Juvenile, we'll make it miserable for you, basically.
21    Q   That's what your husband indicated to you?
22    A   Yes.
23    Q   Did he indicate to you any personal
24 difficulties he had dealing with Osenkarski or Graham?
25    A   That was Gary that said that to him, I believe.

Page 38

1 Other than that, no.
2  Q  Had he been supervised by Osenkarski or Graham
3 prior to that time?
4  A  Yes, because he did totally Juvenile cases
5 before that.
6  Q  Did he communicate to you any problems he had
7 with Graham or Osenkarski supervising him?
8  A  No.
9  Q  Why did he choose Adult, did he tell you?
10  A  Well, I think that was the final straw that
11 made him choose Adult.
12  Q  What were the other straws?  That's what I'm
13 getting at.
14  A  Well, he was leaning that way just based on
15 what he wanted to do, and the positioning and seniority
16 factors, and you know, he was really struggling with the
17 decision, and you know, after that, he was like, well,
18 there's no way I can do that.
19  Q  Your husband was still around when the word
20 came out that Mrs. Varner had brought allegations against
21 Mr. Graham, wasn't he?
22  A  Yes.
23  Q  Between you and your husband, was there ever a
24 discussion as to whether there was an affair between the
25 two?

Page 39

1  A  Not an affair, no.
2  Q  A relationship beyond a business relationship?
3  A  Well, I don't think that he knew of anything
4 specifically that had actually happened, but I think he
5 knew that that's what Gary wanted.
6  Q  I guess my question is directed this way:  Did
7 your husband ever come to you and tell you about stories
8 the men would discuss that you might have been excluded
9 from since you were a female probation officer between
10 what's going on between Graham and Varner?
11  A  He pretty much kept that to himself, but I know
12 he heard a lot of things.
13  Q  Heard a lot of things as to what was going on
14 between the two of them?
15  A  Yes.  And about women in general that were
16 said, because he shared an office with Joe at the time.
17  Q  When you say about women in general, negative
18 things about women in general?
19  A  No, if somebody was pretty, about how pretty
20 she was.  I mean, just things that wouldn't be said in
21 front of other women probably, but things that were said.
22  Q  Guys talking about whether a woman was good
23 looking or not?
24  A  Yes.
25    MR. DELLASEGA: That's all I have.

Page 40

1         EXAMINATION
2 BY MS. WILLIAMS:
3  Q  Mrs. Galbraith, I'm Taylor Williams.  I
4 represent the Court.
5     You indicated that you had not been interviewed
6 by Judge Sheeley or Judge Hoffer.  Let's take them one at
7 a time.  Did you ever have occasion to speak with Judge
8 Sheeley about Miss Varner at any time?
9  A  Not that I recall, no.
10  Q  Did you ever have occasion to talk with Judge
11 Sheeley about Mr. Graham at any time?
12  A  No.
13  Q  Did you ever have occasion to speak with Judge
14 Hoffer about Ms. Varner at any time?
15  A  Not that I recall, no.
16  Q  Did you ever have occasion to speak with Judge
17 Hoffer about Gary Graham?
18  A  No.
19  Q  You indicated in your testimony that you said
20 the Judge said anyone certified will teach.  Which Judge
21 were you talking about when you made --
22  A  That was Judge Hoffer.  That changed when
23 Sheeley left and Judge Hoffer took over.
24  Q  You indicated that there were no openings for
25 teaching in the DUI school.  Was there a waiting list for

Page 41

1 people who --
2  A  Yes.
3  Q  Was that a formal waiting list?
4  A  Not that there was like a written down list,
5 but everybody knew what the order was.  I mean, there was
6 only one person, so.
7  Q  There was only one person who --
8  A  Only one person who had previously been
9 certified that was waiting for a position prior to that.
10  Q  Did Miss Varner jump ahead of a person who was
11 waiting in order to teach?
12  A  I don't recall when she started teaching and
13 when it was opened up, so I'm not sure.  I wasn't involved
14 in that aspect of it at that time.
15    MS. WILLIAMS: Thank you very much.  That's all
16 I have.
17         EXAMINATION
18 BY MR. MACMAIN:
19  Q  Miss Galbraith, my name's David MacMain.  I
20 represent Mr. Graham.  We met just before the deposition.
21 I have a few questions for you.
22     You were asked about going on commitment trips.
23 Did you occasionally go on commitment trips?
24  A  Yes.
25  Q  Commitment trips with Mr. Graham?

