# Exhibit M

```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
        Plaintiff,              .   CIVIL ACTION
                                .   NO. 1:CV 01-0725
     vs.                        .
                                .
COMMONWEALTH OF PENNSYLVANIA,   .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
        Defendants.             .
. . . . . . . . . . . . . . . .

     Deposition of: WILLIAM A. BRANDT

     Taken by      : Defendant Cumberland County Court

     Date          : April 4, 2003, 9:30 a.m.

     Before        : Emily Clark, RMR, Reporter-Notary

     Place         : Cumberland County Courthouse
                     One Courthouse Square
                     Carlisle, Pennsylvania

APPEARANCES:

   DEBRA K. WALLET, ESQUIRE
           For - Plaintiff

   ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
   BY:  A. TAYLOR WILLIAMS, ESQUIRE
           For - Defendant Commonwealth of Pennsylvania
                 Ninth Judicial District, Cumberland County

   THOMAS, THOMAS & HAFER
   BY:  JAMES K. THOMAS, II, ESQUIRE
        PAUL J. DELLASEGA, ESQUIRE
           For - Defendant Cumberland County
```

Page 2

```
 1  APPEARANCES (continued):

 2    MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
      BY:  L. KRISTEN BLANCHARD, ESQUIRE
 3            For - Defendant S. Gareth Graham

 4    SWEENEY & SHEEHAN, P.C.
      BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5            For - Defendant Joseph L. Osenkarski

 6
    ALSO PRESENT:
 7
      MS. BARBARA E. VARNER
 8
      MR. S. GARETH GRAHAM
 9
      MR. JOSEPH L. OSENKARSKI
10
```

Page 3

```
 1                    I N D E X
 2                    WITNESS
 3   William Brandt                       Examination
 4      By Mr. Dellasega                       4
 5      By Mr. Adams                          47
 6      By Ms. Williams                       56
 7      By Ms. Wallet                         59
 8
 9
10                    EXHIBITS
11   (None marked)
12                  * * * * *
```

Page 4

```
 1                    STIPULATION
 2        It is hereby stipulated by and between the
 3   respective parties that sealing, certification and
 4   filing are waived; and that all objections except as to
 5   the form of the question are reserved until the time of
 6   trial.
 7
 8        WILLIAM BRANDT, called as a witness, being
 9   duly sworn, was examined and testified, as follows:
10   BY MR. DELLASEGA:
11   Q  Mr. Brandt, my name is Paul Dellasega, I represent the
12      county in this matter.
13         Have you testified before in any proceeding, sir?
14   A  No.
15   Q  In any court proceeding?
16   A  In something of this matter?  Or just generally?
17   Q  Have you ever testified?
18   A  Yes, sir.
19   Q  Okay.  Have you ever been deposed?
20   A  No.
21   Q  Okay.  You understand that if we ask you a question, if
22      you don't understand the question, you should tell me
23      that?
24   A  Okay.
25   Q  All right?  And if you answer it, we'll assume you did
```

Page 5

1  understand the question?
2  A. (Witness nodded head affirmatively.)
3  Q When were you first hired by the county?
4  A. 1990.
5  Q In what capacity?
6  A. As an intern originally, and then eventually as a
7     probation officer.
8  Q As an intern in the Probation Department?
9  A. Correct.
10 Q When you became a probation officer, were you probation
11    officer 1?
12 A. Actually, the confusion is that I started as a probation
13    officer but not with full benefits for a period of two
14    months. But eventually, yes, as a probation officer 1,
15    within the 1990 year.
16 Q Let me ask you this. What is your date of hire?
17 A. That's also very confusing. It's either August of '90
18    or October of '90, depending on who you ask.
19 Q All right. Why would some people contend it's August of
20    '90?
21 A. I would, because I was a full-time probation officer in
22    August of 1990; however, it was not with benefits paid
23    by the county. October 13th of '90 is when I became
24    full-time with benefits as a probation officer 1.
25 Q When were you hired as an intern?

Page 6

1  A. June 4th of that year.
2  Q So you were an intern for two months --
3  A. Correct.
4  Q -- roughly, and then you became a probation officer
5     without benefits?
6  A. Correct.
7  Q And two months later, you became a probation officer
8     with benefits?
9  A. Correct. I actually covered for a gentleman, another
10    probation officer who was fighting in Desert Storm for
11    August and September of that year, and it worked out
12    that I covered for him at that time period.
13 Q When you came in as an intern, were you a college
14    graduate?
15 A. I had walked through graduation in May. I had to
16    complete my internship to actually fulfill my practicum,
17    but technically, no, I didn't graduate until August.
18 Q Had you previously been employed by the county?
19 A. Never.
20 Q By the court?
21 A. No.
22 Q By any county?
23 A. No.
24 Q By any court?
25 A. No.

