IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA E. VARNER, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | NO: 1:CV 01-0725 |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, NINTH JUDICIAL | : | |
| DISTRICT, CUMBERLAND | : | JURY TRIAL DEMANDED |
| COUNTY; CUMBERLAND | : | |
| COUNTY; S. GARETH GRAHAM, | : | Judge Yvette Kane |
| individually; and JOSEPH | : | Electronically Filed |
| OSENKARSKI, individually, | : | |
| Defendants | : | |

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT
S. GARETH GRAHAM'S
MOTION FOR SUMMARY JUDGMENT**

---

Debra K. Wallet, Esq.
24 N. 32nd Street
Camp Hill, PA 17011
(717) 737-1300 (phone)
(717) 761-5319 (fax)
walletdeb@aol.com (email)
I.D. #PA23989
Attorney for Barbara E. Varner

TABLE OF CONTENTS

Page

TABLE OF CITATIONS ……………………………………………    iv

COUNTER STATEMENT OF THE FACTS …………………………    1

COUNTER STATEMENT OF QUESTIONS INVOLVED …………    3

ARGUMENT

    I.    DEFENDANT GRAHAM AIDED AND ABETTED IN DISCRIMINATORY CONDUCT IN VIOLATION OF THE PHRA ……………………………………………    4

        A.    GRAHAM, AS A SUPERVISORY EMPLOYEE, ENGAGED IN QUID PRO QUO DISCRIMINATION ………………………………    5

        B.    GRAHAM ENGAGED IN CONDUCT CREATING A HOSTILE WORK ENVIRONMENT …………    13

            1.    GRAHAM DISCRIMINATED AGAINST PLAINTIFF BECAUSE OF HER SEX …..    15

            2.    GRAHAM'S HARASSMENT WAS PERVASIVE AND SEVERE ………………    16

            3.    GRAHAM'S CONDUCT WOULD BE OFFENSIVE TO A REASONABLE FEMALE ……………………………………    18

II.    PLAINTIFF DID NOT "FAIL TO EXHAUST HER
       ADMINISTRATIVE REMEDIES" WITH REGARD TO
       DEFENDANT GRAHAM ………………………………    20


CONCLUSION  ……………………………………………………    24

TABLE OF CITATIONS

**Cases:**                                                                                    **Page**

Abramson v. William Paterson College, 260 F.3d 265
        (3d Cir. 2001) ……………………………………………    16

Andrews v. City of Philadelphia, 895 F.2d 1429,
        1483 (3d Cir. 1990) …………………………………………    18

Burlington Industries v. Ellerth, 524 U.S. 742 (1998)………….  5, 13, 14

Davis v. Levy, Angstreich, Finney, Badlnate, Rubenstein & Cohen,
        20 F. Supp. 2d 885 (E.D.Pa. 1998). ……………………………    4

Dici v. Commonwealth of Pa, 91 F.3d 542 (3d Cir. 1996)………….    4

Dreisbach v. Cummins Diesel Engines, Inc.,
        848 F. Supp. 593 (E.D. Pa. 1994)………………………………    20

First Judicial District of Pennsylvania v. PHRC,
        727 A.2d 1110 (Pa. 1999)………………………………………    21

Glickstein v. Neshaminy School District,
        1999 U.S. Dist. LEXIS 727 (E.D. Pa. 1999) …………………    20

Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)…. 13, 14, 15, 16, 17

Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986)………………    13

Schafer v. Bd. of Public Ed., 903 F.2d 243 (3d Cir. 1990) …………    20

**<u>Statutes and Rules</u>:**                                               **<u>Page</u>**

42 U.S.C. §2000e – 5(e)(1)……………………………………………    22

42 U.S.C. §2000e-5(f)(1) ……………………………………………    20

43 Pa. Stat. Ann. § 955(d) ……………………………………………    4

43 Pa. Stat. Ann. § 955(e) ……………………………………………    4, 5

43 Pa. Stat. Ann. §959…………………………………………………    20

43 Pa. Stat. Ann. §962(a) …………………………………………20, 23

## COUNTER STATEMENT OF THE FACTS

Probation Officer Barbara Varner [hereinafter Varner] sues supervisory individuals S. Gareth Graham [hereinafter Graham] and Joseph Osenkarski [hereinafter Osenkarski] as well as her employers, Cumberland County [hereinafter County Defendant] and the Ninth Judicial District, Cumberland County [hereinafter Court Defendant] for sexual harassment, sex discrimination, and retaliation.

