IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA E. VARNER, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | NO: 1:CV 01-0725 |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, NINTH JUDICIAL | : | |
| DISTRICT, CUMBERLAND | : | JURY TRIAL DEMANDED |
| COUNTY; CUMBERLAND | : | |
| COUNTY; S. GARETH GRAHAM, | : | Judge Yvette Kane |
| individually; and JOSEPH | : | Electronically Filed |
| OSENKARSKI, individually, | : | |
| Defendants | : | |

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT
JOSEPH OSENKARSKI'S
MOTION FOR SUMMARY JUDGMENT**

---

Debra K. Wallet, Esq.
24 N. 32nd Street
Camp Hill, PA 17011
(717) 737-1300 (phone)
(717) 761-5319 (fax)
walletdeb@aol.com (email)
I.D. #PA23989
Attorney for Barbara E. Varner

# TABLE OF CONTENTS

Page

TABLE OF CITATIONS ……………………………………… iv

COUNTER STATEMENT OF THE FACTS ………………………… 1

COUNTER STATEMENT OF QUESTIONS INVOLVED ………… 3

ARGUMENT

I.    PLAINTIFF MAKES NO CLAIM AGAINST
DEFENDANT OSENKARSKI UNDER TITLE VII
BECAUSE INDIVIDUALS CANNOT BE HELD
LIABLE UNDER THE FEDERAL STATUTE ………… 3

II.    DEFENDANT OSENKARSKI AIDED AND ABETTED,
INCITED OR COERCED SEXUAL HARASSMENT IN
VIOLATION OF THE PHRA …………………………… 4

    A.    OSENKARSKI FAILED TO TAKE ACTION AS A
SUPERVISOR TO PREVENT DISCRIMINATION
BY GRAHAM ……………………………………… 5

    B.    OSENKARSKI ENGAGED IN RETALIATION
AGAINST VARNER, AN UNLAWFUL
DISCRIMINATORY PRACTICE UNDER THE
PHRA ……………………………………………… 10

    C.    OSENKARSKI AIDED AND ABETTED
SEXUAL HARASSMENT BY CONSPIRING
WITH GARY GRAHAM, AND JUDGES
HOFFER AND SHEELY TO AVOID
DISCIPLINARY ACTION AND TO PREVENT
GRAHAM'S TERMINATION …………………… 18

D.    OSENKARSKI HIMSELF ENGAGED IN SEX
      DISCRIMINATION, SEXUAL HARASSMENT,
      AND INAPPROPRIATE COMMENTS AS A
      SUPERVISOR ..............................................    21


CONCLUSION  ....................................................................    24

## TABLE OF CITATIONS

**Cases:**                                                              **Page**

Caplan v. Fellheimer Eichen, 68 F.3d 828 (3d Cir. 1995)..............    4

Davis v. Levy, Angstreich, Finney, Badlnate, Rubenstein & Cohen,
    20 F. Supp. 2d 885 (E.D.Pa. 1998) ...............................    5

Dici v. Commonwealth of Pa, 91 F.3d 542 (3d Cir. 1996).............    5, 9

Robinson v. City of Pittsburgh, 120 F. 3d.
    1286 (3d Cir. 1997) ................................................... 13, 17

**Statutes and Rules:**

43 Pa. Stat. Ann. § 955(d) ...................................................    10

43 Pa. Stat. Ann. §955(e) ...............................................  4, 5, 10

## COUNTER STATEMENT OF THE FACTS

Probation Officer Barbara Varner [hereinafter Varner] sues supervisory individuals S. Gareth Graham [hereinafter Graham] and Joseph Osenkarski [hereinafter Osenkarski] as well as her employers, Cumberland County [hereinafter County Defendant] and the Ninth Judicial District, Cumberland County [hereinafter Court Defendant] for sexual harassment, sex discrimination, and retaliation.

