IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA E. VARNER, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | NO: 1:CV 01-0725 |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, NINTH JUDICIAL | : | |
| DISTRICT, CUMBERLAND | : | JURY TRIAL DEMANDED |
| COUNTY; CUMBERLAND | : | |
| COUNTY; S. GARETH GRAHAM, | : | Judge Yvette Kane |
| individually; and JOSEPH | : | Electronically Filed |
| OSENKARSKI, individually, | : | |
| Defendants | : | |

_____

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT
COMMONWEALTH OF PENNSYLVANIA, NINTH JUDICIAL
DISTRICT'S
MOTION FOR SUMMARY JUDGMENT**

_____

Debra K. Wallet, Esq.
24 N. 32nd Street
Camp Hill, PA 17011
(717) 737-1300 (phone)
(717) 761-5319 (fax)
walletdeb@aol.com (email)
I.D. #PA23989
Attorney for Barbara E. Varner

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS .................................................... iv

COUNTER STATEMENT OF THE FACTS ............................ 1

COUNTER STATEMENT OF QUESTIONS INVOLVED ............ 3

ARGUMENT

    I.    VARNER HAS SET FORTH A PRIMA FACIE
        CASE OF SEXUAL HARASSMENT
        UNDER TITLE VII ........................................... 4

        A.    THE HARASSMENT WAS PERVASIVE AND
              SEVERE .................................................. 6

        B.    DEFENDANT HAS FAILED TO ESTABLISH
              AN ELLERTH AND FARAGHER DEFENSE ... 11

              1.  VARNER HAS SUFFERED TANGIBLE
                    EMPLOYMENT ACTIONS ...................... 12

              2.  EVEN IF THERE WERE NO TANGIBLE
                    EMPLOYMENT ACTIONS, COURT
                    DEFENDANT FAILED TO PROMPTLY
                    INVESTIGATE OR REASONABLY REMEDY
                    THE HARASSMENT ............................. 15

              3.  EVEN IF THERE WERE NO TANGIBLE
                      EMPLOYMENT ACTIONS, VARNER
                    FOLLOWED THE SEXUAL HARASSMENT
                    POLICY ............................................... 17

II.     VARNER HAS SET FORTH A PRIMA FACIE CASE
        OF RETALIATION ……………………………………     20

        A.     OSENKARSKI'S OR JUDGE HOFFER'S
               RESTRICTIONS ON VARNER'S ACCESS TO
               PARTS OF THE COURTHOUSE ………………     22

        B.     REDUCTION IN PAY FOR CASA POSITION
               FOR REFUSAL TO DROP LAWSUIT …………     23

        C.     FAILURE TO ENSURE VARNER'S
               EVACUATION DURING BOMB SCARE ………     24


CONCLUSION  ……………………………………………………     25

TABLE OF CITATIONS

**Cases:** **Page**

Abramson v. William Paterson College,
    260 F.3d 265 (3d Cir. 2001)…………………………………… 6

Armbruster v. Epstein, 1996 WL 289991 (E.D. Pa. 1996)…………. 21

Burlington Industries v. Ellerth, 524 U.S. 742 (1998)….. 4, 5, 6, 7, 11, 12

Faragher v. City of Boca Raton, 524 U.S. 775 (1998) ……………. 11

Farrell v. Planters Lifesavers Co., 206 F.3d 271 (3d Cir. 2000)…… 21

Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)……………. 4, 5, 6

Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986)………………. 4

Suders v. Easton, 325 F.3d 432, 452 (3d Cir. 2003),
    *cert*. *granted*, 72 U.S.L.W. 3370 (December 1, 2003)………. 11

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997) …………. 21

## COUNTER STATEMENT OF THE FACTS

Probation Officer Barbara Varner [hereinafter Varner] sues supervisory individuals S. Gareth Graham [hereinafter Graham] and Joseph Osenkarski [hereinafter Osenkarski] as well as her employers, Cumberland County [hereinafter County Defendant] and the Ninth Judicial District, Cumberland County [hereinafter Court Defendant] for sexual harassment, sex discrimination, and retaliation.

