IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA E. VARNER, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | NO: 1:CV 01-0725 |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, NINTH JUDICIAL | : | |
| DISTRICT, CUMBERLAND | : | JURY TRIAL DEMANDED |
| COUNTY; CUMBERLAND | : | |
| COUNTY; S. GARETH GRAHAM, | : | Judge Yvette Kane |
| individually; and JOSEPH | : | Electronically Filed |
| OSENKARSKI, individually, | : | |
| Defendants | : | |

**VARNER RESPONSE
TO REVISED STATEMENT OF FACTS TO WHICH COURT
DEFENDANT CONTENDS THERE IS NO MATERIAL ISSUE TO BE
TRIED, SUBMITTED BY COMMONWEALTH OF PENNSYLVANIA
NINTH JUDICIAL DISTRICT, CUMBERLAND COUNTY
<u>COURT OF COMMON PLEAS</u>**

Plaintiff Barbara Varner, through her counsel Debra K. Wallet, Esquire,

responds to the Revised Statement submitted by Commonwealth of Pennsylvania,

Ninth Judicial District, Cumberland County Court of Common Pleas [hereinafter Court Defendant] as follows.  Varner makes these responses only for purposes of the pending motion for summary judgment.  By admitting any statement, Varner does not concede that such statement is a material fact for purposes of deciding the motion.  Most of these facts are believed not to be material to the legal issues raised by the motion.

1. – 11.   Admitted.

12.    Admitted.  By way of further response, this "policy" imposed by Graham applied only to Varner and Green, the only female probation officers on the juvenile side.  (Varner Depos. 102)[1].  Male Probation Officers testified at deposition that there was no such policy of starting trips at 8 a.m. applicable to them.  (Brandt Depos. 77-78; Christlieb Depos. 51-52; Miller Depos. 73-74).

13.    – 41. Admitted.

42.    It is admitted that these facts are accurate based on the pages given.  However, this incident was just one of those cited by Varner in support of her belief that Graham had a sexual interest in her.  (Varner Depos. 145).

43.    Admitted.

---

[1] Complete deposition transcripts already provided to this Court by the County and Court Defendants will not be reproduced by Varner.

44.    Varner admitted that it was not "offensive" to her, but she was fearful of Graham because of these statements about violence toward his wife.  It was a reminder of how Graham could punish people.  (Varner Depos. 151-152).

45.    –46.  Admitted.

47.    Admitted that Graham never specifically asked for sex.  Varner gave examples of why she believed that he wanted sex from her.  (Varner Depos. 145).

48.    – 52.  Admitted.

53.    Denied.  This is a misleading statement of Varner's deposition testimony.  On this occasion Graham was screaming about her performance.  He screamed about things she had done in the same way previously without incident, but now his attitude toward her had changed.  (See Varner Depos.  167-170).

54.    – 62.  Admitted.

63.    Denied.  Varner also testified to an incident in which Osenkarski took a lighter which when flicked was in the shape of a penis to a conference on juvenile sexual offenders in Penn State.  He flicked it at the female presenter at the conference and at Varner.  (Varner Depos. 179-180).  Osenkarski admitted to having this lighter and "may have" used it at a conference.  (Osenkarski Depos. 188).

64.   Admitted.

65.   Varner alleges that she has received more difficult assignments in response to her rebuffing Graham and documentary evidence of April, 1997 does support that she had the second highest number of cases.  (V-j[2] - Hartnett Depos. Exh. 6:  Varner total 27, only Henry J. Thielemann had higher total at 28).   In addition, the April 30, 1997 DeLuce Report quotes statistics of 4/29/97 showing Varner with the most cases.  (V-a - DeLuce Depos. Exh. 2, p. 17).

66.   Denied.  Osenkarski engaged in retaliation by implementing the seniority policy which affected only Varner.

67.   Admitted.

68.   Denied.  The effective date of the promotion for Varner was June 7, 1998.  (V-s - Personnel Action Form).

69.   Denied.  Varner does contend that she has lost an employment benefit as a result of the seniority change.  (See V-CT-9 through V-CT-29 below).

70.   Admitted.

71.   Admitted.

72.   Admitted.

---

[2] References "V__" denote those documents reproduced by Varner in opposition to the various motions for summary judgment.

