IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA E. VARNER, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | NO: 1:CV 01-0725 |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA, NINTH JUDICIAL | : | |
| DISTRICT, CUMBERLAND | : | JURY TRIAL DEMANDED |
| COUNTY; CUMBERLAND | : | |
| COUNTY; S. GARETH GRAHAM, | : | Judge Yvette Kane |
| individually; and JOSEPH | : | Electronically Filed |
| OSENKARSKI, individually, | : | |
| Defendants | : | |

**VARNER RESPONSE TO STATEMENT OF
UNDISPUTED MATERIAL FACTS
SUBMITTED BY CUMBERLAND COUNTY**

Plaintiff Barbara Varner, through her counsel Debra K. Wallet, Esquire,

responds to the Statement submitted by Cumberland County [hereinafter County

Defendant] as follows.  Varner makes these responses only for purposes of the

pending motion for summary judgment.  By admitting any statement, Varner does

not concede that such statement is a material fact for purposes of deciding the

motion.  Most of these facts are believed not to be material to the legal issues

raised by the motion.

1.    – 32.  Admitted

33.    Admitted.  By way of further response, this "policy" imposed by

Graham applied only to Varner and Green, the only female probation officers on

the juvenile side.  (Varner Depos. 102)[1].  Male Probation Officers testified at

deposition that there was no such policy of starting trips at 8 a.m. applicable to

them.  (Brandt Depos. 77-78; Christlieb Depos. 51-52; Miller Depos. 73-74).

34.    – 41.  Admitted

42.    It is admitted that these facts are accurate based on the pages given.

However, this incident was just one of those cited by Varner in support of her

belief that Graham had a sexual interest in her.  (Varner Depos. 145).

43.    - 44.  Admitted.

45.    Denied.  Varner also testified about one particularly offensive

incident which occurred at a conference where Osenkarski repeatedly flicked a

Bic lighter which was in the shape of an artificial penis at a female presenter

---

[1] References are to the pages of the various deposition transcripts reproduced in their entirety by the County and Court Defendants.  They have not been duplicated by Varner.

and at Varner. (Varner Depos. 179-180). Osenkarski admits that he had borrowed this lighter from a friend. He described it as a "makeshift Bic lighter which when flicked ejected an artificial penis." (Osenkarski Depos. 188). Although he denied using this lighter in a work situation, he conceded that he "may have" used it at a conference. (Osenkarski Depos. 188).

46.    – 62. Admitted

63.    It is admitted that these facts are accurate based on the pages given. However, this incident was just one of those cited by Varner in support of her belief that Graham had a sexual interest in her. (Varner Depos. 145).

64.    – 66. Admitted.

67.    – 68. Admitted.

69.    Varner admitted that it was not "offensive" to her, but she was fearful of Graham because of these statements about violence toward his wife. It was a reminder of how Graham could punish people. (Varner Depos. 151-152).

70.    – 71. Admitted.

72.    Admitted that Graham never specifically asked for sex. Varner gave examples of why she believed that he wanted sex from her. (Varner Depos. 145).

73.    - 77. Admitted.

78.    Denied.  This is a misleading statement of Varner's deposition testimony.  On this occasion Graham was screaming about her performance.  He screamed about things she had done in the same way previously without incident, but now his attitude toward her had changed.  (See Varner Depos.  167-170).

79.    - 86.  Admitted.

87.    Denied.  Varner also testified to an incident in which Osenkarski took a lighter which when flicked was in the shape of a penis to a conference on juvenile sexual offenders in Penn State.  He flicked it at the female presenter at the conference and at Varner.  (Varner Depos. 179-180).  Osenkarski admitted to having this lighter and "may have" used it at a conference.  (Osenkarski Depos. 188).

88.    Admitted.

89.    Varner alleges that she has received more difficult assignments in response to her rebuffing Graham and documentary evidence of April, 1997 does support that she had the second highest number of cases.  (V-D[2] - Hartnett Depos. Exh. 6:  Varner total 27, only Henry J. Thielemann had higher total at 28).  In addition, the April 30, 1997 DeLuce Report quotes statistics of 4/29/97 showing Varner with the most cases.  (V-A - DeLuce Depos. Exh. 2, p. 17).

---

[2] References "V___" denote those documents reproduced by Varner in opposition to the various motions for summary judgment.

90.    Denied.  Osenkarski engaged in retaliation by implementing the seniority policy which affected only Varner.

91.    Admitted.

92.    Denied.  The effective date of the promotion for both Brandt and Varner was June 7, 1998.  (V-J - Personnel Action Form).

