V-I

*CONFIDENTIAL ATTORNEY IMPRESSIONS*
*NOT FOR DISCOVERY*

### MEMORANDUM

TO:        HAJ

FROM:      DWD

DATE:      April 30, 1997

RE:        CUMBERLAND COUNTY PERSONNEL
           BARBARA E. VARNER HARASSMENT COMPLAINT

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### I. BACKGROUND

I have been asked by the county to investigate a complaint of sexual harassment/sexual discrimination filed by Barbara E. Varner, Juvenile Probation Officer, against both S. Garth Graham, Supervisor of Juvenile Probation and Joseph Osenkarski, Chief Probation Officer, Juvenile Probation Department. Attached to this memorandum is the written complaint from Barbara E. Varner as well as her proposed solution to the problem. These documents were submitted in writing at my request.

By way of background, Barbara Varner began as a county employee in December 1989 as a case worker for Children & Youth Services. In February 1995 she was hired as a juvenile probation officer upon the recommendation of Mr. Graham. From that point until October 1996, Graham and Varner shared an office where he worked with her closely and trained her. In October 1996, probation was split into two separate departments, adult and juvenile. Graham was promoted to his current position and Barb was one of five juvenile probation officers who report to him. In addition, four senior juvenile probation officers also report to Graham. Basically, Graham runs the department as Osenkarski admits that he is burned out and leaves the day to day operations to Graham. Nonetheless, Osenkarski concedes he is ultimately responsible for what happens in the department.

DEPOSITION
EXHIBIT AW
(2) 10-24-03

## II. EMPLOYMENT LAW SUMMARY

Individuals aggrieved by sexual harassment may pursue a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII"), as well the Pennsylvania Human Relations Act, 43 Pa.C.S. § 951 et seq. Title VII bars discrimination in employment against any individual with respect to his or her compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex or national origin. 42 U.S.C. § 2000 e-2(a)1. A person can assert two theories of sexual harassment. The "quid pro quo" theory or a hostile environment. The damages recoverable in a successful claim can include: back pay or reinstatement; front pay; compound interest; compensatory damages; punitive damages; and attorney's fees.

In order to state a claim for "quid pro quo" sexual harassment, an individual must demonstrate that an employer conditioned a tangible job benefit or privilege upon submission to a form of sexual blackmail, and that adverse employment consequences followed from the employee's refusal to submit to those overtures. Courts have held that an employee's threatened economic loss is sufficient enough to make out a prima facia case of quid pro quo sexual harassment. Employers are strictly liable for this form and liability will attach regardless of whether the specific acts complained of were forbidden by the employer, and regardless of whether the employer knew or should have known of the occurrence of the acts.

The basis for liability in the case of hostile environment sexual harassment is not as clear as that for quid pro quo sexual harassment. The U.S. Supreme Court held that a Title VII prohibition against discriminatory employment practices in regard to "terms, conditions or privileges of employment" evinces a congressional intent to strike at disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment. See Harris v. Forklift Systems, Inc., 114 S. Ct. 367 (1993). Such an environment exists "when the work place is permeated with discriminatory intimidation, ridicule and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment." No injury - psychological or economic - need be

shown. The Supreme Court construed a hostile environment as an environment where conduct falls below that which is merely offensive, and that which causes tangible psychological injury. The EEOC provides that an employer is liable for the acts of its employees, even non-supervisory, where the employer, its agents, or its supervisory employees knew or should have known of the sexually harassing conduct.

The Supreme Court in. Harris further defined the definition of "hostile work environment" and showed how it differs from a quid pro quo case in several important respects. A hostile environment is not limited to sexual advances or even to sexual behavior targeted at the complainant. It may involve non-sexual behavior directed at the complainant because of gender, and sexual behavior that is not directed at the complainant at all but that nonetheless affects the complainants working conditions. (This would include comments about female anatomy, sexual jokes and the like). A hostile environment harassment claim requires no proof of actual or threatened economic injury. It is sufficient to prove that the harassing actions were so severe or pervasive that they effectively changed the complainant's working conditions. Examples involve cases where there are sexually suggested posters, sexually oriented graffiti, sexual language, or pornography, and the litigation normally turns on whether the employer refused to correct conduct particularly offensive to one sex, and thereby discriminated against that sex, rather than on whether the conduct at issue was sexual. See Robinson v. Jacksonville Shipyards, 760 F. Supp. 1486 (1991).

In a widely cited case, Henson v. City of Dundee, 682 F.2d 897 (1982) the Court identified the elements of a prima facia case of hostile environment harassment:

1.    The basis: Membership in a protected group;
2.    The activity: Unwelcome conduct;
3.    The issue: Affecting a term and condition of employment;
4.    The causal connection: On the basis of sex; and
5.    Employer responsibility.

