

```
                 IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                    .
         Plaintiff,                   .    CIVIL ACTION
                                      .    NO. 1:CV 01-0725
         vs.                          .
                                      .
COMMONWEALTH OF PENNSYLVANIA,         .    (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,              .
CUMBERLAND COUNTY; CUMBERLAND         .
COUNTY; S. GARETH GRAHAM,             .
Individually, and JOSEPH              .
OSENKARSKI, individually,             .
         Defendants.                  .
. . . . . . . . . . . . . . . . . . .
```

Volume 1
Pages 1 to 92

Deposition of:  DEBRA GREEN

Taken by       :  Defendant

Date           :  April 8, 2003, 9:38 a.m.

Before         :  Emily Clark, RMR, Reporter-Notary

Place          :  Cumberland County Courthouse
                  Courthouse Square
                  Carlisle, Pennsylvania


APPEARANCES:

      DEBRA K. WALLET, ESQUIRE
           For - Plaintiff

      ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
      BY:  A. TAYLOR WILLIAMS, ESQUIRE
           For - Defendant Commonwealth of Pennsylvania
                 Ninth Judicial District, Cumberland County

      THOMAS, THOMAS & HAFER
      BY:  PAUL J. DELLASEGA, ESQUIRE
           For - Defendant Cumberland County

```
 1    APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  DAVID J. MacMAIN, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
      ALSO PRESENT:
 7
          MS. BARBARA E. VARNER
 8
          MR. S. GARETH GRAHAM
 9
          MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2                                 WITNESS

3     Debra Green                                        Examination

4          By Mr. Adams                                       4

5          By Mr. MacMain                                     88

6

7

8                                EXHIBITS

9     (None marked)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    STIPULATION

 2              It is hereby stipulated by and between the

 3         respective parties that sealing, certification and

 4         filing are waived; and that all objections except as
to
 5         the form of the question are reserved until the time
of
 6         trial.

 7

 8              DEBRA GREEN, called as a witness, being duly

 9         sworn, was examined and testified, as follows:

10    BY MR. ADAMS:

11    Q     Hello.  How are you, Ms. Green?

12    A.    Debra.

13    Q     Debra, okay.  My name is Paul Lancaster Adams.  This
is
14          your deposition.  I actually represent Joe Osenkarski
in
15          this matter involving Ms. Varner.

16              Are you familiar with the case that Ms. Varner
has
17          filed against the county and other defendants?

18    A.    Yes, I am.

19    Q     And one thing we have to do is have some instruction I

20          have to give you.  That will help this thing go a
little
21          smoother than if not without the instructions.

22              Have you ever been deposed before?

23    A.    Never.

24    Q     Okay.  A deposition has the same effect as if it is in
a
25          court of law, meaning that everything you say today is
```

1       sworn testimony.  That is supposed to be the truth to

2       the best of your ability, and can be used later in

3       processes that have to do with litigation.

4            Do you understand that?

5   A.   Yes.

6   Q    I'm going to ask you questions.  It's important that

7        you -- not only will I ask you questions, but other

8        counsel in the room will ask you questions as well.
And

9        it's important that you listen to the questions that
are

10       asked, because we will assume that your answer to each

11       question is the truth to the best of your knowledge.
Is

12       that okay with you?

13  A.   Sure.

14  Q    It's also important that you wait until I finish the

15       question, which is what prompted me to give you more

16       introduction, so that you can make sure you understand

17       it clearly and we can make sure we have the right
answer

18       back.

19            Is there anything that can preclude you or would

20       preclude you from answering truthfully today?

21  A.   No.

22  Q    That you can think of?  You're not under any
medication

23       or anything that may influence an answer that's not

24       correct?

25  A.   I'm under medication but nothing that will prevent me

1          from telling the truth.

2    Q    Okay.  What's the medication, by chance?

3    A.   Vitamins, and a prescription called Synthroid.

4    Q    What is that for?

5    A.   For thyroid.

6    Q    Okay, okay.  But that would not preclude you from giving

7         testimony that ought to be truthful?

8    A.   Not.

9    Q    You have the ability to what we call read and sign,

10        because everything you say today will be transcribed by

11        the court reporter this morning.  Read and sign

12        basically allows you to look at the transcript and in

13        its draft form and you can approve it for its

14        truthfulness and to make sure it's accurate.  Would you

15        like that ability?  First, I'll ask you if you'd like

16        that ability to read and sign.  Some persons will waive

17        that ability to read and take it for granted that

18        counsel here are all going to read it and make sure it

19        says what it says, anyway.  But you do have the ability

20        to look at it, make sure it's truthful in its final

21        form.  Would you like that ability?

22   A.   Yes.  I'd like to see it.

23   Q    So we'll make arrangements?

24            MR. ADAMS:  Ms. Taylor, do you want to?

25            MS. WILLIAMS:  I guess you can send it to me.

```
 1    BY MR. ADAMS:

 2    Q      What's your name?

 3    A.     Debra Green.

 4    Q      Do you have a middle name, by chance?

 5    A.     Kay, K-A-Y.

 6    Q      And where do you reside, Ms. Green?

 7    A.     Exact address?

 8    Q      Please.

 9    A.     3501 Ritner Highway in Newville, here in Pennsylvania.

10    Q      How long have you had that address?

11    A.     Since 1989, I believe.

12    Q      And you currently work for the county; is that
correct?

13    A.     Yes.

14    Q      What's your position with the county?

15    A.     Juvenile probation officer.

16    Q      Is that probation officer 1 in the hierarchy of
things?

17    A.     I believe my title is a senior probation officer.

18    Q      You're currently a senior probation officer?

19    A.     I believe that's what it is.

20    Q      How long have you had the title of senior probation

21           officer?

22    A.     I'm going to guess two years.  I'm not sure exactly.
I

23           would have to check court records, you know, here in
the

24           courthouse.

25    Q      Do you have an anniversary date, by chance?
```

```
 1   A.   February of 1995, I believe.

 2   Q.   That's when you started with the Juvenile Probation

 3        Department?

 4   A.   Correct.

 5   Q.   When you first started with the Juvenile Probation

 6        Department, what was your title?

 7   A.   Just a general probation officer.

 8   Q.   Okay.  So am I correct to say from February 1995 till

 9        two years ago you were a Juvenile probation officer?

10   A.   Correct.

11   Q.   And then two years ago till now, you would have been a

12        senior probation officer; is that correct?

13   A.   Correct.

14   Q.   Juvenile probation officer.  Did you have any other

15        to the county via employment prior to 1995?

16   A.   No.

17   Q.   What did you do before then?

18   A.   I was a probation officer in Franklin County.

19   Q.   Okay.  And how long were you in Franklin County?

20   A.   Approximately six months.

21   Q.   And before that?  I may be testing your memory here.

22   A.   Before that was college and then part-time jobs.

23   Q.   Where did you go to school?

24   A.   Shippensburg University.

25   Q.   And do you have a degree from Shippensburg?
```

ties

| | | |
|---|---|---|
| 1 | A. | Yes, undergrad as well as graduate. |
| 2 | Q | What is year graduate degree in? |
| 3 | A. | Administration and criminal justice. |
| 4 | Q | When were you attending Shippensburg for that degree? |
| 5 | A. | Wow.  I can't ask her, can I?  Because we -- she went |
| 6 | | the same time I did. |
| 7 | Q | Actually, you can.  Were you attending the graduate work |
| 8 | | with Ms. Varner, by chance? |
| 9 | A. | Yes.  We were in the same program. |
| 10 | Q | Did you also enter the program together? |
| 11 | A. | Yes. |
| 12 | Q | That would be with Ms. Varner? |
| 13 | A. | Yes, we did. |
| 14 | Q | Okay. |
| 15 | A. | Dates on these things aren't important to me, so I |
| 16 | | apologize. |
| 17 | Q | That's okay.  What prompted you to attend Shippensburg |
| 18 | | University for the graduate degree? |
| 19 | A. | Well, that was a steppingstone in our department to |
| 20 | | increase in level and pay grade, so that was one |
| 21 | | incentive.  But I figured it's always good to improve |
| 22 | | any opportunities, and that was a free opportunity. |
| 23 | Q | Did the Juvenile Probation Department encourage |
| 24 | | furthering education? |
| 25 | A. | No, because I really didn't know about the program |

 1          until -- I found about it on my own, so I really wasn't

 2          informed by anybody here.  That really wasn't an issue.

 3    Q     Did Ms. Varner, by chance, tell you about the program?

 4    A.    No.  I think I'm the one that told her about it.

 5    Q     Okay.  The Juvenile Probation Department certainly

 6          didn't discourage further education, did they?

 7    A.    No.  Ken Bolze was our chief then, and he approved and

 8          encouraged, once I presented the idea to him, he gave us

 9          a good -- he gave me a good support letter.  I'm

10          assuming he did the same for her.  We had to have our

11          chief's support in order to do the program.

12    Q     Okay.  And who was the chief at the time?

13    A.    That was Ken Bolze.

14    Q     Okay.  When you were attending Shippensburg University

15          for your graduate degree, would you say the degree or

16          the program was very difficult?

17    A.    Pieces of it were difficult for me.

18    Q     Can you explain a little bit in that area?

19    A.    I have to study hard to earn a decent grade, a passing

20          grade.  Some people it seems to come easier to, and some

21          people in our class appeared to have an easier time of

22          getting their grades than I did.  Does that answer your

23          question?

24    Q     But you went through it successfully, obviously?

25    A.    Yes, I did.

```
 1   Q   What were your observations of Ms. Varner's experience

 2       going through the program?

 3   A.  As an ability to learn?  And do the program?  I think

 4       she had an easier time of it than I did.

 5   Q   Okay.  Why do you say easier time?  Can you explain

 6       that?

 7   A.  I'm going to say she was smarter than I was.  I think

 8       she had an easier time of learning and understanding

 9       what we were supposed to be learning.

10   Q   Okay.  Does she handle tasks a little better than you?

11       Is that what you would say?

12   A.  I'm not sure if I'd word it quite that way, but when
it

13       came to the studies, I thought she did better than I

14       did.

15   Q   Okay.

16   A.  She helped me, but I still had a harder time than her.

17   Q   How did she help you doing studies?

18   A.  If I wasn't clear on something the teacher said, I
mean,

19       she would be there and she would help.  We did
projects

20       together, which we had to work with teams and stuff,
in

21       pairs.  And in working with her, I always felt that I

22       had a good partner in doing that process.

23   Q   So obviously you and Ms. Varner were juggling the

24       full-time employment of Juvenile Probation Department
as

25       well as the graduate program at Shippensburg
University;
```

```
 1          is that correct?

 2    A.    Correct.

 3    Q     And in your opinion, at least, she seemed to handle that

 4          a little better than you; is that correct?

 5    A.    She certainly appeared that way.  She didn't seem nearly

 6          as flustered as I felt.

 7    Q     Very well.  Thank you.  Any interest in having a Ph.D.?

 8    A.    No.

 9    Q     Are you familiar with Ms. Varner's interest in having or

10          obtaining a Ph.D. as well?

11    A.    Yes.  She's told me about some of her classes.

12    Q     What has she told you?

13    A.    That she has class, like, certain nights, I don't know.

14          She told me what she's doing, but frankly, I haven't

15          understood parts of it because it's a level above.  I'm

16          making myself sound stupid and I don't think I am.  But

17          she -- that's her niche and I have no interest in that

18          at this point.

19    Q     Okay.  You said some of the stuff is above your head.

20          What kind of buzz words has she said to you about her

21          Ph.D. studies?

22    A.    I can't recall anything off the top.  It's been a while.

23          It's been, like, several months since she shared any of

24          her projects or anything with me, research type

25          projects.  I really can't elaborate much more than that.
```

