V-w

```
                    IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
. . . . . . . . . . . . . . . . . .
BARBARA E. VARNER,                  .
        Plaintiff,                  .   CIVIL ACTION
                                    .   NO. 1:CV 01-0725
        vs.                         .
                                    .
COMMONWEALTH OF PENNSYLVANIA,       .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,            .
CUMBERLAND COUNTY; CUMBERLAND       .
COUNTY; S. GARETH GRAHAM,           .
Individually, and JOSEPH            .
OSENKARSKI, individually,           .
        Defendants.                 .
. . . . . . . . . . . . . . . . . .
```

                                Volume 2
                        Pages 93 to 268 (end)


        Deposition of:  DEBRA GREEN

        Taken by      :  Defendant

        Date          :  April 29, 2003, 9:37 a.m.

        Before        :  Emily Clark, RMR, Reporter-Notary

        Place         :  Administrative Office of Pennsylvania
                         Courts
                         5034 Ritter Road
                         Mechanicsburg, Pennsylvania


APPEARANCES:

        DEBRA K. WALLET, ESQUIRE
             For - Plaintiff

        ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
        BY:  A. TAYLOR WILLIAMS, ESQUIRE
             For - Defendant Commonwealth of Pennsylvania
                   Ninth Judicial District, Cumberland County

        THOMAS, THOMAS & HAFER
        BY:  PAUL J. DELLASEGA, ESQUIRE
             For - Defendant Cumberland County

```
 1   APPEARANCES (continued):

 2        MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
          BY:  DAVID J. MacMAIN, ESQUIRE
 3             For - Defendant S. Gareth Graham

 4        SWEENEY & SHEEHAN, P.C.
          BY:  PAUL LANCASTER ADAMS, ESQUIRE
 5             For - Defendant Joseph L. Osenkarski

 6
     ALSO PRESENT:
 7
          MS. BARBARA E. VARNER
 8
          MR. S. GARETH GRAHAM
 9
          MR. JOSEPH L. OSENKARSKI
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2                         WITNESS

 3   Debra Green                           Examination

 4       By Mr. MacMain                    96, 252, 267

 5       By Mr. Dellasega                          143

 6       By Ms. Williams                  167, 263, 266

 7       By Mr. Adams                          174, 249

 8       By Ms. Wallet                         203, 264

 9

10

11                         EXHIBITS

12   No. Description                        Identified

13    1   5-page "Debra's Timeline"              96

14    2   2-page EEOC interview, 3/23/00         140

15

16

17                    *   *   *   *   *

18

19

20

21

22

23

24

25
```

```
 1              DEBRA GREEN, recalled as a witness, being duly

 2         sworn, was examined and testified, as follows:

 3   BY MR. MacMAIN:

 4   Q    My name's David MacMain.  We met at the last

 5        deposition.  I represent Gary Graham.  I want to ask you

 6        about a series of things that we touched upon at the

 7        first part of your deposition.

 8   A.   Okay.

 9   Q    First of all, you're still under oath, the same

10        instructions apply.  If you don't understand my question

11        or have any need to take a break, say so and we'll

12        certainly accommodate you.  Okay?

13   A.   Yeah.

14   Q    Did you bring a copy of your time line that you had

15        given to us previously?

16   A.   Okay, yes.

17              MR. MacMAIN:  Okay.  Did we mark this at the prior

18        deposition?  Let me mark this as Green 1.

19              (Green Deposition Exhibit No. 1 was marked.)

20   BY MR. MacMAIN:

21   Q    Ms. Green, we had talked briefly about how this was

22        created, at the first deposition.  You said that you

23        looked at your calendar book.  You talked about an Avon

24        book which I guess is a calendar you keep at home; is

25        that correct?
```

1    A.    Yes.

2    Q     Did you have a chance to look for those books?

3    A.    They're -- no, I didn't.  They're tucked away in the

4          bottom of a box that I have stored somewhere else.

5    Q     Do you think you still have all the calendars from which

6          these notes came from?

7    A.    I should.  I -- everything that's in my calendar is on

8          here, so I'm not really too concerned about not looking

9          for them.

10   Q     You think you still have these calendar books, though,

11         somewhere at your house?

12   A.    Probably, yeah.

13   Q     I may ask you to provide copies to us.  I'm going to ask

14         you about this in a minute.  Before we get there, there

15         were some areas from your last deposition that I wanted

16         to follow up on.

17              First, have you ever at any time received any type

18         of counseling either through your pastor or through

19         mental health psychological counseling?

20   A.    I joke about getting counseling services from friends,

21         like, this is therapy.  I mean, just talking to friends

22         and stuff.

23   Q     But no professional counseling?

24   A.    I can't recall anything.

25   Q     Did you have any type of counseling -- you said you have

1          a thyroid problem.  Are you on Synthroid?

2    A.    Yes.  That was just uncovered last, like, six months ago

3          or something.  There's no counseling involved for that.

4    Q     You said you had worked at Franklin County as a

5          probation officer approximately six months?

6    A.    Yes.

7    Q     Okay.  And I don't think we had asked, why did you leave

8          there after six months?

9    A.    I was told of an opening at Cumberland County, and I

10         know it paid more.  It was a little closer to home for

11         me.

12   Q     Did you have any problems while you were at Franklin

13         County with any supervisors?

14   A.    No.

15   Q     Who was your supervisor at Franklin County?

16   A.    Initially it was Chief Sugdon, Ron Sugdon.  And then he

17         retired and then Rich Mertz was involved, or he was my

18         next chief for a brief time.

19   Q     Do you know if Mr. Mertz is still with Franklin County?

20   A.    I believe so.

21   Q     You were telling us before that you and Ms. Varner had

22         taken classes together at Shippensburg, correct?

23   A.    Yes.

24   Q     And what was the time period that you took classes

25         together?

```
 1   A.   I'm -- around 1998 comes to my mind.  I don't even know

 2        when my graduation was.  I'm going to say I graduated in

 3        '98, so it would be two years prior to that, I believe.

 4        I'm guessing on that.  I would have to look at my

 5        paperwork at home.

 6   Q.   Did you take classes together for more than a year?

 7   A.   It was a two-year program.

 8   Q.   This was a master's degree?

 9   A.   Correct.

10   Q.   And how many, what percentage, I guess, of classes do

11        you think the two of you took together?

12   A.   It was every class.  It was all mandatory.  You went to

13        class A and class B half a day, half a day.  That's

14        everything.  The whole class stayed together as a class.

15   Q.   Did you share rides?

16   A.   I don't think we ever did because she comes from a

17        different location than I would.  I just lived five, ten

18        minutes down the road from Shippensburg.

19   Q.   Did you study together?

20   A.   On occasion.  We had projects assigned to us, so we had

21        to confer and work out programs.

22   Q.   I think you had said, you complimented Ms. Varner and

23        said that she did better in school than you did, was a

24        better student?

25   A.   Yeah.
```

1    Q    Did she appear to have any difficulty with the classes?

2    A.    I would say not with the classes, or the teachers, for

3         that matter.

4    Q    There wasn't anything that you know of at work that was

5         bothering her and having her unable to do her studies at

6         Shippensburg?

7    A.    She was always able to complete everything on time as

8         far as I'm aware.

9    Q    You told us last time that you were encouraged to work

10        in pairs for safety reasons, and I think you were

11        putting it in the context of trips to outside

12        commitment, commitment trips?

13   A.    Okay.  Yes.

14   Q    Did you ever have any commitment trips where you rode

15        with Mr. Graham?

16   A.    Yes.  I can think of at least one.  I was with him and

17        Mark Galbraith, who was a new hire as well, and we went

18        to George Junior.

19   Q    Did you have any problems at all with Mr. Graham on the

20        trip?

21   A.    No, none.

22   Q    You had told us that you currently sit approximately, I

23        think you had given an estimate of about six feet, your

24        office is very close to Ms. Varner's office currently?

25   A.    Correct.

```
 1    Q    And has it been close to hers for, say, the past year?

 2    A.   I believe it's a little less than that, but at least, I

 3         would say at least six months, close to a year.

 4    Q    I'm going to ask you about an incident, there was a bomb

 5         scare at the courthouse.  Do you recall that?

 6    A.   Yes.

 7    Q    Were you sitting that close to Ms. Varner's office when

 8         that occurred?

 9    A.   No.  Our offices were at two separate ends of the

10         courthouse at that time.  Her office was nextdoor to Joe

11         Osenkarski's office at the main office.

12    Q    And would it be fair to say you consider yourself a

13         friend of Ms. Varner's today?

14    A.   Yes, I do.

15    Q    And you've been friends since you started working

16         together at the court?

17    A.   That's when I first met her, yes.

18    Q    Okay.  Did you make any attempt to see if Barb had

19         gotten out of the building when this bomb threat took

20         place?

21    A.   You couldn't go back in the building.  I had walked

22         around the outside to see if there were other, as I

23         would say, gangs of our workers hanging out, looking for

24         her.  So I personally physically walked around, like,

25         half the courthouse looking for her.  Didn't see her.
```

```
 1              Didn't know if she was to the front or at a different

 2              location, so I stopped looking for her.

 3    Q         Did you tell anybody, you know, where's Barb, my friend,

 4              I haven't seen her?

 5    A.        Yes.  I know at least with Winnie Stern, I was with her

 6              and we were standing out on the sidewalk waiting, hoping

 7              maybe she would come out a back door or side door.

 8                   And then once we were in the church, which is

 9              nextdoor to the courthouse, I was looking around and

10              asking if anybody had seen her.  Both when we were on

11              the sidewalk and then inside the building, I was asking

12              if anybody had seen her.  No one had.

13    Q         Did you call it to anybody's attention in a position of

14              authority or supervisor?

15    A.        Not in particular.  I don't know if any of the authority

16              people were in the groups that I had asked or not.  I

17              mean, I remember there was a group of six or eight

18              co-workers and I'm just, like, anybody see Barb and,

19              like, no.  I don't know who was actually in that group.

20              I can only vaguely remember one or two faces.

21    Q         My question is:  Did you tell, other than your

22              co-workers, did you go to, say, the fire department or

23              police department or somebody who was there at the scene

24              and tell them, hey, I can't locate my friend Barb

25              Varner?
```

```
 1    A.    No, I didn't ask anybody.

 2    Q     You talked about when you and Ms. Varner had started

 3          that you thought that she got more attention from

 4          Mr. Graham, correct?

 5    A.    Yes.

 6    Q     And in fact, I think you characterized that there was

 7          some flirting going on?

 8    A.    On his part, not hers, yes.

 9    Q     Can you be more specific what you meant by flirting?

10          What specific things can you tell me that you thought

11          was flirting?

12    A.    Extra attention.  Kind of joking, teasing, laughing kind

13          of a demeanor.  Probably I would say extra attention was

14          the big thing.  I mean, not -- attention that wasn't

15          needed for her to conduct her job.

16          MR. MacMAIN:  Can you read that?  I didn't hear the

17          last part.

18          (Record read.)

19    BY MR. MacMAIN:

20    Q     What's the basis, why do you think it wasn't for job

21          purposes?  Did you overhear something?  Did you

22          personally see something?  Or that was just your

23          impression?

24    A.    Body language impression, I guess.  I didn't see the

25          same body language with other co-workers, or myself, for
```

```
 1          that matter.

 2    Q     Did you overhear any conversations?

 3    A.    Yeah.  I can't think -- I'm not sure what in particular,

 4          but --

 5    Q     Well, other than just body language, did you hear

 6          anything that gave you the impression that they were not

 7          talking about work-related issues?

 8    A.    I'm going to have to say yes, in that they would -- I

 9          can't recall a specific conversation, but I can recall

10          them talking about things, like, with their children, or

11          perhaps, you know, training coming up, or in reference

12          to the school program, perhaps.  It was just kind of

13          general.

14    Q     It was both of them talking about these things?  Or was

15          it just Mr. Graham doing all the talking?

16    A.    Oh, she would respond and carry on the conversation and

17          be polite.  And he was polite at that time as well.

18    Q     Okay.  Did Ms. Varner ever complain to you during this

19          time period that she was being mistreated or harassed in

20          any way by Mr. Graham?

21    A.    Eventually, yes.

22    Q     Eventually.  I'm talking about this time period that

23          you're talking about.

24    A.    In the beginning, no.  That's the time period I'm

25          thinking of.
```

 1   Q    And at this point were you taking classes together at

 2        Shippensburg?

 3   A.   I'm going to say the classes started about the same

 4        time, so I guess that would be, like, '96 era, time

 5        period, going into '97.

 6   Q    And during that era, Ms. Varner made no complaints to

 7        you about Mr. Graham?

 8   A.   I'm hesitating just because I don't recall the year or

 9        the dates very well.  I kind of put in my head a time

10        line as they were friends for the first year or so and

11        things were agreeable between them.  And I remember it

12        was after -- things started going downhill in my opinion

13        after Ken Bolze left.  That's kind of the time line I

14        have in my head is that's when things started going bad

15        in that relationship, and Ken Bolze was the chief at the

16        time.

17   Q    So in your mind, that's kind of the demarcation line

18        when the relationship changed?

19   A.   And that's around the same time line when the Adult and

20        Juvenile split.  It was kind of that same -- it didn't

21        happen just, like, from Monday to Tuesday.  It was a

22        brief period of time there.

23   Q    Let me ask you, when Mr. Bolze left and the department

24        was split, would you agree with me that the workload

25        increased for each of the POs?

1    A.    I can't answer that.  Mine didn't change.

2    Q    Do you know if other POs had an increased workload when

3         the department was split?

4    A.    I can't say yes or no to that.

5    Q    Now, you used the term that eventually she complained to

6         you.  When is eventually?  When did eventually take

7         place, can you give me a date?  A time period, a month?

8    A.    Well, perhaps on this, let me see if this draws my

9         memory.  I'm looking on what would be page 3, like, I

10        have April of '97 listed there.  Things went sour before

11        that that I observed, and I would have to say that Barb

12        complained or expressed her concerns about Gary before

13        April of '97.

14   Q    Now you're referring to your time line.  What

15        specifically are you referring to on here about April of

16        '97?

17   A.    I see April 4th, April 7th, April 8th, April 9th, I made

18        notes as when she spoke to other people in the

19        courthouse, our higher personnel.

20   Q    And at the bottom you're referring to your home

21        calendar, parenthesis, Avon, you've got four days

22        listed?

23   A.    Correct.

24   Q    Under 4/4, Friday, B, means Barbara Varner, correct?

25   A.    Correct.

1    Q    And John Ward.  Did you speak to the two of them?

2         What's that indicate?

3    A.   That was just a note to myself that that's when I knew

4         Barb spoke to John Ward on that date and expressed her

5         concerns to him about unfair treatment in our office.

6    Q    How did you know that she had spoken to John Ward?

7    A.   She told me.

8    Q    Were you present for that conversation?

9    A.   No.

10   Q    Did she tell you what was discussed with Mr. Ward?

11   A.   No.

12   Q    All you know is she went and spoke to Mr. Ward?

13   A.   It was about Graham and how the treatment was.  But she

14        didn't -- I couldn't tell you any details about that

15        conversation or anything.

16   Q    Did she tell you what specifically she was going to talk

17        to Mr. Ward about?

18   A.   No.

19   Q    Did she tell you prior to April 4th of '97 what

20        specifically her complaints about Mr. Graham were?

21   A.   I'm not sure I'd say specifically.  I mean, she didn't

22        go into detail and say he did this to me on this date or

23        anything like that.  But she expressed concern and she

24        was wondering if she was being treated unfairly.  And

25        frankly, I was wondering why she hadn't mentioned

```
 1          something earlier about the treatment.

 2   Q      Let's try to be specific.  She wasn't being treated

 3          fairly.  How?  What specifically did she tell you?

 4   A.     He expressed anger that was totally unprofessional.  He

 5          would yell at her.  Unfair as to his attention and

 6          criticisms of her work that were in my opinion no more

 7          or no less than anybody else's quality of work.

 8   Q      Let me stop you there.  Did you evaluate Ms. Varner's

 9          work?

10   A.     Not as a supervisor, no.

11   Q      Did you evaluate other peoples' work?

12   A.     Not as a supervisor.

13   Q      How would you know that her work was no better, no worse

14          than anyone else's, then?

15   A.     She and I worked together in one particular, we would

16          call it a unit, like, a Family Preservation unit, and we

17          were partners for a long time.  We would start to

18          wonder, it's, like, how do I fill out form A and what's

19          the procedure for this incident.  And she would ask me

20          questions like, am I doing this the way you're supposed

21          to do it or whatever.  And we found out we weren't.  We

22          were told two different things, two different ways of

23          doing the same incident.  And in that respect, I thought

24          she was being treated unfairly because she was told to

25          do this in this circumstance, whereas I was told to do
```

1           this.

2    Q      Were you told by different persons how to do it a

3           different way?

4    A.     No.  Same person, Gary as our supervisor.

5    Q      Did you evaluate anyone else's work besides yours and

6           Ms. Varner's?

7    A.     I compared with my office partner, Nick Barrelet, and

8           asked him, how are you supposed to do whatever, you

9           know, that our issue was.  And frequently his did not

10          agree with either of ours, either.

11              I got the impression that the rules changed

12          whenever they felt like being changed, and they might be

13          changed back.  Maybe he forgot the rules.  And it was

14          rather a messy supervision level, inconsistent

15          supervision level.

16   Q      Were you working on different types of cases?

17   A.     Hers and I's, Barb and I's cases were very similar.

18   Q      Were they different cases?  You weren't working on the

19          same case, though, correct?  Different clients?

20   A.     Correct.  One family was hers, one family was mine.

21   Q      And did they involve different issues?

22   A.     Yes.  The issues would be different.  The issues that

23          I'm talking about, though, were procedural issues

24          regarding court, how to fill out a petition.  It didn't

25          matter what kind of a family situation or the crime was,

```
1              it was you fill out a petition this way, this way and

2              this way.  And that's where we found discrepancies

3              frequently.  Gary would tell me to do it one way, tell

4              Barb to do another, and perhaps Nick would have a third

5              way.

6       Q      I forgot, are you working as a supervisor now?

7       A.     No.

8       Q      You've never been a supervisor with Cumberland County?

9       A.     Correct.

10      Q      Did you look at anyone else's evaluations?

11      A.     They were confidential.  I never asked.

12      Q      So the complaints were -- the supervision style was the

13             complaints that Ms. Varner had about Mr. Graham during

14             that April, prior to April of '97 period?

15      A.     That was a concern, yes.

16      Q      Were there any other specific complaints that she told

17             you about with Mr. Graham?

18      A.     Not just in his orders or directions on how to do

19             things, but how he presented himself.  He would lose his

20             temper frequently.  As I would put it, he would try to

21             belittle her.

22      Q      Any specific examples that she told you about?

23      A.     I would hear him yell at her.  I mean, just raising his

24             voice.  If there was a problem with point A, B or C, it

25             should have been pointed out to her and explained, you
```

```
 1              know, here's why you don't do this.  But not in the way

 2              that he handled himself.

 3     Q   Where was your office located in relation to her office

 4              during this time period?  I'm talking before April of

 5              '97.

 6     A.  At one point her office was across -- at one point we

 7              were across the hall, Adult and Juvenile.  And at

 8              another point her office was probably from door to door,

 9              I don't know, 10 feet away, perhaps, from my office door

10              to hers.

11     Q   Did you actually hear what was being said during these

12              conversations, or would you just hear yelling?

13     A.  Both.  I would hear yelling, if I had my door open and

14              wasn't in her office.  Or if I was standing next to her,

15              sometimes, I would hear him be rather rude and hateful

16              to her.

17     Q   Can you give me any specific examples of what you heard

18              that you considered rude and hateful?

19     A.  There's one incident in particular and I'm -- I have to

20              admit, I'm, like, trying to block it out because I

21              thought it was very unprofessional.  I was in her

22              office.  He came in and he as I remember it slammed some

23              papers down or pushed some papers off her desk, of that

24              nature.  And I can just hear him basically yelling, and

25              I can't tell you what the words were exactly.  The
```

```
 1              feeling was he was basically calling her an idiot for
 2              not doing whatever it was needed to be done.  That's my
 3              words, not his.
 4     Q   And you don't remember what words were being used?
 5     A.  I can't tell you exactly.
 6     Q   And you don't recall when this was?
 7     A.  No.
 8     Q   And you don't know -- I think you said either he slammed
 9              the papers down on the desk or he pushed them off the
10              desk.  You don't know which one it was?
11     A.  I remember keeping my head down, looking -- because if I
12              was to make eye contact with him or look at him I
13              figured that would fuel the fire or perhaps have his
14              anger come my way.  I just remember being in a
15              submissive position as to not antagonize it any further.
16              I remember keeping my head down facing this way.  He was
17              standing here, the desk was here (indicating) and Barb
18              was on the other side of the desk.
19     Q   And this incident made an impression in your mind?
20     A.  It did.
21     Q   Did you put it on your time line?
22     A.  No.
23     Q   Now, you had said that you compared notes with how
24              reports should be done between yourself, Ms. Varner and
25              Nick Barrelet?
```

Green                                                              113

```
 1   A.   Barrelet, correct.

 2   Q    Is Nick, is that short for -- is that a man or a female?

 3   A.   That's a male.

 4   Q    And anyone else that you spoke with about what you

 5        thought was inconsistent report writing?

 6   A.   Those two were the key people that I spoke with.

 7   Q    Was there anyone else who wasn't key you spoke with and

 8        compared notes with?

 9   A.   Just, I'm going to say at random, perhaps, and probably

10        Darby Christlieb, Bill Brandt, I would talk to those

11        gentlemen on occasion.

12   Q    Did they have similar complaints or any complaints at

13        all about Mr. Graham and his supervisory style?

14   A.   Well, they agreed and they understood where my concerns

15        were coming from.  And their comeback was in general

16        just do what you know needs to be done, he'll criticize

17        your work regardless.  So that's what I did.

18   Q    Getting back, you had said that Ms. Varner had some

19        complaints about Mr. Graham, and you told me about you

20        thought were inconsistent supervision or preparing of

21        reports, he loses his temper.

22             Any other complaints, any specific complaints she

23        gave to you in the time period between April of '97?

24   A.   I'm sure there were.  I wish you would have asked me in

25        '97, though.  I can't recall specifics right off the top
```

 1          of my head.

 2    Q     Did Mr. Graham lose his temper with other people in the

 3          office?

 4    A.    I would say he was belligerent and rude to people, but I

 5          don't think I would use the word lose control of his

 6          temper in the same way that he did with Barb.

 7    Q     Can you be specific why you think it was not the same

 8          way with Barb as other people that he was belligerent

 9          and rude to?

10    A.    He would be loud, like, very attention-seeking and

11          demeaning, but he wouldn't get in your face and he

12          wouldn't specifically, like, embarrass you in front of

13          people.

14                Let me take that statement back.  He liked to

15          embarrass people, I believe.  But I never saw him get

16          into somebody's face the way he did with Barb.  He would

17          get threatening, kind of, like, intimidating stances.

18          If she would be sitting, he would be standing, kind of

19          using the body language, you know, like, leaning over

20          the desk or something.

21                The other men in the office, he would get loud with

22          them and perhaps try to make comments or embarrass them,

23          but it was in a different manner.  It wasn't quite so

24          confrontational as he was with her.

