IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . .

| | |
|---|---|
| BARBARA E. VARNER, | . |
| Plaintiff, | .   CIVIL ACTION |
| | .   NO. 1:CV 01-0725 |
| vs. | . |
| | . |
| COMMONWEALTH OF PENNSYLVANIA, | .   (JUDGE YVETTE KANE) |
| NINTH JUDICIAL DISTRICT, | . |
| CUMBERLAND COUNTY; CUMBERLAND | . |
| COUNTY; S. GARETH GRAHAM, | . |
| Individually, and JOSEPH | . |
| OSENKARSKI, individually, | . |
| Defendants. | . |

. . . . . . . . . . . . .

VOLUME 2
*Pages 71 to 223*

Deposition of: **JOSEPH L. OSENKARSKI**

Taken by      :   Plaintiff

Date          :   February 11, 2003, 9:14 a.m.

Before        :   Emily Clark, RMR, Reporter-Notary

Place         :   Administrative Offices of
                  Pennsylvania Courts
                  5035 Ritter Road, Suite 700
                  Mechanicsburg, Pennsylvania


APPEARANCES:

    DEBRA K. WALLET, ESQUIRE
        For - Plaintiff

    ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
    BY:  A. TAYLOR WILLIAMS, ESQUIRE
        For - Defendant Commonwealth of Pennsylvania
              Ninth Judicial District, Cumberland County

    THOMAS, THOMAS & HAFER
    BY:  PAUL J. DELLASEGA, ESQUIRE
        For - Defendant Cumberland County

FORM CSR - LASER REPORTERS PAPER & MFG. CO.   800-626-6313

Joseph Osenkarski

1      Q.      Let me try that question again.  Mr. Osenkarski,

2  as a result of your meeting with Mr. Deluce in April of 1997

3  did you believe that any action was required by you as a

4  supervisor with respect to Mr. Graham?

5      A.      No.

6      Q.      Did you believe that any action was required by

7  you with respect to Ms. Varner?

8      A.      No.  It was common sense told me that an

9  investigation was going on, and common sense would tell me

10 that I should not interfere with any investigation.

11     Q.      Do you know whether other individuals under your

12 supervision were interviewed in or about that same time?

13     A.      Yes, I was told that others would be interviewed.

14     Q.      Do you know who was interviewed?

15     A.      No, not specifically.

16     Q.      Did you, sir, at any time tell Ms. Varner that it

17 was not proper for her to go to Mr. Hartnett, a personnel

18 officer for the county, with regard to her complaints of

19 harassment?

20     A.      No.

21     Q.      You wrote a memorandum in or about June 13th of

22 1997 relieving Mr. Graham of any authority or responsibility

23 concerning Barbara Varner.  Do you remember that, sir?

24     A.      Yes.

25     Q.      Did you write that memo before or after you met

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . .
BARBARA E. VARNER,                  .
    Plaintiff,              .   CIVIL ACTION
                 .   NO. 1:CV 01-0725
    vs.                     .

                .
COMMONWEALTH OF PENNSYLVANIA,  .   (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,            .
CUMBERLAND COUNTY; CUMBERLAND  .
COUNTY; S. GARETH GRAHAM,      .
Individually, and JOSEPH       .
OSENKARSKI, individually,      .
    Defendants.             .
. . . . . . . . . . . . . . . .

Deposition of:  HON. GEORGE E. HOFFER

Taken by    : Defendant Cumberland County Court

Date      : April 4, 2003, 1:46 p.m.

Before    : Emily Clark, RMR, Reporter-Notary

Place     : Cumberland County Courthouse
            One Courthouse Square
            Carlisle, Pennsylvania

APPEARANCES:

DEBRA K. WALLET, ESQUIRE
   For - Plaintiff

ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
BY:  A. TAYLOR WILLIAMS, ESQUIRE
   For - Defendant Commonwealth of Pennsylvania
      Ninth Judicial District, Cumberland County

THOMAS, THOMAS & HAFER
BY:  JAMES K. THOMAS, II, ESQUIRE
   PAUL J. DELLASEGA, ESQUIRE
   For - Defendant Cumberland County

Hon. George Hoffer          38

1      be a genius to see that there was extreme antipathy

2      between these two women, and that was what it was all

3      about.  And Barbara Graham mainly wanted to tell me her

4      side of the story about various incidents.

5   Q    Did you personally observe any relationship between

6      Barbara Varner and Barbara Graham?

7   A.   Relationship?

8   Q    Did you ever observe the two of them in the same place?

9   A.   No.

10  Q    You knew about the, what you've described as antipathy

11     between the two of them because of what people told you?

12  A.   Ma'am, I knew about this lawsuit of Ms. Varner's going

13     on.  You have the demotion.  These people aren't

14     friends.

15  Q    Okay.  Did you place some restrictions on Ms. Varner

16     with regard to where she could go within the courthouse?

17  A.   No.

18  Q    Did you call Joe Osenkarski to your courtroom or your

19     chambers and instruct him to tell Ms. Varner that she

20     had some restrictions on where she could go?

21  A.   I don't recollect, but I may have said to Joe please ask

22     Ms. Varner to stay out of the stenographers' room till

23     we get that taken care of, till we get our renovations

24     taken care of.

25    Q    And you thought it was limited to the stenographers'

Hon. George Hoffer          39

1      room?

2   A.   I don't understand your question, ma'am.

3   Q    To the best of your recollection, what did you tell

4        Mr. Osenkarski to tell Ms. Varner?

5   A.   Well, I think you have to understand the situation at

6        the time.  Are you interested in that or not?

7   Q    Sure.

8   A.   At the particular time the old jurors' lounge on the

9        fourth floor of the courthouse used by the lawyers had

10       been used by a judge.  The judge had moved out and we

11       were renovating that space for the court stenographers

12       since we had recently lost their space in the old

13       section of the courthouse.  So the stenographers all had

14       to be moved into what was then occupied by Juvenile

15       Probation and perhaps some Adult Probation in there,

16       too.  Ms. Varner -- excuse me -- Ms. Graham was in this

17       temporary quarters with everyone else.

18          Now, having that understanding I'm ready for your

19       question.

20  Q    Okay.  And these quarters where the stenographers were,

21       is that on the third floor east wing of the courthouse?

22  A.   They were on the third floor at that time, yes,

23       temporarily.

24  Q    You told Mr. Osenkarski to relay something to

25    Ms. Varner?

Hon. George Hoffer                40

1   A.   I may have said something to Joe routinely.

2   Q    Well, what was routine about that?

3   A.   Well, I may have asked him to have Ms. Varner, whose

4        office was not in this section, anyway, to stay out of

5        there unless we have some exchange between she and

6        Mrs. Graham.  I thought it was routine.

7   Q    Did you ever restrict any of your other probation

8        officers from entering any part of the courthouse?

9   A.   I have not restricted any probation officer at any time

10       other than Gary Graham, whose card we took away.

11  Q    So you didn't consider this a restriction on Ms. Varner?

12  A.   I did not restrict her movements, ma'am.

13  Q    Okay.  You told Mr. Osenkarski that she should stay away

14       from the stenographers' area?

15  A.   Please stay away from the room where Barbara Graham is

16       working.

17  Q    Okay.  To the best of your knowledge, did Mr. Osenkarski

18       carry out your instructions?

19  A.   Well, I suspect he did, because I got a note from

20       Mrs. Varner that day or the very next day:  Put it all

21       in writing.  That's what prompted me to have her up to

22       my office.

23  Q    Okay.

24  A.   I knew we had a problem.

25          MS. WALLET:  Well, let me mark now as Deposition

Hon. George Hoffer          45

1      result of this meeting with Ms. Varner?

2   A.   Straightened what out?

3   Q    Where Ms. Varner could go and not go.

4   A.   I didn't --

5         MR. THOMAS:  Objection to form.

6         THE WITNESS:  I didn't know.

7         MR. THOMAS:  Object to form.  He can answer.

8         THE WITNESS:  I didn't know if it was straightened

9      out or not, ma'am.

10   BY MS. WALLET:

11   Q    Okay.  Did you intend to change the instructions that

12       Mr. Osenkarski had given Ms. Varner?

13   A.   What instructions?

14   Q    That she not go anywhere on the third floor east wing of

15       the courthouse?

16   A.   I don't know what instructions he gave her, ma'am.  I

17       don't have any recollection of discussing any

18       instructions from Osenkarski.  Whatever they were, were

19       irrelevant.  This is myself and Ms. Varner talking

20       directly about this.

21   Q    Well, let me ask you this, Judge Hoffer.  Did she agree

22       as a result of this meeting to what you had asked her to

23       do?

24   A.   My impression was that she did not.

25   Q   Did you give a her an order?

Hon. George Hoffer              46

1   A.   What order?

2   Q    An order not to go to the office where Barbara Graham

3        was.

4   A.   Absolutely not, ma'am.

5   Q    So you asked her to do something, she didn't agree, and

6        that's --

7   A.   I said I had the impression that she did not agree.  She

8        never gave me a definitive answer.

