```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . .
BARBARA E. VARNER,              .
     Plaintiff,                 .  CIVIL ACTION
                                .  NO. 1:CV 01-0725
    vs.                         .
                                .
COMMONWEALTH OF PENNSYLVANIA,   .  (JUDGE YVETTE KANE)
NINTH JUDICIAL DISTRICT,        .
CUMBERLAND COUNTY; CUMBERLAND   .
COUNTY; S. GARETH GRAHAM,       .
Individually, and JOSEPH        .
OSENKARSKI, individually,       .
     Defendants.                .
. . . . . . . . . . . . . . . .

  Deposition of: WILLIAM A. BRANDT

  Taken by   : Defendant Cumberland County Court

  Date       : April 4, 2003, 9:30 a.m.

  Before     : Emily Clark, RMR, Reporter-Notary

  Place      : Cumberland County Courthouse
               One Courthouse Square
               Carlisle, Pennsylvania


APPEARANCES:

DEBRA K. WALLET, ESQUIRE
    For - Plaintiff

ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS
BY:  A. TAYLOR WILLIAMS, ESQUIRE
    For - Defendant Commonwealth of Pennsylvania
          Ninth Judicial District, Cumberland County

THOMAS, THOMAS & HAFER
BY:  JAMES K. THOMAS, II, ESQUIRE
     PAUL J. DELLASEGA, ESQUIRE
    For - Defendant Cumberland County
```

Page 2

```
APPEARANCES (continued):

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
BY:  L. KRISTEN BLANCHARD, ESQUIRE
    For - Defendant S. Gareth Graham

SWEENEY & SHEEHAN, P.C.
BY:  PAUL LANCASTER ADAMS, ESQUIRE
    For - Defendant Joseph L. Osenkarski

ALSO PRESENT:

MS. BARBARA E. VARNER

MR. S. GARETH GRAHAM

MR. JOSEPH L. OSENKARSKI
```

Page 3

```
                      I N D E X
                      WITNESS

William Brandt                        Examination
    By Mr. Dellasega                       4
    By Mr. Adams                          47
    By Ms. Williams                       56
    By Ms. Wallet                         59


                     EXHIBITS

(None marked)

                    * * * * *
```

Page 4

STIPULATION

It is hereby stipulated by and between the respective parties that sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved until the time of trial.

WILLIAM BRANDT, called as a witness, being duly sworn, was examined and testified, as follows:

BY MR. DELLASEGA:

Q  Mr. Brandt, my name is Paul Dellasega, I represent the county in this matter.
   Have you testified before in any proceeding, sir?
A  No.
Q  In any court proceeding?
A  In something of this matter? Or just generally?
Q  Have you ever testified?
A  Yes, sir.
Q  Okay. Have you ever been deposed?
A  No.
Q  Okay. You understand that if we ask you a question, if you don't understand the question, you should tell me that?
A  Okay.
Q  All right? And if you answer it, we'll assume you did

**Page 37**

1  A. It's something we all bring on ourselves differently,
2     but I would argue again, yes, that it would be.
3  Q. Prior to the split, what was your understanding of how
4     seniority was calculated in the combined Adult and
5     Juvenile Probation Department?
6  A. My understanding from day one was years of service with
7     the county.
8  Q. Inside and outside of probation?
9  A. Correct. So if a maintenance man came to the Department
10    not possessing even the prerequisites for our position,
11    he would be more senior on the list than someone who had
12    his doctorate.
13 Q. Did that seniority system change at or about the time of
14    the split?
15 A. Let me -- I'm not aware of any in-writing policy other
16    than what I described to you was Judge Sheely's policy.
17    And I never heard Judge Sheely say that out loud. And
18    we were -- it was never tested, either, so that was
19    something that we assumed. And there are many things we
20    assumed on a day-to-day basis that never get tested.
21    So, that was a very -- we don't know if that was the
22    seniority but that was my understanding of it.
23 Q. You did mention a written document, though?
24 A. Never prior to the split.
25 Q. Oh, okay. But prior to the split, no written document?

**Page 38**

1  A. Correct.
2  Q. Just kind of a vaguely understood concept it was
3     seniority within the county --
4  A. To my recollection, correct.
5  Q. -- regardless of the type of county employment?
6  A. Correct.
7  Q. And that did change at or about the time of the split?
8  A. I believe so.
9  Q. How did it change?
10 A. I believe someone within the Juvenile administration
11    came up with their own policy, and I know that the Adult
12    side as well came up with their own policy.
13 Q. And within Juvenile, how did it change?
14 A. I don't know the details, but I believe it's time spent
15    within our department.
16 Q. Is there a written document now?
17 A. I've heard there is. I've never seen it.
18 Q. You've never seen it, okay. At or about the time of the
19    split did Mr. Boyer ever comment, discuss with you the
20    issue of seniority and whether it should be changed and
21    if so, what your view would be on how it should be
22    calculated?
23 A. Ad nauseam.
24 Q. What do you recall of those conversations?
25 A. That our seniority would be date of hire within the