### Page 42

1  A  Yes.
2  Q  Was there any time during any of those
3  commitment trips where he said or did anything
4  inappropriate towards you?
5  A  No.
6  Q  At any point when you were in his company did
7  Mr. Graham ever say or do anything inappropriate towards
8  you?
9  A  No.
10  Q  At any time during the time you worked with Mr.
11  Graham did you ever observe him say or do anything
12  inappropriate towards other females?
13  A  I didn't observe it, no.
14  Q  And you said you began working in the
15  Department in '93?
16  A  Yes.
17  Q  You were asked about rumors about a physical
18  relationship between Mr. Graham and Miss Varner, and your
19  comment was you were not surprised about the rumors?  Is
20  that what you had said?
21  A  Yes.
22  Q  Why weren't you surprised about the rumors?
23  A  Because like I said before, any time it seems
24  that a male and a female have a close working
25  relationship, those types of rumors tend to circulate.

### Page 43

1  Q  Has it been your experience that rumors that
2  circulate around the courthouse aren't always true?
3  A  Yes.
4  Q  And people may say things that in truth when
5  it's looked into in fact aren't accurate?
6  A  Yes.
7  Q  And your experience, your personal experience
8  is that you never observed Mr. Graham speak or act
9  inappropriately towards either you or other women,
10  correct?
11  A  I never directly observed it, no.
12  Q  Do you recall being interviewed by the EEOC
13  where you relayed rumors?
14  A  Yes.  And at that point I told her I didn't
15  observe anything directly, and at that point she spoke
16  with my husband instead of me, yes.
17  Q  So in your experience the rumors about Mr.
18  Graham harassing females were untrue, in your experience?
19  A  I'm not saying they were untrue, I'm saying I
20  didn't personally witness them.
21  Q  You were asked about Cumberland County's
22  Probation Department as compared to Dauphin County, and I
23  think the terms that were asked about were formal and
24  professional, I think you did comment that Dauphin County
25  was more formal than Cumberland County, correct?

### Page 44

1  A  Yes.
2  Q  Would you say that one office was more
3  professional, or were they just handled different styles?
4  A  It was just a different management style,
5  whereas the people in Cumberland County had much more
6  experience than the people in Dauphin County, and the
7  supervisors had much more control over them.
8  Q  Would it be fair to say that the supervisors in
9  Cumberland County were as professional, just in a
10  different style than Dauphin County?
11  A  Yes.
12  Q  Would you say that Mr. Graham as supervisor
13  acted in a professional manner?
14  A  With me he did, yes.
15  Q  Do you recall being interviewed by someone from
16  the EEOC?
17  A  Yes.
18  (Interveiw, March 23, 2000, one page, produced
19  and marked Galbraith Deposition Exhibit No. 1.)
20  BY MR. MACMAIN:
21  Q  What we're putting in front of you is a
22  document which appears to be notes of an interview with
23  you from someone from the EEOC on March 23rd, 2000.  Have
24  you ever seen this document before?
25  A  No.