Page 7

1  Q Was this your first job after college?
2  A. Correct.
3  Q As an intern were you a regular full-time employee of
4     the county?
5  A. Yes, I was.
6  Q Did you receive benefits?
7  A. No, I did not.
8  Q How did your status change from intern to probation
9     officer without benefits?
10 A. I don't think I understand that question, how did it
11    change?
12 Q After two months you stopped being an intern.
13 A. Correct.
14 Q And became a probation officer who did not get benefits.
15 A. Correct.
16 Q How did that change in status come about?
17 A. I don't understand what you mean by status. I mean, I
18    had assumed a caseload.
19 Q One day you were called an intern and the next day you
20    were called a probation officer, correct?
21 A. Correct.
22 Q And you changed in title --
23 A. Correct.
24 Q -- from intern to probation officer --
25 A. Correct.

Page 8

1  Q -- who happened not to have benefits. How did what
2     change in title come about?
3  A. As I explained, Dave, another probation officer, got
4     called to war, and I fulfilled his obligations during
5     the period of time of August and September, part of
6     October, until another position became available within
7     the Department. Then I was hired full-time at that
8     time.
9  Q When did your title change next from probation officer 1
10    to something else?
11 A. I honestly can't answer that. '97? '6, '7, '8, I'm not
12    sure.
13 Q What change occurred? What change in title occurred?
14 A. I had became a senior.
15 Q And when did you next experience a change in title?
16 A. I never did again.
17 Q You are currently a senior probation officer?
18 A. Correct.
19 Q Is there such a title as probation officer 2?
20 A. Yes, there is.
21 Q You are not a PO-II?
22 A. Correct.
23 Q Do you have the same title as Mrs. Varner does, correct?
24 A. I believe so.
25 Q When you were first hired in between '91 and '95, the

Page 9

1  Juvenile and Adult Departments were one department; is
2  that correct?
3  A. Correct.
4  Q Did you primarily work Juvenile or Adult?
5  A. I did both.
6  Q Where do you work now?
7  A. Juvenile.
8  Q When the split occurred, did you immediately go to
9     Juvenile?
10 A. Correct.
11 Q And you've been in Juvenile continuously since --
12 A. Since '96 I believe it was.
13 Q When did you first meet Mr. Graham?
14 A. My guess is my first day as an intern. I don't think I
15    knew Gary before that.
16 Q Was Mr. Graham influential in any way in your change in
17    title from intern to probation officer?
18 A. He could have been. I don't -- he certainly could have
19    been. I don't know if he, in fact, was.
20 Q Do you know whether he was influential in any way in
21    your change in title to probation officer with benefits?
22 A. No. I don't think that -- that was simply by rule by
23    the county as a full-time employee.
24 Q Do you know whether he was influential at all in your
25    change in title to senior probation officer?

Page 10

1  A. He probably was.
2  Q Do you know what that influence was?
3  A. I think he was in favor of it.
4  Q And you think that because of what information?
5  A. He was my supervisor at the time, and I'm not aware of
6     any hardships between Mr. Graham and myself that would
7     have created a position where I couldn't have been
8     accepted for that or denied, that I'm aware of.
9  Q When did Mr. Graham become your supervisor?
10 A. I guess when we -- when the office split, I believe.
11 Q Prior to the split, did he have any supervisor capacity
12    over you?
13 A. In the role of a probation officer 2, I believe. He
14    would be asked to do supervisory duties in the absence
15    of a supervisor, and I know that on many occasions I had
16    to go to him as a superior officer.
17 Q It would be your sense that he functioned as a de facto
18    supervisor on a number occasions --
19 A. Absolutely.
20 Q -- prior to the split?
21 A. Absolutely.
22 Q And who was your formal supervisor prior to the split?
23 A. For Juvenile or Adult side?
24 Q Juvenile.
25 A. Mr. Osenkarski.

Page 11

1  Q And for Adult?
2  A. John Roller.
3  Q When did you first meet Mrs. Varner?
4  A. As an intern.
5  Q And how did you meet her?
6  A. She worked in Children and Youth as a caseworker. I
7     don't know that we shared cases, but I met her because
8     of close proximity to our offices.
9  Q Did you ever share any cases with her prior to her
10    joining the Probation Department?
11 A. My goodness. I'm sorry, I don't know that we did. We
12    may have.
13 Q You don't recall having any?
14 A. Correct.
15 Q Did you ever have any formal business dealings with her?
16    Or did you simply know her as a colleague in another
17    department prior to the split? I mean, prior to her
18    coming on board as a probation officer.
19 A. Knew her as a friend of someone who I was dating at the
20    time, also a Children and Youth caseworker, and that's
21    primarily how I knew Barb.
22 Q Did you ever know Mrs. Varner or did you ever see
23    Ms. Varner in the probation office while she was at CYS?
24 A. Oh, yes.
25 Q For what purposes would she be there?