After she rebuffed his sexual interest, Varner became the victim of sexual harassment by Graham, her immediate supervisor. Graham's immediate supervisor, Osenkarski, refused to take action to stop the harassment and deferred supervision of the juvenile probation office to Graham. Repeated complaints to the County Human Resources Department eventually resulted in an investigation recommending the termination of Graham and discipline or retirement for Osenkarski. The Court Defendant refused to implement these recommendations.

As a result of her gender and in response to her rebuffing Graham, Varner has been given less desirable assignments and worked under less favorable terms and conditions of employment. After rebuffing Graham's sexual advances,

Varner's pay was docked by Graham for failing to comply with a "rule" applicable only to the two female probation officers. She was assigned more cases and more difficult cases by Graham. She was threatened with punishment for having opposed Graham and Osenkarski. She was demoted on the seniority list when Osenkarski, in conjunction with Graham, changed a long-standing seniority policy. She was the *only* probation officer negatively affected by this newly implemented definition of seniority. Further, Varner has been the victim of a hostile work environment created by both Graham and Osenkarski.

When Graham learned from Osenkarski that he might be disciplined as a result of Varner's complaints, Graham went directly to Judge Sheely and successfully headed off the remedial actions recommended by the County, including investigator DeLuce, solicitor Johnson, and Human Relations Director Hartnett, by "confessing" an affair with Varner. Judge Sheely did nothing to investigate Varner's complaints himself and did not even ask Varner to respond to the "I had an affair" defense. Judge Sheely, a personal friend of Graham's, simply accepted Graham's explanation.

Varner relies upon her responses to the Statement of Undisputed Material Facts containing specific facts material to Graham's Motion for Summary Judgment.

## COUNTER STATEMENT OF QUESTIONS INVOLVED

I.     Did Graham aid and abet discriminatory conduct in violation of the Pennsylvania Human Relations Act?

    A.     Did Graham, a supervisory employee, engage in *quid pro quo* discrimination?

    B.     Did Graham engage in conduct creating a hostile work environment?

        1. Did Graham discriminate against Varner because of her sex?

        2. Was the harassment pervasive and severe?

        3. Was Graham's conduct offensive to a reasonable female?

II.     Did Varner fail to exhaust her administrative remedies with respect to Graham?

**ARGUMENT**

I.   DEFENDANT GRAHAM AIDED AND ABETTED IN
DISCRIMINATORY CONDUCT IN VIOLATION OF
THE PHRA.

Section 955(e) of the Pennsylvania Human Relations Act [hereinafter

PHRA] forbids "any person, employer, employment agency, labor organization

**or employee** to aid, abet, incite or coerce the doing of any act declared by the

section to be an unlawful discrimination practice, . . . or to attempt, directly or

indirectly, to commit any act declared by this section to be unlawful

discriminatory practice." 43 Pa. Stat. Ann. § 955(e) (emphasis added).  An

individual supervisory employee can be held liable under an aiding and

abetting/accomplice liability theory pursuant to §955(e) for his own direct acts of

discrimination.  Dici v. Commonwealth of Pa, 91 F.3d 542, 552 (3d Cir. 1996);

Davis v. Levy, Angstreich, Finney, Badlnate, Rubenstein & Cohen, 20 F. Supp.

2d 885, 887 (E.D.Pa. 1998).

Engaging in acts of retaliation would be a direct act of discrimination.   As

stated in 43 Pa. Stat. Ann. § 955(d):  "It shall be an unlawful discriminatory

practice . . . [f]or any person . . . to discriminate in any manner against any

individual because such individual has opposed any practice forbidden by this act,

4

or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." Retaliation is, therefore, an "unlawful discriminatory practice" prohibited by §955(e) of the PHRA.

Varner has presented evidence that Graham engaged in both *quid pro quo* and hostile environment discrimination, as well as retaliation. These acts are sufficient to hold him liable under the PHRA.

> A.    GRAHAM, AS A SUPERVISORY EMPLOYEE, ENGAGED IN *QUID PRO QUO* DISCRIMINATION.