After she rebuffed his sexual interest, Varner became the victim of sexual harassment by Graham, her immediate supervisor.  Graham's immediate supervisor, Osenkarski, refused to take action to stop the harassment and deferred supervision of the juvenile probation office to Graham.  Osenkarski himself engaged in discrimination and inappropriate sexual behavior and comments.  Repeated complaints to the County Human Resources Department eventually resulted in a County investigation recommending the termination of Graham and discipline or retirement for Osenkarski.  The Court Defendant, specifically President Judge Harold Sheely, refused to implement these recommendations.

1

As a result of her gender and her complaints of sexual harassment, Varner has been given less desirable assignments and worked under less favorable terms and conditions of employment.  She was demoted on the seniority list when Osenkarski changed a long-standing seniority policy.  She was the *only* probation officer negatively affected by this new definition of seniority.  She and the only other female probation officer had their pay docked by Graham, apparently with the tacit approval of Osenkarski.  Varner has been the victim of a hostile work environment created by both Graham and Osenkarski.

In addition, after taking her complaints to the County's Director of Human Resources, Varner became the victim of retaliation.  Specifically, she was restricted from areas of the Cumberland County Courthouse where she needed to go to do her job, and denied the position of Program Director of the Cumberland County Appointed Special Advocate (CASA) program unless she agreed to withdraw her charges of discrimination.

Varner relies upon her responses to the Statement of Undisputed Material Facts containing specific facts material to Osenkarski's Motion for Summary Judgment.

## <u>COUNTER STATEMENT OF QUESTIONS INVOLVED</u>

I.    Does Plaintiff make any claims against Defendant Osenkarski under Title VII?

II.    Did Defendant Osenkarski aid, abet, incite or coerce sexual harassment in violation of the Pennsylvania Human Relations Act?

      A.    As a supervisor, did Osenkarski fail to take action to prevent discrimination by Graham?

      B.    Did Osenkarski engage in retaliation against Varner?

      C.    Did Osenkarski aid and abet sexual harassment by conspiring with Gary Graham, and Judges Hoffer and Sheely to avoid disciplinary action and to prevent Graham's termination?

      D.    Did Osenkarski engage in sex discrimination, sexual harassment, and inappropriate comments as a supervisor?

## <u>ARGUMENT</u>

I.    PLAINTIFF MAKES NO CLAIM AGAINST DEFENDANT OSENKARSKI UNDER TITLE VII BECAUSE INDIVIDUALS CANNOT BE HELD LIABLE UNDER THE FEDERAL STATUTE.

Osenkarski's "Memorandum of Law in Support of Motion for Summary Judgment of Defendant, Joseph Osenkarski" contains a section regarding

Plaintiff's claims against Osenkarski under Title VII (see pp. 9 – 14 of Memorandum). Plaintiff filed her complaint on April 26, 2001 containing two counts: Count I – an action against the County and the Court under Title VII of the Civil Rights Act of 1964; and Count II – against individuals Graham and Osenkarski as well as the County under the Pennsylvania Human Relations Act [hereinafter PHRA], 43 Pa. Stat. Ann. §955(e). The Plaintiff has made no claims against Defendant Osenkarski under Title VII and the pleadings in this case are clear on this issue. Consequently, Plaintiff will not respond to those portions of the Memorandum relating to any alleged violation of Title VII by Osenkarski. As early as 1995, the Third Circuit has refused to extend Title VII liability to individuals. Caplan v. Fellheimer Eichen, 68 F.3d 828 (3d Cir. 1995).