As a result of her gender and in response to her rebuffing Graham, Varner has been given less desirable assignments and worked under less favorable terms and conditions of employment. After the relationship between Graham and Varner abruptly changed from friendly to openly hostile, Varner's pay was docked by Graham for failing to comply with a "rule" applicable only to the two female probation officers. Graham assigned her more cases and more difficult cases. She was threatened with punishment for having opposed Graham and Osenkarski. She was demoted on the seniority list when Osenkarski, in conjunction with Graham, changed a long-standing seniority policy. She was the *only* probation officer negatively affected by this newly implemented definition of seniority. Further, Varner has been the victim of a hostile work environment created by both Graham and Osenkarski.

After 1990, the County policy manual contained a policy on "Harassment/Discrimination" which stated that "any person experiencing such treatment should utilize, without fear of reprisal, the County's complaint procedure as outlined in this Personnel Policy Manual."  The policy also states: "[s]hould anyone causing or involved in the harassment be, by virtue of their position, involved in the complaint procedure, the person bringing the complaint shall by-pass that particular step of the complaint procedure."  The three-step procedure provides for:  (1) discussion with the immediate supervisor, (2) a written appeal to the department head, and (3) "a written appeal to the Commissioners or their designee."  The Manual also states that "Complaint Forms may be obtained in the Personnel Office."

Varner took her complaint about Graham first to Osenkarski, the immediate supervisor of Graham, and when he did nothing but tell her that "Mr. Graham was in charge" she went to the County Human Resources Director, Daniel Hartnett with a written complaint in April, 1997.

The County investigated Varner's complaints.  When Graham learned from Osenkarski that he might be disciplined as a result of Varner's complaints, Graham went directly to Judge Sheely and successfully headed off the remedial actions recommended by the County, including investigator DeLuce, solicitor

Johnson, and Human Relations Director Hartnett, by "confessing" an affair with Varner. Judge Sheely did nothing to investigate Varner's complaints himself and did not even ask Varner to respond to the "we had an affair" defense raised by Graham. Judge Sheely, a personal friend of Graham's, simply accepted Graham's explanation.

After taking her complaints to the County's Director of Human Resources in April, 1997, Varner became the victim of retaliation. Specifically, she was restricted from areas of the Cumberland County Courthouse where she needed to go to do her job, denied the full-time position of Program Director of the Cumberland County Appointed Special Advocate (CASA) program unless she agreed to withdraw her charges of discrimination, and was the only employee left in the courthouse during a bomb scare.

Varner relies upon her responses to the Statement of Undisputed Material Facts containing specific facts material to Court Defendant's Motion for Summary Judgment.

## COUNTER STATEMENT OF QUESTIONS INVOLVED

I.   Has Varner set forth a *prima facie* case of sexual harassment under Title VII by showing that the harassment was pervasive and severe?

II.  Has the Court Defendant established an <u>Ellerth</u> and <u>Faragher</u> defense?

   A.  Has Varner suffered tangible employment actions?

    B.  Even if it is determined that there were no tangible employment actions, did the Court Defendant promptly investigate or reasonably remedy the sexual harassment?

    C.  Even if it is determined that there were no tangible employment actions, can it be shown that Varner failed to follow the sexual harassment policy in place at the time she made her complaint?

III.   Has Varner set forth a prima facie case of retaliation?

    A. Were Osenkarski's or Judge Hoffer's restrictions on Varner's access to parts of the courthouse retaliation?

    B. Was the reduction in pay for the CASA position retaliation for Varner's refusal to drop her lawsuit?

    C. Was the failure to ensure Varner's evacuation during the bomb scare retaliation?

## **ARGUMENT**

I.    VARNER HAS SET FORTH A PRIMA FACIE CASE OF SEXUAL HARASSMENT UNDER TITLE VII.

In Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993), the Supreme Court clarified the standard for hostile environment sexual harassment adopted in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986). Of course, Harris was decided before Burlington Industries v. Ellerth, 524 U.S. 742 (1998). If the three "unfulfilled" threats described in Ellerth[1] were sufficient to make out a violation of Title VII, then the facts established by Varner would certainly meet the Ellerth