73.     –74.  Admitted.  By way of further answer, at least one probation officer, William Brandt, said that the probation office believed that Graham "was suspended with pay."  (Brandt Depos. 33).

75.     It is denied that the transfer of Graham eliminated any contact with Graham.  It eliminated daily contact with Graham.  Varner still has some contact with Graham. (Varner Depos. 200).

76.     – 77.  Admitted.

77.     Admitted.

78.     It is admitted that Varner does not fear retaliation from Mr. Thielemann.  She makes no such comment about fear of retaliation from Osenkarski and Graham.  To the contrary, Osenkarski is still her supervisor. (Varner Depos. 185-186).

79.     Denied.   Perhaps most significant to Varner's safety and wellbeing was Osenkarski's failure to ensure that she was notified of a bomb scare which occurred in March, 2002.  (Varner Depos. 241).

80.     –98.  Admitted.

99.     It is admitted that this accurately reflects Osenkarski's opinion about the role of seniority.  Brandt testified:  "The unfortunate part within this county,

not only department-wide but maybe county-wide, is that the next senior person has always been the next to get promoted. Maybe that person's not so deserving, but that's just the chain of events." (Brandt Depos. 41).

100. Denied that the Department split occurred in January, 1997. To the contrary, Bolze retired in July, 1996 (V-n - Osenkarski Depos. Exh. 12, Bates No. 210291) or August, 1996 (Varner Depos. 100). Osenkarski had assumed responsibilities over the Juvenile Probation Department by at least September 9, 1996 when he made his new seniority policy effective. (V-o - Osenkarski Depos. Exh. 13, Bates No. 210280).

101. – 102.    It is admitted that this is what Graham has testified. Varner denies any sexual relationship with Graham. (Varner Depos. 5).

103. –116.    Admitted.

117. It is denied that "foul language was common by both men and women." Probation Officer Christlieb did not think so. (Christlieb Depos. 16, 50).

118. – 123.    Admitted.

124. It is denied that "foul language was common by both men and women." Probation Officer Christlieb did not think so. (Christlieb Depos. 16, 50).

125. – 127.    It is admitted that this is what Brandt testified. However, the seniority policy was in writing. (V-n - Osenkarski Depos. Exhibit 12).

128. Admitted.

129. Denied. This may be Brandt's position but according to Osenkarski, seniority plays a role in three benefits: on-call, vacations, and "to some degree in promotions." (Osenkarski Depos. 134).

130. – 135.    Admitted.

136. It is denied that the Court Defendant never had the earlier DeLuce Report. There is no testimony about this because Varner did not have these reports at the time of the depositions of Judges Sheely and Hoffer. Court Defendant gives no supporting citation for this fact. The Affidavit of John Ward, paragraph 11, submitted by County Defendant states that Judge Sheely insisted on receiving a copy of the DeLuce Report but does not specify which version was given to him.

137. –141. Admitted.

142. Denied. Based upon the memorandum of July 11, 1997, Judge Sheely had to have met with Graham and his wife before issuing the July 11 memorandum. (V-r - Sheely Depos. Exhibit 1).

143.  – 150.        Admitted.

151.    It is admitted that Judge Sheely was disappointed that Varner had not come to him and that the Judge understood the policy as he stated.  It is denied that Varner never followed the procedure.  The "Complaint Procedure" provides for discussion with the immediate supervisor, a written appeal to the department head, and then "a written appeal to the Commissioners or their designee."  The Manual also states that "Complaint Forms may be obtained in the Personnel Office."  (Exhibit to Court Defendant's Statement of Material Facts).  Varner made her written complaint to Daniel Hartnett, the County's Human Resources Director/Director of Personnel Office.  (V-h - Hartnett Depos. Exh.1).

152.  – 189.        Admitted.

190.    It is denied that Judge Guido thought the position would be part time.  He signed a grant application specifically containing language about a full-time position and containing a budget with a full-time salary for the CASA Director. (V-d - Guido Depos. Exh. 2).

191.    It is denied that Judge Guido thought the position would be part time.  He signed a grant application specifically containing language about a full-time position and containing a budget with a full-time salary for the CASA

Director. (V-d - Guido Depos. Exh. 2).

192. – 193.    Admitted.