93.    Denied.  Varner does contend that she has lost an employment benefit as a result of the seniority change.  (See V-C-26 through V-C- 46 below).

94.    – 96. Admitted.

97.    Admitted.  By way of further answer, at least one probation officer, William Brandt, said that the probation office believed that Graham "was suspended with pay."  (Brandt Depos. 33).

98.    – 99. Admitted

100.   Admitted.  By way of further answer, at least one probation officer, William Brandt, said that the probation office believed that Graham "was suspended with pay."  (Brandt Depos. 33).

101.   Denied.  EEOC documents establish that "Original Correspondence received by EEOC on 6/18/97 to establish timely receipt for EEOC to process." (V-L - Notice of Charge of Discrimination).

102.  It is denied that the transfer of Graham eliminated any contact with Graham.  It eliminated daily contact with Graham.  Varner still has some contact with Graham.  (Varner Depos. 200).

103.  - 104

105.  Denied.  Perhaps most significant to Varner's safety and wellbeing was Osenkarski's failure to ensure that she was notified of a bomb scare which occurred in March, 2002.  (Varner Depos. 241).

106.  - 125. Admitted.

126.  It is admitted that this accurately reflects Osenkarski's opinion about the role of seniority.  Brandt testified:  "The unfortunate part within this county, not only department-wide but maybe county-wide, is that the next senior person has always been the next to get promoted.  Maybe that person's not so deserving, but that's just the chain of events."  (Brandt Depos. 41).

127.  Denied that the Department split occurred in January, 1997.  To the contrary, Bolze retired in July, 1996 (V-F - Osenkarski Depos. Exh. 12, Bates No. 210291) or August, 1996 (Varner Depos. 100).  Osenkarski had assumed responsibilities over the Juvenile Probation Department by at least September 9, 1996 when he made his new seniority policy effective. (V - G - Osenkarski Depos. Exh. 13, Bates No. 210280).

128.  – 134.        Admitted.

135.  Denied that the Department split occurred in January, 1997.  To the contrary, Bolze retired in July, 1996 (V-F - Osenkarski Depos. Exh. 12, Bates No. 210291) or August, 1996 (Varner Depos. 100).  Osenkarski had assumed responsibilities over the Juvenile Probation Department by at least September 9, 1996 when he made his new seniority policy effective. (V-G - Osenkarski Depos. Exh. 13, Bates No. 210280).

136.  Admitted.

137.  Denied that Graham became Varner's supervisor on January 1, 1997. To the contrary, Bolze retired in July, 1996 (V-F - Osenkarski Depos. Exh. 12, Bates No. 210291) or August, 1996 (Varner Depos. 100).  Osenkarski had assumed responsibilities over the Juvenile Probation Department by at least September 9, 1996 when he made his new seniority policy effective. (V-G - Osenkarski Depos. Exh. 13, Bates No. 210280). Graham would have been made Varner's supervisor at the same time.

138.  -139. Admitted.

140.  It is admitted that this is what Graham has testified.  Varner denies any sexual relationship with Graham.  (Varner Depos. 5).

141.  It is admitted that this is what Graham has testified.  Varner denies

any sexual relationship with Graham.  (Varner Depos. 5).

142.  – 147.        Admitted

148.  Admitted.  But Houser was not in Juvenile Probation after the split in June, 1996.  (Houser Depos. 15).

149.  Admitted.  But Houser was not in Juvenile Probation after the split in June, 1996.  (Houser Depos. 15).

150.  - 158.        Admitted.

159.  Denied.  This is a misstatement.  Houser said Graham would treat men and women equally poorly, but "with some women he's not as overtly mean to."  According to Green, "he [Graham] was belligerent and rude to people, but I don't think I would use the word lose control of his temper in the same way that he did with Barb."   (Green Depos. 114)[3].

160.  - 166.        Admitted.

167.  It is denied that foul language was typical.  (Christlieb Depos. 16, 50).

168.  - 173.        Admitted.

174.  It is denied that "foul language was common by both men and women."  Probation Officer Christlieb did not think so.  (Christlieb Depos. 16,

---

[3] The complete transcripts of Debra Green's deposition have been reproduced as part of Varner's Exhibits in Opposition to the Court Defendant's Motion for Summary Judgment.

50).

175.   It is admitted that this is what Brandt testified.  However, the seniority policy was in writing.  (V-F - Osenkarski Depos. Exhibit 12).

176.  –178.   Admitted.