The EEOC policy on sexual harassment, defines conduct creating a hostile environment if it is (1) severe enough to alter the complainant's work place experience, even though the conduct occurred only once or rarely, or (2) pervasive enough to become a defining condition of the work place. In particular, the EEOC has said that unwelcome, intentional touching of intimate body areas is sufficiently offensive in and of itself, to alter the conditions of the working environment. Courts have held that the conduct is more severe when a supervisor engages in it. A hostile environment claim that does not involve unusually severe conduct normally requires a showing of multiple instances. A mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. Harris. Some courts have rejected claims based solely on occasional verbal utterances. An interesting case, Baskerville v. Colligan International Company, 50 F.3d 428 (1995) is illustrative. The Plaintiff was assigned to work for a person who made nine (9) suggestive remarks to her, called her a "pretty girl", and made "grunting sounds" when she wore a leather skirt. The jury found for the Plaintiff and awarded her $25,000.00 in damages. The Seventh Circuit Court of Appeals reversed because there was no actionable harassment. The Judge noted that when Title VII was designed "to protect working women from the kind of male attentions that can make the work place hellish for women." It was "not designed to purge the work place of vulgarity." The Court thought it particularly significant that the supervisor did not touch the Plaintiff or ask her on dates. What remained, the Judge observed, was "patter" by a "silly man" that, while no doubt "distasteful" was insufficiently substantial to give rise to a legal violation. Pervasiveness is more likely to be found if the harassment is perpetrated by more than one individual, and the affects of the incidents can be cumulative.

Whether a job environment is unlawfully harassing in many cases depends on the perspective from which one evaluates the evidence, and the standard used to do it. The EEOC, and many courts (including the Third Circuit), have held that the objective standard in the typical case of antifemale harassment ought to be based on the viewpoint of the reasonable woman. The rationale stems from the leading case of Ellison v. Brady, 924 F.2d 872 (1991) where the Court said it would "adopt the perspective of a reasonable woman

primarily because a sex blind reasonable person standard tends to be male biased and tends to systematically ignore the experiences of woman." Our Third Circuit in Andrews v. City of Philadelphia, 895 F.2d 1469 (Third Cir. 1990) stated "pervasive use of derogatory and insulting terms relating to woman generally and addressed to female employees personally may evidence a sexually hostile environment."

The law is clear that when an employer receives a complaint of sexual discrimination or sexual harassment, it must conduct a prompt investigation and take action if necessary. In addition, it must perform post investigation monitoring to make sure no retaliatory action is taken against the complaining employee. Retaliation is specifically outlawed in the applicable statutes and constitutes a second, and often more severe, cause of action. Prompt investigation and corrective action upon receipt of a complaint may shield an employer from liability for sexual harassment. Conversely, a half-hearted or sloppy investigation may result in employer liability. See Stewart v. Weis Markets, 890 F. Supp. 382 (M.D. Pa. 1995) wherein remedial action against an alleged harasser which did not occur until several months after the employer knew or should have known of the incident was not a bar to liability.

Where employers promptly take action even where a hostile environment is found by the courts, employer liability depends upon whether the employer's response or lack thereof to the employee's behavior was negligent. In other words, did the employer know or should have known of the sexually harassing conduct and a prompt appropriate response is taken. The EEOC guidelines direct that an employer with knowledge of sexual harassment must immediately take remedial measures. The employer's action must be reasonably calculated to end the harassment. The sufficiency of the employer's action can be judged by whether a transfer of the complainant is an appropriate employer response and is an issue frequently litigated. Some cases say that it is, others that it may not be. The proper analysis probably is this: Other things being equal, it should be the harasser rather than the victim that is transferred. But in the real world, consideration such as job vacancies and skills may make transfer of the victim more suitable. In such circumstances, as long as the transfer is not

-5-

itself retaliatory, transfer of the victim is appropriate. In any event, at least part of the remedy must be targeted at the harassers.

Keep in mind that if an employer raises its investigation and corrective action as a defense to a sexual harassment claim in litigation, the investigation may be discoverable in a later civil suit filed by the victim. See <u>Harding v. Dana Transport, Inc.</u> (1996) where an investigation conducted by outside legal counsel of a sexual harassment claim was held to be discoverable following the analysis of applicable privileges. The Court held that although aspects of the investigation were protected by attorney/client and work product privileges, the company had waived these privileges by injecting the investigation into the case as a defense.

### III. FACTS

The attached complaint contains a summary of the allegations of the employee. In additions to Barbara Varner, I have spoken to William Brandt, Deborah Green and Nick Baralett, other similarly situated probation officers. I also spoke with Jennifer Crum, a secretary in the office, Mark Galbreath, a former juvenile probation officer who is now on the adult side, as well as Greg Miller, an adult probation officer. I also spoke with a senior probation officer, Kerry Howser, who in 1993 filed a complaint of sexual harassment based on a comment made about her by Mr. Osenkarski. He was reprimanded informally and required to apologize to her and engage in some type of sensitivity training. I also spoke with Joe Osenkarski and Gary Graham and confronted them with the allegations, as well as Mike Varner, Sam Miller, Hank Thielemann and Darby Cristlieb, all senior probation officers.