Green                                    13

```
 1   Q   In your experience would you say that Ms. Varner
handled
 2       the Ph.D. program similar to the graduate program, in
 3       that she was able to successfully go through classes
and
 4       do well while also dealing with full-time employment
and
 5       other things in life as well?
 6   A.  I would say yes, because she never came in and
 7       complained as in I can't do this, this is horrible, I
 8       don't like this.  She has made comments that it is
 9       challenging, but she never has made any comments about
10       wanting to quit the program.
11   Q   Sure.  Are you and Ms. Varner friends?
12   A.  We are now, since, I mean, since we became employees.
I
13       consider myself her friend.
14   Q   Okay.  And if things were going bad, would you be the
15       person or one of the persons she may talk to about
16       things going bad?
17   A.  I would be one, yes.
18   Q   Going back to the office of the Juvenile Probation
19       Department, who do you currently report to now?
20   A.  Right now it's Sam Miller is my immediate supervisor.
21   Q   And how long has it been Sam Miller?
22   A.  Six months, approximately.
23   Q   And prior to that, who was your immediate supervisor?
24   A.  Hank Thielemann.
25   Q   And I'm testing your memory here.  How long would you
```

```
 1            have Hank Thielemann as your supervisor?

 2      A.    Maybe two years.

 3      Q     And prior to that?

 4      A.    I'm going to say Tom Boyer was in there as well.

 5      Q     Was Gary Graham ever an immediate supervisor of yours?

 6      A.    He was in there as well but that was before, that was

 7            before, well, well before I became an intake officer.

 8            And that was I guess up to the point when he was
```
removed
```
 9            in our office.  I claimed him as my immediate
```
supervisor
```
10            up until that point.

11      Q     What's an intake officer?

12      A.    I'm the first person that meets new clients.  A new

13            criminal charge, juvenile charge comes in.  That
```
client
```
14            is referred to an intake officer to explain the
```
juvenile
```
15            process, prepare a recommendation for court.

16      Q     So you're the first line of communication with the

17            juveniles in your office?

18      A.    Correct.

19      Q     And you physically see them when they come into your

20            office?

21      A.    Correct.

22      Q     And how long did you do that?

23      A.    Since '98, I believe.  I would have -- I can find out

24            downstairs in my notes.  I believe it was '98 when
```
they
```
25            created that position.
```

```
 1   Q    And you did it for how long?  I'm sorry, I may have
 2        missed that.
 3   A.   I still do.
 4   Q    You're still doing that, okay.  So along with your
case
 5        responsibilities, you are the intake officer as well;
is
 6        that correct?
 7   A.   No.  My responsibilities are solely intake and that is
 8        my caseload.  Those same pending cases are my people.
 9   Q    So you see all the juveniles?
10   A.   Well, about half.  The other half to go my co-worker,
11        Bill Brandt.
12   Q    There's another intake officer?
13   A.   Yes.
14   Q    What's that person's name?
15   A.   Bill Brandt.  William Brandt.
16   Q    Okay.  Describe the juveniles that you see, that you
see
17        come into the Juvenile Probation Department for the
very
18        first time and you're the first person they see upon
19        that experience.
20   A.   A lots of kids will come in and they do the defensive
21        stance, they sit like this (indicating).  I think they
22        expect us to pick on them or bully them.  But
generally
23        by the time they leave they've answered all my
24        questions.  And I would say for the good part, 98
25        percent are very, maybe not very respectful, but they
```

1          will answer questions and they're usually not the
mean,

2          evil, hateful kids people assume they are.

3     Q    Sure, sure.  Can you explain to me what you mean by
not

4          very respectful?

5     A.   Defensive, slouched down.  They don't answer your

6          questions with anything more than a yeah, you know,
with

7          an attitude, or maybe I wouldn't be here, you know, if

8          mom didn't do this or that.  Very defensive type

9          comments, trying to put their -- trying to avoid

10         responsibility.

11    Q    Any profanity used?

12    A.   Very rarely.  I've never been sworn at, put it that
way.

13         I will have clients swear at their mother or father.

14         I've had that happen different times.

15    Q    Would you say that the clients have more respect for

16         their parents in these scenarios?

17    A.   Yes.

18    Q    But you have in the office experienced juvenile
clients

19         curse or use profanity?

20    A.   Yeah, probably once or twice a year, maybe  --

21    Q    Really?

22    A.   -- I would have a client.  I think by the time they
get

23         to our office they know they have to put on a good
face

24         and they try to, at least.

25    Q    Do you experience as an intake officer does not
include

1          you being out in the quote, unquote, out in the field
as

2          a practice?

3    A.    Not very often.  It's very -- it's rare that I am.

4    Q     Is it your understanding that the Juvenile probation

5          officers and probation officers that are out -- strike

6          that.

7               Is it your experience that the Juvenile probation

8          officers in the field experience things that are

9          different from you as an intake officer?

10   A.    Oh, definitely.

11   Q     Would that include more, for lack of a better word,

12         hostile situations?

13   A.    Only for maybe 10 percent.  A few I think of the more

14         intensive clients who have had repeat offenses, poor

15         parenting, they've been through our system.  But most
of

16         the clients are kids like you guys all have that just

17         have made a mistake.

18   Q     But the field Juvenile probation officers, would they

19         experience juvenile clients that are less respectful

20         verbally to you as an intake officer?  To your

21         knowledge.

22   A.    Well, and I'm going -- I'm thinking back to when I did

23         those cases, and I didn't have an issue -- I didn't
have

24         a problem with disrespect.  Very rarely did I have a

25         problem with disrespect.

```
 1   Q   So what's a typical day, briefly, for you in your

 2       office?

 3   A.  Me, for me?  Come in and it's mostly at my desk, a lot

 4       of paperwork, computer work.  Some court appearances.

 5       Perhaps once or twice a month would be a court

 6       appearance.  The rest is paperwork and doing
interviews
 7       with clients and families.

 8   Q   So you don't often travel in your intake position or
in
 9       your position with the Juvenile Probation Department?

10   A.  No.  It's rare.  I might go to the school to pick up

11       some paperwork.  If clients have a problem perhaps
with
12       coming to the office, I may go to their house.  But

13       that's rare.

14   Q   How often would you say that you travel for the

15       Department?

16   A.  Every other week, perhaps.  And that's not just for my

17       position, but I would assist somebody else.

18   Q   And in that example of travel, what would you be
doing?
19   A.  Could be helping to transfer a client to a placement,

20       from a placement, if someone doesn't want to go alone.

21       I mean, it's encouraged to work in pairs, where just
for
22       comfort reasons and the safety issues, I may go with

23       someone to a school or to a house.

24   Q   Okay.  And you're teaming up with another Juvenile

25       probation officer at the time?
```

1   A.   Correct.

2   Q    Okay.  How often would you team up with Ms. Varner?

3   A.   Once a month, perhaps.

4   Q    Once a month?

5   A.   It really varies.  It might be twice this month and then

6        none for three months.

7   Q    Do you recall the first time you ever teamed up with

8        Ms. Varner for a trip?

9   A.   I don't.  That would probably have to have been probably

10       the first month of employment.

11  Q    Did you team up with other persons in the office besides

12       Ms. Varner?

13  A.   Yes.

14  Q    And how often do you team up with others?

15  A.   Whenever they ask.  It also depends on the gender issue.

16       If they have -- if a male probation officer has a female

17       client, they will try to get a female probation officer.

18       Since I'm in the office I'm easy to access, they can ask

19       me to help.

20  Q    And when you go on trips for the office, what time do

21       you usually -- do you have day trips, for example?

22       Where you might be gone all day and then come back in

23       the afternoon or evening?

24  A.   It's been a long time since I've had one of those trips,

25       but that does happen.

| | | |
|---|---|---|
| 1 | Q | What's the last time you had one of those trips? |
| 2 | A. | A lot of our trips will be several hours, like maybe |
| 3 | | five or six hours, if you call that a day trip. |
| 4 | Q | I don't know. |
| 5 | A. | Okay. |
| 6 | Q | You tell me. |
| 7 | A. | Like, a five, I'll say a five-hour trip, one of the |

last

| | | |
|---|---|---|
| 8 | | trips that took a long time was with Ms. Varner.  We |
| 9 | | went to pick up a female juvenile who was being |
| 10 | | discharged. |
| 11 | Q | Okay.  And we'll get back to that, but how long ago |

was

| | | |
|---|---|---|
| 12 | | that? |
| 13 | A. | About a month ago.  Within the last month, probably. |
| 14 | Q | You and Ms. Varner took a trip together within the |

last

| | | |
|---|---|---|
| 15 | | month? |
| 16 | A. | Correct. |
| 17 | Q | Okay.  Where did you go? |
| 18 | A. | Someplace east to a drug and alcohol rehab.  I don't |
| 19 | | know the name of the town. |
| 20 | Q | What time did you leave?  Did you report to the |

Juvenile

| | | |
|---|---|---|
| 21 | | Probation Department before you took the trip? |
| 22 | A. | Yes.  We started here, and since it isn't my client, I |
| 23 | | just -- I kind of follow, and I don't know what the |
| 24 | | plans were.  But the clients need to be picked up at a |
| 25 | | certain time so we had to make -- I'm sure the |

1          arrangements were made for us to leave in according to

2          get there at that appropriate time.

3      Q   At what time did you leave?

4      A.  I would have to go back and look on my time sheet.  I

5          would -- I'm going to guess seven o'clock in the

6          morning.  Seems to me that was a day where we met in
the

7          parking lot and left early in order to get there.

8      Q   Is seven o'clock to your knowledge a typical time with

9          which Juvenile probation officers may leave the office

10         for a long trip?

11     A.  Well, since Gary left our office I haven't been told a

12         specific time to leave or come, so I've been more

13         flexible and choose whatever I feel is appropriate, or

14         whoever the PO is, you know, to make us match up with

15         the other person being scheduled.

16     Q   Let's go back.  When you say Gary was in charge?

17     A.  Correct.

18     Q   Okay.  When Gary was in charge, was there an office-
wide

19         time for persons to leave the office or an
understanding

20         or something in writing or something along that lines

21         where everyone knew you were supposed to leave at this

22         particular time?  Is that the case?

23     A.  I don't know if everyone knew, because it was a verbal

24         direction that was given to me.

25     Q   Okay.

Green                                    22

```
1    A.    And I was told that I had to leave at eight o'clock,

2          commitment trips started at eight o'clock as opposed
to
3          9:00, 10:00, 11:00, 12:00.

4    Q     And Gary Graham told you himself that that's what he

5          expected?

6    A.    Correct.

7    Q     Okay.  And from your understanding, Mr. Graham, you're

8          saying Gary, Mr. Graham's expectation of everyone in
the
9          office was to leave from the office at eight o'clock;
is
10         that correct?

11   A.    I don't think that was what he expected, because other

12         people didn't do that.

13   Q     What do you mean by that?

14   A.    A few days or weeks after I was told that I had to
leave
15         at eight o'clock, co-workers left at 4:30 to start
their
16         trip.

17   Q     Were those 4:30 trips overnight trips?  Are you saying

18         4:30 a.m. or 4:30 in the p.m.?

19   A.    P.m.

20   Q     Okay.  So those persons were leaving for night trips
as
21         opposed to day trips?  Can you explain what you mean
by
22         that?

23   A.    We have a place that we used to use a lot, a placement

24         for kids who had been sentenced, so to speak.  That's
an
25         adult term, but they were sentenced to a place and it
```

```
 1          was George Junior out near Pittsburgh.  And that would

 2          be an all-day trip.  It would take you several hours
to
 3          get out there and back.  And those types of trips for

 4          overtime purposes I was told to do them starting at

 5          eight o'clock.  And that's where my co-workers would

 6          leave at 4:30 or whatever time.  So I was under the

 7          impression that rule held for me but not my co-
workers.
 8     Q    Could that rule have possibly been held for you
because
 9          of your responsibilities as an intake officer and your

10          need to be in the office during the day and early in
the
11          day?

12     A.   No, because I wasn't an intake officer back then.  I

13          wasn't an intake officer until after Mr. Graham left
our
14          department.

15     Q    Okay.  So I misunderstood.  I thought you had always

16          been an intake officer in the Juvenile Probation

17          Department.  Is that not true?

18     A.   No.  No.  It's been three years, roughly.  '98 I
believe
19          was the year I started doing intakes.  But I was hired

20          in '95.

21     Q    Okay.  So your understanding, and correct me if I'm

22          wrong, is that you were told that you had to leave at

23          eight o'clock in the morning for a long trip to, for

24          example, Pittsburgh, but other officers or other
members
25          in the department could leave later in the day; is
that
```

```
 1        correct?

 2   A.   Correct.

 3   Q    And why do you think that difference existed?

 4   A.   Just a bullying part on Mr. Graham's behalf.  There
was

 5        no reason that he told me.  There was no justification

 6        given.

 7   Q    Could Mr. Graham have told other persons that they had

 8        to leave at eight o'clock in the morning as well?

 9   A.   I believe he told Barb.  I asked friends, other

10        co-workers if they were told the same.  People that I

11        asked didn't know what I was talking about.

12   Q    Would you be surprised if I said to you that a male

13        Juvenile probation officer has indicated that he has
to

14        leave at eight o'clock as well when he has to take
long

15        trips such as that or when he was working under Gary

16        Graham?

17   A.   That's possible.  I maybe just never knew it, if it
is.

18        No one ever -- none of the males ever offered that, or
I

19        never asked that person.

20   Q    Upon Mr. Graham's instruction in terms of leaving at

21        eight o'clock in the morning, and you teaming up with

22        Ms. Varner, how many times did that scenario occur?

23   A.   Could you repeat that?

24   Q    Did you understand that?  Okay.  Under Mr. Graham's

25        instruction of you must leave at eight o'clock in the
```

1       morning for this trip, how many times did that happen in

2       situations where you and Ms. Varner were teamed up?