25    Q     Can you be specific?  How was it less confrontational?

```
 1          Were different words used?

 2     A.   I don't know how to answer that.

 3     Q    So you don't know what the basis of your statement is

 4          that you think it was less confrontational with other

 5          people in the office than Barb?  I'm looking for

 6          specifics.  What specific things can you point to?

 7               MS. WALLET:  Other than what she's already said,

 8          body language, threatening stance?  You're looking for

 9          anything in addition to that?

10               MR. MacMAIN:  Well, anything specific.

11     BY MR. MacMAIN:

12     Q    How was the body language with other people?  How was

13          it different?

14     A.   Well, he didn't, like, lean over them.  He didn't pull

15          the power mill.  Like, if she was sitting, other people

16          I can think would be out at the front counter, it would

17          be, you know, there were -- both guys were standing face

18          to face.  I have to just repeat what I already said.

19          I'm not sure what it is you're looking for.

20     Q    Do you recall any specific statement made to Mrs. Varner

21          during these occasions when you think Mr. Graham was

22          belittling?

23     A.   Nothing specific's coming to mind.

24     Q    These instances where you said Mr. Graham was, through

25          his body language you thought was more intimidating to
```

```
 1              Ms. Varner, can you tell me how many times you observed

 2         that?

 3    A.    When things went wrong between them, and this is

 4         sometime after Ken Bolze left, in that time period, I

 5         can't remember any time where he was respectful to her.

 6         It was, like, I don't have it written in my time line

 7         because it was almost a daily event.  If the two of them

 8         were in the office, there was usually some kind of

 9         tension going on.  That's all I can say, I guess, for

10         that answer.

11    Q    Were you in the office all five days?  Or how often

12         would you travel for commitment trips or going out to

13         visit clients or going out to facilities?

14    A.    There's no, like, I can't say I had a specific time

15         line, but I had supervision, field supervision at the

16         time, so I could be coming and going at random at any

17         time.  I might come in to work at 8:00 and leave at 9:00

18         and come back later.  It was very sporadic.

19    Q    Can you give me some estimation of what percentage of

20         your time, of a hundred percent of your time, how much

21         of it was spent in the office, how much of it was out of

22         the office during the time frame that we're talking

23         about?

24    A.    I would say probably 70 percent was in the office and 30

25         was somewhere else, in the field.
```

1    Q    Going back to my question about complaints, specific

2         complaints that Ms. Varner had given to you, you told me

3         management style, him losing his temper.

4             Any other complaints, specific complaints that you

5         can recall her making to you about Mr. Graham?

6    A.   I guess along with management style would be how he

7         would choose her to go to commitment trips.  She wasn't

8         real happy about having to do all these commitment

9         trips.

10   Q    Can you tell me specifically what she said?

11   A.   I can't say specifically.  It was just she'd rather not

12        be with him on these commitment trips.

13   Q    When did she say this to you?

14   A.   That would have been several comments.  Like, I don't

15        know a specific date.  It would have been before 1997,

16        in April, whenever she spoke to John Ward.

17   Q    Did she give you any specifics why she did not want to

18        be on commitment trips with him?

19   A.   She didn't have to.  I mean, it was -- I have to assume

20        that it was because of how he treated her, that she

21        didn't want to be there.  She knew she was being singled

22        out.

23   Q    I'm not asking you to assume.  Did she tell you anything

24        specifically:  I don't want to go on this commitment

25        trip because?

1    A.    No, nothing like that, not the way you said it.

2    Q    You made a comment at the last deposition that you think

3          Mr. Graham wanted people to think he was having an

4          affair with Ms. Varner.  Do you recall saying that?

5    A.    Yes.

6    Q    What specifically did he do to give you that impression?

7          Did he say anything?  Did he do anything?  What specific

8          basis for that statement do you mean?

9    A.    The comment I made last time, on number 1 on my time

10         line, like he felt he had the freedom or privilege to

11         pat her on the behind.  The extra attention that he

12         showed to her.  The comments, sexual comments or jokes,

13         things that -- we mentioned some of those last time as

14         well.  I think the general, the insinuation or his goal

15         I guess was to entice her.  That was the impression I

16         got, that he was doing things to entice her his way.  He

17         was showing her favoritism in trying to get into a

18         relationship.  And he wanted people -- I got the

19         impression he wanted people to think he was having a

20         relationship with her.

21   Q    And the basis of that would be the one-time patting of

22         the butt that you say you observed?

23   A.    It's everything, the attention, you know, choosing her

24         out to go to commitment trips.  Why didn't, you know,

25         why didn't he choose one of the guys more so than her.

```
 1   Q    For these commitment trips, if a female client is going

 2        to be transported, you need to have a female PO?

 3   A.   It's really been stressed lately that we should, like

 4        the past four, five years.  It wasn't -- it wasn't

 5        mandatory back in the earlier days.  Frequently I would

 6        help transport male POs, and perhaps Barb and I together

 7        would transport male POs, or I'm sorry, male clients.

 8        I'm saying that wrong.

 9   Q    So if a female client was being transported in the

10        '96-'97 time period, it was not important to have a

11        female PO along on the trip as opposed to having two

12        males in a car with a female client?

13   A.   I think it was important but it wasn't office policy.

14   Q    Was it something that was done, though, routinely?

15   A.   Not that I'm aware of.  I have to flip that around,

16        because I would assist with Barb or Barb would assist me

17        in transporting a male client.  It was never mandatory

18        that we had to have a male PO on board if we transported

19        a male client.

20   Q    You were asked some questions last time about Officer

21        Wiser of Newville Police Department.  Remember those

22        questions?

23   A.   Um-hum.

24   Q    Did you have any type of relationship with Mr. Wiser?

25   A.   I got to know him through my job and we became good
```

```
 1              friends.  I think I said that last time.  I became

 2              friends with him and the rest of the police department,

 3              at the encouragement of Gary and Joe.

 4    Q    Did you ever date Mr. Wiser?

 5    A.   No.

 6    Q    Do you know whether or not anybody from the police

 7              department made complaints to any of your supervisors

 8              that you were spending an awful lot of time at the

 9              police station?

10    A.   No complaint was ever given to me by Joe or Gary.  They

11              never came to me and told me to change my ways.

12    Q    You had said at the last deposition that Gary had given

13              you fatherly advice not to get involved with Mr. Wiser?

14    A.   Correct.

15    Q    Do you recall what he said?

16    A.   It was something along the line that I could do better.

17              He assumed I was dating Troy, and this, he was

18              insinuating that I could find somebody better to date

19              than Troy Wiser.

20    Q    Did Gary's concern seem genuine?

21    A.   Yes, it did.

22    Q    I want to ask you some questions about your time line

23              that's in front of you.

24    A.   Okay.

25    Q    At the very first entry, the October 5th, 1995 incident,
```

Green                                                                                          121

```
 1              you have on there SGG patted BEV on the behind.  Right?
 2   A.    Correct.
 3   Q     Where did this happen?
 4   A.    Down at Cumberland County prison.
 5   Q     Where specifically?  Was it indoor, outdoor?
 6   A.    It was indoor.
 7   Q     Can you tell me where?  It was a hallway, a classroom?
 8   A.    We were entering into our classroom and it was in the
 9         doorway, single file.  Barb was first, Gary was second,
10         I was behind him, and I saw him do that.
11   Q     Was this in the doorway going into the classroom?
12   A.    Yes.
13   Q     Was anyone else around?
14   A.    The rest of the class was either ahead of us or
15         scattered behind us.  Everybody was there.  But in our
16         specific -- other people were there scattered out such
17         as we are here.  The three of us were I know all
18         together going back in.  I don't think anybody was
19         directly behind me.  There would have been a couple feet
20         of space, perhaps.
21   Q     Can you tell me specifically what you saw?
22   A.    I saw him reach out with his, it would be his right
23         hand, and he patted her on her buttocks, her behind.
24   Q     Did he say anything?
25   A.    Not until after I commented, and I asked him why he
```

```
 1              could do that, like what -- it slipped when that lady

 2              started talking.  I played that scene back in my mind

 3              for a long time.  I remember asking him something about

 4              what gives him the right to do that, and his reply was:

 5              I've known her longer.

 6    Q         Did Ms. Varner say anything?

 7    A.        She didn't say anything.  She put her both hands behind

 8              her to cover her behind.

 9    Q         You said there were people behind you when this

10              happened?

11    A.        There were I'm guessing maybe 20 people in the class,

12              and some were in the classroom, some were going to be

13              following behind after us.

14    Q         So if this happened, other people would have seen it as

15              well?

16    A.        I don't -- they may have.  I don't know that they would

17              have.  As I'm -- I haven't been to the prison to know

18              where this training room is anymore, I can't recall it.

19              But it seems to me we went in a doorway here and this is

20              where the doorway was (indicating), and then we had to

21              take an immediate left, and it happened right in this,

22              like, two feet of space.  I don't -- I don't remember if

23              it was two separate doorways or if there was something

24              there that blocked us and we had to just take a turn.

25              But it was right in this archway as we were turning to
```

1       go into the classroom where it happened.

2            So I think perhaps the wall would have been here

3       (indicating) as we were coming around that people

4       perhaps may not have seen, as I may have been the one

5       blocking their view because I was behind him.

6   Q   But you don't know --

7   A.  I couldn't say for sure.

8   Q   -- whether other people -- did you speak to Ms. Varner

9       after that occurred?  I know there was some comments

10      made at the time, but did you speak to her later in the

11      day or a week later or a month later about what had

12      happened?

13  A.  No.

14  Q   Did you complain to anybody about what you had seen?

15  A.  Probably just my husband at home, like, whoa,

16      something's not right.

17  Q   Going further down your time line, 12/16/96, Linsenbach

18      to Lourdesmont.  This was the incident we talked about a

19      little bit before, correct?

20  A.  Correct.

21  Q   On here you have:  Tried to explain there was an

22      accident on I-81 on the way home and detoured.  Correct?

23  A.  Correct.

24  Q   Is that what caused -- first of all, can we agree that

25      you were late in getting back, took longer than what you

1        expected?

2   A.   I'm hesitating because I don't really know how many

3        hours it's supposed to take.  To this day I couldn't

4        tell you how long it was supposed to take.  I know we

5        detoured and Gary said it took longer than it's supposed

6        to take, so I'm assuming the detour was the reason it

7        took us longer.

8   Q    Was there any problem with fog?

9   A.   Seems to me going up there was.  I wasn't driving on the

10       way up, I believe Barb was.  I think I drove the whole

11       way home.  I'm going to -- seems to me there was poor

12       weather in the morning going up.

13  Q    How about coming back, was there fog?

14  A.   Not that I remember.

15  Q    Was there any ice?

16  A.   I don't remember that.

17  Q    Further down on the 2/28/97, you told us a little bit

18       about this before about you believe that there was some

19       photocopying of the Linsenbach file of, I think you had

20       said homosexual materials?

21  A.   Okay.  Yes.

22  Q    Do you recall talking about that at your last dep?

23  A.   Yes.

24  Q    Who specifically was photocopying things?

25  A.   Gary was.

```
 1    Q    Did you observe him photocopying?  Or is this something

 2         that someone else told you?

 3    A.   Are you talking about photocopying the things out of the

 4         juvenile's file?  Or are you talking about photocopying

 5         these man parts?  There's two different --

 6    Q    Okay.  My understanding, I thought, maybe I'm wrong, was

 7         that this stuff was in the file, these man part items

 8         you talked about were part of the file?

 9    A.   No.  Let me see if I can explain my notes to you.

10         Again, these were notes for, well, simply for me to jog

11         my memory.

12              He was photocopying -- I saw Gary at the copy

13         machine photocopying things out of the Linsenbach file.

14         That's a juvenile client of ours.  He was copying things

15         out of the Linsenbach file and he was telling us a story

16         about photocopying the man parts.

17              The man parts, the photocopying of I guess what was

18         a dildo, that was not done in my presence.  He was

19         telling me that story as he was photocopying things out

20         of the juvenile's file.

21    Q    So what you observed him photocopying was not the dildo

22         or the man parts?

23    A.   Correct.

24    Q    Okay.  You just heard him tell you that?

25    A.   Yes.
```

1  Q   And did that material you believe come from the -- that

2      didn't come from the Linsenbach file?

3  A.  Correct.

4  Q   It had come from some other file?

5  A.  I don't know where that came from.

6  Q   And so you never did see this material, this dildo

7      material that you --

8  A.  No, I never saw it.

9  Q   April 21st, 1997, again, entry in there that SGG removed

10     box of stuff from JLO's office, acted very secretive, et

11     cetera.

12         Do you see that?

13 A.  Yes.

14 Q   Did you see what materials -- did you actually look in

15     the box or know what the materials were?

16 A.  No, I did not.

17 Q   Do you know if they were file materials?

18 A.  Could have been anything.  Could have been a baseball

19     glove for all I know.

20 Q   You have no idea what it was?

21 A.  No.

22 Q   An entry 5/5/97:  Attorney David Foster went off with

23     SGG, no reason to believe it was Probation business.

24         You see that?

25 A.  Yes.

1    Q    First of all, do you have any idea what Mr. Foster and

2         Mr. Graham were speaking about?

3    A.   No, I do not.

4    Q    You put in there:  No reason to believe it was Probation

5         business.  Why did you put that comment in there?

6    A.   Simply because I didn't know of any cases where private

7         attorney David Foster had been retained in regards to a

8         juvenile client, and I had no reason to know that it was

9         Probation business.  And I had through the rumor mill

10        heard that Dave Foster and Gary were very good friends

11        or at least acquaintances and they would perhaps be

12        talking on personal issues.  And rumor had it that he

13        was asking Dave Foster advice regarding the issue that

14        we're here for today.

15   Q    Why did you feel you needed to put it in your time line?

16   A.   Something that peaked my interest, in case I write a

17        book or something.  No real reason.  I mean, it was just

18        things that I found unusual or perhaps something that

19        caught my attention, I would make myself a note.

20   Q    June 12th, SGG and DD went to Lourdesmont, left at 1:00

21        p.m.  Who is DD?

22   A.   Dennis Drachbar.

23   Q    Why did you put this in, that they went on a trip to

24        Lourdesmont?  What was the significance of putting this

25        in?

1    A.    It was actually the time at 1:00 p.m.  Going back to

2          1996, I was instructed that all placement trips, all

3          trips to placements need to take place starting at 8:00

4          a.m., and that was one of the rules or verbal directions

5          that were given to me by Gary.  And I thought, well,

6          here he is breaking his own rule.  I think he forgot

7          that he even told Barb and I to do that, or told me

8          specifically to do that.

9    Q     The next page, June 17th, again, a notation of

10         Mr. Graham speaking with Attorney David Foster for an

11         hour.

12               Same reason you put that in again?  You didn't

13         think it was business?

14   A.    It was just interesting that he would be there.

15   Q     Why was it interesting?

16   A.    Because he didn't belong there, as in we have our

17         regular juvenile attorneys, and there was no reason to

18         believe that Gary and him had a shared juvenile case at

19         the time.

20   Q     I guess the same question, why would you put this on

21         your time line?  What significance is it of to you?

22   A.    Just interesting, that's all.

23   Q     June 30th:  Spoke with Jane Augustine from Lourdesmont,

24         under the impression that I was no longer on Linsenbach

25         case.

1    A.    Yes.

2    Q     The significance of putting that on your time line?

3    A.    That was my case, this Linsenbach case, and I was

4          wondering why the placement facility, Lourdesmont, would

5          not consider me still in charge of the case.  And that

6          basically was to cover my butt in case a complaint was

7          made to say, well, you know, something was deficient in

8          my work.

9               And it bothered me that Lourdesmont would not

10         consider me still the primary probation officer, because

11         if they didn't, they would not have given me up-to-date

12         information and then I would have been negligent in my

13         duties, and that just bothered me.

14   Q     So you put this down to kind of CYN in case there was a

15         problem with the file that you were no longer

16         responsible for it?

17   A.    Well, not that I wanted to give up responsibility.  I

18         mean, this client I felt I was responsible to and I owed

19         her the best service I could give, and this just made me

20         uncomfortable to think the facility didn't consider me

21         accountable.

22   Q     The next entry I want to ask you about was August 27th:

23         Graham meanly looking in at me as I'm on the Adult side

24         talking to Roxanne.

25              Why did you put this in your time line that

```
 1         Mr. Graham gave you a mean look?

 2    A.   Because the two Adult co-workers pointed it out to me,

 3         and they're like, you know, what's that about, kind of.

 4         They were questioning me as to why he was giving me

 5         these childish looks or mean looks.

 6    Q    Did he say anything?

 7    A.   No.  The doors -- it was through a closed door.  I was

 8         literally in the Adult Probation Office, he was out in

 9         the hallway, or he wasn't in the same room that I was

10         in.

11    Q    He was looking through, like, a glass wall?

12    A.   Correct.

13    Q    The Linsenbach case, is that something that you were

14         assigned to as the primary PO?

15    A.   Yes and no.  It was initially assigned to Gary, and he

16         pulled me in to kind of learn and follow how to do

17         things.  Once she was in placement, he never totally a

18         hundred percent turned the case over to me, he always

19         kept himself involved.  And when it came time for this

20         girl's release, he made -- he got back involved again.

21         But for the routine, the maintenance of the file, it was

22         my responsibility.

23    Q    9/23, problem with Klappatch case, discussing with Barb

24         Varner, and Graham follows us to the basement for sodas.

25         Nicole Horick saw him follow and then turn around and go
```

```
 1          back up the steps.

 2              Tell me about this.

 3    A.    Nicole pointed out that he was following Barb and I, and

 4          she felt it was obvious that he was following us, not

 5          just happening to be going the same way we were.

 6    Q     And then he turned around and went the other way?

 7    A.    Once he saw Nicole, then he turned around and went the

 8          other way.

 9    Q     Did he say anything to you?

10    A.    I didn't know, we didn't -- I didn't know he was back

11          there.

12    Q     But did he say anything to you?

13    A.    No.

14    Q     Did you saying anything to him?

15    A.    Didn't see him.

16    Q     11/26:  Graham gave my home phone number to the

17          Linsenbach parents.  And then 12/8:  Graham admits

18          giving out my phone number to Linsenbachs.

19              What's the significance of this?

20    A.    My phone number, and any probation officer who chooses

21          to have their phone number confidential, should be kept

22          that, and that bothered me.  This girl attempted to kill

23          her mother and wanted to kill her father.  And they did

24          not have my private home phone number.  And it just

25          concerned me that my own supervisor gave out something
```

1          confidential.

2    Q    Did you ever get any phone calls from the Linsenbachs?

3    A.   I believe there was one.

4    Q    Did they ever threaten you in any way?

5    A.   No, the parents did not.  I never spoke to the juvenile

6         at my home phone number.

7    Q    2/10/98, you have a reference in there about baseline

8         testing.  Tell me about that.

9    A.   Baseline testing was in reference to our drug tests.  At

10        the time there were two different testings regarding

11        drug tests for alcohol use and drug use in our kids.

12        There were two tests and one was more expensive than the

13        other.  And this was just another example where he told

14        me to do one thing, and then he turned around and then

15        complained for having done it the way he told me.  Well,

16        that's what that means.

17   Q    The next entry, 3/10:  Graham reported to Adult

18        Probation 8:30 a.m.  That was the date he was

19        reassigned?

20   A.   Yes, sir.

21   Q    Okay.  And the significance of putting that in your time

22        line?

23   A.   Just to help keep my dates.  You know, I have trouble

24        keeping dates straight.

25   Q    You have a handwritten one in there, March 19th:  Spoke

1                to Joe re missing packet of, is that Krista's?

2        A.      Krista's, correct.

3        Q       Underground, slash, gay, slash, sexual stuff.  What's

4                that?

5        A.      That's in reference to the other page at February 28th

6                of 1997.  When he was making photocopies at the copy

7                machine that date, what he was copying was information

8                that was taken out of the Linsenbach file, and that

9                particular information was never put back in the

10               Linsenbach file.  And on 3/19, which is the date of my

11               handwritten entry, that's the date that I spoke to Joe

12               and asked Joe if he would ask Gary to get that stuff

13               back, that it belonged in this girl's file.

14       Q       So a year later you spoke to Joe about it?

15       A.      I spoke to him nine days after Gary was removed.

16       Q       And this, what was this underground gay sexual stuff?

17               What specifically was it?

18       A.      It was black-and-white, like, photocopied information

19               that had been confiscated off the juvenile while she was

20               at placement.

21       Q       Were there pictures of dildos?

22       A.      I don't recall that.  There may have been.  There was

23               some pretty gross stuff in there.

24       Q       Earlier we talked about Linsenbach, there was a comment

25               made in your 2/20 entry, it was quote, faggot, end

1          quote, stuff.

2              Was that a term you used, a term Gary used?  Where

3          did that term come from?

4     A.   The word faggot came from Gary.

5     Q    That was while he was telling you about these

6          photocopies he had made?

7     A.   He referenced the photocopy papers themselves as the

8          faggot stuff in the Linsenbach file.

9     Q    The next page there's an entry of 5/7.

10    A.   Yes.

11    Q    Found SGG resume created 5/5/98 at 1:30 to 2:30 under

12         Fran's directory.

13             Now, first of all, do you have access -- who is

14         Fran?

15    A.   Fran's a secretary, slash, support person.

16    Q    And do you have access to Fran's directory?

17    A.   It's on the computer where everybody has access to

18         everybody's information.  If you're an employee in

19         Juvenile Probation, you could access what's in my

20         directory.

21    Q    Would it be unusual for you to access somebody else's

22         directory?

23    A.   No.  As I have it set up, the secretaries will do typing

24         and then they'll transfer what they've typed to my

25         directory.  Or, if I need something, like a form letter,

1           I will go to their directory.

2               Fran would type out letters for police officers.

3           It's a form letter where you fill in the blank, and if

4           you need that form letter, you go to that person's

5           directory and pull it up.  And that's how I ran into

6           this.

7      Q    Is there a reason why you would pull up Mr. Graham's

8           resume?  That wouldn't be a form that you would use, I

9           assume.

10     A.   I don't know if I -- I'm not sure what it was saved

11          under -- if it was resume or if it said Gary or what.  I

12          don't recall how I clicked on it, if I did it

13          intentionally or by accident.  I just remember finding

14          it and it was, like, whoa, what did I pull up here.  If

15          it was something confidential I would have assumed that,

16          you know, you keep it pass-coded or something.  So I was

17          really shocked when I found it and that kind of caught

18          my attention.

19     Q    Why was it significant that Mr. Graham had a resume?

20     A.   Because it was created after he didn't work there.  And

21          I thought it was kind of odd that our secretary would be

22          doing typing for him that was of a personal nature.

23     Q    And you don't know whether you pulled this up

24          accidentally or intentionally?

25     A.   If I saw it titled Gary Graham's resume I probably would

```
 1            have punched on it on purpose.  I don't think it was

 2            titled that.  I don't remember that happening that way.

 3    Q    At the bottom of that page you have 1997 home calendar,

 4            and we already talked about the 4/4 entry.

 5            4/7/97, Barb Varner and lawyer.  What's that in

 6            reference to?

 7    A.    She would just comment that she was going to speak to an

 8            attorney on this date.  I'm not sure if it was in person

 9            or over the phone.

10    Q    Do you recall what she told you?

11    A.    Just knew that she was going to get some legal advice on

12            how she should handle what was going on with her.

13    Q    Next entry:  Tuesday, Barb Varner and Dan Hartnett.

14            What's that refer to?

15    A.    Just that she spoke with him on that date.

16    Q    Is there a reason why you would put entries as to

17            activities Ms. Varner was involved in on your time line?

18    A.    The same reason I put down other people's activities.

19            Something just caught my attention that I thought it was

20            interesting.

21    Q    The next entry, 4/9:  Lunch with Ken Bolze.

22    A.    A bunch of us went and had lunch with him that day.  It

23            was her -- I'm sorry -- Barb Varner, I'm not sure if his

24            wife was present or not, and I think one or two other

25            co-workers.  We went out for lunch.
```

1    Q    Was any of the Varner-Graham stuff discussed, or was it

2         just a lunch, social lunch?

3    A.   Oh, I'm sure work was talked about.  I mean, because he

4         was recently -- I'm sure this was -- I'm thinking this

5         was after he was retired.  I'm sure he was retired by

6         then.  Seems to me we were going out to lunch six months

7         or so afterwards.  I know he had asked, I remember him

8         asking, like, how things were in the office, if things

9         were any better or worse.  No great detail was gotten

10        into, like, nothing specific, really.

11   Q    Why would you put this on your time line, having lunch

12        with Ken Bolze?  What's the significance?  If any.

13   A.   Just that I had -- that we had lunch.

14   Q    The next page under 2000 appointment book, under 4/4:

15        Graham phone message on Osenkarksi's phone.  Said he

16        needed mower back from Osenkarksi so he guessed it would

17        be all right to come over and take one of his.