9   Q    Did you believe as a result of this meeting that she

10       would stay out of the stenographers' section?

11  A.   I didn't know, ma'am.  That remained to be seen whether

12       she would voluntarily agree to do that or not.

13  Q    Is it your position, sir, that she was never restricted

14       with regard to where she could go in the courthouse?

15  A.   Absolutely no restrictions.

16  Q    Did you place any similar restrictions on Barbara

17       Graham?

18  A.   I haven't restricted anyone, ma'am.

19  Q    Well, let me ask it a different way.  You asked

20       Ms. Varner to stay out of the area where Barbara Graham

21       was.  Did you ask Ms. Graham to stay out of the area

22       where Barbara Varner was?

23  A.   I told Ms. Graham to stay away from Ms. Varner, period.

24  Q    And when did you tell her that?

25   A.   Oh, that was -- I don't recollect.

Barbara E. Varner    v.
Commonwealth of Pennsylvania, et al.

Barbara E. Varner
Vol. 1, January 27, 2003

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA E. VARNER,

Plaintiff,    .   CIVIL ACTION

NO. 1:CV 01-0725

vs.

COMMONWEALTH OF PENNSYLVANIA,  .  (JUDGE YVETTE KANE)

NINTH JUDICIAL DISTRICT,

CUMBERLAND COUNTY; CUMBERLAND

COUNTY; S. GARETH GRAHAM,

individually, and JOSEPH

OSENKARSKI, individually,

Defendants.

VOLUME 1

Pages 1 to 228

Deposition of: BARBARA E. VARNER

Taken by                 : Defendant Cumberland County

Date                     : January 27, 2003, 9:35 a.m.

Before                   : Emily Clark, RMR, Reporter-Notary

Place                    : Administrative Offices of

Pennsylvania Courts

5035 Ritter Road, Suite 700

Mechanicsburg, Pennsylvania

APPEARANCES:

DEBRA K. WALLET, ESQUIRE

For - Plaintiff

ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS

BY: A. TAYLOR WILLIAMS, ESQUIRE

For - Defendant Commonwealth of Pennsylvania

Ninth Judicial District, Cumberland County

THOMAS, THOMAS & HAFER

BY: JAMES K. THOMAS, II, ESQUIRE

PAUL J. DELLASEGA, ESQUIRE

For - Defendant Cumberland County

2

[1] APPEARANCES (continued):

[2]   MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

     BY: DAVID J. MacMAIN, ESQUIRE

[3]      For - Defendant S. Gareth Graham

[4]   SWEENEY & SHEEHAN, P.C.

     BY: PAUL LANCASTER ADAMS, ESQUIRE

[5]      For - Defendant Joseph L. Osenkarski

[6]

[7] ALSO PRESENT:

[8]   MR. LEE VARNER

[9]   MR. S. GARETH GRAHAM

[10]  MR. JOSEPH L. OSENKARSKI

[11]  MS. MELANIE McDONOUGH

[12]  MR. PETER ZANGARDI

[13]  MS. PAT LANE

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 3

[1]              INDEX

[2]              WITNESS

[3] Barbara E. Varner          Examination

[4]   By Mr. Thomas                    4

[5]

[6]

              EXHIBITS

[7]

   Varner Deposition

[8] Exhibit Number              Page

[9] 1  4-page memo, 4/25/97, to Hartnett from  191

      Varner, annotated

[10]

    2  1-page memo, 6/13/97, to Varner from Osenkarski  192

[11]

    3  4 pages: 1-page memo, 7/17/97, to Ward and  194

[12] Deluce from Sheely; 3-page memo, 7/11/97, to

     Ward and Deluce from Sheely

[13]

    4  1-page handwritten note, 7/21/97, "Dear  196

[14] Jo Ann"

[15] 5  10-page EEOC Complaint          197

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 4

STIPULATION

[2] It is hereby stipulated by and between the

[3] respective parties that signing, sealing, certification

[4] and filing are waived; and that all objections except as

[5] to the form of the question are reserved until the time

[6] of trial.

[7]

[8]     BARBARA E. VARNER, called as a witness, being duly

[9] sworn, was examined and testified, as follows:

[10]            BY MR. THOMAS:

[11]    Q: Will you state your full name for the record, please?

[12]    A: Barbara Eileen Varner.

[13]    Q: And where do you presently reside, Barbara?

[14]    A: I live at 5 Maple Drive in Etters, Pennsylvania.

[15]    Q: You understand you're here today for us to take your

[16] sworn testimony in a case which you've instituted

[17] against the Cumberland County Court, Cumberland County

[18] and certain individuals? You understand that?

[19]    A: Yes, I do.

[20]    Q: Is there any reason today that you could not understand

[21] and answer questions completely?

[22]    A: No.

[23]    Q: Are you on any type of medication that would affect your

[24] ability to comprehend the questions that are asked today

[25] and answer fully and completely?

Page 231

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARBARA E. VARNER,
   Plaintiff,   . CIVIL ACTION
           . NO. 1:CV 01-0725
   vs.
COMMONWEALTH OF PENNSYLVANIA, . (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,
CUMBERLAND COUNTY; CUMBERLAND .
COUNTY; S. GARETH GRAHAM,
Individually, and JOSEPH
OSENKARSKI, individually,
   Defendants.

VOLUME 2
Pages 229 to 424

Deposition of: BARBARA E. VARNER

| | | |
|---|---|---|
| Taken by | : | Defendant Cumberland County |
| Date | : | January 28, 2003, 9:27 a.m. |
| Before | : | Emily Clark, RMR, Reporter-Notary |
| Place | : | Administrative Offices of |

     Pennsylvania Courts
     5035 Ritter Road, Suite 700
     Mechanicsburg, Pennsylvania

APPEARANCES:

   DEBRA K. WALLET, ESQUIRE
     For - Plaintiff
   ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
   BY: A. TAYLOR WILLIAMS, ESQUIRE
   For - Defendant Commonwealth of Pennsylvania
   Ninth Judicial District, Cumberland County
   THOMAS, THOMAS & HAFER
   BY: JAMES K. THOMAS, II, ESQUIRE
     PAUL J. DELLASEGA, ESQUIRE
     For - Defendant Cumberland County

230

[1] APPEARANCES (continued):
[2]  MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
   BY: DAVID J. MacMAIN, ESQUIRE
[3]    For - Defendant S. Gareth Graham
[4]  SWEENEY & SHEEHAN, P.C.
   BY: PAUL LANCASTER ADAMS, ESQUIRE
[5]    For - Defendant Joseph L. Osenkarski
[6]
[7] ALSO PRESENT:
[8]  MR. S. GARETH GRAHAM
[9]  MR. JOSEPH L. OSENKARSKI
[10]  MS. MELANIE McDONOUGH
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

[1]          INDEX
[2]         WITNESS
[3] Barbara E. Varner     Examination
[4]   By Mr. Thomas      417
[5]   By Ms. Williams     256
[6]   By Mr. MacMain     331
[7]   By Mr. Adams     232, 420
[8]
[9]         EXHIBITS
[10] Varner Deposition
    Exhibit Number       Page
[11]
   6  1-page memo, 3/27/02, to Hoffer from Varner 261
[12]
   7  28 pages, handwritten notes    263
[13]
   8  1-page handwritten note, 12/3/96 "Joe"  286
[14]
   9  3-page memo, 7/11/97, to Ward and Deluce from 288
[15]    Sheely
[16] 10  1-page "Fax Transmission Sheet" 1/12/00, to 293
   Wallet from Varner
[17]
   11  1-page handwritten notes, "terroristic threats" 296
[18]
   12  1-page memo, 7/12/00, to Guido from Varner 312
[19]
   13  37-page "National CASA Association Request for 313
[20]    Proposals, New Program Development"
[21] 14  2 pages, handwritten notes, 12/16/96, "Trip 373
   to Lourdesmont"
[22]
   15  4-page Probation Department report, 4/8/97 375
[23]
   16  1-page memo, 4/25/97, to Hartnett from Varner 413
[24]
[25]

**Page 17**

[1] down beside me.

[2]  Q: What conversation did you have with Mr. Graham?

[3]  A: General business. He said he was going to visit his

[4] sister. Apparently his wife and children were going to

[5] go with him that day.

[6]  Q: He told you he was going to visit his sister?

[7]  A: That's correct.

[8]  Q: What explanation, if any, did you give Carol Snokes and

[9] Wayne Shearer as to why you were on the bus or where you

[10] were going?

[11]  A: I told Carol I was going down to lay on the beach, that

[12] I passed my undergrad and that was my goal.

[13]  Q: So if I understand correctly, as the trip progressed

[14] after leaving Harrisburg, you and Mr. Graham were

[15] sitting together?

[16]  A: Yes.

[17]  Q: Is that correct?

[18]  A: That's correct.

[19]  Q: And Carol Snoke and Wayne Shearer were sitting in the

[20] seat in front of you?

[21]  A: That's correct.

[22]  Q: After you got to Atlantic City tell me what you did.

[23]  A: I walked through one of the casinos and went out to the

[24] beach.

[25]  Q: Do you remember which casino?