**Page 39**

1     department.
2  Q. And you were asked your opinion about that?
3  A. I usually give my opinion. I don't recall being asked.
4     I possibly offered.
5  Q. What would your opinion offered have been?
6  A. That I agreed with that, or years of probation
7     experience outside of our department as well.
8  Q. As a consequence of the change that was implemented, was
9     your seniority affected?
10 A. I've been told that it was, yes.
11 Q. What have you been told?
12 A. I was told that mine was delayed as a result of -- a
13    promotion that I was instructed that I would receive,
14    that it was delayed as a result of questioning the
15    current seniority policy.
16 Q. Well, let me ask you this. Before the split were you
17    senior or junior to Mrs. Varner, to your knowledge?
18 A. That would have been an opinion question, and yes, I
19    would have believed myself to be senior based on my
20    years of probation experience.
21 Q. Before the split?
22 A. Correct.
23 Q. Okay. And after the split?
24 A. The same.
25 Q. The same, all right. So as far as you're concerned, the

**Page 40**

1     change in the seniority system did not affect where you
2     stood with regard to Mrs. Varner on the seniority list?
3  A. If there is such a hierarchy, yes.
4  Q. All right. When your promotion was delayed did you
5     understand in any way, shape or form that Mrs. Varner's
6     situation played any factor in the delay of your
7     promotion?
8  A. Yes.
9  Q. What is your understanding?
10 A. That she was questioning my promotion in front of hers,
11    because she was questioning the seniority policy, I
12    think, quoting Judge Sheely's opinion of what his was.
13    Any details past that I don't think I recall.
14 Q. Did Osenkarski ever discuss that with you?
15 A. Yes.
16 Q. Do you recall him telling you anything other than what
17    you've just told us?
18 A. No.
19 Q. All right. Did Graham ever discuss that with you?
20 A. I don't remember if Gary was still in our department at
21    that time.
22 Q. How about Boyer?
23 A. Ad nauseam, yes.
24 Q. When you finally were promoted to senior probation
25    officer, was Mrs. Varner promoted at the same time?

### Page 41

1  A. Same day.
2  Q Same day, okay. Sitting here today, who is more senior?
3  A. I am.
4  Q Sitting here today, what benefit does that seniority
5     provide to you?
6  A. Nothing.
7  Q Why do you say nothing?
8  A. The unfortunate part within this county, not only
9     department-wide but maybe county-wide, is that the next
10    senior person has always been the next to get promoted.
11    Maybe that person's not so deserving, but that's just
12    the chain of events. So, I don't know that -- I hope
13    that our department has made a change in that thinking
14    in the future, but as far as what does it get me?
15    Nothing. It doesn't give me anything additional on my
16    paycheck or any more or less support from those below
17    me.
18  Q I'll put it to you this way. Vis-a-vis you and
19    Mrs. Varner, does your spot ahead of her on the
20    seniority list provide you any advantage in promotion,
21    to your understanding?
22  A. Under the old school of promotion, maybe, because if I
23    am, in fact, ahead of her, then I would be next in line
24    for whatever became available. So possibly.
25  Q The old school was what?

### Page 42

1  A. The next in line gets the next available position
2     regardless of performance.
3  Q All right. And regarding promotion, is that rule
4     currently in effect, or as you call it, the old school
5     rule?
6  A. We haven't had a position become available for some
7     time, so it's hard to say whether or not. And Judge
8     Hoffer would be the one who would finalize that based on
9     Mr. Osenkarski's recommendation. But I don't know how
10    to answer that. I don't know.
11 Q Have never seen a written document that addresses that?
12 A. Correct.
13 Q And no supervisor has ever given you a definitive
14    statement regarding that issue; is that correct, also?
15 A. Correct.
16 Q And in any event, whatever the rule is, Hoffer could
17    cancel it?
18 A. Correct.
19 Q Do you know of anybody in either Probation Department
20    who was promoted over a more senior employee?
21 A. Only because a more senior employee turned it down.
22 Q And that example was?
23 A. On the Adult staff.
24 Q Did you ever hear Mr. Graham use the phrase peter meter?
25 A. Never.

### Page 43

1  Q Did you ever hear Mr. Graham or Mr. Osenkarski refer to
2     a woman's genitalia as a bush?
3  A. Never.
4  Q Ever hear either of them refer to a woman's breasts as
5     jeehoobees?
6  A. Never.
7  Q Ever hear either of them discuss or request female
8     interns to dance on tabletops?
9  A. No.
10 Q Did you ever hear Mr. Graham referring to Mrs. Varner as
11    she has no fucking sense, no fucking training or no
12    fucking ability?
13 A. No.
14 Q As part of this litigation there were complaints brought
15    before, there was a federal court Complaint, there was a
16    Complaint filed with the EEOC which included an
17    allegation by Mr. Varner that she had been discriminated
18    because of her age.
19       Did you ever observe any conduct within the office
20    that would indicate her age played any negative role in
21    her terms and conditions of employment?
22 A. No.
23 Q By the way, would it be correct that you have no
24    evidence yourself from firsthand knowledge that she's
25    ever been sexually discriminated against or sexually