### Page 45

1  Q  Do you recall where this interview took place?
2  A  It was over the phone.
3  Q  And so this document or a document like this
4  was never sent to you to look at to make sure that it was
5  accurate?
6  A  No.
7  Q  And this is the first time you've seen this
8  document ever is today?
9  A  Yes.
10  Q  I wanted to ask you about a couple of things in
11  there.  The first paragraph.  Ms. Galbraith says Gary
12  Graham knows of her association with Barb Varner -- they
13  take aerobics together -- but is not hostile towards her,
14  nor is the wife.  Is that something you told the
15  investigator, that Mr. Graham is not hostile towards you?
16  A  I don't recall that he was directly hostile
17  towards me.
18  Q  And his wife was never hostile towards you?
19  A  No.
20  Q  You say you took aerobics classes with Miss
21  Varner?
22  A  Yes.
23  Q  What time period was that?
24  A  Say maybe '99, 2000, 2001.
25  Q  Did she ever speak to you about this lawsuit

Page 46

1 during -- either before or after or during classes?
2  A  She might have mentioned it occasionally, yes.
3  Q  Prior to that time you did not take any
4 classes, aerobic classes with Miss Varner?
5  A  Every year, it was around that time. I don't
6 remember exactly when. But I think I joined the Y in
7 April of '98, so it wouldn't have been any before that.
8  Q  Next paragraph, it says: She never saw Gary
9 Graham sexually harass Barb Varner. And that's what you
10 testified to today as well, you never observed any type of
11 harassment by Mr. Graham towards Ms. Varner, correct?
12  A  Correct.
13  Q  In fact, you never saw any type of harassment
14 by Mr. Graham towards anyone in the office?
15  A  No.
16  Q  You said you were interviewed by Mr. Hartnett,
17 it was just about one specific thing, and that was a
18 comment allegedly made by Mr. Graham?
19  A  Yes.
20  Q  You testified that your husband related to you
21 that there were times when the men in the office behind
22 closed doors may talk about women being attractive?
23  A  Yes.
24  Q  Did women in the office do that about men
25 behind closed doors, that someone was handsome, or....

Page 47

1  A  Yes. But I don't think they made reference to
2 body parts or physical other than basically if somebody,
3 like you said, was handsome.
4      MR. MACMAIN: I have no further questions.
5 Thank you.
6          EXAMINATION
7 BY MR. ADAMS:
8  Q  Mrs. Galbraith, my name is Paul Lancaster
9 Adams. I represent Mr. Osenkarski.
10     Looking at the exhibit that was just shown to
11 you, just to finish it up. Do you want to look at that
12 for a moment? At the bottom, do you agree with the last
13 two lines which says Q, as in question when somebody asked
14 you about jokes, and the answer, no, she said she never
15 heard Joe O. -- I'm assuming Joe Osenkarski -- make sexual
16 jokes. Do you agree with that statement?
17  A  Yes.
18  Q  I know you testified that you never had any
19 supervisory contact with Mr. Osenkarski, but I just want
20 to ask you a few questions about your observations, if you
21 don't mind.
22     Was Mr. Osenkarski always respectful around and
23 to you?
24  A  Yes.
25  Q  Did you see him ever be disrespectful to the

Page 48

1 other subordinates in the office?
2  A  No.
3  Q  Did he appear to be available for subordinates
4 when they needed to discuss items or concerns, did you
5 observe that?
6  A  Well, he wasn't always in the office, no.
7  Q  But when he was in the office was he approached
8 by his subordinates?
9  A  Yes.
10  Q  I have one more question. You didn't actually
11 finish your comment earlier when you were being asked this
12 question, but you testified earlier, you said you couldn't
13 recall any specific moments where women in the office
14 cursed, then you said but I'm sure, and then you didn't
15 finish. What were you about to say?
16  A  I don't know where the context, where I was
17 going with that.
18     MR. ADAMS: No further questions.
19          EXAMINATION
20 BY MS. WALLET:
21  Q  Mrs. Galbraith, my name is Debra Wallet. I'm
22 here representing Barbara Varner.
23     Do you recall this interview with the
24 individual from the EEOC?
25  A  I remember talking on the phone with her. I

Page 49

1 didn't remember anything specific about what was said
2 until I looked at this today.
3  Q  Do you remember whether it was a man or a woman
4 who interviewed you?
5  A  It was a woman.
6  Q  What did she tell you about why she wanted to
7 speak to you concerning this matter?
8  A  Just that she was investigating the case for
9 the -- was it the OC?
10  Q  Do you think that it probably was some time in
11 March of 2000, as indicated on this document?
12  A  I guess. I really don't remember.
13  Q  That would have been before the split, correct?
14  A  No, that was after the split.
15  Q  Do you recall that she spoke to you after the
16 split?
17  A  Yes.
18  Q  You did not have any previous time in
19 Cumberland County, correct?
20  A  No.
21  Q  So you graduated from college, you went to work
22 for Dauphin County, and you worked there about a year?
23  A  Yes, a little over a year.
24  Q  And then you came to work in the combined
25 probation office in Cumberland County?