Page 12

1  A. I would assume professional reasons, sharing cases with
2     Juvenile probation officers.
3  Q From your observations of her when you saw her as a CYS
4     worker and a probation officer, can you identify the
5     probation officer she was working with?
6  A. No.
7  Q Did you ever see her work with Mr. Graham?
8  A. I really couldn't remember.
9  Q Do you have any knowledge of whether she or Mr. Graham
10    shared cases while she was in CYS?
11 A. No.
12 Q Did you ever see her and Mr. Graham talk to each other
13    or interact with each other in any way --
14 A. Yes.
15 Q -- before she was hired as a probation officer?
16 A. Yes.
17 Q What did you see?
18 A. I saw normal conversation. At the time I actually
19    shared my office, this is as an intern, I shared an
20    office with Mr. Osenkarski during that summer. And in
21    Gary's capacity as a PO-II and someone who I described
22    close with Joe, he was in that office a great deal of
23    time. And I recall Barb being in that particular office
24    on various occasions, having conversations with us.
25 Q When you observed Mr. Graham and Mrs. Varner having

## Page 13

1  conversations while together while she was a CYS
2  employee, did you observe any hostility between them?
3  A. No.
4  Q Any antagonism of any kind?
5  A. Not that I recall.
6  Q Did you ever see Mr. Graham being polite to her?
7  A. I assume. I don't recall anything different.
8  Q From your own personal observation.
9  A. Yes.
10 Q Did you ever observe Mr. Graham to raise his voice at
11    her?
12 A. No.
13 Q Yell at her?
14 A. No.
15 Q Say anything offensive towards her?
16 A. No.
17 Q Treat her with anything other than respect?
18 A. Correct.
19 Q Did they seem to have a good working relationship, to
20    you?
21 A. I don't know that I evaluated it in that depth, but I
22    assumed so, yes.
23 Q Did you see anything that would indicate the absence of
24    a good working relationship?
25 A. No.

## Page 14

1  Q Did you see any hesitency or reluctance on the part of
2    Mrs. Varner to work with Mr. Graham?
3  A. No.
4  Q Did you ever know them to go on business trips together
5    while she was in CYS?
6  A. No.
7  Q Did you ever observe them to have coffee or soda or a
8    snack together in the lunch room or coffee room?
9  A. I don't recall.
10 Q Did you ever observe or hear Mr. Graham comment about
11    her abilities while she was a CYS employee?
12 A. No.
13 Q Did you ever hear Mr. Graham recommend her for hire in
14    the Probation office while she was a CYS employee?
15 A. Not to me. I don't know if he recommended her or not.
16    I don't recall him making that statement to myself.
17 Q Do you know that he recommended her to anyone else for
18    hire within the Probation office?
19 A. I wouldn't be privy to that information. I don't know,
20    really.
21 Q When she was hired, was there any discussion within the
22    office that you participated in as to who had sponsored
23    her or urged her hiring within the office?
24 A. Not to my recollection.
25 Q By the way, all the questions I've asked about Graham's

## Page 15

1  interaction with Mrs. Varner during that period of time,
2  would that be true for Mr. Osenkarski with respect to
3  raising his voice to her, was not abusive?
4  A. Yeah, I don't recall any.
5  Q To be more specific, during that same period of time,
6    which is again while she was a CYS employee, did you
7    ever observe Mr. Graham do anything that would in any
8    sense of the word constitute sexual harassment towards
9    Mrs. Varner?
10 A. Not in my presence.
11 Q Did you hear any other employee describe any conduct --
12    again, this is during the time when she was a CYS
13    employee -- any conduct by Mr. Graham that in the
14    broadest sense of the word could constitute sexual
15    harassment?
16 A. I don't believe so.
17 Q Did you ever hear the phrase Barb 1 and Barb 2 used
18    within the office?
19 A. Within the office, yes.
20 Q What was your understanding of that phraseology?
21 A. That was something in jest, designating Mr. Graham's
22    wife and Mrs. Varner.
23 Q Who was Barb Varner?
24 A. I wouldn't know which was which.
25 Q When you say it was in jest, what was the jest? What

## Page 16

1  was the content of the jest?
2  A. I don't recall using it even myself, but as I said, I
3    recall hearing it. And I could very well be confusing
4    what's taken place in the last seven years compared to
5    prior to that, so I -- to think specifically what was
6    the joke, I don't recall.
7  Q Who did you hear using that phrase, do you recall? Is
8    it something that you heard frequently?
9  A. No.
10 Q More than 10 times?
11 A. Probably.
12 Q Did you ever hear Mr. Graham use that terminology,
13    Barb 1 or Barb 2?
14 A. No.
15 Q You never inquired yourself as to what the joke was with
16    regard to the use of that phraseology?
17 A. Did I understand what it was?
18 Q Did you ever inquire of anybody else as to why are they
19    saying Barb 1 and Barb 2?
20 A. No, but I certainly understood its meaning.
21 Q And other than the fact it was the two Barbs, did you
22    understand anything else about its meaning?
23 A. Certainly.
24 Q What else did you understand?
25 A. Are we talking about a time period that's still while