In Burlington Industries v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held that an employer is vicariously liable for a supervisor's unfulfilled *quid pro quo* threats.  In this case, Varner has made out a case of *quid pro quo* actions and threats made by Gary Graham after she rebuffed his sexual overtures. Some of those threats were fulfilled:  Graham docked her pay, assigned her more cases and more difficult cases, and assisted in orchestrating a change in the seniority policy which negatively affected only Varner.  Other Graham comments about "punishment" are in the nature of unfulfilled threats like those experienced by Kimberly Ellerth in Ellerth, *supra*.

5

According to Varner, Graham indicated his interest in having a sexual relationship with her in several concrete ways. (Varner Depos. 154). First, he sent an inappropriate greeting card to her on her birthday. (V-II - Graham Depos. Exh. 3)[1]. On several occasions, Graham told Varner explicit stories regarding his "sexual problems" with his wife and even discussed his wife's masturbation habits and her refusal to have sex with him. (Varner Depos. 129, 135-136)[2]. She also alleges that Graham told Varner about satisfying him and looked at her with a suggestive smile. She claims that he has stated to her several times that in her 'case management' she has to satisfy the victim and the community, and hesitating with a suggestive smile in her direction. Varner interpreted this as a sexual innuendo. (Varner Depos. 156).

Green described Graham's activities as a "flirtatious" interest in Varner. (Green Depos. 202[3]). On one occasion, Graham patted Varner on her butt. This incident was witnessed by Debra Green. (Green Depos. 121).

---

[1] References "V__" denote those documents reproduced by Varner in opposition to the various motions for summary judgment.

[2] Complete deposition transcripts already provided to this Court by the County and Court Defendants will not be reproduced by Varner.

[3] The complete transcripts of Debra Green's deposition have been reproduced as part of Varner's Exhibits in Opposition to the Court Defendant's Motion for Summary Judgment.

More significant, Graham, without any work-related reason, appeared uninvited at Varner's home and demanded to be allowed to enter.  Varner testified at deposition that Graham stated that he knew her husband was not home at the time. (Varner Depos. 143).   Varner believed that his appearance indicated his interest in a sexual relationship.  (Varner Depos. 145).

Finally, during their work-related attendance at a training session at Penn State University, Graham knocked on Varner's hotel room door requesting entrance and called her room repeatedly.  (Varner Depos. 114).  Varner was not alone in her conclusion that Graham was interested in a sexual relationship with her.  Debra Green confirmed this sexual interest.  (Green Depos. 118, 147).

The DeLuce report stated the following:

> With regard to a *quid pro quo* claim, Varner states that Graham frequently talked to her about his marital problems and sex life with his wife.  In that same conversation she alleges that he told Varner she could take care of this by satisfying him and looked at her with a suggestive smile.  She claims that he has stated to her several times that in her 'case management' she has to satisfy the victim and the community, and hesitating with a suggestive smile in her direction, leaving an unanswered question by her interpreted to mean a sexual innuendo.

(DeLuce Depos. Exh. 3, p. 7).

Varner's complaint itself alleges threats and violent behavior by Graham against Varner. *See* Complaint, ¶16 e, f, h, j and 17 c. Varner testified that the concept of punishment was used by both Graham and Osenkarski for those who did not side with them. (Varner Depos. 212). She was understandably uncomfortable and frightened by the unannounced visit from Graham when her husband was not at home. Anyone would feel threatened when Graham speeded up his vehicle in response to her refusal to have sexual discussions about his wife and suggesting instead that he engage in counseling. She now has flashbacks of this incident. (Varner Depos. 415).

Varner's concerns about retaliation were confirmed by at least two witnesses who were deposed. First, Debra Green testified that the concept of "loyalty" was a big thing for Graham. (Green Depos. 238). Green was fearful for Varner's safety and telephoned Varner on one occasion and told her not to come to work because Graham was being "very loud and volatile." (Green Depos. 265).