II.    DEFENDANT OSENKARSKI AIDED AND ABETTED, INCITED OR COERCED SEXUAL HARASSMENT IN VIOLATION OF THE PHRA.

Section 955(e) of the Pennsylvania Human Relations Act forbids "any person, employer, employment agency, labor organization **or employee** to aid, abet, incite or coerce the doing of any act declared by the section to be an

unlawful discrimination practice, . . . or **to attempt, directly or indirectly, to commit any act declared by this section to be unlawful discriminatory practice**." 43 Pa. Stat. Ann. § 955(e).  An individual supervisory employee can be held liable under an aiding and abetting/accomplice liability theory pursuant to §955(e) for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under his supervision.  <u>Dici v. Commonwealth of Pa</u>, 91 F.3d 542, 552-3 (3d Cir. 1996); <u>Davis v. Levy, Angstreich, Finney, Badlnate, Rubenstein & Cohen</u>, 20 F. Supp. 2d 885, 887 (E.D.Pa. 1998).  Plaintiff alleges that Osenkarski engaged in direct acts in violation of the PHRA and failed to prevent discrimination by Defendant Graham.

### A.    OSENKARSKI FAILED TO TAKE ACTION TO PREVENT DISCRIMINATION BY GRAHAM.

Osenkarski alleges that he had no notice that discriminatory conduct was taking place and therefore could not be held responsible for a "failure to take action" under the PHRA.  To the contrary, Varner followed the chain of command and initially went to Osenkarski, Graham's immediate supervisor, to complain about Graham's use of the F word and "treatment."  She told

Osenkarski that he needed to get Graham "under control." (Varner Depos. 97, 167, 169)[1]. Osenkarski told Varner that he did not want to get involved and that he had put his "F--- 35 years in and now Mr. Graham is in charge." This has been Varner's claim since she went to the County's Human Resources Director in April, 1997. (V3[2] - Hartnett Depos. Exh. 1, p. 4). Osenkarski may deny using this language, but he has confirmed in his deposition that Varner told him something to the effect that "you have to do something about Gary Graham." (Osenkarski Depos. 11-12).

Quite similar to Varner's statement, Debra Green reported in her written timeline of incidents under the entry for March 20, 1997, Osenkarski stated in Green's presence: "I don't have to be here. I've been here for 35 fuckin' years. It's your turn." (V2 - Green Depos. Exh. 1; Green Depos. 248[3]).

In June 1997, Osenkarski submitted his "corrective action plan" in response to DeLuce's investigation and this memorandum specifically referenced sexual harassment, although the memo does not reference specific claims of sexual harassment by Varner. (V9 - Osenkarski Depos. Exh. 2). However, it is

---

[1] Complete deposition transcripts already provided to this Court by the County and Court Defendants will not be reproduced by Varner.
[2] References "V__" denote those documents reproduced by Varner in opposition to the various motions for summary judgment.
[3] The complete transcripts of Debra Green's deposition have been reproduced as part of Varner's Exhibits in Opposition to the Court Defendant's Motion for Summary Judgment.

unreasonable to accept the argument by Osenkarski that he "never knew" Varner made complaints of sexual harassment after being interviewed by DeLuce and Hartnett. By June, 1997, Osenkarski should have been on notice that Varner's claims included sexual harassment, an activity prohibited by the PHRA.

If not by June, 1997, Osenkarski certainly knew of these claims by July 11, 1997 when Osenkarski was copied on the Memorandum from President Judge Sheely to John Ward, Chief Clerk, and David W. DeLuce, Esquire dated July 11, 1997. In the first paragraph of this Memorandum Judge Sheely specifically states: "However, I have recently received information, that if true, would nullify in my judgment *any sexual harassment claim* involved in this relationship." (V13 - Sheely Depos. Exh. 1, emphasis added). After receiving this memo in July, 1997, Osenkarski unquestionably knew Varner was making sexual harassment claims.

Osenkarski testified at deposition that he took <u>no</u> action to monitor or otherwise observe the relationship between Graham and Varner. (Osenkarski Depos. 81). According to Osenkarski, no one ever told him to monitor the relationship or avoid retaliating against Varner. (Osenkarski Depos. 81-82). Graham remained in the same office as Varner until Judge Hoffer transferred him to a position in the adult probation department at the prison in March, 1998,

almost one full year after Varner complained in writing to Hartnett.  (Graham

Depos. 280-281).  Osenkarski admitted he did nothing to observe the parties or

prevent retaliation during this period of time.  (Osenkarski Depos. 81-82).  These

actions would be expected of a supervisor to assure a non-hostile environment.