---

[1] The supervisor (1) commented about Ellerth's breasts, told her to "loosen up" and warned, "you know, Kim, I could make your life very hard or very easy at Burlington"; (2) told Ellerth during a promotional interview, a promotion which she ultimately received, that she was not "loose enough" and rubbed her knee, later telling her that "you're gonna be out there with men who work in factories, and they certainly like women with pretty butts/legs" and (3) told her "I don't have time for you right now, Kim—unless you want to tell me what you're wearing" and later asked "are you wearing shorter skirts yet, Kim, because it would make your job a whole heck of a lot easier." Id. at 748.

test.  Varner concedes that the lower court in Ellerth had found the three threats to

be "severe and pervasive enough to create a hostile work environment" and the

Supreme Court merely accepted this finding.  The Court said only that "we

express no opinion as to whether a single unfulfilled threat is sufficient to

constitute discrimination in the terms or conditions of employment."  Id. at 754.

For purposes of this brief, Varner believes that she meets either the Ellerth

or the Harris standard.  The Harris standard has both an objective and a subjective

component.  To state a cause of action, the plaintiff must show that a reasonable

person would find the work environment hostile or abusive.  *See* Harris, 510 U.S.

at 21.  The plaintiff must also demonstrate that she subjectively perceived the

work environment as abusive to show that her conditions of employment were, in

fact, altered.  Id.  The Court stated that the following factors are relevant in

determining what constitutes severe or pervasive conduct: (1) "the frequency of

the discriminatory conduct;" (2) "its severity" – "whether it is physically

threatening or humiliating, or a mere offensive utterance;" (3) "whether it

unreasonably interferes with an employee's work performance;" and (4) "the

effect on the employee's psychological well-being."  Id. at 23.  The Court rejected

the argument that the hostile work environment cause of action requires proof of

psychological harm: "So long as the environment would reasonably be perceived,

and is perceived, as hostile, or abusive, . . . there is no need for it also to be psychologically injurious." Id. at 22.

The Court Defendant raises a challenge to whether or not Varner can meet the severe or pervasive requirement as a matter of law.

A.    THE HARASSMENT WAS PERVASIVE AND SEVERE.

Two of the Harris, *supra*, criteria are the frequency and severity of the offensive conduct.  The frequency of incidents is not alone determinative of a hostile environment.  Abramson v. William Paterson College, 260 F.3d 265 (3d Cir. 2001).  In Abramson, a religious discrimination case, the Third Circuit stated that the Court must look at all of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.   Here, the harassment was sufficiently severe that it unquestionably affected Plaintiff's health and threatened her wellbeing using either a subjective or objective test.

In Ellerth, *supra*, the Supreme Court held that an employer is vicariously liable for a supervisor's unfulfilled *quid pro quo* threats.   In this case, Varner has made out a case of *quid pro quo* actions as well as threats made by Gary Graham after she rebuffed his sexual overtures.  Some of those threats were fulfilled:

Graham docked her pay, assigned her more cases and more difficult cases, and assisted in orchestrating a change in the seniority policy which negatively affected only Varner.   Other Graham comments about "punishment" are in the nature of unfulfilled threats like those experienced by the plaintiff in Ellerth, *supra*.

Varner testified that Graham had expressed a sexual interest in her (Varner Depos. 154)[2] and that he had indicated his interest in having a sexual relationship with her in several concrete ways.  First, he sent an inappropriate greeting card to her on her birthday.  (V-b[3] - Graham Depos. Exh. 3).  On several occasions, Graham told Varner explicit stories regarding his "sexual problems" with his wife and even discussed his wife's masturbation habits and her refusal to have sex with him.  (Varner Depos. 135-6).  She claims that he has stated to her several times that in her 'case management' she has to "satisfy" the victim and the community, and hesitating with a suggestive smile in her direction.  Varner interpreted this as a sexual innuendo.  (Varner Depos. 156).

More significant, Graham, without any work-related reason, appeared uninvited at Varner's home and demanded to be allowed to enter.  Varner testified at deposition that Graham stated that he knew her husband was not home at the

_____

[2] Complete deposition transcripts already provided to this Court by the County and Court Defendants will not be reproduced by Varner.
[3] References "V__" denote those documents reproduced by Varner in opposition to the various motions for summary judgment.

time. (Varner Depos. 143). Varner believed that his appearance indicated his interest in a sexual relationship. Finally, during their work-related attendance at a training session at Penn State University, Graham knocked on Varner's hotel room door requesting entrance and called her room repeatedly. (Varner Depos. 114).