194. It is denied that Judge Guido thought the position would be part time. He signed a grant application specifically containing language about a full-time position and containing a budget with a full-time salary for the CASA Director. (V-d - Guido Depos. Exh. 2).

195. – 198.    Admitted.

199. It is denied that Judge Guido thought the position would be part time. He signed a grant application specifically containing language about a full-time position and containing a budget with a full-time salary for the CASA Director. (V-d - Guido Depos. Exh. 2). The submission itself states: "Cumberland County is planning to contribute a county-funded, FTE (full-time equivalent) staff position to serve as the CASA Program Director." (V-d - Guido Depos. Exh. 2, Bates 220020, emphasis added).

200. – 207.    Admitted.

208. Denied. The policy is a three-step, not a two-step, policy. The "Complaint Procedure" provides for discussion with the immediate supervisor, a written appeal to the department head, and then "a written appeal to the Commissioners or their designee." The Manual also states that "Complaint

Forms may be obtained in the Personnel Office." (Exhibit to Court Defendant's Statement of Material Facts).

209. – 215.    Admitted.

216.   It is denied that the Court Defendant never had the earlier DeLuce Report.  There is no testimony about this because Varner did not have these reports at the time of the depositions of Judges Sheely and Hoffer.  Court Defendant gives no supporting citation for this fact.   The Affidavit of John Ward, paragraph 11, submitted by County Defendant states that Judge Sheely insisted on receiving a copy of the DeLuce Report but does not specify which version was given to him.

217.  Admitted.

218.   Denied.  Varner does not understand what is meant by "initially received by the EEOC on 1/7/1999."  It is admitted that the charge against the Court Defendant was transmitted to the Defendant Court on February 26, 1999 based upon the EEOC docket.  However, by September 4, 1997 the EEOC had the necessary information from Varner to prepare a charge and told Varner that it would prepare a draft charge for her.  (V-u; Letter of September 4, 1997 from EEOC).

VARNER'S STATEMENT OF FACTS MATERIAL TO
COURT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

V-CT-1.    Varner spells out at least one instance where she and another female worker were docked pay by Graham for having left on a commitment trip prior to 8:00 a.m.  (Varner Depos. 102-103).    These facts were confirmed by Green.  (Green Depos. 85-86).

V-CT-2.    Male Probation Officers testified at deposition that there was no such policy applicable to them.  (Brandt Depos. 77-78; Christlieb Depos. 51-52; Miller Depos. 73-74).

V-CT-3.    Varner and Green were the only female probation officers on the juvenile side.  (Varner Depos. 102).

V-CT-4.    Varner alleges that she has received more difficult assignments in response to her rebuffing Graham and documentary evidence of April, 1997 does support that she had the second highest number of cases.  (V-j - Hartnett Depos. Exh. 6:  Varner total 27, only Henry J. Thielemann had higher total at 28).  The April 30, 1997 DeLuce Report quotes statistics of 4/29/97 showing Varner with the most cases.  (V-a - DeLuce Depos. Exh. 2, p. 17).

V-CT-5.    According to DeLuce, "Osenkarski also admitted that Graham assigns all cases and approves all recommendations, that he pretty much leaves it up to him." (DeLuce Depos. Exh. 3, p. 22).

V-CT-6.    Christlieb testified that after the split between adult and juvenile probation, Graham took over such day-to-day operations as case assignments and case reviews. (Christlieb Depos. 46).

V-CT-7.    Varner testified that even if she does not have the most cases, she believes that she is given the more difficult cases or the ones in which she was required to supervise large male juveniles. (Varner Depos. 180-182).

V-CT-8.    Brandt testified that after he confirmed to prior chief Bolze that Osenkarski had used the term "Cunt Club" that it was Brandt's perception that his relationship with Osenkarski changed, that he was treated unfairly by Osenkarski and particularly "in the nature of the types of cases that I was being assigned . . .." (Brandt Depos. 60-64, 45).

V-CT-9.    On October 5, 1995, Ken Bolze, Chief of the Cumberland County Juvenile-Adult Probation Department sent a memorandum to all staff stating that the County's seniority policy "has been (since '84) and still is our Office's seniority policy. If we adopt any modifications, they will not be

retroactive.  Also, not all things are or will be determined by seniority alone."
(V-n - Osenkarski Depos. Exh. 12, Bates No. 210295, emphasis in original).