179.   Denied. This may be Brandt's position but according to Osenkarski, seniority plays a role in three benefits: on-call, vacations, and "to some degree in promotions."  (Osenkarski Depos. 134).

180.  - 192.      Admitted.

193.   Denied.  Based upon the memorandum of July 11, 1997, Judge Sheely had to have met with Graham and his wife before issuing the July 11 memorandum.  (V-H - Sheely Depos. Exhibit 1).

194.  – 200.      Admitted.

201.  - 202.  It is admitted that Judge Sheely was disappointed that she had not come to him and that the Judge understood the policy as he stated.  It is denied that Varner never followed the procedure.  The "Complaint Procedure" provides for discussion with the immediate supervisor, a written appeal to the department head, and then "a written appeal to the Commissioners or their designee."  The Manual also states that "Complaint Forms may be obtained in the Personnel Office."  (Exhibit to Court Defendant's Statement of Material

Facts).  Varner made her written complaint to Daniel Hartnett, the County's

Human Resources Director/Director of Personnel Office.  (V-C - Hartnett Depos.

Exh. 1).

203.  - 251.        Admitted

252.  Denied.  Christlieb also said different things about foul language.

(Christlieb Depos. 50).

253.  - 258.        Admitted.

259.  It is denied that Judge Guido thought the position would be part

time.  He signed a grant application specifically containing language about a full-

time position and containing a budget with a full-time salary for the CASA

Director. (V-B - Guido Depos. Exh. 2).

260.  It is denied that Judge Guido thought the position would be part

time.  He signed a grant application specifically containing language about a full-

time position and containing a budget with a full-time salary for the CASA

Director. (V-B - Guido Depos. Exh. 2).

261.  – 262.        Admitted.

263.  It is denied that Judge Guido thought the position would be part

time.  He signed a grant application specifically containing language about a full-

time position and containing a budget with a full-time salary for the CASA

Director. (V-B - Guido Depos. Exh. 2).

264.    – 323.        Admitted.

VARNER'S STATEMENT OF FACTS MATERIAL TO
COUNTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

V-C-1.        Judge Hoffer stated that the sexual harassment policy in place

when he became President Judge in January, 1998 "would have been contained in

the county manual." (Hoffer Depos. 27).

V-C-2.        Judge Hoffer believed that probation officers were bound by

the sexual harassment policy contained in the county manual.  (Hoffer Depos.

27).

V-C-3.        Judge Hoffer at no time told Varner that she had failed to

follow the sexual harassment policy that was in place.  (Hoffer Depos. 28).

V-C-4.        Judge Sheely testified that he believed that probation officers

had a county badge issued to them.  (Sheely Depos. 12).

V-C-5.    In support of her claim that the County was her employer, Varner submitted to the EEOC a copy of her Cumberland County identification badge, county pay stubs and mileage reimbursement, county Performance Review Forms, and a copy of the county policy manual which had been given to her. (Letter of December 31, 1998, Exhibit V-K).

V-C-6.    Judge Sheely testified about the relationship of probation officers to the county:

> Q.    Do you know whether probation officers had a county badge issued to them?
> A.    I don't know.  I think they did.
> Q.    Do you know whether they were subject to the rules and regulations, some sort of manual for county employees?
> A.    They would have been subject to any rules or regulations that the county had set for other employees, yes.
> Q.    Would you agree that they were sort of hybrid employees; they reported to you, you had the ability to hire and fire, but for basically everything else they were treated like county employees?
> A.    I think that's probably –
> [objections deleted]
> The Witness:  Yes, I would say that's probably correct.

(Sheely Depos. 12).

V-C-7.    As President Judge, Judge Sheely did not have a separate sexual harassment policy in place prior to July of 1997, when he was addressing Varner's complaint.  He felt that a separate policy wasn't necessary because "the

policy of the county would apply to all the employees, including the people in the Probation office" and that this policy was "thought out much better than what I could think up of on my own." (Sheely Depos. 38).

V-C-8.    Judge Sheely was asked whether he ever told Varner that she should not have gone to the county Human Resources Department with her complaints. The Judge stated that he might have told her that he thought she should come to him first, but he didn't think he ever told her not to go to any other place.    (Sheely Depos. 43).

V-C-9.    Judge Hoffer never told Graham to stay away from Varner. (Hoffer Depos. 53, 55).

V-C-10.    The County of Cumberland Personnel Policy Manual 1990 contained a policy on "Harassment/Discrimination" which stated that "any person experiencing such treatment should utilize, without fear of reprisal, the County's complaint procedure as outlined in this Personnel Policy Manual." (Exhibit to Court Defendant's Statement of Material Facts).