With regard to Barb, every incident or comment that she provided to me wherein a third party also witnessed the same, has been verified by the third party. Osenkarski denied all knowledge of the allegations or behavior of Graham. Graham either denied the allegations or when he admitted there was some discussion regarding the topic, had a different version. On the issue of credibility, my belief is with Varner and not with the supervisors. For

example, it is alleged that Graham has stated several times to Varner and coworkers that "he has no plans to hire any more women or middle-aged people in juvenile probation." This was confirmed by Nick Baralett and Mark Galbreath. Deb Green said that she never personally heard it but Nick Baralett told her that Gary Graham said it. Graham's response was that he said "this a young man or young woman's sport - you need a young person to do this job." His explanation was that persons easily get burned out on this job and cited Osenkarski as an example. He also said that Howser's complaint in 1993 about Osenkarski for harassment took the "wind out of him."

seniority

↓

She discussed what she felt was a discriminatory policy against her by lowering her status on the probation seniority list. Unfortunately, she was the only employee in juvenile probation affected by a change in seniority policy that occurred in October 1996. In effect, the seniority list no longer includes other employment time at the county, rather only employment time in probation. I might add though in Osenkarski's defense, the memo confirming the new policy states that other factors will be considered in determining a promotion. This was, of course, emphasized to me by both Graham and Osenkarski and said the decision was ultimately made by Judge Sheely. Varner went to Judge Sheely about the memo and he agreed that it was probably unfair and she claims he said he would later change the policy but that has not occurred. While this issue does not help us, that in and of itself does not concern me.

With regard to a quid pro quo claim, Varner states that Graham frequently talked to her about his marital problems and sex life with his wife. In that same conversation she alleges that he told Varner she could take care of this by satisfying him and looked at her with a suggestive smile. She claims that he has stated to her several times that in her case management she has to satisfy the victim in the community, and hesitating with a suggestive smile in her direction, leaving an unanswered question by her interpreted to mean a sexual innuendo. He also discussed his behavior in that he punishes his wife in order to control her. Graham denies some of this but then goes on to state that for her first year and a half in the department they spent a great deal of time together. They would often drive to Pittsburgh

-7-

or Scranton delivering juveniles to various state facilities and be gone all day. He said in the course of one of those drives they had a discussion about a lot of things which at times did discuss their sex life. She claims that he is now jealous because her new husband has a good job and due to obtaining a lot of frequent flyer miles, they take many trips and lead a good life. He makes comments about her rich husband which he denies.

When confronted, Gary advised that he never had sexual discussions with Barb, only "peripheral". He cited as the example of peripheral when they were transporting two female defendants who admitted they were lesbians. Upon my pressing him, he admitted that he and Barb had a discussion whereby she described her husband as impotent and he discussed things about his wife. He did not elaborate on those discussions, although Barb did as found later in this memo.

In a probation report drafted by Varner and reviewed by Graham, she included a statement that a female juvenile has medical suicidal problem related to premenstrual problems. When Graham saw this, he responded "jesus christ, do I need now a peter meter in my office." Varner said this was stated in front of another probation officer, Hank Thielemann. He denied Graham said this to Varner. "If it was said, it was said to me and not her directly. The walls are thin, she may have heard it." Graham's first response was this is not true in the context she placed it. He said that he told her "I don't want our reports to get into a woman's menstrual cycles and include that in their social history." He denied using the words "peter meter". However, in our second meeting (5/8/97) he said he may have said that. Thielemann and Graham share an office.

Varner claims that her and Deb Green had to take a juvenile to Scranton on December 16, 1996. Graham told her to make sure Deb Green got a tour of the facility when she was there. They did not leave until 9:30 a.m. because Barb had a walk-in client at 8:00 a.m. that delayed the start of the trip. On the way home, there was severe fog that slowed their traveling and an accident that required them to get off Interstate 81 for approximately five miles. Because of the time they also stopped for dinner which is permitted and a common

practice in the department. The next day, Graham screamed at them claiming it took too long, alleged they were lying in what they told him and actually went out to check the mileage on the car. He also docked each of their overtime by one hour. She claims that Tom Boyer and the other guys come and go when they please and frequently make the same trip and receive no cut in pay or questions about their timing. She felt that he has been picking on her unfairly and does not do the same with the men. Deb Green felt that he was also picking on Barb and had no proof to the contrary. She said that frequently the other guys get back after 4:30 and he has never given them a hard time. Deb Green was able to cite me trips by Mike Rose, Hank Thielemann and others since December 16 where they got back after hours and he said nothing. He only told them (not in a written memo) that Varner and Green must leave on all trips by 8:00 a.m. Graham's response was that the trip was for transportation only and nothing more and they should have been back by 4:30. He had no recollection and in fact denied telling Green to get a tour. He admitted he was angry at both of them and questioned their excuse. He said her car mileage was no different than if she had not taken the detour (only four or five miles) and therefore, he felt he caught them in a lie. He claims he also has a handwritten note which she submitted explaining the trip which contrasts her verbal statements. He told me he would provide that information to me. In our second meeting Graham provided copies of documents to justify his position but said he does not know if he is going to let me keep them and pulled them away. I did not push the issue at the time. In those documents, he showed me a statement from Barb outlining her activities for the day. He also provided me with copies of the turnpike tolls which showed her getting on the turnpike at 1:39 and was contrary to a lunch hour she had listed from 1:30 to 2:30 on her sheet. It was on that basis he said she lied. However, he never asked her to explain the discrepancy.

Varner states that Graham frequently screams at her while she is at her desk and in her office, or uses foul language describing her working abilities in the general office area. She claims he frequently uses the "f" word and puts her down in front of other employees and that this has all occurred in recent months. (I note that her last review in January was very good.) The ranting and raving and putting her down was confirmed by Deborah Green

who believes that he treats Barb differently. In fact Green related a statement that Graham made "she's so f_____ incompetent, she can't f_____ to this, I've told her four to five f_____ times how to do this." She claims that Sam Miller and Hank Thielemann were in his office with him when he said this. Both Miller and Thielemann deny hearing this but admit "he gets excited." She claims that many other persons heard this and alleges that Graham is a wild man. Kerry Howser confirmed his behavior. She said he rants and raves frequently, can be intimidating and even heard a story that he smashed a birthday cake his wife made for him one time. This was confirmed by others.