3   A.  I'm not a hundred percent sure I get the question, but I

4       don't think it was -- I remember one incident in

5       particular.

6   Q.  Okay.  Just one incident where Mr. Graham said Debra,

7       Ms. Green, you must leave at eight o'clock and you're

8       actually teamed up with Ms. Varner, in that scenario, it

9       only happened once?

10  A.  I wouldn't say it only happened once, but I remember one

11      incident and that's the incident where he, I'll say

12      reprimanded me for not leaving at eight o'clock.

13  Q.  Okay.  Again, we'll get back to that, I apologize.  But

14      could there have been other instances where you were

15      teamed up with Ms. Varner and Mr. Graham said to you,

16      you must leave at eight o'clock because it's a long

17      trip, and those were the guidelines or the instructions?

18  A.  His instructions were given to me on one time and I

19      followed them ever since, wherever I was able to.

20  Q.  Where is your -- do you have a desk in the office?

21  A.  Yes.

22  Q.  Where, if I were to walk into the Juvenile Probation

23      Department, where would you be seated?

24  A.  In the main Juvenile Department, I am no longer located

25      there.  We have another wing and it's down the hallway.

```
 1              There are two different wings of our courthouse.
 2      Q       How long have you been in that particular part of the
 3              office?
 4      A.      A year and a half, maybe.
 5      Q       So prior to a year and a half, you were in one place
the
 6              whole time since 1995; is that correct?
 7      A.      No.
 8      Q       No?  Okay.  Go backwards with me.  Before a year and a
 9              half, where were you seated and where were you
10              positioned in the office?
11      A.      The location before was in the main office, physically
12              was the first office inside on the right.  And prior
to
13              that, I had an office across the hall in which is now
14              considered Adult Probation.
15      Q       So that you've been in total three different locations
16              physically for your office or desk while with the
17              Juvenile Probation Department; is that correct?
18      A.      Four different offices.
19      Q       Four different offices?
20      A.      I'm sorry.  Three different offices, four different
desk
21              offices.
22      Q       Okay.  Can you name the three offices for me?  Just
real
23              quick.
24      A.      And I'll try and be brief.  My current office.
Previous
25              desk was located in Juvenile, the first office inside
```

```
 1          the front door.

 2   Q      Okay.

 3   A.     Prior to that I was in Adult Probation and I shared an

 4          office with Mike Piper and Buck McKenrick.  They're
both

 5          now Adult probation officers.

 6   Q      Let me start with that one.  The Adult Probation
office,

 7          you were assigned to the Juvenile Probation Office but

 8          you were physically seated in the Adult Probation

 9          Office; is that correct?

10   A.     That's correct.

11   Q      While in that particular office were you also by
chance

12          having intake with Adult probation officers?

13   A.     What do you mean by intake?

14   Q      Did you have intake responsibilities for Adult
officers,

15          Adult -- excuse me -- clients as well?

16   A.     No.

17   Q      Okay.  And how long were you in the Adult Probation

18          Office?  If you can recall how many years or months.

19   A.     From the day I was hired I had a temporary desk in
where

20          the secretaries sit.  And I was on the Adult side at
two

21          different locations.  I was on the Adult side until
our

22          split happened.  I believe it was when the split
between

23          Adult and Juvenile Probation, when the split occurred
I

24          think is when I moved over, shortly thereafter.

25   Q      So February '95 to -- do you know when the split
```

1        actually occurred?

2    A.    I don't recall.

3    Q    When the split occurred, you were then moved to the

4        Juvenile Probation Department office?

5    A.    Correct.

6    Q    Okay.  So between -- okay.  While you were in the

7        Juvenile Probation Office is that where you met

8        Ms. Varner the first time?

9    A.    The first time I met her was physically in Joe's
office,

10        Joe Osenkarski's office, prior to employment.

11    Q    Okay.

12    A.    That was the first day I was introduced to her.

13    Q    And do you know what year that was?

14    A.    I would guess it was '95.  There's a slight chance it

15        could have been the end of '94, but I believe it was

16        January or February of -- probably January of '95.

17    Q    Okay.  So you met Ms. Varner in Mr. Osenkarski's
office.

18        When she started working, you were in the Adult,

19        physically in the Adult Probation office; is that

20        correct?  In '95?

21    A.    Once I was hired, that's where I was located.

22    Q    Obviously, you were hired before Ms. Varner, correct?

23    A.    No.

24    Q    No?

25    A.    We were hired the same day.

1   Q   The same day.  Okay.  Okay.  So physically -- you're

2       both hired the same day, but physically you are

3       positioned or your desk is located in the Adult

4       Probation Office?

5   A.  Correct.

6   Q   Where was Ms. Varner's desk located at that time?

7   A.  When I mentioned I was an office partner with Buck

8       McKenrick and Mike Piper, I believe that was her first

9       desk.  That was my second desk.

10  Q   Okay.  So while in physically in the Adult Probation

11      Office, how far is Ms. Varner to you?  Seating-wise.

12  A.  I would say twice the length of this room.  She was in

a

13      different office space altogether.

14  Q   So you could not necessarily see Ms. Varner?

15  A.  No.  There was no visual -- no.

16  Q   And you were in that location for approximately two

17      years, you think?

18  A.  It was less than -- it was less than that.  I'm going

to

19      say I think it was less than that.  I don't remember

20      when she got moved, because whenever she got moved

from

21      that desk is whenever I got moved to that desk.  And I

22      don't remember when I got moved, either.

23  Q   Is it safe to say that for two years or less, you had

24      very little eye-to-eye contact while sitting at your

25      desk, at least, and while Ms. Varner's sitting at her

```
 1          desk between the two of you?  There was little to no

 2          contact; is that correct?  That's probably a bad

 3          question.  Let me strike that question.

 4               While you were seated at your desk, okay?
```
Between
```
 5          February 1995 and till the split and while Ms. Varner

 6          was seated at her desk, you could not see her; is that

 7          correct?

 8   A.     Correct.

 9   Q      Could you hear her?

10   A.     No.

11   Q      If someone were to come over and talk to Ms. Varner,

12          would you have heard it then?

13   A.     Not -- I would not have heard them.  I would have seen

14          someone going into the office, but I would not have

15          heard anything.

16   Q      Okay.  During that period of time did you ever see
```
Gary
```
17          Graham go talk to Ms. Varner?
```
well.
```
18   A.     I'm sure he did, because he was her supervisor as

19   Q      Okay.  Where was Gary Graham's desk during that time

20          between February 1995 and the split?

21   A.     He was on the Juvenile side.

22   Q      Okay.  So he was physically not -- his desk was not

23          physically in that same office as with you and

24          Ms. Varner?

25   A.     Correct.
```

```
 1   Q    Okay.  When you were moved from the Adult Probation

 2        Office to the Juvenile Probation Office, where was your

 3        seat?  Where was your desk?

 4   A.   I believe my first desk and only desk was, if I'm

 5        looking in the front door, the very first office to the

 6        right.

 7   Q    And where was Ms. Varner's seat or desk at that time?

 8   A.   She would have been, going in the front door, the first

 9        office to the front, the first office you would see.

10   Q    Am I assuming correct that you both moved from the Adult

11        Probation Office to the Juvenile Probation Office at the

12        same time, physically moved?

13   A.   No.  She moved there first.  I came by, I came over

14        months later.

15   Q    Months later?

16   A.   I'm guessing at that.

17   Q    How many months in between, do you think?

18   A.   Maybe six months.

19   Q    So for six months you were physically in the Adult

20        Probation Office, this is I guess after the split, and

21        Ms. Varner was, had already moved before you and she was

22        physically in the Juvenile Probation Office for six

23        months?

24   A.   I know she moved before me.  I'm not clear as to when

25        she moved, if it was before the split or after the
```

```
 1            split.  I know she was gone roughly six months before

 2            me.

 3    Q       And currently you are in the office that you're in now

 4            and that is where?

 5    A.      It's in what we call the wing, the Bixler building.

 6    Q       Is Ms. Varner in that particular area as well?

 7    A.      Yes.

 8    Q       Okay.  Where is your desk in proximity to Ms. Varner's

 9            desk in that part of the office or in that current

10            office?

11    A.      Our desks are probably six feet apart but there's a
wall
12            between us.  We have two separate office spaces.

13    Q       And did you get moved to that wing office before

14            Ms. Varner?

15    A.      I'm going to say yes.

16    Q       When did you move there?

17    A.      A year, year and a half ago, maybe.  A year and a
half,
18            I would guess.

19    Q       Okay.  How long has Ms. Varner been there?

20    A.      I don't remember.  I would guess maybe -- well, I'm

21            thinking she came after me, and I'm guessing, like,
nine
22            months ago.  I'm not sure I have my incidences in
order
23            in my head here.

24    Q       Okay.  Going back to your desk at the Adult Probation

25            Office, you said that of course you say Gary Graham
came
```

1        talk to Ms. Varner because he was her supervisor.  Do

2        you remember that comment?

3    A.  Yes.

4    Q   How often would you see Mr. Graham in a week go talk
to

5        Ms. Varner?

6    A.  I don't think I could even make a guess at that.  I

7        didn't really take notes or -- I'm sure he wasn't the

8        only one who talked to her.

9    Q   Okay.  Well, is it safe to assume that Mr. Graham was

10       supervising other persons and other Juvenile probation

11       officers at the time; is that correct?

12   A.  Yes.

13   Q   Did you notice that he would come see Ms. Varner more

14       frequent than other Juvenile probation officers where

15       you all were located?

16   A.  All I could compare it to is how often he came to see

17       me, and he came to see her much more frequently than
he

18       came to see me.

19   Q   Did it ever make you pause or wonder why he was going
to

20       see Ms. Varner more than he was going to see you?

21   A.  Yes.

22   Q   What were you thinking?

23   A.  As a new employee, on one occasion I may be frustrated

24       because I needed assistance but maybe was too

25       embarrassed to ask.  I was kind of hoping I could
learn

1      the process of being an employee here perhaps a little

2      easier.  I guess on one hand I was perhaps discouraged

3      that I didn't get the guidance and learning my job that

4      I assumed she was getting.

5          On the other hand, I thought it was rather

6      inappropriate, all the attention that he was showing to

7      her.

8   Q   Okay.  What do you mean by inappropriate attention?

9   A.  I didn't feel all the attention was guided on a

10      professional level.

11  Q   Okay.  Did you think that Mr. Graham was flirting with

12      Ms. Varner?

13  A.  Yes.

14          MR. DELLASEGA:  The answer was yes?

15          THE WITNESS:  Correct.

16  BY MR. ADAMS:

17  Q   And why do you think he was flirting with her?

18  A.  You could tell by comments and physical, you know, body

19      movements, laughing.  Not that we shouldn't enjoy our

20      jobs, but it was rather out of the norm.

21  Q   Okay.  So Mr. Graham would come in and see Ms. Varner

22      and suddenly you would see laughing and things that were

23      talked about that had nothing to do with the office

24      work; is that correct?

25  A.  Yes.

1    Q    Okay.  And Ms. Varner laughed with Mr. Graham?  He

2         didn't laugh by himself, did he?

3    A.   Well, it was -- I'm going to say it's two different

4         levels of -- I'm going to say yes, overall, yes.

5    Q    Okay.  And you observed him I guess from your vantage

6         point of him walking around and you would see them; is

7         that correct?

8    A.   And also the reason I was hired was to be a partner
with

9         Barb, do the same program.  So her and I needed to see

10        each other daily, I mean, just continually, regarding

11        our Family Preservation issues that we were to deal

12        with.

13   Q    Okay.  While you and Ms. Varner were in the Adult

14        Probation Office and Mr. Graham would come see

15        Ms. Varner and flirt -- can we say, is it safe to use

16        the word flirt?

17   A.   That would be a good word.

18   Q    Did Ms. Varner ever complain to you about these visits

19        or flirtation?

20   A.   Eventually?  The next question is going to be when.

21   Q    I think it will be.

22   A.   I would say --

23   Q    Well, we can take -- let me back up here in the time

24        line.  I think we're safe to say that you and Ms.
Varner

25        were physically located in the Adult Probation Office

1       for at least two years or less, from hire until the

2       split?