18        Osenkarksi played message for Hank, Denny, Sam and

19        Darby, question mark, with office door open.

20             Tell me about this.

21   A.   I remember Joe saying something about a message from

22        Gary, and he was kind of, I'm going to say entertained

23        by the message, that Gary had the gall, I guess, to ask

24        for this mower back that apparently the mower was years

25        ago, it was a loan years ago.  And I don't know, I kind

Green                                138

```
 1          of thought it was kind of weird that, well, weird in
 2          many ways, I guess, that he would ask for a mower back
 3          that he had loaned numerous years ago.  And it was kind
 4          of, I mean, Joe I guess got a joke out of it and thought
 5          he would entertain the other guys and play it for them.
 6          It was kind of, like, how real is this guy, can you
 7          believe he's calling me wanting this stuff back.
 8    Q     Did you actually hear the message?
 9    A.    Pieces of it.  The door was open.  If I would have
10          stayed there I could have heard the whole thing.  But
11          Joe referenced it and I heard him saying about it.
12    Q     Were you eavesdropping, or were you intended to hear
13          this message?
14    A.    If I was eavesdropping I would have heard the message.
15          I could have stayed and listened, his door was open.  I
16          walked by his doorway and just heard pieces of it, and
17          then I heard the guys talking about it later.
18              If you look at the date above, 3/28, it wasn't a
19          secret.  I mean, it was on -- I guess -- I'm assuming
20          it's the same phone message.  Joe was at the back
21          hallway talking about Gary's phone call on that date as
22          well.
23    Q     Have you ever been threatened by Mr. Graham?
24    A.    Not directly.
25    Q     What do you mean not directly?  Have you been indirectly
```

1          threatened?

2     A.   References have been made, like, to Nicole Horick, who

3          is now Nicole Galbraith, that he made threats to -- put

4          the word out, so to speak.  I've heard he's done

5          insinuation or intimidation against Bill Brandt, against

6          Darby.  And everybody talks.

7               Gary's made it well known that he's going to

8          retaliate.  He's not told me that face to face, but he

9          has put the word out and, you know, tell everybody,

10         everybody who testifies against me will pay, sooner or

11         later they'll pay.  That's the phrase that's going

12         around the office.

13    Q    Can you tell me what specifically, not what you've heard

14         thirdhand from someone, but specifically what you've

15         been told and from whom?

16    A.   From Gary?

17    Q    Mr. Graham's never threatened you directly?

18    A.   Correct.

19    Q    And what you've told me is that you heard thirdhand that

20         the word's out there.  Tell me specifically what you've

21         heard and from whom.

22    A.   With Nicole, seems to me that the word that she was --

23         from Gary to Nicole to my ears was:  You're going to

24         pay, you're all going to pay if you testify against me.

25         That was the big one that stuck with me.  Am I answering

1          your question?

2    Q    Yeah.  Nicole said that Mr. Graham said that to her

3          directly?  Or she heard it from the rumor mill as well?

4    A.   I think it was direct, but you'll have to ask her.

5    Q    I don't think we marked this before, but do you remember

6          giving a statement to the EEOC, an EEOC investigator?

7    A.   Would that have been a person who would have called me?

8    Q    Quite possibly.

9    A.   I remember speaking to a lady.  It was a female.  I

10         couldn't tell you her name.

11   Q    Do you recall telling that person that you never saw

12         Barbara Varner sexually harassed by Gary Graham?

13   A.   I don't remember if I said that or not.

14   Q    Do you remember being called -- do you recall being

15         asked whether or not you have ever observed sexual

16         harassment by Mr. Graham?

17   A.   I don't remember.

18              MR. MacMAIN:  Let's mark this as Green 2.

19              (Green Deposition Exhibit No. 2 was marked.)

20   BY MR. MacMAIN:

21   Q    What we've put in front of you is a two-page document

22         which appears to be an interview from this telephone

23         call that we've spoken about.

24              Have you ever seen this document before?

25   A.   No.

1   Q    I'm not going to ask you about the whole thing, but

2        about eight lines down there is an answer:  Ms. Green

3        said she never saw Barbara Varner sexually harassed but

4        it was obvious to all in the department that Gary Graham

5        was attracted to Barb Varner and flirted with her.  Once

6        she saw him pat Barb Varner on the butt.  She asked him

7        about it and he said he had known her for a long time.

8            Do you see that?

9   A.   Yes.

10  Q    Okay.  Do you recall this conversation with an

11       investigator from the EEOC?

12  A.   Vaguely.  This sounds like something I would have said.

13  Q    The statement that you never saw Barbara Varner sexually

14       harassed, do you remember making that statement to the

15       investigator?

16  A.   I could have.

17  Q    This conversation was a telephone conversation that you

18       recall?

19  A.   I believe so.

20  Q    Do you recall telling anybody that Mr. Graham had

21       sexually harassed Ms. Varner?

22  A.   Just in regards to the professionals asking about it in

23       relationship to this case.

24  Q    Other than the investigator from EEOC, have you spoken

25       to anyone else about the Graham-Varner incident and the

Green                                    142

```
 1        reason we're here for today?

 2   A.   There were people from the county who interviewed us in

 3        the Personnel Department about this.

 4   Q    Anyone else?

 5   A.   No.

 6   Q    Have you ever done a written statement as to what you

 7        observed?  Other than this time line that you've

 8        provided us with.

 9   A.   No.

10   Q    Have you ever spoken to any attorneys representing

11        Ms. Varner prior to the depositions?

12   A.   Huh-uh.  No.  I'm sorry.

13   Q    Prior to your first deposition, prior to this

14        deposition, did you review anything?

15   A.   No.  My own time line.

16   Q    Okay.  Have you ever looked at Ms. Varner's deposition

17        transcript?

18   A.   No.

19   Q    Have you ever looked at the Complaint that was filed in

20        this suit?

21   A.   No.  The only thing I remember reading was in the

22        newspaper.

23            MR. MacMAIN:  Okay.  Those are all the questions I

24        have, thank you.

25            THE WITNESS:  Can I go now?
```

```
 1              MR. MacMAIN:  No.  There are going to be some other

 2         people asking you questions.

 3    BY MR. DELLASEGA:

 4    Q    I have a few.

 5              Do you feel you've been sexually harassed at work?

 6    A.   I've been harassed.  I'm not sure I want to put sexually

 7         in front of that or not.

 8    Q    Have you had sexual harassment training at work?

 9    A.   Yes, we did.

10    Q    Utilizing the use of the training that you acquired from

11         that training, let me ask you if you feel you've been

12         sexually harassed at work?

13    A.   So this is where my dumbness is going to come out.  I

14         would need to pull the book out and read the definition

15         again.  I know I've been bullied upon and mistreated.

16         It's unprofessional, and I think it has to do with being

17         a female, so I think that makes my answer yes.

18    Q    Okay.  Would you like those complaints investigated by

19         your employer?

20    A.   I think they're being addressed here through this

21         Complaint.  A lot of my concerns were identical, if not

22         the same time as to her complaints.

23    Q    Let me ask, would you like a formal investigation done

24         with regard to your own personal complaints?

25    A.   No.
```

1    Q    Is there any remedy you would like your employer to

2         introduce at this point in time to correct what you

3         perceive as sexual harassment against you?

4    A.   Yes.

5    Q    What remedy is that?

6    A.   Mr. Graham needs to be fired.  And I think Joe perhaps

7         needs to be removed from his position as well.

8    Q    Anything else?

9    A.   You guys need to apologize to Barb Varner.  Somebody

10        needs to apologize.  If the world, if it was open

11        season, I would say Graham has to pay back for these

12        proceedings as well.

13   Q    Do you believe it's wrong for two married employees in

14        the workplace to have consensual sex together over a

15        number of years?

16   A.   Yes.

17   Q    Have you ever been involved in any workplace where

18        you've observed an adulterous relationship between

19        co-employees going on?

20   A.   Nothing that I knew of, nothing that I know of for sure,

21        first -- nothing that I witnessed firsthand.

22   Q    Okay.  Have you ever been involved in a situation at the

23        workplace where you've observed a consensual sexual

24        relationship going on between persons who were both

25        unmarried?

```
 1   A.   I would have to make an assumption.  I don't know for
 2        sure.
 3   Q    Have you ever seen at the workplace the consequences of
 4        a romantic breakup to have a negative impact upon the
 5        office?
 6   A.   I'd have to say no.
 7   Q    The raw material from which you compiled your time line,
 8        does that contain any entries that you did not put in
 9        this five-page document?
10   A.   No.
11   Q    So this document has each and every entry you've made
12        over the course of the five or so years you've --
13   A.   Yes.
14   Q    -- you were making such notations?
15        MS. WALLET:  I'm sorry, I object to the form of the
16        question.  I know I'm a little late here.  But are you
17        asking her are there entries in this appointment book
18        that are not included in this time line?  Or entries in
19        the appointment book about this matter that are not in
20        the time line?
21        MR. DELLASEGA:  The second.
22        THE WITNESS:  Okay.  And the answer is no, there's
23        not any additional entries in my time line or in my date
24        books regarding this time line.  I think I answered that
25        right.
```

```
 1                There's entries in my notebook that might say go to
 2           dentist this date, you know, juvenile intake appointment
 3           this time.
 4   BY MR. DELLASEGA:
 5   Q     But anything that would be remotely relevant to this
 6           matter or to harassment at the office in general has
 7           been included in this five-page outline?
 8   A.    Correct.
 9   Q     Okay.  Have you ever heard the phrase Barb 1 and Barb 2?
10   A.    Yes.
11   Q     How did you hear that phrase?
12   A.    I'm going to -- I'm thinking it had to do with, like, a
13           conversation, like a friendly conversation with some of
14           our co-workers, I'm thinking maybe Bill or Darby again,
15           in reference to one of the Barbs.  Like Barb 1, Barb 2,
16           one of them means Gary's wife and one of them means Barb
17           Varner.
18   Q     Did you ever ask Barb Varner about that phrase?
19   A.    I don't think so.  I don't remember.
20   Q     Did you ever ask the folks you were talking with what
21           that phrase meant, beyond the identity of the two Barbs?
22   A.    Just that one referenced one.  I don't know which number
23           was which one or anything like that.
24   Q     Before the relationship between Mr. Graham and
25           Mrs. Varner turned openly hostile, did you ever hear any
```

1          discussion or debate or speculation, even on one single

2          occasion, within the office as to whether or not there

3          was anything sexual going on between those two?

4   A.     That was, like, three questions in one there.  No one

5          ever -- I never heard anybody say, oh, yes, you know,

6          something like, quote, oh, yes, Gary's sleeping with

7          Barb.  No one ever said that.  No one ever indicated

8          that that was an issue.

9               The kind of the joke through the office was that

10         Gary wanted a relationship.  I'm not sure if I answered

11         your question.

12  Q      Okay.  That was because he was overtly flirting with

13         Mrs. Varner?

14  A.     Correct.

15  Q      When that joke was discussed, was it ever discussed

16         whether Mrs. Varner had any interest in reciprocating or

17         what her response to all that flirting was?

18  A.     Say that again.

19  Q      When the fact that Gary appeared to want a relationship

20         with Mrs. Varner was being discussed, was Mrs. Varner's

21         response to that type of flirting ever discussed as to

22         whether she found it acceptable, repulsive?

23  A.     Okay.

24  Q      Whether she benefitted from it, whether she wanted it to

25         stop?  And that's four questions.

1    A.    Yeah.  I have one answer in my head and you move on.

2              Like, for the joking that went on, neither of those

3          two were present.  We didn't tease in front those two.

4          And what I experienced firsthand, Barb never made any

5          derogatory or hateful comments back and said like, you

6          know, quit teasing me or nothing.  She didn't know about

7          it through the rumor mill, or if she did, she never

8          confronted me about that.

9              There were oftentimes jokes, like, it was all

10         one-sided, it was all Gary wanting the relationship, and

11         no one ever seemed to be like, oh, yeah, Barb wants it,

12         too.

13             I'm not sure if I got all your questions.

14   Q    Would you describe Mrs. Varner as a favorite of Graham's

15         before the relationship turned sour?

16   A.    Yes, she was.

17   Q    And would you describe Graham as a man who plays

18         favorites?

19   A.    Yes.

20   Q    Did you perceive from Mrs. Varner's status as a favorite

21         of Graham's that she got any benefit in the terms and

22         conditions of her employment that were denied to you, a

23         person who had started at the same time?

24   A.    What's come to my mind is the promotion, but Gary wasn't

25         there then.  He -- it was after the time he was removed

```
 1           from our office.  But did I -- do I feel mistreated on

 2           behalf of -- I guess the answer is no.

 3   Q    You mentioned that Graham only took you on one trip?

 4   A.   There might have been more.  I can remember that one

 5           specifically.

 6   Q    And when you go on these commitment trips, do you have

 7           to be oriented to what your duties are during the

 8           commitment trip?

 9   A.   You'll know where you're going.  If it's not your

10           client, not your juvenile, you didn't necessarily need

11           to know all the details, but you would be told, okay, we

12           have a commitment trip, are you available, you know, I

13           need you to go with me to this point in time and here's

14           the date, here's who we're taking.

15   Q    Do you have to be oriented to the procedures of the

16           facility who's receiving the commitment?

17   A.   No.

18   Q    Is there any benefit in having somebody take you and

19           show you how to do that on multiple occasions as opposed

20           to just on a single occasion like you received?

21   A.   Just once would be sufficient.  If it's a facility

22           you're not familiar with, you would be more comfortable

23           going with someone else just because they would know

24           their procedure, as in do you go to the front door or

25           the back door, and you might know the contact person
```

Green

150

1        personally.

2    Q    So you didn't feel slighted that Graham only took you on

3        one and he took Mrs. Varner on quite a few?

4    A.    No.

5    Q    Is there any financial benefit to going on multiple

6        commitment trips as opposed to only one?

7    A.    You could get paid or you would have gotten paid comp

8        time or overtime because some of the trips were longer

9        than an eight-hour, seven-and-a-half-hour workday.

10    Q    What were the rules regarding comp time and overtime?

11    A.    Back then I guess it was anything over a seven-and-a-

12        half-hour workday could have been time and a half.

13    Q    Did the employee have the option of electing OT or comp

14        time?

15    A.    Yes.

16    Q    Okay.  So would you from your observations as to how

17        often you went on these commitment trips, as opposed to

18        how often Mrs. Varner went on them when she was Graham's

19        favorite, would you believe that in all likelihood

20        Mrs. Varner made a lot more money than you made because

21        of the overtime?

22    A.    She could have, yes.

23    Q    So that was a benefit to her being Graham's favorite?

24    A.    If money's important, it's a big benefit.

25    Q    Before the relationship turned sour did you ever see

```
 1              Graham yell at Mrs. Varner?

 2    A.    I can't recall anything.

 3    Q     Curse at Mrs. Varner?

 4    A.    Can't think of anything.

 5    Q     Say anything sexually demeaning to her?

 6    A.    Can't think of anything.

 7    Q     Give her arduous or burdensome assignments compared with

 8          the assignments that went to other POs?

 9    A.    No.

10    Q     In fact, before the relationship turned sour did you see

11          Graham treat her with respect?

12    A.    Yes.

13    Q     Treat her as a friend?

14    A.    I'm not sure if I'd use the word friend, but at least as

15          an equal or a co-worker.

16    Q     Treat her, in fact, better than he treated other people

17          who were new to the office as POs?

18    A.    Yeah, some could say that.

19    Q     Did you ever come to understand that Varner and Graham

20          had worked together on cases during the period of time

21          that she was at CYS?

22    A.    Yes.

23    Q     Okay.  What understanding did you acquire?

24    A.    Simply that some of the families that we had in our

25          system had also Children and Youth caseworkers, and on
```

 1          occasion I would get a case or she would have a case in

 2          and reference having that had case prior and perhaps

 3          working with other people in Adult and Juvenile

 4          Probation in regard to the family, not just Gary.

 5     Q    Did Varner ever tell you Graham had been of assistance

 6          to her on those cases that she -- where they, where

 7          Graham and Varner each had a professional interest in

 8          the same case?

 9     A.   Seems to me they maybe went out and did a home visit.

10          I'm drawing here.  I couldn't -- it probably would have

11          been a Newville area family.

12     Q    Did Ms. Varner ever tell you that she and Graham were

13          friends before she came to work?

14     A.   Just that they knew each other.  I don't think she

15          called him a friend.  Just they knew each other.

16     Q    When you two started, did she tell you to watch out for

17          Graham, look out for Graham in any respect?

18     A.   No.

19     Q    Or did she appear, in fact, to like Graham at that time?

20     A.   She was neutral towards him, I guess.  Neither she

21          didn't, like, suck up to him, and she didn't belittle

22          him or be rude about him.

23     Q    But articulated no complaints about him?

24     A.   Right.  Correct.

25     Q    Have you observed Graham yell at male probation

Green                                     153

1          officers?

2    A.    I want to say yes, but I can't say specifically here's

3          where it happened, how it happened and who it was.

4    Q     For example, have you heard him yell at Bill Brandt?

5    A.    My gut says yes, but don't ask me why.

6    Q     Darby Christlieb?

7    A.    Maybe not Darby.  He seemed to have a little more

8          respect for Darby than some co-workers.

9    Q     Well, let me ask this.  Have you heard him yell at

10         female probation officers other than Mrs. Varner?

11   A.    He's raised his voice with me.  At the time we were the

12         only -- for the longest time we were the only two female

13         probation officers in that office.

14   Q     Well, would you call him an equal opportunity yeller; he

15         would yell at men and women both?

16   A.    He would yell at anybody equal opportunity, yes.

17   Q     Okay.  Would he use bad language in front of both men

18         and women?

19   A.    Yes.

20   Q     I think you acknowledged earlier that he appeared to

21         have favorites.  Would the corollary be true, there

22         appeared to be people he didn't like?

23   A.    Yeah.  Yes.

24   Q     He had strong likes and dislikes?

25   A.    Yes.

1    Q    Would it be true that among his strong dislikes were

2         some male probation officers?

3    A.   Not among the strong dislike.  There was sort of a

4         competitive edge to him.  I think of Dirk Madison, I

5         think of Nick Barrelet.  I don't think he really cared

6         for Nick, but I don't think it was a strong dislike of

7         either of those.

8    Q    Did you ever hear him or observe or ever see him treat

9         male probation officers with disrespect?

10   A.   Yes.

11   Q    And that occurred on multiple occasions; is that

12        correct?

13   A.   Yes.

14   Q    Treat them in such a manner that you would have felt

15        they had a valid right to go complain about it, in fact,

16        correct?

17   A.   Yes, at least to the supervisor or the chief.

18   Q    So he could be rotten to both men and women in the

19        office, basically?

20             MS. WALLET:  I missed the operative word, he could

21        be what?

22             MR. DELLASEGA:  Rotten.

23             MS. WALLET:  Rotten?

24             MR. DELLASEGA:  Right.

25             MS. WALLET:  Thank you.

Green                                        155

```
 1              THE WITNESS:  I guess he could have been.  I

 2         mean --

 3    BY MR. DELLASEGA:

 4    Q    Did you ever hear Mr. Graham or Mr. Osenkarksi use the

 5         phrase peter meter?

 6    A.   I never heard that.

 7    Q    Use the phrase black bush to refer to a woman's genital

 8         area?

 9    A.   I never heard that.

10    Q    Use the phrase jeehoobees to refer to a woman's breasts?

11    A.   I never heard any of those things directly.

12    Q    Did you ever hear anything about female interns being

13         asked or instructed to dance on tabletops within the

14         Probation Department?

15    A.   A co-worker -- yes, I'm not sure -- word that question

16         again?  You said interns or?

17    Q    Female interns.

18    A.   Okay.  People I'm thinking of weren't interns.  I think

19         they were employees at the time.

20    Q    Who were they?

21    A.   It was Gail Shuhart and I believe Jill Rhoads.

22    Q    Were they new probation officers at the time?

23    A.   Yes.

24    Q    And what did you hear?

25    A.   That that's the form of entertainment, is dancing on the
```

1          tabletop, they were to be dancing at our staff meeting.

2   Q   Who did you hear that from?

3   A.   I believe it was from Joe, and it was made at a staff

4          meeting to anybody that was present.

5   Q   From Osenkarksi?

6   A.   Yes.

7   Q   Did you ever hear anything to the effect that any new

8          probation officer would be asked to dance on a tabletop

9          as a form of right of initiation?

10  A.   Yes.

11  Q   Men as well?

12  A.   Just the females.  Just those two that I just - those

13         two that I named.

14  Q   But you never heard it at all with regard to a man?

15  A.   No.

16  Q   You didn't appear to note that in your time line.

17  A.   Correct.

18  Q   Did you ever hear Mr. Graham tell Mrs. Varner that she

19         has no fucking sense?

20  A.   That's a phrase, I'm sure I've heard that phrase, yes.

21  Q   No fucking training?

22  A.   I don't remember that.

23  Q   No fucking ability?

24  A.   I don't remember that comment.

25  Q   Are you aware that when Mrs. Varner filed her Complaint

```
 1            with the EEOC, she alleged that she had also been

 2            discriminated against by virtue of her age?

 3    A.      I heard a statement to that nature, yes.

 4    Q       From your years working with Mrs. Varner, have you ever

 5            observed anything that would lead you to believe that

 6            she was discriminated against because she was over 40?

 7    A.      It was just -- what comes to my mind is a comment that I

 8            did not hear.  I'm trying to think how I did hear it or

 9            where I heard it.  It was a comment made by Gary, and I

10            can't remember the circumstances, where he would not

11            hire anybody of an older nature.

12    Q       Okay.  Any other comments?

13    A.      Regarding age?

14    Q       Right.

15    A.      No.

16    Q       Okay.  Now, you said you were recruited by Mr. Graham?

17    A.      Correct.

18    Q       Was it your understanding that Mrs. Varner was recruited

19            by Mr. Graham?

20    A.      Yes.

21    Q       Was it your understanding Mrs. Varner was over 40 when

22            she was recruited by Mr. Graham?

23    A.      I didn't know her age.  Nothing was mentioned about her

24            age at the time.

25    Q       Did she look over 40?
```

1    A.    After I met her?  Yes.

2    Q     You identified two women who were recruited into the

3          office.  Were you able to identify any men who he

4          recruited in?

5    A.    I'm going down the list of co-workers.  I can think of

6          Nick, I don't believe Graham recruited Nick.  Mike

7          Rhode, I don't think Graham recruited him.

8              I can't name any males or females other than us

9          that he recruited.

10   Q     Okay.  If we can look at your time line, page 1, 1997,

11         3/8/13?  Do you see that:  Top guys Reno?

12   A.    Yes.

13   Q     Were the top guys all men?

14   A.    Yes.

15   Q     Were the top guys all the most senior people in the

16         department?

17   A.    Correct.

18   Q     Was it your impression that the most senior people in

19         the office got the plum of going to Reno compared with

20         junior, less senior people?

21   A.    Yes.

22   Q     Did Fran and Kathy ever complain to you about

23         Osenkarksi's language?

24   A.    Not about his language.

25   Q     Did they ever complain to you about Osenkarksi in any

1    way that would relate to harassment, sexual harassment,

2    or improper conduct as an employer?

3    A.    Improper conduct as an employer, yes.

4    Q    Can you be specific?

5    A.    It may be on my time line here.  There was a date -- I

6          remember being in the front office and hearing the two

7          of them speak regarding things being taken out of our

8          supply closet.  Our supply closet is locked.

9    Q    Okay.  That is in your time line.  Can you think of

10         anything else?

11   A.    No.

12   Q    At page 2, directing your attention to the 8/27 entry,

13         it says:  Spoke with Dan Hartnett in Personnel.

14   A.    Okay.  Yes.

15   Q    What did you speak to him about?

16   A.    They were -- Personnel was doing interviews and called

17         us down.  I'm sure he would have questioned me or phoned

18         me and said you need to come down, regarding interviews

19         for this incident that we're here for today.

20   Q    When you spoke to Mr. Hartnett, did he appear

21         sympathetic to Mrs. Varner's situation?