**Page 18**

[1]  A: No, I don't.

[2]  Q: Was it Bally's, by chance?

[3]  A: Wherever the bus dropped us off. I'm not sure.

[4]  Q: And that was a Rohrer bus?

[5]  A: Yes.

[6]  Q: Tell me how you spent the day.

[7]  A: I was on the beach.

[8]  Q: All day?

[9]  A: Yes. Stopped to get something to drink, went up to one

[10] of the little concessions, and then I went back down.

[11] Used the restroom and then I went back to the beach.

[12]  Q: Do you remember what the date of that trip was?

[13]  A: No, I don't know exactly. I finished my classes June.

[14] I'm not sure of the date.

[15]  Q: Were you in the Bally Hotel casino at all that day?

[16]  A: The trip gave you so much, so many tokens to spend, so I

[17] used those before going back on the bus.

[18]  Q: Was that in Bally's?

[19]  A: I'm not sure which one it was.

[20]  Q: Have you ever eaten at Coakley's?

[21]  A: Yes.

[22]  Q: Is that a regular place where you dine?

[23]  A: My husband and I used to go there quite frequently.

[24]  Q: Have you ever been there with Mr. Graham?

[25]  A: Yes, I have.

**Page 19**

[1]  Q: On how many occasions?

[2]  A: Several. He had a person in there he was supervising

[3] who worked I believe in the kitchen, and he would stop

[4] to do a supervision check on him.

[5]  Q: And why would you and Mr. Graham be together?

[6]  A: Because he was training me.

[7]  Q: Can you give me an estimate of how many times you were

[8] in Coakley's with Mr. Graham?

[9]  A: Several.

[10]  Q: During what time frame?

[11]  A: Are you asking during the day, or?

[12]  Q: Either.

[13]  A: It was always during the day. It was always lunchtime,

[14] time frame 1995 to '97, '96, somewhere around there.

[15]  Q: Where would your car be that you were with Mr. Graham?

[16]  A: Quite often at the courthouse, we would leave from the

[17] courthouse, in my parking lot.

[18]  Q: So you would leave together?

[19]  A: Yes.

[20]  Q: Were there ever occasions when you met Mr. Graham in New

[21] Cumberland?

[22]  A: If there was supervision in that area, yes. We would

[23] supervise several kids, several kids he was transferring

[24] to me, that I was down in that area, anyway, since we

[25] would meet. And then he would take me over to meet the

**Page 20**

[1] juveniles or in order to supervise them.

[2]  Q: Meaning the individual he was supervising at Coakley's?

[3]  A: No. There was other juveniles in New Cumberland area as

[4] well.

[5]  Q: On those occasions, where would you leave your car when

[6] the two of you met?

[7]  A: Usually behind Coakley's, in the parking lot.

[8]  Q: Did you ever meet at a grocery store in New Cumberland?

[9]  A: No.

[10]  Q: Do you remember the name of the individual that he was

[11] supervising at Coakley's?

[12]  A: No, I don't. It was an adult.

[13]  Q: It was an adult he was supervising?

[14]  A: Yes.

[15]  Q: Why would he have been supervising an adult in 1995?

[16]  A: At that time we were combined. We were adult and

[17] juvenile combined. So Mr. Graham did both adult and

[18] juveniles. I was specifically juvenile.

[19]  Q: And after the split occurred in 1996, did you still go

[20] to Coakley's with Mr. Graham?

[21]  A: No, I didn't. No.

[22]  Q: So you were never in Coakley's after 1996 when the split

[23] occurred between adult and juvenile? Never there with

[24] Mr. Graham?

[25]  A: I don't believe so.

Page 97

[1] Mr. Graham's leadership or training to anybody?

[2]   A: At the very beginning, no. In '95, no.

[3]   Q: When did you first complain about any problems with

[4] Mr. Graham's leadership or training?

[5]   A: Whenever I went to Mr. Osenkarski, there was a day that

[6] I had taken cases in to Mr. Graham in '96 — '96, '97.

[7] I had taken cases in to him. And I had done everything

[8] that was supposed to be done, gotten everything

[9] together. And he started screaming at me and said who

[10] the F, meaning, do I think I am, making decisions on

[11] these cases.

[12]   When I worked, turned cases in to Mr. Osenkarski, I

[13] never had a problem with going ahead and making a

[14] decision on what I would recommend for disposition on

[15] the juvenile. Suddenly, I had done everything wrong,

[16] according to him. He screamed at me, threw me out of

[17] his office. And I went to Mr. Osenkarski and I said,

[18] you have to get the guy under control. And he said,

[19] he's in charge, I put my so many years in with the

[20] county and he's in charge.

[21]   Q: When was this?

[22]   A: It was in '97.

[23]   Q: So from February 1995 when you started until sometime in

[24] 1997, you never complained about Mr. Graham's leadership

[25] or training?

Page 98

[1]   A: Not to him. To other people. Other people agreed with

[2] me, other staff members, co-workers.

[3]   Q: But you never went up the chain of command to

[4] Mr. Osenkarski prior to 1997?

[5]   A: Like I said, I sought out other help as far as

[6] petitions. He was not — he was not screaming at me or

[7] those kind of things, which happened later on. But I

[8] was aware that he was inconsistent.

[9]   Q: We'll come back to that in a minute. But what do you

[10] attribute the change of behavior to?

[11]   A: Whenever Chief Bolze retired and we split adult and

[12] juvenile and there was not that person who could

[13] basically keep the lid on Mr. Graham, which would have

[14] been Chief Bolze. It was now only Mr. Osenkarski.

[15]   Q: Up until the time of Bolze's retirement, you and

[16] Mr. Graham had a good relationship?

[17]   A: Working relationship.

[18]   Q: And would you describe it as no better than a working

[19] relationship?

[20]   A: I would say no better than that, no.

[21]   Q: When did Bolze retire?

[22]   A: August of '96.

[23]   Q: So from February 1995 until August of 1996 you had no

[24] particular problem with Mr. Graham?

[25]   A: Not with any nasty or yelling at me, no.

Page 99

[1]   Q: No screaming?

[2]   A: No, not at that point.

[3]   Q: No sexual harassment?

[4]   A: Yes, there was incidents of that, but not of the

[5] violence or fear that I had experienced later on.

[6]   Q: We'll talk about the sexual harassment in a minute. But

[7] the episode of deterioration in the relationship, at

[8] least the screaming or fear as you've described it,

[9] didn't materialize until after August of 1996?

[10]   A: Until after Chief Bolze had retired.

[11]   Q: At that point you had been working with him for a year

[12] and a half, or approximately that long, correct?

[13]   A: That's correct.

[14]   Q: And had had no episodes of him losing his temper with

[15] you or screaming at you?

[16]   A: Not at me. With other people, but not at me.

[17]   Q: Had he been complimentary of your work for that year and

[18] a half?

[19]   A: Chief Osenkarski at times was, but Graham, no.

[20]   Q: Who was responsible for doing reviews on you?

[21]   A: Mr. Osenkarski and Mr. Graham signed as well.

[22]   Q: Did you receive unfavorable reviews during the 18 months

[23] from February '95 until August of '96?

[24]   A: Initially Ken Bolze, when he was there he was also

[25] involved in evaluations, and they were fine. I had no

Page 100

[1] problems with my evaluations.

[2]   Q: At any time?

[3]   A: No.

[4]   Q: Was there any particular event or happening that

[5] occurred as best you understand it about August of '96

[6] caused Mr. Graham to suddenly start screaming at you?

[7]   A: I think he had free reign. Mr. Osenkarski took a back

[8] seat and turned everything over to Mr. Graham.

[9]   Q: But there was no specific event? Other than the

[10] retirement of Chief Bolze.

[11]   A: It was a slow progression. Slow progression that you

[12] could see the power and the authority he was just

[13] gaining, gaining the power, and you could feel that. He

[14] was angry most of the time.

[15]   Q: What was he angry about?

[16]   A: It could be basically anything that I did.

[17]   Q: And when did that start?

[18]   A: That would be after Chief Bolze retired.

[19]   Q: After August of '96?

[20]   A: Yes. Things that I had done right one time, that were

[21] acceptable, now were wrong.

[22]   Q: Give me some examples of those things.

[23]   A: Could be the way you do petitions. He just — suddenly

[24] the wording wasn't right. No matter what I did, it was

[25] wrong. He didn't want me —

**Page 153**

[1]  Q: It was sometime after February of '95?

[2]  A: Yes.

[3]  Q: Had you talked to Kerry Houser before that, before you

[4]  got the instruction?

[5]  A: Yes.

[6]  Q: Had you talked to her about her sexual harassment claim?

[7]  A: At that point we had not really discussed it, no. I

[8]  just heard about it when I was with Children and Youth.

[9]  Q: What did you hear about it while you were in Children

[10] and Youth?

[11] A: Just that she had filed a suit against the Department,

[12] Juvenile Department.

[13] Q: Did you hear what the outcome was?

[14] A: No, I didn't.

[15] Q: Do you know whether there was any financial aspect to

[16] the resolution of it?