### Page 44

1     harassed?
2  A. No.
3  Q Do you know whether Mrs. Varner was ever restricted from
4     access to any area of the courthouse while she was a
5     probation officer?
6  A. I believe I've heard as a result of whatever this
7     process is, and because of the proximity of where
8     Mr. Graham's wife works, that she possibly isn't
9     allowed -- I don't know any details but my recollection
10    is was, yes, there are designated areas, maybe, that
11    she's not to be. And I could be wrong that the two of
12    them are related, but that's my recollection.
13 Q You essentially know that as scuttlebutt, right?
14 A. Correct.
15 Q You don't have any recollection of any superior officer
16    telling you that?
17 A. Absolutely.
18 Q Have you ever been personally threatened with adverse
19    consequences if you were to provide any assistance to
20    Mrs. Varner in this litigation?
21 A. No.
22 Q To testify for her?
23 A. No.
24 Q To be friendly with her?
25 A. No.

Page 57

1  no.
2  Q  Do you remember the exact date of that meeting?
3  A. I could get it, because as I -- I can remember the
4     juvenile who -- well, maybe his file's destroyed now.
5     But I remember the juvenile and the purpose of the
6     hearing, so that wouldn't be very difficult to figure
7     out.
8  Q  Would you get that date and report back to me on that?
9  A. If it's a must.
10 Q  Yes, I would appreciate that. Thank you.
11    Did Judge Hoffer explain to you why he was asking
12    the questions he asked you?
13 A. No.
14 Q  You mentioned that you had a personal relationship with
15    Judge Hoffer. Can you describe the nature of that
16    relationship?
17 A. Only that he and I have -- I mean, we don't call each
18    other on the phone or anything like that. But he and I
19    have always been friendly, I would say more so than some
20    others, only because I'm a social person, Judge Hoffer
21    is a social person, for many years, I see him out in
22    social settings. He and myself are both avid golfers,
23    so we see each other frequently there as well and have
24    some friendly competition in local tournaments, if you
25    will.

Page 58

1     So I mean, from that sense, that's the
2     relationship. And many people for some reason struggle
3     with Judge Hoffer, and I just -- I find him to be very
4     approachable and personable with me personally.
5  Q  Did you know Judge Hoffer prior to your employment at
6     the Probation office?
7  A. Never.
8  Q  Did you ever talk with Judge Sheely about Gary Graham?
9  A. Never.
10 Q  Did you ever talk to Judge Sheely about Ms. Barbara
11    Varner?
12 A. Never.
13 Q  Did you ever have a conversation with an EEOC
14    investigator related to this matter?
15 A. Possibly. Maybe.
16 Q  You're saying maybe. Do you remember?
17 A. No.
18 Q  Any particular conversation with an EEOC investigator?
19 A. The only thing I remember is meeting with an attorney
20    downstairs many years ago. I don't really recall
21    anything other than that.
22 Q  You don't recall getting a phone call from any EEOC
23    investigator?
24 A. I don't think so.
25 Q  Did you ever talk to Judge Sheely regarding the

Page 59

1     seniority policy?
2  A. Never.
3  Q  Did you ever talk to Judge Hoffer regarding the
4     seniority policy --
5  A. Never.
6  Q  -- in the Probation Department?
7        MS. WILLIAMS: That's all I have. Thank you,
8     Mr. Brandt.
9        MS. BLANCHARD: No questions.
10 BY MS. WALLET:
11 Q  I am Debra Wallet, I represent Barbara Varner. I do
12    have a number of questions for you. Would you like to
13    take a break?
14 A. No.
15 Q  All right. I would not mind taking a break, if that
16    would be acceptable to you. Do you mind taking a
17    10-minute break?
18 A. Go ahead.
19    (Recess taken from 10:41 until 10:56 a.m.)
20 BY MS. WALLET:
21 Q  Mr. Brandt, before we took the break I introduced
22    myself. My name is Debra Wallet. I'm here representing
23    Barbara Varner in the litigation. Unfortunately, I do
24    have to require you to go back to some ancient history.
25    Did you hear the comment, sir, about the cunt club

Page 60

1     back in 1993?
2  A. Yes.
3  Q  What did you hear?
4  A. Exactly what was taking place was I asked Mr. Osenkarski
5     about an application process. It was at the time the
6     hire of a young lady at the time who was named Nicole
7     Herick, who is now Nicole Galbraith. I inquired as to
8     what type of person she was. And Joe said that she was
9     a nice young girl, then that she would not become a
10    member or a part of the cunt club.
11 Q  And what did you understand that reference, the cunt
12    club, to be?
13 A. A group of -- maybe not a group, maybe only a pair of
14    people consisting of Kerry, I don't know what her last
15    name was at the time, and Julie Staver, someone who is
16    no longer employed with us as well.
17 Q  Were they the only two female probation officers at that
18    time?
19 A. That would be my perception. I don't know if we had a
20    list of who the cunt club was.
21 Q  Now, you told this to someone else, correct?
22 A. I told it to Julie Staver, who was a personal friend of
23    mine at the time.
24 Q  And what, if anything, did Julie do?
25 A. I imagine she said something to Kerry.