### Page 50

1  A   Yes.
2  Q   Would you tell us, please, when you met your
3  husband?
4  A   When -- well, he had been an intern there
5  prior, so probably met him when he stopped in to visit the
6  office while he was still in school, and then not really
7  until he started working there.
8  Q   So you were already a probation officer and he
9  was an intern?
10 A   I was not a probation officer while he was an
11 intern. He had interned prior to when I started. But I
12 believe that he would stop by occasionally when he was in
13 town just to say hi, or whatever.
14 Q   So your husband interned in 1993, you believe?
15 A   Probably that summer, yes.
16 Q   Did he tell you anything about his internship?
17 A   Yeah, a few things.
18 Q   What did he tell you?
19 A   That he had to chop wood. I don't know any
20 specifics. I mean, I remember he said he spent some time
21 chopping wood.
22 Q   Do you know whether he worked directly for Mr.
23 Osenkarski when he was an intern?
24 A   No, I don't know.
25 Q   Did he complain to you about being given

### Page 51

1  assignments that he did not think were probation officer
2  work?
3  A   No.
4  Q   What did he tell you about chopping wood?
5  A   I don't think he minded it.
6  Q   Do you know where he chopped wood?
7  A   No, I don't know that.
8  Q   Did he chop it for Mr. Osenkarski?
9      MR. ADAMS: Objection. Asked and answered.
10     THE WITNESS: I don't know what it was for.
11 BY MS. WALLET:
12 Q   Did your husband think that he had a successful
13 internship some time in or about 1993?
14 A   Yes.
15     MR. MACMAIN: Object.
16 BY MS. WALLET:
17 Q   Did he make any complaints to you about his
18 internship?
19 A   No.
20 Q   Now, you were already there and employed when
21 your husband become a full time probation officer?
22 A   Yes.
23 Q   Do you know how he came to be hired?
24 A   Well, since he had previously done the
25 internship, when an opening became available they usually

### Page 52

1  would hire the interns back.
2  Q   Do you know who made that decision?
3  A   Well, ultimately it would have been Judge
4  Sheeley, but I'm sure that the supervisors picked him and
5  then it went to Judge Sheeley.
6  Q   Do you know which of the supervisors might have
7  picked your husband?
8  A   Well, I'm sure Joe did. I don't know for a
9  fact. I wasn't involved in it, but....
10 Q   Have you taken a minute to look at Galbraith
11 No. 1?
12 A   Yes.
13 Q   Is there anything on here that you believe you
14 did not say to the woman who interviewed you?
15     MR. ADAMS: About what?
16 BY MS. WALLET:
17 Q   Is there any information on this sheet,
18 Galbraith 1, that you think you might not have said to the
19 interviewer?
20     MR. ADAMS: Is that based on questions by the
21 interviewer? I don't understand the question.
22 BY MS. WALLET:
23 Q   Do you understand my question, Miss Galbraith?
24 A   No, I believe I did say everything that's
25 listed here.