Page 17

1  Mrs. Varner is at CYS?
2  Q  Yes.
3  A.  No. I've never heard it at that time.
4  Q  While she was a CYS employee did you ever hear anyone
5     within the office speculate that Mr. Graham and/or
6     Mrs. Varner and Mr. Graham were anything other than
7     business colleagues?
8  A.  Never.
9  Q  Never heard any rumors, suggestion or speculation that
10    they dated or had any kind of sexual --
11 A.  No.
12 Q  -- connotation to their relationship?
13 A.  No.
14 Q  And never thought so yourself?
15 A.  Again, as a CYS worker?
16 Q  Yes.
17 A.  No.
18 Q  Did you ever hear Mr. Graham talk about having affairs
19    with anyone?
20 A.  No.
21 Q  Has he ever divulged to you that he had an affair?
22 A.  No.
23 Q  Has he ever divulged to you that he had any interest in
24    any woman other than his wife?
25 A.  Well, Gary and I shared a friendly relationship at one

Page 18

1     time where we joked about maybe a college fling or
2     something like that, but anything post marriage, I
3     don't -- no, emphatically no.
4  Q  You say you shared a friendly relationship at one time.
5  A.  I would say from the day I was hired as an intern up
6     until shortly before his departure from the Juvenile
7     office. Friendly, I would say friendly.
8  Q  Nonetheless, you used past tense. Do you have a
9     friendly relationship with him today?
10 A.  I don't -- not anything on my part, but I'm fearful
11    that, no, we do not have any friend -- we no longer have
12    a friendly relationship.
13 Q  How did the relationship change?
14 A.  We don't have contact.
15 Q  Was there any change in it other than you don't have
16    contact?
17 A.  Not on my part.
18 Q  On Mr. Graham's part?
19 A.  Only through what I hear from friends, statements that
20    are said.
21 Q  Nothing that he has ever personally said to you?
22 A.  Never in words, no.
23 Q  In anything other than words?
24 A.  I don't think he -- he has displayed behavior or just
25    gestures that I can, that I would take that he is not

Page 19

1     happy with me.
2  Q  Can you tell me what those gestures are?
3  A.  Maybe the way he looks at me in passing, the few times
4     we've had passing. Or I know on occasion -- I work a
5     second and third job, actually performing security where
6     his daughters go to school, and I have to have passing
7     with him and I can -- it's obvious that he has
8     displeasure for my presence. But he has done nothing to
9     harm me.
10 Q  What have you heard from third parties?
11 A.  That his displeasure for me speaking possibly or having
12    anything to do with his departure from the office.
13 Q  Did you have anything to do with his departure from the
14    office?
15 A.  Absolutely not. I spoke with Judge Hoffer, who demanded
16    that I meet with him, and we spoke about Gary.
17 Q  Do you recall when this was?
18 A.  I couldn't remember the date but I can tell you I
19    remember the day very well.
20 Q  Tell me what you remember about the day.
21 A.  I was about to have a six-month review hearing for a
22    person placed in Philadelphia. Courtroom was full of
23    people. I can remember the kid. Judge Hoffer came out
24    of chambers, pointed at me, said: Get in my office now.
25    Everyone looked at me as if what did you do now.

Page 20

1     And I proceeded to go Judge Hoffer's chambers, where we
2     had a very long conversation while the entire courtroom
3     waited for us for over an hour to maybe closer to two
4     hours.
5  Q  Tell me what you recall about that one- to two-hour
6     conversation.
7  A.  Surprisingly, there wasn't any question of Barb dating
8     Gary and the relationship between the two of them. I
9     don't think he -- if he did, I apologize, but I don't
10    remember him even asking that.
11 Q  Okay.
12 A.  He wanted to know more on the lines of who does what
13    within your department. And it was as if he was for the
14    first time trying to learn our hierarchy and whose
15    performance and who's responsible for and those types of
16    questions.
17 Q  Would this conversation have been after the split?
18 A.  I believe so. I believe it was in '97.
19 Q  So when he was asking who does what, it was who does
20    what within Juvenile Probation?
21 A.  Correct. I'm sorry.
22 Q  What else do you recall about the conversation?
23 A.  I really think it was more generated towards
24    Mr. Osenkarski than it was towards Mr. Graham.
25 Q  Tell me what you recall him asking about Osenkarski and

Page 25

1  A. I may answer that question differently now than I would
2     have actually to Judge Hoffer then. But to senior
3     members of the Juvenile staff at that time and myself
4     not being a senior member at that time, my perception
5     would have been they had a gravy detail in comparison to
6     what I had at the current time. If we were able to move
7     to 2003 I'm sure there's a lot of 20-year-olds
8     downstairs who think I'm sitting in a gravy position as
9     we speak. So, perception and age may have changed my
10    opinion on that.
11 Q  Is a gravy position reduced caseload?
12 A. I wouldn't say reduced caseload, but it's not difficult
13    to determine the volatility of a case at the beginning,
14    and should one set of people get -- it would be very
15    hard to put this in and show this for anyone to
16    understand it, but comparing apples to apples, those of
17    us in the profession, we would understand who has a more
18    difficult caseload, so to speak, in terms of more
19    difficult juveniles versus someone who is supervising a
20    phrase I use, cupcake type kids who do not require quite
21    the level of supervision.
22 Q  And to the degree that you observed this distinction, it
23    was between old timers and newer probation officers?
24 A. Myself being a newer one at the time, relatively
25    speaking.