The concept of "punishment" for those who opposed Graham and Osenkarski was not unprecedented. Juvenile Probation Officer Bill Brandt stated that he believed his employment had been affected by his confirmation that Joe

Osenkarski had used the term "cunt club" to female Probation Officer Kerry

Houser.  (Brandt Depos. 60-64, 45).  David DeLuce, the investigator, came to a

similar conclusion:

> I have a concern for retaliation which has also
> been stated by Barb and I believe is merited.  I tried
> to speak to Bill Brandt another juvenile probation
> officer, but he was very reluctant to talk to me.  Bill
> was the person who heard the comment by Joe
> Osenkarski that Kerry Howser was a member of the
> "Cunt Club" that got Brandt in trouble with Graham
> and Osenkarski even though he only told the truth.
> Bill said that he has been paying for it the last four
> years.  "My life has been hell" and he preferred not
> to say any more to me.  He admitted that he has
> heard Gary rant and rave at times but he said he stays
> away from him and Joe as much as he can because of
> the prior incident and how he has suffered as a result
> of it.  He said things have only started to get better
> recently and he does not want to be pulled into this
> mess.

(DeLuce Depos. Exh. 3, p. 14).   Dan Hartnett, County Human Resources

Director, also believed that Varner had reason to fear retaliation based upon what

he knew of the circumstances.  (Hartnett Depos. 56).

Varner alleges that she has received more difficult assignments in response

to her rebuffing Graham and documentary evidence of April, 1997 does support

that she had the second highest number of cases.  (V- IV - Hartnett Depos. Exh.

6:  Varner total 27, only Henry J. Thielemann had higher total at 28).

According to DeLuce, "Osenkarski also admitted that Graham assigns all cases and approves all recommendations, that he pretty much leaves it up to him." (DeLuce Depos. Exh. 3, p. 22).  Christlieb testified that after the split between adult and juvenile probation, Graham took over such day-to-day operations as case assignments and case reviews.  (Christlieb Depos. 46).

Varner testified that even if she does not have the most cases, she believes that she was given the more difficult cases or the ones in which she was required to supervise large male juveniles.  (Varner Depos. 180-182).  Again, the use of "assignments" to punish was a practice confirmed by Probation Officer Brandt. Brandt testified that after he confirmed to prior chief Bolze that Osenkarski had used the term "Cunt Club" that it was Brandt's perception that his relationship with Osenkarski changed, that he was treated unfairly by Osenkarski and particularly "in the nature of the types of cases that I was being assigned . . .." (Brandt Depos. 60-64, 45).

In addition, the change to the seniority policy (See V-G-9 to V-G-29 in Varner's Response to the Graham Statement of Material Facts) by Osenkarski directly affected only one individual in a negative way:  Barbara Varner.

10

(Osenkarski Depos. 149-150).   Osenkarski admitted at deposition that the

decision to change the seniority policy was made by him as Chief of the Juvenile

staff "with consultation of other managers, supervisors."  (Osenkarski Depos.

156).   Osenkarski identified Graham as one of those individuals.  (Osenkarski

Depos. 137-137).  It is important to note that the Chief of the Adult Probation

Department, John Roller, did not implement the seniority policy change.

(Osenkarski Depos. 157).  If this seniority policy change was so "beneficial"

then it is hard to understand why the sister organization did not see fit to make

the same change.  The seniority policy change negatively affected only one

employee in the Juvenile Probation Department:  Varner.  (Osenkarski Depos.

149-150).

Documentary evidence supports the fact that a promotion was "held up" in

April, 1998 because "until this point, Ms. Varner has not been 'hurt' in any

financial way throughout this whole process.  Needless to say, we do not want to

add to her case in any manner.  It is felt, of course, that these actions may very

well give more credence to her allegations."  (V-VI - Hartnett Depos. Exh. 13,

dated April 6, 1998).

Had Varner not been "demoted" below Brandt on the seniority list, she (and not Bill Brandt) would have been next in line on the seniority list for the one promotion to Senior Probation Officer slated to go before the Salary Board on April 6, 1998. (V-VI - Hartnett Depos. Exh. 13). Eventually both Varner and Brandt were promoted on the same date, but Varner lost the increase in salary from April 6, 1998 (the date she should have been promoted instead of Brandt based upon county seniority) through June 7, 1998, the effective date on which both Brandt and Varner were promoted. (V-VI - Hartnett Depos. Exh. 13; V-IX - Personnel Action Form dated May 27, 1998).

In short, the threats by supervisor Graham were either "realized" by the number and type of undesirable case assignments given by Graham to Varner, by the docking of Varner's pay by Graham, or by the implementation of a seniority policy negatively affecting only Varner and resulting in her loss of more than 8 weeks pay at the promotional rate. The testimonial evidence and opinion established that Graham was a vindictive individual known to "punish" individuals who opposed his wishes. Varner certainly believed that she had been threatened with "punishment" just like Graham's wife who would be punished by Graham for refusing to have sex with him. (Varner Depos. 136).