At least one witness, Debra Green, testified that Osenkarski saw the

problems in the relationship between Varner and Graham but did nothing to stop

it.  Green was specifically asked:

> Q.    Do you believe that Mr. Osenkarski as Mr.
>       Graham's supervisor would take any action with
>       regard to Mr. Graham's conduct towards Ms.
>       Varner?
> A.    No.
> Q.    Why not?
> A.    He witnessed very similar things that we had
>       witnessed. I mean, he was present or he had
>       heard about it and made no comment.  He never
>       came to me and said, hey, I'm concerned about
>       Barb, you know, do you have any concerns, or
>       how do you think I should handle this or -- he
>       never asked me if there were problems.  He never
>       offered solutions.  Not that I went to him and
>       asked him for a solution.  He saw the problem
>       and chose to do nothing.  He didn't need me to
>       point it out to him.
> Q.    Did you believe that Mr. Osenkarksi would side
>       with Mr. Graham?
> A.    Definitely.
> Q.    Why?
> A.    They've made it well known -- like I mentioned,
>       you pair up.  They're a pair.  A lot of occasions

> they put themselves together.  They both seem to
> -- I guess the impression, they cover for each
> other.  He would let Gary go, like, and run the
> office however he saw fit and make decisions that
> I didn't feel -- I don't feel Joe knew a lot of what
> Gary was doing. . .

(Green Depos. 214-215).

Osenkarski may deny that he knew of the allegations of sexual harassment made by Varner, but the written and testamentary evidence shows otherwise.  A witness other than Varner confirms that Osenkarski did nothing to intervene in the deteriorating relationship between Varner and Graham.  This "failure to act" subjects him to liability under the PHRA.   Dici, *supra*.

Further, Osenkarski contends: "Plaintiff's failure to provide Osenkarski with information regarding alleged sexual harassment by Graham prevented Osenkarski from having the opportunity to take action to end such alleged behavior."  (Osenkarski Memorandum, p. 19).  Certainly as of the interviews conducted with investigator DeLuce, Osenkarski was put on notice of the sexual harassment claims of Varner.  In fact, Judge Sheely told DeLuce to go back to Graham and Osenkarski and "ask them to come up with a plan and let's see what they come up with.. . . and we did meet with them again and tell them that."  (DeLuce Depos. 61-62).   The "corrective plan" of Osenkarski at least referenced "sexual harassment."  (V9 - Osenkarski Depos. Exh. 2).

The fact that Osenkarski essentially washed his hands of his supervisory responsibility is further confirmed by the conclusions of both investigator David DeLuce and County Solicitor Horace A. Johnson who conveyed those conclusions to the Cumberland County Personnel Department including: "Osenkarski does not run the office, Graham does. Osenkarski admits this and others confirm it." (V4 - Hartnett Depos. Exh. 5, pp. 1-2).

        **B.**     **OSENKARSKI ENGAGED IN RETALIATION AGAINST VARNER, AN UNLAWFUL DISCRIMINATION PRACTICE UNDER THE PHRA.**

Retaliation against an employee for opposing sexual discrimination or harassment or for filing a claim of sexual harassment is itself an activity prohibited by the PHRA. As stated in 43 Pa. Stat. Ann. § 955(d): "It shall be an unlawful discriminatory practice . . . [f]or any person . . . to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." Retaliation is, therefore, an "unlawful discriminatory practice" prohibited by §955(e) of the PHRA.