This case is about more than "mere offensive utterances." (Court Defendant Brief, p. 10). It is about threatening and abusive conduct directly linked to Varner's rejection of Graham's sexual advances described above. The offensive utterances, yelling, and threats may not have been a daily occurrence, but the atmosphere in the Juvenile Probation Office was certainly pervasive and threatening. Many suffered from Graham's yelling and vindictiveness, but no one as much as Varner. (Green Depos. 114).

Varner's complaint itself alleges threats and violent behavior by Graham against Varner. *See* Complaint, ¶16 e, f, h, j and 17 c. Varner testified that the concept of punishment was used by both Graham and Osenkarski for those who did not side with them. (Varner Depos. 212). She was understandably uncomfortable and frightened by the unannounced visit from Graham when her husband was not at home. (Varner Depos. 143). Anyone would feel threatened as a passenger when Graham speeded up his vehicle in response to Varner's refusal

to have sexual discussions about his wife and suggesting instead that he engage in counseling. She now has flashbacks of this incident. (Varner Depos. 415).

The concept of "punishment" for those who opposed Graham and Osenkarski was not unprecedented. Juvenile Probation Officer Bill Brandt stated that he believed his employment had been affected by his confirmation that Joe Osenkarski had used the term "cunt club" to female Probation Officer Kerry Houser. (Brandt Depos. 60-64, 45). David DeLuce, the investigator, came to a similar conclusion:

> I have a concern for retaliation which has also
> been stated by Barb and I believe is merited. I tried to
> speak to Bill Brandt another juvenile probation officer,
> but he was very reluctant to talk to me. Bill was the
> person who heard the comment by Joe Osenkarski that
> Kerry Howser was a member of the "Cunt Club" that
> got Brandt in trouble with Graham and Osenkarski
> even though he only told the truth. Bill said that he
> has been paying for it the last four years. "My life has
> been hell" and he preferred not to say any more to me.
> He admitted that he has heard Gary rant and rave at
> times but he said he stays away from him and Joe as
> much as he can because of the prior incident and how
> he has suffered as a result of it. He said things have
> only started to get better recently and he does not want
> to be pulled into this mess.

(DeLuce Depos. Exh. 3, p. 14). Dan Hartnett, County Human Resources Director, also believed that Varner had reason to fear retaliation based upon what he knew of the circumstances. (Hartnett Depos. 56).

Here, the harassment was sufficiently severe that it affected Plaintiff's health and threatened her well being.  Speeding in a motor vehicle with Varner captive in the passenger seat is physically threatening.  (Varner Depos. 415).  Graham would move toward Varner in a physically aggressive manner, throw wadded paper at her, and point in her face.  (Varner Depos. 104, 171).  This testimony was confirmed by Green.  (Green Depos. 111, 259).  Telling her co-workers that Varner had no "fucking sense, no fucking training, and no fucking ability" was humiliating and offensive.  In fact, Green was so fearful for Varner's safety on one occasion that she telephoned Varner and told her not to come to work because Graham was being "very loud and volatile."  (Green Depos. 265).

In short, the threats by supervisor Graham were either "realized" by the number and type of undesirable case assignments given by Graham to Varner, by the docking of Varner's pay by Graham, or by the implementation of a seniority policy negatively affecting only Varner and resulting in her loss of more than 8 weeks pay at the promotional rate.  The testimonial evidence and opinion established that Graham was a vindictive individual known to "punish" individuals who opposed his wishes.  Varner certainly believed that she had been threatened with "punishment" just like Graham's wife who would be punished by Graham for

refusing to have sex with him.  (Varner Depos. 129, 135-6).  This conduct was both pervasive and severe.

### B.    DEFENDANT HAS FAILED TO ESTABLISH AN ELLERTH AND FARAGHER DEFENSE.

In <u>Suders v. Easton</u>, 325 F.3d 432, 452 (3d Cir. 2003), *cert. granted*, 72 U.S.L.W. 3370 (December 1, 2003), the Third Circuit explained the holdings in <u>Ellerth</u>, *supra* and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998):

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. The affirmative defense is not available, however, when the supervisor's alleged harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

If there is evidence of a tangible employment action, then the employer is absolutely liable and there is no consideration of the affirmative defenses.