V-CT-10.    The County policy provided that "seniority is defined as the
length of continuous service an employee has with the County from his last recent
date of hire."  (V-n - Osenkarski Depos. Exh. 12, Bates No. 210295).

V-CT-11.    Ken Bolze confirmed that this policy was still the seniority
policy of the office by memorandum to probation officers entitled "Seniority"
issued February 12, 1996.  (V-n - Osenkarski Depos. Exh. 12, Bates No.
210293-94).

V-CT-12.    Based upon that policy, Barbara Varner had more seniority
than Bill Brandt.  (V-n - Osenkarski Depos. Exh. 12, Bates No. 210293-94).

V-CT-13.    On October 29, 1996, Osenkarski, then Chief of the Juvenile
Probation Office, issued a memorandum stating that the "Cumberland County
Juvenile Probation Department's seniority list is determined upon the following
criterion:  1.  Initial dated of full-time employment with the Cumberland County
Probation Department as a Probation Officer, and, 2. The continuous full-time
employment with the department."  Based on this changed policy "effective
September 9, 1996," Bill Brandt was moved ahead of Barbara Varner on the
seniority list.  (V-o - Osenkarski Depos. Exh. 13, Bates No. 210280).

V-CT-14.    Bill Brandt continues to have more seniority than Barbara Varner.    (Brandt Depos. 41).

V-CT-15.    Record evidence documents this through at least May 14, 2002.  (V-o - Osenkarski Depos. Exh. 13).

V-CT-16.    Barbara Varner was the only individual negatively affected when the definition of seniority was changed to exclude prior County service. (Osenkarski Depos. 154).

V-CT-17.    Osenkarski described the changes:

    Q.    Now, the complaint that Ms. Varner had was about the promotion of Mr. Brandt, correct?
    A.    Well, essentially, yes.  He --
    Q.    Why do you say essentially?
    A.    He moved up above Barbara Varner.
    Q.    So as a result of the action that you implemented, and that action being that county service no longer was used for seniority purposes but only service within the Probation Department, Mr. Brandt jumped ahead of Mr. [sic] Varner on the seniority list, correct?
    A.     Yes, because of his number of years in Juvenile Probation.
    Q.    Was there anyone else who as a result of the implementation of your policy lost status on the seniority list?
    A.    No.
    Q.    So your policy affected only two people:  Mr. Brandt and Ms. Varner?
    A.    Yes.
    MR. ADAMS:  Objection.  Do you know?

> MS. WALLET:  I believe he answered.  I thought he
> said yes.
> THE WITNESS:  In reality, Mr. Brandt moved up a
> slot above Barbara Varner.

(Osenkarski Depos. 149-150).

V-CT-18.    The separate Adult Probation Department, under John Roller, had the same opportunity to apply this "new" policy.  John Roller did not implement the same seniority policy change.  (Osenkarski Depos. 157).

V-CT-19.    According to Osenkarski, seniority plays a role in three benefits: on-call, vacations, and "to some degree in promotions."  (Osenkarski Depos. 134).

V-CT-20.    Several probation officers confirmed at deposition that they were not aware of any prior promotions that had not been made based upon seniority.  (Brandt Depos. 41-42; Houser Depos. 67).

V-CT-21.    Brandt testified:  "The unfortunate part within this county, not only department-wide but maybe county-wide, is that the next senior person has always been the next to get promoted.  Maybe that person's not so deserving, but that's just the chain of events."  (Brandt Depos. 41).

V-CT-22.    Brandt went even further:

> Q.    "Do you know of anybody in either Probation
> Department who was promoted over a more
> senior employee?

A.    Only because a more senior employee turned it
      down."

(Brandt Depos. 42).

V-CT-23.    Even President Judge Hoffer did not "remember" anyone
promoted who was not the most senior individual. (Hoffer Depos. 78-79).

V-CT-24.    Osenkarski admitted at deposition that the decision to change
the seniority policy was made by him as Chief of the Juvenile staff "with
consultation of other managers, supervisors."  (Osenkarski Depos. 156).

V-CT-25.    Osenkarski identified Graham as one of those individuals.
(Osenkarski Depos. 136-137).