V-C-11.    The policy states: "[s]hould anyone causing or involved in the harassment be, by virtue of their position, involved in the complaint procedure, the person bringing the complaint shall by-pass that particular step of the complaint procedure." (Exhibit to Court Defendant's Statement of Material

Facts).

V-C-12.    Varner took her complaint about Graham first to Osenkarski and when he did nothing but tell her that "Mr. Graham was in charge" she went to Dan Hartnett in April, 1997.  (Varner Depos. 167-169).

V-C-13.    The "Complaint Procedure" provides for discussion with the immediate supervisor, a written appeal to the department head, and then "a written appeal to the Commissioners or their designee."  The Manual also states that "Complaint Forms may be obtained in the Personnel Office." (Exhibit to Court Defendant's Statement of Material Facts).

V-C-14.    Employees of the Probation Department were assigned a county pay range and step.  These employees received the same benefits as other county employees.  (Hartnett Depos. 16).

V-C-15.    Probation employees received a county handbook and there was no separate handbook for employees of the Probation Department.  (Hartnett Depos. 15).

V-C-16.    Probation employees were evaluated using the county forms. (Hartnett Depos. 16-17).

V-C-17.    Hartnett testified:  "The court system in county government whether—any county government, have a great deal of autonomy from, separate

and apart from the county commissioners, you know.  But by and large it's my

opinion that, you know, the court system to a great extent followed the provisions

of the personnel manual. (Hartnett Depos. 15-16).

V-C-18.     Probation Department employees were invited to orientation

meetings at which "the salient factors of the personnel policy manual" and

benefits would be covered. (Hartnett Depos. 17-18).

V-C-19.     The County Salary Board would vote to approve the hiring or

promotion of Probation Office employees. (Hartnett Depos. 19).

V-C-20.     Hartnett was asked whether he ever told Varner "that she

should go directly to Judge Sheely" as opposed to dealing with him about her

complaints, Hartnett replied "I don't think I did, no." (Hartnett Depos. 24-25).

V-C-21.     The Chief Clerk of the County had the ability to "hold up" the

promotion of Probation Officer Brandt in April, 1998.  (Osenkarski Depos. 147-

148, V-E - Osenkarski Depos. Exh. 10).

V-C-22.     On at least one occasion, County Human Resources Director

Hartnett met with a Probation Officer and instructed him with respect to proper

conduct.  According to Probation Officer Sam Miller, Hartnett met with him and

instructed him how important it was that he act professionally and exhibit no

retaliatory behavior or vindictiveness towards Varner.  (Miller Depos. 42).

V-C-23.    The chief clerk of the County, John Connelly, reprimanded Osenkarski in 2002 for his role in the bomb scare incident.  Osenkarski called it a "memo of reprimand" and said it was for failing to follow "county procedure" in an evacuation for a bomb threat.  Osenkarski felt that it was given "by someone other than a judge who I did not work for."  (Osenkarski Depos. 61-62, 67-68, 182).

V-C-24.    After receiving the reprimand, Osenkarski went to the president judge, but the Judge said "I'm not going to do any intervention for you."  (Osenkarski Depos. 67).

V-C-25.    After the incident, Osenkarski was directed to implement a procedure to ensure that all employees under his supervision were out of the building.  (Osenkarski Depos.  67).

V-C-26.  On October 5, 1995, Ken Bolze, Chief of the Cumberland County Juvenile-Adult Probation Department sent a memorandum to all staff stating that the County's seniority policy "has been (since '84) and still is our Office's seniority policy.  If we adopt any modifications, they will not be retroactive.  Also, not all things are or will be determined by seniority alone." (V-F - Osenkarski Depos. Exh. 12, Bates No. 210295, emphasis in original).

V-C-27.    The County policy provided that "seniority is defined as the

length of continuous service an employee has with the County from his last recent date of hire." (V-F - Osenkarski Depos. Exh. 12, Bates No. 210295).

V-C-28.    Ken Bolze confirmed that this policy was still the seniority policy of the office by memorandum to probation officers entitled "Seniority" issued February 12, 1996. (V-F - Osenkarski Depos. Exh. 12, Bates No. 210293-94).

V-C-29.    Based upon that policy, Barbara Varner had more seniority than Bill Brandt. (V-F - Osenkarski Depos. Exh. 12, Bates No. 210293-94).