I also met with Varner on May 6, 1997. This is after Graham and Osenkarski had spoken to me the first time. Apparently, when Osenkarski returned from our conference she overheard him say to another probation officer "I told them nothing." She also informed that Gary told Deb Green "if you keep pushing the issue for gun training, I will give you extra duty, maybe do stat cards to pay for this." This was after Deb Green spoke to me and Barb felt it was because she figured that he was punishing her. To clear up any misconception, Barb advises that she was never offered Act 535 training. She said she never asked for it either. Graham confirmed this but there is no written policy. She said to her knowledge the only person in juvenile probation with the training is Nick Baralett and he got it in Dauphin County. She said that the Judge does not feel good about probation officers carrying guns and to her knowledge only Osenkarski and Graham have guns which are locked in the probation office. She is aware that Deb Green had asked for training and it was denied by Ken Bolze.

When I asked her if she had ever been touched inappropriately by Graham or Osenkarski, she said no to Osenkarski but yes to Graham. She recalled an incident at the prison where he slapped her on her butt and she said nothing. This is the same incident that Deb Green explained to me. Graham denied this and said she is lying.

I asked her to explain her comment that he describes divorced women as "angry at men." She said that he has frequently described Kerry Howser in this manner, and other divorced women in the department such as Deb Green and herself. In fact, she said that Gary

-10-

stated "you are angry at men and should not get remarried." Gary denied that he says this and said that Kerry Howser coined the phrase "angry at men" and frequently uses it.

She also indicated that Graham told her that he drove by her ex-husband's home (which happens to be next to Judge Sheely's current house) and saw him outside. Gary indicated that "I can take your ex, don't worry about him." Barb said that she never made any comments regarding her ex-husband and any problems she was having with him. Barb did indicate that when she was at Children & Youth he would often work with her on cases because the child also had a juvenile probation problem. (Graham confirmed this.) She said that started the friendship, although she did indicate to me that someone in Children & Youth felt that "he was bird dogging her". She also indicated that last year she received a birthday card from Gary where he inscribed "I wish we could be more". She said she has saved this and provided us a copy. The card has no personal note inscribed and is signed by "Gary". He denies sending her one.

She said that Gary, on his own, one evening drove to her home. The next day he told her he drove by her house and said he did it because he wanted to verify that she lived within 25 miles of Carlisle which is a job requirement. She said she lives in York County. She is not aware of him doing this with any other new employee. She said the next night he came to her house unannounced and was calling her from the county cellular phone in the front yard. She had refused to answer the doorbell and he kept leaving messages on the recorder "I know you're in there, please let me in." He also told her that "I know your husband is away and you are home alone." When she finally felt she could not get rid of him, she went outside and asked him how he knew her husband was away and he responded that he noticed a notation on her calendar at work. She finally got rid of him by telling him that a neighbor and her were going out and she was expecting company any minute. She said she felt very uncomfortable with this situation. Graham denies that he ever went to her house unannounced but he has been there and inside the home frequently. He said it was all job related, either picking her up or returning her after their many trips. I might indicate that he provided to me two and a

-11-

half pages of approximately 25 trips that they have taken together since January of 1996 transporting juveniles.

She also described a discussion she had with Graham when they were on a trip together. He described how his wife lays beside him in bed and "plays with herself" and he keeps records of this and tells his wife that "I won't have sex with you if you are doing this." He indicated that he was upset that his wife always reads romantic novels which gives her a false sense of the way things should be. Barb said she felt very uneasy and told him that "you need counseling" and tried to terminate the conversation. Barb stated many times to me that she has no romantic interest in Mr. Graham.

Graham denied the allegations of having the sexual discussion except a conversation wherein Barb described her husband is impotent and he discussed "things about his wife." He refused to elaborate on this. During this discussion he told me that he felt it was in January of 1997 at the juvenile probation counter she came to him and said "Deborah and Rona want to know why you come to the office frustrated and they want to know if you are not getting enough _____ at home or why I'm not giving you enough." He said no one else heard this and he told her that it was inappropriate. He told me this to show that she initiated discussion on sexual matters which she denies.

She also relayed an incident in October of 1996 when she was at a DUI training seminar in State College. Gary "and the guys" were also there but did not have to attend the training sessions because they already had the requisite accreditation. She would go to classes during the day and would join them for dinner at night. She said she would go back to her room to study while Gary and the guys were out having a good time. He kept insisting that she join them and would often call her room and tell her to come down to the bar but she always refused. She said he would come and bang on her door and insist that she come down but she would not let him in and refused. On the last day she went home early because she did not want another evening in her room with this situation and she later found out that he was furious that she had gone home early.

-12-

Barb claims Gary has also described to her incidents where Osenkarski used a vegetable (an asparagus) and placed it on the anatomy of a secretary in adult probation and acted in a very sexual manner. Barb herself did not witness this but it was relayed to her by Graham. Graham said that he never told Barb the asparagus story but that it has been discussed in the department for years.