3    A.    Roughly.

4    Q    Is that correct?

5    A.    Yes.

6    Q    And in that time period Mr. Graham would come visit
you

7       but also visit Ms. Varner more frequently, and in

8       visiting more frequently there was conversation other

9       than work because -- including laughter between

10       Ms. Varner and Mr. Graham; is that correct?

11    A.    Correct.

12    Q    Okay.  During this laughter did she ever complain

13       afterwards, like, say, Mr. Graham would come talk to

14       her, there would be laughter, they would share a
moment,

15       he would leave.  Did she ever come and say, hey, I
don't

16       like this kind of stuff?

17    A.    Initially, no.  Eventually, yes.

18    Q    What do you mean by eventually, yes?  Where were you?

19       Were you still in the Adult Probation Office when all
of

20       a sudden eventually no?

21    A.    By the time she shared her feelings, I would have been

22       located in the Juvenile Probation Office, I believe.

23    Q    This is after the split?

24    A.    Yes.  I'm going to say yes.

25    Q    Is it safe to say -- this may be jumping ahead a
little

```
 1            bit, but is it safe to say that Ms. Varner and

 2            Mr. Graham had a pretty, I guess healthy or positive

 3            relationship or friendship up until a sudden moment

 4            years later?  Is that summarizing it?

 5   A.    I would not call it healthy.

 6   Q.    Okay.  What would you call it?

 7   A.    One-sided and unhealthy.

 8   Q.    Is there a cafeteria in the building?

 9   A.    No.  There used to be a break room years ago.  There's

10            no actual cafeteria.

11   Q.    Was the break room ever used for eating lunch for the

12            employees of the courthouse?

13   A.    It was open to any employee.

14   Q.    Okay.  Did you actually use that break room?

15   A.    Maybe twice.

16   Q.    Maybe twice?  Did Ms. Varner use that break room?

17   A.    Not that I'm aware of.

18   Q.    Who hired you?

19   A.    Ideally or -- ultimately it was Judge Sheely.

20   Q.    Judge Sheely, okay.  Do you know, and from your

21            understanding Judge Sheely had the responsibility of

22            hiring and firing in the Juvenile Probation Office?

23   A.    Juvenile Probation Office.

24   Q.    Yes.  Who has that responsibility now?

25   A.    Judge Hoffer.
```

```
 1   Q   Who interviewed you for the job at the Juvenile

 2       Probation Office?

 3   A.  On official interview or unofficial?

 4   Q   Give me examples of both, if you could.  Officially,

 5       starting.

 6   A.  My unofficial was with Mr. Graham.  He knew who I was

 7       and he basically recruited me.

 8           My official interview was with Joe Osenkarski.

 9       John Roller, and I believe it was Ken Bolze.  I don't

10       think anybody else was in the room.

11   Q   Okay.  And from your understanding collectively those

12       persons you just named made the decision on your hire,

13       or at least recommended your hire?

14   A.  Collectively?  The recommendation would have been, I

15       guess it would have had to have been collective to go
```
to
```
16       the judge.

17   Q   What's your relationship with or like with other, with

18       Juvenile probation officers in the office?  What kind
```
of
```
19       relationship do you have with them?

20   A.  I try to keep it professional.  I try to share some

21       personal issues, but I try to keep it more on a

22       professional level.

23   Q   Are there times where you think the office is less

24       professional?

25   A.  Definitely, yes.
```

1   Q    What do you mean by that?

2   A.   Well, I don't feel that I'm here on the job to hear

3        other peoples' personal issues regarding marital
issues.

4        Well, jokes is a big issue.  A lot of comments are
made

5        and taken place that don't involve or revolve around

6        juvenile probation work.

7   Q    Are there comments made by everyone?  Most persons?

8   A.   Maybe a third that I would hear.  And there are
several

9        probation officers that have never said anything to me

10       or in front of me that I considered disrespectful.

11  Q    So a third of the office in your opinion might make

12       comments that you think are not appropriate?

13  A.   That sounds fair, like a fair statement.

14  Q    How many Juvenile probation officers do you currently

15       have in the office?

16  A.   There's 20-something.  24 of us, maybe.  I'm not sure.

17       22, 23, 24.

18  Q    Is your description of a third -- and I guess that

19       number has changed over the years?

20  A.   Correct.

21  Q    Okay.  Is your number of a third pretty consistent
over

22       the years, that no matter how many officers are
actually

23       in the office, about a third of them kind of make

24       comments that you don't appreciate?  Is that safe?

25  A.   Yes, because as new staff come on, they're -- see,

```
 1           there's different levels of what I consider
 2           inappropriate or offensive --
 3    Q      All right.  Before I ask you what you consider
 4           inappropriate, comments are made by women and men?
 5    A.     What I consider the extremely offensive comments,
 6           they're made by men.
 7    Q      Okay.  But the less offensive comments but still
 8           offensive would come from women; is that correct?
 9    A.     There are two people on staff currently that I wish did
10           not share things, but they do, with me, personal issues.
11    Q      Who are those two persons?
12    A.     One is a secretary named Stephanie.  The other one is a
13           co-worker named Gail.
14    Q      What's Stephanie's last name?
15    A.     Kiess, K-I-E-S-S.  It was Stratton.
16    Q      And what did Stephanie say that you wish she hadn't
17           said?
18    A.     She tells me about her love life, meaning her sex life
19           with her current boyfriend.
20    Q      Okay.  And without getting terribly graphic, what is she
21           saying?
22    A.     She will --
23    Q      Actually, get graphic.  Whatever you want to say, just
24           say it.
25    A.     Well, she has said that she has a new boyfriend and she
```

1        has performed or participated in sex acts that she has

2        never done before.  And I did not ask the details and

3        she didn't offer.

4    Q   Did she say anything else?

5    A.  Items along those lines.  She'll tell me about getting

6        drunk.  I don't need to hear that.  That's not job

7        related.

8    Q   Did she ever give or say to you a joke that you didn't

9        think was appropriate as well?

10   A.  Nothing comes to mind.

11   Q   How long has Stephanie been employed with the Juvenile

12       Probation Office?

13   A.  Maybe five years.

14   Q   When she made this comment to you, were any men

around?

15   A.  No.

16   Q   Has Stephanie ever made any comments that you thought

17       were not appropriate for work where men were around?

18   A.  I'm thinking everything was one-on-one.  They might

19       have -- let me back up there.

20   Q   Sure.

21   A.  It occurred, one incident comes to my mind, it

occurred

22       at her desk, and I don't think anybody was behind me.

23   Q   What happened on that occasion?

24   A.  That was talking about her boyfriend.

25   Q   Okay.  So is that the only time that Stephanie has

said

1      something to you that you thought was inappropriate? Or

2      are there other times?

3   A. There's been other times, and it all has to do with her

4      sex life or drinking, partying life.

5   Q  Okay.  And you can't think of any other examples right

6      now, can you?

7   A. Well, when I say about drinking, she'll say about having

8      been out getting drunk to the point where she's sick or

9      her friends are sick.

10  Q  Did you ever think to complain about Stephanie's

11     comments to anyone?

12  A. I told her as politely as I could, I'm, like, I don't

13     need to hear that, and I'd walk away.

14  Q  Did you ever think to go to a supervisor and complain

15     about Stephanie's comments?

16  A. Not -- no.  If I can't handle it, then I would.  But I

17     felt that she took my comment as I didn't need to hear

18     it.

19  Q  Okay.  Okay.

20  A. And that's the last I've heard about her sex life.

21  Q  Okay.  What's the date?  Do you know the date on which

22     she made this comment?

23  A. I would guess within the last year, but I couldn't tell

24     you.  It was whenever she first -- shortly after meeting

25     this new boyfriend.

```
 1   Q    Okay.  And the other comment, the other female's name,

 2        I'm sorry, was who?

 3   A.   Is Gail, her last name is Shuhart.

 4   Q    Okay.

 5   A.   She's a current employee.

 6   Q    And how long has Gail Shuhart been an employee in the

 7        Juvenile Probation Department?

 8   A.   I'm guessing -- I'm going to say ask Joe.  I don't

 9        remember.  Maybe he would.  Maybe three years.

10   Q    Unfortunately, I have to find out what you know.  But

11        maybe three years?

12   A.   I would have to go back and look at my phone logs to
see
13        when her name showed up.

14   Q    That's all right.  Phone logs, what do you mean by
that?
15   A.   We have a phone list of all the employees' home
phones,
16        work phones.  And I keep a list with my attachments at

17        home, at work, so if I have an emergency, to contact

18        someone.

19   Q    By chance, are cell phones also on that list?

20   A.   Yeah.  Cell phones, pagers, home phones and work
phones.

21   Q    And how long has that list been in existence?

22   A.   That's my own personal list and I made it, I don't
know,
23        five years ago, maybe.  It's been my own, it's not an

24        office list.  The office has since created one.  About

25        six months ago Kathy, our secretary, made one.
```

```
 1   Q    But there was no list like that before?

 2   A.   I'm going to say no.  If it was, I didn't have it.

 3        That's why I made my own.

 4   Q    Okay, fair enough.  Going back to Gail Shuhart?

 5   A.   Yes.

 6   Q    What comment did she make that you thought was

 7        inappropriate?

 8   A.   She'll make reference to jokes or comments that were

 9        made to her and she'd repeat them, and I'd just as
soon

10        not know about the issues.

11   Q    And I know it's uncomfortable for you, but do you

12        remember the jokes?  Do you remember the jokes?

13   A.   One was a comment that Joe had made to her about her

14        looking like his ex-wife.  And she didn't feel, I
guess,

15        that that was an appropriate comment and so she was
kind

16        of having fun with that comment.  There was an
undertone

17        that I didn't feel was professional.  I don't know how

18        better to describe that.

19   Q    What was the joke?  Or what was the comment by Joe,

20        first of all?

21   A.   To the effect that he reminded her of his ex-wife.
And

22        I guess that had some good things as well as some bad.

23        She didn't elaborate, and I didn't ask.

24   Q    Could Mr. Osenkarski, could he have just shared the

25        comment of "you look like my ex-wife" and just be
making
```

1          simply a statement or observation?

2    A.    Could have been.

3    Q.    But Mrs. Shuhart kind of took it in another way a
little

4          bit; is that what you're saying?

5    A.    Yes.

6    Q.    What did she say in connection with Mr. Osenkarski's

7          comment that was joking?

8    A.    Well, it was more just by the nature, ooh, he thinks I

9          might be looking like his ex-wife.  It's along that

10         line.  I'm, like, I don't want to go there.  I don't

11         want any boss to think I look like his ex-wife.
That's

12         a whole -- I just didn't understand why that would be

13         entertaining to her.

14   Q.    You don't have any information at all that suggested

15         that Mr. Osenkarski was being flirtatious when he made

16         that comment, do you?

17   A.    I don't know that.

18   Q.    So did she say anything else about that, Ms. Shuhart?

19   A.    About Joe?  About --

20   Q.    About the comment.

21   A.    Oh, not that I can recall.

22   Q.    You thought that joke or her joking about that was

23         inappropriate?

24   A.    Yes.

25   Q.    Why?

 1    A.    I just felt it was unprofessional, to make any kind of
a

 2          joke or insinuations.

 3    Q     Like with Stephanie, did you kind of tell Gail I don't

 4          appreciate that, and then it ended there?  Or what

 5          occurred?

 6    A.    Generally when she makes a comment of something I
don't

 7          approve of, it's just, like, I don't need to hear
this,

 8          or you know, I can't believe you said that or did
that.

 9              I have not confronted her.  She's a co-worker.
I'm

10          not sure that I want to step over that boundary --

11    Q     Sure.

12    A.    -- and tell her what she should be doing and not
doing.

13    Q     When she, when Gail Shuhart made that comment, were
you,

14          was anyone else around, or the joke, was anyone else

15          around?

16    A.    I heard it from her more than once.  I don't know if

17          Barb would have been in the office to hear that at
that

18          time or not.

19    Q     Were other males around when she made the comment or

20          when she makes that joke or comment?

21    A.    No.

22    Q     Has she said anything else that you thought was

23          inappropriate?