22   A.    Maybe 51 percent.  He was fairly neutral.

23   Q    Did Mrs. Varner ever discuss with you the difference

24         between how the county viewed her complaints as opposed

25         to how the management within the court side of the

```
 1           courthouse viewed her complaints?

 2    A.     No.

 3    Q      Did she ever tell you that Hartnett felt she had been

 4           discriminated against and wanted to see that she was --

 5           her complaints were taken care of?

 6    A.     No.  She never said that.

 7    Q      Okay.  Did she ever complain to you about the county's

 8           investigation?

 9    A.     Just that of the nature I wish they would hurry up and

10           get the ball rolling kind of thing.

11              MS. WALLET:  Are you going to be much longer?  I

12           need five minutes.

13              MR. DELLASEGA:  Why don't we take the five now.

14              MS. WALLET:  Okay, thanks.

15              (Recess taken from 11:53 a.m. until 12:19 p.m.)

16    BY MR. DELLASEGA:

17    Q      Are you a better probation officer today than when you

18           were hired?

19    A.     Oh, I think so.

20    Q      Is there a learning curve?

21    A.     Yes.

22    Q      How would you describe that learning curve?  How long

23           does it take before you have your feet fully on the

24           ground and are a seasoned probation officer?

25    A.     I would say six months to get your feet wet, and
```

```
 1            probably a year till you've experienced a handful of

 2            different crimes and incidences as they occur.

 3      Q     And in the second year do you see any need for

 4            counseling and training?  Or are you pretty much right

 5            at full speed by the end of the first year?

 6      A.    I'm sure you would still have questions at the end

 7            of the first year, but you wouldn't need baby-sat during

 8            that year.

 9      Q     You would agree, at least, that during the first year in

10            somebody's employment as a probation officer, they would

11            require more attention and counseling and oversight from

12            their boss than in their third and fourth year?

13      A.    They'd probably do better to have oversight from a

14            co-worker as opposed to a boss during that first year,

15            simply because the bosses in general stay in the office

16            and the real leg work would be done more by your

17            co-workers.

18      Q     Okay.  But you would agree, at least that in terms of

19            being given guidance and instruction, the need for

20            guidance and instruction is substantially more that

21            first year than in the third and fourth years?

22      A.    Correct.

23      Q     If you would take a look at page 2 of your time line,

24            the very last entry, 4/23, it begins:  Denied my office

25            choice.  Who are the initials?
```

 1   A.    TB is Tom Boyer, MR is Mike Rose, TD is Tim DeAngelo,

 2         and NB is Nicholas Barrelet.

 3   Q     Okay.  And what does it mean:  Denied my office choice

 4         because Boyer insists that these two men get Nick

 5         Barrelet's office choice?

 6   A.    That was what I would consider a seniority issue, where

 7         I should have had my office choice because I am senior

 8         over MR, TD and NB.  My office choice was to have an

 9         office by myself, and I was denied that.  My office

10         choice was to kick my office partner, NB, out of my

11         office.  And he wanted, and he as next in seniority, he

12         should have been next in choice to have his office and

13         he was -- that was not done.

14   Q     So both you and Nick Barrelet had your seniority rights

15         infringed upon in the same incident?

16   A.    Yes.

17   Q     It wasn't a gender-based distinction, then, since the

18         man and the woman each received the same negative

19         consequence, right?

20   A.    It was my request to have Nick removed, and I was denied

21         that.  Because I was denied my office choice, it

22         resulted in Nick being denied his.  It was kind of a

23         domino effect.

24   Q     Okay.  Looking at the next page, the 4/28 entry, you

25         were threatened by Tom Boyer?

1   A.   Correct.

2   Q    As I understand, Nick Barrelet, a male, also received

3        the same threat; is that right?

4   A.   Correct.

5   Q    Now, on that page, 5/7, it says:  Nick was told by Tom

6        Boyer to count overtime night calls at two hours for

7        every one hour.  What does that mean?

8   A.   If you're to work in the evening after 4:30, that's

9        considered a night call.  Like, from 4:30 in the

10       afternoon or in the evening until the following morning

11       at eight o'clock, you could be eligible for an overtime,

12       slash, nighttime call.  And on this incident, in order

13       to use up overtime is what Nick had said, he was

14       instructed to put in his time sheet two hours for some

15       work that actually only took him one hour.

16  Q    Something which would be to his financial favor, right?

17  A.   Correct.

18  Q    Now, if we look at the next page, for 1999 there's an

19       October 4 entry?

20  A.   Yes.

21  Q    Is TAB the same as TB?

22  A.   Correct.

23  Q    Both Tom Boyer?

24  A.   Tom Boyer, yes.

25  Q    And what did Mr. Boyer tell you on 10/4?

1   A.   As it says there, I worked a half an hour on an evening

2         call, and I believe it was the following day after I had

3         worked he had told me to put on my time sheet two hours

4         of overtime.

5   Q   So he was instructing you to do something that would be

6         to your financial favor; is that correct?

7   A.   Right.

8   Q   So there did not appear to be a distinction between his

9         instructions to men and women with regard to these

10        financial favors he was doling out?

11  A.   If I could make note, I didn't take that, because I want

12        that known, because I figured that was unfair.  I got

13        paid simply for what I worked that night.

14  Q   But men and women I think were offered the same

15        financial favors?

16  A.   Yes.  Yes.

17  Q   Whether those favors were appropriate or not?

18  A.   Yes.  Yes.

19  Q   On the very last page, the second entry is 11/14.  Who

20        is KAZ?

21  A.   Kathy Zeigler.

22  Q   She mentioned the phrase the C word?

23  A.   Correct.

24  Q   What's the C word?

25  A.   Her phrase the C word is in reference to C meaning cunt,

1           C-U-N-T.

2    Q    Okay.  That was a woman who said that in talking to SEM.

3         Who is SEM?

4    A.   That's Sam Miller.

5    Q    Why did you put in that a woman used that word?

6    A.   Everyone in our office, or at least the people who are

7         hired prior to me, they all know that there was an

8         incident regarding Joe and other office people in

9         misusing that word in relationship to co-workers, I

10        believe.  It wasn't something I'm directly familiar

11        with.  And everybody knows you don't use that word, it's

12        disrespectful.  And it was kind of a joke, back-handed

13        comment in making that statement.

14   Q    Did Mrs. Varner know you had this time line?

15   A.   Not until the day of or day before when we met the last

16        time in court or in here.  Actually, at the courthouse.

17   Q    Before your first deposition did she know you were

18        keeping this time line?

19   A.   No.

20   Q    Did she ever tell you she kept a similar time line?

21   A.   Maybe I should back up.  She knew I kept notes in my

22        datebook at -- for whatever reason, whatever events

23        humored me.

24   Q    Did she ever tell you she did anything of a like nature?

25   A.   I believe she did.

```
 1   Q    In her datebook or what?  What do you recall?

 2   A.   I didn't see anything.  I would assume it was a datebook

 3        similar to mine.

 4   Q    Did Mrs. Varner ever discuss the CASA program with you?

 5   A.   Yes.

 6   Q    What do you recall of her discussions?

 7   A.   It was a new program for our county, and she was rather

 8        excited about being a part of it because it utilized her

 9        experience in Children and Youth plus her experience in

10        Probation.

11   Q    Did she ever tell you she was offered that position?

12   A.   Yes.

13   Q    And did she tell you she turned it down?

14   A.   I just know she didn't take it.  I'm not really sure how

15        she didn't take it or why.

16   Q    Are there circumstances in which a probation officer

17        can't realistically begin a commitment trip until after

18        8:00 a.m.?

19   A.   If you would have court that morning and, say, court was

20        over at dinnertime, then you would have to go once that

21        was done.

22   Q    Are there other times that could require you to be in

23        the office and leave later in the day than 8:00 a.m.?

24   A.   There are.  There was one occasion I left an hour later.

25        If an emergency happens.  But the understanding was
```

 1       you're supposed to plan ahead of time as best you can to

 2       leave at 8:00 in the morning.

 3   Q   And is that to reduce the amount of overtime?

 4   A.  Correct.

 5   Q   And consequently, save the taxpayers the costs of that

 6       overtime?

 7   A.  Right.

 8   Q   A rule that you view as reasonable?

 9   A.  Pardon?

10   Q   A rule that you view as reasonable, then?

11   A.  Yes.

12           MR. DELLASEGA:  That's fine.  That's all.

13   BY MS. WILLIAMS:

14   Q   Ms. Green, my name is Taylor Williams, and I represent

15       the Commonwealth of Pennsylvania, Ninth Judicial

16       District, Court of Common Pleas of Cumberland County.  I

17       would remind you that you're still under oath.

18           Do you recall a time after Mrs. Varner complained

19       about Gary Graham that she was put under the supervision

20       of Sam Miller?

21   A.  Yes.

22   Q   Did Ms. Varner ever complain to you about Mr. Miller's

23       supervision?

24   A.  Never.

25   Q   Your time line is fairly comprehensive, it would appear.

```
 1            Did you ever talk with Judge Sheely, then President

 2            Judge Sheely, about any of the events that you wrote in

 3            your time line?

 4    A.      No, I did not.

 5    Q       Did you ever talk with now President Judge Hoffer about

 6            any of the events that you detailed in your time line?

 7    A.      Nothing specific.  Seems to me he had called me up to

 8            his chambers, but nothing in specific.  Like, what

 9            happened on January 23rd, it wasn't detailed like that.

10    Q       When did he call you to his chambers?

11    A.      I couldn't say.  It would just be a random guess.

12            Several years ago.  I don't know.

13    Q       Was it shortly after he became president judge?

14    A.      Yes.  He was president judge.

15    Q       Do you remember that President Judge Sheely retired at

16            the end of '97?

17    A.      Okay.  I remember his retirement.

18    Q       Does that help you place the time that you spoke with

19            President Judge Hoffer?

20    A.      All I can say is I believe he was president judge at the

21            time, as opposed to another judge, a lower level judge.

22    Q       And do you recall whether he had just become president

23            judge?

24    A.      Shortly, yeah, he was fresh at the position.

25    Q       Okay.  You say he called you to his chambers?  Or did
```

 1          you take the initiative and go to him?

 2     A.   I believe he called me and asked me to come up to him.

 3     Q    And can you recollect for me that conversation that you

 4          had with Judge Hoffer?

 5     A.   It's very vague.  He was -- it was just basically I

 6          remember:  What's going on down in that office, you

 7          know.  It was on -- I remember the conversation as in

 8          like the place is nuts, you know, tell me about it.  I

 9          don't remember any specific questions.  It was just I

10          think he wanted to get a feeling for what was going on

11          and how out of control the complaints were.

12     Q    Do you remember specifically what you told him?

13     A.   No, I don't.

14     Q    Did you make a note on your calendar as to the date you

15          talked with President Judge Hoffer?

16     A.   No, I didn't.

17     Q    Why did you exclude that conversation?

18     A.   I would have to guess it happened before '97, that I

19          spoke with him.

20     Q    Before he was president judge?

21     A.   See, I'm not -- when was he president judge?

22     Q    He became president judge in January of 1997.

23          MR. DELLASEGA:  '97?

24          MS. WALLET:  It was '98.

25          MS. WILLIAMS:  I'm sorry, '98, yes.  Judge Sheely

```
 1          retired in '97.  I'm sorry.  Thank you.
 2               THE WITNESS:  I don't know why I did or did not put
 3          it down.  You know, I don't recall it here, and I don't
 4          remember any triggers to say when the conversation took
 5          place or what was said.
 6  BY MS. WILLIAMS:
 7  Q    Did nothing noteworthy occur at that time?
 8  A.   No reason.  I can't explain.  I don't know why.
 9  Q    But he gave you an opportunity to tell him about any of
10       the things that you felt were wrong in the department or
11       that you felt you could complain about?
12  A.   I believe I could have, yes.
13  Q    Do you recall if you did?
14  A.   I don't think so.  But again, like, the conversation, I
15       just remember being in his office.  I really don't
16       remember any specific phrases or comments.
17  Q    If you felt you had the opportunity, why did you not
18       talk about some of the things that you've mentioned in
19       your time line?
20  A.   I'll have to say that's because I didn't see any action
21       being done in regards to big issues.  Judge Hoffer does
22       not really avail himself or present himself as someone
23       who's approachable.  Even though we were one-on-one,
24       he's not someone you're going to want to just unburden
25       on and start complaining.
```

1   Q    But he specifically asked you about how things were

2        going, didn't he?

3   A.   I think it was all in regards to what's going on with

4        Gary, you know, not -- I don't think he wanted to know

5        about Joe taking stuff out of the, you know, supply

6        closet.  I think he just -- I got the impression or what

7        I'm feeling is he just wanted to know if Gary is as big

8        a problem as everybody says he is, that kind of feeling.

9   Q    What did you tell him about Gary?

10  A.   I have no idea.  Probably said he needed to be fired.  I

11       probably would have said that.  I just -- I don't know.

12       I don't remember.

13  Q    Was the meeting shortly before Gary was transferred to

14       the prison?

15  A.   I don't remember if it was before.  It could have even

16       been after.  I just don't remember when the date was or

17       anything.

18  Q    Is it fair to say you had the opportunity to talk with

19       Judge Hoffer about any of the things that you have on

20       your time line?

21  A.   Correct, yes.

22  Q    Are you aware that Gary Graham told Judge Sheely that he

23       had had an affair with Ms. Varner?

24  A.   I heard that through the rumor mill.

25  Q    Did you also hear that Gary had told his wife that he

```
 1              had had an affair with Barbara Varner?
 2    A.   I heard that happened about the same time that he made
 3              the statement to Sheely.
 4    Q    Do you have any opinion as to why Gary would tell the
 5              president judge and his wife that he had had an affair
 6              with Barbara Varner, if he had not?
 7    A.   Just to save his own face, to save his own -- to make
 8              him look good, like, to save his own style or character.
 9    Q    I don't understand how that saves his character.  Can
10              you explain your reasoning?
11    A.   As knowing him in the office and all, he made himself
12              known to be kind of a loud braggard type of guy.  And it
13              would have been a real notch on his male ego to have
14              insinuated or implied that he had an affair with Barb,
15              to have it not be true.  And I think in order to keep
16              the guys thinking, oh, Mr. Stud Man, Gary Graham had
17              this affair with Barb Varner, I think he had to make
18              that admission.
19                   If he told the truth and told the judge, no, I
20              didn't, the affair was all in my mind, then he's going
21              to look like the idiot, and he didn't want that to
22              happen, either.  So I believe he made it all up in his
23              own mind to make himself look more manly.
24    Q    Do you think that Judge Sheely was wrong to believe
25              Gary?
```

1    A.   Yes, I do.

2    Q    Why do you think Judge Sheely believed Gary?

3    A.   Probably because he knew of Gary or new Gary longer than

4         Barb.  And Gary makes it well known that he's a strong

5         Republican supporter, and that was part -- and that was

6         something that was very important to Sheely, as I was

7         told.

8    Q    Who told you that?

9    A.   Gary did.

10   Q    Do you believe that Judge Sheely acted out of political

11        motivation?

12   A.   Probably 50 percent political.  50 percent he just

13        doesn't want to think that somebody that works under him

14        would lie to such an extreme.  It's hard to believe that

15        someone would just fabricate such a story.

16   Q    Is it better in your mind to have a liar or an

17        adulterer?

18   A.   They're both wrong.  There's no better or worse.

19        They're both wrong, period.

20   Q    Well, if that's true, then let me ask you again how Gary

21        saved face by confessing to adultery?

22   A.   I'm stepping over into a man's world.  I would think in

23        a man's world it's better to be a stud of sorts than to

24        be known as a liar.  I'm going to say it just has to do

25        with, like, the male ego.  That's my perception, my

1          guess.

2    Q    That's a chauvinistic viewpoint, isn't it?  On your

3          part?

4    A.   Perhaps.  Perhaps.

5               MS. WILLIAMS:  That's all the questions I have.

6               MR. ADAMS:  I have questions but I don't know how

7          Debra --

8               MS. WALLET:  Go ahead.

9    BY MR. ADAMS:

10   Q    Most of these deal with the time line.  Hello again,

11        Ms. Green.

12   A.   Hello.

13   Q    Can you refer to your time line?  You know I represent

14        Mr. Osenkarski from the first time we met, right?

15   A.   Correct, yes.

16   Q    The first page, 1996 appointment book, July 26, you

17        indicated that Ken's retirement party, that's Ken Bolze?

18   A.   Correct.

19   Q    And Wilma Clippinger's home?  Who is Ms. Clippinger?

20   A.   She's a secretary who now works on the Adult side.

21   Q    Okay.

22   A.   Adult Probation.

23   Q    Did she ever work on the Juvenile Probation side?

24   A.   I don't know where she worked prior to my employment

25        there.  When I was hired the sides were combined, so she

```
 1            was considered I guess a generic secretary at that time.

 2    Q     How did it come about that the party for Mr. Bolze's

 3            retirement was held at her home?

 4    A.    I don't know.

 5    Q     Underneath there it says JLO, I guess Osenkarksi,

 6            comments no one will go against or they'll pay.  I've

 7            done it before, I'll do it again.

 8                Why did you insert that in your time line?

 9    A.    That was a comment Joe had made while sitting at the

10            kitchen table at that party.

11    Q     At this party, was food there?

12    A.    There was.

13    Q     Was there alcohol there?

14    A.    Yes.

15    Q     What kind of alcohol?

16    A.    There may have been beer.  I remember Joe himself

17            brought a gallon, I'm going to say a gallon jug of

18            something.  It may have been wine, I'm not sure.

19    Q     Were interns dancing on tables?

20    A.    No.

21    Q     Were new hires dancing on tables?

22    A.    No.

23    Q     Everyone was drinking alcohol at the party?

24    A.    I wouldn't say everybody was.  There are some of us,

25            some people don't drink much or don't drink, I don't
```

1        think.

2    Q    Do you recall what time the party started?

3    A.   I would guess maybe 6:00, 7:00, I'm not sure.

4    Q    How long did the party last?

5    A.   I'm going to say late.  I'm going to guess, 10:00,

6         11:00.  I know I was one of the last -- this comment

7         that's reference to was one of the last comments.  There

8         were probably six or eight people still left.

9    Q    Consuming alcoholic beverages started at six o'clock

10        when the party initiated?

11   A.   It could have.

12   Q    What time in this, during this period did Mr. Osenkarksi

13        make this comment?

14   A.   I would guess around 10:00, towards the closing of the

15        party, the winding down of the party.

16   Q    Was he joking when he said it?

17   A.   He said it with a joke, with a kind of a -- no, I

18        wouldn't call it a joking.  Kind of a sarcastic -- I'm

19        going to take that back, too.  He just -- it was just

20        kind of made.  There wasn't really any real undertones

21        to it.  He just kind of said it.

22   Q    Was he laughing when he made the statement?

23   A.   No.

24   Q    Who did he make the statement to?

25   A.   No one in particular.  I was there, Wilma was there, Joe

```
 1              was there, Roxanne Bumbaugh and her husband were

 2              present, and Doreen Peiffer.  I'm not sure if her

 3              husband was there or not.

 4     Q    Did he make the statement directly to you?

 5     A.   It was aimed, like, towards me.  Like, there was a

 6              conversation, we were around a table much smaller than

 7              this, and I remember him facing me as I was standing,

 8              and the statement was made in my direction as there was

 9              a conversation over here (indicating) being taking

10              place.

11     Q    Okay.  Did his comment come to fruition in any way?

12              MS. WALLET:  Are you saying fruition?

13              MR. ADAMS:  Fruition.

14              THE WITNESS:  I'm going to have to answer no, say

15              no.

16   BY MR. ADAMS:

17     Q    Okay.  Go down to line 1997 appointment book, March

18              20th, you have a notation.  Again JLO, states in back

19              hallway, I don't have to be here, I've been here for 35

20              f-ing years, it's your turn.  And you have here said to

21              various guys in Miller-Drachbar office.  I believe

22              included SGG, for Mr. Graham.

23              Why did you insert this in your time line?

24     A.   I thought it was inappropriate, I guess, for him to be

25              at the back hallway using language like that.  And I
```

```
 1            think he was, I'm guessing that he was feeling the heat
 2            in regards to some of the complaints that were going on
 3            in relationship to this.
 4    Q      Why do you think it was associated -- you mean this
 5            litigation?
 6    A.     Indirectly, yes.
 7    Q      Why do you think his comments were associated with this
 8            litigation?
 9    A.     I believe the pressure was on him for being in the
10            office and being available and being more available from
11            the time of 8:00 to 4:30, between these times.
12    Q      And that's your opinion?
13    A.     That's my opinion.
14    Q      Do you have any evidence at all that substantiates your
15            opinion with regards to this statement?
16    A.     None.
17    Q      And this was said behind closed doors?  Is that correct?
18    A.     It was open.
19    Q      But it was in Mr. Miller's or Mr. Drachbar's office?
20    A.     He was standing in the hallway, and there are three
21            office doors, four office doors all within three feet,
22            four feet of each other, and he was standing in the
23            middle of those office doors facing Sam Miller and Denny
24            Drachbar's office.
25    Q      Okay.  But you have no evidence to show that his comment
```

1       had anything to do with this litigation at all, do you?

2    A.    Correct.

3    Q    The next page --

4         MS. WILLIAMS:  Could we go off the record?

5         (Recess taken from 12:45 until 1:03 p.m.)

6         MR. ADAMS:  We'll go back on the record.

7    BY MR. ADAMS:

8    Q    Ms. Green, if you could turn to your time line, page

9         3, the insert for July 29th.  You indicated there that

10        JLO invited SM and DD.  Who is SM and DD?  I'm assuming

11        Sam Miller might be SM; is that correct?

12   A.    Correct.

13   Q    Who is DD?

14   A.    Dennis Drachbar.

15   Q    To lunch with the BARJ lady?

16   A.    Balance and restorative justice.

17   Q    And it's Susan Blackburn?

18   A.    Correct.

19   Q    What does Susan Blackburn do?  Can you describe that job

20        for us, please, or for me?

21   A.    Well, the BARJ, that's a new approach to juvenile

22        probation.  Like, you're supposed to balance the

23        community and the needs of the child.  It's a kind of a

24        new logo, a new face, a new outlook for juvenile

25        probation.  That's her position, is to enforce and train

1        people in our counties to do those things.

2    Q    Who trained her to do that?

3    A.   Who trained who, Susan?

4    Q    Susan Blackburn, yeah.

5    A.   I don't know who trained her.  She's not a county

6        employee or anything.  She's a State employee.

7    Q    Okay.  And you continue and then it says and not me,

8        knowing I am to be part of BARJ with next grant money

9        and my promised promotion.

10       What is that all about?

11   A.   I was under the impression that some new grant money,

12       grant money had been applied for, and once the grant

13       money came in, I was going to be promoted.  And when I

14       knew that they went to lunch, it gave me doubts.  I'm

15       thinking, oh, no, they're not going to promote me, I'm

16       going to get passed by on this promotion and I might not

17       be, you know, participating in BARJ, so to speak, in our

18       office.

19   Q    Don't be offended by this, but were you paranoid about

20       this?

21   A.   No.

22   Q    Okay.  Did someone else get this promotion that you

23       thought you might?