[17] A: I don't know that.

[18] Q: Did you ever find out?

[19] A: No, I didn't.

[20] Q: What did Mr. Graham instruct you with respect to Kelly

[21] Houser?

[22] A: Kerry Houser. He told me not to talk to her.

[23] Q: Did he tell you why?

[24] A: He said, she's an angry woman, she's divorced, she's an

[25] angry woman, all divorced women are angry.

**Page 154**

[1]  Q: You were a divorced woman at the time, were you not?

[2]  A: Yes, I was.

[3]  Q: Did he tell you that you were an angry woman?

[4]  A: No.

[5]  Q: And in fact, he had expressed or at least as far as you

[6]  were concerned, exhibited a sexual interest in you,

[7]  correct?

[8]  A: Yes.

[9]  Q: Did you follow his instructions not to talk to her?

[10] A: No.

[11] Q: Did you make a notation of when that conversation

[12] occurred?

[13] A: I believe I did.

[14] Q: What date did it occur on?

[15] A: I don't know the date at this time.

[16] Q: Did you have any conversation with him about whether

[17] that conversation was appropriate or inappropriate?

[18] A: I don't think we had a discussion on it. It was just he

[19] told me not to talk to her because of a prior suit that

[20] they had and that she was angry.

[21] Q: Did you respond to him in any fashion when he told you

[22] that?

[23] A: I don't remember. I don't believe.

[24] Q: Did you report that statement by him to anybody in

[25] management?

**Page 155**

[1]  A: Mr. Osenkarski was part of that suit. He would be the

[2]  next in line to complain to, and I chose not to. Again,

[3]  punishment issue.

[4]  Q: Could you have taken your complaint to Judge Sheely?

[5]  A: In hindsight, he probably wouldn't have done anything.

[6]  Q: Could you have taken the complaint to him?

[7]  A: I could have.

[8]  Q: There was nothing that prevented you from doing that,

[9]  was there?

[10] A: No. No.

[11] Q: In fact, you never complained to Judge Sheely about the

[12] treatment you received from Mr. Graham, did you?

[13] A: No, not until after.

[14] Q: Not until after you filed the —

[15] A: Right.

[16] Q: — EEOC Complaint?

[17] A: Right.

[18] Q: But you did understand that Judge Sheely was the head of

[19] the Probation Department, didn't you?

[20] A: Certainly.

[21] Q: In paragraph H you make reference to a conversation that

[22] you had with Mr. Graham involving seniority and the need

[23] to satisfy all parties involved.

[24] A: Yes.

[25] Q: Do you recall that conversation?

**Page 156**

[1]  A: I certainly do.

[2]  Q: When did it occur?

[3]  A: It was — I can tell you where. It was after August of

[4]  '96, it was in my office. Mr. Graham was explaining

[5]  what he called a balanced approach where it's necessary

[6]  for you to satisfy the victim, the community and as well

[7]  as the juvenile to make sure that they're rehabilitated.

[8]  Mr. Graham told me that I have to satisfy the victim,

[9]  the community, and he looked at me and pointed at

[10] himself, that those are the things that I have to

[11] satisfy. And the smile on his face letting me know what

[12] he meant.

[13] Q: Did he make any oral reference to a sexual component to

[14] that satisfaction?

[15] A: His expression saying that I had to satisfy him

[16] certainly meant sexual to me.

[17] Q: Did you challenge him in that regard? Did you ask him

[18] what he meant specifically?

[19] A: I said, I don't want to hear it, and that was it. He

[20] left my office. I didn't want to hear it. And he left

[21] my office.

[22] Q: What was it that led you to believe that the innuendo

[23] there was toward some sort of sexual favor?

[24] A: It was his smile, the way he smiled at me. It wasn't

[25] like a friendly smile, it was a provocative smile I

1 E. Varner          Case 1:01-cv-00725-YK   Document 109   Filed 02/09/2004   Page 19 of 27
., January 27, 2003                                Barbara E. Varner   v.
                                                   Commonwealth of Pennsylvania, et al.

Page 165

[1] Green called and told me what Mr. Graham had said.

[2] **Q:** All right. So it wasn't as if he was confronting you in
[3] person and saying those things; he was doing it in
[4] response to something that set him off in the office?

[5] **A:** He had told me before he felt I had no F-ing ability.
[6] He told me that in the office.

[7] **Q:** Did you report that to anybody?

[8] **A:** Yes. That was whenever, probably almost at the point
[9] where I went down to Human Resources. Well, it was
[10] called the, yeah, Human Resources.

[11] **Q:** And that was in April of 1997?

[12] **A:** Yes.

[13] **Q:** And was it that outburst or something like it that
[14] caused you to go to Human Resources?

[15] **A:** I think it was just a combination of everything. It was
[16] getting worse. No matter what I did, it was wrong.
[17] Anything I did in the past, if I did it now it was
[18] wrong.

[19] Comments were made to me by other probation
[20] officers saying, well — if I would say, how are you
[21] doing this, show me how you do this, and they said don't
[22] come to me because we can do it one way but he won't
[23] allow you to do it that way.

[24] And one of the co — another probation officer had
[25] copied the harassment discrimination policy from the

Page 166

[1] county handbook, almost like as a reminder, like I was
[2] so caught up in this that he reminded me, he said, you
[3] need to go see somebody. He was observing what was
[4] going on.

[5] **Q:** And who was that?

[6] **A:** That was Darby Christlieb.

[7] **Q:** Do you remember when that was?

[8] **A:** It was right before I went down and spoke to
[9] Mr. Hartnett.

[10] **Q:** But you knew that that policy existed, correct?

[11] **A:** Yes, I did. But I think I was so caught up in wondering
[12] what I was doing wrong that I wasn't even thinking
[13] beyond that. I, you know, to complain to
[14] Mr. Osenkarski, I knew it wouldn't do me that much good
[15] because he was not in the office that much. He really
[16] had relinquished his power to Mr. Graham.

[17] **Q:** And I gather you never pursued that route, you never
[18] complained to Mr. Osenkarski?

[19] **A:** Yes, I did. One day I did complain to Mr. Osenkarski.

[20] **Q:** When was that?

[21] **A:** That was —

[22] **Q:** About this same time, about April of '97?

[23] **A:** It would have been a couple, yeah, a couple months, yes.

[24] **Q:** Well, a couple of months or a few days?

[25] **A:** It was not a few days. It was probably prior to that.

Page 167

[1] It was — I can't come up with the date right now.

[2] **Q:** You filed your complaint with Dan Hartnett on April 25,
[3] 1997.

[4] **A:** That's correct.

[5] **Q:** When would it have been in reference to that?

[6] **A:** I would say probably guessing, February, March.

[7] **Q:** And you actually met with Mrs. Osenkarski?

[8] **A:** Yes, I did.

[9] **Q:** In February or March of 1997?

[10] **A:** Right.

[11] **Q:** Where did you meet with him?

[12] **A:** In his office.

[13] **Q:** What did you say to him?

[14] **A:** Mr. Graham had just got done screaming and throwing me
[15] out of his office because he didn't like how I had
[16] handled several cases. And I went into Mr. Osenkarski
[17] and I said, you've got to stop, you've got to get this
[18] man under control.

[19] **Q:** Why was he unhappy with you in February or March of '97?
[20] Meaning Mr. Graham.

[21] **A:** I have no idea.

[22] **Q:** Why was he screaming at you?

[23] **A:** He just was unhappy with the way I handled the cases, I
[24] presume, the pattern I had done a hundreds of times
[25] before. No, a hundred times, 50 times before.

Page 168

[1] **Q:** So the basis for him screaming at you had to do with his
[2] assessment of your performance?

[3] **A:** Yes.

[4] **Q:** And he was unhappy with your performance, he told you —
[5] screamed at you and told you to get out of his office?

[6] **A:** Threw me out of his office.

[7] **Q:** Did he give you any instructions in terms of how he
[8] wanted you to do it differently?

[9] **A:** No.

[10] **Q:** So just threw you out of the office over a performance
[11] issue. You then went to Mr. Osenkarski in February
[12] March, and said, you've got to get this guy under
[13] control?

[14] **A:** Right.

[15] **Q:** What details did you give Mr. Osenkarski in February
[16] March of 1997 about Graham's behavior?

[17] **A:** He had been back in the office to begin with when I had
[18] started discussing this case with Mr. Graham. And I had
[19] looked to Mr. Osenkarski, I said, is this not the way we
[20] always proceed, the same thing we've always done? And
[21] he said, yes, but Mr. Graham's in charge. He verified
[22] that that, indeed, was the way, you know, when we turned
[23] cases in to Mr. Osenkarski that he was fine with it, but
[24] Mr. Graham was in charge.

[25] **Q:** So if I understand correctly, there was an issue about

**Page 169**

[1] the manner in which you were doing some paperwork, I
[2] guess?

[3]   A: Right.

[4]   Q: Graham started to challenge you, Osenkarski was present.
[5] You said to Osenkarski, isn't this the way we always do
[6] it?

[7]   A: Um-hum.

[8]   Q: And Osenkarski said, yeah, but Graham's in charge?