### Page 53

1  Q   Now, in the paragraph that starts Ms. Galbraith
2  said, it goes on to state: The wife once confronted her.
3  Do you know who you told this interviewer had confronted
4  you?
5  A   Who -- can you repeat that, please?
6  Q   Do you know who the wife is?
7  A   Yes, Barb Graham.
8  Q   What do you remember about Barbara Graham, I
9  believe it says confronting you?
10 A   It was one day after Court she pulled me into
11 one of the jury deliberation rooms and asked me pointblank
12 why was I siding with Barb.
13 Q   What did you say?
14 A   I said I wasn't siding with anyone. And she
15 said, well, you and Gary used to be friends, what
16 happened. And I said, well, the reason I'm not friends
17 per se with Gary any more is the way he treated Mark, not
18 anything to do with this case.
19 Q   What did she say?
20 A   Okay. I think she asked me beyond that if --
21 about an affair, and I told her that I didn't know
22 anything.
23 Q   Did you have any evidence that there was an
24 affair between Barbara Varner and Gary Graham?
25 A   No.

## Page 54

1  Q  Do you think that there was an affair between
2  the two of them?
3  A  Personally, I don't believe there was, no.
4  Q  Why not?
5  A  It's just my gutt instinct. I don't have
6  anything to base it on besides just what I know from the
7  situation. It's just what I feel.
8  Q  Did you tell Barbara Graham what went on
9  between your husband and her husband Gary Graham?
10  A  I don't remember specifically what I told her
11  about that.
12  Q  How did this conversation with Barbara Graham
13  end? Was it friendly?
14  A  Yes.
15  Q  And did you have any other conversations with
16  her about the subject of Barbara Varner again?
17  A  No.
18  Q  Did your husband feel threatened by Gary
19  Graham?
20  A  Physically?
21  Q  In any way.
22  A  I believe he -- yes, felt threatened.
23  Q  Why?
24  A  Because he knew that if he got stuck in
25  Juvenile, that his job was going to be miserable, that

## Page 55

1  they were going to make it miserable.
2  Q  Why do you think that they would make him
3  miserable?
4  A  Because if -- there were certain people that
5  they did not want to get in their department that were
6  lower than Mark on the seniority list. So by Mark picking
7  Adult, they would definitely get those people. So they
8  were using that as leverage to get him to do what they
9  wanted.
10  Q  When you say they, who are you referring to?
11  A  Well, I mean -- I should say Gary, because he's
12  the one that said it, but in general, I know that was the
13  feeling.
14  Q  Did your husband tell you about a time when
15  Gary Graham came to his office and talked to your husband
16  about loyalty?
17  A  I don't -- not that I know of.
18  Q  Did your husband at one time share an office
19  with Joe Osenkarski?
20  A  Yes.
21  Q  What did he tell you about Joe Osenkarski's
22  demeanor and behavior in the office?
23  A  Well, he didn't tell me very much, but he did
24  tell me, you know, that they used to -- the jokes and the
25  talk about the women and things like that.

## Page 56

1  Q  And was that conversation just with Mr.
2  Osenkarski and your husband, or did someone else
3  participate in that?
4  A  No, this was usually when there were other
5  people in the office.
6  Q  Did you know anything about the complaint that
7  Carrie Houser had filed against Mr. Osenkarski?
8  A  Not till after the fact. I don't even know if
9  I was there when that happened. I'm not sure what date
10  that was.
11  Q  Did you hear the term cunt club?
12  A  Yes, I've heard that.
13  Q  Did you hear it because someone relayed that to
14  you or had you heard the term around the office?
15  A  No, somebody relating the story of what had
16  happened.
17  Q  Do you remember who that was?
18  A  No.
19  Q  Did you ever talk to Carrie Houser about her
20  complaint?
21  A  No.
22  Q  Now I'm back to Galbraith 1. It says you were
23  upset by Gary Graham's treatment of your husband. Why
24  were --
25  A  Yes.

## Page 57

1  Q  Why were you upset about that?
2  A  Well, I just didn't think it was fair for him
3  to put him on the spot like that. To use that to make him
4  do basically what he wanted him to do rather than what was
5  best for him.
6  Q  Did you ever hear any talk about Gary Graham
7  punishing people if they were disloyal?
8  A  Yes.
9  Q  What do you recall about that?
10  A  Well, there just used to be comments here and
11  there, so and so is being punished for something around
12  the office. I didn't hear anything directly.
13  Q  This statement says she -- this must be a tyep,
14  have -- she have seen GG walk around in a hostile manner.
15  Did you tell the interviewer that you saw Gary Graham walk
16  around in a hostile manner?
17  A  I believe so, yes.
18  Q  Do you recall anything now that you would
19  describe as a hostile manner?
20  A  Just that he was angry and yelling. I mean, it
21  wasn't like directed at any specific person, but, you
22  know, that he was just in one of those moods.
23  Q  Did that happen occasionally, frequently, not
24  very often?
25  A  I would say occasionally.