Page 26

1  Q  Was the distinction, in your mind, limited to the
2     distinction between old timers and new officers? Or
3     political allies and political enemies?
4  A. It just so happened that it was more senior members. So
5     in your words, the two specifically older employees who
6     had the positions of intensive officers at the time who
7     had many more years of working there than myself, I, my
8     opinion was that they were given a much lighter detail
9     than myself. But now again, looking back at that
10    through older eyes I understand how perceptions change.
11 Q  When Mrs. Varner first came on board as a probation
12    officer, did you at that time observe her interactions
13    with Mr. Graham?
14 A. I'm sorry, I didn't understand the second part.
15 Q  When she came first came on board as a probation
16    officer, did you observe her interactions with Graham at
17    that time?
18 A. Yes.
19 Q  All right. And did she seem to work more closely with
20    Graham than other senior probation officers?
21 A. I don't believe I was a senior probation officer at the
22    time, I believe Barb came in '95. But to answer your
23    question, my opinion was, yes, she did work closer with
24    him.
25 Q  And how would you describe their working relationship

Page 27

1     when they were both probation officers together?
2  A. Very friendly.
3  Q  Can you explain that in any greater detail?
4  A. There was a period of time, I don't know the length,
5     that there was obviously some type of relationship. And
6     I use that word in the broadest sense, I'm not
7     insinuating, but there were certainly friendly
8     relations. And it was for a long period of time, maybe
9     a year or more, and they certainly spent a lot of time
10    together.
11    Now, to make sure we understand, I mean, my office
12    partner and I have been together for 13 years, and
13    someone could say that he and I spend a lot of time
14    together more so than me and my wife, unfortunately. So
15    that could be just out of -- I say that in a very broad
16    sense of relationship.
17 Q  There are office partners who get along better with each
18    other than other office partners; is that right?
19 A. Yes, sir.
20 Q  All right. And you're saying that the relationship
21    between Graham and Varner appeared to be one that was a
22    very friendly working relationship, they got along
23    extremely well together?
24 A. Yes.
25 Q  And from your observation, those feelings were mutual?

Page 28

1  A. Yes.
2  Q  But your observations did not include any sexual
3     overtones?
4  A. No.
5  Q  And that relationship at some point changed?
6  A. Yes, it did.
7  Q  It had changed, in looking back at it from the vantage
8     point of several years, was that change an abrupt
9     change?
10 A. I didn't see any signs of a change, but there was a day,
11    a specific day which seemed to be a change. Don't ask
12    me the date because I wouldn't recall, but there was one
13    day specifically where there appeared to be great
14    hostility.
15 Q  The change was abrupt enough it seemed almost overnight
16    to you; is that what you're telling me?
17 A. Yeah. I didn't see anything from my vantage point that
18    changed their relationship.
19 Q  But nonetheless, you observed a change?
20 A. Yes.
21 Q  In a sense there was almost an overnight change?
22 A. Correct.
23 Q  That's what you're saying, okay. And after you observed
24    that overnight change, how did Mr. Graham treat
25    Mrs. Varner?

**Page 29**

1  A. I think he was -- he distanced himself from her. But I
2  didn't see from firsthand knowledge him treating her in
3  any manner -- they were not friendly any longer, but I
4  didn't see anything from, again, my point where it was
5  **anything other than there was a separation.**
6  Q **You personally didn't see him yell at her?**
7  A. I heard him on one occasion, and again, the day where
8  there was a -- something significant changed, where the
9  two of them were alone in an office in the middle of our
10 main office, so it would be very difficult for many not
11 to have heard it had you been in the Department on that
12 specific day, and again, I don't know the day, where the
13 both of them were very upset. And I don't know if it
14 was yelling but it was definitely above normal
15 conversation that everyone could hear. The details, I
16 don't know. And it was something that went on, whatever
17 the conversation was, I recall coming in and out of my
18 office and it was still continuing. So it wasn't a
19 30-second thing, it's something that took place for a
20 **while.**
21 Q **But you didn't hear any detail of the conversation?**
22 A. **I didn't want to, to be honest with you.**
23 Q **I understand that you didn't want to. Did you**
24 nonetheless hear any detail of the conversation?
25 A. **Not that I recall.**

**Page 30**

1  Q **Do you have any idea what the dispute was about?**
2  A. **No, not at all.**
3  Q **Did the dispute seem mutual?**
4  A. **That's hard to answer. Like myself --**
5  Q **Let me rephrase it. Did the tone of voice of both**
6  parties appear upset or agitated?
7  A. Gary's did. But Gary has much like myself, speaks very
8  loudly so that the entire office will hear it. And that
9  was par for the course for either me or Gary. So it was
10 **loud. And he gets very excited when he discusses**
11 things, and so I don't think it was completely out of
12 **the norm for Gary.**
13 Q How about Mrs. Varner, was her tone of voice out of the
14 norm for her?
15 A. Well, she was behind closed doors, and she doesn't have
16 a voice that carries like Mr. Graham's, so I don't
17 **remember hers.**
18 Q I had understood you to mean that it sounded like both
19 were upset, and what I'm trying to get at is what you
20 know about how Mrs. Varner exhibited being upset.
21 A. As I said, both their voices seems to be elevated, and
22 that's the only way I could offer that I knew that both
23 **were not having an average day.**
24 Q But other than that, you do not recall Mr. Graham
25 yelling at Mrs. Varner?