Under either the "realized" or "unrealized" threat theory, Graham, as a supervisory employee, would be deemed to have engaged in sex discrimination whether the activity is called *quid pro quo* discrimination or sexual harassment in the nature of unfulfilled threats. Under either theory, Graham's actions would subject him to individual liability under the PHRA.

B.      GRAHAM ENGAGED IN CONDUCT CREATING
        A HOSTILE WORK ENVIRONMENT.

In Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), the Supreme Court clarified the standard for hostile environment sexual harassment adopted in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986). Of course, Harris was a pre-Ellerth case. If the three "unfulfilled" threats described in Ellerth[4] were sufficient to make out a violation of Title VII, then the facts established by Varner would certainly meet the Ellerth test. However, Varner concedes that the lower court in Ellerth had found the three threats to be "severe and pervasive

---

[4] The supervisor (1) commented about Ellerth's breasts, told her to "loosen up" and warned, "you know, Kim, I could make your life very hard or very easy at Burlington"; (2) told Ellerth during a promotional interview, which she ultimately received, that she was not "loose enough" and rubbed her knee, later telling her that "you're gonna be out there with men who work in factories, and they certainly like women with pretty butts/legs" and (3) told her "I don't have time for you right now, Kim—unless you want to tell me what you're wearing" and later asked "are you wearing shorter skirts yet, Kim, because it would make your job a whole heck of a lot easier." Id. at 748.

enough to create a hostile work environment" and the Supreme Court merely

accepted this finding.  The Court said only that "we express no opinion as to

whether a single unfulfilled threat is sufficient to constitute discrimination in the

terms or conditions of employment."  Id. at 754.

    For purposes of this brief, Varner believes that she meets either the Ellerth

or the Harris standard.  The Harris standard has both an objective and a

subjective component.  To state a cause of action, the plaintiff must show that a

reasonable person would find the work environment hostile or abusive.  *See*

Harris, 510 U.S. at 21.  However, the plaintiff must also demonstrate that she

subjectively perceived the work environment as abusive to show that her

conditions of employment were, in fact, altered.  Id.  The Court stated that the

following factors are relevant in determining what constitutes severe or pervasive

conduct: (1) "the frequency of the discriminatory conduct;" (2) "its severity" –

"whether it is physically threatening or humiliating, or a mere offensive

utterance;" (3) "whether it unreasonably interferes with an employee's work

performance;" and (4) "the effect on the employee's psychological well-being."

Id. at 23.  The Court rejected the argument that the hostile work environment

cause of action requires proof of psychological harm[5]: "So long as the

environment would reasonably be perceived, and is perceived, as hostile, or

abusive, . . . there is no need for it also to be psychologically injurious." Id. at

22.

1.     GRAHAM DISCRIMINATED AGAINST
PLAINTIFF BECAUSE OF HER SEX.

Varner does not dispute that Graham would scream at others and was a hot

head or an excitable individual. (Varner Depos. 90, 99, 173). However,

Varner's theory of this case is that his harassing treatment of her was because of

her refusal to comply with his desire for a sexual relationship. At least one

witness, Debra Green, confirms that Graham's treatment of Varner was worse

than his treatment of others. (Green Depos. 114). If Varner's theory is correct,

Graham's actions were "because of her sex."

Curiously, in this case, if Graham's allegations of a consensual sexual

relationship are accepted,[6] even Graham's explanation would satisfy the "because

of her sex" requirement. According to Graham's story, the sexual relationship

---

[5] Varner has submitted expert witness evidence of psychological injury.

[6] Varner adamantly denies any sexual relationship with Graham. This analysis is offered only to counter the motion for summary judgment.

with Varner began in 1990 and ended in 1996. (Graham Depos. 203). Varner establishes circumstances after this alleged "end of the affair" which establish a hostile working environment. Therefore, these actions would without question constitute discrimination "because of her sex."

Graham's actions had a sexual component. Whether or not Graham actually solicited sex in so many words is not determinative. His actions and related comments made it clear to Varner that he was sexually interested in her. Graham's sexual interest in Varner was obvious to others in the office as well. (See, e.g., Green Depos. 141).