If believed by the factfinder, there is evidence that Osenkarski participated indirectly, if not directly, in retaliation against Varner after she had made her written complaints of discrimination to Dan Hartnett in writing on April 25, 1997. Evidence of at least three instances of retaliation would prevent the entry of summary judgment on this issue: restrictions on Varner's access to parts of the courthouse; changes in the seniority policy negatively affecting only one person, Varner; and acquiescing in Graham's docking of Varner's and Green's pay for violating a "rule" that trips had to start at 8 am. This "rule" was applicable only to female officers Green and Varner.

In May 1998, Osenkarski ordered Varner not to conduct business in certain parts of the Courthouse. (See V-O-22 to V-O-27 in Varner's Response to the Osenkarski Statement of Material Facts). Varner testified that she understood from Osenkarski that she was prohibited from conducting business on the third floor of the Courthouse, where she may have contact with Graham's wife. She spelled out this order by writing a memorandum to Osenkarski dated June 1, 1998. (V12 - Osenkarski Depos., Exh. 16). At Osenkarski's deposition, Osenkarski confirmed that he was directed by Judge Hoffer to tell Varner of certain restrictions:

Q.    Did you have a discussion with Ms. Varner about her access to the third floor east wing of the courthouse?

A.    Yes.

Q.    What do you remember about that, sir?

A.    I was directed by Judge Hoffer to advise Barbara Varner that she should refrain from using that area to conduct any business because of the potential for having some kind of conflict with Barbara Graham, who at that time used that area that was – that was a temporary use by the court stenographers.

(Osenkarski Depos. 167).

Q.    And did Judge Hoffer tell you how you were to relay this to Ms. Varner?

A.    He told me to see her. And I scheduled a brief meeting with her in my office with Barbara Varner, and at that time I told her what Judge Hoffer directed me to do.

Q.    Just the two of you?

A.    Yes.

Q.    And you told her exactly what Judge Hoffer had told you?

A.    Yes.

(Osenkarski Depos. 169). He agreed that Varner's memorandum accurately stated the order. (Osenkarski Depos. 170-171). In his 24 years of supervisory responsibility, Osenkarski had never known of anyone to be restricted like this. (Osenkarski Depos. 175). Osenkarski agreed that there were legitimate business reasons for Varner to be in the restricted area. (Osenkarski Depos. 175). Judge

Hoffer never lifted those restrictions on Varner after May 26, to the best of Osenkarski's knowledge. (Osenkarski Depos. 179).

Curiously, Judge Hoffer's testimony is in stark contrast to Osenkarski's. Judge Hoffer stated that he never gave such an order. (Hoffer Depos. 44-46; see V-O-27). Judge Hoffer's testimony at least raises a factual dispute as to whether Judge Hoffer or Osenkarski himself imposed the restrictions on Varner. These two versions of the facts are mutually exclusive; only one version can be true. If it was Osenkarski, not Judge Hoffer, who imposed the restriction on Varner, then this is an even more compelling example of direct retaliation against Varner by Osenkarski.

Plaintiff concedes that utilizing the Title VII model, retaliatory conduct other than discharge or refusal to hire is proscribed by Title VII only if it alters the employee's "compensation, terms, conditions, or privileges of employment," deprives her of "employment opportunities," or "adversely affects his [or her] status as an employee." Not every action qualifies as retaliation if those acts are otherwise minor and trivial. Robinson v. City of Pittsburgh, 120 F. 3d. 1286, 1300 (3d Cir. 1997). The unlawful retaliatory acts in which Osenkarski participated did adversely affect her status as an employee and were more than minor or trivial.

13

Varner testified that she was humiliated and embarrassed that she was restricted from going to parts of the courthouse necessary for her to do her job. (Varner Depos. 259, 285). Other probation officers knew of this restriction. (Brandt Depos. 44; Houser Depos. 101). Osenkarski agreed that there were legitimate business reasons for Varner to be in the restricted area. (Osenkarski Depos. 175). Probation Officer Houser testified that it would be necessary, at times, to conduct business in the offices from which Varner had been prohibited. (Houser Depos. 101). Osenkarski also agreed that to the best of his recollection no other probation officer had been restricted in this way. (Osenkarski Depos. 174). This restriction adversely affected her status as an employee, affected her conditions of employment, and denied her the employment opportunity to associate with her fellow probation officers located in the restricted area.