### 1.    VARNER HAS SUFFERED TANGIBLE EMPLOYMENT ACTIONS.

In this case, Varner has made out a case of *quid pro quo* actions and threats made by Gary Graham after she rebuffed his sexual overtures.  Some of those threats were fulfilled:  Graham docked her pay, Graham assigned her more cases and more difficult cases, and Osenkarski, with the assistance of Graham, orchestrated a change in the seniority policy which negatively affected only Varner.   Other Graham comments about "punishment" are in the nature of unfulfilled threats like those experienced by the plaintiff in Ellerth, *supra*.

Varner spells out at least one instance in December, 1996 when she and another female worker were docked pay by Graham for having left on a commitment trip prior to 8:00 a.m.  (Varner Depos. 102-3).  These facts were confirmed by Green.  (V-c - Green Depos. Exh. 1; Green Depos. 85-6).  Male Probation Officers testified at deposition that there was no such policy applicable to them.  (Brandt Depos. 77-8; Christlieb Depos. 51-2; Miller Depos. 73-4).  Varner and Green were the only female probation officers on the juvenile side.  (Varner Depos. 102).

Varner received more cases assigned to her by Graham in response to her rebuffing Graham's sexual overtures.  Documentary evidence of April, 1997 does support that she had the second highest number of cases.  (V-j - Hartnett Depos. Exh. 6:  Varner total 27, only Henry J. Thielemann had higher total at 28).

According to DeLuce, "Osenkarski also admitted that Graham assigns all cases and approves all recommendations, that he pretty much leaves it up to him." (DeLuce Depos. Exh. 3, p. 22). Christlieb testified that after the split between adult and juvenile probation, Graham took over such day-to-day operations as case assignments and case reviews. (Christlieb Depos. 46).

Varner testified that even if she does not have the most cases, she believes that she was given the more difficult cases or the ones in which she was required to supervise large male juveniles. (Varner Depos. 180-2). Again, the use of "assignments" to punish was a practice confirmed by Probation Officer Brandt. Brandt testified that after he confirmed to prior chief Bolze that Osenkarski had used the term "Cunt Club" that it was Brandt's perception that his relationship with Osenkarski changed, that he was treated unfairly by Osenkarski and particularly "in the nature of the types of cases that I was being assigned . . .." (Brandt Depos. 60-4, 45).

The change to the seniority policy (See V-CT- 9 to V-CT-29 in Varner's Response to the Court Defendant Statement of Material Facts) by Osenkarski directly affected only one individual in a negative way: Barbara Varner. (Osenkarski Depos. 149-50). Varner argues that seniority affects vacations, on-call, and promotions. Osenkarski confirms this. (Osenkarski Depos. 134).

Documentary evidence supports the fact that a promotion to Senior Probation Officer was "held up" in April, 1998 because "until this point, Ms. Varner has not been 'hurt' in any financial way throughout this whole process. Needless to say, we do not want to add to her case in any manner. It is felt, of course, that these actions may very well give more credence to her allegations." (V-m - Hartnett Depos. Exh. 13, dated April 6, 1998).

Had Varner not been "demoted" below Brandt on the seniority list, she (and not Bill Brandt) would have been next in line on the seniority list for the one promotion to Senior Probation Officer slated to go before the Salary Board on April 6, 1998. (V-m - Hartnett Depos. Exh. 13). Eventually both Varner and Brandt were promoted on the same date, but Varner lost the increase in salary from April 6, 1998 (the date she should have been promoted instead of Brandt based upon county seniority) through June 7, 1998, the effective date on which both Brandt and Varner were promoted. (V-m - Hartnett Depos. Exh. 13; V-s - Personnel Action Form dated May 27, 1998). This is not a "red herring" as argued by the Court Defendant (Court Defendant Brief, p. 14), but a tangible employment action which cost Varner more than eight weeks of pay at the increased rate.

In short, the threats by supervisor Graham were either "realized" by the number and type of undesirable case assignments, the docking of Varner's pay, or the change to the seniority policy which cost her more than eight weeks of increased pay. The "unrealized" threats of punishment may also satisfy the "tangible employment action" requirement under Ellerth, *supra*.