V-CT-26.    When Varner learned that Bill Brandt was going to be
promoted to Senior PO as a result of the policy change, she complained by
memorandum dated March 31, 1998.  (V-l - Hartnett Depos. 11).

V-CT-27.    The resulting promotion was then "held up" until Varner and
Brandt were both promoted on June 7, 1998.  (V-s - Personnel Action Form
dated May 27, 1998).

V-CT-28.    Had Varner not been "demoted" below Brandt on the seniority
list, she (and not Brandt) would have been next in line on the seniority list for the
one promotion to Senior Probation Officer slated to go before the Salary Board
on April 6, 1998.  (V- m - Hartnett Depos. Exh. 13).

V-CT-29.    Varner lost the increase in salary from April 6, 1998 (the date she should have been promoted instead of Brandt based upon county seniority) through June 7, 1998, the effective date on which both Brandt and Varner were promoted. (V7 - Hartnett Depos. Exh. 13; V-s - Personnel Action Form dated May 27, 1998).

V-CT-30.    Judge Hoffer stated that the sexual harassment policy in place when he became President Judge in January, 1998 "would have been contained in the county manual."  (Hoffer Depos. 27).

V-CT-31.    Judge Hoffer believed that probation officers were bound by the sexual harassment policy contained in the county manual.  (Hoffer Depos. 27).

V-CT-32.    Judge Hoffer at no time told Varner that she had failed to follow the sexual harassment policy that was in place.  (Hoffer Depos. 28).

V-CT-33.    Judge Sheely testified that he believed that probation officers had a county badge issued to them.  (Sheely Depos. 12).

V-CT-34.    In support of her claim that the County was her employer, Varner submitted to the EEOC a copy of her Cumberland County identification badge, county pay stubs and mileage reimbursement, county Performance Review

Forms, and a copy of the county policy manual which had been given to her.

(Letter of December 31, 1998, Exhibit V-t).

V-CT-35.    Judge Sheely testified about the relationship of probation

officers to the county:

> Q.    Do you know whether probation officers had a county badge issued to them?
> A.    I don't know.  I think they did.
> Q.    Do you know whether they were subject to the rules and regulations, some sort of manual for county employees?
> A.    They would have been subject to any rules or regulations that the county had set for other employees, yes.
> Q.    Would you agree that they were sort of hybrid employees; they reported to you, you had the ability to hire and fire, but for basically everything else they were treated like county employees?
> A.     I think that's probably –
> [objections deleted]
> The Witness:  Yes, I would say that's probably correct.

(Sheely Depos. 12).

V-CT-36.    As President Judge, Judge Sheely did not have a separate

sexual harassment policy in place prior to July of 1997, when he was addressing

Varner's complaint.  He felt that a separate policy wasn't necessary because "the

policy of the county would apply to all the employees, including the people in the

Probation office" and that this policy was "thought out much better than what I

could think up of on my own."  (Sheely Depos. 38).

V-CT-37.    Judge Sheely was asked whether he ever told Varner that she should not have gone to the county Human Resources Department with her complaints.  The Judge stated that he might have told her that he thought she should come to him first, but he didn't think he ever told her not to go to any other place.   (Sheely Depos. 43).

V-CT-38.    Judge Hoffer never told Graham to stay away from Varner. (Hoffer Depos. 53, 55).

V-CT-39.    The County of Cumberland Personnel Policy Manual 1990 contained a policy on "Harassment/Discrimination" which stated that "any person experiencing such treatment should utilize, without fear of reprisal, the County's complaint procedure as outlined in this Personnel Policy Manual." (Exhibit to Court Defendant's Statement of Material Facts).

V-CT-40.    The policy states:  "[s]hould anyone causing or involved in the harassment be, by virtue of their position, involved in the complaint procedure, the person bringing the complaint shall by-pass that particular step of the complaint procedure." (Exhibit to Court Defendant's Statement of Material Facts).

V-CT-41.    Varner took her complaint about Graham first to Osenkarski

and when he did nothing but tell her that "Mr. Graham was in charge" she went to Dan Hartnett in April, 1997. (Varner Depos. 167-169).