V-C-30.    On October 29, 1996, Osenkarski, then Chief of the Juvenile Probation Office, issued a memorandum stating that the "Cumberland County Juvenile Probation Department's seniority list is determined upon the following criterion: 1. Initial dated of full-time employment with the Cumberland County Probation Department as a Probation Officer, and, 2. The continuous full-time employment with the department." Based on this changed policy "effective September 9, 1996," Bill Brandt was moved ahead of Barbara Varner on the seniority list. (V-G - Osenkarski Depos. Exh. 13, Bates No. 210280).

V-C-31.    Bill Brandt continues to have more seniority than Barbara Varner.   (Brandt Depos. 41).

V-C-32.    Record evidence documents this through at least May 14,

2002.  (V-VIII - Osenkarski Depos. Exh. 13).

V-C-33.    Barbara Varner was the only individual negatively affected when the definition of seniority was changed to exclude prior County service. (Osenkarski Depos. 154).

V-C-34.    Osenkarski described the changes:

> Q.    Now, the complaint that Ms. Varner had was about the promotion of Mr. Brandt, correct?
> A.    Well, essentially, yes.  He --
> Q.    Why do you say essentially?
> A.    He moved up above Barbara Varner.
> Q.    So as a result of the action that you implemented, and that action being that county service no longer was used for seniority purposes but only service within the Probation Department, Mr. Brandt jumped ahead of Mr. [sic] Varner on the seniority list, correct?
> A.    Yes, because of his number of years in Juvenile Probation.
> Q.    Was there anyone else who as a result of the implementation of your policy lost status on the seniority list?
> A.    No.
> Q.    So your policy affected only two people:  Mr. Brandt and Ms. Varner?
> A.    Yes.
> MR. ADAMS:  Objection.  Do you know?
> MS. WALLET:  I believe he answered.  I thought he said yes.
> THE WITNESS:  In reality, Mr. Brandt moved up a slot above Barbara Varner.

(Osenkarski Depos. 149-150).

V-C-35.     The separate Adult Probation Department, under John Roller, had the same opportunity to apply this "new" policy.  John Roller did not implement the same seniority policy change.  (Osenkarski Depos. 157).

V-C-36.     According to Osenkarski, seniority plays a role in three benefits: on-call, vacations, and "to some degree in promotions."  (Osenkarski Depos. 134).

V-C-37.     Several probation officers confirmed at deposition that they were not aware of any prior promotions that had not been made based upon seniority.  (Brandt Depos. 41-42; Houser Depos. 67).

V-C-38.     Brandt testified:  "The unfortunate part within this county, not only department-wide but maybe county-wide, is that the next senior person has always been the next to get promoted.  Maybe that person's not so deserving, but that's just the chain of events."  (Brandt Depos. 41).

V-C-39.     Brandt went even further:

Q.     "Do you know of anybody in either Probation Department who was promoted over a more senior employee?

A.     Only because a more senior employee turned it down."

(Brandt Depos. 42).

V-C-40.    Even President Judge Hoffer did not "remember" anyone promoted who was not the most senior individual. (Hoffer Depos. 78-79).

V-C-41.    Osenkarski admitted at deposition that the decision to change the seniority policy was made by him as Chief of the Juvenile staff "with consultation of other managers, supervisors." (Osenkarski Depos. 156).

V-C-42.    Osenkarski identified Graham as one of those individuals. (Osenkarski Depos. 136-137).

V-C-43.    When Varner learned that Bill Brandt was going to be promoted to Senior PO as a result of the policy change, she complained by memorandum dated March 31, 1998. (V-M - Hartnett Depos. 11).

V-C-44.    The resulting promotion was then "held up" until Varner and Brandt were both promoted on June 7, 1998. (V-J - Personnel Action Form dated May 27, 1998).

V-C-45.    Had Varner not been "demoted" below Brandt on the seniority list, she (and not Brandt) would have been next in line on the seniority list for the one promotion to Senior Probation Officer slated to go before the Salary Board on April 6, 1998. (V-N - Hartnett Depos. Exh. 13).

V-C-46.  Varner lost the increase in salary from April 6, 1998 (the date she should have been promoted instead of Brandt based upon county seniority)

through June 7, 1998, the effective date on which both Brandt and Varner were promoted. (V-N - Hartnett Depos. Exh. 13; V-J - Personnel Action Form dated May 27, 1998).

Respectfully submitted,


s/ Debra K. Wallet
Debra K. Wallet, Esquire
24 N. 32nd Street
Camp Hill, PA  17011
I.D. #PA23989
(717) 737-1300 (phone)
(717) 761-5319 (fax)
walletdeb@aol.com (email)
Attorney for Barbara E. Varner