She explained to me that as a result of her being in the masters program for juvenile probation in Shippensburg through a grant, she must work for at least two years in a juvenile probation program. Because of this, Gary has told her that "I have got you for another two years don't I". Graham denies that he said this to her or that she must remain in the Department for another two years.

She also referred to me an incident between Osenkarski and Rona Boyles at Bolze retirement party at Wilma Klippinger's house. Apparently they were dancing together and Osenkarski was kneeing Rona in the groin and she did not appreciate this. I know nothing more about the incident nor whether Rona has complained about it.

Barb told me that after Bill Brandt returned from meeting with me, he was shaking. He told her that he was nervous about his job because of the hell that he has had to pay for the last four years as a result of him confirming the comment by Osenkarski about Kerry Howser. Barb has not relayed any facts where retaliation has occurred since Brandt met with me.

Jennifer Crum, a secretary, said that she believes there is different treatment of the female officers by Graham. She said he is rude and Barb's work never seems to be good enough, that he puts down female employees, Barb in particular, and publicly states negative comments "work not being done right". She has seen Gary scream at Barb frequently in a very loud and rude manner and he does not do it to other employees. She believes Barb is trying hard to do her job and is being mistreated.

-13-

Mark Galbreath a former probation officer who wanted to transfer to adult probation to get away from Osenkarski and Graham said he heard Gary make the comment that he would never hire any more females in juvenile probation. He said he believes that Gary likes women to be subservient to him and since Barb stands up to him, it creates a conflict. He has heard Gary say "she is a strong middle-aged woman whose former husband abused her. Now she has a rich husband and she is angry at men." (This confirms Barb's version). He said that Gary does use the "f" word a lot, especially when he rants and raves. He said it is common knowledge that if you do not keep Gary and Joe happy, they will punish you. This is what happened to Bill Brandt (and confirmed by Brandt). Mark said he is glad to be out of juvenile probation and anticipated Gary would get power hungry when he got the job. He said he has heard Gary yell at Barb but did not yell at everyone else in the department when he was there. He said it was clear that Gary plays favorites, "you either owe him or you are punished because you didn't kiss up." Some people in the department have it easy and he called it the group of six which includes Osenkarski, Graham, Boyer, Drachbar, Miller and Thielemann.

I have a concern for retaliation which has been stated by Barb and I believe is merited. I tried to speak to Bill Brandt another juvenile probation officer, but he was very reluctant to talk to me. Bill was the person who heard the comment by Joe Osenkarski that Kerry Howser was a member of the "_____ Club" and that got Brandt in trouble with Graham and Osenkarski even though he only told the truth. Bill said that he has been paying for it the last four years. "My life has been hell" and he preferred not to say any more to me. He admitted that he has heard Gary rant and rave at times but he said he stays away from him and Joe as much as he can because of the prior incident and how he has suffered as a result of it. He said things have only started to get better recently and he does not want to be pulled into this mess.

Another interesting interview was Greg Miller who is now on the adult probation side. Greg was up for a senior probation officer position in the juvenile probation department at the time of the split. However, he would have had to report to Gary Graham. He told Osenkarski,

-14-

Graham, Dave Myers and John Roller that he will quit before he works for Gary Graham and in fact, took a transfer to adult probation that was not a senior probation officer position. This cost him a $3,300.00 per year raise. Miller claims that Graham is very egotistical, backstabbing and talks out of both sides of his mouth. In fact, when he refused the transfer which would have included a promotion, Osenkarski said to Graham "it sounds like a lot of people hate you, maybe I ought to rethink this move also." He claims that Graham has his favorites and he takes care of them and he punishes the others. It was a common occurrence to see him rant using the "f" word. He said Graham comments about female employee's physiques in front of other employees. Miller claims that he and Graham no longer speak to each other but he has heard him say these things. He said his job conditions are 100% better since the split, as he is no longer around Osenkarski and Graham. He said he is concerned for Barb because Graham will get back at her for filing the complaint and he does not believe there is any type of protection we can afford her that will prevent it. (Judge Sheely claims Miller is very reliable.) Graham volunteered to explain to me the "black bush" comment. A Torie Blosser was hired in the D.A.'s office and Gary has known her and her family from Newville through his church. She was having problems with two of the secretaries in the District Attorney's office and would come to Gary to discuss the situation and he would give her advice. In fact, he said that Torie's mom thanked him the next time he saw her at church for helping her daughter. Torie frequently comes up to the probation department to do research for ARD cases. One day he claims Greg Miller said to Graham after Blosser left the area, "I bet she has a black bush". Gary told me that Barb asked Graham "what did Miller say" and Graham then told her the statement by Miller. (I need to confirm this with Barb Varner). Graham further went on to tell me that Greg Miller often gives narrative comments on women in the office. When I asked him if that discussion is frequent in his department he said no.

Graham denied the claim that he is known to punish people who do not comply with him, and Osenkarski and said there is no merit to it. Osenkarski also denied this. They denied that they took anything out on Brandt because of him cooperating in the Howser investigation. However, Graham stated that "Kerry Voss, now Kerry Howser and formerly something else"

-15-

in his words, is a trouble maker and he felt that she was behind this complaint by Barb. He said that she never got over the incident with Joe and she has never put that to rest. Gary claims that Barb's recent work performance has contained many deficiencies. He cited to her court petitions lacking certain language and has given her memos on it. He said he has done the same with others and disagrees with her comparison of her work to the male employees that he has not "wrote up". He tells me he will provide me documentation to verify this and did show me some memos to Brandt, Baralett, Miller and Varner.