24    A.    She'll repeat comments that were made by Tom Boyer
that

25          I don't feel are something I need to hear.

```
 1   Q    What did Mr. Boyer say?

 2   A.   There was an issue about flowers, and right now I'm

 3        drawing a blank.  There was -- she received, Gail

 4        received flowers.  I can't recall, I can't picture in
my

 5        mind the exact incident, but it was to the effect or

 6        perhaps he was insinuating that he sent the flowers.

 7        There was something -- there was some kind of
allusion,

 8        something there that wasn't appropriate, in my
opinion,

 9        and I can't put my finger on it.  My apologies.

10   Q    Just as an example, if someone said to you, boy, you

11        look like my wife or my ex-wife, would that offend you

12        personally?

13   A.   I'm going to say yes.

14   Q    Why?

15   A.   If I were to say -- if I were to reverse it and make a

16        comment to a male, boy, you remind me of my ex-
husband,

17        I was married to that man, I loved that man, I slept

18        with that man, and I don't think it's appropriate for
me

19        to make those same accusations about someone else.

20   Q    Why do you think it's an accusation?

21   A.   It's something -- and I don't want anybody thinking
that

22        I'm somebody else's wife.  To me, a wife involves
behind

23        closed doors, it's a holy commitment and I don't think

24        there should be any crossing the lines.  You're either

25        married to that person or you're not.
```

```
 1    Q    You're a very spiritual person; is that correct?

 2    A.   I'd like to be.  I hope to honor Him.

 3    Q    What church do you belong to?

 4    A.   Carlisle Brethren in Christ.

 5    Q    You're a member of that particular church?

 6    A.   Not a member.

 7    Q    What kind of relationship does Ms. Varner have with

 8         other persons in the office, the Juvenile Probation

 9         Office?

10    A.   I would say professional.  She's friends, but I don't

11         think she goes out of her way to spend time with
people

12         to become, like, extra social.

13    Q    Okay.  Are other persons in the office extra social?

14    A.   Some are.  Myself on occasion.  I perhaps should spend

15         more time at my desk.

16    Q    Do you think you're more social than Ms. Varner in the

17         office?

18    A.   A little, but not much.

19    Q    When Ms. Varner chooses to socialize, who does she

20         socialize with?

21    A.   She'll be polite and talk to anybody who's, you know,

22         talks to her.  I'm not sure what you're asking.

23    Q    Yeah, me neither.  When you are in the office and you

24         see Ms. Varner, who does she talk to?  Who have you
seen

25         her talk to socially?  With regularity.
```

```
 1    A.    Probably I would say Nicole Horick -- or Nicole

 2          Galbraith.  She sees her, not very often but I would
put
 3          them on a social level.  And Kerry Houser.  And Winnie

 4          Stern.  They're possibly the three key people.

 5    Q     Are you friends with Nicole, Kerry, and Winnie, that's

 6          Winnie?

 7    A.    Yes.

 8    Q     Are you friends with them as well?

 9    A.    Yes.  I don't know them to a real deep extent.

10    Q     Okay.  But would you say Ms. Varner is closer to
Nicole,
11          Kerry and Winnie than you are?

12    A.    She's closer to Kerry and Nicole.  I would say I'm

13          closer to Winnie than she is.

14    Q     She's closer to Kerry and Nicole, and you're closer to

15          Winnie?

16    A.    That's correct.

17    Q     Okay.  And from your understanding, Ms. Varner's

18          friendship with Nicole and Kerry extends outside the

19          office as well?

20    A.    I don't think it extends out, as in I don't hear them

21          making plans to do things together.

22    Q     Does your friendship with Ms. Varner extend outside
the
23          office?

24    A.    I'm going to say no.  There's been occasions where
we've
25          done things together, but it's -- like, we don't hang
```

```
 1              out on Friday nights.  I mean, we live so far apart.

 2              She's not a friend that I call when I'm out of the

 3              office.

 4    Q    What's Gary Graham, what was Gary Graham's relationship

 5              like with other persons in the office when he was there?

 6              Juvenile Probation Office.

 7    A.   Could you elaborate more?

 8    Q    Was he likable?

 9    A.   He was tolerable.

10    Q    Is that your opinion, or you think that's the consensus?

11              Where did that come from?

12    A.   That's my opinion, and that would probably, you could

13              probably find a lot of staff to agree with that.

14    Q    Certainly he had persons or staff that actually liked

15              him; isn't that correct?

16    A.   I can't confirm that.

17    Q    Do you like Gary Graham?

18    A.   I did.  I have no respect for him now.

19    Q    When did you stop liking Mr. Graham?

20    A.   My respect left as I became closer to the situation that

21              was going on between the two of them.

22    Q    What is your understanding -- that being Ms. Varner, is

23              that correct?

24    A.   Yes.

25    Q    And what's your understanding of the situation that was
```

```
 1              taking place between Ms. Varner and Mr. Graham?

 2    A.    His friendship or his liking her changed, and he
started

 3          to mistreat her.

 4    Q     When do you think that occurred?

 5    A.    Within a year, between a year and two years after we

 6          were hired.

 7    Q     Okay.  So you were hired in February 1995?

 8    A.    Correct.

 9    Q     And you think sometime in 1996 he became, or Mr.
Graham

10          became less friendly towards Ms. Varner?

11    A.    Say that last section?

12    Q     You think sometime in 1996 Mr. Graham became less

13          friendly with Ms. Varner?

14    A.    Yes.

15    Q     And you don't know why?

16    A.    I have my thoughts, but I didn't know why then.  And I

17          didn't -- I guess I'll say I don't have any thoughts

18          back then as to why it was deteriorating.

19    Q     In between that time of 1995 and 1996 that we've --
that

20          you just were describing, was the consensus of the

21          office or rumor mill going about that Mr. Graham and

22          Ms. Varner were having a fling or a relationship that

23          was romantic?

24    A.    I think he wanted people to believe that.

25    Q     Did people in the office believe that?
```

| | | |
|---|---|---|
| 1 | A. | I didn't, and I don't know that any of my co-workers |

did

| | | |
|---|---|---|
| 2 | | or didn't. |
| 3 | Q | Could some of your co-workers have concluded that or |
| 4 | | thought that? |
| 5 | A. | I would have to say not with any proof. |
| 6 | Q | Did you ever have anyone say to you, hey, I think |
| 7 | | Mr. Graham and Ms. Varner, or Barbara and Gary are |
| 8 | | having a romantic relationship? |
| 9 | A. | No. |
| 10 | Q | Did you ever overhear that comment or something |

similar

| | | |
|---|---|---|
| 11 | | to this? |
| 12 | A. | No. |
| 13 | Q | So what makes you believe other persons may have |

picked

| | | |
|---|---|---|
| 14 | | up on or thought that? |
| 15 | A. | Other people have commented to me, the general feeling |
| 16 | | of the office was Gary wants to have an affair.  And |
| 17 | | people have made comments, I've heard co-workers |

allude

| | | |
|---|---|---|
| 18 | | to this as in, yeah, he wants her.  But I did not hear |
| 19 | | anybody ever say, yes, they've had sex and I know it. |
| 20 | Q | Okay.  So there may have been an assumption that sex |

had

| | | |
|---|---|---|
| 21 | | occurred, but no one could prove it?  Is that -- |
| 22 | A. | I don't think people assumed it, I really don't.  I |
| 23 | | think they believed it was all in his mind. |
| 24 | Q | Did Ms. Varner ever say anything to you about romantic |
| 25 | | ties to Mr. Graham? |

```
 1   A.     Never.

 2                MS. WALLET:  Ms. Green, are you all right?  Do
you

 3          need to have a break?

 4                THE WITNESS:  I'm fine, thank you.

 5   BY MR. ADAMS:

 6   Q     Two employees working in the same office, having a

 7          romantic relationship, is that inappropriate, to you?

 8   A.     It's dangerous.

 9   Q     Why do you say dangerous?

10   A.     If you take two equals and the relationship falls
apart,

11          well, hopefully those in charge can help mediate and

12          keep it from becoming an office issue.  If it's a

13          successful relationship and they get married, well.

14   Q     Two employees working in the same county but not for
the

15          same employer having a romantic relationship, is that

16          inappropriate?

17   A.     If neither are married, I guess that's legal, so I
don't

18          want to judge any further than that.

19   Q     Uncomfortable waters.  Who's Troy Wiser?

20   A.     He's a police officer that used to work in Newville.

21          Now he works for Mt. Holly borough police.

22   Q     Uncomfortable waters.  What relationship do you have
or

23          did you have with Mr. Wiser?

24   A.     We used to work a lot together because of the caseload

25          that I had.  And because of knowing him on a
```

```
 1              professional level, I got to know him on a personal

 2              level, and we were friends and we are still friends.

 3     Q        Were you romantic with Mr. Wiser?

 4     A.       Are you asking if I had sex?

 5     Q        Okay.

 6     A.       The answer is no.  He's not my boyfriend, never was.  He

 7              was someone who showed me attention after I was

 8              divorced, and I appreciated his friendship.

 9     Q        The attention that Mr. Wiser -- is he Officer, Police

10              Officer Wiser?

11     A.       Yes, he is.  He's single as well.

12     Q        Police Officer Wiser is with what department?

13     A.       He's now with Mt. Holly.  At the time he was with

14              Newville.

15     Q        And the attention that Officer Wiser showed you, do you

16              think that that was inappropriate?

17     A.       No, because that had to do with -- that was on a

18              personal level outside the office.  It did not prevent

19              me from doing my job, and he did not use his job to

20              bully me into or persuade me against helping someone or

21              doing something, or -- it had no influence over my

22              duties.

23     Q        But you, in fact, did work with Police Officer Wiser on

24              projects and things; isn't that correct?

25     A.       Him as well as many others, other police officers.
```

```
 1   Q   Have you ever heard the phrase earning overtime while

 2       seeing Wiser?

 3   A.  No.

 4   Q   Are you familiar with Chief Vaughn Smith?

 5   A.  Yes.

 6   Q   Was he Officer Wiser's chief at the time?

 7   A.  No.  He was a sergeant at the time.

 8   Q   Okay.  Do you know what -- was he the person that or

 9       the, in the hierarchy of the office that Police
Officer

10       Wiser reported to?  Was he the supervisor of Officer

11       Wiser?

12   A.  No, not that I'm aware of.  I would imagine Chief

13       Hershey would have been at that time.

14   Q   Okay.  Did you ever hear any comments by others who
may

15       have given an opinion or a comment about your

16       relationship with Officer Wiser when you were

17       interacting with him?

18   A.  Yes.  Gary came in, into my office when I was across
the

19       hall in Adult and I was in Buck McKenrick and Mike

20       Piper.  And he knew that I was in Newville a lot.  He

21       sees my time sheets so he would know where I spent my

22       time.  And he was, I'm going to say tried to give

23       fatherly advice that he didn't think Troy Wiser was an

24       appropriate relationship for me.

25   Q   Okay.  Mr. Graham had observed you spending a lot of
```

```
 1              time in Newville, that was with Officer Wiser; is that

 2              correct?

 3     A.       I guess.  I mean, I guess through my time sheet, I
don't

 4              know.

 5     Q        That would have been during office hours if that was
on

 6              the time sheet; is that correct?

 7     A.       Probably after hours, because I had a lot of cases,

 8              there were several I would say, like, intensive cases

 9              where Bill Brandt and I had probably five or six

10              Newville kids, and I was doing some intense work on my

11              kids and I would get calls sometimes regarding other

12              kids.

13     Q        And while out in Newville you would see Officer Wiser,

14              correct?

15     A.       I live in Newville, so I see him, all the officers.

16     Q        So did the phrase or the comment earning overtime, I'm

17              assuming you're earning overtime at the time, right?

18     A.       I'm sure there were on occasions.

19     Q        So earning overtime while seeing Wiser might be a
little

20              accurate when it comes to your scenario, in fact; is

21              that correct?

22     A.       I never heard that phrase till today.  I would say I

23              earned overtime, not because of Wiser but because of
the

24              kids, the names who were attached, Middleton,

25              Ballencourt.  I could give you a list of the
juveniles.
```

1   Q    Okay.  I don't need that.  Just by chance, I have to
ask
2        this question, anyway, how did you prepare for today's
3        deposition?

4   A.   Prayed a lot.  I'm not sure what you mean.

5   Q    Did you have any discussions with anyone prior to
today
6        about the deposition or your testimony today?

7   A.   Not -- not about my testimony, but I asked Barb a lot,
8        like, where is this going to take place.  I mean,
9        initially I was instructed to go down the street.  I
10       asked her about the office, you know, is there
windows;
11       if I have to go to the bathroom, can I get up and go,
12       that kind of stuff.

13  Q    Did you ever discuss with Ms. Varner what you would
14       testify about today?

15  A.   No.  She knows, because I -- we lived it, in one
sense.
16       But I've not told her anything in particular that I'm
17       going to say.

18  Q    Okay.  How about her attorney, Debra Wallet, did you
19       ever have a conversation with Ms. Wallet?

20  A.   I never met her till the last time I was subpoenaed to
21       go down the street, and that was just to say hello.  I
22       never met her before, never talked to her.

23  Q    Did you review any documents prior to this deposition
of
24       today?

25  A.   Just the invitation to come here.

1   Q      Okay.

2          MS. WALLET:   That's the first time I ever heard it

3          as an invitation.