24   A.   No.  I ended up getting the raise and all, too.

25   Q    But you felt compelled to put this in your time line,

```
 1          your concerns?

 2    A.    I thought -- I wish I would have been included in the

 3          luncheon.  At the time I wish I would have.  In

 4          hindsight, it's really irrelevant, but at the time I

 5          thought, oh, no, you know, how come I'm not going to be

 6          part of this.  I wanted to meet Susan Blackburn and get

 7          up on, you know --

 8    Q.    So you felt left out?

 9    A.    Yes, you could say it that way.  Yeah.

10    Q.    Going down further, miscellaneous notes, September 3rd,

11          1997, it says conversation with BB.  BB would be?

12    A.    Bill Brandt, or William Brandt.

13    Q.    Says JLO bought himself a 45 gun with county funds and

14          keeps gun at his home.  What is that about?

15    A.    Exactly what you read there is what Bill Brandt told me.

16    Q.    Bill Brandt told you that?

17    A.    Correct.

18    Q.    Do you have any information yourself as to

19          Mr. Osenkarksi purchasing a 45, I guess calibre gun with

20          county funds?

21    A.    I know guns were purchased for county use and at that

22          time period some of our employees were getting trained,

23          so I know guns were bought.  I have no idea where they

24          went, who owns them, where they're located.

25    Q.    So Mr. Osenkarski within the framework of the office
```

```
 1              could have purchased this gun for county usage; is that

 2              correct?

 3      A.      The insinuation that Bill led me to believe was he

 4              bought a gun with county money to be used for county

 5              purposes, but he was keeping it -- he was not using it

 6              for that, he was keeping it at home and using it for

 7              personal use instead.

 8      Q       Okay.  And you have no information at all that indicates

 9              that he was using it for personal use, do you?

10      A.      Correct.

11      Q       The next page, 2000 appointment book, January 20:  Heard

12              pieces of JLO telling story of Family Ford and Hitler

13              having right idea.  Beverly, ladyfriend, was present.

14                  What's that about?

15      A.      That was just a part of a weird conversation that I

16              overheard.  Joe was leaving the office or heading

17              towards our office doors, and his, as I said there,

18              ladyfriend, his companion was with him.  And I heard the

19              statement as it's written there, pretty much like story

20              of a comment about Family Ford and Hitler having the

21              right idea.

22      Q       But you have no idea what the conversation was about,

23              did you?

24      A.      Correct.

25      Q       The next insert, January 27th:  JLO started comment
```

```
 1              with, in quotation marks, I maybe shouldn't say this for
 2              sexual harassment, close quotation marks, then comments
 3              that peppers from his garden, canned, left residue on
 4              his hand that burned his girlfriend, and you mention
 5              Cindy, question mark, when in bed.  Not burning her
 6              breasts but a more tender spot.
 7                   What is that about?
 8    A.   He was standing in front of Kathy Zeigler and Fran
 9         Rose's desk out in the main office area.
10              MS. WALLET:  Excuse me.  Who is he?
11              THE WITNESS:  Joe Osenkarksi.  And I came out for
12         whatever reason, checked my mailbox or make copies or
13         something.  And I came into this comment where he says,
14         you know, maybe I shouldn't make this comment for sexual
15         harassment, then he proceeds to tell a story about
16         peppers, you know, green peppers, red peppers, I'm
17         assuming from his garden, I know he gardens.  That he
18         was canning these peppers and that it left residue on
19         his finger, and he was saying about in a romantic moment
20         with this ladyfriend the residue will burn your skin,
21         and apparently it burned her skin.
22    BY MR. ADAMS:
23    Q    You said he was talking to who at the time?
24    A.   The front office.  If I'm remembering everybody, I think
25         all four of the secretaries were present.  The
```

Green
184

```
 1           conversation, the comment was more geared towards Kathy

 2           and Fran.

 3    Q      Okay.  It wasn't directed to you, was it?

 4    A.     Not specifically.

 5    Q      And he wasn't talking to you, was he?

 6    A.     He wasn't really talking to anybody in particular.  It

 7           was kind of there's two people, a person here, a person

 8           here, a person here, a person here (indicating), and I

 9           walked out.  He's in the middle of them and he's

10           talking.

11    Q      When you walked out and Mr. Osenkarski was talking, you

12           weren't privy to the conversation, were you?

13    A.     It was speaking like you and me here.  Anybody who

14           walked in the room would have heard it, walked in the

15           open area.

16    Q      Okay.  You walked, correct me if I'm wrong, you walked

17           into an open area while Mr. Osenkarski was having a

18           conversation with persons in the office and you

19           overheard the comment; is that correct?

20    A.     Yes.

21    Q      Okay.  So he wasn't directly talking to you when you

22           walked in on the conversation, was he?

23    A.     I'll say no to that.

24    Q      Ms. Varner wasn't around for this conversation as well,

25           was she?
```

1    A.    No, she wasn't.

2    Q     Okay.  The next insert, February 1st, KAZ, that's Kathy

3          Zeigler?

4    A.    Correct.

5    Q     And FR, what's Fran's last name?

6    A.    Rose.

7    Q     Fran Rose?  Comment about ordering seven of something

8          for the supply closet.  KAZ claims to using one and

9          blames six missing others on the other person who has a

10         closet key, JLO, for taking six.

11               What's that about?

12   A.    The two of those, Kathy Zeigler and Fran Rose, were

13         talking.  Kathy commented to Fran, saying how there were

14         items missing out of the supply closet, and the supply

15         closet has a key.  I'm not sure who all has a key.  I

16         know the girls have one, Fran and Kathy have one where I

17         guess they share, so they can get supplies.  If we need

18         supplies, we go to them.  We can't just walk in and out.

19   Q     Okay.

20   A.    And she was complaining how she had just ordered some

21         things and she knew there was seven of them, and six

22         were missing but she knows that she only gave one away,

23         and Fran said she hadn't given any away.  And they're

24         both kind of joking back and forth, like, well, we know

25         who took the other six, the only other person who has a

```
 1            key, you know.  And insinuating that it was Joe who took

 2            six of these items.

 3   Q        Did they say it was Joe, or did they insinuate?

 4   A.       Insinuated.

 5   Q        But they didn't say it was Joe?

 6   A.       Correct.

 7   Q        And you don't know what those six items were, do you?

 8   A.       No, I don't.

 9   Q        You don't know if they were pencils, do you?

10   A.       Correct.

11   Q        You don't even know if they were yellow Post-Its, do

12            you?

13   A.       Correct.

14   Q        And Ms. Varner wasn't around for this conversation as

15            well?

16   A.       Correct.

17   Q        And you have no information at all as to what these six

18            items are that were stolen or missing?

19   A.       Right.

20   Q        And they weren't talking to you, these two persons,

21            Kathy Zeigler and Fran Rose?

22   A.       No.  It was back and forth to each other.

23   Q        So again, this was a situation where a conversation is

24            taking place and you sort of walk in in the middle of a

25            conversation?
```

1   A.   Correct.

2   Q    The next insert, March 2nd, it says:  Given evaluation

3        by Hank, dated -- I guess that's Hank Thielemann?

4   A.   Hank Thielemann.  Henry Thielemann.

5   Q    Okay, dated January 20th, 2000.  JLO never signed it

6        until after I did, and then backdated it.

7             What's that about?

8   A.   I was given an evaluation by Hank, who was my immediate

9        supervisor.  And he had all the blanks filled in, like

10       the checkmarks filled in, and he asked me to sign it.

11            I thought it was rather backwards.  I figured my

12       evaluation should have come with my boss's, my chief's

13       approval.  I just thought that was interesting, that Joe

14       didn't agree with it until after I agreed with it.

15  Q    Okay.  Who is responsible for evaluating you at this

16       time?

17  A.   I guess Hank.  I'm not -- I'm not a hundred percent on

18       that.  It's both people sign it.  There's always more

19       than one signature on our reviews.

20  Q    Okay.  So by the time you see a review, it typically has

21       two signatures on it?

22  A.   Usually.

23  Q    Okay.  And one of them would be an immediate supervisor;

24       is that correct?

25  A.   Yes.

1    Q    And the other signature would be?

2    A.    The chief's.

3    Q    The chief, okay.  And every time when you reviewed your

4         evaluation with your employon, they've always had two

5         signatures before your presentation?

6    A.    There was probably two or three years, perhaps, even

7         three, where I didn't get an evaluation.  It was just

8         kind of a moot point.  But the first one or two that Ken

9         Bolze had done, they were given with that approval

10        already stamped.  They approved it before I approved it,

11        or agreed with it or disagreed.

12   Q    Is it possible that Mr. Osenkarski simply didn't get a

13        chance to review your evaluation and, therefore, his

14        signature came after yours because of his potential

15        busy-ness?  It's possible?

16   A.    That's possible.

17   Q    And the fact that he signed it after you did, it wasn't

18        negative or detrimental to you in any way, was it?

19   A.    No.  And it was backdated.

20   Q    Okay.  The March 28th insert, I know it's been already

21        explained by you, but again, that it talks about JLO in

22        back hallway, Gary threatening to get even with

23        everybody.  And you said that Mr. Osenkarski was a

24        little sarcastic were the comments.  Do you remember

25        that?

1   A.   Um-hum.

2   Q    That was a situation where Mr. Osenkarski was speaking

3        to Tim and Denny?

4   A.   He was speaking I think to anybody who listened, and he

5        knew the guys were in that area.

6   Q    Okay.  So Tim and Denny -- what's Tim's last name?

7   A.   Tim is Tim DeAngelo, and Denny Drachbar.

8   Q    Okay.  And that's Dennis, right?

9   A.   Yes.

10  Q    So Mr. Osenkarksi was talking in your remembrance to Tim

11       and Denny and not you at this time; is that correct?

12  A.   As I remember, I made an appearance, I came around the

13       corner.  My office at the time had two doorways, and he

14       was standing at the back door one, and I remember coming

15       out to either check the board or check my mailbox and

16       standing in the hallway as he finished up that comment.

17  Q    Could this be another scenario of Mr. Osenkarski's

18       having a conversation with persons in the office and you

19       happened to walk or walk into the conversation or hear a

20       part of the conversation again?

21  A.   The comments aren't directly to me but they are made in

22       an office perhaps this size, and it's open to anybody

23       who walks in, me or anybody else.

24  Q    Okay.  The next insert April 4, SS -- SGG phone message

25       on -- that's the same thing.  Strike that.

```
 1              4/6, April 6:  JLO at corner of office talking to

 2        HT.  That's Hank Thielemann?

 3   A.   Correct.

 4   Q    And SGG's mother, that SGG's mother sold some stock

 5        shortly before she died.  SGG is suing sister Laura,

 6        which is in parenthesis, for mismanagement of the

 7        mother's money.

 8              What's that about?

 9   A.   That was a statement that Joe made, again, to anybody

10        who was in the office.  I'm not sure who in particular

11        it was made to other than perhaps Hank.  I remember Hank

12        being the closest person physically.

13   Q    Why would this be something you put in your time line?

14   A.   For the same reason.  I thought it wasn't something for

15        him to be talking about it in front of everybody in the

16        office, it was inappropriate, and I thought it was kind

17        of weird so I made a note of it.

18   Q    If some of these things you're hearing are considered

19        inappropriate, I'm not trying to be abusive to you, I'm

20        going to ask you this, why do you stand there and

21        listen?

22   A.   You don't have a choice.  If you need to use the copy

23        machine and that's where the conversation's taking

24        place, that's the only one copy machine.  Same for the

25        fax machine.  The secretaries, if I'm taking work out to
```

```
 1            be typed, I have to hear this.  I mean, it's not behind

 2            closed doors where I'm eavesdropping or going into

 3            private offices.

 4    Q     If there's a conversation is taking place that you think

 5            is inappropriate or offensive, can't you just leave the

 6            room and go somewhere else in the courthouse?

 7    A.    I can, but I already heard it.  You know, to know it's

 8            offensive it's kind of too late.

 9    Q     May 4th at the very bottom of the page, it says per JLO.

10            I guess you received this information through

11            Mr. Osenkarski; is that correct?

12    A.    Yes.

13    Q     SGG phoned JLO in morning.  Threatened Darby for going

14            upstairs, beat the shit of him, sandwich, et cetera,

15            thrown at SGG's door at prison.  Ruined his career.

16            Darby is coward and teaming up with them.  Boyer

17            pretended not to know him, and in parenthesis, SGG,

18            close parenthesis, and something about him lying.  Joe

19            claims he hung up on him, SGG.

20                  There's a lot there; would you agree?

21    A.    Yes.

22    Q     Let's take it a little bit by bit.  Threatened Darby for

23            going upstairs, beat the shit out of him, what does that

24            mean?

25    A.    This might get a better date on the time whenever Judge
```

```
 1          Hoffer interviewed us.  I'm guessing it's in reference

 2          to that, where Darby may have been called up to talk to

 3          Judge Hoffer.

 4     Q    Okay.  How did you receive this information?

 5     A.   Directly from Joe.  I think I came out of my office the

 6          same time he was coming out of his, we were two feet

 7          apart, and he just started saying, like, you know, I got

 8          this phone call from Gary and he's threatening this and

 9          that.  And it all came directly from Joe.

10     Q    Are you saying here today that Mr. Osenkarski said this

11          directly to you?

12     A.   Correct.

13     Q    Sandwich, et cetera, thrown at SGG's door at prison,

14          what is that about?

15     A.   Gary has an office down at the prison.  I understood

16          that somebody at the prison threw food at his door at

17          the prison.

18     Q    Do you know who did it?

19     A.   No, I have no idea.

20     Q    And where did you get that information?

21     A.   From Joe.

22     Q    Again, this is the same conversation that you described

23          Mr. Osenkarski comes out of his office and you're there

24          so he talks to you?

25     A.   Correct.
```

Green                                    193

1   Q   Ruined his career, same scenario?

2   A.  Yes.

3   Q   Darby is coward and teaming up with them.  What does

4       that mean?

5   A.  Joe made a reference coming from Gary, I guess, that

6       Gary was insinuating Darby is a coward and teaming up

7       with them.  Them is anybody that Gary I guess perceived

8       out to get him.

9   Q   Why do you -- you concluded that; is that correct?

10  A.  Correct.

11  Q   Why did you conclude that?

12  A.  I can't figure out why else there would be any kind of a

13      statement made about Darby being a coward.

14  Q   Would you agree that there -- and in the Juvenile

15      Probation Department there are persons who are favorable

16      to Ms. Varner and then there are persons who are

17      favorable to Mr. Graham?

18  A.  I would say that besides myself I would say there's no

19      one that's favorable necessarily to one or the other.

20      People are trying to remain neutral regarding personal

21      issues.  I think the atmosphere in the office is just to

22      tell the truth and have the right thing be done by other

23      people.

24  Q   What do you think Mr. Christlieb's opinion is of Gary

25      Graham?

Green
194

```
 1   A.   Outside the office?  I would guess he probably tolerates
 2        him and finds him acceptable.  As a supervisor, I'm
 3        confident that Darby does not think highly of Gary.
 4   Q    What's Bill Brandt's opinion of Mr. Graham?
 5   A.   I would suspect the same.
 6   Q    What's Mr. Christlieb's opinion of Ms. Varner?
 7   A.   I would say favorable, that there's no problem.  There's
 8        no bitterness or hardship between the two.  I would say
 9        it's mutually respectable.
10   Q    And Mr. Brandt's opinion of Ms. Varner?
11   A.   He's a little put out.  I think one-on-one he likes her
12        and has respect for what she does and is okay as a
13        co-worker, but I think he's a little, oh, jealous isn't
14        the word.  He remains perhaps a little aloof because of
15        the seniority issue.  That's a personal -- he takes that
16        as a personal affront to him, I believe.
17   Q    The next page, 2002 appointment book, there's an insert
18        from June 19th:  Covering BEV.  That would be Barbara
19        Varner?
20   A.   Correct.
21   Q    What were you covering Barbara Varner for?
22   A.   Such as yesterday when she was here and not able to be
23        in the office, I would cover her cases.
24   Q    Okay.  So if someone called and needed some information
25        about a case, you would just take the call?
```

Green
195

1   A.   I would fill in, correct.

2   Q    And it would also include showing up for court if need

3        be?

4   A.   It's rare, but could be, if there's an emergency.

5   Q    Okay?  Would that also include taking commitment trips?

6        If she was assigned for a commitment trip and had a

7        conflict, would you cover her?

8   A.   I could, yeah.

9   Q    How often has that happened?

10  A.   I don't think it's ever happened.  I don't remember it

11       ever happening.

12  Q    Okay.  By chance, when taking vacation time, if

13       Ms. Varner wanted to take a vacation day or some time

14       off for vacation, have you ever voluntarily covered for

15       her?

16  A.   If she asks and I'm not on vacation, too, that's no

17       problem.

18  Q    Do you recall doing that before?

19  A.   Oh, yes.

20  Q    Do you recall doing it frequently?

21  A.   Pretty much any time.  A lot of people team up and have

22       their closer relationships with co-worker relationships,

23       and I frequently would cover her, she would cover mine.

24  Q    Okay.

25  A.   Like Bill and Darby would cover each other.  Different

 1          teams pair up.

 2    Q     So you and Ms. Varner are teams with regards to persons

 3          covering each other for vacation time or assignment

 4          issues?

 5    A.    Correct.

 6    Q     Has there ever been a time when Ms. Varner needed a

 7          vacation day or time and you were not available?

 8    A.    Oh, I'm sure there were.

 9    Q     Did she find a suitable replacement if you were not

10          available?

11    A.    Well, yeah.  You can just ask any co-worker.  I mean,

12          just find, hey, are you going to be here, you know,

13          November 23rd, I need off this day, and just go around

14          and ask someone if they would be available.

15    Q     So it's not hard to find a replacement if you want to

16          go -- if you, including Ms. Varner, want to take off for

17          vacation, take off a day for vacation or some time off,

18          you can just find someone suitable in the office to

19          cover you?

20    A.    Correct.  That's pretty easy to do.

21    Q     Okay, thank you.  Going back to 6/,19 the insert:

22          Someone took magazine off her desk, in parenthesis, that

23          I gave her, close parenthesis, and threw it in the trash

24          can.

25                What kind of magazine was that?

```
 1   A.   Oh, probably, like, Martha Stewart or some kind of
 2        parenting magazine or something.
 3   Q    Okay.  And you subscribed to Martha Stewart?
 4   A.   I don't.  I don't get any magazine subscriptions and I
 5        haven't for -- it could have even been a Cooking
 6        magazine, come to think of it.  I did subscribe to
 7        Cooking.  But if I would get something from church or my
 8        mother would give me a magazine I thought there was
 9        something neat, I'd pass it along.
10   Q    Have you ever -- did you and Ms. Varner exchange
11        magazines?  If she had a magazine that she thought was
12        of some interest, she may share it with you; is that
13        possible?
14   A.   I'm going to say no.  I think I've given her a magazine
15        once or twice in the past seven years.
16   Q    Have you ever seen Ms. Varner with a magazine?
17   A.   Other than what I gave her, no.
18   Q    Okay.
19   A.   She reads books.  We --
20   Q    The next entry says:  Only evidence of something being
21        there was envelope of coupons from Harold.
22             Why did you even include this in your time line?
23   A.   Well, I thought it was odd that somebody was at her --
24        it's not odd that somebody would be at her desk.  If a
25        secretary or co-worker needed a case or information
```

Green                                    198

1        regarding one of her cases, it's easy access, you just

2        go in and, you know, look in their file cabinets.  It

3        just struck me odd that I laid this magazine on her desk

4        and come back later and the magazine's in the trash can,

5        when obviously she wasn't in, because I was covering her

6        cases.

7            The reference to the coupons, that is, Harold is a

8        special person that Joe helps take care of.  He's lower

9        IQ level, and he comes in and he cuts coupons, meaning

10       coupons, like, for restaurants and whatnot.  And he cuts

11       coupons and he'll put them in our mailboxes, or

12       sometimes he'll lay them on our desks.

13   Q   What's Harold's last name?

14   A.  Harold -- it will come to me tomorrow.  I can't tell you

15       right now.

16   Q   Okay.  Down the page, 2003 appointment book -- this is

17       the last one, by the way -- February 4th:  Turned in

18       firearm this date to JLO who locked it in wooden

19       cabinet.  I did not sign any form stating turnover of

20       weapon.

21           What's that about?

22   A.  At one point I was certified and qualified to carry our

23       office firearms, and I didn't re-qualify and, therefore,

24       I wasn't certified by the State any longer to carry.

25       And I just documented this is the date that I turned it

```
 1          over to make sure that -- I would have liked to have

 2          signed something.  I mean, Joe knows I gave it to him.

 3          I just wanted to make sure that, hey, I don't want

 4          somebody coming back a year from now, I owe for this

 5          firearm.

 6     Q    Okay.

 7     A.   So it was a documentation for me as to here's the date

 8          that I turned it in.

 9     Q    Well, no one's come back to you and indicated there was

10          an issue with this firearm, have they?

11     A.   No, they haven't.

12     Q    Do you anticipate that happening?

13     A.   No.

14     Q    A few more questions.

15              Have you ever flirted?  Have you ever flirted?

16     A.   I'm sure I have.

17     Q    What do you do when you flirt with someone?

18     A.   Probably, like, you try to say cute, like, intelligent

19          things.  You compliment them on anything from how they

20          dress to their taste in music or whatnot.  Physically it

21          may involve, like, a closer stance, you may get a little

22          closer to someone.

23     Q    Okay.  You're currently married; is that correct?

24     A.   Divorced.

25     Q    You're divorced, okay.  Are you dating now?
```

Green

200

```
 1   A.   No.

 2   Q    Okay.  Have you dated anyone since your divorce?

 3   A.   There was one guy that was kind of a joke.

 4   Q    Why was he a joke?

 5   A.   It was a joke because I thought he was a nice Christian

 6        guy, and he wasn't.

 7   Q    What made him not a nice Christian guy?

 8   A.   How detailed do you want?

 9   Q    As much detail as you'd like to give comfortably.

10   A.   Dating in my mind should be two people going out to a

11        restaurant, seeing a movie, a concert, whatnot.  Dating

12        does not mean coming back to my place or his place and

13        trying to get it on sexually.  And that fell through

14        once I realized that was what the gentleman had in his

15        mind.

16   Q    Okay.  How long did you date this gentleman?

17   A.   Oh, two, three months.  Two months, probably.

18   Q    Did you see him every week during that time period?

19   A.   I would see him probably I would average once a week,

20        maybe, like, once a week.  Like, on weekends maybe

21        Saturday and Sunday.

22   Q    Did you kiss this gentleman?

23   A.   Yes, unfortunately.  One of those bad -- I'm like ew,

24        yuk.

25   Q    Did you hold hands with this gentleman?
```

Green
201

```
 1   A.   Oh, I -- you know, I'm sure we did that.

 2   Q    Did you hug this gentleman?

 3   A.   Probably.

 4   Q    Before your divorce -- how long were you married?

 5   A.   Roughly 11 years.

 6   Q    Okay.  When did the divorce, when did the relationship

 7        expire, the divorce take place officially?

 8   A.   I'm going to guess '97.

 9   Q    Okay.  Let me take you back real quick, and I don't want

10        to exhaust this, but were you very affectionate with

11        your husband?

12   A.   He was my husband.

13   Q    So did you hold hands with your husband?

14   A.   Yes.

15   Q    Did you kiss your husband?

16   A.   Yes.

17   Q    Did you hug your husband?

18   A.   Yes.

19   Q    Did you make love to your husband?

20   A.   Yes.

21   Q    Did you ever flirt with your husband?

22   A.   Yes.

23   Q    Did he flirt with you?

24   A.   Yes.

25   Q    Did you pinch him on the butt?
```

Green

202

1   A.   No.

2   Q    Did he ever pinch you on the butt?

3   A.   No.

4   Q    Did you ever pat him on the butt?

5   A.   I don't think so.

6   Q    Did he ever pat you on the butt?

7   A.   Not that I recall.

8   Q    In your whole lifetime of dating, including your

9        husband, have you ever patted anyone on the butt in a

10       flirtatious sort of manner?

11  A.   No.

12  Q    Has anyone ever patted you on the butt?  Buttocks?

13  A.   No.

14  Q    Would you agree that patting on the buttocks is a form

15       of flirtation?

16  A.   Yes.

17  Q    Okay.  If you're walking down the hallway with a male

18       colleague and someone suddenly pats you on the buttocks,

19       what would you do?

20  A.   I'd probably make a joke out of it, but like, hey, what

21       was that all about, you know, and just, like, that

22       wasn't right, and kind of walk it away.