[9]   A: And he exited and went to his office.

[10]   Q: Graham then proceeded to scream at you?

[11]   A: Right, and threw me out of the office.

[12]   Q: Over the manner in which you were doing certain
[13] paperwork?

[14]   A: Right.

[15]   Q: Threw you out of the office and you went to Osenkarski?

[16]   A: Osenkarski's office.

[17]   Q: And said, you've got to get this guy under control?

[18]   A: Absolutely.

[19]   Q: Was there any solicitation of sex involved?

[20]   A: No.

[21]   Q: What was it about the conversation or comments by
[22] Mr. Graham that you found to be demeaning? If you did.

[23]   A: Telling me that I wasn't doing — like I said, things
[24] that I had done before were okay, now all of a sudden
[25] they were not okay. The yelling at me, not even

**Page 170**

[1] explaining anything.

[2]   Q: Had you done similar or identical paperwork in the same
[3] fashion previously?

[4]   A: Yes.

[5]   Q: Without complaint from him?

[6]   A: Yes.

[7]   Q: Did you ever get an explanation from him as to why it
[8] was okay before but it wasn't okay now?

[9]   A: No, I didn't.

[10]   Q: Other than Mr. Osenkarski, did you report that episode
[11] to anybody else?

[12]   A: To Mr. Hartnett.

[13]   Q: Is that when you went to Mr. Hartnett?

[14]   A: It was about that time, yes.

[15]   Q: Do you remember the date on the first occasion in which
[16] you complained to Mr. Hartnett?

[17]   A: No, I don't. It was probably the beginning of —

[18]   Q: April?

[19]   A: April, yes.

[20]   Q: Of 1997?

[21]   A: Um-hum.

[22]   Q: In 17 B, you mentioned this during your earlier
[23] testimony today, you make reference to wadding up paper.
[24] Do you recall exactly when that occurred?

[25]   A: Again, it was '97 — I believe it was '97.

**Page 171**

[1]   Q: Was that something else that you noted in your personal
[2] notes?

[3]   A: Yes.

[4]   Q: And is there a date contained in those notes, to the
[5] best of your recollection?

[6]   A: Yes. Yes, there is.

[7]   Q: What was the subject matter of the discussion that
[8] morning? If it was morning.

[9]   A: It was morning. I was in my office. Debra Green was
[10] also sitting in my office with me. Mr. Graham came in.
[11] I believe I had the file in my desk. Again, it was the
[12] composite of the victims I had listed extensively for
[13] the crime. He was for some reason not happy with how I
[14] had done that. He came in, wadded the paper up, and
[15] this is, I don't know what he called it but he was not
[16] happy with it. He wadded the paper up and threw it at
[17] me.

[18]   He pointed his finger in my face and started
[19] saying, you have no — don't know what you're doing,
[20] just on and on, you have no fucking idea what's going on
[21] here. He was pushing my pictures on my desk towards me,
[22] moving them around and getting right in my face.

[23]   My office, I only had the one entrance and he was
[24] blocking the entrance and he had his hand in my face,
[25] his finger in my face shaking at me.

**Page 172**

[1]   Q: Was Debra Green there for the entire event?

[2]   A: Yes, she was. And he was loud when he did this. And
[3] it's an open office.

[4]   Q: It was loud?

[5]   A: He was very loud and it was an open office. My door
[6] wasn't shut. He was letting me know.

[7]   Q: And he was letting you know that is he —

[8]   A: He was very angry.

[9]   Q: And very angry, again, about your performance on some
[10] given task?

[11]   A: Right.

[12]   Q: He used the word fuck?

[13]   A: Yes, he did.

[14]   Q: How long did that episode last?

[15]   A: Felt like an eternity. Probably he went on and on for
[16] several minutes. I'd say at least three, four minutes,
[17] he went on and on.

[18]   Q: How close did he get to you?

[19]   A: His finger was right in my face. He came around to my
[20] desk, his finger was right in my face.

[21]   Q: He was pointing at you?

[22]   A: Yes, he was.

[23]   Q: And saying what? You have no idea what you're doing?

[24]   A: Yes. F-ing this, and yes, he would scream when he would
[25] talk.

Page 173

[1] **Q:** Other than Deb Green did anybody else witness that

[2] episode?

[3] **A:** I'm sure other people heard it. The secretary's desk is

[4] right outside of my door. But Debra was right in there

[5] when it happened.

[6] **Q:** Did you ever hear Mr. Graham scream at anybody else?

[7] **A:** Yes, I've heard him scream at other people.

[8] **Q:** Who?

[9] **A:** The director of Children and Youth.

[10] **Q:** Who's that?

[11] **A:** Gary Shuey. There was a meeting in the one of the back

[12] rooms.

[13] **Q:** Do you know what that was about?

[14] **A:** I don't know. I have no idea. We just heard the voices

[15] and him screaming.

[16] **Q:** Who else has he screamed at?

[17] **A:** He had raised his voice to quite a few people. As far

[18] as screaming, that kind of thing, I never heard him do

[19] that at anybody but me.

[20] **Q:** So the only person that you've heard him, the only two

[21] people you've heard him ever scream at are you and

[22] Mr. Shuey?

[23] **A:** That I can recall, yes.

[24] **Q:** But you have heard him raise his voice with others?

[25] **A:** Yes.

Page 174

[1] **Q:** Can you tell me who those people are? Let me ask it to

[2] you a different way.

[3] Is there anybody who you haven't heard him raise

[4] his voice with?

[5] **A:** Many people.

[6] **Q:** Who?

[7] **A:** Sam Miller. Hank Thielemann. Dennis Drachbar. The

[8] secretaries, I can't recall him doing that.

[9] **Q:** How long have Miller, Thielemann and Drachbar been with

[10] the Probation Department?

[11] **A:** I'd say probably over 20 years now.

[12] **Q:** Was his elevated tone of voice something that he used

[13] with newer employees?

[14] **A:** No, not that I believe. No.

[15] **Q:** So who else did you hear him raise his voice with?

[16] **A:** Those are the only three — I heard him, he would go in

[17] to Chief Bolze, he would get loud with him. And with

[18] Mr. Osenkarski, he would get very loud with

[19] Mr. Osenkarski. Not to the point of screaming, but he

[20] basically told Mr. Osenkarski what he would do or what

[21] he wouldn't do.

[22] **Q:** Dictating to Osenkarski?

[23] **A:** Absolutely. Absolutely.

[24] **Q:** And he did that in a very loud and forceful manner?

[25] **A:** Yes. I saw him do that several times.

Page 175

[1] **Q:** Did you ever hear him use the fuck word with Osenkarski

[2] or Bolze?

[3] **A:** No.

[4] **Q:** How about anybody else?

[5] **A:** Yes, he would. Just in conversation, describing things,

[6] not in an angry manner.

[7] **Q:** So he used the fuck word as part of his regular

[8] vocabulary?

[9] **A:** I wouldn't say regular, but you heard it occasionally.

[10] **Q:** How about any other swear words, was there anything else

[11] that was part of the vocabulary?

[12] **A:** Not that I can recall.

[13] **Q:** So the principal word that you heard or at least

[14] remembered was fuck?

[15] **A:** Seemed to be.

[16] **Q:** Is there anything else in 17 A through E that we haven't

[17] talked about?

[18] **A:** I don't believe.

[19] **Q:** In paragraph 19 you allege that Mr. Osenkarski also is

[20] guilty of harassment, correct?

[21] **A:** That's correct.

[22] **Q:** Let's look at those allegations, if we could. In 19 A

[23] you say he called attention to your gender and made

[24] inappropriate comments about other females.

[25] Specifically, what did he say?

Page 176

[1] **A:** He made the comment when I was standing at the door of

[2] our office talking to another probation officer, Mike

[3] Varner, he walked past — Mr. Varner and I had no

[4] relation — were engaged in a conversation, and he just

[5] walked past and he said about a female intern's breasts,

[6] that she had a nice said of jehoobees, and then

[7] continued to walk out the door.

[8] **Q:** Did he ever make any inappropriate comments with respect

[9] to you personally?

[10] **A:** No.

[11] **Q:** Other than this one episode where he made a comment

[12] about the young girl's breasts, were there any other

[13] episodes where Mr. Osenkarski said something that you

[14] thought was inappropriate?

[15] **A:** Yes. There was a time that Mr. Osenkarski was

[16] discussing his girlfriend's genital area, Debra Green

[17] was a witness to this, that he spoke about when he was

[18] canning hot peppers that their fingers would get hot,

[19] and he had learned his lesson about inserting them in

[20] her because it burned her. And this comment was made,

[21] Ms. Green heard this and there was other secretaries

[22] there.

[23] **Q:** When did that occur?

[24] **A:** I'd say '98. I'm speculating on this date. '99.

[25] **Q:** Was that something else that you also noted on your

Page 177

[1] notepad?

[2] A: Yes. Correction. It looks in here it says in September

[3] of 2000 when he made that comment.

[4] Q: That was September of 2000?

[5] A: Yes, according to my reporting.