### Page 70

1  Q  Did you have any information about who had
2  received those messages?
3  A  I can't remember where the messages came from.
4  Q  Did your husband have an opinion about Gary
5  Graham and his ability to supervise individuals?
6  A  Not that we discussed.
7  Q  When you were taking aerobics with Barbara
8  Varner, where was that?
9  A  At the YMCA in Carlisle.
10 Q  Did you ever see Gary Graham in the parking lot
11 after aerobics?
12 A  No.
13 Q  Did you ever see Gary Graham at any time after
14 aerobics?
15 A  No.
16 Q  Were you ever given any directions that when
17 you went on commitment trips that you needed to leave at a
18 particular time?
19 A  No, but then I didn't really do any
20 specifically. I was usually like just along as the
21 ride-along, so I didn't make the arrangements.
22 Q  Before the split, how many times would you say
23 that you went on commitment trips?
24 A  Maybe three.
25 Q  Who did you go with?

### Page 71

1  A  I think I went on two with Gary, and I don't
2  remember if there were any others. I can recall two
3  specifically.
4  Q  Where did you go with Gary Graham, do you
5  remember that?
6  A  Yeah. I think it was George Junior Republic.
7  Q  Where is that located?
8  A  Grove City.
9  Q  And this would be a couple of hour trip up and
10 back?
11 A  Yes.
12 Q  Do you remember anything about leaving at a
13 special time?
14 A  Well, I know we used to leave as early as we
15 could.
16 Q  Do you remember when you might have left for
17 these two trips?
18 A  No, I don't.
19 Q  Do you think it was before your regular working
20 hours, like before 8 or 8:30?
21 A  It might have been around 7:30, but I'm not
22 sure.
23 Q  And do you remember how you met up with Mr.
24 Graham to go on these trips?
25 A  I think he might have picked me up.

### Page 72

1  Q  Did he pick you up at your house?
2  A  At least the one occasion he did. I don't
3  remember the other.
4  Q  Do you recall where you lived at the time?
5  A  Yes.
6  Q  Where was that?
7  A  Pheasant Run Apartments off Sterrets Gap in
8  Carlisle.
9  Q  Do you know whether you were on the way?
10 A  Yes, because we took 34 north up through --
11 well, towards State College, up that way.
12 Q  Did you ever use your vehicle for any of these
13 commitment trips?
14 A  No.
15 Q  When you went with Mr. Graham, did you take his
16 vehicle?
17 A  Yes.
18 Q  Do you remember what vehicle it was?
19 A  It was some type of sport utility vehicle, but
20 I don't recall.
21    (Ms. Wallett and Ms. Varner confer.)
22 Q  Ma'am, do you remember whether Mr. Drachbar
23 became a DUI teacher before or after Miss Varner?
24 A  I don't know without looking at the records, I
25 can't tell you that.

### Page 73

1  Q  Did you ever believe that Gary Graham was
2  interested in having a relationship with you?
3  A  No.
4  Q  Did your husband think that Gary Graham might
5  be interested in you?
6  A  Not that he ever told me.
7  Q  Did your husband ever tell you that Gary Graham
8  was interested in Barbara Varner?
9  A  I'm not sure.
10    MS. WALLET: Thank you very much. That's all
11 the questions I have.
12              EXAMINATION
13 BY MR. DELLASEGA:
14 Q  I have a couple more before we're going to let
15 you go. All this talk about retaliation and phone calls
16 about retaliation, do you know anybody who was retaliated
17 against for talking to Hartnett or DeLuce?
18 A  No.
19 Q  When you met with Mrs. Graham, did you know
20 Mrs. Graham from the courthouse?
21 A  Yes.
22 Q  Somebody you say hello to on a regular basis?
23 A  Yes.
24 Q  Do you ever talk to her after saying hello
25 except this one occasion?