**Page 31**

1  A. **Other than that day?**
2  Q Yes.
3  A. **No.**
4  Q All right. Do you ever recall Mr. Graham doing anything
5  towards Mrs. Varner after that day which in the broadest
6  sense of the word would constitute sexual harassment?
7  A. **No.**
8  Q Did you ever recall Mr. Osenkarski, by the way, ever
9  doing anything towards Mrs. Varner that in the broadest
10 sense of the word would constitute sexual harassment?
11 A. **I don't recall, no.**
12 Q Did you ever observe Mrs. Varner being treated in a
13 manner you thought was unfair after that day by
14 **Mr. Graham?**
15 A. **No.**
16 Q **By Mr. Osenkarski?**
17 A. **No.**
18 Q Have you ever observed any female probation officer
19 being treated in a manner that you thought was unfair by
20 **either Graham or Osenkarski?**
21 A. **No.**
22 Q Your conversation with Judge Hoffer, how did it end?
23 A. About as violently as it began. I refused to answer any
24 of his questions to begin with. He and I have a
25 personal relationship, so it was very -- or difficult.

**Page 32**

1  I think he told me that should I need to come talk to
2  him any longer or anymore, that his door was open, which
3  **that's par for the course.**
4  Q I'm sorry, please continue.
5  A. I don't recall exactly how it ended, but something,
6  should I need to approach him about anything that we
7  **discussed, that his door was open.**
8  Q Did you have any understanding at the time of that
9  conversation whether the Varner-Graham dispute was a
10 catalyst for the conversation?
11 A. **Sure.**
12 Q And what was your sense of why it was a catalyst?
13 A. Well, if I recall, my knowledge is fairly limited, but
14 if I recall, before Judge Hoffer became president judge,
15 this was an issue that was before Judge Sheely. The
16 details of what took place in front of Judge Sheely, I
17 don't recall. But I remember that -- my thoughts were
18 he had made a final determination on this in some way,
19 he retired, Judge Hoffer became president judge, and all
20 of a sudden this was an issue again before Judge Hoffer.
21 So, yes, I had some prior knowledge, but I don't know
22 **that I knew intimate details.**
23 Q Did Judge Hoffer tell you at the end of the conversation
24 he was going to implement any changes?
25 A. **Absolutely not.**

Page 33

1  Q  Were you aware that Mr. Graham had been suspended by
2     Judge Sheely for three days?
3  A. I think. There's a -- it's common knowledge now. I
4     don't know if I knew at the time. I believe I did,
5     because there was a joke in the office that he was
6     suspended with pay, and we -- I'm sorry to bore you, but
7     we joked that if we ever want to get suspended in the
8     office we hope that it's with pay, I would take that
9     kind of suspension. So that's the jest and that's the
10    context how I knew that he was suspended.
11 Q  In what context did you understand the reason for the
12    suspension?
13 A. I knew it was involved with Barb in some shape or form
14    but I didn't know details.
15 Q  When did you first become aware of any allegation,
16    contention or rumor that a sexual affair had existed
17    between the two?
18 A. I think during their friendship, the period of time that
19    I would describe as a friendly relationship.
20 Q  And in what sense did you become aware? Was it
21    something --
22 A. I think anyone of reasonable suspicion, maybe I'm not,
23    but seeing a man and a woman spending that much time
24    together that hadn't previously, there was thoughts in
25    the back of my mind that is this something that's more

Page 34

1     than -- is this extracurricular.
2  Q  All right. And was that a thought you ever heard
3     anybody else articulate?
4  A. Sure.
5  Q  Okay. Was that a thought you heard articulated
6     generally within the office?
7  A. Yes.
8  Q  And were there adherents both pro and con as to whether
9     or not an affair was going on?
10 A. I think everyone stayed the hell out of it, quite
11    frankly. I don't recall. I think it was just general
12    suspicions and the rumor mill of an exceptionally small
13    office.
14 Q  When the relationship changed so abruptly between them
15    as you've described, was there any subsequent rumor that
16    the affair must have ended, to explain this sudden
17    change in the relationship?
18 A. Yes, but I mean, no one knew anything firsthand.
19 Q  But there was speculation about it?
20 A. There was a lot of hypothesizing, yes.
21 Q  Did Mrs. Varner ever discuss with you that she was going
22    to file a complaint against Graham for sexual
23    harassment?
24 A. I don't recall.
25 Q  Has she ever discussed her current case with you?