### 2.   GRAHAM'S HARASSMENT WAS PERVASIVE AND SEVERE.

Two of the Harris, *supra*, criteria are the frequency and severity of the offensive conduct. The frequency of incidents is not alone determinative of a hostile environment. Abramson v. William Paterson College, 260 F.3d 265 (3d Cir. 2001). In Abramson, a religious discrimination case, the Third Circuit stated that the Court must look at all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically

16

threatening or humiliating or a mere offensive utterance, and whether it
unreasonably interferes with an employee's work performance.

Here, the harassment was sufficiently severe that it affected Plaintiff's
health and threatened her well being.  Speeding in a motor vehicle with Varner
captive in the passenger seat is physically threatening.  (Varner Depos. 415).
Graham would move toward Varner in a physically aggressive manner, throw
wadded paper at her, and point in her face.  (Varner Depos. 104, 171).  This
testimony was confirmed by Green.  (Green Depos. 111, 259).  Telling her co-
workers that Varner had no "fucking sense, no fucking training, and no fucking
ability" was humiliating and offensive.  (Varner Depos. 163-164).

Graham does not even deny that he told Varner that he had smashed a
birthday cake prepared by his wife.  (Graham Depos. 320).  Varner stated that
she believed that he would tell her these things about punishing his wife to
remind Varner of how he could dole out punishment.  (Varner Depos. 136, 151).
Varner also believes that Graham told Varner this to threaten Varner—who had
also refused Graham sex.

Graham's harassment may not have been a daily occurrence, but it was
certainly severe, pervasive, and threatening.  As a matter of law, Varner's

evidence meets this prong of the even stricter <u>Harris</u> standard for sexual harassment.

> 3.    GRAHAM'S CONDUCT WOULD BE
>        OFFENSIVE TO A REASONABLE PERSON
>        OF THE SAME SEX.

The purpose of the objective test is to ensure that employers are held liable only when the work environment is hostile from the standpoint of a reasonable person, thus insulating employers from the "hypersensitive employee." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1429, 1483 (3d Cir. 1990). Graham's conduct would unquestionably be offensive to any female. No female employee would find it acceptable to endure unwanted touching (the pat on the butt witnessed by Debra Green), appearing at the employee's home without a legitimate work reason while indicating that Graham knew Varner's husband was not home (Varner Depos. 143-144; V-I - DeLuce Depos. Exh. 2), discussing his wife's masturbation habits and her refusal to have sex with him (Varner Depos. 136; V-I - DeLuce Depos. Exh. 2), or references to a "peter meter" (Varner Depos. 120-121). Certainly, driving a vehicle at 95 miles per hour in response to a

suggestion by Varner that Graham needed counseling would not be tolerated by any reasonable person, male or female.  (Varner Depos. 136).

Graham may indeed deny some if not all of this conduct, but Varner has testified to these incidents under oath.  Investigator David DeLuce found her version of these incidents to be credible and found Graham not to be credible. (Hartnett Depos. 48; V – I - DeLuce Depos. Exh. 2).  Solicitor Johnson went so far as to say:  "[t]here are numerous incidents of Graham's language and conduct which a fact finder could find to be inappropriate sexual advances or harassment. There are at least seven or eight such instances, some of which were confirmed by others and some which were not."  (V- III - Hartnett Depos. Exhibit 5, p. 1).

Additionally, the EEOC issued a determination of probable cause finding: "there is evidence to show that Charging Party was a victim of sexual harassment, and was later subjected to retaliatory treatment in the form of demeaning treatment in front of staff, as well as denial of change in position." (V-XIII - EEOC Determination, p. 2).  For purposes of this summary judgment motion, there exists ample evidence of harassment offensive to a reasonable person.

II.    PLAINTIFF DID NOT "FAIL TO EXHAUST HER
       ADMINISTRATIVE REMEDIES" WITH REGARD TO
       DEFENDANT GRAHAM.

Graham relies exclusively on Title VII precedent for the proposition that a

plaintiff may not assert a complaint of discrimination against a party not

identified as a party in the underlying administrative complaint.  Schafer v. Bd.

of Public Ed., 903 F.2d 243, 251 (3d Cir. 1990) (discussing exhaustion for

purposes of Title VII).  Title VII does impose a jurisdictional requirement

permitting a complainant to bring a subsequent civil action only "against the

respondent named in the charge."  42 U.S.C. §2000e-5(f)(1).  See Dreisbach v.