In addition, the change to the seniority policy (See V-O-1 to V-O-21 in Varner's Response to the Osenkarski Statement of Material Facts) by Osenkarski directly affected only one individual in a negative way: Barbara Varner. (Osenkarski Depos. 149-150). Documentary evidence supports the fact that a promotion was "held up" in April, 1998 because "until this point, Ms. Varner has not been 'hurt' in any financial way throughout this whole process. Needless to say, we do not want to add to her case in any manner. It is felt, of course,

that these actions may very well give more credence to her allegations." (V7 - Hartnett Depos. Exh. 13, dated April 6, 1998).

Had Varner not been "demoted" below Brandt on the seniority list, she (and not Bill Brandt) would have been next in line on the seniority list for the one promotion to Senior Probation Officer slated to go before the Salary Board on April 6, 1998. (V7 - Hartnett Depos. Exh. 13). Varner lost the increase in salary from April 6, 1998 (the date she should have been promoted instead of Brandt based upon county seniority) through June 7, 1998, the effective date on which both Brandt and Varner were promoted. (V7 - Hartnett Depos. Exh. 13; Personnel Action Form dated May 27, 1998).

Osenkarski admitted at deposition that the decision to change the seniority policy was made by him as Chief of the Juvenile staff "with consultation of other managers, supervisors." (Osenkarski Depos. 156). Osenkarski identified Graham as one of those individuals. (Osenkarski Depos. 137-137). The Chief of the Adult Probation Department did not implement the seniority policy change. (Osenkarski Depos. 157).

Varner spells out at least one instance where she and another female worker were docked pay by Graham for having left to take a commitment trip

prior to 8:00 a.m. (Varner Depos. 102-103). These facts were confirmed by Green. (Green Depos. 85-86). This incident occurred in December, 1996. (V2 – Green Depos. Exh. 1). Even Graham concedes that the relationship with Varner had turned sour by fall, 1996. (Graham Depos. 136). Male Probation Officers testified at deposition that there was no such "policy" applicable to them. (Brandt Depos. 77-78; Christlieb Depos. 51-52; Miller Depos. 73-74). Osenkarski at least indirectly (either through total delegation to Graham or through deliberate failure to supervise) permitted Graham to dock Varner's pay. Varner and Green were the only female probation officers on the juvenile side. (Varner Depos. 102).

Perhaps most significant to Varner's safety and wellbeing was Osenkarski's failure to ensure that she was notified of, and evacuated during, a bomb scare which occurred in March, 2002. (Varner Depos. 241). Varner testified that Osenkarski knew she was in work that day, that he had seen her, that her office was next to Osenkarski's, that she had signed in on the board directly outside his office, and that he made no effort to see that she was evacuated from the courthouse. (Varner Depos. 241-243). As a result, Varner was the *only* juvenile probation employee left in the building for more than an hour after the courthouse had been cleared of all other employees. (Varner

Depos. 242).  At least the County believed that Osenkarski, as supervisor, should have implemented some procedure to ensure that all of the employees under his supervision had been evacuated.  Osenkarski considered that he had been "reprimanded" by the Chief Clerk of the County Commissioners for his role in the bomb scare incident.  (Osenkarski Depos. 182).  After the incident, Osenkarski was directed to implement a procedure to ensure that all employees under his supervision were out of the building.  (Osenkarski Depos.  67).

All of these are examples of "privileges of employment" which were denied to either Barbara Varner alone or to Varner and Green (the only other female probation officer at that time) after the relationship with Graham significantly changed.  The application of the seniority policy change to the promotion to Senior Probation Officer and the bomb scare were after Varner made her written complaints of sexual harassment against Graham and Osenkarski in April, 1997 to Daniel Hartnett, the County Human Resources Director, and after those complaints were investigated by DeLuce—including interviews of Osenkarski.  (Osenkarski Depos. 37, 77-78).