> 2.    EVEN IF THERE WERE NO TANGIBLE
>        EMPLOYMENT ACTIONS, COURT
>        DEFENDANT FAILED PROMPTLY TO
>        INVESTIGATE OR REASONABLY TO
>        REMEDY THE HARASSMENT.

Even if this Court were to disagree about the evidence of "tangible employment actions," there are facts which establish that the Court Defendant neither promptly investigated nor reasonably remedied the sexual harassment. President Judges Sheely and Hoffer admitted that they did not conduct their own investigation into Varner's allegations of sexual harassment independent of the County. (Sheely Depos. 81) (Hoffer Depos. 7-8). Judge Sheely didn't investigate at all, even after he learned from the County in April, 1997 that Varner had made written complaints of sex discrimination and harassment. Judge Sheely was not even sure that he ever saw Varner's written complaints. (Sheely Depos. 66, 81). If anything, the Court Defendant turned a deaf ear to the County's investigation and concrete recommendations as to how to remedy the sexual harassment and

discrimination.  This is confirmed by the affidavit of Chief Clerk John Ward

produced by the County in support of its motion.

It is undisputed that on June 26, 1997 the County's solicitor, Horace A.

Johnson, recommended to Hartnett that Graham be "removed from any

supervisory position" and that Osenkarski "should retire."  (V-i- Hartnett Depos.

Exh. 5, p.1).  Hartnett believed that the County Commissioners and the President

Judge received a copy.  (Hartnett Depos. 73).

Another document also states that on July 2, 1997, Judge Sheely had agreed

to suspend Osenkarski and to send him to supervisory skills and sensitivity training

sessions and that Hartnett, the Personnel Director, agreed with those

determinations.  (V-k- Hartnett Depos. Exh. 8;  Hartnett Depos. 82-83).

Osenkarski never served any suspension; no action at all was taken against

Osenkarski.  (Osenkarski Depos. 104-105).

In spite of the County investigator's belief that Varner's claims of potential

retaliation and "punishment" from Osenkarski and Graham were credible,

Osenkarski was never removed from Varner's direct supervisory chain.  Graham

continued to work in the same office from April, 1997 when Varner first made her

written complaint until March, 1998, almost an entire year after Plaintiff's written

allegations of discrimination.  Significantly, no one ever even told Osenkarski, the

Chief of Juvenile Probation, to monitor the relationship between Varner and

Graham.  (Osenkarski Depos. 81-2).  The President Judge apparently believed that

no effort need be taken to protect Varner.

The County Defendant investigated Varner's complaints.  The Court

Defendant did not.  To make matters worse for Varner, the Court Defendant

refused to implement those remedial actions that were recommended by the

investigator.  (See Ward Affidavit).  By no stretch did the Court Defendant meet

the first prong of the affirmative defense.

> 3.    EVEN IF THERE WERE NO TANGIBLE
>        EMPLOYMENT ACTIONS, VARNER
>        FOLLOWED THE SEXUAL HARASSMENT
>        POLICY.

As part of the second prong of the affirmative defense, the employer must

show that the complaining party failed to avail herself of avenues to remedy the

sexual harassment.  Varner followed the written sexual harassment policy and not

a single person in authority at the time suggested any other formal complaint

procedure.  Judge Sheely may have been "disappointed" that Varner failed to

come to him (Sheely Depos. 36), but Varner reasonably believed that she was

following the policy when she went to Daniel Hartnett, the County Human

Resources Director, and at his suggestion followed up with a written complaint.
(Hartnett Depos. 23).

As President Judge, Judge Sheely did not have a separate sexual harassment
policy in place prior to July of 1997, when he was addressing Varner's complaint.
He felt that a separate policy wasn't necessary because "the policy of the county
would apply to all the employees, including the people in the Probation office"
and that this policy was "thought out much better than what I could think up of on
my own." (Sheely Depos. 38).