V-CT-42.    The "Complaint Procedure" provides for discussion with the immediate supervisor, a written appeal to the department head, and then "a written appeal to the Commissioners or their designee." The Manual also states that "Complaint Forms may be obtained in the Personnel Office." (Exhibit to Court Defendant's Statement of Material Facts).

V-CT-43.    Employees of the Probation Department were assigned a county pay range and step. These employees received the same benefits as other county employees. (Hartnett Depos. 16).

V-CT-44.    Probation employees received a county handbook and there was no separate handbook for employees of the Probation Department. (Hartnett Depos. 15).

V-CT-45.    Probation employees were evaluated using the county forms. (Hartnett Depos. 16-17).

V-CT-46.    Hartnett testified: "The court system in county government whether—any county government, have a great deal of autonomy from, separate and apart from the county commissioners, you know. But by and large it's my opinion that, you know, the court system to a great extent followed the provisions

of the personnel manual. (Hartnett Depos. 15-16).

V-CT-47.    Probation Department employees were invited to orientation meetings at which "the salient factors of the personnel policy manual" and benefits would be covered. (Hartnett Depos. 17-18).

V-CT-48.    The County Salary Board would vote to approve the hiring or promotion of Probation Office employees. (Hartnett Depos. 19).

V-CT-49.    Hartnett was asked whether he ever told Varner "that she should go directly to Judge Sheely" as opposed to dealing with him about her complaints, Hartnett replied "I don't think I did, no." (Hartnett Depos. 24-25).

V-CT-50. Osenkarski ordered Varner not to conduct business in certain parts of the Courthouse.  Varner confirmed this order in writing a memorandum dated June 1, 1998.  (Hartnett Depos. Exh. 14).   Osenkarski agreed that Varner's memorandum accurately stated the order that he had relayed to her. (Osenkarski Depos. 170-171).

V-CT-51. Osenkarski testified that he was directed by Judge Hoffer to tell Varner of certain restrictions:

> Q.    Did you have a discussion with Ms. Varner about her access to the third floor east wing of the courthouse?
> A.    Yes.
> Q.    What do you remember about that, sir?
> A.    I was directed by Judge Hoffer to advise Barbara

> Varner that she should refrain from using that area to conduct any business because of the potential for having some kind of conflict with Barbara Graham, who at that time used that area that was – that was a temporary use by the court stenographers.

(Osenkarski Depos. 167).

> Q.    And did Judge Hoffer tell you how you were to relay this to Ms. Varner?
> A.    He told me to see her.  And I scheduled a brief meeting with her in my office with Barbara Varner, and at that time I told her what Judge Hoffer directed me to do.
> Q.    Just the two of you?
> A.    Yes.
> Q.    And you told her exactly what Judge Hoffer had told you?
> A.    Yes.

(Osenkarski Depos. 169).

V-CT-52. In his 24 years of supervisory responsibility, Osenkarski had never known of anyone to be restricted like this.  (Osenkarski Depos. 175).

V-CT-53. According to Osenkarski, there were legitimate business reasons for Varner to be in the restricted area.  (Osenkarski Depos. 175).

V-CT-54. Judge Hoffer never lifted those restrictions on Varner after May 26, to the best of Osenkarski's knowledge.  (Osenkarski Depos. 179).

V-CT-55. Judge Hoffer stated that he never gave such an order.  (Hoffer Depos. 45-46).

Q    Did you tell Ms. Varner that either Mr. Osenkarski had gotten it wrong or that she had gotten it wrong about not being able to go to the third floor east wing at all?

A.    I don't remember, ma'am.  And that wouldn't have been important in my mind, either way, anyway.

.  .  ..

Q    Well, let me ask you this, Judge Hoffer.  Did she agree as a result of this meeting to what you had asked her to do?

A.    My impression was that she did not.

Q    Did you give a her an order?

A.    What order?

Q    An order not to go to the office where Barbara Graham was.

A.    Absolutely not, ma'am.

.  .  ..

Q    Is it your position, sir, that she was never restricted with regard to where she could go in the courthouse?

A.    Absolutely no restrictions.

(Hoffer Depos. 43-46).

V-CT-56.    Judge Edward Guido first learned that there might be grant money available for a Court Appointed Special Advocate, "CASA," in approximately 1999.  (Guido Depos. 6-7).