*work load -*

Graham claims that the problem may stem from the fact that under Ken Bolze there was no authority or control in the department. Since he took control, he has tried to manage the department by establishing procedures, controlling the time out of the office, requiring everybody to submit time sheets and control the amount of overtime. (Others have confirmed this new approach and said it was needed). He said Barb and he have clashed on some of these issues as she speaks her mind and that is why she may think he is picking on her. He claims she is operating on emotion and rejection but did not elaborate. He said it is a new era in the department and he is not treating her differently. Back to Kerry Howser, Graham made reference to sexual comments that she made and felt that Howser is just as culpable as the guys. He claims that all comments about Barb's job performance were made in private and not in front of other employees. He claims her performance has changed in the last four months and he has told her this. Obviously, with a good review in January, "there must have been a change" he stated. He claimed that not only is she "in deficit" in her work performance, Nick Baralett, Deb Green and Bill Brandt are also "in deficit."

Deborah Green who has been a county employee since 1995 and supervised by Mr. Graham since October 1996 spoke with me. She shares an office with Nick Baralett while Barb now has her own office. She feels that various employees in the department receive different treatment but Barb by far has the worst of it. She said that Sam Miller told her when she went to him for help on how to prepare a petition "this is how I would do it but I don't think Gary Graham would want you to do it this way." She said she got no training when she was hired, no one has told her who to report to for help and she is on her own. We

reviewed the incident involving a juvenile being transported to Lordsmont and she confirmed Barb's version which was different than Gary's. For example, she was delayed for the first hour and a half when she had a walk-in client, it was foggy and the road was closed due to an accident on 81 coming home, and Gary told her to get a tour when she was there, and the next day he did not believe their explanations. (Gary denied he told her to get a tour). In fact, she said he was ranting and raving and refused to approve one hour of their overtime. She said he had no proof to the contrary, never checked with anyone in Lordsmont and she said that both before and after, she is not aware of him ever questioning the "guys" when they come back after hours. She also cited a time just after that when she and Tom Boyer took a client to Lordsmont, took the same amount of time, and they received no grief from Graham. Graham told Barb and Deb that from now on they must leave on all trips by 8:00 and she has not heard him tell anyone else nor put it in a memo.

She confirmed that Nick Baralett told her that Gary Graham had said no more middle-aged persons or women shall be hired in juvenile probation. Green did not hear it personally. She also believes that Barb and Nick Baralett have the highest case load because Gary wants to make a point with them. (Statistics as of 4/29/97 from Osenkarski show Barb with the most cases - 45. Next are Drachbar (43), Thielemann (40) and Brandt (35). Lowest are Boyer (14) and Same Miller (24)). Nick Baralett is considered an outsider because he came from Dauphin County and he often gets the worst type of cases.

When I asked her why she felt Graham was picking on Barb, she said because she felt Gary wanted to have a relationship with her. She has no knowledge if one has occurred but she related an incident where Gary reached out and grabbed her on the behind and Barb said nothing, she simply moved away. Deb questioned this and Gary responded that he knew her well. Graham denies this.

Deb Green confirmed that Gary used a lot of foul language (f____ this frequently) and that her office is next to Graham's. She related an incident in early April where Gary was ranting in his office "she is so f_____ incompetent, she can't f_____ do this, I've told her

-17-

four to five f_____ times how to do this." Deb advised that many other people heard it and she described Gary as a wild man. Green told me that Deb Reitzel, the new Victim's Witness assistant from the D.A.'s office, was in the lobby area of the juvenile probation department and heard his ranting and raving. Reitzel confirmed that she was up there one day and heard somebody hollering but she said she did not see the person but felt uncomfortable because some of the people were looking at her and she felt this was something she should not be hearing.

Deb also questioned Gary's handling of the case involving the basketball player from Trinity High School. She believes that Gary promised this basketball player to their contact at George Junior Republic School in Pittsburgh when they were at the convention in Reno. The convention in Reno was in March and Graham, Boyer, Osenkarski, Drachbar, Miller and Thielemann went. Graham and Osenkarski determined who went. When they got back, the George Junior representative asked Barb (confirmed by Barb and Deb Green) when he was getting the basketball player. Barb claims that this kid should be handled informally and does not need to go to this school for one year. Deb concurred that this kid is not a loser, does not belong in the program, comes from a good home and the parents are very involved. She said he should be released to his parent's custody but Gary won't approve it that way, he wants it handled formally and a recommendation that the kid go to Pittsburgh. Gary has since changed his mind and wants it to go before a judge, but not send the kid to Pittsburgh.

Deb also indicated that Nick Baralett helps her and Barb out when Gary takes them on. She said he intervenes to defuse the situation.

She indicated that Osenkarski made a comment leaving Sam Miller and Denny Drachbar's office with Gary Graham and Deb present, "I don't have to be here, I've been here for thirty-five f_____ years, it's your time." Deb claims that he was talking to Graham when he was telling him to handle a situation. Deb claims that Osenkarski has made many off color sexual comments in the office in front of her. (I need Deb Green to elaborate on these comments with specifics).