4          MR. DELLASEGA:   A very kind way to phrase it.

5   BY MR. ADAMS:

6   Q      Do you like Mr. Osenkarski?

7   A.     I think he has a good sense of humor.

8   Q      Do you like him as chief of the Juvenile Probation

9          Department?

10  A.     I've never been a chief of anything, but I think I would

11         run things differently than he does.

12  Q      How does Mr. Osenkarski run things?

13  A.     Pardon?

14  Q      How does Mr. Osenkarski run things in the office?

15  A.     He's very hands off.  A statement shortly after I was

16         hired, it was a rather flattering statement on one hand,

17         he said, I don't -- the insinuation was I don't have to

18         micromanage you, I hire good people to do the job, so

19         just do the job.

20  Q      Who was Mr. Osenkarski's -- who was chief before he took

21         over that position?

22  A.     That was Ken Bolze.

23  Q      Is it true that Ken Bolze also had that kind of

24         hands-off attitude when it came to his Juvenile

25         probation officers?

```
 1   A.   I don't think I could agree or disagree with that

 2        statement.  I don't -- I didn't get to know Ken very

 3        well.  He was gone within probably a year of me
coming.

 4   Q    But you don't know otherwise, whether -- you don't
know?

 5   A.   I just don't.

 6   Q    Very well.  How long have you known Mr. Osenkarski?

 7   A.   Since the day I got hired.

 8   Q    Okay.  If you have a problem in the office, do you
feel

 9        uncomfortable going to him for any problems that you

10        might want to discuss?

11   A.   Now or then?

12   Q    When you say then, what do you mean by then?

13   A.   Then when the problems were when Gary was there?  I

14        would never have gone to Gary or -- I'm sorry, I would

15        never have gone to Joe.

16   Q    Because Gary would have been the line person to talk
to

17        before talking to Joe?

18   A.   Correct.  And they're, they were what I perceived to
be

19        very good friends.

20   Q    And now, is Mr. Osenkarski more approachable now?  Is

21        that what your testimony is?

22   A.   I think because of all this, the reason we're here

23        today, I think he would be more willing to listen, if
I

24        were to approach him.

25   Q    But Mr. Osenkarski never said to you don't come talk
to
```

```
 1          me if you have a problem, did he?

 2    A.    The only time I ever heard him tell me not to call him

 3          or talk to him was regarding after-hour issues,

 4          regarding emergencies.  He says:  Don't call me, I've

 5          done my time, call someone else.

 6    Q     How long have you known Gary Graham?

 7    A.    I've known of him because of living in the same town, I

 8          would say I possibly became of aware of who he is or who

 9          he was, maybe the late '70s, '80s, just because he lived

10          between where I lived and my parents' business and I

11          would walk past the house where he lived.

12    Q     And what was your opinion of Gary back then?

13    A.    He was older so I really didn't have any first -- like,

14          we didn't go to school together or anything.  I didn't

15          have any one-on-one contact that I can recall with him.

16    Q     All right.  Was he energetic?

17    A.    Yes.

18    Q     Is Gary an excitable person, would you say?

19    A.    That he is.

20    Q     Has he always been excitable?

21    A.    From what I can recall, from just the atmosphere around

22          town.

23    Q     Do you like Gary, by chance?

24    A.    Not anymore.

25    Q     When did you not -- when did you stop liking him?
```

1   A.   When he showed that he did not have the ability to be a

2        decent supervisor or friend.

3   Q   And when did he show that to you?

4   A.   From my observations of how he treated people in the

5        office, back starting in 1995, '96.

6   Q   You kind of hand gestured toward Ms. Varner.  Are we

7        really talking about Ms. Varner?

8   A.   No.  That was just a gesture.  I talk with my hands.

9   Q   Sorry.  How did he treat people in the office?

10   A.   He was rude.  He would yell if he felt like it.  He

11        would try to belittle people.  Whatever made him feel

12        like a better supervisor, I guess.

13   Q   Is it possible that in Mr. Graham's mind when he was

14        being this way, you say he wanted to be -- was he trying

15        to be a better supervisor?  Is that possible?

16        MS. WALLET:  I'll object to the form of the

17        question.  Anything is possible, and it also asks this

18        witness to speculate on someone's intention.

19   BY MR. ADAMS:

20   Q   Was Gary like that toward everyone in the office?

21   A.   I would say not everyone.  I can't recall him ever being

22        loud, rude, obnoxious, whatever, bullying, towards,

23        like, Sam Miller.  I can't remember him being loud

24        towards Denny Drachbar or towards Hank Thielemann.  I've

25        heard him holler at Joe and I've heard him holler at

1      Barb.  I've heard him holler at me, I've heard him

2      holler at Nick, Nick Barrelet.

3    Q   Besides those, I think you named four persons in the

4      office that he didn't holler at, Gary probably hollered

5      at everyone else in the office at some time or another;

6      is that safe to say?

7    A.   Probably.

8    Q   Have you personally observed Mr. Osenkarski say anything

9      of a sexual nature in the office?

10   A.   Yes.

11   Q   What did you observe?

12   A.   The first thing that comes to my mind was a comment that

13      he made when he was standing out in the main office

14      area.  The comment was not made to me.  And it had to do

15      with a lady friend of his.  I'm not sure of the name of

16      who that was, if he even said the name.  Where he

17      commented to canning or pickling peppers from his garden

18      and his hands had pepper residue on his hands, and he

19      referenced to having an intimate relationship with his

20      ladyfriend and how the residue burned her.

21   Q   And you said that he wasn't saying it to you?

22   A.   I believe it was towards the secretaries.  They were the

23      only ones out in the front office at the time.  Fran,

24      Kathy.  I came out of my office to pick up my mail or do

25      a fax, whatever, and I stepped into the middle of that

```
 1          comment.

 2   Q.     So Fran and Kathy were present when Mr. Osenkarski made

 3          this comment?

 4   A.     I remember the two of them, and I believe the other two

 5          secretaries may have been there as well.

 6   Q.     Okay.  And you weren't present but you overheard it; is

 7          that what you testified to?

 8   A.     I walked into the middle of it.  He was out there

 9          already and I came out to pick something up, and that's

10          when I heard him make the statement about his peppers.

11   Q.     Okay.  You were offended by that?

12   A.     That's private.  That's between him and his ladyfriend,

13          not for me and the secretaries to hear.

14   Q.     Did you share with Mr. Osenkarski your displeasure?

15   A.     No, I did not.

16   Q.     Did the other women in the office who heard the comment,

17          and I guess it was more directed to them than you, did

18          they share their displeasure?

19   A.     They did not say:  Joe, that's inappropriate.  I would

20          have to say they just continued their work.  And seems

21          to me Fran made a comment as in, oh, that's not good, or

22          something.  But seems to me they tried to ignore him.

23   Q.     So they didn't seem bothered?

24   A.     I wouldn't say that, either.

25   Q.     Ms. Varner was nowhere around when the comment was made;
```

1          is that correct?

2     A.   Correct.

3     Q    What year did this occur?

4     A.   I can give you the exact date.

5     Q    Okay.  You have notes?

6     A.   Well, I figured you would ask me dates and I didn't want

7          to sound too stupid.

8     Q    What have you got there?

9     A.   I made notes in my appointment books --

10    Q    Okay.

11    A.   -- as to things that bothered me and things that I

12         thought may be important at a later date.

13    Q    Okay.  And you made the notes for the purpose of?

14    A.   For me.  If I ever decided to quit, if I ever thought I

15         was going crazy and I was going to do what with, I don't

16         know.  But I figured I needed to be more accurate with

17         what any complaints that I make.  Any complaints that I

18         make I figured should be as accurate as possible.

19    Q    You think you might sue one day?

20    A.   In hindsight, I think I should have.

21    Q    Well, what do you have in front of you that indicates or

22         would give me an answer to my question about the date of

23         Mr. Osenkarski's comment?

24    A.   January 27th of 2000.

25    Q    Okay.  And do you have any idea how, assuming Ms. Varner

1    knows about this incident, how she found out about it?

2    A.   About the peppers statement?

3    Q    Yes.

4    A.   I'm sure I told her.

5    Q    And when did you tell Ms. Varner about it?

6    A.   I don't know.

7    Q    Were you aware at the time you told Ms. Varner about the

8    comment that she had a complaint about sexual

9    harassment?

10    A.   I knew she was bothered by what was going on at that

11    time.

12    Q    So you were helping her by giving her information?

13    A.   I don't -- I'm sure this does help her, that I kept

14    this, but I think my intent was I can't believe it's

15    still going on.  And that was part of his statement. I

16    maybe shouldn't say this for sexual harassment issues,

17    but -- he told his comment, anyhow.

18       I think my reason for telling her was I was

19    appalled that we've had sexual harassment training,

20    we've been told watch yourself, don't be talking about

21    anything of this nature, and he still chose to do it.

22    Q    What was Ms. Varner's response to you sharing this

23    information with her?

24    A.   I don't believe she said or did anything in particular.

25    I would have to say probably just dumbstruck, like

```
 1          dumbfounded, like, I can't believe it's still going
on.

 2    Q     Did you tell her over the telephone or did you tell
her

 3          in person?

 4    A.    I probably told her in person.  Probably the next

 5          working day that I saw her I probably told her.

 6    Q     When you heard this comment did you complain to anyone

 7          or report it to anyone?

 8    A.    No.

 9    Q     Have you ever heard Mr. Osenkarski say anything else

10          that you thought was of a sexual nature?

11    A.    Sexual nature?

12    Q     Yeah, in the office.  If that's it, that's okay.  I
just

13          want to know.

14               MR. ADAMS:  Let the record reflect she's looking
at

15          her notes.

16    BY MR. ADAMS:

17    Q     What page are you on?

18    A.    I don't have them numbered.  He had made a comment
about

19          women at training, or, I'm sorry, on his vacation,

20          looking like whores.

21    Q     Women on his vacation looking like whores.  What date

22          was this?

23    A.    February 14, or I'm sorry, that -- July 14th of 1997.

24    Q     Mr. Osenkarski was on vacation during this observation

25          of his --
```

```
 1   A.   His comment was women on his vacation looked like

 2        whores.

 3   Q    Where was he on vacation?

 4   A.   I don't know.

 5   Q    Who did he make the comment to?

 6   A.   Towards Fran and Kathy.  He was standing in front of
the
 7        secretary's desk.

 8   Q    In both these examples that you've given me, Fran and

 9        Kathy were the listeners or the receivers of the

10        comments; is that correct?

11   A.   Correct.

12   Q    And this comment wasn't made to you; is that correct?

13   A.   Correct.

14   Q    It wasn't made to Ms. Varner; is that correct?

15   A.   Correct.

16   Q    How did you overhear it?

17   A.   It was outside my office door where it was made.

18   Q    Did you share that information with anyone?

19   A.   Not that I recall.

20   Q    Did you report or complain to anyone?

21   A.   No.

22   Q    As far as you know, Fran and Kathy didn't complain to

23        anyone as well; is that correct?

24   A.   Correct.

25   Q    Is that it?  In terms of Mr. Osenkarski?
```

```
 1   A.   In regards to sexual harassing, sexually indicative

 2        comments.

 3   Q    Comments that were made in a sexual nature or tone.

 4   A.   I have to say yes, that that's it regarding any sexual

 5        comments.

 6   Q    That's not a bad thing.

 7   A.   That's a good thing.

 8   Q    By chance did Ms. Varner ever discuss with you her

 9        relationship with her husband?  Strike that.

10            Do you know Lee Varner?

11   A.   Yes, I do.

12   Q    How well do you know Lee Varner?

13   A.   I would probably be able to pick him out of a crowd, but

14        I don't have any -- I've probably not had more than a

15        paragraph of conversation with him.

16   Q    And did Ms. Varner ever talk to you about her

17        relationship with her husband at all?

18   A.   Yes.

19   Q    What did she say about her husband?

20   A.   She shared information regarding him being an employer

21        or employee at AMP.  I knew he worked there.  And I knew

22        there was problems where people were getting laid off

23        and I know he's not working for AMP any longer.  I know

24        he buys the groceries because he's unemployed.  I guess

25        he's retired.  And she has shared about things that he
```

```
 1          does for her and vice versa.
 2    Q.    What kind of things does he do for her?
 3    A.    Like buying the groceries.  I thought that was kind of
 4          neat, because my husband never did that.
 5    Q.    What kind of things does she do for him?
 6    A.    She'll stop on the way home sometimes and pick up food
 7          or, you know, maybe take a sub or sandwich home,
 8          something that he might like.
 9              I know he golfs a lot, and she would make
comments
10          about, you know, I'm going to say allowing him to
golf.
11          I mean, she never stood in his way of things that he
12          would enjoy.
13    Q.    Sure.  He golfs a lot.  Do you know how often?  Did
she
14          ever tell you how often he actually golfs?
15    A.    I would guess on a weekly level, he's out probably
once
16          a week, at least.
17    Q.    Do you know what day of the week, by chance?
18    A.    Oh, probably whenever there's not rain or snow on the
19          ground.  I don't think he has a preference.  I think
he
20          likes golfing regardless.  I don't know that there's
any
21          given day.
22    Q.    Has she ever complained to you about anything?
23    A.    About Lee?
24    Q.    Sure.
25    A.    Never.
```

```
 1   Q   Has she ever complained to you about anything?

 2   A.  Just about Gary.

 3   Q   Has she ever complained to you about Lee playing too

 4       much golf?

 5   A.  No.

 6   Q   Would you think it was an unreasonable complaint for a

 7       wife to complain about how much her husband golfs

 8       instead of spending time with her?

 9   A.  That would be a fair complaint, but I think his
```
golfing
```
10       happened whenever she wasn't home.  I don't -- I never

11       heard her make that an issue in their marriage.

12   Q   Okay.  Was it your understanding that when Lee was

13       golfing, she had other plans doing something else?  Is

14       that -- so it never became an issue?

15   A.  No.

16   Q   So from your understanding, while Lee was golfing, she

17       was probably doing something else to entertain
```
herself?
```
18       Does that sound accurate?

19   A.  I would say she was either working, I mean, on the job

20       working here.

21   Q   Okay.

22   A.  From what I'm aware, he only golfs whenever she's

23       working.  Or maybe she's golfing with him on occasion
```
or
```
24       something.

25   Q   Does she golf with her husband?
```