23            I can't see -- that's my personality.  I can't see

24       myself being real confrontational.  I would probably

25       kind of be, hey, knock it off, you know, what's the

Green                                    203

```
 1        point of that, that's my butt, you know, go pat somebody
 2        else's.
 3   Q    You agree that you would be compelled to say something
 4        to that individual?
 5   A.   I believe I would, especially now.
 6   Q    To explain your displeasure?
 7   A.   Correct.
 8             MR. ADAMS:  No further questions.  Thank you.
 9   BY MS. WALLET:
10   Q    Ms. Green, my name is Debra Wallet.  I'm here
11        representing Barbara Varner in this matter.
12             Let's begin with the time that you were called to
13        Judge Hoffer's chambers.  You told us that you don't
14        have a lot of recollection of what you said to the judge
15        or what he said to you at that time.  Is that correct?
16   A.   Correct.
17   Q    I'd like to show you what has been previously marked as
18        Hoffer Deposition No. 1, subsection C.  Would you just
19        take a minute and take a look at that?
20   A.   I'm having troubles with the handwriting.  I'm not sure
21        what I'm reading.
22   Q    Okay.  I'm going to have to take it back.  It's the only
23        one I have.
24             Ms. Green, these were the notes that were provided
25        to us by Judge Hoffer of his meeting with you, and
```

```
 1          according to Judge Hoffer's notes, you said that Gary

 2          Graham had said that I'll get everyone back.

 3               Do you believe that you may have told Judge Hoffer

 4          that at the time that you met with him?

 5   A.     I probably did.

 6   Q      Had you heard information that led you to believe that

 7          Gary Graham would get people back if they sided with

 8          Ms. Varner?

 9   A.     Yes.

10   Q      Now, your notes reflect at least one time where this

11          information came to you from Mr. Osenkarski.  Is that

12          correct?

13   A.     Correct.

14   Q      Were there other times that you heard things either --

15          well, let's break it into two parts.

16               Did you hear anything from Mr. Graham himself that

17          would lead you to believe that there may be retaliation

18          or retribution if he perceived someone had spoken

19          against him?

20   A.     Nothing directly from Gary.

21   Q      Had you heard things, other than what you've related to

22          us, from Mr. Osenkarski that would suggest that

23          Mr. Graham was vindictive?

24   A.     Yes.

25   Q      Would you tell us what those things are?
```

Green                                  205

 1  A.    Bill Brandt reported an incident that happened in the

 2        courthouse hallway.  I'm not sure how long ago it was.

 3        It was after he was removed and placed in Adult

 4        Probation.  And Bill had said that he, like, slammed,

 5        Gary slammed his fist down on the railing or along the

 6        wall.  And Bill took that as a kind of a bullying move,

 7        and he told me about that.

 8              Bill made a comment to me about being in the

 9        parking lot down at Trinity High School, I believe it

10        was, and Bill was working there as security.  And Gary

11        was there and apparently used his vehicle and tried to

12        make, like, a forceful road rage type move, like, I'm

13        not getting out of the way, you are, I'm going to hit

14        you kind of a thing.

15              Bill's also come to me just in the last couple of

16        months and stuff he's had in the office and point blank

17        said, you watch your back, you watch it, things are

18        going to get ugly.  He's warned me, this was probably

19        six months or so ago where he made that comment to me.

20              Knowing that from Barb, she's alluded to comments

21        where or circumstances where Gary perhaps followed her

22        to a mall or somewhere.  And Gary has also come to her

23        house, and she has made comments you watch yourself.

24              That's the basics that come to my mind.  My

25        parents, for that matter, have even warned me to watch

1          myself.

2    Q    And why would they be in a position to know?

3    A.   My father -- my parents are from Newville, I think we

4         mentioned that last time, as Gary is from Newville.  And

5         they understand and agree that perhaps some kind of

6         damage might come out of this if he gets mad enough.

7    Q    Do your parents know Gary Graham?

8    A.   Yes.

9    Q    Now, the notes from Judge Hoffer say:  No guidelines on

10        how to do a social history.  Do you recall any

11        references to that, now that we've seen these notes?

12   A.   Not really.

13   Q    Saw Gary grab Barb's butt.  I can't read that, some,

14        several years ago, perhaps.

15            Do you believe that you told Judge Hoffer that you

16        had seen Gary grab Barbara Varner's rear-end?

17   A.   I believe I must have.

18   Q    Judge Hoffer says you told him:  Has singled Barb out

19        for trips.  Do you believe you told Judge Hoffer that?

20   A.   Yes.

21   Q    Why did you believe that he had, and I'm using the word

22        singled, Barb out?

23   A.   How trips are done, I had mentioned earlier how people

24        would team up in our office.  Billy Brandt, Darby

25        Christlieb, they're a team.  With Sam Miller and Dennis

 1          Drachbar, they share an office, they're a team.  Barb

 2          and I were hired together and we were the only females,

 3          we've kind of become a team.  Mike Rose, Tim DeAngelo,

 4          they're a team.

 5              If I have a commitment trip, I go to Barb first and

 6          ask her if she's available.  If Tim has a commitment

 7          trip, he would go to Mike Rose first.  And it seemed

 8          rather odd that Gary wouldn't have chosen his office

 9          partner, Hank Thielemann, to do commitment trips, or at

10          least one of the other guys that he's known longer, and

11          you know, as a co-worker.

12              Generally, people team up with their office

13          partners because they know each other's caseloads

14          better.  And that's why I thought it was rather odd that

15          he should choose her and not his co-worker, his

16          immediate office co-worker.

17    Q   Now, Mr. Dellasega asked you some questions about

18          whether it might be financially advantageous to take

19          these commitment trips.

20              Did your workload, was your workload reduced in any

21          way when you spent time out of the office for the

22          commitment trips?

23    A.  I don't think so.

24    Q   Would there be any negative repercussions to spending

25          days at a time on commitment trips?

Green                                                                     208

1    A.    Your caseload would just -- phone calls would mount.

2          Whenever somebody covers somebody else's caseload, like

3          I mentioned yesterday covering hers, I only cover

4          emergencies.  I stick to doing my own caseload, and if

5          there's an emergency regarding one of her kids, then I

6          step up.

7                And if you're just doing a commitment trip,

8          whatever's on your desk is still going to be there.  So

9          you don't want to miss too many days because that

10         stuff's going to keep mounting.

11   Q     Back to Judge Hoffer's notes.  Office is more tense with

12         Gary around.

13               Do you believe that you told Judge Hoffer that with

14         Gary around the office was more tense?

15   A.    I'm sure.  That sounds like something I would have said.

16   Q     Did you give him any examples of what you considered to

17         be more tense?

18   A.    I don't remember.

19   Q     Judge Hoffer says:  Tom Boyer not up on placement work.

20               Does that refresh your recollection at all as to a

21         subject regarding Tom Boyer?

22   A.    I am not sure what that was about or in reference to.

23   Q     It says:  Gary must go, too tense.

24               Do you believe that you told Judge Hoffer that you

25         thought Gary Graham had to leave the office?

1    A.    Probably.  I probably did.

2    Q    Do you recall whether you gave any reasons why you were

3          of that opinion?

4    A.    Other than what you mentioned, I just -- that whole

5          conversation is just very vague for me.

6    Q    Do you remember anything else that you may have said to

7          Judge Hoffer at the time that he called you to his

8          office?

9    A.    Nothing.

10   Q    You said that you had met as well with representatives

11         of the county who may have been investigating this

12         matter.  Do you recall who you met with?

13   A.    I remember Dan Hartnett.  And I remember another

14         gentleman, I couldn't tell you his name off the top.

15              In the more recent past, I met with a young lady.

16         She was filling in I -- she was filling in for, I forget

17         the man's name.

18   Q    Okay.  When you met with Dan Hartnett, was it just you

19         and Mr. Hartnett?

20   A.    I believe so.

21   Q    And is that the reference that's here in your time line?

22   A.    The second page the 8/27.

23   Q    Yes.

24   A.    That must be it.

25   Q    Do you recall, Ms. Green, whether Mr. Hartnett called

Green                                    210

```
 1          you to his office or did you ask to speak with him?

 2    A.    I don't remember asking to speak with anybody.  I would

 3          have to say he called me down.

 4    Q     Can you tell us anything that you remember about what

 5          occurred in August of 1997 when you met with

 6          Mr. Hartnett?

 7    A.    Could you be more specific?  I'm not sure what you want.

 8    Q     Well, did he question you about certain things?  I mean,

 9          did he ask you a series of questions and you answered

10          them?  Or was it more of a tell me what you know about

11          what's going on in the office?

12    A.    Okay.  It was kind of a -- kind of both.  He would ask

13          me a question and then, like, explain, you know, we've

14          heard.  Or he would, like, start a statement as I

15          remember it at this time, like, I've heard this, do you

16          agree with this, and why.  You know, along that line.

17    Q     Do you remember any of the subjects that you covered

18          during that meeting in August of 1997 with Mr. Hartnett?

19    A.    Nothing specific, other than the general -- I would say

20          just general, you know, what's going on in the office,

21          and you know, is Gary out of control, is there a

22          problem, is there inappropriate stuff going on.

23    Q     How did you answer those questions?

24    A.    I don't remember exactly.  I can remember sitting in the

25          office and us talking.  It would have to have been the
```

Green                                     211

```
 1            same line as I've already -- as I alluded to you already

 2            about, you know, Gary being basically bullying us up

 3            there, you know, being loud and obnoxious, in

 4            specifically in regards to Barb.

 5    Q      Do you believe that you told Mr. Hartnett at that time

 6            that you thought Mr. Graham was harassing Ms. Varner?

 7    A.     I probably -- I'm pretty sure I would have.

 8    Q      Did you tell Mr. Hartnett at that time that you had

 9            heard Gary Graham use profanity in the workplace?

10    A.     I may have.

11    Q      You're not certain?

12    A.     Not -- I just don't remember that specific conversation.

13    Q      Do you believe that you told Mr. Hartnett at that time

14            of the profanity that was used by Mr. Osenkarski?

15    A.     I may have.  I'm just -- I'm not certain.

16    Q      Do you believe that you may have -- let's take out the

17            "may."  Do you believe that you told Dan Hartnett at

18            that time that Ms. Varner may have reason to fear for

19            her personal safety?

20    A.     I probably did.

21    Q      Did you tell Mr. Hartnett at that time that you believed

22            that Mr. Graham treated Ms. Varner in a demeaning

23            fashion?

24    A.     That sounds like what I could have said.

25    Q      Do you believe that you told Dan Hartnett at that time
```

```
 1              that Mr. Graham did not act appropriately as a

 2              supervisor?

 3    A.   Yes, I probably did.

 4    Q    Did Mr. Hartnett tell you that he was investigating some

 5              kind of a complaint at that time?

 6    A.   Seems to me he maybe even opened up our conversation

 7              with something along that line, like, I'm trying to

 8              figure out what's going on in your office and we had

 9              these concerns, could you explain or share.

10    Q    Were you concerned at that time that by speaking with

11              Mr. Hartnett about this matter that there may be

12              retaliation against you?

13    A.   Yes.

14    Q    Why were you concerned about that?

15    A.   Going back to the statement that was made by Joe at the

16              retirement party for Ken Bolze, his reference to, you

17              know, I'll make you pay, I've done it before, I'll do it

18              again, was in reference to Bill Brandt and how the

19              office staff believed that Bill was unfairly dumped upon

20              in regards to heavy caseloads and nastier type, more

21              time-consuming cases were given to Bill Brandt.  And

22              that was something that Joe was a proud -- he was proud

23              of the fact that he could do that.  So I feared for that

24              aspect.

25    Q    Why do you think that happened to Mr. Brandt?
```

1   A.    Bill had said it was because he spoke up in regarding to

2         that C word, the comment regarding the C word.  He spoke

3         the truth as he saw it, at least, and was treated poorly

4         because he didn't stick with the guys and deny the

5         statement.

6   Q     Was there any other reason why you felt that there might

7         be retaliation against you in August of 1997?

8   A.    I guess in regards to Gary, because I get -- he would be

9         out of control with his demeanor and composure.  He just

10        seemed very volatile.  I didn't trust being around him.

11        He just -- I wasn't sure what he was going to do at any

12        given moment.  I mean, he never made any physical

13        comments, like, he never slapped me, touched me or

14        anything like that, but I was just -- that kind of goes

15        back to the tense statement.  It's, like, what's going

16        to come out of that man's mouth next, what's he going to

17        do verbally or physically, or what's his mood going to

18        be.

19  Q     In or about August of 1997 did you believe that Barbara

20        Varner felt that she might be in some physical danger?

21  A.    Yes.

22  Q     Did she express that to you?

23  A.    Yeah.  Yes.

24  Q     What did she tell you?

25  A.    Along the same line, just she didn't know what was going

Green
214

```
 1            to come next from him.  He would get verbally
 2            confrontational and be very in her face, you know, in
 3            things that he didn't agree with.  It didn't matter if
 4            he was right or wrong; if he didn't agree with
 5            something, he would let you know and a very threatening,
 6            a very threatening demeanor to himself.
 7    Q      Do you recall anything else that you might have told
 8            Mr. Hartnett at that time?
 9    A.     Probably the same thing I told the judge, assuming I
10            recalled that memory correctly, that I probably gave the
11            suggestion that he be removed.  I seem to have told that
12            to a lot of people.
13    Q      Do you believe that Mr. Osenkarski as Mr. Graham's
14            supervisor would take any action with regard to
15            Mr. Graham's conduct towards Ms. Varner?
16    A.     No.
17    Q      Why not?
18    A.     He witnessed very similar things that we had witnessed.
19            I mean, he was present or he had heard about it and made
20            no comment.  He never came to me and said, hey, I'm
21            concerned about Barb, you know, do you have any
22            concerns, or how do you think I should handle this or --
23            he never asked me if there were problems.  He never
24            offered solutions.  Not that I went to him and asked him
25            for a solution.  He saw the problem and chose to do
```

1         nothing.  He didn't need me to point it out to him.

2   Q    Did you believe that Mr. Osenkarksi would side with

3         Mr. Graham?

4   A.   Definitely.

5   Q    Why?

6   A.   They've made it well known -- like I mentioned, you pair

7         up.  They're a pair.  A lot of occasions they put

8         themselves together.  They both seem to -- I guess the

9         impression, they cover for each other.  He would let

10        Gary go, like, and run the office however he saw fit and

11        make decisions that I didn't feel -- I don't feel Joe

12        knew a lot of what Gary was doing.

13           When Joe was in the office, he could see a lot of

14        wrongdoing.  It didn't have to be pointed out, you could

15        see, you could hear somebody if they were out of control

16        or inappropriate.  And I think Joe chose to turn a deaf

17        ear and make himself invisible rather than deal with it.

18           Joe has complained about Gary.  I remember one

19        indication he called Joe -- I'm sorry, he called Gary a

20        Judas Iscariot, and the reason was that he had to do

21        with private, their own private property.  He was

22        complaining that Gary stole his tenant regarding some

23        rental property that they had.  Rather than confront

24        Gary about it, Joe referenced this to me in front of the

25        office.  And it's, like, why are you telling me, go to

```
 1              him and, you know, settle your complaint that way.

 2                  And I get the impression that they each have dirt

 3              on each other and they won't give each other up and

 4              they're just kind of holding their own, hoping the rest

 5              of us will leave them alone.

 6    Q    Did you have a conversation with someone named David

 7         Deluce representing the county?

 8    A.   That may have been, like, man number two.  After Dan

 9         Hartnett I believe that might have been the gentleman.

10         Is he a lawyer, perhaps?

11    Q    Yes.

12    A.   Okay.  I believe that was the name of the -- that last

13         name sounds familiar.

14    Q    And what do you recall about your conversation with this

15         man?  We will assume for the moment that it was

16         Mr. Deluce.

17    A.   More detailed questions than what Dan Hartnett wanted to

18         know.  He was asking a lot of the same questions that

19         I've been asked here already.  And he made the same

20         statement or foundation, that he was doing an

21         investigation and he wanted to get information regarding

22         inappropriate activity in our office.

23    Q    Do you recall anything today that you said to

24         Mr. Deluce?

25    A.   No specific phrases.  It would all be the general
```

1          comments that I've given you already.

2     Q    Do you believe that you told Mr. Deluce that you had

3          observed Gary Graham harassing Barbara Varner?

4     A.   Yes.

5               MR. DELLASEGA:  I'm going to object on the basis of

6          the privilege.

7     BY MS. WALLET:

8     Q    Do you recall whether you told Mr. Deluce that you

9          believed that Gary Graham had acted inappropriately as a

10         supervisor?

11              MR. DELLASEGA:  I have the same objection, and to

12         the extent that the witness considers herself an

13         employee of the county, I would instruct her not to

14         answer.

15              THE WITNESS:  I think everybody already knows the

16         answer.  I've already said it to everybody already.

17              MS. WALLET:  So you are instructing this witness

18         not to answer any questions with regard to her

19         conversation with David Deluce?

20              MR. DELLASEGA:  To the extent she considers herself

21         an employee of the county.

22              MS. WILLIAMS:  I would join that objection insofar

23         as she considers herself an employee of the court.

24              THE WITNESS:  Does that mean I'm fired if I do

25         answer it?

```
 1            MR. DELLASEGA:  I can't answer that.  I don't know.
 2            THE WITNESS:  You know, well, money's not
 3       important.
 4         MS. WALLET:  Well, under the circumstances I will
 5       discontinue my discussion about this subject, with the
 6       understanding that upon the ruling by the judge with
 7       regard to my pending motion concerning the Deluce
 8       report, I would like to renotice her deposition and
 9       discuss this further.
10            MR. DELLASEGA:  No problem.
11  BY MS. WALLET:
12  Q    Ms. Green, you were an employee of the Probation
13       Office at the time the incident was reported by
14       Ms. Houser Vohs concerning the cunt club, correct?
15  A.   I'm not sure on that.  I don't know when that incident
16       happened.
17  Q    Okay.  After that incident or after you became aware of
18       that incident, did you observe any change in the
19       language used by Mr. Osenkarski in the office?
20  A.   I'm not sure if it was in regards to that, the club
21       statement, or if it was because -- the time I'm not
22       clear on, if -- it may have happened, his statement may
23       have started to change once the county had the mandatory
24       sexual harassment training.  There was a time when his
25       comments started with a statement like, "maybe I
```

```
 1          shouldn't say this," or, "this might be offensive," and
 2          he would still make his statements.  Like, he prefaced
 3          his statements with this disclaimer that this may be
 4          offensive, along that line.  I think one of those was
 5          mentioned in here, we mentioned it earlier.
 6     Q    After you became aware of the Houser complaint
 7          concerning the cunt club, did you hear Mr. Osenkarski
 8          use the F word?
 9     A.   Yes.
10     Q    After that same time period, did you hear Mr. Osenkarski
11          discuss matters of sex in the office?
12     A.   Yes.
13     Q    In your observations, did Mr. Osenkarski make any
14          distinction between the words he said among male
15          co-workers as opposed to the words that he said in front
16          of female employees?
17     A.   Probably not.  I would say if he was going to use
18          something inappropriate, he didn't distinguish or -- I
19          don't think it mattered to him who was present; he was
20          going to make the statement if you were male or female.
21     Q    Why do you think that Mr. Osenkarski felt that he would
22          not be disciplined for sexual references in the
23          workplace?
24     A.   Well, if he had been reprimanded for having, you know,
25          the cunt club statement, if the reprimand or the
```

```
 1            punishment or whatever you want to call it, if it didn't
 2            have any kind of an impact and he still referenced -- he
 3            was still there, he was still allowed to come and go,
 4            there wasn't any reprimand, there wasn't any kind of a
 5            consequence.  So if it happened, if he got away it with
 6            two times, wouldn't he just keep doing it, and I think
 7            that was the thought.  He had no fear because no one had
 8            spoken up or had reprimanded him up until that point to
 9            any significance.
10    Q      When you were hired into your position were you
11            interviewed by Judge Sheely?
12    A.     It was, like, the final installment process.  I felt and
13            was told that I was basically hired without having seen
14            him.  But the final stamp of approval had to come from
15            Judge Sheely.
16    Q      And did you, in fact, meet with Judge Sheely as part of
17            that final process?
18    A.     The very last thing.
19    Q      Did Judge Sheely make any reference to you regarding
20            your political registration?
21    A.     He didn't.  Gary did.
22    Q      What did Gary tell you?
23    A.     He had asked me if I was a Democrat or a Republican, and
24            I remember telling him I didn't know.  It made no
25            difference to me, I would vote whichever way I felt
```

```
 1          appropriate.  And he said, well, for the point of

 2          getting hired you need to change or you should change

 3          from Democrat to Republican.  He knew I was Democrat.

 4          He said he had already checked that out.  He asked me to

 5          change, and gave me the paperwork to change my party.

 6     Q    Did you do that?

 7     A.   I did.

 8     Q    Did you feel that that might be required before you were

 9          hired for this job?

10     A.   Gary made it known it was very important.  But he also

11          said it technically isn't mandatory, but it was very

12          important, that that was important to the judge and he

13          would like to see more Republicans.

14     Q    Has Mr. Graham ever been to your home?

15     A.   Yes.

16     Q    Would you tell us what happened?

17     A.   In regards to the paperwork to be filled out to change

18          my party, he offered to come to my home.  And I told him

19          no, I would meet him at my grandfather's house, which is

20          half a mile from my house.  We met at my grandfather's

21          house to do that paperwork.

22               And then there was an occasion where he came back

23          to my house.  However, I wasn't home.  He came back on

24          his motorcycle and was -- he was stopped, not physically

25          stopped, but he was stopped because my husband was
```

```
 1              working in my lane at that time.  And I believe the two

 2              of them had met.

 3    Q    Do you know why Mr. Graham might have come to your home

 4              on that second occasion?

 5    A.   I think just to show off his motorcycle.  There's no

 6              other reason I could come up with.

 7    Q    Did you ask him, him, Gary Graham, whether or not he had

 8              come to your home?

 9    A.   I think he maybe mentioned it to me perhaps a day or so

10              later at work as to I was back there or something.  I'm

11              not sure.

12    Q    Did he ever offer to you any work-related reason why he

13              should come to your home?

14    A.   No.  There was no work involved.  And he didn't leave a

15              message with my husband, hey, we have an emergency, she

16              must call.  It was totally a social visit on his part.

17    Q    Had you ever invited him to come to your home?

18    A.   Never.

19    Q    Where's your home located?  Maybe I should ask, have you

20              lived at the same place while you've worked at the

21              Probation Office?

22    A.   Yes.

23    Q    Where is your home located?

24    A.   My address is Ritner Highway but physically it's a half

25              mile off the highway.  You can't see my house from the
```

Green                                        223

```
 1          road, I have a long farm lane.

 2     Q    Is it nearer to Newville or nearer to Chambersburg?

 3     A.   The next town up would be Shippensburg.  I'm closer to

 4          Newville.  Well, as the crow flies, I'm closer to

 5          Newville.

 6     Q    Does Mr. Graham live anywhere near you?

 7     A.   He's about 10 mile towards Carlisle.  Possibly close to

 8          10 mile, eight, 10 mile from my house.

 9     Q    Has Mr. Osenkarski ever come to your home?

10     A.   No.

11              MS. WILLIAMS:  Can we go off the record and see

12          what Mr. Boyer's situation is?

13              MS. WALLET:  Sure.

14              (Recess taken from 2:02 until 2:20 p.m.)

15     BY MS. WALLET:

16     Q    You said that after you had the interview with

17          Mr. Deluce that you spoke to someone else who indicated

18          they were representing the county?  Is that correct?

19     A.   You're talking to what I said just here a little bit

20          ago, like an hour ago?

21     Q    Yes.

22     A.   I don't believe it was the county.  It was that lady who

23          phoned me.  It was regards to this.

24     Q    Okay.

25     A.   I don't know that I spoke to anybody else from the
```

```
 1            county.  She's not from the county, from what I
 2            understand.
 3       Q    Okay.  So you had a telephone conversation with someone
 4            from the EEOC.  Then later did you have the conversation
 5            with Mr. Hartnett, or was it before?
 6       A.   I think she phoned after I spoke to Hartnett and Deluce.
 7            I think I have those in that order.
 8       Q    Okay.  And have you spoken to anyone else who indicated
 9            that they were investigating this matter?
10       A.   Oh, yes.  I'm sorry, yes.  That was the lady who was --
11            she's a young lady.  They don't give you business cards,
12            they just tell you their name and I guess you're
13            supposed to remember it, and I don't.  It was a young
14            lady, was representing this agency or this firm.  And
15            since it happened in the Personnel office, I took her at
16            her word and answered her questions.
17       Q    Okay.  But you believe she was also investigating the
18            allegations that are a part and parcel of this
19            litigation?
20       A.   Correct.
21       Q    And did you tell that woman anything different than what
22            you have told us today?
23       A.   No.
24       Q    Did she ask you specific questions?  Or did she ask you
25            just to tell her the narrative?
```

```
 1   A.   It was more general, where she gave me a statement and

 2        is that true, or is that still true.  It was more along

 3        that line.  There really wasn't a conversation going on.

 4   Q    Okay.  Do you feel, Ms. Green, that you have been

 5        treated differently by Mr. Graham because of your

 6        association with Ms. Varner?

 7   A.   I've been treated differently, yes, by him and other

 8        people at the office as well.

 9   Q    Do you think it's related to your relationship with

10        Ms. Varner?

11   A.   Yes.

12   Q    Why do you believe that?

13   A.   In regard to his treatment and with regard to Gary's

14        treatment, I think it would be because I'm friends with

15        Barb Varner.

16             I hadn't thought about it before, and it was in my

17        time line somewhere here where Tom Boyer put that idea

18        into my head, that I was being treated differently

19        because of my friendship with Barb.

20   Q    And what did he say to you that led you to conclude

21        that?

22   A.   It had something to do with secretarial issues.  There

23        was a concern there are things I didn't feel were being

24        done.  I went to him to ask for a solution, you know,

25        how can I make things go smoother or more smoothly.  And
```

1   he stated something along the line, well, do you think

2   you're being treated differently because of your

3   association with Barb.  And that caught me off guard.  I

4   really hadn't thought of that, really, regarding other

5   people.  And he led me to believe that he thought it

6   was, that was the reason that that was why I was being

7   treated differently.