[6] Q: So the inappropriate comments made by Chief Osenkarski

[7] from the time you joined the Probation Department in

[8] February of '95 until September of 2000, a period of

[9] five years, you can identify two, correct?

[10] A: No, there are others.

[11] Q: Okay.

[12] A: On September 12th, 2000, Mr. Osenkarski informed two new

[13] female probation officers they would have to dance on

[14] the table at their first staff meeting. Ms. Green heard

[15] this comment. It was a staff meeting that was about to

[16] begin.

[17] Q: So we're now up to three; is that correct?

[18] A: There was also Mr. Osenkarski commented to a new female

[19] probation officer that hysterectomies ruin women. To my

[20] knowledge, I was possibly the only one in the office

[21] that had that.

[22] Q: Did he know that you had had a hysterectomy?

[23] A: Yes, he did.

[24] Q: Did you interpret that comment as being directed to you

[25] personally?

Page 178

[1] A: Yes, I did.

[2] Q: Was he looking at you when he said it?

[3] A: No. I was not present when he said that.

[4] Q: You were not present?

[5] A: No, I was not. I was —

[6] Q: How did you learn of the comment?

[7] A: The girl herself told me, Gail Schuhart, a probation

[8] officer. Mr. Osenkarski would tell Ms. Schuhart that

[9] she reminded him of his ex-wife.

[10] Q: Was that somehow inappropriate?

[11] A: She was uncomfortable.

[12] Q: Ms. Schuhart was?

[13] A: Yes.

[14] Q: The comment about dance on the table?

[15] A: Yes.

[16] Q: What is it about that comment that you find offensive?

[17] A: It's demeaning. I don't believe he ever told men, guys

[18] that they had to dance on the table at the first staff

[19] meeting. You usually don't see guys dancing on tables.

[20] That's probably presumed by most people it's

[21] provocative.

[22] Q: Was that said in jest?

[23] A: I was not there. Debra Green was there when it happened

[24] as well as other probation officers.

[25] Q: So you were not present to hear that comment, either?

Page 179

[1] A: No, I was not.

[2] Q: Were you aware of any of the new female probation

[3] officers that actually had to dance on tables?

[4] A: No.

[5] Q: Are you aware of any female that ever danced on a table

[6] at any probation meeting?

[7] A: Not that I know of, no.

[8] Q: So of the allegations contained in your paragraph 19,

[9] you were present for the comment about the intern's

[10] breasts, correct?

[11] A: Correct.

[12] Q: Were you present for any of the other comments?

[13] A: No. I was just informed about those.

[14] Q: Okay. So in your presence, the only comment that was

[15] made by Mr. Osenkarski amounted to the comment about the

[16] young girl's breasts, right?

[17] A: Yes.

[18] There was one other incident where I was at a

[19] training with Mr. Osenkarski and Mr. Graham in Penn

[20] State, and it was on sexual, juvenile sexual offenders I

[21] believe is how it was defined. And Mr. Osenkarski had

[22] on him a Bic lighter, Bic type lighter, and when he

[23] flicked it, it was a penis. And he flicked it at the

[24] female presenter several times.

[25] Q: When was that?

Page 180

[1] A: It was '96.

[2] Q: Do you know when in 1996?

[3] A: No, I don't.

[4] Q: And who attended the Penn State conference?

[5] A: Juvenile Probation officers.

[6] Q: Did he ever flick the Bic at you?

[7] A: Yes, he did. He did that wherever he was.

[8] Q: Was there any comment or solicitations associated with

[9] it?

[10] A: No. Not towards me, no.

[11] Q: What was his purpose in doing so?

[12] A: Just amusing people, I guess, because it was a sexual

[13] offenders program and this woman was presenting on

[14] sexual offenders.

[15] Q: In paragraph 20 you allege that you've been given less

[16] desirable assignments.

[17] A: Yes.

[18] Q: Tell me what you mean by that.

[19] A: In the past. I have been, there were times where

[20] assignments were not given out to males to supervise

[21] females because of concerns of maybe inappropriate

[22] allegations being made. That was never the issue with

[23] me. I was given cases where the boys would need urine

[24] tests, they might not even be in school. Schools do not

[25] want to do urines for us. It just puts me in the same

Page 181

[1] position. But I was required to do the urine testing,
[2] drug users, who needed that constant urine testing. It
[3] was almost impossible for me to get a good urine because
[4] I can't observe what they're doing.
[5]     I was given cases of large males, large aggressive
[6] males — obviously, I'm not a very large person — that
[7] I was to supervise them in their home by themselves,
[8] assaultive. It was just — size-wise it was an
[9] inappropriate assignment.
[10]    Q: Did you protest that assignment to anybody?
[11]    A: I talked to at the time it was Mr. Thielemann who had
[12] assigned that case, concerns about that, that I can't
[13] urine test. And physical-ness. And —
[14]    Q: Are we talking about one case involving urine tests of
[15] males?
[16]    A: No, there were several. I would get, you know,
[17] routinely cases males that needed a urine screening,
[18] where I would see males not getting assigned to females
[19] who needed the same thing.
[20]    Q: How many cases involving this urine-sampling problem got
[21] assigned to you?
[22]    A: Really, now, all males need to be urined and I have, you
[23] know, cases with males.
[24]    Q: Do you have any idea of the relative caseload of male to
[25] female in the Probation Department?

Page 182

[1]    A: The girls are getting more and more. Males, I would
[2] just speculate probably 75 percent male, 25 percent
[3] female. It could be more than that for females now.
[4]    Q: And how about in the time frame 1995 to 1996?
[5]    A: I would say it probably would be about the same then. I
[6] think it's getting more now, more females.
[7]    Q: What else, other than the urine testing or the size of
[8] the particular male probation people, are you referring
[9] to when you say you got less desirable assignments?
[10]    A: The numbers. My assignment numbers were extremely high
[11] compared to others for while. That is not — now it's
[12] not happening.
[13]    Q: You had a high caseload?
[14]    A: Yes, I did, compared —
[15]    Q: When was that?
[16]    A: That would be in '96, '97.
[17]    Q: What was your caseload?
[18]    A: I don't know the numbers right now, but just looking in
[19] comparison, mine was a lot higher.
[20]    Q: What do you mean by a lot higher?
[21]    A: Perhaps six, seven more than other ones.
[22]    Q: What was your average caseload in the '96-'97 period?
[23]    A: I'm guessing, speculating 25, 30, 35, somewhere around
[24] there.
[25]    Q: In 20 B you say that other probation officers

Page 183

[1] continually reminded that you were in physical danger of
[2] retaliation by Graham?
[3]    A: Yes.
[4]    Q: Who were the probation officers that told you that?
[5]    A: Sam Miller. Dennis Drachbar. Darby Christlieb. Debra
[6] Green. Kerry Houser. I've been told to always be
[7] careful where I go because of Mr. Graham by the sheriff
[8] and by the CID Department.
[9]    Q: What's CID?
[10]    A: Central Investigation Department of the DA's office.
[11] They had advised me to call my local police and inform
[12] them of Mr. Osenkarski's type of car and Mr. Graham's
[13] type of car. They also asked me to get a phone
[14] monitoring — number monitor on my phone.
[15]    Q: Did you did that?
[16]    A: Yes, I did. My own cost.
[17]    Q: Did you ever receive any crank calls?
[18]    A: We receive lots of crank calls. My husband could verify
[19] that. Probably for a while it was one to two a day,
[20] hang-up calls. We could not trace the number, it would
[21] be unavailable or anonymous. Usually unavailable.
[22]    Q: Do you have any reason to believe that any of those
[23] calls were made by Mr. Graham or Mr. Osenkarski?
[24]    A: Yes, I do.
[25]    Q: On what basis?

Page 184

[1]    A: Just knowledge of the potential, what they could do.
[2] And the police, like I said, the CID are the ones that
[3] informed me that that would be a good idea for me to do.
[4]    Q: When did Mr. Miller tell you that you should be
[5] concerned about physical danger?
[6]    A: Specifically, he told me on, it was it 1999. He said
[7] that he was aware and he was concerned about how angry
[8] he had heard Mr. Graham was, and that I needed to watch
[9] myself.
[10]    Q: Did he indicate that he had received any firsthand
[11] information from Mr. Graham that he was threatening you?
[12]    A: I don't think they would ever tell me specifically that
[13] they would. They were just sort of alerting me just to
[14] be careful.
[15]    Q: How about Mr. Drachbar?
[16]    A: Mr. Drachbar, again, he was concerned — most of them
[17] expressed concern to me or they'll just say, watch your
[18] back, be careful, you know. Or else they'll say
[19] Graham's around or those kind of things, to let me know.
[20]    Q: Has Mr. Graham ever physically threatened you?
[21]    A: He has threatened that he'll punish me. He will punish
[22] anybody who crosses him. And knowing his history with
[23] his wife, I absolutely believed him.
[24]    Q: When did he threaten to punish you?
[25]    A: That was an ongoing thing after he was starting to get

**Page 185**

[1] angry. And we were always told ahead of time even
[2] before that, just letting us know what they had done to
[3] people before, Mr. Osenkarski, Mr. Graham, that they
[4] punished people. They liked to say that.
[5]    Q: Was this '96-'97?
[6]    A: Even before — well, after I — once I started there,
[7] these are comments I heard.
[8]    Q: From February '95 on?
[9]    A: Right, about the punishment phase.
[10]    Q: Mr. Graham no longer has any supervisory
[11] responsibilities over you; is that correct?
[12]    A: No, he did not.
[13]    Q: And hasn't had since the summer of '97? Let's approach
[14] it this way.
[15]    A: Right.
[16]    Q: Sometime after you filed your Complaint —
[17]    A: Right.
[18]    Q: — you received a letter, did you not, removing all
[19] supervisory responsibilities with respect to Mr. Graham?
[20]    A: Yes, I did. It would have been spring of '97, I think.
[21] Late spring, probably.
[22]    Q: And we'll get to that at some point.
[23]    A: Okay.
[24]    Q: And Mr. Osenkarski, of course, has remained in the
[25] Department throughout, correct?