**Page 74**

1  A  Just your normal pleasantries. Not anything
2  indepth.
3  Q  When she talked to you about why she perceived
4  you were talking sides with Barbara Varner, did she
5  mention the fact that there in her mind had been an affair
6  between the two?
7  A  She asked me -- I believe she asked me if there
8  was, if I knew if there was.
9  Q  Did she communicate to you an opinion as to
10 whether she thought there was?
11 A  I think -- no, she more or less acted like she
12 didn't know, and she wanted to know. I don't know what
13 she thought.
14 Q  Was she upset when talking about Barbara
15 Varner?
16 A  Yes.
17 Q  Was she upset when talking about whether or not
18 there had been an affair?
19 A  Yes.
20 Q  One of the suggestions raised by another
21 witness in this case was that Mrs. Graham knew there had
22 not been an affair and helped her husband cook up the
23 story to save his job. From your observation when she was
24 talking, she was visibly upset?
25 A  Yes.

**Page 75**

1  Q  Is that the only time she's ever asked you
2  about it?
3  A  I believe so.
4  Q  Have you ever seen her upset about the subject
5  any other time?
6  A  No.
7  Q  Have you ever heard from any others that she's
8  upset about -- .
9  A  I heard about some other incidents that
10 happened, but that was just --
11 Q  With Mrs. Varner?
12 A  Yes.
13 Q  Have you ever heard within the courthouse that
14 Mrs. Graham's ever emotional, cries, is angry about the
15 affair?
16 A  Not that I can think of, no.
17 Q  Mr. Graham's current job at the prison, is that
18 a desirable job within Probation?
19 A  Well, I don't know that it's undesirable. I
20 mean, it's just there was never -- that job didn't exist
21 before, so.
22 Q  Did not exist before?
23 A  No.
24 Q  And this is away from the mainstream of
25 Probation?

**Page 76**

1  A  Yes.
2  Q  And somebody doing that job would have less
3  interaction with other probation officers than somebody in
4  the courthouse?
5  A  Yes.
6  Q  Do you know Mr. Graham's current rank in
7  performing that job in the prison?
8  A  I believe he's a Senior PO rank.
9  Q  Senior PO?
10 A  I believe.
11 Q  Same as you?
12 A  Yes.
13 Q  I noted when we walked in today you and Mrs.
14 Varner chatting pleasantly, and you said you did aerobics
15 with her?
16 A  Yes.
17 Q  Have you ever socialized with Mrs. Varner?
18 A  Yes.
19 Q  Consider her a friend?
20 A  Yes.
21 Q  Consider Mr. Graham a friend?
22 A  I did at one point, but we don't really have
23 much of a relationship at this time other than
24 work-related things.
25 Q  And you deal with him now at work when he's out

**Page 77**

1  at the prison?
2  A  Yes.
3  Q  Any problems dealing with him?
4  A  No.
5  Q  Pleasant to you?
6  A  Yes.
7  Q  Is there a break room or a smoke room that
8  probation officers and other Court employees go to during
9  the day in the courthouse?
10 A  Not in the courthouse any more, no.
11 Q  Was there?
12 A  Yes.
13 Q  Is that a room that you ever frequent?
14 A  No.
15 Q  Never go there?
16 A  No.
17 Q  Would not have been in a position to observe
18 whether Graham and Varner used to go there a lot together?
19 A  No.
20     MR. DELLASEGA: That's all.
21        EXAMINATION
22 BY MS. WILLIAMS:
23 Q  Miss Galbraith, you testified that Gary Graham
24 punished people. Did he punish men and women equally?
25 A  Well, I think that it was whoever had made him