Page 35

1  A. No. She may have -- I don't recall us having a
2     conversation in detail. No, I really don't think we've
3     really talked about it other than maybe I had a, you
4     know, a hearing or someone else had gone through this
5     and she mentioned that I would be next, or something
6     like that. But nothing in depth.
7  Q  Has she ever asked you to provide any assistance with
8     regard to this litigation?
9  A. No.
10 Q  Indicated that you would be called to testify as a
11    witness on her behalf or as part of this litigation?
12 A. I don't believe so.
13 Q  Have you ever talked to her attorney, Ms. Wallet, about
14    any facts regarding this case?
15 A. No.
16 Q  Have you ever provided any written statement to anybody
17    regarding the facts of this case?
18 A. I met with an attorney, as many of us did, many years
19    ago downstairs somewhere. I don't recall the
20    gentleman's name; I could picture him.
21 Q  Other than that attorney, have you ever provided a
22    statement to anybody?
23 A. No.
24 Q  Within the Probation office is the use of bad language
25    common?

Page 36

1  A. Unfortunately. Myself guilty as well.
2  Q  And is that something that's limited to the male
3     probation officers, or is it both genders?
4  A. I think it's a product of the horrible environment that
5     we work with.
6  Q  So it would be both genders?
7  A. Yes.
8  Q  And can you describe for me that horrible environment?
9  A. Well, we deal with people who inflict harm on others on
10    a daily basis, and go into the homes that others would
11    feel are very -- less desirable, and common language for
12    them is four-letter words. And I think to a certain
13    degree, whether you like it or not, you begin to assume
14    some of that.
15 Q  So the routine day-in/day-out environment within the
16    Probation office is different from a regular business
17    office not involved in the criminal justice procedure?
18 A. I would argue -- well, not in a police department, but I
19    would argue that, yes.
20 Q  And would you argue that such an environment is more
21    stressful than --
22 A. Absolutely.
23 Q  And that the job of a probation officer is more
24    stressful inherently than somebody not involved in the
25    criminal justice system?

## Page 77

1  treatment was different after she made the complaint?
2  A. No.
3  Q Do you believe that the females were treated the same as
4    the male probation officers? And I'm talking about the
5    same time frame up until the split.
6  A. Yes.
7  Q Did you see any difference in which the females were
8    treated as opposed to the male probation officers?
9  A. The only difference in that you would rarely see a
10   female probation officer assigned a male of incredible
11   physical stature, for obvious reasons. I don't recall
12   any of our female probation officers receiving
13   exceptionally large men that they might have to arrest
14   some day. Other than that, no.
15 Q Were there any rules about when commitment trips needed
16   to start? Do you understand the question?
17 A. The time of day?
18 Q Yes.
19 A. I guess it would depend on whether or not there was a
20   court proceeding the same day, or if the commitment was
21   on a day -- some day later than a court process. It was
22   at the -- to easily answer it, it was always at the
23   discretion of the probation officer. We were never
24   questioned because, I mean, it took up a great deal of
25   your time, so I mean, it had to fit your own schedule.

## Page 78

1  Q All right. So that when you had an assignment for
2    taking a juvenile to someplace for commitment, you would
3    use your professional judgment as to when you would
4    leave and when you would return?
5  A. Sure.
6  Q Did anyone ever tell you that you needed to start those
7    commitment trips only at eight o'clock in the morning?
8  A. No, because I as a rule woke up very early in the
9    morning to do them, so I know that no one could have
10   told me not to.
11 Q Were there times when you left for commitment trips
12   prior to 8:00 a.m.?
13 A. All the time.
14 Q Now, did you have an incident in a stairway with
15   Mr. Graham in which you and he had some discussion?
16 A. No words were said.
17 Q What happened?
18 A. I don't recall the date. It was within the last two
19   years. I was walking down a staircase within the
20   building here. Simultaneously, Gary had come out of a
21   door a half a staircase above me. As he came down and I
22   was walking up, when he went to turn the staircase, he
23   struck with his hand the metal railing hard enough that
24   I thought he may have hurt his hand but he must have hit
25   it with a ring because it created a very loud noise.

## Page 79

1    And I just perceived that to be Gary's disinterest -- or
2    not disinterest, but being upset with me.
3  Q Do you believe this was a deliberate act directed at
4    you?
5  A. I don't think he tripped.
6  Q Do you believe it was a deliberate act directed at you?
7  A. Yes.
8  Q And why do you think he took that action?
9  A. Out of frustration.
10 Q Did you take it to be threatening?
11 A. I'm not afraid.
12 Q Did you believe Mr. Graham intended it to be threatening
13   to you?
14       MR. ADAMS: Objection.
15       MS. BLANCHARD: Objection.
16       MR. ADAMS: Requires speculation.
17 BY MS. WALLET:
18 Q You may answer.
19 A. Possibly.
20 Q Why do you think Mr. Graham did this?
21 A. Frustration.
22       MS. BLANCHARD: Objection.
23 BY MS. WALLET:
24 Q Was he frustrated at you?
25 A. I think Gary perceives me as being a portion of or a