Cummins Diesel Engines, Inc., 848 F. Supp. 593, 596-597 (E.D. Pa. 1994).

However, the PHRA contains no analogous language.  See 43 Pa. Stat. Ann.

§959, 962.  Glickstein v. Neshaminy School District, 1999 U.S. Dist. LEXIS

727 (E.D. Pa. 1999).

In addition, these Title VII precedents cannot be dispositive of the

situation, like Varner's, where the PHRC had no jurisdiction over her claim and

sent her to file her claim at the EEOC, which has exclusive jurisdiction over

federal claims.[7]  Varner does not dispute that Graham was identified in the body

of the complaint, not the caption.  (Documents in Support of Graham Statement,

Exhibit N).  The explanation is very simple in that individuals cannot be found

liable under Title VII, the only statute over which the EEOC had jurisdiction.

Varner was *prevented* from filing a charge at the PHRC because this agency

asserted that it had no jurisdiction based upon state court precedent.  (V-X -

Letter of June 16, 1997 referring Varner to EEOC).

Many of the procedural problems encountered by Varner related to the

PHRC's lack of jurisdiction over the Court Defendant.  In First Judicial District

of Pennsylvania v. PHRC, 727 A.2d 1110 (Pa. 1999), Pennsylvania's Supreme

Court held that the PHRC lacks jurisdiction to hear complaints against the court

because of separation of powers concerns.  As this Court previously held, the

First Judicial District case does not render court defendants immune from

liability under the PHRA but merely prohibits the PHRC from exercising any

jurisdiction "to adjudicate any complaints against the judicial branch."

(September 30, 2002 Memorandum and Order at pp. 4 – 5).  Consequently,

---

[7] The PHRC jurisdiction as it relates to the timeliness of the administrative charge was the subject of this Court's previous Order filed September 30, 2002 denying motions to dismiss based upon untimeliness.

Varner was required to bring her administrative charge directly to the EEOC as provided for in 42 U.S.C. §2000e – 5(e)(1).

As a result of the jurisdictional difficulties, Varner had no choice but to allow the EEOC to handle her claims administratively because the PHRC refused to prepare a charge of discrimination for her.  Varner provided all of the information necessary for the EEOC to prepare an administrative complaint, including numerous references to the conduct of both individuals, Gary Graham and Joseph Osenkarski, which ultimately appeared in the body of the EEOC charge.  (Graham Statement Exhibit N).   Prior to this, on September 4, 1997, the EEOC acknowledged receipt of Varner's questionnaire and told her that it would prepare a charge.  (V-XIV - EEOC letter of September 4, 1997).  It is clear from Varner's questionnaire (V-XI - Questionnaire Dated July 21, 1997) that the parties engaging in the harassment were Graham and Graham's immediate supervisor, Osenkarski, who refused to take any action to stop the sexual harassment.  The EEOC prepared a charge based on the information contained in Varner's verified intake questionnaire but that charge addressed only Title VII, not the PHRA.

There is no dispute that Plaintiff utilized those administrative remedies that were available to her. She timely and conscientiously filed her complaint with the EEOC and utilized this agency, as was her prerogative, to prepare and file an administrative charge on her behalf. It is certainly not Varner's fault that the EEOC has responsibility over Title VII, a statute which prevents the naming of individuals as defendants. Only the employer may be named as a defendant under federal law, not individuals.

Just as Title VII must be construed liberally the PHRA states that "[t]he provisions of this act shall be construed liberally for the accomplishment of the purposes thereof . . .." 43 Pa. Stat. Ann. §962(a). This Court should not bar Varner from bringing this action against Graham, who was clearly identified in the body of the administrative charge. The EEOC's failure to name Graham in the caption of the EEOC complaint should have no affect on Varner's ability to bring the instant action against Graham exclusively under state law, the PHRA.

CONCLUSION

For all of the reasons set forth in this brief, Defendant Graham's motion for summary judgment must be denied.

Respectfully submitted,


s/ Debra K. Wallet
Debra K. Wallet, Esq.
24 N. 32nd Street
Camp Hill, PA 17011
(717) 737-1300 (phone)
(717) 761-5319 (fax)
walletdeb@aol.com (email)
I.D. #PA23989
Attorney for Barbara E. Varner

Dated:   January 21, 2004

24