The "adverse employment actions" in which Osenkarski participated which would satisfy even the more stringent Robinson standard are, at a minimum, the order restricting Varner's free access to all areas of the courthouse where she

17

needed to consult with fellow probation officers and the holdup in her promotion

to Senior Probation Officer as a result of a seniority change implemented by

Osenkarski which negatively affected only one person, Varner.

> C.    OSENKARSKI AIDED AND ABETTED
> SEXUAL HARASSMENT BY
> CONSPIRING WITH GARY GRAHAM,
> AND JUDGES HOFFER AND SHEELY
> TO AVOID DISCIPLINARY ACTION
> AND TO PREVENT GRAHAM'S
> TERMINATION.

Osenkarski misstates Plaintiff's deposition testimony regarding the

conspiracy claim.  While it is true that Varner admitted she has no "paperwork"

to support her claim of conspiracy, that claim is established by evidence of

discussions and communications between Osenkarski, Graham, and the decision-

making judges in this case.  It is undisputed that on June 26, 1997 the County's

solicitor, Horace A. Johnson, recommended to Hartnett that Graham be

"removed from any supervisory position" and that Osenkarski "should retire."

(V4 - Hartnett Depos. Exh. 5, p.1).  Hartnett believed that the County

Commissioners and the President Judge received a copy.  (Hartnett Depos. 73).

18

Another document also states that on July 2, 1997, Judge Sheely had agreed to suspend Osenkarski and to send him to supervisory skills and sensitivity training sessions and that Hartnett, the Personnel Director, agreed with those determinations. (V6 - Hartnett Depos. Exh. 8; Hartnett Depos. 82-83). The facts are undisputed that Graham was not "removed from any supervisory position" until Judge Hoffer demoted him in March, 1998, and that Osenkarski never served any suspension. In fact, no action at all was taken against Osenkarski. (Osenkarski Depos. 104-105).

At deposition, Osenkarski testified that Judge Sheely's secretary, Sandy, told Osenkarski that he and Graham may be disciplined as a result of the DeLuce investigation. (Osenkarski Depos. 101-103). Osenkarski testified that he told this information to Graham. (Osenkarski Depos.103). According to Judge Sheely, Osenkarski talked to him in or about the time that the discipline of Graham was reduced from a recommended removal of supervisory responsibilities to a three-day suspension. (Sheely Depos. 81-82). As a result of the communication between Osenkarski and Graham, Graham met directly with Judge Sheely at least two times, one time with his counsel. (Graham Depos. 148-152; 156-158, Sheely Depos. 23, 30-31).

A reasonable conclusion based on these facts is that Graham and Osenkarski engaged in conduct and conversations that headed off the implementation of the recommended discipline.  Osenkarski simply misses the point when he states: "Plaintiff has indicated that all evidence of pled [sic] conspiracy by Osenkarski and the Court and County defendants is shown by the communications between Osenkarski and Judge Hoffer."  (Memo p. 23).  To the contrary, one of the claims of aiding and abetting involves the relationship and conversations between Graham, Osenkarski and Judge Sheely, the initial Court decision maker.

A reasonable fact finder could conclude based on these facts that the reason the county recommendations (Johnson, DeLuce and Hartnett) were not implemented is because of the discussions between Graham, Osenkarski, and Judge Sheely.  Judge Sheely admits he did nothing else to investigate the Varner allegations (Sheely Depos. 81).  Judge Sheely did not even ask Varner if she wanted to respond to the "I had an affair with Varner" defense raised by Graham.  (Sheely Depos. 36-38).  This conclusion is further buttressed by Varner's allegations that Judge Sheely told her that he and Gary Graham were "asshole buddies" (Varner Depos. 267) and that she would just have to "put up with it" when she complained of harassment.  (Varner Depos. 274-5).  Judge

Sheely does not deny that he was personal friends with Graham. He was a guest at the wedding of Graham and his wife. (Sheely Depos. 120).