The County of Cumberland Personnel Policy Manual 1990 contained a
policy on "Harassment/Discrimination" which stated that "any person
experiencing such treatment should utilize, without fear of reprisal, the County's
complaint procedure as outlined in this Personnel Policy Manual." (Exhibit to
Court Defendant's Statement of Material Facts). The policy also states: "[s]hould
anyone causing or involved in the harassment be, by virtue of their position,
involved in the complaint procedure, the person bringing the complaint shall by-
pass that particular step of the complaint procedure." (Exhibit to Court
Defendant's Statement of Material Facts).

Graham was the first step so she bypassed him. Varner took her complaint
about Graham next to Osenkarski, the immediate supervisor of Graham, and when

he did nothing but tell her that "Mr. Graham was in charge" she went to Dan Hartnett in April, 1997.  (Varner Depos. 167-9).   Hartnett was asked whether he ever told Varner "that she should go directly to Judge Sheely" as opposed to dealing with him about her complaints, Hartnett replied:  "I don't think I did, no." (Hartnett Depos. 24-5).

The three-step[4] "Complaint Procedure" provides for discussion with the immediate supervisor, a written appeal to the department head[5], and then "a written appeal to the Commissioners or their designee."  The Manual also states that "Complaint Forms may be obtained in the Personnel Office." (Exhibit to Court Defendant's Statement of Material Facts).  Varner testified that she believed that she had followed the procedure:  she asked Graham to leave her alone, she told Osenkarski and nothing was done, so she went to Dan Hartnett. (Varner Depos. 276).  Judge Sheely was asked whether he ever told Varner that she should not have gone to the county Human Resources Department with her complaints.  The Judge stated that he might have told her that he thought she should come to him first, but he didn't think he ever told her not to go to any other place.   (Sheely Depos. 43).

---

[4] Not "two-step" as the Court Defendant states at page 2 of its brief.
[5] Exactly who is the "Department Head" is unclear.  This could mean the Chief of the Juvenile Probation Office, Osenkarski, or the President Judge.

Judge Hoffer stated that the sexual harassment policy in place when he became President Judge in January, 1998 "would have been contained in the county manual." (Hoffer Depos. 27). Judge Hoffer believed that probation officers were bound by the sexual harassment policy contained in the county manual (Hoffer Depos. 27) and at no time told Varner that she had failed to follow the sexual harassment policy that was in place. (Hoffer Depos. 28).

Contrary to the Court Defendant's allegations, the Plaintiff never bypassed "the outlined complaint procedure." (Brief of Court Defendant, p. 16). Plaintiff followed the written complaint procedure contained in the county handbook. The policy states that she could "by-pass" the harassers and make a complaint to the designee of the Commissioners, namely the County human resources department. This is exactly what she did.

## II.    VARNER HAS SET FORTH A PRIMA FACIE CASE OF RETALIATION.

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). If the

plaintiff succeeds in establishing a prima facie case, the burden of production

shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for

its actions." Woodson v. Scott Paper Co., 109 F.3d 913, 920 n.2 (3d Cir. 1997).

The aura of threats and punishment pervaded the workplace. Varner

testified that the concept of punishment was used by both Graham and Osenkarski

for those who did not side with them. (Varner Depos. 212).

Refusing sexual advances may itself be viewed as protected conduct under

anti-discrimination law. Armbruster v. Epstein, 1996 WL 289991 (E.D. Pa.

1996). Varner made her written complaint to Hartnett in April, 1997. This was

unquestionably protected activity. Later, she attempted to file with the PHRC in

May, 1997 by filing a questionnaire. The EEOC served the County in November,

1998 and the Court on February 26, 1999. All of the alleged retaliatory acts (the

restrictions on access, lowering of the salary of the CASA job, and the bomb scare

incident) were after the protected activity. The Court Defendant attempts to

challenge the causal connection which will be addressed with respect to each

retaliatory event.

> A.  OSENKARSKI'S OR JUDGE HOFFER'S
>     RESTRICTIONS ON VARNER'S ACCESS TO
>     PARTS OF THE COURTHOUSE.