V-CT-57.    In February, 2000, Osenkarski was asked by Laura Patterson to provide information about Varner's salary.  Osenkarski responded by memo of February 7, 2000 and a copy was sent to Judge Guido. (V-p - Osenkarski Depos. Exh. 15; Osenkarski Depos. 163-165).

V-CT-58.    On March 13, 2000, Laura Patterson transmitted to Judge Guido the Final CASA Submission for a grant from the National CASA Association (NCASAA) for the new program in Cumberland County.   (V-d - Guido Depos. Exh. 2).

V-CT-59.    Judge Guido signed the submission on March 8, 2000. (Guido V-d - Depos. Exh. 2, Bates 220029).

V-CT-60.    The March, 2000 submission to NCASAA listed in the "Cumberland County's CASA Proposed Budget" the amount of $40,382 as the 2000-2001 "Program Director Salary." (V-d - Guido Depos. Exh. 2, Bates 220025).

V-CT-61.    Varner testified that this was her salary.  (Varner Depos. 211).

V-CT-62.    Varner's salary was part of the grant package "that was agreed to by the commissioners." (V-f - Guido Depos. Exh. 4; Varner Depos. 312-313).

V-CT-63.    At the meeting with the county commissioners, Varner testified that she signed as the Director for the CASA program.  (Varner Depos. 312-313).

V-CT-64.    The submission itself states:  "Cumberland County is planning to contribute a county-funded, FTE (full-time equivalent) staff position to serve

<u>as the CASA Program Director</u>." (V-d - Guido Depos. Exh. 2, Bates 220020, emphasis added).

V-CT-65.    In a meeting in March, 2000, Judge Guido testified that he introduced Varner "as the lady I hoped would be running the program." (Guido Depos. 25-26).

V-CT-66.    A June 15, 2000 letter confirming discussions between Judge Guido, Joe Osenkarski, Tom Boyer, and Barbara Varner addressed to the Chief Clerk, Commissioner's Office, asks the Commissioners to transfer Varner from Juvenile Probation to Court Administration at her current pay scale of 18E. There is no mention of requiring Varner to drop her discrimination action against the County or the Court. (V-e - Guido Depos. Exh. 3).

V-CT-67.    Varner testified that she was told that she would not be offered the CASA position at her current salary unless she withdrew her Complaint. (Varner Depos. 211-12).

V-CT-68.    On July 18, 2000, County Commissioners' Chief Clerk John Ward wrote to Judge Guido and advised him that the CASA Program Director would be paid at pay grade 16A or $29,689 per year. (V-g - Guido Depos. Exh. 5).

V-CT-69.    Varner turned down the job at the lower salary and refused to withdraw her complaint. (Varner Depos. 211-12).

V-CT-70.    A bomb scare caused the evacuation of the entire Cumberland County Courthouse in March, 2002.  (Varner Depos. 241-42).

V-CT-71.    Varner testified that Osenkarski knew she was in work that day, that he had seen her, that her office was next to Osenkarski's, that she had signed in on the board directly outside his office, and that he made no effort to see that she had been evacuated from the courthouse.  (Varner Depos. 241-243).

V-CT-72.    As a result, Varner was the only person left in the building for more than an hour after the courthouse had been cleared of all other employees. (Varner Depos. 242).

V-CT-73.    The chief clerk of the County, John Connelly, reprimanded Osenkarski in 2002 for his role in the bomb scare incident.  Osenkarski called it a "memo of reprimand" and said it was for failing to follow "county procedure" in an evacuation for a bomb threat.  Osenkarski felt that it was given "by someone other than a judge who I did not work for."  (Osenkarski Depos. 61-62, 67-68, 182).

V-CT-74.    After receiving the reprimand, Osenkarski went to the president judge, but the Judge said "I'm not going to do any intervention for

you."  (Osenkarski Depos. 67).

V-CT-75.     After the incident, Osenkarski was directed to implement a

procedure to ensure that all employees under his supervision were out of the

building.  (Osenkarski Depos.  67).


Respectfully submitted,


s/ Debra K. Wallet           
Debra K. Wallet, Esquire
24 N. 32nd Street
Camp Hill, PA  17011
I.D. #PA23989
(717) 737-1300 (phone)
(717) 761-5319 (fax)
walletdeb@aol.com (email)
Attorney for Barbara E. Varner