-18-

Deb also related an incident at Ken Bolze's retirement party at Wilma's house. Wilma Klippinger is a secretary in the adult probation side. Deb Green was the only probation officer present when Osenkarski said "the people in my department will listen to me, or they are going to get f_____d. I have done it to Bill Brandt and I will do it again." Deb felt it was meant for her as he was looking at her when he said it. This is her reason for being concerned about retaliation in discussing the situation with me and for other employees that will discuss it.

She also felt that she was being treated different as was Barb because Bolze refused to send her to gun training. He stated "women can't do it, men have a sixth sense." She feels she is at a disadvantage because many of the juveniles she deals with carry a gun. She said most of the men in the department have had the necessary Act 235 training and can carry a gun which she cannot. In fact she told me every man in the department can get the Act 235 lethal weapon training but she cannot.

Another example of what she felt was disparate treatment was the fact that Barb and Deb are involved in a masters training program at Shippensburg University. This is through a Grant whereby they take classes on weekends. Everyone in juvenile probation must get forty hours per year in continuing education and the county will pay for the expenses. She claims the other people in the department go during the week and get paid for all of their expenses whereas her and Barb have to take time on weekends and do not get paid. When she went to Gary and Joe to discuss getting paid for doing this over the weekend, she was told that they are already getting a free master's program and they are not entitled to reimbursement.

She also complained about the six going to Reno. She said it is paid by an $8,000.00 grant and if the money was not used it would be lost. The six were chosen by Joe, no one else was asked. She claims that money is still left which is to be used for Act 235 training. She told me, and Barb confirmed this, that Gary told them "don't discuss the Reno trip."

-19-

Deb Green also told me that if Graham is not removed, this "unfair" treatment will continue. She claims that the people on the adult side also want him removed. She feels that there will be retaliation if something is not done and that if he is removed, Drachbar, Thielemann, Boyer and Miller will lose their backing. She thinks that someone from the outside must come in to clean out the problems that exist and were created during the Bolze era.

With regard to Kerry Howser, she clearly does not like Osenkarski and Graham. She claims that Graham does not like women and views them differently. In addition, if you don't agree with him, he will make your life difficult as a supervisor which he has the authority to do. She also complained about the DUI program and the fact that some of these guys make an additional $20,000.00 per year as a DUI instructor. (The actual amounts are between $5,000.00 to $10,000.00 per year.) She claims that Graham told her not to challenge this program even though only a select few get to participate at the control of the "guys." She claims Tom Boyer runs this DUI instructor program and he picks the instructors (Graham, Thielemann, Boyer, Mike Varner, Miller, Lyle Herr, Barry Hair, Osenkarski). It is my understanding that there are eight slots and that they are filled based on seniority. Dennis Drachbar has obtained the requisite training as has Barb. Thielemann told me that Drachbar will get the next slot when there is an opening.