Green                                    71

```
1   A.   She said she has.

2   Q    How often does she golf?

3   A.   I don't know.

4   Q    Did Ms. Varner ever talk to you about Gary's

5        relationship with his wife?

6   A.   Yes.

7   Q    What did she say?

8   A.   She has said that he has destroyed figurines or

9        decorative items in the home.  She has told me that
Gary

10       has told her about inadequate sexual relations between

11       him and his wife.

12  Q    Is that it?

13  A.   That's all I can remember.

14  Q    Did you find it strange that he would talk to Ms.
Varner

15       about things like that?

16  A.   Yes.

17  Q    You agree that's not normal conversation to have with

18       someone?

19  A.   Yes.

20  Q    You think that the things that Gary shared with

21       Ms. Varner about his wife was when they were friendly,

22       that being he and Ms. Varner were friendly at that
time?

23  A.   When she, when Barb shared that information with me,

24       that was whenever his intimidation and bullying had

25       already started.  Because whenever Gary told Barb the
```

1          information, if that's whenever they were friendly or
if

2          they were not friendly, I don't know, when the two of

3          them had that information.

4     Q    Did you ever observe Gary making inappropriate
comments

5          in a sexual nature in the office?

6     A.   Yes.

7     Q    What did you observe?

8     A.   The first thing that comes to my mind was at the

9          photocopy machine, there was a case, a juvenile case

10         that came in, and part of her juvenile file included I

11         guess it was more homosexual material.  It was part of

12         the file regarding, what I would I say, like,

13         contraband, stuff that we had taken off this young
lady.

14         And I remember Gary making photocopies of this

15         paperwork.  He had asked me for it because I had the

16         file.  He asked me for paperwork regarding the
sexually

17         explicit stuff.  And he was making photocopies.  And I

18         have the date here of February 28th of 1997.

19             MR. ADAMS:  Please let the record reflect she's

20         looking at the first page of her notes.

21    BY MR. ADAMS:

22    Q    Okay.  What date again was that?

23    A.   February 28th of 1997.

24    Q    Okay.

25    A.   And for me to relay this perhaps I should just read
off

1          my notes?  Is that appropriate?

2     Q    Okay, sure.

3     A.   I wrote down here a comment from Gary Graham regarding

4          Joe Osenkarski photocopying, as he put it, man parts,

5          and faxing this to two females that they met at a

6          training.  And Gary told this to me and Barb Varner

7          while Gary was standing at the copy machine copying
the

8          underground and homosexual stuff.  And I believe Gary

9          called the information the faggot stuff from the

10         Linsenbach file.

11             And to further explain what I wrote there, I
wrote

12         to myself that this sounded like that this had been
done

13         in the recent past, the photocopying of the man parts,

14         was done in the recent past.  The females who received

15         it believed it was an actual photocopy and Gary had
said

16         it was a dildo that they had photocopied, in fact.

17    Q    And Gary made this comment to you?

18    A.   Yes.

19    Q    Who else was -- was anyone else around?

20    A.   Barb Varner.  It was done out in the main office at
our

21         copy machine.

22    Q    And this is February 28th, 1997?

23    A.   Correct.

24    Q    And when the photograph, the Xeroxing is taking place;

25         is that correct?

```
 1   A.   Correct.

 2   Q    Did you complain to anyone about the comment?

 3   A.   Just to Barb, I'm sure.  I'm sure it was no one else
but
 4        Barb, and probably to Barb.

 5   Q    Do you know if Barb Varner complained to anyone about

 6        that comment about the actions?

 7   A.   I'm not aware.

 8   Q    Mr. Osenkarski wasn't around at the time; is that

 9        correct?

10   A.   Correct.

11   Q    So you don't know if Mr. Osenkarski actually said

12        anything or had anything to do with this particular

13        incident?

14   A.   Correct.

15   Q    Any other comments that you can think of or refer to

16        that Mr. Graham would have said that were of a sexual

17        nature?

18   A.   I will say no.

19   Q    Any behavior by Mr. Graham that you thought was sexual

20        in nature that you thought was inappropriate?

21   A.   Just his attention to Barb.  I'm not sure if --

22   Q    Paying any attention to Barb that you thought -- any

23        acts by Mr. Graham you thought were inappropriate?

24   A.   Yes.

25   Q    What are they?
```

```
 1   A.   It was at a training at the prison, it was an OC
 2        training.  And I remember he patted or slapped or
 3        grabbed at her butt, her derriere, her behind.
 4   Q    What's the date of this?
 5   A.   I don't know if I have -- yes, I do.
 6   Q    You have that in your notes?
 7   A.   I do.  That was October 5th of 1995.
 8   Q    Okay.  This is the time period where you testified
 9        earlier that they were actually getting along pretty
10        well; is that correct?
11   A.   Correct.
12   Q    And did Ms. Varner complain about the patting on the
13        butt?
14   A.   She covered her butt.  She put her hands behind her
15        butt.  How the incident occurred, we were walking
16        through a doorway.  First was Barb, second was Gary,
     and
17        I was third.
18   Q    Okay.
19   A.   She scooted forward and put her hands behind her butt.
20        And I asked him, I said:  What do you have to do to be
21        treated like that?  And his comment was:  I've known
     her
22        longer than you .
23   Q    Okay.  Did Ms. Varner put her hands on her butt before
24        Gary touched it or after?
25   A.   It was after.  She didn't know he was going to grab
     it.
```

1        She couldn't have seen.  She was facing forward, he was

2        behind her.  She didn't know that was coming.

3    Q   And Mr. Graham's comment was:  I've known her longer

4        than you?

5    A.  Correct.

6    Q   But that's not necessarily true, is it?

7    A.  He's known who I am just from being in Newville, but he

8        didn't know me to have a conversation with me.

9    Q   But in actuality, you've actually known from your

10       understanding, Mr. Graham longer than Ms. Varner; isn't

11       that true?

12   A.  Probably.

13   Q   Ms. Varner didn't complain at all to you about that,

14       that touching?

15   A.  She didn't say a word to either one of us.

16   Q   And you didn't report that to anyone, did you?

17   A.  My supervisor was him.  I didn't feel I could report it

18       to anybody.

19   Q   And from your understanding, Ms. Varner didn't report

20       that to anyone as well?

21   A.  I don't know.

22   Q   But do you know?  You have no information that indicates

23       that she reported it?

24   A.  Correct.

25   Q   Did Ms. Varner and Mr. Graham take trips often together?

```
 1    A.    In the beginning, whenever we were recent or new or

 2          fresh employees.

 3    Q     How often were these trips?

 4    A.    I'm not sure I could even give a guess.  If there was
a
 5          trip a week and he was involved in it, he asked her
most
 6          all the time.

 7    Q     So if Gary or Mr. Graham had the option of picking or

 8          teaming up with someone, was it probable that he would

 9          pick Varner over anyone else?  Is that your

10          understanding?

11    A.    Perhaps I should back up and explain.

12    Q     Okay.

13    A.    The day that Barb and I were hired, there was a third

14          person hired, Mark Galbraith.  He took Mark, Gary took

15          Mark and I on a trip on one occasion that I can
remember
16          the two of us went together, and that was to George

17          Junior.  That was one of those long trips.

18    Q     Sure.

19    A.    And we were new employees and he took us.  And I'm

20          assuming that's why he took her -- took Barb
initially.
21          But after the new employee-ness wore off, then the
trips
22          were primarily with Barb.

23    Q     And this is at the time period when you were first
hired
24          between February of '95 and sometime the end of '96?
Is
25          that about right?
```

Green                                                    78

```
 1    A.    Yes.

 2    Q    And how often would these trips take place?

 3    A.    That's why I don't remember.  I mean, it depends on
when
 4          children or juveniles need to be placed.  There would
be
 5          reviews and they would occur every three months, six

 6          months, it was various reviews.  I wouldn't be aware
of
 7          how many reviews, opportunities there were.  I really
--
 8          I couldn't tell you if it was once on week or three

 9          times a week or once a month.  It varied.

10    Q    Would once a week be unheard of?

11    A.    That would be a lot.  You wouldn't be able to do your

12          other caseload very well if you were gone that often.

13    Q    And when Mr. Graham and Ms. Varner teamed up on trips,

14          were they all-day trips, typically?

15    A.    It was generally long-distance trips, which would be,

16          you know, maybe eight hours.

17    Q    In the converse, would Mr. Graham possibly pick
someone
18          else in the office for a shorter trip?

19    A.    I don't know that he did many short trips.  I'm not

20          aware of him going on anything other than the long-

21          distance George Junior trips.

22    Q    Okay.  And when Mr. Graham would come and choose

23          Ms. Varner for most of these long trips, did you ever

24          observe Ms. Varner complain?

25    A.    I would have to say I never heard him ask her.  I
mean,
```

1          I wasn't -- I didn't share an office so I don't know how

2          those arrangements were made.

3     Q    When Mr. Graham would assign Ms. Varner to team up with

4          him for a long trip, did she complain?

5     A.   Not up front initially to me.

6     Q    So between 1995 and sometime in '96 when things, when

7          something suddenly went wrong between the two of them,

8          she didn't complain; is that correct?

9     A.   That's only part of it.  See, I don't think Barb or any

10         co-worker would complain until -- who's going to

11         complain to me when they don't know me very well?  And I

12         think that was the situation with our relationship.  If

13         she complained or had concerns, she wasn't going to do

14         it to me because she didn't know me that well.  And

15         there would have been no benefit in her complaining to

16         me.

17              But after a while, I think you can only take so

18         much and she got mad, and it was -- she said she had had

19         enough, and I believe that's whenever -- and she knew me

20         well enough then to know that I, you know, could be

21         trusted and sympathized with her situation.

22    Q    At that point did she ever complain to you about the

23         trips, the frequent trips she had with Mr. Graham in the

24         past?