8 Q And did you then adopt that conclusion as well?

9 A. I can believe that at least for some people.  Some of

10   the people don't know the whole story.  Like, they came

11   in afterwards and they're getting -- they didn't see

12   stuff firsthand, maybe they were hired later, and I

13   think that's still a carryover.  People are afraid to be

14   real expressive, and not comfortable.  It's like, oh,

15   I'm not really sure, you know, maybe this isn't

16   something we should say because we know there's a

17   lawsuit and all this going on.

18 Q Ms. Green, do you have any knowledge of misuse of

19   supplies, office supplies within the Probation Office?

20 A. I'm thinking of the comment where we addressed earlier

21   regarding the stuff missing out of the closet.  I don't

22   know that I have anything more to say on that.

23    When I had an office or a desk across the hall in

24   Adult Probation, I was facing Wilma Clippinger, and she

25   had commented that -- the closet behind her had supplies

```
 1          in, and she had made a comment along the lines that Joe

 2          would come over and remove things from the supply closet

 3          and that was one of the reasons you were supposed to go

 4          through her now to get to stuff.  They changed the

 5          layout so she knew who was going in and out taking

 6          things.

 7                 That's the top two things.  That's the first thing

 8          that came to my mind regarding that.

 9    Q     Did you have any personal observations of what you

10          considered to be misuse of time within the Probation

11          Office?

12    A.    Yeah.  Back to the comment where Tom Boyer had

13          instructed me to put down more time than I actually had

14          earned, we work in half-hour increments.  When it comes

15          to on-call, if you get a call at midnight and you work

16          for 29 minutes, he told us you're allowed or -- and that

17          was kind of the office atmosphere, that you can put down

18          an hour time.  If you work five minutes, you put an hour

19          down.  If you work 29 minutes, you put an hour down.  If

20          you work 59 minutes, you put an hour down.

21                 And only after you go into, like, after that first

22          hour, then you start working in half-hour increments.

23          And then it's an hour to an hour and a half to two

24          hours.  And he specifically told me I was to put down

25          two hours on my overtime slip on that particular
```

Green
228

```
 1          incident where I didn't earn two hours.  I felt that's a

 2          misuse.  That's -- I would have been forging my time

 3          sheet, because that wasn't true.

 4              And there are some other references that I

 5          mentioned on here as we -- where he instructed Nick

 6          Barrelet to use overtime.

 7    Q     This is he, Tom Boyer?

 8    A.    Tom Boyer told my office partner, and Nick told me, hey,

 9          if you're interested in overtime, go out and work

10          tonight, Tom's got extra.  And on different occasions,

11          two or three occasions, perhaps, Tom will say, if you

12          want overtime, come see me, I'll see what it looks like,

13          if we have it available.  And he'll make the insinuation

14          that you can kind of pad your overtime as well.  And at

15          least two occasions specifically where he's like, yes,

16          add more on than what you actually worked.

17    Q     And you've not done that?

18    A.    I will round, like, if I worked 29 minutes, I round it

19          to the hour and I put that first hour.  But I will not

20          go and add just two.  I mean, he'll allow you to double

21          it, if there's money available, and that I have not

22          done.

23    Q     This Reno conference that you reference in your time

24          line occurring in March of 1997, who picked the

25          individuals who went to this conference?
```

1    A.    That I'm not sure.  It was done after our office split.

2          The joke around the office was that this was a reward,

3          if you came to Juvenile Probation we were going to have

4          you rewarded by going to Reno.  And that was only

5          offered to the top, as they used to call it or reference

6          the dirty half dozen, the dirty six, the top end of our

7          office.

8    Q     And who was in that particular group?

9    A.    The dirty half dozen started with Joe, like,

10         seniority-wise, it's Joe, then it was Gary, Tom Boyer,

11         Sam Miller, Hank Thielemann and Denny Drachbar.

12   Q     You learned sometime in or around July of 1997 that

13         Mr. Graham might be fired; is that correct?

14   A.    Correct.

15   Q     And did you hear that from anyone other than Bill Brandt

16         and Fran Rose?

17   A.    No.

18   Q     Did either one of them tell you where they had gotten

19         that information?

20   A.    No.

21   Q     How did you learn that Mr. Graham had been suspended for

22         three days?

23   A.    There wasn't any official announcement or notice on the

24         bulletin board.  I would have to guess either Bill or

25         Darby.

Green                                              230

1    Q    Did Mr. Osenkarski ever come to you and tell you that

2         Mr. Graham had been suspended?

3    A.   No, I don't remember any conversation like that.

4    Q    You have a reference here on July 14, Mr. Osenkarski

5         made comment re women on his vacation looking like

6         whores.

7              Would you tell us what you remember about that

8         incident?

9    A.   Again, it has to do with the office location, where I

10        have to come out of my office to access anything from

11        the secretaries to the fax machine to the refrigerator.

12        And I come out in the main office area and as I note on

13        the date there, that he was standing near one of our

14        temporary secretary's desks, and as it says, he was

15        speaking towards Fran and Kathy, it was not directed to

16        me.  And it was the same circumstance where it's out in

17        the open for anybody to hear that would happen in the

18        office.

19             And as I wrote there, caught himself and faded the

20        word.  I think when I came out he perhaps checked

21        himself and realized he shouldn't have been using that

22        language.

23   Q    Did you hear enough of the conversation to know whether

24        there was some work-related reason to this conversation?

25   A.   I don't know that.

1    Q    Would you describe the relationship between Mr. Graham

2         and Ms. Varner between the time that he was, he,

3         Mr. Graham, was suspended for several days in July of

4         1997, until the time that he was sent to the prison?

5    A.   Well, that would have been what I would term the highly

6         volatile time period or frame.  That would be the time

7         when I tried to be out of the office as much as

8         possible.  I can't remember any specific comments or

9         confrontation that I know for sure happened in that time

10        period.

11   Q    Was that part of what you described for the judge as

12        tense?

13   A.   Could have been.

14   Q    Was there any indication that Mr. Graham changed his

15        behavior toward Ms. Varner after he was suspended for

16        three days?

17   A.   I'm going back thinking of the feeling, the air in the

18        office, and there definitely wasn't an improvement.  I

19        just remember that same bad feeling, tense feeling.

20   Q    Your time frame indicates that you heard some comments

21        regarding girls on their knees.  I believe you

22        referenced this to Mr. Boyer; is that correct?

23   A.   Correct.

24   Q    What do you remember about that conversation?

25   A.   I didn't hear the conversation.  This is something that

Green                                                    232

1     was told to me by, I believe it was Gail Shuhart.  And

2     as I have it written there, the comment as reported to

3     me was made to Steph and Lisa, and it was the comment

4     that you get farther if you are on your knees,

5     secretaries get farther if they're on their knees.

6  Q  Did you believe that that was a sexual reference?

7  A.  Yes.

8  Q  Why did you believe that?

9  A.  Well, I can't think of any other reason that would have,

10    that statement would have been made.

11 Q  Had you heard comments about women on their knees prior

12    to this time?

13 A.  I can't think of any.

14 Q  Did you know that Ms. Varner had received a personal

15    birthday card from Mr. Graham?

16 A.  Yes.

17 Q  How did you learn that?

18 A.  Barb had told me about it at some point.

19 Q  What did she tell you?

20 A.  Simply that she got one and it was kind of odd that she

21    get one.

22 Q  Did she tell you anything else at that time?

23 A.  I don't remember anymore than the basic there.

24 Q  Did she indicate to you whether she thought that was

25    appropriate or inappropriate?

Green                                    233

1   A.   That it was inappropriate.

2   Q    Did she tell you that?

3   A.   I don't know that she used that particular word, but

4        kind of that it was odd, that it was strange that, like,

5        why is this guy giving me a card, you know, this is

6        weird.

7   Q    Were you required to attend any sexual harassment

8        training?

9   A.   Yes.

10  Q    Do you recall when you attended those?  Was there more

11       than one?

12  A.   Yes.  And the first one I believe was at what we call

13       the Human Service Building.  It seems to me there was at

14       least two, if not even three, and I'm drawing a blank

15       on -- one was upstairs, I think, in the jury assembly

16       room I believe is where it was held.  And I'm not sure

17       who the speakers were or anything, or the presenters.

18  Q    Do you believe that was before or after Mr. Graham was

19       sent to the prison?

20  A.   It seems to me there might have been both.  The one I'm

21       picturing upstairs in the assembly room I think was

22       after he was sent to the prison.  The one before in

23       Human Service Building, I'm not sure when that took

24       place, if it was before or after.

25  Q    The one that occurred after Mr. Graham was sent to the

Green

234

```
 1         prison, were you able to observe any relationship

 2         between Mr. Graham and Ms. Varner at that sexual

 3         harassment training?

 4   A.    I, like, forgot all about that training till just now.

 5         I'll have to pass on that.  I can't remember.  I know it

 6         was Adult Probation and Juvenile Probation, and that

 7         might have been the training where Domestic Relations

 8         people were coming in as well.  I'm not clear on -- I'm

 9         not sure.

10   Q     Okay.  Did you ever hear Mr. Graham talk about his

11         relationship with his wife?

12   A.    No.

13   Q     Did he ever talk about sexual relationships with women

14         other than his wife?

15   A.    If you don't -- like, I mentioned the photocopying and

16         this faxing of this dildo thing.  If you don't consider

17         that sexual, my answer is no.  I forget how you worded

18         the question.

19   Q     Okay.  Did you ever hear Mr. Graham talk about sexual

20         relationships that he had with women other than his wife

21         before he was married?

22   A.    No.

23   Q     This case that you talked to us about, is that the

24         Linsenbach case, the one that had the homosexual

25         materials in it?
```

Green                                    235

1    A.    Yes, correct.

2    Q    Have you made any effort to try to confirm the

3          information regarding that file?

4    A.    Yes.  Approximately two weeks, maybe, before I spoke to

5          you all here, I pulled the file to see if that

6          information had miraculously reappeared, and it didn't.

7          And the day after I spoke with you guys here, I went for

8          the file and the file was missing.

9    Q    Have you been able to locate the file?

10   A.    Yes.  I don't know the date but it was last Friday.  I

11         pulled the keys and looked for it, and it was put back.

12   Q    And was the information contained in the file?

13   A.    That missing paperwork is still missing.

14   Q    Would you describe for us the firearm policy as you

15         understood it before the split and after the split?

16   A.    Regarding the county?  I understand we're not allowed to

17         carry firearms on the job.  However, we have had the

18         opportunity to get trained in firearms, if we chose to.

19   Q    Before the split, were firearms available to you?

20   A.    No.

21   Q    How about after the split?

22   A.    Eventually they were available.  This is going back to

23         when Bolze was still chief.  There was discussion about

24         some people being trained and having the opportunity to

25         carry firearms.  And I went to Mr. Bolze and asked him

Green                                     236

```
 1              about getting trained before I started the master's

 2              program, and I was denied training.

 3      Q       Do you know why?

 4      A.      He told me it was because I was a female and ladies just

 5              can't handle guns as good as men, and he denied my

 6              request.

 7      Q       After the split, were there firearms available within

 8              the office for use by probation officers?

 9      A.      Only after we were trained and, you know, and had passed

10              that the State, I believe it's a State test for

11              probation officers in the state.  And only if you passed

12              the test were you actually, like, allowed to use, keep a

13              firearm.  But again, it was not to be carried on the

14              job.  We weren't allowed to carry on the job.

15      Q       Were there firearms in the courthouse?  Is really what

16              my question is.

17      A.      As far as I would know, they were kept in -- like, the

18              guns and the ammunition and stuff?  I think Joe had --

19              that was all under Joe's jurisdiction.  I guess between

20              his office, there was a back closet that some supplies

21              were kept in there, and perhaps the basement.  We have

22              different areas where our office can keep things.

23      Q       And were these areas locked?

24      A.      Like, when I turned my firearm in to Joe, it was locked

25              in his cabinet in his office.  And the back supply
```

```
 1            closet, it should be kept locked.

 2    Q       Do you know who had keys to those facilities?

 3    A.      I would think just Joe.

 4    Q       Do you know whether Mr. Graham had access to those

 5            firearms?

 6    A.      If he would have asked Joe for the keys.  Or maybe he

 7            had a key as well, I don't -- at one point everybody in

 8            the office or most everybody had an office key to these

 9            supply closets, but then at some point, I'm not sure

10            when, that was rescinded.  Everybody had to turn their

11            key back in.

12                I thought it was because things were being stolen

13            out of the supply closet.  Keys were turned in.  And

14            when I referenced the incident here where six of those

15            seven things were missing, that was after our keys were

16            turned in.

17    Q       You were shown a copy of the note from the EEOC

18            interviewer and you said that you had not seen those

19            notes prior to today.  Is that correct?

20    A.      Correct.

21    Q       Have you had a chance to look at those notes today?

22    A.      Yes, I skimmed over them.

23    Q       I would ask you to take a minute or however long is

24            necessary, to tell me whether you believe that these

25            notes accurately reflect what you told the interviewer
```

1          in March of 2000.

2     A.    Barring some typographical errors that I noted, that's

3          I'm sure what I referenced or made reference to those

4          things.

5     Q    Have you heard Mr. Graham use terms like punish or be

6          loyal or things like that?

7     A.    Loyalty is a big thing for him, yes.

8     Q    What do you recall hearing?

9     A.    Along the lines as like you owe me, I helped get you

10         this job and, you know, you need to help pay back here

11         or something, you owe me a favor.

12    Q    Did he ever say that to you?

13    A.    Yes, I can think of at least -- I can think of only one

14         incident right off the top here.  And it actually wasn't

15         even for himself, it was for a favor for Joe, and that

16         was referenced in one of these papers.  He wanted me to

17         put in a good word with my father so Joe could get a

18         better price on his car repair, vehicle repair.

19    Q    And what did Mr. Graham say to you?

20    A.    As I have the notes that are on here, it referenced how

21         he just came to me and said that Joe needed, you know,

22         repair work done, and I was supposed to tell my father

23         who he was.  The insinuation was that I could get him a

24         better price if he got his repair work done through me

25         and my father as opposed to just somebody on the street.

1    Q    And is that your father's business?

2    A.   Yes.  He has a service station where he fixes cars and

3         sells the parts and everything.

4    Q    Did you have any opportunity to observe the relationship

5         between Barbara Graham and Barbara Varner?

6    A.   There was an incident I can think of up in the hallway

7         of the fourth floor at the courtroom, which is the floor

8         that we hold our juvenile court on, and it's the floor

9         that I believe Barb Graham's office is on that floor,

10        the stenographers.  And I remember an incident where we

11        were waiting for juvenile court, and Barb was facing me,

12        and I was facing her looking down the hallway.  And I

13        remember seeing Barb Graham come from behind and

14        literally just do one of those, like, evil stares you

15        would reference, like the hate look, the glaring type of

16        a look.  And it wasn't necessarily aimed at me, I think

17        it was all aimed towards Barb.

18             And I was watching Barb Graham.  Didn't say

19        anything to her at that distance between us.  I just

20        remember taking note and looking at her, and when she

21        realized I was watching her, she stopped and proceeded

22        about her business.

23   Q    You indicate, or at least in these notes it indicates

24        that there was an incident in which I presume you're

25        referring to Barbara Graham slammed down her purse.

1        What do you remember about that?

2    A.  Pretty much just what's written there.  Initially, like

3        years ago when I would run into her in the hallway or

4        the sidewalk or something, she would kind of give me the

5        dirty look.  In this case it was, like, you know,

6        slamming her purse down.  I'm not sure what the point of

7        that was.

8            I since do all I can to avoid eye contact, and I've

9        had no problem, no any kind of facial gestures since.

10       That was in the early stages of this incident.

11   Q   The notes, again, the one that's been marked Green 2,

12       say that apparently you gave information that Tom Boyer

13       was loyal to Gary Graham and Joe Osenkarksi.  Did you

14       make that statement?

15   A.  I probably did.

16   Q   And do you believe that to be the case?

17   A.  Yes.

18   Q   Why do you believe that?

19   A.  Well, thinking back to when Boyer suggested that I be

20       untruthful on my time sheet, that caught me off guard,

21       that he would make a suggestion to me or anyone else,

22       but especially to me, when he knows I don't like to work

23       things that way.  And I think that was a slip-up on his

24       part, to have offered that.

25           My gut feeling is that Mr. Boyer has done other

1 things that are perhaps reason to be fired by the

2 county, and if he is truthful in how he feels about

3 these guys, that they can do the same against him and

4 all three of them would be fired.  So my feeling is they

5 each have an unspoken agreement to cover each other's

6 backs.

7 Q And what have you observed about Mr. Boyer that you

8  think might put his job in jeopardy?

9 A. Having people lie on their time sheets.  I know Ethan

10 Davis in our office was fired for that.  And he has in

11 my opinion not treated some of my co-workers

12 appropriately, professional.

13  I mentioned before I think the last time about Gail

14 and the comments.  And this time as well about, you

15 know, being on your knees.  To me, that's -- in the

16 private industry somebody would be fired for saying

17 that.  And if Boyer knows that I'm making these

18 statements today, I think, which I'm sure he will after

19 this day is over, I figure then I'm probably going to be

20 the next one to be targeted to be fired.

21 Q Why do you believe that Boyer will know what you say at

22  the deposition today?

23 A. Perhaps Joe, perhaps Gary will tell him.

24 Q Did you ever see Mr. Boyer avoid conversations or

25 interactions with Ms. Varner?

1    A.    Yes.

2    Q    What did you observe?

3    A.    The real obvious one was getting on the elevator.  It

4          was a staff meeting, I believe, that was in the Human

5          Service Building, and which is a different building than

6          when we work, because we all had to go back to our

7          office.  And several people got on the elevator, and he

8          chose to get off whenever Barb got on.  And it was

9          obvious it was Barb who got on, the reason he got off.

10   Q    Were you ever threatened by Mr. Boyer with disciplinary

11         action, other than this incident that's contained in

12         your time line?

13   A.    There were two.  I don't -- I'll look through there

14         quick.  There were two times where he threatened to

15         fire me -- I'm sorry -- he threatened to give me three

16         days on the street.  And the last conversation that he

17         had with me regarding three days on the street, he

18         alluded to being fired as well.  I'm not sure if that

19         is --

20   Q    That would be on the second page of Green 1?  I guess

21         it's the third page.  4/28 of '98?

22   A.    That was the first incident.

23         Another incident here, the very last page, 2003,

24         January 16th.  I was out on funeral leave on one day.

25         Came back the next day, and my light was blinking on my

Green                                        243

```
 1        phone, and one of the messages was from him.  Actually,
 2        I guess there were several messages from him.  And I
 3        hadn't responded to his initial message quick enough.
 4             Once he found out I was on funeral leave, he
 5        pardoned me for that, I guess, infraction of not calling
 6        him back.  But when he knew I was to come in that
 7        particular morning, he had called and I didn't answer.
 8        He verbally reprimanded me for that and said that that
 9        was inappropriate and I should be responding to him, you
10        know, as soon as I come in I should be checking my voice
11        mail for any message from him.
12             And he goes on to say about a story where he was a
13        police officer and his chief or superior reprimanded him
14        for not doing paperwork appropriately, and if he didn't
15        do his paperwork appropriately he was going to be fired.
16        He's, like, looking at me, like, what do you think about
17        that?  And from that comment he's, like, to me the
18        insinuation was if I don't continue or improve my
19        behavior, I'm going to be three days on the street or
20        else fired as well.
21   Q    Where is Mr. Boyer in the supervisory chain with respect
22        to you currently?
23   A.   He would be, like, two above me.  Sam Miller is my
24        immediate supervisor right now, and then above Sam is
25        Tom Boyer, and then Joe Osenkarksi.
```

1    Q     Did you ever hear any reference by Mr. Osenkarski to

2          hysterectomies or similar female operations?

3    A.    The comment wasn't made to me, I believe it was to Barb.

4          I'll have to pass on that.  I'm not sure what was said.

5    Q     Did you hear any comments in the office about

6          supervisory personnel strongly disliking Barbara Varner?

7               MR. ADAMS:  Can you be specific, Ms. Wallet, as to

8          who?

9               MS. WALLET:  Well, no, I can't.

10              MR. ADAMS:  Okay.

11              THE WITNESS:  I would have to say just kind of the

12         feeling that she's picked on.  I think if you were to

13         poll the office, as I would say peons, as to what people

14         thought of Barb, what the supervisors thought of Barb, I

15         think the feeling -- everybody knows that Boyer

16         mistreats her, isn't respectful to her.  And I think the

17         feeling is that everybody knows that she was mistreated

18         by Gary.  I'm not sure if I'm answering your question

19         there or not.

20   BY MS. WALLET:

21   Q     Prior to Mr. Graham being sent to the prison, if

22         Mr. Osenkarski was not present in the office, was there

23         someone given responsibility in his absence?

24   A.    That would have been Gary.

25   Q     Has there ever been anyone else during the period prior

Green                                      245

```
 1            to Mr. Graham being sent to the prison given those same

 2            responsibilities?

 3    A.      The incident that I referenced where the top, the dirty

 4            half dozen went to Reno.  Then the next person in

 5            command, in line of seniority was put in charge.  That

 6            was Darby Christlieb.

 7    Q       Your time line references some instructions that you

 8            were given regarding talking to Commissioner Rovegno.

 9            Do you see that on the last page under 2002?  12/13?

10    A.      Yes.

11    Q       What was told to you and by whom?

12    A.      It was nothing told to me directly.  It was a memo

13            posted on our office bulletin board that's in our break

14            area, kitchen area, and it said we're not to talk to

15            him.  If he, if Rovegno is to approach us or ask us

16            questions about what, I don't know, but if he's to ask

17            us questions, we're not supposed to talk to him, we're

18            supposed to refer him to our supervisor.

19    Q       And was it specific to Commissioner Rovegno?

20    A.      Yes.

21    Q       Do you know what political party Mr. Rovegno is?

22    A.      He's a Democrat.

23    Q       Were these same instructions applicable to the other two

24            commissioners?

25    A.      No.
```

1    Q    Do you know what political party the other two

2         commissioners hold?

3    A.   Republican.

4    Q    Did anyone question why is it that we're allowed to talk

5         to two and not to the other?

6    A.   I questioned, I mean, just as my co-workers, I mean,

7         what's this all about.  No one knew.

8    Q    Do you know why Stephanie Reeder was fired?

9    A.   I understood it was because she had a pending ARD as an

10        adult, a pending charge in the Adult system.  And they

11        were considering handling the case ARD and she was in

12        process of doing that.