**Page 186**

[1]    A: Yes, he has.
[2]    Q: Has he retaliated against you in any fashion whatsoever?
[3]    A: Not directly, no.
[4]    MR. THOMAS: Let's take a couple of minutes, okay?
[5]    (Recess taken from 3:31 until 3:44 p.m.)
[6]    BY MR. THOMAS:
[7]    Q: Barb, before we took the break you were talking a
[8] minute ago about the comments or concerns involving
[9] Mr. Osenkarski, and remember, we reviewed those and you
[10] were only personally present for one of those, as I
[11] recall. Do you recall that conversation? It's
[12] paragraph 19 of your Complaint.
[13]    One of the things I forgot to ask you there was,
[14] you indicated that other probation officers informed you
[15] of the comments that he had made.
[16]    A: Yes.
[17]    Q: Who were those probation officers?
[18]    A: As regard to E would have been Debra Green. D would be
[19] Debra Green observed it. The two females would have
[20] been Gail Schuhart and Jill Grim-Rhoads, that's
[21] hyphenated.
[22]    MR. MacMAIN: Would you repeat that last name?
[23]    THE WITNESS: Grim-Rhoads, G-R-I-M-E, hyphen,
[24] R-H-O-A-D-S, I believe.
[25]    C would have been Gail Schuhart. I think I already

**Page 187**

[1] said that.
[2]    And that would —
[3]    BY MR. THOMAS:
[4]    Q: Let's go back to paragraph 20, now, I believe is where
[5] we were. In D you make reference to seniority problems.
[6] There was a dispute at one point, was there not, over
[7] whether probation officers got credit for all county
[8] time or only time in the Probation Department; is that
[9] correct?
[10]    A: After we split, after we became juvenile and adult.
[11] Prior to that, they had already established a policy.
[12]    Q: And that dispute arose, and as I understand it, you
[13] correct me if I'm wrong, I gather that seniority problem
[14] has been solved to your satisfaction?
[15]    A: No. I'm still below on the seniority list. I'm still
[16] below the gentleman who I had been above when I was
[17] hired.
[18]    Q: Based on total time?
[19]    A: Yes.
[20]    Q: And who is that gentleman?
[21]    A: That's William Brandt.
[22]    Q: And the dispute centers around whether or not a
[23] probation officer, in terms of seniority, gets credit
[24] for all time while employed in any branch of county
[25] government, or whether the only time that applies is the

**Page 188**

[1] Probation Department, correct?
[2]    A: That's correct.
[3]    Q: And you say that still has not been solved to your
[4] satisfaction?
[5]    A: No. I'm still below him. I had — when I first started
[6] with Probation I was above him, and then he was moved
[7] down when we split. Well, not when we split, whenever
[8] the — yes, when the seniority list was changed.
[9]    Q: And what aspects of your employment does that seniority
[10] list affect?
[11]    A: It could be an on-call. We have to go by seniority when
[12] you put down for on-call. Any kind of promotion has
[13] always been historically longevity. And I think it's —
[14] I don't know of any other times that promotions were not
[15] based on longevity and, well, seniority list. And so
[16] that would affect me when that occurs.
[17]    Q: Have you ever been passed over for a promotion?
[18]    A: When the senior — a senior probation officer position.
[19] And I said, wait a minute, that I had more seniority
[20] than Bill Brandt.
[21]    Q: Are you now a senior probation officer?
[22]    A: Yes, I am.
[23]    Q: When were you made a senior probation officer?
[24]    A: I don't know the exact date. '98, I believe.
[25]    Q: How about May 7, 1998?

Page 197

[1] **Q:** And was that because you understood that you were, in

[2] fact, working for the court?

[3] **A:** I work for both county and court. I was an officer of

[4] the court in the Juvenile Probation Department, but I'm

[5] also a county employee. I follow the guidelines of the

[6] county book, procedural book. I'm paid by the county.

[7] **Q:** Who had the right to hire or fire you?

[8] **A:** That would be Judge Sheely. The Court.

[9] **Q:** Did anybody else have the right to hire or fire a

[10] probation officer?

[11] **A:** No. I would say no.

[12] **Q:** It had to be done by the president judge?

[13] **A:** I'm sure — yes, final thing, yes. Final say.

[14] **Q:** You asked for, in a number of documents later you asked

[15] for a number of things to be done, correct?

[16] **A:** Um-hum. Yes.

[17] (Varner Deposition Exhibit No. 5 was marked.)

[18] **BY MR. THOMAS:**

[19] **Q:** At the time Mr. Graham was suspended by Judge Sheely,

[20] did you have any objection to that action that was taken

[21] by him, by Judge Sheely?

[22] **A:** I didn't think it was nearly enough.

[23] **Q:** You thought it was an inadequate penalty?

[24] **A:** Absolutely.

[25] **Q:** Why do you believe that?

Page 198

[1] **A:** Because it was a recurring derogatory threatening me. I

[2] don't think that justified only three days. I was

[3] suffering problems at that point because of this, fear

[4] of my own safety. I didn't think it was enough.

[5] **Q:** So your objection to the penalty imposed was that it was

[6] an inadequate penalty?

[7] **A:** He still would have access to me. He would still be in

[8] our office. He would still be an employee of the

[9] county. Still be able to come across, be around the

[10] area.

[11] **Q:** At that point he had been removed from any supervisory

[12] responsibility over you, correct?

[13] **A:** That's correct.

[14] **Q:** And he had been given a reprimand and a three-day

[15] suspension?

[16] **A:** Right.

[17] **Q:** And what you wanted at that point was you wanted him

[18] fired from the county?

[19] **A:** I — what I had asked, that I did not think he should

[20] supervise any other females, and I wanted to not have

[21] any contact with him whatsoever.

[22] **Q:** You personally?

[23] **A:** Yes.

[24] **Q:** I've placed in front of you what we've marked as your

[25] Deposition Exhibit No. 5. Can you identify that for us,

Page 199

[1] please?

[2] **A:** Yes.

[3] **Q:** What is it?

[4] **A:** This was my initial complaint to the EEOC.

[5] **Q:** Do you know when it was filed?

[6] **A:** I dated it 7/21/97. The date it was filed, let's see

[7] the date on here. That's when I sent it.

[8] **Q:** That's when you sent it to EEOC?

[9] **A:** Right.

[10] **Q:** Does this appear in your handwriting?

[11] **A:** Yes, it is.

[12] **Q:** And the beginning on page 3 of the document and for

[13] several pages thereafter you detail the events that

[14] you're complaining about, correct?

[15] **A:** Yes.

[16] **Q:** When you filed that action or claim in July of 1997,

[17] what is it that you wanted done?

[18] **A:** I wanted the harassment and the discrimination to stop.

[19] I wanted to be, have a safe environment that I could go

[20] to work and not worry about my supervisors, namely,

[21] Mr. Graham, or Mr. Osenkarski, retaliating against me.

[22] I wanted what Title 7 said that I'm allowed to have, a

[23] harassment-free environment, safe environment to work

[24] in. I wanted to be treated equally. I wanted my

[25] seniority addressed.

Page 200

[1] **Q:** As of now, Mr. Graham has been physically removed from

[2] the courthouse, correct?

[3] **A:** His office, he's located at the prison. I believe he

[4] does come to the courthouse sometimes. I'm not sure

[5] when.

[6] **Q:** But Judge Hoffer actually invoked a physical transfer

[7] which moved him out of the courthouse, correct?

[8] **A:** That's correct.

[9] **Q:** So he is no longer in the same work premises that you're

[10] in on a day-to-day basis, correct?

[11] **A:** Correct. That is correct.

[12] **Q:** He no longer has any supervisory responsibility over

[13] you, correct?

[14] **A:** No, he does not.

[15] **Q:** Who's currently supervising you?

[16] **A:** Sam Miller.

[17] **Q:** Do you have any complaints or concerns with respect to

[18] Mr. Miller?

[19] **A:** No, I do not.

[20] **Q:** And how long has he supervised you?

[21] **A:** He was assigned as my supervisor back at this, when that

[22] was.