Page 78

1 angry, it didn't matter the gender.
2  Q  Do you have any personal knowledge of a
3 friendship between former President Judge Sheeley and Gary
4 Graham?
5  A  Can you repeat that?
6  Q  Do you personally know whether Gary Graham and
7 Judge Sheeley were friends?
8  A  No.
9  Q  So that may just be a rumor as well?
10  A  I don't believe so, but I guess it's possible.
11  Q  On what basis do you believe that there is a
12 friendship between Judge Sheeley and Gary Graham?
13  A  Just on the basis of what I've heard.
14  Q  What have you heard?
15  A  Just that their families are familiar with each
16 other and it goes back a ways.
17  Q  Who did you hear this from?
18  A  I don't recall.
19  Q  Do you have any personal knowledge of why Judge
20 Sheeley decided to handle Ms. Varner's complaint the way
21 he did?
22  A  No.
23   MS. WILLIAMS: Thanks.
24    EXAMINATION
25 BY MR. MACMAIN:

Page 79

1  Q  I just want to make sure I understand what you
2 know and what is based on rumor and hearsay. You worked
3 with Mr. Graham from '93 to the present, correct?
4  A  Yes.
5  Q  And you have never at any time felt hostile --
6 treated hostilely or seen him either towards you or any
7 other female act inappropriately, correct?
8  A  No, I never witnessed it, no.
9  Q  And so you were asked by Mr. Dellasega that you
10 heard rumors about retaliation and rumors about telephone
11 calls. You never received any phone call, correct?
12  A  No.
13  Q  You never were on the line when any of these
14 phone calls took place?
15  A  No.
16  Q  So you have no personal knowledge of any type
17 of retaliation firsthand, correct?
18  A  No.
19  Q  In fact, in the six years since Mr. DeLuce and
20 Mr. Hartnett investigated this, there have been no
21 examples of any type of retaliation that you're aware of,
22 correct?
23  A  No.
24  Q  You said that you were not interviewed by Mr.
25 DeLuce or Mr. Hartnett. Had you been interviewed you

Page 80

1 would have told them that you had no knowledge of any type
2 of harassment by Mr. Graham?
3  A  Correct.
4  Q  And you would have told them the same thing you
5 said today, that based upon working with Mr. Graham for --
6 I guess at that point it would have been four years, you
7 never observed any type of inappropriate conduct by Mr.
8 Graham?
9  A  Directly, yes.
10  Q  You made the comment you didn't think they
11 wanted to speak to you. Do you remember saying that? Or
12 was that your sense they didn't want to speak to you, the
13 investigators?
14  A  I didn't see why they would want to speak to me
15 because I hadn't actually witnessed anything.
16  Q  Do you think -- part of your job, do you have
17 some experience with investigations and trying to get to
18 the truth of the matter, correct?
19  A  Yes.
20  Q  Would it be as important to you as investigator
21 that someone did not witness conduct that they were being
22 alleged of committing?
23  A  I assume so.
24  Q  That would have been the type of information
25 that you would have provided to the investigators, that

Page 81

1 you in your experience, you never saw any type of
2 harassment or inappropriate conduct by Mr. Graham?
3  A  Yes.
4  Q  Would that be something that if you were the
5 investigator you would want to know both people who saw
6 inappropriate conduct as well as people who never saw
7 inappropriate conduct?
8  A  Yes.
9   MR. MACMAIN: I have no further questions.
10    EXAMINATION
11 BY MR. ADAMS:
12  Q  Just one question. Miss Galbraith, you were
13 asked questions by plaintiff's counsel about Carrie
14 Houser's complaint against Mr. Osenkarski?
15  A  Yes.
16  Q  You said you heard that that happened, is that
17 correct?
18  A  Yes.
19  Q  And had you ever heard -- did you ever hear
20 that such complaint by Miss Houser was unfounded as well?
21  A  Yes, I believe that's what I heard.
22   MR. ADAMS: Thank you. No questions.
23    EXAMINATION
24 BY MS. WALLET:
25  Q  Miss Galbraith, did you go to any of the office