## Page 80

1    part of or a percentage of where he is at the current
2    time.
3  Q And that meaning?
4  A. Where his place of employment is.
5  Q Do you know whether Mr. Graham knew that you had had
6    this conversation with Judge Hoffer about what happened
7    in the office?
8  A. I had only heard rumors that his perception was that I
9    willingly went to Hoffer to offer opinions or what have
10   you about him. But again, that got to me through
11   rumors. He had never said that to me.
12 Q Had you observed Mr. Graham to engage in conduct which
13   could be described as punishing?
14 A. Not to me.
15 Q Was it understood within the office that Mr. Graham
16   would reward or punish individuals depending upon his
17   perceived -- his perception of their loyalty to him?
18 A. I never heard that.
19 Q Did Mr. Graham ever make any other threatening gestures
20   to you?
21       MR. ADAMS: Objection. Has it been described as
22   threatening? I don't think it's been characterized as
23   threatening.
24       MS. WALLET: I'll withdraw that.
25 BY MS. WALLET:

### Page 81

1  Q  Did Mr. Graham ever engage in any other conduct such
2     as what you described in the stairwell that might be
3     threatening to you?
4        MR. ADAMS: Objection again. You may answer.
5        THE WITNESS: On one occasion as employed as a
6     security officer at the Trinity High School, I knew that
7     his daughter was there for a dance, I believe it was a
8     dance. And I had been working there doing security type
9     things for them for several years and have watched, I
10    can't remember the names of his daughters anymore, but I
11    know that one shows up for functions, not very often,
12    but I do see Gary occasionally. And generally Gary or
13    his wife will come and pick them up after an event.
14       On that particular night I think Gary knew that I
15    was there, either that he saw me, I knew that -- he knew
16    I was there. And he was one of the very last people --
17    I was in the parking lot. I had left the school walking
18    out to my vehicle and sat in it. And the parking lot
19    had cleared. And Gary picked up his daughter and I
20    believe her date or a friend, and had people in the car.
21    And as he turned to depart the parking lot, he drove
22    within half of a car's length beside me, passing me.
23       I don't know if it was intended in a threatening
24    manner, but he could have exited the parking lot by many
25    hundreds of feet in any other direction, and he chose to

### Page 82

1     drive right past my vehicle, I don't know, to show that
2     he knew I was there or what. But that's the only other
3     incident.
4  Q  Did you believe your safety at that time was threatened?
5  A. No.
6  Q  Did you believe the act was deliberate?
7  A. Yes.
8  Q  Why did you believe that act was undertaken by
9     Mr. Graham at that time?
10       MR. THOMAS: Objection. Why did he believe
11    Mr. Graham believed?
12       MS. WALLET: Yes.
13       MR. THOMAS: You're asking him to speculate as to
14    Mr. Graham's state of mind?
15       MS. WALLET: I am.
16       MR. THOMAS: I'm going to object.
17       You can answer.
18 BY MS. WALLET:
19 Q  You may answer.
20 A. Just so that I knew that he knew that he was there, if
21    you understand what I mean by that.
22 Q  You said that bad language was pretty customary in this
23    office. Did you hear bad language from the female
24    probation officers?
25 A. You mean in the form of a four-letter word?

### Page 83

1  Q  Yes, sir.
2  A. Sure.
3  Q  Which female probation officers used the F word?
4  A. Are we talking about repeating what someone else said?
5     Or just as a part of their normal vernacular?
6  Q  Let's take it separately. There might be occasions when
7     a female probation officer would repeat what had been
8     said to her or in conversation with someone that was
9     being supervised, correct?
10 A. Um-hum.
11 Q  Okay. Were there other instances where female probation
12    officers used the F word directed at someone or in
13    conversation?
14 A. I don't recall specifically.
15 Q  Did you ever hear Ms. Varner use the F word?
16 A. No.
17 Q  You've known her for 10 or 12 years?
18 A. 13, almost.
19 Q  Okay. Are you fairly familiar with her speech patterns?
20 A. Yes.
21 Q  Does she use foul language?
22 A. No.
23 Q  Can you think of any other female probation officers
24    that would have used the F word in some direct address?
25 A. No.

### Page 84

1  Q  Was it used by the male probation officers?
2  A. Yes.
3  Q  Was it used in front of the female probation officers?
4  A. I'm sure it has on occasion.
5  Q  Are you familiar with the reputation of Mr. Graham
6     within the Adult Probation office?
7  A. Reputation?
8  Q  What do the Adult probation officers think of
9     Mr. Graham?
10 A. I only know that he has conversations with them about
11    this entire process and I think they are generally tired
12    of that, but other than that, I don't know. No one
13    talks about him. I think many of them, as the office
14    has evolved and changed, didn't even know about this
15    whole thing and probably are fairly clueless.
16 Q  Would you say that Mr. Graham has a reputation for being
17    an excitable individual?
18 A. Yes.
19 Q  Does he have a reputation for being a violent
20    individual?
21 A. Violent?
22 Q  Yes.
23 A. No.
24 Q  Does he have a reputation for punishing individuals who
25    he perceives not to side with him?