Additional evidence of Osenkarski" "aiding and abetting" is that he relayed the information received from the Judge's secretary directly to Graham. (Osenkarski Depos. 103-104). A responsible supervisor, aware of a supposedly "independent" investigation of allegations by one supervisee against another supervisee, should never have leaked information to only one of the parties involved. Moreover, Osenkarski utterly failed to take any action against Graham, even after the DeLuce investigation. Osenkarski admitted that he didn't even "monitor" the interaction between Graham and Varner. He simply deferred his supervisory responsibilities to Graham and washed his hands of the matter.

> D.    OSENKARSKI HIMSELF ENGAGED IN
> SEX DISCRIMINATION, SEXUAL
> HARASSMENT, AND INAPPROPRIATE
> COMMENTS AS A SUPERVISOR.

In her complaint, Varner delineated at least five instances in which Osenkarski himself made inappropriate comments to female staff. Each of these specific allegations were testified to in Varner's deposition. The statement of material facts submitted by Osenkarski confirms the pages at which Varner

testified to these comments.  Although not all of them were made directly to Varner, they are examples of Osenkarski specifically calling attention to females and making inappropriate, sexual comments about females.

Varner also testified about one particularly offensive incident which occurred at a conference where Osenkarski repeatedly flicked a Bic lighter which was in the shape of an artificial penis at a female presenter and at Varner. (Varner Depos. 179-180).  Osenkarski admits that he had borrowed this lighter from a friend.  He described it as a "makeshift Bic lighter which when flicked ejected an artificial penis."  (Osenkarski Depos. 188).  Although he denied using this lighter in a work situation, he conceded that he "may have" used it at a conference.  (Osenkarski Depos. 188).

This is the same supervisory employee who informed new female probation officers that they would have to "dance on the tables" at their first staff meeting.  (Varner Depos. 177).  Not only does Osenkarski not deny this statement, he testified that his notes from staff meetings included references to "dancing on tables."  (Osenkarski Depos. 53).  He admits that on one occasion it was directed toward Jill Grim-Rhoads and Gail Schuhart, two new female probation officers.  (Osenkarski Depos. 52-53).

Osenkarski denied making the statement that he had put in his f'ing thirty-five years and that now Mr. Graham was in charge or that he used the F word in Ms. Varner's presence at any time. (Osenkarski Depos. 16). This testimony is belied by both the testimony of Debra Green (Green Depos. 177) and Barbara Varner (Varner Depos. 97; V3 - Hartnett Depos. Exh. 1 p. 4).

Probation Officer Darby Christlieb testified that there was no policy about the use of profanity in the office, that Osenkarski used the F word behind closed doors, and that Osenkarski never told the staff that this kind of language was not to be used. (Christlieb Depos. 49). Osenkarski is also the supervisor who was alleged by Kerry Houser to have used the term "cunt club" directed at her and the other female probation officers. (Houser Depos. 8). Again, Osenkarski denies this statement as well. (Osenkarski Depos. 23, 106).

Even one instance of sex discrimination, retaliation, or "aiding and abetting" by Osenkarski himself would prevent the entry of summary judgment in Osenkarski's favor. Varner submits that there are many examples set forth in this brief which would preclude the dismissal of the PHRA claims against Osenkarski.

<u>CONCLUSION</u>

For all of the reasons set forth in this brief, Defendant's motion for summary judgment must be denied.


Respectfully submitted,


s/ Debra K. Wallet
Debra K. Wallet, Esquire
24 N. 32nd Street
Camp Hill, PA  17011
I.D. #PA23989
(717) 737-1300 (phone)
(717) 761-5319 (fax)
walletdeb@aol.com (email)
Attorney for Barbara E. Varner


Dated:   January 21, 2004