In May 1998, Osenkarski ordered Varner not to conduct business in certain parts of the Courthouse where she had legitimate business as a probation officer. (See V-CT-50 to V-CT-55 in Varner's Response to the Court Defendant's Statement of Material Facts). This restriction was causally connected to Varner's charges of discrimination and harassment because it involved separating Varner from Mrs. Graham, the wife of the person Varner had complained about. Varner understood from Osenkarski that she was prohibited by Judge Hoffer from conducting business on the third floor of the Courthouse, where she may have contact with Graham's wife. She spelled out this order by writing a memorandum to Osenkarski dated June 1, 1998. (V-q- Osenkarski Depos., Exh. 16).

At his deposition, Osenkarski confirmed that he was directed by Judge Hoffer to tell Varner of certain restrictions. (Osenkarski Depos. 167, 169). He agreed that Varner's memorandum accurately stated the order. (Osenkarski Depos. 170-1). In his 24 years of supervisory responsibility, Osenkarski had never known of anyone to be restricted like this. (Osenkarski Depos. 175). There were legitimate business reasons for Varner to be in the restricted area. (Osenkarski Depos. 175). Judge Hoffer never lifted those restrictions on Varner after May 26, to the best of Osenkarski's knowledge. (Osenkarski Depos. 179).

Curiously, Judge Hoffer's testimony is in stark contrast to Osenkarski's. Judge Hoffer stated that he never gave such an order. (Hoffer Depos. 44-6; see V-O-55). For purposes of holding the Court Defendant responsible for retaliation, it does not matter whether is was the Chief of the Juvenile Probation Department or Judge Hoffer who imposed the restriction on Varner.

## B.    REDUCTION IN PAY FOR CASA POSITION FOR REFUSAL TO DROP LAWSUIT.

The facts relating to the CASA job are set forth in V-CT-56 to V-CT-69 in Varner's Response to the Court Defendant Statement of Material Facts. Varner was selected by Judge Guido and introduced as his pick for the CASA job in March, 2000. It may be disputed as to which entity (the County or the Court) actually changed the CASA Director job from full-time to part-time and which entity reduced the pay from the dollar amount set forth in the original grant application (the same as Varner's) to a much lower salary. What is clear is that Varner could have the CASA job at the originally established pay but only if she withdrew her complaint of discrimination.

The CASA Director job represented an opportunity for Varner to remove herself completely from Osenkarski's supervision and to further distance herself from Graham. It was an employment opportunity which was dashed by the

insistence of both the County and the Court that she drop her litigation. Varner

turned down the job at the lower salary and refused to withdraw her complaint.

(Varner Depos. 211-12). The changes to the pay can only be deemed retaliation

for Varner having made her complaints of discrimination.

C.    FAILURE TO ENSURE VARNER'S EVACUATION
       DURING BOMB SCARE.

Perhaps most significant to Varner's safety and wellbeing was Osenkarski's

failure to ensure that she was notified of a bomb scare which occurred in March,

2002. (Varner Depos. 241). Varner testified that Osenkarski knew she was in

work that day, that he had seen her, that her office was next to Osenkarski's, that

she had signed in on the board directly outside his office, and that he made no

effort to see that she had been evacuated from the courthouse. (Varner Depos.

241-3). As a result, Varner was the only person left in the building for more than

an hour after the courthouse had been cleared of all other employees. (Varner

Depos. 242).

The causal link between the bomb scare incident and Varner's complaints

should be obvious. Varner complained about discrimination and sexual

harassment by Osenkarski. She was the only person to file such a change against

Osenkarski and she was the only employee left in the building.

At least the County believed that Osenkarski, as supervisor, was responsible for the failure to evacuate Varner and should have implemented some procedure to ensure that all of the employees under his supervision had been told to leave the building.  It was the County, not the Court, which looked into the incident.  After the incident, Osenkarski was directed by the County to implement such a procedure.  (Osenkarski Depos. 67).  However, there are *no facts* that the Court Defendant played any role in reprimanding Osenkarski or requiring him to do anything.

## CONCLUSION

For all of the reasons set forth in this brief, the Court Defendant's motion for summary judgment must be denied.

Respectfully submitted,

s/ Debra K. Wallet
Debra K. Wallet, Esq.
24 N. 32nd Street
Camp Hill, PA 17011
(717) 737-1300 (phone)
(717) 761-5319 (fax)
walletdeb@aol.com (email)
I.D. #PA23989
Attorney for Barbara E. Varner

Dated:  January 21, 2004