In describing Graham she said that she is afraid of him especially now that he is in charge. She does not feel that she could go to him for help and that he would not be supportive. And despite her prior incident with Osenkarski, he has been supportive when she
~~~~~~ ~~ ~~~~
department split where she called Graham one night at home about a case (she was with the client at the time) and he hung up on her. She also stated that she complained to Bolze about Osenkarski's comment (which was relayed to her by Bill Brandt) "that she was part of the _____ club" and was made in front of other probation officers. Immediately after she complained to Bolze, Osenkarski found out and called many of the employees in the department to discuss the situation with them. She said Graham assisted him and she lived

-20-

in fear and continues to be scared of them. (Barb is also scared of them). She felt the verbal apology was insufficient and they laughed about it. She claims that Graham and Osenkarski still tell new employees about this and they are vindictive. "You're being punished or you owe me" she said.

She claims that Osenkarski after he saw a new intern (Nicole Gutshall) and later went back to the juvenile probation officers, told a couple of them about her, "look at those _____" in describing her anatomy." She claims Barb Varner and Mike Varner both heard this and responded "I can't believe he said that." Barb Varner confirmed that Osenkarski said this as did Mike Varner.

Howser also confirmed to me that Graham rants and raves frequently and can be intimidating. She heard stories, but not from him directly, that he smashed his birthday cake prepared by his wife to show her that he is in control and bragged about it. She also relayed an incident on April 14, 1997 when she went to get a drink of water in the hall and she heard Gary ranting and raving about Barb's abilities, only working half days, working at a minimum, etc. She later found out that Barb was out of the office at the time. She also told me that she admired how Barb got along with Joe and Gary when she first started there and is surprised how this now has happened. She claims from her view, she works very hard.

Howser also explained to me her situation in September 1996 when it came down to her and Greg Miller to be a senior probation officer. She was told that if she wants a promotion she must go to the juvenile side and she told all four (Osenkarski, Graham, Roller and Graham. Two hours later they moved Thielemann to juvenile probation so there was no opening for her on the adult side. She claims Thielemann's case load is very low and he was rewarded by becoming a DUI worker gaining additional income. She told me that Thielemann and Graham now share an office.

*Ozen*

Osenkarski when interviewed denied that Graham ever made any comments about Barb's age, sex or marital status. He claims he never made any comments about women or middle-aged people. With regard to approving or not approving overtime, he said he leaves this up to Boyer and Graham and he has no knowledge of docking Barb and Deb Green an hour. He claims he has never seen Graham lose his temper, never use the "f" word, although upon further questioning admitted that at time Gary gets very excitable. This was evident in my meeting with him as Graham went on he was getting very loud and boisterous. Osenkarski also admitted that Graham assigns all cases and approves all recommendations, that he pretty much leaves it up to him. He said that Barb has been directed to go to senior POs when she has a question rather than directly to Gary and him. Graham confirmed this. Osenkarski can only remember Barb coming to him once to discuss a case and that was when her and Gary disagreed. (The Trinity basketball player). He told them to work it out and stayed out of the situation. He claims that Graham as a new manager is doing a good job trying to organize the department. (Baralett did state that Graham has been making an attempt to correct the years of problems in the department by trying to be more organized and better manage the situation). Osenkarski also claims that if Barb wants the gun training she can get it but she did not want it. Judge Sheely told me that Osenkarski told him that also. He admits that Darby Cristlieb and Bill Brandt went to get their gun training last week.

Graham and Osenkarski both told me that Barb never came to them and told them that their comments were not appreciated and requested to cease. Barb said she did tell them both that and they laughed at her.

volunteered that he does not see a problem of harassment toward Barb. As a Senior PO he shares an office with Drachbar. With regard to the incident on April 14 where Graham was allegedly ranting and raving and using the "f" word about Barb, he has no memory even though at least two other witnesses have put him at the scene. He admitted that he has seen Gary "pissed off" but no recollection on that day or towards Barb. He offered that the change

in the relationship between Barb and Graham may be due to the change in Graham's responsibilities as now being her supervisor. Thielemann also said this.

Miller is a DUI instructor and explained the program. He said there are eight positions and they are selected on the basis of seniority and qualifications. Frankly, anyone who has gone through a training program has the qualifications and it is just a matter of time before the next person in line takes an open slot. He said though that Judge Sheely determines the persons to be selected for the openings. He then volunteered that he felt that Barb was in over her head and rarely seeks out help. He said that he has never heard Gary say anything about Barb's work that wasn't valid. He felt that he was on point in what he was criticizing her because juvenile petitions require particularity like a criminal complaint.

I spoke with Darby Cristlieb who is a senior probation officer and has been so employed by the county for eight years. He said that he and Bill Brandt share an office. He was aware of the former incident involving Osenkarski because Bill Brandt was in the middle of it. He said that Brandt discussed the situation with him but did not comment further. He said that situation has basically "died out" although from time to time it has come up. He admitted that about a month ago in Barb's office, which has a glass door, Deb Green was in with her and Gary went in and spoke to them for about forty-five minutes to an hour. He said there was loud talking and Graham was being very animated. He said for a short while the door was open but he could not recall exactly what was said. He also advised that a couple of weeks ago Graham gave Cristlieb the definitions from the Pennsylvania Crime Code. He said he was giving them to all others in the office because Barb Varner is having problems in

Barb a couple of weeks ago. He said he did it in jest and felt he was only joking and did not think it would go this far.

He also confirmed that on the fourth of April Gary said "dammit Barb I told you . . ." regarding what I believe to be the basketball player incident. Cristlieb admitted that he has had his outs with Graham but they have been patched up and are able to work together

-23-

although they are not personal friends and keep things at arms length. With regard to the Reno trip, he said that two months before they left Osenkarski told him "you will be in charge while we are gone. There are still some funds left over so next year you can go some place, go where you want, just make sure it's reasonable."

## IV. RECOMMENDATION

My impression is that we have both a hostile environment and an employment problem. It is clear from all employees in the department that there exists certain favorites (the group of six). This is supported by the fact that those six were taken to Reno and are the core group that provides the DUI training which gives each of them additional income. Whether this is justified depends to whom you speak. Others have asked to be included in that DUI training and were told no, stay out of it and also don't discuss the Reno trip. There also appears to be a great disparity in the daily work environment and satisfaction of employees between juvenile probation and adult probation. Almost all employees commented about the problems that have been allowed to permeate both departments for years as a result of a former director who recently retired. It is also clear that many employees did not want to work for Osenkarski and Graham, and cited the same reasons that were described by the complainant.

In all examples cited by the complainant of unwanted activity where a third party witnessed the incident or comment, the complainant's version was verified by the third party. Osenkarski simply denied everything where as Graham denied some or placed his own twist on comments and in some case incident. If significant action is not taken, the behavior will certainly continue and in fact I would expect significant retaliatory action which has been historical in this department. At a minimum, a suspension, sensitivity training and very close monitoring should occur. Whether this will eliminate the work place conditions is doubtful. While termination is severe, unless there is a transfer of the supervisors, or a new supervisor over all of them, I don't expect the activity to cease and retaliatory conduct may continue.

-24-

Also, new non-discriminatory policies need to be implemented to offer all Probation Officers Act 235 training, the same reimbursement for continuing education expenses, and opportunity for participation in DUI training.

From the county's prospective, if only minimal action is taken, can we defend a claim of sexual harassment for a hostile environment? That is very difficult to answer. There is certainly ample evidence of a hostile environment that we cannot refute. It will depend how these persons are portrayed to and perceived by a jury if it ever gets to that point. Frankly, I believe Graham is excitable and will not be the best of witnesses. He loses his temper quickly as he did with me and has an attitude that he is always right and blames others for the problems. Moreover, any litigation would probably involve the deposition and probable trial testimony of much of the department reaching all the way to the President Judge. Even if we prevail, we only make the working environment more tenuous than already exists.

DWD:mh:63245