25    A.   Yes.

```
 1    Q    What did she say?

 2    A.   Simply that she didn't think it was fair that he chose

 3         her.

 4    Q    That's it?

 5    A.   That was about it.

 6    Q    Okay.  Tell me about the trip that you had with

 7         Ms. Varner that you wanted to discuss earlier.  Do you

 8         remember that?  It was a long trip and I think

 9         Mr. Graham said that you were to leave by eight
o'clock?

10         Do you remember that trip?

11    A.   It was -- I don't know that I have the date for that,

12         but I remember the day itself because I had plans to

13         leave at 8:00, and there was an emergency with one of
my

14         cases and that juvenile showed up in the office that

15         morning.  And I remember we didn't get started out of

16         the office that morning because of that other
emergency.

17         And he didn't, he meaning Gary, did not ask for an

18         explanation as to why we did not leave at 8:00, he
just

19         made it clear that we were supposed to be leaving at

20         8:00 and he was highly upset that we did not.

21    Q    Did Mr. Graham share that with you before you left the

22         office?

23    A.   Of that day?

24    Q    Right.

25    A.   Yes.
```

```
 1   Q    So you're supposed to leave at eight o'clock.  A

 2        juvenile comes in unexpectedly and you handle the

 3        situation with the juvenile.  You're about to leave,
and

 4        then Mr. Graham says he thought you were leaving at

 5        eight o'clock?  Is that how it played out?

 6   A.   Basically, yes.

 7   Q    So what time did you actually leave?

 8   A.   I believe it was nine o'clock.

 9   Q    What time were you expected at your location, your
place

10        of destination?

11   A.   That I don't remember.

12   Q    Were you on time?

13   A.   I would have to say yes.  I'm not sure if it was a

14        placement trip that we were going, as in we were
taking

15        someone or if we were bringing someone back.  I don't

16        recall the details of the trip itself.

17   Q    Where did you go?  I know you don't know the details,

18        but assignment-wise, where did you go?

19   A.   It may have been Lourdesmont.  It may have been George

20        Junior.  I would guess one of those two places.

21   Q    So you arrived in Lourdesmont on time.  You
successfully

22        complete the assignment once you're there?

23   A.   I'm sure we did.

24   Q    Okay.  And you eventually I guess left the facility;
is

25        that correct?
```

1    A.    Correct.

2    Q     Okay.  And what time was that?

3    A.    I don't recall.  I'm not sure.

4    Q     Do your notes reflect anything from that trip at all?

5    A.    See, I'm not sure if you're -- I don't think we're

6          talking about the same Lourdesmont trip.  If you're

7          aware of another Lourdesmont trip?

8    Q     Well, no.  I'm probably referring to the same
situation

9          where you wanted to talk about docking of an hour.
Does

10         that sound familiar?

11   A.    Okay.  That's a separate Lourdesmont trip.

12   Q     Let's talk about the one you wanted to talk about
first.

13         You were on a trip with Ms. Varner.  That's a separate

14         trip to either Lourdesmont or somewhere else; is that

15         correct?

16   A.    I don't have any -- the whole point of that trip to

17         wherever it was was just the fact that he made it
clear

18         that we were supposed to leave at 8:30, or I'm sorry,
at

19         8:00, and we didn't leave till later.

20   Q     Okay.  Was that trip before the other trip where you
and

21         Ms. Varner were eventually docketed an hour of pay or

22         overtime pay?

23   A.    The trip where we were docketed occurred first, and
that

24         was -- to me, I guess, that was the comment for his

25         direction to leave at 8:00.

```
 1   Q    Okay.  So this other incident that you're talking
about

 2        was after that trip where you were both docketed an
hour

 3        overtime pay?

 4   A.   The dock in pay came first?

 5   Q    That incident first?

 6   A.   Yes.  Okay.

 7   Q    Okay.  Let's talk about that particular incident.
What

 8        happened on this day?  In your words.

 9   A.   It was a trip to Lourdesmont, and it was Barb Varner
and

10        I.  My notes may tell me who the juvenile was that we

11        took up there.

12   Q    I don't want notes.

13   A.   Okay.  But I remember --

14   Q    I don't want to ask that.

15   A.   Okay.  But I remember we went up, it may have been my

16        first trip to Lourdesmont.  But I remember we went up,

17        we did our business, which was maybe an hour,
something

18        like that.  And it seems to me I got a tour of the

19        facility the same time, which didn't take too long.

20        It's a rather small agency.  I believe there's a Pizza

21        Hut located there at the same stop.  I think it was

22        Pizza Hut that we ate at.  We turned around and came

23        home.

24            On the way home there was an accident on, I
believe

25        it's 81 or something.  I forget the road that we took,
```

```
 1          the highway, but there was an accident on the highway.

 2          The highway was shut down.  And I was driving at that

 3          point and had to detour.  Followed the rest of the

 4          people to detour to get back on the highway.  And in
his
 5          mind, we took too long and he refused to pay us for
the
 6          length of the trip.

 7    Q     How long were you detoured off the main highway?

 8    A     It was only about an hour.  It wasn't that -- it
wasn't
 9          that long that we were late.  I mean, it wasn't like
we
10          had an extra six hours that we were trying to claim.
It
11          wasn't anything extra we were trying to claim.  We
were
12          trying to claim exactly what the length of the trip
took
13          us.

14    Q     Do you know how far off the main highway you detoured?

15    A     I would say miles wasn't very many, but I remember it

16          was slow.  It was not much more than turtle movement.

17          It was bumper to bumper going through the back roads.

18    Q     On that date did you leave at eight o'clock as

19          instructed?

20    A     We weren't told to leave at eight o'clock until after

21          that incident.  I don't recall what time we left on
that
22          day.

23    Q     Okay.  So you were scheduled to arrive back by what

24          time?

25    A     I don't remember how long it even takes to do the
trip.
```

|     |    |                                                                          |
| --- | -- | ------------------------------------------------------------------------ |
| 1   |    | If the trip normally takes seven hours, it took us eight                 |
| 2   |    | hours.  There is no scheduled return time.  The staff                    |
| 3   |    | just knows when you're out, do your job and get back                     |
| 4   |    | when the job's done.                                                     |
| 5   | Q  | What's the normal workday for you and Ms. Varner at this                 |
| 6   |    | time?  Is it 8:30 to 4:30?  What was the time period?                    |
| 7   | A. | The scheduled office day is 8:00 to 4:30.                                |
| 8   | Q  | Okay.  So if you worked as a Juvenile probation officer                  |
| 9   |    | past 4:30, then you're accumulating overtime; is that                    |
| 10  |    | correct?                                                                 |
| 11  | A. | No.  You actually accumulate what we call comp time.                     |
| 12  |    | And I may accumulate comp time today so I can leave                      |
| 13  |    | early tomorrow for a dentist appointment.  As long as                    |
| 14  |    | you get your 37-and-a-half hours in for the week, it's                   |
| 15  |    | always been flexible that if you want to work eight                      |
| 16  |    | hours this day, five this day, 10 the next day, as long                  |
| 17  |    | as you get your hours in.                                                |
| 18  | Q  | Okay.  And when you and Ms. Varner returned from this                    |
| 19  |    | trip you were just describing, and I guess Mr. Graham                    |
| 20  |    | docketed from what you reported one hour of comp time?                   |
| 21  |    | Is that correct?                                                         |
| 22  | A. | From our time sheets, yes.  That's how it became                         |
| 23  |    | presented to me.  Whenever I turned my time sheet in,                    |
| 24  |    | then he spoke to me about.                                               |
| 25  | Q  | So you and Ms. Varner didn't lose any pay from that hour                 |

1           of docketing?

2     A.    We did lose pay.  We lost an hour.

3     Q     You did lose pay?  But if it's comp time, how does

4           it equal out to pay?

5     A.    He didn't grant us comp time or pay.  If I put down on

6           my time sheet that I worked nine hours because of a

7           Lourdesmont trip, he made me change my time sheet that

8           gets turned in for pay purposes.  He made me basically

9           erase an hour on that.  If I worked nine hours, he made

10          me change it to eight hours and that other hour just

11          disappeared.

12    Q     Okay.  At that time did you have comp time accumulated?

13    A.    I don't remember.

14    Q     Do you know if Ms. Varner had comp time, extra comp time

15          accumulated?

16    A.    I don't know.

17    Q     Okay.

18          MS. WALLET:  I think I need a break.

19          MR. MacMAIN:  I was going to say, we've been going

20          at it for two hours.

21          (Recess taken from 11:32 until 11:58 a.m.)

22    BY MR. ADAMS:

23    Q     Back on the record?  Ms. Green, you've handed to all

24          counsel present a copy of your notes that you were

25          referring to earlier in your testimony; is that correct?

1    A.    Correct.

2    Q    And it's entitled Debra's Timeline; is that correct?

3    A.    Correct.

4    Q    And you have notes reflecting from the day at the top

5         1995, I guess APPT is appointment book?

6    A.    That's my appointment, book.

7    Q    And it's five pages long; is that correct?

8    A.    Correct.

9    Q    And it ends on the date 2003 appointment book, and I

10        guess it's February 10th of that year?

11   A.    Correct.

12   Q    Is that the last insert?

13   A.    Correct.

14   Q    Okay.  My question to you is:  Are the inserts in this

15        time line contemporaneous with the event?

16   A.    Explain.

17   Q    In other words, take the very, very first insert.

1995

18        appointment book, I guess October 5th, an incident

19        occurred that you made notes on.  You see that at the

20        very top?

21   A.    Yes.

22   Q    Did that happen, did you insert this on your time, on

23        your time line or in your time line, on the date or

24        contemporaneous in time with the event that you're

25        reporting?

```
 1   A.   Yes.  The date you're looking at is the date that the

 2        incident occurred.

 3   Q    And that's the date you actually created this document

 4        and started --

 5   A.   Within a day or two I would have inserted that into my

 6        date book.

 7   Q    Okay.  So all these insertions into this time line

 8        are -- are they contemporaneous in time with the
event?

 9   A.   Correct.

10        MR. ADAMS:  Okay.

11   BY MR. MacMAIN:

12   Q    David MacMain.  I represent Mr. Graham.  I just had a

13        couple to make sure I understand.

14        So if we got your -- if you brought your 1995

15        appointment book and we turned to October 10th of
1995,

16        there would be a reference in that book that would
have

17        this information?

18   A.   Correct.

19        MS. WALLET:  I'm sorry, I think you meant October

20        5th.

21        MR. MacMAIN:  Right.

22   BY MR. MacMAIN:

23   Q    And do you still have all these calendar books?

24   A.   I'm going to have to say no.  I would have perhaps,

25        well, the recent ones.  I'm not sure I still have all
```

1     the old ones or not.

2  Q   There's a reference on I guess the third page to a
home

3     calendar, and you have in parenthesis, Avon, A-V-O-N?

4     Is that is calendar you keep at home, a personal

5     calendar?

6  A.   That would have been a calendar in my bedroom or
kitchen

7     or somewhere.

8  Q   And do you still have that calendar?

9  A.   I would have to look in my files.

10  Q   And this document itself, this time line, when was
this

11     begun to be created?  When did you start typing up
this

12     document?

13  A.   The five sheets of paper?  The first three pages, yes,

14     the first three pages were created, well, ending in
'97.

15     And I created them in '97 and put them on a computer

16     disc and gave them to some other people to hold for

17     information purposes.

18  Q   Let me make sure I understand.  At the end of '97 is

19     when you created the document, at least the first
three

20     pages?

21  A.   First three pages, I believe.

22  Q   And you put it on a disc and you gave it to some other

23     people.  Who else did you give it to?

24  A.   My parents.

25  Q   Anyone else?

```
 1   A.   No.

 2   Q    Did you provide a copy to Ms. Varner?

 3   A.   No.

 4   Q    Did you provide a copy to Ms. Wallet?

 5   A.   No.

 6   Q    And going forward on the last two pages, was that

 7        created at what point?  To continue on after '97?

 8   A.   I went back and reviewed those other appointment
books,

 9        '99, 2000, after I knew I was going to have to appear

10        here.  So that I typed them up, well, after I got my

11        first invitation to come.

12   Q    Okay.

13   A.   That would have been a couple weeks ago.

14   Q    So the first three pages were done at the end of '97?

15   A.   Yes.

16   Q    And then the last two pages were done fairly recently,

17        after you knew you were going to be deposed in this

18        case?

19   A.   Yes.  So I figured I should review my own personal

20        information.

21            MR. MacMAIN:  That's all the questions I had.

22            (Discussion held off the record.)

23            MS. WALLET:  I think for the record we should

24        indicate that counsel has talked about rescheduling

25        Ms. Green, and she has tentatively agreed to Tuesday,
```

1        the 29th, but she wants to check her office calendar to

2        make sure she's available on that date.

3            Could we ask you to contact Mr. Dellasega?  Since

4        he was the one who noticed your deposition, you should

5        have information on how to reach him.  Would you let him

6        know whether or not the 29th is acceptable to you?

7            MR. DELLASEGA:  If that's a problem, would you look

8        at the 28th and see whether that's a problem for you.

9            THE WITNESS:  I will.

10           (Whereupon, the deposition was continued at

11       12:04 p.m.)

12                              *   *   *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
COMMONWEALTH OF PENNSYLVANIA      )
                                  )  SS.
COUNTY OF DAUPHIN                 )
```

      I, Emily R. Clark, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Dauphin, do hereby certify that the foregoing testimony

was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

DEBRA GREEN

      I further certify that said witness was by me duly

sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me

stenographically, and subsequently transcribed under my

direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

      I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

      Dated at Harrisburg, Pennsylvania, this 7th day of

March, 2003.

```
                        _____
                        Emily R. Clark
                        Reporter - Notary Public
```

(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)