13   Q    Did you know any other probation officers who had

14        criminal charges?

15   A.   More than a speeding ticket?

16   Q    Yes, ma'am.

17   A.   I understood that Mark Galbraith, who was an employee,

18        had a prior juvenile history, criminal history.

19   Q    Do you know whether he was fired?

20   A.   No.  He quit on his own.  He was hired -- he was hired

21        after that juvenile incident.

22   Q    I'm almost finished, Ms. Green.

23             Ms. Green, did you ever report any improprieties to

24        the comptroller's office?

25   A.   They had asked us to come down.  I forgot about that.

```
 1            Don't ask me the date because I don't remember.  But

 2            they had called I believe a bunch of my co-workers,

 3            myself included, to come down in regards to what was

 4            going on in our office.  In particular, they would be

 5            interested in the money part, the money aspect.

 6    Q       And what do you remember about that?  Do you remember

 7            when it was?

 8    A.      No.  Years ago.  I mean, it would be probably three,

 9            four years ago now.  I remember what the man looked like

10            that interviewed me.  And I'm going to say a lot of the

11            questions, we've heard this, is that true, you know,

12            we've heard that, is that true.  And I can't really

13            recall -- I can't play back that conversation in my mind

14            as to what words were actually spoken.

15    Q       And this was the county comptroller's office?

16    A.      Yes.

17    Q       And do you believe that you were called down along with

18            a number of people just to be asked questions concerning

19            monetary aspects of the Probation Office?

20    A.      That was -- from my understanding, that's what their job

21            is.  And they're always sending out these little fraud

22            hotline notices, you know, call and report, you know,

23            there won't be any consequences against you.  Because I

24            remember that was part of the conversation, well, this

25            is all confidential, however, this may need to be
```

```
 1              brought up in court if any serious consequences come out
 2              from whatever your statements are.  But they were
 3              looking for us to report misuse of county time, such as
 4              we talked about here.
 5                   I'm going to say I was hesitant in speaking with
 6              them.  I'm not sure that I shared with them all that
 7              I've shared with you here, part of it because it didn't
 8              happen till after that, but also, if I already reported
 9              it to Personnel and nothing positive came of it, why
10              should I repeat it again.  So I figured why tell them if
11              the county already had the opportunity to fix the
12              problem and didn't, why should I repeat it and put
13              myself in jeopardy of retaliation again.
14    Q    Does Mr. Osenkarski customarily in the office between
15         8:00 and 5:00?
16    A.   I would guess he's probably in the office maybe five
17         hours a day.  And that's more in the last couple of
18         years, maybe the last two years or so.
19              There was a long time, back when his statement that
20         I referenced earlier today, you know, I've been here 35
21         f-ing years, I don't have to be here.  He might have
22         made an appearance once a day, he might be in the office
23         for an hour, two hours or so.
24    Q    Did he ever give any explanation as to why he was out of
25         the office so much?
```

1   A.   No.  I never asked, either.

2   Q   Did you believe that he was out of the office on

3       business-related things?

4   A.   I don't see how.  He didn't have a caseload.  Regarding

5       administrative things, I was under the impression that

6       Tom and Sam and Gary at that time, that they ran things.

7       They didn't need Joe.

8        MS. WALLET:  That's all the questions I have.

9  BY MR. ADAMS:

10  Q   Ms. Green, you had mentioned -- I don't know if I

11      asked you this question before; if I did, I apologize.

12      Just for clarity, in the time you mentioned vacation,

13      that Mr. Osenkarski was on vacation, he mentioned when

14      he got back that the women looked like whores?

15  A.   Yes.

16  Q   Barbara Varner wasn't around during that conversation

17      Mr. Osenkarski had, was she?

18  A.   No.

19  Q   And specifically, how does Tom Boyer mistreat

20      Ms. Varner?

21  A.   In general, disrespectful kind of impoliteness.  Like,

22      if you and I were to pass going somewhere in the

23      hallway, I'd say good morning, and there's lots of

24      occasions where he'll say good morning to me, and she

25      may be two feet away and he wouldn't acknowledge her

Green

250

1        even being there.

2    Q    Was this before or after a charge of discrimination by

3        Ms. Varner?

4    A.   After.

5    Q    So could it be that Mr. Boyer was hesitant to

6        communicate with Ms. Varner based on the charge of

7        discrimination by her?

8    A.   That's possible, but I don't believe that's true,

9        because he doesn't hesitate to pull Gail Shuhart aside

10       and, you know, talk to her.

11   Q    Gail Shuhart doesn't have a lawsuit against the county,

12       does she?

13   A.   No.  But he's proved that he can talk to people.  I

14       mean, he's -- I don't see the connection.  I don't see

15       that.

16   Q    All right.  So that your former reference to

17       mistreatment by Tom Boyer of Ms. Varner is only the fact

18       that he doesn't speak to her in the hallway?  Is that,

19       does that summarize your contention?

20   A.   I think he's scrutinized her time sheets and her other,

21       like, her work that she turns in.  I've gone by their

22       office and the door's open and she's in there.  And I'm,

23       like, afterwards I would talk to her, Barb, what was

24       that about, you know, is there something going on with

25       you and Tom, is there a problem.  And that's how I would

```
 1        learn what not to do, by figuring out what other people

 2        were getting in trouble for.

 3             And frequently she would say how her time sheet

 4        would be scrutinized, and perhaps she didn't have the

 5        wording the way he wanted it worded.  I thought it was

 6        more, I'm going to say petty harassment.  There was no

 7        reason for him to waste her time or his time going over

 8        why the date was in this column and not that column,

 9        vice versa.  It was small things, in my opinion.

10   Q    So time sheets and speaking in the hallway.  Is that

11        totally, does that totally exhaust from your

12        understanding the mistreatment of Tom Boyer towards

13        Ms. Varner?

14   A.   One-on-one?  Mistreatment, yes.

15   Q    What specifically does Mr. Boyer do to disrespect

16        Ms. Varner?

17   A.   I'm sorry, I didn't hear that.

18   Q    What specifically does Mr. Boyer do to disrespect

19        Ms. Varner?

20   A.   He knows, everybody in our office knows that this issue

21        is a hot topic and you shouldn't be making any sexual

22        references or insinuations, and he continues to do so,

23        such as the getting on your knees.

24             I mentioned last time something about flowers, and

25        I wasn't sure of the incident and I went back and had --
```

Green                                    252

1        and I asked Gail what it was about.  And apparently Gail

2        had received flowers, and Tom Boyer took the card off of

3        the flowers and handwrote a note and signed Joe's name

4        to it.  And that's inappropriate.

5             As a supervisor he knows this is a topic and he

6        shouldn't be doing anything to help egg the matter on.

7        And he knows -- they're office partners.  He knows it's

8        going to get back to Barb.  They share an office

9        together.

10   Q   So do those two examples totally exhaust your position

11       that Tom Boyer disrespects Ms. Varner?

12   A.  See, I want to leave that door open because I'll go home

13       tonight and think of something else that I can't

14       remember here.

15   Q   So in your opinion, they're not directly -- there's

16       nothing directly said or done by Mr. Boyer to Ms. Varner

17       that's disrespecting her; it's just subtle things that

18       on the topic of, I don't know, male-female interaction

19       that you think are slams or directed at Ms. Varner?

20   A.  Yes.

21   Q   Okay.  Even though Ms. Varner is nowhere in the picture

22       or not in the presence of Mr. Boyer at the time?

23   A.  Not always, yeah.

24            MR. ADAMS:  That's all I have.

25   BY MR. MacMAIN:

```
 1   Q    I have a few follow-up questions and we'll be done,

 2        I'm sure.

 3             This time line that you prepared, is there some

 4        demarcation of what went into this time line in terms of

 5        your gripes and complaints over the past eight years and

 6        what didn't?

 7   A.   It was really just if I thought to write it down, if it

 8        struck my fancy.  There's no rhyme or reason.  Things

 9        happened that I didn't put down.  Really, just if I was

10        there and had the time to write it down, it was

11        something that caught my attention.

12   Q    You testified about Mr. Graham asking you a question

13        about how you're registered at the time you were hired?

14   A.   Regarding voting?  Yes.

15   Q    Is your father the mayor of Newville?

16   A.   Years ago, he was.

17   Q    And how was he registered?

18   A.   I couldn't tell you.

19   Q    You don't know if he was a Republican or Democrat, your

20        father?

21   A.   I don't know.

22   Q    How old were you when he was mayor?

23   A.   Middle school age, like 13.  I might have been eighth,

24        ninth grade, eighth grade.

25   Q    How long was his term, four years?
```

Green                                    254

```
 1    A.    It was probably longer than that, because he was asked

 2          to fill in -- I think somebody had died, I think he was

 3          asked to fill that position.  And then if I remember

 4          correctly, he ran, officially ran then and got voted in.

 5    Q     Just one time?

 6    A.    I don't remember.

 7    Q     Did you live with your father?

 8    A.    Um-hum.

 9    Q     And you have no idea how many years he served as mayor

10          or how many times he ran?

11    A.    Political stuff wasn't important to me.

12    Q     Do you think your father's affiliation with the

13          Republican party helped you to get a job with Cumberland

14          County?

15    A.    I don't know that he is Republican.  I would have to say

16          no.  No one called and asked my dad for a reference.  I

17          didn't offer him as a reference or anything.

18    Q     You said that you had heard, not directly but through

19          the rumor mill that Mr. Graham said he was going to get

20          everybody back, right?

21    A.    Right.

22    Q     Is there anything in your time line that indicates that

23          he did anything to get anybody back?

24    A.    Nothing in my time line.  I mean, unless -- you see what

25          I see there, but -- it's really the comments, the
```

Green                                                          255

1          insinuations, the threats as in I'm going to get you

2          back, you know, the bullying part.

3     Q    To your knowledge he hasn't done anything to anyone to

4          get them back, though, correct?

5     A.   No, correct.

6     Q    Who is Buck McKenrick?

7     A.   He was an office partner of mine and Mike Piper's.  He

8          actually was Mike Piper's office partner, but I was

9          stuck in his office for a short period.

10    Q    Did you ever flirt with Mr. McKenrick?

11    A.   Never. Never.  He's a nice older gentleman.

12    Q    Anything that anyone else would consider you to be

13         flirting with him?

14    A.   Nobody with any common sense would think that.

15    Q    You had mentioned the fact that since Mr. Osenkarski and

16         Mr. Graham were partners, I think you said they're a

17         pair was the term you used?

18    A.   Yeah.

19    Q    And you kind of insinuated, therefore, you couldn't

20         completely trust one to say something bad about the

21         other, correct?

22    A.   Well, I think they -- I think they like each other, you

23         know, outside the office, I think they're friends.  And

24         my one-on-one experience, I'm not sure they would tell

25         me the truth one-on-one.

```
 1   Q    And that's because they're friends outside the office
 2        and they're partners; would that be fair?
 3   A.   No.  That's just regards to their own morals character,
 4        unrelated to them being friends.
 5   Q    I thought you had said that partners are people that are
 6        paired up, would cover for one another.  Did you say
 7        that?
 8   A.   Cover caseloads, yes.  Like, I would cover Barb's cases
 9        or Gail would cover mine.  She referenced Tim DeAngelo
10        who is covering her right now.
11   Q    And you and Ms. Varner are partners, you're paired up?
12   A.   Sometimes.  I don't have an office partner.  When I had
13        Nick, Nick was my partner.
14   Q    But I thought you -- I'm sorry, I didn't mean to
15        interrupt.  Were you finished your answer?
16   A.   Yes.
17   Q    But you told us earlier today that you and Ms. Varner
18        are partnered up?
19   A.   On occasion.
20   Q    Now, you knew how far away your home was from
21        Mr. Graham's home, correct?
22   A.   Correct.
23   Q    Do you know where Mr. Graham lives?
24   A.   Yes.
25   Q    Have you ever been to his house?
```

```
 1   A.   He had me meet him at his house before one of those

 2        commitment trips, the one we talked about earlier.

 3   Q    And did you object to going to his house to meet for a

 4        commitment trip?

 5   A.   That's a fair place to meet.  And he had I think Mark

 6        met us there as well.

 7   Q    But you didn't object to going to his house to meet?

 8   A.   No.

 9   Q    During the time period from July of '97 to March of '98

10        when Mr. Graham had not been assigned to supervise

11        Ms. Varner, correct?  Did you know that?

12   A.   Are you talking about when Sam was her supervisor?

13   Q    Sam was assigned to be Ms. Varner's supervisor, right?

14   A.   Okay.

15   Q    He continued to be your supervisor during that time

16        period?

17             MS. WALLET:  He who?

18             MR. MacMAIN:  Mr. Graham.

19             MS. WALLET:  Thank you.

20             THE WITNESS:  As far as I remember, yeah.  I don't

21        think I had anybody that --

22   BY MR. MacMAIN:

23   Q    Did he ever physically threaten you in any way?

24   A.   The only -- no.

25   Q    Did he ever verbally threaten you during that time
```

Green                                258

1       period?

2   A.  The threat that comes to my mind first is regards to

3       changing my time sheet.  He threatened if I didn't

4       change my time sheet I wouldn't get paid.  So I had to

5       change the time sheet to meet his standards as opposed

6       to the truth.

7   Q   Where is that referenced?

8   A.  First page, 12/16.  I got my pay docked for an hour.

9   Q   I'm focussing the time frame from July of '97 to March

10      of '98, when Ms. Varner had been reassigned to

11      Mr. Miller, Mr. Graham continued to be your supervisor.

12      During that time period, okay?  Did Mr. Graham ever

13      threaten you verbally in any way?

14  A.  No.

15  Q   And in fact, since this incident was reported by

16      Ms. Varner, Mr. Graham's never verbally threatened you?

17  A.  Correct.

18  Q   You said during that time period you weren't aware of

19      any specific incidents or any specific statements that

20      Mr. Graham made toward Ms. Varner, correct?  Let me back

21      up.

22          You had said the office was tense during that time

23      period when Mr. Graham was still there, correct?

24  A.  Okay.  Yes.

25  Q   But you could not provide any specific statements or

Green                          259

1        specific incidents for the basis of that statement,

2        correct?

3    A.  I think I mentioned the incident where I'm sitting in my

4        chair, she's behind her desk, it was -- I remember being

5        in her office when he was -- that's whenever he either

6        threw something or slammed something down or pushed

7        something off her desk.  And I don't remember the date

8        of that, but to me that was very intimidating and kind

9        of harassing.

10   Q.  Can I focus on just that time period between July of '97

11       and March of '98?  That didn't happen during that time

12       period, did it?

13   A.  I don't know.

14   Q.  You said you were out of the office a lot during that

15       time period?

16   A.  More than I am now.

17   Q.  How often were you out of the office during that time

18       period?

19   A.  Well, actually, I'm like 30, 40 percent maybe.  On

20       really bad days I would try to get out.  But on the

21       average for a month, I was one of the probation officers

22       who spent more time in the office than out.

23   Q.  The birthday card you were asked about, did you ever

24       look at the birthday card?  Did Ms. Varner show it to

25       you?

1    A.    I have seen it.  I couldn't tell you what it looked like

2          now.

3    Q     Do you recall when that was she told you that she

4          received this birthday card?

5    A.    I'm going to say in January shortly after she had

6          received it.  I couldn't tell you what year.

7    Q     Can you put it in relation to any other events to put it

8          in context regarding the year?

9    A.    It was back when he was being nice to her as opposed to

10         before, you know, the tension all got started.  I'm

11         remembering it back as in the first year or two,

12         perhaps.

13   Q     So '95-'96 time period?

14   A.    Maybe, yeah.

15   Q     And you said you thought that was kind of, I think you

16         used the word weird or strange?

17   A.    Yeah.

18   Q     Did you put that in your time line?

19   A.    Apparently not.

20   Q     You refer to that, categorized it as missing paperwork

21         from this Linsenbach file; is that what you said?

22   A.    Yes.

23   Q     What specifically do you think is missing from the file?

24   A.    It was a packet of photocopied black-and-white

25         information.  And I remember seeing a part of a

Green                                261

 1          newspaper, like, an underground newspaper type thing.

 2          I'm not a hundred percent on that, as to whether or not

 3          that was something that she had that was returned to her

 4          and her parents destroyed it or something, or if that

 5          was in the file.

 6              But specifically, I remember the piece of

 7          information that was missing had to do with male

 8          homosexual material.  And it also referenced on there

 9          golden shower, the phrase golden shower, and that's the

10          piece that I remember as being missing.  And it was a

11          paper or stapled section, packet of information.

12   Q    How many pages do you think, approximately?

13   A.   I would guess 10, front and back, probably.  I think

14          those were front and back pages.

15   Q    We had marked at a prior deposition, I don't have a copy

16          with me, a laundry list of criminal charges that

17          Ms. Varner was considering filing against Mrs. Graham.

18              Have you ever seen that document before?

19              MS. WALLET:  I'm sorry, I have to object to the

20          form of the question because I don't think that

21          accurately reflects -- I remember the list but I don't

22          remember anyone saying that they were charges against

23          Mrs. Graham.

24   BY MR. MacMAIN:

25   Q    Well, for purposes of my question, there was a

Green
262

```
 1              document previously marked at Ms. Varner's deposition

 2              which was a list of criminal charges either she was

 3              considering filing against Mr. Graham or Mrs. Graham.

 4                   Are you familiar with that document?

 5     A.   I don't know of any charges against -- no.  I don't know

 6          what you're referencing.

 7     Q    It was previously marked as Varner 11.  I'll show you

 8          the document and we'll read this aloud.

 9                   Have you ever seen this document before?

10     A.   I'm going to say no, but yet, that looks like my

11          handwriting up here, so that's where I'm confused.

12     Q    So some of the --

13     A.   It looks like my handwriting.  Some of it looks like

14          mine, some of it looks like Barb's.

15     Q    Ms. Varner testified that you helped her prepare this

16          list.  Does that refresh your recollection?

17     A.   That could be.

18     Q    You just don't remember that?

19     A.   I don't remember sitting down with her and doing it.

20          But I do remember talking to her and kind of, I'm going

21          to say entertaining myself with all the criminal stuff

22          that Gary's been doing.

23     Q    Some of the handwriting on this list is yours?

24     A.   It looks like it.  I don't remember it, but it does look

25          like it.
```

Green                                    263

```
 1   Q    And that's not on your time line anywhere, this meeting

 2        about sitting down and preparing --

 3   A.   There's lot of stuff not on my time line.  If you didn't

 4        see it, it's not there.

 5             MR. MacMAIN:  That's all the questions I have.

 6        Thanks.

 7             MS. WILLIAMS:  I have a couple more for you.

 8             MS. WALLET:  I have to ask for two minutes.

 9             (Recess taken from 3:15 until 3:33 p.m.)

10   BY MS. WILLIAMS:

11   Q    Ms. Green, you told us about the cunt club incident.

12        Do you know at what level that cunt club incident or

13        comment was settled?

14   A.   No, I don't.

15   Q    So you don't know whether it ever got to Judge Sheely?

16   A.   I don't know that.

17   Q    And you don't know whether Judge Sheely ever had any

18        complaint from Kerry Houser or Kerry Vohs at that time?

19   A.   No, I don't know.

20   Q    Now, you testified that Gary suggested you change

21        political parties.  Did Judge Sheely ever tell you to

22        change political parties?

23   A.   No.

24   Q    You never had any conversation with Judge Sheely about

25        politics on that, did you?
```

Green

264

 1   A.   Correct.

 2   Q    And in fact, Judge Sheely retired shortly after you came

 3        on as a probation officer, didn't he?

 4   A.   Correct.

 5   Q    So he never had to run for office again, did he?

 6   A.   Correct.

 7   Q    And he had little need for political support at that

 8        point in his career?

 9   A.   Yes.

10   Q    Do you agree?

11   A.   Yes.

12   Q    Now, you mentioned some complaints that you have had

13        about Tom Boyer's conduct.  Did you ever make any

14        complaints to President Judge Sheely about Tom Boyer?

15   A.   No.  I didn't have any concerns over Tom's behavior back

16        when Judge Sheely was judge.

17   Q    And other than what we've talked about in your meeting

18        with Judge Hoffer, did you make any complaints to

19        President Judge Hoffer about Tom Boyer --

20   A.   No.

21   Q    -- and his conduct?

22        MS. WILLIAMS:  That's all I have for you.  Thanks a

23        lot.

24   BY MS. WALLET:

25   Q    I have only two questions.  Did Judge Sheely, when he

Green                                265

```
 1            did interview you, ask you any questions about your

 2            personal life?

 3    A.      Like whether or not I was married or was going to have

 4            children?  Is that how personal you want?

 5    Q       Yes.

 6    A.      Okay.  He asked me just that, if I was married, if I had

 7            a husband, what did he do, what was his occupation.  He

 8            asked me if I had any children, if I planned on having

 9            children or would need any, I guess time off for having

10            children, along that line.

11                 And I answered everything.  It's, like, yes, I have

12            a husband, here's what he does, and no, I have no

13            children and have no plans for having children.

14    Q       Was there a time when you called Barbara Varner and told

15            her not to come to work because you were fearful of her

16            safety?

17    A.      Yes.  Don't ask me the date, I don't know it.  But what

18            I do remember sitting in my office in the Juvenile

19            Probation side, I remember calling her and telling her

20            to stay away, that I remember Gary being very loud and

21            volatile, and I just didn't feel that she needed to be

22            present.  I can't remember specific comments that he had

23            made.  I'm trying to play that back through my mind.

24    Q       Do you know why Ms. Varner was not at work that day?

25    A.      I'm thinking she was working.  I'm thinking she was
```

Green
266

```
 1              working in the field.  Doing supervision work outside
 2              the office is what I mean by that.  I'm not a hundred
 3              percent, but I'm thinking I called her on her cell phone
 4              and suggested that she not come in because of the
 5              atmosphere.
 6     Q        And do you remember what you told Ms. Varner?
 7     A.       I remember a conversation telling her to stay away, that
 8              Gary was in a tirade and just not come in.  I don't
 9              remember, I'm drawing a blank.  Ask me about that next
10              time you bring me back, maybe I'll think of it.
11                  MS. WALLET:  I used my two questions.  Thank you
12              very much.
13                  MS. WILLIAMS:  I have two.
14     BY MS. WILLIAMS:
15     Q        Ms. Green, in your initial hiring interview with
16              President Judge Sheely, could you have told the judge
17              that you would prefer not to answer his personal
18              questions if you felt they were inappropriate?
19     A.       Personally, I would never have done that, especially at
20              that time in my life.  I was always taught be respectful
21              to your elders, and he's, like, the judge, so anything
22              he asked I would have answered just because he was the
23              judge.  And he was very nice, polite to me.
24     Q        But you feel you answered voluntarily his questions?
25     A.       Yes.
```

1    Q    And he did approve your hiring, did he not?

2    A.   Yes.

3              MS. WILLIAMS:  Thank you very much.

4              MR. MacMAIN:  I have two.

5    BY MR. MacMAIN:

6    Q    You had said before that you never have gotten any

7         kind of verbal or physical threat from Mr. Graham,

8         correct?

9    A.   Yeah.  He never, like, slapped me or did anything.

10   Q    To your knowledge, has Mr. Graham made any physical or

11        verbal threats to Ms. Varner since '97 when this

12        incident was complained about?

13   A.   Not that I'm aware of.  That was two.  I'm sorry.

14             MR. MacMAIN:  That's all the questions I had.

15             (Whereupon, the deposition was concluded at

16        2:39 p.m.)

17                            *   *   *   *   *

18

19

20

21

22

23

24

25

```
COMMONWEALTH OF PENNSYLVANIA        )
                                    )  SS.
COUNTY OF DAUPHIN                   )
```

        I, Emily R. Clark, Reporter and Notary Public in
and for the Commonwealth of Pennsylvania and County of
Dauphin, do hereby certify that the foregoing testimony
was taken before me at the time and place hereinbefore
set forth, and that it is the testimony of:


                    DEBRA GREEN


        I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

        I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

        Dated at Harrisburg, Pennsylvania, this 7th day of
May, 2003.



                            _____
                            Emily R. Clark
                            Reporter - Notary Public



(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)