[23] **Q:** July of '97?

[24] **A:** Yes. And then, I'm not sure about the time frame, but

[25] then Mr. Thielemann became my supervisor for a period.

Page 236

[1] Q: Okay. Was he helpful?

[2] A: Yes, he was.

[3] Q: Okay. Was he informative?

[4] A: Yes, he was.

[5] Q: Okay. Do you believe that he had any influence at all

[6] in your receiving the job ultimately with the Probation

[7] Department?

[8] A: I believe he did, because he was one of the three

[9] gentlemen who interviewed me for my interview, my

[10] original interview with them.

[11] Q: Okay. In that line, can you explain that process when

[12] you, in fact, did interview for the Probation

[13] Department?

[14] A: I sat down with Mr. Osenkarski, John Roller, who was

[15] with the adult section, and Ken Bolze who was the chief,

[16] and they interviewed me just about how I felt about — I

[17] remember one time they asked about dealing with violent

[18] offenders, how I felt about that, sort of my philosophy

[19] in coming to the program, what I saw with Family

[20] Preservation, and my, of course, my background, what my

[21] schooling was in. I had to provide a resume.

[22] Q: Okay. And that's all the interview process that you

[23] went through at the time?

[24] A: That I went through? Yes. Yes.

[25] Q: Okay. Did Mr. Osenkarski by chance recommend you for

Page 237

[1] your current position of senior probation officer?

[2] A: It would have had to be him. He was the chief.

[3] Q: Okay. Could anyone else have made that decision for you

[4] or on behalf of you?

[5] A: Joe would have the ultimate say in recommending that.

[6] Q: Okay. Did Gary Graham by chance, I guess, was Gary

[7] still involved with your supervision around this time?

[8] A: No, he was not.

[9] Q: This was after that?

[10] A: Right, it was after that.

[11] Q: Okay, thank you.

[12] By chance, did Mr. Osenkarski also have any

[13] influence in recommending a job for your son? I think

[14] that Stafford Detention Center, is that the place?

[15] A: Schaffner Detention Center.

[16] Q: Schaffner? Okay. Did Mr. Osenkarski help in that or

[17] assist in that any way?

[18] A: Not that I'm aware of.

[19] Q: Did he discuss with you the opportunity for your son to

[20] be employed with that particular detention center?

[21] A: I don't believe Mr. Osenkarski mentioned it. I know his

[22] daughter had, when she had started working there, I know

[23] she had gotten a job later at the same place, but I

[24] can't remember whether he discussed it prior to or after

[25] my son getting the job, I don't remember that.

Page 238

[1] Q: You testified yesterday that you had heard that, this is

[2] prior to being an employee with the Probation

[3] Department, that Gary Graham and Mr. Osenkarski would

[4] punish people when they were crossed. Do you recall

[5] that?

[6] A: That's right. Yes.

[7] Q: After suspecting this or hearing this, you still felt

[8] comfortable talking to Mr. Osenkarski about the job

[9] vacancy?

[10] A: To me, it — perhaps it was more rumor. Personally,

[11] Mr. Osenkarski had always been polite to me. I had no

[12] problem with that.

[13] I liked the philosophy when I spoke to him about

[14] the hands-off supervision, that you were allowed to

[15] manage your case and do your own thing. And like I said

[16] yesterday, it wasn't micromanaged like I was in Children

[17] and Youth. And it was my field.

[18] Sure. And that was an attractive feature for you in

[19] this particular job?

[20] A: Absolutely.

[21] Q: Okay. Would you agree that there are different

[22] managerial styles in running an office —

[23] A: Certainly.

[24] Q: — generally speaking? And in the case with

[25] Mr. Osenkarski, he had a hands-off approach to

Page 239

[1] managerial style?

[2] A: I think Mr. Osenkarski was more delegating it to other

[3] people. Mr. Osenkarski has been — it was apparent to

[4] most people that he was not in the office hardly at all.

[5] If I really would have had a complaint, it was very

[6] difficult to catch up to Mr. Osenkarski. And that's

[7] still a pattern now, that just not available. More an

[8] omission, allowing somebody else to do the work for him.

[9] Q: Are you aware of what Mr. Osenkarski is doing when he's

[10] out of the office?

[11] A: No, I'm not aware of that.

[12] Q: Could he be doing Department like jobs, do you think,

[13] that may require him to be at meetings or seeking grants

[14] or things of the like that are not innate with the

[15] office operations as you see it?

[16] A: Possibility. But I know I've heard that the secretaries

[17] when they want to reach him, like, the middle of the day

[18] they'll call his house, that he's home in the middle of

[19] the day, those kind of things. That's an ongoing issue.

[20] Q: Are you aware that Mr. Osenkarski works from home at

[21] times?

[22] A: That's not something I would know about.

[23] Q: On October 21st, 2002, a few months ago, you actually

[24] had a conversation with Mr. Osenkarski in the hall. Do

[25] you remember that?

Barbara E. Varner v. 07-cv-00725-YK   Document 109   Filed 02/09/2004   Page 27 of
Commonwealth of Pennsylvania, et al.

Barbara E. Varner
Vol. 2, January 28, 2003

Page 420

[1]     MR. ADAMS: I have a few more questions. It won't
[2] take long.
[3]                    BY MR. ADAMS:
[4]     Q: Ms. Varner, do you have any correspondence, notes,
[5] memos or any document or piece of evidence at all
[6] supporting your claim that Mr. Osenkarski's conspired
[7] against you in violation of PHRC?
[8]     A: I don't have paperwork. I've just heard that he's had
[9] conversations with Judge Hoffer.
[10]    Q: Who did you hear that from?
[11]    A: At this time I can't recall names. It's just been
[12] information, word of mouth in the office.
[13]    Q: Okay. So would you agree at this time you can't
[14] identify any witness person at all to support your claim
[15] that can testify and support your claim that
[16] Mr. Osenkarski has conspired against you in violation of
[17] PHRC? Is that correct?
[18]    MS. WALLET: I'm sorry, did you say witness?
[19]    MR. ADAMS: Witness or person who can testify in
[20] support of her claims of a violation by Mr. Osenkarski.
[21]    THE WITNESS: I think the fact that I was kept out
[22] of that office for four years, and that was a discussion
[23] between Mr. Osenkarski and Judge Hoffer, I think
[24] whatever that discussion was, Mr. Osenkarski I'm sure
[25] and Judge Hoffer was aware that it was a public office.

Page 421

[1] I'm sure there was discussion, and to me, that was a
[2] retaliation.
[3]                    BY MR. ADAMS:
[4]     Q: But did you hear that discussion? Did you hear any
[5] remnants of that discussion yourself?
[6]     A: From Mr. Osenkarski, yes.
[7]     Q: You heard from Mr. Osenkarski that he was going to
[8] conspire against you?
[9]     A: Well, no. That he had met with Judge Hoffer and that he
[10] had been given this direction to keep me out of there.
[11] To me, even those two talking about it is something that
[12] is illegal to keep me out of a public office.
[13]    Q: But you don't know, yourself, from anything you heard,
[14] that Mr. Osenkarski conspired against you in violation
[15] of the PHRC; is that correct? Yes or No.
[16]    A: I'm just trying to think.
[17]    I did not personally witness that.
[18]    Q: And you can't identify any person at all who witnessed
[19] or heard any type of conversation by Mr. Osenkarski or
[20] Judge Hoffer that would be in violation of the PHRC
[21] based on conspiracy?
[22]    A: I think those two would be the ones to be able to
[23] testify because it would have been private information,
[24] private conversations.
[25]    Q: Would you agree that's strictly related to conversations

Page 422

[1] between Judge Hoffer and Mr. Osenkarski, so only one of
[2] the two of them or both of them can testify to that?
[3]     A: That's correct.
[4]     Q: Okay. And do you have any correspondence, note, memo,
[5] documentation or any shred of evidence at all supporting
[6] your claim that Mr. Osenkarski purposely left you in the
[7] building during the bomb threat that you spoke of?
[8]     A: There was no effort to get me out and he knew I was
[9] there.
[10]    Q: Well, I'm sorry. The question is: Do you have any
[11] documentation, any note, correspondence, any memo,
[12] anything that you can turn to as a piece of evidence to
[13] say this supports your claim?
[14]    A: That he actually said I'm going to leave her behind?
[15] No.
[16]    Q: Okay.
[17]    A: I don't have that, but I believe there was well — he
[18] was well informed, he knew I was there. He had all
[19] reason to believe I was there.
[20]    Q: Okay. Can you identify any person at all that can
[21] testify to support your claim that Mr. Osenkarski
[22] purposely left you in the building during the bomb scare
[23] you spoke of?
[24]    A: I would not have any witnesses except my own testimony
[25] that I was left behind and he knew I was there.

Page 423

[1]     MR. ADAMS: Okay. No further questions.
[2]     MS. WILLIAMS: I have nothing further.
[3]     MR. THOMAS: Nothing further.
[4]     MS. WALLET: I have no questions for this witness.
[5]     (Whereupon, the deposition was concluded at
[6] 3:26 p.m.)